**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff;<br><br>　v.<br><br>POLICE DEPARTMENT OF BALTIMORE<br>CITY, et. al.,<br><br>　　　　　　　Defendants. | Civil Action No. ___ |

**<u>CONSENT DECREE</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

        A.      Background ...................................................................................... 2

II.     COMMUNITY OVERSIGHT TASK FORCE ........................................... 4

III.    COMMUNITY POLICING AND ENGAGEMENT ................................... 6

        A.      Community Policing ....................................................................... 6

        B.      Community Engagement ................................................................. 7

        C.      Community Engagement Assessments ........................................... 9

IV.     STOPS, SEARCHES, ARRESTS, AND VOLUNTARY

        POLICE-COMMUNITY INTERACTIONS ............................................ 11

        A.      Stops, Searches, Arrests, and Voluntary Police-Community

                Interactions Principles .................................................................. 11

        B.      Voluntary Contacts Between BPD Officers and the Public ........... 12

        C.      Involuntary Investigatory Stops and Detentions (Non-Vehicle Stops) ........... 13

        D.      Vehicle Stops ................................................................................. 17

        E.      Searches ......................................................................................... 19

        F.      Arrests ........................................................................................... 22

        G.      Stops, Searches, and Arrests Training .......................................... 24

        H.      Supervisory Review of Stops, Searches, and Arrests ................... 25

        I.      Stop, Search, and Arrest Data Collection and Review .................. 28

V.      IMPARTIAL POLICING .......................................................................... 30

VI.     RESPONDING TO AND INTERACTING WITH PEOPLE

        WITH BEHAVIORAL HEALTH DISABILITIES OR IN CRISIS ......... 34

        A.      BPD Crisis Intervention ................................................................ 35

        B.      Behavioral Health Disability or Crisis Data Collection,

                Analysis, and Reporting ................................................................ 42

VII.    USE OF FORCE ....................................................................................... 42

        A.      Use of Force Principles ................................................................. 42

        B.      Policies on Officers' Use of Force ................................................ 43

        C.      Training ......................................................................................... 54

i

|        | D.   | Reporting, Investigating and Reviewing Force ............................................. 56 |
|        | E.   | Data Collection, Analysis, and Reporting....................................................... 72 |
| VIII.  |      | INTERACTIONS WITH YOUTH .............................................................................. 74 |
| IX.    |      | TRANSPORTATION OF PERSONS IN CUSTODY ............................................. 76 |
|        | A.   | Transportation Equipment ............................................................................ 76 |
|        | B.   | Transportation Procedures ............................................................................ 77 |
|        | C.   | Monitoring of Transportation Practices ......................................................... 79 |
|        | D.   | Policies and Training ..................................................................................... 81 |
| X.     |      | FIRST AMENDMENT PROTECTED ACTIVITIES............................................... 81 |
|        | A.   | Right to Criticize Law Enforcement or Engage in Expressive Activity, as Protected by the First Amendment ............................................... 82 |
|        | B.   | Right to Engage in Lawful Public Protest or Assembly, as Protected by the First Amendment ..................................................................... 83 |
|        | C.   | Right to Observe and Record, as Protected by the First Amendment ............ 84 |
|        | D.   | Policy and Training for First Amendment Protected Activity........................ 86 |
|        | E.   | Supervision of First Amendment Related Arrests and Seizures..................... 86 |
|        | F.   | Ongoing Assessment and Improvement ......................................................... 87 |
| XI.    |      | HANDLING OF REPORTS OF SEXUAL ASSAULT ............................................ 87 |
|        | A.   | Policy and Training........................................................................................ 87 |
|        | B.   | Sexual Assault Investigations, Supervision, and Internal Oversight .............. 89 |
|        | C.   | Community Collaboration and External Oversight ........................................ 93 |
| XII.   |      | TECHNOLOGY ........................................................................................................ 93 |
|        | A.   | Development and Implementation of Updated Technology ............................ 93 |
| XIII.  |      | SUPERVISION.......................................................................................................... 97 |
|        | A.   | Policies Generally ......................................................................................... 97 |
|        | B.   | Training Generally ...................................................................................... 100 |
|        | C.   | Field Training Officer Program ................................................................... 104 |
|        | D.   | Supervisory Character, Duties and Training................................................. 104 |
|        | E.   | Early Intervention System............................................................................ 107 |
|        | F.   | Ongoing Assessment and Improvement ....................................................... 112 |

XIV.    MISCONDUCT INVESTIGATIONS AND DISCIPLINE........................................112

A.    BPD's Office of Professional Responsibility .................................112

B.    Complaint Intake, Classification, and Communication with Complainants... 113

C.    OPR Administrative Misconduct Investigations .............................120

D.    Criminal Misconduct Investigations................................................131

E.    Referral of Criminal and Administrative Misconduct

Investigations to Outside Entities ...................................................133

F.    Disciplinary Charges.......................................................................134

G.    Disciplinary Hearings .....................................................................136

H.    Imposition of Discipline ..................................................................137

I.    Community-Centered Mediation of Misconduct Complaints........................137

J.    Tracking Misconduct Investigations.................................................139

K.    Transparency Measures ...................................................................141

L.    Additional Measures to Encourage Proper Oversight ....................145

M.    Training...............................................................................................147

XV.    COORDINATION WITH BALTIMORE CITY SCHOOL POLICE FORCE..........150

XVI.    RECRUITMENT, HIRING AND RETENTION .......................................................151

XVII.  STAFFING, PERFORMANCE EVALUATIONS, AND PROMOTIONS................155

XVIII. OFFICER ASSISTANCE AND SUPPORT................................................................157

XIX.    AGREEMENT IMPLEMENTATION AND ENFORCEMENT...............................158

A.    Selection and Role of the Independent Monitor .............................158

B.    Term of the Monitor.........................................................................161

C.    Compliance Reviews ........................................................................164

D.    Outcome Assessments ......................................................................165

E.    Monitoring Plan ................................................................................172

F.    Monitor Recommendations and Technical Assistance ...................175

G.    Comprehensive Re-Assessment.......................................................176

H.    Monitor Reports ................................................................................177

I.    Communication Between the Monitor, the Parties, the Court,

and the Public................................................................................178

J.    Public Statements, Testimony, Records, and Conflicts of Interest.................179

K.     Consent Decree Implementation Unit............................................................. 181

L.     Access and Confidentiality ............................................................................ 181

M.     Court Jurisdiction, Modification of the Agreement, and Enforcement .......... 184

N.     Termination of the Agreement........................................................................ 188

XVIII. DEFINITIONS ........................................................................................................ 191

# I.      INTRODUCTION

1.      The United States, the Mayor and City Council of Baltimore ("City") and the Police Department of Baltimore City ("BPD" or "the Department"), collectively the "Parties," are committed to effective, constitutional law enforcement.  The purpose of this Agreement is to ensure that the City and BPD protect individuals' statutory and constitutional rights, treat individuals with dignity and respect, and promote public safety in a manner that is fiscally responsible and responsive to community priorities.

2.      The Parties recognize that these outcomes require partnership between BPD and the communities it serves, one in which the Department is transparent about its processes and provides community members with a voice in its functions.  This Agreement is designed to enhance BPD's relationship with its community through increased transparency and public input, improve oversight and accountability systems to ensure that the Department will collect and analyze data on officer activities, impose discipline for misconduct fairly and efficiently, and enhance support for officers through robust employee wellness programs, law enforcement policies, training, and supervision.

3.      The City and BPD have already begun the critical work of reform, and this Agreement is designed to build on the work that has already been done.  BPD has already made meaningful changes to numerous policies; provided additional training; supplied officers with new equipment, including beginning implementation of body-worn cameras; committed additional resources to its community outreach efforts, particularly with Youth; and invested in additional technology and infrastructure.  While the Parties recognize this progress, they also recognize that much work remains, including in those areas where reform has already begun.  The Parties recognize that police officers work in difficult conditions, risking their well-being

1

and physical safety, including the ultimate sacrifice of their lives, for the public good.  The City and BPD commit to ensure that its officers have the resources to perform their duties successfully and within constitutional boundaries to promote officer and public safety.

### A.    Background

4.     On August 10, 2016, the United States issued a report detailing the findings of its investigation pursuant to 42 U.S.C. § 14141 ("Report").  The Report documented areas in which the United States found reasonable cause to believe that BPD engages in a pattern or practice of conduct that violates the Constitution and federal law, including:  (1) making unconstitutional Stops, Searches, and Arrests; (2) using enforcement strategies that produce severe and unjustified disparities in the rates of Stops, Searches and Arrests of African Americans; (3) using excessive force; and (4) retaliating against people engaging in constitutionally-protected expression.  The Report additionally outlined areas in which the United States had serious concerns about the lawfulness of BPD's police practices.

5.     On that same date, the Parties entered into an Agreement in Principle ("AIP") that provided the contours for this Agreement.  While the City and BPD did not and do not admit or agree with the findings in the United States' Report, in the AIP, the City and BPD recognized that the United States' findings raised issues of importance to the City, BPD, and the community that should be addressed, and they committed to address each of the concerns raised in the United States' Report.  The AIP described reforms already begun by the City and BPD.  To the extent the AIP described future commitments and reforms, this Agreement now embodies and describes in detail the City's and BPD's agreement to address the findings of the Report and supersedes the AIP.  It is the specific intent of the Parties that this Agreement shall control the obligations of the Parties with respect to the Findings Report.

6.      The Parties recognize that constitutional and effective policing are interdependent, and rely on a strong partnership between the police department and the communities that it serves.  To ensure that the reforms embodied in this Agreement are responsive to community concerns, the Parties consulted extensively with community leaders, police officers, advocates, residents, and other concerned individuals who offered meaningful recommendations and insights on reform.  This Agreement reflects the broad input received by the Parties from the diverse communities that make up the City of Baltimore.  The Parties are committed to ongoing engagement with community stakeholders to foster continued participation and long-term sustainability of the reforms created by this Agreement.

7.      The United States filed a Complaint based on the results of its investigation, as outlined in its Report, alleging that the BPD has engaged in a pattern or practice of conduct that violated the Constitution and federal laws by making unconstitutional Stops, searches, and Arrests, in violation of the Fourth and Fourteenth Amendments; using enforcement strategies that disproportionately impact African Americans, in violation of Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d ("Title VI"), the Title VI implementing regulations, 28 C.F.R. §§ 42.101-112, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d ("Safe Streets Act"); using excessive force, in violation of the Fourth Amendment and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131–12134 ("ADA"); and retaliating against individuals engaging in constitutionally-protected expression, in violation of the First Amendment.  The City and BPD deny the allegations in the Complaint and the Report.

8.      The City and BPD are, by and through their officials, officers, employees, agents, assigns, or successors, enjoined from engaging in the patterns or practices of conduct by law enforcement officers of the BPD that were the basis of the August 10, 2016 Findings Report.

9.     The parties have entered this Agreement to avoid the risks, expense, and burdens of litigation and to resolve voluntarily the claims in the United States' Complaint.

## II.     COMMUNITY OVERSIGHT TASK FORCE

10.     The Parties recognize that effective civilian and community oversight of BPD is essential to rebuilding trust between BPD and the communities it serves and ensuring that BPD's enforcement activities reflect community values and are consistent with the Constitution and federal, state, and local laws.  Civilian and community oversight of BPD raises complex issues of state and local law, and it must reflect input from a broad and diverse group of communities and stakeholders throughout the City of Baltimore.

11.     Recognizing that these issues require substantial consideration and public input, the City will establish, within 90 days of the Effective Date of the Agreement, a Community Oversight Task Force ("COTF") to recommend reforms to the current system of civilian oversight.  COTF will consist of five members, representative of diverse communities of Baltimore, appointed by the Mayor.  COTF will review the functions of the Civilian Review Board ("CRB"), and whether there are impediments to BPD civilian complaint processes that inhibit the ability of the Baltimore community to seek accountability for police misconduct.  The City will provide sufficient resources for COTF to fulfill its obligations under the Agreement.

12.     The COTF will review how the civilian oversight system currently functions, how it should function, and what are the impediments to change, and will then make recommendations based on that information.  The assessment will consider civilian oversight models and promising practices in place in other cities throughout the nation.

13.     The assessment will make recommendations to improve civilian and community oversight of BPD, which will include the following areas:

a. Whether changes should be made to the CRB to improve its efficacy, including, but not limited to, changes to complaint intake, investigations, resources, coordination with and independence from BPD, and authority to recommend discipline; the assessment should specify whether any recommended changes require state legislative action;

b. Whether there are impediments to BPD's civilian complaint processes that inhibit the ability of the Baltimore community to obtain accountability for misconduct;

c. Whether the community has sufficient access to information about CRB's organization, complaint investigation activities, and discipline recommendation processes to promote public confidence in the CRB and ensure that it serves its function to enable BPD to be responsive to community values, and whether any recommended access would require state legislative action;

d. Whether existing civilian-police communication and accountability structures can be improved, or whether additional or different civilian or community oversight entities are necessary to:

   i. provide effective guidance on community perspectives on BPD policies, procedures, and practices;

   ii. oversee BPD's accountability systems and disseminate information to the public about BPD's activities in readily accessible format; and

   iii. foster a stronger relationship between BPD and the communities it serves;

e. Whether changes should be made to BPD's community policing strategies to increase cooperation between BPD and the communities it serves.

14.     The City will request that COTF present a public report with its recommendations within 11 months of the Effective Date.  The City will post any COTF report on its website and invite public comment for 30 days.  COTF will review and make any revisions of the report, based on the public comments.  The final report will be posted on the City's website for the duration of this Agreement.

## III.    COMMUNITY POLICING AND ENGAGEMENT

### A.    Community Policing

15.     BPD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.

16.     On an annual basis, BPD will provide eight hours of cumulative, structured in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives, that shall include:

> a.  Methods and strategies to improve public safety and crime prevention through community engagement, including how to establish formal partnerships with community organizations, how to work with communities to set public safety and crime prevention priorities, and how to create opportunities for positive interactions with, among others, Youth, LGBT, homeless, and mental health organizations and communities;
>
> b.  Scenario-based training that promotes the development and strengthening of partnerships between the police and community;
>
> c.  Leadership, ethics, and interpersonal skills;

    d.   Problem-oriented policing tactics;

    e.   Principles of procedural justice and its goals;

    f.   Conflict resolution, including verbal de-escalation of conflict;

    g.   Cultural awareness and sensitivity training that addresses the history and culture of Baltimore's communities, including the relationship with law enforcement; and

    h.   Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination.

17.    BPD will encourage patrol officers to be familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively to address quality-of-life issues in a manner that minimizes stops, Citations, searches, arrests, and use of force consistent with the requirements of this Agreement.

18.    BPD will ensure that data about community policing efforts and outcomes are evaluated by command staff.

**B.    Community Engagement**

19.    The City and BPD will, within their respective spheres, develop and implement community-engagement plans for creating opportunities for routine and frequent positive interactions between officers and community members, including those critical of BPD. The community engagement plans will ensure that:

    a.   BPD provides for all sworn representatives of BPD who interact with the public in the regular course of their activities to participate in neighborhood and community meetings and other community events;

    b.   BPD identifies the number and types of meetings to be attended;

7

    c.   BPD and the City establish or provide for participation in a variety of long-term programs that promote and foster positive police-youth interactions;

    d.   BPD provides for the continuation of a BPD Explorer Program for Youth in Baltimore to learn police-related skills and assist with community events and outreach;

    e.   BPD and the City place emphasis on creating opportunities for positive interactions with Youth, communities of color and residents of low-income and public housing;

    f.   BPD and the City provide for outreach in all neighborhoods, including neighborhoods where no neighborhood association has been established to provide consultation and input to BPD;

    g.   BPD and the City collaborate, where feasible, with neighborhood mediations in Baltimore that promote lasting resolutions of appropriately selected disputes among community members to reduce police involvement in these disputes; and

    h.   BPD develops micro-community policing or similar plans to reflect particular community enforcement priorities.

20.    BPD will ensure that it solicits input from its advisory boards and councils representing particular communities in Baltimore, such as the Youth Advisory Board and the LGBT Advisory Council, on policies, practices, training, engagement programs, and enforcement strategies that affect the communities those advisory groups represent.

21.    To inform the public about BPD's implementation of the Consent Agreement, BPD shall develop a community outreach and public information program about the Agreement in each District.  The program shall include at least two meetings per year in each District that is

open to the public.  During the meetings, BPD will inform the public about the requirements of

this Agreement, update the public on BPD's progress meeting these requirements, and address

areas of community concern.  At least one week before such meetings, BPD will widely

publicize the meetings.  The meetings shall, with appropriate safeguards to protect sensitive

information, include summaries of all audits and reports completed pursuant to this Agreement

and any policy changes made and other significant action taken as a result of this Agreement.

The meetings shall also include public education on an individual's rights and responsibilities

during a police encounter.  These meetings may be held together with the Monitor, partially

fulfilling also the Monitor's public outreach obligations.

### C.        Community Engagement Assessments

22.        On at least an annual basis, BPD will prepare a publicly available report of its

community policing efforts, including a breakdown by district.  As part of this report, BPD will

identify deficiencies and opportunities for improvement in initiatives for community engagement

and community policing.  The report will include specific problems addressed and steps taken by

BPD and the community toward their resolution.  The report will describe the ways BPD has

sought input from the community related to the Agreement's implementation.  The report will

identify steps BPD has taken to measure officer outreach to community members.

23.        On an annual basis, the Monitor will conduct a reliable, comprehensive, and

representative survey, consistent with the criteria set out directly below, of the Baltimore

community's experience with and perceptions of BPD and public safety.  The survey will

include police officers, regarding their experiences with and perceptions of BPD and public

safety. Analysis of the results of this survey may be used to demonstrate sustained continuing

improvement as this Agreement encourages.  To assist the Monitor in conducting the annual

surveys, the Monitor will retain an individual or entity, to be approved by the City and DOJ that will:

    a.   Develop measurements of public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters;

    b.   Identify representative samples of City residents, police personnel, and custodial arrestees so that the survey is designed to capture a representative sample of Baltimore residents including members of each Demographic Category;

    c.   Review and consider prior law enforcement surveys in Baltimore and other cities;

    d.   Observe community meetings and engage in informal conversations with Baltimore residents, BPD officers and command staff, and DOJ representatives to identify current and recent issues or concerns specific to Baltimore;

    e.   Conduct the surveys in English and Spanish, as necessary, to ensure representation of the entire Baltimore community; and

    f.   Design, conduct, and analyze annual surveys of a representative sample of Baltimore residents, law enforcement personnel, and detained arrestees.

24.    The reports of the surveys will be provided to the Court and be publicly distributed and available on the Monitor's website.

25.    BPD will analyze the results of the survey and will use this analysis to modify and improve BPD policies, training, and practices as needed.

26.    BPD and the City will cooperate with the design and conduct of the surveys by, for example, providing previous survey instruments and data, and in the case of BPD, helping to organize focus groups of officers.

## IV.   STOPS, SEARCHES, ARRESTS, AND VOLUNTARY POLICE-COMMUNITY INTERACTIONS

27.     The Parties recognize that constitutional policing is enhanced by proactive, community-focused policing techniques.  These techniques include police officers making regular voluntary social contacts with community members to build relationships, providing an opportunity for the community to ask questions of the police, and allowing police to gather information relevant to criminal investigations.  BPD will provide guidance and training to officers to ensure that these social interactions are friendly, professional, and productive.

28.     In addition to these voluntary contacts, BPD will ensure that it conducts all Investigatory Stops, Searches, and Arrests in accordance with the rights secured or protected by the Constitution, and state and federal law.  BPD will adopt and maintain community policing principles that ensure its officers conduct investigatory Stops, Searches, and Arrests fairly and respectfully as part of an effective overall crime prevention strategy that is consistent with community priorities for enforcement.  To achieve these outcomes, BPD will implement the requirements set out below.

### A.     Stops, Searches, Arrests, and Voluntary Police – Community Interactions Principles

29.     BPD has recently implemented revised policies regarding Stops, Searches, Arrests, and Voluntary Police-Community Interactions.

30.     To the extent BPD's existing policies (collectively the "Stops, Searches, Arrests, and Voluntary Police-Community Interactions Policies") meet the requirements of this Agreement, further revisions are not required.  Notwithstanding its revised policies, if necessary, BPD will build on its policies and continue to improve them, as well as its practices, training,

and review, to ensure that officers respect the civil rights and uphold the value and dignity of all individuals as required by this Agreement.

### B.  Voluntary Contacts Between BPD Officers and the Public

31.     BPD will recognize two distinct classes of voluntary interactions:  Voluntary Contacts, which are non-investigative conversations, and Field Interviews, in which the officer questions a person with an investigatory purpose.

### *Voluntary Contacts*

32.     The Parties recognize that Voluntary Contacts between police officers and the public are an important component of effective community policing.  BPD will encourage officers to speak with members of the public in a friendly, professional manner to enhance communication, trust, and understanding.  These Voluntary Contacts will underscore BPD's commitment to community-oriented policing and will also help officers build relationships with community members that may later assist criminal investigations.

33.     BPD supervisors will encourage officers to regularly communicate with members of the public, and the Department will develop training as set forth in the Training Matrix (Appendix A), to teach officers the best methods for such communications.  Specifically, within one year of the Effective Date of this Agreement, BPD will provide training to all BPD officers that explains the value of proactive, community-oriented policing.  The training will also teach officers skills and techniques that can be used to effectively engage in Voluntary Contacts aimed at building rapport with Baltimore residents.

### *Field Interviews*

34.     In addition to Voluntary Contacts, BPD officers may have voluntary contacts with community members to gather information about criminal activity ("Field Interviews").  These

are contacts that do not rise to the level of a Stop or Arrest, but are more than mere Voluntary Contacts.  (In some cases, Voluntary Contacts may evolve into a Field Interview, in which case the requirements of this subsection shall control).  During a Field Interview, the community member does not have to respond to questions and is free to leave.  Officers conducting a Field Interview shall do the following:

     a.   Introduce themselves by name and rank as soon as reasonable and practicable;

     b.   Refrain from using words or actions that would tend to communicate that the person(s) are not free to leave or must answer questions; and

     c.   Reply in the affirmative if asked by the subject of the Field Interview whether they are free to leave or may decline to answer questions.

35.     During Field Interviews, officers who ask individuals to provide a physical form of identification, such as a driver's license, must inform the individuals that providing identification is voluntary.

36.     Officers engaged in, or attempting to engage in, a Voluntary Contact or Field Interview may not use a person's failure to stop, failure to answer questions, decision to end the encounter, or attempt or decision to walk away to establish reasonable suspicion to justify an Investigatory Stop or Detention, Search, Citation, or Arrest of the person.

37.     If at any point, a Field Interview evolves into an Investigatory Stop or Detention or Arrest, officers must act in accordance with the appropriate provisions of this Agreement.

**C.**     **Involuntary Investigatory Stops and Detentions (Non-Vehicle Stops)**

38.     BPD will prohibit officers from conducting Investigatory Stops or Detentions when they lack reasonable suspicion, based on specific and articulable facts, that a person has committed, is committing or is about to commit a crime.

39.     BPD will require that, when making an Investigatory Stop or Detention, officers inform the person(s) stopped that they are not free to leave.

40.     BPD will ensure that officers' reasonable suspicion for their Investigatory Stops and the facts on which the suspicion is based are documented in a specific and clear manner in a written or electronic report of the Investigatory Stop.  BPD officers will be prohibited from only using boilerplate language when describing the basis for an Investigative Stop or Detention. Instead, officers will be required to use specific and individualized descriptive language.

41.     BPD will ensure the consistent documentation of all Investigatory Stops and Detentions.  Documentation of Investigatory Stops and Detentions shall be required to include:

a.  The race, ethnicity, gender, and age of the person stopped;

b.  The location of the Investigatory Stop, including the street address or nearest intersection;

c.  A central identifying report number.  This number shall allow documentation of Investigatory Stops to be matched with documentation of any criminal or civil Citation or Arrest that results from the Stop;

d.  Specific, individualized description of the facts that established reasonable suspicion to make an Investigatory Stop, prior to the Investigatory Stop being made;

e.  The approximate duration of the Investigatory Stop;

f.  The outcome of the Investigatory Stop, including whether officers issued a civil or criminal Citation, made an Arrest, or issued a warning;

g. Whether officers conducted a weapons Frisk during the Investigatory Stop and, if so, the specific and articulable facts establishing reasonable suspicion that the detained individual was armed and dangerous;

h. Whether officers conducted a Search based on probable cause and, if so, the facts establishing probable cause to conduct a Search;

i. Whether officers asked any person(s) to consent to a Search, and whether such consent was given;

j. Whether officers found any unlawful weapons, narcotics, or other contraband during a Search, and the nature of such contraband; and

k. Whether the Investigatory Stop or Detention began as a Voluntary Contact or Field Interview.

42. BPD shall use a documentation system that provides the stopped person(s) with a record of the encounter, such as providing a carbon copy of the receipt, using a form with a "tear off" portion that contains information identifying the officer and the basis for the Stop, printing a copy of the Citizen Police Contact Receipt from a mobile terminal, or providing a contact card showing the officer's identifying information and the basis for the Stop.  For the record given to the person(s) encountered, it will be sufficient for the basis for the Stop to be described in a summary way that indicates the basis of the Stop such as "suspected of criminal activity" or "traffic offense."  It will not be necessary to provide the stopped person(s) a written narrative for the Stop; however, the written record that is provided to the stopped person(s), such as a Contact Card, shall have an identification number that corresponds to the documentation referred to in Paragraph 41.

43. BPD will prohibit officers from:

a.  Conducting pretext stops under *Whren v. United States*, 517 U.S. 806 (1996), in a manner that violates the Fourteenth Amendment, Title VI, or the Safe Streets Act;

b.  Conducting pretext stops in which the "pretext" justification for the Stop is loitering or misdemeanor trespass.  This language does not prohibit stops that are not pretextual, such as a stop in response to a call for service concerning loitering or misdemeanor trespass;

c.  Using conclusory language without supporting detail in documents or reports documenting Investigatory Stops or Detentions;

d.  Relying on information known at the time of reliance to be materially false or incorrect in effectuating an Investigatory Stop or Detention;

e.  Using an individual's geographic location, such as presence in a high crime area, or proximity to the scene of suspected or reported crimes – without any other reasonable articulable facts that an individual is, has, or is about to be engaged in criminal activity – as a basis for an Investigatory Stop or Detention;

f.  Basing Investigatory Stops or Detentions only on an individual's response to the presence of police officers, such as an individual's attempt to avoid contact with an officer;

g.  Basing Investigatory Stops or Detentions on an individual's presence in the company of others suspected of criminal activity without any additional reasonable articulable facts that an individual is, has, or is about to be engaged in criminal activity; and

h.  Transporting the subject of an Investigatory Stop for fingerprinting, questioning, or other investigatory purpose, where officers do not have probable cause to make

16

an Arrest.  Officers may transport the subject of an Investigatory Stop to a

different location for questioning if the stopped individual requests to speak with

officers in a different location.  Where such a request is made, officers will

document the request in writing and the individual who makes the request will

sign the documentation.

**D.      Vehicle Stops**

44.      BPD officers shall stop and detain vehicles ("Vehicle Stops") only where they

have probable cause that the driver has committed a traffic violation, or reasonable suspicion

based on specific and articulable facts that the vehicle or an occupant of the vehicle has been, is,

or is about to be engaged in the commission of a crime.

45.      BPD officers shall utilize the Computer Aided Dispatch ("CAD") or other

electronic data collection system to routinely and accurately report any Vehicle Stops.  Officers

shall be required to record the location of each stop.

46.      BPD shall memorialize data related to Vehicle Stops on auditable forms.  BPD

officers shall not rely only upon boilerplate language when describing the basis for a Vehicle

Stop.  Instead, officers will use specific and individualized descriptive language sufficient to

describe the basis for the stop.  The amount of detail that is required shall vary with the

complexity of the stop.  Thus, for example, where an individual has been stopped because he or

she ran through a stop sign, it shall be sufficient to state "Subject ran through a stop sign at XYZ

location."  Where, however, an individual is stopped, for example, because he or she engaged in

clandestine and erratic driving behavior in the area of a homicide while matching a description of

a suspect, a correspondingly more detailed description is required.  To implement this

requirement, BPD shall develop a system to ensure that officers collect data on all Vehicle Stops,

whether or not they result in an Arrest or issuance of a Citation.  This system shall allow for summarization and searches and shall require officers to document the following:

a.   The officers' names and sequence number;

b.   Date and time of the Stop;

c.   Location of the violation and/or Stop;

d.   Duration of the Stop;

e.   The driver's apparent Demographic Category;

f.   Reason for the Stop, such as a statement of the traffic offense observed prior to a Stop or other facts creating probable cause or reasonable suspicion that were observed prior to the Stop being initiated;

g.   Whether the driver or any passenger was ordered by an officer to exit the vehicle, and reason;

h.   Whether any officer approached the vehicle with a service weapon drawn;

i.   Whether officers conducted a weapons Frisk during the stop and, if so, the specific and articulable facts establishing reasonable suspicion for the officer's belief that the stopped person(s) was/were armed with a dangerous and deadly weapon;

j.   Whether officers conducted a Search based on probable cause and, if so, the facts establishing probable cause to conduct a Search;

k.   Whether officers asked any person(s) to consent to a Search, and whether such consent was given;

l.   Whether officers found any unlawful weapons, narcotics, or other contraband during a Search, and the nature of such contraband; and

m.  Disposition of the Stop, including whether officers issued a Citation, warning, or made an Arrest.

**E.  Searches**

47.  BPD will prohibit officers from conducting a Frisk for Weapons or Pat Down during an Investigatory Stop or Detention except where officers have reasonable suspicion, based on specific and articulable facts, that a person is armed with a dangerous and deadly weapon.  BPD will ensure that officers understand that there is no routine or automatic "officer safety" justification for a Frisk or Pat Down during an Investigatory Stop.  BPD will revise its "Characteristics of an Armed Person" training to be consistent with the provisions of this Agreement.

48.  BPD will prohibit officers from conducting warrantless Searches of persons and vehicles except where officers have consent to search or have probable cause, based on specific and articulable facts, that a person has committed, is committing or is about to commit a crime or possesses unlawful contraband, where the search is incident to a lawful arrest, or where the search meets an exception to the warrant requirement under the Fourth Amendment.

49.  BPD will ensure that officers are trained on the proper protocols for Strip Searches and Body Cavity Searches in accordance with its recently implemented improved policies regarding Strip Searches and Body Cavity Searches.  A report relating to any Strip Search or Body Cavity Search must be submitted by the officer and reviewed by a command level official within 48 hours of the search.

50.  BPD will ensure that Strip Searches are only performed when the officer has probable cause that a subject is concealing contraband or a dangerous weapon.  All Strip Searches must be approved prior to the search by a permanent rank supervisor, lieutenant or

above, and be conducted in a setting that ensures the privacy of the person searched, unless

exigent circumstances exist.  Less intrusive means, such as Pat Downs, metal detectors (where

available), and clothing searches, will be performed instead of a Strip Search wherever possible.

Officers will explain to the subject why they are being Strip Searched and give the subject an

opportunity to voluntarily produce the suspected item, unless doing so would compromise officer

safety or risk destruction of evidence.

51.     Notwithstanding the provisions of this Agreement for conducting Strip Searches,

officers may immediately seize any object they recognize as a dangerous weapon while

conducting a *Terry* weapons Frisk, even if seizing the object requires reaching into or disturbing

the clothing of the person frisked.

52.     Other than the visual inspection of a suspect's mouth, nose or ears, BPD will

ensure that Body Cavity Searches are only conducted upon receipt of a Search and Seizure

Warrant.  Officers must consult with their immediate supervisors to determine whether probable

cause exists to seek a search and seizure warrant for a Body Cavity Search.  Body Cavity

Searches will be performed with due recognition of privacy and hygienic concerns, and shall be

conducted by licensed medical professionals under sanitary conditions.  BPD shall require that

visual inspection of a suspect's mouth, nose or ears shall be based upon the observation of a

suspect's attempt to hide items pertinent to the investigation.

53.     BPD officers shall not conduct Frisks or searches of LGBT individuals for the

purpose of viewing or assigning gender based on the person's anatomy or genitalia.  LGBT

individuals shall not be subject to more invasive Frisk or search procedures than other

individuals on the basis of their gender expression or sexual orientation.  Absent exigent

circumstances, Frisks of women, including transgender women, shall be conducted by female

officers, and LGBT individuals' preferences with respect to the gender of the officer conducting a search will be honored.

54.     BPD will prohibit officers from relying on information known at the time of reliance to be materially false or incorrect to justify a warrantless search or to seek a search warrant.

55.     BPD will ensure that officers do not make consent Search requests absent the officer having an individualized reason to conduct a search.  BPD will ensure that consent for a Search is freely given by the subject of the Search, and not based on intimidation or coercion.

56.     BPD will require that prior to a consent Search, officers shall provide persons whose person or property they wish to Search with a Consent to Search Form and explain the purpose of the form.  The Consent to Search Form will include an explanation of an individual's right to refuse, limit, and revoke consent at any time.  BPD will ensure that the Consent to Search Form has a separate signature line for civilians to affirm that they understand they have a right to refuse, limit, and revoke consent at any time.  Officers may not conduct a consent Search until the subject of the Search signs the Consent to Search form.  If the subject gives verbal consent to the Search but refuses to sign the Consent to Search form, the officer may proceed with this search and must document the subject's verbal consent and refusal to sign the Consent to Search form.

57.     BPD will require that if further explanation of rights is requested by the subject of a consent search or if it is apparent that the person giving consent has difficulty reading or understanding his or her rights, officers shall affirmatively explain that a civilian has a right to refuse, limit, and revoke consent at any time, and officers will certify that they have read and explained the right to refuse, limit, and revoke consent to the civilian.  BPD will emphasize

through training that individuals have a right to refuse consent, limit consent, and revoke consent at any time.

