# INDEX:   Public Comments on Proposed Consent Decree

## Submissions on behalf of groups

1. American Civil Liberties Union of Maryland
2. Campaign for Justice, Safety, and Jobs
3. Disability Rights Maryland
4. Immigration Outreach Service Center
5. Jews United for Justice
6. Leaders of a Beautiful Struggle
7. NAACP Legal Defense and Educational Fund, Inc.
8. No Boundaries Coalition of Central West Baltimore
9. Office of the Public Defender of the State of Maryland
10. Power Inside
11. School-to-Prison Pipeline Law Clinic – University of Maryland Francis King Carey School of Law
12. TurnAround, Inc.

## Submissions on behalf of individuals

13. C. Alexander
14. J. Armstrong
15. D. Cash
16. S. Curran
17. T. Davis
18. M. Efremov
19. T. Gaston
20. D. George
21. R. Gore
22. M. Harcum
23. B. Hawkins
24. M. Hettleman
25. P. Knopp
26. C. Landers
27. G. Liebmann
28. I. Lunder
29. R. Miller
30. M. Moses
31. M. Moses
32. L. Murray

33. D. Phillips
34. A. Rinsema
35. J. Scanlan
36. Y. Scimone
37. D. Sgouros
38. M. Skarpac
39. A. Skipwith
40. S. Tully
41. L. Van Order
42. A. White
43. D. Whyte
44. I. Wilson
45. T. Wilson
46. B. Zadek
47. M. Zadek

1.   American Civil Liberties Union of Maryland

DAVID ROCAH
SENIOR STAFF ATTORNEY



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
MARYLAND

MAIN OFFICE
 & MAILING ADDRESS:
3600 CLIPPER MILL ROAD
SUITE 350
BALTIMORE, MD  21211
T/410-889-8555
F/410-366-7838

FIELD OFFICE:
6930 CARROLL AVENUE
SUITE 410
TAKOMA PARK, MD  20912
T/301-270-2258

WWW.ACLU-MD.ORG

OFFICERS AND DIRECTORS
COLEMAN BAZELON
PRESIDENT

SUSAN GOERING
EXECUTIVE DIRECTOR

ANDREW FREEMAN
GENERAL COUNSEL

March 7, 2017

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530

Re: United States v. Baltimore Police Dep't et al., Civil No. JKB-17-99

I write on behalf of the American Civil Liberties Union of Maryland to urge the Court to approve the proposed Consent Decree in the above captioned case. More specifically, we view the Consent Decree as a necessary condition to systemic reform of policing in Baltimore.

We believe the need for reform is clearly stated in the Complaint filed in this matter, as well as the comprehensive findings letter issued by the Department of Justice in August 2016, which document the lived experiences of Baltimore's residents who have been victimized by persistent and systemic police misconduct, and failures of accountability and supervision. These practices have caused incalculable harm to Baltimore's residents.

The proposed Consent Decree addresses each of the systemic problems identified in the findings letter, both in terms of substantive practices, failures of supervision, inadequate accountability mechanisms, inadequate data collection, deficient training, and inadequate policies. The proposed Consent Decree also contains important provisions to enhance transparency, which we believe are critical. Finally, the proposed Consent Decree appropriately recognizes that public involvement in the reform process is critical, and seeks to offer opportunities for public input into the monitor selection process, and ongoing monitoring. The Campaign for Justice, Safety, and Jobs, of which we are a part, has submitted comments focused specifically on the public's role in the process, which we endorse.

Because the public's ability to appear before the Court and directly address the Court are inherently and severely limited, we believe it absolutely vital that the Monitor, who will be the eyes and ears of the Court, have as one of his or her highest priorities not only to make affirmative efforts to hear directly from the communities most affected by police misconduct in Baltimore, but also to directly involve community-based organizations in the monitoring process. There is already a huge trust gap between significant parts of Baltimore's population and the police, as documented in the findings letter, which has significant negative effects on public safety. The Monitor will himself or herself likely also face a similar trust gap (which existed even with respect to the DOJ), and directly involving community-based organizations as subcontractors and surrogates in the monitoring process will be critical to ensuring that the Monitor will be able to overcome that mistrust and get accurate and complete information from all of Baltimore's communities.

We also think it critical that the proposed Consent Decree requires the monitor to conduct outcome assessments to measure whether the reform steps taken in compliance with the decree are having the desired effects in terms of changing actual behavior. We think it critical that as part of those outcome assessments the Monitor will make indpendent assessments of the

underlying data (for example looking at a statistically significant sample of arrest reports or stop reports to assess whether they adequately establish probable cause or reasonable suspicion, as the case may be, and whether those that do not are being accurately caught by supervisors), and not just rely on the data reported by the BPD or other sources.  That is qualitiative assessments are as, if not more, important than solely quantitative ones.

While the Baltimore Police Department has begun taking steps to address the issues discussed in the findings letter, the Consent Decree makes clear that huge amounts of work remain to be done. Given that reality, the work of the Monitor will be central to the success or failure of the effort, as will the parties' continued willingness to directly involve the public in the ongoing reform process.  We urge the Court to closely scrutinze any proposed monitoring team to ensure that they will be up to the significant challenges ahead in order to keep the parties focused on the timely and effective implementation of this agreement that is so long overdue in this City.

AMERICAN CIVIL
LIBERTIES UNION OF
MARYLAND

Respectfully submitted,


David Rocah
Senior Staff Attorney

2.    Campaign for Justice, Safety, and Jobs



March 6, 2017

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington D.C. 20530

RE:  United States v. Baltimore Police Dep't et al., Civil No. JKB-17-99

Dear Sir/Madam:


On behalf of the Campaign for Justice, Safety and Jobs (CJSJ), we write in response to Judge James Bredar's court order dated February 15, 2017, which allows members of the public to submit written comments about the proposed consent decree between the U.S. Department of Justice and the Baltimore Police Department.   Before approving the consent decree, the judge must decide whether the agreement is fair, adequate, reasonable, legal, and in the public's interest. CJSJ is a coalition of over 30 organizations representing local and national youth leaders, policy advocates, civil rights organizations, law enforcement, and labor unions.  CJSJ formed in 2015 in the wake of the Baltimore police in-custody death of Freddie Gray, an unarmed Black man.   Since then, we have created and advanced policing reforms and economic solutions to improve the quality of life for Baltimore City residents.

Earlier this year the DOJ and City of Baltimore filed a 227-page consent decree in federal court which seeks to address the constitutional and legal violations detailed in the U.S. Department of Justice's (DOJ) investigative report of the Baltimore City Police Department (the City). That was the result of thousands of hours of work and represents a hope for change in our city to the hundreds of residents that participated in community forums, met with DOJ and BPD representatives, and brainstormed ways to improve policing in Baltimore.  While the DOJ report does not include all of the recommendations made by community members our coalition has engaged, it does represent the beginning of a roadmap forward.  If the path forward is to be effective, we think it is imperative that community members be actively involved in every level of reforming and overseeing their own police department

During the February 1, 2017 hearing before Judge James Bredar concerning the consent decree, we learned that federal and city officials are in the process of developing a Request for Application (RFA), which will detail the criteria that will be used in the selection of an independent monitor as required by paragraph 443 of the consent decree.[1]  We write to propose a selection process, qualifications, and mandates for the independent monitor who will work to ensure full and effective compliance with the consent decree.

---

[1] *See*, Consent Decree, *U.S. v. Police Department of Baltimore City*, Case 1:17-cv-00099-JKB (U.S. D.MD Jan. 12, 2017), https://www.justice.gov/crt/page/file/925046/download.

As community leaders, we believe that policing in Baltimore will never truly by reformed, nor police-community trust established, until the current systems of accountability allow for and encourage robust community participation and oversight of the Baltimore City Police Department. We are encouraged to see that the consent decree contemplates community involvement in the implementation of the agreement, including "public input at each stage of the Monitor selection process."[2] To carry out this provision, the CJSJ submits the following recommendations for community input and involvement in the selection process of and the development of mandates for the monitor:

**Process for Selection of Monitor Team:**

- The DOJ and the City should solicit and incorporate community input into the development of the RFA. This letter serves as an example of the type of input the parties should seek.
- The RFA should emphasize the parties' commitment to community engagement by stating that priority consideration will be given to applicants who commit to hiring community activists or community-based organizations to: serve as a liaison between the monitoring team and Baltimore City residents; and/or collect qualitative data, such as through annual community surveys, on the effectiveness of the implementation of consent decree provisions.
- Paragraph 444b of the consent decree states that DOJ and the City agree to a public comment period during which Baltimore City residents and other stakeholders can review information submitted by candidates in response to the RFA. We propose a 30-day public comment period.
- At least one community member from each neighborhood that is directly impacted by the policing reforms outlined in the consent decree should participate in initial interviews of candidates.
- Paragraph 444d requires DOJ and the City to provide an opportunity for monitor finalists to respond to questions and concerns of the Baltimore community during a public meeting. Because Baltimore is a city of neighborhoods, we recommend at least four public meetings with final candidates held at locations in Northern, Southern, Eastern and Western neighborhoods that are accessible to public transportation.
- The public should be afforded an opportunity to provide feedback to the parties and the court on the final candidates prior to the selection of the Monitor.

**Composition and Qualifications of Independent Monitor Team:**

- As stated in paragraph 442 of the consent decree, the Monitor should comprise a team of persons, and not an individual. This team should be diverse as it relates to race, ethnicity, gender, age, socio-economic status and expertise.
- The Monitor team must include several persons who serve as community liaisons. They must be residents of Baltimore City, particularly those most impacted by the reforms in the consent decree, who have established working relationships and trust with activists, the business community, and other community stakeholders.
- The Monitor team should include persons with diverse expertise, including:
  - Activists with experience in community organizing;
  - Former law enforcement officers and/or executives with experience in implementing best practices for community policing and/or problem-oriented policing;

---

[2] Id. at ¶ 444.

- o Local attorneys with expertise in civil rights litigation and criminal defense;
- o Individuals with at least 10 years of experience in:
  - ➤ appropriate interactions with persons with mental, behavioral, and physical disabilities;
  - ➤ the elimination of the school-to-prison pipeline;
  - ➤ anti-bias and de-escalation training, problem-oriented policing, adolescent development, and crisis intervention trainings;
  - ➤ analyzing policing statistics;
  - ➤ appropriate investigation of sexual assault complaints; and
  - ➤ trauma/trauma-informed care for victims of crime.
- The members of the Monitor team should be independent of any local government entity and politically unaffiliated from any local government entity.
- Members of the Monitor team should be prepared to fully commit their time and energy to monitoring the City's compliance with the consent decree.

**Mandates of the Monitor Team:**

- Community liaisons must be charged with meeting regularly with community stakeholders; especially those representing individuals most impacted by the reforms in the consent decree.
- The Monitor team should hold periodic (at least quarterly) public meetings in which the public can weigh in on the City's progress under the consent decree. This requirement must be over and above meetings the community liaisons have with community stakeholders.
- Paragraph 446 of the consent decree requires an evaluation of the Monitor after three years, including whether the Monitor is "adequately engaging the community." The DOJ, City, and Court should develop a process by which members of the public may submit comments regarding the adequacy of the Monitor's community engagement activities.
- Paragraph 456 requires the Monitor to conduct outcome assessments to determine whether the Baltimore Police Department's revised policies and practices "are having an overall beneficial effect on policing in Baltimore." Members of the public should be permitted to provide input on what outcomes should be measured.

- Paragraph 462 requires the Monitor to submit a Monitoring Plan to DOJ and the City for review and approval. Members of the public should be permitted to comment on the Plan prior to approval by the parties and the Court. We recommend a 30-day comment period.
- Community stakeholders should be able to review semi-annual Monitor reports to the court and offer supplemental reports if they believe the Monitor reports fail to include issues of their concern.
- Court status conferences concerning the monitoring of the consent decree should be done in open court. The Court should endeavor to hear from community stakeholders and community members most impacted by the reforms in the consent decree.
- The Monitor should be required to designate community-based organizations in Baltimore to assist in the implementation of provisions of the consent decree. Accordingly, the City should be required to provide the resources necessary for the designated community-based organizations to adequately assist in the implementation of certain provisions within the consent decree.

**Composition of the Community Oversight Task Force:**

In addition, the proposed consent decree requires the DOJ and the City to create a 5-member Community Oversight Task Force that would make recommendations for improving the current system of civilian oversight of police. Task force members will be
appointed by the Mayor. As advocates and community leaders that have worked together for several years to improve policing and police accountability in Baltimore City, we understand the complex web of systems and policies at the city and state level that will need to be reformed in order to achieve real accountability and transparency in policing in Baltimore City. It is our hope that the Community Oversight Task Force will be a key vehicle for this change, as they will be uniquely positioned to identify and advocate for these structural recommendations that may fall outside the scope of the current consent decree but will be critical to its success.

In order for the Community Oversight Task Force to be as effective as possible and lift up the voices of those communities that are disproportionately and negatively impacted by existing police structures and policies, we recommend that the parties and court consider a more inclusive selection process for Task Force members. For example, the City could develop a process by which the Mayor receives nominations from Baltimore residents, publicizes the list of nominees, and publicly announces her final selection.

In addition, we suggest that the court ensure that the Community Oversight Task Force be composed primarily of African American grassroots community members, and include representatives of the Sandtown Winchester neighborhood, as well as representatives from other vulnerable communities, including youth, women, immigrant, and disabled community members.

We look forward to further participation in this important process. CJSJ members welcome the opportunity to discuss further our recommendations during a meeting with the parties. Please do not hesitate to contact Elizabeth Alex at ealex@wearecasa.org with any questions.

Sincerely,

**The Campaign for Justice, Safety, and Jobs members**

1199 SEIU
ACLU of Maryland
Amnesty International
Baltimore Algebra Project
Beats, Rhymes, and Relief
Baltimore United for Change
CASA
Citibloc
Coalition of Concerned Mothers
Communities United
Council on American-Islamic Relations
Equity Matters
Empowerment Temple
Freddie Gray Project
Fusion Group
Jews United for Justice
Justice League

Leaders of a Beautiful Struggle
Liberty Village Project
Making Change
NAACP Legal Defense and Educational Fund, Inc.
No Boundaries Coalition
Peace by Piece
Pleasant Hope Baptist Church
Power Inside
SEIU 32BJ
Showing Up for Racial Justice (SURJ)
Southern Engagement Foundation
Ujima People's Progress
Universal Zulu Nation

3.    Disability Rights Maryland

 **Disability
Rights
Maryland**

Empowerment. Integration. Equality.



1500 Union Ave., Suite 2000, Baltimore, MD 21211
Phone: 410-727-6352 | Fax: 410-727-6389
www.DisabilityRightsMD.org

March 7, 2017
Submitted via e-mail to: Baltimore.Consent.Decree@usdoj.gov

Re: *United States v. Baltimore Police Dep't et al., Civil No. JKB-17-99*

<u>Statement in Support of Proposed Consent Decree</u>

Disability Rights Maryland (DRM) is the federally mandated state designated protection and advocacy agency.  DRM has over thirty years of experience advocating for and with Marylanders with disabilities. DRM has worked with people in state psychiatric hospitals and private inpatient psychiatric hospitals, in emergency rooms, in state residential centers, in community programs, incarcerated or determined incompetent to stand trial, and in homeless shelters and homelessness. DRM participated in the Ethan Saylor Commission and on the committee establishing police training for interactions with persons with intellectual disabilities.  DRM attorneys have decades of experience with special education and the disparate impact of school discipline and the juvenile and criminal justice system on individuals with disabilities.

DRM writes in support of the findings resulting from the U.S. Department of Justice (DOJ) investigation into the practices and policies of the Baltimore City Police Department (BCPD).  One of the most significant violations cited by the DOJ investigation is the finding that BCPD violated the rights of people with disabilities and the Americans with Disabilities Act (ADA). While DOJ has investigated multiple police departments across the country, only BCPD has been found to engage in systemic disability based discrimination.

As documented by DOJ, BCPD *routinely* uses unreasonable force against individuals with disabilities and those in crisis, including situations where the individual has not committed a crime, or a minor crime and when such individuals are in restraints. DOJ contends that police practices expose individuals to serious harm that exacerbates their disability and the crisis that precipitated the request for BCPD assistance. DOJ's findings include officers repeatedly using drive-stun tasers inappropriately on people with mental health disabilities causing unnecessary suffering; police assault of a youth with disabilities who was in a hospital; and a questionable police shooting resulting in the death of an individual in crisis.  BCPD does not routinely use trained officers to interact with individuals who are demonstrably in a behavioral health crisis, and does not properly utilize community based health care services or supports as proper interventions. The disparate numbers of individuals with disabilities in arrests, detention and police use of force incidents demands attention as do the practices of unconstitutional stops, excessive force and related misconduct.

The criminalization of disability related behaviors by BCPD and its failure to modify policies and practices to accommodate individuals with disabilities must end.  It is unjust,

1


unethical, illegal and cruel. The proposed Consent Decree offers hope for systemic reform that will result in policing that complies with our Constitution and federal civil rights laws. Significantly for our community, if the potential of the Decree is realized, there will be a decrease in the numbers of individuals with disabilities being involved with BCPD and an increase in the numbers of individuals with disabilities offered community based supports.

General goals of the Consent Decree that are supported by DRM include: the involvement of our community to help ensure transparency and sustained change; mandatory review and revision of policies, procedures, and training within BCPD; consultation with experts for technical assistance; improved data keeping and reporting; heightened oversight and accountability measures, including for systems responding to police misconduct; improvements to investigating and processing allegations of sexual assault; and terminating use of school resource officers as adjunct to BCPD. Disability discrimination intersects with race discrimination and DRM is in full support of activities needed to end the racial discrimination identified at BCPD.

More specifically, DRM endorses those requirements of the proposed Consent Decree that require:
- increased training of BCPD related to de-escalation and implicit bias;
- the involvement of members of the disability community in BCPD trainings;
- a specific group of officers receive enhanced training and screening such that if BCPD must respond to calls for assistance involving persons with behavioral health challenges or in crisis, the response involves these specially designated officers who will better protect the rights of persons with disabilities and cause less harm in interactions;
- implementation of crisis response techniques;
- decreased reliance on use of force;
- a decrease in the involvement of persons with disabilities in the criminal justice system;
- affirmative obligations of BCPD to connect people with behavioral health challenges or in crisis with community services;
- an individual (crisis intervention coordinator) tasked with responsibility for oversight and implementation of the reforms related to individuals with disabilities and for analyzing the number of specialized officers and resources needed to respond to persons in behavioral health crisis;
- a process that engages BCPD with the community to identify gaps in services and needed reforms such that alternatives and supports for persons in behavioral health crisis are available to divert them from the current reliance on jails and hospitals;
- reform to dispatch operations to ensure that BCPD is not a default first responder, and that community based services are utilized for individuals in crisis or with apparent behavioral health issues.

2



DRM is concerned that the community process to identify needs for services lead to actual service system reforms. We have multiple sets of recommendations supporting the need for implementation of a behavioral health crisis system.  Existence of such a system is a lynchpin to that portion of the proposed Consent Decree requiring diversion from and decreased reliance on BCBD, jail and hospitals for persons with behavioral health challenges or in crisis.

As implementation details are not articulated in the proposed Consent Decree, DRM emphasizes that this Decree must not be short term; must provide an active role for our community, and; place heavy reliance on the monitoring team selected to oversee its provisions. Community involvement in selection of the Monitor is important to establishing a culture of trust and transparency critical to the success of the proposed Consent Decree.  DRM urges this Court to fully empower the Monitor to enable the broad remedial goals of the proposed Consent Decree, which are so desperately overdue.

Respectfully submitted,

Lauren Young
Director of Litigation
DRM
Fed. Bar No. 14364
410-727-6352 ext 2498

4.    Immigration Outreach Service Center



March 6, 2017

U.S. Department of Justice
Civil Rights Division,
Special Litigation Section,
950 Pennsylvania Avenue, N.W.,
Washington, D.C. 20530

Re: Comments on the Consent Decree (Baltimore, MD)

Dear Civil Rights Division:

We would like to send our sincere thanks to the team that was present at the meeting with the Immigration Outreach Service Center staff and board members on February 16, 2017. We were delighted to have the opportunity to receive explanations and to offer input into the final draft of the Consent Decree.

We offer the following points as a summary of our discussion that evening and request that the vulnerable populations that we have identified might be included in a micro-community plan.

- As the staff and board of an Immigration Center, we call upon the Civil Rights division and the Honorable James K. Bredar, to consider the vulnerability of those who seek refuge and asylum, and residence in the United States. We feel strongly that immigrants because of ethnicity, cultural, and tribal connections come to the U.S. with a limited understanding of the socio-cultural interactions that occur in this country. We ask that those overseeing the Consent Decree process consider increasing the number and content of police training sessions that help officers to understand the multiple cultures seeking homes in Baltimore City. We also ask that a micro-community plan be considered to educate and engage police with the multi-cultural communities in our city. This means attentiveness to all of the cultures who make a home in Baltimore (Latino/Hispanic, African, Asian, Pacific Islanders, Middle Eastern, and other smaller cultural groups)
- Many of our immigrants work with or have family members with mental health issues and disability. We ask that a micro-community plan be established to research appropriate ways to interact with and honor the human rights of people with disabilities.
- Our immigrant youth are at a difficult crossroads in their journey. Many have been born and raised in a culture that is very different from the US culture. Though they are born in another country, they often seek ways to quickly assimilate and "fit into" their new homeland. This often results in difficult

adjustment periods. A micro-community plan that focuses on the difficult adjustment faced by immigrant youth might help these youth to make a slower more careful transition.

Data collection
- The IOSC is most concerned that quantitative data are collected that will result in a robust tracking system that will clearly demonstrate the progress being made in the daily operations of the police department and their interactions with the community. We would respectfully request that a social scientist with extensive experience in survey development and the collection of data be enlisted to develop the tools that will be able to collect data and control for variables in a way that will yield results that will demonstrate progress in the police – community relations.

Strong project management
- The IOSC would also suggest that a project manager be in a lead position on the team and be expected to foster collaboration within the consent decree team.
- The role of project manager will also require a strong leader with excellent communication and mediation skills who can foster trust relationships with the police, FOP, and the community while ensuring that Consent Decree targets are met and all interested parties are collaborating in the collection of data and progressing in the implementation of the decree.

We offer these suggestions as the most important for our constituents. For us, these are clearly the most important in the implementation of the Consent Decree and we hope that this project will garner the support of all of the participants, City officials, police department, and FOP leaders.

Thank you for the opportunity to share our responses.

We look forward to next steps in the process.

Sincere thanks,

Pat Shannon Jones
Executive Director

5.    Jews United for Justice



March 6, 2017

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington D.C. 20530

RE:  United States v. Baltimore Police Dep't et al., Civil No. JKB-17-99

Dear Sir/Madam:

On behalf of Jews United for Justice (JUFJ), an organization engaging more than 1,100 Baltimore City and County residents to help win local social racial and economic justice campaigns. We have been working on issues of police accountability nearly the entire 2.5 years that we've been in Baltimore and committed to continuing that work after the death of Freddie Gray, which galvanized even more support for reforming Baltimore's police department.

Our tradition teaches: *Put judges and police at all your gates that the Sovereign your G-d will give you for your tribes and they shall judge the people with just laws. Do not bend the law; do not show partiality; do not take bribes, for bribes blind the eyes of the discerning and upset the plea of the just. Justice, justice, shall you pursue, that you may thrive and occupy the land that the Sovereign your G-d is giving you.* - Deuteronomy 16:18-20

The DOJ report on Baltimore policing was horrific to read and much of the examples were directly in conflict with the above quote from the Torah. The need for community involvement in every level of reforming and overseeing the police department that is supposed to serve us all, but is clearly failing to do so, is clear. This involvement should begin now, with community involvement in monitor selection for the consent decree.

The proposed consent decree requires the DOJ and the City to create a 5-member Community Oversight Task Force that would make recommendations for improving the current system of civilian oversight of police. In order for the Community Oversight Task Force to be as effective as possible and lift up the voices of those communities that are disproportionately and negatively impacted by existing police structures and policies, we recommend that the parties and court consider a more inclusive selection process for Task Force members. In addition, we suggest that the court ensure that the Community Oversight Task Force be composed primarily of African American grassroots community members, and include representatives of the Sandtown Winchester neighborhood, as well as representatives from other vulnerable communities, including youth, women, immigrant, and disabled community members.

We look forward to further participation in this important process.

Sincerely,
Molly Amster
Baltimore Director, Jews United for Justice, 2221 Maryland Avenue, Baltimore, MD 21218

1

6.    Leaders of a Beautiful Struggle

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington D.C. 20530

Dear Sir/Madam:

I am writing in response to Judge Bredar's court order dated February 15, 2017, which allows members of the public to submit written comments about the proposed consent decree between the U.S. Department of Justice and the Baltimore Police Department.

I am writing on behalf of Leaders of a Beautiful Struggle, a grassroots think-tank dedicated to advancing the public policy interests of people of African descent in Baltimore. We have engaged the policy processes both as activists, organizing marches after the death of Freddie Gray, and as advocates and lobbyists, working on policing reform and a variety of social justice policy issues at the local and state level. We have a network of over 100 "Community Sustainers" across the state of Maryland which give direct us financial support and influence thousands more throughout community outreach, social media, and educational efforts.

It is our contention that police accountability is a process which goes far beyond the scope of the consent decree. As policing is a public service, the institution of policing must be accountable to the community it is ostensibly serving, and as such the community must have the ability to impact the system of policing baked into the foundations of the public safety apparatus. The details of the DOJ's findings report reveals just how far we are from making accountability a

reality. We currently have the exact *opposite* power dynamic: community is too often subjected to the authority of the policing apparatus, without a reciprocal relationship of accountability.

We view the consent decree process as one step toward correcting this power imbalance, but we have deep concerns over the process around the consent decree's implementation. It was the efforts of committed policy reformers, prison abolitionists, and grassroots protesters that generated the impetus for police reform in the first place. Without robust community participation, the process risks cutting itself off from the very engine of change that can drive sustainable enforcement of the proposed solutions forward.

This is a structural dynamic, and is in some ways beyond the power of the court to change. However, we do believe the court has meaningful choices for whether this consent decree process can accommodate the goal of grassroots community empowerment. The empowerment of communities is not only necessary to ensure the process is equitable, but, as previous examples such as the Cincinnati process shows, is a prerequisite for the long-term success of the consent decree effort. Our two sections of comments, broadly framed as *inclusion* and *empowerment*, both center around this core concept of seeing community involvement and expertise as the *sine qua non* of policing reform.

**Inclusion**

On its own, inclusion is insufficient to create an equitable process. Merely having individuals of aggrieved communities involved in the process is irrelevant if the structure of the process itself excludes communities from having meaningful control. Despite being insufficient, inclusion is, however, necessary as a precondition to enable the consent decree process to be accountable to the community it intends to serve. There are several places where we feel the consent decree opens space for, and would grealty benefit from, vigerous enforcement by the stated commitments to community participation in the process (not sure how to edit this sentence without changing meaning, it has too many clauses though and gets jumbled). Section 11 of the consent decree states:

> *"Recognizing that these issues require substantial consideration and public input, the City will establish, within 90 days of the Effective Date of the Agreement, a Community Oversight Task Force ("COTF") to recommend reforms to the current system of civilian oversight. COTF will consist of five members, representative of diverse communities of Baltimore, appointed by the Mayor."*

While appointment power is vested in the office of the Mayor, it states those chosen should be *representative of diverse communities,* and feel it within the purview of the court to apply its oversight authority to ensure this Task Force is reflective of communities of Baltimore. This raises a question about the definitions of "diversity" and "community". While an exhaustive analysis of the politics of diversity is beyond the scope of these comments, it is our opinion, given the historic disenfranchisement of African descended peoples in legal processes in

America, the consent decree's specific mention of Anti-Black Violence perpetrated by the BPD, and the reality that Baltimore is a 60% Black city, that proportional representation of the *diversity* of the Black community of Baltimore should be a frame through which this clause is interpreted. This means the task force would represent the class, gender and sexual orientation diversity of the Black community to the extent possible and reflect the Black communities by having proportional representation on the Task Force. **The court should hold the court** (unclear phrase) to a high standard to ensure this task force, and other spaces for addressing the consent decree for "diversity", "community values", "community oversight", "community perspectives" should be seen in this light. Make no mistake, when one speaks of "community" in Baltimore, specifically the communities with the most direct experience with law enforcement, we speak largely of a diverse Black community, a community lacking in the social currency of legal representation and political access to make their demands on this process heard. Thus, we feel it is the court's responsibility to take these dynamics into account when deciding how it goes about enforcing not only the "*letter of the law*" in relation to the consent decrees' use of terms like "inclusion", "diversity" and "community", but the spirit which brought them to be the specific terms used in this document. We feel our analysis speak directly to the "spirit of the law" and as such we offer this analysis as a heuristic by which the court should interpret its role in relationship to enforcement of the language of the consent decree.

There are other spaces where we feel the court should have a robust engagement with the consent decrees language of "community inclusion". Section 16 of the the consent decree states that the BPD will provide 8 hours of structured, in-service training on community policing. Section 16, sub section a, outlines the framework in which

*"Methods and strategies to improve public safety and crime prevention through community engagement, including how to establish formal partnerships with community organizations, how to work with communities to set public safety and crime prevention priorities, and how to create opportunities for positive interactions with, among others, Youth, LGBT, homeless, and mental health organizations and communities…"*

Again, we refer to the heuristic explained above and ask the court to consider how it would apply the language of the quote (I think this is what you mean): if black communities are experiencing a disproportionate amount of contact with police, **then the specific cultural dynamic and of Black communities** (unclear), as well the diversity within Black communities, should be accounted for when the court determines its relationship with this language. It may be argued that this heuristic on how one defines "community" may be in conflict with Section 16, sub section a's language on *"Youth, LGBT, homeless, and mental health organizations and communities"*. Far from trading off, our heuristic gives context to how the court should interpret this language as well, for the analysis of a diversity *within* Black community reveals that the court should engage (we would, in fact, say prioritize) Black youth, LGBT, homeless and mental health organizations in its interpretation of how to enforce this statute.

**Empowerment**

Inclusion into the process allows the voices of the most marginalized to be ingratiated into the process. We distinguish this from empowerment, which entails actively investing in those from aggrieved community who possess some form of expertise to actively shape the process itself.

The monitor is the arbiter between the court and the parties to the agreement, and as such is the central fulcrum upon which the success or failure of their process lies. Our engagement with advocates from cities which have gone through their own federal consent decree processes bears out the analysis that a lack of community ownership of the monitoring process risks a loss of trust in the very concept of the consent decree. It is out belief that many other orgnizations have stressed to you the improtance of a diverse, experinced monitor team with deep ties to commmunity in their own respective comments, so I will not repeat details here. Instad, I will focus on outlining how the court can incentivize investment in community control of the monitor process.

The framework for this sort of communal involve is laid out in the text of the decree. Section 23-states that the monitor will "retain an individual or entity" which will undertake the task of adminstering a "reliable, comprehensive, and representative survey". While the concent decree clearly vests the authority to select the entity with the Montior, with the agreement of the City and the DOJ, we feel the court does have an oversight role to play here. It is our opinion that the most efficient way to ensure this survey is "reliable, comprehensive, and representative" is to have the Monitor subcontract this task to existing community groups. Several of the specific details of what the survey is to cover, as outline by Section 495 of the consent decree, bolster this argument. Specifically, language saying the survey should cover *"interactions with African Americans, Hispanics, LGBT and other significant and distinct groups"* show the importance of giving the community power to control the process. Groups with existing strong ties to community can facilitate the forms of frank and candid conversations that is required for successful data

collection, and these conversations can only happen when folks in aggrieved communities feel a sense of trust with those who they are interacting with. The consent decree alludes to structural conditions within Baltimore which show how difficult this data might be to obtain. Section 19 of the consent decree states:

> *"The City and BPD will, within their respective spheres, develop and implement community-engagement plans for creating opportunities for routine and frequent positive interactions between officers and community members, including those critical of BPD."*

Subsection f of section 19 goes on to state:

> *"BPD and the City provide for outreach in all neighborhoods, including neighborhoods where no neighborhood association has been established to provide consultation and input to BPD".*

This shows that the process of engaging community outlined in the consent decree goes beyong simple incusion of the :"usual suspects" when it comes to community engagement. The consent decree laid out a goal that those most marginalized, those with negative experinces with BPD, those without community associations to represent them be included in this proess. To meet this lofty goal the court should use its oversight capacity to make clear to the monitor team, city and BPD that in order to meet the obligation the consent decree sets on community outreach, an investment in grassrooots community groups is nessessary for the montior to be able to to effectiely reach these communities.

