# EXHIBIT 1

*Investigations Chapter*
*Public Integrity Bureau*
*Internal Operations and Training Manual*
*15 November 2019*

## I.    INTRODUCTION

The Public Integrity Bureau (PIB) is responsible for the fair and consistent implementation of the disciplinary process throughout the Baltimore Police Department (BPD). Fundamental to this process is the investigation of all allegations of misconduct by BPD members.  In order for PIB to reinforce the Department's goals of constitutional, effective and respectful policing, PIB's investigations serve to ensure that all BPD members perform in a manner consistent with the expectations and policies of the Department, as well as local, state, and federal laws.

PIB has the following powers and authorities:

- PIB investigates all complaints of officer misconduct and coordinates with the Civilian Review Board (CRB) on all complaints within CRB jurisdiction that they are also investigating or reviewing,

- PIB oversees all investigations into allegations of misconduct that do not involve police-civilian interactions.

PIB's mission is to conduct fair, thorough, objective, and timely investigations of all allegations of potential officer misconduct.  In doing so, PIB investigators will treat all individuals with dignity and respect, and without preference or discrimination. All conclusions drawn throughout investigations are based on objective, unbiased, and independent information. PIB rigorously tests the accuracy and reliability of information from all sources and presents the facts and findings without regard to personal beliefs or concern for personal, professional or political consequences.  All investigative findings are based on the appropriate standard of proof, delineated within this manual.

### A. Confidentiality

1. Personnel assigned to PIB must maintain the highest degree of confidentiality concerning all matters related to PIB complaints, investigations and any other confidential or privileged information they glean from their official duties.

2. PIB personnel, other than the PIB Chief or designee, are prohibited from disclosing or confirming to anyone outside of PIB whether a complaint has been made or an investigation is being conducted, including the identity of complainants and named

and witness employees, unless required by PIB protocols or disclosure laws. This does not preclude required communication with complainants or other required disclosures per Departmental and PIB policies and procedures.

3. Complaint and investigative information must not be left unattended in areas accessible by non-PIB personnel. PIB personnel are required to sign an agreement regarding confidentiality and any private experts or BPD technical staff outside of PIB who are consulted must also sign a confidentiality agreement for each specific case for which they are consulted.

4. All media requests should be referred immediately to the Media Services Section (Public Information Officers).

**B. Investigative due diligence**

1. All investigations must be conducted in a thorough and consistent fashion. This means that investigators thoroughly explore and pursue all reasonable investigative leads.

2. For each case, the investigative checklist must be completed by the investigator fully. The investigator must mark with "Not Applicable" or "N/A" where the step does not apply to the case at hand. All investigative checklists will be reviewed for investigative due diligence.

3. Supervisors are responsible for providing regular supervision to address any omissions or deficiencies during the investigative process, and become accountable for any omissions once they approve the investigation and forward to the next level of review.

4. All administrative investigations must be completed to conclusion regardless of whether the member separates from employment with the agency and regardless of what happens to the complainant (e.g., whether complainant is participating or not, whether complainant is charged and goes to prison or not, whether the respondent resigns or retires, etc.).

5. Whenever an investigative deficiency or omission is identified, the investigator must address the issue and take action to address the investigative step of concern.

6. If at any time during the intake or investigation of the misconduct complaint the investigator finds evidence indicating potential criminal conduct by any BPD personnel, the investigator shall promptly notify their chain of command, via their direct supervisor. The PIB investigator shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation.

**C. Case Assignment**

1. The PIB Classification Supervisor will classify the case per the requirements of the PIB Classification Protocol, found at this link: https://www.baltimorepolice.org/0opr1-draft-opr-classification-protocol. Upon classifying a case, the PIB Classification Supervisor will make the preliminary assignment of a case to a primary investigator based on a rotation of which investigator is next up for case assignment.

2. Each PIB investigator will be paired with a partner investigator in their same investigative squad, allowing for a higher quality, timelier investigation. In general, detectives will be paired because they have complimentary skills, and/or one may have more investigative experience than the other. These pairings allow detectives to support each other throughout the investigation and consult with each other about investigative steps or procedures.

3. Both the primary and secondary investigator must fill out an IAS Recusal Form, Appendix A (described in the next section) within one working day of being assigned the case.

4. The investigators' sergeant and lieutenant must review and complete the recusal forms.

5. If upon reviewing the completed form, either the investigator, sergeant or lieutenant determines that a conflict exists for either the primary or secondary investigator, they will notify the Classification Supervisor, who will reassign the case to another investigator pair.

6. Upon reassigning the case to a new primary and secondary investigator, both newly assigned investigators must complete a recusal form on the case.

7. In cases where the investigator's sergeant or lieutenant has a conflict, they will notify the Classification Supervisor, who will reassign the case to a new investigator under a different supervisor or in a different investigative group (if the lieutenant has a conflict).

### a. Role of Primary and Secondary Investigator

1. The primary investigator is the investigator responsible for planning the investigative strategy, completing all of the necessary investigative steps and for recording all investigative work into the case file and IAPro.

2. The secondary investigator will generally assist the primary investigator with area canvasses and interviews. At times, the secondary investigator may also assist with brainstorming investigative strategy or with other needed tasks, depending on the particulars of the case.

3. Additionally, the use of a partner system will allow for the secondary investigator to take over in the event that the primary investigator becomes unavailable, whether

temporarily or permanently, since the secondary investigator will be familiar with the case already and can more easily take over where the primary left the case.

### D. Conflicts of Interest

1. BPD recognizes the negative impact of actual bias or perceived bias on the legitimacy of internal investigations. For that reason, conflicts of interest in misconduct investigations or in those assigned by BPD to recommend or make disciplinary decisions shall be prohibited. As such:

    1.1.  No employee who was involved in or a witness to an incident shall conduct or review a misconduct investigation arising out of that incident;

    1.2.  No employee who has a current or former external business relationship or a current or former close personal relationship with a respondent or witness in a misconduct investigation shall conduct or review the misconduct investigation. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any applicable grievance or appeal arising from any discipline. A close personal relationship includes a personal friendship, a romantic or familial relationship.

    1.3.  No employee shall be involved in an investigation or make any disciplinary decisions with respect to any person who they directly report to in their chain of command. In cases where BPD is unable to meet this requirement, the investigation must be referred to an outside authority. Any outside authority retained by BPD must possess the requisite background and level of experience of PIB investigators and must be free of any actual or perceived conflicts of interest;

2. PIB investigators will not be assigned to any assignments, to include secondary employment or detail assignments, which could create an actual or perceived conflict of interest for their administrative investigations, including any assignment in which the investigator would report to or work with the subject of an open investigation. To fulfill the above requirements, an investigator shall disclose the circumstances of any relationship with a BPD member accused in an investigation (via the IAS Recusal Form, see Appendix A) to ensure that the nature of the relationship could not be perceived to compromise the investigative process. An investigation shall be reassigned if any of the following conditions exist:

    2.1.  Family relationship;

    2.2.  Outside business relationship;

    2.3.  Romantic relationship (current or past);

    2.4.  Personal friendship; or

2.5.    Work relationship, including where the investigator would report to or work with the subject of the investigation.

3.    Additionally, if at any point during the investigation, the investigator thinks it will be difficult to maintain neutrality with any witness, complainant or respondent for any reason, or if specific concerns about a conflict of interest are raised by any person, **they shall document the issue in the case file,** consult with a PIB Sergeant and/or recuse themselves from the case.

4.  The primary investigator must ensure that all PIB investigation case files contain an accompanying recusal form executed by the investigator, sergeant and lieutenant and approved by PIB Command.

5.  PIB investigators and supervisors may be tasked with investigating and assessing the performance and credibility of individuals whom they have known and might have worked with in other capacities at BPD. They must listen closely to and treat with respect all persons who believe the police have mistreated them. Investigators must be aware that extra care needs to be taken to show the public that despite being peers of those against whom complaints are filed, all aspects of PIB's work will be conducted fairly and scrupulously. They should communicate with all participants in an investigation using the same degree of formality for everyone and should identify themselves as investigators within a section or unit of PIB.

### E.  Preparedness Expectations

1.  All investigators must be prepared with necessary equipment prior to leaving the office while on duty, most notably, the investigator must have their Departmental cell phone and their BPD-issued audio recorder.

2.  All investigators have a duty to report any malfunctioning or broken equipment to their supervisor, for example, video and audio recording equipment, printer/scanner, among others, in order for it to be promptly addressed.

### F.  CRB Considerations

1.  The PIB/CRB Protocol, found at this link: https://www.baltimorepolice.org/0oprcrb1-draft-oprcrb-protocol-intake-and-classification, mandates the requirements for the interactions between PIB and CRB as it pertains to cases where the CRB is conducting a parallel investigation for a CRB-eligible case.

2.  For cases where the CRB is conducting a parallel investigation, the primary case investigator must follow all obligations as set forth in the PIB/CRB Protocol.

3. Specifically:

    3.1.   The investigator has an on-going obligation to timely upload, document and alert CRB Liaison of all information, evidence and materials that are added to the file.

    3.2.   The investigator must be aware of and adhere to the 90 day case completion deadline for cases. If the investigator anticipates that a CRB-eligible case will require additional time, an extension request must be timely submitted to the CRB.

## II.    DEFINITIONS

**Field Contact** – An initial contact or contact during an area canvass with an individual, during which the investigator obtains basic information, determines if the person has relevant information to the case, and attempts to arrange a time for a formal interview.

**Field Investigative Interview** – A recorded statement (audio and video if possible; more likely to be audio recording) made by an individual encountered at the scene of an incident or during an area canvass.

**Formal Interview** – A pre-scheduled interview that must always be recorded (audio and video recording; only audio as last resort), except in the rare instance when a non-employee agrees to be interviewed but refuses to be recorded. Formal interviews occur in a controlled setting, such as an interview room at PIB or a controlled setting convenient to or preferred by the interviewee.

**Phone Interview** – A recorded interview over the phone, which may occur on the intake of the complaint, or when the interviewee does not wish to participate in an in-person interview.

**Phone Contact** – Any contact over the phone between an investigator and a complainant, witness or respondent. To the extent possible, phone contacts should be recorded on the PIB recorded line. In the event that a phone contact occurs on a cell phone and is unable to be transferred to the recorded line, the investigator must record the content of the call in the IAPro case file. Phone contacts generally entail garnering basic information, scheduling interviews, or case status updates, but should not include obtaining a statement by a complainant, witness or respondent.

## III.    PLANNING THE INVESTIGATION

The investigator assigned an internal investigations case should initially outline the case to determine the best investigative approach and identify those interviews immediately necessary.

### A.  Organize Investigative Packet

1. Create the physical file

1.1.    The investigator will maintain an organized physical case file to facilitate completing the case at the end of the investigation.

2.  The primary investigator must organize IAPro file and upload all materials received.

3.  The primary investigator must ensure that physical files and IAPro files contain all of the same materials. Therefore, all items in the physical file must be uploaded to the IAPro file and all uploads, tasks and investigative reports entered into IAPro must be printed and included in the physical file.

4.  The ultimate goal is that all PIB investigative files will be fully uploaded and maintained in IAPro, therefore making the physical file unnecessary. Until the point that BPD has the technological capacity to fully store all items seamlessly into IAPro, PIB will rely on the procedure outlined above requiring identical physical and IAPro files.

**B.  Planning the Investigation**

1.  The primary investigator shall review the complaint and all materials collected during the intake process, and will consult with the PIB staff member who conducted the intake to ensure that any perishable evidence has been collected, or to make it a priority to collect the evidence at that point.

2.  The investigator shall create an investigative plan (see Appendix L) to help focus and guide the investigation, and review it with their PIB Sergeant within 24 hours of being assigned the case.  The plan will provide an investigative strategy, identify witnesses and other potential sources of information, set out anticipated timelines for conducting the investigation, and help the investigator anticipate problems before they arise.

2.1.    If an immediate supervisor is not available to review the investigative plan, the investigator must meet with the next available permanent rank supervisor in the chain of command.

**C.  Key Segments of the Investigative Plan**

***a.  Allegations/Issues to be Investigated. To identify all allegations/issues, the primary investigator must do the following:***

1.  Check the complaint and the initial evidence gathered during intake, if available. Review the specific violations alleged for each named employee. Identify and review the BPD policies that apply to or are implicated by the allegations in the complaint.

2.  Review any public safety statements, which BPD employees are obligated to provide regarding a work-related incident or activity, including Use of Force Reports and incident reports.

2.1. Where any employee believes that there may be a Fifth Amendment or Garrity concern if they provide a verbal or written statement that they believe will be self-incriminating and refuses to do so, the employee will not be compelled to provide a statement, unless ordered to do so after PIB Command consults with the prosecuting attorney and receives approval by the Police Commissioner.

3. Review all statements by personnel in incident reports, arrest reports, use of force reports and similar documents and statements made in interviews such as those conducted in conjunction with BPD's routine use of force review process. Such statements are part of each employee's routine professional duties and are not compelled statements.

4. Include in the case file a copy of the BPD policies at issue, along with any related policies, regulations or statutes. If the alleged conduct occurred when a different policy was in effect, that version of the policy must be included. If the alleged conduct occurred over a longer period, include all relevant versions of the policy. Different requirements may have been in effect at different times. Contact the Best Practices Unit (formerly Written Directives) to obtain previous versions of policies by emailing BPU@baltimorepolice.org.

5. Include a photo of officer(s) involved from InPursuit RMS.

6. Identify the legal elements needed to sustain each allegation. Consult with Legal Affairs if any questions arise. Focus on identifying the specific actions, behaviors and words alleged by the complainant.

7. Do not limit the allegations to those explicitly named by the complainant. Complainants are not typically be familiar with BPD policies. They likely will not frame their complaint neatly within the language of BPD policies. Assess the totality of the facts as alleged to ensure that the employees named and allegations listed fully cover the potential misconduct alleged. Where, following the review, additional allegations or involved employees are identified, discuss with a PIB Sergeant and Lieutenant who will consult with the PIB Commander and the Classification Supervisor. Any changes to allegations attached to a complaint must follow the provisions outlined in the PIB Classification Protocol, found at this link: https://www.baltimorepolice.org/0opr1-draft-opr-classification-protocol.

b. *Identify Witnesses and Others with Relevant Information. To identify all witnesses/others, the primary investigator must do the following:*

1. Create a list of witnesses and others who might have relevant information include the complainant, named employee(s), witnesses to the incident, others with information about the incident, and subject matter experts.

2. The complainant likely was interviewed during intake, but consider whether to conduct a follow-up formal interview, particularly if the initial complaint statement was not done in-person. In general, PIB investigators must conduct a follow-up formal interview to ensure all key information is garnered, and to build trust in the process while assuring the complainant that there is activity in the case.

   2.1. Almost invariably, witnesses offering their account of an event will offer details that the complainant did not mention. In addition, subjects of an investigation typically offer a competing narrative that introduces new factual allegations. As a result, it is usually crucial to determine whether the complainant corroborates or disputes material allegations offered in these other narratives. Follow-up interviews are a key means of obtaining that information.

   2.2. Because follow-up interviews are so often critical, investigators should include in their investigative report a detailed explanation of any instance in which they did not conduct a follow-up interview. Additionally, investigators must keep track of the attempts made to locate and make contact with the complainant, and any offers of accommodating the complainant's needs and/or wishes.

3. Note contact information for each potential witness.

4. Identify issues about which each witness is likely to provide testimony.

5. Highlight discrepancies in the actions described, timelines, or otherwise, among witnesses or with other, tangible evidence; consider the physical scene and any special elements (e.g., sight-lines, points-of-view) that should be reviewed with witnesses; note the relationship of any witness to the complainant or the named employees.

6. Consider the order in which to interview witnesses and any special considerations, such as whether any parties are anticipated to be unavailable for any period of time, whether there is concern a witness might be less willing to participate if much time passes, or whether the witness requires any accommodations.

c. **Create an Evidence List. To identify all evidence, the primary investigator must do the following:**

   1. Create a perishable documentary/physical evidence list. *See Section IV(D)(b) below for a list of possible evidence.)* Investigators must prioritize obtaining perishable evidence first.

   2. Identify evidence that will be easier to gather and attempt to obtain that evidence promptly, while planning how to obtain other more complicated items. This permits the two-investigator team assigned to the case to work in parallel fashion to gather evidence more efficiently.

3. Follow policy requirements outlined in Policy 1401, *Control of Property and Evidence*, Policy 1017, *Mobile Device Searches*, Policy 1011, *Electronic Surveillance Procedures* (when applicable).

**d. *Chronologies and Timelines. To identify all timelines, the primary investigator must do the following:***

1. Set out an anticipated chronology for the investigation.
   1.1. Identify what tangible evidence must be collected or analyzed prior to each witness interview. [Identify the optimal sequence for interviewing witnesses]
   1.2. Is the investigation CRB-eligible, and would it require CRB-approval for any extension beyond 90 days?
   1.3. Make an objective estimate as to how long each step of the investigation will take and whether there could be any problem in meeting the investigation deadline.
   1.4. Consider whether holidays, training schedules, workload, or scheduled absences (for you or witnesses) will impact the investigation timeline.
   1.5. Consider the amount of time it will take to prepare the Investigative Summary Report and to organize the case file before forwarding it for review.
2. Develop a schedule for the investigation that includes all steps to be taken before it can be forwarded for review.
3. Keep in mind that there are several steps after you submit the case that must be completed within the allowable statutory and contractual timelines and that if the reviewers request additional investigation, it is preferable that the additional investigation happen before memories or evidence are negatively affected.

**e. *Special Considerations***

1. In making a plan and timeline for the investigation, investigators must consider whether the investigation involves or requires special considerations, and address the following questions:
   1.1. Is assistance from others in PIB necessary because the complaint is time-sensitive, because an unusually large number of witnesses are involved, or because the issues are novel or complex and an additional perspective would be useful? Keep in mind confidentiality and conflict of interest principles outlined above.
   1.2. Is assistance from outside PIB necessary, such as forensic video analysis?
   1.3. Is the complaint related to another PIB complaint or to any other BPD investigation, investigation by another agency, or litigation from which material evidence might be obtained?

1.4.   Does the named employee or complainant have other open PIB cases with which the investigator should be familiar and should discuss with the sergeant?

### f.   Review of the Investigation Plan

1.   The investigator may consult Legal Affairs while developing the Investigative Plan to get feedback on whether any additional information or investigative steps should be taken based on the attorney's review of the preliminary information and proposed investigative plan.

1.1.   For example, Legal Affairs may be consulted to ensure an understanding of the elements of the offense, the rules or regulations regarding the violation(s) they are investigating, and/or if they plan to conduct searches, subpoenas, or intrusive surveillance.

2.   The plan should be developed in conjunction with the investigator's supervisor.  The investigator must submit a draft investigative plan to their supervisor within 24 hours of being assigned the case to ensure that the supervisor is aware of the plan and assists in identifying any areas of improvement in the plan.  The supervisor must review and approve the plan, or return the plan to the investigator for revision, within 24 hours.

### g.   Time Limitations on Administrative Investigations

1.   Administrative investigations must be completed within 90 days from the date of the complaint.  This requirement is mandated by BPD as well as the law governing the CRB's authority. As such:

1.1.   Any request for an extension of time must be approved in writing by the Deputy Commissioner of PIB, and

1.2.   For CRB-eligible investigation, a request for an extension must also be made to the Civilian Review Board. The CRB may grant an extension based on a show of good cause.

### IV.   CONDUCTING THE ADMINISTRATIVE INVESTIGATION

Complaints must be professionally, objectively and expeditiously investigated in order to gather all information necessary to arrive at a proper disposition. It is important to document concerns from members of the public, even those that appear to be unfounded or frivolous. If such complaints are not documented or handled appropriately, public dissatisfaction will grow, fostering a general impression of agency insensitivity to community concerns.

When conducting an internal misconduct investigation, the investigator shall interview the complainant, all witnesses and the respondent officer, as well as retrieve and review all relevant

reports, documents and other data and all video or audio recordings, including local surveillance videos (private and public), social media video, private persons' video footage, and BWC footage. Investigators should respond to the scene, take photographs and identify potential witnesses and evidence through an area canvas, when appropriate.

Only after a thorough and impartial investigation can an informed decision be made as to a complaint's proper disposition. Decisions based upon such an investigation will support the credibility of the department both among its ranks and the public at large.

## A. Investigative Checklist

1. **Investigators must use the Initial and 30-Day investigative checklists to ensure that investigations are thorough and objective. (See Appendix B)**

2. The primary investigator assigned to any case is responsible for ensuring the investigation follows the investigative steps in the investigative checklists (see Appendix B), and documents that the steps were taken.

3. Investigators shall not wait for their initial supervisor meeting to conduct any preliminary investigative steps on the checklist that require immediate attention due to their potential perishability.   However, in all cases where collection of perishable evidence presents legal concerns (e.g., concerns about legality of collection or cases involving potential criminal conduct by BPD members), investigators must consult with a supervisor or, if directed, with Legal Affairs or the concerned prosecuting agency, as applicable.

4. The investigative checklists [Appendix B] are useful, but it is merely a tool to help the primary investigator build the investigative plan that fits the allegations and facts of the assigned case. To conduct a thorough investigation, the investigator must follow the evidence and any investigative leads that arise for each investigation. Therefore, though it is the expectation that the investigator considers each step detailed on the checklists, some steps will not apply to a given case and should be marked "N/A."   In addition, some cases will require investigative steps that are not mentioned on the checklist, but nonetheless belong in the investigative plan.

   4.1. If the investigator is unsure about possible investigative steps or course of action, they shall consult their direct supervisor on the matter.

   4.2. During the course of an investigation the primary investigator should re-review the checklists to ascertain whether items previously marked "N/A" are now pertinent in light of evidence or allegations that emerged later on.

**B.  Procedures for Identifying and Contacting Complainants, Witnesses and Accused**

It is generally recommended that the complainant, and all witnesses (whether civilian or sworn) be interviewed as soon as practicable.

The general preference is that all communications and interviews with complainants and witnesses are recorded (preferably video and audio, but at least audio). There may be times, though, when it is not practical or the person objects to being recorded. The investigator must use their discretion around the feasibility of recording, with a priority of obtaining information. Investigators must consider whether it will be a challenge to obtain the information later. In all instances where the investigator is unable to record, after the conversation, the investigator must document what was said, and why recording of the conversation was not feasible.

