**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES** | * | |
| **OF AMERICA,** | | |
| | * | |
| **Plaintiff,** | | |
| | * | |
| **v.** | | **CIVIL NO. JKB-17-0099** |
| | * | |
| **BALTIMORE POLICE** | | |
| **DEPARTMENT, et al.,** | * | |
| | | |
| **Defendants.** | * | |

**SUBMISSION OF THE MONITORING TEAM**
**OF THE PROPOSED BUDGET FOR FISCAL YEAR 2021 FOR APPROVAL**

Pursuant to paragraph 448 of the Consent Decree entered in this matter, ECF No. 2-2 as modified by ECF No. 39, the Monitoring Team for the Baltimore Police Department ("Monitoring Team") hereby submits for approval its proposed Budget for Fiscal Year 2021, attached as **Exhibit 1** ("Budget"). The Parties have reviewed the proposed budget and concur with it.

**Introduction**

The Budget estimates the fees and expenses the Monitoring Team expects to incur for its work between July 1, 2020 and June 30, 2021. The July 1 - June 30 period covers the latter part of the Third-Year Monitoring Plan, which runs from February 16, 2020 to February 15, 2021, and the first part of the Fourth-Year Monitoring Plan, which has not yet been developed and will run from February 15, 2021 to February 15, 2022. The July 1 – June 30 period also tracks the City's fiscal year, which is what the City uses to budget and allocate funds for the Monitoring Team's work.

The estimated fees and expenses for the budget year that runs from July 1, 2020 to June 30, 2021 are $1,560,446. That is more than the $1.475 million allotted annually under the Consent

Decree. The reason for the overage is that, with the Parties' approval, the Monitoring Team will now aggregate its annual $1.475 million allotment over time, meaning that in some years the Monitoring Team might work and bill for more than $1.475 million, while in other years it will work and bill for less than $1.475 million, so long as the aggregate billed total over the life of the Consent Decree does not exceed $1.475 million multiplied by the number of years remaining.

In practice, the City will continue to allocate only $1.475 million each fiscal year for the Monitoring Team's work. If the Monitoring Team's fees and expenses run over that amount in a fiscal year, the Monitoring Team will not be paid the overage until the following fiscal year, after the next $1.475 million tranche is deposited into the court registry and there are additional funds available. In other words, if the Monitoring Team bills more than $1.475 million in a fiscal year, it will have to wait to receive the overage until after the beginning of the following fiscal year. The upshot is that the Monitoring Team will never actually be paid more than $1.475 million within a fiscal year, though it may budget and bill for more in some years and budget and bill for less in other years. This arrangement will give the Monitoring Team more flexibility to prioritize and address Consent Decree requirements as the Monitoring Team and the Parties deem appropriate, but without exceeding the total amount of compensation allocated under the Consent Decree for the Monitoring Team's work.

Although $1,560,446 sounds like a large sum, the amount of work that the Consent Decree requires during Fiscal Year 2021 is extensive. The progress that must be made will require significant time and effort. Indeed, even $1,560,556, while necessary to conserve the City's finite resources, will not cover nearly all of the work the Monitoring Team must do. That work will include, among other things: (1) working with BPD to improve policies, training programs, supervision, internal affairs operations, IT systems, and recruitment, hiring and retention practices;

(2) monitoring and evaluating a number of new in-class, virtual and e-learning training programs; (3) undertaking comprehensive formal assessments, or "compliance reviews," of BPD's performance in, among other areas, use of force and sexual assault investigations to understand how much progress BPD needs to make to achieve compliance with Consent Decree requirements; and (4) beginning to perform "outcome assessments"—quantitative assessments to determine whether implemented reforms are actually changing policing in Baltimore—under Paragraph 459 of the Consent Decree. Because of all the work required in Fiscal Year 2021, the Monitoring Team will continue to do a significant amount of its work pro bono, or free of charge. In its first two-plus years, from October 2017 through June 2020, the Monitoring Team contributed $1,843,247.80, or 30% of its work, pro bono, at no cost to the City. The attached Budget shows that this trend will continue, with the Monitoring Team estimated to contribute at least $587,325, or roughly 27%, of its work pro bono in Fiscal Year 2021. All members of the Monitoring Team are committed to doing pro bono work because they are dedicated to ensuring that BPD achieves the institutional change that the Consent Decree prescribes.

