# EXHIBIT A



BALTIMORE CONSENT
DECREE MONITORING TEAM
**FIRST COMPREHENSIVE
RE-ASSESSMENT**

**September 30, 2020**

CD
Monitoring
Team

# TABLE OF CONTENTS

**OVERVIEW**                                                                                    3

**INTRODUCTION**                                                                                4

**EXECUTIVE SUMMARY**                                                                           8

**FINDINGS**                                                                                   23

    **Training**                                                           25

    **Misconduct Investigations And Discipline**                            30

    **Technology**                                                         37

    **Staffing, Performance Evaluations And Promotions**                    40

    **Stops, Searches, Arrests And Voluntary Police-Community Interactions**  44

    **Impartial Policing**                                                 50

    **Use Of Force**                                                       53

    **Transportation Of Persons In Custody**                               56

    **Interactions With Individuals With Behavioral Health Disabilities And In Crisis**  59

    **First Amendment-Protected Activities**                               67

    **Interactions With Youth And Coordination With Baltimore School Police**  74

    **Community Policing And Engagement**                                  78

    **Sexual Assault Investigations**                                      82

    **Recruitment, Hiring And Retention**                                  86

    **Officer Assistance And Support**                                     90

**SUMMARY OF MONITORING TEAM ACTIVITIES**                                                      95

# OVERVIEW

THE MONITORING TEAM'S KEY FINDINGS:

## *Overall*

- The Consent Decree is working as designed, with BPD and the City making substantial progress on foundational reforms in policy revisions, training and planning due to the steady, stabilizing work of the Consent Decree Implementation Unit and the committed leadership of Commissioner Harrison, his Deputy Commissioners, a new Training Academy commander, a new Chief Technology Officer and others

- BPD's substantial progress on foundational reforms has given the Monitoring Team greater confidence in BPD's capacity to achieve compliance

- While promising, the threshold reforms have not yet translated into consistent, observable change on the street, as training on the reforms is not complete and BPD's outdated record-keeping systems continue to render inaccessible or unusable the key data required for rigorous performance assessment

## *Specific Areas*

- BPD has successfully revised most Consent Decree-mandated policies
- BPD has fortified its Training Academy by adding sworn and civilian staff, moving to modern facilities at the University of Baltimore, and adopting new training methods that employ adult learning principles
- BPD has conducted effective, Consent Decree-mandated in-class training and/or e-learning on use of force, impartial policing, stops, searches and arrests, body-worn camera use, and sexual assault response
- Upcoming training initiatives are ambitious, particularly during a pandemic, and will present implementation challenges
- BPD's partnership with community stakeholders on the Collaboration Planning and Implementation Committee has generated an impressive body of work—new crisis intervention policies and training curricula, new data requirements for crisis events, an analysis of the gaps in the City's behavioral health support system ("gap analysis")—and established a practical guide to systemic reform
- Other agencies must match BPD's commitment to implementing the recommendations in the gap analysis
- BPD's tempered, lawful response to recent large-scale protests is a preliminary, if limited, indicator of the Consent Decree's positive impact
- The overhaul of BPD's internal investigations and discipline functions is slow but progressing
- Staffing needs, especially in Patrol and Public Integrity, are acute and continue to require urgent action
- Necessary improvements in BPD's antiquated IT systems and historically deficient IT governance structure are gaining steam after some delay, but remain a year or more from completion and thus hamstring the ability of the Monitoring Team and BPD itself to conduct Consent Decree-required analysis of police encounters, particularly stops, searches and arrests
- Implementation of a robust community policing model has been halting and, even with a sound new community policing plan, will be extremely challenging given community mistrust, the persistence of violent crime and Patrol officer shortages

## *The Next Six Months*

- BPD will provide an array of Consent Decree-mandated training on various subjects
- BPD will finalize nearly all remaining policies requiring revision
- BPD will begin developing new records management and learning management systems, enhance its workforce management system, and identify requirements for an Early Intervention System
- The Monitoring Team will conduct qualitative reviews of use of force incidents and quantitative assessments in areas where reliable BPD data is available



# INTRODUCTION

## THE CONSENT DECREE

In May 2015, the **Civil Rights Division of the United States Department of Justice ("DOJ")** initiated an investigation of the **Baltimore Police Department ("BPD")**. The investigation, completed in 2016, found that BPD was engaged in a pattern-or-practice of constitutional violations, including using excessive force, infringing on the First Amendment freedoms of speech and assembly, and stopping, searching, and arresting people in violation of the Fourth Amendment and based on their race. After making these findings, DOJ entered into negotiations with BPD and the City of Baltimore in an effort to settle the parties' differences. BPD and the City did not admit DOJ's allegations, but they recognized that the allegations raised long-standing issues of considerable importance to City residents. As a result, BPD and the City agreed to resolve DOJ's allegations through a Consent Decree. The Consent Decree is a court-approved settlement agreement between DOJ, the City and BPD. **United States District Court Judge James K. Bredar** is the judge who approved the Consent Decree. Judge Bredar now oversees the Consent Decree's implementation. Because the Consent Decree is a court order, Judge Bredar has the power to enforce its provisions and ensure that BPD and the City do what it requires.

The Consent Decree obligates BPD and the City to adopt a comprehensive set of reforms designed to promote fair and constitutional policing, rebuild BPD's relationships with Baltimore's communities, and ensure public safety. The Consent Decree prescribes corrective action in a number of areas, including: community engagement; community policing; stops, searches, arrests, and voluntary police-community interactions; impartial policing; interacting with people with behavioral health disabilities and in crisis; use of force; interactions with youth; transportation of persons in custody; First Amendment protected activities; handling of reports of sexual assault; technology; supervision; misconduct investigations and discipline; coordination with Baltimore City School Police; recruitment, hiring, and retention; staffing, performance evaluations, and promotions; and officer assistance and support.

The Consent Decree, in short, requires transformational institutional change. BPD will achieve compliance with the Consent Decree and free itself from Court oversight when it demonstrates not only that it has successfully implemented all of the required foundational improvements in policies, training, technology and operations, but that those improvements have translated, measurably and sustainably, into constitutional, community-oriented policing.

Achieving transformational change in a large police department does not happen overnight. As the Consent Decree envisions, it takes time, and it requires adherence to a rigorous, methodical reform process. In each area of the Consent Decree that addresses how officers discharge their duties (*e.g.,*

stops/searches/arrests, use of force, and transportation of persons in custody, to name a few), BPD first must draft and adopt revised *policies*. Then BPD must develop and conduct *training* on those revised policies. At the same time, to ensure that the new policies and the new training take root, BPD must revamp vital components of its infrastructure. For instance, BPD must overhaul its technology to become a modern, data-driven, efficient police force, must fortify its system of internal investigations and discipline to enhance officer accountability, must improve the training and supervision of rank-and-file officers to ensure lawful, effective job performance, and must deploy its officers and improve recruiting and retention so as to simultaneously enhance public safety and promote community-oriented policing. It is only after officers have been trained on the new policies, and after infrastructure upgrades are well underway, that community members can expect to see sustained, tangible changes in the conduct of BPD officers. The Consent Decree contemplates that this process will take several years or more.

> **THE CONSENT DECREE, IN SHORT, REQUIRES TRANSFORMATIONAL INSTITUTIONAL CHANGE.**

# THE MONITORING TEAM

On October 3, 2017, Judge Bredar appointed a Monitoring Team to assist him in overseeing implementation of the Consent Decree. The Monitoring Team consists of a lead monitor, Kenneth Thompson, and a team of experts in policing and police reform, civil rights enforcement, psychology, social science, organizational change, data and technology, and community engagement. Serving as an agent of the Court, the Monitoring Team plays three principal roles: arbiter, technical advisor, and facilitator. As *arbiter*, the Monitoring Team oversees the day-to-day efforts of BPD and the City to comply with the reforms the Consent Decree requires. The Monitoring Team reviews, provides feedback on, and ultimately recommends Court approval or disapproval of the changes BPD makes in its policies, its training and, ultimately, its policing practices. As *technical advisor*, the Monitoring Team draws upon decades of collective experience to provide BPD with technical assistance, including advice about national best practices, to help guide BPD toward satisfying the requirements of the Consent Decree. As *facilitator*, the Monitoring Team seeks to ensure that all stakeholders from within BPD and across Baltimore's diverse communities have the opportunity to participate in the reform process (CD 442).[1]

The Court and the Monitoring Team are not alone in overseeing BPD's implementation of the requirements of the Consent Decree. DOJ continues to play an active role. As the plaintiff in the lawsuit that produced the Consent Decree, DOJ retains the right to enforce the Consent Decree when BPD fails to comply with its terms. Accordingly, like the Monitoring Team, DOJ is assessing BPD's progress toward compliance and lets BPD, the Monitoring Team and the Court know when it believes BPD is making progress and when it believes BPD is not. In addition, like the Monitoring Team, DOJ provides technical assistance to BPD as BPD works toward compliance. The reform process under the Consent Decree thus involves four fully-engaged entities: BPD, the City, the Monitoring Team/the Court, and DOJ.

---

1       *All citations to a specific paragraph of the Consent Decree follow the text that relies on that paragraph and appear in parentheses containing "CD" and the number of the cited paragraph. Thus, the citation above, which is to Paragraph 442 of the Consent Decree, follows the relied-on provision of Paragraph 442 and appears as "(CD 442)."*

# THIS REPORT

Every two years, the Monitoring Team is required to prepare a "comprehensive re-assessment to determine whether the material requirements of [the Consent Decree] have been achieved," to recommend any modifications to the Consent Decree that are necessary to achieve or sustain compliance when "changed circumstances or the unanticipated impact (or lack of impact)" of any requirement are interfering with compliance, and to "address areas of greatest achievement and the requirements that appear to have contributed to this success, as well as areas of greatest concern, including strategies and Technical Assistance, for accelerating Full and Effective Compliance." (CD 469-70).

This report is the Monitoring Team's first comprehensive re-assessment. It incorporates the findings from our first four semi-annual reports (issued in July 2018, January 2019, July 2019 and January 2020), as well as our findings regarding the performance of BPD and the City since January 2020. Consistent with the requirements of Paragraph 469 of the Consent Decree, this report explains (1) the Monitoring Team's evaluation of the progress BPD and the City are making toward compliance with the requirements of the Consent Decree in each area of reform; (2) the challenges BPD and the City will continue to face as they strive to achieve compliance with Consent Decree requirements in each area; (3) the areas of greatest achievement and the Consent Decree requirements that we believe have contributed to BPD's and the City's success, as well as the areas posing the greatest challenges and the steps we believe BPD and the City must take to meet them; and (4) the Consent Decree requirements that BPD and the City are expected to address in the immediate future.

Beginning with this report, the Monitoring Team will not only provide a narrative assessment of the progress BPD and the City are making in each area of reform, but a compliance score, too. The compliance scores in each area are reflected in the spreadsheet in **Exhibit 1** and included in the body of this report. The compliance scoring framework is as follows:

**0 - Not Assessed**: The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 - Not Started:** The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:** The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in paragraph 504 of the Consent Decree.

**5 – Sustained Compliance**: The City/Department has complied fully with the requirement and has demonstrated sustained compliance by consistently adhering to the requirement over time, as defined in paragraph 504 of the Consent Decree.

When reading this report and examining the compliance scores, again bear in mind that achieving transformational change in a large police department takes years and requires adherence to a rigorous process for reform. Thus, two and a half years into the reform process, which began with the approval of the First-Year Monitoring Plan in February 2018, BPD and the City have put in place many of the essential building blocks for sustainable change; they have, in fact, come a long way. But they still have a long way to go. That fact is reflected in their compliance scores. In most areas of reform, BPD and the City do not score above a "3"—they have not yet completed the "training phase" of reform—though in a couple of areas, including use of force, they score a "4a" and have moved to the "implementation phase." *See* **Exhibit 1**.

This does not mean BPD and the City are off track. To the contrary, they are mostly on track. Prior to March 2020, when the coronavirus pandemic required cessation of in-service training for four months, as well as a reallocation of certain BPD resources, BPD and the City met the vast majority of the deadlines and satisfied most the requirements in the Monitoring Plans. Even amid the pandemic and the constraints it has imposed, BPD and the City have largely kept pace. Nevertheless, as the Monitoring Plans implicitly acknowledge, most Consent Decree requirements simply cannot be satisfied in three years. BPD, its officers, the City, community members, the Monitoring Team and DOJ need sufficient time and opportunity to focus on each area of reform, and on each requirement within each area, to ensure that change is real and enduring. Change that is rushed, haphazard and superficial is not sustainable and does not qualify as true reform.



# EXECUTIVE SUMMARY

With the approval of the First-Year Monitoring Plan in February 2018, BPD and the City started down the long road to Consent Decree compliance. Over the past two and a half years, they have covered a lot of ground and made good progress. They have finalized most key policies, are devising and implementing core training lessons, and have completed studies and implementation plans on technology, staffing, officer recruitment/hiring/retention, youth diversion, community policing, the City's behavioral health system, and BPD's relationship with Baltimore School Police. These foundational reforms are not fully completed, particularly in the area of training, which has entered a critical phase. That is significant because revised policies cannot take effect until officers have been trained on them. Nevertheless, the foundational reforms are advancing toward completion at an appropriately aggressive pace, even in the face of a global pandemic that has taxed BPD's resources and altered normal operations.

The Monitoring Team has previously observed that the Consent Decree's foundational reforms, while time-consuming and labor-intensive, are the easy part of the reform process. The hard part—sustainable, tangible improvement in organizational and officer ***performance***—lies ahead. But the fact that policy revisions, training and planning are comparatively easy does not make them any less vital. Without clear policy to guide officers and hold them accountable, without effective training to ensure adherence to policy on the street, and without detailed plans for methodically addressing organizational deficiencies in components ranging from technology to internal affairs, the Consent Decree's long-term goal of constitutional, community-oriented policing cannot be achieved.

From the beginning, the Monitoring Team has had little doubt about BPD's commitment to pursuing this goal. It showed its commitment by diving headlong into drafting policies, conducting studies and preparing plans. Yet because of the overwhelming systemic challenges BPD faces, the Monitoring Team questioned BPD's *capability* to reform itself. Over the past year, our concerns have begun to recede. We have grown more confident that BPD's capability to reform matches its commitment to reform. Our growing faith stems from two interrelated organizational developments: the fast maturation of a well-structured, fully accountable Consent Decree Implementation Unit ("CDIU") and the installation of a police commissioner and command staff that is devoted to action, not mere words.

CDIU, whose creation is mandated by the Consent Decree (CD 481), deserves considerable credit for BPD's progress to date. BPD went through three different police commissioners and revolving command staff between October 2017, when the Monitoring Team was appointed, and April 2019, when current Commissioner Michael Harrison took over. Amid these head-spinning changes, CDIU was a stabilizing force. Engaging other BPD components as needed, it pressed forward with key policy revisions, important planning documents, and a new approach to training. There was no slow-rolling or delay. Despite the

instability in leadership, BPD met nearly every single Monitoring Plan deadline for dozens of deliverables over the first 18 months (all except the deadlines for the two deliverables—the now-completed Staffing and Community Policing Plans—that relied directly on the vision of a permanent commissioner). This early progress surpassed what most other agencies under consent decrees have been able to accomplish in a similar amount of time.

In the Monitoring Team's view, CDIU has been able to push BPD forward in the face of significant challenges because it has had a sufficient number of qualified personnel to do the work, has assigned each staff member to a specific area of the Consent Decree, and has held that member accountable for the deliverables in that area. In other words, from the beginning, CDIU has been well-resourced and well-managed. In drafting the Consent Decree, the City, BPD and DOJ were astute to mandate the creation of a permanent, properly supported BPD unit to manage Consent Decree compliance.

> **NEVERTHELESS, THE FOUNDATIONAL REFORMS ARE ADVANCING TOWARD COMPLETION AT AN APPROPRIATELY AGGRESSIVE PACE, EVEN IN THE FACE OF A GLOBAL PANDEMIC THAT HAS TAXED BPD'S RESOURCES AND ALTERED NORMAL OPERATIONS.**

CDIU's work has proceeded apace under Commissioner Harrison. In fact, while BPD was making progress before Commission Harrison took over, the breadth and depth of the reform enterprise has appreciably accelerated under his command. The evidence is readily apparent to the Monitoring Team. Having successfully steered the New Orleans Police Department through the early and middle stages of its own consent decree before he came to BPD, Commissioner Harrison has surrounded himself with highly competent, committed deputies and other top-level command who have begun revamping key departmental functions. For example:

- The **Training Academy** has been transformed, as described in more detail below.

- Previously stalled improvements in technology and IT governance, essential to modernizing BPD and achieving Consent Decree compliance, are gaining steam. Commissioner Harrison hired an experienced Chief Technology Officer, who in turn has hired new technical personnel and reorganized the **Technology Section** based on well-defined assignments of responsibility. Among other things, the Section has adopted a more vigilant approach to IT governance and project management; begun implementing a workforce management system to facilitate scheduling and resource deployment and a learning management system to track and deliver officer training; and, crucially, has hired a vendor to design and install a new records management system ("RMS") scheduled to be completed next year. The new RMS will move BPD from cumbersome, siloed, paper-reporting systems to integrated, electronic, field-based reporting, which will increase officer efficiency, facilitate more effective supervision, and enable necessary but previously impracticable analysis of Department-wide, district, unit and individual officer trends in performance and constitutional policing metrics.

- There are early—if still inconclusive—signs that the **Performance Standards Section**, which conducts internal inspections and audits, has started to function the way it should to monitor compliance with law and policy. The Section routinely performs transportation vehicle equipment inspections and random transport event audits. This year, it published its first annual analysis of responses to First Amendment-protected activity and completed its second annual analysis of sexual assault investigations. It is also currently finishing up its first quarterly analysis of arrests that result in individuals being released without charges.

- Commissioner Harrison is acting aggressively to address a culture that has been overly tolerant of misconduct and poor performance. Sending a strong message about the importance of reform, he elevated to the position of Deputy Commissioner both the head of the **Public Integrity Bureau ("PIB")**, which investigates misconduct, and the civilian head of the Compliance Bureau, which is responsible for Consent Decree implementation. To bolster the coordination and efficiency of the reform effort, Commissioner Harrison placed CDIU, the Training Academy, the Technology Section, and the Performance Standards Section within the same Division—the Compliance Division. Additionally, one of the first policies Commissioner Harrison adopted and has piloted (Draft Policy 321, also not required by any Monitoring Plan) authorizes minor allegations of misconduct to be promptly resolved through acceptance of responsibility and negotiated resolution. The policy promises to increase PIB efficiency, ensure greater accountability and improve officer morale. The serious challenges BPD faces in the area of accountability cannot be overstated. They are explained in the next section. But Commissioner Harrison and his commanders have recognized the imperative of culture change and have begun attempting to achieve it.

- To underscore the relationship between ethical policing and officer wellness and support, BPD will soon be among the first major city police agencies to conduct training and adopt a program on peer intervention/"active bystandership" called **Ethical Policing Is Courageous**. Though not required by the current Monitoring Plan, BPD is also proactively implementing policies mandating a duty to intervene and prohibiting retaliation for reporting misconduct.

A Consent Decree is only as good as the people implementing it. In BPD's case, because of CDIU, Commissioner Harrison and his commanders, the reforms the Consent Decree envisions are advancing. Thus, at this point, the Consent Decree is working. Its provisions do not need to be amended to accomplish its objectives. The implementation process should be permitted to unfold as designed.

To be clear, this does not mean—at least not yet—that the Consent Decree ultimately will succeed. Rather, it means that, thirty months in, early-stage threshold reforms have taken shape and are showing that BPD has the capability to reform. These reforms have not yet translated into widespread changes in officer conduct. Indeed, because BPD's antiquated reporting and record-keeping systems effectively render key data inaccessible or unusable, the Monitoring Team has not yet been able to meaningfully evaluate whether such changes are occurring. Nevertheless, the work BPD has done on the Consent Decree's foundational reforms is beginning to show that BPD *can* fix its structural and operational shortcomings and *can* provide constitutional, accountable, community-oriented policing to the residents of Baltimore.

Certain areas of the Consent Decree have stood out thus far. Some stand out because they vividly demonstrate BPD's capacity for sustainable reform. These include training, responding to individuals in crisis, and First Amendment-protected activity. Other areas stand out because they continue to pose serious challenges to the prospects for sustainable reform. These include accountability (which encompasses misconduct investigations, discipline and supervision) and community policing. We address these areas below. We explain which features of the Consent Decree are working as designed, as well as those BPD should focus on if it is to meaningfully progress toward compliance.

# AREAS OF GREATEST ACHIEVEMENT

## ▎TRAINING

The Monitoring Team reported in July 2019 that BPD's "rapid progress toward establishing a training program consistent with national best practices is perhaps the most promising development to date." ECF No. 220-1. That was 14 months ago. The performance of BPD's Education and Training Section—the Training Academy—has only continued to improve since then, even with a four-month interruption in in-service training because of the pandemic.

The amount of Consent Decree work the Academy has done over the past two years is considerable. It is detailed elsewhere in this report. It includes developing and delivering department-wide e-learning and in-class instruction on use of force, stops/searches/arrests, interviews/interrogations, transportation of persons in custody, impartial policing, body-worn camera use, and responding to reports of sexual assault, as well as the ongoing development of e-learning and in-class curriculum on numerous other Consent Decree topics, to be delivered continuously through the end of 2021.

What distinguishes BPD's work on training, however, is not simply its quantity. Rather, it is the qualitative improvement BPD has made in a short time in both the management of its training function and the quality of instruction. The rapid improvements BPD has made compare favorably to the slower pace of improvement in other departments under consent decrees.

In the Monitoring Team's view, the Training Academy's accomplishments are principally attributable to two developments: the appointment of additional dedicated personnel, including new leadership, and a commitment to a modern, more dynamic approach to officer education. The Consent Decree requires both (CD 292-93, 295-97).

From the beginning, the Monitoring Team made clear to BPD that it would need to increase the number of instructors assigned to the Academy. There was simply no way BPD could satisfy the intensive training requirements of the Consent Decree without dramatically increasing the number of full-time instructors. BPD has delivered. In spring 2019, prior to the first tranche of Consent Decree classroom training, which covered use of force and impartial policing, BPD assigned ten new police instructors to the Academy. In early 2020, prior to the beginning of the second major tranche of Consent Decree classroom training, which covers stops, searches and arrests and additional aspects of impartial policing, BPD hired several additional law instructors. Recently, it brought on two new curriculum writers, civilian employees who will be essential to the development of the raft of new training programs scheduled to be delivered over the next 12 - 15 months.

Importantly, BPD has coupled the augmentation of its Academy staff with the installation of highly qualified leadership. Commissioner Harrison promoted Martin Bartness to Major and tapped him to head the Academy. A 23-year BPD veteran, Major Bartness is an experienced, respected leader with a proven devotion to the mission of modernizing and professionalizing police education. In addition to promoting Major Bartness, BPD hired a first-ever civilian academic director, Gary Cordner. Director Cordner is an accomplished academic and police professional with years of experience developing high-quality, evidence-based education programs for law enforcement agencies. Director Cordner now oversees the development of new curriculum, including curriculum on Consent Decree topics.

Under the leadership of Major Bartness and Director Cordner, BPD has adopted a new approach to training. BPD has switched from providing officers all annual in-service training in a single, lengthy block

to offering shorter blocks on different topics throughout the year. This staggered approach, concentrating on one or two topics at a time, slows things down and facilitates increased retention of training material. It also allows for greater staffing/scheduling flexibility, reducing the operational impact of taking officers away from their assigned duties for training for longer periods.

Even more important, the Training Academy is embracing adult learning principles. In so doing, it has taken advantage of programs and resources from other agencies. For instance, on several occasions, different Academy personnel have traveled to Los Angeles for programming on adult learning at the LAPD Academy, a leader in the field. BPD's new model utilizes e-learning to introduce officers to departmental policies, followed by scenario-based classroom instruction designed to teach officers how to apply the policies in practice. Officers may not commence the classroom component until they pass an online test that accompanies the e-learning. Classroom instruction, previously dominated by static lectures and dense PowerPoint presentations, now features dynamic, interactive problem-solving exercises that incorporate videos from actual police encounters, written scenarios, in-person role playing and digital simulations. Before going live, the classroom component undergoes a piloting process. The piloting process includes sessions with officers, as well as sessions with community members. Notably, BPD formed a Community Training Review Committee to vet and provide feedback on draft training curricula.

> **WHAT DISTINGUISHES BPD'S WORK ON TRAINING, HOWEVER, IS NOT SIMPLY ITS QUANTITY. RATHER, IT IS THE QUALITATIVE IMPROVEMENT BPD HAS MADE IN A SHORT TIME IN BOTH THE MANAGEMENT OF ITS TRAINING FUNCTION AND THE QUALITY OF INSTRUCTION.**

BPD has used the new format to deliver critical Consent Decree training on use of force, stops/searches/arrests, transport, interviews/interrogations, and impartial policing. It will continue to use the format to deliver training in other Consent Decree areas. Based on the Monitoring Team's first-hand observations, the results have been encouraging. Academy instructors have gained increasing confidence and ability in delivering the material through facilitated discussion, as opposed to lectures. They have also become increasingly adept at addressing difficult, pointed questions from their peers and conveying the rationale for policies, including Consent Decree-mandated policies, that have met with skepticism among some participants. Moreover, officers participating in classroom learning appear engaged. They are generally not sitting in their chairs with their arms folded or looking at their cell phones (and instructors are getting better at re-engaging them when they do). Officers are taking part in the discussions and sharing their views. That is reflected in the results from the surveys officers have taken at the end of each course. The vast majority have indicated that they value the change in approach and find it effective. For instance, for the training on stops/searches/arrests, which has now been delivered to roughly three-quarters of the Department, roughly 85% of officers agree or strongly agree that the training is engaging, while only 5% disagree or strongly disagree.

In short, the significant strides the Academy has made mean that officers are receiving better, more practical training on core policing activity. The new training now must translate into practice on the street.

The Monitoring Team expects the quality of training to continue to improve as instruction using adult learning concepts becomes further ingrained in Academy operations. The Monitoring Team also expects the quality of learning to improve as a result of the Academy's recent move to the University of Baltimore.

Early on, the Monitoring Team emphasized the need for BPD to upgrade its training facility, which was housed in a decrepit old school in Northwest Baltimore. The use of that facility conveyed to officers and recruits that BPD did not prioritize training, did not value their professional development, and did not recognize policing as a vocation that requires specialized knowledge and skill. The new facilities at the University of Baltimore—which are expansive, modern, clean, and well-equipped for the use of technology–appropriately convey the opposite message.

Although the Academy has made great progress over a short period, there remain areas for improvement. Classroom instruction sometimes can be uneven, particularly at the start of a course. This potentially indicates the need to fortify the piloting process. More fundamentally, it suggests that BPD should consider establishing an in-house facilitator development program, similar to the program certain Academy instructors have attended at LAPD. The quality of curriculum writing, though improving, also must get better. Curriculum development continues to require substantial technical assistance from the Monitoring Team and DOJ. The recent addition of new curriculum writers should help. Relatedly, early drafts of training curriculum for specialized units (*e.g.,* sex offense unit investigators) have not employed adult learning techniques as readily as Department-wide curriculum drafted within the Academy. Going forward, BPD must ensure that the development of specialized curriculum is closely coordinated with Academy personnel and that such curriculum is delivered with or under the supervision of Academy personnel.

> **AT A GLANCE**
>
> **AREAS OF GREATEST ACHIEVEMENT**
>
> - **TRAINING**
> - **RESPONDING TO INDIVIDUALS IN CRISIS**
> - **FIRST AMENDMENT-PROTECTED ACTIVITY**

Finally, although the Academy has had sufficient staff to deliver the first two tranches of classroom Consent Decree training and to prepare curriculum for others, the Monitoring Team is concerned that the Academy's future staffing needs will not be met. The Staffing Plan issued earlier this year recommends increasing professional civilian staff at the Academy by 38 and decreasing sworn staff by 24. Reductions in BPD's FY21 budget have slowed efforts to create new civilian positions in line with the Plan. At least in the short run, BPD will not be able to implement the Plan's recommendations for the Academy until next fiscal year at the earliest. As a result, BPD will not be able to civilianize certain Academy functions (and will not be able redeploy sworn officers to Patrol or PIB, where they are needed) and will continue to operate at a personnel deficit, even if not one as large as before.

## RESPONDING TO INDIVIDUALS IN CRISIS

In addition to BPD's progress on training, among the most reassuring developments has been the groundwork done to address officer interactions with individuals with behavioral health disabilities and in crisis. In a relatively short period, BPD and the City have satisfied most of the threshold requirements in this area: appointing a **Crisis Intervention Team** coordinator; developing a crisis intervention plan; identifying BPD's data collection needs on encounters with individuals in crisis and creating a new crisis intervention form to record such data; revising three different crisis intervention policies; creating four different sets of training curricula on behavioral health awareness (for recruits, officers, dispatchers/911 call-takers, and specialized CIT officers (the last of which is still in development)); and producing a painstakingly detailed "Gap Analysis" that identifies the shortcomings in Baltimore's behavioral health system and recommends solutions for addressing them.

The catalyst for all these achievements has been the coordination of the City, its nonprofit partner **Behavioral Health System Baltimore ("BHSB")** and BPD with community stakeholders on the **Collaborative Planning and Implementation Committee ("CPIC")**. The expansion of CPIC, and the coordination of CPIC with BPD and the City, are required by the Consent Decree (CD 104). CPIC includes relevant City and State officials, advocacy groups such as Disability Rights Maryland and the National Alliance on Mental Illness, individuals with lived experience, community mental health providers, substance use services providers, local hospitals, advocates, and committed philanthropists. CPIC's leadership represents key components of the crisis intervention system and includes the CEO of BHSB and representatives of the Mayor's Office. CPIC has different committees, each responsible for a category of Consent Decree requirements (*e.g.,* policy, training, Gap Analysis, data).

The policies, training curricula, studies and data needs analysis that BPD and the City have generated under the Consent Decree were all prepared by CPIC. In other words, all of them are the result of close collaboration among BPD, City officials and community members. At the beginning of each monitoring year, CPIC has devised a workplan to ensure that all Monitoring Plan deadlines for all deliverables in the area of behavioral health are satisfied and that there is adequate time within those deadlines for the community stakeholders on CPIC's committees to contribute. Using this organizational framework, CPIC has produced an impressive body of work in just over two years. That work is a testament to what BPD and City officials can achieve by working together with devoted, informed community members to improve policing and behavioral health support in Baltimore.

CPIC has fostered meaningful discussion about other matters as well. Even before the Gap Analysis was completed, the City, BHSB and BPD were exploring ways to integrate different programs that provide support for individuals in need, drawing on the collective experience of CPIC's members to do so. These disparate programs focus respectively on homelessness, substance abuse, and mental illness, but all share the common goal of diverting individuals in crisis from the criminal justice system to the health care system. The City, BHSB and BPD are aware that individuals can struggle with multiple issues. With CPIC's input, they have been looking into how to develop a comprehensive, integrated support system.

The discussions around integrating behavioral health services in Baltimore have included a closer review of BPD's dedicated crisis intervention programs. These programs include the Crisis Response Team (CRT), the Law Enforcement Assisted Diversion (LEAD) Team, and what was formerly known as the Homeless Outreach Team (HOT). CPIC members have expressed concerns that these programs present the risk that program officers, despite good intentions, might violate the rights of the programs' intended beneficiaries during street encounters, intimidate and thus unintentionally discourage them from seeking help, or paternalistically override their decisions to forgo treatment. BPD has shown a willingness to engage in constructive discussions around these concerns. In fact, in early 2020, partly in response to these concerns, BPD eliminated HOT and assigned its officers to CRT. CPIC members have discussed moving to a system that ensures CRT responds to calls involving individuals in crisis and seeks to connect them with support services when appropriate, but does not affirmatively initiate contact like HOT did, leaving such contacts to non-police outreach workers.

The Monitoring Team has participated in CPIC discussions regarding BPD's crisis intervention programs and the City's support systems. We have been impressed with the conviction of community members, the City and BPD to resolve their differences in pursuit of common goals. While the conversations have not always been easy, they have been vital, as they have fostered working relationships among key stakeholders in a single forum and have laid the foundation for what is now CPIC's central mission: implementing the recommendations in the Gap Analysis.

It is important to understand that implementing these recommendations is not the work of BPD alone.

BPD is, of course, responsible for strengthening its crisis response function. But the point of the Gap Analysis is to identify and shore up deficiencies in *the City's* behavioral health system so that BPD is relied upon less often to resolve matters involving individuals in crisis and so that, when it does respond,

> **CPIC HAS PRODUCED AN IMPRESSIVE BODY OF WORK IN JUST OVER TWO YEARS. THAT WORK IS A TESTAMENT TO WHAT BPD AND CITY OFFICIALS CAN ACHIEVE BY WORKING TOGETHER WITH DEVOTED, INFORMED COMMUNITY MEMBERS TO IMPROVE POLICING AND BEHAVIORAL HEALTH SUPPORT IN BALTIMORE**

it has bona fide options for diversion to support services. Thus, the responsibility for implementing the recommendations in the Gap Analysis falls most heavily on City agencies, which must begin to match BPD's commitment to CPIC's work. Those recommendations include providing 24/7 around-the-clock crisis centers and expanding the presently limited availability of mobile crisis teams, furnishing behavioral health outpatient services in primary care settings, establishing an integrated "no wrong door" approach to behavioral health and substance abuse services, recruiting and retaining competent behavioral health workers, particularly in community-based settings, and developing permanently supported housing programs.

By paying heed to the City's broader mental health care needs, the Consent Decree was prescient. It recognizes that police should not be asked or expected to fill the gaps in behavioral health support systems, and it embraces the reforms that many have been advocating during the protest movement this summer. Because of the Consent Decree, Baltimore already has the blueprint for "re-imagining" policing.

Both the City and BPD have a lot of hard work ahead. The City and its partner, BHSB, must set about implementing the demanding recommendations in the Gap Analysis, which will require a sustained, long-range commitment. BPD, for its part, still must train its officers and dispatchers on behavioral health awareness, assemble a Crisis Intervention Team to respond routinely to calls involving individuals in crisis and, above all, handle encounters with individuals in crisis in accordance with policy to reduce the number of outcomes involving the criminal justice system. Nevertheless, the Consent Decree is working as planned so far. The early-stage accomplishments and continuing maturation of CPIC, with buy-in from the City, BHSB and BPD, have set the stage for addressing the formidable challenges ahead.

## FIRST AMENDMENT-PROTECTED ACTIVITY

Because BPD has been focused on foundational reforms and is still developing the technological capacity to collect comprehensive data needed for assessment, there is not yet substantial evidence that the Consent Decree is having an observable or measurable impact on the street. This underscores the reality that transformational change in a major city police department does not happen overnight. Recently, however, the first signs of observable progress began to emerge. Although the evidence is anecdotal and limited, it is noteworthy.

Based on dozens of hours of Monitoring Team observation over a two-week period, BPD responded admirably to this summer's protests calling for police reform in the wake of the killing of George Floyd by Minneapolis police officers. Community organizers deserve substantial credit for keeping the protests peaceful, but BPD also deserves credit for diligently complying with law and policy. BPD performed more capably than most of its peer agencies around the country and, in fact, was hailed as a national model for honoring First Amendment rights while maintaining public safety.

BPD officers allowed community members to assemble in public spaces and march on public streets and sidewalks without intervention; deliver speeches denouncing law enforcement and criticize officers face-to-face without restriction or retaliation; and make video and audio recordings of police activity without impediment. As Judge Bredar observed at the latest public hearing in July, "I take all of it as a measure of progress. The evidence is there. Baltimore didn't burn. A lot of cities did."

As explained in more detail in the body of this report, the Monitoring Team attributes BPD's performance to three developments. First, protest leaders were well-organized, committed to non-violence, and willing to share information needed for BPD to maintain public safety while respecting the First Amendment. Second, BPD commanders lowered the temperature and avoided provocation by permitting the protests to proceed unimpeded; refraining from unnecessary arrests for minor infractions; allowing temporary traffic disruptions; deploying officers largely in their ordinary uniforms rather than in riot gear; keeping BPD's civil disturbance unit away from the protest activity but ready to deploy in case the protests turned violent; and encouraging officers to calmly engage in discussion with protestors and march alongside them. Third, BPD rigorously adhered to an effective Incident Command System, which provided officers clear direction both in advance and as events unfolded. The ICS prevented confusion on the street and led to coordinated, measured police action.

> **COMMUNITY ORGANIZERS DESERVE SUBSTANTIAL CREDIT FOR KEEPING THE PROTESTS PEACEFUL, BUT BPD ALSO DESERVES CREDIT FOR DILIGENTLY COMPLYING WITH LAW AND POLICY.**

The Monitoring Team believes these developments are traceable to the Consent Decree. Under the Consent Decree, BPD officers have undergone training on use of force, and BPD has adopted revised, comprehensive policies on First Amendment-protected activity, which include new, detailed protocols for responding to mass demonstrations. Though not yet formally active because Department-wide training has not yet been conducted, command staff used those policies as a guide. The policies emphasize not only the imperative of permitting unimpeded assembly and speech except in limited circumstances where they imminently threaten public safety, but the importance of working with community members to ensure peaceful protest activity. Further, BPD has placed renewed emphasis on the necessity of utilizing an Incident Command System to respond to both ordinary crime scenes *and* major events. In the Monitoring Team's review of BPD's response to the death of Detective Sean Suiter in late 2017, one of the missteps we observed was the breakdown of the ICS. The training delivered to all commanders in response to the Monitoring Team's review included refresher instruction on ICS.

BPD's response to the recent protests is yet additional evidence that, so far, the Consent Decree is working.

# AREAS POSING THE GREATEST CHALLENGES

## ▌ ACCOUNTABILITY (MISCONDUCT INVESTIGATIONS, DISCIPLINE AND SUPERVISION)

The Consent Decree will not be a success unless and until BPD establishes a robust culture of accountability. A culture of accountability means the Public Integrity Bureau openly accepts, properly classifies, and timely and thoroughly investigates complaints of misconduct; the Department metes out discipline fairly and impartially; officers intervene to stop their peers from engaging in misconduct; and sergeants and lieutenants rigorously monitor officer performance, appropriately rewarding exceptional work and swiftly correcting missteps. For years, there has been no culture of accountability at BPD. The City spends millions annually in settlement payouts for lawsuits alleging misconduct. The Department is still reeling from the Gun Trace Task Force scandal. Maryland courts recently affirmed the dismissal of a dozen administrative cases of major misconduct because PIB's investigations were not completed on time. With numbing regularity, the press reports serious allegations of officers abusing their power—by planting evidence, using excessive force, making unlawful arrests in retaliation for questioning police action, falsifying official reports, and even enlisting colleagues to extort a contractor for a reimbursement for shoddy work on a personal home improvement. There will inevitably be violations of policy in police agencies; hence the need for internal affairs units. But when officers feel as emboldened to cross the line as some BPD officers appear to have been, there is an institutional problem.

And this is just what the community reads about in the paper. Over the past 30 months, the Monitoring Team has observed first-hand the flaws in BPD's accountability structure. PIB is and remains severely understaffed—short more than three dozen investigators, according to BPD's recent Staffing Plan. To compound the problem, PIB investigators are inadequately trained to conduct internal affairs investigations, which are different than ordinary criminal investigations. The natural consequence of understaffing and poor training is there are too many cases for too few investigators, serious allegations are not investigated promptly, and investigative findings are often inadequately supported. Further, PIB supervisors do not timely review investigations upon completion, and data on outcomes is not yet adequately collected or analyzed to gauge unit efficacy and departmental trends.

The Monitoring Team recently completed its first comprehensive compliance review of misconduct investigations. The results were sobering, if predictable. The review focused on investigations from 2018, which was prior to full implementation of early-stage reforms. Among other things, the Monitoring Team found:

- An unacceptable percentage of investigations were of poor quality.

- Over 40 percent of the reviewed investigations were "administratively closed," an outcome the Consent Decree forbids (CD 344.k.iv.).

- Case files were often in disarray, and investigations were not documented in a consistent, uniform manner, leading to a lack of clarity in some cases about the factual issues presented and the investigative steps taken.

- Communications with involved parties were poor, with complainants receiving notice of receipt of their complaints in less than one-quarter of all cases; officers received proper notice that they were subjects of complaints at a similarly low rate.

- Well over half of investigations were not completed within the Consent Decree's 90-day deadline, with extensions of time never requested or approved.

- Complainants were interviewed in less than half of cases, as were subjects, and fewer than a quarter of cases had complete video or audio records of all witness interviews.

- Investigations failed to flag related operational and performance issues that were exposed, such as training deficiencies, repetitive problematic behavior, and potential policy shortcomings.

The public perception of BPD's ability to police itself matches what the Monitoring Team has found. The Monitoring Team's community and arrestee surveys, completed within the past 15 months, reveal that Baltimoreans generally do not believe that BPD holds its officers accountable for misconduct. Officers, too, are frustrated. In focus groups last summer, one of the main reasons officers cited for low morale was that, because PIB takes too long to investigate cases, they are often left in limbo for extended periods, even for unfounded complaints or minor administrative infractions that should be resolved quickly.

Beyond PIB's shortcomings, BPD's supervisory systems are in need of repair. As the Staffing Study completed in 2018 found, unity of command has too often been absent. That was particularly true within the Patrol Division where, due to staffing schedules, officers could go days, even weeks, without working the same shift as their assigned sergeant. Although the new patrol schedule seeks to address this problem, it was a major problem for years, adversely affecting not only accountability but officer wellness, as officers cannot be sure about the support they have. Further, performance evaluations have been historically uneven. And because BPD has an outdated, ineffectual record-keeping system, supervisors have never conducted systematic assessments of the performance of officers under their command. On paper, BPD has an early intervention system, which is supposed to identify officers with emerging performance issues so that prompt corrective action can be taken. But without adequate, accessible data, the system has never functioned well.

**AT A GLANCE**

**AREAS POSING THE GREATEST CHALLENGES**

- **ACCOUNTABILITY**
- **COMMUNITY POLICING**

The Consent Decree prescribes solutions for BPD's myriad deficiencies, and BPD has started slowly down the path of reform. It has designed a new, more refined system for classifying misconduct complaints, and recently completed a model intake/classification/investigations manual for PIB investigators and supervisors, which is coupled with protocols for sharing information with the Civilian Review Board. Relatedly, PIB has streamlined its case assignment system. BPD authorized a long-needed independent investigation of the causes of the Gun Trace Task Force scandal, which is underway, and drafted a best-practices policy ensuring that all BPD members comply with their constitutional obligation to disclose potential exculpatory evidence in criminal cases, which will be implemented once officers are trained on it. Additionally, as noted above, Commissioner Harrison has made efforts, even outside the Consent Decree, to transform PIB.

Change, however, is not yet observable. There is some anecdotal evidence that BPD's oversight functions—PIB, District commanders, and the Performance Standards Section (body-worn camera review unit)—are gradually beginning to identify misconduct when it occurs and are responding as warranted by taking non-disciplinary corrective action, opening an internal investigation, or initiating a criminal referral. But this is far from the norm. That is not because BPD is not trying hard to achieve change. Rather, it is because, in this area, change is especially difficult and slow to take root. BPD has multiple layers of accumulated dysfunction to clear away.

At this point, the formula for change is to stay the course and give BPD an opportunity to do what the Consent Decree prescribes. It begins with providing training to PIB investigators, which is set to take place

in 2021. PIB investigators still have not received specialized instruction in internal investigations. The new PIB investigations manual, as good as it is, will only collect dust until PIB investigators are trained on its provisions. There has been some frustration getting this training off the ground. The pandemic has slowed development, and BPD had to switch to a new consultant after spending months attempting to reach an arrangement and develop a curriculum with another. The completion of training should accelerate improvement in the quality of investigations and the integrity of disciplinary recommendations. Something as straightforward as ensuring that all investigators work off of a set task list and maintain case files in a standard, uniform fashion—the Monitoring Team has never seen uniformly organized files in its PIB case reviews—would go a long way toward consistent completion of timely, complete, well-supported investigations, findings and recommendations.

Peer intervention (EPIC) training, set to be delivered this fall and winter, is also vital, coupled with the finalization of new policies mandating a duty to intervene and prohibiting retaliation for reporting misconduct. A program requiring officers to stop their peers from engaging in misconduct and to intervene when they do, EPIC is inherently about changing culture and improving community trust. Indications are that it is proving successful in the New Orleans Police Department, also under a consent decree. It holds the same promise for BPD.

A number of other mandated accountability reforms are on deck:

- A new policy on performance evaluations
- Revisions to the full suite of disciplinary policies
- Integration of civilians into disciplinary trial boards
- Implementation of a revamped Field Training Officer program
- Expansion of the oversight work of the Performance Standards Section
- Establishment and implementation of a plan for collecting the data needed to complete the statistical reports and internal PIB audits required by Paragraphs 402 and 405 of the Consent Decree
- Development of an e-based Early Intervention System that is fully integrated with IAPro (BPD's misconduct database) and the nascent Record Management System

This is *a lot*. BPD needs to have the chance to conduct training and implement all these other measures before the Monitoring Team is able to determine whether the Consent Decree's accountability provisions are accomplishing what they are designed to achieve. Put differently, it is still too soon to tell whether BPD is failing to implement the Consent Decree's accountability reforms as urgently and effectively as it must or whether the Consent Decree fails to address accountability reform in all the right ways.

Establishing a stout system of accountability very likely poses the greatest challenge to the prospects of the reform enterprise. Unless first-line supervisors and field training officers embrace the change that is afoot, patrol officers will not internalize it and constitutional policing will not become a consistent reality on the street. Unless PIB dramatically improves its operations, certain officers will continue to feel emboldened to break the rules while the rest will continue to suffer from low morale. And unless BPD starts to prove that it can police itself, it will not win the community's trust. BPD needs to get accountability reform right. It has taken baby steps so far. In the coming year, it must start taking full strides.

## COMMUNITY POLICING

Together with constitutional policing, developing an effective community policing model is the Consent Decree's principal objective. It depends on building and maintaining the trust of community members so that, through collaborative problem-solving, crime can be prevented, reduced and solved more readily. Establishing this model will transform how BPD provides police services. Right now, it is far from clear that BPD will be able achieve such transformation.

Currently, BPD patrol officers spend most of their time responding to calls for service. Officers have little time for proactive relationship-building. Under the Community Policing Plan, published in April 2020, that is supposed to change. The Plan envisions that officers will spend up to 40% of their time on proactive, community-oriented policing and 60% on calls for service. The 40% figure, which applies to *all* officers, includes engagement with community members through informal interactions (pursuing unplanned interpersonal interactions between calls), formal programming (participating in neighborhood events and community meetings and establishing partnerships), and problem-solving (proactively working with community members to address recurrent localized issues and prevent future neighborhood disorder).

The challenges to implementing this appropriately ambitious plan are profound. First, as the Monitoring Team's community and arrestee surveys show, satisfaction with and trust in BPD are low. A majority of respondents do not believe that BPD effectively fights crime or respects or tries to cultivate good relationships with community members. A majority also believe that BPD officers do not care about their communities, expressed reluctance to contact BPD about most crimes, and reported observing BPD officers engage in misconduct, such as racial profiling, excessive force, and using verbally abusive language. Much lower percentages of participants have more positive views on these subjects. Because Baltimoreans have diminished faith in BPD, engagement and problem-solving are going to be hard. That said, many survey participants said they would *like* to see improved relations with BPD, expressed a willingness to engage, and feel comfortable communicating with BPD when necessary.

> **OVER THE PAST 30 MONTHS, THE MONITORING TEAM HAS OBSERVED FIRST-HAND THE FLAWS IN BPD'S ACCOUNTABILITY STRUCTURE.**

Second, violent crime persists in Baltimore. The persistence of violent crime makes community members more skeptical of the police's ability to prevent and solve crime and, in the City's most challenged neighborhoods, more fearful of engagement because of a fear of retaliation.

Third, as the Staffing Plan has established, BPD needs to significantly enhance Patrol Division staffing to realize the goal of having officers spend 40% of their time on proactive, community-oriented activity. As of this summer, according to the Staffing Plan, BPD needs over 175 additional patrol officers and over 30 additional sergeants. Simply put, and as the Community Policing Plan acknowledges, BPD will not be able to realize its community policing objectives absent a meaningful increase in the number of patrol officers.

In the face of these challenges, BPD's progress toward the Consent Decree's community policing requirements has been halting. The development of the Community Policing Plan—the threshold reform measure in this area—took over a year longer than initially scheduled. Prior to the pandemic, it stood out as among the very few Monitoring Plan deliverables that BPD did not complete on time. As noted, the delay was due in large part to the serial changes in commissioners prior to the appointment of

Commissioner Harrison. A community policing plan naturally should reflect a commissioner's vision. Nevertheless, completion of the Plan still took longer than anticipated because the initial draft was inadequate—little more than a repackaging of BPD's 2019 crime reduction plan. BPD essentially had to go back to the drawing board.

> **IN THE FACE OF THESE CHALLENGES, BPD'S PROGRESS TOWARD THE CONSENT DECREE'S COMMUNITY POLICING REQUIREMENTS HAS BEEN HALTING.**

The Plan now in place is sound. It provides a good foundation for achieving Consent Decree compliance. Indeed, the International Association of Chiefs of Police recently featured the Plan as a model in one of its publications. However, the Plan will have to be continually reassessed and updated. That is particularly true given the events of the past several months in the wake of the killing of George Floyd. Those events have called attention to inadequacies in policing and underscore the need to re-think community-based strategies for maintaining public safety. In the "Responding to Individuals in Crisis" section above, we stress the necessity of improving the City's behavioral health system in order to improve BPD's responses to individuals in crisis. An effective community policing strategy might similarly require a more holistic approach, incorporating City resources—not just BPD resources—to address localized issues through collaborative problem-solving.

Because BPD only recently completed the Community Policing Plan, it has not yet been required to complete the other Consent Decree deliverables for community policing. Thus, as in the area of accountability, it is too soon to say whether BPD is falling short or whether the Consent Decree's community policing provisions need to be modified. However, there are clearly reforms BPD must implement to advance more quickly toward the Consent Decree's community policing goals. Because effective community policing genuinely depends on complying with the requirements in every other area of the Consent Decree, BPD's "to do list" could encompass the entire agreement. To take a prominent example, BPD will not earn the community's trust, essential for effective community policing, until it shows progress toward the Consent Decree's requirements for accountability and constitutional policing.  Nevertheless, there are more immediate concrete measures BPD must take. They include the following:

**Training** | BPD has yet to deliver training on community policing. No community policing model can be implemented without providing officers specific guidance on the type of engagement and problem-solving that is expected of them. In recognition of the centrality of adopting a community policing model to Consent Decree compliance, community policing training is now being prioritized and has been moved up on the training schedule. Curriculum development is underway, e-learning should begin in early 2021, and in-class instruction should begin in the second quarter of 2021.

**Implementation of Community Policing Plan** | The Community Policing Plan calls for incorporating community policing assessment criteria into field training evaluations and performance evaluations after training is delivered. It similarly calls for establishing data collection requirements and data-driven measurements for community policing and, correspondingly, including reports on community policing data in weekly Comstat meetings. It also envisions incorporating community policing performance into promotion criteria. BPD should move forward with these performance measurements as quickly as possible once training is completed.

The Community Policing Plan requires the development of localized Neighborhood Policing Plans to address the issues unique to each City neighborhood afflicted by high crime. A piloting process is supposed to begin in two districts in the coming months, all commanders and Neighborhood Coordination Officers

are supposed to undergo training on the plans in mid-2021, and plans are supposed to be deployed in every district by the end of 2021. Because implementing these micro-plans is an important feature of the Community Policing Plan, BPD must proceed with alacrity. The calls for reform both nationwide and in Baltimore have only amplified the urgency of prompt implementation.

Consistent with BPD policy, the Community Policing Plan requires fair and impartial policing and adherence to the tenets of procedural justice. Supervisors must ensure that the officers under their command treat the people they encounter with simple respect, including when taking law enforcement action.

During a community-wide call in August 2020 to explain what happened when several blocks in the Eastern District had to be barricaded for over 24 hours because an armed man had fired his gun in the presence of family members, was experiencing a crisis, and refused to come out of his home, one resident complained that two officers stationed on a nearby corner brushed her off when she asked when unimpeded access to her home might be restored. The Chief of Patrol immediately jumped in to assure the resident that the officers' response was unacceptable and asked for the officers' names and the time and location of the encounter so that he could address them directly. That is precisely the type of decisive command- and supervisor-level conduct that conveys to officers the importance of procedural justice, assures community members that BPD is listening to them, and lays the groundwork for an effective community policing strategy.

**Equipment/Patrol Cars** | BPD has developed recruitment, hiring and retention plans under the Consent Decree. To have enough patrol officers to foster community policing, it must continue to implement them. One of the concrete measures BPD can take (and has begun to take) to attract and retain quality officers is to provide them the equipment they need to do their jobs effectively. The completion of a new records management system is vital. By facilitating electronic field-based reporting, the new RMS will reduce the amount of time officers must spend on writing reports and increase the amount of time available for community policing activity. Equally if not more important, BPD must continue replacing its aging fleet of patrol cars with new ones. In the focus groups the Monitoring Team conducted last summer, one of officers' central complaints was the condition of their patrol cars. They indicated that a simple way to improve job quality and officer morale was to ensure their cars—which are effectively their office space— are clean, modern and fully functional.



# FINDINGS

Since February 2018, when their work under the First-Year Monitoring Plan began, BPD and City leadership have made evident progress toward satisfying the Consent Decree's foundational requirements. Notably, BPD and the City achieved this progress despite instability in BPD and City leadership during the first 12 to 18 months of reform and notwithstanding certain unavoidable delays in implementation caused by the coronavirus pandemic. The accomplishments of BPD and the City in the face of these challenges is attributable to the consistent commitment of BPD's various commanders to the reform process and the hard work of BPD's Consent Decree Implementation Unit and the functions that support it, especially the Training Academy.

BPD has almost completed the initial round of policy revisions required by the Consent Decree. Under the Consent Decree, BPD has issued upwards of 50 new policies. These policies provide clearer, more comprehensive guidance to BPD officers.

BPD has prepared and begun conducting training on many of these new policies. It drafted and delivered e-learning and in-class instruction on use of force and related aspects of fair and impartial policing. It prepared and delivered e-learning, and is in the midst of classroom training, on stops, searches and arrests and related aspects of fair and impartial policing. It drafted and is now providing instruction on behavioral health awareness and crisis intervention to recruits. It furnished e-learning to all officers on body-worn camera use and responding to reports of sexual assault. It has finalized and has begun classroom instruction for all officers on behavioral health awareness/crisis intervention and sexual assault investigations, and will soon begin specialized instruction on behavioral health awareness/crisis intervention for dispatchers and 911 call-takers. The classroom components of all of these new training programs incorporate adult learning principles, replacing static, lecture-based instruction with dynamic, scenario-based, problem-solving exercises.

In addition to drafting policies and conducting training, BPD and the City have made at least preliminary progress toward implementing the organizational and structural improvements required by the Consent Decree. They have completed a Technology Resource Study and a Technology Resource Plan and are now carrying through with the Plan. They have conducted studies and/or finalized plans on staffing, hiring, recruitment, community policing and engagement, diversion of youth from the criminal justice system, ameliorating the City's behavioral health system, and refining BPD's memorandum of understanding with Baltimore School Police. And critically, BPD has begun the long, difficult process of transforming its historically ineffectual Public Integrity Bureau.

Finally, BPD has made initial strides toward developing the capacity for self-assessment and self-correction. It is now regularly conducting monthly equipment audits of its transport vehicles. It has begun conducting quarterly audits of a random sample of transport events. And it has issued its first two annual reports regarding the efficacy and integrity of its sexual assault investigations; published an inaugural report its responses to First Amendment-protected activities, including large-scale protests, video recording of police conduct, and simple criticism of police action; and is finalizing its initial report on performance issues revealed by arrests that result in individuals being released without charge.

Despite the achievements of BPD and the City over the past two and a half years, the challenges ahead remain voluminous and acute. Beyond the need to successfully complete training on numerous revised policies, BPD must stand up a well-functioning system of internal investigations and discipline so that officers understand there will be real consequences for misconduct—and for passively standing silent in the face of it. BPD must carry through with modernizing its IT systems and, once those systems are operational, ensure that its officers appropriately use them, including their time-saving, data-liberating electronic field-based reporting capability. BPD must provide essential reinforcements for its Patrol Division and Public Integrity Bureau through reassignment of officers from other units, civilianization of certain administrative functions, and improved recruitment and retention. The City must fill the yawning gaps in its behavioral health system so that BPD officers are not always expected to be the first responders to individuals in crisis. Ultimately, BPD must change its culture. It must get its officers, and especially their supervisors, to own the reform project for themselves so that constitutional, community-oriented policing is the Departmental norm. There is no other way to rebuild community trust and, in the end, no other way to fight crime effectively.

As required by Paragraph 469, this section of the report sets forth the Monitoring Team's findings regarding "whether the material requirements of [each area of the Consent Decree] have been achieved." For each area, the Monitoring Team explains (1) the Consent Decree's requirements over the long term, (2) the progress BPD has made along the arc of compliance and the numeric compliance score BPD is receiving (3) the challenges facing BPD, and (4) immediate next steps. The Monitoring Team is not evaluating BPD's progress toward satisfying each and every paragraph and each and every requirement within each area of the Consent Decree. That kind of report card would not reveal much, if anything, about BPD's performance at this stage in the reform process. The Monitoring Team instead assesses BPD's progress on the specific Consent Decree requirements that are included in the First-, Second- and Third-Year Monitoring Plans in each area, and then describes the road ahead.

This section begins in the area that has been at the heart of the reform effort over the past year: training. It then addresses the areas of the Consent Decree that present among the most pressing threshold challenges facing BPD: misconduct investigations and discipline, technology, and staffing, followed by areas where DOJ found or expressed concerns about a pattern or practice of constitutional violations, including stops, searches and arrests, impartial policing, use of force, and transportation of persons in custody. This section concludes by assessing BPD's progress in other areas of the Consent Decree.

# TRAINING

No changes to BPD policies, practices, or procedures can be implemented without making them clear to officers. As the Monitoring Team has observed in prior reports, even the best policies amount to nothing if officers do not receive appropriate training on how to comply with them.

The Consent Decree therefore provides that "proper, effective, and comprehensive training is a necessary prerequisite to constitutional policing" (CD 291). It outlines specific training requirements for stops, searches, and arrests (CD 67–68); crisis intervention (CD 106–08, 112–113); use of force (CD 166–68); transportation of persons in custody (CD 238); First Amendment-protected activities (CD 251); sexual assault investigations (CD 259); supervision and management (CD 303, 308–10); and misconduct investigations (CD 409–15). BPD must also overhaul its Field Training Officer Program for new Academy graduates. (CD 301–02). Even in areas where the Consent Decree does not provide detailed requirements for training, the full implementation of new policies and procedures requires similarly rigorous, high-quality training to translate paper into practice.

This report elsewhere details the important progress that BPD has made in training on specific subjects, including training on use of force; stops, searches and arrests; impartial policing; behavioral health awareness and crisis intervention; investigation of reports of sexual assault; and body-worn camera use. This section addresses BPD's progress toward improving and enhancing its overall training function.

BPD has begun developing a first-rate training program for its officers. It is successfully transforming from a static, lecture-based approach to an approach that incorporates interactive e-learning coupled with facilitated, scenario-based classroom discussion—a far more dynamic method of instruction that provides officers the practical skills they need to solve the problems they confront on the street. Although BPD still has a distance to travel toward full and successful implementation of this forward-thinking approach to officer training, the Monitoring Team remains encouraged that BPD leadership and Academy staff are eagerly embracing it.

BPD has made substantial progress toward satisfying the Consent Decree's general training requirements regarding Academy facilities, staffing, operations, and approach to instruction. BPD also has developed and delivered training in certain Consent Decree areas, including use of force and body-worn camera use. However, BPD must successfully complete the transformation of its approach to training, and it must continue to collaborate with the Monitoring Team, DOJ and the community to develop and deliver new training curricula in all other areas of the Consent Decree.

***Accordingly, even though BPD is on its way to compliance with the Consent Decree's general training requirements, significant work remains before it reaches sustained compliance. Its compliance score in the "Training Generally" category is "4a" (implementation not yet assessed).***

| TRAINING GENERALLY | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **4A** | Implementation-Not Yet Accessed |

## ▌AREAS OF PROGRESS

### *Implementation of Training Requirements*

As noted elsewhere in this report, BPD has provided officers important training on core policies revised under the Consent Decree, particularly in areas in which DOJ found a pattern or practice of constitutional violations. In November 2019, BPD certified that nearly all eligible officers successfully completed e-learning and classroom training on its new use of force policies, as well as new policies addressing fair and impartial policing (UOF/FIP I). Further, in late 2019, BPD provided e-learning, and beginning in February 2020 began classroom training, on new policies on stops, searches, and arrests and related aspects of fair and impartial policing (SSA/FIP II). After the COVID-19 pandemic interrupted this in-person training in March 2020, BPD re-started the training in July 2020 and plans to complete it by the end of this year. For the e-learning that preceded in-class instruction in both of UOF/FIP I and SSA/FIP II training, officers were required to score 100% on tests administered at the end of the e-learning in order to become eligible for the classroom component.

In addition to this vital UOF, SSA and FIP training, BPD has provided and confirmed completion of classroom training for field training officers (note that the FTO program, including training, is now undergoing revision) and Department-wide e-learning on both body-worn camera use and responding to reports of sexual assault. BPD is increasingly using its e-learning platform as a means of not only introducing new policies in advance of in-person training and thereby making the in-person training more impactful and effective, but to provide ongoing training to ensure continuing skill development and adherence to performance expectations.

Even as the COVID-19 pandemic prevented in-person officer training for several months in 2020, BPD has continued to develop e-learning and/or classroom training programs in the following Consent Decree areas:

- Peer invention; (Ethical Policing is Courageous – EPIC)
- Sexual assault investigations
- Supervisory review of stops, searches and arrests
- Vehicle pursuits
- First Amendment-protected activities
- Behavioral health awareness and crisis intervention
- Misconduct investigations
- Community Policing
- Stops, searches and arrests for lesser offenses

BPD's continued, intensive work over the last six months will help to ensure that officers receive training on core Consent Decree policies with pandemic-related delays that are as short as possible.

### *Staffing, Resources and Facilities*

At the start of the Consent Decree process, BPD's Training Academy was "severely understaffed" and significantly under-resourced. ECF No. 178-1 at 17. As recently as early 2019, there were only three full-

time instructors available to develop and conduct in-service training required by the Consent Decree. ECF No. 279-1 at 31. BPD's rapid leadership turnover throughout 2018 directly contributed to "BPD's delay in providing adequate resources and personnel to the Training Academy." *Id.* at 15.

In the past year and a half, BPD has begun investing appropriately in officer training:

- In early 2019, before UOF/FIP I classroom training began, BPD provided the Academy with ten additional full-time instructors. As the Monitoring Team has audited the performance of these instructors in UOF/FIP I and SSA/FIP II, we have been encouraged by the development and progression of their teaching capabilities.

- In the second half of 2019, BPD hired a civilian Academic Director who is an accomplished academic and police professional with years of experience in developing high-quality, evidence-based education programs for law enforcement agencies.

- In the first part of 2020, BPD added two curriculum writers.

- In the first part of 2020, BPD added several new civilian law instructors to assist with SSA/FIP II training.

The fortification of the Academy's staff is encouraging. As explained in the Challenges Ahead section below, BPD expects to fulfill numerous training objectives simultaneously in the near future. To state the obvious, BPD would not be able to fulfill those objectives without the new personnel it has brought in to the Academy.

The Consent Decree requires BPD to update its training facilities (CD 292). In compliance with that requirement, BPD has moved its Training Academy from "its long-time, deficient facilities to more modern facilities at the University of Baltimore." ECF No. 279-1 at 31. As of April 2020, all training functions had transitioned to the new facilities. It is hard to overstate the significance of this development. As both the Court and the Monitoring Team have emphasized, modern training facilities are vital to establishing a first-rate police force. With attractive, state-of-the-art facilities, BPD conveys to both recruits and officers that policing is a profession and that the Department takes seriously their development as professionals.

### *Adoption of New Training Paradigm*

Prior to the Consent Decree, BPD officers received training in the form of unengaging, lecture-based instruction that covered all topics within a single in-class block of time each year. ECF No. 178-1 at 17-18. Further, BPD developed its training curricula with minimal or no input from other components of the Department or the community.

Under the Consent Decree, BPD has invested substantial time and effort in implementing a fundamentally different approach to officer training. BPD has hired civilian personnel to coordinate curriculum development and provide legal instruction. Academy staff have learned from other departments that have incorporated contemporary adult learning principles into their training programs. Most important, the Academy has embraced these principles for its own training programs. It has adopted a model that employs integrated, scenario-based learning focused on officer decision-making, problem-solving and skill development rather than the static, passive receipt of information.

To ensure that Consent Decree-mandated policies can be implemented as quickly as possible, and to keep officers more actively engaged in their own professional development, BPD also has moved from offering one long block of in-service training each year to holding in-service training in smaller blocks

throughout the year. Further, by using a new, comprehensive, multi-stage pilot process, BPD is providing Academy instructors the opportunity to revise and fine-tune training curricula before they are rolled out Department-wide.

Significantly, BPD is, for the first time, developing training on core subjects in collaboration with community members. As explained above, it is providing for public and officer feedback on training curricula while it is still in draft form. Additionally, BPD has created a Community Training Review Committee, "a panel of community representatives to provide ongoing feedback and guidance on training initiatives." ECF No. 279-1 at 30. CTRC attended and provided feedback at pilot training sessions on both UOF/FIP I and SSA/FIP II. As BPD continues to transform its training approach, it will "utilize community members more directly, both to help devise the curriculum and to participate in the training." *Id.*

## CHALLENGES AHEAD

### *Balancing Training Imperatives*

As previously reported, the training demands of the Consent Decree continue to increase. ECF No. 279-1 at 31. As the slate of training curricula identified above is finalized, the Training Academy's staff will need to balance a greater number of concurrent training initiatives than ever before. BPD will need to ensure the Academy has the resources and support it needs to provide the high-quality training that the Consent Decree requires. This will be particularly challenging in the face of the civilian hiring freeze for Fiscal Year 2021, which delays BPD's plans to civilianize various Academy functions and re-assign sworn officers to the Patrol Division.

### *Long-Term Resources and Capacity*

The Monitoring Team also has reported that BPD will need adapt to a more intensive model of in-service training as "the new normal." *Id.* at 32. Providing such training—which is based on facilitated discussion, problem-solving and decision-making that incorporates scenarios, simulations, role-playing, and performance assessments—requires substantial time and effort and, therefore, substantial staff. For that reason, the Consent Decree requires the Academy to maintain "an adequate number of qualified instructors." (CD 293, 296.)

BPD is presently operating under budgetary constraints, especially because of the pandemic's effect on the City's financial resources. In circumstances like these, it may be tempting to reduce investment in officer training and professional development. But if the Consent Decree's reforms are to be implemented, that temptation must be resisted. The work of the Academy is indispensable to achieving sustainable compliance with the Consent Decree. Even as the City and BPD must weigh competing priorities, they must recognize that BPD's ability to provide community-oriented, constitutional policing will depend on its ability to provide officers with the requisite training, based on the model that the Academy has been working diligently to adopt.

## THE NEXT SIX MONTHS

The COVID-19 pandemic continues to make it difficult to forecast with certainty the training requirements BPD will be able to satisfy in the near future.  Nevertheless, BPD has resumed SSA/FIP II and, using a modified schedule with reduced class sizes, plans to complete it by the end of the year. At the same time, BPD will begin Consent Decree-required training in other critical areas. The Ethical Policing is Courageous ("EPIC") training, which addresses the need for peer intervention and "active bystandership,"

is slated to begin in November 2020, with all officers trained by March 2021. Virtual training on patrol response to both behavioral health crises and reports of sexual assault began earlier this month, with all officers trained by March 2021. Classroom training on defensive tactics should begin in fall 2020. Specialized in-class training on sexual assault investigations for members of the Sex Offense Unit should be held next month (October 2020).

In the coming months, BPD will deliver e-learning on other Consent Decree subjects, including First Amendment-protected activity, deadly force, and proactive policing.

Finally, BPD will develop classroom and e-learning curricula for community policing and stops, searches and arrests for low-level "quality of life" offenses and specialized training on misconduct investigations for Public Integrity Bureau and Civilian Review Board investigators.

# MISCONDUCT INVESTIGATIONS AND DISCIPLINE

The new policies BPD has adopted in other areas of the Consent Decree will mean little if BPD does not hold all officers accountable for following them. As Paragraph 329 of the Consent Decree explains, "[a] robust and well-functioning accountability system in which officers are held to the highest standards of integrity is critical to BPD's legitimacy and a priority of the Department." The need for BPD to repair its internal affairs function, now housed in the Public Integrity Bureau ("PIB"), is thus at the heart of the Consent Decree.

As the Monitoring Team observed in previous reports, the Misconduct Investigations and Discipline section of the Consent Decree is the longest and most comprehensive, spanning 87 paragraphs and 38 pages. It covers the location, independence, resources and authority of PIB (CD 330-34); the process for receiving complaints, classifying them, and communicating with complainants about them (CD 335-42); requirements for conducting fair, thorough, reliable misconduct investigations and making misconduct determinations (CD 343-58); requirements for handling and referring allegations of criminal misconduct (CD 359-71); the lodging of disciplinary charges, the administration of disciplinary hearings, and the imposition of discipline (CD 372-88); the process for community-centered mediation as an alternative to investigation for certain minor allegations of officer misconduct affecting civilians (CD 389-91); record-keeping for misconduct investigations (CD 392-95); measures for ensuring transparency, including issuance of quarterly public reports of aggregate data (CD 396-405); a testing program designed to evaluate the efficacy of the civilian complaint intake process (CD 406-08); and training of OPR investigators and supervisors (CD 409-15).

The ultimate goals of the Consent Decree's provisions implicating PIB are the full, fair, objective, and timely investigation of all potential officer misconduct; the rigorous review of all misconduct investigations; and an impartial, transparent, uniform process for the imposition of discipline and corrective action where appropriate.

In each of the compliance categories addressing misconduct investigations and discipline, BPD has made reasonable progress toward implementing preliminary Consent Decree requirements. It bears noting, however, that as compared to most other areas of the Consent Decree, BPD's progress toward substantial and effective compliance has been modest. That is not because BPD has not done the work it has been required to do under the Monitoring Plans, nor is it because BPD has failed to show the commitment required to achieve compliance. Rather, it is because, in this area, BPD has an extremely tough row to hoe: BPD must completely overhaul an internal affairs system that has been broken for years and that, because of its dysfunction, bears considerable responsibility for the community's lack of faith in the Department.

*In the area of "Misconduct – Intake," BPD's compliance score is "2" (policies/planning), as it has nearly completed policy revisions, but not quite. In the area of "Misconduct – Investigations," BPD's compliance score is "3" (training), as it has completed policy revisions and has begun drafting training curriculum for PIB investigators. In the areas of "Misconduct – Discipline" and "Misconduct – Transparency," BPD has only recently begun revising policies, so its compliance score is "1" (not yet assessed).*

| MISCONDUCT – INTAKE | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **2** | **Policies/ Planning** |

| MISCONDUCT – INVESTIGATIONS | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **3** | **Training** |

| MISCONDUCT – DISCIPLINE | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **1** | **Not Yet Assessed** |

| MISCONDUCT – TRANSPARENCY | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **1** | **Not Yet Assessed** |

## ▮ AREAS OF PROGRESS

*Policies and Procedures*

**Intake and Classification** | Baltimore residents and DOJ identified deficiencies in BPD's misconduct complaint intake and classification process as areas of serious concern during DOJ's investigation. Over the past two years, BPD has taken a number of important steps toward adopting a uniform, reliable, user-friendly complaint intake and classification system.

At the outset of the reform process, BPD made filing complaints easier. Previously, individuals who wanted to lodge misconduct complaints against police officers had to make their complaints in person, sign them, and have them notarized. BPD's revised policies have removed these impediments. Additionally, BPD changed its website to facilitate the acceptance of complaints online and via email and established a dedicated telephone number for individuals to call to make complaints.

In 2018, BPD collaborated with the Monitoring Team and DOJ to finalize revisions to Policy 306, which addresses complaint intake, complaint classification and communication with complainants, and PIB's Classification Protocols. The policy and protocols were finalized and approved in December 2018. *See* ECF No. 175.

In late August 2020, after over a year of collaboration, BPD completed the intake and classifications section of the PIB manual for investigators. *See* ECF No. 336. This section of the manual covers the front end of the internal affairs investigation process, vital to ensuring that complaints are promptly acted upon, uniformly classified, and handled from the outset with the seriousness they deserve. Neither this section of the manual nor Policy 306 nor the investigations section of the manual, discussed below, will be fully active until PIB investigators are trained on it.

Finally, BPD and the Civilian Review Board (CRB) have created a Unified Complaint Form, to be used by individuals filing misconduct complaints with BPD or CRB. BPD is developing an e-learning curriculum to deliver training on the use of the form in preparation for Department-wide rollout late this year or early next year. BPD will pilot test the form in the near future. The form is already in use by the CRB.

**Investigations** | In addition to improving policies and procedures for misconduct complaint intake and classification, BPD has worked diligently to improve policies and procedures governing misconduct investigations—investigations that, historically, have moved too slow, lacked thoroughness, and reached unjustified or inadequately justified conclusions.

After months of intensive collaboration with the Monitoring Team and DOJ, and two rounds of public comment from community members (including the Civilian Review Board), BPD finalized its investigations manual for PIB, which the Monitoring Team approved in November 2019. *See* ECF No. 263. The completion of the investigations manual was a milestone achievement. The manual provides a complete guide to internal affairs investigations for PIB investigators, supervisors and commanders. It establishes a comprehensive investigations procedure that, if followed, will yield thorough, fair and timely investigations that produce appropriate disciplinary recommendations. The Monitoring Team's subject matter experts believe the manual is among the most comprehensive and effective internal affairs investigations manuals in the country. However, it will not be fully implemented until PIB investigators are trained on it.

**Expedited Resolution of Minor Misconduct Allegations** | In mid-2019, shortly after arriving at BPD, Commissioner Harrison developed a policy for addressing complaints of minor misconduct on an expedited basis. The new policy, Policy 321, permits District commanders, rather than PIB investigators, to handle such complaints and allows officers to obtain prompt case closure at the District level by admitting responsibility in negotiated settlements. The Monitoring Team approved the new policy in September 2019. *See* ECF No. 216.

Policy violations eligible for prompt, negotiated resolution include reporting late to roll call, failure to appear in court or for a medical appointment, and loss of BPD property other than a firearm; they do not include alleged misconduct in officer interactions with members of the public (*e.g.,* excessive force, false arrests, harassment). Policy 321 does not remove PIB from the disciplinary process for minor policy violations. PIB will continue to receive and classify complaints at the front end of the process and obtain reports and retain records of negotiated resolutions at the back end in order to ensure consistency in the application of the policy.

By allowing District commanders, rather than PIB, to address minor policy violations that call for supervisory correction, Policy 321 promises to advance several Consent Decree objectives. *First*, it should reduce the number of minor misconduct cases assigned to PIB investigators, which in turn should free PIB investigators to focus on more serious complaints and enable all misconduct complaints, minor and serious alike, to be resolved more quickly. Officers who engage in misconduct should more promptly be held accountable, and community members with bona fide complaints should receive swifter justice. *Second*, by speeding up complaint resolution, officers who are the subject of complaints that can be promptly resolved as unfounded, unsustained or sustained through negotiated resolution should not be left in limbo and kept ineligible for transfer or promotion for unreasonable periods of time, as has been the case in recent years due to PIB backlogs. Given that the duration of misconduct investigations has been a primary cause of officer dissatisfaction, Policy 321 could help boost officer morale. *Third*, by enabling District commanders to resolve policy violations appropriate for supervisory correction, Policy 321 should fortify BPD's command structure and supervisory performance in each district and unit.

Neither BPD nor the Monitoring Team have begun to evaluate whether, in fact, Policy 321 is accomplishing these objectives. BPD will begin to do so shortly and will include the results in its forthcoming quarterly PIB reports.

**PIB-CRB Information Sharing Protocols** | In March 2019, BPD successfully finalized complaint intake and classification protocols for PIB and the Civilian Review Board ("CRB"). These protocols identify the responsibilities of both PIB and CRB for intake and classification of misconduct complaints and for exchanging information at the outset of complaint investigations. The issuance of the protocols was an important step toward improving civilian oversight of BPD. PIB and CRB must interact and coordinate with each other to fulfill their respective statutory roles, but until the adoption of these protocols, PIB and CRB had never developed a formal process for information sharing.

Under the new protocols, CRB must be furnished prompt, consistent, electronic access to PIB data through IAPro, BPD's records system for misconduct investigations and discipline. To facilitate the new relationship between PIB and CRB, BPD also has assigned a CRB liaison. The Monitoring Team has not yet assessed the quality and effectiveness of the new relationship between PIB and CRB. It is too soon to tell whether the protocols can fully repair the historically troubled relationship between PIB and CRB, but the Monitoring has preliminarily observed that they appear to be fostering improved cooperation.

Having completed the intake/classification information sharing protocols last year, BPD and CRB proceeded to draft and complete information sharing protocols for misconduct investigations in 2020. *See* ECF No. 336. As with the information sharing protocols for intake/classification, the information sharing protocols for investigations promise to ensure that PIB and CRB are working with the same information when each conducts its own independent investigations of misconduct allegations.

**Disclosure of Exculpatory Evidence Policy** | In September 2019, the Monitoring Team approved a new BPD policy, Policy 1809, on exculpatory evidence disclosure requirements. *See* ECF No. 246. The policy is intended to ensure that all BPD members comply with their obligation under federal and Maryland law to disclose potential exculpatory and impeachment evidence in criminal cases. The policy requires BPD members to identify and disclose to the prosecution, as soon as possible following the initiation of criminal charges in state or federal court, evidence that is favorable to a criminal defendant because it may disprove the guilt of the defendant, may cast doubt on the credibility of a witness for the government, or may show the defendant should receive less severe punishment.

Once Policy 1809 becomes active, which will occur after officers are trained on it, BPD will join a small but growing number of law enforcement agencies that have formal procedures concerning the disclosure of exculpatory evidence. These are requirements that not only respect the constitutional and statutory rights of the accused, but also promote public safety by seeking to ensure the integrity of criminal prosecutions, which can be compromised if tainted by the nondisclosure of exculpatory evidence.

### *Independent Investigation of the Root Causes of GTTF Scandal*

The Monitoring Team and the Court itself made clear that BPD needed to retain an outside, independent team of investigators to thoroughly examine the Gun Trace Task Force scandal and attempt to discern how far it reached, how it evolved, and how BPD could have allowed it to occur without any internal repercussions for the officers involved. In response, BPD hired Michael Bromwich and his firm in 2019 to conduct to conduct such a review. Mr. Bromwich has a credentialed history of doing such work. The former Inspector General of the Department of Justice, he served as monitor of the Metropolitan Police Department in Washington, D.C. when MPD underwent DOJ-monitored reforms similar to the reforms BPD is now undertaking, and he has conducted several high-profile investigations involving misconduct by law enforcement officers. Mr. Bromwich's independent investigation is underway.

# CHALLENGES AHEAD

## *Quality of Investigations*

Improving the quality of PIB investigations is a central goal of the Consent Decree. In 2019-20, the Monitoring Team conducted its first comprehensive compliance review of PIB investigations. The review covered a significant sample of PIB investigations conducted in 2018. The report detailing the Monitoring Team's compliance review is attached as **Exhibit 2**.

The review serves as a preliminary "baseline" assessment of the quality of PIB investigations. It is intended to show BPD's performance as of 2018, prior to implementation of the major reforms required by the Consent Decree. As of 2018, PIB had sought to implement certain improvements but was still contemplating core improvements. BPD has conceded that improving the quality of PIB misconduct investigations was a work in progress in 2018.

As a pre-reform "baseline" assessment, the Monitoring Team's review did not consider the current quality of BPD's internal investigations. Thus, it does not reflect the impact of the systemic changes, summarized above, that have been underway since 2018.

Because the Monitoring Team reviewed PIB investigations from a pre-reform period, our overall conclusion is unsurprising: PIB will need to dramatically improve on its performance from 2018 before its investigations are of sufficiently high quality to comply with the Consent Decree. The Monitoring Team's specific findings are as follows:

- ■ **The overall quality of BPD's misconduct investigations in 2018 was low.** Some 40 percent of misconduct investigations in 2018 were of "fair" or "poor" overall quality. Many cases (42 percent) were "administratively closed" without a disposition on the merits—a disposition prohibited by the Consent Decree—and cases that resulted in a specific disposition often failed to adequately outline the factual basis for that disposition.

- ■ **The condition of misconduct case files was poor.** Documentation of investigations was chaotic and inconsistent, leading to great uncertainty in a number of instances about both the factual issues presented and the investigative steps taken.

- ■ **Communication with involved civilians and officers was poor.** Individuals making complaints to BPD were sent written notice that their complaint was received in only one-quarter of cases. Implicated BPD personnel received notification in less than one-quarter of cases.

- ■ **Inefficiencies and poor management resulted in missed timelines and wasted efforts in minor cases.** It appeared that some 60 percent of investigations were not completed within the Consent Decree's 90-day deadline, with extensions of time never requested. Several cases remained pending for extended periods of time without explanation, justification or approval.

- ■ **Investigators too often failed to interview complainants and other necessary witnesses.** Complainants were interviewed only 41 percent of the time; subject employees were interviewed in 44 percent of cases. Where interviews occurred, the quality of those interviews appeared encouraging, but only 22 percent of cases had complete audio or video records of all witness interviews.

- ■ **Investigations failed to flag related operational and performance issues exposed by the investigation, such as training deficiencies, repetitive problematic behavior, and potential policy shortcomings.**

Although the Monitoring Team identified some encouraging data points—*e.g.,* complaints of excessive force, unlawful search and seizure, and First Amendment violations were both relatively rare and well-investigated—our findings confirm the need for PIB to transform the way it investigates officer misconduct.

### Staffing

The challenges facing PIB remain severe. PIB needs additional investigators—the Staffing Plan estimates a need for three dozen more—to eliminate the case backlog and ensure timely, thorough, fair resolution of misconduct allegations. The new policy on negotiated resolution of minor misconduct allegations should help. But the problems caused by investigative delays, including the absence of swift accountability and the depletion of officer morale, will not be cured until BPD assigns and trains additional, qualified PIB investigators.

### Training

The completion of the PIB investigations manual in November 2019 was to be closely followed by the development of a training curriculum designed for PIB investigators, supervisors and commanders. The initial draft of the curriculum was due to Monitoring Team and DOJ in early February 2020, to be followed by several months of collaboration and public comment, with a completion date of July 1, 2020, and a start date of July 15, 2020. The deadlines for this crucial training had to be extended for two reasons. First, the work restrictions necessitated by the COVID-19 delayed preparation of the curriculum. Second, for financial and other logistical reasons, BPD elected to not move forward with the program developed by Roger Williams University, which it had originally selected.

BPD has now identified a skilled subject matter expert to assist in the development of the PIB investigator training curriculum in the coming months. The Monitoring Team and DOJ will collaborate with BPD throughout the curriculum development process. Under a newly revised schedule, the curriculum is to be finalized and the training set to take place in the first quarter of 2021.

In addition to training for PIB investigators, BPD is presently developing a curriculum for Department-wide training to implement a program on officer intervention called Ethical Policing is Courageous ("EPIC"). EPIC replicates a well-received initiative implemented in the New Orleans Police Department. It provides officers with practical skills and techniques to employ when facing situations in which they must intervene to prevent or stop misconduct and problematic performance by a fellow officer. Commissioner Harrison views EPIC training as an important part of the culture change BPD is undertaking. The Monitoring Team and Judge Bredar agree. Currently, BPD projects beginning in-person EPIC training in October 2020. As with many other training deadlines, public health realities may compel changes in the projected timeline.

### Technology and Reporting

BPD must begin devising an Early Intervention System ("EIS"), which will permit supervisors to identify and intervene to correct the behavior of officers who begin to display a tendency for violating policy. As discussed in greater detail in the Technology section of this report, BPD is still more than a year away from implementing a fully functional, modern EIS. But because the EIS will depend upon source data from other systems that are being upgraded or overhauled (e.g., IAPro and the Records Management System), BPD must begin to establish the data requirements for the EIS now, as it embarks on implementation of the Technology Resource Plan issued last year.

BPD also must develop a plan for collecting the data needed to complete the statistical reports and internal PIB audits required by paragraphs 402 and 405 of the Consent Decree.

■ ■ ■

Deputy Commissioner Brian Nadeau has solidified his leadership of PIB. Despite the serious challenges PIB continues to face, the Monitoring Team has growing confidence that, with D.C. Nadeau in charge, BPD is not only committed to PIB reform, but capable of achieving it.

In the short run, the Monitoring Team remains concerned that the benefits derived from our previous in-person discussions with PIB staff will begin to erode if pandemic-induced restrictions on in-person meetings remain in place for a prolonged period. Even if these measures must remain in place, however, the Monitoring Team is committed to finding ways to innovate, to maintaining our close working relationships with PIB staff, and to continuing our rigorous oversight of PIB.

## THE NEXT SIX MONTHS

In the next reporting period, in collaboration with the Monitoring Team and DOJ, BPD will complete and disseminate its first Quarterly PIB Report (CD 402) compiling comprehensive aggregate data regarding misconduct complaints, both internal and external. The Monitoring Team has reviewed an initial draft, which is of high quality. (The Monitoring Team has not yet conducted its own assessment of the data under Paragraph 469.n. of the Consent Decree).

BPD will continue to work closely with the Monitoring Team and DOJ on BPD's comprehensive review of its policies pertaining to discipline. The scope of this review is significant, as there are numerous policies implicating discipline that need to be reviewed and updated or drafted and approved. Included among these policies is BPD's core policy on discipline, which includes BPD's disciplinary matrix. The matrix prescribes disciplinary outcomes based on the severity of a violation and the officer's history of discipline.

As noted, BPD will develop a training curriculum for PIB investigators, supervisors and commanders. BPD, the Monitoring Team and DOJ have established a bi-weekly call intended to prioritize the development of the curriculum. In addition, BPD will develop the curriculum for and deliver EPIC training.

# TECHNOLOGY

Paragraph 267 of the Consent Decree requires BPD to "provide its officers with the Technology necessary to implement the Material Requirements of this Agreement . . .." Paragraphs 268-278 then set forth the Consent Decree's technology requirements.

BPD and the City previously completed and submitted a Resource Study (CD 268, 270), which identified current BPD systems, described the current state of those systems, and made preliminary recommendations for improvements. Following completion of the Resource Study, BPD and the City prepared and published a Resource Plan (CD 269-70, 272), which the Monitoring Team approved on December 1, 2018. *See* ECF No. 164. The Resource Plan, which is being updated annually (CD 275), addresses how BPD will provide the necessary computer equipment and access required for personnel to discharge their duties, acquire a centralized records management system, and ultimately develop an Early Intervention System ("EIS"). BPD is required to use its best efforts to implement the Resource Plan (CD 274).

The Technology provisions of the Consent Decree also require BPD to disclose to the public the acquisition of certain new equipment or activity to be used in enforcement activities (CD 278). Further, data collection and data analysis are required in nearly every area of the Consent Decree, not only to enable the Monitoring Team to assess compliance, but to enable BPD leadership to better manage the Department. BPD must review and analyze data in a number of subject areas, including investigatory stops and detentions (CD 41), vehicle stops (CD 46), stops, searches and arrests (CD 82-86), use of force (CD 211-217), transport of persons in custody (CD 232), and misconduct investigations (CD 392), among others.

Without technology improvements, BPD will not be able to achieve compliance with the Consent Decree. As the Consent Decree states, compliance is truly "dependent upon BPD acquiring or developing the appropriate technology." (CD 267).

After some delay, BPD is now diligently implementing the Technology Resource Plan. With the hiring of a new Chief Technology Officer and additional professional staff, BPD has fortified its IT governance structure. Further, BPD has now selected a vendor, secured funding, and begun working in earnest to design and develop a new Records Management System ("RMS"), which is indispensable to achieving compliance in nearly every area of the Consent Decree.

***In short, BPD has completed the planning process and moved into the implementation phase of compliance. However, because it has only recently begun implementation, its compliance score in the Technology Modernization category is "4a" (implementation – not yet assessed).***

| TECHNOLOGY MODERNIZATION | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **4A** | Implementation – Not Yet Assessed |

## ▌AREAS OF PROGRESS

### *IT Staffing and Governance*

BPD hired a Chief Technology Officer and additional IT staff, including two Project Managers, a Business Analyst, two Developers, an Enterprise Architect, a Fiscal Analyst and a Systems Integration Specialist. Further, the CTO has begun to establish proper IT governance. He promptly assessed his unit's operations, identified the unit's needs, and implemented foundational workflow management structures and processes that have long been absent.

### *Records Management System*

On September 30, 2019, BPD released a Request for Information (RFI) for a new Record Management System ("RMS"). After an extensive evaluation of responses to the RFI, BPD identified Axon Enterprises to provide the new RMS. A statement of work was developed, and implementation is beginning.

### *IAPro*

IAPro is the system BPD uses to track both use of force incidents/investigations and misconduct investigations/discipline. Though it took much longer than expected, BPD was able to complete its upgrade of IA Pro, and is now on the most current, standardized version of the platform. This will ensure that BPD is able to support and maintain the system going forward, and leverage all of the features and functionality available to IAPro customers.

### *Workforce Management System*

BPD has identified and deployed and is currently configuring a department-wide work schedule management application (e-Resource), which is nearly complete.

### *Learning Management System*

BPD has identified a vendor to provide Learning Management System ("LMS") services. The acquisition package has been completed and was submitted for City approval. The LMS is on track for full implementation by October 2020.

### *Body-Worn Cameras*

BPD acquired new body-worn camera technology and the related policy was approved. While initial deployment was delayed as a result of COVID-19, it is now in progress.

### *Transport Vehicle Cameras*

BPD has begun to install new cameras in its transport vehicles. The new cameras will make it less cumbersome to upload and review recordings of transport events.

### *Policy regarding Public Disclosure of Technology Acquisitions*

BPD is required to publicly disclose the acquisition of certain new equipment or technology to be used in enforcement activities (CD 278). In furtherance of this requirement, BPD finalized Policy 606, which establishes the procedure for such disclosure in September 2019. *See* ECF No. 239. The policy is among the many measures BPD is adopting under the Consent Decree to enhance the transparency of its operations.

## CHALLENGES AHEAD

While BPD has taken initial steps to address its technology deficits, it still has a long way to go to fully realize a modern and sustainable IT environment.  BPD must continue to plan for and sustain its IT infrastructure needs to integrate data silos, eliminate duplicative data entry, improve data quality, and collect and maintain data thoroughly. Otherwise, BPD will fail to achieve compliance with the numerous Consent Decree requirements that depend upon BPD's ability to capture, maintain, synthesize and analyze comprehensive electronic data regarding its law enforcement activities.  As explained elsewhere in this report, BPD's long-standing technological deficiencies:

- Make it more difficult for supervisors to assess, commend and correct deficiencies in the performance of their officers

- Increase the amount of time officers must spend writing reports

- Lead to under-reporting of non-arrest police encounters, especially investigative stops and weapons pat-downs

- Diminish the amount of time officers have for community policing and additional enforcement activity

- Make Consent Decree-required analyses of police encounters (particularly stops, searches and arrests) impracticable, if not impossible

- Constrain BPD's ability to assess performance by officer, unit, District and Department-wide

- Limit public transparency of BPD enforcement activity

If used properly, a new RMS featuring electronic field-based reporting should address each of these issues.

BPD must be vigilant about ensuring three things for each and every IT initiative. First, each initiative must be accompanied by clear, consistent policy and training. Second, to ensure proper accountability and maximum effectiveness of each IT initiative, BPD must consider how that initiative, as well as the data it generates and retains, will be audited, reviewed or evaluated for a solution. Third, BPD must keep its eye on the long-range development of an Early Intervention System. EIS implementation will come toward the back end of BPD's modernization timeline because BPD must first capture quality data in each source system. Accordingly, the data requirements for BPD's EIS must be integrated into each IT solution implemented under the Resource Plan. What that means is that BPD must determine which data it needs for its EIS as it configures the data requirements for the RMS, and any other system that will contain data upon which the EIS will rely.

## THE NEXT SIX MONTHS

Over the next reporting period, BPD will focus on the implementation of the RMS and the deployment of the new body-worn cameras. RMS implementation, in particular, is extremely complex and will impact nearly every area of the police department.  BPD must commit sufficient time and resources to ensure the proper coordination of the project.

# STAFFING, PERFORMANCE EVALUATIONS AND PROMOTIONS

The Consent Decree requires BPD to complete a comprehensive Staffing Study to determine the appropriate number of sworn and civilian personnel needed to effectively provide police services, enable supervision, and satisfy the requirements of the Consent Decree (CD 428). The Consent Decree further requires that, based on the Staffing Study, BPD must develop a Staffing Plan that will ensure a sufficient number of deployed personnel to, among other things: implement and sustain effective community and problem-oriented policing; conduct timely misconduct investigations; supply sufficient patrol officers to each District without resorting to drafting (*i.e.,* forced overtime), except in unforeseeable circumstances; promote unity of command when feasible; provide a sufficient number of supervisors; and account for BPD's and the City's existing and projected resources (CD 429). BPD must implement the Staffing Plan, but may do so in a phased manner that reflects the City's and BPD's fiscal resources (CD 430).

As for performance evaluations and promotions, the Consent Decree obligates BPD to have supervisors meet with officers to discuss their annual performance reviews, which must include written discussions of the officers' performance during the rating period, any areas for growth and achievement, and any areas requiring further training and supervision (CD 431). Direct supervisors must use a formalized system to document annual performance evaluations for each officer and quarterly evaluations of probationary employees (CD 432). In addition to these formal evaluations, supervisors must meet with their subordinates on an ongoing basis to discuss performance and must document their communications regarding performance challenges and areas for growth (CD 433). The Consent Decree further requires BPD to conduct performance evaluations of each supervisor (from first line supervisor through commander), which will include assessments of ability and effectiveness in conducting performance reviews, including monitoring, deterring and addressing misconduct by officers they supervise (CD 434). Finally, BPD must ensure its promotional system has clear criteria prioritizing effective, constitutional, and community-oriented policing as factors for promotion (CD 435).

In December 2018, BPD produced a Staffing Study compliant with Paragraph 428. BPD completed the Staffing Plan required under Paragraph 429 in February 2020.

In a significant, positive break from past practice, BPD has conceptualized a new promotions regime under Paragraph 435, including a formal application and committee review process. Policy 1738, focused on command promotions for the ranks of Captain and Major, was recently approved. *See* ECF No. 340. Because Paragraph 435 also references "promotional systems," meaning promotions to all ranks, the development of a promotions policy for sergeants and lieutenants is currently underway.

BPD, DOJ and the Monitoring Team have also started work on BPD's performance evaluation system.

***BPD is making reasonable progress on the foundational requirements in these areas. On Staffing (which is coupled with Recruitment and Retention in the scoring framework, see* Exhibit 1*), BPD's compliance score is "4a" (implementation – not yet assessed), as BPD recently completed its comprehensive Staffing Plan but has not yet progressed far enough into the implementation phase to warrant an "on track" or "off track" score. On both Employee Performance Evaluations and Promotions, BPD's compliance score is "2" (policy phase). BPD has responsibly complied with Monitoring Plan deadlines but has not yet finalized policies in either compliance category.***

| STAFFING | COMPLIANCE SCORE: | |
|---|---|---|
| | **4A** | Implementation – Not Yet Assessed |

| EMPLOYEE PERFORMANCE EVALUATIONS | COMPLIANCE SCORE: | |
|---|---|---|
| | **2** | Policies/ Planning |

| PROMOTIONS | COMPLIANCE SCORE: | |
|---|---|---|
| | **2** | Policies/ Planning |

## ▌ AREAS OF PROGRESS

### *Staffing Plan*

After several delays discussed in prior reports, BPD completed its comprehensive Staffing Plan in February 2020. *See* ECF No. 292. The Plan details the staffing needed to meet BPD's anticipated workload and to comply with the Consent Decree. Key elements from the Plan, available **here**, include the following;

■ BPD needs 956 police officers, 133 sergeants and 27 lieutenants assigned to the Patrol Division in order to satisfy BPD's call-for-service demands and still reserve 40% of officers' time on activities other than responding to calls-for-service, proactive community policing in particular.

■ The Public Integrity Bureau needs an additional 39 investigators to address the current backlog in complaint investigations and to meet the requirements of the Consent Decree.

■ Sergeants should be assigned the same day-off group as their subordinates and an additional 34 sergeants should be assigned to Patrol. Presently, sergeants have limited contact and time with the officers they supervise because of the existing patrol work schedule. This prevents unity of command and makes effective supervision exceedingly difficult.

■ Certain specialized units should be consolidated, while others should have fewer sworn personnel or should be eliminated, and certain administrative functions should be performed by civilians, freeing up sworn personnel for other assignments.

■ Civilianization of certain functions is required to increase the number of sworn officers on the street and to bring needed specialized skills into the Department.

■ BPD continues to lose officers through retirement and other forms of separation faster than it is adding new officers. Increasing the size of recruit classes, increasing the number of recruit classes, and reducing the Academy attrition rate would increase the number of new sworn officers. So, too, would reducing the officer attrition rate, which BPD must figure out how to address.

The City and BPD must now work toward meeting the requirements in the Plan. BPD's budget, which was recently approved for Fiscal Year 2021, reflected some of the recommendations in the Plan around consolidating and eliminating certain specialized units. In particular, as of July 1, officers from the Aviation, Mounted, Marine and traffic-related units were transferred to Patrol, where the need for sworn personnel is most acute. The transferred officers will continue to perform their specialized functions, but on a limited basis, with the exception of the officers from the Mounted and Marine Units, which were eliminated in the FY 2021 Budget.

Further, by moving the Training Academy to the University of Baltimore, BPD is able to accommodate more recruits at once. If hiring improves—something BPD has not yet sustainably achieved—BPD will be able to bring on a greater number of new officers more quickly.

### *Performance Evaluations and Command Promotions*

The Monitoring Team and DOJ are collaborating with BPD to revise its performance evaluation system for lieutenants, sergeants and officers. This includes assessing and upgrading the performance evaluation policy, manual and form. Due to delays caused by the coronavirus pandemic, the work recently began and is expected to continue until the end of the year. Once the work is completed, BPD will turn to revising its performance evaluation system for command ranks, Captain and above.

BPD has finalized the development of a command promotions policy, Policy 1738, which covers the ranks of captain and major. The Monitoring Team approved this policy in September 2020 *See* ECF No. 340. The adoption of this policy is an important development. It establishes that promotion into a command rank will be based exclusively on merit—not on who an officer knows, as has often been the case in the past—and thus conveys that transparency, fairness, impartiality, and procedural justice are just as important to BPD's internal operations as they are to BPD's interactions with community members. Policy 1738 formalizes the practice that Commissioner Harrison implemented on his arrival. Since then, no officer has been promoted to captain or major outside the competitive, merit-based process prescribed by the new policy.

Equally important, BPD must develop a promotions policy for ranks below captain. The work on that policy began in 2020, with a scheduled date of completion, following public feedback, in late October 2020.

## CHALLENGES AHEAD

The fiscal impact of COVID-19 on Baltimore's revenues and the resulting impact on BPD's budget present a major obstacle to full implementation of the Staffing Plan, at least in the short run. The Staffing Plan calls for a total of 675 civilian personnel. This requires an increase of 144 civilian employees. Civilianization of certain functions is essential in two ways. First, civilians free up sworn members for the Patrol Division, where BPD needs more officers. Second, professional civilian members will bring needed expertise to the Department. This is especially true in the critical function of training, where the Staffing Plan calls for additional instructors. Despite BPD's need for additional civilian employees, the City recently imposed a civilian hiring freeze and cut 37 vacant civilian positions from BPD's budget. These reductions will naturally affect BPD's ability to achieve the civilian hiring goals established in the Staffing Plan. The Training Academy is likely to be one of the areas hardest hit. The Staffing Plan recommends increasing professional staff by 38 and decreasing sworn staff by 24. This effort is currently on hold.

Without being able to hire civilians to move certain officers to the street, and with only a limited number of officers who can be moved to the street through the elimination or consolidation of specialized units, retaining existing sworn personnel and hiring new sworn personnel will be the primary ways for BPD to

meet the sworn staffing targets identified in the Staffing Plan. The Plan establishes that BPD will need 2,785 sworn members. To handle 911 calls for service and engage in the community policing activities called for in the Community Policing Plan, the Patrol Division, as noted, will need a total of 956 officers, 133 sergeants, and 27 lieutenants across BPD's nine districts, as noted above. As of July 8, 2020, there were 777 officers, 99 sergeants, and 27 lieutenants assigned to Patrol. Thus, as of July 8, 2020, to achieve the Staffing Plan's goals, BPD had to place 179 additional officers and 34 additional sergeants in Patrol. Additional officers are also critically needed in the Public Integrity Bureau, where misconduct investigations remain inadequate and take far too long.

Hiring the additional officers recommended in the Staffing Plan will be a tall order. Recruitment and hiring have been improving but hiring has barely been able to keep pace with attrition thus far in 2020. Further, although the economic dislocation caused by COVID-19 could increase the number of applications and thus the number of officers hired, that remains uncertain, and recruiting and retention efforts could be adversely affected by recent anti-police protests. Achieving the staffing levels established in the Staffing Plan is among BPD's most severe challenges.

## ▌THE NEXT SIX MONTHS

BPD will continue work on a promotions policy for ranks below Captain and will seek finalize its performance evaluation systems.

# STOPS, SEARCHES, ARRESTS AND VOLUNTARY POLICE-COMMUNITY INTERACTIONS

In recognition of the importance of the Consent Decree's requirements on stops, searches, arrests and voluntary police-community interactions ("SSA"), the Consent Decree's provisions addressing those interactions are extensive. They compel BPD to revise its policies and training curricula; provide thorough prescriptions for communicating with individuals, performing field interviews, and conducting stops, weapons pat downs, searches and arrests; and establish detailed training, documentation, supervisory, and data collection and review obligations (CD 29-86).

Over the past 30 months, BPD has made reasonable progress toward satisfying the Consent Decree's preliminary SSA requirements:

- BPD has revised two different sets of SSA policies, is working toward completion of a third and final set covering lesser misdemeanor offenses, and has made adjustments to the already-revised sets to reflect both minor changes in the law and the philosophical orientation of BPD's new leadership.

- BPD also has developed and is in the midst of delivering comprehensive e-learning and in-class SSA/FIP II training; recently developed e-learning for supervisors on supervisory review requirements for stops, searches and arrest; and prepared lesson plans and provided training to both command staff and officers in response to the Monitoring Team's findings regarding BPD's stops, searches and pat-downs of civilians in Harlem Park following the shooting death of Detective Sean Suiter.

- On data collection and analysis, BPD's antiquated IT systems have severely hindered progress, but BPD recently has developed and begun implementing a methodology for auditing and reporting on arrests that result in "release without charge" dispositions.

The deadlines for certain SSA deliverables under the Third-Year Monitoring Plan have been delayed because of resource redeployments necessitated by the COVID-19 pandemic, as well as public safety and security demands arising from sustained, large-scale protest activity in May and June 2020. Nevertheless, BPD's work on SSA requirements—including policy revisions, resumed classroom training, and the inaugural arrest data audit—has continued.

***Because BPD has largely completed policy revisions and continues to provide core SSA training, its score in each of the SSA compliance categories is "3" (training phase). These categories include (i) Stops, Field Interviews and Voluntary Contacts, (ii) Searches, (iii) Arrests, and (iv) Review and Supervision.***

| STOPS, FIELD INTERVIEWS AND VOLUNTARY CONTACTS | COMPLIANCE SCORE: | |
|---|---|---|
| | **3** | Training |

| SEARCHES | COMPLIANCE SCORE: | |
|---|---|---|
| | **3** | Training |

| ARRESTS | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **3** | Training |

| REVIEW AND SUPERVISION | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **3** | Training |

## AREAS OF PROGRESS

*Policies*

In October 2018, after extensive collaboration with the Monitoring Team and DOJ and receipt of public feedback, BPD finalized revisions to its core SSA policy, Policy 1112, titled "Field Interviews, Investigative Stops/Detentions, Weapons Pat-Downs and Searches," as well as five additional policies: 1007 (Search and Seizure Warrants), 1013 (Strip Searches and Body Cavity Searches), 1106 (Warrantless Arrest Procedures and Probable Cause Standard), 1109 (Warrantless Searches) and 1505 (Foot Pursuits). Two months later, with additional feedback from the Monitoring Team, DOJ and community members, BPD finalized six additional SSA policies, including Policies 906 (Traffic Citations), 1002 (Securing & Interviewing Witnesses), 1104 (Arrest Warrants), 1105 (Custodial Interrogations), 1108 (DUI/DWI Arrest Procedure), and 1114 (Persons in Police Custody).

BPD spent the early part of 2020 focused on revisions to SSA policies that address low-level offenses, including "quality of life" offenses. These policies include: Criminal Citation Procedures (803), Civil Citation Procedures (808), Marijuana-- Uniform Civil Citation (809), Misdemeanor Theft Procedures (812), Video Surveillance Procedures (1014) and Lesser Offenses and Alternatives (1018). These policies are intended to properly prioritize enforcement actions that preserve public safety while simultaneously promoting fair, non-arbitrary practices that foster the community's trust. The principles reflected in these policies are currently being reinforced through SSA/FIP II training, particularly in the lesson plan on "most effective, least intrusive response." That lesson plan teaches officers to exercise their discretion to take the least intrusive law enforcement action consistent with preserving public safety when confronted with an individual who may be committing a lesser offense, such as loitering, open container, trespassing, failure to obey, disorderly conduct, and marijuana possession.

Because this final set of SSA policies is integral to advancing the Consent Decree's objective of community-oriented policing, now reflected in BPD's Community Policing Plan, the deadline for issuing drafts of these policies for public comment was extended from the second monitoring year until this year to accommodate the extension of the deadline for preparation of the Community Policing Plan. The initial public comment period on these policies ran from February – March 2020. BPD received both internal and community feedback. The COVID-19 pandemic then interrupted the process, requiring postponement of additional work.  The Monitoring Team, BPD and DOJ have been discussing resumption of the process in the near future and expect that BPD will solicit additional public feedback and finalize the revisions by the end of 2020.

*Training*

The central component of BPD's SSA work over the past nine months has been the development and delivery of both e-learning and classroom training on the first two sets of BPD's revised SSA policies. The training covers policies on voluntary contacts, field interviews, stops, arrests, interviews/interrogations, weapons pat-downs, and searches, as well as policies on foot pursuits, most effective/least intrusive response, custody, transport, and booking. The training also incorporates instruction on previously approved policies on fair and impartial policing ("FIP"), including Policy 317 (Fair and Impartial Policing) and Policy 720 (Interactions with LGBTQ Individuals). With input from the Monitoring Team and DOJ, the approach BPD has taken to integrating instruction on FIP polices with instruction on SSA policies is similar to the approach BPD took to integrate FIP policies into the successfully concluded training on use of force.

BPD drafted and finalized an effective, six module e-learning curriculum relatively quickly. Officers must complete the e-learning and pass tests for each module before becoming eligible for in-class instruction.

BPD experienced some difficulty with the development of the in-class curriculum component of SSA/FIP II training. That was not unexpected, as BPD continues to adapt to adult-oriented, scenario-based instructional methods. It is far more challenging to develop training curricula employing these methods than it is to develop lecture-based curricula. BPD went through several iterations of the SSA/FIP II classroom curriculum before getting it right. Following two public comment periods, input from the new Community Training Review Committee following a pilot session, several additional pilot sessions with officers, and additional input from the Monitoring Team and DOJ, BPD finalized the curriculum in early February 2020. The curriculum successfully conveys the new SSA and FIP policies through interactive activities, scenarios and role plays that, as in the real world, layer in the requirements of multiple policies at once.

Classroom instruction began on February 10, 2020, shortly after the curriculum was approved. Unfortunately, after five weeks, the training had to be halted because of the pandemic. It restarted in July 2020. Originally scheduled for 36 officers in each of two classrooms for the two-day program, physical distancing restrictions have required BPD to reduce class sizes to 24 officers. As a result, BPD will not be able to complete the training for all officers until the end of 2020.

The hiatus between mid-March and mid-July did not go to waste. The first several weeks of instruction revealed that certain SSA policies were not as clear as they needed to be or had to be modestly adjusted for practical reasons. These included policies addressing securing/interviewing witnesses, strip searches, custodial interrogations, and warrantless searches. (The pilot sessions in January 2020 similarly exposed a handful of policy provisions in need of clarification.) After lengthy and intensive consultation with the Monitoring Team and DOJ, BPD is making the necessary changes in policy and has adjusted the training curriculum accordingly.

Based on the Monitoring Team's observations, the quality of instruction rapidly improved over the first two weeks of SSA/FIP II training and, even after the four-month break, has remained at a high level, even with new instructors brought on board after the break. The course has benefited considerably from the participation of law instructors (including some recently hired), who have ably complemented the police instructors. Generally, course content has been delivered effectively, including in the face of classroom pushback, and most officers appear engaged in the discussions of the course material. The results of the surveys that the Training Academy furnishes to officers at the end of the course corroborate this observation, as the vast majority—nearly 85%—have come away from the course either agreeing or strongly agreeing that they know how to apply BPD's SSA policies and believe the course material

is engaging, while only a small number, roughly 5%, either disagree or strongly disagree with those positions. Many officers also have provided positive narrative comments about the quality of the training (even if some officers have expressed skepticism about certain aspects of the revised policies).

As much as any of the reform measures implemented thus far, BPD's revised SSA policies reflect the culture change that the Consent Decree is intended to achieve—that is, a change toward policing that is simultaneously pro-active, community-oriented and constitutional. Training on BPD's revised SSA policies is thus a crucial feature of the reform process. The fact that the Training Academy appears to be hitting its stride with the classroom component of SSA/FIP II training bodes well not only for future Consent Decree-mandated training courses, but for the reform effort overall.

In addition to Department-wide SSA training, BPD supervisors will soon receive e-learning instruction on supervisory review of stops, searches and arrests. The e-learning will reinforce the fact that, because constitutional policing and restoring community trust are dependent on lawful SSAs and proper SSA reporting, constitutional policing and restoring community trust are dependent on sergeants and lieutenants embracing and enforcing BPD's SSA policies.

## CHALLENGES AHEAD

### Training

Although the Academy is successfully providing core SSA/FIP II training, despite the COVID-induced stoppages, there is a substantial amount of SSA-related training left to develop and deliver over the next six to nine months. As noted in the Training section above, the Academy must draft and provide e-learning and curricula for two days of classroom instruction for the third tranche of core Consent Decree training, which will be delivered later in 2021 and focus on the biases that can affect officers' interactions with civilians, including their decisions regarding stops, searches and arrests. In addition, the Academy must develop and deliver training curricula on lesser offenses to reinforce BPD's policy on "most effective, least intrusive response." That training, whose development is underway, is slated for spring-summer 2021 and will be part of Department-wide instruction on community policing. Even in the absence of a pandemic, preparing this curricula and providing this classroom instruction would tax BPD resources. In the midst of a pandemic, it will be even more difficult, especially given all of the other training courses the Academy is expected to develop.

### Reporting on Stops, Searches and Arrests

In each semiannual report, the Monitoring Team has identified the serious deficiencies in BPD's reporting, collection and maintenance of data on stops, searches and arrests. Although a new record management system featuring electronic field-based reporting is scheduled to come online within the next year, the absence of complete, reliable SSA data has made it impossible for BPD to satisfy Consent Decree requirements regarding the collection and analysis of such data. Moreover, it has rendered the Monitoring Team unable to begin thoroughly examining BPD's compliance with Consent Decree requirements for stops, searches and arrests. The likely result of the enduring deficiencies in BPD's IT systems will be the extension of the life of the Consent Decree, as it will likely take longer for BPD to demonstrate sustained compliance with the Consent Decree's SSA requirements than if BPD had the capacity to adequately collect and analyze SSA data from the beginning.

Paragraph 86 requires BPD to provide quarterly reports on the percentage of investigatory stops that produce evidence of a crime, the percentage of weapons pat-downs the result in the seizure of unlawful weapons, and the percentage of searches that result in the seizure of contraband. Data on these "hit

rates" can often indicate whether a police agency, a particular district, a particular unit or a particular officer is conducting stops, pat-downs and searches with proper legal justification. BPD produced a draft of its first Paragraph 86 report in 2019, consistent with the Second-Year Monitoring Plan. Because of the dearth of reliable, meaningful SSA data, BPD had to scrap that draft, which did not contain any of the required information. What BPD ultimately published was a report that did not include the required information, but instead identified all of the gaps in SSA data that BPD needs to address in order to be able to generate that information. At the suggestion of the Monitoring Team and DOJ, BPD requested that the Court approve amendments to the Second-Year Monitoring Plan that relieved BPD of its obligation to produce quarterly SSA reports until such time as BPD can properly report the information required by Paragraph 86. The Court granted the request. Until BPD implements its new records management system, and until officers are trained on and reliably utilize the system's electronic field-based reporting capacity, BPD will not be able to produce Paragraph 86 reports.

As the Monitoring Team has previously reported, the deficiencies in the reporting, collection and maintenance of SSA data are most evident in BPD's data on investigative stops. In short, stops are dramatically underreported and, even when reported, they are recorded in BPD's antiquated record management system either extremely late or not at all. The Consent Decree obligates BPD to accurately record and maintain data on stops, and requires not only BPD, but the Monitoring Team, to evaluate that data on a regular basis. Accurate data on stops is arguably among the most important data for BPD to maintain under the Consent Decree. DOJ's findings emphasized that BPD was engaged in a pattern or practice of unconstitutional stops, and that alleged pattern or practice is a primary reason for community mistrust.

In 2019, BPD explored the feasibility of revising and possibly consolidating its paper report forms to facilitate accurate reporting of stops in the short-term, prior to implementation of the new record management system. The Monitoring Team and DOJ collaborated with BPD in this effort, providing BPD with sample paper forms from other departments and offering edits to a revised form that BPD prepared. Ultimately, however, BPD determined that developing a new form that would be used for only a short period was impracticable.

Although the dearth of reliable, available SSA data has hamstrung the development of BPD's capability for self-evaluation and self-correction, as well as the Monitoring Team's ability to evaluate BPD's SSA performance, there is one potential bright spot. In recent months, consistent with Paragraphs 75-79 of the Consent Decree, BPD's Performance Standards Section has reviewed available arrest data from the State's Attorney's Office (SAO) and Central Booking, and with input from the Monitoring Tam and DOJ, has developed a methodology for identifying and analyzing arrests that, according to the SAO, result in "release without charge" (RWOC) dispositions. BPD is currently preparing its first quarterly report on RWOC arrests and will publish it before the end of this year. Reports on RWOC arrests will follow every three months. The purpose of the RWOC analysis is to determine which RWOC arrests were made without probable cause or inadequate documentation of probable cause, and then to use that information to determine the need for additional training, non-disciplinary corrective action, or referral for disciplinary or criminal investigation.

## ▍THE NEXT SIX MONTHS

In the next reporting period, as noted, BPD will complete SSA/FIP II training for all officers, draft training on community policing and lesser misdemeanor offenses, and complete SSA Policy Set III.

In addition, BPD will continue to work with the Monitoring Team and DOJ to determine whether, in advance of the development of the new records management system, it can utilize any of the soon-to-

be-activated capabilities of the E-tix system to begin to collect and aggregate at least some of the SSA data that the Consent Decree requires BPD and the Monitoring Team to evaluate—*e.g.,* data on the percentage of vehicle searches that result in the seizure of contraband. E-tix is a State-run system used to record information from traffic stops. With the approval of the Monitoring Team and DOJ, BPD also will begin to use it to record information from field interviews, as well as information on searches conducted during traffic stops.

# IMPARTIAL POLICING

Paragraph 87 of the Consent Decree asserts that "policing fairly and without bias is central to promoting broad community engagement and building partnerships between law enforcement and community members that are an important part of effective policing." To that end, the Consent Decree requires BPD to: document the demographic category of all individuals who are stopped, frisked, searched, arrested or make a complaint (CD 88); adopt policies that require fair, impartial, nondiscriminatory policing (CD 89); establish an impartial policing training curriculum and properly train officers, with community input, to perform their duties in a nondiscriminatory manner (CD 90-94); and consider whether officers engage in nondiscriminatory policing in evaluating performance and making hiring and promotion decisions (CD 95). Paragraphs 90-94 specify requirements for training members to carry out impartial policing properly.

*In the first two and a half years of the reform process, consistent with what the first three Monitoring Plans have required, BPD has satisfied the policy revision provisions of the Consent Decree for impartial policing and is nearing fulfillment of the training provisions. Because BPD remains in the training phase of reform, its compliance score is "3" (training phase).*

| IMPARTIAL POLICING | COMPLIANCE SCORE: | |
| --- | --- | --- |
| | **3** | **Training** |

## ▌AREAS OF PROGRESS

### *Policies*

BPD worked with the Monitoring Team, DOJ and Baltimore residents to overhaul two policies that require fair and impartial policing. The first is the core policy, Policy 317 (Fair and Impartial Policing). The second is the policy addressed to interactions with LGBTQ individuals, Policy 720 (Interactions with Lesbian, Gay, Bisexual, Transgender and Queer/Questioning Individuals). Revisions to both policies were completed in August 2018.

Revised Policy 317 provides clear directives to officers to ensure fair, respectful, nondiscriminatory treatment of community members, and expressly notes its close connection with policies addressing specific law enforcement actions, such as stops, weapons pat downs, searches and arrests. Similarly, revised Policy 720 provides key guidance on adherence to the requirements of both the Fourth and Fourteenth Amendments. In so doing, it seeks to ensure that officers stop, pat down, search and arrest individuals, including LGBTQ individuals, only with proper justification and that officers refrain from taking law enforcement action against individuals based on perceived sexual orientation or gender identity. Policies 317 and 720 are referenced and incorporated in other, more specific policies governing law enforcement actions, including BPD's revised policies on stops, searches and arrests.

### *Training*

In 2018, after attempting to craft a one-day standalone training on fair and impartial policing, BPD, with prompting from the Monitoring Team and DOJ, made a key decision: it would weave training on fair and

impartial policing ("FIP") into training on both use of force and stops, searches and arrests. The idea was that encounters involving stops, searches, arrests and uses of force are when otherwise abstract FIP concepts need to be applied on the street. Based on that decision, BPD is now conducting FIP training in three different tranches—one integrated with use of force training (UOF/FIP I), another integrated with training on stops, searches and arrests (UOF/FIP II), and a third that focuses squarely on FIP concepts but will also include refresher training on use of force and SSA (FIP III). It is also worth noting that training concerning active bystandership (called "Ethical Policing Is Courageous," or "EPIC," training), which is currently in development, will similarly incorporate FIP principles.

As explained in the Training section above, BPD has now successfully integrated FIP concepts into its Consent Decree-mandated training on use of force and stops, searches and arrests. BPD completed training all officers on use of force/FIP in October 2019. BPD's Department-wide training on stops, searches and arrests/FIP (SSA/FIP II) is ongoing, having been interrupted by the coronavirus pandemic. BPD has now resumed in-person training, but with smaller class sizes to ensure proper physical distancing, it will not finish training all officers until late this year or early next year. Notably, based on officer feedback, the pilot sessions of SSA/FIP training exposed ambiguities in several policies, and the first two weeks of live SSA/FIP training exposed several additional policy shortcomings. As a result, with the approval of the Monitoring Team and DOJ, BPD revised the pertinent policy provisions. The revisions have made the associated training clearer. That will benefit BPD officers, who must comply with the policies on the street, and will in turn benefit community members who encounter BPD officers in stop, search and arrest situations.

In the next several months, BPD will begin the process of designing the curriculum for the third tranche of Department-wide FIP training, FIP III, which will be delivered later in 2021, following training on community policing and lesser misdemeanor offenses.

All FIP in-service training has incorporated the new, adult-oriented modes of learning that the Academy is utilizing—*i.e.,* facilitated problem-solving exercises based on videos, written scenarios, and live simulation. The effective delivery of FIP training using a new method of instruction, while at the same time fully integrating it with training on the primary types of encounters requiring application of FIP principles, has been one of BPD's most noteworthy accomplishments so far.

## CHALLENGES AHEAD

BPD's long-term challenge is the same as it was when the Monitoring Team published its first semiannual report in July 2018. As we said then:

> One of the central findings of DOJ's investigation was that BPD was engaged in a pattern-or-practice of stopping, patting down, searching and arresting African Americans based on their race. Revamping policies and implementing revised training curricula on both impartial policing and stops, searches and arrests are important first steps in ensuring that BPD officers treat people fairly and equitably, without regard to personal traits like race, national origin, gender expression, and disability. But these are only first steps. As with so many aspects of policing covered by the Consent Decree, the question is whether, in practice, BPD officers interact with community members respectfully and refrain from discrimination in the performance of their duties. The answer to that question will not come quickly. It will depend on the adoption of revamped data collection systems that permit easier, more comprehensive analysis of officer conduct; routine quantitative review and analysis, over time, of the data gathered through those systems, once they are established; routine qualitative review of field reports and body worn camera footage; and a proven

change in culture that values and rewards the quality of police work, rather than the number of arrests. This will be the central task of the Monitoring Team—and more importantly, of BPD itself, especially supervisory officers—in subsequent years.

ECF No. 126-1 at 70-71.

## ▌THE NEXT SIX MONTHS

In the next six months, BPD will complete SSA/FIP II training for all members and begin to develop a curriculum for FIP III training.

# USE OF FORCE

The Consent Decree obligates BPD to ensure that its officers resolve incidents without using force when possible, employ de-escalation techniques to minimize the need to use force, avoid unnecessary injury or risk of injury to officers and civilians when force is necessary, stop other officers from using excessive force, report all uses of force, and be held accountable for using unreasonable force (CD 124). To accomplish these objectives, the Consent Decree's section on Use of Force contains requirements regarding policies on use of force (including weapons-specific policies) (CD 125-65), training on use of force (CD 166-68), reporting, reviewing and investigating use of force incidents (CD 169-210), and collecting, analyzing and reporting data on use of force incidents (CD 211-17).

In the first two years of the monitoring plan, BPD successfully completed revisions to its use of force policies and completed both e-learning and classroom training on the revised policies. BPD filed a certification of completion with the Court in November 2019. *See* ECF No. 260.

***Because of these developments, BPD has made marked progress toward satisfying the Consent Decree's requirements on use of force. It has fulfilled the threshold requirements—policy revisions and training—and has moved into the implementation phase of compliance. Inasmuch as assessments have not yet begun, its compliance score is "4a" (implementation – not assessed).***



| USE OF FORCE | COMPLIANCE SCORE: | |
|---|---|---|
| | **4A** | **Implementation – Not Yet Assessed** |

However, the Monitoring Team should obtain at least a preliminary understanding of BPD's performance in the near future. As explained below, our initial comprehensive use of force compliance review will begin in the next few weeks.

## ▌AREAS OF PROGRESS

### *Policies*

In 2018, BPD successfully completed revisions to its use of force policies. The policies include the core policy on use of force, Policy 1115, as well as 13 other policies, which cover, among other things: de-escalation; reporting, reviewing and investigating uses of force; and proper use of different weapons. The policies BPD revised are as follows:

- ■ Policy 409 (Firearms Regulations)
- ■ Policy 412 (Patrol Rifle Program)
- ■ Policy 414 (Less Lethal Munitions and Chemical Agents)
- ■ Policy 710 710 (Level 3 Use of Force Investigations – SIRT)
- ■ Policy 719 (Conducted Electrical Weapons—CEW)
- ■ 724 (Performance Review Board)

- 725 (Use of Force Reporting, Review and Assessment)
- 1005 (Non-Uniform Policing Standards)
- Policy 1111 (Batons/Impact Weapons)
- Policy 1107 (De-escalation)
- Policy 1115 (Use of Force)
- Policy 1118 (Oleoresin Capsicum Spray).
- 1503 (Emergency Vehicle Operation and Pursuit Policy)
- 1602 (Canine Procedure)

BPD continues to examine and update the policies as needed to provide clarity to officers and ensure best practices. For instance, in late 2019, as explained in the Youth Interactions section of this report, BPD adjusted certain policies to account for circumstances involving youth.

### *Training*

As previously reported, BPD successfully completed Department-wide training on its revised use of force policies (UOF/FIP I) in October 2019. This was the first tranche of Consent Decree training. It included several e-learning modules requiring test scores of 100% for completion, followed by two full days of in-service learning that incorporated facilitated discussion and problem-solving with scenarios (video and written), role plays, and animated simulation. All of the in-service lessons—whether in class, on the simulator, or in the gym—demonstrated the tactical benefits of de-escalation and provided hands-on guidance on using only force that is necessary, reasonable and proportional to the threat presented. According to surveys completed at the end of the course, officers rated the training favorably, with most indicating that it was a vast improvement over prior use of force training.

The training has proven extremely valuable to the reform process—not only for providing vital instruction on use of force, which is obviously a key area of the Consent Decree, but also for enhancing the capacity of the Training Academy. The use of force training program required BPD to hire more instructors; introduced BPD to the process of creating a training program that incorporates both e-learning and an intensive, scenario-based in-class curriculum; and allowed Academy instructors to hone their teaching skills and gain more confidence in the classroom, particularly in addressing difficult, pointed questions from their peers. The experience the Training Academy gained from developing and delivering high quality training on use of force is informing training on other Consent Decree subjects.

### *Performance Review Board*

The PRB reviews serious use of force incidents with the objective of improving policies, tactics, training, and supervision where performance deficiencies are observed. In recent years, the PRB has not served its intended purpose. It often has not reviewed events until many months (sometimes a year) after they take place, and PRB members have been inappropriately reluctant to conduct meticulous, meaningful reviews out of concern that their findings could result in disciplinary action against the involved officers.

BPD has initiated a pilot program with revisions, which require a more rapid review of serious events, usually within 30 days of occurrence. The model being piloted includes a panel consisting exclusively of Deputy Commissioners, reviews of events that are much more recent, ideally no more than 30 days old, and an emphasis on the ameliorative purposes of the PRB—*i.e.,* identifying needed improvements in policies, tactics, training and supervision.

The first pilot took place in early December 2019. In the following months, the PRB reviewed additional events, including officer involved shootings. Unfortunately, due to the COVID-19 pandemic, PRB meetings had to be canceled for several months. They are now resuming. Based on what it observed at PRB reviews prior to the pandemic, the Monitoring Team has been encouraged by the pilot program and expects to see it continues to progress.

BPD is also in the process of revising its PRB policy, Policy 724, to incorporate the reforms being tested in the pilot.

### *Monitoring Team Use of Force Assessment*

The Monitoring Team will soon begin its first comprehensive review of use of force. We are examining a randomly drawn sample of use of force incidents from 2018-2019. In the lead-up to our review, we collaborated with BPD and DOJ to develop an assessment tool designed to capture the requirements of the use of force provisions of the Consent Decree, including the provisions addressing de-escalation and appropriate force, reporting on uses of force, and supervisory review and analysis of uses of force. The Monitoring Team expects to conclude its review by the end of the year or early 2021.

## CHALLENGES AHEAD

BPD must now hold officers and supervisors accountable to the revised use of force policies on which they have been trained. Department-wide, that will require diligent collection and analysis of information on both use of force incidents and the adequacy of use of force reporting. BPD does not have a track record, much less an impressive track record, of self-evaluation on these subjects, and its data collection capabilities remain deficient, as explained elsewhere. BPD thus has a steep hill to climb to satisfy the Consent Decree's requirements on use of force data collection and analysis.

More than anything, however, holding officers accountable to the new policies will require acceptance, supervision and enforcement by sergeants and lieutenants. The new policies will not take hold until these supervisors diligently review force incidents and force reporting, praise officers for upholding policy, counsel officers whose performance is inadequate, and discipline officers for misconduct. Upper management will need to do their part by making sure that first-line supervisors properly review use of force incidents and reporting and by adjusting policy and training when needed.

## THE NEXT SIX MONTHS

In the next reporting period, the PRB pilot program will continue.  In addition, BPD will be developing the third tranche of its core Consent Decree training on use of force, stops, searches, arrests, and fair and impartial policing (FIP III). As explained elsewhere, this tranche will focus on fair and impartial policing concepts but will incorporate refresher training on use of force. Finally, the Monitoring Team will continue with its first compliance review on use of force.

# TRANSPORTATION OF PERSONS IN CUSTODY

Ensuring the safety of individuals in custody is among the most important obligations of any law enforcement agency. The Consent Decree requires BPD to: (1) equip all transport vans with seatbelts, holding straps located along the rear area of each seat that individuals being transported may grip for security during transport, and transport vehicle cameras (TVCs), and also equip all transport cruisers with seatbelts (CD 223-24); (2) inspect transport vehicles monthly and create logs to memorialize the inspections (CD 225); (3) establish and adhere to appropriate procedures for transporting prisoners (including using seatbelts, straps, and TVCs) (CD 226-33), (4) establish and adhere to protocols for documenting and comprehensively auditing prisoner transport events (CD 234-37), and (5) revise policies and training curricula to ensure safe, effective prisoner transport (CD 238).

BPD has made reasonable progress on each of these requirements. It has revised policies, is presently conducting training, has properly equipped its transport vehicles, is conducting required equipment audits, recently began auditing the required number of transport events, is generally determining during its audits whether vehicles are properly equipped and transport officer are complying with policy, and is taking remedial action when there is non-compliance.

***Because the coronavirus pandemic has prevented BPD from completing Department-wide training on transport procedures on time, BPD remains in the training phase of compliance in the Transportation of Persons in Custody category and thus has a compliance score of "3" (training phase). That score may understate BPD's progress because, with the equipment and transport audits it is regularly conducting, BPD has begun implementation of operational requirements.***

| TRANSPORTATION OF PERSONS IN CUSTODY | COMPLIANCE SCORE: | |
|---|---|---|
| | **3** | **Training** |

## ▌AREAS OF PROGRESS

### *Transportation Equipment*

During the first year of monitoring, BPD installed in its transport vehicles all equipment required by the Consent Decree. All transport vans have been equipped with seatbelts for each seat, holding straps located along the rear area of each seat that individuals may grip for security, and TVCs to allow live monitoring of every transported occupant. In addition, all transport cruisers have been equipped with seatbelts. Accordingly, BPD is satisfying the requirements of Paragraphs 223 and 224.

### *Transportation Equipment Audits*

As required by Paragraph 225, BPD continues to perform monthly inspections of all transport vehicles and creates logs to memorialize those inspections. The logs, which are used to verify the continued presence and functionality of all required equipment, are available for inspection by the Monitoring Team and DOJ. The Monitoring Team has routinely reviewed the logs. They appear complete and show that BPD is working hard to ensure that its transport vehicles remain properly equipped. However, BPD needs to take more care to ensure the accuracy of all documentation—specifically, the correlation between the

cover memo for the weekly inspection sheet and the inspection sheet itself. At times, while the cover memo has identified no vehicles requiring preventative maintenance, or one or two, the accompanying inspection the check sheet has identified more. To avoid confusion, the cover memo should accurately reflect the inspection sheets.

### Transport Event Audits

Beginning in 2019, to move toward satisfying the transport procedures provisions of the Consent Decree (CD 226-37), BPD's Inspection Unit began a pilot program for auditing transport events. The pilot consisted of a smaller number of audits than the Consent Decree requires. The pilot helped BPD identify effective workarounds for technological deficiencies that initially hampered BPD's ability to gather all of the information required for complete audits (described in prior reports) and otherwise helped BPD determine its capacity to perform the total number of audits required.

Over the past year, the Inspection Unit has adjusted the scoresheet used to conduct the audits. Adjustments have continued with the adoption of a weighted scoring system designed to give accurate evaluations of compliance with BPD policy.

Beginning in January 2020, the Inspection Unit has been able to perform 20 event audits per month—two from each of the nine patrol districts and two from the Warrant Apprehension Task Force—for a total of 60 event audits per quarter. This is 15 more than the Consent Decree requires. In addition, the Inspection Unit has been performing the required 27 random field audits, or spot checks, per quarter. All of the audits are documented, and the reports are available for review by the Monitoring Team and DOJ.

For the most part, according to the audit reports, transport officers are doing what they are supposed to do under Paragraphs 226-233 of the Consent Decree and BPD policy, though auditors have observed certain deficiencies. The most common deficiency identified has been the failure to properly search prisoners before and after they are placed into transport vehicles and before and after custody is exchanged. This topic is covered in the curriculum for the Department-wide training on stops, searches and arrests that is underway. The Monitoring Team will be watching closely to see if, as a result of the audits and training, BPD's audit scores in this area improve. The most recent audit showed some improvement.

Although the Monitoring Team has not yet begun its periodic random reviews of audited transport events to determine the accuracy and comprehensiveness of the audits, the audits themselves, on their face, generally seem thorough. Auditors appear to be properly reviewing transport events for compliance with the requirements of Paragraphs 226-233 of the Consent Decree and BPD policy. However, the Monitoring Team has observed some inconsistency in scoring methodology among audit reports. In at least some of the reports, it seems different auditors have given different ratings for the same thing. For example, cruisers (unlike vans) do not have transport vehicle cameras (TVCs), so for cruiser transport audit form questions asking whether the transporting officer marked on the TVC when the prisoner exited/entered the transport area and whether the prisoner made any evidentiary statements captured on the TVC, the answer should be "N/A" for not applicable. While most auditors are recording the proper answer, at least a few are instead scoring those questions as "1" for "compliant." To maintain uniformity in audit scoring methodology, BPD must ensure that all auditors fully understand and apply the audit rating system.

### Policies

Consistent with Paragraph 238, BPD completed revisions to its transport policies in August 2018. These include the core transport policy, Policy 1114 (Persons in Police Custody), as well as Policy 825 (Transport Vehicle Camera) and Policy 1511 (Vehicle Inspection and Maintenance).

Also consistent with Paragraph 238, BPD developed and delivered Department-wide e-learning on transport procedures and additionally developed a module on transportation of persons in custody as part of SSA/FIP II training. As explained elsewhere, this in-service training was interrupted by the COVID-19 pandemic but has resumed.

## CHALLENGES AHEAD

As with many areas of compliance, COVID-19 has modestly affected progress in the area of transport. In addition to interrupting Department-wide classroom training, which would have been completed by now, the pandemic has made transport more cumbersome. For the protection of prisoners and officers alike, masking precautions have been implemented, and for transport vans, social distancing measures are being taken, meaning that vans cannot hold as many prisoners and must make more runs.

BPD must finalize the weighted audit scorecard it created and now uses to gauge Consent Decree and policy compliance for every audited transport event. The weighting system is designed to accurately capture transport performance.

Otherwise, BPD must continue to address any compliance and compliance assessment issues that the audits expose. For instance, based on the audits, BPD has found that it must develop a method for auditors to verify that transport officers frequently check on prisoner welfare (*e.g.,* by having officers "mark" the TVC when they visually check subjects or by having them audibly record their inquiries into subjects' welfare on their body worn cameras).

## THE NEXT SIX MONTHS

In the next reporting period, BPD will complete the interrupted transport training for all officers. In addition, BPD will continue to work with the Monitoring Team and DOJ to finalize the transport event audit scorecard. Finally, as explained in the Technology section above, BPD will upgrade its TVC system. The current system requires footage to be downloaded directly into a database from a hard drive in the transport vehicle. This process is time-consuming and cumbersome, and it has delayed auditors' review of the footage. In the coming months, BPD will begin to upload footage remotely in Evidence.com, the same system that stores BWC footage.

# INTERACTIONS WITH INDIVIDUALS WITH BEHAVIORAL HEALTH DISABILITIES AND IN CRISIS

The Consent Decree reinforces BPD's "commit[ment] to responding to individuals with behavioral health disabilities or in crisis in a manner that respects individuals' civil rights and contributes to their overall health and welfare." Paragraph 96 envisions that BPD will accomplish this goal by using appropriate crisis response techniques. Such techniques will help prevent situations that could lead to the unreasonable use of force, promote the utilization of the health system for individuals with behavioral health disabilities and in crisis, and diminish the inappropriate utilization of the criminal justice system for such individuals. Paragraph 96 thus challenges BPD not only to provide effective law enforcement responses to events involving individuals with behavioral health disabilities and in crisis, but to participate in the development of an effective community strategy for improving the City's support system for such individuals.

The Consent Decree identifies a series of requirements to accomplish these objectives. They include the expansion of the Collaborative Planning and Implementation Committee ("CPIC"), which works with BPD to improve crisis response (CD 104-05); an annual work plan to accomplish the requirements of the Consent Decree (CD 96, 105); an assessment of the gaps in the City's behavioral health system coupled with recommendations for solutions ("Gap Analysis") (CD 97); maintenance of a Crisis Intervention Team ("CIT") whose officers have primary responsibility for responding to incidents involving individuals in crisis (CD 101-03, 110, 119); development of a Crisis Intervention Plan and CIT Officer Selection Process to ensure the efficacy of the CIT (CD 120); appointment and training of a Crisis Intervention Team leader (CD 115-18); training for all officers on responding to individuals with behavioral health disabilities and in crisis, and specialized training for CIT officers and dispatch personnel (CD 106-13); revision of policies, including a police emergency dispatch policy, for responding to incidents involving individuals in crisis (CD 98, 114); and identification of quantitative and qualitative performance measures for the CIT program and collection of data needed to make those assessments (CD 121-22). Over the long-term, BPD will analyze this data and issue quarterly public reports gauging its performance in responding to individuals in crisis.

As previously reported, BPD and the City have satisfied a number of the Consent Decree's preliminary requirements, including expanding CPIC membership, appointing a CIT Coordinator, completing (with CPIC) a crisis intervention plan and a plan for selecting CIT officers, creating a form to track data on responses to individuals in crisis, revising policies addressing crisis intervention for both officers and dispatchers, completing and publishing the Gap Analysis, and finalizing training curricula on behavioral health awareness and crisis intervention for both recruits and officers that exceeds the Consent Decree's hours requirements. Within the past eight months, BPD also has completed specialized training curricula on behavioral health awareness and crisis intervention for dispatchers and is nearing completion of specialized in-class training curricula for CIT officers.

*Because BPD has completed core policy revisions but has yet to deliver training on behavioral health and crisis intervention to officers and dispatchers or specialized training to CIT officers, its compliance score in both the Behavioral Health-General and Behavioral Health-CIT Officers categories is "3" (training phase). For the Behavioral Health-System Coordination & Improvement category, its compliance score is "4a" (implementation phase – not assessed), because it has completed the Gap Analysis but has not yet begun meaningful implementation of the recommendations in the report.*

| | COMPLIANCE SCORE: | |
|---|---|---|
| **BEHAVIORAL HEALTH - GENERAL** | **3** | **Training** |

| | COMPLIANCE SCORE: | |
|---|---|---|
| **BEHAVIORAL HEALTH - CIT OFFICERS** | **3** | **Training** |

| | COMPLIANCE SCORE: | |
|---|---|---|
| **BEHAVIORAL HEALTH - SYSTEM COORDINATION & IMPROVEMENT** | **4A** | **Implementation – Not Yet Assessed** |

## AREAS OF PROGRESS

BPD and the City have shown a serious commitment to working with community members to determine how to strengthen behavioral health support systems and improve officers' capacity to respond to individuals experiencing behavioral health crises. Over the past two and a half years, work in this area has required a significant amount of time not only from City and BPD personnel, but from community stakeholders, advocates, individuals with lived experience, and behavioral health professionals, all of whom are volunteering with CPIC. Because of the diligence and commitment of CPIC members, the City and BPD have taken crucial first steps (though only first steps) toward improving the City's behavioral health system and providing BPD with the tools to respond more appropriately to individuals in crisis. Progress has been slowed to a degree because of the COVID-19 pandemic. In particular, as in other areas, certain deadlines under the Third-Year Monitoring Plan have had to be extended. But productive work has continued nonetheless.

### *CPIC*

The City and BPD satisfied their initial obligation under Paragraph 104 by expanding the composition of CPIC to include relevant City and State officials, individuals with lived experience, community mental health providers, substance use services providers, local hospitals, advocates representing a wide range of individuals with disabilities, and committed philanthropists. A review of membership and community representation has continued each year.

CPIC has become a vital advisory body to the City and BPD. The progress made to date—on policies, training, data collection, identifying systemic flaws, and recommending systemic improvements—is the result of CPIC's diligent, collaborative efforts. The efforts of CPIC are all the more impressive because the participation of community members is voluntary.

*Work Plans*

Under each Monitoring Plan to date, BPD and CPIC have completed a Work Plan. The Work Plan establishes a detailed schedule for satisfying specific Consent Decree requirements in a particular monitoring year. Each year, the process of developing the Work Plan has become more sophisticated. In the first two years of monitoring, the City, BPD and CPIC consistently met established deadlines.

For the current monitoring year, the Work Plan was developed in face-to-face meetings throughout during the first part of the year. As the challenges posed by the pandemic grew, CPIC transitioned to meeting by phone and video, ultimately completing the Work Plan that way. Through their contributions to CPIC's four subcommittees, Behavioral Health Services of Baltimore ("BHSB"), BPD's Training and Compliance Divisions, local advocacy groups such as the Baltimore National Alliance on Mental Illness ("NAMI") and Disability Rights of Maryland ("DRM"), and representatives of non-profit organizations, behavioral health providers, hospital systems, the public school system, and City and State government helped complete the Work Plan.

Consistent with the Third -Year Monitoring Plan, the Work Plan prescribes:

- A series of measures intended to prioritize and eventually implement the recommendations set forth in the previously approved Gap Analysis report, which identifies and proposes solutions to remedy deficiencies in the City's behavioral health systems and BPD's practice concerning individuals with behavioral health disabilities;

- An on-going review of behavioral health-related policies previously developed by BPD with CPIC assistance;

- An analysis of a sample of police interactions with people with behavioral health disabilities, designed to identify systemic barriers and solutions to the delivery of care, including, for each interaction, what precipitated the crisis, what services could have prevented the crisis, how police became involved, how the response to the crisis could be improved, and what can be done to prevent the crisis in the future;

- A review of the sources and types of data needed to provide a quarterly report on behavioral health crisis events, intended to achieve the goals of paragraph 96 of the Consent Decree Paragraph 96, which requires BPD to use appropriate crisis response techniques and reduce inappropriate use of the criminal justice system for individuals with behavioral health disabilities;

- Commencing annual in-service behavioral health training for all officers for the current year and developing an initial plan for continuing education for next year;

- Completion of training curriculum for police dispatchers and delivery of the training; and

- Development of training curriculum for Crisis Intervention Team officers.

## *CIT Program*

BPD has established a solid foundation for a Crisis Intervention Team.  A CIT Coordinator was appointed to head the team in 2018. The first Coordinator accepted another assignment, and BPD was quick to seek community input and appoint a replacement. Under the Coordinator's leadership, BPD prepared a Crisis Intervention Plan to address staffing needs, as well as a CIT Officer Selection Plan. Both were approved by the Monitoring Team. The Crisis Intervention Plan used police dispatch data to estimate the overall number of crisis calls in each BPD district and then projected the number of CIT required for the Patrol Division. The CIT Officer Selection Plan used the CIT Officer requirements in the Consent Decree to create a set of qualifications and outlined a systematic selection process for CIT officers.

*Crisis Intervention Policies*

In July 2019, with active input from CPIC, BPD finalized revisions to three policies addressing crisis intervention for both officers and dispatchers: Policy 712 (Crisis Intervention Program), Policy 713 (Petitions for Emergency Evaluation and Voluntary Admission), and Policy 715 (Behavioral Health Crisis Dispatch). The revisions were drafted by CPIC's Policy Subcommittee and finalized following coordination with City agencies (e.g., the Fire Department, which has responsibility for 911 dispatchers), collaboration with the Monitoring Team and DOJ, and input from community members.

*Behavioral Health Data*

Consistent with Paragraph 122, CPIC's Data Subcommittee revised and expanded the form BPD uses to record interactions with individuals in crisis. The revised form is comprehensive. CPIC received input on it from experts at local universities, local advocacy organizations, and individuals with lived experience. The Monitoring Team approved the new form in December 2018. Since then, BPD has been working with CPIC's Data Subcommittee to pilot the form in the field and shepherd the form's data requirements into new IT systems BPD is presently developing.

CPIC's Data Subcommittee has been evaluating available data on BPD officer encounters with individuals in crisis in order determine which performance measures it can reliably analyze and include in the reports required by Paragraph 122. In particular, the subcommittee has been systematically reviewing available reports and outcome studies on BPD's behavioral health intervention programs, including BPD's Crisis Response Team (CRT), Law Enforcement Assisted Diversion (LEAD) program, and now-defunct Homeless Outreach Team (HOT).

In addition to performing this review, CPIC's Data subcommittee is examining data on behavioral health calls in each police district and attempting to extrapolate the call volume to the district's population. The results are intended to determine the number of CIT officers needed in each district.

The subcommittee is also attempting to understand BPD's current hospital referral practices involving individuals in crisis by examining hospital emergency room data. The goal is to determine whether there are opportunities for diversion to community-based alternatives. Initial examination of the data suggests a great deal of variability in emergency room referrals. The variability, however, might not be related to the number of behavioral crisis events in surrounding neighborhoods. Speculatively, the utilization data could suggest the importance of clarifying admissions criteria for each hospital so that patrol officers have adequate guidance on making emergency room referrals.

When BPD conducted new behavioral health training in FY2018 and FY2019, it added a module on behavioral health resources that highlighted the Baltimore Crisis Response Inc.'s crisis information and referral (CIR) line and also directed officers to a resource app on their phones. The new training was delivered not only to recruit classes, but to officers during in-service classes. CPIC's Data subcommittee reported that, as compared to the four years prior to the training, officer calls to the CIR hotline in the period since the training began have increased significantly. This strongly suggests that BPD officers are open to and interested in the availability of community resources.

*Behavioral Health Awareness ("BHA") Training Curricula*

**Recruit Training** | The BHA recruit training curriculum, approved in September 2019, is currently being delivered to recruit classes. It consists of thirteen modules taught over 24 hours. Topics include: an introduction to BPD's crisis strategies, an exercise in understanding auditory hallucinations, an overview of mental illness, an introduction to BPD new behavioral health policies, an introduction to working with individuals in suicidal crisis, understanding working with youth, understanding neurocognitive impairments (dementia), a personal story of mental illness from the National Alliance on Mental Illness, an introduction to neurodevelopmental disorders (intellectual and developmental disabilities), substance use disorders, de-escalation strategies, emergency evaluations/ voluntary admissions, and incident-based scenarios. *See* ECF No. 247 for a complete description of the curriculum.

By requiring 24 hours of instruction for recruits, CPIC and BPD chose to include instruction that exceeds the 16 hours required in the Consent Decree. *See* ECF No. 2-2, ¶ 112.b. Increasing the hours of BHA instruction required of new recruits reflects BPD's commitment to ensuring that its officers have a solid understanding of behavioral health and are more adequately equipped to interact with individuals with behavioral health disabilities.

**In-service BHA Training for Officers** | The Monitoring Team approved in-service BHA training curriculum for all officers in November 2019. *See* ECF No. 262. To accommodate the virtual training necessitated by the pandemic, the curriculum had to be modified. The revised curriculum is presently being delivered remotely Department-wide, with scheduled completion in March 2021. The curriculum consists of six modules. These modules cover a range of topics, including understanding mental health, an overview of substance abuse, working with individuals in suicidal crisis, voluntary admissions and emergency petitions, an in-depth examination and discussion of BPD behavioral crisis events based on body-worn camera footage, and a comprehensive overview of BPD's revised policies relating to interactions with individuals with behavioral health disabilities and in crisis. In modifying and adapting the approved curriculum to a remote learning environment, BPD worked closely with BHSB, community experts, the Monitoring Team and DOJ to create an experience that mirrored the success of earlier training.

The training began several weeks ago. Initial participant feedback has been very encouraging.

**911 and Dispatch Training** | The training curriculum for 911 call-takers and dispatchers was approved in May 2020. *See* ECF No. 314. Training will take place in the fourth quarter of 2020. Developed in coordination with the Fire Department, it will require approximately six weeks to provide classroom instruction to all 911 call-takers and dispatchers. The training consists of nine sections taught over eight hours. The training includes a history of mental health treatment; a review of BPD's Crisis Intervention Team Program; an exercise in understanding stigma in behavioral health, a review of trauma-informed practice; an overview of behavioral health based on realistic scenarios; a panel discussion of the peer and family perspective on behavioral health; engaging and de-escalation over the phone; self-care for 911 specialists and dispatchers; and a comprehensive discussion of BPD's behavioral health crisis dispatch policy.

As with other new training programs, the 911 call-taker and dispatcher training employs adult learning techniques, such as group discussion, realistic videos, applied learning exercises, and role-playing scenarios. The instruction is being delivered by teams of behavioral health professionals, experienced police instructors, advocates, and individuals with lived experience.

**CIT Officer Training** | CPIC and BPD are presently working to develop specialized training for CIT officers, with input from the Monitoring Team and DOJ. Barring delays caused by the pandemic, the Training Academy plans to conduct this training in the first part of 2021.

### *Gap Analysis and Recommendations*

The Gap Analysis, approved in December 2019, provides an essential guide to achieving the Consent Decree's complementary goals of bolstering Baltimore's behavioral health system, diminishing reliance on BPD officers to handle calls for service involving individuals in crisis, and ameliorating the interactions that BPD officers continue to have with individuals in crisis. The Gap Analysis is available **here**.

The City, BPD, BHSB and CPIC worked with a nationally respected research firm, Health Services Research Institute ("HSRI") to conduct the Gap Analysis. The report identifies unmet needs in the City's behavioral health system and makes over 40 specific recommendations to address those needs. Those recommendations focus on the establishment of a fully integrated, systemic approach to behavioral health care. Among the features of the system are:

- 24/7, around-the-clock crisis centers

- a vastly increased number of mobile crisis teams

- a centralized mechanism for managing crisis response

- an oversight committee (including CPIC) to promote a "No Wrong Door" approach to behavioral health support that integrates mental health and substance abuse services (including outpatient services in primary health care settings) and workforce programs

- fortified workforce recruitment, retention and competency for behavioral health specialists, especially in community-based settings

- financial support for peer-run organizations

- a wide-range of improved housing programs, including subsidized housing and permanent supportive housing programs

- collection and analysis of BPD data to determine why trained crisis intervention officers are not responding to a greater number of behavioral health calls and

- improved training for BPD officers, including training on the availability of community-based alternatives to law enforcement action (which is currently underway).

The Gap Analysis observes that among the many benefits of a more complete, more integrated behavioral health system will be a reduction in the need for BPD to serve as the primary—often the only—first responder available for individuals in crisis.

## CHALLENGES AHEAD

### *System Coordination and Improvement*

The Consent Decree's requirement for a Gap Analysis (CD 97) is not yet fully satisfied. To meet the requirement, BPD must evaluate a meaningful sample of officer encounters with individuals in crisis. With an eye toward identifying solutions to the deficiencies observed in the Gap Analysis, the evaluation

of each encounter should include what precipitated the crisis, what services could have prevented the crisis, how police became involved, and what could be done to prevent a similar crisis in the future. Because of BPD's data collection deficiencies, BPD was not able to include such an evaluation in the Gap Analysis report. In the coming year, BPD and CPIC will develop a process for gathering the required data and performing the evaluation.

The Gap Analysis calls for far-reaching change. Implementing its recommendations will be a long-term, intensive enterprise. Establishing an integrated system of community-based care will require cooperative planning across multiple City and state agencies and non-profit institutions. The funding required to develop this system will be significant and will need to draw on multiple sources. Additionally, because of Baltimore's history of "siloing" programs within the behavioral health system, there remains the risk that new programs will continue to be "siloed" and will not be incorporated into an integrated, cohesive system. As Judge Bredar explained at a public hearing in July 2020, and as the Monitoring Team explained earlier on Facebook (*see* Summary of Monitoring Team Activities section below), the early July 2020 police-involved shooting of an armed man experiencing a behavioral health crisis in Northeast Baltimore concretely exposed the flaws the Gap Analysis identified, as well as the urgent need to implement its recommendations.

In the short run, to capitalize on the momentum the Gap Analysis has created, the City and BPD must move expeditiously to shore up the resources they devote to behavioral health issues:

- The City's primary behavioral health care partner, BHSB, has limited funding, cannot always capably implement new programs or strong mechanisms for quality control, and although possessing highly qualified personnel in some areas, suffers from a lack of capacity and technical skill in other areas. The pandemic has strained its resources further. BHSB needs greater support from the City to carry out its mission and, at the same time, the City must demand greater accountability from BHSB.

- Like BPD, which only recently has established consistent leadership on CPIC, the City must provide leadership on CPIC. The City's Law Department has provided strong support for the behavioral health requirements of the Consent Decree, especially as to BPD, but leadership from other City agencies is also required to address the comprehensive needs identified in the Gap Analysis. These include City agencies responsible for health, housing, homeless outreach, youth support, criminal justice, and innovation.

- BPD needs to get its revised CIT program off the ground. Newly appointed CIT leadership must stabilize CIT, continue to actively support CPIC and other community stakeholders, and select enough qualified CIT officers to meet Departmental needs.

Despite these major challenges, Baltimore has a track record of innovative programming and a wealth of professional talent. The City also enjoys a reputation for conducting incisive studies involving behavioral health and developing service models that appear to hold promise, even if they have not endured. The fact that HSRI reviewed 38 different analytical reports regarding behavioral health care delivery in the City is a testament to the work that already has been done here. The challenge will be to make the response to the Gap Analysis more effective and more sustainable than the responses to the other studies. The lack of success of previous efforts to reform the City's behavioral health system underscores the critical need for leadership and accountability in implementing the recommendations in the Gap Analysis.

### *Training*

BPD and the City continue to face challenges under the Consent Decree that are more immediate than implementing the long-term recommendations in the Gap Analysis. Most prominently, BPD is scheduled

to deliver four different behavioral health training programs in the coming year—for recruits, officers, 911 call-takers/dispatchers, and CIT officer candidates. This would have taxed the Training Academy's resources even if there were no pandemic. With the pandemic, BPD's capacity for conducting the required training is stretched even further.

Much of the behavioral health curriculum relies on interpersonal skill development and connecting the officers to treatment providers and those with lived experiences. It is difficult to establish meaningful relationships remotely. Nevertheless, BPD's Training Academy leadership, CPIC's Training Subcommittee and BPD's Compliance Division have worked hard to create a productive remote learning environment. They are experimenting with remote learning for recruits and are revising other BHA curriculum to adapt to the realities of the pandemic. This has not been easy. BPD was informed that it would not be permitted to adapt the previously approved "Mental Health First Aid for Public Safety" (MHFA) curriculum to remote learning and also may not use certified community instructors remotely. As a result, BPD has drawn from other approved curricula to develop the BHA training necessary for all officers to meet the State of Maryland's annual education requirements. If necessary, BPD will also consider adapting approved curricula for other trainings being held in abeyance.

### *Data collection*

As previously reported, BPD has not historically collected and maintained all the data that the Consent Decree requires to analyze officer interactions with individuals in crisis. While BPD has developed a new crisis intervention data form that should capture the required information, the Monitoring Team and BPD itself will not be able to comprehensively assess compliance with Consent Decree requirements until BPD officers routinely use the forms and BPD is technologically capable of maintaining and analyzing data from the forms in a modernized record management system.

## THE NEXT SIX MONTHS

In the next reporting period, as noted, BPD will continue conducting BHA training for recruits and initiate training for veteran officers, 911 call specialists, and dispatchers. CPIC and BPD will finalize the training curriculum for CIT officers. BPD and CPIC will also conduct their on-going review of policies affecting individuals with behavioral health disabilities; an analysis of a sample of police interactions with individuals with behavioral health disabilities, required to complete the Gap Analysis; and an assessment of the sources and types of data needed for quarterly reports on crisis events, which are required by the Consent Decree.

The City, BPD, BHSB and CPIC members also will continue their work to implement the recommendations in the Gap Analysis. Last fall, Disability Rights Maryland (a CPIC member) worked with BHSB to conduct a two-day workshop to begin the work. Presenters from other cities spoke about their own successful efforts to establish integrated behavioral health systems, while local advocates and individuals with lived experienced shared their ideas and voiced their concerns about the City's ability to carry through on the promises of the Gap Analysis. Other advocacy groups such as NAMI, the Bazelon Center, the NAACP Legal Defense Fund and over 20 additional agencies and organizations also participated in the workshop and have joined with DRM to support the recommendations in the Gap Analysis. Adding to the momentum for reform created by the workshop and the Gap Analysis, the State is working on providing additional reimbursements to the hospital system to strengthen crisis intervention supports state-wide, including in Baltimore. The time is thus ripe for decisive action to fortify Baltimore's behavioral health system, lest the Gap Analysis become just another report on the shelf.

# FIRST AMENDMENT-PROTECTED ACTIVITIES

As the Consent Decree and BPD's revised policy on First Amendment Protected Activity explain, the exercise of First Amendment rights is fundamental to democratic governance because it promotes the free exchange of ideas. The preservation and protection of First Amendment rights is also vital to maintaining public trust in the rule of law because it fosters transparency and accountability in government functions, including policing (CD 239).

For these reasons, the Consent Decree requires BPD to protect several different First Amendment rights: the right to free speech and expression, which includes the right to criticize law enforcement and engage in speech in the presence of law enforcement without being subject to retaliation (CD 240-44); the right to freely organize and participate in lawful public assemblies (CD 245); and the right to observe and record the actions of BPD officers in the public discharge of their duties (CD 247). The Consent Decree also protects First Amendment rights by prohibiting the warrantless search and seizure of recorded video and images, except in limited circumstances (CD 249-50). The Consent Decree prescribes protection for all of these constitutional rights by obligating BPD to revise its policies and training programs (CD 239, 244, 246, 251); require supervisory approval for dispersing assemblies, seizing recording devices and recordings, and arresting individuals engaged in expressive activity (CD 252-54); and conduct annual assessments of its practices relating to First Amendment-protected activity (CD 255).

***BPD fully and effectively revised its core First Amendment policies in 2018. However, its compliance score remains at "2" (policy/planning phase) because, due in part to coronavirus-induced delays, it has not completed revisions to standard operating procedures for its Mobile Field Force, which responds to public assemblies when required. BPD is also still in the process of finalizing e-learning curriculum for training on its core First Amendment policies, so it has only begun the training phase of compliance. Nonetheless, BPD has initiated self-assessments of its responses to First Amendment-protected activities, having published its inaugural assessment this year.***

| FIRST AMENDMENT-PROTECTED ACTIVITIES | COMPLIANCE SCORE: | |
|---|---|---|
| | **2** | **Policies/ Planning** |

## ▍ AREAS OF PROGRESS

### *Policy Revisions*

In 2018, BPD completed comprehensive revisions to its two policies addressing First Amendment-protected activities—the core policy, Policy 804 (First Amendment Protected Activity) and the policy regarding recording of police activity, Policy 1016 (Public Observation and Recording of Officers). *See* ECF No. 140.

Revised Policy 804 is now much more tightly organized, comprehensible, and directive than earlier versions. It expressly delineates what officers are required to do to protect First Amendment rights and what they are prohibited from doing. It also clearly sets forth Departmental obligations for training and data collection and analysis on First Amendment events. Moreover, rather than focusing

exclusively on policing public assemblies, as the prior version did, Policy 804 now provides directives on respecting individuals' right to criticize police officers and police activity outside the context of a protest or assembly. This is vital, as DOJ's pattern-or-practice findings principally criticized how BPD officers detained, arrested and used unreasonable force against individuals who criticized or insulted officers—not how BPD officers handled public demonstrations. Finally, revised Policy 804 provides clearer and more comprehensive direction on preserving the right to public assembly, including express protocols for preparing for planned assemblies.

Policy 1016, which addresses the right to observe and record officers in the line of duty, is similarly improved. Although Policy 1016 did not require as many substantive changes as Policy 804, the revised policy provides more comprehensive guidance to officers and is better organized. The revised policy includes detailed procedures for obtaining recorded material thought to be relevant to criminal investigations, clearly delineating what officers and supervisors may and may not do to secure such evidence.

In the past year, BPD has begun revising standard operating procedures ("SOP") for its Mobile Field Force. The Mobile Field Force consists of over 200 specially trained officers from across the Department. The Mobile Field Force is called upon when needed to monitor, maintain order, and protect the right to assemble and speak at both planned and spontaneous public demonstrations. If demonstrations turn violent, the Mobile Field Force intervenes to preserve public safety while respecting First Amendment rights.

BPD currently has a policy (Policy 413) that generally addresses its Mobile Field Force. However, during the first monitoring year, when BPD was revising its First Amendment-related policies, BPD, DOJ and the Monitoring Team agreed that it would be more fitting for Policy 804 to incorporate the general provisions of Policy 413, and for a comprehensive set of SOPs to replace Policy 413 and provide detailed tactical guidance to Mobile Field Force officers about how to carry out their responsibilities while preserving First Amendment rights. BPD, the Monitoring Team, and DOJ determined that rescission of Policy 413 and replacement with SOPs made sense because the policy is not so much a policy as it is an outline for a tactical procedural manual. Policy 413 will not be rescinded until the SOPs are finalized and implemented.

In 2019, BPD began work on the SOPs. BPD produced an initial draft modeled after SOPs for well-functioning civil disturbance units in other jurisdictions, including the District of Columbia. After receiving feedback from the Monitoring Team and DOJ, BPD agreed to revise the draft so that it more closely tracks the Mobile Field Force SOPs for the Maryland State Police, which has adopted a more progressive, European model of mobile field force deployment. Neighboring jurisdictions with which BPD often partners to monitor large crowds are undertaking a similar review of their mobile field force operations.

Under the original Third-Year Monitoring Plan, BPD was scheduled to have nearly completed the SOP revisions by now. The coronavirus pandemic interrupted those plans. As a critical part of the revision process, BPD officials were supposed to observe and take part in State Police Mobile Field Force training this spring. The training had to be cancelled and rescheduled because of the pandemic. Additionally, because of the pandemic, officers tasked with revising the SOPs have had to spend increased time deployed to operations. BPD officials will attend the next scheduled State Police training. Once that occurs, BPD will be fully prepared to revise the SOPs and, accordingly, satisfy the remaining policy requirement for First Amendment protected activities.

*Self-Evaluation*

In February 2020, BPD submitted its first annual audit of the Department's responses to First Amendment-protected activities (CD 255). The purpose of these audits is to implement "corrective action or improvement measures" where deficiencies are identified (CD 256). BPD's report is available **here**.

The challenge in devising a means to audit BPD responses to First Amendment conduct is to ensure that the instrument evaluates not only BPD's responses to larger, planned assemblies and internal affairs complaints based on alleged First Amendment violations, but also the responses of officers to individuals who exercise their First Amendment rights in the course of routine police encounters by criticizing police conduct, including the officer's actions. Evaluating BPD's responses to such routine exercises of First Amendment rights is critical because those encounters are far more frequent than either larger assemblies or encounters that spawn internal affairs complaints. Further, as mentioned above, DOJ's investigation found a pattern or practice of First Amendment violations based in large part on improper retaliatory action, including bringing unwarranted criminal charges or using unreasonable force.

To capture BPD's responses to these more routine exercises of First Amendment rights, BPD, the Monitoring Team and DOJ agreed that BPD would use its Performance Standards Section to review body-worn camera footage of events that involve allegations of disorderly conduct. While disorderly conduct cases obviously do not encompass all situations in which officers might be confronted with First Amendment conduct, and not all disorderly conduct cases implicate First Amendment rights, the parties concluded that, at least initially, such cases might prove useful for exploring whether officers are retaliating against individuals for exercising their rights.

Based on this agreement, BPD's first annual audit report (*see* ECF No. 287-1) evaluates (1) cases involving internal affairs complaints based on alleged First Amendment violations for 2019, (2) BPD's response to two larger First Amendment events in 2019—one involving a protest of the establishment of a university police force at Johns Hopkins, and another involving a speech given in Baltimore by Donald Trump, and (3) 2018 cases involving disorderly conduct arrests that were determined to have implicated First Amendment conduct (a number of disorderly conduct cases, of course, did not). The audit determined that:

- Under the Public Integrity Bureau's revised complaint classification system, adopted in December 2018, there was one First Amendment-related complaint lodged in 2018 and five in 2019. Because the Public Integrity Bureau had not fully resolved any of the complaints by the time the audit was completed, and because prior complaints alleging First Amendment violations were not reliably classified as such under the old system, the audit did not include any evaluation of recent BPD actions that prompted complaints of First Amendment violations.

- Based on review of a statistically representative sample of body-worn camera footage, BPD officers respected protestors' First Amendment rights to peaceably assemble, speak, and record law enforcement activity and fully complied with Departmental policy in responding to the large-scale protests at Johns Hopkins and President Trump's speech.

- BPD arrest rates for disorderly conduct complaints in 2018 were extremely low (.08%), which potentially suggests general compliance with the First Amendment (even though it is hard to know without reviewing a sample of those non-arrest cases, which BPD will do in future audits, and even though not all disorderly conduct events implicate First Amendment rights, as noted above). But of the 30 disorderly conduct arrests reviewed, three (10%) involved First Amendment violations and were thus referred for disciplinary investigation. Two of those cases appeared to involve arrests in response to criticism of police actions, and one appeared to involve an arrest in response to video recording of police actions.

Additionally, although not reflective of First Amendment compliance, a substantial number of the other 27 reviewed cases appeared to involve other policy violations, including arrests likely made without probable cause, statements of probable cause missing critical factual information, including information supporting probable cause, and arrests that unnecessarily drained Departmental resources (e.g., an arrest for spitting on a sidewalk) because the incidents should have been resolved short of arrest with a citation or a warning, consistent with BPD's policy on the "most effective, least intrusive response." One key observation was that, in a number of probable cause statements, the arresting officer supported the disorderly conduct charge by describing the gathering of people, but failed to explain how the defendant's behavior (as opposed to, *e.g.*, the presence of police or pre-incident socializing in the location) caused the gathering, which is a key element of disturbing the peace.

Of the 28 reviewed cases resulting in adult charges for disorderly conduct, only two resulted in convictions. One resulted in release without charges for failure to satisfy the probable cause standard, 21 were dismissed for unexplained reasons, and four were placed on the stet docket.

The Monitoring Team is encouraged by the work BPD did in its fledgling audit. The audit presents a fair, if necessarily incomplete, picture of BPD's response to First Amendment conduct. It identifies the additional information required to present a more complete picture. It isolates certain cases that warrant disciplinary or supervisory review. It reinforces the need to address previously-known shortcomings in First Amendment compliance—*e.g.,* incomplete understanding of the law of disorderly conduct (at least among some officers) and inadequate documentation of facts supporting probable cause that an individual has committed a crime and has not simply engaged in constitutionally protected activity. It highlights previously-known shortcomings in other areas—*e.g.,* unacceptable delays in resolving internal affairs complaints, low-level offenses that should be addressed with warnings or citations rather than arrests, and either the absence of probable cause or shoddy documentation of probable cause for arrests for low-level offenses.

Based on these observed shortcomings, the audit specifies areas of emphasis for training. Further, the review of large-scale protest activity reveals how a solid Incident Command Structure and detailed, properly executed operational plans can simultaneously safeguard First Amendment rights, promote constitutional policing, and ensure public safety.

In short, the audit is a promising start. It demonstrates that BPD is capable of engaging in internal analysis and self-correcting behavior, both of which are essential to becoming a high-functioning, Constitution-abiding police agency. That said, with assistance from the Monitoring Team and DOJ, BPD must continue to try to find a more accurate way to identify police encounters implicating First Amendment protections, if possible. While disorderly conduct cases provide a useful set of such encounters, they are an incomplete set.

### *Response to Recent Widespread Protests against Police Brutality*

In Baltimore, as in many other cities, there have been widespread protests against police misconduct in the wake of the brutal killing of George Floyd by Minneapolis police officers. The Monitoring Team has observed first-hand BPD's response to the protests. On eight different days and nights between May 29 and June 13—all the days and nights that featured significant protest activity in that period—Monitoring Team members stationed themselves in both BPD's command center and on the ground. Those in the command center were able to review BPD's incident actions plans and observe how BPD commanders, using an established Incident Command System, directed officers on the street to respond to the protests. From live video feeds broadcast throughout the command center, Monitoring Team members also were able to observe how BPD officers responded to the directives they received and otherwise carried out their

duties. At the same time, members of the Monitoring Team's community engagement arm were on the street, interacting with protestors and obtaining a ground-level view of BPD's response.

Thus far, based on its dozens of hours of observation, the Monitoring Team believes BPD's response to the protests has complied with both the Constitution and the Consent Decree. BPD has allowed community members to assemble in public spaces and march on public streets and sidewalks without intervention; deliver speeches denouncing law enforcement and criticize officers face-to-face without restriction or retaliation; and make video and audio recordings of police activity without impediment. BPD's actions demonstrate that it has learned important lessons from certain failures in performance in 2015, when it reacted to the unrest that gripped the City in the wake of Freddie Gray's death. The Monitoring Team attributes BPD's accomplishments to date to several developments.

First, the community members who have led the protests have been well-organized and committed to non-violence, and they have shared information needed for BPD to simultaneously protect First Amendment rights and preserve public safety. Violence interrupters have appeared at demonstrations to prevent violence before it occurs and to intervene when it does. For example, during early demonstrations, on two occasions when protest participants hurled items (including small exploding fireworks) at police officers, Monitoring Team members observed peaceful protestors identify the participants, detain them, and take them to the police. Protest organizers' devotion to non-violence undoubtedly has made BPD's management of the protests less fraught.

Second, through the visible accommodations it has made on the street, BPD has clearly conveyed to community members that it intends to honor protestors' First Amendment rights. BPD generally has avoided engaging in provocative conduct. It has not made unnecessary (even if technically lawful) arrests. Further, with limited exceptions for certain officers ringing City Hall and a small line of officers ordered to block off a street on which County Police were effectuating a murder arrest the night of May 31, BPD officers have policed the demonstrations in their regular uniforms. They have generally eschewed riot gear, which is often unnecessarily provocative, as shown in other cities with mass protests. Outfitted Mobile Field Force units have remained ready to respond if violence erupts, but they have kept away from the demonstrations, attracting no attention, in order to minimize the potential for conflict. Similarly, some officers deployed around City buildings where demonstrators have gathered, including BPD headquarters and City Hall, have kept helmets and shields nearby if the need to use them arises, but have assiduously sought to avoid using them.

To further defuse tensions, BPD officers have often calmly engaged in discussion with protestors, occasionally marched with them, and sometimes taken a knee alongside them. Such disarming conduct has contributed to the peacefulness of the demonstrations. Ideally, it will bolster BPD's ongoing efforts to rebuild community trust.

Third, on each day of protest, BPD has utilized a sound Incident Command System, typically headed by the Chief of Patrol, and has meticulously prepared incident action plans to address different contingencies and assign dozens of officers to specific duties. Especially because BPD has coordinated with and led other agencies in managing the protests, a strictly observed and executed ICS has eliminated confusion on the street and produced measured, proportionate and effective police action. Commanders have emphasized the prudence of allowing protestors to peacefully occupy public spaces and march through the streets without interference, even when assembling and marching has caused temporary traffic disruptions. Commanders have similarly emphasized the need for restraint in the face of direct verbal provocation and have deftly handled potentially volatile events. For instance, prior to the main protest activities on May 31, officers checked locations along anticipated march routes and identified and removed palates of bricks and plastic bottles containing accelerant, which individuals with plans for property destruction

appeared to have placed strategically near storefronts. To take another example, with the help of violence interrupters and under the ICS, officers located an individual standing in the middle of the street with a long gun slung over his back and capably ushered him away from the crowd to an isolated location where his detention, which was lawful, would not risk a disturbance.

It bears noting that BPD has proven capable of monitoring the protests without compromising police functions in other parts of the City. Each week, through their participation in BPD Comstat meetings, Monitoring Team members have observed how BPD has simultaneously managed the protests while continue to deploy necessary personnel and resources to each police district.

The overall propriety and effectiveness of BPD's response to recent, large-scale protest activities does not mean that BPD has reached compliance with the Consent Decree's provisions for responding to mass demonstrations. The conclusion here is "so far, so good." There is still a way to go—sustained appropriate responses to demonstrations, Department-wide training on First Amendment conduct, completion of the Mobile Field Force SOPs, new Mobile Field Force training, and more. Nevertheless, the Monitoring Team is cautiously optimistic that BPD's recent performance *does* mean that the Department is turning a corner. Many of BPD's big-city peers have not managed demonstrations and contained violence and property destruction as effectively, and some of them have resorted to disproportionate, sometimes injury-inflicting force and mass arrests. BPD has not only performed well when measured against these other agencies; it has performed well when measured against the pertinent standards for measurement—the Constitution and the Consent Decree.

## CHALLENGES AHEAD

As previously reported, the biggest challenge facing BPD remains ensuring that its officers respect First Amendment rights not during mass demonstrations, but in their daily interactions with City residents. In its investigation, DOJ found that BPD officers were engaged in a pattern or practice of violating the First Amendment by responding to oral criticisms, insults and non-violent provocations with unreasonable force. Similar conduct, at least in isolated pockets, has continued into the Consent Decree period.

Within the past two years, two different officers, Officer Arthur Williams and Sergeant Ethan Newberg, have been charged with crimes for using unreasonable force and bringing criminal charges in retaliation for the exercise of basic free speech rights. The Monitoring Team has reviewed BWC footage and incident reports from these cases, and it appears that these officers in fact responded to non-violent, constitutionally protected provocations with force, criminal charges, or both. Officer Williams was convicted of the charges against him in 2019. Sergeant Newberg has not yet been tried. But the case against him, which alleges nine different instances of unlawful retaliatory conduct over the span of just ten months (July 2018 – May 2019), is particularly troubling, because as an experienced first-line supervisor with 24 years on the job, he has been setting an example for potentially dozens of patrol officers.

BPD's commendable response to the recent protests suggests that systemic improvement may be afoot. The protests include speakers who condemn the police and demonstrators who directly, and sometimes aggressively, criticize officers face-to-face. To the Monitoring Team's knowledge, none of these scores of encounters have provoked unlawful retaliation by way of either force or arrest. By repeatedly exercising restraint in the face of oral provocations, and by receiving consistent reinforcement from commanders about the need for such restraint, hundreds of officers should be developing a reflexive habit of accommodating free speech rights. If that is in fact what is happening, officers' experiences with the recent demonstrations, together with lessons learned from the Williams and Newberg prosecutions, could set BPD on a path to sustained compliance with the Consent Decree's core First Amendment requirements.

## THE NEXT SIX MONTHS

BPD must develop and deliver a training curriculum to ensure that officers respect First Amendment protections. Policies 804 and 1016 were revised nearly two years ago, but because of the immense burdens placed on BPD's training academy, recently exacerbated by the Covid-19 pandemic, officers have not yet received training on them. As a result, they are not yet formally active. To enable them to become effective as soon as possible, BPD is finalizing an e-learning curriculum that will cover all essential policy provisions. All officers will be required to complete the e-learning within the next two months. The e-learning will be supplemented with in-class instruction next year.

In addition to delivering e-learning, BPD will finalize revisions to its Standard Operating Procedures for the Mobile Field Force.

# INTERACTIONS WITH YOUTH AND COORDINATION WITH BALTIMORE SCHOOL POLICE

The Consent Decree requires BPD to alter its approach to how it interacts with youth. The Consent Decree obligates BPD officers to account for the personal characteristics (age, size, developmental/mental status, disability status and maturity) of youth they encounter and, where practical, use alternatives to arrest (e.g. warn and release, counseling, referral to community services and resources, warnings, civil citations) in order to divert youth from criminal justice system (CD218). To accomplish this goal, the Consent Decree requires the City to conduct a comprehensive assessment of its effort to reduce youth involvement in the juvenile and criminal justice systems ("Youth Assessment") (CD219). It requires BPD to revise its policies and training as needed, and conduct training in order to properly guide officers in their interactions with youth (CD220-21). The Consent Decree envisions that, in preparing the Youth Assessment, the City will obtain input from a collaborative consisting of City Officials, BPD representatives and community stakeholders, including community organizations with experts in the field, academic and youth advocates (CD 219).

The Consent Decree also contains several provisions addressing BPD's relationship with the Baltimore School Police ("BSP"). In particular, Paragraph 417 of the Consent Decree requires BPD to conduct an initial assessment of its memorandum of understanding ("MOU") with BSP and evaluate how BSP has used BPD's authorization to exercise law enforcement powers throughout the City. The assessment should include an analysis of data reflecting the frequency with which BSP officers respond to calls, make stops, searches, and arrests, and use force under the MOU. BPD will use the assessment to identify deficiencies and opportunities for improvement, amend the MOU as needed, implement other appropriate corrective action, and document the changes it makes. Following the initial assessment and amendment of the MOU, BPD will conduct a biennial evaluation of its coordination with BSP, and make any modification needed to ensure effective coordination with BSP.

*Thus far, consistent with Monitoring Plan requirements, BPD has completed the Youth Assessment and finished revising some youth-related policies while continuing to work on others. Because BPD remains in the policy revision phase of reform, its compliance score in the Youth Interactions compliance category is "2" (policy/planning phase).*

| YOUTH INTERACTIONS | COMPLIANCE SCORE: | |
|---|---|---|
| | **2** | Policies/ Planning |

*In the School Police compliance category, BPD has completed the required assessment of its MOU with BSP and executed a new MOU that attempts to fix the shortcomings in the prior MOU. What remains in this category are biennial assessments of BPD's coordination with BSP, the first of which is approximately 18 months from now. BPD's compliance score is "4a" (implementation – not yet assessed).*

| SCHOOL POLICE | COMPLIANCE SCORE: | |
|---|---|---|
| | **4A** | Implementation – Not Yet Assessed |

## AREAS OF PROGRESS

### *Youth Diversion Assessment*

In April 2019, with input from the City's Youth Assessment Advisory Board, other community stakeholders, the Monitoring Team and DOJ, BPD published the Youth Diversion Assessment. The assessment, prepared by the Center for Children's Law and Policy, presents a comprehensive evaluation of diversion opportunities for Baltimore youth. Relying on meticulous data analysis and interviews with law enforcement personnel, community advocates, and a number of youth, the Assessment included data on arrests and juvenile court processing of youth, barriers to diversion at different stages in the juvenile justice process, and thoughtful, achievable recommendations for reducing the number of youth entering each stage of the juvenile justice system while at the same time preserving public safety. The assessment is available **here**.

### *Policies Affecting Youth*

Under the Third-Year Monitoring Plan, BPD began implementing a three-phase process to revise policies affecting interactions with youth. The first phase, now completed, entailed developing Policy 1207 on youth interrogations and revising previously approved use of force policies to account for youth interactions. The second phase, currently near completion, involves revising Policy 1202, the core policy on youth interactions. The revisions include BPD's process for pre-arrest diversion. The third phase will require BPD to work with the Mayor's Office and City agencies to develop a broader diversion program that will provide officers with meaningful options for diversion to community-based providers.

As previously reported, BPD finalized Policy 1207, the new youth interrogations policy.  This was a significant accomplishment, as the policy, for the first time, places formal limitations on interrogating individuals under age 18.  Under Policy 1207: all youth must have a parent/legal guardian and/or an attorney present during an interrogation, with a preference for having both a parent/legal guardian and an attorney present; all youth 15 and under must consult with an attorney prior being advised of their Miranda rights; officers may not use deception when questioning youth; and BPD's advice and waiver of rights form has been modified for youth suspects so that it informs youth of their rights in more comprehensible language.

In addition to issuing Policy 1207, BPD completed revisions to Policy 1115, its previously approved core policy on use of force, to account for youth interactions. The revisions prohibit using pain compliance and control techniques on youth unless deadly force is threatened. They further prohibit using force against youth who are restrained. BPD's review also resulted in changes to Policy 719 (Conducted Electrical Weapon), Policy 1111, (Batons), and Policy 1118 (Oleoresin Capsicum (OC) Spray). BPD officers are now restricted from using these instruments on youth who are "preteen or younger."

This year, BPD has been working in close collaboration with youth advocacy organizations, the Monitoring Team and DOJ on phase two of its youth policy reforms, Policy 1202, titled "Youth Interactions." This policy will provide BPD officers general guidance on interactions with youth, including a reshaped process

for pre-arrest diversion, and will establish the framework for completing the third phase of youth policy reforms, which will establish a broader diversion program to prevent youth from unnecessarily entering the criminal or juvenile justice systems. A draft of Policy 1202 will be issued for public comment in the fourth quarter of 2020. The policy should be finalized in the first quarter of 2021.

### *Evaluating and Revising BPD's MOU with Baltimore School Police*

In April 2019, BPD published its assessment of its MOU with BSP. The assessment examine how BSP was exercising law enforcement powers off of school property under the MOU (CD 417). The report on the assessment can be found **here**.

The assessment reaffirmed that BSP was not adequately recording and maintaining the data required for evaluation purposes, including data on the frequency with which BSP officers exercised law enforcement powers under the MOU, as well as data on calls for service, incidents, stops, arrests and uses of force involving BSP officers acting under the MOU. The assessment recommended addressing these gaps in data collection in a new MOU. The assessment also recommended that the new MOU contain clear guidance to BSP officers on reporting uses of force off school property, as well as clear guidance to BPD officers on taking and investigating complaints involving actions of BSP officers off of school property.

BPD and BSP finalized a new MOU on March 31, 2020. The new MOU incorporates the recommendations from the Youth Assessment for improved data collection and use of force reporting and satisfies the Consent Decree requirement to incorporate "policies and protocols governing the proper investigation of civilian complaints involving BSP officers exercising law enforcement powers pursuant to the MOU." (CD 418).

## CHALLENGES AHEAD

BPD must complete phases two and three of the youth policy reform process. Because of the coronavirus, work on Policy 1202 has been delayed and the deadlines in the Third-Year Monitoring Plan have been extended. Nonetheless, BPD, the Monitoring Team, DOJ and community stakeholders continue to refine the draft policy.

Once Policy 1202 is completed, BPD and the City will need to work diligently to establish a comprehensive youth diversion program, which should incorporate the recommendations from the Youth Assessment. Coupled with Policy 1202, which will establish criteria for mandatory or presumptive diversion for certain offenses, the youth diversion program will advance the Consent Decree's principal goal of providing youth with community-based alternatives to arrest when appropriate.

BPD also must train officers on its new youth policies when they are completed. Certain aspects of these policies are already being trained. For instance, BPD has incorporated key provisions of Policy 1207 (Youth Interrogations) into the "Interrogations and Interviews" module of its ongoing Department-wide training on stops, searches and arrests, and also has included limitations on on-scene interviews of youth in the "Crime Scenes and Witnesses" module. Nevertheless, comprehensive training on youth policies will be required. The Third-Year Monitoring Plan calls for BPD to begin to develop such training in the coming months, with delivery in 2021. Given the recent, extended closure of the Training Academy, the temporary redeployment of certain Academy personnel to address staffing shortages, and the temporary delay in finalizing Policy 1202, it is unlikely that BPD will be able to comply with this timeline. It is nonetheless anticipated that BPD will be able to deliver the training in 2021.

## THE NEXT SIX MONTHS

In the next reporting period, BPD will finalize Policy 1202 on youth interactions, begin drafting training curriculum on youth interactions and, together with the City, start in on the development the youth diversion program.

# COMMUNITY POLICING AND ENGAGEMENT

## COMMUNITY POLICING

Community policing is a philosophy that promotes organizational strategies that support the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. (*Community Policing Defined*, (Washington, DC Office of Community Oriented Policing Services, 2014.)

Effective community policing depends on the trust and cooperation of community members. In many of Baltimore's most challenged neighborhoods, mistrust in the police runs high and cooperation with the police is infrequent. BPD thus faces considerable challenges in engaging in effective community policing in some of the City's most underserved communities.

One of the overarching goals of the Consent Decree is to meet those challenges. The Consent Decree contains specific requirements intended that will affect the way BPD officers interact with community members when taking law enforcement action. These requirements—regarding, e.g., use of force; stops, searches and arrests; fair and impartial policing; First Amendment protected activities; and interactions with youth and individuals with behavioral health disabilities or in crisis—are addressed in the preceding sections of this report. The Consent Decree begins, however, with certain broad requirements intended to promote both community policing and community engagement.

Preliminarily, the Consent Decree requires issuance of a new mission statement that integrates community-oriented principles into BPD "management, policies and procedures, recruitment, training, personnel evaluations resource deployment, tactics and accountability systems" (CD15). BPD finalized a new mission statement in July 2018. *See* ECF No. 119, and then revised that statement after Commissioner Harrison was appointed. *See* ECF No. 239.

In addition to a new mission statement, the Consent Decree outlines the kind of community policing training BPD officers must receive (CD16-17), as well as the data BPD should collect (CD18). The Consent Decree also requires the City and BPD to develop community engagement plans (CD19), to obtain input from community groups on policies, practices, training, engagement programs and enforcement strategies (CD20), to develop a community outreach program to educate and communicate with City residents about the Consent Decree (CD21), to publish annual reports on BPD's community policing efforts (CD22), and to use the results of community surveys to inform policies, training and practices (CD25).

***To date, beyond revising its mission statement, BPD has developed a Community Policing Plan. It has begun drafting a community policing training curriculum but has not yet conducted training. Accordingly, its compliance score in the Community Policing category is "3" (training phase).***

| COMMUNITY POLICING | COMPLIANCE SCORE: | |
|---|---|---|
| | **3** | Training |

## ▌AREAS OF PROGRESS

### *Community Policing Plan*

A concrete, comprehensive Community Policing Plan is critical to BPD's reform efforts, as defines how BPD provides police services to Baltimore's diverse communities. Frequent changes in leadership during the first year of monitoring delayed development of the Community Policing Plan. There were further delays after the appointment of Commissioner Harrison, who needed time to ensure that the Plan reflected his vision for satisfying the community policing requirements of the Consent Decree. After receiving Monitoring Team, DOJ and community feedback on several drafts, BPD finalized and published the Community Policing Plan in April 2020. *See* ECF No. 304. The Plan, available **here**, describes BPD's strategy for addressing crime while proactively engaging the community in a manner that builds trust and legitimacy. It prescribes organizational redesign, building community partnerships, problem-solving, building analytical capacity, and district crime plans. Among other things, the Plan establishes a goal for all patrol officers to devote 40% of their time on activity other than calls for service, including pro-active community policing.  The International Association of the Chiefs of Police asked BPD to write an article on the Plan as a model for community policing. See the article **here**.

## ▌CHALLENGES AHEAD

### *Training*

The COVID-19 pandemic has delayed development and delivery of training on community policing. Under the revised training schedule, the curriculum will be developed in the coming months with community input, and finalized by the end of the year, with classroom instruction set to begin in spring 2021. As explained in other sections of this report, this training, on top of the other courses being developed, is going to test the Training Academy's capacity.

### *Staffing*

The Staffing section above describes the difficulty of adopting the community policing strategies prescribed in the Community Policing Plan. To reach the goal of having patrol officers spend 40% of their time on proactive problem-solving and community policing activity, BPD will need to add over 170 patrol officers and over 30 sergeants. Given these estimates, staffing shortages will hamper and delay the full implementation of the community policing plan. It will also affect the ability of District Commanders to establish continuity of assignment by having the same officers work in the same area every day.

### *Earning the Community's Trust*

One of the keys to establishing an effective community policing model is building community trust. The Consent Decree explicitly recognizes this imperative, as earning the community's trust is one of its central, overarching goals. The results of the initial round of surveys the Monitoring Team conducted in 2019—a community survey and a custodial arrestee survey—demonstrate just how much BPD must do to meet that goal. The surveys were designed to measure community attitudes toward BPD. The surveys will be replicated in future years to determine whether those attitudes are changing.

**Community Survey |** The Monitoring Team partnered with the Institute for Urban Research at Morgan State University ("IUR") to devise, conduct, analyze the results of, and prepare a report on the community survey. IUR completed data collection for the community survey at the end of June 2019. IUR interviewed 645 individuals from across Baltimore. It used several different methods for recruiting

participants. The results reflect, through narrative reporting, what a large and diverse sample of people in Baltimore think about BPD and policing generally. Among IUR's findings:

- A majority of participants based their opinions on perceptions, not personal experience, as a majority rarely or never encounter BPD officers.

- Satisfaction with and trust in BPD are low, although participants want to improve relationships with BPD, expressed a willingness to engage with BPD, and feel comfortable communicating with BPD when necessary.

- A majority of participants do not believe that BPD effectively reduces crime and keeps people safe.

- A majority of participants do not believe BPD has a good working relationship with the community, do not observe BPD taking the time to meet members of the community/neighborhood, do not personally know the names or faces of BPD officers, and get nervous when they see a BPD officer.

- A majority of participants do not believe the respect between BPD officers and community members is reciprocal, maintaining that BPD officers do not show respect toward community members, while community members treat BPD officers respectfully.

- A majority of participants have observed BPD officers engage in racial profiling, use excessive force, or use verbally abusive language.

- A majority of participants do not believe BPD officers are held accountable for misconduct.

The full report, titled "The Community's Experiences and Perceptions of the Baltimore City Police Department," can be found **here**. It was published earlier this year.

**Custodial Arrestee Survey** | Researchers from the University of Toronto's Munk School of Global Affairs and Public Policy and Rose Street Community Center, a local organization that assists returning citizens, conducted the custodial arrestee survey and published a report of its findings at the beginning of September 2019. Based on the researchers' interviews of 70 individuals in Baltimore's central booking facility shortly after their arrests, the report found that "most detainees we interviewed judge policing on the basis of their experiences before arrest [rather] than during it." Consistent with the findings of the community survey, the researchers determined that over half of the interviewees thought BPD was doing either a "bad" or "terrible" job, while fewer than 20% thought BPD was doing a "good" or "excellent" job, and roughly 25% said BPD's work was neither good nor bad. Importantly, according to the researchers, this largely negative appraisal was not the result of prejudice against police officers or bias against policing in general. Rather, "much of [the interviewees'] dismay about policing in Baltimore today stems from a sense that the police 'don't care' about their community, despite the persistence of social problems they believe the police can help fix." The full report, titled "Experiences and Perceptions of the Police in Baltimore," can be found **here**.

## COMMUNITY ENGAGEMENT

Consistent with Paragraphs 19-21, BPD has sought to engage community members in the reform process. BPD's Consent Decree Implementation Unit has organized or attended numerous community events, often with sworn BPD personnel in attendance; has disseminated draft policies, training curricula and reform plans for community input, which BPD has incorporated; and has published annual reports describing BPD's community engagement efforts. But re-establishing community trust in BPD will be a years-long process, one that is currently being hindered by a global pandemic. Whether BPD's community engagement work helps to build bridges to City residents, particularly those most distrustful of BPD, remains to be seen.

Over the past 30 months, among other things, BPD's Consent Decree Implementation Unit and other BPD personnel have:

- Complied with the requirement to conduct two community briefings on the Consent Decree in each police district each year, and held City-wide workshops about the Consent Decree

- Established a Community Training Review Committee to participate in training curriculum piloting and provide feedback

- Visited dozens of community fairs, community association meetings, and community partner collaborations

- Conducted officer focus groups, one at MICA and one at Morgan State, and 12 officer/civilian focus groups with Police Foundation assistance

- Attended and made presentations at roll calls in each District

- Completed a community engagement inventory with Police Foundation assistance through interviews of District command staff and other personnel who engage in community outreach

- Participated in meetings with Civilian Oversight Task Force membership

- Canvassed neighborhoods to distribute information on reforms and upcoming Consent Decree meetings,

- Utilized social media, email, online surveys, and media outlets to share and collect information about reform efforts.

# SEXUAL ASSAULT INVESTIGATIONS

The Consent Decree requires BPD to enhance the trust of victims of sexual assault, to strengthen its response to and investigations of reports of sexual assault, and to combat gender bias (CD 257). To achieve these goals, the Consent Decree requires BPD to revise the policies and procedures for responding to and investigating reports of sexual assault (CD 258); provide initial and on-going annual training to support the revised policies and procedures (CD 259); ensure through proper supervision and internal oversight that reports of sexual assault are thoroughly investigated (CD 260, 262, 263); ensure that officers transport victims to a medical facility for a forensic exam in all instances in which a forensic exam is warranted and the victim consents (CD 261); enhance its collection, analysis and reporting of data regarding the nature and extent of sexual assault crimes (CD 264); and share information about its sexual assault investigations with other law enforcement agencies, the public, and the Sex Offense Unit (CD 265). The City and BPD will ensure that their policies and protocols with the Sexual Assault Response Team (SART) enable them to engage in periodic reviews of services provided by BPD and to review samples of open cases and those classified as unfounded (CD 266).

As previously reported, BPD satisfied the threshold requirement to revise both its policy on sexual assault investigations (Policy 708) and its standard operating procedure on such investigations. *See* ECF No. 152. Since then, BPD made minor, technical revisions to the policy to ensure consistency with other policies. *See* ECF No. 266. BPD also successfully created and finalized a new policy on member-involved sexual misconduct. *See* ECF No. 269. Additionally, BPD developed and completed e-learning training for all officers on responding to reports of sexual assault, *see* ECF Nos. 242 & 267, and has devoted considerable time and effort to preparing a draft training curriculum for Sex Offense Unit ("SOU") investigators, as well as a draft virtual classroom curriculum for all officers to complement the completed e-learning. Finally, BPD has produced two annual self-reports on sexual assault investigations, which summarize investigations data from 2018 and 2019, respectively. *See* ECF No. 235 & 317. As explained below, the 2019 report shows some progress.

However, much work is left to be done. Once training for SOU investigators and virtual classroom training for all other officers is completed, which should occur by early 2021, BPD will need to demonstrate adherence to Policy 708 and its requirements for victim-centered, trauma-informed responses to reports of sexual assault. Tracking compliance with Policy 708 will require reviews and assessments of officer responses based on reports, body worn camera footage, and investigator case files. Tracking compliance with Policy 708's provisions on data collection and analysis will be dependent on the effective utilization of a new record management system, which is still in development.

***In view of the work done to date and the work that remains, BPD has made reasonable progress toward satisfying the Consent Decree's requirements. At this point, BPD's compliance score in the sexual assault investigations category is "3," as it has completed policy revisions and remains in the training phase of reform.***

| SEXUAL ASSAULT INVESTIGATIONS | COMPLIANCE SCORE: | |
|---|---|---|
| | **3** | Training |

# ▌AREAS OF PROGRESS

### *Officer Training on Policy 708 and Related SOPs*

As of November 25, 2019, 2,085 sworn personnel had completed e-learning training on responding to reports of sexual assault. The training presented officers not only with changes in procedure for responding to such reports, but also with changes in BPD's philosophy regarding how police officers should view and address alleged sexual offenses, offenders and victims.

Follow-up classroom training on victim-centered, trauma-informed approaches to reports of sexual assault is planned to begin later this calendar year and conclude in March 2021. Originally, the training was scheduled to in-person. However, due to the limitations on in-class instruction caused by the coronavirus, BPD, the Monitoring Team and DOJ agree that BPD may conduct the classroom training virtually. It will be paired with virtual classroom training on responding to individuals experiencing behavioral health crises. These subjects are sufficiently important that, given the completion of policy revisions in both areas, BPD, the Monitoring Team and DOJ believe classroom training, even if virtual, should be delivered as soon as practicable.

### *Policy on Member-Involved Sexual Misconduct*

BPD's Policy 322 (Member-Involved Sexual Misconduct) was approved and filed with the Court in December 2019. *See* ECF No. 269. This policy memorializes BPD's zero tolerance policy regarding member-involved sexual misconduct and establishes responsibilities and guidelines for conducting both criminal investigations of allegations of such misconduct under Policy 708 and internal administrative investigations of such misconduct by BPD's Public Integrity Bureau. The policy will not become effective until personnel in the Sexual Offense Unit and Public Integrity Unit are trained on it. BPD's intent is to produce and deliver e-training this calendar year.

### *Training Curriculum on Investigations for Sexual Assault Investigators*

In recent months, BPD and the Baltimore City Sexual Assault Response Team (which includes both public officials and community advocates) have worked closely with the Monitoring Team, DOJ and experts in sexual assault investigations to develop training curriculum for SOU Unit investigators. That curriculum is now finalized. Consistent with Consent Decree requirements, it stresses a victim-centered, trauma-informed approach to sexual assault investigations, with a focus on the alleged offender's behavior. The draft curriculum is based on the new, previously approved standard operating procedure for BPD's Sex Offense Unit. Training is scheduled for the week of October 12, 2020.

### *Reports on Sexual Assault Investigations*

Paragraph 264 of the Consent Decree requires BPD to collect and analyze data regarding its sexual assault investigations every year. The data should include: the number and nature of sex offenses reported; the number and demographics of the alleged offenders; the number and demographics of the alleged victims; the resolution of sex offense cases; and the processing of forensic medical exams.

In its second annual report, completed in June 2020, BPD demonstrated improvements in the amount and type of data reported, though BPD still did not satisfy all of Paragraph 264's requirements and the data reported has not been independently verified. *See* ECF No. 317. The report, available **here**, contains 2019 data on Child Abuse Unit's (CAU) sexual assault investigations, 2019 data regarding multiple victims and multiple alleged offenders, and 2019 data on the reporting of Sexual Assault Forensic Exam (SAFE)

kit requests and processing times. BPD promises to continue to improve the accuracy, comprehensiveness and clarity of this data. In the report, BPD states that it will begin tracking co-occurring crimes, work with the State's Attorney's Office to obtain data on case outcomes, and explore developing technology to track data on LGBTQ victims when available based on self-reporting.

Among the highlights from the 2019 report are:

- The median processing time of SAFE kits puts BPD in-line with proposed State legislation to process SAFE kits in under 150 days from the date of request.

- In 2019, BPD sent 54% of the cases to the State's Attorney's Office for review as compared to 44% in 2018.

- In 2019, BPD had two unfounded Uniform Crime Reporting cases as compared to 15 in 2018.

## CHALLENGES AHEAD

COVID-19 restrictions pose the greatest challenge to ensuring that BPD officers, including SOU investigators, are fully trained on new policies and that their actions comply with Consent Decree requirements. While patrol officers will undergo virtual, web-based training on victim-centered, trauma-informed approaches to reports of sexual assault, these concepts can be difficult to grasp and even more difficult to put into action. The Monitoring Team fully understands the need to complete training as soon as practicable in the face of the pandemic but has concerns that e-learning and web-based training will not be sufficient to accomplish the behavioral changes in responses to reports of sexual assault that the Consent Decree envisions.

As noted, SOU investigators will receive their training in October. At that point, the Monitoring Team must begin to assess the adequacy of BPD's sexual assault investigations. Together with BPD and DOJ, the Monitoring Team must develop and agree to an assessment instrument and methodology that not only captures what an SOU investigator does, but how—and how well—they do it. There are unique challenges to assessing whether an investigator used a victim-centered, trauma-informed, offender-focused approach by reviewing a case file.

BPD also must confront staffing shortages in the SOU. The Staffing Plan calls for 24 SOU detectives. Currently, there are only ten. Detectives' caseloads will partly determine how effective they are in investigating sexual assaults and meeting the requirements of the Consent Decree.

Data collection and analysis challenges also persist. Until now, BPD has never sought to collect the data necessary for the analyses required by the Consent Decree. Although BPD showed some improvement in its June 2020 report, its current technology limitations, including its inadequate case management system, continue to prevent it from gathering and analyzing a significant amount of the data required by the Consent Decree. The Monitoring Team and DOJ are conferring with BPD about how its reports can more fully address Consent Decree requirements until the deficiencies in its case management system are remedied.

Finally, the Monitoring Team, BPD and DOJ agree that a victim survey measuring satisfaction with BPD's responses to and investigations of sexual assaults would be helpful. Developing a valid and reliable survey instrument and conducting a survey without adding to victims' trauma could prove difficult.

## THE NEXT SIX MONTHS

Training for SOU investigators is tentatively scheduled for the week of October 12, 2020. Virtual web-based training for other officers should be completed by March 2021.

# RECRUITMENT, HIRING AND RETENTION

The Consent Decree recognizes that BPD's recruitment and hiring program, as well as its efforts to retain officers, are in need of significant improvement. BPD's Staffing Plan, discussed above, reinforces the importance of these improvements—*i.e.*, the importance of increasing the number of officers, particularly in Patrol and PIB—to the success of the reform effort. The Consent Decree obligates BPD to: (1) develop and implement a Recruitment Plan with "clear goals, objectives and action steps for attracting and retaining a quality work force that reflects the diversity of the Baltimore Community" (CD 420-22); (2) review and reform its hiring processes (CD 423-25); (3) develop and implement a Retention Plan to "identify challenges and recommend solutions to improve BPD's retention of employees" (CD 426); and (4) routinely assess its recruitment, hiring, and retention practices (CD 427).

*BPD has satisfied the threshold requirements of the Consent Decree—a hiring report, a Recruitment Plan, and a Retention Plan. It is now in the implementation phase, e.g., refining standard operating procedures for its Recruitment Section, adopting a new interview process that includes community members on interview panels, and adopting the National Testing Network's "FrontLine National" exam as the first stage in BPD's officer selection process. BPD's compliance score in the Staffing, Recruitment & Retention category is "4a" (implementation – not yet assessed).*

| STAFFING, RECRUITMENT & RETENTION | COMPLIANCE SCORE: | |
|---|---|---|
| | **4A** | Implementation – Not Yet Assessed |

## ▌AREAS OF PROGRESS

### *On-Going Evaluation of Hiring SOP*

In November 2018, after an in-depth review of its hiring processes, BPD finalized an initial hiring report, as required by Paragraph 423. *See* ECF No. 169. At the same time, BPD adopted new standard operating procedures for its Recruitment Section. Since then, BPD, the Monitoring Team and DOJ have continued to engage in regularly scheduled meetings to review, assess, and discuss modification to the SOP. Discussions and resulting modifications have addressed, but have not been limited to, background investigation procedures. For instance, in 2019, BPD discovered that a number of potential hires who were otherwise well qualified for employment were being prevented from advancing in the hiring process because of their failure to register for the Selective Service by age 26. Although failure to register is a violation of federal law, the Department of Justice and Selective Service agreed to suspend prosecutions of non-registrants in 1988, more than 30 years ago. BPD determined that barring candidates from employment based on a failure to register would both deprive the Department of otherwise qualified candidates and retain a hiring requirement with potentially disparate effect. BPD has now modified the SOP to allow candidates that have not registered previously to obtain a waiver through the selective service "information letter" exception process, rather than automatically disqualifying them.

### Background Checks

Historically, delays in background checks have been a primary reason for delays in hiring. To prevent these delays and expedite the hiring process, BPD retained an outside vendor, Kentech Consulting, to assist with the administration of background checks. Thus far, BPD's partnership with Kentech has proven successful in reducing delays in the hiring process.

### RecruitStat

In 2019, BPD fully implemented RecruitStat, the procedure for reviewing the Department's progress on recruiting, hiring and retention on a weekly basis. In the first quarter of 2020, due to changes in Recruitment Section leadership and the redeployment of resources required by the COVID-19 pandemic, RecruitStat was put on hold. Because RecruitStat is an effective accountability mechanism for BPD's staffing needs, the Monitoring Team expects the Recruitment Section to restart RecruitStat meetings shortly.

### Recruitment and Retention Plans

In 2018, indicative of its priority of improving recruitment, BPD exceeded the requirements of the First-Year Monitoring Plan by issuing a Recruitment Plan, which was not due in Year One. Over the past two years, as discussed above and detailed in our prior reports, BPD has been implementing the Plan by adopting certain measures to bolster recruitment. BPD's progress on recruitment has been aided by its partnership with the Mayor's Office on Innovation, which has helped to identify the root causes of inadequate staffing and to establish strategies for addressing the shortage.

In the last part of 2019, BPD completed the Retention Plan required by Paragraph 426. *See* ECF No. 274. The process of developing the Plan included opportunities for input from both rank and file officers and community members. The plan is available **here**. Among other things, it calls for the adoption of a process that identifies reasons for officer resignations prior to pension eligibility. It also advocates a number of incentives for experienced officers.

## CHALLENGES AHEAD

### Achieving a Positive Hiring-to-Attrition Ratio

In 2019, despite its efforts to recruit, hire and retain more officers, BPD lost more officers to attrition than it hired: 187 vs. 156. Thus far in 2020, due primarily to a large number of retirements in January, the statistics have improved, but not as much as hoped. Attrition still outpaces hiring, though the gap has narrowed. As of the end of August, BPD had hired 134 officers and lost 147 to attrition, for a net loss of 13 officers. *See* ECF No. 338-2.

The persistence of a negative hiring-to-attrition ratio this year may be attributable to interruptions in operations caused by a combination of two events: the pandemic, which has affected operations Department-wide, and the protests following the killing of George Floyd, which required the weeks-long redeployment of Recruitment Section officers to Patrol. Because of both the temporary reduction in Recruitment Section personnel and pandemic-induced safety precautions, interviewing and processing of applicants (who often must travel to complete parts of the background investigation process) had to be postponed.  This created a ripple effect, delaying processing of additional applicants. Further, during the delays, BPD may have lost candidates, who may have selected another police agency, grown disinterested, or found non-police employment.

The Recruitment Section is again fully staffed, but officers will periodically work Patrol to make up for budget cuts in overtime. There is also great concern that another surge in coronavirus infections within BPD will severely hamper recruitment due not only to another possible reduction in Recruitment Section personnel, but also to the reduced capacity of external partners, such as the National Testing Network, which administers the hiring exam.

The Recruitment Section also has identified a structural obstacle to recruitment: a funding shortfall for recruiting out-of-state candidates. While BPD is properly focused on recruiting home-grown candidates, it must also recruit from other regions in order to meet hiring goals. The funding shortfall puts BPD at a competitive disadvantage. For instance, the Washington, DC Metropolitan Police Department offers to relocate new hires to temporary dormitory-style housing and provides a housing stipend afterward. The Recruitment Section often hears from applicants—particularly younger, college-educated applicants with student loans—that they require such assistance.

Despite these challenges, the Recruitment Section continues to work diligently to recruit and hire a diverse cross-section of candidates, representative of the community BPD serves. For instance:

- New Section leadership has focused on assembling the right team and better management practices.

- The Section has adopted a triage methodology, which prioritizes likely successful candidates: applications from candidates without criminal records, compromised work histories, or other likely disqualifiers are segregated and closely monitored, resulting in expedited hiring times, while candidates with more challenging backgrounds are advised of ways to improve their chances so that, if qualified, they are provided equal opportunity.

- The Section has identified a need to evaluate the efficacy of its recruitment strategies—to determine what exactly is working best so that it can allocate its resources appropriately. Such self-evaluation is crucial right now, given the imperative to hire new officers and BPD's resource and budgetary constraints. BPD's ability to perform such self-evaluation will be contingent on the hiring of a recruitment analyst, which is currently on hold due the civilian hiring freeze.

- A new Section strategy prioritizes outreach to other public safety partners, like fire departments. This strategy has resulted in a recent hiring bump. Section leadership believes there is a significant benefit to focusing on this pool of potential applicants, as they tend to be civic-minded, have already been subjected to government background checks, and understand what it means to work in an organization similar to a police agency.

- The Section has adapted to the times by updating recruitment methods. Virtual job fairs, college messaging boards, candidate "mentoring" through e-mail dialog, and simple improvements in customer service have become the order of the day.

These measures likely explain why the hiring-to-attrition ratio is improving this year, even in the face of the daunting challenges of the past six months. Obviously, the numbers must improve far more dramatically if BPD is to meet its staffing goals. Yet there is at least some evidence that a turnaround is underway. Before drawing even tentative conclusions, the Monitoring Team awaits the year-end totals.

### *Retention*

The overarching goal of BPD's Retention Plan is simple and direct: to retain an engaged, productive, and healthy workforce. To accomplish this goal, BPD must affirmatively support the desire of its members to complete their careers, or at least of majority of their careers, with BPD. Consistent with the main takeaways from recent officer focus groups, such affirmative support broadly requires the following:

- Addressing, through planning and policy, the staffing and deployment issues that affect officer morale.

- Adhering to a fair, transparent promotional process and committing to the development of officer leadership skills.

- Implementing burden-reducing practices, updating technology and equipment (especially patrol cars), and improving the physical work environment.

- As described elsewhere in this report, BPD has begun implementing measures to achieve each of these objectives, as required by the Consent Decree.

## THE NEXT SIX MONTHS

BPD will continue to seek to make the hiring process more efficient, implement the Retention Plan, and use RecruitStat to track progress and identify ways to improve its recruitment, hiring and retention practices.

# OFFICER ASSISTANCE AND SUPPORT

Under the Consent Decree, BPD must adopt several important measures to support the health and wellness of its officers. The Consent Decree requires BPD to: provide, review and revise, as needed, an Employee Assistance Plan ("EAP") that furnishes no- or low-cost counseling and mental health wellness services (CD 436-437); develop peer support services (CD 438); offer all officers a voluntary mental health evaluation before returning to duty after a traumatic incident (CD 439); develop well-being protocols to be utilized during officer deployments in periods of civil unrest (CD 440); and develop protocols for annually assessing the efficacy of all of BPD's officer assistance programs (CD 441).

In the two and a half years of monitoring, BPD refined its EAP (CD 436-437), its traumatic and high-stress incident protocols (CD 439-440)., and its peer support program policy (CD 438). Further, BPD's Officer Safety and Wellness Section ("OSW") has actively offered support services to BPD officers. BPD is in the process of developing a methodology for measuring the efficacy of its support programs as part of the Third-Year Monitoring Plan (CD 441).

***Having completed the policy revisions required by the Consent Decree BPD's compliance score in the Officer Assistance and Support category is "3" (training), because BPD is in the process of developing Ethical Policing Is Courageous Training, which is an officer wellness program. Apart from the development of EPIC, however, BPD has progressed into the implementation phase in this category, as its reinvigorated officer wellness services and programs are operational.***

| OFFICER ASSISTANCE AND SUPPORT | COMPLIANCE SCORE: | |
|---|---|---|
| | **3** | **Training** |

## ▌ AREAS OF PROGRESS

### *Policies*

In 2018, BPD completed required revisions to its EAP policy, Policy 1703. *See* ECF No. 151. Since then, OSW has conducted outreach to educate officers about the EAP, including by posting information in each district and on social media, sending materials to supervisors, and speaking at roll-call trainings and "pop up" health fairs.

In 2018, BPD also finalized revisions to its traumatic and high-stress incident protocols, Policy 1731. *See* ECF No. 144. These are wellness protocols for (1) "all officers returning to duty following a traumatic incident (e.g. serious injury, officer-involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death or serious injury)" (CD 439), and (2) "officer deployments during public demonstrations or civil unrest" (CD 440). BPD has trained responsible personnel on the protocols through e-learning.

In November 2019, BPD completed revisions to its peer support program. *See* ECF No. 258. BPD now has a number of officers trained by the International Critical Incident Stress Foundation to respond to critical and traumatic incidents as members of BPD's Peer Support Team. The Peer Support Team provides emotional support to officers and their families and are on-call to respond to incidents as needed.

### *Early Intervention, Support and Guidance*

Over the course of 2019, OSW completed 56 early intervention sessions and 217 support and guidance sessions. For the first half of 2020, OSW completed 18 early intervention sessions and 507 support and guidance sessions.

BPD utilizes Behavioral Health Services Baltimore (BHSB) to assist in furnishing mental health services to BPD officers and their family members. BHSB is a central participant in the Collaborative Planning Implementation Committee, discussed in the Interactions with Individuals with Behavioral Health Disabilities section above. BHSB assists OSW in furnishing critical incident stress debriefings to officers involved in shootings and other critical incidents, consistent with Policy 1731. OSW, BHSB, or peer support program personnel provide follow up support. BHSB also assists OSW in providing field counseling to officers and in hosting health fair "pop-ups." According to BHSB, 6.5% of BPD employees now utilize EAP services, which is 20% higher than the national average.

To reduce its reliance on BHSB in responding to critical incidents, OSW is now developing in-house capacity. OSW will certify several of its staff in Learning Exercise Design for critical incident response through the Federal Emergency Management Institute.

As the Monitoring team and DOJ collaborate with BPD to develop an assessment methodology for officer wellness initiatives, OSW has undertaken an online survey of BPD officers. The survey helps to identify the strengths of OSW programs, as well as any weaknesses. As of July 30, 2020, 1136 officers had responded. The results are encouraging. Over 95% of respondents indicate that they know BPD has an officer wellness program. Additionally, 18% of respondents report having utilized BPD's officer wellness resources—a higher percentage than reported earlier by BHSB. A full discussion of these survey results will be available when the final assessment report is published in the fourth quarter of 2020.

### *Officer Wellness Programming*

In 2019, OSW conducted weekly "Managing Stress in the Workplace" presentations reaching over 2,100 sworn members. Additionally, approximately 100 civilian employees were provided stress reduction training during several "lunch and learn" sessions. OSW has continued to make these presentations in 2020.

The OSW survey indicates that these presentations are needed, as the results indicate that officers experience stress from several sources, including supervision, and witnessing or experiencing physical altercations or injury in the line of duty.

OSW conducted 10 pop-up health fairs in 2019. It has conducted additional fairs in 2020. These workplace events present BPD members with resources related to physical fitness, mental health, and financial well-being. The resources made available during health fairs include nutritional services, meal preparation services, physical therapy, fitness training, acupuncture, meditation, yoga, sound therapy, and financial planning.

OSW is now adjusting certain wellness programming to accommodate the restrictions on in-person interaction necessitated by the pandemic. For starters, OSW plans to hold online video conferences (via Zoom) to answer officers' questions about available resources. It also plans to develop videos that contain interviews with members who have had positive experiences with the health and wellness team. These videos will be distributed through BPD communications channels, including PowerDMS and district television.

Continued in-person programming will include presentations at new employee orientations, which are intended to reinforce the idea that participation in officer wellness and safety initiatives should be a routine part of every officer's career. OSW also intends to extend its services to BPD family members, recognizing that family members are the first line of support.

■ ■ ■

The Monitoring Team has been impressed with OSW's accomplishments over the past two years. We are equally impressed that OSW continues to strive for improvement. It is likely that OSW's efforts to provide wellness services to officers and to educate officers about the availability of those services explain why BPD members focus on self-care at higher rates than the national average for law enforcement personnel.[2]

## CHALLENGES AHEAD

### *Making Operational Changes to Improve Morale*

On behalf of the Monitoring Team, the Crime and Justice Institute conducted a series of eight focus groups of BPD personnel from May 21 – 23, 2019. The focus groups were intended to gauge officer opinions on a range of topics, including how BPD is falling short in providing them the direction and support they need to do their jobs effectively and what BPD can do to improve. The eight groups consisted of (1) two patrol officer groups of mixed race and ethnicity, but gender specific—one male, one female—to allow for comparison by gender, (2) three patrol officer groups, separated by race/ethnicity—one African American, one White, one Latinx—in order to make comparisons across race/ethnicity, and (3) detective, sergeant, and lieutenant groups of mixed race/ethnicity and gender. Officers from every shift and every district were represented. In total, a total of 68 sworn personnel—40 patrol officers, nine detectives, ten sergeants, and nine lieutenants—participated.

The Monitoring Team published CJI's final report on the officer focus groups at the end of July 2019. Among the report's key findings:

■ Officers believe a majority of residents supports and trusts them, though support varies significantly by district, and individuals most likely to interact with the police—both offenders and victims—are less trustful and supportive.

■ Officers are unclear about BPD's expectations around community policing and, because they spend so much time responding to calls for service, they have little or no time for pro-active policing. Officers favor a return to post assignments, which give them a chance to engage with and get to know the residents of one neighborhood.

■ Command staff and supervisors have not adequately communicated Consent Decree objectives and requirements to rank-and-file officers. More clarity and better communication are needed. A frequently cited example is the lack of clarity around the use of force reporting policy—specifically, which actions constitute a reportable "Level 1" (minor) use of force.

---

2        Kuhns, Joseph B., Edward R. Maguire, and Nancy R. Leach. 2015. *Health, Safety, and Wellness Program Case Studies in Law Enforcement*. Washington, DC: Office of Community Oriented Policing Services. *See* https://cops.usdoj.gov/RIC/Publications/cops-p332-pub.pdf

- Morale is low due to deficiencies in leadership, supervision and staffing. Rank-and-file officers feel disconnected from command staff, and the lack of a permanent Commissioner for a lengthy period resulted in the absence of clear and consistent direction. Officers believe that commanders are more concerned about BPD's image than their welfare. Officers also maintain the Department is understaffed: they are often forced to work overtime ("drafted"), are generally overextended, and have no time for pro-active or community policing. According to focus group participants, BPD could improve morale by more consistently recognizing superior performance; effectively communicating changes and expectations down the chain of command; improving equipment (especially patrol cars), technology and facilities; improving the efficiency of the internal affairs process, which takes far too long; and addressing staffing issues by, e.g., eliminating certain specialized units and redeploying the assigned officers to Patrol, hiring civilians for administrative positions, and terminating certain deployment strategies that take officers off the street.

- Participants believe that, due to staffing problems, officers are often promoted too quickly. They also believe that, historically, promotions and transfers have been based on "who you know," rather than on "how well you do."

The full report, titled "Feedback from the Field: A Summary of Focus Groups with Baltimore Police Officers," can be found **here**.

Recently, BPD has taken measures to address some of the concerns expressed in the focus groups. It has developed an objective, uniform, transparent system for promotions for the ranks of Captain and Major; created and distributed a "pocket guide" and e-learning material with key Consent Decree requirements, including the requirements for reportable Level 1 uses of force; opened a new, modern training facility, upgraded facilities in certain districts, and developed a plan for upgrading its aging vehicle fleet; produced a staffing plan that envisions increasing the number of officers in the patrol division not only by bolstering recruitment, but by civilianizing certain functions currently performed by sworn members and reducing the number of specialized units; adopted a community policing plan that will call for officers to spend 40% of their time on pro-active, community-oriented policing and 60% responding to calls for service; and implemented a new policy for prompt negotiated resolution of minor rule violations, which promises to free up investigators to concentrate or more serious violations and thus expedite the disciplinary process in all cases.

### EPIC

As explained elsewhere, BPD has initiated EPIC, a program to train officers to be "active bystanders," to intervene with fellow officers to prevent and address misconduct. EPIC is, at root, an officer wellness program, designed to keep officers from getting into situations that could adversely affect their physical and mental health. The successful implementation of EPIC could reap substantial benefits for officer wellness.

### Self-Assessments

As required by Paragraph 441, BPD must conduct regular assessments of the effectiveness of its officer wellness services. It is presently collaborating with the Monitoring Team and DOJ to develop an appropriate methodology. Meaningful self-assessments are needed to identify and correct deficiencies in OSW services and improve the quality of OSW performance.

*Expanding the Use of Wellness Services and Practices*

To maximize its effectiveness, OSW would like to proactively identify officers who are in need of wellness services and either do not recognize it or are reluctant to acknowledge it. Historically, a high number of officers receive services only after their health problems become critical.

When BPD's new record management system becomes operational, OSW hopes to utilize it to examine various data potentially indicative of health problems and conduct affirmative outreach to officers identified in the data.

Additionally, OSW is seeking to develop ways to identify officers through peer referral, which would enable colleagues to alert OSW confidentially about potential issues. Referrals could be initiated as a result of anecdotal comments in the workplace or observations of an officer's conduct. OSW hopes to identify officers via confidential referral through EPIC, which, by educating officers about the value of accountability, trains them to detect potential physical or behavioral health issues in their peers. OSW also hopes BPD will retain in-house mental health professionals to facilitate early detection. Offering confidentiality, in-house providers could attend roll calls to raise awareness, deploy in BPD's health and wellness vehicle to make direct contacts, and field requests from a confidential referral app to provide treatment.

In addition to proactively identifying officers who would benefit from wellness services, OSW seeks to incorporate wellness practices into BPD's standard operating procedures. Many of the OSW's challenges persist not because it lacks resources, but because commanders and first-line supervisors do not perceive the services it provides as essential to fighting crime. As a result, OSW is often called in late, after a member is already experiencing the after-effects of a traumatic incident. BPD should integrate wellness practices, such as work breaks and nutrition, into the deployment procedures of various units, especially high stress units (*e.g.,* shooting investigations).

## THE NEXT SIX MONTHS

BPD will continue to prepare a methodology for assessing the effectiveness of its officer support programs. The methodology should be finalized in the next six months.



# SUMMARY OF MONITORING TEAM ACTIVITIES

Since its appointment in October 2017, the Monitoring Team has sought to fulfill each of its prescribed roles under the Consent Decree—technical advisor, arbiter, and facilitator. The Monitoring Team's work in each role is summarized below.  The details of the Monitoring Team's work, recorded on time sheets for each Monitoring Team member in 1/10 hour increments, are reflected in the Monitoring Team's approved invoices, which are available on the Monitoring Team's website at **https://www.bpdmonitor.com/ monthly-statements**.

The Consent Decree provides that the Monitoring Team will be paid $1,475,000 per year in fees and expenses. For the first 33 months of its work (October 2017 through June 2020), the City paid the Monitoring Team $4,189,363.00 in fees and $175,572.68 in expenses. In addition, from October 2017 through June 2020, the Monitoring Team contributed pro bono services for its work on the Consent Decree in an amount equal to $1,843,247.80, meaning that 29.7% of the Monitoring Team's work during the 33 months was at no cost to the City.

## ENGAGEMENT WITH STAKEHOLDERS

### COMMUNITY ENGAGEMENT

From the beginning, the Monitoring Team has engaged in active, affirmative community outreach. A core group of Team members are devoted to community engagement: lead monitor, Ken Thompson; deputy monitors Seth Rosenthal and Chuck Ramsey; lead community liaison Ray Kelly; community engagement coordinator Darnyle Wharton; and community engagement specialist Jessica Drake. This group meets once every week to debrief and plan community engagement activity.

As the Consent Decree requires, the Monitoring Team has held community forums once every three months, rotating from one part of the City to another. During the COVID-19 pandemic, the Monitoring Team held its community forum virtually on Facebook Live.

In addition to holding the required community forums, the Monitoring Team and its community engagement team have been meeting with community members where they live. Monitoring Team members have attended or convened dozens of community meetings in different parts of the City, including meetings of neighborhood associations, faith-based organizations, civic leaders, advocacy organizations, and affinity groups. The meetings are intended to inform community members about the Consent Decree process, to obtain input on improving the process, and to listen to their views about BPD.

The Monitoring Team hosts bimonthly Facebook Live sessions. During these sessions, community members are given the opportunity to post questions online and obtain real-time answers from Monitoring Team leadership. One of the last Facebook Live session, held in June 2020 during the COVID-19 pandemic and in the wake of the killing of George Floyd in Minneapolis, received over 1,700 views. Additionally, in the first year of monitoring, community engagement team members participated in several "corner crawls," canvassing neighborhoods and engaging in discussions with residents about the Consent Decree. Although temporarily halted during the pandemic, but restarted this past summer, lead community liaison Ray Kelly also issues a monthly newsletter called "The Monthly Monitor." The newsletter is emailed to the Monitoring Team's distribution list and linked from the Monitoring Team's Facebook and Twitter accounts. The newsletter provides information about recent and upcoming developments under the Consent Decree, with a focus on opportunities for community members to engage in the reform process.

Perhaps the most essential aspect of the Monitoring Team's community engagement effort is the utilization of a team of neighborhood liaisons. There is one liaison in each of the City's nine police districts. Overseen by the team's lead community liaison, Ray Kelly, and community engagement coordinator, Darnyle Wharton, the neighborhood liaisons educate their neighbors about the Consent Decree and the work of the Monitoring Team and serve as the Team's initial points of contact for information and opinions about the performance and conduct of BPD officers, which the Team will need to fully assess BPD's compliance with the Consent Decree. The neighborhood liaisons hold regular "office hours" at local libraries and community centers, attend community meetings and events in their districts, and canvass their neighborhoods to educate community members about the Consent Decree. The neighborhood liaison team is one of a kind: no other consent decree monitoring team has one.

In addition to conducting affirmative, localized outreach to inform and hear from community members about BPD and the reform process, the Monitoring Team has pursued targeted engagement with community members around specific Consent Decree requirements, eliciting written community input on proposed BPD policies and training programs. Under each of the annual Monitoring Plans, the Monitoring Team built in a community feedback component. (BPD and DOJ also have their own feedback mechanisms). As the Monitoring Team's Third-Year Monitoring Plan submission explains: "for each policy undergoing revision, and for each training curriculum being developed, the Third-Year Plan gives community members two separate opportunities for feedback—the first after BPD collaborates with the Monitoring Team and DOJ and produces an initial draft, the second after BPD addresses and incorporates feedback from that initial Comment Period and produces a final draft." ECF No. 290 at 15.

Over the past thirty months, the Monitoring Team, BPD and DOJ sought and received meaningful public comment on dozens of policies covering every area of the Consent Decree, including use of force; stops, searches and arrests; First Amendment-protected activities; misconduct investigations; youth interactions; responding to reports of sexual assault; and interactions with individuals with behavioral health disabilities. Community members similarly provided input on draft curricula for training on use of force; stops, searches and arrests; fair and impartial policing; behavioral health awareness and crisis intervention; responses to reports of sexual assault; and body-worn camera use. Community members also have provided feedback on draft reports and plans for improving City services and BPD operations, including a Community Policing Plan; a "Gap Analysis" identifying the deficiencies in the City's behavioral health systems; an assessment of BPD's memorandum of understanding with Baltimore School Police; a Technology Resource Plan; and Staffing, Hiring and Retention Plans.

To elicit community feedback on these deliverables, the Monitoring Team posted and received comments in response to surveys on its website, received detailed letters and e-mails from community members and organizations, and welcomed more informal oral feedback from community members. The Monitoring

Team shared whatever feedback it received with BPD. In turn, BPD revised each deliverable in response to all feedback provided (that is, feedback provided to BPD, the Monitoring Team and DOJ), collaborated with the Monitoring Team and DOJ to ensure that the revised drafts properly reflected that feedback, and then published a final curriculum, report, plan or policy following approval by DOJ and the Monitoring Team.

In 2019, BPD formed and began utilizing a Community Training Review Committee consisting of community members who attend and provide feedback on in-service training programs while they are in development. Thus far, the CTRC has participated in and provided feedback on in-service training programs on use of force, stops, searches and arrests, and fair and impartial policing. Monitoring Team members and DOJ representatives attended and provided feedback at subsequent pilot sessions involving both Training Academy instructors and other officers.

## COMMUNICATION WITH THE PARTIES

Since its appointment, the Monitoring Team has communicated with BPD, the City and DOJ multiple times on a daily basis—in in-person meetings, in conference calls, and by email. Monitoring Team members have worked exhaustively with the parties to make sure BPD and the City produce all the deliverables the Monitoring Plans have required. By way of example, since January 2020, even with the limitations posed by the pandemic, the Monitoring Team and DOJ have collaborated with BPD and provided extensive oral and written comments and written line edits on the following deliverables, among others:

- Drafts of in-class curriculum for training on stops, searches and arrests, as well as pilot tests of that training

- Drafts of e-learning and in-class curriculum for training on behavioral health awareness and crisis intervention for recruits, officers, specialized CIT officers, and 911 call-takers and dispatchers

- Drafts of in-class curriculum for both Sex Offense Unit investigators and patrol officers on investigations of reports of sexual assault

- Drafts of e-learning on First Amendment-protected activities

- Drafts of revised policies, including policies on misconduct investigations and discipline, youth interactions, and stops, searches and arrests

- Draft BPD reports on responses to First Amendment-protected activities, sex crimes investigations, and arrests resulting in releases without charge; and

- Draft community policing and staffing plans

## POLICE ENGAGEMENT

In addition to conferring daily with members of BPD's Consent Decree Implementation Unit, City Law Department attorneys representing BPD, and BPD command staff, the Monitoring Team engages directly with BPD members. Monitoring Team members have established relationships with union leaders and spent substantial time at BPD's Training Academy (where recruit, in-service, and field training officer training are conducted) and Public Integrity Bureau (which investigates allegations of officer misconduct).

The Monitoring Team also has established and meets periodically with an informal group of rank-and-file officers to obtain their candid feedback on the Consent Decree, the positive attributes of BPD, and the

challenges facing BPD. Although temporarily halted because of the coronavirus pandemic, Monitoring Team members—and Judge Bredar himself—also periodically go on ride-alongs with BPD officers who regularly furnish their views on the Consent Decree and policing in Baltimore. Moreover, in May 2019, as discussed below, the Monitoring Team conducted formal focus groups of BPD officers, detectives, and supervisors to listen to their thoughts and gather their ideas about effective reform.

Soon after our appointment, the Monitoring Team established a protocol for notification and potential response to critical incidents involving BPD officers, such as officer-involved shootings. The notification is immediate and allows for local Monitoring Team members or out-of-town members in Baltimore to go to the scene to observe BPD's response. The notification protocol has been utilized every time there has been an officer-involved shooting over the past 30 months, and a Monitoring Team member, usually lead monitor Ken Thompson, always has responded to the scene.

## MEETINGS WITH THE COURT

The Monitoring Team's leadership, including Ken Thompson, Seth Rosenthal, Chuck Ramsey, Hassan Aden and Theron Bowman, communicate regularly with Judge Bredar—in person, by telephone, and by email—to update him on developments, to advise him, and to take direction.

Early on in the reform process, Judge Bredar determined that each month he would hold a three-hour working session with the Monitoring Team and the parties to discuss developments and challenges in a specific area of the Consent Decree. In recent months, the meetings have covered not only BPD's progress on specific topics (including, *e.g.*, sexual assault investigations, crisis intervention, and stops, searches and arrests), but developments in what the Court and the Monitoring Team view as the indispensable structural elements of the reform process: misconduct investigations and discipline (*i.e.*, integrity and accountability), training, technology, and staffing.

# ASSESSMENTS AND TECHNICAL ASSISTANCE

Since the inception of the First-Year Monitoring Plan in February 2018, the Monitoring Team has assessed BPD's performance and assisted BPD in revising its policies in every area of the Consent Decree; developing and providing training on the revised policies; completing studies and plans involving technology, community policing, staffing, recruitment, retention, the City's behavioral health system, and BPD's memorandum of understanding with the Baltimore School Police; and conducting reviews of BPD's performance in certain areas.

Because the early years of the Consent Decree have necessarily focused on implementing foundational reforms, the Monitoring Team has spent much of its time assisting with and evaluating policy revisions, training curriculum, and training delivery. As BPD moves toward completing training on its revised policies, and especially as BPD completes implementation of new technology enabling more comprehensive, more reliable data collection and analysis, the Monitoring Team will shift its focus to compliance reviews and outcome assessments.

## POLICY REVISIONS

Drawing on their expertise and knowledge of national best practices, the Monitoring Team has assessed and advised BPD on revisions to approximately fifty policies covering every area of the Consent Decree. As explained in more detail in the Findings section below, those policies address:

- Use of force
- Stops, searches and arrests
- Fair and impartial policing
- Misconduct investigations and discipline
- First Amendment-protected activities
- Transportation of arrestees
- Youth interactions
- Interactions with individuals with behavioral health disabilities and in crisis
- Responses to reports of sexual assault
- Disclosure of exculpatory evidence in criminal cases
- Officer wellness
- Officer peer support

## TRAINING

As BPD has finalized revisions to its policies, the Monitoring Team has spent an increasing amount of time observing and assessing BPD's development and delivery of training curricula. The first tranche of Consent Decree-mandated classroom training, which covered use of force and related aspects of fair and impartial policing, was delivered to all sworn BPD personnel (with minor exceptions that have now been addressed) between June and October 2019. The second tranche, which covers stops, searches and arrests and related aspects of fair and impartial policing, began in February 2020, was interrupted for several months because of the coronavirus, and re-started (with smaller class sizes due to physical distancing restrictions) in mid-July 2020, with an expected completion date of December 2020. Throughout these in-service training courses, Monitoring Team members and DOJ attorneys have provided extensive feedback to Academy supervisors and instructors. Each observed training day is typically followed with a debrief among Academy supervisors and instructors, Monitoring Team members, and DOJ members.

The Monitoring Team worked closely with BPD and DOJ to develop both e-learning and in-class training curricula on use of force, stops, searches, arrests and related aspects of fair and impartial policing. Officers had to complete e-learning and pass on-line tests on these topics before they could participate in the in-class components. The Monitoring Team pored over drafts of the curricula, participated in extensive working sessions to revise them, and observed and critiqued pilot testing of the in-class curricula.

The Monitoring Team also has collaborated with BPD and DOJ to develop e-learning and classroom curricula for training on behavioral health awareness and crisis intervention and responses to sexual assault, as well as e-learning curricula on First Amendment-protected activities and body worn camera use.

## FOUNDATIONAL ASSESSMENTS AND REFORM PLANS

Some of the foundational work required by the Consent Decree entails assessing BPD's present capacity to implement reforms and, where BPD falls short, developing a plan for ensuring that those reforms are achievable. Over the past 30 months, the Monitoring Team has reviewed, worked with BPD, the City and DOJ to develop, and evaluated the following:

- A technology plan, which serves as the blueprint for modernizing BPD's IT systems so that report-writing is less time-consuming and cumbersome for officers, supervision is more efficient and data-driven, and rigorous analysis of Departmental trends is finally feasible.

- A comprehensive staffing plan, which seeks to address BPD's personnel shortcomings and needs.

- Plans for improving BPD's efforts to hire and retain officers

- A community policing plan designed to ensure that BPD officers do not spend all of their time responding to calls for service and instead spend adequate time on pro-active policing, engaging with community members and earning their trust.

- A detailed critical assessment, or "Gap Analysis," of City programs devoted to assisting individuals with behavioral health disabilities and histories of substance abuse.

- An assessment of BPD's memorandum of understanding with Baltimore School Police. The objective of the assessment is to improve BPD's coordination with BSP and to modify the MOU accordingly.

## SURVEYS

As described in detail in the Findings section, the Monitoring Team thus far has conducted an initial community survey, an initial custodial arrestee survey, and an initial set of officer focus groups.

The Monitoring Team and the Institute for Urban Research at Morgan State University are currently planning a second community survey. The methodology is being refined to include a true random sample intended to replicate the demographics of Baltimore. It will continue to include a purposive component designed to reach marginalized populations. The second survey has had to be delayed because of the pandemic, which potentially limits in-person interviewing. The Monitoring Team, the City, BPD and DOJ are in the process of making adjustments to the methodology to account for these limitations.

## COMPLIANCE REVIEWS AND OUTCOME ASSESSMENTS

The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments. Compliance reviews are qualitative evaluations of BPD performance in different areas of the Consent Decree. They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with Consent Decree requirements (CD 454). For instance, over time, are the quality of internal investigations improving, are uses of force increasingly well-justified and well-reported, and are investigative stops more routinely supported by well-articulated reasonable suspicion and arrests more routinely supported by well-articulated probable cause?

Outcome assessments, by contrast, are quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact—whether, independent and apart from BPD's progress toward compliance with Consent Decree requirements, policing is changing in the real world (CD 456). For instance, are the policy revisions and training in the area of stops, searches and arrests producing a greater percentage of investigative stops that turn up evidence of prosecutable criminal activity and a lesser percentage of weapons pat downs and searches that turn up no guns or contraband? Or are the policy revisions and training on use of force, which emphasize de-escalation, leading to fewer encounters requiring more serious Level 2 and Level 3 uses of force?

While providing technical assistance and evaluating policy revisions, training and plans for organizational change (*e.g.*, in staffing, supervision, and technology) make up much of the Monitoring Team's work in the early years of the Consent Decree, compliance reviews and outcome assessments will make up most of the work in later years, once the foundational reforms are in place.

The Consent Decree process is now at the point when the Monitoring Team will begin focusing increasingly on measuring progress through compliance reviews and outcome assessments. Presently, however, measuring progress is effectively limited to *qualitative* evaluations of BPD performance. That is because the manifest deficiencies in BPD's IT systems and data collection practices substantially restrict evaluations that rely on quantitative data. Thus, while the Monitoring Team has begun to conduct qualitative compliance reviews in certain areas, it will be hampered in its ability to conduct many of the outcome assessments required by paragraph 459 of the Consent Decree, as well as compliance reviews that entail reliance on quantitative data. At this stage, due to the unreliability, incompleteness or total absence of relevant data, most such evaluations would be of limited value and extremely difficult to perform. The unfortunate result is that, in many areas, the Monitoring Team will not be able to establish meaningful baselines against which to measure BPD's progress for approximately another 12 to 18 months, after BPD finishes upgrading its Record Management System and officers begin reliably using electronic field-based reporting. That delay will inevitably prolong the life of the Consent Decree, as BPD must be able to show sustained improvement in each area in order to achieve substantial and effective compliance.

Over the past year, the Monitoring Team conducted its first comprehensive compliance review of internal investigations by the Public Integrity Bureau. The review covered a randomly drawn sample of the investigations PIB conducted in 2018. A summary of the Monitoring Team's conclusions from this compliance review are included in the Misconduct Investigations and Discipline section below, and the full report is included in **Exhibit 2**.

The Monitoring Team will soon begin comprehensive compliance reviews of use of force incidents. The use of force review will include a randomly drawn sample of force cases from 2018-19. For each case, the Monitoring Team will evaluate the appropriateness of the force used, the accuracy and completeness of the reporting, and the quality of supervisory review.

Due to the above-mentioned deficiencies in BPD's IT systems and data collection practices, the Monitoring Team's work on outcome assessments has been preparatory thus far. In the first year of monitoring, the Monitoring Team and statistical expert Dr. Ralph Taylor invested significant time in understanding which relevant data BPD has available and which, if any, of the required outcome assessments would be worthwhile or even possible. In December 2018, due to competing professional commitments, Dr. Taylor had to resign from the Monitoring Team. After an extensive search, the Monitoring Team contracted with the Crime and Justice Institute at Community Resources for Justice ("CJI") to help design and perform its outcome assessments. The Monitoring Team and CJI are partnering with Dr. Gabriela Wasileski of the University of Baltimore, a statistical and social science expert. The Monitoring Team has worked extensively with its new experts to chart a course for completing the outcome assessments required by the Consent Decree.

One area of note is stops, searches and arrests. DOJ's investigation found a pattern or practice of race-based and otherwise unlawful stops, searches and arrests. It is not an overstatement to say that reforming BPD's stop, search and arrest practices is at the heart of the Consent Decree. Indeed, the fractured relationship between BPD and many communities is thought to be largely attributable to BPD's past practice of making stops, searches and arrests without adequate legal justification. Accordingly, the availability and integrity of BPD's data on stops, searches and arrests has been, and continues to be, of special interest to

the Monitoring Team. As the Monitoring Team has previously reported, this data, particularly on stops and searches, is both notoriously hard to access (requiring manual review of scanned paper reports) and incomplete (due to underreporting by BPD officers). Given the data's inadequacy, the Monitoring Team and the parties have frequently discussed, and will continue to discuss, the feasibility and the utility of evaluating stop, searches and arrests prior to the introduction of a new records management system.

Unfortunately, however, the quantitative review of the data that the Consent Decree requires—to determine aggregate performance and investigate disparate impact—is probably impracticable at this point. A qualitative compliance review of some subset of reports on stops, searches or arrests—to determine officer compliance with policy on conduct and reporting, plus adherence to Consent Decree requirements on supervision—may be feasible, but to make it so, the Monitoring Team will first have to find a way to eliminate or reduce the cumbersomeness of the exercise. To take one example, to determine the frequency with which investigative stops turn up evidence of a crime and the adequacy of the documented justifications for such stops, the Monitoring Team would have to read through thousands of incident reports in hard copy simply to determine which ones feature investigative stops, because BPD's current record management system does not currently have a way of segregating encounters initiated by investigative stops.

## DIAGNOSTIC PERFORMANCE REVIEWS

As part of the work it must do to assess BPD's compliance, the Monitoring Team also has been conducting diagnostic analyses of BPD's performance in discrete matters. The purpose of these analyses is not to formally gauge BPD's compliance with the Consent Decree, but rather to get a sense of how certain core functions are currently being performed and, if they are not being performed effectively or in compliance with the Consent Decree, to provide BPD guidance on how to improve performance. The ultimate objective is for BPD to meaningfully engage in its own after-action assessments so that when it finds problems, it will self-correct and take remedial action on its own, without prompting from the Monitoring Team or DOJ.

The Monitoring Team conducted one such diagnostic analysis by evaluating the propriety of BPD's interactions with civilians in the Harlem Park neighborhood following the shooting death of BPD Detective Sean Suiter. *See* ECF No. 126-1 at 56-67 (explaining concerns about how BPD officers performed and documented stops, searches and arrests). In December 2018, as a result of the Monitoring Team's findings, as well as the findings of an Internal Review Board that conducted a separate assessment of BPD's investigation of Detective Suiter's death, BPD prepared and delivered a full-day training for all command staff on both constitutional requirements for conducting stops, searches and arrests and proper use of an Incident Command System for responding to significant events. In addition, BPD prepared and delivered to all officers a mandatory e-learning training program on BPD policies and constitutional requirements on stops, searches and arrests through its PowerDMS system. The Monitoring Team and DOJ provided input on the lesson plan for the command staff training, attended that training (as did Judge Bredar), and gave BPD feedback following the training. The Monitoring Team and DOJ also provided input on the e-learning lesson plan for the officer training on stops, searches and arrests.

Since its assessment of the Harlem Park lockdown, the Monitoring Team has routinely performed similar assessments. For instance, we show up at the scene, participate in briefings, and scrupulously review reports and body-worn camera footage of police-involved shootings. A recent example is the July 2020 police-involved shooting of a man experiencing a behavioral health crisis in the basement of a home in Northeast Baltimore, which occurred in the context of both the recent, Consent Decree-mandated "Gap Analysis" identifying shortcomings in the City's behavioral health system and nationwide protests calling for allocating adequate resources to behavioral health care. As the Monitoring Team reported on its Facebook page:

From the beginning, the Monitoring Team has been closely following last week's shooting of a Baltimore man experiencing a behavioral health crisis. Lead monitor, Ken Thompson, was on the scene immediately following the shooting. Several team members, including the team's behavioral health expert Dr. Randy Dupont, watched the body worn camera footage, listened to the 911 call and dispatch recordings, and reviewed the police reports in the immediate aftermath of the incident. We also have been conferring regularly with Judge Bredar. And we paid close attention to today's public release of body-worn camera footage.

While Dr. Dupont and Monitoring Team leadership continue our 360 degree assessment of the incident [which the Monitoring Team plans to include a future report], one major question it raises is whether it resulted from gaps or deficiencies in the City's behavioral health system that were identified in a comprehensive, Consent Decree-mandated analysis published late last year. According to *The Sun*, ten days before the incident, the man who was shot was hospitalized during another behavioral health crisis. The Monitoring Team has yet to see evidence that there was adequate behavioral health follow-up after the man's discharge or adequate follow-up investigation to determine whether the man had additional weapons. That kind of follow up is critical, as it can reduce the risk that incidents like this will occur.

One of the goals of the Consent Decree is for the City to do the hard work of plugging the gaps in its behavioral health system so that these events became less frequent. As the Monitoring Team has reported, the City recently has started down this road in earnest, but it still has a long distance to travel.

In addition to this and other police-involved shootings, the Monitoring Team actively reviews non-lethal incidents involving BPD officers. In the past year, such incidents have included an arrest on Pennsylvania Avenue that was originally believed to involve an assault by bystanders on the BPD sergeant who made the arrest but recently resulted in criminal charges against the sergeant for making false statements regarding the incident; an officer's alleged use of a chokehold during a drug arrest; and several incidents that led to the indictment of a BPD sergeant for allegedly abusing his authority by using excessing force and making false arrests.  With these incidents, the Monitoring Team evaluates how BPD handles them just as closely as whether the involved officers engaged in misconduct. In even the most well-run law enforcement agencies, individual officers will periodically engage in misconduct. The health of an agency is determined by how effectively the agency responds.

In May and June 2020, as reported in the Executive Summary and First Amendment-Protected Activity Section above, the Monitoring Team conducted an intensive diagnostic evaluation of BPD's response to sustained demonstrations against police brutality in the wake of the killing of George Floyd in Minneapolis. We spent dozens of hours live-monitoring BPD's performance from BPD's command center and in the street. Our conclusions are included in the First Amendment-Protected Activities section below.

Finally, the Monitoring Team actively monitors approximately twenty specific PIB investigations at a time, receiving regular monthly updates from PIB supervisors. Once the investigations are concluded, the Monitoring Team and DOJ assess whether they were conducted and resolved properly, with an eye toward providing remedial guidance if they were not. In one case from 2018, which involved allegations that an officer exaggerated certain facts in his trial testimony in a drug case, the Monitoring Team and DOJ found shortcomings in PIB's investigation and conclusions and recommended certain remedial training for PIB investigators as a result. If the Monitoring Team observes similar shortcomings in other investigations, it will include its observations and recommended actions in future reports.

# EXHIBIT 1

| Section | Policy/Planning | Training | Implementation | | | | Sustained Compliance |
|---|---|---|---|---|---|---|---|
| | | | Not Yet Assessed | Off Track | On Track | Initial Compliance | |
| Community Oversight Task Force | Not Applicable | Not Started | In Progress | | | | |
| Community Policing | Complete | In Progress | | | | | |
| Stops, Field Interviews & Voluntary Contacts | Complete | In Progress | | | | | |
| Searches | Complete | In Progress | | | | | |
| Arrests | Complete | In Progress | | | | | |
| Stops, Searches & Arrests: Review & Supervision | Complete | In Progress | | | | | |
| Impartial Policing | Complete | In Progress | | | | | |
| Behavioral Health: General | Complete | In Progress | | | | | |
| Behavioral Health: CIT Officers | Complete | In Progress | | | | | |
| Behavioral Health: System Coordination & Improvement | Complete | Not Applicable | In Progress | | | | |
| Use of Force: General | Complete | Complete | In Progress | | | | |
| Use of Force: Reporting & Supervision | Complete | Complete | In Progress | | | | |
| Interactions with Youth | In Progress | Not Started | | | | | |
| Transportation | Complete | In Progress | | | | | |
| First Amendment | Complete | In Progress | | | | | |
| Sexual Assault Investigations | Complete | In Progress | | | | | |
| Technology Modernization | Complete | In Progress | | | | | |
| Policies Generally | Not Applicable | Not Applicable | In Progress | | | | |
| Training Generally | Complete | Not Applicable | In Progress | | | | |
| Supervision: Field Training | In Progress | Not Started | | | | | |
| Supervision: Duties & Training | In Progress | Not Started | | | | | |
| Supervision: Early Intervention System | Not Started | Not Started | | | | | |
| Misconduct: Intake | Complete | In Progress | | | | | |
| Misconduct: Investigations | Complete | In Progress | | | | | |
| Misconduct: Discipline | In Progress | Not Started | | | | | |
| Misconduct: Transparency | In Progress | Not Started | | | | | |
| School Police | Complete | Not Applicable | In Progress | | | | |
| Staffing, Recruitment & Retention | In Progress | Not Started | In Progress | | | | |
| Employee Performance Evaluations | In Progress | Not Started | | | | | |
| Promotions | Complete | Not Applicable | | | | | |
| Officer Assistance | Complete | In Progress | | | | | |

| Legend | | Not Applicable | Not Started | In Progress | Complete |
|---|---|---|---|---|---|

# EXHIBIT 2

Summary of Aggregate Results:
Monitoring Team Preliminary Baseline Assessment
of 2018 OPR Investigations

September 30, 2020

**EXECUTIVE SUMMARY**

This report summarizes the results of the Monitoring Team's review of the Baltimore Police Department's ("BPD" or "the Department") 2018 misconduct investigations, conducted at the time by the Department's Office of Professional Responsibility ("OPR"), which is now called the Public Integrity Bureau ("PIB"). The report is intended to establish a preliminary baseline for assessing the quality of misconduct investigations over the life of the Consent Decree.

This report is technical and details various statistical analyses throughout. As we are writing for several different audiences – the Court, the public, the City of Baltimore, BPD, the Department of Justice, and even academics – the report attempts to present the required information as simply, but as thoroughly, as possible.

This assessment is referred to as a "preliminary baseline assessment" for a few reasons. First, the methodology that the Monitoring Team deployed, with the agreement of the Parties, was designed to get a working overview of where BPD stood on misconduct investigations as of 2018 – a point at which BPD had tried to make some important changes but was still contemplating implementing many other, core reforms. Consequently, many case files were reviewed by just one Monitoring Team reviewer. In the future, when there is reason to believe that BPD's performance may be closer to the level of compliance, a more rigorous methodology is likely to be appropriate.

Second, this assessment is not an assessment of the *current* quality of the Department's internal affairs investigations. It does not capture many systemic changes that have already been made. Instead, this report captures where the Department was in 2018 with regard to the requirements of the Consent Decree for misconduct investigations. Considered in this light, the findings of this assessment are wholly unsurprising – and, perhaps to some extent, underwhelming.

The main findings of this report include the following:

- **The overall quality of BPD's process for investigating and making findings in misconduct investigations remains in need of significant improvement.** Some 40 percent of OPR investigations in 2018 were determined by Monitoring Team experts to be of poor or fair quality (on a five-point scale from poor to excellent, defined in detail below). Although a majority (61 percent) of cases were rated as "good" or above, more cases were rated as "poor" or "fair" in quality (40 percent) than "very good" or "excellent" (23 percent), indicating a weighting towards the lower half.

  Even among the cases that were "good," "very good," or "excellent," systemic deficiencies indicate that BPD will need to travel a significant distance to reach compliance with the Consent Decree's many provisions relating to misconduct investigations. For instance,

2

almost 42 percent of the cases we reviewed were "administratively closed" without a disposition (a determination on the merits). Of the cases that made it to disposition, a full 81 percent did not have narratives that "include a precise description of evidence that either justifies or fails to justify officer's conduct based on investigator's independent review of facts/circumstances of the incident." Material inconsistencies in the evidence were resolved adequately in only 34 percent of cases, and determinations about the credibility of witness statements were properly made in only 35 percent of cases.

- **The condition of misconduct case files was poor.** The documentation of investigative materials was chaotic and inconsistent. As a result, reviewers had great difficulty in making their assessments and, unfortunately, frequently had to use a score of "unable to determine" when auditing the many specific requirements of the Decree.

- **The quality of classification and intake of complaints was poor.** The Classification and Intake Manual developed through the Consent Decree process has not yet been implemented. However, using that as a measure for this report, the classification and intake deadlines, although often difficult to discern from the files, were not met in half of cases we reviewed. In addition, the most serious alleged rule violation was used to determine classification and OPR jurisdiction in only two-thirds of cases.

- **Allegations of excessive force, unlawful search and seizure, First Amendment violations, and criminal acts were rare and typically well-investigated.**

- **Communication with complainants was poor overall.** Reviewers could certify that complainants were sent written notice of OPR's receipt of their complaints in only a quarter of cases and were sent status updates only a third of the time. However, in contrast to the DOJ Findings, which emphasized that OPR investigators discouraged complainant participation in the investigation, reviewers did not identify any such cases. This is encouraging.

- **Communication with employees was likewise poor.** BPD provided timely notification to personnel who were the subjects of complaints in less than a quarter of cases. Reviewers did not identify any cases where the notification jeopardized the investigation.

- **Cases were inefficiently managed, which resulted in consistently missed timelines and wasted efforts on minor cases.** Despite the poor condition of case files, reviewers were able to determinate that 60 percent of investigations were not completed within the 90 day deadline. Extensions of time were never requested.

- **Other performance issues surfacing during the investigation, such as repetitive problematic behavior, training issues, or the need to explore policy revisions, were rarely considered.**

- **Investigators frequently failed to interview complainants and other necessary witnesses.** Complainants were interviewed only 41 percent of the time; subject employees were interviewed in 44 percent of cases. On the positive side, reviewers found bias, leading questions, and concerns about investigator behavior very rarely in both complainant and subject employee interviews. BPD employee witnesses were identified in about a third of cases, but of those, only 61 percent were actually interviewed. Civilian witness interviews were very rare, as were interviews of non-BPD law enforcement witnesses. Only 22 percent of cases had complete audio or video records of all witness interviews.

- **Across misconduct investigations, complainant injuries were uncommon**.  Injuries occurred in only 6.4 percent of cases; officer injuries occurred less than one percent of the time and never due to subject actions. Complainant injuries were documented, and photographs taken, in a majority of cases.

**Overall, there is much that needs to improve before misconduct investigations at BPD will reach compliance with the terms of the Consent Decree.**  As noted repeatedly in this report, the quality of BPD's misconduct investigations in 2018 is not unexpected. Although there may be some improvement when comparing investigations in 2018 and investigations from 2010 through 2015, the period of DOJ's investigation of BPD, BPD is still in the process of making major changes in its practices for addressing and investigating allegations of misconduct. Since 2018, the Department has been working hard on implementing these changes, including producing new, high quality Intake, Classification and Investigations Manuals for the Public Integrity Bureau ("PIB," which is what OPR is now called).

The findings in this report confirm the need for BPD to overhaul the way that it addresses officer misconduct and sets the level for gauging future improvements.

## I.   INTRODUCTION

This report summarizes the results of the Monitoring Team's assessment of the Baltimore Police Department's misconduct investigations in 2018, conducted by the Department's Office of Professional Responsibility("OPR"), which at the time was the primary internal affairs unit for the Department. The purpose of the evaluation was to assess the Department's baseline level of performance, during an era prior to implementation of the significant reforms required by the Consent Decree between the City of Baltimore, BPD and the United States (the "Consent Decree"). From these baseline results, progress over time can be measured.

The Consent Decree expressly recognizes that "[a] robust and well-functioning accountability system in which officers are held to the highest standards of integrity is critical to BPD's legitimacy, and a priority of the Department." Dkt. No. 2 ¶ 329. Accordingly, it sets forth procedural and substantive requirements for BPD's internal investigations function, with specific emphasis on complaints implicating constitutional issues, such as False Arrest, Excessive Force, and infringement on First Amendment-protected activities. *See* Dkt. No. 2 at 112 *et seq*. The Decree clearly defines what a well-functioning accountability system looks like:

> [O]ne in which BPD: openly and readily receives complaints reported by civilians and officers and fully, fairly, and efficiently investigates them; supports all investigative findings by the appropriate standard of proof and documents them in writing; holds accountable all officers who commit misconduct pursuant to a disciplinary system that is fair, consistent, and provides due process; and treats all individuals who participate in BPD's internal disciplinary process—including complainants, officers, and witnesses—with respect and dignity. *Id.*

DOJ identified systemic failures in BPD's investigation and adjudication of officer misconduct, including: "discouraging individuals from filing complaints; poor investigative techniques; unnecessary delays; minimal review and supervision; and a persistent failure to discipline officers for misconduct, even in cases of repeated or egregious violations." Findings Letter at 139. Specific issues included discouraging members of the public from filing complaints, misclassifying complaints to minimize them, administratively closing complaints prematurely, and failure to investigate complaints in a timely manner. *Id.*, 140 *et seq.* These deficiencies, combined with the failure to properly supervise investigations and inadequate civilian oversight, resulted in systemic failures in accountability at the BPD.

At the time of the Consent Decree, the Department's Office of Professional Responsibility conducted investigations of officer misconduct. Consequently, the Decree's specific requirements attach to OPR. BPD Police Commissioner Michael Harrison has since restructured the department to create the Public Integrity Bureau ("PIB"), which investigates allegations of misconduct for BPD. At the time of this review, OPR[1] had primary responsibility for investigating allegations of misconduct.

---

[1] Currently, PIB investigates allegations of misconduct and its efficacy will be assessed in subsequent reports. For purposes of this report, the Monitoring Team uses "OPR" to refer to the investigative arm of BPD, as that was the structure at the time the reviewed cases were completed and to make clear that this is not a review of the current structure. Again, this whole report is a baseline.

Separately, Baltimore's Civilian Review Board ("CRB") reviews allegations of misconduct that fall within its statutory purview: complaints lodged by members of the public regarding police officers' (1) abusive language, (2) false arrest, (3) false imprisonment, (4) harassment, and (5) excessive force. Those allegations are defined in the Code of Public Local Laws of Baltimore City (P.L.L.), §§ 16-41(b)–(f).

Deputy Commissioner Brian Nadeau assumed leadership of PIB and the OPR function in September 2019 and has been working toward overhauling PIB.

On November 18, 2019, the Monitoring Team approved a new Investigations Manual for PIB and filed it with the Court. Dkt No. 263. That manual addresses the processes, standards, and benchmarks to which PIB investigators must adhere as they conduct an investigation. A separate manual on the intake and classification of civilian complaints, the PIB Intake and Classification Manual, has also been filed with the Court.

While a part of the Third-Year Monitoring Plan, this assessment comes at a very early point in the process of overhauling the accountability systems at BPD, especially as the bulk of cases that the Monitoring Team reviewed were completed in 2018 – before BPD began making any meaningful changes to its accountability systems. Therefore, it is important to recognize that this assessment is <u>not</u> designed to test whether BPD has successfully implemented reforms to their accountability systems. Instead, this assessment establishes a general baseline to measure whether the changes that are currently underway actually result in improvements.

BPD will have successfully adopted of a robust accountability system not simply when it achieves compliance with the many specific, technical requirements of the Decree, but when officers and community members alike develop confidence in its ability to fairly identify, investigate, and address conduct that violates Departmental rules.

## II.   METHODOLOGY

The Monitoring Team has done its best to set clear guidelines for reviewers, to train reviewers, and to hold itself accountable for its results. Accordingly, this report, including its qualitative findings, is heavily data-driven and technical. In this section, we explain the methodological decisions we made that generated the data on which our conclusions rely.

The methodology outlined here was developed for the purposes of conducting a *preliminary baseline assessment*.  The Parties and Monitoring Team agreed to the following methodology in order to identify a clearer understanding of where BPD stood with respect to the quality of misconduct investigations in 2018 – before many Consent Decree reforms were implemented – in the most effective and efficient manner.   An expanded methodology is anticipated as the

Monitoring Team charts progress over time and begins to assess whether BPD's various reforms have been implemented sufficiently to constitute eventual compliance with the provisions of the Decree.

## A.    Development of the Methodology

The methodology for this assessment was developed in collaboration with the City of Baltimore, BPD, the Department of Justice and the Monitoring Team. The sample size and the survey instrument were subject to discussion and agreed on by the parties, with full opportunity to consult with external statistical experts and provide feedback during the development process. The reviewers were provided with the data collection instrument and the coding instructions. As discussed in more detail below, because the case files were chaotic and inconsistent, there was no uniform way for reviewers to obtain the required information from the case files. Instead, reviewers had to carefully examine each case file to obtain whatever information they could in order to complete the survey instrument.

## B.    Sample Size and Composition of Cases

As of June 2019, the Department reported a total of 1,372 completed OPR investigations initiated in 2018, in addition to 112 cases with a separate status of "suspended" and 5 cases with a status of "initial." Since these 117 cases were not really "completed," they were eliminated from the initial sample.

BPD sorted the completed cases into several "incident types," purportedly based on their origin (internal or external), the nature of the alleged violation (failure to appear in court, ethics, firearm discharges, serious incidents), and the particular unit responsible for the investigation (Command, Ethics, SIRT (Special Investigation Response Team Investigations ("SIRT"), or Internal Affairs).

Specifically, the incident types BPD used[2] were:

- Command Investigations ("CIU") – minor investigations that were handled by command staff (not OPR) because BPD determined they did not warrant a full internal affairs investigation
- Court Failure to Appear ("FTA") – officer failed to appear in court as scheduled
- Ethics – complaint alleges misconduct by OPR personnel, corruption, or on-going misconduct, or requires proactive investigation

---

[2] BPD has modified the classification process in its recently completed PIB Intake & Classifications manual. PIB now includes three investigative entities – Internal Affairs, Ethics, and SIRT – and uses three  complaint designations – Serious Misconduct, Other Misconduct, and Service Complaint.

- External Complaints – a complaint of misconduct made by a member of the public
- Firearm Discharges – an investigation into the discharge of a firearm
- Internal Complaints – a complaint made by a BPD employee
- SIRT – investigations of serious use of force incidents

To the extent that the explanations or definitions of these incident types are unclear, it should be noted that these were previously developed by the Department – and are distinct from categories that BPD will use under the Consent Decree in the future.

In their evaluations, Monitoring Team reviewers found that these classifications were inconsistently applied and subject to overlap, and the distinctions were often unhelpful. For example, "External Complaints" could include ethics or firearms complaints – and could potentially be handled as a Command Investigation. CIU complaints entailed the least discernibly consistent investigation process, while FTA cases were the most consistent and thorough, as they only addressed a simple, discrete issue – whether the officer appeared in court. Given these conceptual shortcomings in incident type classifications, the value of sampling according to incident type was simply to ensure that a comprehensive cross-section of cases was evaluated.  The table below provides the total breakdown of 1,372 "completed" cases based on BPD-designated incident type:

| 1,122 | Command Investigations |
| 64 | Court Failure to Appear |
| 18 | Ethics |
| 105 | External Complaints |
| 4 | Firearms Discharge |
| 55 | Internal Complaints |
| 4 | SIRT Investigations |

To secure the appropriate representation for each case category, the final sample was randomly selected as follows:

| N | Margin of Error | Category |
|---|---|---|
| 89 | ±10% | CIU |
| 39 | ±10% | FTA |
| 18 | ±0% | Ethics |
| 51 | ±10% | External Complaints |
| 4 | ±0% | Firearms Discharge |
| 36 | ±10% | Internal Complaints |
| 4 | ±0% | SIRT Investigations |
| **241** | **±8%** | **TOTAL** |

**C.    Cases Reviewed by Multiple Reviewers to Examine Inter-Rater Reliability**

A basic question for any assessment with multiple reviewers is whether the reviewers are interpreting the questions consistently and providing consistent responses. To test this, a sub-sample of the 241 total cases (N=40) was randomly selected for review by two independent reviewers.  For these 40 cases, the two reviewers separately reviewed and gathered data from this sub-sample of logged and completed misconduct investigation files. Note that the 18 "Internal Investigations" cases contained a cross-section of Ethics, External Complaints, Firearm Discharges, Internal Complaints, and SIRT investigations.

| 18 | Internal Investigations |
|----|-------------------------|
| 9  | Court FTA               |
| 13 | CIU                     |

These 40 cases were integrated into the overall sample size, but as they were double-reviewed, the value of each case was weighted at .5, which gave proportionate effect to each individual case and avoided double counting these cases.

The purpose of establishing a sub-set of cases to be reviewed by two, rather than just one, reviewer was to be able to evaluate whether anything about the nature of the assessment instrument or about specific reviewer biases may have affected the results.  In more formal terms, the double-review of some cases allow for the computation of inter-rater reliability.

### D.      Measuring Inter-Rater Reliability

The inter-rater reliability of the double-reviewed cases was measured as a percent agreement. Proportion or percentage of agreement is the most straight-forward and widely used way to assess consistency/reliability of scores on categorical variables even though levels of agreement can arise purely by chance. In other words, some agreement is expected because two raters could come to the same conclusion accidentally rather than because they actually agreed on the established code. Thus, throughout this report, where possible, an "agree" column in tables shows the percent of cases in which reviewers came to the same conclusion on any given question. The proportion of agreement – the "agree" column in the various tables presented in this report – demonstrates the consistency of responses provided by two independent reviewers.  It should be noted the "agree" column is *not* reported for questions with a small sample size – less than eight – or questions related to demographic information because the small size makes the statistical test less valid.

The Consent Decree places the burden on the City and BPD to demonstrate that it is affirmatively complying with the various requirements of the Consent Decree. With respect to misconduct investigations, the Decree requires BPD to "support all investigative findings by the appropriate standard of proof and document them in writing." Dkt. No. 2 at ¶¶ 329, 343. Therefore, where Monitoring Team reviewers said they were "Unable to Determine" whether an assessment

criterion had been met, those responses are combined with "No" responses to show BPD's overall noncompliance with a criterion. For purposes of assessment, then, the question is whether the City can demonstrate a sufficient number of "Yes" responses, making the relative percentage of "Yes" and "Not Yes" (*i.e.* "No" or "Unable to Determine") the central inquiry.[3]

The Monitoring Team is reporting the percentage agreement as a way of understanding the results, and the relative weight to assign to any one finding.  Low agreement on questions for cases that were reviewed by multiple reviewers can indicate a problem with the question being asked, a problem with reviewer understanding of the question, a problem in readily determining an appropriate answer based on the thing being reviewed, or that the question simply cannot be readily answered.

For the purposes of gauging progress and certify compliance going forward, any disagreement between raters will be addressed and reconciled, including with the assistance of a third reviewer. For purposes of this preliminary baseline assessment, the parties and the Monitoring Team agreed that devoting the resources to resolving disagreement was unnecessary for the purposes of this report.  Again, this assessment was geared toward establish a baseline in an area where the Parties expected, for a variety of reasons, that BPD would will need to make much additional progress going forward.  Where low rates of agreement were found on a given sub-question, the Monitoring Team, in collaboration with the parties, will reassess the survey instrument and the instructions provided to reviewers to ensure that future reviews yield more robust results.

As discussed throughout this report, the state of the case files varied greatly – some were complete and easy to navigate; some were chaotic and even internally inconsistent. Different case types, *e.g.*, CIU,  FTA, or internal complaint cases, all had different formats and were not always alike within each category. As one reviewer noted:

- Again, I note that the case summaries can be confusing. For example, dates don't always align with the cover sheets and reports. This seems to be strictly an administrative issue. It would be more efficient to eliminate the written checklist and sign-off sheet and go with a clearer integrated, automated solution.

Another reported:

- It continues to be difficult to make accurate assessments on timelines as reports are often not dated and summaries are inconsistent and confusing.

As OPR investigators did not investigate cases or document their investigations in a uniform manner, it was not possible to train Monitoring Team reviewers "how it is done." Reviewers were

---

[3] On cases where "no" was the desired answer, this was reverse-coded as "no" and "not no."

required to approach each case, figure out how it was structured, and investigate the materials to score the required evaluation criteria. Once PIB establishes a consistent intake, classification and investigation process, and especially once all PIB actions are electronically stored, future reviewers will be able to be trained specifically where in an investigation file to locate the information needed to score each evaluation requirement in the assessment instrument. This will lead to faster reviews and a higher percentage of reviewer agreement across the board.

Much of the disagreement between reviewers was found in sub-questions. The workflow of the survey instrument offered different options based on responses to questions. For example, if a reviewer indicated there were problems with an interview, the instrument provided options for exactly what the concern was. While there was good agreement between reviewers about whether an interview was problematic, the reasons for the concern varied between reviewers.

Sub-questions also exposed a complication in the methodology for determining percentage of reviewer agreement. Because the double-reviewed cases are compared against each other, if reviewers disagreed on a core question, that disagreement was necessarily carried over into the sub-questions. For example, in Q40, reviewers were asked whether the involved employee was interviewed. There was 67.5% percent agreement between reviewers on that question. Q42 ("Did the employee decline to be interviewed") only appeared as an option for reviewers who answered "no" to Q40; otherwise the instrument skipped the question. This appropriately controlled relevant follow-up questions for the single-reviewed cases. However, for double-reviewed cases, this resulted in missing values for reviewers that answered "yes" to the threshold question because that reviewer was not presented with the sub-question. The software read the comparison of a missing value with any other answer as disagreement. To fix this, we removed cases in sub-questions with missing values. Although this methodology lowered the sample size for the double-reviewed cases, it allows us to more accurately present the level of agreement and to overcome the limits of the logic in the software.

All of this leads to the conclusion that although the Monitoring Team includes percent agreement for transparency, readers should not over-focus on this metric and lose the forest for the trees. Throughout the report, the percent agreement was typically above 60 percent, with some outliers.

E.     **Testing the Survey Instrument**

In addition to the level of agreement between reviewers, the Monitoring Team explored the quality of the data collection instrument, seeking to determine whether the survey instrument was effective at answering the questions it was designed to answer. Thus, we computed a measure of internal consistency reliability, called the Kuder-Richardson ("KR-20"). The KR-20 measures the consistency of the score(s) of individual items on the data collection instrument. It can be interpreted similarly to Cronbach's alpha. For each section computed, the "alpha" is presented and

11

interpreted as a proportion of variance. The value of alpha tells us how closely related a set of items are as a group (do they measure the same phenomenon). Ideally, the alpha values should range between .70 and .90. An alpha of 0.6 and below would be considered poor reliability in most research situations; above .90 suggests redundancy in the questions. Generally, the alpha was good for the Monitoring Team's survey instrument. Areas where a low alpha is found will be reconsidered for the next iteration of the misconduct assessment.

Examining the results for this assessment, the Monitoring Team identified some questions that were either duplicative or in conflict with other questions. For example, Q33 was linked to Q31, but should have been linked to Q32 and limited to cases where there was an actual refusal to be interviewed. Similarly, Q50, Q57, and Q63, which also asked about documenting refusals to be interviewed, lacked the necessary precursor question of "Did the Complainant Grant Permission to Audio Record?" As such, the results have no value and are not reported, as they will only add confusion. Questions 33, 50, 57, and 63 are therefore excluded. The Monitoring Team will correct this survey error in the next review.

## III.  RESULTS

This report is logically divided into sections based on issue area. Some questions have been rearranged from their original order in the data collection instrument for reader clarity (although the charts include the question numbers for reference). The answers to the questions, both numerical and percentage of the sample size (N), are presented, and where appropriate, followed by the percent agreement (Agree) between reviewers for the double-reviewed cases and by the alpha value.

Sub-questions are indented in the tables to show their dependency on prior answers. The number of cases (N) within the sub-questions are also presented.

Again, the purpose of this report is to test the waters, not draw significant conclusions about the quality of OPR (now PIB) investigations. The results are not unexpected, as new polices and training have not yet been implemented.

The Monitoring Team notes generally here that, across some areas of evaluation and auditing, the reported "inter-rater agreement" rates for those cases that were evaluated by two reviewers are lower than the Team would typically want to see.  Overall, we believe that this is related, first, to the often chaotic and incomplete nature of the files – with documents seemingly randomly included or omitted – and similar pieces of information being reported differently on different forms or different reports.  Second, and especially within this context of unstructured and incomplete case files, reviewers used different, good-faith approaches to gauge the misconduct investigation in light of various requirements that BPD was, in many instances, not yet trying to satisfy in its

process – which led to diverging conclusions on some particular elements of the evaluation. The Team is optimistic that better, more complete case files structured with eye at compliance with Consent Decree requirements will allow reviewers, using an expanded methodology, to better operationalize areas of inquiry – yielding higher levels of agreement on some of the dimensions where there is less agreement than desired in this initial evaluation.

## OVERALL CASE EVALUATION

We begin with a discussion of the Monitoring Team's overall case evaluations. Although these evaluations are, to some extent, the least precise and the most subjective, an understanding of the overall quality of the investigations helps to guide an understanding of the more specific evaluations presented in the remainder of the report.

The Consent Decree requires that misconduct investigations be objective, comprehensive, and timely. Dkt. No. 2 ¶ 329. Accordingly, reviewers were asked to rate the overall quality of the investigations on a five-point scale, using the following definitions:

| |
|---|
| **5 – Excellent** – The investigation complied with all Consent Decree requirements and BPD protocols, and investigators made reasonable attempts to follow all leads and answer all material questions. The investigation was fair, thorough, objective, and timely. |
| **4 – Very Good** – The investigation complied with most Consent Decree requirements and BPD protocols and investigators made reasonable attempts to follow all leads and answer all material questions. |
| **3 – Good** – Although some aspects of the investigation could be improved, the identified flaws did not appear to materially or unduly impact the quality of the overall investigation. The resulting investigation provided sufficient information to evaluate the incident but could be improved. |
| **2 – Fair** – Several aspects of the investigation could be improved. Identified flaws materially impacted the quality of the overall investigation, and the resulting file provided insufficient information to evaluate the incident. |
| **1 – Poor** – All or nearly all aspects of the investigation could be improved. The investigation failed to establish sufficient information to support an evidence-based evaluation of the incident due to investigative deficiencies, material omissions, or other issues. |

Reviewers rated 40 percent of investigations as Poor or Fair. Slightly more than one-third (37 percent) of cases were rated Good, indicating that although the identified flaws tended not to materially or unduly affect the quality of the overall investigation, the investigative quality could still be improved. Less than one-quarter of investigations (23 percent) were rated either Very Good or Excellent.

| (Q92) Based on your overall review of the investigation, what was the overall quality of the investigation? | |
|---|---|
| 5 – Excellent | 6.5 (2.70%) |
| 4 – Very Good | 49 (20.33%) |
| 3 – Good | 88.5 (36.72%) |
| 2 – Fair | 51 (21.16%) |
| 1 – Poor | 46 (19.09%) |

CIU cases, which were essentially *ad hoc* investigations conducted by BPD's chain of command, were rated "poor" and "fair" more often than other case types. This is likely because these chain of command investigations were not being conducted in a manner that even attempted to comply with Consent Decree requirements or the requirements of a full-blown investigation.

A plurality, some 41 percent, of investigations that were not FTA or CIU cases were "good," and another nearly 35 percent were "excellent" or "very good." It must be noted at the outset, however, that even among cases that were "excellent" or "very good" per the standards and definitions articulated above, many investigations did not satisfy all of the specific requirements of the Consent Decree that have been memorialized in policies and manuals for investigators since the time of the investigation.

At the same time about one-quarter (25 percent) of these cases were of "poor or "fair" quality." The fact that approximately one out of every four non-FTA, non-CIU investigations was deficient in fundamental ways indicates to the Monitoring Team – in conjunction with the many specific findings presented throughout this report – that BPD has a distance to travel toward compliance in the area of misconduct investigations.



Across case types, investigations that were rated very good or excellent stood out, and reviewers had little difficulty making these determinations. Reviewer summaries of these cases were generally clear and unambiguous.  Some examples include:

- The investigation was thorough and complete. Investigator effectively reviewed the actions of the officers starting at his initial contact with the suspect, subsequent foot pursuit and use of force to take the suspect into custody.  A copy of the Conducted Electrical Device policy was provided in the investigative packet.  The evidence provided within the report demonstrated the officer was in compliance of the policy and supported the investigative findings of unfounded.

- The Investigators conducted a thorough and very complete investigation. The Investigators did not limit the scope of the investigation to solely the use of force but investigated all the actions (police contact/pursuit) leading up to the suspect's arrest. The file is comprehensive and well done.

The inadequacies in cases rated fair or poor were similarly clear. Reviewers found deficiencies both in the quality of the case files and the overall diligence of the investigators:

- The case file includes a number of related documents, including an incident report, juvenile custody report, and an Axon report that suggests that there may be BWC video of the interactions in question.  However, there is no real investigative report here— simply an IAPro summary that logs some very cursory investigative efforts.  In short,

there is no evidence that an investigator meaningfully considered the complainant's claims, or the basis for "closing" the case without taking action. Although the nature of the complaint may well be outside the purview of OPR (essentially a claim that charges should not have been filed/pressed in a given case), there is insufficient justification provided in any materials for closing the case with minimal investigative action/effort.

- I would not categorize this as an investigation. It is a confusing data entry. It is impossible to ascertain the nature of the complaint or whether the complaint is directed at a BPD employee. I'd like to discuss the BPD data entry systems. This was an automated entry, but a useless one. If they were required to enter something, it should have included more information; for example, the nature of the complaint and whether or not caller identified the subject as a BPD employee.

- The summary and packet were included in the file, but the investigator's report was not present. However, there was a BWC violation and the conclusion was Unfounded. I suspect this was because the officer had requested re-training on BWC prior to the audit that revealed the violation. As there was no investigation in the file, I am unable to conclude one way or another whether the investigation was adequate. Based on the packet, there was enough evidence to conclude that a violation occurred, however, so I am unclear how they got to unfounded.

- The case was closed with little to no investigation. There is no evidence they tried to locate the complainant to call them on the phone. The summary shows a notice was mailed to the complainant, but the case shows closed two days after it was opened. Also the investigator identified on the BWC footage that the officer refused to provide his partner's name so the complainant could lodge a complaint with all the officer's name. Nothing was done related to this issue and the complaint was closed.

- The Consent Decree requires that investigators will conduct objective, comprehensive, and timely administrative investigations. This investigation failed to meet these thresholds. Specific allegations clearly outlined in the complainant's letter are ignored and not addressed. The investigators reliance on the Body Camera as singular determining factor when the complainant outlines several allegations is not an effective investigative process and can limit the objectivity. There is no evidence provided that demonstrated the 911 recorded call was reviewed. The Officer called the Complainant via his phone, no evidence was gathered to address his conduct during the call. The complainant was not formally interviewed. The Complainant called a supervisor who did not respond but called the complainant after she left the location, this was never

16

addressed.  The investigation failed to identify the policy cited and recognize that the confusion by the Complainant started with inconsistent information by BPD personnel.

Reviewers found that investigators had a strong tendency to rely on BWC footage or documentary evidence and forgo witness interviews. Often investigators would simply gather information until they *believed* they had enough information to conclude the investigation, rather than fully following the investigation to its conclusion. Complainant interviews were frequently neglected. Even when witness interviews occurred, frequently they were not included in the case file, either as recordings or transcripts, so it was difficult to assess quality. For example, in certain cases where the failure to conduct witness interviews compromised the investigation, the reviewers reported:

- This was a generally solid investigation of a PO trainee caught cheating by several of his peers.  However, this was only a "good" investigation because officers who saw the cheating were not interviewed; instead, written statements were used.

- As this case involved the conflicting testimony of two parties, additional interviews should have been conducted to resolve if possible.  No attempts were made to interview the officers, the responding supervisor, the involved parties, except for the father of the involved female, who was not present during the dispute.  While the video confirmed there was likely no false arrest or false statement, this investigation could have been much stronger.

- The investigation was missing interviews of the subject officer, the CO that assaulted the suspect, and the responding Sgt. Instead it relied on BWC evidence and written statements.  The officer on scene did exactly what he should have - called for a supervisor and professionally interacted with the suspect who had been assaulted by the CO, but failed to raise the issue of criminal assault.  The responding Sgt did not do a good job of investigating the CO, for which there was already PC for assault; the officer on scene did not discuss this with the Sgt either. The OPR investigator attributed statements to the CO that I cannot find in the file.

BWC evidence was especially persuasive to investigators and frequently supported the employees' version of events. Reviewers frequently noted that evidence lost when an officer did not turn on the BWC would have been helpful to the resolution of the case.  Some examples include:

- The core of this investigation was sound.  The complainant's claims are definitively refuted by the BWC evidence.  The primary deficiency was the failure to identify, and interview, the many other responding officers/law enforcement who are seen on BWC. It appears that only the primary officer was interviewed.  Although interviews with hospital staff were audio-recorded, no recording of the primary involved officer

interview appears in the reviewed case file. The investigator's questioning was not bad, though some reliance on leading questions in a few instances was unnecessary.

- Investigation was through and complete. Investigator effectively used BWC footage combined with several witness statements and medical records to support findings.

In the few cases that alleged rudeness and unprofessional behavior, there was a tendency for the investigators to minimize the officer's behavior. As such, opportunities to address procedural justice issues in call handling were missed. For example:

- The investigator and the Field Supervisor improperly characterized the officer's conduct as professional when in the reviewer's opinion it was not professional. He insulted the complainant, commented on her parenting skills and lack of discipline within the home. He also became angry after a minor use of force and was yelling at the mother when he left the apartment. None of this was noted in the report. Moreover, the report fails to discuss the allegation of conduct unbecoming and how the officer's conduct did not violate this rule.

- The IA investigation was fine and the investigators very professional. It's just unfortunate that a mother who was warming her car to bring her children to school was ultimately arrested for refusing to sign a citation. I acknowledge that she was agitated and behaved poorly, but I'm not certain an arrest would have been necessary if the officers handled the situation a bit differently.

Reviewers noticed significant deviations between case cover sheets and the rest of the case file concerning dates of investigative activities, including the start date.

Reviewers often noted the seeming lack of interest in exploring issues the cases presented beyond the particular rule violations alleged, including tactical issues. In one case, which involved an officer chasing a suspected armed suspect into a building alone, the investigation did not explore the pursuit or the tactical issue of following a suspect into a closed space without backup. In another case, where a corrections officer punched a BPD prisoner, there was no discussion by the officer on scene, the responding sergeant, or the investigators about the possibility of criminal charges, even though clear probable cause existed for assault. In contrast, there were cases where reviewers were impressed that investigators took the time to explore issues not directly implicated by the complaint.

Reviewers found several cases where minor infractions escalated into serious uses of force (one was an officer-involved shooting), where although the actual use of force was reasonable, necessary, and proportional, investigators should have given some consideration to whether

tactics, training, or policy should be adjusted. In one case, a mother waiting for her child was arrested for failing to sign an infraction – all technically legal – but the incident could undoubtedly have been handled in a way to reduce conflict and avoid that unfortunate result. In fairness, the complainant was abusive and argumentative, but that is exactly the type of encounter that police officers must handle daily. Another example:

- [I]t was clear to me that this was a thorough investigation and the officer was justified in using deadly force when confronted with deadly force.  Some may question, however, whether the appropriate laws and/or policies are in place in terms of pursuit (in this case air and foot) of suspects eluding police following minor infractions.[4]

There were a few cases where the inconsistencies in statements likely crossed the line to dishonesty, which was not investigated further.  For example:

- Based on the investigative report and the evidence provided it seems to be evident that the involved officer lied to the investigator and on her interrogatory. She stated she was on vacation but the records show her working and there was no slip for vacation time on the said date.

Finally, turning to inter-rater reliability for this section, as there was a range of five possible ranked responses, and as discussed above, there is a useful demarcation line to divide the responses into poor/fair and good/very good/excellent, it is more helpful to look at the distribution of responses rather than just the percent agreement.

Overall, there was complete agreement between reviewers in a third of cases (32.5%). More than a third of cases were within one rank of another  (35.5%).  As such, there was close or perfect reviewer agreement in 68 percent of all cases.

Similarly, dividing the cases into poor/fair and good/very good/excellent, there was reviewer agreement in 70 percent of cases. An additional 7.5 percent of cases were split between fair/good, which shows reviewer consistency even if the results were on opposite sides of the split.  Generally, because this means that, 32 percent of the time, reviewers disagreed by two ranks or more.  the

---

[4] BPD Policy 1505, Foot Pursuits, was drafted and approved by the Court in late 2018, and provides guidance on balancing the interest of public safety with the risks of foot pursuits. Specifically, the policy directs members: "Members may engage in Foot Pursuits with suspects only when there is [reasonable articulable suspicion] to believe that the suspect has committed, is committing, or is about to commit a crime (with the exception of those instances identified below under prohibited actions) and when members reasonably believe that there is a valid law enforcement need to detain the suspect that outweighs the threat to safety posed by pursuit. The decision to initiate or continue such a Foot Pursuit, however, must be continuously re-evaluated in light of the circumstances presented at the time."

Monitoring Team would like to see higher agreement in this dimension in the future.  If this were a compliance assessment, the Monitoring Team would devote the resources to examining what caused the disagreement between reviewers and would resolve that disagreement by using a third reviewer.

However, at least for purposes of this preliminary baseline assessment, the Monitoring Team is satisfied that the level of agreement sufficiently captures the general, past state of the OPR investigations and provides guidance on where BPD should focus its efforts going forward.

**COMPLAINT SOURCE/TYPE INFORMATION**

We first consider where, how, and by whom complaints were received. Anonymous complaints were rare – less than two percent of the sampled cases. While many police departments have some concerns around accepting anonymous complaints due to worries about the possibility of false allegations from community members or even other officers, the rarity of such complaints in Baltimore should be reassuring. The rarity of anonymous complaints may suggest that community members are not uniformly reluctant to identify themselves to the accountability system because of fears of retaliation. It could also mean that individuals who would otherwise be afraid of the consequences of making a complaint are staying away from BPD entirely, not even giving an anonymous complaint. Other data points and further study will be necessary to understand what the low number of anonymous complaints might mean.

Over 55 percent of the cases reviewed originated with complaints coming from outside the Department. Almost 43 percent were internally generated. Many of the internally-generated cases came from semi-automatic reporting systems, such as failure to appear in court (FTA) cases, which accounted for slightly less than half of the internal referrals.

Most complaints (71 percent) were received by mail, phone, or email. Only 13 percent of complaints were made in-person. This finding supports the on-going need to develop PIB's technological systems for complaint intake and tracking, as most cases are not walk-ins.

| Complainant type (Q6) | Internal | External | Anonymous |
|---|---|---|---|
| | 103.5[5] (42.95%) | 133.5 (55.39%) | 4 (1.66%) |

| Who received the complaint (Q7) | OPR Employee | Non-OPR Employee |
|---|---|---|
| | 146 (60.58%) | 95 (39.42%) |

---

[5] We assigned a weighted value of .5 to double-reviewed cases in order to include them in the overall sample, which explains the 103.5 cases meeting this category.

| Who was the Non-OPR Employee who received the complaint? (Q8) | Other BPD Employee | Other BPD Supervisor | CRB | Other |
|---|---|---|---|---|
| | 32.5 (35.33%) | 51(55.43%) | 1.5 (1.60%) | 8.5 (9.24%) |

| How was the complaint received? (Q9) | In person | Not in-person (post mail, phone, web etc. | Other |
|---|---|---|---|
| | 18.5 (13.45%) | 97.5 (70.91%) | 21.5 (15.64%) |

Monitoring Team reviewers were asked to generally characterize the facts of the complaint, independent of how the case was categorized by BPD. Their free-text summaries of complaints revealed a wide variety of allegations. Some of the most frequently identified complaints were:

- **Dereliction of duty** (not taking necessary action) was the most common complaint, occurring in approximately 1/5 of all cases. Complainants said that officers were lazy, came too quickly to conclusions, disregarded evidence, and were not just. This category captured general dissatisfaction with service.

- **Failure to appear in court** was also very common, especially as the Monitoring Team sampled "FTA" cases. These cases were typically automatically generated by the court liaison and quickly adjudicated, with officers frequently admitting to the violation.

- **Harassment** complaints were relatively common. Complainants felt targeted by police, either because they had multiple contacts, because they believed the interaction was unjust, or because they believed they were profiled. Two cases alleged racial discrimination.

- **Internal administrative** complaints were common. This category included issues such as leaving a post, losing identification or other equipment, exceeding permitted overtime, reporting late, or questionable use of leave. It did not include **integrity** issues or direct **insubordination**, which were alleged rarely.

- **Use of force** was the next most frequent, which is discussed in more detail below.

- **Abuse of authority** included claims such as running criminal or juvenile records for personal reasons, possession of case materials for personal reasons, attempting to change departmental systems to show an accident was non-preventable, or using status as an officer for other benefits.

- Allegations of **rudeness** were common, ranging from a bad attitude to overt hostility.

- **Body worn camera** (BWC) violations were also common and typically surfaced as a secondary complaint revealed during an investigation, although there were several stand-alone cases where officers failed to record.

- Other, less frequent allegations included **loss of property** and **retaliation**.

## COMPLAINANT DEMOGRAPHICS

Demographic information about individuals making misconduct complaints was not reliably captured by OPR. Given that many of the Consent Decree requirements for the collection of such information were not yet incorporated in policy or training at the time the complaints were made and investigations were conducted, the lack of consistency and completeness is unsurprising.

Nevertheless, in some instances where information about a complainant's gender, race, or ethnicity were not captured, Monitoring Team reviewers could discern this information from available evidence (e.g., by reviewing body-worn camera footage showing the complainant).

Most cases (91 percent) involved a single complainant. Distribution of complainant sex was almost equal (48 percent female) and (41 percent male), with 11 percent unknown. The frequent inability of reviewers to determine race (74 percent) or ethnicity (92 percent) from the files renders any conclusions about demographics impossible. Moving forward, under new policies, new manuals, and new training, PIB will need to consistently and clearly record demographic information to allow for analysis.

| (Q21) Whether at the outset of the complaint or during the course of the investigation, was more than one complainant identified? | Yes | No |
|---|---|---|
| | 10 (8.5%) | 106 (91.38%) |

| (Q22) Complainant's Sex | Female | Male | Unknown |
|---|---|---|---|
| | 60 (47.81%) | 51.5 (41.04%) | 14 (11.16%) |

| (Q23) Complainant's Race | White/Caucasian | Black/African-American | Hispanic/Latino | Unknown |
|---|---|---|---|---|
| | 8 (6.51%) | 23 (18.69%) | 1 (0.82%) | 91 (73.98%) |

| (Q24) Complainant's Ethnicity | Hispanic/Latino | Not Hispanic or Latino | Other | Unknown |
|---|---|---|---|---|
| | 0 | 8 (6.53%) | 0 | 97 (92.38%) |

## CRIMINAL CASES AND CONSTITUTIONAL ISSUES

Few internal investigations involved associated criminal investigations: only three cases involved any type of criminal investigation. Of those, one was an officer-involved shooting, for which the State's Attorney declined criminal charges; one involved officers indicted on federal charges unrelated to the misconduct under administrative investigation; and one was an un-sustained domestic violence referral from an outside jurisdiction. In all of these cases, the Monitoring Team reviews gave the investigations an overall investigative quality rating of *Very Good*[6], which may imply that proper internal resources were directed at these potentially more serious cases.

| (Q10) Was a criminal investigation of one of more BPD members conducted that addressed the complaint? | Yes | No |
|---|---|---|
| | 3 (1.24%) | 238 (98.76%) |

The Consent Decree requires the Monitoring Team to focus not just on misconduct investigations generally but on some specific types of complaints – including "the frequency of civilian complaints to OPR and CRB alleging unlawful arrests," (Paragraph 459(c)(ii)); use of force complaints, (Paragraph 459(d)(ii)); and complaints relating to First Amendment protected activities, (Paragraph 459(j)(ii)). Overall, cases involving such complaints were relatively infrequent among the cases that were reviewed: excessive force (7.47 percent, or 18 cases), false arrest (2.28 percent or 5.5 cases), and First Amendment activities (1.24 percent or 3 cases).

| (Q19) Did the complaint involve allegations, whether made originally by the complainant or uncovered during the investigation, relating to: | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Use of Force (e.g., excessive force or failure to report force)? | 18 (7.47%) | 219 (90.87%) | 4 (1.66%) | 38/40 (95.00%) |
| First-Amendment-protected activity? | 3 (1.24%) | 235 (97.51%) | 3 (1.24%) | N/A[7] |
| Unlawful/False Arrest? | 5.5 (2.28%) | 231.5 (96.06%) | 4 (1.66%) | 39/40 (97.5%) |

Of the use of force cases, only one had overlap with false arrest; none overlapped with First Amendment allegations. None of the use of force allegations were sustained by the Department.

---

[6] Question 92 asked reviewers to rate the overall investigation on a scale of Poor, Fair, Good, Very Good, and Excellent.

[7] There were no double-reviewed cases with First Amendment allegations.

The Monitoring Team assigned overall investigative quality ratings of *Good, Very Good,* or *Excellent* to the investigations involving use of force.

The Consent Decree requires that every case result in a particular disposition that is accompanied by a standard of proof. Dkt. No. 2 at ¶344(k):

    i.     "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the accused officer;

    ii.    "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;

    iii.    "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;

    iv.    "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate BPD policies, procedures, or training;

    v.    BPD shall discontinue use of the disposition "administratively closed."

The Monitoring Team found that the evidence in all but one of the use of force cases met the required standard of proof to support the conclusion – and the evidence in the one case that failed to meet that standard was solely due to the investigator not addressing officer rudeness; in other words, it was not related directly to the force allegation. Given that the Monitoring Team found that the conclusions in only 61 percent of all cases were supported by evidence that met the pertinent standard of proof, the use of force cases ranked comparatively well.

The demographic breakdown of complainants in use of force cases does not allow for the ready understanding of either who brings force complaints or whether there are sharp discrepancies in how force complaints are addressed based on race. The race of only two complainants (both African-American) could be identified; the race of complainants in the remaining cases was unknown.

Of the three First Amendment cases, none of the cases involved direct action against any person participating in First Amendment activities. For example, one was an internal complaint that officers had wrongfully accused a Major of not lowering the American flag in memoriam of President George Bush. Allegations were not sustained in one case and were determined to be unfounded in two other cases. The Monitoring Team rated two investigations as *Very Good* overall. One was rated *Fair*, primarily due to a poor intake focused on technical issues rather than the spirit of the complaint (complainant wasn't the owner of the car that was towed).

24

Of the five false arrest cases, one was judged exonerated, three were unfounded, and one was not sustained by the Department. The Monitoring Team found that the evidence in all five cases met the requisite standard of proof. In terms of overall investigative quality, two were ranked *Very Good*, two were *Good*, and one was *Fair*. With respect to the case ranked *Fair*, the investigative issues giving rise to the ranking were unrelated to the determination of whether a false arrest had occurred. In that instance, a complainant's daughter had admitted to kicking out the windows of a car, which was sufficient to establish probable cause for the involved arrest.

## REVIEW/CLASSIFICATION/TIMELINES

Intake and classification of complaints is critically important to ensure proper, consistent Departmental responses to complaints and proper recognition of the severity/complexity of complaints. Appropriate intake and classification help guarantee that similar complaints will be handled in a similar manner, which supports the internal and external legitimacy of the process – again, the goal is that the accountability systems are perceived by all as fair.

The Department of Justice identified systemic problems with intake and classification in their findings letter:

> BPD lacks meaningful accountability systems to deter misconduct. BPD does not consistently classify, investigate, adjudicate, and document complaints of misconduct according to its own policies and accepted law enforcement standards.

Findings Letter at 128.

The Consent Decree has significant requirements governing Intake, Classification, and Communication with Complainants, including revising the relevant policy and manual and ensuring that the complaint process is open and accessible, that complaints may be made anonymously and through any common means of communication, that all complaints are accepted and properly classified according to the allegations, and that all classifications and changes to classification are tracked in a database. *See* Dkt. No. 2 at ¶¶ 335–42.

The PIB Intake and Classification Manual has been updated to ensure that PIB will accept anonymous complaints, that complaints will be accepted by email, phone, mail, or walk-in, and that allegations will be timely classified in IA Pro (the designated computer software program used for internal affairs investigations) and based on the options in that system. From the moment a complaint is received, there is now clarity about how it will be categorized and managed. Strict adherence to these new policies will help with consistency and accuracy of classification.

25

However, the investigations reviewed in this assessment occurred prior to the finalization of the new manual. Consequently, this baseline review essentially grades the Department against standards, expectations, and requirements that they were not yet trying to meet in 2018. For that reason, the Monitoring Team identified a number of core problems with the classification of new complaints and adherence to Consent Decree-required investigative timelines.

In some instances, then, the Monitoring Team was able to definitively conclude that BPD had not, in fact, adhered to the Consent Decree's requirements for intake and classification. In an even greater number of instances, however, because the investigative files were often chaotic – lacking uniform format or structure or missing important information – Monitoring Team reviewers could not determine, one way or another, whether various requirements had been met.

| (Q25) Review & Classification | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Initial classification determination made within 72 hours of OPR being notified of allegation of misconduct? | 119 (49.38%) | 65.5 (27.18%) | 56.5 (23.44%) | 20/40 (50.0%) |
| Complaint assigned to OPR investigator within 72 hours of OPR being notified of allegation of misconduct? | 101.5 (42.12%) | 98.5(40.87%) | 41 (17.01%) | 21/40 (52.5%) |
| All appropriate allegations identified and listed, including those that, if true, would violate BPD policy but are not affirmatively identified by the complaint or complainant? | 166.5(69.09%) | 46.5 (19.29%) | 28 (11.62%) | 21/40 (52.5%) |
| All relevant policy/manual sections accurately identified and listed? | 144 (59.75%) | 66.5 (27.59%) | 30.5 (12.66%) | 32/40 (80.0%) |
| Most serious policy violation appropriately used for purposes of classification? | 162 (67.22%) | 39 (16.18%) | 40 (16.60%) | 34/40 (85.0%) |
| Most serious policy violation appropriately used | 160 (66.39%) | 36.5 (15.15%) | 44.5 (18.46) | 35/40 (87.5%) |

| to determine whether OPR will investigate? | | | | |
|---|---|---|---|---|
| **Alpha (α ) 0.855** | | | | |

Only about half (49 percent) of cases were timely classified within 72 hours, as required by the Consent Decree. Somewhat less than half (42 percent) were assigned to an investigator within 72 hours of an investigator being notified of misconduct. At the intake stage, more than two-thirds (69 percent) of cases had all allegations properly identified. Sixty percent of cases properly identified the specific BPD policies that were implicated by the complaint. In more than two-thirds (67 percent) of cases, the most significant violation was appropriately used to classify the investigation.

The relatively low agreement between reviewers for the questions about timeliness suggests that the number of cases that complied with Decree requirements may actually have been <u>lower</u>. Because the case files were in such disarray, it appears that reviewers used different dates, found in different parts of the file, as plausible "start dates" from which to chart timelines. As such, the Monitoring Team does not have strong confidence in the specific results presented in the first three rows above, but the overall concept – that BPD was not clearly recording timelines, investigators, or capturing all appropriate allegations – is wholly consistent with the reviewers' experiences grappling with the case files. Going forward, PIB will need to ensure that the dates of core administrative actions are reliably captured and uniformly documented in a standard format.

In contrast, there was solid agreement between reviewers about whether all relevant policy violations were identified and whether the most serious allegation was used for classification purposes.

The items that measured intake and classification have a reasonably good alpha reliability coefficient (0.855). Thus, we can comfortably conclude that, for intake and classification, the evaluation instrument is measuring what we are trying to measure.

### *Communication with Complainants*

To ensure transparency, the Consent Decree contains requirements that complainants receive periodic updates from the Department. These requirements are not directed at internal complaints, but at external complaints from members of the public in order to provide good customer service and improve legitimacy. As such, the sample of cases examining communication with complainants is limited to those cases identified by the Monitoring Team as "external."[8] Within

---

[8] This should not be confused with BPD's use of "external" as an incident type. As previously discussed, other incident types, such as CIU, could start with a complaint by a member of the public. External cases here were identified by the Monitoring Team.

these cases, communication was poor overall. OPR provided complainants with written notice that it had received their complaints in only a quarter (27 percent) of cases. Likewise, reviewers were able to find evidence that OPR provided complainants with periodic updates about the status of their cases in only 36 percent of cases. Because of the low number of overall cases in which complainants received communications from BPD, the Monitoring Team found that communications were professional and respectful in just 38 percent of cases.

Inter-rater reliability was approximately  60% agreement across this question set. Although the alpha was lower (0.64) than other sections, this is likely because the sequence of questions about complainant communication combined pure auditing questions ("was there notice within 7 days?") with more qualitative ones ("were communications with complainant professional and respectful?") The Monitoring Team will consider the workflow of the data gathering instrument in future compliance reviews.

| (Q26) Notification/Communication with Complainant(s) | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Written notice of receipt within 7 days of OPR's receipt of a complaint? | 36 (26.97%) | 76.5 (57.30%) | 21 (15.73%) | 12/18 (66.67%) |
| OPR mail or email periodic updates to complainant on status of complaint/investigation? | 48 (35.96%) | 68 (50.94%) | 17.5 (13.11%) | 12/18 (66.67%) |
| Communications with complainant professional and respectful? | 50.5 (37.97%) | 17.5 (13.16%) | 65 (48.87%) | 11/18 (61.11%) |
| α = 0.641 | | | | |

Of the relatively few cases that included communications with the complainant, only slightly more than half (53 percent) of the communications included basic information like the tracking number, the case number, and the allegations being investigated. Fifty-four percent of communications informed complainants how they could follow up to find out case status. As with most of the review results around technical or timing questions, the state of the case files led to some disagreement among reviewers, albeit with a sample size below the reporting threshold.  As such, the below results are better interpreted as thematic than as precise quantifications of the files. The Monitoring Team will expect to see improvement in this area as BPD adopts new policies and procedures.

For this set of questions, there was a moderate level of disagreement between reviewers in the double-reviewed cases, which again is likely due to confusion over where in the files this information could be found and/or internal inconsistency within the files.

The questions that measured communication with the complainant have an acceptable alpha value of 0.782. Thus, we can conclude that these questions adequately measure the communication with the complainant.

The overall conclusion here is that communications with complainants need to be greatly improved for consistency and content, but investigators are not discouraging complainants from making or pursuing complaints.

| (Q27) Details re: Written Notice to Complainant | Yes | No | UTD |
|---|---|---|---|
| Did receipt include tracking number, other relevant case numbers, and allegations being investigated? | 18.5 (52.86%) | 3.5 (10.00%) | 13 (37.14%) |
| Did notice inform complainant how he/she may inquire about complaint status? | 19 (54.29%) | 2.5 (7.14%) | 13.5 (38.57%) |
| Did notice contain any language that could reasonably be construed as discouraging participation in the investigation (such as warning against providing false statements or a deadline by which complainant must contact the investigator)? | 0 | 22 (62.86%) | 13 (37.14%) |
| $\alpha = 0.782$ | | | |

*Communication with Involved Officers & Employees*

Timely notification to the subject officer only occurred in a quarter (24 percent) of cases, though interrater reliability scores were low for this question. Notice to supervisors of involved officers or employees occurred only one out of ten times (12 percent of cases). The Decree's requirement that an officer's supervisor facilitate an officer's appearance before investigators and document such facilitation appeared to be followed in only 12 cases – or about 5 percent of the time overall.

| (Q28) Communication with Involved Officer(s)/Employee(s) | Yes | No | UTD | Agree |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Timely notification to all involved employee(s)? | 57.5 (23.86%) | 114.5 (47.51%) | 69 (28.63%) | 23/40 (57.5%) |
| Timely notification to supervisor of officer(s) under investigation? | 29.5 (12.24%) | 92 (38.17%) | 119.5 (49.59%) | 32/40 (80.00%) |
| Officer's supervisor(s) facilitating officer's appearance documented in writing? | 12 (4.98%) | 101.5 (42.12%) | 127.5 (52.90%) | 36/40 (90.0%) |
| α = 0.762 | | | | |

Where there was a notification to an employee, regardless of whether it was provided on the Decree-required timeline, it was not found to jeopardize the investigation (such as by including too many facts prior to an interview). Notices comported with due process and the law. Only one case involved a notice containing information that might have unnecessarily jeopardized the investigation.

Reviewers determined that fewer than 8 percent of notices prohibited officers from speaking to witnesses, reviewing reports, or taking other actions that could jeopardize the investigation.

| (Q29) Details re: Initial Notification to Officer/Employee(s) (N=57.5 from Q28) | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Did notice jeopardize the investigation? | 0 | 51.5 (89.57%) | 6 (10.43%) | 3/3 (100.00%) |
| Did officer only receive notice prior to being formally interviewed by OPR, and not earlier? | 17.5 (30.70%) | 26 (45.61%) | 13.5 (23.68%) | 1/3 (33.33%) |
| Did notice comport with due process and the law? | 44 (76.52%) | 2 (3.48%) | 11.5 (20.00%) | 3/3 (100.00%) |
| Did the notice contain the nature of the investigation? | 43.5 (75.65%) | 4.5 (7.83%) | 9 (15.65%) | 2/3 (66.66%) |
| Did the notice contain any information that might have unnecessarily jeopardized the investigation? | 1 (1.77%) | 47.5 (84.07%) | 8 (14.16%) | 2/3 (66.66%) |
| Did notice prohibit officers from speaking to | 4.5 (7.83%) | 38 (66.09%) | 15 (26.09%) | 3/3 |

| witnesses/complainants, reviewing police reports, reviewing body camera footage, or taking other actions that could jeopardize the investigation. | | | | (100.00%) |
|---|---|---|---|---|
| **α = 0.762** | | | | |

### *Investigative Timeliness*

The Consent Decree requires that internal investigations be completed within 90 days of the initiation of the investigation unless an extension is specifically requested and approved, in writing, by the OPR Director. Dkt. No. 2-2 at 122.

The state of BPD investigative files, which often featured various and sometimes conflicting dates, made determining the date on which investigations started difficult. Fewer than two out of five (39 percent) investigations were completed within the Decree-required 90-day timeframe, with extensions virtually never sought.

| **(Q70) Regarding investigative timeliness** | **Yes** | **No** | **UTD** | **Agree** |
|---|---|---|---|---|
| Investigation completed within 90 days of initiation of the investigation? | 95 (39.42%) | 142.5 (59.13%) | 3.5 (1.45%) | 38/40 (95.00%) |
| Extension requested at any point during the investigation? | 0.5 (0.21%) | 181.5 (75.31%) | 59 (24.48%) | 25/40 (62.50%) |

### INVESTIGATION: COMPLAINANT INTERVIEW & INJURIES

The Consent Decree requires that reasonable efforts be made to identify and interview any "civilian complainant or witnesses in person at a time and place that is convenient and accessible for the complainant or witness." Dkt. No. 2-2 at ¶ 343. Additionally, audio or video recording shall occur. *Id.* at ¶344(d).

Here, unlike the previous section, the Monitoring Team did not restrict the analysis of complainant interviews to external cases because the complainant in internal cases generally should be interviewed as part of a quality investigation unless there are reasons not to do so. FTA cases could be considered as an exception. Such cases are essentially auto-generated when an officer fails to appear in court, and the record is completed with computer tracking – such that there is not

necessarily a designated individual who is the source of the complaint. Consequently, there is no reason to interview the supervisor who administratively referred the complaint. In contrast, if an employee makes a misconduct referral on another employee, the complainant employee will need to be interviewed even though the referral is internal. Nevertheless, because the terms of the Consent Decree generally address only instances where there is an individual – either a member of the public or member of the Department – identified as the "complainant," this report includes FTA cases within the results regarding complainant interviews. The Monitoring Team expects that the specific protocols that the Department is adopting via misconduct investigation policies and manuals will help to clarify the appropriate mechanisms for addressing the issue surrounding the nature of complainants and the utility of interviewing them in FTA cases going forward.

Complainant interviews occurred in only 41 percent of cases. Of cases where no interviews were conducted, some involved the failure of a complainant – sometimes repeatedly – to appear for scheduled interviews or to respond to investigator inquiries. For many others, however, there simply was no evidence that investigators attempted to conduct an interview. At first glance, it is counterintuitive that reviewers only agreed about whether there was a complainant interview in 26 of 40 cases. On a straightforward and critical question like "was the complainant interviewed," generally the Monitoring Team would want to see higher agreement between reviewers. However, again, the state of the files was wholly inconsistent. There were many cases in which the investigator referred to a complainant interview, but there was no evidence (transcript, recording, or even analysis) that the interview actually occurred or was incorporated into the findings. This sort of inconsistency in the case files led to somewhat inconsistent results by reviewers. The overall takeaway, that BPD needs to interview all complainants when possible and clearly document the information gathered from the interview, remains clear.

Where interviews were conducted, only about half of them were confirmed to be audio recorded. The consistent failure to put either a transcript or audio recording into the case record, even when an interview was said to have been conducted, compromised the ability of reviewers to make thorough assessments of the quality of the interviews. Video recording was only used in three cases. No case suggested a need for translation or accommodations.

| (Q31) Complainant Interview[9] | Yes | No | UTD | Agree |
| --- | --- | --- | --- | --- |
| | | | | |

---

[9] Question 31, sub-question 7 asked whether there was a reported injury in the complainant's interview and Q35 asked whether photographs of the injury were taken, or a medical release requested. As these questions were duplicative of Q66 and Q67, which more appropriately explored injuries in the context of the entire case, rather than in the specific context of the interview, the Monitoring Team removed these questions. Sub-question 7 was also misaligned

| | | | | |
|---|---|---|---|---|
| Complainant interviewed? | 99 (41.08%) | 136 (56.43%) | 6 (2.49%) | 26/40 (65.00%) |
| Interviews occurred at time/place convenient and accessible for witness? | 88.5 (36.72%) | 99 (41.08%) | 53.5 (22.20%) | 6/8 (75.00%) |
| Permission requested to record interview? | 36 (14.98%) | 140.5 (58.30%) | 64.5 (26.76%) | 6/8 (75.00%) |
| Interview video-recorded? | 3 (1.24%) | 201 (83.40%) | 37 (15.35%) | 8/8 (100.00%) |
| Interview audio-recorded? | 43.5 (18.05%) | 154.5 (64.11%) | 43 (17.84%) | 6/8 (75.00%) |
| Was there a request or apparent need for translation or accommodation? | 0 | 223.5 (92.74%) | 17.5 (7.26%) | 5/8 (62.50%) |
| Were reasonable steps taken to gather evidence, documents in a timely manner? | 136.5 (56.64%) | 75.5 (31.33%) | 29 (12.03%) | 5/8 (62.50%) |
| Was there appropriate focus on retrieving perishable items? | 63.5 (26.35%) | 69 (28.63%) | 108.5 (45.02%) | 26/40 (65.00%) |
| Were all contacts logged? | 148 (61.41%) | 45 (18.67%) | 48 (19.92%) | 6/8 (75.00%) |
| Was complainant interview thorough and unbiased? | 51 (21.16%) | 77.5 (32.16%) | 112.5 (46.68%) | 6/8 (75.00%) |
| $\alpha = 0.780$ | | | | |

Although reviewers were unable to determine whether permission to record an interview was requested in 27 percent of cases, and confirmed that no permission was requested in 58 percent of cases, when permission was in fact requested, complainants consented in 97 percent of cases—all but one. It is not clear from the record why the one complainant refused to grant permission, as the

---

with the other sub-questions in Question 31, as it asked about content, not process. The alpha was significantly improved by removing the sub-question.

refusal was not documented or a summary generated, but it does not generally appear that complainants object to having their interviews recorded.

| | **Yes** | **No** |
|---|---|---|
| **(Q32) Did complainant grant permission to record the interview? (N=36 from Q31)** | 35 (97.14%) | 1 (2.86%) |
| **(Q34) Re: the request or apparent need for translation or accommodation, was such translation/accommodation provided?** | 0 | 0 |

When complainant interviews were conducted and appropriate documentation included in the case file, Monitoring Team reviewers found those interviews generally adequate. When identifying specific deficiencies in investigations, reviewers could select one or more possible choices. Overall, in 90 percent of cases where an interview was conducted and there was sufficient documentation to reach conclusions, reviewers identified no significant deficiencies. Nine cases (9 percent of cases with complainant interviews) had one deficiency; and two cases (2 percent of cases with complainant interviews) had three deficiencies listed.

Reviewers consistently flagged the cases that were deficient, even if they gave slightly different reasons for the inadequacies. For example, the only case that identified "Leading Questions" also included "Appearance of Bias" and "Relevant questions left unanswered." That case was double-reviewed and the second reviewer chose "Leading Questions" only. Nevertheless, both reviewers flagged deficiencies. In that case, the second reviewer was left with the impression that the investigator was attempting to discourage the complainant from continuing with her complaint (she was undeterred). Discouraging a complainant – which was identified as a serious issue in the Department of Justice Findings Letter – could be described in many different ways. However, the Monitoring Team is confident that deficiencies were flagged, even if the basis differed.

Monitoring Team reviewers found that questioning reflected bias in three cases. In one case, the complainant raised a concern about the assigned investigator having a conflict of interest with the complainant. The complainant and the investigator were interviewed about that allegation and then the case was administratively closed the same day with little explanation.

| **(Q37) Indicate any deficiencies or issues identified during each complainant interview** | |
|---|---|
| Leading questions noted | 1 |
| Inadequate questioning | 5 |
| Appearance of bias | 3 |
| Inconsistencies not addressed | 0 |
| Relevant questions left unanswered | 5 |
| Concerns about investigator demeanor | 1 |

34

| INVESTIGATION: WITNESSES: SUBJECT/EMPLOYEE INTERVIEW |
|---|

The subject employee was identified by the complainant in 66 percent of cases. Where the employee was not specifically identified in the complaint, investigators made all reasonable efforts to identify the subject employee about 62 percent of the time.

When subject employees were identified by the complainant, they were interviewed in only 44 percent of investigations. As officers rarely declined to be interviewed – that occurred only once across reviewed cases – the Monitoring Team's hypothesis is that the failure to interview was the investigator's decision.

|  | **Yes** | **No** | **Agree** |
|---|---|---|---|
| **(Q38) Did the complainant specifically identify the subject officer's name(s)?** | 158 (65.56%) | 83 (34.44%) | 33/40 (82.50%) |
| **(Q39) Did investigator(s) make all reasonable efforts to identify the officer(s)? (N=83 from Q38)** | 51.5 (62.05%) | 31.5 (37.95%) | 5/7 (71.43%) |
| **(Q40) Involved employee(s) interviewed?** | 106.5 (44.19%) | 134.5 (55.81%) | 27/40 (67.50%) |

| **(Q42) Regarding the employee not being interviewed (N=134.5 from Q40)** | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Did employee(s) decline to be interviewed? | 1 (0.75%) | 104 (78.49%) | 27.5 (20.75%) | 14/14 (100.00%) |
| Could employee(s) be identified/located? | 78.5 (59.25%) | 33.5 (25.28%) | 20.5 (15.47%) | 9/14 (64.29%) |

Where interviews of officers occurred, reviewers found that more than half (59 percent) were adequate in that investigators reasonably pursued all relevant lines of investigative inquiry.

Bias (less than two percent of interviews), leading questions (four percent), actual contamination (less than one percent), and evidence of pre-interview questioning (less than two percent) were not common. OPR interviewers infrequently inquired into the possibility of witness contamination (only 10 percent of interviews). In nine of the ten interviews where investigators inquired about contamination, they also were found to have properly controlled for attorney interference –

suggesting that some interviewers, in some cases, were able to take the type of appropriate investigative precautions necessary under the Consent Decree.

| (Q41) Details of Subject/Employee Interviews (N=106.5) | Yes | No | UTD | Agree |
|---|---|---|---|---|
| All relevant lines of investigative inquiry reasonably and adequately pursued? | 63 (59.43%) | 15 (14.15%) | 28 (26.42%) | 8/13 (61.54%) |
| Possible bias noted (e.g., automatic preference for officer, disregard of complainant based on criminal history or guilty plea)? | 2 (1.90%) | 70.5 (67.14%) | 32.5 (30.95%) | 12/13 (92.31%) |
| Leading questions used in the interview(s)? | 4.5 (4.27%) | 63 (59.72%) | 38 (36.02%) | 11/13 (84.62%) |
| Evidence of potential contamination of employee accounts? | 1 (0.94%) | 73 (68.87%) | 32 (30.19%) | 12/13 (92.31%) |
| Interviewer inquiry as to potential contamination of employee accounts? | 10.5 (10.00%) | 55 (52.38%) | 39.5 (37.62%) | 10/13 (76.92%) |
| Evidence suggesting that pre-interview questioning/discussion occurred prior to the interview? | 2 (1.90%) | 75.5 (71.90%) | 27.5 (26.19%) | 12/13 (92.31%) |
| Interviewer prevent union representation from disrupting interview(s)? | 17.5 (16.51%) | 51 (48.11%) | 37.5 (35.38%) | 9/26 (69.23%) |
| $\alpha = 0.951$ | | | | |

| (Q43) Indicate any deficiencies or issues identified during each subject/employee interview | |
|---|---|
| Leading questions noted | 2 |
| Inadequate questioning | 7 |
| Appearance of bias | 1 |
| Inconsistencies not addressed | 1 |

| Relevant questions left unanswered | 9 |
|---|---|
| Concerns about investigator demeanor | 0 |

## INVESTIGATION: CIVILIAN WITNESSES

The Consent Decree requires that reasonable efforts be made to identify and interview all witnesses and interview any "civilian complainant or witnesses in person at a time and place that is convenient and accessible for the complainant or witness." Dkt. No. 2-2 at ¶343. Additionally, audio or video recording shall occur. *Id.* at ¶344(d).

Efforts to identify, locate, and interview civilian witnesses were not uniform in those cases where civilian witnesses were implicated, occurring in less than half (48 percent) of cases where experts determined that the efforts would have been applicable. Of those cases where civilian witnesses were identified, the civilians were interviewed only 38 percent of the time.

When civilians were interviewed, interviews were generally conducted at a time and place convenient for the civilian witness (78 percent), typically audio-recorded (65 percent), and generally adequate (78 percent). Remarkably, reviewers found no instances of bias, potential contamination, or evidence of any pre-interview questioning. Leading questions only surfaced in two cases. The main takeaway is that civilian interviews need to be pursued in all cases where such witnesses are identified, and that the record keeping of those interviews needs to be improved significantly.

| (Q45) Effort to Contact Civilian Witnesses | Yes | No | UTD | N/A |
|---|---|---|---|---|
| Sustained and reasonable efforts made to contact and interview witnesses | 62 (25.73%) | 58 (24.07%) | 10 (4.15%) | 111 (46.06%) |
| All witness contact efforts logged? | 70 (19.05%) | 41.5 (17.22%) | 21.5 (8.92%) | 108 (44.81%) |

| | Yes | No | Agree |
|---|---|---|---|
| (Q47) Were any civilian witnesses identified or reasonably implicated by the complaint, canvass, or investigation? | 43.5 (18.05%) | 197.5 (81.95%) | 27/40 (67.50%) |
| (Q48) All identified civilian witnesses interviewed? | 16 (37.65%) | 26.5 (62.35%) | 1/ 2 (50.00%) |

| (Q49) Details re: Civilian Witness Interviews (N=16 from Q48) | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Interviews occurred at time/place convenience and accessible for witness? | 12.5 (78.13%) | 0 | 3.5 (21.88%) | 1/2 (50.00%) |
| Interviews video-recorded? | 0.5 (3.13%) | 11.5 (71.88%) | 4 (25.00%) | 1/2 (50.00%) |
| Interviews audio-recorded? | 10.5 (67.74%) | 2 (12.90%) | 3 (19.35%) | 0/2 |
| All relevant lines of investigative inquiry reasonably and adequately pursued? | 12.50 (78.13%) | 0 | 3.5 (21.88%) | 0/2 (0%) |
| Possible bias noted? | 0 | 11.5 (74.19%) | 4.5 (25.81%) | 1/2 (50.00%) |
| Leading questions used in the interview? | 1.5 (9.38%) | 10.5 (65.63%) | 4  (25.00%) | 1/2 (50.00%) |
| Evidence of potential contamination of civilian witness accounts? | 0 | 14 (87.50%) | 2 (12.50%) | 1/2 (50.00%) |
| Interviewer inquiry as to potential contamination of employee accounts? | 0 | 10.5 (65.63%) | 5.5 (34.38%) | 1/2 (50.00%) |
| Evidence suggesting that pre-interview questioning/discussion took place prior to the interview? | 0 | 13 (81.25%) | 3 (18.75%) | 1/2 (50.00%) |
| All witness interviews sufficiently memorialized for purposes of a full and complete investigative file? | 12.5 (78.13%) | 1.5 (9.38%) | 2 (12.50%) | 0/2 (0%) |
| $\alpha = 0.851$ | | | | |

| (Q51) Indicate any deficiencies or issues identified during each civilian witness interview (N=16 from Q48) | |
|---|---|
| Leading questions noted | 2 |
| Inadequate questioning | 0 |
| Appearance of bias | 0 |
| Inconsistencies not addressed | 0 |

| Relevant questions left unanswered | 0 |
|---|---|
| Concerns about investigator demeanor | 0 |

## INVESTIGATION:
## BPD OFFICER/EMPLOYEE WITNESS INTERVIEWS

The Consent Decree requires that:

> BPD shall require its employees to cooperate with administrative investigations, including appearing for an administrative interview when requested by a BPD investigator, and providing all relevant documents and evidence under the person's custody and control.

*Id.* at ¶ 347(d). Additionally, the Decree prohibits interviews of BPD employees from using leading questions and from discouraging the provision of a full account, and requires that BPD employee interviews be thorough and un-biased. *Id.* at ¶ 349.

BPD employees were implicated as possible witnesses in about one-third (35 percent) of cases. Of those, the employees were interviewed 61 percent of the time. As most of the employees identified could be located (62 percent) and none refused to testify, it again is concerning that investigators decided not to regularly interview such witnesses.

Audio recording was the most common means of capture at 74 percent of cases; about 4 percent were video recorded. However, as many of the audio recordings or transcripts were not included in the case files, reviewers frequently were unable to make determinations about the quality of interviews.

Most interviews of BPD employee witnesses were generally sound. No significant deficiencies were noted in 94 percent of cases where civilians were interviewed.

| | Yes | No | UTD | Agree |
|---|---|---|---|---|
| **(Q53) Were any BPD officer/employee witnesses identified or reasonably implicated by the complaint or investigation?** | 84 (34.85%) | 157 (65.15%) | 0 | 32/40 (80.00) |
| **(Q54) Were the employee(s) interviewed?** | 51.5 (61.31%) | 32.5 (38.69%) | 0 | 8/9 (88.89%) |

| | Yes | No | UTD | Agree |
|---|---|---|---|---|
| **(Q55) Regarding the employee(s) not being interviewed (N=32.5 from Q54)** | | | | |

| | | | | |
|---|---|---|---|---|
| Employee(s) decline to be interviewed? | 0 | 21.5 (66.15%) | 11(33.85%) | 3/3 (100.00%) |
| Employee(s) able to be identified/located? | 20 (61.54%) | 6.5 (20.00%) | 5.5 (16.92%) | 3/3 (100.00%) |

| (Q56) Regarding Interview(s) of Involved Officer(s)/Employee(s) (N=51.5 from Q54) | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Interviews video-recorded? | 2 (3.96%) | 39.5 (78.22%) | 9 (17.82%) | 5/5 (100.00%) |
| Interviews audio-recorded? | 37 74.00% | 5 (10.00%) | 8 (16.00%) | 4/5 (80.00%) |
| All relevant lines of investigative inquiry reasonably and adequately pursued? | 32.5 (63.11%) | 4.5 (8.74%) | 14.5 (28.16%) | 3/5 (60.00%) |
| Possible bias noted (e.g., automatic preference for officer, disregard of complainant based on criminal history or guilty plea) | 1 (1.94%) | 36.5 (70.87%) | 14 (27.18%) | 5/5 (100.00%) |
| Leading questions used in the interview? | 1 (1.94%) | 34.5 (66.99%) | 16 (31.07%) | 5/5 (100.00%) |
| Evidence of potential contamination of employee accounts? | 1 (1.94%) | 36.5 (70.87%) | 14 (27.18%) | 5/5 (100.00%) |
| Interviewer inquiry as to potential contamination of employee accounts? | 4.5 (8.82%) | 30 (58.82%) | 16.5 (32.35%) | 3/5 (60.00%) |
| Evidence suggesting that pre-interview questioning/discussion took place prior to the interview? | 0 | 36 (70.59%) | 15 (29.41%) | 4/5 (80.00%) |
| Interviewer prevent union representation from disrupting interview | 8 (16.16%) | 24 (48.49%) | 17.5 (35.35%) | 3/5 (60.00%) |
| α = 0.933 | | | | |

| (Q58) Indicate any deficiencies or issues identified during the interview of Officer(s)/Employee(s) (N=51.5 from Q54) | |
|---|---|
| Leading questions noted | 1 |
| Inadequate questioning | 2 |

| | |
|---|---|
| Appearance of bias | 0 |
| Inconsistencies not addressed | 0 |
| Relevant questions left unanswered | 1 |
| Concerns about investigator demeanor | 0 |

### INVESTIGATION: WITNESSES: LAW ENFORCEMENT (NON-BPD) WITNESS INTERVIEWS

Non-BPD law enforcement witnesses were identified as potential witnesses in fewer than 10 percent of cases. Those witnesses were interviewed about one-third of the time. This meant that only eight cases had non-BPD law enforcement witness interviews.

Most (81 percent) of non-BPD law enforcement witness interviews reasonably pursued all relevant lines of investigative inquiry, and there was no evidence of bias, leading questions, or contamination. One case showed evidence that there was pre-interview questioning. No non-BPD law enforcement witness refused to be interviewed.

| | Yes | No | Agree |
|---|---|---|---|
| **(Q60) Were any non-BPD law enforcement witnesses identified or reasonably implicated by the complaint or investigation?** | 23.5 (9.75%) | 217.5 (90.25%) | 35/40 (87.50%) |
| **(Q61) All identified non-BPD law enforcement witnesses interviewed? (N=23.5 from Q60)** | 8 (34.04%) | 15.5 (65.96%) | |

| (Q62) Non-BPD Law Enforcement Interview Details (N=8 from Q61) | Yes | No | UTD |
|---|---|---|---|
| Interviews video-recorded? | 0 | 7 (87.50%) | 1 (12.50%) |
| Interviews audio-recorded? | 7 (87.50%) | 0.5 (6.25%) | 0.5 (6.25%) |
| All relevant lines of investigative inquiry reasonably and adequately pursued? | 6.5 (81.25%) | 0 | 1.5 (18.75%) |
| Possible bias noted | 0 | 6.5 (81.25%) | 1.5 (18.75%) |
| Leading questions used in the interview? | 0 | 6.5 (81.25%) | 1.5 (18.75%) |
| Evidence of potential contamination of witness accounts? | 0 | 6.5 (81.25%) | 1.5 (18.75%) |
| Interviewer inquiry as to potential contamination of employee accounts? | 0 | 5.5 (68.75%) | 2.5 (31.25%) |

| | | | |
|---|---|---|---|
| Evidence suggesting that pre-interview questioning/discussion took place prior to the interview? | 1(13.33%) | 5 (66.67%) | 1.5 (20.00%) |

| (Q64) Indicate any deficiencies or issues identified during the interview of law enforcement (non-BPD) Witness (N=8 from Q61) | |
|---|---|
| Leading questions noted | 0 |
| Inadequate questioning | 0 |
| Appearance of bias | 0 |
| Inconsistencies not addressed | 0 |
| Relevant questions left unanswered | 0 |
| Concerns about investigator demeanor | 0 |
| Other (write in) | 1 |

## INVESTIGATION: PHYSICAL EVIDENCE, DOCUMENTATION OF INJURIES

Complaints of injury or apparent injuries occurred in 6.4 percent of cases. The Monitoring Team confirmed that there were no injuries reported in 92 percent of cases—the vast majority. This includes cases where use of force by a BPD officer was at the core of the complaint, as well as cases where the complaint was about something else but an injury nonetheless occurred during the interaction at issue. Of the cases involving use of force-related allegations, more than half (56 percent) involved some complaint of injury by the complainant.

In the few cases that involved a complainant injury, the injuries were documented in about three-quarters of cases, photographs were taken about two-thirds of the time, and medical records requested about half of the time. It is unclear why this information was not included, but moving forward, PIB will need to document subject injuries more consistently and/or clearly indicate why investigators were unable to do so.

Officer injuries were involved in only two cases, both of which were documented. Importantly, neither case involved injury inflicted by a suspect.

- A supervisor was attempting to cut a suspect out of a locked patrol car – the officer locked the keys inside – and was injured in the process.

- An officer was attacked by a dog responding to a call. The dog was shot.

| | Yes | No | UTD |
|---|---|---|---|
| | 15.5 (6.43%) | 222.5 (92.32%) | 3 (1.24%) |

| (Q66) Was there a complaint of injury, or a readily apparent injury? | | | |
|---|---|---|---|
| (Q68) Were officers injured? | 2 (0.83%) | 236 (97.93%) | 3 (1.24%) |
| (Q69) Were officer's injuries documented? | 2 (100%) | 0 | 0 |

| (Q67) Regarding the complainant of injury | Yes | No | UTD |
|---|---|---|---|
| Complainant injuries documented | 12 (77.42%) | 2.5 (16.13%) | 1 (6.45%) |
| Photographs taken? | 9.5 (61.29%) | 5 (32.26%) | 1 (6.45%) |
| Medical records release requested? | 8 (51.61%) | 4.5 (26.03) | 3 (19.35%) |

## INVESTIGATIVE REPORT

The Consent Decree, paragraph 351, clearly lays out the requirements for investigative reports for misconduct investigations:

> At the conclusion of each investigation, misconduct investigators will prepare an investigation report. The report will include:
>
> a. A narrative description of the incident, including a precise description of the evidence that either justifies or fails to justify the officer's conduct based on the misconduct investigator's independent review of the facts and circumstances of the incident;
>
> b. Documentation of all evidence that was gathered, including names, phone numbers, and addresses of witnesses to the incident. In situations in which there are no known witnesses, the report will specifically state this fact. In situations in which witnesses were present but circumstances prevented the misconduct investigator from determining the identification, phone number, or address of those witnesses, the report will state the reasons why. The report also will include all available identifying information for anyone who refuses to provide a statement;
>
> c. Documentation of whether officers or other BPD employees were interviewed, including audio and video and a transcript of those interviews, if available;
>
> d. The names of all other BPD employees who witnessed the incident;
>
> e. The misconduct investigator's evaluation of the incident, based on his or her review of the evidence gathered, including a determination of whether the officer's actions appear to be within BPD policy, procedure,

regulations, orders, or other standards of conduct required of BPD officers;

f.  In cases where credibility determinations must be made, explicit credibility findings, including a precise description of the evidence that supports or detracts from the person's credibility;

g.  In cases where material inconsistencies must be resolved between complainant, officer, and witness statements, explicit resolution of the inconsistencies, including a precise description of the evidence relied upon to resolve the inconsistencies;

h.  If a weapon was used, documentation that the officer's certification and training for the weapon were current; and

i.  Documentation of recommendations for non-punitive corrective action or misconduct charges.

Reviewers found that, in 72 percent of cases, the investigative report narrative included a "description of incident that includes precise description of evidence that either justifies or fails to justify the officer's conduct based on investigator's independent review of facts/circumstances of the incident." This requirement requires a comprehensive assessment of a report's analysis of the evidence bearing on an investigator's findings, and the Monitoring Team does not have confidence in these results, which seem very high given the generally low quality of the investigations reviewed.

|  | Yes | No | Agree |
|---|---|---|---|
| **(Q72) Narrative with description of incident that includes precise description of evidence that either justifies or fails to justify officer's conduct based on investigator's independent review of facts/circumstances of the incident?** | 173.5 (71.99%) | 67.5 (28.01%) | 31/40 (77.5%) |

To probe these topline findings further, the Monitoring Team excluded cases which were administratively closed (which, by definition should not have included such a specific narrative). Of the cases that were definitively found not administratively closed, a full 81% did not have narratives meeting the standard. The Monitoring Team also found that FTA cases (which reviewers anecdotally indicated were more often complete) had the highest percentage of narratives; the CIU cases (which often had the most chaotic files) had the lowest.

| Narrative with description (Q72) | | | |
|---|---|---|---|
| **Q82e Allegation closed or administrative closed** | **Yes** | **No** | **Total (N= (241)** |
| Yes | 40 (39.6%) | 61 (60.4%) | N=101 |

| No | 25.5 (19.0%) | 108.5 (81.0%) | N=134 |
| UTD | 1.5 (25%) | 4.5 (75%) | N=6 |

| **(Q75) Did the investigative report include documentation that officer's certification and training for the weapon were current?** | 3.5 (43.75%) | 4.5 (56.25%) |
|---|---|---|

70 percent of cases included sufficient documentation of evidence gathered, which is remarkably high given how incomplete many of the case files were. In 15% of cases where there were no known witnesses, there was not sufficient documentation to support the case resolution.

Only 22% of cases contained complete records of audio, video, or transcript evidence for all witnesses. The paucity of complete interview records greatly limited the reviewers' ability to review cases and make determinations of adequacy based on a comprehensive, complete investigative record. Additionally, while reviewers were able to agree on whether there was sufficient documentation to support the case overall, agreement was poor on the more nuanced questions about sufficiency of evidence. Reviewers agreed on whether there was sufficient documentation of the evidence gathered 78% of the time, but agreement dropped into the 50% range for the more detailed questions. The alpha of 0.964 for this section suggests redundancy in the questions as well, so the Monitoring Team attributes these inconsistencies to repetitive questions and the confused state of the files reviewed. The Monitoring Team will consider revising this work flow in the next compliance review.

| **(Q73) Did the investigative report provide:** | **Yes** | **No** | **UTD** | **N/A** | **Agree** |
|---|---|---|---|---|---|
| Sufficient documentation of all evidence gathered (including names, phone numbers, addresses of witnesses, etc.)? | 169 (70.12%) | 54 (22.41%) | 2.5 (1.04%) | 15.5 (6.43%) | 31/40 (77.50%) |
| Sufficient documentation if no known witnesses? | 43.5 (18.05%) | 36 (14.94%) | 3.5 (1.45%) | 158 (65.56%) | 23/40 (57.50%) |
| Sufficient documentation of reason(s) why witnesses were unable to be identified or have | 33.5 (13.90%) | 18 (7.47%) | 5.5 (2.28%) | 144 (59.75%) | 23/40 (57.50%) |

45

| contact information collected? | | | | | |
|---|---|---|---|---|---|
| Sufficient documentation of identification of anyone who refused to provide a statement? | 32.5 (13.49%) | 27 (11.20%) | 12.5 (5.19%) | 169 (70.12%) | 28/40 (70.00%) |
| Sufficient documentation of whether officers/other BPD employees were interviewed? | 123 (51.04%) | 49 (20.33%) | 3.5 (1.45%) | 65.5 (27.18%) | 23/40 (57.50%) |
| Sufficient documentation of names of all other BPD employees who witnessed interviews? | 69.5 (28.84%) | 35.5 (14.73%) | 7.5 (3.11%) | 128.5 (53.32%) | 20/40 (50.00%) |
| Audio, video, and/or transcripts of all witness interviews included? | 53.5 (22.20%) | 109 (45.23%) | 7.5 (3.11%) | 71 (29.46%) | 22/40 (55.00%) |
| **α = 0.964** | | | | | |

61 percent of cases provided sufficient evaluation of the incident based on the evidence; similarly, evidence was adequately examined in 62 percent of cases. Perhaps more significant, reviewers concluded that a full quarter of cases did not have a sufficient evaluation of the incident.

Overall, material inconsistencies were resolved adequately in only 34 percent of cases and credibility determinations about witness statements were properly made in only 35 percent of cases. Similarly, officer statements were critically evaluated in slightly more than 37 percent of cases and were not well evaluated in almost a quarter of cases. There was prior deception or untruthful statements by witnesses in 134 cases, but investigators in only six of those cases (4%) actually took this information into account. Overall, this shows a lack of rigorous analysis of evidence, even though a majority of evaluations (61%) were passable.

Additionally, throughout this section, very low agree rates appear that cast doubt on the reliability of the results. Overall, it appears that reviewers were simply throwing up their hands in frustration with their ability to tease information out of the files. Any section below with an interrater reliability below 60 percent should be taken as a general comment, not any kind of specific quantitative finding. The Monitoring Team believes that questions with lower agreement rates

suffered from a problematic interplay of unorganized, highly chaotic case files and uncertainty among reviewers about how various elements of the presented file may, or may not, have satisfied Consent Decree requirements.

| (Q76) Evaluation of the Incident in the Investigative report | Yes | No | UTD | N/A | Agree |
|---|---|---|---|---|---|
| Sufficient evaluation of incident, based on review of gathered evidence, as to whether within policy, procedures, regulations, orders, or other standards of required conduct? | 147 (61.00%) | 60 (24.90%) | 17 (7.05%) | 17 (7.05%) | 26/40 (65.00%) |
| Explicit credibility findings, including precise description of evidence supporting/detracting from a person's credibility? | 76.5 (31.74%) | 76 (31.54%) | 10 (4.15%) | 78.5 (32.57%) | 24/40 (60.00%) |
| Explicit resolution or discussion of material inconsistencies, including precise description of evidence relied upon to resolve the inconsistencies? | 82 (34.02%) | 55 (22.82%) | 7 (2.90%) | 97 (40.25%) | 10/26 (38.46%) |
| Evidence adequately examined and described? | 149.5 (62.03%) | 51 (21.16%) | 17.5 (7.26%) | 23 (9.54%) | 29/36 (80.55%) |

| | | | | | |
|---|---|---|---|---|---|
| Credibility determinations about statements based on independent, unbiased, and credible evidence? | 85.5 (35.48%) | 47 (19.50%) | 27.5 (11.41%) | 81 (33.61%) | 9/31 (29.03%) |
| Officer statements critically evaluated? | 89.5 (37.14%) | 54 (22.41%) | 23.5 (9.75%) | 74 (30.71%) | 14/34 (41.18%) |
| Past deception/untruthful statements by witnesses, complainants, officers taken into account? | 6 (2.49%) | 89 (36.93%) | 39 (16.18%) | 107 (44.40%) | 7/26 (26.92%) |
| Importance of evidence reasonably weighed? | 141 (58.51%) | 47.5 (19.71%) | 17 (7.05%) | 35.5 (14.73%) | 22/37 (59.46%) |
| Testimonial evidence reasonably weighed? | 74 (30.71%) | 41.5 (17.22%) | 11 (4.56%) | 114.5 (47.51%) | 6/26 (23.08%) |
| All relevant BPD officer activity in the incident and any evidence of potential misconduct | 120 (49.79%) | 46.5 (19.29%) | 31 (12.86%) | 43.5 (18.05%) | 20/36 (55.56%) |

| | | | | | |
|---|---|---|---|---|---|
| uncovered, whether or not part of the original allegation, fully investigated and evaluated? | | | | | |
| Sufficient documentation of recommendations for non-punitive action or misconduct charges? | 64.5 (26.76%) | 51 (21.16%) | 9 (3.73%) | 116.5 (48.34%) | 9/29 (31.03%) |
| Sufficient documentation of whether additional training, counseling, or intervention was recommended? | 30 (12.45%) | 53 (21.99%) | 11 (4.56%) | 147 (61.00%) | 1/21 (4.76%) |
| *α = 0.963* | | | | | |

Inconsistencies in the evidence were encountered in almost a quarter (23 percent) of cases. Where there were such inconsistencies, they were not resolved some 59 percent of the time. Moving forward, BPD will need to ensure that investigative reports expressly address and resolve material inconsistencies.

| | Yes | No | Agree |
|---|---|---|---|
| **(Q77) Were there material inconsistencies between complainant, officers, witnesses, statements and/or amongst the evidence?** | 55 (22.82%) | 186 (77.18%) | 32/40 (80.00%) |
| **(Q80) Were the inconsistencies appropriately resolved?** | 22.5 (40.91%) | 32.5 (59.09%) | 4/6 (66.67%) |

| **(Q78) What was the nature of the inconsistencies** | |
|---|---|
| Inconsistencies among statements | 29.5 |
| Video inconsistent with statement(s) | 11 |
| Inconsistent evidence | 6.5 |
| Other | 8 |

| **(Q79) Did the investigator make and the investigative report state all reasonable efforts to resolve material inconsistencies?** | |
|---|---|
| All inconsistencies reasonably addressed | 17 |

| Inconsistencies not reasonably addressed | 38 |
|---|---|

Finally, weapons were seldom used during incidents (3.32%, or eight cases), but in that small sample, the current state of the officer's certification for use of that weapon was included in only three cases. The rarity of use of weapons makes it difficult to draw conclusions for this assessment measure, but clearly certification should be included in all cases moving forward.

| (Q74) Was a weapon used or involved during the incident? | 8 (3.32%) | 233 (96.68%) |
|---|---|---|

## INVESTIGATIVE FINDINGS

Of the cases that resulted in disposition, the evidence met the standard of proof required to justify the disposition[10] in 61 percent of cases; the evidence in more than one-quarter (27 percent) did not meet the standard. Also, as expected because these requirements were not implemented at the time of review, very few investigations considered patterns in officer behavior (16.4%), prior unsustained complaints (6%), or officer training records (less than 5%). Agreement and alpha for these questions were very good. Moving forward, PIB will need to significantly improve the quality of both investigations and investigator analysis to ensure that, in every investigation, the evidence meets the standard of proof required to justify the disposition. Further, PIB must adhere to Consent Decree requirements by examining patterns and past behaviors.

In approximately seven out of ten cases (72 percent), investigators expressly identified and recommended a specific disposition. In 33 percent of cases, however, the finding that investigators was "closed" or administratively closed." This is remarkably consistent with the findings in the original investigation by the Department of Justice, which found that "BPD supervisors administratively closed 33 percent of all allegations received from 2010 through 2015—ensuring that the allegations would result in no further investigation or officer discipline." Findings Report

---

[10] As previously discussed, the relevant findings and standards of proof are:

"Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the accused officer;

"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;

"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;

"Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate BPD policies, procedures, or training.

at 142. Administratively closing cases without adequate investigation or without reaching disposition undermines the legitimacy the BPD's system of accountability.

Reviewers said that 68 percent of allegations closed without disposition had documented supervisory approval for closure. The Monitoring Team does not have confidence in this figure. We believe that it is the result of (1) the chaotic nature of the reviewed files and (2) a lack of uniform operationalization among reviewers with respect to how the Consent Decree's requirements for documentation will look like in practice. The Team suspects that some reviewers inferred approval from the fact that a case was documented as closed within the IAPro database. This is not necessarily the case.

| (Q82) Investigative Findings | Yes | No | UTD | Agree |
|---|---|---|---|---|
| For each misconduct allegation, did the investigator expressly identify and recommend a disposition of "unfounded," "sustained," "not sustained," or "exonerated" explicitly identified and recommended by the investigator? | 172.5 (71.58 %) | 60.5 (25.10%) | 8 (3.32%) | 35/40 (87.50%) |
| Did findings consider patterns in officer behavior based on disciplinary history? | 39.5 (16.39%) | 151.5 (62.86%) | 50 (20.75%) | 36/40 (90.00%) |
| Did findings consider prior complaints in which allegations were not sustained? | 14.5 (6.02%) | 168.5 (69.92%) | 58 (24.07%) | 33/40 (82.50%) |
| Did findings consider officer training records? | 11.5 (4.77%) | 173 (71.78%) | 56.5 (23.44%) | 39/40 (97.50%) |
| For any allegation, was the disposition "closed" or "administratively closed" used? | 78.5 (32.57%) | 156.5 (64.94%) | 6 (2.49%) | 29/40 (72.50%) |

| | | | | |
|---|---|---|---|---|
| Based on your review of the investigation, did the investigator's recommended disposition of each allegation and/or finding meet the required level of proof? ("Preponderance of the evidence" for all dispositions other than "unfounded," for which required level of proof is "clear and convincing evidence"). | 147 (61.00%) | 64 (26.56%) | 30 (12.45%) | 30/40 (75.00%) |
| **α = 0.752** | | | | |

| | Yes | No | Agree |
|---|---|---|---|
| **(Q83) Was the approval for the use of the "closed" or "administratively closed" disposition documented in writing? (N=78.5 from Q82e)** | 54 (68.79%) | 24.5 (31.21%) | 6/7 (85.71%) |

## ADMINISTRATIVE REVIEW OF COMPLETED INVESTIGATION

The Consent Decree requires administrative review of completed misconduct investigations. Cases that are managed by supervisors at Districts must be forwarded through the chain of command to the District Commander to determine whether the evidence satisfies the standard of proof that justifies the recommended disposition, whether there are investigative deficiencies, and whether the investigation is complete and accurate. Dkt. 2-2 at ¶354(a).

All investigations are ultimately referred to the Director of OPR, to:

> [R]eview the report to ensure that the report is complete, that it meets the requirements of BPD policy and this Agreement, and that the findings are supported by the appropriate standard of proof;

[O]rder additional investigation when it appears that there is additional relevant evidence that may assist in resolving inconsistencies or improving the reliability or credibility of the findings . . . .

Dkt. 2-2 at ¶354(b).

Only about 44 percent of cases were timely forwarded through the chain of command for review. At the chain of command review, patterns in officer behavior based on disciplinary history were considered in only 14 percent of cases. Prior complaints that did not result in discipline and training records were almost never considered (5.6%).

| (Q85) | Yes | No | UTD | Agree |
|---|---|---|---|---|
| Was completed investigation timely forwarded through investigator's chain of command to Director of OPR? | 105  (43.57%) | 98 (40.66%) | 38 (15.77%) | 30/40 (75.00%) |
| Did review/findings consider patterns in officer behavior based on disciplinary history? | 33 (13.69%) | 148.5 61.41%) | 59.5 (24.69%) | 38/40 (95.00%) |
| Did review/findings consider prior complaints in which allegations were not sustained? | 13.5 (5.60%) | 162 (67.22%) | 65.5 (27.18%) | 35/40 (87.50%) |
| Did review/findings consider officer training records? | 13.5 (5.60%) | 160 (66.39%) | 67.5 (28.01%) | 40/40 (100.00%) |
| Was the disposition "closed" or "administratively closed" used? | 80 (33.20%) | 150.5 (62.45%) | 10.5 (4.36%) | 27/40 (67.50%) |
| α = 0.801 | | | | |

| | Yes | No | Agree |
|---|---|---|---|
| (Q86) Was approval for "closed" or "administratively closed" disposition documented in writing? (N=80 from Q85e) | 43.5 (55.06%) | 35.5 (44.94%) | 3/6 (50.00%) |

In addition to all the specific investigation requirements, the Consent Decree requires BPD to "develop a process to ensure that completed misconduct investigations are evaluated for policy,

training, tactical or equipment concerns, including any recommendations for how those concerns will be addressed." CD at ¶352. Specifically, BPD should evaluate whether:

  a. An assessment of whether the law enforcement action was in compliance with training and legal standards;
  b. Other tactics were more appropriate under the circumstances;
  c. The incident indicates a need for additional training, counseling, or other non- disciplinary corrective actions; and
  d. The incident suggests that BPD should revise its policies, strategies, tactics or training.

Reviewers found that these assessments were rarely evident in the investigation files, with only 35 percent of cases clearly indicating that the conduct under investigation was in compliance with training and legal standards. Consideration of tactics (5.8%), training or counseling (11.4%), and changes to policy (7.8%) was infrequent.

| POLICY, TRAINING, & TACTICAL CONCERNS | | | | |
|---|---|---|---|---|
| (Q88) | Yes | No | UTD | Agree |
| Law enforcement action was in compliance with training and legal standards? | 84.5 (35.06%) | 76 (31.54%) | 80.5 (30.40%) | 31/40 (77.50%) |
| Other tactics were more appropriate under the circumstances? | 14 (5.81%) | 159.5 (66.18%) | 67.5 (28.01%) | 38/40 (95.00%) |
| Incident indicates need for additional training, counseling, or other non-disciplinary corrective actions? | 27.5 (11.41%) | 154.5 (64.11%) | 59 (24.48%) | 35/40 (87.50%) |
| Incident suggests that BPD should revise its policies, strategies, tactics, or training? | 19 (7.88%) | 169.5 (70.33%) | 52.5 (21.78%) | 36/40 (90.00%) |
| A = 0.912 | | | | |

The Consent Decree also imposes supervisory requirements for misconduct investigations. In addition, it imposes restrictions intended to protect against conflicts of interests for investigators, disqualifying as investigators and supervisors PIB staff who either witnessed the incident that is

the subject of the investigation or had a business or personal relationship with the subject, the complainant. or a witness.

Meetings between OPR supervisors and investigators on investigative progress were only documented in about 4 percent of cases. Cases were only reassigned in 5.6 percent of cases, though the vast majority of those reassignments were documented.

Conflicts either with involved personnel or personnel with a personal or financial conflict of interest were identified in less than 1 percent of cases.

| CONFLICTS OF INTEREST | | | |
|---|---|---|---|
| (Q89) | Yes | No | UTD |
| Meetings documented between OPR supervisors and investigators to evaluate progress of an investigation documented? | 10.5 (4.36%) | 174 (72.20%) | 56.5 (23.44%) |
| Was an employee who was involved in or a witness to the incident conduct or review the investigation arising from the incident? | 2 (0.83%) | 192 (79.67%) | 47 (19.50%) |
| Did an employee with (1) an external business relationship, or (2) a personal relationship with a principal or witness in the investigation conduct or review the misconduct investigation? | 1 (0.41%) | 185 (76.76%) | 55 (22.82%) |
| Was the investigation reassigned to another investigator at any point? | 13.5 (5.60%) | 223.5 (92.74%) | 4 (1.66%) |

| | Yes | No |
|---|---|---|
| (90) Was the re-assignment documented? | 11 (81.48%) | 2.5 (18.52%) |