# **Exhibit 1**

# STOPS, SEARCHES, AND ARRESTS ANNUAL PROGRESS REPORT

March 2021



## INTRODUCTION

The Baltimore Police Department (BPD) is committed to transforming its department into a modern, 21st century police agency. BPD is also committed to a foundation of constitutional and fair policing for all, with the Consent Decree providing the roadmap to reform. One of the largest sections of reform within the Consent Decree is Section IV. Stops, Searches, Arrests, and Voluntary Police-Community Interactions. Paragraph 27 of the Consent Decree summarizes that constitutional policing is enhanced by community policing, which in turn requires officers to interact with the community in a myriad of ways. Voluntary contacts build relationships and avenues of communication between the police and the community. However, there are times where BPD may conduct more procedural, investigatory stops in response to crime prevention and enforcement. Yet, BPD must:

> *…adopt and maintain community policing principles that ensure its officers conduct investigatory stops, searches, and arrests fairly and respectfully as part of an effective overall crime prevention strategy that is consistent with community priorities for enforcement.*
> (Paragraph 28, Consent Decree)

In order to implement these goals concerning Section IV, BPD is responsible for several requirements in the areas of policy, training, and data collection and reporting. BPD made progress in the areas of policies and training, but is still unable to fully capture the data required to fulfill the data elements of Section IV, namely Paragraph 86, which states:

> *BPD will develop procedures for regularly assessing the effectiveness of its stop, search, and arrest practices. As a part of these assessments, BPD shall evaluate, on at least a quarterly basis:*
>
> a. *The percentage of investigatory stops and detentions that uncover evidence of criminal activity, including warnings, citations, and arrests, and the nature of the criminal activity uncovered, e.g., the rate at which stops result in evidence of felonies*
> b. *The percentage of weapons frisks that result in seizure of unlawful weapons; and*
> c. *The percentage of searches that result in seizure of contraband, and the nature of the contraband seized.* (Consent Decree)

In 2019, the BPD, Monitoring Team, and DOJ convened a work group dedicated to examining the paper-based reporting process and identifying what data was readily available to analyze. The work group found that most information is being collected, but fragmented across multiple data forms and systems, making the data more difficult to pull together in a cohesive and consistent manner. An analysis of a sample size of clean data was attempted, but the group determined that it was too narrow in scope to effectively make an evaluation about the universe of stops, searches, and arrests made in the city. As a result, the work group decided to shift the quarterly reporting to an annual report on BPDs progress in data collection.

## UPDATES TO 2019 REPORT

In the 2019 report, BPD presented four strategies to address the various holes in data systems and processes:

1

1. Expand the use of the Maryland State Police's (MSP) E-Tix software to capture stops, searches, and arrest data.
2. Hire contracted workers for data entry of backlogged Part II incident reports and stop tickets.
3. Consolidate the paper-based reporting forms.
4. Release a request for proposal for a new records management system (RMS), with the hope to have a vendor selected by fall.

The status of those strategies are detailed below:

*E-Tix Deployment*

BPD deployed 238 E-tix machines as of January 2021, which enhances automated data collection for vehicle stops. Although the introduction of the new RMS in April will provide a long-term solution for data collection of all stops, searches, weapons pat-downs, and arrests (SSA); the State of Maryland still requires traffic stops that result in the issuance of traffic violations or warnings to be captured in E-tix. To ensure all SSA data is stored and accessible in the same RMS, data from E-tix will be migrated into the Department's new RMS. Additionally, any actions beyond issuing a citation or warning that occurred during the traffic stop, such as searches or arrests, will be entered directly into the RMS by the officer conducting the action as soon as practicable, but no later than required by policy.

*Data-Entry*

With regard to hiring contractors, the 2019 sample analysis found that the paper incident reports did not capture the entirety of the stop; therefore, hiring additional resources for data entry would not truly resolve the issue.

BPD currently has a backlog consisting of the majority of 2020's Part II crime reports, all of 2020 and most of 2019 pedestrian stop tickets, and vehicle stop tickets written between March 2020 and the present. The new RMS, configured to capture more information and entered directly by officers, will improve data quality and increase the availability of existing data-entry personnel to address backlogs. With implementation occurring in stages between April and August 2021, data entry personnel can direct their time towards entering the backlog into the new RMS beginning with the oldest reports.

*Consolidating Paper-Based Forms and Deploying a Modern Records Management System*

Strategies three and four are intertwined.

