

# ASSESSMENT OF 2020 FIRST AMENDMENT PROTECTED ACTIVITIES

## REPORT PUBLISHED: SEPTEMBER 2, 2021

# TABLE OF CONTENTS

OVERVIEW ........................................................................................................................1

KEY DEFINITIONS ............................................................................................................3

RELEVANT POLICIES ......................................................................................................4

RESPONSE TO PROTEST ENVIRONMENTS ................................................................5

    Reviews of Arrests during Protests ..........................................................................5

    Review of Failure to Obey (FTO) Arrests ................................................................7

    Reviews of Level Two Uses of Force during Protests ...........................................9

    General Supervisory and Front-Line Response Review .......................................10

DISORDERLY CONDUCT ARREST REVIEW ...............................................................13

MISCONDUCT CASE REVIEW ......................................................................................15

    Case Summaries .....................................................................................................15

    Data ..........................................................................................................................21

    Conclusions regarding Misconduct Cases ............................................................23

RECOMMENDATIONS.....................................................................................................23

CONCLUSIONS ............................................................................................................... 24

APPENDIX A ................................................................................................................... 26

APPENDIX B ................................................................................................................... 31

APPENDIX C ................................................................................................................... 34

The Baltimore Police Department (BPD) recognizes the importance of First Amendment protected activity, not only as a bedrock of our nation's values, but also as a critical foundation for effective, transparent policing in Baltimore City. In order to ensure that BPD officers are respecting the public's First Amendment rights, BPD conducts an annual assessment of data, events, and complaints related to First Amendment activities. This report covers BPD's assessment of its responses to First Amendment activities that occurred in the 2020 calendar year.

Through a collaborative process that incorporated feedback from the public, BPD revised its policies (Policy 804, *First Amendment Protected Activity* and Policy 1016, *Public Observation/Recording of Officers*) to provide officers with clear guidance as they encounter First Amendment Protected Activity in the course of their duties. These revised policies remained in draft form throughout 2020, the period which this report covers, and therefore this report and the below described assessments utilize the then-active policies, published in 2016, as the measure against which BPD was tested for compliance. Future reports will conduct the analysis against compliance with the revised policies, which are on the verge of being published as this report is being finalized. They are referred to below as the versions to be published in September 2021.

As part of this annual assessment and report, BPD:

1. Analyzed responses to public protests or assemblies (Consent Decree ¶ 255.b);

2. Reviewed Disorderly Conduct arrests for possible First Amendment violations;

3. Reviewed and analyzed complaints alleging misconduct related to First Amendment Protected Activity  (Consent Decree ¶ 255.a);

4. Made conclusions, to the extent possible, about BPD's performance in protecting individuals' First Amendment rights; and

5. Identified deficiencies and opportunities for improvement, and made recommendations for appropriate corrective action or improvement measures, which will be documented per BPD policy (Consent Decree ¶ 256).

Of note, similar to challenges mentioned in other BPD public reports, the Department's available data on this topic is incomplete. BPD does not collect data specific to the exercise of the First Amendment by the public beyond its response to protests. This is because interactions related to the exercise of First Amendment rights, while frequent, are so varied in how and when they occur. This makes it difficult to establish a practical way to identify interactions with a First Amendment component from all other police interactions that occur on a daily basis.

Therefore, this report ventures to evaluate BPD's performance with First Amendment protections through the following strategies:

**1. Scrutinizing BPD's response to protest environments.** BPD reviewed Body-Worn Camera (BWC) footage from protests occurring (1) between May 30, 2020 to June 20, 2020 after the killing of George Floyd in Minneapolis; and (2) in August 2020 during the President and Vice President's visit to Baltimore during the Republican National Convention, in order to examine officers' actions during large-scale protest events.[1]  The BWC footage reviewed included footage of both arrests and non-arrest interactions. For arrests made during these protests, BPD also reviewed written reports. Finally, BPD reviewed all Level Two uses of force (defined below) during these protest events.

**2. Examining arrests in 2020 for Disorderly Conduct for possible First Amendment protected activity.** BPD examined these arrests by reviewing incident reports and BWC footage. While BPD recognizes that this analysis is not a complete picture of BPD's response to the public's everyday exercise of First Amendment rights (e.g., the right to criticize law enforcement or simply speak their mind), focusing this study on Disorderly Conduct arrests offers a preliminary view of

---

[1] *The methodology agreed upon by the BPD, U.S. Department of Justice (DOJ) and Monitoring Team for this assessment included an analysis of potential protests related to the Presidential election from November 3, 2020 to December 31, 2020; however, no such events occurred in Baltimore.*

encounters with the public where First Amendment protected activities may be at play and how the Department responded to those incidents. BPD intends to reassess this strategy for future reports with the goal of undertaking potentially more effective methods to identify and evaluate incidents involving the public's routine exercise of First Amendment rights.

**3. Analyzing misconduct complaints classified as related to the exercise of First Amendment protected activities.** To accomplish this, BPD identified a total of 13 misconduct complaints received from 2018 through 2020 that related to First Amendment protected activity. Eight were complaints made by members of the public and five were internally-generated complaints. These complaints are investigated by BPD's Public Integrity Bureau, which is BPD's internal unit charged with conducting administrative investigations of allegations of police misconduct.

These various review strategies enabled BPD to examine its officers' responses to First Amendment protected activity from several angles, in order to determine what is being done well and what needs improvement.

This report finds the following:

1. BPD's responses to protest environments in 2020 were compliant with policy requirements and did not infringe on protesters' First Amendment rights. The review included (1) 30 protest related arrests, (2) six protest related Level Two use of force incidents, (3) random review of 16 First Amendment related protest interactions, and (4) evaluation of departmental planning and supervision during protest events.

2. A review of BPD's handling of Disorderly Conduct related arrests in 2020 found no First Amendment related violations. These arrests were analyzed to determine if they involved First Amendment protected activities. Eight of the total 35 Disorderly Conduct arrests had First Amendment implications. Analysis of one of the eight First Amendment related arrests was inconclusive for reasons outlined later in this report. The other seven arrests were compliant with policy. Of the remaining 27 arrests that did not implicate the First Amendment, two of them were problematic for other reasons. One of these arrests lacked probable cause. The other was problematic because the officer did not provide medical assistance in a timely manner as required by BPD policy. The overall review of these arrests demonstrated (1) the positive trend that BPD arrest rates for Disorderly Conduct calls is extremely low (0.04% of calls for Disorderly Conduct resulted in arrests), meaning that exceedingly few responses to Disorderly Conduct calls even raised the possibility of a First Amendment violation, (2) the general trend of compliance with the First Amendment in BPD responses to Disorderly Conduct calls that did implicate the First Amendment and (3) the need for remedial guidance and training in 4th Amendment stop, search and arrest principles for the officers involved in the two problematic arrests.

3. Since 2018, BPD has investigated 13 complaints alleging misconduct related to violations of First Amendment rights. This review revealed that of those 13 complaints, nine of those investigations are complete and four remain open. Of the nine cases that have been completed, one case resulted in a disposition of "sustained" regarding the First Amendment related allegation. The dispositions of the other eight closed cases were as follows: three were "not sustained" and five were "unfounded". Furthermore, this assessment revealed an opportunity for BPD to improve upon its classification of First Amendment related allegations by consistently following its relatively new Classification Protocol as it classifies incoming complaints. As BPD continues to improve its consistency in applying allegations as outlined in the Classification Protocol, this will better allow the Department to capture and assess trends with regard to First Amendment related complaints in the coming years.

The following sections of the report explain each of the three strategies for review in greater detail, and provide conclusions and recommendations for improvement.

# KEY DEFINITIONS

**First Amendment Protected Activity:** Any of the following conduct, speech, or expression: (1) free speech and expression, which includes criticizing law enforcement or otherwise engaging in protected expression in the presence of law enforcement officers without being subject to retaliation; (2) organization and participation in lawful assemblies and protests in parks, on sidewalks, in streets and in other public forums, including public forums near the object of the assembly or protest so that those assembled may be seen or heard; and/or (3) observation and recording of the actions of law enforcement officers in the public discharge of their duties in all public spaces, as well as all other areas in which persons have a legal right to be present, without being subject to retaliation.

**First Amendment Assembly/Demonstration:** An assembly of persons engaging in First Amendment Protected Activity. These may be scheduled events that allow for law enforcement planning but also may include spontaneous assemblies. They include, but are not limited to, marches, protests, and other assemblies.

**Statement of Probable Cause (SPC):** A clearly written statement made after an arrest in support of an Application for Statement of Charges, which articulates the basis for the member's belief that a particular person has committed a crime.

**Body-Worn Camera (BWC) Footage:** Video footage obtained from police officers' required visual and audio recording device, which is affixed to an officer's person, uniform, or equipment.

**Acts of Retaliation:** A law enforcement officer's illegitimate acts that are made against a person in response to something they have done or said. Acts of Retaliation for persons exercising their First Amendment rights could take the form of ordering persons or groups to disperse, or by stopping, detaining, searching, using force against, arresting, issuing a citation to, or threatening to stop, detain, search, use force against, arrest or issue a citation to any person or group.

**Disorderly Conduct:** A class of criminal offenses under Maryland law that prohibits three (3) types of conduct commonly known as (1) Hindering, (2) Disorderly Conduct/Disturbing the Peace, and (3) Failure to Obey:

1. **Hindering:** "A person may not willfully and without lawful purpose obstruct or hinder the free passage of another in a public place or on a public conveyance."

2. **Disorderly Conduct/Disturbing the Peace:** "A person may not willfully act in a disorderly manner that disturbs the public peace."

3. **Failure to Obey:** "A person may not willfully fail to obey a reasonable and lawful order that a law enforcement officer makes to prevent a disturbance to the public peace."

**Loitering:** The Baltimore City Code defines "loiter" as follows: "(1) to stand around or remain or to park or remain parked in a motor vehicle at a public place or place open to the public and to engage in any conduct prohibited under this law; or (2) to collect, gather, congregate, or to be a member of a group or a crowd of people who are gathered together in any public place or place open to the public and to engage in any conduct prohibited under [Baltimore City Code]." The Baltimore City Code defines the misdemeanor offense of Loitering, or "prohibited Loitering," as follows: "(1) It shall be unlawful for any person to loiter at, on, or in a public place or place open to the public in such manner: (i) to interfere with, impede, or hinder the free passage of pedestrian or vehicular traffic; (ii) to interfere with, obstruct, harass, curse, or threaten or to do physical harm to another member or members of the public; or (iii) that by words, acts, or other conduct, it is clear that there is a reasonable likelihood a breach of the peace or Disorderly Conduct shall result. (2) It shall be unlawful for any person to loiter at a public place or place open to the public and to fail to obey the direction of a uniformed police officer or the direction of a properly identified police officer not in uniform to move on, when not to obey such direction shall endanger the public peace."

**Probable Cause:** Where facts and circumstances taken as a whole, known to the member at the time of the arrest, would lead a reasonable member to believe that a particular person has committed or is committing a crime. Probable Cause is based upon an objective assessment of the facts and circumstances presented to the member.

**Baltimore City State's Attorney's Office (SAO):**  Agency responsible for the prosecution of crimes that occur in Baltimore City.

**Court Commissioner:** In Maryland, a District Court Commissioner is a judicial officer appointed by the Chief Judge of the District Court of Maryland.  Court Commissioners have three primary  responsibilities:  (1)  Reviewing  Applications  for Statement of Charges to determine whether Probable Cause exists to issue charging documents; (2) Conducting initial appearance hearings for arrested individuals to decide the conditions of pre-trial release; and (3) Determining eligibility of applicants for Office of the Public Defender services.

**Stet Docket:** An inactive docket maintained by the court.

**Released Without Charge (RWOC):** Release from the Central Booking Intake Facility (CBIF) after arrest without being charged with the commission of a crime.

**Nolle Prosequi (Nol Pros):** Nolle Prosequi is a legal term and in Latin means, "do not prosecute." It is often referred to as a Nol Pros.  If a person has been charged with a crime or traffic offense and the Assistant State's Attorney elects not to proceed with the case, they will enter a Nolle Prosequi in the court record.  This means the case is dismissed and the State has chosen not to proceed with the charges.

