# EXHIBIT 1

Baltimore Police Department Consent Decree Monitoring Team


Compliance Assessment of Transportation of Persons in Custody
February 2022

**TABLE OF CONTENTS**

I.   EXECUTIVE SUMMARY ................................................................................................ 1

II.  BACKGROUND AND CONTEXT ............................................................................... 7
     A.   **Investigation of the Baltimore City Police Department** .......................... 7
          1.   BPD Has a History of Not Securing Arrestees ............................................ 7
          2.   BPD Continued to Place Detainees at Risk During Transport ................... 7
          3.   BPD Transport Equipment Placed Detainees at Risk .................................. 7
     B.   **Consent Decree** ............................................................................................ 8
     C.   **Summary of Progress to Date** .................................................................. 8
          1.   Transportation Policies and Training ............................................................ 8
          2.   Transportation Equipment ............................................................................. 9
          3.   Transportation Procedures ........................................................................... 11
     D.   **Summary of Compliance Progress to Date** ............................................ 12
          1.   Evaluating Compliance to Date ................................................................... 12
               a.   September 2020: First Comprehensive Re-Assessment ...................... 13
               b.   May 2021: Sixth Semiannual Report ................................................... 14

III. THE ROLE AND PURPOSE OF THIS COMPLIANCE ASSESSMENT ............................ 15

IV.  ASSESSMENT OF TRANSPORT EQUIPMENT ........................................................ 18
     A.   **Vehicle Equipment Spot Checks** ............................................................. 18
          Findings ................................................................................................................. 19
     B.   **Assessment of Vehicle Inspection Records** ............................................ 21
          1.   Weekly District Vehicle Inspection Records ............................................. 21
               i.    Grip Strap Inspection Documentation ................................................ 23
               ii.   Seatbelt Inspection Documentation ..................................................... 24
          2.   Weekly Wagon IT Inspections ................................................................... 25
               Findings .......................................................................................................... 25
          3.   Assessment of TVC Video Retention ......................................................... 27
               Findings .......................................................................................................... 28
     C.   **Compliance Synopsis** .............................................................................. 29

V.   ASSESSMENT OF TRANSPORT PROCEDURES ....................................................... 30
     A.   **Detainee Transport Audits** .................................................................... 30
          Findings ................................................................................................................. 33
     B.   **Quarterly Spot Check Audits** ................................................................. 38
          Findings ................................................................................................................. 38
     C.   **Assessment of Transport Injury Reports** .............................................. 39
          Findings ................................................................................................................. 40
     D.   **Review of Training Records** ................................................................... 40
          Findings ................................................................................................................. 41
     E.   **Compliance Synopsis** .............................................................................. 41

VI.  SUMMARY OF COMPLIANCE DETERMINATIONS ................................................. 44

VII. APPENDICES ..................................................................................................... 48
     **Appendix 1: Timeline of Key Detainee Transport Reform and Oversight Events** ......... 48

**Appendix 2: Detainee Transport Scorecard**........................................................................ **50**
**Appendix 3: Wagon Camera Inspections, by Week and District**.................................................. **53**

## I.     EXECUTIVE SUMMARY

Section IX of the Consent Decree, Transportation of Persons in Custody (¶¶ 222-238), outlines a series of requirements focused on improving transportation equipment, transportation procedures, monitoring of transportation practices, and policies and training. Specifically, the Consent Decree requires the Baltimore Police Department (BPD) to:

1.  Equip all transport vans with seatbelts, holding straps located along the rear area of each seat that individuals being transported may grip for security during transport, and transport vehicle cameras (TVCs) and all transport cruisers with seatbelts (¶¶ 223-24);
2.  Inspect transport vehicles monthly and create logs to memorialize the inspections (¶ 225);
3.  Establish and adhere to appropriate procedures for transporting prisoners (including using seatbelts, straps, and TVCs) (¶¶ 226-33);
4.  Establish and adhere to protocols for documenting and comprehensively auditing prisoner transport events (¶¶ 234-37); and
5.  Revise policies and training curricula to ensure safe, effective prisoner transport (¶ 238).

The Consent Decree Monitoring Team has conducted a comprehensive assessment of BPD's compliance with these requirements and has determined that the Department is making satisfactory progress. Using the compliance scoring framework the Monitoring Team has adopted, BPD's compliance score is "Implementation -- On Track."

To assess compliance with the Consent Decree's transport equipment requirements, the Monitoring Team performed in-person spot checks of transport vehicles and reviewed BPD's routine transport vehicle audits. To assess compliance with the Consent Decree's transport practice and procedure requirements, the Monitoring Team independently reviewed a representative sample of the randomly selected transports that BPD has audited over the past two years, as well as a random sample of transports that were not included in BPD's audits. In so doing, the Monitoring Team confirmed the validity of BPD's audit practices, and so was generally able to rely on those audits for this assessment.

Based on our reviews, we found that BPD has made substantial improvements in the way it is transporting persons in custody and in the appropriateness of the equipment that it utilizes to do so. Generally, BPD is properly equipping its transport cruisers and wagons with the devices that the Consent Decree requires—i.e., partitions and seatbelts for both cruisers and wagons, and grip straps and TVCs for wagons. Based on findings from the paragraphs the Monitoring Team was able to assess, BPD's transport officers also appear to be doing much of what the Consent Decree requires them to do when transporting prisoners from one place to another.

1

At the same time, however, BPD must address several administrative and record-keeping deficiencies to ensure that these nascent changes in performance are sustained over the long-term and, therefore, to achieve full compliance with the requirements of Paragraphs 222 – 238 of the Consent Decree. If and when BPD fixes these administrative and record-keeping issues, it will attain, under the Monitoring Team's compliance scoring framework, a compliance score of "initial compliance" in the area of Transportation of Persons in Custody.

The Monitoring Team makes the following specific findings regarding BPD's compliance with Consent Decree requirements:

- **BPD transport vehicles are appropriately equipped.** The transport equipment required by the Consent Decree (¶¶ 223-224) was in place, and in working order, in most vehicles, based on both the routine inspections conducted by BPD and the independent inspections conducted by the Monitoring Team. Nearly all transport vehicles and wagons had functioning seatbelts, grip straps, and partitions. Many of the vehicles with deficiencies, such as unsatisfactory seatbelt scores, were addressed quickly; however, the current state of the data prevented us from being able to comprehensively track individual vehicles over time. All TVCs observed were functional, and footage appears to be retained for at least a year.

- **BPD is routinely completing the required monthly inspections of transport vehicles and wagons, and IT inspections of transport wagons.** The Department often exceeds the frequency of inspections required by the Consent Decree, inspecting some vehicles multiple times each month.

- **BPD personnel are following a number of the required procedures for transporting detained individuals.** BPD's audits of transport practices determined that in nearly every instance observed, detainees being transported were appropriately restrained, and when in wagons, had access to grip straps and were viewable on TVCs. The Monitoring Team's review of the validity of BPD's audits—which included not only an independent evaluation of a representative sample of the transports that BPD has audited, but also an independent review of a set of randomly selected transports that BPD did not include in its audits—support this finding. All detainees observed were handcuffed prior to being transported, and no detainees were restrained in a position causing undue pain or risk of injury. BPD's monthly audits and quarterly spot checks captured a few instances where prisoners complained of an injury and were not provided medical attention or where the transporting officer did not take immediate action. However, there was evidence, at least in the quarterly audits, that BPD is properly addressing these lapses by making Public Integrity Bureau referrals. To be clear, a referral alone is not sufficient to address policy violations. If a policy violation has occurred, BPD must follow through with corrective action or, if warranted,

2

discipline. The Monitoring Team has not determined what, if any, action BPD has taken on the few referrals that were made but will consider doing so in a future review of PIB's performance.

- **BPD is consistently completing the Decree-required audits and spot checks of prisoner transport events and adhering to the agreed upon methodologies for doing so.** The Department is in fact exceeding the required number of audits per quarter by auditing six transports per district instead of the required five, and by auditing transports by the Warrant Apprehension Task Force (WATF) in addition to transports in each of the nine districts.

- **BPD has successfully revised its transport policies and provided associated training.** The Department has revised and enacted the prisoner transport policies required by the Consent Decree, including Policy 825: Transport Vehicle Camera, Policy 1114: Persons in Police Custody, and Policy 1511: Vehicle Inspection and Maintenance. Training on each of these revised policies has been delivered Department-wide. Additionally, BPD has developed and launched a transport driver training program, which has been provided to existing transport wagon drivers and new recruits at the Academy.

Based on these developments, BPD has made substantial progress toward initial compliance with the full set of the transport provisions of the Consent Decree (Paragraphs 222 through 238). If and when it addresses the following outstanding issues, it will attain initial compliance:

- **While BPD has created logs to memorialize its transport vehicle inspections, its record-keeping processes need to be improved.** BPD needs to establish a timely database of all department vehicles, their location, and maintenance status. The Consent Decree requires BPD to inspect all vehicles used for the transportation of persons in custody on at least a monthly basis. Without a current inventory of these vehicles, and why they may not be present for inspections, it is not possible to completely determine compliance. Additionally, BPD members who conduct monthly vehicle and vehicle IT inspections should be trained to ensure they score inspections in a consistent manner and complete every section in all inspection reports with accurate, legible information. Lastly, the IT inspection reports must document the status of the TVCs being inspected.

- **BPD officers must always search detainees before placing them in transport vehicles, and BPD auditors must be able to ascertain the safety of transport officers' driving practices, including driving speed and observance of other traffic**

**safety laws.** While most transport practices generally comply with Consent Decree requirements, BPD must remedy several deficiencies we observed:

> ➢ In at least 14% of the transports BPD reviewed during its monthly audits, the detainee was not searched before being placed in the transport vehicle. The Monitoring Team flagged this issue in prior reports, yet it persists.

> ➢ Auditors could not determine the transport driver's speed in 73% of transports they audited.

> ➢ When auditors assessed compliance with traffic safety laws, more than one-fifth of audits found that the transport driver did not drive in a manner to preserve the safety and security of persons in custody, i.e., did not operate the vehicle as required in all respects by state law. Examples of driving in an unsafe manner included failing to stop at a stop sign or red light other than in an emergency and operating a handheld device while driving.

For compliance to be achieved in this area, the Monitoring Team expects BPD to demonstrate a sustained trend of improved scores in the prisoner search and safe driving fields of BPD's internal audit scorecards, and to resolve access issues preventing consistent assessment of driving speeds and compliance with other traffic safety laws.

These shortcomings are not insignificant, and they are a primary reason why BPD has not yet achieved "initial compliance" in the transport area. However, policy and traffic safety law violations such as traveling a few miles over the speed limit or failing to come to stop at a stop sign do not diminish BPD's consistent compliance with Consent Decree and policy requirements that are generally more important to safely transporting persons in custody—i.e., restraining them in seatbelts, providing grip straps, and monitoring their safety through either direct or TVC observation. That is why the Monitoring Team has concluded that, despite the shortcomings described here, BPD officers are generally doing much of what the Consent Decree requires when transporting persons in custody.

- **For BPD's audits of prisoner transports, BPD still needs to collect better, more reliable data.** There are a few areas of the audit process that require improvement to ensure that the information being collected is reliable, and that the data necessary to complete the audit scorecard is consistently available. First, the Department must be able to generate a list of all prisoner transports conducted. At present, there is no way to comprehensively identify the frequency of transports or type of vehicle used. The Monitoring Team expects that this will be improved following the full implementation of the new records management system. Additionally, BPD must address the data

shortcomings, such as limited access to Automatic Vehicle Location (AVL) information, that are preventing the Department from routinely assessing safe driving as part of the audits. Lastly, BPD needs to fix the problem related to storage of Charge Information Forms (Form 12s), which could not be located for a significant portion of the transports audited. Without Form 12s that can be queried, or even physically located, it is not possible to complete a large portion of the audit scorecard.

- **The Monitoring Team will need to conduct a follow-up review to focus on the additional issues implicated in Paragraphs 229 and 230.** Currently, BPD cannot readily identify or isolate those transports that implicate various considerations addressed in Paragraphs 229 and 230. This prevents this assessment from evaluating, for instance, requirements involving separately transporting males and females; separately transporting juvenile and adult persons; generally transporting transgender, intersex, and/or gender non-conforming individuals with arrestees of the same gender identity and expression; and ensuring medical equipment is transported with a person who requires it. The Monitoring team will need to conduct a follow-up evaluation to ensure compliance in these areas.

To remedy these outstanding issues, which largely relate to record-keeping and administration rather than personnel performance during transports, BPD needs to do the following:

1. Implement a modern fleet management system to maintain a current vehicle roster that includes location and maintenance status;
2. Make AVL data available to supervisory and audit personnel for all prisoner transports;
3. Implement a digital and/or physical process for securely storing and retrieving Form 12s;
4. Train all personnel involved in vehicle inspections on how to fill out inspection reports accurately and completely;
5. Update the "Wagon Hard Drive Inspection Sheets" to include a question about TVC functionality;
6. Develop an accurate, timely, and comprehensive database of all prisoner transports conducted, to include the persons involved, vehicle ID and type, transport date and time, and location; and
7. Develop and implement a strategy to ensure transport drivers adhere to policies for searching detainees.

