# EXHIBIT 2

Baltimore Police Department Consent Decree Monitoring Team

Compliance Review & Outcome Assessment Regarding BPD Training

February 2022

**TABLE OF CONTENTS**

I.   EXECUTIVE SUMMARY ................................................................................ 1
     Summary of Findings .................................................................................... 1

II.  BACKGROUND ............................................................................................. 5
     A.   The Department of Justice's Investigative Findings Regarding Training ................. 5
     B.   Consent Decree Requirements ................................................................. 6

III. SCOPE OF THE REVIEW .............................................................................. 8

IV.  BPD'S TRAINING ACADEMY & FUNCTION TO DATE .......................................... 12
     A.   Changes to BPD's Training Paradigm ....................................................... 12
          1.   Changes to Training Structure .......................................................... 12
          2.   Changes to Instructional Approach .................................................... 14
          3.   Responding to Emerging Training Needs ............................................. 19
          4.   Changes to Training Staffing ........................................................... 20
          5.   Changes to Training Facilities .......................................................... 21
          6.   Incorporating Community Input & Feedback ......................................... 22
          7.   Adoption of a Multi-Stage Pilot Process for In-Person Training Programs ......... 23
     B.   Implemented Consent Decree Training Initiatives ......................................... 23
          1.   Use of Force/Fair & Impartial Policing I .............................................. 23
          2.   Stops, Searches, and Arrests/FIP II Training ......................................... 28
          3.   Body-Worn Camera Training ............................................................ 29
          4.   Patrol Response to Behavioral Health Crises and Reports of Sexual Assault .......... 29
          5.   Ethical Policing is Courageous ("EPIC") Training .................................... 31
          6.   Sexual Assault Investigations .......................................................... 32
          7.   Behavioral Health Response for Dispatchers and 911 Specialists ................... 33
          8.   Misconduct Investigations .............................................................. 33
          9.   First Amendment Protected Activity ................................................... 34
          10.  Crisis Intervention Team (CIT) Certification ......................................... 34
          11.  Community Policing and Quality of Life Offenses .................................... 35
          12.  Fair and Impartial Policing III/Use of Force/First Amendment ..................... 37

V.   SUMMARY OF COMPLIANCE ASSESSMENT OF THE CONSENT DECREE'S
     SPECIFIC REQUIREMENTS REGARDING BPD TRAINING .................................... 39
     A.   Paragraph 291 ............................................................................... 41
     B.   Paragraph 292 ............................................................................... 42
          1.   Funding of BPD's Training Program & Academy ..................................... 42
          2.   Renovation and Updating of Training Facilities ..................................... 44

    **C.**    **Paragraph 293** ................................................................................ **46**

       1.   Adequate Number of Instructors Assigned to E&T ................................. 47

       2.   Sufficient Number of "Qualified" Instructors .......................................... 49

    **D.**    **Paragraph 294** ................................................................................ **49**

    **E.**    **Paragraph 295** ................................................................................ **53**

    **F.**    **Paragraph 296** ................................................................................ **56**

    **G.**    **Paragraph 297** ................................................................................ **61**

    **H.**    **Paragraph 298** ................................................................................ **62**

    **I.**    **Paragraph 299** ................................................................................ **63**

       1.   Review & Update of BPD Training Plans ................................................. 64

       2.   Needs Assessment .................................................................................... 64

    **J.**    **Paragraph 300** ................................................................................ **65**

       1.   Data Tracking System: Development & Implementation ......................... 65

       2.   Data Tracking System: Officer Attendance & Missed Trainings .............. 66

       3.   Data Tracking System: Performance, Test, and Evaluation Data .............. 67

       4.   Data Tracking System: Supervisor Availability ...................................... 67

       5.   Data Tracking System: Adequate Resources ........................................... 67

       6.   Overall Compliance Determination ......................................................... 67

**VI.**   **TRAINING-RELATED OUTCOME ASSESSMENTS** ................................ **69**

    **A.**    **Paragraph 459(l)(i): Rates of Completion of Approved Training and Performance Assessments of Evaluative Aspects of Training** .............................. **69**

    **B.**    **Paragraph 459(l)(ii): Qualitative Measurements of the Adequacy of Training** ........ **72**

    **C.**    **Paragraph 459(l)(iv): Training Deficiencies** ................................. **73**

**VII.**   **COMPLIANCE ASSESSMENT CONCLUSIONS** ................................ **75**

**APPENDIX A.**     **BUDGETS FOR BPD E&T, FISCAL YEARS 2018 THROUGH 2022.** **78**

**APPENDIX B.**     **TRAINING FEEDBACK RUBRIC** ................................ **79**

**APPENDIX C.**     **BPD OFFICER TRAINING EVALUATIONS, MAJOR CONSENT DECREE TRAINING THROUGH DECEMBER 2021** .......................... **83**

**APPENDIX D.**     **HIGHLIGHTS OF STUDENT OFFICER SURVEY DATA TABLES BY SURVEY** ................................ **94**

## I.   EXECUTIVE SUMMARY

Paragraphs 291 through 300 of the Consent Decree address the Baltimore Police Department's ("BPD" or "the Department") training function generally – the overall infrastructure, resources, and approach that the Department uses to provide training to its personnel.  These requirements relate not to any specific, substantive training program that the Decree requires.  Instead, they relate to the long-term adoption of a dynamic, new approach to effective officer training.

The Monitoring Team has conducted a compliance review, and related outcome assessments, addressing BPD's approach to training.  The Team concludes that BPD has reached compliance with a number of the core, general training requirements of Paragraphs 291 through 300.  If and when BPD and the City of Baltimore ("the City") successfully provide the Department's Education and Training Section ("E&T") with the civilian staffing that the Decree-required Staffing Plan mandates, codify and implement a rigorous training instructor selection process, and transition successfully to an enhanced training tracking platform, the Monitoring Team anticipates that BPD will be in Initial Compliance with all of the Consent Decree's general requirements on training.

**Summary of Findings**

BPD has invested substantial time, resources, and attention to upgrading dramatically the quality and rigor of officer training.  **The overall quality of the Department's training is significantly higher than it was when the Consent Decree process began.**  Specifically:

- **BPD has established and prioritized a robust, dynamic training paradigm grounded in scenario-based, problem-solving, and adult learning techniques.**  Across a host of training that has been provided to BPD personnel since the start of the Consent Decree, BPD has worked to transform fundamentally its approach to officer training.  For instance:

  - Rather than using static, lecture-based instruction, E&T is now deploying a dynamic training paradigm grounded in modern, adult learning techniques such as group discussions, interactive learning exercises, case studies, video and verbal scenarios, and role playing.

  - E-learning programs are supplementing and enhancing such in-person instruction and are providing a separate, independent avenue for the Department to provide professional development.

  - Rather than providing training over a single, continuous, one or two-week span of instruction each year for department-wide, non-specialized officer training, BPD is providing discrete training programs of shorter durations throughout the

year.  This is allowing BPD to be more responsive to identified training needs while providing ongoing training with less significant operational impacts.

o   A Curriculum Coordination Committee and surveys of officers are providing BPD with specific feedback on the quality of training and on new training needs.

o   A Community Training Review Committee, a group of community representatives, is working with BPD to attend training pilot sessions and provide feedback on draft curricula and training development.

o   New training initiatives are subject to an in-depth, multi-stage pilot process that allows for the refinement of training programs before they are rolled out across the Department.

o   Student officers generally must score a 100% on substantive tests taken as part of the training to complete the course successfully.

o   E&T asks student officers for their subjective feedback on training programs.

- **BPD has substantially upgraded its primary training facilities**, transitioning from an inadequate, former school building in significant disrepair to modern, professional facilities at the University of Baltimore.

- **BPD training is benefitting from the involvement of outside instructors.**  Over the past several years, non-sworn, civilian instructors have provided instruction to officers in trainings addressing topics such as stops, searches, and arrests; behavioral health; community policing; crisis intervention; and conducting misconduct investigations.

- **BPD is fielding an adequate number of sworn instructors to provide high-quality instruction to Department personnel.**  Even as E&T and the Department lack a sufficiently rigorous way of detailing the instructor selection and development process, the Monitoring Team's ongoing observation of training initiatives confirms that current instructor quality is sufficient.

- **BPD is completing and updating detailed Training Plans that identify training priorities and scheduling for each year.**

**If and when the City and BPD meaningfully address the following issues, BPD will reach initial compliance with the full set of the Consent Decree's general training requirements** (Paragraphs 291 through 300):

- **The City and BPD need to ensure that resources are available for E&T to benefit from the civilian staffing level that the Decree-required Staffing Plan mandates.** E&T's sworn staffing level is currently slightly higher than the Staffing Plan requires. However, while that Plan calls for 53 civilian personnel to work within E&T, only 14 civilian positions are currently authorized.

- **BPD's Gunpowder range remains in deficient condition and will need to be remedied to comply with the Decree's requirements regarding training facilities.** Additionally, **the indoor range that is in use at the Northeastern District is in poor condition** and suffers from lead problems that often cause the facility to be shut down. These issues will also need to be addressed going forward.

- **E&T needs to continue to enhance the quality of its initially-designed curricula and overall instruction across training initiatives.** Even as the Monitoring Team has observed significant improvements in the quality of BPD's training programs and instruction, initially-designed curricula submitted to the Monitoring Team and the United States Department of Justice ("DOJ" or "the Department of Justice") can still require substantial revision to reach the level of quality that the Decree requires. Similarly, although many instructors are providing high-quality instruction, some instructors are continuing to deviate from the content of curricula and from the adult learning techniques that are at the core of BPD's new training paradigm.

- **BPD needs to develop and implement a more rigorous process for selecting training instructors.** Although the quality of instruction has been sufficient, E&T does not currently operate according to a formally established process for selecting instructors. To ensure that Consent Decree requirements about the review of prospective instructors' past performance are met, a specific protocol for instructor selection needs to be established, implemented, and sufficiently documented.

- **E&T needs to formalize its process for identifying training needs and priorities.** Although the Monitoring Team can identify many instances where analysis of departmental performance and needs is informing training priorities, the process is currently more *ad hoc* than the Consent Decree requires.

- **BPD needs to develop a system for rigorously tracking training deficiencies.** To ensure that the Department timely addresses the instructional needs of officers, both on an

individual and organization-wide basis, the Department needs to develop a system for identifying, logging, tracking, and addressing training deficiencies, needs, and opportunities.  A better system for flagging and addressing training deficiencies will also allow for better, more robust tracking of information necessary for the outcome assessment required by Paragraph 459(l)(iv).

## II.        BACKGROUND

### A.        The Department of Justice's Investigative Findings Regarding Training

The Department of Justice's investigation of BPD concluded that the Department's "deficient training . . . contributes to [a] pattern and practice" of unlawful and unconstitutional policing.[1]

First, DOJ determined that "[o]fficers have not been properly trained on numerous important topics, from the use of force and de-escalation to stops, searches, and arrests, to how to supervise and investigate misconduct."[2]   The DOJ's findings letter describe, within the context of major substantive areas of concern, the way that training deficiencies, along with other issues, contributed to the problematic pattern of performance described.

Second, and even more fundamentally, DOJ indicated that its "observations of training programs, review of internal documents, and conversations with BPD personnel revealed that training deficiencies within the department arise from ***foundational issues in BPD's overall approach to training***."[3]   Among other foundational challenges, DOJ cited:

- "[T]he Department's indifferent attitude toward[] its training program."[4]   DOJ observed that BPD failed to appropriately emphasize training, with many officers having received "no training beyond Maryland's basic requirements," and "training personnel . . . subject to being pulled from their training duties to other tasks."[5]

- BPD's deficient training infrastructure.   This included "inadequate staff," "outdated and ill-repaired" training facilities, and the lack of "mechanisms to track officer attendance and performance" in training programs.[6]

- BPD's need to provide better "real world" training focused on "building officers' skills."[7]

---

[1] DOJ Findings Letter at 130.
[2] *Id.*
[3] *Id.* (emphasis added).
[4] *Id.* at 131.
[5] *Id.*
[6] DOJ Findings Letter at 131.
[7] *Id.*

**B.      Consent Decree Requirements**

Consistent with DOJ's two general findings on training – (1) that BPD provided inadequate training across a host of critical substantive areas, and (2) that BPD's overall approach to and infrastructure for training was inadequate – the Consent Decree contains two general classes of requirements on training.

First, the Decree requires BPD to provide specific types of training on particular subjects or regarding specific policies.  For example, paragraphs 166 through 168 detail training on use of force that BPD must provide.  Per the Consent Decree, and as the following sections recount in detail, BPD revises and implements required training "in consultation with the Monitor and DOJ."[8] This includes review and discussion of proposed curricula, feedback on pilot sessions of new training initiatives, and ongoing monitoring and auditing of in-progress training initiatives.  Under the terms of the current Monitoring Plan, as well as prior Monitoring Plans, BPD certifies to the Court when Decree-required training initiatives have been completed.

Second, the Consent Decree outlines separate requirements relating to "Training Generally."[9] Rather than relating to any specific substantive area or topic (like use of force or crisis intervention), these general provisions address the overall training function within BPD. Most broadly, the Consent Decree commits the City of Baltimore to ensuring that BPD "establish[es] and prioritize[s] a robust training program to ensure that officers and other employees gain full understanding of BPD policies, legal requirements, and practical policing techniques."[10]

Paragraphs 291 through 300 set forth a number of elements dealing not with any particular training program or initiative but, instead, with the training function within BPD overall – that is, the overall approach to training that BPD, through its Training Academy, provides its officers.  This report elsewhere considers, in depth, BPD's current compliance with the following general Consent Decree requirements:

- "The City will ensure that BPD's training program and Academy are reasonably funded."[11]
- BPD will create, implement, and update a plan for "renovating and updating training facilities," including "information technology resources."[12]
- "BPD will ensure that an adequate number of qualified instructors are assigned

---

[8] Dkt. 2-2 ¶ 295.
[9] *Id.* at 100.
[10] *Id.* ¶ 291.
[11] *Id.* ¶ 292.
[12] *Id.* ¶ 292, 299.

to the training academy."[13]

- BPD will develop and maintain a "written Training Plan for comprehensive in-service and supplemental training" and for the Field Training Officer ("FTO") program that contain a number of specific elements.[14]

- "BPD will ensure that best practices in adult learning, scenario-based training, and problem-solving practices . . . are incorporated into training delivery."[15]

- "BPD will . . . assess instructor qualifications and testing materials."[16]

- "BPD will ensure that all instructors responsible for training are proficient in their subject matter and are qualified," including consideration of "an officer's performance evaluations, past performance as a police officer, and disciplinary history" before being selected to be an instructor.[17]

- "BPD will actively seek out and retain qualified instructors from outside BPD to supplement the skills of its in-house training staff . . . ."[18]

- BPD will create and maintain a "training data tracking system" that inventories information about officer attendance, completion, and performance at BPD training.[19]

Separately, the Decree sets forth specific outcome measurements regarding training, which include evaluation of: (1) "[r]ates of completion of approved training and performance assessments of evaluative aspects of training; (2) "[q]ualitative measurements of the adequacy of training, including assessments by officers, feedback from instructors, and evaluations by civilian reviewers"; (3) "[q]ualitative and quantitative assessments of the FTO program . . . "; and (4) "[t]he frequency that training deficiencies are identified through investigations, internal reviews, complaints, disciplinary proceedings, civilian oversight, and other mechanisms."[20] (CD 459(l)).

---

[13] Dkt. 2-2 ¶ 294.
[14] *Id.* ¶ 294.
[15] *Id.* ¶ 295.
[16] *Id.*
[17] *Id.* ¶ 296.
[18] Dkt. 2-2 ¶ 297.
[19] *Id.* ¶ 300.
[20] *Id.* ¶ 459(l).

### III.   SCOPE OF THE REVIEW

This assessment is a combined compliance review and outcome assessment.  The Monitoring Team has previously described the Consent Decree's distinction between these two types of assessment:

> The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments.  Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree.  They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . .

> Outcome assessments, by contrast, are [largely] quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact [overall]—whether, independent and apart from BPD's progress toward compliance with [any specific] Consent Decree requirements, policing is changing in the real world . . . . [21]

This report is a compliance assessment of Paragraphs 291 through 300 of the Consent Decree, which address BPD training generally.  Accordingly, this review and assessment focuses not on the specifics, or adequacy, of any particular substantive training program but, instead, on the Department's long-term adoption of the approach to officer training that the Decree requires.  This report likewise does not evaluate BPD's compliance relating to its Field Training Officer Program and the requirements of Paragraphs 301 and 302, which will be the subject of a separate, future assessment.

However, even as the scope of this assessment is on the training function generally within BPD, the major means of implementing new and renewed approaches to training is through particular training curricula, programs, and initiatives.  Consequently, this report must reference and discuss the various Decree-required training initiatives that BPD has completed to date to determine, for instance, if the Department has adopted "adult learning, scenario-based, and problem-solving" training approaches[22] or if instructors are adequately "proficient in their subject matter."[23]

From a formal perspective, the widely-cited Kirkpatrick Model, which dates to the 1950s, posits four levels of evaluation for any training initiative:

- *Level 1: Reaction.*  The degree to which participants find the training favorable, engaging, and relevant to their jobs.

---

[21] Dkt. 279-1 at 22–23.
[22] Dkt. 2-2 ¶ 295.
[23] *Id.* ¶ 296.

- *Level 2: Learning.*  The degree to which participants acquire the intended knowledge, skills, attitude, confidence, and commitment based on their participation in the training.
- *Level 3: Behavior.*  The degree to which participants apply what they learned during training when they are back on the job.
- *Level 4: Results.*  The degree to which targeted outcomes occur as a result of the training . . . .[24]

All in-person, Consent-Decree-required training has incorporated evaluations during instruction to address Level 1 and Level 2, including substantive tests and post-instructional surveys.  These Levels of evaluation are geared most closely to the nature and quality of the training programs themselves – in this case, what officers learn and how they view the training.

The purpose of any professional training is to positively impact individual performance in the real world in the performance of that person's day-to-day job duties.  Levels 3 and 4 of the Kirkpatrick Model speak to the extent to which training is effective—whether officers are actively applying in the real world what they learned during training and whether the training is achieving its intended objectives.

Levels 3 and 4 are primarily the subject of the Monitoring Team's other compliance reviews and outcome assessments.  For instance, the extent to which officers are *applying* training on BPD's new use of force policies *in the field*, and the extent to which the training is reducing the incidence of the impermissible use of force, are subjects of the Monitoring Team's in-progress Use of Force Compliance Review & Outcome Assessment.

Section IV of this assessment inventories BPD's many training efforts over the past several years, describes BPD's progress and innovation with respect to overhauling and revitalizing its core education and training capabilities, and evaluates Kirkpatrick Model Level 1 and Level 2 efficacy for completed in-person training as a way of gauging the extent to which BPD's new training paradigm is being successfully implemented.  That is, this report reviews the training that BPD has implemented over the past several years to assess what it means, in aggregate, about the extent to which BPD has adopted the "best practices"[25] necessary for establishing the "robust training program"[26] that the Decree requires.

---

[24]   Kirkpatrick Partners, Our Philosophy, The Kirkpatrick Model, https://www.kirkpatrickpartners.com/Our-Philosophy/The-Kirkpatrick-Model (last visited Sep. 2, 2021); *see generally* James D. Kirkpatrick & Wendy Kayser Kirkpatrick, *Kirkpatrick's Four Levels of Training Evaluation* (2016).

[25] Dkt. 2-2 ¶ 295.

[26] *Id.* ¶ 291.

Section IV's account of BPD's progress to date takes into account the Monitoring Team's and DOJ's ongoing monitoring of various training initiatives to date. The Monitoring Team and DOJ – and the Court – have recognized that providing all BPD officers with training is a resource-intensive endeavor. Substantial resources would indeed be wasted if the Monitoring Team and DOJ were not actively involved, from the beginning stages of curriculum development through the provision of training, in providing BPD with real-time monitoring, evaluation, and feedback on the quality and sufficiency of training instruction.

As memorialized in each annual Monitoring Plan, the Monitoring Team and DOJ have for all Decree-required training provided feedback on training curricula and have approved the final version of such curricula. Thus, at least on paper, the Monitoring Team and DOJ have both found BPD's Decree-required training curricula to date to be satisfactory and consistent with the Decree's requirements, including those relating to the use of adult learning techniques, scenario-based instruction, and problem-solving approaches.[27]

Likewise, Decree-required training has been the subject of community review and feedback. This includes feedback obtained during two public comment periods, during which proposed training curricula are made available and community input sought. As the following sections of this report recount, BPD has also formed a Community Training Review Committee, comprised of community representatives, to receive condensed pilots of proposed training courses and provide input, feedback, and suggestions for improvement. Consequently, at least with respect to the written lesson plans, the Baltimore community has been involved in the development and refinement of BPD's Decree-required training.

Section IV therefore memorializes BPD's prior progress in finalizing training curricula consistent with required, new approaches, including the involvement of the community in the development of training initiatives. It recounts the efforts that the Department has made to transform its approach to officer training. However, it also considers, for the first time formally, the degree to which training is having an impact on officers, based on officer evaluations of the training and their demonstrated knowledge development.

Section V systematically considers the Decree's requirements, in paragraphs 291 through 300, regarding training generally. Drawing on the history of BPD's evolution set forth in Section IV, Section V provides additional quantitative and qualitative evaluations designed to determine whether BPD is in compliance with all material requirements of the paragraphs relating to the training function.

Section VI reports on the outcome assessments that Paragraph 459(l) requires. It should be noted here that BPD's progress regarding the FTO program is outside the scope of this assessment.

---

[27] *See id.* ¶ 295.

Accordingly, the "quantitative and qualitative assessments" of the program outlined in paragraph 459(l)(iii) will be conducted when Paragraphs 301 and 302 of the Decree – which outline the substantive requirements regarding the FTO program – are assessed.

## IV.    BPD'S TRAINING ACADEMY & FUNCTION TO DATE

Because the Department of Justice found "foundational issues in BPD's overall approach to training,"[28] the Consent Decree requires that BPD adopt an overhauled, reinvigorated approach. This section reports on the various ways that BPD has endeavored to change its basic training paradigm – from providing infrequent, static training in one- or two-week blocks to providing on an ongoing basis more frequent, dynamic training that utilizes best practices in adult education. It then discusses the various training initiatives that the Department has implemented as it has adopted this revised approach to training.

### A.    Changes to BPD's Training Paradigm

#### 1.  *Changes to Training Structure*

Prior to the Consent Decree, BPD personnel "received all in-service training on all topics within a single" one- or "two-week period each year"[29]:

> This means that all officers have undergone all of their required in-service training during a single [one- or two-]week period at some point during a calendar year. When officers complete that two-week block of training, they do not attend any further training until the next calendar year.[30]

This "single, all-topic in-service program"[31] posed particular challenges to Consent Decree implementation. First, because new policies can only become effective once officers receive adequate training on them, the old training approach risked "substantially delay[ing] implementation of the policy revisions required by the Consent Decree."[32] Second, the older approach risked an overly protracted period between officers receiving training on upcoming policies and those policies becoming effective – and officers "not effectively retain[ing] adequate knowledge of those new requirements."[33]

The prior "annual, all-at-once" training impeded BPD in other fundamental ways beyond Consent Decree implementation. First, with sporadic opportunities for instruction, BPD lacked mechanisms to quickly communicate the Department's expectations, guidelines, and policies. For

---

[28] DOJ Findings Letter at 130.
[29] Dkt. 178-1 at 17.  The Monitoring Team understands that, prior to the DOJ's investigation, annual in-service training was typically one week in duration.  During the DOJ investigation, BPD provided two weeks of training in at least one or two years.
[30] *Id.* at 52.
[31] *Id.* at 18.
[32] *Id.* at 52.
[33] *Id.*

instance, if the Department identified a particular in-person training need in February of a given calendar year, that priority typically would need to wait until January of the following calendar year – with all BPD officers receiving training on that priority only before the end of December of the following year. Under such a scenario, the Department would need to wait nearly two years for an identified training need to be addressed across all relevant personnel.

Second, the Monitoring Team heard from a variety of BPD officers that the single training block posed a significant staffing challenge. "[O]fficers were out for longer blocks of time, which posed a clear impediment to shifting resources when needed to respond to public safety emergencies."[34] The disruption of having regular personnel "out" for training for two continuous weeks also led officers to delay completing their training, resulting in disproportionate demand for training at the end of the calendar year.

Third, many BPD personnel noted that two weeks of continuous training reduced the ability of officers to retain new information or practice newly acquired skills. As a result, there were recurring concerns about the overall effectiveness of BPD's training initiatives.

