# EXHIBIT A



BALTIMORE CONSENT DECREE MONITORING TEAM
# SEVENTH SEMIANNUAL REPORT
February 15, 2022

**CD**
Monitoring
Team

Venable LLP and 21CP Solutions LLC

# TABLE OF CONTENTS

OVERVIEW                                                                          2

INTRODUCTION                                                                      3

EXECUTIVE SUMMARY                                                                 8

FINDINGS                                                                         18

  Training                                                             19

  Misconduct Investigations and Discipline                            24

  Technology                                                           32

  Staffing, Performance Evaluations and Promotions                    36

  Stops, Searches, Arrests and Voluntary Police-Community Interactions 41

  Impartial Policing                                                   48

  Use of Force                                                         51

  Transportation of Persons in Custody                                 55

  Interactions with Individuals with Behavioral Health Disabilities and In Crisis 60

  First Amendment-Protected Activities                                 66

  Interactions with Youth and Coordination with Baltimore School Police 71

  Community Policing and Engagement                                    75

  Sexual Assault Investigations                                        79

  Recruitment, Hiring and Retention                                    82

  Officer Assistance and Support                                       88

SUMMARY OF MONITORING TEAM ACTIVITIES                                            92

# OVERVIEW

## Consent Decree Monitoring Team's 7th Semiannual Report (Feb. 15, 2022)

## The Monitoring Team's Key Findings

- Having implemented foundational reforms in policies, training and operations, BPD is appropriately turning its focus to demonstrating *outcomes* that reflect the Consent Decree's objective of constitutional, accountable, community-oriented policing: stops, searches and arrests made with proper legal justification and without discrimination; de-escalation when feasible and reasonable uses of force only when necessary; safe prisoner transport; permitting free speech without retaliation; reduced police involvement with individuals in crisis; truthful report-writing; close, corrective supervision; timely, thorough internal investigations; and meaningful discipline for misconduct.

- As a new Monitoring Team report concludes, BPD's reinvigorated training academy continues to lead the way to compliance, providing sound classroom instruction and e-learning on an array of Consent Decree subjects.

- With its nascent efforts to implement the recommendations in a 2020 report identifying shortcomings in Baltimore's behavioral health system, including an initiative to divert certain 911 calls involving individuals in crisis to behavioral health professionals, the City is ground zero for reimagining public safety.

- By implementing a new Records Management System that relies on electronic field-based reporting, BPD is turning the corner to data-driven, evidence-based policing—but must now ensure that officers properly use the new technology to record their actions.

- There are tangible signs that BPD's Public Integrity Bureau is improving its investigative efficiency; it must now match those improvements with verifiable advancements in investigative quality.

- BPD is rapidly hiring new officers and offering good financial and workplace-based incentives for existing officers to remain with the Department, yet consistent with nationwide trends, it lost 108 more officers than it hired in 2021, making it harder to meet the community policing, supervision and PIB requirements of the Consent Decree.

- A new Monitoring Team report finds that BPD transport vehicles are adequately equipped for proper detainee transport, and that BPD officers are generally transporting detainees safely, but BPD must improve its record-keeping practices for both transports and vehicle equipment inspections to achieve compliance.

## What's Next

- BPD will perform self-assessments or audits on use of force, responses to behavioral crises, arrests resulting in release without charge, community policing, sex assault investigations, misconduct complaints and investigations, responses to First Amendment activity, detainee transports, and transport vehicle equipment.

- BPD will regularly evaluate the functionality and utilization of its new Records Management System and, provided the data being captured is sufficiently reliable and comprehensive, begin rigorous assessments of investigative stops, weapons pat-downs, searches, and arrests.

- BPD will develop and deliver Department-wide training on youth interactions, crisis intervention, stops, searches, and arrests, and specialized courses for supervisors, Crisis Intervention Team officers, field training officers, and Performance Review Board members.

- BPD will finalize revised discipline policies, which will incorporate requirements from state laws enacted in 2021.

- The City will weigh expanding the categories of 911 calls eligible for diversion to behavioral health professionals.

- BPD will continue piloting targeted neighborhood policing plans as part of its Community Policing Plan.

- BPD will continue implementing its Staffing, Recruitment, and Retention Plans.

- The Monitoring Team will conduct assessments of use of force, sex assault investigations, arrests, misconduct investigations, interactions with individuals in crisis, Performance Review Board performance, hiring, recruitment, retention, and officer wellness programming.

- If the pandemic recedes, the Monitoring Team will complete a community survey, a custodial arrestee survey, and officer focus groups.



# INTRODUCTION

## THE CONSENT DECREE

In May 2015, the Civil Rights Division of the United States Department of Justice ("DOJ") initiated an investigation of the Baltimore Police Department ("BPD"). The investigation, completed in 2016, found that BPD was engaged in a pattern-or-practice of constitutional violations, including using excessive force, infringing on the First Amendment freedoms of speech and assembly, and stopping, searching, and arresting people in violation of the Fourth Amendment and based on their race. After making these findings, DOJ entered into negotiations with BPD and the City of Baltimore in an effort to settle the parties' differences. BPD and the City did not admit DOJ's allegations, but they recognized that the allegations raised long-standing issues of considerable importance to City residents. As a result, BPD and the City agreed to resolve DOJ's allegations through a Consent Decree. The Consent Decree is a court-approved settlement agreement between DOJ, the City and BPD. United States District Court Judge James K. Bredar is the judge who approved the Consent Decree. Judge Bredar now oversees the Consent Decree's implementation. Because the Consent Decree is a court order, Judge Bredar has the power to enforce its provisions and ensure that BPD and the City do what it requires.

The Consent Decree obligates BPD and the City to adopt a comprehensive set of reforms designed to promote fair and constitutional policing, rebuild BPD's relationships with Baltimore's communities, and ensure public safety. The Consent Decree prescribes corrective action in a number of areas, including: community engagement; community policing; stops, searches, arrests, and voluntary police-community interactions; impartial policing; interacting with people with behavioral health disabilities and in crisis; use of force; interactions with youth; transportation of persons in custody; First Amendment protected activities; handling of reports of sexual assault; technology; supervision; misconduct investigations and discipline;

coordination with Baltimore City School Police; recruitment, hiring, and retention; staffing, performance evaluations, and promotions; and officer assistance and support.

The Consent Decree, in short, requires transformational institutional change. BPD will achieve compliance with the Consent Decree and free itself from Court oversight when it demonstrates not only that it has successfully implemented all of the required foundational improvements in policies, training, technology and operations, but also that those improvements have translated, measurably and sustainably, into constitutional, community-oriented policing.

Achieving transformational change in a large police department does not happen overnight. As the Consent Decree envisions, it takes time, and it requires adherence to a rigorous, methodical reform process. In each area of the Consent Decree that addresses how officers discharge their duties (*e.g.*, stops/searches/arrests, use of force, and transportation of persons in custody, to name a few), BPD first must draft and adopt revised *policies*. Then BPD must develop and conduct *training* on those revised policies. At the same time, to ensure that the new policies and the new training take root, BPD must revamp vital components of its infrastructure. For instance, BPD must overhaul its technology to become a modern, data-driven, efficient police force, must fortify its system of internal investigations and discipline to enhance officer accountability, must improve the training and supervision of rank-and-file officers to ensure lawful, effective job performance, and must deploy its officers and improve recruiting and retention so as to simultaneously enhance public safety and promote community-oriented policing. It is only after officers have been trained on the new policies, and after infrastructure upgrades are well underway, that community members can expect to see sustained, tangible changes in the conduct of BPD officers. The Consent Decree contemplates that this process will take several years or more.

# THE MONITORING TEAM

On October 3, 2017, Judge Bredar appointed a Monitoring Team to assist him in overseeing implementation of the Consent Decree. The Monitoring Team consists of a lead monitor, Kenneth Thompson, and a team of experts in policing and police reform, civil rights enforcement, psychology, social science, organizational change, data and technology, and community engagement. Serving as an agent of the Court, the Monitoring Team plays three principal roles: arbiter, technical advisor, and facilitator. As arbiter, the Monitoring Team oversees the day-to-day efforts of BPD and the City to comply with the reforms the Consent Decree requires. The Monitoring Team reviews, provides feedback on, and ultimately recommends Court approval or

disapproval of the changes BPD makes in its policies, its training and, ultimately, its policing practices. As technical advisor, the Monitoring Team draws upon decades of collective experience to provide BPD with technical assistance, including advice about national best practices, to help guide BPD toward satisfying the requirements of the Consent Decree. As facilitator, the Monitoring Team seeks to ensure that all stakeholders from within BPD and across Baltimore's diverse communities have the opportunity to participate in the reform process (CD 442).[1]

The Court and the Monitoring Team are not alone in overseeing BPD's implementation of the requirements of the Consent Decree. DOJ continues to play an active role. As the plaintiff in the lawsuit that produced the Consent Decree, DOJ retains the right to enforce the Consent Decree if BPD ever fails to comply with its terms. Accordingly, like the Monitoring Team, DOJ is assessing BPD's progress toward compliance and lets BPD, the Monitoring Team and the Court know when it believes BPD is making progress and when it believes BPD is not. In addition, like the Monitoring Team, DOJ provides technical assistance to BPD as BPD works toward compliance. The reform process under the Consent Decree thus involves four fully engaged entities: BPD, the City, the Monitoring Team/the Court, and DOJ.

# THIS REPORT

One of the essential duties of the Monitoring Team is to issue semi-annual public reports that inform the Court and the community about the progress BPD is making toward compliance with the Consent Decree's requirements. The reports explain, for each area of the Consent Decree: (1) which compliance measures BPD has taken in the preceding six months; (2) BPD's progress toward compliance; (3) what challenges BPD will continue to face as it strives to achieve compliance; and (4) what to expect from BPD in the next reporting period.

This document is the Monitoring Team's seventh semi-annual report. The first report was filed in July 2018; the second in January 2019; the third in July 2019; the fourth in January 2020; the fifth (which encompassed a comprehensive lookback of the first 30 months of monitoring) in September 2020; and the sixth in May 2021. *See* ECF Nos. 126-1, 178-1, 220-1, 278-1, and 342-1, 414-1. In this report, the Monitoring Team will not only provide a narrative assessment of the progress BPD and the City are making in each area of reform, but compliance scores, too. The overall compliance scores in each area are reflected in the spreadsheet in **Exhibit 1** and included in the body of

---

[1] All citations to a specific paragraph of the Consent Decree follow the text that relies on that paragraph and appear in parentheses containing "CD" and the number of the cited paragraph. Thus, the citation above, which is to Paragraph 442 of the Consent Decree, follows the relied-on provision of Paragraph 442 and appears as "(CD 442)."

this report. The compliance scores for each requirement (*i.e.,* each paragraph) within each area are reflected in the much longer spreadsheet in **Exhibit 2**.

The compliance scoring framework is as follows:

**0 - Not Assessed**: The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 - Not Started:** The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:** The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:** The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in paragraph 504 of the Consent Decree.

**5 – Sustained Compliance**: The City/Department has complied fully with the requirement and has demonstrated sustained

compliance by consistently adhering to the requirement over time, as defined in paragraph 504 of the Consent Decree.

When reading this report and examining the compliance scores, again bear in mind that achieving transformational change in a large police department takes years. Thus, while BPD and the City have put in place the essential building blocks for lasting reform over the past four years—in policies, training, and departmental operations—they are only beginning to demonstrate that the changes underway are producing change on the street. For that reason, even in areas where policies have been revised and training delivered (e.g., use of force, stops/searches/arrests, transportation of persons in custody), BPD's overall compliance score is generally "4c" (implementation—on track); it has not yet attained initial compliance, or a score of "4d." That is so even though BPD and the City have largely met the hundreds of deadlines and adhered to the ambitious schedule established in the annual Monitoring Plans.

Note that the overall score the Monitoring Team gives to BPD or the City in a particular area does not mean that BPD or the City has attained that score for each and every one of the individual requirements in that area. For certain requirements, the Monitoring Team might give BPD or the City a score lower than the overall score; for others, a higher score. Thus, for instance, in the area of Training-General, the Monitoring Team has given BPD an overall score of "implementation—on track," or (4c), but scores of "initial compliance," or (4d), for certain individual requirements and "implementation—on track" for others. *See* **Exhibit 2.**  The overall score in an area simply reflects the Monitoring Team's overall assessment of BPD's progress toward compliance in that area.

The fact that BPD and the City have kept pace for four years but still have more to do before achieving sustained compliance proves what the Monitoring Plans implicitly acknowledge: many of the Consent Decree's most important requirements take five years or more to satisfy. That was anticipated from the beginning. BPD, its officers, the City, community members, the Monitoring Team and DOJ need sufficient time and opportunity to focus on each area of reform, and on each requirement within each area, to ensure that change is real and enduring. Change that is rushed, haphazard and superficial is not sustainable and does not qualify as true reform.



# EXECUTIVE SUMMARY

Over the past four years, BPD and the City have taken major strides toward compliance with the Consent Decree's hundreds of requirements. Comparing the reform process to tearing down a house and rebuilding it from the ground up, BPD and the City have laid a new foundation and erected the frame.

BPD has revised or written over 50 core policies covering every area of the Consent Decree. It has trained officers on most of these policies and will soon deliver training on the rest. Critically, this past summer, it implemented a modernized electronic reporting system. And it continues with the overhaul of its internal affairs function, the expansion of its internal audit function, the implementation of its community policing initiatives, and the improvement of recruitment, hiring, retention, and officer wellness programs.

> **Comparing the reform process to tearing down a house and rebuilding it from the ground up, BPD and the City have laid a new foundation and erected the frame.**

The City is actively participating in the reform effort. It has begun work to implement the ambitious recommendations in a detailed report, or "Gap Analysis," on the shortcomings of the City's behavioral health system. This includes a recent pilot program that diverts certain 911 calls involving individuals in crisis to behavioral health specialists.

Tangible signs of change are emerging. BPD's training academy, once understaffed and listless, is becoming a national model. The number of potentially problematic arrests, particularly for low-level offenses, appears to be declining. According to *The New York Times*, BPD was the only one of approximately a dozen major city police departments credited with handling the racial justice protests in the summer of 2020 in a competent, lawful manner—thanks in part to the disciplined organization of community advocates here.

Still, there is a considerable amount of work left to do. The walls, plumbing, electrical, HVAC, and fixtures all need to be installed and a final punch list completed. To ensure stops, searches, arrests and uses of force comply with the Constitution and the Consent Decree—and to win community trust—supervisors must rigorously monitor officer compliance with BPD policies, and BPD's internal affairs and disciplinary systems must consistently provide accountability for policy violations. To enable effective supervision and assessment of law enforcement actions, officers must properly utilize the field-based, electronic report-writing technology they recently acquired. To adopt a true community policing model, staffing levels, particularly in the Patrol Division, must increase. And more. This work is painstaking. It will require sustained resolve.

> **This work is painstaking. It will require sustained resolve.**

To evaluate whether BPD and the City are proceeding with such resolve, the Monitoring Team is increasingly turning our focus to assessing their performance against Consent Decree requirements. Thus far, we have spent considerable time furnishing technical assistance to BPD and the City— assisting with policy writing, training curriculum development, and improvements in critical department functions, such as misconduct investigations, supervision, staffing, performance evaluations and technology. Going forward, we will be conducting a greater number of the compliance reviews and outcome assessments required by the Consent Decree. These are intended to determine how far BPD and the City have progressed along the road to compliance in each area; whether they must go further and, if so, how they get there; and how much of a difference reforms are making in real-world, street level interactions between officers and community members.

In this reporting period, there have been noteworthy developments in each of the four key areas the Court has emphasized: training, technology, integrity and accountability, and staffing. These are summarized here and explained in greater detail in the Findings section below. Developments in all other areas are described in the Findings section.

**Training |** The Monitoring Team just published its first comprehensive assessment of BPD's compliance with the training requirements of the Consent Decree. That assessment finds that, as previously reported, the fortification of BPD's training function has been one of its signal achievements. BPD has reached "initial compliance" with many Consent Decree requirements and is "on track" in its implementation of the remainder. BPD has upgraded its training academy facilities; has added a number of qualified police and civilian instructors to training academy staff; has partnered with community organizations and members to develop curricula and participate in teaching certain courses; has adopted a dynamic instructional paradigm grounded in adult-oriented, scenario-based learning; is using a new e-learning platform to deliver foundational content and enhance in-person instruction; and is ensuring officers absorb the material by requiring demonstrated proficiency on post-instructional exams. With these improvements firmly in place, BPD has developed and delivered an impressive amount of high-quality Consent Decree-required training—and that is in addition to the state-required training it is required to provide annually.

> The fortification of BPD's training function has been one of its signal achievements.

In this reporting period alone, BPD has developed and delivered in-service training or e-learning on, among other things, community policing, addressing minor offenses, First Amendment-protected activity, supervisory review of stops, searches and arrests, fair and impartial policing, use of force, misconduct complaint intake, performance evaluations, sex assault investigations for sex offense investigators, crisis intervention training for Crisis Intervention Team officers, and behavioral health awareness for dispatchers and 911 call-takers. It is also developing soon-to-be-delivered Department-wide training on youth interactions, behavioral health awareness and crisis intervention, and stops, searches and arrests, as well as certification training for field training officers, training on duties and responsibilities for supervisors, and training for members of the Performance Review Board, which reviews serious use of force incidents.

To reach initial compliance with all Consent Decree training requirements, BPD—with financial support from the City budget—still must add to the training academy a sufficient number of civilian staff, including additional civilian instructors, as required by the Staffing Plan. BPD also must dramatically improve the conditions of its indoor and outdoor firearms ranges; ensure that curriculum writing, which sometimes has been uneven and

required heavy input from the Monitoring Team and DOJ, reaches the necessary level of independence; develop a more rigorous method for selecting instructors; and establish reliable electronic systems for tracking instructional needs and recording officer training histories.

**Technology |** By the end of the summer of 2021, BPD completed implementation of the first phase of a new Records Management System, which relies on electronic field-based officer reporting. The significance of this development cannot be overstated. The new system will make writing reports less cumbersome for officers. It will, at long last, facilitate the reliable collection and maintenance of data on stops, searches, arrests, interactions with youth, interactions with individuals in crisis, and more. It will simplify and strengthen supervisory review of these law enforcement actions—to commend superior performance, correct deficient performance, and refer policy violations to the Public Integrity Bureau. And because of the new system, BPD, after years of effectively operating in the dark, will finally be able to analyze Department-wide, District-wide, and unit-wide trends in stops, weapons pat-downs, searches, and arrests, and take corrective action as needed.

> The effectiveness of the new Records Management System will depend on officers recording necessary data accurately and comprehensively.

The effectiveness of the new RMS will depend on officers recording the necessary data accurately and comprehensively. Correspondingly, it will rely on supervisors making sure that officers properly report the data. Over the next few months, BPD, the Monitoring Team, and DOJ will consistently review the data to determine whether this is happening and, if necessary, remedy any deficiencies. Proper officer use of the new RMS is essential to the integrity of the Monitoring Team's reviews of stops, weapons pat-downs, searches and arrests, as well BPD's own reviews of these actions.

**Accountability (Supervision, Misconduct Investigations, Discipline) |** The **recently published report** on the origins of the Gun Trace Task Force scandal is a bracing reminder of the historical failures of BPD's supervision, internal affairs, and discipline functions. It highlights how important it is not only for commanders, but also for first-line supervisors and field training officers, to affirmatively support the reform enterprise. It likewise underscores how necessary it is for BPD to succeed with the transformation of the Public Integrity Bureau now underway. Without effective officer supervision, probing investigation of alleged misconduct, and meaningful discipline for proven

misconduct, the degenerate legacy of the GTTF will persist, and the Consent Decree will fail.

