```
 1                IN THE UNITED STATES DISTRICT COURT
                        DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   UNITED STATES OF AMERICA          )
                                       )
 4          Plaintiff,                 )
        vs.                            )
 5                                     )  CIVIL NO.: JKB-17-0099
     Baltimore Police Department, et al., )
 6                                     )
            Defendant.                 )
 7   _____)

 8                    Transcript of Proceedings
          Before the Honorable Chief Judge James K. Bredar
 9                   Thursday, August 18th, 2022
                        Baltimore, Maryland
10

11                          APPEARANCES

12   For the Plaintiff Department of Justice:

13        Timothy Mygatt, Esquire
          Nicole Porter, Esquire
14        Curtis Harris, Esquire

15   For the Defendant Baltimore Police Department, et al.:

16        James L. Shea, City Solicitor
          Justin Conroy, Assistant City Solicitor
17        Natalie Amato, Assistant City Solicitor
          Ebony Thompson, Deputy City Solicitor
18        Shannon Sullivan, Director

19   Monitoring Team:

20        Kenneth L. Thompson, Monitor
          Seth Rosenthal, Deputy Monitor
21        Hassan Aden, Deputy Monitor
          Nola Joyce, Deputy Commissioner (ret.)
22        Professor Tracey L. Meares
          Dr. Theron L. Bowman
23   _____

24                    Christine T. Asif, RPR, FCRR
                    101 W. Lombard Street, 4th Floor
25                     Baltimore, Maryland 21201
```

1                          <u>APPEARANCES</u> (Cont'd)

2

3    Also Present:   Commissioner Michael Harrison
                     Deputy Commissioner Eric Malancon
4                    Deputy Commissioner Brian Nadeau
                     Major Derek Loeffler
5                    Chief Derek Canton
                     Deputy Commissioner James Gillis
6                    Deputy Director Amethyst Spivak
                     Deputy Commissioner Sheree Brisco
7                    Captain Jai Etwaroo

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   _____
                     Christine T. Asif, RPR, FCRR
24                101 W. Lombard Street, 4th Floor
                      Baltimore, Maryland 21201
25

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    (10:06 a.m.)

2              THE COURT:  Good morning.  Be seated, please.

3              The clerk will go ahead and call the case.

4              THE CLERK:  Your Honor, calling the matter of the

5    United States of America versus Baltimore Police Department,

6    et al., case number JKB-17-CV-99.  The case is called for the

7    quarterly review of the Consent Decree.

8              If counsel for the Department of Justice can

9    introduce themselves.

10             MR. MYGATT:  Good morning, Your Honor.  Tim Mygatt

11   for the United States.

12             MS. PORTER:  Good morning, Your Honor.  Nicole

13   Porter for the United States.

14             MR. HARRIS:  Good morning, Your Honor.  Curtis

15   Harris for the United States.

16             THE CLERK:  If counsel for the Baltimore City could

17   introduce themselves, please.

18             MR. SHEA:  Good morning, Your Honor, Jim Shea.  I'm

19   joined by Ebony Thompson, Natalie Amato, and Justin Conroy,

20   all on behalf of the City and the Police Department.

21             THE CLERK:  And if the counsel for monitoring team

22   could introduce, please.

23             MR. THOMPSON:  Good morning, Your Honor.  Kenneth L.

24   Thompson for the monitoring team, along with Seth Rosenthal.

25             THE COURT:  Thank you.  Good morning.

1          Quick word about our COVID protocols which are still

2    very much in effect over here in federal court.  As to

3    masking, everyone's required to wear a mask in this courtroom,

4    unless you have a speaking role.  And then when you're

5    speaking, you may remove your mask.  My preference actually is

6    that you do remove your mask when you're speaking, but it's up

7    to you and if you're not comfortable doing so, you can keep

8    your mask on.  And, of course, when you don't have a speaking

9    role then, if you would, go ahead and slip the mask back on.

10         Today, we're convened for this year's third

11   quarterly review with respect to progress made toward

12   compliance with the Consent Decree entered in this case on

13   April the 7th of 2017.  At our last quarterly hearing in April

14   of this year, we marked five years since the entry of the

15   Decree.  We acknowledge the considerable progress that has

16   been made, particularly in the last three years since the city

17   sorted out the police department's leadership crisis.  For the

18   first time in at least a decade, there has been true stability

19   in police leadership and consequently, in the policing

20   policies communicated to rank and file officers.

21         The intensive study of the police department

22   conducted by Michael Bromwich in the wake of the Gun Trace

23   Task Force scandal, pointed out the hazards of unstable

24   leadership and ad hoc policy making.  Provided the city stays

25   the course with its current police leadership, it's now

settled new policies reflecting best practices of police

governance and command, the community can have faith that the

Consent Decree will be successfully implemented.

It will be several more years before the reforms

mandated in the Consent Decree are fully in place.  And it

will take additional time after that for the community to

experience and appreciate the full benefit of those reforms.

But the primary takeaway from the April hearing was that the

city and the police department have made significant progress

toward compliance with the Decree, that the progress is

measurable, and that the police department now has a

trajectory that eventually will yield a re-imagined,

reconstructed department, a reformed department that operates

within the bounds of the law and which consistently adheres to

recognized best police practices.  At this point, while

there's still a long way to go, we can be confident the city

will get there, provided they stay the course.

While implementation of the Baltimore Police Consent

Decree continues apace, in the summer of 2022, the focus of

many in the community has shifted to profound and elevated

concern about shootings, violence, the conundrum of young

people squeegeeing automobile windshields, and other complex

social and enforcement issues facing the city.  I think most

community leaders and members of the public understand that,

first and foremost, the Consent Decree is about restoring and

1    ensuring constitutional policing.  Some are asking, though, in

2    this summer of friction on our streets, just how the Consent

3    Decree and its enforcement intersects with the formulation and

4    execution of overall crime policy, particularly in light of

5    the concerns just highlighted.  Violence in the city does

6    remain at an appalling and unacceptable level.

7           The Consent Decree does not design or determine the

8    broad policing objectives or initiatives that the city

9    pursues.  The Consent Decree does not set enforcement

10    priorities; those responsibilities lie with city leaders.  The

11    Consent Decree does not restrict legitimate law enforcement

12    activity.  It does not prohibit vigorous enforcement action.

13    To the extent that city leaders request that the police

14    department lean in, in the face of the current violence

15    afflicting the city, the Consent Decree does not block such a

16    policy.

17           But, the Decree does limit and regulate how police

18    work is done in pursuit of the city's enforcement objectives,

19    initiatives, and priorities.  It does require adherence to a

20    coherent and appropriate staffing plan.  In short, the Consent

21    Decree establishes guardrails within which the city and the

22    police department must operate as they perform the policing

23    function of government, including when they do so with vigor

24    in the face of a perceived crime wave.  So city and police

25    department leaders always determine crime policy.  The Consent

1  Decree regulates how that policy may be implemented and

2  executed.

3        To provide a contextually appropriate example,

4  consider the following:  Generally speaking, city leaders will

5  decide whether enforcement action should be taken with respect

6  to the squeegee issue.  The terms of the Consent Decree will

7  regulate how that enforcement action is carried out.

8        Baltimore came under investigation by the U.S.

9  Department of Justice because of a perception that there was a

10  pattern and practice of unlawful activity on the part of the

11  police.  Wide-scale constitutional violations were alleged.

12  While there was never a judicial finding that the police

13  department was guilty of this misconduct, a significant body

14  of evidence was accumulated that tended to support the

15  perception of broad illegal conduct, and subsequently there

16  was a settlement in the case that prescribed a remedy.  That

17  remedy was the Consent Decree under which the city agreed that

18  it, and its police department, would come under federal court

19  supervision until they could demonstrate substantial

20  compliance with the Decree's 511 corrective and proscriptive

21  paragraphs.

22        Nothing in the settlement agreement, nothing in the

23  Consent Decree, and indeed nothing in the totality of the

24  legal documents in this case prevents city leaders from

25  performing their duty to conceive and execute a crime control

1   policy.  It's just that when they do so, their policies must

2   comport with and must be executed within the guardrails

3   previously referenced.

4         Baltimore does face a serious danger at this moment

5   when there is an increase in violent crime.  Like many cities,

6   this one can suffer from swinging pendulum syndrome.  After

7   the disturbances in 2015 and after the George Floyd tragedy,

8   the public's focus was on ensuring that policing was

9   restrained and fully compliant with the constitution.  Now in

10  2022, the focus has shifted.  The pendulum has swung.  As has

11  been true in earlier periods, today the human cry,

12  understandably, is about the violence on our streets.  Rather

13  than clamoring for police reform, today many in the community

14  urge more muscular police operations.

15        In the past, as Michael Bromwich detailed for us in

16  his report, such agitation has led to problematic, aggressive

17  policing, that ultimately alienated the community.  At this

18  difficult moment, it is incumbent upon city leaders to stop

19  and reflect on their prior oscillations.  It is incumbent upon

20  them to ensure that the current crime surge does not lead to

21  an ultimately unproductive swing of the pendulum, that the

22  city does not sponsor an unsuccessful crackdown in certain

23  neighborhoods that looks good to some in the short-term but in

24  the end, results only in violations of the Consent Decree and

25  further estrangement between the police and the public.

1          There is a relationship between the city's

2     compliance with the Consent Decree and the ultimate success of

3     its crime fight.  For several years the Court has emphasized

4     the connection between constitutional policing and effective

5     policing.  The first goal of the Consent Decree and the first

6     obligation of the city in complying with it is to deliver

7     police services in a manner that complies with the law and

8     that respects the United States Constitution.  The city and

9     the department must obey the law, as must we all.  The Consent

10     Decree is a device designed to compel and ensure that

11     obedience.  But when they perform their duties lawfully, it is

12     also reasonable for the city and the department to expect

13     that, over time, not only will they become a fully law-abiding

14     institution, but police officers and their department will

15     regain the fundamental trust of the community that they serve.

16          The investigation leading up to entry of the Decree,

17     and the Court's own inquiries in the early months under the

18     Decree, all revealed that poor policing and, frankly,

19     sometimes lawless policing, have fundamentally broken the

20     relationship between the Baltimore Police Department and the

21     community it served.  That broken relationship led to a

22     community that was unwilling to cooperate with police officers

23     and detectives as they investigated crimes and attempted to

24     prevent new offenses.  A police department that does not have

25     the trust and assistance of the community it serves is bound

1    to fail in almost any crime-fighting initiative.

2    Investigations go nowhere when those who know what happened

3    won't tell the authorities what they know.

4          Police departments that enjoy the trust and support

5    of the communities they serve, clear cases at a higher rate,

6    are able to anticipate problems before they occur, and are

7    otherwise -- and otherwise do a better job of keeping their

8    communities safe, because they have the assistance of those

9    they are serving.  In that sense, the Consent Decree

10   ultimately is very much about improving the effectiveness of

11   policing in the city.  As the April hearing made clear, the

12   Baltimore Police Department is now well down the long road to

13   reform.  However, despite Herculean efforts over the last

14   three years by the police department, the U.S. Department of

15   Justice, and the Court's monitoring team, community trust in

16   the police here is still marginal.

17         The problem, of course, is that the relationship was

18   not destroyed overnight, it happened over a period of years.

19   And not surprisingly, it is taking years to restore it.

20   Baltimore's experiencing a wave of violence.  I don't doubt

21   there are additional strategies and resources that can and

22   should be brought to bear, but only within the template of the

23   Decree.  The law requires this.

24         But even more significant, Baltimore's prior

25   practice of quickly changing crime-fighting strategies in the

1    face of new crises has not served it well.  This time, as the

2    ground shifts, with the Decree in place, city leaders are

3    constrained to stay the course, to stay within the Decree's

4    guardrails, and to continue to pursue a strategy that

5    emphasizes regaining the trust and cooperation of the public.

6            Returning to my first point.  Today at the beginning

7    of this hearing, we'll hear from the parties on the broad

8    question of how the Consent Decree relates to and intersects

9    with the formulation and the execution of crime-fighting

10   strategies.  Later today, I also expect to hear updates on the

11   topics that fall within the so-called global four:  Integrity,

12   staffing, training, and technology.

13           I've alerted the parties and the monitoring team

14   that I'm adding a fifth topic to the global four; i.e., going

15   forward, we will refer to these most important topics as the

16   global five.  The new fifth topic is assessment.  Monthly

17   conferences and quarterly hearings will now regularly update

18   the Court on the core monitoring issues of scorecard status,

19   compliance reviews, and outcome assessments.  More and more,

20   these assessment elements must become our focus as we look to

21   the day when the police department will achieve compliance,

22   and thereby be relieved of Court supervision.

23           Now, I request that assessment be addressed in the

24   context of the specific subject matter reviews that otherwise

25   occur during quarterly hearings and monthly conferences.

1           During the parties' presentations on the global

2    topics, the Court expects to hear a report on staffing.

3    Insufficient staffing is an obstacle to the successful

4    implementation of the Baltimore Police Consent Decree.  The

5    fact that the census of police officers in Baltimore continues

6    to decline, threatens prospects for the timely implementation

7    of the Decree.  At some point the loss of officers will impact

8    the capacity of the police department to push back against the

9    current wave of violence, if we're not already at that point.

10          Across the country, law enforcement and correctional

11   agencies are facing staffing crises.  Multiple police agencies

12   in Maryland are losing more officers than they are able to

13   replace.  How is the Baltimore Police Department going to make

14   progress on staffing in view of these considerable headwinds?

15   I remain deeply concerned about this issue.  And I've directed

16   the monitoring team to join the parties in searching for

17   strategies that will successfully address this crisis.  The

18   Consent Decree requires the development of an appropriate

19   staffing plan, and then compliance with it.  The city and the

20   department must come up with a better strategy to meet the

21   staffing crisis.

22          After the discussion of the global topics, I expect

23   to hear today from the parties and the monitoring team in

24   relation to issues that have been discussed at our monthly

25   meeting since the last quarterly hearing, and that includes

1    stops, searches, and arrests, fair and impartial policing,

2    community policing, and sexual assault investigations.

3         So now we'll begin with the parties' presentations.

4    I expect to hear from each party and the monitoring team,

5    first on the intersection of the Consent Decree and the

6    conception planning and execution of crime-fighting

7    strategies, then on each of the global topics, then on the

8    monthly topics that I just enumerated.

9         As usual, we'll go topic by topic.  With respect to

10   each, we'll hear first from the city and the police

11   department, then from the Department of Justice, then from the

12   monitoring team, and of course the city generally goes first

13   because they bear the burden of proof in this remedy phase of

14   the case.

15        Good morning to you, Mr. Shea.  As always, you are

16   the lead-off hitter in the proceeding.

17        MR. SHEA:  Thank you, Your Honor, good morning.  We

18   have just a couple preliminary things and then we'll move to

19   the presentations Your Honor has called for.

20        Let me begin by saying that all the parties,

21   particularly the city and the police department, appreciate

22   your statement this morning, appreciate the wise and strong

23   direction provided by the Court.  And let me say emphatically

24   that the city leadership and the police department completely

25   agrees with each of the points you've made.  The question now

1    is can we live up to the direction, and we will continue to

2    endeavor in that regard.

3            When we last --

4            THE COURT:  I appreciate that endorsement, the

5    notion that as we face a crisis, which I think the city does

6    face.  This violence problem has been extremely serious.

7    People are understandably upset.  But the response to it has

8    to fit within the template of the Decree.  This is what the

9    Decree is about.  It's a stress -- it's a stress test for the

10   Decree.

11           MR. SHEA:  Even more than that, the guardrails that

12   have been provided, I think will advance both goals of the

13   constitutional policing and the effective enforcement.  I

14   think we're in total agreement, and again, it's for us to

15   deliver on that.  And we understand that.

16           When we last met at a monthly meeting, I provided

17   the Court with the sad news that we were losing Lisa Walden, a

18   terrific lawyer and a very fine leader.  But today, I'm happy

19   to present Justin Conroy as her replacement.  Justin is a

20   remarkably versatile and experienced lawyer.  He has been

21   deputy chief of the legal affairs division, Lisa's former

22   post.  He's been deputy for five years.  He has a long and

23   effective career behind him, and I think all the skills and

24   experience needed for what's in front of him.  His ascension

25   to the chief position is heartily endorsed by the police

1    commissioner, so we're all in sync on the team we've got here.

2            Justin, just briefly, is a graduate of Northwestern

3    University, University of Maryland Law School.  He spent time

4    at the NLRB, and also was, in the mid-2000s, an assistant

5    solicitor in the law department.  He went from there to the

6    United States Patent and Trademark Office and while in that

7    role, to China, Beijing, where he advised American companies

8    on patent and trademark issues.  He spent several years in

9    China.  But then, fortunately for all of us, came back to the

10   city in 2018 and took the role as deputy and now as chief of

11   the legal affairs department.  I'm delighted to present him to

12   the Court this morning.

13           THE COURT:  Good morning, Mr. Conroy.  Welcome.  It

14   goes without saying that you have big shoes to fill.  I know

15   that you know that from already being employed in the law

16   department and in a related role.

17           One of the things that makes that particular job so

18   hard is that it's a little bit nontraditional because of the

19   way this case has proceeded.  Typical of how this has gone, as

20   Mr. Shea's opening remark just a moment ago, which is, in

21   general, the city and the Department of Justice and the Court

22   and the monitoring team have agreed on the way forward.  There

23   have been very few classic sort of legal fights in a courtroom

24   in the life of this case.  But there are problems.  There are

25   very substantial problems.  They're in the area of capacity,

1   ability to actually deliver what everyone understands must be

2   done.  And that's a little bit of a nontraditional role for a

3   lawyer.  But any lawyer who's gone off to China and dealt with

4   patent issues in that context is familiar with unconventional

5   roles for lawyers.  So it sounds like you're well suited to

6   this assignment.  I couldn't be more pleased.

7               MR. CONROY:  Thank you, Your Honor.

8               MR. SHEA:  Your Honor, and, finally, I would like to

9   pivot to my deputy, Ebony Thompson, who will report on the

10  collaborative that has been created related to the squeegee

11  workers' problem, which collaborative addresses, among other

12  things, the enforcement issues that Your Honor alluded to.

13              In its own way, the collaborative and this issue is

14  a microcosm of what we face more generally.  I'm delighted to

15  report, and Ebony will give you details about how the

16  communities are coming together.  It's the business community

17  and the downtown community has a point of view, along with the

18  nonprofits who are in this city, we're particularly fortunate

19  to have them, in earnest, wanting to help.  But also the

20  community, the nonbusiness community, and the squeegee workers

21  themselves are part of this collaborative, which I think we

22  have some high hopes and expectations for.  So I'll turn it

23  over to my deputy.

24              THE COURT:  Ms. Thompson, good morning to you, nice

25  to see you again.  I'm eager to hear your report.  You can

 1    make it from there, or you can come to the podium, however

 2    you're more comfortable.

 3              MS. THOMPSON:  Good morning, Your Honor, as long as

 4    you can hear me, I'm comfortable here.

 5              THE COURT:  No problem.

 6              MS. THOMPSON:  As the solicitor stated, I'm very

 7    happy to give an update to the Court on the initiatives and

 8    the progress that this administration has initiated with the

 9    collaborative group.  And as the solicitor stated, we have in

10    the room just on -- Tuesday was our fifth meeting, and in the

11    room we have not only the squeegee workers, but we have

12    government officials, counsel, law enforcement, law is there,

13    nonprofits are there.  We also have tremendous support from

14    the downtown community, as well as the community in general.

15              And the focus has been through the fact -- the last

16    five, initially going into services and addressing the needs

17    in terms of why the squeegee workers are even there, and

18    making this as inclusive as possible and giving an open forum

19    and everyone to have a space to speak.  And from there, as we

20    took in what the needs were and we took in some of the

21    outcomes of some of the bad things that we have seen happen on

22    these corners, outside even of the tragic incident on

23    July 7th, but in terms of theft, in terms of malicious

24    destruction of property, in terms of assault, and just on the

25    fifth one on Tuesday, we actually put pen to paper in coming

1    up with an enforcement strategy, with everyone in the room and

2    everyone having a say.

3         And the law department is extremely excited about

4    this, because this allows us, as you say, within the

5    guardrails with the constitutionality piece of this, in making

6    sure that the enforcement strategy that we do implement and

7    ultimately recommend, that it is going to be a true legitimate

8    balancing test of the legitimate interests in public safety

9    for the city, as well as the interest, the constitutional

10   rights for the squeegee workers.  And we believe that having

11   everyone and having an inclusive approach in bringing everyone

12   to the table, it allows us to narrowly tailor that approach.

13        So we're very, very confident about that, but we've

14   been holding -- in addition to that, we've been holding

15   outside meetings, one on one, to -- if people don't feel as

16   comfortable presenting in front of a large group like that, to

17   just ensure that their voices are heard as we come up with an

18   enforcement strategy, so we are very hopeful for the progress

19   in that regard, Your Honor.

20        THE COURT:  Thank you for that general update,

21   Ms. Thompson.  You know, this is delicate business in the

22   context of the case and the Consent Decree itself.  It isn't

23   for the Court to dictate some kind of solution or resolution

24   to this serious issue that is vexing the city.  The Court

25   recognizes just how serious it is.  But it isn't -- that isn't

1    the Court's responsibility or its job, and it would be the

2    Court extending beyond its sort of lawful function to start to

3    try to dictate what that was.  And yet at the same time it is

4    very much the Court's responsibility under the Decree to

5    police the city as they address this issue.  It's very much

6    the responsibility of the Department of Justice to be watching

7    this closely, the monitoring team, and so forth, to make sure

8    that those essential guardrails are respected.

9            There are probably, you know, a number of different

10   strategies that could be employed here, and it's a hard call

11   to sort out exactly which ones should be selected and which

12   ones should not be.  I'm grateful that that job isn't assigned

13   to me, because it looks like a very tough one.  But the other

14   side of the coin, though, is the responsibility to watch over

15   all of this, and to make sure that whatever is done is within

16   the template of the Decree.  This process that I oversee,

17   without a doubt, will do that.  I believe the city's well

18   aware of that and is operating with that awareness front and

19   center.

20           MS. THOMPSON:  Yes, sir, we are in firm agreement,

21   and that has been our goal.  So whatever enforcement strategy

22   that will come out of that meeting, it will be vigorously

23   analyzed by the legal department to make sure that it fits

24   within those guardrails.  Thank you so much.

25           THE COURT:  Thank you, Ms. Thompson.

1          MS. THOMPSON:  Yes, sir.

2          THE COURT:  All right.  Mr. Shea.

3          MR. SHEA:  At this point I'll turn it over to the

4    police commissioner, Your Honor, if that's okay.

5          THE COURT:  Okay.  Yes, you know, Commissioner

6    Harrison, nice to see you.

7          The long tradition in these quarterly hearings is

8    that if either the commissioner or the mayor is present as the

9    principals of the defendant organizations, we permit them to

10   speak and address the Court even though they're not members of

11   our bar.

12         Commissioner Harrison, good morning.  As always,

13   eager to hear your comments.

14         COMMISSIONER HARRISON:  Good morning, Your Honor,

15   and thank you for allowing me to speak before the Court this

16   morning.

17         Before we actually start the hearing, I also would

18   like to announce a new change in my administration.  As you

19   know, earlier this month the Phoenix Police Department

20   selected our Deputy Commissioner Michael Sullivan, to serve as

21   its interim police chief.  During Sullivan's tenure here at

22   BPD, he was lauded for his deft handling of the BPD's response

23   to COVID-19 pandemic and then overseeing the agency's

24   nationally recognized deployment response to the mass

25   demonstrations protesting the murder of George Floyd.  And in

1    June of '21, Deputy Commissioner Sullivan took over our

2    Compliance Bureau and then led our reform efforts through

3    massive technology overhauls, upgraded training, and bringing

4    the agency into substantial compliance with the mandates of

5    our federal Consent Decree.

6            And while we are sad to see him go, I am immensely

7    proud that he was chosen to lead the men and women of the

8    Phoenix Police Department.  And his selection is an honor to

9    all of us at the Baltimore Police Department and a reflection

10   of the great work that's happening here in our department

11   every day.  But it's also a testament to the development of

12   the next generation of great police leaders.  So I want to

13   thank him for his service to this department and welcome him

14   now as my peer.

15           And with Sullivan's departure, I'm pleased to say

16   that Eric Melancon has been promoted to serve as the

17   department's next deputy commissioner of the Compliance

18   Bureau.  As my chief of staff, Melancon has been a trusted

19   advisor and counsel, not just to me but to our agency as we

20   coordinate with the mayor's office, city council, state

21   government leaders, law enforcement agencies at the local,

22   state, and federal level, as well as his participation in this

23   Consent Decree process much like he did when he was my chief

24   of staff in New Orleans and the work we did there with that

25   Consent Decree.  So he has the law enforcement policy and

1    administration expertise required to excel in this role, move

2    the department forward in compliance, and ultimately achieve

3    the goals of turning the BPD into a world-class law

4    enforcement agency.

5            Now I'd like to take this opportunity to discuss

6    some questions that our department have received about the

7    ability to police proactively and the misconceptions and

8    inaccuracies regarding lesser offenses, such as loitering and

9    panhandling, many of which you've already addressed

10   yourself.

11           THE COURT:  Let me stop for a second, just to

12   welcome Mr. Melancon in his new role as deputy commissioner

13   for compliance.  I would say, somewhat improbably, the

14   department has navigated transitions in this critical role, at

15   least once so far during your administration, Commissioner

16   Harrison, and now, by virtue of this selection, I would

17   predict for a second time.  You have been fortunate with

18   D.C. Murphy, D.C. Sullivan, and now D.C. Melancon, to have

19   particularly skilled people in these roles.

20           And it's interesting to me that the two deputy

21   commissioners who have performed in this role under you so far

22   have come from such completely different backgrounds.  Murphy

23   and Sullivan, in my view, couldn't be more different in terms

24   of their resumes for the job in the first place, and yet each

25   brought unique strengths to the position, and the process I

1       think profited from the input of each of them.

2               Mr. Melancon, you and I have had significant and

3       substantial dealings already, not so much specifically related

4       to the Compliance Bureau function, but the -- more of the sort

5       of general mechanics and financial issues and so forth

6       associated with the operation of the police department.  And I

7       have grown to trust your judgment in that role, and I have

8       every expectation that you're going to be successful and a

9       very capable partner with others involved in this process as

10      you slip into the new role.  But it's a hard job.  Welcome.

11              MR. MELANCON:  Thank you, Your Honor.  And I'm up

12      for the challenge.

13              THE COURT:  Commissioner.

14              COMMISSIONER HARRISON   Thank you, Your Honor.

15              In continuing, as part of our oath, each of our

16      members are sworn to support the Constitution.  We must ensure

17      that we are protecting people's constitutional rights.  And in

18      that same vein, police officers are always encouraged to

19      engage community members, and supervisory approval is not

20      needed to do that and was falsely reported.  Police officers

21      do not need permission from a supervisor to engage with people

22      who commit minor offenses.  This only applies to arresting

23      individuals for minor quality of life offenses when it is

24      reasonably practical to do so.  And then it is specific to the

25      very small number of crimes that have been publicly announced

1    that won't be prosecuted, and that was written guidance that

2    we gave to the police officers.

3              THE COURT:  I appreciate your clarifying that,

4    because it seemed to me, reading about this in the media, that

5    I was having trouble squaring what I was reading in the media

6    with what I knew to be the requirements and limitations in the

7    Consent Decree and the policies that had been promulgated

8    pursuant to it.

9              I mean, if you take a typical situation with a low

10   level offense, the inclination of an officer in the first

11   instance isn't going to be to make an arrest anyway.  It's

12   going to be to contact the individual and try to have some

13   kind of a productive engagement that results in the misconduct

14   or misbehavior or whatever it is, the problematic conduct

15   stopping.  And if they're successful, that's that.  And then

16   if they're not successful, I imagine that things then step up

17   from there.  Could be the possibility of a more vigorous

18   warning having been delivered.  It could be the possibility of

19   issuance of a citation.  I mean, it just seems to me that by

20   the time you would get to arresting people in this kind of a

21   setting, you would almost certainly have a supervisor present

22   anyway, just because that's how officers are now being trained

23   to manage sort of an escalating event.

24             So I was having a little trouble following that

25   indictment, frankly, of how the department was able to address

1   low level offenses.

2           COMMISSIONER HARRISON  We addressed it through

3   written guidance, and it was specific to the, I believe, ten

4   offenses that were announced that were not going to be

5   prosecuted.  So we had to give guidance on what to do with

6   cases with instances where we would have traditionally taken

7   an enforcement action that now are not going to be prosecuted.

8   And we've done that twice.

9           THE COURT:  Well, and I suppose it's premature for

10  you to say anything, but the Court takes notice of the fact

11  that there's been an election in the city since the last time

12  we were all together.  There's evidently going to be a change

13  of administration in the state's attorney's office, so it --

14  in a matter of months, the prosecution policy previously

15  announced with respect to these low level offenses is likely

16  to be under reconsideration, as would all of the policies

17  likely in the state's attorney's office, because there's going

18  to be a new person in charge.

19          So the police department also has to have that in

20  mind, be ready to flex its strategies in collaboration with

21  its partner in the state's attorney's office.  So everything

22  that you have just articulated and the policies that you

23  previously established, may need to be revised in light of

24  this political development.  Am I right about that?

25          COMMISSIONER HARRISON  You're absolutely right

1    about that.  And we will always work with our solicitor's

2    office to get guidance, make sure we're working with the

3    Monitors and the DOJ about policy, policy changes externally

4    that will determine policy changes internally which would then

5    dictate policing protocols and practices.

6          And to touch on what you've already touched on very

7    briefly, what has not been correctly reported is a Supreme

8    Court decision that ruled that appeals for charitable funds to

9    include panhandling is, in fact, protected speech under the

10   First Amendment, which includes people experiencing

11   homelessness and asking for money in the street.

12         Our local nonprofits, our community sports

13   organizations, soliciting funds and even young men and women

14   who squeegee, and any law that bans this protected speech is

15   deemed to be unconstitutional.  So with guidance from the

16   solicitor's office and the squeegee collaborative led by Mayor

17   Scott, which I am part of and have attended each meeting,

18   we're working to created pathways to keep these young people

19   off of the streets and into the workforce development and

20   receive livable wages while also enforcing aggressive

21   panhandling and other crimes in furtherance of squeegeeing.

22         We've made arrests and will continue to apprehend

23   those who commit those serious crimes.  Whenever BPD members

24   interact with community members, that interaction must be

25   professional and include procedural justice principles.  For

1  example, in a field interview, investigative stop, or a

2  weapons search on arrest is conducted, it must be

3  appropriately documented.  And I have said many times, and

4  I'll say it again very publicly, the Consent Decree does not,

5  and let me repeat, does not prevent proactive enforcement.  As

6  we move into the assessment phase of our Consent Decree, we

7  must confirm that our enforcement is done constitutionally.

8  To be clear, the Decree does not take away an officer's

9  discretion.  BPD members can and will continue to take

10  appropriate law enforcement action when laws are broken.

11       Finally, Your Honor, I'd like to discuss the focus

12  of this hearing and how you have rightly put the emphasis on

13  assessments.  For years we've updated the Court and the public

14  on changes to policy and training, and while we will certainly

15  cover those topics again, though briefly, the feature of

16  today's hearing is about assessments to determine if the

17  policy and training improvements are having the intended

18  impacts.  As you have indicated many times, the parties need

19  to be deeply involved in this stage of the process as the

20  technical assistance and foundational work and policies and

21  training is now complete.

22       The transition to the collection of information,

23  documentation, and thorough review of data and documents, and

24  the critical assessment of this information is already under

25  way in some sections of the Decree.  As mentioned by the

1    monitoring team, tangible signs of change are emerging in

2    noteworthy developments in our compliance.  We welcome these

3    assessments and are ready for this comprehensive review to

4    prove our progress and to push the parties in places where

5    reform needs more work.

6            I'd like to also end by saying how extremely proud I

7    am to lead the men and women of the Baltimore Police

8    Department who show up each and every day to protect and serve

9    in some of the most challenging circumstances.  Each of us is

10   committed to rebuilding trust, reducing violent crime, and

11   complying with the Consent Decree to one day soon becoming in

12   full compliance.  I am further reminded, and I'll end just a

13   moment, by just this morning, in a talk radio interview with a

14   local journalist who asked me the question, well, you've been

15   here over three years and nothing has changed.  And I

16   fundamentally and philosophically and psychologically and

17   theologically, and every other ology disagree with that,

18   because we are, even by the Court's own admission, are

19   significantly a different department today than we were three

20   and a half years ago.  And much has changed.  And we are doing

21   better work, more work, with less force, fewer complaints,

22   less litigation, and in a better way.

23           While sometimes it seems it's not translating to why

24   criminal offenders are not making different decisions, I

25   answered the question, Your Honor, that I was hired to come to

1    the Baltimore Police Department to transform the Baltimore

2    Police Department and to be the leader of the police

3    department and to turn it from what it was to what we want it

4    to be, which is a world-class police department.  That is

5    happening.  There's evidence of that happening.  And -- but

6    there are some who will conflate my position as having to fix

7    all of the social ills and social determinants that push and

8    pull people toward crime.  And that because that is not

9    happening -- which the city is working to do that now, but

10   because the police -- that they believe the police department

11   and its commissioner is responsible for changing the decisions

12   of criminal offenders.

13           But I will say that I answered the question by

14   saying I was hired to change the police department, have done

15   that.  Let me be the first to say that there's a lot more to

16   do, and we have a long way to go.  But I wanted to set the

17   record straight for all the listening audience and even here

18   in court today.  To those listening who would conflate that

19   the police department is totally responsible for criminal

20   decisions, it is all of us, in criminal justice, every part of

21   the system and the community, and city leadership, which are

22   working very, very diligently to change behavior of

23   individuals so that they won't commit crimes in the very first

24   place while we enforce to deter those who would commit those

25   crimes and apprehend them after they actually commit it.

1          So thank you for that.  And I know this Court will

2     determine when we are in significant compliance with the

3     mandates of this Decree, and the public will then determine

4     when we have restored their faith in our department.  So thank

5     you for allowing me a few minutes to speak to you, the

6     opportunity to present before the Court this morning.

7          THE COURT:  Anybody who argues that the police

8     department hasn't changed in any material or significant way

9     hasn't been attending these quarterly public hearings over the

10    course of these last three years, because the changes have

11    been on display here for any and all to see.  It's a

12    completely different institution than it was three years ago.

13         At the same time, though, I have a lot of sympathy

14    for those in the public who are looking at the statistics on

15    shooting, and the killings that seem to be unrelenting, and in

16    that respect, their experience of crime hasn't materially

17    changed or goes up and down in waves and so forth, and the

18    city has not been suddenly transformed.  Commissioner, I think

19    you make an essential point, that it does not, sadly, get

20    enough attention, and that is -- policing can only do so much

21    about a city's crime problem.  There are many, many drivers

22    that lead to violence and criminal problems.  I mean, where do

23    we start?  Poverty, addiction, lack of good job opportunities,

24    troubled schools, lead paint, crisis in our mental health

25    treatment community.  All of these things substantially

1      contribute to it.  A dysfunctional police department also

2      contributes to it.  It's a factor, absolutely for certain.

3              I'm confident that very big changes have been made

4      and that over time, the positive consequences will be

5      experienced.  But this ties back into what I was saying in my

6      opening statement, the problems in this police department were

7      about as bad as you can get.  They were to the point where the

8      community, large swaths of the community have just completely

9      lost faith in the police department, lost all trust in the

10     institution.  And you can bring in a superstar leadership

11     team, you can bring in the country's best experts, as we have

12     through the monitoring team to provide technical assistance,

13     and bring all that to bear on this department, and still not

14     have utterly and completely transported the community's

15     perception of the department in just three years, that

16     actually is rational and logical when you consider how long it

17     took to destroy the relationship in the first place.  It ain't

18     going to be restored overnight.  It is going to take years.

19     Baltimore was down in a deep hole, and it takes a long time to

20     climb out of that hole.

21             The value of a Consent Decree is that it compels the

22     city and political leaders to stay the course on a particular

23     strategy even when that strategy doesn't immediately yield

24     positive results.  Past experience in this city has been that,

25     you know, commissioners come in, they announce a strategy,

1   they start to pursue it, they are given a year or two or

2   three, things may go for a while, but then when things go

3   south, the community is understandably upset about it, the

4   political leaders react to that, and we throw out that

5   leadership team and that policing strategy and switch course

6   in an attempt to put something else in place.  And the

7   consequence is that a strategy doesn't get a chance to really

8   get traction, dig in and work.

9          In addition, prior strategies haven't been like that

10  which is required to comply with the Consent Decree.  The

11  Consent Decree has required a complete reimagination and

12  reconstruction of the police department from the ground up.

13  Foundational issues had to be addressed.  Basic things about

14  how command is exercised and who's placed in command of the

15  police department.  Those kinds of personnel issues have been

16  addressed under this Decree.  Those are core foundational

17  issues that you don't see the benefits of or the consequences

18  of, frankly, for a long time.

19         So for better, for worse, the Decree locks the city

20  into a long-term corrective strategy.  And sometimes the

21  public doesn't have the appetite for that sort of a long-term

22  strategy.  Well, in 2017, those who were in charge of the city

23  exercised the discretion and the authority that they had to

24  pursue this different course, and to lock the city into an

25  approach and a strategy, and the Court was pulled into it.

```
1    The Court certainly didn't initiate this.  But that's now the
2    path we're on.  And it's the path that the law compels us to
3    follow all the way to the end of the journey.  And my current
4    sense is that the city and the police department are committed
5    to that and are following through on their legal obligations.
6    And now this summer they're doing that in the face of a lot of
7    heat and a lot of pressure.  But as you well know, as your
8    lawyers well know, given the legal landscape and the situation
9    that the city put itself in legally, there isn't any choice.
10   This is a route we're all committed to.  Thank you,
11   Commissioner.
12            COMMISSIONER HARRISON  Thank you, Your Honor.
13            THE COURT:  Is anything else in the way of opening
14   comments from the city and police department before I turn to
15   the Department of Justice?
16            MR. SHEA:  No, Your Honor.  Thank you.
17            THE COURT:  Very good.
18            Good morning, Mr. Mygatt.
19            MR. MYGATT:  Good morning, Your Honor.  I'll use the
20   podium.
21            Thank you very having us here this morning, Your
22   Honor.  We also agree with Court's view of the intersection
23   between the Consent Decree and the conception and execution of
24   crime-fighting strategies, that crime-fighting -- the
25   crime-fighting strategies that are the responsibility of city
```

1    and BPD leaders, not the Consent Decree, the Court, the

2    monitoring team, or the Department of Justice.  The CD also --

3    the Consent Decree also does not prohibit proactive

4    enforcement.  In fact, it encourages constitutional,

5    community-oriented policing, which is proactive policing.

6        I want to take a few moments though this morning,

7    Your Honor, just to reference some of those guardrails that

8    you talked about, because I think that they help us understand

9    a little bit of how this intersection works.  So first of all,

10   the Consent Decree requires that crime-fighting strategies be

11   developed in collaboration with the diverse communities that

12   the Baltimore Police Department serves.  So for example, the

13   Consent Decree requires BPD to develop microcommunity or

14   neighborhood policing plans.  These plans include input from

15   local community members on crime and public safety concerns in

16   their neighborhood, and then BPD constructs a policing plan to

17   address those concerns in collaboration with that community.

18       The Consent Decree does not prescribe what the

19   policing plan is, but it requires BPD to develop it in

20   collaboration with that community.  The collaboration that

21   Ms. Thompson described on the squeegee issue this morning

22   appears to be consistent with those principles.

23       Second, the Consent Decree creates mechanisms to

24   ensure that any law enforcement activities that BPD engages in

25   as part of the crime-fighting strategy are done in compliance

1    with the constitution and federal law.  So for example, if BPD

2    conducts stops, searches, arrests, or uses force during the

3    execution of its crime-fighting strategies, the Consent Decree

4    ensures that BPD has policies and training in place that are

5    consistent with constitutional requirements, that supervisors

6    guide officer conduct to make sure it is consistent with

7    constitutional norms, and that these interactions are

8    appropriately documented and, if necessary, investigated to

9    correct any departures from constitutional requirements.  The

10   crime-fighting strategy is the city's and BPD's, but the

11   Consent Decree makes sure it is executed consistent with the

12   Constitution.

13           A third example of the way the Consent Decree

14   provides guardrails is on interactions with youth.  The

15   Consent Decree does not prescribe a crime-fighting strategy

16   for the city and BPD that addresses youth that may be involved

17   in crime, but it does require BPD to have policies and

18   training for its officers that provide guidance on

19   developmentally appropriate interactions with youth and to use

20   alternatives to arrest when those alternatives will be

21   effective.

22           Finally, I want to point out that the Consent Decree

23   recognizes that fighting crime and establishing public safety

24   go beyond policing strategies and the authority that BPD

25   exercises.  Much of this work is not even addressed in the

1    Consent Decree, issues such as housing, education, and

2    employment, the Court already described this morning, but the

3    Consent Decree does touch on one area where the city has made

4    considerable efforts.  This is the work the city is doing to

5    assess gaps in the behavioral health service system and to

6    assist in implementing a plan to address those gaps.  This

7    work recognizes that we can improve public safety by putting

8    services in place that reduce police involvement altogether,

9    because a criminal justice response is not always required.

10           To our understanding, the city's engaged in many

11   other efforts to improve public safety and reduce crime that

12   don't involve BPD at all.  And these are also crime-fighting

13   strategies, but they are not required or governed by the

14   Consent Decree.

15           Ultimately, Your Honor, the United States shares

16   your view that constitutional policing and effective policing

17   are inextricably intertwined.  Policing cannot be effective if

18   it does not have the public's trust and cooperation.  And

19   policing that does not abide by the law, does not abide by the

20   Constitution, the foundational document of our democracy,

21   cannot have the public's trust.  Baltimore will fight crime

22   better through the processes set forth in the Consent Decree,

23   even though the Consent Decree does not prescribe any

24   particular crime-fighting strategy.

25           Unless the Court has any questions about that, I

1    don't have anything further on that.

2         THE COURT:  I appreciate your summary, Mr. Mygatt.

3    And as I listen to you, I'm just reminded again that there

4    really isn't much daylight in this case between the positions

5    of the parties and where the Court stands with respect to the

6    core issues.  It's all about finding capacities to do what

7    we're all required to do under the Decree, and executing.  The

8    public and the community, a lot of our city leaders, our

9    politicians inevitably are going to view this issue through

10   the lens or the prism of the statistics on shootings and

11   homicides, and that is understandable, particularly when those

12   numbers are as appallingly high as they are.

13        The problem is that the problem is more complex than

14   that and requires a deeper look.  And when the issues here are

15   examined more deeply, what's revealed is that, at least on the

16   policing side of this equation, and that is only a part of the

17   crime issue in Baltimore, if you don't address and fix the

18   basic foundational issues that the Decree is largely aimed at,

19   you are never going to get out of this mess.

20        And, you know, we're five years into the Decree.

21   We're really three years into actual productive efforts with

22   respect to the Decree.  It coincides with the arrival of the

23   leadership from New Orleans, and that's just an empirical

24   fact.  That's when things actually got rolling around here.

25   And it's not surprising to me in the least that the full

1   benefits and consequences of this process are not yet being

2   felt and experienced and reflected in the statistics.

3            I want to leave this cautionary note, even when we

4   get to the point of sort of maximum improvement for this

5   department, and I hope and pray that that is sooner rather

6   than later, even though it's years away, as this morning's

7   comments made clear, the -- if there isn't simultaneously

8   progress on all the other fronts that have been enumerated

9   here, then the city may not still experience the substantial

10  reduction in crime, particularly violent crime, that it so

11  desperately seeks and needs.  That's just calling it as it is.

12  Thank you, Mr. Mygatt.

13           MR. MYGATT:  Thank you, Your Honor.  I have one

14  housekeeping matter.

15           THE COURT:  Yes, sir.

16           MR. MYGATT:  I notified the Monitor of this morning,

17  who I believe notified your chambers, but I beg the Court's

18  indulgence, I need to step away briefly this afternoon around

19  3:30, a little earlier, for another meeting, but I will rejoin

20  as soon as I can afterwards.

21           THE COURT:  Yes, I understand you have

22  responsibilities in relation to another case.  I appreciate

23  your notifying me in advance.  We will accommodate that in the

24  courthouse, and hopefully you've already been given guidance

25  on how we will do that, if not at the next break, we'll get

1    that nailed down.  But we will make that work, and we do what

2    we can to support our colleagues in other districts who are

3    involved in equally important litigation, and that means

4    making an attorney available as possible.

5              MR. MYGATT:  Thank you, Your Honor.  I appreciate

6    it.

7              THE COURT:  Yes.  Okay.  Mr. Thompson.

8              MR. THOMPSON:  Just real quick, Your Honor, because

9    I have very little to add to this conversation.  Listening to

10   the parties, they are certainly in lockstep with where we are.

11   And of course, we are -- we being the monitoring team, are in

12   total lockstep with the Court for a variety of reasons, mostly

13   which you are well aware of.  The monitoring team and this

14   Court are in constant contact, sometimes -- as you know, you

15   and I probably chat multiple times a week, sometimes multiple

16   times a day.  And of course we address these and other issues.

17   So we are in total lockstep with where the Court is on this

18   point.

19             I don't think that we can say it enough, however,

20   Your Honor, that it is up to the city and the police

21   department to come up with a crime strategy.  The Consent

22   Decree's role is a simple one, even though it's complicated,

23   and that's simply to protect the guardrails.  It's our job to

24   make sure that whatever they do, that it's being done within

25   the requirements of the Consent Decree and the United States

1      Constitution.  That's what we do, and of course that's the job

2      that you have given us to help you do.

3            So I think beyond that, Your Honor, there really

4      isn't very much more I want to say on this.  The only thing I

5      would point out, and I would take the example of the squeegee

6      workers.  I mean, you know, this is a good example, that

7      involves, for the most part, lesser offenses.  So the rule of

8      thumb under the Consent Decree and the policies that the

9      department has created, is that the BPD members are supposed

10     to use good judgment.  They're supposed to try to look at a

11     least intrusive means to respond to the problem.  Which means

12     you try verbal warnings, you -- that doesn't work, you move to

13     the next step, which of course is a citation.  And it's only

14     in the most extreme cases and as a last resort that a

15     custodial arrest would even be considered.  So I think as long

16     as the department, as long as the city come up with policies

17     and then the department executes those policies within those

18     confines, I think we're all moving in the right direction.

19           THE COURT:  I think it's important that the

20     monitoring team stay in close consultation with the city, as

21     they wrestle with this hard problem.  I heard some references

22     in the commissioner's remarks about Supreme Court decisions

23     related to aggressive panhandling and so forth, and of course

24     we're aware of what that law is.  Issues under those

25     provisions of law are not squarely before this Court.  They're

1    not ripe for any ruling by this Court and not ripe for much of

2    a comment by this Court.

3           I only make this limited observation, and that is,

4    like everything in law, you know, you change the facts a

5    little bit, and the way that the law is applied in those

6    circumstances has to change also.  It is true that the Supreme

7    Court has set some markers, some clear lines in terms of what

8    people are permitted to do in the exercise of their First

9    Amendment rights, appealing for charitable contributions,

10   panhandling, asking people to give them money, begging, that

11   sort of thing, a lot of this is protected conduct.  But at

12   some point there is also an interface with basic issues of

13   public order and public safety, safety in traffic, safety of

14   young people where, you know, fast-moving and heavy

15   automobiles are involved and so forth.

16          So like everything in law, it's not simple.  There's

17   not just a line that comes down and, okay, this is an activity

18   or conduct that is -- can't be addressed by law enforcement or

19   city leaders or policy makers or whatever.  The judgments are

20   more subtle than that.  And when there are bona fide issues of

21   public safety that intersects the constitutional analysis

22   unlikely, at least pays attention and perhaps changes.

23          So I think that the monitoring team can be of some

24   assistance in that regard, at least in the discussions that

25   apparently the city is involved in.  The monitoring team's not

1    here to adjudicate constitutional questions, and the Court is

2    not, at least in its current posture, that's not part of its

3    role with respect to this.  But that doesn't mean that you

4    can't help the involved parties navigate tricky issues.

5            MR. THOMPSON:  And we understand that, Your Honor,

6    and we totally agree.  And if the Court will recall just I

7    guess a month ago when we sat with the parties, we made it

8    clear that, you know, we respect the city law department.  I

9    think it's one of the finest law firms around, for a whole

10   host of reasons.  And, you know, we will leave it up to

11   Mr. Shea and his office to figure out the right way to

12   maneuver through a minefield.

13           I mean, you know, we have to recognize that the

14   Supreme Court has made certain rulings, but those things are

15   always subject to interpretation.  As it exists right now, the

16   aggressive panhandling statute is still valid in Maryland.  No

17   one has declared it unconstitutional yet.  It will be up to

18   the law department to figure out how they want to traverse

19   through that maze.  The point is, the monitoring team stands,

20   as we do in all respect, Your Honor, to assist DOJ and

21   primarily the city and BPD in getting through that maze.

22           THE COURT:  What the Consent Decree process wants is

23   a resolution of this problem and many others like it, that

24   enhances the relationship between the police department and

25   the community it serves.  That's our north star.  That's what

1    this process is ultimately and fundamentally about.

2              There are going to be crises.  There are going to be

3    spiking, unfortunately, in murders.  There are going to be

4    squeegee worker issues that arise and so forth.  But at the

5    end of the day, this process has to keep its focus on that --

6    on that north star, which is a restoration of that

7    relationship so that policing can be done in Baltimore in a

8    way that is both constitutional and effective and truly then

9    providing the service that the community is entitled to.

10             MR. THOMPSON:  We're in total agreement, Your Honor.

11   Thank you.

12             THE COURT:  All right.  So I think we're ready to

13   move to global four, perhaps, Mr. Shea.  Are we at the point

14   where Mr. Conroy is ready to perform in the role, the full

15   role of Ms. Walden --

16             MR. SHEA:  I don't know if we're there yet, Your

17   Honor.

18             THE COURT:  -- and direct every actions we're going

19   to take?

20             MR. SHEA:  But as in Tinkers to Evers to Chance, we

21   pass it over to Mr. Melancon for --

22             THE COURT:  All right.

23             MR. SHEA:  -- presentation.

24             THE COURT:  Thank you.

25             MR. MELANCON:  Good morning, Your Honor.  And if we

1    could get the projection up for the presentation.

2         Eric Melancon, deputy commissioner for the

3    Compliance Bureau.  First of all, I want to thank you for your

4    kind words earlier.  As I've mentioned, I'm hopefully equal to

5    the task, and look forward to a positive and productive

6    working relationship in my new role with you, the Court, the

7    monitoring team, and with the Department of Justice.

8         Before we begin into the primary topics, we did

9    provide in our previous monthly briefing an update on the

10   BPD's redistricting plan and strategy.  And so in May, Mayor

11   Scott and Commissioner Harrison announced a process on how BPD

12   would be redrawing the boundary lines for our nine police

13   districts.  These boundaries haven't been changed in more than

14   50 years, and we are definitely in need of having them be

15   modernized.  BPD's used --

16        THE COURT:  So is -- the redistricting every ten

17   years, is that a new circumstance; that's not something that

18   historically has gone on every ten years, but that's a new

19   feature?

20        MR. MELANCON:  Yes, Your Honor, there's a new state

21   law that requires a redistricting process in line with the

22   decennial census.  Upon receiving that information last year,

23   we were able to develop new information regarding population

24   distribution, calls for service data.  We had a five-year look

25   back on violent crime, property crime.  Used all of those

1    factors to create and develop a balanced workload map.  And so

2    it's a data-driven approach.  It's intended to keep our

3    neighborhoods together, manage crime more effectively in each

4    geographic area, and support the department's community

5    policing initiatives while providing officer workload balance

6    and better alignment for our crime reduction strategies

7    overall.

8            In completing our first feedback process, we

9    encountered certain common themes such as certain districts

10   being too large geographically and other communities that were

11   seeking to be reunited under a single police district that

12   typically work together.  So using all of this data and public

13   input from the initial phase, we produced a draft back to the

14   public that was released July the 7th.  That map did initiate

15   a second public comment period wherein members from across the

16   city were able to provide feedback forms to the department.

17   The commissioner himself went to all nine districts to hear

18   feedback and talk about the process, and that version of the

19   map was updated to what you see before you today, Your Honor,

20   and this map has now been submitted by the major and the city

21   council effective August 10th.  During that public feedback

22   process, we had over a thousand responses, formal responses

23   from the public, but that's not even in addition to all the

24   members of the public that the commissioner and other members

25   of our team interacted with over the last several months.

1          So the final map takes into account all the public's

2     feedback that we could, the operational goals that we're

3     setting forward through this process, including that balanced

4     workload approach, and it balances the understanding of those

5     concerns with the need to be able to, you know, change certain

6     geographic boundaries of our districts.  You know, we can't

7     ger everything the same, and we wanted to make sure we

8     accommodated as much as we could.  We believe this provides a

9     more balanced and equitable distribution of our policing

10    resources for all Baltimore residents.

11         This was a large undertaking.  It was done in a very

12    tight time line.  I want to publicly acknowledge the hard work

13    of our data-driven strategies division, our GIS team, our

14    public information office, and of course relations Mayor Scott

15    himself, who spent a great deal of time helping us and guiding

16    us through this effort, and he himself who has been leading

17    this for years and was a big proponent of the legislation

18    itself.

19         This draft map now goes under a review process by

20    the city council.  That must be completed within 180 days.

21    And that will be then the process we move forward on.  Once

22    the map is finalized by the council, we'll be able to proceed

23    in operationalizing it.

24         If Your Honor has any questions, I can address those

25    but if not, we can proceed onward with our presentation.

1          THE COURT:  I'm extremely interested in the issue,

2     but obviously this is one of those things that's left to city

3     leaders and city government and the Consent Decree process,

4     and our monitoring team will follow the implementation of this

5     process with interest.  But the city's driving the bus on

6     this.

7          MR. MELANCON:  Very good.

8          Next slide.

9          So Your Honor, today we're covering the topics that

10    are listed in the agenda, if it's coming up.  It's of course

11    the big four, but as Your Honor intoned, there will be soon to

12    be the big five, which will also include assessments.  We do

13    have a slide on where we are as far as assessment scores

14    overall that we can speak to today.  But those topics of

15    course include integrity, staffing, technology, training, and

16    then we're going to be going into the topics that we went over

17    during the monthly hearings over the last quarter.  That's the

18    community policing, stops, searches, and arrests, fair and

19    impartial policing, and sexual assault investigations.

20         THE COURT:  Are everyone's screens blinking on and

21    off or only mine?

22         MR. MELANCON:  Yes, Your Honor.

23         THE COURT:  All right.  Okay.  So talking to IT

24    right now and once we've got the techs up here in the

25    courtroom, we'll take our morning recess, but we'll wait until

 1    they're here so that we make the most productive use of their

 2    time.  So let's keep going until the technicians show up and

 3    then we'll take our break and try to get this problem

 4    solved.

 5              MR. MELANCON:  As we go through topics throughout,

 6    Your Honor, I will be the main presenter for many of them.

 7    Others we'll have D.C. Nadeau present, D.C. Briscoe will

 8    present.  Ms. Natalie Amato from the law department will make

 9    a presentation.  And so we'll be going back and forth through

10    that presentation as we go forward.

11              So this slide's on our progress.  You've seen a

12    version of this slide before, Your Honor, but the green

13    represents areas in which we've successfully completed.

14    Things like policy, planning, and training are largely

15    complete throughout the vast majority of our Consent Decree

16    categories.  And so as we illustrate, as we move into the

17    implementation phase, again, we welcome, as the commissioner

18    said, entering into that assessment phase that moves away from

19    the policy language and training curriculum involvement and

20    into having compliance reviews, outcome assessments, to

21    identify where we are as a department to ensure that we're

22    living up to what the goals of the Decree ultimately are.

23              And so we look forward to receiving the results of

24    comprehensive monitoring team assessments that are upcoming,

25    including behavioral health, investigations of sexual assault,

1    misconduct investigations, officer safety, wellness, and more.

2              So I'll pause there and if you have any questions

3    about this slide, we'll take those and if not, we'll move into

4    integrity with D.C. Nadeau.

5              THE COURT:  I'm just taking a moment to scan the

6    sections.

7              MR. MELANCON:  Yes, Your Honor.

8              THE COURT:  So does the slide effectively include

9    all relevant sections, I guess is the question that's in my

10   mind.

11             MR. MELANCON:  Yes, Your Honor.  They're grouped

12   into the 18 categories off to the left side.

13             THE COURT:  Yes.  Okay.  Good.

14             MR. MELANCON:  Very good.  At this time we'll turn

15   it over to D.C. Nadeau who will speak on integrity.

16             D.C. NADEAU:  Good morning, Your Honor.

17             THE COURT:  Good morning, D.C. Nadeau.

18             D.C. NADEAU:  In the monitoring team's assessment on

19   PIB progress written in their seventh semiannual report from

20   February this year, the monitoring team wrote, quote, There

21   are tangible signs that BPD's Public Integrity Bureau is

22   improving its investigative efficiency.  It must now match

23   those improvements with verifiable advances, advancements in

24   the investigative quality, end quote.

25             I think these are very encouraging words, and I'm

1    sure that their reviews in the future will echo those same
2    thoughts and see a remarkable improvement from where we were
3    when this team took over three years ago.
4            I just want to highlight a few things for you today,
5    one is on training.  Complaint intake, misconduct, and
6    disciplinary policies are being incorporated into an all
7    personnel training set to be delivered this fall.  Moreover,
8    lessons that were learned from the Bromwich report, which this
9    Court is really familiar with, will be incorporated into those
10   lesson plans.
11           We're working with a vendor, a vendor who is
12   providing interviewing interrogation and training for our
13   educational and training folks.  We've been in contact with a
14   vendor for specialized training on PIB types of interviews.
15   That's one of our weaker areas.  They have a course that
16   they've designed that we will be working with them, and we're
17   in the beginning stages to have them provide that training to
18   BPD PIB detectives.
19           For our quarterly reports, Quarter 3 and 4 of 2021,
20   the report for misconduct investigation has been published on
21   the BPD website.  Moving forward, we will be publishing each
22   quarter separately.  Quarter 1 of 2022 report is currently
23   being drafted and should be released shortly.
24           Audits and testing of PIB, BPD is in the final
25   stages of collaborating with the DOJ and monitoring team on

1    the complaint intake testing program methodology.  We will be

2    using a third-party vendor to conduct the testing of BPD's

3    complaint intake process.  And we've also been collaborating

4    with DOJ and the monitoring team on the internal affairs

5    audit, which is a Consent Decree requirement for this fall,

6    which is in the fifth-year monitoring plan.

7            I'm happy to announce that new captain has been

8    assigned to our investigative division, after the retirement

9    of our former captain.  Captain Lakeisha Blue is an

10   experienced member of the department who has previously served

11   in PIB.  She's extremely familiar with the process, the IAPro

12   system, and is currently up and running.  She is a welcome

13   addition to the command staff.

14           Currently we have 36 detectives working in general

15   misconduct investigations.  The staffing plan does call for

16   48.  The department is in the process of going through

17   applicants for the civilian positions.  There were several

18   hundred applicants.

19           THE COURT:  Now, is the 48 after we -- after you

20   take on the civilians, or is that --

21           D.C. NADEAU:  So 48 total.

22           THE COURT:  What was the number before the creative

23   idea of bringing in the civilians?

24           D.C. NADEAU:  48.

25           THE COURT:  It was 48.

1          D.C. NADEAU:  48 came from the staffing plan.

2          THE COURT:  Okay.  So will the civilians be counted

3   within the 48?

4          D.C. NADEAU:  I'm sorry, sir?

5          THE COURT:  Will the civilian investigators be

6   counted as some of the 48?

7          D.C. NADEAU:  So what we've done is we reduced the

8   number of sworn members by eight, so there will be 40 sworn

9   members and then ten additional civilian members.

10          THE COURT:  Yes.  That's the ultimate strategy.

11          D.C. NADEAU:  That's correct.

12          THE COURT:  All right.  Let's stop here for a

13   second.  Let's go off the record.  I want to talk to our IT

14   staff for a minute.

15          (Pause in the proceedings.)

16          THE COURT:  We're going to take the morning break to

17   allow our IT staff to troubleshoot a couple of issues and I'm

18   sure solve them.  We'll be in recess for 15 minutes.

19          (A recess was taken.)

20          THE COURT:  All right.  Hopefully we've solved the

21   blinking screens.  And D.C. Nadeau will continue.

22          D.C. NADEAU:  Thank you, Your Honor.  So I think we

23   talked about the staffing issue, and what that's really helped

24   us do is, you know, we talked about this three years ago.

25   It's taken us almost a year to do cases.  We're now down to

1   average 175 days, but 55 percent of our cases are being done

2   within six months, which is I think a remarkable improvement

3   from where we were even a year ago.  And a fairly good

4   majority of those cases are being done within 60, some of the

5   more moderate cases that we can rush through.  As you know, we

6   talked before about how we divided the squads up into minor

7   misconduct, major misconduct, or what we call serious

8   misconduct, and that has certainly helped us by staffing those

9   up, having cases go through quicker.

10          THE COURT:  So I think it's important for the

11   benefit of the public, and this is obviously the public

12   quarterly hearing, to tie these developments that we talk

13   about on a monthly basis into the larger objective that I was

14   talking about earlier of restoring the community's trust in

15   the police department.

16          One of the problems that we had was that people

17   would make complaints about an officer or some incident, and

18   it seemed like it just fell into a black hole and there was --

19   it's not so much that the police department didn't, you know,

20   come out with the right result or whatever.  Sometimes there

21   were complaints about that, but more often than not, it was

22   just there's no result, it just -- the matter just

23   disappeared.  There was no -- certainly not prompt

24   investigation or disposition of the complaint.  That erodes

25   public trust in the police department.

1          So, the progress that has been made in this regard,

2     while it's not yet where it ultimately needs to be, is very

3     substantial as compared to where things were before,

4     particularly on some of this more minor stuff and the fact

5     that you're able to move it through more quickly.

6          So, you know, the problem here the Court and the

7     parties make these sort of general statements at a hearing

8     like this, oh, there's been substantial progress.  I think

9     that sometimes we don't do a good enough job of correlating

10    exactly what that progress -- correlating that progress to the

11    global objective, taking it the last step, which is when a

12    process like this is perceived as responsive to the public, to

13    the complainant, that increases people's confidence in the

14    department, and its capacity to police itself.  So that's a

15    footnote, but it's an important one.

16         D.C. NADEAU:  So in addition to that footnote, Your

17    Honor, the fact that we, one, enhanced our IT capabilities in

18    the agency, which has certainly enhanced our IAPro abilities,

19    and we talked before how we wanted a new generation of that,

20    every complaint that comes in now, and this did not happen

21    three, four years ago, and so why we had those dark holes was

22    because today everything that comes in is electronically

23    captured, is electronically tracked.  Our commanders can go

24    through and see exactly who's touched a case, when they

25    touched it, what they did with it, et cetera.

1          We have those capabilities now, which allows us to

2     do exactly what you're talking about, is track and make sure

3     we lose nothing, make sure those cases are being done

4     effectively, promptly, and that not only do we interact with

5     the complainant, especially if it's the public, quickly, but

6     we send a response to them; right?  And there's communication

7     with the public now.

8          And we are hiring.  Under the state statute, we have

9     to hire an individual who that's their whole job, is going to

10    be that interactive-type position in our -- in PIB to have

11    those discussions to make sure that if anything is --

12    somebody's on vacation and can't get a hold of anybody,

13    instead of have them wait, we're going to have one person

14    who's going to be the center conduit for all of that.  That's

15    going to really help us in doing this tracking and making sure

16    that nobody feels like they are not being interacted with.

17         Now, going back to some of the complaints you had

18    talked about prior, I don't get those complaints now of, hey,

19    I filed a complaint and nobody ever called me.  I don't get

20    those.  Now, I may get some where they disagree with the

21    finding, but I don't get the complaints where they haven't

22    been reached out to.  So I think that's because we're tracking

23    it.

24         THE COURT:  Exactly.  And so from the perspective of

25    those who are closest to the process, and making the changes,

1    there's been a lot of progress made.  And as what -- and the

2    story that's told in this courtroom on a quarterly basis

3    reveals that there's been a lot of progress.

4         But we all have to be aware of the broader context

5    within which we're operating.  For years, if not decades, that

6    wasn't the public's experience with the internal affairs

7    function of the Baltimore Police Department.  It was an

8    experience of poor service, responses that either didn't

9    happen or weren't prompt, in addition to resolutions of

10   complaints that they might have also disagreed with.

11        When that has gone on for years and then you come in

12   with a major reform program, as has been implemented under

13   this Consent Decree over the course of the last three years

14   and changed things fundamentally and start to have very

15   different results, of course that's progress and that's a huge

16   development.  But out there in the broader population of this

17   city, you still have hundreds, if not thousands of people

18   whose experience with the police department over the last

19   decade or two, in the context of a complaint or a dispute, was

20   the old bad system.

21        It's going to take a long time to change the

22   fundamental perception.  I'm just using this as an example to

23   support the broader point that I was trying to make in my

24   opening comments, that loss of trust didn't happen overnight.

25   It took years for it to get as bad as it was.  And now you

1    make the sorts of changes that are unquestionably occurring in

2    the police department.  You're not going to reap the benefit

3    in terms of public trust until the reform has been in place

4    for a long time.

5         And the lesson for those of you who are not just

6    leading the reform effort, but then will be its custodians

7    after it's in place, is that you have to sustain it.  You have

8    to sustain it for months, years, et cetera, afterwards.  And

9    then slowly, but surely, the public's perception of the actual

10   responsiveness of PIB will change.  But that perception, that

11   change of perception is going to be the last thing.

12        D.C. NADEAU:  Yeah, I mean, I would agree, Your

13   Honor.  It's very hard to take back a negative.  And the

14   negative perception of the PIB bureau historically has been

15   challenging.  You know, when I talk to some of the community

16   members, they talk about things that happened in, you know,

17   '15, '10, '12, '5, you know, those are things that we can't

18   control.  All we can do as an organization is make sure it

19   doesn't happen in the future.

20        Those things have been changed in the three years

21   that we've been there.  We are in a much better place.  You

22   know, is it even hard sometimes to get, you know, community

23   leaders to realize this change, it is hard.  But as I think

24   with time, as people see it, we get less of the complaints

25   about the process, I think overall the community perception

1   will be different.  Just as the agency is changing as a whole,

2   it takes time.

3           And, you know, nobody thought this was going to be

4   an overnight process.  It's not an overnight process.  I think

5   you know, because we meet with you monthly, we go through

6   these things, I think DOJ knows, I think the Monitors know,

7   there's significant improvement in across the agency.  There's

8   really significant improvement in the PIB process, and for

9   that I'm happy for.  The commissioner has been very supportive

10  of helping us build that program, standing behind us to make

11  sure that we're getting the right people, the right

12  technology, the right processes in place.

13          And so we're moving in the right direction.  We've

14  come a lot -- listen, we would we like to be at a hundred

15  percent?  We would.  We're not at a hundred percent yet, but I

16  do see that we will get there as we continue to move down the

17  road.

18          If we could go to the next slide.  This next slide,

19  as you know, in July 1st, 2021, there was some changes.  This

20  is a flowchart that shows the changes required by Maryland

21  state law under HB 670, SB 763.  These changes mostly cover

22  police misconduct involving a member of the public.  We

23  created a flowchart for transparency purposes to not only show

24  our own members within the agency of how complaints would flow

25  but also to show the public.  And this took place, as I said,

1     on July 1st, and I would just like to walk you through so the

2     public can see how this actually flows.

3            There's four columns, and if we start on the far

4     left, that's the police accountability board.  That of course

5     is run by the city.  They can receive complaints.  The

6     department can also receive complaints.  But if the police

7     accountability board receives complaints, they then transmit

8     them to the police department within three days.  Additional

9     responsibilities of the police accountability board are to

10    have quarterly -- review quarterly disciplinary outcomes, have

11    a report to the mayor about trends, and make appointments to

12    the administrative charging committee and the trial board

13    under the statute.

14            The next column over is the police department, which

15    certainly is our responsibility.  We also can receive

16    complaints from the public, as we have been.  We send those

17    complaints -- if it's a police misconduct involving a member

18    of the public, we send those complaints to the PIB within two

19    weeks.  So they will have a heads up as to what types of

20    complaints are coming their way and what the volume is.  We

21    then investigate the complaint.  And upon completion of

22    investigation, we forward the entire investigative file and

23    the charging -- to the charge -- administrative charging

24    committee, which is set up by the police accountability board.

25            The third column is the administrative charging

1   committee.  So they receive a complaint, investigative file

2   from PIB.  They review the investigative file, and they

3   determine whether or not to charge the officer.  If they

4   determine the allegations are unfounded or exonerated, they

5   send it back with a written determination of that back to the

6   department, and we close the case and notify the complainant

7   and the officer.

8          If they decide to charge the officer, they also give

9   a written opinion detailing their findings, the

10  recommendations, and then using the charging document, they

11  determine, by using the statewide disciplinary matrix, what

12  the discipline should be.

13         I will say the disciplinary matrix is now a

14  statewide process.  There is one matrix for every law

15  enforcement agency in the state of Maryland.  That matrix was

16  done in collaboration with MPTC as the lead putting that

17  together.  There were a few agencies, including Baltimore,

18  that worked together on this matrix.  We've talked about this

19  matrix before.  It's a lot of collaboration that BPD had done

20  with the Monitors and DOJ to put one together.  That was sort

21  of a starting project on the statewide level.  We're very

22  happy with the matrix, and I think statewide it's going to be

23  a good process to know that regardless if you work in

24  Baltimore or Montgomery County or Bel Air PD, everybody uses

25  the same process.

1          Once the administrative charge committee determined

2    what the discipline should be, they send it back to the

3    agency.  We then can either raise the discipline or keep the

4    discipline the same.  Either way, it goes to the officer who

5    could either accept it, or they can elect to have a trial

6    board.  If they elect to have a trial board, the fourth column

7    shows the board.  The trial board will be set.  The trial

8    board consists of a -- either a current or a retired judge, an

9    equal rank person from the police department, and then one

10   person that's been assigned to the trial board as a civilian

11   by the PIB.  So it's a three-person board.  Their decision is

12   made, and then that trial board decision is either final or

13   within 30 days, if the member wants to appeal it to the

14   circuit court, they can appeal it to the circuit court.

15         THE COURT:  So, Mr. Conway, let me ask you a

16   question.  If one of these trial board decisions is appealed

17   to the circuit court, what is the issue, what's the standard,

18   is it generally just a question of procedural due process, is

19   there some deference that is owed, what is it, a de novo

20   review of what the trial board did?  I'm just curious what an

21   officer's circumstances really are procedurally once they

22   decide, at the end of this elaborate administrative process,

23   to take the issue to circuit court.

24         D.C. NADEAU:  So I can probably answer that, Your

25   Honor.  It's the same process that currently happens now.  And

1    Mr. Conway hasn't done any of these yet.  The process is you

2    could appeal saying the process was flawed, the timing was

3    flawed, evidence that was admitted to the trial was flawed, it

4    shouldn't have been admitted.  Or the agency didn't hit the

5    time lines along the way.  So let's say, for instance, we have

6    to -- we have to notify the member within 15 days, you know,

7    maybe it was -- it says 15 days, there was a discrepancy on

8    whether or not that was 15 business days, 15 working days, et

9    cetera, so you could do like a show cause for any of those

10   functions.

11          THE COURT:  Okay.  So all kinds of procedural issues

12   are subject to review at that stage.  But what about the

13   substance of the ruling, you know, that, hey, you know,

14   termination is just too harsh of a consequence for this

15   officer in this situation.

16          D.C. NADEAU:  Yeah, so as long as it's followed --

17   so you could argue that the trial board didn't follow the

18   disciplinary matrix, so that would be a procedural.  The Court

19   cannot reduce the penalty.  What the Court can do is either

20   vacate it or send it back for a redo.

21          THE COURT:  Okay.

22          D.C. NADEAU:  That's the same process that currently

23   happens now with trial boards.  We have very few cases that

24   get appealed.  If they get appealed, it's usually a

25   termination case where somebody will go and say that it's

1    outside the matrix.  A termination, they may argue that it was

2    a class E offense instead of a class F offense.  Most of

3    those -- because of the standard law from LEOBR, most of

4    those, you know, end up in our favor.  But we do anticipate,

5    because LEOBR and all of the case law has been removed now,

6    you know, there will be some challenges, and we'll see how

7    those go throughout the process.

8            But we're looking forward to the new process.  Of

9    course, you know, we're ahead of the game as an agency getting

10   things set up.  We're ready for it.  We've moved a person into

11   the position to be the liaison with the city to make sure that

12   flow of information back and forth from the BPD to the ACC is

13   done fluidly, that we get them back and then we can review

14   them and move them on to the officer in an expeditious point

15   so that we can keep this process going.

16           MR. SHEA:  Your Honor, there is some level of

17   deference to the administrative result.  We're checking the

18   exact level.  I don't know if it's arbitrary and capricious,

19   but it's not de novo.

20           THE COURT:  It's not a de novo review.  You don't

21   get to just retry the entire process by virtue of taking it to

22   circuit court.

23           MR. SHEA:  No.

24           THE COURT:  Okay.  Thank you.

25           D.C. NADEAU:  Okay.  Do you have any questions about

1     the process?

2              THE COURT:  No.  I complimented this chart in the

3     past, because I think it is helpful and useful.  The process,

4     I think is -- except for those who have been directly involved

5     in sorting all of this out between the department, the state,

6     and so forth, it's kind of confusing.

7              MR. SHEA:  It organizes chaos, Your Honor.

8              THE COURT:  Yeah.  So the chart is a very good tool.

9     And I'll tell you, I have actually pinned it up on the wall in

10    my office, because I have questions in my mind as I'm reading

11    submissions, and I need this tool to map it.

12             D.C. NADEAU:  Yeah.  So we think the flowchart is

13    easier for people to look at.  It's certainly actually --

14    because it's a change, right, so we who worked on it

15    understand it.  Those who don't work on it, you know, it's new

16    to them.  So the chart is sort of an easy flowchart for

17    people -- well, as easy as can be for people to follow.  And

18    if we need to tweak it along the way or if there are some

19    changes made in the next legislative session, we can easily do

20    that.

21             But we had many revisions of this going, and this

22    seems to be the easiest flowing one to show the process, you

23    know, for the defense attorneys as well who are learning the

24    process as well as their own attorneys that are learning the

25    process.  Of course the agency and then the city, that has to

1   take on this new role of PIB and ACC, they too need to learn

2   the process.  So it's -- this has sort of been the easiest one

3   we've seen so far.

4              THE COURT:  Thank you.

5              D.C. NADEAU:  Thank you, Your Honor.

6              MR. MELANCON:  So that concludes our presentation on

7   the integrity piece.  We'll defer to the Department of Justice

8   or the monitoring team if they have comments on those topics

9   regarding integrity.

10             THE COURT:  Ms. Porter.

11             MS. PORTER:  Thank you, Your Honor.  We don't have

12  very many comments, but we did want to say that we agree with

13  the statements that D.C. Nadeau made today with respect to PIB

14  and the improvements that have been made there over the past

15  several years.

16             We do believe that PIB is moving in the right

17  direction.  They're on the right path.  They received -- the

18  investigators there received great training in 2021 on how to

19  improve their interviewing and investigative skills, as D.C.

20  Nadeau stated.  They are now developing the training for PIB

21  detectives for this year, and that training should be

22  delivered by the end of the year.

23             And additionally, we know that the monitoring team

24  is conducting an interim review, just to make sure that the

25  changes in policy and the training that these detectives have

1    received is actually translating into better investigations

2    and better outcomes.  So we think that PIB is headed in the

3    right direction, and we hope that this progress with our

4    cooperation and input and also the monitoring team's

5    cooperation and input will continue.

6         THE COURT:  So what's going on with PIB is an

7    example of what I think is going on in general with respect to

8    the Consent Decree.  And accordingly, part of the

9    justification for why we have added assessment to the global

10   five, because increasingly the monitoring team and Court's

11   role with respect to PIB needs to shift away from the

12   provision of technical assistance.  They're obviously rolling,

13   well down the road, and now we need to be making that pivot

14   over to a comprehensive assessment of their performance

15   measured against the requirements imposed by the Consent

16   Decree, and then giving detailed feedback as to where that

17   performance is not yet up to the standard that the Decree

18   requires, all ultimately headed to that day when we will be

19   finding that the Public Integrity Bureau portion of this is in

20   substantial compliance and can shift that part of the Court's

21   work over to sort of a surveillance phase to ensure that the

22   reforms are locked in and then ultimately, the, you know,

23   release from Court supervision.  That's a quick synopsis of my

24   aspirations, you know, for the coming period.

25         MR. THOMPSON:  So may it please the Court, and in an

1    effort to avoid having to come up here more than once, I'd

2    like to generally just talk about the global four just a

3    little bit with your permission.

4             THE COURT:  Okay.

5             MR. THOMPSON:  Then I'll talk a little bit about

6    public integrity.

7             For the last four years, or four years plus, as the

8    Court has indicated, the monitoring team and DOJ have spent a

9    considerable amount of time providing technical assistance

10   and, where applicable to the city, in an effort to assist them

11   in achieving the foundational reforms that people have talked

12   about this morning.

13            And while that assistance continues to be provided,

14   Your Honor, as a result of this Court's directive well over a

15   year ago, the monitoring team has truly shifted more of its

16   efforts into assessing whether all of the hard work spent

17   developing policies, improving training, strengthening the

18   department's accountability functions, improving the

19   department's technology, and addressing staffing, those issues

20   or staffing issues, has that paid off.  Or, as the Court

21   recognized earlier this morning in its opening comments, are

22   there areas like staffing where significant challenges remain.

23   So the areas covered by the global four, along with all the

24   other areas within the Consent Decree, will, pursuant to the

25   Court's directive regarding assessments, be discussed in

1    upcoming monthly meetings and quarterly hearings.

2         So that said, let me address a little -- talk a

3    little bit about misconduct, officer misconduct, which is

4    integrity.  Now, as the parties and the Court and the

5    monitoring team have recognized from day one, a department

6    that cannot be trusted to police itself cannot be trusted to

7    fairly and impartially protect the public.  And the importance

8    of this area to the reform process is, to a degree, reflected

9    in the fact that it represents the largest portion of the

10   Consent Decree.

11        That said, and to update the Court and the public in

12   particular with regards to assessments in this area, the

13   monitoring team has, as Ms. Porter just recognized, has just

14   completed an interim review of 68 PIB cases, and these would

15   be investigations from 2021.  Now, this draft report, Your

16   Honor, was just completed last week, and it's really going

17   through a final review process.  And we expect the final

18   report to be filed by the end of this month.  And so I would

19   essentially ask everyone, including the Court and the public,

20   to stay tuned, because there will be some details and some

21   meat put on the bone that we're talking about this morning.

22        But let me just generally say this, in any event,

23   the review presented in this interim report was conducted

24   largely in response to the critical systems overhaul at PIB.

25   That overhaul included the development of a comprehensive PIB

1    internal operations and training manual.  It included the

2    establishment of governing policies for all aspects of PIB

3    operations.  And it included, perhaps most importantly, the

4    establishment of a five-day, in-class training program that

5    was delivered to all 68 PIB investigators between April 19th

6    through May the 5th of 2021 in two sessions.  And those

7    training modules covered such critical areas as intake and

8    classification, developing an investigation plan, conducting

9    investigations, just to name a few.

10           And I would point out, Your Honor, that at that

11    class, which I attended myself, there were agencies from

12    outside of the city of Baltimore, Baltimore County, you had

13    Howard County, you had Anne Arundel County also attending,

14    their folks were also attending that training session, which

15    to me suggest that folks are recognizing the importance of

16    that program and just how far along Baltimore City and BPD has

17    come.

18           Now, since the interim report is in draft form and

19    by definition is likely to see some revisions, I am a little

20    hesitant to go into any great detail at this time, and that's

21    why I asked the Court indulgence and the public's indulgence

22    to wait until the end of the month before you see the actual

23    details.  But that said, I am comfortable reporting to the

24    Court and the public that the monitoring team has seen

25    significant improvements from when we did our first interim

1       report back in 2018.  We are seeing a positive trend in the

2       overall quality of cases assessed.  And if that trend

3       continues, Your Honor, we would expect a positive review when

4       we conduct our full upcoming compliance review either the end

5       of this year or early next year.  So that's all I have to say

6       on that subject, Your Honor, unless you have some questions.

7               THE COURT:  No, I just feel like we have spent so

8       much time and attention with respect to integrity, and for

9       every good reason, because of the amount of attention that it

10      gets in the Consent Decree.  And I see the evidence that the

11      department has fully committed to this reform, and as has the

12      monitoring team.  The Department of Justice has been fully

13      engaged with it.  The record reflects that D.C. Nadeau has

14      been all in from the very start on this.

15              I am hopeful that this major area is going to be one

16      where we do substantially shift into an assessment function

17      and are going to, in the not too distant future, be able to

18      report to the community, to the public that, you know, this

19      work is largely accomplished, the reform work, and now we're

20      more into a phase of watching for sustainment.

21              Now, you know, I don't want to get too far ahead of

22      ourselves.  The bureau still doesn't have the staffing that it

23      truly requires.  In terms of their targets for time to

24      disposition, they're not there yet.  You know, I recognize

25      that the work is not yet complete.  But there does need to be,

1    you know, this kind of forward-looking thinking, looking over

2    the horizon to what comes next.  There's going to be a mainly

3    assessment function.

4            MR. THOMPSON:  And hopefully, Your Honor, the

5    interim report, that again, will come out the end of this

6    month or early September, will be a significant step in that

7    direction, but the full report coming at the end of the year

8    or early next year.  So, thank you.

9            MR. MELANCON:  Your Honor, we'll return to the topic

10   of the big five topics, and we'll go to staffing.

11           Previous slide, please.

12           THE COURT:  It's always interesting to watch lawyers

13   and professional presenters like yourself to figure out, you

14   know, where did they -- where in their presentation do they

15   plant the bad news.  Do they put it in the start, do they put

16   it in the middle someplace, do they wait until after lunch,

17   you know, et cetera.  But I assure you, Mr. Melancon, wherever

18   it is, I'm watching it like a hawk.

19           MR. MELANCON:  Understood, Your Honor.

20           THE COURT:  So if this is like, oh, we're going to

21   bury it after Nadeau's presentation because he usually does

22   pretty well, yeah, nice try, I'm on it.

23           MR. MELANCON:  Thank you, Your Honor.

24           THE COURT:  And kidding aside, as I said in my

25   remarks, I am deeply concerned about this.

1          MR. MELANCON:  As are we, Your Honor.  I want to

2     make sure that that's provided for the record, that our

3     emphasis on this, you know, is unwavering.  We have to get

4     this right.  Staffing recruitment and retention, as you said,

5     Your Honor, a national challenge, not just a local one.  And a

6     lot of the work we've done have, you know, been really focused

7     on the foundational policy working on this, our processes on

8     how we recruit, making sure that our standards are

9     unimpeachable to ensure that our processes in the academy are

10    with the utmost of integrity, to make sure that when members

11    are finishing their instruction, that they are, you know,

12    fully capable officers that we could be proud of in the

13    field.

14         Performance evaluations are also a part of this

15    section.  Those -- you know, that's in the training score on

16    this slide.  You'll notice that our slide deck, just going

17    back to that assessment emphasis, you know, we're putting our

18    scores front and center to show us where we are.  And we're on

19    track for many of these scores, but the ones for which we're

20    training, the performance evals, that's because we're

21    implementing them this year.  Next year we'll be able to use

22    the 2022 calendar year as the basis of assessment to ensure

23    that we are moving into on-track phase for that section.

24         You know, we've put into place promotional policies

25    that we are very proud of to ensure that there's fairness and

1    equity in how we evaluate members who want to move up in the

2    chain of command, and we've been making significant strides on

3    civilianization and developed an updated staffing plan model

4    that again incorporates the mayor and the police

5    commissioner's vision on how we can reimagine policing in

6    Baltimore.

7            On that, the staffing plan itself, we've updated our

8    long-term approach to how the department should be made up.

9    That submission has been made this past week for public

10   consumption and for the Court's review.  We've updated that

11   approach to now reflect the departmental requirement of 2,605

12   sworn members and 925 civilian members.  So it's 2605 and 925.

13   Previous requirement was 2,785 sworn and 750 civilian.  This

14   is all part of the changes that we are reflecting in our smart

15   policing initiatives, the strategic use of civilianization in

16   some of our investigative functions, and it makes certain that

17   we're trying to effectively deploy our sworn members

18   throughout the department.

19           Now, our current personnel count as of last week was

20   2,213 sworn members and about 522 civilian staff.  Again, that

21   challenge that we're facing is one of a national challenge of

22   members who are, you know, facing the waning interest in the

23   policing profession.  And so we have to do more to ensure that

24   we're building capacity in parallel means.  That's why we've

25   created the new classification for a civilian investigator to

1    offset the need for only relying on sworn members to perform

2    investigative functions.  We identified 163 such positions in

3    our new plan.  That's been updated.  And that's going to allow

4    the department to help better manage caseload requirements in

5    our detective and investigative units.

6           We received over 800 applications for those 35

7    positions that we just created.  It's a lot.  And we're going

8    through those.  We posted those in mid May, and I think it

9    shows an interest in coming to the Baltimore Police

10   Department, albeit in a different method or a different means.

11   So building capacity on a parallel front is something our HR

12   folks are, you know, spending a lot of time on making sure

13   we're prioritizing that effort.  Those interviews are being

14   conducted now for various positions throughout the department.

15   And there will be a robust training component that we will

16   also ensure that the investigators coming in have the skill

17   sets needed to be effective in our department.

18          As it relates to the monitoring team's assessment

19   and our development of our annual evaluation on recruitment,

20   staffing, and retention, the monitoring team has submitted the

21   first draft of their methodology for how they're going to be

22   assessing recruitment and retention methods, and we're

23   expecting that to be finalized by the end of this month.  And

24   we're also compiling information from across the agency to

25   draft our first annual report on recruitment and retention,

1    and that report will cover topics such as capital and

2    infrastructure improvements that are needed and have been

3    completed, results of HR exit interviews to understand why

4    people are leaving the department, and overall historical

5    hiring trends from across the department.  We expect to have

6    the first draft of that report in early September.

7          Of course we're also working to double down on our

8    digital marketing and recruitment efforts.  We're beginning to

9    see more people who are clicking, viewing, and listening to

10   all of our advertisements.  We're seeing market increases in

11   participation and click rates.  We're hoping that that's going

12   to translate into applications.  That's really the ultimate

13   goal.  And we've also added new messaging that's going to be

14   going out in the coming weeks related to our enhancements to

15   the FOP agreement, one in which we're now seeing starting pay

16   at $60,000, which is the highest starting pay for officers in

17   the state of Maryland.  That's going to be part of our

18   messaging to make sure that people know it.

19         But in addition, Your Honor, we're going to be

20   launching several new financial incentives, which you've

21   termed in the past, the macroeconomic problem.  We've heard

22   that loud and clear, and we're pleased to announce that the

23   mayor has approved us to proceed on a number of those

24   initiatives.

25         Now, early this morning, the commissioner pushed out

1    a video message for all of our members informing them of our

2    plan for hiring and retention incentives.  Not only does it

3    review all of the enhancements we have earned in the

4    bargaining sessions with the FOP, and we'll be working over

5    the next week to advertise these initiatives more fully, but

6    they are as follows:  These new initiatives include a $5,000

7    hiring bonus for all new police hires.  A $1,000 per month

8    housing allowance for 12 months for new officer hires that

9    live in the city of Baltimore or will move into the city of

10   Baltimore.  We'll be offering a $5,000 deferment for student

11   debt.  So if you have qualified student debt, you get another

12   $5,000.

13           And so when you combine those incentives, it's a

14   total of $22,000 that a member could be eligible for if they

15   live in the city, have student debt, and they join the agency.

16   And again, combining that with the highest rate pay of an

17   officer in the state of Maryland, you know, that is the big

18   piece of the puzzle for new members coming in.

19           But that's not all.  We're also significantly

20   increasing BPD's referral bonus program.  So this is because

21   we know that the best recruitment tool that we can rely on is

22   often our own people.  So we want to make sure that we are

23   activating that recruitment initiative within our own

24   personnel.  So for any member, civilian or sworn, who works

25   for BPD, we will offer them $5,000 for every qualified hire

1     that makes it into the door and finishes the academy.  If the

2     member, however, has more than 15 years of service, again,

3     with the recognition of retention and for folks who have more

4     tenure in the department, that bonus is $7500.

5              Again, this is paling in comparison what our

6     previous referral bonus was, which was only $1,000 for such

7     referral and 500 for every subsequent referral.  So we're

8     taking the cap off of that.  And we're able to fund all of

9     these efforts, again, through the initiative of the mayor and

10    through state grants that we have received for the current

11    fiscal year.  And that represents a significant investment of

12    our time and in our focus on this key effort.

13             And so we'll be talking about more of these efforts

14    over the coming weeks and months, and again, it'll be fully

15    engrained into our digital marketing strategy so that we can

16    be more competitive on the front end for our efforts.

17             THE COURT:  All right.  Well, I give the city

18    credit, because you've done the one thing that I have insisted

19    you had to do, which is to drill down into that microeconomic

20    equation.  And on the break, Mr. Melancon, I want to check and

21    confirm with my memory, you actually have a degree in

22    economics?

23             MR. MELANCON:  Yes, Your Honor.

24             THE COURT:  I was planning to use that against you

25    if you didn't have something like this to present this

morning.  So by the skin of your teeth, you -- but in all

seriousness, this is reality now, finally.  The marketing, the

people and so forth, those were nice presentations, and those

seemed like impressive things.  The sign in front of police

headquarters, et cetera, et cetera.  But this is a more

fundamental problem than that.  Sadly, the profession of

policing is regarded differently right now in the minds of the

target audience, and you have no alternative, nor do any other

big agencies that are facing this problem, but to alter the

fundamental economics of the equation, to increase the

incentive to come and do this work.

You've got to do a lot of other things.  You've got

to upgrade the working conditions, the cars, the computers,

the districts, et cetera, et cetera, but the fundamental, you

know, basics of the terms of employment have to be altered in

the face of the microeconomic facts of the case which are

right in front of all of us.  So I credit you and I credit the

city.  I know Mr. Shea and I have had a number of discussions

about this previously.  I appreciate that the mayor is seeing

this issue in the same way, and actually doing something now

of substance that if the laws of economics are -- haven't been

repealed, will affect this problem.

MR. MELANCON:  Yes, Your Honor.  And again, the

method by which we're doing this is a little different from

some of our other counterparts across the country who are

1      simply focusing on hiring bonuses.  In this program, we're

2      trying to incentivize people to live in the city, which we

3      know is the hiring goal for us.  We're also trying to

4      encourage members with education to join our department, hence

5      the deferral of student debt issue.  And then overall just

6      making sure that we're activating our own people.  This is as

7      much a retention program for us.  You have to be on the

8      department's payroll to receive these referral bonuses; right?

9      So you can't just refer somebody and then walk away.  You have

10     to be with the department and have that person matriculate

11     through the academy to get the full benefit that we're

12     offering.

13             So these are all pieces of the puzzle that we think

14     create a targeted strategy on how these funds will be spent,

15     and again, we have state funding that we are identifying for

16     this to do so in a way that helps us maintain our budgetary

17     structure for operations overall.

18             THE COURT:  All right.  When does this all go into

19     effect?

20             MR. MELANCON:  Immediately.  Immediately.  So we're

21     pushing out the policies to activate it, but we made the

22     announcement today.  The commissioner will be, you know,

23     available for media later on to speak to it more broadly, but

24     you heard it here first.

25             THE COURT:  Well, excellent.  There's a harsh fact

1    that needs to be confronted here.  My understanding is that

2    since January 1, the negative delta is over 100.  And to put

3    this in more plain terms, we have 100 fewer sworn officers in

4    the department today, on the 18th of August, than we had on

5    the 1st of January.  And probably the -- is the number higher

6    than 100?

7              MR. MELANCON:  As of last week, it was 114 net loss

8    to the agency.  We hired 57 and lost 171 sworn members.

9              THE COURT:  So, you know, that is a very bad

10   statistic, and it warrants a very serious response.  I will

11   concede, I believe I have heard a serious response.

12             MR. MELANCON:  Thank you, Your Honor.  And that

13   concludes our presentation on staffing at this moment.  If

14   there's any comments from the Department of Justice or the

15   monitoring team, we're deferring.

16             THE COURT:  And keep those monthly reports coming,

17   because now I'm going to follow this with rapt attention.

18             MR. MELANCON:  Yes, Your Honor.

19             THE COURT:  If it wasn't before, whatever -- that's

20   what it was before, so the next level up from that.

21             Mr. Mygatt?

22             MR. MYGATT:  Thank you, Your Honor.  The department,

23   we have brief remarks on staffing.

24             The department recognizes BPD's efforts to meet its

25   staffing challenges over the last quarter, including by

1    developing and submitting the 2022 update to their staffing

2    plan.  And going forward, we encourage BPD to continue to make

3    every effort to alleviate the staffing shortages to fully meet

4    the requirements of the Consent Decree staffing provisions,

5    which will in turn facilitate the successful implementation of

6    other Consent Decree initiatives.

7         The department remains committed to supporting BPD

8    on these issues, including by continuing to work with BPD and

9    the monitoring team in the compliance review of BPD's hiring

10   and retention practices over the coming months.  There are no

11   easy solutions to these intractable issues, seemingly

12   intractable issues.  Continuing efforts -- but continuing

13   efforts to improve recruitment and retention practices,

14   reducing officer workloads, and civilianizing certain

15   positions remain key components of a strategic response to

16   these ongoing staffing challenges.  Thank you, Your Honor.

17        THE COURT:  I continue to hold the view that the

18   Department of Justice has a leadership responsibility with

19   respect to this national crisis of law enforcement and

20   corrections staffing.  Mr. Mygatt has assured me in the past

21   that -- that the issue is front and center with the

22   responsible sort of bureaus in the Department of Justice.  I

23   hope that that's true, because despite this very interesting

24   and helpful news that we've just heard from the city this

25   morning, this is a really serious, serious issue.  To the

1    extent that the Department of Justice is serious, and I know

2    they are, about the police reform issue in this country, this,

3    more than any other issue at this point in time, is going to

4    be what stops you.

5             MR. MYGATT:  We recognize that, Your Honor, and

6    there is a lot of attention being put on it.  I don't want to

7    bore you with things I've already told you before, but it

8    certainly is front and center for us.

9             MR. THOMPSON:  Ms. Joyce has a few comments, Your

10   Honor.

11            THE COURT:  Ms. Joyce.

12            MS. JOYCE:  Your Honor, just a very few comments on

13   this.  Totally in agreement that the efforts by the Baltimore

14   Police Department in the three areas that the monitoring team

15   has talked to the Court about in regards to staffing, that

16   being reducing workload, increasing civilianization, and

17   incentives both for hiring and retention.  And the retention

18   part also reflects and builds on the officer's safety and

19   wellness program that the department has put in place, and it

20   seems to be growing acceptance in use by the members.

21            However, I also have to say that a year ago, for

22   example, the department presented several initiatives to

23   reduce workload.  And as of now, they're still in the process

24   of implementing.  Implementation is what's going to determine

25   the effectiveness and hopefully the reality of reducing

1    workload for sworn members and adding sworn members.

2              THE COURT:  How you reduce workload, though, in a

3    climate where you're -- every month you're losing more and

4    more officers?

5              MS. JOYCE:  Exactly.

6              THE COURT:  It seems like it's almost an impossible

7    challenge.

8              MS. JOYCE:  Right, and it is.  I understand that

9    totally.  And unfortunately, I think the short-term solution

10   is increasing callbacks.  And then you get back into the

11   situation where the department was three, four years ago, with

12   mandatory overtime that nobody wants to go to.

13             But short of that, I don't know of any other

14   immediate answer to that question.  And so by reducing

15   workload, and by that I mean we identified a series of calls

16   for service that they believe could be offloaded by either

17   other responders, private contractors, for example, or reduced

18   in terms of, you know, maybe not responding to in the same way

19   you responded to in the past.

20             These are going to be -- these are minimal, these

21   are on the margin reductions and they help.  But you've got to

22   implement them, you've got to realize them.  So I really would

23   encourage the department not only to start reporting on

24   staffing numbers, but also on what's the status of these

25   changes as they move on, because it -- you know, it is

1   reflected in -- it was reflected in the '21 staffing plan.

2   It's reflected in the 2022 staffing plan.

3        And the same with civilianization.  It's, you know,

4   really good to hear that the number of applicants that came

5   forward for a small number of positions, and that's excellent.

6   Bringing them on board is, of course, the first step, but

7   having been a civilian in three major police departments with

8   the blessing of a godfather, being a civilian in a police

9   department is not easy.  It's very hard.  And it's not just

10  training.  But it's also a continual support of the civilian

11  employees in the department and being willing to provide that

12  support, almost on a daily basis as they begin to learn and

13  adapt to the culture of policing.

14       So I would encourage, again, the police department

15  to report not just on how many applications and how many

16  hired, but how many are they retaining.  Right now they are

17  far below their civilian head count number, and they have been

18  for several years.

19       So these are still all very real challenges that I'm

20  sure the department is up to, and they have illustrated that

21  they understand the challenges and approach this in a very

22  rational and strategic way.  As always, a plan is only as good

23  as it's implemented, and that's where they're at today.

24       THE COURT:  So I'm persuaded, Ms. Joyce, as I

25  frequently am by you, and I'll say right now, I'll task you

1   and Mr. Thompson with the responsibility of crafting an

2   instrument that we will, in consultation with the department,

3   but that will require them to use on a monthly basis so that

4   we aren't just getting the raw number that we're getting

5   pursuant to the order that I entered two years ago, but are

6   getting an order that he helps us and them see how they're

7   doing by this critical metric.

8           I'm very encouraged by the reaction this morning and

9   the announcement that Mr. Melancon just made, and it really

10  has taken the wind out of my sails in terms of where I was

11  planning to go with this issue.  And they aer smart to have

12  anticipated it and have gotten this time.  The problem,

13  though, remains.  This is very hopeful and helpful, but I

14  think your point is we've got to see progress.

15          MS. JOYCE:  Yes.

16          THE COURT:  We've got to see progress.  So if you

17  would, in consultation obviously with the Monitor, but then

18  with the department and the Department of Justice, some kind

19  of a user-friendly instrument that doesn't consume massive

20  amounts of time to complete, but nonetheless is something that

21  can augment what we're already getting in the monthly report

22  to show the relevant progress on the implementation of the

23  mitigation measures that have already been designed.

24          MS. JOYCE:  I will do that, sir.

25          THE COURT:  All right.

1          Okay.  Where are we Mr. Melancon, technology?

2          MR. MELANCON:  Yes, Your Honor.  We're moving to the

3    next topic in the big five, technology.  So we're on track

4    when it comes to where we are, and we're working on our next

5    steps to be able to demonstrate compliance overall, the

6    modernization of our technology, and it starts with our

7    records management system and our early intervention system,

8    two key components.

9          From records management, as an update, we continue

10   to work with Axon, the vendor who is working on our case

11   management component.  So we've completed, of course, the

12   field interviews.  Those have been online for a little over a

13   year.  And we're moving into case management.  The

14   requirements for case management are significant and have

15   different layers on layers of depending -- different units and

16   their requirements.  We're trying to make sure we're getting a

17   handle on all of those requirements effectively and correctly.

18         And Axon does need additional time to help configure

19   our solutions.  So we're looking actually at a best estimate

20   that's been pushed out some, but the pilot version of what

21   we're looking at with case management is anticipated for the

22   second quarter of next year, 2023.

23         So originally that had been planned for the end of

24   this calendar year, but given requirements, given what we're

25   looking at, given the development resources that Axon is

1    having to reconfigure its plan for that, and so we'll keep you

2    dated, Your Honor, on that process.  We are going to put our

3    best resources available into that effort to make sure that

4    we're getting a full picture and working on that goal for the

5    second quarter of next year.

6             The mobile fuel base reporting, I'm happy to report

7    is being piloted right now in the Southern District.  This is

8    the -- being able to do your reports over the cell phone.

9    This has the potential to be a game changer, because you can,

10   you know, dictate over your phone the writing of your report,

11   which has the potential to be a huge, you know, reduction in

12   workload and burden on our officers, in cutting down their

13   time that they're writing their reports overall.

14            So we're seeing some positive review from that.

15   We'll have a full readout on it later next month to be able to

16   tell us kind of how it's going before we can work towards a

17   full deployment.  Of course, Your Honor, we have cell phones

18   issued to every member of the department, so this creates that

19   capability that would be pushed out to all members

20   simultaneously once we're ready to go.

21            THE COURT:  From my personal observations on

22   ride-alongs, one of the things that I have seen and been a

23   little frustrated by is that as the technology has rolled out,

24   I have sensed that the department still hasn't shifted

25   cultures in terms of how it actually writes reports.  And you

 1    ride along with the officers, it doesn't matter what district

 2    you're in so forth, the drill is basically the same.  About an

 3    hour or 90 minutes before the end of the shift, the sergeants

 4    are rolling back in to sort of oversee and start to work the

 5    report dimension of the shift.  It's not -- it just -- it's

 6    the old way of doing police work.  It's not writing reports in

 7    real time, which I had always thought was so much of the

 8    objective of putting computers in the cars, issuing cell

 9    phones, and so forth.

10            It's not, I would imagine, just about making it a

11    more sort of efficient way to write reports, but also

12    potentially a more accurate way to write reports, because it's

13    happening right now at this particular incident.  I've watched

14    sergeants sit there at the end of the shift and say, okay, now

15    let's see, what were we doing back at 6:00 o'clock and then at

16    7:00 o'clock, and got all these sort of things sort of

17    accumulated.

18            So all for it.  But once again, it's another one of

19    these sort of implementation issues, well designed, well

20    conceived, best thinking has gone into it.  Let's see it

21    happen.

22            MR. MELANCON:  And again, part of the feedback

23    process is not just from the officers, but the supervisors who

24    are using the tool as well in the Southern District, so we're

25    trying to get that picture as well to help make sure we're

1    creating the right cadence of, you know, entering into a call,

2    managing that call, and then spending time after that call

3    being able to generate at least some portion of the report in

4    real time.  So that's part of that process and making it

5    easier for them to do just that.

6           We also continue to provide biweekly bulletins to

7    officers that outline, you know, tips and guidance on how the

8    RMS system is used and any updates to the system we make as we

9    go forward.  This will make sure that we're improving our

10   accuracy and efficiency of their incident reporting.  We've

11   seen the number of reports kicked back go down, and that's

12   something we're encouraged by.  But that's something that's

13   still a number that's still too high for us.  We want to make

14   sure we're tracking that well without -- making the process

15   streamlined to be able to get those reviews done, even the

16   kickbacks done in an orderly and timely way.

17          We've also acquired a data warehouse product.  This

18   allows BPD to better manage Axon record data and other data

19   throughout the agency.  This is a key foundational component

20   that was needed.  There were some issues trying to make sure

21   we were getting it through procurement.  We've gotten it

22   through procurement now, and we're preparing and beginning

23   installation and configuration of that software.  That's

24   vital, because we need to be able to have a place that's not,

25   you know, using old, old technology, and that data warehouse,

1    that modernized effort will help us with analysis of data for

2    the Monitors' benefit and the assessment phase and that sort

3    of key component for us to go forward.

4         And then finally, we're looking at, on the RMS side,

5    you know, making sure that we are working with our Monitors to

6    collect additional data fields in Axon records.  These updates

7    are going to provide those new input fields, more detailed

8    information about stops and searches.  And those requirements

9    have been defined, and file requirements for all of those have

10   been, you know, set up for approval.  We've tested it in July.

11   We're expecting full implementation by the end of this month,

12   to include those fields in our whole product.  So that's a key

13   thing for the assessment phase to make sure they have the data

14   they need in how these stops and searches are categorized.

15        So those are the pieces of the RMS puzzle.  I'll

16   move into the early intervention system, which we have

17   completed our statement of work.  And again, very complicated

18   system, has a lot of different components.  We've spent a lot

19   of time, you know, working through our system requirements on

20   that, but our statement of work is that foundational piece of

21   the puzzle for our procurement next steps that has been

22   submitted to the procurement office.  So we're looking to have

23   a request for proposals bidding process up and running in the

24   coming months for that.

25             THE COURT:  And there just aren't too many

1   off-the-shelf options for that?  I mean, are we really that

2   cutting edge in terms of what's going on in the country that

3   it's got to be completely invented here?

4           MR. MELANCON:  Not that it's invented, Your Honor,

5   and there are solutions that can be readily copied, if you

6   will, but the nature of an early intervention system is that

7   it connects to all your other systems.  And every police

8   department has a different set of systems to be able to

9   connect to things.  And so the solution is naturally going to

10  be tailored to whatever law enforcement agency you're talking

11  about.  But the whole point of making sure that you're going

12  to get the Baltimore specific way is to adhere to our

13  requirements, making sure that we can connect to our systems

14  the right and effective way.  And what you're looking for in a

15  vendor is the capability to connect those systems together in

16  a meaningful platform that can be used.

17          So that's part of what's sought after.  There really

18  isn't an off-the-shelf solution that's going to fit into every

19  plug and place, you know, variation of our disciplinary

20  system, our HR system, our records system and the like.

21          And then finally, in that EIS scope, the early

22  intervention scope, we are going to have the supervisor

23  feedback log function there.  That's key because, you know, as

24  you mentioned before, Your Honor, when you're talking about

25  reports, waiting until the end of your shift, often

1    supervisors are waiting until the end of the year trying to

2    think of all the different things that we need to articulate

3    in our performance evaluations.  Supervisor feedback is logged

4    as part of the early intervention can be a component that's

5    used to help enhance those performance evals so that when the

6    information is available in the log, you know, in pseudo real

7    time, it makes for a much more seamless process for our

8    supervisors to manage their evaluation process.

9            So that's the pieces that we have for updates on

10   technology at this time, Your Honor.  If there's no questions,

11   we'll defer to the Department of Justice or the monitoring

12   team.

13           THE COURT:  So before we do technology, D.C. Gillis,

14   makes me think about computers, which makes me think about

15   cars.  What's the fleet report?

16           D.C. GILLIS:  Thank you, Your Honor.  Your Honor,

17   James Gillis on behalf of the police department.  The report

18   is that all 80 vehicles from the FY '21 order have been

19   delivered to Baltimore.  53 as of today are operational,

20   meaning THAT they're out in the field being utilized, and

21   there are 15 more that should be operationalized in the next

22   two weeks.  So that is getting us up there.

23           The FY '22 order was placed almost exactly a year

24   ago, August 25th, I believe, of last year, and ten of those

25   vehicles are finally in production.  Although we have not

1      received any, and of course that's 10 of 80.

2              And then the FY '23 vehicle order, which is 90-plus,

3      has not been placed yet, but is pending an order very soon by

4      the Department of General Services.

5              THE COURT:  Okay.  The 53 that are actually rolling,

6      the computers are installed, they're functioning hopefully as

7      intended, as designed?

8              D.C. GILLIS:  Yes.  Yes, Your Honor.  And of the 53,

9      I would say that it's really 51 that are actually rolling,

10     because two of them have been involved in pretty serious

11     accidents, so they have been downed.

12             THE COURT:  Okay.

13             D.C. GILLIS:  But to answer your question, Your

14     Honor, they are fully equipped with the suite of technology,

15     the new cars, including a lot of NP and LPR capabilities as

16     well.

17             THE COURT:  So what's the feedback, you know, in

18     terms of recruitment, morale, those kinds of issues.  This is

19     the patrol officer's office.  This is an important part of the

20     strategy in terms of sort of upgrading the tools that we put

21     in the hands of the officers.  What's the feedback?

22             D.C. GILLIS:  The feedback has been very positive.

23     There were a couple bumps in the very beginning, as Your Honor

24     is aware of.  Those were overcome.  Those had to do with a

25     particular vendor updating the technology.  But generally, the

Christine T. Asif, RPR, FCRR, Federal Official Court Reporter

1    feedback has been extremely positive.  In fact, it is one of

2    the things in my time in the police department that people

3    have actually -- there's been a buzz about it within the

4    agency.  And people are excited to get these new cars.

5    They're excited to see them driving around.  I think that it's

6    also a positive for the community, quite frankly, as there was

7    community collaboration and engagement in the creation of

8    these new cars, meaning what they look like essentially going

9    out there.

10          And so the total package is something that has had a

11   positive effect on how people feel about where they work and

12   the working environment.  So recruitment and retention and

13   these vehicles and the technology that is in them, and how

14   they connect to the command centers and the different forms of

15   operational technology, we are showcasing all of that in our

16   recruitment efforts in the marketing campaign because of how

17   awesome it is really.

18          THE COURT:  Thank you.

19          D.C. GILLIS:  Yes, Your Honor.

20          THE COURT:  Mr. Melancon, you were finished

21   otherwise on tech?

22          MR. MELANCON:  Yes, Your Honor.

23          THE COURT:  Mr. Mygatt.

24          MR. MYGATT:  I just want to add one really quick

25   thing on this, and I don't -- you guys don't have anything on

1    this.  So I just wanted to circle back to the point that D.C.

2    Melancon was making about off-the-shelf EIS systems, because I

3    completely agree with what D.C. Melancon said there.  I think

4    there is some real dangers in adopting an off-the-shelf

5    system.  In our experience, they don't include all of the

6    relevant data points for the agency to be able to consider

7    in -- especially because they're trying to just use a very

8    standardized set of data points instead of adapting to what's

9    available at the agency itself.

10         And so if you have one of those standardized

11   systems, then the vendors tend to charge you or charge the

12   agency an arm and a leg to add any new data point to that

13   system.  They take a long time to be able to add that data

14   point, and the agency's not able to be flexible and adaptable

15   to their own systems to make sure that they're gathering

16   information that helps them supervise their officers

17   effectively and make sure that they're really helping their

18   officers avoid getting into situations that may be

19   problematic.  Really, ultimately, sometimes they can just miss

20   these key data points that hurt agency functionality.  They

21   create liability for the agency in the long run.

22         So we were actually really purposeful here in the

23   Consent Decree to try and create a set of provisions that are

24   flexible and require flexibility out of the EIS designer so

25   that it can continually be able to be adapted to new data

1   points that come online for the agency over time.  And we
2   wanted to be purposeful about that because we understood that
3   a lot of EIS designers were looking at our Consent Decrees and
4   then designing them to a certain set of factors that were
5   included there, and we decided to go away from that on purpose
6   to make it a flexible approach so that it's actually something
7   that works for the agencies in the long run.

8           So I just want to echo what D.C. Melancon was saying
9   and say that that's why it's going to take a little longer,
10   but I think it's going to be much better in the long run for
11   the agency overall.  Sometimes agencies have adapted an
12   off-the-shelf stopgap, but that's if you -- it can only be a
13   stopgap if it can't be the final solution.

14           THE COURT:  Okay.  I understand.  We've been talking
15   about EIS for a long time, and this is a -- this picture that
16   you've just painted has a lot of structure to it, it has a
17   logical sequence, I accept all that.  Big picture, though, on
18   tech issues and on this one in particular, we've been at this
19   a long time.

20           MR. MELANCON:  Yes, Your Honor.  And I think it's
21   getting those foundational systems in place first, like the
22   RMS, like our learning management system, getting the IAPro
23   upgrades that needed to happen to get us there.  Those
24   foundational things have been completed.  Now we're at that
25   phase where we're moving forward.

1          THE COURT:  But they were delay-prone as well.

2          MR. MELANCON:  We had to make sure we got them

3    right, yes, Your Honor, absolutely.

4          THE COURT:  I understand, but this is the cumulative

5    consequence of delays in -- you know, the RMS, how long did

6    that take us?  All right.

7          Monitors on technology?

8          MR. THOMPSON:  Monitoring team will reserve, Your

9    Honor, until we discuss assessments, and the "we" would be

10   Mr. Rosenthal.

11         THE COURT:  Okay.  All right.  He's keeping his

12   powder dry.  All right.  What's next?

13         MR. MELANCON:  We'll do the next slide for training.

14   On that topic, we've continued to make progress.  We're on

15   track for, you know, being able to demonstrate initial

16   compliance in that area.

17         You know, the first thing I want to acknowledge is

18   what Ms. Joyce has said in the past, you know, we need to move

19   on civilianization for when it comes to E&T positions,

20   education and training, our academy, those positions, there's

21   a staffing plan that allows for including more civilians to

22   help with their professional expertise.  And the supervisor

23   positions, for instance, over the legal education unit, we've

24   had a sworn sergeant there before.  We moved that person.  We

25   replaced that with a civilian component, and we're trying to

1    fill that position -- that position was filled in December of
2    last year.  A training records admin position, which was
3    previously held by an officer, that's -- you know, a position
4    has been identified for that as well for our records and
5    compliance unit.
6           And we're working with HR to make sure that we're
7    getting all of our positions filled and creating new positions
8    to be able to build the capacity we need.  And we're working
9    with operations as well to make sure that we're backfilling
10   sworn positions that are also a big component of the academy.
11   We're losing people not just to attrition but to promotions
12   and to other special assignment opportunities like our -- for
13   instance, the Public Integrity Bureau.  And so ultimately --
14           THE COURT:  Answer this question.
15           MR. MELANCON:  Ultimately it's something we're
16   working on.
17           THE COURT:  How do the rules work -- let's suppose
18   we have somebody works for the Baltimore Police Department in
19   a sworn position for 25 years and then they retire and they
20   begin to collect a pension.
21           MR. MELANCON:  Yes, Your Honor.
22           THE COURT:  And then they are interested in
23   rejoining the department as a civilian instructor at the
24   police academy.  What happens to their pay package, their
25   pension, et cetera, and is there any room to maneuver in there

1    to somehow increase incentives to attract top people to those

2    kinds of roles?

3         MR. MELANCON:  So the nature of our employment

4    status with that member, so if that member comes back as a

5    contractor, they're able to retain their pension, retiree

6    benefits and the like.  However, if they were to join the

7    agency as a civilian member, those pension benefits are

8    halted, and their, you know, active status of employment

9    reverts to their civilian pay.  And in the event that their

10   pension exceeds what their normal pay would be as a civilian,

11   they would get the difference, but only the difference.

12        So it is not unfortunately financially advisable for

13   a member to come back in that status, unless it's as a

14   contractor, and the pay is capped because of that difference.

15   Basically you could only earn as a contractor what you would

16   have made if you combined your pension pay plus your

17   contractor pay together.  So you're not going to make more

18   than -- let's say it was a hundred thousand dollars when you

19   were leaving as a sworn member.  If your pension is 60 grand,

20   we can only pay you 40 as a contractor because but for your

21   leaving, you would have same the same amount.  So those rules

22   are currently city rules that we have to explore.

23        THE COURT:  We do have to -- you do have to explore

24   that.  It seems to me that's one of the frontiers that needs

25   to be looked at in the face of the staffing crisis.  You have

1   made a presentation with respect to the incentives earlier

2   today.  That seemed like a very steep hill to climb; you found

3   a way to get up that hill.  It just strikes me that this is

4   another area, and all of a sudden somebody's looking at the

5   situation, they can retain their $60,000 pension and be paid

6   $75,000 a year to be a contract instructor at the police

7   academy, and there's somebody who's otherwise held in high

8   regard at 25 years of solid experience and are well positioned

9   to deliver that content.  Got to somehow get there.

10          MR. MELANCON:  I'm leaning over to Ebony right now.

11  We're going to get together after this to explore a time we

12  can explore what that looks like.

13          THE COURT:  Thank you.

14          MR. MELANCON:  Again, so just turning to other

15  training issues, outdoor, indoor range facilities.  The

16  outdoor range facility is now scheduled for replacement.

17  We're looking at an eight-month project on that.  Turnaround

18  time for about March or so of next year, to completely replace

19  the Gun Powder range facility's buildings.

20          THE COURT:  They're going to build temporary

21  buildings out there?

22          MR. MELANCON:  Correct.  Yes, Your Honor.

23          THE COURT:  Are you going to build new temporary

24  buildings, or are you going to build real buildings?

25          MR. MELANCON:  Again, it's not our property, so we

1    have to build another temporary facility, but we think the
2    useful life of those buildings will be much greater.  But we
3    are also still looking long-term at a solution for our indoor
4    and outdoor range facilities.  You're familiar with the
5    Northeastern's facilities.  We're looking at a planning effort
6    with Coppin State right now on a potential green site for
7    which we would build a permanent police academy, and looking
8    at exploring the feasibility of putting indoor range
9    facilities in the basement of that facility or some kind.

10            So it's a feasibility assessment that's being done
11   right now, and it's through the state.  It's part of the
12   longer term approach to how we, you know, house our training
13   capacity.  But those are the updates, you know, that we wanted
14   to make sure were -- Your Honor was made aware of, because
15   that is a huge piece of the puzzle.  Everybody's going through
16   those every, you know, every year, and it's an important
17   component to retention as much as anything else.

18            THE COURT:  Well, I'll leave that alone for this
19   month or this quarter, but don't interpret that as a lack of
20   intense and continuing interest in the issue.

21            MR. MELANCON:  Yes, Your Honor.  And so we're also
22   looking to improve our ability to produce a consistent
23   curriculum development.  Education and training follows the
24   same curriculum development process that's established by the
25   Monitors and the DOJ, and we're in the early stages of

1    developing an advanced instructor course, that will help build

2    upon our basic instructor course.  And that advanced

3    instructor course is going to give our instructors the skills

4    they need to effectively evaluate and conduct training and be

5    able to compose lesson plans and design training objectives in

6    a thorough manner.  So that's a big piece of the puzzle that

7    right now we rely on other folks to be able to do MPTC and the

8    like.  Having that capacity internally is important for our

9    long-term sustainability of training efforts.

10        We're also working on our instructor selection

11   methods, making sure that we're posting our opportunities for

12   vacancies and soliciting for members, high-quality members to

13   be trainers and permanent members of E&T overall.  We will

14   review the eligibility according to defined criteria.  We're

15   interviewing eligible candidates, and we document the process

16   to make sure that everybody's following it and not just making

17   selections based on who they know but the quality of the

18   applicant that is before us.  We'll make sure that's

19   competitive, that's done with equity in mind.  Our equity

20   officer is involved with ensuring our standards are in place

21   on that.  So those are key components there to report out.

22        And then finally, we need to fully implement our

23   learning management system, and this is -- by the end of this

24   year, we'll have fully implemented the Acadis system.  This is

25   what we use to document all of our training and, you know,

1     records and some of the tests and courses that are done, now

2     are done through the Acadis system.  The technology adds

3     efficiency and functionality to how we deliver courses, how we

4     manage course materials, how we schedule courses, testing

5     compliance, recordkeeping.  And we're piloting a daily

6     observation reporting process in the system with some of our

7     field training officers.

8            So right now field trainers are using essentially

9     paper forms and paper documentation to assess, you know, the

10    academy graduates that they're paired up with, but we're going

11    to start doing that in Acadis long-term and have a system of

12    record for that.  We're doing that now with academy class 2105

13    and 2201, that were recently graduated, and we anticipate

14    being able to launch that whole process for all of our field

15    training officers when class 2202 starts field training in

16    October.

17           And so just as other updates for training, I would

18    say for continuing Ed, behavioral health and youth

19    interactions training was just completed.  Our general

20    supervisor training is now ongoing.  Defensive tactics and CPR

21    are underway.  And the monitoring team and BPD and DOJ are

22    currently working on draft curriculum for the community

23    policing training and the misconduct and ethics training, as

24    well as training for sex offense detectives.

25           So that's our kind of in-service continuing Ed side.

1    And then updates on entry level, we graduated a class in June

2    with 29 members.  We graduated a class last week with 22

3    members.  Right now we have class 2202, which is -- started in

4    March and will finish out in October.  There are currently 17

5    members in that class.  And 2203, which started in May, and

6    will finish out in December, is 24 members, but four of whom

7    are school officer employees and 20 of whom are our employees.

8    So if there are other training questions, Your Honor, let us

9    know.  If not, that's BPD's presentation on training.

10             THE COURT:  Thank you.

11             MR. MELANCON:  Oh, the commissioner just reminded

12   me, we started a class just last Monday as well.  I'll get you

13   the number of what that is -- 22 members?  Yeah, 22 members

14   just started this past Monday as well.

15             THE COURT:  Okay.  Ms. Porter.

16        MS. PORTER:  Thank you, Your Honor.  Not very much to

17   add.  E&T has been updating us on most of the initiatives that

18   the deputy commissioner mentioned today.

19             One of the things that we and the monitoring team

20   have really been working with E&T on are the instructor

21   selection methods, and we want to make sure that whoever is

22   the instructor for these training classes, whoever is teaching

23   these training classes is the right person for the job.  And

24   we also wanted to make sure that the process was fair and

25   transparent, and so everyone knows, you know, if I want to

1   become an E&T facilitator or instructor, what the process is.

2   So we have been working very well with BPD and also the

3   monitoring team on that draft and providing comments, and E&T

4   has been very receptive to our feedback.  So we're hoping to

5   have that particular document finalized very soon.

6           THE COURT:  I think one of the hallmarks of this

7   commissioner's administration of the department has been a

8   professionalization of the HR process, particularly at the

9   command level.  I know that that has been a tiptop priority

10  and has successfully addressed what was otherwise historically

11  a real problem area in this department.  So I would be

12  surprised if that philosophy that influenced how that was

13  restructured didn't carry over into this critical area so that

14  we are using the right criteria and the right processes with

15  lots of transparency in the selection of the people who are

16  going to be providing, you know, this training.  That's my

17  assumption based on the experience.

18          All right.  Mr. Thompson, on training.

19          MR. THOMPSON:  We join with DOJ on their comments,

20  and we have nothing further to add.

21          THE COURT:  Okay.  All right.  Mr. Melancon, does

22  that bring us to the end of the global four, global five for

23  today?

24          MR. MELANCON:  It does, Your Honor.

25          THE COURT:  Okay.  So I think this is an appropriate

 1   point to take our lunch break before we come back on the

 2   specific subjects of -- from the last quarter, which is the

 3   work that still needs to be accomplished today before we

 4   complete this hearing.  So it's 1:10.  Let's be back at 2:10

 5   after the lunch break.  We're in recess till then.

 6              (A recess was taken.)

 7              THE COURT:  Okay.  Mr. Shea, Mr. Melancon, I assume

 8   that we're going to move into our monthly topics?

 9              MR. MELANCON:  Yes, Your Honor.  Our next topic for

10   community policing, Deputy Commissioner Sheree Briscoe will

11   present for the department.

12              THE COURT:  Good afternoon, D.C. Briscoe.

13              D.C. BRISCOE:  Good afternoon, Judge.  Your Honor,

14   it is a pleasure to be before you and this body today.  As you

15   know, sir, we will discuss our progress that we've made in

16   respect to community policing which received a score of 4C for

17   implementation, on track in the monitoring team's seventh

18   semiannual report.

19              As we've done with previous topics of discussion, we

20   start by reviewing where we were prior to the Consent Decree

21   and where we are now.  The overall theme of policy work,

22   training, development, and data implementation is no different

23   for community policing than it has been for other areas of the

24   Decree.

25              Regarding policy, we made several changes to three

1    policies to ensure the following:  Constitutional enforcement,

2    nondiscriminatory policing, and most effective and least

3    intrusive response.  To bolster the policy work, the

4    department created the community policing plan, something the

5    department had never done before.  This plan outlines the

6    three main areas of community engagement and how to implement

7    and keep them on track:  Informal engagements, number one;

8    two, formal engagements; and problem-oriented policing,

9    commonly referred to as POP.  The plan is based on national

10   best practices and also on feedback from community members and

11   BPD Officers through surveys, focus groups, and conversations.

12         Of course, the plan and policies are reliant on

13   training, something the department provided very little of

14   previously, but BPD recruited community-based cofacilitators

15   and codevelopers from community-based organizations and

16   covered topics such as the history of Baltimore, redlining,

17   and the impact law enforcement actions can have on a

18   community.  Survey results indicate the overwhelming majority

19   of officers report that they feel prepared to enact the

20   community policing principles and understand their role in

21   implementing the community policing plan.

22         Your Honor, we look forward to developing the second

23   iteration of community policing training in coordination with

24   the Department of Justice and our monitoring team, and we are

25   using the evaluation conducted by community and the findings

1    from the Bromwich report to conduct a revamped -- to conduct a

2    revamped two-day in-service training that will cover problem

3    solving, ethics, misconduct, and peer intervention model.

4           Your Honor, as you know, the implementation of the

5    policies and the plan require data and the tracking of this

6    work so we can document our efforts, something we couldn't do

7    properly before because there was a lack of guidance of what

8    needed tracking and the lack of technology to track.  That has

9    changed.  However, BPD collects community policing and

10   engagement data by distribution of community computer-aided

11   dispatch codes.  Officers choose from the following:  For

12   patrol, community meeting, business check, and directed

13   patrol.  After completing a community policing or engagement

14   activity, officers identify the appropriate CAD code and

15   notify the dispatcher of their starting and ending times.  CAD

16   data is compiled on a weekly basis, and it is also reviewed in

17   our COMSTAT evaluation meeting.  This is a good start to the

18   department hopes to continue to refine the data moving

19   forward.

20          Our community policing efforts include partnering

21   with the state's attorney's office and community members to

22   implement our Group Violence Reduction Strategy, commonly

23   referred to as GVRS, our focus deterrence model.  It relies on

24   strong collaboration between community members, support and

25   outreach providers, and law enforcement partners.  These

1    partners engage directly with the most intimately involved in
2    and effected by gun violence to keep them safe, free, and
3    alive.  This is also directly related to our work, expanding
4    the victim services unit to provide a customer-driven,
5    trauma-informed approach to working with community members
6    that may be victims or witnesses to crime.
7           In addition to working with partner agencies, our
8    other collaboration includes the mayor's office.  In October
9    of '21, Mayor Scott announced $50 million of investment and
10   ARPA funding for the next three years to the Mayor's Office of
11   Neighborhood Safety and Engagement, commonly referred to as
12   MONSE, to fund violence prevention efforts, including
13   community violence intervention, victim services, youth
14   justice, re-entry, and community healing.  As it relates to
15   the investments and neighborhood policing plans, MONSE has
16   also allocated $700,000 to the development and support of
17   neighborhood policing plans for FY '22 and '23.
18          And I'll pause there if you have any questions or
19   commentary before we move to the next topic.
20          THE COURT:  Thank you, D.C. Briscoe.  A couple of
21   questions.  The first is, the concept of a directed patrol,
22   can you explain that to me so that I have a sort of better
23   sense of what that is, and distinguish that from an officer
24   being on, I don't know, nondirected patrol, or regular patrol.
25   What's the difference?

1          MS. BRISCOE:  So that's a really good question, Your

2     Honor.  So directed patrol is really to get our officers in

3     the geography that we know traditionally historically we've

4     had some challenges, whether that's recent information or

5     long-standing information.  The -- enumerated in our

6     day-to-day, you hear of foot patrols, you hear business

7     checks, you may hear gun offender registry checks.  The code

8     of directed patrol really helps to target our officers in the

9     right geographies and gives them the opportunity to engage.

10         THE COURT:  Who's directing it?  Is it the officer's

11    own choice and decision that, hey, listen, I'm going to pay

12    special attention to this particular parking lot today because

13    of a problem, or I'm going to go into this business and talk

14    with people.  Or is that a supervisor that is saying, listen,

15    I want you to do a directed patrol to X, Y, Z location for the

16    following reason?  I just have a little bit of trouble

17    understanding the concept.

18         MS. BRISCOE:  It is both and.  So as part of the

19    planning, you know, we do annual planning, quarterly planning,

20    and weekly planning.  So district commanders may highlight a

21    problem that they're saying that is data supported and data

22    driven, and with that they may call for a directed patrol.

23    And/or an officer may get some information or intelligence

24    that says, hey, I see a problem, I'm getting some information

25    from the community that there is a challenge in this

1    particular area, I'm going to spend some of my patrol time in

2    this area, and they'll just use it as a directed patrol.  So

3    it's both and, depending on what they're seeing.  It could be

4    something that's being seen from a distance view from the

5    supervisor or the district commander, or it could be something

6    that the officer him or herself is seeing in that moment of

7    their shift.

8                 THE COURT:  Okay.

9            MS. BRISCOE:  It is tied to our problem-oriented

10   policing strategy.  That's the purpose of directed patrol.

11               THE COURT:  Right.  The term is a little bit

12   misleading because it doesn't necessarily mean the commander

13   or supervisor has sent an officer there, it might mean that,

14   but it also could mean that the officer himself or herself,

15   out there on patrol is saying, listen, I know my post, and I

16   listened to what was going on in roll call and so forth, and

17   there's a particular problem around this service station and

18   I'm going to spend extra time here, and I am going to tell my

19   dispatcher that that's what I'm doing and that this is a

20   directed patrol.

21           MS. BRISCOE:  Yes.  To your point, before now, as

22   you know, Your Honor, we were having a really difficult time

23   trying to qualify the time spent by our officers.  And so

24   directed patrol gave them another vehicle, if you will, to be

25   able to account for their time that they're intending to use

1    their time wisely to focus on the geography and the situations

2    that are coming before them.  Same as though we're able to now

3    account whether or not they're doing foot, business checks,

4    any other CAD code.  So that was the goal, to really to be

5    able to say if you see a challenge or an issue, how are you

6    spending your time, are you spending your time in ways that

7    can most effectively impact what you're seeing.

8            THE COURT:  Okay.  And in terms of the Decree's

9    ultimate objective, to be achieved at some point in the

10   future, we've said that we would hope the patrol officer would

11   spend a third of each hour involved in some kind of community

12   engagement, community policing initiative and so forth.  Would

13   direct patrol be one of those activities that would qualify?

14   It is different from just responding to calls for service.

15   It's focusing on sort of proactive outreach, et cetera.  I'm

16   just trying to see how all this marries up.

17           MS. BRISCOE:  So yes, that would be one of the CAD

18   codes that would help to marry us to whether or not our

19   officers are able to focus their energy and efforts toward our

20   problem solving, but we are also doing the evaluation of how

21   they're spending their time, if they're meeting their goals.

22   So for instance, you know our place-based strategy, we use

23   microzones as our place-based strategy.  So in that, in our

24   COMSTAT model, we evaluate whether or not the prescription of

25   having our officers spend between, you know, 12 to 17 minutes

1      the three times during their shift if they are meeting that

2      goal.  So this is -- that's just an example of how we're going

3      to use the data to evaluate whether or not our officers are

4      able to achieve that goal.

5              THE COURT:  Okay.  So directed patrol, though, is

6      right in the heart of what we mean when we're talking about

7      community policing or community-oriented policing.

8              MS. BRISCOE:  Yes.  And you will hear some of that

9      in the next portion of my presentation.  For example, we also

10     use directed patrol to deal with any ecosystem issues, like

11     for instance, the Eastern District uses that directed patrol

12     time and focuses on the entry of 311 entries into -- which is,

13     again, another one of those problem-oriented policing

14     resolves.

15             THE COURT:  Next, different topic, since we were all

16     together, a report was issued that was very critical of the

17     department in terms of an element of victim services, and it

18     raised in my mind the question of how that really intersects

19     with the Consent Decree.  Now, when I examine the Decree, I

20     don't see a lot in there that is addressing directly victim

21     services, and I think the monitoring team pretty much shares

22     that view.  I mean, there's paragraph 89, but that's very

23     general.

24             Nonetheless, given the apparent significance of that

25     report and the fact that the department certainly reacted to

1    it, I thought it would be appropriate during this hearing for

2    there to be at least a little bit of attention paid to the

3    issue and the question of, you know, is that under the

4    umbrella of the Decree, or is that really pretty much a

5    separate matter that was not taken up in the Decree.

6        MS. BRISCOE:  So I can tell you that, you know, we

7    used the report, Your Honor, to evaluate where we were in

8    terms of performance with victim services overall.  We had a

9    victim services unit prior to the implementation of the

10   Consent Decree.  What I can tell you is that we've reseated

11   where it falls.  So victim services falls directly out of my

12   office.  It comes under the daily direction now of Director

13   Sara Ritter, a professional in my office.  We've expanded the

14   victim services unit.  They now have a -- we've expanded them.

15   They now have ten individuals, professional members in our

16   unit.  And we have a job application process out for an

17   additional five persons to join the unit.

18       We've brought in, through our PSP partners, some

19   technical assistance.  So we looked at other cities that were

20   doing it well and taking some best-practice lessons from those

21   other cities and trying to, if you will, increase the capacity

22   of the unit and not just through people, but through

23   performance metrics.  So it is still in progress, if you will,

24   but we have made some strides.

25       We also partner there with the Mayor's Office of

1    Neighborhood Safety and Engagement.  So there are many things

2    that are stated in the document that we were already in

3    underway, and I know D.C. Melancon is willing to jump in and

4    add some more context to that.

5             MR. MELANCON:  Just to additional context, it is of

6    course separate from the Decree, but we also know that

7    improving how we manage victim witness services can greatly

8    impact how we can build trust with the community.

9             So the heart of both missions is the same.  And so

10   we think that there's actually a lot of overlap between a lot

11   of the reform efforts and our ability to build public trust,

12   especially when it comes to how we interact with the public

13   after a crime has been committed and it impacts a member of

14   the city or their family or anyone else who feels the impact

15   of violence in our city.

16            So that is the opportunity that we have where the

17   reforms that we've made and are continuing to make bleed into

18   that work very naturally, hand in glove, without it being a

19   specific paragraph in the Decree itself.

20            MS. BRISCOE:  And to that point of being able to

21   grow and nurture community trust, I can tell you that one of

22   the things that we took very dear is that our -- victim

23   services is attached to our GBRS strategy because never before

24   have we had supports for the victims of gun violence.  That's

25   one of the things that's discussed in the that review, and

1      that's one of the things that we've already undertaken, being

2      able to respond to parts of our community through victim

3      services that have been victimized through gun violence.

4              THE COURT:  Okay.  And then last of all, did you

5      indicate that you are still going to address what Major

6      Thacker's been doing in the Eastern with respect to 311 and

7      all that?

8              MS. BRISCOE:  Yes.  Yes.  Yes, sir.  And so that

9      will take us over to -- thank you -- the next slide, the

10     implementation of our neighborhood policing plan pilot.  So

11     we've also made progress on the implementation of our

12     neighborhood policing plan pilot.  The Greater Baybrook

13     Alliance in South Baltimore and our Fayette Street Outreach in

14     West Baltimore are the two location where we're piloting.

15             In order to collect baseline information, BPD

16     recruited the University of Baltimore to conduct focus groups

17     and surveys.  Based on the baseline information and additional

18     analysis of crime, 311 and property data and the neighborhood

19     policing plan partners identify public safety priorities that

20     require an interagency response.

21             Regarding the implementation and assessments of this

22     work, UBS completed a findings report that summarizes the

23     surveys, focus groups, and other work leading to the

24     identification of the neighborhood policing plan's priorities.

25             Next, UB will be provided a process evaluation to

1    look at the development and implementation of action plans.
2    In the meantime, we continue to meet biweekly with community
3    and city partners to develop and implement action plans as we
4    continue in these two pilots, pilot neighborhoods, and look to
5    expand in 2023.  This will greatly -- this is greatly aided by
6    the $650,000 in funding to be used for external evaluation and
7    technical assistance to build community capacity for this
8    partnership.  We're also thinking about how to expand and
9    sustain this work by onboarding new professional staff
10   positions that will help with program management across our
11   community policing and group violence reduction strategy
12   efforts.
13          That includes when you see the 311 data that's being
14   collected, that is also data that we're participating in.  And
15   that is why you see many of our districts continuing on in
16   that effort, to speak largely to what you've seen in the
17   Eastern District with Major Thacker.  And that's not only
18   happening in the Eastern or our pilot districts.  That's the
19   plan of evaluation in COMSTAT for us weekly.  All of our
20   districts have gotten that cue that we expect our agency to
21   participate.  And unless there's anything -- any questions
22   further, Your Honor, that concludes my presentation.
23          THE COURT:  So the neighborhood policing plan pilots
24   are dependant right now on this -- to some extent anyway, on
25   this infusion of this special money.  To the extent that these

1    are successful pilots, will the city be in a position to bring

2    this to scale in all of the neighborhoods that would profit

3    from it, or are we in a situation where this is an interesting

4    specific pilot project, but it's doubtful that we could really

5    expand it city wide or at least to all the areas where we

6    expect that it would confer benefit.

7           MS. BRISCOE:  So I can tell you that to this point

8    we're hopeful.  As you know, the pilots are in the Western and

9    the Southern Districts proper.  Though those are two

10   communities, what we look to take is the learning from those

11   two communities.  They are vastly different, the needs of

12   them, the asks of them, so I think where we remain hopeful is

13   that we can take the best lessons learned and start to

14   evaluate what of it we scale.  I do not know yet what scale

15   looks like.  I will not assume that we can do in every

16   community what we have done in these two communities, but

17   again, we wait for the results from the University of

18   Baltimore to really help to inform next steps.  But we're

19   hopeful that in some way each district will have a version,

20   not necessarily each individual community, because as you

21   know, there are over 250 identified communities in the city of

22   Baltimore.

23          MR. MELANCON:  And Your Honor, if I could, that's

24   why it was so important through our redistricting process that

25   we make sure we try to keep communities together and not split

1    them across district line.  You know, our redistricting

2    process is reuniting 18 community units that have been split

3    by our police districts so that at least we can have a

4    particular, you know, command structure for that district to

5    be responsible for a community and not splitting it across two

6    different commanders.  So that's a big key component of what

7    we're doing going forward.

8                THE COURT:  Okay.  Thank you.

9                MR. MELANCON:  That concludes BPD's portion for the

10   neighborhood policing plan.  We would defer to DOJ or the

11   monitoring team for remarks on this topic.

12               THE COURT:  On community policing in general?

13               MR. MELANCON:  Yes, sir.

14               THE COURT:  Got it.

15               Ms. Porter.

16               MS. PORTER:  Thank you, Your Honor.  We do have a

17   few comments that we'd like to share.  Your Honor, as D.C.

18   Briscoe noted, the department is currently developing its 2022

19   community policing training for its officers.  The training

20   builds upon concepts learned in last year's training, and it's

21   responsive to officers and community stakeholders' suggestions

22   for improvement.

23               Through the use of problem-solving exercises and

24   case studies, the training provides officers with more

25   in-depth training on how to actually apply community policing

1    concepts in the field.  BPD's neighborhood coordination

2    officers, who serve as community policing specialists and

3    assist officers in conducting community policing activities,

4    are now involved in the development and delivery of the

5    training.  Although funding for community facilitators can

6    still be a challenge for the department, we hope that in the

7    future, community residents can be a little bit more involved

8    in the delivery of the training.

9            The department is also continuing to develop its

10   neighborhood policing plan pilot, as D.C. Briscoe stated.  As

11   she stated, the purpose of the neighborhood policing pilot

12   plans are really to just identify issues of community concern,

13   including those involving crime and disorder, and create

14   strategies to address these issues.

15           The department is currently piloting its

16   neighborhood policing plan in the Phase III outreach and the

17   Greater Baybrook communities, and we're working with community

18   and city stakeholders -- they're working with community and

19   city stakeholders to survey the problems in those two areas.

20           As D.C. Briscoe stated, the goal is really to

21   implement a specific plan of action for those two areas that

22   will address all of the issues found and to assess the

23   effectiveness of those plans and the overall pilot later on

24   this year.  We look forward to learning more about the

25   outcomes of these two pilots and the extension of similar

1    neighborhood policing plans to other parts of the city.

2            As we've stated prior, Your Honor, so far the

3    department has successfully created policies that incorporate

4    community policing principles and has delivered training that

5    emphasizes those principles.  The challenge, however, will be

6    whether the department can effectively transfer those

7    principles to approaches and solutions that meet the

8    expectations of the department and also of Baltimore

9    residents.

10            As we all know, patrol staffing shortages have made

11   it difficult for officers to consistently conduct visible

12   community engagement.  This can dampen the department's

13   community policing efforts.  However, outsourcing

14   administrative functions currently handled by patrol, reducing

15   call volume by diverting calls involving nonpolice issues to

16   the appropriate city agency, and also emphasizing the use of

17   alternatives to arrest in the enforcement of lesser offenses,

18   should allow patrol officers to focus on community policing as

19   a crucial part of their duties.

20            In a renewed commitment by BPD personnel to be more

21   visible in the community in discussing both its vision for

22   community policing and also its community engagement efforts,

23   will significantly improve the public's faith in BPD's

24   community policing approach.

25            And then, Your Honor, I'd like to say one last thing

1    just about assessments.  The parties have not started any sort

2    of community policing assessment yet, but the monitoring team

3    is thinking about how this particular assessment will take

4    shape, and they plan to circulate a draft methodology for the

5    assessment sometime in the fall.  And that concludes my

6    comments, Your Honor, unless you have any questions.

7              THE COURT:  Okay.  Thank you, Ms. Porter.

8              Who's going to speak to this, Mr. Thompson?

9              MR. THOMPSON:  Chief Ramsey, Your Honor.

10             CHIEF RAMSEY:  Thank you, Your Honor.

11             THE COURT:  Good afternoon.

12             CHIEF RAMSEY:  First of all, we agree with what DOJ

13   just stated in the areas in which they covered.  The

14   department has made a lot of progress in the area of community

15   policing.  They did complete last year successfully the

16   16-hour course introducing officers to community policing.

17   Most of us on the monitoring team observed some of those

18   classes, and they went very well.  And the feedback from the

19   surveys of the officers really indicated that they understood

20   what it was that the department was trying to accomplish

21   through this strategy of policing.

22             The one area which the DOJ just mentioned that is

23   going to be perhaps the biggest obstacle to overcome is going

24   to be staffing.  The original plan called for 40 percent

25   officers' time to be spent engaged in proactive problem

1    solving with the community.  In some districts on some nights,

2    they're literally running from call to call.  So trying to

3    have consistency when it comes to dealing with those kinds of

4    issues is challenging, to say the least.

5         There has been some improvement in terms of

6    offloading some workload toward callback and other ways in

7    which to handle where presence of an officer isn't really

8    necessary so that officers don't have to respond to that.

9    Directed patrol, which, by the way, when you asked that

10   question, it is targeted patrol, and it has to be associated

11   with a particular problem that they're working on to be

12   solved.  So that is part of problem solving where you -- it

13   could be drug dealing on a particular corner, it could be

14   other types of activities that officers have become aware of,

15   and they're spending more time in that area to effectively

16   deal with it.

17        But again, the staffing is something that we're

18   going to have to continue to monitor because in order to fully

19   implement to its full potential, it will require more staffing

20   than what's currently available in patrol.

21        The other thing that will have to be part of an

22   assessment is really taking a look at accountability, not just

23   for patrol officers but also their supervisors to make sure

24   that those supervisors are actually paying attention and

25   monitoring what it is that the police officers are actually

1    doing out there in the field and how that is associated with

2    the problem solving that they are engaging in.

3           This is a new strategy, it takes time to get used

4    to, but all that was part of the training.  And so this is

5    something that we'll have to track as well, to make sure that

6    there's actual engagement taking place on the part of the

7    officers.

8           And I know from experience, you know, it's not

9    always easy to get officers out of the car and actually

10   interacting with the community in a positive basis.  You still

11   have some police officers that really feel as if, you know,

12   their presence is not appreciated by -- in some communities,

13   and they're reluctant to get out.  But once they do get out,

14   they start to discover they have more folks that are glad

15   they're there than folks that aren't.  So it's important that

16   that kind of interaction take place and equally important that

17   it be recorded so we can track it and make sure that it's

18   taking place on a regular basis.

19          The new training, they're in the final stages of the

20   curriculum.  This is eight hours now that will be

21   administered, hopefully beginning in October, that that will

22   begin in the department.  So DOJ's reviewed it, we've reviewed

23   it.  We've gone back and forth on some issues, but I think

24   we're getting close now so that it can be finalized and

25   training actually get off the ground this fall.  So again,

1       that will be a major accomplishment.  They have filed their

2       latest annual report with the Court.  And so, you know,

3       they're making progress.  Again, they do have hurdles to

4       overcome, no question about that, but they are moving in the

5       right direction.

6               One last thing with the neighborhood policing

7       pilots.  That is going to be a challenge to expand that

8       citywide.  That's going to have to be something looked at very

9       carefully.  That requires a lot of resources, and the city

10      will have to really work hard to work with the department to

11      establish priorities in terms of some of these areas and the

12      kinds of issues that are going to be addressed, making public

13      safety concerns a top priority.  So even something as simple

14      as, you know, you have X amount of dollars to, you know,

15      repair X number of streetlights, well, it's more important to

16      repair those streetlights in an area where you've got criminal

17      activity taking place under the cover of darkness at night

18      than it is another area that it's -- you know, you'd like to

19      have the light, but it's more important to do this one first.

20      You need to fix them both, but you do -- so those kinds of

21      priorities are very important that when it's identified and

22      made -- and attached to a public safety concern, that it be

23      given some kind of priority.

24              So it's doable to expand it citywide, but it's going

25      to really take some careful really review of the request and

1   priorities being set in order for it to be able to expand.
2   But it is a good program that will make a difference in these
3   neighborhoods.  So I congratulate you for getting it off the
4   ground in those two pilot areas and look forward to it being
5   expanded beyond the two.  Thank you.
6        THE COURT:  The neighborhood initiatives are right
7   in the center, the core of what I think the Decree's
8   aspirations are, but this also -- this discussion gives me the
9   opportunity to put some flesh on the bones of the point that I
10   have made repeatedly in recent months, and that is that the
11   single problem that is most serious in terms of the successful
12   implementation of this Decree is staffing.  We heard earlier
13   from D.C. Nadeau about the challenges that he continues to
14   face in PIB.  And one of the points there is that he's only
15   got 36 detectives assigned to him currently.  The staffing
16   plan says 48.  We've got some civilianization strategy that's
17   going to help us there, but he's still going to be short, by
18   my count, four detectives, over 10 percent, or maybe exactly
19   10 percent of what he needs now in the community policing
20   discussion.
21        We have high aspirations, but of course calls for
22   service are going to take priority over some of these
23   community policing initiatives.  But these initiatives are
24   essential to the accomplishment of the purposes of the Decree.
25   So it's a point that everyone's tired of hearing me pound on

1    and hammer at, but it's just an empirical fact that staffing

2    is a crisis and until we have some substantial improvement or

3    a solution, we are going to be impaired in our capacity to

4    achieve compliance.

5            None of this is meant to undercut the significance

6    of what D.C. Melancon announced earlier this morning.  That's

7    a huge step forward and in the direction that I have been

8    urging the city and the department to go.  But I can't help

9    but highlight the proof, as it keeps presenting itself in this

10   courtroom, of the significance of the issue.  All right.

11           MR. MELANCON:  Your Honor, we'll move into the next

12   portion, stops, searches, and arrests, and also fair and

13   impartial policing.  Both topics were covered together in a

14   previous monthly hearing.  And so we'll cover both topics at

15   once.

16           Next slide.

17           So again, just in review of this, we are on track in

18   this section, and we are carrying that same implementation on

19   track score for stops, field interviews, and voluntary

20   contacts, searches, arrests, and review and supervision.

21           A quick comparison from past to present, when the

22   Decree first began, we had outdated policies that neglected to

23   emphasize the importance of constitutional rights.  Now we

24   have 16 revised policies, two of which -- two new policies on

25   top of that, that highlight and accentuate these rights.  They

1    also include documentation requirements so that we can
2    leverage that for analysis, and analysis is important so that
3    we can identify and correct problems that are associated with
4    how a member may conduct a stop, search, or an arrest.
5              Those policies were divided into three phases when
6    we implemented them.  Training for the first phases was
7    conducted in 2020, the first two phases, and then the third
8    phase was part of the community policing module in 2021.  An
9    updated review of those policies is set to begin next month.
10             In addition to the in-person training that all the
11   members have received, in the second half of last year, BPD
12   delivered an e-learning to all supervisors.  The purpose of
13   that training was to prepare them for performing reviews for
14   quality and completeness of the officers under their command.
15             Also related to the stops, searches, and arrests,
16   supervisor training, there was a three-hour module in the
17   general supervisor training that is currently being delivered
18   as well on this topic.
19             So once again, we're embedding these topics not just
20   as stand-alone, but we're trying to intersperse them through
21   all of the trainings as we go through, you know, in-service
22   for our supervisors overall.
23             Regarding technology and documentation, we've moved
24   away from the paper-based system to a new web-based,
25   field-based electronic reporting system with the Axon records.

1     Then the department has started audits of this work, including

2     the quarterly review of releases without charges, or RWOCs,

3     that have come up.  We'll go through that topic more a little

4     bit in this presentation.  And those audits are now a natural

5     part of the agency's self-assessment and self-correcting

6     culture.

7              And so, go on to the next slide.

8              So in talking about our reporting and the

9     requirements, you know, we've transitioned to a more modern

10    records management system, a little over a year ago.  And up

11    until that point, our officers were documenting offenses and

12    field interactions on paper forms.  And then those were

13    physically delivered to headquarters for manual data entry,

14    and could often take well over a year, or year and a half

15    before the backlog would have been actually inputted into a

16    system for review.

17             That's all changed.  And so we now have, you know,

18    direct entry into our systems that we have that information

19    available.  And in consultation with the monitoring team and

20    DOJ, we have made some changes in order to improve the ease of

21    how this data can be assessed and analyzed.  For instance,

22    we're reconfiguring some of the fields for the investigative

23    stop data to make them mandatory for completion.  We saw an

24    issue there where certain portions of the form were not being

25    filled out, and it's vital that we get that information housed

1    together in a more logical format in the incident report so

2    that it can be used both on the front end and the back end

3    when it comes to the monitoring team's review of our results

4    on this.

5            This is fundamental to when we talked about

6    technology being used as a system for accountability and why

7    it was so important that technology overall is part of our

8    Decree, so that we can measure and, you know, monitor what

9    we're actually hoping is the outcome from these reforms.

10           So moving into the next slide, release without

11   charge, or RWOCs, audits, you know, we're working to improve

12   our data collection for the quantitative analysis of stops,

13   searches, and arrests, and the big key component of that is

14   the RWOC analysis.  So our performance standards section

15   reviews all instances where someone is released without

16   charges.  That's from the state's attorney's office.  And an

17   RWOC can occur for, you know, one or more reasons, to include

18   lack of probable cause, a nexus issue where search warrants

19   are executed for a large group, but it turns out certain

20   individuals may not have actually been party to a criminal

21   misconduct, an inarticulate report that doesn't clearly

22   demonstrate reasonable suspicion, or another reason for RWOC

23   is prosecutorial discretion.

24           Those RWOCs that are categorized as -- you know,

25   based on that discretion, are often because the state's

1    attorney's office may opt not to prosecute certain crimes

2    based on policy decisions made about things like misdemeanor

3    marijuana possession or other lesser offenses.  Your Honor

4    spoke to that earlier today in speaking about that policy

5    impact overall, and the commissioner made it clear that we

6    made training efforts to ensure folks understand on the front

7    end that, you know, the policies of a prosecutor are feeding

8    into what it is we are doing when we're engaging in

9    enforcement action.  As those things change, we need to update

10   the policy changes, and we're going to try to get ahead of

11   that as effectively as we can in coordinating with the state's

12   attorney's office through that transition process.  So we're

13   committed to doing that.

14          Our first published report on RWOCs analyzed the

15   2022 Quarter 2 data, and in that two-year period the

16   percentage of RWOCs continued to decrease.  You can see that

17   from the first -- excuse me, on the graph there to the right,

18   as a percentage of total arrests.  As you can see, the most

19   cent quarter reviewed, and this is the top left box, had it

20   for the first time in this quarter, the 2022 Quarter 2.  This

21   is the first time we actually had RWOCs in the single digits.

22   And I'll say that that's not because we've been arresting

23   fewer people, quite the opposite.  The number of arrests have

24   actually gone up during the same quarter and yet the RWOCs are

25   still going down.

1      So that percentage is now the lowest it's been since

2  we started tracking this data back in 2020.  And so from the

3  audits, though, we're not just doing this on the basis of

4  quantitative analysis.  We're trying to get to the root cause

5  of some of these problems.  As a result of the audits back

6  in -- you'll look at the data point there from 2020 Quarter 4,

7  you can see 107 RWOCs happened in that period.  This is off to

8  the left top box.  Then it dropped down to 64, then 24.

9      We did an analysis there, and it turns out one of

10  the DAT units was without a supervisor for an extended period

11  of time.  And without close and effective supervision, we were

12  finding that there was a lot of RWOC problems in that unit.

13  Once we could identify through this auditing process, we were

14  able to bring that information to operations, they were able

15  to address the supervisory issue, and the RWOCs went down.  So

16  again, this is back to how we're moving forward on a

17  self-correcting, self-assessing, you know, culture of the

18  agency.

19      THE COURT:  Data driven.

20      MR. MELANCON:  Data driven.  So these audits are not

21  for audit's sake.  It helps us to improve operational

22  outcomes, and that's a key component of this effort.

23      And so overall, you know, we're moving this forward,

24  and this is the culture of where we're moving, and we're

25  making sure that our performance standards section is

1   continuing to get the level of participation it needs into

2   this process and other processes where it can be impactful.

3        In addition to the RWOC reports, we're looking at

4   outcome assessments overall.  And the BPD is of course working

5   closely with the monitoring team as they conduct qualitative

6   reviews on a sample of our arrest data from a two-year --

7   actually three-year period, 2019, 2020, and 2021.

8   Additionally, they are reviewing another sample of the RWOC

9   audits conducted by the performance standards section from

10  2020, and, you know, some of the challenges associated with

11  arrest audits is the need to include a review of the body-worn

12  camera, which can be time consuming, any CCTV available

13  footage, and then reviewing the statement of probable cause to

14  ensure that it was reasonable and fully articulated.  But also

15  that could be very difficult because the nature of this audit

16  is chasing back to 2019, which means it's in a couple

17  different systems, it's an arrest view, or some of the

18  information might be in our Lotus Notes system.  We're trying

19  to make sure that the monitoring team has access to all the

20  systems they need to be able to do this analysis, but we

21  recognize it's going to take a while to do the sample of

22  arrests and RWOC reports in this audit.

23        But in sum, you know, when doing all this, and we

24  mentioned this before, Your Honor, you know, when done

25  constitutionally, proactive policing is a highly effective

1    tool in the crime fight.

2              THE COURT:  Say it one more time, Mr. Melancon.

3              MR. MELANCON:  When done constitutionally, proactive

4    policing --

5              THE COURT:  When done constitutionally --

6              MR. MELANCON:  Yes, Your Honor, can be a highly

7    effective tool in the crime fight.

8              THE COURT:  It can be highly effective when it's

9    done unconstitutionally too.  And I say that not to be

10   completely facetious, I mean, that's unfortunately sometimes

11   true, and consequently it creates sort of an appeal to a

12   certain segment of the community.  But your point is the

13   important one.

14             MR. MELANCON:  And if I could amend, Your Honor,

15   effective in the crime fight without damaging our relationship

16   with the community.

17             THE COURT:  There we go.

18             MR. MELANCON:  And so, you know, we want to find

19   ways to collaborate with all parties to make sure that we're

20   teaching officers what they can do, not just what they're not

21   allowed to do, and we're encouraging that proactivity.  We

22   monitor it with this effort, but we also monitor it at the

23   concept level on a weekly basis to ensure that proactivity

24   levels are being responsive in that place-based strategy that

25   D.C. Briscoe was talking about.

1          So that's our presentation on stops, searches, and

2     arrests.  I'm going to move quickly into fair and impartial

3     policing as well.  Both of these topics were covered in the

4     monthly report.

5          THE COURT:  I want to stop you though, just to note

6     that the final point is an extremely important one.  It's

7     responsive to an issue that the Court has raised previously

8     and now is particularly germane this summer given the

9     circumstances on the street and the feeling in the community.

10    And I think that that has to be an actual part of the

11    department's approach in terms of its training with respect to

12    stops, searches, and arrests.

13         It also has to be a part of its messaging to the

14    wider community, which is that under the terms of -- within

15    the template of the Consent Decree, the department is indeed

16    leaning in and facing and confronting the challenge that is

17    presented and leading its officers, training its officers on

18    how they can appropriately push forward on enforcement

19    initiatives that are made necessary by the circumstances in

20    the city that are prevailing right now.  That's an

21    important -- it's important substantively.  It's important in

22    terms of your messaging.

23         MR. MELANCON:  Yes, Your Honor.

24         Again, we're going to move into fair and impartial

25    before we turn it back to the DOJ and monitoring team.

1          THE COURT:  Yes.

2          MR. MELANCON:  So on this --

3          Go to the next slide.

4          You know, we use our processes here to make sure
5     that we're tracking fair and impartial policing standards.
6     And consistent with paragraph 89, we continue to integrate
7     fair and impartial policing principles into the general policy
8     making-process.  You know, we've activated three policies that
9     explicitly center on fair and impartial policing within the
10    last year, and that includes the procedural justice and
11    interactions policy.  That policy codifies BPD's expectation
12    that every interaction with a member of the public must honor
13    and protect the person's inherent human dignity.

14      In order to ensure that officers had that knowledge,
15    skills, and ability to comply, we delivered that training in
16    stages in department-wide efforts.  The first stage was in
17    2019, which was done in conjunction with use of force
18    training.  Stage 2 was in 2020, in conjunction with stops,
19    searches, and arrests training.  And then stage 3 was a
20    full-day training course delivered in 2021, at the end of the
21    calendar year, specifically dedicated to procedural justice
22    and fair and impartial policing.

23          So those trainings covered the topics of describing
24    police legitimacy on how it impacts use of force, impacts of
25    bias in the threat assessment on police legitimacy, and

1   understanding of how perception and implicit bias can affect

2   the decisions and actions made by members of the public and

3   how they can become barriers to procedural justice, and how

4   procedural justice could be used as an intervention strategy

5   or a de-escalation strategy for implicit bias throughout

6   various case studies, practical exercises, group exercises,

7   and the like.

8           Those concepts are now, as I said before, woven

9   throughout.  Our trainings are not just stand-alone trainings.

10  But things such as behavioral health, youth training, or youth

11  interactions training, or community policing training that was

12  done last year, all of them have concepts of procedural

13  justice in it.

14          So this slide here is about procedural justice

15  audits, which is done through our performance standards unit.

16  What you're looking at here is an assessment tool that we use

17  to measure our compliance with procedural justice mandates.

18  You know, each interaction has a progression, and that starts

19  with letting them know that they're being recorded, letting

20  them know who they are, explaining why they've been stopped,

21  and trying to answer questions from the person who is being

22  stopped by the member of the department.  And while we're

23  doing well overall, we need to improve in those first two

24  categories.

25          THE COURT:  Yeah, I'd say.  I mean, first of all,

1   great tool.  Exactly the sort of device that should be used in
2   these circumstances.
3           And what's wrong in the Western District?  They --
4           MR. MELANCON:  So again, it's -- we send this
5   message out making sure --
6           THE COURT:  Zero percent --
7           MR. MELANCON:  Making sure there are
8   opportunities -- now, these are audits that are done, and
9   they're samples of the audits.  So it's not the entirety of
10  the interactions happening in the Western District, or any
11  district, but what performance standards does, is they sample
12  a host of interactions randomly, and determine if they've hit
13  all of these procedural steps.
14          And so the scorecard is issued monthly.  It's
15  reviewed also in COMSTAT on a regular basis, and those
16  questions are asked of the command staff.  And the message
17  needs to get down to them to explain the importance of this,
18  that it's not just to check a box, but as we said before,
19  proper procedural justice steps lead to, you know, better
20  outcomes when it comes to interactions.  It can lead to the
21  ability to de-escalate a situation, and to resolve an
22  interaction well.
23          So again, this is another method of how we're
24  becoming the self-assessing, self-correcting agency that's
25  envisioned by the Decree.  And unless there's any other

1    questions on this, Your Honor, or the previous topic, that

2    concludes BPD's review of those two portions.

3            THE COURT:  Okay.  Well, scorecards are a wonderful

4    tool.

5            Mr. Mygatt?  Ms. Porter?

6            MS. PORTER:  Yes.  Thank you, Your Honor.  I have a

7    few comments on stops, searches, and arrests, and then I will

8    turn it other to my colleague, Curtis Harris, to talk about

9    FIP.

10           Your Honor, as we noted in our 2016 findings report,

11   BPD's practices in the areas of stops, searches, and arrests

12   were at the root of the pattern or practice violations that we

13   found.  These practices significantly undermine BPD's

14   relationship with the Baltimore community.  The department's

15   implementation of Consent Decree requirements in these areas

16   is crucial to re-establishing community trust.  The ability of

17   officers to understand and put into practice the new stops,

18   searches, and arrest policies is critical to BPD's success in

19   establishing itself as an agency that protects public safety

20   and respects the legal rights and dignity of community

21   members.

22           As D.C. Melancon stated earlier, in the past two

23   years, the department has adopted a number of new policies

24   that address stops, searches, and arrests.  They've also

25   trained officers on these policies.  These new SSA policies

1    and training were the product of much hard work by BPD in
2    extensive collaboration with the parties, but the reward from
3    these efforts will depend on implementation.  Specifically, A,
4    where these officers are using these new practices on the
5    street; and, B, where these practices have been successful in
6    improving BPD's relationship with the community and engaging
7    in constitutional policing.
8            Assessing implementation depends on data collection
9    and technology, and BPD's historical shortcomings in these
10   areas are well known to the parties and to the Court.  There
11   is, however, good news.  BPD's new Axon records management
12   system, that we've all been talking about today, is really a
13   big leap forward.  The basic infrastructure for recordkeeping
14   and data-informed policing is in place, and incident reporting
15   can be completed through the new system.
16           However, as we've discussed earlier today, Axon's
17   capabilities are not yet meaningfully utilized in the field.
18   There are challenges in ensuring the new software is properly
19   configured, updated -- there needs to be some updating of data
20   fields, and then also we have to make sure that once it's
21   eventually fully up and running, officers are turning it on
22   and it's consistently being used as intended.
23           However, challenges like these are expected in a
24   major project of this nature, and BPD is working in
25   collaboration with the monitoring team and with DOJ to address

1    these shortcomings.  And that concludes my comments, Your

2    Honor, on SSA, and I'll turn it over to my colleague to talk

3    about FIP.

4              THE COURT:  Mr. Harris.

5              MR. HARRIS:  Thank you, Your Honor.  In the last

6    quarter, BPD completed and certified the delivery of fair and

7    impartial policing training 3, the third and final installment

8    of dedicated training on impartial policing for all officers

9    required by Consent Decree paragraph 91.  And as we recognize

10   the successful delivery of this training, we encourage BPD to

11   consider the ways in which it can, in accordance with

12   paragraph 94, collaborate with the diverse Baltimore community

13   on future iterations of its impartial policing trainings and

14   meaningfully incorporate community voices into the content of

15   those trainings.

16             Moving forward, the next step is assessment of the

17   implementation of these provisions.  The monitoring team will

18   conduct outcome assessments relating to impartial policing in

19   conjunction with the assessments of stops, searches, and

20   arrests.  Future monitoring plans will provide the schedule

21   for these assessments.  And the assessments themselves will

22   measure the impact of BPD's impartial policing training on the

23   nature and scope of demographic disparities in the delivery of

24   police services and assess several important metrics broken

25   down by race, gender, and ethnicity:  The breakdown of

 1    pedestrian and vehicle stops, including their outcomes;

 2    percentage of frisks or searches that result in the seizure of

 3    contraband; and the proportion of arrests for certain

 4    misdemeanor offenses that result in release without charges,

 5    released based on identity issue, decline to charge, or a lack

 6    of probable cause that a crime has been committed.

 7            Ensuring that the data captured in BPD's new RMS

 8    system is both sufficiently comprehensive and reliable and

 9    will be critical to the monitoring team's ability to conduct

10    these assessments, and thus understand the extend to which BPD

11    has successfully put impartial policing principles into

12    practice.  Thank you, Your Honor.

13            THE COURT:   Thank you, Mr. Harris.

14            Mr. Thompson.

15            MR. THOMPSON:  I'm proud to present the triples,

16    Your Honor.  I have Dr. Bowman, Professor Meares, and Sir

17    Seth, Esquire.

18            THE COURT:  All right.  Who goes first?

19            DR. BOWMAN:  I will go first, Your Honor.  First,

20    thank you for the opportunity to have words today, and let me

21    just say first that I wholeheartedly agree with what's been

22    said by both BPD and the DOJ related to stops, searches, and

23    arrests.  And you said, probably at least a half dozen times

24    today, that in order for the BPD to have a successful crime

25    fight, they have to somehow acquire community trust.  I think

1   there is no higher profile publicly visible activity than

2   conducting stops, whether they are traffic stops or

3   investigative stops, pedestrian stops and searches, and

4   arrests, and that activity is, while on the one hand, the

5   public is very interested in understanding the whos, whats,

6   the wheres, whens, whys, and hows of those stops, searches,

7   and arrests, it's also critically important for operational

8   and administrative efficiency within the department that the

9   department understands those five Ws and then the hows of

10  stops.

11          Just last evening on a public call, a public

12  meeting, we were asked a question by a member of the public

13  about disparities, racial and ethnic disparities in stops.

14  And while we're five years into the Consent Decree, the answer

15  was we still don't really know yet.  And there is progress

16  being made.  There is a new records management system that's

17  under implementation, and changes and tweaks are being made.

18  But the fact is today, we still don't have access to all of

19  the information that's going to be required to answer the

20  questions that the public have and to run an organization

21  that's free of bias in stops and searches and arrests.

22          And so I do applaud the BPD for the work that

23  they've done.  We've heard it today, the acquisition of a

24  records management system, I think the progress is phenomenal,

25  but it's behind schedule.  We are all making progress because

1    when we started five years ago, if a member of the public

2    asked us who's being stopped, the answer would have been, we

3    don't know.  Had they asked us if there is a disproportionate

4    percentage of racial or ethnic minorities being stopped, the

5    answer would have been, we don't know.  If they ask us how

6    long are black people kept out on a traffic stop versus white

7    people, the answer would have been, we don't know.  And we

8    don't know and we don't know.

9         When you get to too many we don't knows, it start to

10   sound like we don't care.  And if the public perception is

11   that we don't care, then they don't care either.  And you

12   don't get the buy-in, Judge, that you've talked so much about

13   today that's required by the public as a coproducer of crime

14   fighting in the city.

15        So we applaud the actions of the BPD in moving

16   forward, not just to capture information for the sake of the

17   information and data capture, but they are authentically

18   interested in understanding what they're doing.  And it takes

19   the data capture and the data assessment, the data analysis

20   for them to understand that because they understand, like we

21   understand, that what gets measured gets done and that you

22   can't expect what you don't inspect.

23        And then finally, I think members of the public

24   recognize that what's value in the BPD is actually practiced

25   there.  And to the extent that we can see, assess the data and

1    the data demonstrates the constitutionality of the work that
2    this Consent Decree is driving towards, that allows the public
3    and the police administration to understand the direction with
4    which they're going.  So they're moving that way, we applaud
5    that effort, we're proud to be a part of it, but we also
6    implore the BPD to drive harder, faster to get to the point
7    where we fully understand what's happening.
8              We're able to conduct some assessments now.  The DOJ
9    talked about, and D.C. Melancon talked some about the RWOC
10   assessments, the PC arrest assessments.  We're not at a point
11   where we can talk conclusively about the outcomes, but the
12   work is going on.  So by bits and pieces, we're able to assess
13   some of the activities.  And we see evidence of some positive
14   movement on the constitutional police side, and we want to see
15   much more of that occur.  So I'm going to stop there.  I'll
16   throw it to Seth -- okay, Tracy.
17             THE COURT:  Let me ask Dr. Bowman a question though.
18             DR. BOWMAN:  Sure.
19             THE COURT:  So I appreciate your remarks, I
20   appreciate your observations, I appreciate the wisdom that
21   underlies it all, but then it does give rise to this question,
22   if that's the place we are; that is, at five years in, we are
23   still designing, maybe finishing the design, the construction
24   of the means by which we will gather the data and assemble the
25   data, are you confident, as you peek over the horizon, that

1   once we reach that critical moment where the data is in a form

2   where it is subject to the sorts of assessments and analyses

3   and processing that you're describing, that the department,

4   perhaps in conjunction with the monitoring team and the

5   Department of Justice, is -- to touch upon another issue that

6   animates all of this -- has the capacity to do that analysis

7   and to engage in the learning that your remarks made clear are

8   so critical to the process.  Is that going to happen?  Are you

9   confident that that's what's going to happen?

10          DR. BOWMAN:  It has to happen.  It has to happen.

11  That element of policing and managing the department has to

12  become a core culture and a core competency of the department

13  in order for the department --

14          THE COURT:  You're saying it has to be, or it has

15  become --

16          DR. BOWMAN:  It has to be.  It has to be.  It has to

17  become.

18          THE COURT:  Are we on the road to ensuring that it

19  is there and is a core competency of this reformed police

20  department?

21          DR. BOWMAN:  Everything that I see to this date

22  indicates the department is on the path to developing that

23  core competency required to demonstrate constitutional

24  policing.  You talked earlier about the stability of this

25  leadership team, the stability of this leader of the agency,

1    the interactions that we've all had with key members of the

2    organization, all, to me, indicate that the department is

3    moving in the right direction and moving swiftly in the right

4    direction.

5         Even as far as the records management system goes,

6    the acquisition process went faster than I would expect.  And

7    so to see the kinds of obstacles that we're confronting now in

8    terms of making sure data fields are ripe, making sure that

9    what's being pulled out of the system is accurate, that's to

10   be expected, especially with such a quick procurement process.

11   But it doesn't, to me, indicate that there is any desire to

12   back up or to not continue with the momentum that's been

13   developed to this point.  So I'm confident, Your Honor.

14        THE COURT:  No doubt in my mind about the

15   inclination.  It's specifically about the capacity.  Once they

16   have built the machine, are they going to have the capacity to

17   use it in the productive ways that you've just described, so

18   that all of those I don't knows, which you very persuasively

19   put on the record here, become, oh, yeah, we do know the

20   answer to that question and here's what it is.

21        And then, beyond that, it's like, and to the extent

22   that that's acceptable what that reveals, then we're in good

23   shape, and to the extent it reveals something troubling or

24   problematic, we're ready to go to the next level and start to

25   address what our data has taught us.

1              DR. BOWMAN:  Right.  We've heard about PIB today.

2       We've heard about other systems today, the training, learning

3       management system.  All of those are integral pieces in this

4       whole information management, data management area that must

5       be perfected as part of this culture change of the

6       organization.

7              Again, you can't have a segment of the organization

8       that's data driven and another segment of the organization

9       that's operating on old manual and antiquated systems.  And

10      what I see and what I hear is an uptake of technology and an

11      uptake of being data driven and evidence based throughout the

12      organization, and to meet that says that they will have the

13      capacity that they will do the things that are necessary to

14      drive this through the entire agency; otherwise, it cannot be

15      successful in reformation and transformation if the entire

16      organization doesn't adopt this data-driven and evidence-based

17      philosophy.

18             That's why I say it has to happen.  There is no

19      choice.  It has to be at the core.  And I think it's not a

20      matter of adding more people to make it happen.  Certainly

21      those who were there have to conduct the analysis, but I think

22      it's a core and they will get there.

23             THE COURT:  I think the point is that in a modern

24      police agency, you don't just have to have a SWAT team, an

25      internal affairs bureau, a sex offense unit, whatever else.

1    You have to have a data analytics unit or capacity that can

2    process all of this information that this technology is going

3    to generate, do it in an efficient and intelligent and

4    ultimately productive way to complete sort of a feedback loop

5    back out to the field so that the policing is actually

6    advantaged or improved by the process.  That's all I'm really

7    asking about.

8                    DR. BOWMAN:  Sure.

9                    THE COURT:  But it's rooted in the problems that

10   we've had throughout this Decree.  We've never really had

11   problems with positive intentions or a desire to reform.  When

12   we've run into trouble, it's been capacity.  So for once, I'd

13   like to be ahead of the issue and hear from the monitoring

14   team, if not from the department itself, that once we get

15   these systems in place, and once we are, you know, harvesting

16   this data and it's coming in, we know what we are going to do

17   with it.  We already are planning the questions that we are

18   going to ask and the analyses that we are going to conduct.

19   We already have some worries and fears about what might be

20   generated here and think that this could be a problem area.

21                    And, you know, the problem is the department is

22   always on the borderline of having sort of overwhelming

23   demands put on it by virtue of this reform process.  I don't

24   want them to get to the point where we've got all the

25   technology acquired and then we've finally fired it up and

1    we're able to get the data in and here it comes in and you

2    know what, we're now at the moment and point of exhaustion,

3    we're done.  Wait a minute, we didn't -- we didn't finish it.

4    We didn't do what the whole objective is.  That's what I'm

5    asking.  I'm just asking people and I'm, through these

6    questions, trying to stimulate thinking in this regard.

7              DR. BOWMAN:  Yes, Your Honor.

8              THE COURT:  Mr. Melancon.

9              MR. MELANCON:  If I could, Your Honor.

10             THE COURT:  Yes.

11             MR. MELANCON:  As part of our FY '23 efforts, we are

12   actually increasing our capacity in the research analytics

13   portion of our department.  We are looking at adding on in our

14   data-driven strategies division, which is in charge primarily

15   of a lot of the crime analysis of the department.  But we are

16   absolutely looking at this portion of the puzzle as well.  We

17   are adding a research analyst position to our Compliance

18   Bureau, dedicated for exactly what you're talking about, to be

19   a support mechanism for the monitoring team and for the

20   department to be ready for those kinds of audits and analyses

21   that we anticipate.

22        But we're not stopping there.  We're also increasing

23   capacity to the data-driven strategies division.  Looking at

24   adding three additional research analysts plus a supervisor

25   plus a deputy director to that position, all through efforts

1    that we found that we were able to make budget savings

2    elsewhere and reallocate those positions accordingly.  We're

3    moving on all those as quickly as we can.

4           One of the things we recently learned about our

5    research analyst position is the fact that the job description

6    itself is so generic that we're not exactly getting the right

7    candidates for the job.  So we've been working now with DHR

8    with the city to better refine the job description itself and

9    get us the candidates that have the aptitude that we need and

10   the skill set and the prior experience, either as criminal

11   justice analysts or as data analysts in general, so that we

12   can find the folks with the right fit for the department and

13   be able to bring them on board.  And we're using, you know,

14   our competitive wage schedule in order to get them on board at

15   better than minimum rates.

16          So we are looking at that.  I'd be remiss if we

17   didn't speak to that given that you've made those comments in

18   that direction.  But we're not going to stop there.  You know,

19   I just told the commissioner, I'm going to be getting with him

20   very soon.  As now the deputy commissioner of this bureau, I

21   have a couple of ideas on how could civilianize faster,

22   hopefully within budget, and be able to work collaboratively

23   with the city and what resources we can do to bring capacity

24   online.

25          DR. BOWMAN:  It only took him one day to learn to

1    ask for money in front of the judge.

2         THE COURT:  That's right.

3         MR. MELANCON:  Maybe I'm not in this position very

4    long, but I want to make sure -- I want to make sure that Your

5    Honor knows --

6         THE COURT:  And the judge is very sympathetic,

7    Commissioner.

8         MR. MELANCON:  But Your Honor should know that that

9    is exactly part of the strategy.  We are trying to get ahead

10   of it and make sure that we have that capacity in place.

11        THE COURT:  I mean -- well, I'm not going to restate

12   the point.  I think it's obvious.  It's just we want to be

13   ready to -- you want to be ready to be what you've been

14   planning to be.

15        All right.  Were we going to go to Professor Meares

16   now?

17        MR. THOMPSON:  Yes, Your Honor.

18        PROFESSOR MEARES:  I'm next.  Good afternoon, Your

19   Honor, I'm really happy to be here.

20        THE COURT:  Good afternoon, ma'am.

21        PROFESSOR MEARES:  It's really been gratifying to

22   listen today and hear all of the updates and all of the great

23   work.  So as a person who sits in between fair and impartial

24   policing and stops, arrests, and searches, I just wanted to

25   make a couple of remarks, one about stops, arrests, and

1    searches, and one about the relationship between fair and

2    impartial policing and procedural justice in particular.

3           As the monitoring team's work has progressed, we

4    have been observing all of -- a bunch of the arrests in terms

5    of body cameras and the statement of probable cause, and we

6    don't have an official assessment yet, but I can say for

7    myself personally that it's actually been a really positive

8    experience to see -- to see, you know, what the officers on

9    the street are doing and the arrests that I have been asked to

10   review.

11          And I do think that goes to what Your Honor was

12   asking about in terms of the capacity of the department to do

13   this important work.  We've got a -- that's actually the old

14   system.  And I know that they have the capacity to look at

15   that now as well as we do.  It's going to get better once we

16   switch entirely to Axon.  And I think that means that there's

17   going to be a better way for the department to do the kind of

18   self-assessment and self-correction of work that seems pretty

19   consistent with the policies as given.

20          But the point that I really wanted to bring up on

21   the fair and impartial piece, was that I know from my own

22   research that there's an important relationship between

23   adherence to fair and impartial policing policies and, for

24   example, procedural justice practices, and prevention of

25   unconstitutional policing.

1          And to that end, I think that as we're thinking

2     about forward-looking assessments, we should all be looking

3     to, and we've already had some of these conversations with DOJ

4     and with folks at BPD, I think, about the ways in which

5     there's an intersection between our assessments of arrests and

6     stops to come, and compliance with the fair and impartial

7     policing policy.

8          So right now, the assessment that we're looking at

9     is very specific to the constitutionality of arrests, but I

10    think we can probably think in the future about assessments

11    that actually build on, for example, the procedural justice

12    audits that the department is already doing.

13         Again, I think that's an example of capacity to do

14    the work ahead.  They're already doing it on the procedural

15    justice side.  They already have the capacity to do it on the

16    constitutionality side.  So I don't think it's that much more

17    work to bring those two things together to advance the

18    requirements of the Consent Decree and get us where we want to

19    be.

20              THE COURT:  Okay.

21              MR. THOMPSON:  Mr. Rosenthal.

22              THE COURT:  Mr. Rosenthal.

23              MR. ROSENTHAL:  Yeah, just to tie up what Dr. Bowman

24    and Professor Meares have been talking about in terms of what

25    we as a monitoring team are doing on the assessment front in

1    each of these areas, stops, searches, and arrests and fair and

2    impartial policing, I want to disaggregate arrests from stops

3    and searches.  So as Professor Meares was just saying, we are

4    in the middle now of doing a comprehensive assessment of BPD's

5    arrests in the years 2019 and 2021.  We are taking a look at a

6    random sample of arrests from each of those years that will

7    produce statistically significant results from which we can

8    divine whether, as a matter of course, BPD officers are making

9    arrests with probable cause or not, and whether they are

10   adequately and accurately reporting facts in their statements

11   of probable cause that support probable cause.

12          So that's an analysis that's going on right now.  We

13   picked 2019 and 2021, with the consent of the parties, because

14   2019 was before the new policies on stops, searches, and

15   arrests went into effect and before the training on those new

16   policies took place, and 2021 was the first full year after

17   those policies went into effect and after the training took

18   place.  So we'd like to be able to compare the two to see

19   whether the new policies and the new training had an effect, a

20   positive effect.

21          Right now, we are a little more than halfway through

22   our random sample of 2019 arrests.  Hopefully we'll get done

23   with that within the next few weeks and then we'll go into

24   2021.  We should be done with our assessment, and we should be

25   producing a draft of our report to the parties by the end of

1    October, beginning of November.  And the hope is before the

2    end of this year, we will submit our report to Your Honor and

3    publish it for the community to see.  So that's where we are

4    on arrests.

5              THE COURT:  Okay.

6              MR. ROSENTHAL:  On stops and searches, we're talking

7    about pedestrian stops and traffic stops, and on searches

8    we're talking about both weapons pat downs and full searches.

9    As Dr. Bowman mentioned, the data is not yet there for us to

10   be able to perform that kind of assessment.  As Your Honor

11   knows, the new record management system has been in effect

12   with its accompanying electronic field-based reporting for

13   roughly a year now.  We, along with BPD and DOJ, started

14   kicking the tires on the data that it was producing near the

15   end of the last year, beginning of this year, and we

16   determined that there were some deficiencies in the fields

17   within the electronic reporting form that were leading

18   officers not to report everything that the Consent Decree

19   requires them to report.

20             So we have been working in earnest with the

21   department and with DOJ over the course of the last several

22   months to make sure that going forward, officers will be

23   reporting, and are required to report in those electronic

24   report forms all of the data that the Consent Decree requires.

25             We are almost there.  Mr. Melancon showed you a

1    slide earlier of the field that we have been working on for

2    the last few months.  I'm not sure we're quite there yet, but

3    we're most of the way there in terms of making sure that

4    officers are prompted, mandatorily, to fill out each and every

5    field the Consent Decree requires for us to be able to conduct

6    our assessments and for BPD internally to be able to conduct

7    those assessments.

8            We have a -- what we are going to do is we are going

9    to build into next year's monitoring plan, which will begin

10   late February, early March of 2023, our first comprehensive

11   assessment of both stops and searches, and the hope -- but

12   there's going to be some ramp-up time; right?  Even if the

13   Axon records electronic report form is done, everybody's

14   satisfied with it, within the next month, officers need to be

15   trained on it.  It's got to be rolled out and then it's got to

16   be used and then we need a sufficient amount of time to make

17   sure there's data there, a critical mass of data to evaluate.

18   So that's where we are on our assessments in this area.

19           On fair and impartial policing, I should say, you

20   know, we will be able to do sort of that racial and national

21   origin disparity analysis once the RMS is fixed and once it

22   has all the mandatory data fields that are required.  In the

23   arrests arena, the data is there, and it's something that we

24   are taking a look at in the analysis we are doing now.  So

25   that's that.

1           Let me just say one word, because I think, you know,

2      as between the three of us, I have probably worked most

3      closely with the audit unit in DOJ -- I mean in the department

4      and what they're doing, and Major Dombroski and Captain

5      Etwaroo is here.  And so I mean, I can say, just piggy-backing

6      on what Dr. Bowman said, that we do have confidence that that

7      internal function is one -- and I said this before in public

8      hearings, sort of one of the bright lights in the Consent

9      Decree process.  We have been impressed with the way they have

10     gone about assessing compliance with First Amendment.  We have

11     been impressed with the way they've gone about assessing

12     release without charge arrests, which Mr. Melancon talked

13     about before.  We have been impressed with the engagement that

14     we had with them on these issues.

15          They get it.  I mean, you saw that procedural

16     justice scorecard.  I mean, that's the unit that scorecard is

17     coming from; right?  They've got similar scorecards on use of

18     force; right?  They will have similar scorecards, I hope, on

19     arrests and on stops and searches once the data is there.  So

20     we do think that this is one of the functions within the

21     department that really shows the way forward.  And, you know,

22     I have enjoyed working with those folks, and I have no doubt

23     about their diligence and competency.

24          THE COURT:  Well, it gives me optimism about what

25     the next year or two are going to look like in this process.

1    In the early years of this, there's been so much frustration
2    because we've been waiting, waiting to have the ability to
3    make change, to understand what the change should be and so
4    forth.  And so I'm eager now, as I think all of you are, to be
5    in a position to actually start to affect some of this.
6              All right.  Mr. Melancon, leaves us with our final
7    topic; right?
8              MR. MELANCON:  And I will defer to Ms. Amato for our
9    presentation on sexual assault investigations.  She's our
10   foremost expert on this, and so I will turn over the
11   presentation to her.
12             THE COURT:  Okay.  You're a patient person,
13   Ms. Amato.
14             MS. AMATO:  Good afternoon, Your Honor.
15             THE COURT:  It's 3:37 in the afternoon.  We haven't
16   heard from you yet.
17             MS. AMATO:  Best for last, I guess.  So, Your Honor,
18   now we'll turn to talk about our progress in sexual assault
19   investigations, which received a score of 4C implementation on
20   track in the monitoring team's semiannual report.
21             So, Your Honor, as you know, we've done -- as we've
22   done with previous topics discussion, we start by reviewing
23   where we were prior to the Consent Decree in comparison to
24   where we are now.  The overall theme of policy, training
25   development, and data and implementation is the same here as

1    it has been for the other areas of the Decree.  Both Policy

2    708, rape and sexual assault, and the sex offense unit's SOP

3    have been approved, are active, and have actually gone through

4    an annual review already.

5          Of course, the effectiveness of policy and the SOP

6    are reliant on training, something that unfortunately the

7    department had not provided a lot of in this area in the past.

8    Under the Consent Decree, along with the annual investigator

9    training, BPD has made a conscious effort to ensure that all

10   members of the department are properly trained in

11   victim-centered, trauma-informed interviewing and

12   offender-focused investigations, as well as the neurobiology

13   of trauma and its effect on the brain, and Policy 708, which

14   is the primary department policy on rape and sexual assault

15   investigations.

16         An e-learning was also delivered in 2019 addressing

17   the new policy, and after administering Policy 708 in 2019, at

18   the suggestion of the DOJ and the monitoring team, BPD

19   developed an eight-hour sexual assault training for all

20   officers in 2020.

21         This year, BPD plans to deliver an e-learning to all

22   sworn members via Acadis covering nine of the deliverables

23   from paragraph 259 of the Consent Decree as a refresher to the

24   2020 training.

25         In all, sworn members have received trauma-informed

1    training four times, and are about to receive it for the fifth

2    time in this year's training.  That's how important we believe

3    it to be.  This e-learning will also serve as the triannual

4    MPCTC requirement for law concerning rape and sexual offenses

5    for all sworn personnel for 2022, which as Your Honor knows,

6    is our state requirement.  And as always, we will have our

7    in-person investigator training later this year, and that will

8    cover additional deliverables more specific to the needs of

9    investigators.  For 2022, it will be an eight-hour in-person

10   training for all of the sexual assault investigators who work

11   on any type of sexual assault investigation.

12          Your Honor, as you know, the implementation of the

13   policy and the SOP required data and the tracking of this work

14   so that we can document our efforts, something that we weren't

15   able to do very well before because there was a lack of

16   guidance on what needed tracking and the lack of technology to

17   track.  This has largely changed, however.  BPD collects

18   sexual assault investigations data by the means of Lotus Notes

19   and Axon records.  The BPD has been able to develop an annual

20   report for 2018, '19, and '20.  Each year, more data has been

21   able to be identified through changes in Lotus Notes and the

22   integration of Axon records.

23          The 2021 data report is currently underway as the

24   methodology has recently approved by both the DOJ and the

25   monitoring team, and the BPD plans to release this report to

1    the public in Quarter 4 of 2022, so that will be toward the
2    end of this year.

3           Since 2020, the department also has been auditing
4    sexual assault calls for service, which includes fourth degree
5    sex assaults, as those are primarily handled by patrol, not
6    the sexual offense unit.  The sexual assault call for service
7    audit tests the officers' initial response to sex assault
8    calls for service which can range from fourth degree to rape.

9           In 2020, 13 cases were fourth degree, and all
10   samples were compliant, so that was a hundred percent score.
11   In 2021, 19 cases were fourth degrees, and one sample was
12   noncompliant, so that was a score of 95.75 percent.  And in
13   2022, there have been three cases so far, which does not
14   include the most recent audit data, and that resulted in a
15   score of 100 percent compliant.

16          BPD has also created a victim survey that is posted
17   to BPD's website, and that was a collaboration between the
18   DOJ, the monitoring team, and we also received feedback from
19   our community partner, the Sexual Assault Response Team,
20   which, as Your Honor knows, is composed of a number of
21   victim's rights and advocacy organizations, as well as Mercy,
22   and the Baltimore Child Abuse Center.  And we did that so that
23   we could collect feedback from victims on their experiences in
24   interacting with the department.  And this is part of the
25   department's overall strategy to improve victim services.

1        BPD has also now been able to conduct three annual
2    sexual assault data reports.  These reports summarize the
3    results of BPD's analysis of sexual assault data for 2018,
4    2019, and 2020.  Each report is intended to provide a broad
5    overview of the investigations that BPD conducted.  And it's a
6    description of notable trends and outcomes.  And also to
7    provide an update on BPD's efforts to enhance its oversight of
8    its sexual assault investigations by expanding data collection
9    and analysis.  This includes information on the department's
10   implementation of its new web-based records management system.
11   That will include a case management component to replace Lotus
12   Notes in the future.

13        Over those three years of reporting, BPD has
14   continued to make improvements to increase the amount and
15   types of data available for analysis.  For last year's report,
16   which covered 2020 data, BPD was able to report, through Lotus
17   Notes, a full year's worth of data on co-occurring crimes, and
18   this was not available for 2019 or prior reports for the sex
19   offense unit's cases.  We were also able to report a full
20   year's worth of data on sexual assault evidence kit requests
21   and processing time lines each case in which a kit was
22   conducted for the sex offense unit's cases.  And we were also
23   able to conduct a review of the cases with certain reporting
24   codes to determine a more accurate number of fourth degree
25   sexual assault offense cases handled by BPD patrol.

1          So that brings us to the next stage, which is

2     assessments.  The monitoring team is in the midst of their

3     sexual assault investigation assessments.  The methodology was

4     improved in 2021, and they will review cases from 2018 and

5     2019, which occurred before the detectives received the

6     specialized training that we discussed earlier, and then

7     they'll also review cases from 2020 and 2021.

8          Some initial challenges have included the best way

9     to deliver the large amount of materials to the monitoring

10    team to review, as a complete case file includes reports in

11    Lotus Notes, in video interviews and other evidence.  The

12    monitoring team also needed to add capacity to review the

13    number of cases in the manner that was agreed to in the

14    methodology.  All of this was a time-consuming process and

15    resulted in some delays.  However, the monitoring team has

16    deepened their review, and BPD looks forward to receiving the

17    assessment for the time line in the monitoring plan.  And with

18    that, unless Your Honor has any questions, we can defer to the

19    DOJ and the monitoring team.

20         THE COURT:  I'm looking forward to my upcoming visit

21    at the sex offense unit that Director Sullivan, I think, has

22    got arranged together with my staff.  That's occurring, what,

23    sometime in September?

24         THE CLERK:  The 9th.

25         THE COURT:  The 9th.  And I know that will be a

1    productive session.

2           All right.  Who's going to address this from the

3    Department of Justice, Ms. Porter?

4           MS. PORTER:  Thank you, Your Honor.  Our

5    investigation of BPD raised concerns about gender bias in

6    sexual assault investigations that result in inappropriate

7    treatment of sexual assault victims and mishandling of

8    investigations.  The parties designed the Consent Decree to

9    address these concerns based on one central goal:  BPD must

10   conduct victim-centered, offender-focused, and trauma-informed

11   sexual assault investigations.

12          As Ms. Amato referenced today, for the past four

13   years, BPD, DOJ, and the monitoring team have worked hard to

14   develop policies and trainings to assure that BPD officers and

15   detectives handle every report of sexual assault appropriately

16   and without bias.  The department is currently beginning the

17   process of developing its 2022 sexual assault training

18   curriculum as required by the Consent Decree.

19          And as Ms. Amato stated, the department has also

20   developed a survey for victims to assess their experience with

21   both reporting sexual assault to BPD and the handling of the

22   investigation, including their interview with BPD.  The

23   department has worked with sexual assault advocates, as well

24   as the monitoring team and DOJ, to develop and implement this

25   tool.  These surveys are now in every district and available

1    online.

2            Finally, DOJ and the monitoring team have also been

3    providing SOU detectives and supervisors with technical

4    assistance on recently closed cases.  By reviewing such cases,

5    we've been able to see the impact that the training has had on

6    how detectives manage their cases and how they interact with

7    victims.  We have seen notable improvements, including the use

8    of soft rooms for victims and trauma-informed interviewing

9    techniques.  These sessions also provide DOJ, the monitoring

10   team, and BPD to identify gaps in policy and training that we

11   plan to address and have been addressing with annual

12   trainings.

13           And then lastly, as Ms. Amato referenced, BPD has

14   entered into a phase where the monitoring team can begin

15   assessing Consent Decree compliance and outcomes.  As

16   Ms. Amato stated, the monitoring team has selected cases for a

17   three-year period to review, and we expect to see a draft

18   report of their outcome assessment this fall.  And that

19   concludes our comments, Your Honor.

20           THE COURT:  Thank you, Ms. Porter.

21           Who's going to address this for the monitoring team,

22   you, Ms. Joyce?

23           MR. THOMPSON:  Ms. Joyce.

24           MS. JOYCE:  Yes, Your Honor.  So the monitoring team

25   agrees with the DOJ in terms of the progress that the

1  Baltimore Police Department has made in the area of sexual

2  assault investigation, specifically in the policies, the

3  training, the data collection, the analysis, and sharing

4  results with the public.  And so they are at the point now,

5  and the monitoring team is at the point, of understanding

6  whether or not this training -- the training and the policies

7  have indeed altered the behavior of the investigators and to

8  improve the quality of the investigations.

9        As you've heard, the monitoring team is in the midst

10  of the audit of the sexual assault investigation cases.  We

11  are you're looking at --

12        THE COURT:  When do you think that will be

13  completed?

14        MS. JOYCE:  We will have a draft submitted to the

15  parties in October with the intent to have a final report to

16  the Court in November.

17        We are looking at 149 cases.  There's only a handful

18  left to be done, so that's why I think we'll probably meet

19  those deadlines.  And as was mentioned, it is looking at a

20  variety of information and materials.  We have access to the

21  case file.  We have access to the interviews of the victim,

22  witnesses, and suspects, all of which we view, and we have an

23  instrument that was prepared in order to assess whether or not

24  the investigation and the investigative file and the

25  interviews all comply with the demands of the Consent Decree.

1    And so as you've heard, that includes

2 trauma-informed interviewing.  It's looking -- we're looking

3 for suspect-focused but also victim-centered, meaning that the

4 concerns of the victim is in the forefront.  As I said, we

5 expect to have all this done and to the Court by the -- in

6 November.

7    Outstanding challenges, it's the same themes that

8 you've heard today.  The case management system, they're still

9 functioning on Lotus.  They are looking at moving over to a

10 modern case management system.  And the monitoring team, along

11 with DOJ, have and will continue to be present and help the

12 police department in any way we can as they make that move to

13 ensure that the requirements of the Consent Decree -- because

14 there are a number of data requirements in that Consent

15 Decree, that that's being captured and continue to report on

16 it.

17    Staffing is an issue here also.

18    I think 14 detectives; is that right?

19    So they're at 14 detectives right now in the sex

20 offender unit, and two supervisors, two sergeants.  We heard

21 one sergeant not that long ago, last month, in fact, saying

22 that her squad had about 70 active cases.  That's a lot for

23 one sergeant to continually supervise.  On average, and this

24 is just playing with the numbers, it looks like an

25 investigator would have about 12 to 15-plus active cases on

1   the desk.  As I may have mentioned before, there's no national

2   standard, but one study I did come across suggested it should

3   be closer to eight per sexual assault investigator.

4          And I hesitate to do this, but what the heck,

5   because the topic of staffing and the impact on the Consent

6   Decree is a concern of yours and also a theme today, I just

7   want to say, I have done a number of these assessments myself.

8   And so this is just based on my review alone and just on my

9   cases, and it's not statistical in any sense of the term, it's

10  is just an observation.  And my observations are twofold.  One

11  is, the detectives, when they first get the case, really do

12  invest a great deal of time and effort.  I mean, in some

13  cases, I mean, I was impressed with the time and effort they

14  put in following up with the victim, tracking down leads,

15  trying to identify a suspect.  And yet, it's as if -- it's as

16  if something happened, all the effort stops.  Now, it could be

17  that the leads dried up, it could be all the investigation

18  that could have been done was done.  But again, my observation

19  is that that's not true in all cases.  My sense is they got a

20  new case on their desk.

21         And then when you look at the supervisor review,

22  again, this is a very gross generalization, but it appears to

23  be more pro forma and check-the-box review than it does -- at

24  least on paper.  Now, the conversations between a supervisor

25  and detective, obviously we don't see, but at least on paper

1    it looks more like a checklist review than a -- you know, a

2    helpful guiding directive kind of review.  And again, I would

3    say given that caseload of 70 cases, you can't deal with all

4    of that.  And it's a staffing issue.

5            THE COURT:  So if your full inquiry bears this out,

6    then I know you will report the same in the document that

7    you've produced to the -- for the party's review and

8    ultimately to the Court.

9            MS. JOYCE:  Yes.  Yes.  We will see what the data

10   say.

11           THE COURT:  Yes.

12           MS. JOYCE:  That's all I have, Your Honor.

13           THE COURT:  Okay.  Well, thank you very much.

14           Mr. Thompson, anything else from the monitoring

15   team?

16           MR. THOMPSON:  That's all from the monitoring team,

17   Your Honor.

18           THE COURT:  Mr. Melancon, we seem to have covered

19   all of our assigned topics?

20           MR. MELANCON:  We have, Your Honor.

21           THE COURT:  Ms. Porter, do you agree?

22           MS. PORTER:  Yes, Your Honor, we have nothing

23   further.

24           THE COURT:  Okay.  Very good.  Then, Ms. Porter, I

25   want to reiterate something that's been said many times, but,

1    you know, I pay these periodic visits to the police department

2    myself, different units at different times.  I just want to

3    remind you that the Department of Justice is always invited to

4    be present any time I am having any kind of substantive

5    engagement with the department.  I think you and Mr. Mygatt

6    are well aware of that, but the record should reflect that

7    that is SOP.  I don't have ex parte meetings with the police

8    department, unless the Department of Justice is fully aware

9    and is in agreement with that occurring.  That said, I think

10   it's September 9th that we have lined up.  You know, obviously

11   if you want to send one of your lawyers or attend yourself,

12   you're more than welcome to be a part of that visit.

13          Ms. Joyce, I'm going to ask that you consult with

14   Mr. Thompson and perhaps look at your own calendar and see

15   where you're going to be on September 9th.

16          MS. JOYCE:  Okay.

17          THE COURT:  Because it would be useful to me to have

18   you along on that visit and to assist me in understanding

19   exactly what I'm seeing and hearing.

20          MS. JOYCE:  I will make sure I'm there, Your

21   Honor.

22          THE COURT:  All right.  Well, that would be

23   terrific.

24          I'd like to have two quick meetings in the wake of

25   this hearing, neither of which will be on the record.  The

1    first would be with the Monitor himself, the commissioner, the

2    solicitor, and you, Ms. Porter.  And we'll do that in the jury

3    room right here.  And I don't think that will take very long.

4            And then I would also like, if it's possible, to

5    have a few minutes to meet with those members of the

6    monitoring team who are present today in chambers in 5A, and I

7    would invite the monitoring team to accompany my law clerks

8    who will take you up to chambers, 5A, and get you situated up

9    there.  Hopefully we -- we could probably just be seated in

10   the conference room, or if that's still tied up, in the

11   vestibule and I'll join you shortly.

12           Otherwise, thank you, everyone, for your

13   participation today and we're in recess.

14           (The proceedings were concluded at 3:56 p.m.)

15

16           I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
17   record of proceedings in the above-entitled matter.

                   _____/s/_____
18                      Christine T. Asif
                     Official Court Reporter
19

20

21

22

23

24

25

< Dates >.
April 19th
  69:5.
August 18th,
  2022 1:16.
August 25th
  92:24.
January 1
  80:2.
July 1st 58:19,
  59:1.
July 7th
  17:23.
September 9th
  171:10,
  171:15.
$1,000 76:7,
  77:6.
$22,000
  76:14.
$5,000 76:6,
  76:10, 76:12,
  76:25.
$50 109:9.
$60,000 75:16,
  100:5.
$650,000
  117:6.
$700,000
  109:16.
$75,000
  100:6.
$7500 77:4.
'10 57:17.
'12 57:17.
'15 57:17.
'19 161:20.
'20 161:20.
'21 21:1, 84:1,
  92:18,
  109:9.
'22 92:23,
  109:17.
'23 93:2,
  109:17,
  150:11.
'5 57:17.
(10 3:1.
(1006 3:1.
.

.
< 1 >.
1 50:22.
10 93:1,
  126:18,
  126:19.
100 80:2, 80:3,
  80:6,
  162:15.
101 1:45,
  2:45.
107 132:7.
10th 45:21.
114 80:7.
12 76:8,
  112:25,
  168:25.
13 162:9.
14 168:18,
  168:19.
149 167:17.
15 52:18, 62:6,
  62:7, 62:8,
  77:2,
  92:21.
15-plus
  168:25.
16 127:24.
16-hour
  122:16.
163 74:2.
17 104:4,
  112:25.
171 80:8.
175 53:1.
18 49:12,
  119:2.
180 46:20.
18th 80:4.
19 162:11.
1:10 106:4.
1st 80:5.
.
.
< 2 >.
2 131:15,
  131:20,
  136:18.
2,213 73:20.
2,605 73:11.

2,785 73:13.
20 104:7.
2015 8:7.
2016 139:10.
2017 4:13,
  32:22.
2018 15:10,
  70:1, 161:20,
  163:3,
  164:4.
2019 133:7,
  133:16,
  136:17,
  155:5,
  155:13,
  155:14,
  155:22,
  160:16,
  160:17,
  163:4,
  163:18,
  164:5.
2020 128:7,
  132:2, 132:6,
  133:7,
  133:10,
  136:18,
  160:20,
  160:24,
  162:3, 162:9,
  163:4,
  163:16,
  164:7.
2021 50:19,
  58:19, 65:18,
  68:15, 69:6,
  128:8, 133:7,
  136:20,
  155:5,
  155:13,
  155:16,
  155:24,
  161:23,
  162:11,
  164:4,
  164:7.
2022 5:19,
  8:10, 50:22,
  72:22, 81:1,
  84:2, 119:18,

  131:15,
  131:20,
  161:5, 161:9,
  162:1,
  162:13,
  165:17.
2023 86:22,
  117:5,
  157:10.
2105 103:12.
21201 1:46,
  2:46.
22 104:2,
  104:13.
2201 103:13.
2202 103:15,
  104:3.
2203 104:5.
24 104:6,
  132:8.
25 98:19,
  100:8.
250 118:21.
259 160:23.
2605 73:12.
29 104:2.
2:10 106:4.
.
.
< 3 >.
3 50:19,
  136:19,
  141:7.
30 61:13.
311 113:12,
  116:6,
  116:18,
  117:13.
35 74:6.
36 51:14,
  126:15.
3:30 38:19.
3:37 159:15.
3:56 172:14.
.
< 4 >.
4 50:19, 132:6,
  162:1.
40 52:8, 99:20,

122:24.
48 51:16,
  51:19, 51:21,
  51:24, 51:25,
  52:1, 52:3,
  52:6,
  126:16.
4C 106:16,
  159:19.
4th 1:45,
  2:45.
.
.
< 5 >.
50 44:14.
500 77:7.
51 93:9.
511 7:20.
522 73:20.
53 92:19, 93:5,
  93:8.
55 53:1.
57 80:8.
5A 172:6,
  172:8.
5th 69:6.
.
.
< 6 >.
60 53:4,
  99:19.
64 132:8.
670 58:21.
68 68:14,
  69:5.
6:00 88:15.
.
.
< 7 >.
70 168:22,
  170:3.
708 160:2,
  160:13,
  160:17.
750 73:13.
763 58:21.
7:00 88:16.
7th 4:13,
  45:14.
.

.
< 8 >.
80 92:18,
  93:1.
800 74:6.
89 113:22,
  136:6.
.
.
< 9 >.
90 88:3.
90-plus 93:2.
91 141:9.
925 73:12.
94 141:12.
95.75 162:12.
9th 164:24,
  164:25.
_____/s/___
_____
  172:20.
.
.
< A >.
a.m. 3:1.
abide 36:19.
abilities
  54:18.
ability 16:1,
  22:7, 101:22,
  115:11,
  136:15,
  138:21,
  139:16,
  142:9,
  159:2.
above-entitled
  172:18.
absolutely
  25:25, 31:2,
  97:3,
  150:16.
Abuse 162:22.
academy 72:9,
  77:1, 79:11,
  97:20, 98:10,
  98:24, 100:7,
  101:7,
  103:10,
  103:12.

Acadis 102:24,
  103:2,
  103:11,
  160:22.
ACC 63:12,
  65:1.
accentuate
  127:25.
accept 61:5,
  96:17.
acceptable
  147:22.
acceptance
  82:20.
access 133:19,
  143:18,
  167:20,
  167:21.
accidents
  93:11.
accommodate
  38:23.
accommodated
  46:8.
accompany
  172:1.
accompanying
  156:12.
accomplish
  122:20.
accomplished
  70:19,
  106:3.
accomplishment
  125:1,
  126:24.
accordance
  141:11.
according
  102:14.
accordingly
  66:8,
  151:2.
account 46:1,
  111:25,
  112:3.
accountability
  59:4, 59:7,
  59:9, 59:24,
  67:18,

123:22,
  130:6.
accumulated
  7:14,
  88:17.
accuracy
  89:10.
accurate 88:12,
  147:9,
  163:24.
accurately
  155:10.
achieve 11:21,
  22:2, 113:4,
  127:4.
achieved
  112:9.
achieving
  67:11.
acknowledge
  4:15, 46:12,
  97:17.
acquire
  142:25.
acquired 89:17,
  149:25.
acquisition
  143:23,
  147:6.
Across 12:10,
  45:15, 58:7,
  74:24, 75:5,
  78:25,
  117:10,
  119:1, 119:5,
  169:2.
action 6:12,
  7:5, 7:7,
  25:7, 27:10,
  117:1, 117:3,
  120:21,
  131:9.
actions 43:18,
  107:17,
  137:2,
  144:15.
activate
  79:21.
activated
  136:8.

activating
76:23,
79:6.
active 99:8,
160:3,
168:22,
168:25.
activities
34:24,
112:13,
120:3,
123:14,
145:13.
activity 6:12,
7:10, 41:17,
108:14,
125:17,
143:1,
143:4.
actual 37:21,
57:9, 69:22,
124:6,
135:10.
ad 4:24.
adapt 84:13.
adaptable
95:14.
adapted 95:25,
96:11.
adapting
95:8.
add 39:9,
94:24, 95:12,
95:13,
104:17,
105:20,
115:4,
164:12.
added 66:9,
75:13.
addiction
30:23.
adding 11:14,
83:1, 148:20,
150:13,
150:17,
150:24.
addition 18:14,
32:9, 45:23,
51:13, 54:16,

56:9, 75:19,
109:7,
128:10,
133:3.
Additional 5:6,
10:21, 52:9,
59:8, 86:18,
90:6, 114:17,
115:5,
116:17,
150:24,
161:8.
Additionally
65:23,
133:8.
address 12:17,
19:5, 20:10,
24:25, 34:17,
36:6, 37:17,
39:16, 46:24,
68:2, 116:5,
120:14,
120:22,
132:15,
139:24,
140:25,
147:25,
165:2, 165:9,
166:11,
166:21.
addressed
11:23, 22:9,
25:2, 32:13,
32:16, 35:25,
41:18,
105:10,
125:12.
addresses
16:11,
35:16.
addressing
17:16, 67:19,
113:20,
160:16,
166:11.
adds 103:2.
Aden 1:38.
adequately
155:10.
adhere 91:12.

adherence 6:19,
153:23.
adheres 5:14.
adjudicate
42:1.
admin 98:2.
administered
124:21.
administering
160:17.
administration
17:8, 20:18,
22:1, 22:15,
25:13, 105:7,
145:3.
administrative
59:12, 59:23,
59:25, 61:1,
61:22, 63:17,
121:14,
143:8.
admission
28:18.
admitted 62:3,
62:4.
adopt 148:16.
adopted
139:23.
adopting
95:4.
advance 14:12,
38:23,
154:17.
advanced 102:1,
102:2.
advancements
49:23.
advances
49:23.
advantaged
149:6.
advertise
76:5.
advertisements
75:10.
advisable
99:12.
advised 15:7.
advisor
21:19.

advocacy
162:21.
advocates
165:23.
aer 85:11.
affairs 14:21,
15:11, 51:4,
56:6,
148:25.
affect 78:22,
137:1,
159:5.
afflicting
6:15.
afternoon
38:18,
106:12,
106:13,
122:11,
152:18,
152:20,
159:14,
159:15.
afterwards
38:20,
57:8.
agencies 12:11,
21:21, 60:17,
69:11, 78:9,
96:7, 96:11,
109:7.
agenda 47:10.
aggressive
8:16, 26:20,
40:23,
42:16.
agitation
8:16.
ago 15:20,
28:20, 30:12,
42:7, 50:3,
52:24, 53:3,
54:21, 67:15,
82:21, 83:11,
85:5, 92:24,
129:10,
144:1,
168:21.
agree 33:22,
42:6, 57:12,

65:12, 95:3,
122:12,
142:21,
170:21.
agreed 7:17,
15:22,
164:13.
agreement 7:22,
14:14, 19:20,
43:10, 75:15,
82:13,
171:9.
agrees 13:25,
166:25.
ahead 3:3, 4:9,
63:9, 70:21,
131:10,
149:13,
152:9,
154:14.
aided 117:5.
aimed 37:18.
ain't 31:17.
Air 60:24.
al 1:9, 1:26,
3:6.
albeit 74:10.
alerted
11:13.
alienated
8:17.
alignment
45:6.
alive 109:3.
allegations
60:4.
alleged 7:11.
alleviate
81:3.
Alliance
116:13.
allocated
109:16.
allow 52:17,
74:3,
121:18.
allowance
76:8.
allowed
134:21.

allowing 20:15,
30:5.
allows 18:4,
18:12, 55:1,
89:18, 97:21,
145:2.
alluded
16:12.
almost 10:1,
24:21, 52:25,
83:6, 84:12,
92:23,
156:25.
alone 101:18,
169:8.
already 12:9,
15:15, 22:9,
23:3, 26:6,
27:24, 36:2,
38:24, 82:7,
85:21, 85:23,
115:2, 116:1,
149:17,
149:19,
154:3,
154:12,
154:14,
154:15,
160:4.
alter 78:9.
altered 78:15,
167:7.
alternative
78:8.
alternatives
35:20,
121:17.
Although 92:25,
120:5.
altogether
36:8.
Amato 1:30,
3:19, 48:8,
159:8,
159:13,
159:14,
159:17,
165:12,
165:19,
166:13,

166:16.
amend 134:14.
Amendment
26:10, 41:9,
158:10.
America 3:5.
American
15:7.
Amethyst 2:9.
among 16:11.
amount 67:9,
70:9, 99:21,
125:14,
157:16,
163:14,
164:9.
amounts
85:20.
analyses 146:2,
149:18,
150:20.
analysis 41:21,
90:1, 116:18,
128:2,
130:12,
130:14,
132:4, 132:9,
133:20,
144:19,
146:6,
148:21,
150:15,
155:12,
157:21,
157:24,
163:3, 163:9,
163:15,
167:3.
analyst 150:17,
151:5.
analysts
150:24,
151:11.
analytics
149:1,
150:12.
analyzed 19:23,
129:21,
131:14.
And/or

110:23.
animates
146:6.
Anne 69:13.
announce 20:18,
31:25, 51:7,
75:22.
announced
23:25, 25:4,
25:15, 44:11,
109:9,
127:6.
announcement
79:22,
85:9.
annual 74:19,
74:25,
110:19,
125:2, 160:4,
160:8,
161:19,
163:1,
166:11.
Answer 61:24,
83:14, 93:13,
98:14,
137:21,
143:14,
143:19,
144:2, 144:5,
144:7,
147:20.
answered 28:25,
29:13.
anticipate
10:6, 63:4,
103:13,
150:21.
anticipated
85:12,
86:21.
antiquated
148:9.
Anybody 30:7,
55:12.
anyway 24:11,
24:22,
117:24.
apace 5:19.
appalling

6:6.
appallingly
  37:12.
apparent
  113:24.
apparently
  41:25.
appeal 61:13,
  61:14, 62:2,
  134:11.
appealed 61:16,
  62:24.
appealing
  41:9.
appeals 26:8.
APPEARANCES
  1:19, 2:1.
appears 34:22,
  169:22.
appetite
  32:21.
applaud 143:22,
  144:15,
  145:4.
applicable
  67:10.
applicant
  102:18.
applicants
  51:17, 51:18,
  84:4.
application
  114:16.
applications
  74:6, 75:12,
  84:15.
applied 41:5.
applies
  23:22.
apply 119:25.
appointments
  59:11.
appreciate 5:7,
  13:21, 13:22,
  14:4, 24:3,
  37:2, 38:22,
  39:5, 78:19,
  145:19,
  145:20.
appreciated

124:12.
apprehend
  26:22,
  29:25.
approach 18:11,
  18:12, 32:25,
  45:2, 46:4,
  73:8, 73:11,
  84:21, 96:6,
  101:12,
  109:5,
  121:24,
  135:11.
approaches
  121:7.
appropriate
  6:20, 7:3,
  12:18, 27:10,
  35:19,
  105:25,
  108:14,
  114:1,
  121:16.
appropriately
  27:3, 35:8,
  135:18,
  165:15.
approval 23:19,
  90:10.
approved 75:23,
  160:3,
  161:24.
April 4:13,
  5:8, 10:11.
aptitude
  151:9.
arbitrary
  63:18.
area 15:25,
  36:3, 45:4,
  68:8, 68:12,
  70:15, 97:16,
  100:4,
  105:11,
  105:13,
  111:1, 111:2,
  122:14,
  122:22,
  123:15,
  125:16,

125:18,
  148:4,
  149:20,
  157:18,
  160:7,
  167:1.
areas 48:13,
  50:15, 67:22,
  67:23, 67:24,
  69:7, 82:14,
  106:23,
  107:6, 118:5,
  120:19,
  120:21,
  122:13,
  125:11,
  126:4,
  139:11,
  139:15,
  140:10,
  155:1,
  160:1.
arena 157:23.
argue 62:17,
  63:1.
argues 30:7.
arise 43:4.
arm 95:12.
around 37:24,
  38:18, 42:9,
  94:5,
  111:17.
ARPA 109:10.
arranged
  164:22.
arrest 24:11,
  27:2, 35:20,
  40:15,
  121:17,
  128:4, 133:6,
  133:11,
  133:17,
  139:18,
  145:10.
arresting
  23:22, 24:20,
  131:22.
arrival
  37:22.
articulate

92:2.
articulated
  25:22,
  133:14.
Arundel
  69:13.
ascension
  14:24.
aside 71:24.
Asif 1:44,
  2:44, 172:16,
  172:21.
asks 118:12.
aspects 69:2.
aspirations
  66:24, 126:8,
  126:21.
assaults
  162:5.
assemble
  145:24.
assess 36:5,
  103:9,
  120:22,
  141:24,
  144:25,
  145:12,
  165:20,
  167:23.
assessed 70:2,
  129:21.
Assessing
  67:16, 74:22,
  140:8,
  158:10,
  158:11,
  166:15.
assigned 19:12,
  51:8, 61:10,
  126:15,
  170:19.
assignment
  16:6,
  98:12.
assist 36:6,
  42:20, 67:10,
  120:3,
  171:18.
assistance
  9:25, 10:8,

27:20, 31:12,
41:24, 66:12,
67:9, 67:13,
114:19,
117:7,
166:4.
Assistant 1:29,
1:30, 15:4.
associated
23:6, 123:10,
124:1, 128:3,
133:10.
assume 106:7,
118:15.
assumption
105:17.
assure 71:17,
165:14.
assured
81:20.
attached
115:23,
125:22.
attempt 32:6.
attempted
9:23.
attend
171:11.
attended 26:17,
69:11.
attending 30:9,
69:13,
69:14.
attention
30:20, 41:22,
70:8, 70:9,
80:17, 82:6,
110:12,
114:2,
123:24.
attorney 25:13,
25:17, 25:21,
39:4, 108:21,
130:16,
131:1,
131:12.
attorneys
64:23,
64:24.
attract 99:1.

attrition
98:11.
audience 29:17,
78:8.
audit 51:5,
132:21,
133:15,
133:22,
158:3, 162:7,
162:14,
167:10.
auditing
132:13,
162:3.
Audits 50:24,
129:1, 129:4,
130:11,
132:3, 132:5,
132:20,
133:9,
133:11,
137:15,
138:8, 138:9,
150:20,
154:12.
augment
85:21.
August 45:21,
80:4.
authentically
144:17.
authorities
10:3.
authority
32:23,
35:24.
automobile
5:22.
automobiles
41:15.
available 39:4,
79:23, 87:3,
92:6, 95:9,
123:20,
129:19,
133:12,
163:15,
163:18,
165:25.
average 53:1,

168:23.
avoid 67:1,
95:18.
aware 19:18,
39:13, 40:24,
56:4, 93:24,
101:14,
123:14,
171:6,
171:8.
awareness
19:18.
away 27:8,
38:6, 38:18,
48:18, 66:11,
79:9, 96:5,
128:24.
awesome
94:17.
Axon 86:10,
86:18, 86:25,
89:18, 90:6,
128:25,
140:11,
140:16,
153:16,
157:13,
161:19,
161:22.
.
.
< B >.
backfilling
98:9.
backgrounds
22:22.
backlog
129:15.
bad 17:21,
31:7, 56:20,
56:25, 71:15,
80:9.
balance 45:5.
balanced 45:1,
46:3, 46:9.
balances
46:4.
balancing
18:8.
bans 26:14.

bar 20:11.
bargaining
76:4.
barriers
137:3.
base 87:6.
Based 102:17,
105:17,
107:9,
116:17,
130:25,
131:2, 142:5,
148:11,
165:9,
169:8.
baseline
116:15,
116:17.
basement
101:9.
Basic 32:13,
37:18, 41:12,
102:2,
140:13.
Basically 88:2,
99:15.
basics 78:15.
basis 53:13,
56:2, 72:22,
84:12, 85:3,
108:16,
124:10,
124:18,
132:3,
134:23,
138:15.
Baybrook
116:12,
120:17.
bear 10:22,
13:13,
31:13.
bears 170:5.
become 9:13,
11:20, 105:1,
123:14,
137:3,
146:12,
146:15,
146:17,

147:19.
becoming 28:11,
    138:24.
beg 38:17.
began 127:22.
begging
    41:10.
begin 13:3,
    13:20, 44:8,
    84:12, 98:20,
    124:22,
    128:9, 157:9,
    166:14.
beginning 11:6,
    50:17, 75:8,
    89:22, 93:23,
    124:21,
    156:1,
    156:15,
    165:16.
behalf 3:20,
    92:17.
behavior 29:22,
    167:7.
behavioral
    36:5, 48:25,
    103:18,
    137:10.
behind 14:23,
    58:10,
    143:25.
Beijing 15:7.
Bel 60:24.
believe 18:10,
    19:17, 25:3,
    29:10, 38:17,
    46:8, 65:16,
    80:11, 83:16,
    92:24,
    161:2.
below 84:17.
benefit 5:7,
    53:11, 57:2,
    79:11, 90:2,
    118:6.
benefits 32:17,
    38:1, 99:6,
    99:7.
Best 5:1, 5:15,
    31:11, 76:21,

86:19, 87:3,
    88:20,
    107:10,
    118:13,
    159:17,
    164:8.
best-practice
    114:20.
better 10:7,
    12:20, 28:21,
    28:22, 32:19,
    36:22, 45:6,
    57:21, 66:1,
    66:2, 74:4,
    89:18, 96:10,
    109:22,
    138:19,
    151:8,
    151:15,
    153:15,
    153:17.
beyond 19:2,
    35:24, 40:3,
    126:5,
    147:21.
bias 136:25,
    137:1, 137:5,
    143:21,
    165:5,
    165:16.
bidding
    90:23.
Big 15:14,
    31:3, 46:17,
    47:11, 47:12,
    71:10, 76:17,
    78:9, 86:3,
    96:17, 98:10,
    102:6, 119:6,
    130:13,
    140:13.
biggest
    122:23.
bit 15:18,
    16:2, 34:9,
    41:5, 67:3,
    67:5, 68:3,
    110:16,
    111:11,
    114:2, 120:7,

129:4.
bits 145:12.
biweekly 89:6,
    117:2.
black 53:18,
    144:6.
bleed 115:17.
blessing
    84:8.
blinking 47:20,
    52:21.
block 6:15.
Blue 51:9.
board 59:4,
    59:7, 59:9,
    59:12, 59:24,
    61:6, 61:7,
    61:8, 61:10,
    61:11, 61:12,
    61:16, 61:20,
    62:17, 84:6,
    151:13,
    151:14.
boards 62:23.
body 7:13,
    106:14,
    153:5.
body-worn
    133:11.
bolster
    107:3.
bona 41:20.
bone 68:21.
bones 126:9.
bonus 76:7,
    76:20, 77:4,
    77:6.
bonuses 79:1,
    79:8.
borderline
    149:22.
bore 82:7.
bound 9:25.
boundaries
    44:13,
    46:6.
boundary
    44:12.
bounds 5:14.
Bowman 1:41,

142:16,
    142:19,
    145:17,
    145:18,
    146:10,
    146:16,
    146:21,
    148:1, 149:8,
    150:7,
    151:25,
    154:23,
    156:9,
    158:6.
box 131:19,
    132:8,
    138:18.
brain 160:13.
break 38:25,
    48:3, 52:16,
    77:20, 106:1,
    106:5.
breakdown
    141:25.
Brian 2:5.
brief 80:23.
briefing
    44:9.
briefly 15:2,
    26:7, 27:15,
    38:18.
bright 158:8.
bring 31:10,
    31:11, 31:13,
    105:22,
    118:1,
    132:14,
    151:13,
    151:23,
    153:20,
    154:17.
Bringing 18:11,
    21:3, 51:23,
    84:6.
brings 164:1.
Brisco 2:10.
Briscoe 48:7,
    106:10,
    106:12,
    106:13,
    109:20,

110:1,
110:18,
111:9,
111:21,
112:17,
113:8, 114:6,
115:20,
116:8, 118:7,
119:18,
120:10,
120:20,
134:25.
broad 6:8,
7:15, 11:7,
163:4.
broader 56:4,
56:16,
56:23.
broadly
79:23.
broken 9:19,
9:21, 27:10,
141:24.
Bromwich 4:22,
8:15, 50:8,
108:1.
brought 10:22,
22:25,
114:18.
budget 151:1,
151:22.
budgetary
79:16.
build 58:10,
98:8, 100:20,
100:23,
100:24,
101:1, 101:7,
102:1, 115:8,
115:11,
117:7,
154:11,
157:9.
building 73:24,
74:11.
buildings
100:19,
100:21,
100:24,
101:2.

builds 82:18,
119:20.
built 147:16.
bulletins
89:6.
bumps 93:23.
bunch 153:4.
burden 13:13,
87:12.
Bureau 21:2,
21:18, 23:4,
44:3, 49:21,
57:14, 66:19,
70:22, 98:13,
148:25,
150:18,
151:20.
bureaus
81:22.
bury 71:21.
bus 47:5.
business 16:16,
18:21, 62:8,
108:12,
110:6,
110:13,
112:3.
buy-in
144:12.
buzz 94:3.
.
.
< C >.
CAD 108:14,
108:15,
112:4,
112:17.
cadence 89:1.
calendar 72:22,
86:24,
136:21,
171:14.
call 3:3,
19:10, 51:15,
53:7, 89:1,
89:2, 110:22,
111:16,
121:15,
123:2,
143:11,

162:6.
callback
123:6.
callbacks
83:10.
called 3:6,
13:19, 55:19,
122:24.
calling 3:4,
38:11.
calls 44:24,
83:15,
112:14,
121:15,
126:21,
162:4,
162:8.
camera
133:12.
cameras
153:5.
campaign
94:16.
candidates
102:15,
151:7,
151:9.
Canton 2:7.
cap 77:8.
capabilities
54:17, 55:1,
93:15,
140:17.
capability
87:19,
91:15.
capable 23:9,
72:12.
capacities
37:6.
capacity 12:8,
15:25, 54:14,
73:24, 74:11,
98:8, 101:13,
102:8,
114:21,
117:7, 127:3,
146:6,
147:15,
147:16,

148:13,
149:1,
149:12,
150:12,
150:23,
151:23,
152:10,
153:12,
153:14,
154:13,
154:15,
164:12.
capital 75:1.
capped 99:14.
capricious
63:18.
Captain 2:11,
51:7, 51:9,
158:4.
capture 144:16,
144:17,
144:19.
captured 54:23,
142:7,
168:15.
car 124:9.
care 144:10,
144:11.
career 14:23.
careful
125:25.
carefully
125:9.
carried 7:7.
carry 105:13.
carrying
127:18.
cars 78:13,
88:8, 92:15,
93:15, 94:4,
94:8.
caseload 74:4,
170:3.
categories
48:16, 49:12,
137:24.
categorized
90:14,
130:24.
cause 62:9,

130:18,
132:4,
133:13,
142:6, 153:5,
155:9,
155:11.
cautionary
38:3.
CCTV 133:12.
CD 34:2.
cell 87:8,
87:17,
88:8.
census 12:5,
44:22.
cent 131:19.
Center 19:19,
55:14, 72:18,
81:21, 82:8,
126:7, 136:9,
162:22.
centers
94:14.
central
165:9.
certain 8:22,
31:2, 42:14,
45:9, 46:5,
73:16, 81:14,
96:4, 129:24,
130:19,
131:1,
134:12,
142:3,
163:23.
Certainly
24:21, 27:14,
33:1, 39:10,
53:8, 53:23,
54:18, 59:15,
64:13, 82:8,
113:25,
148:20.
certified
141:6.
certify
172:16.
cetera 54:25,
57:8, 62:9,
71:17, 78:5,

78:14, 98:25,
112:15.
chain 73:2.
challenge
23:12, 72:5,
73:21, 83:7,
110:25,
112:5, 120:6,
121:5, 125:7,
135:16.
challenges
63:6, 67:22,
80:25, 81:16,
84:19, 84:21,
110:4,
126:13,
133:10,
140:18,
140:23,
164:8,
168:7.
challenging
28:9, 57:15,
123:4.
chambers 38:17,
172:6,
172:8.
Chance 32:7,
43:20.
change 20:18,
25:12, 28:1,
29:14, 29:22,
41:4, 41:6,
46:5, 56:21,
57:10, 57:11,
57:23, 64:14,
131:9, 148:5,
159:3.
changed 28:15,
28:20, 30:8,
30:17, 44:13,
56:14, 57:20,
108:9,
129:17,
161:17.
changer 87:9.
changes 26:3,
26:4, 27:14,
30:10, 31:3,
41:22, 55:25,

57:1, 58:19,
58:20, 58:21,
64:19, 65:25,
73:14, 83:25,
106:25,
129:20,
131:10,
143:17,
161:21.
changing 10:25,
29:11,
58:1.
chaos 64:7.
charge 25:18,
32:22, 59:23,
60:3, 60:8,
61:1, 95:11,
130:11,
142:5,
150:14,
158:12.
charges 129:2,
130:16,
142:4.
charging 59:12,
59:23, 59:25,
60:10.
charitable
26:8, 41:9.
chart 64:2,
64:8,
64:16.
chasing
133:16.
chat 39:15.
check 77:20,
108:12,
138:18.
check-the-box
169:23.
checking
63:17.
checklist
170:1.
checks 110:7,
112:3.
CHIEF 1:15,
2:7, 14:21,
14:25, 15:10,
20:21, 21:18,

21:23, 122:9,
122:10,
122:12.
Child 162:22.
China 15:7,
15:9, 16:3.
choice 33:9,
110:11,
148:19.
choose
108:11.
chosen 21:7.
Christine 1:44,
2:44, 172:16,
172:21.
circle 95:1.
circuit 61:14,
61:17, 61:23,
63:22.
circulate
122:4.
circumstance
44:17.
circumstances
28:9, 41:6,
61:21, 135:9,
135:19,
138:2.
citation 24:19,
40:13.
cities 8:5,
114:19,
114:21.
citywide 125:8,
125:24.
CIVIL 1:8.
civilian 51:17,
52:5, 52:9,
61:10, 73:12,
73:13, 73:20,
73:25, 76:24,
84:7, 84:8,
84:10, 84:17,
97:25, 98:23,
99:7, 99:9,
99:10.
civilianization
73:3, 73:15,
82:16, 84:3,
97:19,

126:16.
civilianize
    151:21.
civilianizing
    81:14.
civilians
    51:20, 51:23,
    52:2,
    97:21.
clamoring
    8:13.
clarifying
    24:3.
class 63:2,
    69:11,
    103:12,
    103:15,
    104:1, 104:2,
    104:3, 104:5,
    104:12.
classes 104:22,
    104:23,
    122:18.
classic
    15:23.
classification
    69:8,
    73:25.
clear 10:5,
    10:11, 27:8,
    38:7, 41:7,
    42:8, 75:22,
    131:5,
    146:7.
clearly
    130:21.
CLERK 3:3,
    164:24.
clerks 172:7.
click 75:11.
clicking
    75:9.
climate 83:3.
climb 31:20,
    100:2.
close 40:20,
    60:6, 124:24,
    132:11.
closed 166:4.
closely 19:7,

133:5,
    158:3.
closer 169:3.
closest
    55:25.
co-occurring
    163:17.
code 108:14,
    110:7,
    112:4.
codes 108:11,
    112:18,
    163:24.
codevelopers
    107:15.
codifies
    136:11.
cofacilitators
    107:14.
coherent
    6:20.
coin 19:14.
coincides
    37:22.
collaborate
    134:19,
    141:12.
collaborating
    50:25,
    51:3.
collaboration
    25:20, 34:11,
    34:17, 34:20,
    60:16, 60:19,
    94:7, 108:24,
    109:8, 140:2,
    140:25,
    162:17.
collaborative
    16:10, 16:11,
    16:13, 16:21,
    17:9,
    26:16.
collaboratively
    151:22.
colleague
    139:8,
    141:2.
colleagues
    39:2.

collect 90:6,
    98:20,
    116:15,
    162:23.
collected
    117:14.
collection
    27:22,
    130:12,
    140:8, 163:8,
    167:3.
collects 108:9,
    161:17.
column 59:14,
    59:25,
    61:6.
columns 59:3.
combine
    76:13.
combined
    99:16.
combining
    76:16.
comes 41:17,
    54:20, 54:22,
    71:2, 86:4,
    97:19, 99:4,
    114:12,
    115:12,
    123:3, 130:3,
    138:20,
    150:1.
comfortable
    4:7, 17:2,
    17:4, 18:16,
    69:23.
coming 16:16,
    17:25, 47:10,
    59:20, 66:24,
    71:7, 74:9,
    74:16, 75:14,
    76:18, 77:14,
    80:16, 81:10,
    90:24, 112:2,
    149:16,
    158:17.
command 5:2,
    32:14, 51:13,
    73:2, 94:14,
    105:9, 119:4,

128:14,
    138:16.
commander
    111:5,
    111:12.
commanders
    54:23,
    110:20,
    119:6.
comment 41:2,
    45:15.
commentary
    109:19.
comments 20:13,
    33:14, 38:7,
    56:24, 65:8,
    65:12, 67:21,
    80:14, 82:9,
    82:12, 105:3,
    105:19,
    119:17,
    122:6, 139:7,
    141:1,
    151:17,
    166:19.
COMMISSIONER
    HARRISON
    23:14, 25:2,
    25:25,
    33:12.
commissioners
    22:21,
    31:25.
commit 23:22,
    26:23, 29:23,
    29:24,
    29:25.
commitment
    121:20.
committed
    28:10, 33:4,
    33:10, 70:11,
    81:7, 115:13,
    131:13,
    142:6.
committee
    59:12, 59:24,
    60:1, 61:1.
common 45:9.
commonly 107:9,

108:22,
109:11.
communicated
4:20.
communication
55:6.
communities
10:5, 10:8,
16:16, 34:11,
45:10,
118:10,
118:11,
118:16,
118:21,
118:25,
120:17,
124:12.
community-based
107:14,
107:15.
community-orien
ted 34:5,
113:7.
companies
15:7.
compare
155:18.
compared
54:3.
comparison
77:5, 127:21,
159:23.
compel 9:10.
compels 31:21,
33:2.
competency
146:12,
146:19,
146:23,
158:23.
competitive
77:16,
102:19,
151:14.
compiled
108:16.
compiling
74:24.
complainant
54:13, 55:5,

60:6.
Complaint 50:5,
51:1, 51:3,
53:24, 54:20,
55:19, 56:19,
59:21,
60:1.
complaints
28:21, 53:17,
53:21, 55:17,
55:18, 55:21,
56:10, 57:24,
58:24, 59:5,
59:6, 59:7,
59:16, 59:17,
59:18,
59:20.
complete 27:21,
32:11, 48:15,
70:25, 85:20,
106:4,
122:15,
149:4,
164:10.
completed
46:20, 48:13,
68:14, 68:16,
75:3, 86:11,
90:17, 96:24,
103:19,
116:22,
140:15,
141:6,
167:13.
completely
13:24, 22:22,
30:12, 31:8,
31:14, 91:3,
95:3, 100:18,
134:10.
completeness
128:14.
completing
45:8,
108:13.
completion
59:21,
129:23.
complex 5:22,
37:13.

compliant 8:9,
162:10,
162:15.
complicated
39:22,
90:17.
complies 9:7.
complimented
64:2.
comply 32:10,
136:15,
167:25.
complying 9:6,
28:11.
component
74:15, 86:11,
89:19, 90:3,
92:4, 97:25,
98:10,
101:17,
119:6,
130:13,
132:22,
163:11.
components
81:15, 86:8,
90:18,
102:21.
comport 8:2.
compose
102:5.
composed
162:20.
comprehensive
28:3, 48:24,
66:14, 68:25,
142:8, 155:4,
157:10.
computer-aided
108:10.
computers
78:13, 88:8,
92:14,
93:6.
COMSTAT 108:17,
112:24,
117:19,
138:15.
concede
80:11.

conceive
7:25.
conceived
88:20.
concept 109:21,
110:17,
134:23.
conception
13:6,
33:23.
concepts
119:20,
120:1, 137:8,
137:12.
concern 5:21,
120:12,
125:22,
169:6.
concerned
12:15,
71:25.
concerning
161:4.
concerns 6:5,
34:15, 34:17,
46:5, 125:13,
165:5, 165:9,
168:4.
concluded
172:14.
concludes 65:6,
80:13,
117:22,
119:9, 122:5,
139:2, 141:1,
166:19.
conclusively
145:11.
conditions
78:13.
conduct 7:15,
24:14, 35:6,
41:11, 41:18,
51:2, 70:4,
102:4, 108:1,
116:16,
121:11,
128:4, 133:5,
141:18,
142:9, 145:8,

148:21,
149:18,
157:5, 157:6,
163:1,
163:23,
165:10.
conducted 4:22,
27:2, 68:23,
74:14,
107:25,
128:7, 133:9,
163:5,
163:22.
conducting
65:24, 69:8,
120:3,
143:2.
conducts
35:2.
conduit
55:14.
confer 118:6.
conference
172:10.
conferences
11:17,
11:25.
confidence
54:13,
158:6.
confident 5:16,
18:13, 31:3,
145:25,
146:9,
147:13.
configuration
89:23.
configure
86:18.
configured
140:19.
confines
40:18.
confirm 27:7,
77:21.
conflate 29:6,
29:18.
confronted
80:1.
confronting

135:16,
147:7.
confusing
64:6.
congratulate
126:3.
conjunction
136:17,
136:18,
141:19,
146:4.
connect 91:9,
91:13, 91:15,
94:14.
connection
9:4.
connects
91:7.
Conroy 1:29,
3:19, 14:19,
15:13, 16:7,
43:14.
conscious
160:9.
consequence
32:7, 62:14,
97:5.
consequences
31:4, 32:17,
38:1.
consequently
4:19,
134:11.
consider 7:4,
31:16, 95:6,
141:11.
considerable
4:15, 12:14,
36:4, 67:9.
considered
40:15.
consistency
123:3.
consistent
34:22, 35:5,
35:6, 35:11,
101:22,
136:6,
153:19.
consistently

5:14, 121:11,
140:22.
consists
61:8.
constant
39:14.
Constitution
8:9, 9:8,
23:16, 35:1,
35:12, 36:20,
40:1.
Constitutional
6:1, 7:11,
9:4, 14:13,
18:9, 23:17,
34:4, 35:5,
35:7, 35:9,
36:16, 41:21,
42:1, 43:8,
107:1,
127:23,
140:7,
145:14,
146:23.
constitutionali
ty 18:5,
145:1, 154:9,
154:16.
constitutionall
y 27:7,
133:25,
134:3,
134:5.
constrained
11:3.
construction
145:23.
constructs
34:16.
consult
171:13.
consultation
40:20, 85:2,
85:17,
129:19.
consume
85:19.
consuming
133:12.
consumption

73:10.
Cont'd 2:1.
contact 24:12,
39:14,
50:13.
contacts
127:20.
content 100:9,
141:14.
context 11:24,
16:4, 18:22,
56:4, 56:19,
115:4,
115:5.
contextually
7:3.
continual
84:10.
continually
95:25,
168:23.
continue 11:4,
14:1, 26:22,
27:9, 52:21,
58:16, 66:5,
81:2, 81:17,
86:9, 89:6,
108:18,
117:2, 117:4,
123:18,
136:6,
147:12,
168:11,
168:15.
continued
97:14,
131:16,
163:14.
continues 5:19,
12:5, 67:13,
70:3,
126:13.
Continuing
23:15, 81:8,
81:12,
101:20,
103:18,
103:25,
115:17,
117:15,

120:9,
133:1.
contraband
142:3.
contract
100:6.
contractor
99:5, 99:14,
99:15, 99:17,
99:20.
contractors
83:17.
contribute
31:1.
contributes
31:2.
contributions
41:9.
control 7:25,
57:18.
conundrum
5:21.
convened
4:10.
conversation
39:9.
conversations
107:11,
154:3,
169:24.
Conway 61:15,
62:1.
cooperate
9:22.
cooperation
11:5, 36:18,
66:4, 66:5.
coordinate
21:20.
coordinating
131:11.
coordination
107:23,
120:1.
copied 91:5.
Coppin 101:6.
coproducer
144:13.
core 11:18,
32:16, 37:6,

126:7,
146:12,
146:19,
146:23,
148:19,
148:22.
corner
123:13.
corners
17:22.
Correct 35:9,
52:11,
100:22,
128:3,
172:17.
correctional
12:10.
corrections
81:20.
corrective
7:20,
32:20.
correctly 26:7,
86:17.
correlating
54:9,
54:10.
council 21:20,
45:21, 46:20,
46:22.
counsel 3:8,
3:16, 3:21,
17:12,
21:19.
count 73:19,
84:17,
126:18.
counted 52:2,
52:6.
counterparts
78:25.
country 12:10,
31:11, 78:25,
82:2, 91:2.
County 60:24,
69:12,
69:13.
couple 13:18,
52:17, 93:23,
109:20,

133:16,
151:21,
152:25.
courses 103:1,
103:3,
103:4.
courthouse
38:24.
courtroom 4:3,
15:23, 47:25,
56:2,
127:10.
cover 27:15,
58:21, 75:1,
108:2,
125:17,
127:14,
161:8.
covered 67:23,
69:7, 107:16,
122:13,
127:13,
135:3,
136:23,
163:16,
170:18.
covering 47:9,
160:22.
COVID 4:1.
COVID-19
20:23.
CPR 103:20.
crackdown
8:22.
crafting
85:1.
create 45:1,
79:14, 95:21,
95:23,
120:13.
created 16:10,
26:18, 40:9,
58:23, 73:25,
74:7, 107:4,
121:3,
162:16.
creates 34:23,
87:18,
134:11.
creating 89:1,

98:7.
creation
94:7.
creative
51:22.
credit 77:18,
78:17.
crime-fighting
10:1, 10:25,
11:9, 13:6,
33:24, 33:25,
34:10, 34:25,
35:3, 35:10,
35:15, 36:12,
36:24.
crimes 9:23,
23:25, 26:21,
26:23, 29:23,
29:25, 131:1,
163:17.
criminal 28:24,
29:12, 29:19,
29:20, 30:22,
36:9, 125:16,
130:20,
151:10.
crises 11:1,
12:11,
43:2.
crisis 4:17,
12:17, 12:21,
14:5, 30:24,
81:19, 99:25,
127:2.
criteria
102:14,
105:14.
critical 22:14,
27:24, 68:24,
69:7, 85:7,
105:13,
113:16,
139:18,
142:9, 146:1,
146:8,
157:17.
critically
143:7.
crucial 121:19,
139:16.

cry 8:11.
cue 117:20.
culture 84:13,
  129:6,
  132:17,
  132:24,
  146:12,
  148:5.
cultures
  87:25.
cumulative
  97:4.
curious
  61:20.
current 4:25,
  6:14, 8:20,
  12:9, 33:3,
  42:2, 61:8,
  73:19,
  77:10.
Currently
  50:22, 51:12,
  51:14, 61:25,
  62:22, 99:22,
  103:22,
  104:4,
  119:18,
  120:15,
  121:14,
  123:20,
  126:15,
  128:17,
  161:23,
  165:16.
curriculum
  48:19,
  101:23,
  101:24,
  103:22,
  124:20,
  165:18.
Curtis 1:24,
  3:14,
  139:8.
custodial
  40:15.
custodians
  57:6.
customer-driven
  109:4.

cutting 87:12,
  91:2.
.
.
< D >.
D.C. NADEAU
  49:16, 49:18,
  51:21, 51:24,
  52:1, 52:4,
  52:7, 52:11,
  52:22, 54:16,
  57:12, 61:24,
  62:16, 62:22,
  63:25, 64:12,
  65:5.
daily 84:12,
  103:5,
  114:12.
damaging
  134:15.
dampen
  121:12.
danger 8:4.
dangers 95:4.
dark 54:21.
darkness
  125:17.
DAT 132:10.
data-driven
  45:2, 46:13,
  148:16,
  150:14,
  150:23.
data-informed
  140:14.
date 146:21.
dated 87:2.
day 11:21,
  21:11, 28:8,
  28:11, 39:16,
  43:5, 66:18,
  68:5,
  151:25.
day-to-day
  110:6.
daylight
  37:4.
days 46:20,
  53:1, 59:8,
  61:13, 62:6,

  62:7, 62:8.
de 61:19,
  63:19,
  63:20.
de-escalate
  138:21.
de-escalation
  137:5.
deadlines
  167:19.
deal 46:15,
  113:10,
  123:16,
  169:12,
  170:3.
dealing 123:3,
  123:13.
dealings
  23:3.
dealt 16:3.
dear 115:22.
debt 76:11,
  76:15,
  79:5.
decade 4:18,
  56:19.
decades 56:5.
December 98:1,
  104:6.
decennial
  44:22.
decide 7:5,
  60:8,
  61:22.
decided 96:5.
decision 26:8,
  61:11, 61:12,
  110:11.
decisions
  28:24, 29:11,
  29:20, 40:22,
  61:16, 131:2,
  137:2.
deck 72:16.
declared
  42:17.
decline 12:6,
  142:5.
decrease
  131:16.

Decrees 96:3.
dedicated
  136:21,
  141:8,
  150:18.
deemed 26:15.
deep 31:19.
deepened
  164:16.
deeper 37:14.
deeply 12:15,
  27:19, 37:15,
  71:25.
Defendant 1:11,
  1:26, 20:9.
defense
  64:23.
Defensive
  103:20.
defer 65:7,
  92:11,
  119:10,
  159:8,
  164:18.
deference
  61:19,
  63:17.
deferment
  76:10.
deferral
  79:5.
deferring
  80:15.
deficiencies
  156:16.
defined 90:9,
  102:14.
definitely
  44:14.
definition
  69:19.
deft 20:22.
degree 68:8,
  77:21, 162:4,
  162:8, 162:9,
  163:24.
degrees
  162:11.
delay-prone
  97:1.

delays 97:5,
  164:15.
delicate
  18:21.
delighted
  15:11,
  16:14.
deliver 9:6,
  14:15, 16:1,
  100:9, 103:3,
  160:21,
  164:9.
deliverables
  160:22,
  161:8.
delivered
  24:18, 50:7,
  65:22, 69:5,
  92:19, 121:4,
  128:12,
  128:17,
  129:13,
  136:15,
  136:20,
  160:16.
delivery 120:4,
  120:8, 141:6,
  141:10,
  141:23.
delta 80:2.
demands 149:23,
  167:25.
democracy
  36:20.
demographic
  141:23.
demonstrate
  7:19, 86:5,
  97:15,
  130:22,
  146:23.
demonstrates
  145:1.
demonstrations
  20:25.
department-wide
  136:16.
departmental
  73:11.
departments

10:4, 84:7.
departure
  21:15.
departures
  35:9.
depend 140:3.
dependant
  117:24.
depending
  86:15,
  111:3.
depends
  140:8.
deploy 73:17.
deployment
  20:24,
  87:17.
Deputy 1:31,
  1:37, 1:38,
  1:39, 2:4,
  2:5, 2:8,
  2:9, 2:10,
  14:21, 14:22,
  15:10, 16:9,
  16:23, 20:20,
  21:1, 21:17,
  22:12, 22:20,
  44:2, 104:18,
  106:10,
  150:25,
  151:20.
Derek 2:6,
  2:7.
described
  34:21, 36:2,
  147:17.
describing
  136:23,
  146:3.
description
  151:5, 151:8,
  163:6.
design 6:7,
  102:5,
  145:23.
designed 9:10,
  50:16, 85:23,
  88:19, 93:7,
  165:8.
designer

95:24.
designers
  96:3.
designing 96:4,
  145:23.
desire 147:11,
  149:11.
desk 169:1,
  169:20.
desperately
  38:11.
despite 10:13,
  81:23.
destroy
  31:17.
destroyed
  10:18.
destruction
  17:24.
detail 69:20.
detailed 8:15,
  66:16,
  90:7.
detailing
  60:9.
details 16:15,
  68:20,
  69:23.
detective 74:5,
  169:25.
detectives
  9:23, 50:18,
  51:14, 65:21,
  65:25,
  103:24,
  126:15,
  126:18,
  164:5,
  165:15,
  166:3, 166:6,
  168:18,
  168:19,
  169:11.
deter 29:24.
determinants
  29:7.
determination
  60:5.
determine 6:7,
  6:25, 26:4,

27:16, 30:2,
  30:3, 60:3,
  60:4, 60:11,
  82:24,
  138:12,
  163:24.
determined
  61:1,
  156:16.
deterrence
  108:23.
develop 34:13,
  34:19, 44:23,
  45:1, 117:3,
  120:9,
  161:19,
  165:14,
  165:24.
developed
  34:11, 73:3,
  147:13,
  160:19,
  165:20.
developing
  65:20, 67:17,
  69:8, 81:1,
  102:1,
  107:22,
  119:18,
  146:22,
  165:17.
development
  12:18, 21:11,
  25:24, 26:19,
  56:16, 68:25,
  74:19, 86:25,
  101:23,
  101:24,
  106:22,
  109:16,
  117:1, 120:4,
  159:25.
developmentally
  35:19.
developments
  28:2,
  53:12.
device 9:10,
  138:1.
DHR 151:7.

dictate 18:23,
  19:3, 26:5,
  87:10.
difference
  99:11, 99:14,
  109:25,
  126:2.
different 19:9,
  22:22, 22:23,
  28:19, 28:24,
  30:12, 32:24,
  56:15, 58:1,
  74:10, 78:24,
  86:15, 90:18,
  91:8, 92:2,
  94:14,
  106:22,
  112:14,
  113:15,
  118:11,
  119:6,
  133:17,
  171:2.
differently
  78:7.
difficult 8:18,
  111:22,
  121:11,
  133:15.
dig 32:8.
digital 75:8,
  77:15.
digits
  131:21.
dignity 136:13,
  139:20.
diligence
  158:23.
diligently
  29:22.
dimension
  88:5.
direct 43:18,
  112:13,
  129:18.
Directed 12:15,
  108:12,
  109:21,
  110:2, 110:8,
  110:15,

110:22,
  111:2,
  111:10,
  111:20,
  111:24,
  113:5,
  113:10,
  113:11,
  123:9.
directing
  110:10.
direction
  13:23, 14:1,
  40:18, 58:13,
  65:17, 66:3,
  71:7, 114:12,
  125:5, 127:7,
  145:3, 147:3,
  147:4,
  151:18.
directive
  67:14, 67:25,
  170:2.
directly 64:4,
  109:1, 109:3,
  113:20,
  114:11.
Director 1:32,
  2:9, 114:12,
  150:25,
  164:21.
disaggregate
  155:2.
disagree 28:17,
  55:20.
disagreed
  56:10.
disappeared
  53:23.
disciplinary
  50:6, 59:10,
  60:11, 60:13,
  62:18,
  91:19.
discipline
  60:12, 61:2,
  61:3, 61:4.
discover
  124:14.
discrepancy

62:7.
discretion
  27:9, 32:23,
  130:23,
  130:25.
discuss 22:5,
  27:11, 97:9,
  106:15.
discussed
  12:24, 67:25,
  115:25,
  140:16,
  164:6.
discussing
  121:21.
discussion
  12:22,
  106:19,
  126:8,
  126:20,
  159:22.
discussions
  41:24, 55:11,
  78:18.
disorder
  120:13.
disparities
  141:23,
  143:13.
disparity
  157:21.
dispatch
  108:11.
dispatcher
  108:15,
  111:19.
display
  30:11.
disposition
  53:24,
  70:24.
disproportionat
  e 144:3.
dispute
  56:19.
distance
  111:4.
distant
  70:17.
distinguish

109:23.
distribution
  44:24, 46:9,
  108:10.
District 1:1,
  1:2, 45:11,
  87:7, 88:1,
  88:24,
  110:20,
  111:5,
  113:11,
  117:17,
  118:19,
  119:1, 119:4,
  138:3,
  138:10,
  138:11,
  165:25.
Districts 39:2,
  44:13, 45:9,
  45:17, 46:6,
  78:14,
  117:15,
  117:18,
  117:20,
  118:9, 119:3,
  123:1.
disturbances
  8:7.
diverse 34:11,
  141:12.
diverting
  121:15.
divided 53:6,
  128:5.
divine 155:8.
DIVISION 1:3,
  14:21, 46:13,
  51:8, 150:14,
  150:23.
doable
  125:24.
document 36:20,
  60:10,
  102:15,
  102:25,
  105:5, 108:6,
  115:2,
  161:14,
  170:6.

documentation
27:23, 103:9,
128:1,
128:23.
documented
27:3, 35:8.
documenting
129:11.
documents 7:24,
27:23.
dollars 99:18,
125:14.
Dombroski
158:4.
door 77:1.
double 75:7.
doubt 10:20,
19:17,
147:14,
158:22.
doubtful
118:4.
down 10:12,
30:17, 31:19,
39:1, 41:17,
52:25, 58:16,
66:13, 75:7,
77:19, 87:12,
89:11,
131:25,
132:8,
132:15,
138:17,
141:25,
169:14.
downed 93:11.
downs 156:8.
downtown 16:17,
17:14.
dozen 142:23.
draft 45:13,
46:19, 68:15,
69:18, 74:21,
74:25, 75:6,
103:22,
105:3, 122:4,
155:25,
166:17,
167:14.
drafted

50:23.
dried 169:17.
drill 77:19,
88:2.
drive 145:6,
148:14.
driven 110:22,
132:19,
132:20,
148:8,
148:11.
drivers
30:21.
driving 47:5,
94:5,
145:2.
dropped
132:8.
drug 123:13.
dry 97:12.
due 61:18.
During 11:25,
12:1, 20:21,
22:15, 35:2,
45:21, 47:17,
113:1, 114:1,
131:24.
duties 9:11,
121:19.
duty 7:25.
dysfunctional
31:1.
.
.
< E >.
E&T 97:19,
102:13,
104:17,
104:20,
105:1,
105:3.
e-learning
128:12,
160:16,
160:21,
161:3.
eager 16:25,
20:13,
159:4.
earlier 8:11,

20:19, 38:19,
44:4, 53:14,
67:21, 100:1,
126:12,
127:6, 131:4,
139:22,
140:16,
146:24,
157:1,
164:6.
early 9:17,
70:5, 71:6,
71:8, 75:6,
75:25, 86:7,
90:16, 91:6,
91:21, 92:4,
101:25,
157:10,
159:1.
earn 99:15.
earned 76:3.
earnest 16:19,
156:20.
ease 129:20.
easier 64:13,
89:5.
easiest 64:22,
65:2.
easily 64:19.
Eastern 113:11,
116:6,
117:17,
117:18.
easy 64:16,
64:17, 81:11,
84:9,
124:9.
Ebony 1:31,
3:19, 16:9,
16:15,
100:10.
echo 50:1,
96:8.
economics
77:22, 78:10,
78:21.
ecosystem
113:10.
Ed 103:18,
103:25.

edge 91:2.
Education 36:1,
79:4, 97:20,
97:23,
101:23.
educational
50:13.
effect 4:2,
79:19, 94:11,
155:15,
155:17,
155:19,
155:20,
156:11,
160:13.
effected
109:2.
effective 9:4,
14:13, 14:23,
35:21, 36:16,
36:17, 43:8,
45:21, 74:17,
91:14, 107:2,
132:11,
133:25,
134:7, 134:8,
134:15.
effectively
45:3, 49:8,
55:4, 73:17,
86:17, 95:17,
102:4, 112:7,
121:6,
123:15,
131:11.
effectiveness
10:10, 82:25,
120:23,
160:5.
efficiency
49:22, 89:10,
103:3,
143:8.
efficient
88:11,
149:3.
effort 46:16,
57:6, 67:1,
67:10, 74:13,
77:12, 81:3,

87:3, 90:1,
101:5,
117:16,
132:22,
134:22,
145:5, 160:9,
169:12,
169:13,
169:16.
eight 52:8,
124:20,
169:3.
eight-hour
160:19,
161:9.
eight-month
100:17.
EIS 91:21,
95:2, 95:24,
96:3,
96:15.
Either 20:8,
56:8, 61:3,
61:4, 61:5,
61:8, 61:12,
62:19, 70:4,
83:16,
144:11,
151:10.
elaborate
61:22.
elect 61:5,
61:6.
election
25:11.
electronic
128:25,
156:12,
156:17,
156:23,
157:13.
electronically
54:22,
54:23.
element 113:17,
146:11.
elements
11:20.
elevated
5:20.

eligibility
102:14.
eligible 76:14,
102:15.
elsewhere
151:2.
embedding
128:19.
emerging
28:1.
emphasis 27:12,
72:3,
72:17.
emphasize
127:23.
emphasized
9:3.
emphasizes
11:5,
121:5.
emphasizing
121:16.
emphatically
13:23.
empirical
37:23,
127:1.
employed 15:15,
19:10.
employees
84:11,
104:7.
employment
36:2, 78:15,
99:3, 99:8.
enact 107:19.
encountered
45:9.
encourage 79:4,
81:2, 83:23,
84:14,
141:10.
encouraged
23:18, 85:8,
89:12.
encourages
34:4.
encouraging
49:25,
134:21.

endeavor
14:2.
ending
108:15.
endorsed
14:25.
endorsement
14:4.
energy
112:19.
enforce
29:24.
enforcing
26:20.
engage 23:19,
23:21, 109:1,
110:9,
146:7.
engaged 36:10,
70:13,
122:25.
Engagement
24:13, 94:7,
107:6,
108:10,
108:13,
109:11,
112:12,
115:1,
121:12,
121:22,
124:6,
158:13,
171:5.
engagements
107:7,
107:8.
engages
34:24.
engaging 124:2,
131:8,
140:6.
engrained
77:15.
enhance 92:5,
163:7.
enhanced 54:17,
54:18.
enhancements
75:14,

76:3.
enhances
42:24.
enjoy 10:4.
enjoyed
158:22.
enough 30:20,
39:19,
54:9.
ensure 8:20,
9:10, 18:17,
23:16, 34:24,
48:21, 66:21,
72:9, 72:22,
72:25, 73:23,
74:16, 107:1,
131:6,
133:14,
134:23,
136:14,
160:9,
168:13.
ensures 35:4.
Ensuring 6:1,
8:8, 102:20,
140:18,
142:7,
146:18.
entered 4:12,
85:5,
166:14.
entering 48:18,
89:1.
entire 59:22,
63:21,
148:14,
148:15.
entirely
153:16.
entirety
138:9.
entitled
43:9.
entries
113:12.
entry 4:14,
9:16, 104:1,
113:12,
129:13,
129:18.

enumerated
   13:8, 38:8,
   110:5.
environment
   94:12.
envisioned
   138:25.
equal 44:4,
   61:9.
equally 39:3,
   124:16.
equation 37:16,
   77:20,
   78:10.
equipped
   93:14.
equitable
   46:9.
equity 73:1,
   102:19.
Eric 2:4,
   21:16,
   44:2.
erodes 53:24.
escalating
   24:23.
especially
   55:5, 95:7,
   115:12,
   147:10.
Esquire 1:22,
   1:23, 1:24,
   142:17.
essential 19:8,
   30:19,
   126:24.
essentially
   68:19, 94:8,
   103:8.
establish
   125:11.
established
   25:23,
   101:24.
establishes
   6:21.
establishing
   35:23,
   139:19.
establishment

69:2, 69:4.
estimate
   86:19.
estrangement
   8:25.
et 1:9, 1:26,
   3:6, 54:25,
   57:8, 62:8,
   71:17, 78:5,
   78:14, 98:25,
   112:15.
ethics 103:23,
   108:3.
ethnic 143:13,
   144:4.
ethnicity
   141:25.
Etwaroo 2:11,
   158:5.
evals 72:20,
   92:5.
evaluate 73:1,
   102:4,
   112:24,
   113:3, 114:7,
   118:14,
   157:17.
evaluation
   74:19, 92:8,
   107:25,
   108:17,
   112:20,
   116:25,
   117:6,
   117:19.
evaluations
   72:14,
   92:3.
evening
   143:11.
event 24:23,
   68:22,
   99:9.
eventually
   5:12,
   140:21.
Evers 43:20.
Everybody
   60:24,
   101:15,

102:16,
   157:13.
everyone 4:3,
   16:1, 17:19,
   18:1, 18:2,
   18:11, 47:20,
   68:19,
   104:25,
   126:25,
   172:12.
Everything
   25:21, 41:4,
   41:16, 46:7,
   54:22,
   146:21,
   156:18.
evidence 7:14,
   29:5, 62:3,
   70:10,
   145:13,
   148:11,
   163:20,
   164:11.
evidence-based
   148:16.
evidently
   25:12.
ex 171:7.
exact 63:18.
Exactly 19:11,
   54:10, 54:24,
   55:2, 55:24,
   83:5, 92:23,
   126:18,
   138:1,
   150:18,
   151:6, 152:9,
   171:19.
examine
   113:19.
examined
   37:15.
example 7:3,
   27:1, 34:12,
   35:1, 35:13,
   40:5, 40:6,
   56:22, 66:7,
   82:22, 83:17,
   113:2, 113:9,
   153:24,

154:11,
   154:13.
exceeds
   99:10.
excel 22:1.
excellent
   79:25,
   84:5.
except 64:4.
excited 18:3,
   94:4, 94:5.
excuse
   131:17.
execute 7:25.
executed 7:2,
   8:2, 35:11,
   130:19.
executes
   40:17.
executing
   37:7.
execution 6:4,
   11:9, 13:6,
   33:23,
   35:3.
exercise
   41:8.
exercised
   32:14,
   32:23.
exercises
   35:25,
   119:23,
   137:6.
exhaustion
   150:2.
exists 42:15.
exit 75:3.
exonerated
   60:4.
expand 117:5,
   117:8, 118:5,
   125:7,
   125:24,
   126:1.
expanded
   114:13,
   114:14,
   126:5.
expanding

109:3,
163:8.
expect 9:12,
11:10, 12:22,
13:4, 68:17,
70:3, 75:5,
117:20,
118:6,
144:22,
147:6,
166:17,
168:5.
expectation
23:8,
136:11.
expectations
16:22,
121:8.
expected
140:23,
147:10.
expecting
74:23,
90:11.
expects 12:2.
expeditious
63:14.
experience 5:7,
14:24, 30:16,
31:24, 38:9,
56:6, 56:8,
56:18, 95:5,
100:8,
105:17,
124:8,
151:10,
153:8,
165:20.
experienced
14:20, 31:5,
38:2,
51:10.
experiences
162:23.
experiencing
10:20,
26:10.
expert
159:10.
expertise 22:1,

97:22.
experts
31:11.
explain 109:22,
138:17.
explaining
137:20.
explicitly
136:9.
explore 99:22,
99:23,
100:11,
100:12.
exploring
101:8.
extend
142:10.
extended
132:10.
extending
19:2.
extension
120:25.
extensive
140:2.
extent 6:13,
82:1, 117:24,
117:25,
144:25,
147:21,
147:23.
external
117:6.
externally
26:3.
extra 111:18.
extreme
40:14.
extremely 14:6,
18:3, 28:6,
47:1, 51:11,
94:1,
135:6.
.
.
< F >.
face 6:14,
6:24, 8:4,
11:1, 14:5,
14:6, 16:14,

33:6, 78:16,
99:25,
126:14.
facetious
134:10.
facilitate
81:5.
facilitator
105:1.
facilitators
120:5.
facilities
100:15,
101:4, 101:5,
101:9.
facility
100:16,
100:19,
101:1,
101:9.
facing 5:23,
12:11, 73:21,
73:22, 78:9,
135:16.
fact 12:5,
17:15, 25:10,
26:9, 34:4,
37:24, 54:4,
54:17, 68:9,
79:25, 94:1,
113:25,
127:1,
143:18,
151:5,
168:21.
factor 31:2.
factors 45:1,
96:4.
facts 41:4,
78:16,
155:10.
fail 10:1.
fair 13:1,
47:18,
104:24,
127:12,
135:2,
135:24,
136:5, 136:7,
136:9,

136:22,
141:6,
152:23,
153:1,
153:21,
153:23,
154:6, 155:1,
157:19.
fairly 53:3,
68:7.
fairness
72:25.
faith 5:2,
30:4, 31:9,
121:23.
fall 11:11,
50:7, 51:5,
122:5,
124:25,
166:18.
falls 114:11.
falsely
23:20.
familiar 16:4,
50:9, 51:11,
101:4.
family
115:14.
far 22:15,
22:21, 47:13,
59:3, 65:3,
69:16, 70:21,
84:17, 121:2,
147:5,
162:13.
fast-moving
41:14.
faster 145:6,
147:6,
151:21.
favor 63:4.
Fayette
116:13.
FCRR 1:44,
2:44,
172:16.
fears 149:19.
feasibility
101:8,
101:10.

feature 27:15,
    44:19.
February 49:20,
    157:10.
federal 4:2,
    7:18, 21:5,
    21:22,
    35:1.
feedback 45:8,
    45:16, 45:18,
    45:21, 46:2,
    66:16, 88:22,
    91:23, 92:3,
    93:17, 93:21,
    93:22, 94:1,
    105:4,
    107:10,
    122:18,
    149:4,
    162:18,
    162:23.
feeding
    131:7.
feel 18:15,
    70:7, 94:11,
    107:19,
    124:11.
feeling
    135:9.
feels 55:16,
    115:14.
fell 53:18.
felt 38:2.
few 15:23,
    30:5, 34:6,
    50:4, 60:17,
    62:23, 69:9,
    82:9, 82:12,
    119:17,
    139:7,
    155:23,
    157:2,
    172:5.
fewer 28:21,
    80:3,
    131:23.
fide 41:20.
field 27:1,
    72:13, 86:12,
    92:20, 103:7,

103:8,
    103:14,
    103:15,
    120:1, 124:1,
    127:19,
    129:12,
    140:17,
    149:5, 157:1,
    157:5.
field-based
    128:25,
    156:12.
fields 90:6,
    90:7, 90:12,
    129:22,
    140:20,
    147:8,
    156:16,
    157:22.
fifth 11:14,
    11:16, 17:10,
    17:25,
    161:1.
fifth-year
    51:6.
fight 9:3,
    36:21, 134:1,
    134:7,
    134:15,
    142:25.
fighting 35:23,
    144:14.
fights 15:23.
figure 42:11,
    42:18,
    71:13.
file 4:20,
    59:22, 60:1,
    60:2, 90:9,
    164:10,
    167:21,
    167:24.
filed 55:19,
    68:18,
    125:1.
fill 15:14,
    98:1,
    157:4.
filled 98:1,
    98:7,

129:25.
final 46:1,
    50:24, 61:12,
    68:17, 96:13,
    124:19,
    135:6, 141:7,
    159:6,
    167:15.
finalized
    46:22, 74:23,
    105:5,
    124:24.
Finally 16:8,
    27:11, 35:22,
    78:2, 90:4,
    91:21, 92:25,
    102:22,
    144:23,
    149:25,
    166:2.
financial 23:5,
    75:20.
financially
    99:12.
find 134:18,
    151:12.
finding 7:12,
    37:6, 55:21,
    66:19,
    132:12.
findings 60:9,
    107:25,
    116:22,
    139:10.
fine 14:18.
finest 42:9.
finish 104:4,
    104:6,
    150:3.
finished
    94:20.
finishes
    77:1.
finishing
    72:11,
    145:23.
FIP 139:9,
    141:3.
fired 149:25.
firm 19:20.

firms 42:9.
fiscal 77:11.
fit 14:8,
    91:18,
    151:12.
fits 19:23.
five 4:14,
    11:16, 14:22,
    17:16, 37:20,
    47:12, 66:10,
    71:10, 86:3,
    105:22,
    114:17,
    143:9,
    143:14,
    144:1,
    145:22.
five-day
    69:4.
five-year
    44:24.
fix 29:6,
    37:17,
    125:20.
fixed 157:21.
flawed 62:2,
    62:3.
fleet 92:15.
flesh 126:9.
flex 25:20.
flexibility
    95:24.
flexible 95:14,
    95:24,
    96:6.
Floor 1:45,
    2:45.
flow 58:24,
    63:12.
flowchart
    58:20, 58:23,
    64:12,
    64:16.
flowing
    64:22.
flows 59:2.
Floyd 8:7,
    20:25.
fluidly
    63:13.

focus 5:19,
 8:8, 8:10,
 11:20, 17:15,
 27:11, 43:5,
 77:12,
 107:11,
 108:23,
 112:1,
 112:19,
 116:16,
 116:23,
 121:18.
focused 72:6.
focuses
 113:12.
focusing 79:1,
 112:15.
folks 50:13,
 69:14, 69:15,
 74:12, 77:3,
 102:7,
 124:14,
 124:15,
 131:6,
 151:12,
 154:4,
 158:22.
follow 33:3,
 47:4, 62:17,
 64:17,
 80:17.
followed
 62:16.
following 7:4,
 24:24, 33:5,
 102:16,
 107:1,
 108:11,
 110:16,
 169:14.
follows 76:6,
 101:23.
foot 110:6,
 112:3.
footage
 133:13.
footnote 54:15,
 54:16.
FOP 75:15,
 76:4.

Force 4:23,
 28:21, 35:2,
 136:17,
 136:24,
 158:18.
forefront
 168:4.
foregoing
 172:17.
foremost 5:25,
 159:10.
form 69:18,
 129:24,
 146:1,
 156:17,
 157:13.
forma 169:23.
formal 45:22,
 107:8.
format 130:1.
former 14:21,
 51:9.
forms 45:16,
 94:14, 103:9,
 129:12,
 156:24.
formulation
 6:3, 11:9.
forth 19:7,
 23:5, 30:17,
 36:22, 40:23,
 41:15, 43:4,
 48:9, 63:12,
 64:6, 78:3,
 88:2, 88:9,
 111:16,
 112:12,
 124:23,
 159:4.
fortunate
 16:18,
 22:17.
fortunately
 15:9.
forum 17:18.
forward-looking
 71:1,
 154:2.
found 100:2,
 120:22,

139:13,
 151:1.
Foundational
 27:20, 32:13,
 32:16, 36:20,
 37:18, 67:11,
 72:7, 89:19,
 90:20, 96:21,
 96:24.
four 11:11,
 11:14, 43:13,
 47:11, 54:21,
 59:3, 67:2,
 67:7, 67:23,
 83:11, 104:6,
 105:22,
 126:18,
 161:1,
 165:12.
fourth 61:6,
 162:4, 162:8,
 162:9,
 162:11,
 163:24.
frankly 9:18,
 24:25, 32:18,
 94:6.
free 109:2,
 143:21.
frequently
 84:25.
friction 6:2.
frisks 142:2.
front 14:24,
 18:16, 19:18,
 72:18, 74:11,
 77:16, 78:4,
 78:17, 81:21,
 82:8, 130:2,
 131:6, 152:1,
 154:25.
frontiers
 99:24.
fronts 38:8.
frustrated
 87:23.
frustration
 159:1.
fuel 87:6.
full 5:7,

28:12, 37:25,
 43:14, 70:4,
 71:7, 79:11,
 87:4, 87:15,
 87:17, 90:11,
 123:19,
 155:16,
 156:8,
 163:17,
 163:19,
 170:5.
full-day
 136:20.
fully 5:5, 8:9,
 9:13, 70:11,
 70:12, 72:12,
 76:5, 77:14,
 81:3, 93:14,
 102:22,
 102:24,
 123:18,
 133:14,
 140:21,
 145:7,
 171:8.
function 6:23,
 19:2, 23:4,
 56:7, 70:16,
 71:3, 91:23,
 158:7.
functionality
 95:20,
 103:3.
functioning
 93:6,
 168:9.
functions
 62:10, 67:18,
 73:16, 74:2,
 121:14,
 158:20.
fund 77:8,
 109:12.
fundamental
 9:15, 56:22,
 78:6, 78:10,
 78:14,
 130:5.
fundamentally
 9:19, 28:16,

43:1,
56:14.
funding 79:15,
109:10,
117:6,
120:5.
funds 26:8,
26:13,
79:14.
furtherance
26:21.
Future 50:1,
57:19, 70:17,
112:10,
120:7,
141:13,
141:20,
154:10,
163:12.
FY 92:18,
92:23, 93:2,
109:17,
150:11.
.
.
< G >.
game 63:9,
87:9.
gaps 36:5,
36:6,
166:10.
gather
145:24.
gathering
95:15.
gave 24:2,
111:24.
GBRS 115:23.
gender 141:25,
165:5.
General 15:21,
17:14, 18:20,
23:5, 51:14,
54:7, 66:7,
93:4, 103:19,
113:23,
119:12,
128:17,
136:7,
151:11.

generalization
169:22.
Generally 7:4,
13:12, 16:14,
61:18, 67:2,
68:22,
93:25.
generate 89:3,
149:3.
generated
149:20.
generation
21:12,
54:19.
generic
151:6.
geographic
45:4, 46:6.
geographically
45:10.
geographies
110:9.
geography
110:3,
112:1.
George 8:7,
20:25.
ger 46:7.
germane
135:8.
gets 70:10,
144:21.
getting 42:21,
58:11, 63:9,
85:4, 85:6,
85:21, 86:16,
87:4, 89:21,
92:22, 95:18,
96:21, 96:22,
98:7, 110:24,
124:24,
126:3, 151:6,
151:19.
GILLIS 2:8,
92:13, 92:16,
92:17, 93:8,
93:13, 93:22,
94:19.
GIS 46:13.
give 16:15,

17:7, 25:5,
41:10, 60:8,
77:17, 102:3,
145:21.
given 32:1,
33:8, 38:24,
40:2, 86:24,
86:25,
113:24,
125:23,
135:8,
151:17,
153:19,
170:3.
gives 110:9,
126:8,
158:24.
giving 17:18,
66:16.
glad 124:14.
global 11:11,
11:14, 11:16,
12:1, 12:22,
13:7, 43:13,
54:11, 66:9,
67:2, 67:23,
105:22.
glove 115:18.
goal 9:5,
19:21, 75:13,
79:3, 87:4,
112:4, 113:2,
113:4,
120:20,
165:9.
goals 14:12,
22:3, 46:2,
48:22,
112:21.
godfather
84:8.
gotten 85:12,
89:21,
117:20.
governance
5:2.
governed
36:13.
governing
69:2.

government
6:23, 17:12,
21:21,
47:3.
graduate
15:2.
graduated
103:13,
104:1,
104:2.
graduates
103:10.
grand 99:19.
grants 77:10.
graph 131:17.
grateful
19:12.
gratifying
152:21.
great 21:10,
21:12, 46:15,
65:18, 69:20,
138:1,
152:22,
169:12.
Greater 101:2,
116:12,
120:17.
greatly 115:7,
117:5.
green 48:12,
101:6.
gross 169:22.
ground 11:2,
32:12,
124:25,
126:4.
Group 17:9,
18:16,
108:22,
117:11,
130:19,
137:6.
grouped
49:11.
groups 107:11,
116:16,
116:23.
grow 115:21.
growing

82:20.
grown 23:7.
guardrails
    6:21, 8:2,
    11:4, 14:11,
    18:5, 19:8,
    19:24, 34:7,
    35:14,
    39:23.
guess 42:7,
    49:9,
    159:17.
guidance 24:1,
    25:3, 25:5,
    26:2, 26:15,
    35:18, 38:24,
    89:7, 108:7,
    161:16.
guide 35:6.
guiding 46:15,
    170:2.
guilty 7:13.
Gun 4:22,
    100:19,
    109:2, 110:7,
    115:24,
    116:3.
guys 94:25.
GVRS 108:23.
.
.
< H >.
half 28:20,
    128:11,
    129:14,
    142:23.
halfway
    155:21.
hallmarks
    105:6.
halted 99:8.
hammer 127:1.
hand 115:18,
    143:4.
handful
    167:17.
handle 86:17,
    123:7,
    165:15.
handled 121:14,

162:5,
    163:25.
handling 20:22,
    165:21.
hands 93:21.
happen 17:21,
    54:20, 56:9,
    56:24, 57:19,
    88:21, 96:23,
    146:8, 146:9,
    146:10,
    148:18,
    148:20.
happened 10:2,
    10:18, 57:16,
    132:7,
    169:16.
happening
    21:10, 29:5,
    29:9, 88:13,
    117:18,
    138:10,
    145:7.
happens 61:25,
    62:23,
    98:24.
happy 14:18,
    17:7, 51:7,
    58:9, 60:22,
    87:6,
    152:19.
hard 15:18,
    19:10, 23:10,
    40:21, 46:12,
    57:13, 57:22,
    57:23, 67:16,
    84:9, 125:10,
    140:1,
    165:13.
harder 145:6.
Harris 1:24,
    3:15, 139:8,
    141:4,
    142:13.
Harrison 2:3,
    20:6, 20:12,
    20:14, 22:16,
    44:11.
harsh 62:14,
    79:25.

harvesting
    149:15.
Hassan 1:38.
hawk 71:18.
hazards 4:23.
HB 58:21.
head 84:17.
headed 66:2,
    66:18.
headquarters
    78:5,
    129:13.
heads 59:19.
headwinds
    12:14.
healing
    109:14.
health 30:24,
    36:5, 48:25,
    103:18,
    137:10.
hear 11:7,
    11:10, 12:2,
    12:23, 13:4,
    13:10, 16:25,
    17:4, 20:13,
    45:17, 84:4,
    110:6, 110:7,
    113:8,
    148:10,
    149:13,
    152:22.
heard 18:17,
    40:21, 75:21,
    79:24, 80:11,
    81:24,
    126:12,
    143:23,
    148:1, 148:2,
    159:16,
    167:9, 168:1,
    168:8,
    168:20.
hearing 4:13,
    5:8, 10:11,
    11:7, 12:25,
    20:17, 27:12,
    27:16, 53:12,
    54:7, 106:4,
    114:1,

126:25,
    127:14,
    171:19,
    171:25.
hearings 11:17,
    11:25, 20:7,
    30:9, 47:17,
    68:1,
    158:8.
heart 113:6,
    115:9.
heartily
    14:25.
heat 33:7.
heavy 41:14.
heck 169:4.
held 98:3,
    100:7.
help 16:19,
    34:8, 40:2,
    42:4, 55:15,
    74:4, 83:21,
    86:18, 88:25,
    90:1, 92:5,
    97:22, 102:1,
    112:18,
    117:10,
    118:18,
    126:17,
    127:8,
    168:11.
helped 52:23,
    53:8.
helpful 64:3,
    81:24, 85:13,
    170:2.
helping 46:15,
    58:10,
    95:17.
helps 79:16,
    85:6, 95:16,
    110:8,
    132:21.
hence 79:4.
Herculean
    10:13.
hereby
    172:16.
herself 111:6,
    111:14.

hesitant
  69:20.
hesitate
  169:4.
high 16:22,
  37:12, 89:13,
  100:7,
  126:21.
high-quality
  102:12.
higher 10:5,
  80:5,
  143:1.
highest 75:16,
  76:16.
highlight 50:4,
  110:20,
  127:9,
  127:25.
highlighted
  6:5.
highly 133:25,
  134:6,
  134:8.
hill 100:2,
  100:3.
hire 55:9,
  76:25.
hired 28:25,
  29:14, 80:8,
  84:16.
hires 76:7,
  76:8.
hiring 55:8,
  75:5, 76:2,
  76:7, 79:1,
  79:3, 81:9,
  82:17.
historical
  75:4,
  140:9.
historically
  44:18, 57:14,
  105:10,
  110:3.
history
  107:16.
hit 62:4,
  138:12.
hitter 13:16.

hoc 4:24.
hold 55:12,
  81:17.
holding
  18:14.
hole 31:19,
  31:20,
  53:18.
holes 54:21.
homelessness
  26:11.
homicides
  37:11.
Honorable
  1:15.
hope 38:5,
  66:3, 81:23,
  112:10,
  120:6, 156:1,
  157:11,
  158:18.
hopeful 18:18,
  70:15, 85:13,
  118:8,
  118:12,
  118:19.
Hopefully
  38:24, 44:4,
  52:20, 71:4,
  82:25, 93:6,
  124:21,
  151:22,
  155:22,
  172:9.
hopes 16:22,
  108:18.
hoping 75:11,
  105:4,
  130:9.
horizon 71:2,
  145:25.
host 42:10,
  138:12.
hour 88:3,
  112:11.
hours 124:20.
house 101:12.
housed
  129:25.
housekeeping

38:14.
housing 36:1,
  76:8.
Howard 69:13.
hows 143:6,
  143:9.
HR 74:11, 75:3,
  91:20, 98:6,
  105:8.
huge 56:15,
  87:11,
  101:15,
  127:7.
human 8:11,
  136:13.
hundred 51:18,
  58:14, 58:15,
  99:18,
  162:10.
hundreds
  56:17.
hurdles
  125:3.
hurt 95:20.
.
.
.
< I >.
Iapro 51:11,
  54:18,
  96:22.
idea 51:23.
ideas 151:21.
identification
  116:24.
identified
  74:2, 83:15,
  98:4, 118:21,
  125:21,
  161:21.
identify 48:21,
  108:14,
  116:19,
  120:12,
  128:3,
  132:13,
  166:10,
  169:15.
identifying
  79:15.
identity

142:5.
III 120:16.
illegal 7:15.
ills 29:7.
illustrate
  48:16.
illustrated
  84:20.
imagine 24:16,
  88:10.
immediate
  83:14.
Immediately
  31:23,
  79:20.
immensely
  21:6.
impact 12:7,
  107:17,
  112:7, 115:8,
  115:14,
  131:5,
  141:22,
  166:5,
  169:5.
impactful
  133:2.
impacts 27:18,
  115:13,
  136:24.
impaired
  127:3.
impartial 13:1,
  47:19,
  127:13,
  135:2,
  135:24,
  136:5, 136:7,
  136:9,
  136:22,
  141:7, 141:8,
  141:13,
  141:18,
  141:22,
  142:11,
  152:23,
  153:2,
  153:21,
  153:23,
  154:6, 155:2,

157:19.
impartially
  68:7.
implement 18:6,
  83:22,
  102:22,
  107:6,
  108:22,
  117:3,
  120:21,
  123:19,
  165:24.
implemented
  5:3, 7:1,
  56:12, 84:23,
  102:24,
  128:6.
implementing
  36:6, 72:21,
  82:24,
  107:21.
implicit 137:1,
  137:5.
implore
  145:6.
importance
  68:7, 69:15,
  127:23,
  138:17.
important
  11:15, 39:3,
  40:19, 53:10,
  54:15, 93:19,
  101:16,
  102:8,
  118:24,
  124:15,
  124:16,
  125:15,
  125:19,
  125:21,
  128:2, 130:7,
  134:13,
  135:6,
  135:21,
  141:24,
  143:7,
  153:13,
  153:22,
  161:2.

importantly
  69:3.
imposed
  66:15.
impossible
  83:6.
impressed
  158:9,
  158:11,
  158:13,
  169:13.
impressive
  78:4.
improbably
  22:13.
improve 36:7,
  36:11, 65:19,
  81:13,
  101:22,
  121:23,
  129:20,
  130:11,
  132:21,
  137:23,
  162:25,
  167:8.
improved 149:6,
  164:4.
improvement
  38:4, 50:2,
  53:2, 58:7,
  58:8, 119:22,
  123:5,
  127:2.
improvements
  27:17, 49:23,
  65:14, 69:25,
  75:2, 163:14,
  166:7.
improving
  10:10, 49:22,
  67:17, 67:18,
  89:9, 115:7,
  140:6.
in-class
  69:4.
in-depth
  119:25.
in-person
  128:10,

161:7,
  161:9.
in-service
  103:25,
  108:2,
  128:21.
in. 41:25,
  76:18,
  117:14,
  124:2.
inaccuracies
  22:8.
inappropriate
  165:6.
inarticulate
  130:21.
incentive
  78:11.
incentives
  75:20, 76:2,
  76:13, 82:17,
  99:1,
  100:1.
incentivize
  79:2.
incident 17:22,
  53:17, 88:13,
  89:10, 130:1,
  140:14.
inclination
  24:10,
  147:15.
include 26:9,
  26:25, 34:14,
  47:12, 47:15,
  49:8, 76:6,
  90:12, 95:5,
  108:20,
  128:1,
  130:17,
  133:11,
  162:14,
  163:11.
included 68:25,
  69:1, 69:3,
  96:5,
  164:8.
includes 12:25,
  26:10, 109:8,
  117:13,

136:10,
  162:4, 163:9,
  164:10,
  168:1.
including 6:23,
  46:3, 48:25,
  60:17, 68:19,
  80:25, 81:8,
  93:15, 97:21,
  109:12,
  120:13,
  129:1, 142:1,
  165:22,
  166:7.
inclusive
  17:18,
  18:11.
incorporate
  121:3,
  141:14.
incorporated
  50:6, 50:9.
incorporates
  73:4.
increase 8:5,
  78:10, 99:1,
  114:21,
  163:14.
increases
  54:13,
  75:10.
increasing
  76:20, 82:16,
  83:10,
  150:12,
  150:22.
increasingly
  66:10.
incumbent 8:18,
  8:19.
indicate
  107:18,
  116:5, 147:2,
  147:11.
indicated
  27:18, 67:8,
  122:19.
indicates
  146:22.
indictment

24:25.
individual
  24:12, 55:9,
  118:20.
individuals
  23:23, 29:23,
  114:15,
  130:20.
indoor 100:15,
  101:3,
  101:8.
indulgence
  38:18,
  69:21.
inevitably
  37:9.
inextricably
  36:17.
influenced
  105:12.
inform
  118:18.
Informal
  107:7.
information
  27:22, 27:24,
  44:22, 44:23,
  46:14, 63:12,
  74:24, 90:8,
  92:6, 95:16,
  110:4, 110:5,
  110:23,
  110:24,
  116:15,
  116:17,
  129:18,
  129:25,
  132:14,
  133:18,
  143:19,
  144:16,
  144:17,
  148:4, 149:2,
  163:9,
  167:20.
informing
  76:1.
infrastructure
  75:2,
  140:13.

infusion
  117:25.
inherent
  136:13.
initial 45:13,
  97:15, 162:7,
  164:8.
initially
  17:16.
initiate 33:1,
  45:14.
initiated
  17:8.
initiative
  10:1, 76:23,
  77:9,
  112:12.
initiatives
  6:8, 6:19,
  17:7, 45:5,
  73:15, 75:24,
  76:5, 76:6,
  81:6, 82:22,
  104:17,
  126:6,
  126:23,
  135:19.
input 23:1,
  34:14, 45:13,
  66:4, 66:5,
  90:7.
inputted
  129:15.
inquiries
  9:17.
inquiry
  170:5.
insisted
  77:18.
inspect
  144:22.
installation
  89:23.
installed
  93:6.
installment
  141:7.
instance 24:11,
  62:5, 97:23,
  98:13,

112:22,
  113:11,
  129:21.
instances 25:6,
  130:15.
instead 55:13,
  63:2, 95:8.
institution
  9:14, 30:12,
  31:10.
instruction
  72:11.
instructor
  98:23, 100:6,
  102:1, 102:2,
  102:3,
  102:10,
  104:20,
  104:22,
  105:1.
instructors
  102:3.
instrument
  85:2, 85:19,
  167:23.
Insufficient
  12:3.
intake 50:5,
  51:1, 51:3,
  69:7.
integral
  148:3.
integrate
  136:6.
integration
  161:22.
Integrity
  11:11, 47:15,
  49:4, 49:15,
  49:21, 65:7,
  65:9, 66:19,
  67:6, 68:4,
  70:8, 72:10,
  98:13.
intelligence
  110:23.
intelligent
  149:3.
intended 27:17,
  45:2, 93:7,

140:22,
  163:4.
intending
  111:25.
intense
  101:20.
intensive
  4:21.
intent
  167:15.
intentions
  149:11.
interact 26:24,
  55:4, 115:12,
  166:6.
interacted
  45:25,
  55:16.
interacting
  124:10,
  162:24.
interaction
  26:24,
  124:16,
  136:12,
  137:18,
  138:22.
interactions
  35:7, 35:14,
  35:19,
  103:19,
  129:12,
  136:11,
  137:11,
  138:10,
  138:12,
  138:20,
  147:1.
interactive-typ
  e 55:10.
interagency
  116:20.
interest 18:9,
  47:5, 73:22,
  74:9,
  101:20.
interested
  47:1, 98:22,
  143:5,
  144:18.

interesting
  22:20, 71:12,
  81:23,
  118:3.
interests
  18:8.
interface
  41:12.
interim 20:21,
  65:24, 68:14,
  68:23, 69:18,
  69:25,
  71:5.
internal 51:4,
  56:6, 69:1,
  148:25,
  158:7.
internally
  26:4, 102:8,
  157:6.
interpret
  101:19.
interpretation
  42:15.
interrogation
  50:12.
intersection
  13:5, 33:22,
  34:9,
  154:5.
intersects 6:3,
  11:8, 41:21,
  113:18.
intersperse
  128:20.
intertwined
  36:17.
intervention
  86:7, 90:16,
  91:6, 91:22,
  92:4, 108:3,
  109:13,
  137:4.
interview 27:1,
  28:13,
  165:22.
interviewing
  50:12, 65:19,
  102:15,
  160:11,

166:8,
  168:2.
interviews
  50:14, 74:13,
  75:3, 86:12,
  127:19,
  164:11,
  167:21,
  167:25.
intimately
  109:1.
intoned
  47:11.
intractable
  81:11,
  81:12.
introduce 3:9,
  3:17, 3:22.
introducing
  122:16.
intrusive
  40:11,
  107:3.
invented 91:3,
  91:4.
invest
  169:12.
investigate
  59:21.
investigated
  9:23, 35:8.
investigation
  7:8, 9:16,
  50:20, 53:24,
  59:22, 69:8,
  161:11,
  164:3, 165:5,
  165:22,
  167:2,
  167:10,
  167:24,
  169:17.
Investigations
  10:2, 13:2,
  47:19, 48:25,
  49:1, 51:15,
  66:1, 68:15,
  69:9, 159:9,
  159:19,
  160:12,

160:15,
  161:18,
  163:5, 163:8,
  165:6, 165:8,
  165:11,
  167:8.
investigative
  27:1, 49:22,
  49:24, 51:8,
  59:22, 60:1,
  60:2, 65:19,
  73:16, 74:2,
  74:5, 129:22,
  143:3,
  167:24.
investigator
  73:25, 160:8,
  161:7,
  168:25,
  169:3.
investigators
  52:5, 65:18,
  69:5, 74:16,
  161:9,
  161:10,
  167:7.
investment
  77:11,
  109:9.
investments
  109:15.
invite 172:7.
invited
  171:3.
involve
  36:12.
involved 23:9,
  27:19, 35:16,
  39:3, 41:15,
  41:25, 42:4,
  64:4, 93:10,
  102:20,
  109:1,
  112:11,
  120:4,
  120:7.
involvement
  36:8,
  48:19.
involves

40:7.
involving
  58:22, 59:17,
  120:13,
  121:15.
issuance
  24:19.
issued 87:18,
  113:16,
  138:14.
issuing 88:8.
it'll 77:14.
iteration
  107:23.
iterations
  141:13.
itself 18:22,
  33:9, 46:18,
  54:14, 68:6,
  73:7, 95:9,
  115:19,
  127:9,
  139:19,
  149:14,
  151:6,
  151:8.
.

.

< J >.
Jai 2:11.
James 1:28,
  2:8, 92:17.
James K. Bredar
  1:15.
January 80:5.
Jim 3:18.
JKB-17-0099
  1:8.
JKB-17-CV-99
  3:6.
job 10:7,
  15:17, 19:1,
  19:12, 22:24,
  23:10, 30:23,
  39:23, 40:1,
  54:9, 55:9,
  104:23,
  114:16,
  151:5, 151:7,
  151:8.

join 12:16,
  76:15, 79:4,
  99:6, 105:19,
  114:17,
  172:11.
joined 3:19.
journalist
  28:14.
journey 33:3.
JOYCE 1:39,
  82:9, 82:11,
  84:24, 97:18,
  166:22,
  166:23,
  170:12,
  171:13,
  171:16.
Judge 1:15,
  61:8, 106:13,
  144:12,
  152:1,
  152:6.
judgment 23:7,
  40:10.
judgments
  41:19.
judicial
  7:12.
July 45:14,
  90:10.
jump 115:3.
June 21:1,
  104:1.
jury 172:2.
justification
  66:9.
Justin 1:29,
  3:19, 14:19,
  15:2.
.
.
< K >.
keep 4:7,
  26:18, 43:5,
  45:2, 48:2,
  61:3, 63:15,
  80:16, 87:1,
  107:7, 109:2,
  118:25.
keeping 10:7,

  97:11.
keeps 127:9.
Kenneth 1:36,
  3:23.
kept 144:6.
key 77:12,
  81:15, 86:8,
  89:19, 90:3,
  90:12, 91:23,
  95:20,
  102:21,
  119:6,
  130:13,
  132:22,
  147:1.
kickbacks
  89:16.
kicked 89:11.
kicking
  156:14.
kidding
  71:24.
killings
  30:15.
kind 18:23,
  24:13, 24:20,
  44:4, 64:6,
  71:1, 85:18,
  87:16, 101:9,
  103:25,
  112:11,
  124:16,
  125:23,
  153:17,
  156:10,
  170:2,
  171:4.
kinds 32:15,
  62:11, 93:18,
  99:2, 123:3,
  125:12,
  125:20,
  147:7,
  150:20.
kit 163:20,
  163:21.
knowledge
  136:14.
known 140:10.
knows 58:6,

  104:25,
  144:9,
  147:18,
  152:5,
  156:11,
  161:5,
  162:20.
.
.
< L >.
L. 1:28, 1:36,
  1:40, 1:41,
  3:23.
lack 30:23,
  101:19,
  108:7, 108:8,
  130:18,
  142:5,
  161:15,
  161:16.
Lakeisha
  51:9.
landscape
  33:8.
language
  48:19.
large 18:16,
  31:8, 45:10,
  46:11,
  130:19,
  164:9.
largely 37:18,
  48:14, 68:24,
  70:19,
  117:16,
  161:17.
larger 53:13.
largest 68:9.
lastly
  166:13.
late 157:10.
Later 11:10,
  38:6, 79:23,
  87:15,
  120:23,
  161:7.
latest 125:2.
lauded 20:22.
launch
  103:14.

launching
  75:20.
law-abiding
  9:13.
lawful 19:2.
lawfully
  9:11.
lawless 9:19.
laws 27:10,
  78:21.
lawyer 14:18,
  14:20,
  16:3.
lawyers 16:5,
  33:8, 71:12,
  171:11.
layers 86:15.
lead 8:20,
  21:7, 28:7,
  30:22, 30:24,
  60:16,
  138:19,
  138:20.
lead-off
  13:16.
leader 14:18,
  29:2,
  146:25.
leaders 5:24,
  6:10, 6:13,
  6:25, 7:4,
  7:24, 8:18,
  11:2, 21:12,
  21:21, 31:22,
  32:4, 34:1,
  37:8, 41:19,
  47:3,
  57:23.
leadership
  4:17, 4:19,
  4:24, 4:25,
  13:24, 29:21,
  31:10, 32:5,
  37:23, 81:18,
  146:25.
leading 9:16,
  46:16, 57:6,
  116:23,
  135:17,
  156:17.

leads 169:14,
 169:17.
lean 6:14.
leaning 100:10,
 135:16.
leap 140:13.
learn 65:1,
 84:12,
 151:25.
learned 50:8,
 118:13,
 119:20,
 151:4.
learning 64:23,
 64:24, 96:22,
 102:23,
 118:10,
 120:24,
 146:7,
 148:2.
least 4:18,
 22:15, 37:15,
 37:25, 40:11,
 41:22, 41:24,
 42:2, 89:3,
 107:2, 114:2,
 118:5, 119:3,
 123:4,
 142:23,
 169:24,
 169:25.
leave 38:3,
 42:10,
 101:18.
leaves 159:6.
leaving 75:4,
 99:19,
 99:21.
led 8:16, 9:21,
 21:2,
 26:16.
left 47:2,
 49:12, 59:4,
 131:19,
 132:8,
 167:18.
leg 95:12.
legal 7:24,
 14:21, 15:11,
 15:23, 19:23,

 33:5, 33:8,
 97:23,
 139:20.
legally 33:9.
legislation
 46:17.
legislative
 64:19.
legitimacy
 136:24,
 136:25.
legitimate
 6:11, 18:7,
 18:8.
lens 37:10.
LEOBR 63:3,
 63:5.
less 28:21,
 28:22,
 57:24.
lesser 22:8,
 40:7, 121:17,
 131:3.
lesson 50:10,
 57:5,
 102:5.
lessons 50:8,
 114:20,
 118:13.
letting
 137:19.
level 6:6,
 21:22, 24:10,
 25:1, 25:15,
 60:21, 63:16,
 63:18, 80:20,
 104:1, 105:9,
 133:1,
 134:23,
 147:24.
levels
 134:24.
leverage
 128:2.
liability
 95:21.
liaison
 63:11.
lie 6:10.
life 15:24,

 23:23,
 101:2.
light 6:4,
 25:23,
 125:19.
lights 158:8.
likely 25:15,
 25:17,
 69:19.
limit 6:17.
limitations
 24:6.
limited 41:3.
line 41:17,
 44:21, 46:12,
 119:1,
 164:17.
lined 171:10.
lines 41:7,
 44:12, 62:5,
 163:21.
Lisa 14:17,
 14:21.
listed 47:10.
listen 37:3,
 58:14,
 110:11,
 110:14,
 111:15,
 152:22.
listened
 111:16.
Listening
 29:17, 29:18,
 39:9, 75:9.
literally
 123:2.
litigation
 28:22,
 39:3.
little 15:18,
 16:2, 24:24,
 34:9, 38:19,
 39:9, 41:5,
 67:3, 67:5,
 68:2, 68:3,
 69:19, 78:24,
 86:12, 87:23,
 96:9, 107:13,
 110:16,

 111:11,
 114:2, 120:7,
 129:3,
 129:10,
 155:21.
livable
 26:20.
live 14:1,
 76:9, 76:15,
 79:2.
living 48:22.
local 21:21,
 26:12, 28:14,
 34:15,
 72:5.
location
 110:15,
 116:14.
lock 32:24.
locked 66:22.
locks 32:19.
lockstep 39:10,
 39:12,
 39:17.
Loeffler 2:6.
log 91:23,
 92:6.
logged 92:3.
logical 31:16,
 96:17,
 130:1.
loitering
 22:8.
Lombard 1:45,
 2:45.
long 5:16,
 10:12, 14:22,
 17:3, 20:7,
 29:16, 31:16,
 31:19, 32:18,
 40:15, 40:16,
 56:21, 57:4,
 62:16, 95:13,
 95:21, 96:7,
 96:10, 96:15,
 96:19, 97:5,
 144:6, 152:4,
 168:21,
 172:3.
long-standing

110:5.
long-term
32:20, 32:21,
73:8, 101:3,
102:9,
103:11.
longer 96:9,
101:12.
look 11:20,
37:14, 40:10,
44:5, 44:24,
48:23, 64:13,
94:8, 107:22,
117:1, 117:4,
118:10,
120:24,
123:22,
126:4, 132:6,
153:14,
155:5,
157:24,
158:25,
169:21,
171:14.
looked 99:25,
114:19,
125:8.
looks 8:23,
19:13,
100:12,
118:15,
164:16,
168:24,
170:1.
loop 149:4.
lose 55:3.
losing 12:12,
14:17, 83:3,
98:11.
loss 12:7,
56:24,
80:7.
lost 31:9,
80:8.
lots 105:15.
Lotus 133:18,
161:18,
161:21,
163:11,
163:16,

164:11,
168:9.
loud 75:22.
low 24:9, 25:1,
25:15.
lowest 132:1.
LPR 93:15.
lunch 71:16,
106:1,
106:5.

.

< M >.
ma'am 152:20.
machine
147:16.
macroeconomic
75:21.
main 48:6,
107:6.
mainly 71:2.
maintain
79:16.
Major 2:6,
45:20, 53:7,
56:12, 70:15,
84:7, 116:5,
117:17,
125:1,
140:24,
158:4.
majority 48:15,
53:4,
107:18.
makers 41:19.
making-process
136:8.
Malancon 2:4.
malicious
17:23.
manage 24:23,
45:3, 74:4,
89:18, 92:8,
103:4, 115:7,
166:6.
management
86:7, 86:9,
86:11, 86:13,
86:14, 86:21,
96:22,

102:23,
117:10,
129:10,
140:11,
143:16,
143:24,
147:5, 148:3,
148:4,
156:11,
163:10,
163:11,
168:8,
168:10.
managing 89:2,
146:11.
mandated 5:5.
mandates 21:4,
30:3,
137:17.
mandatorily
157:4.
mandatory
83:12,
129:23,
157:22.
maneuver 42:12,
98:25.
manner 9:7,
102:6,
164:13.
manual 69:1,
129:13,
148:9.
map 45:1,
45:14, 45:19,
45:20, 46:1,
46:19, 46:22,
64:11.
March 100:18,
104:4,
157:10.
margin 83:21.
marginal
10:16.
marijuana
131:3.
marked 4:14.
markers 41:7.
market 75:10.
marketing 75:8,

77:15, 78:2,
94:16.
marries
112:16.
marry 112:18.
Maryland 1:2,
1:17, 1:46,
2:46, 12:12,
15:3, 42:16,
58:20, 60:15,
75:17,
76:17.
mask 4:3, 4:5,
4:6, 4:8,
4:9.
masking 4:3.
mass 20:24,
157:17.
massive 21:3,
85:19.
match 49:22.
material
30:8.
materially
30:16.
materials
103:4, 164:9,
167:20.
matriculate
79:10.
matrix 60:11,
60:13, 60:14,
60:15, 60:18,
60:19, 60:22,
62:18,
63:1.
matter 3:4,
11:24, 25:14,
38:14, 53:22,
88:1, 114:5,
148:20,
155:8,
172:18.
maximum 38:4.
Mayor 20:8,
21:20, 26:16,
44:10, 46:14,
59:11, 73:4,
75:23, 77:9,
78:19, 109:8,

109:9,
109:10,
114:25.
maze 42:19,
42:21.
mean 24:9,
24:19, 30:22,
40:6, 42:3,
42:13, 57:12,
83:15, 91:1,
111:12,
111:13,
111:14,
113:6,
113:22,
134:10,
137:25,
152:11,
158:3, 158:5,
158:15,
158:16,
169:12,
169:13.
meaning 92:20,
94:8,
168:3.
meaningful
91:16.
meaningfully
140:17,
141:14.
means 39:3,
40:11, 73:24,
74:10,
133:16,
145:24,
153:16,
161:18.
meant 127:5.
meantime
117:2.
Meares 1:40,
142:16,
152:15,
152:18,
152:21,
154:24,
155:3.
measurable
5:11.

measure 130:8,
137:17,
141:22.
measured 66:15,
144:21.
measures
85:23.
meat 68:21.
mechanics
23:5.
mechanism
150:19.
mechanisms
34:23.
media 24:4,
24:5,
79:23.
meet 12:20,
58:5, 80:24,
81:3, 117:2,
121:7,
148:12,
167:18,
172:5.
meeting 12:25,
14:16, 17:10,
19:22, 26:17,
38:19,
108:12,
108:17,
112:21,
113:1,
143:12.
meetings 18:15,
68:1, 171:7,
171:24.
member 51:10,
58:22, 59:17,
61:13, 62:6,
76:14, 76:24,
77:2, 87:18,
99:4, 99:7,
99:13, 99:19,
115:13,
128:4,
136:12,
137:22,
143:12,
144:1.
memory 77:21.

men 21:7,
26:13,
28:7.
mental 30:24.
mentioned
27:25, 44:4,
91:24,
104:18,
122:22,
133:24,
156:9,
167:19,
169:1.
Mercy 162:21.
mess 37:19.
message 76:1,
138:5,
138:16.
messaging
75:13, 75:18,
135:13,
135:22.
met 14:16.
method 74:10,
78:24,
138:23.
methodology
51:1, 74:21,
122:4,
161:24,
164:3,
164:14.
methods 74:22,
102:11,
104:21.
metric 85:7.
metrics 114:23,
141:24.
Michael 2:3,
4:22, 8:15,
20:20.
microcommunity
34:13.
microcosm
16:14.
microeconomic
77:19,
78:16.
microzones
112:23.

mid 74:8.
mid-2000s
15:4.
middle 71:16,
155:4.
midst 164:2,
167:9.
million
109:9.
mind 25:20,
49:10, 64:10,
102:19,
113:18,
147:14.
minds 78:7.
mine 47:21.
minefield
42:12.
minimal
83:20.
minimum
151:15.
minor 23:22,
23:23, 53:6,
54:4.
minorities
144:4.
minute 52:14,
150:3.
minutes 30:5,
52:18, 88:3,
112:25,
172:5.
misbehavior
24:14.
misconceptions
22:7.
misconduct
7:13, 24:13,
49:1, 50:5,
50:20, 51:15,
53:7, 53:8,
58:22, 59:17,
68:3, 103:23,
108:3,
130:21.
misdemeanor
131:2,
142:4.
mishandling

165:7.
misleading
  111:12.
missions
  115:9.
mitigation
  85:23.
mobile 87:6.
model 73:3,
  108:3,
  108:23,
  112:24.
moderate
  53:5.
modern 129:9,
  148:23,
  168:10.
modernization
  86:6.
modernized
  44:15,
  90:1.
module 128:8,
  128:16.
modules 69:7.
moment 8:4,
  8:18, 15:20,
  28:13, 49:5,
  80:13, 111:6,
  146:1,
  150:2.
moments 34:6.
momentum
  147:12.
Monday 104:12,
  104:14.
money 26:11,
  41:10,
  117:25,
  152:1.
Monitor 1:36,
  1:37, 1:38,
  38:16, 85:17,
  123:18,
  130:8,
  134:22,
  172:1.
Monitors 26:3,
  58:6, 60:20,
  90:2, 90:5,

97:7,
  101:25.
MONSE 109:12,
  109:15.
Montgomery
  60:24.
month 20:19,
  42:7, 68:18,
  69:22, 71:6,
  74:23, 76:7,
  83:3, 87:15,
  90:11,
  101:19,
  128:9,
  157:14,
  168:21.
Monthly 11:16,
  11:25, 12:24,
  13:8, 14:16,
  44:9, 47:17,
  53:13, 58:5,
  68:1, 80:16,
  85:3, 85:21,
  106:8,
  127:14,
  135:4,
  138:14.
months 9:17,
  25:14, 45:25,
  53:2, 57:8,
  76:8, 77:14,
  81:10, 90:24,
  126:10,
  156:22,
  157:2.
morale 93:18.
mostly 39:12,
  58:21.
move 13:18,
  22:1, 27:6,
  40:12, 43:13,
  46:21, 48:16,
  49:3, 54:5,
  58:16, 63:14,
  73:1, 76:9,
  83:25, 90:16,
  97:18, 106:8,
  109:19,
  127:11,
  135:2,

135:24,
  168:12.
moved 63:10,
  97:24,
  128:23.
movement
  145:14.
moves 48:18.
Moving 40:18,
  50:21, 58:13,
  65:16, 72:23,
  86:2, 86:13,
  96:25,
  108:18,
  125:4,
  130:10,
  132:16,
  132:23,
  132:24,
  141:16,
  144:15,
  145:4, 147:3,
  151:3,
  168:9.
MPCTC 161:4.
MPTC 60:16,
  102:7.
MR. HARRIS
  3:14,
  141:5.
MR. MYGATT
  3:10, 33:19,
  38:13, 39:5,
  82:5,
  94:24.
MR. SHEA 3:18,
  13:17, 14:11,
  16:8, 20:3,
  33:16, 43:23,
  63:16, 63:23,
  64:7.
MR. THOMPSON
  3:23, 39:8,
  42:5, 43:10,
  66:25, 67:5,
  71:4, 82:9,
  97:8, 105:19,
  122:9,
  142:15,
  154:21,

170:16.
MS. JOYCE
  82:12, 83:5,
  83:8, 85:15,
  85:24,
  166:24,
  167:14,
  170:9,
  171:20.
MS. PORTER
  3:12, 65:11,
  104:16,
  119:16,
  139:6, 165:4,
  170:22.
MS. THOMPSON
  17:3, 17:6,
  19:20,
  20:1.
Multiple 12:11,
  39:15.
murder 20:25.
murders 43:3.
Murphy 22:18,
  22:22.
muscular
  8:14.
Mygatt 1:22,
  3:10, 33:18,
  37:2, 38:12,
  38:16, 80:21,
  80:22, 81:20,
  94:23, 139:5,
  171:5.
myself 69:11,
  153:7, 169:7,
  171:2.
.
.
< N >.
Nadeau 2:5,
  48:7, 49:4,
  49:15, 49:17,
  52:21, 65:13,
  65:20, 70:13,
  71:21,
  126:13.
nailed 39:1.
name 69:9.
narrowly

18:12.
Natalie 1:30,
  3:19, 48:8.
national 72:5,
  73:21, 81:19,
  107:9,
  157:20,
  169:1.
nationally
  20:24.
natural
  129:4.
naturally 91:9,
  115:18.
nature 91:6,
  99:3, 133:15,
  140:24,
  141:23.
navigate
  42:4.
navigated
  22:14.
near 156:14.
necessarily
  111:12,
  118:20.
necessary 35:8,
  123:8,
  135:19,
  148:13.
needed 14:24,
  23:20, 74:17,
  75:2, 89:20,
  96:23, 108:8,
  161:16,
  164:12.
needs 17:16,
  17:20, 28:5,
  38:11, 54:2,
  66:11, 80:1,
  99:24, 106:3,
  118:11,
  126:19,
  133:1,
  138:17,
  140:19,
  161:8.
negative 57:13,
  57:14,
  80:2.

neglected
  127:22.
Neighborhood
  34:14, 34:16,
  109:11,
  109:15,
  109:17,
  115:1,
  116:10,
  116:12,
  116:18,
  116:24,
  117:23,
  119:10,
  120:1,
  120:10,
  120:11,
  120:16,
  121:11, 125:6,
  126:6.
neighborhoods
  8:23, 45:3,
  117:4, 118:2,
  126:3.
neither
  171:25.
net 80:7.
neurobiology
  160:12.
news 14:17,
  71:15, 81:24,
  140:11.
nexus 130:18.
nice 16:24,
  20:6, 71:22,
  78:3.
Nicole 1:23,
  3:12.
night 125:17.
nights 123:1.
nine 44:12,
  45:17,
  160:22.
NLRB 15:4.
No. 1:8,
  64:2.
nobody 55:16,
  55:19, 58:3,
  83:12.
Nola 1:39.

nonbusiness
  16:20.
noncompliant
  162:12.
nondirected
  109:24.
nondiscriminato
  ry 107:2.
None 127:5.
Nonetheless
  85:20,
  113:24.
nonpolice
  121:15.
nonprofits
  16:18, 17:13,
  26:12.
nontraditional
  15:18,
  16:2.
nor 78:8.
normal 99:10.
norms 35:7.
north 42:25,
  43:6.
Northeastern
  101:5.
NORTHERN 1:3.
Northwestern
  15:2.
notable 163:6,
  166:7.
note 38:3,
  135:5.
noted 119:18,
  139:10.
Notes 133:18,
  161:18,
  161:21,
  163:12,
  163:17,
  164:11.
noteworthy
  28:2.
Nothing 7:22,
  7:23, 28:15,
  55:3, 105:20,
  170:22.
notice 25:10,
  72:16.

notified 38:16,
  38:17.
notify 60:6,
  62:6,
  108:15.
notifying
  38:23.
notion 14:5.
November 156:1,
  167:16,
  168:6.
novo 61:19,
  63:19,
  63:20.
nowhere 10:2.
NP 93:15.
number 3:6,
  19:9, 23:25,
  51:22, 52:8,
  75:23, 78:18,
  80:5, 84:4,
  84:5, 84:17,
  85:4, 89:11,
  89:13,
  104:13,
  107:7,
  125:15,
  131:23,
  139:23,
  162:20,
  163:24,
  164:13,
  168:14,
  169:7.
numbers 37:12,
  83:24,
  168:24.
nurture
  115:21.
.
.
< O >.
o'clock 88:15,
  88:16.
oath 23:15.
obedience
  9:11.
obey 9:9.
objective
  53:13, 54:11,

88:8, 112:9,
150:4.
objectives 6:8,
6:18,
102:5.
obligation
9:6.
obligations
33:5.
observation
41:3, 103:6,
169:10,
169:18.
observations
87:21,
145:20,
169:10.
observed
122:17.
observing
153:4.
obstacle 12:3,
122:23.
obstacles
147:7.
obvious
152:12.
obviously 47:2,
53:11, 66:12,
85:17,
169:25,
171:10.
occur 10:6,
11:25,
130:17,
145:15.
occurred
164:5.
occurring 57:1,
164:22,
171:9.
October 103:16,
104:4, 109:8,
124:21,
156:1,
167:15.
off-the-shelf
91:1, 91:18,
95:2, 95:4,
96:12.

offender 110:7,
168:20.
offender-focuse
d 160:12,
165:10.
offenders
28:24,
29:12.
offense 24:10,
63:2, 103:24,
148:25,
160:2, 162:6,
163:19,
163:22,
163:25,
164:21.
offenses 9:24,
22:8, 23:22,
23:23, 25:1,
25:4, 25:15,
40:7, 121:17,
129:11,
131:3, 142:4,
161:4.
offer 76:25.
offering 76:10,
79:12.
Office 15:6,
21:20, 25:13,
25:17, 25:21,
26:2, 26:16,
42:11, 46:14,
64:10, 90:22,
93:19,
108:21,
109:8,
109:10,
114:12,
114:13,
114:25,
130:16,
131:1,
131:12.
Official 153:6,
172:22.
officials
17:12.
offloaded
83:16.
offloading

123:6.
offset 74:1.
often 53:21,
76:22, 91:25,
129:14,
130:25.
old 56:20,
88:6, 89:25,
148:9,
153:13.
ology 28:17.
on-track
72:23.
onboarding
117:9.
Once 22:15,
46:21, 47:24,
61:1, 61:21,
67:1, 87:20,
88:18,
124:13,
127:15,
128:19,
132:13,
140:20,
146:1,
147:15,
149:12,
149:14,
149:15,
153:15,
157:21,
158:19.
ones 19:11,
19:12,
72:19.
ongoing 81:16,
103:20.
online 86:12,
96:1, 151:24,
166:1.
onward 46:25.
open 17:18.
opening 15:20,
31:6, 33:13,
56:24,
67:21.
operate 6:22.
operates
5:13.

operating
19:18, 56:5,
148:9.
operation
23:6.
operational
46:2, 92:19,
94:15,
132:21,
143:7.
operationalized
92:21.
operationalizin
g 46:23.
operations
8:14, 69:1,
69:3, 79:17,
98:9,
132:14.
opinion 60:9.
opportunities
30:23, 98:12,
102:11,
138:8.
opportunity
22:5, 30:6,
110:9,
115:16,
126:9,
142:20.
opposite
131:23.
opt 131:1.
optimism
158:24.
options 91:1.
order 41:13,
85:5, 85:6,
92:18, 92:23,
93:2, 93:3,
116:15,
123:18,
126:1,
129:20,
136:14,
142:24,
146:13,
151:14,
167:23.
orderly

89:16.
organization
57:18,
143:20,
147:2, 148:6,
148:7, 148:8,
148:12,
148:16.
organizations
20:9, 26:13,
107:15,
162:21.
organizes
64:7.
origin
157:21.
original
122:24.
originally
86:23.
Orleans 21:24,
37:23.
oscillations
8:19.
Others 23:9,
42:23,
48:7.
Otherwise 10:7,
11:24, 94:21,
100:7,
105:10,
148:14,
172:12.
ourselves
70:22.
outcome 11:19,
48:20, 130:9,
133:4,
141:18,
166:18.
outcomes 17:21,
59:10, 66:2,
120:25,
132:22,
138:20,
142:1,
145:11,
163:6,
166:15.
outdated

127:22.
outdoor 100:15,
100:16,
101:4.
outline 89:7.
outlines
107:5.
Outreach
108:25,
112:15,
116:13,
120:16.
outside 17:22,
18:15, 63:1,
69:12.
outsourcing
121:13.
Outstanding
168:7.
overall 6:4,
45:7, 47:14,
57:25, 70:2,
75:4, 79:5,
79:17, 86:5,
87:13, 96:11,
102:13,
106:21,
114:8,
120:23,
128:22,
130:7, 131:5,
132:23,
133:4,
137:23,
159:24,
162:25.
overcome 93:24,
122:23,
125:4.
overhaul 68:24,
68:25.
overhauls
21:3.
overlap
115:10.
overnight
10:18, 31:18,
56:24,
58:4.
oversee 19:16,

88:4.
overseeing
20:23.
oversight
163:7.
overtime
83:12.
overview
163:5.
overwhelming
107:18,
149:22.
owed 61:19.
own 9:17,
16:13, 28:18,
58:24, 64:24,
76:22, 76:23,
79:6, 95:15,
110:11,
153:21,
171:14.
.
.
< P >.
p.m. 172:14.
package 94:10,
98:24.
paid 67:20,
100:5,
114:2.
paint 30:24.
painted
96:16.
paired
103:10.
paling 77:5.
pandemic
20:23.
panhandling
22:9, 26:9,
26:21, 40:23,
41:10,
42:16.
paper 17:25,
103:9,
129:12,
169:24,
169:25.
paper-based
128:24.

paragraph
113:22,
115:19,
136:6, 141:9,
141:12,
160:23.
paragraphs
7:21.
parallel 73:24,
74:11.
parking
110:12.
parte 171:7.
participate
117:21.
participating
117:14.
participation
21:22, 75:11,
133:1,
172:13.
particular
15:17, 31:22,
36:24, 68:12,
88:13, 93:25,
96:18, 105:5,
110:12,
111:1,
111:17,
119:4, 122:3,
123:11,
123:13,
153:2.
particularly
4:16, 6:4,
13:21, 16:18,
22:19, 37:11,
38:10, 54:4,
105:8,
135:8.
parties 11:7,
11:13, 12:1,
12:16, 12:23,
13:3, 13:20,
27:18, 28:4,
37:5, 39:10,
42:4, 42:7,
54:7, 68:4,
122:1,
134:19,

140:2,
140:10,
155:13,
155:25,
165:8,
167:15.
partner 23:9,
25:21, 109:7,
114:25,
162:19.
partnering
108:20.
partners
108:25,
109:1,
114:18,
116:19,
117:3.
partnership
117:8.
parts 116:2,
121:1.
party 13:4,
130:20,
170:7.
pass 43:21.
Past 8:15,
31:24, 64:3,
65:14, 73:9,
75:21, 81:20,
83:19, 97:18,
104:14,
127:21,
139:22,
160:7,
165:12.
pat 156:8.
Patent 15:6,
15:8, 16:4.
path 33:2,
65:17,
146:22.
pathways
26:18.
patient
159:12.
patrols
110:6.
pattern 7:10,
139:12.

Pause 49:2,
52:15,
109:18.
pay 75:15,
75:16, 76:16,
98:24, 99:9,
99:10, 99:14,
99:16, 99:17,
99:20,
110:11,
171:1.
paying
123:24.
payroll 79:8.
pays 41:22.
PC 145:10.
PD 60:24.
pedestrian
142:1, 143:3,
156:7.
peek 145:25.
peer 21:14,
108:3.
pen 17:25.
penalty
62:19.
pending 93:3.
pendulum 8:6,
8:10, 8:21.
pension 98:20,
98:25, 99:5,
99:7, 99:10,
99:16, 99:19,
100:5.
per 76:7,
169:3.
perceived 6:24,
54:12.
percent 53:1,
58:15,
122:24,
126:18,
126:19,
138:6,
162:10,
162:12,
162:15.
percentage
131:16,
131:18,

132:1, 142:2,
144:4.
perception 7:9,
7:15, 31:15,
56:22, 57:9,
57:10, 57:11,
57:14, 57:25,
137:1,
144:10.
perfected
148:5.
perform 6:22,
9:11, 43:14,
74:1,
156:10.
Performance
66:14, 66:17,
72:14, 72:20,
92:3, 92:5,
114:8,
114:23,
130:14,
132:25,
133:9,
137:15,
138:11.
performed
22:21.
performing
7:25,
128:13.
perhaps 41:22,
43:13, 69:3,
122:23,
146:4,
171:14.
period 10:18,
45:15, 66:24,
131:15,
132:7,
132:10,
133:7,
166:17.
periodic
171:1.
periods 8:11.
permanent
101:7,
102:13.
permission

23:21,
67:3.
permit 20:9.
permitted
41:8.
person 25:18,
55:13, 61:9,
61:10, 63:10,
79:10, 97:24,
104:23,
136:13,
137:21,
152:23,
159:12.
personal
87:21.
personally
153:7.
personnel
32:15, 50:7,
73:19, 76:24,
121:20,
161:5.
persons
114:17.
perspective
55:24.
persuaded
84:24.
persuasively
147:18.
Phase 13:13,
27:6, 45:13,
48:17, 48:18,
66:21, 70:20,
72:23, 90:2,
90:13, 96:25,
120:16,
128:8,
166:14.
phases 128:5,
128:6,
128:7.
phenomenal
143:24.
philosophically
28:16.
philosophy
105:12,
148:17.

Phoenix 20:19,
  21:8.
phone 87:8,
  87:10.
phones 87:17,
  88:9.
physically
  129:13.
PIB 49:19,
  50:14, 50:18,
  50:24, 51:11,
  55:10, 57:10,
  57:14, 58:8,
  59:18, 60:2,
  61:11, 65:1,
  65:13, 65:16,
  65:20, 66:2,
  66:6, 66:11,
  68:14, 68:24,
  68:25, 69:2,
  69:5, 126:14,
  148:1.
picked
  155:13.
picture 87:4,
  88:25, 96:15,
  96:17.
piece 18:5,
  65:7, 76:18,
  90:20,
  101:15,
  102:6,
  153:21.
pieces 79:13,
  90:15, 92:9,
  145:12,
  148:3.
piggy-backing
  158:5.
pilot 86:20,
  116:10,
  116:12,
  117:4,
  117:18,
  118:4,
  120:10,
  120:11,
  120:23,
  126:4.
piloted 87:7.

piloting 103:5,
  116:14,
  120:15.
pilots 117:4,
  117:23,
  118:1, 118:8,
  120:25,
  125:7.
pinned 64:9.
pivot 16:9,
  66:13.
place-based
  112:22,
  112:23,
  134:24.
placed 32:14,
  92:23,
  93:3.
places 28:4.
plain 80:3.
Plaintiff 1:6,
  1:20.
planned
  86:23.
planning 13:6,
  48:14, 77:24,
  85:11, 101:5,
  110:19,
  110:20,
  149:17,
  152:14.
plans 34:14,
  50:10, 102:5,
  109:15,
  109:17,
  117:1, 117:3,
  120:12,
  120:23,
  121:1,
  141:20,
  160:21,
  161:25.
plant 71:15.
platform
  91:16.
playing
  168:24.
please 3:2,
  3:17, 3:22,
  66:25,

71:11.
pleased 16:6,
  21:15,
  75:22.
pleasure
  106:14.
plug 91:19.
plus 67:7,
  99:16,
  150:24,
  150:25.
podium 17:1,
  33:20.
pointed 4:23.
points 13:25,
  95:6, 95:8,
  95:20, 96:1,
  126:14.
political
  25:24, 31:22,
  32:4.
politicians
  37:9.
poor 9:18,
  56:8.
POP 107:9.
population
  44:23,
  56:16.
Porter 1:23,
  3:13, 65:10,
  68:13,
  104:15,
  119:15,
  122:7, 139:5,
  165:3,
  166:20,
  170:21,
  170:24,
  172:2.
portion 66:19,
  68:9, 89:3,
  113:9, 119:9,
  127:12,
  150:13,
  150:16.
portions
  129:24,
  139:2.
position 14:25,

22:25, 29:6,
  55:10, 63:11,
  98:1, 98:2,
  98:3, 98:19,
  118:1,
  150:17,
  150:25,
  151:5, 152:3,
  159:5.
positioned
  100:8.
positions 37:4,
  51:17, 74:2,
  74:7, 74:14,
  81:15, 84:5,
  97:19, 97:20,
  97:23, 98:7,
  98:10,
  117:10,
  151:2.
positive 31:4,
  31:24, 44:5,
  70:1, 70:3,
  87:14, 93:22,
  94:1, 94:6,
  94:11,
  124:10,
  145:13,
  149:11,
  153:7,
  155:20.
possession
  131:3.
possibility
  24:17,
  24:18.
possible 17:18,
  39:4,
  172:4.
post 14:22,
  111:15.
posted 74:8,
  162:16.
posting
  102:11.
posture 42:2.
potential 87:9,
  87:11, 101:6,
  123:19.
potentially

88:12.
pound 126:25.
Poverty
  30:23.
Powder 97:12,
  100:19.
practical
  23:24,
  137:6.
practice 7:10,
  10:25,
  139:12,
  139:17,
  142:12.
practiced
  144:24.
practices 5:1,
  5:15, 26:5,
  81:10, 81:13,
  107:10,
  139:11,
  139:13,
  140:4, 140:5,
  153:24.
pray 38:5.
predict
  22:17.
preference
  4:5.
preliminary
  13:18.
premature
  25:9.
prepare
  128:13.
prepared
  107:19,
  167:23.
preparing
  89:22.
prescribe
  34:18, 35:15,
  36:23.
prescribed
  7:16.
prescription
  112:24.
presence 123:7,
  124:12.
Present 2:3,

14:19, 15:11,
  20:8, 24:21,
  30:6, 48:7,
  48:8, 77:25,
  106:11,
  127:21,
  142:15,
  168:11,
  171:4,
  172:6.
presentation
  43:23, 44:1,
  46:25, 48:9,
  48:10, 65:6,
  71:14, 71:21,
  80:13, 100:1,
  104:9, 113:9,
  117:22,
  129:4, 135:1,
  159:9,
  159:11.
presentations
  12:1, 13:3,
  13:19,
  78:3.
presented
  68:23, 82:22,
  135:17.
presenter
  48:6.
presenters
  71:13.
presenting
  18:16,
  127:9.
pressure
  33:7.
pretty 71:22,
  93:10,
  113:21,
  114:4,
  153:18.
prevailing
  135:20.
prevent 9:24,
  27:5.
prevention
  109:12,
  153:24.
prevents

7:24.
Previous 44:9,
  71:11, 73:13,
  77:6, 106:19,
  127:14,
  139:1,
  159:22.
previously 8:3,
  25:14, 25:23,
  51:10, 78:19,
  98:3, 107:14,
  135:7.
primarily
  42:21,
  150:14,
  162:5.
primary 5:8,
  44:8,
  160:14.
principals
  20:9.
principles
  26:25, 34:22,
  107:20,
  121:4, 121:5,
  121:7, 136:7,
  142:11.
prior 8:19,
  10:24, 32:9,
  55:18,
  106:20,
  114:9, 121:2,
  151:10,
  159:23,
  163:18.
priorities
  6:10, 6:19,
  116:19,
  116:24,
  125:11,
  125:21,
  126:1.
prioritizing
  74:13.
priority 105:9,
  125:13,
  125:23,
  126:22.
prism 37:10.
private

83:17.
pro 169:23.
proactive 27:5,
  34:3, 34:5,
  112:15,
  122:25,
  133:25,
  134:3.
proactively
  22:7.
proactivity
  134:21,
  134:23.
probable
  130:18,
  133:13,
  142:6, 153:5,
  155:9,
  155:11.
probably 19:9,
  39:15, 61:24,
  80:5, 142:23,
  154:10,
  158:2,
  167:18,
  172:9.
problem-oriente
  d 107:8,
  111:9,
  113:13.
problem-solving
  119:23.
problematic
  8:16, 24:14,
  95:19,
  147:24.
problems 10:6,
  15:24, 15:25,
  30:22, 31:6,
  53:16,
  120:19,
  128:3, 132:5,
  132:12,
  149:9,
  149:11.
procedural
  26:25, 61:18,
  62:11, 62:18,
  136:10,
  136:21,

137:3, 137:4,
  137:12,
  137:14,
  137:17,
  138:13,
  138:19,
  153:2,
  153:24,
  154:11,
  154:14,
  158:15.
procedurally
  61:21.
proceed 46:22,
  46:25,
  75:23.
proceeded
  15:19.
proceeding
  13:16.
Proceedings
  1:14, 172:14,
  172:18.
proceedings.
  52:15.
processes
  36:22, 58:12,
  72:7, 72:9,
  105:14,
  133:2,
  136:4.
processing
  146:3,
  163:21.
procurement
  89:21, 89:22,
  90:21, 90:22,
  147:10.
produce 101:22,
  155:7.
produced 45:13,
  170:7.
producing
  155:25,
  156:14.
product 89:17,
  90:12,
  140:1.
production
  92:25.

productive
  24:13, 37:21,
  44:5, 48:1,
  147:17,
  149:4,
  165:1.
profession
  73:23,
  78:6.
professional
  26:25, 71:13,
  97:22,
  114:13,
  114:15,
  117:9.
professionaliza
  tion 105:8.
Professor 1:40,
  142:16,
  152:15,
  152:18,
  152:21,
  154:24,
  155:3.
profile
  143:1.
profit 118:2.
profited
  23:1.
profound
  5:20.
program 51:1,
  56:12, 58:10,
  69:4, 69:16,
  76:20, 79:1,
  79:7, 82:19,
  117:10,
  126:2.
progressed
  153:3.
progression
  137:18.
prohibit 6:12,
  34:3.
project 60:21,
  100:17,
  118:4,
  140:24.
projection
  44:1.

promoted
  21:16.
promotional
  72:24.
promotions
  98:11.
prompt 53:23,
  56:9.
prompted
  157:4.
promptly
  55:4.
promulgated
  24:7.
proof 13:13,
  127:9.
proper 118:9,
  138:19.
properly 108:7,
  140:18,
  160:10.
property 17:24,
  44:25,
  100:25,
  116:18.
proponent
  46:17.
proportion
  142:3.
proposals
  90:23.
proscriptive
  7:20.
prosecute
  131:1.
prosecuted
  24:1, 25:5,
  25:7.
prosecution
  25:14.
prosecutor
  131:7.
prosecutorial
  130:23.
prospects
  12:6.
protect 28:8,
  39:23, 68:7,
  136:13.
protected 26:9,

26:14,
  41:11.
protecting
  23:17.
protects
  139:19.
protesting
  20:25.
protocols 4:1,
  26:5.
proud 21:7,
  28:6, 72:12,
  72:25,
  142:15,
  145:5.
prove 28:4.
provide 7:3,
  31:12, 35:18,
  44:9, 45:16,
  50:17, 84:11,
  89:6, 90:7,
  109:4,
  141:20,
  163:4, 163:7,
  166:9.
Provided 4:24,
  5:17, 13:23,
  14:12, 14:16,
  67:13, 72:2,
  107:13,
  116:25,
  160:7.
providers
  108:25.
provides 35:14,
  46:8,
  119:24.
providing 43:9,
  45:5, 50:12,
  67:9, 105:3,
  105:16,
  166:3.
provision
  66:12.
provisions
  40:25, 81:4,
  95:23,
  141:17.
pseudo 92:6.
PSP 114:18.

psychologically
   28:16.
publicly 23:25,
   27:4, 46:12,
   143:1.
publish
   156:3.
published
   50:20,
   131:14.
publishing
   50:21.
pull 29:8.
pulled 32:25,
   147:9.
purpose 96:5,
   111:10,
   120:11,
   128:12.
purposeful
   95:22,
   96:2.
purposes 58:23,
   126:24.
pursuant 24:8,
   67:24,
   85:5.
pursue 11:4,
   32:1,
   32:24.
pursues 6:9.
pursuit 6:18.
push 12:8,
   28:4, 29:7,
   135:18.
pushed 75:25,
   86:20,
   87:19.
pushing
   79:21.
put 17:25,
   27:12, 32:6,
   33:9, 60:20,
   68:21, 71:15,
   72:24, 80:2,
   82:6, 82:19,
   87:2, 93:20,
   126:9,
   139:17,
   142:11,

147:19,
   149:23,
   169:14.
putting 36:7,
   60:16, 72:17,
   88:8,
   101:8.
puzzle 76:18,
   79:13, 90:15,
   90:21,
   101:15,
   102:6,
   150:16.
.
.
< Q >.
qualified
   76:11,
   76:25.
qualify 111:23,
   112:13.
qualitative
   133:5.
quality 23:23,
   49:24, 70:2,
   102:17,
   128:14,
   167:8.
quantitative
   130:12,
   132:4.
Quarter 47:17,
   50:19, 50:22,
   80:25, 86:22,
   87:5, 101:19,
   106:2,
   131:15,
   131:19,
   131:20,
   131:24,
   132:6, 141:6,
   162:1.
quarterly 3:7,
   4:11, 4:13,
   11:17, 11:25,
   12:25, 20:7,
   30:9, 50:19,
   53:12, 56:2,
   59:10, 68:1,
   110:19,

129:2.
question 11:8,
   13:25, 28:14,
   28:25, 29:13,
   49:9, 61:16,
   61:18, 83:14,
   93:13, 98:14,
   110:1,
   113:18,
   114:3,
   123:10,
   125:4,
   143:12,
   145:17,
   145:21,
   147:20.
questions 22:6,
   36:25, 42:1,
   46:24, 49:2,
   63:25, 64:10,
   70:6, 92:10,
   104:8,
   109:18,
   109:21,
   117:21,
   122:6,
   137:21,
   138:16,
   139:1,
   143:20,
   149:17,
   150:6,
   164:18.
Quick 4:1,
   39:8, 66:23,
   94:24,
   127:21,
   147:10,
   171:24.
quicker 53:9.
quickly 10:25,
   54:5, 55:5,
   135:2,
   151:3.
quite 94:6,
   131:23,
   157:2.
quote 49:20,
   49:24.
.

.
< R >.
race 141:25.
racial 143:13,
   144:4,
   157:20.
radio 28:13.
raise 61:3.
raised 113:18,
   135:7,
   165:5.
ramp-up
   157:12.
RAMSEY 122:9,
   122:10,
   122:12.
random 155:6,
   155:22.
randomly
   138:12.
range 100:15,
   100:16,
   100:19,
   101:4, 101:8,
   162:8.
rank 4:20,
   61:9.
rape 160:2,
   160:14,
   161:4,
   162:8.
rapt 80:17.
rate 10:5,
   76:16.
rates 75:11,
   151:15.
Rather 8:12,
   38:5.
rational 31:16,
   84:22.
raw 85:4.
re-entry
   109:14.
re-establishing
   139:16.
re-imagined
   5:12.
reach 146:1.
reached
   55:22.

react 32:4.
reacted
   113:25.
reaction
   85:8.
readily 91:5.
reading 24:4,
   24:5,
   64:10.
readout
   87:15.
ready 25:20,
   28:3, 43:12,
   43:14, 63:10,
   87:20,
   147:24,
   150:20,
   152:13.
real 39:8,
   84:19, 88:7,
   89:4, 92:6,
   95:4, 100:24,
   105:11.
reality 78:2,
   82:25.
realize 57:23,
   83:22.
reallocate
   151:2.
reap 57:2.
reason 70:9,
   110:16,
   130:22.
reasonable
   9:12, 130:22,
   133:14.
reasonably
   23:24.
reasons 39:12,
   42:10,
   130:17.
rebuilding
   28:10.
recall 42:6.
receive 26:20,
   59:5, 59:6,
   59:15, 60:1,
   79:8,
   161:1.
received 22:6,

65:17, 65:18,
   66:1, 74:6,
   77:10, 93:1,
   106:16,
   128:11,
   159:19,
   160:25,
   162:18,
   164:5.
receives
   59:7.
receiving
   44:22, 48:23,
   164:16.
recent 110:4,
   126:10,
   162:14.
recently
   103:13,
   151:4,
   161:24,
   166:4.
receptive
   105:4.
recess 47:25,
   52:18, 52:19,
   106:5, 106:6,
   172:13.
recognition
   77:3.
recognize
   42:13, 70:24,
   82:5, 133:21,
   141:9,
   144:24.
recognized
   5:15, 20:24,
   67:21, 68:5,
   68:13.
recognizes
   18:25, 35:23,
   36:7,
   80:24.
recognizing
   69:15.
recommend
   18:7.
recommendations
   60:10.
reconfigure

87:1.
reconfiguring
   129:22.
reconsideration
   25:16.
reconstructed
   5:13.
reconstruction
   32:12.
record 29:17,
   52:13, 70:13,
   72:2, 89:18,
   103:12,
   147:19,
   156:11,
   171:6,
   171:25,
   172:18.
recorded
   124:17,
   137:19.
recordkeeping
   103:5,
   140:13.
records 86:7,
   86:9, 90:6,
   91:20, 98:2,
   98:4, 103:1,
   128:25,
   129:10,
   140:11,
   143:16,
   143:24,
   147:5,
   157:13,
   161:19,
   161:22,
   163:10.
recruit 72:8.
recruited
   107:14,
   116:16.
recruitment
   72:4, 74:19,
   74:22, 74:25,
   75:8, 76:21,
   76:23, 81:13,
   93:18, 94:12,
   94:16.
redistricting

44:10, 44:16,
   44:21,
   118:24,
   119:1.
redlining
   107:16.
redo 62:20.
redrawing
   44:12.
reduce 36:8,
   36:11, 62:19,
   82:23,
   83:2.
reduced 52:7,
   83:17.
reducing 28:10,
   81:14, 82:16,
   82:25, 83:14,
   121:14.
Reduction
   38:10, 45:6,
   87:11,
   108:22,
   117:11.
reductions
   83:21.
refer 11:15,
   79:9.
reference
   34:7.
referenced 8:3,
   165:12,
   166:13.
references
   40:21.
referral 76:20,
   77:6, 77:7,
   79:8.
referred 107:9,
   108:23,
   109:11.
refine 108:18,
   151:8.
reflect 8:19,
   73:11,
   171:6.
reflected 38:2,
   68:8, 84:1,
   84:2.
reflecting 5:1,

73:14.
reflection
    21:9.
reflects 70:13,
    82:18.
reform 8:13,
    10:13, 21:2,
    28:5, 56:12,
    57:3, 57:6,
    68:8, 70:11,
    70:19, 82:2,
    115:11,
    149:11,
    149:23.
reformation
    148:15.
reformed 5:13,
    146:19.
reforms 5:4,
    5:7, 66:22,
    67:11,
    115:17,
    130:9.
refresher
    160:23.
regain 9:15.
regaining
    11:5.
regard 14:2,
    18:19, 41:24,
    54:1, 100:8,
    150:6.
regarded
    78:7.
Regarding 22:8,
    44:23, 65:9,
    67:25,
    106:25,
    116:21,
    128:23.
regardless
    60:23.
regards 68:12,
    82:15.
registry
    110:7.
regular 109:24,
    124:18,
    138:15.
regularly

11:17.
regulate 6:17,
    7:7.
regulates
    7:1.
reimagination
    32:11.
reimagine
    73:5.
reiterate
    170:25.
rejoin 38:19.
rejoining
    98:23.
related 15:16,
    16:10, 23:3,
    40:23, 75:14,
    109:3,
    128:15,
    142:22.
relates 11:8,
    74:18,
    109:14.
relating
    141:18.
relation 12:24,
    38:22.
relations
    46:14.
relationship
    9:1, 9:20,
    9:21, 10:17,
    31:17, 42:24,
    43:7, 44:6,
    134:15,
    139:14,
    140:6, 153:1,
    153:22.
release 66:23,
    130:10,
    142:4,
    158:12,
    161:25.
released 45:14,
    50:23,
    130:15,
    142:5.
releases
    129:2.
relevant 49:9,

85:22,
    95:6.
reliable
    142:8.
reliant 107:12,
    160:6.
relies
    108:23.
relieved
    11:22.
reluctant
    124:13.
rely 76:21,
    102:7.
relying 74:1.
remain 6:6,
    12:15, 67:22,
    81:15,
    118:12.
remains 81:7,
    85:13.
remark 15:20.
remarkable
    50:2, 53:2.
remarkably
    14:20.
remarks 40:22,
    71:25, 80:23,
    119:11,
    145:19,
    146:7,
    152:25.
remedy 7:16,
    7:17,
    13:13.
remind 171:3.
reminded 28:12,
    37:3,
    104:11.
remiss
    151:16.
remove 4:5,
    4:6.
removed 63:5.
renewed
    121:20.
repair 125:15,
    125:16.
repealed
    78:22.

repeat 27:5.
repeatedly
    126:10.
replace 12:13,
    100:18,
    163:11.
replaced
    97:25.
replacement
    14:19,
    100:16.
reported 23:20,
    26:7.
Reporter
    172:22.
reporting
    69:23, 83:23,
    87:6, 89:10,
    103:6,
    128:25,
    129:8,
    140:14,
    155:10,
    156:12,
    156:17,
    156:23,
    163:13,
    163:23,
    165:21.
reports 50:19,
    80:16, 87:8,
    87:13, 87:25,
    88:6, 88:11,
    88:12, 89:11,
    91:25, 133:3,
    133:22,
    163:2,
    163:18,
    164:10.
represents
    48:13, 68:9,
    77:11.
request 6:13,
    11:23, 90:23,
    125:25.
requests
    163:20.
require 6:19,
    35:17, 85:3,
    95:24, 108:5,

116:20,
123:19.
required 4:3,
22:1, 32:10,
32:11, 36:9,
36:13, 37:7,
58:20, 141:9,
143:19,
144:13,
146:23,
156:23,
157:22,
161:13,
165:18.
requirement
51:5, 73:11,
73:13, 161:4,
161:6.
requirements
24:6, 35:5,
35:9, 39:25,
66:15, 74:4,
81:4, 86:14,
86:16, 86:17,
86:24, 90:8,
90:9, 90:19,
91:13, 128:1,
129:9,
139:15,
154:18,
168:13,
168:14.
requires 10:23,
12:18, 34:10,
34:13, 34:19,
37:14, 44:21,
66:18, 70:23,
125:9,
156:19,
156:24,
157:5.
research
150:12,
150:17,
150:24,
151:5,
153:22.
reseated
114:10.
reserve 97:8.

residents
46:10, 120:7,
121:9.
resolution
18:23,
42:23.
resolutions
56:9.
resolve
138:21.
resolves
113:14.
resort 40:14.
resources
10:21, 46:10,
86:25, 87:3,
125:9,
151:23.
respect 4:11,
7:5, 13:9,
25:15, 30:16,
37:5, 37:22,
42:3, 42:8,
42:20, 65:13,
66:7, 66:11,
70:8, 81:19,
100:1,
106:16,
116:6,
135:11.
respected
19:8.
respects 9:8,
139:20.
respond 40:11,
116:2,
123:8.
responded
83:19.
responders
83:17.
responding
83:18,
112:14.
Response 14:7,
20:22, 20:24,
36:9, 55:6,
68:24, 80:10,
80:11, 81:15,
107:3,

116:20,
162:7,
162:19.
responses
45:22,
56:8.
responsibilitie
s 6:10,
38:22,
59:9.
responsibility
19:1, 19:4,
19:6, 19:14,
33:25, 59:15,
81:18,
85:1.
responsible
29:11, 29:19,
81:22,
119:5.
responsive
54:12,
119:21,
134:24,
135:7.
responsiveness
57:10.
restate
152:11.
restoration
43:6.
restore
10:19.
restored 30:4,
31:18.
restoring 5:25,
53:14.
restrained
8:9.
restrict
6:11.
restructured
105:13.
result 53:20,
53:22, 63:17,
67:14, 132:5,
142:2, 142:4,
165:6.
resulted
162:14,

164:15.
results 8:24,
24:13, 31:24,
48:23, 56:15,
75:3, 107:18,
118:17,
130:3, 155:7,
163:3,
167:4.
resumes
22:24.
ret. 1:39.
retain 99:5,
100:5.
retaining
84:16.
retention 72:4,
74:20, 74:22,
74:25, 76:2,
77:3, 79:7,
81:10, 81:13,
82:17, 94:12,
101:17.
retire 98:19.
retired 61:8.
retiree 99:5.
retirement
51:8.
retry 63:21.
return 71:9.
Returning
11:6.
reunited
45:11.
reuniting
119:2.
revamped 108:1,
108:2.
revealed 9:18,
37:15.
reveals 56:3,
147:22,
147:23.
reverts 99:9.
reviewed
108:16,
124:22,
131:19,
138:15.
reviewing

106:20,
133:8,
133:13,
159:22,
166:4.
reviews 11:19,
11:24, 48:20,
50:1, 89:15,
128:13,
130:15,
133:6.
revised 25:23,
127:24.
revisions
64:21,
69:19.
reward 140:2.
ride 88:1.
ride-alongs
87:22.
rightly
27:12.
rights 18:10,
23:17, 41:9,
127:23,
127:25,
139:20,
162:21.
ripe 41:1,
147:8.
rise 145:21.
Ritter
114:13.
RMS 89:8, 90:4,
90:15, 96:22,
97:5, 142:7,
157:21.
road 10:12,
58:17, 66:13,
146:18.
robust 74:15.
role 4:4, 4:9,
15:7, 15:10,
15:16, 16:2,
22:1, 22:12,
22:14, 22:21,
23:7, 23:10,
39:22, 42:3,
43:14, 43:15,
44:6, 65:1,

66:11,
107:20.
roles 16:5,
22:19,
99:2.
roll 111:16.
rolled 87:23,
157:15.
rolling 37:24,
66:12, 88:4,
93:5, 93:9.
room 17:10,
17:11, 18:1,
98:25, 172:3,
172:10.
rooms 166:8.
root 132:4,
139:12.
rooted 149:9.
ROSENTHAL 1:37,
3:24, 97:10,
154:21,
154:22,
154:23,
156:6.
roughly
156:13.
route 33:10.
RPR 1:44, 2:44,
172:16.
rule 40:7.
ruled 26:8.
rules 98:17,
99:21,
99:22.
ruling 41:1,
62:13.
rulings
42:14.
run 59:5,
95:21, 96:7,
96:10,
143:20,
149:12.
running 51:12,
90:23, 123:2,
140:21.
rush 53:5.
RWOC 130:14,
130:17,

130:22,
132:12,
133:3, 133:8,
133:22,
145:9.
Rwocs 129:2,
130:11,
130:24,
131:14,
131:16,
131:21,
131:24,
132:7,
132:15.
.
.
< S >.
sad 14:17,
21:6.
Sadly 30:19,
78:6.
safe 10:8,
109:2.
Safety 18:8,
34:15, 35:23,
36:7, 36:11,
41:13, 41:21,
49:1, 82:18,
109:11,
115:1,
116:19,
125:13,
125:22,
139:19.
sails 85:10.
sake 132:21,
144:16.
sample 133:6,
133:8,
133:21,
138:11,
155:6,
155:22,
162:11.
samples 138:9,
162:10.
Sara 114:13.
sat 42:7.
satisfied
157:14.

savings
151:1.
saw 129:23,
158:15.
saying 13:20,
15:14, 28:6,
29:14, 31:5,
62:2, 96:8,
110:14,
110:21,
111:15,
146:14,
155:3,
168:21.
says 62:7,
110:24,
126:16,
148:12.
SB 58:21.
scale 118:2,
118:14.
scan 49:5.
scandal 4:23.
schedule 103:4,
141:20,
143:25,
151:14.
scheduled
100:16.
School 15:3,
104:7.
schools
30:24.
scope 91:21,
91:22,
141:23.
score 72:15,
106:16,
127:19,
159:19,
162:10,
162:12,
162:15.
scorecard
11:18,
138:14,
158:16.
scorecards
139:3,
158:17,

158:18.
scores 47:13,
   72:18,
   72:19.
Scott 26:17,
   44:11, 46:14,
   109:9.
screens 47:20,
   52:21.
seamless
   92:7.
search 27:2,
   128:4,
   130:18.
searching
   12:16.
seated 3:2,
   172:9.
Second 22:11,
   22:17, 34:23,
   45:15, 52:13,
   86:22, 87:5,
   107:22,
   128:11.
section 72:15,
   72:23,
   127:18,
   130:14,
   132:25,
   133:9.
sections 27:25,
   49:6, 49:9.
seeing 70:1,
   75:10, 75:15,
   78:19, 87:14,
   111:3, 111:6,
   112:7,
   171:19.
seeking
   45:11.
seeks 38:11.
seem 30:15,
   170:18.
seemed 24:4,
   53:18, 78:4,
   100:2.
seemingly
   81:11.
seems 24:19,
   28:23, 64:22,

82:20, 83:6,
   99:24,
   153:18.
seen 17:21,
   48:11, 65:3,
   69:24, 87:22,
   89:11, 111:4,
   117:16,
   166:7.
segment 134:12,
   148:7,
   148:8.
seizure
   142:2.
selected 19:11,
   20:20,
   166:16.
selection 21:8,
   22:16,
   102:10,
   104:21,
   105:15.
selections
   102:17.
self-assessing
   132:17,
   138:24.
self-assessment
   129:5,
   153:18.
self-correcting
   129:5,
   132:17,
   138:24.
self-correction
   153:18.
semiannual
   49:19,
   106:18,
   159:20.
send 55:6,
   59:16, 59:18,
   60:5, 61:2,
   62:20, 138:4,
   171:11.
sense 10:9,
   33:4, 109:23,
   169:9,
   169:19.
sensed 87:24.

sent 111:13.
separate 114:5,
   115:6.
separately
   50:22.
September 71:6,
   75:6,
   164:23.
sequence
   96:17.
sergeant 97:24,
   168:21,
   168:23.
sergeants 88:3,
   88:14,
   168:20.
series 83:15.
serious 8:4,
   14:6, 18:24,
   18:25, 26:23,
   53:7, 80:10,
   80:11, 81:25,
   82:1, 93:10,
   126:11.
seriousness
   78:2.
serve 9:15,
   10:5, 20:20,
   21:16, 28:8,
   120:2,
   161:3.
served 9:21,
   11:1,
   51:10.
serves 9:25,
   34:12,
   42:25.
service 21:13,
   36:5, 43:9,
   44:24, 56:8,
   77:2, 83:16,
   111:17,
   112:14,
   126:22,
   162:4, 162:6,
   162:8.
Services 9:7,
   17:16, 36:8,
   93:4, 109:4,
   109:13,

113:17,
   113:21,
   114:8, 114:9,
   114:11,
   114:14,
   115:7,
   115:23,
   116:3,
   141:24,
   162:25.
serving 10:9.
session 64:19,
   69:14,
   165:1.
sessions 69:6,
   76:4,
   166:9.
set 6:9, 29:16,
   36:22, 41:7,
   50:7, 59:24,
   61:7, 63:10,
   90:10, 91:8,
   95:8, 95:23,
   96:4, 126:1,
   128:9,
   151:10.
Seth 1:37,
   3:24, 142:17,
   145:16.
sets 74:17.
setting 24:21,
   46:3.
settled 5:1.
settlement
   7:16, 7:22.
seventh 49:19,
   106:17.
several 5:4,
   9:3, 15:8,
   45:25, 51:17,
   65:15, 75:20,
   82:22, 84:18,
   106:25,
   141:24,
   156:21.
sex 103:24,
   148:25,
   160:2, 162:5,
   162:7,
   163:18,

163:22,
164:21,
168:19.
Shannon 1:32.
shape 122:4,
147:23.
share 119:17.
shares 36:15,
113:21.
sharing
167:3.
Shea 1:28,
3:18, 13:15,
15:20, 20:2,
42:11, 43:13,
43:16, 43:20,
78:18,
106:7.
Sheree 2:10,
106:10.
shift 66:11,
66:20, 70:16,
88:3, 88:5,
88:14, 91:25,
111:7,
113:1.
shifted 5:20,
8:10, 67:15,
87:24.
shifts 11:2.
shoes 15:14.
shooting
30:15.
shootings 5:21,
37:10.
short 6:20,
83:13,
126:17.
short-term
8:23, 83:9.
shortages 81:3,
121:10.
shortcomings
140:9,
141:1.
shortly 50:23,
172:11.
shouldn't
62:4.
show 28:8,

48:2, 58:23,
58:25, 62:9,
64:22, 72:18,
85:22.
showcasing
94:15.
showed
156:25.
shows 58:20,
61:7, 74:9,
158:21.
side 19:14,
37:16, 49:12,
90:4, 103:25,
145:14,
154:15,
154:16.
sign 78:4.
significance
113:24,
127:5,
127:10.
significant
5:9, 7:13,
10:24, 23:2,
30:2, 30:8,
58:7, 58:8,
67:22, 69:25,
71:6, 73:2,
77:11, 86:14,
155:7.
significantly
28:19, 76:19,
121:23,
139:13.
signs 28:1,
49:21.
similar 120:25,
158:17,
158:18.
simple 39:22,
41:16,
125:13.
simply 39:23,
79:1.
simultaneously
38:7,
87:20.
single 45:11,
126:11,

131:21.
Sir 19:20,
20:1, 38:15,
52:4, 85:24,
106:15,
116:8,
119:13,
142:16.
sit 88:14.
site 101:6.
sits 152:23.
situated
172:8.
situation 24:9,
33:8, 62:15,
83:11, 100:5,
118:3,
138:21.
situations
95:18,
112:1.
six 53:2.
skill 74:16,
151:10.
skilled
22:19.
skills 14:23,
65:19, 102:3,
136:15.
skin 78:1.
slide 47:8,
47:13, 48:11,
48:12, 49:3,
49:8, 58:18,
71:11, 72:16,
97:13, 116:9,
127:16,
129:7,
130:10,
136:3,
137:14,
157:1.
slip 4:9,
23:10.
slowly 57:9.
small 23:25,
84:5.
smart 73:14,
85:11.
so-called

11:11.
social 5:23,
29:7.
soft 166:8.
software 89:23,
140:18.
soliciting
26:13,
102:12.
Solicitor 1:28,
1:29, 1:30,
1:31, 15:5,
17:6, 17:9,
26:1, 26:16,
172:2.
solid 100:8.
solution 18:23,
83:9, 91:9,
91:18, 96:13,
101:3,
127:3.
solutions
81:11, 86:19,
91:5,
121:7.
solve 52:18.
solved 48:4,
52:20,
123:12.
solving 108:3,
112:20,
123:1,
123:12,
124:2.
somebody 55:12,
62:25, 79:9,
98:18, 100:4,
100:7.
somehow 99:1,
100:9,
142:25.
someone
130:15.
someplace
71:16.
sometime 122:5,
164:23.
Sometimes 9:19,
28:23, 32:20,
39:14, 39:15,

53:20, 54:9,
57:22, 95:19,
96:11,
134:10.
somewhat
22:13.
soon 28:11,
38:20, 47:11,
93:3, 105:5,
151:20.
sooner 38:5.
SOP 160:2,
160:5,
161:13,
171:7.
sorry 52:4.
sorted 4:17.
sorting 64:5.
sorts 57:1,
146:2.
SOU 166:3.
sought 91:17.
sound 144:10.
sounds 16:5.
South 32:3,
116:13.
Southern 87:7,
88:24,
118:9.
space 17:19.
speaking 4:4,
4:5, 4:6,
4:8, 7:4,
131:4.
special 98:12,
110:12,
117:25.
specialists
120:2.
specialized
50:14,
164:6.
specific 11:24,
23:24, 25:3,
91:12, 106:2,
115:19,
118:4,
120:21,
154:9,
161:8.

Specifically
23:3, 136:21,
140:3,
147:15,
167:2.
speech 26:9,
26:14.
spend 111:1,
111:18,
112:11,
112:25.
spending 74:12,
89:2, 112:6,
112:21,
123:15.
spent 15:3,
15:8, 46:15,
67:8, 67:16,
70:7, 79:14,
90:18,
111:23,
122:25.
spiking 43:3.
Spivak 2:9.
split 118:25,
119:2.
splitting
119:5.
spoke 131:4.
sponsor 8:22.
sports 26:12.
squad 168:22.
squads 53:6.
squarely
40:25.
squaring
24:5.
squeegee 7:6,
16:10, 16:20,
17:11, 17:17,
18:10, 26:14,
26:16, 34:21,
40:5, 43:4.
squeegeeing
5:22,
26:21.
SSA 139:25,
141:2.
stability 4:18,
146:24,

146:25.
staff 21:18,
21:24, 51:13,
52:14, 52:17,
73:20, 117:9,
138:16,
164:22.
Stage 27:19,
62:12,
136:16,
136:18,
136:19,
164:1.
stages 50:17,
50:25,
101:25,
124:19,
136:16.
stakeholders
119:21,
120:18,
120:19.
stand-alone
128:20,
137:9.
standard 61:17,
63:3, 66:17,
169:2.
standardized
95:8,
95:10.
standards 72:8,
102:20,
130:14,
132:25,
133:9, 136:5,
137:15,
138:11.
standing
58:10.
stands 37:5,
42:19.
star 42:25,
43:6.
start 19:2,
20:17, 30:23,
32:1, 56:14,
59:3, 70:14,
71:15, 83:23,
88:4, 103:11,

106:20,
108:17,
118:13,
124:14,
144:9,
147:24,
159:5,
159:22.
started 104:3,
104:5,
104:12,
104:14,
122:1, 129:1,
132:2, 144:1,
156:13.
starting 60:21,
75:15, 75:16,
108:15.
starts 86:6,
103:15,
137:18.
State 21:20,
21:22, 25:13,
25:17, 25:21,
44:20, 55:8,
58:21, 60:15,
64:5, 75:17,
76:17, 77:10,
79:15, 101:6,
101:11,
108:21,
130:16,
130:25,
131:11,
161:6.
stated 17:6,
17:9, 65:20,
115:2,
120:10,
120:11,
120:20,
121:2,
122:13,
139:22,
165:19,
166:16.
statement
13:22, 31:6,
90:17, 90:20,
133:13,

153:5.
statements
  54:7, 65:13,
  155:10.
States 1:1,
  3:5, 3:11,
  3:13, 3:15,
  9:8, 15:6,
  36:15,
  39:25.
statewide
  60:11, 60:14,
  60:21,
  60:22.
station
  111:17.
statistic
  80:10.
statistical
  169:9.
statistically
  155:7.
statistics
  30:14, 37:10,
  38:2.
status 11:18,
  83:24, 99:4,
  99:8,
  99:13.
statute 42:16,
  55:8,
  59:13.
stay 5:17,
  11:3, 31:22,
  40:20,
  68:20.
stays 4:24.
steep 100:2.
stenographic
  172:17.
step 24:16,
  38:18, 40:13,
  54:11, 71:6,
  84:6, 127:7,
  141:16.
steps 86:5,
  90:21,
  118:18,
  138:13,
  138:19.

stimulate
  150:6.
stop 8:18,
  22:11, 27:1,
  52:12, 128:4,
  129:23,
  135:5, 144:6,
  145:15,
  151:18.
stopgap 96:12,
  96:13.
stopped 137:20,
  137:22,
  144:2,
  144:4.
stopping 24:15,
  150:22.
story 56:2.
straight
  29:17.
strategic
  73:15, 81:15,
  84:22.
strategies
  10:21, 10:25,
  11:10, 12:17,
  13:7, 19:10,
  25:20, 32:9,
  33:24, 33:25,
  34:10, 35:3,
  35:24, 36:13,
  45:6, 46:13,
  120:14,
  150:14,
  150:23.
streamlined
  89:15.
Street 1:45,
  2:45, 26:11,
  116:13,
  135:9, 140:5,
  153:9.
streetlights
  125:15,
  125:16.
streets 6:2,
  8:12,
  26:19.
strengthening
  67:17.

strengths
  22:25.
stress 14:9.
strides 73:2,
  114:24.
strikes
  100:3.
strong 13:22,
  108:24.
structure
  79:17, 96:16,
  119:4.
student 76:10,
  76:11, 76:15,
  79:5.
studies 119:24,
  137:6.
study 4:21,
  169:2.
stuff 54:4.
subject 11:24,
  42:15, 62:12,
  70:6,
  146:2.
subjects
  106:2.
submission
  73:9.
submissions
  64:11.
submit 156:2.
submitted
  45:20, 74:20,
  90:22,
  167:14.
submitting
  81:1.
subsequent
  77:7.
subsequently
  7:15.
substance
  62:13,
  78:21.
substantial
  7:19, 15:25,
  21:4, 23:3,
  38:9, 54:3,
  54:8, 66:20,
  127:2.

substantially
  30:25,
  70:16.
substantive
  171:4.
substantively
  135:21.
subtle 41:20.
success 9:2,
  139:18.
successful
  12:3, 23:8,
  24:15, 24:16,
  81:5, 118:1,
  126:11,
  140:5,
  141:10,
  142:24,
  148:15.
successfully
  5:3, 12:17,
  48:13,
  105:10,
  121:3,
  122:15,
  142:11.
sudden 100:4.
suddenly
  30:18.
suffer 8:6.
sufficient
  157:16.
sufficiently
  142:8.
suggest
  69:15.
suggested
  169:2.
suggestion
  160:18.
suggestions
  119:21.
suite 93:14.
suited 16:5.
Sullivan 1:32,
  20:20, 20:21,
  21:1, 21:15,
  22:18, 22:23,
  164:21.
sum 133:23.

summarize
163:2.
summarizes
116:22.
summary 37:2.
summer 5:19,
6:2, 33:6,
135:8.
superstar
31:10.
supervise
95:16,
168:23.
supervision
7:19, 11:22,
66:23,
127:20,
132:11.
Supervisor
23:21, 24:21,
91:22, 92:3,
97:22,
103:20,
110:14,
111:5,
111:13,
128:16,
128:17,
132:10,
150:24,
169:21,
169:24.
supervisors
35:5, 88:23,
92:1, 92:8,
123:23,
123:24,
128:12,
128:22,
166:3,
168:20.
supervisory
23:19,
132:15.
support 7:14,
10:4, 17:13,
23:16, 39:2,
45:4, 56:23,
84:10, 84:12,
108:24,

109:16,
150:19,
155:11.
supported
110:21.
supporting
81:7.
supportive
58:9.
supports
115:24.
suppose 25:9,
98:17.
supposed 40:9,
40:10.
Supreme 26:7,
40:22, 41:6,
42:14.
surely 57:9.
surge 8:20.
surprised
105:12.
surprising
37:25.
surprisingly
10:19.
surveillance
66:21.
Survey 107:18,
120:19,
162:16,
165:20.
surveys 107:11,
116:17,
116:23,
122:19,
165:25.
suspect
169:15.
suspect-focused
168:3.
suspects
167:22.
suspicion
130:22.
sustain 57:7,
57:8,
117:9.
sustainability
102:9.

sustainment
70:20.
SWAT 148:24.
swaths 31:8.
swiftly
147:3.
swing 8:21.
swinging 8:6.
switch 32:5,
153:16.
sworn 23:16,
52:8, 73:12,
73:13, 73:17,
73:20, 74:1,
76:24, 80:3,
80:8, 83:1,
97:24, 98:10,
98:19, 99:19,
160:22,
160:25,
161:5.
swung 8:10.
sympathetic
152:6.
sympathy
30:13.
sync 15:1.
syndrome 8:6.
synopsis
66:23.
systems 68:24,
91:7, 91:8,
91:13, 91:15,
95:2, 95:11,
95:15, 96:21,
129:18,
133:17,
133:20,
148:2, 148:9,
149:15.
.
.
< T >.
T. 1:44, 2:44,
172:21.
table 18:12.
tactics
103:20.
tailor 18:12.
tailored

91:10.
takeaway 5:8.
taken. 52:19,
106:6.
talked 34:8,
52:23, 52:24,
53:6, 54:19,
55:18, 60:18,
67:11, 82:15,
130:5,
144:12,
145:9,
146:24,
158:12.
tangible 28:1,
49:21.
target 78:8,
110:8.
targeted 79:14,
123:10.
targets
70:23.
Task 4:23,
44:5,
84:25.
taught
147:25.
teaching
104:22,
134:20.
tech 94:21,
96:18.
technical
27:20, 31:12,
66:12, 67:9,
114:19,
117:7,
166:3.
technicians
48:2.
techniques
166:9.
technology
11:12, 21:3,
47:15, 58:12,
67:19, 86:1,
86:3, 86:6,
87:23, 89:25,
92:10, 92:13,
93:14, 93:25,

94:13, 94:15,
97:7, 103:2,
108:8,
128:23,
130:6, 130:7,
140:9,
148:10,
149:2,
149:25,
161:16.
techs 47:24.
teeth 78:1.
template 10:22,
14:8, 19:16,
135:15.
temporary
100:20,
100:23,
101:1.
ten 25:3,
44:16, 44:18,
52:9, 92:24,
114:15.
tend 95:11.
tended 7:14.
tenure 20:21,
77:4.
term 101:12,
111:11,
169:9.
termed 75:21.
termination
62:14, 62:25,
63:1.
terrific 14:18,
171:23.
test 14:9,
18:8.
testament
21:11.
tested 90:10.
testing 50:24,
51:1, 51:2,
103:4.
tests 103:1,
162:7.
Thacker 116:6,
117:17.
THE CLERK 3:4,
3:16, 3:21.

theft 17:23.
theme 106:21,
159:24,
169:6.
themes 45:9,
168:7.
themselves 3:9,
3:17, 16:21,
141:21.
theologically
28:17.
thereby
11:22.
Theron 1:41.
they'll 111:2,
164:7.
They've 50:16,
137:20,
138:12,
139:24,
143:23,
158:11,
158:17.
thinking 71:1,
88:20, 117:8,
122:3, 150:6,
154:1.
third 4:10,
35:13, 59:25,
112:11,
128:7,
141:7.
third-party
51:2.
Thompson 1:31,
1:36, 3:19,
3:24, 16:9,
16:24, 18:21,
19:25, 34:21,
39:7, 85:1,
105:18,
122:8,
142:14,
152:17,
166:23,
170:14,
171:14.
thorough 27:23,
102:6.
Though 6:1,

19:14, 20:10,
27:15, 30:13,
34:6, 36:23,
38:6, 39:22,
83:2, 85:13,
96:17, 112:2,
113:5, 118:9,
132:3, 135:5,
145:17.
thoughts
50:2.
thousand 45:22,
99:18.
thousands
56:17.
threat
136:25.
threatens
12:6.
three-hour
128:16.
three-person
61:11.
three-year
133:7,
166:17.
throughout
48:5, 48:15,
63:7, 73:18,
74:14, 89:19,
137:5, 137:9,
148:11,
149:10.
throw 32:4,
145:16.
thumb 40:8.
Thursday
1:16.
tie 53:12,
154:23.
tied 111:9,
172:10.
ties 31:5.
tight 46:12.
till 106:5.
Tim 3:10.
time-consuming
164:14.
timely 12:6,
89:16.

timing 62:2.
Timothy 1:22.
Tinkers
43:20.
tips 89:7.
tiptop 105:9.
tired 126:25.
tires 156:14.
together 16:16,
25:12, 45:3,
45:12, 60:17,
60:18, 60:20,
91:15, 99:17,
100:11,
113:16,
118:25,
127:13,
130:1,
154:17,
164:22.
took 15:10,
17:20, 21:1,
31:17, 50:3,
56:25, 58:25,
115:22,
151:25,
155:16,
155:17.
tool 64:8,
64:11, 76:21,
88:24, 134:1,
134:7,
137:16,
138:1, 139:4,
165:25.
tools 93:20.
top 99:1,
125:13,
127:25,
131:19,
132:8.
topic 11:14,
11:16, 13:9,
71:9, 86:3,
97:14, 106:9,
109:19,
113:15,
119:11,
128:18,
129:3, 139:1,

159:7,
169:5.
topics 11:11,
  11:15, 12:2,
  12:22, 13:7,
  13:8, 27:15,
  44:8, 47:9,
  47:14, 47:16,
  48:5, 65:8,
  71:10, 75:1,
  106:8,
  106:19,
  107:16,
  127:13,
  127:14,
  128:19,
  135:3,
  136:23,
  159:22,
  170:19.
total 14:14,
  39:12, 39:17,
  43:10, 51:21,
  76:14, 94:10,
  131:18.
totality
  7:23.
Totally 29:19,
  42:6, 82:13,
  83:9.
touch 26:6,
  36:3,
  146:5.
touched 26:6,
  54:24,
  54:25.
tough 19:13.
toward 4:11,
  5:10, 29:8,
  112:19,
  123:6,
  162:1.
towards 87:16,
  145:2.
Trace 4:22.
Tracey 1:40.
track 55:2,
  72:19, 86:3,
  97:15,
  106:17,

107:7, 108:8,
  124:5,
  124:17,
  127:17,
  127:19,
  159:20,
  161:17.
tracked
  54:23.
tracking 55:15,
  55:22, 89:14,
  108:5, 108:8,
  132:2, 136:5,
  161:13,
  161:16,
  169:14.
traction
  32:8.
Tracy 145:16.
Trademark 15:6,
  15:8.
tradition
  20:7.
traditionally
  25:6,
  110:3.
traffic 41:13,
  143:2, 144:6,
  156:7.
tragedy 8:7.
tragic 17:22.
trained 24:22,
  139:25,
  157:15,
  160:10.
trainers
  102:13,
  103:8.
trainings
  128:21,
  136:23,
  137:9,
  141:13,
  141:15,
  165:14,
  166:12.
trajectory
  5:12.
Transcript
  1:14,

172:17.
transfer
  121:6.
transform
  29:1.
transformation
  148:15.
transformed
  30:18.
transition
  27:22,
  131:12.
transitioned
  129:9.
transitions
  22:14.
translate
  75:12.
translating
  28:23,
  66:1.
transmit
  59:7.
transparency
  58:23,
  105:15.
transparent
  104:25.
transported
  31:14.
trauma
  160:13.
trauma-informed
  109:5,
  160:11,
  160:25,
  165:10,
  166:8,
  168:2.
traverse
  42:18.
treatment
  30:25,
  165:7.
tremendous
  17:13.
trend 70:1,
  70:2.
trends 59:11,
  75:5,

163:6.
trial 59:12,
  61:5, 61:6,
  61:7, 61:10,
  61:12, 61:16,
  61:20, 62:3,
  62:17,
  62:23.
triannual
  161:3.
tricky 42:4.
triples
  142:15.
trouble 24:5,
  24:24,
  110:16,
  149:12.
troubled
  30:24.
troubleshoot
  52:17.
troubling
  147:23.
true 4:18,
  8:11, 18:7,
  41:6, 81:23,
  134:11,
  169:19.
truly 43:8,
  67:15,
  70:23.
trust 9:15,
  9:25, 10:4,
  10:15, 11:5,
  23:7, 28:10,
  31:9, 36:18,
  36:21, 53:14,
  53:25, 56:24,
  57:3, 115:8,
  115:11,
  115:21,
  139:16,
  142:25.
trusted 21:18,
  68:6.
try 19:3,
  24:12, 40:10,
  40:12, 48:3,
  71:22, 95:23,
  118:25,

131:10.
trying 56:23,
  73:17, 79:2,
  79:3, 86:16,
  88:25, 89:20,
  92:1, 95:7,
  97:25,
  111:23,
  112:16,
  114:21,
  122:20,
  123:2,
  128:20,
  132:4,
  133:18,
  137:21,
  150:6, 152:9,
  169:15.
Tuesday 17:10,
  17:25.
tuned 68:20.
turn 16:22,
  20:3, 29:3,
  33:14, 49:14,
  81:5, 135:25,
  139:8, 141:2,
  159:10,
  159:18.
Turnaround
  100:17.
turning 22:3,
  100:14,
  140:21.
turns 130:19,
  132:9.
tweak 64:18.
tweaks
  143:17.
twice 25:8.
two-day
  108:2.
two-year
  131:15,
  133:6.
twofold
  169:10.
type 161:11.
types 50:14,
  59:19,
  123:14,

163:15.
Typical 15:19,
  24:9.
typically
  45:12.
.
.
< U >.
UB 116:25.
UBS 116:22.
ultimate 9:2,
  52:10, 75:12,
  112:9.
Ultimately
  8:17, 8:21,
  10:10, 18:7,
  22:2, 36:15,
  43:1, 48:22,
  54:2, 66:18,
  66:22, 95:19,
  98:13, 98:15,
  149:4,
  170:8.
umbrella
  114:4.
unacceptable
  6:6.
unconstitutiona
  l 26:15,
  42:17,
  153:25.
unconstitutiona
  lly 134:9.
unconventional
  16:4.
undercut
  127:5.
underlies
  145:21.
undermine
  139:13.
understand
  5:24, 14:15,
  34:8, 38:21,
  42:5, 64:15,
  75:3, 83:8,
  84:21, 96:14,
  97:4, 107:20,
  131:6,
  139:17,

142:10,
  144:20,
  144:21,
  145:3, 145:7,
  159:3.
understandable
  37:11.
understandably
  8:12, 14:7,
  32:3.
understanding
  36:10, 46:4,
  80:1, 110:17,
  137:1, 143:5,
  144:18,
  167:5,
  171:18.
understands
  16:1,
  143:9.
Understood
  71:19, 96:2,
  122:19.
undertaken
  116:1.
undertaking
  46:11.
underway
  103:21,
  115:3,
  161:23.
unfortunately
  43:3, 83:9,
  99:12,
  134:10,
  160:6.
unfounded
  60:4.
unimpeachable
  72:9.
unique 22:25.
unit 97:23,
  98:5, 109:4,
  114:9,
  114:14,
  114:16,
  114:17,
  114:22,
  132:12,
  137:15,

148:25,
  149:1, 158:3,
  158:16,
  160:2, 162:6,
  163:19,
  163:22,
  164:21,
  168:20.
United 1:1,
  3:5, 3:11,
  3:13, 3:15,
  9:8, 15:6,
  36:15,
  39:25.
UNITED STATES
  OF AMERICA
  1:4.
units 74:5,
  86:15, 119:2,
  132:10,
  171:2.
University
  15:3, 116:16,
  118:17.
unlawful
  7:10.
Unless 4:4,
  36:25, 70:6,
  99:13,
  117:21,
  122:6,
  138:25,
  164:18,
  171:8.
unlikely
  41:22.
unproductive
  8:21.
unquestionably
  57:1.
unrelenting
  30:15.
unstable
  4:23.
unsuccessful
  8:22.
until 7:19,
  47:25, 48:2,
  57:3, 69:22,
  71:16, 91:25,

92:1, 97:9,
127:2,
129:11.
unwavering
72:3.
unwilling
9:22.
upcoming 48:24,
68:1, 70:4,
164:20.
update 11:17,
17:7, 18:20,
44:9, 68:11,
81:1, 86:9,
131:9,
163:7.
updated 27:13,
45:19, 73:3,
73:7, 73:10,
74:3, 128:9,
140:19.
updates 11:10,
89:8, 90:6,
92:9, 101:13,
103:17,
104:1,
152:22.
updating 93:25,
104:17,
140:19.
upgrade
78:13.
upgraded
21:3.
upgrades
96:23.
upgrading
93:20.
upset 14:7,
32:3.
uptake 148:10,
148:11.
urge 8:14.
urging 127:8.
useful 64:3,
101:2,
171:17.
user-friendly
85:19.
uses 35:2,

60:24,
113:11.
using 45:12,
51:2, 56:22,
60:10, 60:11,
88:24, 89:25,
103:8,
105:14,
107:25,
140:4,
151:13.
usual 13:9.
utilized 92:20,
140:17.
utmost 72:10.
utterly
31:14.
.
.
< V >.
vacancies
102:12.
vacate 62:20.
vacation
55:12.
valid 42:16.
value 31:21,
144:24.
variation
91:19.
variety 39:12,
167:20.
various 74:14,
137:6.
vast 48:15.
vastly
118:11.
vehicle 93:2,
111:24,
142:1.
vehicles 92:18,
92:25,
94:13.
vein 23:18.
vendor 50:11,
50:14, 51:2,
86:10, 91:15,
93:25.
vendors
95:11.

verbal 40:12.
verifiable
49:23.
versatile
14:20.
version 45:18,
48:12, 86:20,
118:19.
versus 3:5,
144:6.
vestibule
172:11.
vexing 18:24.
via 160:22.
victim 109:4,
109:13,
113:17,
113:20,
114:8, 114:9,
114:11,
114:14,
115:7,
115:22,
116:2,
162:16,
162:21,
162:25,
167:21,
168:4,
169:14.
victim-centered
160:11,
165:10,
168:3.
victimized
116:3.
victims 109:6,
115:24,
162:23,
165:7,
165:20,
166:7,
166:8.
video 76:1,
164:11.
view 12:14,
16:17, 22:23,
33:22, 36:16,
37:9, 81:17,
111:4,

113:22,
133:17,
167:22.
viewing 75:9.
vigor 6:23.
vigorous 6:12,
24:17.
vigorously
19:22.
violations
7:11, 8:24,
139:12.
Violence 5:21,
6:5, 6:14,
8:12, 10:20,
12:9, 14:6,
30:22,
108:22,
109:2,
109:12,
109:13,
115:15,
115:24,
116:3,
117:11.
violent 8:5,
28:10, 38:10,
44:25.
virtue 22:16,
63:21,
149:23.
visible 121:11,
121:21,
143:1.
vision 73:5,
121:21.
visit 164:20,
171:12,
171:18.
visits 171:1.
vital 89:24,
129:25.
voices 18:17,
141:14.
volume 59:20,
121:15.
voluntary
127:19.
vs 1:7.
.

.
< W >.
W. 1:45,
  2:45.
wage 151:14.
wages 26:20.
Wait 47:25,
  55:13, 69:22,
  71:16,
  118:17,
  150:3.
waiting 91:25,
  92:1,
  159:2.
wake 4:22,
  171:24.
Walden 14:17,
  43:15.
walk 59:1,
  79:9.
wall 64:9.
waning 73:22.
wanted 29:16,
  46:7, 54:19,
  95:1, 96:2,
  101:13,
  104:24,
  152:24,
  153:20.
wanting
  16:19.
wants 42:22,
  61:13,
  83:12.
warehouse
  89:17,
  89:25.
warning
  24:18.
warnings
  40:12.
warrants 80:10,
  130:18.
watch 19:14,
  71:12.
watched
  88:13.
watching 19:6,
  70:20,
  71:18.

wave 6:24,
  10:20,
  12:9.
waves 30:17.
ways 112:6,
  123:6,
  134:19,
  141:11,
  147:17,
  154:4.
weaker 50:15.
weapons 27:2,
  156:8.
wear 4:3.
web-based
  128:24,
  163:10.
website 50:21,
  162:17.
week 39:15,
  68:16, 73:9,
  73:19, 76:5,
  80:7,
  104:2.
weekly 108:16,
  110:20,
  117:19,
  134:23.
weeks 59:19,
  75:14, 77:14,
  92:22,
  155:23.
Welcome 15:13,
  21:13, 22:12,
  23:10, 28:2,
  48:17, 51:12,
  171:12.
wellness 49:1,
  82:19.
West 116:14.
Western 118:8,
  138:3,
  138:10.
whatever 19:15,
  19:21, 24:14,
  39:24, 41:19,
  53:20, 80:19,
  91:10,
  148:25.
whats 143:5.

Whenever
  26:23.
whens 143:6.
wherein
  45:15.
wheres 143:6.
wherever
  71:17.
whether 7:5,
  60:3, 62:8,
  67:16, 110:4,
  112:3,
  112:18,
  112:24,
  113:3, 121:6,
  143:2, 155:8,
  155:9,
  155:19,
  167:6,
  167:23.
white 144:6.
whoever 104:21,
  104:22.
whole 42:9,
  55:9, 58:1,
  90:12, 91:11,
  103:14,
  148:4,
  150:4.
wholeheartedly
  142:21.
whom 104:6,
  104:7.
whos 143:5.
whys 143:6.
wide 118:5.
Wide-scale
  7:11.
wider 135:14.
willing 84:11,
  115:3.
wind 85:10.
windshields
  5:22.
wisdom
  145:20.
wise 13:22.
wisely 112:1.
without 15:14,
  19:17, 89:14,

115:18,
  129:2,
  130:10,
  130:15,
  132:10,
  132:11,
  134:15,
  142:4,
  158:12,
  165:16.
witness
  115:7.
witnesses
  109:6,
  167:22.
women 21:7,
  26:13,
  28:7.
wonderful
  139:3.
word 4:1,
  158:1.
words 44:4,
  49:25,
  142:20.
worked 60:18,
  64:14, 158:2,
  165:13,
  165:23.
worker 43:4.
workers 16:11,
  16:20, 17:11,
  17:17, 18:10,
  40:6.
workforce
  26:19.
workload 45:1,
  45:5, 46:4,
  82:16, 82:23,
  83:1, 83:2,
  83:15, 87:12,
  123:6.
workloads
  81:14.
works 34:9,
  76:24, 96:7,
  98:18.
world-class
  22:3, 29:4.
worries

149:19.
worse 32:19.
worth 163:17,
   163:20.
woven 137:8.
wrestle
   40:21.
write 88:11,
   88:12.
writes 87:25.
writing 87:10,
   87:13,
   88:6.
written 24:1,
   25:3, 49:19,
   60:5, 60:9.
wrote 49:20.
Ws 143:9.
.
.
< Y >.
yield 5:12,
   31:23.
young 5:21,
   26:13, 26:18,
   41:14.
yourself 22:10,
   71:13,
   171:11.
youth 35:14,
   35:16, 35:19,
   103:18,
   109:13,
   137:10.
.
.
< Z >.
Zero 138:6.