

# BALTIMORE CONSENT DECREE MONITORING TEAM

## COMPLIANCE REVIEW AND OUTCOME ASSESSMENT REGARDING USE OF FORCE

December 21, 2022



## TABLE OF CONTENTS

LIST OF FIGURES & TABLES ................................................................................... iv

I.    EXECUTIVE SUMMARY ...................................................................... 1
      Summary of Findings ........................................................................... 2

II.   BACKGROUND .......................................................................................... 7
      A.   The Department of Justice's Investigative Findings Regarding Use of Force  7
      B.   Consent Decree Requirements ......................................................... 8
           1.   Use of Force Principles ............................................................. 8
           2.   Use of Force Policies.................................................................. 9
           3.   Use of Force Training................................................................ 10
           4.   Use of Force Reporting, Investigation, and Review ................... 10
           5.   Use of Force Data Collection, Analysis, and Reporting ............. 11
      C.   BPD's Implementation Progress to Date ....................................... 11
           1.   Policy....................................................................................... 11
           2.   Training.................................................................................... 14
           3.   Data ......................................................................................... 15

III.  SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW ........... 17
      A.   Scope of Review............................................................................. 17
      B.   Methodology .................................................................................. 17
           1.   Aggregate Data Review............................................................. 19
           2.   Qualitative Evaluation & Audit of Force Incidents.................... 20
      C.   Standard of Review ....................................................................... 25
           1.   Evaluating Officer Performance During Use of Force Incidents ..... 25
           2.   Determining Compliance Status................................................. 26

IV.   USE OF FORCE DATA: OVERALL ANALYSIS AND TRENDS, 2018–2021 AND
           RELATED OUTCOME ASSESSMENTS ............................................... 31
      A.   Frequency of Force Incidents Overall, by Level, by Type, and by District .. 31
      B.   Involved Subject Characteristics .................................................. 34
      C.   Involved Officer Characteristics ................................................... 38
      D.   Injuries During Force Incidents ................................................... 39

V.    OFFICER USE OF FORCE: COMPLIANCE ASSESSMENT................................ 43
      A.   Overall Findings............................................................................ 45
           1.   Necessity ................................................................................. 47
           2.   Proportionality........................................................................ 53
           3.   Objective Reasonableness ........................................................ 57

|  |  | 4. | De-Escalation ........................................................................... 61 |
|  |  | 5. | BPD Adjudication & Corrective Action of Foundationally Deficient Cases 74 |
|  | **B.** | **Subject Characteristics** ............................................................... **75** |  |
|  |  | 1. | Comparison of Demographic Characteristics of Subjects in Qualitative Sample with Overall Population of Force Subjects ................................ 75 |
|  |  | 2. | Subject Race in Foundationally Deficient Cases ........................... 76 |
|  |  | 3. | Subjects Experiencing Mental Health & Behavioral Health Crisis .......... 78 |
|  |  | 4. | Children/Youth .............................................................. 80 |
|  | **C.** | **Specific Requirements Relating to Officer Equipment** ...................... **82** |  |
|  | **D.** | **Classification of the Force Incident** ............................................ **82** |  |
|  | **E.** | **Body Camera Footage of Force Incidents** ...................................... **83** |  |
|  | **F.** | **Application of Force** .................................................................... **86** |  |
|  |  | 1. | Verbal Warning .............................................................. 86 |
|  |  | 2. | Use of Prohibited Force ..................................................... 88 |
|  | **G.** | **Deadly Force** ............................................................................. **96** |  |
|  | **H.** | **Force Instrument-Specific Considerations** .................................... **100** |  |
|  |  | 1. | Firearms ..................................................................... 100 |
|  |  | 2. | CEWs (Tasers) .............................................................. 101 |
|  |  | 3. | Baton/Impact Weapons ..................................................... 105 |
|  |  | 4. | OC Spray .................................................................... 107 |
|  | **I.** | **Duty to Intervene** ...................................................................... **109** |  |
|  | **J.** | **Performance Following the Application of Force** ............................. **111** |  |
|  | **K.** | **On-Scene Supervision** ................................................................ **115** |  |
|  | **L.** | **Officer Use of Force Reporting** ................................................... **116** |  |

**VI.** **USE OF FORCE INVESTIGATION & REVIEW: COMPLIANCE ASSESSMENT**
................................................................................................. **123**

|  | **A.** | **General Requirements** ................................................................ **123** |  |
|  | **B.** | **Level-Specific Requirements** ....................................................... **124** |  |
|  |  | 1. | Level 1 Force Incidents ..................................................... 124 |
|  |  | 2. | Level 2 Force Incidents ..................................................... 125 |
|  |  | 3. | Level 3 Force Incidents ..................................................... 130 |
|  | **C.** | **Use of Force Investigation: Overall** ............................................. **134** |  |
|  | **D.** | **Assessment & Review of Use of Force** ........................................... **137** |  |
|  | **E.** | **Final BPD Dispositions & Corrective Action** .................................. **140** |  |

**VII.** **BPD DATA COLLECTION, ANALYSIS, AND REPORTING** ................................. **141**

**VIII.** **COMPLIANCE ASSESSMENT CONCLUSIONS** .............................................. **144**

## LIST OF FIGURES & TABLES

Table 1.        Summary of Monitoring Team Use of Force Case Sampling Methodology  21

Table 2.        Use of Force Incidents Overall & By Level, 2018–2021 ............................ 31

Figure 1.       BPD Calls for Service, 2018–2021 ............................................................. 32

Table 3.        Use of Force Incidents Overall & By How the Encounter with Law
                Enforcement Started, 2018–2021 ................................................................ 33

Table 4.        Applications of Force Techniques/Instruments Used by All Involved Officers,
                2018–2021 ................................................................................................... 33

Table 5.        Age of Force Subjects, 2018–2021 ............................................................ 34

Table 6.        Gender of Force Subjects, 2018–2021 ....................................................... 34

Table 7.        Relationship Between Gender of Force Subjects and Level of Force, 2018–
                2021 ............................................................................................................. 35

Table 8.        Race/Ethnicity of Subjects Involved in All Use of Force Incidents, 2018–2021
                ..................................................................................................................... 36

Table 9.        Relationship Between Race/Ethnicity of Force Subjects and Level of Force,
                2018–2021 ................................................................................................... 37

Table 10.       Gender of Involved Officers, 2018–2021.................................................... 38

Table 11.       Race/Ethnicity of Involved Officers, 2018–2021......................................... 39

Table 12.       Number of Officers Involved Injured During Use of Force Incidents &
                Percentage of Involved Officers Who Were Injured During Force Incidents,
                2018–2021, Total & By Force Level ........................................................... 40

Table 13.       Officer Injuries, All Types/Causes, 2018–2021 ......................................... 41

Table 14.       Number & Percentage of Subjects Injured During Use of Force Incidents
                2018–2021 ................................................................................................... 42

Table 15.       Comparison of All BPD Force Incidents (Population) to Reviewed Force
                Cases (Sample) & Statistical Weighting Methodology................................. 44

Table 16.       Was All Use of Force Necessary?................................................................ 47

Table 17.       BPD Dispositions of Incidents Identified by Monitoring Team as Involving
                Unnecessary Force, 2018–2020 .................................................................. 52

Table 18.       Was All Use of Force Proportional? ........................................................... 53

Table 19.       BPD Incident Dispositions of Incidents Identified by Monitoring Team as
                Involving Disproportionate Force, 2018–2020 .......................................... 56

Table 20.       Was All Use of Force Objectively Reasonable? .......................................... 57

Table 21.       BPD Incident Dispositions of Incidents Identified by Monitoring Team as
                Involving Objectively Unreasonable Force, 2018–2020.............................. 60

iv

Table 22.       Involved Officers Took Reasonable Efforts to De-Escalate, All Force Levels
                ................................................................................................... 62

Table 23.       Incidents Where All Officers Took All Reasonable Efforts to De-Escalate, By
                Level .................................................................................................... 64

Table 24.       Incidents In Which Reasonably Available, Additional De-Escalation Tactics
                Could or Should Have Been Used Under The Circumstances But Were Not
                (All Force Levels) ................................................................................ 66

Table 25.       Officer Performance That May Have Escalated the Incident (All Force Levels)
                ................................................................................................... 67

Table 26.       BPD Incident Dispositions of Incidents Identified by Monitoring Team as
                Involving A Failure to De-Escalate, 2018–2020 .......................................... 72

Table 27.       Force Incidents in Which Officer Performance Was Consistent with the Use
                of BPD's Critical Thinking and Decision-Making Model ........................... 73

Table 28.       Incident Dispositions of Incidents Identified by Monitoring Team as Involving
                Force that Was Unnecessary, Disproportionate, Not Objectively Reasonable,
                or Inconsistent with the Duty to De-Escalate, 2018–2020 .......................... 74

Table 29.       Individual Officer Dispositions of Incidents Identified by Monitoring Team as
                Involving Force that Was Unnecessary, Disproportionate, Not Objectively
                Reasonable, or Inconsistent with the Duty to De-Escalate, 2018–2020 ....... 74

Table 30.       Subject Race, Foundationally Deficient Force Cases vs. All BPD Force
                Incidents, 2018–2020 .................................................................................. 76

Table 31.       BPD Data on Body-Worn Camera Recording of All Use of Force Incidents,
                by Involved Officers, 2018–2021 ................................................................ 85

Table 32.       Force Incidents Where Officers Announced That Force Would be Utilized
                Prior to the Application of Force ................................................................. 87

Table 33.       Percentage of Force Incidents where Officers Used Force Against Subject(s)
                Handcuffed or Otherwise Restrained .......................................................... 88

Table 34.       Force Incidents Where Involved Officers Used a Chokehold or Neck Hold 91

Table 35.       Force Incidents Where Force Was Used to Punish the Subject for Fleeing,
                Resisting Arrest, or Assaulting an Officer ................................................... 94

Table 36.       Did Members Use Any Weapons and/or Force Techniques Not Allowed by
                Policy and/or On Which the Member Was Not Trained? ............................. 95

Table 37.       Subject Injuries, Complaints of Injuries, Medical Distress, and Requests for
                Medical Attention ...................................................................................... 112

Table 38.       Incidents Where Officers Rendered Aid & Requested Emergency Medical
                Response or Transported Subject Directly to Emergency Room Where Subject
                Was Visibly Injured, Complained of an Injury, Showed Signs of Medical
                Distress, or Medical Attention Was Requested ........................................... 114

Table 39.        Incidents In Which Involved Officer(s) Notified a Permanent-Rank Supervisor Immediately ........................................................................................................ 116

Table 40.        Incidents In Which Officers Using or Observing Force Provided a Written Use of Force Report By the End of Their Tour of Duty ..................................... 118

Table 41.        Officer Use of Force Reports, Level 1 Force ............................................ 119

Table 42.        Officer Use of Force Reports, Level 2 and Level 3 Force ......................... 120

Table 43.        Did the Use of Force Reports Appropriately Avoid Material Omissions or Inaccuracies? ........................................................................................................ 121

Table 44.        Level 2 Supervisor Response .................................................................... 127

Table 45.        Was the First-Line, Permanent-Rank Supervisor's Use of Force Review Completed and Entered into Blue Team Within 72 Hours of the Use of Reportable Force? (Level 2 Force Incidents) ............................................... 129

Table 46.        Level 3 SIRT Response ............................................................................ 132

Table 47.        Overall Quality of Force Response & Investigation, Level 1 Force ........... 135

Table 48.        Overall Quality of Force Response & Investigation, Level 2 Force ........... 136

Table 49.        Overall Quality of Force Response & Investigation, Level 3 Force ........... 136

Table 50.        District/Unit Commander Determinations, Level 1 Force ......................... 139

# I.      EXECUTIVE SUMMARY

Paragraphs 123 through 217 of the Consent Decree address the Baltimore Police Department's ("BPD" or "the Department") use of force.  They articulate numerous standards and expectations regarding officer use of force in the field, officer reporting and the Department's response immediately following the use of force, the investigation of force incidents, and the Department's post-incident review process.

The Monitoring Team has conducted a compliance review and related outcome assessments regarding use of force.[1]  This evaluation involved two major components.  The first was a review of information about all of BPD's uses of force during each year from 2018 through 2021.  That review involved analysis of overall, aggregate data about force to gauge general trends and dynamics across encounters where officers employed force.

The second element was a review of a random, statistically significant sample of 545 total use of force cases and investigations from 2018, 2019, and 2020.  In that review, nine Monitoring Team experts examined all available documentation and evidence associated with the selected uses of force and assessed whether the decisions and performance of involved officer(s) aligned with BPD policy and Consent Decree requirements.  Case reviewers also assessed the Department's post-incident response, investigation, and review against BPD policy and the Decree.

In evaluating both aggregate data and the large sample of specific force incidents, BPD's performance in 2018 serves as a functional baseline because the Department had not yet fully revised or trained officers on Decree-required use of force policies and procedures.  Performance in 2019 captures a Department in transition – with new force policies finalized and officers receiving in-depth training over the course of the year.  In contrast, performance from 2020 captures the Decree-required force policies fully effective, with all officers having received extensive training on new expectations.  However, regardless of when force incidents occurred, the Monitoring Team evaluated performance against Decree requirements, even if not technically in effect, in order to gauge progress over time.  The purpose, therefore, of considering performance across 2018 through 2020 is to gauge BPD's progress over time and the effectiveness of new policies and training in enhancing officer performance.

The Monitoring Team concludes that BPD and its officers have made notable progress toward compliance across a number of critical requirements.  The findings from the analysis of the Decree's outcome measures are especially encouraging: **BPD officers are using force less frequently, and, when they do, it is more consistent with BPD policy and the Decree across a**

---

[1] Specifically, this assessment evaluates BPD's compliance with Paragraphs 123 through 206 and 211 through 217. Paragraphs 207 through 210, relating to the Performance Review Board ("PRB") that reviews critical use of force incidents, is the subject of an ongoing assessment and will be the subject of a separate, forthcoming report.

**number of significant dimensions.  Likewise, the Monitoring Team can certify that BPD has reached initial compliance with several Consent Decree paragraphs.**

**At the same time, continued progress is necessary in many areas of the Decree related to force to reach compliance.  As the following summary describes, in some areas, officer performance still needs to improve overall.  For other Decree requirements, performance is generally appropriate but, in those instances where deficient performance does occur, the Department is not always systematically identifying and addressing it.**  To this end, the Monitoring Team will be able to certify compliance once it sees evidence that BPD is identifying, for itself, problematic performance and appropriately addressing it.

**Summary of Findings**

Analysis of data on all BPD uses of force from 2018 through 2021 indicates a number of important trends in overall outcomes related to force, including:

- **BPD officers used force substantially less frequently in 2020 and 2021 compared to 2018.**  The number of force incidents in which BPD officers were involved declined by nearly 54.7% from 2018 to 2021 – from 1,525 total force incidents in 2018 to 691 in 2021.

- **BPD's reduced use of force does not appear to be explained by changes in the number of encounters that BPD officers have with members of the public.**  Compared to 2018, calls for service and other encounters logged in BPD's Computer-Aided Dispatch ("CAD") system were down by 18.5% in 2021, but use of force declined by 54.7%.  This means that, even as officers had fewer overall encounters with individuals, the portion of those encounters that involved force declined even more rapidly.

  Indeed, the portion of BPD interactions with members of the public that ultimately involve force is low and has gotten lower.  In 2018, 0.29% of all BPD activity captured in its calls for service database involved a use of force.  In 2021, the portion of BPD calls for service that involved force declined to 0.16% of all BPD call for service activity – a decrease of nearly 45%.

- **A significant majority of force that BPD officers use is less severe Level 1 force**, which accounted for between 76.2% of force incidents in 2018 and 66.6% of force incidents in 2021.

  More serious Level 2 and Level 3 force incidents make up a comparative higher percentage of force incidents in 2021 (33.5%) than in prior years (26.1% in 2020,

29.6% in 2019, and 23.8% in 2018).  At the same time, **the overall numbers of Level 1 and Level 2 incidents were lower in 2021** (898) **than any of 2018** (1,503)**, 2019** (1,268)**, and 2020** (911)**.**  Level 3 force incidents ranged from 24 in 2021 to 20 in 2019.

- **BPD officers are pointing a firearm at subjects far less frequently** – with the number of instances dropping from 461 incidents in 2018 to 209 incidents in 2021, a 54.7% decrease.  The Monitoring Team's qualitative review of force incidents found that nearly all instances where officers pointed firearms at subjects were consistent with relevant BPD policy and Decree requirements.

- **Fewer officers and subjects are being injured during force encounters.**  After an increase in 2019, the number of officers injured during force incidents declined in 2021 by 39.7% compared to 2019 and by 29.8% compared to 2018.  Subject injuries decreased between 2018 and 2021 by 41.2%.

- **Compared to the Baltimore population, force subjects were disproportionately male and disproportionately Black.  At the same time, neither a subject's race nor gender was predictive, in a statistically significant way, of the Level or severity of force used.**

  Additionally, Black subjects in foundationally deficient force cases  – defined elsewhere in this report as force that was unnecessary, disproportionate, unreasonable, and/or inconsistent with the duty to de-escalate – that occurred in each of 2018, 2019, and 2020 were somewhat disproportionately represented compared to their representation in force cases overall.  At the same time, in 2020, white subjects were somewhat  disproportionately represented among foundationally deficient incidents compared to BPD force overall.  However, given the specific nature of the Monitoring Team's analysis and methodology, these numbers are descriptive only and cannot be used to say anything about the likelihood that an individual of a particular race will or will not be the subject of force that is foundationally deficient.

The Monitoring Team's evaluation of the statistically significant, random sample of 545 force incidents from 2018 through 2021 considered BPD's compliance with the many specific, force-related provisions of the Decree and Decree-required policies.[2]  Notable findings include:

- **A large portion of force that BPD officers used was necessary, proportional, and objectively reasonable.  However, the Monitoring Team finds that BPD has not**

---

[2] As this report details, this included *all* 63 Level 3 force incidents that occurred in each of 2018, 2019, and 2020; 230 Level 2 force incidents (75 from 2018, 77 from 2019, and 78 from 2020); and 262 Level 1 force incidents (89 from 2018, 88 from 2019, and 85 from 2020).

**reached initial compliance because (a) too many Level 3 force incidents did not meet these requirements, and (b) BPD failed to identify and take appropriate corrective actions in these instances where performance did not meet requirements.** In 2020, force was necessary in 93.5% of all incidents, which represented continuing, positive progress over 2018 and 2019. Of the 10 cases from 2020 where the Monitoring Team could affirmatively determine that officer force was unnecessary, half (5) were serious, Level 3 force incidents – yet BPD adjudicated just one incident to be "out of policy." The dynamic was similar for the proportionality requirement in 2020, where 94.0% of overall force was proportional, but 5 of 9 of the disproportionate force incidents were significant, Level 3 force and BPD found only 1 case inconsistent with policy. Likewise, with respect to the requirement that force be objectively reasonable, 93.4% of force overall complied in 2020, but 6 of 11 noncompliant cases were significant, Level 3 incidents, with only 1 case flagged by the Department as "out of policy."

- **BPD officers are more regularly, and appropriately, deploying appropriate de-escalation techniques and tactics during encounters with subjects; however, BPD is not yet adequately identifying and addressing the failure to de-escalate.** Officers in 2020 took all reasonable efforts to de-escalate in 87.0% of force incidents compared to 69.5% in 2018. However, in 2019 and 2020, those instances where officers failed to de-escalate were more likely to occur in the context of intermediate (Level 2) or significant (Level 3) force cases, and BPD identified almost no instances of a failure to de-escalate as a policy violation.

- **In the vast majority of incidents that the Monitoring Team determined involved foundationally deficient force – because it was unnecessary, disproportionate, not objectively reasonable, and/or inconsistent with the duty to de-escalate – BPD failed to find officers' performance as "out of policy."** Only 1 of 21 cases from 2020 flagged as foundationally deficient by the Monitoring Team resulted in a BPD finding that the force incident was "out of policy." Indeed, it appears that BPD did a better job in 2018 of closing cases inconsistent with BPD's current force policy as "out of policy" – even though the decree-required force policies were not fully finalized, trained, or implemented before 2020.

- **Officers appear to be recognizing, and changing their response in appropriate ways to, both (a) individuals appearing to experience mental or behavioral health crises, and (b) youth.** For instance, in 29 of 31 incidents in 2020 where the Monitoring Team indicated that a reasonable officer would have concluded that the subject was experiencing a crisis, the involved officer did successfully identify this fact. Meanwhile, **BPD officers are also more regularly deploying developmentally**

appropriate and trauma-informed approaches in the context of force encounters that involved children or youth.

- **Nearly all use of force cases by 2020 were captured on body-worn camera.** Extrapolating from the case files reviewed to force incidents overall, body-worn camera footage is available in 96.8% of all force incidents in 2018, 94.7% of incidents in 2019, and 96.5% of incidents in 2020.

- **Officers are too frequently failing to issue verbal warnings, where it is practical under the circumstances, before using force.** In more than half (54.7%) of force incidents in 2020 where Monitoring Team reviewers believed it was reasonable and practical under the circumstances to provide a warning, BPD officers failed to issue a warning.

- **BPD officers are complying with a number of specific prohibitions against certain force types, including the firing of weapons into crowds, using warning shots, and firing from or at moving vehicles; the use of force against persons exercising their First Amendment rights; the use of unapproved weapons or force techniques; and the application of force to individuals with certain characteristics or conditions.** For other prohibitions – including those against retaliatory force generally and regarding chokeholds and neck holds – BPD is close to compliance but must make continued progress before the Monitoring Team can definitively certify compliance.

- **BPD officers appear to be less frequently using deadly/lethal force before exhausting other reasonably available, less-lethal options.** In 2018, the Monitoring Team determined that 4 of 12 deadly/lethal force applications occurred before all less-lethal force options safe and reasonably available under the totality of the circumstances were tried and failed. In 2020, 2 of 11 deadly/lethal force applications involved a failure to use other available options. Nevertheless, as the report details, **the combined infrequency of deadly/lethal force and the gravity of the force involved point toward BPD needing to demonstrate further improvement in connection to the deployment of such force.**

- **BPD officer use of Tasers and OC spray was consistent with initial compliance**, with positive, encouraging performance trends generally identified across 2018 through 2020. At the same time, the Monitoring Team will need to see additional evidence of compliance going forward with respect to the use of batons, at least in part due to the low level of baton usage.

- **BPD is definitively on track toward compliance with respect to officer intervention in problematic force encounters.** In 2020, compared to earlier years,

Monitoring Team reviewers found the lowest number of incidents where officers engaged in behavior that might have warranted intervention (because it was illegal, inconsistent with policy, or otherwise inappropriate). Likewise, they found the highest number and percentage of incidents in which officers successfully intervened (i.e., the intervention stooped the problematic force). Still, the relatively low rate of intervention in 2019 (in just 1 of 7 instances where applicable) and the relative recency of officer training on intervention mean that the Monitoring Team will want to see continuing, sustained progress with respect to officer intervention before issuing a finding of initial compliance in the area.

- **Considering what officers do immediately following the use of force at a scene, BPD's performance was consistent with compliance in some regards but suggested some distance to travel in others before the Department will be fully compliant with Decree and policy requirements.** In a vast majority of cases across all three years evaluated, BPD officers reduced the level of force or discontinued the application of force as a subject's resistance decreased. However, officers did not uniformly render or request medical aid, and document that fact, as required.

- **Many on-scene supervisors are providing appropriate tactical guidance, oversight, and direction during the incident, but more improvement is necessary.** In those reviewed cases where BPD supervisors arrived on the scene of a force incident, about 4 out of 5 (79.2%) of supervisors were involved appropriately. However, in 1 of 5 instances, supervisors did not provide necessary guidance, oversight, and direction.

- **BPD officers are generally providing a use of force report in a timely manner after encounters where force is used. However, systemic deficiencies in the quality of these reports, and issues with the provision of public safety statements following firearms discharges, make continued improvement necessary for BPD to reach compliance across the relevant reporting requirements of the Decree and policy.**

- **The force investigation and review process must still be improved for BPD to reach initial compliance with provisions relating to force investigation** – even as, across levels of force and for most major dimensions, the overall quality of investigations improved over the 2018 through 2020 time period. In many instances, better, more carefully structured investigative files and templates may assist BPD in ensuring the kind of comprehensive documentation necessary to verify that investigators have complied with critical investigative criteria.

## II.      BACKGROUND

### A.      The Department of Justice's Investigative Findings Regarding Use of Force

The Department of Justice's investigation of BPD concluded that the Department's "officers use unreasonable force in violation of the Fourth Amendment . . . , contributing to the pattern or practice of conduct that violates the constitution and federal law."[3]

Specifically, DOJ found that "in a significant number of cases, officers use aggressive tactics that escalate encounters . . . leading to the use of physical force when it is not necessary . . . ."[4]  To this end, the investigation indicated that BPD officers too frequently used "unreasonable force against people who present little or no threat to them or others," including individuals "who are already restrained and under officers' control"[5] and subjects "fleeing away from officers."[6] Indeed, the investigation found that officers would "resort too quickly to physical force" instead of "attempt[ing] to problem-solve or use conflict-resolution skills" in encounters involving "low-level and highly discretionary violations"[7] and in situations where "civilians simply refuse[d] to obey [officer] commands."[8]

The investigation noted that "[e]ven where [some level or amount of] force is justified," BPD "officers frequently use a high level of force when only a low level of force is objectively reasonable" – making the force "unnecessary and disproportional" to the nature of the threat or resistance that the subject posed.[9]

The investigation observed "excessive force against individuals experiencing a mental health issue"[10] and "against juveniles."[11]  DOJ concluded that BPD's "inadequate policies, training, and programs regarding officer interactions with individuals with a disability or in crisis" contributed to the pattern of inappropriate force.[12]  It concluded that officers "frequently use[d] unreasonable force against juveniles without implementing widely accepted techniques and tactics for engaging with youth."[13]

---

[3]  U.S. Department of Justice, *Investigation of the Baltimore Police Department* (Aug. 10, 2016), https://www.justice.gov/crt/file/883296/download [hereinafter "DOJ Findings Letter"] at 74.

[4]  *Id.* at 75.

[5]  *Id.* at 76; *see id.* at 88–91.

[6]  *Id.* at 76; *see id.* at 91–98.

[7]  *Id.* at 76.

[8]  DOJ Findings Letter at 78.

[9]  *Id.* at 76.

[10]  *Id.* at 75; *see id.* at 80–85.

[11]  *Id.* at 76; *see id.* at 85–87.

[12]  *Id.* at 108–112.

[13]  DOJ Findings Letter at 85–87.

The DOJ investigation expressly concluded that "[t]he fault for officers' systemic use of inappropriate and unlawful force tactics "lies with BPD as an agency."[14]  First, "[d]eficiencies in BPD's policies regarding the use, reporting, and investigation of force have contributed to officers' systemic use of excessive force."[15]  Because they "miss[ed] critical elements," were "difficult for officers to synthesize" and "sometimes inaccessible to some officers," and "included elements that were not enforced," BPD's policies as of 2016 "fail[ed] to provide officers with clear and consistent guidance" necessary "to safely and constitutionally conduct their law enforcement activities."[16]  Second, DOJ cited deficient and inappropriate training – including instruction that emphasized "aggressive tactics" while failing to provide sufficient guidance on de-escalation – as underlying causes of the underlying pattern or practice of unconstitutional force.[17]  Third, the investigation concluded that BPD failed "to exercise oversight of its officers' uses of force" by ensuring high-quality, thorough, and fair investigations of officer use of force that formed the basis of rigorous and analytical supervisory review.[18]

### B.      Consent Decree Requirements

Consistent with DOJ's investigative findings regarding use of force, the Consent Decree includes requirements addressing use of force policies; use of force training; reporting, investigating, and reviewing force; and the collection, analysis, and reporting of force data.

#### 1.   Use of Force Principles

The Decree articulates a set of broadly applicable principles that must be reflected in the Department's policies, training, procedures, and practices regarding the use of force.  Pursuant to these force principles, BPD must "ensure that officers":

- [R]esolve incidents without resorting to the use of force, when possible;
- Use de-escalation techniques and tactics . . . ;
- Use tactics that do not unnecessarily escalate an encounter;
- Continually assess the situation and changing circumstances, and modulate the use of force appropriately;
- [U]se force in a manner that avoids unnecessary injury or risk of injury to officers and civilians;
- [R]ecognize and act upon the duty to intervene to stop any officer from using excessive force;

---

[14] *Id.* at 79.
[15] *Id.* at 98.
[16] *Id.*
[17] *Id.* at 79–80.
[18] DOJ Findings Letter at 102–108.

- Accurately and completely report [force]; and
- Are held accountable for use of force that is not objectively reasonable or otherwise violates law or policy.[19]

### 2. Use of Force Policies

The Consent Decree contains a host of requirements for revised policies on the use of force. Section IV discusses these specific requirements in the context of reporting on the findings of the Monitoring Team's reviews and audits of force incidents. Generally, however, the Consent Decree requires, among other things, that BPD's policies:

- Require officers to de-escalate "whenever possible, before resorting to force";[20]
- Require officers to use "a critical thinking, decision-making framework to analyze and respond to incidents";[21]
- Require officers to "use only the amount of force necessary to control the person and immediately reduce the level of force as the threat diminishes";[22]
- Provide sufficient policy guidance on foot pursuits,[23] interactions with youth,[24] and the use of force on restrained subjects;[25]
- Prohibit retaliatory force,[26] "the use of force for punishment,"[27] "tactics that unnecessarily escalate an encounter,"[28] and chokeholds and neck holds "unless deadly force is authorized and no reasonable force alternative exists"[29];
- Require most officers to carry "at least one less-lethal weapon";[30]
- Ensure that officers only use weapons and techniques outlined in policy and training;[31]
- Ensure that "force that is not objectively reasonable will subject officers to corrective action, discipline, possible criminal prosecution, and/or civil liability";[32]
- Provide specific guidance to officers on the use of various force instruments, including:
  - Conducted Electrical Weapons ("CEWs"), commonly referred to as "Tasers";[33]

---

[19] Dkt. 2-2 ¶ 124.
[20] *Id.* ¶ 125.
[21] *Id.* ¶ 126.
[22] *Id.* ¶ 127.
[23] *Id.* ¶ 130.
[24] Dkt. 2-2 ¶ 131.
[25] *Id.* ¶ 132.
[26] *Id.* ¶ 133.
[27] *Id.* ¶ 134.
[28] *Id.* ¶ 135.
[29] Dkt. 2-2 ¶ 137.
[30] *Id.* ¶ 139.
[31] *Id.* ¶ 136.
[32] *Id.* ¶ 138.
[33] *Id.* ¶¶ 142–48.

- o  Batons and impact weapons;[34]
  - o  Oleoresin Capsicum spray, commonly referred to as "OC spray" or "pepper spray";[35] and
  - o  Firearms;[36]
- • "[R]equire officers to intervene in incidents in which another officer uses excessive force."[37]

### 3.  Use of Force Training

The Decree requires that BPD provide all current officers, as well as new trainees in the Academy, use of force training that sufficiently addresses the required, revised force policies and procedures.[38]  After this initial training, the Department must "provide all officers with annual use of force in-service training."[39]

### 4.  Use of Force Reporting, Investigation, and Review

The Consent Decree requires that officers report the use of force.[40]  The Decree requires that BPD categorize force "into levels for the purposes of reporting and reviewing each use of force," from comparatively less severe or serious Level 1 force to more severe or serious Level 3 force.[41]  Based on these levels, the Decree prescribes varying requirements for the investigation of the underlying force[42] and the review of such force to ensure consistency with law and policy.[43]  This includes the investigation of serious uses of force (Level 3 force) by the Department's Special Investigation Response Team ("SIRT").[44]  The Decree also requires that a Performance Review Board ("PRB") review expressly identified classes of uses of force cases.[45]  As noted elsewhere, this assessment addresses all of the Decree's requirements relating to force reporting, investigation, and review except for the functioning of the PRB, described in Paragraphs 207 to 210, which is the subject of a separate assessment that the Monitoring Team is currently conducting.

---

[34] Dkt. 2-2 ¶¶ 149–52.
[35] *Id.* ¶¶ 153–59.
[36] *Id.* ¶¶ 160–65.
[37] *Id.* ¶ 141.
[38] *Id.* ¶¶ 166–67.
[39] Dkt. 2-2 ¶¶ 166–68.
[40] *Id.* ¶ 171.
[41] *Id.* ¶ 140.
[42] *Id.* ¶¶ 169–70, 172–191.
[43] *Id.* ¶¶ 169–70, 180–200.
[44] Dkt. 2-2 ¶ 201–206.
[45] *Id.* ¶ 207–210.

### 5. *Use of Force Data Collection, Analysis, and Reporting*

BPD must also "collect and maintain all data and records necessary to accurately evaluate its use of force practices and facilitate transparency."[46]  This includes the "maintenance of a reliable and accurate electronic system to track" force and the routine analysis of force data "to determine trends" and "identify and correct deficiencies revealed by this analysis," including in public reports.[47]

## C.    BPD's Implementation Progress to Date

Since 2017, BPD has proceeded to revise its policies on the use of force; provide training to all officers on use of force generally and on the new expectations of the updated force policies specifically; and make changes to the processes and procedures that it uses for the investigation, review, supervision, and oversight of force.

### 1. *Policy*

In July 2018, following collaboration with the Department of Justice and Monitoring Team and the incorporation of public feedback, the Monitoring Team approved Consent Decree-required revisions to BPD's "core policy on use of force" and four other policies addressing how to use the force instruments "most commonly used by patrol officers"[48] in a manner consistent with BPD's overall force requirements.  These policies included:

- *Policy 1115 (Use of Force),* the primary, overriding BPD policy addressing "when a member may use force, and members' duties before, during, and after the Use of Force."[49]

- *Policy 409 (Firearms Regulations)*, which specifically addresses the use, maintenance, and care of firearms.[50]

- *Policy 719 (Conducted Electrical Weapons–CEW)*, which provides specific requirements governing the use of Tasers.[51]

---

[46] *Id.* ¶ 211.
[47] Dkt. 202 ¶ 217.
[48] Dkt. 178-1 at 66.
[49]  Baltimore Police Department Policy 1115, "Use of Force" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1115-use-force [hereinafter "Policy 1115"].
[50]  Baltimore Police Department Policy 409, "Firearms Regulations" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/409-firearms-regulations.
[51]  Baltimore Police Department, Policy 719, "Conducted Electrical Weapon," (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/719-conducted-electrical-weapon-cew      [hereinafter "Policy 719"].

- *Policy 1111 (Batons/Impact Weapons)*, which outlines additional guidance on officer use of batons and other "improvised impact weapons," or "device(s) or object(s) that [are] not a department approved weapon" but can "nonetheless [be] used as an impact weapon (e.g., flashlight, radio, or stick) . . . only in rare, emergency conditions where members lack an authorized Baton or other approved less-lethal alternatives . . . ."[52]

- *Policy 1118 (Oleoresin Capsicum Spray)*, governing the use of OC/pepper spray.[53]

In September 2018, following collaboration with the Department of Justice and Monitoring Team and the incorporation of public feedback obtained during a month-long public comment period, the Monitoring Team approved "nine remaining use of force policies":[54]

- *Policy 412 (Patrol Rifle Program)*, governing the use of patrol rifles/shotguns in expressly-prescribed circumstances, such as "[a]n active-shooter incident" or when a member encounters a suspect that "[i]s armed with a . . . high-powered rifle . . . capable of injuring multiple persons."[55]

- *Policy 414 (Less Lethal Munitions and Chemical Agents)*, addressing the use "of certain less-lethal force options for civil disturbances."[56]

- *Policy 710 (Level 3 Use of Force Investigations – SIRT)*, outlining the role and responsibilities of BPD's Special Investigation Response Team (SIRT) for the investigation of serious uses of force.[57]

- *Policy 724 (Performance Review Board)*, which outlines the process by which the Performance Review Board (PRB) "reviews serious use of force and other incidents and investigations" and "makes a recommendation to the Police Commissioner" about

---

[52] Baltimore Police Department Policy 1111, "Batons" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1111-batons [hereinafter "Policy 1111"].

[53] Baltimore Police Department Policy 1118, "Oleoresin Capsicum (OC) Spray" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1118-oleoresin-capsicum-spray [hereinafter "Policy 1118"].

[54] Dkt. 178-1 at 66.

[55] Baltimore Police Department Policy 412, "Patrol Rifle/Shotgun Program" (last rev. Oct. 16, 2018), https://www.baltimorepolice.org/transparency/bpd-policies/412-patrol-rifle-program.

[56] Baltimore Police Department Policy 414, "Less-Lethal Munitions and Chemical Agents" (last rev. Nov. 30, 2020), https://www.baltimorepolice.org/transparency/bpd-policies/414-less-lethal-munitions-and-chemical-agents-0.

[57] Baltimore Police Department Policy 710, "Level 3 Use of Force Investigations/Special Investigation Response Team (SIRT)" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/710-level-3-use-force-investigationsspecial-investigation-response-team.

the incident, its investigation, and "action items" stemming from its review and analysis.[58]

- ***Policy 725 (Use of Force Reporting, Review, and Assessment)***, addressing various "requirements for reporting and reviewing a Use of Force."[59]

- ***Policy 1005 (Non-Uniform Policing Standards)***, covering various expectations for non-uniformed or undercover officers.[60]

- ***Policy 1107 (De-Escalation)***, requiring the use of "De-Escalation Techniques to reduce threats, gain the voluntary compliance of persons, and safely resolve a situation."[61]

- ***Policy 1503 (Emergency Vehicle Operation and Pursuit Policy)***, outlining "guidance on conducting safe emergency vehicle operations and pursuits."[62]

- ***Policy 1602 (Canine Procedure)***, which inventories requirements for the use of canines in the field.[63]

Consistent with Paragraph 287 of the Consent Decree, BPD "re-review[ed]" each of these policies after they had "been in effect for a year and before 18 months to ensure [they] provide[] clear guidance to officers and [are] consistent with this Agreement and current law,"[64] which led to some changes being submitted and approved in late 2019. Another review of these polices will occur subsequent to the filing of this report.

Sections IV and V summarize the many particular requirements of the Consent Decree, and of BPD's various policies, relating to force as they detail the results of the Monitoring Team's qualitative evaluation of force incidents.

---

[58] Baltimore Police Department Policy 724, "Performance Review Board" (last rev. Dec. 15, 2020), https://www.baltimorepolice.org/transparency/bpd-policies/724-performance-review-board.

[59] Baltimore Police Department Policy 725, "Use of Force Reporting, Review, and Assessment" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/725-use-force-review-and-assessment [hereinafter "Policy 725"].

[60] Baltimore Police Department Policy 1005, "Non-Uniformed Policing Standards" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1005-non-uniformed-policing-standards.

[61] Baltimore Police Department, Policy 1107, "De-Escalation" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1107-de-escalation [hereinafter "Policy 1107"].

[62] Baltimore Police Department, Policy 1503, "Emergency Vehicle Operation and Pursuit Policy" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1503-emergency-vehicle-operation-and-pursuit-policy.

[63] Baltimore Police Department, Policy 1602, "Canine Procedures" (last rev. Nov. 24, 2019), https://www.baltimorepolice.org/transparency/bpd-policies/1602-canine-procedures.

[64] Dkt. 2-2 ¶ 287.

### 2. *Training*

#### a.  Use of Force/Fair & Impartial Policing I

In its February 2022 Compliance Review & Outcome Assessment regarding BPD Training, the Monitoring Team detailed the Department's design and implementation of training on the new expectations under the core use of force policies.  The Use of Force/Fair & Impartial Policing I training, conducted between June 2019 and November 2019 for all BPD officers, included (1) "a three-module e-learning course [that] introduced the substantive requirements of BPD's revised use of force policies," and (2) two days of in-class instruction that "provided officers with guidance on, among other things:

- Use of force decision-making under a Critical Decision-Making Model;
- De-escalation techniques;
- The use of various weapons and techniques;
- The relationship between subject threat or compliance level and the permissible force (if any) authorized in response; and
- Writing use of force reports."[65]

The Use of Force training itself "mark[ed] a significant milestone" because of the Department's use of "a new, dynamic" training paradigm.[66]  In in-class instruction, officers engaged in small- and large-group discussions about use of force issues, analyzed "videos from actual [force] encounters" and "reviewed written hypotheticals . . . that required them to apply their knowledge of the new [use of force] policies."[67]  "Another module utilized a video machine . . . that presented officers with simulated real-time events that required reactive responses consistent with both the new policies and tactical training," with officer performance "critiqued by instructors and their colleagues following their performance."[68]  In another portion of the training, "officers work[ing] in pairs" needed to "us[e] their knowledge of policy and tactics to address situations that presented various real-world options involving live subjects that were role-played by instructors," with each officer's performance 'also critiqued/debriefed following these exercises."[69]

As of November 2019, all but 20 eligible (active and full-time duty) BPD officers had completed the training (with the non-compliant officers referred to PIB for misconduct investigations).[70]  Consequently, following the successful completion of the use of force training, the new, Consent-Decree-required use of force policies became fully effective in the field as of the start of January

---

[65] Dkt. 488 at 24 (quoting Third Semiannual Report at 32).
[66] Dkt. 279-1 at 29.
[67] Fourth Semiannual Report at 53.
[68] *Id.* at 49.
[69] *Id.* at 49–50.
[70] Dkt. 488 at 25 (citing Dkt. 260, Ex. 1 at 2).

2020.  This means that officers began to be subject to discipline for not following these policies in the field as of January 2020.

### b. Fair & Impartial Policing III & Use of Force

Beginning in September 2021, BPD began providing a two-day, in-person training for all BPD officers focusing on fair and impartial policing topics and additional, "advanced" use of force concepts.[71]  Among other topics, the training reviewed the critical decision-making model, key elements of Policy 1115, de-escalation, and the use of the baton.  The training involved the analysis of force case studies, video case studies, and a use of force simulation.  The training was successfully completed in March 2022.

### c. Supervisor Training

To date, BPD supervisors have received the same training as all BPD officers with respect to BPD's new use of force policies.  This includes instruction on the reporting and review of use of force incidents.

During 2021 and into 2022, BPD has been developing an extensive, four-day General Supervisor Training.[72]  The training will address a host of critical supervisory topics, which will include the supervision of, response to, investigation of, and review of use of force incidents.[73]  More than 400 sworn personnel who occupy the ranks of sergeant and above within the Department will complete the training by September 2022.[74]

Separately, the Department's five-day course for newly-appointed sergeants and lieutenants is being "updated to reflect new BPD policies and systems, as well as appropriate content from [the] newly-developed, Consent Decree-mandated General Supervisor Training course."[75]

### 3. Data

The Consent Decree requires that BPD "collect and maintain all data and records necessary to accurately evaluate its use of force practices and facilitate transparency . . . ."[76]  This includes the "collection and tracking of":

---

[71] Dkt. 488 at 37.
[72] 2022 Training Plan (Draft) at 5 (Mar. 2, 2022).
[73] Other topics "Include the new Patrol Supervisors Manual, BPD's new Sworn Performance Evaluation system, coaching, discipline, complaint investigation, critical incident management, after-action review, and supervisory responsibilities related to stop, search, [and] arrest . . . ."  2022 Training Plan (Draft) at 13.
[74] 2022 Training Plan (Draft) at 5 (Mar. 2, 2022).
[75] *Id.* at 12.
[76] Dkt. 2-2 ¶ 211.

- Officer use of force reports;
- Supervisor force reviews;
- SIRT force investigations;
- Any "[r]eviews conducted by OPR relating to officers' uses of Reportable Force"; and
- "All supporting documentation and materials" related to the use of force and investigation (such as video footage, downloads of information from Taser units, etc.).[77]

In addition to maintaining files of underlying documentation and evidence relating to force, the Decree requires that the Department maintain "a reliable and accurate electronic system to track all data" on force. As the Monitoring Team has previously reported, BPD uses a system called IAPro to log information and data, which can then be analyzed and aggregated, on all reportable use of force.[78] Indeed, it is the data from this system that is analyzed for the aggregate information reported in this report. Before the Consent Decree, BPD used a "one-off," customized version of IAPro. Consequently, the Department was not able to install regular updates of the system, as those are only applicable to the standard version of IAPro, and the Department fell behind significantly. During the Consent Decree, BPD moved to the standard version of IAPro, which included upgrading to the most recent version. This brings BPD in alignment with other agencies across the country who use the system.

Finally, the Decree includes various requirements related to the reporting, analysis, and evaluation of force data.[79]

---

[77] *Id.* ¶ 212.
[78] *Id.* ¶ 213.
[79] *Id.* ¶¶ 214–17.

## III.   SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A.   Scope of Review

This assessment is a combined compliance review and outcome assessment.  The Monitoring Team has previously described the Consent Decree's distinction between these two types of assessments:

> The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments.  Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree.  They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . .

> Outcome assessments, by contrast, are [largely] quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact [overall]—whether, independent and apart from BPD's progress toward compliance with [any specific] Consent Decree requirements, policing is changing in the real world . . . . [80]

This report evaluates BPD's compliance with Paragraphs 123 through 206 and 211 through 217.  It also reports on various outcome measures related to Paragraph 459(d)(i).  Paragraphs 207 through 210, which address the performance of BPD's Performance Review Board, and Paragraph 459(d)(ii), which address use of force-related complaints, will be included in future outcome assessment reports.

### B.   Methodology

This report considers BPD performance on use of force in two primary ways: (1) an analysis of *all* BPD uses of force from 2018 through 2021, through the use of aggregate force data; and (2) a structured evaluation of a statistically representative, random sample of uses of force from 2018, 2019, and 2020.  This section describes these methods in turn.

Before detailing the particular modes of analysis, a summary of the Decree-required force classification system is necessary.  The Decree requires that BPD classify use of force according to various Levels.  These Levels reflect the general nature or quality of a force instrument or technique used, the reasonably foreseeable risks generally associated with the particular type of force, and the specific outcome or effects of the force as actually employed in a specific incident.  That is, the general nature of the force and the specific way that the force was applied in a particular incident are both factors that guide the categorization of force.

---

[80] Dkt. 279-1 at 22–23.

Under the Decree, force falls into one of three Levels:

- *Level 1* force is comparatively less severe force that "is not reasonably expected to cause injury" and does not cause "an injury greater than Temporary Pain."  It includes:
    - Using techniques that cause Temporary Pain or disorientation as a means of gaining compliance, hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip), and pressure point compliance techniques.
    - Pointing a firearm, Less-Lethal Launcher, or CEW at a person,
    - "Displaying the arc" with a CEW as a form of warning, and
    - Forcible takedowns that do not result in actual injury or complaint of injury.[81]

- *Level 2* force is intermediate-level force that "causes or could reasonably be expected to cause an injury greater than Temporary Pain."  It also includes uses of specific "weapons or techniques," where they do not result in death, serious physical injury, loss of consciousness, or hospitalization, that include:
    - Discharge of a Taser;
    - Use of OC spray;
    - Weaponless defense techniques including, but not limited to, elbow or closed fist strikes, open hands trikes, and kicks;
    - Discharge of a less-lethal launcher/munitions in the direction of a person;
    - Canine-inflicted injuries;
    - Non-weapon strikes to the head, neck, sternum, spine, groin, or kidney area; and
    - Striking of a person or a vehicle with a vehicle.[82]

- *Level 3* force is serious force that either results in death, serious physical injury, loss of consciousness, or hospitalization or involves weapons or techniques that may reasonably lead to the same.  Level 3 force includes:
    - Strikes to the head, neck, sternum, spine, groin, or kidney area with an impact weapon;
    - Firearm discharges;
    - Applications of more than 3 Taser cycles;
    - Application of a Taser for longer than 15 seconds across applications;
    - Uses of force resulting in death, serious physical injury, loss of consciousness, or requiring hospitalization; and
    - Uses of Deadly Force/Lethal Force.[83]

---

[81] Policy 1115 at 5.
[82] *Id.*
[83] *Id.* at 6.

Any given encounter where force is used may involve multiple officers, multiple types of force (i.e., more than one force instrument or physical technique), or multiple subjects.

This report speaks primarily in terms of *force incidents*. A single force incident (an encounter or circumstance in which officers employ some sort of force, and sometimes also referred to as a force "case" or "investigation") may involve: multiple types of force (i.e., more than one force instrument or type of physical technique), force of more than one Level (i.e., the use of a Taser (Level 2 force) and a shoulder grip (Level 1 force)), multiple applications of the same force (i.e., two distinct discharges of a Taser or different hand control applications at different times during the encounter), multiple officers, and even multiple subjects. Generally, a force incident includes applications of force and the attendant facts and circumstances that stem from a common nucleus of operative fact – that is, that are related to the same string of events or set of circumstances. In this report, the reference to a force Level typically refers to the overall incident. However, at some points in the discussion of overall BPD data and the results of the Monitoring Team's qualitative review, discrete applications of force are referenced and analyzed.

Force incidents are categorized based on the highest Level of force used at any point during the use of force incident. For example, in a use of force incident where an officer applied Level 2 and Level 1 force, the incident – for BPD's reporting and review processes – must be categorized as Level 2 force.

### 1. *Aggregate Data Review*

In modern usage, the term "data" is sometimes associated with a type of distant, impersonal, and numbers-driven analysis that may not reflect the whole story or completely describe a phenomenon. In this way, data is sometimes described as distinct from, or potentially in opposition to, the experiences that people have in the world.

This report presents a variety of different types of data about how BPD uses of force and what happens in the real world when they do. The report presents overall, aggregate information about what occurred across *all* incidents where BPD officers reported that they used force from 2018 through 2021. The overall, aggregate data on force is therefore a method of evaluating all BPD use of force reports and considering what transpired during those use of force encounters. It should be noted that, while the Monitoring Team's qualitative reviews of force incidents discussed below cover three years (2018 through 2020), the aggregate data review spans four (2018 through 2021).

The Consent Decree requires, as summarized in Section II, that BPD log a wealth of information about all use of force incidents – both in long-form narrative reports by involved, investigating, and reviewing officers and via electronic forms and templates designed to gather information across all force incidents in a uniform, standard way that can be analyzed as a whole. As also

noted previously, the Decree contemplates that the Monitoring Team conduct an overall analysis of all use of force data for the purposes of (1) gauging compliance with the various, individual provisions of the Decree guiding the Department's policies, protocols, and procedures on force, and (2) measuring outcome assessments, pursuant to Paragraph 459(d)(i), focusing on overall trends on the use of force over time in Baltimore.

This report therefore considers overall data on BPD force for the purposes of both gauging the Department's compliance with force-related Decree requirements and measuring overall force-related outcomes and trends.

### 2.   *Qualitative Evaluation & Audit of Force Incidents*

The Monitoring Team conducted an in-depth, structured qualitative review of BPD officer uses of force occurring in each of 2018, 2019, and 2020, as well as of the Department's post-force response, investigation, and review.

The methodology that the Monitoring Team designed endeavored to be consistent with accepted best practices for evaluating use of force reports and investigations employed to evaluate use of force reports and investigations in other jurisdictions.[84]  "[U]sing methods that gather and represent human phenomena with numbers (such as standardized questionnaires and structured observation protocols) . . . are classic instances of mixing data gathering and analysis techniques" that are widely used by contemporary social scientists.[85]  This approach was selected so that the Monitoring Team could identify the size or scope of trends over time and evaluate the extent to which BPD and the City are or are not progressing toward compliance.

The overall population of cases to be reviewed will include all reported use of force incidents that occurred in 2018, 2019, and 2020 and for which investigations were completed as of March 26, 2021.  For purposes of sampling force cases for this evaluation, a force investigation can be considered "completed" when (a) for Level 1 and Level 2 cases, all required investigative and review processes required in the Consent Decree and BPD policy have been completed and/or the incident has been marked as "completed" within BPD's IAPro management system, or (b) for

---

[84] *See, e.g.*, Denise Rodriguez King, et al., Community Oriented Policing Services (COPS) Office, U.S. Department of Justice, *Collaborative Reform Model: A Review of Use of Force Policies, Processes, and Practices in the Spokane Police Department* (2014) at 9, 12 (describing random sampling of use of force reports for analysis "using a 95 percent confidence level and a confidence interval of 5 percent"); George Fachner & Steven Carter, *Collaborative Reform Initiative: An Assessment of Deadly Force in the Philadelphia Police Department*, Community Oriented Policing Services (COPS) Office, U.S. Department of Justice (2015) at 16 (describing "investigative quality evaluation" of officer-involved shootings of "randomly selected . . . case files" using a survey instrument "of 'yes/no' and Likert scale (1–5 items)" evaluated by "expert, experienced investigators"); U.S. Department of Justice, Letter to Mayor Richard J. Berry re: Albuquerque Police Department (Apr. 10, 2014) at 3 ("review[ing] a random sample of the department's use of force reports completed by officers and supervisors").

[85] Jennifer C. Greene, et al, "Combining Qualitative and Quantitative Methods in Social Inquiry," *in Research Methods in the Social Sciences*, Bridget Somekh & Cathy Lewins (eds.) 274, 274 (2005).

Level 3 cases, the SIRT investigation has been denoted as completed (even if the case has not yet been heard by the Performance Review Board).

For purposes of the study, "cases" or "incidents" refer to investigations of applied force in a given encounter or instance. It does not refer to individual applications of force within those instances. Accordingly, one force "case" or "incident" may involve multiple types of force (such as a Taser application and a physical takedown), multiple applications of the same type of force (such as multiple Taser applications), and/or multiple officers (such as when one officer applies a Taser and another officer, at a different juncture within the interaction, performs a physical takedown maneuver).

Given the number of use of force cases that occurred in each of the years to be evaluated, the complexity of conducting reviews in this area, and the amount of time necessary to conduct exhaustive force reviews, the Monitoring Team used standard, accepted statistical methods to select randomly a sub-set, or sample, of force cases from each of 2018, 2019, and 2020 that might be large enough to draw conclusions about *all* cases that occurred in the year.

In determining the parameters for selecting a sample, the Team wanted to review enough cases from each year to draw meaningful conclusions overall while, at the same time, ensuring that it reviewed sufficient numbers of cases across all Levels of force. Practically, this meant that – given that Level 3 force incidents occur relatively infrequently – the Monitoring Team reviewed every Level 3 force incident that occurred in 2018, 2019, and 2020. It also reviewed a statistically representative, random sample of Level 2 incidents and a statistically representative, random sample of Level 1 cases from each year at a 95% confidence interval and 10% margin of error. That is, the random incidents were drawn as independent samples from each Level for each year – such that each Level-year was treated as an independent sample (e.g., the sample population for Level 1 force in 2018 was drawn from the total population of Level 1 force cases in 2018). Table 1 summarizes the Monitoring Team's sampling approach.

**Table 1.    Summary of Monitoring Team Use of Force Case Sampling Methodology**

|  |  | Level 1 | Level 2 | Level 3 | TOTAL |
|---|---|---|---|---|---|
| **Total Uses of Force** | 2018 | 1,162 | 338 | 25 | **1,525** |
|  | 2019 | 919 | 363 | 20 | **1,302** |
|  | 2020 | 689 | 227 | 18 | **934** |
| **Proposed Sample** | 2018 | 89 | 75 | 25 | **189** |
|  | 2019 | 88 | 77 | 20 | **185** |
|  | 2020 | 85 | 68 | 18 | **171** |
| **Confidence Level** | 2018 | 95% | 95% | 100% | **95%** |
|  | 2019 | 95% | 95% | 100% | **95%** |

|  | 2020 | 95% | 95% | 100% | **95%** |
|---|---|---|---|---|---|
| **Margin of Error** | 2018 | 10% | 10% | 0% | **8%** |
|  | 2019 | 10% | 10% | 0% | **8%** |
|  | 2020 | 10% | 10% | 0% | **8%** |

The Monitoring Team therefore reviewed 545 force incidents in total – or 189 cases from 2018, 185 from 2019, and 171 from 2020.

One result of this approach is that, when analyzing and reporting on findings for specific levels of force for a given year, the Monitoring Team can report that it is 95% confident that – even if it reviewed *all* force cases rather than just a sample – the results would nonetheless be within 8% of what it found based on the sample of cases. Within each year, the Monitoring Team can be 95% confident for Level 1 and Level 2 force incidents that, even if it reviewed *all* such cases in the year rather than a sample, the results would be within plus or minus 10% of its findings. For the most serious (Level 3) force, the Monitoring Team reviewed all such incidents across the three years evaluated.

Another result is that, to say something about *all* levels of force in a given year – that is, all force incidents, regardless of severity of type of force used – the Monitoring Team must account for the fact that the sampling approach described in Table 1, above, led to the Team reviewing a somewhat higher percentage of Level 2 and Level 3 force incidents than actually occurs in the field, and relatively fewer Level 1 incidents. That is, the overall population of the sample – because it was constructed around ensuring sufficient numbers of reviews to say something meaningful within each Level of force for each year – skews more heavily toward more-serious force incidents. To get an accurate picture of *all* force across a given year, the Monitoring Team must apply statistical "weights." This process is summarized in the discussion at the outset of Section V and the accompanying Table 15 of this report. Ultimately, as summarized in Table 1, the Monitoring Team can be 95 percent confident that its weighted results are accurate within a range of plus or minus 8%.

To conduct the reviews, 545 total cases were randomly assigned to nine Monitoring Team members. Those Monitoring Team members included former police professionals and lawyers with substantial experience in use of force and the review and investigation of police force. The random assignment meant that Team members reviewed incidents of varying significance or severity that occurred at different time periods during BPD's implementation of various force-related Consent Decree requirements.

Monitoring Team reviewers reviewed all materials contained within BPD's investigative file pertaining to the selected use of force incidents – including written narratives, video and audio material, other images, and any other documentary evidence included within BPD systems. This

included:

- Investigative reports;
- Body-worn video footage;
- CCTV and private-party video footage;
- Audio recordings of interviews;
- Arrest and incident report;
- Injury-related records; and
- Other documentation and evidence relating to the use of force encounter.

Reviewers completed a structured, qualitative review instrument indexed closely to the requirements of the Consent Decree and BPD policy relating to force. Where Section IV reports on percentages of force cases that do or do not meet various Consent Decree expectations, this refers to aggregate results of reviewer determinations on this structured review instrument. Reviewers also recorded their own narrative analyses of the use of force and the Department's investigation and review of force. This report's various descriptions of specific force cases stem from the in-depth narrative observations of Monitoring Team reviewers recorded during their evaluations of each force incident.

For various requirements, Monitoring Team reviewers needed to certify whether an officer, BPD personnel, or various elements of the force investigation or review adhered to specific Consent Decree requirements. Where the nature of information or evidence contained within the force investigation did not allow the reviewer to make a definitive determination, one way or another, as to whether requirements were met, reviewers were instructed to denote that they were "unable to determine" and to explain what issues or documentary deficiencies left them unable to conclude definitively whether the requirement was satisfied.

Separately, reviewers could select "not applicable" as a response to questions about various requirements. Reviewers were instructed to use this "not applicable" selection only in those instances where the nature of the facts or underlying incident made the requirement or implicated concern not at issue. For example, in questions about whether investigative or review documentation included various, required elements, reviewers for an incident where the documentation was missing entirely were to select "no" as a response rather than "not applicable." In this way, "not applicable" responses denote instances where the nature of the facts and circumstances at issue functionally made the underlying substance of the question inapplicable to the incident.

Across the aggregate review statistics presented in this report, many, though not all, "not applicable" determinations relate to a subset of instances where involved officers discharged a firearm but the facts and circumstances surrounding the case affirmed that the discharge was

unintentional and that no individuals were hurt.  Under existing BPD policy, any discharge of a firearm – whether intentional or unintentional, whether involving a human subject or an animal, and whether it occurs within an interaction or encounter with a subject or not – is a reportable use of force that is subject to investigation and review in the same manner.  Because many of the parameters of force policy assume that force was used intentionally in a situation that involved a human subject, qualitative review inquiries on these parameters do not readily apply to these circumstances.  Consequently, for a number of areas of inquiry reported in this report, percentage statistics are computed by excluding the number of "not applicable" answers.

Additionally, **this in-depth evaluation of force incidents encompassed not only three years but three distinct implementation periods within BPD.**  In 2018, the Department was working to finalize Decree-required force policies and design officer training on the new expectations. Therefore, although the Monitoring Team's review audited officer and BPD performance against the standards that the Decree and Decree-approved policy articulate, the trends reported for 2018 may be best understood as a kind of performance "baseline" against which future progress can be measured.

In 2019, BPD officers were receiving training on the new, Decree-required use force policies.  In this way, officer and BPD performance in 2019 reflects in-progress or partial implementation of the Decree's force requirements.

In contrast, BPD officer training had been completed by 2020, allowing the Decree's force policies to become fully effective in the field.  By this year, all BPD personnel should have been fully trained in the new policies and following them across interactions.

Therefore, **because of the changing nature of BPD's implementation status, this report's overall analysis of the Monitoring Team determinations is presented by year that the use of force occurred.**

Two final elements of the Monitoring Team's review process are important to note.  First, whenever a reviewer identified an incident in which not all officers used force that was necessary, proportional, objectively reasonable, or consistent with the duty to de-escalate (see Section IV, below), the reviewer was given an opportunity, following completion of the original review, to analyze the case again and make changes to any determinations as warranted.

Second, and following the opportunity for reconsideration or amendment, all cases that were identified as inconsistent with the foundational necessity, proportionality, objective reasonableness, and de-escalation requirements were discussed with BPD and DOJ representatives on a rolling basis.  Although particular determinations in a small number of cases were debated, BPD and DOJ agreed with the Monitoring Team's fundamental assessments in the vast majority

of the cases discussed.  Consequently, the findings of Section IV(A), below, have been previously subjected to scrutiny and discussion from and among BPD, DOJ, and the Monitoring Team – with BPD and DOJ signaling agreement with core determinations in most instances.  It should be noted that, in those very limited instances where BPD or DOJ had differences of views, no Monitoring Team determinations were changed.  All evaluations and conclusions about individual force cases remain the Monitoring Team's sole determinations.

## C.    Standard of Review

### 1.  Evaluating Officer Performance During Use of Force Incidents

The Monitoring Team's review evaluated officer performance in light of the Consent Decree's specific standards and expectations.  Most generally, **in analyzing officer performance during use of force incidents to determine consistency with Decree or policy requirements, the Monitoring Team evaluated the totality of circumstances that the involved officer(s) confronted, as established through available evidence, and considered, as appropriate, what a reasonable officer would have done under the circumstances.**

This mode of inquiry is an *objective* rather than subjective one – which has some important implications.  First, the Monitoring Team's review was not about whether the Team's experts believed that they would have done the same thing had they been in the officer's shoes, or whether they subjectively believed the force to be appropriate.  Instead, the required inquiry focused on what a reasonable officer would have done under the circumstances that the involved officer(s) encountered.

Second, the standard of review was not what reviewers believed that the involved officer could or should have done differently with the "20/20 vision of hindsight."[86]  Rather than an exercise in excessive second-guessing or "Monday morning quarterbacking," the Monitoring Team evaluated performance in light of the circumstances that the involved officer actually encountered and what a reasonable officer on the scene would have known or appreciated about those circumstances.

Further, as the Supreme Court has affirmed, the analysis of an officer's performance during a use of force incident must consider an officer's actions "without regard to their underlying intent or motivation."[87]  An "officer's good intentions" do not "make an objectively unreasonable use of force constitutional," consistent with policy, or otherwise appropriate.[88]  The Monitoring Team therefore evaluated the officer's objective performance and not the officer's purported intent.

---

[86] *Graham v. Connor*, 490 U.S. 386, 396 (1989).
[87] *Id.*
[88] *Id.*

### *2. Determining Compliance Status*

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented.  Although the scheme itself is not required or detailed in the Decree itself, the Parties and Monitoring Team have previously adopted and used a standardized way of characterizing and summarizing BPD's current status across Consent Decree implementation:

**0 – Not Assessed:**  The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 – Not Started:**  The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:**  The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:**  The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:**  The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:**  The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:**  The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:**  The City/Department has demonstrated compliance with the requirement but has not yet demonstrated compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:**  The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree.  This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:**  The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

Of particular significance for this assessment are the rankings within Level "4" of this system.  As the Monitoring Team has previously reported, **BPD has previously revised its force policies in 2018 and provided training to all officers on those new policies in 2019 – making them fully effective in the field in 2020.**  This means that this present compliance review and outcome assessment is the first juncture at which Initial Compliance – a certification that the Department has successfully and systematically translated Decree expectations into practice – is possible.

Consequently, **this review is largely focused on whether BPD has, or has not, moved from working to implement the Decree's requirements on force to having successfully implemented those requirements in practice** across time, officers, and encounters.[89]  To make these determinations about whether BPD is in Initial Compliance with a material requirement of the Decree, the Monitoring Team weighs the following factors:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers.  In this way, isolated compliance does not establish "Initial Compliance" in practice.  At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance.  The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.  For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

---

[89] *See* Dkt. 2-2 ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.**  The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.  Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field.  Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way.  Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue.  With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time.  Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[90]  Even as the test articulated above requires different considerations to be factored together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."[91]

---

[90] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[91] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

In applying this multi-factor test for compliance, the first factor – the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers – is the initial, threshold inquiry. If BPD and/or its officers' performance is not what it should be across a sufficient number or portion relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance. For example, if BPD meets some Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put the Department into compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to the Department and to the community about the benchmarks that it expects and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as *possibly*, though certainly not conclusively or even presumptively, consistent with initial compliance. In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time). Where the Team determines that BPD has adhered to expectations in 95% or more of relevant circumstances, initial compliance will be found unless one of the other factors – severity of deviations, Department identification of noncompliance, and progress over the time – starkly point in the other direction.

On the other hand, where BPD has adhered to expectations less than 85% of the time, initial compliance will *not* be certified unless one of the other factors points definitively in a positive direction. For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that BPD identified and took appropriate corrective action in instances where requirements were not followed, and the Department had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances. Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Finally, it is possible that, the Monitoring Team might assign, pursuant to the weighing of factors outlined above, a score for an individual decree requirement that is lower than the score given in a prior report. For instance, the score for a particular requirement might move from "4c" (implementation—on track) to "4b" (implementation—off track). That has not happened yet.

In this report, certain scores have moved from "4d" (initial compliance) to "4c" (implementation on track).  To be clear, where this has occurred, it does *not* represent backsliding or the reversal of progress.  Instead, the simple explanation is that, for a small number of requirements primarily spelling out requirements for BPD policy, the Monitoring Team gave a score of initial compliance in prior monitoring team reporting because BPD had indeed finalized policies and conducted training that satisfied the plain language of these requirements.

However, the Monitoring Team has recognized that these provisions cannot simply be about policy; they are also about *performance*—about BPD demonstrating *adherence* to policy. Accordingly, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 506, BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions *on the street* that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

## IV.   USE OF FORCE DATA: OVERALL ANALYSIS AND TRENDS, 2018–2021 AND RELATED OUTCOME ASSESSMENTS

This section summarizes BPD's aggregate data on the use of force from 2018 through 2021. Therefore, it captures, reflects, and analyzes *all* reported uses of force by BPD officers during that period.   The overall trends identified are responsive to the Decree's force-related outcome assessment requirements in Paragraph 459(d)(i).

### A.   Frequency of Force Incidents Overall, by Level, by Type, and by District

**Overall data on all BPD force between 2018 and 2021 shows that BPD officers used force substantially less frequently in 2020 and 2021 compared to 2018.**   In 2018, before the Department finalized its new force policies and before officers had received Decree-required force training, BPD officers were involved in 1,525 incidents involving force.   The total number of force incidents has declined in each year since.   In 2020, the number of force incidents declined to 934 incidents overall, a 38.8% decrease from 2018.   By 2021, uses of force decreased further to 691 total incidents – a decrease of nearly 54.7%.   Thus, **BPD officers in 2021 used force less than half as often as in 2018.**

**Table 2.       Use of Force Incidents Overall & By Level, 2018–2021**

|        | Total Force Incidents | Level 1 | | Level 2 | | Level 3 | |
|--------|-----------------------|---------|-------|---------|-------|---------|------|
| **2018** | 1,525 | 1,162 | 76.2% | 341 | 22.4% | 22 | 1.4% |
| **2019** | 1,288 | 908 | 70.5% | 360 | 28.0% | 20 | 1.6% |
| **2020** | 934 | 691 | 74.0% | 220 | 23.6% | 23 | 2.5% |
| **2021** | 691 | 460 | 66.6% | 207 | 30.0% | 24 | 3.5% |

In overall numbers, Level 1 force declined most dramatically – with the number of Level 1 force incidents 60.4% lower in 2021 compared to 2018.   Similarly, the number of Level 2 force incidents declined by 39.3% from 2018 to 2021.   The number of serious, Level 3 incidents remained roughly the same throughout the period of 2018 through 2021.

Importantly, even as some patterns of behavior changed to varying degrees because of the COVID-19 pandemic in 2020 and 2021, **BPD's reduced use of force does not appear to be explained by changes in the volume of encounters that BPD officers have with members of the public.**   For example, calls for service decreased in 2019, compared to 2018, by 3.4%, but the number of use of force incidents declined by 15.5% over the same period.   In 2020, calls declined by 12.8% compared to 2019, but uses of force declined by nearly 27.5%.   This dynamic continued in 2021, with calls declining another 3.3% compared to 2020 but use of force declining by a further 26.0%.

31

Likewise, compared to 2018, calls for service declined by 18.5% in 2021 while use of force declined by 54.7%.  In this way, even as officers had somewhat fewer encounters, the portion of those encounters that involved force declined even more rapidly.

Overall, in 2018, 0.29% of all BPD calls for service involved a use of force.  In 2021, the portion of BPD calls for service that involved force declined to 0.16% of all BPD calls.

**Figure 1.       BPD Calls for Service, 2018–2021**

| | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Total Calls For Service | 522,358 | 504,767 | 440,341 | 425,967 |

**A sizable amount of force in each year from 2018 through 2021 was low-level, Level 1 force** – amounting to 76.2% of force in 2018 to 66.6% of force in 2021.  The vast majority of the remaining force incidents were intermediate-level, Level 2 force, which accounted for 22.4% of force in 2018 and 30.0% of force in 2021.  Significant and/or deadly force, categorized as Level 3 force, accounted in each of the years 2018 through 2021 for a comparatively small amount of force deployed.

Table 3 summarizes the way that encounters leading to use of force started – that is, whether officers arrived pursuant to a call for service, initiated an encounter based on observed behavior ("on-view"), were serving a warrant, or initiated the encounter for some other reason.  Compared to prior years, a greater portion of uses of force stemmed from encounters that originated with a resident calling for help than with an officer initiating contact based on observed behavior, with calls for service serving as the source of 42% of incidents that ultimately involved force in 2018 compared to 48.5% in 2021.

**Table 3.** **Use of Force Incidents Overall & By How the Encounter with Law Enforcement Started, 2018–2021**

|  | 2018 |  | 2019 |  | 2020 |  | 2021 |  |
|---|---|---|---|---|---|---|---|---|
| Call for Service | 640 | 41.9% | 552 | 42.9% | 402 | 43.0% | 335 | 48.5% |
| Off Duty | 7 | 0.5% | 3 | 0.2% | 2 | 0.2% | 2 | 0.3% |
| On View | 768 | 50.3% | 634 | 49.2% | 466 | 49.9% | 291 | 42.1% |
| Warrant Service | 59 | 3.9% | 49 | 3.8% | 30 | 3.2% | 35 | 5.1% |
| Other | 33 | 2.2% | 28 | 2.2% | 19 | 2.0% | 16 | 2.3% |
| Missing | 18 | 1.2% | 22 | 1.7% | 15 | 1.6% | 12 | 1.7% |

As discussed elsewhere in this report, many force incidents involve multiple applications of force and/or multiple types of force (including various techniques or instruments). Likely because the overall number of instances where any force is used has declined from 2018 through 2021, the total number of applications of various force techniques or instruments also declined. Where force is used, **bodily force** (i.e., physical techniques and maneuvers that do not involve an auxiliary force instrument or device) **has remained the most common type of force application used across 2018 through 2021.** CEW (Taser) applications were lower in terms of overall numbers and accounted for a somewhat lower proportion of force applications in 2021 compared to 2018. Meanwhile, firearm discharges made up a larger percentage of overall force applications in 2021 even as the overall number of incidents involving firearm discharges in 2021 (21) was close to the average number of discharges (20) across the period of 2018 through 2021.

**Table 4.** **Applications of Force Techniques/Instruments Used by All Involved Officers, 2018–2021**

|  | 2018 |  | 2019 |  | 2020 |  | 2021 |  |
|---|---|---|---|---|---|---|---|---|
| Bodily Force | 2,427 | 77.5% | 2,298 | 81.8% | 1,462 | 76.5% | 1,183 | 79.3% |
| Pointing a Firearm | 461 | 14.7% | 340 | 12.1% | 297 | 15.5% | 209 | 14.0% |
| Pointing a CEW or Displaying Arc | 131 | 4.2% | 81 | 2.9% | 76 | 4.0% | 50 | 3.4% |
| CEW Use | 77 | 2.5% | 45 | 1.6% | 27 | 1.4% | 17 | 1.1% |
| Firearm Discharge | 16 | 0.5% | 27 | 1.0% | 16 | 0.8% | 21 | 1.4% |
| OC Spray | 14 | 0.4% | 13 | 0.5% | 16 | 0.8% | 9 | 0.6% |
| Less Lethal Launcher | 3 | 0.1% | 6 | 0.2% | 17 | 0.9% | 3 | 0.2% |
| Impact Weapon | 2 | 0.1% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |

*Note: Numbers reflect individual applications or types of force applied during an incident. Because one use of force incident may involve multiple applications of force, and/or multiple techniques or instruments, the numbers reflected are higher than the number of use of force incidents described elsewhere.*

**B.**      **Involved Subject Characteristics**

The subjects involved in force incidents were most likely to be under the age of 29, with well more than 50 percent of force subjects in each of 2018, 2019, 2020, and 2021 being 29 or younger. With use of force down overall across each of these years, fewer subjects were involved in force incidents across nearly all ages, as well.

**Table 5.**      **Age of Force Subjects, 2018–2021**

|          | 2018  |       | 2019  |       | 2020 |       | 2021 |       |
|----------|-------|-------|-------|-------|------|-------|------|-------|
| < 12     | 14    | 0.9%  | 4     | 0.9%  | 0    | –     | 1    | 0.1%  |
| 13 – 17  | 162   | 10.4% | 141   | 10.4% | 106  | 10.7% | 85   | 11.9% |
| 18 – 29  | 754   | 48.5% | 620   | 45.9% | 457  | 46.0% | 312  | 43.8% |
| 30 – 39  | 319   | 20.5% | 290   | 21.5% | 215  | 21.7% | 166  | 23.3% |
| 40 – 49  | 114   | 7.3%  | 116   | 8.6%  | 63   | 6.3%  | 56   | 7.9%  |
| 50 – 59  | 68    | 4.4%  | 55    | 4.1%  | 39   | 3.9%  | 21   | 2.9%  |
| 60+      | 23    | 1.5%  | 16    | 1.2%  | 17   | 1.7%  | 10   | 1.4%  |
| Missing  | 101   | 6.5%  | 108   | 8.0%  | 96   | 9.7%  | 61   | 8.6%  |
| Total    | 1,555 |       | 1,350 |       | 993  |       | 712  |       |

Across all force incidents between 2018 and 2021, subjects were disproportionately male compared to the Baltimore population – constituting about 83 percent of force subjects in each year.[92]

**Table 6.**      **Gender of Force Subjects, 2018–2021**

|                   | 2018  |       | 2019  |       | 2020 |       | 2021 |       |
|-------------------|-------|-------|-------|-------|------|-------|------|-------|
| Male              | 1,286 | 82.7% | 1,132 | 83.9% | 825  | 83.1% | 586  | 82.3% |
| Female            | 259   | 16.7% | 210   | 15.6% | 129  | 13.0% | 112  | 15.7% |
| Transgender       | 2     | 0.1%  | 1     | 0.1%  | 1    | 0.1%  | 0    | –     |
| Unknown/Missing   | 8     | 0.5%  | 8     | 0.5%  | 38   | 3.8%  | 14   | 1.9%  |
| TOTAL             | 1,555 |       | 1,350 |       | 993  |       | 712  |       |

*Note: The categories of genders identified here are those that BPD uses in its existing use of force database system.*

The Monitoring Team also explored whether or not there is a relationship between a subject's gender and the Level – that is, the severity or significance – of force that BPD officers used. Specifically, a binary logistic regression estimating the relationship between subject gender and a level of force used was run for all four years. If force was comparatively less severe in nature, or

---

[92] According to the U.S. Census Bureau's July 2021 population estimates, approximately 53.1% of the Baltimore population is female and 46.7% is male.  United States Census Bureau, *QuickFacts, Baltimore City, Maryland*, https://www.census.gov/quickfacts/baltimorecitymaryland (last visited Sept. 14, 2022).

a Level 1 force incident, it was coded as a 0.  If force was intermediate- or higher-level, Level 2 or 3 force, the incident was coded as a 1.[93]

Table 7, presented with various, technical statistical terms for the sake of comprehensiveness, indicates that, on the whole, male subjects were not more likely than female subjects to experience different Levels of force.  That is, **a subject's gender was not significantly predictive of the Level or severity of force that BPD officers applied.**

**Table 7.      Relationship Between Gender of Force Subjects and Level of Force, 2018–2021**

|  | **2018** | | **2019** | | **2020** | | **2021** | |
|---|---|---|---|---|---|---|---|---|
|  | Odds Ratio (95% CI) | Predicted Probability | Odds Ratio (95% CI) | Predicted Probability | Odds Ratio (95% CI) | Predicted Probability | Odds Ratio (95% CI) | Predicted Probability |
| Male Subjects | 1.409 (.999 – 1.987) | 23.3% | 1.177 (.846 – 1.636) | 30.5% | .818 (.543 – 1.232) | 25.5% | 1.493 (.951 – 2.344) | 35.3% |
| Female Subjects |  | 17.8% |  | 27.1% |  | 29.5% |  | 26.8% |
| Likelihood Ratio Chi-Square | 4.017 |  | .953 |  | .908 |  | 3.148 |  |
| Number of Subjects | 1,545 |  | 1,342 |  | 954 |  | 698 |  |

*Notes: CI = Confidence Interval.  Male subjects were the reference group for this regression.  The number of individuals identified in BPD data as transgender were insufficient for statistical purposes to include in this particular statistical examination.*

The Monitoring Team also considered the race and/or ethnicity of force subjects.  Within many contexts, including in the analysis of use of force subject demographics, the comparison of the race and ethnicity of subjects to overall population data has been the subject of some debate.[94]  Even as many other approaches and benchmarks for comparison are advanced, experts and courts

---

[93] The overall number of Level 3 force incidents was too small to permit meaningful statistical analysis using standard regression techniques.  Consequently, a bi-variate variable was created to combine Level 2 and Level 3 incidents, for which there were sufficient numbers to use the bivariate regression technique described here.  Additionally, because there were a very small number of interactions each year involving individuals identified by BPD as transgender, cases involving transgender subjects were not included for purposes of this specific analysis.

[94] *See, e.g.*, Lorie A. Fridell, U.S. Department of Justice, Office of Community Oriented Policing Services, *A Guide for Analyzing Race Data from Vehicle Stops* (2004); Greg Ridgway, RAND Corporation/New York City Police Foundation, *Analysis of Racial Disparities in the New York City Police Department's Stop, Question, and Frisk Practices* xi (2007); Ian Ayres & Jordan Borowsky, ACLU of Southern California *A Study of Racially Disparate Outcomes in the Los Angeles Police Department* (Oct. 2008); A. Gelman, et al, "An Analysis of the New York City Police Department's "Stop-and-Frisk" Policy in the Context of Claims of Racial Bias," 102 *Journal of the American Statistical Association* 813 (2007).

have considered comparisons to general population data to be relevant, even if not singularly dispositive, evidence of disparity.[95]

Compared to the overall Baltimore population,[96] force subjects were disproportionately more likely to be Black, with white individuals less represented vis-à-vis their share of the general Baltimore population.

**Table 8.**         **Race/Ethnicity of Subjects Involved in All Use of Force Incidents, 2018–2021**

|  |  | Total |  | Level 1 |  | Level 2 |  | Level 3 |  |
|---|---|---|---|---|---|---|---|---|---|
| Black | 2018 | 1,350 | 86.8% | 1,048 | 87.0% | 284 | 85.8% | 18 | 90.0% |
| | 2019 | 1,157 | 85.7% | 808 | 85.6% | 328 | 86.5% | 21 | 77.8% |
| | 2020 | 845 | 85.1% | 628 | 85.9% | 200 | 85.1% | 17 | 63.0% |
| | 2021 | 600 | 84.3% | 393 | 83.8% | 187 | 87.8% | 20 | 66.7% |
| White | 2018 | 100 | 6.4% | 74 | 6.1% | 26 | 7.9% | 0 | – |
| | 2019 | 103 | 7.6% | 77 | 8.2% | 25 | 6.6% | 1 | 3.7% |
| | 2020 | 59 | 5.9% | 42 | 5.7% | 13 | 5.5% | 4 | 14.8% |
| | 2021 | 56 | 7.9% | 42 | 9.0% | 13 | 6.1% | 1 | 3.3% |
| Hispanic/Latino | 2018 | 22 | 1.4% | 18 | 1.5% | 4 | 1.2% | 0 | – |
| | 2019 | 19 | 1.4% | 15 | 1.6% | 4 | 1.1% | 0 | – |
| | 2020 | 9 | 0.9% | 6 | 0.8% | 3 | 1.1% | 0 | – |
| | 2021 | 7 | 1.0% | 1 | 0.2% | 4 | 1.9% | 2 | 6.7% |
| Other | 2018 | 7 | 0.5% | 5 | 0.4% | 1 | 0.3% | 1 | 5.0% |
| | 2019 | 3 | 0.2% | 2 | 0.2% | 1 | 0.3% | 0 | – |
| | 2020 | 2 | 0.2% | 2 | 0.3% | 0 | – | 0 | – |
| | 2021 | 2 | 0.3% | 2 | 0.4% | 0 | – | 0 | – |
| Unknown/Missing | 2018 | 76 | 4.9% | 59 | 4.9% | 16 | 4.8% | 1 | 5.0% |
| | 2019 | 68 | 5.1% | 42 | 4.4% | 21 | 5.5% | 5 | 18.5% |
| | 2020 | 78 | 7.9% | 53 | 7.3% | 19 | 8.1% | 6 | 22.2% |
| | 2021 | 47 | 6.6% | 31 | 6.6% | 9 | 4.2% | 7 | 23.3% |

*Note: Race and ethnicity are mutually exclusive categories including Hispanic as a separate race category. Subjects indicated as "other" race include those identified as "American Indian," "Asian," and "East-Indian." Additionally, in some instances, the various numbers listed reflect incidents where force was applied to multiple subjects within the same incident. Consequently, the numbers here do not equal the number of incidents but rather reflect the number of subjects to whom force was applied.*

[95] *Floyd v. City of New York, Case No. 1:08-cv-01034 Dkt. 373* (Aug. 12, 2013) 51-54, *available at* http://www.sdnyblog.com/files/2013/08/Floyd-v-City-of-NY-liability.pdf.

[96] According to the U.S. Census Bureau's July 2021 population estimates, 62.3% of the Baltimore population is Black or African-American, 27.3% is White (not Hispanic or Latino), 5.4% is Hispanic/Latino, and another approximately 5% is of some other race and/or ethnic background. United States Census Bureau, *QuickFacts, Baltimore City, Maryland*, https://www.census.gov/quickfacts/baltimorecitymaryland (last visited Sept. 14, 2022).

As with gender, described above, the Monitoring Team sought to understand whether or not there is a relationship between a subject's race or ethnicity and the Level – that is, the severity or significance – of force that BPD officers used during force encounters.  A similar statistical methodology was also used, with a binary logistic regression used to estimate the relationship between subject race and Level of force used.  Here, the dependent/outcome variable was again coded as 0 for a Level 1 force and 1 for Level 2 and Level 3 force.  Race was coded as 0 for white and 1 for Black.[97]

**Table 9.**      **Relationship Between Race/Ethnicity of Force Subjects and Level of Force, 2018–2021**

|  | 2018 | | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|---|---|
|  | Odds Ratio (95% CI) | Predicted Probability | Odds Ratio (95% CI) | Predicted Probability | Odds Ratio (95% CI) | Predicted Probability | Odds Ratio (95% CI) | Predicted Probability |
| Black Subjects | .860 (.537 – 1.377) | 22.5% | 1.282 (.808 – 2.035) | 30.2% | .854 (.476 – 1.531) | 25.7% | 1.580 (.843 – 2.961) | 34.5% |
| White Subjects | | 25.3% | | 25.2% | | 28.8% | | 25.0% |
| Likelihood Ratio Chi-Square | .388 | | 1.541 | | .276 | | 2.167 | |
| Number of Subjects | 1,441 | | 1,258 | | 904 | | 656 | |

*Notes: CI = Confidence Interval.  Black subjects are the reference group for this regression.*

Table 9 summarizes the results of this analysis for each of the years 2018 through 2021.  Although the relationships and probabilities that it posits are mixed – with white subjects having a greater probability of being involved in Level 2 or Level 3 force than Black subjects in 2018 and 2020, while Black subjects maintained a higher probability than white subjects in 2019 and 2021 – **the results are not statistically significant for any of the years analyzed.**  This means that whatever differences in probabilities there are as far as certain subjects being more or less likely to be subject to more significant force may simply be random or "statistical noise."  **There is no statistically valid indication that any differences in the level of severity of force applied to subjects varies systematically by race.  Thus, there is no statistically significant evidence of racial disparity in terms of the level or severity of force.**

---

[97] Too few incidents involved subjects of a Hispanic/Latino background or other races in the context of this data set to explore in a statistically significant way and were excluded from this particular analysis.

More generally, then, BPD's overall outcome data on use of force encounters suggests that Black subjects are over-represented, compared to the Baltimore population, among subjects of force even as the severity or significance of force applied is not systematically related to a subject's race.

## C.      Involved Officer Characteristics

Across 2018 through 2021, there was no statistically significant relationship between officer demographics (including gender and race/ethnicity) and the level of force deployed.  In each of the years between 2018 and 2021, women accounted for between 15.6% and 16.0% of sworn BPD personnel across ranks.  This suggests that female officers were less likely, as compared to their share of the BPD sworn population, to be involved in a use of force.

**Table 10.       Gender of Involved Officers, 2018–2021**

|  | **2018** |  | **2019** |  | **2020** |  | **2021** |  |
|---|---|---|---|---|---|---|---|---|
| Male | 893 | 90.7% | 849 | 91.5% | 763 | 90.2% | 691 | 88.0% |
| Female | 90 | 9.1% | 77 | 8.3% | 81 | 9.6% | 88 | 11.2% |
| Unknown/Missing | 2 | 0.2% | 2 | 0.2% | 2 | 0.2% | 6 | 0.8% |
| Total | 985 |  | 928 |  | 846 |  | 785 |  |

Table 11 provides a breakdown of force incidents according to the race(s) of involved officer(s). Across each of the years 2018 through 2021, white officers were somewhat over-represented among officers involved in force incidents compared to their share of all BPD sworn personnel. Per BPD data, white officers accounted for 42.3% of sworn personnel in 2018, and they accounted for 56.6% of officers involved in force incidents.  In 2019, white officers were 41.5% of sworn personnel and accounted for 53.2% of officers involved in force incidents.  In 2020, white officers were 40.8% of sworn personnel and were 48.0% of officers involved in force.  At this time, the Monitoring Team does not explore whether any of these trends may or may not be explained by the racial composition of BPD personnel assigned to administrative, as compared to patrol, functions.

At first glance, 2021 appears to be somewhat different from prior years, with white officers accounting for 39.5% of sworn officers and 38.0% of officers involved in force.  However, in 2021, the number of "unknown" or "missing" data on the race/ethnicity of involved officers increased dramatically – from 4.7% in 2020 to 26.3% in 2021.

Because information on officer race/ethnicity is entered into the IAPro system for ease of analysis, the substantial spike in missing/unknown data is not encouraging.[98]  Although the Monitoring Team could use officer information from BPD's human resources database to fill in some of the

---

[98] Indeed, in 2020 and 2021, only information on race appeared to be collected by BPD, with information on ethnicity not immediately available in the aggregate use of force data set.

missing data, the Department needs to work to ensure that officers are complying systematically with all data requirements and that, likewise, its IAPro force database is capturing such information.

**Table 11.       Race/Ethnicity of Involved Officers, 2018–2021**

|  | **2018** |  | **2019** |  | **2020** |  | **2021** |  |
|---|---|---|---|---|---|---|---|---|
| Black | 920 | 29.4% | 839 | 29.9% | 635 | 28.9% | 410 | 24.0% |
| White | 1,774 | 56.6% | 1,490 | 53.2% | 1,056 | 48.0% | 649 | 38.0% |
| Hispanic/Latino | 315 | 10.1% | 324 | 11.6% | 200 | 9.1% | 145 | 8.5% |
| Other | 77 | 2.5% | 67 | 2.4% | 104 | 4.7% | 57 | 3.3% |
| Missing | 44 | 1.4% | 82 | 2.9% | 203 | 9.2% | 449 | 26.2% |
| Total | 3,130 |  | 2,802 |  | 2,198 |  | 1,710 |  |

*Notes: The numbers here do not equal the number of incidents but rather reflect the number of officers who applied force of some type in force incidents classified according to the various categories (i.e., levels). Because some officers were involved in more than one force incident, and some incidents involved more than one officer, the totals in the table are higher than the number of force incidents in each year.*

Most use of force cases involve officers or sergeants. Of personnel involved in a use of force incident, 71.2% were officers in 2018, 74.1% were officers in 2019, 83.1% were officers in 2020, and 83.9% were officers in 2021. Sergeants accounted for 13.1% of BPD personnel involved in force incidents in 2018, in 10.7% of incidents in 2019, in 11.6% of incidents in 2020, and in 12.5% in 2020.

Somewhat less than two-thirds of officers involved in uses of force incidents in both 2020 (60.7%) and 2021 (61.7%) had less than 10 years of experience at BPD.

Finally, the Monitoring Team analyzed how frequently officers are involved in use of force incidents. Most BPD officers who use force in a given year do so just once. For instance, 46.9% of officers who used force in 2021 did so in one incident. Another one-quarter (25.1%) of officers using force in 2021 were involved in two force incidents that year. A narrower set of officers – about 28% of officers using force in 2021 – were involved in a disproportionately large portion (approximately 55.2%) of force incidents.

## D.       Injuries During Force Incidents

Some articulate a concern that Decree-required changes to policies and procedures might unintentionally place officers at greater risk of injury. This might be true if officers are overly hesitant to use force when subjects threaten imminent physical harm or if subjects are more likely to resist arrest or threaten officers knowing that BPD officers may be less inclined to use force.

To consider whether new policies on use of force are or are not helping to ensure officer safety, the Monitoring Team considered data on officer injury. First, the Team analyzed BPD's data on officers injured during use of encounters. Table 12 summarizes the number of officers injured during use of force encounters, as well as the percentage of all officers involved in force encounters who were injured. In absolute terms, the number of involved officer injuries increased in 2019, to 355 officer injuries in 2019 from 305 injuries in 2018. However, injuries decreased in both 2020 and 2021. **By 2021, the number of officer injuries occurring during use of force incidents declined by 39.7% compared to 2019 and 29.8% compared to 2018.** At the same time, it is also true that a somewhat larger *portion* of officers involved in force incidents were injured in each of 2019, 2020, and 2021 compared to 2018. However, the portion of officers involved in force incidents who were injured was the same in 2020, after full implementation of the new force policies and training, as in 2019, before such implementation was completed. Additionally, the overall, significant reduction in the total number of use of force incidents may be impacting that particular statistic in a substantial way.

**Table 12.**   **Number of Officers Involved Injured During Use of Force Incidents & Percentage of Involved Officers Who Were Injured During Force Incidents, 2018–2021, Total & By Force Level**

| | **Total** | | *Level 1* | | *Level 2* | | *Level 3* | |
|---|---|---|---|---|---|---|---|---|
| | *Number of Officer Injuries* | *Percentage of All Involved Officers Who Were Injured* | *Number of Officer Injuries* | *Percentage of All Involved Officers Who Were Injured* | *Number of Officer Injuries* | *Percentage of All Involved Officers Who Were Injured* | *Number of Officer Injuries* | *Percentage of All Involved Officers Who Were Injured* |
| **2018** | 305 | 9.2% | 161 | 6.6% | 141 | 17.4% | 3 | 8.6% |
| **2019** | 355 | 11.9% | 178 | 8.9% | 168 | 18.2% | 9 | 20.9% |
| **2020** | 254 | 11.9% | 134 | 9.0% | 108 | 18.2% | 12 | 28.6% |
| **2021** | 214 | 13.2% | 94 | 9.3% | 101 | 18.3% | 19 | 27.9% |

*Notes: Numbers in this table reflect discrete officer injuries. For example, an individual officer who was injured in two separate force incidents would be reflected as two officer injuries in the table.*

At the same time, the issue is not solely whether officers are injured in some way during an encounter where they use force. The issue is also whether officers might be hesitating or avoiding using force even when it would be lawful, authorized, and necessary under the circumstances and might be more likely to be injured as a result. Also important is whether some officers are avoiding being injured because they are managing to resolve more incidents effectively without using force.

Consequently, the Monitoring Team analyzed information on BPD officer injury provided by the insurance company that oversees BPD's workers' compensation. The data file provided somewhat limited information on officer injury claims. For example, the data does not provide information

about medical treatment or whether the claimant received any medical treatment. Additionally, the data does not explicitly state if the injury was due to a use of force.

However, the available data provided 8 categories of information, including a short description of the event or underlying issue, a coded variable relating to the source of injuries, and a "cause code."[99] The Monitoring Team synthesized these variables into standardized categories, which are reflected in Table 13.

**Table 13.     Officer Injuries, All Types/Causes, 2018–2021**

|  | **2018** |  | **2019** |  | **2020** |  | **2021** |  |
|---|---|---|---|---|---|---|---|---|
| Injuries/Altercations/Assault | 127 | 12.4% | 117 | 11.4% | 93 | 10.7% | 79 | 9.5% |
| Vehicle Accidents | 162 | 15.8% | 132 | 12.9% | 131 | 15.0% | 131 | 15.8% |
| Exposure to Hazardous Chemicals/Foreign Materials/Contagious Disease | 78 | 7.6% | 53 | 5.2% | 40 | 4.6% | 131 | 15.8% |
| Occupational-Related Illnesses/Diseases* | 102 | 9.9% | 66 | 6.4% | 37 | 4.2% | 31 | 3.7% |
| Overexertion** | 146 | 14.2% | 229 | 22.3% | 125 | 14.4% | 171 | 20.6% |
| Other Field/Office Injuries*** | 342 | 33.3% | 344 | 33.5% | 295 | 33.9% | 293 | 35.3% |
| Other | 69 | 6.7% | 85 | 8.3% | 150 | 17.2% | 63 | 7.6% |
| Total | 1,026 |  | 1,026 |  | 871 |  | 830 |  |

*Source: BPD/Compensation Board*
*Notes:*
*\* Occupational-Related Illnesses/Diseases include psychological stress, hypertension, PTSD, hearing loss, etc.*
*\*\* Overexertion refers to continuous trauma to body due to the wearing of gun belts and/or bulletproof vests, working in weight rooms, working with trainees, helping other officers, etc.*
*\*\*\* Other Field/Office injuries include animal bites, falls/slips in the field and/or the office, natural disasters, etc.*

This broader Compensation Board data set – which encompasses all manner of officer injuries, whether or not they were incurred during a use of force encounter – shows a 19.1% decline in officer injuries *of any sort* from 2018 to 2021. It also shows a 37.8% decline in the category of

---

[99] Specifically, the variables in the data provided information on: (1) whether the claim was closed or open; (2) the date of the claim; (3) the type of claim, including (a) whether the claimant missed more than 3 days of work and/or was represented by an attorney, or (b) the claim was related to a medical reason only and the claimant hadn't missed more than 3 days of work and/or was not represented by an attorney; (4) a narrative of the event or underlying claim; (5) the involved employee's police district; (6) the part of the body injured or implicated; (7) a source of the injury, coded into at least 28 different categories (e.g., motor vehicle accident, slip and fall, crime/criminal action, over-exertion, etc.); (8) a "COB Cause Code," encompassing at least 20 categories (e.g. over-exertion, psychological stress, contact with a sharp object, etc.).

officer injuries – "injuries/altercations/assault (act of crime)" – into which most injuries caused by a subject during a use of force incident would be categorized.

Separately, the Monitoring Team considered data about injuries to subjects during use of force encounters.  As Table 14 summarizes, **41.2% fewer subjects were injured in force incidents in 2021 compared to 2018.**  Although a somewhat larger *percentage* of force incidents involved a subject injury of some sort in 2021 as compared to prior years, that phenomenon must be considered within the broader, overall decline in the number of force incidents and force subjects from 2018 to 2021.

**Table 14.**      **Number & Percentage of Subjects Injured During Use of Force Incidents 2018–2021**

|      | Yes | | No | | Missing | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **2018** | 357 | 23.1% | 1,092 | 70.2% | 106 | 6.8% | 1,555 |
| **2019** | 329 | 24.4% | 937 | 69.4% | 84 | 6.2% | 1,350 |
| **2020** | 234 | 23.6% | 759 | 76.4% | 0 | – | 993 |
| **2021** | 210 | 29.5% | 502 | 70.5% | 0 | – | 712 |

*Note: "Yes" includes all recorded injuries, including minor injuries, pre-existing and self-inflicted injuries, and injuries that may not have been related to or sustained during the use of force or encounter involving the force.*

## V.     OFFICER USE OF FORCE: COMPLIANCE ASSESSMENT

This section summarizes the Monitoring Team's evaluations, using the methodology outlined in Section II, of officer performance during the 545 force total incidents reviewed from 2018, 2019, and 2020 – with incidents from 2018 generally serving as a pre-reform baseline, 2019 serving as a snapshot of active implementation of new force policies and training, and 2020 evaluating officer performance when Decree-required policies were fully effective and initial force training fully implemented.

The Monitoring Team emphasizes again, at the outset, that findings are reported in a few different ways in this section.  First, in a number of instances, we break down (for each year) our findings based on the level of force (i.e. Level 1, Level 2, or Level 3).  Because the Monitoring Team reviewed *all* Level 3 incidents in each year, the Monitoring Team can be certain that no unintended effects of sampling – that is, looking at some but not all cases – may be affecting results.  For Level 1 and Level 2 incident in each year, the Monitoring Team did look at some but not all cases.  There, the statistical assumptions outlined above mean that the Team can be 95% confident that the reported results are within a margin of error of 10%.  That is, given the sampling approach, the Team can say that, for Level 1 and Level 2 force in each year, it is 95% confident that even if it had been able to look at *all* cases, rather than a sample, the findings would differ by plus or minus 10%.

Second, in a number of instances, we aggregate our findings to say something about BPD's overall performance in each year studied across all force, regardless of level.  To do this, we present at least one, and sometimes two, sets of numbers.  The first set of numbers are described as our "unweighted" totals or frequencies.  These totals reflect a simple tabulation of the Monitoring Team's findings across all cases for each year.  That is, the Team's findings across Level 1, Level 2, and Level 3 cases add up to the "unweighted," overall findings.

The second set of totals for each year are "weighted" totals.  These totals are adjusted, statistically, to account for the way that the Monitoring Team selected (i.e., sampled) cases to review.  Specifically, as Table 15 illustrates, for each given year, the methodology that the Team adopted meant that Level 2 cases were somewhat *over*-represented in each year's set of cases compared to how frequently they occur, while Level 1 cases, in particular, were *under*-represented.  For example, in 2018, 48% of the cases that the Monitoring Team reviewed (91 of 189 total) were Level 1 cases.  However, in 2018, 76% (1,162 of 1,525 force incidents total) were Level 1 cases.  Meanwhile, 38% of reviewed cases were Level 2 cases, but 22% of all BPD force cases were Level 2 cases.  To be able to draw conclusions about each year that are not unintentionally skewed by what the Team reviewed, we have to statistically account for this.

**Table 15.      Comparison of All BPD Force Incidents (Population) to Reviewed Force Cases (Sample) & Statistical Weighting Methodology**

| | | Population Proportion (All BPD Force Incidents) | Sample Proportion (Reviewed BPD Force Cases) | Base Weight (Statistical Weight Applied to Each Incident to Compute Total Across Levels for Year) |
|---|---|---|---|---|
| **2018** | Level 1 | 0.762 | 0.481 | 1.583 |
| | Level 2 | 0.222 | 0.386 | 0.574 |
| | Level 3 | 0.016 | 0.132 | 0.124 |
| **2019** | Level 1 | 0.706 | 0.473 | 1.492 |
| | Level 2 | 0.279 | 0.419 | 0.665 |
| | Level 3 | 0.015 | 0.108 | 0.143 |
| **2020** | Level 1 | 0.737 | 0.518 | 1.424 |
| | Level 2 | 0.243 | 0.371 | 0.655 |
| | Level 3 | 0.020 | 0.112 | 0.182 |

The statistical adjustment, for the yearly totals across all force levels, is simply to "weigh" results for each Level of force according to the actual numbers regarding how often they occurred in each year.  The Team can do this because, again, the findings for each Level of force in each year are statistically significant and robust – meaning that, for each Level of force, we reviewed enough to be able to assume that the findings would hold regardless of how many we reviewed.  The weighting process essentially takes the Team's findings for each Level of force in each year and situates them in according to how frequent various types of force actually were, overall, in each calendar year.  It is the weighted results in which the Monitoring Team, as outlined previously, can be 95% confident are within plus or minus 8% of the actual value even if the Team selected another sample of cases to review or reviewed all force cases for each level and year.

Statistical weighting is a standard, common, and accepted approach in social science.  In the interest of transparency, the Monitoring Team presents for some of its most significant findings both its original, "unweighted" results *and* the statistically "weighted" results.  In other instances, only the "weighted" results are reported.  The report specifies what types of results are being discussed.  Typically, when the report summarizes findings for a calendar year in terms of the "cases" reviewed, or the "unweighted" results, it is describing results from the 545 force incidents that the team reviewed.  When the report summarizes findings for a calendar year  in terms of "incidents," or "weighted" results, it is describing the statistics that result from statistically

weighting the findings from those 545 force incidents to account for the relative frequency of force levels across all BPD incidents.

Again, this weighting methodology is necessary only when computing a total for a calendar year across all force levels.  When the report discusses findings for a particular level of force in a given year, no weighting applies.

## A.    Overall Findings

BPD's primary use of force policy, which addresses "when a member may use force, and members' duties before, during, and after the Use of Force," is Policy 1115 (Use of Force).[100]  The policy articulates a set of fundamental "core principles" and a host of specific requirements that apply to all officer interactions and use of force decision-making.[101]  Although all elements of the policy are critical, the most fundamental requirements governing officer use of force are that **force may be used only when it is – in light of the totality of the circumstances[102] – reasonable, necessary, and proportional to the threat or resistance posed by a subject and when de-escalation techniques[103] are "not possible"[104] such that there is "no alternative to using force."[105]**  Specifically, any force must be:

- **Reasonable.**  BPD's policy defines "reasonable" force as "no more force than is required to perform a lawful purpose."[106]  As the United States Supreme Court has emphasized, the reasonableness inquiry focuses not on the situation and circumstances as subjectively perceived or understood by the involved officer but, instead, on what a reasonable officer, under the circumstances, would have perceived or understood.[107]  The involved officer's "underlying intent or motivation" or the "subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular" use of force is "unreasonable."[108]

- **Necessary.**  BPD policy requires that any use of force be necessary under the circumstances.  "Force is necessary only when no reasonably effective alternative exists."[109]

---

[100] Policy 1115 at 1.
[101] *Id.* at 1–2.
[102] *Id.* at 4.
[103] *Id.* at 1.
[104] *Id.* at 6.
[105] Policy 1115 at 7.
[106] *Id.* at 4.
[107] *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[T]he 'reasonableness' inquiry . . . is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them.").
[108] *Id.*
[109] Policy 1115 at 4.

- **Proportional.**  The policy also requires that any force that is used be proportional to the nature of the threat posed, or resistance exhibited, by the subject – that is, "rationally related to the level of resistance or aggression confronting" the officer.[110]

- **Consistent with the Duty to De-Escalate.**  BPD policy dictates that officers must, "unless it is not possible to do so, avoid the Use of Force by using De-Escalation Techniques," which are tactics, techniques, and strategies for successfully and safely resolving incidents with less significant, minimal, or no force.

  Because de-escalation is a duty of BPD officers in all situations, and not just those where use of force is used or contemplated, BPD maintains a separate, standalone policy, Policy 1107, focusing exclusively on de-escalation.

  It should also be noted, at the outset, that "[t]he term de-escalation can be viewed as a both an overarching philosophy" requiring "officers to constantly reassess each situation to determine what options are available to effectively respond, as well as the grouping of techniques designed to achieve this goal."[111]

The determination of whether force is necessary, proportional, reasonable, and consistent with the duty to de-escalate is an *objective* inquiry that looks to "all facts and circumstances surrounding" the event.[112]  It considers what a reasonable officer would have done under the circumstances that the involved officer(s) encountered.

All four concepts are closely related.  For instance, unnecessary force is very unlikely to be proportional or reasonable under the circumstances.  Indeed, necessity, proportionality, and de-escalation may be argued to be concepts embedded within the overall scope of objective reasonableness.

Despite their close relationship, and even as BPD must implement a host of requirements related to use of force, the application of force in the field, and many of the more specific requirements, are guided by four primary principles or concepts: necessity, proportionality, objective reasonableness, and the duty to de-escalate.  If any force that a BPD officer uses in a given incident is unnecessary, disproportionate, not objectively reasonable, or inconsistent with the duty to de-escalate, then the force is deficient in a significant and foundational way.  This section considers BPD's overall compliance with each of these foundational force requirements.

---

[110] *Id.*
[111] International Association of Chiefs of Police, *National Consensus Policy and Discussion Paper on Use of Force* 6 (Oct. 2017)).
[112] Policy 1115 at 4.

### 1. *Necessity*

Under Decree-required BPD policy, "[f]orce is necessary only when no reasonably effective alternative exists."[113]  Practically, this means that force may be used only in the absence of any alternatives that might address a subject's threat or resistance.  Even "[w]hen force is Necessary, members shall use force in a manner that avoids unnecessary injury or risk of injury to members and civilians."[114]

Consequently, Monitoring Team reviewers were asked to summarize whether, across all force used by all officers in the incident, the force was necessary under the circumstances.

**Table 16.      Was All Use of Force Necessary?**

|  |  | Yes | | No | | Unable to Determine | |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 156.4 | 88.8% | 12.2 | 6.9% | 7.6 | 4.3% |
| | Unweighted Frequency | 158[†] | 84.0% | 23[†] | 12.2% | 7 | 3.7% |
| | *Level 1* | 74 | 90.2% | 4 | 4.9% | 4 | 4.9% |
| | *Level 2* | 65 | 86.7% | 8 | 10.7% | 2 | 2.7% |
| | *Level 3* | 16 | 59.3% | 10 | 37.0% | 1 | 3.7% |
| **2019** | Weighted Frequency | 161.8 | 88.4% | 9.9 | 5.4% | 11.4 | 6.2% |
| | Unweighted Frequency | 161 | 87.5% | 11 | 6.0% | 12 | 6.5% |
| | *Level 1* | 75 | 87.2% | 5 | 5.8% | 6 | 7.0% |
| | *Level 2* | 72 | 92.3% | 3 | 3.8% | 3 | 3.8% |
| | *Level 3* | 14 | 70.0% | 3 | 15.0% | 3 | 15.0% |
| **2020** | Weighted Frequency | 154.2 | 93.5% | 5.7 | 3.5% | 5 | 3.0% |
| | Unweighted Frequency | 151 | 90.4% | 10 | 6.0% | 6 | 3.6% |
| | *Level 1* | 80 | 95.2% | 2 | 2.4% | 2 | 2.4% |
| | *Level 2* | 58 | 90.6% | 3 | 4.7% | 3 | 4.7% |
| | *Level 3* | 13 | 68.4% | 5 | 26.3% | 1 | 5.3% |

---

[113] Dkt. 2-2 at 4.

[114] *Id.*

*Notes: Six (6) unintentional/accidental firearms discharge cases not involving use of force subjects are excluded from the reported results for this table.*

† *In 2018, 4 cases were classified by BPD as "non-force" – a designation that, because it is not used in either the Consent Decree or BPD policy, is not presented as a type or Level of force. Of these 4 "non-force" incidents, Monitoring Team reviewers determined that all force was necessary in 3 cases (i.e., "yes") and that not all force was necessary in 1 case (i.e., "no"). These four cases were excluded from the weighted frequency.*

The portion of force that is appropriately necessary increased over the period of 2018 to 2020, from 88.8% in 2018 to 93.5% in 2020, per the percentages weighted per the methodology described previously.  For example:

- **Case No. 405 (Level 2, 2020).**  Officers responded to a domestic call for service in which a wife indicated that her intoxicated husband, who had PTSD, was destroying items in their house.  When officers arrived and began speaking with the wife, the husband began yelling obscenities and threatened to 'go to war" with officers.  One responding officer attempted to use strategic communication skills to calm the subject.  The subject, who exhibited some mood swings during the course of the interaction, eventually became aggressive and made threats toward the officers and his wife.  The subject then began walking toward his wife.  Another responding officer grabbed the man and took him to the ground.  Three BPD officers get the man into handcuffs after a brief struggle during which the man sustained an injury to his face and right arm and officers received minor abrasions to their arms and legs.

  Given the verbal threats that the subject made and the movement of the subject toward his wife, the application of force was necessary to ensure the safety of the woman.

- **Case No. 426 (Level 2, 2018).**   An officer observed an argument between two individuals.  As an officer approached, one of the women turned and walked away from the other, who followed the first woman by bicycle.  A review of body-worn camera footage showed the two women arguing and the officer attempting to intervene.  The woman following the first woman subsequently threw her bike, which struck the first woman in the back.  The officer approached the woman to take her into custody for assault, but the woman resisted the officer's attempts to place her into handcuffs.  The officer used force to take the subject to the ground.  After a brief struggle, the woman was handcuffed and helped to her feet.  The woman complained of an injury to her face and leg.  She was transported to the hospital, treated, and released.  The officer sustained a minor injury to his hands.

The involved officer witnessed the subject assault another individual with a bicycle. Under those circumstances, and given that the subject actively resisted efforts to be handcuffed, the force deployed was necessary for the safety of the other involved woman.

- **Case No. 17 (Level 2, 2019).** A BPD officer, assisting an MTA officer at the scene of a bus accident, approached the BPD officer's vehicle in a strange manner, staring intently at the officer and holding his hand behind his back as if holding something. The officer exited his vehicle and ordered the subject to show his hands. The subject refused, continuing to conceal his hands, which the officer continued to believe was consistent with the subject being armed, as the officer's radio communication during the incident confirmed. The officer drew his weapon, again ordering the subject to raise his hands. The subject refused. The MTA officer came to assist and also drew his weapon. The subject then showed both hands before reaching behind his back again as if something was held in his waistband. With the MTA cover maintaining lethal cover, the BPD officer holstered his firearm and drew his Taser, quickly deploying it against the subject. Both prongs of the Taser hit the subject and delivered a standard 5-second Taser cycle, incapacitating the subject. The subject fell backward onto an area of grass, and officers were able to handcuff him. Once in custody, the subject said he was upset with his job situation and had wanted officers to shoot him. The subject was transported to the hospital for evaluation. No arrests were made.

  The Monitoring Team's review identified this as a particular noteworthy example of a BPD officer applying a reasonably effective alternative force technique in a serious situation involving a non-compliant subject who officers believed to be armed. That is, under the circumstances, the use of force was necessary and the use of the Taser, because it was a reasonably available opportunity within the context of the MTA officer providing lethal cover, meant that lethal force was not deployed.

- **Case No. 457 (Level 2, 2018).** Three officers observed a subject with a large bulge on his left side, which they believed to be a concealed weapon. As one officer approached the subject, the subject fled, keeping his left arm pressed against his body. As he ran, the officer in pursuit heard a metal object drop to the ground. The officer saw the subject pick up a silver hand gun and resume running, and the officer radioed that the subject possessed a firearm. The subject then entered a residence. When officers encountered the subject, he was lying on the kitchen floor with his hands beneath him. Officers ordered the subject to "drop the gun" multiple times. One of the officers then deployed his taser, which incapacitated the subject and allowed officers to handcuff him. Officers retrieved a .22 caliber long rifle handgun with 6 live rounds from beneath where the subject was positioned.

These overall statistics are buttressed by sizable majority of Level 1 force determined to be necessary – including 90.2% of Level 1 force in 2018, 87.2% in 2019, and 95.2% in 2020 – and Level 2 force – including 90.6% of Level 2 force in 2020 – being necessary. However, too many Level 3 force incidents involved unnecessary force in each of 2018, 2019, and 2020 – including 5 cases (or more than one out of four (26.3%) Level 3 force incidents) in 2020. For instance:

- **Case No. 431 (Level 3, 2020).**  Officers responded to a call for service involving a subject refusing to leave a store.  When the subject attempted to re-enter the store, he was blocked by Officer 1, who was then pushed by the subject.  Officers handcuffed the subject.  The subject spit in Officer 1's face.  Officer 1 punched the subject in the back of the head before using his hands to forcibly move the subject's head and neck.  Officer 1 only removed his hands after the subject stated that he could not breathe.

  The Monitoring Team's review found that the force was unnecessary, as well as retaliatory.  Even as the subject spat at Officer 1, a reasonable officer under the circumstances would have identified many other avenues for addressing the restrained subject's behavior not involving force.

- **Case No. 292 (Level 3, 2020).**  Two officers observed the subject exiting a car reported as stolen.  Upon seeing the officers, the subject started toward a sidewalk and then up steps to the front landing of a house.  Officer 2 advanced on the subject, grabbing him around the waist from behind.  The subject fell to the ground on the landing, with Officer 2 on the subject's back.  Twisting and wriggling to break free, the subject was able to stand back up.  Officer 2 then wrapped his arms around the subject's waist from behind, lifted him up, and slammed him, front side down, to the ground.  A scuffle with Officers 1 and 2 ensued.  Three additional BPD officers arrived, and the subject was eventually handcuffed.  During the cuffing process, Officer 2 remained seated on the ground behind the subject, with the subject's head in his lap.  As the subject continued to wriggle and kick, he begins gasping for air and groaning.  Officer 2 pulls back underneath the subject's chain with both hands and says, "I will choke you, I will kill you" before letting go of the chin.  Additional force by Officer 2, likely retaliatory in nature, followed.

  The Monitoring Team review concluded that, among other things, it was not necessary to pull up on the subject's head from underneath the chain, at the top of the neck, particularly given the subject was under 18 – a fact Officer 2 apparently knew from prior encounters with the same subject.  As the officer's supervisor observed, the maneuver in the head and neck region presented a risk of asphyxiation and constituted serious force that was not justified by the nature of the restrained subject's squirming in the presence of at least five BPD officers.

- **Case No. 531 (Level 2, 2018).**  Officers responded to a call for service regarding a person shot.  Upon arriving, officers found no person shot, but witnesses told them that a domestic assault had occurred between a man and a woman.  The man was placed under arrest and placed in a patrol car.  A sergeant arrived to the scene and, while being briefed by responding officers, the woman approached the vehicle and attempted to open the rear passenger door.  The sergeant told the woman to back away from the car.  The woman yelled profanities at the sergeant.  The woman started to walk past the sergeant when he grabbed her arm and attempted to place her under arrest.  After a struggle, the woman was handcuffed but was taken to the ground after attempting to pull away from officers.  A medic treated the woman for a laceration to the forehead.

  Available body-worn camera footage and the investigative narratives indicate that the force was unnecessary when it occurred.  Although the female subject was loud and verbally abusive toward the sergeant, a reasonable officer under the circumstances would not have believed that the woman posed a threat.

One critical factor in the Monitoring Team's compliance determinations, as outlined in Section II, is whether BPD identifies, for itself, officer performance that is out of policy and whether it takes appropriate corrective action upon identifying performance inconsistent with policy.  Although post-incident action after an officer has inappropriately applied force does not negate or excuse poor officer performance, the Department's overall level of compliance with the Decree is likely higher or stronger if it is consistently identifying and taking appropriate corrective action whenever officers engage in problematic force.

The Monitoring Team therefore attempted to consider across force incidents that involved a foundational deficiency – including when forced used was judged unnecessary – whether BPD's final disposition and/or corrective action taken appeared consistent with the nature and scope of the issues identified during the Team's review.

The Team worked with BPD to identify two types of data relating to case disposition and corrective action outcomes.  The first data set relates to the "incident disposition" of a force incident.  The Monitoring Team's understanding is that this is a summary of the overall disposition across all subjects, officers, and/or force deployed during an incident.  Within this data set, the incident dispositions reflected are "closed within policy," meaning that BPD found all officer force in the cases to be consistent with all of the Department's policies; "closed," which the Monitoring Team understands may be used either (a) in instances where involved officers were no longer employed at the time of disposition, making an adjudication non-operative, or (b) for certain types of Level 3 incidents (such as firearms discharges that are unintentional and do not strike an individual or involve animals); "closed out of policy," meaning that BPD identified at least some element of

performance during the incident that was inconsistent with BPD policy; and "missing," where information is not reflected in the system for the incident. This data set comes from the Department's IAPro use of force system.

For those force cases in which the Monitoring Team determined that at least some officer force was unnecessary, BPD found the force out of policy in an exceedingly limited number of instances. As Table 17 summarizes, of those cases involving unnecessary force, BPD found officer performance to be out of policy in 6 cases in 2018 (26.1%), 2 cases in 2019 (18.2%), and 1 case in 2020 (12.5%).

**Table 17.    BPD Dispositions of Incidents Identified by Monitoring Team as Involving Unnecessary Force, 2018–2020**

|  | Closed Within Policy | | Closed Out of Policy | | Closed | |
|---|---|---|---|---|---|---|
| **2018** | 13 | 56.5% | 6 | 26.1% | 4 | 17.4% |
| **2019** | 8 | 72.7% | 2 | 18.2% | 1 | 9.1% |
| **2020** | 6 | 75.0% | 1 | 12.5% | 1 | 12.5% |

*Notes: Reported results for each year are unweighted. Two (2) incidents from 2020 that were identified as involving unnecessary force by the Monitoring Team did not have dispositions available and are excluded here.*

As outlined in Section II, the Monitoring Team weighs overall performance, the severity or significance of noncompliant performance, progress over time, and BPD's identification of and corrective action taken in association with noncompliant performance. Here, BPD's overall performance improved across 2018 through 2020, and aggregate officer performance in 2020 is close to compliance overall (93.5% weighted). However, (1) the continuing number of cases in which Level 3 force was unnecessary and (2) BPD's ongoing challenges with identifying and taking appropriate corrective action in the limited instances where force is unnecessary mean that BPD will need to make additional progress to reach compliance with the core requirements associated with necessity.

BPD therefore has not yet reached initial compliance with the necessity requirement. A sustained or further reduced use of unnecessary force and a higher, consistent rate of BPD identifying and taking corrective action regarding unnecessary force would be likely to be consistent with initial compliance.

## 2. Proportionality

Separately, the Decree-required policy permits only proportional force.[115]   "Proportionality requires that any use of force correspond to the risk of harm the officer encounters, as well as to the seriousness of the legitimate law-enforcement objective that is being served by its use."[116]  This means that an officer's decision to use force, and the particular type or Level of force employed, must be consistent with the threat of harm or imminent danger to officers, or bystanders, that the subject poses.  The "requirement of proportionality operates in addition to the requirement of necessity" and "means that even when force is necessary to achieve a legitimate law-enforcement end, its use may be impermissible if the harm it would cause is disproportionate to the end that officers seek to achieve."[117]  Under BPD policy, force is proportional when it "is rationally related to the level of resistance or aggression confronting the member."[118]

**Table 18.      Was All Use of Force Proportional?**

| | | Yes | | No | | Unable to Determine | |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 163.7 | 92.9% | 8.7 | 4.9% | 3.7 | 2.1% |
| | Unweighted Frequency | 162[†] | 86.2% | 23[†] | 12.2% | 3 | 1.6% |
| | *Level 1* | 79 | 96.4% | 1 | 1.2% | 2 | 2.4% |
| | *Level 2* | 64 | 85.4% | 10 | 13.3% | 1 | 1.3% |
| | *Level 3* | 16 | 59.3% | 11 | 40.7% | 0 | – |
| **2019** | Weighted Frequency | 167.7 | 91.6% | 8.4 | 4.6% | 6.9 | 3.8% |
| | Unweighted Frequency | 165 | 89.7% | 12 | 6.5% | 7 | 3.8% |
| | *Level 1* | 79 | 91.8% | 3 | 3.5% | 4 | 4.7% |
| | *Level 2* | 72 | 92.3% | 5 | 6.4% | 1 | 1.3% |
| | *Level 3* | 14 | 70.0% | 4 | 20.0% | 2 | 10.0% |
| **2020** | Weighted Frequency | 154.9 | 94.0% | 5.1 | 3.0% | 5 | 3.0% |
| | Unweighted Frequency | 152 | 91.0% | 9 | 5.4% | 6 | 3.6% |

---

[115] *Id.* at 4.
[116] *Principles of the Law: Policing* §5.05 cmt. a (Am. Law. Inst. Revised Tentative Draft No. 1, 2017), *available at* https://www.ali.org/media/filer_public/f2/80/f2804962-6431-4535-9649-34c5f872140e/policing-uof-online.pdf.
[117] *Id.*
[118] Dkt. 2-2 at 4.

|  | Level 1 | 80 | 95.2% | 2 | 2.4% | 2 | 2.4% |
|--|---------|-----|-------|---|------|---|------|
|  | Level 2 | 59 | 92.2% | 2 | 3.1% | 3 | 4.7% |
|  | Level 3 | 13 | 58.4% | 5 | 26.3% | 1 | 5.3% |

*Notes: Six (6) unintentional/accidental firearms discharge cases not involving use of force subjects are excluded from the reported results for this table and are excluded here.*

[†] *In 2018, 4 cases were classified by BPD as "non-force" – a designation that, because it is not used in either the Consent Decree or BPD policy, is not presented as a type or Level of force. Of these 4 "non-force" incidents, Monitoring Team reviewers determined that all force was proportional in 3 cases (i.e., "yes") and that not all force was proportional in 1 case (i.e., "no"). All 4 cases are excluded from the weighted frequency.*

The portion of all BPD force that was proportional to the subject's level of resistance or aggression improved in each year from 2018 to 2020 – from 92.9% in 2018 to 91.6% in 2019 and 94.0% in 2020 based on the weighted frequency estimates. For example:

- **Case No. 389 (Level 1, 2020).** An officer responded to a call regarding someone walking on and sitting on a car. Upon arrival, the officer encountered a woman sitting on a car's trunk. As the subject walked away from the vehicle, she began rolling around in the grass and saying that the devil was telling her to attack the officer. The officer urged the woman to stay at a distance from him and talk out the situation. However, the woman ran at the officer and started striking the officer in the shoulder with open-hand strikes. The officer used a hip throw to take the subject to the ground and handcuff her. After other officers arrived to assist, she got up from the ground and lunged at one of the officers, attempting to kick him. She was again taken to the ground, with officers subsequently putting the subject in flex cuffs to prevent her from kicking again. The subject was transported to the hospital for an involuntary mental health committal. Neither officers nor the subject were injured. The multiple applications of Level 1 force here were proportional to the threat and resistance that the subject posed.

- **Case No. 39 (Level 1, 2018).** Upon arrival at a family disturbance call, an officer encountered a man being held down by another family member. The man being held down appeared to be intoxicated and/or experiencing a behavioral health crisis. The officer called for backup. Eventually, the initially responding and backup officers witnessed the man attempt to assault his nephew. The officers physically restrained the man, who refused to comply with officer commands, and proceeded to place him into handcuffs. The officers' physical maneuvers deployed here were proportional to the subject's threat to others and the level of resistance that he was displaying to officers.

Even as a substantial majority of Level 1 and Level 2 force cases were determined to involve proportional force in 2019 and 2020, several force applications across each evaluated year involved at least some application of force that was not proportional under the circumstances. For example:

- **Case No. 612 (Level 3, 2019).** An officer and police trainee responded to a call for service regarding a trespasser. A store owner told officers that a subject, who had been banned from the store because of previous incidents, had taken several items without paying. After the officers went to look for the man at his nearby home, they returned to the store, where the store owner identified a man outside the store as the subject in question. The officer asked the subject for identification and grabbed the subject's arm. The subject asked why the officer was holding his arm and tried to pull away. The officer grabbed the subject by the neck and pushed him onto the hood of the patrol car. The officer took the subject to the ground and a scuffle ensued. A second man attempted to intervene but was held back by the police trainee. Several additional BPD units arrived to the scene and handcuffed the subject, who informed officers that he was having difficulty breathing. The man was transported to the hospital, treated, and released. The involved officers had minor injuries that did not require treatment.

  Multiple applications of force were not proportional to the subject's level of resistance. First, the officer's initial grabbing of the subject's arm occurred shortly after an initial request for identification and was not consistent with the subject's level of resistance. Second, under BPD policy, as discussed in further detail below, a neck hold constitutes deadly, Level 3 force. Under the circumstances, the Monitoring Team concluded that a reasonable officer would not have believed that lethal force was authorized or necessary in light of the resistance.

- **Case No. 31 (Level 3, 2019).** A CitiWatch camera operator advised officers that a subject was involved in multiple hand-to-hand drug transactions. The subject went inside a market. While standing in line, the officers grabbed and tackled the subject, taking him to the floor and placing him under arrest.

  The involved officers grabbed the subject without warning as he stood in line inside the market. They did not announce themselves or give the subject an opportunity to comply voluntarily. Because officers applied force in the absence of any subject resistance or aggression, the force applied was not proportional.

- **Case No. 402 (Level 2, 2018).** Officer 1 responded to a call for service relating to possible illegal gambling. Upon making contact with several subjects standing on a raised porch area, Officer 1 asked the subjects to meet him below. As the subject

approached the officer, the subject turned and fled.  Officer 1 fired his Taser at the
subject without warning.

The firing of the CEW at a fleeing individual, in addition to being specifically
inconsistent with BPD policy and training, was not proportional to the threat posed by
the subject under the circumstances.

Among those incidents where the Monitoring Team identified officers using disproportionate
force, BPD too regularly failed to identify the force as inconsistent with policy.

**Table 19.      BPD Incident Dispositions of Incidents Identified by Monitoring Team as
Involving Disproportionate Force, 2018–2020**

|  | Closed Within Policy | | Closed Out of Policy | | Closed | |
|---|---|---|---|---|---|---|
| **2018** | 11 | 47.9% | 7 | 30.4% | 5 | 21.7% |
| **2019** | 6 | 50.0% | 5 | 41.7% | 1 | 8.3% |
| **2020** | 5 | 71.4% | 1 | 14.3% | 1 | 14.3% |

*Notes: Reported results for each year are unweighted.  Two (2) incidents from 2020 that were
identified as involving unnecessary force by the Monitoring Team did not have dispositions
available and are excluded here.  Within this data set, the incident dispositions reflected are
"closed within policy," meaning that BPD found all officer force in the cases to be consistent with
all of the Department's policies; "closed," which the Monitoring Team understands may be used
either (a) in instances where involved officers were no longer employed at the time of disposition,
making an adjudication non-operative, or (b) for certain types of Level 3 incidents; "closed out of
policy," meaning that BPD identified at least some element of performance during the incident
that was inconsistent with BPD policy; and "missing," where information is not reflected in the
system for the incident.*

BPD has not yet achieved initial compliance with the proportionality requirement.  Overall, BPD
and its officers are using force that is not proportional in progressively fewer incidents from 2018
through 2020.  However, where disproportionate force is used, it is more frequently Level 3 force
– and BPD is not regularly identifying instances of disproportionate force as out of policy.  BPD
will need to continue to enhance its overall performance with respect to proportionality to reach
initial compliance.

### 3. *Objective Reasonableness*

BPD policy requires that all officer force be reasonable, which is defined as a "member us[ing] no more force than required to perform a lawful purpose"[119]   The concept of "objective reasonableness" relates to the United States Supreme Court's guidance on the basic, minimum standard under the United States Constitution as to when police officers may use force.  In *Graham v. Connor*, the Court indicated that, under the Fourth Amendment, force is considered according to what a reasonable officer would do in light of all of the circumstances that the officer who used force encountered.[120]

**Table 20.      Was All Use of Force Objectively Reasonable?**

|  |  | Yes |  | No |  | Unable to Determine |  |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 160 | 90.8% | 11.9 | 6.7% | 4.3 | 2.4% |
|  | Unweighted Frequency | 159[†] | 84.6% | 25[†] | 13.3% | 4 | 2.1% |
|  | *Level 1* | 77 | 93.9% | 3 | 3.7% | 2 | 2.4% |
|  | *Level 2* | 63 | 84.0% | 10 | 13.3% | 2 | 2.7% |
|  | *Level 3* | 16 | 59.3% | 11 | 40.7% | 0 | – |
| **2019** | Weighted Frequency | 167.7 | 91.6% | 7.7 | 4.2% | 7.6 | 4.1% |
|  | Unweighted Frequency | 165 | 89.7% | 11 | 6.0% | 8 | 4.3% |
|  | *Level 1* | 79 | 91.9% | 3 | 3.5% | 4 | 4.7% |
|  | *Level 2* | 72 | 92.3% | 4 | 5.1% | 2 | 2.6% |
|  | *Level 3* | 14 | 70.0% | 4 | 20.0% | 2 | 10.0% |
| **2020** | Weighted Frequency | 154.1 | 93.4% | 5.9 | 3.6% | 5 | 3.0% |
|  | Unweighted Frequency | 150 | 89.8% | 11 | 6.6% | 6 | 3.6% |
|  | *Level 1* | 80 | 95.2% | 2 | 2.4% | 2 | 2.4% |
|  | *Level 2* | 58 | 90.6% | 3 | 4.7% | 3 | 4.7% |
|  | *Level 3* | 12 | 63.2% | 6 | 31.6% | 1 | 5.3% |

*Notes: Six (6) unintentional/accidental firearms discharge cases not involving use of force subjects are excluded from the reported results for this table.*

[119] Policy 1115 at 4.
[120] *Graham v. Connor*, 490 U.S. 386 (1989).

† *In 2018, 4 cases were classified by BPD as "non-force" – a designation that, because it is not used in either the Consent Decree or BPD policy, is not presented as a type or Level of force. Of these 4 "non-force" incidents, Monitoring Team reviewers determined that all force was objectively reasonable in 3 cases (i.e., "yes") and that not all force was objectively reasonable in 1 case (i.e., "no"). These four cases were excluded from the weighted frequency.*

The portion of BPD force incidents overall that involved force that was entirely objectively reasonable increased, in terms of overall weighted frequencies, from 2018 (90.8%) to 2019 (91.6%) and 2020 (93.4%). For instance:

- **Case No. 45 (Level 1, 2020).** Officers responded to a large and disorderly crowd in which individuals were fighting. Officers identified a woman as the main instigator, and she confronted officers, assaulting the primary responding officer. A back-up officer intervened and encouraged the officer to discontinue attempts to arrest the female until they had more resources to make the arrest safely. The officers waited for more back-up officers to arrive before attempting to place the woman into custody, using enough force to get her hands in a position to be handcuffed.

  The Monitoring Team's review noted a strong performance by the backup officer in assessing the situation, threats, and risks and determining a prudent course of action.

- **Case No. 536 (Level 2, 2018).** A woman informed an officer, responding to a call for service about a domestic incident, that her ex-boyfriend was stalking and harassing her. While speaking with the officer, she receives a phone call from her ex-boyfriend. A short time later, body-worn camera footage showed a man, the ex-boyfriend, walking toward the officer and the woman at a fast pace and appearing agitated. After requesting that additional units be dispatched to the location to assist, the officer ordered the man to back away and calm down. The man continued to move toward the officer, who again warned the man to back away. When the subject continued to close the distance between him and the officer and woman, the officer discharged a burst of OC spray into the subject's face.

  Given the subject's lack of compliance with officer commands, the subject's agitated state, the presence of the woman, and the underlying nature of the woman's allegations against the subject, the force deployed was objectively reasonable.

- **Case No. 143 (Level 3, 2018).** Officers were called to the federal court house to remove an uncooperative homeless female who had a knife in her hand. She refused to cooperate and proceeded to leave the court house area. Officers attempted to communicate with the subject, providing several warnings, but the subject remained highly agitated and uncooperative. As the subject approached an intersection where

several bystanders were visible, a BPD officer deployed his taser, which permitted officers to take the subject into custody.

The subject's ongoing noncompliance, the failure of ongoing communication strategies to resolve the situation, possession of a knife, the subject's state of significant agitation, and the subject's proximity to bystanders at the time that force was applied are all factors that point toward the Taser application being reasonable under the circumstances.

However, BPD's improvement with respect to reasonableness was associated with increasing compliance across Level 1 and Level 2 force. Too many Level 3 force incidents (nearly one-third) involved force that was not objectively reasonable under the circumstances that the involved officer encountered – with both 2019 and 2020 involving a *lower* proportion of Level 3 incidents where all force was objectively reasonable than 2018. For example:

- **Case No. 446 (Level 3, 2018).**   A subject was attempting to enter a school. Officers arrived and advised the subject to leave. The subject stayed in the area, and the officer continued to order him to disperse. The suspect, who was upset about an issue involving his brother, continued to refuse to leave. Officer 1 then discharged his Taser, striking the subject and activating for one, five-second cycle. Officers then handcuffed the subject.

  Although not yet in effect at the time of the incident, the failure to provide a warning and providing the subject with time to comply under the circumstances would currently be inconsistent with current BPD policy and training. However, even at the time of the incident, the situation involved a subject angry over an issue involving a family member – and a reasonable officer under the circumstances would not have concluded that the subject was showing any aggression toward responding officers. Consequently, the application of force was not objectively reasonable.

- **Case No. 207 (Level 2, 2020).**   Two officers responded to a call for service at a restaurant, where a manager complained that two individuals were eating inside the restaurant in violation of the then-applicable COVID-19 public health orders. The subjects, who both appeared to be intoxicated, were slow to respond to officer requests to leave but complied after several minutes. One of the individuals complained on their way out that officers were too close to him and taunted officers. The other individual put himself between the first subject and the officer, saying "Let it be, I got him." As the subject moved toward a trash can in front of the store and started putting his trash on top or in the can, Officer 1 suddenly shoved the second man out of the way and onto the ground before slamming the subject up against the restaurant door, which cracked

the window; twisting the subject's face down to the ground; forcing the subject's hands behind his back (while saying "put your [expletive] arm behind your back"); and handcuffing him. When Officer 2 said that the man should be sat up because he was still face down while handcuffed, Officer 1 said, "No, don't sit up. Leave him just like that" – even as, seconds later, Officer 1 rolled the subject to his side, kneeling on the subject's side for about 15 seconds and leading the subject to complain, "You know how much weight you were putting on me?"

In this instance, the officer's initial applications of force – shoving the second man out of the way and slamming the subject against the restaurant door – were, among other things, not objectively reasonable given that, beyond speaking to officers, the men did not pose an immediate threat of harm to themselves, officers, or others. The kneeling on the subject's side was likely was similarly unreasonable. There were also concerns that the force was retaliatory given that the subjects were taunting officers.

**Table 21.**   **BPD Incident Dispositions of Incidents Identified by Monitoring Team as Involving Objectively Unreasonable Force, 2018–2020**

|  | Closed Within Policy | | Closed Out of Policy | | Closed | |
|---|---|---|---|---|---|---|
| **2018** | 13 | 52.0% | 7 | 28.0% | 5 | 20.0% |
| **2019** | 5 | 45.5% | 5 | 45.5% | 1 | 9.0% |
| **2020** | 6 | 75.0% | 1 | 12.5% | 1 | 12.5% |

*Notes: Reported results for each year are unweighted. Three (3) incidents from 2020 that were identified as involving unnecessary force by the Monitoring Team did not have dispositions available and are excluded here. Within this data set, the incident dispositions reflected are "closed within policy," meaning that BPD found all officer force in the cases to be consistent with all of the Department's policies; "closed," which the Monitoring Team understands may be used either (a) in instances where involved officers were no longer employed at the time of disposition, making an adjudication non-operative, or (b) for certain types of Level 3 incidents; "closed out of policy," meaning that BPD identified at least some element of performance during the incident that was inconsistent with BPD policy; and "missing," where information is not reflected in the system for the incident.*

Overall, BPD and its officers used force that is not objectively reasonable in progressively fewer incidents from 2018 through 2020. However, where unreasonable force was used, it has tended toward more significant, Level 3 force. Especially because BPD failed to identify disproportionate force as out of policy in too many instances among each of 2018 through 2020, BPD cannot yet be considered to be in initial compliance with requirements related to objective reasonableness.

### 4. *De-Escalation*

Many Consent Decree provisions require that officers de-escalate situations whenever possible:

- Paragraph 124 requires that BPD ensure that officers: "resolve incidents without resorting to the use of force, when possible"[121]; "[u]se de-escalation techniques and tactics to minimize the need to use force and increase the likelihood of voluntary compliance with legitimate and lawful orders"[122]; "[u]se tactics that do not unnecessarily escalate an encounter"[123]; and "[c]ontinually assess the situation and changing circumstances, and modulate the use of force appropriately."[124]

- Paragraph 125 provides that BPD "require officers to use de-escalation techniques . . . whenever possible, before resorting to force and to reduce the need for force."[125] Such techniques include "verbal persuasion and warnings" and "tactical de-escalation techniques such as slowing down the pace of an incident, waiting out subjects, creating distance . . . between the officer and the threat, and requesting additional resources."[126]

- Paragraph 126 requires that BPD officers use "a critical thinking, decision-making framework to analyze and respond to incidents through which officers," among other things, "[a]ssess the situation, threats and risks" and "[i]dentify options and determine the best course of action" in light of those threats and risks.[127]

- Paragraph 135, "[r]ecognizing that tactics leading up to the use of force can influence whether the use of force used was necessary," requires that BPD "prohibit the use of tactics that unnecessarily escalate an encounter and create a need for force."[128]

- Pursuant to the various de-escalation requirements, the Decree requires BPD to provide ongoing training on de-escalation.[129]

These requirements are codified and explained in BPD Policy 1115, addressing use of force generally, and Policy 1107, which specifically addresses de-escalation. Additionally, Policy 1107 provides an inventory of specific de-escalation tactics, techniques, and strategies.[130]

---

[121] Dkt. 2-2 ¶ 124(a).
[122] *Id.* ¶ 124(b).
[123] *Id.* ¶ 124(c).
[124] *Id.* ¶ 124(d).
[125] *Id.* ¶ 125.
[126] Dkt. 2-2 ¶ 125.
[127] *Id.* ¶ 126.
[128] *Id.* ¶ 135.
[129] *Id.* ¶ 166.
[130] Policy 1107 at 2–3.

Accordingly, the Monitoring Team considered in all cases reviewed whether all involved officer(s) took reasonable efforts to de-escalate prior to using force.  In 2018, officers failed to de-escalate where the duty to do so was implicated in nearly one out of five (18.8% of) incidents.  Officers failed to de-escalate less frequently in 2019 (17.2% of incidents) and 2020 (12.4% of incidents).  This means that, most recently, in 2020, involved officers died take reasonable efforts to de-escalate across 87% of all force incidents.

**Table 22.       Involved Officers Took Reasonable Efforts to De-Escalate, All Force Levels**

|      |                        | Yes   |       | No    |       | Unable to Determine |       |
|------|------------------------|-------|-------|-------|-------|---------------------|-------|
| 2018 | Weighted Frequency     | 107.8 | 69.5% | 29.1  | 18.8% | 18.2                | 11.7% |
|      | Unweighted Frequency   | 110   | 72.4% | 35    | 23.0% | 7                   | 4.6%  |
| 2019 | Weighted Frequency     | 115.7 | 78.7% | 25.4  | 17.2% | 5.9                 | 4.0%  |
|      | Unweighted Frequency   | 116   | 78.4% | 24    | 16.2% | 8                   | 5.4%  |
| 2020 | Weighted Frequency     | 119.2 | 87.0% | 16.9  | 12.4% | 1                   | 0.7%  |
|      | Unweighted Frequency   | 112   | 82.4% | 21    | 15.4% | 3                   | 2.2%  |

*Note: Percentages are computed among the total number of instances where the duty to de-escalate was determined to be applicable (i.e., the total number of "yes," "no," and "unable to determine" responses, and excluding the "not applicable" responses).  For this table, "not applicable" encompasses those situations where the facts indicated that the duty to de-escalate was not applicable under the facts of the case, including incidents involving unintentional/accidental firearm discharges.  Four cases classified by BPD as "non-force" are not included in the totals and were excluded from the weighted frequency.*

Monitoring Team reviewers identified many instances in which BPD officers appropriately deployed reasonably available de-escalation tactics.  For example:

- **Case No. 164 (Level 1, 2018).**  A subject was fighting in public with two other people.  The officer broke up the fight, and the subject walked away.  As the officer approached the subject to investigate, the subject bladed his body toward the officer.  The subject was ordered to place his hands behind his back but refused.  The officer pulled a Taser

and pointed it at the subject.  The subject eventually allowed officers to handcuff him.  After some minimal resistance, the subject submitted to being transported.

The Monitoring Team observed that the involved officer provided numerous verbal warnings in an attempt to elicit cooperation from the subject and made repeated attempts to reason with the subject to gain voluntary compliance.  The officer displayed but ultimately did not need to deploy the Taser.

- **Case No. 547 (Level 1, 2018).**  Officers responded to a residence to serve a court-ordered emergency petition.  The subject's mother led officers to her son's room in her residence, cautioning officers that he might resist or "act out" because of his mental health condition.  Upon encountering the subject, officers described the process implicated by the emergency petition and issued several calm commands.  The subject nonetheless became agitated and uncooperative, and resisted officer attempts to handcuff him, which required that officers guide the subject to the ground, deploying Level 1 force to get the subject under control.

  Even as officers did reasonably employ low-level force to bring the subject under control, the use of various communication strategies across the encounter constituted reasonable, appropriate de-escalation under the circumstances.

- **Case No. 562 (Level 1, 2020).**  Officers conducting a narcotics investigation observed a subject engaging in a potential drug transaction.  Upon making contact with the subject, the subject fled, holding his waistband.  Believing he was armed, officers pursued him.  Officer 1 tripped the subject, which ended the pursuit and allowed officers to control and handcuff the subject.  A weapon was not recovered.

  Especially in contrast to other pursuits resulting in more significant or serious force, officers here effectively used lower-level force to restrain the subject – an example of lower-level force being effective under the circumstances.

However, in a material number of instances across the evaluated years, officers did not take all reasonable efforts under the circumstances they encountered to de-escalate.  For instance:

- **Case No. 507 (Level 3, 2020).**  An officer observed a subject assault another person.  The subject fled upon seeing the officer, with the officer losing sight of the subject near an open, abandoned building.  The officer entered the building, locating the subject in a second-floor bedroom.  A struggle ensued during which the officer can be seen on body-worn camera with the officer's arm around the subject's neck and the subject gasping for air.  No injuries were reported.

The officer in this incident entered an abandoned building looking for a suspect in an assault without waiting for backup, which placed him at a substantially elevated risk that may have contributed to the need to use force upon encountering the subject one-on-one in the building.  A reasonable officer would have waited for additional officers to be present to assist in finding and arresting the subject.

- **Case No. 126 (Level 2, 2019).**  Officers received a license place recognition "hit" on a stolen vehicle sitting in a parking lot with the engine running.  Officer 1 approached the vehicle and found a subject asleep in the car.  The officer immediately proceeded to physically remove the subject from the car.  Additional force was used when the subject, who was placed on the curb, stood up and refused to sit down.

  Involved officers went from investigation to force to effectuate an arrest without requesting that the subject voluntarily submit.  The officers outnumbered the subject at the time, making the use of alternative mechanisms to get the subject to comply and be taken into custody without the use of force even more tactically feasible under the circumstances.

- **Case No. 31 (Level 3, 2019).**  In the case previously discussed, a subject believed to be involved in drug transactions went inside a market.  While standing in line, officers grabbed and tackled the subject, taking him to the floor and placing him under arrest.

  The involved officers grabbed the subject without warning as he stood in line inside the market.  They did not announce themselves or give the subject an opportunity to comply voluntarily.   The officers therefore failed to use readily available and reasonable de-escalation techniques.

**Table 23.     Incidents Where All Officers Took All Reasonable Efforts to De-Escalate, By Level**

| *Did the involved officer(s) take reasonable efforts to de-escalate?* | | Yes | | No | | Unable to Determine | | Not Applicable | |
|---|---|---|---|---|---|---|---|---|---|
| Level 1 | **2018** | 49 | 75.4% | 13 | 20.0% | 3 | 4.6% | 17 | – |
| | **2019** | 53 | 79.1% | 12 | 17.9% | 2 | 3.0% | 19 | – |
| | **2020** | 64 | 91.4% | 6 | 8.6% | 0 | 0.0% | 14 | – |
| Level 2 | **2018** | 51 | 78.5% | 13 | 20.0% | 1 | 1.5% | 10 | – |
| | **2019** | 53 | 77.9% | 11 | 16.2% | 4 | 5.9% | 10 | – |
| | **2020** | 41 | 75.9% | 12 | 22.2% | 1 | 1.9% | 10 | – |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Level 3 | **2018** | 8 | 40.0% | 9 | 45.0% | 3 | 15.0% | 8 | – |
| | **2019** | 10 | 76.9% | 1 | 7.7% | 2 | 15.4% | 9 | – |
| | **2020** | 7 | 58.3% | 3 | 25.0% | 2 | 16.7% | 10 | – |

*Note: Percentages are computed among the total number of instances where the duty to de-escalate was determined to be applicable (i.e., the total number of "yes," "no," and "unable to determine" responses, and excluding the "not applicable" responses). For this table, "not applicable" encompasses those situations where the facts indicated that the duty to de-escalate was not applicable under the facts of the case, including incidents involving unintentional/accidental firearms discharges.*

Across Level 1 force, reviewers found ongoing improvement across 2018, 2019, and 2020 with respect to whether officers took reasonable efforts to de-escalate – with officers taking all reasonable efforts to de-escalate in more than 91% of Level 1 incidents in 2020. At the same time, however, in Level 2 and Level 3 encounters, reviewers could certify that officers took all reasonable efforts to de-escalate in only three out of four Level 2 incidents (about 76%) in 2020 and in 7 out of 12 Level 3 incidents (58%) in 2020.

Where officers took reasonable efforts to de-escalate, this most frequently included using tactical communication techniques (such as regulating tone, attempting to persuade the subject to comply voluntarily, and the like), providing verbal warnings to the subject, slowing down the pace of the incident, and waiting out the subject. Reviewers also identified instances where officers used physical barriers to separate themselves from subjects, creating distance between themselves and the threat, and requesting that additional BPD resources respond to the scene. A number of incident-specific techniques were also identified (e.g., having a subject sit on a curb, allowing a subject to try and sit on her own, waiting for other units to arrive before handcuffing a subject, etc.).

Separately, in all instances – and whether officers used some de-escalation tactics or did not employ any – Monitoring Team members considered whether there were additional de-escalation tactics that the involved officer(s) could or should have used under the circumstances but did not. Across the evaluated years, BPD officers were increasingly exhausting reasonably available de-escalation tactics – with officers across reviewed cases exhausting reasonably available de-escalation tactics, after weighting findings to account for differences between the sample and overall populations as described at the start of this section, in 77.6% of incidents in 2018, in nearly 76.8% incidents in 2019, and in 85.0% of incidents in 2020.

**Table 24.**   **Incidents In Which Reasonably Available, Additional De-Escalation Tactics Could or Should Have Been Used Under The Circumstances But Were Not (All Force Levels)**

|  |  | **Yes** (officers failed to use reasonably available, additional de-escalation tactics) | | **No** (officers used all reasonably available de-escalation tactics) | | **Unable to Determine** | |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 32.3 | 19.4% | 128.9 | 77.6% | 5 | 3.0% |
| | Unweighted Frequency | 42 | 22.8% | 128 | 69.6% | 5 | 7.6% |
| **2019** | Weighted Frequency | 29.4 | 16.5% | 136.8 | 76.8% | 11.9 | 6.8% |
| | Unweighted Frequency | 31 | 17.8% | 132 | 75.9% | 12 | 6.3% |
| **2020** | Weighted Frequency | 21.6 | 13.5% | 136.1 | 85.0% | 2.4 | 1.5% |
| | Unweighted Frequency | 26 | 15.7% | 131 | 78.9% | 4 | 5.4% |

*Note: Percentages are computed among the total number of instances where the duty to de-escalate was determined to be applicable (i.e., the total number of "yes," "no," and "unable to determine" responses, and excluding the "not applicable" responses).  For this table, "not applicable" encompasses situations where the facts indicated that the duty to de-escalate was not applicable under the facts of the case, including incidents involving unintentional/accidental firearms discharges.*

The most commonly identified de-escalation technique that reviewers indicated that a reasonable officer might have also taken under the circumstances, but did not, were communication techniques, verbal warnings, and slowing down the pace of the incident.

Next, the Monitoring Team's evaluation considered whether the involved officer(s) took actions that may have unnecessarily escalated the encounter.  As Table 25 indicates, the Monitoring Team found both more and less encouraging trends in officer performance in this regard.  Specifically, year over year, there were progressively fewer cases involving officers taking affirmative solo action without request additional resources (from 12.0% of all force incidents in 2018 per weighted results to 5.3% in 2020) and a lower rate of incidents in which poor officer communication skills appeared to escalate rather than de-escalate the situation (from 10.5% of all force incidents in 2018 per weighted results to 8.6% of all force incidents in 2020).  On the other hand, after

66

weighting results to account for the frequency of various force types overall, the monitoring team's findings show officers improperly closing the reactionary gap more often in 2020 (in 34.1% of all force incidents) than in 2018 (where officers did so in 23.5% of all incidents).  Similarly, a greater portion of force instances in 2020 involved officers using tactics or techniques that unreasonably sped up the pace of the incident (from 6.9% of all incidents per weighted results in 2018 to 9.4% of incidents in 2020).

**Table 25.      Officer Performance That May Have Escalated the Incident (All Force Levels)**

| *Did the involved officer(s) . . .* | | | Yes | | No | | Unable to Determine | |
|---|---|---|---|---|---|---|---|---|
| Approach a person too quickly without reasonable evaluation? | 2018 | Weighted Frequency | 6.3 | 3.7% | 159.8 | 93.4% | 5 | 2.9% |
| | | Unweighted Frequency | 14 | 7.4% | 163 | 86.2% | 5 | 2.7% |
| | | *Level 1* | 1 | 1.3% | 75 | 94.9% | 3 | 3.8% |
| | | *Level 2* | 7 | 9.3% | 68 | 90.7% | 0 | 0.0% |
| | | *Level 3* | 6 | 24.0% | 17 | 68.0% | 2 | 8.0% |
| | 2019 | Weighted Frequency | 8.1 | 4.5% | 168.4 | 92.6% | 5.2 | 2.9% |
| | | Unweighted Frequency | 8 | 4.3% | 166 | 89.2% | 5 | 2.7% |
| | | *Level 1* | 4 | 4.7% | 79 | 91.9% | 3 | 3.5% |
| | | *Level 2* | 3 | 3.9% | 73 | 94.8% | 1 | 1.3% |
| | | *Level 3* | 1 | 6.3% | 14 | 87.5% | 1 | 6.3% |
| | 2020 | Weighted Frequency | 6.3 | 3.9% | 153.5 | 94.0% | 3.5 | 2.1% |
| | | Unweighted Frequency | 8 | 4.7% | 148 | 87.1% | 7 | 4.1% |
| | | *Level 1* | 2 | 2.4% | 81 | 96.4% | 1 | 1.2% |
| | | *Level 2* | 5 | 8.1% | 55 | 88.7% | 2 | 3.2% |
| | | *Level 3* | 1 | 5.9% | 12 | 70.6% | 4 | 23.5% |
| Leave insufficient space between the officer and the person? | 2018 | Weighted Frequency | 13.7 | 8.5% | 140.0 | 87.0% | 7.2 | 4.4% |
| | | Unweighted Frequency | 19 | 10.1% | 146 | 77.2% | 7 | 3.7% |
| | | *Level 1* | 5 | 6.8% | 65 | 87.8% | 4 | 5.4% |
| | | *Level 2* | 9 | 12.7% | 61 | 85.9% | 1 | 1.4% |
| | | *Level 3* | 5 | 20.8% | 17 | 70.8% | 2 | 8.3% |
| | 2019 | Weighted Frequency | 24.0 | 14.1% | 143.1 | 83.9% | 3.5 | 2.0% |
| | | Unweighted Frequency | 20 | 10.7% | 142 | 76.3% | 4 | 2.2% |
| | | *Level 1* | 13 | 15.7% | 69 | 83.1% | 1 | 1.2% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | *Level 2* | 7 | 10.4% | 57 | 85.1% | 3 | 4.5% |
| | | *Level 3* | 0 | 0.0% | 16 | 100.0% | 0 | 0.0% |
| | **2020** | Weighted Frequency | 11.3 | 7.4% | 138.7 | 89.9% | 4.2 | 2.7% |
| | | Unweighted Frequency | 11 | 6.5% | 136 | 80.0% | 7 | 4.1% |
| | | *Level 1* | 6 | 7.5% | 72 | 90.0% | 2 | 2.5% |
| | | *Level 2* | 4 | 7.0% | 52 | 91.2% | 1 | 1.8% |
| | | *Level 3* | 1 | 5.9% | 12 | 70.6% | 4 | 23.5% |
| Close the reactionary gap? | **2018** | Weighted Frequency | 35.1 | 23.5% | 104.8 | 70.2% | 9.3 | 6.2% |
| | | Unweighted Frequency | 37 | 19.5% | 112 | 59.3% | 9 | 4.8% |
| | | *Level 1* | 16 | 23.2% | 48 | 69.6% | 5 | 7.2% |
| | | *Level 2* | 16 | 24.6% | 47 | 73.2% | 2 | 3.1% |
| | | *Level 3* | 5 | 22.7% | 15 | 68.2% | 2 | 9.1% |
| | **2019** | Weighted Frequency | 47.1 | 32.3% | 94.4 | 64.8% | 4.3 | 2.9% |
| | | Unweighted Frequency | 45 | 24.2% | 93 | 50.0% | 4 | 2.2% |
| | | *Level 1* | 22 | 31.0% | 47 | 66.2% | 2 | 2.8% |
| | | *Level 2* | 21 | 36.8% | 34 | 59.6% | 2 | 3.5% |
| | | *Level 3* | 2 | 14.3% | 12 | 85.7% | 0 | 0.0% |
| | **2020** | Weighted Frequency | 43.3 | 34.1% | 80.4 | 63.2% | 3.5 | 2.7% |
| | | Unweighted Frequency | 46 | 27.1% | 76 | 44.7% | 7 | 4.1% |
| | | *Level 1* | 19 | 28.8% | 46 | 69.7% | 1 | 1.5% |
| | | *Level 2* | 24 | 52.2% | 20 | 43.5% | 2 | 4.3% |
| | | *Level 3* | 3 | 17.6% | 10 | 58.8% | 4 | 23.5% |
| Speed up the pace of the incident? | **2018** | Weighted Frequency | 11.8 | 6.9% | 152.3 | 89.0% | 7.2 | 4.1% |
| | | Unweighted Frequency | 19 | 10.1% | 157 | 83.1% | 7 | 3.6% |
| | | *Level 1* | 4 | 5.1% | 71 | 89.9% | 4 | 5.1% |
| | | *Level 2* | 8 | 10.7% | 66 | 88.0% | 1 | 1.3% |
| | | *Level 3* | 7 | 26.9% | 17 | 65.4% | 2 | 7.7% |
| | **2019** | Weighted Frequency | 16.9 | 9.3% | 160.4 | 88.2% | 4.6 | 2.5% |
| | | Unweighted Frequency | 17 | 9.1% | 159 | 85.5% | 4 | 2.2% |
| | | *Level 1* | 8 | 9.3% | 75 | 87.2% | 3 | 3.5% |
| | | *Level 2* | 7 | 9.1% | 70 | 90.9% | 0 | 0.0% |
| | | *Level 3* | 2 | 11.8% | 14 | 82.4% | 1 | 5.9% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Weighted Frequency | 13.4 | 8.2% | 146.0 | 89.9% | 3.1 | 1.9% |
| | **2020** | Unweighted Frequency | 16 | 9.4% | 142 | 83.5% | 5 | 2.9% |
| | | *Level 1* | 5 | 6.0% | 77 | 92.8% | 1 | 1.2% |
| | | *Level 2* | 9 | 14.3% | 52 | 82.5% | 2 | 3.2% |
| | | *Level 3* | 2 | 11.8% | 13 | 76.5% | 2 | 11.8% |
| Take affirmative solo action without requesting additional resources? | **2018** | Weighted Frequency | 20.8 | 12.0% | 148.1 | 85.2% | 5.0 | 2.8% |
| | | Unweighted Frequency | 21 | 11.2% | 158 | 83.6% | 5 | 2.6% |
| | | *Level 1* | 11 | 13.6% | 67 | 82.7% | 3 | 3.7% |
| | | *Level 2* | 5 | 6.8% | 69 | 93.2% | 0 | 0.0% |
| | | *Level 3* | 4 | 15.4% | 20 | 76.9% | 2 | 7.7% |
| | **2019** | Weighted Frequency | 12.6 | 7.0% | 164.2 | 91.0% | 3.6 | 2.0% |
| | | Unweighted Frequency | 13 | 7.0% | 163 | 87.6% | 3 | 1.6% |
| | | *Level 1* | 6 | 7.1% | 77 | 90.6% | 2 | 2.4% |
| | | *Level 2* | 5 | 6.5% | 71 | 92.2% | 1 | 1.3% |
| | | *Level 3* | 2 | 11.8% | 15 | 88.2% | 0 | 0.0% |
| | **2020** | Weighted Frequency | 9.6 | 5.9% | 151.3 | 92.6% | 2.4 | 1.5% |
| | | Unweighted Frequency | 9 | 5.3% | 150 | 88.2% | 4 | 2.4% |
| | | *Level 1* | 6 | 7.1% | 77 | 91.7% | 1 | 1.2% |
| | | *Level 2* | 1 | 1.6% | 60 | 96.8% | 1 | 1.6% |
| | | *Level 3* | 2 | 11.8% | 13 | 76.5% | 2 | 11.8% |
| Use poor communication skills that escalated rather than de-escalated the situation? | **2018** | Weighted Frequency | 18.1 | 10.5% | 144.8 | 84.1% | 9.3 | 5.4% |
| | | Unweighted Frequency | 24 | 12.6% | 150 | 79.4% | 9 | 4.8% |
| | | *Level 1* | 7 | 8.8% | 68 | 85.0% | 5 | 6.3% |
| | | *Level 2* | 11 | 14.9% | 61 | 82.4% | 2 | 2.7% |
| | | *Level 3* | 6 | 23.1% | 18 | 69.2% | 2 | 7.7% |
| | **2019** | Weighted Frequency | 13.7 | 7.6% | 160.1 | 88.0% | 8.1 | 4.4% |
| | | Unweighted Frequency | 14 | 7.5% | 160 | 86.1% | 6 | 3.2% |
| | | *Level 1* | 6 | 7.0% | 75 | 87.2% | 5 | 5.8% |
| | | *Level 2* | 7 | 9.1% | 69 | 89.6% | 1 | 1.3% |
| | | *Level 3* | 1 | 5.9% | 16 | 94.1% | 0 | 0.0% |
| | **2020** | Weighted Frequency | 14.1 | 8.6% | 148.0 | 90.0% | 2.3 | 1.3% |

| | | Unweighted Frequency | 16 | 9.4% | 145 | 85.3% | 3 | 1.8% |
|---|---|---|---|---|---|---|---|---|
| | | *Level 1* | 6 | 7.1% | 77 | 91.7% | 1 | 1.2% |
| | | *Level 2* | 8 | 12.5% | 55 | 85.9% | 1 | 1.6% |
| | | *Level 3* | 2 | 12.5% | 13 | 81.3% | 1 | 6.3% |

*Notes: For this table, "not applicable" encompasses those situations where the facts indicated that the duty to de-escalate was not applicable under the facts of the case, including incidents involving unintentional/accidental firearms discharges.*

It should be noted that three of the noted behaviors in Table 25 that might escalate a situation – namely, (1) approaching a person too quickly without reasonable evaluation, (2) leaving insufficient space between the officer and the subject, and (3) closing the reactionary gap – implicate similar but not automatically overlapping considerations.  Approaching a subject too quickly refers to those instances where an officer, upon initially arriving at a scene or contacting the subject, proceeds close to the individual at the outset in the absence of a reasonable evaluation.  Leaving insufficient space refers to those situations where an officer, while interacting with a subject, positions themselves in a temporarily fixed position that is unreasonably close to the subject under the circumstances.  Closing the reactionary gap refers to those instances where an officer, during the course of an interaction, affirmatively reduces the amount of space between themselves and a subject.  Examples identified by the Monitoring Team included:

- **Case No. 53 (Level 3, 2019).**  BPD officers were instructed to canvass an area for a vehicle used in an armed robbery earlier in the month.  Officer 1 located the car in a parking lot.  As the only officer on the scene, and being apprised that a second BPD car was en route, the officer approached the driver's side of the vehicle alone.  The subject attempted to get out of the car, and Officer 1 attempted to keep the subject in the car.  The subject in the vehicle grew agitated, pushed the first officer, and attempted to flee.  Officer 1 grabbed the subject, who was in possession of a firearm, and began to struggle with the subject as Officer 2 arrived.  Officers 1 and 2 both pulled and fired their firearm, striking the subject in the chest.

  Although it is unknowable as to whether the presence of more than one BPD officer initially might led the subject to comply without or with less resistance, Officer 1 placed themselves at elevated risk by approaching the vehicle alone, abandoning the tactically superior position of the patrol vehicle at a distance.

- **Case No. 395 (Level 3, 2018).**  Officer 1 was dispatched alone to a trespassing in progress.  The officer arrived and confronted a subject who had barricaded herself in a lunchroom.  Officer 1 placed the subject under arrest, and the subject resisted handcuffing, with a struggle ensuing.  The subject purportedly attempted to control Officer 1's firearm during the struggle.

The decision to engage in a one-on-one confrontation of a subject in an enclosed environment is another example of an officer, potentially even out of good-faith desire to address or solve the situation, closing the amount of space between themselves and a subject, without adequate support resources available – potentially making the use of force more likely.

- **Case No. 453 (Level 1, 2020).**  An officer on patrol saw an altercation between a teenage boy and girl.  The officer exited her vehicle, quickly approached and grabbed the boy with both hands by the front of his jacket, saying, "Calm down, chill out."  The boy responded by saying, "What are you doing?  What are you grabbing me for?"  The girl immediately grabbed the boy's coat, asking the officer, "What are you grabbing him for?" as she tried to push the officer away from the boy.  An extended tussle ensued as a crowd gathered.  Additional BPD officers arrived, one of whom pushed the boy over the hood of the car and slammed him to the ground.  Officers attempted to handcuff the girl.  The girl was booked for assault on police and common assault on the boy.  It was determined that the boy had not been the aggressor in the altercation with the girl.

    The initially involved officer walked up to the boy and grabbed him by the coat even though the boy and girl had already separated and were away from each other – such that there was no immediate threat of physical injury implicated.  The officer initiated physical force without trying to talk to the boy or girl at a distance and without using reasonable verbal techniques to defuse the situation.  Subsequently arriving BPD personnel also failed to use reasonably available de-escalation techniques when they suddenly pushed the boy to the car and on the ground.

Weighing the compliance factors, BPD's overall performance still leaves too many incidents in which Monitoring Team members could not certify that officers used all reasonable available de-escalation techniques or tactics – with more than 13% of cases in 2020 not able to be certified as affirmatively consistent with the duty to de-escalate.  Even as there has been some noteworthy improvement in officer performance in the field over time, the Department has not similarly improved with respect to identifying and taking corrective action with respect to officers failing to de-escalate, as Table 26 summarizes.  Accordingly, **BPD will need to make additional progress and improvements in the use of de-escalation techniques and tactics to reach initial compliance with the Decree's requirements associated with de-escalation during an incident before force is deployed.**

71

**Table 26.**   **BPD Incident Dispositions of Incidents Identified by Monitoring Team as Involving A Failure to De-Escalate, 2018–2020**

|  | Closed Within Policy | | Closed Out of Policy | | Closed | |
|---|---|---|---|---|---|---|
| **2018** | 32 | 71.1% | 7 | 15.6% | 6 | 13.3% |
| **2019** | 23 | 76.7% | 5 | 16.7% | 2 | 6.7% |
| **2020** | 19 | 90.5% | 1 | 4.8% | 1 | 4.8% |

*Notes: Results in this table are unweighted. Within this data set, the incident dispositions reflected are "closed within policy," meaning that BPD found all officer force in the cases to be consistent with all of the Department's policies; "closed," which the Monitoring Team understands may be used either (a) in instances where involved officers were no longer employed at the time of disposition, making an adjudication non-operative, or (b) for certain types of Level 3 incidents; "closed out of policy," meaning that BPD identified at least some element of performance during the incident that was inconsistent with BPD policy; and "missing," where information is not reflected in the system for the incident.*

Separately, the Monitoring Team assessed whether, overall, the actions of involved officer(s) were consistent with BPD's critical thinking and decision-making framework in which members must:

    (1) Assess the situation, threats, and risks;
    (2) Gather relevant facts about the incident;
    (3) Consider police powers and BPD policy;
    (4) Identify options and determine the best course of action; and
    (5) Act, review, and re-assess the situation.[131]

BPD officers are performing more consistently with the critical thinking model over time, with 78.3% of all force incidents (per weighted results) consistent with that model in 2018, 79.2% of all force incidents consistent in 2019, and 91.3% of incidents consistent in 2020. The overall improvement, across force levels, over the evaluated years is encouraging. Although BPD's overall performance for 2020, weighted to account for the actual occurrence of force incidents by level, is in the range (above 85%) where the performance could be consistent with compliance, depending on the other factors discussed in Section III. Here, the Monitoring Team observes that a failure to utilize the critical thinking and decision-making framework in instances where more serious force has been deployed is an especially significant deviation from decree requirements. In 2020, 78% of intermediate, Level 2 force incidents involved performance consistent with the critical decision-making model, while the Monitoring Team could certify consistency with the model in 12 out of 17 of the year's total Level 3 incidents.

---

[131] Policy 1115 at 7; *accord* Dkt. 2-2 ¶¶ 126, 166(a).

**Table 27.     Force Incidents in Which Officer Performance Was Consistent with the Use of BPD's Critical Thinking and Decision-Making Model**

|  |  | Yes |  | No |  | Unable to Determine |  |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 135.8 | 78.3% | 20.0 | 11.5% | 17.6 | 10.1% |
|  | Unweighted Frequency | 134 | 71.3% | 32 | 17.0% | 18 | 9.6% |
|  | *Level 1* | 65 | 79.3% | 7 | 8.5% | 9 | 11.0% |
|  | *Level 2* | 55 | 73.3% | 13 | 17.3% | 5 | 6.7% |
|  | *Level 3* | 11 | 40.7% | 12 | 44.4% | 4 | 14.8% |
| **2019** | Weighted Frequency | 143.2 | 79.2% | 23.8 | 13.2% | 13.9 | 7.7% |
|  | Unweighted Frequency | 143 | 76.9% | 24 | 12.9 | 15 | 8.1% |
|  | *Level 1* | 67 | 7.9% | 12 | 14.0% | 6 | 7.0% |
|  | *Level 2* | 62 | 79.5% | 8 | 10.3% | 7 | 9.0% |
|  | *Level 3* | 14 | 63.6% | 4 | 18.2% | 2 | 9.1% |
| **2020** | Weighted Frequency | 150.2 | 91.3% | 11.8 | 7.2% | 2.5 | 1.5% |
|  | Unweighted Frequency | 143 | 84.1% | 16 | 9.4% | 6 | 3.5% |
|  | *Level 1* | 81 | 96.4% | 3 | 3.6% | 0 | 0 |
|  | *Level 2* | 50 | 78.1% | 11 | 17.2% | 3 | 4.7% |
|  | *Level 3* | 12 | 70.6% | 2 | 11.8% | 3 | 17.6% |

**Although BPD and its officers have made positive and encouraging progress, the aggregate performance in 2020 still points toward BPD needing to make improvements in the adoption and deployment of the critical thinking model.**

Another element of the duty to de-escalate is to discontinue the application of force as the subject's force, resistance, or threat decreases. **The Monitoring Team found consistently high rates of officers appropriately de-escalating force as the subject's force decreased** (in 95.5% of incidents (weighted) where the duty to de-escalate was applicable under the circumstances in 2018, 97.1% in 2019, and 97.7% in 2020) and few instances where force was not appropriately discontinued.[132]

---

[132] In the remaining instances where the issue was implicated by the circumstances, reviewers indicated that they were "unable to determine" based on the available evidence.

*5. BPD Adjudication & Corrective Action of Foundationally Deficient Cases*

The above sections address whether, for each of four foundational areas, BPD's final disposition and corrective action for force incidents was consistent with the Monitoring Team's findings regarding deficiencies. Because some problematic incidents had more than one foundational deficiency, this section considers, in aggregate, how BPD has responded to every case with one or more foundational issues.

**Across cases in which the Monitoring Team identified some force as unnecessary, disproportionate, not objectively reasonable, and/or inconsistent with the duty to de-escalate, BPD overwhelmingly – across each of 2018, 2019, and 2020 – closed the investigation as "within policy."** In fact, troublingly, even as fewer cases in 2020 involved a deficiency across these core areas, a higher percentage of cases involving problematic force were inappropriately "closed within policy" in 2020 (79.2% of cases identified by the Monitoring Team as deficient) than in 2018 before any of the Decree's policy changes or training became effective (66.7% of cases identified by the Team as deficient). Indeed, in 2020, only a single case (of 24 total) reviewed by the Monitoring Team and determined to be deficient across one of these foundational dimensions was "closed out of policy."

**Table 28.** Incident Dispositions of Incidents Identified by Monitoring Team as Involving Force that Was Unnecessary, Disproportionate, Not Objectively Reasonable, or Inconsistent with the Duty to De-Escalate, 2018–2020

|  | Closed Within Policy | | Closed Out of Policy | | Closed | | Missing | |
|---|---|---|---|---|---|---|---|---|
| **2018** | 32 | 71.1% | 7 | 15.6% | 6 | 13.3% | 0 | – |
| **2019** | 23 | 76.7% | 5 | 16.7% | 2 | 6.6% | 0 | – |
| **2020** | 19 | 79.2% | 1 | 4.2% | 1 | 4.2% | 3 | 12.5% |

The second type of data logs not simply overall incident information (i.e., whether any officer involved was found to be out of policy) but the outcomes with respect to each officer involved in each incident. This is also logged in IAPro, but the information about corrective action is maintained in the area of the system related to officer misconduct, not force.

**Table 29.** Individual Officer Dispositions of Incidents Identified by Monitoring Team as Involving Force that Was Unnecessary, Disproportionate, Not Objectively Reasonable, or Inconsistent with the Duty to De-Escalate, 2018–2020

|      | Within Policy | | Not Within Policy | | Not Yet Entered | | Policy Failure to Be Addressed/ Within Policy but Secondary Policy Issue | | Missing | |
|------|------|-------|------|-------|------|-------|------|-------|------|-------|
| **2018** | 17 | 18.1% | 2 | 2.1% | 69 | 73.4% | 5 | 5.3% | 2 | 2.1% |
| **2019** | 1 | 1.6% | 4 | 6.3% | 58 | 92.1% | 0 | – | 0 | – |
| **2020** | 26 | 40.6% | 10 | 15.6% | 26 | 40.6% | 2 | 3.1% | 0 | – |

The Monitoring Team understands from BPD that, because the majority of officer conduct was found to be in policy, the instances of "not yet entered" – which are the majorities in 2018 and 2019 and still a sizeable portion of officer dispositions in 2020 – are likely to be functionally equivalent to "within policy." However, comparing the numbers from incident data to officer disposition data for each year, there is some confusion – with the numbers of "not within policy" officers in 2020 standing at 10 despite 1 overall case being reflected in IAPro as "closed out of policy." Unless that one case involved 10 officers, which is unlikely, data issues would appear to limit the utility of the officer disposition data.

Because, as of 2020, BPD was, across a sizable number and proportion of cases, identifying force with core deficiencies as nonetheless consistent with BPD policy, the Department cannot yet be considered to be in compliance with core elements of the Consent Decree relating to necessity, proportionality, reasonableness, and de-escalation; to be adhering meaningfully to the Decree-required, revised use of force policies; or to be complying with other provisions of the Consent Decree relating to force review and supervision.

## B.    Subject Characteristics[133]

### 1.    Comparison of Demographic Characteristics of Subjects in Qualitative Sample with Overall Population of Force Subjects

It should be noted, at the outset, that the demographics of force subjects in the subset of force incidents from 2018, 2019, and 2020 that the Monitoring Team reviewed closely matched the demographics of all force subjects per BPD's overall, aggregate data on force. For instance, with respect to subject gender, in 2018, 80.1% of subjects in reviewed cases were male (or 85.3% when applying statistical weights), compared to 82.7% across all force incidents in 2018. In 2019, 80.7% of subjects in reviewed cases were male (or 83.1% when applying statistical weights), compared

---

[133] In this and following sections, instances of unintentional/accidental discharges are typically reflected in the aggregate results for the "not applicable" category.

to 83.9% in all 2019 incidents.  In 2020, 83.4% were male in reviewed cases (or 83.5% when applying statistical weights), compared to 83.1% in all 2020 force incidents.

Similarly, with respect to subject race, 88.3% of subjects in qualitatively reviewed cases from 2018 were Black (or 90.1% when applying statistical weights), with Black subjects accounting for 86.8% of all force subjects in 2018.  In 2019, 84.8% of subjects in reviewed incidents were Black (or 87.4% when applying weighting) compared to 85.7% of all force subjects.  In 2020, 85.0% of subjects in incidents that the Monitoring Team reviewed were Black (or 88.6% when applying weighting) while Black subjects accounted for 85.1% of force subjects across all BPD incidents in 2020.

### 2. Subject Race in Foundationally Deficient Cases

The Monitoring Team considered whether a subject's race relates to the likelihood that they may be the recipient of foundationally deficient force (i.e., force that is unnecessary, disproportionate, not reasonable, and inconsistent with the duty to de-escalate).  Even as a subject's treatment during a force incident does not mitigate potential disparities, discussed in Section IV, in who becomes involved in a force incident in the first instance, it would be especially problematic if subjects of a particular race were disproportionately subjected to out-of-policy or inappropriate force.  To this end, Table 28 compares the demographic breakdown of force subjects in incidents that the Monitoring Team concluded to be foundationally deficient with the overall population of force subjects across all BPD incidents in each year.

**Table 30.**      **Subject Race, Foundationally Deficient Force Cases vs. All BPD Force Incidents, 2018–2020**

| | | | |
|---|---|---|---|
| Black | 2018 | All BPD Force Incidents | 86.8% |
| | | Weighted Frequency | 91.1% (36.6) |
| | | Unweighted Frequency | 87.5 (42*) |
| | | *Level 1* | 17 |
| | | *Level 2* | 15 |
| | | *Level 3* | 9 |
| | 2019 | All BPD Force Incidents | 85.7% |
| | | Weighted Frequency | 90.2% (24) |
| | | Unweighted Frequency | 86.7% (26) |
| | | *Level 1* | 12 |
| | | *Level 2* | 9 |
| | | *Level 3* | 5 |
| | 2020 | All BPD Force Incidents | 85.1% |
| | | Weighted Frequency | 87.5 (18.8) |
| | | Unweighted Frequency | 75.9% (22) |
| | | *Level 1* | 7 |

| | | Level 2 | 13 |
|---|---|---|---|
| | | Level 3 | 2 |
| White | 2018 | All BPD Force Incidents | 6.4% |
| | | Weighted Frequency | 1.7% (0.7) |
| | | Unweighted Frequency | 4.2% (2) |
| | | Level 1 | 0 |
| | | Level 2 | 1 |
| | | Level 3 | 1 |
| | 2019 | All BPD Force Incidents | 7.6% |
| | | Weighted Frequency | 7.3% (2.0) |
| | | Unweighted Frequency | 10.0% (3) |
| | | Level 1 | 0 |
| | | Level 2 | 3 |
| | | Level 3 | 0 |
| | 2020 | All BPD Force Incidents | 5.9% |
| | | Weighted Frequency | 11.7% (2.5) |
| | | Unweighted Frequency | 20.7% (6) |
| | | Level 1 | 0 |
| | | Level 2 | 3 |
| | | Level 3 | 3 |
| Hispanic/Latino/Other | 2018 | All BPD Force Incidents | 1.9% |
| | | Unweighted Frequency | 0 |
| | 2019 | All BPD Force Incidents | 1.6% |
| | | Unweighted Frequency | 0 |
| | 2020 | All BPD Force Incidents | 1.1% |
| | | Unweighted Frequency | 0 |
| Missing/Unknown | 2018 | All BPD Force Incidents | 4.9% |
| | | Weighted Frequency | 7.1% (2.9) |
| | | Unweighted Frequency | 8.3% (4) |
| | | Level 1 | 1 |
| | | Level 2 | 2 |
| | | Level 3 | 1 |
| | 2019 | All BPD Force Incidents | 5.1% |
| | | Weighted Frequency | 2.4% (0.7) |
| | | Unweighted Frequency | 3.3% (1) |
| | | Level 1 | 0 |
| | | Level 2 | 1 |
| | | Level 3 | 0 |
| | 2020 | All BPD Force Incidents | 7.9% |
| | | Weighted Frequency | 0.8% (0.2) |
| | | Unweighted Frequency | 3.4% (1) |
| | | Level 1 | 0 |
| | | Level 2 | 0 |
| | | Level 3 | 1 |

*Notes: The differences between weighted and unweighted proportions presented in this table might be related to many factors. Due to the small numbers for some categories (white and missing/unknown categories), small changes in one year for one force level can cause a big statistical change for the whole proportion, and the monitoring team cannot determine anything definitive about how well the weighted proportions predict the whole population when it comes to race.*

For each of 2018, 2019, and 2020, Black individuals were the subjects in force incidents where monitoring team monitors found that force was foundationally deficient at a higher rate than their representation in the population of force incidents overall. In 2018, subjects were Black in 91.1% (weighted) of foundationally deficient force cases, while subjects were Black in 86.8% of all BPD force incidents. Similarly, subjects were Black in 90.2% (weighted) of deficient cases in 2019 and 85.7% of BPD force incidents overall. In 2020, the difference was reduced – with subjects being Black in 87.5% (weighted) of deficient cases compared to 85.1% of all BPD force incidents. Meanwhile, although white subjects were involved in 1.7% (weighted) of foundationally deficient cases compared to 6.4% of force incidents overall in 2018, white subjects were involved in 11.7% of foundationally deficient cases in 2020 compared to 5.9% of force incidents overall that year.

It therefore appears that, while Black subjects were somewhat disproportionately represented among foundationally deficient incidents compared to their representation in force cases overall in all three years, the magnitude of this difference decreased in 2020. Meanwhile, in 2020, white subjects were somewhat disproportionately represented among foundationally deficient incidents compared to BPD force incidents overall. The Monitoring Team cautions that, given the numbers of cases qualitatively reviewed and the number of cases flagged as foundationally deficient, further tests assessing statistical significance are not feasible. Indeed, these numbers, and this comparison, cannot say anything based on whether a Black, white, or subject of another race is more or less likely to be the subject of force that is foundationally deficient – the numbers are only descriptive and a comparison of the population of subjects in deficient cases to the population of subjects across all BPD force incidents.

### 3. *Subjects Experiencing Mental Health & Behavioral Health Crisis*

The Consent Decree includes a number of requirements related to BPD's response to and interactions with behavioral health disabilities or who are experiencing a mental or behavioral health crisis.[134] A separate, forthcoming assessment will evaluate the Department's compliance across those general requirements.

---

[134] *See generally* Dkt. 2-2 ¶¶ 96–122.

The "Behavioral Health Disability or crisis status of individuals subject to law enforcement actions" is highly relevant within the context of use of force incidents,[135] with numerous policy and training requirements geared toward officers "avoid[ing] escalating an interaction with individual with these disabilities" and "us[ing] de-escalation techniques to increase safety and to avoid using force unnecessarily" against individuals whose behavior, noncompliance, or resistance may be related to their underlying behavioral health status or condition.[136]   BPD's Policy 1115 includes "[w]hether the person is exhibiting signs of mental illness or is experiencing a behavioral health crisis" and "[w]hether a person suffers from a medical or behavioral health disability, physical or hearing impairment, [or] is impaired by alcohol or drug use . . . " as "facts and circumstances" that are part of the "Totality of the Circumstances" that factor into the core analysis of whether officer force is reasonable, necessary, and proportional.[137]

To this end, the Consent Decree requires, and BPD officers have received, eight hours of annual in-service training on crisis intervention.[138]   Among many topics, this training has focused on "[h]ow non-medically trained law enforcement personnel can recognize common characteristics and behaviors associated with Behavioral Health Disabilities or Intellectual and Developmental Disabilities" and how to "interact with" and "make reasonable modifications for" such individuals through their response strategies.[139]

Monitoring Team reviewers of force incidents therefore considered, first and foremost, whether a reasonable officer under the circumstances evaluated would have concluded that the subject was likely to be experiencing a behavioral health crisis (i.e., mental health, substance abuse, or other behavioral health issue or condition).   Predicted values, after adjusting for the probability of selection as described previously in this report, suggest that a reasonable officer would have concluded that the involved subject was experiencing a mental health, substance abuse, or other behavioral health issues in 14.8% of all 2018 force incidents, 18.4% of all 2019 incidents and 19.6% of all 2020 incidents

Of those cases where a reasonable officer would have concluded that the subject was in crisis, Monitoring Team reviewers found that the involved officer(s) successfully identified this fact in most instances – in 23 out of 26 cases in 2018, 23 of 28 cases in 2019, and 29 of 31 cases in 2020 (all unweighted).   It therefore appears that, **at least in encounters that result in the use of force, BPD officers are regularly and appropriately identifying individuals in crisis.**   The Monitoring Team is currently conducting an assessment focusing on BPD's interactions with individuals experiencing mental and behavioral health challenges across all encounters and will report these findings in a separate, forthcoming report.

---

[135] *Id.* ¶ 121.
[136] *Id.* ¶ 112(a)(viii).
[137] Policy 115 at 5, 4.
[138] Dkt. 2-2 ¶ 112(a).
[139] *Id.*

Reviewers also inventoried whether the use of force encounter, upon its conclusion, resulted in either (a) an emergency petition, or (b) a voluntary hospital evaluation based on the condition of the subject. With respect to an emergency petition, 10.6% of reviewed cases resulted in an emergency petition in 2018, 8.6% resulted in a petition in 2019, and 14.67% resulted in a petition in 2020. In those reviewed cases where officers identified that a subject was experiencing a behavioral or mental health crisis, an emergency petition resulted in 66.7% of such encounters in 2018 cases, in 65.2% of such encounters in 2019 cases, and in 82.8% of such encounters in 2020 cases. A voluntary hospital evaluation resulted in 10.1% of 2018 cases reviewed, 4.3% of cases in 2019, and 5.9% of cases in 2020. Of cases where officers identified that the subject was experiencing a crisis, a voluntary hospital evaluation occurred in 8.3% of applicable cases (2 of 24 instances) in 2018, 13% of cases (3 out of 23 instances) in 2019, and 10.3% of cases (3 of 29 instances) in 2020.

Finally, among those reviewed cases where a reasonable officer would have determined that the subject was experiencing a behavioral health crisis, relatively few encounters involved force that the Monitoring Team determined to be deficient in one of the foundational dimensions discussed elsewhere in this report (i.e. was unnecessary, disproportionate, not objectively reasonable, and/or inconsistent with the duty to de-escalate). In 2018, 3 of 26 cases involving subjects in crisis were foundationally deficient (11.5%); in 2019, 4 of 28 cases were foundationally deficient (14.3%); and in 2020, 1 of 31 cases (6.5%) were deficient in this way. Overall, BPD's performance in this regard is encouraging. The Monitoring Team will hold a determination of initial compliance in abeyance in this regard pending completion of its in-progress, formalized assessment of the Decree's many requirements relating to crisis intervention.

### 4. Children/Youth

Paragraph 131 includes several requirements addressing the use of force, and use of force decision-making, when the subjects are youth, which the Consent Decree defines as "[a]n individual who is younger than 18 years old."[140] Based on the Monitoring Team's review, 10 incidents (5.3% of cases reviewed, 5.7% of all incidents as weighted) in 2018 involved subjects who were youth, 13 incidents (7.0% of cases reviewed, 6.2% weighted) involved youth in 2019, and 14 incidents (8.2% of cases reviewed, 9.9% weighted) involved youth in 2020.

**The Monitoring Team's review found BPD officers increasingly and appropriately taking into account specific policy provisions relating to interactions with youth.** The Decree and BPD policy requires that officers "[w]hen feasible . . . employ developmentally appropriate and trauma-informed de-escalation tactics."[141] In an increasing majority of cases across 2018, 2019,

---

[140] *Id.* ¶ 511(vvvv).
[141] *Id.* ¶ 131(a).

and 2020, BPD officers were deploying developmentally appropriate and trauma-informed approaches, including:

- Displaying a calm and natural demeanor;
- Avoiding threatening or intimidating language;
- Accounting for fear-based reactions (such as aggression, defensiveness, defiance, or flight);
- Using simple, direct language;
- Using repetition to reinforce instructions;
- Explaining the officer's actions in clear, concrete language;
- Allowing time for the subject to comply with instructions; and
- Allowing a caregiver or family member an opportunity to speak to the youth to calm the youth down, when safe and appropriate.

In 2018, officers used at least one of these techniques in 6 out of 10 (60.0%) of the cases reviewed that involved youth subjects. In 2019, officers used at least one technique in nearly 9 of 13 (69.2%) incidents in the cases reviewed. In 2020, officers used at least one such technique in 12 of 14 (85.7%) cases evaluated.

The Consent Decree, and BPD policy,[142] require that officers reasonably "take into account individualized factors of the Youth including[] apparent age, body size, and relative strength of the officer relative to the Youth; and risk posed by the Youth."[143] In 2018, Monitoring Team reviewers were able to certify that officers reasonably considered these factors in fewer than half (3 out of 7) of the reviewed cases where the requirement was applicable. In 2019, this increased to 4 out of 7 cases. In 2020, 8 out of 10 cases where the requirement was applicable involved officers appropriately taking individualized factors of youth subjects into account. It should also be noted that, in 2022, BPD officers have received youth-specific training.

Reviewers concluded that BPD officers used pain compliance or pressure point control techniques on a child or young person in 1 instance across the 2018 cases reviewed. Per BPD policy, the use of such techniques on a child is only permitted if deadly force was justified at the time of application. In the single application in 2018, this condition was not met. In 2019 and 2020, reviewers identified no instances of BPD officers applying pain compliance or pressure point control to young subjects.

Separately, Monitoring Team reviewers identified some instances across years where BPD officers used force while a young subject was restrained – including 1 instance (out of 9 applicable cases)

---

[142] Policy 1115 at 10.
[143] Dkt. 2-2 ¶ 131(b).

in 2018, 1 instance (out of 13 applicable cases) in 2019, and 3 instances (out of 13 applicable cases) in 2020.

If a Youth is injured, BPD must also "take immediate steps to provide medical attention to the Youth and will notify the Youth's parent, guardian, or other responsible adult."[144]  In 4 out of 10 cases in 2018, in 7 out of 13 cases in 2019, and in 3 out of 14 cases in 2020, a youth or child was injured.  These injuries resulted from the use of force in 2 cases in 2018, 4 cases in 2019, and 3 cases in 2020.  In most but not all (5 out of 9) cases reviewed, a BPD member not involved with the use of force notified the child or young person's parent, guardian, or other responsible adult of the child's injury.

## C.      Specific Requirements Relating to Officer Equipment

Consent Decree Paragraph 139 requires that "officers who carry a firearm also carry on their person at least one less-lethal weapon which they are trained and certified to use, at all times on while on duty . . . ."[145]  BPD policy addresses this requirement by requiring that BPD officers carry OC spray.

Across all reviewed cases, the Monitoring Team considered whether all officers who carried a firearm also carried OC spray or another less-lethal weapon.  On this account, Monitoring Team reviewers were largely unable to certify, one way or another, from available information whether all officers were equipped with a firearm *and* a less-lethal weapon (unable to determine for 66% of reviewed 2018 cases, 75% of reviewed 2019 cases, and 71% of reviewed 2020 cases).  Although video footage shows the incident, that footage rarely permitted reviewers to reach definitive conclusions about what force instruments involved officers carried.  Thus, **although the Monitoring Team does not have reason to believe that BPD officers are *not* appropriately equipped with less-lethal instruments, it cannot yet certify initial compliance with Paragraph 139 and its requirement that officers carry at least one less-lethal instrument.**

Because body-worn camera footage typically depicts what officers are encountering and not what is on their duty belt, that method of auditing compliance simply is unlikely to be realistic going forward.  To this end, enhanced documentation in force investigations about the weapons that officers carried at the time of the incident will be necessary.

## D.      Classification of the Force Incident

---

[144] *Id.* ¶ 131(d); *accord* Policy 1115 at 10.
[145] Dkt. 2-2 ¶ 139.

As described previously, the Decree requires BPD to classify force "into levels for the purposes of reporting and reviewing each use of force."[146]   Policy 1115 incorporates the requirements of Consent Decree Paragraph 140 into BPD policy.[147]

Monitoring Team reviewers considered, based on the totality of the materials available for review, the Level of force for which each incident should have been properly classified – specifically, as either a Level 1, Level 2, Level 3, or as an incident that did not constitute reportable force under Policy 1115.   In analyzing the results of these force incident audits, the Team compared its assessments of force classification to BPD's classifications.

Reviewers found that, in 2018, 13 reviewed cases were inappropriately classified as at a lower level of force than they should have been – with 8 cases that should have been classified as a Level 2 incident classified instead as a Level 1 incident and 3 other cases classified as a Level 2 that should have been classified as Level 3 force.   Meanwhile, in 2018, 3 cases were classified at higher levels than they should have been.   In this way, about 8.5% of the cases that the monitoring team reviewed were mis-classified.

By comparison, in 2019, 8 reviewed cases were classified at a lower level than they should have been, while 5 cases were classified at a higher level than they should have been – making about 7.0% of all cases reviewed that inappropriately classified.   Similarly, in 2020, 9 cases were classified at a lower level than they should have been, while 2 cases were classified at a higher level, making 6.5% of cases reviewed inappropriately classified.

Therefore, with respect to use of force classification, BPD's performance is very close to reaching initial compliance.   However, (a) the volume of force cases that were misclassified without personnel correcting the misclassification *and* (b) the fact that most of the misclassifications placed the force incident into a lower level of force than they should be together lead **the Monitoring Team to want to see continued improvements on force level classification before it can certify initial compliance with Paragraphs 139 and 140.**

## E.      Body Camera Footage of Force Incidents

Although the Department's performance with respect to body-worn cameras ("BWC"s) is not directly the subject of this assessment, capturing officer use of force is one of the many vital functions that BWCs perform.   BPD's policy on BWCs, Policy 824, mandates that BPD members whose "duties involve interactions with citizens and/or enforcement related activities . . . shall

---

[146] *Id.* ¶ 140.
[147] Policy 1115 at 5–6.

wear the BWC at all times while on-duty."[148]   The policy requires that officers activate their cameras in a number of expressly defined circumstances, including:

- "[I]mmediately upon receipt of or response to any in-progress call, or activity likely to require immediate enforcement action";
- "[U]pon arrival for routine, non-emergency calls for service";
- "During any encounter with the public that becomes confrontational"; and
- "[I]mmediately upon obtaining probable cause or reasonable suspicion for" a stop.[149]

Other provisions that, for privacy reasons, generally restrict body-worn camera use in health care facilities and in court proceedings specifically do not apply "in an anticipated use of force instance."[150]

Consequently, absent exceedingly rare and exceptional circumstances, body-camera footage of all use of force incidents should be available.  If an officer indicates that an incident was not successfully captured due to a "BWC malfunction," they must complete an Administrative Form 95 that explains the reason that no BWC footage was available.[151]

Separately, various policies and procedures – discussed in greater detail below – require that BPD investigators seek available video footage from other sources, including other video footage from BPD (such as video in a transport vehicle) or City of Baltimore cameras (such as CCTV cameras), private business or surveillance footage, or civilian-captured footage.

Across the force incidents that the Monitoring Team reviewed, BPD force investigation files contained video of the incident in a vast majority of incidents – including 97.4% of reviewed cases in 2018, 96.8% of reviewed cases in 2019, and 95.9% of reviewed cases in 2020.  Monitoring Team reviewers found only a small number of cases in each of the years reviewed for which there was no video recording of the incident available (5 cases (or 2.6% of cases reviewed) in 2018, 6 cases (3.2% of cases reviewed) in 2019, and 7 incidents (4.1% of cases reviewed) in 2020.

In the cases that Monitoring Team members reviewed, body-worn camera footage was available in 85.8% of total 2018 cases, 86.7% of 2019 cases, and 98.2% of cases in 2020.  When weighting those results in the manner described at the outset of this section, this translates to body-worn camera footage being available in 96.8% of all force incidents in 2018, 94.7% of incidents in 2019, and 96.5% of incidents in 2020.

---

[148]  Baltimore Police Department Policy 824, "Body Worn Camera" at 2 (last rev. Jan. 1, 2018), https://www.baltimorepolice.org/sites/default/files/Policies/824_Body_Worn_Cameras.pdf.
[149] *Id.* at 4-5.
[150] *Id.* at 6.
[151] *Id.* at 3–4.

Among those cases where there was no captured footage whatsoever (whether body-worn camera or otherwise), most force investigation files included the required Administrative Form 95 form explaining why no body-worn camera footage was available (3 of the 5 cases in 2018, 4 of the 6 cases in 2019, and 5 of the 7 cases in 2020). **The improvement across time in body-worn camera compliance during force incidents and the high portion of incidents where video was captured in 2020 are generally consistent with initial compliance with BPD's policy requirements relating to the use of body cameras during force incidents.**

Across all use of force incidents during 2018 through 2021, BPD's own data on the availability of body-worn camera is generally consistent with the Monitoring Team's findings – although a large number of data that BPD classified as "missing" data and that stretches into recent years will need to be addressed going forward, especially given that the presence or absence of camera footage is relatively easy to confirm during a review of a force incident. To this end, the Monitoring Team understands from BPD that a "video footage" data field in the electronic use of force reporting system was made a mandatory field in 2022, which has purportedly led to a dramatic reduction in missing data. Additionally, changes in the cross-linking capacities between Evidence.com, which stores body camera footage, and BPD incident reports promise to better integrated video footage across core electronics systems – which should also reduce the incidence of "missing" data going forward.

**Table 31.** **BPD Data on Body-Worn Camera Recording of All Use of Force Incidents, by Involved Officers, 2018–2021**

|  |  | Total | Level 1 |  | Level 2 |  | Level 3 |  |
|---|---|---|---|---|---|---|---|---|
| Camera Recorded Incident | **2018** | 1,594 | 1,167 | 73.2% | 409 | 25.7% | 18 | 1.1% |
|  | **2019** | 1,741 | 1,167 | 67.0% | 515 | 29.6% | 59 | 3.4% |
|  | **2020** | 1,195 | 851 | 71.2% | 334 | 27.9% | 10 | 0.8% |
|  | **2021** | 871 | 537 | 61.7% | 297 | 34.1% | 37 | 4.2% |
| Camera Partially Recorded Incident | **2018** | 232 | 156 | 67.2% | 74 | 31.9% | 2 | 0.9% |
|  | **2019** | 282 | 181 | 64.2% | 96 | 34.0% | 5 | 1.8 |
|  | **2020** | 185 | 131 | 70.8% | 53 | 28.6% | 1 | 0.5% |
|  | **2021** | 182 | 112 | 61.5% | 70 | 38.5% | 0 | 0.0% |
| Camera Activated but Did Not Record Incident | **2018** | 12 | 9 | 75.0% | 2 | 16.7% | 1 | 8.3% |
|  | **2019** | 22 | 14 | 63.6% | 8 | 36.4% | 0 | 0.0% |
|  | **2020** | 15 | 11 | 73.3% | 4 | 26.7% | 0. | 0.0% |
|  | **2021** | 10 | 8 | 80.0% | 2 | 20.0% | 0 | 0.0% |
| Camera Worn But Not Activated | **2018** | 28 | 21 | 75.0% | 7 | 25.0% | 0 | 0.0% |
|  | **2019** | 23 | 16 | 69.6% | 7 | 30.4% | 0 | 0.0% |
|  | **2020** | 21 | 15 | 71.4% | 5 | 23.8% | 1 | 4.8% |
|  | **2021** | 14 | 7 | 50.0% | 5 | 35.7% | 2 | 14.3% |
| Camera Not Worn | **2018** | 31 | 17 | 54.8% | 13 | 41.9% | 1 | 3.2% |

| | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2019** | 24 | 17 | 70.8% | 6 | 25.0% | 1 | 4.2 |
| | **2020** | 12 | 4 | 33.3% | 8 | 66.7% | 0 | 0.0% |
| | **2021** | 17 | 7 | 41.2% | 3 | 17.6% | 7 | 41.2% |
| Missing Data | **2018** | 1,222 | 959 | 78.5% | 260 | 21.3% | 3 | 0.2% |
| | **2019** | 710 | 475 | 66.9% | 225 | 31.7% | 10 | 1.4% |
| | **2020** | 771 | 515 | 66.8% | 219 | 28.4% | 37 | 4.8% |
| | **2021** | 616 | 400 | 64.9% | 205 | 33.3% | 11 | 1.8% |
| Total | **2018** | 3,119 | 2,329 | 74.7% | 765 | 24.5% | 25 | 0.8% |
| | **2019** | 2,802 | 1,870 | 66.7% | 857 | 30.6% | 75 | 2.7% |
| | **2020** | 2,199 | 1,527 | 69.4% | 623 | 28.3% | 49 | 2.2% |
| | **2021** | 1,710 | 1,071 | 62.6% | 582 | 34.0% | 57 | 3.3% |

*Source: BPD (IAPro)*
*Note: The unit of analysis is involved officers, not force incidents.*

A June 2022 report by the Office of Legislative Audits of the Maryland General Assembly independently identified some issues with BPD's implementation and auditing of body-worn cameras and reported on BPD's internal findings that "approximately ten percent of . . . officers audited were not in full compliance with the BWC policy" between 2017 and 2020.[152]

The Monitoring Team notes that BPD's various audits, and the Office of Legislative Audits review, focused on a broader universe of officer interactions and situations than simply use of force. Thus, the Monitoring Team's findings here regarding the use of body-worn cameras in situations involving force have a narrower scope.

## F.    Application of Force

### 1.  Verbal Warning

BPD policy requires that officers "announce that force will be utilized prior to the application of such force."[153]  The Consent Decree notes that verbal warnings may serve as a de-escalation technique.[154]

Monitoring Team evaluators therefore considered in each instance whether, where it was practical to do so, all involved officers announced that force would be utilized prior to the application of the force.  In those cases where reviewers assessed that it was practical and reasonable under the circumstances to provide a warning before force was used – which were majorities in across all

---

[152] Office of Legislative Audits, Department of Legislative Services, Maryland General Assembly, *Performance Audit Report: Baltimore Police Department, Surveillance Equipment* 2 (June 2022), *available at* https://www.scribd.com/document/579509219/BPD-Surveillance22-4#download&from_embed.
[153] Policy 1115 at 6.
[154] Dkt. 2-2 ¶ 511(y); *accord id.* ¶ 155 (specifically mandating that officers "issue a verbal warning . . . and allow a reasonable amount of time to allow the subject to comply with the warning" before applying OC spray).

years evaluated – the Monitoring Team found that **officers are too frequently failing to issue warnings when they should.**  In both 2019 and 2020, officers were failing to warn in well more than half of the cases where they could.  BPD performance with respect to giving verbal warnings when practical and reasonable under the circumstances will need to improve going forward.

**Table 32.**      **Force Incidents Where Officers Announced That Force Would be Utilized Prior to the Application of Force**

|  |  | Yes | | No | | Unable to Determine | | Not Applicable | |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 68.7 | 57.5% | 47.2 | 39.5% | 3.5 | 3.0 | 56.8 | - |
| | Unweighted Frequency | 75 | 55.1% | 56 | 41.2% | 5 | 3.7% | 52 | - |
| | *Level 1* | 30 | 58.8% | 19 | 37.3% | 2 | 3.9% | 31 | - |
| | *Level 2* | 35 | 55.6% | 28 | 44.4% | 0 | 0.0% | 12 | - |
| | *Level 3* | 9 | 45.0% | 8 | 40.0% | 3 | 15.0% | 7 | - |
| **2019** | Weighted Frequency | 33.7 | 28.5% | 79.4 | 67.1% | 5.1 | 4.3% | 65.0 | - |
| | Unweighted Frequency | 34 | 30.1% | 73 | 64.6% | 6 | 5.3% | 73 | - |
| | *Level 1* | 16 | 28.6% | 38 | 67.9% | 2 | 3.6% | 30 | - |
| | *Level 2* | 14 | 27.5% | 34 | 66.7% | 3 | 5.9% | 27 | - |
| | *Level 3* | 4 | 66.7% | 1 | 16.7% | 1 | 16.7% | 16 | - |
| **2020** | Weighted Frequency | 45.9 | 43.3% | 58 | 54.7% | 2.1 | 2.0% | 59.5 | - |
| | Unweighted Frequency | 46 | 43.4% | 56 | 52.8% | 4 | 3.8% | 64 | - |
| | *Level 1* | 23 | 41.8% | 32 | 58.2% | 0 | 0.0% | 29 | - |
| | *Level 2* | 19 | 48.7% | 17 | 43.6% | 3 | 7.7% | 25 | - |
| | *Level 3* | 4 | 33.3% | 7 | 58.3% | 1 | 8.3% | 10 | - |

For example:

- **Case No. 92 (Level 2, 2018).**  Officers drove up on a subject who was walking.  They exited the car and immediately tackled the subject, without providing any verbal warnings or instructions.  The subject was taken down to the ground as his arms appeared to be highly torqued and twisted behind his back to permit handcuffing.

- **Case No. 446 (Level 2, 2018).**  An officer applied a Taser to a subject, who was refusing to leave the area of a school, without providing a warning – despite there being sufficient time to do so and the fact that, at the time of the Taser application, the subject was non-compliant but not aggressive toward the officer or others.

- **Case No. 538 (Level 2, 2019).**  A CitiWatch camera operator observed the subject involved in a drug transaction.  Officers arrived, exited their vehicle, and approached the subject on foot.  Officer 1 had initial contact with the subject, grabbing him by the left wrist and trying to place the subject's hands behind his back in an attempt to handcuff him.  Even as the initial placing of hands on the subject is low-level force, it was feasible under the circumstances for the involved officer to have first warned the subject that he was under arrest and that force would be used if the subject did not comply before going "hands on" with the subject.

### *2. Use of Prohibited Force*

Pursuant to the Consent Decree, BPD policy prohibits a number of specific types of force in most situations unless certain, expressly defined exceptions are met.  This section considers each of these requirements, and BPD's adherence to them, in turn.

### a.  Force Against Handcuffed or Otherwise Restrained Subjects

BPD policy prohibits the use of force "against persons who are handcuffed or otherwise restrained."[155]  The only exception is "where the Totality of Circumstances makes it Reasonable and Necessary to prevent injury or escape," although "if the person's actions only present a risk of property damage," then force against a restrained subject is nonetheless prohibited.[156]

**Table 33.     Percentage of Force Incidents where Officers Used Force Against Subject(s) Handcuffed or Otherwise Restrained**

|  |  | Yes |  | No |  | Unable to Determine |  | Not Applicable |  |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 11.4 | 6.5% | 164 | 93.2% | 0.6 | 0.3% | 0.2 | - |
|  | Unweighted Frequency | 11 | 5.9% | 173 | 93.5% | 1 | 0.5% | 3 | - |
|  | *Level 1* | 5 | 6.1% | 77 | 93.9% | 0 | 0.0% | 0 | - |
|  | *Level 2* | 6 | 8.0% | 68 | 90.7% | 1 | 1.3% | 0 | - |

---

[155] Policy 1115 at 7*; accord* Dkt. 2-2 ¶¶ 132, 152, 157, 166(j).
[156] Policy 1115 at 7.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | *Level 3* | 0 | 0.0% | 25 | 100.0% | 0 | 0.0% | 2 | |
| **2019** | Weighted Frequency | 16.6 | 9.0% | 166.3 | 91.0% | 0 | 0.0% | 0.4 | - |
| | Unweighted Frequency | 19 | 10.4% | 164 | 89.6% | 0 | 0.0% | 3 | - |
| | *Level 1* | 6 | 7.0% | 80 | 93.0% | 0 | 0.0% | 0 | - |
| | *Level 2* | 11 | 14.1% | 67 | 85.9% | 0 | 0.0% | 0 | - |
| | *Level 3* | 2 | 10.5% | 17 | 89.5% | 0 | 0.0% | 3 | - |
| **2020** | Weighted Frequency | 8.2 | 5.0% | 155.2 | 95.0% | 0 | 0.0% | 2.2 | - |
| | All Force | 10 | 6.1% | 155 | 93.9% | 0 | 0.0% | 5 | - |
| | *Level 1* | 4 | 4.8% | 79 | 95.2% | 0 | 0.0% | 1 | - |
| | *Level 2* | 3 | 4.7% | 61 | 95.3% | 0 | 0.0% | 0 | - |
| | *Level 3* | 3 | 16.7% | 15 | 83.3% | 0 | 0.0% | 4 | - |

As Table 33 details, there was an increase in 2019 in officers inappropriately using force against already restrained subjects. Although the rate of compliance with this requirement (i.e., the percentage of instances in which officers complied with requirements by not using force against handcuffed or restrained subjects) returned to levels equivalent to 2018 in 2020, the significance of this requirement combined with the inconsistent trends over the years studied leads the Monitoring Team to conclude that **continued progress across incidents in the future would likely be consistent with initial compliance.**

> b. Types of Force Prohibited Unless Deadly/Lethal Force is Justified and No Reasonable Alternatives Exist

> i. *Application of Force to Sensitive Areas*

The Consent Decree defines "lethal force" as any "force likely to cause death or serious physical injury," which includes "strike[s] to the head, neck, or throat with a hard object."[157] Consequently, BPD's Use of Force policy includes "[s]trikes with any hard object . . . to the person's head, neck, sternum, spin, groin, or kidneys" as among those types of force that "are prohibited unless the use of Deadly Force/Lethal Force is authorized and no reasonable alternatives exist."[158] The elevated sensitivity of these areas of the body and the elevated risk of force applied to them mean that the force is considered a deadly force option that may be applied only when officers would be authorized to apply any other type of lethal force (i.e., using a firearm).

---

[157] Dkt. 2-2 ¶ 511(yy).
[158] Policy 1115 at 8.

Across most of the various force provisions limiting the application of certain types of force to certain sensitive areas of the body, BPD has reached appears initial compliance.  With respect to holds involving a subject's neck or head, even as the technique is not widely used – occurring in 3.0% of reviewed cases in 2020, for example – the significance of the force maneuver points toward the need for BPD to advise officers further about the use of such techniques.

The Monitoring Team found that strikes to a person's sensitive areas with a hard object were exceedingly rare in the cases reviewed – surfacing in 3 evaluated cases in 2018 (1.6% of cases reviewed, 0.2% of all incidents weighted), no cases in 2019, and 1 case in 2020 (0.6% of cases reviewed, 0.1% of all incidents weighted).

BPD similarly prohibits "[i]ntentional strikes of a persons' head against a hard, fixed object including . . . a roadway, concrete floor, wall, or iron bars" unless deadly force would be justified and no reasonable alternatives exist.[159]  Strikes of a person's head against a hard object were also rare in the cases evaluated, occurring in 2 instances in 2018 (1.1% of cases reviewed, 0.4% of all incidents weighted) and in no cases in either 2019 or 2020.

Policy also prohibits officers from "kneeing," "kicking," or otherwise striking "a person's head, neck, back, or torso."[160]  BPD officers complied with this policy, as well, with just 2 cases from 2018 (1.1% of cases reviewed, 0.7% of all incidents weighted) reviewed by the Monitoring Team, 2 cases in 2019 (1.1% of cases, 0.4% of all incidents weighted), and 1 case in 2020 (0.6%, 0.1% of all incidents weighted) involving kneeing, kicking, or striking sensitive areas.

Separately, Policy 1115 prohibits "[i]ntentionally deploying a CEW to the neck, chest, groin or face of a person" unless deadly force would be authorized and no reasonable alternatives exist.[161]  Officers are generally not applying CEWs inappropriately to sensitive areas, with this occurring in 3 instances in cases reviewed from 2018 (1.6% of cases reviewed, 0.5% of all incidents weighted), in 1 2019 incident (0.5% of cases reviewed, 0.4% of all incidents weighted), and in no cases in 2020.

BPD prohibits "chokeholds" and "neck holds," which are defined in policy as "any hold or contact with the neck that may inhibit breathing by compression of the airway in the neck[;] may inhibit blood flow by compression of the blood vessels in the neck[;] or that applies pressure to the front, side, or back of the neck."[162]  The only exception is for instances where deadly/lethal force would be justified.[163]  As Table 34 summarizes, officers across most evaluated incidents are not generally applying chokeholds or neck holds.  Indeed, in some situations where contact with a subject's head

[159] Id.
[160] Id.
[161] Id. at 9.
[162] Id. at 2, 9.
[163] Policy 1115 at 2, 9.

or neck was noted, reviewers observed that the contact with the neck appeared to be unintentional or the byproduct of a physical struggle with the subject.  For example:

- **Case No. 481 (Level 3, 2020).**  Officers responded to serve an arrest warrant.  They found the person named in the warrant asleep in a chair on the front porch of a residence.  As a responding sergeant placed a handcuff on one of the subject's wrists, the subject became actively aggressive and tried to pull away from the sergeant.

  During the physical struggle that ensued, for a brief moment, the sergeant's arm went around the subject's neck as he tried to take him to the ground.  It did not appear from available video that there was any choking of the subject as a result of the arm placement or that the subject was deprived of blood or oxygen to the brain.  However, the location of the arm appears to fit the definition of a neck hold under BPD policy.  The circumstances surrounding the application, the brief length of time it was applied, and the lack of injury to the subject all point to the neck hold being a byproduct of the struggle.

Across most force cases, BPD officers appropriately did not deploy neck holds or chokeholds.  However, because chokeholds or neck holds are lethal force, and reviewers found that the holds were used even though not warranted by the totality of the circumstances, BPD must continue to advise officers regarding the general prohibition on chokehold or neck holds.

**Table 34.**     **Force Incidents Where Involved Officers Used a Chokehold or Neck Hold**

|  |  | Yes | | No | | Unable to Determine | | Not Applicable | |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 2.1 | 1.2% | 173.1 | 98.4% | 0.7 | 0.4% | 0.2 | - |
| | All Force | 6 | 3.2% | 177 | 95.7% | 2 | 1.1% | 3 | - |
| | *Level 1* | 0 | 0.0% | 82 | 100.0% | 0 | 0.0% | 0 | - |
| | *Level 2* | 3 | 4.0% | 71 | 94.7% | 1 | 1.3% | 0 | - |
| | *Level 3* | 3 | 12.0% | 21 | 84.0% | 1 | 4.0% | 2 | - |
| **2019** | Weighted Frequency | 3.1 | 1.7% | 175.5 | 96.0% | 4.3 | 2.3% | 0.4 | - |
| | All Force | 5 | 2.7% | 174 | 95.1% | 4 | 2.2% | 3 | - |
| | *Level 1* | 1 | 1.2% | 83 | 96.5% | 2 | 2.3% | 0 | - |
| | *Level 2* | 2 | 2.6% | 74 | 94.9% | 2 | 2.6% | 0 | - |
| | *Level 3* | 2 | 10.5% | 17 | 89.5% | 0 | 0.0% | 3 | - |
| **2020** | Weighted Frequency | 0.9 | 0.6% | 162.9 | 98.8% | 1 | 0.6% | 0.7 | - |

| All Force | 5 | 3.0% | 158 | 95.2% | 3 | 1.8% | 4 | - |
|---|---|---|---|---|---|---|---|---|
| *Level 1* | 0 | 0.0% | 84 | 100.0% | 0 | 0.0% | 0 | - |
| *Level 2* | 0 | 0.0% | 63 | 98.4% | 1 | 1.6% | 0 | - |
| *Level 3* | 5 | 27.8% | 11 | 61.1% | 2 | 11.1% | 4 | - |

BPD policy prohibits the "[d]ischarge of a Less-Lethal Launcher to the chest, neck, or head at close range."[164]  Monitoring Team auditors identified no cases in any of 2018, 2019, or 2020 where a Less-Lethal Launcher was discharged to the chest, neck, or head at close range.

> ii.    *Application of Force to Person Whose Health, Age, Condition, or Circumstances Makes it Likely that Death or Serious Physical Injury Will Result*

Policy 1115 also prohibits, except where deadly or lethal force would be justified and no reasonable alternative exists, the application of force to individuals "whose health, age, condition, or circumstances make it likely that death or Serious Physical Injury will result."[165]  **Because no instances were identified in any of 2018, 2019, or 2020 where force was applied to individuals whose specific health, age, condition, or circumstances would have been identified by a reasonable officer as making it likely that death or Serious Physical Injury would result, the Monitoring Team finds BPD's performance consistent with initial compliance.**

> iii.    *Firing a Weapon in Particular Circumstances*

BPD's Use of Force Policy prohibits "[f]iring into crowds" in all circumstances.[166]  Across all cases reviewed, there were no identified instances in which a BPD officer fired into a crowd.

BPD policy similarly prohibits the firing of "warning shots" in all circumstances.[167]  This report considers this requirement in its discussion of additional firearms-specific requirements, below.

Policy 1115 also generally prohibits "fir[ing] any weapon from or at a moving vehicle."[168]  Across cases that the Monitoring Team reviewed, instances where officers fired a weapon from or at a moving vehicle were rare, occurring twice in 2018 (1.1% of cases reviewed, 0.1% of all incidents weighted), twice in 2019 (1.1% of cases reviewed, 0.2% of all incidents weighted), and 3 times in 2020 (1.8% of cases reviewed, 0.4% of all incidents weighted).

---

[164] *Id.* at 9.
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] Policy 1115 at 9; Dkt. 2-2 ¶ 165.

Two exceptions to the general prohibition against firing at or from moving vehicles may apply. First, a member could fire a weapon at or from a moving vehicle "[t]o counter an immediate threat of death or Serious Physical Injury" to an officer or another person that is posed "by a person in [a] vehicles using means other than the vehicle."[169]  This applied in 2 of the 3 reviewed cases in 2020.  Second, a member could fire a weapon at or from a moving vehicle "[t]o counter a situation where the member or another person is unavoidably in the path of the vehicle and cannot move to safety," though officers cannot "position themselves in the path of a moving vehicle" such that "they have no option but to use Deadly Force/Lethal Force."[170]  This applied in the remaining 1 of the 3 reviewed instances in 2020.

Consequently, **the Monitoring Team finds BPD to be in initial compliance with requirements relating to prohibitions against the firing of weapons into crowds, as warning shots, and from or at moving vehicles.**

### iv.  Force Against Individuals Engaging in First Amendment Activity

Consistent with Paragraph 133 of the Decree, BPD officers "are prohibited from using force" to retaliate against "persons engaged in First Amendment protected activities."[171]  The Monitoring Team's review identified no cases of force against individuals engaged in First Amendment activities in 2018, one case in 2019 (0.5% of cases reviewed, 1.9% of all incidents weighted), and three cases in 2020 (1.8% of cases reviewed, 2.9% of all incidents weighted).  In one instance, in 2020, the force reasonably appeared as though it may have been directly in retaliation against an individual engaged in First Amendment activities.

A standalone policy, Policy 804, specifically addresses First Amendment-protected activity, and the Department's adherence to various requirements relating to the First Amendment will be the subject of a separate, forthcoming Monitoring Team compliance review and outcome assessment. Nevertheless, with respect to Paragraph 133, **the consistently low number of cases in which force appeared to be retaliatory against persons exercising their First Amendment rights is consistent with initial compliance.**

### v.  Force Used to Punish a Subject

Consistent with Paragraph 134 of the Decree, BPD Policy 1115 prohibits officers from using force "to punish persons for fleeing, resisting arrest or assaulting a member, or for any other reason."[172] Overall, BPD officers are by and large not using force to punish in this way, complying with

---

[169] Policy 1115 at 9.
[170] *Id.*
[171] *Id.* at 2.
[172] *Id.*

Decree and Policy requirements in 98.1% of all incidents (weighted) where applicable in 2018, 98.1% of all incidents (weighted) in 2019, and 98.4% of all incidents (weighted) in 2020.

Reviewers identified 5 cases in 2018 in which force appeared to be used to punish the subject for fleeing, resisting arrest, or assaulting an officer. When weighted to account for the overall frequency of force levels in the manner described previously, this amounted to 1.7% of 2018 force incidents overall. Force was used to punish the subject in 4 cases (1.6% of overall incidents weighted) in 2019, and 4 cases (1.2% of overall incidents weighted) in 2020.

**Table** 35**.** **Force Incidents Where Force Was Used to Punish the Subject for Fleeing, Resisting Arrest, or Assaulting an Officer**

|  |  | Yes |  | No |  | Not Applicable |  |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 3.0 | 1.7% | 172.9 | 98.1% | 0.2 | 0.1% |
|  | Unweighted Frequency | 5 | 2.7% | 180 | 95.7% | 3 | 1.6% |
|  | *Level 1* | 1 | 1.2% | 81 | 98.8% | 0 | 0.0% |
|  | *Level 2* | 2 | 2.7% | 73 | 97.3% | 0 | 0.0% |
|  | *Level 3* | 2 | 7.4% | 23 | 85.2% | 2 | 7.4% |
| **2019** | Weighted Frequency | 3.0 | 1.6% | 179.9 | 98.1% | 0.4 | 0.2% |
|  | Unweighted Frequency | 4 | 2.2% | 179 | 96.2% | 3 | 1.6 |
|  | *Level 1* | 1 | 1.2% | 85 | 98.8% | 0 | 0.0% |
|  | *Level 2* | 2 | 2.6% | 76 | 97.4% | 0 | 0.0% |
|  | *Level 3* | 1 | 4.5% | 18 | 81.8% | 3 | 13.6% |
| **2020** | Weighted Frequency | 2.0 | 1.2% | 162.8 | 98.4% | 0.7 | 0.4% |
|  | Unweighted Frequency | 4 | 2.4 | 162 | 95.3% | 4 | 2.4 |
|  | *Level 1* | 1 | 1.2% | 83 | 98.8% | 0 | 0.0% |
|  | *Level 2* | 0 | 0.0% | 64 | 100.0% | 0 | 0.0% |
|  | *Level 3* | 3 | 13.6% | 15 | 68.2% | 4 | 18.2% |

BPD identified some, but not all, of the incidents in which officers appeared to use force to punish the subject for fleeing, resisting arrest, or assault the officer. In 2018, BPD found as out of policy 2 of the 5 incidents that the Monitoring Team identified as implicating the issues. In 2019, BPD determined 2 of 3 incidents to be out of policy. In 2020, BPD closed 1 of 3 cases as out of policy,

with one case, being handled by SIRT, still open, though the involved member has resigned.  An additional two cases from 2020 lacked disposition data.

The rate of compliance in 2020 – 98.4% across all 2020 force incidents, per weighted statistics – establishes a presumption of compliance.  However, other factors weigh against a certification of compliance.  Specifically, BPD appropriately identified some, but not all instances of retaliation in each year from 2018 through 2020.  Further, the severity of the force used, the propensity for such retaliatory force incidents to undermine community confidence, and the abdication of professional responsibility and restraint inherent in incidents implicating concerns about retaliation are significant.  Consequently, even as it does not appear that retaliatory force is very common, BPD will need to demonstrate that it identifies those limited instances where it occurs and takes appropriate corrective action with respect to officers who impermissibly use force to punish. **Although the Department is close to compliance, the Monitoring Team will look to see that the Department improves at identifying and addressing instances where retaliatory force occurs before being able to find initial compliance with respect to Paragraph 134's provision prohibiting punitive force.**

<em>vi.    Use of Weapons/Techniques Not Allowed or Not Trained</em>

BPD policy provides that an officer "may only use weapons and/or force techniques that are allowed by policy and on which the member is trained, unless warranted by the Totality of the Circumstances."[173]  **The incidence of unapproved weapons and force techniques declined between 2018 and 2020, with officers very infrequently using weapons or force techniques not allowed by policy or on which officers were not trained – which is consistent with initial compliance.**

**Table 36.     Did Members Use Any Weapons and/or Force Techniques Not Allowed by Policy and/or On Which the Member Was Not Trained?**

|  |  | Yes |  | No |  | Unable to Determine |  | Not Applicable |  |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 4 | 2.3% | 170.8 | 97.4% | 0.6 | 0.3% | 0.7 | - |
|  | All Force | 10 | 5.3% | 174 | 92.1% | 1 | 0.5% | 3 | - |
|  | *Level 1* | 1 | 1.2% | 81 | 98.8% | 0 | 0.0% | 0 | - |
|  | *Level 2* | 3 | 4.1% | 70 | 94.6% | 1 | 1.4% | 1 | - |
|  | *Level 3* | 6 | 23.1% | 20 | 76.9% | 0 | 0.0% | 1 | - |
| **2019** | Weighted Frequency | 1.6 | 0.9% | 179.9 | 98.3% | 1.4 | 0.8% | 0.3 | - |

---

[173] Policy 1115 at 6.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Force | 4 | 2.2% | 177 | 95.2% | 3 | 1.6% | 2 | - |
| | *Level 1* | 0 | 0.0% | 86 | 100.0% | 0 | 0.0% | 0 | - |
| | *Level 2* | 2 | 2.6% | 74 | 94.9% | 2 | 2.6% | 0 | - |
| | *Level 3* | 2 | 10.0% | 17 | 85.0% | 1 | 5.0% | 2 | - |
| **2020** | Weighted Frequency | 0.7 | 0.4% | 164.1 | 99.1% | 0.7 | 0.4% | 0.7 | - |
| | All Force | 4 | 2.4% | 162 | 95.3% | 0 | 0% | 4 | - |
| | *Level 1* | 0 | 0.0% | 84 | 100.0% | 0 | 0.0% | 0 | - |
| | *Level 2* | 0 | 0.0% | 64 | 100.0% | 0 | 0.0% | 0 | - |
| | *Level 3* | 4 | 18.2% | 14 | 63.6% | 4 | 18.2% | 4 | - |

Still, of those instances where an officer used unapproved weapons or techniques, very few were justified by the totality of the circumstances. Specifically, of the 10 cases involving use of an unapproved weapon or techniques that the Monitoring Team reviewed from 2018, 7 were not warranted by the totality of the circumstances; in 2019, 3 of the 4 cases were not warranted; and in 2020, 3 of the 4 incidents cases not warranted. Of the 3 cases where the force was inconsistent with the core necessity, proportionality, reasonableness, or de-escalation requirements, BPD found one case "out of policy," while the other case remains open and does not currently have a recorded disposition.

The Monitoring Team observes that, across the audited years, multiple cases involved the application of various types of force to an individual's neck or mouth area that ostensibly were intended to prevent a subject from swallowing drugs or other potentially dangerous subjects. The intent of preventing a subject from harming themselves is certainly principled, but the potential risk of such force under those circumstances must be adequately weighed. The Monitoring Team advises BPD to provide follow-up guidance and training to officers on how to address subjects who may be attempting to ingest harmful substances.

Although the Monitoring Team will want to see continuing evidence of BPD identifying and correcting any instances of force that uses weapons or techniques not a part of BPD training or specific policy mandates, **the sustained, low frequency of instances where officers used unauthorized weapons or techniques that were not justified establishes initial compliance with implicated policy provisions.**

## G.   Deadly Force

BPD policy defines Deadly Force/Lethal Force as "[a]ny force likely to cause death or Serious Physical Injury, whether the member intended to cause death or Serious Physical Injury or not."[174]

---

[174] *Id.* at 3.

Serious Physical Injury is defined, in turn, as "a disfigurement or substantial disruption or harm to one or more body parts, organs, or systems."[175]   Expressly identified examples of Deadly Force/Lethal Force include:

- The discharge of a firearm at a person;
- Strikes with any hard object such as a baton, flashlight, radio, weapon stock/handle, or Improvised
- Impact Weapon to the head, neck, sternum, spine, groin, or kidneys;
- Intentionally striking a person's head against a hard, fixed object such as a roadway, concrete floor, wall, or iron bars;
- Knee strikes or kicks to a person's head;
- Any strikes to a person's throat;
- "Knee drops" against a prone or supine person's head, neck, or torso;
- Chokeholds/Neck Holds;
- Shooting someone in the head, neck, chest, or back, with a Less-Lethal Launcher at close range.
- The use of any force on a person whose health, age, condition, or circumstances make it likely death or Serious Physical Injury will result.[176]

In this way, Deadly Force includes more than solely an officer using a firearm.  It may include force that does in fact cause death, where the risk of death is reasonably foreseeable, as well as any force of a type that, because of its nature and the risk of significant physical harm, is likely to cause serious injury *regardless of whether such physical harm did or did not occur in the particular incident*.  Thus, an officer has used Deadly Force when, for instance, they have discharged a weapon that does not strike an individual, delivered a knee strike to the head that did not cause a subject injury, or applied a physical maneuver that "applie[d] pressure to the front, side, or back of the neck" consistent with the Department's definition of a Chokehold/Neck Hold.[177]

The Monitoring Team reviewed, as described previously, all Level 3 force – and, therefore, all instances of deadly/lethal force.  In some instances, the Team also encountered incidents that were classified as another Level but should have been classified as a Level 3.

BPD policy provides that "[t]he use of Deadly Force/Lethal Force shall always be the last resort."[178]   Consistent with this charge, officers "shall not use Deadly Force/Lethal Force unless

---

[175] *Id.* at 4.
[176] *Id.* at 3.
[177] *Id.* at 2.
[178] Policy 1115 at 7.

they have exhausted de-escalation and Less-Lethal Force options have been tried and failed, or are not safe based on the Totality of the Circumstances."[179]

The Monitoring Team evaluated whether involved officer(s) tried all Less-Lethal Force options that were safe based on the Totality of the Circumstances and whether those options failed before they employed deadly force.  Of the 12 deadly/lethal force applications in 2018, in 4 circumstances (or one-third of all deadly/lethal force applications that year), not all less-lethal force options safe under the totality of circumstances were tried and failed.  In 2019, the prevalence and proportion of deadly force where all other options were not tried and failed were much lower.  Of the 16 deadly/lethal force applications, only 2 involved a failure to exhaust less-lethal force options.  In 2020, of the 11 deadly/lethal force applications, 2 incidents involved a failure to exhaust less-lethal options.  **The decline of cases in 2019 and 2020 in which officers deployed deadly/lethal force options before exhausting other reasonably available, less-lethal options is a positive development for which BPD and officers should be commended.**

BPD policy further provides that Deadly Force/Lethal Force may be used only when officers "reasonably believe" that such force "is immediately necessary to protect a member or another person from an Imminent Threat of death or Serious Physical Injury."[180]  The Monitoring Team therefore evaluated whether a reasonable officer, in the circumstances of the involved officer(s), would have believed that Deadly Force/Lethal Force was necessary to protect from an imminent threat.

In 2018, 4 of 12 deadly/lethal force applications were instances where reviewers determined that a reasonable officer would *not* have believed that deadly/lethal force was immediately necessary to protect against an imminent threat.  In 2019, the incidence declined to 2 of 16 deadly/lethal force applications.  In 2020, the incidence was 3 out of 11 deadly/lethal force applications.  Across the 9 total instances where deadly/lethal force was used when not necessary to protect against an imminent threat, subjects received injuries of some type in 6 cases.  No subject injuries in those 9 cases were fatal.

BPD policy prohibits the use of Deadly Force/Lethal Force in some circumstances.  First, Deadly Force/Lethal Force may "not be used to subdue persons whose conduct is a threat only to property."[181]  Generally, BPD officers are complying with this requirement.  In 2018, 1 case implicated the use of deadly force to subdue a subject whose conduct was solely a threat to property.  In both 2019 and 2020, no deadly force incidents involved the application to individuals who only posed a threat to property.

---

[179] *Id.* at 7–8.
[180] *Id.* at 3.
[181] *Id.* at 8.

Second, Deadly Force/Lethal Force may "not be used against persons whose conduct is a threat only to themselves."[182] BPD officers appropriately did not use deadly/lethal force in this way in any of 2018, 2019, or 2020.

Finally, officers may use Deadly Force/Lethal Force "to prevent the escape of a fleeing person" only if several conditions are met.[183] BPD officers used deadly/lethal force against fleeing subjects 3 times in 2018, 3 times in 2019, and in 1 instance in 2020. That force may be justified under BPD policy if, first, "no Reasonable force alternative exists."[184] Across the 7 instances in 2018, 2019, and 2020, the Monitoring Team could not identify another reasonably available force option. However, the absence of an alternative to deadly/lethal force under the circumstances does not automatically authorize the use of such force under BPD policy. Instead, force may be used only when there is probable cause to believe three specific things. First, officers must have probable cause that "[t]he person has committed or is in the process of committing a felony involving the infliction or threatened infliction of Serious Physical Injury or death."[185] In 2018, reviewers concluded that this applied to 1 of the 3 incidents at issue. In 2019, this applied to all 3 of the 3 relevant incidents. In 2020, this applied to the 1 relevant incident. Second, officers must *also* have probable cause that "[t]he escape of the person would pose an Imminent Threat of death or Serious Physical Injury to the member or another unless the person is apprehended without delay."[186] This requirement was met in 2 of 3 incidents in 2018, in all 3 incidents in 2019, and in 1 incident in 2020. Finally, officers must have identified themselves, warned the subject of the intention to use deadly/lethal force, and provide "a reasonable opportunity to comply voluntarily" as "time, safety, and the circumstances permit."[187] This requirement was met in 1 of 3 incidents in 2018, in 2 of 3 incidents in 2019, and was judged "not applicable" under the circumstances in the 2020 case.

Regardless of whether the subject is fleeing, officers applying deadly/lethal force must also, "[w]here safety permits," identify themselves "as a law enforcement officer and state" their "intention to use Deadly Force/Lethal Force before using a firearm or employing Deadly Force/Lethal force."[188] Officers failed to do so where Monitoring Team reviewers indicated that it was feasible under the circumstances in 3 of 12 deadly/lethal force incidents in 2018, in 2 of 16 incidents in 2019, and in 3 of 11 incidents in 2020.

"Prior to the decision to employ Deadly Force/Lethal Force," officers "shall consider environmental considerations such as field of fire, backdrop, bystanders, potential for ricochet, possibility of over-penetration, and other risks to life" beyond only those posed to the subject.[189]

---

[182] *Id.*
[183] Policy 1115 at 8.
[184] *Id.*
[185] *Id.*
[186] *Id.*
[187] *Id.*
[188] Policy 1115 at 8; Dkt. 2-2 ¶ 163.
[189] Policy 1115 at 8.

Monitoring Team reviewers indicated that officers did not reasonably account for such environmental considerations in 3 of 12 deadly/lethal force incidents in 2018, in 4 of 16 incidents in 2019, and in 1 of 11 incidents in 2020.  In only a limited number of these instances implicating environmental considerations did Monitoring Team reviewers conclude that a reasonable officer under the circumstances would have considered the environmental factors – in 1 of the 3 cases in 2018, 2 of the 4 cases in 2019, and not in the 2020 case.  This means that, although issues related to backdrop, bystanders, and the like were implicated in some deadly/lethal force incidents, a reasonable officer under the circumstances may not have been able to actively evaluate them in at least some instances.

Overall, three of the 11 deadly/lethal force incidents in 2020 were evaluated by the Monitoring Team as inconsistent with the Decree and BPD policy's core requirements regarding necessity, proportionality, reasonableness, and de-escalation.  Considering this in light of BPD's compliance with other requirements discussed above, the Monitoring Team can conclude that BPD is making continuing, sustained improvements with respect to the application of deadly/lethal force – with such force increasingly being used as a last resort and consistent with BPD policy.  However, **the gravity of the force implicated points toward BPD needing to demonstrate further improvement in connection to the deployment of such force.**

## H.      Force Instrument-Specific Considerations

In addition to general and overall requirements that apply to all uses of force, regardless of the type, instrument, or technique used, the Consent Decree – and therefore BPD policy – includes many specific and detailed requirements that relate to specific force instruments.  These policies on specific instruments outline specific considerations and additional requirements that allow BPD officers to adhere to the general requirements and principles of BPD's general Use of Force Policy and the Consent Decree.  The following sections evaluate BPD's adherence to the Decree's various requirements on the use of firearms, CEWs (Tasers), batons and Impact Weapons, and OC spray (pepper spray).

### 1.   Firearms

The discharge of a firearm is always classified as Deadly Force/Lethal Force under BPD policy, and the requirements governing Deadly Force/Lethal Force apply.  This report analyzes BPD's adherence to these requirements elsewhere (see "Deadly Force," above).

Overall BPD data across all uses of force show that BPD officers discharged firearms during a relatively steady number of incidents across 2018 through 2021 (16 incidents in 2018, 27 in 2019,

16 in 2020, and 21 in 2021).  It appeared that all officers who used firearms were appropriately qualified to carry a firearm.[190]

Additional requirements apply to officers exhibiting or pointing a firearm at a person, regardless of whether it is discharged.  BPD's Policy 409, Firearms Regulations, specifically addresses the un-holstering, exhibiting, and pointing of a firearm.[191]  That policy prohibits officers from "point[ing] a firearm at a person unless they reasonably believe that the person poses a present or imminent threat of death or serious physical injury to the member or another person."[192]

Across *all* BPD uses of force, **the number of instances in which officers pointed a firearm at a subject decreased notably – from 461 incidents in 2018 to 209 incidents in 2021.**  Focusing on the subset of force cases that were the subject of the Monitoring Team's structured qualitative review, across the 21 identified cases in 2018 where officers pointed a firearm at a person, 30 cases in 2019, and another 30 cases in 2020, Monitoring Team evaluators determined that in only 1 2018 case would a reasonable officer under the circumstances *not* have believed that the situation might escalate to create an imminent threat of serious bodily injury to an officer or another person.  Thus, **nearly all instances where officers pointed firearms at subjects were consistent with BPD policy and the Decree.**

Finally, officers may not fire warning shots.[193]  The assessment identified no instances in any of 2018, 2019, or 2020 where the discharge of a firearm was a warning shot.

Thus, **with respect to un-holstering, exhibiting, and pointing a firearm at subjects and avoiding the firing of warning shots, the Monitoring Team concludes that BPD officer performance appears to have been superior during the time period evaluated and consistent with initial compliance.**

### 2. CEWs (Tasers)

BPD officers may be equipped, and may use, several types of less-lethal force instruments.  Less-Lethal Force, per BPD policy, is "[f]orce that, when employed as designed, intended, and consistent with policy and training, is not likely to cause death or Serious Physical Injury."[194]

One such less-lethal tool is a CEW, or Taser.  A Taser has two "modes": probe mode and drive-stun mode.  In probe mode, the Taser fires two "darts" or "probes" at a subject that are attached to

---

[190] Dkt. 2-2 ¶ 161.
[191] Policy 409 at 4; Dkt. 2-2 ¶ 160.
[192] Policy 409 at 4.
[193] Policy 1115 at 9; Dkt. 2-2 ¶ 164.
[194] Policy 1115 at 3.

electricity-conducting wires.[195] "If both darts make contact, a circuit is completed and a[n] . . . electrical charge cycle is initiated."[196] This electrical charge delivers rapid, non-continuous electrical pulses that "overwhelm[] the normal nerve traffic, causing involuntary muscle contractions[,] . . . impairment of motor skills,"[197] and temporary neuro-muscular incapacitation. The second mode, drive-stun mode, "is not designed to cause incapacitation."[198] Instead, the Taser acts "as a traditional stun gun-type" instrument as "a pain compliance option."[199]

According to BPD's overall statistics on all uses of force, CEW use declined over the period of 2018, from 77 incidents in 2018 to 17 incidents in 2021 – a 77.9% drop.  The pointing of a CEW, or displaying the electrical arc to a subject to get the subject to comply, also fell, from 131 instances in 2018 to 50 instances in 2021 – a 61.8% drop overall.

In the subset of incidents that the Monitoring Team evaluated qualitatively, the Taser was almost always deployed in "probe mode."  In 2 reviewed deployments (of 23) in 2018, 2 (of 9) in 2019, and 3 (of 10) in 2020, the Taser was used during the incident at some juncture in both "probe" and "drive stun" modes.  In 1 reviewed case in 2018, the Taser was used in "drive stun" mode only.

The Consent Decree prohibits the use of "drive-stun mode as a pain compliance technique."[200] Instead, drive-stun mode is only acceptable either (a) "to supplement the probe deployment to complete the incapacitation circuit" of the Taser in probe mode, or (b) "as a countermeasure to gain separation between the officer and the subject so that officers can consider another force option."[201]  Across the 8 reviewed Taser applications (3 in 2018, 2 in 2019, and 3 in 2020) that involved "drive stun" mode in some manner, at least one of these required conditions was met in only one instance (in 2019, where the CEW was used in "drive stun" mode to supplement the probe deployment to complete the incapacitation circuit).  In all other instances, the requirements for use in "drive stun" mode were not satisfied.  BPD will likely need to provide additional training to officers on the narrow circumstances in which using the Taser in "drive stun" mode is appropriate.

---

[195] *Beaver v. City of Federal Way*, 507 F. Supp. 2d 1137, 1142–43 (W.D. Wash. 2007).

[196] *Id.*

[197] "How the Taser Works," *Boston.com* (Feb. 23, 2013), https://www.boston.com/uncategorized/noprimarytagmatch/2013/02/23/how-the-taser-works/; *accord* Axon Enterprise, *Taser X2 CEW User Manual* 4 (Mar. 2020), https://f.hubspotusercontent20.net/hubfs/3481471/Manuals/X2%20Manuals/X2%20Product%20Manual%20MMU0 037_LE.pdf.

[198] Axon Enterprise, *Taser X2 CEW User Manual* 40 (Mar. 2020), https://f.hubspotusercontent20.net/hubfs/3481471/Manuals/X2%20Manuals/X2%20Product%20Manual%20MMU0 037_LE.pdf.

[199] *Id.*

[200] Dkt. 2-2 ¶ 146(a).

[201] *Id.*

In drive stun mode, "[u]nless the use of lethal force is justified," officers may "not apply CEWs . . . to a subject's head, neck, chest[,] or groin."[202]  No applications to these sensitive areas were apparent in any of the reviewed cases from 2018, 2019, or 2020.

The Consent Decree and BPD policy outline a number of circumstances in which, and characteristics of subjects against whom, Taser application is inappropriate and generally prohibited, unless lethal force would be justified, including when a subject is:

- Pregnant;
- Elderly;
- A preteen or younger;
- Visibly frail;
- Of low body mass;
- In danger of falling from a significant height;
- In physical control of a vehicle in motion;
- Exposed to the MK-9 Pepper Fogger;
- Exposed to a flammable material (such as gasoline or an alcohol-based pepper spray); and
- Fleeing from officers.[203]

Ultimately, the Consent Decree requires that officers "[d]etermine the objective reasonableness of CEW use based on relevant circumstances, including the subject's apparent age, size, physical and mental condition, and the feasibility of lesser force options."[204]

With respect to applying the Taser to individual whose physical condition or location might make deployment especially dangerous or sensitive, BPD officers generally complied with a number of the specific factors outlined above.  In just one reviewed instance, in 2019, the Taser was applied to a subject that a reasonable officer would have identified as elderly.  Otherwise, no Taser applications in any of 2018, 2019, or 2020 reviewed by the Monitoring Team involved pregnant, elderly, preteen/younger, visibly frail, low-body-mass subjects – or subjects whose physical position put them in danger of falling from a significant height, in physical control of a vehicle in motion, exposed to a pepper fogger, or exposed to flammable material.

In 2018, Monitoring Team auditors found several instances where BPD officers deployed Tasers while a subject was running away or fleeing from officers.  Specifically, the Taser was applied to fleeing subjects in 7 incidents.  In 2 of those instances, reviewers concluded that the subject did not pose an imminent threat, making the Taser applications presumptively contrary to BPD policy

[202] Id. ¶ 146(f).
[203] Id. ¶ 146(c); see Policy 719 at 6–7.
[204] Dkt. 2-2 ¶ 146(b).

103

in this regard.  However, in 2019 and 2020, there was just 1 Taser applied to a fleeing subject in each year.  In 2019, the Monitoring Team's review was unable to determine, based on available evidence, whether the subject posed an imminent threat at the time of the Taser deployment.  In 2020, the review confirmed that the subject did pose an imminent threat at the time of the deployment, making the deployment consistent with BPD policy in this regard.

BPD policy, per the Consent Decree, "require[s] that officers not employ more than three cycles or 15 seconds of a CEW against a subject during a single incident," with a standard Taser cycle lasting for 5 seconds.[205]   Only if "lethal force is justified" could more than three cycles or 15 seconds be justified, depending on the circumstances.[206]  The Monitoring Team's review found that, in each of the years 2018, 2019, and 2020, Tasers were most commonly cycled once during an encounter (14 of 19 cases in 2018, 4 of 8 cases in 2019, and 4 of 8 cases in 2020).  Tasers were applied for more than 3 cycles in 1 instance in 2018 and in 2 instances in 2020.  For the 2 incidents in 2020, officers applied 4 Taser cycles in each case, and Monitoring Team reviewers did not identify, beyond the number of cycles applied, significant issues with the basis or justification for the use of force in either instance.  Nevertheless, the Monitoring Team does recommend that the Department give officers continuing guidance about the importance of discontinuing Taser use after 3 applications – to prevent injury to the subject and to the officer, to the extent that Taser is not successfully eliminating noncompliance, resistance, and/or aggression.

More than one CEW may not be activated "at a time against a subject."[207]  This was not an issue in any cases review for 2018, 2019, or 2020.

After each CEW application, the subject must have the ability and be given a reasonable opportunity to comply prior to a subsequent cycle of the CEW.[208]  Officers must generally discontinue use of the CEW as soon as the circumstances no longer require it.[209]  In most cases involving the Taser, officers did give the subject, who had the ability to comply, a reasonable opportunity to comply prior to a subsequent cycle – in 9 of 12 applicable instances in 2018, in 3 of 4 applicable instances in 2019, and in 4 of 6 instances in 2020.  With the exception of one incident in 2018, no Taser applications involved officers continuing to use the CEW after the circumstances no longer required it.

This report elsewhere details BPD compliance with the general requirement to render medical aid following the application of force.  For CEW applications, BPD policy requires that officers also

---

[205] *Id.* ¶ 145; Policy 719 at 7.

[206] Dkt. 2-2 ¶ 145. Policy 719 at 7.

[207] Dkt. 2-2 ¶ 146(h); Policy 719 at 7.

[208] Dkt. 2-2 ¶ 144.

[209] *See* Policy 719 at 5 ("After the first CEW application, members shall assess whether subsequent cycles are necessary . . . . Each deployment [of the CEW] must be justifiable.").

"summon EMS" to the scene.[210]  BPD appropriately summoned medical aid in all instances where the Taser was deployed in 2018, 2019, and 2020.

Overall, and across the specific provisions related to CEW deployment, **BPD officer use of Tasers was consistent with initial compliance across most force incidents where they were used, with positive, encouraging performance trends generally identified across 2018 through 2020.**

### 3.  *Baton/Impact Weapons*

The Decree and BPD policy include a set of requirements relating to batons and Impact Weapons, a term that "[r]efers collectively to batons (including crowd control straight batons and expandable batons) and espantoons," a type of wooden baton that originated in Baltimore.[211]

Within the cases that the Monitoring Team audited, only 3 incidents – one in each of 2018, 2019, and 2020 – involved the application of batons or Impact Weapons.[212]  In no cases was the Impact Weapon an Improvised Impact Weapon ("IIW"), defined in BPD policy as "a device or object that is not a department approved weapon, but is nonetheless used as an impact weapon (e.g., flashlight, radio, or stick)."[213]  Generally, "[t]he use of an IIW as a weapon for the purpose of striking or jabbing is prohibited, except in the rarest of situations where no other reasonable alternative exists."[214]  Regardless, "[a]ny member who uses an IIW must transition . . . to an approved weapon or force technique as soon as possible."[215]  Even as IIW use might be authorized in limited circumstances where no other reasonable alternative exists, the absence of any use of an IIW is consistent with compliance with the various policy provisions governing their use.

BPD policy prohibits officers from using an Impact Weapon "to strike a person who is compliant or who is exhibiting Passive Resistance or Active Resistance."[216]  A "jab, block, or strike" with such a weapon may be justified only "In response to Active Aggression or Aggravated Aggression,"[217] which is "when a person attacks or attempts to attack" an officer or another person or "when a person presents an Imminent Threat of death or serious physical injury to the member

---

[210] Policy 719 at 5; *see* Dkt. 2-2 ¶ 147.
[211] Baltimore Police Museum, *Espantoon* (last visited Mar. 20, 2022), https://baltimorepolicemuseum.com/en/bpd-history/espantoon.html.
[212] The Monitoring Team notes that BPD's overall force statistics from IAPro capture 2 uses of an Impact Weapon/baton in 2018 and then no instances in 2019, 2020, and 2021.  The discrepancy between the Monitoring Team's identification of 3 applications in the subset of cases that were subject to in-depth qualitative review, including incidents in 2019 and 2020, suggest some quality control challenges with respect to that category of force, which the Department will need to work to address.
[213] Policy 1111 at 3.
[214] *Id.* at 6.
[215] *Id.*
[216] *Id.* at 5.
[217] *Id.*

or another person," respectively.[218]  The Monitoring Team identified no instances where a baton or other Impact Weapon was used to strike a compliant subject or a subject exhibitive passive or active resistance.

Paragraph 152 provides that officers may "not use Impact Weapons on individuals who are restrained or under control, even if they are non-compliant, unless they present an imminent threat to the officer or others."[219]  BPD Policy 1111 clarifies that the use of any Impact Weapon is "only permitted in the rare and exceptional circumstances where":

> 5.1     The person is displaying combative and/or violent behavior,
> 5.2     Presents an Imminent Threat to the safety of the member or other persons, and
> 5.3     Lesser means or attempts to resolve the incident such as hands-on arrest or control techniques have failed.[220]

This additional guidance in BPD policy assists officers in ensuring that the use of force against restrained persons is proportional and consistent with general de-escalation principles, as well as with Paragraph 152 of the Decree, which mandates that before using Impact Weapons on restrained subjects, "officers must first attempt to exercise additional control over the individual by using hands-on control measures or arrest control techniques . . . ."[221]

The Monitoring Team identified no instances in which a baton or Impact Weapon was applied to a subject who was already restrained or under control in any of 2018, 2019, or 2020.

A strike to a subject's "head, neck, sternum, spine, groin, or kidneys" constitutes Deadly Force/Lethal Force.[222]  This was implicated in one 2018 case, even as deadly/lethal force was not justified at the time of the strike.  The two other baton/Impact Weapon applications in 2019 and 2020 avoided the subject's head, neck, sternum, spine, groin, and kidneys.

Unless Deadly Force Lethal Force would be justified, an officer may not strike a person with a baton or IIW if that person is "obviously pregnant," "apparently elderly," "apparently a small child," "is visibly frail or has a low body mass," "is under the effects of a medical or behavioral health crisis," or "is in danger of falling from a significant height."  The Monitoring Team did not identify any baton incidents that involved individuals whose physical condition or position put the subject at elevated risk due to a baton strike.

---

[218] Policy 1111 at 2.
[219] Dkt. 2-2 ¶ 152.
[220] Policy 1111 at 6.
[221] Dkt. 2-2 ¶ 152.
[222] Policy 1111 at 5.

Consistent with the principles of proportionality and de-escalation, "[o]nce a person is no longer a threat," an officer "shall stop striking the person."[223]  Officers appropriately discontinued baton application in all 3 incidents in 2018, 2019, and 2020.

BPD policy emphasizes that, as with all other types of force, each application – in this case, "each strike" – must be independently justified and justifiable.[224]  In 1 of the 3 cases, in 2020, it appeared that not every strike was separately justified.  For the 2019 incident, the review could not specifically determine the justification of each strike based on the nature of available evidence.  For the 2018 incident, it appeared that each strike could be separately justified.

Overall, the Decree requires that BPD ensure that "Impact Weapon use will be limited to situations in which such force is objectively reasonable, consistent with" the Consent Decree's general principles on use of force, "and BPD's training. . . ."[225]  Two of the three baton applications were necessary, proportional, and objectively reasonable.  However, only one of the three was consistent with the duty to de-escalate.

BPD officers appear to use batons very infrequently.  To the extent that the specific requirements related to baton usage are therefore rarely activated, BPD officers are adhering to requirements.  Even as the Monitoring Team was troubled a 2020 baton incident, the Team is mindful that instances of noncompliance do not alone negate otherwise sustained compliance across many other officers and incidents.  At the same time, the Monitoring Team sees insufficient evidence of BPD identifying problematic baton performance and taking corrective action in the limited overall number of instances where warranted.  **The Monitoring Team will need to see additional evidence going forward before it can certify initial compliance with requirements relating to the use of batons.**

### 4.  OC Spray

"OC spray is a less-lethal force alternative" that may be "used to gain compliance" of subjects.[226]  Because specific physical and psychological effects may result from OC spray deployment,[227] the Decree outlines specific provisions governing the use of OC spray, and BPD maintains a specific policy on using it.[228]

BPD's overall, aggregate data on all force incidents shows that OC spray is not widely used by BPD officers, with officers applying it in 14 incidents in 2018, 13 in 2019, 16 in 2020, and 9 in

---

[223] *Id.* at 6.
[224] *Id.* at 7 ("Members are required to justify each strike with a Baton or IIW on their Force Report . . . .").
[225] Dkt. 2-2 ¶ 149.
[226] Policy 1118 at 1.
[227] *Id.* at 3.
[228] *See generally* Policy 1118.

2021.  Across the subset of incidents that were subject to the Monitoring Team's qualitative review, officers applied OC spray on 3 occasions in 2018, twice in 2019, and on another 3 occasions in 2020.

Paragraph 155 of the Consent Decree requires that officers, "whenever practical and reasonable, issue a verbal warning to the subject and allow a reasonable amount of time" for the subject to comply before using OC spray.[229]  BPD's Policy 1118 provides additional guidance about the mandatory issuance of a verbal warning "whenever practical."[230]  Across the limited OC spray deployments evaluated, BPD officers issued a warning when practical and reasonable under the circumstances in all but one incident, which occurred in 2018.

The Consent Decree prohibits the use of OC spray on individuals who are handcuffed or restrained.[231]  The only exception is for those circumstances where a subject (1) "is still combative or violent," (2) "presents an imminent threat to the safety of the officer or others," and (3) officers have "first attempt[ed] to exercise additional control over the individual by using hands-on control measures or arrest control techniques" before using OC spray.[232]  Monitoring Team reviewers found no instance in which BPD officers applied OC spray to a subject who was handcuffed or otherwise restrained.

The Decree also prohibits the use of "OC spray to disperse crowds unless individuals within those crowds are committing acts that endanger officer or public safety and security, property, and participants refuse to obey lawful orders to disperse."[233]  One reviewed OC spray application, in 2019, was used to disperse a crowd, with a review of the incident concluding that the policy's exception to the general prohibition on use in crowds applied and that the application was consistent with the Decree's requirements in that respect.

The Consent Decree requires that "after the initial application of OC spray, each subsequent spray must also be objectively reasonable and consistent with" the Department's general "use of force principles."[234]  In all but one instance – a 2019 force incident – each individual application of OC spray was reasonable, necessary, proportional, and consistent with BPD's general use of force principles.

Officers must, as with other types of force, discontinue application of the OC spray when the circumstances no longer require it, which BPD officers did across all OC spray applications reviewed.

---

[229] Dkt. 2-2 ¶ 155.
[230] Policy 1118 at 4.
[231] Dkt. 2-2 ¶ 157.
[232] *Id.* ¶ 157.
[233] *Id.* ¶ 154.
[234] *Id.* ¶ 156.

BPD officers must work to "minimize[e] exposure of non-targeted persons" to OC spray.[235]  The review of OC spray applications found one instance, occurring in 2019, where the exposure to non-targeted individuals was not reasonably minimized.

After using OC spray, BPD officers must decontaminate exposed subjects according to BPD policy.[236]  In 4 cases – including 1 from 2019 and all 3 OC spray deployments in 2020 – reviewers could not determine one way or another, based on the available information and evidence, whether involved BPD officer(s) did or did not decontaminate subjects who were exposed to OC spray. Going forward, BPD supervisors will need to ensure that steps taken to decontaminate subjects per the Decree and BPD policy are more systematically documented – so that compliance with these requirements is always clear.

Officers must also seek medical treatment for individuals to whom OC spray has been applied if (1) they "complain of or exhibit continued effects after having flushed the affected areas"; (2) they "indicate they have a pre-existing medical condition" or "complain of difficulty breathing," "chest pain[,] or if the member observes the person to be having difficulty breathing"; or they "display[] a reaction not consistent with the expected reaction to aerosol OC spray,' such as "difficulty breathing or loss of consciousness."[237]  Across the 3 OC spray applications in 2020, reviewers could not determine, one way or another, whether the subject complained of or exhibited ongoing physical effects after decontamination.  In the 1 instance otherwise where a subject did complain, in 2018, the officer appropriately arranged for immediate transport to a hospital for medical treatment.  In another instance, in 2019, the subject to whom OC spray was applied indicated that they had a pre-existing medical condition that might be aggravated by chemical spray.  BPD personnel appropriately arranged for immediate transport to a hospital for medical treatment.

**Across OC spray applications, BPD officer performance appeared consistent with initial compliance.**  Going forward, BPD will need to ensure improved documentation of post-application actions so that it, and the Monitoring Team, can more readily ensure that subjects have been appropriately decontaminated and received post-incident medical attention when appropriate.

## I.      Duty to Intervene

BPD officers have a duty to intervene to stop or prevent conduct contrary to BPD policy and law. Paragraph 141 of the Consent Decree requires that BPD officers "intervene in incidents in which another officer uses excessive force."[238]  The Department's Use of Force Policy provides that "[m]embers shall prevent or stop the illegal, inappropriate, or excessive Use of Force by other

---

[235] Policy 1118 at 7.
[236] *Id.* at 5, 7.
[237] *Id.* at 5.
[238] Dkt. 2-2 ¶ 141.

members," with the failure to do so "subject[ing] a member to disciplinary action."[239]   The Department's related Duty to Intervene Policy (Policy 319) "set[s] forth the legal, ethical, and affirmative duty . . . to Intervene to prevent or stop Misconduct and/or other problematic behavior."[240]  Thus, the duty on BPD officers is to identify and prevent performance that "violates law or policy," which expressly includes "[e]xcessive force, including intentionally escalating an encounter . . . ."[241]

Indeed, BPD policy clarifies that the duty to intervene attaches not simply when another officer's conduct is clearly or egregiously counter to policy or law but also when officers "see unsafe behavior and/or bad tactics, corner-cutting, and signs of a fellow member's stress and/or mental health issues that are affecting their performance."[242]

As summarized elsewhere in this report, and discussed in prior Monitoring Team reports, all BPD officers completed Ethical Policing is Courageous ("EPIC") training as of 2021 that focused on the Duty to Intervene and seeks to provide officers with skills and techniques to effectively intervene where necessary.  It must also be noted that BPD policy observes that "intervention" may mean verbal or physical interaction "so as to prevent or alter a result or course of events."[243]

The Monitoring Team considered whether, at any point during the incident, an involved officer might have, under the circumstances, reasonably taken affirmative steps to prevent or stop illegal, out-of-policy, inappropriate, and/or excessive force by other members.  In 2018, reviewers identified 9 instances (4.8% of the total 2018 cases reviewed, 3.6% of all incidents weighted) where an officer should have intervened.  In 2019, reviewers identified 7 such instances (3.8% of 2019 cases reviewed, 3.6% of weighted total).  In 2020, reviewers identified 6 such instances (3.5% of the total 2020 incidents, 2.0% of weighted total).  The Team observes that these numbers are, by necessity, different than the overall number of force incidents identified as implicating deficient or out-of-policy force simply because not all incidents allow time for intervention.  For instance, an officer who suddenly and without warning strikes a subject in retaliation for verbal comments could not reasonably have been the subject of intervention even though the use of force itself is inconsistent with policy.

In some of these instances where an officer, or officers, should have intervened, they did.  In 3 out of the 9 instances in 2018, in 1 of the 7 instances in 2019, and in 4 of the 6 incidents in 2020, at least one officer did take affirmative steps to prevent or stop illegal, inappropriate, and/or excessive use of force by other members where they should have.  Intervention was physical, verbal, or some

---

[239] Policy 1115 at 6.

[240] Baltimore Police Department, Policy 319, "Duty to Intervene" (last rev. May 25, 2021), https://public.powerdms.com/BALTIMOREMD/documents/886939.

[241] *Id.* at 2.

[242] *Id.*

[243] *Id.* at 1.

combination of both.  Across the 8 instances where officers did intervene, the intervention was effective in stopping and/or preventing further illegal, out-of-policy, inappropriate, and/or excessive force in 6 instances.

Even as the Monitoring Team identified 2 incidents where intervention was warranted but did not occur, **it is noteworthy that, in 2020, reviewers identified the fewest number of instances where officers might reasonably have intervened under the circumstances to prevent or stop illegal, out-of-policy, inappropriate, and/or excessive force across the three years studied, and, at the same time, reviewers identified the highest number and rate of officers intervening and** *successfully* **intervening (to the extent that it stopped the problematic force).**

The Monitoring Team concludes that BPD is on track toward compliance with respect to officer intervention in problematic force encounters.  However, the relatively low rate of intervention in 2019 and the relative recency of officer training on intervention mean that **the Monitoring Team will want to see continuing, sustained progress with respect to officer intervention before finding initial compliance in the area.**

## J.        Performance Following the Application of Force

The general duty to de-escalate includes the requirement that officers "reduce the level of force as the threat diminishes" and/or the subject's resistance decreases.[244]  **In a vast majority of all force incidents, BPD officers appropriately reduced the level of force or discontinued the application of force as a subject's resistance decreased** – in 98.4% (weighted) of all incidents where applicable in 2018, in 99.0% (weighted) of incidents in 2019, and in 99.0% (weighted) of 2020 incidents.

As noted previously, one lawful reason that force may be applied is to gain the compliance of a subject who poses a threat to individuals.  Consequently, force encounters often involve and/or conclude with subjects being restrained.  In 2018, 89.3% (weighted) of subjects in incidents involving force were restrained at some point.  In 2019, 82.5% (weighted) of subjects were restrained.  In 2020, the percentage was 58.6%.

When subjects are restrained, they "are not to be positioned facedown as it may cause positional asphyxia" or "on their back," which "may lead to radial nerve damage to the wrists and forearms."[245]  Instead, "[r]estrained persons are to be placed in a seated position or on their sides."[246]

---

[244] Dkt. 2-2 ¶ 127.
[245] Policy 1115 at 2.
[246] *Id.*

Consequently, the Monitoring Team's assessment instrument asked reviewers, "Was the subject positioned face-down while restrained?"  That question parallels language from BPD Policy 1115.[247]  In response to a draft of this assessment report, BPD wondered whether the Monitoring Team's findings using this question ensured that officers temporarily placing a subject face-down *while getting the subject into handcuffs* was not being classified as an inappropriate, out-of-compliance instance of officers putting subjects face-down while restrained.  The Department noted that positioning a subject face-down for the purposes of getting the subjects into handcuffs is consistent with typical tactics and training.

The Monitoring Team agrees that the temporary positioning for the purpose of getting a subject into handcuffs is not by itself problematic and should not be considered as inconsistent with the Consent Decree.  The Team does note that the Parties will need to adjust Policy 1115 to account more precisely for this situation.

Upon a review of data collected from reviewers, and comparing "yes/no" determinations on the question of whether subjects were positioned face-down while restrained with narrative descriptions of the ratings, the Monitoring Team does not have the necessary confidence that responses to the question exclude instances where the subject was placed face-down temporarily in order for officers to apply handcuffs.  Consequently, the Monitoring Team must defer evaluation on this requirement and modify the assessment instrument for the next, follow-up force assessment.

If "there is a visible injury, complaint of injury, signs of medical distress, or when medical attention is requested by any person,"[248] BPD officers must "provide emergency first aid consistent with their training and experience until professional medical care providers are on the scene,"[249] which officers must request.[250]  Table 37 summarizes the Monitoring Team's evaluation of subject injury and medical distress.

**Table 37.    Subject Injuries, Complaints of Injuries, Medical Distress, and Requests for Medical Attention**

| *With respect to the applied force . . . . ?* | | | **Yes** | | **No** | | **Unable to Determine** | |
|---|---|---|---|---|---|---|---|---|
| Was the subject visibly injured? | **2018** | Weighted Frequency | 30.9 | 17.9% | 138.2 | 79.9% | 3.9 | 2.3% |
| | | Unweighted Frequency | 58 | 32.2% | 118 | 65.6% | 4 | 2.2% |
| | | *Level 1* | 3 | 3.8% | 76 | 95.0% | 1 | 1.3% |

---

[247] *Id.*
[248] *Id.* at 9.
[249] Dkt. 2-2 ¶ 185.
[250] Policy 1115 at 2.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | *Level 2* | 43 | 57.3% | 29 | 38.7% | 3 | 4.0% |
| | | *Level 3* | 12 | 44.4% | 10 | 37.0% | 5 | 18.5% |
| | **2019** | Weighted Frequency | 34 | 18.7% | 145.5 | 80.1% | 2.1 | 1.2% |
| | | Unweighted Frequency | 56 | 31.5% | 118 | 66.3% | 4 | 2.2% |
| | | *Level 1* | 3 | 3.5% | 83 | 96.5% | 0 | 0.0% |
| | | *Level 2* | 42 | 54.5% | 32 | 41.6% | 3 | 3.9% |
| | | *Level 3* | 11 | 73.3% | 3 | 20.0% | 1 | 6.7% |
| | **2020** | Weighted Frequency | 34 | 20.6% | 129.1 | 78.4% | 1.7 | 1.0% |
| | | Unweighted Frequency | 49 | 29.5% | 113 | 68.1% | 4 | 2.4% |
| | | *Level 1* | 8 | 9.5% | 76 | 90.5% | 0 | 0.0% |
| | | *Level 2* | 32 | 50.0% | 30 | 46.9% | 2 | 3.1% |
| | | *Level 3* | 9 | 50.0% | 7 | 38.9% | 2 | 11.1% |
| Did the subject complain of an injury? | **2018** | Weighted Frequency | 36 | 21.0% | 128 | 74.8% | 7.2 | 4.2% |
| | | Unweighted Frequency | 61 | 35.1% | 105 | 60.3% | 8 | 4.6% |
| | | *Level 1* | 6 | 7.5% | 71 | 88.8% | 3 | 3.8% |
| | | *Level 2* | 44 | 59.5% | 26 | 35.1% | 4 | 5.4% |
| | | *Level 3* | 10 | 58.8% | 6 | 35.3% | 1 | 5.9% |
| | **2019** | Weighted Frequency | 44.2 | 24.4% | 133.9 | 74.0% | 2.9 | 1.6% |
| | | Unweighted Frequency | 58 | 33.3% | 110 | 63.2% | 6 | 3.4% |
| | | *Level 1* | 10 | 11.6% | 76 | 88.4% | 0 | 0.0% |
| | | *Level 2* | 43 | 55.8% | 30 | 39.0% | 4 | 5.2% |
| | | *Level 3* | 5 | 45.5% | 4 | 36.4% | 2 | 18.2% |
| | **2020** | Weighted Frequency | 38.5 | 23.6% | 121.4 | 74.6% | 2.9 | 1.8% |
| | | Unweighted Frequency | 53 | 32.7% | 105 | 64.8% | 4 | 2.5% |
| | | *Level 1* | 8 | 9.6% | 74 | 89.2% | 1 | 1.2% |
| | | *Level 2* | 40 | 62.5% | 22 | 34.4% | 2 | 3.1% |
| | | *Level 3* | 5 | 33.3% | 9 | 60.0% | 1 | 6.7% |
| Did the subject show signs of medical distress? | **2018** | Weighted Frequency | 22.1 | 12.7% | 149 | 85.7% | 2.7 | 1.6% |
| | | Unweighted Frequency | 35 | 19.4% | 142 | 78.9% | 3 | 1.7% |
| | | *Level 1* | 6 | 7.4% | 74 | 91.4% | 1 | 1.2% |
| | | *Level 2* | 20 | 26.7% | 53 | 70.7% | 2 | 2.7% |
| | | *Level 3* | 9 | 42.9% | 12 | 57.1% | 0 | 0.0% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2019** | Weighted Frequency | 17.9 | 9.9% | 161 | 88.8% | 2.3 | 1.3% |
| | | Unweighted Frequency | 25 | 14.3% | 147 | 84.0% | 3 | 1.7% |
| | | *Level 1* | 6 | 7.0% | 79 | 91.9% | 1 | 1.2% |
| | | *Level 2* | 12 | 15.6% | 64 | 83.1% | 1 | 1.3% |
| | | *Level 3* | 7 | 58.3% | 4 | 33.3% | 1 | 8.3% |
| | **2020** | Weighted Frequency | 28.5 | 17.5% | 131.6 | 81.0% | 2.4 | 1.5% |
| | | Unweighted Frequency | 38 | 23.3% | 121 | 74.2% | 4 | 2.5% |
| | | *Level 1* | 9 | 10.8% | 73 | 88.0% | 1 | 1.2% |
| | | *Level 2* | 22 | 34.9% | 40 | 63.5% | 1 | 1.6% |
| | | *Level 3* | 7 | 41.2% | 8 | 47.1% | 2 | 11.8% |

**Monitoring Team reviewers concluded that officers usually, but not necessarily uniformly, either rendered aid consistent with training and requested an emergency medical response or transported the person directly to the nearest emergency room when there was a visible injury, complaint of injury, request for medical attention, or signs of medical distress.**

**Table 38.       Incidents Where Officers Rendered Aid & Requested Emergency Medical Response or Transported Subject Directly to Emergency Room Where Subject Was Visibly Injured, Complained of an Injury, Showed Signs of Medical Distress, or Medical Attention Was Requested**

| | | Yes | | No | | Unable to Determine | |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 46.6 | 81.0% | 8.6 | 15.0% | 2.3 | 4.0% |
| | Unweighted Frequency | 76 | 82.6% | 13 | 14.1% | 3 | 3.3% |
| | *Level 1* | 9 | 75.0% | 2 | 16.7% | 1 | 8.3% |
| | *Level 2* | 53 | 84.1% | 9 | 14.3% | 1 | 1.6% |
| | *Level 3* | 14 | 82.4% | 2 | 11.8% | 1 | 5.9% |
| **2019** | Weighted Frequency | 62.3 | 84.5% | 9.9 | 13.5% | 1.5 | 2.0% |
| | Unweighted Frequency | 87 | 87.0% | 12 | 12.0% | 1 | 5.6% |
| | *Level 1* | 13 | 76.5% | 3 | 17.6% | 1 | 5.9% |
| | *Level 2* | 62 | 88.6% | 8 | 11.4% | 0 | 0.0% |
| | *Level 3* | 12 | 92.3% | 1 | 7.7% | 0 | 0.0% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2020** | Weighted Frequency | 58.4 | 90.4% | 6 | 9.3% | 0.2 | 0.3% |
| | Unweighted Frequency | 77 | 89.5% | 8 | 9.3% | 1 | 1.2% |
| | *Level 1* | 19 | 95.0% | 1 | 5.0% | 0 | 0.0% |
| | *Level 2* | 44 | 86.3% | 7 | 13.7% | 0 | 0.0% |
| | *Level 3* | 14 | 93.3% | 0 | 0.0% | 1 | 6.7% |

If a subject "has been subjected to impact by any type of Less-Lethal Force including impact weapons or impact projectile," the subject must be provided with medical attention regardless of whether there is actual or purported injury.[251]   It appears that subjects in less-lethal force applications are receiving aid from the officer at the scene, when appropriate, and being transported to the nearest hospital as necessary, with Monitoring Team reviewers not identifying any instance where these requirements were not met in any of 2018, 2019, or 2020.

Use of force typically, but does not always, occur in incidents in which the subject of the force is ultimately arrested.  In 2018, 77.8% (weighted) of subjects of force were arrested.  In 2019, 74.0% (weighted) were arrested.  In 2020, the percentage was 74.9%.

**Considering the post-force application performance of officers at the scene overall, BPD still has some distance to travel before being fully compliant with Decree and policy requirements.**  Even as BPD's officers are appropriately discontinuing or reducing the level of force used as a subject's resistance decreases, the lack of uniformly documented and/or provided medical aid when necessary are issues that the Department will need to address.

## K.    On-Scene Supervision

In some cases, one or more BPD supervisors was present or involved in the force incident itself. In about one-third of all force incidents in each year evaluated (33.1% (weighted) of incidents in 2018, 30.8% (weighted) in 2019, and 36.2% (weighted) in 2020), an on-scene supervisor was present during the application of force.  Where supervisors were present, the supervisor was overwhelmingly likely to be an officer's first-line supervisor, a sergeant.  A noteworthy trend is a decline in 2020 of supervisors further up the chain of command than sergeant being present when force was deployed.  Personnel at the rank of lieutenant or higher were the on-scene supervisor in 19.3% (weighted) of instances where a supervisor was on the scene in 2018 and in 14.4% (weighted) of similar instances in 2019 – but in 4.6% (weighted) of instances in 2020.

---

[251] *Id.* at 9.

The expectation, with a supervisor on the scene, is that the supervisor will provide appropriate tactical guidance, oversight, and direction during the incident.  Monitoring Team reviewers identified improvement over time with respect to on-scene supervisors providing appropriate tactical guidance, oversight, and direction during the incident – from 60.8% of reviewed cases where a supervisor was present in 2018 to 68.8% in 2019 and 79.2% in 2020.  **Even as this improvement over time is notable and appears sustained, the incidence across years, through 2020, of on-scene supervisors failing to provide appropriate tactical guidance has remained too frequent to be consistent with initial compliance.**  BPD supervisors will need to continue to assert enhanced and appropriate command and control of force situations going forward for the Department to be considered in compliance with requirements related to on-scene supervision.

## L.      Officer Use of Force Reporting

The Consent Decree requires that BPD "officers notify a permanent-rank supervisor immediately, or as soon as practicable, following a Reportable Force."[252]  **BPD officers are largely complying with the requirement to report force,** as Table 39 illustrates – **which is consistent with initial compliance.**

**Table 39.      Incidents In Which Involved Officer(s) Notified a Permanent-Rank Supervisor Immediately**

|  |  | Yes |  | No |  | Unable to Determine |  |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 158.2 | 91.6% | 4.9 | 2.8% | 9.6 | 5.6% |
|  | Unweighted Frequency | 171 | 93.4% | 4 | 2.2% | 8 | 4.4% |
|  | *Level 1* | 72 | 90.0% | 3 | 3.8% | 5 | 6.3% |
|  | *Level 2* | 72 | 96.0% | 0 | 0.0% | 3 | 4.0% |
|  | *Level 3* | 24 | 96.0% | 1 | 4.0% | 0 |  |
| **2019** | Weighted Frequency | 169.2 | 92.7% | 3 | 1.6% | 10.4 | 5.7% |
|  | Unweighted Frequency | 174 | 94.1% | 2 | 1.1% | 9 | 4.9% |
|  | *Level 1* | 78 | 90.7% | 2 | 2.3% | 6 | 7.0% |
|  | *Level 2* | 75 | 97.4% | 0 | 0.0% | 2 | 2.6% |
|  | *Level 3* | 21 | 95.5% | 0 | 0.0% | 1 | 4.5% |

---

[252] Dkt. 2-2 ¶ 170; Policy 1115 at 10.

| | | 159.3 | 97.2% | 4.2 | 2.6% | 0.4 | 0.2% |
|---|---|---|---|---|---|---|---|
| | Weighted Frequency | 159.3 | 97.2% | 4.2 | 2.6% | 0.4 | 0.2% |
| **2020** | Unweighted Frequency | 160 | 95.2% | 6 | 3.6% | 2 | 1.2% |
| | *Level 1* | 82 | 98.8% | 1 | 1.2% | 0 | 0.0% |
| | *Level 2* | 60 | 93.8% | 4 | 6.3% | 0 | 0.0% |
| | *Level 3* | 18 | 85.7% | 1 | 4.8% | 2 | 9.5% |

Although a supervisor typically becomes aware of force being used as a result of the involved officers reporting it, "[a]ny member with knowledge that another member used force must also immediately report that Use of Force to a permanent-rank supervisor."[253] Across 2018, 2019, and 2020, 6 reviewed cases did not appear to be reported immediately by either the involved officer or any other BPD personnel.

The Monitoring Team intends, in the future, to conduct a more comprehensive audit of both civilian complaints and general body-worn camera footage to determine whether there are instances of force occurring that are going entirely unreported, and therefore unlogged, by BPD. Nevertheless, with respect to the many force cases that were reported **across 2018, 2019, and 2020, officers complied with Decree and policy requirements in all but a small number of instances.**

"Any officer that discharged their firearm" during an incident must "provide a Public Safety Statement to their supervisor when the[ supervisor] arrive[s] on the scene."[254] **BPD cannot establish compliance at this time, with reviewers being able to verify that a public safety statement was given in 58.3% of reviewed cases involving a firearm discharge in 2018, in 53.3% of such cases in 2019, and in only 33.3% of these cases in 2020.**

The Decree lists a number of elements that the Public Safety Statement must include.[255] In those instances where the provision of a Public Safety Statement could be verified, many of the Decree-required elements of the Public Safety Statement were appropriately present. In 71.4% of cases from 2018 where the provision of a Public Safety Statement could be verified, the public safety statement either included everything required by the Decree or included just one of the listed elements. In 2019, 87.5% of public safety statements reached this level. In 2020, this percentage

---

[253] Policy 1115 at 10.
[254] Dkt. 2-2 ¶ 172.
[255] *Id.* The public safety must include a description of the type of force used by the officer; the threat presented by other involved parties; the direction and approximate number of shots fired by the involved officer(s) and suspect(s); the location of any unsecured weapons; the location of injured persons; outstanding suspect(s); the subject's direction of travel; the time elapsed since the suspect was last seen; any weapon(s) that were available to the suspect; known victims or witnesses, including their location; any known evidence, including the location of such evidence; and other information necessary to ensure officer and public safety, and assist in the apprehension of outstanding suspects. *Id.*

was down to 66.7% – but this was at least partially due to the fact that the year saw fewer firearms discharge situations (3 cases) where the requirements involving Public Safety Statements were applicable than in 2018 (7 cases) or 2019 (8 cases).

Any BPD officer "who uses or observes a use of Reportable Force" must provide a written Use of Force report "by the end of their tour duty."[256]  Officers are documenting the force in a written report by the end of their tour of duty in many instances, and the proportion of cases where reviewers could confirm timely reporting increased year over year during the period studied. However, the proportion of cases where reviewers could conclude that officers did *not* submit a timely report also increased – because the proportion of cases where reviewers could not reach a definitive conclusion, one way or another, decreased substantially over the period evaluated.

**Table 40.**　　**Incidents In Which Officers Using or Observing Force Provided a Written Use of Force Report By the End of Their Tour of Duty**

|  |  | Yes |  | No |  | Unable to Determine |  |
|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 144.4 | 82.7% | 9 | 5.2% | 21.1 | 12.1% |
|  | Unweighted Frequency | 145 | 78.8% | 11 | 6.0% | 28 | 15.2% |
|  | *Level 1* | 68 | 84.0% | 4 | 4.9% | 9 | 11.1% |
|  | *Level 2* | 61 | 68.9% | 4 | 8.9% | 10 | 22.2% |
|  | *Level 3* | 14 | 53.8% | 3 | 11.5% | 9 | 34.6% |
| **2019** | Weighted Frequency | 148.2 | 80.8% | 10.9 | 5.9% | 24.3 | 13.3% |
|  | Unweighted Frequency | 148 | 79.6% | 12 | 6.5% | 26 | 13.9% |
|  | *Level 1* | 69 | 80.2% | 6 | 7.0% | 11 | 12.8% |
|  | *Level 2* | 65 | 83.3% | 2 | 2.6% | 11 | 14.1% |
|  | *Level 3* | 14 |  | 4 |  | 4 |  |
| **2020** | Weighted Frequency | 152.8 | 92.4% | 9.9 | 6.0% | 2.6 | 1.6% |
|  | Unweighted Frequency | 149 | 88.2% | 15 | 8.9% | 5 | 2.9% |
|  | *Level 1* | 81 | 96.4% | 2 | 2.4% | 1 | 1.2% |
|  | *Level 2* | 53 | 82.8% | 10 | 15.6% | 1 | 1.6% |
|  | *Level 3* | 15 | 71.4% | 3 | 14.3% | 3 | 14.3% |

---

[256] Dkt. 2-2 ¶ 173; Policy 725 at 4.

The specific requirements for use of force reports vary according to the Level of force for which the incident is classified. For lower-level, Level 1 force, nearly all officer reports in 2020 satisfied basic requirements as to content and comprehensiveness, as Table 41 illustrates. [257]

**Table 41.      Officer Use of Force Reports, Level 1 Force**

| *Did the officer report . . . . ?* | | Yes | | No | | Unable to Determine | | N/A |
|---|---|---|---|---|---|---|---|---|
| The reason for the initial police presence? | **2018** | 81 | 89.0% | 0 | 0.0% | 10 | 11.0% | 0 |
| | **2019** | 78 | 88.6% | 10 | 11.4% | 0 | 0.0% | 0 |
| | **2020** | 87 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 |
| A specific description of the acts that led to the Reportable Force? | **2018** | 78 | 88.6% | 0 | 0.0% | 10 | 11.4% | 2 |
| | **2019** | 77 | 98.7% | 1 | 1.3% | 0 | 0.0% | 1 |
| | **2020** | 86 | 98.9% | 1 | 1.1% | 0 | 0.0% | 0 |
| The level of resistance encountered? | **2018** | 78 | 88.6% | 0 | 0.0% | 10 | 11.4% | 2 |
| | **2019** | 73 | 86.9% | 1 | 1.2% | 10 | 11.9% | 4 |
| | **2020** | 84 | 100.0% | 0 | 0.0% | 0 | 0.0% | 2 |
| A description of every type of Reportable Force used? | **2018** | 74 | 85.1% | 4 | 4.6% | 9 | 10.3% | 2 |
| | **2019** | 76 | 86.4% | 1 | 1.1% | 11 | 12.5% | 0 |
| | **2020** | 85 | 97.7% | 2 | 2.3% | 0 | 0.0% | 0 |

For higher-level force, or Level 2 and Level 3 force incidents, the Consent Decree requires that reports cover all of the bases required for Level 1 force and additional elements.[258] In comparison with most Level 1 reports, which covered the required areas, Level 2 and Level 3 reports were incomplete, and across several dimensions. Specifically, in too many instances, officers are failing to inventory the force options available to the officer under the circumstances (not addressing this in nearly three-quarters (74.2%) of Level 2 and Level 3 reports in 2020), recounting the presence and location of witnesses at the scene of the incident (not addressing this in 43.1% of force reports in 2020), and not detailing the de-escalation techniques that they employed (not inventorying such techniques in well more than one-quarter (28.6%) of Level 2 and Level 3 incidents in 2020). Although BPD has seen improvement over time with respect to the coverage of de-escalation in Level 2 and Level 3 force reports, there have been no sustained improvements with respect to the presence of witnesses and other force options.

For four other requirements – (1) a detailed description of the suspect, (2) the level of resistance encountered, (3) the threat that the subject posed, and (4) a description of every reportable force used – BPD's performance improved steadily over time, with officers reaching their highest rate of compliance along each of these dimensions in 2020. Still, given the importance of these

---

[257] *See* Dkt. 2-2 ¶ 173(a).
[258] *Id.* ¶ 173(b).

reporting requirements, the Monitoring Team will need to see some continued improvement and sustained performance in these areas before the Department can be considered in compliance.

At the same time, BPD officers are almost uniformly and appropriately addressing the reason for the initial police presence, the severity of the crime at issue, and a specific description of the subject's actions that led to the use of Reportable Force. Consequently, BPD's performance in these areas is generally consistent with compliance.

**Table 42.        Officer Use of Force Reports, Level 2 and Level 3 Force**

| *Did the officer report . . . . ?* | | Yes | | No | | Unable to Determine | | N/A |
|---|---|---|---|---|---|---|---|---|
| The reason for the initial police presence? | 2018 | 81 | 83.5% | 3 | 3.1% | 13 | 13.4% | 1 |
| | 2019 | 83 | 86.5% | 4 | 4.2% | 9 | 9.4% | 2 |
| | 2020 | 76 | 97.4% | 2 | 2.6% | 0 | 0.0% | 4 |
| A detailed description of the subject? | 2018 | 76 | 80.9% | 6 | 6.4% | 12 | 12.8% | 2 |
| | 2019 | 75 | 83.3% | 6 | 6.7% | 9 | 10.0% | 8 |
| | 2020 | 69 | 90.8% | 5 | 6.6% | 2 | 2.6% | 6 |
| The severity of the crime at issue? | 2018 | 77 | 83.7% | 2 | 2.2% | 13 | 14.1% | 6 |
| | 2019 | 76 | 87.4% | 2 | 2.3% | 9 | 10.3% | 11 |
| | 2020 | 71 | 97.3% | 2 | 2.7% | 0 | 0.0% | 9 |
| The presence and location of witnesses at the scene? | 2018 | 51 | 58.0% | 22 | 25.0% | 15 | 17.0% | 10 |
| | 2019 | 52 | 65.8% | 15 | 19.0% | 12 | 15.2% | 17 |
| | 2020 | 36 | 55.4% | 28 | 43.1% | 1 | 1.5% | 17 |
| A specific description of the acts that led to the use of Reportable Force? | 2018 | 80 | 83.3% | 4 | 4.2% | 12 | 12.5% | 2 |
| | 2019 | 81 | 86.2% | 4 | 4.3% | 9 | 9.6% | 3 |
| | 2020 | 78 | 98.7% | 1 | 1.3% | 0 | 0.0% | 3 |
| The level of resistance encountered? | 2018 | 74 | 83.1% | 3 | 3.4% | 12 | 13.5% | 9 |
| | 2019 | 76 | 84.4% | 3 | 3.3% | 11 | 12.2% | 8 |
| | 2020 | 68 | 90.7% | 7 | 9.3% | 0 | 0.0% | 7 |
| The threat the subject posed? | 2018 | 68 | 78.2% | 7 | 8.0% | 12 | 13.8% | 10 |
| | 2019 | 62 | 76.5% | 9 | 11.1% | 10 | 12.3% | 17 |
| | 2020 | 66 | 90.4% | 7 | 9.6% | 0 | 0.0% | 9 |
| The force options available to the officer? | 2018 | 21 | 24.7% | 50 | 58.8% | 14 | 16.5% | 13 |
| | 2019 | 16 | 21.6% | 45 | 60.8% | 13 | 17.6% | 22 |
| | 2020 | 16 | 25.8% | 46 | 74.2% | 0 | 0.0% | 20 |
| Any de-escalation techniques used? | 2018 | 49 | 54.4% | 29 | 32.2% | 12 | 13.3% | 8 |
| | 2019 | 58 | 69.0% | 16 | 19.0% | 10 | 11.9% | 14 |
| | 2020 | 47 | 67.1% | 20 | 28.6% | 3 | 4.3% | 11 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| A description of every type of Reportable Force used? | **2018** | 71 | 75.5% | 11 | 11.7% | 12 | 12.8% | 3 |
| | **2019** | 78 | 83.0% | 6 | 6.4% | 10 | 10.6% | 3 |
| | **2020** | 68 | 87.2% | 9 | 11.5% | 1 | 1.3% | 4 |

Across reports for all levels of force, the Decree requires that officer use of force statements "not use conclusory statements, boilerplate, or canned language" but, instead, provide "incident-specific detail."[259]  Officers appropriately avoided using conclusory statements in 90.4% of all reports in 2020 – which represented improved performance compared to 2018 (76.5%) and 2019 (80.3%).  Similarly, officers appropriately avoided the use of "boilerplate" or "canned" language in 87.9% of reports in 2020 – improvements over 2018 (72.2%) and 2019 (77.6%).  In those instances where officer reports included conclusory, boilerplate, or canned language, officers supported these statements with sufficiently specific incident details in 57.7% of such reports in 2018, in 27.8% of reports in 2019, and in 52.9% of reports in 2020.  Thus, even as officer reports are improving along these various dimensions, the importance of these requirements also means that, for these requirements, the Monitoring Team will need to see enhanced, sustained performance going forward.

The Decree also requires that, if any force reports contain "material omissions or inaccuracies," BPD "take corrective action," including officer discipline as appropriate and "thoroughly review[ing] the entire incident . . . to determine the truth of the incident."[260]  For purposes of this inquiry, an omission or inaccuracy is "material" if it could reasonably lead subsequent reviewers to an erroneous conclusion or determination. In this way, not every deficiency inventoried in Table 40 is material – but they may be if the omission of the information would be critical to gaining a full, fair, and comprehensive understanding of what occurred during the force incident.

**Table 43.**   **Did the Use of Force Reports Appropriately Avoid Material Omissions or Inaccuracies?**

| | | Yes | | No | | Unable to Determine | | Not Applicable | |
|---|---|---|---|---|---|---|---|---|---|
| **2018** | Weighted Frequency | 129.0 | 73.3% | 21.9 | 12.4% | 25.2 | 14.3% | 0.1 | - |
| | Unweighted Frequency | 129 | 69.1% | 28 | 14.9% | 30 | 16.0% | 1 | - |
| | *Level 1* | 63 | 76.8% | 8 | 9.8% | 11 | 13.4% | 0 | - |
| | *Level 2* | 48 | 64.0% | 15 | 20.0% | 12 | 16.0% | 0 | - |
| | *Level 3* | 14 | 53.8% | 5 | 19.2% | 7 | 26.9% | 1 | - |

---

[259] *Id.* ¶ 176.
[260] *Id.* ¶ 177.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2019** | Weighted Frequency | 124.3 | 76.9% | 12.2 | 7.5% | 25.3 | 15.6% | 2.2 | - |
| | Unweighted Frequency | 141 | 76.6% | 16 | 8.7% | 27 | 14.7% | 2 | - |
| | *Level 1* | 68 | 80.0% | 5 | 5.9% | 12 | 14.1% | 1 | - |
| | *Level 2* | 32 | 66.7% | 6 | 12.5% | 10 | 20.8% | 1 | - |
| | *Level 3* | 11 | 52.4% | 5 | 23.8% | 5 | 23.8% | 0 | - |
| **2020** | Weighted Frequency | 145.2 | 88.4% | 17.3 | 10.5% | 1.9 | 1.1% | 1.2 | - |
| | Unweighted Frequency | 135 | 81.3% | 26 | 15.7% | 5 | 3.0% | 4 | - |
| | *Level 1* | 80 | 95.2% | 4 | 4.8% | 0 | 0.0% | 0 | - |
| | *Level 2* | 45 | 71.4% | 16 | 25.4% | 2 | 3.2% | 1 | - |
| | *Level 3* | 10 | 52.6% | 6 | 31.6% | 3 | 15.8% | 3 | - |

As Table 41 details, although an increasing portion of officer force reports are appropriately avoiding any material omissions or inaccuracies (from 69.1% of reports in 2018 to 76.6% in 2019 and 81.3% in 2020), Monitoring team reviewers also identified a higher proportion of force reports that did include material omissions or inaccuracies.  These concurrent increases relate to a substantially reduced portion of cases in 2020 in which Monitoring Team reviewers indicated that they could not definitively determine whether reports avoided material omissions or inaccuracies.

**For those cases where officer reports contained material omissions or inaccuracies, BPD is not yet regularly taking and documenting appropriate corrective action.**  In 2018, reports where the Monitoring Team identified material omissions or inaccuracies, supervisors identified these issues and took appropriate action in 44.4% of reviewed cases.  In 2019, the rate of cases with issues in which supervisors took appropriate action was down to just 12.5%.  However, 2020 saw a substantial increase, to 70.8% (or 17 out of 24 cases), of instances with significant omissions or inaccuracies that supervisors identified and documented appropriate corrective action.  Even as BPD's progress in 2020, compared to prior years, is notable and commendable, BPD will need to continue to focus on both officer report writing and supervisor chain of command review of officer reports going forward to ensure that it reaches initial compliance.

Overall, **BPD officers are generally providing a use of force report in a timely manner after encounters where force is used.  However, systemic deficiencies in the quality of these reports, issues with the provision of public safety statements following firearms discharges, and the continued progress that supervisors must make in identifying problems with force reports all point toward BPD not yet being in initial compliance across the reporting requirements of the Decree and policy.**

## VI.    USE OF FORCE INVESTIGATION & REVIEW: COMPLIANCE ASSESSMENT

The preceding section of the report focuses on the Monitoring Team's evaluation of how officers performed in the field during a force incident – that is, whether BPD officers acted in accordance with BPD policy and Consent Decree requirements in circumstances where they used force. Monitoring Team reviewers also evaluated the quality of BPD's after-incident investigations of force, the adherence of the Department to the Decree's requirements regarding force investigation and supervisory review, and BPD's final determinations about the propriety of officer performance during force incidents.   This section reports on the state of BPD's compliance with Decree requirements in each of these areas.

### A.    General Requirements

The Decree requires, as described previously, that "[w]hen an incident involves multiple types of force or multiple officers, the incident will be reported and investigated at the highest level of force used by any officer during the incident."[261]  This means, for instance, that an incident during which one officer used Level 2 force and another officer used Level 1 force would be reported and investigated as a Level 2 force incident.  Similarly, if the same officer used both Level 2 and Level 1 force during the same incident, the incident would be reported and investigated as a Level 2 incident.  Monitoring Team reviewers found that, when an incident involved multiple types of force or multiple officers, the incident was generally reported and investigated appropriately at the highest level of force.  In fact, **consistent with initial compliance, in 2020, reviewers found that** – at least for cases involving multiple force types and officers – **the incident was appropriately reported and investigated at the highest force level in 101 of 102 instances** (with reviewers unable to determine in the remaining case).

The Decree also requires "that whenever a supervisor uses, directs, or is otherwise personally involved in" force, "a higher-ranking supervisor who was not involved in the incident" conduct the investigation of the incident.[262]  The only exception is that, if the involved supervisor was a "Lieutenant or above . . . , the review may be conducted by a supervisor of equal rank."[263]  Of the 47 cases in 2018 in which a supervisor used or was personally involved in a force incident, an uninvolved, higher-ranking supervisor reviewed the force in 35 (74.5% of cases reviewed, 69.4% weighted).  Of 43 cases in 2019 involving a supervisor, 40 cases were reviewed by a higher-ranking supervisor (93.0%, 89.4% weighted).  In 2020, across 46 cases, uninvolved supervisors of higher rank appropriately reviewed the force in 42 cases (91.3%, 91.4% weighted).  Among the cases that were not reviewed by a higher-ranking supervisor, the "Lieutenant or above" exception applied to only a limited number of instances (2 evaluated cases in 2018, and 1 case in both 2019 and 2020).

---

[261] Dkt. 2-2 ¶ 177.

[262] *Id.* ¶ 187.

[263] *Id.*

**Although the compliance determination here is a close call, with more than 9 out of 10 cases consistent with Decree requirements in 2019 and 2020, the importance of the requirement leads the Monitoring Team to want to see ongoing and ideally strengthened performance.** This is especially the case given that the requirement is a straightforward administrative one that simply requires supervisors to be aware, at the outset of an investigation, about who should and should not investigate depending on a supervisor's direct involvement and rank.

## B.    Level-Specific Requirements

The Decree requires that all uses of force receive a detailed review, and the nature of who conducts the review and what the review entails depends on the designated Level of force.  The following sections consider the Department's adherence to investigative requirements by force Level.[264]

### 1.    Level 1 Force Incidents

For lower-level, Level 1 force, an involved officer's supervisor is the initial reviewer of the force incident.  Specifically, "a permanent-rank supervisor" who was not involved in the force "and who is the same rank or greater than the highest ranking Involved Member"[265] must, following all Level 1 force incidents, either (a) "review and document approval" of the reported force, or (b) "elevate the Level 1 force[,] before the end of the shift during which the Level 1 force was used."[266]  Based on the whole of the documentation available, Monitoring Team reviewers could confirm that supervisors complied with these requirements in 75.0% of Level 1 cases in 2018, in 85.1% of cases in 2019, and in 86.4% in 2020.  **Although the trends are positive over the years evaluated, the Monitoring Team will need to see continued improvement in the overall rate of compliance with post-Level 1 incident supervisory review requirements across incidents before it is able to certify compliance.**

"Supervisors will elevate and investigate any Level 1 use of force that appears to have been inappropriate or improperly categorized . . . ."[267]  Thus, supervisors scrutinize Level 1 force at the outset to determine if the incident warrants a more comprehensive investigation either because the force may have been inconsistent with policy or because the force reported as a Level 1 incident was actually a more serious Level 2 or Level 3 incident, requiring investigation as such.  As a practical matter, this happens relatively infrequently – in 4 (4.4%) Level 1 cases in 2018, 2 (2.3%) 2019 cases, and 6 (6.8%) cases in 2020.  In 2018, those investigations did not lead the supervisor

---

[264] The Decree, and BPD policy, permits "[t]he Commissioner or his/her designee" to use discretion to "reassign a review of force of any Level to SIRT," the Special Investigations Response Team that typically investigates the most serious, Level 3 force incidents.[264]  The review of force was reassigned to SIRT in 17 instances across the 2018 cases reviewed, 14 instances in 2019, and 18 cases in 2019.

[265] Policy 725 at 7.

[266] Dkt. 2-2 ¶ 180.

[267] *Id.*

to determine that the use of Level 1 force was inappropriate or counter to policy, but only to a determination that the force was improperly categorized in 1 instance. In 2019, supervisors who investigated the Level 1 determined the force was inappropriate in both instances, and that the force was also improperly categorized in 1 case. In 2020, the use of Level 1 force was determined to be inappropriate in 2 of 6 cases and also improperly categorized as a Level 1 in 2 cases.

"If a supervisor determines that an officer's report reveals evidence of potential criminal conduct, he or she will promptly notify OPR" so that a misconduct investigation may be conducted.[268] No supervisors notified OPR/PIB of potential misconduct in the Level 1 cases that the Monitoring Team reviewed in any year.

### 2. *Level 2 Force Incidents*

In contrast to Level 1 incidents, where an initial supervisor review of the force incident determines whether a more exhaustive force investigation is necessary, all Level 2 force incidents are subject to an investigation "personally conducted by a permanent-rank supervisor" uninvolved in the force incident "and who is above the rank of the highest[-]ranking Involved Member"[269] (*i.e.*, someone of a higher rank than all of the involved personnel, defined in BPD policy as an officer "who participated in, directed, or influenced the application of the Use of Force").[270]

Generally, this means that the supervisor must "identify and collect evidence sufficient to establish the material facts related to the Reportable Force."[271] The Decree and BPD policy contain a number of specific guidelines that supervisors must meet in this regard.

First, for Level 2 incidents, "the uninvolved permanent-rank supervisor" must "respond to the scene."[272] Troublingly, it appears that BPD has become somewhat less compliant over time with this requirement, with uninvolved, permanent-rank supervisors responding to 84.5% of Level 2 incidents in 2018, to 72.7% in 2019, and to 73.3% in 2020. When supervisors did respond, they held a permanent rank higher than any of the involved officers who used or directed the use of force in 72.9% of applicable instances (43 of 59 cases) in 2018, in 76.9% of instances in 2019 (20 of 26 cases), and in 84.1% of instances (37 of 44 cases). BPD notes that it has amended policy to require specifically that a lieutenant, rather than another sergeant, must investigate a sergeant – which it believes has led to improvements in this regard in 2021 and 2022.

When supervisors respond to the scene, the Decree and BPD policy outline a number of specific responsibilities. Other than the requirement related to supervisors reviewing and flagging body-

---

[268] *Id.* ¶ 181.
[269] Policy 725 at 7.
[270] *Id.* at 1.
[271] Dkt. 2-2 ¶ 188.
[272] *Id.* ¶ 184.

worn camera footage for retention, the Monitoring Team cannot find the supervisory response to Level 2 incidents to be in compliance.  Table 42 illustrates the various levels of compliance for each of the relevant requirements.  It should be noted that, at least with respect to a number of the requirements, there were not only a number of instances where supervisors affirmatively failed to follow requirements, but also a large number of instances where available documentation or evidence could not establish, one way or another, whether the supervisor in fact complied with the requirements.

Specifically, responding supervisors must:

- *"Locate relevant civilian witnesses including the subject and third parties, and arrange for those witnesses to be interviewed . . . separately where possible . . . us[ing] trauma-informed interview techniques where appropriate, and avoid leading questions."*[273] Such interviews should be recorded, including of the subject, whose "refusal to be interviewed" must also be recorded.[274]  The appropriate canvassing for witnesses occurred in a little more than half of all cases in 2018, 2019, and 2020.  Supervisors arranged for those witnesses to be interviewed in just 22.7% of applicable instances in 2018 and – after a spike to 72.7% of incidents in 2019 – 31.3% of applicable instances in 2020.  It should be noted that the occurrence of witness interviews depends on BPD identifying potential witnesses, a witness electing to participate in an interview, and BPD ultimately conducting the interview.  Consequently, the percentage of cases in which civilian witnesses are located and actually interviewed is only partially under the control of BPD.

  When witnesses were interviewed, the Monitoring Team could not, across a majority of incidents in both 2019 and 2020, respectively, determine whether witnesses were interviewed separately, using trauma-informed interview techniques, and avoiding leading questions.  This likely related to the relatively low incidence of all interviews being audio- or video-recorded – in just 1 case in 2018, 2 cases in 2019, and 2 cases in 2020.

- *"[R]equest the subject's statement regarding the use of Reportable Force and explain that it is for BPD's administrative review to determine the propriety of the Reportable Force."*[275]  This request could be verified in only about half of Level 2 incidents in each of 2018, 2019, and 2020.

---

[273] *Id.* ¶ 188(a).
[274] *Id.* ¶ 188(b).
[275] *Id.* ¶ 188(c).

- *"Separate all officers involved . .  until interviewed."[276]*  The Monitoring Team could verify that this occurred in only a small portion (about 20 percent) of Level 2 incidents in each of 2018, 2019, and 2020.

- *Avoid asking officers or other witnesses leading questions during any interview.[277]*  The assessment could verify that this occurred somewhat infrequently, reaching the lowest rate of any of the three years in 2020 (22.7% in 2020 compared to 26.8% in 2018 and 45.5% in 2019).

- Ensure that *"all officers who use Level 2 force . . .  provide an oral use of force statement in person . . .on the scene prior to the subject's being booked, or released, or the contact otherwise concluded."[278]*  Although this appeared to occur in close to two-thirds of cases in each of 2019 and 2020, improved performance – likely through better documentation – is necessary to reach compliance.

- *"Review and flag for retention any body-worn camera footage capturing any part of the use of force incident."[279]*  In 2020, Monitoring Team reviewers could verify that this was occurring close to 89% of the time.

- *"Canvass the area for any CCTV or other surveillance cameras in the area."[280]*  The Monitoring Team could verify compliance with, at most, about half of the cases evaluated in any given year – standing at 51.2% in 2020.  Where a canvass could be verified, documentation was sufficient with respect to the location of the canvass and attempts to obtain video voluntarily.

- Photograph each of *"the scene and location of the incident,"[281]* *"any departmental or private property damaged as a result of an officer's involvement,"[282]* and *"the subject for identification purposes and all injuries or claims of injury to anyone involved."[283]*  As Table 42 inventories, compliance with these requirements cannot yet be identified across a sufficient portion of Level 2 cases.

**Table 44.       Level 2 Supervisor Response**

---

[276] Dkt. 2-2 ¶ 188(d).
[277] *Id.*
[278] *Id.* ¶ 188(d)(ii).
[279] *Id.*¶ 188(e).
[280] *Id.* ¶ 188(f).
[281] Dkt. 2-2 ¶ 188(g).
[282] *Id.* ¶ 188(h).
[283] *Id.* ¶ 188(i).

| *Upon arrival at the scene, did the supervisor . . . ?* | | Yes | | No | | Unable to Determine | | Not Applicable |
|---|---|---|---|---|---|---|---|---|
| Locate relevant civilian witnesses including the subject and third parties? | **2018** | 33 | 58.9% | 13 | 23.2% | 10 | 17.9% | 4 |
| | **2019** | 31 | 58.5% | 13 | 24.5% | 9 | 17.0% | 3 |
| | **2020** | 20 | 54.1% | 14 | 37.8% | 3 | 8.1% | 7 |
| Request the subject's statement regarding the use of Reportable Force, explaining that it is for BPD's administrative review to determine the propriety of the Reportable Force? | **2018** | 25 | 43.9% | 8 | 14.0% | 24 | 42.1% | 3 |
| | **2019** | 27 | 50.0% | 6 | 11.1% | 21 | 38.9% | 2 |
| | **2020** | 22 | 50.0% | 8 | 18.2% | 14 | 31.8% | 0 |
| Separate all officers involve in the Reportable Force incident until interviewed? | **2018** | 11 | 20.4% | 11 | 20.4% | 32 | 59.3% | 6 |
| | **2019** | 8 | 17.4% | 11 | 23.9% | 27 | 58.7% | 9 |
| | **2020** | 8 | 20.5% | 19 | 48.7% | 12 | 30.8% | 5 |
| Avoid asking officers or other witnesses leading questions during any interview? | **2018** | 15 | 26.8% | 3 | 5.4% | 38 | 67.9% | 3 |
| | **2019** | 20 | 37.7% | 4 | 7.6% | 29 | 54.7% | 2 |
| | **2020** | 10 | 22.7% | 5 | 11.4% | 29 | 65.9% | 0 |
| Ensure that all officers who used Level 2 force provide an oral use of force statement in person to the supervisor on the scene prior to the subject's being booked, or released, or the contact otherwise concluded? | **2018** | 28 | 48.3% | 2 | 3.4% | 28 | 48.3% | 1 |
| | **2019** | 36 | 66.7% | 3 | 5.6% | 15 | 27.8% | 1 |
| | **2020** | 28 | 65.1% | 3 | 7.0% | 12 | 27.9% | 1 |
| Review and flag for retention any body-worn camera footage capturing any part of the use of force incident? | **2018** | 49 | 84.5% | 3 | 5.2% | 6 | 10.3% | 2 |
| | **2019** | 46 | 85.2% | 0 | 0.0% | 8 | 14.8% | 1 |
| | **2020** | 39 | 88.6% | 3 | 6.8% | 2 | 4.5% | 0 |
| Canvass the area for any CCTV or other surveillance cameras in the area? | **2018** | 23 | 40.4% | 4 | 7.0% | 30 | 52.6% | 3 |
| | **2019** | 25 | 49.0% | 2 | 3.9% | 24 | 47.1% | 3 |
| | **2020** | 22 | 51.2% | 11 | 25.6% | 10 | 23.3% | 1 |
| Photograph the scene and location of the incident to accurately depict lighting, weather, vehicle placement, points of cover, and to identify relevant evidence to be collected if not collected by the supervisor (such as forensic evidence)? | **2018** | 21 | 36.2% | 14 | 24.1% | 23 | 39.7% | 2 |
| | **2019** | 18 | 34.0% | 13 | 24.5% | 22 | 41.5% | 2 |
| | **2020** | 21 | 48.8% | 15 | 34.9% | 7 | 16.3% | 0 |
| Photograph any departmental or private property damaged as a result of an officer's involvement and/or the subject's actions? | **2018** | 10 | 40.0% | 5 | 20.0% | 10 | 40.0% | 35 |
| | **2019** | 9 | 33.3% | 5 | 18.5% | 13 | 48.1% | 28 |
| | **2020** | 9 | 37.5% | 9 | 37.5% | 6 | 25.0% | 20 |

| Photograph the subject for identification purposes and all injuries or claims of injury to anyone involved? | **2018** | 31 | 57.4% | 7 | 13.0% | 16 | 29.6% | 4 |
| | **2019** | 25 | 48.1% | 6 | 11.5% | 21 | 40.4% | 3 |
| | **2020** | 24 | 55.8% | 11 | 25.6% | 8 | 18.6% | 0 |

Subsequently, "the supervisor conducting the use of force review will evaluate in writing all uses of force for compliance with BPD policy, as well as any other relevant concerns," and "provide timely, constructive feedback, where appropriate."[284]   Monitoring Team reviewers found that supervisors thoroughly evaluated in writing all use of force for compliance with BPD policy in 78.9% of Level 2 incidents in 2018, 89.6% of incidents in 2019, and 93.4% of incidents in 2020. However, this assessment regularly failed to provide a written accounting of "other relevant concerns," including tactical or threat assessment issues – with supervisors doing so in only 27.1% of Level 2 incidents in 2018, in 48.4% in 2019, and in 40.0% in 2020.  Where reviewers determined that it was reasonably appropriate to do so, supervisors provided timely, constructive feedback in 30% of such incidents in 2018, in 36.7% in 2019, and in 40.4% in 2020.

The Decree requires that the supervisor's force review "be completed . . . within 72 hours" of the force incident "unless the supervisor's commanding officer approves an extension."[285]  In the case of an extension, a variety of elements must be sufficiently documented.[286]  The timeliness of first-line supervisory review is not yet meeting the 72-hour timeline as regularly as it should – with compliance rates decreasing over the years from 2018 through 2020, as Table 43 summarizes. Where timelines were not met, the approval of an extension by the supervisor's commanding officer could be located in only 2 instances across any of the years.

**Table 45.**     **Was the First-Line, Permanent-Rank Supervisor's Use of Force Review Completed and Entered into Blue Team Within 72 Hours of the Use of Reportable Force? (Level 2 Force Incidents)**

| | Yes | | No | | Unable to Determine | |
|---|---|---|---|---|---|---|
| **2018** | 56 | 80.0% | 5 | 7.1% | 9 | 12.9% |
| **2019** | 61 | 78.2% | 8 | 10.3% | 9 | 11.5% |
| **2020** | 45 | 72.6% | 15 | 24.2% | 2 | 3.2% |

During the force review process, if "a supervisor determines that force used by an officer may be considered misconduct or potential misconduct, the supervisor will notify OPR [Office of Professional Responsibility] of their determination" for purposes of a misconduct inquiry.[287]  The Monitoring Team could not identify sufficient evidence of OPR/Public Integrity Bureau ("PIB")

---

[284] *Id.* ¶ 189.
[285] *Id.* ¶ 190.
[286] Dkt. 2-2 ¶¶ 190(a)–(c).
[287] *Id.* ¶ 191.

notification to be able to certify compliance with this requirement.  BPD anticipates that specific training on these requirements in general supervisor training being conducted in 2022 will improve compliance in the future.

**Across the requirements relating to Level 2 force incident review, BPD is not yet in compliance.  The Monitoring Team will need to see improved review quality and documentation going forward – and culminating in a more comprehensive identification of officer force that is inconsistent with BPD policy.**

### 3.  Level 3 Force Incidents

Level 3 force incidents are investigated by the Special Investigation Response Team ("SIRT").[288] When a Level 3 incident occurs, any on-scene supervisor "take[]s initial steps in response to the incident consistent with" Level 2 requirements "until turning the scene over to the Shift Commander or arriving SIRT personnel."[289]  Because Shift Commanders may, depending on the time of day that the incident occurs and relative proximity of SIRT personnel, "arrive[] before the SIRT personnel," the Decree articulates several responsibilities of Shift Commanders for the period between when they assume on-scene control and command and SIRT arrives.[290] Monitoring Team reviewers could confirm that Shift Commanders arrived before SIRT in 4 of 25 incidents in 2018, in 6 of 20 incidents in 2019, and 5 of 19 incidents in 2020.  In these limited number of incidents, Shift Commanders largely complied with most the Decree's requirements regarding on-scene responsibilities.  However, for large number of Level 3 incidents (15 of the 25 in 2018, 10 of 20 in 2019, and 10 of 19 in 2021), reviewers could not verify – one way or another – whether a Shift Commander was or was not at the scene before SIRT.  To this end, BPD will need to enhance documentation efforts so that who has command of the scene is clearly recorded across each stage of the post-incident response.

Once SIRT arrives, the Decree also outlines a number of specific requirements for the Team's on-scene investigation.[291]  Even as Monitoring Team members identified few instances where SIRT personnel definitively failed to comply with the on-scene response protocols, documentation and available evidence was insufficient to establish compliance in too many instances, as Table 44 inventories.  Going forward, BPD's compliance with Paragraph 206 of the Decree will require that SIRT better document its efforts when it arrives on the scene of a Level 3 incident.

SIRT personnel must:

---

[288] *Id.* ¶¶ 201–02.
[289] *Id.* ¶¶ 201–04.
[290] *Id.* ¶¶ 205.
[291] Dkt. 2-2 ¶ 206.

- *"[A]ssume control of the use of force investigation upon their arrival" to the scene.*[292] By 2020, SIRT personnel appeared to be assuming appropriate control of the scene in nearly every instance (15 of 16 cases).

- *"[R]ecord all interviews with civilian witnesses."*[293]   Monitoring Team reviewers could certify that all civilian witness interviews were recorded in 6 of 10 relevant SIRT investigations in 2020.  It should be noted that some witnesses declining to be recorded may be responsible for this lower rate of witness recording.

- *"[E]nsure that the Shift Commander has separated all officers involved in or who witnessed"* the force incident *"until they are all interviewed."*[294]   Across evaluated years, the Monitoring Team could not verify that involved and witness officers were separated, suggesting that BPD should make improvements to available documentation.

- *"[E]nsure [that] all video evidence is immediately gathered and assessed."*[295]   This includes SIRT personnel *"canvass[ing] for any CCTV or privately owned video that may have captured the contact."*[296]  If video was captured, SIRT must *"attempt to obtain copies voluntarily."*[297]   *"If the owner of privately owned video refuses"* or *"[i]f no privately owned video is discovered,"* SIRT personnel must document this.[298]   At least in the instances where the availability of relevant private video was documented, this video was provided to SIRT voluntarily in every instance across 2018, 2019, and 2020.

- *"[A]rrange for a crime lab technician to process the scene."*[299]   The technician must *"provide photos as soon as practicable to SIRT,"* which Monitoring Team reviewers could verify across all instances where the involvement of a crime lab technician was sufficiently documented.[300]

- *"[A]ttempt to interview"* the subject of the force, audio-recording the interview.[301]   Any *"areas of injury to complaint of injury"* must be photographed.[302]  As with other areas of SIRT investigations, a lack of documentation across investigations hindered a determination of compliance.

---

[292] *Id.* ¶ 206(a).
[293] *Id.* ¶ 206(b).
[294] *Id.* ¶ 206(c).
[295] *Id.* ¶ 206(d).
[296] Dkt. 2-2 ¶ 206(d).
[297] *Id.*
[298] *Id.*
[299] *Id.* ¶ 206(e).
[300] *Id.*
[301] Dkt. 2-2 ¶ 206(f).
[302] *Id.*

- *"[R]eview body-worn camera or other video" involving the incident and "document the content of such videos . . . prior to the end of their shift(s) unless impracticable."*[303] Available body-worn camera or other video was sufficiently documented in a vast majority of instances, with copies of the videos made available in the electronic use of force case file in BPD's IAPro system.  However, in nearly half of applicable incidents, Monitoring Team reviewers could not determine whether SIRT supervisors reviewed the video (as well as statements from witness officers) prior to the end of the supervisors' shifts.

- *"[A]sk involved officers if they are willing to provide a voluntary statement."*[304]  In the instances where SIRT personnel asked officers if they would provide a voluntary statement, a statement was provided in 70.0% of applicable instances in 2018, 71.4% of instances in 2019, and 50.0% of instances in 2020.  Various requirements regarding these voluntary officer statements – including that SIRT administer *Miranda* warnings prior to the statement, that statements are recorded, and that all statements take place as soon as practical – were followed in many instances but could not be verified in a number of others.

- *"[A]rrange for the involved and witness officers to submit use of force written reports . . . no later than 24 hours after the incident, except in" defined "extenuating circumstances."*[305]  Reviewers could verify, based on available information, that use of force reports were submitted within at least 24 hours (and as soon as practicable) in only some Level 3 incidents in each of 2018 (54.2%), 2019 (50.0%), and 2020 (26.7%).  In only 1 instance in each year could this lack of timely submission be explained by extenuating circumstances, such as an officer injury.

- *Notify various supervisors within BPD, as well as the Baltimore City State's Attorney's Office "no later than 24 hours after learning of the force, unless impractical," with the notification "contain[ing] basic facts about the incident as they are known at the time."*[306]  Monitoring Team could confirm this in 40.9% of Level 3 incidents in 2018, 38.9% in 2019, and 57.1% in 2020.

**Table 46.       Level 3 SIRT Response**

| Upon arrival at the scene, did SIRT personnel . . . ? | Yes | No | Unable to Determine | Not Applicable |
|---|---|---|---|---|

---

[303] *Id.* ¶ 206(g).
[304] *Id.* ¶ 206(h).
[305] *Id.* ¶ 206(i).
[306] Dkt. 2-2 ¶ 206(j).

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Assume control of the use of force investigation upon their arrival? | **2018** | 19 | 90.5% | 0 | 0.0% | 2 | 9.5% | 4 |
| | **2019** | 12 | 63.2% | 0 | 0.0% | 7 | 36.8% | 1 |
| | **2020** | 15 | 93.8% | 0 | 0.0% | 1 | 6.3% | 3 |
| Record all interviews with civilian witnesses? | **2018** | 13 | 61.9% | 0 | 0.0% | 8 | 38.1% | 4 |
| | **2019** | 9 | 60.0% | 0 | 0.0% | 6 | 40.0% | 5 |
| | **2020** | 6 | 60.0% | 0 | 0.0% | 4 | 40.0% | 9 |
| Ensure that the Shift Commander separated all officers in or who witnessed a use of force incident until they were all interviewed in accordance with BPD policy? | **2018** | 2 | 13.3% | 1 | 6.7% | 12 | 80.0% | 10 |
| | **2019** | 1 | 7.1% | 1 | 7.1% | 12 | 85.7% | 6 |
| | **2020** | 1 | 8.3% | 1 | 8.3% | 10 | 83.3% | 7 |
| Ensure all video evidence is immediately gathered and assessed? | **2018** | 17 | 81.0% | 0 | 0.0% | 4 | 19.0% | 4 |
| | **2019** | 15 | 78.9% | 0 | 0.0% | 4 | 21.1% | 1 |
| | **2020** | 11 | 73.3% | 0 | 0.0% | 4 | 26.7% | 4 |
| Canvass for any CCTV or privately-owned video that may have captured the contact, attempting to obtain copies voluntarily? | **2018** | 17 | 73.9% | 0 | 0.0% | 6 | 26.1% | 2 |
| | **2019** | 10 | 52.6% | 0 | 0.0% | 9 | 47.4% | 1 |
| | **2020** | 8 | 57.1% | 0 | 0.0% | 6 | 42.9% | 5 |
| Arrange for a crime lab technician to process the scene according to the Crime Scene Sciences Sections' technical manual? | **2018** | 14 | 63.6% | 0 | 0.0% | 8 | 36.4% | 3 |
| | **2019** | 14 | 73.7% | 0 | 0.0% | 5 | 26.3% | 1 |
| | **2020** | 9 | 56.3% | 1 | 6.3% | 6 | 37.5% | 3 |
| Attempt to interview the person upon whom the officer used the Reportable Force, to obtain the person's account of what happened, if possible, as an audio-recorded interview? | **2018** | 7 | 58.3% | 0 | 0.0% | 5 | 41.7% | 12 |
| | **2019** | 4 | 57.1% | 0 | 0.0% | 3 | 42.9% | 13 |
| | **2020** | 5 | 55.6% | 0 | 0.0% | 4 | 44.4% | 10 |
| Photograph areas of injury or complaint of injury by the person upon whom the officer used the Reportable Force? | **2018** | 8 | 50.0% | 0 | 0.0% | 8 | 50.0% | 9 |
| | **2019** | 8 | 53.3% | 2 | 13.3% | 5 | 33.3% | 5 |
| | **2020** | 8 | 72.7% | 0 | 0.0% | 3 | 27.3% | 8 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Review body-worn camera or other video of the incident? | **2018** | 17 | 81.0% | 1 | 4.8% | 3 | 14.3% | 4 |
| | **2019** | 13 | 72.2% | 0 | 0.0% | 5 | 27.8% | 1 |
| | **2020** | 12 | 85.7% | 0 | 0.0% | 2 | 14.3% | 5 |
| Ask officers if they were willing to provide a voluntary statement? | **2018** | 10 | 50.0% | 0 | 0.0% | 10 | 50.0% | 5 |
| | **2019** | 7 | 38.9% | 0 | 0.0% | 11 | 61.1% | 2 |
| | **2020** | 10 | 62.5% | 0 | 0.0% | 6 | 37.5% | 3 |

"If the SIRT investigation indicates potential criminal conduct or administrative conduct, the SIRT commander" must "notify[] the Chief of OPR."[307]   In one 2018 case, SIRT's investigation indicated potential criminal conduct.   "[I]n cases of potential criminal conduct," SIRT must "notify[] the appropriate prosecuting authority."[308]   For the 2018 case, the SIRT commander did notify the appropriate prosecuting authority.   Where the SIRT investigation indicated potential administrative conduct, the SIRT commander appropriately notified the Chief of OPR in 6 of 8 Level 3 incidents in 2018, in 1 of 1 Level incidents in 2019, and in 3 of 6 incidents in 2020.   However, SIRT's conclusions regarding administrative misconduct and notifications to the Chief of OPR were not as readily identifiable in a sufficient number of cases across 2018, 2019, and 2020 as needed to make a determination of compliance.

The primary issue that BPD must address with SIRT investigations is the quality and comprehensiveness of investigative documentation.   The Monitoring Team identified few instances where it could determine that SIRT investigators affirmatively failed to comply with Consent Decree requirements.   Instead, the issue appears to be that available documentation does not sufficiently establish that the necessary requirements were met.

## C.    Use of Force Investigation: Overall

Monitoring Team members also evaluated the overall quality of the post-incident response and investigation – taking into account all of the factors addressed previously and considering the extent that the overall quality helps to establish a full and comprehensive picture of what transpired during a force incident.

For Level 1 incidents, evaluators considered whether, in light of all of the facts and circumstances of the underlying incident and the response process, the Department's post-incident response allowed it to obtain an account of the incident that was fair, thorough, objective, unbiased, and timely.   With respect to unbiased and timely force response and investigation, BPD by 2020 was performing at a level consistent with compliance.   On other dimensions – namely, the fairness, thoroughness, and objectivity of responses and investigations – BPD improved since 2018. However, a portion of incidents that the Monitoring Team indicated were "unable to determine"

---

[307] *Id.* ¶ 206(l).
[308] *Id.*

along those dimensions reveals deficiencies with the quality and comprehensiveness of underlying investigative files and materials. This further underscores the Department's need to focus on ensuring that involved personnel methodically inventory and memorialize review and investigative efforts in Level 1 investigations.

**Table 47.    Overall Quality of Force Response & Investigation, Level 1 Force**

| *In light of all the facts/circumstances of the underlying incident and the investigative process, did the post-incident response allow the Department to obtain an account of the incident that was . . . ?* | | **Yes** | | **No** | | **Unable to Determine** | |
|---|---|---|---|---|---|---|---|
| Fair? | **2018** | 78 | 85.7% | 4 | 4.4% | 9 | 9.9% |
| | **2019** | 77 | 87.5% | 2 | 2.3% | 9 | 10.2% |
| | **2020** | 86 | 97.8% | 1 | 1.1% | 1 | 1.1% |
| Thorough? | **2018** | 67 | 73.6% | 13 | 14.3% | 11 | 12.1% |
| | **2019** | 68 | 77.2% | 10 | 11.4% | 10 | 11.4% |
| | **2020** | 84 | 95.5% | 4 | 4.5% | 0 | 0.0% |
| Objective? | **2018** | 77 | 84.6% | 4 | 4.4% | 10 | 11.0% |
| | **2019** | 73 | 83.0% | 5 | 5.6% | 10 | 11.4% |
| | **2020** | 84 | 95.5% | 3 | 3.4% | 1 | 1.1% |
| Unbiased? | **2018** | 76 | 84.4% | 4 | 4.4% | 10 | 11.2% |
| | **2019** | 74 | 84.1% | 2 | 2.3% | 12 | 13.6% |
| | **2020** | 84 | 96.5% | 2 | 2.2% | 1 | 1.3% |
| Timely? | **2018** | 73 | 81.2% | 9 | 10.0% | 8 | 8.8% |
| | **2019** | 76 | 86.4% | 4 | 4.5% | 8 | 9.1% |
| | **2020** | 86 | 97.7% | 2 | 2.3% | 0 | 0.0% |

At the same time, the Monitoring Team considered the portion of Level 1 force responses and investigations that had *no* material problems with fairness, thoroughness, objectivity, bias, or timeliness versus those that had *one or more* material problems. In 2018, 78.0% of Level 1 responses/investigations had no material issues along these dimensions. In 2019, that percentage increased to 84.1%. In 2020, the percentage continued to increase – to 93.2%. This confirms that it is primarily problems clustered within a small portion Level 1 cases that will need to be addressed for BPD to come into compliance with respect to the requirements in Level 1 investigations.

For Level 2 and Level 3 incidents, Monitoring Team evaluators considered whether, in light of all of the facts and circumstances of the underlying incident and the investigative process, the overall

investigation was fair, thorough, objective, unbiased, and timely. Although a number of Level 2 and Level 3 investigations were of sufficiently high quality, some backsliding in overall quality in 2020 – as well as the number of Level 3 investigations that could not be certified as sufficiently fair, thorough, objective, unbiased, and timely – suggests that BPD investigations must overall continue to improve in order to each compliance.

**Table 48.      Overall Quality of Force Response & Investigation, Level 2 Force**

| In light of all the facts/circumstances of the underlying incident and the investigative process, did the post-incident response allow the Department to obtain an account of the incident that was . . . ? | | Yes | | No | | Unable to Determine | |
|---|---|---|---|---|---|---|---|
| Fair? | 2018 | 56 | 77.8% | 5 | 6.9% | 11 | 15.3% |
| | 2019 | 68 | 87.2% | 3 | 3.8% | 7 | 9.0% |
| | 2020 | 57 | 90.5% | 5 | 7.9% | 1 | 1.6% |
| Thorough? | 2018 | 46 | 63.9% | 15 | 20.8% | 11 | 15.3% |
| | 2019 | 56 | 72.7% | 9 | 11.7% | 12 | 15.6% |
| | 2020 | 41 | 65.1% | 22 | 34.9% | 0 | 0.0% |
| Objective? | 2018 | 54 | 75.0% | 7 | 9.7% | 11 | 15.3% |
| | 2019 | 67 | 85.9% | 4 | 5.1% | 7 | 9.0% |
| | 2020 | 56 | 88.9% | 7 | 11.1% | 0 | 0.0% |
| Unbiased? | 2018 | 55 | 76.4% | 6 | 8.3% | 11 | 15.3% |
| | 2019 | 66 | 84.6% | 3 | 3.8% | 9 | 11.5% |
| | 2020 | 56 | 88.9% | 5 | 7.9% | 2 | 3.2% |
| Timely? | 2018 | 48 | 66.7% | 14 | 19.4% | 10 | 13.9% |
| | 2019 | 63 | 80.8% | 9 | 11.5% | 6 | 7.7% |
| | 2020 | 36 | 57.1% | 25 | 39.7% | 2 | 3.2% |

**Table 49.      Overall Quality of Force Response & Investigation, Level 3 Force**

| In light of all the facts/circumstances of the underlying incident and the investigative process, did the post-incident response allow the Department to obtain an account of the incident that was . . . ? | Yes | No | Unable to Determine |
|---|---|---|---|

|  | | | | | | | |
|---|---|---|---|---|---|---|---|
| Fair? | **2018** | 20 | 80.0% | 0 | 0.0% | 5 | 20.0% |
|  | **2019** | 11 | 55.0% | 1 | 5.0% | 8 | 40.0% |
|  | **2020** | 14 | 73.7% | 1 | 5.3% | 4 | 21.1% |
| Thorough? | **2018** | 17 | 68.0% | 4 | 16.0% | 4 | 16.0% |
|  | **2019** | 8 | 40.0% | 4 | 20.0% | 8 | 40.0% |
|  | **2020** | 13 | 68.4% | 1 | 5.3% | 5 | 26.3% |
| Objective? | **2018** | 20 | 80.0% | 0 | 0.0% | 5 | 20.0% |
|  | **2019** | 11 | 55.0% | 1 | 5.0% | 8 | 40.0% |
|  | **2020** | 14 | 73.7% | 1 | 5.3% | 4 | 21.1% |
| Unbiased? | **2018** | 20 | 80.0% | 0 | 0.0% | 5 | 20.0% |
|  | **2019** | 10 | 50.0% | 1 | 5.0% | 9 | 45.0% |
|  | **2020** | 13 | 72.2% | 1 | 5.6% | 4 | 22.2% |
| Timely? | **2018** | 16 | 64.0% | 5 | 20.0% | 4 | 16.0% |
|  | **2019** | 6 | 30.0% | 5 | 25.0% | 9 | 45.0% |
|  | **2020** | 14 | 73.7% | 3 | 15.8% | 2 | 10.5% |

Across all levels of force, **Monitoring Team reviewers concluded that the investigation and review process can and must still be improved for BPD to reach initial compliance with provisions relating to force investigation – even as, across levels of force and for most major dimensions, the overall quality of investigations improved over the 2018 through 2020 time period.**

## D.    Assessment & Review of Use of Force

The Consent Decree requires not only that BPD generate a complete, thorough, and accurate account of what transpires during incidents where officers use force but also that BPD supervisors meaningfully review those investigations and evaluate the propriety of officer performance and tactics. As with protocols regarding force investigation, expectations on the assessment and review of force investigations relate to the relative severity, or Level, of force.

For both Level 1 and Level 2 force incidents, "[t]he first commander in the chain of command who reviews" the underlying "supervisor's use of force review of Level 1 and Level 2 Reportable Force" – that is, the initial review discussed previously – "will ensure that the [prior] review is thorough, complete, and makes the necessary and appropriate findings of whether the use of force was consistent with BPD policy."[309]  Thereafter, "each higher-level supervisor in the chain of command will review the use of force review to ensure that it is complete and that the review was thorough."[310]

---

[309] *Id.* ¶ 192.
[310] *Id.*

In this way, higher-level BPD supervisory review of force incidents must consider both officer use of force in the underlying incident, the factual record that BPD personnel have generated on the force incident, and the initial assessment of the incident that lower-level supervisors performed. Monitoring Team reviewers considered, then, whether the supervisory review by BPD supervisors across levels of command and review was sufficiently thorough – that is, "additional relevant and material evidence" was unnecessary to "resolv[e] any discrepancies, lack of information, or improve the reliability or credibility of findings."[311]  In 2018, reviews across 75.9% of Level 1 and Level 2 incidents were identified as sufficiently thorough.  In 2019, that portion went down to 69.5% of Level 1 and 2 incidents.  In 2020, the portion increased to 78.7% of incidents.  In some instances where the underlying review was determined to not be sufficiently thorough, a supervisor "gather[ed] supplementary evidence or statements from officers, witnesses, or subjects."[312]

A reviewing supervisor may "recommend changes to the findings" if they determine "that the findings of the use of force review" previously "are not supported by a preponderance of the evidence."[313]  This occurred in 1 instance in 2018 and 3 instances in 2020.  When doing so, the supervisor must "consult[] with the investigating supervisor and the previous reviewer" and "document the specific evidence or analysis supporting the modification."[314]  This documentation was apparent in each of the 4 relevant instances overall.

For Level 1 force incidents, "the district or unit commander will ordinarily be the final reviewer . . . [,] [m]aking the final determinations of whether the findings by the chain of command . . . are [1] consistent with law and policy and supported by a preponderance of the evidence; [2] whether the review is thorough and complete; [and 3] whether there are tactical, equipment, or policy considerations that need to be addressed."[315]  As Table 4 illustrates, commanders are doing a good job of making formal determinations about whether chain of command findings of Level 1 force are consistent with law and policy and supported by a preponderance of the evidence.  Similarly, most commanders in 2020 were making clear determinations about whether the force review was sufficiently thorough and complete, although several cases still did not contain sufficient information or documentation to allow the Monitoring Team to make a clear determination.  At the same time, however, too few cases include clear indications as to whether the commander has considered tactical, equipment, or policy issues.

---

[311] Dkt. 2-2 ¶ 193.

[312] *Id.*

[313] *Id.* ¶ 194.

[314] *Id.*

[315] *Id.* ¶ 195.

**Table 50.        District/Unit Commander Determinations, Level 1 Force**

| *Did the District or Unit Commander make the final determinations as to whether . . . . ?* | | **Yes** | | **No** | | **Unable to Determine** | | **Not Applicable** |
|---|---|---|---|---|---|---|---|---|
| The findings by the chain of command are consistent with law and policy and supported by a preponderance of the evidence? | **2018** | 82 | 92.1% | 4 | 4.5% | 3 | 3.4% | 1 |
| | **2019** | 78 | 90.7% | 0 | 0.0% | 8 | 9.3% | 1 |
| | **2020** | 80 | 93.0% | 1 | 1.2% | 5 | 5.8% | 2 |
| The use of force review was thorough and complete? | **2018** | 76 | 84.4% | 9 | 10.0% | 5 | 5.6% | 0 |
| | **2019** | 69 | 79.3% | 8 | 9.2% | 10 | 11.5% | 1 |
| | **2020** | 78 | 89.7% | 4 | 4.6% | 5 | 5.7% | 1 |
| There are tactical, equipment, or policy considerations that need to be addressed? | **2018** | 25 | 30.1% | 51 | 61.4% | 7 | 8.4% | 7 |
| | **2019** | 18 | 24.3% | 47 | 63.5% | 9 | 12.2% | 12 |
| | **2020** | 23 | 30.3% | 47 | 61.8% | 6 | 7.9% | 12 |

For Level 2 force incidents, the Department's Use of Force Assessment Unit ("UOFAU") reviews the incident to determine the same things as a unit commander must determine in Level 1 incidents (i.e. consistency with BPD policy, thoroughness of the assessment below, and the possibility of any larger tactical, equipment, or policy considerations being implicated).[316]   Although BPD has improved over time – from 31.9% of Level 2 cases definitively being reviewed by the Unit in 2018 and 19.5% definitively reviewed in 2019 to 60.3% reviewed in 2020 – there is not yet sufficient evidence that the Unit is regularly and systematically reviewing Level 2 force cases.

For Level 3 force incidents, after SIRT completes the investigation, the Decree requires investigators to "present the completed investigation to the Performance Review Board" "[w]ithin 60 days or as soon as possible thereafter."[317]   Based on the available documentation, it appears that only 5 of 25 cases in 2018 (20.0%), 2 of 20 cases in 2019 (10.0%), and 2 of 19 cases in 2020 (10.5%) were presented to the PRB within 60 days.  The Monitoring Team has reason to believe that subsequent reviews are likely to show improvements, and the Monitoring Team's upcoming report summarizing its assessment of the PRB will re-visit the issue.

The Performance Review Board's consideration of SIRT and certain other force investigations is the subject of a separate, standalone Monitoring Team assessment addressing Paragraphs 207 through 210 are currently underway.

---

[316] Dkt. 2-2 ¶ 197.
[317] *Id.* ¶ 206(k).

**E.      Final BPD Dispositions & Corrective Action**

Section IV(A)(5) of this report summarizes BPD's final determinations about, and corrective action taken in connection to, incidents for which the Monitoring Team identified core deficiencies with respect to the force's necessity, proportionality, reasonableness, and consistency with the duty to de-escalate.  **To reach initial compliance generally, and across a host of the specific provisions discussed previously, the Department will need to become better at identifying force inconsistent with BPD policy and taking appropriate corrective action where appropriate.**

140

## VII.    BPD DATA COLLECTION, ANALYSIS, AND REPORTING

The Decree contains several provisions relating to how BPD collects, maintains, and analyzes use of force data.  This section briefly considers the status of compliance with each.

Paragraph 211 of the Decree generally requires that the Department "collect and maintain all data and records necessary to accurately evaluate its use of force practices and facilitate transparency and . . . broad public access to information related to BPD's decision making and activities."[318] As discussed and analyzed previously, and particularly in Section III of this report, the Department is tracking, via its IAPro platform, a wealth of necessary information and data about individual force incidents and applications.  With respect to collection and maintenance, the Department has made substantial strides.  Nevertheless, as Section III also identifies, the current data system does contain some deficiencies and some areas of data that lack the necessary level of quality.  Indeed, based on the Monitoring Team's ongoing review of the Department's required, annual Use of Force Data Analyses, there are some deficiencies in data collection that will need to be addressed for the Department to reach compliance.  Additionally, there are currently no BPD use of force reports or internal assessments available on BPD's website, which is inconsistent with the "transparency" and "broad public access" that the Decree requires.  Consequently, even as the Department has made meaningful strides toward rigorously, reliably, and comprehensively tracking and maintain data on force, further steps are necessary for it to be initial compliance with Paragraph 211.

Paragraph 212 more specifically details the documentation that BPD must "collect[] and track[] . . . related to uses of force," including:

- Officers' Use of Force Reports;
- Supervisor's use of force reviews;
- Force investigations by SIRT;
- Reviews conducted by OPR relating to officers' uses of Reportable Force; and
- All supporting documentation and materials, including relevant CEW downloads, supporting audio-visual recordings, including witness and officer interviews, and any relevant camera downloads, including from body-worn cameras.[319]

BPD has demonstrated that they have the technology and capability to collect and track all of this information via their various data systems.  Officers' use of force reports, supervisor's use of force reviews, force investigation materials, and PIBs reviews are all tracked or maintained within various areas of the Department's IAPro system.  All supporting documentation and materials are generally linkable by a shared identifier for review and assessment.  As this report discusses

---

[318] Dkt. 2-2 ¶ 211.
[319] *Id.* ¶ 212.

elsewhere, the lack of more reliable, streamlined information about incident and officer adjudication is a deficiency that BPD will need to correct before the Department can be considered to be in initial compliance with Paragraph 212.

Separate from required classes of documentation required by Paragraph 212, BPD must "ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from . . . Force-related documents."[320]   The Decree proceeds to list several elements – many of which are being collected in the Department's IAPro database.  However, the available data is insufficient or insufficiently reliable and/or comprehensive in at least six material respects implicated by the Paragraph's requirements:

  (1) **Ethnicity.**  Based on data BPD has provided, the variable of ethnicity is not collected consistently.

  (2) **The subject's perceived use of drugs or alcohol, or presence of disability.**  Force data provided by BPD the years for 2020 and 2021 do not include this information.

  (3) **The subject's actions that led to the use of force**, including whether the subject was in possession of a weapon.  Although this information is frequently reflected in an officer's narrative describing the circumstances and actions associated with a force incident, the nature of a subject's actions that led to force needs to be collected in a way that can be aggregated and analyzed in a more quantitative way.

  (4) For firearms-related deadly force incidents, **the number of shots fired by each involved officer, the accuracy of the shots, and whether the subject was armed or unarmed**.

  (5) **Whether the officer or the subject received medical services.**

  (6) **Whether the subject was handcuffed or otherwise restrained during the use of force.**

Again, it is possible that above mentioned missing data elements are incorporated in narrative or other fields not provided for outcome assessment purposes.  Indeed, across these various areas, the Monitoring Team's reviewers were able, at least for the subset of cases reviewed qualitatively, to distill data points and permit some analysis.  However, the reliable capture of the information above in coded data that can be aggregated and analyzed empirically is vital for the Department's long-term transition to an agency that engages in ongoing, critical self-analysis about use of force performance.  Consequently, BPD is not yet in compliance with Paragraph 213.

---

[320] *Id.* ¶ 213.

BPD is "responsible for the routine reporting of relevant data to the Commissioner, PRB, and OPR."[321]  The Department has made some progress toward compliance with Paragraph 214.  Its Performance Standards Section maintains detailed data and compliance audit scores on use of force, and these ongoing "scorecards" are presented to various other groups within the Department, as well as to the Court.  Nevertheless, BPD will need to ensure the more ongoing sharing of this and other data at regular intervals with PRB and PIB to reach initial compliance with Paragraph 214.

The Department must complete "an annual evaluation of forms and data collection systems to improve the accuracy and reliability of data collection concerning use of force."[322]  BPD is in the process of drafting its first annual evaluation responsive to Paragraph 215, and their implementation remains on track in this regard.

Finally, BPD must "analyze the prior year's force data, including the force-related data listed above, to determine trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report."[323]  BPD is currently finalizing its first report addressing use of force data, which will cover the years 2017 through 2020 and was developed with methodological input from the Department of Justice and Monitoring Team.  Accordingly, BPD is on track toward initial compliance with Paragraphs 216 (requiring the creation of a protocol to facilitate the force analysis) and 217 (requiring the force analysis).

---

[321] *Id.* ¶ 214.
[322] *Id.* ¶ 215.
[323] Dkt. 2-2 ¶ 217.

## VIII.   COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | Compliance Score |
|---|---|
| **A. Use of Force Principles** | |
| 123 — BPD has recently implemented improved policies regarding officers' uses of force, and force reporting, investigations, and reviews. BPD shall build on its recently improved policies, making further revisions where necessary under the provisions of this Agreement and, as enumerated below, improve its training, investigations and review regarding officers' uses of force to ensure that officers uphold the value and dignity of all individuals they encounter. To the extent BPD's use of force and related policies meet the requirements of this Agreement, the policies need not be revised. As noted below, however, BPD must adhere to those requirements. | **4c (Implementation – On Track)** |
| 124 — BPD will ensure that officers: <br>a. Are encouraged to resolve incidents without resorting to the use of force, when possible; <br>b. Use de-escalation techniques and tactics to minimize the need to use force and increase the likelihood of voluntary compliance with legitimate and lawful orders; <br>c. Use tactics that do not unnecessarily escalate an encounter; <br>d. Continually assess the situation and changing circumstances, and modulate the use of force appropriately; <br>e. When force is necessary, use force in a manner that avoids unnecessary injury or risk of injury to officers and civilians; <br>f. Recognize and act upon the duty to intervene to stop any officer from using excessive force; <br>g. Accurately and completely report all Reportable Force used or observed; and <br>h. Are held accountable for use of force that is not objectively reasonable or otherwise violates law or policy. | **4c (Implementation – On Track)** |
| **B. Policies on Officers' Use of Force** | |
| 125 — BPD will require officers to use de-escalation techniques, including verbal persuasion and warnings and tactical de-escalation techniques such as slowing down the pace of an incident, waiting out subjects, creating distance (and thus the reactionary gap) between the officer and the threat, and requesting additional resources (e.g. specialized units, behavioral health care providers, negotiators, etc.), whenever possible, before resorting to force and to reduce the need for force. | **4c (Implementation – On Track)** |
| 126 — Prior to using force, BPD officers shall be required to use, as appropriate and reasonably practical, a critical thinking, decision-making framework to analyze and respond to incidents through which officers: <br>a. Gather relevant facts about the incident; <br>b. Assess the situation, threats, and risks; <br>c. Consider police powers and BPD policy; <br>d. Identify options and determine the best course of action; and <br>e. Act, review, and re-assess the situation. | **4c (Implementation – On Track)** |
| 127 — BPD will ensure that if force becomes necessary, officers will use only the amount of force necessary to control the person and immediately reduce the level of force as the threat diminishes. | **4c (Implementation – On Track)** |

| 128 | BPD will ensure it maintains a clear and comprehensive use of force policy that includes all critical components to guide officers on using force constitutionally. | **4d (Initial Compliance)** |
|---|---|---|
| 129 | BPD will ensure its use of force policies guide officers on all force techniques, technologies, and weapons that are available to BPD officers and clearly define and describe each force option and the circumstances under which use of such force is appropriate and consistent with potential types of resistance. | **4d (Initial Compliance)** |
| 130 | BPD will ensure that its policies provide guidance on the circumstances that may warrant engaging in a foot pursuit and the tactics officers should use to avoid the use of excessive force during or at the conclusion of a foot pursuit, and to keep members of the public and officers safe. | **4c (Implementation – On Track)** |
| 131 | BPD will ensure that its use of force policy provides guidance on specific protocols and practices to use when engaging with Youth, including the circumstances under which force against Youth may be warranted, such as:<br>   a. When feasible, BPD will employ developmentally appropriate and trauma-informed de-escalation tactics including, but not limited to, using a calm, neutral demeanor, and avoiding threatening language;<br>   b. If force is necessary, BPD officers will take into account individualized factors of the Youth including, apparent age, body size, and relative strength of the officer relative to the Youth; and risk posed by the Youth;<br>   c. BPD will ensure that officers consider whether a subject may be noncompliant due to a medical or behavioral health disability, behavioral health crisis, physical or hearing impairment, language barrier, or drug or alcohol use; and<br>   d. In case of injury resulting from a use of Reportable Force, BPD will take immediate steps to provide medical attention to the Youth and will notify the Youth's parent, guardian, or other responsible adult. | **4d (Initial Compliance)** |
| 132 | BPD will ensure that officers do not use more force than necessary to detain a restrained person. BPD will review force used against restrained individuals to ensure that it was necessary and proportional given the offense committed by the subject and the danger the subject posed to others. | **4c (Implementation – On Track)** |
| 133 | With regard to using force against persons engaged in First Amendment protected activity, BPD will explicitly prohibit the use of retaliatory force by officers. | **4d (Initial Compliance)** |
| 134 | BPD shall also explicitly prohibit the use of force for punishment, including that officers shall not use force to punish individuals for fleeing, resisting arrest, or assaulting an officer. | **4c (Implementation – On Track)** |
| 135 | Recognizing that tactics leading up to the use of force can influence whether the force used was necessary, BPD will prohibit the use of tactics that unnecessarily escalate an encounter and create a need for force. | **4c (Implementation – On Track)** |
| 136 | BPD will ensure that officers only use the weapons that are enumerated in policy and force techniques on which they are trained, unless warranted by extenuating circumstances, which will be scrutinized on a case-by-case basis. | **4d (Initial Compliance)** |

| | | |
|---|---|---|
| 137 | BPD will prohibit the use of chokeholds or neckholds unless deadly force is authorized and no reasonable force alternative exists that is within BPD policy. | **4c (Implementation – On Track)** |
| 138 | BPD will revise its policies as needed to ensure they specify that use of force that is not objectively reasonable will subject officers to corrective action, discipline, possible criminal prosecution, and/or civil liability. | **4c (Implementation – On Track)** |
| 139 | BPD will revise its policies to require that officers who carry a firearm also carry on their person at least one less-lethal weapon which they are trained and certified to use, at all times while on duty, whether in uniform or while working in a plainclothes capacity. Officers who are working undercover or whose role is in an administrative or investigative capacity, unless such duties routinely involve conducting Stops, Searches, or Arrests, are exempted from this requirement. | **4c (Implementation – On Track)** |
| 140 | BPD will ensure that it continues to categorize Reportable Force into levels for the purposes of reporting and reviewing each use of force. These levels will be based on the following factors: potential of the technique or weapon to cause injury or disability; degree of actual injury or disability; duration of force; potential for abuse or misuse of weapon or force; and physical vulnerability of the subject. Each level of Reportable Force, as defined below, will require increasingly rigorous reporting, investigation, and review. [Sets forth definitions of Level 1, Level 2, and Level 3 force, above at Section II(B).] | **4d (Initial Compliance)** |
| 141 | BPD will require officers to intervene in incidents in which another officer uses excessive force. | **4c (Implementation – On Track)** |
| *Weapon-specific provisions: Conducted Electrical Weapons (CEWs)* | | |
| 142 | BPD will require that only officers who have successfully completed approved annual training on CEWs, including a testing component, and are currently certified may be issued, carry, and use CEWs. | **4d (Initial Compliance)** |
| 143 | BPD will ensure that officers will use CEWs only where grounds for Arrest or detention are present, and such force is necessary to protect the officer, the subject, or another party from immediate physical harm. | **4d (Initial Compliance)** |
| 144 | BPD will ensure that each application (in probe or drive stun mode) or standard cycle (five seconds) of a CEW is a separate use of force that officers must separately justify as objectively reasonable. BPD will ensure that, after the first CEW application, the officer will reevaluate the situation to determine if subsequent cycles are necessary. In determining whether any additional application is objectively reasonable, officers will consider whether the individual has the ability and has been given a reasonable opportunity to comply prior to applying another cycle. | **4d (Initial Compliance)** |
| 145 | BPD will require that officers not employ more than three cycles or 15 total seconds of a CEW against a subject during a single incident unless lethal force is justified. | **4d (Initial Compliance)** |

146

| 146 | BPD will ensure that officers:<br>  a. Do not use CEWs in drive-stun mode as a pain compliance technique. Officers may use CEWs in drive-stun mode only to supplement the probe deployment to complete the incapacitation circuit, or as a countermeasure to gain separation between the officer and the subject so that officers can consider another force option;<br>  b. Determine the objective reasonableness of CEW use based on relevant circumstances, including the subject's apparent age, size, physical and mental condition, and the feasibility of lesser force options;<br>  c. Except where lethal force is the only other option, do not use CEWs when it is reasonably evident that a deployment may cause serious physical injury, including if the subject is in danger of falling from a significant height, if the subject is in physical control of a vehicle in motion, or if the subject has been exposed to the MK-9 Pepper Fogger or flammable material, such as gasoline or an alcohol-based pepper spray;<br>  d. Except where lethal force is the only other option, do not use CEWs when a reasonable officer would know that the subject is pregnant, elderly, a small child, visibly frail, has low body mass;<br>  e. Do not use CEWs on fleeing persons who do not pose an imminent threat of physical harm to the officer or others. Flight will never be the sole reason for applying a CEW on a subject;<br>  f. Unless the use of lethal force is justified, do not apply  CEWs in drive stun mode to a subject's head, neck, chest or groin;<br>  g. Are trained to target the CEW in probe mode at the lower center mass and to avoid the head, neck, chest and groin;<br>  h. Do not activate more than one CEW at a time against a subject; and<br>  i. Keep CEWs in a weak-side holster to reduce the chances of accidentally drawing and/or firing a firearm. | **4d**<br>**(Initial**<br>**Compliance)** |
|---|---|---|
| 147 | BPD will ensure officers will obtain appropriate medical treatment for suspects after a CEW deployment. BPD will ensure that only trained medical personnel remove probes from a subject. | **4d**<br>**(Initial**<br>**Compliance)** |
| 148 | BPD will require CEW inspections on a periodic basis to conduct information downloads, ensure CEWs are operable, and to perform necessary maintenance or repairs. | **4d**<br>**(Initial**<br>**Compliance)** |
| ***Batons/Impact Weapons*** | | |
| 149 | Officers will be trained and certified for department-approved batons and espantoons (collectively "Impact Weapons") before being authorized to carry Impact Weapons. | **4c**<br>**(Implementation**<br>**– On Track)** |
| 150 | BPD will require that Impact Weapon use will be limited to situations in which such force is objectively reasonable, consistent with the principles outlined above, and BPD's training, for example, when it is necessary to protect the officer, the subject, or another party from immediate serious physical harm. | **4c**<br>**(Implementation**<br>**– On Track)** |
| 151 | BPD will require that officers justify each strike with an impact weapon. | **4c**<br>**(Implementation**<br>**– On Track)** |

| 152 | BPD will ensure that officers will not use Impact Weapons on individuals who are restrained or under control, even if they are non-compliant, unless they present an imminent threat to the safety of the officer or others. Prior to using Impact Weapons on individuals who are restrained, officers must first attempt to exercise additional control over the individual by using hands-on control measures or arrest control techniques before the use of Impact Weapons is justified. | **4c (Implementation – On Track)** |
|---|---|---|
| *Oleoresin Capsicum Spray ("OC Spray")* | | |
| 153 | BPD will ensure that officers use OC Spray only when such force is objectively reasonable and consistent with the use of force principles above, including when used for crowd dispersal or protection. | **4d (Initial Compliance)** |
| 154 | BPD will ensure that officers do not use OC Spray to disperse crowds unless individuals within those crowds are committing acts that endanger officer or public safety and security, property, and participants refuse to obey lawful orders to disperse. Where OC spray is used on an individual in a crowd, BPD will ensure that the spray is directed at the person(s) who presents a threat. | **4d (Initial Compliance)** |
| 155 | BPD will ensure that officers shall, whenever practical and reasonable, issue a verbal warning to the subject and allow a reasonable amount of time to allow the subject to comply with the warning. | **4d (Initial Compliance)** |
| 156 | BPD will ensure that after the initial application of OC spray, each subsequent spray must also be objectively reasonable and consistent with the use of force principles above and the officer should reevaluate the situation accordingly. | **4d (Initial Compliance)** |
| 157 | BPD will ensure that officers do not ordinarily use OC Spray on a person who is handcuffed or otherwise restrained. If such a person, however, is still combative or violent, and presents an imminent threat to the safety of the officer or others, officers must first attempt to exercise additional control over the individual by using hands-on control measures or arrest control techniques before the use of OC Spray is justified. | **4d (Initial Compliance)** |
| 158 | BPD will provide officers with proficiency training on the use of OC Spray before they are certified to carry and/or use OC Spray. Such training will include protocols regarding officers' responsibilities following OC Spray use, including minimizing exposure of non-targeted individuals and decontamination of exposed subjects. Officers will render aid consistent with their training and experience and arrange immediate transport to a hospital for medical treatment for subjects on whom OC Spray has been used under the following circumstances: (1) when they complain of or exhibit continued effects after having flushed the affected areas; (2) when they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment) that may be aggravated by chemical spray. | **4d (Initial Compliance)** |
| 159 | BPD will ensure that officers will use only department-issued or approved OC Spray. | **4c (Implementation – On Track)** |
| *Firearms* | | |
| 160 | BPD will prohibit officers from exhibiting or pointing a firearm unless the officer reasonably believes that the situation may escalate to create an imminent threat of serious bodily injury | **4d** |

| | | |
|---|---|---|
| | or death to the officer or another person. BPD will provide officers with policy guidance on the circumstances under which it is appropriate to exhibit a firearm. | **(Initial Compliance)** |
| 161 | BPD will develop and implement a plan to ensure that it can track the date of officers' qualifications and require that officers successfully qualify in accordance with the Maryland Police Training and Standards Commission ("MPTSC") regulations and standards with each firearm they are authorized to use or carry while on duty. Officers who fail to qualify will immediately relinquish the corresponding BPD-issued firearms. | **4d (Initial Compliance)** |
| 162 | BPD will ensure that, when officers discharge firearms, they continually assess the circumstances that necessitated the discharge and modulate their use of force accordingly, including ceasing to use their firearm when the circumstances no longer require it. | **4c (Implementation – On Track)** |
| 163 | BPD will ensure that officers, when practical, identify themselves as a law enforcement officer and state their intention to use deadly force before using a firearm. | **4c (Implementation – On Track)** |
| 164 | BPD will ensure that officers do not fire warning shots. | **4d (Initial Compliance)** |
| 165 | BPD will prohibit officers from firing at moving vehicles except (1) to counter an imminent threat of death or serious physical injury to the officer or another person, by a person in the vehicle, other than the vehicle itself or (2) to counter a situation where the officer or others are unavoidably in the path of the vehicle and cannot move safely. Officers should avoid positioning themselves in the path of a moving vehicle where they have no option but to use deadly force. | **4d (Initial Compliance)** |
| **C. Training** | | |
| 166 | BPD will provide all current officers with use of force training as determined by the Monitoring Plan and in conformance with the terms of this Agreement. The use of force training will include: <br> a. Proper use of force decision-making under a critical-thinking, decision-making model which requires officers to: <br> i. Gather relevant facts about the incident; <br> ii. Assess the situation, threats, and risks; <br> iii. Consider police powers and BPD policy; <br> iv. Identify options and determine the best course of action; and <br> v. Act, review, and re-assess the situation. <br> b. Role-playing scenarios and interactive exercises that illustrate proper use of force decision-making, including training on the importance of peer intervention; <br> c. The Fourth Amendment and related law; <br> d. De-escalation techniques, both verbal and tactical, that empower officers to make Arrests without using force and instruction that verbal persuasion, slowing down the pace of the situation, disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, using cover, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified; | **4d (Initial Compliance)** |

|  |  |  |
|---|---|---|
|  | e. Officers will be trained to consider the possibility that a subject may be noncompliant due to a medical or mental condition, physical or hearing impairment, language barrier, drug interaction, or emotional crisis; <br> f. The proper deployment and use of all BPD issued or approved weapons or technologies; <br> g. The risks of prolonged or repeated CEW exposure, including the increased risks on persons who are in in crisis or experiencing a Behavioral Health Disability; <br> h. The increased risks CEWs may present to a subject who is pregnant, elderly, a small child, frail, has low body mass, or is in apparent medical crisis; <br> i. That when using an CEW in the drive stun mode it is generally less effective than the probe mode and, when used repeatedly, may exacerbate the situation; <br> j. That force may not be used when a person is non-compliant, but is restrained and under an officer's control; <br> k. Firearms training; <br> l. Identifying and responding to someone who may be armed; <br> m. The circumstances that may warrant engaging in a foot pursuit and appropriate tactics to avoid the use of excessive force during or at the conclusion of a foot pursuit, and to keep members of the public and officers safe; <br> n. For supervisors of all ranks, as part of their initial and annual in-service supervisory training, training in conducting use of force reviews or investigations appropriate to their rank; strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop objectively unreasonable force; and supporting officers who report objectively unreasonable or unreported force, or who are retaliated against for attempting to prevent objectively unreasonable force; and <br> o. Use of force reporting, investigation, and review requirements. |  |
| 167 | BPD also will provide the use of force training described in the paragraph above to all new officers as part of its Professional Development and Training Academy ("Academy") training curriculum. | **4d** <br> **(Initial Compliance)** |
| 168 | BPD will provide all officers with annual use of force in-service training to ensure that officers maintain critical skills as determined by the Monitoring Plan and in conformance with the terms of this Agreement. | **4d** <br> **(Initial Compliance)** |
| **D. Reporting, Investigating and Reviewing Force** | | |
| 169 | BPD will require for every use of Reportable Force, which includes any Level 1, Level 2, or Level 3 use of force as defined in Paragraph 140, regardless of level, the following elements: <br> a. Initial Reporting and Response: requirements that describe officers' duty to report uses of Reportable Force and BPD supervisors' duty to respond and direct activities at the scene of Levels 2 and 3 Reportable Force; <br> b. Supervisory Review: requirements that describe who is responsible for the review of Reportable Force and how to conduct that review. Reviews of all levels of force will require critical examination of the incident, pursuant to BPD policy. Level 1 uses of Reportable Force will be reviewed by an uninvolved permanent-rank supervisor of the same rank or above of the involved officer. Level 2 uses of Reportable Force will be reviewed by an uninvolved permanent-rank supervisor above the rank of the involved officer. Level 3 Reportable Force will be investigated by the Special Investigations | **4c** <br> **(Implementation – On Track)** |

| | | |
|---|---|---|
| | Response Team ("SIRT") and reviewed by the Performance Review Board ("PRB"). Reviews of Reportable Force will review whether the use of force was objectively reasonable, as well as whether it violated any policy, and to identify any concerns regarding training, tactics, equipment, or supervision;<br>c. Departmental Analysis: requirements that describe how use of Reportable Force incidents are reviewed by the BPD command and how information gathered about the incident could be used to increase the effectiveness of the officer and the Department as a whole; and<br>d. Record Keeping and Follow-up: the Administrative Report, Form 95 and Force Report, Form 96 and use of force review form and all associated documentation or other evidence, including photographs and video, related to the incident (collectively "Use of Force Reports") will be maintained in Blue Team or other database as adopted in accordance with this Agreement, tracked, and used to inform BPD force-related practices and training. | |
| **_Reporting_** | | |
| 170 | BPD will ensure that officers notify a permanent-rank supervisor immediately, or as soon as practicable, following a use of Reportable Force. The supervisor will notify the Shift Commander by the end of the shift during which the force occurred. The notification will contain basic information concerning the incident. | **4d**<br>**(Initial Compliance)** |
| 171 | BPD will ensure that officers accurately, thoroughly, and timely report their uses of Reportable Force. | **4d**<br>**(Initial Compliance)** |
| 172 | After any officer-involved shooting, any officer that discharged their firearm will provide a Public Safety Statement to their supervisor when they arrive on the scene. The Public Safety Statement will include:<br>a. Type of force used by the officer and the threat presented by other involved parties;<br>b. Direction and approximate number of shots fired by the involved officer(s) and suspect(s);<br>c. Location of any unsecured weapons;<br>d. Location of injured persons;<br>e. Description of outstanding suspect(s) and his or her direction of travel, time elapsed since the suspect was last seen, and any weapon(s) that were available to them;<br>f. Description and location of any known victims or witnesses;<br>g. Description and location of any known evidence; and<br>h. Other information as necessary to ensure officer and public safety, and assist in the apprehension of outstanding suspects. | **4c**<br>**(Implementation – On Track)** |
| 173 | BPD will ensure that every officer who uses or observes a use of Reportable Force will document all matters that they have a duty to report in a Use of Force Report by the end of their tour of duty:<br>a. For Level 1 Reportable Force, officers have a duty to report: (1) the reason for the initial police presence; (2) a specific description of the acts that led to the Reportable Force; (3) the level of resistance encountered; and (4) a description of every type of Reportable Force used.<br>b. For Level 2 and Level 3 Reportable Force, officers have a duty to report each of the following:<br>    i. The reason for the initial police presence; | **4c**<br>**(Implementation – On Track)** |

|  |  |  |
|---|---|---|
|  | ii. A detailed narrative account of the incident from the officer's perspective, including:<br>　1. A detailed description of the subject;<br>　2. The severity of the crime at issue;<br>　3. The presence and location of witnesses at the scene;<br>　4. A specific description of the acts that led to the use of Reportable Force;<br>　5. The level of resistance encountered;<br>　6. The threat the subject posed;<br>　7. The force options available to the officer;<br>　8. Any de-escalation techniques used; and<br>　9. A description of every type of Reportable Force used. |  |
| 174 | For Level 2 and Level 3 uses of Reportable Force, BPD will require an uninvolved permanent-rank supervisor of an officer using such force to respond to the scene. The supervisor will determine, based on policy and the facts then known, the level at which the use of force should be categorized. A supervisor may opt for a higher level response than would usually be required for the level of the force used, depending on the circumstances of the incident. | **4c (Implementation – On Track)** |
| 175 | When an incident involves multiple types of force or multiple officers, the entire incident will be reported and investigated at the highest level of force used by any officer during the incident. | **4c (Implementation – On Track)** |
| 176 | BPD will revise its policies to ensure that officers will not use conclusory statements, boilerplate, or canned language (e.g., "furtive movement" or "fighting stance") without supporting incident-specific detail in their Use of Force Reports. | **4c (Implementation – On Track)** |
| 177 | BPD will revise its policies to clarify that where Use of Force Reports are found to include material omissions or inaccuracies, BPD will take corrective action, including discipline as appropriate:<br>　a. Where the material omissions or inaccuracies are found to be deliberate, the officer will be disciplined for failing to report, up to and including termination, subject to legal limits; and<br>　b. BPD will review the information previously omitted or provided inaccurately to determine the truth of the incident. BPD will thoroughly review the entire incident using the new information to determine the consequences of the new information on the propriety of officers' actions. | **4c (Implementation – On Track)** |
| 178 | BPD will revise its policies to clarify that officers who use or observe a use of Reportable Force but do not report it will be disciplined, up to and including termination. | **4c (Implementation – On Track)** |
| 179 | BPD will revise its policies to include particularized reporting and review requirements for CEWs, OC spray, and firearms. | **4c (Implementation – On Track)** |
| ***Supervisory response and reviews for Levels 1 and 2 Reportable Force*** | | |
| 180 | A supervisor of the officer(s) employing a Level 1 use of force will review and document approval or elevate the Level 1 force before the end of the shift during which the Level 1 force was used. It is not mandatory for supervisors to report to the scene of a Level 1 use of force. | **4c (Implementation – On Track)** |
| 181 | Supervisors will elevate and investigate any Level 1 use of force that appears to have been inappropriate or improperly categorized as a Level 1 use of force. If a supervisor determines | **4c** |

| | | |
|---|---|---|
| | that an officer's report reveals evidence of potential criminal conduct, he or she will promptly notify OPR. | **(Implementation – On Track)** |
| 182 | BPD will ensure that the uninvolved permanent-rank supervisor of the officer(s) employing a Level 2 use of Reportable Force will thoroughly review the incident for consistency with BPD's Use of Force policy and the terms of this Agreement. The supervisor will complete the use of force review and within 72 hours of the incident will forward it, via Blue Team, to the lieutenant (or above as necessary) of the officer(s) who used the Reportable Force. | **4c (Implementation – On Track)** |
| 183 | If necessary, a supervisor in the chain of command will re-classify a use of force review to the appropriate Reportable Force Level and ensure that any appropriate additional action is taken based on the newly assigned Level of force, if necessary. If a supervisor or above determines that an officer's report reveals evidence of misconduct or potential criminal conduct, he or she will promptly notify the Office of Professional Responsibility ("OPR"). | **4c (Implementation – On Track)** |
| 184 | BPD will ensure that the uninvolved permanent-rank supervisor of the officer(s) using force, upon notification of a Level 2 use of Reportable Force incident, will respond to the scene. | **4c (Implementation – On Track)** |
| 185 | BPD will ensure that whenever there is a visible injury, complaint of injury, or medical attention is requested by any individual, officers shall immediately obtain any necessary medical care. An officer will be expected to provide emergency first aid consistent with their training and experience until professional medical care providers are on scene. | **4c (Implementation – On Track)** |
| 186 | The supervisor who responds to the scene to review the Reportable Force used must hold a permanent-rank higher than any involved officer(s) who used Reportable Force or directed that it be used. | **4c (Implementation – On Track)** |
| 187 | BPD will ensure that whenever a supervisor uses, directs, or is otherwise personally involved in any type of use of Reportable Force, including participating in the tactical planning that led to the Reportable Force, a higher-ranking supervisor who was not involved in the incident will review the Reportable Force. If a Lieutenant or above is involved, the review may be conducted by a supervisor of equal rank. The Commissioner or his/her designee may, in their discretion, reassign a review of force of any Level to SIRT. | **4c (Implementation – On Track)** |
| 188 | For Level 2 uses of Reportable Force, BPD will ensure that upon arrival at the scene, to conduct a thorough, reliable review, the uninvolved permanent-rank supervisor will identify and collect evidence sufficient to establish the material facts related to the Reportable Force. The uninvolved permanent-rank supervisor will: <br> a. Locate relevant civilian witnesses including the subject and third parties, and arrange for those witnesses to be interviewed. Witnesses should be interviewed separately where possible. Supervisors should use trauma-informed interview techniques where appropriate, and avoid leading questions; <br> b. Use Department-issued equipment to record interviews with civilian witnesses. Interviews of the subject, or the subject's refusal to be interviewed, will be also audio or video recorded; <br> c. Not extend the subject's detention to facilitate the screening process of the level of Reportable Force if the subject is free to leave. However, the uninvolved permanent-rank supervisor will request the subject's statement regarding the use of Reportable Force and explain that it is for BPD's administrative review to determine the propriety of the Reportable Force. The subject will be advised that he or she is free to leave, when that is the case; <br> d. Separate all officers involved in a use of Reportable Force incident until interviewed. Group interviews will be prohibited. Supervisors will not ask officers or other witnesses | **4c (Implementation – On Track)** |

| | leading questions that suggest legal justifications for the officers' conduct, where such questions are contrary to appropriate law enforcement techniques;<br>    i. All interviews will be conducted in accordance with BPD policy and the Law Enforcement Officers' Bill of Rights ("LEOBR").<br>    ii. If not in conflict with state law, and consistent with the terms of this Agreement, all officers who use Level 2 force will provide an oral use of force statement in person to the supervisor on the scene prior to the subject's being booked, or released, or the contact otherwise concluded;<br>  e. Review and flag for retention any body-worn camera footage capturing any part of the use of force incident;<br>  f. Canvass the area for any CCTV or other surveillance cameras in the area, document their locations, and attempt to obtain video voluntarily, review the footage, and upload it into Blue Team. If unable to obtain the video voluntarily, document why the footage could not be retrieved;<br>  g. Photograph the scene and location of the incident to accurately depict lighting, weather, vehicle placement, points of cover, and to identify relevant evidence to be collected if not collected by the supervisor, such as forensic evidence; h. Photograph any departmental or private property damaged as a result of an officer's involvement; and i. Photograph the subject for identification purposes and all injuries or claims of injury to anyone involved, and denote the lack of injury when applicable. | |
|---|---|---|
| 189 | The supervisor conducting the use of force review will evaluate in writing all uses of force for compliance with BPD policy, as well as any other relevant concerns (e.g., tactical or threat assessment). The supervisor should provide timely, constructive feedback, where appropriate. | **4c (Implementation – On Track)** |
| 190 | For Level 2 Reportable Force, the first-line permanent-rank supervisor's use of force review will be completed and entered into Blue Team within 72 hours of the use of Reportable Force, unless the supervisor's commanding officer approves an extension. This documentation will include the following:<br>  a. A detailed narrative description of the incident that will describe the force used by the officers and the subject(s), any injuries sustained by the subject(s) and the officer(s), and the sequence of events comprising the incident. Additionally, it will document the supervisor's actions in reviewing or screening the incident. The summary should provide a commander, who is reviewing the report, a complete understanding of the incident;<br>  b. Documentation of all evidence that was gathered, including physical evidence; photographs; and names, phone numbers, addresses, and recorded statements of civilian witnesses to the incident; and reports by witnessing officers; and<br>  c. A review of the incident, including a discussion and resolution of any material inconsistencies in the evidence of statements; whether the force used was necessary, proportional and objectively reasonable, and otherwise within BPD policy. | **4c (Implementation – On Track)** |
| 191 | BPD policy will require that where a supervisor determines that force used by an officer may be considered misconduct or potential criminal conduct, the supervisor will notify OPR of their determination.<br>  a. Any review by OPR of the incident will be connected in BPD's database systems to the use of force review conducted by the supervisor, such that an inquiry into the incident will allow easy and efficient access to the entire review files of both the supervisor and OPR. | **4c (Implementation – On Track)** |
| *Assessments of Levels 1 and 2 Use of Force Reviews* | | |

| 192 | The first commander in the chain of command who reviews the uninvolved permanent-rank supervisor's use of force review of Level 1 and Level 2 Reportable Force will ensure that the review is thorough, complete, and makes the necessary and appropriate findings of whether the use of force was consistent with BPD policy. In accordance with BPD policy, each higher-level supervisor in the chain of command will review the use of force review to ensure that it is complete and that the review was thorough. | **4c (Implementation – On Track)** |
|---|---|---|
| 193 | BPD will ensure that a supervisor gather supplementary evidence or statements from officers, witnesses, or subjects when it appears that additional relevant and material evidence may assist in resolving any discrepancies, lack of information, or improve the reliability or credibility of the findings. Every supervisor in the chain of command is responsible to assure the accuracy and completeness of the use of force review completed by supervisors, and for initiating corrective action. | **4c (Implementation – On Track)** |
| 194 | When it appears that the findings of the use of force review are not supported by a preponderance of the evidence, the supervisor will recommend changes to the findings after consultation with the investigating supervisor and the previous reviewer, and document the specific evidence or analysis supporting the modification. Any supervisor in the chain of command may discuss the modification with the reviewing supervisor or reviewers. | **4c (Implementation – On Track)** |
| 195 | For force reviews involving Level 1 uses of Reportable Force, the district or unit commander will ordinarily be the final reviewer. He or she will make the final determinations of whether the findings by the chain of command regarding the use of Reportable Force are consistent with law and policy and supported by a preponderance of the evidence; whether the review is thorough and complete; and whether there are tactical, equipment, or policy considerations that need to be addressed. | **4c (Implementation – On Track)** |
| 196 | When the district or unit commander determines that an assessment for Level 2 force is complete and the evidence supports the findings, the force file will be forwarded to the Use of Force Assessment Unit ("UOFAU"). BPD will require that the UOFAU conduct an administrative Use of Force Assessment of all Level 2 Reportable Force incidents. BPD will ensure that the UOFAU is staffed to promote effective and efficient reviews of Level 2 Reportable Force. | **4c (Implementation – On Track)** |
| 197 | The UOFAU will review each Level 2 Reportable Force incident and review to determine whether the findings by the chain of command regarding the use of force are consistent with BPD policy and supported by a preponderance of the evidence; whether the assessment was thorough and complete; and whether there are tactical, equipment, or policy considerations that need to be addressed. | **4c (Implementation – On Track)** |
| 198 | The UOFAU may refer cases to the Performance Review Board for consideration by the full board as appropriate, for example, in incidents containing serious policy violations. | **0 (Not Assessed)** |
| 199 | At the discretion of the officer's chain of command, or the UOFAU, a use of force assessment may be assigned or re-assigned for investigation to SIRT, or returned to the unit for further investigation, analysis, or corrective action, if warranted. | **0 (Not Assessed)** |
| 200 | BPD will analyze the data captured in officers' Use of Force Reports and supervisors' use of force reviews on an annual basis to identify significant trends, to correct deficient policies and practices, and to document its findings in an annual report that will be made publicly available pursuant to Section VII(E) below, Data Collection, Analysis, and Reporting. BPD's analysis will include evaluations and assessments of use of Reportable Force by type, unit or assignment, demographics of the subjects, the shift or time of day, location, the nature of offense, the resistance encountered, and comparisons among officers or units. | **4c (Implementation – On Track)** |
| ***Reporting and Investigation of Level 3 Force – Special Investigation Response Team ("SIRT")*** | | |

| 201 | BPD will ensure that its SIRT unit investigating Level 3 Reportable Force incidents is multidisciplinary and conducts both the criminal and administrative investigations of Level 3 Reportable Force incidents. To guide SIRT practices and investigations, BPD will develop and implement a SIRT training curriculum and procedural manual. | **4c (Implementation – On Track)** |
|---|---|---|
| 202 | SIRT will respond to and investigate the following types of incidents:<br>    a. All Level 3 Reportable Force incidents;<br>    b. Any fatal motor vehicle crash in which the actions of a BPD member were a contributing cause; and<br>    c. Any incident at the direction of the Police Commissioner or his/her designee. | **4c (Implementation – On Track)** |
| 203 | In the incidents listed in the preceding paragraph, SIRT will be the primary investigating entity, and may call upon additional units to offer assistance and technical expertise. The SIRT supervisor will lead all investigative activity, which includes locating and interviewing witnesses, securing the scene and evidence, locating video surveillance that may have captured the incident, and making notifications. The Training and Policy representatives to SIRT will not have an investigative role when present at the scene of a use of Reportable Force, but will attempt to identify any policy or training issues.<br>    a. At least one member of SIRT will be available at all times to evaluate potential referrals from BPD supervisors.<br>    b. SIRT staff members will have appropriate expertise and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved; and that its investigations allow the Performance Review Board to identify trends or patterns of policy, training, equipment, or tactical deficiencies, or positive lessons related to the use of force. | **4c (Implementation – On Track)** |
| 204 | The on-scene uninvolved permanent-rank supervisor shall take initial steps in response to the incident consistent with the requirements for Level 2 Reportable Force incidents until turning the scene over to the Shift Commander or arriving SIRT personnel. | **4c (Implementation – On Track)** |
| 205 | If the Shift Commander arrives before the SIRT personnel, the Shift Commander will assume control from the uninvolved permanent-rank supervisor and take steps to secure and maintain the integrity of the scene, including witnesses, which will be left intact to be processed by SIRT personnel. The Shift Commander will also make reasonable attempts to identify civilian witnesses to the event and request that they stand by for the SIRT personnel's arrival. The Shift Commander is responsible for separating all involved and witnessing officers and keeping them at the scene until SIRT personnel arrives. | **4c (Implementation – On Track)** |
| 206 | SIRT will have the following responsibilities in responding to a Level 3 Reportable Force incident:<br>    a. SIRT personnel will assume control of the use of force investigation upon their arrival;<br>    b. SIRT personnel will record all interviews with civilian witnesses;<br>    c. SIRT personnel will ensure that the Shift Commander has separated all officers involved in or who witnessed a use of force incident until they are all interviewed in accordance with BPD policy and the LEOBR;<br>    d. SIRT personnel will ensure all video evidence is immediately gathered and assessed. This evidence may include, but is not limited to, CCTV footage, private or public surveillance, cell phone video footage, and body-worn camera footage. SIRT personnel will arrange for a canvass for any CCTV or privately owned video that may have captured the contact, and attempt to obtain copies voluntarily. If the owner of privately owned video refuses, SIRT personnel will document the location and/or owner of the video. If no privately owned video is discovered, SIRT personnel will document that none was found; | **4c (Implementation – On Track)** |

| | | |
|---|---|---|
| | e. The SIRT supervisor will arrange for a crime lab technician to process the scene according to the Crime Scene Sciences Section's technical manual and provide photos as soon as practicable to SIRT; <br> f. SIRT personnel will attempt to interview the person upon whom the officer used the Reportable Force to obtain the person's account of what happened, if possible, as an audio-recorded interview. They will also photograph areas of injury or complaint of injury; <br> g. The SIRT supervisor responding to the scene will review body-worn camera or other video which may have recorded all or part of the incident and will document the content of such videos. The SIRT supervisor should obtain copies of videos (other than body-worn camera footage) and attach them to the Blue Team use of force entry. SIRT supervisors will review such video downloads as well as witness statements from all witness officers prior to the end of their shift(s) unless impracticable; <br> h. SIRT personnel will ask involved officers if they are willing to provide a voluntary statement, and if so, administer the Miranda warnings prior to conducting an interview. All interviews with officers must be recorded (audio and/or video) and take place as soon as practical; <br> i. The SIRT supervisor responding to the scene will arrange for the involved and witness officers to submit use of force written reports as soon as practicable and no later than 24 hours after the incident, except in extenuating circumstances, such as when an officer is injured, in which case, the officer will submit their written report as soon as the extenuating circumstance allows; <br> j. SIRT personnel will be responsible for notifying the involved officer's commanding officer, the Police Commissioner, Deputy Police Commissioners, all Chiefs, the Director of the Academy, and the Baltimore City State's Attorney's Office ("SAO") no later than 24 hours after learning of the use of force, unless impractical. This notification will contain basic facts about the incident as they are known at the time; <br> k. Within 60 days or as soon as possible thereafter, SIRT investigators will present the completed investigation to the Performance Review Board ("PRB") when it next convenes; and <br> l. If the SIRT investigation indicates potential criminal conduct or administrative misconduct, the SIRT commander will be responsible for notifying the Chief of OPR, and, in cases of potential criminal conduct, notifying the appropriate prosecuting authority. | |
| **E. Data Collection, Analysis, and Reporting** | | |
| 211 | BPD will collect and maintain all data and records necessary to accurately evaluate its use of force practices and facilitate transparency and, as permitted by law, broad public access to information related to BPD's decision making and activities. | **4c (Implementation – On Track)** |
| 212 | BPD will ensure the collection and tracking of all documents related to uses of force and allegations of misconduct and related materials, including: <br> a. Officers' Use of Force Reports; <br> b. Supervisor's use of force reviews; <br> c. Force investigations by SIRT; <br> d. Reviews conducted by OPR relating to officers' uses of Reportable Force; and <br> e. All supporting documentation and materials, including relevant CEW downloads, supporting audio-visual recordings, including witness and officer interviews, and any relevant camera downloads, including from body-worn cameras. | **4c (Implementation – On Track)** |

157

| 213 | BPD will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from Reportable Force-related documents, including:<br>a. The type(s) of force used;<br>b. The actual or perceived race, ethnicity, age, and gender of the subject;<br>c. the name, shift, and assignment of the officer(s) who used force;<br>d. the District where the use of force occurred;<br>e. Whether the incident occurred during an officer-initiated contact or a call for service;<br>f. The subject's perceived mental health or medical condition, use of drugs or alcohol, or the presence of a disability, if indicated at the time force was used;<br>g. The subject's actions that led to the use of force, including whether the subject was in possession of a weapon;<br>h. Whether the subject was handcuffed or otherwise restrained during the use of force;<br>i. Any injuries sustained by the officer or the subject or complaints of injury, and whether the officer or subject received medical services;<br>j. whether the subject was charged with an offense, and, if so, which offense(s);<br>k. For firearms-related deadly force incidents, the number of shots fired by each involved officer, the accuracy of the shots, and whether the subject was armed or unarmed; and<br>l. The length of time between the use of force and the completion of each step of the force investigation and review. | **4c**<br>**(Implementation – On Track)** |
| --- | --- | --- |
| 214 | BPD will be responsible for the routine reporting of relevant data to the Commissioner, PRB, and OPR. | **4c**<br>**(Implementation – On Track)** |
| 215 | BPD will be responsible for an annual evaluation of forms and data collection systems to improve the accuracy and reliability of data collection concerning use of force. This evaluation will be provided to the Monitor, the DOJ and the public. | **4c**<br>**(Implementation – On Track)** |
| 216 | BPD will develop a protocol to accurately analyze the data collected and allow for the assessments required below. This protocol will be subject to the review and approval of the Monitor and DOJ. | **4c**<br>**(Implementation – On Track)** |
| 217 | BPD will annually analyze the prior year's force data, including the force-related data listed above, to determine trends; identify and correct deficiencies revealed by this analysis; and document its findings in a public report. | **4c**<br>**(Implementation – On Track)** |