```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,  )
                   Plaintiff,   )
 4          vs.                 )   CIVIL ACTION NO.
                                )   JKB-17-099
 5   BALTIMORE POLICE           )   Baltimore, Maryland
     DEPARTMENT, et al.,        )   10:10 a.m.
 6              Defendants.     )   Courtroom 1A
     _____)
 7
                        THURSDAY, JANUARY 26, 2023
 8                      TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES K. BREDAR, CHIEF JUDGE
 9
     FOR THE PLAINTIFF DEPARTMENT OF JUSTICE:
10
     David Cooper, Esquire
11   Timothy Mygatt, Esquire

12   FOR THE DEFENDANT BALTIMORE POLICE DEPARTMENT:

13   Ebony Thompson, Acting City Solicitor
     Justin Conroy, Chief of Legal
14   Steven Salsbury, Deputy Solicitor
     Sharon Sullivan, Director
15   Amethyst Spivak, Deputy Director
     Eric Melancon, Chief of Staff
16   Michael Harrison, Commissioner
     Sheree Brisco, Deputy Commissioner
17   James Nadeau, Deputy Commissioner
     Melissa Krafchik, Compliance Manager
18   Chief Derek Canton
     Major Derek Loeffler
19
     MONITORING TEAM:
20
     Ken Thompson, Chief Monitor
21   Matthew Barge, Deputy Monitor
     Theron Bowman, Deputy Monitor
22   Jessica Drake, Deputy Monitor
     Roberto Villasenor, Deputy Monitor
23   Wanda Watts, Deputy Monitor

24   _____
            (Computer-aided Transcription of Stenotype Notes)
25            Reported by: Amanda L. Longmore, RPR
                 Federal Official Court Reporter
```

```
 1                      P R O C E E D I N G S
 2             THE COURT:   Good morning.  Let's take appearances.
 3             MR. MYGATT:   Good morning, Your Honor.  Tim Mygatt on
 4   the half of the United States.
 5             MR. COOPER:   Good morning, Your Honor.  Dave Cooper
 6   on behalf of the United States.
 7             THE COURT:   Good morning.  Ms. Thompson?
 8             MS. THOMPSON:   Good morning.  Ebony Thompson, Acting
 9   City Solicitor for the City.
10             MR. SALSBURY:   Good morning, Your Honor.  Steven
11   Salsbury, Deputy City Solicitor.
12             MR. CONROY:   Good morning, Your Honor.  Justin
13   Conroy, Chief Legal Counsel of Baltimore Police Department.
14             MR. THOMPSON:   Good morning, Your Honor.  Kenneth
15   Thompson for the Monitor Team.  With me is Matthew Barge and
16   the staff.
17             THE COURT:   Good morning.  Thank you.  Go ahead and
18   call it.
19             THE CLERK:   The matter now pending before this Court
20   is Civil Matter JKB-17-0099, United States of America versus
21   Baltimore Police Department, et al.  This matter now comes
22   before this Court for the purpose of a Quarterly Public Consent
23   Decree Hearing.
24             THE COURT:   Once again, good morning.  The Court
25   convenes today for the purpose of conducting the first
```

1    quarterly public hearing of 2023, during which we will review

2    progress by the City of Baltimore and its Police Department on

3    the road to compliance with the Consent Decree entered as an

4    order of this Court on April the 7th of 2017.

5        The Court's acutely aware of the fact that six years have

6    now passed since the parties entered into their settlement

7    agreement, a proposed Consent Decree, and nearly six years have

8    passed since the Court adopted that agreement, made it its own

9    order and entered it on the docket.  We're at a point in the

10   process where the defendants need to be showing results and,

11   generally speaking, they are.

12       As I make my observations this morning, I direct the

13   parties and the public to the Monitoring Team's Second

14   Comprehensive Reassessment Report published on December 22nd, a

15   little more than a month ago.  This document takes a deep dive

16   into the City's effort to comply with the Decree and, in

17   detail, explain where the process stands.  The Court expressly

18   endorses that report.

19       The comprehensive reassessment reveals that a substantial

20   portion of the work required by the Consent Decree has now been

21   completed.  The Police Department has revised all of its core

22   policies, the BPD has devised and provided department-wide

23   inservice training and eLearning on all of the new policies,

24   including use of force, stops, searches, and arrests, fair and

25   impartial policing, peer intervention, and active

1    bystandership, community policing, interactions with

2    individuals in crisis, interaction with youth, First

3    Amendment-protected conduct, responding to reports of sexual

4    assault, and misconduct and discipline.

5         Specialized training for supervisors has been drafted,

6    finalized, and delivered, specialist detectives responsible for

7    misconduct investigations, sex assault investigations, crisis

8    intervention, and other areas have all been trained.  The

9    complete reinvention of training at the BPD has been augmented

10   by the physical move out of the former decrepit academy to a

11   new capable facility on the campus of the University of

12   Baltimore.  A very substantial effort to implement all of the

13   reforms outlined in the Decree is well underway and in some

14   areas is complete.

15        The Police Department, with the full backing of the

16   current leadership of the City, has accomplished its first main

17   task under the Decree.  New leadership has pointed the agency

18   in a markedly different direction.  Compliance with policies

19   that represent the best thinking in contemporary American

20   policing, not to mention the law and the US Constitution, are

21   now tiptop priorities.  The BPD has become a flagship agency

22   nationally when it comes to defining the proper role and

23   approach of police departments and in designing best methods to

24   manage large urban police agencies.  Department leaders, with

25   the help of the Court's Monitoring Team, have defined a new

1    policing philosophy for the City centered on principles of

2    community policing.

3         The department has committed to and has taken big steps

4    toward rebuilding a relationship of trust with city residents.

5    These are the substantial accomplishments and many paragraphs

6    of the Consent Decree are at least tentatively satisfied by

7    this progress.  So all in all, the reform process is moving

8    forward and, for the most part, is on a course.

9         But on the road to implementation, the Court doesn't allow

10   the defendants to rest on their laurels.  The stakes are too

11   high.  The business is too serious.  So while the Second

12   Comprehensive Reassessment Report appropriately highlights the

13   many successes achieved by the defendants to date, I will

14   quickly pivot to ask three questions:

15        First, what barriers stand in the defendants' way

16   frustrating achievement of full compliance with the Decree?

17        Second, is it readily apparent on the street that this is

18   a fundamentally changed Police Department?

19        A third question requires a preamble.  While there may be

20   a growing sense that the reform initiative is bearing fruit and

21   while there are now some objective indicators of success, such

22   as a documented reduction in the use of force by the police, in

23   general, the wider sense of actual progress is just

24   impressionistic.  I say impressionistic because the monitoring

25   process by which reform implementation must be measured, the

1  process of conducting compliance reviews and outcome

2  assessments is in progress but far from complete.  And without

3  the data that this process will yield, the Court is unable to

4  authoritatively state with precision where the defendants stand

5  in terms of implementation and compliance.  Arrows and

6  scorecards are pointing in the right directions.  But despite

7  all of the progress made in inventing and implementing a new

8  system of making and keeping records and of assembling the data

9  necessary to permit comprehensive assessment, there still is

10  some distance to go before progress and change can be measured

11  and assessed with confidence.

12      So the third big question is this:  When will the

13  evaluation process progress to the point that we are no longer

14  relying mostly on impressions of success but instead are able

15  to see and evaluate concrete data; i.e., comprehensive proof.

16      Early in the Consent Decree implementation process, the

17  Court complained the City and the Police Department

18  demonstrated a fundamental lack of capacity to implement the

19  reforms.  Many times from this bench I observed that there

20  seemed to be no lack of will on the part of the defendants,

21  that leadership and City Government and the Police Department

22  seemed motivated to affect change, but nonetheless actual

23  capacity to do what was required was lacking.

24      While much as changed since 2017 and much has been

25  accomplished since then, some specific capacity issues remain,

1   and tech is a good example.  The Police Department needs to

2   accomplish a full activation of its new technological systems

3   so that it can, as I just indicated, reliably generate and

4   record the data necessary to show the true workings of the

5   agency.  The BPD needs to achieve the full capabilities of

6   their new technological systems to complete their evolution to

7   a fully modern law enforcement organization.

8        Additionally, as noted repeatedly, the Court's Monitoring

9   Team can't fully discharge its duties to report to the Court

10  until the Department is fully capable of producing and

11  processing its essential data.  So the full technological

12  reforms and updates envisioned in the Decree must now be

13  completed.

14       Field-level supervision remains a challenge and another

15  example where capacity is lacking.  Much more is expected of

16  rank-and-file officers now that they're operating under the

17  terms of a Consent Decree, and their first-line supervisors

18  must be well trained and available to serve as those officers'

19  primary resource as they endeavor to do the job within the

20  guardrails established by the Decree.

21       Scholarly research holds that sergeants are key when

22  reforming a police department.  Sergeants must be well trained

23  to perform their supervisory roles.  They must be

24  philosophically on board with reforms and they must be present

25  and available in sufficient numbers to meaningfully perform

1  their critical advisory and supervisory roles across the

2  agency.  The BPD needs to do a better job of training and

3  supporting its first-line supervisors, not to mention deploying

4  them in sufficient numbers to ensure that every officer

5  experiences attentive supervision.

6      The Consent Decree has big aspirations and demands when it

7  comes to addressing behavioral health.  Baltimore's required to

8  address this issue systematically, both within and outside of

9  the Police Department.  Substantial steps have been taken and

10 the Department is beginning to pilot some truly innovative

11 strategies, but the capacity of the Police Department to

12 successfully deal with persons in behavioral crisis depends so

13 much on other capabilities and capacities within the City and

14 it is in those areas especially that gaps remain.  Baltimore

15 has big, ambitious plans to address behavioral health, but an

16 actual capacity to achieve the lofty aspirations has not yet

17 been demonstrated and certainly hasn't been demonstrated on a

18 scale ultimately necessary.

19     The final area where capacity is lacking:  staffing.

20 Bluntly, this is the defendants' most daunting challenge.  This

21 is their most serious problem.  The Baltimore Police Department

22 is doing no worse than other large urban law enforcement

23 organizations as the entire profession nationwide confronts a

24 fundamental shift in the inclination of young people to pursue

25 careers in law enforcement.  Virtually every major police

1    department in the country is losing officers faster than they

2    can replace them, just as is true in Baltimore.

3         That said, because of Baltimore's uniquely troubled

4    history and, frankly, because it's under a Consent Decree that

5    requires adherence to a staffing plan, this city simply has to

6    do a better job of responding to this staffing crisis than do

7    other cities.  So far, despite herculean efforts, the City and

8    the Police Department are not delivering on that obligation.

9    Substantial ground has been lost within the last year and real

10   questions exist as to when the Department can get into

11   compliance with the staffing plan.  Certainly not this year or

12   next.  Innovative initiatives to reassign some roles and

13   functions to civilians are helpful, but this and other coping

14   strategies have their limits when it comes to mitigating the

15   consequences of there just being too few sworn officers.

16        Insufficient staffing is the largest single barrier

17   standing between the Police Department and this Court's finding

18   that the defendants have come into compliance with the Decree.

19   The staffing crisis will likely be the reason why Court

20   supervision of the Police Department persists for longer than

21   might have been envisioned in 2017.  I cannot overstate the

22   seriousness of the issue both in terms of compliance with the

23   Consent Decree and frankly the capacity of the Department to

24   effectively police the city in future years.

25        I pound the table on this issue at every hearing because

1    it is so serious.  So much good work is underway here now, all

2    that has been mentioned, plus promising initiatives like GVRS,

3    but it will die on the vine if staffing isn't solved.  The

4    Department must stop the bleeding.  BPD must do better, much

5    better on recruiting and retention.

6         Look, I know this is a tough ask because the Department is

7    already doing so much to address the issue.  But I don't just

8    ask.  I require better results.  Ms. Thompson, Commissioner

9    Harrison, I recognize the effort to date but it's not enough.

10   You're going to have to do better.

11        As we pass the six-year mark, there are many indications

12   of progress and the Second Comprehensive Reassessment Report

13   lays them out.  For all I've said about a few troubling

14   specific issues, I salute the defendants, the Department of

15   Justice, the Monitoring Team for the success achieved at this

16   point.  It is significant.  But the Court is now focused on

17   completion of this process; i.e., substantial compliance.  And

18   so my focus now is less on the successes behind us and more on

19   the issues and factors blocking or slowing outright completion.

20   As the parties move into 2023, they need to focus like a laser

21   on the assessment process so that they, the Court, and the

22   public can gain a more detailed and precise picture of where we

23   stand with Decree implementation.  So that's number one.

24        Number two, the parties must continue to focus on the

25   capacity issues that are outlined in the second reassessment

1    and in my remarks this morning, particularly the staffing

2    crisis.

3         I'm going to make a supplemental statement this morning on

4    the topic of the Consent Decree and crime statistics.  I'm

5    mindful that in my commending the Police Department for the

6    progress they've made and in my references to the essentially

7    positive Second Comprehensive Reassessment Report and in my

8    broader discussion of where the Department is excelling and

9    where it continues to fall short, I made little or no reference

10   to the fact that certain crime indices such as the number of

11   homicides and the number of nonfatal shootings in the city

12   remain extremely high.

13        Many times those involved in implementing the Consent

14   Decree, including this Court, have proffered that police reform

15   will ultimately lead to a restoration of trust between the

16   community and the Police Department, that the increased trust

17   will lead to increased cooperation and collaboration between

18   the community and the Police Department, that such

19   collaboration will ultimately increase the Police Department's

20   crime fighting effectiveness, and that all of this will lead to

21   a reduction in crime and less violence in Baltimore.

22        So some might ask, we're six years in, where are the

23   results?  Where's the fall in violent crime?  As the homicides

24   and shootings refuse to abate, is the oft-stated thesis about

25   constitutional policing leading to more effective policing and

1    a safer community, is that still a sound thesis?

2         As anyone living in Baltimore now realizes, police reform,

3    real police reform that rebuilds the department from the ground

4    up takes a long time.  It took decades for the Department to

5    deteriorate to the point where it found itself in 2015 and

6    2016.  As one would reasonably expect, it's taking many years

7    to complete the reforms required in the Decree and dig out of a

8    very deep hole, and it will take even longer, additional years

9    of positive interactions between police and community to

10   redefine the department in the minds of the hundreds of

11   thousands of people who live here, deeply held views, often

12   borne of difficult personal experiences with police officers

13   over many years.  Not to mention deserved and negative

14   portrayals of the Department in the mass media are not going to

15   be revised overnight.  The public's trust will be won only

16   slowly one positive interaction at a time.

17        And all the while, all the long while, all during the

18   period when the reform initiative was and is being conceived

19   and implemented and measured and assessed and marketed, all

20   during this long period, independent crime drivers persist:

21   addiction, easy availability of illegal guns, a fundamental

22   mismatch between the jobs our economy generates and the stills

23   or the lack of skills of the workforce, the poor state of our

24   educational system, et cetera, et cetera.  All the outside

25   forces driving crime, forces the police don't control, continue

1   unabated while the City and the Department do the hard, slow
2   work of reforming the BPD.

3       Police reform, the reforms envisioned and mandated by this
4   Consent Decree undoubtedly will lead to more effective policing
5   in Baltimore.  And with that greater effectiveness, the police
6   will be able to more fully contribute to the crime fight.  But
7   these other drivers that I have referred to, the drugs, the
8   guns, the problems with jobs and the educational system, the
9   fundamental tears in our social fabric such that we are unable
10  to confront and resolve differences without resorting to
11  violence, these forces are mostly beyond the scope of the
12  Consent Decree and mostly beyond the capacity of even the best
13  functioning police departments to fix.  These are broader
14  societal problems, and in addition to asking the police to do
15  their best, the community has to look to other elements and
16  institutions in the City for their reform and their improvement
17  if the violence is to be reduced.

18      Ultimately, the success or failure of this Consent Decree
19  will not be measured by crime data.  It won't be measured by
20  the homicide rate.  It will be measured by data that reveals
21  whether police officers are obeying the law, operating as
22  professionals, and bringing to bear the best methods for
23  ensuring accountability.  Logic says that a professional,
24  law-abiding, fully staffed Police Department will contribute
25  significantly to a reduction in and a suppression of crime.

1    But no one should mistake a court-supervised police reform

2    initiative for a full-on crime reduction strategy.  The latter

3    requires much more than repairing a broken police department.

4        So now I look forward to hearing the reports of the

5    parties addressing current issues arising under the Consent

6    Decree, then the so-called global topics, and then the specific

7    topics in subject areas that have been the focus of monthly

8    conferences since we last gathered publicly in October.

9        As always, because they have burden of proof, we'll hear

10   first from the defendants, then from the Department of Justice,

11   and finally from the Court's Monitoring Team.  I think the way

12   we'll proceed today is that we will proceed topic by topic,

13   hearing first from the defendants, then from the Department of

14   Justice, but I'm going to ask the Monitoring Team to hold their

15   presentation and comments on all of the topics and particularly

16   assessment which is the largest thing that I want to hear from

17   you on today, until after we have heard the substantive

18   presentations of the parties, if that's acceptable

19   Mr. Thompson?

20           MR. THOMPSON:  It is, Your Honor.  Thank you.

21           THE COURT:  Okay.  So I guess it's Acting Solicitor,

22   Ms. Ebony Thompson?

23           MS. THOMPSON:  Yes, Your Honor.

24           THE COURT:  Let me congratulate you on your new post,

25   and as you assume the top job in the Law Department, a lot of

1    responsibility falls onto your shoulders.  Fortunately, though,
2    I note you're not new to this case.
3              MS. THOMPSON:  No, sir.
4              THE COURT:  And so the title you arrived with today
5    might be different, your depth and experience in the case has
6    not changed.  You've been with us for a long time.  I look
7    forward to hearing from you at the start and others from the
8    City and the Police Department as you deem appropriate here at
9    the beginning.  Then we'll hear from Mr. Mygatt.
10             MS. THOMPSON:  Thank you so much, Your Honor, and
11   good morning.  I want to thank you again for the warm welcome.
12   Former Solicitor Shea sends his regards as our last meeting was
13   postponed to a date after his retirement.  He wished to do that
14   in person.  But I would like to introduce you to our new Deputy
15   Solicitor.  Mr. Steven Salisbury formerly served as Chief of
16   Staff.  I just wanted you to acknowledge that because this is
17   his first time with --
18             THE COURT:  Good morning again to you, Mr. Salisbury,
19   and congratulations on your promotion.
20             MR. SALSBURY:  Thank you, and good morning, Your
21   Honor.
22             MS. THOMPSON:  If you don't mind, I'll move up front
23   for the actual opening remarks.
24             THE COURT:  Yes.
25             MS. THOMPSON:  Your Honor, the City greatly

1    appreciates your recognition of the steps that the Baltimore

2    City Police Department has taken to comply with the Consent

3    Decree including the revision of all of its core policies in

4    devising and implementing department-wide inservice training

5    and all of the new policies.  We understand and recognize that

6    staffing is a huge concern, not only for the Court, but the

7    Baltimore Police Department and the City.

8         While we have drastically increased incentives that have

9    now made our police officers the highest paid in the state and

10   even rival some of the highest paid officers in the region, we

11   still maintain our commitment to this effort.  While we

12   vigorously continue our efforts to increase staffing and

13   technology, I would like to highlight how the administration is

14   utilizing all of our resources currently available to produce

15   results and take some of the burden off of our officers.  And

16   this is a factoring part of the assessment that you so

17   eloquently pointed out earlier.

18        The administration has utilized a collaborative approach

19   providing resources in addition to enforcement and as I'm sure

20   the Commissioner and Deputy Commissioner will later address,

21   this has resulted in a decline in violent crime where the

22   approach has been implemented.  Specifically, the Group

23   Violence Reduction Strategy offers resources and social

24   services as alternatives to incarceration which supports the

25   Police Department and has cited close to a 34 percent decrease

1    in gun violence in West Baltimore.

2         By providing a wholistic investment in crime prevention

3    where police presence and enforcement is complemented with

4    services and alternatives, the benefits are vast.  It aids in

5    restoring the trust, as you again highlighted earlier, between

6    the community and the Police Department and also reduces the

7    burden on a short-staffed Police Department to address crime on

8    its own.

9         I would also like to address another area where we have

10   utilized a strategy and seen extremely positive results.  The

11   Squeegee Collaborative highlights the power of the

12   administration's strategy of being inclusive of the feedback

13   from residents, the business community, nonprofits, City

14   officials, the Baltimore City School System, and the Police

15   Department.  We are able -- we were able to bring as many

16   stakeholders as possible to the table and move beyond the

17   cursory work of simply removing a problem from visibility in a

18   geographic area traditionally linked to prosperity but

19   developed a comprehensive plan that preserves public safety and

20   protects the rights of our citizens.  We have been intentional

21   about constitutionally addressing a public safety issue that

22   has plagued our City for decades.  The City ensured that this

23   safety issue would not rest solely on the shoulders of the

24   Police Department but the administration has rallied around our

25   officers with the community and engaged panhandlers and

1    solicitors that entered our six recently disallowed zones to

2    offer resources and alternatives.

3         As you've so accurately highlighted in your opening

4    remarks, Your Honor, we found through this outreach the

5    problems with jobs and the educational system have driven this

6    activity.  By providing access to those resources that our

7    officers do not currently have access to, we've noticed a

8    significant change.  This is a model that allowed our City to

9    experience a dramatic decrease in activity at the disallowed

10   zones since enforcement was implemented on January 10th, not

11   only because of police presence, but because of the months of

12   intentional outreach and resources provided to the youth well

13   before January 10th.

14        In just a few -- in just the first two weeks of

15   enforcement implementation, the Mayor's Office of

16   African-American Male Engagement has engaged with over 120

17   youth in the disallowed zones with half of them being

18   school-aged youth and the other half nonschool-aged youth, and

19   the results have been a downward spiral of activity in those

20   zones.

21        Again, as you emphasized earlier, collaboration with the

22   community is key.  We understand that a change in the weather

23   will likely bring its own sets of challenges, but we will have

24   established a strong foundation and network of support to aid

25   in the attraction of new officers and the retention of current

1    staff where they will know that they are supported by the

2    administration and the City with additional resources that will

3    complement their valiant efforts.  It's extremely important to

4    note while the Police Department has been at the table of the

5    Squeegee Collaborative from the very beginning, they have

6    always been surrounded by the multiple agencies from the Scott

7    Administration and the community at large.  We will continue

8    our efforts for tracking our progress not only for the six

9    disallowed zones that pose significant safety hazards, but for

10   crime in general to continue to highlight our progress in the

11   collaborative strategy model that this administration is

12   committed to.

13       We believe that we shouldn't just sit behind the walls of

14   City Hall and affect policy but collaboration works and can

15   supplement the efforts of our officers as we continue to push

16   for more staffing and advanced technology.  The City agrees

17   with this Court that we need to formulate the proper metrics to

18   measure and properly assess our progress until we've reached

19   full compliance and we are dedicated to continuing in those

20   efforts, Your Honor.

21       And at this time, I'll turn it over to the client, the

22   Baltimore Police Department.  Thank you, Your Honor.

23           THE COURT:  Thank you, Ms. Thompson.  So who wants to

24   speak for the Police Department this morning?  Commissioner?

25           COMMISSIONER HARRISON:  Good morning, Your Honor, and

1   thank you.  It's good to see you, and good morning to all who

2   are here.  Good morning to our State's Attorney and Chief of

3   Staff who have joined us.  I think this is the first time in my

4   four years that the State's Attorney has joined us in a public

5   hearing, so thank you for doing that.

6             THE COURT:  Welcome, Mr. Bates.  You're an essential

7   partner in this process.

8             MR. BATES:  Good to see you, Your Honor.

9             THE COURT:  You're an essential partner in this

10  process.  Very pleased to see you here.

11            COMMISSIONER HARRISON:  Your Honor, today you're

12  going to hear from our department in a number of presentations.

13  Certainly you and the community will hear from the Global Five

14  and where we are and how we're doing with the Global Five

15  topics that we talk about every month.  Then you're going to

16  hear about the progress made in the three specific areas that

17  we have on the agenda today for our quarterly public hearing.

18      Let me thank you for both your observations and your

19  acknowledgments of the successes made by the parties and the

20  work being done by the Police Department to bring itself into

21  compliance with the Consent Decree.  But let me also thank you

22  for your observations and acknowledgments about the work ahead

23  and the challenges we face.

24      I, too, pound the table every single day, all day every

25  single day about the challenges we face, specifically the

1    staffing challenge.  Let me be the first to say today as I'm
2    the first to always admit that we have a staffing deficiency
3    and we have a staffing challenge and that we are constantly
4    working to find ways, number one, to keep our great people here
5    for as long as we can through great and improved working
6    conditions, through upward mobility, through fair and impartial
7    selection to their assignments and promotions, through pay and
8    all the things that make people come and go in an organization,
9    that we are constantly addressing those because we know those
10   are the key reasons that people look at when they make a
11   decision to stay in an organization.
12             THE COURT:   I'll interrupt to say something actually
13   to Ms. Thompson that maybe I should have said a moment ago, and
14   that is in our monthly conferences where the Commissioner and I
15   are obviously doing a lot of table pounding based on comments
16   made so far this morning.  We are on this issue every month,
17   and you're there as well hearing it all.  I know or at least
18   assume you're taking this back to the Mayor and Council.  But
19   this problem is at a level of severity that it's actually
20   bigger than the Police Department to solve.  Commissioner
21   Harrison is very capable and he has top people focused on the
22   issue.  I'm aware of that.  I hear from them at the monthly
23   conferences.  But my personal belief is that it's going to
24   require the initiative and focus, frankly, of the Mayor and the
25   wider resources of his administration to solve this.

1        This is an enormous problem, not just in Baltimore, but
2   across the country.  From the reading I've done and discussions
3   we've had at our monthly conferences, it's apparent that
4   Baltimore is just feeling its piece of a national crisis.  Top
5   leaders have got to take this on.  Something fundamental is
6   going to have to be changed here.  I'm persuaded that the
7   Commissioner, Deputy Commissioner Briscoe, that they have
8   brought to bear the best thinking, the best strategies that can
9   be generated at least within the department, and through the
10  work with outside consultants, and yet the problem is not
11  yielding to this, it's getting worse, and that means that there
12  has to be attention paid at higher levels of Government to turn
13  this around.  I hope if nothing else comes out of today's
14  hearing, it's that message and you would be the primary
15  messenger to carry it back to leadership.
16              MS. THOMPSON:  Yes, sir.  Absolutely, I will.
17              THE COURT:   Sorry for the interruption, Commissioner.
18              COMMISSIONER HARRISON:   Thank you, Your Honor.  And
19  so we are constantly working to improve working conditions.
20  We've ordered 300 police cars.  The first 80 are already in
21  service.  The second 80 are in the City waiting to be upfitted
22  so we can deploy them.  There are another 150 that will be
23  coming after that where money has been allocated.  You saw us
24  move into a new police academy, to a new police station in the
25  Central.  We have paved the way and now have funding for two

1   more police stations, and the Mayor and I are talking every day

2   about how to accomplish the erection of more new policing

3   stations.  The new technology that we are constantly delivering

4   to the members of the department, though it is slow, we are

5   certainly doing it and we're doing our best with the City to

6   acquire the latest, greatest technology.  And then I will say

7   Baltimore is now leading the country in demonstrating to the

8   country that reform and crime reduction can coexist and are

9   happening at the same time.

10         Though I don't want to get ahead of myself, we still have

11  11 more months to go, but the momentum we were seeing at the

12  end of the year is carrying over to the beginning of the year,

13  and you heard the Solicitor talk about the reductions in the

14  Western District as a result of the Group Violence Reduction

15  Strategy, a comprehensive crime-fighting model that does both

16  enforcement and help people have a pathway away from crime at

17  the same time.  We are confident that we will continue to see

18  momentum but we're demonstrating to the country that reform and

19  crime-fighting strategies and reduction can coexist and, while

20  the narrative is sometimes skewed by some that you can't do

21  both, we're proving that to be false, that you can do both and

22  Baltimore is now the national model that it can be done.

23         I'd like to end by saying we were very pleased to be

24  joined by Mr. Bates, his Chief of Staff, and his entire

25  leadership team just a couple of weeks ago, a very -- in his

1  first week of his administration joined my entire leadership

2  team for more than a two-hour meeting to talk about his

3  policies and where his vision and mission for his agency and

4  how it is perfectly aligned with the crime-fighting strategy of

5  the Baltimore Police Department and where we want to go in the

6  future and how we cocreate decisions, policies that lead to

7  decisions of what we're going to do with arrests and

8  prosecutions, and we're doing that together and we couldn't be

9  more pleased that, number one, we met to go over those things

10  and make sure we are aligned, and we are, and that today he's

11  here not just in support of the work we do at the crime fight,

12  but in support of the reform initiatives in the Consent Decree.

13      So I am hopeful.  I'm excited.  Yes, I am the first to

14  say, yes, we have staffing challenges.  We have many more other

15  challenges, but that just makes us want to focus harder, work

16  harder, not necessarily longer but harder and smarter to make

17  sure we can accomplish this.  And it is our goal, and I'm not

18  afraid to say it, it is our goal that we will exit this Consent

19  Decree as soon as possible when that -- that's the goal.  Right

20  now, we're working on the pathway to accomplish that, and we

21  realize we have a very, very long way to go, but it only wants

22  to -- it only makes us more determined to work harder and

23  smarter, faster to accomplish it.  You not only have my

24  commitment, but the commitment of the entire leadership team,

25  and now I think you see you have the commitment of our State's

1/26/23 Quarterly Consent Decree Hearing

1    Attorney joining us.

2             THE COURT:  Thank you, Commissioner.  Somehow we've

3    got to do a better job of marketing this energy and this

4    positivity that otherwise infuses this Police Department,

5    particularly its leadership, so that there is a better

6    understanding out there in the relevant community, that is

7    people who are considering a career in law enforcement but

8    haven't decided whether to actually make the move and haven't

9    decided which agency it is that they want to join, somehow

10   we've got to do a better job of marketing what is truly unique

11   and special that is going on in this department and in a way

12   that just builds on the success and accomplishments that are

13   otherwise being achieved under the Decree.  That's the positive

14   message.

15        The difficult message is that the net loss to this

16   department last year was around 170 sworn officers.  We just

17   can't take another hit like that in 2023.  At least I don't see

18   how the Department can sustain that and keep up with its

19   obligations, particularly in areas like community policing or

20   patrol officers expected under the Consent Decree to spend 40

21   percent of their time on the street, not simply responding to

22   calls but involved in positive proactive engagement with

23   businesspeople, kids, our senior citizens on the stoops, you

24   know, all of the elements of our community here in Baltimore,

25   that's a critical mandate of the Decree.  I don't see how it

1    can be done with these depleted numbers.  So I'm going to keep

2    pounding the table.

3              COMMISSIONER HARRISON:   I will always join you and

4    thank you for that.

5              THE COURT:  Mr. Mygatt, good morning.

6              MR. MYGATT:  Good morning, Your Honor.

7              THE COURT:  Please.

8              MR. MYGATT:  Just have a few brief remarks this

9    morning, Your Honor.  I just want to start, first of all, by

10   saying we share the Court's sense of urgency, we share the

11   Commissioner's sense of urgency as he just outlined.  I think

12   we all want to come into compliance with this Consent Decree as

13   quickly as possible, bring the City along, bring BPD along so

14   we can all exit this process and push forward towards the

15   solutions that we think are in that Consent Decree so that we

16   see the establishment of constitutional effective policing in

17   this City, and I think that we're all excited for that.

18        We know that everybody's been pushing very hard.  You

19   highlighted that we're over six years in, Your Honor, and been

20   pushing very hard, but now it's time to push some more.  Now

21   the hard work of really making sure that this is felt out on

22   the street comes in and the assessment process is key to

23   telling us whether or not we're actually getting to that point.

24        So, you know, just to address your first question a little

25   bit, Your Honor, we're going to address that, you know, with

1    specificity throughout the presentations today and through all

2    of these monthly meetings and quarterly meetings we have with

3    the Court in terms of what are the obstacles to compliance, but

4    I think, you know, we are focused, you are focused, Your Honor,

5    through the Global Five on some of the big picture obstacles

6    that are leading to us, you know, not being able to make

7    progress as quickly as possible as we would like to here.

8         You know, we've talked about technology already, we've

9    talked about staffing already, we've talked about each of those

10   different issues, but we also need to get into the nitty-gritty

11   some of the different issues that are coming up.  And so as we

12   do the presentations today, we need to dig into some of those

13   particular obstacles in particular areas.  I'm going to be

14   talking about transport a little bit later today and, you know,

15   there's just some particular things that we need to push

16   through there to get across the finish line.

17        I want to talk about staffing really briefly.  You know,

18   we've talked about this every time we come in front of you,

19   Your Honor, and I just want to reiterate that DOJ is acutely

20   aware of this problem, not just in Baltimore but across the

21   country.  DOJ's putting intense focus on this and trying to

22   provide national leadership on this issue, not only through the

23   work of the Civil Rights Division, but maybe much more

24   importantly, through the Office of Justice Programs, the Bureau

25   of Justice Assistance, the COPS Office and many other parts of

1    the Justice Department to rebuild trust in law enforcement, to

2    put money and technical assistance into helping recruitment

3    efforts, retention efforts, helping police departments be able

4    to have those best practices in place to be able to keep their

5    numbers up to be able to provide the services, the policing

6    services that this country needs.  So I want to assure you that

7    the focus is there.  I bring the message back every time from

8    our meetings, and the Department is very, very aware of this.

9         The other thing I want to say is, I think that this Court

10   acknowledges that it's not just in law enforcement that we're

11   seeing staffing crises but in other services related to public

12   service, public safety as well.  And so, you know, just an

13   example of that is behavioral health workers.  You highlighted

14   the behavioral health provisions of this Consent Decree, the

15   needs across the country in this area.  Well, it's also a

16   staffing crisis there trying to recruit people in to provide

17   those services that are so essential and that help relieve some

18   of the burdens on law enforcement.  You know, we can't do that

19   without getting workers in those areas as well, and the

20   Department of Justice and the whole federal government is

21   focused on this issue through the Department of Health and

22   Human Services and others.  So this is -- we are aware and we

23   are focused and we are trying to make a real change and a real

24   difference here.  It's going to continue to take ongoing labor

25   and work, but the Department of Justice is committed to that.

1    The United States is committed to that.

2        I also wanted to talk really briefly about your second

3    question, whether or not this was apparent on the street.  I

4    think the short answer to that question, Your Honor, is not as

5    much as we would like to see, right, and I don't think anybody

6    disputes that.  You know, from our community outreach, we know

7    that a lot of the community groups that we've worked with

8    throughout the investigation and continue to keep in touch with

9    and try to, you know, see whether or not they are experiencing

10   change are continuing to say we don't see it yet, we don't feel

11   it yet.

12       Well, I think this is where the hard work of this Consent

13   Decree really comes in.  We need to make sure that the changes

14   we put into policy, that we put into training are actually

15   happening on the street.  That's the assessment process that

16   we're all engaged in right now, which gets to your third

17   question, Your Honor.  But we also need to address the fact

18   that change under one of these Consent Decrees is incremental.

19   It's always incremental and it makes it hard to feel that

20   change sometimes for people on the street.  It's not something

21   that's easily felt because the way that the police officers are

22   changing their behavior happens gradually enough over time as

23   this message becomes clear throughout the Department that

24   people don't see it until they really can start to compare what

25   was it like before to what is it like now.  And I think that

1    that -- the assessments are also key to this process as well.

2    We need to be able to put the data out there for people to be

3    able to say, oh, yeah, I am seeing change here because I can

4    see, look at the way that the data shows this.

5        And so getting that message out, you talked about that,

6    Your Honor, that's something we need to figure out how to do.

7    The assessments are a huge opportunity for us to be able to get

8    that message out and we need to think really hard about how do

9    we continue to highlight the changes and the successes that

10   have been made here, and I think that data is part of it.  But

11   then we also need to make sure that we are continuing to meet

12   with the community where they are out there to hear from them,

13   how are they experiencing this, what is happening in their

14   neighborhood so that we actually make sure that we're

15   addressing that and continually addressing their concerns,

16   those -- that type of engagement is also going to be critical

17   to it being felt by people on the streets.

18       The last thing I want to say this morning, Your Honor, is

19   just we're in a time of transition generally.  You talked about

20   this shift towards assessments.  This is a time in which DOJ

21   and the Monitoring Team are stepping back a little bit and the

22   City and BPD need to step forward more.  The whole process here

23   is going to be over time DOJ and the Monitoring Team are

24   stepping back further and further and the City and BPD are

25   stepping forward more and more so that we are -- none of us in

1    this room are essential to this process of reform any longer

2    but instead it is entirely owned by the City and BPD.  And so

3    that's the process that we're in.  Our team is focused on how

4    do we -- how do we step back but still provide the support, the

5    guidance that's needed in trying to walk through that careful

6    balance to help make sure that the City and BPD are successful

7    but also that we're stepping back and making sure that they

8    have the opportunity to own this and to be able to push this

9    forward.  And we are seeing that happening, Your Honor.  The

10   encouraging thing is that we are seeing that happening.  The

11   City has already highlighted some of that this morning and

12   they'll highlight it throughout the day today, but we need to

13   continue to see that process take place.  So --

14              THE COURT:  I agree.  I don't think quite enough

15   attention, frankly, has been paid to the parallelisms between

16   what the Department's own internal auditing has found and what

17   the Monitoring Team has found where there have been

18   deficiencies or issues or problems.  The focus immediately turn

19   to, oh, well, there's a problem and it has been highlighted,

20   and that is an issue and it does mean that some attention needs

21   to be paid to something, but hidden in there is actually kind

22   of a silver lining and that is we're seeing evidence that the

23   Department itself is actually surfacing issues and identifying

24   needs in trouble areas itself, even sometimes ahead of the

25   Monitoring Team.  That's not how things were here three and

1  four years ago.  The Department was pretty oblivious to where

2  its real issues and problems were.  Now they have a much more

3  fine-tuned sense of themselves.  That is a positive.

4           MR. MYGATT:  We agree, Your Honor.  And the

5  fundamental point of this process is not to get through a

6  process of reform and then say reform is done.

7           THE COURT:  Right.

8           MR. MYGATT:  But instead, reform is an ongoing

9  process that will always need to be in place here.  And the

10 goal here for the City and for BPD is to help BPD be a

11 self-learning organization that continues to improve over time,

12 they can engage in that critical self-analysis, see where

13 failures took place, and continue to get better all on their

14 own.  They don't need Department of Justice or somebody else

15 coming in and shining a light.  Instead, they see the problem,

16 they recognize the problem, and they fix the problem.

17     There's always going to be new challenges.  There's always

18 going to be new problems that arise.  Unfortunately, policing

19 in this country is never going to be perfect, but it can

20 continue to learn from itself and make itself better and that's

21 the goal that we all have for this process and we're seeing

22 that beginning here in Baltimore and that's really encouraging

23 news.

24           THE COURT:  Thank you, Mr. Mygatt.

25           MR. MYGATT:  Thank you.

1        THE COURT:  Mr. Thompson, do you want to make an

2   opening or do you want to defer until it's your turn on the

3   substance?

4        MR. THOMPSON:  I will reserve until the Monitoring

5   Team presents, Your Honor.

6        THE COURT:  Very good.  Mr. Melancon, so I take it

7   that you're going to be sort of the stage manager here for the

8   defendants' presentations?

9        MR. MELANCON:  Yes, Your Honor.

10        THE COURT:  Where do we go first?

11        MR. MELANCON:  I think if the folks in charge of our

12   AV can put our presentation on the screen.  Thank you so much.

13        And of course, Your Honor, we'll start with an overview of

14   our agenda going through the Global Big Five.  The topics that

15   we'll be going through today encompass the monthly topics that

16   the Court has been briefed on over the past quarter to include

17   stops, searches, and arrests, fair and impartial policing,

18   officer safety and wellness, and transport of persons in

19   custody.

20        And to go through the Global Five, we will start with the

21   presentation on training by Major Derek Loeffler, the head of

22   the Education and Training Division.  Major Loeffler.

23        THE COURT:  Good morning, Major.

24        MAJOR LOEFFLER:  Good morning, Your Honor.

25        THE COURT:  I'm eager to hear your report.

1          MAJOR LOEFFLER:   Thank you, sir.  So we continue to

2     offer our two-day fall inservice course that covers training

3     requirements for community policing and misconduct and

4     discipline.  The misconduct and discipline course incorporated

5     the Steptoe report on the Gun Trace Task Force and also has

6     training regarding Brady and Giglio.  The training also

7     includes deescalation and an EPIC-ABLE refresher.  We

8     anticipate the fall IST course to conclude in mid-March.

9          The one-day ROCA Rewire Course is continuing to be offered

10    that carries some training credit for community policing,

11    behavioral health, and use of force.  Next week we start

12    offering this class every Thursday and Friday throughout 2023.

13         This week we are wrapping up the three-day general

14    supervisor training.  Moving forward, we will be offering the

15    one-week first-line supervisor course which will incorporate

16    the general supervisor's training content, the one-week

17    first-line administrator course, and the one-week FTO

18    certification course and the one-day FTO refresher course once

19    each during the first quarter of 2023.

20         We will hold our one-week crisis intervention team

21    training course six times throughout 2023.  Thirty members will

22    be attending a one-week train-the-trainer course for active

23    shooter/active threat next week.  This will prepare them to

24    deliver a one-day inservice course on the same topic to all

25    sworn members starting in March.  The active shooter/active

 1    threat course will be paired with a one-day public order forces

 2    course.

 3        An update on entry-level training.  Class 2203 graduated

 4    13 members on January 6th; Class 2204 currently has 12 BPD

 5    members and they are expected to graduate on February 24th;

 6    Class 2205 currently has 21 BPD members and are expected to

 7    graduate on May 19th, 2023; Class 2206 currently has 20 BPD

 8    members and is expected to graduate on July 28th, 2023.

 9        MR. MELANCON:   Your Honor, I will also mention that

10    one of the things in our coordination meeting with the State's

11    Attorney's Office referenced by the Commissioner earlier was

12    the opportunity for more training, both with the State's

13    Attorney's members and with our own members.  The State's

14    Attorney's Office has been generous to talk about the

15    opportunity for us to get better when it comes to strengthening

16    how our officers are presenting information in court.  We're

17    going to be looking at programs for mock trial preparation,

18    especially for some of our more junior officers that had not

19    had the level of experience needed to be as effective as they

20    could be witnesses in court.  So we welcome that opportunity

21    for training from the State's Attorney's Office.

22        We, in turn, are offering them the opportunity to have

23    their new personnel do ride-alongs with our officers so they

24    can understand the perspective and make sure that there is

25    alignment with how our stops, searches, and arrests training is

1    being conducted so that they can understand how the probable

2    cause is being generated, what's going on with the

3    documentation, how we can strengthen that partnership and

4    relationship overall.  So I wanted to thank the Office of the

5    State's Attorney for their willingness to participate in that

6    shared opportunity for training.  This is all things that we're

7    looking to try to get up and running this year toward the end

8    of the year.

9              THE COURT:  Very positive developments.  Thank you.

10             MAJOR LOEFFLER:  Thank you, Your Honor.

11             MR. MELANCON:  Thank you, Major.

12             THE COURT:  Thank you, Major.

13        So part of the table pounding, 13, 21, 20, I didn't hear

14   what the fourth number was, hats off to those men and women who

15   have joined up and are in the academy and they're in training

16   and I know they are getting outstanding training in the newly

17   formed academy over there at you UB.  I've visited myself, it's

18   state of the art, it's terrific.  We just don't have enough

19   recruits, and those numbers put us on a bad trajectory for

20   2023.  And I recognize that it is a huge challenge that we've

21   all discussed, but this is data right in front of our noses,

22   just insufficient numbers.

23             COMMISSIONER HARRISON:  I will say -- this is not an

24   excuse, but to -- for some of those classes, those are the

25   graduating numbers.  There has been -- for some of the classes,

1    there have been people who did not make it.

2           THE COURT:  Right.

3           COMMISSIONER HARRISON:   There have been some who were

4    terminated, some who resigned.  And so that accounts for some

5    of the numbers.  And while the class -- the small class, the

6    smallest one I think we had is 13, at the beginning it was much

7    larger.  Some get recycled back to other classes, but

8    terminations and resignations are a huge part of why some of

9    the numbers in the recruit classes are low.

10          THE COURT:  Look, I get it.  I sat through a session

11   with Deputy Monitor Ramsay probably three years ago where he

12   educated us about the experience at the Metropolitan Police

13   Department in DC in the late 1980s and into the early '90s when

14   it was determined that that department was lacking in numbers

15   of police officers and decided, someone overnight, to very

16   substantially increase their numbers and they were responding

17   to a problem, perceived, real, I'm not sure.

18        But nonetheless they responded and they responded too

19   quickly with too much, with too many recruits that they

20   couldn't properly train and that they didn't watch sufficiently

21   closely.  They graduated large numbers and, sure enough, three

22   to four years later, they have a huge problem in terms of

23   integrity, their Internal Affairs caseload jumped and they in

24   the end just created more problems for themselves because they

25   had not put the right people into the pipeline and they hadn't

1    done a good enough job of detecting that in the early stages.

2         So I understand, and it would be a mistake if the

3    Department were to respond to all of the pressure that the

4    Court is applying and that you're feeling beyond this courtroom

5    with respect to the issue, it would be a mistake to lower the

6    standards, start passing people who really should be failing,

7    not doing a good enough job with the psych evaluations on the

8    front end and end up with unqualified or people who are just

9    not by their personal constitution appropriate candidates for

10   police work on the street in police cars.  That would be a

11   mistake, too, so it's a multifaceted problem.

12         MR. MELANCON:  I will say, Your Honor, that I've

13   been, since being in this role, very encouraged by leadership

14   at the Education and Training Division, from the sergeants all

15   the way up to the major, they do not hesitate to provide a

16   recommendation to terminate a candidate who has integrity

17   problems, who has an issue with performance.  Again, we take

18   quality of our personnel very seriously, and I believe the

19   culture of E&T, which as explored in the GTTF report in decades

20   past would have 100 percent graduate rates of 50-class size,

21   you know, quantities.  That's not an acceptable path even in

22   the face of our staffing challenges.

23         And, again, I want to applaud processes that they've put

24   into place.  And Your Honor, I'm also encouraged by the conduct

25   of our trainees who also report and identify when other

1    trainees are insufficient to the task, if you will.

2            THE COURT:  Yes.

3            MR. MELANCON:  I've been very applauded by the

4    culture that has changed amongst our training corp that

5    understand the principles of intervention, understanding the

6    principles of EPIC and ABLE.

7            THE COURT:  Well, if the GTTF autopsy revealed

8    anything, it revealed a previous culture of tolerance within

9    the ranks of people who lacked integrity.  And we got to --

10   that has to be changed fundamentally and my sense is that this

11   leadership team and the Police Department making it priority

12   that they have is accomplishing that task.

13           MR. MELANCON:  And it's bearing itself out in some of

14   our numbers, which I know DC Briscoe will go through kind of

15   the composition of some of the separation and it includes a

16   significant number of trainees last year.  But again, there's

17   rationale for each one, sufficient documentation on each issue

18   and that again is a testament to the processes we've put in

19   place at E&T.

20        With that, we'll conclude on training and move into

21   technology.  Chief Canton will present updates for the quarter

22   on technology.

23           THE COURT:  Good morning, Chief Canton.

24           CHIEF CANTON:  Good morning, Your Honor.  The

25   Information Technology Division has been implementing an IT

1    infrastructure modernization program to update or eliminate a

2    variety of outdated, inefficient technologies that support the

3    Police Department's infrastructure.  This program will

4    implement new technologies in the areas of information and

5    operations.  This program is inclusive of networking, computer

6    storage, IT structure, infrastructure services, Cloud services,

7    IT security, desktop solutions, virturalization software, and

8    automation/orchestration.

9          The objective is to implement IT infrastructure

10   modernization projects, tasks, and activities to the entire BPD

11   IT infrastructure.  Our goal is integration information

12   technology and operational technology and elimination of

13   stovepipes and disjointed systems.  These projects, tasks, and

14   activities will have profound effect across all of BPD IT

15   infrastructure and updates to the following systems are

16   offered:

17         For critical infrastructure, all BPD districts are

18   WiFi-enabled in their primary areas, meaning rollcall rooms and

19   where available BCICs.  Additionally, secure external wireless

20   access points are available outside of each police district.

21   In an effort to get districts WiFi-enabled, each district was

22   allocated five wireless access points giving over 90 percent

23   saturation within each environment.  As need arises and

24   technology becomes available, ITD can provide additional

25   wireless access points to the districts and give greater

1    availability to WiFi.  ITD has also started improving wireless

2    infrastructure areas outside of districts to include BPD's

3    headquarters.  This will have wireless access points configured

4    and installed in the various different locations outside of the

5    districts.

6         Related to RMS, updates to Axon records to capture detail

7    of investigative stop information is proceeding.  Close

8    implementation review of stop and search back-end data is also

9    underway.

10             THE COURT:  For the public's benefit, RMS is the

11   Records Management System, something that is in the spine of

12   the technology system that the Police Department is reforming.

13        Go ahead, Chief.

14             CHIEF CANTON:  Yes, Your Honor.  BPD is continuing

15   with case management to review and configuration, we're working

16   with our partners at Axon to make sure that we can deliver a

17   usable system so that we can replace the current case

18   management system.

19        As it relate to EIS, the Early Intervention System, BPD

20   has successfully connected with seven out of eight requests for

21   information responders and confirmed receipt of their requests

22   for proposal.  The prebid meeting occurred on the 19th of

23   January and the proposal due date is the 15th of February this

24   year.  The BPD project manager continues to track status and

25   assist the procurement agency in every way possible.

1          Those are my updates.

2              THE COURT:   Speed without sacrificing quality,

3      accuracy, those have got to be the goals on the tech front for

4      2023.  We're still climbing mountains here and we started to

5      ascend five years ago, and we've got to get to the top.

6              CHIEF CANTON:   We also need to add security to that.

7      In this current climate, you know, it's critical that we

8      protect our systems from intrusion.  You know, whether that

9      issue comes from within or from without, we need to make sure

10     that -- we're not going to be able to absolutely prevent it,

11     but we have to be able to recover quickly.

12             THE COURT:   So as you rebuild the system, the

13     challenge grows on a daily basis in terms of what it is that

14     you're trying to construct.

15             CHIEF CANTON:   That's absolutely true, Your Honor.

16             THE COURT:   Well, I'm no tech expert, I'm just a

17     consumer, but I know it's critical.  It's critical to what

18     the -- it's critical to the process of evaluating what the

19     Department is doing and that's critical to the completion of

20     the Consent Decree supervision by the Court.  So you're

21     essential to me, Chief Canton.

22             CHIEF CANTON:   Thank you, Your Honor.

23             MR. MELANCON:   And to me as well, Your Honor.  We'll

24     move to integrity.  Deputy Commissioner Brian Nadeau from the

25     Integrity Bureau will present on integrity.

1      THE COURT:  Good morning Mr. Nadeau.

2      DEPUTY COMMISSIONER NADEAU:  Good morning, Your

3  Honor.  How are you?  Staffing is currently at 31 sworn

4  detectives and one civilian working in general misconduct.  The

5  updated staffing chart, of course, has 40 sworn investigators

6  and 10 civilians.

7      THE COURT:  And so we've lost ground in terms of

8  number of investigators in the Public Integrity Bureau over the

9  course of the last year.

10      DEPUTY COMMISSIONER NADEAU:  We did lose ground.

11  Most of those were for promotions and/or retirements.  We're

12  working moving forward in a process right now, we've already

13  posted to select additional detectives to bring us back to

14  that, but as I get down through here, you'll see some of the

15  numbers are still working in our favor, so hopefully that

16  continues in 2023.

17      THE COURT:  But is it just in terms of the interest

18  of full transparency, is, you know, your staffing issue that is

19  apparent by your numbers the consequence of the wider issues in

20  the Department?  In other words, you don't -- this is a

21  specific example of a critical bureau within the Department not

22  being fully staffed as a consequence of the broader problem

23  across the whole agency.  True?

24      DEPUTY COMMISSIONER NADEAU:  True.

25      MR. MELANCON:  Yes, Your Honor.  We agree with that.

1          THE COURT:  All right.  Well, I think it's just

2   important to put flesh on the bones and expose exactly what it

3   means.  It's not just not having enough patrol officers.

4   Critical functions like the Public Integrity Bureau an element

5   of the Department that has gone through a massive

6   transformation over the last four years in particular, and in

7   where we see very significant progress is nonetheless adversely

8   impacted by this wider problem.  That's my only point.

9          DEPUTY COMMISSIONER NADEAU:  Yes, Your Honor.  But as

10  we've talked before, the people that are leaving our -- the

11  Bureau are actually going out to be promoted, which is taking

12  the experience they have from the Public Integrity Unit back

13  out to the field.

14         THE COURT:  I'm all in favor of that.  That's a great

15  thing, that sort of evangelization that's going to occur across

16  the Department is a very positive aspect of better integrating

17  the Internal Affairs function into the general life of the

18  Police Department.  So that's terrific.  My issue is different

19  from that.  It's just that as those people get promoted out and

20  go out to do that additional work, we've got to have other

21  detectives lined up and ready to go so that they come in so

22  that the numbers stay high so that you can stay on top of your

23  caseload so we can continue the effort to promote the notion

24  that this Department is capable of policing itself.  But that

25  and so many other functions get slowed down and impaired by

1     this conundrum of the staffing crisis.  That's my point.

2            DEPUTY COMMISSIONER NADEAU:  Yes, Your Honor.  And I

3     will say that we have posted and we have 17 applicants that are

4     interested in the position, so we're going through interviews

5     this week to select those folks to bring them back on board,

6     but as you know, we've talked before, we need to have the right

7     people in Public Integrity and so that's a little bit of a

8     process.

9         I will say we've taken on one civilian so far who has gone

10    through the entire process and she has proven to be a very

11    valuable member of the agency.  I think that's going to work in

12    our favor.  What we need to do is just multiply the type of

13    person we got times ten and get ten more people in the same

14    fashion, so we're working through that process as well.

15           For transparency, Quarter 1 and Quarter 2 of 2022 reports

16    of misconduct investigations are published on the BPD website.

17    Additionally, we are revamping our online complaint process

18    adding a new system called IAPro Public Portal.  The portal

19    allow citizens outside of the agency to actually go in and file

20    a complaint and get them a unique identifier so they can go

21    back in at any time and check the progress of their complaint.

22    We will hopefully be able to give you demonstration on that in

23    the March hearing.

24           We are continuing to work with Office of Equity and Civil

25    Rights ensure the rollout of the new civilian oversight

1    accountability system created by the Maryland Police

2    Accountability Act of 2021.

3        Also we met with the State's Attorney Office.  I feel very

4    comfortable moving forward on making sure that members of our

5    agency who should be criminally charged are criminally charged,

6    those who do not need to be criminally charged can move forward

7    in the administrative process without any delay.  So I feel

8    comfortable after that meeting that's going to be able to move

9    forward in the right direction in 2023.

10       In March, we're going to go through a lot more data with

11   you but I want to highlight some numbers as we move forward in

12   complying with Consent Decree and hopefully towards an exit.

13   From the start of this administration, overall complaints are

14   down 11 percent across the agency.  I will say that external

15   complaints are actually down 30 percent, which I think we're

16   moving in the right direction.

17           THE COURT:  All right.  So for the record, external

18   complaints are complaints that are made by people who are not

19   within the Police Department against police officers.

20           DEPUTY COMMISSIONER NADEAU:  That's correct.

21           THE COURT:  That number is down by 30 percent.

22           DEPUTY COMMISSIONER NADEAU:  That is correct.

23           THE COURT:  The total number of complaints against

24   police officers is only down by 11 percent.

25           DEPUTY COMMISSIONER NADEAU:  That's correct.

1/26/23 Quarterly Consent Decree Hearing

1      THE COURT:  But that actually is reflective, in your

2  view, of the fact that the number of internal complaints is up

3  or holding relatively steady, which can be suggestive,

4  actually, of a department that is under reform and becoming

5  healthier as more officers within the department, supervisors

6  and so forth, are more prepared to report misconduct by other

7  police officers.  Is that fair assessment of the data?

8      DEPUTY COMMISSIONER NADEAU:  That is a fair

9  assessment.  I would also say that now we are holding people

10  accountable for not taking training, whereas before we would

11  just on them all the time.

12      THE COURT:  Give them a pass.

13      DEPUTY COMMISSIONER NADEAU:  Correct, take the

14  training.  Now I think in 2022 we had 245 people that we

15  actually investigated for not taking the trainings.  That's 245

16  more cases than we had.

17      THE COURT:  And this department that is undergoing

18  this critical reform which is based upon a complete change of

19  policies and then training on those policies, failure to make

20  yourself available to receive that training and show up when

21  you're supposed to results in and warrants discipline.  That's

22  what you're telling me.

23      DEPUTY COMMISSIONER NADEAU:  That's correct.  In

24  addition to that, of course, we have -- we do reviews cameras

25  of body-worn cameras, level ones, level twos, et cetera.  Any

1    violations seen during those reviews also get referred to us as
2    well.  So the increase in numbers of internal complaints for
3    the most part are coming from the Department itself doing
4    self-audits of itself making sure that we are in compliance
5    with all of our policies and procedures and that our members
6    are following the proper process.
7         As I mentioned before, when administration started, we had
8    18 detectives doing internal investigations.  We now have 31,
9    plus a civilian.  That's a 44 percent increase from the
10   beginning of this administration.
11        And as this Court knows, at the beginning of this
12   administration we were doing cases in approximately 365 days.
13   At the end of the 2022, minor cases which were investigated by
14   our detectives are completed within 90 days 36 percent of the
15   time; in minor cases which are completed by our detectives and
16   the expedited resolution process are completed 72 percent of
17   the time within 90 days.  So I think that's a very big increase
18   from where we are in 2019.  And on average, we completed all
19   cases, serious and minor misconduct cases 53 percent of the
20   time within 180 days.  So we really brought the number down
21   from where we are in 2019.  I would suggest these significant
22   improvements are based on more detectives, better training,
23   better supervision, and all-electronic system, and a PIB
24   process that is now working.
25        Do you have any questions, Your Honor?

1        THE COURT:   No, but that timeliness issue is very

2   important because people make complaints and one of the huge

3   problems that existed before, the GTTF report reveals this,

4   other investigation reveals it is this is what contributes to a

5   destruction of trust and faith in the agency.   People make

6   complaints and they disappear into a black hole and they never

7   hear anything, and this Department suffered from that badly

8   previously.

9        Under your leadership and the Commissioner's, I believe

10  that has been fundamentally turned around and that is critical

11  to this process of trying to restore trust.   So yep, moving in

12  the right direction.   Now, it's still not fast enough and so

13  that's got to get better.   This is part of why I am hammering

14  on this issue in the reduction in the number of detectives down

15  to 31.   That's moving in the wrong direction in terms of this

16  issue of timeliness of investigation and conclusion of these

17  reports.

18        It's also a huge morale issue for police officers who face

19  an accusation and if it's well-grounded, then it should be

20  sustained and they should suffer the consequences of that.   But

21  there are instances where they are accused and they didn't do

22  anything wrong and the investigation reveals that, and I think

23  that your Bureau has done an increasingly good job of

24  separating out the solid cases from the ones that are unfounded

25  and that improves morale in the department for sure, but it's

1    the timeliness of that occurring that is so critical.

2         You know, any of us can put ourselves in the position of

3    an officer who's been accused of some act of misconduct and

4    knows that they are innocent, that they didn't do what they're

5    accused of, and then they're left to wait for weeks and then

6    months for resolution of this.  There are practical things like

7    they can't be promoted, there are transfer issues that come

8    into play while they're waiting, but then there's just the

9    psychological toll that it imposes on an accused officer.  And

10   then finally they're exonerated, you know, ten months after

11   they were accused.  That's a big, huge, difficult burden to

12   bear and that's a reason to perhaps leave a police department

13   and go somewhere else where they process things more quickly.

14        Now, as I say, I think the data shows that there's been

15   very significant improvement with respect to that issue under

16   your leadership.  And it's one of the reasons why at the start

17   of today's hearing I make a point of saying, look, we've made

18   real progress, there are real accomplishments, but you've

19   appeared in front of me enough times to know that I don't spend

20   a lot of time on the positives, maybe I should spend more on it

21   but I am going to hammer on the negatives.  And I'm worried

22   about the reduction in the number of investigators over there.

23   I don't want to see us backslide on something that's so

24   critical.

25             DEPUTY COMMISSIONER NADEAU:  We're on the same sheet

1   music, Your Honor, and I take it to full heart that we are

2   moving forward in the right direction and hopefully have better

3   news for you March on that aspect of it.

4          THE COURT:   Thank you.

5          DEPUTY COMMISSIONER NADEAU:   Thank you, Your Honor.

6          MR. MELANCON:   Your Honor, we'll move into the fourth

7   topic in the Big Five and go into staffing.  As Your Honor has

8   mentioned, a lot of those efforts we've outlined here in a few

9   slides and Deputy Commissioner Briscoe of the Admin Bureau will

10  provide a presentation on those slides.

11         THE COURT:   I just want to know what Commissioner's

12  going to give her the accomodation for courage that is deserved

13  by virtue of the fact that she marches up to this podium

14  without the slightest concern today and on many times

15  previously.

16     DC Briscoe, you know that I have great faith in you and

17  acknowledge what you have accomplished to this point on a very

18  hard problem.  Let me get that said out front before the

19  fireworks begin.

20     (Laughter.)

21         THE COURT:   Let's go.

22         DEPUTY COMMISSIONER BRISCOE:   Good morning, Your

23  Honor.

24         THE COURT:   Good morning.

25         DEPUTY COMMISSIONER BRISCOE:   Don't let my stray face

1  fool you, I'm very concerned.  Sir, as the graph shows you, you
2  can see just how many members left the agency in the year 2022.
3  279 members departed from the agency with 103 hires.  That's a
4  net negative of 176.  We recognize that hiring has been a
5  challenge not just for our agency --
6              THE COURT:  And what does that leave us with now in
7  terms of the total sworn force?
8              MR. MELANCON:  About 2150, Your Honor.
9              THE COURT:  2150.  2,150 officers with a delta last
10  year of negative 176.  I am not as good at quick math as you
11  are, Mr. Melancon, but that is -- what is that in percentages?
12  We've lost eight percent?
13              MR. MELANCON:  About seven and a half, eight percent,
14  Your Honor.
15              DEPUTY COMMISSIONER BRISCOE:  Yes, sir.  So we
16  recognize that hiring has been a challenge not just for our
17  agency.  It has been nationally, as previously stated.  In
18  acknowledging the challenges we face in the profession, we're
19  pushing ourselves in better understanding the factors behind
20  the number, the reasons why a member may leave and the factors
21  that may attract a member.
22      As a leadership team of recruitment and in HR, and I have
23  with me today Major Brickus in the gallery, we're fully engaged
24  with every step of the process.  And despite the challenging
25  year that we've seen, Your Honor, our recruiting section still

1    takes those steps to get out every day and try to attract those

2    members that we want to join the ranks of our team.

3         So let's just say a little bit more than what's behind the

4    number.  What the data tells us in the 279 separations from the

5    agency, there were 131 retirements.  110 of those retirements

6    were male, 21 of those retirees were female.  You asked that

7    question at our last hearing what was behind the number.  And

8    those resignations of 132 resignations, there are 33 trainees

9    that are in that number.  24 of those trainees resigned in lieu

10   of termination, and 9 of them were terminated.  There were --

11        THE COURT:  Is our problem more on the departure side

12   of the equation or is it more on the recruiting side?  You got

13   all these retirements.  People are going to retire.  They reach

14   a certain age and out they go, and that's a normal process in

15   the life of a department.  So is it that are we losing too many

16   officers or are we losing sort of a normal number of officers

17   and doing insufficient job of replacing them, or are we both

18   losing too many officers and recruiting too few?

19        DEPUTY COMMISSIONER BRISCOE:  So I think both are

20   happening to us as according to the data.  We've seen an

21   increased number of retirements in the course of the year, as

22   well as we've seen some increase separations, some voluntary

23   resignations.  So we dug a little bit more in terms of what

24   we're hearing from those individuals resigning, just to get

25   some things.  The top reasons that were listed were for

1    personal reasons, career opportunities and advancements, family

2    reasons, and to other organizations.  And we have seen in the

3    numbers that target audience of that three- to five-year member

4    is where we're most vulnerable.

5        So with the recruitment efforts that we've put in place,

6    we've also put some retention efforts in place.  The

7    Commissioner stated some of those in his opening statement and

8    remarks.  Some of the efforts that we're making for our

9    retention, of course, include a few are education pay

10   enhancements, of course clarity around our upward mobility, our

11   patrol incentives, our field training officer incentives,

12   improved training opportunities, improved working conditions,

13   technology enhancements, and tuition assistance in officer

14   wellness just to name a few.

15       But to get back on track what's behind the number, you

16   asked last session tell me more about the people that are

17   leaving, and in that 131 number I can tell you there were 61

18   African-Americans, 59 Caucasians, and 11 Hispanic members that

19   left.  And in the number of resignations, there were 55

20   Caucasian members, 38 African-American members, 31 Hispanic

21   members, and 8 Asian members that resigned from the agency.

22       So recognizing the challenge that we have in the target

23   populus that we're intentionally trying to attract, we've taken

24   a look at our campaign partner, our idfive is our campaign

25   partner, and we've made some adjustments and enhancements to

1    that campaign to not just have the digital platform that we've

2    all gotten accustomed to recognizing that Baltimore is a city

3    that struggles with a digital divide, we've gone to some more

4    traditional medians to be able to attract more local residents

5    and use such things as our QR code -- thank you so much for the

6    next slide -- to attract more of those members and to offer

7    more opportunity.

8          When you look at this slide, Your Honor, this is who we

9    are getting in terms of applicants and who we're attracting in

10   terms of hire.  So that's what lies beyond that number.  I'll

11   give you an opportunity to adjust what you're seeing there if

12   you have any questions.

13               MR. MELANCON:  These are 2022 totals, Your Honor.

14               DEPUTY COMMISSIONER BRISCOE:  Yes, sir.

15               THE COURT:  There's a lot here.  Just give me a

16   moment.

17               DEPUTY COMMISSIONER BRISCOE:  Yes, sir.  And as you

18   know, our focus has been minority members to have a more

19   diverse core in our team.  Residency was a focus, has been a

20   focus for us in Baltimore City.  As a result, you know, we have

21   our incentive that is geared toward housing.

22               THE COURT:  We're not doing as well with female

23   officers as you have aspired to.

24               DEPUTY COMMISSIONER BRISCOE:  We have not.

25               THE COURT:  30 by 2030 and we are 13 out of, looks

1    like --

2                MR. MELANCON:  13 out of 103 would be about 11

3    percent.

4                THE COURT:  -- what is that, 12 percent?

5                MR. MELANCON:  11 or 12 percent, Your Honor.  Yes.

6                THE COURT:  Okay.  Thank you.

7                DEPUTY COMMISSIONER BRISCOE:  So recognizing that the

8    female populous is, of course, a populous that we've pushed to

9    attract, we're still attending some conferences just to ensure

10   that we're using all of our resources and tools and we're

11   partnering with the right partners to help us attract the

12   populous of female.

13       For our recruitment incentives, last hearing you asked

14   where are we with the numbers.  We've had 12 referrals that

15   we've paid out for the incentive, nine housing allowance

16   referrals that we've paid out, one student loan assistance

17   payout thus far, and we have 47 members that are eligible for

18   the signing bonus that will receive that pay out upon

19   completion of their field training time.

20               THE COURT:  We talked at a previous I think monthly

21   conference, this is months ago now, but it come to my mind in

22   seeing the female numbers here again.  Have we done anymore

23   thinking, talking with the Union about a potential alteration

24   of shift opportunities for parents, regardless of gender, who

25   can have a bone fide, a demonstrated situation where they are

1    primary or a sole parent of a school-aged child and as a

2    consequence ask for and arguably are deserving of, you know,

3    some greater consideration in terms of shift assignment?

4                DEPUTY COMMISSIONER BRISCOE:  To answer the question

5    as you've asked it, what we have done is had some internal

6    conversations because the shift itself is assigned -- is

7    attached to our contract --

8                THE COURT:  Right.

9                DEPUTY COMMISSIONER BRISCOE:  -- with the FOP that

10   lends itself to a different type of conversation.  We have --

11   the Commissioner has requested a survey be conducted of members

12   to understand how childcare plays a role so that has happened

13   through the Equity Office, Officer Blyther who is in the

14   gallery.  She's conducted the surveys at this point so we have

15   some preliminary information that we're not yet prepared to

16   report out on so we're combing through that to better

17   understand what are the conditions in which, what are the

18   circumstances in which we can attract more members,

19   specifically female, and what may be the barriers.  So we're

20   asking those questions now but we've not yet partnered

21   officially with the FOP simply because the shift question is

22   attached to the contract.

23               THE COURT:  Okay.  But I think this is the kind of

24   thinking that has to happen and the kind of move that has to be

25   made.  This court by no means is trying to assign childcare

1    responsibilities to female officers.  I am, though, trying to

2    react to the anecdotal information that comes forward and

3    female officers, for better, for worse, in the way that our

4    society is choosing to organize itself right now have more

5    childcare responsibilities and accommodating that somehow it

6    seems to me helps us to improve that number from 11 percent up

7    towards the objective of 30 percent.

8            DEPUTY COMMISSIONER BRISCOE:  Yes, sir.  And to kind

9    of go a little further, the point of what we can do to attract

10   and retain female officers, we're not just looking at

11   scheduling.  We're looking at working conditions to include

12   lactation stations and we're looking at the uniform and

13   appearance policy.  So we're taking a more holistic review of

14   ourselves as an organization and how we welcome and retain our

15   female members.

16           THE COURT:  Presumably as we design and build new

17   police stations we take into account the fact that we have

18   truly gender diversity in this profession in a way that didn't

19   exist perhaps as recently as when you were a recruit.  I mean,

20   it's a fundamental transition.  Do we encourage this, do we

21   accommodate it, do we foster it?

22           DEPUTY COMMISSIONER BRISCOE:  So I can tell you in

23   our facilities conversations with the City, while we're working

24   to establish two new stations and retrofit others, the space

25   that we're automatically asking for in this regard is more

 1    space for female locker rooms and showers, more space for

 2    lactation accommodations, and more space for the needs of

 3    women.  So it is all a part of the conversation, sir.

 4                MR. MELANCON:  I will say, Your Honor -- I apologize.

 5                DEPUTY COMMISSIONER BRISCOE:  You go.

 6                MR. MELANCON:  I will say, Your Honor, that the

 7    survey that was referenced by the Deputy Commissioner in

 8    regards to childcare was actually very revealing in that a

 9    large sample of men who responded to the survey also identified

10    childcare as an opportunity and shift alignment as an obstacle

11    for, you know, being successful in the Department going

12    forward.  And so we lend our eye towards equity on the 30 by 30

13    goals but certainly if done correctly we can extend those

14    benefits for anyone who has childcare issues, and I think

15    that's something --

16                THE COURT:  Absolutely.

17                MR. MELANCON:  -- from which our data is showing.

18                THE COURT:  I'm agnostic on which gender ought to

19    raise children.  The point is to respond to the need as

20    presented.  I will say that I suspect that it is still many

21    more women officers who are in that status than men.

22                MS. THOMPSON:  And Your Honor, to complement the

23    strides that we're taking, we just want to highlight that the

24    Law Department has initiated and the administration has

25    approved moving forward with the parental leave option for all

1   City employees for 12 weeks, whether male or female, that may

2   aid in this discussion, and that is something that is moving

3   through the process right now, sir.

4           THE COURT:  Of course, the cynic in me says that the

5   short-term consequence of that is even more staffing problems

6   in the Police Department, you know.

7           (Laughter.)

8           THE COURT:  But I don't discourage that at all

9   because ultimately you show those kinds of progressive

10  inclinations, you will attract more workers.

11          DEPUTY COMMISSIONER BRISCOE:  Thank you, Your Honor.

12  That concludes my presentation.

13          THE COURT:  All right.  You are still -- you retain

14  confidence in your contractor, you are continuing to

15  collaborate with them and from your perspective that remains a

16  productive relationship that is going to help us move in the

17  right direction?

18          DEPUTY COMMISSIONER BRISCOE:  Yes, we've retained

19  confidence in our contract, but we're ever so watchful over

20  this relationship.  We are talking with regular basis -- on a

21  regular basis to be able to establish, you know, where our gaps

22  and pitfalls may be, and at any point that that may change, you

23  will certainly know, sir, without a doubt.

24          THE COURT:  So, you know, I don't know anything about

25  running a hiring campaign or public relations or anything like

 1   that, but that's not going to stop me from offering a couple of

 2   opinions.

 3        First, in other cities I'm seeing advertising on buses and

 4   billboards for police officers.  I brought up at one of our

 5   monthly conferences how come we don't have like a more

 6   impressive sign on the outside of the new police academy there

 7   at UB, a highly trafficked part of the city, that somehow --

 8   I'm not saying it has to be a specific recruiting sign but

 9   somehow lends an aura of professionalism and positivity to what

10   goes on there.  So you know, you talk about going back to more

11   traditional media, pulling back maybe a little bit from the

12   focus on the social media because of the digital divide that

13   exists in the city which is documented and known, it would seem

14   to me like billboards, placards on buses, taking advantage of

15   this real estate at UB, just better visibility.

16             DEPUTY COMMISSIONER BRISCOE:  That was part of our

17   discussion, sir.  Those were part of our discussions with

18   idfive, but until they solidify exactly where the space and the

19   cost that include QR codes for some, I'm a little slow to speak

20   out loud, Your Honor, just this hearing.  I want to wait until

21   we have it all nailed down.  But that was part of our

22   discussions in terms of traditional outreach and engagement,

23   not just the physical presence but we did discuss bus hubs and

24   a few other locations, so we're working out some of the

25   details.

 1              COMMISSIONER HARRISON:   I'll add to that, in the

 2     marketing research that had to be done to figure out how do we

 3     reach the target demographic that we were aiming to reach, the

 4     marketing research showed that people in that target

 5     demographic respond to job advertisements digitally.

 6              THE COURT:   Digitally?

 7              COMMISSIONER HARRISON:   Digitally.   And so it

 8     became -- four years ago when I started it became the digital

 9     marketing campaign because the majority of applicants when

10     asked how did you learn about this went on websites and learned

11     about it digitally, and policing websites, employment websites,

12     all of the above.   So while we always want to think about the

13     traditional means, the very traditional means of how we go

14     about marketing and reaching people, even those here in

15     Baltimore, the majority of applicants who actually got hired,

16     all -- the majority of them cited that, you know, it was

17     digital.   It wasn't at a job fair, it wasn't the billboards.

18     Those things are great, but the fastest way to get the large

19     amount of people was to go right to their -- to the palm of

20     their hands and send it to them.   So as they begin to look for

21     jobs, mainly police, law enforcement jobs, every time they

22     click on something we can populate it and put it right in front

23     of them within a second.   So that was the research that pushed

24     us toward the digital marketing campaign.

25              THE COURT:   I got it, and I acknowledge my lack of

1    expertise, but the thought that comes into my head is how do we

2    reach the people who maybe are not in the job market and

3    actually don't -- the germ of the idea of becoming a law

4    enforcement officer actually isn't there yet.  Those people I

5    would think, yeah, they're on their device and they're

6    searching around to see what their opportunities are, but how

7    about somebody who's in some other whole different category of

8    work and, you know, how do you spark them and drive them to the

9    digital portals that you're otherwise creating.

10            COMMISSIONER HARRISON:  I agree with you.  I'm with

11   you a hundred percent.  I will say that a large number of the

12   people who apply are asking us, how do I do this and work from

13   home at the same time because we're competing against that.

14            THE COURT:  Yeah.

15            COMMISSIONER HARRISON:  COVID has now made us

16   complete against jobs that are offering remote work, but police

17   officers that requires a certain thing that perhaps in the

18   corporate world they can offer.  So we're not just competing

19   against other law enforcement agencies.  We're competing

20   against that very heavily right now.

21            THE COURT:  God help us.

22        (Laughter.)

23            DEPUTY COMMISSIONER BRISCOE:  Thank you, Your Honor.

24            THE COURT:  Okay.  You can do police work from home.

25            MR. MELANCON:  That concludes our comments on

1    recruitment, Your Honor.  Just moving into the last topic on

2    the Big Five topic, assessments.

3            THE COURT:  Yes.

4            MR. MELANCON:   And so in looking through this, you

5    know, we have, as we've gone through this process now for the

6    second time in a public hearing, Your Honor, we've updated

7    these scores to match the most recent eighth semiannual

8    assessment, a comprehensive assessment performed by the

9    Monitors at the end of last year, the published use of force

10   and officer safety and wellness assessments also were

11   incorporated into these, and the good news is that, you know,

12   there are no paragraphs for which we are designating as off

13   track, to be clear, but I think, as Your Honor mentioned in

14   your opening comments --

15           THE COURT:  So no purple.

16           MR. MELANCON:   There are no purple.  And I think part

17   of what we make sure of is that we continue to push things into

18   the green and we're focused like a laser on the areas that are

19   highlighted in either red or yellow, the foundational things

20   that need to be done to get us over those, the continuous

21   coordination and working together in conjunction with the

22   Monitoring Team to identify the requirements to get us to our

23   planning and training and to implementation.  It's ongoing and

24   I just want to applaud the work of our Consent Decree

25   Implementation Unit.  I want to thank the Monitoring Team for

1    acknowledging that work in its most recent assessment.  It has

2    not gone unnoticed, the level of significant coordination and

3    effort from that team and I couldn't be more proud of their

4    efforts.

5         But as we move into initial compliance throughout, you

6    know, paragraph by paragraph, we're tracking it on a regular

7    basis to be able to provide updates to the Court.  This coming

8    year we anticipate the completion of the sexual assault

9    investigations assessment, misconduct, arrests, and so as we

10   get those scores updated we'll provide updates to the Court on

11   where we are.  And again, I just want to thank the coordination

12   efforts between the Monitoring Team and my team.  They've done

13   an outstanding job in getting this together.

14        This slide provides the same information but a different

15   way.  So instead of showing the percentage of the whole for

16   each section, it just shows you the relevant size of each

17   section.  So the number of paragraphs for things like

18   misconduct or use of force are, you know, much more significant

19   as a percentage of the entire Decree.  Of course relative

20   importance, relative attention is being placed on those greater

21   sections.  This just provides another kind of slice of the

22   apple.  And this again is kind of a summary of all of where we

23   are.  23.8 percent of all paragraphs have been given a score of

24   initial compliance.  That's up from 21 and a half from last

25   reporting out.  Again, these are all updated based on the most

1    recent semiannual assessment, comprehensive assessment

2    performed at the end of last year.  As things move into initial

3    compliance or move into things that are now on track, we want

4    to make sure that we're maintaining that level, not just

5    getting the score and forgetting about it.  We're creating

6    systems of accountability and self-assessment around those

7    areas to ensure that we are not just achieving initial

8    compliance but are able to demonstrate at the appropriate time

9    full effect of compliance.  That will ultimately bring us into

10   that sustainment phase and, you know, which that can then

11   precipitate a motion to pull us out of federal oversight for

12   that whole section once that sustained compliance has been

13   achieved over a one- or two-year period.

14            THE COURT:  Go back two graphs and let's look at, for

15   instance, transportation of persons in custody.

16            MR. MELANCON:  Yes, Your Honor.  And so --

17            THE COURT:  To look at this, really it's in pretty

18   good shape except that we've got, what is that, 28 percent that

19   is essentially not assessed.

20            MR. MELANCON:  Yes, Your Honor.  We'll go through --

21            THE COURT:  We're going to talk about this in more

22   detail obviously because it's one of our topics, but in terms

23   of where we are with the completion process, it's a perfect

24   example of what I'm sort of increasingly concerned about, and

25   that is lots of progress has been made, all kinds of changes

1    have occurred, we're way down the road but we're not finishing.

2    And that's what in 2023 and, you know, the coming months and so

3    forth, we've got to turn our attention to not just on track,

4    doing well, made a lot of progress, it's got to get done.

5            Sorry.  We can go forward to the -- where you were.

6            MR. MELANCON:  Thank you, Your Honor.  And we agree,

7    making sure we're all moving forward, the vast majority of

8    where we are, you know, nearly a quarter of all of the Decree

9    has achieved some measure of initial compliance.  Almost

10   two-thirds of it is demonstrated.  I think we're on track and

11   moving into that compliance phase.  It's only about 10 percent

12   is at a place where it hasn't receive that level of policy

13   implementation, some measure of training or planning or

14   assessment needs to occur.

15           And so again, I think it's encouraging for us but I think

16   what I'm trying to make sure is that we're staying motivated,

17   we're staying focused on the areas that need us to get from red

18   to yellow to green so that ultimately we can have data, provide

19   it, show the methodology, and then make certain that the

20   Monitoring Team has all the information they need to be able to

21   do exactly what you're describing, Your Honor, to be able to

22   create their assessments and have all the information they need

23   to demonstrate compliance.

24           So that's where we are in broad kind of status on

25   assessments and the Big Five topics.  I'll pause here, if the

 1    Department of Justice has any comments before we move into

 2    individual topics or if Your Honor wants to make any other

 3    brief remarks.

 4            THE COURT:   No, let's go over to the Department of

 5    Justice on the globals and that, see if you have some reactions

 6    at this point before we get into the specific topics.

 7            MR. COOPER:   Thank you, Your Honor.

 8            THE COURT:   Mr. Cooper?

 9            MR. COOPER:   Thank you, Your Honor.

10            THE COURT:   Your mask is optional.  You can keep it

11    on or you can take it off.

12            MR. COOPER:   Thanks.  So I'll start off on training,

13    Your Honor.  I wanted to add a little bit of context about

14    inservice training that Major Loeffler talked about this

15    morning.  We talked a lot about the trainings that BPD has put

16    on that have trained officers on the new policies that have

17    been put in place, and we are now in a phase where the focus is

18    on the ongoing training obligations that are in the Decree and

19    there's a significant -- significant obligations in the Decree

20    for annual trainings.  And so some of the trainings that the

21    Major talked about are intended to meet those requirements, and

22    so we'll be continuing to focus on helping BPD and ensuring

23    that the BPD continues to provide strong inservice trainings in

24    those areas and increasingly tailors those trainings towards

25    the needs of the Department as they are identified in the

1    compliance reviews and assessments that the Monitoring Team is

2    doing and will be doing increasingly in the coming months.

3        On technology, very briefly, we'll be talking more about

4    the Records Management System in the context of the stops,

5    search, and arrest discussion in a moment.  On early

6    intervention, we think this is a very important project that is

7    only at its start right now, but procurement process is moving

8    forward and we'll be working with BPD as that moves forward to

9    ensure that some of the nontechnical decisions that have to be

10   made about how to run the program are being considered and made

11   and moving ahead as well.

12       On integrity, I want to add to what the DC Nadeau talked

13   about that they'll be working with BPD on their general

14   discipline policy and ensuring that that accounts for some of

15   the changes that are coming online as a result of the reform

16   legislation that passed a couple years ago.

17       On staffing, Mr. Mygatt addressed staffing earlier.  I

18   don't have anything to add about the specifics that DC Briscoe

19   discussed just a few months ago.

20       So that brings us to assessments and I wanted to address

21   those a little bit more detail.  The third of your three key

22   questions that you posed for us this morning, Your Honor, when

23   will we have concrete data and compliance reviews available to

24   us, and so I wanted to talk about that a little bit more.

25       So several assessments have been completed, rigorous

1     assessments based on concrete data.  Most notably a review of

2     the use of force --

3          THE COURT:  Right.

4          MR. COOPER:   -- was completed last month.  And you

5     alluded to this earlier, there was a substantial drop in the

6     use of force over the last few years which is encouraging, and

7     that review also identified a drop in the use of the rate of

8     which use of force was found to be unnecessary.  In 2020, it

9     was 3.5 percent, that was the last year in review, and that

10    compares with the first year, 2018, when it was 6.9 percent.

11    So in other words, the use of unnecessary force by BPD officers

12    was much less frequent than just two years prior and that came

13    from uses of force being less frequent and when used force was

14    less likely be used unnecessarily.  Review also found that the

15    unnecessary use of force was still too frequent and wasn't

16    consistently addressed by BPD as it should be when it occurred

17    and we are working with BPD to address those issues and come

18    into full compliance with that part of the Decree as soon as

19    possible.

20         THE COURT:  Okay.  So I want to ask an awkward

21    question with respect to use of force and the assessments

22    because data is one area where we've got some concrete data.

23    It's quite impressive in terms of what it reveals.  Here's the

24    awkward question:

25         Are we able to detect and, if so, do we detect instances

1    when officers have failed to use force when they should have,

2    which would be a metric that would support a thesis that the

3    constraints of the Consent Decree are a factor in the lack of

4    crime control in the City?

5         That's a very awkward, even ugly question.  But we're

6    involved in a process here where we're not afraid of facts and

7    we're not afraid of data and it's our collective responsibility

8    to assess for all effects.  I am, by asking the question, not

9    suggesting for a second that I think there is a particular

10   answer or even have a suspicion about that.  I just think that

11   it's something that is part of a complete picture.

12        MR. COOPER:  Well, it's certainly part of

13   the picture.

14        THE COURT:  And with all the body-worn camera footage

15   that we now have available and the audits that we do of and so

16   forth, is the Department, Monitoring Team, the Department of

17   Justice in a position to answer that question?  I suggest to

18   you that you should be.

19        MR. COOPER:  Well, Your Honor, what I would say is

20   that supervision is a critical part of the Consent Decree

21   process, and in that -- so that involves the specific problems

22   that we identified in our investigation which was the excessive

23   use of force and it also involves the other problems, other

24   performance problems like what you're suggesting, and so we do,

25   you know, we have worked on the general practices of

1   supervisors of the Department, the Major referenced the general

2   supervisor training that was just completed and as we -- you

3   know, as we move forward with some of these reviews and work

4   with BPD to ensure that they're responding to problems, I think

5   we will see -- have an opportunity to address more concretely

6   how well supervisors are conveying the policies and priorities

7   of the Department to their officers and how well they're

8   monitoring their officers' conduct on their own, which is

9   really critical to the success of the Consent Decree process.

10        THE COURT:   But it would be pretty powerful if there

11  was objective data and analysis that was able to say that in

12  fact, no, there are few or no instances detected where, from

13  the perspective of responsible professional policing, a greater

14  level of force should have been employed in a situation and it

15  wasn't.   I'll just say -- I think it would be quite

16  illuminating attention paid to that issue.   I see the

17  Commissioner wants to say something.

18        COMMISSIONER HARRISON:   Yes.   You asked the question

19  that most police chiefs, our ears perk up when we hear that

20  because we ask those questions and that's how, without a

21  researcher or an analyst or an assessment through technology to

22  give you the answer, those are questions we would look at

23  weekly, monthly, quarterly, annually.

24        When you look at the areas where most force is used,

25  vehicle stops, pedestrian stops, gun arrests, drug arrests,

1    warrants serve -- arrests warrants and/or search warrants, when

2    you look at that those are usually the main criteria where

3    engagement and interaction would constitute people or make

4    people want to resist to some degree where force could be used,

5    in 2022, all of those metrics had in some degree double-digit

6    increases.  More gun arrests, more drug arrests, more field

7    interviews, pedestrian stops, more vehicle stops, more gun

8    seizures, more warrants to serve, above 20 percent.  But

9    citizen complaints reduced while all those metrics increased.

10        So it may be somewhat anecdotal, but as police executives

11   we look at that, the work that usually causes uses of force, we

12   increased in all those work outputs, while at the same time we

13   looked at, well, did the use of force also increase in that,

14   which it didn't, it decreased.  But we then saw the increase of

15   internal complaints where we assess ourselves and audit and

16   assess ourselves where that metric increased.  So when we did

17   learn about it, what did we do when we learned about it.

18             THE COURT:  But what would capture instances where

19   officers responded insufficiently forcefully to a situation?

20             COMMISSIONER HARRISON:  You would look at an incident

21   where an arrest resulted in a prisoner escape, an arrest

22   resulted in an officer or an arresting injury.

23             THE COURT:  Or a citizen.

24             COMMISSIONER HARRISON:  Or a citizen injury.  So when

25   making an arrest did the officer get injured, did the arrestee

1    escape, situations and scenarios like that where we then, it

2    goes to the Performance Review Board and then we can say, okay,

3    this is a result of the officer not taking the appropriate

4    action or not using force when they --

5          THE COURT:  Should have gone hands on.

6          COMMISSIONER HARRISON:  Absolutely.

7          THE COURT:  Try to deescalate that situation but

8    stuck with that strategy for too long --

9          COMMISSIONER HARRISON:  And then those scenarios --

10         THE COURT:  -- and then somebody got hurt as a

11   consequence of the officer's timidity.

12         COMMISSIONER HARRISON:  And then -- but then we do

13   audit and catch that because those cases come to the

14   Performance Review Board and then come back to me for

15   recommendations for either retraining and/or discipline.

16         THE COURT:  Yes.  So don't hear any advocacy from me

17   in asking this question for a greater use of force at all.  I

18   want to say that I think that's implicit but it's such a

19   sensitive area I need to say it explicitly.  I just think it's

20   an important metric in the ultimate explanation of what has

21   changed and how the Department does its job.

22         COMMISSIONER HARRISON:  Yes.

23         THE COURT:  You've got to be able to say, we have

24   made this improvement, we have improved our performance in

25   terms of adherence to the law and the constitution and

```
 1        protecting people's rights --

 2                COMMISSIONER HARRISON:   Yeah.

 3                THE COURT:   -- without there being a -- could come at

 4        a cost in terms of our discharging our responsibility to assert

 5        ourselves and stop criminal conduct, stop violence, et cetera.

 6        You got to be able to say that.

 7                COMMISSIONER HARRISON:   Absolutely.  Didn't mean to

 8        interrupt but I did want to point out to the Court and to our

 9        community that those are things we look at, those are questions

10        I think as executives I would hope we all do it but I certainly

11        do it, and when we find that officers perhaps did not use the

12        correct force or too less of force, what were those reasons and

13        how can we then retrain officers to do it the appropriate way

14        so that, number one, we can prevent injury, we can prevent

15        complaint, we can prevent escape, all the things that would not

16        have happened had the officer used the appropriate force.

17                MR. THOMPSON:   Your Honor, may I interrupt?

18                THE COURT:  Yes, Mr. Thompson?

19                MR. THOMPSON:   Even though we would normally present

20        this later, I have Mr. Barge, he can actually give you a more

21        detailed explanation because it is a part of use of force

22        reports.  Are you willing to hear that now to make some sense?

23                THE COURT:   Yes, let's.  Mr. Barge?

24                MR. BARGE:   Your Honor, I just wanted to pick up on

25        what the Commissioner was saying, which is in the context of
```

1    the use of force assessment we did look at officer injuries and

2    subject injuries during use of force encounters and just

3    overall.  And when you look at data that is within the -- both

4    the use of force dataset itself, but also larger data from the

5    Compensation Board about any officer injury suffered at their

6    desk or in the field or what have you, the trends are all

7    encouraging compared to a -- prior to 2018 there was a decline

8    of officer injuries by 19 percent of any sort incurred in any

9    sort of situation.  And when you look at during use of force

10   encounters, officer injuries we're down by nearly 40 percent

11   and subject injuries were down substantially as well.  So it's

12   not dispositive data.

13              THE COURT:  Right.

14              MR. BARGE:  But it is suggestive that there, you

15   know, are encouraging trends with respect to officers not only

16   using an appropriate amount of force where it's called for, but

17   not necessarily systemically hesitating to use force when it's

18   authorized and appropriate to confront a threat.

19              MR. MYGATT:  Your Honor, if I can just make --

20              THE COURT:  Yes.

21              MR. MYGATT:  -- something explicit that's implicit in

22   all of this is that the Consent Decree contemplated trying to

23   answer these questions and some of the metrics that Mr. Barge

24   and the Commissioner just spelled out were things that were

25   referenced in the outcome assessment piece of the Consent

1    Decree.  So maybe not with all the specificity that was laid
2    out here but the idea was not to shy away from this, we want
3    answers to this that's built into the process that we are all
4    engaged in here right now.
5              THE COURT:  Okay.  Good.  So I think it's part of the
6    necessary transparency and ultimate revelation of the truth of
7    what comes as a consequence of a major reform initiative like
8    this one.
9          All right, Mr. Cooper, we went off on a bit of a tangent
10   there.
11             (Laughter.)
12             MR. COOPER:  That's okay.
13             THE COURT:  I'd say you're doing fine.  What do you
14   got next?
15             (Laughter.)
16             MR. COOPER:  Well, so two other areas where the
17   Monitoring Team has given us a rigorous compliance review are
18   transportation of individuals in custody and officer wellness,
19   and those are two areas we'll be discussing in more detail
20   later today.  And then there's a number of compliance reviews
21   that are currently underway.  There's a review of
22   investigations and reports of sexual assaults by the Sex
23   Offense Unit, a review of a sample of BPD arrests to assess
24   whether officers' conduct was lawful and complied with the
25   Decree, and we understand that the Monitoring Team was planning

1      to complete that review in the coming weeks or months.

2           There's a review of BPD's responses to activity protected

3      by the First Amendment, which we understand is planned to be

4      completed this spring, and review of the activities of the

5      Performance Review Board, that's the board that the

6      Commissioner just mentioned which meets following critical

7      incidents to assess the Department's performance, and we

8      understand that's planned to be completed this spring also.

9           And finally, there's a series of reviews that are planned

10     for later in the year where the parties and the Monitoring Team

11     have been talking about the methodology for the reviews and

12     putting in place the plans for those to go forward.  One is a

13     review of BPD's response to individuals experiencing behavioral

14     health crises expected to be completed in the spring or summer.

15     Community policing, a review of the community policing

16     engagement work that BPD is doing which also is planned for

17     spring or summer, a review of investigations of misconduct

18     allegations by the Public Integrity Bureau, which is planned to

19     be completed in the fall, and review of officer interactions

20     with youth which is also planned to be completed in the summer

21     or fall.

22          Unless you have further questions for me, I'll turn it

23     back over to DC Melancon.

24               THE COURT:  Okay.  Very good.  We'll hear more about

25     the assessments when we get further into this discussion this

1    afternoon.  I know the Monitors are ready to go on that topic,

2    and it is a matter of great focus of interest at the moment.

3         All right.  So with the Department having responded,

4    Mr. Melancon, where would we go next?

5              MR. MELANCON:  Well, we would move into the four

6    individual topics that we've covered over the last quarter.

7              THE COURT:  Okay.  So why don't we stop here to give

8    our reporter a break.  We've gone for about two hours and, in

9    fact, let's take our longer break now so let's reconvene at 10

10   minutes past one, and then we'll probably have a shorter break

11   at some point in the afternoon.  So recess till 1:10.

12        (A recess was taken from 12:11 to 1:14 p.m.)

13             THE COURT:  Mr. Melancon?

14             MR. MELANCON:  Good afternoon, Your Honor.

15   We'll proceed with the beginning of the topics that were

16   covered under the quarterly over this past quarter.  The first

17   is stops, search, and arrests.  This area reflects, you know,

18   all the areas associated with stop, search, and arrest

19   policies.  In particular, when we showed these from now on,

20   Your Honor, we're going to do our best to kind of show where we

21   are in the assessments for each subtopic.  So you'll see that

22   the meter there at the end shows kind of that progress on where

23   we are for the topic and questions.  So you'll see that from

24   now on in our presentation format.

25        So the area in red, just to kind of highlight that, that

1     was Paragraph 31, that was not assessed in the semiannual

2     report you recently received.  That paragraph mandates that BPD

3     will recognize two distinct classes of voluntary interactions,

4     which are voluntary contacts and field interviews.  We believe

5     we've achieved that through the formulation of Policy 1112, so

6     we look forward to that being assessed in the upcoming review

7     of those policies and down the road we'll see us move that into

8     the green, if you will.  So it is policy implementation that we

9     think satisfies that paragraph in the red.

10          Moving into kind of the past to the present.  Might be

11    best to present this from the table.

12              THE COURT:  Can you operate it from up there?

13              MR. MELANCON:  Yes.  So we'll go through -- and

14    again, I think part of what we want to show here is the story

15    of where we were versus where we are today.  In doing so, you

16    know, we start with policies, all of our policies were outdated

17    when we first adopted the Consent Decree.  We've gone through a

18    systemic process to completely overhaul all of our policies

19    that intersects stops, searches, and arrests.  We revised a

20    total of 16 such policies and then specially created two

21    policies that were focused on the importance of preserving a

22    person's constitutional rights in the process of executing the

23    stop, search, and arrest.  These policies cover a host of

24    topics on how to do an investigative stop.  These are

25    warrantless or warrant searches, arrests, weapons pat-downs,

1    traffic violations, lesser offenses, and citations.

2         For training, in the first quarter of this year as we

3    conduct the re-review of these policies, we're also going to be

4    delivering a four-hour inservice training again at the end of

5    the year regarding stops, searches, and arrests.  We've also

6    ensured that with the new RMS that's come online, the Records

7    Management System, the places for which stops, searches, and

8    arrest data are being captured and categorized, we've trained

9    now our officers on that.  So that expanded training is

10   important because it's important that documentation is

11   sufficient when we are pushing these issues through our systems

12   and we want to make sure we're tracking everything that we need

13   to track for demonstration for compliance.

14        As we show later on, we also improved our field reporting

15   system to ensure that we're capturing this data accurately.  As

16   was updated during our technology section, that's something

17   that's been effectively deployed now in underway.

18             THE COURT:  So with the appointment of or the

19   election of a new State's Attorney who will in evidently bring

20   new and different charging policies to Baltimore, should the

21   Monitors expect to see a change in RWOCs statistics or should

22   there -- should we expect that there will be such a tight sort

23   of communication connection between the Police Department and

24   the State's Attorney's Office and such close collaboration that

25   even though there might be a fundamental change of direction in

1    terms of the handling of so-called lesser offenses that the

2    Police Department will be so closely paired with the State's

3    Attorney's Office as these changes come to pass that there

4    won't be any change?

5         I mean, thinking through a little bit, I imagine that

6    based on the announced policies of the new State's Attorney is

7    compared to the policies that the former State's Attorney

8    claimed that she was pursuing, we would perhaps expect a higher

9    RWOCs number under the former regime and a lower one now, but

10   perhaps the Police Department had changed their approach and

11   strategies on the street to so closely conform to what the

12   State's Attorney said she would have prosecuted that there

13   wouldn't be a change.  I know I'm thinking out loud here, but

14   it seems to me this is an example of, okay, we're trying to get

15   a handled on an important metric but there's been this external

16   massive change that was -- that potentially impacts this.  This

17   is the sort of thing that interferes with sort of longitudinal

18   review of how a Police Department is doing.

19              MR. MELANCON:   Your Honor, I think the proxy for that

20   is also looking at our general proactivity, our general

21   activity enforcement through things like arrests.  We've seen

22   arrests go up in the last calendar year and yet the RWOCs have

23   not increased accordingly.  They've been marginal at best for

24   any kind of increases.  We'll go through that data here later

25   on in this section.  I think part of what's important that I

1  think we demonstrated earlier in the first half of court today,

2  we are working in very close coordination with the new state's

3  Attorney's administration.

4       The lesser offenses policy did come up, making sure that

5  we are sticking to the policy that parties all agreed to back

6  in 2020 is kind of the approach we would like to go back to and

7  focus on.  That's where we are providing for a progressive path

8  of enforcement whether it be warnings or citations or even

9  arrests in certain circumstances.  The idea is that we want to

10 get back to that policy.  There might be some recalibration of

11 our officers' behavior but that's why it's so important for the

12 audits to take a clear mind towards those lesser offenses.

13      So we're also developing a strategy for when those

14 policies, would we go back to the Consent Decree policies on

15 that instead of the discretion that was provided by the

16 previous State's Attorney governing our guidance to the policy

17 on that.  So we're going to make sure that we're auditing that

18 ourselves and providing that as open as we can with the

19 Monitoring Team to assess that exact concern because it is

20 something with which we can't expect simply a different result.

21           THE COURT:  The point is some things change,

22 different administrations running the State's Attorney's Office

23 that directly impact how a police department does its work.

24 And then another things stay absolutely the same, i.e. the

25 Consent Decree and its directive for least intrusive means, et

1    cetera, that's a constant across both of the administrations,

2    but there is the, you know, the external factor that has to be

3    considered when making an assessment of this metric.

4            MR. MELANCON:   And again, with out quarterly reviews

5    for RWOCs, we think we'll be able to identify that pretty

6    quickly shortly after any posture of guidance changes to the

7    Department when it comes to handling lesser offenses.  So we'll

8    be able to identify it, if there are needs for corrections, we

9    go back and we look at every single instance from which there

10   is a RWOC to figure out why it happened, and that's something

11   I'll present on later on in this presentation, Your Honor.

12       Moving into, again, the assessment scores, so I mentioned

13   previously there was an introductory paragraph that was not

14   assessed what we envision will be captured in the upcoming

15   assessment so we're encouraged by that.

16           THE COURT:   That's the red?

17           MR. MELANCON:   That's the red.  But as far as the

18   other lion's share of these paragraphs, you know, most of them

19   were relating to policies and the delivery and training of

20   policies are what fall into the initial compliance wedge.  The

21   other piece is when it comes to items that are on track is

22   really tied back to that data collection, the data analysis.

23   Your Honor is well aware of our field reporting being a key

24   part of that.  We need to make sure we're able to see data and

25   have a sufficient sample size to be able to ensure that we are

1    checking all of the compliance boxes on our level of effort.

2        We continue to do, again, the release without charges

3    audits, the RWOC audits.  We've done that for the past two

4    years and we will continue to have that cadence going forward

5    of quarterly audits.  And in the coming year, we think that we

6    will be able to move the needle in a lot of the areas that are

7    in the on-track category.

8        The Monitoring Team will soon share their qualitative

9    assessments of arrests, and both the Monitoring Team and the

10   BPD are conducting analysis on investigative stop data that's

11   collected with that recent reconfiguration of field reportings

12   from Axon.  And so these analyses will ensure that we are

13   promptly assessing not just stops, searches, and arrests, but

14   it will also bleed into the fair and impartial policing side of

15   the house as well.  So kind of two for one where we're able to

16   see different aspects of both sections to the Decree.

17               THE COURT:  Okay.

18               MR. MELANCON:  So we mentioned previously, I

19   mentioned previously the stops, searches, and arrests field

20   reporting data.  When we went through and reconfigured these

21   fields, we found, you know, in looking back that they weren't

22   properly configured to make sure that we're getting the results

23   and outcomes we're looking for.  We need to make sure the data

24   is properly being collected, things like, you know, where's the

25   individual to exit the vehicle, what was the duration of the

1    stop, and was there a weapons pat-down conducted and making
2    sure they're articulating reasonable suspicion into these
3    reports and making sure that it's not boilerplate language,
4    making sure that we have the right understanding and rationale
5    which becomes the ultimate case file for what's happening with
6    these -- with these stops and potentially arrests.
7            So overall, these are some image shots of our RMS system.
8    You know, we reconfigured this at the end of last year,
9    beginning of this year and, you know, we're now fully deployed
10   on that and doing some post-review just to make sure there's no
11   issues or errors or ability to pull the back end data is
12   sufficient for what the Monitoring Team and what BPD need to
13   demonstrate compliance.
14           THE COURT:  And all these fields, including the
15   so-called additional details, the stuff you showed me in red
16   and so forth, that's served up to the officer on the handheld
17   device in the field?
18           MR. MELANCON:  Yes, Your Honor.
19           THE COURT:  And so as we discussed at a recent
20   monthly conference, when the Court makes its next sort of field
21   visit to the Department it's going to see the randomly
22   identified and selected officers utilizing those handheld
23   devices to do true field-based reporting, right?
24           MR. MELANCON:  I would hope, Your Honor.
25        (Laughter.)

1        MR. MELANCON: We have made the tools available for

2   every patrol officer and giving them appropriate guidance and

3   training on how to use these tools, absolutely, Your Honor.

4        THE COURT: Yes. Well, to me, this is an important

5   transition that will indicate whether or not, you know, you got

6   the rank-and-file, you got the field officers, you know,

7   actually making the transitions that the Decree envisions so

8   it's kind of a crude tool but it's something I'm watching for

9   and now tipping my hand, even. Lots of opportunity to explain

10   that to command and I can't really imagine why I wouldn't see

11   what we're expecting.

12        MR. MELANCON: My folks are feverish writing notes in

13   the background, yes.

14        THE COURT: Hopefully they're sending texts on their

15   handheld devices.

16      (Laughter.)

17        MR. MELANCON: You got me, Your Honor.

18        THE COURT: Yes.

19        MR. MELANCON: Thank you. Just to be clear, we are

20   moving forward on assessing this data. We're not going to wait

21   for a year to start looking at it. So we're actually going to

22   start examining the stop data in the next month to start seeing

23   if we're in compliance with Paragraphs 86 and 459 and basically

24   making sure like we're not just going to wait, we're going to

25   start pulling data in realtime because this data is populated

1    in realtime.

2         THE COURT:  Right.  And then if that's all occurring,

3    then first line supervisors have easy access to it also while

4    in the field and can sort of assess what's going on realtime in

5    the middle of the shift.

6         MR. MELANCON:  Right.  Okay.

7         THE COURT:  Can't wait.  Can't wait.

8         MR. MELANCON:   I think you'll be pleased, Your Honor.

9    Once again mentioning the release without charges audits,

10   this is just a status where we are.  We're still in the process

11   of completing Q4 of 2022.  We should be having that information

12   released shortly but, again, as you and I were discussing

13   earlier in this conversation, the level of arrest activity for

14   the Department in 2022 as shown on the chart on the right has

15   only increased while the number of RWOCs has remained

16   relatively flat.

17        And just for context, Your Honor, when the DOJ did their

18   initial investigation and looked at from 2010 to 2015, the

19   average number of RWOCs in a year was upwards to 2,000

20   instances, right?  We only have, you know, between 7 or 14 in a

21   given quarter, that's monumental.  And again, even that is down

22   90 percent from when we first started tracking this in 2020.

23        THE COURT:  The first question anybody's going to ask

24   when they hear the number is, okay, what's the total number of

25   arrests and really what's going on is we're not arresting

1    anybody, but the facts are the facts.

2            MR. MELANCON:  But lends itself --

3            THE COURT:  And they arrested 3,136 in Q2 and 3,232

4    in Q3, and those are numbers that are roughly equivalent to

5    what was going on pre-COVID when the RWOCs numbers were through

6    the roof, that's your point.

7            MR. MELANCON:  Yes, Your Honor.  And so again, when a

8    State's Attorney is choosing not to prosecute, we are

9    encouraged by our new relationship to be able to understand

10   greater the reasons why that's in fact the case, and of course

11   if there is a release without charge instance for the public's

12   awareness it may have an issue where there was lack of probable

13   cause, it could have been valid PC but insufficient

14   documentation, or it could just be prosecutorial discretion.

15   We want to make sure we understand each one, we look at each

16   one, we go back and understand what the rationales were.

17       When we can correct the behavior of the officer involved,

18   we do that.  If it's persistent, we may refer it to Public

19   Integrity because of a continuation of not following the proper

20   policies and procedures.  And so this is something, again,

21   where we have become that self-correcting, self-assessing

22   agency and this is the kind of tools that we're using to help

23   do that for stops, searches, and arrests.

24       Just looking at my notes here.  I think, Your Honor,

25   that's what I have for stops, searches, and arrests.  During

1    our monthly hearings we also went through fair and impartial

2    policing at the same hearing.  If Your Honor would prefer I

3    will --

4              THE COURT:  Go ahead and do it and --

5              MR. MELANCON:  I can do that as well.

6              THE COURT:  -- then I'll have DOJ come in on both

7    afterwards.

8              MR. MELANCON:  Very good.  Fair and impartial

9    policing section, it's nine paragraphs, with other parts of the

10   Decree, policy and training also part of this section.  And to

11   recap, we had activated policies that explicitly center on fair

12   and impartial policing just within the last year.  We have the

13   Fair and Impartial Policing Policy 317, which provides that

14   foundational prohibition against discriminatory policing and

15   requires that equal protection be provided to all classes under

16   federal, state, or local law.

17        How the Department interacts with LGBTQ individuals.

18   Policy 720 was enacted that speaks to this as well, and then of

19   course procedural justice interactions of which we do

20   monitoring and scoring, which I'll show you in a little bit,

21   where it codifies our expectation of how officers are to

22   comport themselves and it assures that we are honoring and

23   protecting a person's inherent human dignity through a police

24   interaction.

25        So we initiated the trainings throughout the entire

1  Department over the course of 2019 through 2021, and those were

2  delivered in three phases alongside stops, searches, and

3  arrests training, use of force training, and so, you know,

4  that's all now bent into the core of recruitment training, new

5  recruit training, excuse me, to ensure that's part of the DNA

6  of how officers are taught to do the job.

7       Assessments, it should be noted that the analysis done in

8  most of the Consent Decree sections, most notably the recent

9  use of force assessment and stops, searches, and arrests, they

10  contain a cross-section of this component that makes sure that

11  we are considering for race, gender, age, and how these are

12  interacting.

13       So as we mentioned previously, the use of force, for

14  instance, we look at the demographics of those interactions and

15  subjects so that we have an understanding of how fair and

16  impartial policing is being executed.  So this, while it has

17  its own section, of course, Your Honor, has a spillover effect,

18  bleed over effect into all of the Decree, and so we're

19  monitoring for that simultaneously in those assessments

20  currently.

21            THE COURT:  Okay.

22            MR. MELANCON:  Again, just a review of kind of the

23  dollars and cents here.  Again, the assessment, the piece

24  that's not assessed here is another introductory paragraph that

25  speaks to that.  As I just mentioned, that qualitative

1   assessment across multiple sections and so we're working with

2   the Monitoring Team about how that can be properly assessed

3   through this process.  But again, encouraged that more than

4   half the paragraphs in this section have already entered into

5   initial compliance.

6       And Your Honor, this is a summary slide of all of 2022.

7   And so when we do our procedural justice audits, we do them

8   monthly, we do them by our districts, and we do them across the

9   categories you see off to the left side, whether or not a

10  person was notified if they're being filmed on body-worn

11  camera, whether or not the officer has introduced themselves

12  appropriately and all the other categories that are listed

13  there that are components of the Decree when it comes to

14  procedural justice interactions, interactions with officers and

15  the citizens to protect them.

16      So the biggest concern for us are what's in the red.  It's

17  whether or not our folks are introducing themselves, whether or

18  not they're notifying people that they're on body-worn camera.

19  Now, the good news is that activations are, you know, 99

20  percent or better.  So what we're finding is that they're

21  initiating the body-worn camera but they're not simply not

22  introducing themselves, they're simply not, you know, taking

23  that extra step to notify folks that they're being notified.

24  So this is where we have concept come into play.

25      In about June or so we really were beating the drum in

 1    Comstat about why is this not improving, can we get this
 2    message out.  We had efforts to ensure that we're educating our
 3    officers in roll calls and really trying to make sure that it
 4    was clear to the command staff who were in Comstat every day
 5    that you need to have your folks understand this is not
 6    something that's going away, that we have to take it seriously,
 7    that it's not just a voluntary thing.  It's part of our policy.
 8    You have to make sure it's being adhered to and have your folks
 9    hold people accountable when it's not the case.
10              THE COURT:  It also goes to the fundamental spirit
11    and philosophy of the reform initiative.
12              MR. MELANCON:  Yes.
13              THE COURT:  Which is the first thing you do is
14    humanize yourself in any interaction with a member of the
15    community and do you that by introducing yourself.
16              MR. MELANCON:  And we find that instances where a
17    person was able to do that leads to more compliance with the
18    stop and less uses of force and everything else.
19         Well, when that message was delivered in July, looking at
20    the June scorecard, we saw a dramatic improvement after that.
21    I do want to commend our command staff for taking it to task
22    and really understanding it.  Now, we have seen a bit of a
23    drop-off in the notification in December, but that just shows
24    why we have to stay vigilant, we have to stay on top of it.
25         These procedural justice audits, we do three in a district

1      randomly every month, so when we're talking about 27 audits,

2      you know, across every month, across the entire year, there's

3      more than 325 audits that we do to capture all of these

4      different categories.  Now, we mentioned in the monthly

5      hearing, Your Honor, that --

6                  THE COURT:  Through BWC?  Is that how the audit is

7      always done?

8                  MR. MELANCON:  Yeah, for large or better, that's how

9      we're able to be able to answer these questions, yes, Your

10     Honor.  And so the pieces that we are working with the

11     Monitoring Team on is the areas from which we may not see a lot

12     of data.  For instance, the category here for being concluded

13     or stopped respectfully, you know, there might be instances

14     from which there's just not enough in the random audit for

15     which that's occurring.

16          So again, we're working with the Monitoring Team to make

17     sure that we're looking at methodologies that lets us capture

18     that outside of the randomized audits that we're doing so that

19     we can, again, demonstrate compliance in those categories.  But

20     it's very positive.  Overall we're seeing 94 percent across the

21     year for 2022 but our areas of weakness are areas things that

22     we can target and make sure that we are getting compliance in a

23     different or more effective way.

24          So that's our section for fair and impartial policing,

25     Your Honor.  We'll pause there because the next section is

 1    officer safety and wellness, so I'll cede to the DOJ.

 2              THE COURT:  Mr. Cooper?

 3              MR. COOPER:  Thanks, Your Honor.  BPD's practices in

 4    the area of stops, searches, and arrests were at the heart of

 5    the violations that we identified during our 2016 investigation

 6    that led to this Consent Decree and, in fact, DC Melancon noted

 7    one of those -- the most troubling of those findings, the very

 8    large number were arrests followed by immediate release without

 9    charge, and those practices deeply undermined the relationship

10    with the community.  And so the implementation of this part of

11    the Decree is crucial to reestablishing community trust.

12         As we've discussed today, BPD has put in place new

13    policies and has now turned its attention toward the even more

14    crucial work of implementation.  The ability of officers to

15    understand and put into practice these new policies will be

16    critical to BPD's success, and we, the DOJ, as well as BPD

17    itself and the Monitoring Team must now assess whether officers

18    are, in fact, putting these new practices into effect.

19         So we talked earlier about the Monitoring Team's ongoing

20    review of arrests, but their ability to assess compliance with

21    the provisions that relate to stops and searches depends on the

22    implementation of the new Records Management System that you

23    just discussed with DC Melancon.  And so --

24              THE COURT:  So this is a prime example of what I was

25    referring to in my opening remarks about how you've got to have

1    tactfully implemented to be able to do the work on assessment

2    and to determine exactly where we stand.

3         MR. COOPER:  Exactly.  We are, as he described, BPD

4    has made some changes to the system that we are very hopeful

5    will make these assessments possible and will be able to

6    proceed in pretty short order.  And I believe the Monitoring

7    Team is hoping to do a preliminary review later this year,

8    assuming that the new system is working as it's intended to.

9         And just one other note on this subject, Your Honor, is

10   that we will be doing -- we will be working with BPD to do a

11   review of the new policies that have been in place for more

12   than a year, which is a requirement of the Decree to do a

13   periodic review of the policies to ensure that they are

14   providing sound guidance to officers, that they're consistent

15   with the Decree and consistent with current law.  And so --

16        THE COURT:  Right.  And one of the measures of how

17   healthy the organization and the process are is, in fact,

18   evidence that policies are amended, that is not a sign of

19   weakness or having made mistakes, it's a sign of vigilance and

20   completing feedback groups and, you know --

21        MR. COOPER:  Absolutely.

22        THE COURT:  -- conforming things to the reality of

23   the experience with them.

24        MR. COOPER:  Absolutely.  If there are no other

25   questions, Your Honor, I'll turn it back over.

1          THE COURT:  All right.  Have we covered everything on

2    both topics?

3          MR. COOPER:  I have nothing else on those topics.

4          THE COURT:  Okay.  Great.

5          MR. MELANCON:  I had it working earlier, Your Honor.

6    Melissa's going to draw up our slides here.  In recognition for

7    her outstanding service, I promoted her to Deputy Director of

8    the Consent Decree Implementation Unit.  It's not because she

9    knows how to work the clicker.  It's because she knows how to

10   do everything else in the department.  So it's fantastic, thank

11   you.

12         THE COURT:  Well, whatever the reason, so far she's

13   confirming the wisdom of the decision.

14         MR. MELANCON:  Thank you.

15       (Laughter.)

16         MR. MELANCON:  Moving to officer safety and wellness,

17   Your Honor, this one from which -- I want to say this is one of

18   the most encouraging areas of progress and reform that we've

19   seen in the Department over the past several -- past six years.

20   When we come into looking at where we are, we've come into

21   compliance, initial compliance in four out of the seven

22   paragraphs of this section, but I think it belies the really

23   dramatic impact that officer safety and wellness has.  Just

24   look at one of the seven paragraphs, I think the impact it's

25   had on the Department has been much greater than that.  So

1    we'll talk through a little bit about what we found through

2    this process.

3         But just in the areas from which we're seeing things on

4    track to compliance and not yet showing initial compliance we

5    do believe that it's just some minor things which we need to

6    demonstrate a couple of extra steps.  For instance, there was

7    some observations about noncompliance with sufficient

8    promotional materials inside of the districts related to

9    officer wellness.  We've remedied this, we put out posters with

10   QR codes that link directly to resources in a digital way.  Of

11   course we have our behavioral health system resources on our

12   cell phones, all of which provides confidential and really

13   important resources to our officers who might need assistance.

14        Another finding was relating to how we need to strengthen

15   the documentation surrounding supervisory wellness checks

16   during protests and large gatherings.  Again, I think we've

17   been able to remedy this problem by introducing a new form in

18   our Records Management System just for this purpose.  That form

19   will generate sufficient evidence we believe for when such

20   evaluations are indeed offered.  And so minor issues like this

21   I think will allow for us to demonstrate compliance very soon

22   in the paragraphs that are still outstanding.

23        Next line.  Again, this is just a breakdown of that, you

24   know, of the paragraphs that are in this section for initial

25   compliance show we're on track.

1        Moving to the next slide, so we'll go through some of the
2   accomplishments I mentioned.  So we do annual reporting now.
3   These annual reports really show that level of effort in a
4   discreet way.  We've done one in 2021, we're about to do
5   another one summarizing 2022's content and that's also, you
6   know, showing all of the activities we've been doing in a way
7   that shows we're just a much more professional organization
8   when it come to handling these issues.  The product coming out
9   of the Department that summarizes these efforts is also much
10  more professional.  There's a new dashboard that we'll be able
11  to show a little bit here in court of where our status is on
12  some activities and we'll go through some of that.
13       We did a third-party study with Johns Hopkins about
14  wellness where we used -- we examined the use of BPD members in
15  how they leverage wellness resources.  The factors that
16  contribute to that use, the demographic trends around that use,
17  the most frequent reasons for that use, all of that was looked
18  at.  And again, you know, making sure that we're able to use
19  the vehicle by which that information is delivered, the cell
20  phone, those apps provide us data on -- aggregate data on our
21  ability to see how well we're doing and whether or not our
22  officers are actually leveraging those resources.  So that
23  study was very helpful.  We'll go through some of that.
24       We've revised our forms and recordkeeping.  Again, we
25  mentioned something about after-action reports and some of

1    these large incidents, but just overall we want to make sure

2    that when we're having interactions, you know, for the benefit

3    of our members that we're not losing track of it over time,

4    right?  There might be an instance where a member approaches

5    officer wellness and then two or three years might go by before

6    approach, but having the documentation and understanding of

7    that first interaction might be vital to helping to assist that

8    officer in what their needs are.

9         But overall, you know, we want to make sure that for the

10   purpose of the Decree that we're being straightforward about,

11   you know, whether or not folks who were involved in these

12   large-scale incidents are receiving the checks that they need

13   and we're getting away from paper and PDF to do all of that and

14   going digital and making sure that we can demonstrate it for

15   compliance.

16        And then finally do an annual survey of officers.

17   Beginning in 2020, we looked at collecting our own data on this

18   and making sure we understand the health and wellness needs of

19   the agency.  And so we now have -- I think it's three, we did

20   2020, 2021, and 2022, we're starting to collect data from 2022

21   on this, and so previously we had no insight or no history as

22   to what those needs were prior to that survey effort and,

23   again, gives us a data-driven approach about how do we leverage

24   resources, how do we secure resources that best fit with those

25   survey results so that we can be responsive.

1          This is a key component for retention.  I mean, we have to

2     be able to understand that if our survey is telling us

3     something about what's going on with a host of members and it's

4     something environmental or it's something, you know, work

5     related, if it's something within our control that we can

6     address and that can lead to a person's decision to stay

7     longer, that's absolutely vital for our retention effort.  So

8     it's not just for the sake of the officer's wellness, it's for

9     the sake of the organizational health going forward as well.

10         All right.  And so moving to the next slide, so this is

11    just a summary data of 2022.  Your Honor, we showed you 2021

12    data when we had it in our previous meeting.  We've been able

13    to gather up the 2022 data for the Court's consideration here.

14    Most of the early interventions here and, again, we talked

15    about the early intervention system, the technology, but on the

16    left you can see we're doing early interventions even without

17    the technology.

18         I want to make that clear.  You know, we are able to use

19    our officer safety and wellness as a point of intervention for

20    our members because we are identifying them in certain

21    circumstances where information comes to light that is

22    important that might be tracked by a technology system, for

23    sure, but this is the human element of early intervention that

24    is also a huge component of getting in front of issues before

25    they become a misconduct or before they become manifested in

1    improper use of force and the like.

2        So we focus on the technology and we absolutely are moving

3    forward on that, but we are also moving forward and we've been

4    consistently performing early interventions on the human side.

5    We did 52 such interventions last year, the majority of which,

6    large majority of which are Phase 2 interventions.  Phase 3

7    interventions are when they are entering a more formal

8    disciplinary side.  But as you can see, you know, the lion's

9    share of these are mostly nondisciplinary related which, again,

10   is a key factor of success in an intervention program.  You

11   don't want it to be a bludgeoned by, you know, Internal

12   Affairs.

13       In fact, the way we situated it is in the Admin Bureau,

14   not a disciplinary function, because otherwise you're not going

15   to be able to gain the compliance, the cooperation, the support

16   from officers to be able to report out these issues for which

17   they could be personal, they could be, you know, substantial

18   for fear that it might result in a disciplinary side of the

19   house.  So this is important for us, it's a posture that's

20   important, it's something we've both had experience with in New

21   Orleans to ensure that it's done in a way that encourages

22   acceptance of the help when it's being offered.

23       On the right side, there are some important guidance

24   sections that we catalog for, again, various categories.  You

25   saw on the previous week a host of them related to COVID-19,

1    for instance, in 2021.  With the abatement of that, we've seen

2    that kind of revert back to a more general work issue category

3    or general referrals so that COVID-19 category is not something

4    we're seeing a lot of anymore because of the change of posture

5    of the pandemic.

6          But overall, it just gives you a snapshot of what 2022 had

7    as to some of the underlying reasons that we were able to

8    catalog.  And again, you know, we're doing some of these

9    ourselves.  When a Level 3 use of force happens, we are

10   automatically referring to officer wellness as a matter of

11   course because we know and understand whether that officer is

12   even in the midst of an investigation about that use of force

13   or not, that there could be an impact to that officer's psyche

14   and wellbeing about that interaction.  And that includes

15   officers that are not just, you know, engaged in the force but

16   also could be witness to the force or otherwise engaged in the

17   incident.  And that's something that we check through our

18   Performance Review Board as well, as of course all Level 3 uses

19   of force go through that process.  We always ask, did that

20   person get to officer wellness, did they get the help that they

21   need, and that's something for which we monitor and track.

22         Next slide.  So in addition to annual reporting we did

23   this wellness study, and what we found is that -- with a team

24   at Johns Hopkins found is that of the nearly 300 respondents to

25   the study over 30 percent indicated they had used mental health

1    services either inside or outside of the department.  That

2    compares to about 17 percent average for other police

3    departments across the country.  It demonstrates that we are

4    performing comparatively well, but that also we see that folks

5    are valuing the services that are being offered and that

6    they're engaged in that activity.  And we're trying to

7    destigmatize, you know, behavioral and mental health, you know,

8    things, factors that lend itself to this issue.

9        And I think a lot of what I've seen and what we've seen in

10   the success of officer safety and wellness is that

11   destigmatization, that ability to realize that the help is

12   there, it doesn't mean that you're bad at your job.  It means

13   that you need support and what we find is that those that do

14   the survey and those that are in the study are saying that, you

15   know, there are sleeping issues from stress of work, stress of

16   supervision, other stress, mood-related issues.  Those are the

17   top categories that you see from the chart on the right from

18   what they think they could benefit from the use of that

19   counseling.

20       And so again, that's a very positive thing.  We think it's

21   because, again, of how well we've been able to market

22   internally those resources, make them available and to make it

23   okay to receive help in a way that supports our officers

24   instead of marginalizes them.

25       And so we think these are working, we're trying to gear

1    our resources around things like stress and supervision issues.

2    We're trying to target, well, okay, let's see the underlying

3    cause of some of these concerns, is there anything we can do

4    either policy wise or resource wise that can contribute to how

5    these factors are being reported out.

6         And so that leads to the annual survey which is the next

7    line.  And again, you know, we're doing these surveys now.

8    We've started to do the one for 2022.  We're still trying to

9    get a sufficient sample because we're collecting that at the

10    end of the calendar year, but in the 2021 survey, you know,

11    these are the various reasons why a person may self-refer to

12    our program.  And again, I think, you know, they represent a

13    cross-section of issues from which if the right resources

14    applied it could greatly benefit that officer and, you know, I

15    think, again, if BPD can show that it cares about their

16    officers in this way, it lends itself to a built-in retention

17    strategy.

18         In the year of the survey approximately 96 percent of

19    respondents indicated they were aware of the wellness program,

20    more than 85 percent of respondents claim they had some

21    understanding of what the program offers, and 45 percent said

22    they had a full understanding of what it offers.  And then

23    usage of the program, so in 2021, we had about just over a

24    thousand consultations which is, again, I think demonstrates

25    that we've been able to make certain that folks know that these

1     are resources that are readily available.  In 2020 that was

2     closer to 500 so, like, that more than doubled.

3           And usage of those resources for things like counseling,

4     primary care appointments, the frequency for which members

5     engaged in healthier activities also rose marginally.  So

6     people are exercising more, they're getting regular physicals

7     more, they're getting better sleep habits, and they're reducing

8     their alcohol consumption which is encouraging.

9                 THE COURT:  Do you monitor statistics on the other

10    end of it, how many members are being terminated, counseled out

11    of the department, whatever it is, due to alcoholism year to

12    year?

13                MR. MELANCON:  I don't have that in front of me, Your

14    Honor, no.

15                THE COURT:  So I mean, it would be interesting to

16    know sort of what ultimate consequences of the process are in

17    terms of, hey, look, we divert some people, we helped, there

18    was an alcohol problem here, we got him into treatment before

19    things got to a point of severe discipline or termination and,

20    I mean, that would be a very positive metric.

21                COMMISSIONER HARRISON:  We have that.  We don't have

22    that in front of us at the moment.  We do have an external --

23    an external facility and organization that supports us and we

24    have had a number of members who self-reported the need for

25    help and asked for help, and it's at Havre de Grace and it's a

1    30-day inhouse residency program.  We have had a number of

2    members, a small number, who have taken advantage of it and

3    have asked for help and who have checked themselves in, some

4    through the officer wellness program, some on their own, mostly

5    through the officer wellness program making the referral and we

6    have not made that a disciplinary issue.

7            THE COURT:  Maybe not the program that I'm thinking

8    of in Havre de Grace or it may be.  The one I'm thinking of is

9    very expensive.  So to the extent there is an expense, is this

10   covered in the benefits package, the 30-day residential?

11           COMMISSIONER HARRISON:  This one is covered by

12   insurance and there's no out-of-pocket expenses.  I believe no

13   out-of-pocket expense for members of the Department, and we

14   have had members and I have visited the place, not the members

15   itself but visited and took a tour, there is a place that many

16   of our members have gone who self-report and have gotten help

17   and have come back successfully back to work.

18           MR. MELANCON:  And we authorized paid sick leave to

19   go and participate in that, too, so they don't lose pay by

20   getting the help they need, which is also a key factor there.

21           COMMISSIONER HARRISON:  And there is then again

22   occasionally we get notifications of a member perhaps in

23   another county maybe stopped or in accident involving DUI.  We

24   get those notifications.  Those go through the disciplinary

25   process for that offense but we still make sure that they are

1   afforded the help they need to fix the root cause issue.

2            MR. MELANCON:   Yeah, that's -- I want to reiterate

3   that.  Even if a person lands themselves into a disciplinary

4   infraction, we still refer them to officer wellness.

5            THE COURT:   It's not either/or?

6            MR. MELANCON:   Correct.

7            COMMISSIONER HARRISON:   That is correct.

8            MR. MELANCON:   Again, for the annual survey, this is

9   again encouraging for us.  We want to make sure that we full

10  participation in this on an annual basis, but it also shows,

11  again, the variety of different issues which we, you know,

12  provide counseling and support for those that are referred to

13  the officer wellness.

14       Looking forward to the next line, so just as I mentioned

15  before, we're moving forward on the EIS policy doing that in

16  collaboration with the Monitoring Team and the Court, but I

17  think part of what we're trying to make sure of is that we're

18  not just waiting for the technology to do that.  Our policy

19  will speak to the technology.  But there are human elements to

20  this we can move forward on that.

21       The first public comment period on that will be in the

22  middle of February.  And so, you know, the RFP for the

23  technology as was mentioned previously has been submitted but,

24  again, that is due for proposal submissions by the middle of

25  February.  We're assembling a diverse team at BPD with

1    different perspectives to be able to assess those proposals and

2    give the right decision forward for procurement.  And so we

3    expect to see some iteration of that coming online September

4    and October of this year.  And again, we're not going to wait

5    on that.  We're going to move forward now on the policies we

6    can put together, get things into alignment, especially when it

7    come to the factors that we want to include into any EIS policy

8    it's especially important.

9         We're also planning on recruiting more civilian personnel,

10   specifically those with technology backgrounds to help manage

11   that EIS.  Once we -- as I mention to Chief Canton all the

12   time, you could buy the nice shiny thing but if you don't have

13   a trained person to run it, it's just going to sit on the

14   shelf.  That's not what we're going to have here.  We're going

15   to have the resources in place to be able to pull the reports,

16   pull the data, make sure that the Monitoring Team can see and

17   assess it in a way that fully leverages the system and that we

18   have the support to meet that demand.

19        One of the things we got in our survey was the need for

20   more fitness resources.  That's something we know that can

21   contribute directly to stress and stress management.  A lot of

22   folks in the department in their survey responded that that's

23   how they manage and deal with stress is through exercise.  So

24   we've contracted with a fitness instructor from Howard

25   University for our members.  We think that, again, will meet

1    that demand and help provide that resource that aligns with

2    that survey result.

3        We've also introduced a new two-hour wellness course for

4    our new recruits that come through the academy training.  We

5    want to catch them right at the front end.  These are resources

6    that exist for you, make sure that they know how to leverage

7    them so that they're not figuring it out after they've gone

8    through field training.  It's part of the culture of who we are

9    on the front end and we teach that on the front end.

10        And again, we also make those automatic referrals for

11    Level 3 uses of force.  Anytime an officer is involved with a

12    Level 3 use of force they're automatically referred to officer

13    wellness for a consult to make sure that they are, again, okay

14    and getting the resources they need to help manage how that

15    issue has manifested themselves in their own daily life.

16        So with that, Your Honor, again, I wanted to spend a

17    little you extra time on this because of all the success we've

18    seen.  I'm again very proud that this Department is setting the

19    national benchmark on a lot of these programs and efforts.

20    Vernon Herron has been a tremendous asset for the department.

21    He has been to, I mean, more than a dozen different law

22    enforcement agencies at this point to provide them the story of

23    what BPD is doing and we have a lot of folks that reach into

24    him to figure out what the best practice is that we are doing

25    that can be modeled in their jurisdictions as well.

1          With that, Your Honor, I'll conclude my remarks for

2     officer wellness.

3          THE COURT:   One of the most critical pieces of the

4     Decree in terms of supporting, building, maintaining the morale

5     of the force and sometimes people think of a Consent Decree,

6     they don't appreciate how important that is to the achievement

7     of the many other objectives that are in the Decree.   First you

8     got to have healthy people who are stable, content with their

9     situation.   Those are the foundational factors before we can

10    build the other.   So very interesting, important piece of it.

11         Mr. Cooper, how do you see it?

12         MR. COOPER:   Well, we completely agree, Your Honor.

13    Officer wellness is a necessary component of constitutional

14    policing, and that's why the Consent Decree includes provisions

15    that relate to it.   It's essential for officers to have the

16    physical, mental, and emotional support they need to perform

17    their jobs well.

18         The Decree has several specific requirements.   BPD's

19    required to provide officers with counseling services, as we

20    just heard about, peer support services with voluntary mental

21    health evaluations before returning to duty after a traumatic

22    incident.   It also requires protocols to ensure officers are

23    supported when they're deployed at public demonstrations, and

24    it requires implementation of a peer intervention program which

25    is EPIC at BPD, Ethical Policing Is Courageous.   And under that

1   program officers are trained to protect each other by

2   intervening if they believe a colleague is on the edge of

3   committing misconduct.

4         So as we've discussed, the Monitoring Team completed a

5   compliance review in this area, and they concluded that there's

6   a lot of progress toward compliance of these provisions, there

7   is still a few areas where more improvement is needed, though.

8   Publicizing the availability of the services and ensuring

9   they're being fully utilized, demonstrating that officers can

10  consistently follow through on the peer intervention principles

11  of EPIC and fully documenting actions taken to assist officers

12  during public demonstrations and demonstrating that those are

13  consistent with the protocols in the Decree.  And we are

14  assisting BPD in moving forward as quickly as possible so they

15  move into full compliance in this area.

16        Any questions, Your Honor?

17              THE COURT:  No.

18              MR. COOPER:  Okay.

19              THE COURT:  Thank you.

20              MR. MELANCON:  Your Honor, we'll move into the last

21  topic which is transportation of persons in custody.  Again,

22  just as a summary, we are putting out the meter here, we'll go

23  more into detail with that in a few slides.  Next slide.

24        Again, our past and present slides.  So policies, again,

25  we've revised our policies on transport, persons in custody,

1   Policy 1114, is delivered with our stops, searches, and arrests

2   training and it's currently active.  Like the stops, searches,

3   and arrests policy, it will also be re-reviewed in the first

4   quarter of this year.

5       And we've developed additional trainings for transport.

6   So at the end of 2021, an eLearning was issued Department-wide,

7   a four-hour training was updated for wagon drivers and, again,

8   just demonstrates our ability to kind of keep things current,

9   make sure folks know the tools that are being used in these

10  scenarios.

11      Policies 1511 and 825 which were vehicle inspection and

12  maintenance and transport vehicle camera systems were activated

13  in the mid of 2021 after a Department-wide requirement for

14  members to read policy and answer test questions.  For data

15  collection is where we'll discuss in a bit, we also

16  reconfigured our RMS to have the charge information form

17  included into our system.  That form is used to document

18  transport details, which is destination location, whether

19  injury occurred, and if the person was transported with other

20  individuals.

21      And then finally auditing.  So we, again, conduct monthly

22  audits on this topic.  We do about 20 audits per month which

23  are two for each district plus two for our Warrant Apprehension

24  Task Force which conducts a lot of transports so about 240

25  audits per year is what we're doing now, as compared to before

1     where we weren't auditing at all.  These audits, again,

2     demonstrate the agency's shift to that self-assessing,

3     self-correcting model that lends itself to demonstrate

4     compliance.

5         Moving to the next slide.  So just kind of a breakdown

6     here, about a third and a third and a third in these different

7     categories.  From the ones that are in initial compliance,

8     those related to policies that have been updated, transport

9     equipment and cameras inside of our vehicles, and compliance

10    with how we are restraining detainees in our transport

11    scenarios.

12        And the areas that are in 4-C and 4-A usually came down to

13    either some insufficient performance scores that we need to

14    improve before we move from on track to initial compliance or

15    underlying gaps in how we're tracking certain data systems.

16    For example, fleet management, we want to ensure there's proper

17    systems that allow us to monitor the different aspects of the

18    Decree that require fleet checklisting and maintenance checks,

19    so we're exploring -- we're currently exploring a module with

20    the City's fleet management system that will allow us to meet

21    these requirements and we also want to make sure that we are

22    ensuring that we're not just digitizing the transport form but

23    as, Your Honor, we discussed last week, that form could be

24    readily accepted electronically by our jail in lieu of

25    duplicating a report by paper that's also going into our

1/26/23 Quarterly Consent Decree Hearing

 1    digital record system.

 2        As for training --

 3            THE COURT:  That's an aspiration that has been held

 4    for a long time and discussed at length in the -- very much in

 5    the category that I referred to in my opening remarks, it's,

 6    you know, it's when.  When's it going to happen?  When?  And

 7    I'm not asking the answer for that right now but that's the

 8    question.

 9            MR. MELANCON:  It does require coordination with the

10    Department of Corrections and Public Safety.  We intend on

11    scheduling those conversations sooner rather than later to

12    ensure that we are not missing out on an opportunity,

13    especially with a changeover in administration at the --

14            THE COURT:  Well, especially that.  Because I think

15    you're -- and I don't mean criticism of the former

16    administration by this comment, but I think you are dealing

17    with an administration now with respect to which police reform

18    is a high agenda item.

19            MR. MELANCON:  We would agree.

20            THE COURT:  These kinds of technological reforms and

21    improvements are, as we have learned through this process, the

22    keys to the kingdom.

23            COMMISSIONER HARRISON:  Just to note, Your Honor, I

24    happen to be on the new Governor's Public Safety Transition

25    Team and technology integration is a big -- a big thing that

1    the Public Safety Transition Team Advisory Committee is focused

2    on, making sure that the state, especially when it come to

3    corrections, has technology that synchronizes and integrates

4    with locals like ours so that, number one, that when we upgrade

5    technology, they can see it.  It can be transferred,

6    information can be transferred back and forth between cities,

7    counties, and the state.

8        So that's a big thing that we are making recommendations

9    for that the state has to do to build something, but when it

10   does, it's doing it with our team and with all the other IT

11   teams of all the jurisdictions so that we can build something

12   that we all can see, that we all can read, and we all can

13   communicate through.

14            THE COURT:  Got it.

15            MR. MELANCON:  Moving to the next slide.  So as I

16   mentioned previously, this is the example of the old paper

17   form.  We've digitized it, making sure we're collecting all the

18   relevant information from that.  In some instances where the

19   data already exists in the incident report, rather than make

20   the officer, you know, reprovide it, some of these things are

21   populating automatically and that's, again, we're trying to

22   reduce burden as much as we can.  Just getting rid of the paper

23   form would be the ultimate burden reduction on this, and we're

24   working to get that conversation going with the new

25   administration.

1          The issues with the form also, again, affects compliance.

2     We're trying to make sure that through the course of our

3     transport audits we're seeing enough of the data to be able to

4     make qualified judgments on compliance.  And so, for instance,

5     medical equipment or separating youth or opposite genders,

6     we're just not seeing the level of volume that we used to

7     before the Decree of those instances.  And so we need to find a

8     different way to capture that data.

9          We think having this digital method allows much more

10    ability for us to do that, that we can search on certain terms

11    and then kind of review the full population or a sample of that

12    population in those instances.  Or for instance, as you can see

13    from the center here, the did the arrestee have medical

14    equipment is one of the items in the digital form.

15               THE COURT:  Right.

16               MR. MELANCON:  Well, instead of a random audit for

17    which this may or may not occur, we can search into that, pull

18    the data, and provide it for compliance review.

19               THE COURT:  We discussed this at length this our

20    monthly conference a week ago, but this is the kind of issue

21    that has to be faced as we move into completion phase under

22    this Decree.  There are going to be these little gaps where we

23    can't get the information that we know we need and that we

24    thought we'd be able to acquire through conventional means, and

25    that's where the whole process has got to be nimble and able to

1    react to the realities as you have actually found them to

2    exist, work with the Monitoring Team and come up with a method

3    that is still reliable that's going to surface this

4    information.  And the sooner we realize we've got those issues,

5    the better, so it doesn't -- you know, we're not hung up at the

6    end because we can't finish the last one percent.

7            MR. MELANCON:  Yes, Your Honor.  Moving to the last

8    slide.  So as we showed in the procedural justice audits, this

9    is a presentation of all of 2022's transport audit scores.

10   Again, we tracked this by every district and the Warrant

11   Apprehension Task Force, two audits are performed in every

12   district per month and two at WATF, and that's about 20 or so,

13   across all of this, about 240 different audits.

14       The biggest concerns for us, safe driving.  I mean, our

15   officers need to do a better job of not speeding and we need to

16   find ways to better track that.  There's some kind of

17   technology pieces that need to be really figured out to ensure

18   that we're measuring that properly.

19       Whether or not folks are immediately attending to medical

20   issues is a concern but, again, when we're finding these

21   instances, right now we've gone through a process of

22   socializing -- again, this is thrown up in Comstat every month

23   so that we see which districts are performing well, which are

24   not, they're asked to explain what happens, they're given the

25   information about the instances for which we've audited those

1  cases, and we need to understand what was the followup done
2  with the officer who failed to perform on that particular item.
3        But overall, 94 percent across 2022's transport score, I
4  will again point out the area that is areas that are NA and
5  blue for accommodations for medical equipment or whether or not
6  detainees were separated properly.  Again, in our randomized
7  audits, we're simply not capturing the quantity of data that
8  lends itself to perhaps the kind of conclusions of the
9  Monitoring Team would like to be able to make an assessment so
10 we will be coming up with different methods to demonstrate
11 compliance in those areas.
12        THE COURT:  So I'm not sure where the -- when the
13 proper moment is to raise this issue and maybe it's under the
14 general category of safe driving, maybe it's with respect to
15 audits on equipment, but one of the problems afflicting the
16 department right now is that you don't have the number of
17 transport vehicles, wagons in the vernacular of the Baltimore
18 Police Department, in service to really properly perform that
19 function and to have the full capability that you wish to have
20 and that the Decree essentially requires you to have when
21 you're making any transport.  You have got a shortage --
22        MR. MELANCON:  Yeah.
23        THE COURT:  -- of wagons.  And we discussed this in
24 one of the monthly conferences and what quickly was revealed is
25 that the Department knows it and is attempting to remedy the

1    probably acquiring replacement vehicles but the supply chain is

2    failing us and the consequence of that is that there are

3    districts that might have one wagon or no wagon on a particular

4    shift in the transporting is all occurring in police cars.

5              MR. MELANCON:   Yes.   And you know, in those instances

6    we instruct our officers to turn on their body-worn cameras for

7    the duration of such transports so that we can continue to

8    capture all of this information as part of our auditing

9    process.   We want to make sure that the lack of having the

10   technology that a wagon would bring does not hinder our ability

11   to demonstrate that those transports still followed these

12   requirements as well.

13        And so for us, it is a challenge.   It's a national

14   shortage challenge.   And the pipeline for vehicles in general

15   has been something which we've been working diligently with our

16   partners at procurement to ensure that we've got the active

17   contracts we need, the funding is available.   It's just a

18   question of when we get the vehicles, not if.

19             THE COURT:   So we had persistent problems with

20   regular police cars, or trucks as I understand they're now

21   referred to, but we are slowly but surely making progress on

22   that front and the cars are being delivered.   I imagine that

23   some of that is the product of the pressure applied starting

24   with the Court, carrying over to DC Gillis and now DC Briscoe,

25   you know, pushing them, prodding them and so forth.   And you

1/26/23 Quarterly Consent Decree Hearing

1    know, whether it's others in the City getting the vehicles

2    actually equipped or whether it's the Ford Motor Company but

3    these processes have worked.

4         Are we applying the same kind of pressure with the same

5    urgency in the context of much smaller number of transport

6    vehicles that the City desperately needs and all of this needs

7    to be thought about in the context of why we're under a Consent

8    Decree in this city in the first place.  The precipitating

9    event arose in the context of the transportation of someone who

10   was in custody.  So this is important.

11             DEPUTY COMMISSIONER BRISCOE:  And Your Honor, if I

12   may, yes, and we've raised this conversation not just with our

13   partners at Department of General Services, but with the vendor

14   themselves.  We have our regular followup meetings.  So this is

15   an issue that remains on the table for us and as executives

16   I'll continue to hound our partners.  They do understand the

17   sense of urgency.  They're not moving fast enough about it

18   because of course we're the ones --

19             THE COURT:  Do we have our orders in in our

20   procurement --

21             DEPUTY COMMISSIONER BRISCOE:  Yes, sir.  Yes, sir.

22             THE COURT:  -- process?  So we're not just going to

23   catch up but maybe even get ahead of it and so that we're

24   ordering the transport vehicles that we don't -- we haven't

25   wrecked yet but the statistics say will have another wreck

1/26/23 Quarterly Consent Decree Hearing

1    within the year, I mean, you got to get ahead of it.  And by no

2    means am I trying to say we should have policies that just

3    accommodate unsafe driving and crashes, but statistically there

4    are going to be some and we've got to procure -- have

5    procurement policies that anticipate what we're actually really

6    going to need or we'll be perpetually behind.

7              DEPUTY COMMISSIONER BRISCOE:  Yes, sir.  And to the

8    point that you're making, I can tell you some of our

9    jurisdictional partners aren't getting any vehicles in or a far

10   fewer number.  We are getting our vehicles now, though it's

11   taken a monumental amount of time to get them, the same urgency

12   is placed for our transport vehicles so we won't let up and

13   will continue to report on and update your office.

14             THE COURT:  Thank you.

15             MR. MELANCON:  And just to make reference to, as I

16   mentioned before, safe driving, immediately attending to

17   medical issues, we do believe improvements can be made in these

18   areas.  We're looking at policy updates, better training, more

19   auditing, and then ultimately potentially referrals to PIB get

20   we're getting to that place now with this.  Again, this is

21   brought up in Comstat every month and we've made it very clear

22   these slides are not going away and that they are tied to how

23   we're going to be judged when it comes to Consent Decree

24   compliance.

25             THE COURT:  I mean, I don't want to get ahead of

1  myself.  I assume that it's accidents with respect to the

2  wagons.  Is it something else?  Is it just failures of

3  technology?  Is that they're wearing out and they go out of

4  service or is it that we're having too many accidents?

5           COMMISSIONER HARRISON:  Wear and tear.  Wear and

6  tear, by and large.

7           MR. MELANCON:  There's some mileage counts on some of

8  these wagons, Your Honor.

9           THE COURT:  All right.

10           MR. MELANCON:  And again, part of the Decree requires

11  us to have a view and understanding of whether or not our

12  vehicles are in or out of service and be able to track that and

13  move on it quickly so that we can have the full suite of

14  capability available in transports for the purposes of proper

15  monitoring.  And I will say that when these new transports

16  come, they will be outfitted with even more modernized

17  technology, we went over that in our monthly hearing

18  previously, and I so that suite of technology will be upfitted

19  the moment they show up in Baltimore.  So we're committed to

20  making sure we get that operationalized once the base vehicle

21  arrives.

22           COMMISSIONER HARRISON:  Well, Your Honor, even with

23  that, we don't have -- I've given instruction not to wait for

24  cars and/or vans to arrive.  The movement we know that they're

25  ready, if we get word that vehicles are ready but it's going to

1    take 45 days for them to be shipped here, well, we'll just go

2    get them and drive them back.  And we have given that order,

3    I've done it before, we'll do it again.  That's quite easy.  So

4    we don't have to wait on them to be shipped.  We just need them

5    to be ready wherever they are in the country.

6              DEPUTY COMMISSIONER BRISCOE:  And to how we're

7    shipping, sir, the City has contracted transporter services

8    because we were at a point during DC Gillis's tenure driving

9    out to get them.  But we've contracted for transport services.

10   As soon as the vehicles are ready and produced by the

11   manufacturer, we're prepared to get them up to get them to us.

12             THE COURT:  Well, my sense is that the cars have

13   started showing up and so that's one thing I've stopped, you

14   know, banging the table about.  But I'm pivoting.  Now it's

15   going to be wagons.

16        (Laughter.)

17             THE COURT:  There we go.

18             MR. MELANCON:  Again, Your Honor, just to close out

19   on this, the transport score card represents yet another

20   instance where we're trying to be self-assessing so we can

21   self-correct.  Part of that is again the accountability

22   metrics.  As part of Comstat, it's not just crime that we're

23   looking at in Comstat, it's how we're managing our resources

24   and how our folks with comporting themselves in adherence to

25   policy.  I think it's demonstrated a huge culture change in

1/26/23 Quarterly Consent Decree Hearing

1    this particular area.  I know Your Honor had mentioned that,

2    you know, seeing compliance in this area as early as the

3    beginning of the Decree was encouraging.  You know, we are

4    committed to ensuring we're getting through the last pieces of

5    this so that we can demonstrate compliance overall.

6            THE COURT:  I've long thought that this might be an

7    area where the, you know, Department can claim it's sort of

8    first unqualified victory under this entire implementation

9    process and it would be fitting if it was given the history.

10   So I'd still like to see that happen.  All right.

11           MR. MELANCON:  That concludes our remarks for

12   transport.

13           MR. MYGATT:  This is me, Your Honor.

14           THE COURT:  Mr. Mygatt?

15           MR. MYGATT:  Your Honor, this is a good place to talk

16   about your first question that you raised this morning, how do

17   we break through and overcome some obstacles to compliance.

18       I think the presentation already this afternoon

19   demonstrated that BPD is getting much closer in this area but

20   there are some obstacles that they still need to break through.

21   I appreciate BPD's candor about the obstacles that are there.

22   So in many ways I feel like I'm going to be repetitive because

23   we've already surfaced those.  This is not a situation where

24   DOJ has to come and shine a light on the fact that there are

25   obstacles, but BPD is recognizing them and working to address

1    them.  I really appreciate that.  That's essential to this

2    process.  It's essential to actually getting fully into

3    compliance here because as DC Melancon related, if BPD is

4    expected to be self-correcting, self-assessing, then they have

5    to be able to just talk about this stuff openly and publicly.

6    And this is encouraging that we're at that point but there's

7    some obstacles.

8        So you know, I do -- I don't want it to be lost that BPD

9    has come a long way since the Monitor's original assessment in

10   this area.  You know, the most recent scorecard from December

11   shows compliance at 95 percent.  That's really encouraging.

12   You know, but you look at the scorecard that was up on the

13   screen earlier and it shows areas of considerable

14   inconsistencies.  You see documentation, safe driving, proper

15   searches, monitoring a person in custody's medical issues.

16   Those are things we got to figure out why that inconsistency is

17   happening and we got to be able to fix it.

18       And then we see the NAs that are on this scorecard as

19   well, Your Honor, so BPD already talked about these but these

20   areas that have been very difficult to assess because they're

21   low frequency, we again need to figure out some methods to be

22   able to capture that, and I think that there has been a lot of

23   good thought going into that already and I think we're going to

24   be able to do that over the coming months so that everybody can

25   start to be able to report on exactly what's happening there,

1    even though they are low frequency.

2         So you know, that's -- it's encouraging to see this and

3    it's discouraging to see this at the same time.  So we want to

4    figure out how to get over those final obstacles, and this is

5    where that hard work goes, overcoming obstacles comes in.  Part

6    of that, and BPD already talked about this, is there's a couple

7    of technological problems that need to get fixed in this area

8    and some equipment problems.

9         We talked about transport so I'm not going to repeat all

10   that, but we need to figure out and I think we're a long way

11   down figuring transport data reporting.  With the new RMS

12   system in place, the new reports that are in the Axon system

13   that were already highlighted here, that's going to really ease

14   the ability to gather some of the data, to be able to look at

15   it in realtime and then start being able to figure out what the

16   interventions that need to happen with particular officers to

17   try to address why that inconsistency keeps occurring.  And so

18   is it a change of policy, is it a change in training, is it

19   active supervision of some sort, is it a referral over to PIB,

20   you know.  That's going to greatly ease that process but we

21   need to kind of get that in place.

22        Second, you know, this issues just around the fleet

23   generally and really the needs for a fleet management system

24   that in some ways is dependent on the City itself to be able to

25   do.  And so how do we get that in place to be able to make sure

 1     that the fleet can do what it needs to do to transport people

 2     safely once they're in custody.

 3         And then the last one is trying to figure out how to make

 4     sure that officers are not speeding, and some of that is

 5     technological advancements in the automatic vehicle locator

 6     technology and other things of that nature so that officers can

 7     be held accountable there as well and we can make sure that

 8     they're getting the interventions that they need to be

 9     successful.

10         You've highlighted, Your Honor, why this is so critical.

11     I was going to say so but everybody knows why, you know, one of

12     the major factors that led to our investigation in the first

13     place and then we documented it in our findings report here.

14     This is a critical area, everybody knows why this is important,

15     the community knows why it's important.  We got to get it

16     fixed.  We got to figure out how to get across the finish line.

17     So that's the energy that all of us are putting in right now is

18     how to break down those final obstacles and figure out how to

19     get across the finish line.

20         THE COURT:  All right.  Mr. Mygatt, thank you for

21     those observations.

22         MR. MELANCON:  That concludes the discussion of the

23     four topics, so at this point I think Your Honor had mentioned

24     that the Monitoring Team would be reviewing all the different

25     topics.

1          THE COURT:  Right.  So why don't we take just a

2    10-minute break and the Monitoring Team get ready with their

3    different presentations, Mr. Thompson, and we'll be ready to

4    hear from you across all topics ten minutes.

5          (A recess was taken from 2:28 to 2:42 p.m.)

6          THE COURT:  Mr. Thompson, good afternoon.

7          MR. THOMPSON:  Late good afternoon, Your Honor.  May

8    it please the Court, I think my timing is right but I think

9    close to two years ago this Court directed the Monitoring Team

10    to begin pivoting.

11          THE COURT:  It was.  It was two years ago in January.

12          MR. THOMPSON:  Okay.  To privet its focus away from

13    providing technical assistance and to focus more in assessing

14    where the department was in terms of progress along the road to

15    compliance and with the many requirements of the Consent

16    Decree.

17          Now, we obviously took your directive to heart and

18    hopefully we have done just that.  While we continue to this

19    day to provide technical assistance where appropriate, we have

20    dramatically shifted our focus to concentrate far more on

21    compliance reviews and outcome assessments in those areas where

22    we have sufficient data and, of course, sufficient data is the

23    key term.

24          Like the Court, the Monitoring Team recognizes the

25    importance of ascertaining as soon as possible whether the time

1    and effort the parties and the Monitoring Team have spent

2    working with BPD over the years in revising its policies,

3    reimagining its training programs and protocols, and working

4    with the Department in putting in place a robust

5    state-of-the-art IT system, whether it's bearing fruit.  In

6    other words, through the lens of these data-driven assessments,

7    are we seeing a Department that is not only getting better but

8    is making significant progress again along the road to Consent

9    Decree compliance.

10        And so as reflected in our Second Comprehensive

11   Reassessment Report, the Monitoring Team has concluded that at

12   least up to this current period, the answer is a resounding

13   yes.  We are seeing, Your Honor, a department that is not only

14   getting better, but is making significant progress along the

15   road to compliance.  Now, has the progress across the board

16   been even?  No.  Some areas are quite close to achieving

17   initial compliance while others will require some work and in

18   some cases will require a great deal more work.

19        So let's look at a couple of examples.  Let's take

20   training which as I see it Your Honor, is among the brightest

21   lights evidencing progress under the Consent Decree.

22        The improvements of BPD's training function have been

23   dramatic.  As I think we discussed this morning, BPD has

24   updated its training academy facilities, it's added a number of

25   qualified police and civilian instructors to the training

1    academy staff, it's partnered with community organizations and

2    residents to develop curricula and to actually have those in

3    the community participate in teaching certain courses.  And

4    perhaps most important, the Department has adopted a dynamic

5    instructional platform grounded in adult-oriented

6    scenario-based learning.  So you may ask why has the Monitoring

7    Team not seen fit to give the Department a score of initial

8    compliance in this area?

9         Where they fall short, our finding that the academy is not

10   operating with the number of civilian personnel that the

11   staffing plan requires.  Some may say, well, is there a way to

12   get around that?  Well, there is.  You have to do it.  I mean,

13   while progress has been made as I indicated, they're not being

14   graded on a curve, Your Honor, and to get through this Consent

15   Decree process, all of the requirements must be satisfied to

16   establish substantial compliance.

17        That said, once this issue has been rectified, unless

18   something else comes up, I would expect, Your Honor, that in

19   the very near future that we should be able to get to that

20   point where I know you want to go and I know where I want to

21   go, we can find them in initial compliance.  The department

22   knows what it has to do, Your Honor.  The blueprint has been

23   laid out.  It simply has to put in the effort.  Even if it

24   requires a burden, it just has to get it done.

25        Now, let me go to the other side of the spectrum, and I

1    hate to do it because we beat on staffing 24 hours a day it
2    seems, but this is where the Department has the furthest to go.
3    The Court over the course of the Consent Decree process as we
4    have noted has consistently addressed this issue with BPD.  It
5    did so again this morning.  And as of the filing of the
6    Monitoring Team's Second Comprehensive Assessment Report, BPD
7    is down more, as I see it, more than 400 sworn officers as well
8    as more than 440 civilians, and that's based on the
9    requirements established in the 2022 staffing plan.
10        As the Court has repeatedly warned BPD, if these shortages
11   are not somehow addressed, the Department will have a very,
12   very difficult time attaining compliance with the Consent
13   Decree's community-oriented policing objectives, objectives
14   which have as their goal building community trust.  In other
15   words, Your Honor, as I see it, officers are going to have to
16   get out of their cars and engage in proactive problem-solving
17   with the public they serve.  But again, with insufficient
18   staffing, this presents a very, very difficult problem.
19        Now, that said, even in the area of staffing and retention
20   where BPD undoubtedly has significant challenges, it cannot go
21   unnoticed, but that they have taken major steps to try to
22   address the problem.  They have developed a burden reduction
23   strategy to reduce call volume and workload for the Patrol
24   Division, acknowledging the nationwide challenge to recruit,
25   hire, and retain police officers, the Department's 2022

1    staffing envisions replacing 120 open positions previously

2    designated for sworn personnel with 163 new civilian

3    investigative positions.  And, as indicated early this morning,

4    starting officer pay has been increased to $60,000, now the

5    highest in the state, and a $12,000 housing allowance for

6    officers who choose to live in the city is now in place.

7        So these represent, Your Honor, just some of the

8    initiatives BPD has put in place to try to address this

9    problem.  Accordingly, while it is not an easy task for BPD to

10   overcome their staffing hurdle, it is doable, and we will

11   expect them to do it and to use an expression they have to do

12   it by whatever means necessary because it's got to be done if

13   they intent to come out from out under this Consent Decree.

14       So recognizing the importance of assessments in the

15   Consent Decree process, especially as we enter into our sixth

16   year, I have with me today Mr. Matthew Barge who is the

17   Monitoring Team's -- he's the team lead in the area of

18   compliance reviews and outcome assessments, and he will provide

19   the Court, Your Honor, with a more fulsome discussion of the

20   Team's assessment process including what has been done and what

21   the Monitoring Team expects will be done this year.  I also

22   have with me the Monitoring Team's subject matter experts in

23   the areas that have been discussed with the Court over this

24   past quarter, the stop, search, and arrest, transportation of

25   persons in custody, and officer safety and wellness.

1        So following up on the Court's earlier comment that your

2    current focus is less on the success behind us but more on the

3    factors hindering completion of the process, I submit that the

4    Monitoring Team's discussions in these three areas should

5    provide the Court and the public with some of the issues the

6    Monitoring Team has confronted and will expect to confront as

7    we move forward.

8        So with that, Your Honor, with your permission, I would

9    like to call to the podium Mr. Barge to discuss the assessment

10    process.

11            THE COURT:   Before we hear from Mr. Barge, I want to

12    engage you on one topic, Mr. Thompson, and it really only

13    occurs to me as I'm sitting here listening to you, I think the

14    Department is trying as hard as it can on staffing.  I think

15    that they have explored every reasonable idea and strategy that

16    is reasonably available to them.

17        Notwithstanding the comment about by whatever means

18    necessary, I don't think they've gone there yet, but that's

19    part of why I'm addressing Ms. Thompson and directing her to

20    take this directly to the Mayor, because I think it's a larger

21    problem.  I think it -- I don't let the Police Department off

22    the hook, not for a moment, but I'm not sure it's within their

23    means or in their means alone to solve this to the extent that

24    it has to be solved.

25        So one thought that comes into my head is and, you know,

1    it might be that the Department is well connected as they are
2    to national resources and authorities might think that there's
3    not much in this for them, but as a Monitoring Team thought in
4    terms of technical assistance with respect to the staffing
5    issue; in other words, what expertise can the Monitoring Team
6    perhaps tap into or leverage that might add value, add
7    assistance to this most vexing problem?  Because I think that,
8    like you, it is going to be by, you know, whatever means
9    necessary, but what that's going to translate to is things
10   like -- well, things that are outside the box.
11        The Police Department and its leadership thinks in terms
12   of the realities that constrain them on an everyday basis.  For
13   instance, well, maybe we should do X, Y, or Z.  Well, wait a
14   minute, all of this is controlled by a Collective Bargaining
15   Agreement.  You just can't make a change to X, Y, or Z without
16   some alteration of the contract, and that ends up being kind of
17   a hard stop in terms of the thinking.  But we're at a point
18   with this crisis where the seemingly insurmountable barriers
19   that, you know, you can't overcome as you were trying to solve
20   the problem maybe are going to have to be reconsidered.
21        And some of the thinking that might ultimately be helpful
22   in this context actually might come from orbits, you know,
23   outside of policing and law enforcement, might come from
24   industry, might come from other elements of Government, it
25   might come from thinking of, you know, how does the Defense

 1   Department solve similar issues and problems when they've got a

 2   crisis of man and womanpower as this department has.

 3        So not so much asking for a direct response now, but I, as

 4   part of the process of sort of pulling fire alarms in relation

 5   to this issue, think that there is potentially a role for the

 6   Monitoring Team to play here in stimulating thought outside the

 7   box, leveraging resources that might be available to the

 8   Monitoring Team, perhaps with the Court's assistance, to try to

 9   crack this seemingly intractable problem.

10        MR.  THOMPSON:   Your Honor, Nola Joyce, who you well

11   know, and to a great degree you started this conversation, we

12   had this conversation with Mr. Shea about a year ago.  It was

13   somewhat productive in terms of we think, for example, golden

14   handcuffs, and I'm not suggesting that's the answer, but trying

15   to think out of the box.  But I think the problem we run into,

16   and I don't mean to denigrate anyone, but when you're dealing a

17   bureaucracy sometimes it's difficult to get people to get

18   outside of their box.

19        And without question, they do have obligations with

20   respect to the Union.  But it seems to me, I mean, I'm in

21   private industry and my view is if you engage in a conversation

22   early on and you talk about it, you know, enough, you should be

23   able to persuade your partners even if they're on the other

24   side of the fence to begin to think about the long-term

25   benefits even to them.  And so I think that what I will do, I

1    can assure you I will talk to Ms. Joyce probably tomorrow and

2    try to get back on that train because I do think that we have

3    not explored all avenues right now.  I think there are things

4    out there that can be done.  We've got a new governor.  And I

5    don't want to go too far with this, but I think there are going

6    to be new initiatives that we can utilize.  So I think it's

7    just a matter of focusing attention on this and we have to

8    focus on it, as you indicated, with a laser beam.

9              THE COURT:  That's right.  I don't think anybody is

10   better connected or frankly more highly respected among police

11   executives than our Commissioner.

12             MR. THOMPSON:  That's correct.

13             THE COURT:  And yet we don't have the problem solved

14   and we don't have a clear vision on how to solve it.  And I

15   don't fault him for that nor anyone on his leadership team.  I

16   think it is genuinely confounding situation, but our response

17   just has to be think more broadly, bring more resources to

18   bear, and I think that while we are in transition very much in

19   terms of the Court's interface with the Department and

20   Monitoring Team's interface as this Decree matures, we are

21   moving away from the technical assistance function that the

22   Decree much for and more into the monitoring function.  This is

23   an area where the TA is desperately needed if it can be -- if

24   there is assistance that actually can be mustered.

25             So that's a directive for the coming months in terms of

1    the Monitor's set of responsibilities.  We've got to see if we

2    can't from some external sources contribute to a solution as

3    part of what the Decree requires.

4              MR.  THOMPSON:   You've inspired me to call Ms. Joyce

5    tonight.  I don't want to wait until tomorrow.

6         (Laughter.)

7              THE COURT:   Very good.

8              MR.  THOMPSON:   That's all I have, Your Honor.

9              THE COURT:   Mr. Barge?  Good afternoon, Mr. Barge.

10             MR.  BARGE:   Good afternoon, Your Honor.  I wanted to

11   simply provide an update to the Court in my capacity leading

12   the Monitoring Team's outcome assessments and compliance

13   reviews on where we are and where we're going and some of the

14   challenges and opportunities that we have identified over the

15   past year and some time as we have focused evermore on this

16   work.

17        As the Court is aware and the parties are aware, the

18   Consent Decree authorizes and gives the responsibility to the

19   Monitoring Team to conduct a series of compliance reviews and

20   outcome assessments to gauge whether BPD, number one, is

21   complying with all of the formal provisions, individual

22   paragraphs of the Decree; and secondly is reaching the desired

23   outcomes in terms of real-world effects of policing in the

24   field.

25             THE COURT:   Can you move that mic a little bit

 1    closer?

 2              MR. BARGE:  Of course.

 3              THE COURT:  Maybe the courtroom deputy could bring up

 4    the volume on that.  Just having the slightest trouble hearing

 5    you.  Just want to bring that up.

 6              MR. BARGE:  So with respect to what the Monitoring

 7    Team has already completed, we have in the last 11 months filed

 8    with the Court four outcome assessments and compliance reviews.

 9    They've covered transport, training, officer assistance and

10    support, and most recently use of force.

11         We currently have three outcome assessments and compliance

12    reviews where we have substantially completed work or are in

13    the process of analyzing data and writing up the report for the

14    Court and for the public.  Those areas that are being evaluated

15    include sexual assault investigations, arrests, and the

16    functioning of the Performance Review Board.

17         We also have underway an additional four outcome

18    assessments and compliance reviews covering recruitment,

19    hiring, and retention, First Amendment, crisis intervention,

20    and community policing.  And in the most recent draft of the

21    monitoring plan that is still being discussed with the parties

22    but is far down the road, there are another six that would be

23    scheduled to be completed before the end of the monitoring

24    year, so that would be in addition to what has been previously

25    filed, something on the order of 13 compliance reviews and

1/26/23 Quarterly Consent Decree Hearing

1    outcome assessments before a little more than a year from now.

2        One thing that the Monitoring Team --

3        THE COURT:   Just to help me understand the process

4    and the phases.  So they're familiar with what you've done on

5    use of force, okay, and it produced the results that it

6    produced and to some extent, you know, still like other areas a

7    work in progress broadly within the context of the Decree, but

8    a comprehensive report was prepared.

9        So when do we look at use of force again and compare to

10   this recent very thorough report?  How does that process work?

11   How do we, you know, go through the generations of this till

12   we're at the point where we're saying we're done?

13       MR. BARGE:   So I think there are a few different

14   elements of that.  The first is to take the example on use of

15   force.  Part of the process that the Monitoring Team and the

16   parties used was as that assessment was underway in particular

17   as the qualitative review of force incidence was underway,

18   where the Monitoring Team identified foundational issues with a

19   force incident because we found it was not reasonable, not

20   necessary, not proportional or inconsistent with the duty to

21   deescalate, we flagged that case to the parties, allowed BPD

22   and the Department of Justice to review the case in turn, and

23   then we all convened to talk about that.

24       The purpose of this was, number one, to give some insight

25   into our findings as we generated it since it would ultimately

1    be memorialized in the report that was filed with the Court,

2    but also to provide realtime feedback to the Department so

3    they're not waiting for longer than they need to in order to

4    understand some of the issues that are -- were emerging within

5    the context of that report.

6          In terms of after our full evaluation has been completed,

7    figuring out when the next earliest and best time is to conduct

8    another analysis, in some ways that is highly dependent on the

9    findings.  I'm not sure there's a one size fits all answer.

10   The Department needs time to update its practices or protocols

11   or translate guidance to individual officers for improving or

12   changing performance in different areas.  It doesn't make sense

13   for us to review something where the Department doesn't feel

14   like it's had ample time or opportunity to address the issues

15   that we have pointed out.

16         So I think it's been the topic of some conversation I know

17   within the context of the monitoring plan for the next year

18   monitoring, which the Court will soon receive, just what the

19   best interval is, you know, for -- to have a lapse in order for

20   the Monitoring Team to do another assessment.

21         There's another issue sort of wrapped up in this question,

22   Your Honor, which is the Monitoring Team has been somewhat

23   specific with respect to the factors it is weighing as far as

24   determining whether a particular performance threshold is

25   identified within the Department is or is not consistent with

1    initial compliance.  We've highlighted four factors that we are
2    weighing systemically across all of the requirements of the
3    Decree, and the first of those is simply the quality of
4    performance of the Department across a material span of time,
5    number of incidents or officers, you know, or the number of
6    events that have transpired.  That means we can't just go back
7    one month later --

8                THE COURT:  No.

9                MR. BARGE:  -- in many circumstances and look at a
10   limited number of incidents or officers or amount of time.
11   There needs to be some material span of time that has elapsed.
12   So I think we're trying to determine for each area based on the
13   findings how quickly the Department indicates that it may be
14   able to remedy the outstanding deficiencies that we found and
15   how much sort of information, data, or time needs to elapse in
16   order for a new comprehensive evaluation to be ripe.

17               THE COURT:  My worry is a familiar word in this
18   process just applied in a different setting:  capacity.  The
19   capacity to do these assessments given the breadth of the
20   Baltimore Decree.  I think Mr. Mygatt would probably still
21   stand by his proposition but certainly as of a couple years ago
22   was the broadest one that the Department of Justice had ever
23   participated in crafting.  Maybe others -- well, you're not
24   involved in Chicago but that's a pretty broad one, I know, and
25   there are perhaps others that are being contemplated as we

1     speak that will have a similar breadth.  But it just strikes me

2     that this is a big job.  A big job.  You can take something

3     like use of force, easily going to have to be done two or three

4     times to get to a point of satisfaction.  Am I wrong about

5     that?

6                   MR. BARGE:  I think it might but I think that the

7     capacity issue is a real one.  I think that as we have

8     conversations with the parties as we do at the start of each

9     evaluation, we talk about methodology, what specifically is the

10    Monitoring Team going to do.  What are the types of qualitative

11    analyses, quantitative analyses they will perform.  The goal is

12    no that there are no surprises.  The Monitoring Team isn't

13    working in a silo with an unknown to the parties what's

14    happening.  We talk about it in advance, receive comments and

15    work collaboratively as best as possible to figure out what

16    we're doing.

17         There may be some instances where the Monitoring Team,

18    because of the scope of the Consent Decree, the scope of what's

19    on the agenda even just for this year, we may need to limit the

20    amount of time that's evaluated, the number of cases that are

21    reviewed.  We may need to, for example, say, well, there's a

22    certain time period over which, you know, the Department is

23    indicating we probably weren't up to compliance yet during that

24    time period, maybe you should look at a more recent material

25    relevant span of time or number of incidents.

1          So I think we may need to decide that sort of continuous

2     data, especially continuous qualitative analysis, while it may

3     be nice, may not be something given the scope and the breadth

4     we need to cover we can always do across every area.  I think

5     we're just going to need to in each area of evaluation sort of

6     determine what may be analytically necessary to make the types

7     of compliance determinations using the metrics that we've laid

8     out.

9          THE COURT:  In the coming months I'll be interested

10    to learn more about that part of the process, the thinking that

11    you and the team do and the conclusions you reach on how the

12    process can be made a little bit more targeted, a little bit

13    more efficient without losing the underlying quality of what it

14    is that you're tasked with producing.  Because as I watch this

15    process get rolling now in earnest, I do have this question

16    about the capacity to do this across the huge, wide range of

17    topics that this Decree takes on.

18         MR. BARGE:  I share the Court's concerns and in part

19    I think that's why the Monitoring Team has added a number of

20    team members recently, as the Court is aware, to help with the

21    evaluation process and the assessment process in particular.

22    It is a daunting task at the outset to contemplate rigorous

23    pieces of what essentially social science as well as legal

24    analysis and many other types of evaluations wrapped into one

25    for each of the Consent Decree's areas, but we are pushing

 1    forward to do as comprehensive a job in each as possible.

 2         And I will note here, again, that this Monitoring Team has

 3    been committed from the outset to being as clear and as

 4    transparent about how it is making compliance determinations

 5    and how it is proceeding to assess and evaluate where BPD is.

 6    Proceeding along that route takes more time.

 7         Mr. Thompson could get up in the morning, eat something

 8    for breakfast and depending on how he liked it just determine

 9    that the Department was or was not in compliance in a

10    particular area.  But that would not be rigorous, wouldn't have

11    credibility with this Court or with the community, and it would

12    do a disservice to all of the hard work that all of us, most

13    chiefly the men and women in the Baltimore Police Department

14    have been making across this process.

15         So we're wanting to use rigorous, comprehensive forms of

16    analyses and evaluations so we can really certify when the

17    Monitor, when the Court, when the parties say we've done this

18    Consent Decree from top to bottom, we have reached stand

19    compliance with all of the Decree, that people can see the

20    work, that they can identify what goes into that determination

21    and believe that it is a signifier that the Department has

22    indeed come the distance that many folks have indicated here

23    today they feel that the Department has reached.  We want to be

24    able to certify factually that there are indicators that that's

25    the case.  That takes more time, takes more capacity, that

1    takes more work.  We're prepared to obviously continue to do

2    that, but it's not as simple as, you know, just sort of looking

3    at a few things, looking at a few spreadsheets and then making

4    a crude determination.  We're wanting to be much more rigorous

5    on that.

6            THE COURT:  And the Court, of course, wants, insists

7    that the rigor be there, but the practical point is rigor

8    without grounding -- rigor and yet completion, I think it's a

9    big challenge and bears some considerable -- is worthy of

10   considerable and continuing thought in terms of how to do this

11   in a way that delivers reliable results, the truth of where

12   things stand, but in my lifetime.

13           MR. BARGE:  Your Honor, the last thing I'd say with

14   respect to that issue is that the Monitoring Team in its

15   reports has endeavored to be somewhat systematic about spelling

16   out precisely what the Department needs to do to reach

17   compliance, what findings are the chief impediments in each

18   area to a certification of initial compliance across the board.

19   Our view is that if and when the Department does the things

20   that the Monitoring Team lays out in an assessment report that

21   it needs to do, if and when they do it, they will presumptively

22   be in initial compliance unless some other area has changed

23   dramatically from before.

24       So we are trying to give to the greatest extent possible,

25   I don't think we're always going to get it right, but it's our

1    intent to provide a very sort of clear set of directions to the
2    Department so they know what to focus on and as we are toggling
3    over to one of the many areas that require evaluation that the
4    Department can focus its work and its efforts on those very
5    particular things that we have identified as being outstanding
6    areas were evaluation.
7         We're trying to do that so that there's not a sense with
8    the Department, with the community, with the Court that it's
9    unclear or unknown what the Department needs to do.  We're
10   trying to set out very clearly, you know, what the Department
11   needs to focus on even as there is other Monitoring Team
12   evaluation in other areas going on, sort of what they need to
13   focus on.
14        It's a long way of saying that simply because the
15   Monitoring Team is working on a few assessments over here
16   doesn't mean that the things we just -- that we've just
17   assessed are going to be static or sort of, you know, progress
18   depends on when the Monitoring Team can loop back to look at it
19   again.  I think there's going to be a process, an iterative
20   process where in some ways the Department and the Monitoring
21   Team, always with the DOJ collaborating in that process, are
22   passing the batons back and forth in terms of zooming in and
23   either making additional progress or evaluating whether that
24   progress has reached the requisite level of performance.
25             THE COURT:  Well, it's going to -- my prediction is a

1    part of this is approve the wisdom of establishing a distinct

2    Consent Decree Compliance Unit in the Police Department that

3    has a very -- focus very much that is, if not identical to,

4    very congruent with what the Monitoring Team is thinking and so

5    forth and it will be that unit in its existence that helps to

6    deliver exactly what you're describing, that is the continuing

7    progress toward compliance even though the Monitoring Team's

8    spotlight is in a different place.

9              MR. BARGE:   I think that's exactly right, and we've

10   already seen that.   The collaborative relationship continues to

11   be very fruitful and fast forwards on a number of issues.

12   Given that BPD has a lot of facility, many areas with not only

13   the state of data systems and information but is doing some of

14   the auditing and evaluation work themselves, we are able to

15   sort of take some of the same methodologies and do ourselves to

16   independently evaluate whether BPD's performance is good and

17   whether the auditing function is auditing as it should be, and

18   as this process proceeds and as the Court is aware, that it's

19   the Monitoring Team's responsibility to hand over the direct

20   responsibility of ongoing evaluation and assessment at some

21   point to the Department.

22        So you know, another reason that we are, you know, in some

23   instances spending a lot of time with the parties as we are

24   doing an evaluation is to make sure that everyone is on the

25   same page about what that looks like, what that takes so that

1    the Department when the time comes can do it for themselves.

2              THE COURT:   Thank you for that discussion.

3              MR. BARGE:   That concludes my remarks, Your Honor.

4              THE COURT:   Okay.  Mr. Thompson?

5              MR. THOMPSON:  Dr. Bowman, Your Honor.

6              THE COURT:  Hello, Dr. Bowman.

7              DR. BOWMAN:   Thank you, Your Honor, for the

8    opportunity to present for a few minutes to you today.  My

9    focus area is stops, searches, and arrests, and so much has

10   already been said.  Mr. Barge just spoke about the different

11   assessments that we're expecting to conduct during this

12   monitoring year.  BPD earlier also talked a lot about the

13   assessments and the process, so I really want to take a moment

14   to kind of sum up what we're looking at going forward this

15   coming year when we, in fact, are looking to see how the

16   Baltimore community experiences the conduct of the Baltimore

17   Police Department during stops, searches, and arrests.

18        So a lot of what we'll be able to do with the technology

19   enhancements and with the access to data is to see just how

20   healthy is in your term the stop, search, and arrest ecosystem

21   and making sure that when members of the Baltimore community

22   experience either voluntary or involuntary stops and searches

23   and arrests, that their experience with Baltimore police is

24   that the police conduct themselves in a manner that's friendly

25   and professional, as well as productive.

1         And so as we assess this ecosystem, what we'll look to see
2    are the efforts of the individual officers but how the system
3    itself performs as well.  We'll look at the stops and we'll
4    look to see if when officers conduct the stops how they conduct
5    themselves as professionals.  We'll also look to see that
6    officers are reporting every single stop that's made on the
7    form that's been provided by the BPD, that that report is
8    conducted and submitted by the end of the shift where that
9    stop, search, or arrest occurred but it doesn't stop there.
10   The report has to reviewed by supervisors, and that supervisory
11   review must occur within 72 hours of the time that report is
12   submitted by the end of the shift.
13        But for the ecosystem to function properly, we know that
14   sometimes either the report won't be submitted, won't be
15   submitted properly, or that the officer will not articulate
16   reasonable suspicion or will not articulate probable cause in
17   making the stops or and conducting the search when making the
18   arrest, and we expect the supervisors in that supervisory
19   review of every single stop of every single search and every
20   single arrest that's conducted that the supervisors are able to
21   capture whether or not that action was conducted appropriately,
22   lawfully, constitutionally, and within BPD policy.
23        We expect that the supervisor will document those reviews
24   and in the instances where mistakes are found or where problems
25   or found in the officer reporting that the supervisors properly

1    documented, even to the extent where mistakes are made that

2    they're documenting it in the early intervention system so

3    there is a nexus between stops, searches, and arrests and

4    reporting in the EIS system so that corrective measures can be

5    taken.  Those corrective measures may be training, those

6    corrective measures may involve reformulating policy, amending

7    policy, changing the training, but the corrective measures must

8    come to bear on problematic stop searches and arrests.

9         And then finally, supervisor ride reviews themselves must

10   be reviewed so that if supervisors aren't performing their jobs

11   appropriately, the ecosystem can capture that supervisors

12   aren't supervising, because it takes supervisors to supervise.

13   It takes officers to give 100 percent effort 100 percent of the

14   take in making sure that the experience of Baltimore residents

15   and the Baltimore community is that is required by the Consent

16   Decree.

17        So again, these assessments are starting.  I think we're

18   at the delta of this Consent Decree process.  This year is

19   exciting in that we're finally having access to data where we

20   are able through data analysis to actually understand the

21   health of this ecosystem.  That's where we are, that's what we

22   expect moving forward working with BPD in collaboration with

23   DOJ.  We think we'll know a lot more this time next year.

24             THE COURT:  Thank you, Dr. Bowman.  As I said in my

25   opening remarks, one of my concerns and it comes from some of

1    what I got from the Monitoring Team, some formally, some
2    informally is in this area of supervision and the Department's
3    demonstrated capacity or lack thereof to do the level of
4    supervision that is really necessary when you're under a
5    Consent Decree and you've got a lot of officers who will assume
6    or operate in good faith, trying to operate within the
7    guardrails, but there are a lot of new policies and there are a
8    lot of new perspectives.  Especially for more experienced
9    officers, there's changes that have to be made.  And the first
10   resource that they want to turn to should be able to turn to is
11   their first-line supervisor.  And the Department's got to come
12   through and provide that resource so that the, first of all,
13   that there are enough sergeants or first-line supervisors that
14   they're reasonably available to provide this kind of
15   consultation, advice, direction; and then number two, when they
16   provide it, that it's correct.
17          DR. BOWMAN:  Yes, sir, absolutely.  We know that a
18   lot of what we expect this whole ecosystem to achieve is
19   impacting the culture of the organization so that the tendency
20   of each officer conducting a stop is to abide by the policy and
21   abide by the training that the supervisory review acts as a
22   safety net to ensure that the cultural implementation is
23   sufficient to expect a high degree of compliance with policy
24   and the Consent Decree.  But it will require the appropriate
25   numbers of supervisors, the right span of control to ensure

1    that the checks are occurring and that the checks are of a

2    sufficient quantity and nature to catch the problems and impart

3    some resolution to the problem.

4         So I do agree but I think the demand on supervisors and

5    supervisors time will be partially offset by the change in the

6    culture of the organization and the orientation of the officers

7    towards compliance with policy so that that becomes an

8    expectation and not an exception.

9         THE COURT:   When I'm making field visits to the

10   Department and when it is in the patrol area, I make a point of

11   riding with and talking with sergeants for a lot of the reasons

12   that we're describing here.

13        One of the things that I have seen on several occasions is

14   how many officers in this Department are young and are

15   especially in need of this sort of input.  And maybe from the

16   perspective of some of the sergeants, and this seems somewhat

17   reasonable to me watching you in action, almost needing too

18   much advice, some of the officers afraid to make a move without

19   having cleared it through the sergeant first.

20        And so part of the training that needs to be imparted is

21   in how to become a little bit more independent and confident in

22   your individual decisionmaking as a rank-and-file officer, and

23   that, too, is something that a sergeant somehow through

24   mentoring has to impart.  But in order for that to be

25   successful, there has to be a very robust and solid

1    relationship between the sergeant and the officer, and that
2    means, first of all, there have got to be enough sergeants to
3    sort of teach and cultivate and instill confidence and so forth
4    and then there's got to be enough stability in the
5    organizations such that these relationships develop in a
6    meaningful way, it's not scattered so an officers being
7    supervised by a different supervisor every time they post for
8    their shift.  I mean, these are sort of second- and third-layer
9    issues that the process reveals, it seems to me, but it's in
10   those second- and third-level issues that success and
11   compliance is actually going to be achieved or actually going
12   to be determined.  I have concerns about that.  That's why I
13   put it many my opening remarks this morning.
14           DR. BOWMAN:  Yes, sir, and I absolutely agree.  And
15   those of us in policing, I'm a former Chief, I couldn't agree
16   with you more.  First-line supervisors, there are no more
17   critical supervisor positions in a police organization than the
18   first-line cops out there.  And so we have to have them in
19   sufficient number, sufficiently trained, and in line with the
20   organization's culture in order to expect the great results, so
21   I couldn't agree with you more.
22           THE COURT:  All right.  Well, it's an area that I
23   guess we have to keep our eyes on as this process continues.
24           Anything else, Dr. Bowman?
25           DR. BOWMAN:  That's it.

```
 1                    THE COURT:  Thank you.
 2                    DR. BOWMAN:  Yes, sir.
 3                    THE COURT:  Mr. Thompson?
 4                    MR. THOMPSON:  Ms. Drake, Your Honor.
 5                    THE COURT:  Good afternoon.
 6                    MS. DRAKE:  Hello, Your Honor.  I wanted to speak
 7       briefly at the top to celebrate where BPD has come so far in
 8       officer safety and wellness.  We're really pleased to see the
 9       progress.  As someone who's worked in this field for a number
10       of years, I always remember where Tracey Meares said at the
11       President's Task Force:  Hurt people hurt people.
12            And it's why we focused so heavily eight years ago on
13       departments across the nation needing to lift up officer
14       safety, wellness, and programs, and I'm glad to see Baltimore
15       has continued to be celebrated for that as they've developed
16       it.  There's still some work to be done and we know it, but the
17       pathway is clear and BPD is going to get there.
18            As we looked to assess BPD on officer safety and wellness,
19       we found that a number of employees did, in fact, know about
20       the Employee Assistance Program, and we were pleased to see
21       that between 80 and 90 percent were familiar with it and
22       familiar with how to access it.  A large number of the
23       personnel had begun to use it and the cell phone device app
24       that is now installed through Power DMS on most phones is
25       really useful for officers to engage privately in behavioral
```

1   health services and access EAP services as needed, and we hope
2   that that technology continues to grow and add in more programs
3   that officers can learn more about how to take care and charge
4   of their own health and wellness needs.
5       As we went to assess, though, we did see a shortfall in
6   the district representing officer safety wellness program.  We
7   could not find brochures.  Some districts were robust and had a
8   whole bulletin board, where others had nothing and commanders
9   walking around for several moments hoping to find the thing
10  that I was looking for.
11      We're excited to see the development of the posters that
12  will now go up with the QR codes.  Certainly that will help.
13  But as we've talked supervisors today, it cannot be remiss the
14  importance of talking at roll calls about the services with
15  regularity normalizing the need to access health and wellness
16  services, not just mental health but physical health as well.
17  Where 57 percent of officers encounter a cardiac arrest upon
18  retirement, we want to see those that are employed at Baltimore
19  Police Department live long and healthy lives beyond this work.
20  And so --
21              THE COURT:  What was that statistic?
22              MS. DRAKE:    57 percent of officers experience some
23  form of cardiac arrest or attack upon retirement, within five
24  years of retirement.
25              THE COURT:  Wow.

1          MS.  DRAKE:   It's pretty profound, and it can be with

2     health and wellness treatments inside the Department while

3     they're in service, we can decrease that number and that

4     requires regular physicals, considering the reduction of stress

5     and the systems that Baltimore has set up is serving towards

6     doing that, and so we're glad to see them taking care of their

7     officers.

8          Peer-to-peer services has been going well inside the

9     Department and we're pleased to see that people have developed

10    internal counseling mechanisms where a member can reach out to

11    one of fellow member to discuss a challenging situation

12    scenario or problem that they're having.  We do know that the

13    Peer Intervention Program continues to be substantial and make

14    progress and we're glad to see it's growing, as well as how the

15    Ethical Policing Is Courageous training went, the EPIC

16    training.

17         However, we do know that in order to make compliance we

18    found that some officers weren't intervening quite enough or

19    that tracking has not long enough been developed by the

20    Department and we do need to see some growth in that area in

21    order to see compliance hit.  We've talked to the Department

22    about this and we believe that there are measures taking to do

23    that and we heard about some of those today.

24         Finally, the Monitoring Team has reviewed BPD's wellness

25    services following traumatic incidents and civil unrest which

1    was often a topic after the civil unrest that happened in 2020

2    and before in 2014.  We know that there are officers out there

3    offering trauma services in realtime to the officers in the

4    field touching base with how they're doing as these incidents

5    unfold, but again, tracking in that space was not within the

6    realm for which we felt we could see them being compliant.

7          And so we need to continue to help BPD lift up how they

8    track and how their supervisors keep record of these touch

9    points which are so important.  It's not just about whether

10   you're overheated, thirsty, it can also be about how long have

11   you been out here, what have you seen, has the language you've

12   been listening to hard, do you need to step out and take a

13   break, all of those measures will continue to encourage the

14   health and wellness of our officers as they're out there.

15         I was excited to see the sleep deprivation work that's

16   being done inside the officer safety and wellness programs and

17   the trainings that are going to be occurring both at the

18   academy and with others how to take care.  Quality sleep helps

19   limit trauma inside of the brain and will also lower the chance

20   of cardiac arrest.  Continuing to do that but also framing it

21   around health and wellness, not just mental health, can get rid

22   of stigmas and make people invest in it.

23         I think that's all I really have to say.  We will be

24   revisiting this again in the fall, and as Matthew said, or

25   Mr. Barge said when he presented, there'll be an opportunity

1/26/23 Quarterly Consent Decree Hearing

```
 1    for BPD to continue to show success in this space, which we
 2    believe they are very close to.
 3              THE COURT:  Okay.  Critical area.  Thank you.
 4              MR. THOMPSON:  Mr. Villasenor.
 5              MR. VILLASENOR:  Your Honor, I'm so excited to talk
 6    about transport as the last topic of the day.
 7         (Laughter.)
 8              THE COURT:  If anybody can make it exciting, it's
 9    going to be you and I have high expectations.
10              MR. VILLASENOR:  I hope I do not disappoint.
11              THE COURT:  I hope not, too.
12              MR. VILLASENOR:  I'm not going to go over the topics
13    that we've talked about, the progress that BPD has made and it
14    has been tremendous.  I'd like to concentrate on the few areas
15    that I think with concerted effort over the next couple of
16    months that I'm hoping by the end of 2023 we could actually
17    bring this topic into compliance, and I'd like to talk about
18    some of the ideas and some of the discussions --
19              THE COURT:  So finally somebody put a date on it,
20    Mr. Thompson.
21         (Laughter.)
22              THE COURT:  You heard him say it.  It's on the
23    record.
24              MR. THOMPSON:  It's not the date I like, but it's
25    okay.
```

1/26/23 Quarterly Consent Decree Hearing

1          THE COURT:  I'm watching my court reporter.  She's

2     hunch sort of hunched over the machine getting that down.

3     She's getting that down.  Getting that down.  It was 2023.

4          MR. VILLASENOR:  Wow, just thew me off now, okay.

5          THE COURT:  Should have taken the advice of counsel

6     before you made that statement, but it's too late now.

7          (Laughter.)

8          MR. VILLASENOR:  The areas we have been scoring and

9     where we've seen up and down progress on ones that we've

10    mentioned this morning, on safe searches -- excuse me, safe

11    driving and searching of prisoners.  The topics are out there,

12    the policy's been developed, the training has been given, so at

13    this point it falls back on what Doctor Was talking about just

14    a little bit ago in that it's supervision.  It's making sure

15    that officers are held accountable for doing what they're

16    supposed to do, conducting the searches, not only the arresting

17    officer, but the transport officer.

18         The driving, that's going to be somewhat of a

19    technological issue because it ABLs need to be put in all the

20    vehicles to help with the speed, but they also monitor through

21    body-worn camera footage and they found various incidents where

22    an officer has blown a stop sign or blown a red light.  So

23    those are areas where BPD has either offered training where

24    appropriate but now I think that they're getting more and more

25    often with referrals to PIB because you can only train so many

1  times to drive the speed limit and obey traffic signals, and if

2  the same officer continues to do that, it's justified to refer

3  that to PIB for disciplinary action.

4  THE COURT:  Which is also training of its own.

5  MR. VILLASENOR:  In its own.  I would like to see us

6  be able to have access to the followup on some of those so that

7  we could see they're being adjudicated appropriately.

8  The areas where I am a little bit more concerned but I'm

9  also hopeful based upon the conversations that I had while I

10  was here last week with the staff on reviewing these transport

11  audits are the areas of low frequency that Mr. Mygatt mentioned

12  in his presentation and was not the expectation when the

13  Consent Decree was written that there would be more of these,

14  and thankfully there are not, but multiple-person transports

15  where you need separation between adult and juvenile,

16  male-female, gender nonconforming, those are low-frequency

17  events and we've started the process, the Major is here, we've

18  talked about identifying the multi-transport events, the events

19  that have had more than one prisoner transported, which are

20  very few as compared to where they used to be.  Once you have

21  that number, going into that and identifying how many of those

22  are male, female, and so forth.  Once we identify those events,

23  there's going to have to be some purposeful audits of those

24  events so that we can answer those questions about those

25  events.

1          I am somewhat concerned on the gender nonconforming issue
2     because they don't really track that in BPD records, and
3     there's been a conscious decision not to do that because you
4     don't want to necessarily identify someone that that
5     information then becomes public knowledge because it's in a
6     database somewhere.  So we're still looking at how we're going
7     to resolve that.
8          I was fortunate enough, though, through BPD's random
9     selection of cases to audit and then my random selection of
10    their random selection, I came across one, as I mentioned to
11    you last week, and BPD performed perfectly on that.  They were
12    conscious, they were polite, they did the proper separation,
13    they spoke very eloquently with the individual explaining what
14    to do in the process, what to expect in the process, so I
15    couldn't have asked for a better example.
16               THE COURT:  Even counselled the person as I recall
17    about how the situation might be different at the facility --
18               MR. VILLASENOR:  At the jail, correct.
19               THE COURT:  -- to which they were being delivered and
20    how to perhaps prepare themselves and manage it.
21               MR. VILLASENOR:  Correct.  And so I couldn't have
22    asked for a better performance on that particular incident.
23    But that's the only one I've seen.  I've seen an adult and
24    juvenile and it was done correctly as well.  But they're pretty
25    rare that those come across in our random selection, so I think

1    we're going to have to do pointed audits of those events that

2    we can identify and that will help us to answer those three

3    categories.

4            THE COURT:   It might even start with requiring

5    officers for some designated period of time to specifically

6    call out instances when they thought that that's the

7    circumstance they're in, even if the other data collection

8    process is not tasking them with reporting it.

9            MR. VILLASENOR:   Well, that can definitely be

10   something that we can discuss with BPD as their policies.

11           THE COURT:   Somehow you got to get a handle on it.

12           MR. VILLASENOR:   Yes, I agree.   And that's why I'm

13   saying these, with pointed effort at resolving them, I think

14   can give us the data that we need to make an assessment on

15   whether or not BPD is in compliance or not by the end of the

16   year.

17       I am also hopeful, though, in that the issue of the

18   documentation with what's required, BPD tried to remedy that

19   by -- when we started this process, we had a paper form that we

20   could watch them filling out on the BWC footage, but yet that

21   paper form never made it back into BPD records so we have to

22   give them a score of zero on documentation.   They then had Axon

23   records formulate that in their records management system so

24   they could fill it out there, but now the jail will not accept

25   that for their purposes.   And there's specific questions that

1    can only be answered by the paper format on the transport form.

2    So the officers are required to fill out two forms, as we

3    discussed last week.  You have officers filling out duplicate

4    forms, high probability that one of those won't be completed,

5    and we're still having the issue of the documentation not

6    coming through.

7              THE COURT:  Plus just the morale problem that that

8    ridiculous situation generates for a line officer.

9              MR. VILLASENOR:  And I heard earlier that, you know,

10   in conversations with the state and new governor and the new

11   technology will keep in consideration interaction, my fear with

12   that, knowing Government bureaucracy since I came from that,

13   that could be years down the road before we see the fruition of

14   that and we can't wait that long.  So there has to be some

15   remedy there, whether it's putting a BPD terminal inside the

16   Court system, getting an ICAT line or IP address to get

17   connected through so that BPD is able to negotiate a terminal

18   that officers can go to and fill out their form or print it,

19   something to overcome that obstacle.

20             THE COURT:  Okay.  Low hanging fruit, I say to the

21   Department, because he's set up a challenge for you and set an

22   expectation and saying it's just probably not going to happen

23   because bureaucracies are bureaucracies, and my belief is that

24   the two of you crack that.

25             COMMISSIONER HARRISON:  Okay.

1/26/23 Quarterly Consent Decree Hearing

 1        MR. MELANCON:  We can.  And in fact, Chief Canton was

 2   whispering over my shoulder during the break challenges about

 3   the challenges in the previous administration that led itself

 4   to getting very close to an integrated solution, and yet going

 5   as high as the CIO of the jail saying yes but leadership not

 6   responding.  And because that in and of itself has changed,

 7   that does lend itself to an opportunity and already directed

 8   the Chief to resubmit his request.  The technological

 9   capability does appear to be there.

10        Chief Canton, if you want to just briefly articulate where

11   we are with that, I'd appreciate it.

12        CHIEF CANTON:  So we're aware of the issue with Form

13   12 at Central Booking.  We want to be able to, you know, make

14   it such that we only have to make entry once.  This is what

15   Axon records was all about and we're prepared to do it from the

16   Axon records side.  What we need to be able to do is make sure

17   that the Central Booking facility can take the information in

18   and that's not my IT, you know, so we got all the way to the

19   point of an MOU, and what I'm going to do is go after it again.

20        THE COURT:  With all the beatings that this police

21   department has taken through the years in this area, in the

22   state, in this region and so forth, now the Department's in the

23   position to walk into a conversation with the state, other

24   agencies or whatever and say, hey, look, are you going to keep

25   up with us or not?  You know, are you at our level or do you

 1    lag behind in the stone age?  You know, this is how this is all

 2    got to work.  Come on up to the BPD's standard, please.  I

 3    mean, that's --

 4              COMMISSIONER HARRISON:  I say it everywhere I go.

 5              THE COURT:  Push them, prod them, shame them.

 6              MR. MELANCON:  Yes, Your Honor.  We'll work on it

 7    now.

 8              COMMISSIONER HARRISON:  Yes.

 9              MR. VILLASENOR:  So with those being addressed as

10    rigorously as possible, I maintain my hope for 2023, Your

11    Honor, and it won't be because of lack of effort.

12              THE COURT:  Now you've done it again.  That's

13    dangerous, but impressive.  All right.  We're going to watch

14    that, Mr. Thompson.

15              MR. THOMPSON:  Yes, Your Honor.  I'm glad you said

16    2023.

17              THE COURT:  Transportation of persons in custody, I

18    think -- you know, we've got our whole calendar set for 2023,

19    Mr. Thompson, but I think, you know, if it's not on for

20    November or December, now it needs to be so that we can have a

21    celebration of this achieving completion.

22              MR. THOMPSON:  Okay.

23              THE COURT:  Yeah.

24              MR. THOMPSON:  We're going to work with that, Your

25    Honor.  I think that's going to work out quite nicely.  I'll

1    leave it at that.

2         THE COURT:  Yeah.  Mr. Villasenor's promised it, so

3    of course it's going to.

4         (Laughter.)

5         THE COURT:  What else you got?

6         MR. THOMPSON:  Your Honor, that would conclude the

7    Monitoring Team's presentations.

8         THE COURT:  All right.  Let me just see if the

9    parties have anything else that they want to put on the record

10   before we conclude this hearing.

11        Ms. Thompson, is there anything else from the City?

12        MS. THOMPSON:  No, Your Honor.

13        THE COURT:  Okay.  Thank you.  Mr. Mygatt?

14        MR. MYGATT:  Nothing else from the Department of

15   Justice, Your Honor.

16        THE COURT:  Very good.  I think it's been a very

17   productive hearing.  I appreciate the participation of all, and

18   we look forward to the events on our upcoming schedule.

19        We're up for our next monthly is on Thursday, February 16,

20   use of force; and our next quarterly, Thursday, April 13 at

21   10:00 a.m.

22        Thank you, everyone.  We're in recess and off the record.

23        THE CLERK:  All rise.  This court stands in recess.

24        (The proceedings concluded at 3:45 p.m.)

25

1/26/23 Quarterly Consent Decree Hearing

1                CERTIFICATE OF OFFICIAL REPORTER

2

3        I, Amanda L. Longmore, Registered Professional Reporter,

4  in and for the United States District Court for the District of

5  Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

6  the foregoing is a true and correct transcript of the

7  stenographically-reported proceedings held in the

8  above-entitled matter and that the transcript page format is in

9  conformance with the regulations of the Judicial Conference of

10  the United States.

11

12                      Dated this 14th day of February 2023

13                        -S-

14                    _____

15                    AMANDA L. LONGMORE, RPR
                        FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25

**$**

**$12,000** [1] - 133:5
**$60,000** [1] - 133:4

**'**

**'90s** [1] - 37:13

**1**

**1** [1] - 45:15
**10** [3] - 43:6; 67:11; 79:9
**10-minute** [1] - 129:2
**100** [3] - 38:20; 151:13
**103** [2] - 52:3; 56:2
**10:00** [1] - 167:21
**10th** [2] - 18:10, 13
**11** [8] - 23:11; 46:14, 24; 54:18; 56:2, 5; 58:6; 139:7
**110** [1] - 53:5
**1112** [1] - 80:5
**1114** [1] - 113:1
**12** [6] - 35:4; 56:4, 14; 60:1; 165:13
**120** [2] - 18:16; 133:1
**12:11** [1] - 79:12
**13** [7] - 35:4; 36:13; 37:6; 55:25; 56:2; 139:25; 167:20
**131** [2] - 53:5; 54:17
**132** [1] - 53:8
**14** [1] - 88:20
**150** [1] - 22:22
**1511** [1] - 113:11
**15th** [1] - 41:23
**16** [2] - 80:20; 167:19
**163** [1] - 133:2
**17** [2] - 45:3; 104:2

**170** [1] - 25:16
**176** [2] - 52:4, 10
**18** [1] - 48:8
**180** [1] - 48:20
**19** [1] - 76:8
**1980s** [1] - 37:13
**19th** [2] - 35:7; 41:22
**1:10** [1] - 79:11
**1:14** [1] - 79:12

**2**

**2** [2] - 45:15; 102:6
**2,000** [1] - 88:19
**2,150** [1] - 52:9
**20** [5] - 35:7; 36:13; 73:8; 113:22; 118:12
**2010** [1] - 88:18
**2014** [1] - 158:2
**2015** [2] - 12:5; 88:18
**2016** [2] - 12:6; 95:5
**2017** [3] - 3:4; 6:24; 9:21
**2018** [2] - 70:10; 76:7
**2019** [3] - 48:18, 21; 91:1
**2020** [7] - 70:8; 83:6; 88:22; 100:17, 20; 106:1; 158:1
**2021** [10] - 46:2; 91:1; 99:4; 100:20; 101:11; 103:1; 105:10, 23; 113:6, 13
**2022** [18] - 45:15; 47:14; 48:13; 52:2; 55:13; 73:5; 88:11, 14; 92:6; 94:21; 100:20; 101:11, 13; 103:6; 105:8; 132:9, 25

**2022's** [3] - 99:5; 118:9; 119:3
**2023** [18] - 3:1; 10:20; 25:17; 34:12, 19, 21; 35:7; 36:20; 42:4; 43:16; 46:9; 67:2; 159:16; 160:3; 166:10, 16, 18
**2030** [1] - 55:25
**21** [4] - 35:6; 36:13; 53:6; 65:24
**2150** [2] - 52:8
**2203** [1] - 35:3
**2204** [1] - 35:4
**2205** [1] - 35:6
**2206** [1] - 35:7
**22nd** [1] - 3:14
**23.8** [1] - 65:23
**24** [2] - 53:9; 132:1
**240** [2] - 113:24; 118:13
**245** [2] - 47:14
**24th** [1] - 35:5
**27** [1] - 94:1
**279** [2] - 52:3; 53:4
**28** [1] - 66:18
**28th** [1] - 35:8
**2:28** [1] - 129:5
**2:42** [1] - 129:5

**3**

**3** [5] - 102:6; 103:9, 18; 110:11
**3,136** [1] - 89:3
**3,232** [1] - 89:3
**3.5** [1] - 70:9
**30** [7] - 46:15, 21; 55:25; 58:7; 59:12; 103:25
**30-day** [2] - 107:1, 10
**300** [2] - 22:20; 103:24
**31** [5] - 43:3; 48:8; 49:15; 54:20; 80:1
**317** [1] - 90:13

**325** [1] - 94:3
**33** [1] - 53:8
**34** [1] - 16:25
**36** [1] - 48:14
**365** [1] - 48:12
**38** [1] - 54:20
**3:45** [1] - 167:24

**4**

**4-A** [1] - 114:12
**4-C** [1] - 114:12
**40** [3] - 25:20; 43:5; 76:10
**400** [1] - 132:7
**44** [1] - 48:9
**440** [1] - 132:8
**45** [2] - 105:21; 124:1
**459** [1] - 87:23
**47** [1] - 56:17

**5**

**50-class** [1] - 38:20
**500** [1] - 106:2
**52** [1] - 102:5
**53** [1] - 48:19
**55** [1] - 54:19
**57** [2] - 156:17, 22
**59** [1] - 54:18

**6**

**6.9** [1] - 70:10
**61** [1] - 54:17
**6th** [1] - 35:4

**7**

**7** [1] - 88:20
**72** [2] - 48:16; 150:11
**720** [1] - 90:18
**7th** [1] - 3:4

**8**

**8** [1] - 54:21
**80** [3] - 22:20; 155:21
**825** [1] - 113:11
**85** [1] - 105:20
**86** [1] - 87:23

**9**

**9** [1] - 53:10
**90** [5] - 40:22; 48:14, 17; 88:22; 155:21
**94** [2] - 94:20; 119:3
**95** [1] - 126:11
**96** [1] - 105:18
**99** [1] - 92:19

**A**

**a.m** [1] - 167:21
**abate** [1] - 11:24
**abatement** [1] - 103:1
**abide** [2] - 152:20
**abiding** [1] - 13:24
**ability** [9] - 86:11; 95:14, 20; 99:21; 104:11; 113:8; 117:10; 120:10; 127:14
**ABLE** [2] - 34:7; 39:6
**able** [78] - 6:14; 13:6; 17:15; 27:6; 28:3-5; 30:2, 7; 31:8; 42:10; 45:22; 46:8; 55:4; 60:21; 65:7; 66:8; 67:20; 70:25; 72:11; 74:23; 75:6; 84:5, 8, 24-25; 85:6, 15; 89:9; 93:17; 94:9; 96:1, 5; 98:17; 99:10, 18; 101:2, 12, 18; 102:15; 103:7; 104:21; 105:25; 109:1, 15; 117:3,

24-25; 119:9; 123:12; 126:5, 17, 22, 24-25; 127:14, 24-25; 131:19; 136:23; 142:14; 145:24; 148:14; 149:18; 150:20; 151:20; 152:10; 161:6; 164:17; 165:13, 16
**absolutely** [14] - 22:16; 42:10, 15; 59:16; 74:6; 75:7; 83:24; 87:3; 96:21, 24; 101:7; 102:2; 152:17; 154:14
**academy** [10] - 4:10; 22:24; 36:15, 17; 61:6; 110:4; 130:24; 131:1, 9; 158:18
**accept** [1] - 163:24
**acceptable** [2] - 14:18; 38:21
**acceptance** [1] - 102:22
**accepted** [1] - 114:24
**access** [13] - 18:6; 40:20, 22, 25; 41:3; 88:3; 149:19; 151:19; 155:22; 156:1, 15; 161:6
**accident** [1] - 107:23
**accidents** [2] - 123:1, 4
**accommodat**

**e** [2] - 58:21; 122:3
**accommodating** [1] - 58:5
**accommodations** [2] - 59:2; 119:5
**accomodation** [1] - 51:12
**accomplish** [5] - 7:2; 23:2; 24:17, 20, 23
**accomplished** [3] - 4:16; 6:25; 51:17
**accomplishing** [1] - 39:12
**accomplishments** [4] - 5:5; 25:12; 50:18; 99:2
**according** [1] - 53:20
**accordingly** [2] - 82:23; 133:9
**account** [1] - 58:17
**Accountability** [1] - 46:2
**accountability** [4] - 13:23; 46:1; 66:6; 124:21
**accountable** [4] - 47:10; 93:9; 128:7; 160:15
**accounts** [2] - 37:4; 69:14
**accuracy** [1] - 42:3
**accurately** [2] - 18:3; 81:15
**accusation** [1] - 49:19
**accused** [5] - 49:21; 50:3, 5, 9, 11
**accustomed** [1] - 55:2
**achieve** [3] - 7:5; 8:16; 152:18
**achieved** [7] - 5:13; 10:15; 25:13; 66:13; 67:9; 80:5; 154:11

achievement [2] - 5:16; 111:6
achieving [3] - 66:7; 130:16; 166:21
acknowledge [3] - 15:16; 51:17; 62:25
acknowledges [1] - 28:10
acknowledging [3] - 52:18; 65:1; 132:24
acknowledgments [2] - 20:19, 22
acquire [2] - 23:6; 117:24
acquiring [1] - 120:1
act [1] - 50:3
Act [1] - 46:2
Acting [2] - 2:8; 14:21
action [5] - 74:4; 99:25; 150:21; 153:17; 161:3
actions [1] - 112:11
activated [2] - 90:11; 113:12
activation [1] - 7:2
activations [1] - 92:19
active [6] - 3:25; 34:22, 25; 113:2; 120:16; 127:19
activities [6] - 40:10, 14; 78:4; 99:6, 12; 106:5
activity [7] - 18:6, 9, 19; 78:2; 82:21; 88:13; 104:6
acts [1] - 152:21
actual [4] - 5:23; 6:22; 8:16; 15:23
acutely [2] - 3:5; 27:19

add [8] - 42:6; 62:1; 68:13; 69:12, 18; 135:6; 156:2
added [2] - 130:24; 144:19
addiction [1] - 12:21
adding [1] - 45:18
addition [5] - 13:14; 16:19; 47:24; 103:22; 139:24
additional [9] - 12:8; 19:2; 40:24; 43:13; 44:20; 86:15; 113:5; 139:17; 147:23
additionally [3] - 7:8; 40:19; 45:17
address [19] - 8:8, 15; 10:7; 16:20; 17:7, 9; 26:24; 29:17; 69:20; 70:17; 72:5; 101:6; 125:25; 127:17; 132:22; 133:8; 141:14; 164:16
addressed [5] - 69:17; 70:16; 132:4, 11; 166:9
addressing [7] - 8:7; 14:5; 17:21; 21:9; 30:15; 134:19
adhered [1] - 93:8
adherence [3] - 9:5; 74:25; 124:24
adjudicated [1] - 161:7
adjust [1] - 55:11
adjustments [1] - 54:25
Admin [2] -

51:9; 102:13
administration [18] - 16:13, 18; 17:24; 19:2, 11; 21:25; 24:1; 46:13; 48:7, 10, 12; 59:24; 83:3; 115:13, 16-17; 116:25; 165:3
Administration [1] - 19:7
administration's [1] - 17:12
administrations [2] - 83:22; 84:1
administrative [1] - 46:7
administrator [1] - 34:17
admit [1] - 21:2
adopted [3] - 3:8; 80:17; 131:4
adult [3] - 131:5; 161:15; 162:23
adult-oriented [1] - 131:5
advance [1] - 143:14
advanced [1] - 19:16
advancements [2] - 54:1; 128:5
advantage [1] - 61:14; 107:2
adversely [1] - 44:7
advertisements [1] - 62:5
advertising [1] - 61:3
advice [3] - 152:15; 153:18; 160:5
advisory [2] - 8:1; 116:1
advocacy [1] - 74:16

Affairs [3] - 37:23; 44:17; 102:12
affect [2] - 6:22; 19:14
affects [1] - 117:1
afflicting [1] - 119:15
afforded [1] - 108:1
afraid [4] - 24:18; 71:6; 153:18
African [3] - 18:16; 54:18, 20
African-American [2] - 18:16; 54:20
African-Americans [1] - 54:18
after-action [1] - 99:25
afternoon [9] - 79:1, 11, 14; 125:18; 129:6; 138:9; 155:5
afterwards [1] - 90:7
age [3] - 53:14; 91:11; 166:1
aged [3] - 18:18; 57:1
agencies [5] - 4:24; 19:6; 63:19; 110:22; 165:24
agency [21] - 4:17, 21; 7:5; 8:2; 24:3; 25:9; 41:25; 43:23; 45:11, 19; 46:5, 14; 49:5; 52:2, 5, 17; 53:5; 54:21; 89:22; 100:19
agency's [1] - 114:2
agenda [4] - 20:17; 33:14; 115:18; 143:19
aggregate [1] - 99:20

agnostic [1] - 59:18
ago [12] - 3:15; 21:13; 23:25; 32:1; 37:11; 42:5; 56:21; 62:8; 69:16, 19; 117:20; 129:9, 11; 136:12; 142:21; 155:12; 160:14
agree [12] - 31:14; 32:4; 43:25; 63:10; 67:6; 111:12; 115:19; 153:4; 154:14, 21; 163:12
agreed [1] - 83:5
agreement [2] - 3:7
Agreement [1] - 135:15
agrees [1] - 19:16
ahead [10] - 2:17; 20:22; 23:10; 31:24; 41:13; 69:11; 90:4; 121:23; 122:1, 25
aid [2] - 18:24; 60:2
aids [1] - 17:4
aiming [1] - 62:3
al [1] - 2:21
alarms [1] - 136:4
alcohol [2] - 106:8, 18
alcoholism [1] - 106:11
aligned [2] - 24:4, 10
alignment [3] - 35:25; 59:10; 109:6
aligns [1] - 110:1
all-electronic [1] - 48:23
allegations [1] - 78:18
allocated [2] - 22:23; 40:22

allow [5] - 5:9; 45:19; 98:21; 114:17, 20
allowance [2] - 56:15; 133:5
allowed [2] - 18:8; 140:21
allows [1] - 117:9
alluded [1] - 70:5
almost [2] - 67:9; 153:17
alone [1] - 134:23
alongs [1] - 35:23
alongside [1] - 91:2
alteration [2] - 56:23; 135:16
alternatives [3] - 16:24; 17:4; 18:2
ambitious [1] - 8:15
amended [1] - 96:18
amending [2] - 151:6
Amendment [3] - 4:3; 78:3; 139:19
Amendment-protected [1] - 4:3
America [1] - 2:20
American [3] - 4:19; 18:16; 54:20
Americans [1] - 54:18
amount [5] - 62:19; 76:16; 122:11; 142:10; 143:20
ample [1] - 141:14
analyses [4] - 85:12; 143:11; 145:16
analysis [9] - 32:12; 72:11; 84:22; 85:10; 91:7; 141:8; 144:2, 24;

151:20
analyst [1] - 72:21
analytically [1] - 144:6
analyzing [1] - 139:13
anecdotal [2] - 58:2; 73:10
announced [1] - 82:6
annual [8] - 68:20; 99:2; 100:16; 103:22; 105:6; 108:8, 10
annually [1] - 72:23
answer [14] - 29:4; 57:4; 71:10, 17; 72:22; 76:23; 94:9; 113:14; 115:7; 130:12; 136:14; 141:9; 161:24; 163:2
answered [1] - 164:1
answers [1] - 77:3
anticipate [3] - 34:8; 65:8; 122:5
anytime [1] - 110:11
apologize [1] - 59:4
app [1] - 155:23
apparent [4] - 5:17; 22:3; 29:3; 43:19
appear [1] - 165:9
appearance [1] - 58:13
appearances [1] - 2:2
appeared [1] - 50:19
applaud [2] - 38:23; 64:24
applauded [1] - 39:3
apple [1] - 65:22

**applicants** [4] - 45:3; 55:9; 62:9, 15
**applied** [3] - 105:14; 120:23; 142:18
**apply** [1] - 63:12
**applying** [2] - 38:4; 121:4
**appointment** [1] - 81:18
**appointments** [1] - 106:4
**appreciate** [5] - 111:6; 125:21; 126:1; 165:11; 167:17
**appreciates** [1] - 16:1
**Apprehension** [2] - 113:23; 118:11
**approach** [7] - 4:23; 16:18, 22; 82:10; 83:6; 100:6, 23
**approaches** [1] - 100:4
**appropriate** [12] - 15:8; 38:9; 66:8; 74:3; 75:13, 16; 76:16, 18; 87:2; 129:19; 152:24; 160:24
**appropriately** [5] - 5:12; 92:12; 150:21; 151:11; 161:7
**approve** [1] - 148:1
**approved** [1] - 59:25
**apps** [1] - 99:20
**April** [2] - 3:4; 167:20
**area** [36] - 8:19; 17:9, 18; 28:15;

70:22; 74:19; 79:17, 25; 95:4; 112:5, 15; 119:4; 125:1, 7, 19; 126:10; 127:7; 128:14; 131:8; 132:19; 133:17; 137:23; 142:12; 144:4; 145:10; 146:18, 22; 149:9; 152:2; 153:10; 154:22; 157:20; 159:3; 165:21
**areas** [50] - 4:8, 14; 8:14; 14:7; 20:16; 25:19; 27:13; 28:19; 31:24; 40:4, 18; 41:2; 64:18; 66:7; 67:17; 68:24; 72:24; 77:16, 19; 79:18; 85:6; 94:11, 21; 97:18; 98:3; 112:7; 114:12; 119:4, 11; 122:18; 126:13, 20; 129:21; 130:16; 133:23; 134:4; 139:14; 140:6; 141:12; 144:25; 147:3, 6, 12; 148:12; 159:14; 160:8, 23; 161:8, 11
**arguably** [1] - 57:2
**arise** [1] - 32:18
**arises** [1] - 40:23
**arising** [1] -

14:5
**arose** [1] - 121:9
**arrest** [16] - 69:5; 73:21, 25; 79:18; 80:23; 81:8; 88:13; 133:24; 149:20; 150:9, 18, 20; 156:17, 23; 158:20
**arrested** [1] - 89:3
**arrestee** [2] - 73:25; 117:13
**arresting** [3] - 73:22; 88:25; 160:16
**arrests** [38] - 3:24; 24:7; 33:17; 35:25; 65:9; 72:25; 73:1, 6; 77:23; 79:17; 80:19, 25; 81:5; 82:21; 83:9; 85:9, 13, 19; 86:6; 88:25; 89:23, 25; 91:3, 9; 95:4, 8, 20; 113:1, 3; 139:15; 149:9, 17, 23; 151:3, 8
**arrive** [1] - 123:24
**arrived** [1] - 15:4
**arrives** [1] - 123:21
**arrows** [1] - 6:5
**art** [2] - 36:18; 130:5
**articulate** [3] - 150:15; 165:10
**articulating** [1] - 86:2
**ascend** [1] - 42:5
**ascertaining** [1] - 129:25
**Asian** [1] - 54:21
**aspect** [2] -

44:16; 51:3
**aspects** [2] - 85:16; 114:17
**aspiration** [1] - 115:3
**aspirations** [2] - 8:6, 16
**aspired** [1] - 55:23
**assault** [4] - 4:4, 7; 65:8; 139:15
**assaults** [1] - 77:22
**assembling** [2] - 6:8; 108:25
**assert** [1] - 75:4
**assess** [17] - 19:18; 71:8; 73:15; 77:23; 78:7; 83:19; 88:4; 95:17, 20; 109:1, 17; 126:20; 145:5; 150:1; 155:18; 156:5
**assessed** [9] - 6:11; 12:19; 66:19; 80:1, 6; 84:14; 91:24; 92:2; 147:17
**assessing** [7] - 85:13; 87:20; 89:21; 114:2; 124:20; 126:4; 129:13
**assessment** [37] - 6:9; 10:21; 14:16; 16:16; 26:22; 29:15; 47:7, 9; 64:8; 65:1, 9; 66:1, 6; 67:14; 72:21; 76:1, 25; 84:3, 12, 15; 91:9, 23; 92:1; 96:1; 119:9; 126:9; 132:6; 133:20; 134:9; 140:16; 141:20;

144:21; 146:20; 148:20; 163:14
**assessments** [34] - 6:2; 30:1, 7, 20; 64:2, 10; 67:22, 25; 69:1, 20, 25; 70:1, 21; 78:25; 79:21; 85:9; 91:7, 19; 96:5; 129:21; 130:6; 133:14, 18; 138:12, 20; 139:8, 11, 18; 140:1; 142:19; 147:15; 149:11, 13; 151:17
**asset** [1] - 110:20
**assign** [1] - 57:25
**assigned** [1] - 57:6
**assignment** [1] - 57:3
**assignments** [1] - 21:7
**assist** [3] - 41:25; 100:7; 112:11
**Assistance** [2] - 27:25; 155:20
**assistance** [12] - 28:2; 54:13; 56:16; 98:13; 129:13, 19; 135:4, 7; 136:8; 137:21, 24; 139:9
**assisting** [1] - 112:14
**associated** [1] - 79:18
**assume** [4] - 14:25; 21:18; 123:1; 152:5
**assuming** [1] - 96:8
**assure** [2] - 28:6; 137:1

**assures** [1] - 90:22
**attached** [2] - 57:7, 22
**attack** [1] - 156:23
**attaining** [1] - 132:12
**attempting** [1] - 119:25
**attending** [4] - 34:22; 56:9; 118:19; 122:16
**attention** [8] - 22:12; 31:15, 20; 65:20; 67:3; 72:16; 95:13; 137:7
**attentive** [1] - 8:5
**Attorney** [11] - 20:2, 4; 25:1; 36:5; 46:3; 81:19; 82:6, 12; 83:16; 89:8
**Attorney's** [8] - 35:11, 13-14, 21; 81:24; 82:3; 83:3, 22
**attract** [10] - 52:21; 53:1; 54:23; 55:4, 6; 56:9, 11; 57:18; 58:9; 60:10
**attracting** [1] - 55:9
**attraction** [1] - 18:25
**audience** [1] - 54:3
**audit** [7] - 73:15; 74:13; 94:6, 14; 117:16; 118:9; 162:9
**audited** [1] - 118:25
**auditing** [9] - 31:16; 83:17; 113:21; 114:1; 120:8; 122:19; 148:14, 17
**audits** [25] - 48:4; 71:15; 83:12; 85:3,

5; 88:9; 92:7; 93:25; 94:1, 3, 18; 113:22, 25; 114:1; 117:3; 118:8, 11, 13; 119:7, 15; 161:11, 23; 163:1
**augmented** [1] - 4:9
**aura** [1] - 61:9
**authoritatively** [1] - 6:4
**authorities** [1] - 135:2
**authorized** [2] - 76:18; 107:18
**authorizes** [1] - 138:18
**automatic** [2] - 110:10; 128:5
**automatically** [4] - 58:25; 103:10; 110:12; 116:21
**automation/ orchestration** [1] - 40:8
**autopsy** [1] - 39:7
**AV** [1] - 33:12
**availability** [3] - 12:21; 41:1; 112:8
**available** [17] - 7:18, 25; 16:14; 40:19, 24; 47:20; 69:23; 71:15; 87:1; 104:22; 106:1; 120:17; 123:14; 134:16; 136:7; 152:14
**avenues** [1] - 137:3
**average** [3] - 48:18; 88:19; 104:2
**aware** [12] - 3:5; 21:22; 27:20; 28:8, 22; 84:23; 105:19;

1/26/23 Quarterly Consent Decree Hearing

138:17;
144:20;
148:18;
165:12
**awareness** [1]
- 89:12
**awkward** [3] -
70:20, 24;
71:5
**Axon** [7] -
41:6, 16;
85:12;
127:12;
163:22;
165:15

# B

**back-end** [1] -
41:8
**background**
[1] - 87:13
**backgrounds**
[1] - 109:10
**backing** [1] -
4:15
**backslide** [1] -
50:23
**bad** [2] - 36:19;
104:12
**badly** [1] - 49:7
**balance** [1] -
31:6
**Baltimore** [40]
- 2:13, 21;
3:2; 4:12;
8:14, 21; 9:2;
11:21; 12:2;
13:5; 16:1, 7;
17:1, 14;
19:22; 22:1,
4; 23:7, 22;
24:5; 25:24;
27:20; 32:22;
55:2, 20;
62:15; 81:20;
119:17;
123:19;
142:20;
145:13;
149:16, 21,
23; 151:14;
155:14;
156:18;
157:5
**Baltimore's** [2]
- 8:7; 9:3
**banging** [1] -
124:14
**bargaining** [1]

- 135:14
**barge** [8] -
75:20, 23;
76:23; 134:9,
11; 138:9;
149:10;
158:25
**Barge** [3] -
2:15; 133:16;
138:9
**BARGE** [12] -
75:24; 76:14;
138:10;
139:2, 6;
140:13;
142:9; 143:6;
144:18;
146:13;
148:9; 149:3
**barrier** [1] -
9:16
**barriers** [3] -
5:15; 57:19;
135:18
**base** [2] -
123:20;
158:4
**based** [11] -
21:15; 47:18;
48:22; 65:25;
70:1; 82:6;
86:23; 131:6;
132:8;
142:12;
161:9
**basis** [6] -
42:13; 60:20;
65:7; 108:10;
135:12
**Bates** [2] -
20:6; 23:24
**BATES** [1] -
20:8
**batons** [1] -
147:22
**BCICs** [1] -
40:19
**beam** [1] -
137:8
**bear** [5] -
13:22; 22:8;
50:12;
137:18;
151:8
**bearing** [3] -
5:20; 39:13;
130:5
**bears** [1] -
146:9
**beat** [1] - 132:1

**beating** [1] -
92:25
**beatings** [1] -
165:20
**became** [2] -
62:8
**become** [5] -
4:21; 89:21;
101:25;
153:21
**becomes** [5] -
29:23; 40:24;
86:5; 153:7;
162:5
**becoming** [2] -
47:4; 63:3
**begin** [4] -
51:19; 62:20;
129:10;
136:24
**beginning** [12]
- 8:10; 15:9;
19:5; 23:12;
32:22; 37:6;
48:10; 79:15;
86:9; 100:17;
125:3
**begun** [1] -
155:23
**behalf** [1] - 2:6
**behavior** [3] -
29:22; 83:11;
89:17
**behavioral** [10]
- 8:7, 12, 15;
28:13; 34:11;
78:13; 98:11;
104:7;
155:25
**behind** [9] -
10:18; 19:13;
52:19; 53:3,
7; 54:15;
122:6; 134:2;
166:1
**belief** [2] -
21:23;
164:23
**belies** [1] -
97:22
**bench** [1] -
6:19
**benchmark** [1]
- 110:19
**benefit** [4] -
41:10; 100:2;
104:18;
105:14
**benefits** [4] -
17:4; 59:14;

107:10;
136:25
**bent** [1] - 91:4
**best** [17] -
4:19, 23;
13:12, 15,
22; 22:8;
23:5; 28:4;
79:20; 80:11;
82:23;
100:24;
110:24;
141:7, 19;
143:15
**better** [33] -
8:2; 9:6;
10:4, 8, 10;
25:3, 5, 10;
32:13, 20;
35:15; 44:16;
48:22; 49:13;
51:2; 52:19;
57:16; 58:3;
61:15; 92:20;
94:8; 106:7;
118:5,
15-16;
122:18;
130:7, 14;
137:10;
162:15, 22
**between** [15] -
9:17; 11:15,
17; 12:9, 22;
17:5; 31:15;
65:12; 81:23;
88:20; 116:6;
151:3; 154:1;
155:21;
161:15
**beyond** [6] -
13:11; 17:16;
38:4; 55:10;
156:19
**Big** [3] - 33:14;
51:7; 67:25
**big** [14] - 5:3;
6:12; 8:6, 15;
27:5; 48:17;
50:11; 64:2;
115:25;
116:8; 143:2;
146:9
**bigger** [1] -
21:20
**biggest** [2] -
92:16;
118:14
**billboards** [3] -
61:4, 14;

62:17
**bit** [23] - 26:25;
27:14; 30:21;
45:7; 53:3,
23; 61:11;
68:13; 69:21,
24; 77:9;
82:5; 90:20;
93:22; 98:1;
99:11;
113:15;
138:25;
144:12;
153:21;
160:14;
161:8
**black** [1] - 49:6
**bleed** [2] -
85:14; 91:18
**bleeding** [1] -
10:4
**blocking** [1] -
10:19
**blown** [2] -
160:22
**bludgeoned**
[1] - 102:11
**blue** [1] - 119:5
**blueprint** [1] -
131:22
**bluntly** [1] -
8:20
**Blyther** [1] -
57:13
**board** [7] -
7:24; 45:5;
76:5; 78:5;
130:15;
146:18;
156:8
**Board** [5] -
74:2, 14;
78:5; 103:18;
139:16
**body** [7] -
47:25; 71:14;
92:10, 18,
21; 120:6;
160:21
**body-worn** [7]
- 47:25;
71:14; 92:10,
18, 21;
120:6;
160:21
**boilerplate** [1]
- 86:3
**bone** [1] -
56:25
**bones** [1] -

44:2
**bonus** [1] -
56:18
**Booking** [2] -
165:13, 17
**borne** [1] -
12:12
**bottom** [1] -
145:18
**Bowman** [4] -
149:5;
151:24;
154:24
**BOWMAN** [5] -
149:7;
152:17;
154:14, 25;
155:2
**box** [4] -
135:10;
136:7, 15, 18
**boxes** [1] -
85:1
**BPD** [85] -
3:22; 4:9, 21;
7:5; 8:2;
10:4; 13:2;
26:13; 30:22,
24; 31:2, 6;
32:10; 35:4,
6-7; 40:10,
14, 17;
41:14, 19,
24; 45:16;
68:15,
22-23; 69:8,
13; 70:11,
16-17; 72:4;
77:23; 78:16;
80:2; 85:10;
86:12; 95:12,
16; 96:3, 10;
99:14;
105:15;
108:25;
110:23;
111:25;
112:14;
125:19, 25;
126:3, 8, 19;
127:6; 130:2,
23; 132:4, 6,
10, 20;
133:8;
138:20;
140:21;
145:5;
148:12;
149:12;
150:7, 22;

151:22;
155:7,
17-18;
158:7; 159:1,
13; 160:23;
162:2, 11;
163:10, 15,
18, 21;
164:15, 17
**BPD's** [12] -
41:2; 78:2,
13; 95:3, 16;
111:18;
125:21;
130:22;
148:16;
157:24;
162:8; 166:2
**Brady** [1] -
34:6
**brain** [1] -
158:19
**breadth** [3] -
142:19;
143:1; 144:3
**break** [9] -
79:8-10;
125:17, 20;
128:18;
129:2;
158:13;
165:2
**breakdown** [2]
- 98:23;
114:5
**breakfast** [1] -
145:8
**Brian** [1] -
42:24
**Brickus** [1] -
52:23
**brief** [2] - 26:8;
68:3
**briefed** [1] -
33:16
**briefly** [5] -
27:17; 29:2;
69:3; 155:7;
165:10
**brightest** [1] -
130:20
**bring** [15] -
17:15; 18:23;
20:20; 26:13;
28:7; 43:13;
45:5; 66:9;
81:19;
120:10;
137:17;
139:3, 5;

159:17
**bringing** [1] -
13:22
**brings** [1] -
69:20
**BRISCOE** [21]
- 51:22, 25;
52:15; 53:19;
55:14, 17,
24; 56:7;
57:4, 9; 58:8,
22; 59:5;
60:11, 18;
61:16; 63:23;
121:11, 21;
122:7; 124:6
**Briscoe** [6] -
22:7; 39:14;
51:9, 16;
69:18;
120:24
**broad** [2] -
67:24;
142:24
**broader** [3] -
11:8; 13:13;
43:22
**broadest** [1] -
142:22
**broadly** [2] -
137:17;
140:7
**brochures** [1]
- 156:7
**broken** [1] -
14:3
**brought** [4] -
22:8; 48:20;
61:4; 122:21
**build** [4] -
58:16;
111:10;
116:9, 11
**building** [2] -
111:4;
132:14
**builds** [1] -
25:12
**built** [2] - 77:3;
105:16
**built-in** [1] -
105:16
**bulletin** [1] -
156:8
**burden** [8] -
14:9; 16:15;
17:7; 50:11;
116:22;
131:24;
132:22

**burdens** [1] -
28:18
**bureau** [1] -
43:21
**Bureau** [9] -
27:24; 42:25;
43:8; 44:4,
11; 49:23;
51:9; 78:18;
102:13
**bureaucracie
s** [2] - 164:23
**bureaucracy**
[2] - 136:17;
164:12
**bus** [1] - 61:23
**buses** [2] -
61:3, 14
**business** [2] -
5:11; 17:13
**businesspeo
ple** [1] -
25:23
**buy** [1] -
109:12
**BWC** [2] -
94:6; 163:20
**bystandershi
p** [1] - 4:1

## C

**cadence** [1] -
85:4
**calendar** [3] -
82:22;
105:10;
166:18
**camera** [6] -
71:14; 92:11,
18, 21;
113:12;
160:21
**cameras** [4] -
47:24; 114:9;
120:6
**campaign** [6] -
54:24; 55:1;
60:25; 62:9,
24
**campus** [1] -
4:11
**candidate** [1] -
38:16
**candidates** [1]
- 38:9
**candor** [1] -
125:21
**cannot** [3] -
9:21; 132:20;

156:13
**CANTON** [6] -
39:24; 41:14;
42:6, 15, 22;
165:12
**Canton** [6] -
39:21, 23;
42:21;
109:11;
165:1, 10
**capabilities** [2]
- 7:5; 8:13
**capability** [3] -
119:19;
123:14;
165:9
**capable** [4] -
4:11; 7:10;
21:21; 44:24
**capacities** [1] -
8:13
**capacity** [17] -
6:18, 23, 25;
7:15; 8:11,
16, 19; 9:23;
10:25; 13:12;
138:11;
142:18;
143:7;
144:16;
145:25;
152:3
**capture** [9] -
41:6; 73:18;
94:3, 17;
117:8; 120:8;
126:22;
150:21;
151:11
**captured** [2] -
81:8; 84:14
**capturing** [2] -
81:15; 119:7
**card** [1] -
124:19
**cardiac** [3] -
156:17, 23;
158:20
**care** [4] -
106:4; 156:3;
157:6;
158:18
**career** [2] -
25:7; 54:1
**careers** [1] -
8:25
**careful** [1] -
31:5
**cares** [1] -
105:15

**carries** [1] -
34:10
**carry** [1] -
22:15
**carrying** [2] -
23:12;
120:24
**cars** [8] -
22:20; 38:10;
120:4, 20,
22; 123:24;
124:12;
132:16
**case** [10] -
15:2, 5;
41:15, 17;
86:5; 89:10;
93:9; 140:21;
145:25
**caseload** [2] -
37:23; 44:23
**cases** [12] -
47:16; 48:12,
15, 19;
49:24; 74:13;
119:1;
130:18;
143:20;
162:9
**catalog** [2] -
102:24;
103:8
**catch** [4] -
74:13; 110:5;
121:23;
153:2
**categories** [8]
- 92:9, 12;
94:4, 19;
102:24;
104:17;
114:7; 163:3
**categorized**
[1] - 81:8
**category** [7] -
63:7; 85:7;
94:12; 103:2;
115:5;
119:14
**Caucasian** [1]
- 54:20
**Caucasians**
[1] - 54:18
**causes** [1] -
73:11
**cede** [1] - 95:1
**celebrate** [1] -
155:7
**celebrated** [1]
- 155:15

**celebration** [1]
- 166:21
**cell** [3] - 98:12;
99:19;
155:23
**center** [2] -
90:11;
117:13
**centered** [1] -
5:1
**Central** [3] -
22:25;
165:13, 17
**cents** [1] -
91:23
**certain** [11] -
11:10; 53:14;
63:17; 67:19;
83:9; 101:20;
105:25;
114:15;
117:10;
131:3;
143:22
**certainly** [10] -
8:17; 9:11;
20:13; 23:5;
59:13; 60:23;
71:12; 75:10;
142:21;
156:12
**certification**
[2] - 34:18;
146:18
**certify** [2] -
145:16, 24
**cetera** [5] -
12:24; 47:25;
75:5; 84:1
**chain** [1] -
120:1
**challenge** [14]
- 7:14; 8:20;
21:1, 3;
36:20; 42:13;
52:5, 16;
54:22;
120:13;
132:24;
146:9;
164:21
**challenges**
[12] - 18:23;
20:23, 25;
24:14; 32:17;
38:22; 52:18;
132:20;
138:14;
165:2
**challenging**

[2] - 52:24;
157:11
**chance** [1] -
158:19
**change** [23] -
6:10, 22;
18:8, 22;
28:23; 29:10,
18, 20; 30:3;
47:18; 60:22;
81:21, 25;
82:4, 13, 16;
83:21; 103:4;
124:25;
127:18;
135:15;
153:5
**changed** [10] -
5:18; 6:24;
15:6; 22:6;
39:4, 10;
74:21; 82:10;
146:22;
165:6
**changeover**
[1] - 115:13
**changes** [8] -
29:13; 30:9;
66:25; 69:15;
82:3; 84:6;
96:4; 152:9
**changing** [3] -
29:22;
141:12;
151:7
**charge** [5] -
33:11; 89:11;
95:9; 113:16;
156:3
**charged** [2] -
46:5
**charges** [2] -
85:2; 88:9
**charging** [1] -
81:20
**chart** [3] -
43:5; 88:14;
104:17
**check** [2] -
45:21;
103:17
**checked** [1] -
107:3
**checking** [1] -
85:1
**checklisting**
[1] - 114:18
**checks** [5] -
98:15;
100:12;

114:18;
153:1
**Chicago** [1] -
142:24
**chief** [1] -
146:17
**Chief** [13] -
2:13; 15:15;
20:2; 23:24;
39:21, 23;
41:13; 42:21;
109:11;
154:15;
165:1, 8, 10
**CHIEF** [6] -
39:24; 41:14;
42:6, 15, 22;
165:12
**chiefly** [1] -
145:13
**chiefs** [1] -
72:19
**child** [1] - 57:1
**childcare** [6] -
57:12, 25;
58:5; 59:8,
10, 14
**children** [1] -
59:19
**choose** [1] -
133:6
**choosing** [2] -
58:4; 89:8
**CIO** [1] - 165:5
**circumstance**
[1] - 163:7
**circumstance
s** [4] - 57:18;
83:9; 101:21;
142:9
**citations** [2] -
81:1; 83:8
**cited** [2] -
16:25; 62:16
**cities** [2] - 9:7;
61:3; 116:6
**citizen** [3] -
73:9, 23
**citizens** [4] -
17:20; 25:23;
45:19; 92:15
**city** [9] - 5:4;
9:5, 24;
11:11; 55:2;
61:7, 13;
121:8; 133:6
**City** [43] - 2:9,
11; 3:2; 4:16;
5:1; 6:17, 21;
8:13; 9:7;

13:1, 16;
15:8, 25;
16:2, 7;
17:13, 22;
18:8; 19:2,
14, 16;
22:21; 23:5;
26:13, 17;
30:22, 24;
31:2, 6, 11;
32:10; 55:20;
58:23; 60:1;
71:4; 121:1,
6; 124:7;
127:24;
167:11
**City's** [2] -
3:16; 114:20
**Civil** [3] - 2:20;
27:23; 45:24
civil [2] -
157:25;
158:1
**civilian** [8] -
43:4; 45:9,
25; 48:9;
109:9;
130:25;
131:10;
133:2
**civilians** [3] -
9:13; 43:6;
132:8
**claim** [2] -
105:20;
125:7
**claimed** [1] -
82:8
**clarity** [1] -
54:10
**class** [4] -
34:12; 35:3;
37:5
**Class** [3] -
35:4, 6
**classes** [6] -
36:24; 37:7,
9; 80:3;
90:15
**clear** [11] -
29:23; 64:13;
83:12; 87:19;
93:4; 101:18;
122:21;
137:14;
145:3; 147:1;
155:17
**cleared** [1] -
153:19
**clearly** [1] -

147:10
**CLERK** [2] -
2:19; 167:23
**click** [1] -
62:22
**clicker** [1] -
97:9
**client** [1] -
19:21
**climate** [1] -
42:7
**climbing** [1] -
42:4
**close** [9] -
16:25; 41:7;
81:24; 83:2;
124:18;
129:9;
130:16;
159:2; 165:4
**closely** [3] -
37:21; 82:2,
11
**closer** [3] -
106:2;
125:19;
139:1
**Cloud** [1] -
40:6
**cocreate** [1] -
24:6
**code** [1] - 55:5
**codes** [3] -
61:19; 98:10;
156:12
**codifies** [1] -
90:21
**coexist** [2] -
23:8, 19
**collaborate** [1]
- 60:15
**collaborating**
[1] - 147:21
**collaboration**
[7] - 11:17,
19; 18:21;
19:14; 81:24;
108:16;
151:22
**collaborative**
[3] - 16:18;
19:11;
148:10
**Collaborative**
[2] - 17:11;
19:5
**collaboratively**
[1] - 143:15
**colleague** [1] -
112:2

**collect** [1] -
100:20
**collected** [2] -
85:11, 24
**collecting** [3] -
100:17;
105:9;
116:17
**collection** [3] -
84:22;
113:15;
163:7
**collective** [2] -
71:7; 135:14
**combing** [1] -
57:16
**comfortable**
[2] - 46:4, 8
**coming** [18] -
22:23; 27:11;
32:15; 48:3;
65:7; 67:2;
69:2, 15;
78:1; 85:5;
99:8; 109:3;
119:10;
126:24;
137:25;
144:9;
149:15;
164:6
**command** [3] -
87:10; 93:4,
21
**commanders**
[1] - 156:8
**commend** [1] -
93:21
**commending**
[1] - 11:5
**comment** [4] -
108:21;
115:16;
134:1, 17
**comments** [6]
- 14:15;
21:15; 63:25;
64:14; 68:1;
143:14
**COMMISSIO
NER** [63] -
19:25; 20:11;
22:18; 26:3;
36:23; 37:3;
43:2, 10, 24;
44:9; 45:2;
46:20, 22,
25; 47:8, 13,
23; 50:25;
51:5, 22, 25;

52:15; 53:19;
55:14, 17,
24; 56:7;
57:4, 9; 58:8,
22; 59:5;
60:11, 18;
61:16; 62:1,
7; 63:10, 15,
23; 72:18;
73:20, 24;
74:6, 9, 12,
22; 75:2, 7;
106:21;
107:11, 21;
108:7;
115:23;
121:11, 21;
122:7; 123:5,
22; 124:6;
164:25;
166:4, 8
**Commission
er** [21] - 10:8;
16:20; 19:24;
21:14, 20;
22:7, 17;
25:2; 35:11;
42:24; 51:9;
54:7; 57:11;
59:7; 72:17;
75:25; 76:24;
78:6; 137:11
**Commission
er's** [3] -
26:11; 49:9;
51:11
**commitment**
[4] - 16:11;
24:24
**committed** [7]
- 5:3; 19:12;
28:25; 29:1;
123:19;
125:4; 143:3
**committee** [1]
- 116:1
**committing** [1]
- 112:3
**communicate**
[1] - 116:13
**communicati
on** [1] - 81:23
**community**
[38] - 4:1; 5:2;
11:16, 18;
12:1, 9;
13:15; 17:6,
13, 25;
18:22; 19:7;
20:13; 25:6,

19, 24; 29:6;
30:12; 34:3,
10; 75:9;
78:15; 93:15;
95:10;
128:15;
131:1, 3;
132:13;
139:20;
145:11;
147:8;
149:16, 21;
151:15
**community-
oriented** [1] -
132:13
**Company** [1] -
121:2
**comparatively**
[1] - 104:4
**compare** [2] -
29:24; 140:9
**compared** [4] -
76:7; 82:7;
113:25;
161:20
**compares** [2] -
70:10; 104:2
**compensatio
n** [1] - 76:5
**competing** [3]
- 63:13, 18
**complained**
[1] - 6:17
**complaint** [4] -
45:17,
20-21; 75:15
**complaints**
[11] - 46:13,
15, 18, 23;
47:2; 48:2;
49:2, 6; 73:9,
15
**complement**
[2] - 19:3;
59:22
**complemented**
[1] - 17:3
**complete** [9] -
4:9, 14; 6:2;
7:6; 12:7;
47:18; 63:16;
71:11; 78:1
**completed** [20]
- 3:21; 7:13;
48:14-16,
18; 69:25;
70:4; 72:2;
78:4, 8, 14,
19-20;

112:4; 139:7,
12, 23;
141:6; 164:4
**completely** [2]
- 80:18;
111:12
**completing** [2]
- 88:11;
96:20
**completion**
[10] - 10:17,
19; 42:19;
56:19; 65:8;
66:23;
117:21;
134:3; 146:8;
166:21
**Compliance**
[1] - 148:2
**compliance**
[96] - 3:3;
4:18; 5:16;
6:1, 5; 9:11,
18, 22;
10:17; 19:19;
20:21; 26:12;
27:3; 48:4;
65:5, 24;
66:3, 8-9,
12; 67:9, 11,
23; 69:1, 23;
70:18; 77:17,
20; 81:13;
84:20; 85:1;
86:13; 87:23;
92:5; 93:17;
94:19, 22;
95:20; 97:21;
98:4, 21, 25;
100:15;
102:15;
112:5, 15;
114:4, 7, 9,
14; 117:1, 4,
18; 119:11;
122:24;
125:2, 5, 17;
126:3, 11;
129:15, 21;
130:9, 15,
17; 131:8,
16, 21;
132:12;
133:18;
138:12, 19;
139:8, 11,
18, 25;
142:1;
143:23;
144:7; 145:4,

9, 19;
146:17, 22;
148:7;
152:23;
153:7;
154:11;
157:17, 21;
159:17;
163:15
**compliant** [1] -
158:6
**complied** [1] -
77:24
**comply** [2] -
3:16; 16:2
**complying** [2]
- 46:12;
138:21
**component** [4]
- 91:10;
101:1, 24;
111:13
**components**
[1] - 92:13
**comport** [1] -
90:22
**comporting**
[1] - 124:24
**composition**
[1] - 39:15
**Comprehensi
ve** [5] - 3:14;
5:12; 10:12;
11:7; 130:10
**comprehensi
ve** [12] - 3:19;
6:9, 15;
17:19; 23:15;
64:8; 66:1;
132:6; 140:8;
142:16;
145:1, 15
**computer** [1] -
40:5
**Comstat** [6] -
93:1, 4;
118:22;
122:21;
124:22
**conceived** [1]
- 12:18
**concentrate**
[2] - 129:20;
159:14
**concept** [1] -
92:24
**concern** [5] -
16:6; 51:14;
83:19; 92:16;
118:20

1/26/23 Quarterly Consent Decree Hearing

concerned [4] - 52:1; 66:24; 161:8; 162:1

concerns [6] - 30:15; 105:3; 118:14; 144:18; 151:25; 154:12

concerted [1] - 159:15

conclude [5] - 34:8; 39:20; 111:1; 167:6, 10

concluded [4] - 94:12; 112:5; 130:11; 167:24

concludes [5] - 60:12; 63:25; 125:11; 128:22; 149:3

conclusion [1] - 49:16

conclusions [2] - 119:8; 144:11

concrete [4] - 6:15; 69:23; 70:1, 22

concretely [1] - 72:5

conditions [5] - 21:6; 22:19; 54:12; 57:17; 58:11

conduct [14] - 4:3; 38:24; 72:8; 75:5; 77:24; 81:3; 113:21; 138:19; 141:7; 149:11, 16, 24; 150:4

conducted [7] - 36:1; 57:11, 14; 86:1; 150:8, 20

conducting [6] - 2:25; 6:1; 85:10; 150:17; 152:20;

160:16

conducts [1] - 113:24

conference [3] - 56:21; 86:20; 117:20

conferences [7] - 14:8; 21:14, 23; 22:3; 56:9; 61:5; 119:24

confidence [4] - 6:11; 60:14, 19; 154:3

confident [2] - 23:17; 153:21

confidential [1] - 98:12

configuration [1] - 41:15

configured [2] - 41:3; 85:22

confirmed [1] - 41:21

confirming [1] - 97:13

conform [1] - 82:11

conforming [1] - 96:22

confounding [1] - 137:16

confront [3] - 13:10; 76:18; 134:6

confronted [1] - 134:6

confronts [1] - 8:23

congratulate [1] - 14:24

congratulations [1] - 15:19

congruent [1] - 148:4

conjunction [1] - 64:21

connected [4] - 41:20; 135:1; 137:10; 164:17

connection [1] - 81:23

CONROY [1] - 2:12

Conroy [1] -

2:13

conscious [2] - 162:3, 12

Consent [62] - 2:22; 3:3, 7, 20; 5:6; 6:16; 7:17; 8:6; 9:4, 23; 11:4, 13; 13:4, 12, 18; 14:5; 16:2; 20:21; 24:12, 18; 25:20; 26:12, 15; 28:14; 29:12, 18; 42:20; 46:12; 64:24; 71:3, 20; 72:9; 76:22, 25; 80:17; 83:14, 25; 91:8; 95:6; 97:8; 111:5, 14; 121:7; 122:23; 129:15; 130:8, 21; 131:14; 132:3, 12; 133:13, 15; 138:18; 143:18; 144:25; 145:18; 148:2; 151:15, 18; 152:5, 24; 161:13

consequence [7] - 43:19, 22; 57:2; 60:5; 74:11; 77:7; 120:2

consequences [3] - 9:15; 49:20; 106:16

considerable [3] - 126:13; 146:9

consideration [3] - 57:3; 101:13; 164:11

considered [2] - 69:10; 84:3

considering [3] - 25:7; 91:11; 157:4

consistent [4]

- 96:14; 112:13; 141:25

consistently [4] - 70:16; 102:4; 112:10; 132:4

constant [1] - 84:1

constantly [4] - 21:3, 9; 22:19; 23:3

constitute [1] - 73:3

constitution [2] - 38:9; 74:25

Constitution [1] - 4:20

constitutional [4] - 11:25; 26:16; 80:22; 111:13

constitutionally [2] - 17:21; 150:22

constrain [1] - 135:12

constraints [1] - 71:3

construct [1] - 42:14

consult [1] - 110:13

consultants [1] - 22:10

consultation [1] - 152:15

consultations [1] - 105:24

consumer [1] - 42:17

consumption [1] - 106:8

contacts [1] - 80:4

contain [1] - 91:10

contemplate [1] - 144:22

contemplated [2] - 76:22; 142:25

contemporary [1] - 4:19

content [3] - 34:16; 99:5; 111:8

context [11] -

68:13; 69:4; 75:25; 88:17; 121:5, 7, 9; 135:22; 140:7; 141:5, 17

continually [1] - 30:15

continuation [1] - 89:19

continue [26] - 10:24; 12:25; 16:12; 19:7, 10, 15; 23:17; 28:24; 29:8; 30:9; 31:13; 32:13, 20; 34:1; 44:23; 64:17; 85:2, 4; 120:7; 121:16; 122:13; 123:18; 129:18; 146:1; 158:7, 13; 159:1

continued [1] - 155:15

continues [10] - 11:9; 32:11; 41:24; 43:16; 68:23; 148:10; 154:23; 156:2; 157:13; 161:2

continuing [11] - 19:19; 29:10; 30:11; 34:9; 41:14; 45:24; 60:14; 68:22; 146:10; 148:6; 158:20

continuous [3] - 64:20; 144:1

contract [4] - 57:7, 22; 60:19; 135:16

contracted [3] - 109:24; 124:7, 9

contractor [1] - 60:14

contracts [1] - 120:17

contribute [6] - 13:6, 24; 99:16; 105:4; 109:21; 138:2

contributes [1] - 49:4

control [4] - 12:25; 71:4; 101:5; 152:25

controlled [1] - 135:14

conundrum [1] - 45:1

convened [1] - 140:23

convenes [1] - 2:25

conventional [1] - 117:24

conversation [10] - 57:10; 59:3; 88:13; 116:24; 121:12; 136:11, 21; 141:16; 165:23

conversations [6] - 57:6; 58:23; 115:11; 143:8; 161:9; 164:10

conveying [1] - 72:6

COOPER [16] - 2:5; 68:7, 9, 12; 70:4; 71:12, 19; 77:12, 16; 95:3; 96:3, 21, 24; 97:3; 111:12; 112:18

Cooper [5] - 2:5; 68:8; 77:9; 95:2; 111:11

cooperation [2] - 11:17; 102:15

coordination [6] - 35:10; 64:21; 65:2, 11; 83:2; 115:9

coping [1] - 9:13

COPS [1] - 27:25

cops [1] - 154:18

core [4] - 3:21; 16:3; 55:19; 91:4

corp [1] - 39:4

corporate [1] - 63:18

correct [14] - 46:20, 22, 25; 47:13, 23; 75:12; 89:17; 108:6; 124:21; 137:12; 152:16; 162:18, 21

correcting [3] - 89:21; 114:3; 126:4

Corrections [1] - 115:10

corrections [2] - 84:8; 116:3

corrective [4] - 151:4

correctly [2] - 59:13; 162:24

cost [2] - 61:19; 75:4

Council [1] - 21:18

counsel [1] - 160:5

Counsel [1] - 2:13

counseled [1] - 106:10

counseling [5] - 104:19; 106:3; 108:12; 111:19; 157:10

counselled [1] - 162:16

counties [1] - 116:7

country [11] - 9:1; 22:2; 23:7, 18; 27:21; 28:6, 15; 32:19; 104:3; 124:5

counts [1] - 123:7

county [1] -

107:23
**couple** [8] -
23:25; 61:1;
69:16; 98:6;
127:6;
130:19;
142:21;
159:15
**courage** [1] -
51:12
**Courageous**
[2] - 111:25;
157:15
**Course** [1] -
34:9
**course** [38] -
5:8; 33:13;
34:2, 4, 8,
15, 17-18,
21-22, 24;
35:1; 43:5, 9;
47:24; 53:21;
54:9; 56:8;
60:4; 65:19;
89:10; 90:19;
91:1, 17;
98:11;
103:11, 18;
110:3; 117:2;
121:18;
129:22;
132:3; 139:2;
146:6; 167:3
**courses** [1] -
131:3
**court** [9] -
14:1; 35:16,
20; 57:25;
83:1; 99:11;
129:9; 160:1;
167:23
**COURT** [208] -
2:2, 7, 17,
24; 14:21,
24; 15:4, 18,
24; 19:23;
20:6, 9;
21:12; 22:17;
25:2; 26:5, 7;
31:14; 32:7,
24; 33:1, 6,
10, 23, 25;
36:9, 12;
37:2, 10;
39:2, 7, 23;
41:10; 42:2,
12, 16; 43:1,
7, 17; 44:1,
14; 46:17,
21, 23; 47:1,

12, 17; 49:1;
51:4, 11, 21,
24; 52:6, 9;
53:11; 55:15,
22, 25; 56:4,
6, 20; 57:8,
23; 58:16;
59:16, 18;
60:4, 8, 13,
21; 62:6, 25;
63:14, 21,
24; 64:3, 15;
66:14, 17,
21; 68:4, 8,
10; 70:3, 20;
71:14; 72:10;
73:18, 23;
74:5, 7, 10,
16, 23; 75:3,
18, 23;
76:13, 20;
77:5, 13;
78:24; 79:7,
13; 80:12;
81:18; 83:21;
84:16; 85:17;
86:14, 19;
87:4, 14, 18;
88:2, 7, 23;
89:3; 90:4, 6;
91:21; 93:10,
13; 94:6;
95:2, 24;
96:16, 22;
97:1, 4, 12;
106:9, 15;
107:7; 108:5;
111:3;
112:17, 19;
115:3, 14,
20; 116:14;
117:15, 19;
119:12, 23;
120:19;
121:19, 22;
122:14, 25;
123:9;
124:12, 17;
125:6, 14;
128:20;
129:1, 6, 11;
134:11;
137:9, 13;
138:7, 9, 25;
139:3; 140:3;
142:8; 17;
144:9; 146:6;
147:25;
149:2, 4, 6;
151:24;
153:9;

154:22;
155:1, 3, 5;
156:21, 25;
159:3, 8, 11,
19, 22;
160:1, 5;
161:4;
162:16, 19;
163:4, 11;
164:7, 20;
165:20;
166:5, 12,
17, 23;
167:2, 5, 8,
13, 16
**Court** [48] -
2:19, 22, 24;
3:4, 8, 17;
5:9; 6:3, 17;
7:9; 9:19;
10:16, 21;
11:14; 16:6;
19:17; 27:3;
28:9; 33:16;
38:4; 42:20;
48:11; 65:7,
10; 75:8;
86:20;
108:16;
120:24;
129:8, 24;
132:3, 10;
133:19, 23;
134:5;
138:11, 17;
139:8, 14;
141:1, 18;
144:20;
145:11, 17;
146:6; 147:8;
148:18;
164:16
**court's** [2] -
4:25; 137:19
**Court's** [9] -
3:5; 7:8;
9:17; 14:11;
26:10;
101:13;
134:1; 136:8;
144:18
**court-**
**supervised**
[1] - 14:1
**courtroom** [2]
- 38:4; 139:3
**cover** [2] -
80:23; 144:4
**covered** [6] -
79:6, 16;

97:1; 107:10;
139:9
**covering** [1] -
139:18
**covers** [1] -
34:2
**COVID** [2] -
63:15; 89:5
**COVID-19** [2] -
102:25;
103:3
**crack** [2] -
136:9;
164:24
**crafting** [1] -
142:23
**crashes** [1] -
122:3
**create** [1] -
67:22
**created** [3] -
37:24; 46:1;
80:20
**creating** [2] -
63:9; 66:5
**credibility** [1] -
145:11
**credit** [1] -
34:10
**crime** [23] -
11:4, 10,
20-21, 23;
12:20, 25;
13:6, 19, 25;
14:2; 16:21;
17:2, 7;
19:10; 23:8,
15-16, 19;
24:4, 11;
71:4; 124:22
**crime-**
**fighting** [3] -
23:15, 19;
24:4
**criminal** [1] -
75:5
**criminally** [3] -
46:5
**crises** [2] -
28:11; 78:14
**crisis** [13] -
4:2, 7; 8:12;
9:6, 19; 11:2;
22:4; 28:16;
34:20; 45:1;
135:18;
136:2;
139:19
**criteria** [1] -
73:2

**critical** [25] -
8:1; 25:25;
30:16; 32:12;
40:17; 42:7,
17-19;
43:21; 44:4;
47:18; 49:10;
50:1, 24;
71:20; 72:9;
78:6; 95:16;
111:3;
128:10, 14;
154:17;
159:3
**criticism** [1] -
115:15
**cross** [2] -
91:10;
105:13
**cross-section**
[2] - 91:10;
105:13
**crucial** [2] -
95:11, 14
**crude** [2] -
87:8; 146:4
**cultivate** [1] -
154:3
**cultural** [1] -
152:22
**culture** [8] -
38:19; 39:4,
8; 110:8;
124:25;
152:19;
153:6;
154:20
**current** [9] -
4:16; 14:5;
18:25; 41:17;
42:7; 96:15;
113:8;
130:12;
134:2
**curricula** [1] -
131:2
**cursory** [1] -
17:17
**curve** [1] -
131:14
**custody** [9] -
33:19; 66:15;
77:18;
112:21, 25;
121:10;
128:2;
133:25;
166:17
**custody's** [1] -
126:15

**cynic** [1] - 60:4

## D

**daily** [2] -
42:13;
110:15
**dangerous** [1]
- 166:13
**dashboard** [1]
- 99:10
**data** [73] - 6:3,
8, 15; 7:4,
11; 13:19;
30:2, 4, 10;
36:21; 41:8;
46:10; 47:7;
50:14; 53:4,
20; 59:17;
67:18; 69:23;
70:1, 22;
71:7; 72:11;
76:3, 12;
81:8, 15;
82:24; 84:22,
24; 85:10,
20, 23;
86:11; 87:20,
22, 25;
94:12; 99:20;
100:17, 20,
23;
101:11-13;
109:16;
113:14;
114:15;
116:19;
117:3, 8, 18;
119:7;
127:11, 14;
129:22;
130:6;
139:13;
142:15;
144:2;
148:13;
149:19;
151:19;
163:7, 14
**data-driven** [2]
- 100:23;
130:6
**database** [1] -
162:6
**dataset** [1] -
76:4
**date** [6] - 5:13;
10:9; 15:13;
41:23;
159:19, 24

**daunting** [2] -
8:20; 144:22
**Dave** [1] - 2:5
**days** [5] -
48:12, 14,
17, 20; 124:1
**DC** [12] -
37:13; 39:14;
51:16; 69:12,
18; 78:23;
95:6, 23;
120:24;
124:8; 126:3
**de** [2] - 106:25;
107:8
**deal** [3] - 8:12;
109:23;
130:18
**dealing** [2] -
115:16;
136:16
**decades** [3] -
12:4; 17:22;
38:19
**December** [4] -
3:14; 93:23;
126:10;
166:20
**decide** [1] -
144:1
**decided** [3] -
25:8; 37:15
**decision** [5] -
21:11; 97:13;
101:6; 109:2;
162:3
**decisionmaki**
**ng** [1] -
153:22
**decisions** [3] -
24:6; 69:9
**decline** [2] -
16:21; 76:7
**decrease** [3] -
16:25; 18:9;
157:3
**decreased** [1]
- 73:14
**Decree** [104] -
2:23; 3:3, 7,
16, 20; 4:13,
17; 5:6, 16;
6:16; 7:12,
17, 20; 8:6;
9:4, 18, 23;
10:23; 11:4,
14; 12:7;
13:4, 12, 18;
14:6; 16:3;
20:21; 24:12,

19; 25:13, 20, 25; 26:12, 15; 28:14; 29:13; 42:20; 46:12; 64:24; 65:19; 67:8; 68:18; 70:18; 71:3, 20; 72:9; 76:22; 77:1, 25; 80:17; 83:14, 25; 85:16; 87:7; 90:10; 91:8, 18; 92:13; 95:6, 11; 96:12, 15; 97:8; 100:10; 111:4, 7, 14, 18; 112:13; 114:18; 117:7, 22; 119:20; 121:8; 122:23; 123:10; 125:3; 129:16; 130:9, 21; 131:15; 132:3; 133:13, 15; 137:20, 22; 138:3, 18, 22; 140:7; 142:3, 20; 143:18; 144:17; 145:18; 148:2; 151:16, 18; 152:5, 24; 161:13
**Decree's** [2] - 132:13; 144:25
**Decrees** [1] - 29:18
**decrepit** [1] - 4:10
**dedicated** [1] - 19:19
**deem** [1] - 15:8
**deep** [2] - 3:15; 12:8
**deeply** [2] - 12:11; 95:9
**deescalate** [2] - 74:7; 140:21

deescalation [1] - 34:7
**defendants** [9] - 3:10; 5:10, 13; 6:4, 20; 9:18; 10:14; 14:10, 13
**defendants'** [3] - 5:15; 8:20; 33:8
**Defense** [1] - 135:25
**defer** [1] - 33:2
**deficiencies** [2] - 31:18; 142:14
**deficiency** [1] - 21:2
**defined** [1] - 4:25
**defining** [1] - 4:22
**definitely** [1] - 163:9
**degree** [4] - 73:4; 136:11; 152:23
**delay** [1] - 46:7
**deliver** [3] - 34:24; 41:16; 148:6
**delivered** [7] - 4:6; 91:2; 93:19; 99:19; 113:1; 120:22; 162:19
**delivering** [3] - 9:8; 23:3; 81:4
**delivers** [1] - 146:11
**delivery** [1] - 84:19
**delta** [2] - 52:9; 151:18
**demand** [3] - 109:18; 110:1; 153:4
**demands** [1] - 8:6
**demographic** [3] - 62:3, 5; 99:16
**demographics** [1] - 91:14
**demonstrate** [12] - 66:8; 67:23; 86:13; 94:19; 98:6,

21; 100:14; 114:2; 119:10; 120:11; 125:5
**demonstrated** [9] - 6:18; 8:17; 56:25; 67:10; 83:1; 124:25; 125:19; 152:3
**demonstrates** [3] - 104:3; 105:24; 113:8
**demonstrating** [4] - 23:7, 18; 112:9, 12
**demonstration** [2] - 45:22; 81:13
**demonstrations** [2] - 111:23; 112:12
**denigrate** [1] - 136:16
**departed** [1] - 52:3
**Department** [138] - 2:13, 21; 3:2, 21; 4:15; 5:18; 6:17, 21; 7:1, 10; 8:9-11, 21; 9:8, 10, 17, 20, 23; 10:4, 6, 14; 11:5, 8, 16, 18; 12:4, 14; 13:1, 24; 14:10, 13, 25; 15:8; 16:2, 7, 25; 17:6, 15, 24; 19:4, 22, 24; 20:20; 21:20; 24:5; 25:4; 28:1, 8, 20-21, 25; 29:23; 31:23; 32:1, 14; 37:13; 38:3; 39:11; 41:12; 42:19; 43:20; 44:5, 16, 18, 24; 46:19; 48:3; 49:7; 59:11; 60:6;

68:1, 4, 25; 71:16; 72:1; 79:3; 81:23; 82:2, 10, 18; 84:7; 86:21; 88:14; 90:17; 91:1; 97:19, 25; 99:9; 107:13; 110:18; 113:6, 13; 115:10; 119:18, 25; 121:13; 130:4; 134:21; 135:11; 136:1; 140:22; 141:2, 10, 13, 25; 142:4, 13, 22; 143:22; 145:9, 13, 21, 23; 146:16, 19; 147:2, 4, 8-10, 20; 148:2, 21; 149:1, 17; 153:10, 14; 156:19; 157:2, 9, 20-21; 164:21; 167:14
**department** [46] - 3:22; 4:24; 5:3; 7:22; 9:1; 12:3, 10; 14:3; 16:4; 20:12; 22:9; 23:4; 25:11, 16, 18; 37:14; 47:4, 17; 49:25; 50:12; 53:15; 59:24; 72:7; 74:21; 83:23; 97:10; 104:1; 106:11; 109:22; 110:20; 119:16; 125:7; 129:14; 130:7, 13; 131:4, 7, 21; 132:2, 11; 134:14;

135:1; 136:2; 137:19; 165:21
**Department's** [8] - 11:19; 31:16; 40:3; 78:7; 132:25; 152:2, 11; 165:22
**Department-wide** [2] - 113:6, 13
**department-wide** [2] - 3:22; 16:4
**departments** [5] - 4:23; 13:13; 28:3; 104:3; 155:13
**departure** [1] - 53:11
**dependent** [2] - 127:24; 141:8
**depleted** [1] - 26:1
**deploy** [1] - 22:22
**deployed** [3] - 81:17; 86:9; 111:23
**deploying** [1] - 8:3
**deprivation** [1] - 158:15
**depth** [1] - 15:5
**Deputy** [8] - 2:11; 15:14; 16:20; 22:7; 37:11; 51:9; 59:7; 97:7
**deputy** [2] - 42:24; 139:3
**DEPUTY** [34] - 43:2, 10, 24; 44:9; 45:2; 46:20, 22, 25; 47:8, 13, 23; 50:25; 51:5, 22, 25; 52:15; 53:19; 55:14, 17, 24; 56:7; 57:4, 9; 58:8, 22; 59:5; 60:11, 18; 61:16; 63:23; 121:11, 21;

122:7; 124:6
**Derek** [1] - 33:21
**described** [1] - 96:3
**describing** [3] - 67:21; 148:6; 153:12
**deserved** [2] - 12:13; 51:12
**deserving** [1] - 57:2
**design** [1] - 58:16
**designated** [2] - 133:2; 163:5
**designating** [1] - 64:12
**designing** [1] - 4:23
**desired** [1] - 138:22
**desk** [1] - 76:6
**desktop** [1] - 40:7
**desperately** [2] - 121:6; 137:23
**despite** [3] - 6:6; 9:7; 52:24
**destigmatization** [1] - 104:11
**destigmatize** [1] - 104:7
**destination** [1] - 113:18
**destruction** [1] - 49:5
**detail** [6] - 3:17; 41:6; 66:22; 69:21; 77:19; 112:23
**detailed** [2] - 10:22; 75:21
**details** [3] - 61:25; 86:15; 113:18
**detainees** [2] - 114:10; 119:6
**detect** [1] - 70:25
**detected** [1] - 72:12
**detecting** [1] -

38:1
**detectives** [9] - 4:6; 43:4, 13; 44:21; 48:8, 14-15, 22; 49:14
**deteriorate** [1] - 12:5
**determination** [2] - 145:20; 146:4
**determinations** [2] - 144:7; 145:4
**determine** [4] - 96:2; 142:12; 144:6; 145:8
**determined** [3] - 24:22; 37:14; 154:12
**determining** [1] - 141:24
**develop** [2] - 131:2; 154:5
**developed** [7] - 17:19; 113:5; 132:22; 155:15; 157:9, 19; 160:12
**developing** [1] - 83:13
**development** [1] - 156:11
**developments** [1] - 36:9
**device** [3] - 63:5; 86:17; 155:23
**devices** [2] - 86:23; 87:15
**devised** [1] - 3:22
**devising** [1] - 16:4
**die** [1] - 10:3
**difference** [1] - 28:24
**differences** [1] - 13:10
**different** [32] - 4:18; 15:5; 27:10; 41:4; 44:18; 57:10; 63:7; 65:14; 81:20; 83:20, 22; 85:16;

1/26/23 Quarterly Consent Decree Hearing

94:4, 23;
108:11;
109:1;
110:21;
114:6, 17;
117:8;
118:13;
119:10;
128:24;
129:3;
140:13;
141:12;
142:18;
148:8;
149:10;
154:7;
162:17
**difficult** [7] -
12:12; 25:15;
50:11;
126:20;
132:12, 18;
136:17
**dig** [2] - 12:7;
27:12
**digit** [1] - 73:5
**digital** [12] -
55:1, 3;
61:12; 62:8,
17, 24; 63:9;
98:10;
100:14;
115:1; 117:9,
14
**digitally** [4] -
62:5-7, 11
**digitized** [1] -
116:17
**digitizing** [1] -
114:22
**dignity** [1] -
90:23
**diligently** [1] -
120:15
**direct** [3] -
3:12; 136:3;
148:19
**directed** [2] -
129:9; 165:7
**directing** [1] -
134:19
**direction** [9] -
4:18; 46:9,
16; 49:12,
15; 51:2;
60:17; 81:25;
152:15
**directions** [2] -
6:6; 147:1
**directive** [3] -

83:25;
129:17;
137:25
**directly** [4] -
83:23; 98:10;
109:21;
134:20
**Director** [1] -
97:7
**disallowed** [4]
- 18:1, 9, 17;
19:9
**disappear** [1] -
49:6
**disappoint** [1]
- 159:10
**discharge** [1] -
7:9
**discharging**
[1] - 75:4
**disciplinary**
[7] - 102:8,
14, 18;
107:6, 24;
108:3; 161:3
**discipline** [7] -
4:4; 34:4;
47:21; 69:14;
74:15;
106:19
**discourage** [1]
- 60:8
**discouraging**
[1] - 127:3
**discreet** [1] -
99:4
**discretion** [2] -
83:15; 89:14
**discriminator
y** [1] - 90:14
**discuss** [5] -
61:23;
113:15;
134:9;
157:11;
163:10
**discussed** [14]
- 36:21;
69:19; 86:19;
95:12, 23;
112:4;
114:23;
115:4;
117:19;
119:23;
130:23;
133:23;
139:21;
164:3
**discussing** [2]

- 77:19;
88:12
**discussion** [8]
- 11:8; 60:2;
61:17; 69:5;
78:25;
128:22;
133:19;
149:2
**discussions**
[5] - 22:2;
61:17, 22;
134:4;
159:18
**disjointed** [1] -
40:13
**dispositive** [1]
- 76:12
**disputes** [1] -
29:6
**disservice** [1]
- 145:12
**distance** [2] -
6:10; 145:22
**distinct** [2] -
80:3; 148:1
**district** [7] -
40:20; 93:25;
113:23;
118:10, 12;
156:6
**District** [1] -
23:14
**districts** [10] -
40:17, 21,
25; 41:2, 5;
92:8; 98:8;
118:23;
120:3; 156:7
**dive** [1] - 3:15
**diverse** [4] -
55:19;
108:25
**diversity** [1] -
58:18
**divert** [1] -
106:17
**divide** [2] -
55:3; 61:12
**division** [1] -
132:24
**Division** [4] -
27:23; 33:22;
38:14; 39:25
**DMS** [1] -
155:24
**DNA** [1] - 91:5
**doable** [1] -
133:10
**docket** [1] -

3:9
**Doctor** [1] -
160:13
**document** [3] -
3:15; 113:17;
150:23
**documentati
on** [10] - 36:3;
39:17; 81:10;
89:14; 98:15;
100:6;
126:14;
163:18, 22;
164:5
**documented**
[4] - 5:22;
61:13;
128:13;
151:1
**documenting**
[2] - 112:11;
151:2
**DOJ** [10] -
27:19; 30:20,
23; 88:17;
90:6; 95:1,
16; 125:24;
147:21;
151:23
**DOJ's** [1] -
27:21
**dollars** [1] -
91:23
**done** [35] -
20:20; 22:2;
23:22; 26:1;
32:6; 38:1;
55:22; 56:22;
57:5; 59:13;
62:2; 64:20;
65:12; 67:4;
85:3; 91:7;
94:7; 99:4;
102:21;
119:1; 124:3;
129:18;
131:24;
133:12,
20-21;
137:4; 140:4,
12; 143:3;
145:17;
155:16;
158:16;
162:24;
166:12
**double** [1] -
73:5
**double-digit**
[1] - 73:5

**doubled** [1] -
106:2
**doubt** [1] -
60:23
**down** [25] -
43:14; 44:25;
46:14, 21,
24; 48:20;
49:14; 61:21;
67:1; 76:10;
80:7; 86:1;
88:21;
114:12;
127:11;
128:18;
132:7;
139:22;
160:2, 9;
164:13
**downs** [1] -
80:25
**downward** [1]
- 18:19
**dozen** [1] -
110:21
**Dr** [4] - 149:5;
151:24;
154:24
**DR** [5] - 149:7;
152:17;
154:14, 20;
155:2
**draft** [1] -
139:20
**drafted** [1] -
4:5
**Drake** [1] -
155:4
**DRAKE** [3] -
155:6;
156:22;
157:1
**dramatic** [4] -
18:9; 93:20;
97:23;
130:23
**dramatically**
[2] - 129:20;
146:23
**drastically** [1]
- 16:8
**draw** [1] - 97:6
**drive** [3] -
63:8; 124:2;
161:1
**driven** [3] -
18:5; 100:23;
130:6
**drivers** [3] -
12:20; 13:7;

113:7
**driving** [9] -
12:25;
118:14;
119:14;
122:3, 16;
124:8;
126:14;
160:11, 18
**drop** [3] - 70:5,
7; 93:23
**drop-off** [1] -
93:23
**drug** [2] -
72:25; 73:6
**drugs** [1] -
13:7
**drum** [1] -
92:25
**due** [3] - 41:23;
106:11;
108:24
**dug** [1] - 53:23
**DUI** [1] -
107:23
**duplicate** [1] -
164:3
**duplicating** [1]
- 114:25
**duration** [2] -
85:25; 120:7
**during** [17] -
3:1; 12:17,
20; 34:19;
48:1; 76:2, 9;
81:16; 89:25;
95:5; 98:16;
112:12;
124:8;
143:23;
149:11, 17;
165:2
**duties** [1] - 7:9
**duty** [2] -
111:21;
140:20
**dynamic** [1] -
131:4

---

**E**

---

**E&T** [2] -
38:19; 39:19
**eager** [1] -
33:25
**EAP** [1] - 156:11
**earliest** [1] -
141:7
**Early** [1] -
41:19

**early** [13] -
6:16; 37:13;
38:1; 69:5;
101:14-16,
23; 102:4;
125:2; 133:3;
136:22;
151:2
**earnest** [1] -
144:15
**ears** [1] - 72:19
**ease** [2] -
127:13, 20
**easily** [1] -
29:21; 143:3
**easy** [4] -
12:21; 88:3;
124:3; 133:9
**eat** [1] - 145:7
**Ebony** [2] -
2:8; 14:22
**economy** [1] -
12:22
**ecosystem** [6]
- 149:20;
150:1, 13;
151:11, 21;
152:18
**edge** [1] -
112:2
**educated** [1] -
37:12
**educating** [1] -
93:2
**education** [1] -
54:9
**Education** [2] -
33:22; 38:14
**educational**
[3] - 12:24;
13:8; 18:5
**effect** [5] -
40:14; 66:9;
91:17; 95:18
**effective** [5] -
11:25; 13:4;
26:16; 35:19;
94:23
**effectively** [2]
- 9:24; 81:17
**effectiveness**
[2] - 11:20;
13:5
**effects** [2] -
71:8; 138:23
**efficient** [1] -
144:13
**effort** [17] -
3:16; 4:12;
10:9; 16:11;

1/26/23 Quarterly Consent Decree Hearing

40:21; 44:23;
65:3; 85:1;
99:3; 100:22;
101:7; 130:1;
131:23;
151:13;
159:15;
163:13;
166:11
**efforts** [19] -
9:7; 16:12;
19:3, 8, 15,
20; 28:3;
51:8; 54:5, 8;
65:4, 12;
93:2; 99:9;
110:19;
147:4; 150:2
**eight** [4] -
41:20; 52:12;
155:12
**eighth** [1] -
64:7
**EIS** [5] - 41:19;
108:15;
109:7, 11;
151:4
**either** [9] -
64:19; 74:15;
104:1; 105:4;
114:13;
147:23;
149:22;
150:14;
160:23
**either/or** [1] -
108:5
**elapse** [1] -
142:15
**elapsed** [1] -
142:11
**eLearning** [2] -
3:23; 113:6
**election** [1] -
81:19
**electronic** [1] -
48:23
**electronically**
[1] - 114:24
**element** [2] -
44:4; 101:23
**elements** [5] -
13:15; 25:24;
108:19;
135:24;
140:14
**eligible** [1] -
56:17
**eliminate** [1] -
40:1

**elimination** [1]
- 40:12
**eloquently** [2]
- 16:17;
162:13
**emerging** [1] -
141:4
**emotional** [1] -
111:16
**emphasized**
[1] - 18:21
**employed** [2] -
72:14;
156:18
**Employee** [1] -
155:20
**employees** [2]
- 60:1;
155:19
**employment**
[1] - 62:11
**enabled** [2] -
40:18, 21
**enacted** [1] -
90:18
**encompass**
- 33:15
**encounter** [1] -
156:17
**encounters** [2]
- 76:2, 10
**encourage** [2]
- 58:20;
158:13
**encouraged**
[5] - 38:13,
24; 84:15;
89:9; 92:3
**encourages**
[1] - 102:21
**encouraging**
[13] - 31:10;
32:22; 67:15;
70:6; 76:7,
15; 97:18;
106:8; 108:9;
125:3; 126:6,
11; 127:2
**end** [26] -
23:12, 23;
36:7; 37:24;
38:8; 41:8;
48:13; 64:9;
66:2; 79:22;
81:4; 86:8,
11; 105:10;
106:10;
110:5, 9;
113:6; 118:6;
139:23;

150:8, 12;
159:16;
163:15
**endeavor** [1] -
7:19
**endeavored**
- 146:15
**endorses** [1] -
3:18
**ends** [1] -
135:16
**energy** [2] -
25:3; 128:17
**enforcement**
[19] - 7:7;
8:22, 25;
16:19; 17:3;
18:10, 15;
23:16; 25:7;
28:1, 10, 18;
62:21; 63:4,
19; 82:21;
83:8; 110:22;
135:23
**engage** [5] -
32:12;
132:16;
134:12;
136:21;
155:25
**engaged** [9] -
17:25; 18:16;
29:16; 52:23;
77:4; 103:15;
104:6; 106:5
**engagement**
[5] - 25:22;
30:16; 61:22;
73:3; 78:16
**Engagement**
[1] - 18:16
**enhancement
s** [4] - 54:10,
13, 25;
149:19
**enormous** [1] -
22:1
**ensure** [20] -
8:4; 45:25;
56:9; 66:7;
69:9; 72:4;
81:15; 84:25;
85:12; 91:5;
93:2; 96:13;
102:21;
111:22;
114:16;
115:12;
118:17;
120:16;

152:22, 25
**ensured** [2] -
17:22; 81:6
**ensuring** [6] -
13:23; 68:22;
69:14; 112:8;
114:22;
125:4
**enter** [1] -
133:15
**entered** [5] -
3:3, 6, 9;
18:1; 92:4
**entering** [1] -
102:7
**entire** [10] -
8:23; 23:24;
24:1, 24;
40:10; 45:10;
65:19; 90:25;
94:2; 125:8
**entirely** [1] -
31:2
**entry** [2] -
35:3; 165:14
**entry-level** [1]
- 35:3
**environment**
[1] - 40:23
**environment
al** [1] - 101:4
**envision** [1] -
84:14
**envisioned** [3]
- 7:12; 9:21;
13:3
**envisions** [2] -
87:7; 133:1
**EPIC** [5] - 34:7;
39:6; 111:25;
112:11;
157:15
**EPIC-ABLE** [1]
- 34:7
**equal** [1] -
90:15
**equation** [1] -
53:12
**equipment** [6]
- 114:9;
117:5, 14;
119:5, 15;
127:8
**equipped** [1] -
121:2
**Equity** [2] -
45:24; 57:13
**equity** [1] -
59:12
**equivalent** [1]

- 89:4
**erection** [1] -
23:2
**errors** [1] -
86:11
**escape** [3] -
73:21; 74:1;
75:15
**especially** [11]
- 8:14;
35:18; 109:6,
8; 115:13;
116:2;
133:15;
144:2; 152:8;
153:15
**essential** [9] -
7:11; 20:6, 9;
28:17; 31:1;
42:21;
111:15;
126:1
**essentially** [4]
- 11:6;
66:19;
119:20;
144:23
**establish** [3] -
58:24; 60:21;
131:16
**established**
[3] - 7:20;
18:24; 132:9
**establishing**
[1] - 148:1
**establishmen
t** [1] - 26:16
**estate** [1] -
61:15
**et** [6] - 2:21;
12:24; 47:25;
75:5; 83:25
**Ethical** [2] -
111:25;
157:15
**evaluate** [3] -
6:15; 145:5;
148:16
**evaluated** [2] -
139:14;
143:20
**evaluating** [2]
- 42:18;
147:23
**evaluation** [12]
- 6:13;
141:6;
142:16;
143:9; 144:5,
21; 147:3, 6,

12; 148:14,
20, 24
**evaluations**
[5] - 38:7;
98:20;
111:21;
144:24;
145:16
**evangelizatio
n** [1] - 44:15
**event** [1] -
121:9
**events** [9] -
142:6;
161:17, 22,
24-25;
163:1;
167:18
**evermore** [1] -
138:15
**everyday** [1] -
135:12
**everywhere** [1]
- 166:4
**evidence** [3] -
31:22; 96:18;
98:19
**evidencing** [1]
- 130:21
**evidently** [1] -
81:19
**evolution** [1] -
7:6
**exact** [1] -
83:19
**exactly** [8] -
44:2; 61:18;
67:21; 96:2;
126:25;
148:6, 9
**examined** [1] -
99:14
**examining** [1]
- 87:22
**example** [13] -
7:1, 15;
28:13; 43:21;
66:24; 82:14;
95:24;
114:16;
116:16;
136:13;
140:14;
143:21;
162:15
**examples** [1] -
130:19
**excelling** [1] -
11:8
**except** [1] -

66:18
**exception** [1] -
153:8
**excessive** [1] -
71:22
**excited** [5] -
24:13; 26:17;
156:11;
158:15;
159:5
**exciting** [3] -
151:19;
159:8
**excuse** [3] -
36:24; 91:5;
160:10
**executed** [1] -
91:16
**executing** [1] -
80:22
**executives** [2]
- 73:10;
75:10;
121:15;
137:11
**exercise** [1] -
109:23
**exercising** [1]
- 106:6
**exist** [4] - 9:10;
58:19; 110:6;
118:2
**existed** [1] -
49:3
**existence** [1] -
148:5
**exists** [2] -
61:13;
116:19
**exit** [4] - 24:18;
26:14; 46:12;
85:25
**exonerated** [1]
- 50:10
**expanded** [1] -
81:9
**expect** [16] -
12:6; 81:21;
82:8; 83:20;
109:3;
131:18;
133:11;
134:6;
150:18, 23;
151:22;
152:18, 23;
154:20;
162:14
**expectation**
[4] - 90:21;

1/26/23 Quarterly Consent Decree Hearing

153:8;
161:12;
164:22
**expectations**
[1] - 159:9
**expected** [7] -
7:15; 25:20;
35:5, 8;
78:14; 126:4
**expecting** [2] -
87:11;
149:11
**expects** [1] -
133:21
**expedited** [1] -
48:16
**expense** [2] -
107:9, 13
**expenses** [1] -
107:12
**expensive** [1] -
107:9
**experience**
[11] - 15:5;
18:9; 35:19;
37:12; 44:12;
96:23;
102:20;
149:22;
151:14;
156:22
**experienced**
[1] - 152:8
**experiences**
[3] - 8:5;
12:12;
149:16
**experiencing**
[3] - 29:9;
30:13; 78:13
**expert** [1] -
42:16
**expertise** [2] -
63:1; 135:5
**experts** [1] -
133:22
**explain** [3] -
3:17; 87:9;
118:24
**explaining** [1]
- 162:13
**explanation**
[2] - 74:20;
75:21
**explicit** [1] -
76:21
**explicitly** [2] -
74:19; 90:11
**explored** [3] -
38:19;

134:15;
137:3
**exploring** [2] -
114:19
**expose** [1] -
44:2
**expression** [1]
- 133:11
**expressly** [1] -
3:17
**extend** [1] -
59:13
**extent** [5] -
107:9;
134:23;
140:6;
146:24;
151:1
**external** [8] -
40:19; 46:14,
17; 82:15;
84:2; 106:22;
138:2
**extra** [3] -
92:23; 98:6;
110:17
**extremely** [3] -
11:12; 17:10;
19:3
**eye** [1] - 59:12
**eyes** [1] -
154:23

---

**F**

---

**fabric** [1] -
13:9
**face** [6] -
20:23, 25;
38:22; 49:18;
51:25; 52:18
**faced** [1] -
117:21
**facilities** [2] -
58:23;
130:24
**facility** [5] -
4:11; 106:23;
148:12;
162:17;
165:17
**fact** [17] - 3:5;
11:10; 29:17;
47:2; 51:13;
58:17; 72:12;
79:9; 89:10;
95:6, 18;
96:17;
102:13;
125:24;

149:15;
155:19;
165:1
**factor** [4] -
71:3; 84:2;
102:10;
107:20
**factoring** [1] -
16:16
**factors** [12] -
10:19; 52:19;
99:15; 104:8;
105:5; 109:7;
111:9;
128:12;
134:3;
141:23;
142:1
**facts** [3] - 71:6;
89:1
**factually** [1] -
145:24
**failed** [2] -
71:1; 119:2
**failing** [2] -
38:6; 120:2
**failure** [2] -
13:18; 47:19
**failures** [2] -
32:13; 123:2
**fair** [13] - 3:24;
21:6; 33:17;
47:7; 62:17;
85:14; 90:1,
8, 11, 13;
91:15; 94:24
**faith** [3] - 49:5;
51:16; 152:6
**fall** [9] - 11:9,
23; 34:2, 8;
78:19, 21;
84:20; 131:9;
158:24
**falls** [2] - 15:1;
160:13
**false** [1] -
23:21
**familiar** [4] -
140:4;
142:17;
155:21
**family** [1] -
54:1
**fantastic** [1] -
97:10
**far** [13] - 6:2;
9:7; 21:16;
45:9; 56:17;
84:17; 97:12;
122:9;

129:20;
137:5;
139:22;
141:23;
155:7
**fashion** [1] -
45:14
**fast** [3] - 49:12;
121:17;
148:11
**faster** [2] - 9:1;
24:23
**fastest** [1] -
62:18
**fault** [1] -
137:15
**favor** [3] -
43:15; 44:14;
45:12
**fear** [2] -
102:18;
164:11
**February** [5] -
35:5; 41:23;
108:22, 25;
167:19
**federal** [3] -
28:20; 66:11;
90:16
**feedback** [3] -
17:12; 96:20;
141:2
**fellow** [1] -
157:11
**felt** [4] - 26:21;
29:21; 30:17;
158:6
**female** [14] -
53:6; 55:22;
56:8, 12, 22;
57:19; 58:1,
3, 10, 15;
59:1; 60:1;
161:16, 22
**fence** [1] -
136:24
**feverish** [1] -
87:12
**few** [21] - 9:15;
10:13; 18:14;
26:8; 51:8;
53:18; 54:9,
14; 61:24;
69:19; 70:6;
72:12; 112:7,
23; 140:13;
146:3;
147:15;
149:8;
159:14;

161:20
**fewer** [1] -
122:10
**fide** [1] - 56:25
**field** [21] -
7:14; 44:13;
54:11; 56:19;
73:6; 76:6;
80:4; 81:14;
84:23; 85:11,
19; 86:17,
20, 23; 87:6;
88:4; 110:8;
138:24;
153:9; 155:9;
158:4
**field-based** [1]
- 86:23
**field-level** [1] -
7:14
**fields** [2] -
85:21; 86:14
**fight** [2] - 13:6;
24:11
**fighting** [4] -
11:20; 23:15,
19; 24:4
**figure** [13] -
30:6; 62:2;
84:10;
110:24;
126:16, 21;
127:4, 10,
15; 128:3,
16, 18;
143:15
**figured** [1] -
118:17
**figuring** [3] -
110:7;
127:11;
141:7
**file** [5] - 7:16;
45:19; 86:5;
87:6; 153:22
**filed** [3] -
139:7, 25;
141:1
**filing** [1] -
132:5
**fill** [3] - 163:24;
164:2, 18
**filling** [2] -
163:20;
164:3
**filmed** [1] -
92:10
**final** [3] - 8:19;
127:4;
128:18

**finalized** [1] -
4:6
**finally** [9] -
14:11; 50:10;
78:9; 100:16;
113:21;
151:9, 19;
157:24;
159:19
**findings** [6] -
95:7; 128:13;
140:25;
141:9;
142:13;
146:17
**fine** [2] - 32:3;
77:13
**fine-tuned** [1] -
32:3
**finish** [4] -
27:16; 118:6;
128:16, 19
**finishing** [1] -
67:1
**fire** [1] - 136:4
**fireworks** [1] -
51:19
**First** [3] - 4:2;
78:3; 139:19
**first** [49] - 2:25;
4:16; 5:15;
7:17; 8:3;
14:10, 13;
15:17; 18:14;
20:3; 21:1;
22:20; 24:1,
13; 26:9, 24;
33:10; 34:15,
17, 19; 61:3;
70:10; 79:16;
80:17; 81:2;
83:1; 88:3,
22-23;
93:13; 100:7;
108:21;
111:7; 113:3;
121:8; 125:8,
16; 128:12;
140:14;
142:3; 152:9,
11-13;
153:19;
154:2, 16, 18
**first-line** [8] -
7:17; 8:3;
34:15, 17;
152:11, 13;
154:16, 18
**fit** [2] - 100:24;
131:7

**fitness** [2] -
109:20, 24
**fits** [1] - 141:9
**fitting** [1] -
125:9
**five** [5] - 40:22;
42:5; 54:3;
64:2; 156:23
**Five** [7] -
20:13; 27:5;
33:14, 20;
51:7; 67:25
**five-year** [1] -
54:3
**fix** [4] - 13:13;
32:16; 108:1;
126:17
**fixed** [2] -
127:7;
128:16
**flagged** [1] -
140:21
**flagship** [1] -
4:21
**flat** [1] - 88:16
**fleet** [6] -
114:16, 18,
20; 127:22;
128:1
**flesh** [1] - 44:2
**focus** [29] -
10:18, 20,
24; 14:7;
21:24; 24:15;
27:21; 28:7;
31:18;
55:18-20;
61:12; 68:17,
22; 79:2;
83:7; 102:2;
129:12, 20;
134:2; 137:8;
147:2, 4, 11,
13; 148:3;
149:9
**focused** [13] -
10:16; 21:21;
27:4; 28:21,
23; 31:3;
64:18; 67:17;
80:21; 116:1;
138:15;
155:12
**focusing** [1] -
137:7
**folks** [16] -
33:11; 45:5;
87:12; 92:17,
23; 93:5, 8;
100:11;

1/26/23 Quarterly Consent Decree Hearing

104:4;
105:25;
109:22;
110:23;
113:9;
118:19;
124:24;
145:22
**follow** [1] -
112:10
**followed** [2] -
95:8; 120:11
**following** [6] -
40:15; 48:6;
78:6; 89:19;
134:1;
157:25
**followup** [3] -
119:1;
121:14;
161:6
**fool** [1] - 52:1
**footage** [3] -
71:14;
160:21;
163:20
**FOP** [2] - 57:9,
21
**Force** [4] -
34:5; 113:24;
118:11;
155:11
**force** [54] -
3:24; 5:22;
34:11; 52:7;
64:9; 65:18;
70:2, 6, 8,
11, 13, 15,
21; 71:1, 23;
72:14, 24;
73:4, 11, 13;
74:4, 17;
75:12, 16,
21; 76:1, 4,
9, 16-17;
91:3, 9, 13;
93:18; 102:1;
103:9, 12,
15-16, 19;
110:11;
111:5;
139:10;
140:5, 9, 15,
17, 19;
143:3;
167:20
**forcefully** [1] -
73:19
**forces** [4] -
12:25; 13:11;

35:1
**Ford** [1] -
121:2
**forgetting** [1] -
66:5
**Form** [1] -
165:12
**form** [16] -
98:17;
113:16;
114:22;
116:17, 23;
117:1, 14;
150:7;
156:23;
163:19, 21;
164:1, 18
**formal** [2] -
102:7;
138:21
**formally** [1] -
152:1
**format** [2] -
79:24; 164:1
**formed** [1] -
36:17
**former** [6] -
4:10; 15:12;
82:7, 9;
115:15;
154:15
**formerly** [1] -
15:15
**forms** [4] -
99:24;
145:15;
164:2, 4
**formulate** [2] -
19:17;
163:23
**formulation**
[1] - 80:5
**forth** [11] -
47:6; 67:3;
71:16; 86:16;
116:6;
120:25;
147:22;
148:5; 154:3;
161:22;
165:22
**fortunate** [1] -
162:8
**fortunately** [1]
- 15:1
**forward** [40] -
5:8; 14:4;
15:7; 26:14;
30:22, 25;
31:9; 34:14;

43:12; 46:4,
6, 9, 11;
51:2; 58:2;
59:12, 25;
67:5, 7; 69:8;
72:3; 78:12;
80:6; 85:4;
87:20; 101:9;
102:3;
108:14, 20;
109:2, 5;
112:14;
134:7; 145:1;
149:14;
151:22;
167:18
**forwards** [1] -
148:11
**foster** [1] -
58:21
**foundation** [1]
- 18:24
**foundational**
[4] - 64:19;
90:14; 111:9;
140:18
**four** [13] -
20:4; 32:1;
37:22; 44:6;
62:8; 79:5;
81:4; 97:21;
113:7;
128:23;
139:8, 17;
142:1
**four-hour** [2] -
81:4; 113:7
**fourth** [2] -
36:14; 51:6
**framing** [1] -
158:20
**frankly** [5] -
9:4, 23;
21:24; 31:15;
137:10
**frequency** [5] -
106:4;
126:21;
127:1;
161:11, 16
**frequent** [4] -
70:12, 15;
99:17
**Friday** [1] -
34:12
**friendly** [1] -
149:24
**front** [15] -
15:22; 27:18;
36:21; 38:8;

42:3; 50:19;
51:18; 62:22;
101:24;
106:13, 22;
110:5, 9;
120:22
**fruit** [3] - 5:20;
130:5;
164:20
**fruitful** [1] -
148:11
**fruition** [1] -
164:13
**frustrating** [1]
- 5:16
**FTO** [2] - 34:17
**full** [18] - 4:15;
5:16; 7:2, 5,
11; 14:2;
19:19; 43:18;
51:1; 66:9;
70:18;
105:22;
108:9;
112:15;
117:11;
119:19;
123:13;
141:6
**full-on** [1] -
14:2
**fully** [12] - 7:7,
9-10; 13:6,
24; 43:22;
52:23; 86:9;
109:17;
112:9, 11;
126:2
**fulsome** [1] -
133:19
**function** [8] -
44:17;
102:14;
119:19;
130:22;
137:21;
148:17;
150:13
**functioning**
[2] - 13:13;
139:16
**functions** [3] -
9:13; 44:4,
25
**fundamental**
[9] - 6:18;
8:24; 12:21;
13:9; 22:5;
32:5; 58:20;
81:25; 93:10

**fundamentally** [3] - 5:18;
39:10; 49:10
**funding** [2] -
22:25;
120:17
**furthest** [1] -
132:2
**future** [3] -
9:24; 24:6;
131:19

## G

**gain** [2] -
10:22;
102:15
**gallery** [2] -
52:23; 57:14
**gaps** [4] - 8:14;
60:21;
114:15;
117:22
**gather** [2] -
101:13;
127:14
**gathered** [1] -
14:8
**gatherings** [1]
- 98:16
**gauge** [1] -
138:20
**gear** [1] -
104:25
**geared** [1] -
55:21
**gender** [6] -
56:24; 58:18;
59:18; 91:11;
161:16;
162:1
**genders** [1] -
117:5
**general** [15] -
5:23; 19:10;
34:13, 16;
43:4; 44:17;
69:13; 71:25;
72:1; 82:20;
103:2;
119:14;
120:14
**General** [1] -
121:13
**generally** [3] -
3:11; 30:19;
127:23
**generate** [2] -
7:3; 98:19
**generated** [3] -

22:9; 36:2;
140:25
**generates** [2] -
12:22; 164:8
**generations**
[1] - 140:11
**generous** [1] -
35:14
**genuinely** [1] -
137:16
**geographic** [1]
- 17:18
**germ** [1] - 63:3
**Giglio** [1] -
34:6
**Gillis** [1] -
120:24
**Gillis's** [1] -
124:8
**given** [11] -
65:23; 77:17;
88:21;
118:24;
123:23;
124:2; 125:9;
142:19;
144:3;
148:12;
160:12
**glad** [4] -
155:14;
157:6, 14;
166:15
**global** [1] -
14:6
**Global** [5] -
20:13; 27:5;
33:14, 20
**globals** [1] -
68:5
**goal** [8] -
24:17-19;
32:10, 21;
40:11;
132:14;
143:11
**goals** [2] -
42:3; 59:13
**God** [1] - 63:21
**golden** [1] -
136:13
**governing** [1] -
83:16
**Government**
[4] - 6:21;
22:12;
135:24;
164:12
**government**
[1] - 28:20

**governor** [2] -
137:4;
164:10
**Governor's** [1]
- 115:24
**Grace** [2] -
106:25;
107:8
**graded** [1] -
131:14
**gradually** [1] -
29:22
**graduate** [4] -
35:5, 7-8;
38:20
**graduated** [2] -
35:3; 37:21
**graduating** [1]
- 36:25
**graph** [1] -
52:1
**graphs** [1] -
66:14
**great** [10] -
21:4; 44:14;
51:16; 62:18;
79:2; 97:4;
130:18;
136:11;
154:20
**greater** [8] -
13:5; 40:25;
57:3; 65:20;
72:13; 74:17;
89:10; 97:25
**greatest** [2] -
23:6; 146:24
**greatly** [3] -
15:25;
105:14;
127:20
**green** [3] -
64:18; 67:18;
80:8
**gritty** [1] -
27:10
**ground** [4] -
9:9; 12:3;
43:7, 10
**grounded** [2] -
49:19; 131:5
**grounding** [1]
- 146:8
**Group** [2] -
16:22; 23:14
**groups** [2] -
29:7; 96:20
**grow** [1] -
156:2
**growing** [2] -

5:20; 157:14

**grows** [1] -
42:13

**growth** [1] -
157:20

**GTTF** [3] -
38:19; 39:7;
49:3

**guardrails** [2] -
7:20; 152:7

**guess** [2] -
14:21;
154:23

**guidance** [7] -
31:5; 83:16;
84:6; 87:2;
96:14;
102:23;
141:11

**Gun** [1] - 34:5

**gun** [4] - 17:1;
72:25; 73:6

**guns** [2] -
12:21; 13:8

**GVRS** [1] -
10:2

# H

**habits** [1] -
106:7

**half** [7] - 2:4;
18:17; 52:13;
65:24; 83:1;
92:4

**Hall** [1] - 19:14

**hammer** [1] -
50:21

**hammering** [1]
- 49:13

**hand** [2] -
87:9; 148:19

**handcuffs** [1] -
136:14

**handheld** [3] -
86:16, 22;
87:15

**handle** [1] -
163:11

**handled** [1] -
82:15

**handling** [3] -
82:1; 84:7;
99:8

**hands** [2] -
62:20; 74:5

**hanging** [1] -
164:20

**hard** [13] -
13:1; 26:18,

20-21;
29:12, 19;
30:8; 51:18;
127:5;
134:14;
135:17;
145:12;
158:12

**harder** [4] -
24:15, 22

**Harrison** [2] -
10:9; 21:21

**HARRISON**
[29] - 19:25;
20:11; 22:18;
26:3; 36:23;
37:3; 62:1, 7;
63:10, 15;
72:18; 73:20,
24; 74:6, 9,
12, 22; 75:2,
7; 106:21;
107:11, 21;
108:7;
115:23;
123:5, 22;
164:25;
166:4, 8

**hate** [1] - 132:1

**hats** [1] - 36:14

**Havre** [2] -
106:25;
107:8

**hazards** [1] -
19:9

**head** [3] -
33:21; 63:1;
134:25

**headquarters**
[1] - 41:3

**Health** [1] -
28:21

**health** [22] -
8:7, 15;
28:13; 34:11;
78:14; 98:11;
100:18;
101:9;
103:25;
104:7;
111:21;
151:21;
156:1, 4,
15-16;
157:2;
158:14, 21

**healthier** [2] -
47:5; 106:5

**healthy** [4] -
96:17; 111:8;

149:20;
156:19

**hear** [18] -
14:9, 16;
15:9; 20:12,
16; 21:22;
30:12; 33:25;
36:13; 49:7;
72:19; 74:16;
75:22; 78:24;
88:24; 129:4;
134:11

**heard** [6] -
14:17; 23:13;
111:20;
157:23;
159:22;
164:9

**Hearing** [1] -
2:23

**hearing** [22] -
3:1; 9:25;
14:4, 13;
15:7; 20:5,
17; 21:17;
22:14; 45:23;
50:17; 53:7,
24; 56:13;
61:20; 64:6;
90:2; 94:5;
123:17;
139:4;
167:10, 17

**hearings** [1] -
90:1

**heart** [3] -
51:1; 95:4;
129:17

**heavily** [2] -
63:20;
155:12

**held** [4] -
12:11; 115:3;
128:7;
160:15

**Hello** [1] -
155:6

**hello** [1] -
149:6

**help** [28] -
4:25; 23:16;
28:17; 31:6;
32:10; 56:11;
60:16; 63:21;
89:22;
102:22;
103:20;
104:11, 23;
106:25;
107:3, 16,

20; 108:1;
109:10;
110:1, 14;
140:3;
144:20;
156:12;
158:7;
160:20;
163:2

**helped** [1] -
106:17

**helpful** [3] -
9:13; 99:23;
135:21

**helping** [4] -
28:2; 68:22;
100:7

**helps** [3] -
58:6; 148:5;
158:18

**herculean** [1] -
9:7

**Herron** [1] -
110:20

**hesitate** [1] -
38:15

**hesitating** [1] -
76:17

**hidden** [1] -
31:21

**high** [8] - 5:11;
11:12; 44:22;
115:18;
152:23;
159:9; 164:4;
165:5

**higher** [2] -
22:12; 82:8

**highest** [3] -
16:9; 133:5

**highlight** [7] -
16:13; 19:10;
30:9; 31:12;
46:11; 59:23;
79:25

**highlighted**
[10] - 17:5;
18:3; 26:19;
28:13; 31:11,
19; 64:19;
127:13;
128:10;
142:1

**highlights** [2] -
5:12; 17:11

**highly** [3] -
61:7; 137:10;
141:8

**hinder** [1] -
120:10

**hindering** [1] -
134:3

**hire** [2] -
55:10;
132:25

**hired** [1] -
62:15

**hires** [1] - 52:3

**hiring** [4] -
52:4, 16;
60:25;
139:19

**Hispanic** [2] -
54:18, 20

**history** [3] -
9:4; 100:21;
125:9

**hit** [2] - 25:17;
157:21

**hold** [3] -
14:14; 34:20;
93:9

**holding** [2] -
47:3, 9

**holds** [1] -
7:21

**hole** [2] - 12:8;
49:6

**holistic** [1] -
58:13

**home** [2] -
63:13, 24

**homicide** [1] -
13:20

**homicides** [2]
- 11:11, 23

**Honor** [152] -
2:3, 5, 10,
12, 14;
14:20, 23;
15:10, 21,
25; 18:4;
19:20, 22,
25; 20:8, 11;
22:18; 26:6,
9, 19, 25;
27:4, 19;
29:4, 17;
30:6, 18;
31:9; 32:4;
33:5, 9, 13,
24; 35:9;
36:10; 38:12,
24; 39:24;
41:14; 42:15,
22-23; 43:3,
25; 44:9;
45:2; 48:25;
51:1, 5-7,
23; 52:8, 14,

25; 55:8, 13;
56:5; 59:4, 6,
22; 60:11;
61:20; 63:23;
64:1, 6, 13;
66:16, 20;
67:6, 21;
68:2, 7, 9,
13; 69:22;
71:19; 75:17,
24; 76:19;
79:14, 20;
82:19; 84:11,
23; 86:18,
24; 87:3, 17;
88:8, 17;
89:7, 24;
90:2; 91:17;
92:6; 94:5,
10, 25; 95:3;
96:9, 25;
97:5, 17;
101:11;
106:14;
110:16;
111:1, 12;
112:16, 20;
114:23;
115:23;
118:7;
121:11;
123:8, 22;
124:18;
125:1, 13,
15; 126:19;
128:10, 23;
129:7;
130:13, 20;
131:14, 18,
22; 132:15;
133:7, 19;
134:8;
136:10;
138:8, 10;
141:22;
146:13;
149:3, 5, 7;
155:4, 6;
159:5; 166:6,
11, 15, 25;
167:6, 12, 15

**honoring** [1] -
90:22

**hook** [1] -
134:22

**hope** [7] -
22:13; 75:10;
86:24; 156:1;
159:10;
166:10

**hopeful** [4] -

24:13; 96:4;
161:9;
163:17

**hopefully** [6] -
43:15; 45:22;
46:12; 51:2;
87:14;
129:18

**hoping** [3] -
96:7; 156:9;
159:16

**Hopkins** [2] -
99:13;
103:24

**host** [3] -
80:23; 101:3;
102:25

**hound** [1] -
121:16

**hour** [4] - 24:2;
81:4; 110:3;
113:7

**hours** [3] -
79:8; 132:1;
150:11

**house** [2] -
85:15;
102:19

**housing** [3] -
55:21; 56:15;
133:5

**Howard** [1] -
109:24

**HR** [1] - 52:22

**hubs** [1] -
61:23

**huge** [11] -
16:6; 30:7;
36:20; 37:8,
22; 49:2, 18;
50:11;
101:24;
124:25;
144:16

**Human** [1] -
28:22

**human** [4] -
90:23;
101:23;
102:4;
108:19

**humanize** [1] -
93:14

**hunch** [1] -
160:2

**hunched** [1] -
160:2

**hundred** [1] -
63:11

**hundreds** [1] -

12:10
**hung** [1] - 118:5
**hurdle** [1] - 133:10
**hurt** [3] - 74:10; 155:11

**I**

**i.e** [3] - 6:15; 10:17; 83:24
**IAPro** [1] - 45:18
**ICAT** [1] - 164:16
**idea** [4] - 63:3; 77:2; 83:9; 134:15
**ideas** [1] - 159:18
**identical** [1] - 148:3
**identified** [10] - 59:9; 68:25; 70:7; 71:22; 86:22; 95:5; 138:14; 140:18; 141:25; 147:5
**identifier** [1] - 45:20
**identify** [8] - 38:25; 64:22; 84:5, 8; 145:20; 161:22; 162:4; 163:2
**identifying** [4] - 31:23; 101:20; 161:18, 21
**idfive** [2] - 54:24; 61:18
**illegal** [1] - 12:21
**illuminating** [1] - 72:16
**image** [1] - 86:7
**imagine** [3] - 82:5; 87:10; 120:22
**immediate** [1] - 95:8
**immediately** [3] - 31:18; 118:19;

122:16
**impact** [4] - 83:23; 97:23; 103:13
**impacted** [1] - 44:8
**impacting** [1] - 152:19
**impacts** [1] - 82:16
**impaired** [1] - 44:25
**impart** [2] - 153:2, 24
**imparted** [1] - 153:20
**impartial** [10] - 3:25; 21:6; 33:17; 85:14; 90:1, 8, 12-13; 91:16; 94:24
**impediments** [1] - 146:17
**implement** [4] - 4:12; 6:18; 40:4, 9
**implementation** [18] - 5:9, 25; 6:5, 16; 10:23; 18:15; 41:8; 64:23, 25; 67:13; 80:8; 95:10, 14, 22; 97:8; 111:24; 125:8; 152:22
**implemented** [4] - 12:19; 16:22; 18:10; 96:1
**implementing** [4] - 6:7; 11:13; 16:4; 39:25
**implicit** [2] - 74:18; 76:21
**importance** [5] - 65:20; 80:21; 129:25; 133:14; 156:14
**important** [24] - 19:3; 44:2; 49:2; 69:6; 74:20; 81:10; 82:15, 25; 83:11; 87:4;

98:13; 101:22; 102:19, 23; 109:8; 111:6, 10; 121:10; 128:14; 131:4; 158:9
**importantly** [1] - 27:24
**imposes** [1] - 50:9
**impressionistic** [2] - 5:24
**impressions** [1] - 6:14
**impressive** [3] - 61:6; 70:23; 166:13
**improper** [1] - 102:1
**improve** [4] - 22:19; 32:11; 58:6; 114:14
**improved** [5] - 21:5; 54:12; 74:24; 81:14
**improvement** [5] - 13:16; 50:15; 74:24; 93:20; 112:7
**improvements** [4] - 48:22; 115:21; 122:17; 130:22
**improves** [1] - 49:25
**improving** [3] - 41:1; 93:1; 141:11
**incarceration** [1] - 16:24
**incentive** [2] - 55:21; 56:15
**incentives** [4] - 16:8; 54:11; 56:13
**incidence** [1] - 140:17
**incident** [6] - 73:20; 103:17; 111:22; 116:19; 140:19; 162:22
**incidents** [9] - 78:7; 100:1, 12; 142:5,

10; 143:25; 157:25; 158:4; 160:21
**inclination** [1] - 8:24
**inclinations** [1] - 60:10
**include** [7] - 33:16; 41:2; 54:9; 58:11; 61:19; 109:7; 139:15
**included** [1] - 113:17
**includes** [4] - 34:7; 39:15; 103:14; 111:14
**including** [5] - 3:24; 111:14; 16:3; 86:14; 133:20
**inclusive** [2] - 17:12; 40:5
**inconsistencies** [1] - 126:14
**inconsistency** [2] - 126:16; 127:17
**inconsistent** [1] - 140:20
**incorporate** [1] - 34:15
**incorporated** [2] - 34:4; 64:11
**increase** [9] - 11:19; 16:12; 37:16; 48:2, 9, 17; 53:22; 73:13
**increased** [10] - 11:16; 16:8; 53:21; 73:9, 12, 16; 82:23; 88:15; 133:4
**increases** [2] - 73:6; 82:24
**increasingly** [4] - 49:23; 66:24; 68:24; 69:2
**incremental** [2] - 29:18
**incurred** [1] - 76:8
**indeed** [2] -

98:20; 145:22
**independent** [2] - 12:20; 153:21
**independently** [1] - 148:16
**indicate** [1] - 87:5
**indicated** [7] - 7:3; 103:25; 105:19; 131:13; 133:3; 137:8; 145:22
**indicates** [1] - 142:13
**indicating** [1] - 143:23
**indications** [1] - 10:11
**indicators** [2] - 5:21; 145:24
**indices** [1] - 11:10
**individual** [8] - 68:2; 79:6; 85:25; 138:21; 141:11; 150:2; 153:22; 162:13
**individuals** [6] - 4:2; 53:24; 77:18; 78:13; 90:17; 113:20
**industry** [2] - 135:24; 136:21
**inefficient** [1] - 40:2
**informally** [1] - 152:2
**information** [24] - 35:16; 40:4, 11; 41:7, 21; 57:15; 58:2; 65:14; 67:20, 22; 88:11; 99:19; 101:21; 113:16; 116:6, 18; 117:23; 118:4, 25; 120:8; 142:15;

148:13; 162:5; 165:17
**Information** [1] - 39:25
**infraction** [1] - 108:4
**infrastructure** [8] - 40:1, 3, 6, 9, 11, 15, 17; 41:2
**infuses** [1] - 25:4
**inherent** [1] - 90:23
**inhouse** [1] - 107:1
**initial** [19] - 65:5, 24; 66:2, 7; 67:9; 84:20; 88:18; 92:5; 97:21; 98:4, 24; 114:7, 14; 130:17; 131:7, 21; 142:1; 146:18, 22
**initiated** [2] - 59:24; 90:25
**initiating** [1] - 92:21
**initiative** [6] - 5:20; 12:18; 14:2; 21:24; 77:7; 93:11
**initiatives** [5] - 9:12; 10:2; 24:12; 133:8; 137:6
**injured** [1] - 73:25
**injuries** [5] - 76:1, 8, 10
**injury** [5] - 73:22, 24; 75:14; 76:5; 113:19
**innocent** [1] - 50:4
**innovative** [2] - 8:10; 9:12
**input** [1] - 153:15
**inservice** [7] - 3:23; 16:4; 34:2, 24; 68:14, 23; 81:4
**inside** [8] -

98:8; 104:1; 114:9; 157:2, 8; 158:16, 19; 164:15
**insight** [2] - 100:21; 140:24
**insists** [1] - 146:6
**inspection** [1] - 113:11
**inspired** [1] - 138:4
**installed** [2] - 41:4; 155:24
**instance** [12] - 66:15; 84:9; 89:11; 91:14; 94:12; 98:6; 100:4; 103:1; 117:4, 12; 124:20; 135:13
**instances** [17] - 49:21; 70:25; 72:12; 73:18; 88:20; 93:16; 94:13; 116:18; 117:7, 12; 118:21, 25; 120:5; 143:17; 148:23; 150:24; 163:6
**instead** [8] - 6:14; 31:2; 32:8, 15; 65:15; 83:15; 104:24; 117:16
**instill** [1] - 154:3
**institutions** [1] - 13:16
**instruct** [1] - 120:6
**instruction** [1] - 123:23
**instructional** [1] - 131:5
**instructor** [1] - 109:24
**instructors** [1] - 130:25
**insufficient** [7] - 9:16; 36:22; 39:1; 53:17; 89:13;

1/26/23 Quarterly Consent Decree Hearing

114:13;
132:17
**insufficiently**
[1] - 73:19
**insurance** [1] -
107:12
**insurmounta**
**ble** [1] -
135:18
**integrated** [1] -
165:4
**integrates** [1] -
116:3
**integrating** [1]
- 44:16
**integration** [2]
- 40:11;
115:25
**Integrity** [6] -
42:25; 43:8;
44:4, 12;
45:7; 78:18
**integrity** [7] -
37:23; 38:16;
39:9; 42:24;
69:12; 89:19
**intend** [1] -
115:10
**intended** [2] -
68:21; 96:8
**intense** [1] -
27:21
**intent** [2] -
133:13;
147:1
**intentional** [2]
- 17:20;
18:12
**intentionally**
[1] - 54:23
**interacting** [1]
- 91:12
**interaction** [8]
- 4:2; 12:16;
73:3; 90:24;
93:14; 100:7;
103:14;
164:11
**interactions**
[9] - 4:1;
12:9; 78:19;
80:3; 90:19;
91:14; 92:14;
100:2
**interacts** [1] -
90:17
**interest** [2] -
43:17; 79:2
**interested** [2] -
45:4; 144:9

**interesting** [2]
- 106:15;
111:10
**interface** [2] -
137:19
**interferes** [1] -
82:17
**Internal** [3] -
37:23; 44:17;
102:11
**internal** [7] -
31:16; 47:2;
48:2, 8; 57:5;
73:15;
157:10
**internally** [1] -
104:22
**interrupt** [3] -
21:12; 75:8,
17
**interruption**
[1] - 22:17
**intersects** [1] -
80:19
**interval** [1] -
141:19
**intervening** [2]
- 112:2;
157:18
**intervention**
[13] - 3:25;
4:8; 34:20;
39:5; 69:6;
101:15, 19,
23; 102:10;
111:24;
112:10;
139:19;
151:2
**Intervention**
[2] - 41:19;
157:13
**interventions**
[8] - 101:14,
16; 102:4-7;
127:16;
128:8
**interviews** [3]
- 45:4; 73:7;
80:4
**intractable** [1]
- 136:9
**introduce** [1] -
15:14
**introduced** [2]
- 92:11;
110:3
**introducing**
[4] - 92:17,
22; 93:15;

98:17
**introductory**
[2] - 84:13;
91:24
**intrusion** [1] -
42:8
**intrusive** [1] -
83:25
**inventing** [1] -
6:7
**invest** [1] -
158:22
**investigated**
[2] - 47:15;
48:13
**investigation**
[9] - 29:8;
49:4, 16, 22;
71:22; 88:18;
95:5; 103:12;
128:12
**investigation**
**s** [8] - 4:7;
45:16; 48:8;
65:9; 77:22;
78:17;
139:15
**investigative**
[4] - 41:7;
80:24; 85:10;
133:3
**investigators**
[3] - 43:5, 8;
50:22
**investment**
- 17:2
**involuntary** [1]
- 149:22
**involve** [1] -
151:6
**involved** [7] -
11:13; 25:22;
71:6; 89:17;
100:11;
110:11;
142:24
**involves** [2] -
71:21, 23
**involving** [1] -
107:23
**IP** [1] - 164:16
**issue** [44] -
8:8; 9:22, 25;
10:7; 17:21,
23; 21:16,
22; 27:22;
28:21; 31:20;
38:5, 17;
39:17; 42:9;
43:18; 44:18;

49:1, 14, 16,
18; 50:15;
72:16; 89:12;
103:2; 104:8;
107:6; 108:1;
110:15;
117:20;
119:13;
121:15;
131:17;
132:4; 135:5;
136:5;
141:21;
143:7;
146:14;
160:19;
162:1;
163:17;
164:5;
165:12
**issued** [1] -
113:6
**issues** [39] -
6:25; 10:14,
19, 25; 14:5;
27:10; 31:18,
23; 32:2;
43:19; 50:7;
59:14; 70:17;
81:11; 86:11;
98:20; 99:8;
101:24;
102:16;
104:15;
105:1, 13;
108:11;
117:1; 118:4,
20; 122:17;
126:15;
127:22;
134:5; 136:1;
140:18;
141:4, 14;
148:11;
154:9
**IST** [1] - 34:8
**IT** [9] - 39:25;
40:6, 9, 11,
14; 116:10;
130:5;
165:18
**ITD** [2] - 40:24;
41:1
**item** [2] -
115:18;
119:2
**items** [2] -
84:21;
117:14
**iteration** [1] -

109:3
**iterative** [1] -
147:19
**itself** [26] -
12:5; 20:20;
31:23; 32:20;
39:13; 44:24;
48:3; 57:6,
10; 58:4;
76:4; 89:2;
95:17; 104:8;
105:16;
107:15;
114:3; 119:8;
127:24;
150:3; 165:3,
6

## J

**jail** [4] -
114:24;
162:18;
163:24;
165:5
**January** [5] -
18:10, 13;
35:4; 41:23;
129:11
**JKB-17-0099**
[1] - 2:20
**job** [21] - 7:19;
8:2; 9:6;
14:25; 25:3,
10; 38:1, 7;
49:23; 53:17;
62:5, 17;
63:2; 65:13;
74:21; 91:6;
104:12;
118:15;
143:2; 145:1
**jobs** [8] -
12:22; 13:8;
18:5; 62:21;
63:16;
111:17;
151:10
**Johns** [2] -
99:13;
103:24
**join** [3] - 25:9;
26:3; 53:2
**joined** [5] -
20:3; 23:24;
24:1; 36:15
**joining** [1] -
25:1
**Joyce** [3] -
136:10;

137:1; 138:4
**judged** [1] -
122:23
**judgments** [1]
- 117:4
**July** [2] - 35:8;
93:19
**jumped** [1] -
37:23
**June** [2] -
92:25; 93:20
**junior** [1] -
35:18
**jurisdictional**
[1] - 122:9
**jurisdictions**
[2] - 110:25;
116:11
**justice** [5] -
90:19; 92:7,
14; 93:25;
118:8
**Justice** [15] -
10:15; 14:10,
14; 27:24;
28:1, 20, 25;
32:14; 68:1,
5; 71:17;
140:22;
142:22;
167:15
**justified** [1] -
161:2
**Justin** [1] -
2:12
**juvenile** [2] -
161:15;
162:24

## K

**keep** [11] -
21:4; 25:18;
26:1; 28:4;
29:8; 68:10;
113:8;
154:23;
158:8;
164:11;
165:24
**keeping** [1] -
6:8
**keeps** [1] -
127:17
**Kenneth** [1] -
2:14
**key** [11] - 7:21;
18:22; 21:10;
26:22; 30:1;
69:21; 84:23;

101:1;
102:10;
107:20;
129:23
**keys** [1] -
115:22
**kids** [1] - 25:23
**kind** [30] -
31:21; 39:14;
57:23; 58:8;
65:21; 67:24;
79:20, 22,
25; 80:10;
82:24; 83:6;
85:15; 87:8;
89:22; 91:22;
103:2; 113:8;
114:5;
117:11, 20;
118:16;
119:8; 121:4;
127:21;
135:16;
149:14;
152:14
**kinds** [3] -
60:9; 66:25;
115:20
**kingdom** [1] -
115:22
**knowing** [1] -
164:12
**knowledge** [1]
- 162:5
**known** [1] -
61:13
**knows** [9] -
48:11; 50:4;
97:9; 119:25;
128:11,
14-15;
131:22

## L

**labor** [1] -
28:24
**lack** [9] - 6:18,
20; 12:23;
62:25; 71:3;
89:12; 120:9;
152:3;
166:11
**lacked** [1] -
39:9
**lacking** [4] -
6:23; 7:15;
8:19; 37:14
**lactation** [2] -
58:12; 59:2

lag [1] - 166:1
laid [3] - 77:1; 131:23; 144:7
lands [1] - 108:3
language [2] - 86:3; 158:11
lapse [1] - 141:19
large [15] - 4:24; 8:22; 19:7; 37:21; 59:9; 62:18; 63:11; 94:8; 95:8; 98:16; 100:1, 12; 102:6; 123:6; 155:22
large-scale [1] - 100:12
larger [3] - 37:7; 76:4; 134:20
largest [2] - 9:16; 14:16
laser [3] - 10:20; 64:18; 137:8
last [36] - 9:9; 14:8; 15:12; 25:16; 30:18; 39:16; 43:9; 44:6; 52:9; 53:7; 54:16; 56:13; 64:1, 9; 65:24; 66:2; 70:4, 6, 9; 79:6; 82:22; 86:8; 90:12; 102:5; 112:20; 114:23; 118:6; 125:4; 128:3; 139:7; 146:13; 159:6; 161:10; 162:11; 164:3
late [3] - 37:13; 129:7; 160:6
latest [1] - 23:6
latter [1] - 14:2
Laughter [6] - 51:20; 87:16; 159:7, 21; 160:7; 167:4
laughter [8] - 60:7; 63:22;

77:11, 15; 86:25; 97:15; 124:16; 138:6
laurels [1] - 5:10
law [19] - 4:20; 7:7; 8:22, 25; 13:21, 24; 25:7; 28:1, 10, 18; 59:24; 62:21; 63:3, 19; 74:25; 90:16; 96:15; 110:21; 135:23
Law [1] - 14:25
law-abiding [1] - 13:24
lawful [1] - 77:24
lawfully [1] - 150:22
layer [1] - 154:8
lays [2] - 10:13; 146:20
lead [7] - 11:15, 17, 20; 13:4; 24:6; 101:6; 133:17
leaders [2] - 4:24; 22:5
leadership [17] - 4:16; 6:21; 22:15; 23:25; 24:1, 24; 25:5; 27:22; 38:13; 39:11; 49:9; 50:16; 52:22; 135:11; 137:15; 165:5
leading [4] - 11:25; 23:7; 27:6; 138:11
leads [2] - 93:17; 105:6
learn [5] - 32:20; 62:10; 73:17; 144:10; 156:3
learned [3] - 62:10; 73:17; 115:21

learning [2] - 32:11; 131:6
least [6] - 5:6; 21:17; 22:9; 25:17; 83:25; 130:12
leave [6] - 50:12; 52:6, 20; 59:25; 107:18; 167:1
leaving [2] - 44:10; 54:17
led [3] - 95:6; 128:12; 165:3
left [5] - 50:5; 52:2; 54:19; 92:9; 101:16
Legal [1] - 2:13
legal [1] - 144:23
legislation [1] - 69:16
lend [3] - 59:12; 104:8; 165:7
lends [6] - 57:10; 61:9; 89:2; 105:16; 114:3; 119:8
length [2] - 115:4; 117:19
lens [1] - 130:6
less [8] - 10:18; 11:21; 70:12-14; 75:12; 93:18; 134:2
lesser [5] - 81:1; 82:1; 83:4, 12; 84:7
level [18] - 7:14; 21:19; 35:3, 19; 47:25; 65:2; 66:4; 67:12; 72:14; 85:1; 88:13; 99:3; 117:6; 147:24; 152:3; 154:10; 165:25
Level [4] - 103:9, 18; 110:11
levels [1] -

22:12
leverage [4] - 99:15; 100:23; 110:6; 135:6
leverages [1] - 109:17
leveraging [1] - 99:22; 136:7
LGBTQ [1] - 90:17
lies [1] - 55:10
lieu [1] - 53:9; 114:24
life [3] - 44:17; 53:15; 110:15
lifetime [1] - 146:12
lift [2] - 155:13; 158:7
light [4] - 32:15; 101:21; 125:24; 160:22
lights [1] - 130:21
likely [3] - 9:19; 18:23; 70:14
limit [3] - 143:19; 158:19; 161:1
limited [1] - 142:10
limits [1] - 9:14
line [18] - 7:17; 8:3; 27:16; 34:15, 17; 88:3; 98:23; 105:7; 108:14; 128:16, 19; 152:11, 13; 154:16, 18-19; 164:8, 16
lined [1] - 44:21
lining [1] - 31:22
link [1] - 98:10
linked [1] - 17:18
lion's [2] - 84:18; 102:8
listed [2] -

53:25; 92:12
listening [2] - 134:13; 158:12
live [3] - 12:11; 133:6; 156:19
lives [1] - 156:19
living [1] - 12:2
loan [1] - 56:16
local [2] - 55:4; 90:16
locals [1] - 116:4
location [1] - 113:18
locations [2] - 41:4; 61:24
locator [1] - 128:5
locker [1] - 59:1
Loeffler [3] - 33:21; 68:14
LOEFFLER [2] - 33:24; 34:1; 36:10
lofty [1] - 8:16
logic [1] - 13:23
long-term [1] - 136:24
longitudinal [1] - 82:17
look [41] - 10:6; 13:15; 14:4; 15:6; 21:10; 30:4; 37:10; 50:17; 54:24; 55:8; 62:20; 66:14, 17; 72:22, 24; 73:2, 11, 20; 75:9; 76:1, 3, 9; 80:6; 84:9; 89:15; 91:14; 97:24; 106:17; 126:12; 127:14; 130:19; 140:9; 142:9; 143:24; 147:18; 150:1, 3-5; 165:24; 167:18
looked [5] -

73:13; 88:18; 99:17; 100:17; 155:18
looking [23] - 35:17; 36:7; 58:10-12; 64:4; 82:20; 85:21, 23; 87:21; 89:24; 93:19; 94:17; 97:20; 108:14; 122:18; 124:23; 146:2; 149:14; 156:10; 162:6
looks [2] - 55:25; 148:25
loop [1] - 147:18
lose [2] - 43:10; 107:19
losing [6] - 9:1; 53:15, 18; 100:3; 144:13
loss [1] - 25:15
lost [4] - 9:9; 43:7; 52:12; 126:8
loud [2] - 61:20; 82:13
low [6] - 37:9; 126:21; 127:1; 161:11, 16; 164:20
low-frequency [1] - 161:16
lower [3] - 38:5; 82:9; 158:19

**M**

machine [1] - 160:2
main [2] - 4:16; 73:2
maintain [2] - 16:11; 166:10
maintaining [2] - 66:4;

111:4
maintenance [2] - 113:12; 114:18
Major [8] - 33:21, 23; 36:11; 52:23; 68:14; 72:1; 161:17
major [7] - 8:25; 33:22; 38:15; 68:21; 77:7; 128:12; 132:21
MAJOR [3] - 33:24; 34:1; 36:10
majority [6] - 62:9, 15-16; 67:7; 102:5
male [4] - 53:6; 60:1; 161:16, 22
Male [1] - 18:16
male-female [1] - 161:16
man [1] - 136:2
manage [5] - 4:24; 109:10, 23; 110:14; 162:20
Management [5] - 41:11; 69:4; 81:7; 95:22; 98:18
management [7] - 41:15, 18; 109:21; 114:16, 20; 127:23; 163:23
manager [2] - 33:7; 41:24
managing [1] - 124:23
mandate [1] - 25:25
mandated [1] - 13:3
mandates [1] - 80:2
manifested [2] - 101:25; 110:15
manner [1] - 149:24
manufacturer [1] - 124:11
March [5] -

34:8, 25;
45:23; 46:10;
51:3
**marches** [1] -
51:13
**marginal** [1] -
82:23
**marginalizes**
[1] - 104:24
**marginally** [1]
- 106:5
**mark** [1] -
10:11
**markedly** [1] -
4:18
**market** [2] -
63:2; 104:21
**marketed** [1] -
12:19
**marketing** [7] -
25:3, 10;
62:2, 4, 9,
14, 24
**Maryland** [1] -
46:1
**mask** [1] -
68:10
**mass** [1] -
12:14
**massive** [2] -
44:5; 82:16
**match** [1] -
64:7
**material** [3] -
142:4, 11;
143:24
**materials** [1] -
98:8
**math** [1] -
52:10
**matter** [6] -
2:19, 21;
79:2; 103:10;
133:22;
137:7
**Matter** [1] -
2:20
**Matthew** [3] -
2:15; 133:16;
158:24
**matures** [1] -
137:20
**Mayor** [4] -
21:18, 24;
23:1; 134:20
**Mayor's** [1] -
18:15
**mean** [19] -
31:20; 58:19;
75:7; 82:5;

101:1;
104:12;
106:15, 20;
110:21;
115:15;
118:14;
122:1, 25;
131:12;
136:16, 20;
147:16;
154:8; 166:3
**meaning** [1] -
40:18
**meaningful** [1]
- 154:6
**meaningfully**
[1] - 7:25
**means** [16] -
22:11; 44:3;
57:25; 62:13;
83:25;
104:12;
117:24;
122:2;
133:12;
134:17, 23;
135:8; 142:6;
154:2
**Meares** [1] -
155:10
**measure** [3] -
19:18; 67:9,
13
**measured** [6] -
5:25; 6:10;
12:19; 13:19
**measures** [7] -
96:16;
151:4-7;
157:22;
158:13
**measuring** [1]
- 118:18
**mechanisms**
[1] - 157:10
**media** [3] -
12:14; 61:11
**medians** [1] -
55:4
**medical** [6] -
117:5, 13;
118:19;
119:5;
122:17;
126:15
**meet** [5] -
30:11; 68:21;
109:18, 25;
114:20
**meeting** [6] -

15:12; 24:2;
35:10; 41:22;
46:8; 101:12
**meetings** [4] -
27:2; 28:8;
121:14
**meets** [1] -
78:6
**Melancon** [8] -
33:6; 52:11;
78:23; 79:4,
13; 95:6, 23;
126:3
**MELANCON**
[71] - 33:9,
11; 35:9;
36:11; 38:12;
39:3, 13;
42:23; 43:25;
51:6; 52:8,
13; 55:13;
56:2, 5; 59:4,
6, 17; 63:25;
64:4, 16;
66:16, 20;
67:6; 79:5,
14; 80:13;
82:19; 84:4,
17; 85:18;
86:18, 24;
87:1, 12, 17,
19; 88:6, 8;
89:2, 7; 90:5,
8; 91:22;
93:12, 16;
94:8; 97:5,
14, 16;
106:13;
107:18;
108:2, 6, 8;
112:20;
115:9, 19;
116:15;
117:16;
118:7;
119:22;
120:5;
122:15;
123:7, 10;
124:18;
125:11;
128:22;
165:1; 166:6
**Melissa's** [1] -
97:6
**member** [9] -
45:11; 52:20;
54:3; 93:14;
100:4;
107:22;

157:10
**members** [41] -
23:4; 34:21,
25; 35:4-6,
8, 13; 46:4;
48:5; 52:2;
53:2; 54:18,
20-21; 55:6,
18; 56:17;
57:11, 18;
58:15; 99:14;
100:3; 101:3,
20; 106:4,
10, 24;
107:2,
13-14, 16;
109:25;
113:14;
144:20;
149:21
**memorialized**
[1] - 141:1
**men** [4] -
36:14; 59:9,
21; 145:13
**mental** [6] -
103:25;
104:7;
111:16, 20;
156:16;
158:21
**mention** [5] -
4:20; 8:3;
12:13; 35:9;
109:11
**mentioned**
[22] - 10:2;
48:7; 51:8;
64:13; 78:6;
84:12; 85:18;
91:13, 25;
94:4; 99:2,
25; 108:14,
23; 116:16;
122:16;
125:1;
128:23;
160:10;
161:11;
162:10
**mentioning** [1]
- 88:9
**mentoring** [1]
- 153:24
**message** [9] -
22:14; 25:14;
28:7; 29:23;
30:5, 8; 93:2,
19
**messenger** [1]

- 22:15
**met** [2] - 24:9;
46:3
**meter** [2] -
79:22;
112:22
**method** [2] -
117:9; 118:2
**methodologi
es** [2] - 94:17;
148:15
**methodology**
[3] - 67:19;
78:11; 143:9
**methods** [4] -
4:23; 13:22;
119:10;
126:21
**metric** [6] -
71:2; 73:16;
74:20; 82:15;
84:3; 106:20
**metrics** [6] -
19:17; 73:5,
9; 76:23;
124:22;
144:7
**Metropolitan**
[1] - 37:12
**mic** [1] -
138:25
**mid** [2] - 34:8;
113:13
**mid-March** [1]
- 34:8
**middle** [3] -
88:5; 108:22,
24
**midst** [1] -
103:12
**might** [27] -
9:21; 11:22;
15:5; 80:10;
81:25; 83:10;
94:13; 98:13;
100:4, 7;
101:22;
102:18;
120:3; 125:6;
135:1, 6,
21-25;
136:7; 143:6;
162:17;
163:4
**mileage** [1] -
123:7
**mind** [3] -
15:22; 56:21;
83:12
**mindful** [1] -

11:5
**minds** [1] -
12:10
**minor** [5] -
48:13, 15,
19; 98:5, 20
**minority** [1] -
55:18
**minute** [1] -
135:14
**minutes** [3] -
79:10; 129:4;
149:8
**misconduct**
[14] - 4:4, 7;
34:3; 43:4;
45:16; 47:6;
48:19; 50:3;
65:9, 18;
78:17;
101:25;
112:3
**mismatch** [1] -
12:22
**missing** [1] -
115:12
**mission** [1] -
24:3
**mistake** [4] -
14:1; 38:2, 5,
11
**mistakes** [3] -
96:19;
150:24;
151:1
**mitigating** [1] -
9:14
**mobility** [2] -
21:6; 54:10
**mock** [1] -
35:17
**model** [5] -
18:8; 19:11;
23:15, 22;
114:3
**modeled** [1] -
110:25
**modern** [1] -
7:7
**modernizatio
n** [2] - 40:1,
10
**modernized**
- 123:16
**module** [1] -
114:19
**moment** [9] -
21:13; 55:16;
69:5; 79:2;
106:22;

119:13;
123:19;
134:22;
149:13
**moments** [1] -
156:9
**momentum** [2]
- 23:11, 18
**money** [2] -
22:23; 28:2
**monitor** [4] -
103:21;
106:9;
114:17;
160:20
**Monitor** [3] -
2:15; 37:11;
145:17
**monitor's** [2] -
126:9; 138:1
**Monitoring**
[77] - 3:13;
4:25; 7:8;
10:15; 14:11,
14; 30:21,
23; 31:17,
25; 33:4;
64:22, 25;
65:12; 67:20;
69:1; 71:16;
77:17, 25;
78:10; 83:19;
85:8; 86:12;
92:2; 94:11,
16; 95:17,
19; 96:6;
108:16;
109:16;
112:4; 118:2;
119:9;
128:24;
129:2, 9, 24;
130:1, 11;
131:6; 132:6;
133:17,
21-22;
134:6; 135:3,
5; 136:6, 8;
137:20;
138:12, 19;
139:6; 140:2,
15, 18;
141:20, 22;
143:10, 12,
17; 144:19;
145:2;
146:14, 20;
147:11, 15,
18, 20;
148:4, 7, 19;

152:1;
157:24;
167:7
**monitoring**
[13] - 5:24;
72:8; 90:20;
91:19;
123:15;
126:15;
134:4;
137:22;
139:21, 23;
141:17;
149:12
**monitors** [2] -
79:1; 81:21
**Monitors** [1] -
64:9
**month** [12] -
3:15; 20:15;
21:16; 70:4;
87:22; 94:1;
113:22;
118:12, 22;
122:21;
142:7
**monthly** [18] -
14:7; 21:14,
22; 22:3;
27:2; 33:15;
56:20; 61:5;
72:23; 86:20;
90:1; 92:8;
94:4; 113:21;
117:20;
119:24;
123:17;
167:19
**months** [14] -
18:11; 23:11;
50:6, 10;
56:21; 67:2;
69:2, 19;
78:1; 126:24;
137:25;
139:7; 144:9;
159:16
**monumental**
[2] - 88:21;
122:11
**mood** [1] -
104:16
**mood-related**
[1] - 104:16
**morale** [4] -
49:18, 25;
111:4; 164:7
**morning** [43] -
2:2, 5, 7-8,
10, 12, 14,

17, 24; 3:12;
11:1, 3;
15:11, 18,
20; 19:24;
20:1; 21:16;
26:5, 9;
30:18; 31:11;
33:23; 39:23;
43:1; 51:22,
24; 68:15;
69:22;
125:16;
130:23;
132:5; 133:3;
145:7;
154:13;
160:10
**most** [27] - 5:8;
8:20; 43:11;
48:3; 54:4;
64:7; 65:1,
25; 70:1;
72:19, 24;
84:18; 91:8;
95:7; 97:18;
99:17;
101:14;
111:3;
126:10;
131:4; 135:7;
139:10, 20;
145:12;
155:24
**mostly** [5] -
6:14; 13:11;
102:9; 107:4
**motion** [1] -
66:11
**motivated** [2] -
6:22; 67:16
**Motor** [1] -
121:2
**MOU** [1] -
165:19
**mountains** [1]
- 42:4
**move** [32] -
4:10; 10:20;
15:22; 17:16;
22:24; 25:8;
39:20; 42:24;
46:6, 8, 11;
51:6; 57:24;
60:16; 65:5;
66:2; 68:1;
72:3; 79:5;
80:7; 85:6;
108:20;
109:5;
112:15, 20;

114:14;
117:21;
123:13;
134:7;
138:25;
153:18
**movement** [1]
- 123:24
**moves** [1] -
69:8
**moving** [31] -
5:7; 34:14;
43:12; 46:4,
16; 49:11,
15; 51:2;
59:25; 60:2;
64:1; 67:7,
11; 69:7, 11;
80:10; 84:12;
87:20; 97:16;
99:1; 101:10;
102:2;
108:15;
112:14;
114:5;
116:15;
118:7;
121:17;
137:21;
151:22
**MR** [144] - 2:3,
5, 10, 12, 14;
14:20; 15:20;
20:8; 26:6, 8;
32:4, 8, 25;
33:4, 9, 11;
35:9; 36:11;
38:12; 39:3,
13; 42:23;
43:25; 51:6;
52:8, 13;
55:13; 56:2,
5; 59:4, 6,
17; 63:25;
64:4, 16;
66:16, 20;
67:6; 68:7, 9,
12; 70:4;
71:12, 19;
75:17, 19;
76:14, 19,
21; 77:12,
16; 79:5, 14;
80:13; 82:19;
84:4, 17;
85:18; 86:18,
24; 87:1, 12,
17, 19; 88:6,
8; 89:2, 7;
90:5, 8;
91:22; 93:12,

16; 94:8;
95:3; 96:3,
21, 24; 97:3,
5, 14, 16;
106:13;
107:18;
108:2, 6, 8;
111:12;
112:18, 20;
115:9, 19;
116:15;
117:16;
118:7;
119:22;
120:5;
122:15;
123:7, 10;
124:18;
125:11, 13,
15; 128:22;
129:7, 12;
136:10;
137:12;
138:4, 8, 10;
139:2, 6;
140:13;
142:9; 143:6;
144:18;
146:13;
148:9; 149:3,
5; 155:4;
159:4, 10,
12, 24;
160:4, 8;
161:5;
162:18, 21;
163:9, 12;
164:9; 165:1;
166:6, 9, 15,
22, 24;
167:6, 14
**MS** [12] - 2:8;
14:23; 15:3,
10, 22, 25;
22:16; 59:22;
155:6;
156:22;
157:1;
167:12
**multi** [1] -
161:18
**multi-
transport** [1]
- 161:18
**multifaceted**
[1] - 38:11
**multiple** [3] -
19:6; 92:1;
161:14
**multiple-**

**person** [1] -
161:14
**multiply** [1] -
45:12
**music** [1] -
51:1
**must** [14] -
5:25; 7:12,
18, 22-24;
10:4, 24;
95:17;
131:15;
150:11;
151:7, 9
**mustered** [1] -
137:24
**MYGATT** [11] -
2:3; 26:6, 8;
32:4, 8, 25;
76:19, 21;
125:13, 15;
167:14
**Mygatt** [10] -
2:3; 15:9;
26:5; 32:24;
69:17;
125:14;
128:20;
142:20;
161:11;
167:13

# N

**NA** [1] - 119:4
**Nadeau** [3] -
42:24; 43:1;
69:12
**NADEAU** [13] -
43:2, 10, 24;
44:9; 45:2;
46:20, 22,
25; 47:8, 13,
23; 50:25;
51:5
**nailed** [1] -
61:21
**name** [1] -
54:14
**narrative** [1] -
23:20
**NAs** [1] -
126:18
**nation** [1] -
155:13
**national** [6] -
22:4; 23:22;
27:22;
110:19;
120:13;

135:2
**nationally** [2] -
4:22; 52:17
**nationwide** [2]
- 8:23;
132:24
**nature** [2] -
128:6; 153:2
**near** [1] -
131:19
**nearly** [4] -
3:7; 67:8;
76:10;
103:24
**necessarily** [3]
- 24:16;
76:17; 162:4
**necessary** [11]
- 6:9; 7:4;
8:18; 77:6;
111:13;
133:12;
134:18;
135:9;
140:20;
144:6; 152:4
**need** [78] -
3:10; 10:20;
19:17; 27:10,
12, 15;
29:13, 17;
30:2, 6, 8,
11, 22;
31:12; 32:9,
14; 40:23;
42:6, 9; 45:6,
12; 46:6;
59:19; 64:20;
67:17, 20,
22; 74:19;
81:12; 84:24;
85:23; 86:12;
93:5; 98:5,
13-14;
100:12;
103:21;
104:13;
106:24;
107:20;
108:1;
109:19;
110:14;
111:16;
114:13;
117:7, 23;
118:15, 17;
119:1;
120:17;
122:6; 124:4;
125:20;

126:21;
127:7, 10,
16, 21;
128:8; 141:3;
143:19, 21;
144:1, 4-5;
147:12;
153:15;
156:15;
157:20;
158:7, 12;
160:19;
161:15;
163:14;
165:16
**needed** [5] -
31:5; 35:19;
112:7;
137:23;
156:1
**needing** [2] -
153:17;
155:13
**needle** [1] -
85:6
**needs** [28] -
7:1, 5; 8:2;
28:6, 15;
31:20, 24;
59:2; 67:14;
68:25; 84:8;
100:8, 18,
22; 121:6;
127:23;
128:1;
141:10;
142:11, 15;
146:16, 21;
147:9, 11;
153:20;
156:4;
166:20
**negative** [3] -
12:13; 52:4,
10
**negatives** [1] -
50:21
**negotiate** [1] -
164:17
**neighborhoo
d** [1] - 30:14
**net** [3] - 25:15;
52:4; 152:22
**network** [1] -
18:24
**networking** [1]
- 40:5
**never** [3] -
32:19; 49:6;
163:21

**new** [56] - 3:23; 4:11, 17, 25; 6:7; 7:2, 6; 14:24; 15:2, 14; 16:5; 18:25; 22:24; 23:2; 32:17; 35:23; 40:4; 45:18, 25; 58:16, 24; 61:6; 68:16; 81:6, 19-20; 82:6; 83:2; 89:9; 91:4; 95:12, 15, 18, 22; 96:8, 11; 98:17; 99:10; 110:3; 115:24; 116:24; 123:15; 127:11; 133:2; 137:4, 6; 142:16; 152:7; 164:10

**New** [1] - 102:20

**newly** [1] - 36:16

**news** [4] - 32:23; 51:3; 64:11; 92:19

**next** [24] - 9:12; 34:11, 23; 55:6; 77:14; 79:4; 86:20; 87:22; 94:25; 98:23; 99:1; 101:10; 103:22; 105:6; 108:14; 112:23; 114:5; 116:15; 141:7, 17; 151:23; 159:15; 167:19

**nexus** [1] - 151:3

**nice** [2] - 109:12; 144:3

**nicely** [1] - 166:25

**nimble** [1] - 117:25

**nine** [2] - 56:15; 90:9

**nitty** [1] - 27:10

**nitty-gritty** [1] - 27:10

**Nola** [1] - 136:10

**noncomplian ce** [1] - 98:7

**nonconformi ng** [2] - 161:16; 162:1

**nondisciplina ry** [1] - 102:9

**none** [1] - 30:25

**nonetheless** [3] - 6:22; 37:18; 44:7

**nonfatal** [1] - 11:11

**nonprofits** [1] - 17:13

**nonschool** [1] - 18:18

**nonschool-aged** [1] - 18:18

**nontechnical** [1] - 69:9

**normal** [2] - 53:14, 16

**normalizing** [1] - 156:15

**normally** [1] - 75:19

**noses** [1] - 36:21

**notably** [2] - 70:1; 91:8

**note** [5] - 15:2; 19:4; 96:9; 115:23; 145:2

**noted** [4] - 7:8; 91:7; 95:6; 132:4

**notes** [2] - 87:12; 89:24

**nothing** [4] - 22:13; 97:3; 156:8; 167:14

**noticed** [1] - 18:7

**notification** [1] - 93:23

**notifications**

[2] - 107:22, 24

**notified** [2] - 92:10, 23

**notify** [1] - 92:23

**notifying** [1] - 92:18

**notion** [1] - 44:23

**notwithstand ing** [1] - 134:17

**November** [1] - 166:20

**number** [62] - 10:23; 11:10; 20:12; 21:4; 24:9; 36:14; 39:16; 43:8; 46:21, 23; 47:2; 48:20; 49:14; 50:22; 52:20; 53:4, 7, 9, 16, 21; 54:15, 17, 19; 55:10; 58:6; 63:11; 65:17; 75:14; 77:20; 82:9; 88:15, 19, 24; 95:8; 106:24; 107:1; 116:4; 119:16; 121:5; 122:10; 130:24; 131:10; 138:20; 140:24; 142:5, 10; 143:20, 25; 144:19; 148:11; 152:15; 154:19; 155:9, 19, 22; 157:3; 161:21

**numbers** [24] - 7:25; 8:4; 26:1; 28:5; 36:19, 22, 25; 37:5, 9, 14, 16, 21; 39:14; 43:15, 19; 44:22; 46:11; 48:2; 54:3; 56:14,

22; 89:4; 152:25

**O**

**obey** [1] - 161:1

**obeying** [1] - 13:21

**objective** [4] - 5:21; 40:9; 58:7; 72:11

**objectives** [3] - 111:7; 132:13

**obligation** [1] - 9:8

**obligations** [4] - 25:19; 68:18; 136:19

**oblivious** [1] - 32:1

**observations** [5] - 3:12; 20:18, 22; 98:7; 128:21

**observed** [1] - 6:19

**obstacle** [2] - 59:10; 164:19

**obstacles** [11] - 27:3, 5, 13; 125:17, 20-21, 25; 126:7; 127:4; 128:18

**obviously** [4] - 21:15; 66:22; 129:17; 146:1

**occasionally** [1] - 107:22

**occasions** [1] - 153:13

**occur** [4] - 44:15; 67:14; 117:17; 150:11

**occurred** [5] - 41:22; 67:1; 70:16; 113:19; 150:9

**occurring** [7] - 50:1; 88:2; 94:15; 120:4; 127:17; 153:1;

158:17

**occurs** [1] - 134:13

**October** [2] - 14:8; 109:4

**offense** [2] - 77:23; 107:25

**offenses** [5] - 81:1; 82:1; 83:4, 12; 84:7

**offer** [4] - 18:2; 34:2; 55:6; 63:18

**offered** [6] - 34:9; 40:16; 98:20; 102:22; 104:5; 160:23

**offering** [6] - 34:12, 14; 35:22; 61:1; 63:16; 158:3

**offers** [3] - 16:23; 105:21

**Office** [13] - 18:15; 27:24; 35:11, 14, 21; 36:4; 45:24; 46:3; 57:13; 81:24; 82:3; 83:22

**office** [1] - 122:13

**officer** [63] - 8:4; 33:18; 50:3, 9; 54:11, 13; 57:13; 63:4; 64:10; 73:22, 25; 74:3; 75:16; 76:1, 5, 8, 10; 77:18; 78:19; 86:16; 87:2; 89:17; 92:11; 95:1; 97:16, 23; 98:9; 100:5, 8; 101:19; 103:10, 20; 104:10; 105:14; 107:4; 108:4, 13; 110:11; 111:2, 13; 116:20;

119:2; 133:4, 25; 139:9; 150:15, 25; 152:20; 153:22; 154:1; 155:8, 13, 18; 156:6; 158:16; 160:17, 22; 161:2; 164:8

**officer's** [3] - 74:11; 101:8; 103:13

**officers** [103] - 7:16; 9:1, 15; 12:12; 13:21; 16:9, 15; 17:25; 18:7, 25; 19:15; 25:16, 20; 29:21; 35:16, 18, 23; 37:15; 44:3; 46:19, 24; 47:5, 7; 49:18; 52:9; 53:16, 18; 55:23; 58:1, 3, 10; 59:21; 61:4; 63:17; 68:16; 70:11; 71:1; 72:7; 73:19; 75:11, 13; 76:15; 81:9; 86:22; 87:6; 90:21; 91:6; 92:14; 93:3; 95:14, 17; 96:14; 98:13; 99:22; 100:16; 102:16; 103:15; 104:23; 105:16; 111:15, 19, 22; 112:1, 9, 11; 118:15; 120:6; 127:16; 128:4, 6; 132:7, 15, 25; 133:6; 141:11; 142:5, 10; 150:2, 4, 6; 151:13; 152:5, 9; 153:6, 14, 18; 154:6;

155:25; 156:3, 17, 22; 157:7, 18; 158:2, 14; 160:15; 163:5; 164:2, 18

**officers'** [4] - 7:18; 72:8; 77:24; 83:11

**officially** [1] - 57:21

**officials** [1] - 17:14

**offset** [1] - 153:5

**oft** [1] - 11:24

**oft-stated** [1] - 11:24

**often** [3] - 12:11; 158:1; 160:25

**old** [1] - 116:16

**on-track** [1] - 85:7

**once** [11] - 2:24; 34:18; 66:12; 88:9; 109:11; 123:20; 128:2; 131:17; 161:20, 22; 165:14

**one** [77] - 10:23; 12:6, 16; 14:1; 21:4; 24:9; 29:18; 34:9, 15-18, 20, 22, 24; 35:1, 10; 37:6; 39:17; 43:4; 45:9; 49:2; 50:16; 56:16; 61:4; 66:13, 22; 70:22; 75:14; 77:8; 78:12; 79:10; 82:9; 85:15; 89:15; 95:7; 96:9, 16; 97:17, 24; 99:4; 105:8; 107:8, 11; 109:19; 111:3; 116:4; 117:14; 118:6; 119:15, 24;

120:3;
124:13;
128:3, 11;
134:12, 25;
138:20;
140:2, 24;
141:9; 142:7,
22, 24;
143:7;
144:24;
147:3;
151:25;
153:13;
157:11;
161:19;
162:10, 23;
164:4
**one-day** [4] -
34:9, 18, 24;
35:1
**one-week** [5] -
34:15-17,
20, 22
**ones** [5] -
47:25; 49:24;
114:7;
121:18;
160:9
**ongoing** [6] -
28:24; 32:8;
64:23; 68:18;
95:19;
148:20
**online** [4] -
45:17; 69:15;
81:6; 109:3
**open** [2] -
83:18; 133:1
**opening** [9] -
15:23; 18:3;
33:2; 54:7;
64:14; 95:25;
115:5;
151:25;
154:13
**openly** [1] -
126:5
**operate** [3] -
80:12; 152:6
**operating** [3] -
7:16; 13:21;
131:10
**operational** [1]
- 40:12
**operationaliz
ed** [1] -
123:20
**operations** [1]
- 40:5
**opinions** [1] -

61:2
**opportunities**
[5] - 54:1, 12;
56:24; 63:6;
138:14
**opportunity**
[17] - 30:7;
31:8; 35:12,
15, 20, 22;
36:6; 55:7,
11; 59:10;
72:5; 87:9;
115:12;
141:14;
149:8;
158:25;
165:7
**opposite** [1] -
117:5
**option** [1] -
59:25
**optional** [1] -
68:10
**orbits** [1] -
135:22
**order** [13] -
3:4, 9; 35:1;
96:6; 124:2;
139:25;
141:3, 19;
142:16;
153:24;
154:20;
157:17, 21
**ordered** [1] -
22:20
**ordering** [1] -
121:24
**orders** [1] -
121:19
**organization**
[11] - 7:7;
21:8, 11;
32:11; 58:14;
96:17; 99:7;
106:23;
152:19;
153:6;
154:17
**organization'
s** [1] - 154:20
**organization
al** [1] - 101:9
**organization
s** [4] - 8:23;
54:2; 131:1;
154:5
**organize** [1] -
58:4
**orientation** [1]

- 153:6
**oriented** [2] -
131:5;
132:13
**original** [1] -
126:9
**Orleans** [1] -
102:21
**otherwise** [5] -
25:4, 13;
63:9; 102:14;
103:16
**ought** [1] -
59:18
**ourselves** [9] -
50:2; 52:19;
58:14; 73:15;
75:5; 83:18;
103:9;
148:15
**out-of-pocket**
[1] - 107:12
**outcome** [10] -
6:1; 76:25;
129:21;
133:18;
138:12, 20;
139:8, 11,
17; 140:1
**outcomes** [2] -
85:23;
138:23
**outdated** [2] -
40:2; 80:16
**outfitted** [1] -
123:16
**outlined** [4] -
4:13; 10:25;
26:11; 51:8
**outputs** [1] -
73:12
**outreach** [4] -
18:4, 12;
29:6; 61:22
**outright** [1] -
10:19
**outset** [2] -
144:22;
145:3
**outside** [14] -
8:8; 12:24;
22:10; 40:20;
41:2, 4;
45:19; 61:6;
94:18; 104:1;
135:10, 23;
136:6, 18
**outstanding**
[6] - 36:16;
65:13; 97:7;

98:22;
142:14;
147:5
**overall** [10] -
36:4; 46:13;
76:3; 86:7;
94:20; 100:1,
9; 103:6;
119:3; 125:5
**overcome** [4] -
125:17;
133:10;
135:19;
164:19
**overcoming**
[1] - 127:5
**overhaul** [1] -
80:18
**overheated** [1]
- 158:10
**overnight** [2] -
12:15; 37:15
**oversight** [2] -
45:25; 66:11
**overstate** [1] -
9:21
**overview** [1] -
33:13
**own** [15] - 3:8;
17:8; 18:23;
31:8, 16;
32:14; 35:13;
72:8; 91:17;
100:17;
107:4;
110:15;
156:4; 161:4
**owned** [1] -
31:2

---

**P**

**p.m** [3] - 79:12;
129:5;
167:24
**package** [1] -
107:10
**page** [1] -
148:25
**paid** [9] - 16:9;
22:12; 31:15,
21; 56:15;
72:16;
107:18
**paired** [2] -
35:1; 82:2
**palm** [1] -
62:19
**pandemic** [1] -
103:5

**panhandlers**
[1] - 17:25
**paper** [7] -
100:13;
114:25;
116:16, 22;
163:19, 21;
164:1
**Paragraph** [1]
- 80:1
**paragraph** [6]
- 65:6; 80:2,
9; 84:13;
91:24
**Paragraphs**
[1] - 87:23
**paragraphs**
[12] - 5:5;
64:12; 65:17,
23; 84:18;
90:9; 92:4;
97:22, 24;
98:22, 24;
138:22
**parallelisms**
[1] - 31:15
**parent** [1] -
57:1
**parental** [1] -
59:25
**parents** [1] -
56:24
**part** [42] - 5:8;
6:20; 16:16;
30:10; 36:13;
37:8; 48:3;
49:13; 59:3;
61:7, 16-17,
21; 64:16;
70:18; 71:11,
20; 75:21;
77:5; 80:14;
82:25; 84:24;
90:10; 91:5;
93:7; 95:10;
108:17;
110:8; 120:8;
123:10;
124:21;
127:5;
134:19;
136:4; 138:3;
140:15;
144:10, 18;
148:1;
153:20
**partially** [1] -
153:5
**participate** [3]
- 36:5;

107:19;
131:3
**participated**
[1] - 142:23
**participation**
[2] - 108:10;
167:17
**particular** [16]
- 27:13, 15;
44:6; 71:9;
79:19; 119:2;
120:3; 125:1;
127:16;
140:16;
141:24;
144:21;
145:10;
147:5;
162:22
**particularly** [4]
- 11:1;
14:15; 25:5,
19
**parties** [19] -
3:6, 13;
10:20, 24;
14:5, 18;
20:19; 78:10;
83:5; 130:1;
138:17;
139:21;
140:16, 21;
143:8, 13;
145:17;
148:23;
167:9
**partner** [4] -
20:7, 9;
54:24
**partnered** [2] -
57:20; 131:1
**partnering** [1]
- 56:11
**partners** [7] -
41:16; 56:11;
120:16;
121:13, 16;
122:9;
136:23
**partnership**
[1] - 36:3
**parts** [2] -
27:25; 90:9
**party** [1] -
99:13
**pass** [3] -
10:11; 47:12;
82:3
**passed** [3] -
3:6, 8; 69:16

**passing** [2] -
38:6; 147:22
**past** [11] -
33:16; 38:20;
79:10, 16;
80:10; 85:3;
97:19;
112:24;
133:24;
138:15
**pat** [2] - 80:25;
86:1
**pat-down** [1] -
86:1
**pat-downs** [1]
- 80:25
**path** [2] -
38:21; 83:7
**pathway** [3] -
23:16; 24:20;
155:17
**patrol** [6] -
25:20; 44:3;
54:11; 87:2;
132:23;
153:10
**pause** [2] -
67:25; 94:25
**paved** [1] -
22:25
**pay** [5] - 21:7;
54:9; 56:18;
107:19;
133:4
**payout** [1] -
56:17
**PC** [1] - 89:13
**PDF** [1] -
100:13
**pedestrian**
[2] - 72:25; 73:7
**Peer** [1] -
157:13
**peer** [6] - 3:25;
111:20, 24;
112:10;
157:8
**peer-to-peer**
[1] - 157:8
**pending** [1] -
2:19
**people** [50] -
8:24; 12:11;
21:4, 8, 10,
21; 23:16;
25:7; 28:16;
29:20, 24;
30:2, 17;
37:1, 25;
38:6, 8; 39:9;

44:10, 19;
45:7, 13;
46:18; 47:9,
14; 49:2, 5;
53:13; 54:16;
62:4, 14, 19;
63:2, 4, 12;
73:3; 92:18;
93:9; 106:6,
17; 111:5, 8;
128:1;
136:17;
145:19;
155:11;
157:9;
158:22
**people's** [1] -
75:1
**per** [3] -
113:22, 25;
118:12
**perceived** [1] -
37:17
**percent** [44] -
16:25; 25:21;
38:20; 40:22;
46:14, 21,
24; 48:9, 14,
16, 19;
52:12;
56:3-5; 58:6;
63:11; 65:23;
66:18; 67:11;
70:9; 73:8;
76:8, 10;
88:22; 92:20;
94:20;
103:25;
104:2;
105:18,
20-21;
118:6; 119:3;
126:11;
151:13;
155:21;
156:17, 22
**percentage** [2]
- 65:15, 19
**percentages**
[1] - 52:11
**perfect** [2] -
32:19; 66:23
**perfectly** [2] -
24:4; 162:11
**perform** [6] -
7:23, 25;
111:16;
119:2, 18;
143:11
**performance**

[11] - 38:17;
71:24; 74:24;
78:7; 114:13;
141:12, 24;
142:4;
147:24;
148:16;
162:22
**Performance**
[5] - 74:2, 14;
78:5; 103:18;
139:16
**performed** [4]
- 64:8; 66:2;
118:11;
162:16
**performing** [4]
- 102:4;
104:4;
118:23;
151:10
**performs** [1] -
150:3
**perhaps** [13] -
50:12; 58:19;
63:17; 75:11;
82:8, 10;
107:22;
119:8; 131:4;
135:6; 136:8;
142:25;
162:20
**period** [8] -
12:18, 20;
66:13;
108:21;
130:12;
143:22, 24;
163:5
**periodic** [1] -
96:13
**perk** [1] -
72:19
**permission** [1]
- 134:8
**permit** [1] - 6:9
**perpetually** [1]
- 122:6
**persist** [1] -
12:20
**persistent** [2] -
89:18;
120:19
**persists** [1] -
9:20
**person** [12] -
15:14; 45:13;
92:10; 93:17;
103:20;
105:11;

108:3;
109:13;
113:19;
126:15;
161:14;
162:16
**person's** [3] -
80:22; 90:23;
101:6
**personal** [5] -
12:12; 21:23;
38:9; 54:1;
102:17
**personnel** [6] -
35:23; 38:18;
109:9;
131:10;
133:2;
155:23
**persons** [7] -
8:12; 33:18;
66:15;
112:21, 25;
133:25;
166:17
**perspective**
[4] - 35:24;
60:15; 72:13;
153:16
**perspectives**
[2] - 109:1;
152:8
**persuade** [1] -
136:23
**persuaded** [1]
- 22:6
**phase** [4] -
66:10; 67:11;
68:17;
117:21
**Phase** [2] -
102:6
**phases** [2] -
91:2; 140:4
**philosophical
ly** [1] - 7:24
**philosophy** [2]
- 5:1; 93:11
**phone** [2] -
99:20;
155:23
**phones** [2] -
98:12;
155:24
**physical** [4] -
4:10; 61:23;
111:16;
156:16
**physicals** [2] -
106:6; 157:4

**PIB** [5] - 48:23;
122:19;
127:19;
160:25;
161:3
**pick** [1] - 75:24
**picture** [4] -
10:22; 27:5;
71:11, 13
**piece** [5] -
22:4; 76:25;
84:21; 91:23;
111:10
**pieces** [5] -
94:10; 111:3;
118:17;
125:4;
144:23
**pilot** [1] - 8:10
**pipeline** [2] -
37:25;
120:14
**pitfalls** [1] -
60:22
**pivot** [1] - 5:14
**pivoting** [2] -
124:14;
129:10
**placards** [1] -
61:14
**place** [27] -
28:4; 31:13;
32:9, 13;
38:24; 39:19;
54:5; 67:12;
68:17; 78:12;
95:12; 96:11;
107:14;
109:15;
121:8;
122:20;
125:15;
127:12, 21,
25; 128:13;
130:4; 133:6,
8; 148:8
**placed** [2] -
65:20;
122:12
**places** [1] -
81:7
**plagued** [1] -
17:22
**plan** [7] - 9:5,
11; 17:19;
131:11;
132:9;
139:21;
141:17
**planned** [6] -

78:3, 8-9,
16, 18, 20
**planning** [4] -
64:23; 67:13;
77:25; 109:9
**plans** [2] -
8:15; 78:12
**platform** [2] -
55:1; 131:5
**play** [3] - 50:8;
92:24; 136:6
**plays** [1] -
57:12
**pleased** [7] -
20:10; 23:23;
24:9; 88:8;
155:8, 20;
157:9
**plus** [4] - 10:2;
48:9; 113:23;
164:7
**pocket** [2] -
107:12
**podium** [2] -
51:13; 134:9
**point** [36] - 3:9;
6:13; 10:16;
12:5; 26:23;
32:5; 44:8;
45:1; 50:17;
51:17; 57:14;
58:9; 59:19;
60:22; 68:6;
75:8; 79:11;
83:21; 89:6;
101:19;
106:19;
110:22;
119:4; 122:8;
124:8; 126:6;
128:23;
131:20;
135:17;
140:12;
143:4; 146:7;
148:21;
153:10;
160:13;
165:19
**pointed** [5] -
4:17; 16:17;
141:15;
163:1, 13
**pointing** [1] -
6:6
**points** [5] -
40:20, 22,
25; 41:3;
158:9
**Police** [54] -

2:13, 21; 3:2,
21; 4:15;
5:18; 6:17,
21; 7:1; 8:9,
11, 21; 9:8,
17, 20; 11:5,
16, 18-19;
13:24; 15:8;
16:2, 7, 25;
17:6, 14, 24;
19:4, 22, 24;
20:20; 21:20;
24:5; 25:4;
37:12; 39:11;
40:3; 41:12;
44:18; 46:1,
19; 60:6;
81:23; 82:2,
10, 18;
119:18;
134:21;
135:11;
145:13;
148:2;
149:17;
156:19
**police** [58] -
4:23; 5:22;
7:22; 8:25;
9:24; 11:14;
12:2, 9, 12,
25; 13:3, 5,
13-14, 21;
14:1, 3; 16:9;
17:3; 18:11;
22:20, 24;
23:1; 28:3;
29:21; 37:15;
38:10; 40:20;
46:19, 24;
47:7; 49:18;
50:12; 58:17;
61:4, 6;
62:21; 63:16,
24; 72:19;
73:10; 83:23;
90:23; 104:2;
115:17;
120:4, 20;
130:25;
132:25;
137:10;
149:23;
154:17;
165:20
**policies** [45] -
3:22; 4:18;
16:3, 5; 24:3,
6; 47:19;
48:5; 68:16;
72:6; 79:19;

80:7, 16, 18,
20-21, 23;
81:3, 20;
82:6; 83:14;
84:19; 89:20;
90:11; 95:13,
15; 96:11,
13, 18;
109:5;
112:24;
113:11;
114:8; 122:2,
5; 130:2;
152:7;
163:10
**Policing** [2] -
111:25;
157:15
**policing** [35] -
3:25; 4:1, 20;
5:1; 11:25;
13:4; 23:2;
25:19; 26:16;
28:5; 32:18;
33:17; 34:3,
10; 44:24;
62:11; 72:13;
78:15; 85:14;
90:2, 9,
12-14;
91:16; 94:24;
111:14;
132:13;
135:23;
138:23;
139:20;
154:15
**policy** [30] -
19:14; 29:14;
58:13; 67:12;
69:14; 80:5,
8; 83:4, 10,
16; 90:10,
13, 18; 93:7;
105:4;
108:15, 18;
109:7; 113:3,
14; 122:18;
124:25;
127:18;
150:22;
151:6;
152:20, 23;
153:7
**Policy** [1] -
113:1
**policy's** [1] -
160:12
**polite** [1] -
162:12

poor [1] - 12:23
populate [1] - 62:22
populated [1] - 87:25
populating [1] - 116:21
population [2] - 117:11
populous [3] - 56:8, 12
populus [1] - 54:23
Portal [1] - 45:18
portal [1] - 45:18
portals [1] - 63:9
portion [1] - 3:20
portrayals [1] - 12:14
pose [1] - 19:9
posed [1] - 69:22
position [4] - 45:4; 50:2; 71:17; 165:23
positions [3] - 133:1, 3; 154:17
positive [12] - 11:7; 12:9, 16; 17:10; 25:13, 22; 32:3; 36:9; 44:16; 94:20; 104:20; 106:20
positives [1] - 50:20
positivity [2] - 25:4; 61:9
possible [13] - 17:16; 24:19; 26:13; 27:7; 41:25; 70:19; 96:5; 112:14; 129:25; 143:15; 145:1; 146:24; 166:10
post [3] - 14:24; 86:10; 154:7
post-review

[1] - 86:10
posted [2] - 43:13; 45:3
posters [2] - 98:9; 156:11
postponed [1] - 15:13
posture [3] - 84:6; 102:19; 103:4
potential [1] - 56:23
potentially [4] - 82:16; 86:6; 122:19; 136:5
pound [2] - 9:25; 20:24
pounding [3] - 21:15; 26:2; 36:13
Power [1] - 155:24
power [1] - 17:11
powerful [1] - 72:10
practical [2] - 50:6; 146:7
practice [2] - 95:15; 110:24
practices [6] - 28:4; 71:25; 95:3, 9, 18; 141:10
pre [1] - 89:5
pre-COVID [1] - 89:5
preamble [1] - 5:19
prebid [1] - 41:22
precipitate [1] - 66:11
precipitating [1] - 121:8
precise [1] - 10:22
precisely [1] - 146:16
precision [1] - 6:4
prediction [1] - 147:25
prefer [1] - 90:2
preliminary [2] - 57:15; 96:7
preparation

[1] - 35:17
prepare [2] - 34:23; 162:20
prepared [6] - 47:6; 57:15; 124:11; 140:8; 146:1; 165:15
presence [3] - 17:3; 18:11; 61:23
present [9] - 7:24; 39:21; 42:25; 75:19; 80:10; 84:11; 112:24; 149:8
presentation [10] - 14:15; 33:12, 21; 51:10; 60:12; 79:24; 84:11; 118:9; 125:18; 161:12
presentations [7] - 14:18; 20:12; 27:1, 12; 33:8; 129:3; 167:7
presented [2] - 59:20; 158:25
presenting [1] - 35:16
presents [2] - 33:5; 132:18
preserves [1] - 17:19
preserving [1] - 80:21
President's [1] - 155:11
pressure [3] - 38:3; 120:23; 121:4
presumably [1] - 58:16
presumptively [1] - 146:21
pretty [8] - 32:1; 66:17; 72:10; 84:5; 96:6; 142:24; 157:1; 162:24
prevent [4] - 42:10; 75:14
prevention

[1] - 17:2
previous [6] - 39:8; 56:20; 83:16; 101:12; 102:25; 165:3
previously [13] - 49:8; 51:15; 52:17; 84:13; 85:18; 91:13; 100:21; 108:23; 116:16; 123:18; 133:1; 139:24
primary [5] - 7:19; 22:14; 40:18; 57:1; 106:4
prime [1] - 95:24
principles [4] - 5:1; 39:5; 112:10
print [1] - 164:18
priorities [2] - 4:21; 72:6
priority [1] - 39:11
prisoner [2] - 73:21; 161:19
prisoners [1] - 160:11
private [1] - 136:21
privately [1] - 155:25
privet [1] - 129:12
proactive [2] - 25:22; 132:16
proactivity [1] - 82:20
probability [1] - 164:4
probable [3] - 36:1; 89:12; 150:16
problem [32] - 8:21; 17:17; 21:19; 22:1, 10; 27:20; 31:19; 32:15; 37:17, 22;

38:11; 43:22; 44:8; 51:18; 53:11; 98:17; 106:18; 132:16, 18, 22; 133:9; 134:21; 135:7, 20; 136:9, 15; 137:13; 153:3; 157:12; 164:7
problem-solving [1] - 132:16
problematic [1] - 151:8
problems [21] - 13:8, 14; 18:5; 31:18; 32:2, 18; 37:24; 38:17; 49:3; 60:5; 71:21, 23-24; 72:4; 119:15; 120:19; 127:7; 136:1; 150:24; 153:2
procedural [5] - 90:19; 92:7, 14; 93:25; 118:8
procedures [2] - 48:5; 89:20
proceed [4] - 14:12; 79:15; 96:6
proceeding [3] - 41:7; 145:5
proceedings [1] - 167:24
proceeds [1] - 148:18
process [94] - 3:10, 17; 5:7, 25; 6:1, 3, 13, 16; 10:17, 21; 20:7, 10; 26:14, 22; 29:15; 30:1, 22; 31:1, 3, 13; 32:5, 9, 21; 42:18; 43:12; 45:8, 10, 14, 17; 46:7; 48:6,

16, 24; 49:11; 50:13; 52:24; 53:14; 60:3; 64:5; 66:23; 69:7; 71:6, 21; 72:9; 77:3; 80:18, 22; 88:10; 92:3; 96:17; 98:2; 103:19; 106:16; 107:25; 115:21; 117:25; 118:21; 120:9; 121:22; 125:9; 126:2; 127:20; 131:15; 132:3; 133:15, 20; 134:3, 10; 136:4; 139:13; 140:3, 10, 15; 142:18; 144:10, 12, 15, 21; 145:14; 147:19-21; 148:18; 149:13; 151:18; 154:9, 23; 161:17; 162:14; 163:8, 19
processes [3] - 38:23; 39:18; 121:3
processing [1] - 7:11
procure [1] - 122:4
procurement [6] - 41:25; 69:7; 109:2; 120:16; 121:20; 122:5
prod [1] - 166:5
prodding [1] - 120:25
produce [1] - 16:14
produced [3] - 124:10;

140:5
producing [2] - 7:10; 144:14
product [2] - 99:8; 120:23
productive [4] - 60:16; 136:13; 149:25; 167:17
profession [3] - 8:23; 52:18; 58:18
professional [5] - 13:23; 72:13; 99:7, 10; 149:25
professionalism [1] - 61:9
professionals [2] - 13:22; 150:5
proffered [1] - 11:14
profound [2] - 40:14; 157:1
Program [2] - 155:20; 157:13
program [16] - 40:1, 3, 5; 69:10; 102:10; 105:12, 19, 21, 23; 107:1, 4-5, 7; 111:24; 112:1; 156:6
Programs [1] - 27:24
programs [6] - 35:17; 110:19; 130:3; 155:14; 156:2; 158:16
progress [38] - 3:2; 5:7, 23; 6:2, 7, 10, 13; 10:12; 11:6; 19:8, 10, 18; 20:16; 27:7; 44:7; 45:21; 50:18; 66:25; 67:4; 79:22; 97:18; 112:6; 120:21;

129:14;
130:8,
14-15, 21;
131:13;
140:7;
147:17,
23-24;
148:7; 155:9;
157:14;
159:13;
160:9
**progressive**
[2] - 60:9;
83:7
**prohibition** [1]
- 90:14
**project** [2] -
41:24; 69:6
**projects** [2] -
40:10, 13
**promised** [1] -
167:2
**promising** [1] -
10:2
**promote** [1] -
44:23
**promoted** [4] -
44:11, 19;
50:7; 97:7
**promotion** [1]
- 15:19
**promotional**
[1] - 98:8
**promotions**
[2] - 21:7;
43:11
**promptly** [1] -
85:13
**proof** [2] -
6:15; 14:9
**proper** [9] -
4:22; 19:17;
48:6; 89:19;
114:16;
119:13;
123:14;
126:14;
162:12
**properly** [11] -
19:18; 37:20;
85:22, 24;
92:2; 118:18;
119:6, 18;
150:13, 15,
25
**proportional**
[1] - 140:20
**proposal** [3] -
41:22;
108:24

**proposals** [1] -
109:1
**proposed** [1] -
3:7
**proposition**
[1] - 142:21
**prosecute** [1] -
89:8
**prosecuted** [1]
- 82:12
**prosecutions**
[1] - 24:8
**prosecutorial**
[1] - 89:14
**prosperity** [1]
- 17:18
**protect** [3] -
42:8; 92:15;
112:1
**protected** [2] -
4:3; 78:2
**protecting** [2]
- 75:1; 90:23
**protection** [1]
- 90:15
**protects** [1] -
17:20
**protests** [1] -
98:16
**protocols** [4] -
111:22;
112:13;
130:3;
141:10
**proud** [2] -
65:3; 110:18
**proven** [1] -
45:10
**provide** [26] -
27:22; 28:5,
16; 31:4;
38:15; 40:24;
51:10; 65:7,
10; 67:18;
68:23; 99:20;
108:12;
110:1, 22;
111:19;
117:18;
129:19;
133:18;
134:5;
138:11;
141:2; 147:1;
152:12, 14,
16
**provided** [5] -
3:22; 18:12;
83:15; 90:15;
150:7

**provides** [4] -
65:14, 21;
90:13; 98:12
**providing** [7] -
16:19; 17:2;
18:6; 83:7,
18; 96:14;
129:13
**proving** [1] -
23:21
**provisions** [5]
- 28:14;
95:21;
111:14;
112:6;
138:21
**proxy** [1] -
82:19
**psych** [1] -
38:7
**psyche** [1] -
103:13
**psychologica**
**l** [1] - 50:9
**public** [22] -
3:1, 13;
10:22; 17:19,
21; 20:4, 17;
28:11; 35:1;
60:25; 64:6;
89:18;
108:21;
111:23;
112:12;
115:10;
116:1;
132:17;
134:5;
139:14;
162:5
**Public** [8] -
2:22; 43:8;
44:4, 12;
45:7, 18;
78:18;
115:24
**public's** [3] -
12:15; 41:10;
89:11
**publicizing** [1]
- 112:8
**publicly** [2] -
14:8; 126:5
**published** [3] -
3:14; 45:16;
64:9
**pull** [5] - 66:11;
86:11;
109:15;
117:17

**pulling** [3] -
61:11; 87:25;
136:4
**purple** [2] -
64:15
**purpose** [5] -
2:22, 25;
98:18;
100:10;
140:24
**purposeful** [1]
- 161:23
**purposes** [2] -
123:14;
163:25
**pursue** [1] -
8:24
**pursuing** [1] -
82:8
**push** [7] -
19:15; 26:14,
20; 27:15;
31:8; 64:17;
166:5
**pushed** [2] -
56:8; 62:23
**pushing** [6] -
26:18, 20;
52:19; 81:11;
120:25;
144:25
**put** [26] - 28:2;
29:14; 30:2;
33:12; 36:19;
37:25; 38:23;
39:18; 44:2;
50:2; 54:5;
62:22; 68:15,
17; 95:12,
15; 98:9;
109:6;
131:23;
133:8;
154:13;
159:19;
160:19;
167:9
**putting** [7] -
27:21; 78:12;
95:18;
112:22;
128:17;
130:4;
164:15

---

**Q**

**Q2** [1] - 89:3
**Q3** [1] - 89:4
**Q4** [1] - 88:11

**QR** [4] - 55:5;
61:19; 98:10;
156:12
**qualified** [2] -
117:4;
130:25
**qualitative** [5]
- 85:8;
91:25;
140:17;
143:10;
144:2
**quality** [5] -
38:18; 42:2;
142:3;
144:13;
158:18
**quantitative**
[1] - 143:11
**quantities** [1] -
38:21
**quantity** [2] -
119:7; 153:2
**Quarter** [2] -
45:15
**quarter** [10] -
33:16; 34:19;
39:21; 67:8;
79:6, 16;
81:2; 88:21;
113:4;
133:24
**quarterly** [8] -
3:1; 20:17;
27:2; 72:23;
79:16; 84:4;
85:5; 167:20
**Quarterly** [1] -
2:22
**questions** [18]
- 5:14; 9:10;
48:25; 55:12;
57:20; 69:22;
72:20, 22;
75:9; 76:23;
78:22; 79:23;
94:9; 96:25;
112:16;
113:14;
161:24;
163:25
**quick** [1] -
52:10
**quickly** [11] -
5:14; 26:13;
27:7; 37:19;
42:11; 50:13;
84:6; 112:14;
119:24;
123:13;

142:13
**quite** [7] -
31:14; 70:23;
72:15; 124:3;
130:16;
157:18;
166:25

---

**R**

**race** [1] - 91:11
**raise** [2] -
59:19;
119:13
**raised** [2] -
121:12;
125:16
**rallied** [1] -
17:24
**Ramsay** [1] -
37:11
**random** [6] -
94:14;
117:16;
162:8-10, 25
**randomized**
[2] - 94:18;
119:6
**randomly** [2] -
86:21; 94:1
**range** [1] -
144:16
**rank** [3] - 7:16;
87:6; 153:22
**rank-and-file**
[3] - 7:16;
87:6; 153:22
**ranks** [2] -
39:9; 53:2
**rare** [1] -
162:25
**rate** [2] -
13:20; 70:7
**rates** [1] -
38:20
**rather** [2] -
115:11;
116:19
**rationale** [2] -
39:17; 86:4
**rationales** [1] -
89:16
**re** [2] - 81:3;
113:3
**re-review** [1] -
81:3
**re-reviewed**
[1] - 113:3
**reach** [8] -
53:13; 62:3;

63:2; 110:23;
144:11;
146:16;
157:10
**reached** [4] -
19:18;
145:18, 23;
147:24
**reaching** [2] -
62:14;
138:22
**react** [2] -
58:2; 118:1
**reactions** [1] -
68:5
**read** [2] -
113:14;
116:12
**readily** [3] -
5:17; 106:1;
114:24
**reading** [1] -
22:2
**ready** [8] -
44:21; 79:1;
123:25;
124:5, 10;
129:2
**real** [11] - 9:9;
12:3; 28:23;
32:2; 37:17;
50:18; 61:15;
138:23;
143:7
**real-world** [1] -
138:23
**realities** [2] -
118:1;
135:12
**reality** [1] -
96:22
**realize** [3] -
24:21;
104:11;
118:4
**realizes** [1] -
12:2
**really** [35] -
26:21; 27:17;
29:2, 13, 24;
30:8; 32:22;
38:6; 48:20;
66:17; 72:9;
84:22; 87:10;
88:25; 92:25;
93:3, 22;
97:22; 98:12;
99:3; 118:17;
119:18;
122:5; 126:1,

11; 127:13,
23; 134:12;
145:16;
149:13;
152:4; 155:8,
25; 158:23;
162:2
**realm** [1] -
158:6
**realtime** [6] -
87:25; 88:1,
4; 127:15;
141:2; 158:3
**reason** [4] -
9:19; 50:12;
97:12;
148:22
**reasonable** [5]
- 86:2;
134:15;
140:19;
150:16;
153:17
**reasonably** [3]
- 12:6;
134:16;
152:14
**reasons** [12] -
21:10; 50:16;
52:20; 53:25;
54:1; 75:12;
89:10; 99:17;
103:7;
105:11;
153:11
**reassessmen
t** [2] - 3:19;
10:25
**Reassessme
nt** [5] - 3:14;
5:12; 10:12;
11:7; 130:11
**reassign** [1] -
9:12
**rebuild** [2] -
28:1; 42:12
**rebuilding** [1]
- 5:4
**rebuilds** [1] -
12:3
**recalibration**
[1] - 83:10
**recap** [1] -
90:11
**receipt** [1] -
41:21
**receive** [6] -
47:20; 56:18;
67:12;
104:23;

141:18;
143:14
**received** [1] -
80:2
**receiving** [1] -
100:12
**recent** [10] -
64:7; 65:1;
66:1; 85:11;
86:19; 91:8;
126:10;
139:20;
140:10;
143:24
**recently** [5] -
18:1; 58:19;
80:2; 139:10;
144:20
**recess** [5] -
79:11; 129:5;
167:22
**recognition** [2]
- 16:1; 97:6
**recognize** [7] -
10:9; 16:5;
32:16; 36:20;
52:4, 16;
80:3
**recognizes** [1]
- 129:24
**recognizing**
[5] - 54:22;
55:2; 56:7;
125:25;
133:14
**recommenda
tion** [1] -
38:16
**recommenda
tions** [2] -
74:15; 116:8
**reconfigurati
on** [1] - 85:11
**reconfigured**
[3] - 85:20;
86:8; 113:16
**reconsidered**
[1] - 135:20
**reconvene** [1]
- 79:9
**record** [7] -
7:4; 46:17;
115:1; 158:8;
159:23;
167:9, 22
**recordkeepin
g** [1] - 99:24
**Records** [5] -
41:11; 69:4;
81:6; 95:22;

98:18
**records** [8] -
6:8; 41:6;
162:2;
163:21, 23;
165:15
**recover** [1] -
42:11
**recruit** [5] -
28:16; 37:9;
58:19; 91:5;
132:24
**recruiting** [6] -
10:5; 52:25;
53:12, 18;
61:8; 109:9
**recruitment**
[7] - 28:2;
52:22; 54:5;
56:13; 64:1;
91:4; 139:18
**recruits** [3] -
36:19; 37:19;
110:4
**rectified** [1] -
131:17
**recycled** [1] -
37:7
**red** [9] - 64:19;
67:17; 79:25;
80:9; 84:16;
86:15; 92:16;
160:22
**redefine** [1] -
12:10
**reduce** [2] -
116:22;
132:23
**reduced** [2] -
13:17; 73:9
**reduces** [1] -
17:6
**reducing** [1] -
106:7
**reduction** [11]
- 5:22;
11:21; 13:25;
14:2; 23:8,
19; 49:14;
50:22;
116:23;
132:22;
157:4
**Reduction** [2]
- 16:23;
23:14
**reductions** [1]
- 23:13
**reestablishin
g** [1] - 95:11

**refer** [4] -
89:18;
105:11;
108:4; 161:2
**reference** [2] -
11:9; 122:15
**referenced** [4]
- 35:11;
59:7; 72:1;
76:25
**references** [1]
- 11:6
**referral** [2] -
107:5;
127:19
**referrals** [6] -
56:14, 16;
103:3;
110:10;
122:19;
160:25
**referred** [6] -
13:7; 48:1;
108:12;
110:12;
115:5;
120:21
**referring** [2] -
95:25;
103:10
**reflected** [1] -
130:10
**reflective** [1] -
47:1
**reflects** [1] -
79:17
**reform** [24] -
5:7, 20, 25;
11:14; 12:2,
18; 13:3, 16;
14:1; 23:8,
18; 24:12;
31:1; 32:6, 8;
47:4, 18;
69:15; 77:7;
93:11; 97:18;
115:17
**reforming** [3] -
7:22; 13:2;
41:12
**reforms** [7] -
4:13; 6:19;
12:7, 24;
12:7; 13:3;
115:20
**reformulating**
[1] - 151:6
**refresher** [2] -
34:7, 18
**refuse** [1] -

11:24
**regard** [1] -
58:25
**regarding** [2] -
34:6; 81:5
**regardless** [1]
- 56:24
**regards** [2] -
15:12; 59:8
**regime** [1] -
82:9
**region** [2] -
16:10;
165:22
**regular** [7] -
60:20; 65:6;
106:6;
120:20;
121:14;
157:4
**regularity** [1] -
156:15
**reimagining**
[1] - 130:3
**reinvention** [1]
- 4:9
**reiterate** [2] -
27:19; 108:2
**relate** [3] -
41:19; 95:21;
111:15
**related** [9] -
28:11; 41:6;
98:8; 101:5;
102:9, 25;
104:16;
114:8; 126:3
**relating** [2] -
84:19; 98:14
**relation** [1] -
136:4
**relations** [1] -
60:25
**relationship**
[8] - 5:4;
36:4; 60:16,
20; 89:9;
95:9; 148:10;
154:1
**relationships**
[1] - 154:5
**relative** [2] -
65:19
**relatively** [2] -
47:3; 88:16
**release** [4] -
85:2; 88:9;
89:11; 95:8
**released** [1] -
88:12

**relevant** [4] -
25:6; 65:16;
116:18;
143:25
**reliable** [2] -
118:3;
146:11
**reliably** [1] -
7:3
**relieve** [1] -
28:17
**relying** [1] -
6:14
**remain** [3] -
6:25; 8:14;
11:12
**remained** [1] -
88:15
**remains** [3] -
7:14; 60:15;
121:15
**remarks** [13] -
11:1; 15:23;
18:4; 26:8;
54:8; 68:3;
95:25; 111:1;
115:5;
125:11;
149:3;
151:25;
154:13
**remedied** [1] -
98:9
**remedy** [5] -
98:17;
119:25;
142:14;
163:18;
164:15
**remember** [1] -
155:10
**remiss** [1] -
156:13
**remote** [1] -
63:16
**removing** [1] -
17:17
**repairing** [1] -
14:3
**repeat** [1] -
127:9
**repeatedly** [2]
- 7:8; 132:10
**repetitive** [1] -
125:22
**replace** [2] -
9:2; 41:17
**replacement**
[1] - 120:1
**replacing** [2] -

53:17; 133:1
**Report** [5] -
3:14; 5:12;
10:12; 11:7;
130:11
**report** [28] -
3:18; 7:9;
33:25; 34:5;
38:19, 25;
47:6; 49:3;
57:16; 80:2;
102:16;
107:16;
114:25;
116:19;
122:13;
126:25;
128:13;
132:6;
139:13;
140:8, 10;
141:1, 5;
146:20;
150:7,
10-11, 14
**reported** [2] -
105:5;
106:24
**reporter** [2] -
79:8; 160:1
**reporting** [12] -
65:25; 81:14;
84:23; 85:20;
86:23; 99:2;
103:22;
127:11;
150:6, 25;
151:4; 163:8
**reportings** [1]
- 85:11
**reports** [12] -
4:3; 14:4;
45:15; 49:17;
75:22; 77:22;
86:3; 99:3,
25; 109:15;
127:12;
146:15
**represent** [3] -
4:19; 105:12;
133:7
**representing**
[1] - 156:6
**represents** [1]
- 124:19
**reprovide** [1] -
116:20
**request** [1] -
165:8
**requested** [1] -

57:11
**requests** [2] -
41:20
**require** [8] -
10:8; 21:24;
114:18;
115:9;
130:17;
147:3;
152:24
**required** [8] -
3:20; 6:23;
8:7; 12:7;
111:19;
151:15;
163:18;
164:2
**requirement**
[2] - 96:12;
113:13
**requirements**
[10] - 34:3;
64:22; 68:21;
111:18;
114:21;
120:12;
129:15;
131:15;
132:9; 142:2
**requires** [13] -
5:19; 9:5;
14:3; 63:17;
90:15;
111:22, 24;
119:20;
123:10;
131:11, 24;
138:3; 157:4
**requiring** [1] -
163:4
**requisite** [1] -
147:24
**research** [4] -
7:21; 62:2, 4,
23
**researcher** [1]
- 72:21
**reserve** [1] -
33:4
**residency** [2] -
55:19; 107:1
**residential** [1]
- 107:10
**residents** [5] -
5:4; 17:13;
55:4; 131:2;
151:14
**resignations**
[5] - 37:8;
53:8, 23;

54:19
**resigned** [3] -
37:4; 53:9;
54:21
**resigning** [1] -
53:24
**resist** [1] -
73:4
**resolution** [3] -
48:16; 50:6;
153:3
**resolve** [2] -
13:10; 162:7
**resolving** [1] -
163:13
**resorting** [1] -
13:10
**resounding** [1]
- 130:12
**resource** [5] -
7:19; 105:4;
110:1;
152:10, 12
**resources** [29]
- 16:14, 19,
23; 18:2, 6,
12; 19:2;
21:25; 56:10;
98:10, 13;
99:15, 22;
100:24;
104:22;
105:1, 13;
106:1, 3;
109:15, 20;
110:5, 14;
124:23;
135:2; 136:7;
137:17
**respect** [12] -
38:5; 50:15;
70:21; 76:15;
115:17;
119:14;
123:1; 135:4;
136:20;
139:6;
141:23;
146:14
**respected** [1] -
137:10
**respectfully**
[1] - 94:13
**respond** [3] -
38:3; 59:19;
62:5
**responded** [6]
- 37:18;
59:9; 73:19;
79:3; 109:22

**respondents**
[3] - 103:24;
105:19
**responders** [1]
- 41:21
**responding** [6]
- 4:3; 9:6;
25:21; 37:16;
72:4; 165:6
**response** [3] -
78:13; 136:3;
137:16
**responses** [1]
- 78:2
**responsibiliti
es** [3] - 58:1,
5; 138:1
**responsibility**
[6] - 15:1;
71:7; 75:4;
138:18;
148:19
**responsible**
[2] - 4:6;
72:13
**responsive** [1]
- 100:25
**rest** [2] - 5:10;
17:23
**restoration** [1]
- 11:15
**restore** [1] -
49:11
**restoring** [1] -
17:5
**restraining** [1]
- 114:10
**resubmit** [1] -
165:8
**result** [7] -
23:14; 55:20;
69:15; 74:3;
83:20;
102:18;
110:2
**resulted** [3] -
16:21; 73:21
**results** [12] -
3:10; 10:8;
11:23; 16:15;
17:10; 18:19;
47:21; 85:22;
100:25;
140:5;
146:11;
154:20
**retain** [4] -
58:10, 14;
60:13;
132:25

**retained** [1] -
60:18
**retention** [10] -
10:5; 18:25;
28:3; 54:6, 9;
101:1, 7;
105:16;
132:19;
139:19
**retire** [1] -
53:13
**retirees** [1] -
53:6
**retirement** [4]
- 15:13;
156:18, 23
**retirements** [5]
- 43:11;
53:5, 13, 21
**retrain** [1] -
75:13
**retraining** [1] -
74:15
**retrofit** [1] -
58:24
**returning** [1] -
111:21
**revamping** [1]
- 45:17
**revealed** [3] -
39:7; 119:24
**revealing** [1] -
59:8
**reveals** [7] -
3:19; 13:20;
49:3, 22;
70:23; 154:9
**revelation** [1] -
77:6
**revert** [1] -
103:2
**review** [36] -
3:1; 41:8, 15;
58:13; 70:1,
7, 9, 14;
77:17, 21,
23; 78:1, 4,
13, 15, 17,
19; 80:6;
81:3; 82:18;
86:10; 91:22;
95:20; 96:7,
11, 13;
112:5;
117:11, 18;
140:17, 22;
141:13;
150:11, 19;
152:21
**Review** [5] -

74:2, 14;
78:5; 103:18;
139:16
**reviewed** [5] -
113:3;
143:21;
150:10;
151:10;
157:24
**reviewing** [2] -
128:24;
161:10
**reviews** [20] -
6:1; 47:24;
48:1; 69:1,
23; 72:3;
77:20; 78:9,
11; 84:4;
129:21;
133:18;
138:13, 19;
139:8, 12,
18, 25;
150:23;
151:9
**revised** [5] -
3:21; 12:15;
80:19; 99:24;
112:25
**revising** [1] -
130:2
**revision** [1] -
16:3
**revisiting** [1] -
158:24
**Rewire** [1] -
34:9
**RFP** [1] -
108:22
**rid** [2] -
116:22;
158:21
**ride** [2] -
35:23; 151:9
**ride-alongs** [1]
- 35:23
**ridiculous** [1] -
164:8
**riding** [1] -
153:11
**Rights** [2] -
27:23; 45:25
**rights** [3] -
17:20; 75:1;
80:22
**rigor** [3] -
146:7
**rigorous** [6] -
69:25; 77:17;
144:22;

145:10, 15;
146:4
**rigorously** [1]
- 166:10
**ripe** [1] -
142:16
**rise** [1] -
167:23
**rival** [1] - 16:10
**RMS** [6] - 41:6,
10; 81:6;
86:7; 113:16;
127:11
**road** [9] - 3:3;
5:9; 67:1;
80:7; 129:14;
130:8, 15;
139:22;
164:13
**robust** [3] -
130:4;
153:25;
156:7
**ROCA** [1] -
34:9
**role** [4] - 4:22;
38:13; 57:12;
136:5
**roles** [3] -
7:23; 8:1;
9:12
**roll** [2] - 93:3;
156:14
**rollcall** [1] -
40:18
**rolling** [1] -
144:15
**rollout** [1] -
45:25
**roof** [1] - 89:6
**room** [1] - 31:1
**rooms** [2] -
40:18; 59:1
**root** [1] - 108:1
**rose** [1] -
106:5
**roughly** [1] -
89:4
**route** [1] -
145:6
**run** [3] - 69:10;
109:13;
136:15
**running** [3] -
36:7; 60:25;
83:22
**RWOC** [2] -
84:10; 85:3
**RWOCs** [7] -
81:21; 82:9,

22; 84:5;
88:15, 19;
89:5

---

**S**

---

**sacrificing** [1]
- 42:2
**safe** [6] -
118:14;
119:14;
122:16;
126:14;
160:10
**safely** [1] -
128:2
**safer** [1] - 12:1
**safety** [21] -
17:19, 21,
23; 19:9;
28:12; 33:18;
64:10; 95:1;
97:16, 23;
101:19;
104:10;
115:10;
116:1;
133:25;
152:22;
155:8, 14,
18; 156:6;
158:16
**Safety** [1] -
115:24
**sake** [2] -
101:8
**Salisbury** [2] -
15:15, 18
**SALSBURY** [2]
- 2:10; 15:20
**Salsbury** [1] -
2:11
**salute** [1] -
10:14
**sample** [5] -
59:9; 77:23;
84:25; 105:9;
117:11
**sat** [1] - 37:10
**satisfaction**
[1] - 143:4
**satisfied** [2] -
5:6; 131:15
**satisfies** [1] -
80:9
**saturation** [1] -
40:23
**saw** [4] -
22:23; 73:14;
93:20;

102:25
scale [2] -
8:18; 100:12
scattered [1] -
154:6
scenario [2] -
131:6;
157:12
scenario-
based [1] -
131:6
scenarios [4] -
74:1, 9;
113:10;
114:11
schedule [1] -
167:18
scheduled [1]
- 139:23
scheduling [2]
- 58:11;
115:11
scholarly [1] -
7:21
School [1] -
17:14
school [2] -
18:18; 57:1
school-aged
[2] - 18:18;
57:1
science [1] -
144:23
scope [4] -
13:11;
143:18;
144:3
score [6] -
65:23; 66:5;
119:3;
124:19;
131:7;
163:22
scorecard [4] -
93:20;
126:10, 12,
18
scorecards [1]
- 6:6
scores [5] -
64:7; 65:10;
84:12;
114:13;
118:9
scoring [2] -
90:20; 160:8
Scott [1] - 19:6
screen [2] -
33:12;
126:13

search [13] -
41:8; 69:5;
73:1; 79:17;
80:23;
117:10, 17;
133:24;
149:20;
150:9, 17, 19
searches [25] -
3:24; 33:17;
35:25; 80:19,
25; 81:5, 7;
85:13, 19;
89:23, 25;
91:2, 9; 95:4,
21; 113:1;
126:15;
149:9, 17,
22; 151:3, 8;
160:10, 16
searching [2] -
63:6; 160:11
second [10] -
5:17; 10:25;
22:21; 29:2;
62:23; 64:6;
71:9; 127:22;
154:8, 10
Second [6] -
3:13; 5:11;
10:12; 11:7;
130:10;
132:6
secondly [1] -
138:22
section [16] -
52:25; 65:16;
66:12; 81:16;
82:25; 90:9;
91:10, 17;
92:4; 94:24;
97:22; 98:24;
105:13
sections [5] -
65:21; 85:16;
91:8; 92:1;
102:24
secure [2] -
40:19;
100:24
security [2] -
40:7; 42:6
see [80] - 6:15;
20:1, 8, 10;
23:17; 24:25;
25:17, 25;
26:16; 29:5,
9-10, 24;
30:4; 31:13;
32:12, 15;

43:14; 44:7;
50:23; 52:2;
63:6; 68:5;
72:5, 16;
79:21, 23;
80:7; 81:21;
84:24; 85:16;
86:21; 87:10;
92:9; 94:11;
99:21;
101:16;
102:8; 104:4,
17; 105:2;
109:3, 16;
111:11;
116:5, 12;
117:12;
118:23;
125:10;
126:14, 18;
127:2;
130:20;
132:7, 15;
138:1;
145:19;
149:15, 19;
150:1, 4-5;
155:8, 14,
20; 156:5,
11, 18;
157:6, 9, 14,
20-21;
158:6, 15;
161:5, 7;
164:13;
167:8
seeing [19] -
23:11; 28:11;
30:3; 31:9,
22; 32:21;
55:11; 56:22;
61:3; 87:22;
94:20; 98:3;
103:4; 117:3,
6; 125:2;
130:7, 13
seem [1] -
61:13
seemingly [2]
- 135:18;
136:9
seizures [1] -
73:8
select [2] -
43:13; 45:5
selected [1] -
86:22
selection [5] -
21:7; 162:9,
25

self [15] -
32:11; 48:4;
66:6; 89:21;
105:11;
106:24;
107:16;
114:2;
124:20;
126:4
self-analysis
[1] - 32:12
self-
assessing [4]
- 89:21;
114:2;
124:20;
126:4
self-
assessment
[1] - 66:6
self-audits [1]
- 48:4
self-correct [1]
- 124:21
self-
correcting
[3] - 89:21;
114:3; 126:4
self-learning
[1] - 32:11
self-refer [1] -
105:11
self-report [1]
- 107:16
self-reported
[1] - 106:24
semiannual
[3] - 64:7;
66:1; 80:1
send [1] -
62:20
sending [1] -
87:14
sends [1] -
15:12
senior [1] -
25:23
sense [11] -
5:20, 23;
26:10; 32:3;
39:10; 75:22;
121:17;
124:12;
141:12;
147:7
sensitive [1] -
74:19
separated [1] -
119:6
separating [2]

- 49:24;
117:5
separation [3]
- 39:15;
161:15;
162:12
separations
[2] - 53:4, 22
September [1]
- 109:3
sergeant [3] -
153:19, 23;
156:9
sergeants [7] -
7:21; 38:14;
152:13;
153:11, 16;
154:2
series [2] -
78:9; 138:19
serious [4] -
5:11; 8:21;
10:1; 48:19
seriously [2] -
38:18; 93:6
seriousness
[1] - 9:22
serve [4] -
7:18; 73:1, 8;
132:17
served [2] -
15:15; 86:16
service [7] -
22:21; 28:12;
97:7; 119:18;
123:4, 12;
157:3
Services [1] -
28:22;
121:13
services [22] -
16:24; 17:4;
28:5, 11, 17;
40:6; 104:1,
5; 111:19;
112:8; 124:7,
9; 156:1, 14,
16; 157:8,
25; 158:3
serving [1] -
157:5
session [2] -
37:10; 54:16
set [7] - 138:1;
147:1, 10;
157:5;
164:21;
166:18
sets [1] - 18:23
setting [2] -

110:18;
142:18
settlement [1]
- 3:6
seven [4] -
41:20; 52:13;
97:21, 24
several [5] -
69:25; 97:19;
111:18;
153:13;
156:9
severe [1] -
106:19
severity [1] -
21:19
sex [2] - 4:7;
77:22
sexual [4] -
4:3; 65:8;
77:22;
139:15
shame [1] -
166:5
shape [1] -
66:18
share [6] -
26:10; 84:18;
85:8; 102:9;
144:18
shared [1] -
36:6
Shea [2] -
15:12;
136:12
sheet [1] -
50:25
shelf [1] -
109:14
shift [13] -
8:24; 30:20;
56:24; 57:3,
6, 21; 59:10;
88:5; 114:2;
120:4; 150:8,
12; 154:8
shifted [1] -
129:20
shine [1] -
125:24
shining [1] -
32:15
shiny [1] -
109:12
shipped [2] -
124:1, 4
shipping [1] -
124:7
shooter/
active [2] -

34:23, 25
shootings [2] -
11:11, 24
short [6] -
11:9; 17:7;
29:4; 60:5;
96:6; 131:9
short-staffed
[1] - 17:7
short-term [1]
- 60:5
shortage [2] -
119:21;
120:14
shortages [1] -
132:10
shorter [1] -
79:10
shortfall [1] -
156:5
shortly [2] -
84:6; 88:12
shots [1] -
86:7
shoulder [1] -
165:2
shoulders [2] -
15:1; 17:23
show [14] -
7:4; 47:20;
60:9; 67:19;
79:20; 80:14;
81:14; 90:20;
98:25; 99:3,
11; 105:15;
123:19;
159:1
showed [5] -
62:4; 79:19;
86:15;
101:11;
118:8
showers [1] -
59:1
showing [6] -
3:10; 59:17;
65:15; 98:4;
99:6; 124:13
shown [1] -
88:14
shows [10] -
30:4; 50:14;
52:1; 65:16;
79:22; 93:23;
99:7; 108:10;
126:11, 13
shy [1] - 77:2
sick [1] -
107:18
side [11] -

53:11; 85:14; 92:9; 102:4, 8, 18, 23; 131:25; 136:24; 165:16

sign [5] - 61:6, 8; 96:18; 160:22

signals [1] - 161:1

significant [14] - 10:16; 18:8; 19:9; 39:16; 44:7; 48:21; 50:15; 65:2, 18; 68:19; 130:8, 14; 132:20

significantly [1] - 13:25

signifier [1] - 145:21

signing [1] - 56:18

silo [1] - 143:13

silver [1] - 31:22

similar [2] - 136:1; 143:1

simple [1] - 146:2

simply [12] - 9:5; 17:17; 25:21; 57:21; 83:20; 92:21; 119:7; 131:23; 138:11; 142:3; 147:14

simultaneous ly [1] - 91:19

single [8] - 9:16; 20:24; 84:9; 150:6, 19

sit [2] - 19:13; 109:13

sitting [1] - 134:13

situated [1] - 102:13

situation [11] - 56:25; 72:14; 73:19; 74:7; 76:9; 111:9; 125:23; 137:16;

157:11; 162:17; 164:8

situations [1] - 74:1

six [10] - 3:5, 7; 10:11; 11:22; 18:1; 19:8; 26:19; 34:21; 97:19; 139:22

six-year [1] - 10:11

sixth [1] - 133:15

size [4] - 38:20; 65:16; 84:25; 141:9

skewed [1] - 23:20

skills [1] - 12:23

sleep [3] - 106:7; 158:15, 18

sleeping [1] - 104:15

slice [1] - 65:21

slide [11] - 55:6, 8; 65:14; 92:6; 99:1; 101:10; 103:22; 112:23; 114:5; 116:15; 118:8

slides [6] - 51:9; 97:6; 112:23; 122:22

slightest [2] - 51:14; 139:4

slow [3] - 13:1; 23:4; 61:19

slowed [1] - 44:25

slowing [1] - 10:19

slowly [2] - 12:16; 120:21

small [2] - 37:5; 107:2

smaller [1] - 121:5

smallest [1] - 37:6

smarter [2] -

24:16, 23

snapshot [1] - 103:6

so-called [3] - 14:6; 82:1; 86:15

social [4] - 13:9; 16:23; 61:12; 144:23

socializing [1] - 118:22

societal [1] - 13:14

society [1] - 58:4

software [1] - 40:7

sole [1] - 57:1

solely [1] - 17:23

Solicitor [6] - 2:9, 11; 14:21; 15:12, 15; 23:13

solicitors [1] - 18:1

solid [2] - 49:24; 153:25

solidify [1] - 61:18

solution [2] - 138:2; 165:4

solutions [2] - 26:15; 40:7

solve [6] - 21:20, 25; 134:23; 135:19; 136:1; 137:14

solved [3] - 10:3; 134:24; 137:13

solving [1] - 132:16

someone [4] - 37:15; 121:9; 155:9; 162:4

sometimes [6] - 23:20; 29:20; 31:24; 111:5; 136:17; 150:14

somewhat [7] - 73:10; 136:13; 141:22;

146:15; 153:16; 160:18; 162:1

somewhere [2] - 50:13; 162:6

soon [7] - 24:19; 70:18; 85:8; 98:21; 124:10; 129:25; 141:18

sooner [2] - 115:11; 118:4

sorry [2] - 22:17; 67:5

sort [28] - 33:7; 44:15; 53:16; 66:24; 76:8; 81:22; 82:17; 86:20; 88:4; 106:16; 125:7; 127:19; 136:4; 141:21; 142:15; 144:1, 5; 146:2; 147:1, 12, 17; 148:15; 153:15; 154:3, 8; 160:2

sound [2] - 12:1; 96:14

sources [1] - 138:2

space [7] - 58:24; 59:1; 61:18; 158:5; 159:1

span [4] - 142:4, 11; 143:25; 152:25

spark [1] - 63:8

speaking [1] - 3:11

speaks [2] - 90:18; 91:25

special [1] - 25:11

specialist [1] - 4:6

specialized [1] - 4:5

specially [1] - 80:20

specific [11] - 6:25; 10:14; 14:6; 20:16; 43:21; 61:8; 68:6; 71:21; 111:18; 141:23; 163:25

specifically [6] - 16:22; 20:25; 57:19; 109:10; 143:9; 163:5

specificity [2] - 27:1; 77:1

specifics [1] - 69:18

spectrum [1] - 131:25

speed [3] - 42:2; 160:20; 161:1

speeding [2] - 118:15; 128:4

spelled [1] - 76:24

spelling [1] - 146:15

spend [4] - 25:20; 50:19; 110:16

spending [1] - 148:23

spent [1] - 130:1

spillover [1] - 91:17

spine [1] - 41:11

spiral [1] - 18:19

spirit [1] - 93:10

spotlight [1] - 148:8

spreadsheets [1] - 146:3

spring [4] - 78:4, 8, 14, 17

Squeegee [2] - 17:11; 19:5

stability [1] - 154:4

stable [1] - 111:8

staff [6] - 2:16;

19:1; 93:4, 21; 131:1; 161:10

Staff [3] - 15:16; 20:3; 23:24

staffed [3] - 13:24; 17:7; 43:22

staffing [37] - 8:19; 9:5, 11, 16, 19; 10:3; 11:1; 16:6, 12; 19:16; 21:1-3; 24:14; 27:9, 17; 28:11, 16; 38:22; 43:3, 5, 18; 45:1; 51:7; 60:5; 69:17; 131:11; 132:1, 9, 18-19; 133:1, 10; 134:14; 135:4

stage [1] - 33:7

stages [1] - 38:1

stakeholders [1] - 17:16

stakes [1] - 5:10

stand [7] - 5:15; 6:4; 10:23; 96:2; 142:21; 145:18; 146:12

standard [1] - 166:2

standards [1] - 38:6

standing [1] - 9:17

stands [2] - 3:17; 167:23

start [20] - 15:7; 26:9; 29:24; 33:13, 20; 34:11; 38:6; 46:13; 50:16; 68:12; 69:7; 80:16; 87:21, 25; 126:25; 127:15; 143:8; 163:4

started [10] -

41:1; 42:4; 48:7; 62:8; 88:22; 105:8; 124:13; 136:11; 161:17; 163:19

starting [5] - 34:25; 100:20; 120:23; 133:4; 151:17

state [14] - 6:4; 12:23; 16:9; 36:18; 90:16; 116:2, 7, 9; 130:5; 133:5; 148:13; 164:10; 165:22

state's [1] - 83:2

State's [18] - 20:2, 4; 24:25; 35:10, 12-13, 21; 36:5; 46:3; 81:19, 24; 82:2, 6-7, 12; 83:16, 22; 89:8

state-of-the-art [1] - 130:5

statement [3] - 11:3; 54:7; 160:6

States [4] - 2:4, 6, 20; 29:1

static [1] - 147:17

station [1] - 22:24

stations [5] - 23:1, 3; 58:12, 17, 24

statistic [1] - 156:21

statistically [1] - 122:3

statistics [4] - 11:4; 81:21; 106:9; 121:25

status [5] - 41:24; 59:21; 67:24; 88:10; 99:11

stay [7] -

1/26/23 Quarterly Consent Decree Hearing

21:11; 44:22;
83:24; 93:24;
101:6
**staying** [2] -
67:16
**steady** [1] -
47:3
**step** [5] -
30:22; 31:4;
52:24; 92:23;
158:12
**stepping** [4] -
30:21,
24-25; 31:7
**steps** [6] - 5:3;
8:9; 16:1;
53:1; 98:6;
132:21
**Steptoe** [1] -
34:5
**Steven** [2] -
2:10; 15:15
**sticking** [1] -
83:5
**stigmas** [1] -
158:22
**still** [29] - 6:9;
12:1; 16:11;
23:10; 31:4;
42:4; 43:15;
49:12; 52:25;
56:9; 59:20;
60:13; 70:15;
88:10; 98:22;
105:8;
107:25;
108:4; 112:7;
118:3;
120:11;
125:10, 20;
139:21;
140:6;
142:20;
155:16;
162:6; 164:5
**stills** [1] -
12:22
**stimulating** [1]
- 136:6
**stone** [1] -
166:1
**stoops** [1] -
25:23
**stop** [24] -
10:4; 41:7;
61:1; 75:5;
79:7, 18;
80:23; 85:10;
86:1; 87:22;
93:18;

133:24;
135:17;
149:20;
150:6, 9, 19;
151:8;
152:20;
160:22
**stopped** [3] -
94:13;
107:23;
124:13
**stops** [30] -
3:24; 33:17;
35:25; 69:4;
72:25; 73:7;
79:17; 80:19;
81:5, 7;
85:13, 19;
86:6; 89:23,
25; 91:2, 9;
95:4, 21;
113:1; 149:9,
17, 22;
150:3, 17;
151:3
**storage** [1] -
40:6
**story** [2] -
80:14;
110:22
**stovepipes** [1]
- 40:13
**straightforwa**
**rd** [1] -
100:10
**strategies** [5] -
8:11; 9:14;
22:8; 23:19;
82:11
**strategy** [10] -
14:2; 17:10,
12; 19:11;
24:4; 74:8;
83:13;
105:17;
132:23;
134:15
**Strategy** [2] -
16:23; 23:15
**stray** [1] -
51:25
**street** [8] -
5:17; 25:21;
26:22; 29:3,
15, 20;
38:10; 82:11
**streets** [1] -
30:17
**strengthen** [2]
- 36:3; 98:14

**strengthenin**
**g** [1] - 35:15
**stress** [8] -
104:15;
105:1;
109:21, 23;
157:4
**strides** [1] -
59:23
**strikes** [1] -
143:1
**strong** [2] -
18:24; 68:23
**structure** [1] -
40:6
**struggles** [1] -
55:3
**stuck** [1] - 74:8
**student** [1] -
56:16
**study** [5] -
99:13, 23;
103:23, 25;
104:14
**stuff** [2] -
86:15; 126:5
**subject** [5] -
14:7; 76:2,
11; 96:9;
133:22
**subjects** [1] -
91:15
**submissions**
[1] - 108:24
**submit** [1] -
134:3
**submitted** [5] -
108:23;
150:8, 12, 14
**substance** [1]
- 33:3
**substantial**
[10] - 3:19;
4:12; 5:5;
8:9; 9:9;
10:17; 70:5;
102:17;
131:16;
157:13
**substantially**
[3] - 37:16;
76:11;
139:12
**substantive**
[1] - 14:17
**subtopic** [1] -
79:21
**success** [13] -
5:21; 6:14;
10:15; 13:18;

25:12; 72:9;
95:16;
102:10;
104:10;
110:17;
134:2;
154:10;
159:1
**successes** [4]
- 5:13;
10:18; 20:19;
30:9
**successful** [4]
- 31:6;
59:11; 128:9;
153:25
**successfully**
[3] - 8:12;
41:20;
107:17
**suffer** [1] -
49:20
**suffered** [2] -
49:7; 76:5
**sufficient** [14]
- 7:25; 8:4;
39:17; 81:11;
84:25; 86:12;
98:7, 19;
105:9;
129:22;
152:23;
153:2;
154:19
**sufficiently** [2]
- 37:20;
154:19
**suggest** [2] -
48:21; 71:17
**suggesting** [3]
- 71:9, 24;
136:14
**suggestive** [2]
- 47:3; 76:14
**suite** [2] -
123:13, 18
**sum** [1] -
149:14
**summarizes**
[1] - 99:9
**summarizing**
[1] - 99:5
**summary** [4] -
65:22; 92:6;
101:11;
112:22
**summer** [3] -
78:14, 17, 20
**supervise** [1] -
151:12

**supervised** [2]
- 14:1; 154:7
**supervising**
[1] - 151:12
**supervision**
[12] - 7:14;
8:5; 9:20;
42:20; 48:23;
71:20;
104:16;
105:1;
127:19;
152:2, 4;
160:14
**supervisor** [8]
- 34:14;
72:2; 150:23;
151:9;
152:11;
154:7, 17
**supervisor's**
[1] - 34:16
**supervisors**
[21] - 4:5;
7:17; 8:3;
47:5; 72:1, 6;
88:3; 150:10,
18, 20, 25;
151:10-12;
152:13, 25;
153:4;
154:16;
156:13;
158:8
**supervisory**
[6] - 7:23;
8:1; 98:15;
150:10, 18;
152:21
**supplement**
[1] - 19:15
**supplemental**
[1] - 11:3
**supply** [1] -
120:1
**support** [13] -
18:24; 24:11;
31:4; 40:2;
71:2; 102:15;
104:13;
108:12;
109:18;
111:16, 20;
139:10
**supported** [2]
- 19:1;
111:23
**supporting** [2]
- 8:3; 111:4
**supports** [3] -

16:24;
104:23;
106:23
**supposed** [2]
- 47:21;
160:16
**suppression**
[1] - 13:25
**surely** [1] -
120:21
**surface** [1] -
118:3
**surfaced** [1] -
125:23
**surfacing** [1] -
31:23
**surprises** [1] -
143:12
**surrounded**
[1] - 19:6
**surrounding**
[1] - 98:15
**survey** [15] -
57:11; 59:7,
9; 100:16,
22, 25;
101:2;
104:14;
105:6, 10,
18; 108:8;
109:19, 22;
110:2
**surveys** [2] -
57:14; 105:7
**suspect** [1] -
59:20
**suspicion** [3] -
71:10; 86:2;
150:16
**sustain** [1] -
25:18
**sustained** [2] -
49:20; 66:12
**sustainment**
[1] - 66:10
**sworn** [7] -
9:15; 25:16;
34:25; 43:3,
5; 52:7;
132:7; 133:2
**synchronizes**
[1] - 116:3
**System** [7] -
17:14; 41:11,
19; 69:4;
81:7; 95:22;
98:18
**system** [31] -
6:8; 12:24;
13:8; 18:5;

41:12,
17-18;
42:12; 45:18;
46:1; 48:23;
81:15; 86:7;
96:4, 8;
98:11;
101:15, 22;
109:17;
113:17;
114:20;
115:1;
127:12, 23;
130:5; 150:2;
151:2, 4;
163:23;
164:16
**systematic** [1]
- 146:15
**systematicall**
**y** [1] - 8:8
**systemic** [1] -
80:18
**systemically**
[2] - 76:17;
142:2
**systems** [12] -
7:2, 6; 40:13,
15; 42:8;
66:6; 81:11;
113:12;
114:15, 17;
148:13;
157:5

---

**T**

**TA** [1] - 137:23
**table** [10] -
9:25; 17:16;
19:4; 20:24;
21:15; 26:2;
36:13; 80:11;
121:15;
124:14
**tactfully** [1] -
96:1
**tailors** [1] -
68:24
**tangent** [1] -
77:9
**tap** [1] - 135:6
**target** [6] -
54:3, 22;
62:3; 94:22;
105:2
**targeted** [1] -
144:12
**Task** [4] - 34:5;
113:24;

118:11;
155:11
**task** [6] - 4:17;
39:1, 12;
93:21; 133:9;
144:22
**tasked** [1] -
144:14
**tasking** [1] -
163:8
**tasks** [2] -
40:10, 13
**taught** [1] -
91:6
**teach** [2] -
110:9; 154:3
**teaching** [1] -
131:3
**team** [18] -
23:25; 24:2,
24; 31:3;
34:20; 39:11;
52:22; 53:2;
55:19; 65:3,
12; 103:23;
108:25;
116:10;
133:17;
137:15;
144:11, 20
**Team** [70] -
2:15; 4:25;
7:9; 10:15;
14:11, 14;
30:21, 23;
31:17, 25;
33:5; 64:22,
25; 65:12;
67:20; 69:1;
71:16; 77:17,
25; 78:10;
83:19; 85:8;
86:12; 92:2;
94:11, 16;
95:17; 96:7;
108:16;
109:16;
112:4;
115:25;
116:1; 118:2;
119:9;
128:24;
129:2, 9, 24;
130:1, 11;
131:7;
133:21;
134:6; 135:3,
5; 136:6, 8;
138:19;
139:7; 140:2,

15, 18;
141:20, 22;
143:10, 12,
17; 144:19;
145:2;
146:14, 20;
147:11, 15,
18, 21;
148:4; 152:1;
157:24
**Team's** [10] -
3:13; 95:19;
132:6;
133:17, 22;
137:20;
138:12;
148:7, 19;
167:7
**team's** [2] -
133:20;
134:4
**teams** [1] -
116:11
**tear** [2] - 123:5
**tears** [3] - 13:9
**tech** [3] - 7:1;
42:3, 16
**technical** [5] -
28:2; 129:13,
19; 135:4;
137:21
**technological**
[8] - 7:2, 6,
11; 115:20;
127:7; 128:5;
160:19;
165:8
**technologies**
[2] - 40:2, 4
**technology**
[35] - 16:13;
19:16; 23:3,
6; 27:8;
39:21; 40:12,
24; 41:12;
54:13; 69:3;
72:21; 81:16;
101:15, 17,
22; 102:2;
108:18, 23;
109:10;
115:25;
116:3, 5;
118:17;
120:10;
123:3,
17-18;
128:6;
149:18;
156:2;

164:11
**Technology**
[1] - 39:25
**ten** [4] - 45:13;
50:10; 129:4
**tendency** [1] -
152:19
**tentatively** [1]
- 5:6
**tenure** [1] -
124:8
**term** [4] - 60:5;
129:23;
136:24;
149:20
**terminal** [2] -
164:15, 17
**terminate** [1] -
38:16
**terminated** [3]
- 37:4;
53:10;
106:10
**termination** [1]
- 53:10;
106:19
**terminations**
[1] - 37:8
**terms** [34] -
6:5; 7:17;
9:22; 27:3;
37:22; 42:13;
43:7, 17;
49:15; 52:7;
53:23; 55:9;
57:3; 61:22;
66:22; 70:23;
74:25; 75:4;
82:1; 106:17;
111:4;
117:10;
129:14;
135:4, 11,
17; 136:13;
137:19, 25;
138:23;
141:6;
146:10;
147:22
**terrific** [2] -
36:18; 44:18
**test** [1] -
113:14
**testament** [1] -
39:18
**texts** [1] -
87:14
**thankfully** [1] -
161:14
**THE** [210] - 2:2,

7, 17, 19, 24;
14:21, 24;
15:4, 18, 24;
19:23; 20:6,
9; 21:12;
22:17; 25:2;
26:5, 7;
31:14; 32:7,
24; 33:1, 6,
10, 23, 25;
36:9, 12;
37:2, 10;
39:2, 7, 23;
41:10; 42:2,
12, 16; 43:1,
7, 17; 44:1,
14; 46:17,
21, 23; 47:1,
12, 17; 49:1;
51:4, 11, 21,
24; 52:6, 9;
53:11; 55:15,
22, 25; 56:4,
6, 20; 57:8,
23; 58:16;
59:16, 18;
60:4, 8, 13,
24; 62:6, 25;
63:14, 21,
24; 64:3, 15;
66:14, 17,
21; 68:4, 8,
10; 70:3, 20;
71:14; 72:10;
73:18, 23;
74:5, 7, 10,
16, 23; 75:3,
18, 23;
76:13, 20;
77:5, 13;
78:24; 79:7,
13; 80:12;
81:18; 83:21;
84:16; 85:17;
86:14, 19;
87:4, 14, 18;
88:2, 7, 23;
89:3; 90:4, 6;
91:21; 93:10,
13; 94:6;
95:2, 24;
96:16, 22;
97:1, 4, 12;
106:9, 15;
107:7; 108:5;
111:3;
112:17, 19;
115:3, 14,
20; 116:14;
117:15, 19;
119:12, 23;

120:19;
121:19, 22;
122:14, 25;
123:9;
124:12, 17;
125:6, 14;
128:20;
129:1, 6, 11;
134:11;
137:9, 13;
138:7, 9, 25;
139:3; 140:3;
142:8, 17;
144:9; 146:6;
147:25;
149:2, 4, 6,
151:24;
153:9;
154:22;
155:1, 3, 5;
156:21, 25;
159:3, 8, 11,
19, 22;
160:1, 5;
161:4;
162:16, 19;
163:4, 11;
164:7, 20;
165:20;
166:5, 12,
17, 23;
167:2, 5, 8,
13, 16, 23
**themselves**
[17] - 32:3;
37:24; 90:22;
92:11, 17,
22; 107:3;
108:3;
110:15;
121:14;
124:24;
148:14;
149:1, 24;
150:5; 151:9;
162:20
**there'll** [1] -
158:25
**thereof** [1] -
152:3
**thesis** [3] -
11:24; 12:1;
71:2
**thew** [1] -
160:4
**they've** [9] -
11:6; 38:23;
65:12; 82:23;
110:7;
134:18;

136:1; 139:9;
155:15
**thinking** [13] -
4:19; 22:8;
56:23; 57:24;
82:5, 13;
107:7;
135:17, 21,
25; 144:10;
148:4
**thinks** [1] -
135:11
**third** [10] -
5:19; 6:12;
29:16; 69:21;
99:13; 114:6;
154:8, 10
**third-layer** [1]
- 154:8
**third-level** [1] -
154:10
**third-party** [1]
- 99:13
**thirds** [1] -
67:10
**thirsty** [1] -
158:10
**Thirty** [1] -
34:21
**Thompson**
[21] - 2:7, 15;
10:8; 14:19,
22; 19:23;
21:13; 33:1;
75:18; 129:3,
6; 134:12,
19; 145:7;
149:4; 155:3;
159:20;
166:14, 19;
167:11
**THOMPSON**
[28] - 2:8, 14;
14:20, 23;
15:3, 10, 22,
25; 22:16;
33:4; 59:22;
75:17, 19;
129:7, 12;
136:10;
137:12;
138:4, 8;
149:5; 155:4;
159:4, 24;
166:15, 22,
24; 167:6, 12
**thorough** [1] -
140:10
**thousand** [1] -
105:24

**thousands** [1]
- 12:11
**threat** [3] -
34:23; 35:1;
76:18
**three** [16] -
5:14; 20:16;
31:25; 34:13;
37:11, 21;
54:3; 69:21;
91:2; 93:25;
100:5, 19;
134:4;
139:11;
143:3; 163:2
**three-day** [1] -
34:13
**threshold** [1] -
141:24
**throughout** [8]
- 27:1; 29:8,
23; 31:12;
34:12, 21;
65:5; 90:25
**thrown** [1] -
118:22
**Thursday** [3] -
34:12;
167:19
**tied** [2] - 84:22;
122:22
**tight** [1] -
81:22
**Tim** [1] - 2:3
**timeliness** [3]
- 49:1, 16;
50:1
**timidity** [1] -
74:11
**timing** [1] -
129:8
**tipping** [1] -
87:9
**tiptop** [1] -
4:21
**title** [1] - 15:4
**today** [24] -
2:25; 14:12,
17; 15:4;
20:11, 17;
21:1; 24:10;
27:1, 12, 14;
31:12; 33:15;
51:14; 52:23;
77:20; 80:15;
83:1; 95:12;
133:16;
145:23;
149:8;
156:13;

1/26/23 Quarterly Consent Decree Hearing

157:23

**today's** [2] -
22:13; 50:17

**together** [4] -
24:8; 64:21;
65:13; 109:6

**toggling** [1] -
147:2

**tolerance** [1] -
39:8

**toll** [1] - 50:9

**tomorrow** [2] -
137:1; 138:5

**tonight** [1] -
138:5

**took** [4] - 12:4;
32:13;
107:15;
129:17

**tool** [1] - 87:8

**tools** [5] -
56:10; 87:1,
3; 89:22;
113:9

**top** [10] -
14:25; 21:21;
22:4; 42:5;
44:22; 53:25;
93:24;
104:17;
145:18;
155:7

**topic** [16] -
11:4; 14:12;
34:24; 51:7;
64:1; 79:1,
23; 112:21;
113:22;
134:12;
141:16;
158:1; 159:6,
17

**topics** [21] -
14:6, 15;
20:15; 33:14;
66:22; 67:25;
68:2, 6; 79:6,
15; 80:24;
97:2; 128:23,
25; 129:4;
144:17;
159:12;
160:11

**total** [4] -
46:23; 52:7;
80:20; 88:24

**totals** [1] -
55:13

**touch** [2] -
29:8; 158:8

**touching** [1] -
158:4

**tough** [1] -
10:6

**tour** [1] -
107:15

**toward** [7] -
5:4; 36:7;
55:21; 62:24;
95:13; 112:6;
148:7

**towards** [9] -
26:14; 30:20;
46:12; 58:7;
59:12; 68:24;
83:12; 153:7;
157:5

**Trace** [1] -
34:5

**Tracey** [1] -
155:10

**track** [18] -
41:24; 54:15;
64:13; 66:3;
67:3, 10;
81:13; 84:21;
85:7; 98:4,
25; 100:3;
103:21;
114:14;
118:16;
123:12;
158:8; 162:2

**tracked** [2] -
101:22;
118:10

**tracking** [7] -
19:8; 65:6;
81:12; 88:22;
114:15;
157:19;
158:5

**traditional** [5] -
55:4; 61:11,
22; 62:13

**traditionally**
[1] - 17:18

**traffic** [2] -
81:1; 161:1

**trafficked** [1] -
61:7

**train** [4] -
34:22; 37:20;
137:2;
160:25

**train-the-**
**trainer** [1] -
34:22

**trained** [8] -
4:8; 7:18, 22;

68:16; 81:8;
109:13;
112:1;
154:19

**trainees** [5] -
38:25; 39:1,
16; 53:8

**trainer** [1] -
34:22

**Training** [2] -
33:22; 38:14

**training** [69] -
3:23; 4:5, 9;
8:2; 16:4;
29:14; 33:21;
34:2, 6, 10,
14, 16, 21;
35:3, 12, 21,
25; 36:6,
15-16; 39:4,
20; 47:10,
14, 19-20;
48:22; 54:11;
56:19; 64:23;
67:13; 68:12,
14, 18; 72:2;
81:2, 4, 9;
84:19; 87:3;
90:10;
91:3-5;
110:4, 8;
113:2, 7;
115:2;
122:18;
127:18;
130:3, 20,
22, 24-25;
139:9; 151:5,
7; 152:21;
153:20;
157:15;
160:12, 23;
161:4

**trainings** [9] -
47:15; 68:15,
20, 23-24;
90:25; 113:5;
158:17

**trajectory** [1] -
36:19

**transfer** [1] -
50:7

**transferred** [2]
- 116:5

**transformatio**
**n** [1] - 44:6

**Transition** [1] -
115:24

**transition** [5] -
30:19; 58:20;

87:5; 116:1;
137:18

**transitions** [1]
- 87:7

**translate** [2] -
135:9;
141:11

**transparency**
[3] - 43:18;
45:15; 77:6

**transparent**
[1] - 145:4

**transpired** [1]
- 142:6

**transport** [29] -
27:14; 33:18;
112:25;
113:5, 12,
18; 114:8,
10, 22;
117:3; 118:9;
119:3, 17,
21; 121:5,
24; 122:12;
124:9, 19;
125:12;
127:9, 11;
128:1; 139:9;
159:6;
160:17;
161:10, 18;
164:1

**transportatio**
**n** [6] - 66:15;
77:18;
112:21;
121:9;
133:24;
166:17

**transported**
[2] - 113:19;
161:19

**transporter** [1]
- 124:7

**transporting**
[1] - 120:4

**transports** [6]
- 113:24;
120:7, 11;
123:14;
161:14

**trauma** [2] -
158:3, 19

**traumatic** [2] -
111:21;
157:25

**treatment** [1] -
106:18

**treatments** [1]
- 157:2

**tremendous**
[2] - 110:20;
159:14

**trends** [3] -
76:6, 15;
99:16

**trial** [1] - 35:17

**tried** [1] -
163:18

**trouble** [2] -
31:24; 139:4

**troubled** [1] -
9:3

**troubling** [2] -
10:13; 95:7

**trucks** [1] -
120:20

**true** [6] - 7:4;
9:2; 42:15;
43:23; 86:23

**truly** [3] - 8:10;
25:10; 58:18

**trust** [10] - 5:4;
11:15; 12:15;
17:5; 28:1;
49:5, 11;
95:11;
132:14

**truth** [2] - 77:6;
146:11

**try** [9] - 29:9;
36:7; 53:1;
74:7; 127:17;
132:21;
133:8; 136:8;
137:2

**trying** [31] -
27:21; 28:16,
23; 31:5;
42:14; 49:11;
54:23; 57:25;
58:1; 67:16;
76:22; 82:14;
93:3; 104:6,
25; 105:2, 8;
108:17;
116:21;
117:2; 122:2;
124:20;
128:3;
134:14;
135:19;
136:14;
142:12;
146:24;
147:7, 10;
152:6

**tuition** [1] -
54:13

**tuned** [1] -

32:3

**turn** [12] -
19:21; 22:12;
31:18; 33:2;
35:22; 67:3;
78:22; 96:25;
120:6;
140:22;
152:10

**turned** [2] -
49:10; 95:13

**two** [29] -
10:24; 18:14;
22:25; 24:2;
34:2; 58:24;
66:13; 67:10;
70:12; 77:16,
19; 79:8;
80:3, 20;
85:3, 15;
100:5; 110:3;
113:23;
118:11;
129:9, 11;
143:3;
152:15;
164:2, 24

**two-day** [1] -
34:2

**two-hour** [2] -
24:2; 110:3

**two-thirds** [1] -
67:10

**two-year** [1] -
66:13

**twos** [1] -
47:25

**type** [3] -
30:16; 45:12;
57:10

**types** [3] -
143:10;
144:6, 24

**U**

**UB** [3] - 36:17;
61:7, 15

**ugly** [1] - 71:5

**ultimate** [5] -
74:20; 77:6;
86:5; 106:16;
116:23

**ultimately** [10]
- 8:18;
11:15, 19;
13:18; 60:9;
66:9; 67:18;
122:19;
135:21;

140:25

**unabated** [1] -
13:1

**unable** [2] -
6:3; 13:9

**unclear** [1] -
147:9

**under** [21] -
4:17; 7:16;
9:4; 14:5;
25:13, 20;
29:18; 47:4;
49:9; 50:15;
79:16; 82:9;
90:15;
111:25;
117:21;
119:13;
121:7; 125:8;
130:21;
133:13;
152:4

**undergoing**
[1] - 47:17

**underlying** [4]
- 103:7;
105:2;
114:15;
144:13

**undermined**
[1] - 95:9

**underway** [8] -
4:13; 10:1;
41:9; 77:21;
81:17;
139:17;
140:16

**undoubtedly**
[2] - 13:4;
132:20

**unfold** [1] -
158:5

**unfortunately**
[1] - 32:18

**unfounded** [1]
- 49:24

**uniform** [1] -
58:12

**union** [2] -
56:23;
136:20

**unique** [2] -
25:10; 45:20

**uniquely** [1] -
9:3

**unit** [4] -
64:25; 77:23;
97:8; 148:5

**Unit** [2] -
44:12; 148:2

**United** [4] - 2:4, 6, 20; 29:1
**University** [2] - 4:11; 109:25
**unknown** [2] - 143:13; 147:9
**unless** [3] - 78:22; 131:17; 146:22
**unnecessaril y** [1] - 70:14
**unnecessary** [3] - 70:8, 11, 15
**unnoticed** [2] - 65:2; 132:21
**unqualified** [2] - 38:8; 125:8
**unrest** [2] - 157:25; 158:1
**unsafe** [1] - 122:3
**up** [56] - 12:4; 15:22; 25:18; 27:11; 28:5; 34:13; 36:7, 15; 38:8, 15; 44:21; 47:2, 20; 51:13; 58:6; 61:4; 65:24; 72:19; 75:24; 80:12; 82:22; 83:4; 86:16; 97:6; 101:13; 118:2, 5, 22; 119:10; 121:23; 122:12, 21; 123:19; 124:11, 13; 126:12; 130:12; 131:18; 134:1; 135:16; 139:3, 5, 13; 141:21; 143:23; 145:7; 149:14; 155:13; 156:12; 157:5; 158:7; 160:9; 164:21;

165:25; 166:2; 167:19
**upcoming** [3] - 80:6; 84:14; 167:18
**update** [5] - 35:3; 40:1; 122:13; 138:11; 141:10
**updated** [8] - 43:5; 64:6; 65:10, 25; 81:16; 113:7; 114:8; 130:24
**updates** [8] - 7:12; 39:21; 40:15; 41:6; 42:1; 65:7, 10; 122:18
**upfitted** [2] - 22:21; 123:18
**upgrade** [1] - 116:4
**upward** [2] - 21:6; 54:10
**upwards** [1] - 88:19
**urban** [2] - 4:24; 8:22
**urgency** [5] - 26:10; 121:5, 17; 122:11
**US** [1] - 4:20
**usable** [1] - 41:17
**usage** [2] - 105:23; 106:3
**useful** [1] - 155:25
**uses** [5] - 70:13; 73:11; 93:18; 103:18; 110:11
**utilize** [1] - 137:6
**utilized** [3] - 16:18; 17:10; 112:9
**utilizing** [2] - 16:14; 86:22

## V

**valiant** [1] -

19:3
**valid** [1] - 89:13
**valuable** [1] - 45:11
**value** [1] - 135:6
**valuing** [1] - 104:5
**vans** [1] - 123:24
**variety** [2] - 40:2; 108:11
**various** [4] - 41:4; 102:24; 105:11; 160:21
**vast** [2] - 17:4; 67:7
**vehicle** [8] - 72:25; 73:7; 85:25; 99:19; 113:11; 123:20; 128:5
**vehicles** [15] - 114:9; 119:17; 120:1, 14, 18; 121:1, 6, 24; 122:9, 12; 123:12, 25; 124:10; 160:20
**vendor** [1] - 121:13
**vernacular** [1] - 119:17
**Vernon** [1] - 110:20
**versus** [2] - 2:20; 80:15
**vexing** [1] - 135:7
**victory** [1] - 125:8
**view** [4] - 47:2; 123:11; 136:21; 146:19
**views** [1] - 12:11
**vigilance** [1] - 96:19
**vigilant** [1] - 93:24
**vigorously** [1] - 16:12
**Villasenor** [1] - 159:4

**VILLASENOR** [12] - 159:5, 10, 12; 160:4, 8; 161:5; 162:18, 21; 163:9, 12; 164:9; 166:9
**Villasenor's** [1] - 167:2
**vine** [1] - 10:3
**violations** [3] - 48:1; 81:1; 95:5
**Violence** [2] - 16:23; 23:14
**violence** [5] - 11:21; 13:11, 17; 17:1; 75:5
**violent** [2] - 11:23; 16:21
**virtually** [1] - 8:25
**virtue** [1] - 51:13
**virtualizatio n** [1] - 40:7
**visibility** [2] - 17:17; 61:15
**vision** [2] - 24:3; 137:14
**visit** [1] - 86:21
**visited** [3] - 36:17; 107:14
**visits** [1] - 153:9
**vital** [2] - 100:7; 101:7
**volume** [3] - 117:6; 132:23; 139:4
**voluntary** [6] - 53:22; 80:3; 93:7; 111:20; 149:22
**vulnerable** [1] - 54:4

## W

**wagon** [4] - 113:7; 120:3, 10
**wagons** [5] - 119:17, 23; 123:2, 8; 124:15

**wait** [12] - 50:5; 61:20; 87:20, 24; 88:7; 109:4; 123:23; 124:4; 135:13; 138:5; 164:14
**waiting** [4] - 22:21; 50:8; 108:18; 141:3
**walk** [2] - 31:5; 165:23
**walking** [1] - 156:9
**walls** [1] - 19:13
**wants** [5] - 19:23; 24:21; 68:2; 72:17; 146:6
**warm** [1] - 15:11
**warned** [1] - 132:10
**warnings** [1] - 83:8
**warrant** [1] - 80:25
**Warrant** [2] - 113:23; 118:10
**warrantless** [1] - 80:25
**warrants** [5] - 47:21; 73:1, 8
**watch** [4] - 37:20; 144:14; 163:20; 166:13
**watchful** [1] - 60:19
**watching** [3] - 87:8; 153:17; 160:1
**WATF** [1] - 118:12
**ways** [6] - 21:4; 118:16; 125:22; 127:24; 141:8; 147:20
**weakness** [2] - 94:21; 96:19
**weapons** [2] -

80:25; 86:1
**wear** [2] - 123:5
**wearing** [1] - 123:3
**weather** [1] - 18:22
**website** [1] - 45:16
**websites** [3] - 62:10
**wedge** [1] - 84:20
**week** [16] - 24:1; 34:11, 13, 15-17, 20, 22-23; 45:5; 102:25; 114:23; 117:20; 161:10; 162:11; 164:3
**weekly** [1] - 72:23
**weeks** [5] - 18:14; 23:25; 50:5; 60:1; 78:1
**weighing** [2] - 141:23; 142:2
**welcome** [4] - 15:11; 20:6; 35:20; 58:14
**well-grounded** [1] - 49:19
**wellbeing** [1] - 103:14
**wellness** [40] - 33:18; 54:14; 64:10; 77:18; 95:1; 97:16, 23; 98:9, 15; 99:14; 100:5, 18; 101:8, 19; 103:10, 20, 23; 104:10; 105:19; 107:4; 108:4, 13; 110:3, 13; 111:2, 13; 133:25; 155:8, 14, 18; 156:4, 6, 15; 157:2, 24; 158:14, 16, 21
**West** [1] - 17:1
**Western** [1] - 23:14
**whereas** [1] - 47:10
**whispering** [1] - 165:2
**whole** [10] - 28:20; 30:22; 43:23; 63:7; 65:15; 66:12; 117:25; 152:18; 156:8; 166:18
**wholistic** [1] - 17:2
**wide** [5] - 3:22; 16:4; 113:6, 13; 144:16
**wider** [4] - 5:23; 21:25; 43:19; 44:8
**WiFi** [3] - 40:18, 21; 41:1
**WiFi-enabled** [2] - 40:18, 21
**willing** [1] - 75:22
**willingness** [1] - 36:5
**wireless** [5] - 40:19, 22, 25; 41:1, 3
**wisdom** [2] - 97:13; 148:1
**wise** [2] - 105:4
**wish** [1] - 119:19
**wished** [1] - 15:13
**witness** [1] - 103:16
**witnesses** [1] - 35:20
**womanpower** [1] - 136:2
**women** [4] - 36:14; 59:3, 21; 145:13
**won** [1] - 12:15
**word** [2] - 123:25; 142:17
**words** [5] - 43:20; 70:11; 130:6;

1/26/23 Quarterly Consent Decree Hearing

132:15;
135:5
**workers** [3] -
28:13, 19;
60:10
**workforce** [1] -
12:23
**workings** [1] -
7:4
**workload** [1] -
132:23
**works** [1] -
19:14
**world** [2] -
63:18;
138:23
**worn** [7] -
47:25; 71:14;
92:10, 18,
21; 120:6;
160:21
**worried** [1] -
50:21
**worry** [1] -
142:17
**worse** [3] -
8:22; 22:11;
58:3
**worthy** [1] -
146:9
**wow** [2] -
156:25;
160:4
**wrapped** [2] -
141:21;
144:24
**wrapping** [1] -
34:13
**wreck** [1] -
121:25
**wrecked** [1] -
121:25
**writing** [2] -
87:12;
139:13
**written** [1] -
161:13

**Y**

**year** [58] - 9:9,
11; 10:11;
23:12; 25:16;
36:7; 39:16;
41:24; 43:9;
52:2, 10, 25;
53:21; 54:3;
64:9; 65:8;
66:2, 13;
70:9; 78:10;

81:2, 5;
82:22; 85:5;
86:8; 87:21;
88:19; 90:12;
94:2, 21;
96:7, 12;
102:5;
105:10, 18;
106:11;
109:4; 113:4,
25; 122:1;
133:16, 21;
136:12;
138:15;
139:24;
140:1;
141:17;
143:19;
149:12, 15;
151:18, 23;
163:16
**years** [30] -
3:5, 7; 9:24;
11:22; 12:6,
8, 13; 20:4;
26:19; 32:1;
37:11, 22;
42:5; 44:6;
62:8; 69:16;
70:6, 12;
85:4; 97:19;
100:5; 129:9,
11; 130:2;
142:21;
155:10, 12;
156:24;
164:13;
165:21
**yellow** [2] -
64:19; 67:18
**yield** [1] - 6:3
**yielding** [1] -
22:11
**young** [2] -
8:24; 153:14
**yourself** [3] -
47:20; 93:14
**youth** [7] - 4:2;
18:12,
17-18;
78:20; 117:5

**Z**

**zero** [1] -
163:22
**zones** [5] -
18:1, 10, 17,
20; 19:9
**zooming** [1] -

147:22