

BALTIMORE POLICE DEPARTMENT
CONSENT DECREE MONITORING TEAM

**OUTCOME ASSESSMENT AND AUDIT OF SEXUAL ASSAULT INVESTIGATIONS**

May 2023



## TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY .................................................................................. 1

II.  BACKGROUND ............................................................................................. 3
     A.  The Department of Justice's Investigative Findings Regarding Sexual Assault
         Investigations ........................................................................................ 3
     B.  Consent Decree Requirements ................................................................ 5

III. SCOPE OF THE REVIEW AND METHODOLOGY ...................................... 7
     A.  Scope of Review .................................................................................... 7
     B.  Methodology .......................................................................................... 8
         1.  Sexual Assault Investigation Audit .................................................. 8
         2.  Outcome Assessment ..................................................................... 10
     C.  Determining Compliance Status ........................................................... 11

IV.  BPD'S SEXUAL ASSAULT INVESTIGATION IMPLEMENTATION PROGRESS
     TO DATE .................................................................................................... 15
     A.  Sexual Assault Investigator Training .................................................... 15
     B.  Policy and Standard Operating Procedures ........................................... 19

V.   SEXUAL ASSAULT INVESTIGATION AUDIT PROCESS AND RESULTS ......... 20
     A.  Basic Information .................................................................................. 22
     B.  Victim Details ....................................................................................... 24
     C.  Investigative Files ................................................................................ 25
     D.  Victim Contacts .................................................................................... 26
     E.  Witness Interviews ............................................................................... 29
     F.  Suspect Interviews ............................................................................... 30
     G.  Administrative Reviews ........................................................................ 31

VI.  OUTCOME ASSESSMENT RESULTS ......................................................... 33
     A.  Paragraph 459(k)(i): Number of sexual assault reports made to BPD ................. 33
     B.  Paragraph 459(k)(ii): Rate of victim participation in BPD sexual assault
         investigations ...................................................................................... 35
     C.  Paragraph 459(k)(iii): Clearance rate in sexual assault cases and Paragraph
         459(k)(iv): Rate of declination of sexual assault cases referred to Baltimore City
         State's Attorney's Office for prosecution ............................................. 36

VII. BASELINE COMPLIANCE ASSESSMENT CONCLUSIONS................................... 39

## I.     EXECUTIVE SUMMARY

Paragraph 260 of the Consent Decree articulates requirements specific to how the Baltimore Police Department ("BPD" or "the Department") must approach investigations of reports of sexual assault, and Paragraph 262 of the Consent Decree specifies how these investigations must be supervised.

The following report presents a baseline audit that focuses specifically on the sexual assault investigative capacity of BPD. This assessment is based on a sample of sexual assault investigations opened by the Sex Offense Unit ("SOU") in 2018, 2019, and 2020. The timeframe covered by this audit largely predates the enactment of many of the policies and trainings developed and implemented in response to the requirements of the Consent Decree. It would not be reasonable to expect investigations initiated between 2018 and 2020 to fully comply with policies, standard operating procedures, or training that were not yet in place.  Consequently, we have not assessed compliance with paragraphs 260 and 262 of the Consent Decree.   While this audit is framed as a "compliance assessment," its real utility is in establishing a starting point – identifying where BPD, and specifically SOU, must focus its efforts to achieve compliance.

Additionally, Paragraph 459(k) requires the Monitoring Team to annually assess outcome measures related to whether BPD responds to sexual assault in a nondiscriminatory manner that complies with the Constitution and federal law and improves the safety and security of sexual assault victims in Baltimore. The assessment presented here is therefore a combined baseline compliance audit and outcome assessment.

**Summary of Findings**

The primary takeaways from the Monitoring Team's baseline compliance audit and outcome assessment include:

- **The overall quality of BPD's investigations of sexual assaults requires continued improvement going forward.**

- **The lack of a cohesive case management system hampers the Monitoring Team's ability to thoroughly assess the investigation and supervisory review of sexual assault cases.** Sexual assault case information currently exists in four distinct data and information systems as well as physical case folders. The assembly of case information from multiple sources led to incomplete and disorganized files for review.

- **Interviews and interactions with victims often involved the same issues described in DOJ's findings report**, such as high levels of skepticism among investigators regarding

sexual assault reports as determined by reviewer assessment of the totality of information provided about how cases were investigated, and the quality of interview techniques used during the interview process.

- **Trauma-informed interview techniques were not used consistently**. The use of open-ended questions and appropriate interview prompts were among the deficiencies found in the interviews reviewed for this audit.

- **Not all steps required for a thorough investigation of reports of sexual assault were conducted or documented such that they could be tracked.** Limitations of documentation in case files make it difficult to discern whether certain investigative processes were not done, not documented, or simply not provided in the case information for review.

- **SOU supervisors did not conduct consistent review and oversight checks of each case assigned to the investigators.** While supervisor checklists and progress reports were largely present in case files that were reviewed, reviewers noted lack of follow up and guidance documented in the materials assessed for this audit.

## II.     BACKGROUND

### A. The Department of Justice's Investigative Findings Regarding Sexual Assault Investigations

During its pattern or practice investigation into the Baltimore Police Department, the United States Department of Justice's findings "raised serious concerns about how BPD responds to and investigates reports of sexual assault."[1]

First, DOJ determined that there was "evidence of gender bias in BPD's response to sexual assault."[2]  For example, based on information from victim advocates, victims, and a review of sexual assault case files and related documents, DOJ found that officers in the Sex Offense Unit "often question victims in a manner that puts the blame for the sexual assault on the victim's shoulders," and that officers and detectives "asked questions suggesting that they discredit the reports of victims who delayed in reporting the assault to the police."[3] DOJ also found that detectives made statements "suggesting an undue skepticism of reports of sexual assault" and indications that "BPD disregards reports of sexual assault by people involved in the sex trade."[4] Additionally, DOJ also "received allegations of BPD officers' mistreatment of transgender individuals and have concerns that BPD's interactions with transgender individuals reflect underlying unlawful gender bias."[5]

Second, DOJ found that "BPD seriously and systematically under-investigates reports of sexual assault, and the sexual assault investigations it does conduct are marked by practices that significantly compromise the effectiveness and impartiality of its response to sexual assault."[6] DOJ determined that despite prior efforts at reform in this area, BPD's sexual assault investigations had the following deficiencies:

- "Failure to Develop and Resolve Preliminary Investigations."[7]  DOJ observed that in the majority of sexual assault cases BPD failed to "pursue investigations beyond the immediate, preliminary response to a report of sexual assault."[8]

- "Failure to Identify and Collect Evidence to Corroborate Victims' Complaints."[9] This included not "identifying and interviewing witnesses, gathering other types of

---

[1] DOJ Findings Letter at 122.
[2] *Id.*
[3] *Id.*
[4] *Id.*
[5] *Id.* at 123.
[6] DOJ Findings Letter at 123.
[7] *Id.* at 124.
[8] *Id.*
[9] *Id.*

evidence" such as surveillance footage, not "identifying and interrogating suspects", and "almost never mak[ing] a second attempt to contact" witnesses who were not reached in first contact attempt.[10]

- "BPD persistently neglects to request lab testing of rape kits and other forensic evidence."[11] Specifically, "detectives consistently neglect to gather DNA evidence and to request lab tests for DNA evidence from swabs or clothing."

- BPD "makes minimal to no effort to locate, identify, interrogate, or investigate suspects."[12]

- "BPD fails to identify and follow up on indications of serial suspects in its sexual assault cases."[13]

- "Missing or Inadequate Documentation of Investigation."[14] BPD's sexual assault case files were found to be "missing critical information and lack[ed] sufficient documentation of the investigation to allow detectives, their supervisors, and prosecutors to effectively evaluate the quality of the investigation and to assess and respond to the reported crimes."[15]

- "Failure to Collect and Review Data About, and to Appropriately Report and Classify, Reports of Sexual Assault."[16] In addition to determining that many cases were incorrectly classified, DOJ found BPD could not provide "basic data about the victim and suspect population, the incidence and nature of cases of sexual assault reported and handled by the department, and the incidence of cases of sexual assault involving BPD officers."[17]

- "Lack of Supervisory Review."[18] DOJ found supervisory review forms were almost always blank, and when completed, contained very little information. Similar concerns were raised regarding a "State's Attorney Contact Log" form.

---

[10] *Id.*
[11] DOJ Findings Letter at 125.
[12] *Id.*
[13] *Id.*
[14] *Id.* at 126.
[15] *Id.*
[16] DOJ Findings Letter at 126.
[17] *Id.* at 127.
[18] *Id.* at 127.

## B. Consent Decree Requirements

Consistent with DOJ's findings regarding the general inadequacies of sexual assault investigations and data – the Consent Decree contains two general classes of requirements on sexual assault investigations: supervision, and internal oversight.

First, the Decree requires BPD to follow a specific set of criteria in its investigations into reports of sexual assault. These are articulated throughout Paragraph 260, and specify that BPD will:

- "Assign all reports of sexual assault that meet the criteria outlined BPD policy to detectives for follow up investigation;"[19]
- "Thoroughly investigate reports of sexual assault, including any assaults that appear to be non-stranger assaults, assaults facilitated by alcohol or drugs, or assaults involving victims who were incapacitated or otherwise unable or unwilling to clearly describe the assault;"[20]
- "Consult with forensic examiners to obtain and discuss the results of medical/forensic examinations, and include a summary of the findings of the forensic examinations, including findings related to all injuries, in case reports;"[21]
- "Ensure that investigators of sexual assaults do not have a history of complaints of bias relating to gender or complaints of sexual misconduct that could impair their ability to investigate sexual assault in accordance with BPD policy and training;"[22]
- "If the victim consents, BPD shall enable advocates to be present during victim interviews, unless doing so would compromise the evidentiary value of the interview;"[23]
- "Continue to provide a 'soft' interview room, equipped with audio and video recording capabilities, for conducting victim interviews;"[24]
- "Ensure that officers introduce sensitive lines of questioning by first explaining why those questions are relevant to the investigation;"[25]
- "Ensure that if there is a specific and articulable investigative purpose, detectives can ask the victim about their desire to prosecute the assailant…"[26]

---

[19] Dkt. 2-2 ¶ 260(a).
[20] *Id.* ¶ 260(b).
[21] *Id.* ¶ 260(c).
[22] *Id.* ¶ 260(d).
[23] *Id.* ¶ 260(e).
[24] Dkt. 2-2 ¶ 260(f).
[25] *Id.* ¶ 260(g).
[26] *Id.* ¶ 260(h).

