

# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

## COMPLIANCE REVIEW
## REGARDING RECRUITMENT & RETENTION

August 2023



## TABLE OF CONTENTS

I.   EXECUTIVE SUMMARY ................................................................................ 3

II.  BACKGROUND ........................................................................................... 6
  A.  DEPARTMENT OF JUSTICE FINDINGS REGARDING RECRUITMENT AND RETENTION ............. 6
  B.  CONSENT DECREE REQUIREMENTS ....................................................................... 6
  C.  BPD'S IMPLEMENTATION PROGRESS TO DATE ....................................................... 7

III. SCOPE OF THE REVIEW, METHODOLOGY & DETERMINING COMPLIANCE
STATUS ........................................................................................................... 8

IV.  EVALUATION OF BPD'S COMPLIANCE WITH DECREE REQUIREMENTS
REGARDING RECRUITMENT, HIRING, AND RETENTION ......................................... 11
  A.  PARAGRAPH 419 ....................................................................................... 11
  B.  PARAGRAPH 420 ....................................................................................... 13
  C.  PARAGRAPH 421 ....................................................................................... 14
  D.  PARAGRAPH 422 ....................................................................................... 19
  E.  PARAGRAPH 423 ....................................................................................... 19
  F.  PARAGRAPHS 424 AND 425 (BACKGROUND INVESTIGATIONS) ......................... 22
    1.  Background and BPD Implementation Progress to Date ............................. 22
    2.  Review Methodology ......................................................................... 26
    3.  Findings ......................................................................................... 27
    4.  Limitations to the Monitoring Team's Review of Background Checks ......... 36
  G.  PARAGRAPH 426 ....................................................................................... 38
  H.  PARAGRAPH 427 ....................................................................................... 40

V.   COMPLIANCE ASSESSMENT CONCLUSIONS ........................................... 42

## I.      EXECUTIVE SUMMARY

Paragraphs 419 through 427 of the Consent Decree require the Baltimore City Police Department ("BPD" or "the Department") to evaluate and revise its recruiting, hiring, and retention practices to better attract, hire, and retain a qualified and diverse police force capable of providing quality service, ensuring public officer safety and accountability, and promoting constitutional, effective policing.

To do so the Consent Decree mandates that BPD analyze its recruitment and hiring program and revise it as necessary.  It requires the Department to develop and implement a recruiting plan with specified characteristics.  BPD must also determine whether its hiring policies have a disparate impact on demographic categories, and BPD must alter its practices where reasonable to reduce those disparities.  BPD must further ensure that it conducts appropriate background checks on all applicants and must develop a retention plan to maximize the Department's ability to keep good officers in its ranks.  Finally, the Department must conduct annual assessments to allow BPD to update its policies and practices as circumstances change in the future.

This compliance review and assessment is designed to measure how far BPD has come in satisfying these requirements.  It must be emphasized at the outset that this assessment focuses on the Department's efforts to recruit, hire, and retain officers – and not on the staffing numbers that have occurred alongside these efforts.  Specifically, with respect to its practices and approaches to attracting and hiring qualified personnel, the Department has come quite far, reaching initial compliance with respect to many of the requirements.  Once 1) the Department better demonstrates ongoing self-analysis, showing it can update its practices in light of data and experience with recruitment and hiring, 2) the Department updates its background checks of applicants with law enforcement experiences to include a review of use of force incidents and training, and 3) the City creates opportunities for non-BPD city employees to assist BPD in recruitment efforts, the Department will likely reach initial compliance with Paragraphs 419 through 427.

**Summary of Findings**

- **BPD has revamped its hiring program to increase the diversity of its applicant pool and enhance the quality of its hires.**  After researching best practices and analyzing data from its then-current program, BPD instituted several changes that have attracted a more diverse, qualified applicant pool.  The Department eliminated the application fee for all the applicants.  BPD also allowed online applications and remote testing, which increased the pool.  Data show increases in applications of Black/African Americans, women, and Baltimore City residents from 2019-2020 after these changes to the program.  While these increases slowed in the last few years, likely due in part to impacts of the pandemic, BPD's successful analysis of

its program and implementation of the changes have brought them into initial compliance with the first requirement in this area.

- **BPD successfully created and implemented a recruitment plan that met the requirements of the Consent Decree**.  BPD developed a recruitment plan that the Court approved in the fourth quarter of 2018.  The plan set goals for hiring a diverse group of police officers mirroring Baltimore's demographics and suited for the profession with a greater emphasis on hiring Baltimore City residents.  The plan successfully met the Consent Decree's requirements regarding minimum standards for recruits and hires, broad outreach, creation of an online application process, and opportunities for officers, civilians, and members of city government to assist with recruiting.

- **BPD has adjusted its hiring process to address disparate impacts on demographic groups.**  As required by the Consent Decree, BPD analyzed its hiring practices to determine whether any part of its processes had a disparate impact on certain demographic groups.  BPD has identified specific aspects of its program that had disparate impacts and changed practices to reduce those effects.

- **BPD has overhauled its system for conducting background investigations of applicants and has shown that it screens all potential officers in an efficient manner in most, but not all, areas required by the Consent Decree.**  BPD has deployed a new system for background screening that meets the Consent Decree's requirements for checking education, employment, military, and credit history, along with a review of social media communications to determine suitability.  BPD, however, has yet to implement an effective process for reviewing and documenting all uses of force by applicants with prior law enforcement experience.

- **BPD developed and deployed a retention plan designed to improve BPD's ability to keep high quality officers.**  BPD finalized a plan to retain officers in December 2019.  The plan meets the requirements of the Consent Decree and contains specific steps to address staffing, leadership, and work environment, including civilianization of positions and other burden reduction, leadership training, and IT and other capital improvements.

- Even as BPD has made notable strides in overhauling its recruitment and hiring practices, the Monitoring Team finds that **the Department needs to further operationalize and institutionalize its processes for continuously evaluating and implementing evidence-based changes to its recruitment and hiring strategies where appropriate.**  This need for continuous self-evaluation and self-

analysis – which is something that the Decree emphasizes across many of its substantive areas – is especially acute given the current challenges that many police departments and municipal governments have attracting qualified personnel. While hiring police officers is a challenge across the country, BPD should have a process to study creative strategies employed elsewhere that have demonstrated success.

- **BPD needs to continue to refine its processes in response to its annual assessments.** While BPD is conducting annual assessments of its retention and recruitment program, it has yet to cement a system for improving its program in response to those assessments.

Additionally, the Consent Decree requires that the City of Baltimore establish ways for non-BPD city personnel to assist BPD's recruitment efforts. These efforts will need to be more robust and operationalized for the City to demonstrate initial compliance with the totality of the section relating to recruitment, hiring, and retention.

## II.    BACKGROUND

### A.    Department of Justice Findings Regarding Recruitment and Retention

The August 2016 Department of Justice ("DOJ") report on its investigation of the Baltimore Police Department concluded that "the Department lacks effective strategies for staffing, recruitment, and retention."  Further, the report singled out infrastructure limitations that "inhibit effective data collection."[1]

The report described the significant staffing shortages and recognized in 2016 the absence of a department-wide plan to confront the situation.  At the time, BPD districts were managing their own shortages through forced overtime – colloquially, officers were routinely "drafted" to work an extra 10-hour shift after a regularly scheduled shift.  There was no centralized data collection on the drafting process, which prevented a full understanding of whom, with what regularity, or for how many hours officers were drafted.

The DOJ report also discussed the Departments' difficulty in recruiting qualified officers and its inability to reach its goals for the 2016 academy class.  The forced overtime/"drafting" practices and compensation, along with other factors beyond the scope of this particular assessment, were identified as having a negative impact on morale.  Additionally, personnel at all levels reported to the DOJ that officers "join BPD to gain experience" and then leave within five years for easier and better paid positions in the region.  With these findings, the DOJ identified the need for the City of Baltimore to develop plans to improve recruitment numbers as one of many steps in resolving the staffing shortages.

The DOJ further reported that the Department's background check process was unable to screen out inappropriate candidates.  In 2015, the *Baltimore Sun* reported on an investigation by the City's inspector general which found that the Department's psychological examination process compromised quality to expedite hiring, raising concerns about not only the number of officers that BPD had available but also the quality of those who BPD hired.[2]

### B.    Consent Decree Requirements

To address the Department of Justice's findings, the Consent Decree requires BPD to reform its recruitment and hiring practices and program with the expectation that changes will increase the quality of applicants and, thereby, the quality of its personnel.

---

[1] Findings report https://www.justice.gov/d9/bpd_findings_8-10-16.pdf
[2] https://www.baltimoresun.com/health/bs-md-police-psych-evals-20150805-story.html

The Decree contains nine paragraphs, Paragraphs 419 through 427, that address recruitment and retention:

- Paragraph 419 requires BPD to review and revise its recruitment and hiring program to ensure the Department successfully attracts and hires a diverse group of qualified individuals.
- Paragraphs 420 through 422 require BPD to develop and implement a written Recruitment Plan.
- Paragraph 423 states that BPD will conduct an in-depth review of hiring processes for officers, and assess whether any process, criterion, or requirement has a disparate impact on a demographic category; if disparate impacts are identified, BPD will determine if there are reasonable alternative selection procedures available.
- Paragraph 424 sets forth eight requirements, with explicit activities, for BPD's evaluation of officer applicants.
- Paragraph 426 requires BPD to create a Retention Plan to identify challenges and recommend solutions to improve the Department's retention of employees.
- Paragraph 427 requires BPD to conduct assessments of its recruitment and retention efforts on an annual basis.

## C.      BPD's Implementation Progress to Date

This report addresses the various steps that BPD has taken toward complying with the Decree as part of its compliance evaluation.

