

# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

## COMPLIANCE REVIEW
## REGARDING COMMUNITY POLICING AND ENGAGEMENT

August 11, 2023



# TABLE OF CONTENTS

I.    EXECUTIVE SUMMARY ........................................................................... 3

II.    BACKGROUND ......................................................................................... 5

     A.    The Department of Justice's Investigative Findings ........................ 5
     B.    Consent Decree Requirements ............................................................. 6
     C.    Summary of BPD's Implementation To-Date ...................................... 7

III.   SCOPE OF THE REVIEW & DETERMINING COMPLIANCE STATUS ................. 8

     A.    Compliance Scoring ............................................................................. 8
     B.    Determining Initial Compliance ...................................................... 10
     C.    Assessment Sources and Evaluation Techniques .......................... 12

IV.   EVALUATION OF COMPLIANCE WITH PARAGRAPHS 15 THROUGH 22 ........ 13

     A.    Paragraph 15 ...................................................................................... 13
         1.    Mission Statement ........................................................................ 14
         2.    Integration into BPD Systems ..................................................... 14
         3.    Conclusion ..................................................................................... 24
     B.    Paragraph 16 ...................................................................................... 24
         1.    2021 In-Service Training ............................................................... 25
         2.    2022 In-Service Training ............................................................... 26
         3.    2023 In-Service Training and Beyond ......................................... 27
         4.    Conclusion ..................................................................................... 27
     C.    Paragraph 17 ...................................................................................... 27
         1.    Neighborhood Familiarity ........................................................... 27
         2.    Problem Solving with Community ............................................... 32
         3.    Quality-of-Life Issues .................................................................. 37
         4.    Conclusion ..................................................................................... 38
     D.    Paragraph 18 ...................................................................................... 38
     E.    Paragraph 19 ...................................................................................... 40
         1.    Attending Community Events ..................................................... 40
         2.    Youth Programs ............................................................................ 41
         3.    Micro-Community Policing .......................................................... 42
         4.    Other Requirements ..................................................................... 48
         5.    Conclusion ..................................................................................... 48
     F.    Paragraph 20 ...................................................................................... 49
     G.    Paragraph 21 ...................................................................................... 50
     H.    Paragraph 22 ...................................................................................... 52

V.    COMPLIANCE ASSESSMENT CONCLUSIONS ............................................. 54

## I.    EXECUTIVE SUMMARY

Paragraphs 15 through 22 of the Consent Decree address the obligations of the City of Baltimore ("the City") and Baltimore Police Department ("BPD" or "the Department") related to community policing and problem-oriented policing ("CPOP") and community engagement. The Monitoring Team conducted a compliance review to determine whether the City and BPD are complying with these requirements.

This review finds that the City and BPD have made significant progress in an area that is difficult to implement and measure. BPD's work in this area includes: documenting throughout the Department the manner in which the principles of community policing should reflect in the Department's operations; beginning to implement micro-community policing plans that allow for the co-creation with community members of customized neighborhood-level safety and disorder-reduction strategies; and creating an impressive process for incorporating community input into training development.

However, **overall BPD has much work to do to meet—and prove that it has met—its obligations regarding officer engagement with the community in the field.** The City and BPD will need to demonstrate considerably more progress to come into Initial Compliance with most requirements of Paragraphs 15 through 22. Thus, though the present report addresses the progress BPD has made to successfully implement those requirements in practice, the report's primary purpose is to identify where the gaps remain and identify steps needed for BPD to come into Initial Compliance.

In particular, BPD must be able to demonstrate that community policing is working in practice throughout the Department and that the department is meaningfully assessing the outcomes its community policing activities are having in the field. BPD will not be able to fulfill these requirements until it finds ways to free officer time to conduct meaningful community engagement—a deficiency affected, in part, by the Department's current staffing shortage—and to measure that this engagement is having its intended outcomes.

For example, BPD continues to fall short of meeting its commitment to allow patrol officers to spend 40 percent of their time on engaging in proactive and community policing. For a variety of reasons, officers also do not currently have sufficient time and support to engage in the longer-term problem solving with communities that is more likely to result in solutions for chronic problems and community trust- and relationship-building.

**Summary of Findings**

- **BPD has made significant progress in thoughtfully memorializing how it should integrate its commitment to community and problem-oriented policing** into some of the myriad areas of the Department's operational and management systems, including in policies, training, written guidance materials, and data collection mechanisms. **BPD must now show that its written commitments to community policing are being carried out in practice** throughout the Department's operations. As discussed in more detail throughout this assessment, because the Community Policing section of the Consent Decree does not specify the manner in which BPD must accomplish this monumental task, this area will be one of primary focus for the Monitoring Team in the coming months (specifically, working with the parties to determine that BPD is applying quality practices and documenting its efforts in a way that the Monitoring Team can evaluate implementation progress).

- **BPD's staffing issues continue to be a barrier to reaching BPD's community policing targets,** including the Department's commitment to make every officer a community policing officer by allowing them enough time on their shifts to proactively engage and problem solve with the communities they serve. BPD will need to demonstrate that it has resources dedicated to more engagement with community members to identify and solve community problems.

- **BPD has taken notable strides to begin recording and reviewing quantitative data on some of its officers' day-to-day community policing activities. BPD will need to find ways to assess qualitative data reflecting the impact of longer-term community policing efforts** and community policing outcomes (*i.e.*, the cause and effect resulting from the Department's community policing efforts).

- **Despite implementation challenges, the City and BPD's Neighborhood Policing Plan program appears to be a promising path** to increasing BPD's positive engagement with the community, connecting residents to City services they need to enhance public safety and security, and collaborating with the community to identify and solve problems. The City and BPD should follow the recommendations of the independent evaluator of the pilot program prior to expanding the program citywide.

More specificity regarding how BPD can advance toward compliance with the particular requirements of the Community Policing section of the Consent Decree are included in their respective sections below.

## II.       BACKGROUND

Community policing is a philosophy that promotes the "systematic use of partnerships and problem-solving techniques to proactively address the immediate conditions that give rise to public safety issues such as crime, social disorder, and fear of crime."[1] Effective community policing depends on the trust and cooperation of community members. In many of Baltimore's neighborhoods, mistrust in the police has traditionally run high. BPD has faced considerable challenges in engaging in effective community policing, especially in some of the City's most underserved communities.

### A.       The Department of Justice's Investigative Findings

In May 2015, the Civil Rights Division of the United States Department of Justice ("DOJ") initiated an investigation of the Baltimore Police Department. The investigation, completed in 2016, found that BPD was engaged in a pattern-or-practice of constitutional violations, including using excessive force, infringing on the First Amendment freedoms of speech and assembly, and stopping, searching, and arresting people in violation of the Fourth Amendment and based on their race.

Among its findings, the DOJ concluded that "BPD fail[ed] to engage in effective community policing" and that "through all levels of the Baltimore Police Department, from members of command staff down to officers on the street, the Department has not implemented fundamental principles of community policing."[2] DOJ concluded that "to remedy the constitutional violations [] found in [its] investigation, a comprehensive community policing strategy must be a central component of police reform in Baltimore."[3]

Related to BPD's community engagement, the investigation concluded "the relationship between the Baltimore Police Department and many of the communities it serve[d was] broken."[4]

---

[1] U.S. Dep't of Justice Community Oriented Policing Services, *Community Policing Defined*, 2014,     https://portal.cops.usdoj.gov/resourcecenter/RIC/Publications/cops-p157-pub.pdf     (last accessed Aug. 11, 2023).
[2] U.S. Department of Justice, *Investigation of the Baltimore Police Department*, Aug. 10, 2016, https://www.justice.gov/crt/file/883296/download ("DOJ Findings Letter") at 156 (last accessed Aug. 11, 2023).
[3] *Id.*
[4] *Id.* at 157.

### B.      Consent Decree Requirements

After the DOJ issued its findings, the City, BPD, and DOJ agreed to enter into a consent decree, which is a court-approved settlement agreement that obligates BPD and the City to adopt a comprehensive set of reforms designed to promote fair and constitutional policing ("CD" or "the Consent Decree").[5] The federal judge overseeing the Consent Decree appointed a Monitoring Team to assist in overseeing the implementation of the Consent Decree. The Monitoring Team is required to conduct compliance reviews to determine whether the City and BPD have complied with the Consent Decree requirements.[6]

Consent Decree Paragraphs 15 through 22 include specific requirements intended to promote both community policing and community engagement. Preliminarily, the Consent Decree requires issuance of a new mission statement that integrates community-oriented principles into BPD "management, policies and procedures, recruitment, training, personnel evaluations resource deployment, tactics and accountability systems" (CD ¶ 15). Further, the Consent Decree requires BPD and/or the City to:

- Annually train officers and supervisors on how to use community and problem-oriented policing in their day-to-day work (CD ¶ 16);

- Encourage patrol officers to be familiar with the geographic areas they serve, engage with community members, engage in problem identification and problem-solving activities around community priorities, and work proactively to address quality-of-life issues in a manner that minimizes stops, citations, searches, arrests, and uses of force (CD ¶ 17);

- Collect and evaluate specified types of the data to gauge whether community policing objectives are being met (CD ¶ 18);

- Develop and implement community-engagement plans to create opportunities for routine and frequent positive interactions between officers and community members (CD ¶ 19);

- Solicit input from community groups on policies, practices, training, engagement programs, and enforcement strategies (CD ¶ 20);

- Develop a community outreach program to educate and communicate with City residents about the Consent Decree (CD ¶ 21); and

---

[5] *See generally* Dkt. 2-2.
[6] CD ¶ 454.

- Publish annual reports on BPD's community policing efforts (CD ¶ 22).

**C.       Summary of BPD's Implementation To-Date**

This report is the Monitoring Team's first comprehensive compliance assessment in the area of community policing and community engagement. However, the Monitoring Team has been tracking BPD's efforts in this area on an ongoing basis and providing technical assistance as appropriate to help BPD implement the required reforms.

The Monitoring Team recently summarized in our December 2022 *Second Comprehensive Reassessment* the efforts BPD has made toward complying with the community policing and engagement requirements since the Consent Decree was entered in 2018:[7]

- Issued a new and revised mission statement;
- Prepared a comprehensive Community Policing Plan, issued in 2020, with input from community members;
- Sought and obtained input from community members on numerous policies and training curricula;
- Published annual reports on community policing accomplishments, engagement, and challenges;
- In conjunction with community partners and other City agencies, piloted Neighborhood Policing Plans in two Baltimore neighborhoods;
- Delivered a two-day, in-service training Department-wide on community policing and addressing low-level offenses, which included community facilitators from Reconcile Baltimore, the Mayor's LGBTQ Commission, and Baltimore Community Mediation Center;
- Established a module devoted to community policing in the Field Training Officer certification program;
- Developed dispatch codes to capture the time officers spend engaging in certain activities other than calls for service;
- Incorporated community policing principles into performance evaluations; and
- Created an award for problem-solving, alongside new awards for de-escalation and peer intervention and added community policing as a category for commendations.

