

# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

## COMPLIANCE REVIEW & OUTCOME ASSESSMENT
## REGARDING ARRESTS

November 2023



# TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ...........................................................................................1

II.     BACKGROUND ........................................................................................................4

        A.      The Department of Justice's Investigative Findings Regarding
                Arrests ...........................................................................................................4

        B.      Consent Decree Requirements ......................................................................4

        C.      BPD's Implementation Progress to Date ......................................................5

                1.      Policies and Training ........................................................................5

III.    SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF
        REVIEW ...................................................................................................................11

        A.      Scope of Review ..........................................................................................11

        B.      Methodology ...............................................................................................11

                1.      Review of Probable Cause Determination and Reporting ...........11

                2.      Evaluation of BPD's Audit of RWOCs ........................................12

                3.      Frequency  of  Civilian  Complaints  Alleging  Unlawful
                        Arrests .............................................................................................13

        C.      Standard of Review .....................................................................................13

                1.      Evaluating Officer Arrests and Arrest Reporting .........................13

                2.      Determining Compliance Status ....................................................14

IV.     CHARACTERISTICS OF ARRESTS SAMPLED ..................................................19

V.      COMPLIANCE REVIEW AND OUTCOME ASSESSMENTS .............................23

        A.      Assessment of Probable Cause ...................................................................23

        B.      Arrest Reporting..........................................................................................25

        C.      RWOC Audits .............................................................................................29

        D.      OPR/CRB Complaints:  Outcome Assessment...........................................31

VI.     COMPLIANCE ASSESSMENT CONCLUSIONS ..................................................33

## LIST OF FIGURES & TABLES

Figure 1.    Total RWOC Arrests, Q2 2020 – Q4 2022....................................................8

Figure 2.    Total BPD Arrests, Q2 2020 – Q4 2022.......................................................9

Figure 3.    RWOC Percentage Total of Arrests, Q2 2020 – Q2 2022.............................9


Table 1.    Number of Arrestees per Incident.................................................................19

Table 2.    Arresting Officer Assignment........................................................................19

Table 3.    Type of Interaction that Led to Arrest ..........................................................20

Table 4.    Domestic Violence Arrests ...........................................................................20

Table 5.    Arrests for Minor Violations..........................................................................21

Table 6.    Race/Ethnicity of Arrestee ...........................................................................21

Table 7.    Gender of Arrestee........................................................................................21

Table 8.    Age of Arrestee .............................................................................................22

Table 9.    Was there Probable Cause?...........................................................................23

Table 10.   Basis of Probable Cause ...............................................................................23

Table 11.   Probable Cause in Report .............................................................................26

Table 12.   Inaccurate Report..........................................................................................26

Table 13.   Inconsistencies and Contradictions in Report...............................................27

Table 14.   Inappropriate Use of Boilerplate Language...................................................27

Table 15.   Use of Conclusory Language without Supporting Detail................................28

Table 16.   Failure to Include Facts that Undercut Probable Cause.................................28

Table 17.   Number of Arrest-Related PIB and CRB Complaints ....................................31

Table 18.   Disposition of the Arrest-Related Allegations................................................31

## I.      EXECUTIVE SUMMARY

Paragraphs 60, 65, and 75-79 of the Consent Decree address the Baltimore Police Department's ("BPD" or "the Department") use of its arrest power.  Paragraphs 60 and 65 respectively require that BPD ensure that its officers only make arrests supported by probable cause, and that officers complete arrest reports documenting the probable cause by the end of their shift.  Paragraphs 75 through 79 require BPD to identify and evaluate, each quarter, arrests that result in an arrested individual being released without charge based on the determination of the reviewing prosecutor at Central Booking ("Released without Charge" or "RWOC arrests").  Under the Consent Decree, the Monitoring Team must assess BPD's compliance with each of these paragraphs.

The Consent Decree also requires the Monitoring Team to conduct an outcome assessment measuring the rate at which BPD arrests lack probable cause, and the number of complaints alleging illegal arrests made to BPD's Public Integrity Bureau ("PIB") (formerly called the Office of Professional Responsibility), and to the Civilian Review Board ("CRB").

The Monitoring Team has conducted a compliance assessment of BPD's arrests and arrest reporting by reviewing the arrest reports and associated body-worn camera footage for a random sample of arrests conducted in 2019, before training on revised policies was conducted and in 2021, after the training was conducted and the revised policies went into effect.  With respect to RWOC arrests, the Monitoring Team has supplemented its ongoing review of BPD's quarterly reviews of those arrests by reviewing a sample of 20 RWOC arrests from April 1, 2020 through September 30, 2021.  Finally, this assessment reports the number of false arrest allegations made to PIB and the outcome of those investigations.  We do not assess the quality of those investigations; we will do so as part of our assessments of PIB.

The Consent Decree requirements for arrests are part of a larger set of requirements relating to all stops, searches, and arrests.  Before entering the Consent Decree, BPD, like many departments around the country, did not document all non-voluntary, non-arrest citizen/law enforcement encounters (stops, temporary detentions, and searches).  The Department has made changes to its policies to include such documentation, but its work implementing those changes is still in process.  Accordingly, the findings here relate only to the more limited number of paragraphs that relate only to the arrests of individuals and alone are insufficient to establish whether BPD has reached initial compliance with the entire area of stops, searches, and arrests.

**Summary of Findings**

The Monitoring Team makes the following key findings:

- **Only 4% of a sample of BPD's arrests in 2021, following training on and implementation of BPD's revised arrest policies, lacked probable cause**.   The Monitoring Team found 4% (8 of 200) of the arrests in 2021 in the sample it reviewed lacked probable cause.

- **BPD reduced the number of arrests lacking probable cause between 2019, before its new policies and training, and 2021, after the training was conducted and the policies went into effect.**  The number of arrests lacking probable cause in the Monitoring Team's sample made a statistically significant drop from 10.4% (21 out of 201) in 2019, before BPD implemented new arrest training and revised policies, to 4% (8 out of 200) afterward. This improvement shows both progress by BPD and the effectiveness of its training program in this area.

- **Where BPD makes an arrest without probable cause, it appears to be due to unintentional errors, rather than as part of a broader strategy to make arrests, even if unsupported by probable cause, as a means of reducing crime.**  One of the main concerns identified in the DOJ's investigation of BPD that led to the Consent Decree was its finding that BPD supervisors and upper-level management directed officers to conduct arrests that lacked probable cause as a strategy to reduce crime.  Instead, the limited instances where arrests lacked probable cause appeared to be the result of honest mistakes.

- **Most arrest reports adequately document the legal basis for an arrest, but not with sufficient frequency to establish compliance.**  The Monitoring Team found a number of instances where a report was insufficient – either because it failed to state facts supporting probable cause, contained inaccuracies or inconsistences, or failed to include exculpatory information – but where, upon review of body-worn camera footage, the Monitoring Team was able to determine that probable cause supported the arrest.  The rate at which the sampled reports were inadequate, and particularly the rate at which they contained material deficiencies (12% in 2019 and 9% in 2021), leaves BPD short of compliance in this area.

- **BPD's audits of RWOC arrests are in compliance.**  The Monitoring Team sampled 20 RWOC arrests found by BPD's internal auditors to be supported by probable cause.  The Monitoring Team disagreed with the BPD reviewers on two of the 20 cases.  Nevertheless, given that the two cases were close calls, the Monitoring Team finds that the process is sufficient for the Monitoring Team to find BPD in initial compliance in this area.

