

BALTIMORE POLICE DEPARTMENT
CONSENT DECREE MONITORING TEAM

COMPLIANCE REASSESSMENT OF OFFICER ASSISTANCE AND SUPPORT

December 2023



# Table of Contents

I.      *EXECUTIVE SUMMARY* .................................................................................................... *1*

II.     *BACKGROUND* ............................................................................................................... *2*

    A.     Evaluating Compliance ............................................................................................ 4

    B.     The Role and Purpose of this Compliance Assessment ......................................... 5

III.    *COMPLIANCE REASSESSMENT METHODS AND FINDINGS* ....................................... *9*

    A.     Employee Assistance Program (Paragraphs 436 and 437) ................................. 9

           Findings ................................................................................................................... 9

    B.     Peer Support Services (Paragraph 438) ............................................................. 15

           Findings ................................................................................................................. 16

    C.     Voluntary Mental Health Evaluations (Paragraph 439) ................................... 17

           Findings ................................................................................................................. 18

    D.     Officer Wellbeing during Public Demonstrations or Civil Unrest (Paragraph 440) ......... 21

           Findings ................................................................................................................. 22

    E.     Annual Assessment of Officer Assistance and Support Programs (Paragraph 441) ......... 26

           Findings ................................................................................................................. 27

IV.    *SUMMARY OF COMPLIANCE DETERMINATIONS* ...................................................... *27*

## I.   EXECUTIVE SUMMARY

Paragraphs 436 through 441 of the Consent Decree address the Baltimore Police Department's ("BPD") programs and resources related to officer assistance and support. These include:

- The operation of an Employee Assistance Program ("EAP") for sworn officers;

- The provision of counseling and mental health services;

- The availability of peer support services; and

- The development of health and well-being protocols after a traumatic incident or during significant events such as public demonstrations or civil unrest.

The Monitoring Team conducted an initial, comprehensive compliance review regarding officer assistance and support in December 2022. Although the Team found BPD's progress to have been "noteworthy, important, and commendable,"[1] and that BPD was "on track" toward compliance with all requirements relating to officer assistance and support, the 2022 assessment identified several, discrete Consent Decree requirements for which BPD needed to demonstrate enhanced progress to reach initial compliance.

The Monitoring Team has now conducted a second, follow-up assessment of BPD's compliance with these requirements. This review has determined that BPD indeed has continued to make progress. Using the compliance scoring framework the Monitoring Team has adopted, **BPD's compliance score for the material requirements of the Consent Decree section relating to officer assistance and support (¶¶ 436–41) is "Full and Effective Compliance" because BPD has reached "Initial Compliance" with every paragraph in the area,** except for Paragraph 438(b), involving peer intervention training, which will be assessed instead with the requirements of the Misconduct Investigations and Discipline section of the Consent Decree.

To reassess compliance with the Consent Decree's officer assistance and support requirements, the Monitoring Team repeated many of the same assessment procedures used in the initial, December 2022 assessment. This included reviewing activities conducted by the Officer Safety & Wellness ("OSW") section and Peer Support Team and reviewing documentation of resources and procedures.

The Monitoring Team's review found improvement in several areas, including:

---

[1] Dkt. 576-1 at 1.

- BPD and its OSW personnel communicating the availability of programs through posters hung in each district;

- BPD developing clear directives for supervisors during civil unrest and public demonstrations; and

- BPD adapting internal reports to ensure accurate documentation of peer support and outreach activities.

The Monitoring Team commends BPD and the City of Baltimore for its sustained efforts and focus on officer assistance and support. Indeed, as in the Monitoring Team's initial assessment, the current review found ample evidence of BPD and OSW undertaking initiatives and creating programs for officers well *beyond* what the Decree strictly requires.

Even as BPD's improvements have now brought them into compliance, and thus an overall score of "**5a – Full and Effective Compliance**" with respect to Paragraphs 436 through 441, it is critical that BPD continue to implement the changes documented in the two compliance assessments, and continually reassess and adapt as needed. In particular, BPD must focus on improving its practices with respect to (1) systematically documenting the services offered to its personnel following traumatic events, and the timing of this outreach, relative to the members' return to full duty, and (2) documenting and labeling of protest and demonstration-related activity, as relevant. When public demonstrations and civil unrest events do occur, BPD must ensure that personnel adhere to the directives outlined for supervisors.

Paragraph 506 of the Decree provides that "'Full and Effective Compliance' must be maintained according to the time periods set forth in Paragraph 504." Paragraph 504 divides the material areas of the Decree into two groups: "Group A", which requires that compliance be sustained for one year, and "Group B", which requires two years. An order of the Court on May 6, 2021 corrected the original omission of the area of Officer Assistance and Support from either of these compliance schedules – placing it in "Group A" and requiring sustainment for a period of one year.[2] Consequently, should the Court agree that the available evidence supports a finding of Full and Effective Compliance with Paragraphs 436 through 441, BPD will then be required to sustain that compliance for a one-year period from the date of the Court's order.

## II.    BACKGROUND

In the initial compliance review, the Monitoring Team found that "BPD, and its Officer Safety and Wellness ("OSW") section, have engaged in a number of new and useful initiatives relating to officer assistance, safety, and wellness", and also uncovered "ample evidence of BPD and OSW undertaking initiatives and creating programs for officers well beyond what the Decree strictly

---

[2] Dkt. 410.

requires."[3]   However, the Monitoring Team also concluded that "the Department will need to demonstrate some additional progress and more sustained improvement in some areas to demonstrate initial compliance with the specific requirements of the Decree." [4]

Specifically, in its prior assessment, the Monitoring Team found that:

- BPD had been providing, and BPD members were increasingly utilizing, an Employee Assistance Program that was providing officers and members of their households with counseling and assistance services.

- A large portion of BPD officers appeared to know that the EAP was available and had at least some knowledge about the types of help that they could access through the program.

- Although BPD and OSW engaged in a variety of robust efforts to raise awareness of EAP and officer wellness resources, EAP information was not as available in BPD's districts as it should be.