58.     BPD will require that any affidavit or sworn declaration supporting an application for a search and seizure warrant will provide an accurate, complete, and clear description of the offense, the place or thing to be searched, the scope and the time of the Search, and state whether the warrant authorizes a Knock and Announce or No Knock warrant.

59.     BPD will record all Searches and Seizures conducted during pedestrian Stops, Vehicle Stops, and other Investigative Detentions according to the procedures described herein.

**F.     Arrests**

60.     BPD will ensure that officers issue a Citation or make a custodial Arrest only where they have probable cause to believe a person has committed, is committing, or is about to commit a criminal infraction or citable offense.  Officers will not rely on information known at the time of receipt of information to be materially false or incorrect in effectuating an Arrest.

61.     For any of the following offenses, BPD will require that an officer seek permission from a permanent rank supervisor prior to effectuating an Arrest, unless not practicable under the circumstances, in which case officers must notify a permanent rank supervisor as soon as practicable after effectuating an Arrest:

a.   Obstructing, Hindering, or Resisting an Officer;

b.   Disorderly Conduct;

c.   Failure to Obey an Officer;

d.   Gambling;

e.   Making a False Statement to an Officer; and

f.   Misdemeanor Trespassing Offenses.

62.     BPD will enforce its policy instructing officers that, for Quality of Life Offenses, that the appropriate response is the least intrusive response appropriate under the circumstances as reasonably understood by the officer at the time.  In other words, a verbal warning and counseling is preferable to a Citation, and a Citation is preferable to a custodial Arrest.  BPD will develop a system for tracking all Citations given for Quality of Life Offenses or for any of the offenses listed above in Paragraph 61(a) through (f).  The tracking system will be provided to the Monitor and DOJ in advance for their approval on a timeline established in the Monitoring Plan. BPD will report this Citation data to the Monitor on a quarterly basis.  In addition, BPD will analyze Citation data using Peer Group Analysis on at least an annual basis to assess how officers are enforcing Quality of Life Offenses and to identify officers who may benefit from additional guidance or counseling.

63.     BPD will require that a permanent rank supervisor approve or disapprove the officer's request to make an Arrest for Quality of Life Offenses and BPD will ensure that its supervisors ensure that any Arrest is based on the existence of probable cause and that the officer adhered to BPD policy when determining when to verbally warn and counsel, issue Citations, or Arrest individuals for Quality of Life Offenses.

64.     BPD will require that supervisors take appropriate action to address violations or deficiencies in officers' Arrest requests and recommendations, including releasing the subject, recommending non-disciplinary corrective action for the involved officer, and/or referring the incident for administrative or criminal investigation.  Such action will be documented by the permanent rank supervisor.

65.     BPD will require that officers complete all Arrest reports properly documenting the probable cause for the Arrest by the end of the officers' shifts.

66.     BPD will ensure that it obtains and tracks all data provided by Central Booking about arrestees at the time of presentment at Central Booking, including any evaluations of the arrestee's injuries and the results of any searches of the detainee for contraband.  If emergency treatment is necessary, officers will ensure that the detainee or arrestee receives medical attention from an appropriate medical provider. BPD will require officers to advise the duty Supervisor as soon as practicable of all situations in which emergency treatment is sought or provided and shall include a description of the circumstances necessitating such treatment.  The above-referenced notification of a supervisor by an officer should not exceed 24 hours from presentment of the detainee to a medical treatment facility.

### G.     Stops, Searches, and Arrests Training

67.     BPD will provide all officers with training on Stops, Searches, and Arrests, including the requirements of this Agreement, of no fewer than 16 hours within one year of the Effective Date and at least 4 hours on an annual basis thereafter.  Such training will be taught by a qualified legal instructor with significant experience in Fourth Amendment issues, and will address Fourth Amendment requirements and related law; BPD policies; and this Agreement's requirements regarding Investigatory Stops and Detentions, Searches and Seizures, and Arrests, including:

a. The difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable articulable suspicion and mere speculation; and truly voluntary and consensual encounters;

b. The facts and circumstances that may be considered in initiating, conducting, terminating, and expanding an Investigatory Stop or Detention;

    c.   The level of permissible intrusion when conducting Searches, such as "Pat Downs" or "Frisks";

    d.   The nature and scope of Searches based on the level of permissible intrusion on an individual's privacy interests, including Searches conducted pursuant to probation or parole release provisions;

    e.   The nature and scope of Searches incident to an Arrest;

    f.   Procedures for executing Searches, including handling, recording, and taking custody of seized property or evidence;

    g.   The effect that differing approaches to Stops, Searches, and Arrests can have on community perceptions of police legitimacy and public safety.

68.    BPD will review these trainings regularly, at least once per year, to ensure that they be updated if necessary to continue to reflect current law and constitutional requirements.

**H.    Supervisory Review of Stops, Searches, and Arrests**

69.    BPD will ensure that a Supervising Officer will review all documentation of Investigatory Stops and Detentions, Searches, and Arrest reports for completeness and adherence to law and BPD policy.  This review will be completed within 72 hours of when the Stop, Search, or Arrest occurred, unless the review finds deficiencies and additional investigation or corrective action is required.

70.    BPD will ensure that a Supervising Officer document and report:

    a.   Investigatory Stops and Detentions that appear unsupported by reasonable articulable suspicion, or that are otherwise in violation of BPD policy or this Agreement;

b.  Searches that appear to be without legal justification or are in violation of BPD policy or this Agreement; or

c.  Stops or Searches that, while comporting with law and policy, indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

71.    BPD will ensure that a Supervising Officer review each Arrest report of officers under their supervision and will memorialize their review in writing, indicating any need for corrective action, within 72 hours of when the Arrest occurs, absent exceptional circumstances, and the exceptional circumstances should be documented.

72.    BPD will ensure that Supervising Officers review reports and forms for deficiencies including:

a.  "Boilerplate" or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the reports or forms may contain information that was not accurate at the time it was reported;

b.  Arrests following Stops where the Stop was based solely on information or evidence discovered after the Stop was initiated or the fact that individual was ultimately arrested;

c.  Arrests that are unsupported by probable cause, or are otherwise in violation of the law, BPD policy, or this Agreement.

73.    BPD will ensure that it provides training and conducts audits of supervisory reviews of Investigatory Stops or Detentions, Searches, and Arrests to evaluate the supervisor's review and conclusions within seven days of their completion and ensure that officers understand and apply appropriate legal standards in conducting Investigatory Stops or Detentions, Searches, and Arrests.  If misconduct is identified, a commanding officer will evaluate the supervisor's

26

assessment and recommendations and ensure that all appropriate corrective action is taken, including referring the incident to the Office of Professional Responsibility ("OPR") for investigation.  BPD will also take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough, and accurate reviews of officers' Investigatory Detentions, Searches, and Arrests.

74.     BPD will take into account the quality and completeness of these supervisory and commander reviews of officer Stops, Searches, and Arrests, in supervisory and commander performance evaluations.

75.     BPD will identify all Arrests for which the District Court Commissioner provides data showing one of the following actions:

    a.  Released without charge;

    b.  Released based on identity issue;

    c.  Declined to charge; and

    d.  Lack of probable cause finding.

76.     In the District Court Commissioner data, the BPD will review the probable cause determinations for:  (1) all Arrests that resulted in a disposition of "lack of probable cause"; and (2) all Arrests that resulted in a disposition of "released without charge" or "declined to charge" where the basis of the disposition was a lack of probable cause.  This review will not be performed by a supervisor who previously reviewed the probable cause determination.

77.     Following this review, BPD will take any appropriate action, which may include recommending training or other non-disciplinary corrective action for the involved officer(s) and/or referring incident(s) for administrative or criminal investigation.

78.     Where BPD's review finds that an Arrest was not supported by probable cause, BPD will document in writing what actions were taken in response to the review or the reasons that no actions were taken.

79.     BPD will maintain a searchable electronic record of all Arrests that meet any of the criteria listed in Paragraph 75(a)-(d).  BPD will, on at least a quarterly basis, review this data to assess patterns in Arrest practices by officer, shift, unit, or district.  This review will be designed to help evaluate BPD's enforcement priorities and identify patterns of officer, shift or district behavior that may warrant corrective or disciplinary action.

80.     For every Search or Arrest involving the recovery of contraband evidence, BPD will require the supervisor to review and document whether the circumstances by which evidence was recovered was supported by probable cause.

81.     BPD will ensure that supervisors take appropriate action to address all apparent violations or deficiencies in Investigatory Stops or Detentions, Searches, and Arrests, including deficiencies in reporting.  Appropriate action may include recommending non-disciplinary corrective action for the involved officer, training, and/or referring the incident for administrative or criminal investigation.  For each subordinate, the supervisor will be required to track each violation or deficiency and the corrective action taken, if any, to identify officers needing repeated corrective action.  BPD will ensure that the supervisor note each violation or deficiency in BPD's Early Intervention System.

### I.     Stop, Search, and Arrest Data Collection and Review

82.     BPD will modify its Stop, Search, and Arrest data collection and review procedures as set out below to ensure that it is collecting and analyzing Stop, Search, and Arrest data in a manner that allows for a determination of the nature and scope of demographic

disparities in Stop, Search, and Arrest practices, as well as a determination regarding what Stop, Search, and Arrest practices are most effective and efficient.

83.     BPD will modify or develop a written or electronic report format to collect data on all Investigatory Stops and Searches, whether or not they result in an Arrest or issuance of a summons or Citation.  This system will allow for summarization and searches and also will be integrated into BPD's Early Intervention System.  BPD's Stop and Search data collection system will be subject to the review and approval of the Monitor and the United States, and will require officers to document the information described in the "Stops" section of this Agreement.

84.     BPD will develop a protocol for comprehensive analysis, on at least an annual basis once the appropriate technology is in place, of the Stop, Search, and Arrest data collected. The protocol will set out steps for determining BPD practices and efficiency on stops, searches and arrests, including whether they are documented with sufficient factual predicates in conformance with this Agreement, what percent of Stops result in weapons Frisks (and what percent of those recover weapons), arrests, or searches.  The analysis will analyze whether improved training would be helpful.

85.     BPD will ensure that supervisors establish a system for regular review of their assigned officers' Stop, Search, Citation, and Arrest documentation for completeness, accuracy, legal sufficiency, and compliance with BPD policy and this Agreement.

86.     BPD will develop procedures for regularly assessing the effectiveness of its Stop, Search, and Arrest practices.  As part of these assessments, BPD shall evaluate, on at least a quarterly basis:

> a.  The percentage of Investigatory Stops and Detentions that uncover evidence of criminal activity, including warnings, Citations, and Arrests, and the nature of the

criminal activity uncovered, e.g., the rate at which Stops result in evidence of felonies;

    b.   The percentage of weapons Frisks that result in seizure of unlawful weapons; and

    c.   The percentage of Searches that result in seizure of contraband, and the nature of the contraband seized.

## V.   IMPARTIAL POLICING

87.    The Parties recognize that policing fairly and without bias is central to promoting broad community engagement and building partnerships between law enforcement and community members that are an important part of effective policing.  Recognizing this principle, BPD has recently taken steps to ensure that its officers provide impartial policing services, including issuing a new policy in April 2015 offering training curricula that provides background information to officers about the City and the communities in which they work.  To the extent BPD's existing policies meet the requirements of this Agreement, further revisions are not required.  As described below, BPD will continue to develop systems and build on its policies to further enhance community trust of its policing efforts and ensure that it provides equal protection of the law to all individuals.

88.    BPD will ensure that officers document the Demographic Category of all persons who are subjects of Investigatory Stops and Detentions, Vehicle Stops, Frisks, Searches, Seizures, Arrests, and civilian complaints as required by this Agreement.  Information about an individual's transgender status should be included in BPD records only to the extent such information is relevant and necessary to BPD investigations or other law enforcement actions, in order to protect the privacy of the transgender individual.  BPD will revise any documents or forms as necessary to ensure that information required by this Agreement is captured.

89.     BPD will, consistent with this Agreement, ensure that its policies and procedures prohibit discrimination on the basis of Demographic Category.  BPD will:

a.  Ensure that its Fair and Impartial Policing policy extends to all protected classes under state, federal, and local laws, including race, ethnicity, national origin, gender, age, religion, sexual orientation, gender identity, or disability.

b.  Prohibit officers from considering Demographic Category to any extent or degree when taking, or refraining from taking, any law enforcement action – including pedestrian and vehicle Stops, Frisks, Searches, Arrests, and uses of force – except when such information is part of an actual and credible description of a specific suspect in an ongoing investigation that also includes other appropriate non-demographic identifying factors;

c.  Reaffirm that officers will (1) not engage in or condone Discriminatory Policing; (2) be responsible for knowing and complying with BPD's Fair and Impartial Policing policy; and (3) report all incidents where they observe or are aware of other officers who have engaged in Discriminatory Policing.

d.  Require that all BPD employees interact with all members of the public in an unbiased, fair, and respectful manner.

e.  Ensure that BPD officers address and in documentation refer to all members of the public, including LGBT individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual.  Proof of the person's gender identity, such as an identification card, will not be required.

     f.   Prohibit officers from inquiring about intimate details of an individual's sexual practices, anatomy, or gender-related medical history, except as necessary to serve valid, nondiscriminatory law enforcement objectives.

90.    The Parties recognize that training is an important component of impartial policing.  BPD's training on police actions, including Stops, Frisks, Searches, Arrests, and use of force, will include training on how to take these actions in a non-discriminatory manner.

91.    In addition to incorporating impartial policing principles into its training curricula as specified above, BPD will provide Fair and Impartial Policing training to all officers.

92.    BPD will ensure its training curriculum includes appropriate modality or combination of modalities (scenario-based, classroom, academy, etc.) and training assessment tools.  Such training will emphasize that Discriminatory Policing is a violation of BPD policy. To the extent that BPD determines that it would be beneficial for it to retain consultants in developing this policy, training, and supervisory direction, such consultants shall possess the requisite expertise and be approved by the Monitor and the Department of Justice.

93.    BPD's Fair and Impartial Policing training will include providing all officers with comprehensive training on the following topics:

     a.   The existence of implicit bias, based on characteristics such as race and gender, and how to minimize its impact on policing;

     b.   The importance of police legitimacy and how it is impacted by implicit bias and Discriminatory Policing;

     c.   Methods and strategies for more effective policing that relies upon nondiscriminatory Factors;

     d.   Police and community perspectives related to Discriminatory Policing;

    e.   Constitutional and other legal requirements related to equal protection and unlawful discrimination, including the requirements of this Agreement;

    f.   The protection of civil rights as a central part of the police mission and as essential to effective policing;

    g.   The existence and impact of arbitrary classifications and stereotyping;

    h.   Instruction in the data collection protocols required by this Agreement;

    i.   Identification of key decision points where prohibited Discriminatory Policing can take effect at both the incident and strategic-planning levels;

    j.   Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies;

    k.   The specific history and racial challenges in the City of Baltimore;

    l.   The principles of procedural justice and its goals; and

    m.   Methods, strategies, and techniques for interacting with LGBT individuals.

94.    BPD will seek to have members of the community and community-based organizations knowledgeable about various communities and issues in Baltimore, including representatives knowledgeable on issues of race, ethnicity, national origin, gender, age, religion, sexual orientation, gender identity, and disability, participate in the trainings, including, where possible and appropriate, by leading or co-facilitating such trainings.

95.    BPD will consider Discriminatory Policing or other bias based on protected characteristics by officers or officer candidates in evaluating officer performance and making hiring and promotion decisions.  This includes considering an individual's history of sustained

bias-related violations, including any type of unlawful biased policing, sexual harassment, or discrimination against BPD employees.

## VI.     RESPONDING TO AND INTERACTING WITH PEOPLE WITH BEHAVIORAL HEALTH DISABILITIES OR IN CRISIS

96.     BPD is committed to responding to individuals with Behavioral Health Disabilities and those in crisis in a manner that respects individuals' civil rights and contributes to their overall health and welfare.  Ensuring that BPD uses appropriate crisis response techniques when responding to individuals with Behavioral Health Disabilities or in crisis will help prevent situations that could lead to unreasonable use of force, promote connection of people with Behavioral Health Disabilities or in crisis to the behavioral health system, and decrease inappropriate criminal justice involvement for people with Behavioral Health Disabilities or in crisis.

97.     The City will coordinate with the Collaborative Planning and Implementation Committee ("CPIC") to conduct an assessment to identify gaps in the behavioral health service system, recommend solutions, and assist with implementation of the recommendations as appropriate.  The assessment will include an analysis of a sample of police interactions with people with Behavioral Health Disabilities to identify systemic barriers and solutions, including what precipitated the crisis, what services could have prevented the crisis, how police became involved, how the response to the crisis could be improved, and what can be done to prevent the crisis in the future.  The analysis will include identifying gaps in Behavioral Health Disability services (including assertive community treatment, permanent supported housing, targeted case management, crisis services, and substance use disorder services), problems with the quality or quantity of existing services, and other unmet needs that lead to preventable criminal justice system involvement.

**A.      BPD Crisis Intervention**

98.     BPD will revise its policy to establish a preference for the least police-involved response possible consistent with public safety.  In situations that do not involve an Emergency Petition, BPD will divert people with Behavioral Health Disabilities or in crisis to the Behavioral Health service system rather than jail or a hospital emergency room whenever appropriate.

99.     A person may be suspected of having a Behavioral Health Disability or being in crisis from a number of factors including self-report, information provided by witnesses or informants to dispatch or to BPD officers, from BPD's previous knowledge of the individual, or the officer's direct observation.

100.    Officers will be trained to not make assumptions regarding the dangerousness of an individual based on that individual's disability.

*Crisis Intervention Team (CIT) Program*

101.    BPD currently operates the BEST program for responding to individuals in crisis. BPD may continue to utilize the BEST program as its CIT program, as long as the BEST program meets the obligations of this Agreement.

102.    BPD will implement a CIT first-responder model of police-based crisis intervention with community, health care, and advocacy partnerships to assist individuals with Behavioral Health Disabilities and individuals who are in crisis.

103.    The goals of the CIT program will continue to be to equip police officers with methods to properly interact with persons with Behavioral Health Disabilities or in crisis safely; de-escalate crises and reduce the unnecessary use of force against individuals with Behavioral Health Disabilities or in crisis; minimize arrests; improve the safety of patrol officers, individuals with Behavioral Health Disabilities or in crisis and their families, and others within the

community; refer individuals to the City's behavioral health crisis system; and reduce the

inappropriate involvement of individuals with Behavioral Health Disabilities with the criminal

justice system.

### *Collaborative Planning and Implementation Committee*

104.    BPD will seek to expand the membership of CPIC by encouraging  representation

from the Maryland Department of Health and Mental Hygiene; judges from the Baltimore City

Mental Health Court; Baltimore City State's Attorney's Office; Office of the Public Defender for

Baltimore City; the jails that serve Baltimore City; other relevant Baltimore City officials;

Disability Rights Maryland (the federally-designated Protection & Advocacy organization);

community mental health providers; substance use services providers; local hospitals; and

advocates.  CPIC will also include the Crisis Intervention Coordinator and Behavioral Health

Services Baltimore.

105.    BPD will encourage CPIC to identify and implement, as appropriate, strategies to

reduce the number of people with Behavioral Health Disabilities who have unnecessary

encounters with the police, consistent with the City's and BPD's goals of promoting public

health, welfare, and safety.

### *Crisis Intervention Team (CIT) Officers*

106.    BPD will provide enhanced, specialized training in responding to individuals in

crisis to certain officers ("CIT officers"). All officers will receive some intervention training for

responding to individuals in crisis; that training is separate and distinct from the training and

qualifications required to be a CIT officer.  CIT officers will continue to be assigned to the patrol

division and will maintain their standard patrol duties, except when called upon to respond to

incidents or calls involving individuals in crisis.

107.    The enhanced training for CIT officers will be at least 40 hours of in-person training.  This enhanced training will be adequate for officers to achieve competence in the following areas: how to conduct a field evaluation, suicide intervention, community behavioral health and Intellectual and Developmental Disability resources, common behavioral health and Intellectual and Developmental Disability diagnoses, the effects of substance misuse, perspectives of individuals with Behavioral Health Disabilities and their family members, the rights of persons with Behavioral Health Disabilities, civil commitment criteria, crisis de-escalation, and scenario-based exercises.  This training must include on-site visits to mental health, substance use, and Intellectual and Developmental Disability community programs and interaction with individuals with Behavioral Health Disabilities.  CIT officers must receive eight hours of annual in-service training on responding to individuals in crisis to maintain their expertise and skills as specialized CIT officers.

108.    Training and designation as a CIT officer will be voluntary.  To be eligible for consideration, officers must have at least one year of experience as a BPD officer.  BPD will provide an in-depth assessment of each applicant to determine the applicant's fitness to serve as a CIT officer.  This assessment will include an examination of the officer's written application, supervisory recommendations, use of force by the applicant, complaints against the applicant, disciplinary file, and an in-person interview.

109.    Supervisors will identify and encourage officers across all shifts and all districts who are qualified to serve as CIT officers.

110.    BPD will ensure that CIT officer capacity is sufficient to ensure that, at all times and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis.  Absent unusual circumstances, at least one CIT officer will respond to all

calls or incidents where BPD knows or reasonably should know an individual with a Behavioral Health Disability or an individual in crisis is involved.

111.    CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene unless a supervisor has assumed responsibility.  If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of a CIT officer regarding strategies for responding to the individual in crisis where it is reasonable for the supervisor to do so.

### *Crisis Intervention Training for All BPD Officers*

112.    BPD will provide CIT training on responding to individuals in crisis to all of its officers and recruits:

a.    All officers will receive at least eight hours of annual in-service training.  The annual training will be adequate for officers to demonstrate competence in the subject matter and will include these topics:

    i.    How non-medically trained law enforcement personnel can recognize common characteristics and behaviors associated with Behavioral Health Disabilities or Intellectual and Developmental Disabilities;

    ii.    How to interact with individuals with these disabilities;

    iii.    When and how to make reasonable modifications for individuals with these disabilities;

    iv.    That individuals with these disabilities may have alternate perceptions and how that may affect their interactions with others;

v.      How to take appropriate steps to ensure effective communication with individuals with these disabilities;

vi.     How to recognize and respond to conduct or behavior that is related to these disabilities;

vii.    How to avoid escalating an interaction with individuals with these disabilities;

viii.   How to use de-escalation techniques to increase safety and to avoid using force unnecessarily;

ix.     What local resources are available to provide treatment, services, or support for individuals with Behavioral Health Disabilities or Intellectual and Developmental Disabilities, and when and how to draw upon these resources; and

x.      The circumstances in which a CIT officer should be dispatched or consulted; and how situations involving individuals in crisis should be addressed if a CIT officer is not immediately available.

b.   All new recruits will receive at least 16 hours of training in the Academy;

c.   Completion of this training does not qualify an officer as a CIT officer.

### BPD Dispatch

113.    All BPD dispatchers and their supervisors will receive crisis intervention training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis.

114.    BPD will revise its dispatch policies and protocol as necessary to meet the requirements of this Agreement, with input from the CPIC, the Monitor, and DOJ.  With the goal

of limiting police involvement in crises where appropriate, calls related to crises that do not necessitate a police response will be sent to other crisis services, such as a Mobile Crisis Team. When a police response is necessary, BPD will ensure that dispatchers use all reasonable efforts to dispatch a CIT trained officer to respond to the call.

### *Crisis Intervention Coordinator*

115.    Within 180 days of the Effective Date, BPD will designate an officer at the rank of Sergeant or above to act as a Crisis Intervention Coordinator ("Coordinator") to better facilitate communication between BPD and members of the behavioral health provider community and to increase the effectiveness of BPD's crisis intervention program.  BPD will ensure that the Coordinator is empowered to fulfill all duties of the Coordinator required by this Agreement.

116.    The Coordinator shall receive at least eight hours of training on the role and duties of the Crisis Intervention Coordinator, in addition to the CIT training he or she has already received in the Academy and to become a CIT trained officer.

117.    The Coordinator shall identify, develop, and maintain partnerships with program stakeholders and shall serve as a point of contact for advocates, individuals with Behavioral Health Disabilities, their families, caregivers, professionals, and others associated with the behavioral health and Intellectual and Developmental Disability community.  The Coordinator will solicit input and guidance from the CPIC regarding BPD's CIT program.

118.    The Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as CIT officers consistent with the requirements set forth in this Agreement.

119.     BPD, through the Coordinator, shall also ensure that CIT officer capacity is sufficient to ensure that, at all times of the day and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis.

120.     BPD, through the Coordinator, will develop and implement a crisis intervention plan ("Crisis Intervention Plan").  The goal of the Crisis Intervention Plan will be to ensure that a CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis.  On an annual basis, BPD will conduct an analysis of crisis intervention incidents to determine whether BPD has enough CIT officers, whether it is deploying those officers effectively, and whether CIT officers, call-takers, and dispatchers are appropriately responding to people in crisis, and will make appropriate changes to policies, procedures, and training regarding police contact with individuals in crisis.  The Crisis Intervention Plan will include an assessment of the number of officers necessary to achieve the goal of ensuring that a CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis; identification of gaps in coverage of particular shifts or districts; and development of mechanisms to fill those gaps. BPD will review and revise the Crisis Intervention Plan in order to identify and address barriers to full coverage.  BPD will identify performance measures for the CIT program.  These measures will consider quantitative data on key aspects of program operation as well as qualitative data on officers' and community members' perceptions of the program.  Community members include individuals who have experienced Behavioral Health crises that have included police involvement.  BPD may consider engaging a university or other expert partner to guide these data collection and analysis efforts.

**B.**     **Behavioral Health Disability or Crisis Data Collection, Analysis, and Reporting**

121.     BPD will collect data on suspected Behavioral Health Disability or crisis status of individuals subject to law enforcement actions including Stops, Searches, Arrests (to include type of offense and probable cause), use of force, injuries, and in-custody deaths.  For any section of this Agreement that calls for data collection, analysis, or reporting, BPD shall report on the suspected Behavioral Health Disability or crisis status of the individuals involved.

122.     BPD will collect, analyze, and report data related to Behavioral Health Disability or crisis status, including:

a.     BPD will collect data regarding calls for service that involve possible Behavioral Health Disabilities or people in crisis, including the number of calls, the nature of the crisis, and the extent to which individuals previously interacted with BPD; the disposition of those calls, including whether referred to community services, an emergency room, Emergency Petition, Arrest, booking; whether force was used; the type of forced used; and the steps taken, if any, to de-escalate interactions, especially when confrontations resulted in use of force, injury or death.

b.     BPD will analyze the data on an ongoing basis to drive improvement toward the goals of Paragraph 96 and report the data on a quarterly basis to the Crisis Intervention Coordinator and the CPIC.

**VII.     USE OF FORCE**

**A.     Use of Force Principles**

123.     BPD has recently implemented improved policies regarding officers' uses of force, and force reporting, investigations, and reviews.  BPD shall build on its recently improved policies, making further revisions where necessary under the provisions of this Agreement and,

as enumerated below, improve its training, investigations and review regarding officers' uses of force to ensure that officers uphold the value and dignity of all individuals they encounter.  To the extent BPD's use of force and related policies meet the requirements of this Agreement, the policies need not be revised.  As noted below, however, BPD must adhere to those requirements.

124.    BPD will ensure that officers:

a.    Are encouraged to resolve incidents without resorting to the use of force, when possible;

b.    Use de-escalation techniques and tactics to minimize the need to use force and increase the likelihood of voluntary compliance with legitimate and lawful orders;

c.    Use tactics that do not unnecessarily escalate an encounter;

d.    Continually assess the situation and changing circumstances, and modulate the use of force appropriately;

e.    When force is necessary, use force in a manner that avoids unnecessary injury or risk of injury to officers and civilians;

f.    Recognize and act upon the duty to intervene to stop any officer from using excessive force;

g.    Accurately and completely report all Reportable Force used or observed; and

h.    Are held accountable for use of force that is not objectively reasonable or otherwise violates law or policy.

**B.    Policies on Officers' Use of Force**

125.    BPD will require officers to use de-escalation techniques, including verbal persuasion and warnings and tactical de-escalation techniques such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the

officer and the threat, and requesting additional resources (e.g. specialized units, behavioral

health care providers, negotiators, etc.), whenever possible, before resorting to force and to

reduce the need for force.

126.    Prior to using force, BPD officers shall be required to use, as appropriate and

reasonably practical, a critical thinking, decision-making framework to analyze and respond to

incidents through which officers:

     a.   Gather relevant facts about the incident;

     b.   Assess the situation, threats, and risks;

     c.   Consider police powers and BPD policy;

     d.   Identify options and determine the best course of action; and

     e.   Act, review, and re-assess the situation.

127.    BPD will ensure that if force becomes necessary, officers will use only the

amount of force necessary to control the person and immediately reduce the level of force as the

threat diminishes.

128.    BPD will ensure it maintains a clear and comprehensive use of force policy that

includes all critical components to guide officers on using force constitutionally.

129.    BPD will ensure its use of force policies guide officers on all force techniques,

technologies, and weapons that are available to BPD officers and clearly define and describe

each force option and the circumstances under which use of such force is appropriate and

consistent with potential types of resistance.

130.    BPD will ensure that its policies provide guidance on the circumstances that may

warrant engaging in a foot pursuit and the tactics officers should use to avoid the use of

excessive force during or at the conclusion of a foot pursuit, and to keep members of the public and officers safe.

131.    BPD will ensure that its use of force policy provides guidance on specific protocols and practices to use when engaging with Youth, including the circumstances under which force against Youth may be warranted, such as:

      a.   When feasible, BPD will employ developmentally appropriate and trauma-informed de-escalation tactics including, but not limited to, using a calm, neutral demeanor, and avoiding threatening language;

      b.   If force is necessary, BPD officers will take into account individualized factors of the Youth including, apparent age, body size, and relative strength of the officer relative to the Youth; and risk posed by the Youth;

      c.   BPD will ensure that officers consider whether a subject may be noncompliant due to a medical or behavioral health disability, behavioral health crisis, physical or hearing impairment, language barrier, or drug or alcohol use; and

      d.   In case of injury resulting from a use of Reportable Force, BPD will take immediate steps to provide medical attention to the Youth and will notify the Youth's parent, guardian, or other responsible adult.

132.    BPD will ensure that officers do not use more force than necessary to detain a restrained person.  BPD will review force used against restrained individuals to ensure that it was necessary and proportional given the offense committed by the subject and the danger the subject posed to others.

133.    With regard to using force against persons engaged in First Amendment protected activity, BPD will explicitly prohibit the use of retaliatory force by officers.

134.    BPD shall also explicitly prohibit the use of force for punishment, including that officers shall not use force to punish individuals for fleeing, resisting arrest, or assaulting an officer.

135.    Recognizing that tactics leading up to the use of force can influence whether the force used was necessary, BPD will prohibit the use of tactics that unnecessarily escalate an encounter and create a need for force.

136.    BPD will ensure that officers only use the weapons that are enumerated in policy and force techniques on which they are trained, unless warranted by extenuating circumstances, which will be scrutinized on a case-by-case basis.

137.    BPD will prohibit the use of chokeholds or neckholds unless deadly force is authorized and no reasonable force alternative exists that is within BPD policy.

138.    BPD will revise its policies as needed to ensure they specify that use of force that is not objectively reasonable will subject officers to corrective action, discipline, possible criminal prosecution, and/or civil liability.

139.    BPD will revise its policies to require that officers who carry a firearm also carry on their person at least one less-lethal weapon which they are trained and certified to use, at all times while on duty, whether in uniform or while working in a plainclothes capacity.  Officers who are working undercover or whose role is in an administrative or investigative capacity, unless such duties routinely involve conducting Stops, Searches, or Arrests, are exempted from this requirement.

140.    BPD will ensure that it continues to categorize Reportable Force into levels for the purposes of reporting and reviewing each use of force. These levels will be based on the following factors: potential of the technique or weapon to cause injury or disability; degree of

actual injury or disability; duration of force; potential for abuse or misuse of weapon or force; and physical vulnerability of the subject. Each level of Reportable Force, as defined below, will require increasingly rigorous reporting, investigation, and review.

    a.  Level 1: Level 1 Reportable Force includes: (1) force that causes only transient pain or disorientation during its application as a means of gaining compliance, including hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip) and pressure point compliance techniques, but that is not reasonably expected to cause injury; (2) pointing a firearm or Conducted Electrical Weapon ("CEW") at an individual; (3) "cycling" a CEW as a form of warning ("Displaying the Arc"); and (4) forcible takedowns that do not result in actual injury or complaint of injury. It does not include escorting, touching, or handcuffing a person with minimal or no resistance.  Pointing a firearm or CEW at a person is a Level 1 use of Reportable Force, subject to the following exceptions:

        i.    SWAT Team Officers and officers assigned to work on a federal task force will not be required to report the pointing of a firearm at a subject as a use of force during the execution of SWAT Team or federal task force duties; and

        ii.    Pointing of a firearm at a subject will not be a use of Reportable Force if done solely while entering and securing a building in connection with the execution of an arrest or search warrant and a supervisor prepares a report detailing the incident.

b.  Level 2: Level 2 Reportable Force includes: (1) force that causes or could reasonably be expected to cause an injury greater than transitory pain but does not rise to a Level 3 use of Reportable Force; (2) any discharge of a CEW in drive-stun or probe mode, aimed at a person, that is not Level 1 or Level 3 Reportable Force, including where a CEW is fired at a person but misses; (3) any use of OC spray or other chemical weapons; (4) weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks); (5) any discharge of a less-lethal launcher/munition; (6) any canine inflicted injury, except those that would otherwise constitute Level 3 Reportable Force; (7) any strike, other than a strike with an impact weapon to the head, neck, sternum, spine, groin, or kidney area; (8) any striking of a vehicle or subject with a vehicle that does not rise to Level 3 Reportable Force.

c.  Level 3: Level 3 Reportable Force includes: (1) strikes to the head, neck, sternum, spine, groin, or kidney area with an impact weapon; (2) firearm discharges, including unintentional firearm discharges; (3) applications of more than three CEW cycles on an individual during a single encounter regardless of the mode or duration of the application, and regardless of whether the applications are by the same or different officers; (4) a CEW application for longer than 15 seconds; (5) uses of force resulting in death, serious physical injury, loss of consciousness or requiring hospitalization; and (6) uses of lethal force.  Level 3 Reportable Force can result from a lower level force option being improperly applied.