We understand the court's reticience to interpret the language of the consent decree in a way that could be seen as "expansive". We feel however that our interpretations fits within a legitimate interpretation of language of the dcree. For example, while Section 23 states the monitor will retain an "individual or entity", the expansive scope of the task outlined by councurent subsections, as well as section 19, lead us to belive this task goes far beyond the role of an "individual". The "entity" option

seems far more appropiate, and we additionally feel that this term is elastic enough to include a "coalition" of groups as the "entity" which the monitor can retain. No single nonprofit, civic group, academic department, or data collection ciompany would seem to have the requisite breadth of experiences with the Baltimore community to effectivley meet the requirement laid out in the decree. As such, it is nessessary that the court recognize the impotance of community empwoerment in the monitor process, espcially given the fiscal pressures on the city, which may lead it to select an "individual" or entity rather than a comglomoration of community groups because of percived cost savings. Ironically, this argument may actually futher bolster the argument for a community empowerment approach to monitoring, as community groups with experience working on small budgets may be able to compile data in a more cost effective way than large academic or corporate entities burdened by overhead and bureaucracy.

**Conclusion**

The court is set with the daunting task of enforcing a consent decree in a chaotic politcal environment. Local, state and national trends all impact the material application of the lofty goals outlines in this document. To this amalgam of factors we might add that the court is acting within a historical context. Given the task of decipering how Baltimore is to achieve a state of "Consitutional Policing," we would feel remiss without mentioning that not only does the consitution make no mention of "polciing" as we know it today, it makes no mention of the historical violence against people of African dessent that brings us to our current predicament.

It is our belief that so called "constitutional policing" is a prerequisit for, not equaliavant to, a system of public saftey that refelct a commitment to social justice. As such, we feel obligated to push the court to expand its interpretatation of its role in this process. A tradtionally conservative legal approach based on "precedent" and "established law" seem incongruous with the unprecidented scale of human

rights violations carried out against the citizens of Baltimore, particularly those of African dessent, outlined in the DOJ's report. We see two potential outcomes of this process. In one, the consent decree is used to promote a legalistic, abstracted notion of procedural justice, which isolates and de-facto denigrates community experiences by framing "police reform" as a technocratic venture. In other hand, through robust enforcement of the community participation provision within the consent decree, the court can center entities within community as being essential to the process, allowing the consent decree to become a vehicle to reflect the larger social movement around police reform.

While we have no illusions about the difficulty of achieving the latter outcome, we submit these comments to the court with the sincere hope that our analysis makes it just a bit more likely.

Thank you for considering my comments.

Sincerely,

Lawrence Grandpre
Director of Research
Leaders of a Beautiful Struggle
235 Holiday Street
Baltimore, Maryland

7.    NAACP Legal Defense and Educational Fund, Inc.

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. JKB-17-99 |
| v. | ) |
| | ) |
| POLICE DEPARTMENT OF BALTIMORE | ) |
| CITY, *et. al.* | ) |
| | ) |
| Defendants. | ) |

### Written Comments of the NAACP Legal Defense and Educational Fund, Inc.
### on the Proposed Consent Decree between the U.S. Department of Justice and the Police
### Department of Baltimore City, *et al.*

Thank you for the opportunity to provide written comments on the above-captioned consent decree. Prior to approving the proposed settlement, the Court must determine whether it is "fair, adequate, and reasonable and is not illegal, the product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999). Given the long-standing police violence and misconduct in Baltimore, documented in the U.S. Department of Justice's (DOJ) investigative report, a court-enforceable agreement is fair, warranted, and should be approved. We offer several recommendations for improving the proposed consent decree.

## I. Background

As the nation's oldest civil rights legal organization, NAACP Legal Defense and Educational Fund, Inc. (LDF) has utilized the U.S. Constitution and federal and state civil rights laws to pursue equality and justice for African Americans and other people of color in the areas of education, voting, employment and housing for almost eight decades. LDF has also fought to address racial bias at every stage of the criminal justice system – from police stops, to sentencing, to reentry.[1]

---

[1] *See, e.g.*, Complaint, *Davis, et al. v. City of New York, et al.*, Case No. 1:10-cv-00699-SAS-HBP (S.D.N.Y Jan. 28, 2010) (challenging the unlawful stopping, questioning and arresting of African-American and Latino public housing residents and their guests by New York City Police Department officers), http://www.naacpldf.org/update/court-approves-final-settlement-federal-classaction-lawsuitchallenging-police-practices-nyc. *See also*, *Buck v. Davis*, 580 U.S. ____ (2017)(holding that Duane Buck received ineffective assistance of counsel when his attorney introduced racially-biased testimony during his capital sentencing hearing), http://www.naacpldf.org/press-release/naacp-legal-

Three years ago, following an unrelenting series of police-involved deaths of African-American men, women, and children,[2] LDF launched its Policing Reform Campaign, which seeks to promote unbiased and responsible policing policies and practices at the national, state, and local levels.  In Baltimore, shortly after the police in-custody death of Freddie Gray, LDF and a coalition of clergy and civil rights organizations sent a letter to then President Barack Obama asking him to direct the U.S. Attorney General to open a civil rights investigation of the Baltimore Police Department (BPD).[3]  We argued that city residents had endured years of police violence and misconduct costing the city $5.7 million in settlements and court judgments from 2011 through 2014.   The DOJ launched its probe of the BPD in May 2015, and over a year later, released a scathing report of its findings in August 2016.  The report found that the BPD engaged in a pattern or practice of: conducting unconstitutional stops, searches, and arrests; using racially discriminatory policing strategies; using excessive force; and retaliating against persons who criticized police officers or were involved in lawful protests.[4]

To inform settlement negotiations between the DOJ and Baltimore City officials, in September 2016, LDF co-hosted a town hall meeting at the University of Maryland Francis King Carey School of Law for Baltimore residents and stakeholders to share with attorneys from the DOJ policing reforms they wanted to see in any consent decree between the DOJ and BPD.[5] This Court may view testimony provided at the meeting at http://www.naacpldf.org/news/watch-baltimore-town-hall-policing-reforms.

On January 12, 2017, the DOJ, BPD and the Mayor and City Council of Baltimore (the City) filed a 227-page consent decree in this Court.[6] The proposed consent decree details reforms to police policies and practices that are necessary to address the constitutional and statutory

---

defense-fund-wins-major-victory-united-states-supreme-court; and, *LDF Statement on President Obama's Actions to Promote Rehabilitation and Reintegration of Persons with Criminal Records* (Nov. 3, 2015), http://www.naacpldf.org/press-release/ldf-statement-president-obama%E2%80%99s-actions-promote-rehabilitation-and-reintegration-perso.

[2] Daniel Funke and Tina Sussman, *From Ferguson to Baton Rouge: Deaths of Black men and women at the hands of police*, Los Angeles Times, July 12, 2016, http://www.latimes.com/nation/la-na-police-deaths-20160707-snap-htmlstory.html.

[3] Letter from Rev. Dr. S. Todd Yeary, Maryland State Conference of the NAACP and Sherrilyn A. Ifill, President & Director Counsel, NAACP LDF to President Barack Obama, May 6, 2015, http://www.naacpldf.org/document/clergy-letter-president-obama-regarding-death-freddie-gray.

[4] *See generally*, U.S. Dep't of Justice Civil Rights Division, *Investigation of the Baltimore City Police Department*, Aug. 10, 2016, https://www.justice.gov/opa/file/883366/download, (hereinafter *Baltimore Investigative Report*)

[5] Jessica Anderson, *Rep. Elijah Cummings hosts town hall on Baltimore DOJ report*, The Baltimore Sun, Sept. 7, 2016, http://www.baltimoresun.com/news/maryland/baltimore-city/doj-report/bs-md-ci-cummings-police-town-hall-20160907-story.html.

[6] *See, U.S. v. Police Department of Baltimore, et al.*, Consent Decree, Case No. Case 1:17-cv-00099-JKB, (2017), https://www.justice.gov/crt/page/file/925046/download. (hereinafter *Baltimore Consent Decree*).

violations the DOJ uncovered in its investigative report. The violations allegedly committed by the BPD warrant a comprehensive, court-enforceable agreement that will remain in effect for numerous years to ensure sustainable reforms. Indeed, the recent federal criminal indictment of seven BPD officers for allegedly robbing Baltimore residents, fabricating court documents, and submitting fraudulent overtime claims underscores the urgent need for federal oversight of the BPD.[7]

Overall, the proposed consent decree contains many promising provisions that, if followed, will eliminate racially-discriminatory stops, arrests and searches and the use of excessive or lethal force by Baltimore police officers. Provisions in the consent decree also seek to improve the process for collecting and investigating misconduct and create a system for the timely investigation and fair discipline of officers who engage in misconduct. Nevertheless, we offer the following recommendations for improving the proposed consent decree.

## II. Recommendations

### A. Selection and Role of the Independent Monitor

The selection of a team of persons who will work with the Court to monitor the consent decree to ensure that all provisions are carried out fully will be essential to the success of the agreement. While the consent decree appropriately states that "it is important to allow for public input at each stage of the Independent Monitor (Monitor) selection process," we respectfully urge the Court and the Parties to make the following additions to the agreement.

Members of any monitoring team should be diverse as it relates to race, ethnicity, gender, age, socio-economic status and expertise. Diversity would make it easier for members of the team to build trust with Baltimore residents and BPD officers and engage in a multi-disciplinary approach to understanding and addressing policing challenges in Baltimore.

Paragraph 444b of the proposed consent decree states that the DOJ and the City agree to a public comment period during which members of the public can review information submitted by Monitor applicants. We recommend that the comment period should last 30 days. This will allow community members sufficient time to review Monitor applications and present questions to applicants during interviews. These interviews should be accessible to the public, and at least one community member from each neighborhood that is directly impacted by the policing reforms outlined in the consent decree should participate in initial interviews of candidates.

---

[7] Kevin Rector and Justin Fenton, *Federal Judge orders six officers indicted on racketeering charges to be held pending trial,* The Baltimore Sun, Mar. 2, 2017, http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-bail-hearings-bpd-20170302-story.html.

Paragraph 444d requires the DOJ and the City to provide an opportunity for monitor finalists to respond to questions and concerns of the Baltimore community during a public meeting. There should be at least four public meetings with final candidates held at locations around the city that are accessible to public transportation. Holding the meetings in various locations around the city would ensure that community members in different neighborhoods in Baltimore question finalists in person. The Monitor must have the trust and confidence of Baltimore residents to effectively oversee the implementation of the consent decree, and having multiple opportunities of community engagement during the selection process will help ensure the Monitor is well-suited to oversee the implementation of the consent decree.

Paragraph 446 of the proposed consent decree requires an evaluation of the Monitor, including whether the Monitor is "adequately engaging the community." The DOJ, the City, and the Court should develop a process by which members of the public may submit comments regarding the adequacy of the Monitor's community engagement activities. This would maintain community involvement and participation in the consent decree process and ensure that the Monitor team is adhering to its community engagement responsibilities stipulated in the consent decree.

Paragraph 462 requires the Monitor to submit a monitoring plan to the DOJ and the City for review and approval. Members of the public should be permitted to comment on the plan prior to approval by the Parties and the Court during a 30-day comment period.

Additionally, community stakeholders should be able to review semi-annual monitor reports submitted to the Court and offer supplemental reports if they believe the reports fail to include issues of public concern. This would provide the Court and the Parties with a more comprehensive view of the status of the consent decree implementation. Status conferences with the Court concerning the monitoring of the consent decree should be done in open court. The Court should endeavor to hear from community stakeholders and members from the neighborhoods most impacted by the reforms detailed in the consent decree.

The Request for Application, which will be used by the Parties to solicit applications from potential monitors, should give priority consideration to applicants who commit to hiring individuals or community-based organizations (CBO) to serve as a liaison between the Monitor and Baltimore residents and/or assist with the collection of qualitative data, such as through annual community surveys, as required by paragraph 23 of the consent decree. Community members and CBOs are best positioned to assist the Monitor with engaging the community.

**B. Civilian Oversight Task Force**

The proposed consent decree requires the DOJ and the City to create a 5-member Community Oversight Task Force (COTF) that would make recommendations for improving the current system of civilian oversight of police, including review of the Civilian Review Board (CRB). The CRB is an independent agency through which members of the public can file a complaint against police officers alleging the use of force, abusive language, harassment, false arrests and false imprisonment.[8] Since its inception, the CRB has struggled with completely filling vacancies,[9] and a *Baltimore Sun* investigation found that from January 2013 through March 2016, only 4 percent of excessive force complaints were upheld.[10] Consequently, Baltimore residents believe that the CRB is useless.[11]

The proposed consent decree states that COTF members will be appointed by the Mayor; however, we recommend that the Parties and the Court consider a more inclusive selection process for the COTF members. For example, the City could develop a process by which the Mayor would receive nominations from Baltimore residents, publicize a list of nominees, and publicly announce her final selection. The DOJ and the City of Portland included such a nominations process for a Community Advisory Board in their proposed settlement agreement.[12]

**C. Community Policing and Engagement**

The violations of constitutional and federal laws that are detailed in the DOJ's investigative report of the BPD expose a police department that many would argue is beyond repair. Any police commissioner and command staff tasked with addressing these violations could benefit from the expertise of similarly-situated police chiefs and commanders. Accordingly, the City and BPD should create an advisory team for the current and successor Baltimore Police Commissioner comprising law enforcement officials, academics and activists experienced in transforming a police department and creating a police culture that respects the rule of law and diverse communities. Advisory team members should be selected by the Baltimore Police Commissioner,

---

[8] *See*, Subtitle 16 of Article 1 of the Code of Local Laws of Baltimore City § 16-43(a).

[9] *See*, Karen Houppert, *The Civilian Review Board ups its game*, The City Paper, May 11, 2016 http://www.citypaper.com/news/mobtownbeat/bcp-051116-mob-civilian-review-board-20160511-story.html.

[10] *See*, Catherine Rentz, *Baltimore police failed to share misconduct complaints with civilian oversight board; promise to do so now*, The Baltimore Sun, Aug. 31, 2016 http://www.baltimoresun.com/news/maryland/baltimorecity/bs-md-civilian-review-board-20160831-story.html.

[11] *See*, Justin Fenton, *Baltimore police review board called irrelevant, ineffective*, The Baltimore Sun, Jun. 2, 2013 http://articles.baltimoresun.com/2013-06-02/news/bs-md-ci-police-civilian-review-board-20130602_1_civilianpanel-police-misconduct-baltimore-sun.

[12] *See*, Proposed Settlement Agreement, *U.S. v. City of Portland*, Case No. 3:12-cv-02265-SI, ¶ 145 (D. OR. Dec. 17, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2013/11/13/ppb_proposedsettle_12-17-12.pdf.

the Mayor, deans of leading academic institutions in the City, City Council Members, and residents of Baltimore City.

### D. Stops, Searches, Arrests, and Voluntary Police-Community Interactions

The way police officers engage civilians during stops, searches and arrests directly impacts police-community relations.[13] Paragraph 34 of the consent decree allows officers to conduct field interviews of community members to collect information about criminal activity. Officers conducting field interviews must introduce themselves and refrain from using language or actions that suggests that residents are not free to leave.

During these encounters, officers should be required to provide civilians with a business card that includes the officer's name and rank. President Obama's Task Force on 21st Century Policing also recommended law enforcement officers to carry business cards because it allows members of the public to offer suggestions or commendation or to file complaints with the appropriate individual, office, or board.[14]

Paragraph 42 states that BPD is required to create a system for providing persons who are stopped with a record of the citizen-police contact, such as a carbon copy of a receipt. The Parties should include in the receipt the race, ethnicity, gender, and age of the persons stopped and the race of the officer.

The record of the stop must include the basis for the stop. Under the consent decree it would be sufficient to say an officer stopped someone "suspected of criminal activity" or "traffic offense." But because paragraph 43 prohibits officers from conducting pretext stops for loitering and misdemeanors, a specific reason for the stop should be included in the citizen-police contact receipt.

Paragraph 82 of the proposed consent decree requires BPD supervisors to collect and analyze stop, search, and arrest data of officers to improve training and determine the effectiveness of these practices. Because BPD needs to build trust with the community they should also publicly report these data and analyses annually. Making this information public for community use would allow Baltimore residents and stakeholders to use these data to monitor police activities.

### E. Impartial Policing

---

[13] *See*, President's Task Force on 21st Century Policing, *Final Report of the President's Task Force on 21st Century Policing*, Washington, DC: Office of Community Oriented Policing Services, May 2015 at 24, available at http://www.cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf. (hereinafter *President's Policing Task Force Final Report*).

[14] *Id.* at 27.

The DOJ investigative report stated that BPD officers' mistreatment and improper searches of transgender individuals reflected underlying unlawful gender bias.[15] Paragraph 89 of the proposed consent decree requires BPD officers to "address and in documentation refer to all members of the public, including LGBT individuals, using the names, pronouns, and titles of respect appropriate to the individual's gender identity as expressed or clarified by the individual." Paragraph 53 states that "LGBT individuals' preferences with respect to the gender of the officer conducting the search will be honored." Because BPD has had a history of mistreating this population and not respecting the way transgender and gender non-conforming individuals identify themselves, BPD should mandate its officers to inform these individuals that they may indicate a gender preference regarding their self-identification and that their preference for the gender of the officer conducting a search will be followed. By mandating these actions, officers will be encouraged to respond to transgender individuals with compassion, dignity, and respect.

### F. Use of Force

In the wake of highly-publicized police shootings of unarmed civilians, law enforcement leaders have agreed that police departments should hold themselves to a higher standard than what the law allows in use-of-force incidents; and, the preservation of life should be the goal in police-civilian encounters.[16] Instead of exercising these principles, the DOJ investigative report found that BPD officers escalated encounters and used force when it was not necessary to resolve an incident, and used excessive force against individuals with disabilities and youth.[17]

The proposed consent decree should include a provision requiring BPD officers who use deadly force to submit to a drug test immediately after the incident. Currently, the Memorandum of Understanding (MOU) between the BPD and the local Fraternal Order of Police allows officers who use deadly force to be drug tested when there is reason to believe that the officer was under the influence of drugs or alcohol.[18] Additionally, a drug-test policy was implemented by the St. Louis County Police Department after tests revealed that an off-duty officer, who wrecked a police vehicle and was involved in a controversial shooting, was drunk and had cocaine in his system.[19]

---

[15] *Baltimore Investigative Report, supra* note 4 at 123.
[16] *See generally*, Police Executive Research Forum, Critical Issues in Policing Series: Guiding Principles on Use of Force, March 2016, available at http://www.policeforum.org/assets/30%20guiding%20principles.pdf.
[17] *See*, *Baltimore Investigative Report, supra* note 4, at 75-76.
[18] *See*, City of Baltimore, *Memorandum of Understanding between The Baltimore City Police Department and the Baltimore City Lodge No. 3, Fraternal Order of Police, Inc., Unit I Police Officers, Police Agents and Flight Officers*, Fiscal Years 2014-2016, Appendix E, at 62.
[19] Christine Byers, *St. Louis Police to undergo drug and alcohol testing after shootings, wrecks*, St. Louis Post Dispatch, Jan. 30, 2016, http://www.stltoday.com/news/local/crime-and-courts/st-louis-police-to-undergo-drugand-alcohol-testing-after/article_f75d2997-6632-5270-8705-f94092b181c9.html.

Paragraph 217 of the proposed consent decree requires BPD to analyze the previous year's force data on an annual basis "to determine trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report." BPD should be required to publicly report on its website data collection and analysis of use-of-force incidents disaggregated by demographic information of the victims on a quarterly basis. Making this information public would allow community members to identify discriminatory policing practices and excessive use of force by BPD officers.

### G. Response to Sexual Assault

The DOJ's investigative report found that BPD systematically under-investigated reports of sexual assault, and did not collect data regarding sexual assault involving BPD officers.[20] Any final consent decree must require BPD to develop policies and practices aimed at documenting and addressing sexual harassment and assault of victims by BPD officers. This includes putting systems in place to collect data on the victim and suspect populations, the incidence and nature of cases of sexual assault reported to and handled by BPD, and the incidence of cases of sexual assault involving BPD officers.[21]

### H. Technology

Public safety is maintained and reinforced in communities when residents and the police who serve them work together to develop and carry out problem-solving policing strategies to prevent and fight crime. Paragraph 276 requires BPD to disclose to the public on its website or disclose to any civilian oversight entity agreed upon by the Parties: (1) the type of new equipment or technology sought; and (2) BPD's intended use of the equipment. BPD should be required to provide opportunities for community input on the use of new equipment and technology sought by BPD. BPD should also discontinue the use of current equipment and technology not subjected to community feedback, such as its aerial mass surveillance system, until public feedback is provided.

### I. Supervision

The DOJ's investigative report found that the BPD "relies on deficient accountability systems that fail to curb unconstitutional policing."[22] That finding was echoed during our town hall, in which family members of persons killed by Baltimore police officers lamented that the

---

[20] *See, Baltimore Investigative Report*, *supra* note 4, at 123.
[21] *Id.* at 127.
[22] *Id.* at 139.

officers involved in these incidents were neither criminally charged nor disciplined, even though some officers had other complaints of excessive use of force pending against them.[23]

Paragraph 317 requires BPD's early intervention system (EIS) relational database to "capture all information necessary to ensure supervisory awareness and early identification of potentially problematic individual and department-wide conduct or signs of stress or other behavior that would benefit from being addressed." This information should be disaggregated by race, ethnicity, national origin, gender, age, physical and mental disability, and civilian's zip code. This will provide adequate information to supervisors to discern bias-based policing by BPD officers, and to determine the proper response, whether it be corrective training or imposition of disciplinary measures. accountable.

## J. Coordination with Baltimore City School Police Force

Paragraph 417 requires BPD to conduct an initial assessment of how it uses the Baltimore City School Police Force (BSPF) as supportive law enforcement officers and determine areas of improvement. The initial assessment should begin 90 days after the approval of the consent decree. To the extent that the BPD continues to contract with BSPF, then any memorandum of understanding must require BSPF to follow the same policies, training and data collection and reporting as BPD officers under the final consent decree between DOJ and Baltimore City.

## K. Recruitment, Hiring, and Retention

BPD has faced challenges in recruiting qualified officers – meeting only a fraction of its goals for the 2016 police academy class.[24] The DOJ investigative report found that as of 2015, the BPD was successful in recruiting African-American officers who comprised 42% of sworn officers, and 20% women; but, 75% lived outside of Baltimore City.[25] BPD should be required to adopt residency incentives to motivate more Baltimore residents to serve as members of the police force, and attract more officers to live in the city. Community-police relations could be strengthened if officers are in regular and direct contact with the community members they serve.

Paragraph 424 of the proposed consent decree requires BPD to include certain factors in its background investigations for hiring officers. BPD should be required to change restrictions on

---

[23] *See*, *UMB-NAACP Legal Defense Fund Town Hall on Policing Reform in Baltimore*, Sept. 7, 2016, http://www.naacpldf.org/news/watch-baltimore-town-hall-policing-reforms.

[24] *Id.* at 137.

[25] *Id.* at 16.

past marijuana use in police hiring. BPD Commissioner Kevin Davis acknowledged that marijuana use is the primary reason why Baltimore residents are disqualified from police service.[26]

Paragraph 421b requires BPD's Recruitment Plan to include "[r]ecruitment outreach to a broad spectrum of community stakeholders, aimed at increasing the diversity of its ranks, including race and gender . . . ." BPD should be required to make specific efforts to increase gender diversity on the force by engaging in special outreach and recruitment for women.[27]

Additionally, BPD officials responsible for recruitment, retention, and staffing should be screened regularly to identify any implicit biases in their hiring decisions.

### L. Termination of the Consent Decree

Paragraph 505 states that the proposed consent decree may be terminated five years after the effective date of the agreement. The consent decree should be in effect for no less than 10 years given the widespread police misconduct detailed in the DOJ's investigative report. Termination of Baltimore's consent decree in no less than 10 consecutive years assures sufficient time to determine if the BPD is in full and effective compliance.

### M. Conclusion

The DOJ's investigative report uncovered police violence and misconduct that Baltimore residents have endured for decades. The terms of any final consent decree between the DOJ and City officials must hold the promise of transforming the BPD into an agency of sworn officers and civilians who seek to serve and protect communities, with a guardian—not warrior—mindset, without regard to race, ethnicity, gender, age, and socio-economic status, and consistent with the U.S. Constitution, state and federal laws, and departmental policies. We appreciate the opportunity to comment on the proposed consent decree, and look forward to a continued partnership with the Court and the Parties following the approval of this very important agreement.

Respectfully submitted,

*Shirley A. Ifill*

Sherrilyn A. Ifill
President & Director Counsel

Monique L. Dixon
Deputy Director of Policy

Carlton Mayers
Policing Reform Policy Counsel

---

[26] *See, e.g.*, Kevin Rector, *Davis wants to relax restrictions on past marijuana use for police recruits in Maryland*, The Baltimore Sun, July 22, 2016, http://www.baltimoresun.com/news/maryland/crime/bs-md-ci-policemarijuana-standard-20160721-story.html.

[27] *President's Policing Task Force Final Report*, *supra* note 13, at 2.

8.   No Boundaries Coalition of Central West Baltimore



March 6, 2017

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington DC  20530

RE: United States v. Baltimore Police Dep't et al, Civil No. JKB-17-99

**Submission to the Court Regarding Strong Community Support for the Proposed Consent Decree**

The No Boundaries Coalition respectfully requests that the Court enter the proposed Consent Decree.

### Background regarding No Boundaries Coalition
The No Boundaries Coalition in Central West Baltimore is a resident-led advocacy organization that formed organically from an annual "No Boundaries" block party.  The Coalition encompasses Sandtown, Druid Heights, Upton, Madison Park, Penn North, Reservoir Hill, and Bolton Hill.   With 19 member organizations, the Coalition is committed to improving the safety of our streets, increasing police accountability increasing the access to healthy foods, and dismantling the barriers that have segregated our neighborhoods for years.

Isolated and segregated communities lead to disparities that limit people's lives.  According to the Baltimore City Health Department's Neighborhood Health Profiles, the violent crime rate is nearly double across our neighborhoods; the percent of family households living below the poverty line varies by more than three-fold; and the proportion of vacant rowhouses varies by more than six-fold.  It is easier in some neighborhoods to buy alcohol than it is to buy a banana, as the Coalition has estimated that in some areas there are 11 stores selling liquor for every 1 store selling fresh produce.  As a consequence, census data indicate that life expectancy is up to 10 years shorter between our neighborhoods.

Police – community relations in West Baltimore have been troubled for many years.  Yet Baltimore City lacks any effective mechanism for community involvement or civilian oversight.  Thus, the death of Freddie Gray at the hands of Western District police dismayed and alarmed an already-concerned community, which has been frustrated by the lack of effective oversight.

After the tragedy but before the Department of Justice announced its intent to investigate, the No Boundaries Coalition members created the West Baltimore Community Commission on Police Misconduct.  The Commission collected evidence regarding police misconduct, held a public hearing to permit the sharing of these narratives in a healing and constructive environment, and drafted and disseminated a report entitled "Overpoliced and Underserved." A copy of this report is attached as Exhibit A.

### Cooperation with the Department of Justice Investigation
Once the Department of Justice announced its intent to investigate the Police Department's conduct, the Coalition engaged directly with the investigative team to ensure that the team was able to connect directly with residents in Central West Baltimore.  The Coalition and the Community Commission shared

all of its findings and information with the Department of Justice, and met repeatedly with the investigators.

The Coalition commends the investigative efforts by the Department of Justice. The Coalition found that the Department's investigative report accurately portrayed the conduct by the Baltimore Police Department in the impoverished neighborhoods represented by the Coalition.

### *Community Oversight Task Force*

The Coalition was pleased that the Department of Justice, the City of Baltimore, and the Police Department of Baltimore City reached an agreement in lieu of litigation. The Coalition strongly supports the entry of the Proposed Consent Decree. The Coalition has concerns that the Proposed Consent Decree lacks provisions for an ongoing community involvement. In particular, the Coalition is concerned about the failure to look to best practices elsewhere, such as in the consent decrees entered in Seattle and Cleveland. When those consent decrees are compared to the Proposed Consent Decree here, it is clear that Section II., Community Oversight Task Force, fails to adopt the best practices of community involvement in police oversight.

As presently drafted at Section II., paragraphs 10-14, the Community Oversight Task Force is envisioned as a short-term entity with a narrow focus, and with only five members, all selected and appointed by the Mayor. We believe this approach is too limited, and does not reflect the best practices evidenced in other consent decrees. The Coalition is working in Annapolis to pass legislation (House Bill 1465) that would create a more robust and permanent Community Policing Steering Committee. A draft of the Bill is attached as Exhibit B.

The Coalition recommends that the Court convene a hearing after the Community Oversight Task Force has completed its report to hear from the parties and the community regarding whether the Task Force should continue to exist past the promulgation of its report. By that time, it will be known whether the State Legislature has created a more robust and permanent mechanism for community involvement.

### *Commitment to the Implementation of the Consent Decree*

In conclusion, the Coalition appreciates the opportunity to go on record in this litigation, and urges the Court to enter the Consent Decree, and move forward with the Monitoring Process. The Coalition remains fully committed to cooperating with this process.

Respectfully submitted,

Ray Kelly and Rebecca Nagle
Executive Directors
No Boundaries Coalition of Central West Baltimore

# HOUSE BILL 1465

E4                                                                                                          7lr0610

---

By: **Delegate Hayes**
Introduced and read first time: February 10, 2017
Assigned to: Judiciary

---

## A BILL ENTITLED

1    AN ACT concerning

2    **Baltimore City – Police Community Policing Steering Committee**

3    FOR the purpose of establishing the Baltimore City Police Community Policing Steering
4        Committee; providing for the composition, terms of office, quorum, chair, governance
5        procedures, subcommittee structure, meetings, and duties of the Committee;
6        providing that the Committee is subject to open meetings laws; requiring the
7        Committee, in cooperation with the Baltimore City Police Department, to develop
8        annually a Baltimore City Police Department Community Interaction Plan;
9        specifying the focus of the Plan; requiring the Plan to include certain elements;
10       requiring the Committee to submit the Plan to the Mayor of Baltimore, the Baltimore
11       City Council, and the members of the Baltimore City Senate and House Delegations
12       to the General Assembly on or before a certain date annually; defining certain terms;
13       and generally relating to the Baltimore City Police Community Policing Steering
14       Committee.

15   BY adding to
16       The Public Local Laws of Baltimore City
17       Section 16–15
18       Article 4 – Public Local Laws of Maryland
19       (1979 Edition and 1997 Supplement, and 2000 Supplement, as amended)

20       SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND,
21   That the Laws of Maryland read as follows:

## Article 4 – Baltimore City

23   **16–15.**

24       (A)    (1)    IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS
25   INDICATED.

---

EXPLANATION: **CAPITALS INDICATE MATTER ADDED TO EXISTING LAW.**
        [Brackets] indicate matter deleted from existing law.

1        **(2)** "**COMMITTEE**" **MEANS THE BALTIMORE CITY POLICE**
2 **COMMUNITY POLICING STEERING COMMITTEE.**

3        **(3)** "**PLAN**" **MEANS THE BALTIMORE CITY POLICE DEPARTMENT**
4 **COMMUNITY INTERACTION PLAN.**

5    **(B)** **THERE IS A BALTIMORE CITY POLICE COMMUNITY POLICING**
6 **STEERING COMMITTEE.**

7    **(C)** **(1)** **THE COMMITTEE CONSISTS OF:**

8        **(I)** **ONE MEMBER OF THE BALTIMORE CITY HOUSE**
9 **DELEGATION TO THE MARYLAND GENERAL ASSEMBLY, DESIGNATED BY THE**
10 **SPEAKER OF THE HOUSE OF DELEGATES;**

11        **(II)** **ONE MEMBER OF THE BALTIMORE CITY SENATE**
12 **DELEGATION TO THE MARYLAND GENERAL ASSEMBLY, DESIGNATED BY THE**
13 **PRESIDENT OF THE SENATE;**

14        **(III)** **THE CHAIR OF THE CITY COUNCIL'S PUBLIC SAFETY**
15 **COMMITTEE;**

16        **(IV)** **TWO DESIGNEES OF THE PRESIDENT OF THE CITY**
17 **COUNCIL;**

18        **(V)** **THE COMMISSIONER OF POLICE;**

19        **(VI)** **THE DIRECTOR OF CIVIL RIGHTS AND WAGE**
20 **ENFORCEMENT; AND**

21        **(VII)** **THE FOLLOWING MEMBERS, APPOINTED BY THE MAYOR**
22 **WITH THE ADVICE AND CONSENT OF THE CITY COUNCIL:**

23        **1.** **ONE RESIDENT OF EACH OF THE NINE POLICE**
24 **DISTRICTS OF BALTIMORE CITY;**

25        **2.** **A RESIDENT OF BALTIMORE CITY PUBLIC HOUSING;**

26        **3.** **AN INDIVIDUAL BETWEEN THE AGES OF 14 AND 21**
27 **YEARS;**

28        **4.** **A REPRESENTATIVE OF THE HISPANIC COMMUNITY;**

1        **5.**  A REPRESENTATIVE OF THE LESBIAN, GAY, BISEXUAL,
2 AND TRANSGENDER COMMUNITY;

3        **6.**  AN INDIVIDUAL WITH EXPERTISE IN THE AREA OF
4 REENTRY AFTER INCARCERATION;

5        **7.**  A REPRESENTATIVE OF THE FRATERNAL ORDER OF
6 POLICE; AND

7        **8.**  A REPRESENTATIVE OF THE VANGUARD JUSTICE
8 SOCIETY.