*a.  Initial Complainant Contact*

1. Procedures and guidelines for contacting the complainant apply for both internal and external complainants.
2. The complainant should be personally initially interviewed if circumstances permit. All reasonable steps must be taken to locate and interview in-person all complainants at a time and place that is convenient for them. If the complainant cannot travel to the investigator's office, or if it is not convenient for them to do so, the investigator should conduct the interview at the complainant's home or place of employment if feasible. If not, a recorded phone interview may be conducted. All relevant identifying information concerning the complainant should be obtained, e.g., name, complete address, telephone numbers and area codes, race or ethnic identity, sex, date of birth, place of employment, and place of employment (name and address). All relevant facts known to the complainant should be obtained during the interview. An effort should be made to obtain a recorded statement from the complainant at the initial interview.
3. If the person making the complaint (or a witness) has been arrested or is also facing investigation involving a criminal charge related to the same transaction or occurrence as the PIB case, the investigator should nonetheless seek an initial recorded interview.
   3.1.  If the person has not been charged yet, they must be advised of the Fifth Amendment privilege against self-incrimination (consult legal affairs with any questions).
   3.2.  If criminal charges related to the same transaction or occurrence have been filed, the very first question that the investigator must as them is whether they have an attorney.

3.2.1. If the person states that they do have an attorney, the investigator must contact the attorney to discuss the possibility of the complainant participating in a formal interview.

3.2.2. If the person does not have an attorney, the investigator must contact the public defender and determine if they are representing the person. If yes, the investigator must arrange an interview through the public defender.

3.2.3. If an attorney cannot be identified and the person is facing criminal charges, under no circumstances should an interview be conducted without counsel present. Such an interview may violate the person's Sixth Amendment right to counsel.

3.2.4. If the person is facing criminal charges related to an event that is completely different than the event they are claiming involved the misconduct, they can be interviewed about the event that is not related to the criminal charges, and the criminal charges should not be discussed.

4. As with all contacts or attempts to contact anyone regarding a specific case, the investigator must promptly document all calls, call attempts, voicemails left, letters sent, texts, and emails sent in the case file. The investigator must describe the reason for the communication and summarize any communications that resulted.

### b. *Procedures for Contacting and Arranging an Interview of the Complainant*

1. Upon receipt of each new case for administrative investigation, the assigned investigator shall reach out to the complainant by telephone (recorded line when available) within one business day of being assigned the case. The investigator shall leave a message if there is no answer. This call will serve as an opportunity for the investigator to introduce themselves and schedule a time and place convenient and accessible for the complainant to be interviewed. If convenient and accessible for the complainant, preferred practice is to conduct the interview in the controlled setting of PIB. If the complainant is not willing to come to PIB but is otherwise willing to participate, the investigator must conduct the interview at a time and place that is acceptable to the complainant.

2. The initial call to the complainant shall also serve as an opportunity to ask the complainant about the existence of electronic or media evidence such as texts, photographs, video or other recording of the incident.

2.1. Many forms of electronic evidence (e.g. items posted online or store security video) require rapid collection and thus should be identified at the earliest opportunity.

2.2.    The investigator should request for the complainant to preserve any tangible or electronic evidence, such as text messages, photographs or recordings. (Preservation of source material is important even if the complainant has forwarded copies.)

2.3.    It is important for the complainant to bring to their first interview any such evidence they possess – even if they have previously provided copies via email or other means.  If the interview is at the complainant's home or workplace, the investigator should inquire about the original evidence.  Viewing the material from its original source will enable the investigator to identify issues of authentication, forensic analysis/preservation, etc.

3.  This initial call also serves as an opportunity to explain the investigative process to the complainant.  A brief overview helps dispel any inaccurate assumptions, address any fears of retaliation, and develop rapport that will prove helpful in the interview process.

3.1.    This overview should include advising the complainant that retaliation against them is prohibited and they should immediately report any instances of retaliation to the investigator.

4.  Additionally, the investigator must compose and mail a letter via regular mail within 5 business days of case assignment, in order to introduce themselves and schedule a time for the complainant to come into the office for a recorded interview (see Appendix C).  If the investigator and complainant have already scheduled an interview during the initial phone call, the letter must confirm the date/time/location agreed upon during the call. If the investigator has an email address for the complainant, they may send an email containing the same information instead of the letter.

5.  If the investigator does not receive contact by the complainant within 10 days of sending the letter, the investigator must re-send the letter by mail as a certified letter. Likewise, if no response to an initial email is received within 10 days, the investigator must send a certified letter by mail.

6.  If the investigator calls the person and the number is no longer in service, the investigator must do the following to identify another valid phone number: search in databases like LINX, BPD Navigator, In Pursuit, MVA database, or conduct an internet search.

7.  All reasonable steps must be taken to locate and interview in-person all complainants at a time and place that is convenient for them.

### c.  Procedures for When the Complainant Does Not Wish to Participate

In an effort to ensure integrity of the Department and the complaint process, along with securing the trust of the members of the Department and the citizens and residents of Baltimore City, PIB

investigators will thoroughly investigate all allegations whether or not the complainant is participating in the investigation. In this regard, anonymous complaints will be provided with the same level of scrutiny to verify the allegations as provided to complaints with a named complainant.

1. If the investigator is unable to make contact with the complainant, the investigator shall make reasonable steps to make contact such as:
   1.1. Attempt to call at three different times from a recorded line – in the morning, in the afternoon, and before investigator's tour ends. Leave a message if no answer. The investigator shall note in the file the date/time/recorded line they called from. Additionally, the investigator shall pull the audio from each attempt and/or successful call and upload the audio file to the IAPro case file.
   1.2. Additionally, if the investigator does not successfully contact the complainant through the first two calls, after making the second call the investigator must also send a text message to any cell phone number provided to request a callback from the complainant.
   1.3. When the investigator is not able to successfully contact the complainant by call or text, the investigator shall visit the complainant's home or another known location where the complainant may be in order to interview the complainant.  If no answer at the home or other location, the investigator will leave a contact card;
   1.4. If no response, the investigator should check for an alternative address via law enforcement available databases, the inmate locator database, or public information.
2. If at any point the complainant indicates that they do not want to receive further contact from PIB regarding their complaint, the member receiving this information shall attempt to record this request with an audio and video recording. After receiving such a request, the BPD member receiving this information must include this information in the IAPro case file, noting specifically what the complainant stated. The BPD member who receives this information from the complainant shall inform the complainant that the complaint will still be investigated as thoroughly as possible, even if the complainant no longer wishes to participate.  At no point will an investigator suggest to the complainant that they may make such a request.
3. After receiving an explicit request from a complainant to no longer be contacted by PIB, the investigator shall not contact the complainant further, but shall continue to follow all investigative procedures set forth in this manual, to include those covered on the Investigative Checklist.  The investigator is responsible for making diligent efforts to gather evidence to verify the allegation(s), even without further

participation by the Complainant. Such diligent efforts shall include attempts to locate witnesses, surveillance, reports, documents and other relevant evidence.

4. The investigator must ensure that the reason stated for the recommended finding is based on the evidence collected and <u>not</u> the fact that the complainant is uncooperative.

5. If a Complainant expresses their desire to withdraw a Complaint, they may complete a Request to Withdraw Complaint Form (See Appendix D). A Complainant may choose to formally withdraw, but BPD shall not stop an investigation based on the Complainant's desire to withdraw.

   5.1.  Upon receiving the Complainant's Request to Withdraw Complaint Form, the investigator assigned to the case shall audio and/or video record the interview with the Complainant in which they shall be asked to explain the reason(s) for the request to withdraw. This audio and/or video recording and the completed withdrawal form shall be made a part of the investigation which must continue, utilizing what information has already been provided by the Complainant and any witness. The investigation must be concluded with a proper disposition. The disposition of "WITHDRAWN" is not utilized by BPD.

6. If a Complainant withdraws their Complaint, and subsequently refuses to participate in a recorded interview, or refuses to assert their withdrawal in writing, the assigned investigator must memorialize the withdrawal in writing, clearly stating, when and how the withdrawal was communicated and any witnesses to the withdrawal.

7. If the complainant at any point says that they no longer want to participate, the investigator must tell them that they can always call at a later date if they change their mind to find out the status of the investigation and/or to participate.

   7.1.  Advise complainant that PIB will still send them an outcome letter at the end of the investigation.

   7.2.  If complainant says they do not want to receive an outcome letter, the investigator will inform the person that they will make note of this request in the case file.

### d.  Procedures for Continued Communication with the Complainant

Throughout the investigation, the investigator serves as the point of contact with the complainant.

1. The investigator must make all calls to complainants on a recorded line and must document every conversation with a complainant as soon as possible.  When the complainant prefers to communicate by text message, the investigator shall attempt contacts with the complainant by text message via their departmental cell phone.  The

investigator will retain the text message communications by screenshot in the investigative file.

2. In the event that the investigator receives a call on their cell phone when they are unable to record the call, the investigator must do the following:

   2.1. If the complainant is calling to have a conversation that does not involve discussing the facts of the incident (for example, they are calling back to schedule an interview or to ask about the status of the investigation), the investigator should take the call and then document what was discussed as soon as they return to the office.

   2.2. If the complainant is calling to discuss facts of the incident, the investigator should try to either schedule an in-person interview or ask the person if they can call them back upon having a recorded line (or audio recorder available).

   2.3. If the complainant does not want to wait, or if there is a likelihood that by not having the conversation at that moment, the information will be lost, the investigator must conduct a phone interview and document the content of the call as soon as possible after the call has ended. It is best for the investigator to write down notes during or immediately after the call in order to preserve as much information as possible. The investigator must complete an investigative report with the information from the statement as soon as possible, but no longer than 48 hours after the phone interview.

3. The investigator must send periodic updates to the complainant by mail and by email (if the complainant provides an email address) as described below.

4. Within five business days of receipt of a complaint, the investigator will send non-anonymous complainants written notice of receipt (See page 15 and Appendix C).

   4.1. This letter shall include the CC# originally assigned to the complaint, along with all other case numbers (e.g., IA number, CRB number if applicable) assigned to the case.

   4.2. This letter shall state how the complainant may ask about the status of the complaint.

   4.3. This letter shall not include any language that could be reasonably construed as discouraging participation in the investigation, such as warning against providing false statements or a deadline by which the complainant must contact the investigator.

5. 30 days after receipt of the complaint, the investigator will contact the complainant by written letter (See Appendix E) and by email (if available) to inform them of the status of the investigation.

6. In the course of investigating a civilian complaint, the investigator will send written updates to the complainant at least every 30 days by mail and by email (if available).

Communication with the complainant every 30 days is the minimum requirement. Investigators may find it helpful or necessary to maintain more frequent contact with a complainant.

7. Investigators must be responsive to calls and requests by the complainant. If the specific request by the complainant is not possible or permissible (*e.g.*, the information requested does not exist or the information is protected by law), the investigator must inform the complainant as to why the information is not being provided. The investigator cannot simply ignore the request by the complainant.

   7.1. Information protected by law that cannot be shared with a complainant includes:

      7.1.1. Personnel records

      7.1.2. Juvenile arrest records

      7.1.3. Medical records for someone other than the complainant

8. Additionally, an investigator cannot disclose any information that would jeopardize the integrity of an investigation and/or an administrative or criminal trial. If the complainant requests such information, the investigator shall explain that they are unable to provide that information in order to protect the investigation and/or potential trial.

9. All investigators shall communicate with complainants in a professional and respectful manner. Investigators who fail to do so shall be subject to discipline, demotion, and/or appropriate corrective action based on the seriousness of the conduct per Policy 302, *Rules and Regulations*.

### e. Procedures for Identifying the Accused Officer

1. In many instances the accused officer will be readily identifiable from the Complaint or named by the complainant.

2. In instances where the accused officer is not named, and is not readily identified through KGA, BWC, incident reports or charging documents, other officers, supervisors, or witnesses, the investigator must make all reasonable efforts to identify the officer if the complainant could not identify the officer's name

3. These efforts shall include:

   3.1. Reviewing or requesting information about officer's description

   3.2. Using incident time, location, type, complainant information, any other applicable factors to attempt to identify the implicated officer. This could involve:

      3.2.1. Reviewing the KGA

      3.2.2. Looking for body-worn camera footage from approximate date/time/location.

      3.2.3.   Reviewing CAD

      3.2.4.   Going to the schedule and the run sheets from that particular district or unit to determine who was working that day.

      3.2.5.   Talking to supervisors from that particular district or unit.

      3.2.6.   Utilizing any GPS data available.

      3.2.7.   Contacting Citiwatch and/or businesses in the area to see if cameras perhaps captured the accused officer.

      3.2.8.   When all of the above avenues have been exhausted, conducting a photo array with the complainant and/or witnesses per Policy 1009, *Double-Blind Sequential Photographic Array Procedures.*

4. The primary investigator may request that the complainant or other witnesses identify otherwise-unknown persons depicted in BWC or other pertinent video footage obtained during the investigation.

   4.1.   If the person has already seen the video, the investigator may do so by showing the person the video.

   4.2.   If the person has not already seen the video, the investigator should show a still photo of a frame in the video, but not expose the complainant or witness to a video that they have not yet viewed.

5. If none of the above turns up the person, the investigator shall discuss the issue with their supervisor for other possible strategies to identify the accused member.

### f. *Identifying and Contacting Witnesses – Non-BPD Affiliated and BPD Employees*

1. The primary investigator must use all information gathered in the investigation to identify all witnesses to the incident, and ensure that they are added to the witness list created during the Investigative Planning Stage, Section III(C)(b) above.

2. The investigators should conduct area canvas, talk to post officers, conduct search of nicknames in BPD databases (for example, In Pursuit, BPD Navigator, Lotus Notes, LINX, etc.).

3. Identification of persons anonymously claiming to be witnesses in social media posts or online comments to news articles may present special challenges. Nonetheless, the witness list should include any online pseudonyms of persons claiming to be witnesses and updated once those persons are positively identified.

4. The investigator shall contact every witness identified either in the complaint or by the complainant or other witnesses (via recorded line, whenever possible). When the investigator successfully makes contact with any witness, this presents an opportunity to confirm the person's contact information, schedule an in-person interview, ask about the identities of any other potential witnesses, and/or learn about any facts or evidence that the witness would like to share.

5. Written communications to witnesses should be limited to logistical matters, such as obtaining contact information or setting up the time for a recorded interview. Written communications regarding substantive matters (*e.g.*, sending an e-mail message to witnesses that ask them to provide a written account of what they saw) deprive the investigator of the ability to obtain spontaneous statements, to evaluate witnesses' demeanor, and to test responses with immediate follow-up questions. If a complainant or witness is only willing to communicate with PIB in writing (e.g., via text message or social media platform), then the investigator must consult with their supervisor, but in such a case an exception to the above may need to be applied.

6. It is always preferable to conduct an in-person interview, as long as the witness agrees to be interviewed. When contacting complainants and witnesses, find out about their availability. (e.g., Do they have upcoming vacations? What is their work schedule so you know when to contact them and when may be a convenient time to arrange an interview?)

7. If the witness refuses an in-person interview but is willing to undergo an interview over the phone, the investigator must conduct a recorded phone interview at a time that is convenient for the witness.

   7.1. The investigator must notify the person that the call is being recorded and if the person does not refuse, the recording shall continue.

   7.2. Confirm during the recorded interview that the witness had declined or was unable to appear in person.

   7.3. Use the recorded interview (i) to confirm there were no prior, unrecorded interviews by the investigator (*e.g.*, "We haven't spoken about this incident before, correct") and (ii) to memorialize any prior, unrecorded statements made by the witness (*e.g.*, "When I called you yesterday to schedule this interview, you said something about the incident. Could you repeat that so I have a clear record of it?")

8. The investigator shall discuss with each witness any evidence that they may possess or may be aware of to assist in progressing the investigation. If the witness possesses evidence, discuss evidence preservation and how to provide it to the investigator (same as guidance under Section IV(B)(b)(2) above.

9. The investigator must ensure all evidence and its origin are documented in the investigative file with an administrative report.

10. The investigator must take all reasonable steps to locate and interview in-person all witnesses at a time and place that is convenient for them.

11. All efforts to contact non-BPD witnesses should be noted in in IAPro in a Task or in an Investigative Report. Sustained and reasonable efforts must be made to contact these individuals and complete interviews. All available means of contacting these

individuals shall be attempted, including but not limited to attempting to locate them in person, calling them texting them, and or contacting them through social media if necessary.

**C. Procedures for Formal Interviews**

*a. Types of Interviews*

1. A **formal interview** refers to a planned interview that occurs in a controlled environment. This interview is conducted by an investigator, and its purpose is to get an official recorded account from the complainant, a witness (whether civilian or sworn), or the respondent officer, about the incident in question. Often, this interview occurs at the PIB office, though it may occur at another place preferred by the interviewee. If the interviewee refuses to be recorded, the priority should be to obtain the information and write an investigative report immediately following the formal interview.

2. A **field investigative interview** may occur when an individual is identified at the scene of an incident, or during an area canvass at some time after the incident. Though it is preferred by PIB that any involved person or witness provides their statement in a controlled setting, whether the PIB office or elsewhere, there are times when the interviewee will either refuse to be interviewed in such a controlled setting, or where the investigator understands that getting the person's statement at the time may be critical (e.g., there's a risk of losing contact with the person later). As such, there may be less time to prepare for a field investigative interview, but the below guidelines should apply to the extent possible. All field investigative interviews must be recorded with at least an audio recorder, and should be conducted in a quiet/controlled environment to the extent possible (e.g., in the investigator's car, in a quieter area of the street, in a person's home, in order to obtain the recorded statement. All PIB investigators must bring their BPD-issued audio recorder with them when responding to a scene and when conducting an area canvass. In the rare instance where a member's audio recorder is unavailable, they may use their BPD-issued cell phone to record the interview. If the interviewee refuses to be recorded, the priority should be to obtain the information and write an investigative report immediately following the formal interview.

3. There may be times where a complainant or witness calls the investigator on the telephone. In general, phone conversations are not considered formal interviews or field investigative interviews, and therefore should not be used to get facts of the case or the person's account of the incident. In such cases where the person would like to give facts of the case over the phone (a **phone interview**), the investigator should ensure the call occurs over the PIB recorded line. Therefore, if the person reaches the

investigator on their cell phone at a time that the person is not at their desk, the investigator should schedule a time to call the person back on the PIB recorded line. Where the individual does not wish to participate in an in-person interview but is willing to speak over the phone, the investigator should follow the below guidelines to the extent that they can apply to an over the phone interview. At the start of a phone interview, the investigator should inform the person that the conversation is being recorded. If the person refuses to be recorded, the investigator should document the refusal, take thorough notes and prepare a narrative summary for inclusion into IAPro and the investigative file, in accordance with Section (IV)(C)(b)(iii)(4.3.).

### b. *General Guidelines for All Interviews*

1. Every effort must be made to conduct a formal interview all individuals in-person. BPD employees must be interviewed in-person. For circumstances where non-BPD complainants or witnesses cannot or decline to be interviewed in-person, the reason must be explained in sufficient detail in IAPro.

2. Interviews should be scheduled to allow time for preparation by the investigator and to provide sufficient notice to the person being interviewed.

3. The investigator shall take audio and video recorded statements from every witness, unless in the field, in which case a BPD-issued digital audio recorder should be used to record the statement. If a witness who is not a BPD employee objects to the statement being recorded, specifically document the objection.

4. The investigator shall conduct due diligence on all persons to be interviewed by reviewing all available background information, to include a database review for addresses, contact information, employment information, criminal history, open warrants, or other BOLOs for the individual. This does not include a review of financial records or immigration status.

5. The order of interviews will be guided by the specific nature of the complaint, the anticipated testimony of each person being interviewed, and other tactical considerations, though special circumstances may dictate when an interview can or should take place. Individuals who are being interviewed who are expected to be uncooperative are sometimes best interviewed last, allowing the investigator to gather evidence from other sources and to develop specific questions, rather than relying on that individual to offer information. Generally, interviews should be conducted in the following order:

   5.1. Complainant (interview as soon as possible)

   5.2. Individual affected by the misconduct (if not the complainant)

   5.3. Non-BPD witnesses

    5.4.     BPD employee witnesses

    5.5.     Respondent employee

6. The investigator shall conduct a follow-up interview of the complainant when appropriate or if necessary (for instance, if additional questions need to be asked). It may be necessary to conduct a follow-up interview with one or more witnesses as a way to corroborate and/or test new factual claims that emerge during the course of interviews.

7. All adult interviewees – whether witness, complainant, respondent or witness officer – shall be interviewed separately and individually. Interviewees may have their counsel present with them, if requested. If the person requires an accommodation, see paragraph 8 in Section (IV)(C)(b)(ii) below for accommodations. In the exceptional circumstance where a person cannot or will not be interviewed without the presence of a specific support person, do the following:

    7.1.     Interview the support person first to ask their knowledge of the incident at hand and find out if they were a witness;

    7.2.     Then, during the interview with the other complainant or witness, state on the recording that the support person was previously interviewed by the investigator, that their presence in this interview is only that of a support person, and ask that they please do not suggest any answers being asked of the complainant or witness.

8. For youth interviewees, parental permission is required to conduct the interview. Parents also have a right to be present during the interview. When considering interviewing a minor witness or complainant, consult with your supervisor to determine the best course of action. There may be times where it is appropriate to have the Baltimore Child Abuse Center or another provider specializing in working with children as the interviewers of the minor, or where otherwise appropriate (consult your supervisor).

9. For witnesses not employed by BPD, including the complainant, interviews should be scheduled at the time and place most convenient for the interviewee, while avoiding unnecessary delays to the investigation.

10. If a witness is difficult to locate, an investigator should consult with a PIB Sergeant about strategies to use to locate the witness.

    10.1.    If the witness is not returning phone calls or text messages, attempt to call them from a recorded line three (3) times during the same shift – in the morning, in the afternoon, and before the investigator's tour ends. Leave a message if no answer.

    10.2.    Additionally, if the investigator does not successfully contact the witness through the first two calls, after making the second call the investigator must

also send a text message to any cell phone number provided to request a callback from the witness.

10.3.  Visit the witness's home or workplace to establish contact, if necessary. Whenever the investigator has gone to a location to locate a witness and did not find that person, the investigator must leave a card with their contact information.

10.4.  Attempt to contact the witness via social media, if you have the person's social media identifiers. No BPD member shall use a personal social media account for such communications. Communication with complainants or witnesses through social media may only be done through a BPD-approved social media account and with supervisory approval.