### The Process for Drafting the Proposed Budget

A.  *How the Hours Were Assigned*

The Monitoring Team includes specialists in policing and police reform, civil rights enforcement, psychology, social science, organizational change, data and technology, and community engagement. The Budget shows the number of hours the Monitoring Team estimates each Team member will work in each area of the Consent Decree from July 2020 through June 2021. The more work the Monitoring Plans require in a particular area, the more hours the Budget assigns to the Team members assigned to that area. For instance, because the Monitoring Plans require intensive work in the areas of Use of Force (*e.g.*, conducting a comprehensive compliance

review   and   developing   and   evaluating   additional   training)   and   Misconduct
Investigations/Discipline (*e.g.*, completing and implementing policy revisions, developing and
evaluating investigator training and Ethical Policing Is Courageous training, and furnishing
technical assistance on organizational reform), the Budget allocates comparatively more hours to
work in those areas and to Team members assigned to those areas.

The billable hours shown in the Budget for work in each area of the Consent Decree are
*estimates* only, and the Monitoring Team is likely to do more work in most areas than the Budget
shows. To the extent the Budget underestimates the amount of billable time needed to fulfill the
Monitoring Team's duties in any area of the Consent Decree, Monitoring Team members will do
the additional work required in that area pro bono. Of note, and as described in further detail below,
the vast majority of the community engagement work that lead monitor Ken Thompson and deputy
monitor Seth Rosenthal have done and will do will be pro bono, as reflected in the time sheet
narratives that the Monitoring Team publishes with its invoices on its website. *See*
*https://www.bpdmonitor.com/monthly-statements*. The Monitoring Team remains committed to
doing all of the work that needs to be done.

It should also be noted that, although the Budget includes hours for "Training" for time
spent generally overseeing and assisting with BPD's training operations, the Budget also includes
hours for helping BPD develop and assessing training programs in specific areas of the Consent
Decree—for instance, Impartial Policing, First Amendment-Protected Activities, and
Misconduct/Discipline. While these hours devoted to training are included in the hours budgeted
for those specific areas, they substantially increase the total number of hours devoted to training
in the Budget.

Similarly, the Budget includes hours for "Quantitative Outcome Assessments" generally. These are hours devoted to developing methodologies for and performing and reporting on quantitative assessments of BPD performance in the areas identified in Paragraph 459 of the Consent Decree for which reliable data is currently available. As indicated above, outcome assessments are distinct from "compliance reviews," which include quantitative measures but are more qualitative in nature. By way of example, whereas outcome assessments on use of force examine, say, the total number of Level 2 force incidents from year to year, compliance reviews examine the *appropriateness* of a statistically significant sample of those uses of force, including whether inappropriate Level 2 uses of force are decreasing over time and whether the quality of reporting and supervisory review of Level 2 uses of force is improving over time. The hours for the compliance reviews that will be conducted this fiscal year, including the compliance reviews of use of force incidents and sexual assault investigations, are not included in the hours for Quantitative Outcome Assessments, but are instead included in the subject areas in which they will be performed (*i.e.,* use of force and sexual assault investigations).

Subject matter assignments are based on Team members' roles, experience and expertise. The subject matter assignments of each Team member, based on his or her experience and expertise, are set forth in the chart below:

| | Team Lead | Other Team Members Assigned |
|---|---|---|
| **Community Engagement** | Chuck Ramsey<br>Seth Rosenthal | Ray Kelly (primary liaison)<br>Darnyle Wharton (coordinator)<br>Jessica Drake<br>Hassan Aden |
| **Community Policing** | Chuck Ramsey | Nola Joyce<br>Kevin Bethel |
| **Stops, Searches, Arrests, and Voluntary Police-Community Interactions** | Theron Bowman | Brian Maxey<br>Seth Rosenthal<br>Tracey Meares |
| **Impartial Policing** | Tracey Meares | Seth Rosenthal |