Shortly after publishing the June 2019 report, BPD completed its organizational restructuring that elevated the IT Division's decision-making authority, and included a new Chief Technology Officer and other IT support staff. With the onboarding of experienced IT staff, BPD quickly released a request for information (RFI) of RMS vendors in September 2019, finalized the contract in June 2020, and scheduled implementation for April 2021. The RMS plan went from a vision to a tangible reality.

With a long-term solution on the horizon, BPD redirected resources from the short-term plan to consolidate its paper-based forms and concentrated efforts toward preparing twenty years-worth of existing data for migration into the new, comprehensive RMS, which will be implemented in April. Information, such as single locations and individuals' names, were in the system indices multiple times due to spelling errors or shorthand. Consolidating paper forms and reflecting those changes in the current 20-year-old RMS would disrupt data-validation efforts. Additionally, the new RMS deployment is

2

within a few months of the activation of the new SSA policies. Any updated SSA paper forms would only be in effect for roughly three months before transitioning to the new RMS.

*New Records Management System*

After months of reviewing and demoing records management systems, BPD selected Records by Axon, the same vendor that produces BPD's body worn cameras (BWC), tasers, and storage platform for BWC and other footage. In the statement of work (SOW), BPD outlined over 1,500 requirements that would ensure not only the collection of needed data, but also the functionality required for business processes. Examples of such functionality include the ability to:

- Enable electronic reporting compliant with the data capture requirements on Stops, Searches, and Arrests and other consent decree areas.
- Provide a configurable workflow utility that allows for document (e.g., reports, orders, requisitions, receipts, acknowledgements, etc.) approval paths.
- Provide the capability to designate selected data fields as mandatory for submission.
- Designate data fields as a certain type (e.g. pick lists, drop down menus, auto-populate fields based on search results, etc.
- Create ad hoc reports based on multiple concurrent parameters (including but not limited to date range, type code, priority code, locations/addresses, Unit assignments) to satisfy reporting requests.
- Create summary reports of calls for service, arrests, citations, and offenses.

By the end of last year, BPD completed the discovery phase for patrol reporting, which consisted of identifying interfaces and configurations required to meet the operational and data collection needs for patrol reporting and analysis, including those required by the Consent Decree. Subject matter experts from both the Operations and Compliance Bureaus examined current processes and those soon to be implemented by updated policies in transport, SSA, sexual assault, and behavioral health. The resultant product was a report and data field library outlining necessary fields and functionality to meet the officers' needs "to document the information described in the 'Stops' section." (Paragraph 83, Consent Decree) BPD shared the data field library with the Department of Justice (DOJ) and the Monitoring Team, and incorporated feedback into the system where possible.

Additionally, in accordance with Paragraph 83, BPD provided demos of the system to the DOJ and the Monitoring Team, and continues to incorporate feedback to ensure that the system readily captures data required by the Consent Decree. BPD is also currently developing a detailed plan for training and implementation, which will be shared with the DOJ and the Monitoring Team.

*Releases Without Charge (RWOC) Arrests*

Last year, BPD began, per Paragraph 79, quarterly examinations of RWOC arrest determinations made by the State's Attorney's Office (SAO). BPD completed and filed with the court two reports for 2020 that collectively cover the months of April through September, and are finishing the final 2020 report covering October through December.

## **CONCLUSION**

Although BPD is still unable to extract all data needed to conduct analysis around stops, searches, and arrests as set forth in Paragraphs 86 and 459 due to antiquated technology and reporting systems, BPD's new RMS will soon allow far greater analysis of stops, searches, and arrests in line with consent decree requirements.

BPD focused tremendous energy towards preparation for the new RMS, something that only existed in discussions for years prior. BPD cleaned historical data for integration into the new RMS, outlined data fields needed to meet the operational and informational needs of the future, and continues to work with Axon on developing configurations for quality control. A few configurations include establishing structured and mandatory fields to ensure officers are capturing relevant information that is void of errors; developing a supervisory review workflow that tracks reports sent back for correction; and analyzing data output and making modifications to the system as necessary.

In January, BPD demoed the system and solicited feedback from the DOJ and the Monitoring Team. As implementation progresses, BPD will continue to consult with the DOJ and MT about data collection and the department's ability to measure the assessments found in Paragraphs 86 and 459 e-g, amongst other paragraphs. Based on that consultation and review of user feedback, the BPD will work with Axon to make the appropriate modifications. With implementations scheduled to end by the beginning of August 2021, the BPD aims to have, by the beginning of 2022, comprehensive Q4 2021 data to meet the assessments required by Paragraph 86.

In the meantime, BPD continues its quarterly RWOC arrest reports to assess the quality of arrests.