# RELEVANT POLICIES

Policy 725, *Use of Force Reporting, Review, and Assessment*, dated November, 24, 2019.
Policy 804, *First Amendment Protected Activity*, dated July 1, 2016.
Policy 824, *Body Worn Camera*, dated January 1, 2018.
Policy 1016, *Citizen Observation/Recording of Officers*, dated July 1, 2016.
Policy 1018, *Quality of Life Offenses-Core Legal Elements*, dated July 1, 2016.
Policy 1115, *Use of Force*, dated November 24, 2019.
Draft Policy 1018, *Lesser Offenses and Alternatives to Arrest*, dated 18 November 2020.
Policy 804, *First Amendment Protected Activity*, (to be published September 2021).
Policy 1016, *Public Observation/Recording of Officers*, (to be published September 2021).

# RESPONSE TO PROTEST ENVIRONMENTS

## Reviews of Arrests during Protests

BPD's Audits & Inspections Unit (A&I) compiled data regarding arrests during (1) protests resulting from the killing of George Floyd taking place May 29 through June 20, 2020, and (2) the demonstrations during the President and Vice President's visit to Baltimore during the Republican National Convention during the evening of August 26, 2020. A&I then assessed which arrests were directly related to the protests as opposed to unrelated incidents that occurred in the area[2]. A&I found no citations related to protest events in 2020. A&I then assessed and categorized the arrests requiring supervisory approval following dispersal orders, as well as all other arrests related to protest activity. This replicates what the Monitoring Team is ultimately required to do under Consent Decree ¶459.j. (*"to assess whether members of the public are able to express themselves freely, observe and record law enforcement, and engage in lawful public demonstration and protests without intimidation or retaliation by police, the Monitor will conduct analysis of, the number of citations and arrests requiring supervisor approval under the First Amendment section of this Agreement, broken down by police district and arrest charges."*).

**2020 Protest related arrests[3]**

| George Floyd Protests | | Presidential visit to Fort McHenry | |
|---|---|---|---|
| Burglary | 15 | Assault | 1 |
| Assault | 5 | | |
| Destruction of Property | 2 | | |
| Firearms violation | 1 | | |
| Failure to Obey | 6 | | |
| **Total** | **29** | **Total** | **1** |

A&I conducted a review of all 30 arrests directly related to the exercise of First Amendment protected activities during these protest events to analyze their quality and compliance with Consent Decree requirements.

The components of each arrest review included all of the following, as available:

- Incident reports and/or statements of probable cause; and
- BWC footage from the arresting officer(s).

The following questions were considered for each sampled arrest:

1. Did the incident giving rise to the arrest occur in the officer's presence and proximity?

2. Was the individual engaged in First Amendment Protected Activity as defined in Policies 804 and 1016 (e.g., criticizing police action, recording police action, or assembling with others)?

3. Was there sufficient and individualized probable cause that their actions met the elements of a crime?

4. If the person's arrest was due mainly to their physical location (trespassing, blocking traffic, etc.), did the officer recommend an alternative location where the individual could continue to engage in constitutionally-protected speech/conduct?

5. Did the officer give a verbal warning or attempt to use a less intrusive means of enforcement prior to the arrest?

---

[2] *For example, an arrest for failure to obey after verbal commands at the site of a First Amendment protest would be included in the sample. In contrast, an arrest for an open warrant stemming from a motor vehicle violation in the area of a First Amendment protest would not be included in the sample.*

[3] *Only the most significant charge is listed. Many arrests included multiple criminal charges.*

6. Did officers in any way restrict or prohibit individuals in the vicinity of the arrest from observing and/or recording the arrest?

7. If any individual in the vicinity of the arrest was moved to effect the arrest, was there a specific articulable law enforcement basis for moving the individual at that time?

8. Was the arrested individual or any individual in the vicinity of the arrest asked to cease audio or video recording prior to, during, or after the arrest? If so, was there a particular and specific legitimate law enforcement basis for doing so at the time?

9. Did the officer intentionally or recklessly destroy any audiovisual recording equipment?

10. If any camera or other audiovisual recording equipment was seized prior to, during, or after the arrest, was a legal subpoena, search warrant, or other valid order obtained after the fact? Was supervisory approval obtained for such seizure?

11. If multiple civilians were involved in the incident and only some were arrested, is there evidence suggesting that the content or viewpoint of the arrested individuals' speech was a reason for their arrest?

12. If an arrest was made for refusal to obey a dispersal order, did the officer obtain supervisory approval for the arrest? Was there any imminent threat to property or public safety that would exempt an officer from requesting said supervisory approval?

13. Did the officer articulate in the Statement of Probable Cause/Incident Report why a less intrusive means of enforcement was not utilized or effective?

14. Are the events reported by the officer in the Statement of Probable Cause/Incident Report consistent with the BWC footage?

15. Is there evidence suggesting that an arrest was in retaliation for constitutionally-protected speech?

16. If force was used in response to an individual engaging in legally protected speech, was the force in compliance with policy and reasonable, necessary, and proportional?

Reviewers examined each of the previous questions and provided an overall assessment of the quality of the arrest decision and reporting using the following review outcomes:

- *Satisfactory*. The officer acted in compliance with applicable policy and protected the First Amendment rights of all involved.

- *Inconclusive*. The review could not determine whether the officer did or did not comply with applicable policy or protect the First Amendment rights of all involved.

- *Unsatisfactory*. The officer did not act in compliance with applicable policy and/or protect the First Amendment rights of all involved.

A&I reviewed 29 arrests related to the George Floyd protests and one arrest related to the Presidential visit. 29 arrests complied with applicable legal standards and BPD policy. One arrest was inconclusive. Each arrest is summarized in Appendix A.

| Sample | Date | CCN | Arresting Officer Assignment | Primary Charge | Finding |
|--------|------|-----|------------------------------|----------------|---------|
| 1 | 5/30/2020 | 1-200508618 | CD | Burglary | Satisfactory |
| 2 | 5/31/2020 | 1-200508618 | ND | Burglary | Satisfactory |
| 3 | 5/31/2020 | 1-200508662 | ND | Assault | Satisfactory |
| 4 | 5/31/2020 | 1-200508618 | CD | Assault | Satisfactory |
| 5 | 5/31/2020 | 1-200508618 | SED | Failure to Obey | Satisfactory |
| 6 | 5/31/2020 | 1-200508618 | SED | Failure to Obey | Satisfactory |

| | | | | | |
|---|---|---|---|---|---|
| 7 | 5/31/2020 | 1-200508618 | CD | Failure to Obey | Satisfactory |
| 8 | 5/31/2020 | 3-200508679 | ED | Burglary | Satisfactory |
| 9 | 5/31/2020 | 3-200508679 | ED | Burglary | Satisfactory |
| 10 | 5/31/2020 | 3-200508679 | ED | Burglary | Satisfactory |
| 11 | 5/31/2020 | 1-200508618 | CD | Burglary | Satisfactory |
| 12 | 5/31/2020 | 1-200508662 | CD | Assault | Satisfactory |
| 13 | 6/2/2020 | 1-200600265 | TAC | Firearms Viol | Satisfactory |
| 14 | 6/2/2020 | 1-200600263 | E&T | Assault | Satisfactory |
| 15 | 6/2/2020 | 1-200600317 | CD | Destruction of Property | Satisfactory |
| 16 | 6/2/2020 | 1-200600284 | CD | Burglary | Satisfactory |
| 17 | 6/2/2020 | 1-200600263 | E&T | Failure to Obey | Satisfactory |
| 18 | 6/2/2020 | 1-200600263 | E&T | Failure to Obey | Satisfactory |
| 19 | 6/2/2020 | 1-200600298 | TAC | Failure to Obey | Inconclusive |
| 20 | 5/31/2020 | 3-200508679 | ED | Burglary | Satisfactory |
| 21 | 5/31/2020 | 1-200508618 | CD | Burglary | Satisfactory |
| 22 | 8/26/2020 | 9-200807873 | SD | Assault | Satisfactory |
| 23 | 6/2/2020 | 9-200600326 | SD | Burglary | Satisfactory |
| 24 | 6/2/2020 | 9-200600326 | SD | Burglary | Satisfactory |
| 25 | 6/2/2020 | 9-200600326 | SD | Burglary | Satisfactory |
| 26 | 5/29/2020 | 1-200508319 | CD | Assault | Satisfactory |
| 27 | 6/2/2020 | 1-200600290 | CD | Burglary | Satisfactory |
| 28 | 6/3/2020 | 1-200600581 | CD | Destruction of Property | Satisfactory |
| 29 | 6/2/2020 | 1-200600324 | CD | Burglary | Satisfactory |
| 30 | 6/2/2020 | 1-200600302 | CD | Burglary | Satisfactory |

## Review of Failure to Obey (FTO) Arrests

Although BPD's A&I analyzed each arrest, it focused especially on FTO arrests. These arrests include arrests for failure to obey dispersal orders. Although not required by BPD policy in 2020, draft Policy 1018, *Lesser Offenses & Alternatives to Arrest,* which will be published later this year, requires those arrests to be approved by a permanent rank supervisor.

Seven (7) arrests[4] involved subjects arrested for failing to obey orders of police to disperse from the roadway during a protest[5]. The arrests were made by members of BPD's Mobile Field Force (MFF), which had numerous supervisors attached to each group, including high-ranking supervisors on the ground and in the Command Center.

After numerous dispersal orders were issued over a loud speaker, BPD lieutenants met with State Police prior to the arrests listed above as samples 5, 6, and 7. They issued orders through the chain of command to arrest those in violation of the dispersal orders. The arrests were then made.

Relative to arrest #17, two BPD sergeants physically participated in the arrest and directed that the specific individual be arrested. A&I determined that Probable Cause (PC) to arrest the subject existed based on BWC video. Numerous dispersal orders were issued verbally, both over a loud speaker and on the ground. BPD Lieutenants conferred with each other and the State Police prior to directing arrest teams, to include two sergeants, to arrest a non-compliant subject. The subject was arrested after refusing to comply and continuing to block the roadway in the middle of a downtown thoroughfare. After the arrest, the Lieutenant notified Incident Command of the arrest.

---

[4] Samples 5, 6, 7, 17, 18, and 19. Sample 14 was an assault arrest, spawned by failing to obey a dispersal order.
[5] At least one of these arrests was randomly selected in BPD's Assessment of Arrests Resulting in a Release Without Charge (RWOC) from the second quarter of 2020, filed in December of 2020, which contained the same analysis and findings.

Although Probable Cause existed for the arrest, relevant reports were unavailable. This appears to be the result of the booking officer using the same central complaint number (CCN) that was used for another arrest that occurred during the same general time and location (Sample #18). After processing, the arrestee for Sample #17 was released without charges. The statement of probable cause was expunged from central booking records. The incident report, CCN 1200600263, was obtained from BPD central records and only included information about the arrest of the subject in Sample 18. Apart from the BWC footage, the only documentation about the Sample 17 arrest that could be obtained was a brief summary written by the States Attorney's Office (SAO) based on information they received prior to the release without charge, which read, "Protest Case. 300 blk South St.  Several orders to a large crowd to move back and def would not comply."

Relative to arrest #18, two BPD sergeants physically participated in the arrest and directed that the specific individual be arrested. PC existed based on a review of reports and video footage. The same dispersal orders and supervisory conferrals occurred as for Sample #17.  The arrestee for Sample #18 also refused to comply and continued to block the roadway in the middle of a downtown thoroughfare. He was then arrested. After the arrest, the Lieutenant notified Incident Command of the arrest.

Although A&I determined that Probable Cause existed based on BWC video from the arresting officer and other officers, the booking officer used the same CCN as other arrests from the protest. This occurred in other instances as well, which made it difficult to assess each individual report because they shared the same CCN.

For Sample #19, the arrest was made by members of the Maryland State Police and/or Maryland Transportation Authority Police, who did not have BWCs. Therefore, A&I could not view the arrest and make a determination about compliance with law and policy. After the subject's arrest, her custody was transferred to BPD for arrest processing. BPD processed the arrest due to an arrangement with the outside jurisdiction agencies. After processing, the arrestee was released without charges. The statement of probable cause was expunged from central booking records. The incident report, CCN 1200600298, was obtained from BPD central records and had been reported as "issued in error" with no information about the arrest. The only documentation about this arrest that could be obtained was a brief summary written by the SAO based on information they received prior to the release without charge, which read, "Protest Case. Unit Blk E. Baltimore St at Guilford.  Citywide curfew went into effect at midnight and police gave an order to disperse 3 times and def failed to comply."