BPD must take these vital steps to improve and refine its transport record-keeping practices before the Monitoring Team can confidently certify that the performance of BPD transport drivers is generally consistent with Consent Decree requirements and, whenever it is not, that BPD is taking prompt remedial action. Although nothing in this compliance assessment should suggest that the resolution of these record-keeping deficiencies would reveal performance problems that did not

surface in the significant universe of transport events that the Monitoring Team could review, BPD—through improved record-keeping—will need to be able to provide greater certainty about transport driver performance going forward, both to achieve Consent Decree compliance and to effectively self-monitor long after the Consent Decree is terminated. Again, if and when it provides such certainty, it will achieve a score of "initial compliance" in the transport area.

## II.     BACKGROUND AND CONTEXT

Ensuring the safety of individuals in police custody is among the most important obligations of any law enforcement agency. All persons in police custody should be handled in a way that both maintains their safety and civil rights. The April 19, 2015 death of Freddie Gray Jr., following his arrest and transport in a Baltimore Police Department ("BPD") van prompted widespread protests and unrest. While Mr. Gray's death is not the only in-custody or transport-related death in BPD's recent history, this particular incident, its widespread media coverage, and the substantial community anger and concern that it inspired, all served to underscore deep and entrenched divisions between BPD and parts of the Baltimore community.

### A.     Investigation of the Baltimore City Police Department

During the Department of Justice's ("DOJ") civil pattern or practice investigation into the Baltimore Police Department, which examined BPD actions between 2010 and 2016, a lack of available transport data or video monitoring precluded DOJ from making a specific finding regarding constitutional violations in BPD's transportation of detainees, or the practice of "rough rides". However, DOJ determined that "Baltimore's transport practices create a significant risk of harm", as demonstrated by multiple instances in which failures had resulted in serious injuries and death. DOJ's findings report detailed three transport-related areas requiring remediation:

### 1.    *BPD Has a History of Not Securing Arrestees*

DOJ found that BPD officers routinely failed to safely secure arrestees in transport vans with seatbelts, pointing to numerous instances in the past where these failures resulted in serious and sometimes fatal injuries to passengers.

### 2.    *BPD Continued to Place Detainees at Risk During Transport*

While BPD lacked comprehensive data during the investigation, DOJ found through reviewing a series of historical audits that the use of seatbelts had increased over time. However, the findings of BPD's audits were inconsistent with statements made by officers and arrestees about BPD's actual conduct, which included the use of "load and go" or "rough ride" practices. A lack of functioning video prevented investigators from independently determining whether detainees were secured during transports. Further, BPD did not collect data about injuries incurred during transports, or about the source of injuries reported by detainees after accepted at Central Booking or the emergency room.

### 3.    *BPD Transport Equipment Placed Detainees at Risk*

In addition to BPD's practices, DOJ also determined that deficiencies in equipment created risks during detainee transports. In particular, the lack of functional video recording meant that there

was no clear line of sight from the driver to rear compartments, where sounds are muffled by the barrier. Additionally, while BPD indicated they were anticipating additional patrol cars that would be used for transports, it was unclear if they would altogether eliminate the need for transport vans.[1]

## B.   Consent Decree

The Consent Decree includes a section specific to the transportation of persons in custody (Section IX, ¶¶ 222-238), based on the findings from the pattern or practice investigation. The reforms outlined in these paragraphs are divided into sub-sections focused on transportation equipment, transportation procedures, monitoring of transportation practices, and policies and training. Specifically, the Consent Decree requires BPD to:

1. Equip all transport vans with seatbelts, holding straps located along the rear area of each seat that individuals being transported may grip for security during transport, and transport vehicle cameras (TVCs) and all transport cruisers with seatbelts (¶¶ 223-24).
2. Inspect transport vehicles monthly and create logs to memorialize the inspections (¶ 225).
3. Establish and adhere to appropriate procedures for transporting prisoners (including using seatbelts, straps, and TVCs) (¶¶ 226-33).
4. Establish and adhere to protocols for documenting and comprehensively auditing prisoner transport events (¶¶ 234-37).
5. Revise policies and training curricula to ensure safe, effective prisoner transport (¶ 238).

## C.   Summary of Progress to Date

While this report reflects the first comprehensive compliance assessment in the area of transportation of persons in custody, the Monitoring Team has been tracking BPD's ongoing reform efforts in this area. Much progress has already been observed and documented regarding the policy, training, and equipment requirements of the Consent Decree. See Appendix 1 for a timeline of key reform events in this area.

### 1.   *Transportation Policies and Training*

Consistent with Paragraph 238, BPD has already completed and enacted revisions to its transport policies, including:

- Policy 825: Transport Vehicle Camera;[2]

---

[1] "Justice Department Announces Findings of Investigation into Baltimore Police Department." *The United States Department of Justice*, 10 August 2016, https://www.justice.gov/opa/pr/justice-department-announces-findings-investigation-baltimore-police-department. Accessed 12 Nov. 2021.
[2] Baltimore Police Department. (2021). Transport Vehicle Camera (TVC) System Policy. (BPD Policy 825). https://www.baltimorepolice.org/transparency/bpd-policies/825-transport-vehicle-camera-tvc-system.

- Policy 1114: Persons in Police Custody;[3] and
- Policy 1511: Vehicle Inspection and Maintenance.[4]

BPD, working with the Monitoring Team and DOJ, produced and issued final proposed versions of all three policies in June 2018. Following a 30-day public comment period, BPD finalized the policies in July 2018, and the Monitoring Team filed its notice of approval that August. The most current version of each policy has been activated as of February 9, 2021 (Policy 1114) and June 26, 2021 (Policies 825 and 1511).

Also consistent with Paragraph 238, BPD developed and delivered a department-wide e-learning on transport procedures with a module on transportation of persons in custody (Policy 1114) as part of its training on stops, searches, and arrests and related aspects of fair and impartial policing (SSA/FIP II). In June 2021, before Policies 825 and 1511 were activated, e-learning was provided department-wide, and comprised of reading the policies and taking a test. While training policies and practices are relevant here, compliance with training-related Consent Decree requirements will be assessed in a comprehensive standalone assessment, to be filed in early 2022.

## 2. Transportation Equipment

On January 22, 2018, Monitoring Team members conducted a preliminary audit to verify that, consistent with Paragraphs 223 through 225 of the Consent Decree, BPD had outfitted its transport vans with seatbelts, grip straps and TVCs, and that BPD was maintaining a monthly log documenting the presence and functionality of that equipment. During the audit, the Monitoring Team inspected 16 of BPD's 22 vans. Three wagons were under repair, two are kept as spares and were out of service, and one was in use transporting arrestees at the time. The Monitoring Team did not inspect any cruisers during this preliminary audit.

The preliminary audit revealed the following:

- Each of the 16 inspected vans was properly outfitted with functional seatbelts and grip straps (¶ 223).
- Each of the 16 vans was equipped with an operational TVC that, as required, could "display a live video to officers located in the driver's section of the vehicle, and also record the video to be preserved for future viewing". BPD IT personnel verified the functionality of the TVCs and confirmed that BPD's IT system had sufficient capacity to retain captured video for at least one year (¶ 224).

---

[3]  Baltimore Police Department. (2021). Persons in Police Custody. (BPD Policy 1114). https://www.baltimorepolice.org/transparency/bpd-policies/1114-persons-police-custody.
[4]  Baltimore Police Department. (2021). Vehicle Inspections and Maintenance. (BPD Policy 1511). https://public.powerdms.com/BALTIMOREMD/documents/900649.

- The Monitoring Team verified the existence of and reviewed the contents of weekly transport inspection logs for transport vans. However, the Monitoring Team did not see evidence of compliance with inspection processes for transport cruisers (¶ 225).

In late April of 2018, after working with BPD and DOJ to develop a comprehensive transport equipment audit methodology, the Monitoring Team conducted a more thorough audit of both transport vans and transport cruisers. Key findings included:

- Each of the 17 vans and 18 cruisers inspected had the required equipment—though two of the vans had inadequate interior lighting, which made it difficult for the TVCs to capture activity in the vans, and one cruiser had a defective seat belt.
- The Monitoring Team also confirmed that BPD had begun memorializing weekly inspections of both transport vans and transport cruisers in logs.

By the end of the first year of monitoring, BPD installed in its transport vehicles all equipment required by the Consent Decree. All transport vans were equipped with seatbelts for each seat, straps located along the rear area of each seat that individuals may grip for security, and TVCs to allow live monitoring of every transported occupant. In addition, all transport cruisers were equipped with seatbelts.

Early reviews of BPD equipment audits and documentation found the logs, which are used to verify the continued presence and functionality of all required equipment, to be complete but required additional care to ensure the accuracy of the documentation. In particular, the Monitoring Team identified that, despite properly performing and logging the equipment audits, BPD was not always ensuring consistency between the number of transport vans identified as being out of service and in need of maintenance in the cover memos for the wagon IT inspection logs and the number identified in the accompanying inspection sheets.[5]

The Monitoring Team's Sixth Semiannual Report (2021) recognized numerous technological upgrades made by BPD. For example, BPD installed a new AVL module in all vehicles, helping to facilitate the monthly audit process. The AVL captures important information necessary for the audits, such as vehicle speed and routes taken, which need to be assessed to ensure that officers are complying with safe driving mandates. Although the AVL had been implemented, when last observed by the Monitoring Team, it was not yet fully operational. Instead of mapping the street speed limit automatically, BPD manually cross-referenced speeds with posted speed limits to determine compliance.

---

[5] "Baltimore Consent Decree Monitoring Team First Comprehensive Re-Assessment." *CD Monitoring Team*, 30 September 2020. *https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/ConsentDecree_MonitoringTeam _First_Comprehensive_Re-assessment_09_30_2020.pdf*. Accessed 12 Nov. 2021.

Additionally, the Monitoring Team noted that BPD was in the process of upgrading TVC systems in transport vans, so that recordings can automatically be uploaded to Wi-Fi nodes at each BPD substation.[6]

### 3.    *Transportation Procedures*

The Parties collaboratively developed a methodology and instruments responsive to the transportation process audit requirements of the Consent Decree. In September of 2018, members of BPD's audit section, together with the Monitoring Team and DOJ, performed mock audits of transport events to verify the functionality of the audit assessment tool. BPD used the revised assessment tool to perform its first inspection of transport events in October 2018.

Beginning in 2019, BPD's Inspection Unit initiated a pilot program for auditing transport events. The pilot consisted of a smaller number of audits than the Consent Decree requires, but helped BPD identify effective workarounds for technological deficiencies that initially hampered their ability to gather all the information required for complete audits. Following the initial pilot, the Parties developed a weighted transport audit scorecard to evaluate compliance with the 29 transport-related requirements of the Consent Decree.

Since January 2020, the Inspection Unit has performed 20 event audits per month, for a total of 60 event audits per quarter: two from each of the nine patrol districts and two from the WATF. This is 15 more than the Consent Decree requires, per quarter. Starting in March 2021, BPD began using the full, weighted scorecard to score almost all requirements. Additionally, as of 2019 the Inspection Unit has also been performing the required 27 random field audits, or spot checks, per quarter. All audits have been documented, and the reports have been available for review by the Monitoring Team and DOJ.

During our early reviews of BPD's audit reports, the Monitoring Team found that, according to the reports, transport officers were largely doing what they were supposed to under Paragraphs 226 through 233 of the Consent Decree and BPD policy. However, certain deficiencies were observed. The most common deficiency identified was the failure to properly search prisoners before and after they were placed into transport vehicles and before and after custody was exchanged. This issue was not immediately remedied and persisted over multiple reporting periods, including the Monitoring Team's most recent semiannual report published in May of 2021.

Additionally, the Monitoring Team observed some inconsistencies in scoring methodology among BPD's audit reports. In at least some of the reports, it appeared that different BPD auditors issued

---

[6] "Baltimore Consent Decree Monitoring Team Sixth Semiannual Report." *CD Monitoring Team*, 14 May 2021, https://static1.squarespace.com/static/59db8644e45a7c08738ca2f1/t/60a29fc548aab97b803fdb53/1621270484255/BPD+-+Sixth+Semiannual+Report+-+FILED.pdf. Accessed 12 Nov. 2021.

different scores for the same finding. For example, some auditors marked questions about TVCs for cruiser transports (which do not have TVC systems) as compliant, rather than not applicable. While a minor issue, it indicated that it was possible that not all auditors fully understood the audit rating system and compromised the uniformity of the data.

As of the Sixth Semiannual reporting period, the Parties discovered that BPD had not been rigorously tracking whether every new transport van driver had been receiving the extra four hours of transport driver training that they are required to receive, in addition to the four hours that all officers receive during recruit training. While BPD was able to verify through training attendance records that all current drivers received the additional training, it required a painstaking manual search through training attendance rosters for the last several years. BPD had not been systemically maintaining and tracking the information in easily accessible electronic format as proof of compliance with Consent Decree requirements. Moreover, the Training Academy realized that its training curriculum for transport drivers does not utilize the scenario-based, adult learning methods that the Consent Decree requires. In response, BPD has indicated that it is working to develop a system for uniformly documenting when new transport drivers are trained, and has already rewritten the four-hour transport driver lesson plan consistent with its current, Consent Decree-mandated training standards.