As of 2020, BPD has been using a different overall structure for providing ongoing training to BPD officers. Now, training is provided "in rolling, multi-day blocks on different topics throughout the year."[35] The Monitoring Team observed in July 2019 that "this staggered model for annual training does not require more training time than BPD's old model."[36] It simply provides training "in one or two day segments, rather than all at once."[37]

BPD's Training Plans, covering both Consent Decree-required and other officer training for each of the years 2019, 2020, and 2021, have adopted this approach. For example, BPD's 2021 Training Plan provided for, among other things:

- Two days of training on Behavioral Health Awareness and Patrol Sexual Assault Investigations, to be provided to all BPD personnel between January 4 and April 1, 2021;
- Two days of training on Community Policing & Lesser Offenses for all BPD personnel between May 3 and September 3, 2021;
- Two days of training for all sworn personnel on Fair & Impartial Policing, Use of Force, and First Amendment issues between September 6 and December 31, 2021; and
- A multi-day, State of Maryland-required course on No-Knock Search Warrants,

---

[34] Third Semiannual Report at 30.
[35] Dkt. 178-1 at 52–53.
[36] Third Semiannual Report at 30.
[37] *Id.*

provided on another timeframe during 2021.[38]

The rolling, staggered approach to training appears, based on BPD's Training Plans, to be allowing BPD to complete significant, in-person instruction for all BPD personnel within a focused span of time (months) rather than requiring at least one calendar year to ensure common expectations and knowledge across all sworn personnel.  It also allows for the Department to provide – in addition to the training that every sworn member receives – specialized training for specific units.

### 2.  Changes to Instructional Approach

A primary focus of BPD's Education & Training Section has been to "develop[] a less lecture-focused, more facilitative, increasingly scenario-based model for in-person training at the Academy."[39]  This model of instruction aligns with the Consent Decree's core requirement that "best practices in adult learning, scenario-based training, and problem-solving practices . . . are incorporated into training delivery."[40]

Contemporary theories of adult education are grounded in the particular needs and attributes of adult learners.  Specifically, adults "learn new knowledge, understandings, skills, values, and attitudes most effectively when they are presented in the context of application to real life situations."[41]  Within the context of policing, this has necessitated a turn away "from the mechanical, militaristic and behavioral aspects of" traditional law enforcement training and toward "training programs that inform police how to identify, respond to, and solve problems" and that realistically connect with the real-world experiences of officers and the communities that they serve.[42]

Police departments embracing adult educational techniques proceed from the assumption that training should be "as experiential, interactive[,] and participatory as possible,"[43] and thus should feature techniques that may include:

- Large- and small-group discussions[44];

---

[38] BPD, *Baltimore Police Department Education & Training Section: Master Training Plan, 2021 Edition* at 15.

[39] Dkt. 178-1 at 18.

[40] Dkt. 2-2 ¶ 295.

[41] Michael L. Birzer, "The Theory of Andragogy Applied to Police Training," 26 *Policing* 29, 33 (2003) (quoting M. Knowles, *The Adult Learner: A Neglected Species* 61 (1990)).

[42] *Id.* at 34.

[43] *Id.* at 36.

[44] Cynthia L. Lewis, Federal Bureau of Investigation, "Discussion as a Strategy for Educating Law Enforcement Officers," *FBI Law Enforcement Bulletin* (June 6, 2019),

- Knowledge acquisition through interactive learning activities (rather than passive lectures);
- "[S]elf-directed group discussions," with instructors facilitating "critical discussion"[45];
- The use of real-world case studies; and
- "[S]imulation exercises and problem-solving activities."[46]

Studies have concluded that this type of dynamic, interactive, and real-world-focused training has been demonstrated to be both more effective than traditional instructional approaches and rated more highly among law enforcement officers.[47]

Importantly, BPD has actively sought and received outside assistance and expertise as it has looked to change is training paradigm. In 2018 and again in 2020, BPD sent "two cadres of BPD staff to attend training at the LAPD [Los Angeles Police Department] Training Academy,"[48] which, pursuant to a Consent Decree in the 2000s, developed a training paradigm that "prioritizes active student participation."[49] LAPD also sent personnel to BPD to provide training to potential BPD training instructors.[50] Additionally, BPD's engagement of non-sworn personnel – including an Academic Director, curriculum writers, and civilian law instructors[51] – is further evidence of the Department's commitment to harnessing outside expertise as it grows its training capacity.

The instructional paradigm upon which BPD has focused is one that "is far less lecture-based and far more interactive, using videos from real world events, case studies, hypothetical scenarios, role playing, and group discussions that make learning more engaging and practical."[52] For example, the Department's required training on its new use of force policies engaged officers in a variety of learning activities, including but not limited to:

- Open-ended discussion prompts in lectures (rather than passive lectures) so that large-group, substantive discussions are learner-involved;
- Viewing videos of real incidents and prompted group discussions in which officers analyze whether the force would be consistent with BPD policy;
- Discussion and analysis of verbal scenarios;

---

https://leb.fbi.gov/articles/featured-articles/discussion-as-a-strategy-for-educating-law-enforcement-officers.

[45] Michael L. Birzer, "The Theory of Andragogy Applied to Police Training," 26 *Policing* 29, 35 (2003).

[46] *Id.* at 36.

[47] *See, e.g.*, Robert F. Vodde, *Andragogical Instruction for Effective Police Training* (2009).

[48] Dkt. 178-1 at 53.

[49] *Id.*

[50] *Id.*

[51] Third Semiannual Report at 31; Dkt. 342-1 at 28.

[52] Third Semiannual Report at 31.

- Small-group discussions about various aspects of policy and procedure; and
- Scenario-based instruction in which E&T staff instructors simulate members of the public, with additional staff grading student officer performance and providing feedback.

This approach to training also involves substantially more evaluation. With respect to student officers, substantive tests and exams are geared toward ensuring that officers attain a sufficient level of knowledge about the topics, policies, and procedures addressed in training initiatives. For Consent Decree trainings subsequent to the initial Use of Force Training, where 80% was a passing score for some introductory e-learning modules on new policy requirements, BPD personnel have generally needed to score 100% on evaluations to successfully complete all requirements. For non-Consent Decree training required by the State of Maryland, student officers must score a 70% per Maryland Police and Correctional Training Commissions ("MPCTC") standards.

Meanwhile, BPD is asking officers about their subjective impressions of the training, so that the Department might continually improve the quality and utility of training. E&T has also implemented mechanisms for evaluating and providing feedback to E&T facilitators on the quality of their classroom instruction. For instance, E&T's instructional development specialist, conducts ongoing observations of training, provides formal evaluations of instructors, and gives ongoing feedback.

The Monitoring Team's Decree-required Comprehensive Re-Assessment of BPD in September 2020 found that BPD had "made substantial progress toward satisfying the Consent Decree's general training requirements," including in its "approach to instruction."[53] The Monitoring Team has not been alone in identifying BPD's progress with its training function. "In April 2021, in recognition of its accomplishments, the Academy was one of only six academies selected nationwide, through a highly competitive process, by the International Association of Directors of Law Enforcement Standards and Training" – supported by the DOJ's COPS Office – "to participate in the Academy Innovations project," which "seeks to foster evidence-based training methods for law enforcement with the objective of establishing national best practices."[54]

BPD has also implemented a contemporary, e-learning platform, first PowerDMS and, as of late 2021, a platform called Acadis. As the Monitoring Team summarized in its Third Semiannual Report:

> For certain subjects, e-learning will be paired with, and serve as a prerequisite for, in-class instruction; for other subjects, e-learning will be the primary method of training delivery. E-learning will focus on the core requirements of revised

---

[53] Dkt. 342-1 at 26.
[54] Dkt. 414-1 at 20.

policies, freeing up in-class instruction for opportunities to apply the policies in practice.[55]

In this way, e-learning serves at least three purposes under BPD's rebooted training approach. The first is to provide a mechanism for the Department to provide quick, timely instruction to officers about topics of import in a manner that is quicker and more efficient than waiting to provide in-classroom training – that is, e-learning as an alternative, where appropriate, for in-person instruction. The second is to provide a new forum for ongoing, refresher training – that is, e-learning as a supplementary mechanism for reminding officers about various policies, procedures, or expectations. The third is to provide a new mechanism for officers to receive foundational information about upcoming in-person instruction – or e-learning as a new way of maximizing the effectiveness of in-person training programs.

It should be noted that social science research has generated evidence that e-learning and in-class training are capable of being just as effective – and embraced by police officers as a helpful alternative and supplement to traditional instruction.[56]

In July 2019, the Monitoring Team reported that early e-learning curricula on search and seizure and sexual assault investigations, respectively, were "thoughtfully craft[ed] . . . to engage officers with essential content on BPD policy" while "laying the groundwork for the scenario-based in-class instruction that" followed.[57] In May 2021, the Team's Sixth Semiannual Report found that e-learning was enabling officers to "come to the classroom better prepared to engage in effective interactive learning" and to receive "instruction on basic subjects that can be taught effectively" in the electronic learning environment.[58] As Table 1 inventories, in 2021 alone, BPD has provided personnel with instruction on an array of topics through e-learning.

**Table 1.      BPD 2021 and 2022 E-Learning Status (through February 4, 2022)**

| E-learning | Status |
|---|---|
| **Consent Decree Related** | |
| 1A protected activity | Completed |
| 1A public recording | Completed |
| 1A supervisors | Completed |

---

[55] Third Semiannual Report at 30.

[56] *See, e.g.*, Brian W. Donavant, "The New, Modern Practice of Adult Education: Online Instruction in a Continuing Professional Education Setting," 59 *Adult Education Quarterly* 227 (2009).

[57] Third Semiannual Report at 31.

[58] Dkt. 414-1 at 21.

| E-learning | Status |
|---|---|
| CP lesser offenses | Completed |
| PIB (5 modules) | Completed |
| SSA supervisors | In Acadis @ 82% |
| Youth interrogation | In Acadis @ 82% |
| Complaint intake | In Acadis on 1/28/22 |
| Performance evaluation | In Acadis on 2/8/22 |
| Prisoner transport | In Acadis @ 58% |
| 302 Rules & regs | In Acadis on January 21, 2022 |
| 211 NDCA | Approved |
| 321 ERMM | In Acadis @ 54% |
| Sexual assault investigators | Completed |
| Sexual assault supervisors | Completed |
| **Others** | |
| Bloodborne pathogens | Completed |
| CJIS security awareness | Completed |
| Immigration | Completed |
| RMS/NIBRS | Completed |
| Pedestrian safety | Completed |
| Proactive policing | Completed |
| Firing at/from vehicles | Completed |
| Scooter enforcement | Completed |
| Plainclothes policing | Completed |
| Medical MJ | In Acadis @ 77% |
| PSP crime guns | External @ 52% |
| PSP crime scene | External @ 19% |
| Hate crime | In Acadis @ 65% |
| Language access | In Acadis @ 57% |

| E-learning | Status |
|---|---|
| Dog encounters | Under final collaboration |
| ERPO | Draft under review |
| SUV hybrid | Under development |

*Source: BPD*

### 3. Responding to Emerging Training Needs

BPD has established several mechanisms for identifying potential training needs and priorities. First, the E&T Commander is a member of the Department's Performance Review Board ("PRB"). That body reviews use of force incidents and identifies training needs within the context of various real-world use of force encounters. Although these training needs are often specific to individual members who were involved in particular incidents, a charge of the PRB is to identify themes or patterns that might suggest a broader training need across the Department. The E&T Commander brings back such systemic training needs to E&T.

Second, the Audits & Inspections function generates regular data and reports on BPD performance – including on use of force, constitutional policing, search and seizure, and other topics. E&T indicates that it tracks this information and is in regular communication with Audits & Inspections so that it can be aware of themes or patterns in member performance that suggest a training need across the agency.

Third, BPD maintains a Curriculum Coordination Committee ("CCC"). This Committee meets at a designated time on Fridays: (1) in the formative stages of a new in-service course, to provide overall guidance and strategic direction on the development of new training initiatives; (2) to troubleshoot issues that arise in the context of particular training initiatives or within E&T's functions generally; and (3) to plan each year's training priorities and course offerings. Because most continuing education staff are not teaching in-class trainings on Fridays, they are able to participate directly with the CCC.

Additionally, E&T is conducting surveys of members to help identify the issues and topics that personnel would find most useful for upcoming training. For instance, in November 2021, some 1,550 BPD personnel responded to a survey that asked "how valuable training . . . would be" on a variety of topics. Identified areas of interest for future training included enhanced firearms skills (with 76% of officers saying the training would be "very valuable"), using BPD databases (69%), civil liability (68%), and wellness and coping with stress (65%). E&T is exploring mechanisms for offering these and other topics as possible 'elective' courses that officers may select in addition to Decree- and State-required training.

E&T has also institutionalized a process for periodically reviewing all existing BPD policies and identifying all instances where the policy includes or implicates a training requirement.  These ongoing, often annual requirements are incorporated into each year's training planning.

### 4.   Changes to Training Staffing

The Monitoring Team's First Semiannual Report, in July 2018, observed that the Training Academy was "understaffed."[59]  In its subsequent semiannual report, the Team affirmed the lack of adequate training staffing,[60] indicated that it believed "the City's failure to confirm a new Commissioner explain[ed], at least in part, BPD's delay in providing adequate resources and personnel to the Training Academy."[61]

The Monitoring Team's Second Semiannual Report in January 2019 reported that the size of BPD's "Academy staff . . . is shockingly small."[62]  It reported that, at the time, BPD had just "one sergeant and two officers, working with one lieutenant" to address ongoing, in-service training of current BPD officers, including Consent Decree-required training.[63]   "A separate, small complement of approximately five officers focuses on Academy training for new recruits."[64] Although no definitive formula exists for determining how many personnel are necessary for effectuating high-quality training for new and current officers alike, "[a]s one of DOJ's subject matter experts asserted, and consistent with the Monitoring Team's own experience and observations, there are departments of 150 or 200 officers" with "full-time training staffs that are larger than BPD's" was as of January 2019.[65]

By June 2019, the Monitoring Team reported that BPD had "assigned ten additional, full-time personnel to the Academy," with "in-service training their primary responsibility."[66]  Even as the Monitoring Team saw this staffing increase as a noteworthy improvement, it noted in its Fourth Semiannual Report in January 2020 that BPD's new "commit[ment] to providing its officers with scenario-based, skill-building, problem-solving instruction on different topics at different times throughout the year" would likely necessitate permanently "increased time, resources, and personnel" to the E&T.[67]  The Monitoring Team observed that this greater, long-term commitment to E&T staffing represented a "new normal."[68]

---

[59] Dkt. 126-1 at 77.
[60] Dkt. 178-1 at 17.
[61] *Id.* at 15.
[62] *Id.* at 55.
[63] *Id.*
[64] *Id.*
[65] Dkt. 178-1 at 55.
[66] Third Semiannual Report at 31.
[67] Dkt. 279-1 at 32.
[68] *Id.* at 31.

BPD also proceeded to hire non-sworn personnel to assist in the development and provision of training.  For instance, in 2019, it hired an Academic Director to oversee the design of new training curricula and assist in the direction of E&T overall.[69]   In 2020, BPD "added two curriculum writers" and "several new civilian law instructors."[70]   Additionally, after a search process that involved both internal and external candidates, BPD selected a civilian to lead E&T's Legal Instruction Unit.  In early 2022, E&T reclassified a sworn position in its Records & Compliance Unit, which addresses internal records and compliance with state training mandates, as a civilian position.

The Monitoring Team's Comprehensive Re-Assessment in September 2020 concluded that BPD had "made substantial progress toward satisfying the Consent Decree's general training requirements regarding . . . staffing . . . ."[71]  As Section V discusses in greater detail, the Education & Training section had a staff of 74 individuals as of November 2021.

In addition to a previously deficient number of assigned training personnel, BPD's prior practice of "detailing" training staff to patrol functions negatively impacted E&T and the Department overall.  The practice took personnel technically assigned to E&T and compelled them to work in other capacities, which functionally reduced the resources available to the Department's training function.  In January 2019, the Monitoring Team observed that such "detailing depletes an already inadequate number of Academy officers."[72]

As of 2021, E&T staff is not being detailed to other units as an ongoing practice.  Although they may be asked to work special events or during incidents of significant impact, such as protests, E&T reports that it is not being "singled out" for such coverage.  For instance, in early January 2022, BPD command staff reached out to all special units (i.e., all non-patrol units) to learn what personnel might be temporarily loaned to patrol to compensate for a significant, COVID-related shortage among patrol personnel.  (As of early January 4, 2022, approximately 300 officers could not work due to COVID isolation or quarantine.).  E&T indicated that it could spare one squad from the Firearms Training Section (a sergeant and five officers) because they did not have any recruits at the range during the subsequent several weeks.  E&T indicates that, absent these unprecedented circumstances, the practice of extended detailing of E&T personnel out of training has concluded.

### 5.   *Changes to Training Facilities*

---

[69] Dkt. 342-1 at 28.
[70] *Id.*
[71] *Id.* at 26.
[72] Dkt. 178-1 at 56.

In January 2019, the Monitoring Team observed that "[t]he absence of an adequate physical space for training continues to be an impediment to the professionalization and effectiveness of BPD's training function."[73]  At the start of the Consent Decree, BPD's Academy was "located in a run-down school building with substandard amenities" – including a lack of climate control (heat in the winter, cooling in the summer), poor water quality, and substandard maintenance of facilities.[74]  As the Monitoring Team observed, "[t]he facilities send precisely the wrong message to BPD personnel about the professionalism that is expected of them."[75]

In early 2019, "BPD and the City began exploring options for moving the Academy to newer, more modern facilities at the University of Baltimore."[76]  By April 2020, "all training functions have transitioned to the new facilities."[77]  In its Comprehensive Re-Assessment of BPD in 2020, the Monitoring Team observed that it was "hard to overstate the significance" of BPD's move to modern instructional facilities at the University of Baltimore.[78]  The Monitoring Team's Comprehensive Re-Assessment concluded that BPD had "made substantial progress toward satisfying the Consent Decree's general training requirements regarding Academy facilities . . . ."[79]

### 6.  Incorporating Community Input & Feedback

Another critical element of BPD's new training paradigm is the Department's development, "for the first time . . . [of] training on core subjects in collaboration with community members."[80]

In 2019, BPD "established a panel of community representatives – the Community Training Review Committee ("CTRC") – to provide input on training curricula as they are being developed."[81]  In practice, this "panel of community representatives"[82] has attended pilot sessions of major in-person training programs and provided feedback on draft curricula, including training on stops, searches, and arrests; fair and impartial policing; and community policing.  Separately, for each Consent Decree-required training, BPD has posted draft curricula for community feedback on two occasions.  BPD has considered and incorporated such feedback as appropriate across a variety of training initiatives.

---

[73] Id.
[74] Third Semiannual Report at 33.
[75] Id.
[76] Id. at 34.
[77] Dkt. 342-1 at 28.
[78] Id.
[79] Id. at 26.
[80] Id. at 29.
[81] Third Semiannual Report at 34.
[82] Dkt. 279-1 at 30.

Separately, there has been substantial stakeholder and community involvement in the development of 2021 Community Policing training and Youth Interactions training, to be delivered in 2022. External behavioral health advocates and experts have been involved in the development of behavioral health-related training via the Collaborative Planning and Implementation Committee ("CPIC"), "a working group comprised of individuals and organizations representing a wide range of disciplines and perspectives who seek to improve encounters between law enforcement and people with behavioral health disorders."[83]

### 7.   *Adoption of a Multi-Stage Pilot Process for In-Person Training Programs*

Beginning with the Use of Force/Fair & Impartial Policing I Training in 2019, BPD has been "using a new, comprehensive, multi-stage pilot process."[84]   This provides "instructors the opportunity to revise and fine-tune training" before a training program is launched.[85]

### B.   **Implemented Consent Decree Training Initiatives**

BPD has implemented the new approach to training described in Section A in the context of numerous courses on specific subjects.  This section details the significant training initiatives that, using the new paradigm explained above, BPD has conducted pursuant to the Decree's specific requirements.

### 1.   *Use of Force/Fair & Impartial Policing I*

The Use of Force and Fair & Impartial Policing I Training was "the first product of BPD's effort to overhaul its approach to curriculum development."[86]   The training was designed around two primary components.   First, a three-module e-learning course introduced "the substantive requirements of BPD's . . . revised use of force policies."[87]   All sworn BPD personnel needed to "successfully complete the e-learning component by scoring a 100% on an evaluation" in order to "qualify[] to attend" the second, in-class component.[88]   The two-day, in-class instruction employed:

> [A]dult learning techniques—including roleplaying and group discussions prompted by videos of real-world police encounters and by hypothetical cases—to

---

[83]  City of Baltimore, City of Baltimore Consent Decree, *Collaborative Planning and Implementation Committee*, https://consentdecree.baltimorecity.gov/collaborative-planning-and-implementation-committee (last visited Feb. 7, 2022).
[84]  Dkt. 342-1 at 29.
[85]  *Id.*
[86]  Third Semiannual Report at 33.
[87]  *Id.* at 32.
[88]  *Id.*

enhance officer understanding of BPD's use of force policies and, crucially, to allow officers the opportunity to practice applying those policies to real-world situations.[89]

The training "provide[d] officers with guidance on, among other things":

- "[U]se of force decision-making under a Critical Decision-Making Model";
- "[D]e-escalation techniques";
- "[T]he use of various weapons and techniques";
- "[T]he relationship between subject threat or compliance level and the permissible force (if any) authorized in response"; and
- "[W]riting use of force reports."[90]

In addition to use of force topics, the training addressed "certain requirements" of the Consent Decree relating to fair and impartial policing.[91]   Specifically, it offered instruction "on the existence of implicit bias and the importance of police legitimacy."[92]   As other sections of this report clarify, subsequent Consent Decree training courses similarly incorporated pertinent aspects of fair and impartial policing.

BPD received substantial input, feedback, and technical assistance from the Monitoring Team and Department of Justice during the curriculum design stage.  At the conclusion of this process, BPD submitted a final version of the training curriculum to DOJ and the Monitoring Team.  Per the Second-Year Monitoring Plan, DOJ "indicate[d] its formal approval,"[93] and the Monitoring Team likewise approved the curriculum in a filing to the Court.

Subsequently, BPD proceeded trough a "multi-stage pilot process that allowed Training Academy staff to refine the curriculum following pilot sessions before rolling it out Department-wide" – something that, again, had not been a standard operating procedure within E&T prior to the Decree:[94]

> BPD conducted the pilot sessions with Training Academy instructors and officers from across the Department, with the Monitoring Team, DOJ and Training Academy and Consent Decree Implementation Unit personnel observing and providing feedback.  Importantly, the pilot process included presenting parts of the

---

[89] *Id.*
[90] *Id.*
[91] Third Semiannual Report at 32.
[92] *Id.*
[93] Second-Year Monitoring Plan at 25.
[94] Third Semiannual Report at 33.

training to, and obtaining feedback from, a newly-formed Community Training Review Committee, which consists of one resident from each of the City's nine police districts, plus representatives from various community organizations.[95]

BPD began providing in-person instruction on Use of Force and Fair and Impartial Policing in June 2019.[96]  BPD certified to the Court in November 2019 that all eligible (i.e., active and full-duty) BPD personnel had completed the training, with the exception of 20 members who were referred to the Department's PIB for investigation.[97]

In its Fourth Semiannual Report in January 2020, the Monitoring Team observed that "[t]he completion of this training . . . marks a significant milestone" in part because it "demonstrated" the Department's "ability to conduct training in a new, dynamic way."[98]

Additionally, the Monitoring Team observed that BPD's "collaboration with the CTRC" on the curricula, as well as "the opportunities it is providing for [general] public feedback on drafts of training curricula," signaled a "noteworthy commitment to encouraging community participation . . . ."[99]

**Table 2.        BPD Officer First Substantive Exam Attempt Scores, Use of Force E-Learning**

|            | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|------------|--------------------------|----------------------------|--------------------------|-------------|
| Module 1   | 92.1                     | 90                         | 100 (46.9%)              | 0 - 100     |
| Module 2   | 90.6                     | 90                         | 100 (45.3%)              | 0 - 100     |
| Module 3   | 95.6                     | 100                        | 100 (66.6%)              | 0 - 100     |

*Source:* BPD

*Notes:* Module 1: n=2,170; Module 2: n=2,171; Module 3: n=2,167.

For the introductory e-learning modules that provided an initial overview of the specific requirements of BPD's new force policies, officers demonstrated a sufficient level of substantive engagement with covered material.  As a threshold matter, officers needed to obtain a sufficiently high test score to proceed from introductory e-learning to the in-class components of training.  Table 2 considers the initial scores of BPD officers on tests focusing on officers' substantive knowledge of the new use of force policies.  Although initial test scores ranged from 0% to 100%, the average test score was at least 90% for all three e-learning modules, with 100% the most

---

[95] *Id.*

[96] *Id.*

[97] Dkt. 260, Ex. 1 at 2.

[98] Dkt. 279-1 at 29.

[99] *Id.* at 30.

common first-attempt score for all three.

For all three modules, nearly all BPD officers ultimately scored a 100%. BPD records indicate that the average final test score on module 1 was 99.5%, 98.8% on module 2, and 99.8% on module 3. It should be noted that, although some BPD officers who failed to score 100% were nonetheless permitted to proceed to the in-person component of this Use of Force/FIP I training, BPD has invested additional effort on ensuring that officers obtain the 100% passage rate, which data sets from subsequent and more-recent training initiatives by and large (though not uniformly) demonstrate.