To BPD's credit, PIB does not look like it did when the corruption of the GTTF and other plainclothes units was permitted to flourish. Through their actions, Commissioner Harrison, PIB Deputy Commissioner Nadeau and PIB commanders recognize the urgency and imperative of reform. PIB has adopted a comprehensive, best-in-class intake and investigations manual. BPD has developed a complaint card, which all officers will carry, and a uniform complaint form. PIB has dispensed with paper files and now utilizes an electronic filing system. For the first time, PIB investigators have received specialized training on internal investigations and will continue to receive such training annually. The number of PIB investigators has more than doubled since January 2020, from 17 to 35. BPD has made PIB service a plus-factor in the promotional process. The number of applicants for PIB investigator positions, which reflects the level of interest in PIB service, has increased exponentially. Case backlogs are down. In 15 months, the average time to complete an investigation was reduced from over 300 days to under 200. The percentage of investigations completed within 90 days— a Consent Decree requirement—increased from 5% to 30%. A system for expedited, District commander-led resolution of allegations of minor misconduct, which can free up PIB investigators to focus on more serious allegations (including harassment, excessive force, and false arrest) has taken root. And revisions to BPD's disciplinary policies and practices, including those required by new state laws enacted last year, are nearing completion.

> **To BPD's credit, the Public Integrity Bureau does not look like it did when the corruption of the GTTF and other plainclothes units was permitted to flourish.**

As for supervision, BPD has completed a comprehensive field training officer manual, has developed and is delivering a certification course for new field training officers, and will soon deliver refresher training for existing FTOs. It has provided e-learning on supervisory responsibilities for stops, searches, arrests and First Amendment-protected activities. It is developing, and in the next reporting period will begin delivering, a four-day training for all supervisors, following which it will implement a new performance evaluation system that prioritizes fair, community-oriented, constitutional policing. And it has developed and will soon begin implementing a protocol for evaluating supervisor performance.

These developments reflect a sea change in BPD's accountability mechanisms. Nonetheless, as we have emphasized before, they are a prelude to compliance—necessary but not sufficient. More PIB investigators are needed to satisfy the recommendations in the Staffing Plan and ensure that PIB performs as it should. Unless the PIB Deputy Commissioner grants an exception in writing, all misconduct investigations, not merely one-third, must be completed within 90 days. PIB must improve the consistency of its record-keeping, the thoroughness of its investigations, the frequency of investigator communications with civilian complainants, the quality and credibility of its investigative findings, and the completeness and accuracy of its data and analysis on complaints and outcomes. At the same time, BPD must show that its supervisors are doing what the Consent Decree demands: critically reviewing uses of force, stops, searches, and arrests; meaningfully scrutinizing requests for arrests for lesser offenses before approval or disapproval; counseling officers on policy compliance and sound tactics; and more.

> **These developments reflect a sea change in BPD's accountability mechanisms. Nonetheless, they are a prelude to compliance—necessary but not sufficient.**

BPD is on track to achieve compliance with the supervision, misconduct investigations and discipline provisions of the Consent Decree. But to reach initial compliance—and to prevent the scandals of the past from repeating themselves—it has more to do.

In the next reporting period, the Monitoring Team will be conducting an informal evaluation of the quality of PIB investigations concluded since completion of PIB investigator training in April 2021. The evaluation should provide some indication of whether the procedural and structural reforms implemented in PIB are having a real-world impact, and what BPD still needs to do to achieve compliance. The Monitoring Team will follow up this informal evaluation with a comprehensive review early next year.

**Staffing |** In 2020, BPD bucked nationwide trends by hiring more sworn officers than it lost to attrition. Unfortunately, it could not escape those trends in 2021, losing 108 more sworn officers than it hired. The dismaying result was not for lack of effort. BPD hired an average of more than 15 officers per month, a laudable pace. BPD management negotiated a new union contract that provides officers good financial and workplace incentives to remain with the Department. And BPD has continued to take "soft" retention measures by improving workplace conditions. It has purchased new patrol vehicles to

replace an aging fleet that has been a constant (and understandable) source of officer disaffection; implemented an electronic field-based reporting system; continued to make improvements in training; fortified officer wellness programming; accelerated a still-too-lengthy misconduct investigations process; and moved forward with implementation of fairer, more transparent processes for promotions, commendations, and performance evaluations. Moreover, much of the increase in attrition in 2021 was due not to any increase in voluntary retirements and resignations, which actually declined, but instead to significant increases in medical, disciplinary, and trainee separations. This is not unwanted attrition; it is indicative of a more efficiently run agency.

Nevertheless, if the net losses in sworn officers cannot be reversed, the objectives of BPD's Staffing Plan will remain elusive. That would be troublesome for PIB, which, as explained above, still needs more investigators to improve the quality and timeliness of its investigations. Failing to meet Staffing Plan objectives would be even more problematic for the Patrol Division, which has seen a precipitous decline in officer strength over the past 18 months. As of the end of 2021, less than 30% of sworn officers were assigned to patrol. The paucity of patrol officers, if it persists, will make BPD's ambitious community policing goals (e.g., officers should increase to 40% the time spent on pro-active community-oriented policing and reduce to 60% the time spent responding to calls for service) exceedingly difficult, if not impossible, to achieve.

> **The paucity of patrol officers, if it persists, will make BPD's ambitious community policing goals exceedingly difficult, if not impossible, to achieve.**

BPD needs to reassess certain priorities and reassign officers to patrol. That can make up for some of the shortfall. But the remainder must be remedied through redoubled efforts to recruit and retain qualified officers. The Monitoring Team hopes that the concrete measures BPD took in this reporting period will soon begin to bear fruit and that, in 2022, hiring will begin to outpace attrition.

***

In our last report, we observed that "the next 12-18 months will be pivotal." ECF No. 414-1 at 15. That observation is as true now as it was nine months ago. This is where the rubber meets the road.

With most foundational reforms in place, BPD will not progress much further along path to compliance without measurably demonstrating that its officers are generally adhering to law, policy and the Consent Decree in their encounters with community members. In other words, BPD must demonstrate that the reason it is under court supervision—an alleged pattern or practice of constitutional violations—is no longer valid. BPD must show that its officers are de-escalating potentially fraught encounters when feasible; using no more force than reasonable and proportional if force becomes necessary; conducting stops, weapons pat-downs, searches, and arrests with proper legal justification and without discrimination based on race; completing official reports fully and accurately without misrepresentations or material omissions; taking the least intrusive, most effective approach to addressing minor offenses; respecting First Amendment rights, including the right to criticize law enforcement; safely transporting prisoners; conducting sex assault investigations using a victim-centered, trauma-informed approach; and responding appropriately to individuals in crisis and youth. Because there are inevitably times when officers will violate law or policy in even the best police agencies, BPD also must show that when its officers go astray, supervisors promptly step in to correct their behavior, PIB conducts thorough investigations when warranted and makes sound and well-supported investigative findings, and meaningful discipline is imposed.

> **With most foundational reforms in place, BPD will not progress much further along path to compliance without measurably demonstrating that its officers are generally adhering to law, policy and the Consent Decree in their encounters with community members.**

For the duration of the Consent Decree, BPD and especially the Monitoring Team will focus on these issues. The Monitoring Team just published comprehensive assessments of BPD's compliance with the training and transportation of persons in custody provisions of the Consent Decree. In the next reporting period, we will complete ongoing evaluations of use of force incidents, reporting, and supervisory review for the years 2018-2020, and sex assault investigations from 2021. We will also finalize methodologies for and begin conducting evaluations of arrests and arrest reporting, interactions with individuals experiencing behavioral health crises, responses to individuals engaged in First Amendment activity, investigative stops, weapons pat-downs, and searches (provided the new Records Management System contains sufficiently reliable data), the work of the Performance Review Board, recruitment, hiring and retention practices, and BPD's officer wellness

program. As noted, we will conduct an informal evaluation of the quality of Public Integrity Bureau investigations to gauge the effectiveness of the PIB investigator training delivered in 2021. Finally, we will conduct our second set of surveys. In particular, provided the pandemic recedes, we will conduct and publish reports on the results of a representative community survey, a survey of recently arrested individuals in custody, and focus groups of BPD officers.

In the next six to nine months, BPD will continue to have a full plate, too. It has a few policies left to revise, mainly in the area of discipline, where the implementation of changes made to state law in 2021 is still taking shape. BPD also has yet another ambitious array of training to develop and deliver. This includes new Department-wide training on youth interactions, completion of an ongoing course on fair and impartial policing, and annual instruction on behavioral health awareness, stops, searches, arrests, community policing, and use force . It also includes specialized courses for Crisis Intervention Team officers, new and existing supervisors, new and existing field training officers, Performance Review Board members, and members of BPD's Public Order Forces, which monitor and preserve First Amendment rights during public assemblies and quell civil disturbances if they arise.

In addition, like the Monitoring Team, BPD will devote an increasing amount of time to assessing and analyzing its members' interactions with community members. This work will enhance BPD's transparency and strengthen its capacity for self-evaluation and self-correction, both of which are vital to sustaining the reforms BPD is making, especially after the Consent Decree ends and the Monitoring Team is gone. The work will include:

- Continuing routine audits of transport vehicle equipment and transport events involving individuals in custody.

- Preparing and publishing reports on use of force incidents, first covering 2017 – 2020, and then covering 2021.

- Preparing and publishing annual reports on: (1) community policing, (2) responses to First Amendment activity, and (3) sexual assault investigations.

- Preparing and publishing regular reports on (1) misconduct complaints and investigations, (2) interactions with individuals in crisis, and (3) arrests that result in release without charge.

- Preparing and publishing quarterly reports on stops, searches and arrests data once the new Records Management System is confirmed to be reliably capturing such data.

- Conducting a survey of victims of sexual assaults to gauge the efficacy of sexual assault investigations.

- Implementing protocols for evaluating the effectiveness of supervisors.

- Developing a civilian complaint intake testing program intended to assess compliance with misconduct complaint intake policies.

- Preparing and publishing a report regarding its coordination with Baltimore School Police.

For its part, the City will prepare and publish semiannual reports on its efforts to implement the recommendations in the previously published report analyzing deficiencies in its behavioral health system. It will also report on its initiative to divert to behavioral health professionals certain 911 calls involving individuals in crisis.



# FINDINGS

Below, as required by Paragraph 469 of the Consent Decree, the Monitoring Team provides a progress report regarding "whether the material requirements of [each area of the Consent Decree] have been achieved." For each area, we explain (1) the Consent Decree's requirements over the long term, (2) the progress BPD has made toward compliance and the numeric compliance score BPD has earned, (3) the challenges BPD continues to face, and (4) immediate next steps.

We begin in the area that has been at the heart of the reform effort over the past year: training. We then address the areas of the Consent Decree that continue to present the most pressing challenges: misconduct investigations and discipline, technology, and staffing, followed by areas where DOJ found or expressed concerns about a pattern or practice of constitutional violations, including stops, searches and arrests, impartial policing, use of force, and transportation of persons in custody. We conclude by assessing BPD's progress in the other areas of the Consent Decree.

# TRAINING

The successful implementation of any Consent Decree-mandated changes to BPD policies and practices depends on officers receiving high-quality training. In recognition of this reality, the Consent Decree expressly recognizes that "proper, effective, and comprehensive training is a necessary prerequisite to constitutional policing." (CD 291). Accordingly, the Consent Decree includes specific training requirements for stops, searches, and arrests (CD 67–68); crisis intervention (CD 106–08, 112–113); use of force (CD 166–68); transportation of persons in custody (CD 238); First Amendment-protected activities (CD 251); sexual assault investigations (CD 259); supervision and management (CD 303, 308–10); and misconduct investigations (CD 409–15). BPD must also make changes to its Field Training Officer program for new academy graduates (CD 301–02). In areas where the Consent Decree does not provide explicit training requirements, the full implementation of new policies and procedures similarly requires adequate training.

The Monitoring Team just published its **first comprehensive assessment** of BPD's effort to comply with the training requirements of the Consent Decree. Consistent with the less formal assessments presented in prior reports, the Monitoring Team has concluded that BPD is nearing initial compliance. BPD has a new, modernized training academy facility, competent and enthusiastic instructors, a much larger cohort of instructors than when Consent Decree implementation began, and an improving curriculum writing team. It has adopted dynamic, scenario-based, skills-focused in-service instruction utilizing contemporary adult learning techniques. It is effectively employing an e-learning platform to reinforce core policy requirements. And it has designed and delivered sound training on many Consent Decree topics: use of force; fair and impartial policing; stops, searches, and arrests; peer intervention; behavioral health awareness and crisis intervention; responding to reports of sexual assault; community policing; internal investigations for Public Integrity Bureau detectives; sex assault investigations for sex offense detectives; and crisis intervention for Crisis Intervention Team officers.

Based on this progress, BPD's compliance score in the area of training is "4c" (implementation—on track).

| TRAINING GENERALLY | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | Implementation – On Track |

## Areas of Progress

The Monitoring Team's just-published comprehensive assessment of BPD's progress toward compliance with the Consent Decree's training requirements is **here**. Below, the Monitoring Team briefly catalogs the Education and Training Section's accomplishments during this reporting period.

### Completion of Training Requirements

The pandemic continued to slow the pace of in-person training to a degree, as social distancing requirements have limited the number of officers per classroom. Nevertheless, the training academy pressed forward with its ambitious schedule and completed a number of vital Consent Decree training programs during this reporting period. These programs are described in more detail in other sections of this report. They include the following:

**Community Policing and Lesser Offenses** | In December 2021, BPD successfully completed Department-wide delivery of a two-day in-class course on implementing community policing policies and objectives and addressing low-level offenses in accordance with BPD's "least intrusive, most effective response" directive.

**First Amendment Protected Activity** | In May 2021, BPD certified completion of e-learning for all officers on First Amendment protected activity—freedom of speech, freedom of assembly, and freedom to observe and record official police activity.

**Supervisory Responsibilities for Stops, Searches and Arrests** | In early December 2021, BPD certified completion of e-learning on supervisors' review and reporting responsibilities for stops, searches and arrests made by officers under their command. Delivered Department-wide, the e-learning served as a refresher of the stops, searches and arrests in-service training completed in 2020 for all BPD members, not just supervisors.

**Fair and Impartial Policing/Use of Force/First Amendment Protected Activity** | BPD is nearing completion of a two-day course for all officers that includes a full-day of instruction on core fair and impartial policing concepts, as well as refresher instruction on use of force and First Amendment-protected activity.

**Behavioral Health Response for Dispatchers and 911 Specialists |** In May 2021, BPD completed delivery of a one-day course on behavioral health awareness and crisis intervention for all police emergency dispatchers and 911 specialists.

**Crisis Intervention Training for CIT Officers |** BPD developed and began utilizing a specialized, five-day, 40-hour certification course for patrol officers who volunteer to become Crisis Intervention Team members and will respond to behavioral health and other crisis-related calls for service. The course has been offered a number of times in recent months. The curriculum was developed in collaboration with several local behavioral health organizations who are co-facilitating the course.

**Sex Offense Investigator Training |** In collaboration with community advocates and external subject matter experts, BPD developed additional training for sex offense detectives. This two-day training, which was delivered in December 2021, supplements the inaugural training delivered to detectives in 2020.

**Field Training Officer Certification |** BPD developed a five-day, 40-hour course to certify field training officers. The course is currently in use for officers who are becoming FTOs.

**Transportation of Persons in Custody Training |** In December 2021, BPD delivered e-learning regarding its policies on transporting persons in custody. BPD also developed a four-hour training course for newly assigned transport wagon drivers.

**Misconduct Complaint Intake |** BPD is presently delivering Department-wide e-learning on its policy on intake of misconduct complaints.

**Expedited Resolution of Minor Misconduct |** BPD officers are finishing up e-learning on the policy governing expedited resolution of allegations of certain minor violations not involving interactions with civilians.

**Performance Evaluations |** BPD is presently delivering e-learning on its new performance evaluation system.

**Promotions |** In April and July 2021, BPD delivered e-learning on its new promotions systems for commanders (captains and majors) and classified ranks (sergeants and lieutenants).

**Training for 2022**

In this reporting period, BPD also made progress on designing and implementing Consent Decree training in other key areas, including:

**General Supervisor Training |** BPD is developing a four-day curriculum for training all supervisors—both current supervisors and those being promoted to sergeant. This training will be delivered over the course of the next two months.

**Field Training Officer Refresher Course |** BPD is developing and will soon deliver a one-day refresher training for existing FTOs.

**Youth Interactions/Behavioral Health Awareness |** In collaboration with community advocates, BPD is developing a two-day course that combines training on youth interactions with refresher training on behavioral health awareness and crisis intervention. BPD will deliver this training Department-wide over the next several months.

**Performance Review Board |** BPD has drafted a training curriculum for members of the Performance Review Board, which reviews serious use of force incidents for the purpose of improving Departmental policies, training and supervision. The training will be conducted by the end of the spring.

## Challenges Ahead

At a recent public hearing, the Court observed that BPD's indoor and outdoor gun ranges are in a state of disrepair and need to be completely revamped. As it did when it moved its training academy to a modern building at the University of Baltimore in 2020, BPD and the City must commit the resources needed to upgrade this critical component of the Department's training facilities.

As explained in the Monitoring Team's assessment of the training function, BPD—with financial support from the City—must increase the number of civilians, including civilian instructors, assigned to the academy. Civilianizing certain positions will allow at least a handful of sworn personnel to be re-assigned to patrol.

Further, the quality of curriculum writing and classroom instruction must become consistent. First drafts of classroom curricula and e-learning material often still require heavy edits from the Monitoring Team and DOJ. At times, instructors also deviate from course material and adult-learning techniques. To achieve compliance, BPD must demonstrate that curriculum writers are capable of consistently preparing high-quality lesson plans without substantial input from the

Monitoring Team or DOJ, and that all academy instructors consistently follow course curricula utilizing adult-learning methods.

The forthcoming Fifth-Year Monitoring Plan, which kicks in at the beginning of March 2022, will include a Consent Decree training schedule as ambitious as earlier monitoring plans. In addition, BPD will continue to have to deliver state-mandated annual training, training for specialized units and assignments, training on new and updated technologies, and additional training required to recertify officers to use certain tactics and weapons. To maintain this "new normal" for the academy will required continued vigilance.

## The Next Six Months

In the next reporting period, BPD will be developing and/or implementing training programs in a number of areas. As explained above, it will be providing targeted training to supervisors, field training officers, and PRB members, as well as Department-wide training on youth interactions and behavioral health awareness. In addition, BPD will be developing Department-wide training on its revised disciplinary policies and the constitutional obligation to disclose exculpatory evidence in criminal cases, and will begin developing curricula for annually required training on use of force, fair and impartial policing, stops, searches, arrests, and community policing.

# MISCONDUCT INVESTIGATIONS
# AND DISCIPLINE

As Paragraph 329 of the Consent Decree explains, "[a] robust and well-functioning accountability system in which officers are held to the highest standards of integrity is critical to BPD's legitimacy and a priority of the Department." The need for BPD to repair its internal affairs function, now housed in the Public Integrity Bureau ("PIB"), is thus at the heart of the Consent Decree.

Spanning 87 paragraphs and 38 pages, the Misconduct Investigations and Discipline section of the Consent Decree addresses the location, independence, resources and authority of PIB (CD 330-34); the process for receiving complaints, classifying them, and communicating with complainants about them (CD 335-42); requirements for conducting fair, thorough, reliable misconduct investigations and making misconduct determinations (CD 343-58); requirements for handling and referring allegations of criminal misconduct (CD 359-71); the lodging of disciplinary charges, the administration of disciplinary hearings, and the imposition of discipline (CD 372-88); the process for community-centered mediation as an alternative to investigation for certain minor allegations of officer misconduct affecting civilians (CD 389-91); record-keeping for misconduct investigations (CD 392-95); measures for ensuring transparency, including issuance of quarterly public reports of aggregate data (CD 396-405); a testing program designed to evaluate the efficacy of the civilian complaint intake process (CD 406-08); and training of PIB investigators and supervisors (CD 409-15).

In each of the compliance categories addressing misconduct investigations and discipline, BPD continues to make reasonable progress, though PIB remains some distance away from realizing the Consent Decree's ultimate goals. Those goals include: seamless, user-friendly complaint intake; timely, thorough investigations; routine, open communications with complainants; rational investigative findings and disciplinary recommendations supported by the evidence; and meaningful discipline and corrective action when warranted. Nevertheless, despite some delays caused by the pandemic, PIB has accomplished what the Monitoring Plans have required.