Second, the Decree requires BPD to "establish and implement measures to ensure supervision and internal oversight of sexual assault investigations."[27] These measures, specified in Paragraph 262, include:

- "Developing a system of automated alerts to trigger a supervisory reviews of open sexual assault investigations" and "protocol governing the supervisory review." [28] Supervisory reviews must occur "within 48 hours of the report being taken", [29] and evaluate the thoroughness of the investigation in cases when "the victim has not been interviewed within one week" of the report, or "a case has been classified as "open," without any investigative activity, for longer than six months." [30]
- Before a sexual assault investigation or report is closed or classified as "unfounded," a supervisor "shall assess whether a comprehensive investigation has been conducted and whether appropriate follow- up has been completed."[31]

Separately, Paragraph 459(k) of the Decree sets forth specific outcome measurements to assess "whether BPD responds to sexual assault in a nondiscriminatory manner that complies with the Constitution and federal law, and improves the safety and security of sexual assault victims in Baltimore." The outcome assessment requires an annual evaluation of: (i) "[n]umber of sexual assault reports made to BPD"; (ii) "[r]ate of victim participation in BPD sexual assault investigations"; (iii) "[c]learance rate in sexual assault cases"; and (iv) "[r]ate of declination of sexual assault cases referred to the Baltimore City State's Attorney's Office for prosecution."[32]

---

[27] *Id.* ¶ 262.
[28] *Id.* ¶ 262(a).
[29] Dkt. 2-2 ¶ 262(a-i).
[30] *Id.* ¶ 262(a-ii).
[31] *Id.* ¶ 262(b).
[32] *Id.* ¶ 459(k).

## III.   SCOPE OF THE REVIEW AND METHODOLOGY

### A.  Scope of Review

This assessment is a combined compliance audit and outcome assessment.  The Monitoring Team has previously described the Consent Decree's distinction between these two types of assessments:

> The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments.  Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree.  They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . .

> Outcome assessments, by contrast, are [largely] quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact [overall]—whether, independent and apart from BPD's progress toward compliance with [any specific] Consent Decree requirements, policing is changing in the real world . . . . [33]

The audit presented in this report focuses specifically on the sexual assault investigative capacity of the Baltimore Police Department (i.e., Paragraphs 260 and 262). This assessment is based on a sample of sexual assault investigations opened by the Sex Offense Unit ("SOU") in 2018, 2019, and 2020. Fourth degree sex offenses handled by the patrol unit and sex offenses investigated by the Child Abuse Unit ("CAU") are not included in the audit portion of this assessment. Fourth degree cases are handled by patrol and therefore require a separate auditing methodology. As this is the first comprehensive audit of BPD's sexual assault investigation capacity, the Monitoring Team, with the Parties' approval, determined the focus should concentrate where the majority of the Baltimore Police Department, Department of Justice and Monitoring Team efforts have focused over the past four years – sexual assault cases investigated by the SOU.

The timeframe covered by this audit (2018 to 2020) largely predates the enactment of many of the policies and trainings developed and implemented in response to the requirements of the Consent Decree and predates the implementation of a cohesive case management system for sexual assault investigations that the BPD is currently planning. The primary goal of this review is to establish a baseline for where the Department and SOU will need to focus their efforts to reach compliance.

This report is also an outcome assessment pursuant to the requirements of Paragraph 459(k). The Decree sets forth specific outcome measurements regarding sexual assault, which include evaluation of: "whether BPD responds to sexual assault in a nondiscriminatory manner that

---

[33] Dkt. 279-1 at 22–23.

complies with the Constitution and federal law, and improves the safety and security of sexual assault victims in Baltimore…" To that end, the Monitor is required to conduct an annual review of the "[n]umber of sexual assault reports made to BPD," "[r]ate of victim participation in BPD sexual assault investigations," "[c]learance rate in sexual assault cases," and "[r]ate of declination of sexual assault cases referred to the Baltimore City State's Attorney's Office for prosecution."[34]

## B.  Methodology

### 1.  *Sexual Assault Investigation Audit*

To assess compliance with the requirements specific to BPD's sexual assault investigation capacity, the Monitoring Team conducted a systematic audit of a sample of sexual assault investigations opened by the Sex Offense Unit in 2018, 2019, and 2020. The Monitoring Team's audit team included a sexual assault investigation subject matter expert ("SME") whose selection was approved by the Parties. The SME supported the team by conducting a briefing on trauma-informed investigations, serving as a primary point of contact within the audit team for any content-related questions as the audits were underway, and completing a portion of the audits.

The Monitoring Team selected a random sample of cases investigated in 2018, 2019, and 2020. Based on data provided by BPD there were 298 sex offenses investigated by SOU in 2018, 285 investigated in 2019, and 274 cases in 2020. From a total of 857 sex offenses opened by SOU over the three-year period, 138 randomly selected cases of sexual assault investigations were reviewed. The Monitoring Team randomly selected 29 cases each from 2018, 2019, and the first ten months of 2020; and all 51 cases opened in November and December of 2020, for a total of 80 from 2020. During data analysis, it was discovered that one case from October 2020 was originally classified as a fourth degree sexual assault and should not have been included in the sample. As such, **the total sample included in the analysis is 137**. This sample size provided less than ten percent margin of error with a 95 percent confidence level. Drawing cases from each of the three years provided a baseline for future audits to measure progress toward compliance. The decision was made to review all cases opened during the last two months of 2020 to assess whether there were any initial changes that could be observed after a two-day sexual assault investigator training had been completed and a revised policy and standard operating procedures had taken effect. This training was the first Consent Decree approved training for sexual assault investigators.

Case information was requested by the Monitoring Team and compiled by BPD personnel into a single online case file for each incident, from locations including:

1.  Physical Case Folder and Lotus Notes including: database search results for criminal history/MVA/other, S&S Warrants, arrest warrants, evidence receipts, waiver of rights,

---

[34] Dkt. 2-2 ¶ 459.

detective notes, signed copies of reports and supplements, SAFE exams (with the exception of photos)

2. I-record: Suspect, victim, witness interviews – with audio recordings if video recordings were not available
3. Evidence.com: digital evidence files including body worn camera footage and crime scene photographs
4. Communications: 911 call recordings, police radio dispatch ("KGA") recordings

Each case was then assessed using an automated review instrument that captured data including:

1. Basic Information
2. Victim Details
3. Victim Contacts
4. Witness Interviews
5. Suspect Interviews
6. Victim Participation
7. Administrative Reviews
8. Overall Case Evaluations

In determining whether the sexual assault investigations audited were thorough and comprehensive, the reviewers considered whether (1) the investigators used trauma-informed interviewing techniques,[35] (2) the investigative process was documented in accordance with the requirements of the Consent Decree, and (3) there was adequate supervision and internal oversight of sexual assault case investigations. Accordingly, reviewers were asked to rate the overall quality of the sexual assault investigations on a five-point scale using the following definitions:

| |
|---|
| **5 – Excellent** – The investigation complied with **all** Consent Decree requirements and BPD protocols, and investigators made reasonable attempts to follow all leads and answer all material questions. The investigation was fair, thorough, objective, and timely. The investigator successfully used trauma-informed, victim-centered techniques. |
| **4 – Very Good** – The investigation complied with **most** Consent Decree requirements and BPD protocols and investigators made reasonable attempts to follow all leads and answer all material questions. |

---

[35] Trauma-informed interviewing techniques reframe interview questions to avoid the perception by victims that they are being blamed for their actions, increase recall from traumatic events, and help victims feel supported during the investigative process. *See also* International Association of Chiefs of Police, *Successful Trauma Informed Victim Interviewing*, https://www.theiacp.org/sites/default/files/2020-06/Final%20Design%20Successful%20Trauma%20Informed%20Victim%20Interviewing.pdf (last accessed May 16, 2023).

| **3 – Good** – Although **some aspects** of the investigation could be improved, the identified flaws did not appear to materially or unduly impact the quality of the overall investigation. The resulting investigation provided sufficient information to evaluate the incident but could be improved. |
| --- |
| **2 – Fair** – **Several aspects** of the investigation could be improved. Identified flaws materially impacted the quality of the overall investigation, and the resulting file provided insufficient information to evaluate the incident. |
| **1 – Poor** – **All or nearly all aspects** of the investigation could be improved. The investigation failed to establish sufficient information to support an evidence-based evaluation of the incident due to investigative deficiencies, material omissions, or other issues. |

The audit team first assessed a pilot case to identify any issues with the instrument, ensure there was a shared understanding of the meaning behind each audit question, and to assess consistency amongst reviewers. The outside SME provided information to all the assessors on how to best judge and interpret subjective aspects of the assessment and fielded additional questions from the team about trauma-informed investigations throughout the audit.