III.     SCOPE OF THE REVIEW, METHODOLOGY & DETERMINING
         COMPLIANCE STATUS

This assessment is a compliance review of Section XVI of the Consent Decree, which encompasses Paragraphs 419 through 427 and which address BPD's recruitment, hiring, and retention of qualified personnel.   The Monitoring Team has previously described the role of compliance reviews in the Decree:

> Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree.  They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . .. [3]

To conduct the compliance review, the Monitoring Team reviewed dozens of documents provided by BPD and its Recruitment Section.  The Team reviewed other materials shared at bi-weekly meetings with the Recruitment Section and Compliance Manager.  Monitoring Team members were provided access as needed to the Recruitment Section's candidate management database system, eSOPH, for an in-depth analysis of the background investigations.  Documents that describe BPD activities and goals, as well as materials generated to advance initiatives, were assessed considering the expectations and requirements of the Consent Decree.  In its own section is a detailed compliance assessment on paragraph 424 which has prescribed activities for the background investigations on applicants for police officer at BPD.

This report evaluates BPD's compliance with Paragraphs 419 through 427.  The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of scoring BPD's performance in its effort to fully implement the Decree's many requirements:

> **0 – Not Assessed:**  The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

> **1 – Not Started:**  The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

> **2 – Planning/Policy Phase:**  The City/Department is addressing the planning and/or policy provisions for the requirement.

> **3 – Training Phase:**  The City/Department is addressing the training provisions for the requirement, based on approved policy.

---

[3] Dkt. 279-1 at 22–23.

8

**4 – Implementation Phase:**  The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:**  The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:**  The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:**  The City/Department has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in Paragraph 504 of the Consent Decree.

**5a – Full and Effective Compliance:**  The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree.  This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance**:  The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

**This review is largely focused on whether BPD has, or has not, moved from working to implement the Decree's requirements on recruitment and retention to having successfully implemented those requirements in practice.**[4]  To make determinations about whether BPD is in Initial Compliance with a material requirement of the Decree, the Monitoring Team continues to weigh the following factors:

---

[4] *See* Dkt. 2-2 ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers.  In this way, isolated compliance does not establish "Initial Compliance" in practice.  At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance.  The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.  For some requirements that are applicable only to a relatively small, absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.**  The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.  Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field.  Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way.  Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue.  With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time.  Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

## IV.   EVALUATION OF BPD'S COMPLIANCE WITH DECREE REQUIREMENTS REGARDING RECRUITMENT, HIRING, AND RETENTION

To assist with the Monitoring Team review of the Decree's sections regarding recruitment, hiring, and retention, BPD provided access to dozens of internal and public documents and files, internal databases, and briefing memos.  They also continued to share information on a bi-weekly basis with DOJ and the Monitoring Team.  Despite a vacancy in a key analytic role since the autumn of 2022, with the assistance of analysts from other sections, the BPD compliance and recruitment section staff provide data-rich updates on the progress and challenges in these areas.  BPD also provided its own, internal self-assessment of its recruitment efforts.

### A.   Paragraph 419

*To maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, BPD will review and revise as necessary its recruitment and hiring program to ensure the BPD successfully attracts and hires a diverse group of qualified individuals.*

Paragraph 419 requires BPD to evaluate its recruitment and hiring program and to ensure it deploys best practices to attract and hire qualified and diverse applicants.  This paragraph addresses the *quality* of BPD recruitment and hiring – whether the individuals BPD brings into its ranks meet the standards of a modern police force and reflect the diversity of the city.  Paragraph 419 does not, however, address the *quantity* of officers that BPD hires each year.  Staffing levels, while important, come into play elsewhere in the Consent Decree and will be addressed in the Monitoring Team's assessments of those areas.

BPD has made great strides in reforming its recruitment and hiring program to ensure its hires are qualified and diverse.  After analyzing relevant research and data, the Department's Recruitment Section created an approved written recruitment plan, which is discussed in greater detail in the assessment of paragraph 426 in this report.  As discussed in the reviews of paragraphs 424 and 425 in this report, BPD streamlined and otherwise improved application and recruitment processes, moved to online applications, and otherwise improved its use of technology.

Two of the most significant changes were (1) an adjustment to BPD's testing protocol and provider to allow for completing the required testing remotely and (2) the elimination of the application fee for residents of Baltimore.

These two changes expanded the pool of applicants.  A data report from the new testing system, the National Testing Network ("NTN"), reflects that scheduled remote tests in the month of March 2021 accounted for about 54% of all tests.  Of the 195 scheduled tests, 106 were virtual.

Remaining tests were scheduled to be taken at other testing sites across the country, with a majority of the locations in the mid-Atlantic region.  The March 2021 NTN report reflects that of those that took the test, 22 were from Baltimore, 27 from Maryland, and 75 from outside Maryland.

For that same one-month period in 2021, NTN reports that about 32% of those who applied were female, about 52% were Black and about 19% were Hispanic or Latino.  Of those who took the prospective officer test during the reporting period, 23 women and 65 men for a total of 89 (one test taker did not disclose gender).  Of those 89, 44 were Black and 18 were Hispanic/Latino.

Sixty-nine percent of the men who took the test ultimately passed, with 39% of the women passing. Women of color passed at a similar, but slightly lower rate of 33%.  White candidates, both men and women, passed at higher percentages at 86% and 100% respectively.[5]

BPD's recruitment and hiring process involves additional online elements beyond the NTN exam. The BPD officer application itself is online, using Workday and the NTN exam.  The job postings are visible on the BPD and the City's websites.  There are online sign-up forms for prospective applicants to participate in a ride-along.  Monitoring Team reviewers also reviewed a BPD "Concierge Spreadsheet" where BPD tracks applicant progress, enabling staff to connect with applicants to keep them engaged.

BPD shares with the Monitoring Team on weekly calls information about application numbers, hiring data, pass rates for each phase in the process, and BPD hiring performance as compared to targets.  BPD is developing an automated daily tracker that captures this information, but its progress has been stalled because an analyst position within the Recruitment Section is currently vacant.

The Recruitment Section reviews its data regularly and updates its targets.  The commander leads regular internal meetings that review current and historic data and trends, investigator progress, and other performance related metrics.  Since the inaugural recruitment plan was approved in 2018, the use of RecruitSTAT and support from the Office of Performance and Innovation, there continues to be close attention to the data and recruitment benchmarks.  There appear to be a number of methods by which the recruitment targets are reviewed within the Department. Unfortunately, BPD's regular production of hiring and retention reports, workforce demographic tables, and the Concierge Spreadsheet all require substantial manual upkeep.

The additional work of the Recruitment Unit has benefited from BPD's expansion of the scope of personnel who work on recruitment.  Since the start of the Consent Decree, additional staff positions were approved to add capacity to the Recruitment Section.  Four background

---

[5] NTN reports provided in sections by the Recruitment Section.

investigators, a sergeant, a lieutenant, and a data analyst were brought into Recruitment to abbreviate processing times.

BPD points to results from 2019 to 2020, where data show increases in the hiring of Black/African Americans, women, and Baltimore City residents by 26, 35, and 19% respectively.  There were more officers hired overall in 2020 as compared to 2021.  As of the first half of May 2023, BPD has hired 43 officers, as compared to 32 at this point last year.  Of those, 53% are Black, 19% are women, and 4% are from Baltimore City.  However, these hires are not keeping pace with separations.  Year to date, 2023, there have been 91 departures with a net loss of 48.  There are 21 new recruits in an academy class that began in May.[6]  The net loss of personnel is a decades old problem.  Internal reports show that in the last 10 years in only one year was there a net gain.

Because the BPD has successfully updated its hiring and recruitment plan as the Decree requires and as described above, the Monitoring Team concludes that BPD has reached initial compliance with this requirement.

**Compliance Score for Paragraph 419: 4d, Implementation – Initial Compliance**

**B.**     **Paragraph 420**

> *According to the timeline specified in the monitoring plan, BPD will develop a written recruitment plan that includes clear goals, objectives, and action steps for attracting and retaining a quality workforce that reflects the diversity of the Baltimore community.*

BPD provided its recruitment plan, *Recruiting the Best in Blue for Baltimore* (the "Recruitment Plan") to the Monitoring Team in November 2018.  The Recruitment Plan was subsequently approved and submitted to the court late in the fourth quarter of 2018.

The Recruitment Plan contains appropriate goals, objectives, timelines, and action steps as the Consent Decree requires.  It addresses issues relating to diversity and place of residence, and it establishes targets and benchmarks to increase the quantity and diversity of its applicants, the quality of candidates, and to recruit more people from Baltimore City.  The document describes itself as "a living document that will evolve" with constant evaluation.[7]  This is one way in which the Department has "integrated community and problem-oriented policing principles into its . . . recruitment."  *See* Paragraph 15 of the Consent Decree.

---

[6] Meeting with Recruitment Section May 15, 2023, as reported by Director Onamade.
[7] The plan, "Recruiting the Best in Blue for Baltimore", submitted November 12, 2018, for the period 2018-2021. Page 3.

The Recruitment Plan set appropriate hiring goals, which are as follows:

- More:  Fulfill anticipated staffing needs, enabling patrol officers to spend more time building community relationships and preventing crime.
- Diverse:  Through targeted outreach, ensure applicants and hires reflect the demographics of Baltimore's population.
- Ideal:  Recruit and hire people who exemplify the most important traits for being a great police officer.
- Local:  Hire more officers who are from and reside in Baltimore City.

The identified demographic goals for recruitment are aspirational:

- 250 new applications per month and 25 hires per month.[8]
- One third of applicants are women.[9]
- One half of applicants are Black.[10]
- One third of all applicants and hires are City residents.[11]

As discussed below, the Recruitment Plan meets all the specific requirements laid out in the Consent Decree.  Accordingly, the Monitoring Team finds that BPD has reached initial compliance with Paragraph 420.

**Compliance Score for Paragraph 420: 4d, Implementation – Initial Compliance**

**C.     Paragraph 421**

*The Recruitment Plan, will at a minimum require the following:*

Paragraph 421 lays out a number of specific requirements of the Recruitment Plan.  Each are addressed in turn.