The Monitoring Team spent much of the first four years of the Consent Decree providing BPD with technical assistance to develop the foundation for these reforms (*e.g.*, policy writing, training

---

[7] Monitoring Team's *Second Comprehensive Reassessment*, Dec. 22, 2022, Dkt. 586 ("Second Comprehensive Reassessment"), at 88. The Monitoring Team's reports are also available at https://www.bpdmonitor.com/resources-reports.

curriculum development and instructional feedback, and improvements in core operations). We have now shifted focus to what the Consent Decree refers to as "compliance reviews" and "outcome assessments." The purpose of these evaluations is to gauge whether BPD officers are adhering to policy and training in the field and whether BPD is effectively implementing the required structural and operational reforms.

## III.    SCOPE OF THE REVIEW & DETERMINING COMPLIANCE STATUS

This assessment is a Compliance Review (*i.e.*, a qualitative evaluation of BPD performance) conducted pursuant to Consent Decree ¶ 454. The Monitoring Team has previously described this assessment type:

> Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree. They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . . [8]

### A.    Compliance Scoring

The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of scoring BPD's performance in its effort to fully implement the Decree's many requirements:

**0 – Not Assessed:**  The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 – Not Started:**  The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:**  The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:**  The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:**  The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the

---

[8] Monitoring Team's *Fourth Semiannual Report*, Jan. 21, 2020, Dkt. 279-1 at 22–23.

requirement.

**4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:**  The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:**  The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:**  The City/Department has demonstrated compliance with the requirement but has not yet demonstrated compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:**  The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree. This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:**  The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

The Monitoring Team has conducted continuous, informal evaluations on Consent Decree requirement progress pertaining to community policing and engagement, including on BPD's mission statement, Community Policing Plan, and community policing training. Based on these ongoing evaluations, the Monitoring Team reported in our *Second Comprehensive Reassessment* that BPD had preliminarily achieved a progress score of 4c (Implementation on Track) on most of the requirements related to community policing and engagement.[9] The present report is, however, the first detailed and formalized determination of BPD's compliance status in these areas.

The BPD, the DOJ, and the Monitoring Team agree that BPD has much work left to do to come into compliance with the community policing and engagement requirements. Thus, though the

---

[9] Second Comprehensive Reassessment, at 91; *Compliance Assessment Spreadsheet*, Dec. 22, 2022, Dkt. 586-2, at 2.

present report addresses the progress BPD has made to move from working to implement the Decree's requirements to having successfully implemented those requirements in practice (*i.e.*, whether BPD has progressed to a score of 4d, Initial Compliance), **the report's primary purpose is to identify where the gaps remain and identify steps needed for BPD to come into Initial Compliance**.[10]

### B.    Determining Initial Compliance

The Consent Decree provides that "[n]o specific numerical test shall be required" to demonstrate compliance "so long as BPD is demonstrating substantial adherence with the Material Requirements, continual improvement, and the overall purpose of the Material Requirements has been met."[11] To determine whether BPD is in Initial Compliance (Score 4d) with a material requirement of the Decree, the Monitoring Team weighs the following factors across the Decree's various areas and many requirements:

> **1.   The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, isolated compliance does not establish "Initial Compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires. For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

> **2.   The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.** The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational

---

[10] *See* CD ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

[11] *Id.*

requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

**3. The extent to which BPD is identifying and appropriately addressing problematic performance.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will have mechanisms in place to engage with Departmental and officer performance that is deficient in some way. Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

**4. BPD's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

We note that the present report will reflect that certain of the City and BPD's scores have moved from 4d (Initial Compliance), as reflected in the Monitoring Team's recent semiannual reports, to 4c (Implementation on Track). As we noted in a prior report, "this does *not* represent backsliding."[12] Rather:[13]

> The simple explanation is that, for this small number of requirements, the Monitoring Team gave a score of initial compliance in the last report because BPD had adopted policies and conducted training that satisfied the plain language of these requirements. However, while completing our first comprehensive use of force assessment . . . we recognized that these provisions cannot simply be about policy; they are also about performance—about demonstrating adherence to policy. Accordingly, we determined that, to establish initial compliance. . . , BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions on the street that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally.

---

[12] Second Comprehensive Reassessment, at 7.
[13] *Id.*

### C.    Assessment Sources and Evaluation Techniques

Though the Community Policing section of the Consent Decree contains only a few paragraphs, their content is far-reaching and will have an impact on many areas of BPD's operations. Compliance with these paragraphs will require significant effort on the City and BPD's parts and will not happen overnight. Our approach for this evaluation was to take a higher-level view of the work BPD is doing in this space and to provide guidance on more specific evaluation techniques we intend to use for future evaluations. That is, although we evaluate BPD's compliance status, the primary value of this report is establishing a starting point by identifying where BPD should focus its efforts to achieve and demonstrate compliance.

The Consent Decree does not prescribe any specific outcome assessment for community policing. This compliance review evaluates BPD's current practices, and corresponding documentation, data, and, where practicable, observations, to determine whether the requirements of the paragraphs are being implemented in practice. The Consent Decree requires that "BPD will bear the burden of demonstrating by a preponderance of the evidence its Full and Effective Compliance."[14]

In addition, to understand more about officers' candid thoughts, opinions, and perceptions about community policing and engagement and problem-oriented policing, the Monitoring Team, with assistance from BPD, fielded an anonymous electronic survey of BPD members in Spring 2023. The content of the survey spanned the eight paragraphs central to the assessment. Participation in the survey was voluntary. BPD asked members across ranks to participate through Department-wide communications. **A total of 293 BPD members provided a response to at least one survey question.** Not all members who began the survey completed it or answered every question.

Finally, to gain perceptual and experiential insight about community policing, **the Monitoring Team conducted a series of 16 informal virtual and in-person focus groups and interviews in Spring 2023 with a total of approximately 112 BPD officers, supervisors, community members, advocates, community association members, and several of BPD's community and City program partners.** The solicitation for these focus groups emphasized that the Monitoring Team sought to solicit feedback from individuals with firsthand experience in BPD's community engagement efforts, particularly community meetings, day-to-day engagement, and implementation of the Neighborhood Policing Pilots. To promote candor, participants were informed their identities would be kept anonymous and that feedback they provided would not be attributable to any individual or identifiable group.

---

[14] CD ¶ 493; Legal Information Institute, https://www.law.cornell.edu/ (last accessed Aug. 11, 2023) ("Under the preponderance standard, the burden of proof is met when the party with the burden convinces the fact finder that there is a greater than 50% chance that the claim is true.").

## IV.   EVALUATION OF COMPLIANCE WITH PARAGRAPHS 15 THROUGH 22

This section provides the Monitoring Team's evaluation of the City and BPD's compliance with Consent Decree Paragraphs 15 through 22. The review focuses primarily on the City and BPD's efforts during calendar years 2021 and 2022, though some earlier and more recent work is also discussed where relevant to the compliance determinations.

A table summarizing the paragraph-level compliance scores is included in the last section of this report.

### A.   Paragraph 15

*BPD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies, and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.*

The Consent Decree requires BPD to: (1) ensure its mission statement reflects a commitment to community-oriented policing, and (2) integrate community and problem-oriented policing principles into its management, policies, and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems.

BPD has made significant progress in thoughtfully memorializing how it will integrate its commitment to community policing into the myriad areas of the Department's operational and management systems, including in policies, training, written guidance materials, and data collection mechanisms. As discussed below, BPD has also demonstrated that some of these written commitments are being carried out in practice. The efforts taken thus far are extensive, and we deem the progress BPD has made commendable. The Monitoring Team finds encouraging that, in an anonymous officer survey, a majority of respondents (75.5%) who answered the question of whether BPD integrates the community policing philosophy into its overall approach agreed or strongly agreed.

As noted in our Second Comprehensive Reassessment, however, to reach Initial Compliance "BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions on the street that, as an agency, it is complying with the policies."[15] Initial

---

[15] Second Comprehensive Reassessment, at 7.

Compliance with CD ¶ 15 will require BPD to show that its written commitments to community policing are "being carried out in practice"[16] in the areas the paragraph delineates.

### 1.   Mission Statement

CD ¶ 15 first requires BPD to "ensure its mission statement reflects its commitment to community-oriented policing." BPD's current mission statement, as written, complies with this requirement.

After extensive collaboration with the Monitoring Team and DOJ, in 2018 BPD published a revised mission statement, which provided that BPD was "committed to community-oriented policing, through which we engage in problem-solving partnerships with community members and organizations to develop proactive solutions and increase community trust in police."[17] BPD revised the mission statement again in 2021, which now states "the Department's commitment to constitutional, community-oriented policing and the adoption of community policing as a philosophy that permeates through all aspects of BPD operations."[18]

### 2.   Integration into BPD Systems

CD ¶ 15 also requires BPD to "integrate community and problem-oriented policing principles into its management, policies, and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems." In 2020, BPD released its Community Policing Plan, which outlined the Department's blueprint for organizational redesign, building community partnerships, problem solving, building analytical capacity, and district crime plans.[19] The Plan also delineated BPD's framework for integrating a community policing philosophy throughout the Department:

---

[16] CD ¶ 506 ("To achieve 'Full and Effective Compliance,' the City and BPD must demonstrate that they have (a) incorporated all Material Requirements of this Agreement into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice").

[17] BPD's *Mission and Vision Statement*, July 3, 2018, Dkt. 119-1. BPD updated the Mission Statement in 2019 to promote further transparency in BPD's operations; the language regarding community policing was not changed.

[18] BPD Policy 305, *Department Mission and Vision*,  Dec. 18, 2021, *available at* https://www.baltimorepolice.org/transparency/bpd-policies/305-department-mission-and-vision.

[19] BPD's *Community Policing Plan*, Apr. 1, 2020, Dkt. 304-1 ("Community Policing Plan").

**Figure 1.**     **BPD Framework for Integrating Community Policing Philosophy throughout the Department**



*Source: BPD Community Policing Plan, at 11*

In implementing the framework in Figure 1, BPD has made progress integrating community policing principles in each of the systemic areas specified in Paragraph 15 (*i.e.*, management, policies and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems).

For the present review, the Monitoring Team and the parties agreed to a review methodology that focuses on four of these areas: (1) recruitment; (2) personnel evaluations; (3) training; and (4) accountability.[20] In future assessments, the Monitoring Team will continue to monitor BPD's

---

[20] The Consent Decree does not prescribe specific evaluation metrics the Monitoring Team must apply to evaluate the Community Policing section. For purposes of this first assessment of the Community Policing section, the parties and Monitoring Team agreed to a limited review methodology. As noted above, the report's primary purpose is to identify where the gaps remain and identify steps needed for BPD to come into Initial Compliance. For future assessments, the Monitoring Team will work with the parties to create detailed evaluation methodologies that outline specific and appropriate metrics and assessment sources as needed to evaluate the material requirements of the section. In so doing, the Monitoring Team will consider whether, and to what extent, it is appropriate and/or preferable to evaluate BPD's community policing efforts as part of our assessments of other sections (*e.g.*, Recruitment, Hiring and Retention and Supervision).

progress integrating community policing principles in its recruitment, personnel evaluations, training, and accountability systems. In addition, the Team will also begin assessing BPD's progress integrating community policing principles in the other systemic areas specified in Paragraph 15: <u>policies and procedures</u>, <u>management</u>, <u>resource deployment</u>, and <u>tactics</u>.