- **Complaints to PIB for false arrest declined from 2019 to 2021, and the number of sustained complaints was low throughout.**  Complaints to PIB alleging false arrest or false imprisonment went from 203 in 2019, to 118 in 2020, to 111 in 2021.  Fourteen complaints were sustained in 2019, six in 2020, and seven in 2021.  While the number of sustained complaints has remained small (between 5-7% of all complaints lodged), whether that number demonstrates BPD officers' compliance with the law in those cases depends on the adequacy of PIB's investigations and findings, which the Monitoring Team will separately assess in a review of PIB.

## II.     BACKGROUND

### A.     The Department of Justice's Investigative Findings Regarding Arrests

The Department of Justice's investigation of BPD concluded that from 2010 to 2015 the Department made "thousands of unlawful arrests over the past five years" and that a component of that pattern involved "warrantless arrests made without probable cause."[1]  DOJ traced this practice in part to BPD's "zero tolerance" enforcement strategy, dating to the early 2000s.[2]  DOJ found that "[a]s part of this strategy, BPD leadership pressured officers to increase the number of arrests and to 'clear corners,' whether or not the officers observed criminal activity."[3]

As an initial matter, DOJ pointed to the number of times from November 2010 to July 2015 that reviewing officials – either a BPD supervisor or a representative from the State's Attorney's Office – made a decision on the day of the arrest not to charge the suspect with a crime, allowing the suspect to be released.[4]  DOJ found that this occurred 10,163 times during this period, an average of roughly 200 times per month.[5]  DOJ further found that the rate of arrests that resulted in an RWOC arrest was particularly high in arrests for highly-discretionary, non-violent, non-felony offenses resulting from street encounters with police.[6]

### B.     Consent Decree Requirements

Paragraph 60 of the Consent Decree provides that "BPD will ensure that officers issue a Citation or make a custodial Arrest only where they have probable cause to believe a person has committed, is committing, or is about to commit a criminal infraction or citable offense."  Relatedly, the Monitoring Team must assess BPD's compliance with Paragraph 65, which provides "BPD will require that officers complete all Arrest reports properly documenting the probable cause for the Arrest by the end of the officers' shifts."

Paragraph 75 of the Consent Decree requires that BPD identify all arrests for which the Commissioner of the District Court for Baltimore City provides data showing that an arrestee was released without charge, among other reasons.  Paragraph 76 further requires a supervisor not involved in the arrest to review cases where the arrestee was released without charge and where the reason for an arrestee's release was lack of probable cause.  Paragraphs 77 and 78 require BPD to take appropriate corrective action with the officers involved in those cases and to properly

---

[1]  U.S. Department of Justice, *Investigation of the Baltimore Police Department* (Aug. 10, 2016), https://www.justice.gov/crt/file/883296/download at 34.
[2]  *Id.* at 24.
[3]  *Id.* at 41.
[4]  *Id.* at 34-35.
[5]  *Id.* at 35.
[6]  *Id.* at 35.

document those steps, respectively.  Finally, Paragraph 79 requires BPD to maintain a database of arrests resulting in a release without charge and the other categories identified in Paragraph 75 and to review that database at least on a quarterly basis to assess patterns and evaluate whether corrective or disciplinary action is required.

Finally, Paragraph 459.c. of the Consent Decree calls for the Monitoring Team to assess:

> i. The rate at which Arrests are found to lack probable cause or otherwise violate the Fourth Amendment by BPD supervisors, and in any court commissioner data made available to BPD; and

> ii. The frequency of civilian complaints to OPR and CRB alleging unlawful Arrests, the disposition of such complaints, and the quality of BPD's complaint investigations.

## C.    BPD's Implementation Progress to Date

Since the adoption of the First-Year Monitoring Plan in February 2018, BPD has:

- Drafted, revised and finalized three different sets of now-effective Stops, Searches, and Arrests ("SSA") policies;
- Prepared training curriculum and delivered Department-wide training on SSA;
- Prepared training curriculum and delivered Department-wide training on community policing, which includes material on SSA for low-level offenses;
- Prepared and delivered Department-wide e-learning on supervisory review of SSA;
- Prepared and published quarterly audit reports of arrests resulting in individuals being released without charge;
- Prepared annual reports on developing the technology needed to properly record, maintain and analyze SSA data; and
- Procured, developed and implemented a new Record Management System ("RMS") that should facilitate the recording and maintenance of the SSA data necessary to ensure officer accountability, effective supervision, robust internal auditing, and meaningful external Monitoring Team and community evaluation.
- Prepared and delivered in-person training to all sworn supervisors (sergeants and above) that included a module on reviewing subordinates' stops, searches, and arrests.

### 1.  Policies and Training

As stated above, BPD has issued three new sets of policies related to SSA.  All SSA policies adopted under the Consent Decree are active.  The first two sets of SSA policies became active in

early 2021, following completion of Department-wide in-service training on them.  Later in 2021, BPD supplemented this training with Department-wide e-learning on supervisory review of SSA, which reinforced core SSA policies, particularly reporting requirements, and provided guidance to supervisors on ensuring compliance with those policies.

The first two sets of SSA policies focus on investigative stops, weapons pat-downs, warrantless arrests and searches, warrants, traffic violations, and interviewing witnesses and persons in custody.  Most relevant to this assessment, BPD issued a revised policy, Policy 1106 (Warrantless Arrest Procedures and Probable Cause Standard), which "explains the probable cause standard and establishes guidelines for BPD members to follow when arresting persons without a warrant."[7]

In September 2022, a third set of policies, focusing on responding to low-level offenses, became active following completion of Department-wide in-service training on community policing.  Among other things, this training taught officers how to take the least intrusive law enforcement action and pursue alternatives to arrest, if consistent with public safety, when confronted with the commission of low-level offenses, including loitering, open container, trespassing, failure to obey, disorderly conduct, and public urination.   These policies included the following, which were relevant to this assessment:

- ***Policy 803 (Criminal Citation Procedures; Policy 808 (Civil Citation Procedures)***, which respectively establish BPD's policies to issue Criminal and Civil Citations "when a citation represents the most effective and least intrusive response appropriate under the circumstances as reasonably understood by the [BPD] member(s) at the time consistent with the goal of advancing public safety" and to issue Criminal and Civil Citations in a non-discriminatory fashion.[8]

- ***Policy 812 (Misdemeanor Theft Procedures)***, which provides guidance on the enforcement of misdemeanor theft offenses.[9]

---

[7] Baltimore Police Department Policy 1106, "Warrantless Arrest Procedures and Probable Cause Standard" (last rev. Feb. 9, 2021),  https://www.baltimorepolice.org/transparency/bpd-policies/1106-warrantless-arrest-procedures-and-probable-cause-standard [hereinafter "Policy 1106"].

[8] Baltimore Police Department Policy 803, "Criminal Citation Procedures" (last rev. Apr. 12, 2022), https://www.baltimorepolice.org/transparency/bpd-policies/803-criminal-citation-procedures;  Baltimore Police Department Policy 808, "Civil Citation Procedures" (last rev. Apr. 12, 2022), https://www.baltimorepolice.org/transparency/bpd-policies/808-civil-citation-procedures-0.

[9] Baltimore Police Department Policy 812, "Misdemeanor Theft Procedures" (last rev. June 14, 2022), https://www.baltimorepolice.org/transparency/bpd-policies/812-misdemeanor-theft-procedures-0.