- BPD created and maintained a Decree-required list of mental and physical health service providers available for the EAP – and was appropriately making this information available to BPD officers.

- BPD's Peer Support Team was meaningfully responding to critical and traumatic incidents to provide the emotional, social, and practical support that the Decree requires.   This brought BPD into initial compliance with requirements related to peer support.

- BPD made substantial and commendable strides toward implementing the type of peer intervention program that the Decree requires, but performance in the field was still needed to demonstrate sustained, effective intervention when appropriate.

- BPD appeared to be offering mental health evaluations to officers following a traumatic incident.

- BPD made progress toward implementing wellness protocols during periods of public demonstrations and civil unrest.

- BPD was appropriately and adequately assessing the quality of its safety and wellness programs on an annual basis.

---

[3] Compliance Review Regarding Officer Assistance & Support at 1

[4] Compliance Review Regarding Officer Assistance & Support at 1

The Monitoring Team identified several actions for BPD to take to remedy outstanding compliance issues raised in the initial assessment, including:

1. Address lack of visible information on EAP resources in districts (¶ 436);

2. Enhanced record-keeping protocols regarding the offering of mental health evaluation in traumatic incidents (¶ 439); and

3. Thoughtful engagement with the potential difference in what OSW is currently considering traumatic with what officers find traumatic (¶ 439).

The follow-up compliance review, presented here, evaluated BPD's performance across time, incidents, and officers to determine if the requirements of Paragraphs 436 through 441 are being implemented in practice, and if deficiencies identified in the initial assessment have been addressed. This review included a reassessment of paragraphs that did not earn a score of "4d (Initial Compliance)," and a maintenance check of those that were determined to be in initial compliance.

### A.     Evaluating Compliance

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented. The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of characterizing BPD's current status across Consent Decree implementation. Thus, as in both the initial compliance assessment and previous Semiannual Reports, the Officer Assistance and Support section and all other sections of the Consent Decree are scored according to the following framework:

**0 – Not Assessed**: The Monitoring Team has yet to assess if the City/BPD has made progress or complied with the requirement.

**1 – Not Started**: The City/BPD has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/BPD is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase**: The City/BPD is addressing the training provisions for the requirement, based on approved policy.

4

**4 – Implementation Phase:** The City/BPD is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

> **4a – Implementation - Not Assessed:** The City/BPD has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/BPD's progress in implementation.
>
> **4b – Implementation - Off Track:** The City/BPD is not making satisfactory progress toward compliance with the requirement.
>
> **4c – Implementation - On Track:** The City/BPD is making satisfactory progress toward compliance with the requirement.
>
> **4d – Implementation - Initial Compliance:** The City/BPD has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in Paragraph 504 of the Consent Decree.

**5a – Full and Effective Compliance:** The City/BPD has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree.  This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance**: The City/BPD has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

During the initial formal compliance evaluation, the Team assigned individual scores for each paragraph of the Officer Assistance and Support section of the Consent Decree (see Section IV for each initial compliance score by paragraph).  The Monitoring Team has also conducted continuous, informal evaluations on Consent Decree requirement progress, and provided scores based on these ongoing activities as recently as in the Seventh Semi-Annual Report.

### B.     The Role and Purpose of this Compliance Assessment

The Monitoring Team has previously described the two major types of assessment that the Consent Decree requires: (1) compliance reviews, and (2) outcome assessments.  Compliance reviews, which almost always have qualitative elements and may also have quantitative elements, are evaluations of BPD's performance across time, incidents, cases, events, and officers that are

5

conducted to determine if BPD is adhering in practice to the specific requirements of the Consent Decree.

In this way, compliance reviews consider whether BPD is meaningfully doing what the Decree requires across its many requirements. Within the classification scheme that the Monitoring Team has previously adopted, the purpose of this and other compliance reviews is to determine whether BPD can be considered to be in initial compliance across a major substantive area of the Consent Decree.

Outcome assessments are largely quantitative assessments that are "designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact – whether, independent and apart from BPD's progress toward compliance with Consent Decree requirements, policing is changing in the real world."[5] Because the Consent Decree does not outline any outcome assessments pertaining specifically to officer assistance and support, the present report focuses on a systematic compliance review of BPD's performance in this area.

As Paragraph 506 of the Consent Decree describes:

> To achieve "Full and Effective Compliance," the City and BPD must demonstrate that they have (a) incorporated all Material Requirements of this Agreement into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the Agreement's Outcome Assessments.

A core issue in determining whether BPD has reached "initial" compliance with any material requirement of the Consent Decree is determining whether that requirement "is being carried out in practice" by BPD. To that end, the Monitoring Team considers the following:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires adhering to Decree requirements across a material span of time, number of incidents, and number of officers. In this way, isolated compliance does not establish "initial compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue

---

[5] Consent Decree, *United States of America v. Police Department of Baltimore City, et al.* Case No. 1:17-CV-00099-JKB (D. Md. Jan. 12, 2017), https://www.justice.gov/opa/file/925056/download

is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that BPD must remedy deficiencies in departmental and officer performance.  Consequently, the Monitoring Team in its compliance reviews considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.**  Consistent with the Decree, the Monitoring Team's compliance reviews will consider whether, when BPD has deviated from policy, law, or Decree requirements, BPD has identified the deviation and, if so, if it has appropriately addressed the issue.  With respect to Consent Decree implementation and meaningful change, BPD is in a different place if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time.  Steady improvement over time suggests positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or fail to adequately address competing considerations.  Even as the test articulated above requires different considerations to be weighed together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."

In applying this multi-factor test for compliance, the first factor – the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers – is the initial, threshold inquiry.  If BPD and/or its officers' performance is not what it should be across a sufficient number or portion relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance.  For example, if BPD meets some Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put BPD into compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to BPD and to the community about the benchmarks that it expects and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as possibly, though certainly not conclusively or even presumptively, consistent with initial compliance. In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time). Where the Team determines that BPD has adhered to expectations in 95% or more of relevant circumstances, initial compliance will be found unless one of the other factors – severity of deviations, BPD identification of noncompliance, and progress over the time – starkly point in the other direction.