141.    BPD will require officers to intervene in incidents in which another officer uses excessive force.

***Weapon-specific provisions: Conducted Electrical Weapons (CEWs)***

142.    BPD will require that only officers who have successfully completed approved annual training on CEWs, including a testing component, and are currently certified may be issued, carry, and use CEWs.

143.    BPD will ensure that officers will use CEWs only where grounds for Arrest or detention are present, and such force is necessary to protect the officer, the subject, or another party from immediate physical harm.

144.    BPD will ensure that each application (in probe or drive stun mode) or standard cycle (five seconds) of a CEW is a separate use of force that officers must separately justify as objectively reasonable. BPD will ensure that, after the first CEW application, the officer will reevaluate the situation to determine if subsequent cycles are necessary. In determining whether any additional application is objectively reasonable, officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle.

145.    BPD will require that officers not employ more than three cycles or 15 total seconds of a CEW against a subject during a single incident unless lethal force is justified.

146.    BPD will ensure that officers:

    a.    Do not use CEWs in drive-stun mode as a pain compliance technique. Officers may use CEWs in drive-stun mode only to supplement the probe deployment to complete the incapacitation circuit, or as a countermeasure to gain separation between the officer and the subject so that officers can consider another force option;

49

b.  Determine the objective reasonableness of CEW use based on relevant circumstances, including the subject's apparent age, size, physical and mental condition, and the feasibility of lesser force options;

c.  Except where lethal force is the only other option, do not use CEWs when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is in danger of falling from a significant height, if the subject is in physical control of a vehicle in motion, or if the subject has been exposed to the MK-9 Pepper Fogger or flammable material, such as gasoline or an alcohol-based pepper spray;

d.  Except where lethal force is the only other option, do not use CEWs when a reasonable officer would know that the subject is pregnant, elderly, a small child, visibly frail, has low body mass;

e.  Do not use CEWs on fleeing persons who do not pose an imminent threat of physical harm to the officer or others. Flight will never be the sole reason for applying a CEW on a subject;

f.  Unless the use of lethal force is justified, do not apply CEWs in drive stun mode to a subject's head, neck, chest or groin;

g.  Are trained to target the CEW in probe mode at the lower center mass and to avoid the head, neck, chest and groin;

h.  Do not activate more than one CEW at a time against a subject; and

i.  Keep CEWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm.

147.    BPD will ensure officers will obtain appropriate medical treatment for suspects after a CEW deployment.  BPD will ensure that only trained medical personnel remove probes from a subject.

148.    BPD will require CEW inspections on a periodic basis to conduct information downloads, ensure CEWs are operable, and to perform necessary maintenance or repairs.

### Batons/Impact Weapons

149.    Officers will be trained and certified for department-approved batons and espantoons (collectively "Impact Weapons") before being authorized to carry Impact Weapons.

150.    BPD will require that Impact Weapon use will be limited to situations in which such force is objectively reasonable, consistent with the principles outlined above, and BPD's training, for example, when it is necessary to protect the officer, the subject, or another party from immediate serious physical harm.

151.    BPD will require that officers justify each strike with an impact weapon.

152.    BPD will ensure that officers will not use Impact Weapons on individuals who are restrained or under control, even if they are non-compliant, unless they present an imminent threat to the safety of the officer or others.  Prior to using Impact Weapons on individuals who are restrained, officers must first attempt to exercise additional control over the individual by using hands-on control measures or arrest control techniques before the use of Impact Weapons is justified.

### Oleoresin Capsicum Spray ("OC Spray")

153.    BPD will ensure that officers use OC Spray only when such force is objectively reasonable and consistent with the use of force principles above, including when used for crowd dispersal or protection.

51

154.    BPD will ensure that officers do not use OC Spray to disperse crowds unless individuals within those crowds are committing acts that endanger officer or public safety and security, property, and participants refuse to obey lawful orders to disperse.  Where OC spray is used on an individual in a crowd, BPD will ensure that the spray is directed at the person(s) who presents a threat.

155.    BPD will ensure that officers shall, whenever practical and reasonable, issue a verbal warning to the subject and allow a reasonable amount of time to allow the subject to comply with the warning.

156.    BPD will ensure that after the initial application of OC spray, each subsequent spray must also be objectively reasonable and consistent with the use of force principles above and the officer should reevaluate the situation accordingly.

157.    BPD will ensure that officers do not ordinarily use OC Spray on a person who is handcuffed or otherwise restrained.  If such a person, however, is still combative or violent, and presents an imminent threat to the safety of the officer or others, officers must first attempt to exercise additional control over the individual by using hands-on control measures or arrest control techniques before the use of OC Spray is justified.

158.    BPD will provide officers with proficiency training on the use of OC Spray before they are certified to carry and/or use OC Spray.  Such training will include protocols regarding officers' responsibilities following OC Spray use, including minimizing exposure of non-targeted individuals and decontamination of exposed subjects. Officers will render aid consistent with their training and experience and arrange immediate transport to a hospital for medical treatment for subjects on whom OC Spray has been used under the following circumstances: (1) when they complain of or exhibit continued effects after having flushed the affected areas; (2)

when they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment) that may be aggravated by chemical spray.

159.    BPD will ensure that officers will use only department-issued or approved OC Spray.

### *Firearms*

160.    BPD will prohibit officers from exhibiting or pointing a firearm unless the officer reasonably believes that the situation may escalate to create an imminent threat of serious bodily injury or death to the officer or another person. BPD will provide officers with policy guidance on the circumstances under which it is appropriate to exhibit a firearm.

161.    BPD will develop and implement a plan to ensure that it can track the date of officers' qualifications and require that officers successfully qualify in accordance with the Maryland Police Training and Standards Commission ("MPTSC") regulations and standards with each firearm they are authorized to use or carry while on duty.  Officers who fail to qualify will immediately relinquish the corresponding BPD-issued firearms.

162.    BPD will ensure that, when officers discharge firearms, they continually assess the circumstances that necessitated the discharge and modulate their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it.

163.    BPD will ensure that officers, when practical, identify themselves as a law enforcement officer and state their intention to use deadly force before using a firearm.

164.    BPD will ensure that officers do not fire warning shots.

165.    BPD will prohibit officers from firing at moving vehicles except (1) to counter an imminent threat of death or serious physical injury to the officer or another person, by a person in the vehicle, other than the vehicle itself or (2) to counter a situation where the officer or others

are unavoidably in the path of the vehicle and cannot move safely.  Officers should avoid

positioning themselves in the path of a moving vehicle where they have no option but to use

deadly force.

### C.    Training

166.    BPD will provide all current officers with use of force training as determined by

the Monitoring Plan and in conformance with the terms of this Agreement.  The use of force

training will include:

a.    Proper use of force decision-making under a critical-thinking, decision-making

model which requires officers to:

i.    Gather relevant facts about the incident;

ii.    Assess the situation, threats, and risks;

iii.    Consider police powers and BPD policy;

iv.    Identify options and determine the best course of action; and

v.    Act, review, and re-assess the situation.

b.    Role-playing scenarios and interactive exercises that illustrate proper use of force

decision-making, including training on the importance of peer intervention;

c.    The Fourth Amendment and related law;

d.    De-escalation techniques, both verbal and tactical, that empower officers to make

Arrests without using force and instruction that verbal persuasion, slowing down

the pace of the situation, disengagement, area containment, surveillance, waiting

out a subject, summoning reinforcements, using cover, calling in specialized

units, or delaying arrest may be the appropriate response to a situation, even when

the use of force would be legally justified;

e.  Officers will be trained to consider the possibility that a subject may be noncompliant due to a medical or mental condition, physical or hearing impairment, language barrier, drug interaction, or emotional crisis;

f.  The proper deployment and use of all BPD issued or approved weapons or technologies;

g.  The risks of prolonged or repeated CEW exposure, including the increased risks on persons who are in in crisis or experiencing a Behavioral Health Disability;

h.  The increased risks CEWs may present to a subject who is pregnant, elderly, a small child, frail, has low body mass, or is in apparent medical crisis;

i.  That when using an CEW in the drive stun mode it is generally less effective than the probe mode and, when used repeatedly, may exacerbate the situation;

j.  That force may not be used when a person is non-compliant, but is restrained and under an officer's control;

k.  Firearms training;

l.  Identifying and responding to someone who may be armed;

m.  The circumstances that may warrant engaging in a foot pursuit and appropriate tactics  to avoid the use of excessive force during or at the conclusion of a foot pursuit, and to keep members of the public and officers safe;

n.  For supervisors of all ranks, as part of their initial and annual in-service supervisory training, training in conducting use of force reviews or investigations appropriate to their rank; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop objectively unreasonable force; and supporting officers who report objectively unreasonable

or unreported force, or who are retaliated against for attempting to prevent

objectively unreasonable force; and

    o.   Use of force reporting, investigation, and review requirements.

167.    BPD also will provide the use of force training described in the paragraph above

to all new officers as part of its Professional Development and Training Academy ("Academy")

training curriculum.

168.    BPD will provide all officers with annual use of force in-service training to ensure

that officers maintain critical skills as determined by the Monitoring Plan and in conformance

with the terms of this Agreement.

**D.**    **Reporting, Investigating and Reviewing Force**

169.    BPD will require for every use of Reportable Force, which includes any Level 1,

Level 2, or Level 3 use of force as defined in Paragraph 140, regardless of level, the following

elements:

    a.   Initial Reporting and Response: requirements that describe officers' duty to report

        uses of Reportable Force and BPD supervisors' duty to respond and direct

        activities at the scene of Levels 2 and 3 Reportable Force;

    b.   Supervisory Review: requirements that describe who is responsible for the review

        of Reportable Force and how to conduct that review.  Reviews of all levels of

        force will require critical examination of the incident, pursuant to BPD policy.

        Level 1 uses of Reportable Force will be reviewed by an uninvolved permanent-

        rank supervisor of the same rank or above of the involved officer.  Level 2 uses of

        Reportable Force will be reviewed by an uninvolved permanent-rank supervisor

        above the rank of the involved officer.  Level 3 Reportable Force will be

investigated by the Special Investigations Response Team ("SIRT") and reviewed by the Performance Review Board ("PRB").  Reviews of Reportable Force will review whether the use of force was objectively reasonable, as well as whether it violated any policy, and to identify any concerns regarding training, tactics, equipment, or supervision;

c.   Departmental Analysis: requirements that describe how use of Reportable Force incidents are reviewed by the BPD command and how information gathered about the incident could be used to increase the effectiveness of the officer and the Department as a whole; and

d.   Record Keeping and Follow-up: the Administrative Report, Form 95 and Force Report, Form 96 and use of force review form and all associated documentation or other evidence, including photographs and video, related to the incident (collectively "Use of Force Reports") will be maintained in Blue Team or other database as adopted in accordance with this Agreement, tracked, and used to inform BPD force-related practices and training.

### *Reporting*

170.   BPD will ensure that officers notify a permanent-rank supervisor immediately, or as soon as practicable, following a use of Reportable Force.  The supervisor will notify the Shift Commander by the end of the shift during which the force occurred. The notification will contain basic information concerning the incident.

171.   BPD will ensure that officers accurately, thoroughly, and timely report their uses of Reportable Force.

57

172.     After any officer-involved shooting, any officer that discharged their firearm will provide a Public Safety Statement to their supervisor when they arrive on the scene. The Public Safety Statement will include:

    a.  Type of force used by the officer and the threat presented by other involved parties;

    b.  Direction and approximate number of shots fired by the involved officer(s) and suspect(s);

    c.  Location of any unsecured weapons;

    d.  Location of injured persons;

    e.  Description of outstanding suspect(s) and his or her direction of travel, time elapsed since the suspect was last seen, and any weapon(s) that were available to them;

    f.  Description and location of any known victims or witnesses;

    g.  Description and location of any known evidence; and

    h.  Other information as necessary to ensure officer and public safety, and assist in the apprehension of outstanding suspects.

173.     BPD will ensure that every officer who uses or observes a use of Reportable Force will document all matters that they have a duty to report in a Use of Force Report by the end of their tour of duty:

    a.  For Level 1 Reportable Force, officers have a duty to report: (1) the reason for the initial police presence; (2) a specific description of the acts that led to the Reportable Force; (3) the level of resistance encountered; and (4) a description of every type of Reportable Force used.

b. For Level 2 and Level 3 Reportable Force, officers have a duty to report each of the following:

    i. The reason for the initial police presence;

    ii. A detailed narrative account of the incident from the officer's perspective, including:

        1. A detailed description of the subject;

        2. The severity of the crime at issue;

        3. The presence and location of witnesses at the scene;

        4. A specific description of the acts that led to the use of Reportable Force;

        5. The level of resistance encountered;

        6. The threat the subject posed;

        7. The force options available to the officer;

        8. Any de-escalation techniques used; and

        9. A description of every type of Reportable Force used.

174. For Level 2 and Level 3 uses of Reportable Force, BPD will require an uninvolved permanent-rank supervisor of an officer using such force to respond to the scene. The supervisor will determine, based on policy and the facts then known, the level at which the use of force should be categorized. A supervisor may opt for a higher level response than would usually be required for the level of the force used, depending on the circumstances of the incident.

175.     When an incident involves multiple types of force or multiple officers, the entire incident will be reported and investigated at the highest level of force used by any officer during the incident.

176.     BPD will revise its policies to ensure that officers will not use conclusory statements, boilerplate, or canned language (e.g., "furtive movement" or "fighting stance") without supporting incident-specific detail in their Use of Force Reports.

177.     BPD will revise its policies to clarify that where Use of Force Reports are found to include material omissions or inaccuracies, BPD will take corrective action, including discipline as appropriate:

    a.  Where the material omissions or inaccuracies are found to be deliberate, the officer will be disciplined for failing to report, up to and including termination, subject to legal limits; and

    b.  BPD will review the information previously omitted or provided inaccurately to determine the truth of the incident.  BPD will thoroughly review the entire incident using the new information to determine the consequences of the new information on the propriety of officers' actions.

178.     BPD will revise its policies to clarify that officers who use or observe a use of Reportable Force but do not report it will be disciplined, up to and including termination.

179.     BPD will revise its policies to include particularized reporting and review requirements for CEWs, OC spray, and firearms.

### *Supervisory response and reviews for Levels 1 and 2 Reportable Force*

180.     A supervisor of the officer(s) employing a Level 1 use of force will review and document approval or elevate the Level 1 force before the end of the shift during which the

Level 1 force was used. It is not mandatory for supervisors to report to the scene of a Level 1 use of force.

181.    Supervisors will elevate and investigate any Level 1 use of force that appears to have been inappropriate or improperly categorized as a Level 1 use of force. If a supervisor determines that an officer's report reveals evidence of potential criminal conduct, he or she will promptly notify OPR.

182.    BPD will ensure that the uninvolved permanent-rank supervisor of the officer(s) employing a Level 2 use of Reportable Force will thoroughly review the incident for consistency with BPD's Use of Force policy and the terms of this Agreement.  The supervisor will complete the use of force review and within 72 hours of the incident will forward it, via Blue Team, to the lieutenant (or above as necessary) of the officer(s) who used the Reportable Force.

183.    If necessary, a supervisor in the chain of command will re-classify a use of force review to the appropriate Reportable Force Level and ensure that any appropriate additional action is taken based on the newly assigned Level of force, if necessary. If a supervisor or above determines that an officer's report reveals evidence of misconduct or potential criminal conduct, he or she will promptly notify the Office of Professional Responsibility ("OPR").

184.    BPD will ensure that the uninvolved permanent-rank supervisor of the officer(s) using force, upon notification of a Level 2 use of Reportable Force incident, will respond to the scene.

185.    BPD will ensure that whenever there is a visible injury, complaint of injury, or medical attention is requested by any individual, officers shall immediately obtain any necessary medical care. An officer will be expected to provide emergency first aid consistent with their training and experience until professional medical care providers are on scene.

186.     The supervisor who responds to the scene to review the Reportable Force used must hold a permanent-rank higher than any involved officer(s) who used Reportable Force or directed that it be used.

187.     BPD will ensure that whenever a supervisor uses, directs, or is otherwise personally involved in any type of use of Reportable Force, including participating in the tactical planning that led to the Reportable Force, a higher-ranking supervisor who was not involved in the incident will review the Reportable Force.  If a Lieutenant or above is involved, the review may be conducted by a supervisor of equal rank.   The Commissioner or his/her designee may, in their discretion, reassign a review of force of any Level to SIRT.

188.     For Level 2 uses of Reportable Force, BPD will ensure that upon arrival at the scene, to conduct a thorough, reliable review, the uninvolved permanent-rank supervisor will identify and collect evidence sufficient to establish the material facts related to the Reportable Force.  The uninvolved permanent-rank supervisor will:

    a.  Locate relevant civilian witnesses including the subject and third parties, and arrange for those witnesses to be interviewed. Witnesses should be interviewed separately where possible. Supervisors should use trauma-informed interview techniques where appropriate, and avoid leading questions;

    b.  Use Department-issued equipment to record interviews with civilian witnesses. Interviews of the subject, or the subject's refusal to be interviewed, will be also audio or video recorded;

    c.  Not extend the subject's detention to facilitate the screening process of the level of Reportable Force if the subject is free to leave.  However, the uninvolved permanent-rank supervisor will request the subject's statement regarding the use

of Reportable Force and explain that it is for BPD's administrative review to determine the propriety of the Reportable Force.  The subject will be advised that he or she is free to leave, when that is the case;

d.  Separate all officers involved in a use of Reportable Force incident until interviewed.  Group interviews will be prohibited. Supervisors will not ask officers or other witnesses leading questions that suggest legal justifications for the officers' conduct, where such questions are contrary to appropriate law enforcement techniques;

    i.  All interviews will be conducted in accordance with BPD policy and the Law Enforcement Officers' Bill of Rights ("LEOBR").

    ii.  If not in conflict with state law, and consistent with the terms of this Agreement, all officers who use Level 2 force will provide an oral use of force statement in person to the supervisor on the scene prior to the subject's being booked, or released, or the contact otherwise concluded;

e.  Review and flag for retention any body-worn camera footage capturing any part of the use of force incident;

f.  Canvass the area for any CCTV or other surveillance cameras in the area, document their locations, and attempt to obtain video voluntarily, review the footage, and upload it into Blue Team.  If unable to obtain the video voluntarily, document why the footage could not be retrieved;

g.  Photograph the scene and location of the incident to accurately depict lighting, weather, vehicle placement, points of cover, and to identify relevant evidence to be collected if not collected by the supervisor, such as forensic evidence;

h.  Photograph any departmental or private property damaged as a result of an officer's involvement; and

i.  Photograph the subject for identification purposes and all injuries or claims of injury to anyone involved, and denote the lack of injury when applicable.

189.    The supervisor conducting the use of force review will evaluate in writing all uses of force for compliance with BPD policy, as well as any other relevant concerns (e.g., tactical or threat assessment). The supervisor should provide timely, constructive feedback, where appropriate.

190.    For Level 2 Reportable Force, the first-line permanent-rank supervisor's use of force review will be completed and entered into Blue Team within 72 hours of the use of Reportable Force, unless the supervisor's commanding officer approves an extension. This documentation will include the following:

a.  A detailed narrative description of the incident that will describe the force used by the officers and the subject(s), any injuries sustained by the subject(s) and the officer(s), and the sequence of events comprising the incident. Additionally, it will document the supervisor's actions in reviewing or screening the incident. The summary should provide a commander, who is reviewing the report, a complete understanding of the incident;

b.   Documentation of all evidence that was gathered, including physical evidence; photographs; and names, phone numbers, addresses, and recorded statements of civilian witnesses to the incident; and reports by witnessing officers; and

c.   A review of the incident, including a discussion and resolution of any material inconsistencies in the evidence of statements; whether the force used was necessary, proportional and objectively reasonable, and otherwise within BPD policy.

191.   BPD policy will require that where a supervisor determines that force used by an officer may be considered misconduct or potential criminal conduct, the supervisor will notify OPR of their determination.

a.   Any review by OPR of the incident will be connected in BPD's database systems to the use of force review conducted by the supervisor, such that an inquiry into the incident will allow easy and efficient access to the entire review files of both the supervisor and OPR.

### Assessments of Levels 1 and 2 Use of Force Reviews

192.   The first commander in the chain of command who reviews the uninvolved permanent-rank supervisor's use of force review of Level 1 and Level 2 Reportable Force will ensure that the review is thorough, complete, and makes the necessary and appropriate findings of whether the use of force was consistent with BPD policy. In accordance with BPD policy, each higher-level supervisor in the chain of command will review the use of force review to ensure that it is complete and that the review was thorough.

193.   BPD will  ensure that a supervisor gather supplementary evidence or statements from officers, witnesses, or subjects when it appears that additional relevant and material

evidence may assist in resolving any discrepancies, lack of information, or improve the reliability or credibility of the findings. Every supervisor in the chain of command is responsible to assure the accuracy and completeness of the use of force review completed by supervisors, and for initiating corrective action.

194.    When it appears that the findings of the use of force review are not supported by a preponderance of the evidence, the supervisor will recommend changes to the findings after consultation with the investigating supervisor and the previous reviewer, and document the specific evidence or analysis supporting the modification.  Any supervisor in the chain of command may discuss the modification with the reviewing supervisor or reviewers.

195.    For force reviews involving Level 1 uses of Reportable Force, the district or unit commander will ordinarily be the final reviewer. He or she will make the final determinations of whether the findings by the chain of command regarding the use of Reportable Force are consistent with law and policy and supported by a preponderance of the evidence; whether the review is thorough and complete; and whether there are tactical, equipment, or policy considerations that need to be addressed.

196.    When the district or unit commander determines that an assessment for Level 2 force is complete and the evidence supports the findings, the force file will be forwarded to the Use of Force Assessment Unit ("UOFAU").  BPD will require that the UOFAU conduct an administrative Use of Force Assessment of all Level 2 Reportable Force incidents. BPD will ensure that the UOFAU is staffed to promote effective and efficient reviews of Level 2 Reportable Force.

197.    The UOFAU will review each Level 2 Reportable Force incident and review to determine whether the findings by the chain of command regarding the use of force are

consistent with BPD policy and supported by a preponderance of the evidence; whether the assessment was thorough and complete; and whether there are tactical, equipment, or policy considerations that need to be addressed.

198.    The UOFAU may refer cases to the Performance Review Board for consideration by the full board as appropriate, for example, in incidents containing serious policy violations.

199.    At the discretion of the officer's chain of command, or the UOFAU, a use of force assessment may be assigned or re-assigned for investigation to SIRT, or returned to the unit for further investigation, analysis, or corrective action, if warranted.

200.    BPD will analyze the data captured in officers' Use of Force Reports and supervisors' use of force reviews on an annual basis to identify significant trends, to correct deficient policies and practices, and to document its findings in an annual report that will be made publicly available pursuant to Section VII(E) below, Data Collection, Analysis, and Reporting.  BPD's analysis will include evaluations and assessments of use of Reportable Force by type, unit or assignment, demographics of the subjects, the shift or time of day, location, the nature of offense, the resistance encountered, and comparisons among officers or units.

### *Reporting and Investigation of Level 3 Force – Special Investigation Response Team ("SIRT")*

201.    BPD will ensure that its SIRT unit investigating Level 3 Reportable Force incidents is multidisciplinary and conducts both the criminal and administrative investigations of Level 3 Reportable Force incidents. To guide SIRT practices and investigations, BPD will develop and implement a SIRT training curriculum and procedural manual.

202.    SIRT will respond to and investigate the following types of incidents:

   a.   All Level 3 Reportable Force incidents;

b.   Any fatal motor vehicle crash in which the actions of a BPD member were a contributing cause; and

c.   Any incident at the direction of the Police Commissioner or his/her designee.

203.   In the incidents listed in the preceding paragraph, SIRT will be the primary investigating entity, and may call upon additional units to offer assistance and technical expertise. The SIRT supervisor will lead all investigative activity, which includes locating and interviewing witnesses, securing the scene and evidence, locating video surveillance that may have captured the incident, and making notifications.  The Training and Policy representatives to SIRT will not have an investigative role when present at the scene of a use of Reportable Force, but will attempt to identify any policy or training issues.

a.   At least one member of SIRT will be available at all times to evaluate potential referrals from BPD supervisors.

b.   SIRT staff members will have appropriate expertise and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved; and that its investigations allow the Performance Review Board to identify trends or patterns of policy, training, equipment, or tactical deficiencies, or positive lessons related to the use of force.

204.   The on-scene uninvolved permanent-rank supervisor shall take initial steps in response to the incident consistent with the requirements for Level 2 Reportable Force incidents until turning the scene over to the Shift Commander or arriving SIRT personnel.

205.   If the Shift Commander arrives before the SIRT personnel, the Shift Commander will assume control from the uninvolved permanent-rank supervisor and take steps to secure and maintain the integrity of the scene, including witnesses, which will be left intact to be processed

68

by SIRT personnel. The Shift Commander will also make reasonable attempts to identify civilian witnesses to the event and request that they stand by for the SIRT personnel's arrival.  The Shift Commander is responsible for separating all involved and witnessing officers and keeping them at the scene until SIRT personnel arrives.

206.    SIRT will have the following responsibilities in responding to a Level 3 Reportable Force incident:

a.  SIRT personnel will assume control of the use of force investigation upon their arrival;

b.  SIRT personnel will record all interviews with civilian witnesses;

c.  SIRT personnel will ensure that the Shift Commander has separated all officers involved in or who witnessed a use of force incident until they are all interviewed in accordance with BPD policy and the LEOBR;

d.  SIRT personnel will ensure all video evidence is immediately gathered and assessed.  This evidence may include, but is not limited to, CCTV footage, private or public surveillance, cell phone video footage, and body-worn camera footage. SIRT personnel will arrange for a canvass for any CCTV or privately owned video that may have captured the contact, and attempt to obtain copies voluntarily. If the owner of privately owned video refuses, SIRT personnel will document the location and/or owner of the video. If no privately owned video is discovered, SIRT personnel will document that none was found;

e.  The SIRT supervisor will arrange for a crime lab technician to process the scene according to the Crime Scene Sciences Section's technical manual and provide photos as soon as practicable to SIRT;

f.  SIRT personnel will attempt to interview the person upon whom the officer used the Reportable Force to obtain the person's account of what happened, if possible, as an audio-recorded interview.  They will also photograph areas of injury or complaint of injury;

g.  The SIRT supervisor responding to the scene will review body-worn camera or other video which may have recorded all or part of the incident and will document the content of such videos.  The SIRT supervisor should obtain copies of videos (other than body-worn camera footage) and attach them to the Blue Team use of force entry.  SIRT supervisors will review such video downloads as well as witness statements from all witness officers prior to the end of their shift(s) unless impracticable;

h.  SIRT personnel will ask involved officers if they are willing to provide a voluntary statement, and if so, administer the *Miranda* warnings prior to conducting an interview. All interviews with officers must be recorded (audio and/or video) and take place as soon as practical;

i.  The SIRT supervisor responding to the scene will arrange for the involved and witness officers to submit use of force written reports as soon as practicable and no later than 24 hours after the incident, except in extenuating circumstances, such as when an officer is injured, in which case, the officer will submit their written report as soon as the extenuating circumstance allows;

j.  SIRT personnel will be responsible for notifying the involved officer's commanding officer, the Police Commissioner, Deputy Police Commissioners, all Chiefs, the Director of the Academy, and the Baltimore City State's Attorney's

Office ("SAO") no later than 24 hours after learning of the use of force, unless impractical. This notification will contain basic facts about the incident as they are known at the time;

k. Within 60 days or as soon as possible thereafter, SIRT investigators will present the completed investigation to the Performance Review Board ("PRB") when it next convenes; and

l. If the SIRT investigation indicates potential criminal conduct or administrative misconduct, the SIRT commander will be responsible for notifying the Chief of OPR, and, in cases of potential criminal conduct, notifying the appropriate prosecuting authority.

### *Performance Review Board ("PRB")*

207.    BPD will maintain its Performance Review Board in a manner that is consistent with this Agreement.

a. The PRB will examine all Level 3 Reportable Force incidents, any fatal motor crash in which the actions of a BPD member were a contributing cause, and any other incident or investigation of the Police Commissioner or his/her designee;

b. The PRB will develop procedures, outlined in a manual, to govern its operations;

c. The PRB will conduct timely, comprehensive, and reliable reviews of any Level 2 force incidents referred by the UOFAU and all Level 3 force incidents. The PRB also will conduct the administrative review of other incidents, as the need arises; and

d. Where additional investigation is necessary to reach administrative findings, the PRB will refer to SIRT for additional investigation.

208.    The PRB will include the Commissioner or the Commissioner's designee (who will chair the PRB); the remaining membership will be drawn from across the BPD, in accordance with BPD policy.

209.    Each member will receive a minimum of eight hours of training on an annual basis, including legal updates regarding use of force and the Training Academy's current use of force curriculum.

210.    The PRB will document its findings and recommendations for SIRT investigations in a memorandum to the Police Commissioner. Unless the PRB Chair grants an extension, the memorandum shall be submitted within fourteen days of the SIRT presentation to the PRB.  The PRB will not make recommendations concerning discipline, however, the Chair of the PRB is obligated to ensure a referral to OPR if potential misconduct is discovered in the review process.  Any member of the PRB may also refer any potential misconduct to OPR, even if the PRB as a whole does not make such a referral. The PRB's memorandum shall include observations and recommendations for improvements in training, policies, procedures, tactics, equipment and technology, organization, and any other issues that could improve future performance of the member(s) involved, other members, or the BPD as a whole. The PRB Chair will also ensure that its findings and recommendations are brought to the attention of the relevant commanding officer for appropriate action.

**E.      Data Collection, Analysis, and Reporting**

211.    BPD will collect and maintain all data and records necessary to accurately evaluate its use of force practices and facilitate transparency and, as permitted by law, broad public access to information related to BPD's decision making and activities.

212.    BPD will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials, including:

    a.   Officers' Use of Force Reports;

    b.   Supervisor's use of force reviews;

    c.   Force investigations by SIRT;

    d.   Reviews conducted by OPR relating to officers' uses of Reportable Force; and

    e.   All supporting documentation and materials, including relevant CEW downloads, supporting audio-visual recordings, including witness and officer interviews, and any relevant camera downloads, including from body-worn cameras.

213.    BPD will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from Reportable Force-related documents, including:

    a.   The type(s) of force used;

    b.   The actual or perceived race, ethnicity, age, and gender of the subject;

    c.   the name, shift, and assignment of the officer(s) who used force;

    d.   the District where the use of force occurred;

    e.   Whether the incident occurred during an officer-initiated contact or a call for service;

    f.   The subject's perceived mental health or medical condition, use of drugs or alcohol, or the presence of a disability, if indicated at the time force was used;

    g.   The subject's actions that led to the use of force, including whether the subject was in possession of a weapon;

    h.   Whether the subject was handcuffed or otherwise restrained during the use of force;

     i.   Any injuries sustained by the officer or the subject or complaints of injury, and whether the officer or subject received medical services;

     j.   whether the subject was charged with an offense, and, if so, which offense(s);

     k.   For firearms-related deadly force incidents, the number of shots fired by each involved officer, the accuracy of the shots, and whether the subject was armed or unarmed; and

     l.   The length of time between the use of force and the completion of each step of the force investigation and review.

214.    BPD will be responsible for the routine reporting of relevant data to the Commissioner, PRB, and OPR.

215.    BPD will be responsible for an annual evaluation of forms and data collection systems to improve the accuracy and reliability of data collection concerning use of force. This evaluation will be provided to the Monitor, the DOJ and the public.

216.    BPD will develop a protocol to accurately analyze the data collected and allow for the assessments required below. This protocol will be subject to the review and approval of the Monitor and DOJ.

217.    BPD will annually analyze the prior year's force data, including the force-related data listed above, to determine trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report.

## VIII.  INTERACTIONS WITH YOUTH

218.    BPD will ensure that officers approach all interactions with Youth in a manner that takes into account the individual characteristics of the Youth, if apparent or known, including age, size, developmental and mental status, disability status, and maturity.  Taking into

account such individualized characteristics and the seriousness of the offense, BPD officers will, as appropriate, use alternatives to arrest, including warn and release; informal counseling; referral to community services and resources such as mental health, drug treatment, mentoring, and counseling organizations, educational services, and other agencies; station house warnings and adjustments; and civil Citations.

219.    The City will conduct a comprehensive assessment of the City's efforts to decrease Youth involvement with the juvenile and criminal justice systems and obstacles to doing so, including the City's diversion programs, community-based alternatives to incarceration, and treatment options for Youth in need of mental health treatment, drug treatment, or other services.  The assessment will include community organizations with particular expertise and/or insight into issues affecting Youth, academics, and Youth advocates. The City will issue a report publicizing the results of its assessment and making recommendations to improve the City's supports for Youth and its diversion programs.

220.    BPD will assess its current policies and training relating to Youth and will revise its policies and training as necessary to ensure that BPD provides officers with guidance on developmentally appropriate responses to, and interactions with, Youth, consistent with the provisions of this Agreement, including for appropriate officer conduct during voluntary interactions, stops, searches, arrests, uses of force, and custodial detentions and interrogations.