9    **(2)**  **(I)**  THE TERM OF A MEMBER APPOINTED BY THE MAYOR IS 4
10 YEARS.

11      **(II)**  THE TERMS OF THE MEMBERS APPOINTED BY THE MAYOR
12 ARE STAGGERED AS REQUIRED BY THE TERMS PROVIDED FOR MEMBERS OF THE
13 COMMITTEE ON OCTOBER 1, 2017.

14      **(III)**  AT THE END OF A TERM, A MEMBER APPOINTED BY THE
15 MAYOR CONTINUES TO SERVE UNTIL A SUCCESSOR IS APPOINTED AND QUALIFIES.

16      **(IV)**  A MEMBER WHO IS APPOINTED AFTER A TERM HAS BEGUN
17 SERVES ONLY FOR THE REST OF THE TERM AND UNTIL A SUCCESSOR IS APPOINTED
18 AND QUALIFIES.

19      **(V)**  NO MEMBER MAY SERVE FOR MORE THAN TWO TERMS.

20    **(3)**  A MAJORITY OF THE AUTHORIZED MEMBERSHIP OF THE
21 COMMITTEE IS A QUORUM.

22    **(4)**  THE COMMITTEE SHALL ANNUALLY ELECT A CHAIR.

23    **(5)**  THE COMMITTEE SHALL ESTABLISH GOVERNANCE PROCEDURES
24 AND SUBCOMMITTEE STRUCTURE BY MAJORITY VOTE.

25    **(6)**  THE COMMITTEE SHALL HOLD PUBLIC MEETINGS AT LEAST ONCE
26 QUARTERLY.

27    **(7)**  THE COMMITTEE IS SUBJECT TO OPEN MEETINGS LAWS.

(D)   (1)   THE COMMITTEE, IN COOPERATION WITH THE DEPARTMENT, SHALL DEVELOP ANNUALLY A BALTIMORE CITY POLICE DEPARTMENT COMMUNITY INTERACTION PLAN, WHICH SHALL FOCUS ON CREATING CONSISTENT POSITIVE INTERACTIONS BETWEEN POLICE OFFICERS AND COMMUNITY RESIDENTS.

(2)   THE PLAN SHALL:

(I)   1.   ENSURE THAT ALL POLICE OFFICERS WILL ACTIVELY PARTICIPATE IN NEIGHBORHOOD MEETINGS AND EVENTS THAT WILL BRING POLICE TOGETHER WITH A WIDE ARRAY OF CITY RESIDENTS;

2.   REQUIRE THAT ALL NEIGHBORHOOD MEETINGS AND EVENTS BE REPORTED TO THE CITY COUNCIL MONTHLY; AND

3.   REQUIRE THAT ALL POLICE OFFICERS ARE SCHEDULED TO ATTEND A SPECIFIED NUMBER OF EVENTS EACH YEAR;

(II)   OUTLINE STEPS TO ENSURE LONG–TERM CONSISTENT INTERACTION BETWEEN POLICE OFFICERS AND YOUTH IN BALTIMORE'S SCHOOLS, RECREATION CENTERS, AND OTHER YOUTH PROGRAMS;

(III)   OUTLINE STEPS TO ENSURE THAT POLICE OFFICERS INTERACT DIRECTLY WITH MEMBERS OF THE REENTRY COMMUNITY IN A POSITIVE MANNER;

(IV)   DIRECT THAT EMPHASIS BE PLACED ON CREATING POSITIVE INTERACTIONS WITH BALTIMORE'S AFRICAN AMERICAN, LESBIAN, GAY, BISEXUAL, TRANSGENDER, DOMESTIC VIOLENCE VICTIM, PUBLIC HOUSING, AND IMMIGRANT AND REFUGEE COMMUNITIES;

(V)   DIRECT THAT EMPHASIS BE PLACED ON IMPROVING RELATIONSHIPS BETWEEN THE POLICE DEPARTMENT AND THE SMALL BUSINESS COMMUNITY;

(VI)   PROVIDE INPUT ON CITIZEN–INVOLVED TRAINING FOR POLICE OFFICERS;

(VII)  LIST AND EVALUATE NONPROFIT AND NONLAW ENFORCEMENT PARTNERSHIPS;

(VIII) INCLUDE A PLAN FOR HOMELESS AND LESBIAN, GAY, BISEXUAL, AND TRANSGENDER COMMUNITY INTERACTIONS;

1      **(IX)** **ADDRESS** **EFFORTS** **TO** **RECRUIT** **AND** **RETAIN** **CITY**
2 **RESIDENTS AS POLICE OFFICERS;**

3      **(X)** **OUTLINE** **STEPS** **FOR** **FORMING** **AND** **MAINTAINING**
4 **COORDINATED RELATIONSHIPS WITH COLLEGES AND UNIVERSITIES LOCATED IN**
5 **BALTIMORE CITY, INCLUDING MORGAN STATE UNIVERSITY AND COPPIN STATE**
6 **UNIVERSITY; AND**

7      **(XI)** **INCLUDE ANY OTHER ITEMS IN FURTHERANCE OF THE**
8 **FOCUS OF THE COMMITTEE AS SPECIFIED IN PARAGRAPH (1) OF THIS SUBSECTION.**

9  **(E)** **THE COMMITTEE SHALL ALSO:**

10    **(1)** **REVIEW, ON A QUARTERLY BASIS, THE REQUIREMENTS OF § 3–510**
11 **OF THE PUBLIC SAFETY ARTICLE OF THE ANNOTATED CODE OF MARYLAND; AND**

12    **(2)** **PERFORM SUCH OTHER DUTIES AS APPROVED BY A MAJORITY**
13 **VOTE OF THE ENTIRE COMMITTEE MEMBERSHIP.**

14  **(F)** **ON OR BEFORE NOVEMBER 15 ANNUALLY, THE COMMITTEE SHALL**
15 **SUBMIT THE PLAN FOR THE FOLLOWING CALENDAR YEAR TO THE MAYOR, THE CITY**
16 **COUNCIL, AND, IN ACCORDANCE WITH § 2–1246 OF THE STATE GOVERNMENT**
17 **ARTICLE, THE MEMBERS OF THE BALTIMORE CITY HOUSE AND SENATE**
18 **DELEGATIONS TO THE MARYLAND GENERAL ASSEMBLY.**

19  SECTION 2. AND BE IT FURTHER ENACTED, That the terms of the initial
20 appointed members of the Baltimore City Police Community Policing Steering Committee
21 shall expire as follows:

22    (1)  the term of the Central police district representative shall expire in
23 2018;

24    (2)  the term of the Southeastern police district representative shall expire
25 in 2018;

26    (3)  the term of the representative of the lesbian, gay, bisexual, and
27 transgender community shall expire in 2018;

28    (4)  the term of one designee of the President of the City Council shall expire
29 in 2018;

30    (5)  the term of the Eastern police district representative shall expire in
31 2019;

1    (6)    the term of the Northern police district representative shall expire in
2 2019;

3    (7)    the term of the representative of the Hispanic community shall expire
4 in 2019;

5    (8)    the term of the member with expertise in the area of reentry after
6 incarceration shall expire in 2019;

7    (9)    the term of the Northwestern police district representative shall expire
8 in 2020;

9    (10)    the term of the Western police district representative shall expire in
10 2020;

11    (11)    the term of the Southern police district representative shall expire in
12 2020;

13    (12)    the term of the member between the ages of 14 and 21 years shall expire
14 in 2020;

15    (13)    the term of the representative of the Fraternal Order of Police shall
16 expire in 2020;

17    (14)    the term of the Northeastern police district representative shall expire
18 in 2021;

19    (15)    the term of the Southwestern police district representative shall expire
20 in 2021;

21    (16)    the term of the resident of Baltimore City public housing shall expire
22 in 2021;

23    (17)    the term of one designee of the President of the City Council shall expire
24 in 2021; and

25    (18)    the term of the representative of the Vanguard Justice Society shall
26 expire in 2021.

27    SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect
28 October 1, 2017.

# OVER-POLICED, YET UNDERSERVED:

BY THE WEST BALTIMORE COMMISSION ON POLICE MISCONDUCT AND THE NO BOUNDARIES COALITION

# THE PEOPLE'S FINDINGS REGARDING

MARCH 8, 2016
1526 N. FREMONT, BALTIMORE, MD 21217
WWW.NOBOUNDARIESCOALITION.COM
NOBOUNDARIESCOALITION@GMAIL.COM
IN COLLABORATION WITH BUILD AND THE UNIVERSITY OF MARYLAND, BALTIMORE COUNTY (UMBC)

# POLICE MISCONDUCT IN WEST BALTIMORE

THIS REPORT DETAILS STORIES OF POLICE MISCONDUCT TOLD BY WITNESSES AND VICTIMS FROM WEST BALTIMORE AND MAKES RECOMMENDATIONS FOR POLICY CHANGE TO IMPROVE COMMUNITY-POLICE RELATIONSHIPS.



Copyright © 2016 No Boundaries Coalition
and the West Baltimore Commission on Police Misconduct

All rights reserved.

Printed in the United States of America

Main entry under title:

**Over Policed, Yet Underserved:
The People's Findings Regarding Police
Misconduct in West Baltimore**

Library of Congress Cataloging in Publication Data

## TABLE OF CONTENTS:

4   **INTRODUCTION**

8   **METHODOLOGY**

10   **FINDINGS**

20   **POLICY RECOMMENDATIONS**

25   **APPENDIX**

30   **EXHIBITS**

31   **REFERENCES**

**REPORT TEAM:**

Analysis designed and results drafted by Charles Cange, Researcher at UMBC.

Quantitative and qualitative analysis prepared by Nick Jacobsen (Sociology MA Program, UMBC).

Transcription support provided by Nimasha Fernando, Kendrick Hudson, and Won Lee (UMBC).

Interviews conducted by Ray Kelly and Rebecca Nagle of the No Boundaries Coalition.

Photography by Carde Cornish.

Report and cover design by Zak Bickel.

**ACKNOWLEDGMENTS:**

Thank you to St Peter Claver Church for providing space for commission interviews.

Thank you to Sharon Baptist Church for hosting the Public Heaaring.

Thank you to the Campaign for Jobs, Safety and Justice for howsting the summary press release.

Made by possible by The Open Society Institute Baltimore, The Baltimore Community Foundation, The Fund For Change, and The Catholic Campaign for Human Development.

**DEDICATION:**

This report is dedicated to all the victims of police misconduct who are afraid to share their stories. In publishing these collected stories, we also remember the stories that will never be told.

# THE APRIL 2015 DEATH OF FREDDIE GRAY,

**a young African-American resident of Baltimore,** led to outrage, protests, and unrest at the local and national levels. Mr. Gray died while in the custody of Baltimore City police. A viral video of Gray's brutal treatment by law enforcement officials opened up local and national conversation about the issue of police misconduct in lower-income, urban African-American neighborhoods. Following similar events in New York City, Cleveland, and Ferguson, Missouri, in which unarmed African-American men were killed by police, this incident brought attention to a growing divide between police and their communities.

$\longrightarrow$

The week after Freddie Gray's death, Baltimore's Sandtown-Winchester community was in a state of crisis. Sandtown-Winchester is the neighborhood where Freddie Gray lived and where the police encounter that led to his death occurred. On Saturday, April 25, fifteen volunteers from the No Boundaries Coalition conducted a door-knocking campaign to hear directly from residents of Sandtown-Winchester what they needed and what they wanted to see happen in response to the death of Freddie Gray. 250 residents of Sandtown-Winchester spoke with the No Boundaries Coalition's volunteers that day. The decision to create the West Baltimore Community Commission on Police Misconduct arose out of that door-knocking campaign. In just that one afternoon, we talked to people who had had family members killed by police, people who had sustained broken bones in police encounters, and people whose house had been torn apart during a drug raid–only to find out that the police had the wrong address. From the stories we heard that day, we knew we needed to document the prevalence of police misconduct in West Baltimore. Although the community was well aware of the commonness of police misconduct, people outside of the community, policymakers, and the general public needed to be made aware.

## THE NO BOUNDARIES COALITION

**The No Boundaries Coalition is a res**ident-led advocacy organization building an empowered and unified Central West Baltimore (CWB) across the boundaries of race, class, and neighborhoods. Founded in 2010, the No Boundaries Coalition advocates safer streets, greater police accountability, more fresh, affordable produce in the neighborhood, and increasing opportunities for young people. The No Boundaries Coalition works in eight neighborhoods in Central West Baltimore (ZIP code 21217).

In 2013, the No Boundaries Coalition identified improving public safety and increasing police accountability as key issues in CWB through a listening campaign with residents. The No Boundaries Coalition successfully lobbied for police foot patrols along Pennsylvania Avenue through an eight-month campaign that included multiple meetings with city leadership, letter-writing, and community organizing. We also advocated for and successfully organized roundtable discussions between patrol officers and residents to improve police-community relationships. We have organized peace walks, marches, and a National Night Out Block Party to promote public safety. Beginning in December 2014, we conducted another listening campaign, in which we asked residents about their interactions with police and what they would like to see happen in order to improve police-community relationships. Based on the results of our listening campaign, we drafted legislation to reform Baltimore City's Civilian Review Board. The No Boundaries Coalition has met with and worked with every level of the Baltimore Police Department (BPD), from cadets and patrol officers to command staff and the Commissioner. We have worked with BPD to express residents' concerns, plan neighborhood events, advocate change, and improve police-community relationships.

## OUR NEIGHBORHOOD: SANDTOWN-WINCHESTER

**The majority of outreach to possible** participants occurred in the Sandtown-Winchester neighborhood. Due to the concentration of our outreach efforts, the majority of individuals interviewed for this report are Sandtown-Winchester residents. However, everyone who expressed interest in sharing their story was interviewed.

Sandtown-Winchester is a neighborhood of approximately 9,000 residents. The Sandtown neighborhood is located near downtown Baltimore, in ZIP code

21217. This 72-block neighborhood is part of "Old West Baltimore," a historically Black area of Baltimore with a rich history of arts, culture, and civil rights activism. Performers such as Billie Holliday and Diana Ross performed at venues along the historic Pennsylvania Avenue, often called the "Harlem of the South." "The Avenue" was known as the heart of Baltimore's Entertainment scene during the time of prohibition through the civil rights movement. In the second half of the 20th century, Sandtown experienced economic depression, housing abandonment, increased crime, and, with the decline of Baltimore's industrial sector in the 1990's, middle class flight to the surrounding suburbs.

## AIMS OF THIS REPORT

**This report has several goals: one, document** community recollections of specific incidents of police misconduct in West Baltimore. Second, describe recent changes (2005-2015) in law enforcement practice that have produced new strategies, procedures, and techniques of policing in West Baltimore. Lastly, reflect on ways to improve police and community relations, including returning to an emphasis on community policing.

## ORIGINS OF ZERO TOLERANCE POLICING

**An emerging pattern of police misconduct has** led to frustrations in many impoverished, inner-city communities in the United States. This frustration has helped fuel protests in cities across the United States since the summer of 2014. Moreover, this frustration is traceable to the same set of inter-related socio-economic, political, and discursive shifts that unfolded throughout the country from the late-twentieth century to the present. Baltimore is in many ways emblematic of these shifts because it pioneered the process of "red-lining" with residential segregation ordinances early in the twentieth century.[1,2] This model would later heavily influence post-industrial urban development and lead to the development of zero tolerance policing in African-American communities deemed to be high-risk.

Since 1975, employment in Baltimore has become increasingly irregular, precarious, and part-time; salaried manufacturing, which once employed a third of the city's residents, represented less than 5% of workers in 2012.[3,4] In the crumbling inner-city areas of Baltimore's East and West sides, a growing share of available jobs tended to be informal, and

**ALTHOUGH THE COMMUNITY WAS WELL AWARE OF THE COMMONNESS OF POLICE MISCONDUCT, PEOPLE OUTSIDE OF THE COMMUNITY, POLICYMAKERS, AND THE GENERAL PUBLIC NEEDED TO BE MADE AWARE.**

by the 1980s and 1990s, were primarily with trafficking gray- and black-market goods.

## CONTEMPORARY POLICING AND THE WARS ON DRUGS, CRIME AND GANGS

**The multiplication and diffusion of stereotypes** about crime and drug use fostered White demands for expansive prison policies directed toward harsh retribution and neutralization. The assertion that drug use was the "most important component and cause of street crime," supported by sensationalized media coverage of inner city violence, linked America's 'drug problem' to all of society's ills, cultivating a "crisis mentality" among voters.[5,6] Consistent with this framing, the nation's War on Drugs, War on Crime, and War on Gangs were focused primarily upon low-level dealers and users in African-American neighborhoods.

## REDEVELOPMENT AND PREFERENTIAL COMMUNITY POLICING

**Capital and population flight to the suburbs** prompted a coincidental shift in Baltimore's mode of governance, from a managerial city to an entrepreneurial city.[7] Local business leaders formed an association, the Greater Baltimore Committee, to pressure local government into implementing a large-scale urban renewal project in the city's downtown and Inner Harbor. This was part of a more extensive pivot in municipal governance, which saw city halls across the country forgo the continued funding of public services in favor of investment in commercial (re)development and public-private joint business ventures. The more enduring legacy of redevelopment has been the reconfiguration of policing strategies enacted to contain poor city residents to the "ghetto." The fragmentation of urban space into zones within which citizens would be policed and treated differently based upon their class, race, and residency has become a fixture of post-industrial Baltimore.

# CONTEMPORARY POLICING TERMS OF REFERENCE

The contemporary law enforcement regime has developed out of the interaction of local circumstances and national policing mandates. These mandates have led to a reciprocal and self-reinforcing dynamic, however, that has accelerated the estrangement between police and the very communities that they were designated to protect. These interrelated mandates and policies can be classified with the following terms:

- **The introduction of "zero tolerance" or "broken window" policing.** The Broken Window theory suggests that serious crime is incubated by conditions in which disorderly, disreputable, and anti-social behaviors are the norm; therefore, police departments should proactively address minor, street-level disturbances that allegedly lead to more harmful patterns of criminality. However, in conceiving of nuisance behaviors as prerequisites to serious criminal offenses, police began to treat misdemeanors as being on par with felonies in terms of resource allocation.[8] Police, who hold broad and flexible powers to regulate public space, began removing those residents designated as "disorderly," a catch-all term that encompasses the potentially criminal, the homeless, the mentally ill, and anyone deemed unpredictable or suspicious.

- **The legislation of "quality of life" and "'civility codes."** Ordinances which complement zero tolerance policies, which illegalize certain actions in public spaces, including sitting, sleeping, or loitering, provided a justification for the selective policing of certain residents in certain contexts. This strategy of policing permits officers the ability to enact a program of punitive containment, whereby law enforcement may target "undesirable elements" for detainment and removal for engaging in routine activities, in a manner that is legally defensible.[9]

- **The War on Drugs and the War on Terror.** The complementary rationalities of these imperatives support the broadening of law enforcement discretion in detaining and/or arresting suspects; the weakening of substantive due process in the case of search, seizure and forfeiture; a high emphasis on pre-emptive and preventative action in law enforcement; and the effacement of the legal distinction between criminal and noncriminal members of the community.[10] In accordance with "tough on crime" laws, not only are more residents arrested, convicted, and incarcerated for minor offenses, but sentences have grown steadily harsher and longer. Most significantly, the War on Drugs distorted police incentives, rewarding and steering law enforcement efforts toward policing drug-related crime—most of which is nonviolent in nature—and away from investigating homicides, robberies, and criminal intimidation.[11]

- **Community Policing.** This is a set of related policing strategies that emerged out of the Broken Window theory and subsequently developed into a line of theory and practices distinct from, and often in conflict with, "tough on crime" policies. In general terms, community policing refers to a philosophy that promotes the use of community partnerships to collaboratively and proactively address the immediate conditions that foster public safety issues (i.e. crime). In contrast to traditional policing, community policing maintains that it is the role of individual officers to be facilitators, working with community members to develop creative techniques that ensure a safe, orderly social environment.[12] By empowering the "beat officer" to take initiative in preventing crime and building community trust, this strategy represents "full service personalized policing, where the same officer patrols and works in the same area on a permanent basis, from a decentralized place, working in a proactive partnership with residents to identify and solve problems."[13]

# THE PRESENT COMMISSION AROSE SPONTANEOUSLY

**from an outpouring of concern triggered by the** death of Freddie Gray. The No Boundaries Coalition and BUILD (Baltimoreans United In Leadership Development) realized that they were both engaging in fact-finding efforts and decided to join forces. This resulted in the creation of the West Baltimore Community Commission on Police Misconduct. This community-led Commission received organizational input from a lawyer who is active with the No Boundaries Coalition and who has 28 years of legal experience, including years spent investigating human rights abuses in foreign countries.

$\longrightarrow$

**B**UILD is a broad-based, nonpartisan, interfaith, multi-racial community power organization rooted in Baltimore's neighborhoods and congregations. BUILD is dedicated to making our city a better place for all Baltimoreans to live and thrive. For more than 35 years, BUILD has worked to improve housing, increase job opportunities, and rebuild schools and neighborhoods, among other issues. BUILD is affiliated with the Industrial Areas Foundation, a coalition of like-minded organizations in cities across the United States.

After conducting the interviews, the Commission invited the University of Maryland, Baltimore County (UMBC) to assist with the data analysis. Interestingly, UMBC was founded during an earlier wave of civil unrest in the 1960s as the first integrated university in Maryland. As a member of the University System of Maryland, UMBC is a dynamic public research university integrating teaching, research, and service to benefit the citizens of Maryland. It strives to be innovative, interdisciplinary, and inclusive.

All evidence and findings collected by the Commission will be shared with the US Department of Justice.

### RECRUITMENT AND SAMPLING

**The Commission took as its mission an** intensive, on-the-streets investigation into the impact of police misconduct on the lives of those living in the Sandtown-Winchester. The Commission began by holding a public hearing in May 2015, during which residents willing to do so publicly testified about what they had encountered and endured. Despite the public nature of the hearing, numerous residents came forward and revealed their personal stories regarding police misconduct.

Thereafter, the Commission began to interview residents using a purposive sampling

technique. The Commission was interested in collecting further testimony from residents with a history of a negative interaction with the police. For uniformity, the Commission trained and used the same two people to conduct the interviews. The Commission publicized the effort with paper fliers and media coverage. The Commission distributed 3,000 fliers to West Baltimore residents, providing information about the commission and a related hotline. Through canvassing, door-knocking, and community meetings, the commission spoke with 1,500 people. The Commission conducted in-depth, one-on-one personal interviews (IDIs) of approximately 31 persons in addition to the 8 persons who testified at the public hearing. The total number of individuals who told us stories about police misconduct was 453 people. Yet, of these 453 persons only 39 were willing to give their accounts on the record, even when they were promised that their names would be kept confidential from the public. These individuals shared 57 unique accounts of misconduct with the Commission. The refusal rate to participate on the record–anonymously–was 92%, showing the extremely high level of fear community residents have of police retaliation.

The extremely high level of fear of retaliation prevented many people from talking to the Commission. As one witness stated, "I understand we need to speak up on the way the police treat the community, but certain things ain't nobody going to talk about."

The interviews were conducted pursuant to a guideline interview document, which is attached hereto as Exhibit A*. Testimonies were also collected using an incident statement, attached as Exhibit B*. Before the start of each interview or focus group, interviewers explained the study and obtained oral and informed consent. The interviewees were promised complete confidentiality. Their identities were protected by the use of unique identifying numbers, and pseudonyms were assigned and used in order to attribute their quotes in the Findings section. Some witnesses wished to speak publicly

"

## I UNDERSTAND WE NEED TO SPEAK UP ON THE WAY THE POLICE TREAT THE COMMUNITY, BUT CERTAIN THINGS AIN'T NOBODY GOING TO TALK ABOUT.

about their experiences, and their photographs have been included to show the faces of the impact of police misconduct in West Baltimore.

### ETHICAL REVIEW

**The scientific analysis of the transcripts was approved** by UMBC's Institutional Review Board (IRB).

### ANALYSES

**The study design was both quantitative and qualita**tive, also known as "mixed-methods." For the quantitative analysis, we collated all of our data from 47 complete accounts and performed descriptive statistics of the results. These are available in Tables 1, 2 and 3**. Then, we commenced the qualitative analysis. First, audio recordings were transcribed. Then, the transcripts were triaged to eliminate those of poor or inconsistent quality, leaving 42 usable IDI transcripts out of the 45 total. The study team developed a codebook, working together until they reached agreement on a set of thematic codes. Codes were based on topics of interest and additional themes that the team identified from the transcripts. The study team read these texts to identify themes, and codes were then applied to a sample of the transcripts by using a semi-automated process aided by Microsoft Word Macros (Redmond, WA).[14] This process allowed coded text to be extracted for further analysis. The key themes were developed into the findings presented in this paper. The teams used thematic analysis to identify, analyze, and report themes in the data.[15] Using the codebook, a line-by-line review of the transcripts was performed; first-level codes–descriptors of important themes–were noted in Microsoft Word 2010 Comments. Coded texts were extracted from the transcript comments using Word Macros.14 They were analyzed using an iterative process that focused on finding the main narratives based on the connotation and denotation of coded text across cases.[16,17,18] From these analyses, we determined the dominant themes in the transcripts.[19] Preliminary findings were also presented to collaborators for feedback and discussion.

# FINDINGS

## A THOROUGH ANALYSIS OF THE COLLECTED BODY OF INCIDENT REPORTS, INTERVIEWS AND TESTIMONIALS PROVIDED A DETAILED CHRONICLE OF POLICE MISCONDUCT IN WEST BALTIMORE.

**This misconduct occurred in multiple forms, including physical and psychological abuse.** More significantly, the narratives revealed a complex, intimate, and sobering illustration of how police misconduct has shaped the perceptions, attitudes, and relationships between law enforcement and the community.



The positions expressed within the texts are sharply at odds with the dominant media narrative of the events surrounding Freddie Gray's death. Contrary to media representations, criticisms centering upon a personal vilification of individual officers were minimal. Rather than describing a few bad officers, witnesses described a prevalence of police misconduct that shaped their perception of all police.

From the wide variety of reports, reflections, and personal anecdotes and stories, a much more complicated picture of law enforcement emerged, through which broader issues of perceived institutional racism, corruption, neighborhood disinvestment, and community were discussed in revealing and unexpected ways. As such, the misconduct problem is complicated and layered; however, the level of abuse is excessive compared to policing in the city's other neighborhoods.

### PERCEPTIONS OF RACISM IN LAW ENFORCEMENT

**In conducting interviews, the Commission** found that Baltimore residents receive radically different treatment from police based on the race and class of their neighborhood. Residents in majority White neighborhoods were more likely to receive responses to crime complaints and 911 calls, as well as more likely to receive respectful treatment from the officers with whom they interacted. One informant from a White neighborhood was told by a police officer at her community meeting, "Hey, listen, we don't have the same problems here in South Baltimore. We know you; you know us. We love you; you love us. We don't have the same problems here as in West and East Baltimore. You all are going to be fine." The witness stated, "The comment really pitted residents of the peninsula [South Baltimore] against East and West Baltimore. The people in the room didn't seem to be bothered or troubled by [the] implications. Seemed like it was an everyday understanding."

After witnessing the extremely high level of police protection in the Inner Harbor during the civil unrest, in contrast to the lack of police protection for Sandtown, one resident commented, "The city was pretty much saying Sandtown doesn't matter; the Black neighborhood can burn. They were protecting the White people, the richer people. Made it clear to me that even though we have a Black Mayor, Baltimore is still a very racist city."

On Monday, December 1, 2015, the No Boundaries Coalition met with the Commander of Patrol for the Baltimore Police Department to request foot patrols along Pennsylvania Avenue in response to a marked increase in drug trafficking. The Coalition members were told that the police department did not have the resources. The very next day, the same group attended a Mount Royal Improvement Association meeting in the Bolton Hill community (a majority White community) at which the Major of Central District told Bolton Hill residents that due to an increase in robberies over the weekend, the deployment of officers to Bolton Hill would increase from 2 to 6 effective immediately. The same police district was unwilling to increase patrols on Pennsylvania Avenue until March (two months later), yet it would assign four patrols to Bolton Hill within days.

In a letter to then-Commissioner Anthony Batts, an advocate with the No Boundaries Coalition wrote:

" How can you tell a community, dealing with a thriving open air drug market, as well as all the other violence that is associated with this activity, that they should be patient and wait for two months for our Police Department to take action, while neighbors only five blocks away, get an immediate allocation of time, money and resources?"

In the two weeks prior to our December 1 meeting with Lt. Col. DeSousa, the Pennsylvania Avenue corridor and surrounding blocks had five aggravated assaults, four burglaries and three car break-ins.

One witness in West Baltimore called the police because some children were throwing rocks at his dog. The officer who responded to the 911 call stated, "I don't know what you expect living around these animals."

Although residents live in neighborhoods that do not have sufficient police response to emergencies, residents report that officers do make a presence to harass them on the street or while driving locally. Some of the residents believe that this harassment constitutes racial profiling. In most cases, informants acknowledged, implicitly or explicitly, that the existing law enforcement regime has

served to disenfranchise African-Americans. The practice of profiling was recognized as prevalent, and even routine, with one informant remarking that, repeatedly, "I have been arrested by police officers and harassed by them just because of the way I look." Similarly, there was a widely accepted belief that the violent deaths of African-American men are not afforded proper coverage or investigation, especially if the events in question involve law enforcement officials.

Rather than perceiving racism as a problem rooted in the individual officer, witnesses described the problem being rooted in policies and practices. They felt that they received unequal treatment from the police department based on the race of the alleged suspect and the predominant race and/or socio-economic level of his/her neighborhood. Indeed, witnesses shared that they had experienced unfair treatment from officers of all races:

" I've had some ... you know, I've seen some Black officers who were not so nice and some White ones who were not so nice ...
—Mr. T., Resident

Informants stated that, "America's always been about race," and African-Americans today still "live in a racist ... capitalist, sexist system." The focus of frustration was directed toward the policies that have distorted the priorities of the department and transformed the ways in which law enforcement officials interact with the community. This shift was identified as responsible for normalizing policing strategies, tactics and techniques that multiply opportunities for misconduct to take place. Furthermore, residents lamented a police culture in which officers engaged in misconduct are not held responsible for their actions.

## INEFFECTIVE POLICING AND CRIME RATES

**One typical narrative of police brutality is** that force is necessary in high crime areas to combat crime. However, our testimonies confirmed that the multi-layered problem of police neglect, corruption, misconduct, and brutality

" I HAVE BEEN ARRESTED BY POLICE OFFICERS AND HARASSED BY THEM JUST BECAUSE OF THE WAY I LOOK.

increased crime rather than deterring it. As one witness said, "It used to be that if you did something illegal, they patted you down, they arrested you, and they locked you up. Now, they don't even arrest you, they just take you in the alley and they beat you up. It doesn't matter what you do."

If the theory of law enforcement is that it acts as a deterrent to crime, the problem in West Baltimore seems to be that the legal response to crime is not being applied fairly and consistently. Many witnesses who experienced the police's excessive use of force, who were subjected to unreasonable stops and searches ("stop and frisk"), and/or who were even detained were not committing any crime at the time of their encounter with police. Most of the informants were not arrested and the overwhelming majority were not convicted of any crime; all the reported cases were thrown out. These testimonies were often also coupled with stories of police corruption and police neglect that allow drug dealing to go on in the community. One witness observed a police officer taking money from a drug dealer and stating, "My kids are going to have a good Christmas this year."

Following the week of the Baltimore civil unrest in May 2015, a well-established homeowner in Sandtown made 35 documented calls to 911 regarding heavy drug activity on their block. There was no response to any of the calls. Documentation of the calls was given to the former Police Commissioner Anthony Batts, yet nothing happened.

Police non-response also includes a lack of thorough investigation into crimes committed in the community, including homicides. After a local store owner's video surveillance camera captured a homicide that happened outside their store, the store owner called 911 several times over a period of two days and received no response. Then, the store owner called the Baltimore Crime Watch line and was told by the officer on call that someone would be in touch to collect the footage. After a week with no contact from the police department and no attempt to collect the footage, the store owner reached out to a Lieutenant Colonel (Lt. Col.) through a local advocacy group. Seven days after the homicide, the Lt. Col. came to store to collect the footage. As of this report's release date, the store owner still has not heard anything more about the incident or investigation.

In one incident, a mother witnessed her own son's murder. Although the police apprehended and questioned a suspect, as an eye witness, she was never brought in to identify the suspect. The corner where her son was murdered had video cameras, and her son had previously been convicted for selling drugs on the same corner with footage from the cameras. When she asked the police about the video tape of her son's murder, they told her the video was not usable because of a sun flare.

## THE WAR ON DRUGS AND POLICE VIOLENCE

**A shift toward police militarization, zero-toler**ance enforcement, and tough-on-crime sentencing were all identifiable factors that have purportedly weakened community trust in the police. However, an additional emerging theme of many narratives is the function the War on Drugs played in criminalizing virtually the entire West Baltimore community. An "Us Against Them" type of policing produced a separation of police out of the conventional fabric of the community, and consolidated the two parties as mutually antagonistic opposites. When one witness went to the Western District to complain about her son being physically assaulted by a police officer, the officer on duty responded, "It's the neighborhood you live in."