10.5.  As a final step, a letter and an email should be sent asking for contact.

10.6.  The investigator must specifically document in IAPro as a Task any and all efforts taken to reach the witnesses. Upload audio recordings of calls and call attempts into IAPro file. List dates, times, name of investigator(s), locations, etc. of all attempted attempts to call, door knocks, or other attempts to contact.  Include copies of any written correspondence.

11. Two investigators will attend all formal and field investigative interviews conducted, whenever practicable. Nevertheless, obtaining the information should always outweigh the need for two investigators.

11.1.  Generally speaking, the two investigators attending the interview will divide their duties as described below.

11.1.1. The primary investigator is generally the person to lead the interview, ask the questions, and steer where the interview is going. They must listen carefully to the interviewee's answers to ask appropriate follow up questions and ensure all relevant information has been elicited from the interviewee.

11.1.2. The secondary investigator detective is present to assist the primary by listening to the interview, and help ensure all relevant information is gathered. The secondary investigator may interject questions. The secondary investigator's role in the interview is also to serve as a witnessing member in the event that the primary investigator becomes unavailable at a later time. This model may be modified given the specific circumstances of each case and interview.

11.2.  If another investigator has a related case, meaning another case that involves some or all of the same complainants or witnesses, that investigator should serve as the secondary interviewer for the sake of efficiency. The primary investigator on the case takes the lead to set the strategy prior to the

interview, control the flow of the interview, ask most of the questions, take brief notes, and operate the recorder. Note that even if two investigators with related cases support each other in the interview, each interview must be planned and conducted separately.

12. If the complainant declines to be interviewed in person or over the phone, try to gather the necessary information from them by email or text.  Note – Generally substantive conversations with complainants and witnesses via email or text should be avoided.  This should be a last resort after several attempts at in-person or telephonic cooperation, or in circumstance where the individual has made clear that it is the only manner in which they are willing to communicate.

i.   <u>Location of interviews</u>

1. Interviews of BPD employees generally will take place at the PIB office.
2. Witnesses not employed by BPD should be interviewed at a time and place that is convenient and accessible for them (if they agree to be interviewed).  Generally speaking, it is preferable for the interview to occur in the controlled setting of the PIB office, so long as the witness agrees that it is a convenient and accessible location for them.  On occasion, it may be preferable to interview witnesses as well at the location of an incident so that they may identify points of view (POVs), sight lines, and the like.  In such cases, the investigator should seek to video record any walk-throughs conducted and take POV photographs when practicable.
3. When the witness determines that it is most convenient and accessible for them to be interviewed in a location other than PIB, the investigator must ensure the location is private, no one else is present, environmental distractions are eliminated, (e.g., radio, television), and the interview is recorded  audio recording on BPD recording device, at a minimum).

ii.   <u>Preparing for the Interview</u>

1. The investigator shall review the Investigative Plan to determine the interview objectives and the issues to be addressed with the individual to be interviewed. The investigator shall refer to the interview template as the guide while preparing for the interview (See Appendix F).
2. The investigator shall consider whether there are documents, BWC video, photos or other evidence about which you want to show and question the interviewee.
3. The investigator shall consider using photographs of the scene or diagrams in order to assist the interviewee with identifying where certain people were located, the relative positioning of people and things, and events that took place.

     3.1.    For easy reference, the investigator shall bring extra copies of diagrams or maps to the interview so that the witness is able to draw or makes notes on them during the interview.

4.   The investigator shall prepare an outline of topics and subtopics to be covered with the interviewee.

5.   The investigator may want to show witnesses evidence captured on video. In most circumstances where video is to be shown, video review should be conducted at the end of an interview, after a witness's uncontaminated full recollection has been exhausted by careful questioning. Video-related preparation includes deciding which video footage to show, and/or which excerpts to show. Investigators should also consider whether video review with a witness should be postponed for a planned follow-up interview.

     5.1.    The investigator must determine whether to show video, must plan on what video footage to show and how they want to show it (e.g., on a computer monitor or a large television monitor where the recording equipment picks up what is seen on the video as well as the witness who is pointing things out or narrating what is being viewed).

     5.2.    There may be times where it is helpful to have the witness walk the investigator through what happened with the aid of video.

     5.3.    There may be times where video can be used to confront inconsistencies.

     5.4.    When using video, the investigator must ensure that the person authenticates the video, by asking, for example "Is that you?" and having the witness confirm.

     5.5.    If the video does not have audio, the investigator should be prepared to ask what was said at certain moments in the video.

     5.6.    Supervisors should play an active role in assisting the investigators for planning the use of video in interviews.

     5.7.    The decision to show video footage, and how to show video footage, shall not depend on whether the interviewee is a BPD member or a member of the public. The criteria used to decide whether and how to use video should be applied equally to both populations of interviewees.

6.   The investigator shall consult with their supervisor prior to conducting any significant or complex interviews to discuss the plan and the appropriate strategies for conducting the interview given the case's complexity, the interviewee's potential knowledge, the existence of other evidence and how it may be used in the interview if appropriate, etc.

7.   The investigator shall consult with Legal Affairs prior to conducting an interview of a respondent officer in any case where the allegations, if true, would result in a

Category E or F violation. This consultation will entail the investigator sharing their proposed interview questions with the Legal Affairs attorney, and discussing the case and their proposed questions to determine if there are additional questions they should ask based on the attorneys review the questions and preliminary investigation. There may be times when, upon consultation with Legal Affairs, the Legal Affairs attorney determines that they should be present for the interview to provide the investigator with advice and counsel while conducting interview.

8. PIB personnel will ascertain if the interviewee needs a foreign language interpreter or any other accommodation, such as for a hearing or sight impairment. PIB will arrange for an interpreter or language line service, if needed, and will make reasonable accommodations to assist those complainants and witnesses with disabilities. *See Policy 1103, Communicating with Individuals Who are Deaf and Hard of Hearing, Policy 1735, Language Access Services for Limited English Proficient Persons, Policy 1736, Service Animals, and Policy 1737, Accommodation Procedure.*

iii. <u>Recording the Interview</u>

1. All interviews conducted at PIB shall be recorded with audio and video recording equipment in their entirety absent a specific, documented objection by a complainant or witness not employed by the BPD. Audio and video recordings serve as a safeguard to ensure an objective record of exactly what was said during any interview.

2. If audio and video equipment is not attainable, or if the interview is being conducted at a location other than PIB, the interview must be audio recorded with the BPD-issued digital audio recorder.

3. BPD employees are required to submit to recorded interviews. Still, consent to the recording should be noted at the beginning of the interview, and if they refuse, the refusal should be documented.

4. Complainants and witnesses who are not employed by BPD are not required to consent to a recorded interview, but investigators are obligated to notify the interviewee that they are being recorded (Md. Code, Cts. & Jud. Proc. § 10-402).

   4.1. As such, investigators must advise these witnesses that they are being recorded, and state the time, date and location of the recording, as well as the IAD case number and the investigator(s) conducting the interview.

   4.2. If the person declines to be recorded, the investigator will tell the interviewee the rationale for recording interviews and encourage them to consent.

   4.3. If consent is not provided, the investigator must document the refusal and take thorough notes during the interview. The interview should still be conducted to the same level of detail as if it were recorded. In these circumstances, prepare a narrative summary of the interview immediately after the interview to include in IAPro and the investigative file. Information

derived from an unrecorded interview should be given the same weight and credibility that would be provided if it was recorded.

5. At the beginning of the recorded interview, the investigator must memorialize all previous communications that have been made between the investigator and the witness previously about the case. (*e.g.*, Have you and I spoken before? Did we talk about anything else? Did you talk to anybody else in the agency about the case?)

    5.1. If any relevant discussion or review of a video or other evidence occurred prior to the recording, it should be noted on the record. This is accomplished by making a statement like the following to the interviewee while the recording device is activated:

        5.1.1. *Before starting this recording, please tell us what you reviewed. Confirm whether it included BWC footage, your cell phone video, an email, a report, etc.] that was [recorded, written] on X date. Can you confirm that this is what you reviewed?*

        5.1.2. The recorded statement must include WHAT was reviewed, WHEN that item was created (if known), and a verbal confirmation from the interviewee that this is the item they reviewed prior to the activation of the recording device.

        5.1.3. *What other sources of information about the matter have come to your attention?* [Cover extraneous sources such as media or social media, statements from fellow officers, family members, etc.]

        5.1.4. Similarly, the recorded statement must include details about what sources of information reached the officer prior to the interview.

    5.2. Additionally, the investigator must ask the interviewee on the record whether they have spoken to anyone else about the incident, and ask them to identify all persons they have spoken with about the incident.

6. Typically, during a formal interview, an interviewee will not be permitted to make a recording of the interview in order to protect the integrity of the case. If a non-employee civilian complainant or witness refuses to be interviewed without being allowed to make their own recording, the investigator shall consult their supervisor to determine whether it is advisable to allow an exception.

iv. <u>Conducting the Interview</u>

1. Investigators must give interviewees all appropriate warnings as required by law, to include, if necessary, warnings required pursuant to Miranda (see Appendix M), LEOBR, and Garrity (see Appendix N). If the interviewee is represented by counsel, the advisements may be made by counsel, but the advisement must be noted on the recording.

2. The investigator's demeanor during the interview shall be respectful, courteous, and professional. It is very important to maintain formality and neutrality, even if the interviewee is someone the investigator knows. This can include body language and overall demeanor in the interview.

3. The investigator must consider the interviewee's information to be perishable; they may move away or stop participating. It is important to get as much information as possible, because it may be the only opportunity to speak to the interviewee.

4. The investigator must strive to maintain appropriate eye contact throughout the interview, engage in active listening, listening closely to the answers provided.

5. The investigator must seek to establish rapport with the interviewee. Work to overcome barriers to communication, explain the investigative process, including timeframes and dispositions.

6. Throughout the interview, investigators must not make statements that an interviewee could reasonably understand as intended to discourage the interviewee from providing a full account. An example of such a statement may include: *"If I catch you lying, you could be charged with a false statement"* or, *"Only tell me about what happened that day. Your previous encounters with the officer are irrelevant."*

7. The investigator shall not make false promises or convey unreasonable expectations.

8. The investigator may need to preface the interview by reinforcing that the witness or someone associated with them is not in legal peril.

9. The investigator should give a brief explanation about the purpose of the interview, and why the person is being interviewed, though the investigator must avoid taking actions that may inadvertently taint the interviewee's testimony).

10. In a non-threatening manner, the investigator shall seek the interviewee's commitment to provide a truthful, complete account of the incident. For example: *In order for us to do a complete investigation and make accurate findings in the case, we want everyone we interview to provide us a truthful, complete account of what they remember about this matter. We also want everyone to tell us about any other sources of evidence, such as other witnesses, or physical evidence. Does that sound fair to you? Are you fine with that?*

11. The investigator shall explain the entire investigative process, including timeframes and dispositions.

12. The investigator must avoid forming any inappropriate or biased-based assumptions regarding the person being interviewed and instead focus on obtaining as much information and evidence as possible. Do not rush to judgement concerning the agenda or credibility of the interviewee, and do not question the integrity of the interviewee. The investigator will not express to the interviewee any opinion regarding the complaint or eventual outcome of the case.

13. If at any point during the interview, it becomes obvious to the investigator that the person is having a hard time following along or comprehending what is going on, the investigator should ask the interviewee if they are ok or if they understand what is being asked of them. The investigator should make any appropriate accommodations necessary based on the interviewee's response.

14. Although the nature of the complaint may make the interview uncomfortable, the investigator nonetheless must ask the necessary questions. Specific and sometimes direct questions must be asked in order to address the elements present in each allegation.  If there is reason to believe the witness was the victim of trauma, then the investigator must keep in mind the following:

14.1.   Everyone reacts differently to traumatic events

14.2.   Most victims of trauma experience continuing trauma that may affect their physical, emotional, social and economic well -being.

14.3.   Victims of trauma may not remember all details of the incident due to the impact of trauma.

14.4.   Trauma may be a factor in delayed reporting of an incident

14.5.   Therefore, the investigator must treat victims of trauma with respect, patience, compassion, and professionalism.

14.6.   Investigators must not express blame, judgment or disbelief.

15. Open-ended and probing follow-up questions (see chart at paragraph 21.1. of this Section) must be asked in order to fully understand what the person being interviewed saw, heard and/or otherwise knows about the matter under investigation. Keep interruptions to a minimum so that the interviewee offers as much detail as possible. Attempt to obtain information to fill in any gaps that remain after the preliminary investigation interview, or that have arisen prior to the interview.

16. It is the responsibility of the investigator to collect all available information so that the Investigative Lieutenant can make initial findings based on facts discovered during a complete, objective and thorough investigation.

17. At times it may be necessary to challenge assertions and probe further when there are incomplete responses. Prepare topics of discussion ahead of time to be addressed, but be sure to listen closely to the interviewee's responses in order to ask appropriate follow up questions. Additionally, be prepared to address specific points of contention and to anticipate how interviewees may respond.

18. Interviewers must be familiar with policy requirements relevant to the allegations raised against the Respondent employee to guide the interview.  Some witnesses may be able to speak to all elements of all allegations, while other witnesses may offer more limited information.

19. While the interview outline serves as a guide, it may be necessary to pursue an unexpected line of information or clarify inconsistent or incomplete answers. Do not lose the opportunity to gather as much information as needed to assist you later in making a determination regarding the case.

20. Investigators shall attempt to answer the *Who? What? When? Where? How? And Why?* as much as possible given the interviewee's experience and knowledge.

21. Investigators shall not ask leading questions that assume facts not established in the interview, that suggest or imply an answer, suggest legal justifications for the officer's conduct, or otherwise do not provide an individual with an opportunity to provide a sufficiently full and complete answer. Leading questions typically are those that can be answered with a "yes" or "no, or that otherwise imply the answer in the phrasing of the question.  Leading questions may also be framed in terms of an interviewer making a statement and asking the interviewee whether they would agree with the statement.

   21.1.   Examples of leading questions to avoid, and better ways to frame your questions include:

| Examples of questions to avoid | Open-ended way to ask the question to get to the necessary facts |
| --- | --- |
| Do you remember seeing the subject with a gun when you arrived? | What did you see when you arrived? Who was there? What did you notice about them? |
| Were you next to your car when you saw the officer? | Where were you when you saw the officer? |
| Were Officers Smith and Jones present? | Were any officers present? If so, who? |
| Did Officer Smith say that the subject had a weapon? | Did Officer Smith say anything? If so, what? |
| Did you use your Taser because the subject would not drop his weapon after you asked him to? | Why did you use your Taser? Or, what were you thinking when you made the decision to use your Taser? |
| You were worried about your safety, right? | What was going through your mind at the time? |
| Did the other officers ask for your assistance? | Did the other officers say anything? If yes, what? |
| You didn't see anything, though, right? | What, if anything, did you see? |
| Did the officer sound apologetic after you told him you wanted to make a complaint? | What, if anything, did the officer say to you after you told him you wanted to make a complaint? |

| And you were hurt during the event, right? | Did you sustain any injuries from the event? |
| And, is it true that as the officer walked away, you yelled at him? | Did you do or say anything when the officer walked away? |

22. Investigators should likewise avoid questions that unnecessarily convey value judgements about the complainant or witness (e.g., "Why were you at that location, instead of being in school?" "You said you've called the police on your partner four times. Why haven't you left him yet?").

23. Interviews should move from broad to more specific questions.

   23.1.   Use repetition to understand details.

   23.2.   Restate what you heard to ensure accuracy.

   23.3.   Avoid commenting on what was said.

   23.4.   Don't express judgment about what is said, either verbally, by tone of voice, or by facial expression.

24. Investigators may ask the interviewee to use a map, diagram, photo, video, etc. to help explain what happened. In such cases, the investigator should ask the interviewee to initial and date any document used.

   24.1.   While the interview is being recorded, the investigator must identify any exhibits they are presenting to the witness, and state what annotations they are using (e.g., "Here's a diagram of the room we can call Exhibit 1. Now, with your initials, please indicate where you were standing when the police arrived…").

   24.2.   If the person is using a video to help explain what happened, it must be a video they possess and have seen, unless the investigator has carefully planned and prepared to use other video footage (see Section IV(C)(b)(ii)(5) and subpoints above). Otherwise, they may also use a diagram or photo to help explain their account. For example, if the interviewee is trying to explain where they were standing in relation to another person, they may decide to show the interviewer a photo, or their cell phone video footage of the incident to explicitly show their positioning and distance.

   24.3.   The investigator shall mark whatever documents or photographs are used with an exhibit letter or number and ensure they are placed into the casebook and uploaded to IAPro after the interview.

   24.4.   The investigator must keep in mind that any person reviewing the investigation will need to understand the witness's testimony in relation to any tool or gesture used during the interview. For example, if the interviewee watches the BWC video of an event and makes a comment, the investigator should make a statement on the record of the point in the video that the

comment was made. (e.g., "So we are pausing the video at 12:03:24. The screen shows three people in view. Can you identify them") Or, if the interviewee uses their hands to indicate the type of force used or size or distance, the investigator must verbally describe the gesture on the record, and should ask the interviewee what they mean by it.

25. If acronyms or special terminology are used, the interviewer shall ask the interviewee to explain.. If the interviewee uses police terminology, ask them what they mean by that word or phrase.

26. The investigator shall maintain appropriate eye contact with the interviewee, engage in active listening, and observe interviewee's demeanor and non-verbal behavior.

27. Some investigators may find it useful to keep short notes during the interview.

28. The investigator shall ask the interviewee to provide any other information they may have describing the involved employee(s), whether there were witnesses who could be contacted, and any other evidence that might be helpful. The investigator shall inquire if the interviewee has photos, private video, text messages, electronic posting by anyone regarding the incident on Twitter, Facebook, or other social media platform, or other evidence. The investigator shall ask the interviewee to provide the evidence or a copy of the evidence. For electronic evidence, forwarding or sending screenshots by email (preferably) or text message are often a good way to transmit the evidence. The investigator shall ensure that all evidence is included in the investigative file and documented via an investigative report.

29. The investigator should seek to establish the relationships among any parties present at the incident as well as any other witnesses, with each other and with the named employee. Perceptions, statements and credibility may vary depending on the interviewee's relationship to others.

30. When interviewing non-police personnel, the investigator must avoid the use of police terminology. Use terms and concepts that are familiar to the public to ensure that the interviewees understand what is being asked of them.

31. If there was a possibility of injury, the investigator must ask if photos may be taken and whether they will sign a release to allow for medical records to be gathered detailing the injury (if medical treatment was sought).

32. It may be necessary to probe inconsistencies in answers that contradict previous statements made by the individual. Where there is a discrepancy between the interviewee's testimony and other testimony or evidence, the investigator should question the interviewee about the discrepancy without expressing judgment. For example: "Can you clarify, because you said you returned to the district after the incident, but CAD indicates you were responding to another call at the time. Can you help me understand this?" or "We have some conflicting information between

evidence X and evidence Y – can you clarify?". This is something that will be important for investigators to discuss with their supervisors prior to conducting an interview.

    32.1.    This may be another place where it could be beneficial to show video, after careful planning and consideration on the part of the investigator, in consultation with the supervisor. See guidelines outlined in see see Section IV(C)(b)(ii)(5) and subpoints  above and subpoints above.

33. Inconsistent statements concerning material issues and/or material facts must be analyzed. This analysis should be applied to both citizen and police witnesses/respondent officer statements.

    33.1.    Material issues or facts are those relevant to whether or not the misconduct occurred, and if it did occur, whether it was a policy violation. Thus, material issues are facts that assist the investigator in coming to the appropriate conclusion about whether the misconduct occurred or whether it constitutes a policy violation.

    33.2.    Examples of material issues or facts are the identity of complainant/witness/respondent, whether certain individuals were or were not witnesses to the event, the sequence of events that occurred, among others.

34. When an interviewee asks to take a bathroom break, the investigator should accommodate this request but attempt to find a natural pause in the questioning to take the break. The investigator should keep the recording running during the break.

v.  <u>Concluding the Interview</u>

1. Before ending the interview, the investigator shall ask if the interviewee has any other information about the incident or complaint they would like to provide, including whether they are aware of other witnesses, or if they possess or are aware of any evidence or documentation that relates to the matter under investigation.

2. If the interviewee provides any further documentary evidence, the investigator shall mark the evidence with an exhibit letter or number and put it in the casebook. For physical evidence, such as clothing, be sure to follow the procedures for handling evidence, per Policy 1401, *Control of Evidence and Property*.  The investigator should ask the interviewee to explain the evidence provided. The investigator may ask for a moment to review the new evidence, which may be done in front of the interviewee or outside of the room, if necessary. If the investigator steps out of the room, the investigator must keep the recording running.

3. The investigator must always make sure that they have current contact information for all witnesses, including the complainant. Let all individuals know that there may

be a follow-up with them if necessary to clarify information gathered during their interview.

4. The investigator shall encourage interviewees to contact the investigator if they recall additional information, learn of new information or witnesses, or are contacted by anyone else about the matter under investigation.

5. The investigator should also remind the witness that retaliation for participating in the investigation process violates BPD policy and may be unlawful. They should encourage the witness to contact them if they feel they are facing any form of retaliation.

6. After all questions have been asked, the investigator should step out of the interview room to review the information provided, identify any open issues, and consult with the secondary investigator and/or Legal Affairs on any questions that need to be asked. The investigator should keep the recording equipment running. If any open issues or additional questions are identified, the investigator will return to the interview room and follow up with the interviewee on the recording.

7. The investigator should state to the interviewee the following: *In order to protect the integrity of the investigation, please do not discuss the facts of the case with anyone other than your lawyer.* See below ("Interviewing Respondent Officer", paragraph 14) for confidentiality requirements for BPD employee interviewees.

8. Upon completion of the interview, the investigator shall document the relevant facts from the witness's statement in the investigative file with an investigative report. Included in that report shall be a recount of the witness's recollection with respect to previous conversations between the witness and the investigator and/or other departmental members concerning the incident.

9. After each interview conducted, the investigator shall evaluate the statements for additional leads or a change in investigative strategy.

### c.  *Specific Procedures for Interviews of Accused Sworn Non-Probationary Members*

1. Most PIB complaints involve allegations against sworn police officers through the rank of Lieutenant, all of whom are members of the Baltimore Police Fraternal Order of Police (FOP) and are afforded certain protections under the Law Enforcement Officers Bill of Rights (LEOBR). Both the FOP Memorandum of Understanding (MOU) and the LEOBR provide for certain processes when interviewing a respondent officer.  The below requirements are to ensure that investigators adhere to the requirements of LEOBR and the MOU, as well as BPD policy.