| | | |
|---|---|---|
| **Responding To and Interacting with People with Behavioral Health Disabilities or in Crisis** | Randy Dupont | Roberto Villasenor |
| **Use of Force** | Roberto Villasenor | Brian Maxey<br>Matthew Barge |
| **Interactions with Youth** | Kevin Bethel | Roberto Villasenor |
| **Transportation of Persons in Custody** | Roberto Villasenor | |
| **First Amendment Protected Activities** | Chuck Ramsey<br>Seth Rosenthal | |
| **Handling of Reports of Sexual Assault** | Nola Joyce | Kathleen O'Toole |
| **Technology** | Maggie Goodrich | |
| **Policies (Coordination)** | Theron Bowman | |
| **Training (Coordination)** | Matthew Barge | Hassan Aden<br>Kathleen O'Toole |
| **Supervision (including Field Training Officer Program and Early Intervention System)** | Hassan Aden<br>Maggie Goodrich (EIS) | Kathleen O'Toole<br>Sean Smoot<br>Nola Joyce |
| **Misconduct Investigations and Discipline** | Hassan Aden | Brian Maxey<br>Matthew Barge<br>Kathleen O'Toole |
| **Coordination with Baltimore City School Police Force** | Kevin Bethel | Roberto Villasenor |
| **Recruitment, Hiring, and Retention** | Sean Smoot | Nola Joyce |
| **Staffing, Performance Evaluations, and Promotions** | Nola Joyce | Sean Smoot |
| **Officer Assistance and Support** | Sean Smoot | Roberto Villasenor |
| **Compliance Reviews and Outcome Assessments** | Matthew Barge | Seth Rosenthal<br>Hassan Aden<br>Gabriela Wasileski<br>Christine Cole<br>Sarah Lawrence<br>Katie Zafft[1] |

[1] Gabriela Wasileski is a professor at the University of Baltimore. Christine Cole, Sarah Lawrence and Katie Zafft are consultants with the Crime and Justice Institute, a division of Community Resources for Justice. All four team members are identified collectively in **Exhibit 1** as "Outcome Assessments SMEs." Working collaboratively and with other team members, principally Matthew Barge, they develop methodologies for and perform the quantitative outcome assessments required by Paragraph 459 of the Consent Decree.

In addition to allocating hours to Team members for their work on specific Consent Decree topics, the Budget allocates hours to certain Team members for drafting required reports, assessments, court filings, and other formal public communications. As the Consent Decree provides, these documents are the principal method of comprehensively communicating to the Court and the public the Monitoring Team's work and the Monitoring Team's findings about BPD's progress. The Monitoring Team is required to produce two reports each year and a comprehensive re-assessment after two and four years. The Monitoring Team is currently in the process of preparing its first comprehensive re-assessment, which will be published at the end of September 2020. Writing these reports is a collaborative process. For every report, each Team member allotted report writing hours is expected to produce a preliminary draft of the section of the report pertaining to the topic for which he or she is responsible, then deputy monitor Seth Rosenthal will take all of the preliminary draft sections, as well as his own, and prepare the full, final report.

The Budget also allocates hours to Monitoring Team leadership for "court communication and project management." These responsibilities include meetings and communications with Judge Bredar, meetings and communications with the Parties, the creation of content for the Team website and other public-facing Team materials, and management, coordination and review of the work of the subject matter experts by lead monitor Ken Thompson, and deputy monitors Chuck Ramsey, Seth Rosenthal, Theron Bowman and Hassan Aden. Mr. Thompson oversees the entire project and is the final decision-maker for the Team. For that reason, as the Budget shows, Mr. Thompson is allocated hours in every area of the Budget. Mr. Ramsey assists Mr. Thompson in his general oversight role. So does Mr. Rosenthal, who, in addition to being the principal drafter of the Team's reports and court filings, manages the bulk of the Team's administration and

oversees Team responsibilities in the areas of community engagement, First Amendment-protected activities, impartial policing, and compliance reviews/outcome assessments. Mr. Bowman and Mr. Aden are also responsible for directly overseeing Team responsibilities in certain areas. Mr. Bowman, for instance, oversees Team responsibilities for policy revisions and stops, searches and arrests, while. Mr. Aden manages Team responsibilities for use of force, misconduct/discipline, and supervision.