For Sample #14, MFF members conducted maneuvers to clear an intersection after protestors threw objects at officers, including an exploding pyrotechnic object that injured an officer. The clearing of the intersection was ordered by Incident Command. The focus of the MFF was to push the crowds west, north and east, out of the middle of the street. The subject could be seen refusing to move north after being told numerous times. The subject used both hands and pushed the police shield and officer down to the ground. The subject was arrested. A BPD sergeant participated in the arrest.

## Identifying Markers on Uniforms

Review of BWC footage revealed many BPD officers in civil disturbance protective gear with little to no identifying markers. Officers' nametags were often covered by issued protective gear. Outside agencies had identification numbers on the back of their helmets in bright letters, but BPD did not. It also was difficult to determine supervisory rank, as supervisors were often dressed the same as other BPD members.

## Recommendations

BPD's Compliance Bureau is recommending that (1) the Operations Bureau generate a unique CC number for each separate incident, including each individual arrest, during a civil disturbance; (2) BPD develop protocol with outside jurisdiction agencies to formalize transfer of detainees to BPD members for arrest processing during civil disturbance events; and (3) BPD invest in identification markers for helmets and protective gear, to include clearly readable nametags.

# Reviews of Level Two Uses of Force during Protests

The Use of Force Assessment Unit (UOFAU) within BPD's Compliance Bureau reviewed all Level Two uses of force (UOFs) that occurred during the above-analyzed protest events. Each UOF incident is summarized in Appendix B. As defined in Policy 1115, *Use of Force*, a Level Two Use of Force includes: force that causes or could reasonably be expected to cause an injury greater than temporary pain or the use of weapons or techniques listed below – provided they do not otherwise rise to a Level 3 use of force; discharge of a CEW in drive-stun or probes deployment, in the direction of a person, including where a CEW is fired at a person but misses; use of OC spray or other chemical agents; weaponless defense techniques including, but not limited to, elbow or closed fist strikes, open hand strikes, and kicks; discharge of a less-lethal launcher/munitions in the direction of a person; canine-inflicted injuries that do not rise to a Level 3 use of force; non-weapon strikes to the head, neck, sternum, spine, groin, or kidney area; and striking of a person or a vehicle with a vehicle that does not rise to Level 3 use of force.

Here is a snapshot of the six Level Two UOFs and the results of each review for this assessment:

| Control # | Type of Force Used | UOF Reasonable, Proportional, & Necessary? | Other issues identified |
|---|---|---|---|
| NIC 20-0505 | Use of hands (strike) | Yes | Higher-ranking supervisor did not respond to the scene to investigate the UOF. BWC violation. |
| NIC 20-0504 | Less Lethal Munitions | Yes | Investigated by an improperly ranked supervisor. One deployment not fully investigated by chain of command. BWC violation. |
| NIC 20-0447 | Riot Shield | Yes | Did not properly report. |
| NIC 20-0440 | OC Spray | Yes | N/A |
| NIC 20-0441 | Use of hands | Yes | N/A |
| 2021-0876 | Pepper Fogger | Pending | Did not report. |

The UOFAU found six incidents of Level Two use of force during the George Floyd protests and none during the Presidential visit to Fort McHenry. All are included in the above table. After initial assessment, the five incidents previously reported (those with NIC numbers in the table above) were all found to be reasonable, necessary, and proportional. The sixth case (last row in the above table) remains pending with the Public Integrity Bureau (PIB). Although the uses of force in the above-listed incidents complied with BPD's use of force policy (Policy 1115, *Use of Force*), UOFAU revealed two instances of non-compliance with BPD Policy 824, *Body Worn Cameras*, and two cases of force which were not reported as required by Policy 725, *Use of Force Reporting, Review, and Assessment*. The BWC and UOF reporting violations were referred to PIB for appropriate action.[6] The lack of full compliance with Policies 725 and 824 did not prevent assessors from being able to fully view these uses of force incidents through existing BWC footage and/or other available video footage such as CCTV or cell phone video.

The preliminary UOF assessment also revealed one set of less-lethal munition deployment during an incident on May 30, 2020, that had not been fully investigated by the chain of command at the time of this report. While the member properly notified a permanent ranked supervisor after deployment, the proper follow-up items were not completed. This was partly due to the scene not yet being safe. It was also due to Incident Command not having a designated branch assigned to respond to Level Two UOF incidents. Additionally, for the less-lethal munitions deployments during the May 30th incident that *were* fully investigated,[7] the investigation was completed by an improperly ranked supervisor (sergeant instead of lieutenant).

---

[6] *IAPro control numbers NIC 20-0447, NIC 20-0504, NIC 20-0505, and 2021-0876.*

[7] *Use of Force control number NIC 20-0504.*

In reference to the first UOF incident outlined in the above table, investigation revealed another instance of a higher-ranking supervisor not responding to the scene to investigate the Level Two UOF.

Independent of this assessment, a Mobile Field Force lieutenant discovered an unreported Level Two UOF and reported it to PIB, which opened a formal investigation (last case listed in the above table). The lieutenant discovered the video of the incident when developing MFF training. Video footage of the use of force showed a MFF officer deploying a pepper fogger when encountering a group of individuals who refused to move back after numerous warnings. While the use of force may have been justified based on video evidence[9], the action was not properly reported. PIB is investigating the incident.

Communication regarding the UOF for all of these incidents was lacking amidst the protest's ongoing events. Numerous supervisors were on the scenes, including command members, but their primary focus was on ground movements and overall operational objectives.

## Recommendations

Policy and training should proactively address the immediate notification mandate and emphasize that part of the notification needs to be *that a use of force occurred, as well as the type of force,* and the unit who used force, in order to facilitate appropriate follow-up by the appropriate uninvolved supervisor. This should be centralized within Incident Command for Protest Events. The supervisor receiving the information should acknowledge receipt and announce their role as the investigator. They should respond to the scene to investigate when safe and practicable to do so, understanding that a member who used force may not be able to come off the line until the protest environment becomes stabilized. Additionally, BPD should develop protocols with outside jurisdiction agencies to formalize use of force reporting requirements by the various agencies, since outside jurisdictions are guided by their own respective policies and procedures.

Furthermore, controlled forward motion of members with riot shields is often deployed as a tool to enforce dispersal orders. BPD should address in policy and training the reporting requirements associated with the common team tactic of forward movement towards non-compliant crowds. Policies 1115, *Use of Force,* and Policy 413, *Mobile Field Force*, do not address the physical contact that may occur between protestor and riot shield. While using a riot shield in a striking motion is a reportable use of force, other incidental contact is not as clear.

# General Supervisory and Front-Line Response Review

## Incident Command System Review

A&I examined the execution of the Incident Command System, as well as Incident Action Plans (IAPs), After-Action Reports, and other operational planning and deployment documents.

IAPs for the George Floyd protests were analyzed and found to be complete and thorough. They included the following Incident Command Structure (ICS) Forms:

- Form 201 Incident Briefing,
- Form 202, Incident Objectives,
- Form 203 Organizational Assignment List,
- Form 204, Assignment List,
- Form 205 Communication Plan,
- Form 205a Communication List,
- Form 206, Medical Plan

---

[8] Use of Force control number NIC 20-0505.
[9] At the conclusion of their investigation, PIB will ultimately determine whether the force was reasonable, necessary and proportional. This assessment included video footage review, but no statements from the officers on the scene were obtained.

- Platoon Rosters;
- Officer Safety and Wellness Plan,
- Standardized Warning Script,
- First Amendment Assemblies and Mass Demonstrations Enumerated Legal Charging Language, and
- Applicable BPD Policies

The documentation related to the George Floyd protests also included estimations of crowd sizes and after action reviews submitted by field supervisors and commanders. Activities related to the protest were logged into "Web EOC" and reflected significant operational activity that facilitated the expression of the First Amendment rights of the protestors. Ground units and Foxtrot (police helicopter) relayed constant updates of crowd movements to the Incident Command Center. Streets were strategically blocked to allow marching. Bicycle units and BPD motorcycle officers were used to respond quickly to needed locations to continue to facilitate safe demonstrations, while allowing normal commerce to continue in downtown Baltimore to the extent possible.

Over the course of the protests, estimated crowd sizes ranged from a few hundred to thousands of people. Crowds often gathered in multiple parts of the city simultaneously.

The coordination of these efforts was centralized in the Incident Command Center, which contained representatives from essential entities including, but not limited to, law enforcement from outside agencies, federal law enforcement partners, BPD Legal Affairs, Department of Justice (DOJ) Civil Rights Division, Consent Decree Monitoring Team, Maryland Transportation Authority (MTA). Other City agencies also were present, including Baltimore City's Office of Emergency Management (OEM), the Fire Department, Department of Transportation (DOT), and Department of Public Works (DPW). The gathering of these groups facilitated constant communication and resource sharing along with a persistent focus on supporting lawful demonstrations.

This review found that several lower level logistical components could benefit from improvement. Noteworthy to the George Floyd protests, the demonstrations were daily and often lasted late into the night and next morning, causing the need to plan for the next day's events based on intelligence received during the current event. While this dynamic cannot be avoided, preparation for it can be improved. Few commanders have advanced training in ICS planning, leaving many tasks to few people, repetitively. Possible solutions are recommendations 1 and 2, listed below.

ICS Form 214 activity logs were not always stored in an accessible location for collection and review. This creates a problem for auditors trying to complete an accurate and thorough assessment. Item #3 (below) is recommended to address this issue.

Creating new or updated IAPs was often overly time consuming and arduous, especially when requesting additional staffing resources. This is a problem because the time and resources could be spent on other important ICS tasks, hence recommendation #4.

The following recommendations attempt to address these items:

1. Provide Executive Level ICS training to commanders;

2. Commanders assigned to new ICS roles should shadow commanders from previous operational periods to help fully prepare and become comfortable in their assigned role;

3. Form 214's should be collected prior to the conclusion of a tour of duty and centrally filed in Web EOC or some other established database; and

4. Software to assist in creating and updating IAPs and effectively manage the documentation and movement of personnel and resources should be fully utilized or adopted.

The IAP for the smaller gatherings related to the Presidential visit to Fort McHenry were analyzed and found to include adequately detailed Incident Command Structure (ICS) Form 201, Incident Briefing, and a site assessment with photos and designated Road Closures with Protest Areas.

A&I identified events with the highest protest activity and randomly selected 16 officers working in direct contact with protesters on the front lines of those events in order to assess the quality of protection offered for First Amendment activities. The random selection of 16 officers, while not statistically significant, was a workable solution given BPD's current resources. Auditors reviewed 80 minutes of BWC footage of peak engagement during the protest events, randomly selecting 8 five-minute intervals from the available BWC footage from each protest event. Auditors evaluated the quality of BPD's response by asking the following questions:

1. Did the member respect the First Amendment rights of all persons?

2. Did the member take any action in retaliation for an individual's criticism of law enforcement, observing or recording of law enforcement, or engaging in expressive activity, as protected by the First Amendment?

3. Were there any complaints by arrestees claiming that they were not permitted to observe, record, criticize, or protest police activity, or that they were the object of retaliation for engaging in such activities? If anyone wished to file a formal complaint, the auditors reviewed IAPro to see whether any formal complaint was filed.

4. Did the member only interrupt demonstrations under the following permissible circumstances? The permissible circumstances are:

   a. Imminent threat to the officer, the public, or other person(s), when any of these actors were physically present and able to receive the threat in question.

   b. Speaker inciting an audience to engage in imminent unlawful action.  Individual(s) inciting other individual(s) to engage in imminent unlawful action.

   c. Effecting an arrest for a violation of the law.

   d. Physical interference with an officer's lawful activity, in spite of efforts to relocate the interfering individual.

   e. Compromising legitimate police actions and/or rescue efforts.

5. If force was used in response to an individual engaging in legally protected speech, was the use of force reasonable, necessary, and proportional?

6. Did the member engage in unauthorized enforcement activities? (Examples of unauthorized enforcement activities include, but are not limited to: unauthorized information collection based on an immutable characteristic {i.e. ethnicity or race}, information collection based on First Amendment protected associations {i.e. religious or political associations}, allowing personal beliefs and opinions to interfere with the member's duties as a law enforcement officer, etc.) NOTE: BPD Policy 804, *First Amendment Protected Activity*, (both the July 2016 version and the September 2021 version) provide a greater explanation of unauthorized enforcement activities.