### D.    Summary of Compliance Progress to Date

This report marks the Monitoring Team's first Compliance Review.  The purpose of this report is to determine, formally, whether BPD and the City have reached initial compliance with respect to the Consent Decree's various, specific requirements relating to the transport of individuals in custody.

#### 1.   *Evaluating Compliance to Date*

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented. The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of characterizing BPD's current status across Consent Decree implementation. Thus, in previous Semiannual Reports, all sections of the Consent Decree have been scored according to the following framework:

**0 - Not Assessed**: The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 - Not Started**: The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase**: The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:** The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in Paragraph 504 of the Consent Decree.

**5 – Sustained Compliance:** The City/Department has complied fully with the requirement and has demonstrated sustained compliance by consistently adhering to the requirement over time, as defined in Paragraph 504 of the Consent Decree

The Monitoring Team has conducted continuous, informal evaluations on Consent Decree requirement progress pertaining to transport equipment and procedures, including whether BPD has implemented and is adhering to the required transport policies, and whether they are using the transport equipment correctly and consistently. Based on these ongoing evaluations, the Team offered preliminary progress scores for Transportation of Persons in Custody section of the Consent Decree in our First Comprehensive Re-Assessment and, most recently, in our Sixth Semi-Annual Report. It should be noted that the present report – the first of the Monitoring Team's formalized, systemic compliance review and outcome assessments – is designed to make a far more structured, formalized determination as to BPD's progress than the characterization of implementation stages found in the Team's semiannual reports and comprehensive re-assessment.

### a.  September 2020: First Comprehensive Re-Assessment

In the Monitoring Team's first biannual reassessment, BPD received a progress score of "3" (training phase). The report stated:

> BPD has made reasonable progress on each of these requirements. It has revised policies, is presently conducting training, has properly equipped its transport vehicles, is conducting required equipment audits, recently began auditing the required number of transport events, is generally determining during its audits whether vehicles are properly equipped and transport officer are complying with policy, and is taking remedial action when there is non-compliance.

In part, BPD received a 3 because the coronavirus pandemic prevented the on-time completion of Department-wide training on transport procedures. The Monitoring Team acknowledged that the score may have understated BPD's progress because, with the equipment and transport audits it was regularly conducting, BPD had begun implementation of operational requirements.

### b.  May 2021: Sixth Semiannual Report

In the Monitoring Team's May 2021 Sixth Semiannual Report, BPD received a progress score of "4a" (Implementation – Not Assessed). The score recognized that BPD had completed policy revisions and training and moved fully into the implementation phase of reform. The Monitoring Team determined:

> BPD has made steady progress toward meeting these requirements over the past three years. It has made all required equipment changes, has been conducting routine equipment audits and routine (although, for technological reasons, incomplete) audits of transport events, has generally determined during its audits whether vehicles are properly equipped and transport officers are complying with policy, and has been taking remedial action when there is non-compliance.

## III.     THE ROLE AND PURPOSE OF THIS COMPLIANCE ASSESSMENT

The Monitoring Team has previously described the two major types of assessment that the Consent Decree requires: (1) compliance reviews, and (2) outcome assessments. Compliance reviews, which almost always have qualitative elements and may also have quantitative elements, are evaluations of BPD's performance across time, incidents, cases, events, and officers that are conducted to determine if BPD is adhering in practice to the specific requirements of the Consent Decree. For instance, this compliance review audits, among other things, whether BPD is adhering to the Decree's requirements to have transport vehicles equipped with specific equipment.

In this way, compliance reviews consider whether the Department is meaningfully doing what the Decree requires across its many requirements. Within the classification scheme that the Monitoring Team has previously adopted, the purpose of this and other compliance reviews is to determine whether BPD can be considered to be in initial compliance across a major substantive area of the Consent Decree.

Outcome assessments are largely quantitative assessments that are "designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact – whether, independent and apart from BPD's progress toward compliance with Consent Decree requirements, policing is changing in the real world."[7] Because the Consent Decree does not outline any outcome assessments pertaining specifically to transport, the present report focuses on a systematic compliance review and audit of BPD's performance with respect to the transport of persons in custody.

As described in Paragraph 506 of the Consent Decree:

> To achieve "Full and Effective Compliance," the City and BPD must demonstrate that they have (a) incorporated all Material Requirements of this Agreement into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the Agreement's Outcome Assessments.

A core issue in determining whether BPD has reached "initial" compliance with any material requirement of the Consent Decree is determining whether that requirement "is being carried out in practice" by BPD. To that end, the Monitoring Team considers the following:

---

[7] Consent Decree, *United States of America v. Police Department of Baltimore City, et al.* Case No. 1:17-CV-00099-JKB (D. Md. Jan. 12, 2017), https://www.justice.gov/opa/file/925056/download

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires adhering to Decree requirements across a material span of time, number of incidents, and number of officers. In this way, isolated compliance does not establish "initial compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that BPD must remedy deficiencies in departmental and officer performance. Consequently, the Monitoring Team in its compliance reviews considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.** Consistent with the Decree, the Monitoring Team's compliance reviews will consider whether, when BPD has deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful change, the Department is in a different place if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time. Steady improvement over time suggests positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

The following report outlines the methodology and results of the Monitoring Team's compliance assessment of the Transport of Persons in Custody section of the Consent Decree.

Consistent with the findings from DOJ's initial investigation, and the pertinent paragraphs of the Consent Decree, the compliance review is broken into two general areas: transport equipment and transport procedures. This assessment will cover compliance with the central requirements in this area (¶¶ 222-228, 231-238), due to current limitations in the availability of certain data) it will not

cover compliance with particularized requirements covering transport events that occur infrequently, i.e., transport of individuals that identify as transgender, or the transport of individuals with medical equipment (¶¶ 229, 230). Subsequent assessments will also include an evaluation of compliance with those requirements when the necessary data become available.

## IV.    ASSESSMENT OF TRANSPORT EQUIPMENT

The Consent Decree requires that BPD's transport vehicles be outfitted with the equipment necessary to protect the wellbeing and safety of the officers, public, and people being transported. Specifically, it requires all vehicles used to transport persons in custody to have dividers and sufficient and functioning seatbelts for each person transported. Additionally, all transport wagons or vans must be outfitted with a strap along the rear of each seat that a person being transported may grip for security. All transport wagons must also have a functioning TVC system that both provides a live feed and records activity in all compartments used to transport persons in custody; this footage is to be maintained by BPD for at least one year. All vehicles used to transport persons in custody must be inspected on at least a monthly basis to ensure that all equipment, including video recording equipment, seatbelts, and straps, are fully functional.

The Monitoring Team's review of BPD's compliance with Paragraphs 223, 224, and 225 consists of (1) first-hand observations and assessments of all transport vans and a sample of cruisers, (2) assessments of BPD's internal transport equipment audits, including data from BPD's vehicle and IT inspection logs and digital evidence management systems, and (3) a review of TVC retention.

Specifically, the transportation equipment assessment relied on the following data sources:

- Video footage from body worn cameras ("BWC") and transport vehicle cameras ("TVC");
- Weekly District Vehicle Inspection Records; and
- Wagon Hard Drive Inspection Sheets.

A comprehensive review of BPD vehicles and equipment was complicated by BPD's current inability to provide a timely, complete list of vehicles assigned to each district, and of the current maintenance status of each vehicle. It does not appear that the Department maintains a centralized database of vehicles. Consequently, the Monitoring Team could not determine the full population, or reliably generate a random sample, of vehicles that were currently in use for each district. This core limitation created many challenges in implementing the assessment methodology, as it was never clear how many vehicles there were to make compliance determinations about. For example, while the Monitoring Team has previously observed and documented progress on installing grip straps and TVCs, without a comprehensive inventory, or timely explanations for why vehicles might be missing inspections, it is not possible to determine if all vehicles are in compliance with the requirements.

### A.    Vehicle Equipment Spot Checks

To assess compliance with equipment requirements firsthand, Monitoring Team members conducted spot checks of a random selection of prisoner transport vehicles and wagons across all

18

districts. As the Monitoring Team was developing the methodology, BPD provided an estimate of the total number of transport vehicles within the Department: 220 prisoner transport cruisers or sport utility vehicles, and 15 district wagons, with an additional 3 wagons with the Warrant Apprehension Task Force (WATF). These figures were an estimate and not exact, as BPD could not provide the Monitoring Team a current fleet inventory that identifies the population, location, or maintenance status of its vehicles. Based on the estimates provided, the Monitoring Team generated a sample size of 66 spot checks of cruisers/SUVs, to achieve a 95% confidence interval, with a margin of error $\pm$10%. As, per BPD, approximately one-third of vehicles are undergoing maintenance at any given time, this sample is likely more representative of the fleet that is currently being used for transports than the confidence interval suggests. All 18 transport wagons were included in the sample.

Three Monitoring Team members conducted spot checks on site at each of the nine districts over a three-week period from late November to early December 2021. Given the number of reviews that the Team needed to conduct, it was not possible to show up unannounced. However, shop numbers were randomized for each district. A Monitoring Team member and BPD escort worked through the randomized list, bypassing any vehicles that were in the repair shop or undergoing preventive maintenance, until meeting the required number of vehicles for the district. Wagons were viewed at the districts and during the weekly wagon IT inspection.

Each Monitoring Team member completed a score sheet during their spot checks, which included five primary questions:

1. Is the vehicle operable?
2. Was the vehicle equipped with a seatbelt for every potential passenger? (¶ 223)
3. Was a grip strap located along the rear of each seat? (¶ 223) (wagons only)
4. Was the vehicle outfitted with a divider or partition? (¶ 223)
5. If a TVC is installed, is it capable of recording all compartments where prisoners may be transported? (¶ 224) (wagons only)

Additionally, the Monitoring Team members documented pertinent notes and/or additional observations.

### *Findings*

The Monitoring Team viewed a total of 66 transport vehicles and 14 wagons. Of those viewed, 91% (n=61) of the vehicles, and 94% (n=13) of the wagons were operable. One vehicle was scored as "other", because while the engine started, the rear passenger door would not open. Because the Monitoring Team members observed a random selection of vehicles at the districts and did not view those located at maintenance shops, it follows that most vehicles observed were operable.

**Figure 1: Was the Vehicle Operable? (n=66 vehicles, n=14 wagons)**

| Sedans & SUVs | Wagons |
|---|---|
| Yes 91%, No 8%, Other 1% | Yes 93%, No 7% |

*Data Source: Monitoring Team Vehicle Spot Checks*

Four of the five vehicles that were scored as inoperable were unable to start due to a dead battery. The Fleet Manager in the Eastern District, where three of the dead batteries were observed, told a Monitoring Team member that there have been ongoing issues with the City's contracted battery vendor – and that if a cruiser sits for a day or two without being started, its battery dies.

Two viewed vehicles had broken seatbelts (Figure 2). However, in both vehicles there was a buckle locking mechanism from the center seat that could be used instead if needed. All detainee seatbelts in the other 64 vehicles, and all vans, were observed to be working.

**Figure 2: Images of Broken Seatbelt Mechanisms in Two Transport Vehicles**



*Data Source: Photos taken by Monitoring Team member during spot checks*

Four of the 66 cruisers inspected did not have partitions between the driver and person being transported, and were all located in the Southern District. Two of the 14 transport wagons viewed, both with front-facing seats rather than lengthwise benches, did not have grip straps or a partition installed. The Monitoring Team recognizes that the Consent Decree did not account for different seat configurations, and do not believe that these two vans are out of compliance.

All wagons observed had a functioning TVC system.

**B.      Assessment of Vehicle Inspection Records**

*1.   Weekly District Vehicle Inspection Records*

Paragraph 225 of the Consent Decree requires that BPD inspect all vehicles used for the transportation of persons in custody on at least a monthly basis. BPD provided the Monitoring Team access to all Weekly District Vehicle Inspection Records dating back to 2018. These forms were handwritten by district inspectors and compiled into PDF files based on week and district. As such, the only way to accurately identify the number of unique vehicles inspected each month was to review all of the handwritten reports individually.

Further, without a current, accurate transport vehicle roster for each district that accounts for maintenance status, we could not determine if all of the transport vehicles required were inspected each month. BPD provided a "District Vehicle Inventory" Excel spreadsheet compiled from multiple sources, with varying levels of detail (e.g., some vehicles listed had only a vehicle shop number, while others included details such as tags, and make and model).

For these reasons, instead of assessing a random sample of vehicles or inspection records, *all* inspection reports completed during the months of July, August, and September 2021 were reviewed against the "District Vehicle Inventory." Each of the over 200 vehicles listed in the inventory spreadsheet were expected to appear in at least one "Weekly District Vehicle Inspection Records" file per month, for each of the three months reviewed.

Additionally, to assess compliance with the requirements, and completeness of the inspections more generally, all 564 Weekly District Vehicle Inspection Records from the month of August 2021 were transcribed into a database for analysis.

This assessment methodology is certainly not the most ideal approach. In numerous instances, the handwriting was illegible, and best guesses had to be made regarding the intended shop number or score on a given report. Additionally, large-scale data entry, such as the digitization of 564 records, introduces countless opportunities for human error.