Finally, it did not take BPD officers who failed to obtain a passing score on their initial attempt very long to demonstrate the necessary level of proficiency. The average number of exam attempts for module 1 was 1.7, with officers needing between one and six attempts to pass the test. The average number of exam attempts for module 2 was 1.8, with officers needing between one and five attempts to pass. For module 3, the average number of exam attempts was 1.4, with officers taking the test between one and four times to secure the passing score of 100%.

BPD officers provided their subjective feedback on the in-person course. On a simple scale of one to four, with four being the best rating, officers on average ranked the training a 3.5, with more than half of participating officers (55%) giving the training a top rating of four. Table 3 aggregates particular officer impressions – with approximately three of four officers saying that the Use of Force training "clearly explained policy updates" and "helped me to explain how uses of force relate to police legitimacy."

**Table 3.**     **Summary of BPD Officer Feedback, Use of Force/FIP I Training (Percentage Agreeing with Statements About Training)**

| This course . . . | Police Officer | Sergeant | Lt./Captain | Major or Higher | **Overall** |
|---|---|---|---|---|---|
| Clearly explained policy updates relating to uses of force. | 996 (78.0%) | 244 (74.2%) | 88 (72.1%) | 25 (86.2%) | **1,354 (77.0%)** |
| Helped me to explain how uses of force relate to police legitimacy. | 901 (70.6%) | 238 (72.3%) | 79 (64.8%) | 24 (82.8%) | **1,243 (70.1%)** |
| Increased my confidence in applying de-escalation skills in the field. | 822 (64.4%) | 211 (64.1%) | 76 (62.3%) | 24 (82.8%) | **1,135 (64.5%)** |
| Helped me to explain how the critical decision making model promotes member actions that | 867 (67.9%) | 227 (69.0%) | 80 (65.6%) | 26 (89.7%) | **1,201 (68.3%)** |

| | Police Officer | Sergeant | Lt./Captain | Major or Higher | Overall |
|---|---|---|---|---|---|
| uphold the Department's core values. | | | | | |
| The "Red Man" use of force scenario challenged me to think critically and to apply new use of force policy to a realistic situation. | 885 (69.3%) | 226 (68.7%) | 82 (67.2%) | 23 (79.3%) | **1,217 (69.2%)** |
| Number of Surveys | 1,277 (100.0%) | 329 (100.0%) | 122 (100.0%) | 29 (100.0%) | **1,759 (100.0%)** |

*Source: BPD*

*Note:* One Officer Trainee and one Other Staff are included in the overall total but not listed in individual columns.

A large portion of BPD officers ranked individual training modules on BPD's updated use of force policies, and scenario-based training applying these policies, as useful.

**Table 4.     BPD Officer Feedback by Course Module/Topic, Use of Force/FIP I Training (Percentage of Officers Indicating they Found Course Topic "Useful")**

| | Police Officer | Sergeant | Lt./Captain | Major or Higher | Overall |
|---|---|---|---|---|---|
| Use of Force and Police Legitimacy | 896 (70.2%) | 232 (70.5%) | 84 (68.9%) | 26 (89.7%) | 1,239 (70.4%) |
| Use of Force Policy 1115 Updates | 970 (76.0%) | 263 (80.0%) | 99 (81.1%) | 27 (93.1%) | 1,361 (77.4%) |
| De-escalation | 954 (74.8%) | 257 (78.1%) | 92 (75.4%) | 26 (89.7%) | 1,330 (75.6%) |
| Critical Decision Making Module | 874 (68.4%) | 238 (72.3%) | 82 (67.2%) | 29 (100.0%) | 1,224 (69.6%) |
| Baton Re-certification Training | 765 (60.0%) | 218 (66.3%) | 84 (68.9%) | 25 (86.2%) | 1,093 (62.1%) |
| Live Use of Force Scenario | 1,005 (78.7%) | 285 (86.6%) | 101 (82.8%) | 27 (93.1%) | 1,419 (80.7%) |
| Number of Surveys | 1,277 (100.0%) | 329 (100.0%) | 122 (100.0%) | 29 (100.0%) | 1,759 (100.0%) |

*Source: BPD*

*Note:* One Officer Trainee and one Other Staff are included in the overall total but not listed in individual columns.

In free responses to a question asking officers what they would do differently to improve the training, "nothing" and "more scenarios" were the most frequent responses.

## 2. *Stops, Searches, and Arrests/FIP II Training*

The next major in-service program conducted pursuant to the Consent Decree, "after a four-month suspension of in-service training caused by the pandemic," focused on stops, searches, and arrests and fair and impartial policing.[100]  The two-day in-class training, supported by an introductory e-learning program:

> [A]ddressed policies on voluntary contacts, field interviews, stops, arrests, interviews/interrogations, weapons pat-downs, and searches, as well as policies on foot pursuits, most effective/least intrusive response, custody, transport, and booking. The training also incorporated instruction on previously approved policies on fair and impartial policing.[101]

Overall, the curricula emphasized that BPD officers may, and should, conduct stops and searches so long as they have the requisite, articulable legal justification for doing so.  Importantly, a civilian legal instructor conducted the training along with sworn BPD personnel.

BPD completed the training in December 2020.[102]  It reported that, of 2,266 sworn personnel eligible to complete the training, 2,191 had done so – with the difference accounted for by those officers on "extended absences from service including medical leave, disciplinary suspension, and military leave."[103]

As the Monitoring Team previously reported, the Team and DOJ "randomly audited training sessions and confirmed that it properly reinforced BPD's SSA and impartial policing through interactive facilitated, scenarios and role plays that, as in the real world, incorporate the requirements of multiple policies at once."[104]

Officer performance on substantive examinations administered on both days of the two-day training suggest that learning objectives were satisfied.  On day 1, the average score of initial examinations was about 91% across all officers; on day 2, the average was slightly less than 90%. All officers eventually satisfied the requirement of receiving a 100% score.  Although it took as many as 15 attempts, the average number of attempts needed to receive a 100% was slightly more than two.

BPD officers again provided their subjective feedback on the course.  On a scale of one to five,

---

[100] Dkt. 414-1 at 42.
[101] *Id.*
[102] *Id.*
[103] Dkt. 381-1 at 1.
[104] Dkt. 414-1 at 42.

with five corresponding to "strongly agree" and one corresponding to "strongly disagree," BPD officers seemed to generally agree that the training helped to facilitate their ability to follow BPD's new policies on stops, searches, and arrests.  As Table 5 also summarizes, officers appeared to find the training engaging, with some 43% of officers "strongly" agreeing that the training was engaging and officers, on the whole, giving the training an average ranking of 4.16 (on the one-to-five scale) on this dimension.

**Table 5.        BPD Officer Feedback, SSA/FIP II Training**

| *On Likert scale 1 – 5 (1= Strongly Disagree and 5 = Strongly Agree):* | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) |
|---|---|---|---|---|
| Based on these lessons, I know how to apply the SSA policies. | 1,955 (100%) | 4.08 | 4 | 4 (46.9%) |
| I feel confident to conduct stops in line with SSA policies and law. | 1,955 (100%) | 4.07 | 4 | 4 (46.3%) |
| These Lessons were engaging. | 1,937 (100%) | 4.16 | 4 | 5 (43.3%) |

*Source: BPD*

In open-ended questions about what officers liked most about the training, officers most frequently cited instructors (404 times) and scenario(s) (240 times).  Notable number of respondents also cited "discussion" (97 times) and the presence of "attorney" (71 times) and "lawyer/law instructor" in the training (69 times) (referring to the participation of qualified civilian legal instructors in the in-class training).  When asked what officers liked least about training, the most recurring response was "nothing" (335 references).

### 3. *Body-Worn Camera Training*

BPD developed an electronic learning program for the Department's updated body-worn camera units.  The DOJ and Monitoring Team approved the training in February 2020, and BPD certified, in April 2020, that 2,093 of its 2,240 members had completed the training – with those failing to complete the training referred to PIB.[105]

### 4. *Patrol Response to Behavioral Health Crises and Reports of Sexual Assault*

"In March 2021, BPD successfully completed" training "for all officers on behavioral health crisis

---

[105] Dkt. 311-1 at 2.

response and response to reports of sexual assault."[106]  In light of public health restrictions, BPD delivered the interactive, classroom-style training via Zoom.[107]  The Monitoring Team previously observed that "[t]he ability of the Training Academy and CPIC's Training Committee to pivot and effectively conduct such training for all officers remotely using interactive technology is commendable."[108]

This training provided an overview of a number of topics associated with behavioral health awareness and crisis intervention.[109]  In the area of sexual assault reports, [t]he training covered key concepts like trauma-informed interviewing techniques and the effect of trauma on a victim's memory."[110]

In May 2021, BPD certified that it completed the training, with 2,106 of 2,393 sworn personnel completing the course.  Of the remainder, most were not eligible to complete the training because of long-term leave.  Eleven members who "were in active, full-duty status . . . failed to successfully complete the training" and were referred to PIB for investigation.[111]

Officer performance on tests administered during the training suggest that learning objectives were met.  Initial test scores averaged about 89%.  Some 99.74% of all BPD officers eventually received a 100% score, with officers requiring, on average, three attempts to secure a 100% score.[112]

BPD officers provided their feedback on the course.  Officers overwhelmingly ranked the training facilitator's ability to deliver the instructional content as high for both the behavioral health and the sexual assault investigation material.  More than three-quarters (78%) of the 1,916 officers who completed an evaluation gave behavioral health instructors a topic rating of five (on a Likert scale of one to five, with one corresponding to "poor," three corresponding to "neutral," and five corresponding to "excellent").  A full four out of five officers (80%) gave sexual assault investigation instructors a top mark of "excellent."  Average responses were 4.70 for behavioral health instructors and 4.73 for sexual assault investigations instructors.

BPD officers responded favorably to the interactive, Zoom-based format.  More than three-quarters (76%) of officers said that they in fact preferred the Zoom format to in-person instruction. Officers who preferred Zoom said that they found the remote learning option more "convenient," provided "less distraction," was better because it required "no travel time," and was a better

---

[106] Dkt. 414-1 at 21.

[107] *Id.* at 77.

[108] *Id.* at 60.

[109] *See* Dkt. 405 at 1 (summarizing subject areas covered in curriculum).

[110] Dkt. 414-1 at 77.

[111] Dkt. 405-1 at 1.

[112] BPD data suggests that at least one of the final scores were as low as 75%.  The Monitoring Team is not clear as to why the data set reflects some final scores as less than 100%.

experience because they could take the training from the more "comfortable environment" of "home."  Ten percent of officers said they preferred in-class instruction, with the remaining 14% of participating officers saying that they did not have a preference between the training modes. Officers who expressed a preference for in-person training cited "technology" or "computer issues," as well as a desire for "more personal" and "engaging" interactions during training.

Overall, BPD officers in open-response feedback referenced "instructors" (185 times) and the "Zoom training" or "remote learning" (118 times) as primary reasons that they enjoyed the training.  When asked about suggestions or recommendations as to what could change, participating officers overwhelmingly used the opportunity to emphasize the course was "good training" or a "great class" (802 times).

### 5. Ethical Policing is Courageous ("EPIC") Training

The Ethical Policing is Courageous ("EPIC") Training:

> [I]s a peer intervention program that trains officers to be "active bystanders"—to intervene with fellow officers to prevent misconduct before it occurs and to stop misconduct as it occurs.  At its core, EPIC is an officer wellness program.  It is designed to keep officers from getting into situations that could ruin their careers in law enforcement or adversely affect their physical and mental health.[113]

"In April 2021, BPD successfully completed one-day [in-person] EPIC training for all officers"[114] other than those who were not eligible for the training due to extended leave.[115]

The Sixth Semiannual Report indicated that:

> The Monitoring Team, as well as Judge Bredar, observed various EPIC classes. The instructors have been confident in the materials they are teaching and fully vested in the EPIC program and its benefits for both BPD members and the communities they serve.[116]

Officer performance on tests administered during the training suggest that learning objectives were achieved.  On the initial administration, the average officer score was 86.8%.  The most common initial score for officers who took the test was 90% (attained by slightly less than one-third (32%) of officers).  Ultimately, nearly every officer obtained a 100% final score on the exam, with 80%

---

[113] Dkt. 414-1 at 86.
[114] *Id.* at 21.
[115] Dkt. 413-1 at 1.
[116] Dkt. 414-1 at 86–87.

as the lowest final score accepted.  On average, officers needed to take the test twice to score the desired 100%.

The National Police Foundation has conducted an independent evaluation of BPD's EPIC program.  Specifically, it "conducted an officer survey immediately post-training[,] which resulted in 1,753 responses"[117] out of 2,029 identified training participants.  The Foundation reported that, among other findings:

- "More than 80% of the respondents indicated that they thought the training was likely to promote ethical conduct (81%)";
- "A large majority of respondents indicated a *greater* likelihood of intervening after completing the training (82%) and having confidence in their ability to intervene with peers (86%) and supervisors (79%)";
- "Officers indicated willingness to intervene across a wide variety of scenarios, including: confronting fellow officers who had violated departmental policy, appeared to be making an unjustifiable search, or were demonstrating unusual behavior or moods. They were also likely to refer coworkers to behavioral health services. Agreement with these questions ranged from 73% to 84%"; and
- "Officers indicated considerable confidence in their ability to intervene in a wide variety of situations. They were most confident in responding to co-workers using excessive force (86%) and in peer-to-peer verbal altercations."[118]

Ultimately, the Foundation concluded that "[o]fficers generally perceived the training as useful and likely to promote ethical conduct."[119]   It noted that "[l]onger-term follow-up" would be beneficial with respect to officer intervention with supervisors and providing further scenario-based opportunities to develop and practice intervention skills, as a number of officers suggested would be beneficial.[120]

### 6. *Sexual Assault Investigations*

In October 2020, "BPD completed a two-day course for all Sex Offense Unit detectives, as well as for all detectives assigned to the Family Crimes Unit, the Child Abuse Unit, and the Sex Offender Registry Unit."[121]   The Monitoring Team previously summarized the curriculum:

---

[117] National Police Foundation, "Do Something.  Do the Right Thing: An Evaluation on the Impact of       Active       Bystandership       Training"       (Sept.       11,       2021), https://datascience.policefoundation.org/2021/09/11/epic-training/.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] Dkt. 414-1 at 21; Dkt. 351-1 at 2.

The training used a Baltimore case study to highlight key learning points, such as the danger of bias and assumptions that preclude solving serious sexual assault crimes. It also employed role-playing, with members from the advocacy organization, Turn Around, acting as sexual assault victims, to give investigators practice with trauma-informed interview techniques.[122]

The Department used an outside consultant, from the Austin Police Department, to help develop the curriculum and co-facilitate the in-class instruction.[123] "The training curriculum also reflects substantial input from the Baltimore City Sexual Assault Response Team (SART), particularly from two SART partners—TurnAround and the Maryland Coalition Against Sexual Assault."[124]

All 37 of the 40 sworn personnel required to complete the course successfully did so, with the remaining three personnel required to take the training upon return from their approved leave.[125] "SOU investigators reported being very satisfied with the training; some said it was the best they have had at BPD."[126]

### 7. *Behavioral Health Response for Dispatchers and 911 Specialists*

As of May 2021, BPD had provided "a one-day course on behavioral health awareness and crisis intervention for all police emergency dispatchers and 911 specialists."[127]

BPD reported that all 61 of the Emergency Dispatchers in its employ completed the training, with 81 of 83 911 specialists employed by the Baltimore City Fire Department also having completed the training.[128] "[D]ispatchers and 911 specialists rated the training very highly, with many remarking that it was more engaging than in-person training" that the Department provided previously.[129]

### 8. *Misconduct Investigations*

"In April 2021, after some delay, . . . all Public Integrity Bureau and Civilian Review Board investigators" successfully "completed a specialized, five-day, in-person training on police internal investigations" conducted by BPD's Legal Affairs and an external subject-matter

---

[122] Dkt. 414-1 at 77.
[123] *Id.*
[124] Dkt. 351 at 1.
[125] Dkt. 351-1 at 2.
[126] Dkt. 414-1 at 77.
[127] *Id.* at 21.
[128] Dkt. 424-1 at 2.
[129] Dkt. 414-1 at 60–61.

expert.[130]   BPD certified that all personnel, except one member medically retiring and another serving as a non-investigating property officer, completed the investigator training course.[131]

In a survey of those who took the course, more than three out of five (61%) said that the quality of the five e-learnings was of "high" or "very high" quality, with instruction by legal affairs (61%) and the outside subject-matter expert (50%) rated "high" or "very high" in quality.  Some 71% of officers who took the course said that "group exercises/breakout sessions were engaging and applied training topics."

### 9.   *First Amendment Protected Activity*

"In April 2021, after developing the lesson plan over many months, BPD completed e-learning for all officers on First Amendment protected activity—freedom of speech, freedom of assembly, and freedom to observe and record official police activity."[132]   The standalone e-learning training consisted of three modules:

> The first module teaches the provisions of BPD's core First Amendment policy, Policy 804, covering the right to free speech, including the right to criticize law enforcement, and the right to assemble and protest.  The second module focuses on BPD's policy regarding the observation and recording of police activity, Policy 1016.   The third module addresses supervisory responsibilities, particularly supervisory responsibilities during protest activity.  Each module is accompanied by a test requiring officers to answer all questions correctly in order to complete the training.   Collectively, the three modules provide officer comprehensive information on the First Amendment principles reinforced in BPD policies.[133]

BPD reported that 2,082 members successfully completed the training.[134]  "Three members were in active, full-duty status during the delivery period of the training and failed to successfully complete it," with the issue forwarded to PIB for investigation.[135]

### 10. *Crisis Intervention Team (CIT) Certification*

---

[130] *Id.* at 21.
[131] Dkt. 423 at 4.
[132] Dkt. 414-1 at 21.
[133] *Id.* at 66.
[134] Dkt. 437-1 at 2.
[135] *Id.*

BPD is presently delivering "a five-day certification course for patrol officers who volunteer to become CIT members to respond to behavioral health and other crisis-related calls for service. The curriculum for this course was developed in collaboration with several local behavioral health organizations that will co-facilitate the course with BPD instructors.  BPD seeks to certify 30% of its patrol membership as CIT members."[136]  CIT training is ongoing and will likely continue to be offered three to four times per year through the end of the next Monitoring Plan in February 2023.

### 11. Community Policing and Quality of Life Offenses

"With substantial input from community stakeholders, BPD developed a two-day classroom training program for all officers on community policing and responding to low-level or quality of life offenses."[137]  The "two-day, ten-module in-class curriculum" was the result of collaboration with "over 46 participants representing 16 organizations who attended over 40 meetings over the course of eight months."[138]  Two "public comment periods" and a pilot with the Community Training Review Committee "produced helpful feedback" on the proposed community policing curriculum.[139]  The comment periods "included two virtual community policing training public comment workshops on Zoom with breakout rooms, which attracted approximately 90 participants for the first session and over 50 participants for the second."[140]

In addition to community representatives actively working with BPD to create the curriculum on community policing, community members – including representatives of organizations including Reconcile Baltimore, Project Pnuema, and the Baltimore Community Mediation Center – co-facilitate the training sessions themselves.[141]

The final curriculum, approved by the Monitoring Team and DOJ, addressed "topics such as community policing as envisioned by the Plan, the history of policing in Baltimore, and a community policing approach for dealing with lesser offenses."[142]  With respect to lesser offenses, the training provided guidance on officers choosing to "take the least intrusive law enforcement action consistent with preserving public safety when confronted with an individual who may be committing a low-level offense, such as loitering, open container, trespassing, failure to obey, disorderly conduct, and marijuana possession."[143]

In January 2022, BPD certified to the Court that 2,119 members had completed the Community

---

[136] Dkt. 414-1 at 21.
[137] *Id.*
[138] *Id.* at 73.
[139] *Id.*
[140] *Id.*
[141] Dkt. 414-1 at 73.
[142] *Id.*
[143] *Id.* at 40.

Policing training as of December 3, 2021.[144]  Five eligible members who failed to complete the training successfully were referred to PIB.[145]

The Community Policing training included an exam on which officers needed to score a 100% in order to complete the course successfully.  The average score on the initial administration of the exam was 89.7%.  Scores ranged from 0% to 100% on the first effort, with the largest group of officers (32%) scoring 100 on the initial exam.  Ultimately, every BPD officer who took the exam scored 100%.  It took BPD officers taking the test an average of 2.2 times to obtain this score, with BPD officers most typically (for nearly 40% of officers) needing to take the exam twice.  The number of exam attempts ranged from one to fifteen.

For the Community Policing training, 1,437 personnel gave their consent to complete a pre-training survey.  These same personnel took a post-training survey that included some questions common to the pre-training survey.  To measure objectively the impact of the full training, a total of 489 pre-surveys had to be excluded because they were completed on the same date as the post-survey.[146]

The pre-training and post-training surveys asked 10 substantive questions that were the same on both surveys. Table 6, below, compares the mean responses for those questions to show group-based differences.  Generally, there appears to be small improvement in understanding for most items, with slightly larger gains in understanding what "lesser" offenses are and how to problem-solve for policing lesser offenses. There was no group-level change in respondents' answers to how well they understand how to engage in daily problem solving or how prepared they are to engage with the community informally.

**Table 6.**    **Community Policing Pre-Training/Post-Training Comparison**
*Likert Scale of 1 – 5, with 1 = Strongly Disagree, 2 = Disagree, 3 = Neutral, 4 = Agree, and 5 = Strongly Agree*

| Question | Pre-Survey Mean Response | Post-Survey Mean Response | Difference |
|---|---|---|---|
| 2. I feel prepared to engage in community policing. | 4.2 | 4.3 | +0.1 |
| 4. I understand how social conditions, such as racism and red lining, have impacted Black people in Baltimore. | 4.2 | 4.3 | +0.1 |

---

[144] Dkt. 474-1 at 1.

[145] *Id.*

[146] This administrative issue, which appeared to relate to a lack of understanding about survey protocols among some but not all course instructors, was identified and corrected by BPD.

| | | | |
|---|---|---|---|
| 6. I understand my role in BPD's community policing plan. | 4.2 | 4.3 | +0.1 |
| 8. I am prepared to engage with the community informally. | 4.3 | 4.3 | No change |
| 10. I understand how to engage in daily problem solving, such as solving small problems, conflict, or issues, while on duty. | 4.3 | 4.3 | No change |
| 12. It is clear to me what constitutes a "lesser" offense in Baltimore. | 4.1 | 4.3 | +0.2 |
| 14. I understand how to problem-solve for policing lesser offenses. | 4.1 | 4.3 | +0.2 |
| 16. As a member of BPD, I understand how I can formally engage with vulnerable populations, such as youth, LGBTQ people, those experiencing homelessness, and those living with a mental illness or substance use disorder. | 4.2 | 4.3 | +0.1 |
| 18. I understand how to apply the SARA Model as part of my role in successfully implementing BPD's community policing program. | 4.0 | 4.1 | +0.1 |
| 20. I know how to document my community policing activities in CAD. | 4.0 | 4.1 | +0.1 |

*Source: BPD*

Although the changes between average pre-training and post-training survey responses were not substantial, the training did appear to modestly improve officer knowledge and confidence on topics related to community policing.  The relatively high pre-survey responses also may have provided relatively modest room for improvement.

### 12. Fair and Impartial Policing III/Use of Force/First Amendment

Beginning in September 2021, BPD has been conducting "a two-day in-class training for all officers . . . address[ing] advanced topics on use of force, fair and impartial policing, and First Amendment protected activity."[147]  As with other training initiatives, the curriculum was issued for two public comment periods and proceeded through an extensive piloting process in the summer of 2021.  BPD engaged a subject-matter expert, retired from the Stockton Police Department and with experience in the National Initiative for Building Community Trust and

---

[147] Dkt. 414-1 at 21.

Justice initiative, to assist in the construction of the curriculum and to provide training and guidance to Academy instructors assigned to facilitate the training.

As of January 20, 2022, the FIP III/Use of Force/First Amendment Training was still being provided to BPD personnel.  E&T currently projects that the training will be completed by March 3, 2022.

## V.     SUMMARY OF COMPLIANCE ASSESSMENT OF THE CONSENT DECREE'S SPECIFIC REQUIREMENTS REGARDING BPD TRAINING

This section addresses BPD's compliance with the training requirements in Paragraphs 291 through 300 of the Decree.  To avoid repetition, the following discussion frequently references Section IV-A, which describes BPD's work to improve the training function, and Section IV-B, which describes specific training initiatives that E&T has conducted pursuant to Decree requirements.

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented.  The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of characterizing BPD's current status across Consent Decree implementation.  Of particular significance for this assessment are the rankings within Level "4" of this system, as the Monitoring Team's current compliance reviews are taking place when BPD has entered a phase of implementation in which Initial Compliance is possible (i.e., the Department has moved to the stage of seeking to translate new policies, practices, protocols, and systems into practice):

> **0 - Not Assessed:**  The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.
>
> **1 - Not Started:**  The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.
>
> **2 – Planning/Policy Phase:**  The City/Department is addressing the planning and/or policy provisions for the requirement.
>
> **3 – Training Phase:**  The City/Department is addressing the training provisions for the requirement, based on approved policy.