In the area of "Misconduct – Intake," BPD's compliance score is "3" (training phase), as it has completed policy revisions and is just beginning the delivery of e-learning. In the area of "Misconduct – Investigations," BPD's compliance score is "4c" (implementation – on track), as it has completed policy revisions and specialized training for PIB investigators, who are now endeavoring, case by case, to comply with the provisions of the PIB investigations manual. In the area of "Misconduct – Discipline," BPD's compliance score is "3" (training phase), as it is finalizing policy revisions in the wake of last year's state-wide legislative reforms and starting to draft a curriculum for Department-wide training on the revamped disciplinary process.

Finally, in the area of "Misconduct – Transparency," BPD recently completed and filed its transparency initiatives plan, *see* ECF No. 447, moving its compliance score to "4c" (implementation – on track).



# Areas of Progress

## The Quality of Misconduct Investigations

In this reporting period, the Monitoring Team and DOJ continued to provide PIB with technical assistance by reviewing specific investigative case files and then debriefing with PIB commanders to identify areas for commendation as well as areas for improvement. Apart from performing formal assessments, this is the only way to meaningfully gauge PIB's progress, even if the evidence is anecdotal. The Monitoring Team is encouraged that, through these case file reviews, it is observing improvement, especially since the adoption of the new PIB investigations manual and associated training in April 2021. That training was videotaped and is given to all incoming PIB staff, including commanders and supervisors.

The Monitoring Team recently began an assessment of PIB investigations initiated and concluded since the April 2021 training, as well as certain investigations commenced prior to the training and completed afterward. Although this is not a comprehensive assessment, which would require reviewing a representative sample of randomly selected case files over a longer period, it will provide the Monitoring Team, BPD and DOJ a much better sense of whether the new policies and training are, in fact, improving the quality of PIB investigations. The Monitoring Team should complete this review and publish a report in the next three months. Provided that the review shows improvement over the poor marks we gave PIB in our comprehensive assessment of investigations from 2018, we will commence another comprehensive assessment toward the end of this year.

## Staffing, Investigative Efficiency, and Organizational Structure

To improve the quality and speed of misconduct investigations as the Consent Decree demands, BPD's Staffing Plan calls for 48 qualified detectives in PIB. Over the past two years, BPD has been steadily moving toward this goal, notwithstanding its rate of attrition and staffing demands in other divisions.

PIB now has 35 detectives. This represents a 40% increase over October 2020, when it had 25, and more than a 100% increase over January 2020, when it had just 17. Importantly, BPD understands the centrality of improving the quality of PIB investigations to the reform effort, and so has sought to attract candidates with the skills, intelligence, and ethics needed to conduct some of the most sensitive, high-stakes investigations a police agency conducts. Moreover, there has been increased interest in PIB assignments among officers. The applicant pool has grown, perhaps because the new promotions policy gives added weight to service in PIB. Although BPD must assign additional officers to PIB to satisfy the goals of the Staffing Plan—and although this remains the biggest short-term challenge for PIB—BPD is finally turning the corner on PIB staffing.

The immediate result is that the backlog of PIB cases is diminishing and the average time to complete a PIB investigations has been reduced dramatically over a short period, from 314 days in Q1 2020 to 198 days by the end of Q2 2021. This is still nowhere near the Consent Decree's requirement to complete all misconduct investigations within 90 days unless an extension is approved in writing by the PIB Deputy Commissioner (CD 344(i)). But even on that requirement, the percentage of investigations completed within 90 days increased from 5.2% in Q1 2020 to 30.4% in Q2 2021. These are tangible signs of progress.

PIB is also benefiting from a refined organizational structure. It now has three investigative squads: serious misconduct (three units), minor misconduct (two units), and preliminary discipline offers (one unit). Each squad is supervised by a lieutenant, with a sergeant over each unit. There are also six detectives assigned to ethics investigations and four serving on the Special Investigations Response Team, which investigates serious uses of force, including officer-involved shootings.

Recently, BPD moved the Equal Opportunity and Diversity Section to PIB and appointed a new Deputy Director. Merging EODS with PIB puts the EODS complaint and investigation process within the same structure as the misconduct investigation process. BPD anticipates the move will help to achieve organizational efficiencies and, importantly, reduce the existing backlog of EODS cases.

### Policies

With input from the public, BPD members, the Monitoring Team and DOJ, BPD has largely finished revising its suite of disciplinary policies. During this reporting period, BPD finalized the following policies, which will become effective once officers are trained on them later this year:

- Policy 211, Non-Disciplinary Corrective Action
- Policy 302, Rules and Regulations
- Policy 306, Complaint Intake Process
- Policy 321, Expedited Resolution of Minor Misconduct

*See* ECF No. 434.

BPD continues to collaborate with the Monitoring Team and DOJ on revisions to Policy 308 (General Disciplinary Process), and on a new Disciplinary Matrix. This work is advanced, but temporarily on hold, as BPD, the Monitoring Team and DOJ seek to determine how the policy will be affected by the implementation of the police reform legislation passed by the Maryland legislature in April 2021, specifically HB670. Among other things, the new law requires Maryland law enforcement agencies to adopt a uniform, state-wide matrix developed by the Maryland Police

Training and Standards Commission. It is possible that BPD will need to revise its draft matrix to make it consistent with the state matrix, which will be finalized in the coming months.

## Complaint Intake

This month, BPD will begin delivery of Department-wide e-learning on its new complaint intake policy. *See* ECF No. 446. The e-learning was developed several months ago. Delivery was delayed because it took longer than expected to process the print order for the complaint forms and cards that are incorporated into the e-learning and will be used by officers as the process goes live.

Upon issuance of the e-learning, BPD, at long last, will begin using a unified complaint form to receive complaints of misconduct from community members. The Civilian Review Board began using the same form earlier.

## Expedited Resolution of Minor Misconduct

In mid-2019, shortly after arriving at BPD, Commissioner Harrison developed a policy for addressing on an expedited basis specific types of minor misconduct, excluding civilian complaints. The policy, Policy 321, permits commanders, rather than PIB investigators, to handle qualifying incidents and allows officers to obtain prompt case closure at the District or unit level by admitting responsibility in negotiated settlements. The Monitoring Team approved the new policy for a pilot program in September 2019. *See* ECF No. 216. The permanent policy was approved in the last reporting period, *see* ECF No. 434, and will become effective upon completion of the associated e-learning, which was posted for all members to take at the end of December 2021.

As previously reported, Policy 321 is designed to accomplish several key BPD and Consent Decree objectives. First, it should free up PIB investigators to focus on more serious complaints by reducing the number of minor complaints assigned to them. Second, it should improve officer morale by expediting resolution of not only minor complaints, but also more serious complaints, particularly unfounded complaints, which should be resolved more promptly given the reduced number of minor complaints to investigate. Third, it should fortify BPD's command structure and supervisory performance in each district and unit.

The minor policy violations currently eligible for prompt, negotiated resolution under Policy 321 were recently expanded and now include the following:

- Neglect of Duty – Loss or damage of equipment (excluding firearms)
- Neglect of Duty – Failure to Appear in Court
- Neglect of Duty – Failure to Attend and Complete Required Training
- Neglect of Duty – Failure to Attend PSI Medical Appointment

As of this report, BPD has resolved more than 300 cases utilizing the ERMM process. The policy is serving its intended purpose of decluttering PIB detective caseloads. Together with training, a new investigations manual, and increases in staffing, it is an important part of the progress PIB is making to improve the quality of investigations for more serious cases.

## Quarterly PIB and CRB Reports

In this reporting period, following from its first report in November 2020, *see* ECF No. 359, PIB issued a **report** containing comprehensive aggregate data on misconduct complaints for the entire year of 2020. The report presents a quantitative analysis of those complaints, providing insight into the type and volume of misconduct complaints PIB received. BPD is currently finalizing the report on misconduct complaints for the first six months of 2021, which should be published shortly. The Monitoring Team and DOJ continue to work with the BPD to improve the manner with which the information is presented so that is more easily digestible and useful to the public.

While PIB has produced its required reports on misconduct complaint data, the Civilian Review Board has had more difficulty. But it is now catching up. CRB published its first report covering the fourth quarter of 2019 and, at the end of 2021, published another report covering all of 2020. *See* ECF No. 473. CRB also recently submitted a draft of its report for the first two quarters of 2021.

## Transparency Initiatives Plan

In September 2021, BPD published a Transparency Initiatives Plan (CD 397-401). *See* ECF No. 447. The Plan establishes goals and timelines for educating City residents about the process for filing misconduct complaints against BPD officers. It includes developing material on BPD's website to inform community members about the full disciplinary process, from complaint intake to the imposition of discipline. BPD has completed this requirement. The written description of the process now on **the website** will soon be accompanied by a video explaining the organizational structure of PIB and the roles and responsibilities of each unit within PIB. In addition, under the Plan, BPD must (1) post at the reception desk at BPD headquarters, at all District stations, and at the Civilian Review Board permanent, readily visible placards that describe the complaint filing, intake and investigation process, (2) produce a brochure explaining the process, which is available at those locations, as well as other locations throughout the City, (3) create a complaint card explaining how to file a complaint, which is available from BPD officers, patrol supervisors and BPD's website, and (4) establish a unified complaint form—a form that will shortly be in use, as explained above, and available from BPD facilities, BPD patrol supervisors, CRB, libraries and community organizations.

The website will soon include a database enabling complainants to enter their case number and follow the progress of their case. BPD will also ensure that PIB staffing is adequate to timely respond to all complainant questions, including by designating a victims' rights advocate with experience in community policing and engagement.

To complement the content on its website and the written materials it has prepared, BPD is also implementing a Community Awareness Program, which entails hosting public information sessions on the complaint-investigation-discipline process two to four times each year. The first session was held in December 2021. Approximately 45 people participated.  Another session is set for February and will be held on the same topic but conducted in Spanish. The program also includes receiving invitations to and participating in meetings led by community organizations.

## Challenges Ahead

Meeting the goals of the Staffing Plan for PIB must remain a top priority. Although BPD has more than doubled the number of PIB detectives over the past two years, the process has been painstaking. That is as it should be given the skills and qualifications PIB detectives must possess. But BPD still must accelerate the recruitment and assignment of skilled, ethical officers to PIB. This is a tall demand, as there are competing staffing needs in other components, especially Patrol, and a consistently and worryingly high attrition rate. But there is simply no other way to reduce case backlogs to a manageable level or satisfy the Consent Decree's general directive to complete all investigations within 90 days—a directive that is as important to preserving officer morale as it is to building community trust.

Amplifying this challenge is that PIB officers at all ranks are being sought out for other priority assignments within BPD and, in some cases, recruited out of BPD. Making PIB a desired assignment and a springboard to career advancement is the sign of an improved accountability function—a good thing, obviously, and consistent with Consent Decree goals. But BPD must be careful to balance the salutary objective of making PIB a coveted assignment for promotion against the pressing need to retain a PIB staff that is sufficiently large and talented to conduct thorough and timely misconduct investigations on a consistent basis.

## The Next Six Months

In the next reporting period, in addition to continuing to provide technical assistance to PIB, the Monitoring Team will complete its assessment of misconduct investigations from 2021, focusing on the impact of the training PIB detectives received and the activation of the new investigation manual in April 2021.

BPD will finalize Policy 308 (General Disciplinary Process), as well as its disciplinary matrix. It will also develop Department-wide training on the disciplinary process, as well as training and e-learning on officers' constitutional obligation to disclose exculpatory evidence in criminal cases.

To increase PIB's efficiency, BPD will continue to pursue early resolution of minor misconduct complaints through the ERMM process. It will also continue to implement its Transparency Initiatives Plan and produce quarterly reports on misconduct complaints and investigations. CRB, too, will continue producing quarterly reports on misconduct complaints.

Finally, BPD will begin self-evaluations of PIB's performance. It will devise a civilian complaint intake testing program, which will use individuals posing as complainants to test the efficacy of the revamped complaint intake process. And it will design its first audit of its complaint intake, internal investigation, and discipline functions.

# TECHNOLOGY

Section XII of the Consent Decree requires BPD to "provide its officers with the Technology necessary to implement the Material Requirements of this Agreement . . .." Paragraphs 268-278 then outline the Consent Decree's technology requirements. As the Consent Decree bluntly states, compliance with the Consent Decree is "dependent upon BPD acquiring or developing the appropriate technology." (CD 267).

BPD and the City previously completed and submitted a Resource Study (CD 268, 270), which identified then-existing BPD systems, described the state of those systems, and made preliminary recommendations for improvements. Following completion of the Resource Study, BPD and the City produced and submitted a Resource Plan (CD 269-70, 272), and the Monitoring Team filed its notice of approval on December 1, 2018. *See* ECF No. 164. The Resource Plan, which must be updated annually (CD 275), addresses how BPD will provide the necessary computer equipment and access required for personnel to discharge their duties, acquire a centralized Records Management System, and ultimately develop an Early Intervention System ("EIS"). BPD is required to use its best efforts to implement the Resource Plan (CD 274).

The Technology provisions of the Consent Decree also require BPD to disclose to the public the acquisition of certain new equipment or activity to be used in enforcement activities (CD 278). Further, data collection and data analysis are required in nearly every area of the Consent Decree, not only to enable the Monitoring Team to assess compliance, but to enable BPD leadership to better manage the Department. BPD must review and analyze data in a number of subject areas, including investigatory stops and detentions (CD 41), vehicle stops (CD 46), stops, searches and arrests (CD 82-86), use of force (CD 211-217), transport of persons in custody (CD 232), and misconduct investigations (CD 392), among others.

BPD's efforts at implementing the Resource Plan are beginning to bear fruit. Most significantly, in this reporting period, BPD implemented the first phase of a new Records Management System. The RMS now enables patrol officers to complete incident reports in the field on laptops in their cars and stores the recorded data in a relational database. BPD also has deployed the e-learning functionality of its Learning Management System and is working on implementing other functionalities, including tracking each officer's training history. Further, BPD has deployed the City's new human resources ERP system called Workday, and it has begun the process of drawing up an Early Intervention System, which will be used as a supervisory tool to track officer performance and intervene with officers at risk of

| TECHNOLOGY MODERNIZATION | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | **Implementation – On Track** |

engaging in misconduct. Based on BPD's progress thus far in the area of Technology Modernization, its compliance score is "4c" (implementation – on track).

## Areas of Progress

### Records Management System

An RMS implementation is typically one of the most complex IT initiatives an organization will undertake. An RMS implementation is more than standing up new technology for a law enforcement agency. A new RMS touches nearly every agency component (e.g., patrol, investigations, evidence, etc.) and its business processes. BPD has engaged the Monitoring Team and DOJ on a regular basis to review data collection requirements in order to ensure that the RMS is configured in a way that will comply with the requirements of the Consent Decree, recognize organizational efficiencies, and improve business processes—from officer report writing and supervision to internal audits and investigations.

BPD developed an aggressive RMS training and deployment schedule and, in this reporting period, was able to successfully deploy Phase One of the RMS (incident reporting) Department-wide. Throughout the implementation, BPD identified various challenges. For example, there were issues relating to the transition from the hierarchal rules of the Universal Crime Reporting's Summary Reporting System to the National Incident Based Reporting System (NIBRS). Further, BPD identified reporting delays: some incident reports were sent back to officers for corrections but were not then resubmitted for final approval. These types of issues are to be expected in a deployment of this magnitude. The Monitoring Team is encouraged that BPD has worked hard to identify and correct them as quickly as possible.

### Early Intervention System

During this reporting period, BPD worked with Gartner Consulting to review the current state of the EIS market, establish BPD's vision for an EIS, and develop high-level system requirements and options for procurement. BPD then developed and released a Request for Information (RFI) to enable vendors to submit

documentation regarding their EIS platforms. BPD is also planning to allow responding vendors to demonstrate their platform to BPD staff.

### Learning Management System

BPD has implemented and is now deploying a Learning Management System. Thus far, it has used the new LMS platform to deliver numerous e-learnings: supervisory review of stops, searches, and arrests; medical marijuana; youth interrogations; prisoner transport; expedited resolution of minor misconduct; hate crimes; language access; sex assault investigations for investigators; and sex assault investigations for supervisors. Additional course will be added over the next several months. The LMS will dramatically improve the accuracy of BPD's training records and provide one of the key inputs to a revamped Early Intervention System.

## Challenges Ahead

BPD's challenges are in the same key areas where it is making good progress—RMS and EIS implementation.

As for the RMS, ensuring officers in the field are actually utilizing the system properly is indispensable to the system's success. BPD must monitor whether officers are using their mobile computers to complete incident reports in the field and ensure that there are no delays in reporting. Moreover, BPD must successfully support an entire agency of end users while planning for the deployment of the next phase of the RMS—case management.

BPD must also continue to monitor data integrity, identify any issues that arise from the shift to NIBRS for crime reporting, and resolve those issues quickly. Further, BPD must continue to make data available across the Department, as well as to the DOJ and the Monitoring Team, to ensure the data can be utilized and assessed as required.

As for the EIS, while BPD has begun an RFI process, there remains much work to do. Once the RFI process is complete, BPD must finalize detailed requirements and decide how to proceed with procurement and final vendor selection.

In parallel with these procurement activities, BPD must address a number of data requirements on which it appears to not yet have made progress. BPD must identify the existing data sources that will feed an EIS, assess the integrity of the data, identify and address any gaps in the data, and develop a plan to aggregate the data from all the sources. Ultimately, BPD must provide for automated support to feed data to an EIS and implement reporting and analytics capabilities. It is not yet clear whether BPD has a plan to accomplish all these tasks or deploy the resources

to execute it. Though BPD has discussed the use of a consulting group to assist with the next steps for EIS planning, a contract for the work is not currently in place.

Moreover, BPD must determine what intervention and officer wellness tools will be leveraged, extended or newly implemented; develop policies and procedures to support supervisors as they engage in the EIS process with their subordinates; and provide appropriate Department-wide training across all officer ranks. To begin to address these requirements, the Monitoring Team has included the development of the procedural components of an EIS policy in the Fifth-Year Monitoring Plan for late 2022. The establishment of procedural policy components need not await procurement and development of the technological components of an EIS. Ideally, they will inform how the technological components are developed.

## The Next Six Months

In the next reporting period, BPD will plan for Phase Two of RMS implementation, which will include the deployment of case management functionality. This will involve documenting business requirements for 14 functional areas across BPD. Additionally, BPD will work to provide more in-depth NIBRS reporting to commanders across the Department and will be analyzing the NIBRS data to identify any additional issues with it.

BPD will also work to finalize its plan for EIS requirements and procurement. This will include establishing a vision for the EIS and priorities for the goals of the EIS, and documenting requirements that can be utilized during a procurement process. Further, BPD must begin the data work and planning effort discussed above.

# STAFFING, PERFORMANCE EVALUATIONS AND PROMOTIONS

The Consent Decree requires BPD to complete a comprehensive Staffing Study to determine the appropriate number of sworn and civilian personnel needed to effectively provide police services, enable supervision, and satisfy the requirements of the Consent Decree (CD 428). The Consent Decree further requires that, based on the Staffing Study, BPD develop a Staffing Plan that will ensure a sufficient number of deployed personnel to, among other things: implement and sustain effective community and problem-oriented policing; conduct timely misconduct investigations; supply sufficient patrol officers to each District without resorting to drafting (*i.e.,* forced overtime), except in unforeseeable circumstances; promote unity of command when feasible; provide a sufficient number of supervisors; and account for BPD's and the City's existing and projected resources (CD 429). BPD must implement the Staffing Plan but may do so in a phased manner that reflects the City's and BPD's fiscal resources (CD 430).

As for performance evaluations and promotions, the Consent Decree obligates BPD to have supervisors meet with officers to discuss their annual performance reviews, which must include written discussions of the officers' performance during the rating period, any areas for growth and achievement, and any areas requiring further training and supervision (CD 431). Direct supervisors must use a formalized system to document annual performance evaluations for each officer and quarterly evaluations of probationary employees (CD 432). In addition to these formal evaluations, supervisors must meet with their subordinates on an ongoing basis to discuss performance and must document their communications regarding performance challenges and areas for growth (CD 433).

The Consent Decree further requires BPD to conduct performance evaluations of each supervisor (from first line supervisor through commander), which will include assessments of ability and effectiveness in conducting performance reviews, including monitoring, deterring, and addressing misconduct by officers they supervise (CD 434). Finally, BPD must ensure its promotional system has clear criteria prioritizing effective, constitutional, and community- oriented policing as factors for promotion (CD 435).