### 2. *Outcome Assessment*

Pursuant to the requirements of Paragraph 459(k)(i), this outcome assessment describes the number of sexual assault reports by contextual measures (i.e., type of case, police district, and victim/survivor demographics). Paragraph 459(k)(ii) was addressed through the analysis of victim participation data collected during the audit process.  Assessment of Paragraph 459(k)(iii) involved clearance rates by the type of case clearance (i.e., cleared by arrest or cleared by exceptional means) in addition to providing a description of other types of case closures (i.e., closed as unfounded or closed by other means). For fourth degree sex offenses investigated by Patrol, case closure dispositions are also described (i.e., unable to investigate, no police action, abated, or report written). Finally, pursuant to Paragraph 459(k)(iv), case declinations were assessed by describing the number of cases that were declined for prosecution as compared to the number of cases submitted to the prosecutor's office for review each year.

The Baltimore Police Department provided the Monitoring Team data for sexual assaults reported in 2018, 2019 and 2020. Case information for sexual assault cases that were opened in previous years but closed in 2018, 2019 or 2020 were also provided. Data were provided in four files: sexual assaults processed by the Sex Offense Unit or the Child Abuse Unit (CAU) (Sexual Assault File), calls for service data related to fourth degree sexual assaults in 2018 and 2019 (Calls for Service

File), case information related to fourth degree sexual assaults in 2020 (2020 Fourth Degree Sex Offense File) and sexual assault cases closed in 2018, 2019, and 2020 (Closed Cases File).

- *The Sexual Assault File* contains information for cases for all sexual assaults, including information about the severity of the offense, victim/survivor demographics, and case processing information.

- *The 2018-2019 Calls for Service File*[36],[37] includes all cases designated as fourth degree sexual assaults ("other sex offense"), which are reported sexual assaults that patrol officers investigate, rather than assigned SOU or CAU detectives. Addresses in this file were geocoded using ArcGIS software to determine the police district from which the call originated.

- *The 2020 Fourth Degree Sex Offense File* includes all fourth degree sex offenses designated as 2F (placing hands) and relevant fourth degree sex offenses designated as 2J (other sex offenses) as provided in calls for service data.

- *The Closed Cases File* provides case information for sexual assault cases that had case closure or clearance dates in 2018, 2019, and 2020.

Due to the nature of the incident, there is overlap between the Sexual Assault File and the Calls for Service File for cases that were reported and classified as fourth degree sexual assaults but where SOU or CAU detectives investigated the case rather than patrol officers. To avoid duplication, these cases are represented in the analysis of sexual assault cases and excluded from the fourth degree sexual assault case analysis.

## C. Determining Compliance Status

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented. Although the scheme itself is not required or detailed in the Decree itself, the Parties and Monitoring Team have previously adopted and used a standardized way of characterizing and summarizing BPD's current status across Consent Decree implementation:

> **0 – Not Assessed:** The Monitoring Team has yet to assess if the City/Department

---

[36] BPD did not assess fourth degree sexual assault in their annual report on sexual assault in 2018. Their report can be found at https://www.baltimorepolice.org/resources-and-reports.

[37] In 2019 and 2020, BPD's methodology for identifying fourth degree sexual assault cases focuses on incident reports rather than calls for service information for the purposes of their reporting. As a result, the number of fourth degree sexual assault cases described in this report differs from BPD's reporting. More information about BPD's data reports can be found at https://www.baltimorepolice.org/resources-and-reports.

has made progress or complied with the requirement.

**1 – Not Started:**  The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:**  The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:**  The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:**  The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:**  The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:**  The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:**  The City/Department has demonstrated compliance with the requirement but has not yet demonstrated compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:**  The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree.  This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:**  The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently

adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

As the Monitoring Team reported earlier, **BPD has previously revised its sexual assault investigation policies, standard operating procedures, and training, with revised and updated training for SOU detectives being issued as recently as 2021** (described in greater detail in the following section), another one-day in-service training for all BPD SOU, CAU, and Family Crimes Detectives in November 2022, and departmental e-learning for all sworn members completed in March 2023. This means that this present compliance review should be seen more as an informative and instructive tool, for baselining purposes, than a full-fledged compliance assessment. It would not be reasonable to expect investigations initiated between 2018 and 2020 to fully comply with policies, standard operating procedures, or training that were not yet in place.

Consequently, this review is largely focused on where BPD started out, relative to the requirements of the Consent Decree and revised policies, and how much progress may be required going forward to achieve Initial Compliance.[38]   To make these determinations about whether BPD is in Initial Compliance with a material requirement of the Decree, the Monitoring Team weighs the following factors:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers.  In this way, isolated compliance does not establish "Initial Compliance" in practice.  At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.  For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.**  The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.   Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the

---

[38] *See* Dkt. 2-2 ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

field.  Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way.  Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time.  Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

## IV.   BPD'S SEXUAL ASSAULT INVESTIGATION IMPLEMENTATION PROGRESS TO DATE

Broadly, the Consent Decree requires BPD to enhance the trust of sexual assault victims, to strengthen its response to and investigations of reports of sexual assault, and to combat gender bias (¶ 257). Per the Monitoring Team's Seventh Semiannual Report, published in February 2022, BPD has satisfied all the foundational requirements in Section XI of the Consent Decree, including making revisions to policies on sexual assault investigations and officer-involved sexual misconduct; conducting Department-wide e-learning and in-service training for all sworn members on responding to reports of sexual assault; and providing specialized training for detectives who investigate sex offenses, including not only an initial two-day training in late 2020, but also a follow-up two-day training delivered in December 2021, and an additional one-day training delivered in November 2022. BPD also has produced four annual reports on sexual assault investigations and created a victim survey that has been posted to their website since February 2022, and also is accessible through a link provided on the Form 310, which must be provided to all victims. **Accordingly, BPD's compliance score for Sexual Assault Investigations as of February 2022 was "4c" (implementation – on track).**[39]

### A.  Sexual Assault Investigator Training

In accordance with the requirements of the Consent Decree, BPD has provided revised sexual assault investigation training to SOU investigators on several occasions since 2020 (see Table 1). In October 2020, "BPD completed a two-day course for all Sex Offense Unit detectives, as well as for all detectives assigned to the Family Crimes Unit, the Child Abuse Unit, and the Sex Offender Registry Unit."[40]  As previously described by the Monitoring Team:

> The training used a Baltimore case study to highlight key learning points, such as the danger of bias and assumptions that preclude solving serious sexual assault crimes. It also employed role-playing, with members from the advocacy organization, Turn Around, acting as sexual assault victims, to give investigators practice with trauma-informed interview techniques.[41]

The Department used an outside subject matter expert in sexual assault response and investigation from the Austin Police Department, to help it develop the curriculum and co-facilitate the in-class instruction.[42]  "The training curriculum also reflects substantial input from the Baltimore City Sexual Assault Response Team (SART), particularly from two SART partners—Turn Around and

---

[39] Seventh Semiannual Report at 79.
[40] Dkt. 414-1 at 21; Dkt. 351-1 at 2.
[41] Dkt. 414-1 at 77.
[42] *Id.*

the Maryland Coalition Against Sexual Assault."[43]

All 37 of the 40 sexual assault investigators and supervisors required to complete the 2020 course did so, with the remaining three personnel required to take the training upon return from their approved leaves of absence.[44]  "SOU investigators reported being very satisfied with the training; some said it was the best they have had at BPD."[45]

In 2021, BPD developed and delivered an additional two-day training for detectives who investigate sexual assaults. The training expanded upon the initial two-day training detectives received in October 2020. It covered offender-focused investigations; victimization and victim vulnerability, accessibility and credibility; the consent defense; the intersection of intimate partner violence and sexual assault; report-writing; and trauma-informed interviewing.[46]

Starting in 2021 and still continuing, several BPD detectives also received individualized technical assistance from a DOJ subject matter expert, who counseled and provided advice to them in connection with their performance on specific cases.[47]

BPD also continues to provide training to SOU detectives and all sworn personnel on the response and investigation of sexual assault. In November of 2022 SOU detectives received a one-day training that continued to build their skills in investigation, and an e-learning training was completed in March 2023 by 1,868 sworn members.

**Table 1.**　　**Sexual Assault Investigations Trainings October 2020 – March 2023**

| Time Period | Type & Length | Participants | Content |
|---|---|---|---|
| **September 2019** | E-Learning 1 hour | All sworn personnel | • Policy 708<br>• Patrol officer's responsibilities when responding to a sex offense call for service<br>• Victim-centered, trauma-informed strategies |
| **November 2019** | E-Learning 1 hour | All sworn personnel | • Topics related to child sex trafficking, including definitions, detection, member responsibilities, and |

---

[43] Dkt. 351 at 1.
[44] Dkt. 351-1 at 2; Training Compliance Review and Outcome Assessment at 33.
[45] Dkt. 414-1 at 77.
[46] Seventh Semiannual Report at 80.
[47] *Id.*