*1.   Paragraph 421(a)*

*Minimum standards for recruits and lateral hires.*

BPD worked with DOJ and the Monitoring Team to revise its written hiring standards for officers, and the Monitoring Team approved the changes in early 2020.  The changes were incorporated

---

[8] Recruiting the Best in Blue for Baltimore, Page 9.
[9] Recruiting the Best in Blue for Baltimore, Page 19.
[10] Recruiting the Best in Blue for Baltimore, Page 19.
[11] Recruiting the Best in Blue for Baltimore, Page 24.

into Recruitment Section standard operating procedure ("SOP").  Applicants must cooperate with BPD, pass each step of the hiring process, and be assessed against the BPD hiring standards as articulated in the SOP.  The SOP also adopts the Code of Maryland Regulations ("COMAR") and the Maryland Police Training Commission minimum hiring standards.

Because BPD has appropriately revised and memorialized its hiring standards and is applying the criteria appropriately in background investigations (discussed below), the Monitoring Team concludes that BPD is in **initial compliance with Paragraph 421(a)**.

**Compliance Score for Paragraph 421(a): 4d, Implementation – Initial Compliance**

### 2.  *Paragraph 421(b)*

*Recruitment outreach to a broad spectrum of community stakeholders, aimed at increasing the diversity of its ranks, including race and gender, and applicants who are community policing and problem-solving oriented.  BPD and the City will explore opportunities for Youth in the City's high schools to gain exposure to policing through internship or other programs and create ways to support interested Youth in fulfilling the requirements to join BPD.*

BPD has taken a number of steps to broadly distribute recruitment materials to a diverse array of potential applicants:

- All new recruitment materials have links for informational emails and relevant websites, and QR codes to scan that quickly bring a user to online information.  There are clear links on the BPD site to postings on the City of Baltimore's Job Opportunity site and the National Testing Network, the external provider of officer testing.[12]  Since 2021 BPD has relied on the full operations of Workday and its online application system.  The platform integrates with LinkedIn and Indeed to expand its reach.  Updating recruitment materials to include electronic and social media will increase its reach with youth.

- BPD launched a marketing campaign through IDFive, a Baltimore based mission focused marketing firm, designed particularly to attract youth and community focused people.  The campaign is "geo-fenced," meaning that advertising is delivered to individuals based on their proximity to certain areas such as high schools and community centers.  The Recruitment Section targets high schools, colleges, veteran

---

[12] https://baltimorecity.wd1.myworkdayjobs.com/en-US/External/details/Police-Officer---Baltimore-City-Police-Department_R0000688?q=National+Testing+Network and
https://www.nationaltestingnetwork.com/publicsafetyjobs/search.cfm?position=1&state=MARYLAND.

groups, community organizations, and law enforcement expositions.  Physical presence at fairs and events diminished considerably during 2020 and 2021 due to the COVID 19 pandemic.  The IDFive materials include print materials as well as those designed for web and social media, all with QR codes and key web addresses and links.  Web based materials depict real cadets and include embedded video testimonials about experiences.  The photos show officers engaged in activities that highlight community policing roles, interacting with youth and other community members, and in a range of attire.  All the materials include information on eligibility, descriptions of the hiring process, and a list of benefits.  The Department also produces professional videos that area used on social media.

- BPD has joined the national *30x30 Initiative*[13], a collection of law enforcement agencies that expresses a commitment to increase the representation of women to 30% by 2030.

-  BPD's website includes a prominent section available from two different links on its the home page that includes a description range of job options for both sworn and civilian personnel.  The City's home page likewise has a link to this section from its "careers section" to a webpage regarding BPD jobs that is rich with information on the requirements, disqualifiers, career advancement opportunities, compensation, and benefits, as well as applicable deadlines and requirements for officers. The application process begins with an on-line application and is open to anyone accessing the site, irrespective of geographic location.

- The City of Baltimore has instituted signing bonuses to increase interest and manage competition with other agencies.

- To engage young people in the business of policing early, BPD created a Cadet Program to entice participating high schoolers to gain exposure and experience in police work.  IDFive also created materials specific for cadet recruitment.  The BPD webpage has descriptions of cadet career opportunities, the incentive programs, and links for applications through NTN.

- BPD developed a youth explorers program for students to discover the benefits of a career in policing.  Explorer programs across the country, and in Baltimore, are coordinated with the Boy Scouts of America.  The Boy Scouts refer participants to BPD.  In 2018 there were 92 youth and in 2019 96 youth participating.  As set forth in BPD Policy 508:

---

[13] https://30x30initiative.org.

Explorers receive training and actively participate in community service and non-hazardous law enforcement activities. The rationale is to provide, through actual experience, a means by which young men and women may determine if they would like to pursue a career in law enforcement.[14]

- BPD has a program that provides bonuses to current BPD members who refer BPD applicants. BPD does a good job of promoting this program among its members. Policy 184 explains the process and award system. BPD members in good standing are entitled to an award if they refer an applicant that is hired by the Department. The amount of the award depends on how far the hired applicant progresses in BPD's training program. At the first milestone, referring members receive $2,500. Once the candidate successfully graduates from police field training, the referring member receives another $2,500. If the referring member has more than 15 years of experience with the BPD in either a sworn or civilian capacity, they are awarded an additional $2,500. There are no limits on the number of times an employee can receive a referral bonus, but certain members are not eligible for the program. Sworn members of lieutenant colonel or above, civilian members with a rank of chief or higher, and members of the Human Resources Section or Recruitment Section.

Through these efforts, BPD is conducting wide outreach to a variety of stakeholders, including to city residents, younger potential applicants, and women. As a result of the ongoing efforts described above, the Monitoring Team concludes that BPD is in initial compliance with this Consent Decree requirement.

**Compliance Score for Paragraph 421(b): 4d, Implementation – Initial Compliance**

### 3. *Paragraph 421(c)*

*Broad distribution of recruitment information, including information regarding career opportunities, compensation, the testing and hiring process, and applicable deadlines and requirements. Such information will, at a minimum, be readily accessible on City and BPD websites and available upon request to City or BPD officials.*

BPD's rebranding efforts, supported by IDFive, created a set of comprehensive promotional materials designed to showcase a new BPD. The materials are tailored toward youth and community-minded individuals. The photos depict officers in uniform in non-traditional police

---

[14] https://www.baltimorepolice.org/transparency/bpd-policies/508-law-enforcement-explorer-program

activities. They are engaged with a diverse group of people and are not performing typical enforcement activities.

All BPD-distributed recruitment information describes the required information about the nature of available career opportunities, compensation, the testing and hiring process, and applicable deadlines and requirements that Paragraph 421(c) requires. The re-branded site and materials all provide a range of methods for securing additional information. They include an email address, recruit@baltimorepolice.org, and a QR code that brings a user to a page with that email and other relevant information.

The materials are comprehensive, including both QR codes directing a user to a website and web and email addresses for additional information. The details of all job qualifications, compensation, benefits, career opportunities, and the testing and hiring processes are readily accessible. The materials and websites offer multiple methods of contact providing a failsafe for users. Consequently, the Monitoring Team concludes that BPD is in initial compliance with this Consent Decree requirement.

**Compliance Score for Paragraph 421(c): 4d, Implementation – Initial Compliance**

### 4. *Paragraph 421(d)*

*That candidates be allowed to submit initial applications online to BPD . . ..*

Candidates are not only "allowed" but are expected to complete an online application, which is consistent with Paragraph 421(d). Beyond the initial application, much of the subsequent process is also online. Recruitment materials provide web links to the application and descriptions of the online application process. Accordingly, BPD is in initial compliance with this requirement.

**Compliance Score for Paragraph 421(d): 4d, Implementation – Initial Compliance**

### 5. *Paragraph 421(e)*

*Opportunities for officers, civilians, and members of City Government to assist the BPD's efforts to attract a broad spectrum of qualified applicants.*

BPD looks to and rewards its members to help recruit appropriate candidates. BPD has created referral incentives for current employees who refer successful candidates. The referring employee receives the incentive in two installments, at hire and after the applicant successfully completes the field training requirements. This has been incorporated into BPD policy and is visible in

recruitment materials.  BPD offers bonuses and assistance for recruits who opt to live or buy in Baltimore as well as educational assistance.

However, even as BPD job postings are advertised and available on a variety of websites, there is no information nor evidence that the City has created opportunities for its *non-BPD* employees to assist in or contribute to BPD's recruitment needs.  According to the terms of Paragraph 421(e), the City must provide non-BPD city employees opportunities to assist in BPD's efforts to attract quality applicants.  While the City currently publicizes information about BPD through its website and in other media, such efforts are not sufficient to satisfy the Consent Decree requirement.  The Consent Decree does not prescribe specific opportunities that the city must provide, so the City has latitude to identify reasonable steps that achieve this goal.  The City must, however, institute some process to allow broad engagement with the hiring process by City employees.  For instance, as one but by no means the only example, other jurisdictions have instituted referral bonus programs to city employees who refer a candidate that the department hires.  Consequently, the Monitoring Team determines the City is on track to reach compliance with this requirement but has not yet reached initial compliance.

**Compliance Score for Paragraph 421(e): 4c, Implementation – On Track**

**D.      Paragraph 422**

>   *The Recruitment Plan will be submitted for the Monitor's approval.  BPD and the Monitor will meet and confer to resolve any objections the Monitor notes.  BPD will implement the Recruitment Plan upon approval and as required by the Monitoring Plan.*

BPD produced the initial written Recruitment Plan that was approved by the Court in 2018.[15]  In 2019, BPD published a retention plan with recommendations to improve the retention of employees.  The 2019 plan detailed several initiatives and opportunities to be incorporated.  As described above, BPD has successfully implemented the Recruitment Plan.  Consequently, the Monitoring Team concludes that BPD has reached initial compliance with the requirement that it produce and implement the recruitment plan.

**Compliance Score for Paragraph 422: 4d, Implementation – Initial Compliance**

**E.      Paragraph 423**

>   *BPD, with the aid of the Monitor, will conduct an in-depth review of BPD's current hiring processes for officers, including Paragraph 424, and state hiring criteria to*

---

[15] Reference the 2018 approved Recruitment plan.