Here, this report provides a brief overview of BPD's accomplishments so far and what the Monitoring Team anticipates BPD should expect to demonstrate for Initial Compliance.

**<u>Recruitment</u>**. BPD's Community Policing Plan did not provide for any specific action related to recruitment. However, BPD has made notable efforts to revamp its officer recruitment strategy to emphasize serving the community with "empathy and integrity" and committing to "the work needed to help communities thrive in the city you care about."[21] The new recruitment campaign, entitled "Join for Good," also highlights the importance of meaningful police-community relationships, through, for example, officer testimonials:[22]



*Source: BPD Recruiting Website*

The Monitoring Team also reviewed samples of recruitment flyers, brochures, and promotional videos that BPD provided. All these materials reflected the "Join for Good" ethos.

---

[21] *See* BPD recruiting website, https://bpdrecruit.org/ (last accessed Aug. 11, 2023).
[22] *Id.*

BPD's published police officer job description likewise emphasizes that new officers are expected to be "proactive member[s] of our Department, engaging in community-oriented policing" and that "[t]he ideal candidate is someone who is committed to public service, constitutional policing, and making a positive impact on Baltimore communities; is a person of integrity; and has strong communication skills."[23]

These are positive steps toward integrating community policing principles into BPD's recruitment systems. However, to reach Initial Compliance, BPD will need to demonstrate (through, *e.g.*, an audit of recruiting files and surveys/interviews with prospective candidates) whether the CPOP principles have carried beyond the promotional materials and have permeated BPD's actual recruitment practices.

**Personnel Evaluations**. BPD likewise revamped its personnel evaluations process to now reflect integration of community policing principles. Consistent with the goals set forth in the Community Policing Plan, on December 5, 2022, BPD issued Policy 1708, *Sworn Performance Evaluation*.[24] The policy requires that community policing is one of nine performance-of-duty areas for which officers, sergeants, and lieutenants must be annually evaluated.[25] The policy instructs evaluators to "recognize exceptional performance, and any areas of particular growth and achievement, especially in the area of Community Policing."[26]

BPD also provided the Monitoring Team a draft of an accompanying Evaluation Manual, which provides additional guidance about how evaluators should assess members' community policing efforts in the performance evaluations. The draft Manual states that evaluators should assess the officers' knowledge of the Community Policing Plan, understanding of the neighborhoods they serve, trust building and courtesy, ability to create partnerships and positive interactions, and address community priorities and concerns.

To reach Initial Compliance, BPD will need to demonstrate (through, *e.g.*, an audit of completed personnel evaluations) whether these new procedures are being carried out in practice, such that evaluators are meaningfully assessing members' community policing efforts on a regular basis.

---

[23] BPD Police Officer Job Description, *available at* https://baltimorecity.wd1.myworkdayjobs.com/en-US/External/details/Police-Officer---Baltimore-City-Police-Department_R0000688 (last accessed Aug. 11, 2023).
[24] BPD Policy 1708, *Sworn Performance Evaluation*, Dec. 5, 2022, available at https://www.baltimorepolice.org/transparency/bpd-policies/1708-sworn-performance-evaluation (last accessed Aug. 11, 2023).
[25] *Id.* at Page 3.
[26] *Id.* at Page 8.

**Accountability**. BPD's Community Policing Plan calls for one primary measure to hold members and the organization accountable for integrating community policing principles throughout the Department: incorporating community policing metrics into COMSTAT, a "performance management system that is used to reduce crime and achieve other police Department goals" by emphasizing "information-sharing, responsibility and accountability, and improving effectiveness."[27] Specifically, the Community Policing Plan requires that:[28]

- COMSTAT will serve as a forum to identify areas that need improvement, develop strategies for improvement, and "[r]ecognize successes in Community Policing to share with other districts for possible replication";

- Officers will abide by the new requirements to document their Community Policing activities outlined in the Community Policing Plan;

- The Department's Data-Driven Strategies Division will build a community policing dashboard for COMSTAT to allow for continual monitoring and accountability of community policing activities;

- The Department's Performance Standards Section will conduct performance reviews of body-worn camera footage and reports, which will be a regular part of COMSTAT, to "assess procedural justice and compliance with" the Community Policing Plan and Department policies;

- District command will present on the implementation of the Neighborhood Policing Plans regularly at COMSTAT; and

- Executive command will "regularly recognize officers for outstanding Community Policing in COMSTAT to praise exemplary officer performance and reinforce the foundational importance of Community Policing in improving the Department".

To evaluate the extent to which COMSTAT is serving the necessary function, the Monitoring Team reviewed sample presentations from three 2022 COMSTAT meetings that BPD provided. The Monitoring Team also regularly attends BPD's weekly COMSTAT meetings.

---

[27] Bureau of Justice Assistance and Police Executive Research Forum, *COMPSTAT: Its Origins, Evolution, and Future in Law Enforcement* (2013), *available at* https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/PERF-Compstat.pdf, at 2 (last accessed Aug.11, 2023). BPD's version of the program is entitled COMSTAT.
[28] Community Policing Plan, at 17.

BPD's COMSTAT meetings follow a standardized format week to week. As it relates to community policing, the districts rotate each week to present and field questions on crime and police activity statistics. As illustrated in the below snapshot from a COMSTAT presentation, districts are also asked to present specifically on the district's levels of proactivity versus crime:

**Figure 2.        Sample COMSTAT Presentation Slide**



*Source: BPD*

The districts also present on similar statistics at the "microzone" (high-crime priority areas) and team-level activity.

Based on the Monitoring Team's observations of COMSTAT meetings and review of historical COMSTAT materials, the Team concludes that BPD's COMSTAT meetings are an effective tool for maintaining internal visibility and accountability over certain officer activities. The Monitoring Team will continue to evaluate the COMSTAT meetings, or other performance management systems BPD institutes, to ensure they incorporate community policing principles.

Though the present evaluation focuses on BPD's performance management, the Consent Decree contemplates that:[29]

> A well-functioning accountability system is one in which BPD: openly and readily
> receives complaints reported by civilians and officers and fully, fairly, and

---

[29] CD ¶ 329.

efficiently investigates them; supports all investigative findings by the appropriate standard of proof and documents them in writing; holds accountable all officers who commit misconduct pursuant to a disciplinary system that is fair, consistent, and provides due process; and treats all individuals who participate in BPD's internal disciplinary process—including complainants, officers, and witnesses—with respect and dignity.

For Initial Compliance, then, BPD will need to demonstrate that its misconduct/disciplinary system also integrates the concepts of community and problem-oriented policing. BPD is on its way to achieving such; as noted in our evaluation of CD ¶ 16, BPD created a Department-wide training on misconduct and discipline for 2022, which included material on community policing. BPD must show that members are applying the training in practice (through, *e.g.*, an audit of complaint investigations).

**Training**. CD ¶ 16 requires BPD to deliver annual community policing training that addresses a variety of specific topics. This report provides a detailed evaluation of BPD's community policing training in our evaluation of Paragraph 16 below. In short, BPD has created and delivered high-quality annual in-service training curricula that is designed to transform community policing from theory into practice. In future assessments, the Monitoring Team will continue to evaluate this requirement in tandem with CD ¶ 16.

**Policies and Procedures.** BPD's Community Plan indicates the Department's intent to revise "all of its policies and procedures to ensure they reflect Community Policing principles and national best practices."[30] As discussed in our Second Comprehensive Reassessment,[31] BPD revised *all* its core policies—more than 50 in total—and is now beginning to re-examine them, as the Consent Decree requires, to determine whether any updates are necessary. These policies reflect best practices and are among the most comprehensive municipal police policies in the nation.

As it relates to community policing, notable revisions to BPD's policies and procedures include BPD's publication of Policy 1712, *Departmental Awards and Commendations*,[32] in August 2021. The updated policy adds Community Policing as a category for commendation to recognize meritorious service.[33] Specifically, directive 46 of the policy provides that a problem-solving ribbon may be awarded to "sworn or civilian personnel for a notable achievement resulting in increased community trust and collaboration, improved planning and execution of community

---

[30] Community Policing Plan, at 13.
[31] Second Comprehensive Reassessment, at 10.
[32] BPD Policy 1712, *Departmental Awards and Commendations*, Aug. 2, 2021, *available at* https://www.baltimorepolice.org/transparency/bpd-policies/1712-departmental-awards-and-commendations (last accessed Aug. 11, 2023).
[33] *Id.* at Page 7.

policing strategies, substantial savings in operational costs, or an enhanced quality of life for a specific Baltimore community."[34]

In future assessments, the Monitoring Team will review documentation to evaluate whether BPD continues to review (and, if necessary, revise) its policies to ensure the policies and procedures integrate concepts of community policing on an ongoing basis.

**Management**. The Community Policing Plan mandated an "organizational redesign" intended to promote community policing. The changes include two primary components related to management: (1) organizational "flattening," *i.e.*, streamlining chain of command to increase individual accountability and improve lines of communication, and (2) centralizing coordination for Department-wide community policing and placing this responsibility with the Patrol Support Services Division. BPD's updated organizational chart reflects this new structure.[35]

In addition, the Community Policing Plan denotes specific responsibilities related to community policing for managers:[36]

- *District Sergeants* are required to "focus on the management of Officers . . . to ensure members during their tour of duty are meeting their requirements on a daily basis"; "build relationships with residents, community groups, and businesses"; ask officers in their command about ongoing problems in their districts and connect Neighborhood Coordination Officers to these problems to promote problem-oriented policing; and "regularly emphasize Community Policing in roll calls."

- *District Lieutenants* are required to "specifically ensure[] the deployment of proactive Community Policing strategies in high crime areas"; review samples of officers' day-to-day engagement activities and body-worn camera footage and provide feedback; review performance evaluations "to ensure appropriate guidelines of Community Policing are addressed"; and attend community meetings to "work proactively with the community on problem solving and crime prevention."

- *District Commanders* are required to "collaborate" with supervisors in their command "to determine the appropriate resources needed to address recurring problems"; "[r]ecognize Officers for outstanding Community Policing efforts on a monthly basis"; "[w]ork to build relationships and partnerships with community members and entities throughout the

---

[34] *Id.*
[35] BPD Organizational Chart, dated March 2023, *available at* https://www.baltimorepolice.org/sites/default/files/2023-03/Org_Chart_-_March_2023_-_Web.pdf (last accessed Aug. 11, 2023).
[36] Community Policing Plan, at 25-30.

district"; and have final responsibility for creating Neighborhood Policing Plans and ensuring their implementation.

- *Executive Command* are required to "ensur[e] an organizational orientation around Community Policing efforts that align with the Department's Staffing Plan"; regularly recognize and commend notable community policing efforts occurring throughout the Department; identify and support partnerships with community stakeholders to "coordinate cross-sector responses to problems"; and hold Department leadership accountable for implementation of the Department's community policing priorities.