- ***Policy 1018 (Lesser Offenses and Alternatives to Arrest)***, which provides guidance on BPD's philosophy governing enforcement action for lesser offenses, seeking to enforce laws in a fair, impartial, and ethical manner to build trust and police legitimacy.[10]

### 2. *Quarterly Audits on Arrests Resulting in Release without Charge*

BPD continues to produce quarterly audits of arrests resulting in individuals being released without charge, as required by Paragraphs 75 through 79 of the Consent Decree. As discussed below, part of the present assessment involves reviewing a sample of RWOC arrests that BPD has reviewed to test the reliability of BPD's audits.

The purpose of BPD's RWOC arrest audit is to determine whether officers are making unlawful arrests unsupported by probable cause of a crime; to determine whether officers are properly documenting RWOC arrests, including the probable cause for arrest; and to use those determinations to identify the need for remedial action, including additional training, non-disciplinary corrective action, or referral for disciplinary investigation.

To perform the audits, BPD's Performance Standards Section ("PSS") obtains information from the Baltimore City State's Attorney's Office on all arrests that the State's Attorney's Office declined to prosecute immediately after arrest. The reasons include "4th Amendment violation," "elements of crime not readily provable," "nexus issue," and "prosecutorial discretion." For every arrest resulting in dismissal of charges for one of these reasons, with the exception of "prosecutorial discretion," the Performance Standards Section reviews all available documentation and body-worn camera footage to determine if the arrest lacked probable cause and if the officer properly documented all of their actions and the supporting reasons. For RWOC dispositions based on "prosecutorial discretion," PSS performs the same review for at least 10% of them each quarter.[11] Those RWOC dispositions have generally been far more voluminous and, as the label "prosecutorial discretion" suggests, are justified by the State's Attorney's Office for policy reasons based on office priorities, rather than due to legal infirmities. However, BPD still examines a randomly drawn sample of these dispositions every quarter to ensure that they do not involve arrests made without probable cause.

Thus far, BPD has published quarterly reports on its RWOC arrest audits for the second, third, and fourth quarters of 2020 and all four quarters of 2021 and 2022—eleven quarters, or 33 months, in total.[12] These reports reflect that, between Q2 2020 and Q4 2022, the number of RWOC arrests steadily declined both overall and as a percentage of total arrests. Between Q2 2020 and Q4 2022,

---

[10] Baltimore Police Department Policy 1018, "Lesser Offenses and Alternatives to Arrest" (last rev. Apr. 12, 2022), https://www.baltimorepolice.org/transparency/bpd-policies/1018-lesser-offenses-and-alternatives-arrest.

[11] Due to the low number of RWOC arrests in the fourth quarter of 2022, BPD reviewed all RWOC arrests in that period.

[12] Those reports can be found at https://www.baltimorepolice.org/resources-and-reports.

the number of quarterly RWOC arrests dropped from 161 to 11, or 93%.  This trend continued even as the number of arrests increased sharply in Q3 and Q4 of 2022.  In none of the recent audits has BPD identified arrests that lacked probable cause, and only isolated cases in which reporting was inadequate (most recently, two such reports in Q3 2022 and two in Q4 2022).

The following graphs illustrate the trend:

**Figure 1.     Total RWOC Arrests, Q2 2020 – Q4 2022**



**Figure 2.      Total BPD Arrests, Q2 2020 – Q4 2022**



**Figure 3.      RWOC Percentage Total of Arrests, Q2 2020 – Q2 2022**



The diminishing number of RWOC arrests is encouraging.  RWOC arrests may not be a perfect proxy for arrests made without probable cause:  on one hand, many RWOC arrests are made with probable cause, as BPD's audit reports show; on the other hand, prosecutors screening cases at Central Booking may approve arrests that lack probable cause.  However, the sharp downward trend remains noteworthy, especially as the number of arrests ticks up.  Recall that DOJ's

investigation found BPD averaged over 2,000 RWOC arrests per year between 2010 and 2015. DOJ believed that this extremely large number of RWOC arrests meant that officers were routinely arresting people without probable cause.  For the most recent year (Q1 2022 – Q4 2022), the figure is down to less than 50.  The dramatic reduction in RWOC arrests is a positive sign that officers are much less frequently making arrests for questionable cases that do not warrant prosecution.

It also suggests that, as BPD policy requires, officers are less frequently making arrests for low-level offenses that the State's Attorney's Office promptly declines to prosecute.  And perhaps most importantly, based on BPD's analysis, vanishingly few of these arrests are based on evidence that is insufficient to establish probable cause – i.e., arrests that violate the Constitution and BPD policy.  In fact, in the last several quarters, the Performance Standards Section has determined that no RWOC arrests were made without probable cause.

In each RWOC arrest report, the PSS recommends various remedial actions based on its findings. Where PSS has found problematic arrests, problematic reporting, or concerning trends within a district or with a particular officer, PSS has recommended, among other things:  (1) requiring counseling and remedial training and/or disciplinary referrals for officers who make arrests without probable cause or fail to adequately document probable cause in their reports; (2) requiring a report from the Operations Bureau about why some districts may be making a disproportionate number of arrests the State's Attorney will not prosecute, together with any actions taken; and (3) recommending amending Policy 1112 (Field Interviews, Investigative Stops, Weapons Pat-Downs and Searches) to deal with contraband seized during an RWOC arrest.  Making such recommendations, aimed at ensuring future compliance with policy, is the principal purpose of the RWOC arrest audits, and is another sign that BPD is becoming a more reflective, self-correcting agency.

## III.   SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A.   Scope of Review

This assessment is a combined compliance review and outcome assessment.  The Monitoring Team has previously described the Consent Decree's distinction between these two types of assessments:

> The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments.  Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree.  They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . .

> Outcome assessments, by contrast, are [largely] quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact [overall] – whether, independent and apart from BPD's progress toward compliance with [any specific] Consent Decree requirements, policing is changing in the real world . . . . [13]

This report evaluates BPD's compliance with Paragraphs 60, 65 and 75-79.  It also reports on various outcome measures related to Paragraph 459.c.ii.

### B.   Methodology

This report considers BPD's performance on arrests through:  (1) a review of the arresting officer's probable cause determination and reporting in a randomly drawn, representative sample of arrests in 2019 and 2021, (2) an assessment of BPD's audits of RWOC arrests in 2020 and 2021 through a review of a sample of RWOC arrests that BPD has reviewed; and (3) a review of misconduct incident data files from 2019 to 2021 to determine the frequency of civilian complaints to PIB and CRB.  This section describes these reviews in turn.

#### 1.   *Review of Probable Cause Determination and Reporting*

To assess and report on BPD's compliance with Paragraphs 60 and 65, the Monitoring Team reviewed the probable cause statements and associated body-worn camera footage in a sample of arrests.  Monitoring Team members examined this evidence in BPD databases and recorded their evaluations using an instrument that required them to answer a standard set of questions for each arrest.

---

[13] Dkt. 279-1 at 22–23.

The arrests sample for this analysis was drawn from arrests made in 2019 and 2021. The Monitoring Team selected a total of 400 arrests for those two years – 200 from each year – using a "stratified random sampling technique" in which every arrest for each year was assigned a number, and then numbers were randomly selected for inclusion in the sample, giving equal weight to arrests in each year. Each arrest of each arrestee was analyzed individually regardless of whether others were taken into custody at the same time as the arrestee. Using this sampling method to identify and assess 400 arrests over a three-year period generated results at a 95% confidence level with a margin of error $\pm$5%.