On the other hand, where BPD has adhered to expectations less than 85% of the time, initial compliance will not be certified unless one of the other factors points definitively in a positive direction. For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that BPD identified and took appropriate corrective action in instances where requirements were not followed, and BPD had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances. Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Finally, it is possible that, the Monitoring Team might assign, pursuant to the weighing of factors outlined above, a score for an individual decree requirement that is lower than the score given in a prior report. For instance, the score for a particular requirement might move from "4c" (implementation—on track) to "4b" (implementation—off track).

Ultimately, to establish initial compliance with the Consent Decree's provisions and to sustain "full and effective" compliance pursuant to Paragraph 506, BPD must do more than show that it has technically adopted the pertinent policies, procedures, and protocols. Instead, it must demonstrate through officers' actions on the street that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

The following report outlines the methodology and results of the Monitoring Team's compliance reassessment of the Officer Assistance and Support section of the Consent Decree. Consistent with the findings from DOJ's initial investigation, and the pertinent paragraphs of the Consent

Decree, and the prior compliance assessment, this assessment will cover compliance with the central requirements in this area (¶¶ 436-441).

## III.   COMPLIANCE REASSESSMENT METHODS AND FINDINGS

### A.   Employee Assistance Program (Paragraphs 436 and 437)

Paragraph 436 articulates the need for BPD to provide an Employee Assistance Program ("EAP"), and what it must include:

> *BPD will provide an Employee Assistance Program ("EAP") to all sworn officers, which allows access to no- or low-cost counseling and mental wellness services including: confidential counseling services; crisis counseling; stress management counseling; and mental health evaluations. BPD will provide information about this program in all BPD facilities.*

Paragraph 437 requires BPD to ensure officers have access to information about the EAP service providers:

> *BPD will compile, periodically review and revise as necessary, and maintain a list of mental and physical health service providers available as part of the EAP to all officers and employees. BPD will ensure that officers have easy access to this information through email, the BPD website, or other means.*

To assess compliance with Paragraphs 436 and 437, the Monitoring Team: (i) inventoried program elements of the EAP currently made available to officers; (ii) reviewed the frequency of program utilization; (iii) conducted unannounced audits of all BPD district stations during the assessment to check whether the new OSW poster, previously approved by the Parties, was hanging in a prominent location in each district; and (iv) reviewed BPD's corresponding documentation of EAP providers for completeness, availability, and whether it is up to date.

### *Findings*

Consistent with the EAP-related requirements of the Consent Decree, BPD Policy 1703 states:

> *All services offered by the EAP are maintained in an updated list…and disseminated via email, in print, and accessible on the BPD website and mobile app. The EAP has a network of approximately 60,000 providers, including 150 in the Baltimore area. The EAP maintains the listing of providers that is available to BPD to ensure the availability of appointments, licenses, and insurance coverage*

*of providers and will facilitate all connections to services. The EAP also has a resource library and additional information online.*[6]

The Appendix to Policy 1703 (Figure 1) contains the contact numbers for several EAP service providers, including Behavioral Health System Baltimore, Inc. ("BHS"), a non-profit organization contracted by Baltimore City to manage the City's behavioral health system (i.e., "the system of care that addresses emotional health and well-being and provides services for individuals with substance use and mental health disorders").[7] BHS is the principal mental health services provider to BPD, and can provide BPD members and their families with voluntary, confidential mental health evaluations and consults.

According to BPD, this list was approved in 2020, but does not reflect the most current version. BPD provided the Monitoring Team with a more comprehensive list of EAP service providers that is available to BPD officers through BPD intranet (Figure 2). BPD also shared with the Monitoring Team a similar list that provides information about fitness resources, and gym discount programs. These lists were revised and reuploaded, indicating that the information is both available to officers, and being "periodically review[ed] and revise[ed] as necessary" (¶ 437).

---

[6] https://www.baltimorepolice.org/transparency/bpd-policies/1703-employee-assistance-program, accessed August 23, 2023

[7] https://www.bhsbaltimore.org/about-us/vision-mission-values/,accessed December 20, 2023

**Figure 1: Policy 1703 Appendix A – List of EAP Service Providers**

| Policy 1703 | EMPLOYEE ASSISTANCE PROGRAM (EAP) | Page 5 of 5 |

**APPENDIX A**

**List of EAP Health Service Providers**

OFFICER SAFETY AND WELLNESS SECTION
CLINICIAN AND MENTAL HEALTH PROVIDERS LIST

| PROVIDER NAME | CONTACT NUMBER |
| --- | --- |
| BHS | 800-327-2251 |
| MARWORTH | 800-442-7722 |
| TRANQUILITY WOODS | 410-360-6600 |
| HOUSE OF RUTH | 410-889-7884 |
| MY SISTERS PLACE/CATHOLIC CHARITIES | 844-443-5732 |
| SHEPARD PRATT | 410-983-3000 |
| BALTIMORE CRISIS RESPONSE INC. (BCRI) | 410-433-5175 |
| LA FITNESS | 410-242-2062 |
| YMCA | 410-728-1600 |
| BURN ALONG | 443-873-0950 |
| MASSAGE ENVY | 410-234-3689 |
| ABOUT FACES | 410-675-0099 |
| MEND ACUPUNCTURE | 410-235-1776 |
| CHARM CITY YOGA/YOGA WORKS | 800-336-9642 |
| BLUELINE YOGA | 800-BLUYOGA |