221.    BPD will ensure that it provides sufficient initial and ongoing training for officers on interacting with Youth to all of its existing and incoming officers.  BPD will invite and encourage community-based Youth advocates and community organizations to participate in the development and implementation of Youth-focused training for BPD.

## IX.    TRANSPORTATION OF PERSONS IN CUSTODY

222.    The Parties recognize that safe and effective transportation of detainees is an essential step in the process of taking a person into custody, and must be conducted in a manner that protects the wellbeing and personal security of officers, the public, and the people being transported.  BPD has recently implemented new and/or amended policies regarding transportation of passengers and persons in custody.  To the extent those policies meet the requirements of this Agreement, further revisions are not required.  BPD will build upon its recently revised policies as required by this Agreement to ensure that all detainees are treated in a humane manner before, during, and after their transportation, with due regard for their physical safety and protection, consistent with sound principles of prisoner security.  BPD will ensure that officers responsible for prisoner transportation are aware of detainees' physical well-being to ensure that the individual is transported safely.

### A.    Transportation Equipment

223.    BPD will ensure that all vehicles used by BPD for the transportation of persons in custody, including transport wagons or vans and police cruisers outfitted with dividers, contain sufficient and functioning seatbelts for each person in custody they are intended to transport. In addition to a seatbelt, BPD will ensure that all transport vans or wagons are outfitted with a strap located along the rear area of each seat that persons being transported may grip for security during transport.

224.    BPD will supplement its existing policies to ensure that all transport wagons or vans that are used during prisoner transport are equipped with a functioning transport vehicle camera ("TVC") system, which includes video recording equipment within all compartments used for the transportation of persons in custody.  The TVC system will display a live video to

officers located in the driver's section of the vehicle, and also record the video to be preserved for future viewing.  The TVC system will be used to record every instance of transportation of a person in custody, for the duration of the time the person in custody is within the vehicle.  BPD officers will be prohibited from turning off or disabling the TVC system at any point while a person in custody is within the vehicle or being loaded into or removed from the vehicle.  All transport vehicle video recordings will be maintained by BPD for a period of at least 1 year, or for longer as required by BPD policy.

225.    BPD will inspect all vehicles used for the transportation of persons in custody on at least a monthly basis to ensure that all equipment, including video recording equipment, seatbelts, and straps, are fully functional.

**B.    Transportation Procedures**

226.    BPD will ensure that every person in custody being transported is secured by a fastened seatbelt or other authorized restraining device, in accordance with existing BPD policy. The number of people being transported in a given vehicle shall never exceed the number of seatbelts or other authorized restraining devices in the vehicle.

227.    BPD will ensure that officers periodically check on the persons in custody during the transport process, either by direct observation or through live video transmission, in a manner that ensures the safety and security of the officers and the people being transported.  At no time will a person in custody be left unattended in a transport vehicle.  BPD will ensure that officers who are transporting persons in custody do not engage in any unrelated enforcement activities unless failure to act would result in imminent risk of death or serious bodily injury.

228.    BPD will ensure that officers restrain persons in custody for transport in a manner that does not cause undue pain, undue risk of injury, or actual injury to the individual being

transported.  BPD will prohibit officers from transporting any persons who are restrained in a prone position (including the so-called "hog-tie" position), or handcuffing persons in custody to any part of a vehicle being used for transport.

229.    BPD will ensure that males and females are not transported within the same compartment of a vehicle.  If a vehicle contains only one compartment used for transporting persons in custody, BPD will use separate vehicles to transport males and females.  Similarly, to the extent reasonably apparent, juvenile and adult persons in custody will not be transported in the same compartments.  Transgender, Intersex, and/or Gender Non-conforming individuals, as defined in this Agreement, shall be transported with other arrestees of the same Gender Identity and Expression unless the individual expresses a safety concern or the officer identifies a safety concern, in which case the individual shall be transported alone.

230.    BPD will ensure that wheelchairs, crutches, prosthetic devices, and other medical equipment required by persons with disabilities are transported to the final destination of the individual who requires them.  If possible, without creating potentially hazardous conditions, such medical equipment will be transported in the same vehicle as the individual who requires them.

231.    Other than the exception listed below, BPD will ensure that all officers driving a transport vehicle do not exceed the posted speed limit, and that the vehicle is driven in a manner that is calculated to preserve the safety and security of the persons in custody being transported. If a person being transported requires urgent and emergency medical care, the transporting officer may exceed the posted speed limit, as allowed for emergency vehicles under state law.

232.     BPD will ensure that during every instance of transport of a person in custody, the transporting officer will communicate the following information to dispatch or through other field-based reporting, which will be recorded and preserved for review:

   a.   The location of the vehicle where persons in custody are picked up;

   b.   The time that the transportation unit departs the scene where a person was taken into custody;

   c.   How many persons in custody are being transported;

   d.   The destination of the vehicle;

   e.   The starting and ending mileage on the vehicle;

   f.   The time of arrival at the destination; and

   g.   Whether at any time the officer perceived the person in custody to be in need of medical attention.

233.     BPD will ensure that its officers periodically check on persons in custody from the time of arrest to the time of transfer of custody for apparent signs of medical distress or emergency. When a person in custody displays signs of medical distress or physical injury, BPD will ensure that officers take immediate action.  These actions may vary depending on the particular circumstances, but may include (a) calling for assistance from medical personnel; (b) rendering first aid; or (c) immediately transporting the person to a hospital emergency room. Any time that an officer perceives that a person in custody is in medical distress or has a physical injury, the officer shall communicate this information to his or her supervisor.

**C.     Monitoring of Transportation Practices**

234.     BPD will develop policies and procedures for determining at the point of transfer to another agency whether arrested persons were placed at undue risk, harmed, or injured while

being transported.  This process will include gathering and preserving data regarding whether persons were adequately restrained by a seatbelt during transport, whether force was used during transport, whether the person was injured during transport, the nature of the injury, and whether first aid or medical care was provided.

235.     Every injury that is reported to have occurred during transport will be reviewed as a use of force as provided for in Section VII(D), Use of Force, or, if appropriate, as part of a vehicle crash investigation.

236.     BPD will conduct quarterly audits of its transportation process to determine whether officers are properly following correct transportation procedures and that persons in custody who are being transported are not placed at risk of injury.  The audits will include:

a.   A review of information for at least five randomly selected instances of transport of persons in custody from each police district within the previous quarter, including reviewing all video recordings associated with each instance; reviewing and analyzing location, time, and odometer information to calculate the speed that the transport vehicle was driven; and reading any reports associated with the arrest, detention, and transport of the arrested person;

b.   An analysis of the data collected during the previous quarter in Paragraph 232 of this Section;

c.   A review of every injury reported to have occurred during transportation to determine if there are any trends related to transport policies and practices;

d.   Random and unannounced spot-checks of at least three transportation vehicles from each BPD district to inspect for use of seatbelts and operation of the TVC system.

237.    Whenever, through auditing or otherwise, it is determined that an officer did not comply with BPD policies and procedures, BPD will take appropriate action, including the initiation of disciplinary procedures.

### D.    Policies and Training

238.    BPD will review and revise its policies, procedures, and trainings associated with the transportation of persons in custody to ensure compliance with the requirements of this Agreement.  BPD will ensure that all officers who drive transport wagons are provided a training of at least eight hours on safe and humane transportation of persons in custody, including the requirements of this Agreement, BPD policy and procedures related to transport, safe driving methods, the identification of medical distress and injuries, and proper restraint techniques.  Up to four hours of the training required under this section may be satisfied by general training programs, which may include units regarding the requirements of the Agreement that are relevant to the safe transportation of detainees, including the identification of medical distress and injuries, and proper restraint techniques.

## X.    FIRST AMENDMENT PROTECTED ACTIVITIES

239.    The Parties recognize that First Amendment protected expression promotes the free exchange of ideas that is a fundamental value of our nation and leads to better governance and trust in the rule of law.  It also engenders transparency and trust in policing, and advances accountability for law enforcement officers and the public.  BPD has recently implemented new and/or amended policies designed to safeguard the First Amendment rights of all individuals. To the extent those policies meet the requirements of this Agreement, further revisions are not required.  BPD will build upon its recently revised policies as required by this Agreement, and promptly investigate and take appropriate corrective measures for any officer who violates BPD

policy and training concerning First Amendment activity, to ensure that all BPD personnel

respect the First Amendment rights of all persons, including, as defined by the First Amendment:

    a.   The right to criticize law enforcement or otherwise engage in protected expression

        in the presence of law enforcement officers without being subjected to retaliation;

    b.   The right to engage in lawful public protest or assembly;

    c.   The right to observe BPD police officers in the public discharge of their duties in

        all public spaces, including sidewalks, parks, and locations of lawful public

        protests, as well as any other areas where individuals otherwise have a legal right

        to be present, including an individual's home or business and common areas of

        public and private facilities and buildings, so long as the individual does not

        endanger officers or the public, or physically interfere with the law enforcement

        action;

    d.   BPD policy will continue to honor a citizen's right to peacefully record BPD

        police officers publicly discharging their duty.

**A.**     **Right to Criticize Law Enforcement or Engage in Expressive Activity, as Protected by the First Amendment**

240.    BPD will ensure that officers do not take any police action in retaliation for

individuals lawfully exercising their right to witness, observe, record, comment on, or peacefully

protest police activity.  This includes retaliation by ordering individuals or groups to disperse, or

by stopping, detaining, searching, arresting, issuing a Citation to, or threatening to stop, detain,

search, arrest or issue a Citation to any individual or group.

241.    BPD will ensure that officers do not use force in response to an individual

engaging in legally protected speech, unless the individual poses an imminent threat to the safety

of the officers or others, consistent with the provision of this Agreement in Section VII, Force.

242.     BPD will ensure that officers do not treat protesters differently based on the content or viewpoint of their legally protected speech.

243.     BPD will ensure that individuals who observe stops, detentions, arrests, and other incidents shall be permitted to remain in the proximity of the incident unless there is an actual and articulable law enforcement basis to move an individual, such as: an individual's presence would jeopardize the safety of the officer or others in the vicinity or would physically interfere with an officer's lawful activity; the individual violates the law; or the individual incites others to violate the law.

244.     BPD will ensure that BPD policy and training makes clear what conduct constitutes "interference."  BPD policy and training will provide specific examples to ensure BPD officers understand these concepts and how they apply to scenarios they are likely to encounter so they do not unjustifiably claim that an individual's presence amounts to interference with law enforcement activity, or otherwise violates the law. BPD will ensure that when the person's location is causing the interference, the officers recommend, where practicable and consistent with officer safety, an alternative location from which the bystander may continue to record, and/or protest and give the individual reasonable opportunity to comply prior to taking further enforcement action.

**B.       Right to Engage in Lawful Public Protest or Assembly, as Protected by the First Amendment**

245.     BPD will ensure that officers do not unlawfully interfere with lawful protests and assemblies.

246.     BPD will revise current policies and protocols for policing public protests and assemblies as necessary to accommodate the requirements of this Agreement, and will specifically include:

a.  Factors officers should consider when exercising their lawful discretion to arrest;

b.  Clear guidelines that minimize discretionary enforcement decisions by non-supervisory officers during public protests;

c.  Guidelines and limitations on the use of less-lethal force during public demonstrations, including the criteria and circumstances for the use of different types of force, required warnings, and documentation; and

d.  A requirement that BPD develop a plan for all known significant pre-planned or anticipated public protests or assemblies, which will include:

    i.  An effective traffic control plan for streets and sidewalks; and

    ii.  To the extent possible, a plan for public information sharing before, during and after significant public assemblies;

    iii.  For purposes of this subsection, a significant protest or assembly is one in which the participation of more than 50 individuals is anticipated.

**C.      Right to Observe and Record, as Protected by the First Amendment**

247.    BPD will ensure that its personnel permit members of the public to peacefully photograph or record police officers performing their law enforcement duties in public, so long as the individuals who are photographing or recording police activity do not threaten the officer's safety or the safety of others; do not compromise legitimate police actions and/or rescue efforts; and do not physically interfere with the performance of the officer's duties.  Officers may instruct an individual to cease recording and put away the recording device when that individual is being placed under lawful arrest, or for any other lawful reason. BPD policy may account for

preservation of the privacy interest of non-police individuals in a manner that does not interfere with the First Amendment right to record law enforcement activity.

248.    BPD will require officers to document any instance in which they order a member of the public to stop recording police activity that occurs in public because there is a threat to the safety of the officer or others, the recording is compromising legitimate police actions and/or rescue efforts, or physically interfering with the officer's duties.

249.    BPD will ensure that officers do not search, seize, or otherwise coerce production of recorded sounds, images, or videos without obtaining a warrant.  Where an officer has probable cause to believe that a bystander or witness has captured a recording of critical evidence related to a crime and the exigencies of the circumstances demand it, the officer may secure such evidence while a legal subpoena, search warrant, or other valid order is obtained. The officer will obtain the subpoena, warrant, or other order as soon as reasonably possible with diligent effort.  If the subpoena, warrant, or other order is denied for lack of probable cause, the officer may not continue to hold the recording device while seeking additional evidence to support the request for the subpoena, warrant, or other order.  Upon seizing such property, officers may not search or review its contents without first obtaining a search warrant unless exigent circumstances exist to justify a warrantless search, such as an immediate threat to public safety.

250.    BPD will ensure that officers do not intentionally destroy cameras, other recording devices, sounds, images, videos, or other recorded material, and that they do not order an individual to intentionally destroy the same or otherwise cause such destruction, provided, however, that materials may be disposed of in accord with the record retention and destruction requirements established by law or BPD policy.

**D.      Policy and Training for First Amendment Protected Activity**

251.     BPD will review and revise its policies, procedures, and trainings associated with

First Amendment protected activity as needed to comply with the requirements of this

Agreement.

**E.      Supervision of First Amendment Related Arrests and Seizures**

252.     Only a member of BPD Command of the rank of Major or above may declare an

assembly to be unlawful, and such a declaration must be subsequently documented in writing.  If

no officers of the rank of Major or above are available, the declaration may be made by a

Lieutenant or Captain who is serving as shift commander. Orders to disperse may only be issued

following such a declaration, and may only be initiated by a Lieutenant or above.  BPD will

ensure that officers obtain supervisory approval, to be documented as soon as practicable, before

issuing any Citations or making Arrests related to refusal to obey a dispersal order, or related to

public protest activities unless those activities pose an imminent threat to property or public

safety in violation of any state or local law.

253.     BPD will ensure that officers obtain supervisory approval within two hours when

exigent circumstances have required the warrantless seizure of a recording device or recording.

If reasonably practical, a supervisor shall respond to the scene and assess the situation in person.

254.     At a minimum, a supervisor must be present to approve arrests for obstructing or

hindering law enforcement while recording police activity, or for refusal to obey a dispersal

order while engaged in public protest prior to arrestees being transported to a holding facility,

absent exigent circumstances to be documented as soon as practicable.

**F.      Ongoing Assessment and Improvement**

255.    BPD will conduct annual assessments of its practices related to First Amendment protected activity, which will include, at a minimum:

    a.   Review and analysis of complaints alleging misconduct related to First Amendment protected activity; and

    b.   Analysis of law enforcement responses to public protest or assembly.

256.    As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement any appropriate corrective action or improvement measures; and document measures taken.

## XI.   HANDLING OF REPORTS OF SEXUAL ASSAULT

257.    To increase the trust of victims[1] of sexual assault in BPD, strengthen BPD's response to and investigations of reports of sexual assault, and to combat gender bias, BPD shall implement the below measures.

**A.      Policy and Training**

258.    BPD shall ensure its sexual assault policy and protocols:

    a.   Identify procedure and practice guidelines for a trauma-informed, victim-centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime;

    b.   Articulate the significant role and responsibilities of all officers throughout the sexual assault response and investigation;

---

[1] The Parties respect that individuals who have been subjected to sexual assault are survivors. Because the context of this Agreement refers to the role of police interactions with people as victims of crimes, it refers to them as "victims".

    c.   Articulate the opportunity for forensic examination and comprehensive medical care to the sexual assault victim; and

    d.   Ensure all victims are offered access to free and confidential support, social service referrals, and information from a trained sexual assault victim advocate.

259.    BPD shall provide initial and on-going annual training to all BPD detectives in the Sex Offense, Family Crimes, and Child Abuse Units about its policies and practices applicable to law enforcement response to sexual assault.  This initial and annual in-service training shall ensure that these BPD detectives can perform their duties pursuant to this Agreement and include:

    a.   Guidance to patrol on how to respond to reports of sexual assault, including cases presenting co-occurring crimes such as domestic violence or stalking;

    b.   Guidance to detectives on strategies that postpone judgment regarding the validity of a case until a thorough investigation is completed;

    c.   Highlighting methods to minimize further physical and psychological trauma to victims of sexual violence by creating a respectful, objective response;

    d.   Identification of strategies to keep the investigation focused on the behavior and actions of the suspect;

    e.   The impact of trauma on victims and adjustments to interview practices to allow sensitivity to victims' needs and the dynamics of sexual assault, and thus increase the likelihood of continued victim participation with law enforcement, improve the experience for victims cooperating with law enforcement, and strengthen sexual assault investigations;

f.   The dynamics of and relevant core scientific concepts related to sexual assault including trauma-related behavior, tonic immobility, and the effects of trauma on memory;

g.   Guidance on working with vulnerable populations, including homeless people, sex workers, people with Behavioral Health Disabilities, and LGBT individuals;

h.   Law enforcement response to non-stranger sexual assault, alcohol and drug-facilitated sexual assault, sexual assault where the victim is incapacitated or otherwise unwilling or unable to clearly describe the assault;

i.   Report writing and documentation of the investigation undertaken, techniques for investigations of sexual assault, and classification of reports of sexual assault;

j.   Trauma-informed interviews of individuals reporting sexual assault;

k.   Taking statements from, interviewing, and interrogating suspects, including training about interrogating suspects in non-stranger or drug/alcohol-facilitated sexual assaults; and

l.   For those detectives with supervisory responsibilities, supervision of sexual assault cases, including sexual assault case reviews and other mechanisms to detect and prevent gender bias in the response to reports of sexual assault.

**B.      Sexual Assault Investigations, Supervision, and Internal Oversight**

260.   BPD will:

a.   Assign all reports of sexual assault that meet the criteria outlined in BPD policy to detectives for follow up investigation;

b.   Thoroughly investigate reports of sexual assault, including any assaults that appear to be non-stranger assaults, assaults facilitated by alcohol or drugs, or

89

assaults involving victims who were incapacitated or otherwise unable or unwilling to clearly describe the assault;

c.   Consult with forensic examiners to obtain and discuss the results of medical/forensic examinations, and include a summary of the findings of the forensic examinations, including findings related to all injuries, in case reports;

d.   Ensure that investigators of sexual assaults do not have a history of complaints of bias relating to gender or complaints of sexual misconduct that could impair their ability to investigate sexual assault in accordance with BPD policy and training;

e.   If the victim consents, BPD shall enable advocates to be present during victim interviews, unless doing so would compromise the evidentiary value of the interview;

f.   Continue to provide a "soft" interview room, equipped with audio and video recording capabilities, for conducting victim interviews;

g.   Ensure that officers introduce sensitive lines of questioning by first explaining why those questions are relevant to the investigation; and

h.   Ensure that if there is a specific and articulable investigative purpose, detectives can ask the victim about their desire to prosecute the assailant, but the victim's responses should not be a determinative factor in law enforcement decisions about whether or how to pursue investigation.

261.   BPD will ensure that officers transport victims to the designated medical facility for a forensic exam in all instances in which a forensic exam is warranted and the victim consents to the transport.

262.     BPD shall establish and implement measures to ensure supervision and internal oversight of sexual assault investigations.  These measures should include but not be limited to:

a.   Developing a system of automated alerts to trigger supervisory review of open sexual assault investigations, and a protocol governing the supervisory review. This system and protocol shall include:

i.     Supervisory review of all sexual assault reports, that fall under the investigative criteria for the Sex Offense Unit or Child Abuse Unit, within 48 hours of the report being taken in order to ensure consistency with BPD policy for initial officer response and documentation; and

ii.    Supervisory evaluation of the thoroughness of the investigation in sexual assault cases when: (1) the victim has not been interviewed within one week of BPD receiving the report of sexual assault; (2) a case has been classified as "open," without any investigative activity, for longer than six months.

b.   Before an investigation of a report of sexual assault is closed or a report of sexual assault is classified as "unfounded," a supervisor shall assess whether a comprehensive investigation has been conducted and whether appropriate follow-up has been completed.

263.     With the goal of better identifying serial offenders, BPD shall collect, share, and track crime-specific information about unresolved investigations of reports of sexual assault, including, to the extent possible, with law enforcement agencies in neighboring or with

overlapping jurisdictions who are willing to cooperate, to identify similarities between reported sexual assaults and unresolved cases.

264.     BPD will continue to enhance its data collection, analysis, and reporting.  The data to be collected and analyzed should include the following:

a.   The numbers of sex offenses, broken down by crime category, that are reported to BPD, identifying, where applicable, incidents involving co-occurring crimes (i.e., sexual assaults involving domestic violence or stalking);

b.   The number of offenders, both the totals and broken down by gender (i.e., male, female, transgender, queer or non-binary) and the relationship of the offender to the victim (i.e., stranger or non-stranger);

c.   The number of victims/complainants, both the totals and broken down by gender, race, and age (i.e., under 18 and 18 and older);

d.   The total number of sex offense reports categorized as founded and unfounded, broken down by the BPD unit categorizing the report;

e.   The total numbers of sex offense reports, broken down by the BPD unit handling the report, that (1) were cleared by arrest, (2) were cleared by exceptional clearance, including by clearance category, (3) remain open and inactive, and (4) were referred to the Baltimore City State's Attorney's Office for the filing of charges; and

f.   Data about the processing of forensic medical exams (often referred to as "rape kits"), including: (1) date of reported incident; (2) date of SAFE exam; (3) date detectives request lab analysis of SAFE exam; (4) date detectives receive lab analysis results.

## C. Community Collaboration and External Oversight

265.     In a manner permitted by law, BPD shall share the information in Paragraph 264 with the public, and with its community and law enforcement partners and the Sexual Assault Response Team ("SART"), to promote public safety and better support the needs of sexual assault victims.

266.     To promote a coordinated, multidisciplinary, and victim-centered response to victims of sexual assault, the City and BPD will evaluate and revise as necessary the policies and protocol governing the functioning of Baltimore's SART to ensure that it is empowered to engage in periodic systems reviews to improve services provided to victims of sexual assault and ensure they are victim-centered, subject to the limits of applicable law.  The SART will continue to be permitted to review cases in accordance with the MOU, including samples of open cases and cases that are classified as "unfounded".

## XII.   TECHNOLOGY

### A. Development and Implementation of Updated Technology

267.     BPD will provide its officers with the Technology necessary to implement the Material Requirements of this Agreement, as set forth in this Section.  The Parties agree that the data collection and review required by this Agreement is dependent upon BPD acquiring or developing the appropriate technology for such data collection and review.

268.     Within the first year of the Effective Date of the Agreement, BPD will complete a comprehensive study of the Technology (the "Resource Study") necessary to satisfy the Material Requirements of this Agreement.  The design, objectives, and deadline for completion of the Resource Study shall be set forth in the Monitoring Plan.

269.     BPD will develop a resource plan ("Resource Plan") for adopting the Technology necessary to satisfy the Material Requirements of this Agreement.  The deadline for submitting the Resource Plan shall be set forth in the Monitoring Plan.

270.     The Resource Study and the Resource Plan shall address how BPD can best and most cost-effectively:

   a.   Provide BPD personnel with an adequate number of computers or equivalent electronic devices for accessing and processing data as necessary to discharge their duties;

   b.   Provide BPD personnel with access to law enforcement databases as necessary to discharge their duties, containing:

      i.      Basic information about the civilians with whom they interact;

      ii.     The call history associated with the locations to which they are responding;

      iii.    Warrant and driver's license information;

      iv.     Information concerning restraining orders.

   c.   Create a centralized data and records management system that is:

      i.      Capable of storing, in an easily searchable manner, all data required by this Agreement;

      ii.     Capable of using unique numbers or other identifiers to track all officer activities and supervisory reviews that are required by this Agreement.  For example, the system shall be capable of using a single unique identifier to identify all documents related to a pedestrian or vehicle Stop, any Search or Arrest connected to that

Stop, any Use of Force connected to the Stop, Search, or Arrest,

and all reviews, investigations, and complaints arising from a Stop,

Search, Arrest, or Use of Force;

d. Develop an Early Intervention System ("EIS") as described in Section XIII(E).

271.   In conjunction with the Monitor and with DOJ, BPD will ensure that its policy on body-worn cameras addresses the use of cameras, retention of videos, access and privacy issues, the use of recordings as evidence in force and complaint reviews, and the use of recordings for other criminal justice purposes (such as evidence in prosecutions or evidence required to be turned over to defense attorneys).  At a minimum, BPD's body-worn camera policy will:

a. Clearly state which officers are required to use body-worn cameras and under which circumstances;

b. Specify the location(s) on the body where the camera should be worn;

c. Require officers to articulate in writing their reasons for failing to record an activity that BPD policy otherwise requires to be recorded;

d. Require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible;

e. Establish a protocol governing the download, supervisory review, and retention of body-worn camera recordings;

f. Require officers to document the existence of any camera footage on all required reports, and require officers to report to their supervisor, and document in writing, any non-recorded event that should have been recorded under BPD policy, as well as any interruptions or terminations of recordings; and

g. Require periodic random review and auditing of officers' videos to assess whether the officer activity was conducted consistent with law and BPD policy.

272. To the extent that BPD already provides, or is in the process of providing, the items specified above, nothing in this Agreement requires BPD to delay its procurement or use of that technology. The Resource Plan shall identify any of the items specified in Paragraph 270 that BPD either (a) already provides or (b) is in the process of providing to officers. For technology that BPD is in process of providing, the Resource Plan shall indicate how BPD will finish acquiring or implementing the technology.

273. BPD shall submit the Resource Plan to the Monitor and DOJ for review and approval based on the schedule set forth in the Monitoring Plan. DOJ and the Monitor shall assess whether the Resource Plan sets out a reasonable and cost-effective plan for complying with the Material Requirements of this Agreement. If an objection is noted by either DOJ or the Monitor, DOJ, the Monitor, and BPD shall meet and confer to resolve any objections. If the objections are not resolved, the Parties may seek relief from the Court.

274. BPD will employ its best efforts to implement the Resource Plan over the period of time set forth in the approved Monitoring Plan.

275. BPD will annually update the Resource Plan to take into account the needs of BPD regarding the Material Requirements of this Agreement.

276. When acquiring any new type of equipment or technology that is used in enforcement activities or oversight of such activities, including records management systems, computers and mobile data terminals, service weapons and less lethal weapons, and surveillance or tracking equipment, BPD shall timely disclose to the public on its website or disclose to any civilian oversight entity agreed upon by the Parties: (1) the type of new equipment or technology

sought; and (2) BPD's intended use of the equipment.  BPD shall make these disclosures prior to deploying the equipment or technology.  The disclosure requirement shall not apply when BPD is merely purchasing an additional quantity of an existing technology, such as additional patrol vehicles.

277.    For equipment or technology procured through the public process conducted by the Baltimore City Board of Estimates, BPD may satisfy the requirements of the preceding paragraph by identifying the new type of equipment or technology on BPD's website and providing a link to relevant procurement information maintained by the Board of Estimates.

278.    If BPD seeks to acquire or develop new technology without advising the public, BPD shall timely disclose the technology to DOJ and the Monitor and explain why BPD believes non-disclosure is necessary to achieve law enforcement objectives.  If the Parties are unable to resolve any disagreement about the necessity of public non-disclosure of a particular technology, DOJ may seek an order from the Court to have the technology disclosed to the public.

## XIII.  SUPERVISION

### A.    Policies Generally

279.    The Parties recognize that sound, clear, and fair policies and procedures are the foundation of constitutional policing.  The Parties further recognize that officers rely on clear, accessible, and feasible policies in order to effectively do their jobs and preserve public safety. BPD policies must be developed, distributed, and updated in a manner that incorporates public and officer input.

280.    Any and all new policies or policy revisions required by this Agreement will be plainly written, logically organized, and use terms that are clearly defined, and written in language that is accessible to officers and community members without formal legal training.

281.    BPD will ensure that it provides all specialized units with policies and protocol to govern their functions.

282.    BPD will design a process to ensure that officers affected by newly created or revised policies are given an opportunity to meaningfully review and provide input before the policies are finalized.  This process will include specific procedures to solicit input from both supervisors and line officers, as well as the employees who will be most affected by the policies, and employees with expertise in the policy area.

283.    BPD will work collaboratively with the Monitor and DOJ on the creation of or revisions to policies relating to the Material Requirements of this Agreement.  The Monitoring Plan shall specifically include time for a period of collaboration ("Collaboration Period").  All policies related to the Material Requirements of this Agreement are subject to review and approval by the Monitor and DOJ prior to publication and implementation. Policies that do not relate to the Material Requirements of this Agreement, or revisions that are nonsubstantive, are exempt from collaboration and approval, as well as from the posting and public comment period described below.

284.    BPD will submit all newly created or revised policies to the Monitor and DOJ prior to publication and implementation.  If BPD believes that a newly drafted policy or revision is nonsubstantive or falls outside the scope of this Agreement, it will indicate as such as part of its submission.  For policies that are substantive and related to the Material Requirements of this Agreement, Monitor and DOJ approval will be deemed granted if neither the Monitor nor DOJ responds substantively within 30 days of the submission.  Notification that either the Monitor or DOJ will engage collaboratively on drafting or revising the policy shall be deemed a substantive response.

285.     After the Collaboration Period, BPD will post any new or revised policy that relates to the Material Requirements of this Agreement on its website and provide the public and its officers an opportunity to comment within a 30 day period ("the Comment Period").  In response to any comments, BPD shall consider, in its discretion, whether any further revisions are appropriate, or whether to resume the Collaboration Period.  Changes implemented in response to public or officer comment will remain subject to approval by the Monitor and DOJ prior to publication and implementation.

286.     If circumstances demand that a policy or procedure requires an urgent revision or clarification (e.g., due to a significant change in law), the BPD Commissioner may issue an appropriate temporary memorandum or directive following notice and submission of such to the Monitor and DOJ.  Nothing in this provision will exempt a policy or procedure that relates to the Material Requirements of this Agreement from the Collaboration Period, Comment Period, review, or final approval by the Monitor and DOJ.

287.     BPD agrees to re-review each new or revised policy or procedure that relates to the Material Requirements of this Agreement after it has been in effect for a year and before 18 months to ensure it provides clear guidance to officers and is consistent with this Agreement and current law.  When the Monitor gives BPD notice of a significant policy deficiency, the BPD agrees to collaborate with the Monitor to review and remedy any deficiency.

288.     Officers and employees will have access to a readily usable electronic format of all the policies (e.g., accessible through an electronic device within department vehicles or carried on the officer's person).

289.     BPD agrees that all policies will continue to be made available to the public electronically on BPD's website.  The BPD agrees to publish each new or revised policy or

procedure on its website promptly upon implementation.  There will be reasonable exceptions for policies that are law enforcement-sensitive, such as procedures regarding undercover officers or operations.

290.    BPD agrees to revise policies required by this Agreement in a timely manner to reflect significant changes in the law, in accordance with the procedures provided by this Agreement.

## B.    Training Generally

291.    The parties agree that proper, effective and comprehensive training is a necessary prerequisite to constitutional policing.  The Parties agree that BPD must establish and prioritize a robust training program to ensure that officers and other employees gain full understanding of BPD policies, legal requirements, and practical policing techniques.  The Parties recognize that under state law certification of training may be subject to approval by the Maryland Police Training and Standards Commission (the "MPTSC").

292.    With BPD's assistance, the City will ensure that BPD's training program and academy are reasonably funded.  In consultation with the Monitor, the City, and DOJ, BPD will create a plan for renovating and updating training facilities in a cost-effective and reasonable manner to accomplish the training requirements of this Agreement, including the provision of information technology resources.  All of the training requirements of this Agreement are set forth in the Training Matrix, Appendix A.  The information technology resources required by this Agreement shall be determined in accordance with Section XII, Technology.

293.    BPD will ensure that an adequate number of qualified instructors are assigned to the training academy.

294.     BPD will develop a written Training Plan for comprehensive in-service and supplemental training for officers and for enhancing BPD's field training with a revised Field Training Officer ("FTO") program.  The Training Plan will be developed in consultation with the Monitor and DOJ, and will be consistent with the Monitoring Plan.  The Training Plan will:

    a.  Identify training priorities, principles and broad goals consistent with this Agreement and the substantive training requirements it contains;

    b.  Include a plan for delivering supplemental basic training, remedial training, in-service training, and roll-call training as necessary to provide the relevant training required by this Agreement;

    c.  Coordinate the topics of supplemental basic training and in-service training with FTO training;

    d.  Establish the frequency and subject areas for supplemental basic and in-service training;

    e.  Develop a plan for annual in-service training;

    f.  Identify available training delivery and related resources, as well as unmet needs;

    g.  Coordinate with the City and others to assist in obtaining necessary training resources;

    h.  Where appropriate, provide time for obtaining any  required approval from the MPTSC; and

    i.  Establish a method for assessing the content and delivery of training, including training provided by outside instructors.  This method will allow for the measurement and documentation of trainee reaction to, and satisfaction with, the training they received, and learning as a result of training, including the extent to

which trainees are applying the knowledge and skills acquired in training to their jobs.