The thematic pattern of the testimonies suggested that the tension between the community and police resulted from systemic changes in law enforcement policy. These changes facilitated, or even rewarded, abusive and illegal policing practices in Sandtown. More concretely, many informants placed explicit blame on the War on Drugs and War on Crime discourses that empower officers to act more aggressively and invasively and weaken the institutional mechanisms by which citizens could seek legal redress and hold law enforcement accountable for any perceived misconduct.

As a result, the emphasis on drug policing allows officers the legal pretense to "do whatever they want." In the collected reports, police intervention is predicated or legitimated by suspicion of drug possession or distribution in 43% of cases, while loitering, nuisance behavior, or 'disorderly' conduct are implicated in 54% of cases. Of these cases, only 20% of suspects involved were subjected to arrest and detention; the number of suspects that were subsequently charged for a crime is nil (0%).

This variety of routinized, imprudent policing, often described as harassment, was referenced repeatedly in the accounts. Of the police interventions described, informants identify 67% as unwarranted (not prompted by a ⟶ PAGE 14

# "US V. THEM": A COLLAPSE IN COMMUNITY POLICING

## LACK OF PROFESSIONALISM

**Although most informants were convinced of the illegality of police misconduct** (83%), a consistent theme within the accounts was that condemnation follows from an "appeal to decency" rather than an appeal to the law itself. The actions of officers were viewed as incompatible with, or hostile to, social codes of conduct within the community, as distinct from the legal code that is normally enforced by the department. Social code violations included failing to abide by conventions of due deference to certain community members, such as respectful treatment of elders and community leaders, exceptional treatment afforded vulnerable groups, such as children, juveniles, and the disabled, and appropriate treatment of men and women. In all reports (100%) involving senior citizens, officers acted in a manner that violated community norms of respectful treatment of the elderly. In all reports involving children or young adults, officers conducted themselves in a way that was viewed as indecent.

In one account, a lifelong resident, church pastor, and community elder in Sandtown approached a few officers who had blocked in his car with their police cars. When he politely asked them to move, they cursed at him, with one stating, "We do what the fuck we want." In one account, a police officer arrived to a community lunch an hour late, did not apologize for being late, and chastised community residents for beginning to eat without him.

In cases in which the gender of an individual was a significant factor in the interaction, 74% of the accounts described conduct in which abuse was gendered or sexually inappropriate. These accounts included instances of sexual misconduct and sexualized language, a perceived unnecessary roughness directed towards women by male police officers, and abusive and derogatory language employed specifically to address female community members.

In addition, a number of accounts featured police behavior that humiliated and emasculated young men, with witnesses being forced to undergo unwarranted strip searches that included officers asking the young men to remove their pants and handling the alleged suspect's genitals. The young men were also subjected to embarrassing and disparaging comments by officers. 100% of reports indicated that officers failed to act in accordance with standards of professionalism expected of law enforcement.

Another witness, Mr. S., reported that when he was pulled over in his car, he asked the police for permission to go to the restroom at a friend's house. The police refused and detained him, and he soiled himself. The police laughed at him when he soiled himself.



A COMMUNITY PARK IN WEST BALTIMORE

legitimate public safety concern), 73% as unwanted (not desired by those subject to the intervention), and 86% as excessive (the intervention resulted in a response that was disproportionate to what was expected or necessary in the circumstances described). Excessive punitive measures encompass acts of physical violence directed toward victims, which are reported in 57% of interventions, but may also constitute extended periods of detention, including "walk throughs" (46% of cases), and abusive, demeaning, and sub-ordinating language (57% of cases).

Several stories give a sobering illustration of the routine and excessive stops and searches West Baltimore residents endure:

" The officer picked me up and slammed me on my face, took my back-pack off, and threw all my books out, and when they didn't find any-thing kicked me in my stomach. I was just happy they didn't lock me up and bounced.
—Mr. K., Resident

One witness, Mr. P., was on his way home from school and stopped at the corner of Fulton and North Avenues to chat with some friends. As they were talking, two unmarked cars pulled up, and eight officers ordered all the students to get down on the ground. A police officer subjected the witness to a "vulgar" and invasive search, which included the officer putting his hand in the witness' underwear and handling his genitals. The officer also slapped him. His friends were treated in a similar fashion. All were let go without being charged with any crimes.

### LACK OF POSITIVE INTERACTIONS WITH THE POLICE

**The perception that, as one participant stated, "officers need** to be trained in human relations" accompanied a widespread belief that a lack of proactive engagement by law enforcement in schools and neighborhoods weakened trust and mutual understanding between police and community-members. Many informants lamented the withdrawal of engagement efforts and linked it to a decline in community confidence in law enforcement.

A reflection by one informant concisely articulated the worri-some effects of "Law and Order"-type policing:

" By the time we were teenagers, we didn't trust the police at all. And when the crack epidemic descend-ed on Baltimore and the so-called war on drugs was declared with street sweeping and military tac-tics, it shifted to 'us against them.' When things became violent in our community, we were all suspects and treated as such. It was noth-ing to be stopped and searched by the police. As a young Black man in a high crime area, it was actual-ly routine.
—Mr. W., Resident

One informant recounts:

" I ask my granddaughter, 'Do Officer Friendly come in y' all school?'
She said, 'What that, ma?'
I said, 'Lord, have mercy.
—Ms. M., Resident

Repeatedly, informants stressed the "need to have officers trained in public relations," to "know how to talk to people." A number of infor-mants expressed a deep respect for police officers and an earnest desire

for relations to be rehabilitated; yet they also conceded a reticence to trust law enforcement, even in cases of emergencies. The perception that officers act unpredictably or arbitrarily, cited in 96% of cases, or may conduct themselves improperly, prompted community members to "actually avoid contact with the police." One informant summarized the dilemma faced by many residents, especially parents:

" Because I want to teach my children, if you are ever in need and you need help, go find a police officer. And right now, the way this thing is going, it's hard to teach your child to look for an officer for help, because they fear that the officer is not going to be the one to help them.
—Mr. D., Resident

## A CYCLE OF ANTAGONISM AND RESENTMENT

**The cycle of antagonism, recrimination, and resent**ment, which was a fixture of nearly all of the accounts surveyed, is perceived to reinforce a relationship of mutual disrespect and mistrust between officers and community members. In several cases, informants suggested that this process is sustained by an inability of law enforcement and community members to develop relationships with each other. As the two parties become more removed from one another and interact only in circumstances involving interventions and arrests, neither one is able to familiarize itself with the other and establish the basis for mutual trust and regard. A component of this is a perceived transience of officer assignments that are coordinated and executed from above:

" You get action for a while and then they are reassigned and you start all over with a fresh crew of police representatives who know nothing about your history, nothing about your situation. This is the other aspect of it. The police constantly changing their structure.
—Mr. C., Resident

"

## THEY CAN'T POLICE OUR COMMUNITY IF THEY DON'T LEARN OUR COMMUNITY.

The sentiment that community members do not know, or are not given the opportunity to know, their neighborhood officers was expressed throughout many in-depth reflections, especially by informants who could recall a time when police were a stable, integral part of the community itself. One informant, after recollecting these changes, argued:

" In conclusion, I have heard from many neighbors about things, and I gotta tell ya: people wanna see cops on the beat. They do not want to see cops sitting in their cruisers, being unapproachable.
—Ms. P., Resident

Another informant stated,

" They can't police our community if they don't learn our community.
—Mr. B., Resident

Most accounts pointed toward two interrelated, mutually-reinforcing processes as responsible for this collapse in community policing. The first is an institutional practice in which the Baltimore Police Department (BPD), responding to contingent circumstances in one district or another, transfers frontline officers between posts so often that they are not given an opportunity to become acquainted with the community members whom they are policing. Without the time necessary to develop a mutual rapport and familiarity, residents are hesitant to approach or engage with officers. This first process produces the other: since officers reasonably anticipate a brief assignment at a specific post, they have little incentive to get to know, appreciate and respect the norms of the community and rights of its members; similarly, community members are less likely to treat officers with respect or trust if they expect them to be only a temporary feature of the neighborhood. Several informants suggested that a positive relationship can only be cultivated when both residents and officers are committed to the long-term success of the neighborhood.

## CORRUPTION, RETALIATION AND FAILED SYSTEMS: WHAT HAPPENS WHEN VICTIMS OF POLICE MISCONDUCT SEEK JUSTICE

**Informants identified a lack of accountability** within the department and a willingness of law enforcement officials, at multiple levels, to protect officers accused of misconduct. Institutional unresponsiveness is perceived as highly conducive to misconduct, protecting and rewarding perpetrators and unfairly punishing the community. Instances of





PICTURED IS THE FAMILY OF JEFFREY MARROW, WHO WAS KILLED IN A POLICE INVOLVED SHOOTING IN 2006.

fraud were reported in 70% of accounts, while instances in which officers planted, tampered with, or invented evidence to advance a case were reported in 45%. It was alleged in 46% of cases that the department manipulated institutional procedures to frustrate the advancement of an investigation or unfairly penalize claimants. Similarly, 29% of accounts cited the utilization of excessive paperwork and filing processes to delay or exhaust an investigation. A failure to hold abusive officers accountable was presented as the factor most damaging to the legitimacy of the BPD:

" When you got police officers that sworn to protect and serve the community, and you violate or take advantage of the privilege of your badge to violate, imprison and just have no disregards for anybody's civil rights, you should be held accountable.
—Mr. O., Resident

There was a consensus expressed within the testimonies that misconduct from individual officers stems from and is perpetuated by an institutional culture that fails to hold wrongdoers accountable. In cases in which informants filed complaints and sought legal redress for their grievances, only 25% saw their cases officially resolved, and only 2% to their satisfaction. The sentiment that "the system is broken" and that the law enforcement structure is riddled with corruption was echoed repeatedly among the testimonies.

A family that lost a loved one to a police-involved shooting shared the following account. The State's Attorney deemed the shooting "justified" and refused to provide the family members with any information about the investigation leading to that conclusion. In addition, the government performed an autopsy without familial consent, which the family would not have provided for religious reasons. During the investigation, the family called the detective's office "almost every day" and "couldn't even talk to the detective." The family was never given an autopsy report; the family learned that their loved one's death was caused by a shot to the back of the head because the funeral home director provided them with photographs.

The result of this institutional corruption is diminished confidence in law enforcement as a whole. When it becomes clear that abusive officers are insulated from the consequences of their actions, the institution itself is perceived as being implicated in officers' crimes. As one informant noted, "We know all police ain't bad ... We know we need police," but "one bad apple make them look all the same to us." This lack of accountability leads many residents to conclude, with deep dismay, that they "can't trust the people that the City of Baltimore hires to protect us."

Witnesses described how the lack of accountability within the B.P.D. changes officers' behavior. One witness stated, "the whole neighborhood was outside when he did it. It was a summer afternoon, but he didn't care. He felt like his badge made him God." During another incident of physical assault, a witness observed the officers who were involved stating, "go ahead and film us."

Beyond frustration at the lack of accountability, many witnesses also described officers retaliating against those who sought redress for their grievances. The high level of fear of retaliation from Baltimore City police was demonstrated by the high percentage of people who told the Commission that they had experienced police misconduct but would not say so on the record (92%). One witness, Ms. R., had previously filed a formal complaint against an officer who harassed her son. She was later arrested by the same officer in her neighborhood for dropping a candy wrapper on the ground. During the arrest the officer called her a "bitch" and physically hurt her.

## THE PSYCHOLOGICAL IMPACT OF MISCONDUCT: PANIC, FEAR, AND MISTRUST

**It is clear that a sense of mistrust and antipathy** toward law enforcement is deeply rooted in many of Baltimore's communities. However, a narrative interpretation of the collected texts provides only a partial image of how interactions with police are negotiated, processed, and internalized by a community. Identifying the emotional or affective responses involved in police interventions is perhaps most telling. In the cases reported, 69% of informants disclosed an experience of anxiety or fear; 94% experienced a sense of confusion or frustration; 59% experienced a sense of shame or humiliation; 39% experienced a sense of despair or hopelessness; 76% described a sense of fatigue or exhaustion; and only 4% expressed feeling a sense of happiness or satisfaction. More explicitly, 28% of informants reported longstanding psychological distress as a consequence of their interaction.

**ONE WITNESS, MS. R., HAD PREVIOUSLY FILED A FORMAL COMPLAINT AGAINST AN OFFICER WHO HARASSED HER SON. SHE WAS LATER ARRESTED BY THE SAME OFFICER IN HER NEIGHBORHOOD FOR DROPPING A CANDY WRAPPER ON THE GROUND.**

Cumulatively, witnesses described interactions with law enforcement eliciting panic. Some residents reported feeling a high level of anxiety that causes their ability to engage in rational analysis to break down. A majority of accounts explained an inability to anticipate or interpret the behavior of officers, especially with respect to a breakdown in legal order and social norms and conventions, or, simply put, "common sense." This disorientation and alienation is articulated in the following excerpt:

" You know, we want to respect the police. Just yesterday I almost had to call the police on another Black person in my community ... but at the end of the day, if you have the police causing the disruption in the community, where do you go?
—Ms. S., Resident

The long-term impact of negative interactions with police upon the community should not be understated. Even in cases in which informants do not cite enduring physical or psychological trauma, it is clear that the marks of police misconduct do not diminish quickly or easily in time. From the material consequences of a wrongful arrest or conviction, to a loss of confidence in the legitimacy of the institution of law enforcement, the legacy of abuse is complex, deep-seated and emotional. As one informant recounted:

" I gave it all up to God and let Him take it from there but I'm still having wounds from that past because they won't heal because of what they have done to me ... I'm feeling with what the families are going through because I know how police brutality is. I have been a part of police brutality. Some of the things that have [been] done to me, I can't forget.
—Mr. L., Resident

# SUMMARY

This initiative has provided a unique insight into the conditions of West Baltimore, containing perspectives that resonate deeply with an ongoing national debate on race and law enforcement, as well as those which problematize all-encompassing narratives on the subject. There is a critical set of conclusions to be drawn from the accounts of residents of Sandtown-Winchester, which can be identified herein.

Informants agreed that the legacy of racism in Baltimore is a defining feature of community life and is experienced through concentrated poverty, disinvestment, discrimination, and police profiling and abuse in Sandtown, West Baltimore. Informants viewed the conduct of law enforcement today as a product of federal, state, and city-level policy changes that are prone to over-empower police to act with impunity. While informants expressed the need for individual officers to be held accountable, they did not view officers accused of misconduct as being the central problem, but rather a symptom of more extensive issues at a systemic level.

The raft of legislation which grounds the War on Drugs is perceived as enabling and incentivizing aggressive, intrusive policing. At the same time, it also shields those officers accused of wrongdoing from being held accountable by individuals whom they may have wronged. In other words, the community is "over-policed, yet under-served," and as a consequence, its residents are not as well protected as residents of other neighborhoods. The martial ethos propagated by the various Wars is seen as filtering down into law enforcement strategies, tactics, and behaviors, so that increasingly residents are perceived and treated as enemies rather than partners. At the same time, the B.P.D. is understood as prioritizing the sheltering of abusive officers while willingly obscuring misconduct from the public. These two perceptions serve to weaken the stability and permanence of police within communities, which in turn reinforces estrangement.

At a personal, subjective level, misconduct is deeply damaging to the psychological and, to a lesser extent, physical well-being of community members. Not only can interventions with abusive officers result in protracted and even lifelong trauma among individual victims, but they also leave more grave consequences. Informants reporting incidents of police misconduct expressed a deep concern that their children should be safe when interacting with police. Similarly, informants articulated that they would caution their children against contacting police officers in the case of an emergency due to fear of misconduct against their children. The long-term consequences of this transgenerational impact cannot be understated or ignored.

→

# THE WEST BALTIMORE COMMUNITY COMMISSION RECOMMENDS THAT BALTIMORE CITY, THE BALTIMORE POLICE DEPARTMENT, AND THE MARYLAND GENERAL ASSEMBLY REFORM POLICY TO INCREASE CIVILIAN OVERSIGHT OF THE BALTIMORE CITY POLICE DEPARTMENT, IMPLEMENT COMMUNITY POLICING MODELS, AND ENSURE THAT EVERY BALTIMORE CITIZEN AND NEIGHBORHOOD IS POLICED IN AN EQUITABLE, EFFECTIVE, AND CONSTITUTIONAL MANNER.

This Commission recommends that the Baltimore Police Department work to rebuild trust with Baltimore City residents in the following ways:

- **Provide anti-racism training** for seasoned officers, command staff, and cadets. These trainings should target common assumptions made by police officers when they interact with non-White suspects (i.e. profiling). These trainings should be led by skilled facilitators and involve members of the local community.

- **Provide de-escalation and community relations training** for seasoned officers, command staff, and cadets. Officers should be trained in how to de-escalate tense situations. Officers should be trained in how to talk with residents and community members, how to build relationships with residents, and how to patrol on foot. In addition to receiving anti-racism training, officers should be trained on how to interact with youth, people with disabilities, people with mental illness, women, and LGBTQ community members. This commission recommends a de-escalation training modeled after best practices in Richmond, CA, and by the Washington State Criminal Justice Training Commission.

- **Establish a community policing model** that includes fully funded permanent foot posts in resident-designated areas. Communities want to be familiar with their officers, see them "on the beat," and know that they can be approachable. The police department should work with residents and community organizations to determine where permanent foots posts should go.

- **Redefine the policies that govern how and where officers are assigned**. Residents cannot establish good relations with officers when (re)assignments are made frequently and without warning; this includes command staff. The department should create better models for staffing that prioritizes officers and command staff being able to build relationships with communities. The department must actively work with the community to identify and penalize officers that engage in misconduct. These individuals must be held accountable for their actions, not have their abuses 'swept under the rug' by being shuffled around.

- **Meet regularly with local leaders and residents**. Through round table discussions, patrol officers should meet the residents whose neighborhood they patrol. Neighborhood leaders, faith leaders, and activists should have clear mechanisms to give feedback to B.P.D., including regular meetings with command staff and designated points of contact within the department.

- **Incentivize officers to live in the communities where they work.**

- **Reinstate relationship-building programs** (e.g. 'Officer Friendly' and 'PAL Centers') that introduce police officers to the community and the community to police officers in order to build relationships. Improve outreach efforts within neighborhood associations, schools, and community events. Focus on initiatives that build trust with children and youth.

- **Fully fund the Baltimore Civilian Review Board**. Without resources and staff, the Baltimore Civilian Review Board cannot be an effective mechanism for civilian oversight. The CRB should have enough funding for at least three full-time investigators and an attorney.

- **Increase transparency** by allowing public input on collective bargaining agreements between municipal government and the police union.

- **Increase civilian input into BPD reform, practices, priorities, and budgeting.** In addition to increasing civilian oversight in situations of wrongdoing, the Baltimore Police Department should have clear mechanisms in place for a diverse group of community stakeholders to be able to give input about departmental reforms and practices. The Commission recommends a stakeholder coalition modeled after Seattle's Community Police Commission.

→

THIS COMMISSION RECOMMENDS THAT THE MARYLAND GENERAL ASSEMBLY MAKE THE FOLLOWING CHANGES TO THE BALTIMORE CIVILIAN REVIEW BOARD. THIS COMMISSION SUPPORTS HB1262 WITH AMENDMENTS:

→

THIS COMMISSION RECOMMENDS THAT THE MARYLAND GENERAL ASSEMBLY MAKE THE FOLLOWING CHANGES TO THE LAW ENFORCEMENT OFFICERS' BILL OF RIGHTS:

→

THIS COMMISSION RECOMMENDS THAT THE DEPARTMENT OF JUSTICE INCLUDE IN ITS CONSENT DECREE PROVISIONS TO ADDRESS THE FOLLOWING:

- Create mechanisms to increase community input on CRB board members by having the members of the CRB be nominated by neighborhood associations and selected by City Council.

- The CRB should require the Executive Director to conduct a comprehensive investigation of filed complaints and report findings to the Board in a written report within 90 days.

- The CRB should not be permitted to ignore a complaint filed by a citizen. Given the high level of fear of retaliation this Commission heard from citizens, the CRB should accept non-notarized and anonymous complaints.

- All CRB reports should be sent to the Commissioner and Mayor. If the Commissioner and Mayor sustain the complaint, then the complaint is to be considered closed. If the Commissioner and the Mayor do not sustain the complaint, then the board's recommendation should move to City Council for review. The final ruling on sustained complaints should be be public knowledge.

- The CRB should no longer be able to "exonerate the police officer" or "find the complaint is unfounded." Instead, the Board should be limited to sustaining the complaint, not sustaining the complaint, or requiring further investigation.

- All CRB investigative records should be kept for a period of 10 years and controlled by the board. The CRB should also retain independent records of the Internal Affairs Investigation.

---

- Allow civilians or non-sworn officers to be involved in investigations of allegations of police misconduct.

- Remove time restrictions for citizens to file a complaint.

- Eliminate the 10-day rule that allows officers to wait 10 days before giving a statement.

- Allow anonymous civilian complaints against police officers.

- Add a non-collusion clause to LEOBR so that officers cannot unduly influence each other's stories.

- Allow civilians to serve on trial boards.

---

- Include the aforementioned recommendations for changes to the Baltimore City Police Department.

- Given the frustration with police non-response to 911 calls for service, instate external oversight of 911 response time and enforce equitable police response to different communities. Ensure that residents in communities of color are seeing the same emergency responsiveness as residents in White communities.

- Oversee the forwarding of Internal Affairs complaints to Baltimore Civilian Review Board and ensure that all complaints made to the police department are forwarded within 48 hours.

- We know that the Baltimore Civilian Review Board requires adequate staff and funding to be effective. We recommend that Baltimore City be required to fully fund the Baltimore Civilian Review Board with an annual operating budget of at least $1,000,000.

- Lastly, we also recommend that the Department of Justice meet with local communities and advocacy organizations to get input on the community's need for police reform.

## TABLE 1. POLICING STRATEGIES AND TACTICS

| | REPORTED IN INFORMANT ACCOUNTS (%) |
| --- | --- |
| 'QUALITY OF LIFE' OR NUISANCE LAW CITED BY LAW ENFORCEMENT AS PRETENSE FOR INTERVENTION (LOITERING, TRESPASSING, DISORDERLY CONDUCT, ETC.) | YES: 54% NO: 46% |
| ILLEGAL DRUGS (USE, POSSESSION, OR SALE) CITED BY LAW ENFORCEMENT AS PRETENSE OR JUSTIFICATION FOR INTERVENTION | YES: 43% NO: 57% |
| LAW ENFORCEMENT CONDUCT A 'STOP AND FRISK' | YES: 30% NO: 70% |
| INDIVIDUAL SUBJECT TO TEMPORARY DETENTION WITHOUT CHARGE (A 'WALK THROUGH') | YES: 39% NO: 61% |
| INDIVIDUAL SUBJECT TO ARREST AND DETENTION | YES: 30% NO: 70% |
| INTERVENTION INVOLVED VIOLENCE | YES: 57% NO: 43% |

## TABLE 2. PERCEPTIONS OF POLICE MISCONDUCT

| | REPORTED IN INFORMANT ACCOUNTS (%) |
| --- | --- |
| LAW ENFORCEMENT ACCUSED OF PLANTING, TAMPERING WITH, OR MANIPULATING EVIDENCE | YES: 38% NO: 62% |
| LAW ENFORCEMENT SUSPECTED OF ENGAGING IN FRAUDULENT PRACTICES | YES: 57% NO: 43% |
| CONDUCT OF POLICE OFFICER(S) PERCEIVED AS DECEPTIVE OR DELIBERATELY OBSTRUCTIVE | YES: 81% NO: 19% |
| CONDUCT OF POLICE OFFICER(S) PERCEIVED AS NEGLIGENT | YES: 72% NO: 28% |
| VIOLENCE USED BY LAW ENFORCEMENT PERCEIVED AS EXCESSIVE (PERCENTAGE OF CASES WHICH REPORT VIOLENCE) | YES: 96% NO: 4% |
| CONDUCT OF LAW ENFORCEMENT CONSIDERED UNPROFESSIONAL | YES: 100% NO: 0% |

## TABLE 3. EXPERIENCE OF MISCONDUCT

| | REPORTED IN INFORMANT ACCOUNTS (%) |
| --- | --- |
| INTERVENTION PRODUCED EXPERIENCE OF HAPPINESS OR SATISFACTION | YES: 4% NO: 96% |
| INTERVENTION PRODUCED EXPERIENCE OF FEAR OR ANXIETY | YES: 57% NO: 43% |
| INTERVENTION PRODUCED EXPERIENCE OF CONFUSION OR FRUSTRATION | YES: 96% NO: 4% |
| INTERVENTION PRODUCED EXPERIENCE OF SHAME OR HUMILIATION | YES: 59% NO: 41% |
| INTERVENTION PRODUCED EXPERIENCE OF DESPAIR OR HOPELESSNESS | YES: 39% NO: 61% |
| INTERVENTION PRODUCED EXPERIENCE OF FATIGUE OR EXHAUSTION | YES: 24% NO: 76% |
| INTERVENTION RESULTED IN LONG-TERM PHYSICAL INJURIES | YES: 22% NO: 78% |
| LONG-TERM PSYCHOLOGICAL DISTRESS OR DISTURBANCE REPORTED | YES: 41% NO: 59% |

# THIS APPENDIX SUMMARIZES THE HIGHLIGHTS OF INTERVIEWS CONDUCTED BY THE COMMISSION:

$\longrightarrow$

1. Witness was driving home from work with her child when she was pulled over by three officers. The officers told her "we know about your brother" (who had died prior to the encounter). The tall white officer placed his hand on her leg. She contacted several government agencies (internal affairs, States' Attorney, Baltimore police, MTA police) to complain but received no response.
(November 2006)

2. Witness, a resident, approached a few officers who had blocked in his car with their police cars.  When he politely asked them to move, they cussed at him, with one stating "we do what the fuck we want."
(Winter, 2010)

3. Witness reported that when he was pulled over on Mount Street between Lorman and Laurens, he asked the police permission to go to the restroom at a friends' house. The police refused, and snickered when he soiled himself.
(1998 or 1999)

4. Witness called the police when her grandsons engaged in a fight. But when the officer arrived, the fight had ended and the scene was peaceful. Yet the officer attempted to assault one of her grandsons, causing her to have to protect him with her body.
(Summer 2009)

5. Witness was riding a dirt bike near Leslie Street. Three officers chased him into the alley and beat him up.  They did not arrest him.
(Summer 2010)

6. Witness was chased into an alley and beat up by three or four officers near Leslie Street. When some neighbors began filming, one of the officers stated "go ahead and film us."
(Summer 2014)

**7.** Witness observed police officer robbing a drug dealer, and stating "my kids are going to have a good Christmas this year."
(Date unknown)

**8.** Witness observed an officer pat down a boy on the corner of Stricker and Presstman, apparently looking for drugs. The officer then took the boy's money from his pocket, and told him "get the fuck off this corner."
(Date unknown)

**9.** Witness's son was sitting in his car in front of her house. Officers pulled up and told him to "get the fuck out of the car". Officers told son he was being searched because it was illegal to be sitting in his car without his seatbelt on because the car was running.
(September 2014)

**10.** Witness recounted convening a community luncheon and inviting an officer to attend. The officer arrived one hour late, failed to apologize for his tardiness, but instead chastised the community members for having begun to eat before his arrival.
(March 2012)

**11.** Witness' brother was shot in the back of the head and killed by a police officer. The State's Attorney deemed the shooting "justified" and refused to provide the family members with any information about the investigation leading to that conclusion. In addition, government performed an autopsy without familial consent, which would have been denied because brother was Muslim. The family was never given an autopsy but learned the death was caused by shot to back of head because the funeral home director provided them photographs.
(2007)

**12.** Witness and her son went to the store. A police officer stopped her son and asked him why he was not in school. As he turned to the officer to respond, the officer punched him in the face. When the Witness

and her son went to the Western District to complain about the assault, the officer responded, "it's the neighborhood you live in."
(2004)

**13.** Police officer brought nephew to Witness' door and claimed, while covering his badge, "he is eyeball fucking me" and "he's looking at me." Witness complaint to internal affairs at Western District, and believes the officer was suspended.
(2006 or later)

**14.** Witness threw a candy wrapper on the ground on Pennsylvania Ave. A police officer pulls up in a car, and says, "bitch, you're going to jail." Witness had previously filed a complaint against the same officer and believed the arrest to be retaliatory. Witness was brought to Central Booking, where she remained for 8 hours without being arrested or charged.
(2006 or later)

**15.** Witness's neighbor observed police officer placing a bag in the glove compartment of son's car on Presstman Street while son was being detained by a different police officer on the curb. The son was arrested for drug possession. The son's car was confiscated and sold by police department while the charges were still pending. The government failed to obtain a conviction, but despite having retained a lawyer, the son was unable to recover the car.
(May 2010)

**16.** Witness' stepson was visiting, and sitting on the steps of home at Presstman and Stricker across from Sharon Baptist. Police officer claimed that he could be "locked up" for sitting on the steps.
(Spring 2012 or 2013)

**17.** Witness saw a large pool of blood, EMT gloves, and fragments of a human body in the alley between Sharon Baptist Church and Lilian Jones Rec. Field on 1300 block of Stricker. There was no police tape or

anything else cordoning off the crime scene from the nearby children. Witness and her neighbor cleaned up the blood and body parts left on the scene.
(late Spring or early Summer, 2015)

**18.** Witness was sitting on her own steps when a police car stopped, and an officer began to question her. When Witness began to walk into her home, the officer ordered her to stop. Witness explained she could prove she lived at the house if he would let her go inside. The officer told her he did not want to see any identification and ordered her to be quiet. He called a second officer, who allowed Witness to go into her home and get her identification.
(July 15, 2015)

**19.** Witness reported being physically mistreated by officers who arrested him. One officer placed him on a hot car hood. When Witness attempted to get off the hood, another officer threw him on the ground and cuffed his arms and legs together. At this point, an officer jumped on him, with a knee hitting into his chest. A separate officer pulled out a tazer, but did not use it. Witness was then placed on the floor of a van for transport. Witness was not placed on a seat or seatbelted. Witness complained to internal affairs without result.
(August 2011)

**20.** Witness and some friends were inside her home when they heard screaming outside. They went outside to see what was occurring, and observed police arresting a man, who was yelling, "get off me, you're hurting me." As a crowd began to congregate, the police told observers to "back up, get on curbs." The police then began to spray mace into the crow, and called for backup. One of the Witness' friend (a 6 foot tall man) was kicked and beaten by several police officers. Witness observed police body-slam her son. Witness asked why police were harming her son, and in response, the officer hit her on the chest with his baton. Police threatened to arrest Witness but did not do so.