2. Whenever a Law Enforcement Officer is under investigation or subjected to interrogation by BPD for any reason which could lead to disciplinary action, demotion,

or dismissal, pursuant to the Law Enforcement Officers' Bill of Rights, the investigation or interrogation shall be conducted under the below conditions.

i.  <u>Notice of Investigation for Respondent Officer</u>

1.  Before an officer can be interviewed about an allegation during an administrative investigation, a notice in writing must be provided to the officer.
2.  The notice shall contain information about the general nature of the investigation so the officer is on notice about what will be the subject of the questions.  The notice provided does not require it to be detailed and precise to cover every single specific allegation.  The notice shall not contain any information that may unnecessarily jeopardize the investigation.
3.  The notice must include:
    3.1.  The date(s) and location(s) of the incident being investigated;
    3.2.  The incident under investigation;
    3.3.  The name of the investigator or investigating officer; and
    3.4.  the name of the person supervising the investigation.
4.  The notice must be specific enough so the officer understands what they are being investigated for (nature of the investigation), but it does not have to be so specific to mention the specifics of the incident.
    4.1.  Example: if the officer is being investigated for an allegation of excessive force, the notice need simply state that the officer is being investigated "for the force used in the arrest of John Doe on X date around X time near X location", but need not state the specifics of the alleged violation, e.g., the strikes, punches and kicks.
5.  Additionally, the notice shall include language prohibiting officers under investigation from speaking to witnesses or complainants, reviewing police reports (other than reports about the incident authored by the officer) or body-worn camera footage, or taking other actions that could jeopardize the investigation, until notified by PIB that they are permitted to do so.
6.  The Notice of Investigation should appear in the memo form, following the template provided in Appendix G.
7.  Additionally, the accused officer must sign the Non-Disclosure, Non-Retaliation, and Confidentiality Order. See Appendix H.
8.  If additional misconduct is identified during the course of the investigation after the Notice of Investigation has been served on the respondent officer, a second or supplemental Notice must be served on the accused officer prior to any interview about the additional misconduct.

ii.  <u>Notice of Interview Date</u>

   1.  The PIB investigator shall notify the respondent/involved employee, or their attorney, of the interview date.  Additionally, the respondent employee's supervisor shall be notified in order to facilitate the officer's appearance for the interview.

   2.  If a BPD member fails to appear, this must be documented in IAPro along with the reason given and whether PIB was notified in advance. A new interview date must be scheduled and new notice sent. Failure to appear for the interview could subject the member to additional disciplinary action.

iii.  <u>Interviewing Respondent Officer</u>

   1.  The investigators shall follow the general procedures outlined in the interview section above. Additionally, the investigators shall ensure that the following provisions are followed:

   2.  The interview shall be at a reasonable hour, preferably while the respondent officer is on duty, unless the seriousness of the investigation is of such a degree that an immediate interview is required.

   3.  The interview shall take place either at PIB, or the District or Division where the alleged incident occurred, or any other reasonable and appropriate place.

   4.  The officer shall be informed of the name, rank, and command of the officer in charge of the investigation, the interviewing officer, and all persons present during the interview.

   5.  When a sworn member, covered by the MOU between the BPD and FOP Lodge 3, is required to submit to an interview as a respondent in reference to a complaint being investigated by the Department, the employee shall be given a copy of any prior statement or report which that employee wrote/authored relating to the complaint being investigation, before being interviewed. These reports shall be provided to the respondent immediately prior to the interview.

   6.  The investigator shall consult with Legal Affairs prior to conducting an interview with a respondent officer where the allegations, if true, would result in a Category E or F violation. For other cases, the investigator may consult Legal Affairs if any legal advice is needed prior to conducting any interviews.

      6.1.  Whenever Legal Affairs is consulted by the investigator, the investigator must document the fact that the investigator consulted Legal Affairs as a "Task" in IAPro.

      6.2.  For each legal consultation, the investigator must also create a memorandum to the file documenting the content of the communication, which shall include:

      6.2.1.  The date the advice was sought

      6.2.2.  The respondent member and case number of the case;

      6.2.3.  The attorney that provided the advice;

      6.2.4.  the legal advice that was sought;

      6.2.5.  the legal advice that was given;

      6.2.6.  the following notice shall be included: CONFIDENTIALITY NOTICE: This document contains confidential and privileged information. If you are not an intended recipient of this document, you are hereby notified that any unauthorized use or distribution of this document is strictly prohibited and requested to return to this document to the Baltimore Police Department Public Integrity Bureau without making any copies thereof.

      6.2.7.  Ensure the file name for the memorandum includes "CONFIDENTIAL ATTORNEY-CLIENT" prior to being uploaded to IAPro.

7. All questions directed to the officer being interviewed shall be asked by and through one investigator during any one interview session.[1] Notwithstanding, the secondary investigator should help identify areas where more probing is needed and consult with the primary investigator for follow-up questioning when needed. The secondary investigator should engage in active listening and observe the demeanor and non-verbal behavior of the respondent officer.

8. The respondent officer may be questioned about *any matter relating to the misconduct in question* regardless of whether it is specified in the notice of investigation.

9. Interview sessions shall be for reasonable periods and shall be timed to allow for any personal necessities and rest periods that are reasonably necessary.

10. During the course of the interview, the respondent officer may not be threatened with transfer, dismissal, or disciplinary action.

11. The respondent officer has the right to be represented by counsel or any other responsible representative of their choice during the interview unless waived in writing. The interview may be suspended for a period of time not to exceed 5 days until representation is obtained.

12. If at the time of the interview the respondent member is under arrest, or is likely to be placed under arrest as a result of the interview, the investigator shall inform the respondent officer of their Miranda rights prior to the commencement of this interview. xi. Interviewees should be asked about their understanding of the policy at issue and all related training.

---

[1] Section 3-104(h)(1), Law Enforcement Officer's Bill of Right, Public Safety Article, Maryland Annotated Code

13. Employees shall not be permitted to have cell phones or other electronic devices with them during an interview.

14. The investigator must give the respondent officers a specific order not to discuss the matter or their interview with any persons, aside from: the respondent officer's commanding officers (except in those instances where the commanding officer may be involved in the incident in some manner), PIB investigators, and the respondent's legal counsel.

15. At the conclusion of the interview, the investigator should inform the respondent officer that they are under an on-going duty to disclose information to PIB at any point that it comes to light during the investigation. Explain to the respondent that the introduction of new and material evidence at a disciplinary hearing will cause the hearing to be suspended so that the new information can be investigated and evaluated. The investigator should inform the respondent officer that they can be disciplined if it is established that the respondent officer intentionally withheld the new and material evidence during the initial investigation.

iv. <u>Role of the Representative in the Interview (for Respondent Officer)</u>

1. The primary role of a representative during a PIB interview is to protect the contractual and statutory rights of the employee. Otherwise, the union representative must not be allowed to interrupt or otherwise disrupt an interview.

2. Employees covered by the LEOBR may be represented by the person of the officer's choice, even if the representative is not a lawyer, at any stage of the LEOBR process prior to court review[2]. Therefore, the officer can request their supervisor, FOP representative, or Vanguard representative to accompany them to the interview instead of an attorney. Nevertheless, the accompanying individual cannot be a witness or otherwise involved in the case at hand. An officer may waive this right and speak without representation. If the officer elects to waive their rights under this section, the waiver must be documented in writing and noted on the record.

3. Prior to the start of the interview, but after the recording has begun, the investigator will inform the attorney or representative for the officer that they may make an objection for the record, meaning they can say, "I object to that question." However, they may not make a speaking objection.[3]

---

[2] LEOBR § 3-104(j)(1) provides: "On request, the law enforcement officer under interrogation has the right to be represented by counsel or another responsible representative of the law enforcement officer's choice who shall be present and available for consultation at all times during the interrogation."

[3] LEOBR § 3-104(j)(3) provides: "During the interrogation, the law enforcement officer's counsel or representative may: (i) request a recess at any time to consult with the law enforcement officer; (ii) object to any question posed; and (iii) state on the record outside the presence of the law enforcement officer the reason for the objection."

3.1.    A speaking objection is any objection or stated issue with an interviewer's questioning that goes beyond simply saying "objection," it suggests to the person being questioned an answer to the question.  E.g., when questioning an officer as to whether they witnessed something, the attorney says, "objection, how is it possible for my client to have seen that when he already stated he was sitting in his cruiser."  This objection is suggesting that the officer answer, "I couldn't possibly see that because I already told you I was sitting in my cruiser."

4.  If an attorney makes a speaking objection during questioning, remind them of the statute.  Advise the attorney (or representative) that if they have comments to make other than "I object to that question," the officer being questioned should be excused, and the attorney (or representative) can state their reason for the objection on the record.

5.  The PIB investigator should invite the union representative to place any objections on the record before the investigator begins asking questions and at the end of the interview, if necessary.

6.  Regardless of the objection, the respondent officer shall be compelled to answer the question.


v.  <u>Compelled Statements</u>

1.  Absent a criminal investigation, all respondent officers shall be compelled to give a statement. If there is a criminal investigation, follow the procedures outlined in Section (V)(A) below.

2.  A public safety statement is not a compelled statement. Therefore, even if a respondent has given a public safety statement, the officer shall still be obligated to give a compelled statement.


vi.  <u>Use of Polygraph Examination</u>

1.  The use of polygraph examinations requires deliberate planning and reasoning.

1.1.    Consult with your immediate supervisor and Legal Affairs to determine the investigative need for utilization of polygraph examination;

1.2.    The decision to utilize a polygraph will be made by the Deputy Commissioner of PIB; and

1.3.    If a polygraph examination has been approved for the respondent employee, it must be performed within the confines of the Law Enforcement Officer's Bill of Rights.

1.4.     Other limitations on the use of polygraphs are discussed in Section "Physical Tests" on page 48-49, below.

### d.  Procedures for Complainant and/or Witness Officer Interviews

1.  Investigators shall follow all procedures outlined in "general interview" section above. Additionally, investigators shall follow the below procedures.
2.  Attempts should be made to get BPD employees to voluntarily provide an interview. If they decline to provide a voluntary interview, they shall be compelled to participate in an interview.  If they refuse to be interviewed or fail to appear, they may be subject to disciplinary action and should be so advised.
    2.1.     If a BPD member fails to appear for a formal interview, the investigator must document the issue in the IAPro case file along with the reason given and whether PIB was notified in advance. A new interview date must be scheduled and new notice sent. Failure to appear for the interview could subject the member to additional disciplinary action.
3.  Employees shall not be permitted to have cell phones or other electronic devices with them during an interview.
4.  If anytime during an interview of a witness officer, the investigator believes that the interview could result in discipline of the interviewee, they should stop the interview and provide the officer with a notification of investigation and advisement of rights and shall suspend the interview for a period not exceeding 5 business days until representation is obtained, unless they waive their rights to representation in writing.
5.  If anytime during an interview of a witness officer, the investigator believes that a crime may have occurred and the witness may incriminate themselves, the investigator should stop the interview and seek advice from the prosecutor's office.
6.  Investigators shall remind employees that Departmental policy requires them to be truthful and to report all potential misconduct.
7.  Witness officers are to be given a specific order not to discuss the matter or their interview with persons other than PIB investigators or the Department's representatives in disciplinary hearings.

### e.  Procedures for Civilian BPD Employee Interviews

1.  When employees covered by Collective Bargaining Agreements are to be interviewed, investigators shall check the contract for notice requirements.
    1.1.     For instance, CUB members who are respondents are entitled to have a union representative present and may be entitled to Weingarten rights. Additionally, they are allowed a reasonable time period to obtain

representation – a reasonable period can be anywhere from two-hours to two-days, depending on the circumstances.

2. Civilian employee witnesses do not have any specific rights under Collective Bargaining Agreements but are required to provide a statement if requested. Visit the Labor Commissioner's website prior to conducting an interview of a civilian employee to review the applicable contract for full guidance, as labor contracts are regularly updated: *https://labor-commissioner.baltimorecity.gov/contract-agreements*.

#### f. Command Staff (Captain and above), Probationary Officers and Police Officer Trainees are not afforded the protections of the Law Enforcement Officer's Bill of Rights (LEOBR).

1. The above-listed members are not entitled to have an attorney present for administrative investigations. An attorney or representative will only be present when required by law or a contract.

2. There is no requirement to provide them with a Notice of Investigation.

   2.1. This is strictly a LEOBR protection.  A simple phone call or email directing the person to respond to the office for an interview is sufficient.

   2.2. There is no 5-day waiting period to obtain representation.

   2.3. A respondent member in this category can be compelled to submit to an interview immediately.   If they request an attorney or other representative, see bullet number one of this section.

3. More than one investigator can question the respondent member.

   3.1. Both investigators can question the accused during the interview, though this is not be the preferred interview method. As in all investigations, the member should prepare for the interview beforehand to establish the best interview method.

4. There is no requirement to provide the preamble regarding speaking objections, etc.

   4.1. There are no pre-interview warnings or protections that need to be read to the respondent member.

5. Exception to the above: The only exception is when a Probationary Officer is being investigated for Excessive Force. In those instances, the same LEOBR rights are applicable to the respondent member, and the investigation is handled the same way as any other sworn officer.

#### D. Other Investigative Techniques

#### a. Responding to the Scene

1. Any time a PIB investigator, sergeant and/or lieutenant responds to a scene or conducts an area canvass, they must have their digital recorder with them.

2. The PIB Duty Sergeant and Lieutenant should respond to the scene to any criminal complaint involving a Baltimore Police Officer. There may be other times when an investigator responds to a scene. This will be determined on a case-by-case basis. On scene responses will typically be required when evidence may be lost (whether physical or a complainant or witness statement), or an administrative action needs to occur immediately (e.g., the suspension of an officer).

3. If evidence could be present at the incident scene, response is required. During business hours, two investigators will respond in these instances, and a supervisor may respond.  A supervisor will determine if response to the scene is necessary. Investigators may also determine that specialized response is necessary to collect evidence, and may summon other units/crime scene to the incident location.

4. During evenings and weekends, if scene response is required, the Duty Sergeant and Duty Lieutenant will respond to the scene. They may determine that other personnel are required for response to the scene also.

5. When responding out to a scene of an event, recorded field investigative interviews of any civilians or sworn witnesses should be conducted as soon as practical. Notwithstanding, the investigator will evaluate whether it is the right time to interview a complainant and/or witness. Consider whether the person requires medical attention, is impaired, or is extremely distraught.

6. If the location of the event affords a quiet/controlled space for obtaining a recorded statement, (for example a spare office, a person's home, the investigator's vehicle, or a quieter area on the street) then the investigator should attempt to conduct a field investigative interview.

7. If the investigator does not have their digital recorder available, they must use their BPD issued cell phone to record the field investigative interview.

8. Whichever PIB-assigned members respond to the scene, those responding will attempt to take as many preliminary investigative steps as possible (especially obtaining perishable evidence) by themselves or with the aid of crime lab technicians, as appropriate.

### b. *Evidence and Related Materials Collection*

The investigator must promptly identify, collect, and consider all relevant evidence, including any audio or video recordings.

i.   Reports, Records and Other Documents

1. All relevant reports should be obtained and preserved as expeditiously as possible.

2. Internal department reports relating to the incident or the respondent officer's duties should be obtained and examined. Examples of such reports include arrest and investigative reports, radio, patrol, vehicle and evidence logs pertaining to or completed by the officer.

3. The investigator should also examine and retrieve all electronic, computer, digital and video records. These may include analog and digital records created by radio and telephone recorders, computer aided dispatch systems, mobile data terminals, in-car video systems, video surveillance systems and other forms of audio and video recording. In these cases, relevant data should be copied to an appropriate medium - for example, a flash drive, CD, DVD, etc. - as soon as possible and retained by PIB. What evidence is not able to be stored in IAPro directly will be saved maintained with the hardcopy case file.

4. Records and documents of any other individual or entity that could prove helpful in the investigation should be examined. These may include reports from other law enforcement agencies, hospital records, doctors' reports, jail records, court transcripts, F.B.I. records, motor vehicle abstracts and telephone and cellular phone records.

5. In some instances, a search or communications data warrant or a subpoena may be necessary to obtain the information. Because PIB cannot issue administrative subpoenas, these may need to be prepared to be issued by the trial board or via the grand jury in criminal matters.

    5.1.   Maryland Public Information Act Requests may also be used to obtain records from other government agencies.

    5.2.   For noncriminal investigations, the investigator should identify any evidence that may require a subpoena and consult with Legal Affairs about whether there is a way to obtain the evidence without a subpoena, or whether to wait until administrative charges have been lodged.

6. Below is a list of example documents that may be relevant to an investigation:

    6.1.   BPD incident reports including the CAD reports; daily activity sheets ("run sheets")(BPD, BCFD, Medic); Event reports; DV reports; Use of Force reports including the Supervisor's Summary, SIRT reports, Command Review, and documentation from the Use of Force Review Board; Statement of Probable Cause and Charges; District Logs; Parking Citations; copies of Traffic Infractions, etc.

    6.2.   Property or evidence reports

    6.3.   Booking reports and photos

6.4.   Consent to search form or other evidence of consent

6.5.   Secondary employment permits

6.6.   Work Assignments

6.7.   Notes, correspondence, and memoranda, including electronic communications, whether stored on a device accessible to BPD or stored on remote computer servers (e.g., Internet Service Provider servers, social media platforms, or cloud-based storage).

6.8.   Metadata (*i.e.,* data that describes other data, such as author, creation date, file name, data type, etc.)

6.9.   Training protocols or records

6.10.  Operational or unit manuals

6.11.  Payroll or financial records

6.12.  Fire Department or Medical records, (obtain medical examiner's opinion regarding the mechanism of injury, if applicable)

6.13.  Unit logs, officer run sheets, or CAD for Unit daily activity report, Central Booking Intake Facility prisoner intake information, booking photos, jail booking records

6.14.  Any other records (whether departmental or otherwise) of potential relevance

6.15.  Personnel file of respondent officers, which includes the past disciplinary history and related case files, in order to determine patterns of past behavior.


ii.   <u>Physical Evidence</u>

1. Investigators should obtain all relevant physical evidence.  Some physical evidence may have been gathered during intake.

2. All evidence, such as fingerprints, clothing, hair or fabric fibers, bodily fluids, stains and weapons should be handled according to established evidence procedures.


ii.a.   *Photographs and Audio and/or Video Recordings*

Photographs, audio and/or video recordings can be useful tools if relevant to the investigation. The following considerations should be taken into account when obtaining and using such evidence.

1. With respect to radio and telephone recordings, the recording is the best evidence and should be secured at the investigation's outset.

2. Transcripts or copies of the original recordings can be used as investigative leads.

3. Entire tapes or transmissions should be reviewed to reveal the totality of the circumstances.

4. If a complaint involves use of force, photographs of the complainant and the officer should be taken as close as possible to the time of the incident.

5. Photographs also can be used to create a record of any other matter the investigator believes is necessary. Whenever possible, digital color photography should be used.

6. The following is a list of Photographs, and audio or video records that might be relevant to an investigation:

6.1. Evidence of injuries and damage (photograph with ruler to scale)

6.2. Body Worn Camera Video

6.3. In-car video systems

6.4. Holding Cell Video, Transport Van Video

6.5. 911 recordings

6.6. Citiwatch footage – the investigator should contact Citiwatch to determine if there are any cameras located in close proximity to the location of the incident. If so, the investigator should arrange to retrieve footage as soon as possible.

6.7. BPD Communications recordings

6.8. Video and/or audio from the scene (e.g., security systems from nearby businesses) or taken by witnesses. Many businesses, government buildings and other public areas, have video surveillance for security reasons. Video obtained from these sources may be extremely helpful to internal investigations.

6.9. Photographs

6.10. Texts

6.11. Social media posts

6.12. phone records

6.13. Maps

6.14. GPS devices

6.14.1. Some BPD vehicles and departmental phones are equipped with GPS devices. These devices can locate a vehicle or cell phone with great accuracy.  Phones with GPS inactivated may nonetheless be tracked by cell tower pings.  See Carpenter v. U.S.   Information gleaned from these devices may be used in PIB investigations because the respondent officer has no expectation of privacy in their whereabouts when performing police duties.

6.14.2. A different standard may apply, however, when the officer is off-duty, even if they leave their City-issued phones on. If the investigator believes information from a member's City-issued phone from when

they are off-duty may assist in the investigation, the investigator must consult Legal Affairs.

6.15. Additionally, air bag control modules record information on crashes and near crash deployments with great accuracy and may also be useful in internal investigations.

*ii.b.   Physical Tests*

1. Police officers, and other employees, who are the subjects of internal investigations may be compelled to submit to various physical tests or procedures to gather evidence.

2. An employee may be ordered to submit to physical tests including but not limited to blood alcohol tests, blood, breath, or urine tests for controlled dangerous substances, or polygraph examinations that specifically relate to the subject matter of the investigation. The order must be reasonable and relevant to the investigation at hand. Additional tests include:

   2.1.   Buccal swab

   2.2.   Requiring suspect to speak

   2.3.   Voice recordings

   2.4.   Handwriting samples

   2.5.   Hair and saliva samples

   2.6.   Urine specimens

   2.7.   Video taping

   2.8.   Field sobriety tests

**Note**: If an employee is charged with a DUI/DWI, the investigator that responds to the scene should always compel a breath test for alcohol if the officer has refused to submit voluntarily. This result may be used for the administrative disciplinary hearing, only.

**Note:** Refusal to submit to such a test or adherence to such an order may lead to disciplinary action taken against the officer that refuses. Any employee that refuses to submit to testing described above, should be advised of the employment consequences for his refusal.

3. The result of such tests is not admissible in any criminal proceeding against the officer, however it is admissible in the administrative hearing. The results of a polygraph examination may not be used as evidence against an officer in an administrative hearing, unless both the Officer and the Department agree to the admission of the results.

4. Under no circumstances should polygraph examinations be used to discourage or dissuade citizen complainants.

iii. <u>Search and Seizure of Persons, Places and Things for Administrative Investigations (Not Criminal)</u>

1. PIB investigators should document their reasons for conducting any search and limit its intrusiveness. If any doubts or concerns exist about the propriety or legality of a search, the investigator should seek advice from Legal Affairs before proceeding with the search.