B. *The Monitoring Team's Hourly Rates*

In addition to performing significant work pro bono, Monitoring Team members or their employers will be compensated at hourly rates that are lower than the hourly rates they customarily earn. Because of each Team member's pro bono commitment, effective hourly rates are even lower. Hourly rates remain unchanged from the hourly rates in the Monitoring Team's very first budget, submitted in early 2018.

Most subject matter experts on the Team will be paid $235 per hour, with an effective hourly rate of approximately $175 per hour given their estimated pro bono commitments. $175 per hour is below the rate paid for subject matter experts working under other Consent Decrees and also well below the rates the Team's subject matter experts customarily earn working in consulting capacities for law enforcement agencies engaged in reform. The Venable law firm will be paid $475 per hour for the work of Mr. Thompson and Mr. Rosenthal, who are attorneys, with an effective hourly rate of approximately $315 per hour given Mr. Thompson's and Mr. Rosenthal's estimated pro bono contributions. $315 per hour is both substantially lower than their ordinary hourly rates (as is $475 per hour) and within the lower end of the range of the standard, court-established rates for court-awarded attorneys' fees in this Court in civil rights and other cases for lawyers with equivalent experience. Lead community engagement liaison Ray Kelly earns $235

per hour, community engagement coordinator Darnyle Wharton earns $75 per hour, and the Team's nine neighborhood liaisons (one for each police district) earn $20 per hour, plus a monthly travel allowance of $25. No Team member will bill for more than eight hours in a day, even if he or she works more hours in a given day, except in extraordinary circumstances and only with prior approval of Team leadership.

C.   *The Budget for Community Engagement Work*

A sizeable portion of the Monitoring Team's tight budget is devoted to the Team's engagement with the community. The Budget allocates approximately $250,000 for community engagement work. That amount includes over $135,000 in funds for the work of Ray Kelly, Darnyle Wharton, and the neighborhood liaisons, and additional funds for community engagement specialist Jessica Drake and the community engagement work of Monitoring Team leaders (Thompson, Ramsey and Rosenthal). As explained above, the amount allocated to community engagement is actually much greater than $250,000, because a substantial amount of the Monitoring Team's community engagement work, especially by Mr. Thompson and Mr. Rosenthal, will be done pro bono.

Community engagement work covers a lot of ground. The Monitoring Team maintains a website, www.bpdmonitor.com, with regularly updated content, checks and responds to email at info@bpdmonitor.com, responds to telephone calls made to the Team's number, (410) 538-4670, holds bimonthly Facebook Live sessions to answer community questions, and maintains a consistent presence on Facebook (https://www.facebook.com/bpdmonitor/) and Twitter (https://twitter.com/BPDMonitor), both of which the Team regularly uses to let community members know about the Team's work. Four times a year, as the Consent Decree requires, the Monitoring Team holds community meetings in different areas of the City to report on BPD's

progress. Additionally, and more importantly, the Monitoring Team meets routinely with community members to inform them about the Consent Decree process and hear from them about their experiences with BPD. These meetings are often with smaller groups or one-on-one. Finally, the neighborhood liaisons that are part of the Monitoring Team proactively engage residents of their communities in order to provide access to the Monitoring Team that is both localized and familiar.

### How to Read the Budget

The Budget, at **Exhibit 1**, has three tabs: "Fees," "Costs," and "Summary."

The "Fees" tab shows the fees the Monitoring Team expects to incur from July 1, 2020 – June 30, 2021, as well as the amount of estimated pro bono, or uncompensated, work.

Along the left side of the "Fees" spreadsheet, there is a row for each type of work that is required: (1) work in the different areas of the Consent Decree (*i.e.,* community policing, community engagement, stops/searches/arrests, impartial policing, interacting with people with behavioral health disabilities and in crisis, interactions with youth, transportation of persons in custody, First Amendment-protected activities, sexual assault investigations, technology, policies (coordination and general oversight), training (coordination and general oversight), supervision (including FTO program and early intervention system), use of force, misconduct investigations and discipline, coordination with Baltimore City School Police, recruitment/hiring/retention, staffing/performance evaluations/promotions, and officer assistance and support); (2) work preparing written reports and court filings; (3) quantitative outcome assessments; and (4) necessary managerial work, including workflow management and review, and communications with the Court and the Parties.