For each of the 16 samples, auditors determined that officers complied with each assessment area. The table below depicts the results for all 16 random samples:

| Sample | Date of Incident | Duration of BWC time watched | Location of Incident | Time of BWC Video Incident | Finding |
|---|---|---|---|---|---|
| 1 | 5/30/2020 | 1st 5 mins | 100 Holiday | 1959 hrs | Satisfactory |
| 2 | 5/30/2020 | 1st 5 mins | Baltimore & Gay | 1950 hrs | Satisfactory |
| 3 | 5/30/2020 | 1st 5 mins | Baltimore & Gay | 1948 hrs | Satisfactory |
| 4 | 5/31/2020 | Mins 5-10 | 100 Holiday | 0037 hrs | Satisfactory |
| 5 | 5/31/2020 | Mins 5-10 | Lomb and Calver | 0035 hrs | Satisfactory |
| 6 | 5/31/2020 | Mins 5-10 | 100 Holiday | 0026 hrs | Satisfactory |
| 7 | 5/31/2020 | Mins 5-10 | Fayette & Charles | 0243 hrs | Satisfactory |
| 8 | 6/1/2020 | Mins 10-15 | 100 Holiday | 2033 hrs | Satisfactory |

| 9 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2120hrs | Satisfactory |
| 10 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2120hrs | Satisfactory |
| 11 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2153hrs | Satisfactory |
| 12 | 8/26/2020 | Mins 10-15 | 2000 E. Fort Ave | 2117hrs | Satisfactory |
| 13 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2153hrs | Satisfactory |
| 14 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2153hrs | Satisfactory |
| 15 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2151hrs | Satisfactory |
| 16 | 8/26/2020 | 1st 5 mins | 2000 E. Fort Ave | 2153hrs | Satisfactory |

# DISORDERLY CONDUCT ARREST REVIEW

BPD has determined that analysis of Disorderly Conduct arrests is a helpful tool to evaluate enforcement actions that may relate to the public's exercise of First Amendment rights that occur outside of the protest context. While this is not a precise method to determine BPD's compliance with First Amendment Protected activity policies overall, it provides a foundation for conducting this analysis and for future inspections.

A&I conducted a review of all Disorderly Conduct arrests for 2020. Disorderly Conduct arrests under review will include arrests for the following: loitering, obstructing or hindering, disorderly conduct that disturbs the peace, and failure to obey. For 2020, there were 35 of these type of arrests. A&I reviewed the arrest reports and body-worn camera footage for each arrest to determine whether (1) the incident implicated First Amendment Protected Activity and (2) the arrest was lawful and within policy. The methodology used for the Disorderly Conduct Arrest Review mirrored the methodology used for BPD's Response to Protest Review, described above. Thus, for each reviewed disorderly conduct arrest, BPD answered the 16 questions listed in the Response to Protest Review section.

| Sample | Date | CCN | Arresting Officer Assignment | Findings |
|--------|------|-----|------------------------------|----------|
| 1 | 1/11/2020 | 2-200103093 | SED | Satisfactory |
| 2 | 1/8/2020 | 4-200102348 | NED | Satisfactory |
| 3 | 2/9/2020 | 9-200202716 | SD | Unsatisfactory |
| 4 | 3/1/2020 | 2-200300254 | SED | Unsatisfactory |
| 5 | 3/10/2020 | 1-2003026 | CD | Satisfactory |
| 6 | 6/24/2020 | 4-200607085 | NED | Satisfactory |
| 7 | 7/3/2020 | 7-200701005 | WD | Satisfactory |
| 8 | 8/4/2020 | 5-200800897 | ND | Satisfactory |
| 9 | 8/16/2020 | 9-200804453 | SD | Satisfactory |
| 10 | 9/23/2020 | 8-200907077 | SWD | Satisfactory |
| 11 | 10/3/2020 | 4-201000854 | NED | Satisfactory |
| 12 | 10/16/2020 | 4-201004888 | NED | Satisfactory |
| 13 | 10/18/2020 | 5-205005367 | ND | Satisfactory |
| 14 | 10/28/2020 | 6-201008660 | NWD | Satisfactory |
| 15 | 10/31/2020 | 7-201009491 | WD | Satisfactory |
| 16 | 11/1/2020 | 1-201100280 | CD | Satisfactory |
| 17 | 11/5/2020 | 9-201101286 | SD | Satisfactory |
| 18 | 11/21/2020 | 2-201106169 | SED | Satisfactory |
| 19 | 11/6/2020 | 4-201107497 | NED | Satisfactory |
| 20 | 12/8/2020 | 4-201202233 | NED | Satisfactory |
| 21 | 12/25/2020 | 5-201206683 | ND | Satisfactory |
| 22 | 5/26/2020 | 2-200507271 | SED | Satisfactory |
| 23 | 6/2/2020 | 1-200600298 | TAC | Inconclusive |
| 24 | 6/13/2020 | 9-200603718 | SD | Satisfactory |

| 25 | 8/7/2020 | 2-20080417 19 | SED | Satisfactory |
|----|----------|---------------|-----|--------------|
| 26 | 2/17/2020 | 9-200205254 | SD | Satisfactory |
| 27 | 4/12/2020 | 8-200402484 | SWD | Satisfactory |
| 28 | 5/9/2020 | 9-200502325 | SD | Satisfactory |
| 29 | 5/31/2020 | 1-200508618 | SED | Satisfactory |
| 30 | 5/31/2020 | 1-200508618 | SED | Satisfactory |
| 31 | 5/31/2020 | 1-200508618 | SED | Satisfactory |
| 32 | 9/24/2020 | 6-200907367 | NWD | Satisfactory |
| 33 | 6/2/2020 | 1-200600263 | E&T | Satisfactory |
| 34 | 6/2/2020 | 1-200600263 | E&T | Satisfactory |
| 35 | 6/1/2020 | 1-200600263 | E&T | Satisfactory |

A summary of each Disorderly Conduct arrest is contained in Appendix C. The results of the inspection revealed that out of the 35 samples reviewed, two samples had infractions that violated BPD policies.

Sample #3 lacked probable cause for arrest. In this sample, an officer was operating the wagon with lights and siren in route to a shooting. He stated that he advised the subject to move several times. Once at the crime scene, the subject walked through the tape and he was arrested for hindering for earlier blocking the wagon. Review of BWC revealed, though, that the subject was on the left side of the wagon and was not shown blocking the wagon. The officer yelled, "Get out of the way asshole." Once at the crime scene, the supervisor told the subject to leave and the subject complied. As the subject was leaving, he was placed under arrest. This case is being investigated by PIB.

In Sample #4, the officer failed to provide timely medical attention. Officers were dispatched to an apartment complex after security called police. Officers met security at a loading dock where the subject was yelling. Officers arrested the subject after over 22 minutes of warnings to leave the property. The arrest was satisfactory; however, after the arrest, the subject threatened to spit on officers. He then spit on the ground and an officer said that he was spitting blood. The officer did not render aid or call for a medic as required by policy. The subject was taken to CBIF and cleared their medical screening process. This case was referred to PIB for formal investigation.

Inconclusive Sample #23 was the same arrest as analyzed as Sample #19 in the *Review of Arrests during Protests* section.

Only eight (8) of the arrests implicated First Amendment activity. Seven (7) of these arrests were previously referenced in the Protest Arrest section of this report.[10] The final First Amendment related arrest was Sample #7. In this sample, officers were on the scene of a gun arrest awaiting medical attention for an arrestee. While waiting for medics, a crowd started to form, and a subject was upset about the length of time it was taking for medical attention. After being warned many times by officers on the ground and by police helicopter, the subject tried to walk past officers who had established a skirmish line. The subject was then arrested by the ranking supervisor on scene.

Only arrests were reviewed in this analysis. For context, BPD handled 87,823[11] disorderly calls in 2020 according to Computer Aided Dispatch (CAD) data and conducted only 35 arrests for Disorderly Conduct related crimes (0.04% of calls). While this basic analysis does not serve as a perfect encapsulation of BPD's response to First Amendment activities since disorderly calls may or may not involve First Amendment activities, it does indicate that BPD responds to a high volume of Disorderly Conduct calls that possibly pertain to First Amendment rights and that BPD rarely conducts arrests in those situations.

---

[10] *Disorderly Arrests samples 23, 29, 30, 31, 33, 34, 35 are Protest Arrest samples 19, 5, 6, 7, 17, 18 and 14 respectively.*

[11] *Unfounded calls are not included in this number.*

# MISCONDUCT CASE REVIEW

To report the number of First Amendment-related misconduct complaints that were investigated by PIB, the BPD conducted a search of IA Pro[12] for cases that included at least one allegation referring to a First Amendment infringement or violation. PIB began classifying cases with specific allegations referring to First Amendment violations in 2018, upon the implementation of PIB's Classification Protocol, which was developed in collaboration with the U.S. Department of Justice and the Consent Decree Monitoring Team. The total list of PIB cases with at least one allegation related to the violation of a person's First Amendment rights is as follows:

| PIB CASES WITH FIRST AMENDMENT RELATED ALLEGATIONS | | | |
|---|---|---|---|
| **CLOSED CASES** | | **OPEN CASES** | |
| 1 | PIB Case Number 2018-0767 | 10 | PIB Case Number 2019-0981 |
| 2 | PIB Case Number 2019-0285 | 11 | PIB Case Number 2019-1877 |
| 3 | PIB Case Number 2019-1482 | 12 | PIB Case Number 2020-1097 |
| 4 | PIB Case Number 2019-1682 | 13 | PIB Case Number 2020-1192 |
| 5 | PIB Case Number 2020-0305 | | |
| 6 | PIB Case Number 2020-0486 | | |
| 7 | PIB Case Number 2020-0487 | | |
| 8 | PIB Case Number 2020-0488 | | |
| 9 | PIB Case Number 2020-0704 | | |

## Case Summaries

The case summaries below reflect conclusions made by PIB, and include: (1) the source of the allegation, (2) the allegation(s), (3) the complaint summary, (4) the investigative finding, and (5) the disposition (where available).

1. Source: Where did the complaint originate? If listed as INTERNAL, the complaint was produced by BPD in response to internal auditing or it came from another BPD employee. If listed as EXTERNAL, the complaint was generated outside of BPD internal mechanisms (i.e. a member of the public alleging or witnessing potential misconduct).

2. Allegation: What suspected policy violation(s) occurred?

3. Complaint Summary: A brief narrative of the substance of the allegation(s).

4. Investigative Finding: After investigation, BPD's determination based on the available facts and evidence.

5. Disposition: What was the final outcome as determined by PIB? There are four possible case dispositions:

   a. Sustained: The investigation determined, by the preponderance of the evidence, that the alleged misconduct did occur.

   b. Not Sustained: The investigation was unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred.

   c. Unfounded: The investigation determined, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the accused BPD member.

   d. Exonerated: The evidence determined, by a preponderance of the evidence, that the alleged conduct did occur but did not violate BPD policies, procedures, or training.

*NOTE: For cases that remain open, there is no investigative finding nor disposition yet available to include in this report. Cases may remain open either because the investigation is still ongoing, the SAO is considering or has filed pending charges related to the case, or more information is needed. If a case remains open, it means that*

---

[12] *Software program utilized by BPD for case management of complaints regarding potential member misconduct.*

*PIB has not conducted all investigative steps to draw a conclusion in the case, which would render the case file incomplete and thus it is premature to render a conclusion as to the member's alleged behavior.*

Below is a summary of each case that includes at least one allegation of a First Amendment violation.

# CLOSED CASES

**1.    PIB Case Number 2018-0767**

Source: External

Allegations: Harassment; Conduct Unbecoming a Police Officer; Impairing First Amendment Rights.

Complaint Summary: In December 2018, while they were taking pictures of a shooting crime scene, a member of the public alleged on social media that a detective was unprofessional when she told the civilian to stop taking pictures or the officer would take the camera away. Based on the social media post, a BPD sergeant initiated a formal investigation into the conduct of the detective.

Investigative Findings: Based on review of available Body Worn Camera (BWC) footage and interview with the respondent, there was no evidence to show that the officer was unprofessional in her interaction with the member of the public. Following the interaction with the civilian, the crime scene tape was adjusted to a more appropriate distance surrounding the crime scene evidence. The investigation found no violation of BPD Policy 1016, *Citizen Observation/Recording of Officers*, or other related policies. The investigation determined that the detective's actions were reasonable to protect the integrity of the investigation and handling of the crime scene.

Disposition: Not Sustained.

**2.    PIB Case Number 2019-0285**

Source: External

Allegations: Harassment; Conduct Unbecoming of an Officer; Impairing First Amendment Rights;

Excessive Force

Complaint Summary: The complainant stated that in February of 2019, they stopped to record a police stop of two persons that resulted in an arrest. While the complainant was recording the event, the complainant alleged that the accused officer walked up to him and poked him in his chest to get him to move from where the arrest was occurring. The complainant stated that he felt threatened and intimidated by the officer.