That said, an exhaustive review of one month (August 2021) should provide a reasonably comprehensive understanding of how these inspections are being conducted. In light of the November 2021 directive issued by United States Attorney General Garland focused on improving the efficiency and efficacy of the consent decree process, we find that this approach, rather than

one that would require many more hours of additional data entry for marginal gain, to strike the most appropriate and reasonable balance under the circumstances.[8]

**Findings**

On average, across the nine districts, between 43% and 81% of all vehicles on the inventory had at least one inspection each month (Figure 3). The lack of a centralized fleet database meant that it was not possible to determine whether the vehicles that were not inspected during a particular month were temporarily or permanently out of service, undergoing preventive maintenance, or just failed to comply with the inspection requirement.

**Figure 3: Occurrence of Transport Vehicles and Wagon Inspections**

|  | July | August | September | 3-month Average | Total Vehicles |
|---|---|---|---|---|---|
| **Central** | 35% | 52% | 42% | 43% | 31 |
| **Eastern** | 60% | 75% | 50% | 62% | 40 |
| **Northeastern** | 51% | 57% | 70% | 59% | 37 |
| **Northern** | 34% | 52% | 45% | 44% | 29 |
| **Northwestern** | 80% | 84% | 76% | 80% | 25 |
| **Southeastern** | 58% | 48% | 45% | 51% | 31 |
| **Southern** | 50% | 67% | 60% | 59% | 30 |
| **Southwestern** | 79% | 79% | 83% | 81% | 24 |
| **Western** | 64% | 73% | 82% | 73% | 22 |

*Data Sources: "District Vehicle Inventory" Excel spreadsheet provided by BPD, and all Vehicle Inspection and Maintenance Reports from July - September 2021*

Additionally, the vehicle inventory provided did not include many of the vehicles that were inspected. For example, the vehicle shop numbers on several Central District inspection forms from September did not correspond with any of the vehicles on the list. This issue was detected in other districts and months as well. Further, some of the vehicles that were not identified as a prisoner transport vehicle were inspected. Due to the administrative and data issues still being resolved, including the inability to query all transport events, it is not possible to determine if vehicles were not on the inventory because they are not used for prisoner transports, or if it is because they are missing from the list.

All 564 Vehicle Inspection and Maintenance Reports completed in August 2021 were individually reviewed for completeness and compliance with seatbelt and grip strap requirements. Of the 564

---

[8] "Attorney General Merrick B. Garland Announces Results of Monitor Review." *The United States Department of Justice*, 13 September 2021, https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-results-monitor-review. Accessed 21 Nov. 2021.

reports reviewed, 123 (22%) were incomplete. For some reports, incompleteness meant missing entire sections, whereas on other reports, it was failure to complete one or two boxes in the inspection grid.

**Figure 4: Sample Table from Vehicle Inspection and Maintenance Report**



*Data Source: Vehicle Inspection and Maintenance Report*

### i.    *Grip Strap Inspection Documentation*

Perhaps the highest degree of inconsistency within BPD's vehicle inspections was with completing the "grip strap" box. All prisoner transport vehicles use the same inspection form, and there is no checkbox to indicate whether the vehicle is a wagon; while there are boxes to enter vehicle make and model, these are inconsistently completed, and often illegible. Because wagons cannot easily be identified in reviewing reports, it is often unclear how to interpret the grip strap box when it is left blank, or a score other than "1" (unsatisfactory), "2" (improvement needed), "3" (satisfactory), or "N/A" is assigned. Further, many of the inspection forms provided a numerical score of 1, 2, or 3 when the vehicle was not a wagon and the response should have been "N/A". Based on the scores in Figure 5, it appears that additional clarification and training is required regarding how to complete the inspection grid in a way that is accurate and consistent across the Department. Digitizing the inspection documentation process could help to address both the issues of illegibility, and inconsistency in how this data is entered.

**Figure 5: Grip Strap Scores in All August 2021 Inspection Reports**

| Score | Frequency | Percent |
|---|---|---|
| **0** | 44 | 11% |
| **1 – Unsatisfactory** | 3 | <1% |
| **2 – Improvement Needed** | 9 | <1% |
| **3 – Satisfactory** | 144 | 35% |

23

| Not Applicable | 46 | 11% |
|---|---|---|
| Missing | 168 | 41% |
| Total | 414 | 100% |

*Data Source: All Vehicle Inspection and Maintenance Reports from August 2021*

As of August 2021, some districts were still using an older Maintenance and Inspection form that did not include a question about grip straps at all. As such, the total number of inspection forms with questions regarding grip straps is 414, rather than the full population of inspections conducted in August. That month, the outdated form appeared in the Central, Northeastern, Northwestern, Southeastern, and Southwestern districts at least once. Thus, in addition to the inaccurate reporting of grip strap data, it has also been inconsistently tracked, as the field was not included in 27% of inspection reports completed in the month of August. Nevertheless, this issue appears to have been resolved as of October 2021 – by which time 100% of inspection reports submitted used the new form that includes the "grip strap" field.

Eleven of the 14 wagons in the vehicle inventory were inspected at least once in August, with an average of 2.6 inspections each over the five-week period. The inspections of two of the 11 were documented on the old inspection form without the question about grip straps. Of the 9 wagons that did have grips strap scores:

- 7 wagons scored exclusively "3";
- 1 wagon scored two "3"s, one "2", and one blank; and
- 1 wagon had two "3"s and one "N/A."

An additional two wagons that were not included in the vehicle inventory both reported grip strap scores of "3." Therefore, of the wagons that were inspected, the grip straps were satisfactory in all but one instance. The single wagon that received a "2" earned a "3" when reinspected the following two weeks.

Ultimately, BPD is largely in compliance with the grip strap requirements in practice. The lingering issues affecting grip strap requirements are seemingly administrative: conducting inspections of all wagons being used, documenting why certain wagons were not inspected, and logging inspection findings accurately.

### ii.    Seatbelt Inspection Documentation

The Consent Decree requires that all vehicles used for prisoner transport, including both wagons and cruisers, contain functioning seatbelts for each person in custody. It is unclear how BPD's three-point scale (1: Unsatisfactory, 2: Needs Improvement, 3: Satisfactory) corresponds with this requirement. Any score below a 3 was determined to be out of compliance with the requirements

24

of the Paragraph. Nearly every vehicle inspected (99%) in August 2021 included a seatbelt score, and the vast majority (93%) were satisfactory.

The 31 scores that were less than satisfactory (< 3) corresponded to 26 vehicles. Ten of these 26 received a seatbelt score of 3 in the week immediately following their low score, indicating that the issue was promptly resolved. Conversely, three vehicles had scores below satisfactory for multiple weeks in a row. The balance of vehicles with low seatbelt scores either had intermittent inspections, making it unclear if or how quickly the issue was resolved, or received the low score during the last week of the month.

Because of the way that transport data is currently stored, it is not possible to determine if any of the vehicles with seatbelt scores below 3 were being used to transport detainees before the equipment issue was resolved.

**Figure 6: Seatbelt Scores in All August 2021 Inspection Reports**

| Score | Frequency | Percent |
|---|---|---|
| **1 - Unsatisfactory** | 4 | 1% |
| **2 – Improvement Needed** | 27 | 5% |
| **3 - Satisfactory** | 527 | 93% |
| **Missing** | 6 | 1% |
| **Total** | 564 | 100% |

*Data Source: All Vehicle Inspection and Maintenance Reports from August 2021*

### 2. *Weekly Wagon IT Inspections*

The Consent Decree requires BPD to "inspect all vehicles used for the transportation of persons in custody on at least a monthly basis to ensure that all equipment, including video recording equipment… [is] fully functional" (¶ 225). BPD conducts weekly inspections of prisoner transport vans on Monday mornings in the Northern District, during which time the TVC systems are reviewed.

BPD has provided the Monitoring Team with the "Wagon Hard Drive Inspection Sheets," which BPD completes during the Weekly Wagon IT inspections, dating back to January of 2019. As with the Weekly District Vehicle Inspection Records, these forms were handwritten and then scanned and uploaded into PDF files for each week. Every individual form completed during the seven-month period of April through October 2021 was reviewed, hand counted, and assessed against the requirement that each wagon be inspected at least monthly.

**Findings**

25

A review of ITD's weekly inspections of TVC systems in transport wagons conducted between April and October of 2021 found that each month, most vehicles were inspected at least once (Figure 7). However, except for during May, each month at least two wagons did not undergo a single IT inspection (see Appendix 3 for a full breakdown of IT inspections by week and by wagon).

**Figure 7: Transport Wagons with One or More IT Inspections Per Month, by District**

|  | Total Wagons | April | May | June | July | August | September | October |
|---|---|---|---|---|---|---|---|---|
| Central | 1 | 1/1 | 1/1 | 1/1 | 0/1 | 0/1 | 0/1 | 0/1 |
| Eastern | 2 | 2/2 | 2/2 | 2/2 | 2/2 | 2/2 | 2/2 | 1/2 |
| Northeastern | 2 | 2/2 | 2/2 | 1/2 | 2/2 | 2/2 | 2/2 | 2/2 |
| Northern | 2 | 2/2 | 1/2 | 1/2 | 2/2 | 2/2 | 2/2 | 2/2 |
| Northwestern | 1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 |
| Southeastern | 2 | 1/2 | 2/2 | 2/2 | 2/2 | 1/2 | 1/2 | 2/2 |
| Southern | 1 | 0/1 | 1/1 | 1/1 | 0/1 | 1/1 | 1/1 | 1/1 |
| Southwestern | 2 | 2/2 | 2/2 | 2/2 | 2/2 | 2/2 | 2/2 | 1/2 |
| Western | 2 | 2/2 | 2/2 | 2/2 | 1/2 | 0/2 | 1/2 | 2/2 |
| WATF | 3 | 2/3 | 3/3 | 3/3 | 3/3 | 3/3 | 3/3 | 3/3 |

*Data Source: All Wagon Hard Drive Inspection Sheets from April through October 2021*

The reports that ITD produced following these inspections are problematic for two reasons. First, the Monitoring Team has repeatedly flagged the inconsistencies between the cover memos and the corresponding inspection sheet, including as recently as the Sixth Semiannual Report. This ongoing issue, despite being identified as an area requiring improvement in past reports, calls into question the level of care and attention to detail applied to the internal inspection process. Second, the "Wagon Hard Drive Inspection Sheet" that corresponds with each weekly inspection only documents the district, shop number, wagon operator, HD space, and wagon inspector (Figure 8). These reports provide no indication that the cameras were checked, and if so, whether they were working properly.

**Figure 8: Screenshot of "Wagon Hard Drive Inspection Sheet" Data Fields**



26

*Data Source: Wagon Hard Drive Inspection Sheet from August 9, 2021*

The review of the IT inspections revealed discrepancies between the wagons listed in the "Vehicle Inventory", and those listed on the "Wagon Hard Drive Inspection Sheet." It was later clarified that two of the wagons listed in the Inventory were permanently out of service, explaining why they did not appear in the IT list. As was the case with the transport vehicles, the lack of a clear, definitive determination regarding the number and status of transport wagons within BPD makes it difficult to be certain that every wagon in the Department is being inspected monthly.

### 3. Assessment of TVC Video Retention

The Consent Decree requires all transport vehicle video recordings to be maintained by BPD for a period of at least one year, or for longer as required by BPD policy (¶ 224). To assess compliance, and ensure this footage is being stored for at least one year, the Monitoring Team generated a sample of transport cases for BPD personnel to pull.

Because BPD cannot determine how many transports are conducted per year, how many use a van or wagon, or how many have corresponding TVC footage, a series of workarounds had to be employed to generate a sample. Using factors such as arrests and transports logged within the Department's Evidence.com system, BPD estimated that approximately 2,675 transports occur over a three-month period, extrapolating to approximately 10,700 transports per year, though they cannot determine what portion of those are conducted using a wagon; a sample size of 96 TVC videos would provide a sample with a 95% confidence interval, and $\pm$10% margin of error. While the sample size was generated using the estimated number of transports per year for all vehicles, the sample itself was drawn from wagon transports that were 10 and 11 months old, to ensure that the oldest videos are being retained, and due to the issues in identifying relevant cases, detailed below.

To create a sample, all Evidence.com files for December 2020 and January 2021 were filtered for subject lines including the term "transport" (n=1,817). This is not an ideal first step, as it potentially eliminates any footage that does not have corresponding BWC footage with a transport, or that does not include the word "transport" in the title. The videos that are included in these search results are not only transports of persons in custody, but any BWC video involving any form of transport. To further refine this sample, the results were filtered for members whose primary duty is wagon driver. This step was also necessary, as the Evidence.com files do not distinguish between cruiser/SUV and wagon transports. Filtering for both "transport" and members whose primary role is transport reduced the Evidence.com returns for December 2020 and January 2021 to n=498.

A random number generator was used to randomly order the 498 transports. Then with BPD, the Monitoring Team worked its way down the random list for the first 96 randomly-identified transports to determine whether footage had been retained.