> **4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.
>
> **4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

> **4b – Implementation - Off Track:**  The City/Department is not making satisfactory progress toward compliance with the requirement.
>
> **4c – Implementation - On Track:**  The City/Department is making satisfactory progress toward compliance with the requirement.
>
> **4d – Implementation - Initial Compliance:**  The City/Department has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in Paragraph 504 of the Consent Decree.

**5 – Sustained Compliance:**  The City/Department has complied fully with the requirement and has demonstrated sustained compliance by consistently adhering to the requirement over time, as defined in Paragraph 504 of the Consent Decree.

Determining whether BPD has reached Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD."[148]  To make such determinations, the Monitoring Team considers the following:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that BPD adhere to Decree requirements across a material span of time, number of incidents, and number of officers.  In this way, isolated compliance does not establish "Initial Compliance" in practice.  At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance.  The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Consent Decree will need to engage with departmental and officer performance that is deficient in some way.  Consequently, the Monitoring Team in its compliance reviews considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.**  Consistent with the Decree, the Monitoring Team's compliance reviews

---

[148] Dkt. 2-2 ¶ 506.

consider whether, when BPD or the department has deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue.  With respect to Consent Decree implementation and meaningful change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time.  Steady improvement over time suggests positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

A. **Paragraph 291**

*The parties agree that proper, effective and comprehensive training is a necessary prerequisite to constitutional policing. The Parties agree that BPD must establish and prioritize a robust training program to ensure that officers and other employees gain full understanding of BPD policies, legal requirements, and practical policing techniques. The Parties recognize that under state law certification of training may be subject to approval by the Maryland Police Training and Standards Commission (the "MPTSC").*

Paragraph 291 primarily provides a statement of intent with respect to the appropriate role of the training function within BPD.  As a general matter, it obligates BPD to "establish and prioritize a robust training program."

Section IV of this report and the discussion of the various requirements of Paragraphs 292 through 300 below provide a specific accounting of the many steps that BPD has taken to overhaul and strengthen its training function since the start of the Consent Decree process.  The discussion below of BPD's compliance with Paragraphs 292 through 300 also inventories the many ways that the Department has worked to "establish and prioritized a robust training program."

Even as BPD still has a variety of Consent Decree-required training initiatives to complete, and even as some specific requirements warrant attention, the Monitoring Team concludes that BPD has, for a material length of time across a sufficient number of the training programs detailed in Section IV, sufficiently "establish[e]d and prioritize[d] a robust training program" that allows personnel to "gain [a] full understanding of BPD policies, legal requirements, and practical policing techniques."  Consequently, the Team concludes that BPD is **in Initial Compliance with Paragraph 291.**

41

**B.      Paragraph 292**

*With BPD's assistance, the City will ensure that BPD's training program and academy are reasonably funded. In consultation with the Monitor, the City, and DOJ, BPD will create a plan for renovating and updating training facilities in a cost-effective and reasonable manner to accomplish the training requirements of this Agreement, including the provision of information technology resources. All of the training requirements of this Agreement are set forth in the Training Matrix, Appendix A. The information technology resources required by this Agreement shall be determined in accordance with Section XII, Technology.*

### 1.  Funding of BPD's Training Program & Academy

Although the resources expended on officer training are not alone dispositive in determining whether BPD is complying with its training commitments – as the Department could be spending substantial sums on inadequate, deficient, or counter-productive training – the Consent Decree requires that BPD's training function be funded at a "reasonable" level.

The number of officers within BPD, the number and nature of Decree- and State-required training initiatives, BPD's ongoing training plans, the requirements of the Decree-required BPD Staffing Plan, the variety of specific or specialized trainings that BPD's organizational structure (i.e., the maintenance of various specialized units with specific job functions) requires, and the various other Decree requirements related to officer training (such as those pertaining to information technology and data systems) inform whether BPD has committed "reasonable" funding to the training function.

The Team observes that no set formula or threshold exists for how large a Department's training function should be.  Certainly, no Court has outlined a specific formula, threshold, or test, and, although the Department of Justice has made findings about the inadequacy of training in departments like BPD, it has not provided detailed guidance on the level of resource expenditure that would be sufficient, appropriate, or "reasonable."

Nevertheless, it appears as though the core inquiry is whether the City and BPD is providing resources to E&T necessary for BPD to provide the nature, quality, type, scope, and duration of in-service and Academy instruction consistent with the Decree.

Within the context of the Consent Decree, BPD has been investing substantially more financial resources in training and E&T than in the past.  As Table 7 summarizes, and as Appendix A details more specifically, BPD's training budget surged significantly in fiscal year 2020, with E&T's budget allocation nearly doubling.  Subsequent years have largely maintained this funding level,

with budget allocations reduced by about 10% from the high in 2020.  When setting aside the budgetary line item for "grants, subsidies & contributions," which was abnormally high in fiscal year 2020, the fiscal year 2021 budget decreased by only 0.6% from 2020, and the fiscal year 2022 budget decreased by slightly less than 3% from 2021.

**Table 7.**     **BPD E&T Budget Summary, Fiscal Years 2018 – 2022**

|  | FY18 | FY19 | FY20 | FY21 | FY22 |
|---|---|---|---|---|---|
| Contractual Services | $1,744,065 | $1,896,140 | $1,839,028 | $3,214,149 | $3,248,914 |
| Equipment* | $    11,478 | $    11,742 | $    26,296 | $    28,285 | $    33,661 |
| Grants, Subsidies & Contributions | $  313,079 | $  316,760 | $2,178,966 | $  583,442 | $  727,500 |
| Materials      & Supplies | $  322,485 | $  464,425 | $  479,352 | $  487,172 | $  495,454 |
| Other    Personnel Costs (Benefits) | $2,001,391 | $1,939,261 | $4,363,240 | $3,923,755 | $3,857,685 |
| Salaries | $3,450,789 | $3,404,184 | $7,156,442 | $6,118,254 | $5,747,937 |
| Transfers** | $    45,990 | $    47,048 | – | – | $1,744,065 |
| **TOTAL** | **$7,889,277** | **$8,079,560** | **$16,043,324** | **$14,355,057** | **$14,111,151** |

*Source: BPD*

*Notes:* * This category corresponds to equipment charges of $4,999 or less.

** This category corresponds to costs listed as "unallocable debits" for fiscal years 2018 and 2019.

Importantly, the sustained, elevated budget in fiscal years 2021 and 2022 appears to reflect the institutionalization of enhanced investment in training – the embrace of a "new normal" of increased attention and resources to training, which the Monitoring Team and Court have previously stressed.  The drivers of the increased spending on training in fiscal years 2020 through 2022 are predominantly higher salaries and personnel costs.  Although resources earmarked for salaries and personnel costs have been reduced somewhat since fiscal year 2020, they remain at substantially higher levels compared to fiscal years 2018 and 2019.  This represents an encouraging ongoing commitment to providing E&T with greater resources.

As explained in the discussion of BPD's compliance with Paragraph 293 below, however, E&T is not yet staffed at the levels that the Decree-required Staffing Plan mandates.  E&T is actually staffed above Staffing Plan requirements when it comes to *sworn* personnel – 65 authorized positions as of December 10, 2021, or 7 sworn members above requirements in the July 2021 Staffing Plan Update.  It remains substantially understaffed with respect to *civilian personnel* – 14 authorized positions as of February 9, 2022 compared to 53 positions required by the Staffing Plan.

It appears from the Monitoring Team's review of the Staffing Plan, E&T's current staffing, and

the E&T budget, as well as conversations with various BPD and City stakeholders, that the primary impediment to E&T reaching the civilian personnel levels required by the Staffing Plan remains financial resources devoted to E&T in the City budget. That is, it does not appear that BPD's deficient civilian staffing in the training function is a result of BPD receiving funding but electing to use it elsewhere, or of civilian positions being authorized and funded but not successfully filled by qualified candidates. Instead, it is a matter of the City not allocating sufficient financial resources to fully fund the necessary contingent of civilian training staff.

As this report also discusses elsewhere, the Consent Decree expressly contemplates the incorporation of civilians into the training function as a means of increasing the quality of instructional expertise and enhancing the general capacity of BPD's training function. The Staffing Plan determined how many civilian personnel are required based on realistic assumptions about workload, training requirements, and the specific tasks and responsibilities of various roles within E&T.

The Monitoring Team concludes that BPD has made great strides in institutionalizing a long-term, elevated commitment to officer training, which E&T's budget notably reflects. However, principally because the civilian positions that the Staffing Plan requires have not yet been funded, the City has not yet ensured that the training function within BPD is adequately funded. Ultimately, although the City and BPD have commendably invested significantly in the training function, which the Monitoring Team concludes is reflective of a compliance score of **Implementation – On Track, the City is therefore not yet in compliance with the Consent Decree with respect to the reasonableness of funding to BPD's training function.** When the City provides funds to BPD, and BPD makes funds available to E&T, to hire and employ the 49 total civilian personnel that the July 2021 Staffing Plan Update requires, the City and BPD will be in initial compliance with the reasonable funding requirement in Paragraph 292.

### 2. *Renovation and Updating of Training Facilities*

As summarized in Section III, when the Consent Decree process began, the Academy's physical facilities, a former school, were deficient and substandard. This included deficient climate control, water quality, and facility maintenance. These deficiencies often detracted from the learning experience, with student officers, for instance, needing to wear several layers of warm clothing for instruction in the winter months and struggling at times to hear instructors and fellow participating officers during instruction in the summer over the din of small, window-based air conditioning units that failed to properly cool classrooms.

As of April 2020, BPD transitioned all of its training functions (other than vehicle and firearms instruction) to new facilities at the University of Baltimore. Thus, rather than attempt to "renovate" or retrofit the existing facilities, BPD elected to reach an agreement with the University of

Baltimore to use its space on an ongoing basis.  This has allowed the Department to benefit from clean, modern, and appropriate facilities and infrastructure.  The Monitoring Team's review of and experience with the new facilities confirm that they are sufficient to meet Consent Decree training requirements in the coming years.

Consequently, BPD's transition from its prior, deficient training facilities to contemporary facilities at the University of Baltimore continues to mark "substantial progress toward satisfying the Consent Decree's general training requirements regarding Academy facilities . . . ."[149]

However, BPD's training facilities encompass more than the spaces in which E&T provides classroom-based instruction.  The Department's Gunpowder range was established "in 1989 with the understanding that this would be a short-term solution to the [D]epartment[']s needs for a range facility."[150]  The buildings at the premises were constructed of modular, pre-fabricated building components expected, according to BPD, to last between 20 and 25 years. The facilities are well past their life expectancy.[151]

A number of significant issues have arisen with the Gunpowder range.  These include:

- Water damage and dampness to floor joists, causing unstable flooring and "weakening skirting" that "allows woodland creatures to enter, make home and often nest below" buildings;
- Mold;
- Leaking roofs, including caved roofs in some locations;
- "HVAC and electrical components" requiring replacement;
- "Bathroom facilities" that are "well beyond replacement";
- Insufficient administrative space; and
- Firearm safes that are "not to the standards that are desired to keep ammunition and additional firearms properly secured."

The Monitoring Team, Department of Justice, and Court have all visited the Gunpowder range, including in the latter half of 2021.  Observations revealed a decrepit, unprofessional environment urgently in need of replacement.  Conversations with personnel who are assigned to the range confirmed ongoing issues with the cleanliness and odor.  After viewing the range infrastructure, the Court observed that BPD would not be considered to be in compliance with the requirements of the Consent Decree unless and until the Gunpowder facilities range are improved.  The Department itself has observed that the Gunpowder range "is an essential component to the

---

[149] Dkt. 342-1 at 26.
[150] BPD, "Gunpowder Range Current Conditions" at 1.
[151] *Id.*

training on an officer[']s first introduction to the department and a continual training throughout their career" and that the Gunpowder range should be upgraded or replaced in order to provide officers with an appropriately "professional learning environment."[152]

The City and BPD have made notable strides toward compliance with Paragraph 292 by moving E&T operations to the University of Baltimore. To reach initial compliance, they must now focus on remedying ongoing deficiencies with the Gunpowder range. **Unless and until the Gunpowder range facilities are reasonably addressed, BPD will not be in compliance with Paragraph 292.**

Separately, the indoor range that is in use at the Northeastern District station is an OSHA hazard with significant lead problems that often cause the facility to be shut down. This severely hampers the Department's firearms qualification efforts, and **BPD will also need to address this deficiency with the indoor range in order to comply with Paragraph 292.**

The Monitoring Team observes here that the language of Paragraph 292 speaks only of BPD establishing a "a plan for renovating and updating training facilities" – and not of actually completing such "renovating and updating." However, as with the other paragraphs in the training section, Paragraph 292 must be read as providing specific mechanisms for BPD to "establish and prioritize a robust training program to ensure that officers and other employees gain full understanding of BPD policies, legal requirements, and practical policing techniques," as required by Paragraph 291. That is, as the Court appears to have recognized by asserting that BPD cannot reach compliance until the Gunpowder and indoor range facilities are improved, compliance with Paragraph 292 means, in practice, successful implementation of the "plan" for training facilities.

Separately, Paragraph 292 also includes "the provision of information technology resources" within the ambit of the "training facilities" that BPD must "update." This report's discussion of BPD's current state of compliance with Paragraph 300, below, addresses the extent to which "information technology resources" are aiding in the implementation of the Department's new training paradigm. There, the Monitoring Team concludes that BPD is in compliance but that sustaining such compliance is dependent on the full and successful transition to a new training data and information tracking system (called Acadis). Therefore **compliance with Paragraph 292 is also dependent upon BPD's successful transition to tracking necessary data and information on officer training within the new Acadis system.**

C.   **Paragraph 293**

> *BPD will ensure that an adequate number of qualified instructors are assigned to the training academy.*

---

[152] *Id.* at 5.

## 1. *Adequate Number of Instructors Assigned to E&T*

Currently, BPD's Education & Training Section is authorized for 77 personnel. This includes 65 sworn personnel and 12 civilian employees. Seven positions were vacant as of December 10, 2021 (including three sworn positions and four civilian positions).

According to BPD's July 2021 Staffing Plan,[153] E&T's goals are 111 total staff – including 58 sworn and 53 civilian personnel.[154] The numbers in this most recently updated Staffing Plan include an increase in E&T personnel from the prior version of the Staffing Plan which relate to the addition of the Crisis Response Team ("CRT") Unit to E&T (increasing the number of sworn personnel in E&T by 6 members) and the addition of sworn supervisors to the Firearms Section (increasing the number of sworn personnel in E&T by a further 5 members).[155] The number of civilian personnel assigned to E&T also increased by 4 employees.[156]

**Table 8.**    **BPD Staffing Plan Goals for E&T vs. Actual E&T Staffing (Authorized Positions as of February 8, 2022)**

|  | Sworn | | Civilian | | Total | |
|---|---|---|---|---|---|---|
|  | Plan | Actual | Plan | Actual | Plan | Actual |
| E&T Management & Admin | 9 | 6 | 4 | 3 | 13 | 9 |
| Entry Level Section | 21 | 19 (1) | 7 | 0 | 28 | 19 (1) |
| Cadets in Training | 0 | 0 | 4 | 0 | 4 | 0 |
| Continuing Education Section | 15 | 13 | 7 | 0 | 22 | 13 |
| Crisis Response Team | 7 | 5 | 0 | 0 | 7 | 5 |
| Academic Section | 1 | 3 | 16 | 10 (2) | 17 | 13 (2) |

---

[153] July 2021 Staffing Plan Update.

[154] *Id.* at 31.

[155] *Id.*

[156] *Id.*

| | | | | | | |
|---|---|---|---|---|---|---|
| Firearms Training Section | 5 | 20 | 15 | 1 (1) | 20 | 21 (1) |
| **TOTAL** | **58** | **66 (1)** | **53** | **14 (3)** | **111** | **80 (4)** |

*Source:* BPD July 2021 Staffing Plan Update at 28, BPD.

*Notes:* Numbers in parentheses reflect current vacancies due to retirements, promotions, and/or reassignments. This means that, overall, E&T has 80 authorized positions, of which 4 are currently vacant – such that E&T has 76 individuals actively working within it as of February 8, 2022.

BPD indicates that, as of February 8, 2022, E&T had four vacancies, including three authorized civilian positions and one authorized sworn position.

E&T's current roster includes more sworn personnel than BPD's Decree-required Staffing Plan requires, with the Plan calling for 58 sworn personnel and BPD currently authorizing 66 sworn personnel and 65 personnel actively working within E&T. Solely in terms of numbers, then, BPD is meeting and exceeding the Consent Decree's requirements with respect to sworn staffing within its training function.

The Department still has some distance to travel to attain the level of civilian staff strength that the Staffing Plan contemplates. Currently, E&T is authorized for 14 civilian personnel. With three of those positions currently vacant, just 11 civilian staff members work within E&T. This falls well below the 53 civilian personnel called for by the Staffing Plan.

In short, BPD currently exceeds the identified targets of the Staffing Plan by eight funded sworn positions. It falls short of civilian personnel targets by 39 funded positions. Overall, the total number of E&T personnel in funded positions as of February 9, 2022 was 80, which is approximately 31 positions shy of Staffing Plan targets.

BPD has made notable strides to devote dedicated, full-time sworn resources to BPD. As indicated elsewhere, it has not only increased sworn staffing but has eliminated the practice of technically assigning such personnel to E&T but detailing them for material spans of time to other assignments outside E&T.

The Department has also made notable progress on incorporating non-sworn personnel into the training function. BPD's civilian Academic Director, curriculum writers, and others have aided substantially in E&T's implementation of new approaches to officer training.

E&T's staffing deficits are the result of the City's failure to fund the civilian support personnel that the Decree-required Staffing Plan identifies as necessary. This civilian support staff is necessary to ensure that E&T functions as effectively as possible. As these civilian support

personnel are primarily needed to assist E&T to continue to fortify the training function, these civilians are not intended to serve as primary instructors for training initiatives.  Therefore, the deficit of civilian staffing, while significant and requiring the City's urgent attention, is not implicated directly by Paragraph 293's requirements with respect to training *instructors*.

Ultimately, because E&T is fielding an adequate number of instructors to provide Decree- and State-required training, as well as other identified training needs, the Monitoring Team finds **BPD has reached Initial Compliance (4d) with Paragraph 293.  However, it is vital that E&T receive support from the civilian personnel required by the Staffing Plan.**  Going forward, maintaining a determination of initial compliance will be dependent on the City providing the resources necessary for E&T to have the sworn *and* civilian staffing required by the Staffing Plan.

### 2. *Sufficient Number of "Qualified" Instructors*

Paragraph 293 does not, by itself, define "qualified instructor." The separate requirement of Paragraph 296 that *all* E&T instructors be qualified according to several specific criteria means that Paragraph 293's requirement that BPD ensure an adequate number of "qualified instructors" does not impose a separate, standalone obligation.  Accordingly, we consider the extent to which BPD is deploying appropriately qualified instructors in Section F below, which discusses the Department's compliance with Paragraph 296.

### D.   Paragraph 294

*BPD will develop a written Training Plan for comprehensive in-service and supplemental training for officers and for enhancing BPD's field training with a revised Field Training Officer ("FTO") program. The Training Plan will be developed in consultation with the Monitor and DOJ, and will be consistent with the Monitoring Plan. The Training Plan will:*

*a. Identify training priorities, principles and broad goals consistent with this Agreement and the substantive training requirements it contains;*

*b. Include a plan for delivering supplemental basic training, remedial training, in-service training, and roll-call training as necessary to provide the relevant training required by this Agreement;*

*c. Coordinate the topics of supplemental basic training and in-service training with FTO training;*

*d. Establish the frequency and subject areas for supplemental basic and in-service training;*

*e. Develop a plan for annual in-service training;*

*f. Identify available training delivery and related resources, as well as unmet needs;*

    g. *Coordinate with the City and others to assist in obtaining necessary training resources;*

    h. *Where appropriate, provide time for obtaining any required approval from the MPTSC; and*

    i. *Establish a method for assessing the content and delivery of training, including training provided by outside instructors. This method will allow for the measurement and documentation of trainee reaction to, and satisfaction with, the training they received, and learning as a result of training, including the extent to which trainees are applying the knowledge and skills acquired in training to their jobs.*

Prior to the Consent Decree, and as discussed previously, BPD provided officers with training either for recruits in the Academy or in a single one to two-week block of annual in-service instruction for existing officers. Although this severely limited the Department's ability to provide officers with effective training responsive to identified needs, it was relatively straightforward to administer: the same training was offered either multiple times per year (for recruits in the Academy) or numerous times per year (for officers in the one or two-week in-service course).

Part of BPD's transition to a more dynamic, responsive, and sustainable training paradigm has been the adoption of ongoing in-service training – including both in-class and e-learning components. To ensure that training can be provided effectively and efficiently, and to ensure that BPD systematically proceeds through Consent Decree requirements, the Consent Decree requires BPD to develop a written Training Plan.

At the outset, BPD, the Monitoring Team and DOJ discussed the possibility of E&T developing a single, multi-year, comprehensive schedule addressing all Consent Decree-required training and anticipated state requirements. However, BPD, the Monitoring Team and DOJ quickly agreed that, with many known and unknown contingencies likely impacting the schedule beyond the immediate calendar year, E&T should focus on identifying training needs, proposed initiatives, and timelines for each calendar year. In so doing, E&T would generally project the additional training content anticipated to be delivered in upcoming years.

Since agreeing that BPD should maintain one-year training schedule, BPD has generated various documents codifying its training approach, including a *Standard Operating Procedures: Staff Manual*, and a continuously updated training management document – a tabbed spreadsheet – that reflects the schedule of current and upcoming training initiatives.

The *Baltimore Police Department Education & Training Section Master Training Plan: 2021 Edition* (the "2021 Training Plan") is the Department's latest statement of training initiatives within the context of an overall training plan. The Monitoring Team and DOJ have reviewed the

2021 Training Plan and determined that it is consistent with Paragraph 294 and the terms of the Consent Decree.  Among other things, the 2021 Training Plan:

- Describes E&T's current organizational structure and staffing;[157]
- Re-articulates E&T's mission;[158]
- Provides a summary of E&T's activities and training initiatives in the prior year;[159]
- Describes the schedule and provides details about entry-level training to be provided in 2021, including a partnership with the Reginald F. Lewis Museum of Maryland African-American History;[160]
- Details and provides a schedule for State of Maryland-mandated in-service training for current BPD officers;[161]
- Details and provides a schedule for Consent Decree-required in-service training;[162]
- Details and provides a schedule for various, required range training (relating to re-qualifications and certifications for the use of less-lethal instruments and firearms);[163]
- Outlines ongoing and future efforts at training instructor development;[164]
- Inventories various E&T "administrative and planning initiatives [that] will take place during 2021";[165]
- Identifies and describes training priorities for future years;[166] and
- Provides a detailed schedule of BPD and E&T's Consent Decree-required training programs from 2019 through anticipated 2024 initiatives.[167]

Consequently, the Monitoring Team concludes that:

- The 2021 Training Plan sufficiently identifies training priorities, principles, and goals consistent with the requirements of Paragraph 294(a) of the Consent Decree.
- Because it sets forth plans and timelines for all relevant training, the 2021 Training Plan complies with Paragraph 294(b).

---

[157] 2021 Training Plan at 3.
[158] *Id.*
[159] *Id.* at 4–11.
[160] *Id.* at 12.
[161] *Id.* at 13–14.
[162] 2021 Training Plan at 15–18.
[163] *Id.* at 19.
[164] *Id.* at 19–20.
[165] *Id.* at 20–21.
[166] *Id.* at 21–22.
[167] 2021 Training Plan at 26–27.

- The 2021 Plan memorializes FTO Certification and Recertification training conducted in 2020.[168]  It clarifies that all state-mandated training applies to FTOs.[169]  It provides details about FTO Certification and Recertification training to be conducted in 2021.[170]  The Plan also describes the ways that the "[i]mplementation of a new Learning Management System" will enable more robust, real-time feedback for the FTO program.[171]  Even as the FTO program is the subject of separate Consent Decree requirements, and is outside the scope of this assessment, the Monitoring Team concludes that the Training Plan adequately addresses the relationship between general Academy training, general continuing education initiatives, and FTO training, as required by Paragraph 294(c)

- The Training Plan adequately "[e]stablished the frequency and subject areas for supplemental and basic in-service training" – focusing both on the specific details of training conducted in 2021[172] and in future years,[173] consistent with Paragraph 294(d).

- The 2021 Training Plan identifies a specific plan for in-service training conducted in 2021[174] and for subsequent years through 2024.[175]  The Plan is therefore compliant with Paragraph 294(e).

- The 2021 Training Plan, consistent with Paragraph 294(f), adequately identifies training resources[176] and unmet needs.[177]

- Pursuant to Paragraph 294(g), the 2021 Training Plan describes BPD and E&T's coordination with the City to secure adequate training resources[178] and developments in outside training partnerships.[179]

- The 2021 Training Plan sets forth MPTSC (State of Maryland police officer training) requirements and includes adequate time for BPD to obtain relevant approvals from the State for proposed training curricula.  Consequently, the Monitoring Team concludes that the Training Plan complies with Paragraph 294(h).