BPD continues to make reasonable progress in each of these areas. BPD completed its Staffing Study and an initial Staffing Plan, and then updated the Plan in the summer of 2021. The revised plan, which calls for 2,785 sworn positions and 750 civilian positions, reflects BPD's enhanced ability to apply analytics and structured decision-making to inform deployment decisions. The challenge remains achieving the prescribed staffing levels, particularly in the Patrol Division, which depends on recruitment and retention. BPD's compliance score in the area of Staffing is "4c" (implementation—on track).

BPD is also progressing in the area of performance evaluations, with an improved compliance score of "3" (training phase). BPD adopted new performance evaluations policies and manuals in 2021, *see* ECF No. 372, and developed and delivered an e-learning to educate officers about the new system. It is now developing in-service training for supervisors, which will be delivered later this year and will incorporate instruction on utilizing the new system. BPD will fully implement the new system in January 2023, after supervisors have completed the training. The new annual performance evaluation form includes assessments for compliance with policies issued under the Consent Decree.

In the area of promotions, BPD adopted new policies for both commander (Captain and Major) and classified rank (Lieutenant and Sergeant) promotions in 2020. *See* ECF Nos. 340 & 349. The next set of promotions will utilize these policies. BPD's compliance score for promotions is "4c" (implementation—on track).



# Areas of Progress

## Staffing

In this reporting period, BPD issued an **updated Staffing Plan** that reflects current priorities. *See* ECF No. 433. It accounts for reductions in calls for service and the increased staffing to meet the need for additional detectives assigned to the Group Violence Reduction Strategy; to add members to the Data-Driven Strategy Division for the operational needs of a 24/7 real-time crime center; and to bolster the Telephone Reporting Unit to pursue call diversion strategies. These adjustments, although not directly tied to Consent Decree requirements, will help reduce patrol workloads and address persistent violence in the City.

The updated Plan envisions reducing patrol call-for-service workloads by:

- Reducing false alarms by 25%
- Diverting 25% of traffic accident management to a third-party vendor
- Reducing "other" calls for service by 25%
- Diverting 75% of larceny calls for service to online or telephone reporting
- Diverting 25% of disorderly conduct calls for service

BPD expects that these projected reductions in call volume will reduce Patrol Division needs by 53 sworn members. The adjustments should thus free patrol officers to engage more frequently in proactive community policing, as envisioned by the Community Policing Plan.

The 2021 Plan also reflects a reduction of 18 previously prescribed non-patrol positions. However, because of increases in other units, the 2021 Plan reflects an increase of 85 sworn positions over 2020. The updated Plan now calls for 2,785 sworn positions and 750 civilian positions.

## Performance Evaluations

Having completed a new performance evaluation policy and manual in early 2021, *see* ECF No. 372, BPD worked with the Monitoring Team and DOJ to develop e-learning on the new rating system, which has been delivered Department-wide, as well as lesson plans on the new system for comprehensive in-service supervisor training, which will be delivered shortly. Once this training is completed, all officers, including all supervisors and commanders, will be evaluated under the new system.

The new system reflects the requirements of the Consent Decree, and so ushers in a critical change in performance expectations for all officers. The system provides for fair, objective and impartial evaluations, and seeks to ensure that officer performance is consistent with BPD's stated values, that officers receive recognition

for superior performance, and that supervisors deliver meaningful guidance to address performance deficiencies.

### Promotions

BPD delivered e-learning on the new Command Promotions and Promotion Committee policy in April 2021. Under the new policy, a promotion committee interviews and evaluates candidates on criteria such as ethical decision-making, specialized leadership or management training, and prior work performance and supervisory duties. Each member of the panel scores each applicant, and the committee aggregates the scores into "bands." The Commissioner must then choose the most highly qualified applicants from among the top two bands. BPD's Equity Officer observes the interviews and the committee's deliberations to ensure adherence to policy and law. This new system for command promotions is now in effect and is being used for the current round of command promotions. The system eliminates the favoritism reported to have pervaded BPD's promotions process in the past.

BPD delivered e-learning on its policy for promotions to classified ranks (Lieutenant and Sergeant) in July 2021. The policy is now in effect and will be used for the next round of classified rank promotions. The policy newly requires a holistic review of a candidate, which consists of an assessment of the candidate by their Commander; a review of the candidate's performance, disciplinary history, commendations, and education; and an evaluation of the candidate's interpersonal, leadership, communication, problem-solving, and decision-making abilities; past supervisory duties; and specialized leadership training. This approach looks beyond what a candidate scores on a written test and considers overall performance and aptitude. As previously reported, BPD is weaving the imperatives of the Consent Decree—community-oriented policing, accountability, integrity, critical thinking and problem-solving, fairness, and procedural justice—into its promotion practices.

## Challenges Ahead

Attaining the staffing levels required to fully implement and sustain the reforms in the Consent Decree remains the most daunting challenge facing BPD. As of November 30, 2021, BPD reported a total of 2,342 sworn members. This is 443 fewer sworn members than the revised Staffing Plan calls for (2,785). The Patrol Division continues to have the most acute needs, and those are growing. As of November 30, 2021, there were only 662 officers assigned to patrol, a precipitous drop from a high of 813 just a little over a year ago, and far fewer than the 908 recommended by the revised Staffing Plan. It is also vexing that *less than 30%* of BPD's sworn members are currently in patrol. That is a far lower percentage than is customary or appropriate, particularly for an agency with demanding expectations for community policing. The imbalance needs to be remedied.

Recruitment and retention lie at the heart of the staffing problem. The Staffing Plan contemplates that hiring will outpace attrition. BPD has not been able to replace the number of members leaving the Department. While BPD is hiring an average of more than 15 new officers a month—a commendable pace—it is presently losing substantially more. In 2021, BPD hired 184 new sworn members, but lost 292, leaving a twelve-month deficit of 108 sworn members. 2021 saw a total 126 medical, disciplinary, and trainee and discipline-related separations, which is far more than in past years and arguably a sign of more efficiently run agency. However, the number of voluntary resignations and retirements remains concerning: 173 in 2020 and 162 in 2021.

The number of civilian members also has declined every month in 2021. The critical shortage of civilian members is thus growing—currently, 221 fewer civilians than the revised Staffing Plan recommends (750). As explained in prior reports, civilianizing certain functions will enable sworn members handling those functions to be re-assigned to patrol. Civilianization is thus a critical component of the reform enterprise.

## The Next Six Months

All of the groundwork on staffing, performance evaluations and promotions is complete. The Monitoring Team will be watching closely to ensure that implementation proceeds as planned.

Commissioner Harrison has stated that increasing the number of officers in the Patrol Division is a priority. BPD has implemented StaffStat, which is intended to hold the relevant BPD components accountable for achieving the goals of the Staffing Plan, including reducing patrol workload and hiring more sworn and civilian personnel.

Implementation of the new performance evaluations and promotions systems will continue in earnest over the next six months. All performance evaluations and promotions in 2023 will follow the new systems.

# STOPS, SEARCHES, ARRESTS AND VOLUNTARY POLICE-COMMUNITY INTERACTIONS

In recognition of the importance of the Consent Decree's requirements on stops, searches, arrests and voluntary police-community interactions ("SSA"), the Consent Decree's provisions addressing those interactions are extensive. They compel BPD to revise its policies and training curricula; provide thorough prescriptions for communicating with individuals, performing field interviews, and conducting stops, pat downs, searches and arrests; and establish detailed training, documentation, supervisory, and data collection and review obligations (CD 29-86).

Since the adoption of the First-Year Monitoring Plan in February 2018, BPD has:

- Drafted, revised and finalized three different sets of SSA policies;
- Prepared training curriculum and delivered Department-wide training on SSA;
- Prepared training curriculum and delivered Department-wide training on community policing, which includes material on SSA for low-level offenses;
- Prepared and delivered e-learning Department-wide on supervisory review of SSA;
- Prepared and published regular quarterly audit reports of arrests resulting in individuals being released without charge, which are showing a diminishing number of potentially problematic arrests over the past 18 months;
- Prepared annual reports on developing the technology needed to properly record, maintain and analyze SSA data; and
- Procured, developed and implemented a new Record Management System that should facilitate the recording and maintenance of the SSA data necessary to ensure officer accountability, effective supervision, robust internal auditing, and meaningful external Monitoring Team and community evaluation.

With these reforms, BPD has achieved a compliance score of "4c" (implementation–on track) in all four SSA compliance categories: (i) Stops, Field Interviews and Voluntary Contacts, (ii) Searches; (iii) Arrests; and (iv) Review and Supervision.



## Areas of Progress

### Policies

During the last legislative session, the Maryland General Assembly passed new laws that significantly affect Policy 1007, Search and Seizure Warrants, which the Monitoring Team previously approved. Senate Bill 178, which went into effect on October 1, established new requirements for seeking and serving no-knock warrants, while House Bill 670, which becomes effective until July 1, 2022, mandates annual

reporting requirements. In this reporting period, in consultation with the Monitoring Team and DOJ, BPD revised Policy 1007 consistent with these new state laws.

## Training

In this reporting period, BPD completed Department-wide delivery of a two-day classroom training on community policing, which included several modules on addressing low-level offenses. *See* ECF No. 474. Reinforcing the principles in Policy 1018 (Lesser Offenses and Alternatives to Arrest), the training taught officers to take the least intrusive law enforcement action and pursue alternatives to arrest, if consistent with public safety, when confronted with the commission of low-level offenses, such as loitering, open container, trespassing, failure to obey, disorderly conduct, and public urination.

BPD also delivered e-learning to all officers on supervisory requirements for reviewing and reporting on stops, searches, and arrests. *See* ECF No. 472. The e-learning reinforced core SSA policies, particularly reporting requirements, taught during Consent Decree-mandated e-learning and in-service training on SSA in 2020, while providing guidance to supervisors on ensuring compliance with those policies.

## Supervisory SSA Review

In addition to delivering e-learning on supervisory review of stops, searches, and arrests, BPD worked with the Monitoring Team and DOJ to develop a formal SSA "Supervisory Review System." The system, depicted in a flow chart, establishes the process for supervisory review of stops, searches, and arrests that are now supposed to be recorded in BPD's new Record Management System.

## Quarterly Audits on Arrests Resulting in Release without Charge

BPD continued to produce quarterly audits of arrests resulting in individuals being released without charge ("RWOC"), as required by Paragraphs 75-79 of the Consent Decree. *See* ECF Nos. 441 & 471. The purpose of these RWOC arrest audits is to determine whether officers are making unlawful arrests unsupported by probable cause of a crime; to determine whether officers are properly documenting RWOC arrests, including the probable cause for arrest; and to use those determinations to identify the need for remedial action, including additional training, non-disciplinary corrective action, or referral for disciplinary investigation.

To perform the audits, BPD's Performance Standards Section obtains information from the Baltimore City State's Attorney's Office on all arrests that the State's Attorney's Office declined to prosecute immediately after arrest. The reasons include "4th Amendment violation," "elements of crime not readily provable," "nexus issue," and "prosecutorial discretion." For every arrest resulting in dismissal of charges for one of these reasons, with the exception of "prosecutorial discretion," the

Performance Standards Section reviews all available documentation and body-worn camera footage to determine if the arrest lacked probable cause and if the officer properly documented all of their actions and the supporting reasons. For RWOC dispositions based on "prosecutorial discretion," the Performance Standards Section performs the same review for at least 10% of them each quarter. Those RWOC dispositions have been far more voluminous and, as the label "prosecutorial discretion" suggests, are justified by the State's Attorney's Office for policy reasons based on office priorities, rather than due to legal infirmities. However, BPD still examines a randomly drawn sample of these dispositions every quarter to ensure that they do not involve arrests made without probable cause.

Thus far, BPD has published quarterly reports on its RWOC arrest audits for the second, third, and fourth quarters of 2020 and the first three quarters of 2021. The reports can be found **here**. The **most recent report** shows not only that there were no RWOC arrests made without probable cause and no RWOC arrests lacking proper documentation of probable cause between April 1 and June 30, 2021, but also that, between Q2 2020 and Q2 2021 (a period of 15 months), the number of RWOC arrests steadily declined. That is a positive sign that, as Policy 1018 requires, officers are less frequently making arrests for low-level offenses that the State's Attorney's Office promptly declines to prosecute. As the Q2 2021 report explains, the vastly reduced number of RWOC arrests in the Northeast District—which in prior quarters had a strikingly disproportionate number of those arrests—suggests that, consistent with BPD's existing crime plan, officers are increasingly focused on arresting suspects known to be involved in violent and gun crime.

In each report, the Performance Standards Section has recommended various remedial actions based on its findings. These actions have included requiring counseling and remedial training and/or disciplinary referrals for officers who make arrests without probable cause or fail to adequately document probable cause in their reports; requiring a report from the Operations Bureau about why some districts may be making a disproportionate number of arrests the State's Attorney will not prosecute, together with any actions taken; and recommending amending Policy 1112 (Field Interviews, Investigative Stops, Weapons Pat-Downs and Searches) to deal with contraband seized during an RWOC arrest. Making such recommendations, aimed at ensuring future compliance with policy and best practices, is the principal purpose of RWOC arrest audits, and is another sign that BPD is becoming a more mature, self-correcting agency.

### SSA Data Analysis and Reporting

Prior reports have chronicled BPD's progress in developing the technological capacity to record and maintain SSA data. Having finally implemented its new Records Management System in this reporting period, BPD is now at, or at least nearing, the point when it should be able to produce the quarterly SSA data analyses that the Consent Decree requires. First, however, it will need to obtain ready access

to all the data now being stored on the RMS. This year, BPD will build a data warehouse for data from the RMS and other systems. This will allow BPD to more easily aggregate information across its systems.

To ensure BPD works toward satisfying the Consent Decree's SSA data collection and reporting requirements as quickly as possible, BPD will conduct its SSA analyses in two phases. For Phase One, BPD will address the data elements identified in Paragraphs 86 and 459.e., f., g. and i. These include the rate at which stops uncover evidence of criminal activity; the outcomes of stops, weapons pat-downs, and searches; the demographics (race/ethnicity, gender, and age) of those stopped, searched, and arrested; and the locations of stops, searches, and arrests. In theory, BPD should be able to access and analyze these data more readily than the more extensive data on pedestrian stops, vehicle stops, and arrests for low-level offenses required by Paragraphs 41, 46, and 62, which will be the focus of Phase Two.

BPD will begin Phase One by collaborating with the Monitoring Team and DOJ to review the reports produced by BPD's database manager and Axon to ensure the data needed to conduct the Phase One analyses are present and accessible. If there are any gaps in the data, BPD will examine the cause and develop solutions to fill them. The first Phase One data report will cover the period from July 1, 2021 to September 30, 2021. Subsequent reports will be produced on the 15th of every month, displaying SSA data from the previous month. Once all gaps are eliminated from the reports, BPD will begin to prepare and publish the quarterly reports required by Paragraph 86, which should reflect the data.  If there are no gaps, BPD will produce its first quarterly report by the end of March 2022 using data from October 1 - December 31, 2021.

BPD will follow a similar process for Phase II. Its database manager and Axon will run reports to determine whether all the data identified in Paragraphs 41, 46, and 62 are present and accessible. If there are gaps in the data, they will try to determine the cause and will continue to run reports until all the gaps are filled. Once the gaps are eliminated, BPD will work with the Monitoring Team and DOJ to develop a methodology for the audits required to ensure the availability of the data identified in Paragraphs 41, 46, and 62, as well as a timetable for producing the quarterly reports on citations for low-level offenses required by Paragraph 62.

## Challenges Ahead

BPD hired Axon Systems to design and install a new RMS. The new RMS features expected to move BPD from cumbersome, siloed, paper-reporting systems to integrated, electronic, field-based reporting, which will increase officer efficiency, facilitate more effective supervision, and enable necessary but previously impracticable analysis of department-wide, district, unit and individual officer trends in performance and constitutional policing. Phase I of the new RMS, incident

reporting, came online in June 2021. It is in use throughout the Patrol Division. Each patrol car or officer is equipped with the necessary technology, and all officers have received training on use of the associated electronic field-based reporting system for their law enforcement encounters. The success of the RMS is, of course, dependent on officers properly utilizing the new technology and accurately reporting stops, searches or arrests.

Implementation of the RMS has had its challenges. As noted above, the initial configuration of the system has thwarted easy BPD (and Monitoring Team) access to SSA data, which is necessitating system updates in lieu of immediate data analysis. Because of these access issues, BPD is not yet capable of methodically determining the extent to which officers are successfully adapting to electronic field-based reporting. Further, while anecdotal evidence suggests that many officers are utilizing the new technology and providing feedback to inform potential improvements, case management is not yet launched and is behind schedule. There has also been a delay in training supervisors to look at the right information when the system is kicking back reports for deficiencies.

Growing pains are expected with the rollout of any RMS as comprehensive as the one BPD is implementing. Nonetheless, to move any closer toward initial compliance with the SSA requirements of the Consent Decree, BPD must have an operational, accessible, universally utilized RMS. The Monitoring Team simply cannot validate whether BPD is achieving the central objective of the Consent Decree—constitutional, community-oriented policing—unless and until we have access to data that thoroughly and accurately reflects the stops, searches, and arrests BPD officers are making.

## The Next Six Months

In the next six months, provided the RMS becomes fully functional, BPD will prepare and publish its initial quarterly SSA data analyses; otherwise, it will continue to address gaps in the data so that it is able to prepare and publish such analyses as soon as possible. BPD will also continue to prepare and publish its quarterly reports on RWOC arrests.

For its part, the Monitoring Team will continue to work with BPD to ensure the SSA data in the new RMS is thorough, accurate, and accessible so that we may commence our own SSA assessments that will rely on the RMS data.

The Monitoring Team also will undertake its first assessment of the lawfulness of BPD arrests, and the adequacy of officer reporting on arrests, from 2019 – 2021. The Monitoring Team is currently working with BPD and DOJ to finalize the methodology for this assessment. Unlike data and documentation on stops and searches, data and documentation on arrests is not dependent on the successful

operationalization of the new RMS and is believed to be sufficiently comprehensive for analysis.

# IMPARTIAL POLICING

Paragraph 87 of the Consent Decree asserts that "policing fairly and without bias is central to promoting broad community engagement and building partnerships between law enforcement and community members that are an important part of effective policing." To that end, the Consent Decree requires BPD to: document the demographic category of all individuals who are stopped, frisked, searched, arrested or make a complaint (CD 88); adopt policies that require fair, impartial, nondiscriminatory policing (CD 89); establish an impartial policing training curriculum and properly train officers, with community input, to perform their duties in a nondiscriminatory manner (CD 90-94); and consider whether officers engage in nondiscriminatory policing in evaluating performance and making hiring and promotion decisions (CD 95). Paragraphs 90-94 specify requirements for training members to carry out impartial policing properly.

To date, BPD has satisfied the policy revision and training requirements in this area. BPD successfully integrated its core fair and impartial policing policies into e-learning and scenario-based classroom training on use of force in 2019 and on stops/searches/arrests in 2020. In 2021, it began an additional, Department-wide two-day, in-class training on fair and impartial policing principles, combined with refresher training on use of force and First Amendment protected activity. Because BPD is now well into the implementation phase of reform in this area, its compliance score is "4c" (implementation – on track).

| IMPARTIAL POLICING | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | Implementation – On Track |

## Areas of Progress

### Training

In this reporting period, BPD developed and has nearly completed Department-wide delivery of the third and final tranche of concentrated training on impartial policing ("FIP III"). *See* ECF No. 445. The FIP III training incorporated additional instruction on use of force and First Amendment protected activity in order to demonstrate how impartial policing principles are applied in everyday law enforcement encounters. As previously reported, BPD engaged a subject matter

expert recommended by the Monitoring Team, Scott Meadors, who worked with BPD to develop the curriculum and train BPD's instructors on employing it.

FIP III addresses the science of bias and the ways in which bias can infect officers' decision-making, especially in core Consent Decree areas like stops, searches, arrests, use of force, and community policing. Because of the complexity and sensitivity of the subject matter, it was particularly important for BPD to identify strong trainers for FIP III.