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

| Time Period | Type & Length | Participants | Content |
|---|---|---|---|
| | | | trauma-informed communication |
| **October 2020** | In Person 2 Days | • Sex Offense Unit<br>• Family Crimes Unit<br>• Child Abuse Unit<br>• Sex Offender Registry Unit | • Dangers of bias and assumptions in sexual assault investigations<br>• Trauma-informed interviewing |
| **December 2020 – March 2021** | Virtual 8 hours | All sworn personnel | • Procedure and practice guidelines for a trauma-informed, victim centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime<br>• Role and responsibilities of all officers throughout the sexual assault response and investigation<br>• Procedure for forensic exams and medical care for sexual assault victims<br>• Procedure for access to victim advocate |
| **December 2021** | E-Learning 1 Hour | • Sex Offense Unit<br>• Family Crimes Unit<br>• Child Abuse Unit<br>• Sex Offender Registry Unit | • Guidance on working with vulnerable populations<br>• Trauma-informed interviewing<br>• Policy |
| **December 2021** | E-Learning 1 Hour | • Sex Offense Unit<br>• Family Crimes Unit<br>• Child Abuse Unit<br>• Sex Offender Registry Unit | • Supervision standards for sexual assault cases<br>• Report writing and documentation standards<br>• Policy<br>• Standard Operating Procedures |
| **December 2021** | In Person 2 Days | • Sex Offense Unit<br>• Family Crimes Unit | • Offender-focused investigations |

| Time Period | Type & Length | Participants | Content |
|---|---|---|---|
| | | • Child Abuse Unit<br>• Sex Offender Registry Unit | • Victimization and victim vulnerability<br>• Accessibility and credibility<br>• Consent defense<br>• Intersection of intimate partner violence and sexual assault<br>• Report writing<br>• Trauma-informed interviewing |
| **November 2022** | In Person<br>1 Day | • Sex Offense Unit<br>• Family Crimes Unit<br>• Child Abuse Unit<br>• Sex Offender Registry Unit | • Accessibility and credibility<br>• Offender-focused investigations<br>• Victimization and victim vulnerability<br>• Guidance on working with vulnerable populations<br>• Report writing and documentation<br>• Trauma-informed interviews<br>• Interviewing non-stranger suspects in sexual assault cases<br>• Supervision standards for sexual assault case investigations |
| **November 2022 – March 2023** | E-Learning<br>2 Hours | • All sworn personnel | • Guidance to patrol on how to respond to reports of sexual assault<br>• Procedure and practice guidelines for a trauma-informed, victim centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime<br>• Offender-focused investigations<br>• Victimization and victim vulnerability<br>• Accessibility and credibility<br>• Guidance on working with vulnerable populations<br>• Interviewing non-stranger suspects in sexual assault cases<br>• Report writing and documentation<br>• Trauma-informed interviews |

| Time Period | Type & Length | Participants | Content |
|---|---|---|---|
| **2021 – Ongoing** | Varies | • Sex Offense Unit Detectives | • Technical assistance from DOJ subject matter expert |

## B.  Policy and Standard Operating Procedures

BPD has previously satisfied the threshold requirement to revise both its policy on sexual assault investigations (Policy 708) and its standard operating procedure on such investigations.[48] Since then, BPD made minor, technical revisions to that policy to ensure consistency with other policies.[49] BPD has also successfully created and finalized a new policy on member-involved sexual misconduct.[50]

The most recent revisions to the SOU Investigative Standard Operating Procedures, which went into effect after training was completed in 2020, were activated on August 30, 2021, and to Policy 708, "Rape and Sexual Assault" on September 7, 2021.

Finally, per the requirements of Paragraph 264, BPD has produced four annual reports on sex assault investigations, for the years 2018, 2019, 2020, and 2021, all of which are available to the public on BPD's website.[51]

---

[48] Dkt. 152.
[49] Dkt. 266.
[50] Dkt. 269.
[51] Baltimore Police Department, *Resources and Reports* (last updated May 5, 2023), https://www.baltimorepolice.org/resources-and-reports.

## V.     SEXUAL ASSAULT INVESTIGATION AUDIT PROCESS AND RESULTS

As described above, in determining the comprehensiveness of the sexual assault investigations reviewed, the Monitoring Team considered whether: (1) sexual assault investigators used trauma-informed interviewing techniques, (2) the investigative process was documented in accordance with the requirements of the Consent Decree, and (3) there was adequate supervision and internal oversight of sexual assault case investigations. Accordingly, reviewers scored the overall quality of the sexual assault investigations using the five-point scale described in Section III.

Ratings for the audited cases were shared with the parties during the draft report review process that the Monitoring Plan requires and that began in November 2022. DOJ and BPD provided comments on the draft report in December 2022. In January 2023, the Parties agreed to allow the BPD to independently review the cases that the Monitoring Team had previously reviewed in light of some concerns about the degree of missing documentation and deficiencies of the investigation process noted in the initial, draft report. BPD worked throughout February 2023 to complete their review of the documentation contained in the audited cases to assess the materials that were made available to the Monitoring Team reviewers. This report reflects the trends found during the Monitoring Team's review process which occurred prior to the additional assessment of case files BPD conducted in February 2023. We summarize BPD's findings here to describe the effort made to understand the quality of the case files reviewed, however the Monitoring Team did not conduct a second audit of case files or adjust the findings of the Monitoring Team's assessment.

Upon BPD's review of the cases that the Monitoring Team had evaluated, BPD discovered there were 14 cases where interview videos or case investigation documentation were missing from the files that BPD had originally produced to the Monitoring Team. BPD also found 35 cases in the audit sample where applicable body-worn camera footage for the incident was not originally flagged or produced for the Monitoring Team. Finally, BPD found three cases where case and supervisor review checklists were used but not present in the case files provided to reviewers for the assessment.

In some instances, BPD's review suggested that information was present within a sexual assault investigation file that the Monitoring Team's original review had concluded was not present in the case file. Much of this discrepancy appears to have been related to whether (1) a victim advocate was requested or offered, and (2) whether case investigation checklists or supervisor checklists were present in the file or completed with accuracy.

Comparison of BPD's review and the Monitoring Team's assessment indicated 21 cases where BPD's review asserts that a victim advocate was requested or offered but Monitoring Team reviewers did not find documentation to support that. Additionally, there were 36 cases where BPD indicates an advocate was requested or offered and Monitoring Team reviewers marked "don't

know" on the assessment instrument because they were not able to affirmatively determine whether it occurred.

Regarding case investigation checklists, BPD's review indicated crime scene checklists were present in 49 cases where Monitoring Team reviewers said the checklist was not present in the file. Similar disagreements varied for other checklists: supervisor's checklist (31 cases), evidence checklist (20 cases), supervisor's audit (13 cases), and the investigative documents checklist (8 cases).

It appears that the issues with the produced case files – missing or incomplete case files on the one hand and disagreements or confusion about the presence or absence of certain case file materials on the other – all stem from foundational issues with BPD's systems and processes for tracking and storing investigative information and materials. As the report describes elsewhere, a "sexual assault investigation file" functionally existed, within the evaluation period of 2018 through 2020, scattered across several discrete data and filing systems. Ultimately, it appears that even BPD personnel, attempting to assemble a complete and thorough case file for Monitoring Team review, and Monitoring Team reviewers, attempting to fully and fairly review all available case materials, had difficulty in a material number of instances identifying and ensuring consideration of all relevant BPD case file materials.

In light of the above-described issues with the case files, the parties agreed to focus the compliance assessment on the qualitative aspects of sexual assault case investigations and report on the themes noted by the reviewers during the initial case review. Quantification of many of the specific documentation standards required by the Consent Decree is more appropriate at a later date when BPD has a cohesive case management system in place.

Among the sexual assault investigations that reviewers scored as "Excellent", "Very Good", or "Good" in overall quality, a number of common themes or attributes emerged. These included BPD personnel making numerous attempts to locate and follow-up with victims, investigators demonstrating empathy and using a trauma-informed approach, investigations appropriately following the evidence, and SOU conducting a generally thorough investigation. At the same time, in many of the cases judged as "Good" or better in overall quality, reviewers nonetheless identified areas for improvement or specific Consent Decree requirements that needed to be more fully met.

Among cases that were judged as "Fair" or "Poor" in terms of overall investigative quality, reviewers noted particular concerns with the nature, style, and quality of the victim interviews. These cases each contained deficiencies, that included concerns from reviewers about secondary trauma and revictimization, bias, and failure to provide basic accommodation, including to individuals with intellectual disabilities.

The proportion of cases rated as being "Fair" or "Poor" did not appear to trend in a consistent direction over time. What was clear, however, was that there was not an observed improvement in case quality following the investigator training completed in October 2020. The information presented throughout Section V of this report does not offer comparisons of each of the audited items by year because no clear trends or patterns of improvement were found over time. It is possible that changes to procedures in response to the COVID-19 pandemic may have affected some elements of the 2020 investigations (e.g., canvassing and interviews); however, it is unclear if or how these may have impacted the overall investigative quality scores.

### A.  Basic Information

Of the 137 cases analyzed, BPD classified: 109 (79.6%) as Rape, 23 cases (16.8%) as Other, and five cases (3.6%) as Sex Offense. The "other" category included second degree rape, third degree sex offense, attempted rape, possible sex offenses, sexual child abuse, a different classification throughout the case file, and a nursing home incident, or cases in which there were multiple classifications present on different forms within the case file. The prosecutorial classification of the incidents matched BPD's classification in all cases, except for nine instances in which their classification was missing.

**Table 2.        BPD and Prosecutor Incident Classification**

|  | **BPD's Incident Classification** | **Prosecutor's Incident Classification** |
|---|---|---|
| Rape | 109 (79.6%) | 105 (76.6%) |
| Sex Offense | 5 (3.6%) | 5 (3.6%) |
| Other | 23 (16.8%) | 18 (13.1) |
| Missing | 0 | 9 (6.6) |
| Total | 137 (100.0%) | 137 (100.0%) |

*Note: "Missing" refers to cases that did not have an affirmative classification based on the information provided.*

In 80.3% of reported incidents no additional crime was reported. In 27 incidents, 39 additional crimes were charged[52]. The additional crimes included: assault (n=16), domestic violence (n=9) robbery (n=3), false imprisonment (n=3), burglary (n=1), and other (n=7).

The use of drugs or alcohol was reported in 42.3% of incidents. The suspect was not a stranger to the victim in more than two-thirds (67.2%) of the incidents, whereas 23.4% of the cases involved a stranger, and in 9.5% the reviewer was not able to determine the victim-offender relationship.

---

[52] Prior to 2020, the case notes may not include additional crime information. After 2020 a drop-down box in Lotus Notes should capture this information.

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

In most cases, the incident reports were taken by either a patrol member (70.8%), or an SOU investigator (22.6%). Only 6.6% of the incident reports were taken by individuals from other agencies such as the Annapolis, Baltimore County, Howard County, Towson University, Coppin State, St. Mary's County, or Morgan State University Police Departments.