> *assess whether any process, criterion, or requirement has a disparate impact based on demographic categories. The BPD will determine whether there are reasonable alternative selection procedures available that would comply with state requirements and serve the BPD's needs while having less of a disparate impact and if there are, will implement those alternative selection procedures.*

BPD's Recruitment Section has reviewed all stages of the application process across gender, racial, and geographic demographics across three years, 2018, 2019, and 2020, to understand process attrition. Its conclusions included:

- Women are passing the NTN at a higher rate than previously but fail the fitness exam more than other groups.
- City residents have a lower pass rate at the application phase and in 2020 scheduled the NTN at higher rates than in the past.
- Those identifying as Black fail the background check at higher levels and those who identify as white are less process compliant than other groups.
- The percentage of applications and hires of women remains statistically similar across those three years, although fewer women are hired compared to other groups.

In February 2021, a staff member in the Recruitment Section conducted an in-depth review of the impact of the NTN question on recent use of marijuana. The results, reported in an internal memo referenced in the BPD internal compliance assessment, indicate that the question is only affecting a small portion of applicants but disproportionally women, city residents, and people who identify as white, Alaskan, Native American, or two or more ethnicities. Of the 8,031 applications received in 2020, 7% (593) were eliminated by marijuana recency alone. BPD's analysis concluded that if the marijuana recency question was eliminated, there would be a proportional increase in the number of approved applications for women, city residents, and applicants with white, Alaskan, Native American, or two or more ethnic identities.

As recently as the spring of 2023, the Deputy Director of the Recruitment Section made requests of the vendors to abbreviate timelines for background investigations to curtail losses to other agencies who move more quickly. There is some anecdotal evidence that the suitability assessment on the NTN is causing a failure of otherwise suitable candidates. The theory is that the test design has a negative impact on test takers. The Recruitment Section is in discussion with NTN about this segment of the test. The BPD is confident that elimination of this section will have no adverse impact on the assessment of candidates.

BPD also asked the contracted background investigators to use more precise language in their summary reports regarding the significance of issues that the investigators identify. For example, previously in contractor summary reports, any minor discrepancy or flagrant issue was noted in red font with all caps as "unfavorable." The report thus gave the impressive of a serious issue in

all cases, even minor ones.  For instance, BPD appropriately gives more weight to non-voluntary terminations due to misconduct such as use of derogatory language and absenteeism than a discrepancy between the dates of prior employment provided by an applicant.  Yet both issues were, until recently, reported as similarly "unfavorable" in the KENTECH report.  To its credit, BPD's recruitment section appropriately identified the minor discrepancies in their investigative reports as explainable discrepancies rather than "unfavorable" results.

While BPD has successfully analyzed and adjusted its hiring processes, and thus satisfied this requirement of the Consent Decree, the Monitoring Team encourages the Department to continue to be vigilant and use the required annual assessment referenced in Paragraph 427.  These assessments provide a formal opportunity for BPD to continue to review whether components of their hiring process are resulting in disparities.

Anecdotally, BPD's Recruitment Section believes that the NTN suitability assessment section has a disparate impact on certain demographic groups.  BPD staff suspect that the pace at which questions are asked offers too little opportunity for a complete response.  They are seeing applicants perform poorly on that section who otherwise appear to be quality candidates based on their scores for the video interview, writing, and reading.  In a review of a recruiter's tracking system of individual NTN scores from January to September of 2022, the data show that there is a 63% passing rate for the suitability assessment section.  They identified 82 individuals that were failed for the score in that section and passed in the video, writing, and reading sections.  They are examining changes to the NTN component and will rely on other measures to assess skills, temperament, and policing goals.[16]

BPD has met the Consent Decree requirement that it analyze its hiring processes and made changes to components that were shown to have a disparate impact on demographic groups.  BPD worked with KENTECH to reduce the duration of the background check process to 30 days to reduce the impact of competing offers from other departments to qualified applicants.  They are studying the impact of the use of marijuana question and working within Maryland statutes to minimize its impact on hiring.  BPD has modified the NTN test process to eliminate the suitability assessment.

[16] Unfortunately, the analyst position within the Recruitment Section that was filled in 2021 became vacant in the fall of 2022.  As of May 2023, the Recruitment Section remained without a full-time analyst, seriously impeding the ability for routine and timely analysis of the vast amounts of data collected.  This has similarly stalled efforts for the implementation of automated dashboards for information about recruitment and hiring.  Despite support from analysts in other areas, and although interviews began taking place to fill the position as of May 2023, the vacancy has been deeply felt.

BPD's Recruitment Section has continued to hold roughly biweekly meetings with members of the Monitoring Team.  Meetings feature regular discussion about the hiring and separation numbers, the status of academy classes, and any changes or adjustments to plans.  The Recruitment Section, even without an analyst, is reviewing the demographics of those in the application process and the results.

Accordingly, the Monitoring Team concludes that BPD is in initial compliance with this requirement.

**Compliance Score for Paragraph 423: 4d, Implementation – Initial Compliance**

**F.      Paragraphs 424 and 425 (Background Investigations)**

*1.   Background and BPD Implementation Progress to Date*

BPD has made significant changes to strengthen and expedite the review of applicants and extend offers to high quality candidates.  In April 2023, in accordance with methodology approved by the parties, members of the Monitoring Team reviewed and assessed the processes and systems used by applicants and investigators from application through background checks to the decision to extend an offer of hire.

Once an application is submitted, BPD investigators conduct a preliminary vetting process.  If there are no immediately apparent facts that disqualify the candidate, the applicant is invited to take the NTN test, schedule a physical agility test, participate in an in-person interview, take a polygraph, and join the electronic management system, eSOPH, to complete and submit all other materials.  Satisfactory completion of all these steps, and others, are required for the candidate to be considered for employment.

BPD implemented an electronic repository and management system for all materials related to the application called eSOPH in March 2018.  According to its website, eSOPH is a leader in pre-employment background investigation software to public safety agencies in the United States.  The product serves as an organized repository of all materials submitted by the applicant and created by the investigator.  It enables creation of standard documents in Microsoft Word, such as reports and requests for information, and retains them in the applicant's file.  Authorized users must sign in and those logins are collected as part of the sophisticated internal audit function.  Protected information such as medical, psychological, and polygraph results can be locked such that access is limited to supervisors.  It is designed and is used to prompt all users, both applicants and BPD staff, to complete each necessary step and move along in the system.  Supervisors are prompted to review specific aspects of the file for the investigator to complete the next phase of the background investigation.  Working within the eSOPH system, with the support of BPD staff, afforded the Monitoring Team reviewers insight into not only the system as used but also the benefits to the applicant and staff.

As described previously, since January 2019, BPD has contracted with the National Testing Network to post positions, direct applicants to postings, and test for positions.[17]  Within the NTN

---

[17] https://www.nationaltestingnetwork.com/publicsafetyjobs/search.cfm?position=1&state=MARYLAND.

website, interested parties access the job posting, related application requirements and some of the factors that could disqualify a candidate, and the benefits information for the BPD. From links within the posting on NTN, an applicant reaches a City website with current recruit information[18] and then the application page for the City of Baltimore Job Opportunities.[19] Once completed, the NTN application is saved within the eSOPH system. NTN offers national testing sites, making it easier for applicants outside of the greater Baltimore area to complete and take the test. BPD continues to offer on-site testing two days a week at police headquarters.

The NTN test has four components: a reading test, a writing test, a video interview, and the suitability assessment which is a series of about 200 questions.[20] Each section is scored separately, and an average or combined score is provided. A score of at least 60 is required for passing the video portion and the writing and reading minimum score is 70. An overall score as well as scores for the individual segments is provided. If the candidate passes the NTN test, they are scheduled for a physical agility test. When the applicant passes the agility test, the assigned investigator conducts a preliminary personal interview, and then, with approval of the supervisor, a conditional offer of employment is extended.

The letter of conditional offer explicitly states that an offer for hire is predicated on the successful completion of the polygraph, urinalysis, and comprehensive background investigation. The polygraph test follows the in-person interview. The polygraph is used to identify any areas of deception arising from the interview and application. Should a polygraph result be inconclusive, a second opportunity is offered. Two inconclusive findings on the polygraph constitutes failure. Rejection or disqualifying letters are sent at any stage in the process when disqualifying information surfaces. At this stage, the applicant is invited to eSOPH to provide additional personal data and enter the Comprehensive Background Investigation phase. Applicants have two weeks to submit their completed eSOPH profile.

The comprehensive background investigation commences at this stage. The applicant's failure to comply at any of the following steps, including providing written clarification of any issues raised, results in the disqualification of the candidate. The background investigation is conducted by both BPD investigators assigned to the Recruitment Section and KENTECH Consulting, Inc. ("KENTECH"), a contracted background check company.

---

[18] https://bpdrecruit.org.
[19] https://baltimorecity.wd1 myworkdayjobs.com/en-US/External/details/Police-Officer---Baltimore-City-Police-Department_R0000688.
[20] As of the end of May 2023, the BPD eliminated the suitability assessment based on data indicating that that step screened out otherwise qualified applicants, including those who were assessed as otherwise suitable for BPD employment.

KENTECH describes itself as "a licensed Private Detective Agency" working globally to provide background check services.[21]  At the beginning of its contract with BPD in October 2018, KENTECH was required to complete the investigation within 30 days.  Throughout the term of the contract, KENTECH has been agreeable to modifications based on newly presenting needs of the Department.  The Monitoring Team understands that, as part of contract negotiations ongoing in May 2023, BPD is endeavoring to reduce that to 14 days.

KENTECH reports are comprehensive and are included in the eSOPH file.  Reports include social media searches, confirmation of applicant provided information on employment and dates, interviews where possible with prior employers and supervisors, relatives, and neighbors.  KENTECH reports include detailed descriptions of their efforts and documentation of findings.  KENTECH reaches out to professional and personal references, neighbors, and family members to learn about the candidate.  All interviews and attempts at interviews are stored in the departments eSOPH system.