To reach Initial Compliance, BPD will have to demonstrate how, and to what extent, BPD's organizational redesign has resulted in the Department's stated goal of "institutionalizing the philosophy of Community Policing,"[37] through, *e.g.*, officer/supervisor focus groups and surveys and documentation demonstrating compliance with the supervisor responsibilities stated in the Community Policing Plan (or any reasonable adjustments BPD makes to improve its capacity to integrate community policing principles throughout the Department).

**Resource Deployment**. In addition to the management changes discussed above, the Community Policing Plan prescribes several other measures to address resource (*i.e.*, staffing) deployment for community policing:[38]

- Dedicated Patrol Time. As prescribed by the Department's staffing plan,[39] BPD "seeks to increase patrol staffing to allow patrol officers to spend at least 40% of their time engaging in proactive and Community Policing."

- District Coordination. Each district is to be assigned at least one Neighborhood Coordination Officer (NCO) "to provide district-level support in implementing Community Policing and will serve as the district lead in addressing recurring problems through Problem-Oriented Policing."

- Department Coordination. Patrol Support Services is assigned as the Department's "central coordinating entity" for the implementation of the Community Policing Plan and "all related community initiatives."

- Data Analysts. The Data-Driven Strategies Division is assigned to "work collaboratively with district personnel and the Patrol Support Services Division to ensure community

---

[37] *Id.* at 7.
[38] *Id.* at 11.
[39] *See* BPD's 2022 Staffing Plan Update, Aug. 18, 2022, Dkt. 533-1.

problem analyses include relevant data" and to "facilitate data-driven analyses of whether problem-solving strategies are effective."

Currently, the City of Baltimore, BPD, DOJ, and the Monitoring Team all agree that BPD's current staffing levels and implicated resource deployment strategies are continuing to serve as a barrier toward implementing the Community Policing Plan's goals, particularly regarding officers having at least 40% of their time devoted to proactive, community policing. As the Monitoring Team has previously recommended, to address its staffing shortages, BPD must:[40]

- Aggressively implement the recommendations in the current Staffing Plan, which calls for reducing call volume and workload for Patrol by reducing false alarms by 25%, diverting 25% of traffic accident management to a third-party vendor, reducing "other" calls for service by 25%, diverting 50% of larceny calls to online or telephone reporting, and diverting 25% of disorderly conduct calls for service;

- Implement the civilianization targets in the current Staffing Plan by beginning to fill the civilian positions created for investigative specialists, who work alongside detectives and assist in tasks that do not require law enforcement powers, including database review, investigative research, and report writing;

- Continue to think innovatively about other traditional sworn officer functions that civilians can serve;

- Continue to use creative means to retain officers and recruit new ones; and

- Continue to improve job quality to support employee retention.

**<u>Tactics</u>**. BPD's community policing training provides officers specific guidance on problem-oriented policing tactics in a module on daily and in-depth problem solving. The training focuses on teaching officers specific tactics and skills that they can use to apply CPOP principles and practices, including procedural justice, interpersonal skills, and fair and impartial policing to their tactics.

To demonstrate Initial Compliance, BPD will have to show (through, *e.g.*, an audit of reports and associated body-worn camera footage from officers' field interactions) that trained CPOP principles are being applied in practice.

---

[40] Second Comprehensive Reassessment, at 21-22.

### 3. Conclusion

BPD has developed a framework for integrating a community policing philosophy throughout the Department but has not yet completed implementing it. Therefore, BPD's compliance status for Paragraph 15 is **4c – Implementation on Track**. In future assessments, the Monitoring Team will continue to monitor BPD's progress integrating community policing principles in its recruitment, personnel evaluations, training, and accountability systems. In addition, the Team will also begin assessing BPD's progress integrating community policing principles in the other systemic areas specified in Paragraph 15: <u>policies and procedures</u>, <u>management</u>, <u>resource deployment</u>, and <u>tactics</u>.

### B. Paragraph 16

*On an annual basis, BPD will provide eight hours of cumulative, structured in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives, that shall include:*

    *a. Methods and strategies to improve public safety and crime prevention through community engagement, including how to establish formal partnerships with community organizations, how to work with communities to set public safety and crime prevention priorities, and how to create opportunities for positive interactions with, among others, Youth, LGBT, homeless, and mental health organizations and communities;*

    *b. Scenario-based training that promotes the development and strengthening of partnerships between the police and community;*

    *c. Leadership, ethics, and interpersonal skills;*

    *d. Problem-oriented policing tactics;*

    *e. Principles of procedural justice and its goals;*

    *f. Conflict resolution, including verbal de-escalation of conflict;*

    *g. Cultural awareness and sensitivity training that addresses the history and culture of Baltimore's communities, including the relationship with law enforcement; and*

    *h. Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination.*

The paragraph includes eight subsections, each detailing specific requirements for the training. To evaluate compliance with this paragraph, the Monitoring Team reviewed that the content of the training contained all the required elements; assessed records to determine whether all required

personnel completed the training; and assessed whether the Department has institutionalized the training such that it is occurring on a recurring basis as the paragraph requires.

### 1.   2021 In-Service Training

In 2020, BPD worked closely with the Monitoring Team, DOJ and community members to create a two-day, 10-module, community policing training curriculum that addressed each element of Paragraph 16's requirements and went well beyond the eight-hour requirement. The Monitoring Team and DOJ approved this training in May 2021.[41]

As the Monitoring Team noted in our approval of the training:[42]

> Its ten modules appropriately cover why BPD is prioritizing community policing, what officers are expected to do to implement BPD's community policing model (as set forth in the previously approved Community Policing Plan), and how officers should go about engaging community members and problem-solving in order to implement the model. In other words, the curriculum is designed to transform community policing from theory into practice, which is one of the overarching goals of the Consent Decree. Additionally, the curriculum includes instruction on addressing low-level offenses. Thus, consistent with the Consent Decree, it reinforces BPD's "most effective, least intrusive response" policy, which emphasizes problem-solving and, where consistent with public safety, alternatives to arrest, including warnings, counseling, referrals to community-based services, and citations.

In addition, the training curriculum reflected substantial input and feedback from community members and BPD officers, including BPD's Community Training Review Committee, which consisted of one community representative from each police district and other stakeholders in the criminal legal system.[43]

In January 2022, BPD certified to the court that BPD had completed delivery of the training to its members.[44] BPD indicated that of the 2,197 sworn personnel employed at the Department at that time, the community policing training was completed by 2,119 members as of December 3, 2021, which "represents the great majority of BPD members presently in full, active duty status."[45] BPD

---

[41] Notice of Approval of Community Policing Training, May 4, 2021, Dkt. 407.
[42] *Id.*
[43] *Id.*
[44] Notice of Delivery of Community Policing Training, Jan. 3, 2022, Dkt. 474.
[45] BPD's Certificate of Delivery, Jan. 3, 2022, Dkt. 474-1.

indicated that "approximately 5 members were in active, full-duty status during the delivery period for the training and failed to successfully complete it" and that the failure to complete training was referred to the Public Integrity Bureau for investigation and appropriate disciplinary action."[46]

An in-depth analysis of the pre- and post- training survey results can be found in the Monitoring Team's February 2022 Training Compliance Review and Outcome Assessment, available at https://www.bpdmonitor.com/resources-reports.

### 2.    *2022 In-Service Training*

As discussed in our Sixth Semiannual Report, after the 2021 training concluded, the Monitoring Team and community members conducted focus groups to discuss ways BPD could improve the training.[47] In April 2022, the evaluation team issued recommendations that included:

- BPD should increase the participation of community residents and Neighborhood Coordination Officers (NCOs).
- Instruction should emphasize why the training is important.
- Instructors should devote more time addressing the concerns expressed by officers in class.
- Officers needed additional training focused on the implementation of the Community Policing Plan.

After the focus groups, BPD drafted curriculum for a 2022 community policing training, which was piloted in October 2021.[48] BPD has since indicated that to satisfy Paragraph 16's annual training requirements for 2022, BPD allocated toward Community Policing training: 6.5 hours of its Youth Interactions training; 4 hours of Community Policing training; and 5 hours of Misconduct and Discipline training.

On July 31, 2023, BPD certified that all eligible members had completed a two-day, sixteen-hour in-service training on community policing, de-escalation, and misconduct and discipline, the curriculum of which was approved by the Monitoring Team and the DOJ.[49]

---

[46] *Id.*
[47] Second Comprehensive Reassessment, at 92.
[48] *Id.*
[49] BPD Notice of Training Certification, July 31, 2023, Dkt. 625; Certificate of Training Delivery, July 31, 2023, Dkt. 625-1.

### 3. *2023 In-Service Training and Beyond*

Per the Sixth Year Monitoring Plan, BPD is scheduled to submit a draft of the 2023 in-service training for the Monitoring Team and DOJ's review in Q2 2023.[50] BPD is scheduled to deliver the training Department-wide by the end of the year.

### 4. *Conclusion*

Because BPD has provided documentation sufficient to certify satisfactory annual delivery of the training on a recurring basis, it has established Initial Compliance. Therefore, BPD's compliance status with Paragraph 16 is **4d – Initial Compliance.** To maintain initial compliance, BPD will need to demonstrate that it is continuing to create and deliver the training each year and that the training meets the requirements specified in the paragraph. In addition to reviewing training curricula and attendance records, the Monitoring Team will continue to observe the classes and evaluate course surveys periodically to ensure continued high-quality delivery and student engagement.

### C. **Paragraph 17**

*BPD will encourage patrol officers to be familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively to address quality-of-life issues in a manner that minimizes stops, Citations, searches, arrests, and use of force consistent with the requirements of this Agreement.*

BPD has made progress in implementing the requirements of Paragraph 17 and remains on track in this area. As discussed below, to reach Initial Compliance, BPD will need to demonstrate more engagement with community members to identify and solve community problems and correct some data issues preventing a fulsome analysis of BPD's efforts to address quality-of-life issues without increasing enforcement measures.

### 1. *Neighborhood Familiarity*

To evaluate compliance with Paragraph 17's requirement that BPD "encourage patrol officers to be familiar with the geographic areas they serve," the Monitoring Team reviewed BPD's Community Policing training and conducted an anonymous survey of sworn members to gauge

---

[50] Sixth Year Monitoring Plan, Apr. 13, 2023, Dkt. 608-1, at 4-5.

their sentiment on whether the Department is encouraging them to be familiar with the neighborhoods they serve.

As discussed in our evaluation of CD ¶ 16, BPD's community policing training addresses the history of Baltimore communities and police, problem solving, problem-oriented policing, and procedural justice, such that the Department's formal instruction to officers encourages them to participate in frequent engagement with the community to build trust and partnerships to improve crime-reduction efforts. For example, the 2021 training, which BPD has certified was delivered Department wide, included modules on policing lesser offenses, how to conduct formal and informal community engagement, and in-depth and daily problem solving. Based on these training efforts, BPD has demonstrated Initial Compliance with this portion of Paragraph 17.