The years 2019 and 2021 were selected because of the timing of in-service training on the first two sets of revised SSA policies described above. In-service training on those policies was completed in early 2021, so most of the reviewed 2021 arrests occurred after BPD members had the benefit of that training.

The randomly selected arrests were assigned to a group of Monitoring Team members that included former police professionals and lawyers with substantial experience in assessing the existence of probable cause and what is required to properly document an arrest.

BPD does not yet reliably keep track of arrests that supervisors determine to have been without probable cause, so for this assessment the Monitoring Team was not able to calculate the rate at which supervisors determined their officers' arrests to have been without probable cause, as required by Paragraph 459.c.i.

### 2. Evaluation of BPD's Audit of RWOCs

BPD has been evaluating RWOC arrests on a quarterly basis since the second quarter of 2020. Its most recent report is for Q4 2022. For these reports, PSS reviews BWC footage, probable cause statements and incident reports for all RWOC arrests categorized by the SAO as (1) "4th Amendment violation," (2) "Elements of crime not readily provable," and (3) "nexus issue," and a percentage of RWOC arrests categorized by the SAO as "prosecutorial discretion," and evaluates the arrests for both probable cause and proper reporting.

To determine whether BPD PSS has been accurately assessing RWOC arrests for probable cause and proper reporting, the Monitoring Team independently reviewed a randomly selected sample of approximately 10% of all RWOC arrests that BPD PSS reviewed for the period April 1, 2020 through September 30, 2021 (Q2 2020 – Q3 2021). BPD PSS evaluated 191 RWOC arrests for the period from Q2 2020 through Q2 2021, so the Monitoring Team reviewed a randomly selected sample of 21 of those arrests (just over 10%), plus an additional 10% of the RWOC arrests BPD PSS reviewed from Q3 2021. With a sample size of 21 of the 191 RWOC arrests BPD's PSS reviewed from Q2 2020 through Q2 2021 the Monitoring Team has a 90% chance of identifying

at least one problematic case – i.e., one flawed, erroneous audit result – in the full set of 191, if at least 20 such cases exist, based on a hypergeometric probability calculation.

### 3. *Frequency of Civilian Complaints Alleging Unlawful Arrests*

To report on the frequency of civilian complaints to PIB and CRB alleging unlawful arrests, as well as the disposition of such complaints, as required by Paragraph 459.c.ii., the Monitoring Team used "Misconduct Incidents" data files for 2019 through 2021, which BPD provided.  The data files contain information on misconduct incidents and associated allegations of false arrests, including when the incident occurred, when the complaint was filed and when the investigation was completed; status, type, and source of the incident; outcome of the case; and the nature of the contact.

The Monitoring Team is not including in this report an evaluation of "the quality of BPD's complaint investigations," which Paragraph 459.c.ii. also requires.  Such an evaluation will target the quality of the work of PIB, rather than the extent to which BPD officers are making arrests without probable cause.  The Monitoring Team will include this evaluation in its next comprehensive assessment of the quality of PIB investigations.

## C.   **Standard of Review**

### 1. *Evaluating Officer Arrests and Arrest Reporting*

The Monitoring Team's review evaluated officer performance in light of the Consent Decree's specific standards and expectations.

With respect to assessing whether an arrest was supported by probable cause, the Monitoring Team applied the relevant legal standards.  The Fourth Amendment requires that arrests be supported by probable cause.  *See, e.g.*, *Dunaway v. New York*, 442 U.S. 200, 207–13 (1979); U.S. CONST. AM. IV.  Probable cause requires "a probability or substantial chance of criminal activity" and is evaluated by examining "the totality of the circumstances."  *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).  It "require[s] . . . the kind of fair probability on which reasonable and prudent people, not legal technicians, act."  *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013).  Police may satisfy the probable cause requirement by obtaining a warrant prior to arrest or determining that probable cause exists in the field.  *Gerstein v. Pugh*, 420 U.S. 103, 113–14 (1975).

With respect to assessing whether "officers complete all Arrest reports properly documenting the probable cause for the Arrest by the end of the officer's shifts" (Consent Decree Paragraph 65), the Monitoring Team analyzed whether (1) the narrative in the statement of probable cause clearly articulated probable cause (i.e., whether the report and PC statement give the facts and circumstances known to the officer at the time that would justify a reasonable person in believing

the suspect committed or was committing a crime); (2) whether the statement of probable cause included conclusory language without providing supporting detail; (3) whether the statement of probable cause used "boilerplate" language without further elaboration; (4) whether the statement of probable cause included information that was internally inconsistent or contradictory; (5) whether the statement of probable cause included factual representations that, given the video footage, were inaccurate; and (6) whether the statement of probable cause omitted facts that undercut or compromised probable cause.

### 2. *Determining Compliance Status*

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented. The Monitoring Team and the parties have adopted a standardized way of characterizing and summarizing BPD's compliance status in each area of the Consent Decree:

> **0 – Not Assessed:** The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

> **1 – Not Started:** The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

> **2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

> **3 – Training Phase:** The City/Department is addressing the training provisions for the requirement, based on approved policy.

> **4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

> **4a – Implementation - Not Assessed:** The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

> **4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:**  The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:**  The City/Department has demonstrated compliance with the requirement but has not yet demonstrated compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:**  The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree.  This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:**  The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

The scores within Level "4" of this assessment framework are particularly significant.  BPD's revised arrest policies became effective, and "went live" in the field in 2021, after all members received training on them.  Accordingly, this compliance review and outcome assessment is the first opportunity for BPD to establish Initial Compliance for general arrest practices and arrest reporting.  As indicated in the scoring framework above, a score of "4d" (Initial Compliance) would certify that BPD has successfully and systematically translated Decree requirements regarding general arrest practices and reporting into practice.

Consequently, **this review is focused on whether BPD has, or has not, moved from working to implement the Decree's requirements on arrests and arrest reporting to having successfully implemented those requirements in practice** across time, officers, and encounters.[14]  To determine whether BPD is in Initial Compliance with a material requirement of the Decree, the Monitoring Team weighs the following factors:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers.  In

---

[14] *See* Dkt. 2-2 ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

this way, isolated compliance does not establish "Initial Compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires. For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.** The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way. Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or

implicate competing considerations.[15]   Even as the test articulated above requires different considerations to be factored together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."[16]

In applying this multi-factor test for compliance, the first factor – the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers – is the initial, threshold inquiry.   If BPD and/or its officers' performance is not what it should be across a sufficient number or portion of relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance. For example, if BPD meets some Decree requirement in only 25% of cases, the fact that it may have improved over time would not qualify the Department for compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to BPD and to the community about the benchmarks that it expects to meet and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate of 85% or above as *possibly*, though certainly not conclusively or even presumptively, consistent with initial compliance with a Consent Decree requirement.   In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time). Where the Team determines that BPD has adhered to Consent Decree requirements in 95% or more of evaluated cases, initial compliance will be found unless one of the other factors starkly points in the other direction.

On the other hand, where BPD has adhered to requirements less than 85% of the time, initial compliance will *not* be certified unless one of the other factors points definitively in a positive direction.   For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was minimal, that BPD identified and took appropriate corrective action in instances where requirements were not followed, and the Department had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

---

[15] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying a four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[16] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

Additionally, some important requirements apply to, or are activated by, a more limited number of encounters, incidents, or circumstances.  Where the absolute number of instances where the requirement applies is lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Finally, it is possible that the Monitoring Team might assign, pursuant to the weighing of factors outlined above, a score for an individual decree requirement that is lower than the score given in a prior report.  For instance, the score for a particular requirement might move from "4c" (implementation – on track) to "4b" (implementation – off track).