11

**Figure 2: EAP Resource List Available via BPD Intranet**

| Baltimore Police Department Resource and EAP List | | |
|---|---|---|
| **Organization** | **Service Offered** | **Contact Information** |
| Officer Safety and Wellness | Identifying resources and assisting members with contacting resources that may be beneficial to them | 410-396-2451 or OSW@baltimorepolice.org |
| Peer Support Team | Connect members with peers that may be able to assist by providing support and guidance in certain circumstances | 410-396-2451 or OSW@baltimorepolice.org |
| BPD Human Resources Section | Assist members with HR or Personnel issues | 410-396-2322 or Human.Resources@baltimorepolice.org |
| FOP #3 | Representative of general membership issues to include grievance and contract negotiations | 410-243-9141 or info@fop3.org |
| Vanguard Justice Society | Representative of minorities within the law enforcement profession | 410-542-5777 or vjsinc.org |
| Signal 13 Foundation | Offers emergency financial support and educational scholarships to members | 443-442-7576 or Signal13foundation.org |
| InvestED | Financial education and planning | 410-469-9532 or mdinvested.com |
| MECU | Credit union for municipal employees of Baltimore | 410-752-8313 or MECU.com |
| Nationwide | Deferred compensation and retirement planning | 443-907-8858 or 443-984-2389 NRSFORU@nationwide.com |
| Washington National | Supplemental insurance provider | 800-525-7662 or WashingtonNational.com |
| BHS | Employee assistance program to include counseling services for members and their families | 800-327-2251 or portal.BHSonline.com |
| Burn-A-Long | Online physical training services offered to employees at no charge | 855-494-6377 or BurnALong.com |
| FX Physical Therapy | Preventative physical therapy sessions | 410-646-8272 or FXPhysicalTherapy.com |
| Nourish | Nutritional guidance service | 410-370-04115 or NourishFamily.com |
| Tranquility | Sound therapy offered at a discounted rate for employees | 410-852-1100 |
| Yoga Works | Yoga classes at discounted rates for employees | 800-336-9642 or YogaWorks.com |
| AT&T FirstNet | Cellular phone services through the FirstNet program designed for law enforcement use offering protected service and special pricing | 800-574-7000 or FirstNet.com |
| MEND Acupuncture | Acupuncture services at special pricing | 410-235-1776 or MendAcupuncture.com |
| FX Well Dietician | Nutritional guidance service | 240-285-6174 or FXStudios.com |
| Harbor of Grace | Substance abuse and PTSD counseling services | 844-428-8333 or HarborofGraceRecovery.com |
| Tranquility Woods | Substance abuse counseling services | 410-517-7715 or 410-360-6600 Tranquilitywoods.com |
| Marworth | Substance abuse counseling services | 800-442-7722 or Marworth.com |
| Jimmy's Famous Seafood | Meal prep services offering member discounts and specials | 443-966-3257 or JimmysFamousSeafood.com |
| Xquisite Catering | Meal prep services offering member discounts and specials | 410-274-2601 or Xquisitecateringllc.com |
| Operation Hope | Financial education and planning | 410-531-8480 |
| M&T Bank | Financial education and planning | 410-545-2321 |
| HOLEA | Hispanic Officers Law Enforcement Association | 443-986-8627 or holea.baltimore@gmail.com |

Page | 1

The EAP resource list in Figure 2 is also available to officers when they scan a QR code that appears on a new Officer Safety and Wellness poster (Figure 3) that was approved by the Officer Assistance and Support working group, which includes representatives from the Parties and Monitoring Team.

Monitoring Team members visited eight of the nine BPD districts in June 2023 to ensure the poster was hanging in a prominent location.  At that time the poster was visible in seven of the eight districts visited, in locations such as a roll call room or on a bulletin board.  Neither the Monitor nor their BPD escort could locate the poster at the Central District during the June spot check (scheduling conflicts prevented a spot check of the Northern District during these visits).

**Figure 3: EAP Poster**



In late September 2023, a Monitoring Team member visited the Northern District, and re-visited the Central District, at which time the poster was prominently hung in both districts' roll call rooms.  The Northern District also had a bulletin board that featured additional information related to officer resources, health, and wellness (Figure 4).

**Figure 4: Northern District Bulletin Board**



Based on data provided by BPD, the QR codes on the OSW posters were scanned a total of 72 times between January 2023 and July 2023, by 55 unique users (Figure 5).  This indicates that at least some BPD personnel have successfully interacted with the poster to access information about officer safety and wellness resources.

**Figure 5: 2023 Officer Safety & Wellness Poster Interactions**



BPD also provided the Monitoring Team with a copy of the Fall 2023 edition of its "Officer Safety & Wellness Quarterly Newsletter," which provides timely news, event recaps and highlights, and information related to OSW services, including peer support.

To assess program utilization trends, BHS prepared a "Program Insights and Utilization Report" for BPD that summarizes BPD participation in programming between January 1 and December 31, 2022.[8]  In total, BHS found that of 3,340 participants (i.e., eligible BPD personnel) per quarter, there was a utilization rate that ranged from a low of 1.98% in the fourth quarter, to a high of 4.82% in the third quarter, when the benefits fair occurred.  Overall, BHS estimated a 13.0% utilization rate (434 of 3,340 participants) over the course of the 2022 calendar year.  BPD noted that this was a decrease in utilization from the prior year, when the program was utilized by 1,036 participants (31.1%) and speculated that the reduced impact of the COVID-19 pandemic in 2022 relative to 2021 could explain the difference.  As BPD explained in the 2022 OSW Annual Report:

> *Though this is lower than the rate for 2021 (31.1%), it does not represent a major deviation historically. For example, the utilization rate during the height of the COVID-19 pandemic, a period of significant stress for members, stood at 15.5 percent (518 participants).[9]*

---

[8] BHS prepared the annual usage report for BPD, and BPD has shared the report publicly here: https://app.box.com/file/1146504291145?s=ywmm8ksati70uh0f7mxvt6sb481c4o7m

[9] https://www.baltimorepolice.org/sites/default/files/2023-07/2022%20OSW%20Annual%20Report.pdf at 8

**Figure 6: Total BHS Program Utilization by BPD Participants, 2021 and 2022**



BPD has established and maintained a robust EAP program that provides officers with the services required by Paragraph 436, and the dissemination and update requirements of Paragraph 437.