295.    BPD, pursuant to the Training Plan and in consultation with the Monitor and DOJ, will review all training curricula and lesson plans for consistency, quality, and compliance with applicable law, BPD policy, and this Agreement.  BPD will ensure that best practices in adult learning, scenario-based training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into training delivery.  BPD will advise the Monitor and DOJ regarding training that can be delivered in roll-call or online, or in large class formats, as opposed to training that will require more intensive delivery. BPD will also assess instructor qualifications and testing materials.

296.    BPD will ensure that all instructors responsible for training are proficient in their subject matter and are qualified, including, as applicable, previous instructor experience, training in instruction and adult learning techniques, and instruction skills.  In addition, BPD will consider an officer's performance evaluations, past performance as a police officer, and disciplinary history in selecting instructors.

297.    BPD will actively seek out and retain qualified instructors from outside BPD to supplement the skills of its in-house training staff and adjunct instructors.  As appropriate, BPD will incorporate experts, community-based instructors, and guest speakers, including mental health service providers and consumers, judges, prosecutors, crime victims, academics in the field of criminal justice, community resource providers, and community members, including Youth, to participate in relevant courses.

298.    Where necessary to comply with this Agreement, BPD will develop or adopt supplemental basic training and in-service training curricula and lesson plans.  All new curricula

and lesson plans will be reviewed and approved by the Monitor and DOJ prior to implementation.  Any training required by this Agreement that is conducted by an outside instructor or non-BPD entity will be reviewed and approved by the Monitor and DOJ prior to implementation.  Approval of curricula and lesson plans submitted to the Monitor and DOJ will not be unreasonably withheld and will be deemed granted if there has been no substantive response within 30 days.  Notification that either the Monitor or DOJ will review the training and provide commentary, or similar, shall be deemed a substantive response.

299.    BPD will review and update BPD's Training Plan on a periodic basis.  To inform these updates,  BPD will conduct a needs assessment, taking into consideration:  trainee-to-instructor ratios; trainee feedback and evaluations of trainings; trends in misconduct complaints; problematic uses of force; data concerning stops, searches and arrests; analysis of officer safety issues; and changes in the law or BPD policy.

300.    In order to ensure that all trainings are adequately documented, BPD will develop and implement a training data tracking system in consultation with the Monitor and DOJ. The training data tracking system will include a central and comprehensive database containing information on trainings attended by each officer, including in-service training and remedial training. The data tracking system will include information on which officers require trainings, and class attendance, including missed classes. The data tracking system will additionally include performance data and trainees' results on any tests or scored evaluations. The system will be readily available to supervisors throughout the Department to facilitate their supervisory duties. BPD will ensure that adequate resources are provided to maintain the system up to date and review the data contained therein.

### C.       Field Training Officer Program

301.      BPD will develop a plan to enhance its FTO program for new recruits in order to attract and retain sufficient numbers of suitable FTO officers.  The FTO plan will incorporate established standards for police training officer programs, including effective methods of adult education, and problem-based learning methods. BPD's plan will include eligibility criteria and methodology to select FTOs based on written applications, performance evaluations, previous performance as police officers, and disciplinary histories.  The plan will include a mechanism for recruits to provide confidential evaluations regarding the quality of their FTO training.

302.      BPD agrees to ensure that all FTOs receive a minimum of 40 hours of initial training, as well as necessary refresher training, consistent with the Training Plan, after one year of participation in the program. The training will address management and supervision; community-oriented policing; effective problem- solving techniques; and field communication. FTOs will be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing and teaching community-oriented policing, and solving problems effectively.  BPD will maintain current documentation of FTOs' evaluations and training in the training data tracking system, and remove or add FTOs as appropriate and necessary.

### D.       Supervisory Character, Duties and Training

303.      BPD will ensure that supervisors to provide close and effective supervision and accordingly shall:

a.   Establish and enforce throughout the department the expectation that officers will police in a manner that is consistent with the Constitution and other laws, and BPD policy;

b. Provide leadership, counseling, direction, and support to officers as needed;

c. Lead efforts to increase public trust;

d. Respond to, document, review and investigate stops, searches, Citations, arrests, uses of force, and other officer conduct as required by BPD policy and this Agreement;

e. Identify misconduct and ensure that it is adequately addressed through corrective action, training, or referral for discipline; and

f. Identify training and professional development needs and opportunities on an individual, squad, and department-wide level.

304. BPD will ensure that supervisors document the performance of their supervisory duties in BPD's records management system or the Early Intervention System, as appropriate.

305. Supervisors shall be required to document, at a minimum:

a. All disciplinary referrals and non-disciplinary counseling;

b. All occasions where supervisors respond to the scene as required by policy;

c. All reviews of officer conduct, including reviews of use of force and other reports as required by BPD policy and this Agreement; and

d. Any training or professional development needs supervisors identify for officers, as well as the specific actions they take in response to those needs.

306. Supervisors' performance evaluations and promotions will be based upon the fulfillment of their supervisory duties.

307. The failure to fulfill supervisory duties will result in corrective action, training, or discipline, as deemed appropriate by the Commissioner.

308.    Effective, comprehensive supervisory training prior to the start of a promotional assignment is essential to successful supervision.  BPD will develop and implement mandatory supervisory training for all new and current supervisors. This training for new and current supervisors may be different, but both will include the following topics:

a.  Techniques for effectively guiding and directing officers and promoting effective and constitutional police practices;

b.  De-escalating conflict;

c.  Evaluating written reports, including identification of canned or conclusory language that is not accompanied by specific facts;

d.  Investigating officer uses of force;

e.  Building community partnerships and guiding officers on this requirement;

f.  Understanding supervisory tools such as the Early Intervention System and body–worn cameras;

g.  Responding to and investigating allegations of officer misconduct;

h.  Evaluating officer performance;

i.  LEOBR and Department disciplinary system requirements, and non-punitive corrective actions; and

j.  Monitoring use of force to ensure consistency with policies and legal updates.

309.    The supervisory training for new supervisors will include a field training component that will allow newly promoted supervisors to better understand the requirements of their positions.

310.     All sworn supervisors will receive annual in-service training concerning management, which may include updates and lessons learned related to the topics covered in the initial supervisor training and other areas covered by this Agreement.

311.     BPD will hold supervisors directly accountable for the quality and effectiveness of their supervision, including whether supervisors identify and effectively respond to misconduct and ensure that officers effectively engage with the community.

### E.     Early Intervention System

312.     BPD will design, undertake, and report on an analysis of existing systems used to record, track, review, and evaluate officer activity.

313.     BPD will upgrade its Early Intervention System ("EIS") as required by this Agreement and in accordance with the timeframe set forth in the Resource Plan.  BPD will ensure that the EIS functions as a flexible management tool that promotes supervisory awareness and proactive identification of potentially problematic behavior among officers, and facilitates the delivery of individualized interventions to correct identified problematic or potentially problematic officer behavior.

314.     BPD may either enhance the current data management system or contract with another qualified service provider to implement the EIS relational database.  BPD will ensure it has a reasonable and cost-effective system to fulfill the requirements of the EIS. The City will ensure BPD has reasonable and cost-effective funding levels to implement and maintain the EIS, including its ongoing hardware and support requirements.

315.     The EIS will be:

    a.     Customizable to BPD's particular needs;

    b.     Adaptive as new information becomes available;

    c.   Able to be audited and validated to improve accuracy, reduce false outcomes, and timeliness of intervention;

    d.   Able to prioritize officers for intervention; and

    e.   Able to assess the efficacy of the intervention.

316.    The EIS will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve department-wide, district-wide, and unit-wide data, as well as data for each officer.  In consultation with the Monitor and to be approved by the DOJ pursuant to the Paragraph 324, BPD will develop policies setting forth the specific information that the EIS will capture, as well as data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation, audits, access to the system, and confidentiality of personally identifiable information.

317.    The EIS relational database will capture all information necessary to ensure supervisory awareness and early identification of potentially problematic individual and department-wide conduct or signs of stress or other behavior that would benefit from being addressed.  The EIS will include appropriate identifying information for each sworn officer (e.g., name, badge number, shift, and supervisors).  Among the other information that will be captured will be:

    a.   All uses of force, broken down by level and type;

    b.   All injuries and deaths to persons in custody;

    c.   Vehicle pursuits and traffic collisions involving BPD equipment;

    d.   All instances in which force is used and a subject is charged with Failure to Obey, Resisting Arrest, Assault on an Officer, Disorderly Conduct, Trespassing, or similar charges; or a Quality-of-Life Offense, as delineated in BPD Policy;

e.  All instances in which an officer issues three or more Citations during a single encounter;

f.  Violations of BPD's body-worn and in-car camera policies;

g.  All instances in which BPD learns:

   i.  That a declination to prosecute any crime or municipal code violation was based upon  concerns of the Prosecutor about an officer's credibility;

   ii.  That a court has made a negative credibility determination regarding a BPD officer; or

   iii.  That a motion to suppress evidence was granted on the grounds of a constitutional violation by a BPD officer;

h.  All misconduct complaints, including the disposition of each allegation;

i.  Judicial proceedings where an officer is the subject of a Full Order of Protection or other restraining order, which BPD policy shall require officers to report;

j.  All criminal proceedings initiated against an officer, as well as all civil or administrative claims filed with or against the BPD or its agents that result from the actions of sworn BPD personnel;

k.  All disciplinary action taken against BPD officers;

l.  All non-disciplinary corrective action required of BPD officers;

m.  All awards and commendations received by BPD officers, including those received from civilians;

n.  Officer sick leave usage, especially in concert with regular days off and holidays; and

o.   Training record for each officer.

318.    All required information shall be entered into the EIS database in a timely, accurate, and complete manner by BPD supervisors and other responsible individuals.  All information captured within the EIS database will be organized and readily accessible in a manner that facilitates identification of potentially problematic officer behavior before it occurs.

319.    The EIS will allow for and require close monitoring of officer conduct, including Peer-Group Analysis between officers with similar assignments and duties. BPD will set and implement levels for supervisory review based on the EIS indicators, either cumulatively, separately, or both. The BPD will ensure that once a review of a particular officer has been triggered, each subsequent event indicating increased risk to the officer will trigger supervisory review.  The Monitor and DOJ will review and approve BPD's plan for supervisor review levels. In addition to supervisory review upon reaching a particular level based on EIS indicators, the BPD will ensure that BPD command staff and other supervisors regularly review EIS data to evaluate the performance of officers across all ranks, units, and shifts.

320.    The BPD will ensure that BPD command staff collect and, at least quarterly, analyze EIS information related to supervisor, squad, and officer trends.

321.    The BPD will ensure that BPD first line supervisors and Lieutenants review EIS data for all officers under their direct command at least monthly, and whenever an officer first comes under their supervision. At least quarterly, supervisors will review broader, pattern-based reports.

322.    BPD will ensure that all supervisors are trained on how to use the EIS system, interpret its outputs, and perform appropriate interventions.

323.     BPD will retain or internally develop the expertise necessary to implement

individualized interventions to respond to identified problematic or potentially problematic

officer conduct. Non-disciplinary interventions will be timely implemented and designed to

assist officers in avoiding or correcting potentially problematic behavior. All interventions will

be documented in writing and entered into the EIS.  BPD will review, evaluate, and document in

writing the progress and effectiveness of the intervention strategy.

324.     BPD will develop and implement a comprehensive protocol for using the updated

EIS, to be approved by the Monitor and DOJ in accordance with the schedule specified in the

Monitoring Plan. This information will include data storage, data retrieval, reporting, data

analysis, pattern identification, supervisory use, supervisory/departmental intervention,

documentation, audits, access to the system, and confidentiality of information protected by law.

325.     BPD will properly maintain all necessary equipment and software sufficient to

permit maintenance, and use of the EIS as set out in this Agreement and BPD policy.  BPD will

maintain all officer specific information in the EIS for at least five years following the officer's

separation from BPD, unless prohibited by law.  Information necessary for anonymized

aggregate statistical analyses will be maintained for 20 years.

326.     In addition to providing training to supervisors and others directly responsible for

using the EIS, BPD will ensure that all BPD officers are provided with information regarding the

scope and function of the EIS within 60 days of its implementation.

327.     To ensure the EIS accounts for the unique operations of BPD and the needs and

interests of its supervisors, BPD will create an EIS specific compliance plan, with input from the

Monitor and DOJ. The plan will, at minimum, set forth a clear explanation of how the different

types of data within EIS will be related to each other; what hardware and information

architecture will be required to achieve that; what source systems will supply the data; what internal or external resources will be required; which BPD personnel will be responsible for implementation; and what the proposed timeline for implementation will be.

### F.    Ongoing Assessment and Improvement

328.    BPD will develop protocols for annually evaluating the effectiveness of the supervision of its officers.  As part of this assessment process, the BPD will identify deficiencies and implement and document appropriate corrective action.

## XIV.  MISCONDUCT INVESTIGATIONS AND DISCIPLINE

329.    A robust and well-functioning accountability system in which officers are held to the highest standards of integrity is critical to BPD's legitimacy, and a priority of the Department.  A well-functioning accountability system is one in which BPD: openly and readily receives complaints reported by civilians and officers and fully, fairly, and efficiently investigates them; supports all investigative findings by the appropriate standard of proof and documents them in writing; holds accountable all officers who commit misconduct pursuant to a disciplinary system that is fair, consistent, and provides due process; and treats all individuals who participate in BPD's internal disciplinary process—including complainants, officers, and witnesses—with respect and dignity.  To achieve these outcomes, the City and BPD will implement the requirements set out below within their respective spheres of control.

### A.    BPD's Office of Professional Responsibility

330.    The OPR shall continue to be physically located in a facility that is separate from other BPD buildings, is easily accessible to the public and has space for receiving members of the public and for permitting them to file complaints.

331.     Employees working in OPR will not be assigned to duties that may create any conflict of interest, or appearance of conflict of interest, with their investigatory responsibility.

332.     The OPR will have sufficient resources and qualified staff to successfully fulfill its mission.

333.     The OPR will have the following powers and authority:

    a.   The OPR will investigate all complaints of officer misconduct and will coordinate with CRB on all complaints within CRB jurisdiction that CRB is also investigating or reviewing;

    b.   The OPR will oversee investigations into allegations of misconduct that do not involve police-civilian interactions. These investigations are currently centralized, and may, after appropriate policies and training have been developed, be conducted by supervisors at the officer's District or Unit;

334.     BPD will ensure that the OPR reviews and revises as necessary its policies and protocols to ensure that investigators and supervisors are provided with sufficient guidance to effectively fulfill their mission.

**B.     Complaint Intake, Classification, and Communication with Complainants**

335.     BPD will review and revise as necessary its policies governing OPR to ensure its processes for complaint intake, classification, and tracking, and its processes for communicating with complainants, to comply with the terms of this Agreement.

336.     BPD will ensure that the complaint intake process is open and accessible for individuals who wish to file complaints about BPD officers' conduct:

a. BPD will ensure individuals may make complaints in multiple ways, including in person or anonymously, by telephone, online, and through third parties to ensure broad and easy access to its complaint system:

    i. BPD will make complaint forms widely available at public buildings and locations throughout Baltimore City, and will make them available to community groups to provide to their members;

    ii. Complaint forms will be made available, at a minimum, in English and Spanish.  BPD will comply with the law to make complaints accessible to people who speak other languages (including sign language).  The fact that a complainant does not speak, read, or write English, or is deaf or hard of hearing will not be grounds to decline to accept or investigate a complaint;

    iii. BPD will ensure that a free, 24-hour hotline exists for members of the public to make complaints, and will clearly display this information on its website and other BPD printed materials;

b. BPD will ensure that all complaints they receive about BPD officer conduct will be accepted and investigated whether submitted by a BPD employee or a member of the public; whether submitted verbally or in writing; in person, by phone, or online; whether submitted by a complainant, someone acting on the complainant's behalf, or anonymously;

c. BPD will document all complaints in writing;

d. BPD will ensure that complaints about officers in specialized units are accepted, even if the complainant could not identify the officer's name or badge number;

e. BPD's complaint form will not contain warnings about the potential criminal consequences for filing false complaints;

f. BPD will coordinate with CRB to develop a unified complaint form that will satisfy the requirements of state law and this Agreement;

g. BPD will ensure all officers carry complaint forms in their BPD vehicles, and provide complaint forms to individuals upon request.  Alternatively, BPD may provide a card, approved by the Monitor and DOJ, with information about how to file a complaint electronically instead of a complaint form to comply with the requirements of this paragraph.  BPD will ensure officers will provide their name and badge number upon request;

h. The City will ensure that civilian complaints of police misconduct it receives through other existing systems, such as CrimeStoppers tip line, the Mayor's office, or the Civilian Review Board, are timely forwarded to the OPR.  BPD will ensure that these complaints, where appropriate, will also be timely forwarded to the CRB;

i. BPD will ensure that individuals who make complaints in person receive a copy of their complaint form upon intake.  Each complaint form will prominently display a unique tracking number or barcode.  This tracking number or barcode will be linked with any case number ultimately assigned to the complaint, if any.  Complainants may use the barcode or tracking number to obtain information about the status of the investigation.

337.     BPD shall ensure that there are adequate protocols to encourage and protect officers who report violations of policy by other officers and that every BPD officer, regardless

of rank, who observes or becomes aware of any act of misconduct by a BPD officer against a member of the public shall report the incident to a Supervisor or to the OPR for appropriate documentation and investigation. BPD will ensure:

    a.  Where an act of misconduct is reported to a Supervisor, the Supervisor shall timely document and report the information to the OPR;

    b.  The failure to report an allegation of misconduct, as defined in this Agreement, will be considered misconduct, and will be subject to discipline and/or appropriate corrective action based on the seriousness of the conduct;

    c.  All forms of retaliation, interference, intimidation, coercion, or adverse action against any person, civilian or sworn officer, who, because that person reports misconduct, attempts to make or makes a misconduct complaint, or cooperates with an investigation of misconduct, are strictly prohibited and shall result in discipline, demotion, and/or appropriate corrective action based on the seriousness of the conduct;

338.   BPD complaint classification will be based solely on the nature of the allegations and the facts alleged in such allegations:

    a.  OPR will develop a protocol to ensure that all complaints are properly classified. The protocol will list all allegation types and provide examples of officer conduct that fits each allegation type. The protocol will be publicly available on BPD's website;

    b.  A commander in BPD's OPR will coordinate the initial classification of internal complaints received by BPD employees and ensure they are consistent with BPD's complaint classification protocol;

c.  Changes to a complaint's classification must be documented in writing and approved by a commander in OPR;

d.  In accordance with Public Local Law, OPR will promptly refer civilian complaints to the Civilian Review Board, pursuant to the protocol developed under Paragraph 339;

e.  Upon being notified of any allegation of misconduct through an internal or external complaint, the OPR will, within 72 hours, make an initial determination of the classification of the alleged offense and will assign a misconduct investigator;

f.  When an allegation of misconduct contains multiple categories of offenses or multiple separate policy violations, all applicable policy violations shall be charged, but the most serious violation shall be used for the purposes of classification and to determine whether OPR will investigate.  Exoneration for the most serious offense will not preclude discipline for less serious offenses stemming from the same misconduct;

g.  The OPR will require that all allegations that, if true, would violate BPD policy, are captured and classified appropriately even if the complainant does not affirmatively identify the violation;

h.  BPD will require that at any time an investigator determines that there may have been additional misconduct or violations beyond those initially alleged, OPR shall take all necessary steps to ensure that such misconduct is fully and fairly documented, classified, and investigated;

    i.   If supervisors in districts or units conducting investigations into misconduct identify allegations of misconduct that, under BPD policy, should be investigated by OPR, the investigator shall promptly notify OPR;

    j.   If a supervisor believes that the principal of an investigation may have committed a violation that is criminal, he or she shall promptly notify the OPR.

339.    BPD and CRB will each develop a protocol delineating each agency's responsibilities for complaint intake, classification, investigation and review, and how the agencies will interact throughout the investigation and disciplinary process.  The protocols will provide that:

    a.   The CRB will coordinate the initial classification of complaints received from sources other than BPD;

    b.   The CRB will have information sufficient to determine whether a civilian complaint falls within the jurisdiction of the CRB, regardless of its source or initial classification; and

    c.   Changes to a complaint's classification must be documented in writing and approved by the CRB Director or the OPR Director.

340.    OPR shall develop a system to document and address allegations it receives concerning BPD officer conduct from the State's Attorney's Office or by a judicial officer during a civil or criminal proceeding.  Such allegations will be documented, tracked, and assessed for further investigation.  Any decision to decline investigation shall be documented in writing.

341.    BPD will ensure that, in response to complaints about officers under their command, supervisors respond to the scene, document the complaint, and report it to OPR:

a. If an individual indicates to an officer that they would like to make a complaint about that officer, the officer will promptly inform their supervisor and ask the supervisor how long it would take them to respond to the scene. The officer will then inform the individual that their supervisor can respond to the scene to assist the individual in filing a complaint, if the individual desires and is willing to wait for the supervisor to arrive;

b. If the individual desires, the supervisor will respond to the scene, assist the individual, and provide the individual with a copy of the completed complaint form. Otherwise the officer will provide the complainant with information to assist them in filing a complaint, including a copy of the completed complaint form;

c. An officer shall not be required to delay taking law enforcement action while they wait for the supervisor to arrive, including, where appropriate, making an arrest;

d. Where a supervisor receives a complaint alleging that misconduct has occurred, the supervisor shall gather all relevant information and evidence and provide the information and evidence to the OPR. This may include identifying witnesses and their contact information; video or photographic evidence; and any other physical evidence. All misconduct complaints shall be referred to the OPR by the end of the shift in which the misconduct complaint was received, absent exceptional circumstances.

342.   In the course of investigating a civilian complaint, the misconduct investigator will send periodic written updates to the complainant by mail and by email, if the complainant provides an email address:

a. Within seven days of receipt of a complaint, the misconduct investigator will send non-anonymous complainants a written notice of receipt.  The receipt shall include the tracking number or barcode originally assigned to the complaint, along with any other case number subsequently assigned, if applicable, and the allegations being investigated.  The notice will inform the complainant how he or she may inquire about the status of a complaint.  The notice will not contain any language that could reasonably be construed as discouraging participating in the investigation, such as a warning against providing false statements or a deadline by which the complainant must contact the investigator;

b. Periodic updates will be mailed or emailed to the complainant; and

c. BPD shall ensure that all investigators communicate with complainants in a professional and respectful manner; investigators who fail to do so shall be subject to discipline, demotion, and/or appropriate corrective action based on the seriousness of the conduct.

### C.  OPR Administrative Misconduct Investigations

343.  BPD will ensure that misconduct investigators will conduct objective, comprehensive, and timely administrative investigations of all allegations of officer misconduct. All findings will be based on the appropriate standard of proof.  BPD will clearly delineate these standards in policies, training, and procedures and accompany them with detailed examples to ensure misconduct investigators properly apply them.

344.  In each misconduct investigation, investigators shall ensure that they:

a. Conduct investigations designed to determine the facts;

b.  Promptly identify, collect, and consider all relevant evidence, including any audio or video recordings;

c.  Take all reasonable steps to locate and interview all witnesses, including civilian witnesses and attempt to interview any civilian complainant or witness in person at a time and place that is convenient and accessible for the complainant or witness;

d.  Audio record all interviews, and video-record where possible;

e.  Make all reasonable efforts to identify the officer if the complainant could not identify the officer's name;

f.  Evaluate all relevant BPD officer activity in the incident and any evidence of potential misconduct uncovered during the course of the investigation, whether or not the potential misconduct was part of the original allegation;

g.  Consider patterns in officer behavior based on disciplinary history – including complaints in which allegations were not sustained, if available, and officer training records;

h.  Make credibility determinations, as appropriate, including;

    i.   Making credibility determinations about civilian, officer and witness statements based on independent, unbiased, and credible evidence;

    ii.  An officer's statement must be critically evaluated like any other evidence.  Misconduct investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the officer or because the witness or

complainant has a criminal history, but those factors should be considered along with other indicia of credibility;

    iii.    In conducting the investigation, misconduct investigators may take into account the record of any witness, complainant, or officer who has been determined to have been deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

i.  Complete their administrative investigations within 90 days of the initiation of the investigation.  Any request for an extension of time must be approved in writing by the Director of the OPR;

j.  Make all reasonable efforts to resolve material inconsistencies between officer, complainant, and witness statements; and

k.  For each allegation of misconduct, explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:

    i.    "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the accused officer;

    ii.    "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;

    iii.    "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;

    iv.      "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate BPD policies, procedures, or training;

    v.      BPD shall discontinue use of the disposition "administratively closed".

345.    BPD shall conduct a sexual misconduct incident review at the conclusion of every investigation of a sexual misconduct complaint against a BPD officer or employee concerning conduct against a non-BPD employee, unless the report has been determined to be unfounded. Such review shall ordinarily occur within one month following the conclusion of the investigation of the allegation.  The review team shall include upper-level management officials, with input from line supervisors and investigators.  The review team shall:

    a.  Consider whether the report or investigation indicates a need to change BPD policies or practices to better prevent, detect, or respond to sexual misconduct;

    b.  Consider where the incident occurred and the staffing in that area to assess whether physical or other conditions in that area may enable abuse; and

    c.  Prepare a report of its findings, including any recommendations for improvement. This report shall be provided to BPD leadership.

346.    BPD shall document its reasons for implementing or not implementing the recommendations of the sexual misconduct incident review team.

347.    BPD will develop and implement policies to ensure that the officer accused of misconduct receives notice that he or she is under investigation:

a.  Officers under investigation will not receive notice if it would jeopardize the investigation, and will only receive notice prior to being formally interviewed by OPR;

b.  Such notice will comport with due process and the law, and will contain the nature of the investigation, and will not contain any information that may unnecessarily jeopardize the investigation;

c.  When BPD provides notice to officers that they are under investigation, such notice will include provisions prohibiting officers under investigation from speaking to witnesses or complainants, reviewing police reports (other than reports about the incident authored by the officer) or body camera footage, or taking other actions that could jeopardize the investigation, until notified by BPD that they are permitted to do so;

d.  BPD shall require its employees to cooperate with administrative investigations, including appearing for an administrative interview when requested by a BPD investigator, and providing all relevant documents and evidence under the person's custody and control.  Supervisors shall be notified when an officer under their supervision is summoned as part of a misconduct complaint or internal investigation and shall facilitate the officer's appearance, absent extraordinary circumstances, documented in writing.  If a criminal investigation has been commenced, the head of the prosecuting agency may request that an interview of an officer or employee be postponed during the course of the criminal investigation.  If such a request is made the BPD Commissioner or his/her

designee will determine whether the administrative interview will be postponed.

This determination will be documented in writing.

348.    Interfering with a misconduct investigation, colluding with other individuals to undermine an investigation, including intentionally withholding evidence or information from a misconduct investigator, will be a terminable offense.  BPD will ensure that officers under investigation do not review any investigative files, reports (except for reports about the incident authored by the officer), or other evidence, including body camera footage, unless publicly released by BPD, or other photographic evidence, related to an incident under investigation, in which they are the principal or a witness in an investigation, until notified by BPD that they are permitted to do so.

349.    BPD will ensure that misconduct investigators do not:

a.   Ask leading questions that suggest legal justifications for the officer's conduct, where such questions are contrary to appropriate law enforcement techniques, during interviews of witnesses, complainants, or the principal of an investigation;

b.   Make statements that an employee or witness could reasonably understand as intended to discourage the BPD employee or witness from providing a full account; and

c.   Close an investigation for any of the following reasons:

i.     The complainant seeks to withdraw the complaint or is unavailable, unwilling, or unable to cooperate with an investigation; if the complainant is unable or unwilling to provide additional information beyond the initial complaint, the investigation will continue as necessary to resolve the original

125

allegation(s) where possible based on the available evidence and investigatory procedures and techniques;

ii.    The complainant pleads or is found guilty of an offense;

iii.    The principal resigns or retires; BPD and CRB will continue the investigation and reach a finding, where possible, based on the evidence and investigatory procedures and techniques available;

iv.    The complainant disagrees with the officer's rationale for stopping or citing the complainant (such as contending that she was not committing a violation), if the complaint also includes an allegation of officer misconduct in addition to a disagreement with the officer's rationale for the encounter.

350.    BPD will ensure that OPR supervisors regularly meet with misconduct investigators to evaluate the progress of an investigation.  BPD will ensure that those meetings are properly documented.

351.    At the conclusion of each investigation, misconduct investigators will prepare an investigation report. The report will include:

a.    A narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the misconduct investigator's independent review of the facts and circumstances of the incident;

b.    Documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in

which witnesses were present but circumstances prevented the misconduct

investigator from determining the identification, phone number, or address of

those witnesses, the report will state the reasons why. The report also will include

all available identifying information for anyone who refuses to provide a

statement;

c.   Documentation of whether officers or other BPD employees were interviewed,

including audio and video and a transcript of those interviews, if available;

d.   The names of all other BPD employees who witnessed the incident;

e.   The misconduct investigator's evaluation of the incident, based on his or her

review of the evidence gathered, including a determination of whether the

officer's actions appear to be within BPD policy, procedure, regulations, orders,

or other standards of conduct required of BPD officers;

f.   In cases where credibility determinations must be made, explicit credibility

findings, including a precise description of the evidence that supports or detracts

from the person's credibility;

g.   In cases where material inconsistencies must be resolved between complainant,

officer, and witness statements, explicit resolution of the inconsistencies,

including a precise description of the evidence relied upon to resolve the

inconsistencies;

h.   If a weapon was used, documentation that the officer's certification and training

for the weapon were current; and

i.   Documentation of recommendations for non-punitive corrective action or

misconduct charges.

352.     BPD will develop a process to ensure that completed misconduct investigations are evaluated for policy, training, tactical or equipment concerns, including any recommendations for how those concerns will be addressed. This evaluation will include:

   a.  An assessment of whether the law enforcement action was in compliance with training and legal standards;

   b.  Other tactics were more appropriate under the circumstances;

   c.  The incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and

   d.  The incident suggests that BPD should revise its policies, strategies, tactics or training.

353.     BPD may develop a protocol governing the imposition of discipline in an expedited manner, when an officer agrees to the proposed discipline.  BPD shall reserve the right to revoke the expedited disciplinary agreement if BPD discovers additional misconduct arising out of the same incident.  The protocol will describe:

   a.  Those misconduct allegations that qualify for expedited discipline;

   b.  How BPD will ensure that expedited discipline, when it is made available, is offered in a fair manner, and is appropriately reviewed by chain of command.

354.     The reviews of misconduct investigations will be conducted as follows:

   a.  For investigations into allegations of misconduct that do not involve police-civilian interactions, when carried out by supervisors at Districts, the supervisor shall forward the completed investigation report through his or her chain of command to the District Commander:

i. Where the findings of the investigation report are not supported by the appropriate standard of proof, the supervisor's chain of command shall document the reasons for this determination;

ii. The supervisor's chain of command shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it;

iii. District Commanders shall be responsible for the accuracy and completeness of investigation reports into allegations of misconduct that do not involve police-civilian interactions prepared by supervisors under their command;

iv. District Commanders will forward the completed investigation report to the OPR;

b. For investigations conducted by OPR, the investigator will forward the completed investigation report through his or her chain of command to the Director of the OPR:

i. The Director of the OPR will review the report to ensure that the report is complete, that it meets the requirements of BPD policy and this Agreement, and that the findings are supported by the appropriate standard of proof;

ii. The Director shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings;

129

iii.      Whenever a superior officer orders additional investigation, it shall

be documented in writing.

355.    BPD will ensure that anyone tasked with investigating employee misconduct

possesses excellent investigative skills, a reputation for integrity, the ability to write clear

reports, and the ability to be fair and objective in determining whether an employee committed

misconduct.  When selecting new investigators, BPD will consider the candidates' complaint

history, including any pattern of complaints, the severity of the alleged misconduct, and the

outcome of the misconduct investigation.

356.    BPD recognizes the negative impact of actual bias or the appearance of bias on

the legitimacy of internal investigations.  For that reason, conflicts of interest in misconduct

investigations or in those assigned by BPD to hold hearings and make disciplinary decisions

shall be prohibited.  This provision requires BPD to ensure the following:

a.  No employee who was involved in or a witness to an incident shall conduct or

review a misconduct investigation arising out of that incident;

b.  No employee who has an external business relationship or close personal

relationship with a principal or witness in a misconduct investigation shall

conduct or review the misconduct investigation.  No such person may make any

disciplinary decisions with respect to the misconduct including the determination

of any applicable grievance or appeal arising from any discipline;

c.  No employee shall be involved in an investigation or make any disciplinary

decisions with respect to any person who they directly report to in their chain of

command.  In cases where BPD is unable to meet this requirement, the

investigation must be referred to an outside authority.  Any outside authority

130

retained by BPD must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest;

    d.   OPR investigators will not be assigned to any assignments which could create a conflict of interest for their administrative investigations, including any assignment in which the investigator would report to or work with the subject of an open investigation.

357.   At the discretion of the Director of the OPR, a misconduct investigation may be assigned or re-assigned to another misconduct investigator.  This assignment or re-assignment shall be documented in writing.

358.   BPD will provide information to the Office of the Public Defender about how to file and follow-up on complaints about officer misconduct.

**D.    Criminal Misconduct Investigations**

359.   If at any time during the intake or investigation of the misconduct complaint the investigator finds evidence indicating apparent criminal conduct by any BPD personnel, the investigator shall promptly notify the OPR.  The OPR shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, OPR shall and, when applicable, CRB may continue with the administrative investigation(s) of the allegation, absent specific circumstances that would jeopardize the criminal investigation.  In such circumstances, the decision to postpone the administrative investigation, along with the rationale for doing so, will be documented in writing and reviewed by the Commissioner or his/her designee, and, when applicable, the Director of CRB.