The friend was arrested, held for 24 hours, and released without charges being brought.
(2010)

**21.** Witness was in the parking lot of the Morning Star Baptist Church with a friend when police officers approached them. They told the women that there had been a lot of killings nearby, and asked for identification. Witness' friend did not have any identification. The police officer then frisked the friend, and gave her a citation for not carrying identification.
(December 2011)

**22.** Witness' son suffered from lead poisoning, and was mentally slow. He broke into the home of an off-duty police officer, and was killed by that officer.
(date unknown)

**23.** Witness was sitting on the front steps of his family home on Mt.

Holly Street when an officer began to harass him. When his mother stepped out and told that her son was her family member, the officer pushed her in the face and told her to move back. When the Witness went to the aid of his mother, the officer called for more officers and arrested Witness. After Witness was placed in an unlocked cell, several police officers came in and savagely beat him. Witness was not convicted of any crime. Witness attempted without success to file a report with Internal Affairs.
(1983)

**24.** Witness was walking towards his home on Holly Street when an officer arrested him on a drug charge and brought him to the Southwestern District. There, a group of officers beat him up.
(1992)

**25.** Witness was on his way home from school, and stopped at the corner of Fulton and North Avenues to chat

with some friends. As they were talking, two unmarked cars pulled up, and 8 officers ordered all the students to get down on the ground. A police officer subjected Witness to a "vulgar" and invasive search, which included the officer putting his hand in Witness' underwear. The officer also slapped him. His friends were treated in a similar fashion. All were let go without being charged with any crimes.
(2010 or 2011)

**26.** Witness was walking home from school when a police officer tackled him from behind, slammed his face into the ground, pinned him to the ground and began to conduct an aggressive and invasive search with his knee jammed into Witness' back. The officer dumped all the contents of his bookbag onto the ground. The officer let him go after detaining him

ELDER C.W. HARRIS, SANDTOWN RESIDENT AND FOUNDER OF NEWBORN COMMUNITY OF FAITH CHURCH AND WITNESS



for approximately 15 minutes.
(October 2012 or 2013)

**27.** Witness observed his neighbor calling the police to report his mother's car had been stolen. The police were disrespectful to the neighbor, who was able to identify the perpetrator. As a result of the police failing to listen to the neighbor, they failed to apprehend the perpetrator, who appeared during the encounter.
(November 2000)

**28.** Witness observed the police manhandling and yelling at her mentally disabled neighbor on the 1500 block of Leslie Street. Witness intervened.
(2015)

**29.** Witness arrived at his home in Cherry Hill, intoxicated after attending a party. He and his wife began arguing, when an officer arrived. Witness' wife informed the officer that she did not need his assistance, but the officer told her that she did not have any choice in the matter, and pushed past her into the back yard, and pepper sprayed the Witness. At this time, other police officers arrived, and began to beat and stomp on the Witness. Witness had to go to the hospital. Witness filed a report with the Baltimore Civilian Review Board but nothing happened.
(July 2006)

**30.** Witness observed police being disrespectful to him and other demonstrators during a peaceful demonstration at the corner of Charles and Mount Royal.
(September 2011)

**31.** Witness was walking with a group of friends when police car stopped. Police officers accused one person in the group who was carrying a stick as the culprit a beating that had occurred a few blocks away. Witness observed the officers handcuffing his friend, placing him on the curb, and then beating him, bruising his ribs.
(2015)

**32.** Witness was getting off at Upton Metro station and saw a police

officer pull a gun on a young man who had been accused of stealing a cell phone. Witness believed that if the young man had not stopped the officer would have shot him. Witness was with three younger siblings and did not want her younger brothers and sisters to watch someone be shot.
(Dec 2015)

**33.** Witness was at a community meeting in a mostly white neighborhood in South Baltimore in June 2015 after the Baltimore civil unrest. After the community liaison officer was asked what the police department was doing to keep South Baltimore safe, the officer replied, "Hey listen, we don't have the same problems here in South Baltimore. We know you, you know us. We love you, you love us. We don't have the same problems here as in West and East Baltimore. You all are going to be fine."
(June 2015)

**34.** Witness was walking home from a friends house at Erdman and Manasota, when a police car pulled in front of him and an officer got out and tackled him. The officer then stopped and left. Witness assumed the officer realized he had the wrong person.
(August 2011)

**35.** Witness' 82 year old mother was knocked over in the attempt to arrest him, while police were serving a warrant for theft, and witness was physically assaulted when coming to her aid.
(April 1990)

**36.** Witness was present on W. North Ave. and Monroe St. when a police officer hit an inebriated man in the forehead, causing him to bleed.
(July 1987)

**37.** Witness' son was on a dirt bike when he was cut off by a police officer driving a car. When the son swerved and hit a tree, the officer gave him the choice of going to the hospital followed by jail, or simply leaving. The son left. As he was walking home, another police car

pulled alongside him, and an officer got out and assaulted him.
(date unknown)

**38.** Witness was sitting on her front stoop during a family birthday party, when officers came and began harassing them. The officers told the family members that they had to go in the house. The Witness called the officers' supervisor, and maintained calm.
(July 2015)

**39.** Witness was being arrested for prostitution. The arresting police officer helped her by giving her information about drug rehabilitation programs, and helping her enter such a program.
(date unknown)

**40.** Witness got out early from school because of a water issues, when she exited the Metro at Upton Station there were other kids from the school throwing snowballs at cars and buses, other kids gathered in front of Legends Restaurant. When the police officers arrived, they told all of them to show their school ID to prove they went to Douglass, those that did not have ID's had to sit on the icy curb for a half hour before being told to go home.
(February 2015)

**41.** Witness was exchanging cell phone photos with a friend, when a policeman jumped out, put her in a headlock, choked her and caused her to urinate on herself. After the incident told her to "take her ass home".
(date unknown)

**42.** Witness saw her son murdered in West Baltimore, and though she was an eyewitness to his homicide with she was not considered a viable witness and was subsequently "blocked" from giving or receiving information about the investigation.
(February 2015)

**43.** Witness recalls being a 14 year old child and seeing from her window the paddy wagon pull up and drag out a popular neighborhood resident named 'Leprechaun' out of an

establishment. A group of police beat him with their clubs and left him.
(summer 1976)

44. Witness was involved in a verbal altercation on the block where she lived. When police arrived and intervened, she informed them she had her child in the house. She was subsequently arrested for child endangerment and leaving a child unattended.
(June 2015)

45. Witness was working in Harbor East the night of Civil Unrest on April 27, 2015. As she was leaving work, she witnessed the police barricading in the Inner Harbor, but did not see that level of police protection in West Baltimore. Witness viewed the discrepancies in levels of police protection protecting the white parts of the city but "letting the black neighborhood burn".
(April 2015)

46. Witness's sister was at Mondawmin Mall and saw the police pulling schools kids off MTA buses. The police told the students they were there to start a riot. Sister observed students were trying to get home, but couldn't because they weren't being allowed on buses or the metro.
(April 2015)

47. A Witness/homeowner called the police 35 times in the week following the civil unrest about heavy drug activity on his block. He documented the dates and times of his calls. The police never responded to any calls. The Witness gave the information to Commissioner Batts, but nothing happened.
(April/ May 2015)

48. A homeowner found bullet casings from a shooting in front of his house while sweeping his front. He called Western District, but could not get in touch with any officers that he knew at the station. He called his city council representative who said the police would send a person to get the casings from his house.

No one ever came to collect the evidence.
(Summer 2015)

49. Witness's car was stolen, The Witness reported the theft to an off duty police officer who he saw at a nearby food store. Officer called a detective who took Witness to police station to make a statement. At the police station, officers accused Witness of fabricating story and interrogated Witness for several hours. During the interrogation, Witness falsely confessed to hacking (offering someone a ride for money) in response to police pressure. Witness was arrested and was in jail overnight. On the day of his trial, the police officer did not appear, and the Court dismissed the charges. Nothing was done about the Witness' stolen car.
(April 2015)

50. Witness called 911 after an incident where young people were throwing rocks at his dog. The officer who came stated, "What do you expect living around these animals?"
(summer 2011)

51. Witness was on Fulton St when someone told him that his childhood friend had been shot a few block away. Witness arrived at crime scene and overheard an an officer stating, "I'm glad that happened." Witness perceived the officers verbally celebrating friend's death, likely because the friend was a drug dealer. Witness was unsatisfied with the limited extent of the police investigation into the homicide.
(September 2013)

52. Witness was told by police he was being pulled over because his tags were suspended on Harford Rd. Officer pulled him out of his car by his neck through his car window. After being detained, officers told him that dispatch had made a mistake and there was not a problem with his plates. Witness was in the 11th grade at the time of incident.
(2005)

53. Witness was being arrested on a drug charge. During arrest, officer had witness stand with his hands behind his head and then punched

him in the face. Witness stated, "That's what the knockers do."
(2003)

54. Witness was pulled over on Reisterstown Rd and subjected to an invasive search. Officer hit him twice in his private area and looked down his pants to search for drugs. Officer asked witness to go into alleyway but Witness refused because he did not want to be strip-searched.
(2013)

55. Witness was on Presstman Street when a group of police officers jumped out of their cars, and drew their guns, with one officer stating "Shut the fuck up". The officers did not nothing further, however, and quickly left with one saying, "let's get out of here." The Witness interpreted the incident as the officers playing a joke.
(February 2016)

56. Witness's store video surveillance taped a homicide that occurred outside store. The Witness (store owner) called 911 several times over a period of 2 days and received no response. The Witness then called Baltimore Crime Watch line. The officer on call said that someone would be in touch with him to collect the footage. After a week, with no contact from the police, the Witness (store owner) reached out to a Lieutenant Colonel (Lt Col) through a local advocacy group. Seven days after the homicide, the Lt Col came to store to collect the footage.
(Summer 2015)

57. Detective requested footage from surveillance camera from a local store owner. At the time of the request, the system was under repair. The store owner explained that the footage could not be copied, and that the detective would need to come back to the store to watch the footage. Detective filed a complaint with the liquor board against store for failing to cooperate with the police. Store owners filed a complaint with the Baltimore Civilian Review Board against the detective.
(Fall 2015)

# EXHIBITS

The Commission interviewed witnesses pursuant to the below guideline interview document:

Testimonies were also collected using this incident statement:

---

Interview Guide for qualitative pilot inquiry related to Police Brutality in West Baltimore
Interviewers: R. Nagle & R. Kelly

**PERSONAL INFORMATION**

Date of interview:

Start time of interview:

End time of interview:

Location of interview:

Name of person conducting interview:

Contact phone and email of person conducting interview:

Interview Questions
Address (neighborhood):

Years local:

Date of birth:

Family status:
(married, children, etc)

Many witnesses will have more than one incident to report to us. It is important to fill out a separate incident report for each incident. Indicate total number of reports after you conclude the interview.

Please prepare a separate incident report even if the witness was not personally involved in the incident but simply observed police misconduct from afar.

Total number of incidents reported by witness:

Email completed forms to noboundaries@nbc.org.

WITNESS ID CODE:

Date?

Time of day?

Day of week?

Physical location

Why there?

Was anyone with you?

Who?

Did they observe what occurred?

What were you doing before the police officers approached you?

**PHYSICAL DESCRIPTIONS OF ALL INVOLVED OFFICERS**

How may police officers?

Do you know any names? Badge numbers?

Please describe officer no. I

Please describe officer no. 2

Etc.

**STATEMENTS BY OFFICERS**

Have the witness quote exactly what was said as precisely as possible
Ask for details on tone, inflection, body language (e.g. loud voice while glaring)

Please describe any statements made by officer no. I

Please describe any statements made by officer no. 2

Etc.

PHYSICAL CONTACT MADE BY OFFICERS

Have the witness explain exactly what occurred as precisely as possible using the officer designations

Please describe any physical contact made by officer no. I

Please describe any physical contact made by officer no. 2

Etc.

Did these contacts cause you pain?

Did you take any steps to protect yourself during this encounter? What did you do?
(describe any physical reactions with specificity – e.g., after officer no. I placed his hand on my left leg, I swung my right arm and hit his right side)

**STEPS TAKEN AFTER INCIDENT BY WITNESS**

How did the incident conclude?
(e.g. arrest, walked away)

Were you charged with any crime? If so, what crime?

Were you convicted?

Did you ever complain about the police officer misconduct to anyone?
(e.g. yes, told my mother)

When did you tell them?
(e.g. day after happened)

Are you able to provide us their contact information?

Did you complain to any governmental body? If answer is no, why not?

To whom?

When?

Did you prepare anything in writing?

Do you have a copy of what you prepared?

Will you give us a copy?

What happened?

Did you ever contact a lawyer about the incident?

When?

Who did you contact?

What happened?

---

**PERSONAL INFORMATION**

WBCCOPM respects your right to anonymity, this section is completely optional.

Name:

Sex: M/F

Age:

Address:

Phone:

Email:

Are you willing to meet with the WBCCOPM for a formal Interview:   Y/N

Signature:

**INCIDENT INFORMATION.**
Please be as specific as possible.

Date of Incident:

Location:

Officer no. I

Officer no. 2

Were you arrested? (if yes, what charge)

How did this incident conclude?

Account. Please describe as best you can what occurred:

# REFERENCES



1. Pietila, A. (2010). *Not In My Neighborhood: How Bigotry Shaped a Great American City*. Chicago: Ivan R. Dee.

2. Power, G. (1982). Apartheid Baltimore Style: The Residential Segregation Ordinances of 1910 and 1913. *Maryland Law Review*, 42, 289-328.

3. Barrickman, N. (2015). The Deindustrialization of Baltimore. http://www.wsws.org/en/articles/2015/05/20/balt-m20.html

4. Vicino, T. J. (2008). *Transforming Race and Class in Suburbia: Decline in Metropolitan Baltimore*. New York: Palgrave Macmillan.

5. Baughman, S. B., "Drugs and Violence" (2014). 88 *USC Law Review* 227 (2015); University of Utah College of Law Research Paper No. 75

6. Cummings, A. D. P. (2012). "All Eyez on Me": America's War on Drugs and the Prison-Industrial Complex. *The Journal of Gender, Race & Justice*, (15) 417-448.

7. Harvey, D. (2001). *Spaces of Capital: Towards a Critical Geography*. New York: Routledge.

8. Wacquant, L. (2014). Marginality, Ethnicity and Penality in the Neoliberal City: An Analytic Cartography. *J Ethnic and Racial Studies*, 37(10), 1686-1686.

9. Beckett, K., & Herbert, S. (2008). Dealing with Disorder: Social Control in the Post-Industrial City. *J Theoretical Criminology*, 12(1), 5-30.

10. Hall-Blanco, A. R. and Coyne, C. J., The Militarization of U.S. Domestic Policing (August 2, 2012). The Independent Review, Forthcoming; GMU Working Paper in *Economics* No. 12-50.

11. Laqueur, H., Rushin, S. and Simon, J. S. (2014) Wrongful Convictions, Policing, and the 'Wars on Crime and Drugs'. *Examining Wrongful Convictions: Stepping Back and Moving Forward*.

12. Community Oriented Policing Services. (2014). Community Policing Defined. United States Department of Justice.

13. Bertus, F. (1996). The Use and Effectiveness of Community Policing in a Democracy. National Institute of Justice. Washington, D.C.

14. Cange, CW. Piloting a Qualitative Data Algorithm Using Microsoft Word Macros for Low-Middle Income Country (LMIC) Partners in HIV/AIDS Research. Paper presented at: 142nd APHA Annual Meeting and Exposition (November 15-November 19, 2014) 2014.

15. Braun, V, Clarke V. Using Thematic Analysis in Psychology. *Qualitative Research in Psychology*. 2006;3(2):77-101.

16. Ayres, L. Thematic Coding and Analysis. *The Sage Encyclopedia of Qualitative Research Methods*. 2008:867-868.

17. Barthes, R. *Littérature et réalité*. 1982.

18. Sandelowski, M. Focus on Research Methods Combining Qualitative and Quantitative Sampling, Data Collection, and Analysis Techniques. *Research in Nursing & Health*. 2000;23:246-255.

19. Attride-Stirling, J. Thematic Networks: An Analytic Tool for Qualitative Research. *Qualitative Research*. 2001;1(3):385-405.



SAMIRAH FRANKLIN, SANDTOWN RESIDENT
AND WITNESS

BY THE WEST BALTIMORE COMMISSION ON POLICE MISCONDUCT AND
THE NO BOUNDARIES COALITION

MARCH 8, 2016

1526 N. FREMONT, BALTIMORE, MD 21217
WWW.NOBOUNDARIESCOALITION.COM
NOBOUNDARIESCOALITION@GMAIL.COM

IN COLLABORATION WITH BUILD AND
THE UNIVERSITY OF MARYLAND, BALTIMORE COUNTY (UMBC)

9.    Office of the Public Defender of the State of Maryland


**OFFICE OF THE PUBLIC DEFENDER**
**ADMINISTRATION**
**WILLIAM DONALD SCHAEFER TOWER**
**6 SAINT PAUL STREET, SUITE 1400**
**BALTIMORE, MARYLAND 21202**
*Ph. (410) 767-8460*
*Fax (410) 333-8496*
*Toll Free: 1 (877) 430-5187*

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Ave., NW
Washington, DC 20530
Via email:  Baltimore.Consent.Decree@usdoj.gov

### RE:  United States v. Baltimore Police Dep't et al., Civil No. JKB-17-99

March 7, 2017

Dear Judge Bredar and Parties to the Proposed Consent Decree,

On behalf of the Maryland Office of the Public Defender, we thank you for the opportunity to provide comment on the proposed Consent Decree.  The proposed Consent Decree begins to address the widespread, systemic constitutional deficiencies that our clients have endured for years.

The federal indictment last week of seven BPD officers on racketeering charges, U.S. v. Gondo, 17-0106, make clear that, despite initial efforts lauded in the proposed decree, there is still a very long road ahead.

Significant oversight and accountability measures are urgently needed, and while the proposed Consent Decree includes many important provisions, it disregards the critical role that disclosure in criminal cases plays in protecting individuals' constitutional rights with respect to the police.

Disclosure of *Giglio* and *Brady* Materials

A systemic lack of compliance with constitutionally mandated disclosures in criminal cases has contributed to the culture of impunity that allowed for misconduct and abuse to permeate the BPD.  Our office is rarely provided with materials that are constitutionally mandated for disclosure under Giglio v. United States, 4058 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1963).  We uniformly face strong opposition from Assistant State's Attorneys on motions for in camera review of IID files and demands for discovery are heavily litigated.  Shortly before last week's indictment was filed, OPD moved for in camera review of personnel files relating to two of the named officers who were the key witnesses in the underlying cases, but the BPD opposed

providing this information and the Assistant State's Attorneys insisted that they had no information.

Even prior to the indictment, the DOJ report noted credible allegations of criminal activity, patterns of clear racial animus, and other forms of misconduct and abuse by unnamed officers remaining on the force that amount to possible impeachment evidence. We submitted a FOIA request with DOJ, which was denied, and a discovery request to the State's Attorney's Office, which is pending. Once this Court removes its litigation hold, there is a significant risk that Giglio and Brady material will be destroyed.

As a condition of the decree, and prior to lifting any litigation hold, the Court should require DOJ and the City to disclose to OPD and the Federal Public Defender a full list of officers with IID investigations that were examined by DOJ; the charges and resolutions of those investigations; a list of officers cited by DOJ for misconduct that did not result in an IID investigation, and the allegations underlying DOJ's determination; and any documents specifically providing exculpatory information.

Moreover, it is not appropriate for BPD to object to discovery demands, and prosecutors should not be able to shield themselves from complying with constitutional obligations by relying on inadequate police responses to discovery requests. The Consent Decree should require BPD to respond to all discovery requests by promptly providing the requested materials to the State's Attorney's Office.

Addressing Officer Misconduct

The proposed Consent Decree rightfully requires BPD to provide our office with information about how to file and follow-up on complaints about officer misconduct. (¶ 358.) Consistent with the level of detail provided elsewhere in the proposed Decree, this provision should include more detail in terms of who in the chain of command is responsible for responding to OPD requests and providing information to the State's Attorney's Office for disclosure in relevant cases.

BPD must also ensure that misconduct investigations proceed in a timely manner and that its internal investigations database is kept up-to-date. The Consent Decree details how an internal investigation should be conducted, and by whom, but does not address the long delays in investigations that can make them meaningless. In addition, information is often not inputted or updated into the BPD's database in a timely manner, impeding transparency and disclosure needs. The consent decree should include a timeframe for completing misconduct investigations and for updating the internal investigations database, and establish a protocol for determining when extension are needed.

## Prompt Presentment of Arrestees

Beyond investigating, documenting, and disclosing misconduct, the Consent Decree should encourage existing oversight mechanisms. Maryland Rule 4-212(f) is intended to safeguard against detention resulting from illegal stops and arrests by requiring that individuals arrested without a warrant appear before a judicial officer within 24 hours after arrest. The BPD often circumvents this Rule by having individuals, without the benefit of counsel, waive their right to prompt presentment. Adding a provision to the Decree to require BPD to provide access to an attorney before seeking a waiver of prompt presentment would encourage timely police processing, minimize lengthy pre-charge detention, and ensure that waivers of prompt presentment are knowing and voluntary. Such a provision could be added without any cost to the Parties. OPD is willing, capable and ready to serve as 'stand-by counsel' for this purpose.

## Improving Transparency

The mechanisms within the criminal justice system, while important, are not sufficient. Greater transparency, as the Consent Decree seeks to achieve, is also vitally needed. OPD endorses the various provisions that mandate public access to BPD policies, data, policing strategies, and misconduct complaints. Further clarification is needed in some places to ensure that sufficient information is shared. In particular, the provision for the OPR and CRB quarterly public reports (¶402) should define what constitutes "serious misconduct" to be included in the aggregated data related to multiple misconduct allegations. (¶402(g).) If feasible, data should be collected and reported for all misconduct allegations, with delineated categories based on defined levels of seriousness. In addition, the Consent Decree should provide base requirements for the protocol to ensure transparency concerning the disciplinary hearing process and outcomes. (¶403.)

The availability of current BPD policies has long been an issue for our office, and their presence on the BPD website is good progress that, as proposed in ¶289, must be maintained. The policies currently posted on BPD's website do not include the document retention schedule, making it difficult for members of the public to be aware of the timing needed to access materials related to their interactions with the police. More importantly, BPD often destroys materials too soon to make access meaningful. For example, videotape evidence that is not being used in the prosecution's case is generally retained for only 30 days from the date of recording. As a result, individuals interested in obtaining these materials, including defense counsel, have a very short window to request preservation and secure a copy.

The proposed decree, if accepted, will mandate that BPD notify the Monitor and DOJ of aspects of the purge schedule that may impact the Agreement and Monitoring Plan. (¶482.) This provision should be expanded to more broadly consider whether the retention schedule needs adjusting to match the spirit of the decree. The retention schedule should also be posted on the BPD's website with its policies.

## Collecting Outside Data

The proposed Consent Decree will require the BPD to gather information from the District Court regarding cases that were dismissed because a stop or search lacked reasonable suspicion, that an arrest lacked probable cause, or that any Fourth Amendment violation occurred. (¶75-76.) Similar information should be gathered from the SAO for cases not pursued for prosecution based on its assessment that the evidence provided would not survive a constitutional challenge. Determinations that the police action was related to racial animus, retaliation, and/or a First Amendment violation should require prompt investigation and discipline, including training relevant to the issue identified.

The BPD also needs data-driven monitoring and assessment of its relationship with the Baltimore City School Police Force (BCSPF). At a minimum, BPD should require, as a condition of the memorandum of understanding, that BSCPF collect and provide data regarding: calls and referrals received from BCSPF; warrants served and arrests conducted or participated in on or near Baltimore City Public Schools; use of force inflicted against a student on school property; and school-based diversions and referrals to DJS. Where possible, data should be broken down by school, neighborhood, age, race, and gender of student, and by officer and supervisor. Analysis and review of this data should be used to inform the relationship between BPD and BCSPF, addressing any trends and patterns identified and ensuring that BCSPF officers are held to the same standards as BPD officers.

## Public Input

In its negotiations leading up to the proposed Consent Decree, and at the hearing that proposed this comment period, the Parties recognized the critical importance of engaging the public to ensure confidence and credibility in this process. This commitment should continue once the final Decree is in place. In particular, public input should be invited on the outcome assessment compliance review methodology (¶467), any changes, modifications or amendments to the consent decree (¶¶468, 494), and termination of any part of the agreement (¶508).

*                              *                         *

As criminal justice stakeholders, counsel to individuals disproportionately impacted by BPD action, and members of the Baltimore City community, we are hopeful that the resulting Consent Decree will help the City move forward in meeting its constitutional obligations and properly serving all of its residents. Our recommendations will encourage and advance oversight beyond the Parties to this litigation, repairing existing mechanisms for accountability. We stand ready to play our part in this crucial effort.

4

Sincerely,

Paul DeWolfe
Public Defender of Maryland

Elizabeth Julian
District Public Defender, Baltimore City

Becky Feldman /MR
Becky Feldman
Acting Deputy Public Defender
of Maryland

Natalie Finegar
Deputy District Public Defender,
Baltimore City

10. Power Inside

United States Department of Justice
Civil Rights Division, Special Litigation Section
950 Pennsylvania Avenue, NW
Washington D.C. 20530

**RE:  United States v. Baltimore Police Department et al., Civil No. JKB-17-99**

Dear Sir/Madam:

On behalf of Power Inside, we write in response to Judge James Bredar's court order dated February 15, 2017, which allows members of the public to submit written comments about the proposed consent decree between the U.S. Department of Justice and the Baltimore Police Department. Before approving the consent decree, the judge must decide whether the agreement is fair, adequate, reasonable, legal, and in the public's interest.

Power inside is a sixteen year old nonprofit organization in Baltimore that serves women impacted by incarceration, street life, and abuse. We offer direct client services and advocacy to help women build self-sufficiency, heal from violence, and avoid future criminal justice contact. We work with roughly 300 women per year who have frequent and unavoidable contact with law-enforcement in Baltimore City.

We find the Agreement outlined in the Consent Decree inadequate to address the widespread gender-bias, mishandling of sexual assault investigation and reporting, and mistreatment of transgender individuals found in the Department of Justice Investigation of the Baltimore City Police Department. We believe that the following recommendations offer improvements in furtherance of the public's interest, and human rights of women, transgender or gender non-conforming persons, and survivors of sexual violence.

HANDLING OF SEXUAL ASSAULT INVESTIGATIONS

Arrests (Paragraph 61)
- We recommend adding "Loitering" and "Prostitution" to the list of offenses for which BPD will require an officer to seek permission from a permanent rank supervisor prior to effectuating an arrest.
- We recommend replacing "unless practicable under the circumstances" language regarding officer discretion with concrete and specific parameters for justification of arrests for violations outlined in Paragraph 61 (a)-(f), with the intent of reducing the number of arrests for these types of violations.

Reporting (Paragraph 259)
- We recommend initial and on-going annual training to all BPD officers, city-wide, about policies and practices applicable to law enforcement response to sexual assault.
- While we appreciate the spirit of the agreement to provide training on policies and practices applicable to law enforcement response to sexual assault to specific detective

units, we recommend that this training extend to all officers, and especially patrol officers who are often the first point of contact for women reporting sexual assault.

Sexual Assault Investigations (Paragraph 260(e))
- The Department of Justice found in their 2016 report that BPD officers and detectives engaged in lines of questioning that were deemed inappropriate and indicative of gender bias (pp122), and that the BPD "seriously and systematically under-investigates reports of sexual assault" (pp123). We believe that enabling advocates to be present during victim interviews is vital to mitigating improper or inappropriate lines of questioning that may prevent sexual assault victims from reporting sexual violence or having their cases handled thoroughly.
- We recommend amending practices to ensure that BPD officers affirmatively disclose that victims may have an advocate present during questioning, and solicit community input into resources that will be offered to assist victims in seeking out an appropriate advocate.

Paragraph 262(b)
- The Department of Justice found in their 2016 report (pp123), that the BPD routinely disregards reports of sexual assault by people involved in the sex trade, and so;
- We recommend inclusion of disciplinary measures in cases where a supervisor concludes that a comprehensive investigation has not been conducted, and that mechanisms are included to ensure that these findings are available to the public and incorporated in other accountability measures in the Monitor process.

Paragraph 264
- We recommend that data is similarly tracked for victims of sexual assault as for offenders, as this would serve to additionally identify populations more at-risk for sexual assault.

Community Collaboration and External Oversight (Paragraph 266)
- We appreciate the commitment to evaluate and revise policies and protocols governing the Sexual Assault Response Team (SART).
- We recommend collaboration from victims' advocates and other appropriate organizations in the evaluation and revision of SART policies and practices to ensure accountability to the communities most impacted.


TRANSPARENCY AND ACCOUNTABILITY

Community Oversight Task Force (COTF) (Paragraphs 10-14)
- In order for the COTF to be more broadly representative of the communities disproportionately impacted by interactions with the police, and in order to fulfill the specified mandates, we recommend increasing the number of participants in the Task Force.
- We recommend that the COTF must pursue feasible implementation of assessment recommendations in the COTF report.


Community Engagement (Paragraph 16(a))

- We appreciate the spirit of the Agreement to encourage BPD to solicit input from its advisory boards and councils representing different communities, such as the Youth Advisory Board and LGBTQ Advisory Council. We recommend transparency in the composition of these advisory groups as well as the specific input they provide, in order to foster accountability to the broader communities who are disproportionately impacted by police practices and policies.
- We recommend increasing the notice period for public Agreement progress meetings to a minimum of 30 days, and ensuring that they are widely publicized in a variety of media in order to garner meaningful community participation.

## Voluntary Police-Community Interactions (Paragraphs 31-37)
- We believe that the lack of transparency in the transition from Voluntary Contacts to Field Interviews goes against the good-faith efforts of establishing quality relationships between the BPD and community members. Community members may not be willing to participate in conversations that could potentially lead to Investigatory Stops or Detention, and there is no clear delineation of when a conversation ceases to be simply voluntary.
- Without affirmative disclosure of when these interactions are "voluntary" and when they are "investigatory," these paragraphs simply serve to reinforce existing information-gathering practices of the BPD. We recommend that BPD affirmatively disclose to community members that they are not required to speak with them at the outset of Voluntary Contacts.
- Further, we recommend that Voluntary Contacts are tracked and reported by the BPD, as they have the potential to result in Investigatory Stops or detentions.

## Impartial Policing (Paragraph 94)
- Because of the diversity of the communities being policed, we strongly recommend that local organizations are involved in leading and co-facilitating trainings.

## Crisis Intervention Training (Paragraph 112)
- We recommend that in-service training on "responding to individuals in crisis" includes drug and alcohol use alongside Behavioral Health Disabilities or Intellectual and Developmental Disabilities.

## PROCESS FOR SELECTION OF MONITOR TEAM

- The RFA should emphasize the Parties' commitment to community engagement by stating that priority consideration will be given to applicants who commit to hiring community activists or community-based organizations to: serve as a liaison between the Monitor and Baltimore City residents; and/or collect qualitative data, such as through annual community surveys, on the effectiveness of the implementation of Consent Decree provisions.
- Paragraph 444(b) of the consent decree states that DOJ and the City agree to a public comment period during which Baltimore City residents and other stakeholders can review information submitted by candidates in response to the RFA. We recommend a minimum of 30 days for public comment.

MANDATES OF THE MONITOR TEAM

- We recommend that the Monitor designate community-based organizations in Baltimore to assist in the implementation of provisions of the consent decree. Accordingly, the City should be required to provide the resources necessary for the designated community-based organizations to adequately assist in the implementation of certain provisions within the consent decree.

- Paragraph 446 of the Consent Decree requires an evaluation for the Monitor after three years, including whether the Monitor is "adequately engaging the community."
- We recommend that the DOJ, City, and Court develop a process by which members of the public may submit comments regarding the adequacy of the Monitor's community engagement activities.

We thank you for your consideration of our comments and recommendations, and look forward to further opportunities to participate in this important process.

Sincerely,

Jacqueline Robarge
Executive Director, Power Inside
jrobarge@powerinside.org

11. School-to-Prison Pipeline Law Clinic – University of Maryland Francis King Carey School of Law

To:     The Honorable James K. Bredar, United States District Court of Maryland

From: Lillian Simmons, Katherine Rodriguez, Aarti Sardana, Yvette Pappoe and Dena
        Robinson, Student Attorneys, School-to-Prison Pipeline Clinic, University of Maryland
        Francis King Carey School of Law

Re:     Proposed Consent Decree, *United States v. Baltimore Police Dep't et al., Civil No. JKB-
        17-99*

Date:   March 7, 2017


> *"There can be no keener revelation of a society's soul than the way in which it treats its*
> *children." -Nelson Mandela*


We are student attorneys from the School-to-Prison Pipeline Clinic ("the Clinic") at the
University of Maryland Francis King Carey School of Law. The Clinic works in a variety of
ways to implement and enhance policies and practices to ensure that schoolchildren remain in
school and out of the juvenile and criminal justice systems.

Since September, we have taught conflict prevention and resolution classes to students at
Frederick Douglass High School in Baltimore. Large parts of our discussions with the students
have focused on current events that impact them both in school and in their communities. Several
of our classes were dedicated to the events surrounding and following Freddie Gray's death,
including the U.S. Department of Justice's report based on its investigation of the Baltimore
Police Department (BPD). We have also discussed the proposed Consent Decree with the
students. Below are the written comments offered by several students that address the proposed
decree. Overall, many students express a desire for BPD to be positively involved within their
communities so that they can build a better bond with the officers. Many are scarred from past
interactions involving them as well their family members, and they believe that positive and
consistent interactions are necessary to heal and develop positive relationships between officers
and communities.  Much of their comments mesh with community engagement requirements set
forth in the proposed decree.[1]

We are mindful of the Court's Order that individuals submitting written comments provide their
full names. We have provided our full names above. However, we believe that the
schoolchildren, because they are under eighteen years of age, need and deserve an extra layer of
privacy, particularly as all written comments will be publically available on the Court's website.
As a result, they have used their initials, rather than their full names.

---

[1] *U.S. v. Police Department of Baltimore City et al.,* Consent Decree 7-10 (2017).

1

S.W.

I live in a mainly black neighborhood and I attend a mainly black high school in Baltimore. The judge should care about my opinion because I am a black youth who lives in a pretty high crime neighborhood. Police brutality has been a serious issue. People are becoming more aware of it now because of the popular use of technology. This goes way back to the Rodney King incident in 1991. So this has been an issue for the longest. We are just becoming more aware of it because everything is recorded nowadays. Police are people we should look up to, our protectors, or you should feel a safe feeling when you see them. Now when we see them we may feel as though we need to pull out our phones or walk in the opposite direction. This is all because how the police interact with the public. Personally, when I see the police I feel nervous and uncomfortable. I have a personal experience with the cops that I feel as though they could of reacted in a much better manner. I am 16 now so when this happened I was about 11. My dad had his own place and a warrant out for him. I figured when the police saw him come to my house sometimes to see me, it gave them evidence to check my mom's house. I was home alone in the shower when three cops bust into the bathroom with guns pointed toward me. After I told them my age they still had their guns up for about 10 minutes. They were yelling and speaking very aggressively. They did not allow me to call an adult. I sat in the house with them for two hours until my mother came home after work. She was not informed or aware of what was going on until she got there. The police interaction was not good. They could have handled that better and allowed me to call someone or handled everything differently when they noticed my age and that I was alone. This all goes back to how police should be trained to handle situations differently. When kids are under age and alone, doing things like this should involve a call to a caseworker (social worker) so he/she can explain what is going on. During my experience, I felt very scared and confused. They never once explained to me what was happening. BPD should frequently interact positively with the youth to show us they are really here for the people.  They could come to neighborhood events, interact with the people and really

get to know us on a personal level. This will improve the police and community's relationship with each other.