2. All individuals in the United States, including police officers, have a Fourth Amendment right to be free from unreasonable searches and seizures. In a PIB investigation, the Fourth Amendment applies to any search the employing agency undertakes where the employee has a reasonable expectation of privacy. The PIB investigator must be cognizant of the various principles governing search and seizure, particularly where the investigator will search personal property belonging to the respondent officer. Any searches related to a criminal investigation should be conducted pursuant to Policy 1007, *Search and Seizure Warrants* and Policy, 1109, *Warrantless Searches*.

3. The investigator should exercise great care before determining whether to search property or items in which the respondent officer may have a reasonable expectation of privacy.

4. BPD issued equipment and devices are permitted to be searched for the purpose of an administrative investigation. This includes BPD issued phones, computers, email systems, and take-home cars. Departmental policy and the Department's computer log in makes clear that the Department has the right to enter and review the contents of any department-issued computer at any time. (See policies 1017, *Mobile Device Searches*; 1303, *Departmental Email Usage*; 1305, *Use of Departmental PC Systems*; 1509, *Take-Home Vehicles*).

5. There are some areas in a person's workplace where this privacy expectation can exist just as there are some where it does not.

   5.1. Generally, areas that several employees share or where numerous employees go to utilize files or equipment would present no expectation, or a diminished expectation, of privacy. Included here would be roll call rooms, lobby areas, dispatch areas, government provided vehicles (patrol cars), general filing cabinets, etc.

   5.2. However, employees may have a greater expectation of privacy in their own lockers, assigned desks, locked duffel bags, personal electronic devices. For such searches, investigators must consult Legal Affairs.

6. Searches of BPD-issued electronic devices may require the assistance of the Computer Crimes Unit or the City's IT department.

7. A voluntary consent to a search may preclude some Fourth Amendment problems. A consent search eliminates the need to determine what threshold standard must be met before conducting the search or seizure. If a consent search is undertaken, the PIB investigator should consult Legal Affairs, and shall follow the procedure for such a search outlined in Policy 1109, *Warrantless Searches*, and have the respondent officer sign a consent form.

iv. Lineups and Photo Arrays

1. A law enforcement officer may be ordered to stand in a lineup to be viewed by witnesses or complainants or their photo can be used in a photo array. The Investigator should follow Policy 1009, *Double-Blind/Sequential Photographic Array Procedures*.
2. Probable cause need not exist, and the officer may be disciplined for refusal to participle in a lineup or refusing to be photographed for a photo array. The lineup or photo array must be constructed so as not to be unfairly suggestive.

v. Covert Surveillance

1. In public areas, video surveillance may be used. Video surveillance, especially covert surveillance, shall not be used in areas where employees have a high expectation of privacy, such as locker rooms and bathrooms.
2. Questions about the specific application of video surveillance, especially covert surveillance, should be addressed to Legal Affairs. It must be emphasized that this refers to video surveillance with no sound recording component.
3. Surveillance targeted at complainants or other non-BPD persons is not permitted without written authorization from the Deputy Commissioner for PIB.
4. Generally, the use of evidence derived from an authorized wiretap is limited to criminal investigations and prosecutions and are not permitted for administrative investigations.
5. If an investigator wishes to use wiretap information previously gathered in the administrative investigation, they should consult with the prosecutor who oversaw the wiretap because it will be necessary to obtain a court order to obtain and use it.

V.   **INVESTIGATIONS INVOLVING CRIMINAL MISCONDUCT**

A. **Procedures Pursuant to Garrity**

1. For the PIB investigator, it is critical to distinguish between those Investigations involving potential criminal conduct and those limited to administrative disciplinary infractions. The investigator also must be able to identify and apply the appropriate procedures to be utilized during the interview process in either a criminal or an administrative investigation.

2. Failure to identify and apply the appropriate procedures can compromise and render inadmissible evidence gathered during the interview process in a criminal investigation or needlessly complicate the interview process during an administrative investigation.

3. The vast majority of PIB investigations will be limited to alleged administrative disciplinary infractions and the vast majority of law enforcement officer interviews conducted during a PIB investigation will be limited to gathering evidence of administrative disciplinary infractions. But in cases of a potential criminal violation, it is absolutely necessary that the PIB investigator coordinate officer interviews with the prosecutor's office.

4. All decisions to take a compelled statement while a criminal investigation is ongoing must be approved by the Police Commissioner or their designee. Because the prosecutor is ultimately responsible for prosecuting criminal cases, the PIB investigator shall consult with the prosecutor prior to initiating an officer interview in matters that include a criminal investigation and shall consider the prosecutor's input concerning the types of interviews to be conducted and procedures to be utilized (e.g., Miranda warning, Garrity warning , etc.). The general practice is for administrative investigators to not pursue a compelled statement while the criminal case is still under investigation.  Nevertheless, if it seems appropriate to obtain a compelled statement prior to the close of the criminal investigation, the investigator must consult the prosecutor and get the approval of the Police Commissioner or designee. Additionally, all decisions regarding compelling an interview, holding any aspect of an administrative investigation in abeyance, and all consultations with the criminal investigator and prosecuting authority must be documented in IAPro.

5. Interviews of officers under criminal investigation and administrative investigation are often complex because the officer has the constitutional right to avoid self-incrimination in a criminal interview, but the obligation to answer questions truthfully during an administrative interview.  So, while an agency may compel an officer to answer questions posed during the course of an administrative investigation, an officer cannot be forced to give answers that could be used against them in a criminal prosecution.

6. Officers who have been compelled by Departmental order to produce incriminating information, with the belief that a failure to do so will result in disciplinary action,

cannot have that evidence used against them in a criminal prosecution. However, an officer can be compelled to provide answers during a PIB investigation if those answers are to be used as evidence only in a disciplinary proceeding.

7. An accused officer who reasonably believes that what they might say during a PIB interview could be used against them in a criminal case cannot ordinarily be disciplined for exercising their privilege against self-incrimination. However, an officer can be disciplined for refusing to answer questions during a PIB interview if they have been told that whatever they say during the interview will not be used in a criminal case. Informing an officer that their statement will not be used against them in a criminal case is called a Garrity warning. See Appendix N. This warning informs the officer being interviewed that they must cooperate with the investigation and can be disciplined for failing to do so because the prosecutor has decided to provide the officer with "use immunity."

8. It is for this reason that the PIB investigator in consultation with their supervisor (and Legal Affairs, when appropriate) must continually reassess the nature of a PIB investigation as evidence is being gathered. Having initially determined that a particular allegation is criminal or administrative in nature, it is important for the PIB investigator to revisit that decision during the course of an investigation to determine whether any of the evidence gathered following the initial determination changes the investigation's nature and scope. If the nature and scope of an investigation change, the investigator must be prepared to change the methods and procedures they utilize to reflect the new focus.

9. For example, if an investigator initially determines that an allegation appears to be a disciplinary matter, but later evidence leads the investigator to conclude that criminal conduct may have occurred, they must cease using the methods and procedures appropriate for an administrative investigation and notify the prosecutor immediately before proceeding further.

10. Serious allegations of officer misconduct may implicate both a violation of a criminal statute and BPD's rules and regulations. As a result, a criminal investigation and an administrative disciplinary investigation may be needed to properly resolve a misconduct complaint. Where both a criminal and an administrative disciplinary investigation are needed, the PIB investigator is often expected to conduct both.

11. As already explained, a respondent officer has the right to remain silent during a criminal investigative interview. But the same officer must cooperate and answer questions posed by their employer during an administrative disciplinary interview. So while the PIB investigator cannot require a subject officer to answer questions during a criminal interview, they can require that officer to answer questions during an administrative disciplinary interview.

12. The confusion caused by these issues can be alleviated several ways. One way is to separate the investigations by time - - the criminal investigation is completed first and then the administrative investigation may follow. Where the administrative investigation is postponed to allow for the criminal investigation to proceed first, the decision to postpone the administrative investigation and the rationale for doing so will be documented in writing and reviewed by the Police Commissioner or designee, and the Administrator of the CRB, if applicable. See PIB/CRB Protocol for Intake and Classification, found at this link: https://www.baltimorepolice.org/0oprcrb1-draft-oprcrb-protocol-intake-and-classification

13. Another way is to conduct parallel investigations.  In this situation, the responsibility for a criminal investigation is separated from that for an administrative investigation. Thus, one investigator (typically from the criminal investigative division) is assigned the responsibility of gathering evidence of criminal wrongdoing while a second (typically the PIB investigator) is assigned the responsibility of gathering evidence of a disciplinary infraction. The investigation may proceed jointly up and until the decision is made on the administrative investigation side to compel an officer to give a statement or compel the officer to provide other evidence (*e.g.,* submit to a drug test, administrative searches or seizures as permitted by the following policies: 1017, *Mobile Device Searches*; 1303, *Departmental Email Usage*; 1305, *Use of Departmental PC Systems*; 1509, *Take-Home Vehicles*; and 1720, *Drug Urinalysis Testing Programs*.. Once this occurs the administrative investigator cannot share the statement or any evidence subsequently obtained with the criminal investigator but may continue to receive updates and evidence from the criminal investigation, as long as they refrain from sharing any subsequent information identified in the administrative investigation.

14. The preference for PIB is that the administrative investigation and the criminal investigation are conducted in parallel.

15. If there is a criminal investigation, the determination about when to compel an interview of the respondent officer is a decision that will require the approval of the Police Commissioner or their designee, who will consult the appropriate prosecuting authority. When criminal misconduct is alleged, the investigator must maintain regular contact with the prosecutor to ensure there is agreement on the investigative strategy.

**B. Procedures for Misconduct Investigations Related to Criminal Conduct**

1. When PIB receives notice that an employee is the subject of a criminal process, is a respondent of a Protective Order, a Peace Order, or an employee's driver's license is expired, suspended, or revoked, or if they obtain an ignition interlock driver license, a

PIB administrative investigation is generated pursuant to the PIB Classification Protocol.

2. Similarly, any allegation of criminal misconduct made by a civilian will generate a PIB administrative investigation.

3. When an officer is accused of criminal conduct within BPD's jurisdiction, the PIB will be contacted immediately and will have oversight over the investigation.

 3.1. In cases where PIB determines that there is no specialty unit at BPD that should handle the case, PIB will assume all investigative responsibility for the case.

  3.1.1. The PIB investigator must contact the relevant prosecutor as soon as possible to notify them about the investigation.

  3.1.2. The PIB investigator is responsible for coordinating the investigative steps with the prosecuting authority, conducting the investigative steps, and keeping the prosecutors aware of the progress of the investigation.

  3.1.3. Searches for criminal investigations generally require the investigator to obtain a search warrant to conduct a search. Search warrants require probable cause to believe that the search will reveal evidence of a crime. Prior to conducting a search or seizure beyond what is described in Section IV(D)(3) above, you must consult your supervisor, Legal Affairs, and the prosecutor. Additionally, refer to Policy 1007, *Search and Seizure Warrants* and Policy 1011, *Electronic Surveillance Procedures*.

 3.2. PIB may determine that it is appropriate to refer such criminal matters to specialized units within the Department.  Any such decision will require approval, in writing, by the Deputy Commissioner of PIB.  As well, in such cases, PIB will still maintain the ultimate authority over the investigation.  For cases that require the expertise of a specialized BPD unit, for example, Sex Offense, Child Abuse, or Family Crimes, the specialized BPD unit will generally serve as the lead investigative unit and the PIB investigator will work in tandem with them to provide consultation. In such cases, the assigned PIB investigator will continue to brief their PIB supervisors on the progress of the case.

  3.2.1. The lead investigative unit will communicate with the relevant prosecuting authority as they normally would. The PIB Investigator must contact the SAO Police Integrity Unit or the corresponding unit at the relevant prosecuting authority as early as possible to ensure they are aware of the criminal investigation.

      3.2.2. The PIB investigator may observe any interviews conducted by the specialized unit. Since interviews will be recorded, the PIB investigator will be able to review the recording.

      3.2.3. An interview of a non-member witness should not be delayed due to the unavailability of a PIB investigator. PIB investigators must be consulted prior to any interview of a BPD accused member.

   3.3. If the criminal matter is outside of BPD's jurisdiction, the PIB investigator shall contact the investigating agency to obtain relevant information and report as needed.

4. No matter who the complaining party is, whether a civilian, entity without law enforcement powers, law enforcement agency, or prosecutor's office:

   4.1. The State's Attorney's Office (SAO) or relevant prosecuting agency must be contacted immediately by phone for consultation on the apparent criminal allegations. This early notice allows for regular contact and sharing of information, as well as consultation on investigative steps to take.

   4.2. The case is assigned for an administrative investigation, per the PIB Classification Protocol.

      4.2.1. All Allegations will be applied to the case, including all applicable Allegations of criminal Misconduct and non-criminal Misconduct.

5. If an outside agency notifies PIB of possible criminal Misconduct but either (1) has no law enforcement powers (e.g., an unarmed security firm) or (2) does not have jurisdiction over the incident (e.g., a complaint was made to Baltimore County police, but the incident actually occurred in Baltimore City), then BPD will conduct the criminal investigation.

   5.1. PIB Command, in consultation with the SAO, will determine the appropriate unit to conduct the criminal investigation. This could be a unit within PIB or another investigative unit within BPD. PIB Command may deem it necessary to refer the case to an outside law enforcement agency or qualified outside investigator to conduct the criminal investigation.

   5.2. Notwithstanding, the case will also be assigned for an administrative investigation within the appropriate PIB unit, unless PIB Command determines that the administrative investigation should also be referred to an outside law enforcement agency or qualified outside investigator.

6. If the result of the criminal investigation is that no charges will be brought against the BPD member, the case will still be thoroughly administratively investigated to determine whether the evidence supports the allegations by a preponderance of the evidence.

6.1.    Since the standard of proof in criminal cases is different from that of administrative investigations, the administrative investigator shall not recommend any findings solely based on the outcome of the criminal matter. The investigator is required to consider all evidence pursuant to Section VIII(A-C) below in order to recommend findings for the administrative investigation.

    6.1.1.    If there is a criminal conviction for criminal misconduct, the investigator can rely on the criminal conviction to make a finding of sustained for the criminal misconduct.

    6.1.2.    If there is an acquittal, the investigator shall not solely rely on that conclusion, given the different standards of proof required for criminal cases and administrative cases.

7.    See Section V(D) below for the procedure for determining when cases will be investigated by an outside entity.

## C.    Procedures for Maintaining Contact with the Prosecuting Authority

1.    PIB personnel may contact a prosecuting authority to monitor the status of criminal charges pending against an employee, or to clarify the status of criminal charges against a complainant, to determine if there is information relevant to the PIB investigation.  However, PIB personnel must avoid attempts to influence or even the appearance of influencing the criminal case when contacting a prosecuting authority. When contacting a prosecuting authority, PIB personnel should always identify themselves as being with PIB and shall not request or attempt to influence the filing of criminal charges or in any way attempt to influence the criminal prosecution of a person who has or may file a complainant with PIB.

2.    When a PIB investigator submits a criminal investigation to any prosecuting authority for consultation on a possible criminal charge, it shall be the assigned investigator's responsibility to maintain contact with the prosecutor to ensure ongoing awareness of the current status.  The investigator shall record date of every verbal and/or written consultation and the results into IAPro on the day of the consultation and shall also ensure their supervisor is apprised of the case status.

3.    The investigator shall follow the procedures outlined in Section V(A)(4) regarding Garrity related procedures and communicating with the prosecuting authority.

4.    On or before <u>DAY 30</u> from the date of submission to the respective prosecuting authority, the PIB investigator must contact the prosecutor (by email, with Legal Affairs cc'd) to request an update on the case status.

5.    On or before <u>DAY 45</u> with no prosecutorial resolution, the investigator must contact the prosecutor (by email, cc Legal Affairs) to request a status conference to occur with SAO regarding the case status.

6. On or before DAY 60, a status conference with SAO, Legal Affairs, and the PIB investigator shall occur to discuss the case status. IA and Legal Affairs, based on that conference, will determine whether to continue to wait for the criminal case to be resolved before compelling the respondent's statement, or whether to bifurcate the administrative investigation from the criminal investigation and proceed with the respondent interview immediately. The investigator must document the reasoning behind whichever decision is made.

7. If a decision is made to bifurcate, IA will attempt to complete the administrative investigation within the 90-day deadline. If the investigator cannot complete the investigation by day 90, the IA investigator will make the extension request, which must be approved in writing by the Deputy Commissioner of PIB.  The investigator will also seek to obtain an extension from the CRB.  See Section (I)(F), above.

8. If the investigator is waiting on the criminal matter to be resolved and the criminal case is not resolved by day 90, they must request the extension of the 90-day deadline.

9. Every thirty (30) days thereafter, the investigator must contact the prosecutor (by email, with Legal Affairs cc'd) to request an update on the case status.

10. Copies of all emails and attachments, and all mailed letters sent and received, shall be made a part of the investigation as exhibits.

**D. Procedures for When Outside Entities Conduct the Criminal Investigation**

1. The Deputy Commissioner of PIB will determine whether an investigation will be referred to an outside agency or body for investigation.

    1.1. A referral to an outside agency shall occur when BPD is unable to meet the requirement that no employee shall be involved in an investigation with respect to any person who they directly report to in their chain of command (to include a case involving an employee assigned to PIB).

    1.2. Such a determination will be also made where there is compelling public or Departmental interest for the case to be investigated by an outside agency.

    1.3. The Police Commissioner shall select to which outside agency or investigator to refer the case. A letter of request, signed by the Police Commissioner, must be sent to the outside agency or investigator to make the official request for investigation.

2. If an outside law enforcement agency is conducting the criminal investigation, PIB will still classify and assign the case, applying all applicable Allegations of criminal and non-criminal Misconduct, for an administrative investigation to occur.

3. For all investigations that the Department is aware of that are being conducted by an outside agency which involves possible misconduct of any BPD member, PIB has a

duty to review the outside investigation as part of PIB's inquiry, to ensure the investigation is of satisfactory quality, and is thorough and complete.

    3.1.    If PIB determines that the investigation is not thorough and complete, or that there appears to be additional relevant evidence that may improve the reliability or credibility of the investigation, PIB must request that the outside agency conduct additional investigative steps to complete the investigation. If they refuse to take additional investigative steps, the Deputy Commissioner of PIB shall identify an alternative avenue for the investigation to be completed.

    3.2.    Should the outside entity conducting the investigation decide to close the investigation without referring it to a prosecuting authority, PIB must obtain this decision in writing. In such cases, PIB shall separately consider whether to refer the matter to a prosecuting authority and shall document this decision in writing. If referring to the prosecutor, refer to the above guidelines (Section V(C)) regarding communication with the prosecuting authority.

        3.2.1.    If the prosecuting authority declines to prosecute or dismisses the case at a later date, PIB shall request a written explanation for the decision (i.e. a declination letter), which will be attached to the criminal investigation report.

4.    PIB must maintain all criminal and administrative investigation reports and files of the outside entities performing the investigation after reports and files are completed.

## VI.    <u>CONFLICT INVESTIGATIONS</u>

### A.    Procedures for Misconduct Investigations Related to the Police Commissioner or PIB Personnel

1.    For cases involving PIB Personnel, the complaint must be immediately forwarded to the Deputy Commissioner of PIB to determine the nature and the extent of the conflict.

    1.1.    Based on their review, the Deputy Commissioner of PIB must evaluate the conflict and make a recommendation to include a justification of whether or not it can be handled by any investigative group in PIB.

        1.1.1.    If the allegation involves a member of the PIB, typically the Ethics Section will handle the investigation (unless the conflict was discovered under the rules above (see Section (V)(D)(1)).

        1.1.2.    If the allegation involves a member of the Ethics Section, the investigation must be handled by an officer of the rank of Lieutenant or above who is not assigned to Ethics, (compliant with conflicts procedure, see Section I(4) above)

      1.1.3.  If the Deputy Commissioner of PIB determines that no one at PIB can investigate the matter without an actual or apparent conflict of interest, the Deputy Commissioner of PIB shall refer the case to an outside investigative agency or the Office of the Inspector General.

  1.2.  The Deputy Commissioner of PIB will review the subject matter of the complaint and the persons involved. If the complaint involves any PIB Commander, no PIB personnel can be de-conflicted, and the matter must be referred to an outside investigative agency.

  1.3.  Decisions will be documented in writing, to include the reason for the decision, when it was decided, and who made the decision.

2. When the case involves a PIB related topic or PIB supervision, the Deputy Commissioner of PIB will forward the case to the Police Commissioner with a recommendation that he assign it to an outside agency. Additionally, if the Deputy Commissioner of PIB otherwise believes that it cannot be investigated by any PIB investigator without an actual or apparent conflict of interest, the Deputy Commissioner of PIB will forward the complaint to the Police Commissioner, recommending it be assigned to an outside agency or investigator.

3. A case referred to an outside agency or investigator may be referred to an agency such as the Office of the Inspector General for Baltimore City, and/or an internal investigative police misconduct unit for a law enforcement agency in Maryland, which can include the Maryland State Police.

4. When an outside agency conducts an investigation, the Deputy Commissioner of PIB shall request that the agency adhere to PIB's Investigations Manual to the extent possible. PIB shall request that the outside entity document if there are any steps that they cannot conduct and the reason why they cannot be taken.

5. Upon review of an outside agency's investigation, if there are any investigative steps that have not been taken, the Deputy Commissioner of PIB shall request that the outside investigator perform additional investigative steps needed, to ensure a thorough and complete investigation, consistent with the requirements of this manual.

6. If the outside agency states that they are unable to follow PIB's Investigations Manual, the Deputy Commissioner of PIB shall consider whether another outside agency is able to conduct the investigation according to the PIB Investigations Manual requirements. If unable to find such an investigator, the Deputy Commissioner of PIB must balance the need to have the outside investigation due conducted to conflict versus the need to adhere to PIB's Investigative Manual.

7. If the subject of the complaint is the Deputy Commissioner of PIB, the complaint shall be forwarded to the Police Commissioner, who will assign it to an outside agency for investigation.

8. Where the Police Commissioner is named in a complaint filed with PIB, the Deputy Commissioner of PIB will refer the investigation to the Office of the Inspector General for Baltimore City.