Along the top of the "Fees" spreadsheet, there are columns for each Monitoring Team member. The columns indicate each Team member's hourly rate, the amount of time the Team member is estimated to spend in each area of work, the total number of billable hours each Team member is budgeted to work, the total amount expected to be expended for each Team member's work, the hours each Team member is anticipated to contribute, and the estimated amount in savings the City should realize from each Team member's pro bono work.

In the bottom right hand corner of the "Fees" spreadsheet, there are totals—total fees of $1,475,255 and total costs of $85,191 (imported from the "Costs" tab), a grand total of all fees and costs of $1,560,446, and a grand total minimum of $587,325 in savings from the Monitoring Team's estimated pro bono work.

The "Costs" tab of **Exhibit 1** reflects the expenses the Monitoring Team expects to incur from July 1, 2019 to June 30, 2020. It shows estimated travel costs for Team members who are not local (airfare, train fare, taxi, mileage reimbursement, per diem for meals and incidentals, and lodging), and miscellaneous expenses for things like printing community engagement materials, maintaining a website and Team email addresses, interpreters and refreshments for community meetings, and Monitoring Team identification for ride-alongs with police officers and critical incident monitoring. The mileage reimbursement and per diem rates are standard Federal rates from the General Services Administration rate schedule. The Monitoring Team was able to negotiate a discounted rate for the hotel where out-of-town Team members will stay when in Baltimore.

The "Summary" tab of **Exhibit 1** contains an aggregated summary of the hours and fees allotted for each area of work, as well as an aggregated total cost for each area. Note that the aggregated total fees for each area are not precise estimates because they are derived by

11

multiplying the hours of work in each area by the Monitoring Team's overall average hourly rate, rather than by multiplying the hours of work for each team member in each area by that team member's hourly rate, and then totaling the fees for all team members in that area.

## Invoicing

The Monitoring Team prepares an invoice each month for its work. Every invoice contains a breakdown of billable hours worked and expenses incurred, along with any accompanying receipts or documentation. Every invoice also shows the amount of pro bono hours worked and the corresponding savings to the City. The Monitoring Team submits every invoice to the Parties for review. If the Parties have questions or concerns, the Monitoring Team addresses them. The Parties then indicate whether they approve the invoice. When all Parties approve, the Monitoring Team submits the invoice to Judge Bredar for review. When Judge Bredar approves, he issues an order for payment. Every invoice is thus reviewed and approved by three different entities—the City, DOJ, and the Court—to ensure that the Monitoring Team's hours and expenses are proper. The Monitoring Team posts every approved invoice to its website for public review. *See* *https://www.bpdmonitor.com/monthly-statements*.

## Conclusion

For the foregoing reasons, the Monitoring Team, with the Parties' concurrence, requests that the Court approve the proposed budget for Fiscal Year 2021.

A proposed Order is attached.

Respectfully submitted,


_____/s/_____
Kenneth Thompson, Monitor
Seth Rosenthal, Deputy Monitor
VENABLE LLP
750 E. Pratt Street
Baltimore, MD 21202
Ken.thompson@bpdmonitor.com
Seth.Rosenthal@bpdmonitor.com
(410) 244-7400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES** | * | |
| **OF AMERICA,** | | |
| | * | |
| **Plaintiff,** | | |
| | * | |
| **v.** | | **CIVIL NO. JKB-17-0099** |
| | * | |
| **BALTIMORE POLICE** | | |
| **DEPARTMENT, et al.,** | * | |
| | | |
| **Defendants,** | * | |

## ORDER

Upon consideration of the Submission of the Monitoring Team of the Proposed Budget for Fiscal Year 2021 for Approval, and in view of the concurrence of the Parties in that Submission, it is hereby **ORDERED** that the Proposed Budget for Fiscal Year 2021 is approved.

DATED this ___ day of August, 2020.

BY THE COURT:

_____

James K. Bredar
United States District Judge