Investigative Findings: Based on review of video footage, both civilian and BWC, and interviews with involved parties, the investigator concluded that the complainant was never told that he could not record the incident and was specifically told that he could record. The investigator also concluded that the officer did advise the complainant that he needed to move out of the street or he could be arrested for hindering, but that the contact made between the officer and complainant was inadvertent and the touching did not constitute a use of force.

Disposition: Unfounded.

**3.    PIB Case Number 2019-1482**

Source: External

Allegations: Harassment; Conduct Unbecoming a Police Officer; Impairing First Amendment Rights; Interference with Civilians Protected Free Expression of Speech.

Complaint Summary: The complainant stated that in August of 2019, the accused officer was harassing him and kept bothering him, and that at several times over a nine-year period the officer has told him to stop playing his music in public. The complainant stated that people would complain that he was panhandling, though he was not.

Investigative Findings: The investigation revealed that the accused officer had in fact arrested the complainant twice previously – over an eight-year period – for playing loud music in public without the required permit. There is also sufficient evidence that the police were called about the complainant in the past, and that the complainant did not have a permit to play his music in public. The investigation found that the officer did not violate policy in his previous encounters nor in this most recent instance. Furthermore, after the complainant did obtain a permit, he no longer had a problem with the officer.

Disposition: Unfounded.

4.     **PIB Case Number 2019-1682**

Source: External

Allegations: Improper Seizure of Personal Property; Impairing First Amendment Rights; Improper Search; Interfering with a Person's Right to Observe or Record Law Enforcement Activities; Harassment; False Arrest/Imprisonment.

Complaint Summary: Complainant stated that he was in a vehicle accident in September of 2019. Neighbors called the police and two officers arrived. He said that they asked him for his license and registration, which he did not provide because he felt that no crime was committed. He stated that he was arrested, and that video of the encounter on his phone were deleted by one of the officers.

Investigative Finding: The investigator determined through reviewing BWC footage from both officers that the officers did not conduct an improper search or harass the complainant.  BWC footage also revealed that the officers did not take the complainant's cell phone and thus did not erase a recording.

Disposition: Unfounded

5.     **PIB Case Number 2020-0305**

Source: Internal

Allegation: Interference with Civilians' Protected Free Expression/Speech.

Complainant Summary: The complaint alleged that in October of 2019, the accused officer issued a civil citation for an open container violation in retaliation for a person exercising their First Amendment right and criticizing police activity by yelling at police while on the scene of an arrest.

Investigative Finding: The investigation revealed that the officer observed the person at the scene of the arrest and requested her identification, advising her that it was in reference to an open container violation. The officer instructed another BPD member to write a citation for the open container and give it to the woman. BWC footage did not capture the comments made by the woman prior to the officer requesting her identification.

Disposition: Not Sustained.

6.     **PIB Case Number 2020-0486**

Source: Internal

Allegations: False Arrest; Impairing First Amendment Rights; Neglect.

Complaint Summary: In January 2018, officers conducted a stop for a potential CDS violation when the stopped suspect's family member, who was present, began arguing with police about the legitimacy of the stop and was yelling. One of the officers told the family member several times to lower his voice or he would be arrested for being disorderly. This occurred several times, and then the family member was handcuffed while another officer confirmed that he did not have a warrant. He was then released along with the original suspect. They walked away, but the family member continued to yell and there were several more back-and-forth communications between him and the officer, with the officer asking him to lower his voice. After many verbal exchanges, the officer arrested the person for disorderly conduct, and the person yelled that he had a freedom of speech.

Investigative Finding: The investigation, based on the lack of evidence as observed on body worn camera footage, failed to show that a crowd was forming due to the person's yelling and cursing. This, coupled with officer's incident report that stated the citizen directed his outburst toward the police, led the investigator to find that the arresting officer did impair the person's First Amendment Rights and did conduct a False Arrest. Furthermore, the investigation found that the primary officer on the case failed to author an incident report documenting the detention of the original suspect and the recovery of suspected CDS. Based on the investigation, a third officer, who was not the primary officer in the CDS stop nor in the disorderly arrest, was found not to have committed a policy violation.

Disposition: Officer 1: Sustained for Impairing First Amendment Rights and False Arrest (Officer resigned in lieu of termination); Officer 2: Sustained for Neglect of Duty (pending trial board); Officer 3: Not Sustained.

7. **PIB Case Number 2020-0487**
Source: Internal

Allegations: False Arrest; Impairing First Amendment Rights.

Complaint Summary: In July of 2018, a police sergeant allegedly falsely arrested a member of the public for disorderly conduct and violated her first amendment rights. The arrested woman had been on the scene of an assault investigation where the suspect was being uncooperative, and was recording video of the scene.

Investigative Finding: The investigation revealed that the person was recording police activity and walked past officers and medics to approach and take pictures of the person being arrested. She was told by a sergeant that she could record, but she needed to do so from a safer distance. She continued to attempt to get closer to record, and was told several times by the sergeant and other officers on the scene to move back to a safer distance. The arrest was not made in retaliation for recording, nor was force used to place the person in custody. The sergeant allowed another person to record the incident, as he was doing so from a distance and not interfering with officers.

Disposition: Unfounded.

8. **PIB Case Number 2020-0488**
Source: Internal

Allegations: False Arrest; Impairing First Amendment Rights.

Complaint Summary: In November of 2018, the accused officer arrested a minor who was blocking the front entrance of a grocery store. The officer asked the minor to move and pointed to the 'no loitering' sign, and the minor responded that he was waiting for his family member and raised his voice to the officer. The officer told the minor to lower his voice and warned the minor that he would write them a citation. The minor would not provide his name for the citation. The minor cursed at the officer. The officer told the minor to lower his voice a couple more times, and then arrested the minor for disorderly conduct. The officer may have violated the minor's First Amendment rights. The officer transported the minor to a hospital for medical evaluation after he complained of light-headedness. The minor was cleared, and then transported to the Juvenile Justice Center for processing.

Investigative Finding: The initial investigation determined a sustained finding for the false arrest and a not sustained finding for the First Amendment allegation (because Policy 804 on First Amendment Rights did not address protected speech by an individual not engaged in assembly, demonstration or protest (though the new policy, finalized in August 2021 does so). Nevertheless, further review through the chain of command was conducted into the evidence available. The additional review concluded that while the minor did have a right to be in the store, he did not have a right to block the entrance. The officer warned the minor several times, and the minor did not cooperate and instead ignored the commands and yelled at the officer. The minor made it clear to the officer that he would not accept a civil citation, which the officer was prepared to issue. The officer perceived that the conduct was causing onlookers to gather and film the incident. Given these circumstances, the investigation found that the officer did have cause to make an arrest pursuant to Policy 1018.

Disposition: Not sustained.

9.     **PIB Case Number 2020-0704 ***
Source: External

Allegations: Interference with Right to Assemble; Excessive Force; False Arrest; Neglect/Failure to Report Use of Force.

Complaint Summary: The complaint states that in June of 2020, the complainant was engaged in and documenting a protest. At one point, officers were pressing forward and the complainant was walking backward as quickly as he was able, but he suffers from a medical condition that limits his mobility. The complainant was trying to comply, and was rushed by officers and struck with multiple riot shields and a baton to the skull, and was ordered to get on the ground. He attempted to inform the officers of his mobility limitations. He was taken to Central Booking, and then realized that he was bleeding, so he was transported to the hospital. He required staples and was diagnosed with a concussion. He reported that he has suffered symptoms ever since the incident. He was facing charges of assaulting an officer and failure to obey.

Investigative Findings: The investigation revealed that orders were given to the complainant to move back and turn around and keep walking. BWC showed that the complainant did not have a problem walking toward the advancing line, indicating that he could have turned around and continued walking, but that instead he stopped, which caused the police line to make contact with him. An unknown officer stepped backward after encountering the complainant. Due to the complainant stopping and not complying with police actions and the resulting exposure of the left flank due to the encounter, the complainant was arrested. Furthermore, while BWC footage did show an additional known officer waving his baton, due to the chaotic nature of the event, it could not be determined whether the he actually struck the complainant with the baton. No other evidence allowed for it to clearly be determined whether the officer struck the complainant, and the officer stated that he did not strike the complainant.

Disposition: Arresting Officer: Unfounded (Interfering with Right to Assemble, False Arrest). Officer with Baton: Not Sustained (Excessive Force, Neglect/Failure to Report a Use of Force).

*Note that this case is the same as arrest #14 from the Protest Cases Arrest Section (Appendix A).*

## OPEN CASES

The following cases remain open. Therefore, the summaries provided below are brief, consistent with how open cases were presented in last year's First Amendment Protected Activity Report.

10.    **PIB Case Number 2019-0981**
Source: External
Allegations: Failure to Supervise; Interference with Civilians' Protected Free Expression/Speech; Conduct Unbecoming a Police Officer/Employee; Failure to Report Use of Force; Neglect of Duty; Excessive Force; False Arrest; Harassment; False Statement/Untruthfulness; Improper Stop.

Alleged incident occurred in May of 2019. This case is assigned to PIB's Ethics division[13], and therefore it is confidential. This matter is still awaiting adjudication through the criminal court process. As such, no further information can be provided regarding the matter.

---

[13] PIB's Ethics division handles cases that are deemed highly sensitive due to the nature of the complaint and/or of the alleged misconduct. The types of complaints that the Ethics division handles can include complaints alleging corruption, on-going misconduct, complaints requiring proactive investigation such as surveillance, or complaints involving high level BPD commanders or PIB personnel. Therefore, these cases are treated with great care in order to ensure sensitive information is not released or discovered that could compromise the investigation.

11.     PIB Case Number 2019-0800
        Source: External

Allegations: Abuse of Discretion/Authority; Conduct Unbecoming a Police Officer/Employee; False Arrest; Interference with Civilians' Protected Free Expression/Speech; Excessive Force; Failure to Supervise.

Alleged incident occurred in June of 2019. This is case assigned to PIB's Ethics division, and therefore it is confidential. This matter is still awaiting adjudication through the criminal court process. As such, no further information can be provided regarding the matter.

12.     PIB Case Number 2020-1097
        Source: Internal

Allegations: Interference with Civilians' Protected Free Expression/Speech; False Imprisonment.

Complaint Summary: The complaint alleges that a person was subjected to a car stop because he yelled in protest to a sergeant. In September of 2020, an officer was patrolling and noticed a person fitting the characteristics of an armed person. By the time additional officers arrived, the person was inside a parked vehicle. He was patted down, and officers discovered that his license was suspended. The sergeant told the officers that because the man's license was suspended, if the person was seen driving, they should ticket him, tow the vehicle, and a warrant would be written for the vehicle. Not long afterward, the person was observed driving and officers conducted a traffic stop. The sergeant instructed the officer to get the person out of the vehicle and tow the vehicle. The person exited and gave permission for the officers on scene to search. Officers did not find anything. The person was issued citations and left.

13.     PIB Case Number 2020-1192
        Source: External

Allegations: Interference with Civilians' Protected Free Expression/Speech

Complaint Summary: The complainant alleges that in November of 2020, the accused officer refused to allow them to speak their First Amendment rights on their own property by ordering the complainant to go inside their residence while another neighbor was allowed to continue to speak their rights and was never ordered to go inside their residence.

# Data

Below are several charts and tables showing the available data regarding the 13 complaints summarized above. While limited data is available at this time, these figures provide at least some preliminary information regarding complaints of First Amendment violations, which will be built upon in the coming years and in future reports.

## District of Occurrence

The below chart shows the BPD geographic district where each of the 13 above-described incidents occurred.

**Chart 1:**



Upon basic statistical analysis, the fact that five of these 13 incidents occurred in Southeastern District does appear to make it an outlier among districts. While the reasoning behind this is unknown, BPD will monitor these numbers for future reports to determine whether this is a trend that continues to persist and what could be done to address it. BPD will also notify the commanders for the Southeastern District of this trend so they can monitor and consider what they can or should do to prevent further complaints of this nature.

## Outcomes of Closed First Amendment Allegations in Misconduct Investigations

A review of the nine closed cases reveals that only one of the nine cases included a disposition of "sustained" on the allegation related to First Amendment violations (see Chart 2 below).