27

As with many aspects of this compliance assessment, the quality of data and data systems means that the most robust or ideal assessment methodology could not be fully embraced. This assessment was further complicated because TVC footage is organized in nested folders labeled by wagon number and upload date, without a master list of files or retention periods. There is no way to systematically count the number of video files. Ultimately, for this assessment, the Monitoring Team devised some meaningful workarounds – subject to their own limitations – to generate a sample. Although this was not the ideal process by which to generate a sample, we are confident that given (1) the robust sample size, and (2) the randomness of the selection process, if there was a problem related to footage retention, it would be identified.

### Findings

Most transports checked for retention were identified in the TVC footage system (Figure 9). Of the 96 random transports selected from December 2020 and January 2021, 77 had footage that was identified in the TVC files. Two of the transports did not have corresponding footage because WATF's TVC cameras were not installed until March of 2021, and five of the transports did not have footage because they were conducted using a sedan or SUV. Twelve of the transports are still unaccounted for; all of which involved the Central or Southwestern Districts. Only one of the twelve randomly selected Central District transports was located, and five of the ten from Southwest. At this point it remains unclear if the transports are missing because of a retention issue, or due to an administrative or record-keeping issue that is making them difficult to locate.

**Figure 9: TVC Footage Retention Check Findings, n=96**



*Data Source: Monitoring Team Review of TVC Storage Files*

Due to the way the sample was generated relative to how the footage was stored, the Monitoring Team viewed the TVC files for *all* wagons in the corresponding district during the time of the transport, rather than only the individual transport of interest. While viewing this high volume of

wagon footage, it became apparent that many wagons did not have their passenger compartments illuminated when transporting detainees at night. In many cases, it was only possible to determine if someone was in the back by waiting for the wagon to pass an external light source such as a streetlamp, to see if there was a passenger inside. As the transports considered occurred in December 2020 and January 2021, it is possible that this issue has been resolved in the time since, as the Department's revised policies were enacted after these videos were captured.

## C.    Compliance Synopsis

Taken together, the Monitoring Team's findings regarding transport equipment (¶¶ 223 – 224), reflect a status of **Implementation – Initial Compliance (4d).** The Monitoring Team's observations in the field, and assessment of data reported during BPD's own inspections, are consistent with the Decree's transport equipment requirements. While BPD is meeting the requirements of the Consent Decree in practice, data systems must be improved for these changes to be sustained over time. As such, the various administrative, documentation, and data issues discussed above must be remedied for BPD to remain in compliance. Specifically, an improved fleet management process must be adopted, so that we can be certain that the full fleet of transport vehicles has met the requirements of the Consent Decree. This includes adopting an inspection documentation process that makes clear which vehicles are in or out of service, and when any vehicle equipment deficiencies observed are addressed.

The Monitoring Team found the status of transport equipment inspections **(¶ 225) to be Implementation – On Track (4c).** The Monitoring Team found that BPD was completing inspections routinely, and findings regarding the presence of equipment were consistent with our own spot checks in the field. However, the recordkeeping issues are such that we cannot determine with confidence whether all transport vehicles are being inspected with the frequency required. Additionally, issues related to scoring consistency and completeness must also be addressed.

29

## V.        ASSESSMENT OF TRANSPORT PROCEDURES

The Consent Decree requires that BPD's transports of individuals in custody are conducted in a manner that protects the well-being and safety of the officers, public, and people being transported. This section considers BPD's current compliance status with respect to the provisions of Paragraphs 226, 227, 228, 231, 232, 233 and 238, which all relate to the Department's procedures for transporting persons in custody.

To assess this area, the Monitoring Team considered data from BPD audits, the Team's own audits, information from Internal Affairs, and information from the Department's Education & Training Section. In particular, the Monitoring Team audited BPD transport events in two contexts. First, the Team reviewed a sample of transports that had been audited by BPD to determine whether the Department's auditors are fairly and validly reviewing their own transports. Second, the Team also reviewed nine additional transports not previously reviewed by BPD auditors, for an additional level of independent review of BPD's compliance with transport requirements.

Additionally, to determine compliance with Paragraphs 234 through 237, the Team assessed BPD's own internal processes for self-monitoring with respect to transportation practices.

As with the assessment of transport equipment described in Section IV, the Monitoring Team's attempts to conduct a comprehensive review of BPD transport events was, at least to some relevant extent, compromised by administrative gaps and challenges – including the Department's current inability to identify, and to provide a list of, detainee transport events. As such, it is not yet possible for BPD, or the Monitoring Team, to identify the number of transports conducted in a given period, in a particular location, or using a certain vehicle type. This limitation, as well as problems around data access and recordkeeping, forced the Monitoring Team to adapt our methodological approach, as necessary and appropriate, to balance the availability of information with the desired, ideal level of methodological and analytical rigor.

### A.        Detainee Transport Audits

As described elsewhere in this report, BPD, for its internal purposes, uses a weighted scorecard to assess randomly selected detainee transport events each month. The scorecard includes 41 "yes/no" questions about whether the vehicle was properly equipped, whether detainees were properly searched, secured, separated, and monitored, documentation, any medical issues experienced, and safe driving. The full scorecard is provided in Appendix 2.

To select cases for review, BPD relies on the Performance Standards Section (PSS) searching for footage titled "transport" in Evidence.com for the previous month. Search results are then sorted by district and transport date. Using a random number generator, 10 sets of numbers – one for each district, and for the Warrant Apprehension Task Force (WATF) – are generated, with 15 numbers

30

in each set. BPD reviewers use the random numbers to select two cases within each district. Ten numbers are generated for each district because not all transports are necessarily detainee transports; if a reviewer sees that a case does not involve a prisoner, they will use the next random number, until they have two appropriate transports to review.

While this random selection process ensures that the Department is not purposely selecting transports they know to be within policy, it does highlight some of the ongoing data limitations. Simply, there is presently no single way to identify all detainee transports that have occurred within a particular timeframe or district. Transports involving detainees also cannot be separated out from other types of transports conducted by BPD, further complicating efforts to generate an accurate count of these events.

BPD's current method of creating a sample of detainee transports for its internal auditing process relies upon Evidence.com, where body worn camera (BWC) footage is stored. While this is necessary given the fragmented state of the detainee transport data, it means that any transports that are mislabeled, or more notably, do not have corresponding BWC footage (which would be a violation of Policy 1114(2)) are not included in the audit sample. A preferable process would involve querying a comprehensive database of transport events by date, location, and transport type to produce the audit sample each month. With the Department-wide launch of Axon Records, and e-learning scheduled to be completed by January 2022, the Monitoring Team expects that the audit sampling will be updated to resemble this process in the coming months.

BPD has been using its scorecard to complete audits of the randomly selected transports every month since January 2020 for a total of 20 audits per month. BPD's revised Policy 1114 was implemented in February 2021 with training through March 2021, meaning that the audits completed in April 2021 were the first to reflect the new policy. While the Consent Decree calls for five random audits per quarter from each district, for a total of 45 audits (¶ 236(a)), BPD has exceeded the requirement by treating WATF as an additional district, and conducting six audits per district, for a total of 60 audits per quarter.

Following the monthly audit of 20 transports by BPD, a Monitoring Team member uses a random number generator to select two of BPD's audits for independent verification. The Monitoring Team member validates each of the data points in the scorecard, by reviewing the corresponding BWC footage, Form 12, and TVC footage when relevant and accessible. The Monitoring Team member's findings are captured in an automated form and discussed with BPD monthly.

Six months of BPD transport audit scorecard data have been compiled into a single database, capturing 18 district-level audits per month from April through September of 2021 (n=108), plus an additional 12 audits of WATF transports. Based on estimates that indicate approximately 4,324 transports occur in the nine BPD districts in a 6-month period, a sample size of 94 BPD transport audits would be sufficient to produce a 95% confidence level and margin of error less than or equal

to $\pm$10%; the sample of 108 district audits conducted by BPD exceeds this threshold.[9] However, although BPD has been auditing two transports per district per month, for a total of 12 per district over the 6 month period, the actual transports that occurred between April and September 2021 were not evenly distributed. Thus, the Monitoring Team has supplemented its own review of transports in the two commands with the highest frequency of transports, to ensure they are adequately represented in the review.[10]

Monitoring Team members have assessed a total of 21 transports: (a) reviewing 12 of BPD's 120 random audits conducted over six months, and (b) auditing an additional nine transports not previously reviewed by BPD (7 from Central, 2 from Northeast), to ensure there is enough representation from the two busiest commands, and to provide an additional independent review of events outside of BPD's own audits.

**Figure 10: Six-Month Transport Estimates Across BPD Districts**

| District | % Total Transports | % District Transports | Transports (est.) over 6 mos. |
|---|---|---|---|
| Central | 16.0 | 19.8 | 854 |
| Northeast | 11.7 | 14.5 | 626 |
| Southwest | 9.6 | 11.8 | 512 |
| Northwest | 8.5 | 10.5 | 455 |
| Southeast | 8.5 | 10.5 | 455 |
| Western | 8.5 | 10.5 | 455 |
| Northern | 6.4 | 7.9 | 341 |
| Southern | 6.4 | 7.9 | 341 |
| Eastern | 5.3 | 6.6 | 285 |
| WATF | 19.1 | -- | 1,024 |
| Total | 100.0% | 100.0% | 5,348 |

---

[9] BPD stated in email correspondence that by using factors like arrests and Evidence.com transports, they estimated approximately 2,162 transports across the nine districts for a three-month period.

[10] BPD provided an approximate breakdown of transports based on the arrest/booking table for a three-month period. BPD also included an eleventh category, "Other", which was removed from the sample table, as it is not one of the ten commands included in the recurring audits.

*Source: BPD*

Transports that involved the Warrant Apprehension Task Force are included in the monthly audit review but were excluded when determining which districts to supplement (Figure 10) because WATF conducts few of the transports associated with the arrests that they execute. Instead, WATF's transports are typically conducted by a unit assigned to the district where the arrest occurred.

Altogether, the Monitoring Team created a database of 129 audits: 120 conducted by BPD – 12 of which were verified by the Monitoring Team, and nine net new audits conducted by the Monitoring Team.

### Findings

In the 12 BPD audits that were verified by the Monitoring Team, there were only nine out of 492 possible instances (41 questions across 12 audits) in which the Monitoring Team member scored any field differently than BPD. Specifically, in one instance, the BPD auditor selected "unable to determine" for "Did the transporting member obey the posted speed limit, unless a person being transported required urgent and emergency medical care?" whereas the Monitoring Team auditor selected "No." In the other eight instances, the discrepancy was regarding how to classify information that was unknown because of a missing Form 12. In these instances, the BPD reviewer selected "0" (not compliant), whereas the Monitoring Team member selected "unable to determine." These were the only instances of disagreement across 41 questions in all 12 randomly audited transports. Because these differences were generally related to coding decisions and not substantive differences, we felt that it was appropriate to use BPD's broader pool of transport audits, combined with the Monitoring Team's nine supplemental audits, as a reliable data source to assess transport procedures.

The Monitoring Team requested from BPD all relevant materials to conduct supplemental audits of transports. In numerous instances the Monitoring Team members were provided with incorrect Form 12s and were not provided with TVC footage until the after the reviews had been completed. The Monitoring Team had access to the corresponding BWC footage and was able to make determinations regarding most questions on the scorecard. When it was not possible to make a determination, due to the lack of TVC or Form 12, the field was scored "unable to determine." In addition to the summary of the audits that follows, the full results for each of the 41 scorecard measures are provided in Appendix 2.

In total, the Monitoring Team constructed and analyzed a database of 129 transport events. Scorecard data from BPD's 108 district audits and 12 WATF audits, as well as the Monitoring Team's 12 audit reviews and nine supplemental audits, were merged into a single file to produce

33

frequencies and descriptive statistics of each measure. The transports that were reviewed by both BPD and the Monitoring Team were matched to ensure those events were not counted twice.

Of the 129 audits, about half were conducted using a wagon, nearly all of which had a functioning TVC system (1 score of "0") and grip straps (2 scores of "0"). Only one audit revealed an instance where the member did not capture the entire transport on the TVC system, though four were unable to determine (question 41).

There were 19 events in which an auditor (either BPD or Monitoring Team) indicated that there were signs of medical distress or a physical injury; of these, 4 reported that the transporting member did not take immediate action (question 5). For example, in one of the cases reviewed by a Monitoring Team member, it appeared that the transporting officers did not believe a prisoner who complained of pain. The Monitoring Team member found that regardless of whether the officers were correct in their assessment of the prisoner's actual level of distress, policy dictates that they call for medics, and they did not do so. In three of the four cases in which immediate action was not taken, the auditor was unable to determine if the officer communicated the information about the medical distress or injury to their supervisor (question 6).

**Figure 11: Responses to Scorecard Question 5, n=19**



*Data Source: Combined Detainee Scorecards (April through September 2021), excluding responses of "N/A" or "U/D" for question 5*

The detainee was handcuffed prior to transport in 100% of cases audited (question 9), but in at least 18 (14%), the detainee was not searched before being placed in the transport vehicle (question 10; n=11 "unable to determine"). Failure to search was identified in at least one transport randomly audited during five of the six months reviewed, and in seven of the nine districts. Of those that were searched, three searches were conducted by an officer of a different gender than the detainee (question 11; n=4 "unable to determine").