- The 2021 Training Plan describes various "[s]ystems and procedures [that] are being developed to improve course and curriculum assessment."[180]  Elsewhere in this assessment, the Monitoring Team uses information and data collected about trainee

---

[168] *Id.* at 9.
[169] *Id.* at 14.
[170] *Id.*
[171] *Id.* at 21.
[172] 2021 Training Plan at 13–19.
[173] *Id.* at 26–27.
[174] *Id.* at 13–19.
[175] *Id.* at 26–27.
[176] *Id.* at 3–5, 19–21.
[177] 2021 Training Plan at 21–22.
[178] *Id.* at 5
[179] *Id.* at 12.
[180] *Id.* at 21.

reaction to and learning from BPD instruction, as well as other forms of content assessment as to the quality and delivery of training from both internal and external instructors. The 2021 Training Plan adequately addresses the requirements of Paragraph 294(i).

BPD provided the Monitoring Team with a draft of its 2022 Training Plan on January 4, 2022. Although E&T will be continuing to work to finalize the Plan, with feedback from the Department of Justice and Monitoring Team, the Plan appears to use the same format and covers the same type of content as the 2021 Plan.

The Monitoring Team also observes that BPD and E&T have continuously maintained and updated a training calendar that identifies upcoming training programs, dates for delivery, and deadlines for completion. Utilizing its Learning Management System, E&T maintains a dashboard that allows it to easily determine, for ongoing training initiatives, the percentage of required personnel who have completed the course – including, where applicable, breakdowns according to district and geographic unit. This level of ongoing maintenance and updating of training priorities codified in the Training Plan and tracking of progress toward successful fulfillment of those priorities is further evidence both of the Plan's centrality to E&T operations and to the sea-change in the sophistication of the Department's training function.

In sum, the Monitoring Team concludes that **BPD is in Initial Compliance with Paragraph 294** regarding the construction and maintenance of a Training Plan, **presuming that future Training Plans will address more comprehensively the requirements of the FTO Program**, which are beyond the scope of the present assessment. BPD will need to continue to generate Training Plans of sufficient quality during upcoming years, per the terms of the Consent Decree. For as long as BPD is still providing training to comply with, or sustain compliance, with the Consent Decree, BPD will need to generate and maintain a formalized Training Plan to ensure that the Monitoring Team and Department of Justice can provide input on or flag any issues with training initiatives before the Department invests resources in designing and conducting officer instruction.

## E.    Paragraph 295

*BPD, pursuant to the Training Plan and in consultation with the Monitor and DOJ, will review all training curricula and lesson plans for consistency, quality, and compliance with applicable law, BPD policy, and this Agreement. BPD will ensure that best practices in adult learning, scenario-based training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into training delivery. BPD will advise the Monitor and DOJ regarding training that can be delivered in roll-call or online, or in large class formats, as opposed to training*

*that will require more intensive delivery. BPD will also assess instructor qualifications and testing materials.*

This report has previously inventoried the Monitoring Team and DOJ's involvement in the review of training curricula and lesson plans. The Monitor and DOJ have reviewed and provided express approval of all Consent Decree-required training that BPD has conducted to date, including in-class trainings and e-learning initiatives. The Monitoring Team and DOJ have also conducted ongoing auditing and observation of in-progress training initiatives, offering real-time feedback. Neither the Monitoring Team nor DOJ has objected to the curricula, training plans, or training as implemented across any Decree-required training conducted to date. This is, in many ways, a testament to BPD and E&T's commitment to conducting training in a fundamentally new way.

The requirement that BPD use "best practices in adult learning, scenario-based training, and problem-solving practices" in its 'training delivery' goes to the heart of the Decree's general requirements on training – and to the Department's efforts over the past nearly five years to dramatically overhaul how training is conducted.

Section IV-A describes the many specific things that E&T and the Department have done to address the way that training is conducted. It is vital to remember that, during the DOJ investigation and at the start of the Consent Decree, BPD training was conducted in a single, standalone block using largely static, almost exclusively lecture-based instruction. By using a variety of interactive learning techniques during in-person training, scheduling ongoing and dynamic training programs rather than a single block of instruction, using e-learning for standalone initiatives and as a learning component for larger in-class trainings, the quality, rigor, and dynamism of BPD training has dramatically improved.

During the DOJ investigation and at the start of the Consent Decree, BPD had no meaningful mode of evaluating the impact of training or the quality of instruction in real-time. E&T now regularly includes mechanisms for gauging instructional quality. Indeed, E&T has adjusted the format of its feedback and evaluation materials as it has progressed through the reform process.

Consequently, the Monitoring Team finds that **BPD has progressed substantially toward adopting and using a new training paradigm consistent with Paragraph 295**. BPD is complying with Paragraph 295's requirements regarding the participation of the Monitoring Team and DOJ in reviewing training programs and the assessment of training materials.

At this time, however, it remains slightly premature for a finding of initial compliance with Paragraph 295. First, although the quality of BPD curricula has improved in quality by orders of magnitude since the start of the Consent Decree, initial draft curricula that BPD creates and submits to the Monitoring Team and Department of Justice continue to require some substantial revisions.

For example, in 2021, E&T submitted to the Monitoring Team and DOJ for review e-learning curricula on the supervisory review of stops, searches, and arrests.  Initial iterations of the e-learning suffered from several foundational deficiencies with respect to content and did not incorporate some of the promising practices with respect to content delivery that prior e-learning initiatives had embraced.  Initial submissions of draft curricula for First Amendment e-learning were similarly disappointing.  Likewise, even as in-service curricula for Use of Force/First Amendment/Fair and Impartial III Training were somewhat better in initial quality, Monitoring Team and DOJ feedback continued to focus on how BPD might better integrate adult learning practices into the training.  The issue ultimately is not that the initial curricula submissions are bad or wholly inadequate.  It is, instead, that BPD's final training curricula are continuing to require meaningful input from DOJ and the Monitoring Team to reach the level of quality that the Decree requires – even if the volume of the input is far less than with early trainings at the outset of the Decree process and the nature of that input is somewhat less substantial.

With respect to the assessment of instructor qualifications, the Monitoring Team finds that it is a close call as to whether BPD has adequately fulfilled the requirement.  First, as discussed below with respect to Paragraph 296, BPD must still establish formal instructor qualifications for E&T positions and a process for selecting instructors.  The absence of clear, formal requirements for E&T personnel, an established selection process, and clear selection criteria, make E&T's operations less rigorous than they ideally should be.

Second, the Monitoring Team has observed in its ongoing monitoring of E&T courses that BPD has identified a number of sworn instructors who can credibly and capably deliver Consent Decree-required training.  Many instructors have performed very well and, in instances where problems or opportunities for improvement have been identified, instructors have by and large exhibited the capacity to grow within their roles.  Several instructors have demonstrated a noteworthy ability to navigate different subject matter areas and engage meaningfully with student officers who appeared skeptical or resistant to new policies, new performance expectations, and new training approaches.

However, at the same time, the overall quality of instructors appears somewhat uneven.  Again, many are performing at a very high level.  Others are satisfactory.  A few instructors have struggled over time.  In particular, a few instructors in different training initiatives have deviated significantly from the approved curricula during in-class training initiatives – in good faith trying to make lessons relatable and bring their own voice to instruction but, in practice, compromising the delivery of some of the core concepts of training.  In some instances, instructors prioritize the telling of stories from their careers or articulating their own perspectives over participating in the type of inclusive facilitation that BPD's new training paradigm requires.  Separately, some instructors are continuing to rely on more static, passive facilitation styles – proceeding through content in a lecture-oriented way rather than facilitating discussions – and appearing to treat

designated adult learning activities (small-group discussions, break-out groups, facilitated case studies) as standalone elements that are disconnected from the imparting of content on nearby PowerPoint slides. The Monitoring Team and DOJ have raised these and other concerns with BPD in real-time, and some improvements have been observed. Nevertheless, for E&T's new training paradigm to be considered meaningfully operationalized such that it can endure well after the Consent Decree is complete, the overall quality of instruction across facilitators and various curricula will need to stabilize.

Ultimately, the Monitoring Team finds that **BPD's current status of compliance with Paragraph 295 is best characterized as Implementation – On Track.** BPD and can reach compliance by continuing to refine the quality of drafted curricula and instruction in upcoming in-service and e-learning training initiatives in 2022.

### F.   Paragraph 296

> *BPD will ensure that all instructors responsible for training are proficient in their subject matter and are qualified, including, as applicable, previous instructor experience, training in instruction and adult learning techniques, and instruction skills. In addition, BPD will consider an officer's performance evaluations, past performance as a police officer, and disciplinary history in selecting instructors.*

For this assessment, the Monitoring Team requested that E&T provide information about all current instructor qualifications, background, and relevant performance history. E&T indicated that it did not have such information currently compiled within a system, or via a process, that could easily be extracted. Instead, it conducted a survey of current training personnel that inquired, among other things, about how many years instructors had worked at BPD, previous assignments within the Department, other experiences relevant to E&T, education, degree, and instructor courses and certifications completed.

Seventy-four (74) E&T members completed E&T's survey. This included the Major in charge of E&T; a Captain; the civilian Director; the Section's three Lieutenants; 15 Sergeants; 43 officers; and some civilian personnel, including two non-sworn curriculum developers and eight civilian instructors.

- *Most instructors have a good deal of prior experience.* Half (50%) of instructors have more than 15 years of experience with BPD. Nearly one-quarter (about 23%) have between 11 and 15 years of experience, another 12% have been with BPD for between 6 and 10 years. Ten instructors, or 15% of the instructor pool overall, have five or fewer years of experience with BPD.

- *A majority of BPD instructors hold at least a high school diploma or GED.*  More than half (53%) of instructors have a high school education or equivalent.  Approaching one-quarter of instructors (nearly 23%) have a post-graduate degree (a Doctorate, Juris Doctorate, or Master's degree).  About 15% have a bachelor's degree and close to 10% have an Associate's degree.  Areas of study within the various degree programs varied widely, although 7 instructors focused on criminal justice in their post-high school studies.

- *BPD instructors have worked across an array of prior assignments.*  Most (nearly 60% of) E&T instructors have worked in three or more official assignments within BPD before being assigned to serve as training instructors.  Table 9 details the diversity of those prior assignments.

**Table 9.**  **Prior Assignments of E&T Instructors During BPD Tenure**

| Prior BPD Assignments | Number of E&T Instructors |
|---|---|
| Academy and Firearms Training Unit | 1 |
| Admin | 1 |
| Casino Unit | 1 |
| City EPU | 1 |
| City-wide Investigations | 13 |
| City-wide Operations | 15 |
| Criminal intelligence | 2 |
| Curriculum Specialist | 1 |
| District Investigations | 12 |
| District Operations | 37 |
| Education and Training | 23 |
| FEMA Field Force Extrication Tactics | 1 |
| Firearms Training Unit | 1 |
| Legal, E&T, Various details, task force | 1 |
| Lexington Market Foot Unit | 1 |
| OCD, VCID, VCIS | 1 |
| Patrol | 53 |
| Personnel | 1 |
| Police Commissioner's Office, Chief of Patrol's Office, Deputy Commissioner of Operations' Bureau Office | 1 |
| Public Integrity Bureau/Internal Affairs Section | 1 |
| Recruitment, Academy | 1 |

| RMS / Administrative report / Instructor | 1 |
|---|---|
| SIS Executive Protection, Gang Unit | 1 |
| Simunition Instructor | 1 |
| Special Operations | 12 |
| Undercover Work | 1 |
| Warrant Squad before WATF | 1 |

*Source: BPD*

- *Current BPD instructors are certified across a number of important domains.* BPD's survey indicates that current BPD instructors are certified for instruction across a number of critical areas, which Table 10 summarizes.

**Table 10.      Current Training Instructor Certifications**

| Instructor Certifications | Number Of Education and Training Staff |
|---|---|
| Armorer | 1 |
| Bicycle Training Instructor | 6 |
| Classroom Instructor | 1 |
| Cooper Standards Law Enforcement Fitness Specialist | 1 |
| CPR Instructor | 14 |
| Defensive Tactics Instructor | 11 |
| EVOC Instructor | 18 |
| Firearms Instructor (any firearm used by BPD) | 15 |
| General Instructor | 1 |
| Instructor Certificate | 1 |
| LEEMCC, SIMS, Active Shooter | 3 |
| Less Lethal Munitions, Active Shooter | 2 |
| LPR | 1 |
| Mental Health First Aid Instructor, RADAR/LIDAR Instructor, LPR Instructor | 1 |
| Mental Health First Aid Instructor, USSS Realistic De-Escalation Instructor | 1 |
| MPCTC Civilian Supervisor Training | 1 |
| MPTC Drill instructor / FLETC Use of Force instructor/ Gracie survival tactics level 1 Instructor | 1 |
| NCIC Instructor | 4 |

| SFST Instructor | 5 |
| Simunions Instructor. FEMA Field Force Extrication | 1 |
| Taser Instructor | 4 |

*Source: BPD*

Although the results of E&T's survey are helpful in painting a picture of E&T's pool of current instructors, BPD's need to ask instructors to complete a survey to gather basic background about instructors indicates that E&T still needs to build better mechanisms to select and track the performance of its instructors.  Even if basic and prior performance information might reside in other databases (including Human Resources and systems recording disciplinary decisions), E&T should be able to more readily produce and track the backgrounds and qualifications of instructors.

BPD's survey also does not provide information about current BPD instructors' "performance evaluations, past performance as a police officer, and disciplinary history," which Paragraph 296 requires that BPD consider when selecting instructors in the first instance.  Although BPD or the Monitoring Team could readily collect that information separately, the requirement here is that BPD collect and consider that information when selecting new instructors.  Currently, E&T and BPD do not have files or records that this information has been systematically considered during the course of the selection process of current E&T instructors.

To this end, BPD still needs to memorialize a clear, standard process for evaluating potential training instructors, in alignment with the Consent Decree, and for selecting such instructors. Paragraph 296 requires that BPD consider a candidate officer's performance evaluations, past performance generally, and disciplinary history during the training instructor selection process. BPD does not appear to have established policies and protocols for when and how to evaluate the prior performance of potential, new instructors.

E&T needs to develop expanded policy or manual guidance for how E&T instructors are selected. During the Consent Decree process, E&T has needed to use a variety of mechanisms for rapidly growing the ranks of training instructors, and key members of E&T's leadership team have been substantially involved in the process of identifying and selecting new E&T personnel.  However, as part of the process of institutionalizing Consent Decree changes for the long-term, the process for selecting new instructors, the criteria for selection, and the performance standards that selected instructors must meet need to be reduced more formally and systematically to writing.  As part of this operationalized and codified selection process, E&T should ensure that the process for reviewing prior performance evaluations, overall performance, and disciplinary history are codified so that the Monitoring Team, BPD's internal audit function, and the Department generally can verify that E&T has appropriately adhered to its selection protocols.

The Monitoring Team has observed the performance of E&T instructors within the context of numerous Consent Decree-required trainings to date. As may be expected, the quality of the instruction has varied, with some instructors performing more capably than others – whether overall or with respect to some key aspects of BPD's new training paradigm or particular components of specific training initiatives. Some instructors have appeared to struggle or to adapt somewhat less quickly, but, crucially, the Monitoring Team has seen improvement in many instances as a result of E&T creating feedback mechanisms.

To this end, BPD has recently created, with the input and feedback of DOJ and the Monitoring Team, a Training Feedback Rubric (the "Rubric") that E&T and CDIU, as well as DOJ and the Monitoring Team, will use to evaluate the performance of training instructors going forward. It is attached as Appendix B. The Rubric in many ways codifies the dimensions along which E&T, DOJ, and the Monitoring Team have been providing ongoing feedback to training instructors to date. This is the type of internal mechanism that will allow for what has been happening dynamically within BPD and E&T to be operationalized so that ongoing, constructive evaluation of instructor performance continues well beyond the Consent Decree.

BPD's relatively recent codification of the instructor review process to a standardized Rubric and process is not a signal that instructor evaluation has only just begun within E&T. On the contrary, and as noted elsewhere in this report, E&T has made ongoing evaluation, critique, and performance analysis of instructors a core part of its new training paradigm. Within the context of the piloting of in-class training initiatives, E&T personnel's discussion, with DOJ and the Monitoring Team, has focused on both the substance of what is being taught and the quality of the instruction itself. As training initiatives are implemented in earnest, E&T convenes instructors regularly (often on Fridays, when in-class training programs are generally not scheduled) to discuss performance, challenges encountered during training sessions, and potential opportunities for further refining or enhancing the quality of in-progress instruction. This type of ongoing, iterative performance evaluation process is consistent with organizational change models in which all stakeholders come to see themselves as equal contributors to a new institutional approach – and seek to help enhance the performance of themselves and others in collaboration with other stakeholders who share the same goals and outcomes.

In short, **the Monitoring Team, in its numerous observations of BPD training since 2018, has not identified any E&T instructor who does not meet minimum standards of proficiency, even as some instructors have needed more time, effort, and guidance on adopting new training approaches or becoming more comfortable in their role as a training instructor.**

However, **BPD is not yet in initial compliance with Paragraph 296 because E&T has not yet adopted a codified, standardized approach for selecting training instructors.** If and when the Department does so, and is able to track both the prior and current performance of personnel

selected as training instructors, the Department will be in initial compliance with Paragraph 296. At present, the Monitoring Team finds that BPD's compliance status is consistent with **Implementation – On Track (4c).**

The Monitoring Team also notes that E&T does not currently benefit from a system that allows it to track the performance and instructor-specific training credentials of E&T personnel. BPD observes that, for purposes of MPCTC compliance, it conducts formal evaluations and re-certifications, which the Department tracks. E&T's instructional development specialist also conducts observations of training and provides formal evaluations to instructors on an ongoing basis. Although these efforts are recorded and tracked, they are not part of a formalized system for tracking instructor performance. It appears that the new Acadis system, discussed elsewhere in this report, will assist E&T in this regard. As of the end of 2021, however, E&T cannot as easily identify what personnel have received what specialized instructor training, and when.

G.    **Paragraph 297**

> *BPD will actively seek out and retain qualified instructors from outside BPD to supplement the skills of its in-house training staff and adjunct instructors. As appropriate, BPD will incorporate experts, community-based instructors, and guest speakers, including mental health service providers and consumers, judges, prosecutors, crime victims, academics in the field of criminal justice, community resource providers, and community members, including Youth, to participate in relevant courses.*

As referenced in Section IV, above, BPD has benefitted from the use of outside instructors across a number of training initiatives. This includes:

- **Behavioral Health/Sexual Assault Training.** External behavioral health specialists and clinicians taught substantial portions of the Zoom-based instruction.
- **Community Policing/Lesser Offenses.** External community partners and BPD non-sworn legal instructors (attorneys) taught significant portions of the in-person instruction.
- **Public Integrity Bureau Training.** A contracted, external specialist provided a four-day, in-person training for sworn personnel within PIB on conducting misconduct investigations.
- **Crisis Intervention Training (CIT).** External behavioral health specialists and clinicians taught significant portions of this five-day, in-person training for sworn members who volunteer to become CIT officers.
- **Trial Preparation & Testimony.** This four-hour, in-person course for selected sworn personnel was co-taught by attorneys from the State's Attorney's Office, US Attorney's Office, and BPD non-sworn legal instructors (attorneys).

61

Additionally, current training under development addressing the Consent Decree's provisions on youth contemplate the participation of instructors and training contributors from outside the Department.

Paragraph 297 requires that BPD incorporate any of a variety of outside instructors "to participate in relevant courses" "[a]s appropriate."  In this way, Consent Decree commits the Department to using outside instructors and experts of the type, within those contexts, that are useful in light of the learning objectives of various training initiatives.  As a result, the fact that BPD has yet to incorporate the participation of crime victims, for instance, into training is not necessarily an impediment to compliance with Paragraph 297 to the extent that the Department has been – as recounted above – incorporated external resources "as appropriate . . . in relevant courses."

Because the Department has sought and obtained the participation of high-quality, outside instructors across a variety of training courses where such outside expertise is relevant and appropriate, **BPD is in Initial Compliance with Paragraph 297.**  As with many other of the Paragraphs considered here, to maintain this level of compliance, BPD will need to continue to incorporate outside experts and community-based resources as it implements various required training initiatives going forward.

### H.    Paragraph 298

> *Where necessary to comply with this Agreement, BPD will develop or adopt supplemental basic training and in-service training curricula and lesson plans. All new curricula and lesson plans will be reviewed and approved by the Monitor and DOJ prior to implementation. Any training required by this Agreement that is conducted by an outside instructor or non-BPD entity will be reviewed and approved by the Monitor and DOJ prior to implementation. Approval of curricula and lesson plans submitted to the Monitor and DOJ will not be unreasonably withheld and will be deemed granted if there has been no substantive response within 30 days. Notification that either the Monitor or DOJ will review the training and provide commentary, or similar, shall deemed a substantive response.*

Section IV-B of this report describes the various training curricula that BPD has developed to comply with the subject-specific training requirements of the Decree.  This has included, for example, training on use of force; fair and impartial policing; stops, searches, and arrests; community policing; behavioral health; sexual assault investigation; and other topics.

As Section III describes, all new lesson plans have been developed with the input and feedback of the Monitoring Team and Department of Justice.  Per the express terms of each year's Monitoring

Plan, the Department of Justice and the Monitoring Team have both independently reviewed and approve all required training.

Since the start of the Consent Decree, BPD has provided training to officers that is not directly designed to meet specific Consent Decree requirements.  This has included training designed to meet State of Maryland mandates, to address identified officer training needs not specifically covered in the Monitoring Plan, or to address other organizational needs.  In those instances, the Department has provided the Monitoring Team and Department of Justice with proposed curricula or course outlines so that both could make a determination as to whether the subject implicates the Decree.  In all of those instances where the proposed training reasonably related to the Decree, the Monitoring Team and Department of Justice have provided their approval—sometimes after providing feedback or proposed changes, which the Department incorporated.  In those instances where the Team and DOJ have determined that the substance of the training is *not* reasonably related to the Decree, the Monitoring Team and DOJ have communicated that the training falls outside of the scope of the Decree and, therefore, does not require the Monitor's or DOJ's approval.

The Monitoring Team's various observations about the substance of submitted curricula is discussed above with respect to Paragraph 295.  The Monitoring Team interprets Paragraph 298 to memorialize important but largely procedural expectations that facilitate the robust, real-time oversight and feedback with respect to Decree-required training initiatives.  In this way, the more consistent improvement that the Monitoring Team indicates that it will need to see for BPD to reach Initial Compliance with Paragraph 295 is not at issue with respect to the particular requirements of Paragraph 298.

Therefore, because the Monitoring Team and DOJ have reviewed and approved the provision of all BPD training designed to comply with the express terms of the Consent Decree and that the Monitoring Team and/or DOJ have deemed reasonably related to the Consent Decree, the Monitoring Team finds that **BPD is in Initial Compliance with Paragraph 298.**  However, unless and until the Monitoring Team finds that the Department has reached compliance with the various paragraphs of the Consent Decree that set forth the specific requirements of various training initiatives, the Department must continue to receive Monitoring Team and DOJ approval before it conducts future training initiatives.

I.      **Paragraph 299**

> *BPD will review and update BPD's Training Plan on a periodic basis. To inform these updates, BPD will conduct a needs assessment, taking into consideration: trainee-to-instructor ratios; trainee feedback and evaluations of trainings; trends in misconduct complaints; problematic uses of force; data concerning stops,*

*searches and arrests; analysis of officer safety issues; and changes in the law or
BPD policy.*

### 1. Review & Update of BPD Training Plans

BPD updates its Training Plan on an ongoing basis, producing annual updates in formalized, public-facing documents.  Practically, BPD's Curriculum Coordination Committee, described in this report previously, helps to set the strategic direction for E&T's training initiatives.  As detailed previously, the Monitoring Team finds BPD's Training Plans to be consistent with Consent Decree requirements.

### 2. Needs Assessment

Paragraph 299 requires that a "needs assessment" "inform" the Training Plan, and it outlines several specific areas for assessment – including trainee feedback; misconduct complaint trends; information and issues relating to uses of force; data on stops, searches, and arrests; officer safety considerations; and law and policy changes.  To date, BPD has incorporated consideration of some of these issues – such as trainee feedback, information and issues relating to uses of force, and law and policy changes – into its training plans.  For instance, as of early February 2022, BPD was completing a contemplated e-learning training on interactions with canines as a result of the Performance Review Board ("PRB") identifying trends and systemic issues with the use of firearms in situations involving dogs.

At the same time, other expressly contemplated areas for consideration within the needs assessment, such as data on stops, searches, and arrests, has not been incorporated into the Training Plan.  Indeed, that data has only recently begun to be collected systematically per Consent Decree requirements within BPD's new Records Management System, which has prevented the analysis of such data to inform Training Plans.

Further, although the Training Plans are reflecting good-faith appraisals of what the Department's training needs, BPD still has some distance to travel to formalize and systematize the needs assessment process.  Rather than relying on forward-thinking personnel to periodically surface training needs and issues, E&T should establish a formalized process, as an early part of its development of annual Training Plans and revisions, for conducting and codifying the type of needs assessment that Paragraph 299 requires.