The Monitoring Team and DOJ have observed FIP III during both the piloting and "live" stages. There were initially some rocky areas. Instructors sometimes deviated from the curriculum in unproductive ways (e.g., relating war stories that bore no discernible relationship to the course material) and regressed from adult-oriented, facilitated learning to more static lecturing, which had the effect of reducing officer engagement. The Monitoring Team, DOJ, and Mr. Meadors provided this feedback at several points in time, and BPD worked to make corrections. For the most part, the instruction has adequately conveyed the subject matter, and officer surveys show that the training has been well-received.

## Challenges Ahead

Officers have received three intensive tranches of training on fair and impartial policing, as well as associated training on use of force, stops, searches, arrests, and First Amendment-protected activity. The question now is whether this comprehensive training is having an impact on the street, e.g., whether "hit rates" for investigative stops (the percentage of investigative stops that result in citation or arrest) of Blacks and Latinos are increasing—an indicator that officers are engaging less in conscious or subconscious racial profiling and focused more on indicia of actual criminal activity—and whether the racial disparities in these rates are diminishing; whether hit rates for weapons pat-downs and searches (the percentage of pat-downs and searches that lead to the seizure of guns and other contraband, respectively) of Blacks and Latinos are increasing and the racial disparities diminishing; whether uses of forces against Blacks and Latinos and racial disparities in uses of force are diminishing; and whether there are fewer meritorious misconduct complaints for disrespectful or discriminatory treatment.

With the implementation of BPD's new Records Management System, both the Monitoring Team and BPD should be able to begin assessing the impact of BPD's impartial policing training. In particular, if officers properly record the data from their civilian encounters in the new RMS, the new RMS will facilitate the collection and analysis of data on BPD's stop, search, arrest and use of force practices by race and ethnicity. The Monitoring Team and BPD will regularly evaluate the integrity of such data over the next few months to determine whether officers are using the RMS

as intended, and thus whether the comprehensive assessments required by the Consent Decree in the area of impartial policing are—finally—feasible.

These assessments include a determination by BPD of "the nature and scope of demographic disparities in Stop, Search and Arrest practices…," including a determination of stop, pat-down and search hit rates by demographic category (CD 82, 86, 88). For its part, under Paragraph 459.g., the Monitoring Team must "assess whether BPD delivers police services without an unnecessary disproportionate impact on individuals based on Demographic Category, including by assessing pedestrian stops, traffic stops, pat-downs, searches, citations, and arrests for misdemeanor offenses, plus the outcomes of such actions, broken down by race, ethnicity and gender."

The capacity of the new RMS to capture demographic stop, search, arrest, and use of force patterns is vital to establishing a culture of impartial policing and facilitating Consent Decree compliance. That is why the proper implementation and utilization of the new RMS is so important.

## The Next Six Months

Over the coming months, as noted, the Monitoring Team and BPD will regularly evaluate the integrity of the demographic data being captured in the new RMS. Relatedly, the Monitoring Team and BPD will begin developing a methodology for conducting the impartial policing assessments required by Paragraphs 82, 86, 88, and 459.g., described above. When the data in the new RMS is determined to be sufficiently sound, the Monitoring Team and BPD will conduct the required assessments.

Because Paragraph 88 requires the documentation of the demographic information of "all persons who are the subjects of . . . civilian complaints," BPD also will continue to work with the Monitoring Team and DOJ to devise methods to encourage complainants to voluntarily disclose their demographic information.

# USE OF FORCE

The Consent Decree obligates BPD to ensure that its officers resolve incidents without using force when possible, employ de-escalation techniques to minimize the need to use force, avoid unnecessary injury or risk of injury to officers and civilians when force is necessary, stop other officers from using excessive force, report all uses of force, and be held accountable for using unreasonable force (CD 124). To accomplish these objectives, the Consent Decree's section on Use of Force contains requirements regarding policies on use of force (including weapons-specific policies) (CD 125-65), training on use of force (CD 166-68), reporting, reviewing and investigating use of force incidents (CD 169-210), and collecting, analyzing and reporting data on use of force incidents (CD 211-17).

BPD successfully completed revisions to its use of force policies and delivered Department-wide e-learning and classroom training on the revised policies by the fall of 2019. It is now in the implementation phase of use of force reform. Within the next two months, BPD will be publishing its first internal use of force analysis, which will cover use of force incidents from 2017-2020, to be followed shortly by an analysis for 2021. *See* ECF No. 371. At the same time, the Monitoring Team, which published its **first report** on use of force data in January 2021, is presently undertaking its first comprehensive qualitative review of use of force incidents, reporting and supervisory review. Even though the Monitoring Team's formal assessment of BPD's use of force is still underway, our ongoing informal assessments have not revealed compliance problems. BPD's compliance score is thus "4c" (implementation – on track). The Monitoring Team gives this score while acknowledging that training for Performance Review Board members remains in development and will be delivered in the next reporting period.

| USE OF FORCE | COMPLIANCE SCORE | |
| --- | --- | --- |
| | **4c** | Implementation – On Track |

# Areas of Progress

## Performance Review Board

BPD's Performance Review Board evaluates serious use of force incidents with the objective of improving policies, tactics, training, and supervision when performance deficiencies are observed. The effective functioning of the PRB is an important indicator of the progress of the reform effort. A well-functioning PRB would demonstrate that BPD has transformed itself into an agency that consistently engages in reflection and self-correction to address and prevent violations of law and policy.

There have been fifteen PRB meetings, evaluating 34 incidents, since the last report. The Monitoring Team has had representatives at every meeting. The significant progress PRB has made in meaningfully scrutinizing serious use of force cases demonstrates BPD's commitment to reform. In each case, consistent with the new PRB policy approved in late 2020, the Board has reviewed and discussed the feasibility and utilization of de-escalation; supervision prior to, during and following the incident; tactical considerations; implications for policy, training, and communications; the appropriateness of the force used; the quality of the reporting on the force used; and supervisory review of the incident up the chain of command. The Board has not been hesitant to criticize officer and supervisor performance and to recommend corrective action. In contrast to what the Monitoring Team observed when it first began attending PRB meetings in 2018, it is clear that Board members are now using PRB sessions as intended: to improve departmental operations and future officer performance.

In collaboration with the Monitoring Team and DOJ, BPD is presently developing a formal training curriculum for PRB members. This eight-hour block of classroom training provides a refresher on use of force policies and specific instruction on BPD's PRB policy (Policy 724). The training incorporates scenario-based exercises that require review of several Level 3 use of force cases, as well as certain, more serious Level 2 cases from early 2021.

## Monitoring Team Use of Force Compliance Review (Audit)

In this reporting period, the Monitoring Team began its first comprehensive assessment of use of force incidents, reporting, and supervisory review. The assessment covers a representative sample of use of force cases—over 500—between 2018 – 2020. The Monitoring Team is reviewing all of the comparatively few cases involving potentially deadly force (Level 3), as well as a much larger random sample of cases involving more serious (Level 2) and less serious (Level 1) non-lethal force. The review has proven very time-consuming.

To ensure the Monitoring Team is following the agreed-upon assessment methodology, BPD and DOJ are meeting periodically with the Monitoring Team to discuss cases in which the Monitoring Team has found either a failure to de-escalate or the use of unreasonable force. These meetings have proven fruitful. To their credit, BPD's auditors have almost always agreed with the Monitoring Team's determination of a failure to de-escalate or an improper use of force, even when, in the ordinary course of supervisory review of an incident, no one in the chain of command found a violation of BPD's de-escalation or use of force policies.

The Monitoring Team expects to complete its assessment and publish a report in the next reporting period. As previously explained, the Monitoring Team believes the assessment could shed light on the impact of the Consent Decree because the period under assessment—2018-2020—straddles Consent Decree training (and the activation of BPD's new policies) on use of force, which occurred in mid-2019. The Monitoring Team will attempt to discern whether, in the year following the training in 2019, BPD officers used force and violated the use of force policy less often than before the training; whether their use of force reports were more thorough and accurate than before the training; and whether supervisors properly reviewed force incidents more often than before the training.

## Challenges Ahead

As observed in previous reports, any meaningful change in BPD's use of force practices will rely heavily upon the acceptance and enforcement of the new use of force policies by sergeants and lieutenants. Those supervisors must reinforce the training their officers have received on critical decision-making, de-escalation, and using force only when necessary, reasonable, and proportional, and must carefully review use of force incidents, commend officers who follow policy and use proper tactics, take corrective action with officers who make mistakes, and hold accountable officers who violate policy. And to ensure sergeants and lieutenants do what they should, commanders must also take seriously their role in the use of force review process. They must not only independently evaluate use of force incidents, but also meaningfully review supervisors' review of such incidents. No one in the command can simply rubber stamp what a subordinate has done. The Monitoring Team's ongoing use of force assessment, in part, seeks to determine whether this is occurring.

## The Next Six Months

In the next reporting period, the Monitoring Team will complete its ongoing assessment of use of force incidents from 2018 – 2020. In the coming weeks, BPD will complete its own report on use of force incidents from 2017-2020, and should complete another report for use of force incidents in 2021 within six months after. PRB members will complete training on their Board service. And the Monitoring Team will continue to observe PRB meetings.

.

# TRANSPORTATION OF PERSONS IN CUSTODY

Safely transporting individuals in custody is among the most important obligations of any law enforcement agency. The Consent Decree requires BPD to: (1) equip all transport vans with transport vehicle cameras (TVCs), and seatbelts as well as holding straps located along the rear area of each seat so that individuals being transported may have a grip for security during transport, and also equip all transport cruisers with seatbelts (CD 223-24); (2) inspect transport vehicles monthly and create logs to memorialize the inspections (CD 225); (3) establish and adhere to appropriate procedures for transporting prisoners (including using seatbelts, straps, and TVCs) (CD 226-33), (4) establish and adhere to protocols for documenting and comprehensively auditing prisoner transport events (CD 234-37), and (5) revise policies and training curricula to ensure safe, effective prisoner transport (CD 238).

The Monitoring Team's just-published **comprehensive assessment** of BPD's compliance with these requirements shows that BPD has made considerable progress. It has made all required equipment changes, has been conducting routine equipment and transport audits, and has been making repairs when equipment audits find problems. Further, transport drivers are consistently securing passengers with seatbelts, providing van passengers access to grip straps, and routinely monitoring passenger safety through either direct or video (TVC) observation. BPD also has been taking remedial action against drivers when transport event audits find non-compliance with policy. There are, however, certain additional measures BPD must take—particularly ensuring transport officers record more comprehensive data on transport events, search prisoners prior to transport without exception, and consistently obey traffic safety laws—to reach full compliance with Consent Decree's transport requirements. Accordingly, BPD's compliance score is "4c" (implementation—on track).

| TRANSPORTATION OF PERSONS IN CUSTODY | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | Implementation – On Track |

# Areas of Progress

## Monitoring Team Assessment

In our just-published **assessment**, the Monitoring Team finds that BPD has made substantial progress toward compliance with Paragraphs 223 – 238 of the Consent Decree, as well as the additional steps BPD must take to achieve full compliance. In summary, the Monitoring Team made the following findings regarding BPD's progress:

First, BPD is routinely completing the required monthly inspections of transport vehicles and wagons, and IT inspections of transport wagons.

Second, BPD transport vans are generally equipped with functioning seatbelts, grip straps and TVCs. Patrol cars are generally equipped with functional seatbelts. And when audits have found equipment that is not properly functioning, the problems appear to be fixed promptly.

Third, BPD is consistently completing the required quarterly audits and monthly spot checks of transport events using the agreed upon methodology. In fact, BPD is exceeding Consent Decree requirements for the quarterly audits, examining six transports for each of the nine districts instead of the required five, as well as six transports by the Warrant Apprehension Task Force (WATF).

Fourth, BPD transport drivers are following many of the required procedures for transporting detained individuals. BPD's transport audits, the validity of which the Monitoring Team confirmed with its own reviews, determined that transported detainees were: (1) handcuffed prior to being transported; (2) appropriately restrained with seatbelts in positions that did not cause undue pain or risk of injury; and (3) when in wagons, had access to grip straps and were viewable on TVCs. Further, in a handful of audited transports in which a transport officer did not take immediate action to respond to a detainee who complained of an injury, BPD properly addressed the lapse by making a Public Integrity Bureau referral.

However, there remain certain observed deficiencies and record-keeping problems. In at least 14% of audited transports, the detainee was not searched before being placed in the transport vehicle. The Monitoring Team flagged this issue in prior reports, yet it persists. BPD auditors also could not determine the transport driver's speed in 73% of transports they audited. In addition, more than one-fifth of audits found that the transport driver did not operate the vehicle as required in all respects by state law, e.g., they did not stop at a stop sign or red light in a non-emergency, drove the wrong way down a one-way street in a non-emergency, or operated a handheld device while driving.

These shortcomings are not insignificant, and they are a primary reason why BPD has not yet achieved "initial compliance" in the transport area. However, policy and traffic safety law violations such as traveling a few miles over the speed limit or failing to come to a complete stop at a stop sign do not diminish BPD's general compliance with Consent Decree and policy requirements that are typically more important to safely transporting persons in custody—i.e., restraining them in seatbelts, providing grip straps, and monitoring their safety through either direct or TVC observation.

For BPD to achieve initial compliance in the transport area, it must demonstrate a sustained trend of improved scores in the prisoner search and safe driving fields of BPD's internal audit scorecards. Further, as described in more detail in the Challenges Ahead section below, it must improve its record-keeping to provide for consistent assessment of driving speed and compliance with other traffic safety laws.

### Transport Van Driver Training

As noted in the Training section, BPD delivered Department-wide e-learning regarding its policies on transporting persons in custody in December 2021. BPD also developed a four-hour training course for newly assigned transport wagon drivers.

## Challenges Ahead

To reach compliance, BPD must sustain all the improvements it has made in its transport and transport auditing practices. It also must address the outstanding deficiencies in its transport practices described above (i.e., searching detainees prior to transport and obeying traffic safety laws). Above all, it must fill the gaps in its record-keeping so that its equipment inspections and transport audits capture all required information and are fully verifiable. Specifically, as set forth in the Monitoring Team's new report:

- BPD must establish a consistently up-to-date database identifying each department vehicle, its present location, and its present maintenance status. The Consent Decree requires BPD to inspect all transport vehicles on at least a monthly basis. Without an accurate vehicle inventory, which should indicate which vehicles are not available for inspection and why, it is not possible for the Monitoring Team to definitively determine compliance with the Consent Decree's vehicle inspection requirements.

- BPD members who conduct monthly vehicle and vehicle IT inspections should be trained to ensure that they score inspections in a consistent manner and complete every section in all inspection reports with accurate, legible information.

- BPD should include on "Wagon Hard Drive Inspection Sheets" a question about TVC functionality.

- BPD must improve several of its current record-keeping practices for transport events to ensure that transport audit scorecards include complete, reliable data.

  First, BPD must be able to generate a list of all prisoner transports. At present, there is no way to identify either the overall number of transports during a given period or the type of vehicle used for each one. Without a list of all transports, BPD cannot make a true random selection from *all* transports for its quarterly audits. Rather, it must select from body-worn camera recordings labeled "transport," thus excluding any transports with either mislabeled or unavailable BWC footage. The Monitoring Team expects the implementation of the new Records Management System to facilitate creation of a comprehensive list.

  Second, BPD must address the data deficiencies that have prevented complete audits of safe driving practices. This includes providing full access to Automatic Vehicle Location (AVL) information, which includes vehicle speeds.

  Third, BPD must ensure that Charge Information Forms (Form 12s), which are currently paper forms, are both completed by transport officers and accessible to auditors. Form 12s contain the data needed to satisfactorily complete a portion of the transport audit scorecard, yet BPD auditors often cannot locate the Form 12s for the transport events they are reviewing. This is so even for some audited transports where body worn camera footage shows officers completing a Form 12 at the Central Intake and Booking Facility (CBIF). Transport officers either are not completing the electronic form for the new Records Management System or the paper form gets lost along the way and the information is not transferred to the RMS. This is problematic because when data from the Form 12 is not available to an auditor, BPD receives a failing score for the scorecard category that is dependent on that data. BPD has sought to resolve the issue by requiring transport officers to complete Form 12s only electronically in the RMS and fill out a much shorter paper Form 12 containing only the information the jail requires to accept transported suspects. But this is still not ideal, as it requires officers to prepare two separate reports with duplicative information. The best solution would be for the CBIF system, administered by the State, to interface with and migrate data from BPD's new RMS.

- Currently, BPD cannot readily isolate transports that implicate Paragraphs 229 and 230 of the Consent Decree. Accordingly, neither BPD

auditors nor the Monitoring Team has been able to assess BPD's compliance with the requirements to separately transport cisgender males and females; separately transport youth and adults; transport transgender, intersex, and/or gender non-conforming individuals with arrestees of the same gender identity; and accommodate the needs of individuals with medical issues or medical equipment needs. BPD, the Monitoring Team and DOJ continue to work on developing a process for flagging these transports for review.

The Monitoring Team has no reason to believe that resolution of these record-keeping deficiencies would reveal performance problems that did not surface in the significant set of transport events that BPD auditors and the Monitoring Team have reviewed. However, BPD records must provide greater certainty about transport driver performance before the Monitoring Team can conclude that BPD is in initial compliance with the Consent Decree's transport requirements.

## The Next Six Months

BPD will continue to audit transport equipment and transport events as the Consent Decree requires. With continued attention from command staff—*e.g.*, including transport scorecards in weekly COMSTAT meetings—it will make the above-discussed adjustments, necessary for reviewing certain types of infrequent transport events addressed by the Consent Decree and for ensuring the consistent recording and storage of all data required for accurate transport event audit scoring. By making such adjustments, should be able to attain initial compliance with the transport provisions of the Consent Decree.

# INTERACTIONS WITH INDIVIDUALS WITH BEHAVIORAL HEALTH DISABILITIES AND IN CRISIS

The Consent Decree reinforces the commitment of both BPD and the City "to responding to individuals with behavioral health disabilities or in crisis in a manner that respects individuals' civil rights and contributes to their overall health and welfare." Paragraph 96 envisions that BPD and the City will accomplish this goal by using appropriate crisis response techniques, with a preference for the least police-involved response. Such techniques will help prevent situations that could lead to the unreasonable use of force, promote utilization of the health system for individuals with behavioral health disabilities and in crisis, and diminish inappropriate utilization of the criminal justice system for such individuals.

The Consent Decree identifies a series of requirements to accomplish these objectives. Certain requirements, unlike in most other areas of the Consent Decree, necessitate the full participation of City leadership and other City agencies alongside BPD. The Consent Decree obligates BPD and/or the City to expand the Collaborative Planning and Implementation Committee ("CPIC"), which works with BPD to improve crisis response (CD 104-05); establish an annual work plan to accomplish the requirements of the Consent Decree (CD 96, 105); assess and report on the gaps in the City's behavioral health system coupled with recommendations for solutions ("Gap Analysis") (CD 97); maintain a Crisis Intervention Team ("CIT") whose officers have primary responsibility for responding to incidents involving individuals in crisis (CD 101-03, 110, 119); develop a Crisis Intervention Plan and CIT Officer Selection Process to ensure the efficacy of the CIT (CD 120); appoint and train a Crisis Intervention Team leader (CD 115-18); train all officers on responding to individuals with behavioral health disabilities and in crisis, and provide specialized training for CIT officers and dispatch personnel (CD 106-13); revise policies, including a police emergency dispatch policy, for responding to incidents involving individuals in crisis (CD 98, 114); and identify quantitative and qualitative performance measures for the CIT program and collection of data needed to make those assessments (CD 121-22).

BPD and the City have satisfied a number of the Consent Decree's preliminary requirements, including expanding CPIC membership, appointing a CIT Coordinator (though the position is currently open), completing (with CPIC) a crisis intervention plan and a plan for selecting CIT officers, and creating a form to track data for responses to individuals in crisis. BPD also has revised policies addressing crisis intervention for both officers and dispatchers. And importantly, BPD has developed and delivered training on behavioral health awareness and crisis intervention for recruits, officers, and dispatchers/911 specialists, as well as specialized training for CIT officers, that often exceeds Consent Decree requirements.