Of the 137 cases reviewed, only 10 cases were unfounded (7.3%). Among unfounded cases, two were classified as baseless (i.e., the call was improperly coded or did not meet the elements of a crime), and four cases were classified as false (i.e., there was no evidence of a crime after an investigation was conducted).[53] In four of the unfounded cases (33.3%), the reason for the unfounded classification was not specified in the case file.

For the ten unfounded cases, reviewers explored whether all reasonable efforts were made to locate the victim or the reporting person, to identify and secure witnesses, identify the crime scene(s) and collect evidence, to include any other possible investigative efforts, and whether a supervisor approved the report as unfounded.

**Table 3.       Reasonable Efforts in Unfounded Cases**

| *For unfounded cases, were all reasonable efforts made to . . . .?* | **Yes** | **No** | **Unable to Determine** |
|---|---|---|---|
| Locate the victim or reporting person | 10 (100.0%) | 0 | 0 |
| Identify the scene of the crime and collect evidence | 5 (50.0%) | 5 (50.0%) | 0 |
| Identify and secure witnesses[1] | 4 (44.4%) | 4 (44.4%) | 1 (11.1%) |
| Other investigative actions | 3 (30.0%) | 4 (40.0%) | 3 (30.0%) |
| Did a supervisor approve unfounding the case? | 7 (70.0%) | 1 (10.0%) | 2 (20.0%) |

Note: [1] One unfounded case indicated that the victim stated there were no witnesses. Percentages are based on the nine relevant cases where witnesses were identified.

In most (93.4%) of the 137 incidents reviewed, a criminal investigation was conducted. The reviewers were asked to classify the status of the reviewed case as of the time of their review. Table 4 below summarizes the findings:

---

[53] An incident can only be officially classified as Unfounded-False after a complete investigation by SOU which demonstrate through evidence that no crime occurred or was attempted, has Special Investigation Section (SIS) chain of command approval, and is reviewed by SART. Note that while the review instrument captured whether cases were determined to be unfounded-false, this review did not assess whether necessary steps were taken to reach that disposition.

**Table 4.**      **Status of Review Upon Monitoring Team Review**

| Status | Frequency (percent) |
|---|---|
| Open | 71 (51.8%) |
| Open/Inactive | 10 (7.3%) |
| Closed with an exception | 17 (12.4%) |
| Closed with an arrest | 10 (7.3%) |
| Unable to Determine or N/A | 29 (21.2%) |

The open but inactive cases included situations in which the victim declined prosecution, the victim was killed in a separate incident, or detectives made numerous but unsuccessful attempts to locate the victim.

Of the 17 cases "closed with an exception" 15 were declined by the prosecutor, and two were unfounded. Of the ten closed with an arrest, reviewers could discern that five were not declined by the prosecutor but were unable to determine if the other five cases were declined.

## B.  Victim Details

Most of the victims in the cases reviewed were Black and female; the average victim age was 32 years old. Tables 5, 6, 7, and 8 provide descriptive statistics for the victims of reported sexual assault incidents. Victim demographics presented below are based on how they were captured and described in the reports contained in each investigative file reviewed.

**Table 5.**      **Victim's Gender in Reviewed Cases**

| Gender | Frequency (percent) |
|---|---|
| Female | 122 (89.1%) |
| Male | 14 (10.2%) |
| Transgender Woman | 1 (0.7%) |
| Total | 137 (100.0%) |

**Table 6.**      **Victim's Race in Reviewed Cases**

| Race | Frequency (percent) |
|---|---|
| White/Caucasian | 46 (33.6%) |
| Black/African American | 87 (63.5%) |
| Asian or Pacific Islander, Native American | 1 (0.7%) |

| | |
|---|---|
| Unknown | 1 (0.7%) |
| Other | 2 (1.5%) |
| Total | 137 (100.0%) |

*Note: "Other" includes cases when victim's reported race varied throughout the file.*

**Table 7.      Victim's Ethnicity in Reviewed Cases**

| Race | Frequency (percent) |
|---|---|
| Hispanic/Latino | 6 (4.4%) |
| Not Hispanic/Latino | 83 (60.6%) |
| Unknown | 48 (35.0%) |
| Total | 137 (100.0%) |

**Table 8.      Victim's Age in Reviewed Cases**

| Age Range | Frequency (percent) |
|---|---|
| <18 years old | 8 (5.8%) |
| 18-29 years old | 65 (47.4%) |
| 30-39 years old | 30 (21.9%) |
| 40-49 years old | 16 (11.7%) |
| 50-59 years old | 14 (10.2%) |
| 60 and older | 4 (2.9%) |
| Total | 137 (100.0%) |

**C.  Investigative Files**

This section summarizes the reviewers' assessment of the investigative file. The SOU Investigative Standard Operating Procedures articulate a set of standards for utilizing crime scene and investigative checklists; for example, the crime scene checklist should be utilized to ensure that all necessary investigative steps are taken. Training on this procedure was not completed until late November 2020 and thus this review offers a baseline understanding for the quality of investigative tracking in sexual assault cases.

Overall, reviewers found the case files to be disorganized and incomplete as provided to the Monitoring Team. That said, there were some instances in which a reviewer noted that the case file included complete documentation, but these occasions were infrequent. The range of deficiencies observed by reviewers was broad and implicated each phase of the investigation process. Further, many of the most problematic cases and files were from 2020, indicating that these issues are not unique to the oldest cases reviewed. As discussed at the beginning of Section

III.C.1. of this report, the case files for review were gathered from multiple systems and uploaded to evidence.com. This assembly contributed to the disorganization of the file materials and does not reflect the organization of the case file materials investigators interact with through the course of their investigation.

## D.  Victim Contacts

BPD's primary sexual assault policy (708) outlines a number of specific principles to fully investigate all reported rapes and other sexual offenses, and the responsibilities of its members. The relevant requirements and directives for patrol members responding to a victim that reports a sexual assault includes conducting an on-scene investigation in which they attempt to obtain an initial victim statement that captures the victim's own words in narrative, obtain the victim's contact information, and advise the victim that they have a right to services and assistance from a victim advocate. Patrol members are also required to provide victims with Form 310 after the policy became active in December 2019.[54]

There were several incidents in which a patrol officer failed to provide a victim with the required Form 310 or advise a victim about his or her right to the services and assistance of a victim advocate. That said, it is often unclear whether an investigative action did not occur (e.g., providing a Form 310), or if there was just a failure to document that it occurred in the case file. Consequently, the indication that a Form 310 was provided to the victim may have been located on several different forms represented in several different places in the file. Throughout the course of the audit, Monitoring Team reviewers could only indicate that actions occurred with certainty if there was documentation provided.

In most incidents reviewed, the victims participated in an interview with the SOU Detective. However, in just over one third the victim did not participate in an interview.

**Table 9.        Rate of Victim Interview by SOU Detective**

|  | **Frequency (percent)** |
|---|---|
| Victim Interviewed | 89 (65.0%) |
| Victim Not Interviewed | 48 (35.0%) |
| Total | 137 (100.0%) |

---

[54] Form 310 provides information about local organizations that provide services to victims of sexual assault. The responding officer must provide their information, the date, the detective's name, and the central complaint ("CC") number on Form 310.

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

In some cases, the reason for why the interview did not occur was clear – the victim refused to participate, did not want police involvement, could not be located, or was deceased. In other cases, it was unclear whether the interview was not conducted or if it was missing from the case files assembled for the Monitoring Team to review.

Unlike patrol members' responsibilities, the SOU detectives' responsibilities include preparing and conducting the follow-up interview with a victim, including conducting the interview in a "soft location" and using trauma-informed interview techniques. Table 10 shows whether the various relevant requirements and directives were met by a SOU investigator.

**Table 10.     Features of SOU Detective Interviews of Sexual Assault Victims (n=89)**

|  | Frequency (percent) | N/A |
|---|---|---|
| The interview was at least audio recorded | 68 (76.4%) | 0 |
| The interview was audio-video recorded | 62 (69.7%) | 0 |
| Was the interview conducted the same day the incident occurred? | 63 (70.8%) | 0 |
| Was a victim advocate requested? | 6 (6.7%) | 0 |
| If yes, was a victim advocate present? | 1 (16.7%) | 83 |
| The interview occurred in a soft room | 48 (54.6%) | 1 |
| Open-ended questions were used | 52 (58.4%) | 0 |
| Did the investigator interrupt the victim? | 22 (24.7%) | 0 |
| Appropriate prompts were used | 46 (51.7%) | 0 |
| The victim was not discouraged | 50 (56.2%) | 0 |
| Did the interviewer ask judgmental questions? | 1 (1.1%) | 0 |

Note: "N/A" cases excluded in percentage calculations.

Of the 89 interviews conducted by the SOU detectives in the cases reviewed, 70.8% were conducted the same day the incident occurred, a concerning practice given the SOP requirement to allow a sleep cycle prior to interviewing a victim of sexual assault as part of trauma-informed interview techniques. . Approximately three-quarters of the interviews had at least recorded audio (76.4%), with fewer audio-video recorded. However, as noted earlier, reviewers noted that recordings were often missing from the case files.

To increase the trust, comfort, and participation of victims of sexual assault, investigations should follow a trauma informed, victim-centered, and multidisciplinary approach. The reviewers found

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

that of the 89 SOU interviews conducted with victims, investigators used opened ended questions in 52 cases (58.4%) and used appropriate prompts in 46 cases (51.7%). However, reviewers found that the investigators interrupted the victim in 22 cases (24.7%) and asked judgmental questions in one case (1.1%).

Regarding the interview location, just over half of the interviews (54.6%) were conducted in a soft room.[55] When the soft room was not used, interviews were conducted in the hospital room, residences, or in other locations such as a SOU conference room, or a hotel room. In many of the interviews (n=20, 22.5%) the reviewer was unable to determine what type of location the interview occurred in, often because there was not a recording that could be accessed at the time of review. It is important to note that in some cases there is a reasonable exception to the use of a soft room such as when a residence is preferred by the victim, in cases when a victim is in the hospital for an extended period of time, or for safety reasons when COVID-19 protocols needed to be followed.