While KENTECH is conducting its reviews, the investigators assigned to the recruitment unit work on other aspects of the background investigation.  The investigators, in accordance with the Consent Decree, review police records for all addresses the applicant lists as residential addresses and a variety of databases that collect information on criminal involvement.  These include local, statewide, and national sources.  For a full listing and description of the databases, see Appendix A.  These databases provide detailed information on criminal history as well as current court supervision status, driving records, protective orders, local calls for service, and civil court engagement.

Investigators collect and review military history, credit history, and driving records.  They further review information that KENTECH has collected regarding the applicant's employment history.  In cases where the applicant is a current or former police officer the investigator speaks with the Internal Affairs Unit or otherwise named unit that has information on complaint history, including problematic use of force.  Use of force training across departments is based on a Maryland standard issued by the Maryland Police and Correctional Training Commission ("MPCTC") and the review with MPCTC on license status reveals any training deficiencies.  Investigators also check with National Decertification Index ("NDI") for all current and former law enforcement officers.  Based on the applicant's former addresses, the investigator conducts searches for civil matters through state judicial websites.

Investigators create a final summary report evaluating all the materials gathered by KENTECH and themselves.  To assess suitability of temperament and goals for policing and community policing, they rely on the totality of the information collected and the responses to the court approved NTN test.  Applicants are provided an opportunity to explain any discrepancies or

---

[21] https://www.ekentech.com/about-kentech-background-services.

unfavorable information and details are included in the investigator's summary report. All these data are retained and easily accessible in eSOPH. The commander in the Recruitment Section reviews and approves or disapproves of the recommendation of the investigator. Applicants approved at this stage advance to the next level of scrutiny.

After approval by the Recruitment Section command, applicants are moved in the process to the "2Ps," the colloquial term for psychological and physical examinations. Failure of the psychological portion of the 2Ps disqualifies the candidate. This can be either temporary (the candidate can re-apply after a certain period of time) or permanently disqualifying (the candidate is permanently rejected and cannot reapply). Failure of the medical examination is similar, there can be a medical deferral or a medical disqualification.

Applicants who reach this milestone, with approval of the command, are advanced for hire and Human Resources is notified. The Final Processing Unit provides an official hire date and completes all hiring paperwork. The applicant is notified of the academy start date.

For any applicant with prior law enforcement experience, BPD investigators are in direct contact with the previous employer's internal affairs section. Investigators create a memo to the section commander documenting their findings. They ask about any civilian complaints, discipline, problematic use of force, and any other internal investigations. Investigators query all agencies to which an applicant applied. Investigators contact MPCTC for information about the status of an applicant's license, they are unable, per state law, to get any further documentation of status. Investigators query the Law Enforcement Information Exchange ("LinX") to learn if a candidate has been involved in any criminal or other questionable activity. LinX is an information sharing platform maintained by nearly 2,000 police agencies. Investigators review all findings of criminal or law enforcement findings to ensure the applicant is compliant with COMAR. The NDI is checked for anyone with law enforcement history and is reported to supervisors and documented as part of the background investigation.

The overall review of the applicant's file informs the investigator of the suitability for employment, based on skills, temperament, and goals for policing. Review of all interview notes, comments from known parties (friends, neighbors, co-workers), and the NTN examination are completed by the investigator and recommendations based on the whole file are submitted to the supervisor for approval.

Each investigator completes a standard and nearly uniform background summary report on each candidate. Each summary report includes the results of each step in the review process. At completion, the summary report is presented to the supervisor.

## 2. Review Methodology

To assess compliance with Paragraph 424, the Monitoring Team performed a comprehensive review of the BPD's background investigation process and files for all applicants of the most recent academy class. The parties approved the methodology and the assessment instrument. In April 2023, Monitoring Team members reviewed the complete applications and all investigation materials under consideration for the most recent academy class, 22-03.[22] The review included all applications that were assessed after the 22-02 class was seated and considered prospective candidates for the 22-03 class that began on May 23, 2023. Ultimately, 22 of this 92-person cohort joined academy class 22-03, with 21 completing the academy. The review specifically assessed the requirements as set forth in Paragraphs 424 and 425 and informs the overall assessment of recruitment and hiring practices detailed throughout this section of the Consent Decree.

To review the files of all candidates the Monitoring Team coordinated with the Compliance Manager and members of the Recruitment Section to gain access to the materials. The Recruitment Section staff and managers provided significant information and support during the planning phase to facilitate a smooth and thorough review of their work.

Three Monitoring Team reviewers reviewed electronic files.[23] The review was conducted partially while on-site at BPD Headquarters and partially utilizing Zoom. For the total review, BPD staff provided Monitoring Team reviewers with individual credentials to access eSOPH. The individual logins permitted the reviewers nearly full access.[24] While on-site and virtually, BPD staff were immediately available to resolve any technical questions, provide clarifying information, and for system support.

At the time the methodology was submitted, the parties also approved an assessment tool created by the Monitoring Team. Reviewers used an online version of that tool hosted in Alchemer.com. Alchemer allows easy collection and analysis of the data. The first step in the review process was a pilot test of the tool. Each of the three Monitoring Team members reviewed a case using the tool. They then discussed questions, ambiguities, and clarified understanding of the questions within the assessment tool. Decision rules were made and agreed upon to increase the consistency of responses among the reviewers.

Reviewers were assigned approximately 30 applications each from the pool of 92 prospective candidates. The off-site remote reviews were handled similarly with an open Zoom call for the

---

[22] Appropriately, the Monitoring Team reviewers were not provided access to the contents and results of the medical and psychological screenings for applicants.

[23] Due to the personal nature of the information, reviewers were provided full access to the system for a limited duration with individual log in credentials.

[24] Sufficient safeguards were in place, however, to prevent the Monitoring Team reviewers from altering the data.

approximately four-hour review period.  During each review, the reviewers discussed with each other issues that arose as needed.

In accordance with the agreed-upon methodology and the requirements of the Consent Decree, BPD's background investigations for hiring officers included a review to ensure that each of the following factors was completed in a satisfactory fashion:

- An in-person psychological screening of candidates selected for conditional offers of employment by an appropriately qualified and trained psychiatrist or psychologist;
- A background investigation that includes an evaluation of police records, education, employment, military history, credit history, and driving records;
- A review of personnel files from candidates' previous employment, unless the BPD is unable to obtain such files after making all reasonable efforts, and a requirement that BPD seek to speak with the candidates' previous supervisor(s);
- A pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use-of-force training records, and complaint history if a candidate has previous law enforcement experience;
- Contacting MPCTC to review the license status and any known disciplinary history of potential hires before making an offer of employment;
- Checking the National Decertification Index (NDI) administered by the International Association of Directors of Law Enforcement Standards and Training (IADLEST);
- Determining whether the candidate has been named in any civil action; and
- Implementing pre-employment screening mechanisms, including of applicants' social media platforms, to ensure their suitability, based on skills, temperament, and goals, for policing, including the community policing principles required in this Agreement.

The reviewers used the totality of the eSOPH files to respond to the questions in the assessment tool.  Demographic data is self-reported on the NTN application.

### 3.  Findings

The personal demographics of the applicants considered for the 22-03 class were 87% male, 63% Black, and nearly 15% Latino.  Of the 88 that advanced beyond initial background investigations, 11 individuals, 14% of the pool, had previous law enforcement experience.  All but 10 under consideration received a conditional offer of employment and 22 were extended offers of hire.  The background investigations disqualified applicants at nearly every stage of review.

### i.  Paragraph 424(a)

*An in-person psychological screening of candidates who are selected for condition offers of employment by and appropriate qualified and trained psychiatrist or psychologist[.]*

Any candidate who passed the initial background check and moved to the comprehensive background investigation was scheduled for the "2Ps," the psychological and physical examinations after supervisor review.  There were candidates who "washed out" or became disqualified based on the psychological examination.  The disqualification notes were available in the eSOPH file and reviewed by supervisors.  The psychological screening is conducted along with the physical screening as the final evaluations and only with candidates who successfully complete all other assessments, the background investigation, and are approved by the Recruitment Section supervisor.[25]  The BPD currently contracts with two licensed psychologists to administer the psychological screenings.  Based on the review of the doctors' respective websites, the Monitoring Team concludes that they are appropriately qualified, credentialed, and trained.  Consequently, the Monitoring Team finds BPD in initial compliance with this requirement.

**Compliance Score for Paragraph 424(a): 4d, Implementation – Initial Compliance**

### ii.  Paragraph 424(b)

*A background investigation that includes an evaluation of police records, education, employment, military history, credit history, and driving records[.]*

The Recruitment Section along with KENTECH investigations together examined a range of records explicitly required by the Consent Decree.  The results of the Monitoring Team review are depicted below with explanatory paragraphs of the assessment following Table 1.

---

[25] Recruitment Section Standard Operating Procedures, 2018. Page 12.

**Table 1.**      **Evaluation of Specific Applicant Records**

|  | Yes | No, not reviewed | Unable to determine | Total Responses |
|---|---|---|---|---|
| Police Records | 77 99% | 1 1% |  | 78 |
| Education | 69 87% | 3 4% | 6 8% | 78 |
| Military History | 59 76% | 10 13% | 9 12% | 78 |
| Credit History | 72 92% | 3 4% | 3 4% | 78 |
| Driving Records | 72 92% | 3 4% | 3 4% | 78 |
| Total Average | 89% | 5% | 6% |  |

*Source: Summary of Monitoring Team data.*

Using materials in eSOPH, including KENTECH reports, individual documents, and Background Summary Sheets prepared by BPD investigators, the Monitoring Team reviewers assessed BPD compliance with the required evaluation of specific applicant records.  Table 1 shows the results of that review by record category.  For the 22 candidates who received a final offer of employment, all aspects of the background check were completed.  Because aspects of the background investigation are occurring contemporaneously, a candidate may be disqualified before the completion of some aspects of the background check.  Consequently, some reviews of records prescribed by Paragraph 424(b) were not completed by investigators and therefore marked as "no" or "unable to determine" because the applicant exited the process at an earlier stage.  Monitoring Team reviewers referenced in notes that applicants were disqualified for polygraph failures, past employment issues, driving records, and credit issues often prior to these records being checked.