The anonymous electronic survey that the Monitoring Team administered to BPD members also provides informative and encouraging context. The survey asked how familiar the members were with the issues and problems specific to the geographic areas they served. Of those who responded to this question, nearly all (96.3%) said they were very familiar or familiar:

**Figure 3.        Officer Familiarity with Geographic Area Served**



*Source: Monitoring Team Anonymous BPD Officer Survey*

A lower percentage, but still a majority (77.5%), strongly agreed or agreed that BPD encouraged them to become familiar with the geographic area's specific issues, problems, and community leaders:

**Figure 4.        Officer Perception of BPD Encouragement of Geographic Area Familiarity**



*Source: Monitoring Team Anonymous BPD Officer Survey*

In future assessments, the Monitoring Team will evaluate whether BPD continues to encourage patrol officers to be familiar with the geographic areas they serve, through in-service training and/or other mechanisms BPD may employ. The Team will continue to gauge officer sentiment on this topic.

The Monitoring Team also recommends that BPD provide officers with more district- and neighborhood-level standardized guidance than the annual Department-wide training can provide.

Only 43.8% of the survey respondents reported they were very familiar or familiar with the community leaders in their geographic areas:

**Figure 5.         Officer Perception of Familiarity with Community Leaders**



24. How familiar would you say you are with community leaders in the geographic area that you serve?

18% Very unfamiliar

14% Very familiar

30% Familiar

39% Unfamiliar

| Value | Percent | Responses |
|---|---|---|
| Very familiar | 13.8% | 11 |
| Familiar | 30.0% | 24 |
| Unfamiliar | 38.8% | 31 |
| Very unfamiliar | 17.5% | 14 |
| | | Totals: 80 |

*Source: Monitoring Team Anonymous BPD Officer Survey*

 In the Community Policing Plan, BPD indicated it would create and distribute to officers District Profiles to "provide them with an understanding of the resources, problems, and conditions within the district to deepen officers' knowledge of the community and facilitate problem solving."[51] The

---

[51] Community Policing Plan, at 14.

Monitoring Team encourages BPD to implement this initiative, or a similar one, aimed at providing district- and neighborhood-specific information to officers, particularly about the community leaders in their districts.

## 2.    *Problem Solving with Community*

CD ¶ 17 also requires BPD to "engage in problem identification and solving activities with the community members around the community's priorities." BPD's Community Policing Plan outlines three primary strategies for proactive neighborhood-level policing and problem solving with the community:[52]

- **Informal and Formal Community Engagement** to help "build community partnerships and trust to enhance problem solving and crime reduction efforts," including foot patrol in officers' assigned areas and increasing patrol staffing to allow patrol officers to spend at least 40 percent of their time engaging in proactive and community policing;

- **Daily Problem Solving,** described as "the tactical arm of Community Policing" wherein officers will "partner with community members to address problems on a daily basis"[53]; and

- **Problem-Oriented Policing in High-Risk Places**, wherein Neighborhood Coordination Officers ("NCOs"), who are designated as the "Community Policing and Problem-Oriented Policing specialists for each district"[54] will "conduct Problem-Oriented Policing (POP) to address enduring problems requiring a more coordinated intervention than Daily Problem Solving."

To measure whether, and to what extent, members are engaging in problem-oriented policing, BPD's Community Policing Plan requires patrol officers to document informal engagement and daily problem-solving activities in the Computer Aided Dispatch (CAD) system.[55] Specifically, BPD reports that it "is currently tracking proactivity and opportunities for informal engagement through the foot patrol, business checks, and directed patrol CAD signals. Other measures of proactivity include field interviews, traffic stops, investigative stops, and warrant services."[56] Officers are also required to report environmental issues (such as abandoned cars and garbage) in

---

[52] *Id.*
[53] *Id.* at 21.
[54] *Id.*
[55] *Id.* at 19.
[56] 2021 Community Policing Annual Report, Aug. 4, 2022, Dkt. 530-1 ("2021 Community Policing Report"), at 9.

the 311 App available on their assigned mobile devices.[57] 311 is a City service that allows customers (including City employees and the public) to report a problem or request a non-emergency service. Constituents may also call 311 to file non-emergency police reports.[58]

BPD reported that in 2021, officers averaged "24% of their time dedicated to proactive efforts."[59] Data analysis provided by BPD indicates an increase in recorded engagement activities and 311 reports from 2021 to 2022:

**Figure 6.        BPD Proactive Calls per Year**



*Source: BPD*

---

[57] Community Policing Plan, at 19.
[58] *See* Baltimore City website, https://311services.baltimorecity.gov/ (last accessed Aug. 11, 2023).
[59] 2021 Community Policing Report, at 10.

**Figure 7.**    **BPD 311 Service Requests**



*Source: BPD*

The Monitoring Team also independently reviewed raw dispatch and 311 data to determine frequency and time spent on proactive policing, community engagement activities, and addressing quality of life issues (versus responding to calls for service). To conduct this analysis, the Monitoring Team attempted to review the median amount of time officers spent responding to community policing calls versus other calls for service in 2021 and 2022, by reviewing the time officers recorded arriving to the scene of a call and the time at which the call was cleared as completed. For purposes of this analysis, the Monitoring Team applied BPD's definition of community policing calls (foot patrol, business checks, community meetings, and directed patrol).

The Monitoring Team was not able to draw definitive conclusions from the data because for approximately 20 percent of calls, officers' on-scene time was not recorded. However, the data that are available show that for the 80 percent of calls where on-scene time was recorded, median officer time spent on community policing calls increased from 2021 to 2022 (and approached nearly 40 percent):[60]

---

[60] A summary of the time spent on community policing and other calls are reported in the minutes (mm:ss) as the median, the value in the 'middle' of the distribution, the 50th percentile. The median is considered the most appropriate measure of central tendency when the data is not evenly

**Figure 8.      Total Median Time Spent on Community Policing Calls for Service**

| Calls for Service | 2021 | 2022 |
|---|---|---|
| Community Policing Calls | 669,455 (33.4%) | 876,998 (39.5%) |
| Other Calls | 1,336,121 (66.6%) | 1,336,986 (60.4%) |
| **Total** | 2,005,576 (100%) | 2,213,984 (100%) |

*Source: Monitoring Team Analysis of CAD Data*

As the table below suggests, time spent responding to community policing calls increased from 2021 to 2022 by approximately 24 percent. Specifically, the community meetings increased by 75 percent, followed by the directed patrol that increased by 37 percent:

**Figure 9.      Median Time Spent on Community Policing Calls for Service by Call Type**

| Community Policing Calls by Type | 2021 | 2022 |
|---|---|---|
| Foot Patrol | 58,237 (8.7%) | 78,508 (9.0%) |
| Business Check | 345,250 (51.6%) | 375,992 (42.9%) |
| Community Meeting | 278 (0.1%) | 1,099 (0.1%) |
| Directed Patrol | 265,690 (39.6%) | 421,399 (48.1%) |
| **Total** | 669,455 (100%) | 876,998 (100%) |

*Source: Monitoring Team Analysis of CAD Data*

In addition, review of 311 data suggests that the number of BPD's referrals to 311 increased dramatically from 2021 to 2022:

**Figure 10.      Police Referrals to 311**

| Year | BPD referrals to 311 |
|---|---|
| **2021** | 2,450 (8.8%) |
| **2022** | 25,411 (91.2%) |
| **Total** | 27,861 (100%) |

*Source: Monitoring Team Analysis of 311 Data*

In 2022, the majority of the calls were referred to a housing authority (41.6%), followed by Solid Waste (28.3%), and Transportation (21.4%). The remaining calls were referred to BGE and Parks and Recreation.

---

distributed. As the Call for Service data files contain outlier values, the median provides the most useful information without being influenced by outliers.

The Monitoring Team commends BPD on taking the important first steps to record and analyze some data related to patrol officers' day-to-day community policing and engagement activities. However, two key issues must be addressed for BPD to come into Initial Compliance with CD ¶ 17.

*One*, as the Monitoring Team has previously reported, and discussed above, BPD must address its workload issues and staffing shortages to enable patrol officers to have more time to spend on community and problem-oriented policing and come closer to the Department's current goal of spending 40 percent of their time on proactivity. These measures include diverting calls for services that do not require a police response; civilianizing positions that do not require a sworn officer; being creative about recruiting and retaining employees; and improving job quality to support retention.

*Two*, even if the CAD data were complete, the Monitoring Team cannot evaluate on CAD and 311 data alone whether BPD is engaging in problem identification and solving activities *with the community members around the community's priorities*, as the paragraph requires. In addition to continuing to evaluate the CAD signal data and 311 referrals to determine how much of officers' time is being spent on day-to-day proactive policing and engagement, in future assessments, the Monitoring Team will also evaluate the *type* and *quality* of interactions to determine whether they are effective in identifying and solving problems that the community prioritizes. The Monitoring Team will also factor into its analysis:

- The Department's in-depth problem-solving and formal engagement activities (which currently are largely handled and recorded by NCOs and are not necessarily reflected in the dispatch and 311 data); and

- Application of the Scanning, Analysis, Response, and Assessment (SARA) decision-making model, "a preventative approach that seeks to understand the underlying conditions for why crime and disorder repeats in particular geographies" and which officers have been trained to apply for longer-term problem solving.[61]

BPD will need to begin systematically capturing data that the Monitoring Team can analyze for these inquiries. These data are particularly important because of feedback we heard during the focus groups regarding the impact of BPD's community policing efforts. Though this experiential feedback was not a dispositive factor into our evaluation of Paragraph 17, we gleaned common threads relevant to Paragraph 17 that will inform our approach to future assessments:

---

[61] Community Policing Plan, at 9.

*First*, the general sentiment from both police and community members is that although the NCOs are active and known in the communities where they work, beat officers generally are not. For instance, a number of the people we spoke to said that they thought foot patrol is an important part of proactive policing, but officers are spending noticeably more time patrolling in their vehicles than they do on foot patrols. A number also said that when BPD officers attend community events or engage in in-depth problem solving, it is the NCOs—not patrol officers. This feedback suggests that BPD and the Monitoring Team should delve deeper into whether the decisions about what types of engagements the Department is prioritizing, and who is expected to attend those engagements, are being made *with* the community and align with the community's priorities.

*Second*, NCOs are generally regarded highly as important for, and effective at, problem-oriented policing, particularly for issues that require longer-term problem solving or coordinated intervention with other City agencies or community resources. Indeed, several of the community members who participated in our focus groups reported that if they saw the SARA model applied at all (many of them had not), it was by the NCOs in their district. However, both BPD members and community members reported most districts don't have enough NCOs, and that the NCOs who are assigned are often deployed to other more acute patrol responsibilities.

*Third*, a number of officers believed the Department too heavily prioritized activities over outcomes. Many of the members we spoke to expressed that the Department should look for a different a way to assess the *quality* of officers' engagements with the community, rather than just the quantity of engagements. We address this issue further in our assessment of CD ¶ 18 below.

### 3.    *Quality-of-Life Issues*

To evaluate CD ¶ 17's requirement that BPD "work proactively to address quality-of-life issues in a manner that minimizes stops, Citations, searches, arrests, and use of force", the Monitoring Team attempted to analyze geographic trends in the overall number of stops, citations, searches, arrests, and use of force over time, in areas where proactive policing has increased. The purpose of this analysis is to determine whether community policing activity is increasing *independent of* changes in stops, citations, searches, arrests, and use of force (or, if, in the alternative, another trend is emerging).