However, the Monitoring Team has recognized that these provisions cannot simply be about policy; they are also about *performance* – about BPD demonstrating *adherence* to policy.  Accordingly, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 506, BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions *on the street* that, as an agency, it is complying with the policies.  Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

## IV.      CHARACTERISTICS OF ARRESTS SAMPLED

This section summarizes characteristics of the arrests sampled from 2019 and 2021 that the Monitoring Team reviewed.

Overall, BPD made 8,814 total arrests of adults or youths charged as adults in 2019, and 4,398 total arrests in 2021, excluding arrests pursuant to a warrant or arrests attributed to a law enforcement agency other than BPD.[17]  Changes in arrest practices arising from the COVID-19 pandemic explain the sharp decrease in arrests from 2019 to 2021.

Within the reviewed sample, most arrests involved incidents in which a single individual was arrested (roughly 80% in both 2019 and 2021), with a fewer number occurring during incidents when multiple individuals were arrested (roughly 20% in both 2019 and 2021).  The percentage of each remained roughly constant between the two years reviewed.  Among the sampled RWOC arrests, the split was close to 50%/50% between incidents involving a single arrestee and incidents involving multiple arrestees.

**Table 1.      Number of Arrestees per Incident**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Multiple Individuals Arrested | 9 | 42.9% | 35 | 17.4% | 34 | 17.0% |
| Single Individual Arrested | 11 | 52.4% | 157 | 78.1% | 163 | 81.5% |
| Undetermined | 1 | 4.8% | 9 | 4.5% | 3 | 1.5% |
| Total | 21 |  | 201 |  | 200 |  |

Within the samples, the officers making the arrests were mostly patrol officers.  District Action Team ("DAT") officers and officers from other specialized units made up most of the rest.

**Table 2.      Arresting Officer Assignment**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Patrol | 10 | 47.6% | 111 | 55.2% | 147 | 73.5% |
| DAT | 6 | 28.6% | 20 | 10.0% | 18 | 9.0% |
| Specialized Unit | 3 | 14.3% | 37 | 18.4% | 26 | 13.0% |
| Unable to Determine | 1 | 4.8% | 33 | 16.4% | 8 | 4.0% |
| Missing | 1 | 4.8% | 0 | 0% | 1 | 0.5% |

---

[17] This assessment only reviewed adult arrests.  The Monitoring Team is analyzing youth arrests in a separate assessment of BPD's interactions with youths.

19

| Total | 21 | | 201 | | 200 | |

Most of the arrests in the reviewed samples occurred after calls for service (30% in the RWOC arrests, 42.3% in 2019, and 57% in 2021) or investigative stops (45% in the RWOC arrests, 33.8% in 2019, 25% in 2021).  The next largest group occurred after traffic stops (10% in the RWOC arrests, 11.9% in 2019, and 8% in 2021).

**Table 3.        Type of Interaction that Led to Arrest**

| | **RWOC** | | **2019** | | **2021** | |
|---|---|---|---|---|---|---|
| Investigative Stop | 9 | 45.0% | 68 | 33.8% | 50 | 25.0% |
| Traffic Stop | 2 | 10.0% | 24 | 11.9% | 16 | 8.0% |
| Voluntary Contact/Field Interview | 0 | 0.0% | 2 | 1.0% | 1 | 0.5% |
| Call for Service | 6 | 30.0% | 85 | 42.3% | 114 | 57.0% |
| Missing/Incomplete | 0 | 0.0% | 3 | 1.5% | 0 | 0.0% |
| N/A - Other (e.g., warrant arrest, warrantless arrest after witness identification) | 3 | 15.0% | 19 | 9.5% | 19 | 9.5% |

Many of the 2019 and 2021 arrests reviewed in the sample involved domestic violence:  20.9% in 2019 and 34.5% in 2021.  Only one of the RWOC arrests reviewed involved domestic violence.

**Table 4.        Domestic Violence Arrests**

| | **RWOC** | | **2019** | | **2021** | |
|---|---|---|---|---|---|---|
| Domestic-Violence Related | 1 | 4.8% | 42 | 20.9% | 69 | 34.5% |
| Non-Domestic Violence Related | 19 | 90.5% | 154 | 76.6% | 130 | 65.0% |
| Undetermined | 1 | 4.8% | 5 | 2.5% | 1 | 0.5% |

Only a very small portion of the 2019 and 2021 arrests sampled involved arrests for alleged minor offenses.  A slightly larger proportion (four) of RWOC arrests reviewed involved such offenses.

**Table 5.        Arrests for Minor Violations**

|  | RWOC | 2019 | 2021 |
|---|---|---|---|
| Obstructing, hindering, or resisting a BPD member | 1 | 3 | 6 |
| Disorderly conduct (including disturbing the peace) | 1 | 3 | 1 |
| Failure to obey a BPD member | 0 | 1 | 2 |
| Gambling | 0 | 0 | 0 |
| Loitering | 1 | 1 | 0 |
| Public urination/defecation | 0 | 0 | 0 |
| Open container | 0 | 1 | 0 |
| Littering | 0 | 0 | 0 |
| Making a false statement to a BPD member | 0 | 0 | 2 |
| Misdemeanor trespassing | 1 | 5 | 2 |

Compared to the overall Baltimore population,[18] arrest subjects in the reviewed samples were disproportionately Black.

**Table 6.        Race/Ethnicity of Arrestee**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Asian | 0 | 0% | 0 | 0% | 1 | 0.8% |
| Black or African-American | 16 | 76.2% | 169 | 84.1% | 168 | 84.0% |
| Latino | 0 | 0% | 3 | 1.5% | 9 | 4.5% |
| Undetermined | 1 | 4.8% | 3 | 1.5% | 4 | 2.0% |
| White | 4 | 19.0% | 26 | 12.9% | 18 | 9.0% |

The arrestees in the reviewed samples were predominately male.

**Table 7.        Gender of Arrestee**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Female | 5 | 23.85% | 31 | 15.4% | 35 | 17.5% |
| Male | 16 | 76.2% | 170 | 84.6% | 164 | 82.0% |
| Missing | 0 | 0% | 0 | 0% | 1 | 0.5% |

---

[18] According to the U.S. Census Bureau's July 2021 population estimates, 62.3% of the Baltimore population is Black or African-American, 27.3% is White (not Hispanic or Latino), 5.4% is Hispanic/Latino, and another approximately 5% is of some other race and/or ethnic background.  United States Census Bureau, *QuickFacts, Baltimore City, Maryland*, https://www.census.gov/quickfacts/baltimorecitymaryland (last visited Sept. 14, 2022).

Almost half of the arrestees in the reviewed samples from 2019 and 2021 were below the age of 30, while an even greater percentage was under 30 in the RWOC arrests.