While the initial compliance assessment found "inadequacy of visible information on EAP resources in districts prevents a finding of initial compliance with Paragraph 436", the production, availability, and functionality of the new OWS poster, QR code, and link to service provider information, has moved BPD into initial compliance with Paragraph 436. Additionally, with the availability of these posters in the districts and demonstrated updates to provider lists over time to keep information current, the Monitoring Team again finds **BPD to be in initial compliance with Paragraph 437. (Implementation – Initial Compliance (4(d)).**

### B.  Peer Support Services (Paragraph 438)

Paragraph 438 requires BPD to develop peer support services, including a peer support program and peer intervention program.

> *The BPD will develop peer support services including:*
>
> a.  *A peer support program through which officers provide emotional, social, and practical support to other officers; and*
>
> b.  *A peer intervention program through which BPD will provide officers with training, based on theories of active bystandership and passive bystandership, (1) to safely intervene before an officer engages in unethical behavior, to prevent it from occurring; (2) to accept an intervention from another officer when it occurs; and (3) provide emotional, social, and practical support to officers who intervene to prevent or end unethical behavior.*

The 2022 assessment found BPD to be in "initial compliance (4(d))" with Paragraph 438(a) and "on track (4(c))" with Paragraph 438(b), noting that while BPD had made progress in implementing a peer intervention program, more evidence was needed to demonstrate "that each material requirement is being carried out in practice" (¶506).

While BPD's Ethical Policing is Courageous ("EPIC") peer intervention training and intervention program contains elements of officer wellness, BPD's Officer Support and Wellness section is not responsible for the program's implementation or for holding officers accountable under it.  As such, Paragraph 438(b) will be reviewed in the Monitoring Team's assessment of BPD compliance with the misconduct investigations and discipline provisions of the Consent Decree, rather than this reassessment.  The Monitoring Team recognizes that peer intervention and misconduct investigations are two distinct processes, and not a perfect fit.  That said, an assessment of compliance, which will require a review of PIB investigations and potentially a broader review of body worn camera video, other BPD records, and possibly other evidence, is more appropriate as part of the assessment of Misconduct and Officer Discipline.  Additionally, as the peer intervention requirements do not implicate the other requirements of the Officer Assistance and Support section of the decree, any findings of non-compliance with peer intervention would not put that section's compliance determinations at risk.  For both these reasons, shifting the area in which this paragraph is assessed is appropriate.  Should the parties agree with this adjustment, the Monitoring Team invites them to seek Court approval to formally transfer this paragraph from the Officer Assistance and Support section of the Consent Decree to the Misconduct section of the Consent Decree.

To assess compliance with Paragraph 438(a), the Monitoring Team reviewed data on the utilization of the peer support program, provided by BPD.  As noted above, because this section of the paragraph was previously found to be in initial compliance, the follow up assessment consisted of a "maintenance check" rather than a full reassessment.

### Findings

BPD provided the Monitoring Team with a log of all "Peer Support and Guidance" contacts that occurred between January 2023 through the May 2023.  BPD also provided a month-by-month breakdown of encounters in the 2022 Annual Report, making it possible to compare the frequency and type of encounters during first five months of the past two years (Figure 7).

**Figure 7: Peer Support and Guidance Contacts, January – May of 2022 & 2023**

| Situation | 2022 | 2023 |
|---|---|---|
| Trauma Related | 29 (22.5%) | 46 (26.9%) |
| Police Officer Involved Shooting Incident | 6 (4.7%) | 4 (2.3%) |
| Substance Abuse | 2 (1.6%) | 2 (1.2%) |

| Situation | 2022 | 2023 |
|---|---|---|
| Family Concerns and Domestic Problems | 28 (21.7%) | 19 (11.1%) |
| Work Issues | 54 (41.9%) | 93 (54.4%) |
| General Referral | 10 (7.8%) | 6 (3.5%) |
| COVID-19 | 0 (0.0%) | 1 (0.6%) |

Data from the 2022 Annual Report indicated that in 2022, the Officer Safety and Wellness section activity included: 41 peer deployments, 4 police officer involved shooting ("POIS") deployments, and the delivery of 195 care packages.

The Monitoring Team concludes that BPD's Peer Support Team has continued to provide the type of "emotional, social, and practical support" that the Decree envisions.  **Consequently, BPD remains in initial compliance with Paragraph 438(a). (Implementation – Initial Compliance (4(d)).**  As stated above, compliance with Paragraph 438(b) will be reviewed in the Monitoring Team's assessment of misconduct investigations and discipline.

### C.    Voluntary Mental Health Evaluations (Paragraph 439)

Paragraph 439 outlines the services that must be offered to all officers following a traumatic incident:

> *BPD will offer to all officers a voluntary mental health evaluation before returning an officer to full duty following a traumatic incident (e.g., serious injury, officer involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death or serious injury).  Officers may voluntarily seek further mental health services following this meeting.*

According to BPD Policy 1731 "Critical Incident Stress Management Protocol," the following are common incidents that may pose increased potential for trauma:

- Police Officer Involved Shootings,

- An actual or perceived threat to one's life or of grievous physical harm,

- Suicide or suicide attempt by a colleague,

- Serious injury inflicted on, or death of a colleague,

- Serious injury or death of a non-member, especially a child, under particularly tragic or grotesque circumstances,

- Cruelty/abuse to a child,

- Line of duty contact with friend/relative during a tragic/traumatic event,

- Death or injury of a person resulting from duty operations,

- Perceived 'failure' during a tragic/traumatic event,

- Large scale or prolonged disaster,

- Events with high media exposure,

- Any tragic/traumatic event that may have private/personal emotional significance to a member, particularly when the event is characterized by: relative surprise; intense negative emotion; and perceived helplessness,

- Diagnosed or recovering from a terminal illness,

- Caring for a loved-one who has been diagnosed or recovering from a terminal illness, and/or

- Experiencing a familial death or loss (including children, spouse, etc.).[10]

To assess compliance with the requirement that officers be offered a voluntary mental health evaluation following a traumatic incident, the Monitoring Team reviewed all after-action reports ("AARs") from critical incidents that occurred in the time since the initial compliance assessment report was filed, to determine whether these resources were consistently being offered.