360.     When a BPD officer affirmatively refuses to give a voluntary statement and BPD has probable cause to believe the person has committed a crime, BPD shall consult with the prosecuting agency (e.g. State's Attorney's Office or the United States' Attorney's Office), and seek approval of the Commissioner or his/her designee before taking a compelled statement for the purposes of conducting an administrative investigation.  All decisions regarding compelling an interview, all decisions to hold any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority shall be documented in writing.

361.     The OPR will ensure that criminal investigators do not have access to any materials protected by *Garrity v. New Jersey*, 385 U.S. 493 (1967), and shield any compelled interview and its fruits from criminal investigators.  To protect BPD officers' rights under the Fifth Amendment, BPD shall develop and implement protocols to ensure that criminal and administrative investigations of BPD employees are kept appropriately separate and to ensure that any *Garrity*-compelled statement taken during an OPR investigation will not compromise the criminal investigation or criminal prosecution for the same conduct.

362.     Nothing in this Section shall alter BPD employees' obligation to provide a public safety statement regarding a work-related incident or activity, including Use of Force Reports and incident reports. BPD shall make clear that all statements by personnel in incident reports arrest reports, Use of Force Reports and similar documents, and statements made in interviews such as those conducted in conjunction with BPD's routine use of force review process, are part of each employee's routine professional duties and are not compelled statements. Where an employee believes that providing a verbal or written statement will be self-incriminating, the employee shall affirmatively state this and shall not be compelled to provide a statement without

prior consultation with the prosecuting attorney (e.g., State's Attorney's Office or the United States' Attorney's Office), and approval by the Commissioner.

363.    If BPD refers an investigation of an officer for prosecution and the prosecuting agency declines to prosecute or dismisses the criminal case after the initiation of criminal charges, the OPR shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

364.    The OPR shall maintain all reports and files concerning criminal investigation of officers after they are completed for the duration of the officer's employment with BPD. Thereafter, the officer's disciplinary record shall be maintained as a personnel record by BPD's Human Resources section in the normal course of business.

**E.    Referral of Criminal and Administrative Misconduct Investigations to Outside Entities**

365.    BPD shall develop protocols to govern when to refer allegations of administrative or criminal misconduct by BPD officers to another law enforcement agency or qualified outside investigator to conduct the investigation.  There shall be separate protocols for referring a criminal investigation and an administrative investigation.  Each protocol will specify the criteria to be considered in making the referral, including how to select the agency or outside investigator to receive the referral.

366.    The protocols shall include provisions for dealing with incidents in which there are actual or perceived conflicts of interest that would prevent BPD from effectively conducting the investigation.

367.    The protocols shall include provisions that govern when BPD's review of a referred investigation would be appropriate.

368.    In cases when BPD review is appropriate, OPR shall review the completed investigation to ensure that it is of sufficient quality and completeness.  The Director of the OPR shall request the entity conducting the investigation to conduct additional investigation when it appears that there is additional relevant evidence that may improve the reliability or credibility of the investigation.

369.    In the case of potentially criminal conduct, should the entity conducting the investigation decide to close the investigation without referring it to a prosecuting agency, this decision must be documented in writing and provided to the OPR. The OPR shall separately consider whether to refer the matter to a prosecuting agency and shall document its decision in writing.

370.    If the prosecuting agency declines to prosecute an officer or dismisses the criminal case after the initiation of criminal charges, the OPR shall request an explanation for this decision, which shall be documented in writing and appended to the criminal investigation report.

371.    The OPR shall maintain all criminal and administrative investigation reports and files of the outside entities performing the investigation after reports and files are completed.

**F.    Disciplinary Charges**

372.    BPD will ensure that disciplinary charges for sustained allegations of misconduct are consistently applied, fair, and based on the nature of the allegation, the evidence, and that mitigating and aggravating factors are identified and consistently applied and documented.

373.    Where, after OPR conducts a misconduct investigation and an officer's actions are found to violate policy, BPD shall ensure appropriate charges are brought and/or corrective action is taken.

374. Where the investigation concerns misconduct that does not involve police-civilian interactions and is conducted by a Supervisor at a District or a Unit, the District Commander will have the authority to initiate appropriate disciplinary action and/or take corrective action depending on the seriousness of the misconduct.

375. In order to ensure consistency in the imposition of discipline, BPD will review its current disciplinary matrices, policies, and procedures and will amend them as necessary to ensure that they:

    a. Establish a presumptive range of discipline for each type of violation;

    b. Increase the presumptive discipline based on an officer's prior violations;

    c. Set out defined mitigating and aggravating factors;

    d. Prohibit consideration of the officer's race, religion, gender, gender identity, sexual orientation, national origin, age, ethnicity, or familial relationships;

    e. Prohibit consideration of the high (or low) profile nature of the incident;

    f. Prohibit taking only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;

    g. Provide that the BPD will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed; and

    h. Require that any departures from the discipline recommended under the disciplinary matrices be justified in writing.

376. Each sustained misconduct allegation shall be considered for the purposes of recommending discipline.

377. BPD will review its policies and procedures regarding resignation of officers under investigation, and referral of officers found to have engaged in misconduct to state and

federal agencies. BPD will ensure that such policies do not authorize suspending a misconduct investigation solely because the officer resigned.

378.   BPD will provide the required notice to the Maryland Police Training and Standards Commission, including when an officer resigns while a misconduct investigation or disciplinary charges are pending.

### G.   Disciplinary Hearings

379.   If a disciplinary hearing is convened, BPD will ensure the disciplinary hearing comports with state law and the following requirements.

380.   Two civilian voting members will participate and vote in each disciplinary hearing conducted by BPD, if permitted by law.

381.   Disciplinary hearings will be audio recorded in their entirety.

382.   If an accused officer provides new and material evidence at a disciplinary hearing, the hearing will be suspended, upon the Department's motion, unless there is good cause to continue with the hearing explained in writing by the hearing panel.  If the hearing is suspended, BPD shall ensure that the new and material evidence is properly investigated and evaluated before resumption of the hearing. The OPR shall initiate a new or consolidated misconduct investigation if it appears that the officer intentionally withheld the new and material evidence during the initial misconduct investigation.

383.   Where a disciplinary hearing is convened, BPD shall require that the hearing board provide in writing the findings, as well as a recommendation of discipline made pursuant to the BPD disciplinary matrix.  When the hearing board decides not to impose discipline or non-disciplinary corrective action, it will set forth its justification for doing so in writing.  All documentation from the disciplinary hearing will be included in the Department's investigative

file. Dissenting hearing board members may also provide their conclusions and reasoning in writing.

384.    Disciplinary hearings shall be scheduled within 30 days of informing the involved officer of the recommended discipline. BPD will use its best efforts to ensure that disciplinary hearings will be conducted within 120 days of informing the involved officer of the recommended discipline.

### H.    Imposition of Discipline

385.    BPD will ensure that discipline comports with due process and is consistently applied, fair, and based on the nature of the charges, the evidence, and that mitigating and aggravating factors are identified and consistently applied and documented.

386.    When appropriate, the full investigative file, along with all recommendations of discipline made throughout the disciplinary process, shall be provided to the Commissioner or his/her designee for the ultimate determination of whether to impose discipline.

387.    The OPR shall maintain all administrative investigation reports and files after they are completed for the duration of the officer's employment with BPD.  Once the officer leaves BPD employment, that officer's disciplinary record will be maintained as a personnel record by BPD Human Resources Division in the normal course of business.

388.    BPD will eliminate policies that authorize the expungement of records where an employee accepts discipline.

### I.    Community-Centered Mediation of Misconduct Complaints

389.    BPD will continue to provide a mediation program designed by community organizations and mediated by community members to act as an alternative to the investigation process described above for certain minor allegations of officer misconduct  impacting civilians.

BPD will ensure that the complaint-mediation program is designed to increase understanding and trust between community members and BPD officers and to prevent future misconduct and complaints of misconduct.  The City will support this program when it is involved.  The program will specifically provide that:

    a.  Complaints will only be resolved through mediation where both the complainant (or his or her designee) and the subject officer agree to participation in the mediation process;

    b.  Only certain minor complaint allegations will be eligible for mediation, as set out in BPD policy; a screening process for identifying complaints that may be suitable for mediation shall include a review of the principal's disciplinary history, including investigations that resulted in a finding of not sustained, to look particularly for patterns of behavior or allegations of retaliation; and

    c.  Where the mediator determines that the officer is not participating in the mediation program in good faith, the mediation shall end and the complaint investigation shall resume.

390.    BPD and the City, to the extent it is involved, will ensure that the program is effectively administered.  BPD will disseminate information to the public about the availability of community mediation.

391.    BPD will ensure that any complaints that are sent to community-centered mediation are tracked in its centralized electronic numbering and tracking system for all allegations of misconduct.

**J.      Tracking Misconduct Investigations**

392.     BPD will maintain a centralized electronic numbering and tracking system for all allegations of misconduct, whether internally discovered or based upon a civilian complaint:

a.   The centralized numbering and tracking system will maintain accurate and reliable data regarding the number, nature, and status of all misconduct allegations, from initial intake to final disposition, including investigation timeliness and notifications made to the complainant of the interim status and final disposition of the complaint;

b.   The system will be used to determine the status of misconduct investigations, as well as for periodic assessment of compliance with relevant policies and procedures and this Agreement, including requirements of timeliness of investigations;

c.   The system also will be used to monitor and maintain appropriate caseloads for misconduct investigators, and to monitor supervisory role in investigations;

d.   All documents and files – including audio and video – will be kept in a digital format, and shall be accessible via the centralized numbering and tracking system.

393.     BPD will develop a protocol to share information from OPR misconduct investigations with prosecuting agencies when appropriate.  In developing this protocol, BPD will seek to collaborate with local prosecuting attorneys (e.g., State's Attorney's Office or the United States' Attorney's Office).

394.     BPD will ensure that complainants and the public will be able to assess the status of, and track, misconduct investigations, including the following:

a. A complainant may contact BPD between 8:30 and 4:30 to determine the status of his or her complaint, and BPD will provide the status;

b. BPD will ensure that individuals who contact any officer or unit of BPD to inquire about the status of a complaint investigation will be promptly routed to OPR;

c. BPD shall aggregate and analyze data about misconduct investigations on at least an annual basis;

d. As permissible by law, BPD shall share this information with the public;

395. The OPR will track, as a separate category of complaints, at least the following:

a. Allegations of discriminatory policing, including allegations that an officer issued a Citation, or conducted a stop or arrest based on an individual's Demographic Category, or used a slur based on an individual's Demographic Category;

b. Allegations of unlawful Stop, Search, Citation, or Arrest practices;

c. Allegations of excessive force;

d. Allegations of misconduct involving individuals who are known to be homeless;

e. Allegations of misconduct involving individuals who have a disability, including mental illness;

f. Allegations of theft by BPD officers;

g. Allegations of retaliation;

h. Allegations that BPD officers interfered with civilians' constitutionally protected free expression;

i. Allegations that BPD officers engaged in sexual misconduct;

j.   Allegations of inappropriate conduct by officers during investigations of sexual assault or other crimes of violence against women;

k.   Allegations of misconduct in officers' interactions with people who are LGBT;

l.   Allegations of misconduct in officers' interactions with sex workers; and

m.   Allegations of misconduct in officers' interactions with Youth.

**K.   Transparency Measures**

396.   The City and BPD recognize the importance of transparency to improving BPD-community relations and BPD has already taken significant steps to increasing transparency about its operations, including how it conducts internal investigations into officer misconduct. The City and BPD will continue to take steps to increase transparency, including the following provisions.

397.   The City and BPD will develop and implement a program to promote awareness throughout the Baltimore City community about the process for filing complaints about the conduct of BPD officers.  The program will address how to inform members of vulnerable communities in Baltimore of the existence of the complaint investigation process, and may include collaborating directly with local community groups.

398.   BPD shall make available on its website a detailed written description, in plain language, of the BPD administrative investigative process from the intake of a complaint to imposition of discipline.  BPD's website will also include a description of the CRB complaint option and a link to the CRB website.

399.   In addition to a written description, BPD shall create a short video that explains the jurisdiction and duties of entities within BPD, including the Office of Professional Responsibility, the Internal Affairs Section, and the Special Investigative Response Team.  The

141

video shall be posted on the website of the BPD.  BPD shall make publicly available all policies and procedures regarding its internal investigation and disciplinary process.

400.    BPD will post and maintain at the reception desk at BPD headquarters and in locations at all District stations that are clearly visible to members of the public permanent placards clearly and simply describing the BPD and CRB civilian complaint intake process.  The placards shall include relevant contact information, including telephone numbers, email addresses, and Internet sites.  The placards shall be in both English and Spanish.

401.    The City and BPD will create complaint forms, and informational materials, including brochures and posters that describe the internal investigation and disciplinary process at CRB and BPD, respectively; provide information about the multiple places and ways individuals may file complaints; information about how and where individuals may check the status of the complaint investigations; and contact information for the OPR and CRB.

402.    The OPR and the CRB will separately produce a quarterly public report on misconduct investigations, including, at a minimum, the following:

a. Aggregate data on complaints received from the public, broken down by district; rank of principal(s); nature of contact (traffic stop, pedestrian stop, call for service, etc.); nature of allegation (rudeness, bias-based policing, etc.); complainants' demographic information (age, gender, race, ethnicity, etc.); complaints received from anonymous or third parties; and principals' demographic information;

b. Aggregate data on internally-generated misconduct allegations, broken down by similar categories as those for civilian complaints;

c.  Aggregate data on the processing of misconduct cases; the average and median time from the initiation of an investigation to its submission by the investigator to his or her chain of command; the average and median time from the submission of the investigation by the investigator to a final decision regarding whether to impose charges; the average and median time from the decision to impose charges to a final disposition; the average and median time from the receipt of the complaint to the initial contact with the complainant; the number of investigations returned to the original investigator due to conclusions not being supported by the evidence; and the number of investigations returned to the original investigator to conduct additional investigation;

d.  Aggregate data on the outcomes of misconduct investigations, including the number of sustained, not sustained, exonerated, and unfounded misconduct complaints; the number of sustained allegations resulting in a non-disciplinary outcome the number resulting in disciplinary charges;

e.  Aggregate data on the disposition of charges, including the number resulting in written reprimands, suspension, demotion, and termination;

f.  Aggregate data on outcomes of misconduct investigations by allegation, broken down by race, ethnicity, and gender of the complainant and the officer;

g.  Aggregate data on officers with persistent or serious misconduct problems, including the number of officers who have been the subject of more than two completed misconduct investigations involving serious misconduct allegations  in the previous 12 months; the number of officers who have had more than one sustained allegation of  serious misconduct in the previous 12 months, including

the number of sustained allegations and the number of criminal prosecutions of officers, broken down by criminal charge;

h.  Aggregate data on officers who have been the subject, in the previous 12 months, of more than 2 complaints of the following categories, regardless of the outcome of those complaint investigations:

   i.   Allegations of biased policing, including allegations that an officer conducted an investigatory stop or arrest based on an individual's Demographic Category or used a slur based on an individual's Demographic Category;

   ii.  Allegations of excessive force; allegations of unlawful stops, searches and arrests, including allegations of improper Strip Searches;

   iii. Allegations of interference with constitutionally protected expression; and

   iv.  Allegations of criminal misconduct, broken down by allegation.

403.   BPD will develop a protocol to ensure appropriate transparency concerning the disciplinary hearing process and outcomes.

404.   After final disposition of misconduct complaints, BPD shall make detailed summaries readily available to the public to the full extent permitted under state and federal law, in electronic form on a designated section of its website that is linked to directly from BPD's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct by BPD officers.

405.    BPD will audit, on at least an annual basis, BPD's disciplinary process to ensure quality control. The audit(s) will include complaint intake, investigation, and the imposition of discipline. BPD will make public any of the audits' findings, to the extent state and federal law permits.

**L.    Additional Measures to Encourage Proper Oversight**

406.    BPD shall establish a testing program designed to assess civilian complaint intake.  The testing program shall assess whether employees are providing civilians appropriate, accurate, and complete information about the complaint process and whether employees are notifying the OPR and the CRB upon the receipt of a civilian complaint.  The testing program shall:

a. Assess complaint intake for complaints made in person at BPD facilities, complaints made telephonically, and complaints made electronically by email or through BPD's website;

b. Include sufficient random and targeted testing to assess the complaint intake process, using surreptitious video and/or audio recording of testers' interactions with BPD personnel to assess the appropriateness of responses and information provided, to the extent state law permits;

c. Assess whether complainants of different races, ethnicities, or gender identities are treated differently;

d. Assess whether employees who take complaints promptly notify the OPR and the CRB of civilian complaints and provide accurate and complete information.

407.    The testing program shall not:

a. Assess investigations of civilian complaints, and BPD shall design the testing program in such a way that it does not waste resources investigating fictitious complaints made by testers;

b. Interfere with officers taking law enforcement action;

c. Attempt to assess complaint intake in the course of traffic stops or other law enforcement action being taken outside of City facilities.

408. BPD shall produce an annual report on the testing program. This report shall include, at a minimum:

a. A description of the testing program, including the testing methodology and the number of tests conducted broken down by type (i.e., in-person, telephonic, and electronic);

b. The number and proportion of tests in which employees responded inappropriately to a tester;

c. The number and proportion of tests in which employees provided inaccurate information about the complaint process to a tester;

d. The number and proportion of tests in which employees failed to promptly notify the OPR of the civilian complaint;

e. The number and proportion of tests in which employees failed to convey accurate information about the complaint to the OPR;

f. An evaluation of the civilian complaint intake based upon the results of the testing program; and

g. A description of any steps to be taken to improve civilian complaint intake as a result of the testing program.

## M.    Training

409.    BPD will provide all investigators assigned to the OPR with at least 40 hours of comprehensive training on conducting employee misconduct investigations.

410.    BPD's training will include instruction in:

    a.   Investigative skills, including proper interrogation and interview techniques; gathering and objectively analyzing evidence; and data and case management;

    b.   How to appropriately classify complaints pursuant to BPD policy;

    c.   The particular challenges of administrative law enforcement misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation;

    d.   Weighing the credibility of witnesses, including properly weighing the credibility of civilian witnesses against officers' credibility;

    e.   Using objective evidence to resolve inconsistent statements;

    f.   The proper application of the appropriate standard of proof;

    g.   Relevant BPD rules and policies, including protocols related to administrative investigations of alleged officer misconduct;

    h.   BPD policies, including the requirements of this Agreement and protocols related to administrative investigations of officer misconduct; and

    i.   Relevant state and federal law.

411.    The training will be provided by sources both inside and outside of BPD, in order to ensure the highest training on investigative techniques that are specific to the Baltimore community, and BPD policies, procedures, and disciplinary rules.

412.     The City will provide all investigators employed by the CRB with at least 40 hours of comprehensive training on conducting investigations into officer misconduct. This training will include instruction in:

a.   Investigative skills, including proper interrogation and interview techniques; gathering and objectively analyzing evidence; and data and case management;

b.   How to appropriately classify complaints pursuant to CRB policy;

c.   The particular challenges of misconduct investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation;

d.   Weighing the credibility of witnesses, including properly weighing the credibility of civilian witnesses against officers' credibility;

e.   Using objective evidence to resolve inconsistent statements;

f.   The proper application of the appropriate standard of proof;

g.   Relevant BPD and CRB rules and policies, including protocols related to investigations of alleged officer misconduct;

h.   The requirements of this Agreement and protocols related to investigations of officer misconduct; and

i.   Relevant state and federal law.

413.     BPD will ensure the training that is provided to BPD misconduct investigators pursuant to this Agreement is available to CRB investigators.

414.     All BPD Supervisors and personnel who may become responsible for investigating complaints misconduct not involving police-civilian interactions will receive 8 hours of in-service training annually related to conducting misconduct investigations. BPD will

148

provide 4 hours of in-service training to all Supervisors on their obligations when called to a scene by a subordinate to accept a civilian complaint about that subordinate's conduct.

415.    BPD will provide training to all police personnel on BPD's revised or new policies related to misconduct investigations and discipline. This training shall include instruction on:

    a.   Identifying and reporting misconduct, the consequences for failing to report misconduct and the consequences for retaliating against a person for reporting misconduct or participating in a misconduct investigation;

    b.   To properly handle complaint intake, including how to provide complaint materials and information and the consequences for failing to take complaints;

    c.   The proper categorization of complaints including recognizing allegations of misconduct even when not explicitly identified by the complainant;

    d.   Strategies for turning the complaint process into a positive police-civilian interaction;

    e.   The consequences for intentionally mis-categorizing complaints related to: discriminatory policing based on an individual's Demographic Category; allegations of unlawful stops, searches and arrests; allegations of improper Strip Searches; allegations of interference with constitutionally protected expression; and any allegations of criminal misconduct, including sexual misconduct; and

    f.   The consequences for failing to provide information, or failing to make information available.

## XV.   COORDINATION WITH BALTIMORE CITY SCHOOL POLICE FORCE

416.    The Parties agree that Baltimore's partnerships with other agencies are important to supporting its mission to protect and to serve.  In particular, BPD has a collaborative relationship with the Baltimore City School Police Force ("BSP") in which BPD authorizes BSP to exercise law enforcement powers beyond BSP Primary Jurisdiction, to encompass the entire City, under specific circumstances.  BSP Primary Jurisdiction is on City Schools' premises and on any other property used for educational purposes owned, leased or operated by or under the control of the Baltimore City Schools Board of School Commissioners ("BCSBSC"). BPD authorization to BSP to exercise law enforcement powers throughout the City is memorialized in a Memorandum of Agreement between BCSBSC and the BPD dated Feb 2, 2016 (the "MOU").

417.    BPD will conduct an initial assessment to evaluate how BSP has used BPD's authorization to exercise law enforcement powers throughout the City pursuant to the MOU. The Assessment will include an analysis of information that BCSBSC makes available to it concerning the frequency with which BSP officers exercise law enforcement powers pursuant to the MOU, calls, incidents, stops, arrests, and uses of force involving officers from BSP exercising law enforcement powers pursuant to the MOU.  BPD will use the assessment to identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.  Following the initial assessment, BPD will conduct a biennial evaluation of its efforts at improving its coordination with BSP, and modify its efforts as necessary to ensure its coordination with BSP is effective.

418.    Based on the assessment, BPD will determine areas for improvement in its coordination with BSP and will implement the improvements to the extent they are in BPD's control.  BPD will advocate to change the MOU to require BPD and BSP officers to cooperate

with each agency's respective administrative investigations when both agencies' officers are involved in an incident under investigation unless doing so would jeopardize BPD's investigation of the matter, and to address issues arising from the assessments in Paragraph 417 above. BPD will propose policies and protocols governing the proper investigation of civilian complaints involving BSP officers exercising law enforcement powers pursuant to the MOU to BSP and seek agreement from BSP on those policies and protocols.

## XVI.   RECRUITMENT, HIRING AND RETENTION

419.    To maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, BPD will review and revise as necessary its recruitment and hiring program to ensure that BPD successfully attracts and hires a diverse group of qualified individuals.

420.    According to the timeline specified in the Monitoring Plan, BPD will develop a written Recruitment Plan that includes clear goals, objectives, and action steps for attracting and retaining a quality work force that reflects the diversity of the Baltimore community.

421.    The Recruitment Plan will, at a minimum, require the following:

a.  Minimum standards for recruits and lateral hires;

b.  Recruitment outreach to a broad spectrum of community stakeholders, aimed at increasing the diversity of its ranks, including race and gender, and applicants who are community policing and problem-solving oriented. BPD and the City will explore opportunities for Youth in the City's high schools to gain exposure to policing through internship or other programs, and create ways to support interested Youth in fulfilling the requirements to join BPD;

     c.  Broad distribution of recruitment information, including information regarding career opportunities, compensation, the testing and hiring process, and applicable deadlines and requirements. Such information will, at a minimum, be readily accessible on City and BPD websites and available upon request to City or BPD officials;

     d.  That candidates be allowed to submit initial applications online to the BPD; and

     e.  Opportunities for officers, civilians, and members of City government to assist the BPD's efforts to attract a broad spectrum of qualified applicants.

422.    The Recruitment Plan will be submitted for the Monitor's approval.  BPD and the Monitor will meet and confer to resolve any objections the Monitor notes.  BPD will implement the Recruitment Plan upon approval and as required by the Monitoring Plan.

423.    BPD with the aid of the Monitor will conduct an in-depth review of BPD's current hiring processes for officers, including Paragraph 424, and state hiring criteria to assess whether any process, criterion, or requirement has a disparate impact based on a Demographic Categories.  If BPD determines that any step in the hiring process may result in a disparate impact based on Demographic Categories, the BPD will determine whether there are reasonable alternative selection procedures available that would comply with state requirements and serve the BPD's needs while having less of a disparate impact and if there are, will implement those alternative selection procedures.

424.    BPD's background investigations for hiring officers will include evaluation of the following factors:

a.   An in-person psychological screening of candidates who are selected for conditional offers of employment by an appropriately qualified and trained psychiatrist or psychologist;

b.   A background investigation that includes an evaluation of police records, education, employment, military history, credit history, and driving records;

c.   A review of personnel files from candidates' previous employment, unless the BPD is unable to obtain such files after making all reasonable efforts, and a requirement that BPD seek to speak with the candidates' previous supervisor(s);

d.   A pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use-of-force training records, and complaint history if a candidate has previous law enforcement experience;

e.   Contacting MPSTC to review the license status and any known disciplinary history of potential hires before making an offer of employment;

f.   Checking the National Decertification Index ("NDI") administered by the International Association of Directors of Law Enforcement Standards and Training ("IADLEST");

g.   Determining whether the candidate has been named in any civil action; and

h.   Implementing pre-employment screening mechanisms, including of applicants' social media platforms, to ensure their suitability, based on skills, temperament, and goals, for policing, including the community policing principles required in this Agreement.

425.   The background investigation and screening need not be completed for candidates whose applications do not meet the minimum criteria, or for candidates who do not advance

beyond the initial interview.  The background investigation and screening information will be documented and maintained with the candidate's employment application.  BPD will ensure that the decision to exclude an applicant following the background investigation is documented and independently reviewed by the commanding officer/director of the Recruitment Section.

426.    To ensure that BPD is able to retain qualified and experienced officers, BPD will, with the aid of the Monitor, create a Retention Plan to identify challenges and recommend solutions to improve BPD's retention of employees.  The Plan may include:

    a.   Incentives for experienced officers;

    b.   Access to fitness facilities for all officers,

    c.   Educational reimbursement opportunities; and

    d.   Developmental opportunities with merit-based selection criteria for officers interested in transferring or temporarily rotating to sections within BPD.

427.    BPD will conduct assessments of its recruitment and retention efforts on an annual basis.  These assessments will be designed to ensure that BPD's recruitment and retention practices are achieving the objective of attracting and retaining a diverse workforce of highly qualified officers.  Assessments will include review of application and hiring information; review of the background investigation system, including applications rejected on account of the background investigation; surveys of officers to assess employee satisfaction; and analyses of officer exit interviews. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XVII.  STAFFING, PERFORMANCE EVALUATIONS, AND PROMOTIONS

428.    BPD will complete a comprehensive staffing study to assess the appropriate number of sworn and civilian personnel to perform the functions necessary for BPD to fulfill its mission, enable supervision, and satisfy the requirements of this Agreement.

429.    Based upon the staffing study, BPD will develop a Staffing Plan that provides for each of the following:

a.  Personnel deployment to ensure effective community and problem-oriented policing;

b.  Sufficient number of well-trained staff and resources to conduct timely misconduct investigations;

c.  Sufficient number of officers in patrol in each district, without needing to resort to drafting, except in unforeseeable circumstances;

d.  To the extent feasible, Unity of Command;

e.  Sufficient number of supervisors; and

f.  The BPD's and the City's existing and projected resources.

430.    BPD will implement the Staffing Plan, and may do so in a phased manner that reflects the City's and BPD's fiscal resources.

431.    Performance evaluations will include a written discussion of the officer's performance during the rating period by the supervisor of any areas of particular growth and achievement and areas where officers require further training and supervision.  As part of the annual performance review process, supervisors shall meet with the officer whose performance is being evaluated to discuss the evaluation.

432.    The BPD will use a formalized system documenting annual performance evaluations of each officer, and quarterly evaluations for probationary employees, by the officer's direct supervisor. When evaluating officer performance, including promotions, BPD supervisors shall consider factors, including:

    a.  Demonstrated integrity and ethical decision-making;

    b.  Demonstrated commitment to community engagement and building trust with communities, and effective use of community-policing and neighborhood problem-solving strategies;

    c.  Demonstrated commitment to bias-free policing;

    d.  Effective use of de-escalation and crisis management techniques;

    e.  Communication and decision-making skills;

    f.  Civilian commendations;

    g.  Disciplinary actions; and

    h.  The quality and accuracy of officer reports, search warrants, and supportive affidavits or declarations.

433.    Supervisors will meet with their subordinates on an ongoing basis to discuss their performance and will document the supervisor's ongoing efforts and communications regarding officer performance challenges and areas of growth.

434.    Performance evaluations for each supervisor (whether first-line or commander) will include assessment of the supervisor's ability and effectiveness in conducting the supervisory reviews as required by this Agreement, including monitoring, deterring, and addressing misconduct by officers they supervise.

435.     The BPD will ensure its promotional systems establish clear criteria that prioritize effective, constitutional, and community-oriented policing as factors in promotion.

## XVIII. OFFICER ASSISTANCE AND SUPPORT

436.     BPD will provide an Employee Assistance Program ("EAP") to all sworn officers, which allows access to no- or low-cost counseling and mental wellness services including: confidential counseling services; crisis counseling; stress management counseling; and mental health evaluations.  BPD will provide information about this program in all BPD facilities.

437.     BPD will compile, periodically review and revise as necessary, and maintain a list of mental and physical health service providers available as part of the EAP to all officers and employees.  BPD will ensure that officers have easy access to this information through email, the BPD website, or other means.

438.     The BPD will develop peer support services including:

   a.   A peer support program through which officers provide emotional, social, and practical support to other officers; and

   b.   A peer intervention program through which BPD will provide officers with training, based on theories of active bystandership and passive bystandership, (1) to safely intervene before an officer engages in unethical behavior, to prevent it from occurring; (2) to accept an intervention from another officer when it occurs; and (3) provide emotional, social, and practical support to officers who intervene to prevent or end unethical behavior.

439.     BPD will offer to all officers a voluntary mental health evaluation before returning an officer to full duty following a traumatic incident (e.g., serious injury, officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting

in death or serious injury). Officers may voluntarily seek further mental health services following this meeting.

440. BPD will develop well-being protocols to be activated during officer deployments during public demonstrations or civil unrest. These protocols will include:

a. Close monitoring and periodic affirmative checks of officers' well-being by supervisors;

b. Availability of mental health and medical professional(s) to provide health care to officers;

c. Inclusion of health and safety guidance during pre-deployment briefings;

d. Close monitoring of officer fatigue and indications of stressors;

e. During prolonged periods of demonstrations or unrest, the deployment of police counselors or psychologists to provide individual counseling to officers and their family members.

441. BPD will develop protocols for annually, assessing BPD's officer assistance and support programs to ensure officers are provided adequate support to maintain their physical and mental health. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

## XIX. AGREEMENT IMPLEMENTATION AND ENFORCEMENT

### A. Selection and Role of the Independent Monitor

442. The Parties will jointly select an Independent Monitor ("Monitor"), which will include a team of individuals with expertise in policing, civil rights, monitoring, data analysis, project management, and related areas, as well as local experience and expertise with the diverse

communities of Baltimore, to assess and report on whether the requirements of this Agreement have been implemented and provide Technical Assistance in achieving compliance.

443.    The selection of the Monitor shall be pursuant to a process jointly established by the City, BPD and DOJ, further explained in a Request for Application ("RFA") that will be mutually developed by the parties.  The RFA shall specify the criteria upon which the selection for the Monitor shall be made, including:  each team member's experience and qualifications to perform the tasks outlined in this Agreement; the ability to work collaboratively with BPD and DOJ to enable BPD to reach compliance with this Agreement; and the ability to do so in a cost-effective manner.  As part of the RFA, applicants will be required to submit a proposed budget for the work to be performed under this Agreement.

444.    The Parties agree to file a joint motion asking the Court to appoint the Monitor chosen by the Monitor selection process described herein.  The Parties agree that it is important to allow for public input at each stage of the Monitor selection process.

a.    As further explained in the RFA, the Parties will publicly seek information from all qualified individuals or groups of individuals who are interested in being considered for the Monitor team.  The Parties will publicly announce a time period in which interested parties can make submissions, and will review all information provided.  All information submitted by interested parties will be made publicly available.

b.    After the deadline for Monitor candidates to submit information as specified in the RFA, the Parties agree to a public comment period, in which members of the public can review candidate information and make recommendations to the Parties about the potential candidates.

c.  After the public comment period, the Parties will evaluate the candidates, considering the recommendations made by members of the public, and agree on a subset of the teams to interview.  In selecting whom to interview, the Parties may request additional information from the candidates.  Interviews will be in person and conducted in Baltimore.  Any travel expenses associated with these or other interviews shall be borne by the candidates.

d.  Following the Party interviews, the Parties will then agree upon the teams that are finalists for the Monitor role.  If the Parties cannot agree on finalists, the City and BPD, and DOJ may each name up to two teams (two for the City and BPD, and two for DOJ), to the finalist list.  In selecting the finalists, the Parties may request additional information from the candidates.  After a list of finalists is established, the Parties may conduct a second interview of the candidates, in–person at the parties' discretion.  The Parties will provide an opportunity for candidates to respond to questions and concerns from the Baltimore community.  As part of this process, the Parties will provide for a public meeting at which candidates may respond to written questions submitted by members of the public.

e.  After the finalists have been interviewed and responded to questions submitted by the public, the Parties will agree on a Monitor to propose to the Court in a joint motion.  If the Parties cannot agree on a Monitor, the City/BPD and DOJ may each submit one proposed team to the Court, which will select the Monitor.

f.  Candidates for the position of Monitor shall be responsible for their own expenses incurred as a result of the application process to become the Monitor.