T.J.

I am a student at a Baltimore City public school. I would like to talk to you about the BPD. The way they carry themselves is not how police officers are supposed to carry themselves. There should be no reason why the police should be able to do whatever they please towards the youth. There have been plenty of times I witnessed the police use an excessive amount of force for no reason. I don't understand why the police feel as though it is okay for them to just beat up someone and use force on someone if they are not refusing. There was an altercation down by my house where this young man was walking out of his house and out of nowhere there were like 5-6 police cars that pulled up on him, pulled their guns on him and put him in handcuffs. The boy's mother came outside (mind you the young man is a minor) and was trying to find out what was going on with her son. The police were just ignoring her, not telling her the issue. When they finally told her what was going on, they said they have an eyewitness that this person was an accomplice to a robbery. In the end, they locked up the wrong person. I feel as though the police have too much leverage in this city. What I would like to see is the police getting trained better for things like this. There should be a limit on how far the police can go. I want to see the police getting punished without pay. There should not be favoritism because they are police officers.


A.W.

I am a student at a Baltimore City school and I wonder why police beat us (the youth) in Baltimore. No matter where you go in Baltimore there's always police around beating our youth for no reason. The police should come together and build something nice like rec centers, playground, basketball courts, and much more. This stuff would help because it will keep the youth out the streets, away from drugs and help stop teenagers from getting pregnant at a young age. Instead of the police attacking us they should join the activities we do to help people get a better image on life. Why do police officers treat us like crap because we are young and black? What happened to Freddie Gray? Why did Mr. Gray have to get arrested for just chilling on the block? What happened to Freddie really did harm to the city and now people get attacked by

police. Police officers should play in the activities and help raise money for the rec center, basketball court, playground and much more. For example, I was outside with my father, grandma and little brother when the police pulled up and slammed my dad on the ground. My grandma asked what he did but got no answer. Instead, they told her to "back up before you be next." Then it hit me that the police are bad police. I started crying and my little brother started crying with me. Then they threw my father in the car and drove away very fast. Then my grandma put us in the car and we went to go get my father out. It took hours for them to release him. In conclusion, the police should do better to keep a positive record. No shooting, beating people up or anything else. Police need to get back together and work on the positive things in the community.

C.S.S.

      I am a student attending a Baltimore City high school.  I've never had a bad interaction with the police myself no more then hello but from what I heard it's not good at all. It usually ends with someone being hurt or actions by an officer that could have ended with injury or that someone was unfairly stopped by the police. I have one story I hope that will help you better understand how youth today feel about the BPD. A few years ago, there was a 12 year old little girl I know that had a bad encounter with the police. Fast forward I was told that she did hit the police and after she was slammed to the ground.  She was mistaken for a boy but to me it was like "are you for real?" expression on my face because even if she was a boy, she was still a child.  The officer could have easily restrained her but he didn't.  So your Honor, I feel we should train our police men and women on how to deal with our young boys and girls. Instead of telling us what to do show us, they should direct us on how we should act out in public and show us that there are better places for us to hang out or play besides the streets because some kids don't know any better. But to make it simple, they should direct us to a better place and we will not be in the wrong. I feel that this will help us in a couple of ways. One, it will help the police and girls and boys understand one another and why we (youth) do what we do. Two, it gives us (youth) a safe environment to do everyday things like basketball, running and being loud without hurting anyone or getting ourselves into trouble. Three, it helps us make a connection with one another.  This is really good for those kids who only see the bad things in the BPD.  It opens

their eyes to see that the things police do are for a good reason sometimes and that not all police officers are bad.

A.J.

I am a scholar at Frederick Douglass High School.  I am a part of the Law and Leadership Program.  The judge should care about my input because more than just parents and guardians are affected by the consent decree. More than a handful of students and young teens have questions and want answers to the conflicts that have been going on in Baltimore City with police officers against young Black youth. The way I would describe the police interactions with the youth in my neighborhood is bad. I have seen many, many police officers pick with young black males. For example, I seen a police officer follow my brothers through the park and stop them for nothing. I feel as though the officers shouldn't do that. Why? Because it creates confusion between youth and the officers. Young males fear the police.  They react out of fear and run because they do not know the officer's mentality. Police officers do the things they do because they're the force and are allowed to do what they want and do not have any consequences for being wrong.


T. S.

I am a 10th grade student at a Baltimore City public school and I am concerned about my fellow Baltimore City residents. Police interactions with the youth in my neighborhood are not healthy. People in my neighborhood do not know how to interact with the police because of all of the crimes that our own police are committing against people of our Black community. To help improve the relationships between citizens and the police, the police can try to do more positive things in the community with residents like basketball games, food drives, etc. Then maybe youth would start to be respectful towards BPD and it can eliminate all problems. In conclusion this will make a difference because people will feel safer in their own communities.


D.O.

I'm in the 11th grade at Frederick Douglass High School.  I hope to be lawyer one day and play basketball.  When I got in the end of my 9th grade year, things between the police and

citizens were getting out of hand (not in just Baltimore). Baltimore is a city of young black teens who get abused by police men or women for no reason. Police are there to help us not to beat us, kill us or hurt us. They are there to help us. In order to make the places in Baltimore get better with the cops, they should try to do more fun stuff with communities like a block party, play sports, open old things back up for the kids, make more parks and rec centers and more.

Q.W.

Police are supposed to protect us but they are doing all the crime. Police in my neighborhood interact with us like we are the ones doing wrong and bad things. Also the BPD should have more community get-togethers and talk to the community so they get to know the people in the community more. This should make a difference because they will know your family and know that you're not into the streets and not doing anything but walking down the street.

K.K.

I am a student at Frederick Douglass High School. I think you should listen to my testimony because I feel that when police do something out there bad it should be a consequence. Like for example during the Freddie Gray case the police were suspended for 2 months but they still got paid. That's not a real consequence. It's like they getting paid to sit home. People in community get found not guilty yet they still have to sit in jail. People get life in jail and they don't get to go home and be with there family. Compare that to police who get to go home and get paid.

W.G.

BPD routinely violate our rights as citizens, use excessive force and discrimination against black people. Our relationship with the police is broken. It seems as though police view themselves as controlling the city rather than being part of the city.

12. TurnAround, Inc.



March 6, 2017


The Honorable Judge James Bredar
United States District Court for the District of Maryland
101 West Lombard Street
Baltimore, MD  21201



RE: Baltimore City Consent Decree, USA v. Police Department of Baltimore City, et. al., 17-CV-0099-JKB

Dear Judge James Bredar:

Thank you on behalf of survivors of sexual assault in Baltimore for allowing the opportunity to community-based agencies to provide written testimony to support and provide supplemental information for the proposed consent decree.  In our opinion, the consent decree is fair, adequate and reasonable.  Furthermore, it is not against public interest.

TurnAround is the designated rape crisis center for Baltimore city and Baltimore County.  We opened our doors in 1978 in Baltimore County and 1995 in Baltimore City.  Our agency serves thousands of sexual assault, domestic violence and sex trafficking survivors a year.  We provide individual and group therapy, advocacy and case management, Drop-In services, shelter and community education.  TurnAround is a member of the Baltimore City Sexual Assault Response Team (SART) as a community-based victim service provider, and has regularly worked with City law enforcement, government and other community-based agencies.

**HISTORY OF TURNAROUND INVOLVEMENT**

TurnAround has been serving survivors of sexual assault in Baltimore for over 20 years.  Throughout that time, we have seen the transition of local administrations, police leadership and elected State's Attorneys.  At times, things seemed to immensely improve only to shift under the pressure of new leadership within city government.  Even through the positive periods in relation to sexual assault investigations in Baltimore City, we acknowledge a pervasive and consistent problem with the intersection between race, age, gender and sexual assault.  As a jurisdiction that is predominately African American, this is extremely problematic.  Our perception is that this is often tied to underlying stigmas and societal pressures; however, regardless of the cause the

effect is traumatizing for the survivor, and directly impacts the safety and security of the general populace.

Through our work as a social justice agency and as advocates for survivors, our position is often at odds with others whose roles intersect with our clients. In 2010, an investigative report by the *Baltimore Sun* found Baltimore to be the city in the nation with the highest rate of unfounded sexual assault cases. The "unfounded" classification of sexual assault cases is defined as those that are baseless or false. In Baltimore, more than 30% of the sexual assault cases investigated each year were unfounded, nearly five times the national average. 40% of emergency calls to the police involving allegations of rape were not referred for investigation. The increase in unfounded rape cases over a period of four years coincided with an 80% decrease in the number of rapes reported by the Baltimore Police Department to the FBI UCR data base. On a national level, the decrease in the number of rapes reported during that time was 8% (The Baltimore City Sexual Assault Response Team Annual Report, October 2011). This report led to Congressional hearings concerning sexual assault investigations.

## BALTIMORE CITY SART

In response to the *Sun* report, Baltimore's mayor and police commissioner committed to a comprehensive review of investigative practices and the response to sexual assault victims. The Mayor's Office on Criminal Justice provided leadership in forming a new Sexual Assault Response Team ("SART") including police, medical/forensic responders, advocates, and prosecutors, supported by the newly elected State's Attorney. TurnAround has been a member of the SART since its inception. The SART was re-established by the most recent Memorandum of Understanding, which was signed in 2011.

The SART reviewed all unfounded rape cases from January 2009 to August 2010, in addition to a sampling of other sexual assault reports. Detectives and advocates partnered to locate and interview these victims. Of 134 cases reviewed, 60 cases were found to be properly unfounded. In addition to re-opening cases for investigation, the SART also identified a number of policy and procedural changes that were implemented by the Baltimore Police Department, including the development of a new standard operating procedure concerning sexual assault investigations. Training was implemented within the unit responsible for sexual assault investigations following substantial personnel changes.

The SART also undertook a review of best practices in the response to sexual assault victims. This review was not limited to the police department, but included other SART members, such as advocacy, forensic evidence collection, and prosecutors. The SART established a multi-disciplinary policy and practice work group, focused on establishing a shared statement of mission and values, and developed standards of practice for responding to sexual assault cases. The SART also implemented and maintained an ongoing case audit process, including a review of all unfounded cases. The SART collected data from all partners, which included numbers of

sexual assaults reported, the number of cases unfounded, the numbers of sexual assault victims who obtained a forensic exam, those victims who had access to immediate advocacy services, and tracking of outcomes in the justice system

From 2011 to 2013, there were substantive reforms within the Baltimore Police Department sex offense unit that resulted in significant improvements in investigations and in the way victims were treated. There was also considerable effort to provide outreach to the community to improve trust in reporting sexual assault. Based on a commitment to treating victims with dignity and respect, and to implementing improved investigative practices, the city saw an increase of 68% in reported rapes during the first year. The number of unfounded rape cases decreased by 93%, while the number of unfounded sex offense cases decreased by 67% (Annual report, 2011).

After a period of marked improvement in investigation of sexual assault cases, there were also significant changes in leadership throughout the police department at the levels of commissioner, the department of special investigations, and the sex offense unit. In addition, there were changes in the leadership of the Mayor's Office on Criminal Justice and another newly elected State's Attorney, with personnel changes in the "special victims" prosecution unit. The police department chafed under the perceived oversight of the mayor's office and the SART, and there was a lessening of a commitment to collaboration within the SART. Procedures and practices were changed unilaterally, often without informing the SART partners. Resources within the police department were shifted away from sexual assault investigations, and redirected toward the increasing homicide rate, which reached a high of 342 in 2015. At the same time, however, 366 sexual assaults were reported, down from 453 in 2013 and 392 in 2014. By 2016, the sex offense unit had declined from 22 detectives to 12.

Our hope is through this process, we can re-establish the successes from just a few years ago. By implementing several of the steps outlined in the consent decree we believe this is possible. However, what is not outlined in the consent decree that we believe would be extremely beneficial is utilizing the institutional knowledge of the SART to implement many of the recommendations. The SART was successful in establishing victim-centered policies and procedures, coordinating training, and, ultimately, realizing measurable outcomes. However, the SART is only effective when it is mandated to provide oversight. The strength of this oversight is directly correlated to the dedication of its partner agencies. The mandate originated at the Mayor's office. Our hope is it will be even more effective through the Monitor.

**CONSENT DECREE**

We believe the consent decree is fair, adequate and reasonable, and is not against public interest. We do not believe it to be illegal or a product of collusion. We would like to highlight some provisions related to sexual assault investigation and the ongoing work of TurnAround, as well as other members of the SART team. We believe that some of the recommendations and requirements of the consent decree already exist or could be easily created with the oversight of

the SART. This coordinated effort would ensure a multi-disciplinary approach and trauma-informed victim centered response.

*Policy and Practice Guidelines*

There are resources currently available to the Baltimore Police Department through the SART and other community partners, which includes substantive policies and practices to support strengthening a victim-centered and multi-disciplinary response. The SART can also assist with data collection and case tracking, which can include the pursuit of funding in areas of technology, analyzing and tracking rape kits, and data analysis. Historically, the SART also assisted with community collaboration, including outreach, public education and awareness, and engaging community partners to address specific areas of concern or interest.

*Training*

The SART and community partners can provide assistance with training, particularly in the areas of minimization of secondary trauma, working with vulnerable populations, and addressing co-occurring crimes, particularly in assessing risks and planning for safety. There are substantial resources available regarding training for law enforcement and investigators that can be implemented immediately. There has been considerable advancement in knowledge and skills in conducting sexual assault investigations, as well as the development of best practices and model policies. The International Association of Chiefs of Police has funding from the Department of Justice's Office on Violence Against Women (OVW) to provide tools, policies, and training on the following:

- Roll-call training to help officers improve their response to victims of sexual assault and domestic violence and build stronger cases
- IACP Sexual Assault Guidelines, Supplemental Report Form, and Investigative Strategies
- Trauma-Informed Sexual Assault Investigation Training
- Sexual Assault and Domestic Violence Report Review Checklist
- National Law Enforcement First-Line Supervisor Training on Violence Against Women
- Sexual Offenses and Misconduct by law Enforcement: Executive Guide
- Leadership Institute on Violence Against Women

**DESIRED OUTCOMES**

At TurnAround, our desired outcome is that a survivor who connects with Baltimore City Police is not harmed by that interaction. This would be exemplified by thorough investigations without regard for age, race, gender or income-level, cases that properly reflect the demographics of the city, and a cohesive and functioning SART. Successful outcomes in the criminal justice field are difficult to effectuate in a vacuum. A police unit may indicate attendance at training, updated policies and protocols, and implementation of tools for supervision. However, the true measure

of success can only be based on the perception of the community and, most importantly, the survivor.

Short-term outcomes are measurable through initial case reviews, increased referrals to TurnAround or another appropriate trauma-informed victim service agency, and a reconstituted SART. Long-term outcomes require sustained periods of stability, which has been unattainable in Baltimore City. The consent decree and Monitor will be able to establish this stability, which will hopefully culminate in a marked change for survivors of sexual assault.

## CONCLUSION

We applaud the work of the Civil Rights Division of the Department of Justice and this Honorable Court in this matter. As an agency that has worked with sexual assault survivors in Baltimore City for over 20 years, we have often felt as though progress on these issues has been elusive. Gender, race and age-based discrimination is a reality, and without the tools to change the current practices by the police survivors are left without recourse, which is re-traumatizing and leads to heighten risk for a survivor to be subsequently victimized. The work of the Monitor will be a significant step in the right direction for survivors. TurnAround is willing and able to support survivors, and the Monitor through this process. Thank you for your dedication to the citizens of Baltimore City and sexual assault survivors; we hope that the long-term effects of this decree will impact not only our clients today, but for a significant time to come.


Sincerely,

/s/

Rosalyn Branson
Chief Executive Officer

13. C. Alexander

Sir/Madam,

As I understand the matter, comments on the Baltimore City consent decree must be limited to whether it's "fair, adequate, and reasonable ... or against public interest."

African Americans commit the vast majority of murders and violent crimes in America, as well as being responsible for a large of amount of the drug trade in this country. African American scholars, as well as their white counterparts, have tabulated the data. I recall quite clearly that 99.5 % of murders are committed by African Americans.

The decree states BPD " uses enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches and arrests of African Americans".

Effective policing, in my opinion, must target the populations that commit the offences that endanger  public safety. A former resident of NYC reminded me that in the first three years of "stop and frisk" murders in that city plummeted.  Most stops were in Harlem. Almost three thousand illegally carried guns were confiscated in that time frame. Despite cries of unfairness  that no one on the Upper East side was being stopped and searched at random. Now that stop and frisk has been discontinued, murders are beginning to rise, as criminals now are able to carry with far less risk.

Black citizens and communities are targeted for enforcement actions, because scholars have clearly documented most violent crimes in America are committed by black citizens. I believe this  "decree" will indeed endanger public safety.


Sincerely,

Charles Alexander

14. J. Armstrong

| From: | J.C. Armstrong█████████████████████ |
| Sent: | Tuesday, March 07, 2017 5:40 PM |
| To: | Decree, Baltimore.Consent (CRT) |
| Subject: | Comments on Proposed Consent Decree |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

To: Baltimore.Consent.Decree@usdoj.gov

To whom it may concern:

I believe that the Consent Decree, in its current form, is not reasonable, nor is it in the public interest. I specifically object to Paragraph 43(e) and Paragraph 43(f), which provide that BPD will be prohibited from:

(e) Using an individual's geographic location, such as presence in a high crime area, or proximity to the scene of suspected or reported crimes – without any other reasonable articulable facts that an individual is, has, or is about to be engaged in criminal activity – as a basis for an Investigatory Stop or Detention; [or]

(f) Basing Investigatory Stops or Detentions only on an individual's response to the presence of police officers, such as an individual's attempt to avoid contact with an officer;

Paragraph 43(e) and Paragraph 43(f) are somewhat ambiguous as whether BPD will be required to depart from the holding of *Illinois v. Wardlow*, 528 U.S. 119 (2000). In *Wardlow*, the Supreme Court of the United States held that a unprovoked flight upon noticing the police" in a "high crime area" could justify "reasonable suspicion" and a *Terry* stop. To extent that Paragraph 43(e) and Paragraph 43(f) require the BPD to observe a different rule than that announced by *Wardlow*, I object.

To be clear, it is not that I believe that I believe that the *Wardlow* standard is a good, one, or that *Wardlow* was even correctly decided. I don't doubt that the application of *Wardlow* could result in discriminatory policing. *Wardlow* justified the stop of Freddie Gray Sandtown-Winchester, but has probably never been used to stop a white jogger in Roland Park.

But *Wardlow* represents a tradeoff between privacy and law enforcement that the Supreme Court is qualified to make, and it is the law of the land. I would have no objection the Supreme Court abandoning *Wardlow*. But I do

object to the BPD, and only the BDP, abandoning *Wardlow*. This would result in Baltimore being the only jurisdiction in Maryland that does not follow *Wardlow*. Criminals would respond accordingly.

Baltimore City is almost entirely surrounded by Baltimore County. A "wise" street drug dealer in Baltimore County may decide to move his business down the road a mile. He could take his Overlea and Parkville based product to Hamilton/Lauraville. Dealers in Lansdowne and Brooklyn Park may move to Cherry Hill, Brooklyn, and Curtis Bay. A drug dealer would know, that upon seeing the BPD, he could flee without worrying about a potential Terry stop. In Baltimore County, such conduct results in a search, and possible discovery of contraband. In short, if BPD abandons *Wardlow* and Baltimore County does not, smart criminals will use BPD's inability to follow *Wardlow* to their advantage.

Some may think that I am overestimating this possibility, as corner drug dealers are unlikely to read the 292 page Consent Order. But their attorneys will, and the jailhouse informational network is strong. Even stupid ideas spread like wildfire. *See, e.g. United States v. Mitchell*, 405 F. Supp. 2d 602 (D. Md. 2005) (the "flesh and blood defense"); Drum, Kevin, Too Weird for the Wire, Washington Monthly (July 16, 2008) (noting that "nearly twenty defendants in other Baltimore cases had begun adopting what lawyers in the federal courthouse came to call 'the flesh-and-blood defense.'"). News of the *Warlow*-less BPD will spread and will contribute to crime in Baltimore City.

Finally, I would like to mention a word about the cost to Baltimore City. Baltimore City Schools are preparing to layoff teachers and social workers to close a $130 million budget gap. This is before we get to the massive structural upgrades needed at Baltimore City Schools. Baltimore City has massive outstanding infrastructure obligations (both in things falling apart and to the EPA in the form of Consent decrees). But there is no more revenue to be had. Businesses and families flee Baltimore City because it has a property tax rate that is more than double any neighboring jurisdiction. Most economists that have looked at the issue agree that Baltimore City must reduce its property tax rate to attract businesses and families. I have not seen an estimate as to the cost of implementing this Consent Decree. It is likely that I won't see any. The Baltimore officials will spin this as a win, and will downplay the hit to Baltimore's budget. But every dollar that is spent on this Consent Decree is a dollar that is not devoted to necessary tax relief, schools, or infrastructure.

Although, ordinarily the "cost" of the Consent Decree would be something that Baltimore's officials would typically work hard to negotiate down, this Consent Decree is not the result of an arm's length negotiation. The DOJ had all the leverage in this negotiation from day one, with the capability to bring the full weight of the federal government down on Baltimore City. I urge the Court to make direct findings as to how this Consent Decree will affect Baltimore City's budget, or at least require Baltimore City officials to make a record as to the Consent decree's cost. If the Consent decree materially affects the resources that can be devoted to schools, infrastructure, and property tax reform, then it is no longer in the public interest.

John Armstrong

15. D. Cash

**From:** Dmarye Cash ███████████████

**Sent:** Monday, March 06, 2017 5:28 PM

**To:** askipwith@baltimoreintersection.org; Decree, Baltimore.Consent (CRT)

**Subject:** Letter for the Consent Decree

**Follow Up Flag:** Follow up

**Flag Status:** Completed

Dear Consent Decree Commitee,

     I am a citizen of Baltimore City and I've lived in both lower and upper class districts of the city. In both environments I've witnessed and have had my own experiences with the Baltimore city police department. As a youth advocate i believe that the Consent Decree will help decrease police brutality and stop the few police out their from being deceitful from what actually happened during an arrest.

     If we had the Consent Decree signed before the date of April 12, 2015.

the deceased victim of police brutality, Freedie Carlos Gray Jr. would possibly still be alive today. If not so, i believe unanswered questions during his trial would've been answered. The Consent Decree should stop any repeat of this incident from happening again. The Consent Decree states that their would be video recorders placed in a all transportation vans turned on for the entire time of the detainee is in the vehicle.

     The agreement that is designed to increase transparency. To train the BCPD in a new and brighter way, Not to just enforce laws. This is for them to get more connected with the city, and the districts those officers are assigned to. I believe where there is prosperity there is peace.

Sincerely,
D'Marye Cash

16. S. Curran

Stephen F. Curran, Ph.D., ABPP
Licensed Psychologist
29 W. Susquehanna Ave, Suite 704
Towson, MD 21204
410.823.0555
Fax:  410.823.2677

February 24, 2017

United States Department of Justice's Civil Rights Division
Special Litigation Section
950 Pennsylvania Ave, NW
Washington, DC 20530

Re: Case 1:17-cv-00099-JKB Document 2-2 Filed 01/12/17

Comment: 424, page 158

*a. An in-person psychological screening of candidates who are selected for conditional offers of employment by an appropriately qualified and trained psychiatrist or psychologist;*

Really?  This is the best result from the DOJ  investigation?  Perhaps a bit of recent background will be helpful.

On August 7, 2015 Mayor Stephanie Rawlings-Blake identified the undersigned to take over psychological services for the Baltimore Police Department (BPD).  Dr. Stephen Curran, the undersigned, of the Towson based firm, Atlantic OccuPsych, is nationally known and respected in the field of Police Psychology.  Following the August 2015 news reports discrediting the psychological services provided to the Baltimore Police Department by the prior firm the department named Atlantic OccuPsych to take over the contract to provide services.  However, receiving no media attention, within 90 days the undersigned rejected working any longer for BPD.  Among factors leading to terminating the relationship with the Baltimore Police Department  was a promised contract was never instituted.  The lack of integrity in dealing with certain members of the Baltimore

Police Department was disappointing.  Further, the undersigned had minimal cooperation with department members in implementing best practices for psychological services.

The points to the present letter is not about the undersigned but that the consent decree lacks substantive change to various psychological services components.  The DOJ is misguided to accept the word of BPD about how psychological services are currently rendered ranging from preemployment evaluations of candidates to traumatic stress interventions to officers.  Did the DOJ consider to ask if the current provider of psychological services met #424, a.?  The current firm lacks the expertise to render services that approach acceptable standards of police and public safety services.  The current firm is no better than the prior discredited firm.  There will be little change if negligent hiring continues and interventions to officers do not meet professional standards.  Specifically, the consent decree needs to specify at a minimum that:

1.  Preemployment Psychological Assessments shall be conducted by a licensed psychologist or psychiatrist with demonstrated competence in the specialty domain of Police & Public Safety Psychology.  Qualifications must include meeting a minimum of continuing professional education in police psychology within two years of rendering any psychological services to BPD and active participation in professional police psychology.  Psychological assessments must include at a minimum two objective psychological tests with validity and reliability for use in the selection of public safety candidates.

2.  Implement an advisory panel of at least three (3) non-Maryland licensed psychologists to review current psychological services related programs and provide specific recommendations to BPD.  These psychologists are recommended to be prior or current chief/director of psychology of an urban police agency and are board certified psychologists in the specialty of Police & Public Safety Psychology.

Respectfully,

*Steph F. Curran PhD*

Stephen F. Curran, Ph.D., ABPP
Board Certified in Police and Public Safety Psychology

17. T. Davis

Dear Consent Decree Committee,

      The work you have done in trying to change the Baltimore City Police Department is greatly appreciated. In the agreement it focuses on ensuring public safety, building community trust, preventing excessive force and discriminatory policing, and prohibiting unlawful stops and arrests. In the agreement it says that there will be a person who has no ties to the parties, that will reported daily if the agreement is being upheld. In ways of changing the Baltimore City Police Department, I would suggest that you should have the police be more engaging and helping when it comes to building community trust. Another thing being that you should enforce your officers to only make important stops and arrests, not making petty, unlawful stops and arrests. Also, I think the officers should have more training in using deadly force to make arrests, ways to not be so aggressive and with bringing the criminal down. There should be training with teaching your officers to not be bias and racial profile people they see. Without the Consent Decree, there would be more crime. The people wouldn't trust the police. Without the Consent Decree Baltimore would save money. The Consent Decree would make officers and the youth to get to know each other better. The Consent Decree will prevent there from being stops and arrests on major crimes. The Consent Decree is very important and it is needed in Baltimore.

18. M. Efremov

| From: | Max ████████████████████ |
|---|---|
| Sent: | Thursday, March 09, 2017 4:31 PM |
| To: | Decree, Baltimore.Consent (CRT) |
| Subject: | Baltimore Citizen in support of the BPD Consent Decree |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

To the United State Department of Justice:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,
Max Efremov
March 2017

19. T. Gaston

Dear Consent Decree Committee,

While considering on whether pass the Consent Decree this year, I thought I would share my thoughts and opinions with you on the act. I feel as if my opinions, me being a 17-year-old black male from Baltimore, actually matter, not to say that all opinions do not matter but since this decree and the ramifications of the decree affects me directly I feel as though my opinion should weigh heavily on your thoughts. While researching the decree I began to understand why people were upset with the Baltimore City Police Department (BCPD).  The BCPD was accused of violating people's unalienable rights, including unconstitutional arrests, using excessive and even deadly force, and discrimination against black people. All accounts listed above have substantial evidence to support each claim. African Americans accounted for 95% of people stopped over nine times by the police. While it is understandable to be stopped by the police in certain situations, it becomes ridiculous when a person is stopped multiple times, because they fit a general description or because they look "suspicious and dangerous." It is even more deplorable when an entire race is subjected to judgment because of the actions of a few. I do, on the contrary, understand that every action does not have malicious intent

.The decree also details that if passed, the BCPD will go through a department-wide regime where they will be retrained on how to enforce the law and keep the peace. I feel as if this is a fantastic idea but also in a sense, a waste of time. Officers who have been on the force for years have a general idea of what a criminal looks like. They are confident in their ability to identify a criminal and if needed to eliminate a threat. Officers have their own personal ideas of the characteristics of a criminal whether discriminatory or not. The new training regimen will not be effective in swaying their ideas or personal procedures because they have been following them for years. The training regime will only act as a system of accountability. If the Officers go through the regime and still commit the actions that the BCPD are accused of, the cannot blame improper training for their actions. For new officers, The retraining will instill the correct ideals and procedures before they have a chance to experience actual law enforcing and be corrupted. A key aspect of making Baltimore a friendlier police city is to gain newer law enforcers and to build a trust with the city, a respect for the city and citizens that can eventually be shown to the officers by the citizens.

The Consent Decree is a large step in the right direction but more work needs to be completed before we can ensure a safer Baltimore. The community needs to be able to trust the officers and the officers need to be able to trust the community.


Sincerely, Tyreke D Gaston

A student at Bard Early College and a Citizen of Baltimore City

20. D. George

| From: | Deepak George ███████████ |
| Sent: | Tuesday, March 07, 2017 1:10 PM |
| To: | Decree, Baltimore.Consent (CRT) |
| Subject: | Support for the Baltimore Consent Decree |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Regards,
Deepak George

21. R. Gore

Hello,

I am writing to express my general support for the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. It is my expectation as a citizen of Baltimore that the decree be finalized in full transparency, and as a priority of the DOJ and the city. We want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices.  We also want to ensure that representatives of the affected communities are on the review board. I would also like to express concern at Jeff Sessions' statements on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,
Rachel Gore

22. M. Harcum

The Baltimore Consent Decree has made a lot of point of views change and I am only 16 years old so It's something that's very helpful and informative for someone who wants to know the answers to their questions about BCPD. The consent decree gives people who have been curious and silent a chance to speak out once and for all. "90 percent of the reported excessive force incidents involved African Americans" We should not continue to be seen as criminals just because of our skin color. The investigation of the BCPD should change how things operate and the flow of things. With the BCPD it will control the amount of crimes and arrests that are happening in our community by the police. The consent decree speaks up for people that have no voice or people who experienced harassment and witnessed the death of loved ones or those who are scarred for life by the police. There are facts that state from the report "officers are given orders to clear corners". What about something that says clear all bad police off the streets and police who do not do their job correctly? I feel that everything isn't always due to the people. It's up to the law and how they are treated and then there is our reaction is what leads to most people to jail. People in the community only react if there is a reason to. Yes sometimes people who maybe get stopped by the police can over react but it's the way you go about it. This Consent Decree has helped me and made me look at things more differently because I have proven facts right in front of me about the truth that has been happening in the city of Baltimore.

23.   B. Hawkins

**From:** Brian Hawkins ████████████████
**Sent:** Friday, February 17, 2017 9:32 AM
**To:** Decree, Baltimore.Consent (CRT)
**Subject:** Violetville Community

**Follow Up Flag:** Follow up
**Flag Status:** Completed

We live between Caton & Wilkens Avenue in Violetville
There are many children living in our commuity
It is disheartening to see drug dealers @ The Haverhill Convenience Store while walking w/ my children as it is only a few blocks from the school
We have dirt bikes & ATV's running up & down the street all the time
We have property destruction & many cars broken into costing our Baltimore residents thousands of dollars in repair & insurance deductible costs...it is very sad for my family as we have been home owners since 1999
Please advise how I can move forward to address these issues
ThanX

**B. David Hawkins**
**Danielle A. Hawkins**
**DH Diesel, LLC**
**DHD Transport, LLC**
████████████

24. M. Hettleman

**From:** Morning Sunday Hettleman <​███████████​>
**Sent:** Friday, February 17, 2017 8:40 PM
**To:** Decree, Baltimore.Consent (CRT)
**Subject:** Northern District Policemen

**Follow Up Flag:** Follow up
**Flag Status:** Completed

US Department of Justice Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue N.W.
Washington D. C. 20530


Below I've listed a few of many negative experiences I have had with Baltimore Northern District policemen. Unfortunately it doesn't include all of the negative police experiences.
In Baltimore, I've lived in Guilford , then Old Goucher with offices in Charles Village all the interactions I had with police were positive.  There was a sea change when I later moved to Better Waverly.
I am Black, perceived as poor and a woman.  All three represent  stinky cesspools from which the police now  draw their  behavior towards me.  I am afraid of a situation escalating  which may  lead to my death by Police.
Measuring police bias is tricky and often imprecise.  With so many negative experiences I have a clear idea of the bias confronting me. I' m not alone, simply one of many people who've experienced really really  bad Baltimore Police service.
I've been  ticketed,   escorted out of Rite Aid, Giant and  ironically Goodwill because of my service dog, police encouraged the Rite Aid  manager to have me arrested. I carried copies of the Federal disability law regarding service animals. A policemen told me I could have written them myself.  Police were in  violation of Baltimore and Federal  disability laws.
Police have stopped, searched my vehicle on York Rd in front of CVS being used as a staging area and attempted to force me to sit in the street.  Why ? I'm not sure.  All I had in the vehicle was fried chicken, honey and biscuits. However, I was accompanied by a caucasian male.
I had a mentally ill neighbor  who'd threatened other  white neighbors who'd  made many calls to police about her misbehavior,   gone to a commissioner and  filed numerous complaints.  She'd poured vinegar  destroying my garden, overturned Sun Flower plants which died and  threw trash into my yard daily.  That night she'd  entered my yard with a butcher knife. I called the police , Police refused to give me a report...they verbally abused and yelled at me, accusing me of  entering her home thru a window,   ummm,  I have a key provided by her family and I can't physically enter a window.
I'd been threatened  because of  911 calls  about  long term violent domestic abuse  on this block, I called numerous times . With  Sergeants, patrolmen, showing  up they witnessed but refused to write a report about his mistreatment of his mate. Disgusted,  I called the Baltimore Attorney's office,  it was an election year,  asking them to talk to Northern District Police failure to protect that woman and her 6 kids. Then the gentleman was arrested, receiving  a 6 year jail sentence because of the viciousness of the assaults.
A spate of robberies  on the  block were solved,  when we  caught the robber. Oft times police will not show up to address problems. I had a break-in, police said they'd checked my back yard and saw

nothing, I don't have a back yard. Complaints about  threats of violence, misbehavior,  drug dealing, loud noises, barking dogs and loud music problems fall on deaf ears, we  have had to resolve problems with  no help from police.  Why ? One patrolman said " you can have community standards that doesn't mean we have to help uphold them".  Better Waverly  standards are based on existing Baltimore City laws.