## VII. PROCEDURES FOR CASEBOOK ORGANIZATION AND DOCUMENTING INVESTIGATIONS IN IAPRO

1. Case books and IAPro electronic case files shall include all records, evidence, investigative reports and notes pertaining to the case. The case book shall be organized in a uniform fashion by the case investigator prior to submission to their supervisor. The hard copy of the case book will include colored paper used as a divider to divide the investigation and make it easy to locate documents quickly.  In addition, after the final case book and investigative summary have been approved by PIB supervisors, each page of the case book shall be number-stamped in sequence to ensure document control.  Each addition made thereafter needs to be included as an addendum.

2. Investigators are required to document all case work in the IAPro case file.

3. Any and all investigative work conducted by an investigator must be documented in the IAPro case file. This includes all communications and attempts to contact the complainant, accused, and witnesses. It also includes uploading all information received, including reports, texts, photos, video, evidence.om links, emails discussing the case (including with CRB personnel), handwritten notes and voicemails. It also includes case discussions with PIB staff or supervisors (e.g. discussion of case progress, investigative planning, or resource needs).

4. All documentation must include the date and time that the evidence, information or statement was obtained.

5. All investigative work must be documented in IAPro in one of two ways:

    5.1. **Investigative Reports** (see Appendix I): For investigative steps that generate substantive information relative to the case (e.g., complainant or witness interview), the investigator must memorialize it in an investigative report. Investigative reports are a record of the investigative steps taken and the information gathered.

        5.1.1. These reports must be detailed by naming all persons spoken to, all information said or provided (or, if certain information was or appeared to be omitted from the exchange).

5.1.2. Upon completing an investigative report, the investigator must submit it to their supervisor. Once approved by the supervisor, the investigator must upload the investigative report to IAPro and place the original report in the case book.

5.1.3. Investigative reports shall be submitted to the investigator's supervisor within 48 hours of completing the related investigative step.

5.1.4. Examples of when an Investigative Report must be written include, but are not limited to:

5.1.4.1. After a complainant or witness interview

5.1.4.2. After the investigator reviews the BWC footage, in order to document the parts relevant to the investigation

5.1.4.3. After having reviewed phone records and emails to document a timeline of events discovered through such a review

5.1.4.4. Documenting the relevant information gleaned from medical records

5.1.4.5. Documenting when the State's Attorney's Office reports to the investigator regarding their prosecutorial decision

5.1.4.6. Documenting the suspension of an officer

5.2. **Tasks**: For investigative steps that are completed but do not generate substantive information, these must be documented as a "task" in IAPro. Tasks must still be memorialized with enough information to account for an investigator's work.

5.2.1. Examples of appropriate IAPro "task" entries include:

5.2.1.1. I called the complainant and left a voicemail asking for a call back.

5.2.1.2. I visited the home of witness [name], and left my business card when no one responded.

5.2.1.3. This morning, I mailed a request for medical records to Records Administrator John Smith at Johns Hopkins Bayview (see attachment).

5.2.1.4. At 1400 hrs, I responded to the 2000 block of Monument Street to conduct an area canvass (the details of the area canvass – addresses knocked, photos or video taken, persons contacted, statements obtained, follow up required,– must be included in an investigative report).

5.2.2. All tasks must be entered into IAPro by the end of the investigator's tour of duty on the day that the task occurred.

5.3.  Additionally, whenever Legal Affairs is consulted by the investigator, the investigator must document the fact that the investigator consulted Legal Affairs as a "Task" in IAPro.

    5.3.1.  For each legal consultation, the investigator must also create a memorandum to the file documenting the content of the communication, which shall include:

        5.3.1.1.  The date the advice was sought

        5.3.1.2.  The respondent member and case number of the case;

        5.3.1.3.  The attorney that provided the advice;

        5.3.1.4.  the legal advice that was sought;

        5.3.1.5.  the legal advice that was given;

        5.3.1.6.  the following notice shall be included: CONFIDENTIALITY NOTICE: This document contains confidential and privileged information. If you are not an intended recipient of this document, you are hereby notified that any unauthorized use or distribution of this document is strictly prohibited and requested to return to this document to the Baltimore Police Department Public Integrity Bureau without making any copies thereof.

        5.3.1.7.  Ensure the file name for the memorandum includes "CONFIDENTIAL ATTORNEY-CLIENT" prior to being uploaded to IAPro.

## VIII.    PROCEDURES FOR REVIEW AND EVALUATION OF EVIDENCE

As evidence is obtained during the investigation, it should be carefully and thoroughly catalogued in the case file (source, date obtained, etc.), examined and described in the case notes, and tangible evidence logged in the Evidence Control Unit. At the conclusion of the investigation, the value and importance of each piece of evidence must be weighed and described in the investigative summary.

### A.  Evaluating Statements

1.  Statements made by involved parties and witnesses must be carefully evaluated as to relevance and credibility.

2.  Care should be taken to mitigate the effects of bias (conscious or unconscious) on the part of the investigator. For example, the investigator must avoid giving any greater or lesser weight or credence to an individual's testimony because of that person's position (including employment by BPD or another City entity), race, ethnicity, gender identity, economic status, sexual orientation, etc.

3. In all investigations, investigators shall make credibility assessments when reviewing the statements/allegations of complainants, accused employees, and witnesses in accordance with the nature of the statements/allegations and the issues of the case.

   3.1. Credibility determinations about civilian, officer and witness statements must be based on independent, unbiased, and credible evidence.

   3.2. An officer's statement must be critically evaluated like any other evidence. Misconduct investigators shall not disregard a witness's statement solely because the witness has some connection to either the complainant or the officer or because the witness or complainant has a criminal history, but those factors should be considered along with other indicia of credibility;

   3.3. Investigators shall use a preponderance of the evidence standard when making credibility determinations. Investigators shall not give automatic preference to a member's statement over a complainant's statement or vice-versa.

   3.4. Factors to consider when making a credibility assessment include, but are not limited to:

      3.4.1. The person's opportunity to see or hear the things that the person claims to have seen or heard;

      3.4.2. Any motive the person has to lie;

      3.4.3. Any interest the person may have in the outcome of the case;

      3.4.4. Any expressed bias of the person;

      3.4.5. The person's memory and ability to recall events;

      3.4.6. Any inconsistencies in the person's statement and whether they are supported or contradicted by evidence;

         3.4.6.1. When inconsistencies occur, investigators and reviewing supervisors should not automatically disbelieve the person who made an inconsistent statement.

         3.4.6.2. The investigator should consider whether the inconsistencies relate to significant or insignificant matters and whether the inconsistency is reasonable in light of the circumstances.

         3.4.6.3. For example, a witness motorist may inconsistently state which lane their vehicle occupied but nonetheless provide details about the incident that correspond closely to video footage of the incident. The inconsistencies may be the natural consequence of the witness's focus on the incident, rather than an indicator of untruthfulness or generally faulty memory.

3.4.6.4. On the other hand, a different motorist claiming to have witnessed the same incident may present reliability issues if their account includes material inconsistencies (*e.g.*, describing the incident occurring in a different neighborhood, alleging the presence of officers known to have been at other locations, etc.).

3.4.6.5. In evaluating potential inconsistencies, investigators must be mindful that minor inconsistencies may arise from a variety of factors other than dishonesty, (*e.g.*, stress from the event or the interview, fatigue, passage of time, etc.).

3.4.7. Information reflecting an individual's habit, routine, or modus operandi. (Subject to the limitations stated in paragraph 3.5. of this section, this may include in some circumstances the individual's criminal or disciplinary record.)

3.4.7.1. However, information about a person's character or reputation alone, without more, shall not be considered.

3.4.7.2. See Section C, *Evaluating whether a pattern of behavior exists*, below for additional details regarding pattern analysis.

3.5. Only objective criteria relating directly to the truthfulness or credibility of the person should be used in deciding what weight is to be given to their testimony. Some examples may include: if their statements are not corroborated by other evidence, if their statements are not consistent with established facts or are consistent with established facts, and a past history of untruthfulness. Existence of a criminal record or a witness's connection to a complainant or officer should not alone be determining factors in establishing credibility.

3.6. Note that the manual *Investigating Workplace Harassment: how to be Fair, Thorough, and Legal,* published by the Society for Human Resource Management advises that, despite what many people think, it is very difficult to make credibility determinations on the basis of peoples' demeanor. The truthful witness may exhibit great nervousness, whereas someone lying may exude extreme confidence and composure. For this reason, **corroborating evidence** is extremely important, which in turn heightens the importance of locating and interviewing potential witnesses and gathering medical evidence where the complainant was injured.

4. In conducting the investigation, misconduct investigators may take into account the record of any witness, complainant, or officer who has been determined to have been

deceptive or untruthful in any legal proceeding, misconduct investigation, or other investigation.

5. Investigators must recognize that even truthful, accurate narratives of events may contain some inconsistencies and contradictions.

## B. Authenticating and Evaluating Documentary Evidence

1. The investigator must make assessments as to the authenticity and probative value of documents that are offered as evidence during an investigation.  The first step is to determine whether a given document is authentic – i.e., that it is what it purports to be. Some documents are self-authenticating (e.g., certified public records, books, newspaper articles).  Other documents have inherent indicia of reliability (e.g., letters on a doctor's letterhead or with a company logo, a company's security video). To authenticate a document, an investigator may need to take additional steps to verify the facts that are asserted in the document or the electronic evidence. When documents cannot be authenticated, the investigator should consult with a supervisor and/or Legal Affairs to discuss what additional steps can be taken to confirm or dispel the assertions presented, and to evaluate the weight given to the evidence in reference to the overall investigation.

2. The second step is to assess whether or to what extent statements or information contained in an authentic document shed light on issues relevant to the investigation. For example, some authentic documents may offer only conclusory opinions without evidentiary support. When finding evidence relevant and probative, it is important for an investigator to be able to justify their decision.

    2.1.    For instance, if an investigator determines that a statement in an incident report is accurate, she should be able to explain her decision, such as that the statement is consistent with the other evidence or statements taken in the investigation.  The statements contained in a document cannot be judged to be truthful simply because they are contained in an official report; corroboration of those statements must be established.

3. An investigator's determination of authenticity and probative value should be unbiased. The same standards should be applied to determine the authenticity and probative value of documents offered by external and internal sources.

## C. Evaluating Whether a Pattern of Behavior Exists

1. The Public Integrity Bureau shall review past case reports and specific allegations and dispositions to determine whether there is commonality or a pattern similar to the allegations in the case at hand, considering the time between complaints and their similarity to the

subject case. When a member's disciplinary history includes Unfounded, Exonerated, or Not Sustained cases, these cases cannot be used in a credibility determination unless there is a clear pattern or relevancy to the subject case.

2. The Public Integrity Bureau may contact the respondent member's supervisor and ask that supervisor to provide his or her observations and assessment of the accused employee.

### D. Supervision of the Investigation

### a. *Sergeant Duties*

1. Upon permanent assignment as direct supervisor of an investigation, the sergeant must promptly meet with the assigned primary investigator (if the secondary investigator is available, they should participate) to discuss the case, identify steps already taken and the investigative plan going forward by close of business the day of the assignment.

2. Each sergeant must meet with each investigator under their command at a minimum once per week to review their progress on every case and identify next steps, roadblocks and additional resources needed.

3. All weekly case reviews between the sergeant and investigator must be memorialized in IAPro by the sergeant.

4. During the weekly case review, the sergeant and investigator will review progress on each case, referring to the investigative checklist to guide this discussion.

   4.1.   The sergeant must consider whether the investigation is being conducted in a *thorough, fair, and timely* manner.

   4.2.   Sergeants must ensure that investigators are prepared to discuss the status of their investigations by keeping their investigative checklists updated, ensuring investigative steps have been documented, and addressing any questions/concerns the investigator has regarding the case.

   4.3.   Upon noticing any gaps in investigation, legal or policy concerns, delay in investigatory actions, insufficient documentation, or missing items on the checklist, the sergeant must promptly alert the investigator about the issues and then work with the investigator to remedy the concerns. The plan will be memorialized by the sergeant as a task in the IAPro case file.

   4.4.   If the sergeant notes continued problems or deficiencies on the part of an investigator, the sergeant shall consult with their lieutenant to discuss the best way to address the issues with the investigator.

5. Sergeant timeline expectations:

   5.1.   Once the investigation has been open for 30 days, the sergeant must perform a complete review of the investigator's case file. They must ensure all necessary investigative steps have been taken, identify any gaps or steps that

need to be taken, and ensure that the investigator is on schedule to complete the investigation in 90 days.

5.2. The sergeant may determine that the investigator needs to readjust their resources to complete the investigation in 90 days and/or the investigator may need to begin documenting reasons why more time might be needed beyond 90 days.

5.3. After the Lieutenant conducts a 60 day review of the investigator's case file (see following section, "Lieutenant Duties"), if the investigation is not on track to be completed by day 90, then the lieutenant must attend the next two weekly meetings between the investigator and the sergeant to help the investigator identify the concrete steps they need to take and to determine whether an extension request will be needed.

5.3.1. If after the two weekly meetings it is clear that an extension will be required, the investigator must complete an administrative report requesting an extension of no more than 30 days. This report must include a detailed justification for the extension and a plan of action for completing the investigation within 120 days. This report must be submitted to the investigator's sergeant by day 75. Additionally, for CRB-eligible cases, the investigator will submit the same request to CRB through the Administrative Unit by day 75.

5.3.2. All requests for extension must be forwarded, via chain of command, to the Deputy Commissioner of PIB, who must approve all extensions in writing.

6. Sergeants must be available to their investigators to discuss questions or concerns that the investigators may have pertaining to their investigations, to include, but not limited to:

6.1. The investigator's investigative plan or strategy

6.2. The investigator's request for coaching or guidance

6.3. The investigator's concerns about remaining neutral with any witness, officer or complainant

6.4. Legal issues that may arise during the course of an investigation (e.g., discovery of evidence through subpoena or search warrant)

7. Sergeants are also responsible for promptly reviewing all investigative reports within 48 hours of receiving the report from the investigator, and either approve the investigative report or return it to the investigator for corrections. If this timeline requires extension, it may be done so for an additional 24 hours only with approval by the Lieutenant. If another 24 hour extension is required, it may only be taken with

approval by the Captain, or the Major, if Captain is unavailable. Any extension request must be documented immediately in the IAPro case file.

8. In accordance with Subsection *d* of this Section, "IAStat", below, sergeants must attend every IAStat meeting, unless on approved leave or other priority duty related absence, and must follow up with the investigators on any items brought up during IAStat that require follow up. This follow up will occur during the weekly meeting between the investigator and the sergeant, and will be documented in the IAPro case file.

### b. *Lieutenant Duties*

1. Lieutenants must meet with all sergeants under their command on a weekly basis.

2. At these weekly meetings, Lieutenants and Sergeants must discuss:

    2.1. The status of all cases under their supervision

    2.2. Determine which cases should be prioritized (based on factors such as severity of the allegations, availability of perishable evidence, availability of witnesses, referrals to the SAO, suspension status of officers, how close the case is to the expiration date, among other factors). Ensure immediate investigative steps are identified in priority cases and communicated to the investigators responsible for those cases.

    2.3. Identify investigative steps that need to be taken on all cases.

    2.4. Any concerns that either has about specific cases or specific investigators

    2.5. Administrative issues or concerns within their command

    2.6. Legal issues, such as search warrants, subpoenas, or parallel criminal proceedings.

3. Lieutenant timeline expectations:

    3.1. Once an investigation has been open for 60 days, the lieutenant must perform a complete review of the investigator's case file to see whether the case is fully investigated, identify any gaps in investigative steps, and ensure that the investigation is on schedule to be completed within 90 days.

    3.2. The Lieutenant must assist the investigator in creating a detailed plan of action in order to successfully conclude the investigation by day 90.

    3.3. If the investigation is not on track to be completed by day 90, then the lieutenant must attend the next two weekly meetings between the investigator and the sergeant to help the investigator identify the concrete steps they need to take and to determine whether an extension request will be needed.

        3.3.1. If after the two weekly meetings it is clear that an extension will be required, the investigator must complete an administrative report requesting an extension of no more than 30 days. This report must include

a detailed justification for the extension and a plan of action for completing the investigation within 120 days. This report must be submitted to the investigator's sergeant by day 75. Additionally, for CRB-eligible cases, the investigator will submit the same request to CRB through the Administrative Unit by day 75.

    3.3.2. All requests for extension must be forwarded, via chain of command, to the Deputy Commissioner of PIB, who must approve all extensions in writing.

4. Lieutenants must be available to their sergeants to discuss questions or concerns that they have pertaining to specific investigations or investigators under their supervision.

5. Lieutenants must attend every IAStat meeting, unless on approved leave or other priority duty related absence and ensure that sergeants follow up with the investigators on any items brought up during IAStat that require follow up.

6. Lieutenants are responsible for managing caseloads within their command by reviewing the caseloads of each investigator in their command and ensuring caseloads are generally evenly distributed.

7. Manage command resources, for example staffing required on particular investigations.

### c. Considerations for Supervising a Thorough, Fair and Timely Investigation

On-going supervision of an investigation will consider criteria that include, but are not limited to, the following:

1. Was the investigation adequate, reasonable, thorough, timely and conducted to determine the truth?

    1.1. Were all reasonable efforts made to identify, locate, and interview potential witnesses?

    1.2. Was an area canvass conducted to locate witnesses and evidence?

    1.3. Was the incident scene inspected and documented?

    1.4. Was evidence identified, secured, inspected, and maintained appropriately?

    1.5. Was electronic evidence, including social media or online evidence identified and secured by appropriate legal means?

    1.6. Were all witnesses and subject officers interviewed?

    1.7. Were all reasonable leads followed to their logical conclusion?

    1.8. Were witnesses asked to identify other potential witnesses?

    1.9. Did the investigator assign priority to the most important issues of the investigation, or did they focus on minor concerns?

2. Were the interviews conducted appropriately?

2.1.    Did the investigator ask open-ended questions?

2.2.    Did the investigators ask appropriate follow-up questions and complete follow-up investigation when warranted?

2.3.    Did the investigator use leading questions only when appropriate?

2.4.    Were the interviews recorded?

2.5.    Were the interviews conducted in person at a convenient location for civilian witnesses?

2.6.    Were the witnesses separated and interviewed individually?

2.7.    Did the investigator make proper use of the interview environment under their control?

2.8.    Were all witnesses and subject officers treated with dignity and respect?

3.    Was the investigation conducted fairly?

3.1.    Was there evidence of bias against the complainant?

3.2.    Was there evidence of bias against the officer?

3.3.    Did the investigator suppress or minimize statements unfavorable to the subject officer?

3.4.    Did the investigator selectively interview only witnesses who favored the officer(s)?

3.5.    Were the subject officers allowed representation during interview and advised of applicable rights?

3.6.    Did the investigators allow the subject officers to review evidence or witness statements prior to the subject officer's interview?

3.7.    Was there evidence that the investigator pressured the complainant to withdraw or minimize their complaint?

3.8.    Was there evidence that the investigator conspired with the subject officer to lessen the subject officer's culpability?

4.    Was the investigation properly and timely documented?

4.1.    Was the report well written and generally free of grammatical errors?

4.2.    Did the report detail a chronological account of events?

4.3.    Was the report prepared in a logical format?

4.4.    Was the report factual, or did it contain statements that jumped to conclusions?

4.5.    Did the report clearly identify what facts were not disputed and what factual claims were disputed?

4.6.    Did the report clearly identify inconsistencies in the factual accounts and evidence?

4.7.    Is there documentation of which accounts are corroborated by independent evidence obtained in the investigation?

4.8.    Were all reference documents included in the case file?

4.9.    Were all witnesses, officers, and involved parties identified (names, addresses and phone numbers?)

4.10.   Was there evidence of bias, embellishments, exaggerations or false statements, and is there an analysis of how these affect the outcome the case?

4.11.   Were credibility assessments supported with evidence?

4.12.   Did the report provide a clear, defensible basis for all conclusions?

4.13.   Did the report provide alternative interpretations based on conflicting but credible evidence?

4.14.   Ensure that any evidence collected was done so in accordance with Policy 1401, *Control of Property and Evidence.*

5.  Was the investigation and report prepared in a timely manner?

5.1.    Was the investigation and report completed within 90 days?

5.2.    If not concluded in the required time period, was an extension requested, and was this extension request justified?

6.  Review the core components of the investigation, including listening to the interviews of all material witnesses to the extent possible.

6.1.    Assess whether asked open-ended questions and used effective and appropriate follow up questions.

6.2.    Listen for leading questions or suggestions of defenses to subject officers.

6.3.    Provide the investigator timely feedback regarding interview techniques and the need for any follow-up questioning.

7.  Determine whether or not all reasonable efforts were made to identify, locate, and interview witnesses, preserve and collect evidence, and follow reasonable leads.

### d. IAStat

1.  IAStat is a critically important internal PIB meeting PIB that occurs once per week and is convened by PIB Command. In the event a PIB Commander is unavailable to convene IAStat, an Administrative Lieutenant is able to convene the meeting.

2.  IAStat must be attended by all scheduled Lieutenants, Investigative Sergeants, the Captain, Major, Deputy Commissioner, and a Legal Affairs representative, unless on approved leave or other priority duty related absence.

3.  At each IAStat meeting, the lieutenant of one investigative team, its two investigative sergeants, and all of the team's investigators must be prepared to present the case progress on all of their cases.

4. Commanders will determine which specific cases will be presented during the meeting each week. Those chosen will include cases set to expire within 30 days, any noteworthy cases, and a selection of recently assigned new cases.

5. IA Stat meetings will rotate through each investigative team as follows: week 1, team 1; week 2, team 2; week 3, team 3; week 4, team 1; week 5, team 2; etc.

   5.1. The investigator must be prepared to walk through the progression of each case, noting all tasks assigned and completed. This allows supervisors to review steps, ask questions, asking follow up tasks, and ensure no investigative steps have been missed or overlooked

   5.2. During the presentation, the investigator's sergeant or lieutenant will assign tasks as recommended by Command within IAPro and assign due dates for tasks to be completed.

   5.3. Detectives will be required to complete the assigned tasks and documents steps taken within IAPro and sergeants and lieutenants will ensure that tasks have been completed by the assigned due date.

6. IAStat also serves to identify training needs based on patterns and trends in the investigatory process. Over time PIB leadership will identify these trends across investigators and as part of a comprehensive continuous improvement culture, is to identify training needs as well as other corrective actions to address trends observed.


## IX.   **COMPLETION OF THE INVESTIGATION**

### A. **Investigative Summary**

1. Upon completion of all investigative steps, the investigator is responsible for properly summarizing the facts of the case and recommending investigative findings. Each investigator will adhere to the following procedure when summarizing an investigation.