**Chart 2:**



*\* Recall that of the 13 cases in Chart 1, four remain open and therefore are not accounted for in Chart 2.*

**Source and Outcome of Closed First Amendment Allegations**

The below chart shows the outcomes of each allegation of a First Amendment related violation and whether those complaints were received from external (non-BPD complainants) or internal (BPD employees) sources. Internal complaints could come from either an individual employee entering a complaint or referred by other internal units, such as the Audits & Inspections Unit, upon conducting an audit and identifying possible misconduct.

**Chart 3:**



**Demographic Information**

Below is a table that shows the demographic breakdown (race and gender) for each complaint. Upon consideration of this data, the reviewers noted that for several of the internal complaints in the sample, the 'complainant' listed was in fact a member of BPD's Audits & Inspections Unit, as opposed to the person that was the alleged subject of the accused officer's behavior. Therefore, for many of the internal complaints, the listed complainant's demographic information would not provide any valuable information and might, in fact, slant the reader's interpretation of the data. Thus, for external complaints, BPD provides available demographic data for both the complainant and the accused officer. For internal complaints, only the accused officer demographic data is provided.

| EXTERNAL COMPLAINTS | | | | |
|---|---|---|---|---|
| **Case Number** | **Complainant** | | **Accused Officer** | |
| | **Race/Ethnicity** | **Sex** | **Race/Ethnicity** | **Sex** |
| 2018-0767 | Unknown | Unknown | African American | Female |
| 2019-0285 | African American | Male | White | Male |
| 2019-1482 | African American | Male | White | Male |
| 2019-1682 | African American | Male | Hispanic | Male |
| 2020-0704 | White | Male | White | Male |
| 2019-0981 | African American | Male | White | Male |
| 2019-1877 | White | Male | White | Male |
| 2020-1192 | Unknown | Unknown | Unknown | Male |

| INTERNAL COMPLAINTS | | |
|---|---|---|
| **Case Number** | **Accused Officer** | |
| | **Race/Ethnicity** | **Sex** |
| 2020-0305 | Black | Male |
| 2020-0486 | Black | Male |
| 2020-0487 | Black | Female |

| 2020-0488 | White | Male |
| 2020-1097 | White | Male |

## Conclusions regarding Misconduct Cases

Given the rather small number of misconduct cases that allege First Amendment violations, it would be hard, and perhaps even irresponsible, to attempt to draw emphatic conclusions about patterns, trends or problems from the data. Therefore, BPD is providing the above charts for the reader's knowledge, with the caveat that such a limited number of data points will not produce statistically sound conclusions about how BPD fares with misconduct complaints raising allegations of First Amendment violations.

For the purposes of this review, the most notable data point is that one of the nine closed cases described above did contain a finding of "sustained" against a BPD officer for a First Amendment violation. In that case, the officer resigned in lieu of termination. These annual reports will continue to track the numbers of sustained allegations of violations related to First Amendment rights, as that is an important measure of whether BPD's response to First Amendment protected activity is complying with BPD policy.

Despite not being able to draw statistically significant conclusions from so few cases, this review did reveal a few gaps in data that could be improved upon by PIB as it moves forward with its investigations of First Amendment related cases. Particularly, the above review uncovered an inconsistency in the application of allegations regarding to First Amendment violations to complaints.  Reviewers noticed that while many of the cases included classifications that are contained within the PIB Classification Protocol (as they should), they also observed the use of a more general allegation entitled "Impairing First Amendment Rights," which is not contained in the PIB Classification Protocol. The only First Amendment violations contained in the PIB Classification Protocol are the following: interference with civilians' protected free expression/speech, interfering with right to assemble, interfering with religious practice, and interfering with a person's right to observe or record law enforcement activities. The more general allegation of "Impairing First Amendment Rights" appears to be an allegation that was assigned to cases by PIB prior to the completion of the PIB Classification Protocol. As such, this report recommends that PIB discontinue the use of the allegation "Impairing First Amendment Rights," as this allegation is not contained in the PIB Classification Protocol and is less descriptive than the other allegations.

Additionally, as it pertains to demographic data, where the referrer of the case was the BPD's A&I Unit, it could be beneficial for PIB to list or identify the race and gender of the person who was the subject of the possible misconduct, as opposed to listing the race and gender of the referrer from A&I. This may create some discrepancies in data, but it is worth PIB exploring whether the subject data could be tracked for cases referred by BPD auditors.

# RECOMMENDATIONS

Below is the cumulative list of recommendations from each of the three review sections above.

1. BPD shall ensure Incident Command establishes systems to generate new CCNs for each separate arrest during protest events, rather than using one CCN for the entire event.

2. BPD should examine the feasibility of purchasing identifying markers for helmets and/or civil disturbance protective gear. These markers would identify the officer and supervisory rank.

3. BPD should develop a protocol with outside jurisdiction agencies to formalize transfer of detainees to BPD members for arrest processing during protest events.

4. BPD shall take appropriate measures, as determined through the PIB process, in reference to the incidents referred as a result of this review.

5. BPD shall establish a centralized collection of protest event documentation to include IAPs, staffing rosters, after-action reviews, associated arrests, UOF incidents, public information releases, and other related items.

6.  BPD should develop and establish an ICS policy to guide Operations Bureau during protest events. Consideration should be given to including specific branches dedicated to properly handle Level Two UOF investigations and proper notification and acknowledgment channels during ongoing protest events.

7.  BPD policy should clarify and emphasize that the immediate notification mandate for Level Two and Three use of force incidents applies even during large-scale protest events. The uninvolved supervisor receiving the notification should acknowledge receipt and announce their role as the investigator.

8.  BPD should provide Executive Level ICS training to commanders.

9.  BPD should fully utilize and/or adopt software to assist in creating and updating IAPs and effectively manage the documentation and movement of personnel and resources.

10. Commanders assigned to ICS roles should shadow commanders from previous operational periods to help fully prepare and become comfortable in their assigned role.

11. ICS Form 214's should be collected prior to the conclusion of a tour of duty and centrally filed in Web EOC or some other established database.

12. BPD should address in policy and training the reporting requirements associated with the common MFF team tactic of forward movement towards non-compliant crowds. Policies 1115, *Use of Force*, and Policy 413, *Mobile Field Force*, do not currently address the physical contact that may occur between protestor and riot shield.

13. Southeastern District commanders should monitor and consider what they can or should do to prevent further complaints about First Amendment related violations in the future.

14. PIB should discontinue the use of "Impairing First Amendment Rights" as an allegation and should only use classifications included in the PIB Classification Protocol.

15. BPD should explore whether it can track demographic information of persons subject to possible miscondcut separately from complainant demographics in IAPro, since complainants are not always the people who were actually subjected to the alleged police misconduct.

# CONCLUSIONS

While implementation of the above 15 recommendations could improve BPD's responses to and assessment of First Amendment protected activities, the following conclusions have been drawn from this year's assessment of BPD's responses to First Amendment activities. Specifically:

1. BPD's response to protest environments in 2020 was compliant with policy requirements and did not infringe on protesters' First Amendment rights. The Level Two Use of Force incidents that were problematic for reasons unrelated to First Amendment protections were referred to PIB for investigation.

2. A review of BPD's handling of Disorderly Conduct-related calls for service and arrests in 2020 found no First Amendment-related issues. The two Disorderly Conduct arrests that were found to be problematic during this review were concerning for other reasons, and were both referred to PIB.

3. Since 2018, BPD has investigated 13 complaints alleging misconduct related to violations of First Amendment rights. This review revealed that of those 13 complaints, nine of those investigations have been completed and four remain under investigation. Of the nine cases that have been completed, one case resulted in a disposition of "sustained" regarding the First Amendment related allegation. The dispositions of the other eight close cases were as follows: three were "not sustained" and five were "unfounded." Furthermore, this assessment revealed an opportunity for BPD to improve its consistency in classifying First Amendment-related allegations.

BPD will continue to review its responses to First Amendment protected activities on an annual basis in order to monitor its compliance with the law and policy. These annual reviews will help BPD identify areas for improvement to protect the

public's First Amendment rights, including identifying ways to better track and assess BPD's responses to First Amendment protected activities. BPD endeavors to continue building public trust by performing accurate and objective assessments of its officers' responses to First Amendment protected activities and by clearly communicating the results of its assessments to the community.

# APPENDIX A

Summaries of Arrests Related to 1st Amendment Protests

| Sample | Date | CCN | Arresting Officer Assignment | Brief Case Summary | Most significant criminal charge |
|--------|------|-----|------------------------------|--------------------|----------------------------------|
| 1 | 5/30/2020 | 1-200508618 | CD | Officers responded to a downtown shopping center for persons seen by security entering into the location through broken glass. Officers stopped three individuals related to incident and placed them under arrest. | Burglary |
| 2 | 5/30/2020 | 1-200508618 | ND | Officers responded to a downtown shopping center for persons seen by security entering into the location through broken glass. Officers stopped three individuals related to incident and placed them under arrest. | Burglary |
| 3 | 5/31/2020 | 1-200508662 | ND | Officers deployed for a civil disturbance that consisted of a crowd throwing objects at officers. The subject threw a metal shopping cart at officers, striking one officer. Officers apprehended the subject and placed him under arrest. A BPD lieutenant participated in this arrest. | Assault |
| 4 | 5/31/2020 | 1-200508618 | CD | Officers responded to a downtown bank for a suspected arson fire. Subject threw a burning box at the responding officer's vehicle. Subject was arrested. A BPD sergeant participated in the arrest. | Assault |
| 5 | 5/31/2020 | 1-200508618 | SED | Downtown at 2am, the Incident Commander decided to disperse the crowd and three announcements were made.  The defendant refused to disperse from the street and was arrested. More details about this arrest are contained within the body of the report. | FTO |
| 6 | 5/31/2020 | 1-200508618 | SED | Downtown at 2am, the Incident Commander decided to disperse the crowd and three announcements were made.  The defendant refused to disperse from the street and was arrested. More details about this arrest is contained within the body of the report. | FTO |
| 7 | 5/31/2020 | 1-200508618 | SED | Downtown at 2am, the Incident Commander decided to disperse the crowd and three announcements were made.  The defendant refused to disperse from the street and was arrested. More details about this arrest is contained within the body of the report. | FTO |
| 8 | 5/31/2020 | 3-200508679 | ED | Officers responded to the Downtown Locker Room shoe store for an alarm call. Officers observed a vehicle parked near the store and individuals running out of the store with items in their hands. There were several individuals still in the store trying to leave with items. The chains on the metal doors of store had been broken off. Officers entered the store and arrested individuals still in the store, including the subject. | Burglary |
| 9 | 5/31/2020 | 3-200508679 | ED | Officers responded to the Downtown Locker Room shoe store for an alarm call. Officers observed a vehicle parked near the store and individuals running out of the store with items in their hands. There were several individuals still in the store trying to leave with items. The chains on the metal doors of store had been | Burglary |

| | | | | | |
|---|---|---|---|---|---|
| | | | | broke off. Officers entered the store and arrested individuals still in the store, including the subject. | |
| 10 | 5/31/2020 | 3-200508679 | ED | Officers responded to the Downtown Locker Room shoe store for an alarm call. Officers observed a vehicle parked near the store and individuals running out of the store with items in their hands. There were several individuals still in the store trying to leave with items. The chains on the metal doors of store were broken off. Officers entered the store and arrested individuals still in the store, including the subject. | Burglary |
| 11 | 5/31/2020 | 1-200508618 | CD | Officers responded to a downtown Dunkin Donuts for a commercial burglary. Officers saw numerous individuals running from the location. The front door of the location was smashed and the subject was laying behind the counter on the ground next to a broken cash register. Officers placed the subject under arrest. Upon placing the individual in the transport van he broke free and fled on foot. Officers again were able to apprehend individual. | Burglary |
| 12 | 5/31/2020 | 1-200508662 | CD | Officers were deployed to a civil disturbance downtown at about 2am. Individuals in the crowd began to throw objects at the police. The subject threw a brick at officers. Officers began to use less lethal pepper ball, striking the subject. The subject grabbed another brick and threw it at the officers. The subject was then arrested. A BPD sergeant was involved with this incident. | Assault |
| 13 | 6/1/2020 | 1-200600265 | TAC | Officers were deployed downtown for a civil disturbance. A subject was walking with a rifle case. Officers responded as the subject was seen placing the rifle case in the trunk of the vehicle. Officers approached the subject and recovered the rifle case with a .22 cal. rifle with 103 live rounds. | Firearms Violation |
| 14 | 6/1/2020 | 1-200600263 | E&T | During a civil disturbance at about 11pm, maneuvers by Mobile Field Force (MFF) were conducted to clear an intersection after protestors threw objects at officers, including an exploding pyrotechnic object that injured an officer. The clearing of the intersection was ordered by Incident Command. The focus of the MFF was to push the crowds west, north and east, out of the middle of the street.  The subject could be seen refusing to move north after being told numerous times to do so. The subject used both hands and pushed the police shield and officer down to the ground. A BPD sergeant participated in the arrest. | Assault (push) FTO |
| 15 | 6/2/2020 | 1-200600317 | CD | Officers received information from Citiwatch cameras in reference to an individual throwing a brick through a front glass window of Shoe City. After canvass based on description given, officers located the subject and placed him under arrest. | Destruction of Property  (DOP) |