**Figure 12: Responses to Scorecard Question 10, n=129**



*Data Source: Combined Detainee Scorecards (April through September 2021)*

Although only one audit identified a transport in which a passenger was not secured properly (question 15), six audits reported that a detainee became unrestrained, of which two reported the transporting member did not take action (question 20). None of the 129 transports found the detainee to be restrained in a position causing undue pain or risk of injury (question 16), handcuffed to any part of the vehicle (question 17), or left unattended in the transport vehicle (question 18). Additionally, there were no instances in which the transport member engaged in unrelated enforcement activities, unless failure to act would result in imminent risk of death or serious bodily injury (question 19).

**Figure 13: Responses to Scorecard Questions 33 and 34, n=129**



*Data Source: Combined Detainee Scorecards (April through September 2021)*

The data necessary to conduct comprehensive assessments of safe driving practices related to vehicle speed remain limited. For most audits (73%), the auditor was unable to determine whether the transporting member obeyed the posted speed limit (question 33). In cases in which they were able to, this determination was often made by using BWC footage of the speedometer and viewing speed limit signs using resources such as Google Street View. Even without the ability to determine speed, more than one-fifth of audits (n=29 of 129) found that the member did not drive in a manner to preserve the safety and security of persons in custody (question 34), i.e., operating an emergency vehicle as allowed under state law. Examples of driving in an unsafe manner include failing to stop at a stop sign or red light (other than during emergency situations) and operating a handheld device while driving. This was observed at least once in every district – and at least once during each of the six months audited.

Even without the AVL data to assess speed, some of the Monitoring Team's own reviews identified unsafe driving practices. These included backing up on a one-way street without using emergency equipment, and in another example, driving the wrong way down a one-way street and using emergency equipment to run several red lights and expedite the transport of a disruptive detainee. Additionally, BPD auditors identified an instance, based on BWC footage alone, in which a transport driver ran a stop sign. While the Monitoring Team is concerned about unsafe driving practices, the Team also recognizes and commends the demonstrated level of attention to detail on the part of the BPD auditors to identify those types of violations.

As described previously, the transports randomly selected for audits by BPD are identified using the Evidence.com BWC footage database, due to the lack of a comprehensive detainee transport database. As such, it follows that 100% of transporting members' BWCs were found to be powered on and activated during the transports (question 40). It is not possible to effectively assess this question through the audits, given how the sample was generated.

Questions 22 through 31 focus on the documentation of transport details. While some of these questions can be answered based on radio traffic or observations from BWC footage, they all refer to the Form 12. BPD had significant difficulty locating and sharing the correct Form 12s for many of the audits; on numerous occasions when Form 12s were shared, they were provided for the wrong cases. This issue existed both for sharing Form 12s with the Monitoring Team, and with BPD's own internal auditors. Further, when Monitoring Team members encountered a missing Form 12, they would indicate "unable to determine" for the corresponding questions, if the answer could not be inferred from BWC; it appears that BPD auditors indicated "0" (i.e., not compliant) when the Form 12 was not located. While this is not incorrect, for scorecard measures such as question 28, "did the transporting member report via Charge Information Form, Form 12, whether the transport vehicle made any additional stops?" it is unclear if the 57 scores of "0" (44%) are because the forms were missing, incomplete, or some combination thereof.

Ultimately, for six of the Form 12 questions, more than one-third of transports audited were scored as being non-compliant, or "unable to determine" (Figure 14; Appendix 3). BPD has indicated that a new process will be in place for the collection, storage, and retrieval of Form 12s, once Axon Records is fully implemented. Until that time, a significant portion of the questions that rely on Form 12 reporting are likely to continue to be scored as being out of compliance. It is likely that questions 22 though 26 are less impacted by the missing Form 12s, as they can be assessed based on either Form 12 or radio traffic. There were instances in which Monitoring Team members could see from BWC that the officer completed a Form 12 during a stop, but then it was determined to be missing during the audit. As such, this is another area in which BPD appears to be complying with requirements in practice, but is struggling with corresponding administrative elements.

**Figure 14: Distribution of Scores for Scorecard Questions Involving Form 12, n=129**



*Data Source: Combined Detainee Scorecards (April through September 2021)*

Substantively, the lack of Form 12s and corresponding information means that we are limited in what we know about whether BPD is correctly documenting critical elements of transports, such as making additional stops, using force, or adequately restraining detainees. Without appropriate

37

documentation and follow-up, when necessary, BPD will not have a comprehensive accountability system in place for all transports.

## B.    Quarterly Spot Check Audits

In addition to the post-hoc reviews of transports, the Consent Decree requires that BPD conduct random and unannounced spot-checks of at least three transports from each BPD district to inspect for use of seatbelts and operation of the TVC system each quarter (¶ 236(d)). These inspections have been documented in separate scorecards that address seven requirements and BPD policies:

1. Was the wagon TVC system operating properly
2. Was the prisoner seat belted?
3. Was a transport vehicle with safety barriers utilized?
4. Were males and females separated?
5. Were youth in the same vehicle as adult prisoners?
6. If the prisoner complained of injury, or if there was obvious signs of injury, was the prisoner provided medical attention?
7. Was the transporting officer's BWC activated during transport?

Transport inspection data is available dating back to the first quarter of 2019, and scorecards are available in Excel spreadsheet format beginning with the second quarter of 2020. For this assessment, the contents of all 27 scorecards from each of the most recent four quarters were aggregated into a single database. The most recent quarter (Q3 2021) is not yet available, so the assessment is limited to the third and fourth quarters of 2020, and the first and second quarter of 2021.

### *Findings*

Each quarter exactly three random spot checks were conducted in each of the nine districts, for a total sample of 108 transports reviewed over a one-year period. Two-thirds of the audits (67%) occurred in wagons rather than transport cruisers. Because of the way that the transport data are currently maintained, it is not possible to determine if this proportion is representative of the broader population of transports that occur across districts. Audits were dispersed across drivers, with no transport officer being audited more than four times over the one-year period. However, there was little variation in the shift time during which audits occurred, with transports but one occurring between 7:40am and 1:55pm.

A review of the 108 scorecards completed between the third quarter of 2020 and the second quarter of 2021 revealed the following:

### *1.   Was the wagon TVC system operating properly?*

Scorecard responses indicated that 100% (n=72) of wagons had a properly functioning TVC system during the audit.

2.   *Was the prisoner seat belted?*

Only one instance of a prisoner not being seat belted was observed. This occurred in Q2 2021 and was referred to the Public Integrity Bureau (PIB).

3.   *Was a transport vehicle with safety barriers utilized?*

All vehicles were documented as having the required safety barriers.

4.   *Were males and females separated?*

Five instances were recorded in which males and females were being transported; of those, only one audit (Q2 2021) observed a failure to separate male and female detainees. The transport officer was referred to PIB.

5.   *Were youth in the same vehicle as adult prisoners?*

All 108 audits were coded as "not applicable."

6.   *If the prisoner complained of injury, or if there were obvious signs of injury, was the prisoner provided medical attention?*

The audits included 10 instances in which a prisoner complained of an injury. In two of these audits the prisoner was not provided medical attention. In at least one of these cases (Q4 2020) the transporting officer was referred to PIB. The other violating transport occurred during Q3 2020, which was before BPD began including PIB referral information with scorecards.

7.   *Was the transporting officer's BWC activated during transport?*

Three of the 108 transports identified a failure to activate, or late activation of the officer's body worn camera. The officers in two of the instances were referred to PIB; the third was from Q3 2020, before the PIB information was included.

## C.   Assessment of Transport Injury Reports

Under the Consent Decree, BPD must not only enhance practices that reduce the likelihood of injury during transports but also improve its documentation when injuries do occur. The Monitoring Team conducted a search in BPD's Internal Affairs records system, house within the IAPro platform, to identify records in which injuries were reported during transport events. To do so, a Monitoring Team member logged into IAPro and ran an advanced search for incidents of "suspect injured in P/O Vehicle" dating back to January 1, 2020.

There are noteworthy limitations to assessing transport-related injuries this way. As we are to assume that transport injuries are a relatively rare event, the likelihood that one will be captured in a randomly selected audit is even less probable. The only other process to systematically identify and review these events rely on the accurate and complete reporting through Charge Information Forms (Form 12) and IAPro. The limitations here include the possibility that data are not accurately, comprehensively entered, either intentionally or unintentionally; further, Form 12s are not currently available in a centralized or digitized format and are often inaccessible or missing.

The injury-related data fields collected in the Form 12 include:

- Was force used during transport?
- At any time did the transporting BPD member perceive the arrestee to be in need of medical attention?
- Was the arrestee injured during transport? If "Yes", state the nature of injury and whether first aid or medical care was provided.

Without a comprehensive repository of digitized Form 12s, it is not possible to estimate the full universe of transport-related injuries. As such, we must rely on other approaches, such as reporting in IAPro to assess this information.

### *Findings*

A Monitoring Team member reviewed IAPro for reports that indicated "Suspect Injured in P/O Vehicle" for January 2020 to present and returned no hits. However, the Monitoring Team then received an update from BPD indicating that the Use of Force Assessment Unit identified one instance from May. This event was not captured in the search because the option "Injury in P/O Vehicle" had not been selected when the report was completed. While BPD shared that an instruction addressing this issue has since been added to the e-learning training, there remain concerns about the accurate tabulation of transport-related injuries. The reliance on checking a box on a Form 12, and the widespread problems observed in completing, retaining, locating, and sharing Form 12s, reduces confidence that this information is complete.

### D.    Review of Training Records

BPD provided the Monitoring Team with a spreadsheet titled "Wagon Operators Training History." For each district, a list of names and sequence numbers were provided, and for some, a "completed" date. This spreadsheet was compiled based on both paper and digital training records, capturing instruction that was provided in a four-hour course format to BPD members who have been on the force since before 2015, and BPD members who received driving training as part of the Academy curriculum, beginning in 2015.

Without a centralized database for transport events, it is not possible to generate a list of wagon transports and drivers for a particular time period. To work around this, all wagon transports listed in the random audit cases for both the monthly and quarterly audits were queried, and the drivers identified in the audits were compared to the training history spreadsheet. Recognizing the limitations of the spreadsheet, which does not identify if or when an officer changed assignments, the review focuses on the most recent six months of the quarterly audits (Q1 and Q2 of 2021), and monthly audits (April through September 2021) that are currently available.

### *Findings*

Of the 38 wagon transports audited between during the first two quarters of 2021, 11 (29%) were driven by officers without training completion dates documented in the spreadsheet; some were identified in the spreadsheet without a training date next to their name, whereas others were not on the list at all; 27 wagon transports (71%) were driven by officers who had completed the required training since 2015.

Additionally, BPD's random monthly audits conducted in each district and WATF were also compared against the training history spreadsheet. Between April and September 2021, 55 of the 120 transports audited used wagons. Of the 55 wagon transports, 12 (22%) involved transporting officers that did not have a training completion date listed next to their name, while the others (n=43) were driven by officers who had completed the required training since 2015.

## E.      Compliance Synopsis

In the area of prisoner transport procedures, the Monitoring Team identified several areas in which BPD is currently either on track toward compliance or in initial compliance. BPD's issues determining speed and driving in a manner consistent with policy are not insignificant, and they are a primary reason why BPD has not yet achieved "initial compliance" in the transport area overall. However, these shortcomings do not diminish BPD's consistent compliance with Consent Decree and policy requirements that are generally more important to safely transporting persons in custody—i.e., restraining them in seatbelts, providing grip straps, and monitoring their safety through either direct or TVC observation. That is why the Monitoring Team has concluded that, despite the challenges described here, BPD officers are generally doing much of what the Consent Decree requires when transporting persons in custody.

However, as a result of ongoing administrative issues detailed throughout this report, there were also a few areas in which the Monitoring Team was unable to make a determination, due to missing or insufficient data. Specifically:

- The Monitoring Team's reviews of BPD transport events indicate that **BPD is in initial compliance (4d initial compliance) with Paragraphs 226 and 228**, which address BPD

ensuring all persons in custody being transported are secured by a fastened seatbelt, and are not transported in a position to cause undue pain, undue risk of injury, or actual injury. BPD's own audits, and the Monitoring Team's audit reviews and supplemental reviews support this finding.

- The Monitoring Team's reviews of the requirements of **Paragraph 227,** relating to ensuring that the transporting member periodically checks on the detainee, reflect a status of **Implementation – On Track (4c)**. The Monitoring Team's findings indicate that in practice, it is likely that BPD is in compliance with the requirements of this paragraph, but the Monitoring Team cannot confirm compliance at this time, as this measure was not scored in numerous transport events audited.

- The Monitoring Team was **unable to determine BPD's compliance with Paragraph 231 (4a Implementation – Not Assessed)**, which requires officers to drive in a manner that preserves the safety and security of the persons being transported, due to the lack of AVL data in transport events audited. The Monitoring Team expects to be able to provide a compliance score as soon as BPD's audits begin consistently integrating this information.

- Due to the widespread problems locating Form 12s and the corresponding data, **the Monitoring Team was unable to determine the compliance status on Paragraph 232,** requiring field-based reporting **(4a Implementation – Not Assessed), or Paragraph** 235, which requires BPD to review all transport injuries as a use of force **(4a Implementation – Not Assessed).** The Monitoring Team will continue to track the availability of this information, and expects that necessary administrative changes will be made to allow us to provide a score in the Eighth Semiannual Report.