Therefore**, although BPD's Training Plans are reflecting some important analysis of organizational needs, the needs assessment process still needs to be more formalized to meet the specific requirements of Paragraph 299.**  At present, the Monitoring Team finds that BPD's compliance status is consistent with **Implementation – On Track (4c).**

## J.      Paragraph 300

*In order to ensure that all trainings are adequately documented, BPD will develop and implement a training data tracking system in consultation with the Monitor and DOJ.  The training data tracking system will include a central and comprehensive database containing information on trainings attended by each officer, including in-service training and remedial training.  The data tracking system will include information on which officers require trainings, and class attendance, including missed classes.  The data tracking system will additionally include performance data and trainees' results on any tests or scored evaluations.  The system will be readily available to supervisors throughout the Department to facilitate their supervisory duties.  BPD will ensure that adequate resources are provided to maintain the system up to date and review the data contained therein.*

### 1.   Data Tracking System: Development & Implementation

At the start of the Consent Decree process, E&T did not systematically track training attendance and completion using a single process or electronic database platform.  Indeed, it struggled to provide definitive evidence, one way or another, as to what officers had completed what training.  The Monitoring Team understood from E&T staff at the time that pen-and-paper sign-in sheets often served as the most formal records available for who attended training sessions.

Pursuant to conversations with the Monitoring Team and DOJ, BPD elected to use the PowerDMS platform as a way of systematically tracking training information in a database system – even as a longer-term solution was contemplated.  From approximately 2018 through the present, E&T has obtained information about what personnel have completed various training initiatives from its PowerDMS platform.  Due to limitations of that platform, E&T personnel take data obtained from PowerDMS and enter into a locked, Web-based spreadsheet, called the Continuing Education Input Report, that functionally serves as E&T's "dashboard" for attendance.  Specifically, E&T personnel take the list of individuals who have successfully completed the required tests and evaluations for each course and, using personnel sequence numbers, compare it to the list (from Human Resources) of everyone in the agency.  Through this comparison, BPD determines who has and has not completed specific training programs or elements.  The Monitoring Team understands that this is possible for both general purpose, all-officer training; specialized training initiatives; and specific remedial training.

The Monitoring Team has reviewed E&T's Web-based dashboard.  It provides a wealth of detailed information about current completion rates for in-progress and past trainings, with breakdowns by district and administrative unit.  It also tracks scores on the evaluation components of training programs.

The Monitoring Team has also received an overview of E&T's PowerDMS platform. As discussed below, this system is being phased out in favor of a newer, more dynamic training tracking platform. Consequently, the Team did not independently assess the quality and veracity of data within the PowerDMS platform. However, the Monitor has no reason to believe that the information within the PowerDMS system is any different from E&T's summary dashboard, which the Team understands is where information and data provided to the Court on numbers of personnel completing various Decree-required trainings has been harvested.

As one member of E&T observed in a conversation with the Monitoring Team and DOJ, the process of using test scores within PowerDMS, a comparison to the HR database, and manual entry into a Web-based spreadsheet "is not our ideal or favorite method." The Department indicates that its understanding of the clear limitations of the approach is why it is in the midst of moving to a new system for tracking training, called Acadis. In addition to being able to track officer attendance in a much more streamlined manner, by simply generating a report of officers who have not yet completed particular training requirements, Acadis will vastly enhance the process of scheduling officers for in-person training. Specifically, individual officers will sign up for individual spots in specific training initiatives – allowing E&T to understand and track, in real-time, who has failed to show up for training. Currently, particular districts sign up for particular "slots" in training, and E&T does not know precisely what district personnel will be attending on what days until they arrive. Although it does not appear that the current sign-up process has posed any significant operational challenges, E&T and the Department will benefit from the more sophisticated and dynamic training sign-up system that is possible in Acadis.

### 2.  Data Tracking System: Officer Attendance & Missed Trainings

As outlined above, E&T has, to date, been able to track attendance (including what officers have missed what trainings[181]) through its tracking of test scores and officer training evaluations in PowerDMS. Although the process is more resource-intensive than it will be in the new Acadis system, BPD's assertion that the PowerDMS and spreadsheet-focused process is nonetheless superior to the hand-written sign-in sheets that the Department was using before the Consent Decree to track training attendance – as such hard-copy forms were not as uniform, dependable, and searchable as records of completed tests and training evaluations within PowerDMS. Through this manual process, E&T can identify what officers have not yet completed various, required

---

[181] The Monitoring Team interprets Paragraph 300's reference to "missed classes" to refer to instances where officers fail to attend a required class at any point and therefore fail to adhere to the training requirement. Although it is useful for BPD and E&T to know when specific officers signed up for a class, did not attend, and subsequently needed to sign up and attend on a different day, attendance is of primary importance in understanding whether officers attend and complete the specific training initiatives that the Department requires.

trainings; which officers attended what class on what day; and whether various personnel have missed any courses, days, or elements of required training.

### 3. Data Tracking System: Performance, Test, and Evaluation Data

PowerDMS tracks data on trainee test scores and evaluations.  As noted above, the completion and tracking of such scores and performance data is the foundation of BPD's ability to track personnel training completion.

### 4. Data Tracking System: Supervisor Availability

Currently, BPD supervisors are administrators in PowerDMS, as are any personnel that work within an administrative capacity in districts through the Department.  This gives supervisors and designated administrators a higher level of access to the system than other officers, which allows them to view reports on test and evaluation completion, identify if a member has completed an e-learning, and/or view what tests and evaluations specific personnel have completed.

Although supervisors can use PowerDMS to understand what personnel have and have not completed various training requirements, it appears that Acadis has the ability to enhance this ability even further.  Specifically, supervisors and managers will be able to see, via a straightforward dashboard or portal within Acadis, whether members are in compliance with training requirements.  Acadis also provides individual officers with an individualized snapshot of the training that they have completed.  This "at-a-glance" ability promises to make information about training more readily accessible to BPD supervisors going forward.

### 5. Data Tracking System: Adequate Resources

The Department indicates that it is hoping to begin live implementation of the Acadis system by the end of January 2022.  By the second quarter of 2022, the Department anticipates that it will solely be using the new Acadis system for providing e-learning and tracking and administratively facilitating in-person instruction.  E&T also notes that it will track various, required certifications (for things like firearms qualifications, less-lethal instrument qualifications, CPR or first aid certifications, and the like) through Acadis, which will replace another spreadsheet that the Department currently uses to keep track of whether officers are appropriately certified, when various certifications expire, and the like.

### 6. Overall Compliance Determination

As E&T itself concedes, the current process for tracking training completion and performance is, as described here, somewhat cumbersome.  Nevertheless, the processes and systems involving

PowerDMS that BPD has in place are sufficient to generate reliable information about who has completed what training and how officers have performed in training – as well as to make that information available to supervisors.  Consequently, however convoluted the current system may be, BPD has managed to comply with Consent Decree requirements even as it contemplates a more permanent, resource-effective solution.  The Monitoring Team credits the earnest efforts of BPD to comply with as much of the Consent Decree as possible with the existing resources that have been available, even as a longer-term solution is being contemplated.

Ultimately, although the limitations of the PowerDMS platform make BPD's current system for tracking officer completion of training more complicated than ideal, the Monitoring Team concludes that BPD is **in Initial Compliance with Paragraph 300 of the Consent Decree** because it is able – even as it requires several steps and manual processes – to track which officers are completing what training requirements.  **However, this determination is dependent on BPD's imminent, successful adoption of the Acadis program and the Department's move, currently underway, to a more sustainable, less resource-intensive process for tracking information on training completion and performance in the future.**

## VI.     TRAINING-RELATED OUTCOME ASSESSMENTS

The various outcome assessments that Paragraph 459 requires are intended to "measure whether BPD's revised practices and procedures are achieving the purposes of this Agreement and are having an overall beneficial effect on policing in Baltimore."[182]   To achieve "Full and Effective Compliance" with any material part of the Consent Decree, such as the general requirements that are the subject of this report, the City and BPD must show that they have complied with all specific requirements of the Decree in the given area and "shown sustained and continuing improvement in constitutional policing as demonstrated by the Agreement's Outcome Assessments."[183]

Paragraph 459(l) requires that the Monitoring Team conduct a review of:

     i.     *Rates of completion of approved training and performance assessments of evaluative aspects of training;*

     ii.    *Qualitative measurements of the adequacy of training, including assessments by officers, feedback from instructors, and evaluation by civilian reviewers;*

     iii.   *Qualitative and quantitative assessments of the FTO program, including the availability of sufficient numbers of eligible FTOs and officer complaints files against FTOs, and*

     iv.   *The frequency that training deficiencies are identified through investigations, internal reviews, complaints, disciplinary proceedings, civilian oversight, or other mechanisms.*[184]

The scope of the present training assessment excludes the FTO program.  Consequently, outcome assessments relating to 459(iii) are not addressed here.

## A.     Paragraph 459(l)(i): Rates of Completion of Approved Training and Performance Assessments of Evaluative Aspects of Training

At the beginning of the Consent Decree process, training completion rate data was erratically gathered and not sufficiently reliable.  The adoption of a more mechanized process, and the use of the PowerDMS system has enabled the Department to provide more comprehensive training completion data – even if the process is cumbersome, as described previously.

BPD has provided formal attestations to the Court at the conclusion of all major trainings with respect to training completion rates.  Table 11 summarizes the rate of completion for each Consent

---

[182] Dkt. 2-2 ¶ 459.

[183] *Id.* ¶ 506.

[184] *Id.* ¶ 459.

Decree-related training based on the number of BPD members eligible or required to complete the training.

As discussed previously in this report, completion rates have been high for most Consent Decree-related trainings.  For purposes of 459(i) and the compliance review above, the Monitoring Team considered "completion rates" to correspond to the portion of BPD officers who were eligible for the training and who successfully completed it during the timeframe that the training was originally provided.  This means that the completion rate is computed by taking the number of officers who completed the training and dividing that by the number of officers who were eligible to take the training (which necessarily excludes officers away from the Department on an extended basis due to long-term medical or disability leave, military leave, and other reasons).

**Table 11.        BPD Training Completion Rates, Major Consent Decree Training**

| Delivery Method | Training | Number of Officers Completed | Number of Officers Eligible for Training | Completion Rate |
|---|---|---|---|---|
| Classroom | Use of Force – 2019 | 1,957 | 1,977 | 98.99% |
| Classroom | Stop, Search, and Arrest – 2020 | 2,191* | 2,266* | 96.69% |
| Classroom | Behavioral Health, Sexual Assault – 2020-2021 | 2,106 | 2,117 | 99.48% |
| Classroom | Ethical Policing is Courageous – 2020-2021 | 2,393** | 2,393** | 100.0% |
| Classroom | Community Policing – 2021 | 2,119 | 2,124 | 99.76% |
| eLearning | 1st Amendment eLearning – 2021 | 2,082 | 2,085 | 99.86% |
| eLearning | Body-Worn Camera | 2,093* | 2,240* | 93.44% |

*Source: BPD Certifications to Court.*

*Notes:*  * BPD's certification to the Court did not specifically detail how many officers were eligible to complete the training during the period that it was provided.  Instead, the total number of officers eligible corresponded to all officers employed by BPD during the time of the training.  Consequently, the number of eligible officers is higher than in some other trainings and the completion rate somewhat lower.

** BPD's certification did not provide specific details on how many of its officers were either eligible or how many specifically completed.  Instead, it noted simply that "all eligible members" completed it, with "[z]ero members [who] were in active, full-duty status during the delivery period of the training" failing to complete it.  (Dkt. 413-1 at 1.)

Given the low numbers of officers who have failed to complete required training, and the fact that BPD indicates that it is forwarding those who fail to complete required training to the Department's Public Integrity Bureau ("PIB"), the completion rate scores are encouraging and consistent with sound policing practices.

Before the Consent Decree, BPD did not regularly or reliably present evaluations to officers that tested knowledge, information retention, or skill development.  As it the Department has developed a new training paradigm, the Department now regularly gives student officers substantive examinations or evaluations during various Consent Decree training programs.  For this report, E&T provided the Monitoring Team with performance assessment data related to the following classroom trainings:

- Use of Force Modules 1, 2, and 3 (2019 – 2021)
- Stop, Search, and Arrest Days 1 and 2 (2020 – 2021)
- Patrol Response to Behavioral Health Crises & Sexual Assault (2021)
- Ethical Policing is Courageous (2021)
- Community Policing (2021)

The performance assessment data were reviewed by the Monitoring Team and summarized in this report to identify variation across rank in the Department for first attempt scores, final scores, and the number of assessment attempts.

Table 12, below, provides a summary of the substantive evaluation scores of officers across various, major Consent Decree trainings through December 2021.  The Monitoring Team observes that the average, initial scores on substantive examinations across the displayed training elements was nearly 87% or greater for each, individual test.  Final scores on these tests equaled nearly 100%.  A full accounting of each evaluation, including a breakdown of scores by rank and an accounting of the number of test attempts necessary to reach the set level of substantive knowledge (which was 100% across most instances) is provided in Appendix C.

Finally, this report has elsewhere discussed the Monitoring Team's ongoing evaluations of the ongoing quality of BPD's Consent Decree-required training programs.  To date, no implemented Consent Decree training has been found to be deficient, and the Monitoring Team is increasingly and favorably impressed by the extent to which training is reflecting the required, new approach to training grounded in adult learning techniques and scenario-based instruction.

Overall, the high rates of completion for BPD training, strong scores and mechanisms for evaluating officer knowledge and information retention, and the Monitoring Team's ongoing qualitative of BPD training initiatives all show sustained and continuing improvement with respect to the quality of training and the Department's training function.

**Table 12.**      **BPD Officer Training Evaluations Scores, Major Consent Decree Trainings through December 2021**

| | First Attempt | | | | | Final Attempt | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
| Use of Force: E-Learning Module 1 | 2,170 (100.0%) | 92.1 | 90 | 100 (46.9%) | 0 - 100 | 2,170 (100.0%) | 99.5 | 100 | 100 (96.9%) | 60 - 100 |
| Use of Force: E-Learning Module 2 | 2,171 (100.0%) | 90.6 | 90 | 100 (45.3%) | 0 - 100 | 2,171 (100.0%) | 98.8 | 100 | 100 (93.3%) | 0 - 100 |
| Use of Force: E-Learning Module 3 | 2,167 (100.0%) | 95.6 | 100 | 100 (66.6%) | 0 - 100 | 2,167 (100.0%) | 99.8 | 100 | 100 (98.3%) | 40 - 100 |
| Community Policing | 2,062 (100.0%) | 89.7 | 93 | 100 (32.2%) | 0 - 100 | 2,062 (100.0%) | 100 | 100 | 100 (100.0%) | 100 - 100 |
| Stop, Search, and Arrest: Day 1 | 2,020 (100%) | 91.31 | 90 | 90 (39.9%) | 30 - 100 | 2,020 (100%) | 100 | 100 | 100 (100%) | 100 - 100 |
| Stop, Search, and Arrest: Day 2 | 2,020 (100%) | 89.66 | 90 | 90 (42.5%) | 0 - 100 | 2,020 (100%) | 100 | 100 | 100 (100%) | 0 - 100 |
| Behavioral Health/Sexual Assault Investigations | 1,992 (100%) | 88.97 | 90 | 90 (29.4%) | 20 - 100 | 1,992 (100%) | 99.74 | 100 | 100 (98.1) | 75 - 100 |
| Ethical Policing is Courageous (EPIC) | 2,097 (100%) | 86.80 | 90 | 90 (32.1%) | 40 - 100 | 2,097 (100%) | 99.99 | 100 | 100 (100%) | 80 – 100 |

*Source: BPD*

72

**B.      Paragraph 459(l)(ii): Qualitative Measurements of the Adequacy of Training**

Student officers have provided their qualitative feedback at the conclusion of various training programs.  The format of these qualitative feedback opportunities differed from course to course. The overall results of the surveys are summarized in Section IV of this report and provided in full in Appendix D.

The Monitoring Team concludes that BPD officers are finding Consent Decree training useful and, importantly, applicable to their day-to-day duties.  Although it is possible that substantively sound training that officers do not enjoy might nonetheless generate improvements in real-world performance after training, the likelihood of BPD training shaping officer performance is likely stronger given the generally (if not uniformly) high officer ratings of various training initiatives. Especially given the static nature of BPD's prior training paradigm, and the lack of resources available to E&T before the Consent Decree, the Monitoring Team finds that its continuing qualitative measurement of the adequacy of BPD training is consistent with the promotion of constitutional policing and with sustained and continuing improvement.

The Monitoring Team does not consider the feedback of training instructors or evaluations by civilian reviewers at this time because such information does not currently exist in an aggregate format.  The Team will continue to work with BPD and the Parties to expand the available pool of qualitative feedback measurements available before the Team's next report on Paragraph 459(l) outcome assessments.

**C.      Paragraph 459(l)(iv): Training Deficiencies**

E&T receives notice of training recommendations and deficiencies for individual officers from several sources within BPD.  Notices are sent directly to Education and Training sub-units such as EVOC (driving), Firearms, and Defensive Tactics.

The Education and Training Section provided the Monitoring Team with the number of training notices sent to them in 2021 and the sources from which the notices were sent.  Currently, there is not a centralized tracking system for these notices of training deficiencies.  Information on training notices received and/or completed in 2021 is summarized below in Table 13.

**Table 13.      Frequency of Training Deficiencies by Type and Source of Notice (Received And/Or Completed in 2021)**

| Type | Source | Number[*] | Explanation |
|---|---|---|---|
| Remedial Driving | Fleet Safety or Traffic Accident Hearing Board | 167[**] | Training provided by EVOC Unit |

| Remedial Firearms | PRB or PIB (Public Integrity Bureau) | 25 | Training provided by Firearms Training Unit |
|---|---|---|---|
| Defensive Tactics | PRB, PIB, or Unit Commands | 15 | Training provided by Defensive Tactics Unit |
| Prisoner Transport | Audits & Inspections | 30 | Training provided by Defensive Tactics Unit |
| Miscellaneous Performance | PRB | 73*** | Training responsibility assigned to different E&T units depending on specific recommendation or deficiency |

*Source: BPD*

*Notes:* * Number completed in 2021.

** Includes substantial backlog from prior year(s).

*** This PRB number is per person/topic (i.e., if PRB requires Officer A to be trained/re-trained on 3 topics, this is counted as 3 notices). The number listed includes some overlap (double counting) with remedial firearms and remedial defensive tactics. Additionally, the number includes some PRB training notices assigned in 2020 and completed in 2021. Remaining PRB training notices not yet completed as of December 28, 2021 totaled 53.

Even as E&T maintains records about training deficiencies that it receives from various locations in the Department, BPD needs to adopt a centralized system and process for flagging training deficiencies. Because training deficiencies, issues, and opportunities can arise during the review of performance from a number of different places, and through a number of various routes (performance reviews, use of force investigations, internal affairs investigations, regular supervisory duties, post-incident debriefings, etc.), the Department will benefit from a system that ensures that it systematically logs, tracks, and addresses training issues. A more formalized system going forward for logging and tracking training deficiencies will allow the Monitoring Team to better gauge whether the way that the Department is addressing deficiencies is demonstrating sustained and continuing improvement consistent with constitutional policing

## VII.    COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | Compliance Score |
|---|---|
| 291 | The parties agree that proper, effective and comprehensive training is a necessary prerequisite to constitutional policing. The Parties agree that BPD must establish and prioritize a robust training program to ensure that officers and other employees gain full understanding of BPD policies, legal requirements, and practical policing techniques. The Parties recognize that under state law certification of training may be subject to approval by the Maryland Police Training and Standards Commission (the "MPTSC"). | **4d** <br> **(Initial Compliance)** |
| 292 | With BPD's assistance, the City will ensure that BPD's training program and academy are reasonably funded. In consultation with the Monitor, the City, and DOJ, BPD will create a plan for renovating and updating training facilities in a cost-effective and reasonable manner to accomplish the training requirements of this Agreement, including the provision of information technology resources. All of the training requirements of this Agreement are set forth in the Training Matrix, Appendix A. The information technology resources required by this Agreement shall be determined in accordance with Section XII, Technology. | **4c** <br> **(Implementation – On Track)** |
| 293 | BPD will ensure that an adequate number of qualified instructors are assigned to the training academy. | **4d** <br> **(Initial Compliance)** |
| 294 | BPD will develop a written Training Plan for comprehensive in-service and supplemental training for officers and for enhancing BPD's field training with a revised Field Training Officer ("FTO") program. The Training Plan will be developed in consultation with the Monitor and DOJ, and will be consistent with the Monitoring Plan. The Training Plan will: a. Identify training priorities, principles and broad goals consistent with this Agreement and the substantive training requirements it contains; b. Include a plan for delivering supplemental basic training, remedial training, in-service training, and roll-call training as necessary to provide the relevant training required by this Agreement; c. Coordinate the topics of supplemental basic training and in-service training with FTO training; d. Establish the frequency and subject areas for supplemental basic and in-service training; e. Develop a plan for annual in-service training; f. Identify available training delivery and related resources, as well as unmet needs; g. Coordinate with the City and others to assist in obtaining necessary training resources; h. Where appropriate, provide time for obtaining any required approval from the MPTSC; and i. Establish a method for assessing the content and delivery of training, including training provided by outside instructors. This method will allow for the measurement and documentation of trainee reaction to, and satisfaction with, the training they received, and learning as a result of training, including the extent to which trainees are applying the knowledge and skills acquired in training to their jobs. | **4d** <br> **(Initial Compliance)** |
| 295 | BPD, pursuant to the Training Plan and in consultation with the Monitor and DOJ, will | **4c** |

| | | |
|---|---|---|
| | review all training curricula and lesson plans for consistency, quality, and compliance with applicable law, BPD policy, and this Agreement. BPD will ensure that best practices in adult learning, scenario-based training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into training delivery. BPD will advise the Monitor and DOJ regarding training that can be delivered in roll-call or online, or in large class formats, as opposed to training that will require more intensive delivery. BPD will also assess instructor qualifications and testing materials. | **(Implementation – On Track)** |
| 296 | BPD will ensure that all instructors responsible for training are proficient in their subject matter and are qualified, including, as applicable, previous instructor experience, training in instruction and adult learning techniques, and instruction skills. In addition, BPD will consider an officer's performance evaluations, past performance as a police officer, and disciplinary history in selecting instructors. | **4c (Implementation – On Track)** |
| 297 | BPD will actively seek out and retain qualified instructors from outside BPD to supplement the skills of its in-house training staff and adjunct instructors. As appropriate, BPD will incorporate experts, community-based instructors, and guest speakers, including mental health service providers and consumers, judges, prosecutors, crime victims, academics in the field of criminal justice, community resource providers, and community members, including Youth, to participate in relevant courses | **4d (Initial Compliance)** |
| 298 | Where necessary to comply with this Agreement, BPD will develop or adopt supplemental basic training and in-service training curricula and lesson plans. All new curricula and lesson plans will be reviewed and approved by the Monitor and DOJ prior to implementation. Any training required by this Agreement that is conducted by an outside instructor or non-BPD entity will be reviewed and approved by the Monitor and DOJ prior to implementation. Approval of curricula and lesson plans submitted to the Monitor and DOJ will not be unreasonably withheld and will be deemed granted if there has been no substantive response within 30 days. Notification that either the Monitor or DOJ will review the training and provide commentary, or similar, shall be deemed a substantive response. | **4d (Initial Compliance)** |
| 299 | BPD will review and update BPD's Training Plan on a periodic basis. To inform these updates, BPD will conduct a needs assessment, taking into consideration: trainee-to-instructor ratios; trainee feedback and evaluations of trainings; trends in misconduct complaints; problematic uses of force; data concerning stops, searches and arrests; analysis of officer safety issues; and changes in the law or BPD policy. | **4c (Implementation – On Track)** |
| 300 | In order to ensure that all trainings are adequately documented, BPD will develop and implement a training data tracking system in consultation with the Monitor and DOJ. The training data tracking system will include a central and comprehensive database containing information on trainings attended by each officer, including in-service training and remedial training. The data tracking system will include information on | **4d (Initial Compliance)** |

| | which officers require trainings, and class attendance, including missed classes. The data tracking system will additionally include performance data and trainees' results on any tests or scored evaluations. The system will be readily available to supervisors throughout the Department to facilitate their supervisory duties. BPD will ensure that adequate resources are provided to maintain the system up to date and review the data contained therein. | |