Additionally, BPD and the City completed and published the Gap Analysis and, consistent with the recommendations in that report, are working diligently with community members on CPIC and Behavioral Health Services Baltimore (BHSB) to begin strengthening the City's behavioral health support systems and developing the resources needed to respond more effectively to individuals in crisis. BPD and the City also have been analyzing data on police interactions with individuals in crisis and have begun issuing quarterly public reports with these analyses.

Because BPD has completed core policy revisions, delivered essential training across the Department, including to CIT officers, and begun tracking performance in response to calls for service involving with behavioral health disabilities or in crisis, BPD's compliance score in the Behavioral Health-General and Behavioral Health-CIT Officers categories is "4c" (implementation – on track). For the Behavioral Health-System Coordination and Improvement category, the compliance score for BPD and the City is likewise "4c" (implementation – on track), as they have begun collecting data on systemic efficacy, are completing an implementation plan for the Gap Analysis, and have begun implementing the Gap Analysis recommendations, e.g., piloting a system for diverting certain 911 calls to behavioral health specialists.



# Areas of Progress

## CIT Officer Training

In this reporting period, BPD began delivering a 40-hour in-service training course to officers who have volunteered to become Crisis Intervention Team members and thus to take on a lead role in responding to calls for service involving individuals in crisis. *See* ECF No. 450. Thus far, 42 patrol officers and 40 SWAT team officers have completed the training.  The large number of officers who have volunteered for the CIT is encouraging. Officer feedback on the course has been overwhelmingly positive.

## Data Collection

BPD's new Records Management System has incorporated the Crisis Data form that BPD and CPIC developed over two years ago. BPD officers are thus now able to complete the form on their laptops in the field when they respond to calls for service involving individuals in crisis. The Monitoring Team has not yet assessed the consistency and reliability of the data now in the RMS.

BPD has worked with CPIC to complete an initial report containing data on BPD's responses to individuals in crisis between January 1 – June 30, 2021. *See* ECF No. 470. BPD and CPIC will produce quarterly reports going forward. The CPIC Data Committee also worked with BPD and the City Mayor's Office of Performance and Innovation to create a behavioral health data dashboard that is now populated with data from these quarterly reports.  The availability of this data will finally facilitate the Monitoring Team and BPD assessments required to move toward compliance with the behavioral health provisions of the Consent Decree.

## System Coordination and Improvement

During this reporting period, the City and BPD have continued to move forward with the implementation of the recommendations in the Gap Analysis. The City, in particular, has stepped up to the challenge, committing key leadership personnel and significant resources to improving behavioral health support systems. The City has established and set its sights on achieving short-term goals and is working cooperatively with CPIC members, including Behavioral Health Systems of Baltimore (BHSB), and the State of Maryland's Greater Baltimore Regional Integrated Crisis System (GBRICS), toward long-term reform.

**911 Call Diversion Pilot Program |** The City worked with the Baltimore Fire Department (BFD) and BPD to successfully implement a pilot program for diverting certain 911 calls involving individuals in crisis to behavioral health professionals from Baltimore Crisis Response, Inc. (BCRI).  The calls eligible for the pilot involved

individuals who present with suicidal ideation but without weapons or plans to act on those thoughts. These calls represent about 10% of the 13,000 behavioral health-related calls that 911 receives each year. The pilot project started with daily review of calls eligible for diversion and eventually moved to weekly meetings. The results of the pilot were encouraging. The effort reduced reliance on BPD and BFD EMTs and increased intervention by BCRI for a sizeable number of 911 calls, saving over 100 hours of unit time by BPD and BFD. Based on the success of the initial pilot, the City has begun considering options for expanding the categories of calls eligible for diversion.

**Funding |** As previously reported, the City's primary behavioral health care partner, BHSB, obtained funding to build out the City's behavioral health infrastructure through GBRICS, a regional partnership among multiple Maryland counties and the City. The City is now filing with the Court regular reports on projects that will benefit from GBRICS. *See* ECF Nos. 428, 443 & 456.

**Gap Analysis Implementation Plan |** Together with CPIC, the City and BPD have developed a comprehensive, thoughtful **implementation plan for the recommendations in the Gap Analysis**. This 52-page document sets forth detailed objectives and a concrete multi-year timetable for effecting the recommendations in the Gap Analysis and "reducing unnecessary police encounters with people in crisis." The plan highlights the non-enforcement measures the City will take collectively to bridge the gaps that lead to these unnecessary interactions." It envisions expanding the initiative for diverting 911 calls to community-based behavioral health or crisis response services where appropriate; increasing access to mobile crisis teams; integrating the services offered by hospitals, crisis services and community providers to establish an accessible, unified system to assist individuals at elevated risk of crisis; building a peer support network, including bolstering the peer support workforce and peer support services; and addressing social determinants of health by, e.g., increasing coordination among hospitals to address the effects of violence, trauma and poverty on individuals with behavioral health disabilities and enhancing housing opportunities for these individuals.

The Gap Analysis implementation plan is perhaps the most tangible evidence to date of the City's commitment to systemic change—change built on establishing new and hopefully transformative partnerships among a range of City agencies and educational, social services and health care entities.

## Challenges Ahead

### Quality Assurance Review of Crisis Events

As explained in the prior semiannual report, the sentinel event review/quality assurance process the City is establishing to evaluate the efficacy of its responses to

selected crisis events has the potential to be a national model. But establishing this process will require effective coordination among a number of stakeholders. It will also require candor and honesty in determining when improvements in crisis response are needed. It remains to be seen if all the agencies involved can work cooperatively and productively to examine and recognize system failures.

Encouragingly, the City and CPIC have drafted a protocol for conducting the quality assurance reviews. The protocol has been published twice for public comment and is nearing completion. Additionally, the City has sought to determine whether conducting the reviews will require legislation to protect the confidentiality of the individuals involved.

### Achieving Systemic Change

To overhaul, expand and fully integrate the City's behavioral health system so as to provide improved care and better resources to individuals with behavioral health and substance abuse issues is a monumental undertaking. It will take years. One threshold question is whether the system will be able to locate and draw in those in need of help. Advocates worry that, notwithstanding its good intentions, the City might be building a bridge to nowhere. The plan for implementing the recommendations in the Gap Analysis must include finding ways to reach the people who are the intended beneficiaries of the anticipated reforms.

Changing the default method of addressing behavioral health issues from reliance on reactive responses from police and the courts to reliance on proactive, pre-police-interaction intervention from an expanded behavioral health system will require more than the expansion of traditional forms of professional health treatment. Even more ambitiously, it will require effective programs to destigmatize mental illness and substance abuse, improved job placement, and better access to housing. As envisioned in the Gap Analysis implementation plan, these programs must include intensive case management, seamless referral processes, and peer-driven support strategies. To give a sense of the magnitude of the work that must be done to achieve the objectives of the implementation plan, none of these exist yet on a systemic basis. The Consent Decree does not obligate the City to fully implement all the initiatives in the implementation plan and successfully complete the overhaul of its behavioral health system in order to achieve compliance—a process that will take years. But the City must show tangible progress.

## The Next Six Months

The next reporting period will require a lot of work. BPD will finalize revised policies on reasonable accommodations and its Law Enforcement Assisted Diversion program. It will continue to train its new CIT officers. It will conduct refresher training on behavioral health awareness and crisis intervention for all officers. And

it will continue preparing and publishing regular reports with data on its responses to calls involving individuals in crisis.

The City will continue to implement the recommendations in the Gap Analysis, including GBRICS-funded initiatives, such as developing Mobile Crisis Team standards, expanding the 911 diversion system, establishing a comprehensive behavioral health call center using care traffic control technology, and launching a public awareness campaign that promotes alternatives to calling 911 for behavioral health crises (e.g., the Here2Help Hotline). The City also will prepare and publish a report on its 911 diversion program. Further, it will implement the new protocol for quality assurance review of its responses to selected crisis events and will provide regular reports to the Court.

Finally, the Monitoring Team, BPD and DOJ will prepare a methodology for assessing the quality of BPD's responses to calls involving individuals in crisis. Later in the year, both the Monitoring Team and BPD will conduct independent assessments utilizing the methodology.

# FIRST AMENDMENT
# PROTECTED ACTIVITIES

As the Consent Decree and BPD's revised policy on First Amendment Protected Activity explain, the exercise of First Amendment rights is fundamental to democratic governance because it promotes the free exchange of ideas. The preservation and protection of First Amendment rights is also vital to maintaining public trust in the rule of law because it fosters transparency and accountability in government functions, including policing (CD 239).

For these reasons, the Consent Decree requires BPD to protect several different First Amendment rights: the right to free speech and expression, which includes the right to criticize law enforcement and engage in speech in the presence of law enforcement without being subject to retaliation (CD 240-44); the right to freely organize and participate in lawful public assemblies (CD 245); and the right to observe and record the actions of BPD officers in the public discharge of their duties (CD 247). The Consent Decree also protects First Amendment rights by prohibiting the warrantless search and seizure of recorded video and images, except in limited circumstances (CD 249-50). The Consent Decree prescribes protection for all of these constitutional rights by obligating BPD to revise its policies and training programs (CD 239, 244, 246, 251); require supervisory approval for dispersing assemblies, seizing recording devices and recordings, and arresting individuals engaged in expressive activity (CD 252-54); and conduct annual assessments of its practices relating to First Amendment-protected activity (CD 255).

BPD continues to make good progress toward fulfilling these requirements. During this reporting period, BPD completed both e-learning and scenario-based in-service training on First Amendment protections. As a result, the First Amendment policies BPD revised earlier in the reform process are now in effect, and officers are accountable to them. BPD also finalized the standard operating procedure for its Public Order Forces, units that respond to public assemblies to maintain order while protecting First Amendment rights and intervene in the event an assembly turns into a civil disturbance. In addition, BPD continues with self-assessments of its responses to First Amendment activity. In 2020, it conducted its first audit and published its first report, which covered its responses to First Amendment-protected activities in 2019. In this reporting period, BPD conducted an audit of its responses to such activities in 2020 and published its second report. Based on these accomplishments, BPD's compliance score is "4c" (implementation—on track). The Monitoring Team gives this score while acknowledging that training for BPD's Public Order Forces has not yet occurred and will be developed this year.

# FIRST AMENDMENT PROTECTED ACTIVITIES

**COMPLIANCE SCORE**

## 4c

Implementation —on track

## Areas of Progress

### Training

At the beginning of the reporting period, BPD certified completion of delivery of First Amendment e-learning to all officers. *See* ECF No. 437. With the certification, BPD's two First Amendment policies—Policy 804 covering the right to free speech, including the right to criticize law enforcement, and the right to assemble and protest, and Policy 1016 regarding the observation and recording of police activity—formally went into effect.

BPD is also nearing completion of in-service training on First Amendment activity. The training, which is appropriately paired with lessons on both fair and impartial policing and use of force, includes one classroom module that uses case studies to reinforce the concepts conveyed through the e-learning, and another live scenario module that requires officers to think on their feet and apply their knowledge to respond to role players.

Collectively, the e-learning and the in-service training officers received in 2021 provided comprehensive instruction on the First Amendment principles reflected in BPD policies.

### Public Order Forces Standard Operating Procedure

After a series of delays caused by the pandemic and changes in personnel, BPD completed a new **standard operating procedure** for its Public Order Forces, which are comprised of Rapid Field Formations of on-duty officers and a specially trained Mobile Field Force. *See* ECF No. 483. Employing a more progressive, less confrontational approach to public demonstrations and any disorder arising from them, the SOP provides Rapid Field Formation officers, Mobile Field Force officers, and their supervisors and commanders with detailed practical guidance that adheres rigorously to BPD's First Amendment policies.

### BPD Self-Assessment

BPD submitted its second annual audit of the Department's responses to First Amendment-protected activities (CD 255) in September 2021. *See* ECF No. 440. The purpose of these audits is to candidly evaluate BPD compliance with the First

Amendment and to implement "corrective action or improvement measures" where deficiencies are identified (CD 256). BPD's audit report, which covered the year 2020, is available **here**.

Because of the large-scale protests that took place in Baltimore in the wake of the murder of George Floyd, the report on 2020 is more extensive than the report covering 2019. BPD reviewed and audited: (1) BPD's response to the protests, which spanned May 30 – June 20, 2020, as well as its response to the August 2020 protest during former President Trump's visit to Baltimore during the Republican National Convention; (2) disorderly conduct arrests with First Amendment implications—a vital metric because officer responses to individuals who exercise their First Amendment rights in the course of routine police encounters by criticizing police conduct, including officers' actions, are far more frequent than larger assemblies, and DOJ determined in its investigation that it was principally in *this* area that BPD was engaged in a pattern-or-practice of First Amendment violations; and (3) the results of the Public Integrity Bureau's completed internal investigations of complaints alleging First Amendment violations between 2018 and 2020.

The 2020 audit was reassuring. First, by taking a hard, discerning look at how BPD officers responded in real-time to large-scale protests, sometimes harsh criticism from community members, and the videorecording of their actions, the audit continued to demonstrate BPD's growing capacity for—and increasing comfort with— self-reflection and self-correction, the hallmarks of a maturing police agency. Second, the results of the audit revealed that BPD is making good progress toward compliance with the First Amendment requirements of the Consent Decree.

After reviewing extensive body-worn camera footage and written reports, the auditors determined that BPD's response to protests in the summer of 2020 complied with policy and the Constitution. This finding was consistent with the Monitoring Team's own first-hand, real-time observations, which we previously reported in September 2020. *See* ECF No. 342-1 at 70-72. BPD arrested only a small number of people during the protests. The vast majority involved criminal conduct that had nothing to do with the exercise of First Amendment rights. Only six were for failing to obey repeated, properly issued dispersal orders and, according to the auditors, all were justified and approved in advance by permanent rank supervisors.

Despite BPD's overall compliance with the First Amendment during the protests, the auditors still had recommendations for improvement. They found that officers had grouped two simultaneous arrests together under a single CC number, making it difficult to track and review each individual arrest, and so advised the Operations Bureau to generate a unique CC number for every arrest made during a civil disturbance. The auditors also found that the identifiers on the uniforms of BPD officers observing the protests were sometimes obscured by their protective gear. To improve transparency, the auditors thus recommended investment in unique identification markers, including nametags, for all helmets and gear.

Additionally, the auditors determined that, although the few Level Two uses of force (more serious but still non-lethal) during the protests were generally justified, several were either not properly reported or not properly reviewed by supervisors. Accordingly, the auditors recommended that "[p]olicy and training should proactively address the immediate [uninvolved permanent rank supervisor] notification mandate and emphasize that part of the notification needs to be that a use of force occurred, as well as the type of force, and the unit who used force, in order to facilitate appropriate follow-up by the appropriate uninvolved supervisor. This should be centralized within Incident Command for Protest Events."

According to the audit report, BPD arrested only 35 people for disorderly conduct in 2020, or .04% of all calls for disorderly conduct, a sign that officers are complying with BPD policy requiring problem-solving and alternatives to arrest for low-level offenses when consistent with public safety. Only eight of these 35 arrests implicated the First Amendment. The audit determined that none of them presented a violation of First Amendment rights. Two of the 35 arrests were problematic for another reason—they lacked probable cause—and the auditors recommended remedial training for the officers involved.

Of the nine completed internal misconduct investigations of alleged First Amendment violations between 2018-2020, one resulted in a "sustained" finding, which led to the officer's resignation in lieu of discipline; three were "not sustained"; and five were "unfounded." The auditors found that, in the period under review, the Public Integrity Bureau did not properly classify First Amendment complaints on a consistent basis, which made it more difficult than necessary to identify First Amendment complaints. The auditors thus emphasized the need for PIB to adhere to the Classification Protocol.

## Challenges Ahead

To ensure appropriate, disciplined, measured responses to demonstrations that turn into civil disturbances, BPD must effectively train Public Order Forces officers on the new standard operating procedure and continue to properly prepare for and respond to protest activity by ensuring that its officers respect First Amendment rights.

Consistent with the department-wide First Amendment e-learning and in-service training, BPD commanders and supervisors also must continue to ensure that officers respect First Amendment rights in everyday encounters—that they de-escalate and exercise restraint in the face of criticism and non-violent provocation, rather than resorting to unlawful retaliation.

## The Next Six Months

In the next reporting period, the Monitoring Team will develop the methodology for and commence its first comprehensive assessment of BPD's responses to First Amendment protected activity. In addition, BPD will prepare a training curriculum and deliver training to Mobile Field Force officers, and its Performance Standard Section will conduct and publish a report on its third annual audit of BPD's responses to First Amendment activity, this one covering 2021.

# INTERACTIONS WITH YOUTH AND COORDINATION WITH BALTIMORE SCHOOL POLICE

The Consent Decree requires BPD to alter its approach to how it interacts with youth. The Consent Decree obligates BPD officers to account for the personal characteristics (age, size, developmental/mental status, disability status and maturity) of youth they encounter and, where practical, use alternatives to arrest (e.g. warn and release, counseling, referral to community services and resources, warnings, civil citations) in order to divert youth from criminal justice system (CD218). To accomplish this goal, the Consent Decree requires the City to conduct a comprehensive assessment of its effort to reduce youth involvement in the juvenile and criminal justice systems ("Youth Assessment") (CD219). It requires BPD to revise its policies and training as needed, and conduct training in order to properly guide officers in their interactions with youth (CD220-21). The Consent Decree envisions that, in preparing the Youth Assessment, the City will obtain input from a collaborative consisting of City Officials, BPD representatives and community stakeholders, including community organizations with experts in the field, academic and youth advocates (CD 219).

The Consent Decree also contains several provisions addressing BPD's relationship with the Baltimore School Police ("BSP"). In particular, Paragraph 417 of the Consent Decree requires BPD to conduct an initial assessment of its memorandum of understanding ("MOU") with BSP and evaluate how BSP has used BPD's authorization to exercise law enforcement powers throughout the City. The assessment should include an analysis of data reflecting the frequency with which BSP officers respond to calls, make stops, searches, and arrests, and use force under the MOU. BPD will use the assessment to identify deficiencies and opportunities for improvement, amend the MOU as needed, implement other appropriate corrective action, and document the changes it makes. Following the initial assessment and amendment of the MOU, BPD must conduct a biennial evaluation of its coordination with BSP, and make any modification needed to ensure effective coordination.

BPD has completed the Youth Assessment (available **here**), finished revising core youth-related policies on youth interactions (Policy 1202) and youth interrogations (Policy 1207), *see* ECF Nos. 283 & 383, prepared a training curriculum on these policies, and within the next two weeks will commence Department-wide training. Because BPD remains in the training phase of reform, its compliance score in the Youth Interactions compliance category is "3" (training phase).

In the School Police compliance category, there have been no changes since the last report. In 2020, BPD completed the required **assessment** of its MOU with BSP

and executed a new MOU that attempts to fix the shortcomings in the prior MOU. This year, BPD will complete its first biennial assessment of its coordination efforts under the new MOU. BPD's compliance score is "4c" (implementation – on track).



## Areas of Progress

### Training

In this reporting period, BPD prepared a two-day in-service training curriculum that covers both youth interactions and behavioral health awareness. Drafts of the youth interactions curriculum were developed in coordination with youth advocates in Baltimore, mental health experts from CPIC, and Strategies for Youth (SFY), which is a nationally recognized policy and training organization dedicated to improving police/youth interactions. Following several pilot sessions, Department-wide training will get underway in the next two weeks and should be completed by early spring. The youth interactions modules utilize scenario-based content to reinforce the provisions of Policy 1202 (Interactions with Youth), which provides BPD officers practical guidance on interactions with youth. The modules focus on how children develop cognitively and behaviorally and how both trauma and interacting with law enforcement affects them.

In the fall of 2021, BPD also began delivering Department-wide training on youth interrogations, addressed in Policy 1207. The e-learning reinforces the content of two of the modules from the 2020 in-service training on stops, searches, and arrests. Those modules, on "Interrogations and Interviews" and "Crime Scenes and

Witnesses," included scenarios and hypotheticals that focused on the special considerations and limitations on the questioning of youth.