While victim advocates can be very helpful to investigators in sexual assault cases and supportive to victims, only one in six cases where a victim requested an advocate involved the presence of an advocate during the interview. It is unclear why the requested advocates were not present for interviews in cases where they were requested.

It should be noted that many of the cases did not include sufficient information or documentation for the reviewers to conclusively determine whether a number of the interviewing expectations were followed. Reviewers noted that they were unsure whether a victim advocate was requested in just over half of the reviewed cases (55.1%). Reviewers also noted they were unsure whether next steps were explained in 39.3 percent of cases, which is likely due to inconsistency among investigators regarding whether they cover next steps during the recording or afterward.

Reviewers were very concerned with the quality and appropriateness of some of the interviews that they witnessed during the reviews. While Table 10 indicates that just over half of the victim interviews showed investigators using open-ended questions, appropriate prompts, or using a style that was not discouraging, reviewers often noted only one or two elements of quality interviews rather noting investigators using all appropriate techniques. In only 29 cases did a reviewer note that the detective used the full range of trauma-informed victim interview techniques (e.g., used open-ended questions, limited interruptions, and not suggesting feelings or responses), and in just 40 did they indicate that the victim was treated with respect. Additionally, reviewers identified two interviews with bias (e.g., threatening to charge the victim, questioning the victim's credibility, suggesting the victim consented, suggesting the victim was unbelievable) and six with leading

---

[55] A soft room refers to a quiet, private space that looks and feels like a place where a victim/survivor can be comfortable. These rooms typically consist of soft chairs, soft lighting, and subtle audio and video equipment. Conference rooms are considered semi-soft rooms in that they incorporate some but not all these criteria.

questions. The most common deficiency involved inadequate questioning, concerns about investigator demeanor, and not addressing the inconsistencies.

Reviewers noted numerous, significant instances in which there were deficiencies in the interview process, including several cases in which the victim may have needed additional time, some level of assistance, and/or an advocate, to effectively participate.

Additionally, for recorded interviews that could be assessed, reviewers frequently raised concerns about the lack of rapport built between interviewers and victims. In numerous instances, the reviewer noted that the investigator began the interview by immediately asking about the assault. However, it is unclear whether rapport was built prior to the recording in some cases due to the differences in investigator style and the individualized nature of each case.

To be clear, there were some instances in which investigators appeared to utilize trauma-informed techniques, and/or demonstrated empathy toward the victims. However, among the cases for which recordings were available, there were far more examples of problematic interview techniques than best practices.

Per Policy 708, which was not activated until December of 2019, and best practice, investigators should proactively maintain contact with victims until the final resolution of the case and notify victims of updates. Contact with a victim should be initiated at 7, 14 and 28 days. Table 14 shows the details regarding the time of the initiated contact with victims. Reviewers were able to determine that follow-up was conducted in over half of the sampled cases but due to the previously discussed case file issues, it is unclear in some cases whether the follow up was not conducted or if the documentation was just not present in the case files assembled for review.

## E.  Witness Interviews

The SOU Investigative Standard Operating Procedures and Rape and Sexual Assault Policy were implemented in December of 2019 to ensure that the investigator will identify, secure and interview any potential witnesses and obtain valuable evidence from individuals who witness the conduct or statements of the suspect and/or the victim before, during, or after the assault. Strict adherence to these policies may help with obtaining consistency and accuracy of additional evidence.

Investigators asked about any possible witnesses in 62 (45.3%) of reviewed incidents; in 50 cases (36.5%), investigators did not inquire about possible witnesses; and in 25 (18.2%) reviewed cases, reviewers were not able to determine if an inquiry took place based on available information.

**Table 11.      Rate of Witness Interviews & Recordings (n=62)**

|  | Frequency (percent) | N/A |
|---|---|---|
| All identified witnesses interviewed? | 26 (45.6%) | 5 |
| Interview audio-video-recorded? | 25 (48.1%) | 10 |
| Interview at least audio-recorded? | 28 (53.8%) | 10 |

Note: N/A cases not included in percent calculations

Of the 62 cases in which witnesses were identified and did not affirmatively state a refusal to be interviewed, the witnesses were interviewed less than half the time (45.6%), and in 19.4% of cases, reviewers were not able to determine based on the available information whether the witness was interviewed. There were numerous instances in which the case files indicated that the interviews occurred and were recorded, but the recordings could not be located by the reviewers in the assembled case materials.

**Table 12.   Observed Deficiencies in Witness Interviews**

| Observed Deficiency | Frequency |
|---|---|
| Appearance of Bias | 1 |
| Inconsistencies not addressed | 3 |
| Relevant questions left unanswered | 6 |
| Concerns about investigator demeanor | 5 |
| All relevant lines of investigative inquiry were not reasonably and adequately pursued | 17 |

## F.  Suspect Interviews

The complainant or investigator identified potential suspect(s) in a majority of the reviewed cases 101 (73.7%). In 36 cases (26.3%), a suspect(s) was not identified. Of the 101 cases in which a potential suspect(s) was identified, the investigator initiated an interview with the suspect in 47 cases (46.5%). As noted by reviewers, the most common reasons suspects were not interviewed involved situations in which a suspect refuses an interview, an attorney for a suspect refuses an interview on behalf of their client, or investigators were unable to locate a suspect. In four cases, investigators indicated the interview did not occur because the suspect was in jail or otherwise incarcerated. In 19 cases, reviewers indicated they were unable to determine why suspects were not interviewed based on the information present in the case file.

**Table 13.   Suspect Interview Characteristics (n=47)**

|  | Frequency (percent) | N/A |
|---|---|---|
| The interview was at least audio recorded | 30 (78.9%) | 9 |

| | | |
|---|---|---|
| The interview was audio-video recorded | 29 (76.3%) | 9 |
| Investigator was familiar with the suspect's background criminal history, statements from others, social media and other pertinent suspect information | 22 (53.7%) | 6 |
| The interview was not accusatory, question and answer session | 27 (73.0%) | 10 |
| Did the investigator transition from an interview to interrogation? | 4 (10.8%) | 10 |

Note: "N/A cases" excluded from percentage calculations.

**Table 14.    Observed Deficiencies in Suspect Interviews (n=47)**

| Observed Deficiency | Frequency (percent) |
|---|---|
| Appearance of Bias | 0 (0.0%) |
| Inconsistencies not addressed | 8 (17.0%) |
| Relevant questions left unanswered | 9 (19.1%) |
| Concerns about investigator demeanor | 4 (8.5%) |
| All relevant lines of investigative inquiry were not reasonably and adequately pursued | 16 (34%) |

There were some cases in which the reviewer indicated that the suspect interview was sufficient, or appropriate (73% of suspect interviews). Reviewers also noted that 66% of the suspect interviews showed investigators adequately pursuing all relevant lines of investigative inquiry. However, there were numerous examples of problematic encounters with suspects, in which the interviews were not thorough, or should have been handled by someone with specialized training due to cognitive or mental impairments.

## G.  Administrative Reviews

SOU supervisors must keep consistent review and oversight of each case assigned to the investigators under their command and follow the guidance on investigation supervision, accountability, and review outlined in the SOU Standard Operating Procedures. This includes ensuring that SOU detectives, who are responsible for securing and collecting evidence at the crime scene, utilize and complete all necessary checklists.  Overall, reviewers found there to be room for improvement, particularly with regard to ensuring checklist items were completed.

Reviewers consistently noted that the supervisors' reviews were not signed. Additionally, dates of reviews conducted often did not align with the timing of the when the review was supposed to occur. Many reviewers reported that the supervisor reviews were not done in a meaningful way,

and it was at best a box-checking exercise. This finding likely results in part from the limitations of the database that generates the checklists (Lotus Notes).

## VI.    OUTCOME ASSESSMENT RESULTS

Paragraph 459(k) requires that the Monitoring Team conduct a review of:

i.    *Number of sexual assault reports made to BPD;*
ii.    *Rate of victim participation in BPD sexual assault investigations;*
iii.    *Clearance rate in sexual assault cases; and*
iv.    *Rate of declination of sexual assault cases referred to the Baltimore City State's Attorney's Office for prosecution.*

### A.    Paragraph 459(k)(i): Number of sexual assault reports made to BPD

To assess Paragraph 459(k)(i), this outcome assessment presents the number of sexual assault reports by contextual measures including the type of sexual assault case, the police district, and victim demographics. Offenses classified as "other" include sex offenses investigated as a part of an abduction, aggravated assault, attempted sex offense, burglary, or robbery-home invasion.

The total for fourth degree sex offenses only includes those that were investigated by patrol. The fourth degree sex offenses that were investigated by SOU or CAU are included in the other sex offense categories. As discussed in Section III.B.2 of this report, the datasets assembled for this report were done using a different methodology than was used in BPD's annual report of sexual assault cases. This is primarily due to data limitations for gathering data for incidents that fit the definition of a fourth degree sexual assault. This report estimates the number of fourth degree sex offenses by using calls for service data while BPD's annual reports more specifically focus on incident reports. Future reporting periods will more closely align with BPD's estimates for these types of offenses as BPD's technology systems improve.