The data available to background investigators related to police records are voluminous. Reviewers note that only one application was not reviewed for police records, 99% were reviewed. BPD's investigators reviewed several databases and reports from all levels of government.  This is one of the clearest and consistently completed type of review that background investigators conduct.  Among the issues identified were acquittals after trial, criminal driving offenses, drugs, disputes, and domestic violence cases.  When BPD's investigators identified prior criminal offenses, they provided applicants the opportunity to explain.  Not all issues were disqualifying. The BPD investigators appropriately assessed the issues and in no cases did Monitoring Team reviewers question an applicant that advanced in the process.

In most cases, 87%, background investigators appropriately considered educational records, including certification of enrollment, completion, and, if school was completed in the last five years, any disciplinary records. In a few situations, the investigators were unable to corroborate education due to attendance in another country, though documents were submitted.

In appropriate cases, BPD confirmed that the applicant registered for selective service and checked for the existence of military records. In 76% of the applications, military records were reviewed or deemed non-existent (no military history). As with other categories of record checks, the no and unable to determine can be the result of an abbreviated background investigation due to disqualification for other purposes.

The credit history was affirmatively reviewed in 92% of the cases. The cases where credit reports were not reviewed (N=3) are likely those cases where the background checks were not completed because a candidate was disqualified for another reason. Among those with credit check issues, Monitoring Team reviewers observed a pattern of delinquent accounts, mostly resolved, inconsistent payments, and accounts in collection. While the delinquent payment amounts were not large, it might be prudent for the Department and/or City to offer financial advisement to young recruits to ensure that they have management plans for an increase in salary and end a pattern of overextending their credit. BPD already partners with a vendor that offers financial assistance to officers through the Department's Office of Wellness.

The Monitoring Team reviewers examined the driving records of 92% of the applicants. The driving issues the reviewers observed within this sample of applicants included a range of moving traffic violations, including operating under the influence of alcohol and operating with suspended licenses. In one instance the violations were described as "immature choice of youth" and in other, the applicant's cases were actively pending resulting in a temporary disqualification. When BPD investigators identified a concerning driving records, the records resulted in or contributed to the disqualification.

Overall, Monitoring Team reviewers noted that the background investigators paid attention to the results of the background investigations, and they did not advance applicants with questionable or concerning activity.

While the total percentage of compliance in the review is below the 95% threshold for presumptive compliance, the Monitoring Team nevertheless finds that BPD is in initial compliance with this requirement. First, the overall percentage, while not over 95%, is high – 89%. Second, as discussed above, the Monitoring Team believes it probable that the instances where the reviews were not conducted were cases where the applicant withdrew or was disqualified prior to the review, rather than a failure by the BPD to do so. This conclusion is supported by the fact that the

reviewers found no instance where a candidate was offered employment without the completion of the required checks.

**Compliance Score for Paragraph 424(b): 4d, Implementation – Initial Compliance**

### iii.  Paragraph 424(c)

*A review of personnel files from candidates' previous employment, unless the BPD is unable to obtain such files after making all reasonable efforts, and a requirement that BPD seek to speak with the candidates' previous supervisor(s)[.]*

For all candidates the Consent Decree requires a review of personnel files from previous employment, unless the BPD is unable to obtain such files after making all reasonable efforts, and a requirement that BPD seek to speak with the candidates' previous supervisor.  BPD investigators and KENTECH investigators engage in outreach to prior employers and supervisors.

KENTECH and BPD investigators store transcripts, documents, and the results of all interviews in the Department's eSOPH system.  Efforts to secure personnel records or conversations with employers is nearly impossible due to human resource policies and privacy regulations across organizations that typically prevent or certainly restrict such access.  BPD therefore is not always able to access personnel files.  BPD files document efforts by KENTECH and the BPD investigators to obtain personnel information.  When that outreach is successful, the files contain information obtained from co-workers, references, neighbors, and supervisors.

The reviewers found no instance where an individual was hired without BPD conducting an appropriate background check of the applicant's personnel files.  The files of a number of individuals not hired lacked documentation of the background checks, but such a situation was likely due to the individual washing out of the hiring process – voluntarily or otherwise – before the check could be conducted.

With respect to 62 applicants, or about 80% of 78 that advanced to a comprehensive background check, investigators made efforts to secure personnel records.  Some 13 applicants, or nearly 17%, were disqualified before this stage.  For 61 of the 78 applications, including all of the individuals in the sample who were eventually hired, the reviewers recorded that investigators attempted to review personnel files.  In another case, there was no readily available evidence of the review, and in three cases reviewers could not determine if a review took place.  Efforts to contact some or all prior supervisors were documented in 61 instances.  In only two cases were efforts not taken or not documented.  Actual communication with all of an applicant's prior supervisor(s) occurred for 70 of the 78 applicants, which again included all the applicants in the sample whom BPD hired.

As with the requirements with Paragraph 424(b), the percentage of compliance is above 80% but not above 95%. For the same reasons – that the instances where no check was conducted was likely due to a candidate withdrawing or being disqualified – the Monitoring Team nevertheless finds the BPD in initial compliance. Based on the Monitoring Team's review, the BPD, directly and through its agent, KENTECH, takes all reasonable steps to review files and speak with prior employers or supervisors. Consequently, the Monitoring Team finds the BPD has achieved initial compliance.

**Compliance Score for Paragraph 424(c): 4d, Implementation – Initial Compliance**

### iv.  Paragraph 424(d)

*A pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history if a candidate has previous law enforcement experience.*

For those candidates that have prior experience as a law enforcement officer, the Consent Decree requires that the pre-employment investigation include requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history if a candidate has previous law enforcement experience. The Monitoring Team reviewers believe this was completed as indicated by the Consent Decree, though in most circumstances the request was not documented. The sergeant in the Recruitment Section explained that investigators interview staff from the prior agencies' unit that reviews complaints and discipline and check with NDI to identify problematic uses of force. For in-state transfers, use of force training is standard and verified by MPCTC. These standard steps, however, are not documented in the file.

Of the 78 applications that advanced during the period reviewed, 12 involved candidates who reported previous law enforcement experience. In all cases, complaint history was reviewed. However, just two of the 12 background checks of applicants with prior law enforcement experience included a review of either the applicants' use of force or less lethal use of force history. Training records were reviewed in six of twelve cases. Finally, not all candidates with prior law enforcement experience completed the process with BPD. As with the larger pool, some withdrew, and others were disqualified before this stage.

There are some potential explanations for these seemingly inadequate results. BPD investigators explained to the Monitoring Team that, in all cases where applicants had prior law enforcement experience, investigators met with or spoke directly to detectives in the other agency's internal affairs unit. This allowed investigators to ask about all problematic history, sustained complaints, and discipline. Investigators further explained that all law enforcement officers in Maryland are required to complete identical state-wide training requirements. Any officer in good standing in Maryland, therefore, has completed the required training, the same training required of BPD

officers.  Therefore, actual training records for any officer from a jurisdiction in-state, in good standing, were not requested.  For those coming from other states, training records were requested.

Accordingly, while it appears that BPD is inquiring into the disciplinary history of candidates with prior law enforcement experience, they are not doing so with respect to all uses of force.  The Consent Decree requires that BPD inquire to both (1) uses of force that were deemed improper and resulted in discipline, and (2) uses of force that were found to be justified.  BPD only inquires about the former.  To come into initial compliance, it must change its practices to request information on the latter.  BPD is therefore on track with respect to this requirement.

**Compliance Score for Paragraph 424(d): 4c, Implementation – On Track**

### v.  Paragraph 424(e)

*Contacting MPSTC[26] to review the license status and any known disciplinary history of potential hires before making an offer of employment.*

BPD appropriately contacts the Maryland Police and Correctional Training Commissions (MPCTC) in instances where (1) an applicant has prior law enforcement experience in Maryland outside of BPD and (2) BPD knows the applicant has a prior disciplinary history.  MPCTC maintains data for law enforcements officers who served in Maryland, but not those who served in other states or jurisdictions.  Further, if a candidate is a BPD rehire, with no other intervening law enforcement experience, BPD possesses all relevant data (use of force training and history, complaint history, and disciplinary history.)  Several candidates fitting these criteria were rejected prior to the completion of the background investigation, obviating the need to contact MPCTC.

In the eleven cases that the Monitoring Team reviewed where applicants had prior law enforcement experience, MPCTC was contacted three times.  Contacting MPCTC was not necessary in the other 11 cases for the following reasons.  Three applicants were disqualified or withdrew prior to the MPCTC being contacted.  Four were re-hired after previously serving at BPD, their only prior law enforcement experience, which, as stated above, obviated the need to contact MPCTC.  One applicant's only experience was attending BPD academy (without finishing and thus never fully serving as an officer).  With the final applicant, BPD contacted his prior law enforcement agency, the Maryland Transportation Authority Police, and confirmed the individual had no disciplinary history, and because BPD contacted directly the only prior law enforcement employer contacting MPCTC was not necessary.

---

[26] The Consent Decree requires the BPD to contact the MPSTC, the Maryland Police Training and Standards Commission.  The MPSTC is formally known as the Maryland Police and Correctional Training Commission (MPCTC).

Because BPD contacted MPCTC in the appropriate cases, they are in initial compliance with this requirement.

**Compliance Score for Paragraph 424(e): 4d, Implementation – Initial Compliance**

### vi.   Paragraph 424(f)

*Checking the National Decertification Index ("NDI") administered by the International Association of Directors of Law Enforcement Standards and Training ("IADLEST")*

The Monitoring Team's review of applicant background checks confirmed that, across all reviewed background checks, investigators checked the NDI.  Accordingly, the Monitoring Team finds BPD in initial compliance with this requirement.