The Monitoring Team was not able to conduct this analysis because sufficient reliable data related to stops, searches, and arrests did not yet exist at the time of drafting this report. However, BPD has been working diligently with the Monitoring Team to cure these data issues, such that the Monitoring Team intends to conduct this analysis in future assessments.

### 4.     Conclusion

BPD has made progress in implementing the requirements of CD ¶ 17 and remains **On Track (Score 4c)** in this area. As discussed above, to reach Initial Compliance, BPD will need to demonstrate more engagement with community members to identify and solve community problems and correct the data collection issues preventing a full analysis of BPD's efforts in this area.

### D.     Paragraph 18

*BPD will ensure that data about community policing efforts and outcomes are evaluated by command staff.*

BPD's Community Policing Plan emphasizes that the Department will take a data-driven approach to community policing.[62] As discussed above, since the Consent Decree was entered, BPD has put the infrastructure in place to track "proactivity and opportunities for informal engagement through the foot patrol, business checks, and directed patrol CAD signals."[63] BPD also tracks officers' reports of environmental issues to 311.[64] BPD's Community Policing Plan requires district commanders to report at COMSTAT on the status of district-level community policing activities.

In addition, the Monitoring Team reviewed 2021 and 2022 quarterly district crime plans/end-of-year recaps provided by BPD. These documents were prepared for the districts to present their 2021 year-end review and 2022 priorities in COMSTAT. The document template asked the districts to address a number of standardized questions focused on identifying their main crime trends/patterns, supporting data, an action plan for addressing the trends, and how the district intends to leverage community and city resources and partnerships to address the problems.

The Monitoring Team's interviews with sworn members, including command staff, confirmed that COMSTAT and the quarterly district plans are the primary mechanisms by which command staff evaluates community policing data.

As discussed in more detail above, BPD COMSTAT meetings are an effective tool for maintaining internal visibility over data related to some day-to-day activities. The Monitoring Team's review of COMSTAT materials and observation of COMSTAT meetings confirms that BPD command is, on a consistent basis, systematically reviewing quantitative data about officers' day-to-day community policing efforts and these efforts' correlation to crime in the districts.

---

[62] Community Policing Plan, at 13.
[63] 2021 Community Policing Report, at 9.
[64] Community Policing Plan, at 19.

Where the Department's evaluation appears to be falling short is in: (1) assessing *qualitative* data reflecting the impact of longer-term community policing efforts, and (2) assessing *outcomes* (*i.e.*, the cause and effect resulting from all the Department's community policing efforts).

During our focus groups, a number of members expressed that COMSTAT reviews tend to focus on the number of activities each district is contributing, as opposed to the quality of officers' engagements with the community and the outcomes of those engagements. This feedback is consistent with the observation from the academic evaluator assessing the NPP pilot, which stated that involved City agencies were overly focused on clearing out 311 service requests, an activity the evaluator concluded does not address the goal of "build[ing] out problem-solving partnerships with the community."[65]

To be sure, outcome metrics in this space are difficult to define and evaluate, especially on a large scale.[66] But they are critical to truly gauging the impact of BPD's community policing efforts.[67] In conclusion, BPD's compliance score for Paragraph 18 is **4c – Implementation on Track**. To demonstrate Initial Compliance, BPD will need to show that leadership is using both quantitative and qualitative measures to assess the outcomes of the Department's community policing efforts.

---

[65] University of Baltimore, *Neighborhood Policing Plans: Pilot Phase 1 Process Evaluation Report*, Sept. 30, 2022, ("NPP Phase 1 Evaluation"), at 13.

[66] *See, e.g.*, National Institute of Justice, *The IMPACTT of a Patrol Officer: Evaluating Productivity Metrics*, available at https://nij.ojp.gov/topics/articles/impactt-patrol-officer-evaluating-productivity-metrics (last accessed Aug. 11, 2023).

[67] *See, e.g.*, U.S. Dep't of Justice Community Oriented Policing Services, *Community Policing Defined*, *available at* https://cops.usdoj.gov/RIC/Publications/cops-p157-pub.pdf (last accessed Aug. 11, 2023), at 6 ("In addition to the typical measures of police performance . . . community policing calls for broadening police outcome measures to include such things as greater community satisfaction, less fear of crime, the alleviation of problems, and improvement in quality of life. Community policing calls for a more sophisticated approach to evaluation—one that looks at not only how outcomes are measured but also how feedback information is used.").

### E.        Paragraph 19

*The City and BPD will, within their respective spheres, develop and implement community-engagement plans for creating opportunities for routine and frequent positive interactions between officers and community members, including those critical of BPD. The community engagement plans will ensure that:*

   a.   *BPD provides for all sworn representatives of BPD who interact with the public in the regular course of their activities to participate in neighborhood and community meetings and other community events;*
   b.   *BPD identifies the number and types of meetings to be attended;*
   c.   *BPD and the City establish or provide for participation in a variety of long-term programs that promote and foster positive police-youth interactions;*
   d.   *BPD provides for the continuation of a BPD Explorer Program for Youth in Baltimore to learn police-related skills and assist with community events and outreach;*
   e.   *BPD and the City place emphasis on creating opportunities for positive interactions with Youth, communities of color and residents of low-income and public housing;*
   f.   *BPD and the City provide for outreach in all neighborhoods, including neighborhoods where no neighborhood association has been established to provide consultation and input to BPD;*
   g.   *BPD and the City collaborate, where feasible, with neighborhood mediations in Baltimore that promote lasting resolutions of appropriately selected disputes among community members to reduce police involvement in these disputes; and*
   h.   *BPD develops micro-community policing or similar plans to reflect particular community enforcement priorities.*

### 1.        *Attending Community Events*

CD ¶ 19 subsections (a) and (b) require that BPD plan for all sworn members who interact with the public to participate in community meetings and events and identify the number and types of meetings to be attended. Though BPD's Community Policing Plan does not specify the number of meetings officers should attend, it does provide that officers are expected to "participat[e] in neighborhood and community meetings/events."[68] BPD reported that members across the Department attended a wide variety of events with the community in 2021, ranging from virtual community safety meetings to food drives. For example:[69]

---

[68] Community Policing Plan, at 8.
[69] 2021 Community Policing Report, at 18.

**Figure 11.      Example District Community Engagement Activities**



*Source: BPD 2021 Community Policing Report*

Based on the activities BPD reported, the Department is on track in this area. As of the date of the drafting of this report, BPD had not provided the Monitoring Team finalized documentation reflecting community events and meetings attended in 2022, but the Monitoring Team expects that a similar level and type of activity occurred in 2022 as in 2021. If and when the Monitoring Team can determine that BPD's engagement activities are not simply the result of a one-time initiative or drive—but, instead, are institutionalized in the way that the Consent Decree and Community Policing Plan contemplate—the Team anticipates that BPD will be in a position to reach Initial Compliance with the Decree.

Additionally, in future assessments, the Monitoring Team will evaluate whether BPD continues to provide sworn members who frequently interact with the public (and, in particular, non-NCOs) the opportunity to attend community events. The Team will also evaluate whether BPD identifies in a planning document *in advance* the number and type of meetings officers are expected to attend, as the paragraph requires.

### 2.      *Youth Programs*

Subsections (c), (d), and (e) require that BPD and the City's engagement plans provide for opportunities for positive interactions with youth, including "participation in a variety of long-

term programs that promote and foster positive police-youth interactions" and "the continuation of a BPD Explorer Program for Youth in Baltimore to learn police-related skills and assist with community events and outreach."

BPD reported that its "Community Youth Services Division (CYS) is responsible for regular day-to-day community engagement and policing activities, including engagement activities with youth and youth-serving organizations."[70] BPD also reported that in 2021, "CYS coordinated and planned community events such as crime walks, town hall meetings and forums, and neighborhood clean-ups" as "proactive opportunities to hear about challenges in the community and address crime collaboratively with neighborhood groups."[71]

In addition, BPD reported that in 2021 it hosted the Law Enforcement Explorer Program, "a 36-week program that provides young adults who may be interested in a career in law enforcement with a comprehensive program of training, competition, service and practical experiences."[72]

Based on the activities BPD reported, it is off track in this area because BPD has not provided documentation demonstrating that it has addressed the Consent Decree's requirement that BPD plan a variety of long-term programs. In future assessments, the Monitoring Team will evaluate that BPD and the City have planned and implemented a variety of long-term programs to foster youth interactions, including, but not only, the Explorers Program.

### 3. *Micro-Community Policing*

Subsection (h) requires BPD to develop "micro-community policing or similar plans to reflect particular community enforcement priorities." CD ¶ 511(bbb) defines micro-community policing as "[a] policing strategy based on community partnerships and problem-solving techniques that are tailored to a neighborhood or other small geographic area, recognizing that priorities vary between and within differing neighborhoods or other geographic communities."

In 2021, BPD and the Mayor's Office of Neighborhood Safety and Engagement ("MONSE") and other City agencies worked in collaboration with two community-based organizations to build and pilot Neighborhood Policing Plans (NPP)—crime and public safety plans co-developed by BPD and community members to identify and address public safety priorities at the neighborhood level.[73] According to the City, "[t]hese plans allow for individually-tailored strategies by

---

[70] *Id.* at 22.
[71] *Id.*
[72] *Id.*
[73] *Id.* at 19.

neighborhood and are a direct response to calls by Baltimore residents to have more agency over decision making impacting their communities."[74]

BPD, in coordination with MONSE, chose two police districts in which to pilot the NPP program: the Western District, in partnership with Fayette Street Outreach, and the Southern District, in partnership with the Greater Baybrook Association,[75] with the intent of expanding the program to other districts following an independent evaluation of the pilot by the University of Baltimore. Other City agencies involved in the NPP pilot are the Department of Transportation; Department of Public Works; Department of Recreation and Parks; Department of Housing and Community Development; and Baltimore City Information and Technology.[76]

The Monitoring Team reviewed a September 30, 2022, report from the University of Baltimore evaluating Phase 1 of the Pilot. According to the report, throughout the first year of the pilot (January through December 2021), the program's focus was on understanding a community's public safety needs and planning activities (*e.g.*, goal setting and testing data tracking functionality).[77] Phase 2 of the pilot, which began in January 2022 and is still underway, has been focused on creating and implementing action plans to outline the specific priorities for involved City agencies:[78]

---

[74] *Baltimore City Comprehensive Violence Prevention Plan*, effective 2021-2026, *available at* https://monse.baltimorecity.gov/sites/default/files/MayorScott-ComprehensiveViolencePreventionPlan_1.pdf (last accessed Aug. 11, 2023), at 21.
[75] 2021 Community Policing Report, at 19.
[76] 2021 Community Policing Report, at 21.
[77] NPP Phase 1 Evaluation, at 7-8.
[78] *Id.* at 9.