**Table 8.        Age of Arrestee**

|  | **RWOC** |  | **2019** |  | **2021** |  |
|---|---|---|---|---|---|---|
| 17 and younger | 1 | 4.8% | 4 | 2.0% | 5 | 2.5% |
| 18-29 | 15 | 71.4% | 86 | 42.8% | 97 | 48.7% |
| 30-39 | 2 | 9.5% | 65 | 32.3% | 50 | 25.1% |
| 40-49 | 3 | 14.3% | 21 | 10.4% | 34 | 17.1% |
| 50-59 | 0 | 0% | 21 | 10.4% | 11 | 5.5% |
| 60 and older | 0 | 0% | 4 | 2.0% | 2 | 1.0% |

## V.        COMPLIANCE REVIEW AND OUTCOME ASSESSMENTS

### A.        Assessment of Probable Cause

BPD has reached initial compliance with the Consent Decree requirement in paragraph 60 that its arrests be supported by probable cause.  As described above, BPD has completed substantial revisions to its policies and training on arrests.  The Monitoring Team's review confirms that work has borne fruit that is being realized in the real world.

The Monitoring Team's first and primary assessment was a determination of whether each of the sampled arrests was supported by probable cause.  The results of that review are as follows:

**Table 9.        Was there Probable Cause?**

|      | RWOC | | 2019 | | 2021 | |
|------|------|------|------|-------|------|------|
| Yes  | 19 | 90% | 180 | 89.6% | 192 | 96% |
| No   | 2  | 10% | 21  | 10.4% | 8   | 4% |

The Monitoring Team analyzed the cases that lacked probable cause for patterns in age, sex, race, ethnicity, and arresting officer assignment.  The Monitoring Team found no statistically significant pattern in any of those categories.

The Monitoring Team reviewers assessed the source of the facts supporting probable cause in those cases where they found the arrest valid.  Those sources broke down into the following categories. Note that the facts supporting probable cause can – and often do – come from more than one source.

**Table 10.        Basis of Probable Cause**

|      | RWOC | | 2019 | | 2021 | |
|------|------|-------|------|-------|------|-------|
| Officer's personal observation of crime | 13 | 38.2% | 107 | 24.5% | 118 | 27.2% |
| Specific information from dispatch | 1 | 2.9% | 25 | 5.7% | 17 | 3.9% |
| Specific information from another officer | 6 | 17.6% | 50 | 11.4% | 42 | 9.7% |
| Specific information from eyewitness/victim, including informant | 3 | 8.8% | 95 | 21.7% | 115 | 26.5% |

| Statements by arrestee prior to the arrest | 2 | 5.9% | 41 | 9.4% | 45 | 10.4% |
|---|---|---|---|---|---|---|
| Officer's prior knowledge of arrestee (prior interactions; knowledge of arrestee's criminal history or prior criminal conduct) | 2 | 5.9% | 14 | 3.2% | 6 | 1.4% |
| Arrestee's proximity to crime scene | 2 | 5.9% | 52 | 3.2% | 43 | 9.9% |
| Arrestee's suspicious physical behavior (flight, concealment, etc.) | 3 | 8.8% | 39 | 11.9% | 31 | 7.1% |
| Other | 2 | 5.9% | 23 | 8.9% | 17 | 3.9% |

Consistent with the Monitoring Team's approach across assessments, and described in Section III-C of this report, the finding that 96% of the arrests in the 2021 sample were supported by probable cause means BPD should be in initial compliance with the requirements of paragraph 60 of the Consent Decree unless the other factors starkly point in the other direction. Here, analysis of the other factors confirms that BPD is in initial compliance.

The first factor to consider is BPD's performance across a material span of time, number of incidents/events, and number of officers. Here, BPD has shown strong compliance – 96% – in a robust, random sample of both officers and incidents in 2021. Across a broader time period, taking the samples in both 2019 and 2021, BPD's compliance rate is 92.5%, which is not above the 95% threshold, but still strong. This factor weighs in favor of initial compliance.

The next factor is the severity or significance of deviations from Consent Decree requirements, BPD policy, or law. As a general matter, where probable cause was found lacking, it appeared most likely that the officer involved made an error in their analysis of the evidence – in other words, an inadvertent mistake rather than an intentional act. This contrasts with the findings in the DOJ's investigation, which found evidence that arrests, even with questionable legal justifications, were part of an intentional strategy.

Additionally, the reviewers identified no consistent flaw in the arrests that lacked probable cause. The most common error was insufficient evidence that the conduct observed was criminal (14 cases in 2019 and 7 in 2021). The rest of the errors were split relatively evenly among the following types of deficiencies: (1) nervousness as a disproportionate justification (5 cases in 2019, 2 in 2021); (2) flight from police as a disproportionate justification (3 cases in 2019, 3 cases in 2021); (3) supporting evidence was obtained during an unlawful stop (3 cases in 2019, 2 cases

in 2021; (4) supporting evidence was obtained during an unlawful pre-arrest search (2 cases in 2019, 2 cases in 2021); and (5) some other deficiency (3 cases in 2019, 3 cases in 2021).[19]

A serious aggravating factor in an arrest lacking probable cause can be the presence of evidence of either a retaliatory motive for the arrest or racial profiling. The Monitoring Team found little evidence of either. The Monitoring Team found 4 cases where there was evidence of potential racial profiling in 2019, and none in 2021. Likewise, we found evidence of potential retaliatory motive in 4 cases in 2019, and none in 2021.

The third factor to consider is the extent to which BPD is identifying and appropriately addressing problematic performance. This factor is neutral. Each arrest report is reviewed by a supervisor. This assessment, however, did not examine how often a supervisor uncovered arrests lacking probable cause from his review of an arrest report (which occurs after the arrest is complete and the suspect has been transported to the Central Booking Intake Facility). Further, it is unclear what steps the supervisor took to address any misunderstanding by the primary officer in such cases. Additionally, other than the RWOC audit, discussed below, the Monitoring Team is not aware of any audit of arrests that could identify and rectify problems. While such an audit is not a specific requirement of the Consent Decree, the Monitoring Team cannot credit BPD under this factor without some evidence that BPD is taking steps to monitor and correct bad arrests.

The fourth factor is BPD's progress over time. This factor weighs in favor of a finding of initial compliance. Again, in 2020, BPD conducted comprehensive training on its revised arrest policies. The results of the Monitoring Team's review appear to demonstrate the effectiveness of that training. The Monitoring Team identified half as many problematic arrests in 2021 as it did in 2019, with the number dropping from 21 to 9. With a 95% confidence level, this drop is statistically significant. This demonstrates both progress, and BPD's ability to use its training to reduce unconstitutional arrests.

Because BPD is over 95% compliant, and the other factors weigh in favor of compliance, the **Monitoring Team finds BPD in initial compliance with the requirement in paragraph 60, requiring that its arrests be supported by probable cause.**

## B.      Arrest Reporting

The Monitoring Team also finds that BPD is on track, but not yet in initial compliance, with the requirement in paragraph 65 that officers complete reports properly documenting the probable cause for arrests by the end of the officers' shifts.

---

[19] Some stops suffered from multiple deficiencies, so the totals here exceed the total number of arrests lacking probable cause.

The Monitoring Team assessed the arrest reports in its random sample to determine whether arresting officers adequately established probable cause and, even if so, whether they included certain problematic language that often (but not always) indicates the absence of probable cause.

The Monitoring Team first assessed whether a report clearly articulated probable cause, further defined as whether the report and probable cause statement gave the facts and circumstances known to the officer at the time that would justify a reasonable person in believing the suspect committed or was committing a crime.  This is the core requirement for an arrest report.