### *Findings*

BPD provided the Monitoring Team a list of 13 incidents that yielded AARs in the time since the initial compliance assessment; some of the information pertinent to the Consent Decree in the AAR forms is summarized in Figure 8, below.

**Figure 8: Peer Support Activity Documented in 2023 After Action Reports**

| AAR | Ensured involved member had confidential conversation with mental health clinician | Offered to connect involved member(s) with additional resources | Follow-up scheduled with involved member(s) | Were dispatched immediately following the incident |
|---|---|---|---|---|
| 23-01 | No | Yes | Yes | Yes |
| 23-02 | No | Yes | No | Yes |
| 23-03 | No | Yes | No | Yes |
| 23-04 | No | Yes | Yes | Yes |
| 23-05 | No | Yes | No | Yes |
| 23-06 | No | Yes | No | No |
| 23-07 | *blank* | Yes | Yes | Yes |

---

[10] https://www.baltimorepolice.org/transparency/bpd-policies/1731-critical-incident-stress-management

| AAR | Ensured involved member had confidential conversation with mental health clinician | Offered to connect involved member(s) with additional resources | Follow-up scheduled with involved member(s) | Were dispatched immediately following the incident |
|---|---|---|---|---|
| 23-08 | No | Yes | No | No |
| 23-09 | No | No | No | Yes |
| 23-10 | No | Yes | No | Yes |
| 23-11 | No | Yes | Yes | Yes |
| 23-12 | Member Declined | Yes | Yes | Yes |
| 23-13 | No | Yes | Yes | No |

Generally, peer support members did not ensure that the involved member had a conversation with the mental health clinician (11 AARs indicated that they did not, 1 indicated that the member declined, and 1 was blank). However, in 12 of the 13 cases, the peer support member offered to connect the involved member(s) with the additional resources provided by BHS, whose array of services includes voluntary mental health evaluations. The one instance in which additional resources were not offered (23-09), was because BPD was supporting officers from an external agency that BHS does not serve.

Ten of the thirteen AAR forms indicated that the peer team was dispatched immediately after the incident, suggesting that the involved officer was made aware of BHS resources, such as the voluntary mental health evaluation, prior to returning to "full duty." The three events in which the AAR indicates that the peer team was not immediately dispatched were AAR numbers 23-06, 23-08, and 23-13. BPD provided the following explanations for each case:

- AAR 23-06: The peer team was dispatched because a particular shift had responded to numerous infant deaths over a several-month period; the team was not responding to a discrete, traumatic event.

- AAR 23-13: Although the available data field indicates that peer support did not respond immediately following the event, the involved member was still at the hospital for the implicated call, and out of service for other calls, when they met with peer support.

- AAR 23-08: Describes an event involving "a vehicle pursuit which resulted in the death of a citizen and multiple citizen injuries." BPD provided a peer support debrief to the involved shift two days after the incident. According to BPD, peer support was "requested to have someone respond to speak with the shift, which is why we responded two days later, and the shift was addressed as a whole and reminded of resources such as BHS. No one was placed on leave."

Overall, it appears that members are regularly and appropriately being advised by peer team members of BHS resources such as voluntary mental health evaluations immediately following a

19

traumatic event.  Documentation of the timing of outreach, particularly with regard to whether members involved in traumatic events are being contacted regarding voluntary mental health evaluations *"before returning to full duty,"* can be improved – and should be completed in a clear, consistent manner – to facilitate BPD's self-monitoring during the sustainment period.

According to the AAR forms, OSW peer team members scheduled follow-ups with involved members in only six of the 13 cases.  However, the notes in two of the other seven cases indicated that the peer support officer planned to follow up with the individual, for a total of eight cases.  Furthermore, Vernon Herron, Director of the Officer Safety & Wellness Section has told the Monitoring Team that he personally follows up with each involved officer named in the AAR, regardless of whether the form indicates that a follow-up has been scheduled or requested.

According to the Peer Support and Guidance Contact log, in the first 5 months of 2023, there were 46 instances of peer support and guidance following traumatic events and 4 following police involved shootings.

For 7 of the 13 critical incidents reported in the AARs, follow-ups with the officers involved were documented in the Peer Support and Guidance Contact log.  Follow up was not required or needed in the other six incidents, however, because BHS resources were already provided during the initial contact, or the incident involved a member death, in which case resources need only be provided if requested.  Notwithstanding that follow up was not required, in several of these six cases, follow up was scheduled but was not documented in the log.

BPD has noted that the AAR form has been revised with the goal of improving documentation and reducing instances of missing information.  Changes to the AAR include:

1. Converting checkboxes on the form to be clickable (rather than requiring manual entry);

2. Reconfiguring a field that documents contact time with members; and

3. Adding clarifying language in parentheses to the following statement: "A mental health clinician responded (In-person or Phone) to the incident."

BPD has also provided documentation of several instances in which personnel were able to discuss how trauma is defined within BPD.  As part of the initial assessment, the Monitoring Team fielded an anonymous survey of officers, which included questions about experiences with traumatic events, and resources provided in the aftermath.  Based on responses to these survey questions, it appeared that there may have been a disconnect between what officers perceived to be traumatic events and those that were defined as such in policy, or are typically responded to by the OSW peer team.  As a result, the Monitoring Team issued guidance for BPD to demonstrate more critical engagement with its definition of "trauma" and how officers are educated on its various manifestations.

During the reassessment period, BPD has demonstrated that in addition to articulating what is considered a traumatic event in its written policy (Policy 1731), BPD also provides at least three trainings during which defining trauma is covered in slides and/or instructor guides: (1) "Understanding and Mitigating Stress" by BHS for BPD, delivered during initial officer academy training and in-service training, (2) "Trainees and Trauma", and (3) BPD's FTO Refresher Course.  As the anonymous officer survey was not fielded a second time during the reassessment period, we cannot compare responses across time periods to determine if a higher percentage of officers recalled being offered resources after a traumatic event.  However, based upon the available information it does seem that (1) there is likely a greater consensus on what is considered a traumatic event by BPD, and (2) the availability of resources following traumatic events is being directly communicated to affected officers, and broadly advertised across BPD.