445.     The Monitor will be the agent of the Court and subject to the supervision and orders of the Court, consistent with this Agreement.  The Monitor will only have the duties, responsibilities, and authority conferred by this Agreement.  The Monitor will not, and is not intended to, replace or assume the role and duties of the City or BPD, or any duties of any City or BPD employee, including the Commissioner, or any City official.

### B.      Term of the Monitor

446.     The Monitor shall be appointed for a period of three years from the Effective Date, subject to an evaluation by the Court to determine whether to renew the Monitor's appointment until the Termination of this Agreement or for another two years, whichever happens first.  In evaluating the Monitor, the Court shall consider the Monitor's performance under this Agreement, including whether the Monitor is adequately engaging the community, completing its work in a cost-effective manner and on budget, and is working effectively with the Parties to facilitate BPD's efforts to comply with the Agreement's terms, including by providing Technical Assistance to BPD.  The Monitor may be removed for good cause by the Court at any time, on motion by any of the Parties or the Court's own determination.

447.     If the Agreement continues more than five years pursuant to Paragraphs 504-510, the Court shall evaluate the Monitor's performance and decide whether to extend the term of the Monitor.  If the monitoring period is extended under this Agreement, it should be extended only as to those Material Requirements of the Agreement that have not been terminated pursuant to this Agreement.

448.     Once the Monitor is retained, the City will pay the Monitor a maximum of $1,475,000 per year for performing all of the Monitor's duties under this Agreement.  The Parties recognize the importance of ensuring that the fees and costs of monitoring the Agreement

are reasonable, and thus fees and costs will be a factor to be considered when selecting the

Monitor and the Monitor's reappointment.  The Monitor will submit a proposed budget annually

to the Court for approval, including an accounting of the actual budget for the previous year.

The Monitor will maintain a public website and will post its proposed budget and accounting to

its public website.  In the event that any dispute arises regarding the reasonableness or payment

of the Monitor's fees and costs, the City, DOJ, and the Monitor will attempt to resolve such

dispute cooperatively prior to seeking the assistance of the Court.  The City and/or BPD will

provide the Monitor with office space and reasonable office support such as office furniture,

telephones, internet access, secure document storage, and photocopying.  The City shall not be

responsible for paying for non-working travel time.  The Monitor may, at any time after its initial

selection, request to be allowed to hire, employ, or contract with additional persons or entities

that are reasonably necessary to perform the tasks assigned to the Monitor by this Agreement.

Any person or entity hired or otherwise retained by the Monitor to assist in furthering any

provision of this Agreement will be subject to the provisions of this Agreement.  The Monitor

will notify the City, BPD and DOJ in writing if the Monitor wishes to select such additional

persons or entities.  The notice will identify and describe the qualifications of the person or entity

to be hired or employed, the monitoring task to be performed, and any additional fee or cost

associated with the proposed selection.  If the City, BPD and DOJ agree to the Monitor's

proposal, the Monitor will be authorized to hire or employ such additional persons or entities.

The City, BPD and DOJ have ten business days to disagree with any such proposal.  If the City,

BPD, DOJ, and the Monitor are unable to reach agreement within ten business days of receiving

notice of the disagreement, then any Party or the Monitor may seek the Court's approval for the

selection.  Any fees or costs charged by this additional person or entity will count toward the annual $1,475,000 Monitor budget cap, except as provided in Paragraph 450.

449.    The City will deposit $150,000 into the Registry of the Court as interim payment of costs incurred by the Monitor. This deposit and all other deposits pursuant to this Agreement will be held in the Court Registry and will be subject to the standard registry fee imposed, if any, on depositors.  The Monitor will submit monthly statements to the Court, with copies to the Parties, detailing all expenses the Monitor incurred during the prior month.  These monthly statements shall be posted to the Monitor's public website.  The Court will order the clerk to make payments to the Monitor.  Upon receipt of an Order from the Court directing payment, the clerk will ensure timely payment of all approved statements received from the Monitor. Within 45 days of the entry of each Order directing payment, the City will replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $150,000, or to a lesser amount if the annual cap would be exceeded.

450.    The Court has the discretion to increase the Monitor's cap by a specific amount for a specific year at the Monitor's request.  To grant the request, the Court must find that the increase is necessary for the Monitor to fulfill its duties under the Agreement and is not due to a failure in planning, budgeting, or performance by the Monitor.

451.    Before submitting a monthly statement to the Court, the Monitor will submit the monthly statements to the Parties.  The Parties will review such statements for reasonableness. Upon completion of the Parties' review, but in no case more than 30 days after submission of the statements by the Monitor, the Parties will notify the Monitor of their approval of the statement. Upon receipt of the Parties' approval, the Monitor may submit the statement to the Court for payment.  The statement submitted to the Court will indicate that it was reviewed and approved

by the Parties.  In the event the Parties cannot agree on approval of a statement, the Parties will attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court to resolve the dispute.

452.    In the event that the Monitor is no longer able to perform its functions, is removed, or is not extended, within 60 days thereof, the City, BPD and the DOJ will together select and advise the Court of the selection of a replacement Monitor, acceptable to both.  The Parties' selection of the Monitor will be made pursuant to a method jointly established by the DOJ, the City and BPD, and the method will include public input.  If the Parties are unable to agree on a Monitor or an alternative method of selection within 90 days of the Monitor's incapacitation, each Party will submit the names of up to two candidates, or two groups of candidates, along with resumes and cost proposals, to the Court, and the Court will select and appoint the Monitor from among the qualified candidates/candidate groups.

453.    Should any of the Parties to this Agreement determine that the Monitor has exceeded its authority or failed to satisfactorily perform the duties required by this Agreement, the Party may petition the Court for such relief as the Court deems appropriate, including replacement of the Monitor, and/or any individual members, agents, employees, or independent contractors of the Monitor.  In addition, the Court, on its own initiative and its sole discretion, may replace the Monitor or any member of the Monitor's team for failure to adequately perform the duties required by this Agreement.

## C.    Compliance Reviews

454.    The Monitor will conduct Compliance Reviews.  The purpose of a "Compliance Review" is a review to determine compliance with the Material Requirements of this Agreement. Compliance Reviews shall be conducted in a reliable manner based on accepted and trustworthy

means and methods.  Any statistical analysis used as part of a Compliance Review must conform

to statistical techniques that are accepted in the relevant field.  The Monitor shall provide the

City, BPD, and DOJ with the underlying analysis, data, methods, and source of the information

relied upon in the Reviews.

455.    The Compliance Reviews to be conducted pursuant to this Agreement shall be

specifically set forth in the Monitoring Plan.

### D.    Outcome Assessments

456.    In addition to Compliance Reviews, the Monitor will conduct Outcome

Assessments as specified in this section of the Agreement to measure whether BPD's revised

practices and procedures are achieving the purposes of this Agreement and are having an overall

beneficial effect on policing in Baltimore.  Outcome Assessments shall be conducted in a

reliable, cost-effective manner based on accepted and trustworthy means and methods.  Any

statistical analysis used as part of an Outcome Assessment must conform to statistical techniques

that are accepted in the relevant field.  The Monitor shall provide the City, BPD, and DOJ with

the underlying analysis, data, methods, and source of the information relied upon in the

Assessments.

457.    For at least the first three years of this Agreement, the Monitor will be responsible

for conducting the Outcome Assessments required by this section.  During this period, BPD will

work with the Monitor and DOJ to develop the capacity to conduct these assessments on its own.

Beginning three years from the Effective Date or as soon as practicable thereafter, BPD will

begin performing the assessments and report these results to the Monitor and DOJ for review.

Should the Monitor find that Outcome Assessments not included in this section of the Agreement

are necessary to determine whether the City and BPD are achieving Full and Effective

Compliance, Court approval will be required.

458.   BPD will develop a plan, in consultation with the Monitor to conduct these or

similar assessments following the termination of the Consent Decree.  BPD will publish the plan

for continuing assessments on BPD's website.

459.   In accordance with this section, the Monitor will conduct the following Outcome

Assessments:

a.  An annual Community Survey that assesses the satisfaction of the community

with BPD's:

i.      Overall police services:

ii.     Trustworthiness;

iii.    Engagement with the community;

iv.     Effectiveness;

v.      Responsiveness;

vi.     Interaction with Youth;

vii.    Misconduct investigation and discipline systems; and

viii.   Interactions with African Americans, Hispanic Americans, LGBT,

and other significant and distinct groups within the community;

b.  An annual analysis of response times for calls of service, accounting for the type

of call, in each police district and different neighborhoods within Baltimore;

c.  To assess whether Arrests made by BPD officers are supported by probable cause,

based on constitutional policing practices, and consistent with this Agreement, an

annual analysis of:

      i.      The rate at which Arrests are found to lack probable cause or otherwise violate the Fourth Amendment by BPD supervisors, and in any court commissioner data made available to BPD;

      ii.      The frequency of civilian complaints to OPR and CRB alleging unlawful Arrests, the disposition of such complaints, and the quality of BPD's complaint investigations;

d.  To assess whether officers are using force lawfully; using tactics that minimize the need to use force; modulating their use of force appropriately in response to changing circumstances; and critically analyzing, learning from, and holding officers accountable for uses of force, the Monitor will conduct an annual:

      i.      Analysis of use of force incidents, broken down by Reportable Force type, District, type of Arrest; race, ethnicity, age, and gender of the subject; and, if indicated at the time force was used, the subject's perceived mental health or medical condition, use of drugs or alcohol, or the presence of a disability;

      ii.      Analysis of force complaints, including: number of force complaints and rate of complaints compared to reported uses of force, broken down by geographic area, Reportable Force type, and race, ethnicity, gender, and age of complainant;

e.  To assess whether BPD officers make Stops and Detentions based on community policing principles that protect the constitutional rights of Baltimore residents the Monitor will conduct analysis of data showing the rate at which officers' Stops and Detentions uncover evidence of criminal activity;

f.  To assess whether BPD officers conduct Searches, Frisks, and Strip Searches consistent with constitutional requirements and the provisions of this Agreement, the Monitor will conduct analysis of data showing:

    i.  The rate at which Frisks result in officers recovering a weapon;

    ii.  The rate Searches yield evidence of illegal weapons or contraband.

g.  To assess whether BPD delivers police services without an unnecessary disproportionate impact on individuals based on Demographic Category, the Monitor will conduct analysis of data showing:

    i.  The breakdown of pedestrian and vehicle Stops by race, gender, and ethnicity, accounting for the demographics of the individuals residing in the area,  crime rates, calls for service, or other relevant facts and circumstances;

    ii.  The outcome of pedestrian and vehicle Stops, including warnings, Citations, and Arrests, broken down by race, gender, and ethnicity, for each police district and the City as a whole, accounting for relevant facts and circumstances surrounding officers' decisions to make the Stops;

    iii.  The percentage of Frisks or Searches that result in seizure of contraband, and the nature of the contraband seized, controlling for available data on facts and circumstances surrounding the Frisk or Search, broken down by race, gender, and ethnicity;

    iv.  The proportion of Arrests for misdemeanor offenses specified in Paragraph 61(a)-(f)  broken down by race, gender, and ethnicity,

that result in one of the following determinations after booking: released without charge; released based on identity issue; declined to charge; and lack of probable cause;

h. To assess whether people with behavioral health disabilities or in crisis are receiving reasonable modifications, the Monitor will conduct analysis of data showing:

    i. The number of people subject to Emergency Petitions who were eligible for community-based services;

    ii. The number of referrals by BPD to community mental health services or to a hospital emergency room; and

i. To assess whether officers interact appropriately with Youth in a manner that accounts for their individual characteristics, the Monitor will conduct analysis of the rate of police interactions with Youth, including Stops, Searches, and Arrests, that result in officers using force;

j. To assess whether members of the public are able to express themselves freely, observe and record law enforcement, and engage in lawful public demonstration and protests without intimidation or retaliation by police, the Monitor will conduct analysis of:

    i. The number of Citations and arrests requiring supervisor approval under the First Amendment section of this Agreement, broken down by police district and arrest charges;

    ii. Complaints in which a person claims he or she was not permitted to observe, record, criticize, or protest police activity, or was

retaliated against for such conduct and the disposition of such

complaints;

k.  To assess whether BPD responds to sexual assault in a nondiscriminatory manner

that complies with the Constitution and federal law, and improves the safety and

security of sexual assault victims in Baltimore, the Monitor will conduct an

annual review of:

   i.    Number of sexual assault reports made to BPD;

   ii.   Rate of victim participation in BPD sexual assault investigations;

   iii.  Clearance rate in sexual assault cases; and

   iv.   Rate of declination of sexual assault cases referred to the Baltimore

         City State's Attorney's Office for prosecution;

l.  To assess whether BPD effectively trains officers and provides them with the

skills and knowledge necessary to conduct their law enforcement activities in

accordance with policy, law, and this Agreement, the Monitor will conduct an

annual review of:

   i.    Rates of completion of approved training and performance

         assessments of evaluative aspects of training;

   ii.   Qualitative measurements of the adequacy of training, including

         assessments by officers, feedback from instructors, and evaluations

         by civilian reviewers;

   iii.  Qualitative and quantitative assessments of the FTO program,

         including the availability of sufficient numbers of eligible FTOs

         and officer complaints filed against FTOs; and

iv.     The frequency that training deficiencies are identified through investigations, internal reviews, complaints, disciplinary proceedings, civilian oversight, or other mechanisms;

m.  To assess whether BPD is providing effective supervision of officers, the Monitor will conduct an annual review of the number of supervisory interventions initiated through the EIS, and on a sampling basis a qualitative analysis of the quality of those interventions;

n.  To assess whether BPD is effectively holding officers accountable, the Monitor will conduct an annual review of the separate OPR and CRB quarterly public reports and underlying data as necessary, examining data on complaints, misconduct allegations, misconduct investigations, and officer discipline.

460.    In conducting these Outcome Assessments, the Monitor should, to the extent practicable, use any relevant data collected and maintained by BPD prior to conducting separate data collections. In the absence of available BPD-collected data, the Monitor may rely on data collected by the Monitor, and information concerning civil liability of BPD, its officials, officers, employees, agents, assigns, or successors, provided that it has determined, and the Parties agree, that this information is reasonably reliable and complete.  In reporting on the Outcome Assessments, the Monitor shall provide the City, BPD, and DOJ with its methodology, underlying analysis and the source of the information relied upon, including, but not limited to, data collected and maintained by BPD, information concerning civil liability of BPD, its officials, officers, agents, or employees, interviews, surveys, including the Community Survey, or public source material.

### E.      Monitoring Plan

461.    Within 90 days of assuming duties as Monitor, the Monitor, in conjunction with the Parties, will develop a Monitoring Plan for the first year of the Agreement.  This plan will:

a.   Provide an overview for how BPD will reach Full and Effective Compliance with all Material Requirements of the Agreement within five years.  This overview will include a specific schedule and deadlines for the upcoming year of the Agreement and a general schedule for successive years, including those deadlines for subsection (e), below, that will extend beyond the first year of the Agreement;

b.   Set forth a review and approval process for all BPD actions that are subject to review and approval by DOJ and or the Monitor, including reasonable deadlines, a period for consultation; a mechanism for extending deadlines; and provisions describing the consequences for failing to meet the deadlines, including but not limited to notice to the Court and the public of missed deadlines;

c.   Clearly delineate how the Material Requirements of the Agreement will be assessed for Full and Effective Compliance so that it is clear when and how Full and Effective Compliance may be achieved;

d.   Describe any Outcome Assessments or Compliance reviews that will be used to assess Full and Effective compliance with the Agreement, including a general description of the methodology and whether any requirements will be assessed collectively or separately;

e.   Establish a schedule for conducting all Outcome Assessments and Compliance reviews, taking into account that the data and technology necessary to conduct the assessments or reviews may be currently unavailable;

     f.   Establish a process for sharing the results of all Outcome Assessments and Compliance Reviews with the Parties, including all source data and information, analysis, and a complete and detailed explanation of any conclusions;

     g.   Clearly delineate the roles and responsibilities of the Monitor's team members, including identifying a Deputy Monitor with authority to act in the Monitor's absence, lead members who have primary authority for each section of this Agreement and achieving Full and Effective Compliance with that section, and specifying whether they or any team member (besides the Monitor and Deputy Monitor) has approval authority for BPD actions;

     h.   Establish a protocol for communication, engagement, and problem solving with BPD and DOJ;

     i.   Establish a method of communicating with the public and receiving public input, which shall include quarterly in-person meetings in different Baltimore neighborhoods;

     j.   Specify any documents that must be preserved pursuant to the Agreement beyond the requirements of applicable retention policies.

462.   The Monitor will submit the Monitoring Plan to the Parties for review and approval. The Parties will have 45 days to either approve or propose changes to the Monitoring Plan. Prior to approval, the Parties agree to hold at least one in-person meeting with the Monitor to discuss the Monitoring Plan. If either Party proposes changes the Monitor will have 15 days to accept or object to those changes. If the Monitor objects to any of the proposed changes and/or the Parties suggest changes that are in conflict, either Party or the Monitor will provide

the rationale for its proposal or objection, in writing, and the Parties and Monitor will have 20 days to confer to resolve the disagreement.

463.    The Monitor will submit the Monitoring Plan to the Court for approval after it is approved by the Parties.  If after good faith attempts, disagreement remains unresolved between the Parties and/or Monitor so that the Monitoring Plan is not approved by the Parties in accordance with the preceding paragraph the Monitor will submit the Monitoring Plan to the Court, noting the areas of disagreement, and either Party or the Monitor may petition the Court thereafter to resolve the disagreement.

464.    To promote flexibility in the implementation of the Agreement, the Parties and the Monitor may change a provision in the Monitoring Plan at any time without Court approval, so long as the Parties and the Monitor are all in agreement that the change should be made, and the Monitor files a written notice of the Change to the Court within five days of making the change.  The notice shall state the reasons for the change, the date on which the change was made, and a statement that all parties and the Monitor are in agreement with the change.  The notice shall also be posted to the Monitor's website.

465.    For each subsequent year of the Agreement, the Monitor shall revise and update the Monitoring Plan pursuant to the process described above.  The Monitor will initiate the development of the Monitoring Plan for the upcoming year at least 90 days before the previous year's Monitoring Plan will conclude.

466.    Where the Monitor and the Parties agree, and subject to Court approval, the Monitor will refrain from conducting a Compliance Review or Outcome Assessment of a requirement of this Agreement previously found to be in compliance by the Monitor where the outcome intended by the requirement has been achieved.

467.    At least 60 days prior to the initiation of any Outcome Assessment or Compliance Review required by the Monitoring Plan, the Monitor will submit a description of the proposed methodology for the Outcome Assessment or Compliance Review to the Parties.  The Parties and the Monitor will have 30 days to meet and confer about the proposed methodology.  If, at the end of this period, any Party continues to have comments or concerns, the Party will submit the comments or concerns regarding the proposed methodology to the Monitor within 20 days. Within 10 days, the Monitor will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it is not modifying its methodology as proposed.  If any party objects to the Monitor's decision, the Party may petition the Court for review.

### F.        Monitor Recommendations and Technical Assistance

468.    The Monitor may make recommendations to the Parties regarding measures necessary to ensure timely Full and Effective Compliance with this Agreement and its underlying objectives.  Such recommendations may include a recommendation to change, modify, or amend a provision of the Agreement; a recommendation for additional training in any area related to this Agreement; or a recommendation to seek Technical Assistance.  Any such recommendation to change, modify, or amend a provision of the Agreement must be in writing and must comply with the requirements to modify the Agreement as described in Paragraph 494 of this Agreement.  In addition to such recommendations, the Monitor may also, at the request of the DOJ or BPD and based on the Monitor's reviews, provide Technical Assistance consistent with the Monitor's responsibilities under this Agreement.

### G.      Comprehensive Re-Assessment

469.      Two years after the Effective Date, the Monitor will conduct a Comprehensive Re-assessment ("Comprehensive Re-assessment" or "Re-assessment") to determine whether and to what extent the Material Requirements of this Agreement have been achieved, and any modifications to the Agreement that are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of the requirement.  This Re-assessment also will address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies and Technical Assistance, for accelerating Full and Effective Compliance.  The Monitor shall file the Comprehensive Re-assessment with the Court no later than 30 months from the Effective Date. At least 60 days prior to filing the Comprehensive Re-assessment, the Monitor will submit the Re-assessment to the Parties in draft form for review and comment by the Parties, and meet with the Parties to discuss the Re-assessment.  The Parties shall have 30 days from receiving the draft Comprehensive Re-assessment to provide comments and objections.  The Monitor will make any revisions that it deems appropriate in light of the Party's comments and file the Comprehensive Re-assessment, any written comments received from the Parties that the Parties request be filed with the Comprehensive Re-assessment, and the Monitor's response with the Court.  These documents will be a public record, and they shall also be posted on the Monitor's website. Based upon this Comprehensive Re-assessment, the Monitor will also recommend modifications to the Agreement that are necessary to achieve the purposes of this Agreement.  These recommendations shall be filed with the Court and posted on the Monitor's website at the same time the Comprehensive Re-Assessment is due.  Where the Parties agree with the Monitor's recommendations, the Parties will submit such stipulation to the Court and request approval.

The Court may, at the Court's discretion, allow public comment regarding suggested modifications.  This provision in no way diminishes the Parties' ability to modify this Agreement, subject to Court approval, as set out in Paragraph 494 of this Agreement.  Nothing in this Agreement will empower the Monitor to unilaterally modify the terms of this Agreement.

470.    These Comprehensive Re-assessments will be conducted every two years while the Agreement is in place.

**H.    Monitor Reports**

471.    The Monitor will file with the Court and post to the Monitor's website semi-annual written reports covering the reporting period that will include:

a.    The progress made by the City and BPD under the Monitoring Plan, as well as an overall assessment of the City's and BPD's progress to date in complying with the Agreement;

b.    A description of the work conducted by the Monitor during the reporting period;

c.    The methodology and specific findings for each Compliance review conducted, redacted as necessary for privacy concerns and legal compliance.  An unredacted version will be filed under seal with the Court and provided to the Parties;

d.    The methodology and specific findings for each Outcome Assessment conducted;

e.    A projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement;

f.    For all Material Requirements of the Agreement, the extent to which the requirements have been:  (1) incorporated into implemented policy; (2) trained at the levels set forth in this Agreement  for all relevant BPD officers; (3) reviewed

or audited by the Monitor in determining whether BPD has reached Full and
Effective Compliance, including the date of the review or audit and the data and
materials relied upon for the review or audit; and (4) found by the Monitor to
have reached Full and Effective Compliance, and the date of this finding;

g.  For all Material Requirements of the Agreement, the report will provide the
Monitor's recommendations regarding necessary steps to achieve Full and
Effective Compliance;

h.  For all Material Requirements of the Agreement, the report will provide the extent
to which the Monitor has provided Technical Assistance; and

i.  An appendix listing each requirement of the Agreement that the Monitor reviewed
and stating whether the requirement has reached "Full and Effective
Compliance," is "In Progress," or is "Not Started."

472.   The Monitor will provide a copy of semi-annual reports to the Parties in draft
form at least 30 days prior to Court filing and public release of the reports to allow the Parties to
comment on the reports.  The Monitor will also post the final reports, along with comments by
the Parties that the Parties request be posted, and the Monitor's response, if any, to its website
and will establish an electronic mechanism for receiving public feedback on the reports.

> **I.   Communication Between the Monitor, the Parties, the Court, and the Public**

473.   The Monitor will maintain regular contact with the Parties in order to ensure
effective and timely communication regarding the status of the implementation of and
compliance with this Agreement.  To facilitate this communication, the Monitor shall hold
regular status teleconferences and in-person meetings with the Parties on a schedule agreed upon
by the Parties and the Monitor.

474.     The Monitor will meet interested community stakeholders on a regular basis to discuss the BPD's progress under the Agreement, to explain the Monitor's reports, to inform the public about the Agreement implementation process, and to hear community perspectives of police interactions.  The Monitor will designate a member of the team as a community liaison, who will serve as a point of contact to community members.

475.     The Monitor will meet with BPD officers on a routine basis to inform them about the Agreement implementation process and to hear their questions, concerns, and suggestions regarding its implementation.  The Monitor will designate a member of the team as an officer liaison, who will serve as a point of contact to officers, including the Fraternal Order of Police, Vanguard, Hispanic Officers Law Enforcement Association, and other officer associations. Rank and file BPD officers may report misconduct, including retaliation, to the Monitor either anonymously or on the record.  The Monitor will not investigate these reports, but will convey information regarding the complaint to Internal Affairs without revealing the officer's identity if anonymity has been requested, and may track the complaint investigation to ensure it is handled appropriately.

**J.      Public Statements, Testimony, Records, and Conflicts of Interest**

476.     Except as required or authorized by the terms of this Agreement, by the Parties acting together, or by authorization of the Court, the Monitor, will not make any public statements or issue findings with regard to any act or omission of the Parties or their agents, representatives, or employees; or disclose non-public information provided to the Monitor pursuant to the Agreement.

477.     The Monitor, may testify as to its observations, findings, and recommendations before the Court with jurisdiction over this Agreement, but will not testify in any other litigation

or proceeding with regard to any policy or practice, act or omission of the City, BPD, or any of their officials, officers, agents, or employees related to this Agreement or regarding any matter or subject that the Monitor may have received knowledge of as a result of its performance under this Agreement.  This paragraph does not apply to any proceeding before the Court related to performance of contracts or subcontracts for monitoring this Agreement.

478.    Unless such conflict is waived by the Parties, the Monitor will not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including future retention (on a paid or unpaid basis) by any current or future private litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the City, BPD or their officials, officers, agents, or employees.  The Monitor will not enter into any contract with the City, BPD, or the United States while serving as the Monitor unless the Monitor first discloses the potential contract to the Parties and the Parties agree in writing to waive any conflict.  If the Monitor resigns from its position as Monitor, the former Monitor may not enter into any contract with the City, BPD, or the United States on a matter related to the Agreement without the written consent of the Parties while the Agreement remains in effect.  If the DOJ wishes to hire a member of the monitoring team to assist in a separate investigation or matter that does not involve the City or the BPD, or their departments, officials, officers, agents or employees, it will notify the Monitor, the City, and BPD in advance of the hiring and discuss any potential conflicts of interest.

479.    The Monitor will not be permitted to represent or work for any individual or organization in any criminal, civil or administrative matter adverse to the City or BPD or the United States, including any individual or organization designated as a witness, consultant, victim, defendant, subject, target, or person of interest, for the duration of the monitorship.

180

480.    The Monitor is an agent of the court and not a state or local agency, or an agent

thereof, and accordingly the records maintained by the Monitor will not be deemed public

records subject to public inspection.  The Monitor will not be liable for any claim, lawsuit, or

demand arising out of and substantively related to the Monitor's performance pursuant to this

Agreement brought by non-parties to this Agreement.

### K.    Consent Decree Implementation Unit

481.    During the United States' investigation, BPD formed an inter-disciplinary unit,

the Compliance, Accountability, and External Affairs Division, to facilitate the investigation

("Compliance Unit").  BPD agrees to maintain this unit to facilitate implementation of this

Agreement, and to hire and retain individuals, or reassign current BPD employees, with the skills

and abilities necessary to ensure that the Agreement is implemented in a timely manner.  The

Compliance Unit will serve as a liaison between the BPD and the Monitor and will assist with

the implementation of and compliance with this Agreement.  At a minimum, this unit will:

coordinate the BPD's compliance and implementation activities; facilitate the provision of data,

documents, materials, and access to the BPD personnel to the Monitor and the DOJ, as needed;

ensure that all data, documents, and records required by this Agreement are maintained in an

usable format; and assist in assigning implementation and compliance related tasks to BPD

personnel, as directed by the Police Commissioner or the Commissioner's designee.

### L.    Access and Confidentiality

482.    As specified in this Agreement, BPD will collect and maintain all data and

records necessary to document implementation of the Agreement and assess compliance.  These

data and records include documentation of Stops, Searches, Arrests, uses of force, training

records, documentation of sexual assault investigations, internal and external complaints,

complaint investigations, and supporting documentation, and other documentation required by the Agreement and specified in the Monitoring Plan.  To the extent that these data and records are routinely purged according to a document retention schedule, BPD will notify the Monitor and DOJ of the schedule for all relevant data and records and the Monitor and the Parties will develop a protocol for maintaining the data and records that balances the burden of maintaining the data and records on BPD with the need to maintain the data and records to adequately assess compliance.

483.    To facilitate their work pursuant to this Agreement, the Monitor and DOJ may conduct on-site visits and assessments with reasonable prior notice to BPD and, when necessary to assess compliance, may conduct on-site visits and assessments without prior notice to BPD, although such circumstances should be rare.  The Monitor and DOJ will have access to all necessary individuals, facilities, and documents, which will include access to Agreement-related trainings, meetings, and reviews, such as critical incident reviews, use of force review, materials documenting stops, searches, arrests, and uses of force, citizen complaints of officer misconduct and public trial boards.  The Monitor will have access to protected employee personnel records, including misconduct complaints and investigations, and non-public trial boards or other disciplinary hearings, and DOJ will have access to the same information in compliance with state and federal law.  The role of the Monitor and DOJ during these visits and assessments is solely to observe and monitor.  To avoid unnecessary confusion, distraction, duplication of effort, and undue burdens on BPD, the Monitor, DOJ, and the Compliance Unit shall coordinate in making any on-site visits or observations and otherwise seeking access to BPD or its individuals, facilities, and documents. BPD will notify the Monitor and the DOJ as soon as practicable, and

in any case within 24 hours, of any critical firearm discharge, in-custody death, or arrest of any officer.

484.    BPD, through the Compliance Unit, will ensure that the Monitor and DOJ have timely, full and direct access to all BPD staff, employees, critical incident crime scenes, and facilities that the Monitor and DOJ reasonably deem necessary to carry out their duties under this Agreement.  The Monitor and DOJ will cooperate with the BPD to access people and facilities in a reasonable manner that minimizes interference with daily operations.

485.    Upon reasonable notice and request, the City and BPD will ensure that the Monitor and DOJ have access to all documents and data that the Monitor and DOJ reasonably deem necessary to carry out their duties under this Agreement, except any documents or data protected by the attorney-client or other recognized privileges, or, as to DOJ, where disclosure is prohibited by law.  Should the City or BPD decline to provide the Monitor or DOJ access to documents or data based on privilege, or as to DOJ, other legal prohibition, the City or BPD will inform the Monitor and the DOJ that they are withholding documents or data on this basis and will provide the Monitor and the DOJ with a log describing the documents or data and the basis for withholding.  If the Monitor or DOJ disagrees with the basis for withholding the Monitor or the DOJ may request that the Court, or the Court may *sua sponte*, order an *in camera* review of the protected material to make a determination on disclosure.

486.    The Monitor and the DOJ will provide BPD, through the Compliance Unit, with reasonable notice of a request for copies of documents.  Upon such request, BPD will provide in a timely manner copies (electronic, where readily available) of the requested documents to the Monitor and the DOJ.

487.     The Monitor and DOJ will have access to all records and information relating to criminal investigations of BPD officers as permissible by law.  The Monitor and DOJ will have access to all documents in criminal investigation files that have been closed by BPD after the Effective Date as permissible by law.  The Monitor and DOJ also will have reasonable access to all arrest reports, warrants, and warrant applications initiated after the Effective Date whether or not contained in open criminal investigation files as permissible by law.

488.     The Monitor and the DOJ will maintain all non-public information provided by the City and BPD in a confidential manner.  Other than as expressly provided in this Agreement, this Agreement will not be deemed a waiver of any privilege or right BPD or the City may assert, including those recognized at common law or created by statute, rule or regulation, against any other person or entity with respect to the disclosure of any document.

**M.     Court Jurisdiction, Modification of the Agreement, and Enforcement**

489.     This Agreement will become effective upon approval and entry as an order of the Court.

490.     The investigation that led to this Agreement was initiated pursuant to the authority granted to the DOJ under 42 U.S.C. § 14141 to seek declaratory or equitable relief to remedy an alleged pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law.

491.     This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345.  The United States is authorized to initiate this action pursuant to 42 U.S.C. § 14141.  Venue is proper in the District of Maryland pursuant to 28 U.S.C. § 1391, because BPD is located in and the claims arose in the District of Maryland.

492.    The Agreement will constitute the entire integrated agreement of the Parties.  No prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

493.    To ensure that the requirements of this Agreement are properly and timely implemented, the Court will retain jurisdiction of this action for all purposes until such time as the Court determines BPD has achieved Full and Effective Compliance as defined herein and the Court issues an order terminating the Agreement.  At all times, BPD will bear the burden of demonstrating by a preponderance of the evidence its Full and Effective Compliance with this Agreement.  The DOJ acknowledges the good faith of BPD in trying to address measures that are needed to promote police integrity and ensure Constitutional Policing in Baltimore.  The DOJ, however, reserves its right to seek enforcement of the provisions of this Agreement if it determines that BPD has failed to fully comply with any provision of this Agreement.  The DOJ agrees to consult with officials from the City and BPD before instituting enforcement proceedings and will make a good faith attempt to resolve any disputes before seeking intervention from the Court.