I  planted wild flower seeds.  A policeman rang my door bell told me about a report I had marijuana growing in my front yard. 6 additional policeman showed up including a female shift Sergeant.   I attempted to pull up the plant, the police  took it away for  lab  testing. I never heard anything else.  I believe It was false Ariella a weed  which looks like marijuana. Who plants marijuana in their front yard ?

October 2014, shortly after 11 PM, six policemen were in my yard and one on my porch with long rifles/shotguns? A Hispanic officer rang my bell. I saw  the others from my video camera. I left the lights off and crept downstairs.  Thru the door a Hispanic officer asked if everything was ok. I said yes . Angry, scared, relieved   I asked them to leave,  but first asked why were they there, the  response from the white older male officer,  "because that is what we do" as he walked out the yard to the gate,  funny they never asked to enter the house to search . Calling 911,  I was told there was no record of a call from my address. After having made several  phone calls  to Northern District I received a partial  explanation , " the  call came to 911 from a number on The  Alameda that someone was being held hostage in my home ". That information came  from a sergeant female officer,  on the night shift that informed me she had tracked the call.

I am afraid of a situation escalating  which will lead to my death by police.

Morning Sunday Hettleman

# l'état, c'est moi 'I myself am the nation'

Morning Sunday is a founder of the National Juneteenth Movement,  the Mid-Atlantic Environmental Justice Representative, works with the United Nations Environment Programme (UNEP)  on Environmental Justice and is an award-winning correspondent, host and author.  Sunday,  a former national reporter for the Afro American newspaper and feature reporter for NPR,  has written extensively on culture, health, environment and the arts. In addition to her years of on-the-job education, Sunday is a lifelong student of history.

The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

25.  P. Knopp

| | |
|---|---|
| **From:** | Pasha Knopp ███████████████ |
| **Sent:** | Tuesday, March 07, 2017 6:59 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Baltimore consent decree public comment |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

To whom it may concern,

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,


Pascal Knopp

26. C. Landers

**From:** Claire Landers
**To:** Decree, Baltimore.Consent (CRT)
**Subject:** A Strong Consent Decree for Baltimore
**Date:** Tuesday, March 07, 2017 2:59:03 PM

Dear Judge Bredar:

As a concerned private citizen, I write to support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. I sincerely hope and expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I hope you will ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also hope you will ensure that representatives of the affected communities are on the review board. I am extremely concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,
Claire Landers
Baltimore

Sent from my iPhone

27.  G. Liebmann

To:

Baltimore,consent.decree@USdoj.gov

I make these comments only because I have been a public critic of this 'Consent Decree' [1] and do not wish silence to be taken as acquiescence.

I shall not appear at the April 6 hearing, unauthorized by the Federal Rules of Civil Procedure, since, like others before it in this Court's Housing case, it is so structured, and is being promoted, as a pep rally for advocacy groups. Such 'hearings' mis-educate the public as to the functions of, and appropriate influences upon, courts, whose central function is the protection of individual rights, including those of unpopular individuals. For similar reasons, I find objectionable the public meetings provided by Paragraph 19 and 444 and the annual survey in paragraph 23.

The showing of current or recent constitutional violations by the named defendants that is a necessary predicate for federal jurisdiction and the decree is absent. The unsworn and unsigned Report attached to the Complaint recites few recent incidents, none chargeable to the current Mayor and Police Chief, and no improper directives by them. FRCP 65(d), a protection for members of labor organizations derived from the Clayton Act forbids 'John Doe' injunctions, The leading case under it is *Alemite v. Staff*, 42 F.2[nd] 832 (L. Hand,J.):

"No court can make a decree which will bind anyone but a party; a court of equity is as much so limited as a court of law; it cannot lawfully enjoin the world at large no matter how broadly it words its decree. It is not vested with sovereign powers to declare conduct unlawful. Its jurisdiction is confined to those over whom it gets personal service, and who therefore can have their day in court…If the defendant is not involved in the contempt, the employee cannot be. It is by ignoring such procedural limitations that the injunction of a court of equity may by slow steps be made to realize the worst fears of those who are jealous of its prerogative."

This is a City in which any number of Mayors, Councilmen and Police Chiefs have been black, as is at least 40% of its police force. Whatever the misconduct of a few individuals, the charge of racism is one that should not be lightly entertained, let alone sanctified, on slender or non-existent evidence, in a decree of a United States District Court. Such a finding is a jurisdictional prerequisite; the disclaimer in paragraph 5 that the City does not agree with the Findings in no way obviates the jurisdictional need for them. Their falsity and exaggeration is welcomed by the original sponsors of the decree because it feeds not only into a decree but into a political narrative supportive of electoral mobilization and identity politics.

The decree is transparently collusive—an alliance of two lame duck administrations to victimize unrepresented interests, those of the police unions and their members and those of the State, which will be pressured to provide money for reforms, the BPD being at least nominally a State agency. Nor is the United States Attorney anywhere to be found. See "Obama Races to Overhaul Police in Baltimore and Chicago Before Trump Era," New York Times, January 10, 2017. The assumption that decrees, once signed, or even entered, are impervious to subsequent political change is a mistaken one. See *Rufo v. Inmates of Suffolk County Jail*, 502 U. S. 367 (1992); *Frew v. Hawkins*, 504 U. S.437 (2004); J. Rabkin and N. Davies, *Avoiding Government by Consent Decree*, 40 Stanford L. Rev. 205 (1981); D. Schoenbrod and R. Sandler, *Democracy by Decree: What Happens When Courts Run Government* (Yale U. P., 2003). Article III of the Constitution limits court jurisdiction to "cases and controversies", an important limitation. *Moore v. Charlotte-Mecklenburg*, 402 U. S. 47 (1971);

---

[1] G. Liebmann, *The Fix is in with Baltimore's Consent Decree*, Baltimore Sun, November 6, 2016

*Chicago and G.T.R. Co. v. Wellman*, 143 U. S. 339(1892). There is none here; the parties have avowed since before this case filed their intention to enter a consent decree. Given the apparent lack of enthusiasm of the current Justice Department, entry of the decree will deliver public policy into the hands of advocacy groups. It is inconceivable that even the recent and current City administrations would have conceded control of the police to advocacy groups, including some with a declared agenda in favour of federal control of local law enforcement.

The vague and sweeping injunction contained in paragraph 8 can thus be enforced, if at all, only by contempt fines falling on City taxpayers and fustian from the bench. The Court, to be sure, will have the aid of a credulous press. Notwithstanding an express finding in the Report that the facts found on handling of sexual assault complaints did not establish a constitutional violation, the lead story by Sheryl Gay Stolberg and Jess Bidgood in the next day's *New York Times*, August 16, 2016, page 1, column six at the top of the page bore the headline in the print edition: "Baltimore Police Fostered a Bias Against Women." The Court in its Agenda for Counsel accurately characterized the decree as "aspirational, general, lacking in deadlines" as well as lacking in information about "standards to be applied, resources, costs."

Neither this Court nor the litigating lawyers framing the decree are authorities in police administration. As the 'time line' appropriately directed by the Court indicates, there are an almost comically large number of reporting requirements, the costs of which in time, manpower, morale, and response speed are not assessed. There is every reason to think that these external mandates will be resented and little in the recent history of structural decrees provides reason to think that they will be effective. Non-constructive compliance costs will be enormous, and, given paragraph 450, even the much-vaunted ceiling on monitors' fees is bendable.

The City was vindicated in this court's housing case after twenty years of costly litigation, the only relief granted being a cosmetic decree against the federal government affecting a few hundred families; while the case was pending, several hundred thousand minority families moved to the Baltimore suburbs without the court's assistance. This court's special education case was of equal length and bore fruit, as Kalman Hettleman and others have shown, in enhanced paper shuffling and no improvements in the quality of the personnel giving classroom instruction. As for nearby school desegregation decrees, the best comment was that of the late Professor Philip Kurland in a letter to Professor Alexander Bickel: "Every night, when I put my three little girls to bed, they say to me: 'Daddy! Tell us again the story of how Judge J. Skelly Wright desegregated the public schools of the District of Columbia!'" The effective police reformers have been Commissioners, not judges: William Bratton in 1990s New York and Los Angeles, Donald Pomerleau in 1970s Baltimore.

Paragraphs 251 through 259 of the decree relating to sexual assault are improperly included as a sop to advocacy groups in the face of a Report finding "We do not, at this time, find reasonable cause to believe that BPD engages in gender-biased policy in violation of federal law."

The provisions of paragraphs 43(b) and 61 limiting arrests for loitering, misdemeanour trespass, (important in drug law enforcement), as well as disorderly conduct, gambling, and quality of life offenses will become rapidly known and are gifts to the underworld, lowering the risks and costs of illegal drug distribution and increasing its profitability. In no way do they foster or are they equivalent to the decriminalization of drugs. The benefits of decriminalization, all absent here, include labelling, licensing, quality control, availability of drug testing without fear of self-incrimination, excise taxes, enhanced revenues from sales, payroll, income and business taxes, and the replacement of a distribution system reaching into every workplace and classroom with one operating from fixed locations. Insofar as it curbs "broken windows" and "quality of life"

enforcement, the decree completely deprives the City of options the value of which is the subject of political and professional controversy, a dis-service to responsible self-government.

The decree cedes power not only to the federal court and its monitor but to the federal Department of Justice itself, see paragraphs 285, 286, 298, 319, 324, 483. The merit of Justice Jackson's view may not have been apparent in October but should be in March: "I think the potentialities of a federal centralized police system for ultimate subversion of our form of government are very great."

The decree adopts unacceptable "disparate impact" criteria on both employment and enforcement, paragraphs 43, 423 and 511 (cc). It is particularly deplorable that the last of these restrictions is buried in the "Definitions" section of the decree. Its effect, as a representative of an advocacy group has joyfully proclaimed, is to prevent police from "targeting citizens in high crime areas." Reduced enforcement in such areas is assumed to be a public good, an insight probably not shared by the residents. Throughout history, and in nearly every society, law enforcement plays a role in socializing new and rising groups, a role not to be abandoned in favour of "defining deviancy down"

The proposed decree is not a measured, thoughtful response to social problems, but a rushed one, the product of panic and a failure of nerve by a municipal leadership running scared of an adolescent street mob and its drug-gang adult followers, who efficiently looted the City's pharmacies. The Mayor conceded not only the decree, but time and space to 'act out' at the expense of innocent merchants, proposed destruction of municipal monuments, and an extravagant monetary award to the family of a prisoner not yet shown to have been wronged. The decree is not a harmless sop, but a measure whose effect on police recruitment and behaviour threatens a sudden and complete collapse of public order, or at best a long period of slow attrition as police, residents and businesses vote with their feet for jurisdictions that have not thus handcuffed themselves.

I feel sympathy, though not guilt, at the plight of Freddie Gray and his mourners. Their occupation in the drug trade and their grievances as regards police misconduct are not the product of disinterested malice or municipal public policy. They arise from a national failure to address youth unemployment as it was addressed in the Depression years and from persistence in a foolish and failed drug war. Saying this now is not, on my part, a post hoc rationalization for opposition to the decree. I have been saying it for years.[2]

The court is being urged to enter both a political thicket and a minefield, to no good purpose. There are provisions of the decree relating to training which have merit, but no constitutional predicate. The court might consider deferring action on the decree for six months or a year until a report on changes in police training is received. Assuming, as I do, that the new Mayor is acting in good faith in emphasizing "training, training, training", the Court can at that time dismiss the complaint without prejudice with an entirely clear conscience.

Respectfully submitted,

George W. Liebmann

---

[2] As to youth employment, see G. Liebmann, *The Youth Employment Conundrum*, Baltimore Sun, November 26, 2010; also www.c-span.org/video/?296762-4/youth-employment. As to the Drug War, see G. Liebmann, *Reefer Madness: Reform Our Crazy Marijuana Laws*, Baltimore Sun, August 15, 2011; G. Liebmann, Governor Gary Johnson, Donald Santarelli, Dr. Jerome Jaffe, and Dr. Robert Du Pont, *The Drug War: A Reconsideration After Forty Years* (Calvert Institute, 2005); G. Liebmann (ed.), *Prohibition in Maryland: A Collection of Documents* (Calvert Institute, 2011)

28. I. Lunder

| | |
|---|---|
| **From:** | Indra Lunder ███████████████ |
| **Sent:** | Monday, March 06, 2017 5:28 PM |
| **To:** | askipwith@baltimoreintersection.org; Decree, Baltimore.Consent (CRT); Indra Lunder |
| **Subject:** | Consent Decree Letter |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Consent Decree Committee,

As a youth advocate and citizen of Baltimore City I believe that the Consent Decree will be a vital part of improving the justice system in our city that many disagree with and are angry about. Many people, including myself, believe that there is far too much unfair violence and racial profiling between the Baltimore City Police Department and the citizens of Baltimore. I believe this small step can make a huge difference in the relationship and interactions between the BCPD and citizens of Baltimore which will start to diffuse the tensions.

The investigation of the Baltimore City Police Department by the U.S Department of Justice shows factual evidence of the law violating activities performed by BCPD; therefore, I personally see no downsides to a training that will work toward the Police Department performing their duties lawfully and reasonably. When the citizens of Baltimore start to see a change in the actions and routines of the BCPD, that is when we will feel safe.

I feel the Consent Decree is especially important under Trumps presidency when tensions between many citizens and the government will grow even stronger. This can start to break down the tensions before they get more out of hand. In Baltimore over a 5 year period, 410 people were stopped over nine times and 95 percent were African American. It is clear that there is a way too high level of racial profiling that needs to be stopped. It is first of all wrong, but it is also illegal.

Not only will the Consent Decree start to bring justice to our city, it can also begin to create a more trusting bond between the citizens of Baltimore and the BCPD, which will improve the city as a whole. I hope that you take this letter in to strong consideration, as it speaks on behalf of young students and advocates, and my voice itself.

Sincerely,
Indra

29. R. Miller

To Whom It May Concern:

I will keep my feelings on the Baltimore Consent Decree brief.  I think it could be more comprehensive, particularly in regards to community policing.  However, I do think the way it stands is a *desperately* needed start to curtail the violence in our city.  This applies across the board, from violence from the BPD to the violence within the community.  When neighbors feels like the BPD is an institution they can trust to act fairly and justly, they are more likely to be helpful with investigations.  The Consent Decree is a step in the right direction and *must*  be implemented.


Sincerely,

Romana K. Miller

30.  M. Moses

**From:** Matt Moses █████████████

**Sent:** Tuesday, March 07, 2017 4:25 PM

**To:** Decree, Baltimore.Consent (CRT)

**Subject:** Baltimore Consent Decree Public Comment

**Follow Up Flag:** Follow up

**Flag Status:** Completed

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,

Matthew R. Moses

31.  M. Moses

**From:**
**To:** Decree, Baltimore.Consent (CRT)
**Subject:** Consent decree commentary
**Date:** Tuesday, March 07, 2017 11:24:04 PM

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a native of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments. Thank you.

Sincerely,
Molly

--
Molly Moses
MSW Candidate, Smith College SSW

32. L. Murray

| From: | Lauren Murray <███████████████> |
| Sent: | Tuesday, March 07, 2017 9:31 PM |
| To: | Decree, Baltimore.Consent (CRT) |
| Subject: | Baltimore consent decree written comment |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Completed |

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,

Sent from my iPhone

33. D. Phillips

| | |
|---|---|
| **From:** | David Phillips ████████████████ |
| **Sent:** | Thursday, February 23, 2017 7:25 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Comment on Baltimore City Consent Decree |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

It's funny how the tone and effect of the Consent Decree are entirely consistent with Baltimore City's State's Attorney's foregone conclusion: no justice, no peace. After the DOJ's incendiary reaction to Ferguson, was there ever any doubt. That alone is enough to question the credibility of the investigation. Regardless, the Decree is onerous and unmanageable. It could be summed up in a couple of lines: Memo to the Police, the Mayor of Baltimore and City Council do not trust you, AT ALL.

The introduction says, critical work has already begun, which is obvious by the drastic increase in serious and violent crime. The government's principal purpose is to protect the rights of citizens, which includes public safety, and by almost every measure, the Baltimore City government has failed in that regard. The fact that we are taking more time to devolve into Detroit is a testament to the strength of remnants of long past administrations.

Before I go further, what is the cost of implementation, including allocation of resources to comply with all the additional administration, including documenting statistical data to further inhibit the police, lots of meetings and surveys and so forth, not to mention the economic impact of decreased public safety due to all the distraction. Also, how about the cost of all the associated law suits that will surely clog the courts and result in even more quick, unjustified settlements to further burden already overburdened taxpaying, law abiding citizens. Not just in Baltimore, but across Maryland and, in fact, the entire country, all of which will bear part of the cost. And, what are the metrics other than judging police officers. How about murders per day? Or, maybe how much space gets destroyed? Another might be turnover. I'm betting our best are just hoping to make it to retirement, preferably early retirement.

Back to the key topic. What the Decree essentially says in a couple hundred pages is that deference is to be given to suspected criminals over the discretion of the police, whom are expected to hesitate to consider all possibilities at their own risk loss of life or serious bodily harm.

That includes inability to frisk for weapons except under circumstances too vague to risk. The only proactivity allowed is polite communication, which is, in fact, mandated. All this means is that police will rightly continue to avoid all confrontation as public safety continues to erode. On the positive side, that will help achieve the Decree's key objectives of minimizing citations and arrests.

I have spoken with police officers in various parts of the city and also with teachers, and what I constantly hear is that crime and classroom disruptions, which are related, are caused by about ten percent of the population. Concentrate on that element and you will go much further than the Decree in making Baltimore safe for everyone. Get and keep violent criminals off the street, and place chronic classroom problem children in a highly controlled environment with intensive help to hopefully put them on a path that avoids the criminal justice system.

I have personally witnessed police officers abused to a point beyond what I believe I could take. Worse yet, to think they probably are subjected to that several times every day. I have also personally witnessed deterioration in public safety, not that I fault the police, at all. They are in an impossible situation. For instance, when I first moved to the city, my wife and I were slowly riding our bikes on the promenade around the harbor. A police officer stopped us and politely informed us of the restrictions, for which we thanked him and immediately complied. A week or so ago on a nice day, the Inner Harbor was very crowded, yet, as I have seen many times over the past year or so, kids were racing bikes through the crowds and popping wheelies without any apparent regard for risk of serious injury to pedestrians, which almost happened when one got out of control and nearly came down on a baby carriage. The parents were terrified and, if visiting, may be hesitant to come back. At a time not so long ago, that would not have happened.

In conclusion, I know of no evidence that justifies the extent of the Decree, and recommend that it be scrapped in its entity, and that time and money be better spent reviewing and, where warranted, improving current policies and practices that have already proven effective in dealing with criminals and bad police officers, keeping in mind, no system is perfect. I believe that will not only improve safety for everyone and particularly those in high crime areas, but also help reverse the growing murder rate of citizens and law enforcement officers nationwide, to which Baltimore City's rush to judgement mightily contributed. As I alluded to above, education is also a key component. City kids must be given every opportunity to succeed and that includes removing the few that create an environment non-conducive to learning. If we continue to ignore that obvious fact, nothing is going to change, Decree or not. Furthermore, respect goes both ways, and the Decree avoids that truth, except for acknowledging that Officers will need frequent health checks and eventually psychological help to cope with the alternate reality forced upon them.

If we keep going as we are, I can see a time when the city either falls into irreparable decline like Detroit, or possibly parts break away in a BREXIT type move to join adjacent counties with more reliable, responsive governance. It would only take revocation of our charter.

David Phillips

34. A. Rinsema

I am writing in support of the U.S. Department of Justice's efforts to monitor and reform the Baltimore police force to protect the Constitutional rights of the citizens of that city.

Police who endanger the rights of the very people they are meant to protect are not only a danger to the public, but also the good officers we need on the streets of every city.

Sincerely,
Amy Rinsema
15218

35. J. Scanlan

Comments of James P. Scanlan Regarding Proposed Consent Decree in *United States v. Police Department of Baltimore City and Mayor and City Council of Baltimore*, No. 17-cv-00099 (March 7, 2017)

These comments on the proposed Consent Decree in *United States v. Police Department of Baltimore City and Mayor and City Council of Baltimore*, No. 17-cv-00099 (D. Md.), are submitted pursuant to the Court's Order of February 15, 2017.

By letter[1] to the Honorable James K. Bredar dated February 14, 2017, which was copied to counsel of record, I previously explained problems in the proposed decree arising from the fact that the decree, like the Department of Justice (DOJ) report underlying it and numerous actions of the DOJ in other cases, is premised on the belief that generally reducing adverse criminal justice outcomes will tend to reduce (a) relative racial and other demographic differences in rates of experiencing those outcomes and (b) the proportions groups most susceptible to the outcomes make up of persons experiencing them. The letter explained, as I had recently explained with regard to the proposed decree in "Compliance Nightmare Looms for Baltimore Police Department," Federalist Society Blog (Feb. 8, 2017), exactly the opposite is the case. Generally reducing any outcome will tend to increase both (a) and (b) as to the outcome. The letter also explained the pattern whereby the rarer an outcome the greater tends to be the relative difference in experiencing it and the smaller tends to be the relative difference in avoiding it and the importance of understanding the pattern with regard to implementation of the decree.

A copy of the letter is attached (with identifying information beyond that permitted by the February 15, 2017 Order removed).[2] I add here three additional points.

First, some readers of my work have interpreted it as saying that reductions in an adverse outcome tend to worsen inequality. That is not correct. Rather, I have simply explained that reducing an adverse outcome tends to increase relative differences in rates of experiencing the outcome while reducing relative differences in rates of avoiding the outcome. The problem is that neither relative difference is a sound measure of association. Thus, neither can indicate whether inequality has increased or decreased in any meaningful sense (at least not without consideration of the way the measure tends to be affected by the prevalence of an outcome).

Further regarding the same issue, it is important to recognize that the two rows of Table 1 (at 3) of the letter mean exactly the same thing with regard to such things as the likelihood that decisions are influenced by bias. As I explain in the section of the Federalist Society item titled "Appraising BPD Compliance With the Consent Decree" (page 5 of the PDF version), assuming that the failure rates in Table 1 of the item (which is essentially the same as Table 1 of the letter) reflect the proportion of arrest or other confrontational situations where an officer uses force, officers who are most circumspect about the use of force or best master de-escalation techniques will tend to show results more akin to those in row 2 than row 1 (*i.e.*, larger relative differences in adverse outcomes and larger proportions of persons experiencing those outcome made up of

---

[1] To facilitate consideration of issues addressed in documents such as this I include links to referenced materials in electronic copies of the documents. Electronic copies are available by means of the Measurement Letters page of jpscanlan.com. Published items can also be secured by online searches for the titles.

[2] The attached letter and that available online have the following typographic corrects to the original: (1) page 2, second paragraph, fourth line: "decrees" changed to "decree's"; (2) page 4, third paragraph, second last line: "presumable" changed to "presumably." ably."

persons from the disadvantaged group), while other officers will tend to show results more akin to row 1 than row 2. The key point is that, without understanding these patterns it is not possible to appraise, for purposes either of officer evaluation or officer discipline, the likelihood that particular officers or groups of officers have engaged in discriminatory policing.

The above is one of many reasons why a rational decree covering police practices must be informed by an understanding of the patterns described in the letter and its references.

Second, the letter (at 4) stated that, while few people understand that generally reducing an outcome tends to increase, not reduce, relative differences in rates of experiencing the outcome, the point is hardly debatable.[3] And I listed several scholars who, though they may not yet fully understand the matter, should be able to provide an informed opinion on it.

In light of the statement as to whether the point is debatable, I should call to the Court's attention a March 5, 2017 post on medium.com titled "Debunking the Scanlan Doctrine – Part I," by David C. Norris, MD. The title and tone of the post suggest that it is a serious refutation of my claim that as an outcome declines in prevalence relative differences in experiencing it tend to increase while relative differences in avoiding it tend to decrease.

Dr. Norris's post arose out an exchange on the portion of the American Statistical Association website called ASA Connect following my posting there a link to my "Misunderstanding of Statistics Confounds Analyses of Criminal Justice Issues in Baltimore and Voter ID Issues in Texas and North Carolina," Federalist Society Blog (Oct. 3, 2016). My last communication to Dr. Norris as part of the exchange may be found as my Response to David Norris on ASA Connect (Oct. 14, 2016), and that item largely suffices as response to Dr. Norris's recent post so far as is relevant here.

Dr. Norris's recent post leaves me uncertain as to whether he would agree or disagree with my claim that generally reducing criminal justice outcomes in Baltimore would tend to increase relative racial difference in rates of experiencing those outcomes and the proportions African Americans make up of persons experiencing them. I have alerted Dr. Norris and other American Statistical Association members to this matter and of the deadline for submission of comments on the proposed decree, and possibly Dr. Norris will submit something clarifying his views. Whether Dr. Norris submits something or not, however, Dr. Norris could provide his views on the matter in the event the Court finds the recent post to call seriously into question key elements of the instant comments (including the attached letter).

I add the following point pertaining to Dr. Norris's recent post. The post places some weight on the first of the two papers by Peter J. Lambert and Subbu Subramanian cited in note 6

---

[3] I have said the same thing with regard to the pattern whereby (a) the rarer an outcome the greater tends to be the relative difference in experiencing and (b) the smaller tends to be the relative difference in avoiding it. As (a) is implied in (b) and vice-versa (my note 14 (at 19) of my letter to the American Statistical Association (Oct. 8, 2015), with regard to whether the point in text above is debatable, there is no reason to distinguish it and the seemingly broader point about the way the two relative differences tend to change in opposite directions.

(at 4) of the February 14 letter.  I read those papers as essentially agreeing with me that as an outcome declines in prevalence relative difference in experiencing it tend to increase while relative differences in avoiding it tend to decrease.  But I also read the papers as disagreeing with my work, or my own interpretations of it, in two respects.  First, the papers appear to regard my work as maintaining that declines in an outcome tend to increase inequality.  Second, the papers appear to regard the rate ratios as to the favorable or corresponding adverse outcomes as sound measures of association, while maintaining that the important thing is that one make clear which of the two one is using and is generally transparent about the matter.

As indicated in my first point above, I do not regard an increasing relative difference in rates of experiencing an adverse outcome that is solely a consequence of a general decline in the outcome as reflecting an increase in inequality any more than I regard the corresponding decrease in the relative difference in the favorable outcome as reflecting a decrease in inequality.  For related reasons, I do not regard either relative difference as a sound measure of association.

It is when the question of discrimination is at issue that shortcomings of those measures (and other measures that tend to be affected by the prevalence of an outcome) should be most evident.  That is why I have in numerous places used the situation where discrimination is at issue to illustrate the fallacy of the view that choice of measure when two measures yield differing conclusions involves a value judgment, as discussed, for example, with respect to Table 5 (at 335-336) of "Race and Mortality Revisited," *Society* (July/Aug. 2014).

Finally, with regard to any question as to the actual effects on measures of demographic difference of the general declines in adverse outcomes envisioned by the proposed decree, the Court should be mindful that, even if the DOJ was unaware of the mistaken premise of its decree prior to my recently bringing the matter to the attention of attorneys handling the case, those attorneys should by now have some understanding of the issues.  And even if the attorneys handling the case to do not yet recognize that the premise is mistaken, there is a good chance the DOJ will come to such recognition in ensuing months.  Hence, I reemphasize the importance of the Court's addressing these issues with the parties at the earliest possible time.

Attachment:  Letter to the Honorable James K. Bredar (Feb. 14, 2017)

**James P. Scanlan**

*[This letter, which was originally mailed to the Court on February 14, 2017, is submitted as an attachment to the Comments of James P. Scanlan Regarding Proposed Consent Decree in United States v. Police Department of Baltimore City and Mayor and City Council of Baltimore, No. 17-cv-00099 (March 7, 2017). Pursuant to the Court's Order of February 15, 2017, identifying information beyond name has been redacted.]*

February 14, 2017

The Honorable James K. Bredar
United States District Judge
United States District Court
 for the District of Maryland
101 West Lombard Street
Baltimore, MD 21201

          Re: *United States v. Police Department of Baltimore City and Mayor and City Council of Baltimore*, No. 17-cv-00099

Dear Judge Bredar:

At some point the Court will establish procedures for public comment on the proposed consent decree in the referenced case. Presumably, those procedures will allow me to bring to the Court's attention the issues addressed here, assuming the parties believe those issues are appropriate for the Court's consideration,[1] and I may later submit a written statement in accordance with those procedures.

I am sending this letter, however, because the nature of the issues it addresses is such that I believe it imperative that the Court be made aware of the issues at the earliest possible time. One issue involves the fact that, like numerous actions of the Department of Justice (DOJ) in other cases and the report underlying the agency's actions in this case, the proposed consent decree is premised on the belief that generally reducing adverse criminal justice outcomes will tend to reduce (a) relative racial and other demographic differences in rates of experiencing those outcomes and (b) the proportion groups most susceptible to the outcomes make up of persons experiencing them. Exactly the opposite is the case. Generally reducing any outcome will tend to increase both (a) and (b) as to the outcome.

A second issue involves the fact that, while at this time the DOJ is presumably unaware that reducing the frequency of adverse criminal justice outcomes tends to increase (a) and (b), there is a good chance that the agency will come to recognize such fact in coming months.

---

[1] The parties' filing of February 10, 2017, contemplates that the public may submit written comments to the parties, who then will forward to the Court those comments not deemed "irrelevant, threatening, or inflammatory, or [revealing] confidential information." I do not know whether that approach had been suggested or directed by the Court.

The key statistical issue is explained fairly succinctly in my "The Paradox of Lowering Standards,"[2] *Baltimore Sun* (Aug. 5, 2013), which addresses the Maryland Board of Education's mistaken belief that relaxing public school discipline standards would tend to reduce relative racial differences in suspensions and expulsions, and my "Things DoJ doesn't know about racial disparities in Ferguson," *The Hill* (Feb. 22, 2016), which addresses the DOJ's mistaken belief that reducing adverse interactions between the residents of Ferguson, Missouri and the city's police and courts would tend to reduce the proportion African Americans make up of persons experiencing those interactions. The latter item also addresses the longstanding anomaly where, as a result of the government's failure to understand certain fundamental statistical concepts, the government has encouraged entities covered by federal civil rights laws to engage in conduct that increases the chance that the government will sue them for discrimination.

The issue is explained somewhat more elaborately, and with attention to terms of the proposed decree in this case, in my "Compliance Nightmare Looms for Baltimore Police Department," Federalist Society Blog (Feb. 8, 2017). The item explains, for example, that the more the Baltimore Police Department complies with the decree's requirement that the Department reduce certain adverse interactions between the police and the public, the greater will tend to be the perceived racial impact of its policies. Also, the more individual officers endeavor to reduce the use of force, the greater will tend to be the likelihood that officer decisions to use force will be deemed to reflect racial bias.

Much more extensive explanations of this and related issues may be found, among many other places, in my comments for the Commission on Evidence-Based Policymaking (CEBP) (Nov. 14, 2016); letter to American Statistical Association (Oct. 8, 2015)[3]; *amicus curiae* brief in *Texas Department of Housing and Community Affairs et al. v. The Inclusive Communities Project, Inc*., Sup. Ct. No. 13-1371 (Nov. 2014) (TDHCA brief); "Race and Mortality Revisited," *Society* (July/Aug. 2014); "The Perverse Enforcement of Fair Lending Laws," *Mortgage Banking* (May 2014); and "The Mismeasure of Discrimination," Faculty Workshop, University of Kansas School of Law (Sept. 20, 2013) (Kansas Law paper).