   1.1. Discuss the investigation and projected conclusion with their immediate supervisor.

   1.2. Organize the investigative case book into logical sequence, not chronological order.

   1.3. Request four sets of photographs for all sustained cases; one set in original case book, two sets in the case book to go to OAH, and the fourth set to go to CRB.

   1.4. Prepare an Investigative Summary Report of the investigation in numerical order. The summary is a consecutively numbered, step-by-step, neutral exposition of the investigative procedures and results in each case, i.e., complainant, corroborative witnesses, respondent, respondent's supporting

witnesses, other police personnel, and other pertinent data. The purpose of the summary step is to outline the testimony, bringing out the critical issues and facts. It is to be presented without personal comment.

1.5. The investigative summary will be organized by detailing the chronological order of events of how the investigation transpired and what information was learned at each step.

2. The investigative Summary Report shall include the following:

2.1. A narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the misconduct investigator's independent review of the facts and circumstances of the incident;

2.2. Documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the misconduct investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report also will include all available identifying information for anyone who refuses to provide a statement;

2.3. Documentation of whether officers or other BPD employees were interviewed, including audio and video and transcript of those interviews, if available;

2.4. Interviewees listed in the Investigative Summary Report evidence section should be identified, i.e., as the named employee, witness employee, complainant, or subject

2.5. The names of all other BPD employees who witnessed the incident;

2.6. The investigator's evaluation of the incident, based on their review of the evidenced gathered, including a determination of whether the officer's actions appear to be within BPD policy, procedure, regulations, orders or other standards of conduct required of BPD officers;

2.7. In cases where credibility determinations must be made, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

2.8. In cases where material inconsistencies must be resolved between complainant, officer, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

2.9.    If a weapon was used, documentation that the officer's certification and training for the weapon were current; and

2.10.    Documentation of recommendations for non-punitive corrective action or misconduct charges.

3. The investigator will make a recommendation regarding a disposition for each allegation but will <u>not</u> provide a finding; the Lieutenant is responsible for making the initial finding in each case. The final determination of the case finding will be made by PIB Command. See below for guidance around recommended dispositions.

4. Additionally, the investigative summary will include the investigator's evaluation of policy, training, or equipment concerns and any recommendations for how to address these concerns. Specifically, the investigator will evaluate:

4.1.    Whether the law enforcement action was in compliance with training and legal standards;

4.2.    Whether other tactics were more appropriate under the circumstances;

4.3.    If the incident indicates a need for additional training, counseling, or other non-disciplinary corrective actions; and

4.4.    If the incident suggests a need to revise BPD policies, strategies, tactics or training.

5. Upon concluding the investigation, each investigator shall:

5.1.    Prepare a table of contents for the case book;

5.2.    Deliver the entire investigation package to their immediate supervisor for review and approval;

5.3.    Insert numerical separators as required in the work booklet only;

5.4.    In cases recommended as "sustained" , insert a photograph of the respondent in the case book;

5.5.    In sustained cases, include forms reflecting prior sustained PIB cases and prior disciplinary action;

5.6.    Ensure that in instances wherein the complainant or witnesses are not contacted in a timely fashion that certified letters are promptly posted requesting their immediate assistance.

**B.  Investigative Summary Review**

Once the Investigative Summary is prepared and the file is ready to submit to a PIB sergeant for review.  The Investigative Summary review continues up to the Deputy Commissioner, or designee, for all cases. Once the case finding has been completed, a letter will be forwarded to the complainant and the respondent employee(s) indicating the investigative finding.  The investigator will document this update, as with all other investigative milestone updates.

**C. Disposition Recommendation**

1. For each allegation of misconduct, investigators shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:

   1.1. "Unfounded," means where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the accused officer;

   EXAMPLES:

   - Complainant alleges that the officer who responded to her call for assistance in the service of a protective order against her estranged spouse ripped up the paperwork, let the spouse leave the location without effecting service, and called her an idiot. The officer's body worn camera footage, which was activated during the entire call for service, establishes that the officer reviewed the paperwork, served it upon the spouse, and spoke respectfully to the complainant.

   - Complainant alleges that an officer used excessive force in arresting him. The officer named in the complaint is not the arresting officer, as evidenced by the arrest paperwork and the arresting officer's body worn camera. At the time of the arrest, the accused officer and her sergeant were handling another call three blocks away from the arrest of the complainant and never responded to the complainant's arrest location.

     1.1.1. Maryland law dictates that evidence that meets the clear and convincing burden of proof "should be 'clear' in the sense that it is certain, plain to the understanding, and unambiguous and 'convincing' in the sense that it is so reasonable and persuasive as to cause you to believe it." Maryland Civil Pattern Jury Instruction 1:15 (5th Ed., 2018). In order to meet the burden of proof known as by a preponderance of the evidence:

        *a party must prove that it is more likely so than not so. In other words, a preponderance of the evidence means such evidence which, when considered and compared with the evidence opposed to it, has more convincing force and produces in your minds a belief that it is more likely true than not true.*

        Maryland Civil Pattern Jury Instruction 1:14 (5th Ed., 2018).

   1.2. "Sustained," means where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;

   EXAMPLES

- Complainant alleges that the officer who responded to her home for a domestic complaint failed to arrest her ex-boyfriend, who was present at the location and had assaulted her, causing a visible injury, and failed to write a report about the incident. The complainant and her teenage son gave consistent statements about the assault and the officer's response, and the complainant provided photographs of her injuries. The officer did not activate his body worn camera during the incident. CAD reflected the officer's response to the location. The officer coded the call as unfounded. No report was located in RMS.

- Complainant alleges that an off-duty police officer caused a minor car accident at an intersection. When they both pulled over, the officer got out of her car and approached the complainant with her badge in one hand and a firearm in the other hand. The officer yelled at the complainant and accused him of causing the accident, and stated that she was a police officer and she would have him arrested. She then got back into her car and fled the scene. The complainant obtained a partial tag number. An independent witness who was walking down the street made a complaint two days after the complainant, which was consistent with the complainant's account. The witness provided a description of the officer and her car, but no tag number. The investigator identified the officer's personal vehicle based on the tag number, located it parked on the lot of the district to which the officer was assigned, and observed damage and paint transfer that were consistent with the complainant's account. A surveillance video from a business across the street from the scene of the accident captured the incident on video, but did not contain audio. The officer denied that she was involved in the accident and that she had a confrontation with the complainant.

1.3. "Not Sustained," means where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; EXAMPLE

- Complainant alleges that an officer failed to arrest his neighbor after the complainant called in a noise complaint on the neighbor and advised the officer that the neighbor was wanted on a warrant. The officer's body worn camera captured the interaction between the officer and the complainant, and the officer and the neighbor. None of the recordings captured the complainant saying anything about the open warrant to the officer. The officer asked dispatch to run a warrant check on the complainant and the neighbor, which came back as negative. According to departmental

records, there were no open warrants for the neighbor on or prior to the date of the incident.

1.4.　"Exonerated," means where the evidence determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate BPD policies, procedures, or training;

EXAMPLES

- Complainant alleges that officers illegally searched her home and falsely arrested her son. She was not at home at the time of the search or arrest. Officers had obtained a valid search and seizure warrant for the location, and upon their arrival, the complainant's son admitted that he had a handgun in his bedroom closet; the handgun had been reported stolen two weeks prior to the execution of the warrant. A copy of the search warrant was left at the location. All of the officers' actions were captured on body worn camera.

1.5.　The investigator shall not use the disposition "administratively closed" or "tracking only". This disposition has been discontinued.

## X.　**REVIEW OF THE INVESTIGATION**

1. The investigator will submit the completed investigation to their PIB Sergeant for approval.　The sergeant must complete the "Sergeant Review Checklist" (see Appendix J) to conduct a thorough review.

1.1.　All items on the checklist must be completed.

1.2.　For any item that the sergeant feels is insufficiently performed or documented, or for any part of the investigation that the sergeant determines needs further investigative work, the sergeant must document their observations and reasons for returning a case to the investigator.

1.3.　If the sergeant does not agree with the investigator's recommended finding, the sergeant must document their reason for disagreement. This will be included as an addendum to the investigative report.

2. If the sergeant approves, it is then reviewed by the Investigative Lieutenant, who will review the investigation by completing the "Lieutenant Review Checklist" (see Appendix K) and either approve or disapprove of the investigator's recommended finding of sustained, not sustained, unfounded or exonerated.

2.1.　All items on the checklist must be completed.

2.2.　For any item that the Lieutenant feels is insufficiently performed or documented, or for any part of the investigation that the Lieutenant determines needs further investigative work, the Lieutenant must document their observations and reasons for returning a case to the investigator.

2.3.    If the Lieutenant does not agree with the investigator's recommended finding, the Lieutenant must document their reason for disagreement. This will be included as an addendum to the investigative report.

3. Each reviewer will review the report to ensure that the report is complete, that it meets the requirements of BPD policy and this manual, and that the findings are supported by the appropriate standard of proof.  A reviewer shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings;

4. Whenever a superior officer orders additional investigation, they must document the actions it as a "task" in IAPro. Whenever a superior officer does not agree with the investigator's recommended findings, but does not order additional investigation, they must document their reasons for their conclusion in an addendum to the casebook, and forward it through their chain of Command.
**Note**: Refer to Section VIII(D)(c) above for helpful considerations for assessing the thoroughness, fairness and timeliness of the investigation.

4.1.    The case's Investigative Summary will be amended to reflect any additional steps taken as requested by any superior officer; the investigation will be re-submitted to PIB Command to review the additional investigative work conducted. It is important to keep in mind that there must be sufficient time available for any additional work, as well as review by PIB Command and those involved in the disciplinary process to be completed, prior to the statutory limitations.

5. All cases will be forwarded, through chain of Command, to the Deputy Commissioner of PIB or their designee to make the final determination as to findings in the case. The Deputy Commissioner of PIB or their designee shall order additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings.  If the Deputy Commissioner of PIB or their designee does not agree with the investigator's recommended findings, but does not order additional investigation, they may order the finding to  be changed.  This determination must be based solely on the Deputy Commissioner of PIB's or designee's (1) independent review of the investigative file; (2) determination that there is not additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings; and (3) determination that the evidence did not support the previous finding, based on the applicable standard of proof.
**Note**: For cases where the finding was changed by the Deputy Commissioner or designee, the addendum will be provided to the PIB Investigative Sergeant and

Lieutenant for consideration in training of PIB investigators and debriefing the investigation.

## XI.    POST-FINDINGS PROCEDURES

### A.  Not Sustained/Unfounded/Exonerated

1. For cases where the final findings are not sustained, unfounded or exonerated, the case will be forwarded to PIB's Administrative Section, where the findings will be noted in IAPro, and the case file will be maintained.[4] The last task that must be entered in IAPro should state that the case was forwarded to the Administrative Section.

2. The Administrative Section will ensure that a letter is forwarded to the complainant within 5 business days of receiving the final approved case file, advising them of the findings.

   2.1.  The investigation will be closed out by the Administrative Section without further review.

      2.1.1.  Select the finding in IAPro.

      2.1.2.  If case is not sustained, ensure each allegation that applies is marked with the finding.

      2.1.3.  If the case is anything but sustained, mark complete.

3. The Administrative Section will ensure that an email is sent to the respondent officer via their departmental email informing them of the outcome of the case.

### B.  Sustained Finding

1. For cases with a final finding of sustained, PIB will forward the sustained case file to the Office of Administrative Hearings (OAH) by the next business day in order for OAH to prepare the case presentation for the Disciplinary Review Committee (DRC). OAH will notify the member of the sustained finding.

2. The DRC will make a disciplinary recommendation on behalf of the Police Commissioner.

   2.1.  The recommended discipline will be based on the totality of the investigation, and the respondent's disciplinary history, consistent with the Disciplinary Matrix[5].

---

[4] There will be no further investigation unless directed so by the Deputy Commissioner of PIB.
[5] Policy 310

3. Upon DRC making their recommendation, the OAH will send the case file back to the PIB Administrative Section, where the findings will be noted in IAPro.

4. The Administrative Section will ensure that a letter is forwarded within five business days to the complainant advising them of the findings.

5. The investigation will be placed in "suspended" state by the Administrative Unit.

    5.1. Select the finding in IAPro.

    5.2. If the case is sustained, add all of the charges from the charging document and mark each allegation with its appropriate finding.

        5.2.1. If sustained, mark the charges as indicated above and then mark the case 'suspended', pending the officer's acceptance of discipline or request of trial board.

        5.2.2. Stays suspended until the discipline has been completed.

        5.2.3. After the discipline has been completed, the Administrative Unit enters the discipline and it is marked as closed.

**XII.**   **<u>APPENDICES</u>**

  **A. IAS Recusal Form**
  **B. Initial Checklist and 30-Day Checklist**
  **C. Complainant 5-Day Letter**
  **D. Request to Withdraw Complaint**
  **E. Complainant Case Update Letter**
  **F. PIB Interview Template**
  **G. Notice of Investigation**
  **H. Non-Disclosure, Non-Retaliation and Confidentiality Order**
  **I. Investigative Report Template**
  **J. Sergeant Review Checklist**
  **K. Lieutenant Review Checklist**
  **L. Investigative Plan Template**
  **M. Miranda Warnings & Waiver**
  **N. Sample Use Immunity Grant Advisement Form, "Garrity Warning"**
  **O. Sample Response Letters to Complainant**
  **P. Respondent Notification of Finding Template**

**APPENDIX A**

**IAS Recusal Form**



# Baltimore Police Department
## IAS Recusal Form

This form shall be completed and approved by OPR command prior to the permanent assignment of the investigation.

| Case Number | Investigator's Name (Printed) | Seq. # | Investigator's Sergeant (Printed) | Seq. # |
|---|---|---|---|---|
|  |  |  |  |  |
| Accused BPD Member(s): |  |  |  |  |

BPD recognizes the negative impact of actual bias or the appearance of bias on the legitimacy of internal investigations. For that reason, conflicts of interest in misconduct investigations or in those assigned by BPD to recommend or make disciplinary decisions shall be prohibited. This provision requires BPD to ensure the following:

    a.   No employee who was involved in or a witness to an incident shall conduct or review a misconduct investigation arising out of that incident;

    b.   No employee who has an external business relationship or close personal relationship with a principal or witness in a misconduct investigation shall conduct or review the misconduct investigation. No such person may make any disciplinary decisions with respect to the misconduct including the determination of any applicable grievance or appeal arising from any discipline. A close personal relationship includes a personal friendship, a romantic or familial relationship.

    c.   No employee shall be involved in an investigation or make any disciplinary decisions with respect to any person who they directly report to in their chain of command. In cases where BPD is unable to meet this requirement, the investigation must be referred to an outside authority. Any outside authority retained by BPD must possess the requisite background and level of experience of internal affairs investigators and must be free of any actual or perceived conflicts of interest;

OPR investigators will not be assigned to any assignments which could create a conflict of interest for their administrative investigations, including any assignment in which the investigator would report to or work with the subject of an open investigation. To ensure the above requirements, and in accordance with Policy 306, *Complaint Intake and Classification Process*, an investigator shall disclose the circumstances of any relationship with a BPD member accused in an investigation to ensure that the nature of the relationship could not be perceived to compromise the investigative process. An investigation shall be reassigned if any of the following conditions exist:

➢ Family relationship;
➢ Outside business relationship;
➢ Romantic relationship (current or past);
➢ Personal friendship; or
➢ Work relationship, including where the investigator would report to or work with the subject of the investigation.

**Declaration:**

| Detective | Sergeant | Lieutenant |
|---|---|---|
| ❑ I was directly involved in the incident | ❑ I was directly involved in the incident | ❑ I was directly involved in the incident |
| ❑ I have a relationship with one or more of the parties accused which could be perceived as compromising to the investigative process | ❑ I have a relationship with one or more of the parties accused which could be perceived as compromising to the investigative process | ❑ I have a relationship with one or more of the parties accused which could be perceived as compromising to the investigative process |
| ❑ I am not directly involved in the incident and do not have any relationship with any of the accused parties which could be perceived as compromising to the investigation | ❑ I am not directly involved in the incident and do not have any relationship with any of the accused parties which could be perceived as compromising to the investigation | ❑ I am not directly involved in the incident and do not have any relationship with any of the accused parties which could be perceived as compromising to the investigation |
| Detective's Signature: | Sergeant's Signature: | Lieutenant: |
| Date:      Seq: # | Date:      Seq: # | Date:      Seq: # |

**Review:**

| Sergeant Review | Lieutenant Review | OPR Commander Review |
|---|---|---|
| I have met with the investigator and made the following determination: | I have reviewed this form and have made the following determination: | I have reviewed this form and have made the following determination: |
| ❑ Approved/No Conflict<br>❑ Reassigned | ❑ Approved/No Conflict<br>❑ Reassigned | ❑ Approved/No Conflict<br>❑ Reassigned |
| Signature: _____ | Signature: _____ | Signature: _____ |
| Date: _____ Seq.: _____ | Date: _____ Seq.: _____ | Date: _____ Seq.: _____ |

**APPENDIX B**

**Initial Investigative Checklist and 30-Day Checklist**

## Initial Investigative Checklist (first 48 hours)

The primary investigator must complete the below checklist and mark the date that each task is completed. Mark "N/A" when the task does not apply to the case and be prepared to explain why you marked "N/A" This checklist serves as a guidance tool. Investigators must follow all take all necessary steps to follow all investigative leads, even if a specific task is not outlined in the checklist.

| Task | Date Completed or "N/A" if Not Applicable | Supervisor Approve Date & Initials |
|------|------|------|
| ☐ Scene Response / Area Canvass | | |
| ☐ Complete Recusal Forms | | |
| ☐ Obtain BWC | | |
| ☐ Identify all officers involved (BWC, CAD, Incident Reports) | | |
| ☐ Supervisor Meeting | | |
| ☐ Schedule Complainant Interview | | |
| ☐ Citiwatch Cameras | | |
| ☐ Private Cameras (incl. cell phone video) | | |
| ☐ Identify all witnesses involved | | |
| ☐ Schedule Witness Interviews | | |
| ☐ Witness 1 (name) _____ | | |
| ☐ Witness 2 _____ | | |
| ☐ Witness 3 _____ | | |
| ☐ Identify all forms of misconduct | | |
| Was arrest lawful? ☐Y ☐N | | |
| Abusive language? ☐Y ☐N | | |
| Excessive force? ☐Y ☐N | | |
| UOF report complete? ☐Y ☐N | | |
| Harassment? ☐Y ☐N | | |
| Criminal misconduct? ☐Y ☐N | | |
| If criminal, SAO notified? ☐Y ☐N | | |
| ☐ Draft Investigative Plan | | |
| ☐ 5-Day Letter to Complainant | | |
| ☐ Preliminary review of written reports | | |
| ☐ KGA recording reviewed | | |

**APPENDIX B, Continued**

**Initial Investigative Checklist and 30-Day Checklist**

# First 30 Day Investigative Checklist



The primary investigator must complete the below checklist and mark the date that each task is completed. Mark "N/A" when the task does not apply to the case and be prepared to explain why you marked "N/A" This checklist serves as a guidance tool. **Investigators must follow all take all necessary steps to follow all investigative leads, even if a specific task is not outlined in the checklist.**

| Task | Date Completed or "N/A" if Not Applicable | Supervisor Approve Date & Initials |
|---|---|---|
| ☐ Chronological account of events | | |
| ☐ Photographs of involved members | | |
| ☐ Other Evidence Obtained | | |
| ☐ Crime lab docs/reports | | |
| ☐ Run sheets | | |
| ☐ Photos | | |
| ☐ Text messages | | |
| ☐ 911 recordings | | |
| ☐ Social media posts | | |
| ☐ Property/Evidence Reports | | |
| ☐ Statement of Probable Cause | | |
| ☐ Medical evidence and/or records | | |
| ☐ Incident reports, UOF reports, CID investigative reports | | |
| ☐ Other _____ | | |
| ☐ Other _____ | | |
| ☐ Other _____ | | |
| ☐ Policies identified & reviewed | | |
| ☐ Review of member's complaint history, personnel file & attendance | | |
| ☐ Complainant Interview | | |
| ☐ Respondent Served | | |
| ☐ Respondent Interview Scheduled | | |

Complaint XXXXXXXXXXX

**APPENDIX C**

**Complainant 5-Day Letter**

DATE

Mr. _____
ADDRESS
Baltimore, MD ZIP

### <u>Notice of Receipt of Complaint</u>

Dear Mr. _____:

The Public Integrity Bureau (Internal Affairs) of the Baltimore Police Department has opened an investigation into your complaint against an officer of the Baltimore Police Department, filed on DATE, alleging [allegations]. The initial number assigned to this case is [WRITE CC NUMBER HERE], and the PIB case number is **[PIB NUMBER]. The** assigned investigator is Detective NAME.

[Detective NAME will contact you within the next five (5) days to schedule an interview,] [Your interview with Detective NAME is scheduled for DAY, DATE at TIME.] The interview will take place at the Public Integrity Bureau, located at 2524 Kirk Avenue, Baltimore, Maryland 21218 [or other location, if applies].

The Baltimore Police Department takes all complaints against our members seriously. We appreciate your participation in the process, although it is not required. Please be advised that the Department will investigate the complaint, regardless of your participation.

Please contact Detective NAME at 410-396-2300, which is a recorded line, if you need to reschedule the interview or if your address, telephone number, or e-mail address changes. You may also contact [him or her] any time you have questions about the investigation or to request an update on the status of your complaint. Our business hours are 8:30am to 4:30pm, Monday through Friday.

[INSERT THE FOLLOWING IF CRB-ELIGIBLE] You may also file a complaint against a police officer in person or by calling the following organization:

Civilian Review Board
7 E. Redwood St., 9th Floor
Baltimore, Maryland 21202
(410) 396-3141

Sincerely,

*Major S.C. Lansey-Delgado*
Major Stephanie Lansey-Delgado
Public Integrity Bureau

**APPENDIX D**

**Request to Withdraw Complaint**

**POLICE DEPARTMENT
BALTIMORE MARYLAND**

<u>STATEMENT OF WITHDRAWAL</u>

<u>PIB Case Number:</u>

I hereby withdraw my complaint being investigated in Public Integrity Bureau (Internal Affairs) case number 2019-xxxx. I voluntarily withdraw this complaint without coercion, threats, promises of reward, or immunity of any kind by anyone.