| 16 | 6/2/2020 | 1-200600284 | CD | Officers responded to Metro PCS for a destruction of property call. The store's front glass window and door were shattered and the store appeared to be ransacked. A few hours later, an officer received a broadcast from Citiwatch. Units responded and saw a man handing out fireworks to protestors. The subject handing out fireworks was also carrying a large bag with various items which were identified as property from the Metro PCS store.  The subject was placed under arrest. | Burglary |
|---|---|---|---|---|---|
| 17 | 6/2/2020 | 1-200600263 | E&T | During a civil disturbance downtown after midnight, and after numerous dispersal orders over loud speaker and on the ground, the arrestee refused to comply and continued to block the roadway. He was arrested. More details about this arrest are contained within the body of this report. | FTO |
| 18 | 6/2/2020 | 1-200600263 | E&T | During a civil disturbance downtown after midnight, and after numerous dispersal orders over loud speaker and on the ground, the arrestee refused to comply and continued to block the roadway. He was arrested. More details about this arrest are contained within the body of this report. | FTO |
| 19 | 6/2/2020 | 1-200600298 | TAC | This arrest was made by members of the Maryland State Police and/or Maryland Transportation Authority Police. Those agencies did not have BWCs, so A&I could not view the arrest and make a determination about compliance with law and policy. After the subject's arrest, her custody was transferred to BPD for arrest processing only. After processing, the arrestee was released without charges. The statement of probable cause was expunged from central booking records. The incident report, CCN 1200600298, was obtained from BPD central records and found to be reported as "issued in error" with no information about the arrest. The only documentation about this arrest that could be obtained was a brief summary written by the SAO based on information they received prior to the release without charge which read, "Protest Case. Unit Blk E. Baltimore St at Guilford.  Citywide curfew went into effect at midnight and police gave an order to disperse 3 times and def failed to comply." Video footage and radio transmissions confirmed that the group of protestors involved in the civil disturbance were given numerous dispersal orders prior to this arrest. | FTO |
| 20 | 5/31/2020 | 3-200508679 | ED | Officers responded to the Downtown Locker Room shoe store for an alarm call. Officers observed a vehicle parked near the store and individuals running out of the store with items in their hands. There were several individuals still in the store trying to leave with items. The chains on the metal doors of store had been broken off. Officers entered into store and were able to arrest individuals still in the store, including the subject. | Burglary |
| 21 | 5/30/2020 | 1-200508618 | CD | Officers responded to a downtown shopping center for persons seen by security entering into the location through broken glass. Officers stopped three individuals related to incident and placed them under arrest. | Burglary |

| 22 | 8/26/2020 | 9-200807873 | SD | During gatherings related to the visit of the President and Vice President, officers observed the subject tase a male victim during an altercation amongst demonstrators. BPD supervisors participated in this arrest. | Assault (Taser) |
|----|-----------|-------------|-----|----|----|
| 23 | 6/2/2020 | 9200600326 | SD | Officers responded for a commercial burglary in progress at Boost Mobile Store. Upon arrival, they could see the steel gate was up and that persons were in the rear of store. One individual was seen in the front of store, another was located in ceiling area, and one was on the top shelf in the rear of store. All were arrested. | Burglary |
| 24 | 6/2/2020 | 9200600326 | SD | Officers responded for a commercial burglary in progress at Boost Mobile Store. Upon arrival they could see the steel gate was up and that persons were in the rear of store. One individual was seen in the front of store, another was located in ceiling area , and one was on the top shelf in the rear of store. All were arrested. | Burglary |
| 25 | 6/2/2020 | 9200600326 | SD | Officers responded for a commercial burglary in progress at Boost Mobile Store. Upon arrival, they could see the steel gate was up and that persons were in the rear of store. One individual was seen in the front of store, another was located in ceiling area, and one was on the top shelf in the rear of store. All were arrested. | Burglary |
| 26 | 5/29/2020 | 1200508319 | CD | BPD members were conducting traffic control at a downtown intersection, and were assigned to direct traffic based on the movements of the protesters. The subject was driving a vehicle erratically and was directed to stop. She later assaulted a BPD member by spitting on him and punching him twice. She was arrested after a use of force. A BPD sergeant participated in this arrest. This arrest is described in more detail in the Use of Force section of this report (Appendix B) | Assault (spits and punches) |
| 27 | 6/2/2020 | 1-200600290 | CD | Officers responded to a burglary and destruction of property call at Streets Market and Cafe. Citiwatch advised of the location of suspects. Based on the description given, officers were able to locate the individual who was arrested. | Burglary |
| 28 | 6/3/2020 | 1-200600581 | CD | Officers responded to a Burglary in progress at Shoe City. Citiwatch advised that a group of 6 males were in the front entrance of the store. Citiwatch observed individuals with bolt cutters. Upon seeing the police, the individuals fled in multiple directions. One individual threw the bolt cutters in a dumpster and then laid on the ground and surrendered. Subject was arrested. | DOP |
| 29 | 6/2/2020 | 1-200600324 | CD | Officers responded for a report of Metro PCS being burglarized. Upon arrival, Citiwatch cameras observed an individual enter the premise. When officers entered the location to conduct a search, the individual was located hiding in bathroom of store. The subject was arrested. | Burglary |

| 30 | 6/2/2020 | 1-200600302 | CD | Officer responded to Zeke's Coffee Shop in reference to a suspicious activity call that might be burglary related. Citiwatch advised that they observed an individual kick and punch on the front door of the location. After the individual got inside, they saw the individual leave out with a cash register. Officers conducted a canvass which led to a foot pursuit. Officers were able to apprehend the subject and recover the property. | Burglary |
|---|---|---|---|---|---|

# APPENDIX B

Summaries of Level Two Uses of Force during Protests

## NIC 20-0505        May 29, 2020        2228 hours

On May 29, 2020, while some BPD members were conducting traffic control at a downtown intersection during protests related to the death of George Floyd, members broadcasted that a vehicle had almost hit several people. After the broadcast, the same vehicle pulled up to the downtown intersection and began to head through. A BPD member put his hands up in an attempt to get the vehicle to stop because the light was red. The vehicle accelerated towards him. He stepped to the side away from the path of the vehicle. The vehicle then proceeded through the intersection, made a U-turn, and drove toward the member again.

After officers withdrew their weapons and pointed them at the driver, the driver got out of the car and stated "shoot me" and then sat on the ground. While on the ground, the BPD member closed the driver-side door. The subject then spat on the member three times. Additional officers were called to assist. The subject then stood up and walked towards the member. After pointing her hands towards the member's face, the last of which made contact with his face, the member grabbed her arm in attempt to place her under arrest. Once the member grabbed her arm, the subject struck the member in the face. A backup officer then attempted to restrain the subject's arms, but she broke free and struck the member in the face again. In response to the second strike, the backup officer struck the subject in the face with a closed fist, causing her to fall to the ground.

While the officers were attempting to place the subject inside a transport vehicle, she continued to shout at the officers, go limp and spit on them.  The subject was transported to the hospital by Baltimore City Fire Department Paramedics for treatment.  After a medical evaluation, no injuries were found and she was released from the hospital and transported to the Central Booking and Intake Facility.

This case was investigated by BPD's Special Investigation Response Team (SIRT). Members of the Baltimore City State's Attorney's Office (SAO) also completed a review of the incident. The SAO found that the backup officer's actions did not rise to the level of criminal conduct and issued a formal public report explaining their reasoning.[14] The SIRT investigation was then presented to BPD's Performance Review Board (PRB). The Board considered the back-up officer's training records when assessing the incident. While the backup officer had recently completed BPD's new use of force training, the last training he received from the BPD on defensive tactics was in October, 2012, which stressed the importance of punching in an efficient and affirmative manner, taking an adversary's balance away, and causing chaos or unconsciousness. The officer had not been trained otherwise in defensive tactics and arrest and control techniques since then. Despite extensive classroom and eLearning modules on the new Use of Force Policy, this officer has not been trained to physically utilize arrest and control techniques and defensive tactics in conjunction with recently issued policy. Although the force was found reasonable, necessary and proportional, advanced training was recommended for the backup officer to provide alternative tactics when needing to quickly restrain an actively aggressive subject.

## NIC 20-0504        May 30, 2020        2120 hours

On May 30, 2020, BPD's Incident Commander authorized deployment of the Mobile Field Force (MFF) platoons in reference to a large crowd throwing projectiles at officers in front of City Hall. Individuals in the crowd vandalized police cars and other city vehicles by smashing windows and marking them with spray paint. Crowds surrounded officers attempting to travel in marked police cars, preventing them from moving. A ground commander described the officers as getting "bombarded." Multiple crowds converged at once at City Hall and individuals in the crowd threw fireworks, bricks, rocks, glass bottles, plastic jugs filled with unknown liquid and other objects at police officers throughout the ongoing incident.

---

[14] https://www.stattorney.org/images/data/gaystreet_report05-29-2020.pdf.

Once deployed, MFF warned protesters to "Move back" out of the street. Clear points of egress were present. Glass bottles continued to be thrown at MFF officers, and individuals were pushing and blocking other officers from responding in order to replace officers who were being assaulted. At least one subject was reported to be using mace. Over the course of many hours, the MMF members deployed pepper balls, FN-303, and smoke for area dispersal and area denial.[15] Direct impact force was also deployed by MFF members, targeted at those displaying active and aggravated aggression. With the exception of one man arrested[16], those struck with less-lethal munitions fled the area and were not identified. This group of events was investigated by the chain of command and assessed by BPD's Use of Force Assessment Unit (UOFAU). The uses of force were found to be reasonable, necessary and proportional and compliant with Policy 414, *Less-Lethal Munitions and Chemical Agents*.

### 2021-0876          June 1, 2020          2228 hours

During a civil disturbance on June 1, 2020, maneuvers by Mobile Field Force (MFF) were conducted to clear an intersection as protestors threw objects at officers. Review of recordings of radio traffic  indicated that the deployment was approved by Incident Command to aid officers who were being assaulted by people throwing bottles and fireworks. Video footage showed a MFF officer spraying a pepper fogger when encountering the group of individuals who refused to move back after numerous warnings. The action was not properly reported. PIB is investigating the incident and will ultimately determine whether the force was reasonable, necessary and proportional.

### NIC 20-0447          June 1, 2020          2254 hours

During a civil disturbance on June 1, 2020, a subject reported to a BPD ground commander that he was struck in the mouth by a riot shield that caused an abrasion to the inside of his lip. He advised he was told to walk across the street 6 or 7 times prior to the line of officers moving forward. He then described being pushed by an officer with a shield which impacted his lip. The subject could not identify the officer. The subject was treated and released on the scene by medics. BPD supervisors launched a Level Two UOF investigation as outlined in BPD Policy 725. The subject's lip was photographed. The location and approximate time of the incident was identified. Numerous BWC recordings, Aviation video and CCTV video were reviewed.

Review of available recordings showed that maneuvers by Mobile Field Force (MFF) were conducted to clear an intersection after protestors threw objects at officers, including an exploding pyrotechnic object that injured an officer. The clearing of the intersection was ordered by Incident Command. The focus of the MFF was to push the crowds west, north and east, out of the middle of the street. Review of KGA transmissions indicated that the maneuvers were required by Incident Command to allow National Guard vehicles to travel on Guilford Avenue.

After being told repeatedly to move behind the police line, the subject refused. After numerous warnings by several BPD members, he was pushed behind the line. The subject returned back towards the restricted area and an unidentified officer[17] stepped in with a shield to block him from returning across the established line. The subject quickly moved forward into the shield and made physical contact as the officer pushed back with the shield. He was then pulled away from the shield by other unidentified civilians.