- The Monitoring Team's reviews of transport events reflected a status of **Implementation – On Track (4c) for Paragraph 233**, which requires BPD to ensure officers take immediate action when a person in custody displays signs of medical distress or injury.

- **The Monitoring Team found BPD to be in Initial Compliance (4d) with Paragraph 234**, which states that BPD will develop policies and procedures for determining at the point of transfer to another agency whether arrested persons were placed at undue risk, harmed, or injured while being transported. The revision of and training on Policy 1114, which includes new language about transportation procedures, is consistent with the requirements of the Consent Decree. While BPD is in initial compliance with the requirement that these policies and procedures be revised, it is not yet possible to determine if the policies are being adhered to in practice, as explained elsewhere.

- **Paragraph 236** includes four subsections. BPD is at a different level of compliance for each one:
  - For subparagraph (a)**,** requiring reviews of at least five transports in each district per quarter, BPD's score is **Implementation – On Track (4c)**. BPD has conducted thorough audits, and has done more than required by the Consent Decree. BPD will reach initial compliance once issues assessing vehicle speed are resolved.
  - For subparagraph (b), requiring analysis of data collected under Paragraph 232, BPD's score is **Implementation – On Track (4c)**. BPD has the processes in place to collect the information (i.e., Form 12), but the data itself is not yet reliably available.
  - For subparagraph (c), requiring a review of every injury reported during transportation, BPD's score is **Implementation – On Track (4c)**. BPD's audits incorporate this information when available, but as with subsection (b), this information has not been consistently available.
  - For subparagraph (d), requiring unannounced spot checks of transport vehicles, BPD's score is **Implementation – Initial Compliance (4d)**, as records indicate that this is taking place routinely and completely.

- **The Monitoring Team has observed progress, and what appears to generally be compliance with Paragraphs 237 through 238. However, the findings of the assessments reflect a status of Implementation – On Track (4c), due to the ongoing administrative and record-keeping challenges.** It appears that in practice, BPD's audits, spot-checks, training, and policies are consistent with the requirements of the Consent Decree. However, due to the inability to provide important information necessary to be certain of initial compliance we cannot make that determination until these issues are remedied.

43

## VI.    SUMMARY OF COMPLIANCE DETERMINATIONS

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| 222 | The Parties recognize that safe and effective transportation of detainees is an essential step in the process of taking a person into custody, and must be conducted in a manner that protects the wellbeing and personal security of officers, the public, and the people being transported.<br><br>BPD has recently implemented new and/or amended policies regarding transportation of passengers and persons in custody. To the extent those policies meet the requirements of this Agreement, further revisions are not required. BPD will build upon its recently revised policies as required by this Agreement to ensure that all detainees are treated in a humane manner before, during, and after their transportation, with due regard for their physical safety and protection, consistent with sound principles of prisoner security. | **4d**<br><br>**(Initial Compliance)** |
| 223 | BPD will ensure that all vehicles used by BPD for the transportation of persons in custody, including transport wagons or vans and police cruisers outfitted with dividers, contain sufficient and functioning seatbelts for each person in custody they are intended to transport. In addition to a seatbelt, BPD will ensure that all transport vans or wagons are outfitted with a strap located along the rear area of each seat that persons being transported may grip for security during transport. | **4d**<br><br>**(Initial Compliance)** |
| 224 | BPD will supplement its existing policies to ensure that all transport wagons or vans that are used during prisoner transport are equipped with a functioning transport vehicle camera ("TVC") system, which includes video recording equipment within all compartments used for the transportation of persons in custody. The TVC system will display a live video to officers located in the driver's section of the vehicle, and also record the video to be preserved for future viewing. The TVC system will be used to record every instance of transportation of a person in custody, for the duration of the time the person in custody is within the vehicle. BPD officers will be prohibited from turning off or disabling the TVC system at any point while a person in custody is within the vehicle or being loaded into or removed from the vehicle. All transport vehicle video recordings will be maintained by BPD for a period of at least 1 year, or for longer as required by BPD policy. | **4d**<br><br>**(Initial Compliance)** |
| 225 | BPD will inspect all vehicles used for the transportation of persons in custody on at least a monthly basis to ensure that all equipment, including video recording equipment, seatbelts, and straps, are fully functional. | **4c**<br><br>**(Implementation – On Track)** |
| 226 | BPD will ensure that every person in custody being transported is secured by a fastened seatbelt or other authorized restraining device, in accordance with existing BPD policy. The number of people being transported in a given vehicle shall never exceed the number of seatbelts or other authorized restraining devices in the vehicle. | **4d**<br><br>**(Initial Compliance)** |

44

| | | |
|---|---|---|
| 227 | BPD will ensure that officers periodically check on the persons in custody during the transport process, either by direct observation or through live video transmission, in a manner that ensures the safety and security of the officers and the people being transported. At no time will a person in custody be left unattended in a transport vehicle. BPD will ensure that officers who are transporting persons in custody do not engage in any unrelated enforcement activities unless failure to act would result in imminent risk of death or serious bodily injury. | **4c** <br><br> **(Implementation – On Track)** |
| 228 | BPD will ensure that officers restrain persons in custody for transport in a manner that does not cause undue pain, undue risk of injury, or actual injury to the individual being transported. BPD will prohibit officers from transporting any persons who are restrained in a prone position (including the so-called "hog-tie" position), or handcuffing persons in custody to any part of a vehicle being used for transport. | **4d** <br><br> **(Initial Compliance)** |
| 229 | BPD will ensure that males and females are not transported within the same compartment of a vehicle. If a vehicle contains only one compartment used for transporting persons in custody, BPD will use separate vehicles to transport males and females. Similarly, to the extent reasonably apparent, juvenile and adult persons in custody will not be transported in the same compartments. Transgender, Intersex, and/or Gender Non-conforming individuals, as defined in this Agreement, shall be transported with other arrestees of the same Gender Identity and Expression unless the individual expresses a safety concern or the officer identifies a safety concern, in which case the individual shall be transported alone. | **4a** <br><br> **(Implementation – Not Assessed)** |
| 230 | BPD will ensure that wheelchairs, crutches, prosthetic devices, and other medical equipment required by persons with disabilities are transported to the final destination of the individual who requires them. If possible, without creating potentially hazardous conditions, such medical equipment will be transported in the same vehicle as the individual who requires them. | **4a** <br><br> **(Implementation – Not Assessed)** |
| 231 | Other than the exception listed below, BPD will ensure that all officers driving a transport vehicle do not exceed the posted speed limit, and that the vehicle is driven in a manner that is calculated to preserve the safety and security of the persons in custody being transported. If a person being transported requires urgent and emergency medical care, the transporting officer may exceed the posted speed limit, as allowed for emergency vehicles under state law. | **4a** <br><br> **(Implementation – Not Assessed)** |
| 232 | BPD will ensure that during every instance of transport of a person in custody, the transporting officer will communicate the following information to dispatch or through other field-based reporting, which will be recorded and preserved for review: a. The location of the vehicle where persons in custody are picked up; b. The time that the transportation unit departs the scene where a person was taken into custody; c. How many persons in custody are being transported; d. The destination of the vehicle; e. The starting and ending mileage on the vehicle; f. The time of arrival | **4a** <br><br> **(Implementation – Not Assessed)** |

| | | |
|---|---|---|
| | at the destination; and g. Whether at any time the officer perceived the person in custody to be in need of medical attention. | |
| 233 | BPD will ensure that its officers periodically check on persons in custody from the time of arrest to the time of transfer of custody for apparent signs of medical distress or emergency. When a person in custody displays signs of medical distress or physical injury, BPD will ensure that officers take immediate action. These actions may vary depending on the particular circumstances, but may include (a) calling for assistance from medical personnel; (b) rendering first aid; or (c) immediately transporting the person to a hospital emergency room. Any time that an officer perceives that a person in custody is in medical distress or has a physical injury, the officer shall communicate this information to his or her supervisor. | **4c**<br><br>**(Implementation – On Track)** |
| 234 | BPD will develop policies and procedures for determining at the point of transfer to another agency whether arrested persons were placed at undue risk, harmed, or injured while being transported. This process will include gathering and preserving data regarding whether persons were adequately restrained by a seatbelt during transport, whether force was used during transport, whether the person was injured during transport, the nature of the injury, and whether first aid or medical care was provided. | **4d**<br><br>**(Initial Compliance)** |
| 235 | Every injury that is reported to have occurred during transport will be reviewed as a use of force as provided for in Section VII(D), Use of Force, or, if appropriate, as part of a vehicle crash investigation. | **4a**<br><br>**(Implementation – Not Assessed)** |
| 236 | BPD will conduct quarterly audits of its transportation process to determine whether officers are properly following correct transportation procedures and that persons in custody who are being transported are not placed at risk of injury. The audits will include: | |
| | a. A review of information for at least five randomly selected instances of transport of persons in custody from each police district within the previous quarter, including reviewing all video recordings associated with each instance; reviewing and analyzing location, time, and odometer information to calculate the speed that the transport vehicle was driven; and reading any reports associated with the arrest, detention, and transport of the arrested person; | **4c**<br><br>**(Implementation – On Track)** |
| | b. An analysis of the data collected during the previous quarter in Paragraph 232 of this Section; | **4c**<br><br>**(Implementation – On Track)** |
| | c. A review of every injury reported to have occurred during transportation to determine if there are any trends related to transport policies and practices; | **4c**<br><br>**(Implementation – On Track)** |

| | | |
|---|---|---|
| | d. Random and unannounced spot-checks of at least three transportation vehicles from each BPD district to inspect for use of seatbelts and operation of the TVC system. | **4d**<br><br>**(Initial Compliance)** |
| 237 | Whenever, through auditing or otherwise, it is determined that an officer did not comply with BPD policies and procedures, BPD will take appropriate action, including the initiation of disciplinary procedures. | **4c**<br><br>**(Implementation – On Track)** |
| 238 | BPD will review and revise its policies, procedures, and trainings associated with the transportation of persons in custody to ensure compliance with the requirements of this Agreement. BPD will ensure that all officers who drive transport wagons are provided a training of at least eight hours on safe and humane transportation of persons in custody, including the requirements of this Agreement, BPD policy and procedures related to transport, safe driving methods, the identification of medical distress and injuries, and proper restraint techniques. Up to four hours of the training required under this section may be satisfied by general training programs, which may include units regarding the requirements of the Agreement that are relevant to the safe transportation of detainees, including the identification of medical distress and injuries, and proper restraint techniques. | **4c**<br><br>**(Implementation – On Track)** |

## VII.   APPENDICES

**Appendix 1: Timeline of Key Detainee Transport Reform and Oversight Events**

| | |
|---|---|
| April 2017 | Consent Decree took effect |
| January 2018 | Monitoring Team conducted preliminary audit of transport vans |
| February 2018 | Judge Bredar convened working sessions to discuss transportation of persons in custody |
| April 2018 | Monitoring Team conducted a comprehensive audit of both transport vans and transport cruisers |
| June 2018 | BPD, working with the Monitoring Team and DOJ, produced final proposed versions of Policy 1114 (Persons in Police Custody), Policy 825 (Transport Vehicle Camera) and Policy 1511 (Vehicle Inspection and Maintenance). A 30-day public comment period |
| July 2018 | BPD finalized its transport policies in July 2018 |
| August 2018 | The Monitoring Team filed its notice of approval in August 2018 |
| September 2018 | BPD's audit section, together with both the Monitoring Team and DOJ, performed mock audits of transport events to verify the functionality of the audit assessment tool |
| October 2018 | BPD used the revised assessment tool to perform its first inspection of transport events<br><br>BPD's Office of Inspector General submitted its inspection report to the Acting Commissioner |
| January 2019 | Audit and Inspections Unit conducted first round of random quarterly inspections |
| April 2019 | Audit and Inspections Unit completed and distributed draft report to chain of command |
| December 2019 | Monitoring Team and DOJ had a follow-up meeting with audit staff and the Deputy Commissioner of Compliance about the progress of the required audits. BPD introduced a "weighting" system designed specifically to evaluate transport events for consent decree compliance |
| January 2020 | Audit and Inspection Unit began conducting 20 audits of 20 random transport events per month (9 districts plus WATF) |
| February 2021 | Training for Policy 1114; Policy 1114 Activated |
| March 2021 | BPD began using the scorecard to score almost all requirements. |
| April 2021 | 3 hour working session with Judge Bredar and parties focused on Transportation of persons in custody |

48

| June 2021 | e-learning for Policy 825 and Policy 1511 held Department-wide, comprising of reading the policies and taking a test. |
|---|---|
| June 2021 | Policy 825 and Policy 1511 activated |
| September 2021 | Public Comment -- Training: Prisoner Transport & Searches Lesson Plan |
| October 2021 | Second Comment Period -- Training: Prisoner Transport & Searches Lesson Plan<br><br>Transport van driver e-learning |
| December 2021 | Prisoner Transport e-learning |