## APPENDIX A.        BUDGETS FOR BPD E&T, FISCAL YEARS 2018 THROUGH 2022

*Source: BPD*

| | Adopted FY18 | Adopted FY19 | Adopted FY20 | Adopted FY21 | Adopted FY22 |
|---|---|---|---|---|---|
| Education and Training Section | $ 7,889,277 | $ 8,079,560 | $ 16,043,324 | $ 14,355,057 | $ 14,111,151 |
| Education and Training Section | $ 7,889,277 | $ 8,079,560 | $ 16,043,324 | $ 14,355,057 | $ 14,111,151 |
| Contractual Services | $ 1,744,065 | $ 1,896,140 | $ 1,839,028 | $ 3,214,149 | $ 3,248,914 |
| Dues | $ 110 | $ 113 | $ 116 | $ 119 | $ 121 |
| In-service Training | $ 400,000 | $ 409,200 | $ 196,900 | $ 201,429 | $ 204,853 |
| Maintenance and Repair of Equipment - Other | $ 5,423 | $ 5,548 | $ 5,676 | $ 5,807 | $ 5,906 |
| Maintenance and Repair of Equipment - Vehicle | $ - | $ 5,759 | $ 673 | $ 673 | $ 673 |
| Other Professional Services | $ 66,268 | $ 67,792 | $ 69,351 | $ 70,946 | $ 72,152 |
| Printing | $ 21,691 | $ 22,190 | $ 22,700 | $ 23,222 | $ 23,617 |
| Rental - Lease Data - Word Processing Equipment | $ - | $ - | $ - | $ 1,161 | $ 1,181 |
| Rental of Business Machines | $ 13,015 | $ 13,314 | $ 13,620 | $ 13,933 | $ 14,170 |
| Rental of City Motor Equipment | $ 392 | $ 615 | $ 3,997 | $ 3,309 | $ - |
| Rental of Real Property - DGS | $ 884,722 | $ 1,011,059 | $ 1,157,152 | $ 1,580,000 | $ 1,612,239 |
| Rental/Lease Data/Word Processing Equipment | $ 1,084 | $ 1,109 | $ 1,135 | $ 937,384 | $ 931,800 |
| Subscriptions | $ 276 | $ 282 | $ 288 | $ 295 | $ - |
| Travel | $ 1,084 | $ 1,109 | $ 1,135 | $ 1,161 | $ 1,122 |
| Tuition Reimbursement | $ 350,000 | $ 358,050 | $ 366,285 | $ 374,710 | $ 381,080 |
| Equipment - $4,999 or less | $ 11,478 | $ 11,742 | $ 26,296 | $ 28,285 | $ 33,661 |
| MOIT Hardware Replacement | $ 6,520 | $ 6,670 | $ 7,983 | $ 10,096 | $ 11,618 |
| MOIT Software Maintenance | $ 4,958 | $ 5,072 | $ 18,313 | $ 18,189 | $ 22,043 |
| Grants, Subsidies and Contributions | $ 313,079 | $ 316,760 | $ 2,178,966 | $ 583,442 | $ 727,500 |
| Workers' Comp - Direct | $ 313,079 | $ 316,760 | $ 2,178,966 | $ 583,442 | $ 727,500 |
| Materials and Supplies | $ 322,485 | $ 464,425 | $ 479,352 | $ 487,172 | $ 495,454 |
| Ammunition/Grenades/Chemical Devices (Police) | $ 240,112 | $ 265,112 | $ 271,210 | $ 277,448 | $ 282,165 |
| Books and Periodicals | $ 10,845 | $ 11,094 | $ 11,349 | $ 11,610 | $ 11,807 |
| Business Machine Supplies | $ 2,170 | $ 2,220 | $ 2,271 | $ 2,323 | $ 2,362 |
| Custodial Materials | $ 1,627 | $ 1,664 | $ 1,702 | $ 1,741 | $ 1,771 |
| Equipment Maintenance and Repair Supplies | $ 5,423 | $ 38,283 | $ 39,164 | $ 40,065 | $ 40,746 |
| Food for Human Consumption | $ 5,423 | $ 5,548 | $ 5,676 | $ 5,807 | $ 5,906 |
| General Operating and Maintenance Supplies | $ 54,227 | $ 55,474 | $ 56,750 | $ 58,055 | $ 59,042 |
| Heating Fuels | $ 2,658 | $ 2,738 | $ 3,275 | $ 3,350 | $ 3,407 |
| Medical and Surgical Supplies | $ - | $ 60,500 | $ 61,892 | $ 63,316 | $ 64,392 |
| Motor Vehicle Fuels and Lubricants | $ - | $ 21,792 | $ 26,063 | $ 23,457 | $ 23,856 |
| Other Personnel Costs | $ 2,001,391 | $ 1,939,261 | $ 4,363,240 | $ 3,923,755 | $ 3,857,685 |
| Dental | $ 6,768 | $ 6,440 | $ 13,300 | $ 17,670 | $ 16,815 |
| Employees Retirement - City Share (Regular) | $ 16,242 | $ 16,232 | $ 21,772 | $ 80,978 | $ 193,838 |
| FICA - Medicare Only | $ 43,388 | $ 42,899 | $ 103,027 | $ 93,965 | $ 90,001 |
| Fire and Police Retirement - City Share | $ 1,410,673 | $ 1,407,637 | $ 3,077,114 | $ 2,742,507 | $ 2,435,662 |
| Fiscal 2021 Benefit Adjustments | $ - | $ - | $ - | $ (32,619) | $ - |
| Health Maintenance Organizations | $ 59,887 | $ 76,653 | $ 293,666 | $ 299,919 | $ 345,789 |
| Medical and Hospital Insurance | $ 363,201 | $ 304,110 | $ 684,211 | $ 562,373 | $ 570,298 |
| Medical Waiver | $ - | $ - | $ - | $ 1,300 | $ 650 |
| Prescription Drugs (Classified) | $ 70,315 | $ 55,955 | $ 140,147 | $ 109,044 | $ 117,785 |
| Social Security-City Share (Regular) | $ 15,793 | $ 14,502 | $ 8,280 | $ 30,595 | $ 69,023 |
| Survivor Benefits | $ 13,432 | $ 13,188 | $ 18,411 | $ 15,109 | $ 15,051 |
| Vision Care (CUB) | $ 1,692 | $ 1,645 | $ 3,312 | $ 2,914 | $ 2,773 |
| Salaries | $ 3,450,789 | $ 3,404,184 | $ 7,156,442 | $ 6,118,254 | $ 5,747,937 |
| Contract | $ - | $ - | $ - | $ - | $ 84,000 |
| Out-of-title | $ 2,746 | $ 2,815 | $ 2,885 | $ 2,943 | $ 3,002 |
| Overtime | $ 12,747 | $ 13,066 | $ 13,393 | $ - | $ - |
| Overtime – Sworn Personnel | $ 214,328 | $ 219,686 | $ 225,178 | $ - | $ - |
| Permanent Full-time | $ 90,764 | $ 92,587 | $ 133,548 | $ 493,472 | $ 1,138,816 |
| Permanent Full-time Positions (Police) | $ 3,311,104 | $ 3,261,453 | $ 6,971,497 | $ 5,986,709 | $ 5,068,234 |
| Salary and Wage Differential | $ 5,655 | $ 5,796 | $ 5,941 | $ 6,060 | $ 6,181 |
| Sick Leave Conversion (Regular) | $ 549 | $ 563 | $ 577 | $ 589 | $ 601 |
| Turnover Savings | $ (187,104) | $ (191,782) | $ (196,577) | $ (542,056) | $ (552,897) |
| Fiscal 2020 COLA Adjustment | $ - | $ - | $ - | $ 170,537 | $ - |
| Transfers | $ 45,990 | $ 47,048 | $ - | $ - | $ - |
| Unallocable Debits | $ 45,990 | $ 47,048 | $ - | $ - | $ - |
| Grand Total | $ 7,889,277 | $ 8,079,560 | $ 16,043,324 | $ 14,355,057 | $ 14,111,151 |

**APPENDIX B.        TRAINING FEEDBACK RUBRIC**

# Training Feedback Rubric

Instructor's Name: _____    Date: _____

Module Day/Title: _____

Evaluator's Name: _____

***Rate the instructor in all categories using the following 4-point scale***

| | |
|---|---|
| **4=Excellent** | Extremely effective performance that is above criteria for successful instructor performance; Surpasses expectations; Meets all major/essential/core criteria or acceptable equivalents |
| **3=Good** | More than adequate for effective instructor performance; generally exceeds criteria relative to quality and quantity of behavior required for an instructor; No major deficiencies exist in the areas assessed; Consistently demonstrated better than average level of performance |
| **2=Fair** | Should be adequate for effective instructor performance; Meets some criteria relative to quality and quantity of behavior required; Meets a few of the major/essential/core criteria; Demonstrates a bare minimum range of skills for handling the situation and the desired outcome is obtained; Some of the major and minor criteria were met; some deficiencies exist in the areas assessed |
| **1=Poor** | Insufficient for performance requirements; Generally does not meet criteria relative to quality and quantity of behavior required for successful instructor performance (*e.g. meets half or less of criteria*); Does not demonstrate a sufficient range of skills appropriate for handling of the situation, or displays plausible but inappropriate behaviors for handling the instructional situation; or the desired result or outcome is not obtained. |
| | Significantly below criteria required for successful instructor performance; Few or no criteria met; Many deficiencies; A major |

| 0=Not Demonstrated | problem exists; Describes/demonstrates counter-productive behaviors that have negative outcomes or consequences for the students |
| --- | --- |

| Category # | Category | Rating |
| --- | --- | --- |
| | **Introduction** | |
| 1 | Introduces self *(name, agency, background, background with topic)* | |
| 2 | Shares overview of topic | |
| 3 | Lesson objectives are clearly stated | |
| | **Section Subtotal _____/12** | |
| | **Class Presentation** | |
| 4 | Attire *(dress code appropriate for this instructional situation)* | |
| 5 | Confidence in topic knowledge | |
| 6 | Uses eye contact | |
| 7 | Uses appropriate verbal and nonverbal language | |
| 8 | Uses voice effectively *(volume, rate, inflection, etc.)* | |
| 9 | Minimal distracters *(um's, ok's, pacing, etc.)* | |
| | **Section Subtotal _____/24** | |
| | **Presentation** | |
| 10 | Lesson plan is followed *(timing, order of activities, discussion questions)* | |
| 11 | Demonstrates sufficient knowledge of the lesson plan content (*did not require reading directly from the lesson plan during delivery*) | |
| 12 | Demonstrates confidence throughout the delivery of the lesson (*delivery of material was organic; not mechanical*) | |
| 13 | Clarity of explanation, breaks content down to clarify a point or correct misunderstanding | |
| 14 | Maintains atmosphere of mutual respect | |
| 15 | Utilizes instructional methods provided in lesson plan | |
| 16 | Uses training aids as appropriate to the lesson | |
| 17 | Questions are utilized as outlined in the lesson plan | |
| 18 | Performs comprehension checks | |
| 19 | Manages class time efficiently | |

| 20 | Administers the desired evaluation/closure of the lesson as outlined in the lesson plan | |
| | Section Subtotal ____/44 | |
| | Total ____/80 | |

*(Explanation(s) must be provided for any score less than 4)*

## Evaluator's Notes:

| Category # | Feedback |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

|  |  |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

## APPENDIX C.      BPD OFFICER TRAINING EVALUATIONS, MAJOR CONSENT DECREE TRAINING THROUGH DECEMBER 2021

## I.      USE OF FORCE TRAINING ASSESSMENT

Classroom training for use of force was provided in three modules with performance assessments focused on each module.  Performance assessment data for the first module of use of force training is available for 2,170 members of BPD (Tables A-1 to A-3).  Overall, officers' first attempt exam scores were high, averaging 92.1% across all ranks, with higher ranks scoring higher.  Final scores ranged between 60 and 100%, with 96.9% of officers scoring 100%.  Members with the rank of Police Officer had the highest number of attempts to achieve a suitable final score (median of 2 attempts) with those in higher ranks needing fewer attempts.  Tables A-4 to A-6 summarize data for the module 2 use of force training and Tables A-7 to A-9 summarize data for module 3 use of force training.  These modules show similar trends to module 1.  Officers score high upon first attempt overall, achieve near perfect scores with final scores and show higher scores and fewer attempts in higher ranks.

**Table A-1.      UOF MOD 1 First Attempt Scores by Job Title**

|  | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,670 (77.0%) | 91.5 | 90 | 100 (44.0%) | 20 - 100 |
| Police Sergeant | 339 (15.6%) | 93.7 | 100 | 100 (55.8%) | 0 - 100 |
| Police Lieutenant or Captain | 126 (5.8%) | 94.5 | 100 | 100 (59.5%) | 50 - 100 |
| Police Major and Higher Rank | 29 (1.3%) | 94.8 | 100 | 100 (55.2%) | 80 - 100 |
| Overall | 2,170 (100.0%) | 92.1 | 90 | 100 (46.9%) | 0 - 100 |

*Notes:*  Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-2.      UOF MOD 1 Final Attempt Scores by Job Title**

|  | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,670 (77.0%) | 99.5 | 100 | 100 (96.7%) | 60 - 100 |
| Police Sergeant | 339 (15.6%) | 99.6 | 100 | 100 (97.6%) | 80 - 100 |

| | | | | | |
|---|---|---|---|---|---|
| Police Lieutenant or Captain | 126 (5.8%) | 99.8 | 100 | 100 (97.6%) | 90 - 100 |
| Police Major and Higher Rank | 29 (1.3%) | 100 | 100 | 100 (100%) | 100 - 100 |
| Overall | 2,170 (100.0%) | 99.5 | 100 | 100 (96.9%) | 60 - 100 |

*Notes:* Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-3.      UOF MOD 1 Number of Exam Attempts by Job Title**

| | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,670 (77.0%) | 1.7 | 2 | 1 (43.8%) | 1 - 6 |
| Police Sergeant | 339 (15.6%) | 1.6 | 1 | 1 (54.9%) | 1 - 4 |
| Police Lieutenant or Captain | 126 (5.8%) | 1.5 | 1 | 1 (59.5%) | 1 - 4 |
| Police Major and Higher Rank | 29 (1.3%) | 1.4 | 1 | 1 (55.2%) | 1 - 2 |
| Overall | 2,170 (100.0%) | 1.7 | 2 | 1 (46.6%) | 1 - 6 |

*Notes:* Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-4.      UOF MOD 2 First Attempt Scores by Job Title**

| | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,671 (77.0%) | 89.6 | 90 | 100 (40.6%) | 0 - 100 |
| Police Sergeant | 339 (15.6%) | 93.6 | 100 | 100 (58.7%) | 0 - 100 |
| Police Lieutenant or Captain | 126 (5.8%) | 95.0 | 100 | 100 (66.7%) | 30 - 100 |
| Police Major and Higher Rank | 29 (1.3%) | 96.2 | 100 | 100 (69.0%) | 80 - 100 |
| Overall | 2,171 | 90.6 | 90 | 100 (45.3%) | 0 - 100 |

| | (100.0%) | | | | |
|---|---|---|---|---|---|

Notes: Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-5.    UOF MOD 2 Final Attempt Scores by Job Title**

| | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,671 (77.0%) | 98.6 | 100 | 100 (92.2%) | 0 -100 |
| Police Sergeant | 339 (15.6%) | 99.6 | 100 | 100 (97.1%) | 80 - 100 |
| Police Lieutenant or Captain | 126 (5.8%) | 99.5 | 100 | 100 (96.8%) | 80 - 100 |
| Police Major and Higher Rank | 29 (1.3%) | 100 | 100 | 100 (100%) | 100 - 100 |
| Overall | 2,171 (100.0%) | 98.8 | 100 | 100 (93.3%) | 0 - 100 |

Notes: Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-6.    UOF MOD 2 Number of Exam Attempts by Job Title**

| | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,671 (77.0%) | 1.9 | 2 | 1 (40.2%) | 1 - 5 |
| Police Sergeant | 339 (15.6%) | 1.5 | 1 | 1 (58.4%) | 1 - 4 |
| Police Lieutenant or Captain | 126 (5.8%) | 1.5 | 1 | 1 (66.7%) | 1 - 4 |
| Police Major and Higher Rank | 29 (1.3%) | 1.4 | 1 | 1 (69.0%) | 1 - 3 |
| Overall | 2,171 (100.0%) | 1.8 | 2 | 1 (45.0%) | 1 - 5 |

Notes: Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-7.    UOF MOD 3 First Attempt Scores by Job Title**

| | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|

| Police Officer | 1,667 (76.9%) | 95.1 | 100 | 100 (63.7%) | 0 - 100 |
| Police Sergeant | 339 (15.6%) | 97.3 | 100 | 100 (76.4%) | 50 - 100 |
| Police Lieutenant or Captain | 126 (5.8%) | 97.7 | 100 | 100 (77.8) | 80 -100 |
| Police Major and Higher Rank | 29 (1.3%) | 96.6 | 100 | 100 (69.0%) | 80 - 100 |
| Overall | 2,167 (100.0%) | 95.6 | 100 | 100 (66.6%) | 0 - 100 |

*Notes:*  Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-8.     UOF MOD 3 Final Attempt Scores by Job Title**

| | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,667 (76.9%) | 99.7 | 100 | 100 (98.0%) | 40 - 100 |
| Police Sergeant | 339 (15.6%) | 99.9 | 100 | 100 (99.4%) | 80 - 100 |
| Police Lieutenant or Captain | 126 (5.8%) | 99.9 | 100 | 100 (99.2%) | 90 - 100 |
| Police Major and Higher Rank | 29 (1.3%) | 100 | 100 | 100 (100.0%) | 100 - 100 |
| Overall | 2,167 (100.0%) | 99.8 | 100 | 100 (98.3%) | 40 - 100 |

*Notes:*  Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-9.     UOF MOD 3 Number of Exam Attempts by Job Title**

| | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,667 (76.9%) | 1.5 | 1 | 1 (63.5%) | 1 - 4 |
| Police Sergeant | 339 (15.6%) | 1.3 | 1 | 1 (75.5%) | 1 - 4 |
| Police Lieutenant or Captain | 126 (5.8%) | 1.3 | 1 | 1 (77.8%) | 1 - 3 |

| | | | | | |
|---|---|---|---|---|---|
| Police Major and Higher Rank | 29 (1.3%) | 1.4 | 1 | 1 (69.0%) | 1 - 3 |
| Overall | 2,167 (100.0%) | 1.4 | 1 | 1 (66.4%) | 1 - 4 |

*Notes:* Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

## II.   COMMUNITY POLICING TRAINING ASSESSMENT

Tables A-10 to A-12 summarize information by rank for first attempt scores, final attempt, and the number of times the Community Policing Training assessment was taken. Overall, officers scored an average of 89.7% on their first attempt of the assessment, with higher scores achieved in higher ranks. All members of BPD achieved a score of 100% for their final assessment score, averaging two attempts to achieve 100%.

**Table A-10.   Community Policing Exam First Attempt Scores by Job Title**

| | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,586 (76.9%) | 89.1 | 93 | 100 (30.2%) | 0 - 100 |
| Police Sergeant | 326 (15.8%) | 91.5 | 93 | 100 (37.4%) | 0 - 100 |
| Police Lieutenant or Captain | 122 (5.9%) | 92.1 | 93 | 100 (41.8%) | 60 - 100 |
| Police Major and Higher Rank | 26 (1.3%) | 92.1 | 93 | 100 (42.3%) | 66 - 100 |
| Overall | 2,062 (100.0%) | 89.7 | 93 | 100 (32.2%) | 0 - 100 |

*Notes:* Overall includes two individuals with non-rank job titles such as: Director and Police Officer Trainee or Cadet.

**Table A-11.   Community Policing Exam Final Attempt Scores by Job Title**

| | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Overall | 2,062 | 100 | 100 | 100 (100.0%) | 100 - 100 |

*Notes:* No variation by job title because everyone scored 100 on the final attempt. This includes two individuals with non-rank job titles such as: Director and Police Officer Trainee or Cadet.

**Table A-12.   Community Policing Exam Number of Exam Attempts by Job Title**

| | Number | Mean Number of Attempts | Median Number of | Mode Number of Attempts | Range of Number of |
|---|---|---|---|---|---|

| | | | Attempts | | Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,586 (76.9%) | 2.2 | 2 | 2 (39.2%) | 1 - 15 |
| Police Sergeant | 326 (15.8%) | 2.0 | 2 | 2 (41.1%) | 1 - 10 |
| Police Lieutenant or Captain | 122 (5.9%) | 1.8 | 2 | 2 (44.3%) | 1 - 4 |
| Police Major and Higher Rank | 26 (1.3%) | 2.0 | 2 | 1 (42.3%) | 1 - 4 |
| Overall | 2,062 (100.0%) | 2.2 | 2 | 2 (39.7%) | 1 - 15 |

*Notes:* Overall includes two individuals with non-rank job titles such as: Director and Police Officer Trainee or Cadet.

## III.   STOP, SEARCH, AND ARREST ASSESSMENTS

The Stop, Search, and Arrest Training was provided over two days with assessments summarized for both days. Tables A-13 to A-15 provide information by rank for the first exam attempt, final attempt, and number of attempts for the first day assessment of Stop, Search, and Arrest training. Tables 14-16 provide information for day 2.

First attempt scores for both days averaged near 90% (91.3% for day 1 and 89.7% for day 2), with higher ranks achieving higher first attempt scores on average.  It took an average of two attempts for officers to obtain 100% as a final assessment score among all ranks for both days of training.

**Table A-13.   SSA Day 1 First Attempt Scores by Job Title**

| | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,536 (76.0%) | 90.88 | 90 | 90 (39.5%) | 30 - 100 |
| Police Sergeant | 330 (16.4%) | 91.94 | 90 | 90 (42.4%) | 70 - 100 |
| Police Lieutenant or Captain | 124 (6.1%) | 94.44 | 100 | 100 (53.2%) | 80 - 100 |
| Police Major and Higher Rank | 29 (1.4%) | 93.45 | 90 | 100 (48.3%) | 80 - 100 |
| Overall | 2,020 (100%) | 91.31 | 90 | 90 (39.9%) | 30 - 100 |

*Notes:* Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-14.    SSA Day 1 Final Attempt Scores by Job Title**

|  | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Overall | 2,020 (100%) | 100 | 100 | 100 (100%) | 100 - 100 |

*Notes:*  No variation by job title because everyone scored 100 on the final attempt. Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-15.    SSA Day 1 Number of Exam Attempts by Job Title**

|  | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,536 (76.0%) | 2.04 | 2 | 2 (40.8%) | 1 -14 |
| Police Sergeant | 330 (16.4%) | 2.02 | 2 | 1 (39.1%) | 1 - 8 |
| Police Lieutenant or Captain | 124 (6.1%) | 1.69 | 1 | 1 (53.2%) | 1 - 6 |
| Police Major and Higher Rank | 29 (1.4%) | 1.59 | 2 | 1 (48.3%) | 1 - 3 |
| Overall | 2,020 (100%) | 2.01 | 2 | 2 (40.0%) | 1 - 14 |

*Notes:*  Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-16.    SSA Day 2 First Attempt Scores by Job Title**

|  | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,533 (76.0%) | 89.07 | 90 | 90 (42.9%) | 0 - 100 |
| Police Sergeant | 330 (16.4%) | 91.33 | 90 | 90 (41.2%) | 60 - 100 |
| Police Lieutenant or Captain | 124 (6.1%) | 91.61 | 90 | 90 (43.5%) | 70 - 100 |
| Police Major and Higher Rank | 29 (1.4%) | 93.45 | 100 | 100 (51.7%) | 80 - 100 |
| Overall | 2,020 (100%) | 89.66 | 90 | 90 (42.5%) | 0 - 100 |

*Notes:*  Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-17.    SSA Day 2 Final Attempt Scores by Job Title**

|  | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Overall | 2,020 (100%) | 100 | 100 | 100 (100%) | 0 - 100 |

*Notes:*  No variation by job title because everyone scored 100 on the final attempt. Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-18.    SSA Day 2 Number of Exam Attempts by Job Title**

|  | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,533 (76.0%) | 2.32 | 2 | 2 (39.0%) | 1 - 14 |
| Police Sergeant | 330 (16.4%) | 2.18 | 2 | 1 (37.6%) | 1 - 9 |
| Police Lieutenant or Captain | 124 (6.1%) | 1.98 | 2 | 2 (39.5%) | 1 - 7 |
| Police Major and Higher Rank | 29 (1.4%) | 1.76 | 1 | 1 (51.7%) | 1 - 5 |
| Overall | 2,020 (100%) | 2.27 | 2 | 2 (38.0%) | 1 - 14 |

*Notes:*  Overall includes one individual with the rank of Police Officer Trainee or Cadet.

## IV.    BEHAVIORAL HEALTH AND SEXUAL ASSAULT TRAINING ASSESSMENT

Assessment information for Behavioral Health and Sexual Assault training is summarized in Tables A-19 to A-21.  Based on information from 1,992 officers, the average first attempt on the assessment achieved a score of 89%, with final attempt scores averaging 99.7% with a range of 75 to 100% across all ranks.  It took officers up to 16 attempts to achieve their final score, with a median of three attempts across all ranks.  Those in higher ranks took fewer attempts to achieve their final assessment score.