### Youth Diversion Programs

Under the Fourth-Year Monitoring Plan, the City, BPD, the Monitoring Team, DOJ, and community-based technical assistance providers hold regular meetings to discuss expanding and improving the City's youth diversion programs, as recommended in the Youth Diversion Assessment completed in 2020. BPD is working actively with the Mayor's Office of Neighborhood Safety and Engagement (MONSE) and others to develop youth diversion strategies. In the Western District, BPD and MONSE will soon pilot SideStep, a promising pre-arrest diversion program. Sidestep aims to divert into community-based support programs up to 30 youth who might otherwise be arrested.

## Challenges Ahead

Now that BPD has finalized its central youth interactions policies and is proceeding with training, it must translate those policies and training into action on the street. That means not only interacting with children with the understanding that they are still developing cognitively and behaviorally, but also employing diversion strategies when warranted, rather than arresting them and sending them into the juvenile justice system. At the same time, for BPD's diversion guidance to be effective, the City must do its part by developing and successfully operationalizing SideStep, consistent with the ambitious recommendations in the Youth Diversion Assessment. The City's role in the effective implementation of BPD's new youth policies is indispensable. Without reliable City-wide support services for youth at risk of becoming entangled in the juvenile and criminal justice systems, even the best law enforcement diversion policies and training will be ineffectual. Simply put, police officers who encounter suspected youth offenders will have nowhere—or nowhere good—to divert the youth to.

## The Next Six Months

In the next reporting period, BPD will complete in-service training on youth interactions, which will activate Policy 1202, and will also complete delivery of e-learning on youth interrogations, which will activate Policy 1207. Additionally, the City will continue to work and report on the development of youth diversion programs. BPD and the City will also continue to provide monthly updates to the Monitoring Team and DOJ regarding the long-term implementation and expansion of these programs.

Finally, BPD will perform its first biennial evaluation of its coordination with Baltimore School Police under the revised MOU adopted in 2020. These evaluations are required under Paragraph 417 of the Consent Decree.

The Monitoring Team will closely monitor whether BPD's new Records Management System is, as intended, capturing relevant data on stops, searches, arrests, and uses of force involving youth. Provided the data is being properly recorded and stored, the Monitoring Team will prepare a methodology for conducting our inaugural assessment of BPD interactions with youth, as required by Paragraph 459.i. of the Consent Decree. We will conduct the assessment in the subsequent reporting period.

# COMMUNITY POLICING AND ENGAGEMENT

Community policing is a philosophy that supports the systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime. (*Community Policing Defined*, (Washington, DC Office of Community Oriented Policing Services, 2014.) Effective community policing depends on the trust and cooperation of community members. In some Baltimore's neighborhoods, mistrust in the police runs high, and collaboration with the police is infrequent. BPD thus faces considerable challenges in engaging in effective community policing in some of the City's most underserved communities.

One of the overarching goals of the Consent Decree is to meet those challenges. The Consent Decree contains specific requirements that affect how BPD officers interact with community members when taking law enforcement action. These requirements—regarding, *e.g.*, use of force; stops, searches, and arrests; fair and impartial policing; First Amendment-protected activities; and interactions with youth and individuals with behavioral health disabilities or in crisis—are addressed in the preceding sections of this report. However, the Consent Decree begins with general requirements intended to promote both community policing and community engagement.

Preliminarily, the Consent Decree requires issuance of a new mission statement that integrates community-oriented principles into BPD "management, policies and procedures, recruitment, training, personnel evaluations resource deployment, tactics and accountability systems" (CD15). Further, the Consent Decree outlines the kind of community policing training BPD officers must receive (CD16-17) and the data BPD should collect (CD18). The Consent Decree also requires the City and BPD to develop community engagement plans (CD19), to obtain input from community groups on policies, practices, training, engagement programs, and enforcement strategies (CD20), to develop a community outreach program to educate and communicate with City residents about the Consent Decree (CD21), to publish annual reports on BPD's community policing efforts (CD22), and to use the results of the Monitoring Team's community surveys to inform policies, training, and practices (CD25).

Thus far, BPD has issued a new mission statement, *see* ECF Nos. 119 & 239, prepared a comprehensive Community Policing Plan (issued in June 2020), developed community engagement plans, sought and obtained input from community members on policies and training, published annual reports on emergent community policing efforts and community engagement accomplishments, delivered

in-service training on community policing and addressing low-level offenses to all officers Department-wide, and is piloting tailored neighborhood policing plans in two Baltimore neighborhoods. BPD's compliance score in the Community Policing and Engagement category is "4c" (implementation – on track).

| COMMUNITY POLICING | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | Implementation – On Track |

## Areas of Progress

In June 2020, the BPD released a **Community Policing Plan** that describes the department's strategy to address crime while proactively engaging the community in a manner that builds trust and legitimacy. *See* ECF No. 304. The Plan provides a relatively detailed blueprint for organizational redesign, building community partnerships, problem-solving, building analytical capacity, and district crime plans. It establishes roles and responsibilities for patrol officers, Neighborhood Coordination Officers (NCOs), supervisors, and command staff.

In this reporting period, to begin to realize the goals of the Plan, BPD took several important steps. First, after working closely with community members, the Monitoring Team and DOJ to develop a curriculum, BPD successfully completed Department-wide training on community policing in December 2021. *See* ECF No. 474. The two-day, ten-module in-class course was co-taught by BPD instructors and community facilitators from Reconcile Baltimore, the Mayor's LGBTQ Commission, and the Baltimore Community Mediation Center. The course included material on the Community Policing Plan; the history of policing in Baltimore; building community trust and establishing police legitimacy; critical thinking, problem-solving and problem-oriented policing; the principles of procedural justice; forming community partnerships; and policing lesser offenses.

The Monitoring Team observed a number of the training sessions and was encouraged by the quality of the instruction and the engagement of the officers, including their engagement with the module on the history of policing in Baltimore, which is essential to helping them understand the perception of policing in the City, especially among those in the most challenged neighborhoods. Based on the results of officer pre- and post-course officer surveys administered by training academy staff, officers found that the training was informative and gave them a better

understanding of community policing and their responsibilities under the Community Policing Plan.

Alongside training, BPD has begun integrating the imperative of community policing throughout Department operations. There are now several CAD codes for recording time spent on community policing activity. BPD will soon begin collecting Problem Oriented Policing (POP) data through the use of a new community policing form. BPD has provided clearer guidance to officers on the use of 311 for daily problem-solving activities, which are routinely reviewed by Executive Command. Performance against criteria regarding community policing is now part of an officer's performance evaluation. The Field Training Officer certification program contains a module devoted to community policing, including instruction on how FTOs can operationalize community policing concepts for new officers. And BPD has created an award for problem-solving, in addition to new awards for de-escalation and peer intervention.

Finally, under the Community Policing Plan, BPD has launched neighborhood policing plan pilot programs in the Fayette Street Outreach neighborhood in West Baltimore and the Brooklyn and Curtis Bay neighborhoods in South Baltimore. These communities were chosen because they generate a large number of service requests from city agencies and experience a high volume of violent crime. The plans will be co-produced by community leaders, the City and BPD. Currently in development, they will incorporate specific, place-based public safety strategies to address persistent problems that affect the quality of residential life and produce crime and disorder. BPD will manage implementation of the pilot programs in coordination with the Mayor's Office of Neighborhood Safety and Engagement.

## Challenges Ahead

Achieving staffing levels sufficient to realize the objectives of the Community Policing Plan—especially the goal of broadly implementing neighborhood policing plans in high-crime neighborhoods—remains BPD's most daunting challenge. Staffing in the department is low overall, but the most significant deficit is in the Patrol Division. The shortages in patrol will make it difficult for officers to engage proactively with the community in daily problem-solving. To reach the Community Policing Plan's goals of (1) having patrol officers spend 40% of their time on proactive problem-solving and community policing activity and (2) continuity of assignment, with the same officers working the same areas every day, BPD will need to add over 170 patrol officers and over 30 sergeants.

## The Next Six Months

In the next reporting period, BPD will gauge how effectively its neighborhood policing plan pilot programs are building community trust, fostering problem-solving, and reducing crime. BPD will also continue to educate community members about the Consent Decree.

For its part, the Monitoring Team, in collaboration with the Institute for Urban Research at Morgan State University, will continue conducting and complete its second resident survey on community attitudes toward BPD. Covid-19 restrictions permitting, the Monitoring Team and its partners at the University of Toronto's Munk School and Rose Street Community Center will also conduct its second survey of custodial arrestees at the Central Booking Intake Facility.

# SEXUAL ASSAULT INVESTIGATIONS

The Consent Decree requires BPD to enhance the trust of victims of sexual assault, to strengthen its response to and investigations of reports of sexual assault, and to combat gender bias (CD 257). To achieve these goals, the Consent Decree requires BPD to revise the policies and procedures for responding to and investigating reports of sexual assault (CD 258); provide initial and on-going annual training to support the revised policies and procedures (CD 259); ensure through proper supervision and internal oversight that reports of sexual assaults are thoroughly investigated (CD 260, 262, 263); ensure that officers transport victims to a medical facility for a forensic exam in all instances in which a forensic exam is warranted and the victim consents (CD 261); enhance its collection, analysis and reporting of data regarding the nature and extent of sexual assault crimes (CD 264); and share information about its sexual assault investigations with other law enforcement agencies, the public, and the Sex Offense Unit (CD 265). The City and BPD will ensure that their policies and protocols with the Sexual Assault Response Team (SART) enable them to engage in periodic reviews of services provided by BPD and to review samples of open cases and those classified as unfounded (CD 266).

BPD has satisfied all the foundational requirements in this area, including revisions to policies on sexual assault investigations and officer-involved sexual misconduct; Department-wide e-learning and in-service training for all officers on responding to reports of sexual assault; and specialized training for detectives who investigate sex offenses, including not only an initial two-day training in late 2020, but follow-on two-day training delivered in December 2021. BPD also has produced three annual reports on sex assault investigations and created a victim survey that will be administered this year. Accordingly, BPD's compliance score is "4c" (implementation – on track).

Given its progress to date, the Monitoring Team will be conducting its initial assessment of BPD's sexual assault investigations shortly. The Monitoring Team has finalized the methodology and is working with BPD to access the case files.

| SEXUAL ASSAULT INVESTIGATIONS | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | Implementation – On Track |

## Areas of Progress

In this reporting period, with the assistance of community advocates and outside experts, BPD developed and delivered an additional two-day training for detectives who investigate sexual assaults. The training expanded upon the initial two-day training detectives received in late 2020. It covered offender-focused investigations; victimization and victim vulnerability, accessibility and credibility; consent defense; the intersection of intimate partner violence and sexual assault; report-writing; and trauma-informed interviewing.

Several BPD detectives also received individualized technical assistance from a DOJ subject matter expert, who counseled and provided advice to them in connection with their performance on specific cases. Going forward, the expert will provide technical assistance to supervisors to support them as they provide guidance to detectives.

Taken together, the training and technical assistance detectives have received over the past 15 months, and will continue to receive, should improve their investigations, provide better service to victims, and lead to the apprehension and successful prosecution of sex offenders.

In this reporting period, BPD was, for the first time, able to ascertain key data about fourth degree sexual assaults, which are less serious and handled by patrol officers, rather than Sex Offense Unit detectives. The data is essential to understanding both what "Level 4" offenses entail and how prevalent they are. BPD presented this data in its most recent annual report on sexual assault investigations. That report—BPD's third and most comprehensive to date—is available **here**. It covers investigations in 2020.

Finally, over the course of several months, the Monitoring Team, with input from BPD and DOJ, developed a methodology for conducting its first formal assessment of BPD's sexual assault investigations. The assessment will focus on whether BPD is investigating reports of sexual assault using victim-centered, trauma-informed methods. The Monitoring Team has randomly selected 29 cases each from 2018, 2019, and the first ten months of 2020. The sample will also include all cases opened in November and December of 2020. The total sample size is approximately 130 cases, which will provide less than a ten percent margin of error with a 95 percent confidence level.

The assessment is now underway. The Monitoring Team is reviewing each case using an instrument approved by BPD and DOJ. The Monitoring Team expects to complete the assessment and publish a report this spring. Having drawn cases from 2018 – 2020, the assessment should reveal how much progress BPD is making toward compliance, expose what BPD needs to do to reach compliance, and provide a baseline against which to evaluate the results of future assessments.

## Challenges Ahead

BPD continues to make progress on pulling and analyzing data on reported sexual assaults. With the implementation of the new Records Management System, it is anticipated that BPD will resolve many of the prior problems with the sexual assault data reported by patrol officers. The next big challenge is to establish for detectives a case management system that will replace the antiquated Lotus Notes. BPD is developing the specifications for a new system. The Monitoring Team is participating in the development to help ensure it records and stores all the information the Consent Decree requires—and best practices dictate.

While BPD has developed and will soon conduct the victim survey required by the Consent Decree, which seeks to measure victim satisfaction with BPD's response to allegations of sexual assault, BPD will need to ensure that victims know the survey exists and is accessible for the results to be informative. The Monitoring Team will closely track how the survey is rolled out.

## The Next Six Months

In the next reporting period, the Monitoring Team will complete and publish the results of its assessment of sexual assault investigations from 2018 – 2020. BPD also will provide a survey to victims of sexual assault to gauge their experiences with BPD personnel and their performance.

In addition, BPD's Sex Offense Unit supervisors will proceed with case reviews with outside subject matter experts. BPD will continue working with the Monitoring Team and DOJ to ensure all required data on reports of sexual assault are captured in the new RMS and that a new, fully modernized case management system for sexual assault investigations is adopted. And BPD will prepare and publish its annual report on sexual assault investigations, which will cover investigations in 2021.

# RECRUITMENT, HIRING AND RETENTION

To satisfy the Consent Decree's staffing goals, which are driven by its requirements for community policing, supervision, misconduct investigations, and training (among others), BPD must recruit, hire and retain more qualified officers. Accordingly, the Consent Decree obligates BPD to: (1) develop and implement a Recruitment Plan with "clear goals, objectives and action steps for attracting and retaining a quality work force that reflects the diversity of the Baltimore Community" (CD 420-22); (2) review and reform its hiring processes (CD 423-25); (3) develop and implement a Retention Plan to "identify challenges and recommend solutions to improve BPD's retention of employees" (CD 426); and (4) routinely assess its recruitment, hiring, and retention practices (CD 427).

As previously reported, BPD has satisfied all the threshold requirements for recruitment, hiring and retention—a hiring report, a Recruitment Plan, and a Retention Plan. BPD is thus squarely in the implementation phase of reform, which includes continuing to refine and improve the policies and practices of its Recruitment Section and developing new incentives to retain high-quality officers. BPD's compliance score in the Recruitment, Hiring & Retention category is "4c" (implementation – on track).

| RECRUITMENT, HIRING AND RETENTION | COMPLIANCE SCORE | |
|---|---|---|
| | **4c** | Implementation – On Track |

## Areas of Progress

As the Fourth-Year Monitoring Plan requires, BPD, the Monitoring Team, and DOJ continue to engage in regular meetings to discuss BPD's efforts to comply with the recruitment, hiring and retention provisions of the Consent Decree and, critically, to increase the number of officers needed to meet Consent Decree requirements in other areas, including community policing, misconduct investigations, and training. Like other police agencies across the country, BPD faces significant challenges in recruiting, hiring and retaining a stable workforce. And in 2021, as described below, it had considerable difficulties, losing far more officers than it hired. That is in

contrast to 2020, when BPD defied national trends and saw hiring slightly outpace attrition.

But the disappointing hiring/attrition ratio in 2021 should not diminish the good, important work BPD has done to recruit and hire officers and to adopt creative retention strategies. In fact, in 2021, BPD hired 184 new officers, an average of over 15 officers per month, which is a commendable pace. And even the attrition numbers are not as discouraging as they seem. Although the number of voluntary resignations and retirements remained disappointingly high, the reason for the substantially increased overall attrition figure in 2021 was not an increase in resignations and retirements, which actually decreased (173 vs. 162), but rather a large increase in the number of separations for medical reasons (62 vs. 7), misconduct complaints (33 vs. 22), and trainee separations (31 vs. 20). Candidly, these separations are not unwanted, as they involve officers who already were not working, proved unworthy of remaining in law enforcement by their conduct, or determined in the academy that they were not cut out for police work.

### Recruitment and Hiring Processes

In this reporting period, BPD sustained and strengthened numerous salutary initiatives to improve recruitment and hiring. These initiatives are described in detail the last report. In summary, they include the following:

- Using RecruitStat to track recruitment and hiring efforts at weekly command staff meetings.

- Using an online application, NeoGov.

- Consistent with national best practices, using the National Testing Network (NTN) exam as an entrance requirement for employment.

- Allowing applicants to complete physical fitness tests in person at BPD's new training facilities at the University of Baltimore or remotely using video technology.

- Maintaining a daily tracker that captures information on hiring, including application volume, general and cadet hiring data, pass rates for NTN/physical agility/psychological exams, gender/diversity data, and hiring performance versus targets.

- Deploying a new "customer experience survey" for BPD to understand the types of applicants that are attracted to the department, their perceptions of the overall recruitment process, and any suggestions for improving the recruitment process

- Hiring a new analyst in 2021 to centralize this data and render it more accessible to department stakeholders.

- Utilization of a spreadsheet by concierge staff to track the various types of contacts made with applicants during the initial phases of recruitment (NTN exam, physical agility test, online profile/questionnaire). BPD compares this contact data to the overall rates of completion of each phase of hiring to determine if there is a correlation with the timing and frequency of concierge contact.

- Expanding recruitment outreach to increase the number of officers who are from diverse backgrounds, oriented toward community-oriented policing, and adept at problem-solving. BPD uses a **rebranded, geo-fenced marketing campaign** through IDFive to appeal to youth and community-minded prospects.

- Maintaining relationships with youth at local high schools by regularly hosting events and promoting its Cadet Program (which gives high school students direct experience with police work) and its Youth Explorer Program (which enables students to discover the benefits of a career in policing).

Between January 1, 2020 and December 31, 2021, these initiatives can fairly be credited with the hiring of over 400 new officers—an impressive figure over a two-year period, particularly given downward national trends in police hiring.

### Retention

The Monitoring Team is acutely aware of the interplay between officer retention, officer recruitment, and the overall goal of appropriate staffing. For any organization, its employees are its most valuable recruitment tool.

In this reporting period, BPD leadership and the officers' union entered into a new collective bargaining agreement that increases officers' incentives to remain with BPD. The incentives are for all officers, though the contract focuses on officers with three years of experience or less because more than 65% of all voluntary resignations over the past five years have been with officers with less than five years of service. Under the new agreement:

- Beginning later this year, starting officer pay will increase to $60,000, making it the highest among any jurisdiction in Maryland.

- Officers will receive base pay increase education incentives: $1,500 for an associate degree, $3,000 for a bachelor's degree; $4,500 for a master's or law degree.

- The incentive to serve in patrol will double to $2,000 per year; shift differential pay (night shift assignments) also will more than double.

- Wages will be enhanced to varying degrees across all seniority levels beginning later this year, with a 2% increase for officers with 11 or more years to encourage experienced officers to stay.

- Wages will be enhanced 2% across all seniority levels in mid-2023, with an added 1% increase for officers with 19 or more years of service.

BPD also continues to implement its well-conceived retention plan, which was finalized over two years ago. The Monitoring Team has previously reported certain measures BPD is taking to improve retention under the Plan. In summary, they include:

- New policies on command promotions and promotion to classified ranks (sergeant and lieutenant), now in effect, which greatly improve the fairness and transparency of the promotions process, including by recognizing certain experiences as distinguishing factor, e.g., service as a field training officer, in the Training Academy or in the Public Integrity Bureau.

- Access to fitness facilities at each district and headquarters.

- An educational reimbursement program that provides a 50 percent tuition reimbursement to members.

- Adoption of merit-based selection criteria for transfers and temporary rotations to different BPD components, including specialized units.

- Take-home vehicles for officers who reside in Baltimore.

- Employee referral bonuses.

- Increased per diem rate for Field Training Officers, from $30 per day to $50 per day

Finally, BPD has purchased 80 new patrol vehicles. Delivery has been slowed because of recent supply chain delays, but the first set of new vehicles is now in service. This is significant because among officers' chief complaints has been the poor condition of their cars, which, for patrol officers, effectively serve as their offices.