**Table 15.    Sex Offense Frequency by Type and Year**

| Offense | 2018 | 2019 | 2020 |
|---|---|---|---|
| Fourth Degree Sex Offenses | 667 (50.6%) | 412 (41.2%) | 408 (42.7%) |
| Attempted Rape | 17 (1.3%) | 19 (1.9%) | 5 (0.5%) |
| Attempted Sex Offense | 0 | 0 | 1 (0.1%) |
| Possible Sex Offense | 52 (3.9%) | 43 (4.3%) | 51 (5.3%) |
| Possible Sexual Child Abuse | 37 (2.8%) | 22 (2.2%) | 25 (2.6%) |
| Rape | 371 (28.1%) | 322 (32.2%) | 315 (33.0%) |
| Rape Sodomy | 6 (0.5%) | 10 (1.0%) | 7 (0.7%) |
| Sex Offense | 90 (6.8%) | 90 (9.0%) | 62 (6.5%) |
| Sexual Child Abuse | 76 (5.8%) | 77 (7.7%) | 78 (8.2%) |
| Other | 2 (0.2%) | 4 (0.4%) | 2 (0.2%) |

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

| | | | |
|---|---|---|---|
| Total | 1318 (100.0%) | 999 (100.0%) | 955 (100.0%) |

*Note: As discussed in Section III.C.2 of this report, identification of fourth degree sex offenses differed by year due to data availability and analysis methods.*

Sex offense cases by district include fourth degree offenses for 2018 and 2019 (Table 16a), whereas the 2020 data only include cases that were investigated by SOU or CAU, and does not include fourth degree offenses, and are therefore presented separately (Table 16b).

**Table 16a.    Sex Offense Cases by District and Year**

| District | 2018 | 2019 |
|---|---|---|
| Central | 181 (13.7%) | 137 (13.7%) |
| Eastern | 116 (8.8%) | 100 (10.0%) |
| Northern | 158 (12.0%) | 97 (9.7%) |
| Northeastern | 177 (13.4%) | 156 (15.6%) |
| Northwestern | 132 (10.0%) | 103 (10.3%) |
| Southern | 151 (11.5%) | 117 (11.7%) |
| Southeastern | 153 (11.6%) | 108 (10.8%) |
| Southwestern | 140 (10.6%) | 98 (9.8%) |
| Western | 104 (7.9%) | 78 (7.8%) |
| Out of Jurisdiction or Missing | 6 (0.5%) | 5 (5.0%) |
| Total | 1318 (100.0%) | 999 (100.0%) |

**Table 16b.    Sex Offense Cases by District and Year**

| District | 2020 |
|---|---|
| Central | 49 (9.3%) |
| Eastern | 53 (10.1%) |
| Northern | 42 (8.0%) |
| Northeastern | 80 (15.2%) |
| Northwestern | 68 (12.9%) |
| Southern | 64 (12.2%) |
| Southeastern | 73 (13.9%) |
| Southwestern | 54 (10.3%) |
| Western | 43 (8.2%) |
| Out of Jurisdiction or Missing | 0 |
| Total | 526 (100.0%) |

*Note: 2020 data does not include fourth degree offenses.*

Fourth degree sexual assault cases are typically investigated by patrol, rather than the Sex Offense Unit and Child Abuse Unit detectives. The frequencies and case totals for the victim demographics

presented in Tables 17 through 19 reflect data collected by SOU and CAU, and are therefore measurably lower, as they do not include fourth degree sexual offenses.

**Table 17.     Sex Offense Cases by Victim Race/Ethnicity and Year**

| Race/Ethnicity | 2018 | 2019 | 2020 |
|----------------|------|------|------|
| Black | 467 (71.7%) | 405 (69.0%) | 378 (69.1%) |
| White | 123 (18.9%) | 115 (19.6%) | 105 (19.2%) |
| Hispanic | 50 (7.7%) | 59 (10.1%) | 52 (9.5%) |
| Other | 11 (1.7%) | 8 (1.4%) | 12 (2.2%) |
| Total | 651 (100.0%) | 587 (100.0%) | 547 (100.0%) |

*Note: The "other" race category includes Asian.*

**Table 18.     Sex Offense Cases by Victim Gender and Year**

| Gender | 2018 | 2019 | 2020 |
|--------|------|------|------|
| Female | 550 (84.5%) | 502 (85.5%) | 476 (87.0%) |
| Male | 99 (15.2%) | 84 (14.3%) | 70 (12.8%) |
| Transgender | 2 (0.3%) | 1 (0.2%) | 1 (0.2%) |
| Total | 651 (100.0%) | 587 (100.0%) | 547 (100.0%) |

**Table 19.     Sex Offense Cases by Victim Gender and Year**

| Age Range | 2018 | 2019 | 2020 |
|-----------|------|------|------|
| Under 18 years old | 368 (56.5%) | 326 (55.5%) | 299 (54.7%) |
| 18-34 years old | 181 (27.8%) | 169 (28.8%) | 154 (28.2%) |
| 35-64 years old | 84 (12.9%) | 77 (13.1%) | 89 (16.3%) |
| 65 and older | 5 (0.8%) | 8 (1.4%) | 1 (0.2%) |
| Missing | 13 (2.0%) | 7 (1.2%) | 4 (0.2%) |
| Total | 651 (100.0%) | 587 (100.0%) | 547 (100.0%) |

**B.  Paragraph 459(k)(ii): Rate of victim participation in BPD sexual assault investigations**

Outcome measures for Paragraph 459(k)(ii) were collected as part of the investigation audit. As such, the data provided below in Table 26 are not exhaustive of 2018, 2019, or 2020. Instead, they are based on random samples of 29 sexual assault cases from 2018, 29 from 2019, 28 from the first ten months of 2020, and the 51 sexual assaults reported in November and December 2020 (see Section III(B) of this report for a complete description of the sampling methodology). These samples do not include fourth degree sexual offenses, as fourth degree cases are typically investigated by patrol officers and were not included in the audit of sexual assault investigations.

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

**Table 20. Victim Participation in Investigation Activity**

|  | **2018** | **2019** | **2020** |
|---|---|---|---|
| Was a victim located by the reporting officer? | 29 (100.0%) | 25 (86.2%) | 71 (89.9%) |
| Did the victim provide the reporting officer his/her contact information? | 24 (82.8%) | 24 (82.8%) | 61 (77.2%) |
| Did the victim agree to a forensic exam? | 17 (63.0%) | 20 (95.2%) | 40 (70.2%) |
| Did the investigator contact the victim after the initial interview? | 20 (69.0%) | 23 (79.3%) | 55 (74.3 %) |
| Did the victim participate fully in all investigative stages in which investigators found their participation necessary or useful? | 16 (55.2%) | 17 (58.6%) | 41 (53.9%) |

*Note: Percentages are based on applicable totals and exclude cases where reviewers determined the investigation activity was not applicable. For example, in 2018 there were two cases where measuring victim participation in a forensic exam was not applicable because of the nature of the case.*

**Table 21.      Major Investigative Stages at Which the Victim Participated**

|  | **2018** | **2019** | **2020** |
|---|---|---|---|
| Victim did not participate from outset | 1 (3.4%) | 2 (6.9%) | 6 (7.6%) |
| Victim provided complaint/initial contact | 27 (93.1%) | 29 (100.0%) | 69 (87.3%) |
| Victim participated in forensics exam | 16 (55.2%) | 20 (69.0%) | 35 (44.3%) |
| Victim interviewed by SOU Detective[56] | 21 (72.4%) | 24 (82.8%) | 52 (65.8%) |

## C.   Paragraph 459(k)(iii): Clearance rate in sexual assault cases and Paragraph 459(k)(iv): Rate of declination of sexual assault cases referred to Baltimore City State's Attorney's Office for prosecution

Paragraph 459(k)(iii) was assessed by describing clearance rates by the type of case clearance (i.e., cleared by arrest or cleared by exceptional means) in addition to providing a description of other types of case closures (i.e., closed as unfounded or closed by other means) for 2018 (Table 28), 2019 (Table 29), and 2020 (Table 30). These tables exclude fourth degree sex offenses investigated by patrol. Cases "closed by other means" include criminal summonses, cases that were out of jurisdiction, and cases that were re-classified. All of the data provided in the remaining tables reflect cases that were closed in 2018, 2019, or 2020, regardless of the year that they were opened.

---

[56] There is an 8-case disparity between the series of questions about interview processes and deficiencies (n=89), and the present section regarding victim participation in major investigation stages (n=97). There is no clear explanation or trend in the 8 cases with inconsistent responses other than previously mentioned case file quality issues that may have impacted reviewer ability to assess the case. The results will therefore be presented as captured, in the two sections of this report. However, additional quality control measures will be embedded in the assessment instrument during follow-up compliance audits, to ensure that any variance within individual cases can be explained.

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

Tables 22 through 24 also provide annual frequencies and rates of cases that were declined for prosecution relative to the number of cases submitted to the prosecutor's office for review. The number of cases referred for prosecution includes cases that are closed by arrest, criminal summons, or declined each year.