**Compliance Score for Paragraph 424(f): 4d, Implementation – Initial Compliance**

### vii.   Paragraph 424(g)

*Determine whether the candidate has been named in any civil action.*

Background investigators use a national judicial database to search for connections to civil cases. A check for prior civil action was conducted for 93% of the individuals in the sample, including all the applicants that BPD hired.  Although there is no way to determine, based on the randomness of the sequence of activities in a background investigation, it is probable that in the remaining cases the candidate was disqualified before reaching this stage.  Across the reviewed background checks, about 19% of the applicants were named or connected to some civil action.  In the cases where an applicant was named in a civil action, in most cases they were dismissed or resolved or for non-relevant situations such as divorce, small claims, traffic related litigation, contract actions, or in one application a closed tort case.

Though the 93% compliance is just short of the required 95% threshold, the Monitoring Team recommends this is sufficient for initial compliance.  The small number of applications where there was no evidence of a check for civil action is likely due to an applicant's withdrawal rather than a failure to check for an applicant who was advancing.  Again, the Monitoring Team confirmed that a check for involvement in prior civil actions was completed for all applicants in the list of applicants that BPD hired.  For this reason, the Monitoring Team finds BPD in initial compliance with this requirement.

**Compliance Score for Paragraph 424(g): 4d, Implementation – Initial Compliance**

###### viii.  **Paragraph 424(h)**

*Implementing pre-employment screening mechanisms, including of applicants' social media platforms, to ensure their suitability, based on skills, temperament, and goals, for policing, including the community policing principles required in this Agreement.*

KENTECH and BPD investigators conducted searches for applicant activity on social media platforms for nearly 90% of the applications on social media platforms for compromising activity. While the three-quarters of applicants have some online presence, in 74% of the applications there was no compromising information found.  In the six scenarios with compromising content, the information found included intolerant or derogatory language, drugs, guns, or gang signs, and the use of sexually explicit language.  In all cases, applicants were given an opportunity to clarify or explain their online posture while investigators delved more deeply.  In two cases, the explanations were accepted as youthful, ignorant indiscretions, the other four were not hired.

BPD's investigators review information collected about the applicant's social media presence and from interviews of family members, neighbors, co-workers, and others to assess overall suitability, temperament, skills and goals for policing, and their fitness for community policing.  Investigators also rely on the NTN suitability assessment in this review.  The video portion of the NTN examination in particular measures several dimensions related to community policing.  The video portion of NTN tests for situational judgment, critical thinking, communication, working with teams, decision making, and restraint in use of authority.  The background summary report prepared by investigators on each applicant encapsulates the investigators' assessment of suitability based on the totality of the application packet.

In all 13 situations (17.8%) where social media accounts were not reviewed by investigators, the applicants were previously disqualified or withdrew from the process.  The Monitoring Team finds the BPD in initial compliance with Paragraph 424(h).

**Compliance Score for Paragraph 424(h): 4d, Implementation – Initial Compliance**

ix.  **Paragraph 425**

*The background investigation and screening need not be completed for candidates whose applications do not meet the minimum criteria, or for candidates who do not advance beyond the initial interview. The background investigation and screening information will be documented and maintained with the candidate's employment application.  BPD will ensure that the decision to exclude an applicant following the background investigation is documented and independently reviewed by the commanding officer/director of the Recruitment Section.*

As discussed above, eSOPH system is the case management system for the Recruitment Section. All materials related to an application are contained there, including materials for those who did not complete the process due to disqualification or voluntary withdrawal at any point in the process.

The full application, all investigatory documents, and related correspondence are maintained in the electronic management system.  The reviewers saw evidence in every application that the supervisor signed off at various stages including any disqualification, conditional offer stage, or the final offer.  There are notes and signatures on multiple documents indicating disqualification, permanent or temporary, by supervisors.  Supervisors affix their signature for approval for candidates who receive a conditional offer of employment, to proceed to the 2Ps, and ultimately to be hired.  All these approvals are easily viewed in documents as well as in the eSOPH access history.  The audit function also reveals the frequency and the regularity with which supervisory personnel are in the eSOPH file for a particular candidate.

Within eSOPH one can see the reasons for disqualification, supervisory assent and approval, and notices to the applicant. Any applicant that is disqualified at early stages for not meeting minimum criteria, does not move to a comprehensive background check though the applicant's file remains in eSOPH.  Failure at the initial screening – personal interview, polygraph, application standards – precludes them from advancing in the background investigation process.

The Monitoring Team review finds the BPD in initial compliance for Paragraph 425 because of the demonstrated use of the eSOPH system, the approvals in place, and the background checks that occur only for those that complete the preliminary review.

**Compliance Score for Paragraph 425: 4d, Implementation – Initial Compliance**

### 4.  *Limitations to the Monitoring Team's Review of Background Checks*

Monitoring Team reviewers examined the files for all 92 named applicants for the most recent BPD Academy class 23-03.  Four of those applicants did not have completed files as they either

elected to withdraw early in the process, did not pass initial screening, or failed to complete their eSOPH profile. For those reasons, the total number of examined applicants is 88. Of those 88, the Monitoring Team reviewers considered the 22 who were offered a seat in the academy and the remaining 66. In some cases, information was not available due to the stage of the background at which applicants were disqualified or stopped participating and withdrew from the application process.

Due to a technological issue on the Monitoring Team's end, data was not systematically collected for questions focusing on in-person psychological questions. Although the Monitoring Team is unable to produce aggregated results, the Monitoring Team reviewers can represent with confidence that all those who advanced in the application process for the most recent academy class passed an in-person psychological screening as evidence of that was noted in each file.

While the Consent Decree requires background investigations to request and review personnel files from previous employers, employers, in practice will not permit that. Similarly, the Consent Decree requires the background investigation to include requests for and actual conversations with prior supervisors. That, too, is customarily not permitted by legal departments. Investigators affirmatively reviewed and confirmed prior employment and whenever possible spoke with and have written materials from prior employers, supervisors, and co-workers. Notably, when the prior employer is a police department, BPD investigators traveled to area departments for in-person meetings with Internal Affairs staff. For departments beyond reasonable driving distance, BPD investigators had direct telephone conversations about the applicant's history of problematic behavior.

The Monitoring Team finds that efforts to speak with prior employers and conversations about the candidates' performance with supervisors or co-workers telephonically or in writing that produced qualitative information is reasonable and meets the Consent Decree's requirements. Likewise, in the case of those candidates with prior law enforcement experience, documented evidence of conversations with Internal Affairs or units of similar function and an affirmative review of the past employment history too is reasonable and satisfies the Consent Decree's requirements.

Since the Consent Decree was signed, a change in Maryland state law has limited a prospective employer's access to social media and the candidate's requirement to provide that information.[27] At the suggestion of BPD's Legal Department in 2022, including the special circumstances of law enforcement agencies and their obligations under COMAR for background investigations and the requirements of the Consent Decree, the Recruitment Section asks applicants for their social media handles so that investigators can review the publicly available information. Because an applicant can refuse to provide BPD with any of their social media handles, whether explicitly or

---

[27] Md. Code Ann., Lab. & Empl. § 3-712, prohibits a unit of State or local government from "request[ing] or requir[ing] that… an applicant disclose any username, password, or other means for accessing a personal account."

surreptitiously, BPD's findings are limited to what is discernable based on what they know of the candidate. Our review found that candidates provided usernames for easier searches and that, even without usernames, KENTECH and Recruitment Section Investigators searched many social media sites including Google, TikTok, Facebook, LinkedIn, Twitter, Instagram, and other common search engines for activity.

The Consent Decree requires investigators consult with Maryland Police Standards and Training Committee (MPCTC) to review the license status and any known disciplinary history of the candidate. In cases where the applicant was a BPD rehire, the investigators did not contact MPCTC for disciplinary history or license status because that history was known to them. Additionally, investigators reported that all officers from the state of Maryland experience identical use of force training in accordance with state standards. Therefore, Maryland agencies were not asked to provide evidence of use of force training.

## G.    Paragraph 426

*To ensure that BPD is able to retain qualified and experienced officers, BPD will, with the aid of the Monitor, create a Retention Plan to identify challenges and recommend solutions to improve BPD's retention of employees. The Plan may include:*

      *a. Incentives for experienced officers;*
      *b. Access to fitness facilities for all officers,*
      *c. Educational reimbursement opportunities; and*
      *d. Developmental opportunities with merit-based selection criteria for officers interested in transferring or temporarily rotating to sections within BPD.*

In December 2019 BPD submitted its retention plan, *The Baltimore Police Department Plan for Retaining Talent* and supplemented it with an annual report *Retention and Recruitment* in 2021.[28] The initial plan presents a detailed review of the data on the current state of retention combined with information garnered from officer input. The plan is informed by members' input and available data from the BPD and the Mayor's Office regarding staff retention between 2013 and 2017. The report was created in consultation with the DOJ and Monitoring Team.

The retention plan focused on three main areas: staffing, leadership, and work environment. Each objective has accompanying assignments for responsibility, actions and timeframes, and desired outcomes. Together, the objectives are designed to address the reasons members voluntarily separate and reinforce or create factors that incentivize members to remain at the Department.

---

[28] https://www.baltimorepolice.org/sites/default/files/2023-05/2021%20Recruitment%20Annual%20Report.pdf
Accessed 06.09.23.

The section on staffing addresses immediate concerns expressed by staff that would reduce staffing stress and reduce forced overtime or drafting. Objectives include addressing staffing shortages through civilianization of appropriate roles; changing policy to increase clarity on drafting, overtime, and leave; improving the timeliness and efficiency of the internal affairs process; updating assessment of employee performance and using those data to support development and career planning; implementing strategies for member input including through exit surveys; and using internal audits to hold themselves accountability to policies.