**Figure 12.       BPD Neighborhood Policing Plan Action Plan Sample (Southern District)**

## Table 3: Action Plan Commitments – Southern District

| Agency | Action Items |
|---|---|
| MONSE | • Educate and inform partners and the public on components of NPP program<br>• Build capacity and buy-in for NPPs across a range of community stakeholders and orgs.<br>• Develop funding and grant strategy to equitably distribute ARPA funding in each of the pilot districts<br>   o Identify comprehensive long-term fundraising strategies for programming<br>• Coordinate city agency partners to provide the appropriate data as necessary to support impact assessment |
| BPD | • Conduct regular foot patrol in the priority areas<br>• Conduct business checks in the priority areas<br>• Document environmental concerns via 311 submissions<br>• Provide detailed tracking of environmental issues impacting public safety<br>   o Ex. Vacant buildings, lighting issues, abandoned vehicles<br>• Prioritize proactive engagement overlapping DAT and Microzone |
| GBA | • Engage residents and key stakeholders living and working with focus area in ongoing analysis and assessment for the NPP<br>• Engage property owners of priority vacant properties located in areas of high crime/violence<br>• Work with occupied business owners and vacant storefront owners to improve façade storefronts through Community Safety Works grant and Façade Improvement program<br>• Seek additional funds/resources for CPTED improvements<br>• Work with neighborhood associations and residents to obtain community support required for alley gate installation of 400 block of Cambria St<br>• Engage with business owners to form a Merchant's Association |
| BCRP | • Install trashcans in Garrett Park & Farring Baybrook Park<br>• Engage with Friends of Garret Park Group<br>   o BCRP Community Engagement – hold workplan meeting with group<br>• Creation of Farm Alliance Urban Farm Project<br>   o Six acre portion of Farring Baybrook Park<br>• Removal of tree stumps and planting of trees in Brooklyn Neighborhood<br>• Re-design and renovation of Curtis Bay Rec Center and Park<br>   o Garner community engagement and support for redesign |
| DOT | • Safety division to complete monthly scans of focus areas<br>   o Identify and ticket abandoned vehicles and other safety/traffic violations<br>   o To be completed in partnership with BPD<br>• Maintenance division to complete monthly scans to remedy DOT issues related to signage, lighting, street markings, curb replacements, and tree pits/overgrown islands.<br>• Work in partnership with BCRP to identify areas in need of tree removal.<br>   o DOT will replace/repair sidewalks after BCRP addresses trees/stumps |
| DHCD | • Weekly monitoring of the focus areas to identify code violations<br>• Weekly monitoring of the focus areas for open or unsanitary vacant properties<br>• Including service requests for boarding and/or cleaning |
| DPW | • Working to lower 311 backlog<br>   o Implementing a 6-week cycle of proactive cleaning around NPP neighborhoods<br>• Maintain regularly scheduled solid waste services<br>• Respond to 311 calls related to vacant properties, corner cans, and Municipal trash cans/recycle carts |
| BCIT | • N/A |

*Source: NPP Phase 1 Evaluation at 22*

**Figure 13.    BPD Neighborhood Policing Plan Action Plan Sample (Western District)**

## Table 4: Action Plan Commitments – Western District

| Agency | Action Items |
|---|---|
| MONSE | • Educate and inform partners and the public on components of NPP program<br>• Build capacity and buy-in for NPPs across a range of community stakeholders and orgs.<br>• Develop funding and grant strategy to equitably distribute ARPA funding in each of the pilot districts<br>  ○ Identify comprehensive long-term fundraising strategies for programming<br>• Coordinate city agency partners to provide the appropriate data as necessary to support impact assessment |
| BPD | • Conduct regular foot patrol in the priority areas<br>• Conduct business checks in the priority areas<br>• Document environmental concerns via 311 submissions<br>• Provide detailed tracking of environmental issues impacting public safety<br>  ○ Ex. Vacant buildings, lighting issues, abandoned vehicles |
| FSO | • Organize community events entered around civic engagement, community, empowerment, and community healing<br>  ○ Ex. Cleanups, resource fairs, COVID vaccination clinics, health and wellness demos, etc.<br>• Host community listening sessions to engage residents and businesses to address infrastructure and environmental concerns<br>• Identify resources to aid in the renovation and upgrades to 29 N Smallwood Center<br>• Identify city owned properties for receivership for community development and housing |
| BCRP | • Assessment of facility upgrades and grounds at Warwick Park<br>  ○ Including outdoor security cameras<br>• Assessment of facility upgrades and programming at Bentlou Rec Center<br>  ○ Including outdoor security cameras<br>  ○ Hold three movie nights at Bentlou Rec Center<br>• Removal of tree stumps and planting trees in Penrose/Fayette Neighborhood |
| DOT | • Safety division to complete monthly scans of focus areas<br>  ○ Identify and ticket abandoned vehicles and other safety/traffic violations<br>  ○ To be completed in partnership with BPD<br>• Maintenance division to complete monthly scans to remedy DOT issues related to signage, lighting, street markings, curb replacements, and tree pits/overgrown islands.<br>• Work in partnership with BCRP to identify areas in need of tree removal.<br>• DOT will replace/repair sidewalks after BCRP addresses trees/stumps |
| DHCD | • Weekly monitoring of the focus areas to identify code violations<br>• Weekly monitoring of the focus areas for open or unsanitary vacant properties<br>  ○ Including service requests for boarding and/or cleaning |
| DPW | • Working to lower 311 backlog<br>  ○ Implementing a 6-week cycle of proactive cleaning around NPP neighborhoods<br>• Maintain regularly scheduled solid waste services<br>• Respond to 311 calls related to vacant properties, corner cans, and Municipal trash cans/recycle carts |
| BCIT | • N/A |

*Source: NPP Phase 1 Evaluation at 23*

The evaluation highlighted some bright spots and some challenges in the first phase of the pilot implementation. The evaluation noted that the City agencies did a "great job proposing action items that meet the needs expressed by community members," taking one of two approaches—most agencies scheduled regular area scans "to facilitate a consistent intervention and monitoring of the focus areas," while the other agencies target specific locations and items to address to "emphasize improving facilities serving these neighborhoods so that they can offer support to residents."[79]

The evaluation also identified several areas for improvement, particularly where the City agencies "were not able to respond to, or are only able to respond to partially, due to their missions and capacity"[80]:

- In both pilot sites, "residents expressed concerns related to youth in the neighborhoods . . . including access to activities and role models." The evaluation notes that "the capacity to support youth more holistically in these areas is not fully developed under the current iteration of the NPP pilot program" and that other City entities (*e.g.*, the Mayor's Office of Employment Development) would likely need to be included in the program to do so.

- Residents expressed concerns about mental health and mental illness and their relationship to drug use and sales. The evaluator recommended that the NPP program engage partners equipped to handle these types of issues (*e.g.*, the Baltimore Department of Public Health, Baltimore City's Opioid Intervention Team, the National Alliance of Mental Illness, and local mental health and drug treatment partners in the area).

- Vacant housing was a "persistent issue among residents in both pilot sites." The evaluator recommended engaging with longer-term solutions for vacant homes, which will likely require investment from other divisions within the Department of Housing and Community Development and other City resources.

- To address "unofficial avenues in entrepreneurship" (*e.g.*, snowball stands, car washes) the evaluator recommended considering introducing pathways to official entrepreneurship that would enrich the neighborhoods in need of these services.

---

[79] *Id.* at 9-11.
[80] *Id.* at 10.

- Though the community partners work to develop unity in the communities, the evaluator recommended that the City agencies working on the program should "work purposefully to support and expand these efforts."

The evaluation also noted a number of process and organizational challenges to the program, which the evaluator recommended the City address before expanding the program to other districts, including:[81]

- Constant change in City personnel and short staffing;

- The accountability and reporting structure, specifically, MONSE's "barriers in holding agencies accountable to identifying and committing to action items for the NPP program";

- The City's delayed approval of the project budget; and

- The involved City agencies were overly focused on clearing out 311 service requests, an activity that "does not address the goals of the NPP pilot program to build out problem-solving partnerships with the community."

The evaluation conclusions are consistent with feedback that the Monitoring Team heard during focus groups conducted for this assessment. A number of people involved in the implementation of the NPP pilots reported that it has been difficult to get non-BPD City agencies to keep up with the demands of the implementation plan.

Overall, despite its challenges, the City and BPD's concept design of the NPP pilot reflects a thoughtful and measured approach to developing neighborhood-level policing plans that reflect the community's enforcement priorities. However, the program has significant implementation challenges that need to be addressed for the program to be successful and expand. For example, members of the community, police officers working the area, and city employees likely need to be trained on problem solving and provided the needed facilitation to identify, plan, and work an approach to specific crime or disorder problems. In future assessments, the Monitoring Team will evaluate additional micro-policing plans the City and BPD develop to ensure they reflect particular community enforcement priorities.

The Monitoring Team commends the City and BPD for engaging a committed independent evaluator to evaluate the pilot and provide honest feedback about the implementation. The

---

[81] *Id.* at 13.

Monitoring Team recommends that the City and BPD implement as many of the evaluator's recommendations as possible prior to expanding the NPP program citywide.

### 4.    Other Requirements

The remaining subsections of CD ¶ 19 require the City and BPD's community engagement plans to account for:

- "[E]mphasis on creating opportunities for positive interactions with . . . communities of color and residents of low-income and public housing" (Subsection e);

- "[O]utreach in all neighborhoods, including neighborhoods where no neighborhood association has been established to provide consultation and input to BPD" (Subsection f); and

- "[C]ollaborat[ion], where feasible, with neighborhood mediations in Baltimore that promote lasting resolutions of appropriately selected disputes among community members to reduce police involvement in these disputes" (Subsection g).

BPD's Community Policing Plan and 2021 Community Policing Annual Report do not discuss plans or implementation for these particular elements of Paragraph 19; nor does any of the documentation BPD provided to the Monitoring Team for this evaluation. For Initial Compliance, BPD will have to show documented plans and implementation progress of these subsections.

### 5.    Conclusion

BPD is **Off Track (Score 4b)** in its implementation of Paragraph 19, which intends to create opportunities for routine and frequent positive interactions between BPD and the community. As discussed above, to demonstrate Initial Compliance in this area, BPD will need to show more progress not only implementing, but also planning, the paragraph's numerous and varied requirements.

### F.      Paragraph 20

*BPD will ensure that it solicits input from its advisory boards and councils representing particular communities in Baltimore, such as the Youth Advisory Board and the LGBT Advisory Council, on policies, practices, training, engagement programs, and enforcement strategies that affect the communities those advisory groups represent.*

BPD's Community Policing Plan instructs the Patrol Services Division to "coordinate regular meetings of advisory boards to help inform the operations of the Department."[82] The Plan states that these boards include, but are not limited to, the Youth Advisory Board; LGBTQ+ Advisory Board; Interfaith Advisory Board; Aging Commission, and Veterans Commission.[83]

From 2019 to 2021, BPD convened a Community Training Review Committee, which consisted of one community representative from each police district and other stakeholders in the criminal legal system. This committee reviewed and provided meaningful and robust input on BPD's 2021 community policing training. BPD reported that in 2021, the "LGBTQIA+ Liaison Officer is responsible for working closely with the LGBTQIA+ community on a variety of community-related events and issues, including attending the LGBTQIA+ Advisory Council Meetings." BPD reported that "[d]ue to staffing challenges, BPD was not able to engage in as many activities as hoped."[84] In addition, BPD provided documentation reflecting its 2022 and 2023 participation in the City's Behavioral Health Collaborative, a convening of relevant City and state agencies, local healthcare providers, behavioral-health advocates, and researchers, with the goal of improving Baltimore City's system of behavioral-health response. The agendas and notes provided by BPD reflect that BPD's policies and training related to behavioral-health response have been discussed with the Collaborative.