**Table 11**.      **Probable Cause in Report**

|  | RWOC | | 2019 | | 2021 | |
|---|---|---|---|---|---|---|
| Yes | 15 | 71.4% | 176 | 87.6% | 179 | 89.5% |
| No | 6 | 28.6% | 21 | 10.4% | 18 | 9.0% |
| Missing[20] | 0 | 0% | 4 | 2.0% | 3 | 1.5% |
| Total | 21 | 100.0% | 201 | 100.0% | 200 | 100.0% |

The review identified those reports which, based on the body-worn camera and other evidence, contained factual inaccuracies.  Inaccuracies in reports, even if they are not material or do not defeat probable cause, can cause problems in the investigative process, and could prevent the state from providing potentially exculpatory evidence to defendants during criminal discovery.[21]

**Table 12.**      **Inaccurate Report**

|  | RWOC | | 2019 | | 2021 | |
|---|---|---|---|---|---|---|
| Yes | 1 | 4.8% | 18 | 9.0% | 8 | 4.0% |
| No | 20 | 95.2% | 175 | 87.1% | 189 | 94.5% |
| Missing | 0 | 0% | 8 | 4.0% | 3 | 1.5% |
| Total | 21 | 100.0% | 201 | 100.0% | 200 | 100.0% |

As an example, one inaccurate report in the reviewed sample stated that the suspect in an assault admitted to grabbing the victim first, when the body-worn camera shows a translator explaining to the officer that the victim grabbed the suspect first and pushed her down.

---

[20] The category "missing" denotes a case where the report was missing from the file.

[21] The Monitoring Team also assessed whether the arrest report's narrative "include[ed] all facts supporting probable cause."  The reviewers found that the sampled reports did so 74.6% of the time in 2019 and 83.5% of the time in 2021.  Failure to provide all facts supporting probable cause does not render the report inadequate unless the facts in the report do not establish probable cause.  Nevertheless, doing so is good practice and could reduce the rate of reports failing to establish probable cause.

The review next analyzed whether the report contained internal contradictions or inconsistencies. Such errors undermine the credibility of the report and confuse the narrative presented.

**Table 13.      Inconsistencies and Contradictions in Report**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Yes | 0 | 0% | 2 | 1.0% | 4 | 2.0% |
| No | 21 | 100.0% | 194 | 96.5% | 193 | 96.5% |
| Missing | 0 | 0% | 5 | 2.5% | 3 | 1.5% |
| Total | 21 | 100.0% | 201 | 100.0% | 200 | 100.0% |

As an example of this error, one sampled report referred to the location where the arrest was made as a "vacant" home.  The report, however, later stated that the subject's wife lived there, contradicting that the home was "vacant," and the report further stated that the arrestee did not have permission from the owner to be at the home.

Next, the Monitoring Team assessed whether the report used boilerplate language in describing probable cause (terms such as "high crime area," "furtive movement," "nervous," or "characteristics of an armed person") without further elaboration.  Boilerplate language is not inherently problematic, but it must be combined with specific facts supporting the boilerplate conclusion.  The Monitoring Team sought to identify reports that used boilerplate language without specific supporting facts.

**Table 14.      Inappropriate Use of Boilerplate Language**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Yes | 0 | 0% | 20 | 10.0% | 12 | 6.0% |
| No | 21 | 100.0% | 178 | 88.6% | 185 | 92.5% |
| Missing | 0 | 0% | 3 | 1.5% | 2 | 1.0% |
| Total | 21 | 100.0% | 201 | 100.0% | 200 | 100.0% |

The Monitoring Team further examined whether reports included other conclusory language without supporting detail.  As with boilerplate, conclusions are helpful tools, but reports must provide the specific facts that support the conclusion.

**Table 15.      Use of Conclusory Language without Supporting Detail**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Yes | 2 | 9.5% | 13 | 6.5% | 5 | 2.5% |
| No | 19 | 90.5% | 185 | 92.0% | 191 | 95.5% |
| Missing | 0 | 0% | 3 | 1.5% | 4 | 2.0% |
| Total | 21 | 100.0% | 201 | 100.0% | 200 | 100.0% |

The Monitoring Team reviewers sought to identify reports that, based on the body-worn camera footage and other evidence, failed to include evidence that tended to defeat a finding of probable cause.  A proper report includes not only those facts which support a finding of probable cause, but those that defeat it, so that an accurate picture is presented.

**Table 16.      Failure to Include Facts that Undercut Probable Cause**

|  | RWOC |  | 2019 |  | 2021 |  |
|---|---|---|---|---|---|---|
| Yes | 4 | 19.0% | 19 | 9.5% | 26 | 13.0% |
| No | 17 | 81.0% | 174 | 86.6% | 171 | 85.5% |
| Missing | 0 | 0% | 8 | 4.0% | 3 | 1.5% |
| Total | 21 | 100.0% | 201 | 100.0% | 200 | 100.0% |

One report with this error failed to describe initial statements by two individuals that they had assaulted each other.  Instead, the report presented the facts as if it were clear that one individual assaulted the other first.

Overall, with respect to BPD's performance across time, incidents/events, and number of officers, BPD falls into the "middle category," described above, between 85% and 95%, where they could be – but are not presumptively – in compliance.  BPD avoids most of these errors over 90% of the time and over 95% of the time with respect to two of the more serious errors – inaccurate or contradictory reports.  It is under 90%, but above 85%, with respect to the dispositive error – failure to present facts establishing probable cause – and one other error – failure to include facts that undercut probable cause.  As discussed below, it avoided material errors 88% of the time in 2019 and 91% of the time in 2021.

The Monitoring Team thus must look to the other factors to determine whether BPD is in compliance.

The second factor, the severity or significance of deviations from Consent Decree requirements, weighs against compliance.  The Monitoring Team did a further review of the cases in which the

primary reviewer found one of the errors described above (e.g., failure to articulate probable cause, inaccuracy, etc.). In that secondary review, the Monitoring Team determined that 24 reports in 2019 and 18 in 2021 had some type of *material* error, a rate of 12% and 9%, respectively. In this secondary review, the Monitoring Team viewed an error as material if it had the potential to affect a finding that probable cause existed, either by omitting or misrepresenting facts necessary to establish probable cause or containing errors significant enough to call into question the reporting officer's credibility. This puts BPD outside the 95% threshold, even when considering only material errors.

The third factor is the extent to which BPD is identifying and appropriately addressing problematic performance. As with arrests, this factor is neutral. Each report is reviewed by a supervisor. This assessment, however, did not examine how often a supervisor corrected an inaccurate report and what steps he or she took to address the cause of the error with the primary officer. It is clear, however, that the supervisory review did not identify and correct the errors in the sampled reports that were apparent on their face.[22] As with arrests, other than the RWOC audit, discussed below, the Monitoring Team is not aware of any further audit of arrest reporting that could identify and rectify problems.

The fourth factor is BPD's progress over time. This factor is also neutral. While there was some improvement between 2019 and 2021, it was not significant. The percentage of reports with each of the errors above remained at a rate of approximately 90%.