As BPD has contacted personnel following traumatic events and ensured that they are aware of voluntary mental health evaluation services following these incidents, **BPD remains in initial compliance in this area. (Implementation – Initial Compliance (4(d)).**

### D.  Officer Wellbeing during Public Demonstrations or Civil Unrest (Paragraph 440)

Paragraph 440 states that BPD will develop well-being protocols to be activated during officer deployments in response to public demonstrations or civil unrest that include:

    a.  *Close monitoring and periodic affirmative checks of officers' well-being by supervisors;*

    b.  *Availability of mental health and medical professional(s) to provide health care to officers;*

    c.  *Inclusion of health and safety guidance during pre-deployment briefings;*

    d.  *Close monitoring of officer fatigue and indications of stressors;*

    e.  *During prolonged periods of demonstrations or unrest, the deployment of police counselors or psychologists to provide individual counseling to officers and their family members.*

To assess compliance with the requirements of this paragraph, the Monitoring Team intended to review a sample of the "protest planning forms" that are attached to incident action plans ("IAP") to determine what role Officer Safety and Wellness is playing during protests and unrest, and whether peer support members conducted checks.  However, BPD reported that during the assessment period no large protest activity occurred, and as such there were no IAPs to review.  As in some other areas of the Consent Decree, this section pertains to events that are relatively rare.  Because it is not possible to forecast when then next significant protest or civil unrest event will occur, other means of assessing compliance in this area must be used.

Accordingly, the present assessment reviewed revisions and enhancements to internal processes that demonstrate that they will be prepared the next time one of these low frequency events occurs. As such, the Monitoring Team assessed: (i) new processes and directives implemented in response to the Consent Decree requirements, and (ii) available documentation detailing how the processes are deployed in practice, such as pre-deployment briefings, the new "supervisor wellness check form", and a formal PowerPoint briefing.  As in other areas of this assessment, even if BPD receives a score of compliance based on this review, if a large protest or demonstration event occurs during the sustainment period and BPD does not follow through on the processes that have been established, the compliance score may be downgraded.

### Findings

The Officer Safety and Wellness Team has developed and implemented a robust strategy for notifying sworn personnel of the expectations and resources related to wellness during deployments to protests and large public gatherings.  As of January 27, 2023, BPD enacted the following protocols "intended to make members aware of the wellness resources available to them during protests and large public gatherings" (Figure 9).[11]

---

[11] Source: "Operations Guidance – Officer Wellness Protest/Public Gathering Protocols" email correspondence from Deputy Commissioner of Operations, Richard Worley to All Sworn Members of the BPD

**Figure 9: Email Text Describing Officer Wellness Protest/Public Gathering Protocols**

<u>DIRECTIVES</u>

1.  All detail orders issued for participation in a protest or large public gathering shall contain Form 1121, Supervisor Wellness Check Form, for ease of access to supervisors (see appendix A).

2.  At least one mental health counselor shall be on call during protests of more than 50 participants, or protests of a severity large enough to merit an Incident Action Plan.

3.  All <u>wellness-related briefings</u> given by an Incident Commander or their designee during a protest event shall be:

    3.1.  Recorded on body-worn camera (BWC) by a designee from Officer Safety and Wellness or Operations, as appropriate. These recordings must show that BPD members were in attendance.

    3.2.  Tagged in Axon Records with the "deployment briefing" designation.

4.  An officer safety and wellness video briefing (see appendix B) shall be disseminated to all members via PowerDMS prior to the commencement of a protest or large public gathering.

5.  **All supervisors holding the rank of Sergeant or above who are deployed <u>to a protest or large public gathering</u>** shall perform wellness checks on the personnel under their command. These checks must be documented on the attached Form 1121, Supervisor Wellness Check Form (see appendix A), and then scanned and e-mailed to the Officer Safety and Wellness Section ([osw@baltimorepolice.org](mailto:osw@baltimorepolice.org)) at the conclusion of deployment. The subject line of the e-mail should be titled "Wellness Check" and include the date of deployment (MM/DD/YY).

Form 1121 (Directives 1 and 5) was provided for supervisors to complete in order to document wellness checks (Figure 10).

**Figure 10: Supervisor Wellness Check Form**



As there have not yet been any protests to warrant an IAP, BPD has not had the opportunity to demonstrate compliance with Directive 2, provision of a mental health professional, during this assessment period, but did during the initial compliance assessment:

> *The Monitoring Team's review of the one IAP Health and Wellness Plan (ICS Form 208) BPD provided found a summary record of peer members deploying to headquarters or the atrium during the demonstration, and the outcome of that*

*check. Additionally, the form indicated that a mental health professional was on call during the event…*[12]

BPD has begun labeling the body worn camera footage of some pre-deployment briefings in Axon Evidence.com (i.e., BWC storage), indicating that they have the mechanisms in place to follow Directive 3, should a protest or unrest event occur.  Examples of pre-deployment briefings on BWC were available from recent events including Preakness, Artscape, and the Baltimore Running Festival.

To demonstrate implementation of Directive 4, BPD shared with the Monitoring Team a video that has been distributed to supervisors, and that may be played during pre-deployment briefings. The video was circulated internally as a file and is publicly available via YouTube (Figure 11).

**Figure 11: Select screenshots from Pre-Deployment Briefing Video**[13]



The briefing video detailed the role of OSW, team structure, and schedule of deployments. Additionally, it articulated the types of issues to report to peer team members, and provided contact information for OSW and BHS, in addition to login information for the BHS app.

---

[12] [Compliance Review Regarding Officer Assistance & Support](#) at 36

[13] Video is available on YouTube using the following link: [https://www.youtube.com/watch?v=gv_iqhVLMj4](https://www.youtube.com/watch?v=gv_iqhVLMj4) (accessed October 2023).