494.    The City and BPD and the DOJ may jointly stipulate to make changes, modifications, and amendments to this Agreement, which will be subject to Court approval. Such changes, modifications, and amendments to this Agreement will be encouraged when the Parties agree, or where the Compliance Reviews and Outcome Assessments of the Monitor demonstrate, that the Agreement provision as drafted is not furthering the purpose of the Agreement, or that there is a preferable alternative that will achieve the same purpose.  Where the Parties or the Monitor are uncertain whether a change to the Agreement is advisable, the

Parties, with Court approval, may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension. During this suspension, the Parties, with Court approval, may, but are not required to, agree to temporarily implement an alternative requirement. The Monitor will assess and report to the Court whether the suspension of the requirement and the implementation of any alternative provision is as, or more, effective at achieving the purpose as was the original/current Agreement requirement, and the Parties will consider this assessment in determining whether to request that the Court approve the suggested change, modification, or amendment. The Court may, at its discretion, allow public comment on the proposed changes, modifications and amendments.

495.    Unless stated otherwise in this Agreement, if any party disagrees with any aspect of the implementation of the Agreement, that party will engage in good faith informal consultation with the other party and the Monitor to attempt to resolve the disagreement. If the disagreement persists, that party will, within 10 days of the apparent impasse, inform the other Parties and the Monitor in writing of the fact of the disagreement. Within 5 days thereafter, the Parties will meet and confer on the disagreement at a mutually agreeable time. If necessary, any party may petition the Court thereafter to resolve the dispute pursuant to the provisions below.

496.    In the event of ambiguity or inconsistency in any of the terms of this Agreement, the Agreement shall be interpreted in a flexible and practical manner to achieve the purposes of this Agreement.

497.    Subject to the confidentiality protections for collective bargaining negotiations, the City and BPD agree to notify the Monitor and the DOJ when and if the FOP takes a position during negotiations that any of the Material Requirements of the Agreement are not valid or enforceable. In addition, subject to the same confidentiality protections the City and BPD agree

to notify the Monitor and DOJ when the addition of voting civilian members on disciplinary trial boards will become or has become a topic of negotiations.

498.     The Parties will defend the provisions of the Agreement.  The Parties will notify each other and the Court of any court, union or administrative challenge to this Agreement.  In the event any provision of this Agreement is challenged in any court other than this Court, the Parties will seek removal, transfer or consolidation with this Case in this Court.  To the extent any state law, local ordinance, or collective bargaining provision conflicts with any provision of this Agreement or impedes its effective implementation, the City and BPD will use its best efforts to advocate to change the law(s), ordinance(s), or collective bargaining provision(s).  This Agreement does not alter or affect current CBAs or collective bargaining rights, or state law.  If the City and BPD are unable to eliminate conflicts between the provisions of this Agreement and law(s), ordinance(s), or collecting bargaining provision(s), the City and BPD will comply with the Agreement to the extent permissible.

499.     The City and BPD will require compliance with this Agreement by their respective officials, officers, employees, agents, assigns, or successors.

500.     The City will be responsible for providing necessary and reasonable financial resources to BPD to enable BPD to fulfill its obligations under the Agreement.

501.     The City and BPD deny the allegations in the Complaint and Report.  Nothing in the Report, AIP or this Agreement was intended to be used by third parties to create liability by or against the City or the BPD or any of their officials, officers, agents or employees under any federal, state or municipal law, including 42 USC § 1983.  This Agreement (including the assessments and reports the Agreement requires to be produced), Report, Complaint, or AIP, are not intended to confer any right on any third-person or entity seeking relief against the City,

BPD, or any officer or employee thereof, for their conduct or the conduct of BPD officers.  This Agreement (including the assessments and reports produced by the Monitor pursuant to the Agreement), Report, Complaint, or AIP shall not be construed or used as an admission of liability by or against the City or BPD under any federal, state or municipal law including, but not limited to, 42 U.S.C. § 1983.  By entering into this Agreement, neither the City nor BPD admit or agree that they have violated the law.

502.    This Agreement is enforceable only by the Parties.  No person or entity is or is intended to be a third-party beneficiary of this Agreement for the purposes of any civil, criminal, or administrative action.  Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

503.    The Parties agree that, as of the Effective Date of this Agreement, litigation is not "reasonably foreseeable" concerning the matters described in this Agreement.  To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Agreement, the Party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves any Party of any other obligations imposed by this Agreement, including the document creation and retention requirements described herein.

**N.    Termination of the Agreement**

504.    Upon the Court's determination that the City and BPD have achieved Full and Effective Compliance with this Agreement as defined below and have maintained such compliance for at least one year for any material requirements in the Consent Decree sections delineated as Group A below, and for at least two years for the sections delineated as Group B below, the Court will terminate the Agreement and dismiss the case.

a.  Group A includes: Community Oversight Task Force, Interactions with Youth,

Transportation, First Amendment, Technology, and Coordination with School

Police.

b.  Group B includes: Community Policing and Engagement, Stops, Searches,

Arrests, and Voluntary Police-Community Interactions, Impartial Policing,

Responding to and Interacting with People with Behavioral Health Disabilities or

in crisis, Use of Force, Handling of Reports of Sexual Assault, Supervision,

Misconduct Investigations and Discipline, and Recruitment, Hiring and Retention.

505.   Five years from the Effective Date, upon the motion of any Party, the Court will

hold a hearing to assess the status of the City's and BPD's compliance with the Agreement and

to determine whether the Agreement should continue.  The standards for termination of all or

part of the Agreement described in this Section of the Agreement shall apply to the hearing.  If

the City and/or BPD have achieved Full and Effective Compliance as to some Material

Requirements, the Agreement shall not be extended as to those Requirements.

506.   To achieve "Full and Effective Compliance," the City and BPD must demonstrate

that they have (a) incorporated all Material Requirements of this Agreement into policy, trained

relevant personnel as necessary to fulfill their responsibilities pursuant to the material

requirements, and ensured that each material requirement is being carried out in practice; and (b)

shown sustained and continuing improvement in constitutional policing as demonstrated by the

Agreement's Outcome Assessments.  Full and Effective Compliance must be maintained

according to the time periods set forth in Paragraph 504.  No specific numerical test shall be

required to demonstrate Full and Effective Compliance so long as BPD is demonstrating

substantial adherence with the Material Requirements, continual improvement, and the overall

purpose of the Material Requirements has been met.  Non-compliance with mere technicalities, or temporary or isolated failure to comply during a period of otherwise sustained compliance, will not constitute failure to achieve or maintain Full and Effective Compliance.  At the same time, temporary compliance during a period of otherwise sustained noncompliance will not constitute compliance with this Agreement.

507.    The City and BPD may move the Court at any time to terminate this Agreement upon a showing by a preponderance of the evidence that BPD has reached Full and Effective Compliance and maintained that compliance according to the time periods set forth in Paragraph 504.  The Parties may also agree to jointly ask the Court to terminate this Agreement at any time after BPD has been in Full and Effective compliance with this Agreement in accordance with Paragraph 504.

508.    If BPD has reached Full and Effective Compliance with a part of the Agreement and maintained that compliance in accordance with Paragraph 504, but not the entire Agreement, even before five years from the Effective Date of the Agreement, the City and BPD may move at any time to terminate that part of the Agreement.  To terminate a part of the Agreement, that part must be sufficiently severable from the other requirements of the Agreement that non-compliance with those other requirements does not implicate BPD's ability to police in accordance with federal law and this Agreement in the part to be terminated.  In determining whether there is Full and Effective Compliance with a part of the Agreement, all the requirements of the Agreement may be assessed collectively to determine whether the intended outcome of the part has been achieved.

509.    If the Parties disagree about whether BPD has been in Full and Effective Compliance either (1) as to the entire Agreement, or (2) as to any severable part of the

Agreement at any time, the City and BPD may move to terminate by following the procedures of this paragraph.  Prior to filing a motion to terminate, the City and BPD must notify DOJ and the Monitor in writing that the City and BPD believe BPD has been in Full and Effective Compliance with this Agreement or a severable part, for in accordance with Paragraph 504. Thereafter, the Parties will promptly confer as to the status of compliance.   The Parties will allow for a period of 60 days for consultation or the completion of any Compliance Review that DOJ and/or the Monitor may wish to undertake, including on-site observations, document review, or interviews with BPD personnel, to assess BPD's compliance.  After this period of consultation and review, if the Parties cannot resolve any disagreements, the City and BPD may file a motion to terminate the Agreement or any severable part.   If the City and BPD move for termination of this Agreement, DOJ will have 45 days after the receipt of the motion to respond to the motion, and the City and BPD shall have 30 days to file a reply.

510.    For any motion to terminate, the Court shall hold a hearing on the motion and the burden will be on the City and BPD to demonstrate that they are in Full and Effective Compliance with this Agreement or any severable part and have maintained such compliance in accordance with Paragraph 504.

## XVIII.        DEFINITIONS

511.    This section defines terms used in this Agreement.  Other terms used in this Agreement shall be defined consistent with relevant case law and applicable principles of contractual interpretation:

a.        "Apparent signs of medical distress or emergency." Signs of medical distress, injury, or emergency that a reasonable officer, having been

trained to identify medical distress, injury, or emergency, would recognize as such.

b.　　　"Arrest."  Taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the person arresting him or her.  An arrest is a restraint of greater scope or duration than an investigatory stop or detention.  An arrest is lawful when supported by probable cause.

c.　　　"Behavioral Health."  Behavioral health includes not only ways of promoting well-being by preventing or intervening in mental illness such as depression or anxiety, but also has as an aim of preventing or intervening in substance abuse or other addictive disorders.

d.　　　"Behavioral Health Disabilities." Disabilities associated with substance-related disorders, addictive disorders, and mental disorders.

e.　　　"BEST Program." The Behavioral Emergency Services Team training, a certification course intended to equip police officers with methods to properly interact with individuals with behavioral and/or mental health disorders safely and in a mutually beneficial manner.

f.　　　"Body Cavity Search." Any search of an individual involving not only visual inspection of skin surfaces but the internal physical examination of body cavities and, in some instances, organs such as the stomach.

g.　　　"Body-worn camera" or "BWC."  Audio and/or video recording equipment that is worn affixed to an officer's person, uniform, or

equipment, with the capability of capturing, recording, and storing information for later viewing.

h.      "BPD Command."  Officers of the rank of Captain and above.

i.      "Case." Complaint filed in United States v. Police Department of Baltimore City and Mayor and City Council of Baltimore.

j.      "Child." An individual under the age of thirteen.

k.      "CIT Officer." An officer who has received enhanced, specialized training in responding to individuals in crisis.

l.      "Citation." Official documentation stating that an individual has been made aware of a violation by a law enforcement officer.

m.      "Civilian Review Board" or "CRB."  An independent agency in the City that may investigate and/or review certain categories of civilian complaints involving BPD employee interactions with members of the Baltimore community.

n.      "Community Survey."  A reliable, comprehensive, and representative survey, consistent with the criteria of this Agreement, of the Baltimore community's experience with and perceptions of BPD and public safety.

o.      "Compliance, Accountability, and External Affairs Division" or "Compliance Unit."  An inter-disciplinary unit the Baltimore Police Department formed during the DOJ investigation to facilitate the investigation and implementation of this Agreement.

p.      "Computer Aided Dispatch System" or "CAD system."  A computer-aided or -assisted dispatch system in which police vehicles are able to send

and receive electronic information to and from dispatchers, as well as store and display information.

q.      "Compliance Review." An assessment that may include audits, statistical analysis or other reviews to assess compliance by the City for its obligations and BPD for its overall compliance with this Agreement.

r.      "Conducted Electrical Weapon" or "CEW."  A weapon, including those manufactured by TASER International, designed primarily to discharge electrical charges into a subject that will cause involuntary muscle contractions and override the subject's voluntary motor responses.

s.      "Consent to Search Form." Document advising person of his or her constitutional right not to have a search made of their person or property without a search warrant being obtained, and notifying person that they do not have to consent to a warrantless search.

t.      "Court." The United States District Judge for the District of Maryland presiding over this case.

u.      "Crisis." An incident in which an individual experiences or displays intense feelings of personal distress (e.g., anxiety, depression, anger, fear, panic, hopelessness) and disruptions in thinking (e.g., visual or auditory hallucinations, delusions, cognitive impairment). This could be the result of mental illness, a substance use disorder, an intellectual or developmental disability, a personal crisis, or the effects of drugs or alcohol.

v.        "Crisis Intervention Coordinator." Designated officer at the rank of

Sergeant or above responsible for facilitating communication between

BPD and members of the behavioral health provider community and to

increase the effectiveness of BPD's crisis intervention program.

w.        "Crisis Intervention Team" or "CIT." A first-responder model of police-

based crisis intervention with community, health care, and advocacy

partnerships.  CIT provides law enforcement-based crisis intervention

training for assisting those individuals with a mental illness and improves

the safety of patrol officers, consumers, family members, and citizens

within the community.

x.        "Custody."  A person who has been arrested or otherwise detained and is

not free to leave.

y.        "De-escalation techniques."  Tactics used by offices during encounters to

minimize the need to use force and increase the likelihood of voluntary

compliance.  These may include verbal persuasion and warnings, as well

as tactical de-escalation techniques such as creating space, slowing down

the pace of an incident, and requesting additional resources.

z.        "Demographic Category." Race, ethnicity, color, national origin, age,

gender, gender expression or identity, sexual orientation, disability status,

religion, or language ability.

aa.       "Developmentally appropriate." Incorporating an understanding of the

social, emotional, physical, neurological, behavioral, and moral aspects of

development in an individual under eighteen (18) years of age.

bb.      "Discipline or disciplinary action."  A personnel action for violation of an established law, regulation, rule, administrative rule, or BPD policy, including a written reprimand, suspension, or dismissal.

cc.      "Discriminatory policing."  Differential enforcement or non-enforcement of the law, including the selection or rejection of particular policing tactics or strategies, that has a disparate impact on individuals of a Demographic Category.

dd.      "District Commander."  A captain, major or other supervisory BPD officer with authority to oversee one of BPD's nine police districts.

ee.      "Drafting." A term to describe a BPD staffing process in which patrol officers are required to work overtime after the end of their regular shifts in order to compensate for staffing shortages, or be subject to discipline.

ff.      Effective Date." The day this Agreement is approved and entered as an order of the court.

gg.      "Emergency Petition." A petition for emergency evaluation as defined under Maryland Code § 10-622.

hh.      "Employee Assistance Program" or "EAP." A service for officers that allows access to no- or low-cost counseling and mental wellness services including: confidential counseling services; crisis counseling; stress management counseling; and mental health evaluations.

ii.      "Explorer Program." Program that offers youth an opportunity to develop leadership skills and learn about police procedures and policy, while

getting to know local police officers and how they serve their community through public service.

jj.    "Field interviews."  Voluntary contacts during which a BPD officer may ask questions or try to gain information about possible criminal activity, without indicating or implying that a person is not free to leave or is obligated to answer the officer's questions.

kk.    "Field Training Officer" or "FTO." An experienced or senior BPD officer responsible for the training and evaluation of junior or probationary level officers.

ll.    "Firearm" or "service weapon."  A handgun, shotgun, or any other weapon designed to expel a projectile by the action of an explosive.

mm.    "Force."  Any physical effort used to compel compliance, control or restrain another, or to overcome the resistance of another.

nn.    "Frisk" or "Pat Down." A brief, non-invasive search of the outer layers of a person's clothing for weapons only when the officer possesses specific and articulable facts creating reasonable suspicion that the subject is armed and dangerous.

oo.    "Gender Identity."   A person's internal, deeply-felt sense of being male, female, or something other or in-between, regardless of the sex they were assigned at birth.

pp.    "Gender Expression." An individual's characteristics and behaviors (such as appearance, dress, mannerisms, speech patterns, and social interactions) that may be perceived as masculine or feminine.

197

qq.     "Gender Non-Conforming."  People who have, or are perceived to have, gender characteristics and/or behaviors that do not conform to traditional or societal expectations.

rr.     "Impact Weapon."  Refers collectively to batons (including crowd control straight batons and expandable batons) and espantoons.

ss.     "Implicit bias." Bias that occurs as the result of cognitive processes of which the individual is not consciously aware.

tt.     "Including, includes, or include." Including, but not limited to.

uu.     "Intellectual and Developmental Disability." A severe chronic disability of an individual that is attributable to a physical or mental impairment, other than the sole diagnosis of mental illness, or to a combination of mental and physical impairments; is manifested before the age of 22; and is likely to continue indefinitely.

vv.     "Intersex."  A person whose sexual or reproductive anatomy or chromosomal pattern does not seem to fit typical definitions of male or female.

ww.     "Investigatory stop or detention." A brief, involuntary restraint of a person not in a vehicle for investigatory purposes by an officer when she has reasonable suspicion, based on specific and articulable facts, that the detained person has been, is, or is about to be engaged in the commission of a crime.  An investigatory stop occurs when a person reasonably believes that she is not free to leave based on the circumstances and the conduct of the officer(s), regardless of intent. A weapons Frisk may be

conducted as part of an investigatory stop only if the officer has additional articulable facts creating reasonable suspicion that the detained person is armed and dangerous.

xx.  "Less-lethal Weapon."  A weapon neither intended nor likely to cause death or serious physical injury, but that can cause death or serious physical injury. Less-lethal force weapon includes, but is not limited to, CEW, an impact weapon such as an asp or baton, and OC spray.

yy.  "Lethal force."  Any use of force likely to cause death or serious physical injury, including the use of a firearm; neck hold; or strike to the head, neck, or throat with a hard object.

zz.  "LGBT."A common abbreviation that refers to the lesbian, gay, bisexual, and transgender community. Intersex and gender-nonconforming, while not included in the LGBT acronym, are included whenever the LGBT acronym is used in this Agreement.

aaa.  "Material Requirement." A requirement of the Agreement that has a significant relationship to achieving the purposes of this Agreement.

bbb.   Micro-community policing." A policing strategy based on community partnerships and problem-solving techniques that are tailored to a neighborhood or other small geographic area, recognizing that priorities vary between and within differing neighborhoods or other geographic communities.

ccc.  "Misconduct." A violation of BPD policies or procedures; violation of federal, state, or local criminal or applicable civil laws; constitutional

violation, whether criminal or civil; violation of administrative rules; or violation of regulations.

ddd.    "Misconduct indicating apparent criminal conduct by an employee." Misconduct that a reasonable and trained Supervisor or misconduct investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

eee.    "Misconduct investigator."  Any employee who conducts an administrative investigation of misconduct, including but not limited to investigators assigned to the Office of Professional Responsibility, investigators assigned to the Civilian Review Board, and Supervisors at the District or Unit level responsible for investigating certain allegations of misconduct by their subordinates.

fff.    "Monitor." The person or team of people, including any agent, employee or independent contractor thereof, who shall be jointly selected to monitor and report on the implementation of this Agreement.

ggg.    "Mobile crisis team." A team of service providers that respond to people at their homes and in other community settings and offer services, support, and treatment to de-escalate crises without removing the individual from the community or, when this is not appropriate, ensuring that individuals are linked with appropriate least-restrictive healthcare services.

hhh.    "Neckholds" or "chokeholds."  Any of the following types of holds: (a) arm-bar control holds, which inhibit breathing by compression of the airway in the neck; (b) carotid restraint holds, which inhibit blood flow by

compression of the blood vessels in the neck; (c) lateral vascular neck constraints; (d) holds with a knee or object to the back of a prone subject's neck.

iii. "Non-demographic identifying factors." Information used to identify an individual that are unrelated to, and are not a proxy for, Demographic Categories.  This information may include, but is not limited to, height, weight, or clothing.

jjj. "Oleoresin Capsicum Spray" or "OC Spray."  A natural inflammatory agent derived from the pepper plant. As an inflammatory agent, aerosol OC Spray causes a near immediate inflammation of the eyes and breathing passages. There is an intense burning sensation of the eyes, throat, and other exposed areas of the skin. When OC is inhaled, the respiratory tract becomes inflamed and breathing might become restricted.

kkk.  "Peer Group Analysis."  Using internal benchmarks or other appropriate statistical measures to compare officers' enforcement activities to the enforcement activities taken by other officers with similar relevant characteristics, such as unit, district assignment, and experience.

lll. "Performance Review Board" or "PRB."  The Performance Review Board serves as an advisory body to the Police Commissioner. The PRB reviews serious use of force and other incidents and investigations. At the conclusion of its review of such incidents and investigations, the PRB makes a recommendation to the Police Commissioner regarding the completeness of the investigations, findings, and action items.

201

mmm.    "Policies" or "Procedures." Includes regulations or directives, regardless of their official title, describing the duties, functions, and obligations of BPD officers or employees, specifically directing how to fulfill those duties, functions or obligations.

nnn.    "Presence in a lawful location."  Presence in any location where members of the public may lawfully be present, and that does not pose a threat to officer safety or interfere with the ability of law enforcement officers to perform their jobs.

ooo.    "Procedural justice." A concept involving four central principles designed to build public confidence in the police: 1) treating people with dignity and respect; 2) giving individuals a chance to be heard during encounters; 3) making decisions fairly and transparently, based on facts; and 4) conveying goodwill and trustworthiness.

ppp.    "Principal." An employee against whom an allegation of misconduct or wrongdoing has been made and who is a subject of a misconduct investigation.

qqq.    "Prone position."  Body position in which a person's chest is on the ground and back is facing up.  Includes positions in which a person is "hog tied" or hand cuffed and placed on his or her chest or stomach.

rrr.    "Public discharge of duties."  Officer activities that can be observed from any area in which the public may be lawfully present.

sss.    "Quality of Life Offenses." Certain infractions of statutes and ordinances enumerated in the Baltimore City Code and the Maryland Annotated

Code:  Loitering, Trespassing, Public Urination/Defecation, Disorderly Conduct, Failure to Obey, Disturbing the Peace, Hindering, Open Container, Littering, and any other offense added to BPD's Quality of Life Offense policy.

ttt.    "Reasonable force."   Force which is objectively reasonable under the circumstances and the minimum amount of force necessary to effect an arrest or protect the officer or other person.

uuu.    "Records Management System."  Any department-wide system that provides for the storage, retrieval, retention, manipulation, archiving, and viewing of information, records, documents, or files pertaining to law enforcement operations.

vvv.    "Recruitment Plan." A written plan that includes clear goals, objectives, and action steps for attracting and retaining a quality work force that reflects the diversity of the Baltimore community.

www.    "Reportable Force."  Use or show of force that falls within Level 1, Level 2, or Level 3 force, as defined in this Agreement.

xxx.    "Resource Plan." A written plan for adopting the Technology necessary to satisfy the Material Requirements of this Agreement.

yyy.    "Resource Study." Comprehensive study of the Technology necessary to satisfy the Material Requirements of this Agreement.

zzz.    "Request for Application." The document explaining the process by which the Monitor shall be selected.

aaaa.    "Search." Exploration or inspection of a person's house, body, clothing, property or other intrusion on a privacy interest by a law enforcement officer for the purpose of discovering evidence of a crime or a person who is accused of a crime.

bbbb.    "Seizure." The act of a law enforcement officer taking possession of property; or the words or actions of a law enforcement officer that convey to a reasonable person that he or she is not free to leave.

cccc.    "Sexual Assault."  Attempted or completed rape and sexual offenses, as defined by §§ 3-303 to 3-312 of the Maryland state criminal laws.

dddd.    "Sexual Misconduct."  Any behavior by a BPD officer or employee that uses the employee's law enforcement authority to commit a sexual act or initiate sexual contact with another person, including a sexual act or sexual contact in response to a perceived sexually motivated cue (from a subtle suggestion to an overt action) from another person.  It also includes any sexual communication or behavior by an officer that would likely be construed as lewd, lascivious, inappropriate, or conduct unbecoming an officer.

eeee.    "Special Investigations Response Team" or "SIRT." BPD unit tasked with conducting investigations of Level 3 Reportable Force, investigations specially assigned to SIRT by the Police Commissioner or designee, and any fatal motor vehicle crash in which the actions of a BPD member were a contributing cause. SIRT is a sub-unit of the Office of Professional Responsibility ("OPR").

ffff.      "Stops."  Used herein to generally describe "Investigatory Stops" and

"Vehicle Stops."

gggg.     "Strip Search."  A search of a person for contraband, including weapons or

drugs, that involves either:  (a) removing or moving at least some of a

person's clothing not including shoes, jackets, or other outer wear and

searching part of the person's body; or (b) visual inspection without

touching the inside of a person's mouth, nose or ears.  Strip Searches do

not include weapons Frisks or Pat Downs for weapons that can be

performed lawfully pursuant to *Terry v. Ohio* and its progeny.

hhhh.     "Supervisor."  A sworn BPD employee at the rank of sergeant or above (or

anyone acting in those capacities) with oversight responsibility for BPD

personnel.

iiii.      "Termination of this Agreement."  The dismissal of the Case.

jjjj.      "Tester." A person who poses as a civilian making a fictitious complaint

for assessment purposes.

kkkk.     "Tonic immobility."  Involuntary muscular paralysis of victim that occurs

during sexual assault from significant stress or injury; also known as

"rape-induced paralysis."

llll.      "Transgender." A term for people whose gender identity, expression or

behavior is different from those typically associated with their assigned

sex at birth.

mmmm.  "Transport or transportation."  The process of moving detainee from the

place of their detention until the transfer of custody, which usually occurs

at booking.  Transport includes the process of placing a detainee in a transport vehicle, securing and monitoring the detainee, driving a vehicle for any purpose with a detainee inside, and unloading the detainee and moving him or her to any other location until there is a transfer of custody.

nnnn.    "Use of Force Assessment Unit" or "UOFAU." The Use of Force Assessment Unit conducts administrative assessments of all Level 1 and Level 2 Reportable Force incidents.

oooo.    "Undue pain." Excessive or unwarranted pain knowingly inflicted upon a person by a police officer, when such pain could have been avoided while maintain the safety and security of the officer and other persons. Knowledge is presumed where a reasonable officer would have known that undue pain was being inflicted.

pppp.    "Undue risk of injury." Excessive or unwarranted risk of injury to which a person is knowingly subjected by an officer, when such could have been avoided while maintaining the safety and security of the officer and other persons.  Knowledge is presumed where a reasonable officer would have known the existence of an undue risk of injury.

qqqq.    "Unity of Command." The principle that all officers are assigned to a consistent, clearly identified first-line supervisor and that first-line supervisors are assigned to work the same days and hours as the officers they are assigned to supervise.

rrrr.    "Unit." Any designated organization of officers within BPD, including area and specialized units.

ssss.   "Vehicle stop."  The involuntary detention of a vehicle and the person

driving the vehicle or an occupant based on probable cause that the driver

has committed a traffic violation, or reasonable suspicion based on

specific and articulable facts that the vehicle or an occupant of the vehicle

has been, is, or is about to be engaged in the commission of a crime.

tttt.   "Voluntary contacts." Interactions between BPD officers and community

members that do not involve coercion. During the course of a voluntary

contact, a community member is free to leave at any time, and is under no

obligation to respond to officers' attempts at questioning or conversation.

uuuu.   "Voluntary social contacts." Voluntary contacts between BPD officers and

community members that are intended to serve no specific investigative

purpose.  Voluntary social contacts do not include questioning about

possible criminal activity, but may serve other law enforcement purposes,

including building trust and developing rapport with community members.

vvvv.   "Youth." An individual who is younger than 18 years old.

It is so ordered, this _____ day of _____, 2017.

_____

United States District Court Judge

For Plaintiff UNITED STATES OF AMERICA:


VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division


ROBERT J. MOOSSY
Deputy Assistant Attorney General
Civil Rights Division


STEVEN H. ROSENBAUM
Chief, Special Litigation Section
Civil Rights Division


TIMOTHY D. MYGATT
Deputy Chief, Special Litigation Section
Civil Rights Division


PUNEET CHEEMA
MICHAEL J. SONGER
MAUREEN JOHNSTON
SETH WAYNE
Trial Attorneys, Special Litigation Section
Civil Rights Division
950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 514-2000

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed in their respective names by their respective duly authorized officers as of the date first above written.

**ATTEST**                                **MAYOR AND CITY COUNCIL OF BALTIMORE**

Alternate Custodian of the City Seal      By: _____
                                          Name:  Catherine E. Pugh
                                          Title:  Mayor

                                          **POLICE DEPARTMENT of BALTIMORE CITY**

                                          By: _____
                                          Kevin Davis
                                          Police Commissioner

Approved as to Form and                   APPROVED BY THE BOARD OF ESTIMATES:
Legal Sufficiency:

_____                 _____
David E. Ralph,                           Clerk                Date  January 12, 2017
Acting City Solicitor

# APPENDIX A

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Cumulative, Structured In-Service Training on Community Policing** (establishing formal partnerships with community organizations, scenario-based training, leadership, ethics, and interpersonal skills, principles of procedural justice, conflict resolution, verbal de-escalation of conflict, and cultural awaeness and sensitivity training) | 16(a)-(h) | All BPD officers, including Supervisors, Managers, nad Executives | 8 Annually | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Police-Community Interactions** (skills and techniques to effectively engage in voluntary social contacts with community members to build relationships, provide an opportunity for the community to ask questions of the police, and allow police to gather information relevant to criminal investigations) | 27, 33 | All BPD Officers | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Stop, Search, Arrest Training** (Fourth Amendment requirements and related law, BPD policies, and the Consent Decree's requirements regarding Investigatory Stops and Detentions, Searches and Seizures, and Arrests) | 67 | All BPD Officers | 16 (4 annual) | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Fair and Impartial Policing Training** (Methods and strategies for more effective policing that relies on non-dicriminatory factors, Constitutional and legal requirements related to equal protection and unlawful discrimination, existence and impact of arbitrary classifications, stereotypicng and implicit bias, instruction in data collection protocols required by the Agreement) | Impartial Policing/Paras. 93-95 | All BPD Officers | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Specialized Crisis Intervention Training** (How to conduct a field evaluation, suicide intervention, community mental health and Intellectual and Developmental Disability resources, effects of substance misuse, civil commitment criteria, crisis de-escalation, rights of persons with Behavioral Health Disabilities) | Behavioral Health/Para. 106-107 | CIT Officers | 40 (8 hours annual in-service training) | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Crisis Intervention Training** (How non-medically trained law enforcement personnel can recognize common characteristics and behaviors associated with Mental Health Disabilities or Intellectual Development Disability; and how to interact with individuals with these disabilities, how to use de-escalation techniques knowledge of local resources available to provide, treatement, services or support for individuals) | 112 | All BPD officers; and recruits | 8 annual for experienced officers); 16 hours in academy for recruits | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Crisis Intervention Training** (Enable personnel to identify, dispatch, and appropriately respond to call for service of individuals in Crisis, with goal of limited police involvement in behavioral health crises that do not necessitate a police response) | 113 | All BPD dispatchers and their supervisors | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Crisis Intervention Coordinator Training (**Training on the role and duties of the Crisis Intervention Coordinator) | 116 | Crisis Intervention Coordinator | 8 hours | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Use of Force Training** (Proper use of force decision-making, role-playing scenarios, Fourth Amendment law, de-escalation techniques, risks of CEWs, firearms training, foot pursuits, and use of force reporting) | 166-167 | All current officers; All new officers | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Use of Force In-Service Training** | Use of Force/Para. 170 | All BPD Officers | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Use of Force SIRT Training** (BPD to develop and implement SIRT Training Curriculum) | Use of Force/Para. 201 | SIRT | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Performance Review Board Training** (Training including legal updates regarding use of force and the Training Academy's current use of force currriculum) | 209 | Performance Review Board Members | 8 annually | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Youth** (Training on developmentally appropriate interactions with youth) | 220-221 | All BPD Officers | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Transportation of Persons in Custody Training** (Safe and human transportation of persons in custody, BPD policy, safe driving methods, identitification of medical distress and injuries and proper restraint techniques) | 238 | All officers who drive transport wagons | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Sexual Assaults Investigations Training** (Training regarding investigating sexual assaults) | 259 | All BPD detectives in Sex Offense, Family Crimes, and Child Abuse Units; Supervisors, command staff, and other employees who may be involved in supervision/oversight of sexual assault investigations | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Supervision Training Plan** (written Training Plan for in-service and supplemental training; enhancing BPD's field training) | 294 | All BPD Officers | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

**Training Requirements**

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Field Training Officer Program Plan** (Develop a plan to enhance its FTO program for new recruits in order to attract and retain sufficient numbers of suitable FTO officers) | 302 | FTOs | 40 hours of initial training, followed by refresher training as determined by the Monitoring Plan in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Supervisor Training** (Mandatory supervisory training; techniques for effectively guiding and directing officers and promoting effective and constitutional police practices; de-escalating conflict; and in-service annual training concerning management) | 308 and 310 | All new and current supervisors | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

Training Requirements

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Early Intervention System Training** (Training regarding the scope and function of the EIS, and interpreting its outputs, and performing appropriate interventions) | 322 | All Supervisors | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Misconduct Investigations and Discipline Training** (Comprehensive training on conducting employee misconduct investigations) | 409-411 | All investigators assigned to the OPR and all investigators employed by the Civilian Review Board | 40 hours | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Misconduct Investigations and Discipline Training** (Comprehensive training for CRB investigators on conducting employee misconduct investigations) | 412 | All investigators assigned to the OPR and all investigators employed by the Civilian Review Board | 40 hours | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |

Baltimore Consent Decree
**Training Requirements**

| Training | Consent Decree Paragraph | Relevant Personnel | No. of Hours | Timeline for Implementation |
|---|---|---|---|---|
| **Misconduct Investigations and Discipline In-Service Training** (In-service training annually related to conducting misconduct investigations) | 414 | All BPD Supervisors and personnel responsible for investigating misconduct complaints not involving police-civilian interactions | 8 hours annually for misconduct investigations; 4 hours annually for supervisors regarding their obligations when called to a scene to accept a civilian complaint | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |
| **Misconduct Investigations and Disipline Policy Training** (Training on BPD's revised or new policies related to misconduct investigations and discipline) | 415 | All police personnel | As determined by the Monitoring Plan, in conformance with the terms of the Agreement | As determined by the Monitoring Plan, in conformance with the terms of the Agreement |