Many graphical and tabular illustrations of the pertinent statistical patterns may be found in methods workshops I have given on the subject at American universities in recent years, including an October 2014 workshop at the Maryland Population Research Center of the

---

[2] To facilitate consideration of issues addressed in documents such as this I include links to referenced materials in electronic copies of the documents. Electronic copies are available by means of the Measurement Letters page of jpscanlan.com. Published items can also be secured by online searches for the titles.

[3] A July 25, 2016 follow-up letter to the American Statistical Association (in Section B, at 7-11) gives particular attention to misunderstandings regarding effects of reducing adverse criminal justice outcomes on measures of racial/ethnic differences in experiencing those outcomes. See also the December 14, 2015 memorandum to the Duke University Professor Jerome P. Reiter, Chair of the American Statistical Association's Scientific and Public Affairs Advisory Committee, discussed *infra*.

University of Maryland titled "Rethinking the Measurement of Demographic Differences in Outcome Rates."[4]

Table 1 below, which may also be found in the recent item on the Federalist Society Blog, and which reflects the same hypothetical employed in the *Baltimore Sun* commentary, illustrates the pertinent statistical patterns. The table shows (in numbered columns 1 through 4) the pass and fail rates of an advantaged group (AG) and a disadvantaged group (DG) at two cutoff points in a situation where the groups have normally distributed test scores with means that differ by half a standard deviation (a situation where approximately 31 percent of DG's scores are above the AG mean). It also shows (in columns 5 through 8) measures that might be used to appraise differences in test outcomes of AG and DG.

Column 5 shows that at the higher cutoff, where pass rates are 80 percent for AG and 63 percent for DG, AG's pass rate is 1.27 times (27 percent greater than) DG's pass rate. If the cutoff is lowered to the point where AG's pass rate is 95 percent, DG's pass rate would be about 87 percent. At the lower cutoff, AG's pass rate is only 1.09 times (9 percent greater than) DG's pass rate.

**Table 1. Illustration of effects of lowering a test cutoff on measures of differences in test outcomes**

| Row | (1) AG Pass Rate | (2) DG Pass Rate | (3) AG Fail Rate | (4) DG Fail Rate | (5) AG/DG Pass Ratio | (6) (a) DG/AG Fail Ratio | (7) DG Prop of Pass | (8) (b) DG Prop of Fail |
|---|---|---|---|---|---|---|---|---|
| 1 | 80% | 63% | 20% | 37% | 1.27 | 1.85 | 44% | 65% |
| 2 | 95% | 87% | 5% | 13% | 1.09 | 2.60 | 48% | 72% |

That lowering a cutoff tends to reduce relative differences in pass rates is well understood in civil rights circles and underlies the widespread view that lowering a cutoff tends to reduce the disparate impact of tests where some groups outperform others.

---

[4] Other workshops addressing this subject include "The Mismeasure of Health Disparities in Massachusetts and Less Affluent Places," Methods Seminar, Department of Quantitative Health Sciences, University of Massachusetts Medical School (Nov. 2015); "The Mismeasure of Discrimination," Center for Demographic and Social Analysis, University of California, Irvine (Jan. 2015); "The Mismeasure of Demographic Differences in Outcome Rates" Public Sociology Association of George Mason University (Oct. 2014); "The Mismeasure of Association: The Unsoundness of the Rate Ratio and Other Measures That Are Affected by the Prevalence of an Outcome," Minnesota Population Center and Division of Epidemiology and Community Health of the School of Public Health of the University of Minnesota (Sept. 2014); "The Mismeasure of Group Differences in the Law and the Social and Medical Sciences," Institute for Quantitative Social Science at Harvard University (Oct. 2012); "The Mismeasure of Group Differences in the Law and the Social and Medical Sciences," Department of Mathematics and Statistics of American University (Sept. 2012).

But, whereas lowering a cutoff tends to reduce relative differences in pass rates, it tends to increase relative differences in failure rates. As shown in column 6 (which is also designated (a) to correspond with the usage in the second paragraph of this letter), initially DG's failure rate was 1.85 times (85 percent greater than) AG's failure rate. With the lower cutoff, DG's failure rate is 2.6 times (160 percent greater than) AG's failure rate.

Columns 7 and 8 show the proportions DG makes up of persons who pass and fail the test at each cutoff in a situation where DG makes up 50 percent of persons taking the test. Column 7 shows that lowering the cutoff increases the proportion DG makes up of persons who pass from 44 percent to 48 percent (hence, *reducing* all measures of difference between the proportions DG makes up of persons who took the test and persons who passed the test). And Column 8 (also designated (b) to correspond with usage in the second paragraph) shows that lowering the cutoff increases the proportion DG makes up persons who fail the test from 65 percent to 72 percent (hence, *increasing* all measures of difference between the proportions DG makes up of persons who took the test and persons who failed the test).

These patterns are not peculiar to test score data or the numbers I used to illustrate them. Rather, as discussed and illustrated in the materials cited above, the patterns exists to a degree in essentially all circumstances where groups differ in their susceptibility to some outcome (and its opposite). Further, actions of the DOJ regarding this and other matters that are based on the belief that reducing the frequency of an outcome tends to reduce relative differences in rates of experiencing the outcome do not involve a situation where the DOJ is aware that lowering a test cutoff tends to increase relative differences in failure rates, but believes that for some reason the same pattern would not be observed with regard to things like borrower, school discipline, or criminal justice outcomes.[5] Rather, the DOJ has yet to show an understanding even that lowering a test cutoff tends to increase relative differences in failure rates (though presumably some persons in the agency are aware of such pattern).

In any case, while few people understand that generally reducing an outcome tends to increase, not reduce, relative differences in rates of experiencing it, the point is hardly debatable.[6] And I note that the National Center for Health Statistics recognized more than a

---

[5] Inasmuch as a pattern of increases in the proportions more susceptible groups make up of persons experiencing an outcome is a corollary to the pattern of increases in relative differences in rates of experiencing the outcome, for simplicity, I refer only to relative differences in the remainder of this letter. I note, however, that there are reasons beyond the fact that the proportion a group makes up of persons experiencing an outcome is affected by the frequency of an outcome that militate against ever appraising a demographic disparity on the basis of the difference between the proportion a group makes up of persons potentially experiencing an outcome and the proportion it makes up of persons actually experiencing the outcome. See CEBP comments (Section I.C, at 39-4), TDHCA brief (Section I.B., at 23-27), Kansas Law paper (Section C, at 23-36), and the University of Maryland workshop (slides 96-108).

[6] Demonstrations of the pertinent patterns by methods other than those I commonly employ may be found in Lambert PJ, Subramanian S (Disparities in Socio-Economic outcomes: Some positive propositions and their normative implications. Soc Choice Welf 2014;43:565-576), and Lambert PJ, Subramanian S (Group inequalities and "Scanlan's Rule": Two apparent conundrums and how we might address them. Working Paper 84/2014, Madras School of Economics (2014)).

decade ago that  as healthcare generally improves – with increasing rates of receipt of appropriate care and decreasing rates of non-receipt of appropriate care – relative differences in receipt of appropriate care tend to decrease and relative differences in non-receipt of appropriate care tend to increase.  See my "The Mismeasure of Health Disparities," *Journal of Public Health Management and Practice* (July/Aug. 2016).

Many scholars in Baltimore or Maryland should be able to provide expert advice on this matter, if the Court desires it.  Professor Amy Ong Sui of the Bloomberg School of Public Health of Johns Hopkins University is also President of the Population Association of America.  As a result of her role as President-Elect last year, Professor Ong should be familiar with my March 29, 2016 letter to the organization requesting that it explain to the government that generally reducing an outcome tends to increase, not decrease, relative differences in rates of experiencing the outcome.  Though in April 2016 the Population Association of America Board declined to explain the issue to the government, Professor Ong ought to be able to give an informed opinion on the matter.

Professor Sangeetha Madhavan, Associate Director of the University of Maryland's Maryland Population Research Center, who organized and attended the above-mentioned methods workshop at the University, should be very able to provide an informed view on the matter.  Professor Katherine Abraham, who is affiliated with the same Center and is Director of the University of Maryland's Center for Economics and Policy, is also the Chair of the CEBP to which the above-mentioned November 2016 comments were directed.  At the time of submitting the comments, I brought them directly to the attention of Professor Abraham, while advising that the comments involved the fact that many government civil rights law enforcement policies are based on the mistaken belief that generally reducing adverse outcomes will tend to decrease relative differences in rates of experiencing the outcome.[7]  Whether or not Professor Abraham

---

[7] The final paragraphs of the comments (at 46) are comprised of the following recommendations:

Fifth, the Commission should recommend that Congress take all steps necessary to ensure that no federal law enforcement actions are based the belief that reducing the frequency of an adverse outcome tends to increase relative demographic differences in rates of experiencing the outcome or the proportion disadvantaged groups make up of persons experiencing those outcomes.

Sixth, the Commission should recommend that Congress identify all existing legislation (a) that reflects the belief that reducing the frequency of an adverse outcome will tend to reduce relative demographic differences in rates of experiencing the outcome or the proportion disadvantaged groups make up of persons experiencing the outcome; (b) that require the monitoring of demographic differences with regard to some outcome; (c) that impose liability for a practice that has a disparate impact; (d) that require implementation of a less discriminatory alternative to practices having a disparate impact.  Congress should then consider options for eliminating any false beliefs reflected in such legislation and for either clarifying how differences and disparate impacts are to be measured or eliminating the requirements.

Seventh, the Commission should recommend that Congress require that federal agencies take the same actions regarding regulations that the prior paragraph suggests Congress take regarding legislation.

already understands the issue, after giving the manner minimal thought, she should be able to provide the Court a sound opinion the matter.

Outside of Maryland, Duke University Professor of Statistical Science Jerome P. Reiter, is especially well-positioned to provide an informed opinion on the matter. Professor Reiter is Chair of the American Statistical Association's Scientific and Public Affairs Advisory Committee, to which my October 2015 letter to the American Statistical Association was referred. See my December 14, 2015 memorandum (especially Section C, at 10-11) responding to Professor Reiter's query regarding situations where the government recommended lowering standards or taking other actions aimed at reducing demographic differences. Professor Reiter also received my July 25, 2016 letter to the American Statistical Association mentioned in note 3 that was substantially devoted to discussion of the misunderstandings of the effects of reducing adverse criminal justice outcomes on measures of demographic differences regarding those outcomes.

Professor Reiter's Committee advised against the American Statistical Association's taking actions of the type I suggested (which included advising the government of its mistaken beliefs regarding the effect of reducing outcomes on demographic differences regarding the outcomes) on the basis that the Committee believed that I was effectively highlighting the issue and that it did not see an additional role for the American Statistical Association to play. But the American Statistical Association gave no indication of any questioning of the essential validity of my views regarding the effects of reducing an outcome on measures of differences in rates of experiencing it, which views it has several times presented in its publications.[8]

In any event, Professor Reiter can certainly provide an informed opinion as to whether there is any basis for disagreement with my assessment of the DOJ's mistaken belief as to the consequences of generally reducing adverse criminal justice outcomes on the measures of racial and other demographic differences that the agency commonly employs.

Turning to the second issue mentioned at the outset, the concluding paragraphs of "Race and Mortality Revisited" discuss the prospects, as of the middle of 2014, for the government to eventually recognize that its understanding of the effects of reducing adverse outcomes on measures of difference in experiencing the outcomes is incorrect. My recent "Will Trump Have the First Numerate Administration?" Federalist Society Blog (Jan. 4, 2017), discusses reasons to believe that a new administration will more readily understand this and related issues than prior administrations have been.

Those reasons exist whether or not the CEBP addresses the subject in its report to Congress and the President that is due later this year. But it is difficult to conceive of a report that minimally satisfies the CEBP's statutory mandate while failing to address the fact that many

---

[8] See "Misunderstanding of Statistics Leads to Misguided Law Enforcement Policies," *Amstat News* (Dec. 2012); "Can We Actually Measure Health Disparities?," *Chance* (Spring 2006); "Divining Difference," *Chance* (Fall 1994). I have also addressed the subject at seven American Statistical Association conferences.

law enforcement policies are based on an understanding of statistics that is the opposite of reality.

Further, emails I have sent to counsel of both sides put DOJ counsel under an obligation to bring the issues I raise to the attention of new leadership at the agency whether or not counsel themselves yet understand the matter or agree with my views. This letter creates a like obligation. Thus, regardless of any actions I might take to cause the DOJ to understand these issues,[9] there is a good chance that at some point during ensuing months the DOJ will recognize that certain statistical understandings underlying its actions in this case and many other matters in recent decades are mistaken.

Regardless of when that recognition occurs, it will be a positive development. But the sooner it occurs in this case, the fewer will be the misguided actions taken in the case pursuant to existing misunderstandings and the fewer will be the resources required to correct such actions. And, assuming the decree goes forward, the sooner will the decree be able to accomplish its legitimate goals.

Thus, I suggest that before proceeding further with the case the Court ensure that the parties fully understand the extent to which any aspect of the decree, or the DOJ's reasons for seeking a decree and the City's reasons for agreeing to it, are based on the statistical misunderstandings described above.

Respectfully submitted,

*/s/ James P. Scanlan*

James P. Scanlan

cc: Counsel of record (by email)

---

[9] In addition to frequently publishing on this subject, I often contact individuals or entities by email or formal letter regarding the subject. Links to formal letters since 2009 are collected on the Measurement Letters page of jpscanlan.com. Those of special pertinence to the instant matter (or closely related matters regarding the effects of lowering discipline standards on relative racial/ethnic differences in public school discipline rates) include letters to Federal Judicial Center (July 7, 2016), House Judiciary Committee (Oct. 19, 2015), Chief Data Scientist of White House Office of Science and Technology Policy (Sept. 8, 2015), Department of Health and Human Services and Department of Education (Aug. 24, 2015), United States Department of Justice and City of Ferguson, Missouri (Mar. 9, 2015), United States Department of Justice (Apr. 23, 2012), and United States Department of Education (Apr. 18, 2012). Similar letter may receive greater attention from the recipients under the new administration.

36.  Y. Scimone

| | |
|---|---|
| **From:** | Ysa████████████ |
| **Sent:** | Wednesday, March 01, 2017 2:43 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Approve the consent decree in Baltimore MD |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

As a resident of Maryland, I want to voice my strong support for the agreement on a consent decree drafted by The Justice Department, the city of Baltimore and the Baltimore City Police Department (BPD) to address systemic problems identified during the Justice Department's investigation of BPD. It is imperative that improvements be made in policing, particularly in communities of color, which are often subject to discriminatory practices, as found by the Justice Department.

This agreement has the potential to improve community trust in city cops, and to ensure that both civilians AND officers are safer on the streets due to better policies, procedures and training.

I am writing to express support for the Court's approval of this agreement. Thank you for your time.

Y. Scimone
Frederick, MD

37. D. Sgouros

| | |
|---|---|
| **From:** | Denis Sgouros ███████████████ |
| **Sent:** | Tuesday, March 07, 2017 9:31 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Baltimore Consent Decree |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,

38. M. Skarpac

22 February 2017

Monica Skarpac



US Dept of Justice
Civil Rights Division Special Litigation Section
950 Pennsylvania Ave. NW
Washington, DC 20530

Dear Sir,

I am writing in reference to the Call for Comments relative to the Baltimore City Police Department Consent Decree, as indicated by the Baltimore Sun Newspaper.

I am a victim and was subject to a ruse in order to separate me from my firearms which the Baltimore City Police Department will not return to me. The Property Section is in possession of 3 long guns and a sidearm which I have attempted to retrieve on several occasions, with the proper paperwork, only to be thrown out of Police Headquarters, (also known as Central) on Baltimore Street.

It is illegal to permanently deprive someone of their property, and I'm well aware of the statute. There is _**no legal reason**_ that I such not be able to recover my property.

I have sought the help of my Councilmember in District 1 and have also written many letters in order to get someone to help me, to no avail. Thank you for attention to this matter, as I may not be available in person in the near future to retrieve them myself. I the event that I am not available when you order Commissioner Davis to release my property, I request that my firearms be returned to my mother in-so-that she may secure them:

Marcella Skarpac



Thank you for your time and attention.

Sincerely,

Monica Skarpac

Monica Skarpac
enclosures
cc: Marylyn Mosby City States Attny



# Department of Public Safety and Correctional Services

**Division of Parole and Probation**
3027 E. Madison Street · BALTIMORE · MARYLAND 21205
(410) 537-7300 · FAX (410) 333-0585 · TOLL FREE (877) 379-8636 · V/TTY (800) 735-2258 · www.dpscs.maryland.gov

8/11/15

STATE OF MARYLAND

LARRY HOGAN
GOVERNOR

BOYD K. RUTHERFORD
LT. GOVERNOR

STEPHEN T. MOYER
SECRETARY

WILLIAM G. STEWART
DEPUTY SECRETARY
ADMINISTRATION

WENDELL M. FRANCE
DEPUTY SECRETARY
OPERATIONS

RHEA L. HARRIS
ASSISTANT SECRETARY &
CHIEF OF STAFF

DAVID N. BEZANSON
ASSISTANT SECRETARY
CAPITAL PROGRAMS

JOSEPH CLOCKER
ACTING DIRECTOR OF
PAROLE AND PROBATION

Baltimore City Police
Southeast District
Baltimore MD 21224

Re: Monica Skarpac
CC # ███████

Dear Sir:

     Ms. Skarpac asked this writer to write a letter on her behalf. She was placed probation for one year on 8/1/14. She has satisfactorily completed that probation. Because she was not allowed to have any weapons in her possession while on probation she surrendered her weapons at the Southeast District. Those weapons were to be held by the police until she completed her probation. Ms. Skarpac is now requesting that her three hunting rifles and one handgun be returned to her.
It is this writer's understanding that Officer Robert Lance or a supervisor has to go to Evidence Control and sign off on paperwork saying it is OK to release the weapons to Ms. Skarpac. As indicated she satisfactorily completed her probation on 7/3/15.

    If you have any questions please feel free to contact this writer.

Sincerely yours

David Whitman

Senior Agent

Phone # ███████

111 N. Calvert St.
Balt. MD 21202

Case # ███████

23 February 2017

Monica Skarpac

████████████████████

Baltimore City States Attorney
Marilyn Mosby
120 E. Baltimore Street
Baltimore, MD 21202

Dear Ms. Mosby,

I was the victim of a ruse in-so-that my firearms would be removed from my possession. I have on several occasions attempted to retrieve my property from the Baltimore City Police Department, to no avail. I have been angrily asked to leave Central, commonly known as Headquarters, without anyone inspecting my paperwork. I did not receive help at the Southeastern District and was told by an officer: "I'm just a cog in the wheel". I have asked Councilman Jim Kraft to assist me. He did nothing on my behalf. I have written letters which were never answered.

There is **no legal reason** for the Baltimore City Police Department to **permanently deprive me of my property**. I am well aware of this statute, and I am seeking your help in resolving this matter before I have to contact an attorney. I do not wish to sue the City, but I will if I have to. Ms. Pratt has already paid out $12 million dollars because of police misconduct which Baltimore City cannot afford to do.

I am aware of the Consent Decree. It's about time that I get my property back without further delay. I will be leaving the area in the near future. If this is not resolved before my departure, returning my property to my mother, would be fine with me:

Marcella Skarpac



Please find a letter from Mr. Whitman regarding this matter.

Thank you.

Sincerely,

Monica Skarpac
Monica Skarpac

## Court invites comment on city police consent decree

U.S. District Judge James K. Bredar set a March 7 deadline for written comments from the public regarding the Baltimore police consent decree with the U.S. Department of Justice, according to an order filed Wednesday. Bredar's order also formally sets an April 6 date for a hearing at the U.S. District Courthouse on Lombard Street at which the public can offer commentary on the agreement. Comments must be limited to whether the agreement is "fair, adequate, and reasonable and is not illegal, the product of collusion, or against public interest," the order says. The city and the federal government struck an agreement last month on the consent decree, which will eventually lead to a court monitor overseeing reforms to the Police Department. Bredar's order directs anyone wishing to comment in writing on the consent decree to submit their comments by March 7 to baltimore.consent.decree@usdoj.gov, or hand-deliver or mail them to the U.S. Department of Justice's Civil Rights Division, Special Litigation Section, at 950 Pennsylvania Ave NW, Washington, DC 20530. Submissions should be no more than 10 pages. The public fairness hearing will be held at the U.S. District Courthouse on April 6 from 9:30 a.m. to 5 p.m.

*—Justin Fenton*

## Man fatally stabbed in East Baltimore corner store

Baltimore police are searching for a man they say fatally stabbed a co-worker in an East Baltimore store before fleeing the area Thursday afternoon. Officers were called to the 600 block of E. Eager St., across from the city jail complex, about 12:15 p.m. and found the victim suffering from stab wounds, police said. He was pronounced dead at the scene. Police believe both men were working on a construction project in the area when they got into an argument at the corner store, said Detective Jeremy Silbert, a police spokesman. Police did not identify the men, pending the notification of the victim's family and verification of the suspect's identity, Silbert said.

*—Kevin Rector*

## Baby giraffe born Feb. 6 at the Maryland Zoo

A giraffe was born Feb. 6 at the Maryland Zoo in Baltimore, the zoo announced Thursday. It's the first giraffe to be born at the zoo in more than 20 years, according to a news release. The female calf measured 6 feet, 1 inch, and was quickly standing on her legs. Zoo spokeswoman Jane Ballentine said a naming contest will be announced next week.

*—Ellen Fishel*

## 5 charged with murder in

17-year-olds have been charged with n the death of Damaris Reyes Rivas, 15. Po tified the adults as Jose Ivan Castillo Riv Wilmer A. Sanchez Serrano, 21.

*—Associated Press*

## Man gets 45 years in pr for fatally shooting tode

UPPER MARLBORO — A Maryland been sentenced to 45 years in prison fo shooting a 3-year-old girl in Landover Davon Wallace, 27, was sentenced Wedne Prince George's County state's attorney said. Wallace was found guilty in Nove second-degree murder in the death of Bibb. On Aug. 10, 2014, Wallace got into a ment with residents of the home where staying. He was beaten by the two men arguing with. He left, then returned, firing ple shots into the home, authorities said. the shots killed the child. Wallace testified had wanted to scare the people inside the l

*—Associated Press*

# LOTTERY

Yesterday's numbers and recent drawings.

**MARYLAND**

Day Daily 664   Pick 4 9986
Night Daily 136   Pick 4 7136
5 Card Cash 8♠ 10♠ 5♠ A♠ A♠
Bonus
Match 5 04 05 10 34 39/25
Multi-Match
Feb. 16 07 16 26 28 37 41

**DELAWARE**

Day Daily 888   Play 4 4445
Night Daily 895   Play 4 2978
Multi-Win
Feb. 15 02 07 11 20 27 33

**PENNSYLVANIA**

Day Pick 3 515   Pick 4 1451
Night Pick 3 272   Pick 4 2499
Treasure Hunt 19 20 25 27 30
Match 6,
Feb. 16 02 03 20 31 34 37
Cash 5 02 15 26 31 39

**DISTRICT OF COLUMN**

Day D.C. 3 199   D.C. 4
Night D.C. 3 107   D.C. 4
Day D.C. 5 3 0 0 6 9
Night D.C. 5 2 6 7 4 2

**MULTISTATE GAMES**

Mega Millions,
Feb. 14 07 11 33 60 98/15

Powerball,
Feb. 15 09 26 33 36 42/19
Cash4Life,
Feb. 16 08 12 19 42 35/4
MegaMillions: There was ner in Tuesday's drawi day's jackpot is an estim million.
Powerball: There was no in Wednesday's drawing urday's jackpot is an est $349 million.

## Maryland's news station

Coverage of the day's stories, breaking news and First Warning weather WJZ at 4 p.m., 5 p.m., 6 p.m. and 11 p.m.

39.  A. Skipwith

Dear Consent Decree committee,


Thank you so much for your willingness to listen to the people question the Department of Justice and BCPD consent decree. The consent decree gives the people in our community the opportunity to be heard on the law-violations that the police department has committed. It forces everyone under BCPD to give their ears, to listen to the crime that their fellow partners have endured. I appreciate your help in providing JUSTICE for the allegations that were made from citizens, that their civil rights have either been taken advantage of or violated. Thank you for interrogating the BCPD for the answers to questions like: Why is there a higher percentage of African Americans stopped more than any other race? Why are officers given orders to "clear corners" by stopping and arresting African American youth standing on sidewalks? Why are officers violating their civil rights? Also why are officers routinely arresting and using force against innocent citizens simply for exercising their First Amendment right, Freedom to Speak!! Strategies like "zero-tolerance" encourage officers to violate rights on a daily basis by stopping people for minor and insignificant reasons, causing BLACKS to be disproportionately targeted. For the reasons above and for the safety of my brothers, male cousins, uncles , etc. I urge you to continue to push to get the community heard, and fight for our rights to be given BACK, and RESPECTED. I urge you to continue hearing our story and telling it; being our road to our freedom FROM the BCPD. To help project our voices so loud that the future will hear, and these incident will never re-open. So that our black brothers can stand on a sidewalk without fear of being arrested. Or walk down the street without being forced to stop and get frisked. Will you actually listen or will our cry be heard in one ear and come out the other?

40. S. Tully

| From: | |
| --- | --- |
| **Sent:** | Thursday, February 16, 2017 12:47 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Consent decree |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Judge Bredar,

I am against the consent decree because I believe it is against the public interest. I believe it will hamper the police force and result in the general public being at a greater risk as incidents of crime will increase. The cure for some bad police will be worse than the actions of those same bad police.

Thank you.

Sean Tully



T-Mobile. America's First Nationwide 4G Network.

41. L. Van Order

**From:**          Lindsay Van Order <█████████████>
**Sent:**          Tuesday, March 07, 2017 1:02 PM
**To:**          Decree, Baltimore.Consent (CRT)
**Subject:**          Baltimore police department consent decree written testimony

**Follow Up Flag:**          Follow up
**Flag Status:**          Completed

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Lindsay Van Order

M.S. Pathology, 2017
University of Maryland, Baltimore

42.  A. White

| **From:** | Anthony S. White ll < ███████████████████ > |
| **Sent:** | Wednesday, March 08, 2017 7:09 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Input |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

I, Anthony S. White as a community member appreciates and value the opportunity to have input on the Consent Decree between the DOJ and Baltimore City Schools. There could be so much to say, and reflect upon with the 227 page consent decree. Yet, I would like to focus on the accountability of the monitor and the compliance review process which will determine rather the outcome assessments are done fairly. How will these individuals "monitors" be selected? It is my belief that all monitors should be selected by a community base independent board, that way to ensure the "trustworthiness" of the monitors ability to report information,  be it favorable accurately or (unfavorable) of the Baltimore Police Department behavior and methods as it relates to the respectability of the community. All reviews, data and assessments, should include community members in initial and all review board meetings.


*In The Highest Regards,*
*Anthony S. White II*

███████████████████████████████

43. D. Whyte

| | |
|---|---|
| **From:** | malika whyte < ▮▮▮▮▮▮▮▮▮ > |
| **Sent:** | Monday, March 06, 2017 5:36 PM |
| **To:** | Decree, Baltimore.Consent (CRT) |
| **Subject:** | Consent decree letter |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Dear Consent Decree Committee,

A consent decree is an agreement or settlement that resolves a dispute between two parties.I'm writing this letter because I feel as if the consent decree is good for our community. I feel like the police department is corrupted in so many ways. Police have so much power I feel as if most them know they can get away with things without facing any consequences. I don't believe all police are prejudice and or racist but I do believe most police officers targets the African American community out of fear which makes a lot of African Americans feel unsafe and unsure about the people who are suppose to protect them because the police take advantage of what the power they have. That's why I believe the consent decree protects our citizens.
African Americans have the right of freedom of speech, religion, speech, and press , the right of equal protection of the law. But then yet again African Americans don't have that when it comes to African Americans facing the police it's like those amendments don't apply it's like African Americans are treated like animals. 95% of African Americans were stopped by the BCPD over nine times. So my question is why that high number of African Americans are being pulled over? And why aren't a high number of white people are not being pulled over?
The consent decree will make new police officers go through training on how to treat Baltimore citizens and help stop racial profiling and tension between the Baltimore city police department and citizens of Baltimore and I believe it's a step in making a community safe again by starting with the people who are suppose to protect and  serve us.


     Sincerely,
     Diandra Whyte

44.  I. Wilson

Dear Consent Decree Committee,


Being a person who has experienced the misconduct of the BCPS, I feel like there is no real punishment for the misconduct of officers who mistreat and sometimes even kill the civilians of the city. When I discovered that the BCPs was found guilty of violating constitutional rights of civilians I was not at all surprised because as I was growing up in the city, I learned it was not an uncommon thing to be abused by the police. There has always been an aspect of race involved in encounters with the police. When I was young, my father would be stopped by police officers very often when driving and I myself inherited this burden. Especially in my freshman year of high school when I found myself being stopped by officers more often than I had in previous years. The solution to this problem does not lie in increasing funding. Every year Baltimore city school funding is cut. Teachers and resources are lost as a result. Body cameras were implemented in order to reduce police misconduct. Although this would be a solution to said misconduct it would not fix why it is happening. Police brutality occurs when an officer is faced with a situation he is not suited to deal with. This can include civilians using their constitutional rights or challenging the officer's' authority in any way. In closing I urge you to pass the consent decree so that officers of the BCPD will be cured of their discriminatory behaviors.


Thank you,


Isaac Wilson, Student at Frederick Douglass High School

45. T. Wilson

Taylor Wilson

3/6/2017

Intersection


Dear Consent Decree Committee,

Hello I am Taylor Wilson, I was born and raised in Cleveland, Ohio, When I first found out that I out that I was coming to Baltimore I had no idea what to think. I never watched the news or cared about anything that happened outside of Cleveland or Ohio so I decided to look it up on the computer. WHen I searched Baltimore on Google the first  thing that Google suggested to me were about police brutality,Baltimore city riots and missing people.It was completely different from the world I was living in. When I finally got here I was prepared to be homeschooled and not go outside at all. I am relieved to say that I have seen no such things myself here in Baltimore City.

 I am completely disappointed in the Baltimore city Police Department, as adults it is important for you all have to have the least bias as possible to complete your jobs. You enforce our laws but you can't abide by our 1st,4th and 14th amendments that does not make any sense to me. If you can not abide by our laws then you can't possibly be in charge of enforcing them. Those who are pulling over citizens because of your own selfish bias is inexcusable and needs to be corrected immediately in order for we the people to feel more secure in your hands. If you're thinking that this couldn't possibly any of my business because I was born in Cleveland you couldn't be possibly be more wrong, Baltimore is my future and my now and there would be a problem if I felt insecure in your hands.I am here right now and i am not looking down on any of you I am truly trying to help you all in fact. I am here on both the side or you and the people, If I tell you how to better yourself and you take advice from a youth like me then you can only get wiser.You might feel a little bit better knowing the unbiased youth perspective of your jobs because you all need to know that not everybody sees you all as villainous.

Someone who is really close to me is an officer and some of the things people forget when they encounter officers is that they are human. Humans who have feelings and mess up who makes mistakes so I understand that. Its different though when 95% of people stopped by BCPD over nine time where african american, that was no accident and should never occur again. It is gonna be very hard to abide by the Consent Decree because of its many tiny details and the fact that you're human but I fully support the Consent Decree . I am part of a youth leadership organization who is concerned about the well being and future of Baltimore city and we need to better all ourselves in order to make Baltimore city brighter for the future. In which case you all have to be on your A game to set the path for our future by protecting us and not harm us any longer. Thanks for you time.

Sincerely,

Taylor Wilson

46. B. Zadek

**From:** B Zadek
**To:** Decree, Baltimore.Consent (CRT)
**Subject:** Baltimore Police Department - Consent Decree
**Date:** Tuesday, March 07, 2017 5:45:09 PM

To whom it may concern:

I support the Baltimore Consent Decree and its central mission of implementing reforms in the Baltimore Police Department. As a citizen of Baltimore, I expect that the decree be finalized in full transparency, and as a priority of the DOJ and the city. I want to ensure that the team of monitors selected to oversee the reform process includes non-police persons who are familiar with the BPD policies and practices. I also want to ensure that representatives of the affected communities are on the review board. I am concerned by statements made by Jeff Sessions' on pulling back on consent decree processes in general, and on slowing or dropping civil rights abuse cases against police departments.

Sincerely,

Barbara Zadek

47. M. Zadek

| From: | miriam zadek < ██████████████ > |
|---|---|
| Sent: | Tuesday, March 07, 2017 7:04 PM |
| To: | Decree, Baltimore.Consent (CRT) |
| Subject: | Consent Degree. Baltimore |
| | |
| Follow Up Flag: | Follow up |
| Flag Status: | Flagged |

I am pleased that the consent decree will be utilized to further cement reforms re: the Baltimore Police Dept. and the citizenry of Baltimore. Mt expectation is that there will be full transparency and will be approached by relevant parties as a priority.The Review Board can function effectively if it represents also non police and members of the affected communities.
The ineffectiveness of the current Federal administration in addressing legitimate concerns of urban communities must not deter implementation of the Consent Decree.

Thank you for your consideration.

Miriam Zadek
████████████████████████