I understand that while this is a formal record of my desire to withdraw the complaint, BPD will not stop its investigation based on my desire to withdraw the complaint.

REASON FOR WITHDRAWAL:

Complainant Name: _____

Signed: _____

Today's Date: _____

Witness Name: _____

Witness Signature: _____

**APPENDIX E**

**Complainant Case Update Letter**

DATE


Mr. _____
ADDRESS
Baltimore, MD ZIP

### **Update Regarding Your Complaint**


Dear Mr. _____:

 The Public Integrity Bureau of the Baltimore Police Department is reaching out to let you know that we continue to investigate your complaint filed on DATE (Case Number XXXX-XXXX).

 Please contact Detective NAME at 410-396-2300, which is a recorded line, if you have questions about the investigation.  In addition, please contact Detective NAME if your address, telephone number, or e-mail address changes. .

 Thank you.




Sincerely,

*Major S.C. Lansey-Delgado*

Major Stephanie Lansey-Delgado
Professional Integrity Bureau


SLD/xxx




**APPENDIX F**

# **PIB Interview Template**

*The follow is a general template for PIB interviews. All investigators **MUST** review their interview plan with their supervisor prior to conducting a formal interview, in order to ensure that you are prepared to cover all anticipated and appropriate topics.*

## A. <u>INTRODUCTION AND ADVISEMENTS</u>

### 1. <u>WITNESS OFFICER</u>

This is the recorded statement of Police Officer _____ taken at the office of the Public Integrity Bureau on _____, 2019 at approximately _____hours.  This interview is being conducted by Detective _____ in the presence of Detective _____.  This statement is in reference to PIB Case Number _____.  For the record, this interview will be audio [and video, if applicable]-recorded.

*Provide Applicable Advisements (LEOBR, Miranda, and/or Garrity)*

Q:      Please state your full name, rank, and current assignment.

Q:      What is your EOD?

Q:      What is your Sequence Number?

Q:      Officer _____ you are here to discuss an incident that occurred on _____ at _____ at approximately _____hours.  Other than with legal counsel, have you discussed this incident with anyone else?  Who and when?

Q:      Did you write any report, 95, memorandum or any other written document pertaining to the incident that we are here for today?

Q:      Are you aware of any report, 95, memorandum or any other written document written by anyone else pertaining to the incident we are here for today?

## GO TO SECTION B – INCIDENT FACTUAL BACKGROUND

**APPENDIX F, Continued**

## 2. **ACCUSED OFFICER**

This is the recorded statement of Police Officer _____ taken at the office of the Public Integrity Bureau on _____, 2019, at approximately _____ hours.  This interview is being conducted by Detective _____ in the presence of Detective _____.  Counsel for the accused is _____.  This statement is in reference to PIB Control Number _____.  For the record, this interview will be audio [and video, if applicable] recorded.

*Provide Applicable Advisements (LEOBR, Miranda, and/or Garrity)*

Q:    Officer _____, you were just provided with your Law Enforcement Officer's Bill of Rights.  Do you understand those rights?

Q:    Have you received your written Notification to Accused of Complaint?

Q:    Please state your full name, rank, and current assignment.

Q:    What is your EOD?

Q:    What is your Sequence Number?

Q:    At this time, [NAME OF ATTORNEY], do you have any statements to add?

Q:    Officer _____ you are here to discuss an incident that occurred on [DATE] at [ADDRESS] at approximately [TIME] hours.  Other than with legal counsel, have you discussed this incident with anyone else?  Who and when?

Q:    Did you write any report, 95, memorandum or any other written document pertaining to the incident that we are here for today?

Q:    Are you aware of any report, 95, memorandum or any other written document written by anyone else pertaining to the incident we are here for today?

## GO TO SECTION B – INCIDENT FACTUAL BACKGROUND

## 3. **CIVILIAN WITNESS OR COMPLAINANT**

Good Morning/ Good Afternoon, _____. This is the recorded statement of _____ taken at the office of the Public Integrity Bureau [OR STATE OTHER LOCATION] on _____, 2019, at approximately _____ hours.  This interview is being conducted by Detective _____ in the presence of Detective _____.  This statement is in reference to IAD Control Number _____. For the record, this interview will be audio [and video, if applicable] recorded.

**APPENDIX F, Continued**

Thank you for coming in today, the department takes misconduct of police officers very seriously and your participation is greatly appreciated.  We know you have taken time out of your day to be here and we appreciate you doing so. You are here to discuss an incident that occurred on _____at _____.

In order for us to do a complete investigation and make accurate findings in the case, we want everyone we interview to provide us a truthful, complete account of what they remember about this matter.  We also want everyone to tell us about any other sources of evidence, such as other witnesses, or physical evidence.  Does that sound fair to you? Are you fine with that?

*Give a brief explanation about the purpose of the interview, and why they are being interviewed (be careful not to taint testimony). Also, explain the investigative process, including timeframes and dispositions, by stating something like the following:*

I am the lead investigator tasked with collecting all of the evidence that exists and evaluating it to determine whether or not Officer _____ violated any BPD policies, rules or laws. I will send you a letter at least every 30-days to let you know the status of the case, and I will send you a letter at the conclusion of the investigation. You may reach out to me at any point by phone or email if you have questions or concerns, and I will answer them to the best of my ability. There may be certain pieces of information that I cannot share with you to preserve the integrity of the investigation, and I will let you know when that is the case. The investigation should be completed within 90 days, but it may be extended if needed. If the officer is found to have violated policy, he/she will be charged and face discipline as determined to be appropriate by commanders in the Department. If the Department seeks to discipline the officer, the officer may elect to take the case to trial.

Q:    Have you and I spoken before?

Q:    Did we talk about anything else?

Q:    Did you talk to anybody else in the agency about the case? If yes, with who and what did you discuss?

Q:    Did we review any video or evidence together prior to the recording?

- If yes, state: *Before starting this recording, please tell us what you reviewed. [Confirm whether it included BWC footage, your cell phone video, an email, a report, etc.] that was [recorded, written] on X date. Can you confirm that this is what you reviewed?*

Q:    What other sources of information about the matter have come to your attention?

Q:    Have you spoken to anyone else about the incident? If so, please state who you have spoken to about the incident.

## GO TO SECTION B – INCIDENT FACTUAL BACKGROUND

**APPENDIX F, Continued**

# B. <u>INCIDENT FACTUAL BACKGROUND</u>

*Get a complete statement of facts including and any and all details.*

       Q:     Can you tell me what happened or what you recall or know about that incident?

*Make sure to drill down on details by asking follow up questions. If any BPD employee refuses to answer a question, instruct the interviewee that they must provide an answer. BPD policy requires them to cooperate fully with this investigation.*

*Generally, you want to ask the following questions:*

       Q:     What happened?

       Q:     When did happen?

       Q:     Where did happen?

       Q:     Who was there?

       Q:     Who did it? *Get a description.*

       Q:     Why did it happen?

       Q:     How did it happen?

       Q:     Do you know why it happened?

       Q:     What led up to the investigation?

       Q:     What did you do afterwards?

       Q:     Did you video record?

       Q:     Did you audio record?

       Q:     Did anyone else record it?

       Q:     Did you take any photos?

       Q:     Did you tell anyone about it?

       Q:     Are there any text messages or social media posts about what happened?

       Q:     Are there any witnesses?

       Q:     Who are they and what contact information do have them?

**APPENDIX F, Continued**

Q:   Do you have any documents or evidence related to the event (ensure you get the documents or evidence and properly document the source)?

  • Please explain the evidence that you have provided.

Q:   Are you aware of any other evidence or documentation related to the event?

*The investigator must document the receipt of all evidence from witnesses contemporaneously with the receipt of it.*

Q:   **[FOR ALL BPD OFFICERS]** What is your understanding of the policy at issue and all related training?

## GO TO SECTION C FOR ALL INTERVIEWS

## C. <u>CLOSING QUESTIONS FOR ALL INTERVIEWS</u>

Q:   Is there anything you care to add at this time that would clarify any of your responses to the questions asked of you, or that would aid in this investigation?

Q:   Have you had ample time and opportunity to answer all of the questions asked of you during this investigation?

Q:   Has what you've told me been the truth to the best of your knowledge and recollection?

Q:   Has this recorded interview been interrupted by me or any other investigator for the purpose of influencing your responses to any questions asked of you?

## FOR CIVILIAN WITNESS OR COMPLAINANT, GO TO SECTION D.

## FOR WITNESS OFFICERS, GO TO SECTION E

## FOR ACCUSED OFFICERS, GO TO SECTION F

**APPENDIX F, Continued**

## D. <u>CONCLUDING CIVILIAN WITNESS OR COMPLAINANT INTERVIEW</u>

In order to protect the integrity of the investigation, please do not discuss the facts of the case with anyone other than your lawyer.

Let me make sure I have your correct contact information [*CONFIRM INFORMATION*].  I may need to follow up with you to clarify information we spoke about today. Also, if you recall any additional information, learn of any new information or witnesses, or are contacted by anyone else about the matter, please contact me. If you change your address, phone number or email address, please contact me to let me know as well.

As a reminder, retaliation for participating in an investigation violates BPD policy and may be unlawful. Please contact me if you are facing any form of retaliation.

If the officer faces discipline in relation to this investigation, he or she may elect to take the case to trial. Are you willing to testify in an administrative disciplinary trial?

This statement is terminated on _____ at approximately _____ hours.


## E. <u>CONCLUDING WITNESS OFFICER INTERVIEW</u>

You are not allowed to discuss this matter with anyone other than your attorney, FOP representative, PIB Investigator, or Commanding Officer (unless your Commanding Officer is involved in the incident).

This statement is terminated on _____ at approximately _____ hours.


## F. <u>CONCLUDING ACCUSED OFFICER INTERVIEW</u>

You are under an on-going duty to disclose information to PIB at any point that it comes to light during the investigation. The introduction of new and material evidence at a disciplinary hearing, not previously disclosed, will cause the hearing to be suspended so that the new information can be investigated and evaluated. You may face additional discipline if it is established that the new and material evidence was intentionally withheld during the investigation.

Additionally, any intimidation of witnesses in this investigation is prohibited. Any allegations of threats, intimidation, or retaliation in connection to the complaint under investigation will

**APPENDIX F, Continued**

generate a new investigation that may subject you to further disciplinary action. You are not to have any contact with the witnesses in this case. If you encounter witnesses in this case, you are prohibited from discussing the investigation or the case with those individuals.

This statement is terminated on _____ at approximately _____ hours.

**APPENDIX G**

**Notice of Internal Investigation**

**TO:**         Police Officer

**FROM:**     Deputy Commissioner _____

             Public Integrity Bureau

**SUBJECT:**      IA Control Number: 2016-XXXX

Pursuant to the Law Enforcement Officers Bill of Rights, Md. Code Ann., Pub. Safety § 3-101, *et seq*., you are hereby informed that you are the subject of an internal investigation being conducted by the Department. The nature of the investigation involves, amongst other things, the following:

> *Your actions, inactions, and reports as they pertain to the arrest of Mr. Doe on April 1, 2016, at 1313 Mockingbird Lane.*

### *NOTICE OF RIGHTS*

You have the right to the presence and assistance of a responsible representative or attorney of your choice during the questioning.  Pursuant to the LEOBR (Md. Code, Public Safety § 3-104(j)(2)(i)), the questioning shall be suspended for a period of time not to exceed five (5) days until representation is obtained.

In addition, you are prohibited from speaking to any witnesses or complainants, reviewing police reports (other than reports about the incident authored by you) or body-worn camera footage, or taking other actions that could jeopardize the investigation, until notified by PIB that you are permitted to do so.

The Department reserves the right to expand the scope of questioning based upon responses rendered during the administrative interview.

**Investigating Detective:**

**Supervising Detective:**

### *NOTICE OF RECEIPT*

I hereby acknowledge receipt of a copy of this form.

_____          _____

Police Officer                          Seq. #                          Date

_____          _____

Serving Officer's Signature                                    Date

**APPENDIX H**

**Non-Disclosure, Non-Retaliation and Confidentiality Order**

TO BALTIMORE POLICE DEPARTMENT MEMBER [insert officer's name]:

The Police Commissioner for the Baltimore Police Department hereby ORDERS you:

1. To refrain from discussion, disclosure, or otherwise sharing of information related to the investigation regarding the alleged incident on January 1, 2019 at approximately --- hour at 123 ABC Street, Baltimore, MD --- and investigated under [IAD or SIRT] Case Number 2019-xxxx with anyone other than your legal representative, medical provider, investigative officer, supervising officer (unless they are involved in the incident in some manner), and other authorized command members (unless they are involved in the incident in some manner).

2. To refrain from contacting, attempting to contact, and/or harassing any complainant or witnesses involved in this investigation, whether in person, by e-mail, through social media, and/or by a third party.

3. To refrain from committing or threatening to commit any of the following acts against a complainant or witness: (i) an act that causes serious bodily harm, (ii) an act that places the petitioner in fear of imminent serious bodily harm; (iii) Assault in any degree, (iv) Rape or sexual offense, (v) False imprisonment, (vi) Harassment; (vi) Stalking, (viii) Trespass, (ix) Malicious destruction of property, (x)    Misuse of telephone facilities and equipment, (xi) Misuse of electronic communication or interactive computer service, (xii) Revenge porn, or (xiii) Visual surveillance.

4. To stay away from complainants and witnesses, including from their place of employment, school, residence, and/or temporary residence.

In the event that a complainant or witness in this investigation is a family member, or resides with you, you are prohibited from discussing this investigation with that person. You are further prohibited from influencing or attempting to influence that person's interactions with investigators and counsel involved in this investigation. All other interactions with a complainant or witness who is a family member or resides with you must comply with Maryland law, Department policy, and any valid court orders.

Any violation of this Order will subject you to disciplinary action, up to and including termination, and may subject you to criminal prosecution. Additionally, this CONFIDENTIAL investigation relates to personnel records, and thus, dissemination of any information from the investigation may subject you to criminal penalties. Nothing herein shall preclude an employee from seeking appropriate   representation or legal counsel or exercising grievance rights provided under the CBA.

I, _____, hereby acknowledge that I have received the above Non-Disclosure, Non-Retaliation, and Confidentiality Order, and fully understand the Order and the consequences should it be violated.

_____        _____        _____
Police Officer                                  Sequence Number               Date

_____        _____        _____
Serving Officer's Signature                     Sequence Number               Date

95

**APPENDIX I**

**Investigative Report Template**

# POLICE DEPARTMENT
# BALTIMORE MARYLAND


                                                    **DATE:**


**TO:**        Commanding Officer
               Public Integrity Bureau

**VIA:**       Official Channels

**FROM:**      Lieutenant John Smith
               Public Integrity Bureau

**SUBJECT:**   PIB Control #   **2019-0000**
               Report of Interview
               Officer John Doe


        *Provide a written synopsis and account of the statement provided and/or investigative steps taken.*


                              Respectfully,

                              John Smith
                              Lieutenant
                              Public Integrity Bureau

**APPENDIX J**

**Sergeant Review Checklist**

Name of sergeant conducting review:

Date of Review:

- Was the investigation thorough, complete, and timely?    Y   N
- Did the investigation comply with the requirements of the PIB Investigations Manual? Y   N
  If not, provide explanation of what did not comply:
- Findings are or are not supported by appropriate standard of proof? Y   N
  If not provide explanation:

Does the casebook include:

- A narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the misconduct investigator's independent review of the facts and circumstances of the incident?    Y   N
- Documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the misconduct investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report also will include all available identifying information for anyone who refuses to provide a statement? Y   N
- Documentation of whether officers or other BPD employees were interviewed, including audio and video and a transcript of those interviews, if available? Y   N
- The names of all other BPD employees who witnessed the incident? Y   N
- The misconduct investigator's evaluation of the incident, based on their review of the evidence gathered, including a determination of whether the officer's actions appear to be within BPD policy, procedure, regulations, orders, or other standards of conduct required of BPD officers? Y   N
- In cases where credibility determinations must be made, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility? Y   N
- In cases where material inconsistencies must be resolved between complainant, officer, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies? Y   N
- If a weapon was used, documentation that the officer's certification and training for the weapon were current? Y   N
- Documentation of recommendations for non-punitive corrective action or misconduct charges? Y   N
- An evaluation of any policy, training, tactical or equipment concerns and recommendations to address these concerns? Y   N

If the sergeant is returning the case to the investigator for any reason, the sergeant must state in writing why the case is being sent back and must state what other investigative steps the investigator must take. Y   N

**APPENDIX K**

**Lieutenant Review Checklist**

Name of Lieutenant conducting review:

Date of Review:

- Did the sergeant complete their review checklist?   Y  N
- Did the sergeant adequately identify any issues of concern in the investigation? Y  N
- Was the sergeant's review thorough?  Y  N
- Does the Lieutenant agree with the recommended finding?  Y  N


If the Lieutenant is returning the case to the investigator for any reason, the Lieutenant must state in writing why the case is being sent back and must state what other investigative steps the investigator must take.

**APPENDIX L**

**Investigative Plan Template**

INVESTIGATOR/SUPERVISOR MEETING 1 DATE _____    COMPLETE?   Y    N

To Do This Week

☐ _____

☐ _____

☐ _____

☐ _____

☐ _____

INVESTIGATOR/SUPERVISOR MEETING 2 DATE _____    COMPLETE?   Y    N

To Do This Week

☐ _____

☐ _____

☐ _____

☐ _____

☐ _____

INVESTIGATOR/SUPERVISOR MEETING 3 DATE _____    COMPLETE?   Y    N

To Do This Week

☐ _____

☐ _____

☐ _____

☐ _____

☐ _____

INVESTIGATOR/SUPERVISOR MEETING 4 DATE _____    COMPLETE?   Y    N

To Do This Week

☐ _____

☐ _____

☐ _____

☐ _____

**APPENDIX M**

**Miranda Warnings & Waiver**

1. You have the right to remain silent and refuse to answer any questions.
2. Anything you say may be used against you in a court of law.
3. You have the right to consult with an attorney at any time and have him present before and during questioning.
4. If you cannot afford an attorney one will be provided if you so desire prior to any questioning.
5. A decision to waive these rights is not final and you may withdraw your waiver whenever you wish either before or during questioning.

I acknowledge that I have been advised of my constitutional rights listed above.
Signature: ---------------
Date: _ Time: _

Do you understand each of these rights listed above? ---------------
Having these rights in mind, do you wish to talk to us now? -------------
Signature: ---------------
Date: _ Time: _
Witnessed by:
Others Present:

**Appendix N**

**Sample Use Immunity Grant Advisement Form**

"Garrity Warning"

1. I am being questioned as part of an investigation by this agency into potential violations of department rules and regulations, or for my fitness for duty. This investigation concerns
2. I have invoked my Miranda rights on the grounds that I might incriminate myself in a criminal matter.
3. I have been granted use immunity. No answer given by me, nor evidence derived from the answer, may be used against me in any criminal proceeding, except for perjury or false swearing.
4. I understand that I must now answer questions specifically, directly and narrowly related to the performance of my official duties or my fitness for office.
5. If I refuse to answer, I may be subject to discipline for that refusal which can result in my dismissal from this agency.
6. Anything I say may be used against me in any subsequent departmental charges.
7. I have the right to consult with a representative of my collective bargaining unit, or another representative of my choice, and have him or her present during the interview.

Assistant State's Attorney or Assistant U.S. Attorney authorizing: --------------------

Signature: ---------------

Date: _     Time: _

Location: ---------------

Witnessed by:

**Appendix O**
**Sample Response Letters to Complainant**

<u>Officer Exonerated</u>

The Public Integrity Bureau (Internal Affairs) of this department has completed its investigation of your report concerning the conduct of {name of subject officer]. The investigation and a review of all information currently available to this office indicates that the officer followed the appropriate department policies and procedures. More specifically, department policies and procedures permit the officer to [give details of the policy or procedure] ...

If you have any additional information which you believe should be considered, please contact the Public Integrity Bureau at 410-396-2300.

Thank you for bringing this matter to our attention.

<u>Not Sustained</u>

The Public Integrity Bureau (Internal Affairs) of this department has completed its investigation of your report concerning the conduct of {name of subject officer]. The investigation and a review of all information failed to disclose sufficient evidence to clearly prove or disprove the allegation. More specifically, ...
a. (witness could not be located)
b. (document could not be located)
c. (physical or forensic evidence could not be located)
c. (witness did not support your complaint)
d. (document did not support your complaint)
e. (physical or forensic evidence did not support your complaint)
f.  (the investigation failed to yield enough evidence to support your complaint)
g. (while some evidence supported your complaint there was not enough evidence to support your complaint)

If you have additional information which you believe should be considered, please contact the Public Integrity Bureau at 410-396-2300. If no additional information is received within ten days, this case will be considered closed.

Thank you for bringing this matter to our attention.

Unfounded

The Public Integrity Bureau (Internal Affairs) of this department has completed its
investigation of your report concerning the conduct of [name of subject officer]. The
investigation revealed that the alleged incident did not occur. If you have additional
information which you believe should be considered, please contact the Public Integrity
Bureau at 410-396-2300. If no additional information is received within ten days, this
case will be considered closed.

Thank you for bringing this matter to our attention.

Sustained

The Public Integrity Bureau (Internal Affairs) of this department has completed its
investigation of your report concerning the conduct of [name of subject officer]. The
investigation revealed that the officer violated departmental rules and regulations.
He/she will be subject to appropriate discipline under our agency's procedures.

If you have any questions, please feel free to contact the Public Integrity Bureau at 410-396-
2300.

Thank you for bringing this matter to our attention

**APPENDIX P**

**Respondent Notification of Finding Template**

 

**BALTIMORE POLICE DEPARTMENT**

Bernard C. "Jack" Young
Mayor

Michael Harrison
Police Commissioner

[Date]

TO:          [Respondent]
             [Assignment]

FROM:        *[Commanding Officer]*
             Public Integrity Bureau

SUBJECT:     Notification of Finding
             PIB Case Number [Number]

     You are hereby advised that a PIB finding has been rendered in reference to the captioned case number in which you were identified as an accused. The investigation has resulted in a PIB finding of [disposition] for the allegation(s) of [allegation(s)].

*[Commanding Officer]*
Public Integrity Bureau

c/o 242 West 29th Street  ●  Baltimore, Maryland 21211-2908  ●  410-396-XXXX