The reported UOF was documented and reviewed through the chain of command and by the UOFAU which determined that the use of force was within policy. Video evidence confirmed this. The case was referred to PIB for further investigation to determine the identity of the officer and if he properly reported the UOF when safe to do so.

---

[15] Policy 414, Less-Lethal Munitions and Chemical Agents, *defines Area Dispersal as a projectile hitting a hard surface 3-5 feet before the target individual(s) for the purpose of moving a group or groups of individuals from one location to another. Policy 414 defines Area Denial as an area that is deliberately contaminated with a chemical irritant to deny and or make the area uncomfortable for individuals to gather at that location.*
[16] See sample 12 Appendix A Protest Related Arrests.
[17] The identification of officers in riot gear is discussed on page 9.

On June 2, 2020, officers were called to the area of a local establishment for a commercial burglary in progress. Four subjects were fleeing, one of which was holding a cash register. The officers saw one of the subjects fleeing on foot. The officer gave verbal commands but the subject did not comply. The subject jumped over a fence. The officer deployed two separate one second bursts of OC spray to the individual's eyebrow area of his face. The officer was at a distance of greater than 3 feet during the deployment of his OC spray. The subject continued to flee out of the sight of the officer and was not apprehended nor identified. The cash register was recovered nearby. The incident was reported and investigated in accordance with Policy 725 through the officer's chain of command, and by the UOFAU. Training from 2019 included the UOF continuum which indicated that OC Spray could be applied for active resistance situations if reasonable, necessary, and proportional. All levels of review agreed the use of force was within policy.

### NIC 20-0441        June 2, 2020        0310 hours

On June 2, 2020, officers responded to a commercial burglary in progress. Upon arrival, they located subjects still inside the store. Officers displayed patience and developed a strategy as three subjects moved around inside the location upon noticing police on scene. Officers gave multiple warnings, yet the subjects refused to comply. Officers finally entered the store and arrested the subjects, one of whom attempted to escape through the roof. Officers did not use level two force at this point. The subjects were taken outside to await transport. One subject then attempted to break free and immediately ran into a pole as the officers held him from escaping. This event caused injury to the subject. The incident was reported and investigated according to Policy 725 through the officer's chain of command, and within the UOFAU. All levels of review agreed the use of force was reasonable, necessary, and proportional. This incident was also flagged for possible inclusion in future training since the officers displayed calm, deliberate and firm actions to attempt to de-escalate the encounter.

# APPENDIX C

Summaries of Disorderly Conduct Arrests from 2020

**Key:**

| |
|---|
| Green = No Violations |
| Yellow = Unsatisfactory |
| Orange = Inconclusive |

| Sample # | CCN | Brief Summary of Case |
|---|---|---|
| 1 | 2-200103093 | Bar closing and subject was arguing with another individual. Officers advised subject to leave and he refused. Same was yelling causing a public disturbance. |
| 2 | 4-200102348 | Subject was in 7-11 and was bumped by another female and they both began to argue. Subject followed the female to the laundromat next door and attempted to fight her. Subject was disorderly and  given several commands to leave but refused. Officer stated his BWC fell off thus incident was not recorded. |
| 3 | 9-200202716 | Unit 9B92 was operating the wagon with lights and siren in route to a shooting. Stated he advised subject to move several times. Once at the crime scene, subject walked through the tape and he was arrested for hindering for earlier blocking the wagon. Review of BWC revealed the subject was on the left side of the wagon and was not shown blocking the wagon. The officer yelled, "Get out of the way asshole." Once at the crime scene, the supervisor told the subject to leave and the subject complied. As the subject was leaving, he was placed under arrest. This case is being investigated by PIB. |
| 4 | 2-200300254 | Officer is dispatched to the area by apartment security.  Upon arrival he met security at a loading dock where the subject was still yelling.  Officers arrested subject after over 22 minutes of warnings. Arrest was satisfactory; however, Officer referred to PIB for failing to immediately render aid to an injured prisoner. |
| 5 | 1-200303026 | Fight on The Block at closing, group was ordered to leave, subject was arrested after he continued to argue/fight with a female. |
| 6 | 4-200607085 | Subject was warned earlier by a charlie shift unit.  Subject returned on the adam shift.  Special Police had the subject detained on their parking lot (apartment complex). Subject would not leave and was arrested. |
| 7 | 7-200701005 | Officers were on scene of a gun arrest, awaiting medical attention for an arrestee.  While waiting for medics, a crowd started to form, and a subject was upset about the length of time it was taking for medical attention. After being warned many times by officers on the ground and by police helicopter the subject tried to walk past officers who established a skirmish line. The subject was arrested by the ranking supervisor on scene. |
| 8 | 5-200800847 | Subject was asked to leave by supermarket security. After refusal, security called police.  Police arrived and ask subject to leave, subject refused by not complying.  Same was arrested. |
| 9 | 9-200804453 | Subject waiting in Greyhound property, was asked to leave by security. Officer previously warned him, then returned to the location due to another call.  Subject would not leave the property of Greyhound.  Was warned several times, even offered a citation instead of arrest.  Subject refused. |
| 10 | 8-200907077 | Subject was intoxicated, walking around with an open container.  Subject was starting arguments with several people to the point of an attempted assault.  Same was warned several times, and kept yelling and arguing with people.  Same was arrested. |
| 11 | 4-201000854 | NED officers responded for a family disturbance. Two brothers where arguing and the aggressor was placed under arrest for disorderly conduct due to his yelling and causing a disturbance. Neighbors came out to observe the commotion. |
| 12 | 4-201004888 | Officer responded to Safeway supermarket for a disorderly. Subject was yelling inside, causing a commotion. This made patrons stop to look. Subject was made to leave but he remained in the parking lot and continued to yell/scream profanity towards the other officers.  Several patrons of Safeway where stopping to observe the commotion and were recording the scene on their cell phones. Same was advised multiple times to leave the property and subsequently was placed under arrest |

| 13 | 5-205005367 | Subject was released from the hospital but was not satisfied with the treatment, and refused to leave the ER. Subject was then escorted by hospital security to the lobby where the subject still refused to leave and caused a scene. Same was arrested by the Overtime unit. |
|---|---|---|
| 14 | 6-201008660 | Subject was asked to leave McDonalds, and refused. After 56 minutes, subject was arrested. |
| 15 | 7-201009491 | Subject was observed counting CDS. A foot pursuit followed where the officer told the subject to stop running. The subject was then caught and CDS recovered. The lone charge accepted by the SAO was Failure to Obey a lawful order made to prevent a disturbance to the public peace. |
| 16 | 1-201100280 | Subject was involved in a civil dispute with a citizen regarding a cell phone. The subject refused to leave the citizen's home despite being told to do so by the citizen and officers many times. The subject then began banging on the window of the citizen's home. She continued to refuse to leave and told officers she would not accept a citation. A sergeant arrived on the scene and also told her to leave. The subject said that she would not leave and that the police would have to arrest her. The subject was arrested. |
| 17 | 9-201101286 | Subject was involved in a domestic dispute. Officers responded and attempted to resolve the dispute and then left the location. Officers then responded to another call to the home a little while later. Citiwatch CCTV operator advised that the subject assaulted his girlfriend (she denied she was assaulted). The subject started arguing and causing a disturbance, drawing a large crowd in a neighborhood. The subject was arrested. |
| 18 | 2-201106169 | Neighborhood fight. Subject would not let go of the original arrested subject. After being warned and after officers tried to physically separate the subject, he was arrested. |
| 19 | 4-201107497 | Officers responded to location for a family disturbance/disorderly. Subject was on scene attempting to pick her 13 year old son from his grandmother. The subject and grandmother then became involved in a verbal dispute. The subject was advised to leave with her son multiple times but she continued to argue causing a commotion. Due to subject continuing to argue and instigating a verbal altercation that could have possibly have led to a physical altercation, and her refusing to leave the area, she was placed under arrest. Several vehicles traveling on the road were slowing down and braking to observe the commotion at the time of arrest. |
| 20 | 4-201202233 | Subject would not leave significant other's mother's porch. Was warned several times; subject refused. Subject was arrested. |
| 21 | 5-201206683 | Officers were called to a local store by store owner because a subject refused to leave the store. Officers told the subject to leave and escorted subject out. As soon as officers walked away, subject returned in the store. Same was arrested. |
| 22 | 2-200507271 | Security at Family Dollar store asked subject to leave. Subject was previously banned from the store. Refused to leave after officers warned subject. Subject was arrested. |
| 23 | 1-200600298 | The arrest was made by members of the Maryland State Police and/or Maryland Transportation Authority Police. Those agencies did not have BWCs, so A&I could not view the arrest and make a determination about compliance with law and policy. After the subject's arrest, her custody was transferred to BPD for arrest processing. After processing, the arrestee was released without charges. The statement of probable cause was expunged from central booking records. The incident report, CCN 1200600298, was obtained from BPD central records and found to be reported as "issued in error" with no information about the arrest. The only documentation about this arrest that could be obtained was a brief summary written by the SAO based on information they received prior to the release without charge which read, "Protest Case. Unit Blk E. Baltimore St at Guilford. Citywide curfew went into effect at midnight and police gave an order to disperse 3 times and def failed to comply." Video footage and radio transmissions confirmed that the group of protestors involved in the civil disturbance were given numerous dispersal orders prior to this arrest. |
| 24 | 9-200603718 | Intoxicated subject with a knife was yelling at police and bystanders about drug dealers in the block. Subject attracted onlookers and argued with them as well. After he put the knife away, he sprayed two officers with a hose. After many warnings, the subject was arrested. |
| 25 | 2-200801712 | Officer observed a female and male fighting in the street. Female subject was then placed under arrest for disorderly. Officer stated she was advised to stop engaging with the group several times due to her yelling and residents on the block where turning on their house lights. Only the female was arrested due to the male subject going inside a home on the block and officers where not able to obtain his information. |

| 26 | 9-200205254 | Officers observed a man displaying characteristics of an armed person which they properly described in detail in their reporting. Upon stopping the individual, he pushed an officer and fled on foot. The subject stepped in front of the officer to help the armed person flee. The subject was arrested and a gun and narcotics were recovered. The subject then claimed the drugs and gun from the armed person were hers. |
|----|-------------|-----|
| 27 | 8200402484 | Police responded to a fight in 3400 blk W. Caton Ave. Police had a hard time stopping the fight. Afterwards, the subject would not calm down after police requests, and police felt her yelling was to incite the crowd to start fighting again. A BPD Lieutenant ordered her to be arrested. |
| 28 | 9200502325 | Call to Greyhound Bus Terminal for a male refusing to leave who did not have a ticket to travel.  Returned several times after being escorted off the premises.  Arrest was a last resort because subject did not have his ID, so could not be properly issued a citation, and kept returning despite multiple warnings. |
| 29 | 1200508618 | Protest related case. Downtown at 2am, a decision was made to disperse the crowd and 3 announcements were made.  The defendant refused to disperse from the street and was arrested. |
| 30 | 1200508618 | Protest related case. Downtown at 2am, a decision was made to disperse the crowd and 3 announcements were made.  The defendant refused to disperse from the street and was arrested. |
| 31 | 1200508618 | Protest related case. Downtown at 2am, a decision was made to disperse the crowd and 3 announcements were made.  The defendant refused to disperse from the street and was arrested. |
| 32 | 6200907367 | The subject was at a local business and was intoxicated and belligerent. Security asked him to leave but he would not.  Police tried to get him to leave and escorted him out, but he would not cooperate and tried to walk back to the store. He was arrested. |
| 33 | 1-200600263 | During a civil disturbance downtown after midnight, and after numerous dispersal orders over loud speaker and on the ground, the arrestee refused to comply and continued to block the roadway. He was arrested. More details about this arrest is contained within the body of the report. |
| 34 | 1-200600263 | During a civil disturbance downtown after midnight, and after numerous dispersal orders over loud speaker and on the ground, the arrestee refused to comply and continued to block the roadway. He was arrested. More details about this arrest is contained within the body of the report. |
| 35 | 1-200600263 | During a civil disturbance at about 11pm, maneuvers by Mobile Field Force (MFF) were conducted to clear an intersection after protestors threw objects at officers, including an exploding pyrotechnic object that injured an officer. The clearing of the intersection was ordered by Incident Command. The focus of the MFF was to push the crowds west, north and east, out of the middle of the street. The subject could be seen refusing to move north after being told numerous times. The subject used both hands and pushed the police shield and officer down to the ground. A BPD sergeant participated in the arrest. |