**Appendix 2: Detainee Transport Scorecard**

| | Scorecard Measure | 0 | 1 | NA | UD |
|---|---|---|---|---|---|
| 1 | Was the transport vehicle equipped with a functioning transport vehicle camera (TVC) system? | 1 (1%) | 55 (43%) | 71 (55%) | 2 (2%) |
| 2 | Did the transporting member conduct a function test to ensure the TVC was operating properly and contained sufficient available memory before each tour of duty? | | 53 (41%) | 73 (57%) | 3 (2%) |
| 3 | Was the transport van outfitted with a grip strap along the rear area of each seat? | 2 (2%) | 46 (36%) | 81 (63%) | |
| 4 | Did the transporting and the receiving member communicate transfer of custody? | | 118 (91%) | 9 (7%) | 2 (2%) |
| 5 | Did the transporting member take immediate action in response to signs of medical distress or a physical injury? | 4 (3%) | 15 (12%) | 110 (85%) | |
| 6 | If the officer perceived that a person in custody was in medical distress or had a physical injury, did the officer communicate this information to his/her supervisor? | | 10 (8%) | 111 (86%) | 8 (6%) |
| 7 | Did the transporting member make a reasonable accommodation for an arrest involving a detainee with a disability requiring wheelchairs, crutches, prosthetic devices, or other medical equipment required by persons with disabilities? | | 1 (1%) | 128 (99%) | |
| 8 | Did the transporting member determine if the detainee was under any prescribed medication prior to transporting him or her from the detention facility, mental health facility or hospital, and ensured that the medication accompanied the detainee in sufficient quantity to cover the anticipated time in departmental custody? | 3 (2%) | | 112 (87%) | 14 (11%) |
| 9 | Was the detainee handcuffed prior to transport? | | 129 (100%) | | |
| 10 | Did the arresting and transporting member search the detainee before placing him/her in the transport vehicle? | 18 (14%) | 100 (78%) | | 11 (9%) |
| 11 | If the detainee was searched, did the transporting member refrain from conducting a cross-gender search, absent exigent circumstances, or if impracticable ? | 3 (2%) | 28 (22%) | 94 (73%) | 4 (3%) |
| 12 | Were male and females detainees transported in separate compartments? | | 1 (1%) | 128 (99%) | |
| 13 | Were transgender, intersex, and/or gender non-conforming detainees transported with other arrestees of the same gender identity and expression or were they transported alone after expressing a safety concern or if a safety concern was apparent to the officer? | | | 129 (100%) | |

| | | | | | |
|---|---|---|---|---|---|
| 14 | Were juvenile and adult detainees transported in separate compartments (when it is reasonably apparent that the juvenile is a juvenile)? | | 2 (2%) | 127 (98%) | |
| 15 | Were all passengers, regardless of age and seat location, restrained by a seatbelt or other authorized restraining device before transport commenced? | 1 (1%) | 128 (99%) | | |
| 16 | Did the transporting member confirm the detainee was not restrained in a manner that caused undue pain, undue risk of injury, actual injury or a prone position (including the so called "hog-tie")? | | 129 (100%) | | |
| 17 | Did the transporting member refrain from handcuffing detainees to any part of the vehicle used for transport? | | 129 (100%) | | |
| 18 | Did the transporting member refrain from leaving the detainee unattended in the transport vehicle? | | 129 (100%) | | |
| 19 | Did the transporting member refrain from engaging in unrelated enforcement activities, unless failure to act would result in imminent risk of death or serious bodily injury? | | 129 (100%) | | |
| 20 | Did the transporting member periodically check on the detainee by direct observation or live video transmission from the time of the arrest to the time of transfer of custody? | 15 (12%) | 99 (77%) | 1 (1%) | 14 (11%) |
| 21 | Did the transporting member take action if a detainee became unrestrained? | 2 (2%) | 4 (3%) | 123 (95%) | |
| 22 | Did the transporting member report, via radio/Charge Information Form, Form 12, the number of detainees in custody that were being transported? | | 128 (99%) | | 1 (1%) |
| 23 | Did the transporting member report, via radio/Charge Information Form, Form 12, the location where the detainee(s) were picked up by the transport vehicle (if different from arrest location)? | | 78 (60%) | 49 (38%) | 2 (2%) |
| 24 | Did the transporting member report, via radio/Charge Information Form, Form 12, the location of the detainee(s) destination? | | 128 (99%) | | 1 (1%) |
| 25 | Did the transporting member report via radio/Charge Information Form, Form 12, when the transporting vehicle departed the scene with dispatch providing the official timestamp? | | 127 (98%) | | 2 (2%) |
| 26 | Did the transporting member report via radio/Charge Information Form, Form 12, when the transportation vehicle arrived at the destination with dispatch providing the official timestamp? | 6 (5%) | 122 (95%) | | 1 (1%) |
| 27 | Did the transporting member report, via Charge Information Form, Form 12, the starting and ending mileage on the vehicle? | 54 (42%) | 72 (56%) | | 3 (2%) |
| 28 | Did the transporting member report, via Charge Information Form, Form 12, whether the transport vehicle made any additional stops? | 57 (44%) | 66 (51%) | | 6 (5%) |

51

| # | Question | | | | |
|---|---|---|---|---|---|
| 29 | Did the transporting member report, via radio/ Charge Information Form, Form 12, whether the detainee requested medical attention, was perceived to be in need of medical attention, injured during transport, the nature of the injury, and if first aid or medical care was provided? | 48 (37%) | 77 (60%) | | 4 (3%) |
| 30 | Did the transporting member report, via Charge Information Form, Form 12, whether force was used during transport? | 45 (35%) | 79 (61%) | | 5 (4%) |
| 31 | Did the transporting member report, via Charge Information Form, Form 12, whether the detainee was adequately restrained by the seatbelt? | 44 (34%) | 83 (64%) | | 2 (2%) |
| 32 | Did the transporting member submit all completed Charge Information Forms, Form 12, to their supervisor by the end of their tour of duty? | 37 (29%) | 85 (66%) | | 7 (5%) |
| 33 | Did the transporting member obey the posted speed limit, unless a person being transported required urgent and emergency medical care? If a person being transported requires urgent and emergency medical care, the transporting officer may exceed the posted speed limit, as allowed for emergency vehicles under state law. | 17 (13%) | 15 (12%) | 3 (2%) | 94 (73%) |
| 34 | Did the member drive the vehicle in a manner to preserve the safety and security of persons in custody? | 29 (22%) | 100 (78%) | | |
| 35 | Were sufficient officers present when moving detainees from the transporting vehicle to the booking facility, or other locations that might afford the opportunity for the detainee's escape or injury to the officer/others? | | 128 (99%) | | 1 (1%) |
| 36 | Did the detainee escape the transporting member's custody at any time? | 1 (1%) | 128 (99%) | | |
| 37 | Did the transporting member mark the video data when the detainee entered and exited the vehicle's prisoner holding area? | 20 (16%) | 37 (29%) | 69 (53%) | 3 (2%) |
| 38 | Did the transporting member advise the arresting member of any activity captured on the TVC system that may be used for investigation/prosecution purposes? | 3 (2%) | | 71 (55%) | 55 (43%) |
| 39 | Did the transporting member submit any seized/ recovered property to the ECU before the completion of their tour of duty? | 3 (2%) | | 121 (94%) | 5 (4%) |
| 40 | Were the transporting members' body-worn camera powered on, worn on the body at all times and activated for the duration of the transport? | | 129 (100%) | | |
| 41 | Did the transporting member capture the entire transport on the TVC system? | 1 (1%) | 53 (41%) | 71 (55%) | 4 (3%) |

**Appendix 3: Wagon Camera Inspections, by Week and District**

| Week | Accurate Cover Sheet | C | E | | NE | | N | | NW | SE | | S | SW | | W | | WATF | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 9552 | 9502 | 9578 | 9514 | 9534 | 9546 | 9549 | 9554 | 9533 | 9547 | 9548 | 9514 | 9510 | 9550 | 9547 | 9579 | 4401 | 4402 |
| 4/5/21 | N | ✓ | ✓ | S | S | ✓ | S | ✓ | ✓ | ✓ | S | S | ✓ | ✓ | ✓ | ✓ | 0 | ✓ | ✓ |
| 4/12/21 | N | ✓ | S | S | ✓ | 0 | S | ✓ | S | S | S | S | ✓ | ✓ | 0 | ✓ | 0 | S | 0 |
| 4/23/21 | N | ✓ | S | ✓ | L | ✓ | ✓ | ✓ | ✓ | S | S | S | S | ✓ | ✓ | ✓ | 0 | ✓ | ✓ |
| 4/26/21 | N | ✓ | S | ✓ | ✓ | ✓ | S | ✓ | ✓ | S | S | S | ✓ | S | ✓ | ✓ | 0 | 0 | ✓ |
| ≥ 1 inspection in April? | | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y |
| 5/3/21 | Y | ✓ | S | ✓ | ✓ | 0 | S | ✓ | S | ✓ | S | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | ✓ |
| 5/11/21 | N | ✓ | ✓ | ✓ | 0 | ✓ | 0 | 0 | 0 | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | S | ✓ | ✓ | ✓ |
| 5/17/21 | N | ✓ | ✓ | ✓ | ✓ | ✓ | S | ✓ | S | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | S | 0 | ✓ | ✓ |
| 5/24/21 | N | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | S | ✓ | ✓ | ✓ | s | ✓ | ✓ | ✓ | 0 | 0 | 0 |
| ≥ 1 inspection in May? | | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 6/2/21 | N | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 0 | ✓ | ✓ |
| 6/7/21 | Y | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | S | 0 | ✓ | ✓ |
| 6/17/21 | Y | S | ✓ | S | ✓ | S | 0 | ✓ | S | ✓ | S | ✓ | ✓ | ✓ | ✓ | S | 0 | ✓ | ✓ |
| 6/21/21 | N | S | 0 | 0 | ✓ | S | 0 | ✓ | ✓ | 0 | S | S | S | ✓ | ✓ | S | ✓ | 0 | ✓ |
| ≥ 1 inspection in June? | | Y | Y | Y | Y | N | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| 7/7/21 | N | S | 0 | 0 | S | ✓ | ✓ | ✓ | 0 | 0 | 0 | 0 | 0 | 0 | ✓ | S | 0 | 0 | 0 |
| 7/14/21 | N | S | ✓ | ✓ | S | S | ✓ | ✓ | ✓ | S | ✓ | S | ✓ | ✓ | 0 | 0 | 0 | ✓ | ✓ |
| 7/21/21 | N | S | ✓ | 0 | S | S | ✓ | ✓ | ✓ | ✓ | S | S | 0 | ✓ | S | S | 0 | ✓ | ✓ |

| Date | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/26/21 | N | S | S | ✓ | ✓ | 0 | 0 | ✓ | ✓ | 0 | 0 | S | S | ✓ | S | S | ✓ | 0 | ✓ |
| ≥ 1 inspection in July? | N | Y | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | Y | Y | Y | |
| 8/2/21 | Y | S | S | ✓ | ✓ | S | ✓ | ✓ | ✓ | ✓ | S | ✓ | S | ✓ | S | S | ✓ | ✓ | ✓ |
| 8/9/21 | N | S | ✓ | S | ✓ | S | ✓ | ✓ | ✓ | ✓ | S | ✓ | ✓ | ✓ | S | S | 0 | ✓ | ✓ |
| 8/17/21 | Y | 0 | ✓ | 0 | 0 | 0 | 0 | ✓ | ✓ | ✓ | 0 | 0 | 0 | ✓ | 0 | 0 | 0 | ✓ | ✓ |
| 8/23/21 | N | S | ✓ | S | ✓ | ✓ | ✓ | ✓ | S | ✓ | ✓ | ✓ | ✓ | ✓ | S | S | 0 | ✓ | ✓ |
| ≥ 1 inspection in August? | N | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | N | N | Y | Y | Y | |
| 9/8/21 | Y | S | ✓ | ✓ | ✓ | S | 0 | ✓ | S | S | ✓ | ✓ | ✓ | ✓ | S | S | 0 | ✓ | ✓ |
| 9/15/21 | Y | S | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | ✓ | 0 |
| 9/20/21 | N | S | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | S | S | ✓ | S | ✓ | S | S | S | ✓ | 0 | ✓ |
| 9/28/21 | N | S | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | S | ✓ | S | S | ✓ | S | ✓ | 0 | ✓ | 0 |
| ≥ 1 inspection in September? | N | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | N | Y | Y | Y | Y | |
| 10/11/21 | N | 0 | 0 | 0 | ✓ | S | ✓ | ✓ | ✓ | S | ✓ | ✓ | S | ✓ | S | ✓ | ✓ | ✓ | ✓ |
| 10/18/21 | N | S | ✓ | S | S | ✓ | 0 | S | ✓ | S | ✓ | S | S | ✓ | 0 | ✓ | ✓ | ✓ | S |
| 10/28/21 | Y | 0 | ✓ | S | S | 0 | S | ✓ | ✓ | ✓ | S | S | S | ✓ | ✓ | ✓ | 0 | 0 | 0 |
| ≥ 1 inspection in October? | N | Y | N | Y | Y | Y | Y | Y | Y | Y | Y | N | Y | Y | Y | Y | Y | Y | |

**Key:** ✓ - Documented Inspection.   S - In Shop, Down, Preventive Maintenance.   L - On Loan.   0 - Blank.   Y - Yes.   N - No.