**Table A-19.    Behavioral Health/Sexual Assault Investigations Training First Attempt Scores by Job Title**

|  | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,513 (76.0%) | 88.43 | 90 | 90 (28.4%) | 20 - 100 |
| Police | 328 (16.5%) | 90.95 | 90 | 90 (33.5%) | 70 - 100 |

| | | | | | |
|---|---|---|---|---|---|
| Sergeant | | | | | |
| Police Lieutenant or Captain | 123 (6.2%) | 90.12 | 90 | 90 (27.6%) | 75 - 100 |
| Police Major and Higher Rank | 27 (1.4%) | 90.74 | 90 | 90 (40.7%) | 80 - 100 |
| Overall | 1,992 (100%) | 88.97 | 90 | 90 (29.4%) | 20 - 100 |

*Notes:* Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-20.   Behavioral Health/Sexual Assault Investigations Training Final Attempt Scores by Job Title**

| | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,513 (76.0%) | 99.73 | 100 | 100 (98.0%) | 75 - 100 |
| Police Sergeant | 328 (16.5%) | 99.77 | 100 | 100 (98.5%) | 80 - 100 |
| Police Lieutenant or Captain | 123 (6.2%) | 99.92 | 100 | 100 (99.2%) | 90 - 100 |
| Police Major and Higher Rank | 27 (1.4%) | 99.63 | 100 | 100 (96.3%) | 90 - 100 |
| Overall | 1,992 (100%) | 99.74 | 100 | 100 (98.1) | 75 - 100 |

*Notes:* Overall includes one individual with the rank of Police Officer Trainee or Cadet.

**Table A-21.   Behavioral Health/Sexual Assault Investigations Training Number of Exam Attempts by Job Title**

| | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,513 (76.0%) | 2.89 | 3 | 2 (29.1%) | 1 - 16 |
| Police Sergeant | 328 (16.5%) | 2.73 | 2 | 2 (27.2%) | 1 - 11 |
| Police Lieutenant or Captain | 123 (6.2%) | 2.94 | 2 | 2 (30.1%) | 1 - 13 |
| Police Major and Higher | 27 (1.4%) | 2.81 | 2 | 2 (40.7%) | 1 - 9 |

| | | | | | |
|---|---|---|---|---|---|
| Rank | | | | | |
| Overall | 1,992 (100%) | 2.87 | 3 | 2 (29.1%) | 1 - 16 |

*Notes:* Overall includes one individual with the rank of Police Officer Trainee or Cadet.

## V.     ETHICAL POLICING IS COURAGEOUS TRAINING ASSESSMENT

The Ethical Policing Is Courageous (EPIC) training assessment is summarized in Tables A-22 to A-24 based on exams completed by 2,097 officers.  Overall, officers averaged a first attempt score of 86.8%, with those at the rank of Major or higher scoring highest (88.5%).  Final scores were nearly perfect, with only a small number of officers at the rank of Officer scoring below 100% (but above 80%).  Officers took up to 11 attempts to achieve their final score, averaging 2 attempts across all ranks in the Department.

**Table A-22.   EPIC First Attempt Scores by Job Title**

| | Number | Mean First Attempt Score | Median First Attempt Score | Mode First Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,612 (76.9%) | 86.45 | 90 | 90 (31.5%) | 40 - 100 |
| Police Sergeant | 329 (15.7%) | 88.02 | 90 | 100 (32.2%) | 50 – 100 |
| Police Lieutenant or Captain | 123 (5.9%) | 88.05 | 90 | 90 (37.4%) | 60 - 100 |
| Police Major and Higher Rank | 27 (1.3%) | 88.52 | 90 | 90 (55.6%) | 70 - 100 |
| Overall | 2,097 (100%) | 86.80 | 90 | 90 (32.1%) | 40 - 100 |

*Notes:* Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-23.       EPIC Final Attempt Scores by Job Title**

| | Number | Mean Final Attempt Score | Median Final Attempt Score | Mode Final Attempt Score | Score Range |
|---|---|---|---|---|---|
| Police Officer | 1,612 (76.9%) | 99.99 | 100 | 100 (99.9%) | 80 - 100 |
| Police Sergeant | 329 (15.7%) | 100 | 100 | 100 (100%) | 100 - 100 |
| Police Lieutenant or Captain | 123 (5.9%) | 100 | 100 | 100 (100%) | 100 - 100 |

| | | | | | |
|---|---|---|---|---|---|
| Police Major and Higher Rank | 27 (1.3%) | 100 | 100 | 100 (100%) | 100 - 100 |
| Overall | 2,097 (100%) | 99.99 | 100 | 100 (100%) | 80 – 100 |

*Notes:*  Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**Table A-24.        EPIC Number of Exam Attempts by Job Title**

| | Number | Mean Number of Attempts | Median Number of Attempts | Mode Number of Attempts | Range of Number of Attempts |
|---|---|---|---|---|---|
| Police Officer | 1,612 (76.9%) | 2 | 2 | 2 (54.5%) | 1 - 9 |
| Police Sergeant | 329 (15.7%) | 1.96 | 2 | 2 (48.0%) | 1 - 6 |
| Police Lieutenant or Captain | 123 (5.9%) | 2.04 | 2 | 2 (49.6%) | 1 - 11 |
| Police Major and Higher Rank | 27 (1.3%) | 2.04 | 2 | 2 (63.0%) | 1 - 4 |
| Overall | 2,097 (100%) | 2 | 2 | 2 (53.3%) | 1 - 11 |

*Notes:*  Overall includes six individuals with non-rank job titles such as: Director, Contract Specialist, Compliance Manager, and Police Officer Trainee or Cadet.

**APPENDIX D.          HIGHLIGHTS OF STUDENT OFFICER SURVEY DATA TABLES BY SURVEY**

**I.        USE OF FORCE/FAIR & IMPARTIAL POLICING I TRAINING SURVEY (DAY 1)**

**Table A-25.    Use of Force/FIP I Training: Usefulness of the Course on Likert scale 1 – 4 (4 = best rating)**

| Job Title | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) | Missing Response Number |
|---|---|---|---|---|---|
| Police Officer | 1,277 (72.6%) | 3.5 | 4 | 4 (55.6%) | 3 (0.2%) |
| Police Sergeant | 329 (18.7%) | 3.5 | 4 | 4 (55.3%) | 0 |
| Police Lieutenant or Captain | 122 (6.9%) | 3.4 | 3 | 4 (48.8%) | 1 (0.8%) |
| Police Major and Higher Rank | 29 (1.6%) | 3.6 | 4 | 4 (65.5%) | 0 |
| Police Officer Trainee or Cadet | 1 (0.06%) | 4 | 4 | 4 (100.0%) | 0 |
| Other Staff | 1 (0.06%) | 4 | 4 | 4 (100.0%) | 0 |
| Overall | 1,759 (100.0%) | 3.5 | 4 | 4 (55.3%) | 4 (0.2%) |

**Table A-26.    Use of Force/FIP I Training: Selection of All Answers That Apply: This Course . . . (Percentage of Officers Agreeing with Statement)**

| | Police Officer | Sergeant | Lt./Captain | Major or Higher | Overall |
|---|---|---|---|---|---|
| Clearly explained policy updates relating to uses of force | 996 (78.0%) | 244 (74.2%) | 88 (72.1%) | 25 (86.2%) | 1,354 (77.0%) |
| Helped me to explain how uses of force relate to police legitimacy. | 901 (70.6%) | 238 (72.3%) | 79 (64.8%) | 24 (82.8%) | 1,243 (70.1%) |
| Increased my confidence in applying de-escalation skills in the field. | 822 (64.4%) | 211 (64.1%) | 76 (62.3%) | 24 (82.8%) | 1,135 (64.5%) |
| Helped me to explain how the critical decision making model promotes member actions that uphold the Department's core values. | 867 (67.9%) | 227 (69.0%) | 80 (65.6%) | 26 (89.7%) | 1,201 (68.3%) |
| The "Red Man" use of force scenario challenged me to think | 885 (69.3%) | 226 (68.7%) | 82 (67.2%) | 23 (79.3%) | 1,217 (69.2%) |

| critically and to apply new use of force policy to a realistic situation. | | | | | |
|---|---|---|---|---|---|
| Number of Surveys | 1,277 (100.0%) | 329 (100.0%) | 122 (100.0%) | 29 (100.0%) | 1,759 (100.0%) |

*Notes:* One Officer Trainee and one Other Staff are included in the overall total but not listed in individual columns.

**Table A-27.   Use of Force/FIP I Training: Selection of Course Topics Found Useful**

| | Police Officer | Sergeant | Lt./Captain | Major or Higher | Overall |
|---|---|---|---|---|---|
| Use of Force and Police Legitimacy | 896 (70.2%) | 232 (70.5%) | 84 (68.9%) | 26 (89.7%) | 1,239 (70.4%) |
| Use of Force Policy 1115 Updates | 970 (76.0%) | 263 (80.0%) | 99 (81.1%) | 27 (93.1%) | 1,361 (77.4%) |
| De-escalation | 954 (74.8%) | 257 (78.1%) | 92 (75.4%) | 26 (89.7%) | 1,330 (75.6%) |
| Critical Decision Making Module | 874 (68.4%) | 238 (72.3%) | 82 (67.2%) | 29 (100.0%) | 1,224 (69.6%) |
| Baton Re-certification Training | 765 (60.0%) | 218 (66.3%) | 84 (68.9%) | 25 (86.2%) | 1,093 (62.1%) |
| Live Use of Force Scenario | 1,005 (78.7%) | 285 (86.6%) | 101 (82.8%) | 27 (93.1%) | 1,419 (80.7%) |
| Number of Surveys | 1,277 (100.0%) | 329 (100.0%) | 122 (100.0%) | 29 (100.0%) | 1,759 (100.0%) |

*Notes:* The question prompt was, "Please select all of the course topics you found useful." One Officer Trainee and one Other Staff are included in the overall total but not listed in individual columns.

## II.   COMMUNITY POLICING TRAINING SURVEY

### A.   Pre-Survey Results

A total of 1,437 users gave their consent to complete a pre-survey for the Community Policing Training.  A total of 489 pre-surveys were excluded because they were completed on the same date as the post-survey.  Those surveys were excluded and the table below represents information from 948 users that took the pre-survey on the first day of training. Not all users answered all questions.  By job title, most respondents were Police Officers (78.8%), followed by Sergeants (15.1%), Lieutenants or Captains (5.2%), and those with the rank of Major or higher (0.8%). There was one respondent with the job title "Compliance Manager."

**Table A-28:   Community Policing Training: Pre-Survey: Question Responses from Strongly Disagree (1) to Strongly Agree (5)**

| Question | Number of Responses | Mean Response | Median Response | Mode Response |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 2. I feel prepared to engage in community policing. | 935 (98.6%) | 4.2 | 4-Agree | 4-Agree (43.7%) |
| 4. I understand how social conditions, such as racism and red lining, have impacted Black people in Baltimore. | 933 (98.4%) | 4.2 | 4-Agree | 4-Agree & 5-Strongly Agree (42.2% each) |
| 6. I understand my role in BPD's community policing plan. | 931 (98.2%) | 4.2 | 4-Agree | 4-Agree (46.3%) |
| 8. I am prepared to engage with the community informally. | 933 (98.4%) | 4.3 | 4-Agree | 4-Agree (47.6%) |
| 10. I understand how to engage in daily problem solving, such as solving small problems, conflict, or issues, while on duty. | 933 (98.4%) | 4.3 | 4-Agree | 4-Agree (46.6%) |
| 12. It is clear to me what constitutes a "lesser" offense in Baltimore. | 933 (98.4%) | 4.1 | 4-Agree | 4-Agree (48.0%) |
| 14. I understand how to problem-solve for policing lesser offenses. | 932 (98.3%) | 4.1 | 4-Agree | 4-Agree (45.9%) |
| 16. As a member of BPD, I understand how I can formally engage with vulnerable populations, such as youth, LGBTQ people, those experiencing homelessness, and those living with a mental illness or substance use disorder. | 932 (98.3%) | 4.2 | 4-Agree | 4-Agree (47.1%) |
| 18. I understand how to apply the SARA Model as part of my role in successfully implementing BPD's community policing program. | 918 (96.8%) | 4.0 | 4-Agree | 4-Agree (44.2%) |
| 20. I know how to document my community policing activities in CAD. | 908 (95.8%) | 4.0 | 4-Agree | 4-Agree (39.1%) |

## B.    Post-Survey Results

A total of 1,377 users gave consent to complete a post-survey for the Community Policing Training. Most of the respondents were Police Officers (76.4%), followed by Sergeants (15.5%), Lieutenants or Captains (6.5%), and Major or higher rank (1.5%). There was one Trainee and one Compliance Manager as well.

**Table A-29:   Community Policing Training: Post-Survey: Question Responses from Strongly Disagree (1) to Strongly Agree (5)**

| Question | Number of Responses | Mean Response | Median Response | Mode Response |
|---|---|---|---|---|
| 2. I feel prepared to engage in community policing. | 1,365 (99.1%) | 4.3 | 4-Agree | 5-Strongly Agree (46.0%) |
| 4. I understand how social conditions, such | 1,365 | 4.3 | 4-Agree | 5-Strongly |

| | | | | |
|---|---|---|---|---|
| as racism and red lining, have impacted Black people in Baltimore. | (99.1%) | | | Agree (45.1%) |
| 6. I understand my role in BPD's community policing plan. | 1,363 (99.0%) | 4.3 | 4-Agree | 4-Agree (44.8%) |
| 8. I am prepared to engage with the community informally. | 1,361 (98.8%) | 4.3 | 4-Agree | 4-Agree (45.1%) |
| 10. I understand how to engage in daily problem solving, such as solving small problems, conflict, or issues, while on duty. | 1,360 | 4.3 | 4-Agree | 4-Agree (46.8%) |
| 12. It is clear to me what constitutes a "lesser" offense in Baltimore. | 1,361 (98.8%) | 4.3 | 4-Agree | 4-Agree (46.1%) |
| 14. I understand how to problem-solve for policing lesser offenses. | 1,359 (98.7%) | 4.3 | 4-Agree | 4-Agree (48.1%) |
| 16. As a member of BPD, I understand how I can formally engage with vulnerable populations, such as youth, LGBTQ people, those experiencing homelessness, and those living with a mental illness or substance use disorder. | 1,359 (98.7%) | 4.3 | 4-Agree | 4-Agree (47.8%) |
| 18. I understand how to apply the SARA Model as part of my role in successfully implementing BPD's community policing program. | 1,352 (98.2%) | 4.1 | 4-Agree | 4-Agree (46.5%) |
| 20. I know how to document my community policing activities in CAD. | 1,354 (98.3%) | 4.1 | 4-Agree | 4-Agree (42.1%) |
| 24. The exercises in the training were effective for demonstrating and practicing the concepts learned. | 1,352 (98.2%) | 4.2 | 4-Agree | 4-Agree (47.7%) |
| 26. As a result of this training, I feel confident in engaging in community policing activities. | 1,348 (97.9%) | 4.2 | 4-Agree | 4-Agree (46.1%) |

## C.     Community Policing Survey Pre- and Post-Training Comparison

The pre and post surveys asked 10 substantive questions that were the same on both surveys. The table below compares the mean responses for those questions to show group-based differences. Generally, there appeared to be small improvement in understanding for most items, with slightly larger gains in understanding what "lesser" offenses are and how to problem-solve for policing lesser offenses. There was no group-level change in respondents' answers to how well they understand how to engage in daily problem solving or how prepared they are to engage with the community informally.

**Table A-30:   Community Policing Training: Survey Pre/Post Comparison**

| Question | Pre-Survey Mean Response | Post-Survey Mean Response | Difference |
|---|---|---|---|
| 2. I feel prepared to engage in community policing. | 4.2 | 4.3 | +0.1 |
| 4. I understand how social conditions, such as racism and red lining, have impacted Black people in Baltimore. | 4.2 | 4.3 | +0.1 |
| 6. I understand my role in BPD's community policing plan. | 4.2 | 4.3 | +0.1 |
| 8. I am prepared to engage with the community informally. | 4.3 | 4.3 | No change |
| 10. I understand how to engage in daily problem solving, such as solving small problems, conflict, or issues, while on duty. | 4.3 | 4.3 | No change |
| 12. It is clear to me what constitutes a "lesser" offense in Baltimore. | 4.1 | 4.3 | +0.2 |
| 14. I understand how to problem-solve for policing lesser offenses. | 4.1 | 4.3 | +0.2 |
| 16. As a member of BPD, I understand how I can formally engage with vulnerable populations, such as youth, LGBTQ people, those experiencing homelessness, and those living with a mental illness or substance use disorder. | 4.2 | 4.3 | +0.1 |
| 18. I understand how to apply the SARA Model as part of my role in successfully implementing BPD's community policing program. | 4.0 | 4.1 | +0.1 |
| 20. I know how to document my community policing activities in CAD. | 4.0 | 4.1 | +0.1 |

## III.    STOP, SEARCH, AND ARREST (SSA) TRAINING SURVEY

The SSA survey consisted total of five (5) questions: (1) three questions are measured on Likert scale 1 -5, and (2) two questions are in qualitative nature/narrative responses.

A total of 1,955 users participated in a survey for the two-days long Stop, Search and Arrests Training. Not all users answered all three quantitative questions.  By job title, most respondents were Police Officers (76.1%), followed by Sergeants (16.2%), Lieutenants or Captains (6%), and those with the rank of Major or higher (1.4%).  There was one respondent with the job title "Police Officers Trainee or Cadet."

**Table A-31.   SSA Training: Based on these lessons, I know how to apply the SSA policies on Likert scale 1 – 5 (1=Strongly Disagree and 5 = Strongly Agree)**

| Job Title | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) |
|---|---|---|---|---|
| Police Officer | 1,490 (76.2%) | 4.06 | 4 | 4 (47.5%) |
| Police Sergeant | 317 (16.2%) | 4.11 | 4 | 4 (50.8%) |
| Police Lieutenant or Captain | 119 (6.1%) | 4.26 | 5 | 5 (50.4%) |
| Police Major and Higher Rank | 28 (1.4%) | 4.39 | 5 | 5 (71.4%) |
| Police Officer Trainee or Cadet | 1 (0.1%) | 5 | 5 | 5 (100%) |
| Overall | 1,955 (100%) | 4.08 | 4 | 4 (46.9%) |

**Table A-31.   SSA Training: I feel confident to conduct stops in line with SSA policies and law on Likert scale 1 – 5 (1= Strongly Disagree and 5 = Strongly Agree)**

| Job Title | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) |
|---|---|---|---|---|
| Police Officer | 1,474 (76.1%) | 4.06 | 4 | 4 (48.0%) |
| Police Sergeant | 318 (16.4%) | 4.04 | 4 | 4 (45.0%) |
| Police Lieutenant or Captain | 118 (6.1%) | 4.23 | 4 | 5 (49.2%) |
| Police Major and Higher Rank | 27 (1.4%) | 4.44 | 5 | 5 (77.8%) |
| Police Officer Trainee or Cadet | 1 (0.1%) | 5 | 5 | 5 (100%) |
| Overall | 1,955 (100%) | 4.07 | 4 | 4 (46.3%) |

**Table A-32.   SSA Training: These Lessons were engaging on Likert scale 1 – 5 (1= Strongly Disagree and 5 = Strongly Agree)**

| Job Title | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) |
|---|---|---|---|---|
| Police Officer | 1,475 (76.1%) | 4.14 | 4 | 4 (41.5%) |
| Police Sergeant | 318 (16.4%) | 4.15 | 4 | 5 (43.1%) |
| Police Lieutenant or Captain | 117 (6.0%) | 4.37 | 5 | 5 (60.7%) |
| Police Major and | 26 (1.3%) | 4.35 | 5 | 5 (73.1%) |

| | | | | |
|---|---|---|---|---|
| Higher Rank | | | | |
| Police Officer Trainee or Cadet | 1 (0.1%) | 5 | 5 | 5 (100%) |
| Overall | 1,937 (100%) | 4.16 | 4 | 5 (43.3%) |

## IV.   BEHAVIORAL HEALTH & SEXUAL ASSAULT INVESTIGATION TRAINING

A total of 1,925 users participated in a survey for the Behavioral Health and Sexual Assault Training ("BHA" and "SA," respectively).  Each participant could select multiple answers from the multiple-choice questions.

More than half of all participants selected *the Behavioral and Health Policy Updates* (53.6%) as the most useful topic in BHA training followed by the *Mental Illness Overview* (51.0%) and *Scenario Discussion* (49.3%).  Only 33.2% of the participant found the *Substance Use Disorder* as most useful.

**Table A-33.   BHA/SA Training: Choose the(s) topics that you found most useful in BHA.**

| Job Title | Behavioral Health Policy Updates | Emergency Petition | Mental Illness Overview | Scenario Discussions | Substance Use Disorder | Working with Person in Suicidal Crisis |
|---|---|---|---|---|---|---|
| Police Officer | 808 (78.3%) | 580 (79.7%) | 749 (76.3%) | 716 (75.4%) | 484 (78.2%) | 684 (76.3%) |
| Police Sergeant | 151 (14.6%) | 105 (14.4%) | 156 (15.9%) | 154 (16.2%) | 94 (15.2%) | 146 (16.3%) |
| Police Lieutenant or Captain | 60 (5.8%) | 35 (4.8%) | 63 (6.4%) | 68 (7.2%) | 34 (5.5%) | 54 (6.0%) |
| Police Major and Higher Rank | 13 (1.3%) | 8 (1.1%) | 13 (1.3%) | 10 (1.1%) | 7 (1.1 %) | 12 (1.3%) |
| Police Officer Trainee or Cadet | 0 | 0 | 1 (0.1%) | 1 (0.1%) | 0 | 1 (0.1%) |
| Overall | 1,032 (100%) | 728 (100%) | 982 (100%) | 949 (100%) | 619 (100%) | 897 (1.3%) |

In the SA section of the survey, the participants were more likely to select the *Trauma Effect on Behavior* as most useful topic (62.1% of the participant selected it), followed by the *Being Trauma Informed* (49.3%) and *Patrol Officers Responsibilities Relating to Sexual Assault Investigations* (47.4%). Less than 31% of participants found *Survival Reflexes* topic in SA training to be most useful.

100

**Table A-34.   BHA/SA Training: Choose the(s) topics that you found most useful in Sexual Assault Investigations**

| Job Title | Being Trauma Informed | Obstacles to Effective Victim Investigations | Overcoming Challenges and Barriers: Establish a Rapport and Trust | Patrol Officers responsibilities relating to Sexual Assault Investigations | Survival Reflexes | Trauma's Effect on Behavior |
|---|---|---|---|---|---|---|
| Police Officer | 722 (76.1%) | 583 (76.7%) | 629 (76.8%) | 728 (79.8%) | 454 (76.4%) | 914 (76.4%) |
| Police Sergeant | 156 (16.4%) | 119 (15.7%) | 126 (15.4%) | 129 (14.1%) | 91 (15.3%) | 192 (16.1%) |
| Police Lieutenant or Captain | 56 (5.9%) | 48 (6.3%) | 51 (6.2%) | 43 (4.7%) | 39 (6.6%) | 71 (5.9%) |
| Police Major and Higher Rank | 14 (1.5%) | 9 (1.2%) | 12 (1.5%) | 11 (1.2%) | 9 (1.5%) | 18 (1.5%) |
| Police Officer Trainee or Cadet | 1 (0.1%) | 1 (0.1%) | 1 (0.1%) | 1 (0.1%) | 1 (0.1%) | 1 (0.1%) |
| Overall | 949 (100%) | 760 (100%) | 819 (100%) | 912 (100%) | 594 (100%) | 1,196 (100%) |

**Table A-35:   BHA/SA Training: In general, how would you rate the facilitators' ability to deliver the instructional content in BHA?**

| Job Title | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) | Missing Response Number |
|---|---|---|---|---|---|
| Police Officer | 1,453 (75.8%) | 4.72 | 5 | 5 (80.5%) | 0 |
| Police Sergeant | 317 (16.5%) | 4.60 | 5 | 5 (69.4%) | 0 |
| Police Lieutenant or Captain | 120 (6.3%) | 4.63 | 5 | 5 (71.7%) | 0 |
| Police Major and Higher Rank | 25 (1.3%) | 4.60 | 5 | 5 (72.0%) | 0 |
| Police Officer Trainee or Cadet | 1 (0.1%) | 5 | 5 | 5 (100%) | 0 |
| Overall | 1,916 (100%) | 4.70 | 5 | 5 (78.0%) | 0 |

101

**Table A-36:   BHA/SA Training: In general, how would you rate the facilitators' ability to deliver the instructional content in Sexual Assault Investigations?**

| Job Title | Number of Surveys | Average Response (mean) | Median Response | Most Frequent Response (mode) | Missing Response Number |
|---|---|---|---|---|---|
| Police Officer | 1,452 (75.8%) | 4.74 | 5 | 5 (81%) | 0 |
| Police Sergeant | 317 (16.6%) | 4.69 | 5 | 5 (75.1%) | 0 |
| Police Lieutenant or Captain | 120 (6.3%) | 4.71 | 5 | 5 (77.5%) | 0 |
| Police Major and Higher Rank | 25 (1.3%) | 4.68 | 5 | 5 (80.0%) | 0 |
| Police Officer Trainee or Cadet | 1 (0.1%) | 5 | 5 | 5(100%) | 0 |
| Overall | 1,915 (100%) | 4.73 | 5 | 5 (80.1%) | 0 |