## Challenges Ahead

As observed in the Monitoring Team's prior report, there is a nationwide crisis in officer hiring and retention. According to a recent article:

> A June 2021 survey of nearly 200 departments by the Police Executive Research Forum (PERF), a nonprofit think tank, shows a startling 45% increase in the retirement rate and a nearly 20% increase in resignations in 2020-21 compared to the previous year.
>
> "We are in uncharted territory right now," PERF's Executive Director Chuck Wexler says. "Policing is being challenged in ways I haven't seen, ever."
>
> The exodus is affecting departments large, small and in between. The research group's survey shows that in the largest departments with 500 hundred or more officers, the retirement rate increased by nearly 30%. Overall, new police hiring has dropped 5%.

National Public Radio, "Cops Say Low Morale And Department Scrutiny Are Driving Them Away From The Job," June 24, 2021.

In 2021, consistent with this trend, BPD saw a high number of voluntary resignations and retirements. It was actually slightly lower than the number of resignations and retirements in 2020, but as noted above, overall attrition was higher due to the much higher number of medical, disciplinary and trainee separations. As a result, while hiring was able to keep pace with attrition in 2020, defying national patterns, attrition overwhelmed hiring in 2021, with BPD losing 108 more officers than it gained. As explained in the Staffing section of this report, the impact has been most acute in the Patrol Division, which hemorrhaged officers in 2021.

For BPD to realize the goals of the Consent Decree, particularly in the areas of community policing, misconduct investigations, and supervision, it must not only halt this trend, but reverse it. There is no other way to put it.

## The Next Six Months

BPD will continue to utilize RecruitStat to track recruitment and hiring. It will continue to work with the Monitoring Team and DOJ to improve the recruitment and hiring processes and devise new and creative ways to improve retention. And it will watch closely to see whether measures like the new collective bargaining agreement and the deployment of new vehicles help to keep experienced officers in the Department.

# OFFICER ASSISTANCE AND SUPPORT

Under the Consent Decree, BPD must adopt several important measures to support the health and wellness of its officers. The Consent Decree requires BPD to: provide, review and revise, as needed, an Employee Assistance Plan ("EAP") that furnishes no- or low-cost counseling and mental health wellness services (CD 436-437); develop peer support services (CD 438); offer all officers a voluntary mental health evaluation before returning to duty after a traumatic incident (CD 439); develop well-being protocols to be utilized during officer deployments in periods of civil unrest (CD 440); and develop protocols for annually assessing the efficacy of all of BPD's officer assistance programs (CD 441).

Over the past four years, BPD has done extensive work and made considerable progress toward meeting these requirements. It refined its EAP (CD 436-437), its traumatic and high-stress incident protocols (CD 439-440), and its peer support program policy (CD 438). BPD's Officer Safety and Wellness Section ("OSW") continues to provide mental health support services to BPD officers. In addition to the wellness support its own officers provide, OSW has enlisted a cadre of approximately 20 outside vendors that furnish services ranging from stress management to addiction therapy to financial planning. BPD also has successfully completed department-wide peer intervention training, called EPIC (Ethical Policing Is Courageous). And BPD has developed a methodology for measuring the efficacy of its support programs and produced its first two reports (CD 441). *See* ECF No. 368. As a result, BPD's compliance score in the area of officer wellness is "4c" (implementation – on track).



| OFFICER ASSISTANCE AND SUPPORT | COMPLIANCE SCORE | |
| --- | --- | --- |
| | **4c** | Implementation – On Track |

## Areas of Progress

### Early Intervention, Support and Guidance

Early interventions consist of meetings with BPD members who have triggered an alert within BlueTeam, the department's misconduct complaint and use of force reporting system. Support and guidance is provided by OSW's peer support team, which consists of over 50 BPD members trained by the International Critical Incident Stress Foundation. Peer team members automatically co-respond with staff from the

organization Behavioral Health Services (BHS) to critical incidents, such as police-involved shootings. They also answer requests for assistance concerning both physical/emotional trauma on the job (e.g., witnessing a crime against children, examining dismemberment during a crash investigation) and work/life issues, including ill family members, emotional trauma experienced by a child, and financial hardship.

Over the course of 2019, OSW completed 56 early intervention sessions and 217 support and guidance sessions. In 2020, OSW completed 37 early interventions and 1715 support and guidance sessions, over 1,000 of which were COVID-related. Comparatively, in 2021, OSW completed 66 early interventions and 724 support and guidance sessions.

The reasons officers received early interventions in 2021 were as follows:



*Figure 1 - Violations of criminal statutes and misconduct are the leading causes of early intervention at BPD, though 97 percent of members correct their behavior before reaching "phase three" or most serious level.*

Only a very small percentage of these interventions—two of the 66—reached "phase three," the phase where members risk termination if their behavior is not corrected. Together with the overall increase in early interventions (which are initiated by supervisors) from 2020 to 2021, this suggests the system is working: interventions have not only increased but are producing changes in officer behavior before it is too late.

The reasons officer obtained support and guidance in 2021 were as follows:

| Reason | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trauma-Related | 2 | 1 | 6 | 4 | | 5 | 4 | | 3 | 4 | 1 | 8 | **38** |
| Police-Involved Shooting Incident | | 2 | 1 | | 25 | 1 | 3 | 22 | | | 4 | 7 | **65** |
| Substance Abuse | 1 | 1 | 1 | 1 | 3 | 2 | 2 | 1 | 2 | 2 | 2 | 1 | **19** |
| Family Concerns & Domestic Problems | 3 | 5 | 7 | 7 | 7 | 5 | 5 | 4 | 6 | 1 | 3 | 9 | **58** |
| Work Issues | 3 | 4 | 6 | 9 | 7 | 6 | 6 | 10 | 9 | 4 | 25 | 4 | **93** |
| General Referral | 6 | 8 | 6 | 1 | 2 | 1 | 2 | 4 | 3 | 6 | 2 | 2 | **43** |
| COVID-19 | 198 | 36 | 54 | 63 | 40 | 4 | 1 | 11 | 1 | | | | **408** |
| Other | | | | | | | | | | | | | **0** |
| **Total Cases** | **213** | **57** | **81** | **81** | **84** | **24** | **23** | **52** | **24** | **17** | **37** | **31** | **724** |

Support and guidance consultations related to COVID-19 decreased significantly between 2020 and 2021. This is expected, as a greater proportion of members are vaccinated or already had contracted the virus. Consultations also decreased from 369 to zero in the "other" category, which was created specifically for the George Floyd-related protests that took place in June 2020. Support and guidance consultations for other reasons increased overall from 277 to 316, with consultations for "work issues" increasing from 36 to 93. The overall increase in these traditional areas, and the dramatic overall increase over the past two years combined, suggests that officers are increasingly aware and taking advantage of the wellness services available to them. This is vital to maintaining and improving officer morale and sustaining effective job performance.

## Departmental Mental Health Assessments

BPD has been consistently seeking to assess the health and wellness needs of its members through a combination of data dashboards, agency-wide surveys, and external partnerships. In 2020, BPD disseminated a health and wellness survey, which found that, in a rolling 12-month period, a significant number of officers had experienced disturbing or traumatic events, namely:

- Murder or shooting (50%)
- Crime against children (38%)
- Police-involved shooting (22%)
- Serious or fatal motor vehicle accident (22%)

In December 2021, in conjunction with the Johns Hopkins Bloomberg School of Public Health, BPD began a year-long study of its employees' mental health perceptions, mental health conditions, and workplace stressors. The professors

leading this study will be combining surveys with one-on-one interviews to assess the mental health landscape of the agency, and will provide BPD with periodic updates on the results.

## Challenges Ahead

The survey OSW conducted in 2020 revealed that BPD must better educate its officers about the specific types of officer wellness services that are available. Given that OSW is only three years old and that BPD did not have a dedicated officer wellness unit before then, it is not entirely surprising that many officers still do not fully understand what OSW offers, even if they generally understand that support is available. The increase in usage of OSW's support and guidance services in 2020 is, as noted, a potentially encouraging sign that OSW is getting the message out. It must continue to be vigilant in its communication efforts.

Challenging working conditions, insufficient staffing, and often inadequate resources remain sources of stress among BPD officers. Although BPD's wellness programming is not a solution to these problems, it can help officers cope.  BPD must continue to promote and institutionalize this programming. OSW must continue to educate supervisors, as well as rank and file officers, about the availability of support services. Promoting awareness of OSW programming should be incorporated into the assessment of supervisor performance.

## The Next Six Months

In the next reporting period, as OSW continues to strengthen and promote awareness of its programming, the Monitoring Team will work with BPD and DOJ to develop a methodology for assessing BPD's compliance with the Officer Assistance and Support provisions of the Consent Decree and will then conduct the assessment and publish a report.



# SUMMARY OF MONITORING TEAM ACTIVITIES

Since our appointment in October 2017, the Monitoring Team has sought to fulfill each of our prescribed roles under the Consent Decree—technical advisor, arbiter, and facilitator. The Monitoring Team's work in each role is summarized below.  The details of the Monitoring Team's work, recorded on time sheets for each Monitoring Team member in 1/10 hour increments, are reflected in the Monitoring Team's approved invoices, which are available on the Monitoring Team's website at **https://www.bpdmonitor.com/monthly-statements**.

The Consent Decree provides that the Monitoring Team will be paid $1,475,000 per year in fees and expenses. For the first 49 months of its work (October 2017 through October 2021), the City paid the Monitoring Team $6,010,226.75 in fees and $199,706.44 in expenses. In addition, from October 2017 through October 2021, the Monitoring Team contributed pro bono services for its work on the Consent Decree in an amount equal to $2,149,618.35, meaning that 25.7% of the Monitoring Team's work during the 49 months was at no cost to the City.

## Engagement with Stakeholders

### Community Engagement

From the beginning, the Monitoring Team has engaged in active, affirmative community outreach. A core group of Team members are devoted to community engagement: lead monitor, Ken Thompson; deputy monitors Seth Rosenthal and Chuck Ramsey; lead community liaison Wanda Watts; community engagement coordinator Miller Roberts; and community engagement specialist Jessica Drake. This group meets once every week to debrief and plan community engagement activity.

During this reporting period, as the Consent Decree requires, the Monitoring Team continued to hold quarterly community forums. Because of the continued restrictions on in-person meetings necessitated by the COVID-19 pandemic, the

Monitoring Team held these quarterly community forums virtually on Facebook Live.

In addition to the required quarterly forums, the Monitoring Team hosted bimonthly Facebook Live sessions, where community members are given the opportunity to post questions online and obtain real-time answers from Monitoring Team leadership.

Because the pandemic made it impossible for the Monitoring Team to continue to meet less formally with community members where they live, Monitoring Team members also attended or convened community meetings with different organizations and individuals, including meetings of neighborhood associations, faith-based organizations, civic leaders, advocacy organizations, and affinity groups. We use these meetings to inform community members about the Consent Decree process, to obtain their input on improving the process, and to listen to their views about BPD.

The Monitoring Team's cohort of neighborhood liaisons continues to be the most essential aspect of our community engagement effort. There is one liaison in each of the City's nine police districts. There was some turnover among liaisons during this reporting period, but most of the liaisons who left the team have been replaced. The names of each liaison are on the Monitoring Team's website.

Overseen by the community engagement coordinator, Miller Roberts, the liaisons educate their neighbors about the Consent Decree and the work of the Monitoring Team and serve as points of contact for information and opinions about the performance and conduct of BPD officers. Despite the pandemic, the neighborhood liaisons have maintained contact with the residents in their districts by attending virtual community and other organizational meetings, leafletting neighborhoods with information about the Consent Decree, and continuing to hold regular "office hours" virtually, advertised on their social media pages. As the restrictions on in-person contact lifted to a degree during this reporting period, the liaisons also resumed attending certain community events in person.

In addition to conducting affirmative, localized outreach to inform and hear from community members about BPD and the reform process, the Monitoring Team has continued targeted engagement with community members around specific Consent Decree requirements, eliciting written community input on proposed BPD policies and training programs. Over the past year, the Monitoring Team advertised and participated in well-attended community workshopping sessions on drafts of BPD's revised policy on youth interactions, BPD's training curriculum on youth interactions, and BPD's training curriculum on community policing.

Correspondingly, the Monitoring Team and BPD sought and obtained written public feedback on drafts of all policies and training curricula, which the Monitoring

Plans required BPD to issue for two separate rounds of public comment—the first after collaborating with the Monitoring Team and DOJ and producing an initial draft, the second after addressing and incorporating feedback from the initial comment period. The Monitoring Team shared whatever feedback it received with BPD. In turn, BPD revised each deliverable in response to all feedback provided (that is, feedback provided to BPD and the Monitoring Team), collaborated with the Monitoring Team and DOJ to ensure that revised drafts properly reflected that feedback, and then published a final policy or curriculum following approval by DOJ and the Monitoring Team.

We remain encouraged that in this reporting period, as in the last one, nearly all comments on draft policies and training curricula were made to BPD, rather than the Monitoring Team. That is as it should be: BPD should welcome feedback from community members, and community members should feel comfortable providing feedback directly to BPD, because once BPD has achieved compliance with the Consent Decree and is released from court oversight, BPD and Baltimoreans are going to have interact directly with—and trust—one another as partners in public safety, without the assistance of the Monitoring Team, DOJ, or the court.

## Communications with the Parties

The Monitoring Team continues to communicate with BPD, the City and DOJ multiple times on a daily basis. Because of the pandemic, in-person meetings have been replaced by numerous Zoom meetings, as well as conference calls and email. In this reporting period, the meetings, calls and emails have addressed every area of the Consent Decree, with a focus on the deliverables that came due under the Fourth-Year Monitoring Plan.

## Police Engagement

In addition to conferring daily with members of BPD's Consent Decree Implementation Unit, City Law Department attorneys representing BPD, and BPD command staff, the Monitoring Team engages directly with rank-and-file BPD members. Monitoring Team members have established relationships with union leaders and continue to spend time at BPD's Training Academy and Public Integrity Bureau. In this reporting period, as Covid restrictions lifted to some degree, Monitoring Team members resumed in-person visits with union leaders and to the Training Academy and PIB.

Soon after our appointment, the Monitoring Team established a protocol for notification and potential response to critical incidents involving BPD officers, such as officer-involved shootings. The notification is immediate and allows for local Monitoring Team members to go to the scene to observe BPD's response. The notification protocol was invoked several times during this reporting period so that lead monitor Ken Thompson could respond to the scene.

### Meetings with the Court

The Monitoring Team's leadership, including Ken Thompson, Seth Rosenthal, Chuck Ramsey, Hassan Aden and Theron Bowman, communicate regularly with Judge Bredar—in person, by telephone, and by email—to update him on developments, to advise him, and to take direction.

Early on in the reform process, Judge Bredar determined that each month he would hold a three-hour working session with the Monitoring Team and the parties to discuss developments and challenges in specific areas of the Consent Decree. Every month, BPD, the Monitoring Team and DOJ discuss what Judge Bredar and the Monitoring Team have identified as the four indispensable structural elements of the reform process: training, staffing, technology, and misconduct investigations and discipline. In addition, since May 2021, the meetings have covered staffing, recruitment, hiring and retention (May 2021), stops, searches, arrests, and impartial policing (June 2021), compliance reviews and outcome assessments (July 2021), supervision, promotions, performance evaluations, and officer wellness (September 2021), misconduct investigations and discipline (October 2021), community policing (November 2021), behavioral health and crisis response (December 2021), and First Amendment protected activity (January 2022).

## Assessments and Technical Assistance

The Monitoring Team continues to assess BPD's performance and provide technical assistance on policies, training, and self-assessments or audits. In addition, as BPD moves toward completing training in each area, the Monitoring Team has undertaken several compliance reviews and outcome assessments. These reviews and assessments will increase in frequency and intensity as BPD satisfies additional training requirements and completes implementation of new technology enabling more comprehensive data collection and analysis, particularly in the critical area of stops, searches and arrests.

### Policy Revisions

In this reporting period, the Monitoring Team has drawn on our expertise and knowledge of national best practices to review and provide feedback on policies on the following subjects:

- Field training officers
- Public Order Forces
- Child abuse investigations
- Sexual assault investigations
- Overdose/Naxalone use

- Law Enforcement Assisted Diversion
- Reasonable accommodations for individuals with disabilities
- Disclosure of exculpatory evidence in criminal cases
- Non-disciplinary corrective action
- Expedited resolution of minor misconduct
- Disciplinary process

## Training

As BPD nears finalizing Consent Decree-required revisions to its policies, the Monitoring Team has spent more and more time assessing and assisting with BPD's development and delivery of classroom training curricula and e-learning. In this reporting period, the Monitoring Team has assessed, assisted with the preparation of, and/or observed training in all of the many areas listed in the Training section of this report.

## Internal BPD Audits

The Consent Decree requires BPD to conduct a number of internal audits of departmental performance. In this reporting period, the Monitoring Team has assisted with the development of the methodology for, commented on draft reports of, and assessed BPD audits in the following areas, as explained in greater detail in the Findings section above:

- Transport vehicle equipment
- Transport events
- First Amendment protected activity
- Misconduct investigations
- Arrests resulting in release without charge
- Use of force

## Compliance Reviews and Outcome Assessments

The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments. Compliance reviews are qualitative evaluations of BPD performance in different areas of the Consent Decree. They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with Consent Decree requirements (CD 454). For instance, over time, are the quality of internal investigations improving, are uses of force increasingly well-justified and well-reported, and are investigative stops more routinely supported by well-articulated reasonable suspicion and arrests more routinely supported by well-articulated probable cause?

Outcome assessments, by contrast, are quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are

having a tangible, measurable impact—whether, independent and apart from BPD's progress toward compliance with Consent Decree requirements, policing is changing in the real world (CD 456). For instance, are the policy revisions and training in the area of stops, searches and arrests producing a greater percentage of investigative stops that turn up evidence of prosecutable criminal activity and a lesser percentage of weapons pat downs and searches that turn up no guns or contraband? Or are the policy revisions and training on use of force, which emphasize de-escalation, leading to fewer encounters requiring more serious Level 2 and Level 3 uses of force?

While providing technical assistance and evaluating policy revisions, training and plans for organizational change make up much of the Monitoring Team's work in the early years of the Consent Decree, compliance reviews and outcome assessments will make up most of the work in later years, once the foundational reforms are in place. As a general matter, the Monitoring Team has determined that, in each area of the Consent Decree, it should combine compliance reviews and outcome assessments into one comprehensive assessment. Combining compliance reviews and outcome assessments will provide BPD, the City, Judge Bredar, and the community comprehensive, rather than piecemeal, reports on how BPD's progress toward compliance in each area of the Consent Decree is making a real-world difference. BPD, the City and DOJ agree with this approach.

The Monitoring Team's assessments have been constrained, and in some areas rendered impracticable, by the limitations of BPD's IT systems and data collection practices. With the implementation a new Records Management System in this reporting period, the Monitoring Team is hopeful that will change. However, in some areas, including stops, searches, interactions with individuals in crisis, and interactions with youth, it is too soon to tell. Over the next few months, the Monitoring Team will be conducting regular evaluations of the integrity of the data officers are recording in these areas to determine whether comprehensive assessments have become feasible.

As explained in the Findings section above, the Monitoring Team either completed, commenced, or designed a number of assessments in this reporting period. These include the following:

- Completion of a comprehensive assessment of BPD responses to calls for service from 2017 – 2019
- Completion of a comprehensive assessment of BPD's training function
- Completion of a comprehensive assessment of BPD's compliance with and performance under the transportation of persons in custody provisions of the Consent Decree
- Near-completion of a comprehensive assessment of BPD use of force incidents, use of force reporting, and use of force supervisory review from 2018 – 2020

- Commencement of a comprehensive assessment of the quality of BPD's sexual assault investigations in 2020
- Commencement of an informal assessment of the quality of BPD's internal investigations of complaints of officer misconduct since PIB detectives received training on conducting internal investigations in April 2021
- Development of a methodology for assessing the constitutionality of BPD arrests and the adequacy or arrest reporting from 2019 – 2021

CD
Monitoring
Team