**Table 22.        2018 Clearance Rates for Cases Investigated by SOU and CAU**

|  | Closed Cases | Total Cases | Clearance Rate |
|---|---|---|---|
| Number of cases closed by arrest in 2018 compared to number of cases in 2018 (excluding unfounded (122), out of jurisdiction (6), and re-classified (7)) | 135 | 516 | 26.2% |
| Number of cases closed by exception in 2018 compared to number of cases in 2018 (excluding unfounded (122), out of jurisdiction (6), and re-classified (7)) | 134 | 516 | 26.0% |
| Number of cases declined in 2018 compared to number of cases referred for prosecution in 2018 | 20 | 156 | 12.8% |
| Number of cases unfounded in 2018 compared to number of cases in 2018 | 122 | 651 | 18.7% |
| Number of cases closed by other means | 15 | 651 | 2.3% |

**Table 23.        2019 Clearance Rates for Cases Investigated by SOU and CAU**

|  | Closed Cases | Total Cases | Clearance Rate |
|---|---|---|---|
| Number of cases closed by arrest in 2019 compared to number of cases in 2019 (excluding unfounded (51), out of jurisdiction (2), and re-classified (9)) | 128 | 525 | 24.4% |
| Number of cases closed by exception in 2019 compared to number of cases in 2019 (excluding unfounded (51), out of jurisdiction (2), and re-classified (9)) | 79 | 525 | 15.0% |
| Number of cases declined in 2019 compared to number of cases referred for prosecution in 2019 | 35 | 177 | 19.8% |
| Number of cases unfounded in 2019 compared to number of cases in 2019 | 51 | 587 | 8.7% |
| Number of cases closed by other means | 12 | 587 | 2.0% |

**Table 24.       2020 Clearance Rates for Cases Investigated by SOU and CAU**

| | Closed Cases | Total Cases | Clearance Rate |
|---|---|---|---|
| Number of cases closed by arrest in 2020 compared to number of cases in 2020 (excluding unfounded (29), unsubstantiated (2), non-criminal (1), and re-classified (33)) | 109 | 482 | 22.6% |
| Number of cases closed by exception in 2020 compared to number of cases in 2020 (excluding unfounded (29), unsubstantiated (2), non-criminal (1), and re-classified (33)) | 8 | 482 | 1.7% |
| Number of cases declined in 2020 compared to number of cases referred for prosecution in 2020 | 29 | 138 | 21.0% |
| Number of cases unfounded or unsubstantiated in 2020 compared to number of cases in 2020 | 31 | 547 | 5.7% |
| Number of cases closed by other means | 35 | 547 | 6.4% |

For fourth degree sex offenses investigated by Patrol, case closure dispositions are described (i.e., unable to investigate, no police action, abated, or report written) in Table 25.

**Table 25.       Closed Classification for Fourth degree Sex Offense Calls for Service**

| | 2018 | 2019 | 2020 |
|---|---|---|---|
| Unable to Investigate | 52 (7.8%) | 27 (6.6%) | 23 (6.2%) |
| No Police Action | 81 (12.1%) | 52 (12.6%) | 25 (6.7%) |
| Abated | 33 (4.9%) | 16 (3.9%) | 10 (2.7%) |
| Report Written | 483 (72.4%) | 310 (75.2%) | 314 (84.4%) |
| Open | 18 (2.7%) | 7 (1.7%) | 0 |
| Total | 667 (100.0%) | 412 (100.0%) | 372 (100.0%) |

## VII.   BASELINE COMPLIANCE ASSESSMENT CONCLUSIONS

As stated throughout this report, the audit portion of this assessment covered a sample of sexual assault investigations opened by the Sex Offense Unit in 2018, 2019, and 2020. This timeframe largely predates the enactment of many of the policies and trainings developed and implemented in response to the requirements of the Consent Decree. As such, while this audit is framed as a "compliance assessment" and "outcome assessment" of Paragraphs 260, 262, and 459(k), its purpose is to establish a starting point, and identify where BPD, and specifically SOU must focus its efforts to achieve compliance. Future compliance assessments will focus more acutely on the specific, lettered provisions within each paragraph, so that detailed actions that may be required to achieve compliance may be identified.

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| 258 | BPD shall ensure its sexual assault policy and protocols: <br> a.  Identify procedure and practice guidelines for a trauma-informed, victim- centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime; <br> b.  Articulate the significant role and responsibilities of all officers throughout the sexual assault response and investigation; <br> c.  Articulate the opportunity for forensic examination and comprehensive medical care to the sexual assault victim; and <br> d.  Ensure all victims are offered access to free and confidential support, social service referrals, and information from a trained sexual assault victim advocate. | **4c – Implementation - On Track** <br><br> (*Based on findings from Seventh Semiannual Report*) |
| 259 | BPD shall provide initial and on-going annual training to all BPD detectives in the Sex Offense, Family Crimes, and Child Abuse Units about its policies and practices applicable to law enforcement response to sexual assault. This initial and annual in-service training shall ensure that these BPD detectives can perform their duties pursuant to this Agreement and include: <br> a.  Guidance to patrol on how to respond to reports of sexual assault, including cases presenting co-occurring crimes such as domestic violence or stalking; <br> b.  Guidance to detectives on strategies that postpone judgment regarding the validity of a case until a thorough investigation is completed; <br> c.  Highlighting methods to minimize further physical and psychological trauma to victims of sexual violence by creating a respectful, objective response; <br> d.  Identification of strategies to keep the investigation focused on the behavior and actions of the suspect; <br> e.  The impact of trauma on victims and adjustments to interview practices to allow sensitivity to victims' needs and the dynamics of sexual assault, and thus increase the likelihood | **4c – Implementation - On Track** <br><br> (*Based on findings from Seventh Semiannual Report*) |

*Outcome Assessment and Audit of Sexual Assault Investigations – May 2023*

| | | |
|---|---|---|
| | of continued victim participation with law enforcement, improve the experience for victims cooperating with law enforcement, and strengthen sexual assault investigations;<br><br>f.   The dynamics of and relevant core scientific concepts related to sexual assault including trauma-related behavior, tonic immobility, and the effects of trauma on memory; Guidance on working with vulnerable populations, including homeless people, sex workers, people with Behavioral Health Disabilities, and LGBT individuals; Law enforcement response to non-stranger sexual assault, alcohol and drug-facilitated sexual assault, sexual assault where the victim is incapacitated or otherwise unwilling or unable to clearly describe the assault;<br><br>g.   Report writing and documentation of the investigation undertaken, techniques for investigations of sexual assault, and classification of reports of sexual assault; Trauma-informed interviews of individuals reporting sexual assault; Taking statements from, interviewing, and interrogating suspects, including training about interrogating suspects in non-stranger or drug/alcohol-facilitated sexual assaults; and<br><br>h.   For those detectives with supervisory responsibilities, supervision of sexual assault cases, including sexual assault case reviews and other mechanisms to detect and prevent gender bias in the response to reports of sexual assault. | |
| 260 | BPD will:<br>a. Assign all reports of sexual assault that meet the criteria outlined in BPD policy to detectives for follow up investigation;<br>b. Thoroughly investigate reports of sexual assault, including any assaults that appear to be non-stranger assaults, assaults facilitated by alcohol or drugs, or assaults involving victims who were incapacitated or otherwise unable or unwilling to clearly describe the assault;<br>c. Consult with forensic examiners to obtain and discuss the results of medical/forensic examinations, and include a summary of the findings of the forensic examinations, including findings related to all injuries, in case reports;<br>d. Ensure that investigators of sexual assaults do not have a history of complaints of bias relating to gender or complaints of sexual misconduct that could impair their ability to investigate sexual assault in accordance with BPD policy and training;<br>e. If the victim consents, BPD shall enable advocates to be present during victim interviews, unless doing so would compromise the evidentiary value of the interview; | **4a – Implementation – Not Assessed** |

| | | |
|---|---|---|
| | f. Continue to provide a "soft" interview room, equipped with audio and video recording capabilities, for conducting victim interviews;<br>g. Ensure that officers introduce sensitive lines of questioning by first explaining why those questions are relevant to the investigation; and<br>h. Ensure that if there is a specific and articulable investigative purpose, detectives can ask the victim about their desire to prosecute the assailant, but the victim's responses should not be a determinative factor in law enforcement decisions about whether or how to pursue investigation. | |
| 261 | BPD will ensure that officers transport victims to the designated medical facility for a forensic exam in all instances in which a forensic exam is warranted and the victim consents to the transport. | **4a – Implementation - Not Assessed** |
| 262 | BPD shall establish and implement measures to ensure supervision and internal oversight of sexual assault investigations. These measures should include but not be limited to:<br>a. Developing a system of automated alerts to trigger supervisory review of open sexual assault investigations, and a protocol governing the supervisory review. This system and protocol shall include:<br>i. Supervisory review of all sexual assault reports, that fall under the investigative criteria for the Sex Offense Unit or Child Abuse Unit, within 48 hours of the report being taken in order to ensure consistency with BPD policy for initial officer response and documentation; and<br>ii. Supervisory evaluation of the thoroughness of the investigation in sexual assault cases when: (1) the victim has not been interviewed within one week of BPD receiving the report of sexual assault; (2) a case has been classified as "open," without any investigative activity, for longer than six months.<br>b. Before an investigation of a report of sexual assault is closed or a report of sexual assault is classified as "unfounded," a supervisor shall assess whether a comprehensive investigation has been conducted and whether appropriate follow-up has been completed. | **4a – Implementation - Not Assessed** |
| 263 | With the goal of better identifying serial offenders, BPD shall collect, share, and track crime-specific information about unresolved investigations of reports of sexual assault, including, to the extent possible, with law enforcement agencies in neighboring or with overlapping jurisdictions who are willing to cooperate, to identify similarities between reported sexual assaults and unresolved cases. | **4a – Implementation - Not Assessed** |
| 264 | BPD will continue to enhance its data collection, analysis, and reporting. The data to be collected and analyzed should include the following: | **4c – Implementation – On Track** |

|  | <ol type="a"><li>The numbers of sex offenses, broken down by crime category, that are reported to BPD, identifying, where applicable, incidents involving co-occurring crimes (i.e., sexual assaults involving domestic violence or stalking);</li><li>The number of offenders, both the totals and broken down by gender (i.e., male, female, transgender, queer or non-binary) and the relationship of the offender to the victim (i.e., stranger or non-stranger);</li><li>The number of victims/complainants, both the totals and broken down by gender, race, and age (i.e., under 18 and 18 and older);</li><li>The total number of sex offense reports categorized as founded and unfounded, broken down by the BPD unit categorizing the report;</li><li>The total numbers of sex offense reports, broken down by the BPD unit handling the report, that (1) were cleared by arrest, (2) were cleared by exceptional clearance, including by clearance category, (3) remain open and inactive, and (4) were referred to the Baltimore City State's Attorney's Office for the filing of charges; and</li><li>Data about the processing of forensic medical exams (often referred to as "rape kits"), including: (1) date of reported incident; (2) date of SAFE exam; (3) date detectives request lab analysis of SAFE exam; (4) date detectives receive lab analysis results.</li></ol> |  |