The second area of focus is leadership. The objectives here commit to revising transfer and promotion processes to ensure opportunities are known and that selection is through a fair and standardized process; developing and providing leadership training for supervisors and command staff; creating job descriptions that align with the requisite knowledge, skills, and abilities for each position; creating a leadership program for new officers; and beginning retention with the academy classes.

The final set of objectives address the work environment. Objectives here include strategies to reduce administrative and process burdens on officers through IT improvements in particular; improve working conditions for personnel with capital projects; prioritize the fleet replacement program; revise the process for departmental awards and commendations including recognition for longevity and exemplary behavior.

Overall, the plan includes 16 specific reforms to improve job satisfaction for current officers and other staff. Included in the plan is the expectation for routine review at RecruitSTAT and an annual review of attrition.

As reported by BPD, each district has a workout room that is accessible to all members of the department and BPD also maintains a small gym at its headquarters building. Implemented in 2016, Policy 408 encourages members to see educational opportunities by offering 50% tuition reimbursement as well as monetary rewards for completion of a bachelor's degree from an accredited institution. Consistent with the goals of the retention plan and the commitment to publish internal career opportunities, BPD created one-page infographics describing the skills needed for nine different specialty positions. The series of infographics called "BPD Career Ladders" includes high level job descriptions along with the required skills and abilities for success in the role. They include instructions for responding to active job postings for each position.

The BPD submitted retention plan meets the expectations of the paragraphs and the Monitoring Team finds that BPD is initial compliance with this requirement.

**Compliance Score for Paragraph 426: 4d, Implementation – Initial Compliance**

H.      **Paragraph 427**

> *BPD will conduct assessments of its recruitment and retention efforts on an annual basis. These assessments will be designed to ensure that BPD's recruitment and retention practices are achieving the objective of attracting and retaining a diverse workforce of highly qualified officers. Assessments will include review of application and hiring information; review of the background investigation system, including applications rejected on account of the background investigation; surveys of officers to assess employee satisfaction; and analyses of officer exit interviews. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.*

BPD's 2021 annual report on Retention and Recruitment, as well as in the initial Recruitment Report, puts the department on track to understand more comprehensively how the plans are working or if adjustments to strategies are needed.  While processes have been changed and efforts are in line with plans, the results – more recruits – are not being realized.

As with Paragraph 421(e), the Consent Decree does not mandate that specific innovations be taken. BPD, however, can do more to analyze successful strategies from departments in other jurisdictions that, if implemented, may improve BPD's results.  For instance, and again not the only example, other jurisdictions have hired qualified candidates to civilian positions on an expedited basis to bring them into the department pending their completion of the academy, so that they are not recruited and hired to another department or other civilian employment during the time it takes for them to finish their academy training.  Given its staffing challenges, BPD has not done enough to look for new strategies.

The early results of new recruitment strategies are promising with the increase in the number of applicants from Baltimore City, with the steady and strong number of women applicants, and steady numbers of people identifying as Black, Latino, Asian, and Native American.  Anecdotally, investigators report that those who are returning to BPD indicate they are coming back because their other choice was not as hoped.  They recognize that opportunities for movement, growth, and development are superior at BPD.  At BPD the health care choices are better and career opportunities abound.

The supervision quality survey fielded in 2021 indicates widespread satisfaction among employees, a positive change from the results of the CJI survey in 2019.  Exit interviews take place in a variety of modalities limiting the ability to draw specific conclusions.  Overall, people are leaving for opportunities – money, growth, personal, or professional – that they don't believe can

be realized at BPD.  There is an abundance of data collected and with the vacant analyst position, there is insufficient analysis and discussion of that data.

The Consent Decree requires an annual assessment of BPD's recruitment and retention efforts. The assessment must review the achievement of objectives to attract and retain a diverse workforce of highly qualified officers.  Assessments must include review of application and hiring information; review of the background investigation system, including applications rejected on account of the background investigation; surveys of officers to assess employee satisfaction; and analyses of officer exit interviews.  As part of this assessment process, BPD is required to identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.

BPD produces an analytical report of the efforts and achievements toward detailing and assessing their recruitment and retention practices.  BPD's Recruitment & Hiring Process Analysis from 2021 includes detailed description of several strategies that both fundamentally change the recruitment and background review process and permit regular review of these processes by department personnel.  The inaugural Recruitment and Retention report for the calendar year 2021 was finalized in September 2022.

BPD is appropriately analyzing recruitment and separation data.  Given the challenges it has faced with recruiting, however, BPD must do more to explore new strategies – those successfully deployed by departments in other jurisdictions or otherwise – to change the course of those results. **To reach initial compliance with this requirement, BPD must adjust its recruitment and retention strategies in response to its annual assessment.**

**Compliance Score for Paragraph 427: 4c, Implementation – On Track**

## V.  COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| 419 | To maintain high-level, quality service, ensure officer safety and accountability, and promote constitutional, effective policing, BPD will review and revise as necessary its recruitment and hiring program to ensure the BPD successfully attracts and hires a diverse group of qualified individuals. | **4d.** **(Initial Compliance)** |
| 420 | According to the timeline specified in the monitoring plan, BPD will develop a written recruitment plan that includes clear goals, objectives, and action steps for attracting and retaining a quality workforce that reflects the diversity of the Baltimore community. | **4d** **(Initial Compliance)** |
| 421(a) | The Recruitment Plan, will at a minimum require the following:<br>   a.  Minimum standards for recruits and lateral hires. | **4d** **(Initial Compliance)** |
| 421(b) | b.  Recruitment outreach to a broad spectrum of community stakeholders, aimed at increasing the diversity of its ranks, including race and gender, and applicants who are community policing and problem-solving oriented.  BPD and the City will explore opportunities for Youth in the City's high schools to gain exposure to policing through internship or other programs and create ways to support interested Youth in fulfilling the requirements to join BPD. | **4d** **(Initial Compliance)** |
| 421(c) | c.  Broad distribution of recruitment information, including information regarding career opportunities, compensation, the testing and hiring process, and applicable deadlines and requirements.  Such information will, at a minimum, be readily accessible on City and BPD websites and available upon request to City or BPD officials. | **4d** **(Initial Compliance)** |
| 421(d) | d.  That candidates be allowed to submit initial applications online to BPD; and | **4d** **(Initial Compliance)** |
| 421(e) | e.  Opportunities for officers, civilians, and members of City Government to assist the BPD's efforts to attract a broad spectrum of qualified applicants. | **4c** **(Implementation - On Track)** |
| 422 | The Recruitment Plan will be submitted for the Monitor's approval.  BPD and the Monitor will meet and confer to resolve any objections the Monitor notes.  BPD will implement the Recruitment Plan upon approval and as required by the Monitoring Plan. | **4d** **(Initial Compliance)** |

| 423 | BPD, with the aid of the Monitor, will conduct an in-depth review of BPD's current hiring processes for officers, including Paragraph 424, and state hiring criteria to assess whether any process, criterion, or requirement has a disparate impact based on demographic categories.  The BPD will determine whether there are reasonable alternative selection procedures available that would comply with state requirements and serve the BPD's needs while having less of a disparate impact and if there are, will implement those alternative selection procedures. | **4d. (Initial Compliance)** |
|---|---|---|
| 424(a) | BPD's background investigations for hiring officers will include evaluation of the following factors:<br>a. An in-person psychological screening of candidates who are selected for conditional offers of employment by an appropriately qualified and trained psychiatrist or psychologist[.] | **4d. (Initial Compliance)** |
| 424(b) | b. A background investigation that includes an evaluation of police records, education, employment, military history, credit history, and driving records[.] | **4d. (Initial Compliance)** |
| 424(c) | c. A review of personnel files from candidates' previous employment, unless the BPD is unable to obtain such files after making all reasonable efforts, and a requirement that BPD seek to speak with the candidates' previous supervisor(s)[.] | **4d. (Initial Compliance)** |
| 424(d) | d. A pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history if a candidate has previous law enforcement experience. | **4c (Implementation - On Track)** |
| 424(e) | e. Contacting MPSTC to review the license status and any known disciplinary history of potential hires before making an offer of employment. | **4d. (Initial Compliance)** |
| 424(f) | f. Checking the National Decertification Index ("NDI") administered by the International Association of Directors of Law Enforcement Standards and Training ("IADLEST"). | **4d. (Initial Compliance)** |
| 424(g) | g. Determine whether the candidate has been named in any civil action. | **4d. (Initial Compliance)** |
| 424(h) | h. Implementing pre-employment screening mechanisms, including of applicants' social media platforms, to ensure their suitability, based on skills, temperament, and goals, for policing, including the community policing principles required in this Agreement. | **4d (Initial Compliance)** |

| 425 | The background investigation and screening need not be completed for candidates whose applications to not meet the minimum criteria, or for candidates who do not advance beyond the initial interview.  The background investigation and screening information will be documented and maintained with the candidate's employment application.   BPD will ensure that the decision to exclude an applicant following the background investigation is documented and independently reviewed by the commanding officer/director of the Recruitment Section. | **4d.** **(Initial** **Compliance)** |
|---|---|---|
| 426 (a.-d.) | To ensure that BPD is able to retain qualified and experienced officers, BPD will, with the aid of the Monitor, create a Retention Plan to identify challenges and recommend solutions to improve BPD's retention of employees.  The Plan may include:<br>a. Incentives for experienced officers;<br>b. Access to fitness facilities for all officers,<br>c. Educational reimbursement opportunities; and<br>d. Developmental opportunities with merit-based selection criteria for officers interested in transferring or temporarily rotating to sections within BPD. | **4d.** **(Initial** **Compliance)** |
| 427 | BPD will conduct assessments of its recruitment and retention efforts on an annual basis.  These assessments will be designed to ensure that BPD's recruitment and retention practices are achieving the objective of attracting and retaining a diverse workforce of highly qualified officers.  Assessments will include review of application and hiring information; review of the background investigation system, including applications rejected on account of the background investigation; surveys of officers to assess employee satisfaction; and analyses of officer exit interviews.  As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken. | **4c.** **(Implementati on on Track)** |