Although these are encouraging developments, BPD did not provide evidence that it has convened the advisory boards required by CD ¶ 20 since 2021. BPD indicated recently that early efforts are underway to convene a BPD-led Youth Advisory Committee and that a job posting for a new LGBTQIA+ Liaison is under development. BPD was also awarded a federal grant in 2022 to engage community collaborators "to organize, directly collaborate with, and bring community members together as cohorts - representing private, public, and nonprofit sectors - to review and

---

[82] Community Policing Plan, at 28.
[83] *Id.*
[84] 2021 Community Policing Report, at 24.

make recommendations regarding draft policies, training, youth engagement practices; and the implementation of them all."[85]

In conclusion, the failure of BPD to provide evidence that it has convened the required advisory boards and is soliciting input from them on the required topics means that BPD is **Off Track (Score 4b)** with this requirement. In future assessments, the Monitoring Team will evaluate that BPD is soliciting input from the required advisory boards and councils on an ongoing basis. The Monitoring Team expects that BPD will document these interactions so that the Monitoring Team can review and audit them to verify that input on the topics specified in CD ¶ 20 is being solicited.

### G.      Paragraph 21

> *To inform the public about BPD's implementation of the Consent Agreement, BPD shall develop a community outreach and public information program about the Agreement in each District. The program shall include at least two meetings per year in each District that is open to the public. During the meetings, BPD will inform the public about the requirements of this Agreement, update the public on BPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, BPD will widely publicize the meetings. The meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's rights and responsibilities during a police encounter. These meetings may be held together with the Monitor, partially fulfilling also the Monitor's public outreach obligations.*

CD ¶ 21 requires BPD to develop a community outreach and public information program about the Consent Decree. The paragraph further articulates what should occur doing the community meetings and how they should be publicized.

In 2021, BPD's Consent Decree Implementation Unit ("CDIU") began hosting and attending in-person and virtual meetings to inform the public about the Consent Decree and BPD's implementation progress. According to BPD's 2021 Community Policing Report, the meetings were arranged on request from community associations, through solicitation efforts from police department members, and from CDIU outreach efforts.[86]

---

[85] U.S. Dep't of Justice Office of Justice Programs, *Baltimore City Police Department Community Collaboration Initiative*, https://bja.ojp.gov/funding/awards/15pbja-22-gg-00040-brnd (last accessed Aug. 11, 2023).
[86] 2021 Community Policing Report, at 25-28.

The Monitoring Team reviewed Excel spreadsheets maintained and provided by BPD entitled "Community Engagement Tracker" for the years 2021, 2022, and 2023, as well as a sample of flyers and social announcements designed to publicize the meetings that BPD provided. The documentation BPD provided indicates that BPD hosted or attended beyond the required number of meetings. BPD also provided evidence of a newsletter it distributes to advertise the meetings. Indeed, over the years, the Monitoring Team attended a number of these meetings, and the ones we observed were generally well done and informative.

BPD's compliance status with Paragraph 21 is **4d – Initial Compliance**. In future assessments, the Monitoring Team will evaluate that BPD continues to host the required meetings and that these meetings meet the requirements of the paragraph.

The Monitoring Team recommends that BPD maintain minutes or notes so the content of the meetings can be audited at a later time, as the Monitoring Team's contemporaneous attendance at the meetings to evaluate their content may not be feasible. The Monitoring Team will also evaluate how BPD widely publicizes the meetings, including by auditing documentation reflecting that the meetings were widely publicized at least one week in advance, as the Consent Decree requires. Though the specificity of CD ¶ 21's requirements may seem administrative in nature, a number of residents reported during focus groups the Monitoring Team conducted that they felt underinformed about the Consent Decree and BPD's progress implementing it. These meetings can be a valuable mechanism for keeping residents informed about the Consent Decree.

### H.        Paragraph 22

*On at least an annual basis, BPD will prepare a publicly available report of its community policing efforts, including a breakdown by district. As part of this report, BPD will identify deficiencies and opportunities for improvement in initiatives for community engagement and community policing. The report will include specific problems addressed and steps taken by BPD and the community toward their resolution. The report will describe the ways BPD has sought input from the community related to the Agreement's implementation. The report will identify steps BPD has taken to measure officer outreach to community members.*

The Consent Decree requires BPD to prepare and publish an annual report on its community policing efforts, to include analysis of "deficiencies and opportunities for improvement in initiatives for community engagement and community policing" and "specific problems addressed, and steps taken by BPD and the community toward their resolution." To evaluate this paragraph, the Monitoring Team reviewed the annual reports BPD published for 2019, 2020, and 2021.[87] BPD has indicated it is on track to publish the 2022 report later this year.

The published reports provide updates on BPD's community policing and engagement efforts, including deficiencies identified and plans for improvement, as well as general updates on BPD's progress implementing the Community Policing Plan.

The reports are thorough and comply with the required elements of Paragraph 22; they are also written in plain language for residents to understand. Therefore, BPD is in **Initial Compliance (Score 4d)** with this paragraph. In future assessments, the Monitoring Team will evaluate whether BPD continues to publish the required reports on an annual basis and that the reports continue to include the required elements.

The Monitoring Team provides one recommendation to increase transparency around the reports. Though they are publicly available on the court docket and "Reports and Resources" section of BPD's website, the Monitoring Team encourages BPD to make the reports more easily accessible on the Transparency and Community tabs of BPD's website (similar to the Community Policing Plan, which is prominently featured and easy to access):[88]

---

[87] *See* 2019 Community Policing Annual Report, Dec. 20, 2019, Dkt. 273; 2020 Community Policing Annual Report, June 24, 2021, Dkt. 425; 2021 Community Policing Report.
[88] *See* BPD website, https://www.baltimorepolice.org/community (last accessed Aug. 11, 2023).

**Figure 14.      BPD Website, Community Page**



*Source: BPD Website*

## V.   COMPLIANCE ASSESSMENT CONCLUSIONS

Below is a table summarizing the Monitoring Team's compliance determinations for Paragraphs 15 through 22.

| | Consent Decree Paragraph and Summary of Requirements | Compliance Scoring |
|---|---|---|
| 15 | BPD agrees to ensure its mission statement reflects its commitment to community-oriented policing and agrees to integrate community and problem-oriented policing principles into its management, policies, and procedures, recruitment, training, personnel evaluations, resource deployment, tactics, and accountability systems. | **4c – Implementation On Track** |
| 16 | On an annual basis, BPD will provide eight hours of cumulative, structured in-service training on community policing and problem-oriented policing methods and skills for all officers, including supervisors, managers and executives, that shall include:<br><br>a.   Methods and strategies to improve public safety and crime prevention through community engagement, including how to establish formal partnerships with community organizations, how to work with communities to set public safety and crime prevention priorities, and how to create opportunities for positive interactions with, among others, Youth, LGBT, homeless, and mental health organizations and communities;<br><br>b.   Scenario-based training that promotes the development and strengthening of partnerships between the police and community;<br><br>c.   Leadership, ethics, and interpersonal skills;<br><br>d.   Problem-oriented policing tactics;<br><br>e.   Principles of procedural justice and its goals;<br><br>f.   Conflict resolution, including verbal de-escalation of conflict;<br><br>g.   Cultural awareness and sensitivity training that addresses the history and culture of Baltimore's communities, including the relationship with law enforcement; and<br><br>h.   Methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination. | **4d – Initial Compliance** |
| 17 | BPD will encourage patrol officers to be familiar with the geographic areas they serve, including their issues, problems, and community leaders; engage in problem identification and solving activities with the community members around the community's priorities; and work proactively to address quality-of-life issues in a manner that minimizes stops, Citations, searches, arrests, and use of force consistent with the requirements of this Agreement. | **4c – Implementation On Track** |

| 18 | BPD will ensure that data about community policing efforts and outcomes are evaluated by command staff. | **4c – Implementation On Track** |
|----|----|----|
| 19 | The City and BPD will, within their respective spheres, develop and implement community-engagement plans for creating opportunities for routine and frequent positive interactions between officers and community members, including those critical of BPD. The community engagement plans will ensure that:<br><br>a. BPD provides for all sworn representatives of BPD who interact with the public in the regular course of their activities to participate in neighborhood and community meetings and other community events;<br>b. BPD identifies the number and types of meetings to be attended;<br>c. BPD and the City establish or provide for participation in a variety of long-term programs that promote and foster positive police-youth interactions;<br>d. BPD provides for the continuation of a BPD Explorer Program for Youth in Baltimore to learn police-related skills and assist with community events and outreach;<br>e. BPD and the City place emphasis on creating opportunities for positive interactions with Youth, communities of color and residents of low-income and public housing;<br>f. BPD and the City provide for outreach in all neighborhoods, including neighborhoods where no neighborhood association has been established to provide consultation and input to BPD;<br>g. BPD and the City collaborate, where feasible, with neighborhood mediations in Baltimore that promote lasting resolutions of appropriately selected disputes among community members to reduce police involvement in these disputes; and<br>h. BPD develops micro-community policing or similar plans to reflect particular community enforcement priorities. | **4b – Implementation Off Track** |
| 20 | BPD will ensure that it solicits input from its advisory boards and councils representing particular communities in Baltimore, such as the Youth Advisory Board and the LGBT Advisory Council, on policies, practices, training, engagement programs, and enforcement strategies that affect the communities those advisory groups represent. | **4b – Implementation Off Track** |
| 21 | To inform the public about BPD's implementation of the Consent Agreement, BPD shall develop a community outreach and public information program about the Agreement in each District. The program shall include at least two meetings per year in each District that is open to the public. During the meetings, BPD will inform the public about the requirements of this Agreement, update the public on BPD's progress meeting these requirements, | **4d – Initial Compliance** |

| | | |
|---|---|---|
| | and address areas of community concern. At least one week before such meetings, BPD will widely publicize the meetings. The meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's rights and responsibilities during a police encounter. These meetings may be held together with the Monitor, partially fulfilling also the Monitor's public outreach obligations. | |
| 22 | On at least an annual basis, BPD will prepare a publicly available report of its community policing efforts, including a breakdown by district. As part of this report, BPD will identify deficiencies and opportunities for improvement in initiatives for community engagement and community policing. The report will include specific problems addressed and steps taken by BPD and the community toward their resolution. The report will describe the ways BPD has sought input from the community related to the Agreement's implementation. The report will identify steps BPD has taken to measure officer outreach to community members. | **4d - Initial Compliance** |