Because BPD's overall rate of compliance is between 85% - 95% compliant, and the other factors point against compliance, the **Monitoring Team finds BPD on track with the requirement in paragraph 60, requiring that its arrests be supported by probable cause.**

## C.     RWOC Audits

The Monitoring Team has been reviewing on an ongoing basis each BPD quarterly report of its audits of RWOC arrests. Through those reviews, the Monitoring Team has concluded that BPD has been (1) identifying arrest data on arrests that resulted in (a) a release without charge, (b) a release based on identity issue, (c) a decline to charge, and (d) a finding that the arrest lacked probable cause (Consent Decree Paragraph 75); (2) BPD has reviewed those arrests with a disposition of "lack of probable cause" or "released without charge" or "declined to charge" where the basis of the disposition was a lack of probable cause (Consent Decree Paragraph 76); (3) BPD has been taking appropriate action with respect to arrests that lack probable cause or otherwise violate BPD policy or law (Consent Decree Paragraph 78); and (4) BPD has maintained a

---

[22] Again, some of the errors identified by the Monitoring Team reviewers were only found after a review of body-worn camera footage. Presumably those errors could not be caught in a supervisory review before the end of the shift, which does not include review of body-worn camera recordings. Many errors that the Monitoring Team reviewers identified, however, were apparent from the face of the report.

searchable electronic record of all arrests that fit the categories listed in Paragraph 75 (Consent Decree Paragraph 79).  Further, BPD's quarterly reports identify and describe the specific arrests that BPD found to lack probable cause or otherwise violate BPD policy or law; identify and describe arrest reports that do not contain facts sufficient to establish probable cause (even where probable cause existed); explain the remedial action recommended for deficient performance; and describe the remedial action taken to address deficiencies identified in prior reports.  Because BPD's review of and reporting on RWOC arrests found to lack probable cause is robust, the Monitoring Team concludes that BPD is in initial compliance with the corresponding requirements of Paragraphs 75-79.

What remains is whether BPD is properly auditing all RWOC arrests – and, specifically, whether BPD's auditors are correct when they conclude that an RWOC arrest is supported by probable cause.  Here, the Monitoring Team has assessed BPD's audit of a sample of 21 RWOC arrests that BPD auditors reviewed and found to be supported by probable cause.

The Monitoring Team found that two of those twenty-one arrests were not supported by probable cause and that the remainder were.  Accordingly, in 10% of the cases reviewed, the Monitoring Team reviewer disagreed with the conclusions of the auditors in BPD's Performance Standard Section.

In the first of those two cases, the officers observed two individuals behind a building.  One of the individuals was holding money.  The officer suspected that the individual was about to hand the money to the other individual.  The officer further believed that the money exchanged was part of a hand-to-hand drug transaction.  However, the officer saw no item that he suspected to be narcotics.  Without seeing anything suspected to be narcotics, the officer did not have probable cause to arrest.

In the second case, an officer was conducting surveillance of a parking lot in an area about which BPD had received complaints about drug activity.  He saw one individual drive into the parking lot and another individual walk over and get into the car.  Looking through the car's windows, the officer saw the two individuals appear to exchange something.  The officer pulled the car over as it drove away, entered the car, and found a bag with suspected cocaine in it.  Without seeing more during the exchange between the two individuals in the parking lot, the officer did not have probable cause to search the car.

Using the Monitoring Team's working standard, BPD's overall rate of compliance with Paragraphs 75-79 in the reviewed sample stands at 90%.  Because this falls within the 85% and 95% range, BPD could be – but are not presumptively – in compliance.  The Monitoring Team thus again turns to consider the other factors.

Consideration of the severity or significance of deviations from Consent Decree requirements weighs in favor of initial compliance. DOJ's main concern with RWOC arrests was the total number of such arrests that occurred during the period of its review. As discussed above, the number of RWOC arrest totals has fallen dramatically. Moreover, as discussed above, the two cases in which the Monitoring Team believed probable cause was lacking were close calls.

The third and fourth factors are the extent to which BPD is identifying and appropriately addressing problematic performance and BPD's progress over time. Because only one period was reviewed, the Monitoring Team cannot assess this factor as to its reviewed sample. Accordingly, these factors weigh neither for nor against compliance. BPD, however, should examine the two cases where the Monitoring Team reviewers disagreed with their audit findings .

After duly weighing the relevant factors, **the Monitoring Team finds BPD in initial compliance with the requirement in paragraphs 75-79.**

### D.    OPR/CRB Complaints:  Outcome Assessment

The Consent Decree requires the Monitoring Team to assess the frequency of civilian complaints to OPR (now PIB) and CRB alleging unlawful arrests and the disposition of such complaints. Tables 18 and 19 reflect the frequency of complaints classified as False Arrest and False Arrest/Imprisonment.

**Table 17.    Number of Arrest-Related PIB and CRB Complaints**

|  | False Arrest | False Arrest/Imprisonment | CRB – from Baltimore City |
|---|---|---|---|
| 2019 | 162 (79.8%) | 41 (20.2%) | 13 |
| 2020 | 98 (83.1%) | 20 (16.9%) | 11 |
| 2021 | 78 (70.3%) | 33(29.7%) | 15 |

**Table 18.    Disposition of the Arrest-Related Allegations**

|  | Sustained | Not Sustained | Exonerated | Unfounded | Missing | Total |
|---|---|---|---|---|---|---|
| 2019 | 14 (6.9%) | 61 (30.0%) | 25 (12.3%) | 99 (48.8%) | 4 (2.0%) | 203 |
| 2020 | 6 (5.1%) | 34 (28.8%) | 11 (9.3%) | 67 (56.8%) | 0 | 118 |
| 2021 | 7 (6.3%) | 34 (30.6%) | 12 (10.8%) | 58 (52.3%) | 0 | 111 |

As reflected in this data, the number of complaints dropped from 2019 to 2020, and then remained at about the same level in 2021.  The number of sustained complains also dropped from 2019 to 2020 and then remaining steady in 2021 (each year, 5-7% of all complaints were sustained).

This assessment does not review the quality of the PIB investigation of those false arrest allegations.  That review will occur as part of the Monitoring Team's assessment of PIB generally.  That review will determine whether the low level of sustained false arrest allegations is due to BPD officers' compliance with policy or, alternatively, insufficiently rigorous PIB investigations and findings.

## VI.     COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| 60 | BPD will ensure that officers issue a Citation or make a custodial Arrest only where they have probable cause to believe a person has committed, is committing, or is about to commit a criminal infraction or citable offense. | **4d** <br><br> **(Implementation – Initial Compliance)** |
| 65 | BPD will require that officers complete all Arrest reports properly documenting the probable cause for the Arrest by the end of the officers' shifts. | **4c** <br><br> **(Implementation – On Track)** |
| 75-79 | 75. BPD will identify all Arrests for which the District Court Commissioner provides data showing one of the following actions:<br><br>a. Released without charge;<br>b. Released based on identity issue;<br>c. Declined to charge; and<br>d. Lack of probable cause finding.<br><br>76. BPD will review the probable cause determinations for:<br>(1) all Arrests that resulted in a disposition of "lack of probable cause"; and<br>(2) all Arrests that resulted in a disposition of "released without charge" or "declined to charge" where the basis of the disposition was a lack of probable cause.  This review will not be performed by a supervisor who previously reviewed the probable cause determination.<br><br>77. Following this review, BPD will take any appropriate action, which may include recommending training or other non-disciplinary corrective action for the involved officer(s) and/or referring incident(s) for administrative or criminal investigation.<br><br>78. Where BPD's review finds that an Arrest was not supported by probable cause, BPD will document in writing what actions were taken in response to the review or the reasons that no actions were taken.<br><br>79. BPD will maintain a searchable electronic record of all Arrests that meet any of the criteria listed in Paragraph 75(a)-(d).  BPD will, on at least a quarterly basis, review this data to assess patterns in Arrest practices by | **4d** <br><br> **(Implementation – Initial Compliance)** |

| | officer, shift, unit, or district.  This review will be designed to help evaluate BPD's enforcement priorities and identify patterns of officer, shift or district behavior that may warrant corrective or disciplinary action. | |
|---|---|---|