In this reassessment, the Monitoring Team found that OSW has developed processes and directives to ensure that the requirements articulated in Paragraph 440 are followed during protests and civil unrest. This reflects a marked improvement from the initial assessment, which found that the specificity and comprehensiveness of documentation related to protest events was limited. **Paragraph 440 will be scored** *4d – Initial Compliance***, with the expectation that when a public demonstration or civil unrest event occurs, the directives described here are followed by BPD personnel.** BPD must ensure that these provisions are adhered to during the types of events described in Paragraph 440 of the Consent Decree, to avoid the risk that it falls out of compliance.

The Monitoring Team is aware that there have been some "trial runs" of the new protocols, such as during the 2023 Baltimore Running Festival. This is an imperfect proxy for a mass protest or civil unrest event, as the dynamics and interactions between police and civilians, and the physical and emotional risks involved, are different. However, it does provide the opportunity for BPD to "rehearse" for less predictable protest events. In accordance with OSW's directive that "wellness-related briefings given by an Incident Commander or their designee during a protest event shall be…[r]ecorded on body-worn camera", the Monitoring Team located three videos documenting a Baltimore Running Festival pre-deployment briefing in Evidence.com. BPD also provided 25 Form 1121s from the Baltimore Running Festival, but the Monitoring Team found that 14 of the 25 Form 1121s were blank and had not been completed, though many were signed by supervisors. It is possible that supervisors might approach officer wellness more seriously in the context of an active protest situation. However, the failure to complete the Form 1121s raise some question about if and how the directives would be followed during the protest events or civil unrest described in Paragraph 440. As stated earlier, BPD has demonstrated a level of preparedness for these infrequent events consistent with a compliance score of 4d, but if a large protest or demonstration event does occur and BPD does not follow through on the processes that have been established, the compliance score may be downgraded.

### E.    Annual Assessment of Officer Assistance and Support Programs (Paragraph 441)

Paragraph 441 addresses self-assessment and continuous improvement within the area of officer assistance and support.

> *BPD will develop protocols for annually, assessing BPD's officer assistance and support programs to ensure officers are provided adequate support to maintain their physical and mental health. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.*

To assess compliance, the Monitoring Team reviewed the 2022 "Officer Assistance Assessment Report" produced by the Officer Safety and Wellness section, to determine if the self-assessment, improvement, and documentation measures outlined in Paragraph 441 were being done in a

complete and thorough manner.  As this section of the paragraph was previously found to be in initial compliance, the follow up assessment consisted of a "maintenance check" rather than a full reassessment.

### *Findings*

Consistent with the findings of the prior assessment, the Monitoring Team found that in 2022, BPD prepared a comprehensive annual report on its Officer Safety and Wellness programs.  This report addressed the early intervention system, EAP, peer support team activity, and an array of other safety and wellness initiatives, such as providing care packages, a therapy dog program, and acupuncture.  Additionally, building on the prior two reports, the most recent report included a comparison of results from 2021 and 2022 personnel surveys, assessing members' awareness of, and experiences with wellness initiatives and programming.

The report includes self-identified areas for improvement and sustainment, including enhancing technological capabilities, and providing officer resources through peer support deployments, pop-up workshops, and communications, among other activities.

**BPD remains in initial compliance with Paragraph 441. (Implementation – Initial Compliance (4(d)).**

## IV.    SUMMARY OF COMPLIANCE DETERMINATIONS

| Consent Decree Paragraph | | Initial Compliance Score (2022) | Reassessment Compliance Score (2023) |
|---|---|---|---|
| 436 | BPD will provide an Employee Assistance Program ("EAP") to all sworn officers, which allows access to no- or low-cost counseling and mental wellness services including: confidential counseling services; crisis counseling; stress management counseling; and mental health evaluations.  BPD will provide information about this program in all BPD facilities. | **4c** *(Implementation - On Track)* | **4d** *(Initial Compliance)* |
| 437 | BPD will compile, periodically review and revise as necessary, and maintain a list of mental and physical health service providers available as part of the EAP to all officers and employees.  BPD will ensure that officers have easy access to this information through email, the BPD website, or other means. | **4d** *(Initial Compliance)* | **4d** *(Initial Compliance)* |
| 438 (a) | The BPD will develop peer support services including:<br>   a.   A peer support program through which officers provide emotional, social, and practical support to other officers; and | **4d** *(Initial Compliance)* | **4d** *(Initial Compliance)* |

27

| Consent Decree Paragraph | Initial Compliance Score (2022) | Reassessment Compliance Score (2023) |
|---|---|---|
| 438 (b)    b. A peer intervention program through which BPD will provide officers with training, based on theories of active bystandership and passive bystandership, (1) to safely intervene before an officer engages in unethical behavior, to prevent it from occurring; (2) to accept an intervention from another officer when it occurs; and (3) provide emotional, social, and practical support to officers who intervene to prevent or end unethical behavior. | **4c** *(Implementation - On Track)* | N/A |
| 439    BPD will offer to all officers a voluntary mental health evaluation before returning an officer to full duty following a traumatic incident (e.g., serious injury, officer- involved shooting, officer-involved accident involving fatality, or all other uses of force resulting in death or serious injury. Officers may voluntarily seek further mental health services following this meeting. | **4d** *(Initial Compliance)* | **4d** *(Initial Compliance)* |
| 440    BPD will develop well-being protocols to be activated during officer deployments during public demonstrations or civil unrest. These protocols will include:<br><br>a. Close monitoring and periodic affirmative checks of officers' well-being by supervisors;<br><br>b. Availability of mental health and medical professional(s) to provide health care to officers;<br><br>c. Inclusion of health and safety guidance during pre-deployment briefings;<br><br>d. Close monitoring of officer fatigue and indications of stressors;<br><br>e. During prolonged periods of demonstrations or unrest, the deployment of police counselors or psychologists to provide individual counseling to officers and their family members. | **4c** *(Implementation - On Track)* | **4d** *(Initial Compliance)* |
| 441    BPD will develop protocols for annually, assessing BPD's officer assistance and support programs to ensure officers are provided adequate support to maintain their physical and mental health. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken. | **4d** *(Initial Compliance)* | **4d** *(Initial Compliance)* |