# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

## COMPLIANCE REASSESSMENT OF TRANSPORTATION OF PERSONS IN CUSTODY

December 2023



# Table of Contents

I.    EXECUTIVE SUMMARY .................................................................................. 1

II.   BACKGROUND ............................................................................................... 3
      A.    Evaluating Compliance ........................................................................ 5
      B.    The Role and Purpose of this Compliance Assessment ....................... 7

III.  ASSESSMENT OF TRANSPORT EQUIPMENT .................................... 10
      A.    Vehicle Equipment Spot Checks ........................................................ 11
            Findings .............................................................................................. 11
      B.    Weekly District Vehicle Inspection Records ..................................... 12
            Findings .............................................................................................. 13
      C.    Weekly Wagon IT Inspections ........................................................... 17
            Findings .............................................................................................. 17
      D.    Assessment of TVC Video Retention ................................................. 18
            Findings .............................................................................................. 19

IV.   ASSESSMENT OF TRANSPORT PROCEDURES ................................. 20
      A.    Detainee Transport Audits ................................................................. 20
            Findings .............................................................................................. 22
            i.     Audit of Equipment-Related Requirements ............................ 22
            ii.    Audit of Responses to Medical Distress ................................. 22
            iii.   Audit of Transportation Procedures for Persons in Custody ... 23
            iv.    Audit of Monitoring Detainees and Other Enforcement Activities ... 24
            v.     Audit of Safe Driving Practices .............................................. 25
            vi.    Documentation of Transport Details ....................................... 27
      B.    Quarterly Spot Check Audits ............................................................. 28
            Findings .............................................................................................. 29
      C.    Assessment of Transport Injury Reports ............................................ 30
            Findings .............................................................................................. 31
      D.    Review of Training Records ............................................................... 32
            Findings .............................................................................................. 33

E.    Compliance with Provisions Protecting Specific Classes...................................... 33

    i.    Medical Equipment.................................................................... 33

    ii.    Gender Identity ........................................................................ 35

    iii.    Juvenile Status ........................................................................ 36

V.    *APPENDIX I: Summary of Compliance Determinations* ...................................... *37*

VI.    *APPENDIX II: Detainee Transport Scorecard*.................................................... *41*

## I.    EXECUTIVE SUMMARY

Section IX of the Consent Decree, Transportation of Persons in Custody (¶¶ 222–38), includes requirements intended to improve transportation equipment, transportation procedures, monitoring of transportation practices, policies, and training.  Those provisions require the Baltimore Police Department (BPD) to:

1.  Equip all transport vans with seatbelts, holding straps located along the rear area of each seat that individuals being transported may grip for security during transport, and transport vehicle cameras (TVCs) and all transport cruisers with seatbelts (¶¶ 223-24);

2.  Inspect transport vehicles monthly and create logs to memorialize the inspections (¶ 225);

3.  Establish and adhere to appropriate procedures for transporting prisoners (including using seatbelts, straps, and TVCs) (¶¶ 226-33);

4.  Establish and adhere to protocols for documenting and comprehensively auditing prisoner transport events (¶¶ 234-37); and

5.  Revise policies and training curricula to ensure safe, effective prisoner transport (¶ 238).

In February 2022, the Monitoring Team filed an Initial Compliance Assessment on the Transportation of Persons in Custody.  That assessment evaluated BPD's performance in 2021.  It found that, while BPD' was "On Track" toward compliance in every paragraph relating to transportation, improvements in performance were still necessary.

The Consent Decree Monitoring Team (the "Monitoring Team") has now conducted a comprehensive reassessment of BPD's compliance with these requirements.  This follow-up review, focusing on BPD performance in 2023, finds that BPD has continued to demonstrate satisfactory progress.  Using the compliance scoring framework the Monitoring Team has adopted, **BPD's compliance score for the material requirements of the Consent Decree section of the Transportation of Persons in Custody (¶¶ 222–38) is "Full and Effective Compliance," because BPD has reached "Initial Compliance" in every paragraph in the area of transportation.**  This means that, should the Court concur that the available evidence indicates that BPD has reached Full and Effective Compliance with the transportation section of the Decree, BPD must demonstrate sustained compliance for a period of one year (¶ 504(a)).  When BPD can demonstrate such compliance for this one-year period, the Parties and Court may contemplate termination of the Decree's requirements relating to transport.

To reassess compliance with the Consent Decree's transport equipment requirements, the Monitoring Team repeated many of the same assessment procedures used in the initial assessment. For transport equipment, this included in-person spot checks of transport vehicles and reviewed BPD's routine transport vehicle audits. For transport practice and procedure requirements, the Monitoring Team independently reviewed a representative sample of the randomly selected transports that BPD has audited over the past two years, as well as a random sample of transports that were not included in BPD's audits. The Monitoring Team's reviews validated BPD's audits, and thus the Monitoring Team was also able to rely on BPD audit results for this assessment.

The Monitoring Team's review found improvement in a number of areas, including:

- Even higher rates of compliance in transport equipment spot checks at BPD Districts, meaning that nearly all BPD transport vehicles observed contained the appropriate safety equipment (seatbelts, partitions, a TVC system);

- Increased consistency in documentation of BPD's own vehicle inspections and audits, particularly related to information technology required to be operable and used in transport vehicles;

- A significant improvement in BPD's retention of TVC footage of transport events, with only one event in a random sample not being available;

- Sustained, high levels of quality with BPD's internal audits relating to transport;

- The introduction of some new vehicles to the fleet, and expected delivery of new wagons with updated TVC technology; and

- Newly digitized documentation of transport events using Axon Records.

The Monitoring Team commends BPD and the City of Baltimore for its sustained efforts and focus on the transport of individuals in custody. During the course of the Consent Decree, BPD has moved from an organization whose "transport practices," per the DOJ's investigation, "create[d] a significant risk of harm"[1] across a sustained period to one that has implemented policies and procedures, equipment and technology, and auditing practices to maximize the security and safety of arrested individuals who BPD is transporting. The results of the Monitoring Team's assessment are consistent with an agency that has established an entirely different culture when it comes to transporting detainees.

Even as BPD's improvements have brought them into compliance, and thus an overall score of "5a – Full and Effective Compliance," additional work will be needed to ensure that this compliance will be sustained – both for the required one-year period under the Decree and, indeed,

---

[1] DOJ Findings Letter at 112.

long after the Decree's requirements have concluded.  The following are further steps BPD must take to further institutionalize its progress to date and avoid non-compliance:

(1) **Reinforce safe driving practices and medical aid policies.**  BPD has demonstrated that they have internal audit and accountability processes in place, such as conducting extra audits each quarter, making PIB referrals based on audit findings, and providing additional instruction via roll calls.  However, the Monitoring Team also expects the rate of problematic transports uncovered during audits to decrease, with the aid of proactive supervision, and the effects of the accountability and training activity.

(2) **Ensure all wagon drivers have completed required training**.  Most wagon transports reviewed by the Monitoring Team were conducted by individuals who completed the required training, however there were some who were serving in a "secondary" capacity, and filling in as wagon drivers, despite not having documentation of completing the course.  The Monitoring Team recognizes that (1) all new officers are completing the wagon driving course as part of their entry-level training, and (2) BPD is facing staffing challenges.  That said, we expect that in time all transports will be conducted by drivers with the required training, particularly as the number of officers who complete it as part of their entry-level training continues to increase.

(3) **Continue to improve transport-related record keeping.**  The Monitoring Team observed measurable improvement in the ability to search and analyze transport-related records within BPD's records management system ("RMS").  BPD must nevertheless continue to work to ensure that officers are completely and accurately completing the new Transport Log and the Inspection Reports.  The Monitoring Team found instances where arrest-related injuries were reported as transport-related, and where the number of arrestees identified in documentation were different than what was captured on video footage.  The Monitoring Team likewise identified some Inspection Reports that included grip strap scores for sedans, none of which are equipped with grip straps, and one wagon had video equipment scores of "satisfactory" and "not applicable" within the same month.

## II.    BACKGROUND

In its initial compliance review of transports from April through October of 2021, the Monitoring Team found that BPD was "properly equipping its transport cruisers and wagons with the devices that the Consent Decree requires" and that officers "appear to be doing much of what the Consent

Decree requires them to do when transporting prisoners from one place to another."[2]   However, the Monitoring Team also determined that "BPD must address several administrative and record-keeping deficiencies to ensure that these nascent changes in performance are sustained over the long-term and, therefore, to achieve full compliance with the requirements of Paragraphs 222 – 238 of the Consent Decree."[3]

Specifically, in the initial assessment the Monitoring Team made the following findings regarding compliance:

- BPD transport vehicles were appropriately equipped;

- BPD was routinely completing the required monthly inspections of transport vehicles and wagons, and IT inspections of transport wagons;

- BPD personnel were following a number of the required procedures for transporting detained individuals;

- BPD was consistently completing the Decree-required audits and spot checks of prisoner transport events and was adhering to the agreed upon methodologies for doing so;

- BPD had successfully revised its transport policies and provided associated training;

- While BPD had created logs to memorialize its transport vehicle inspections, its record-keeping processes needed to be improved;

- BPD officers needed to always search detainees before placing them in transport vehicles, and BPD auditors needed to be able to ascertain the safety of transport officers' driving practices, including driving speed and observance of other traffic safety laws; and

- For BPD's audits of prisoner transports, BPD still needed to collect better, more reliable data.

---

[2] Compliance Assessment of Transportation of Persons in Custody at 1.

[3] Compliance Assessment of Transportation of Persons in Custody at 2.

In the initial compliance assessment, the Monitoring Team identified six[4] suggested actions for BPD to take to remedy the deficiencies identified in the initial assessment and come into compliance:[5]

1. Implement a modern fleet management system to maintain a current vehicle roster that includes location and maintenance status;

2. Make Automatic Vehicle Location (AVL) data available to supervisory and audit personnel for all prisoner transports;

3. Implement a digital and/or physical process for securely storing and retrieving the transport-related information articulated in Paragraph 232;[6]

4. Train all personnel involved in vehicle inspections on how to fill out inspection reports accurately and completely;

5. Develop an accurate, timely, and comprehensive database of all prisoner transports conducted, to include the persons involved, vehicle ID and type, transport date and time, and location; and

6. Develop and implement a strategy to ensure transport drivers adhere to policies for searching detainees.

Due to limitations in how the transport data could be queried at the time, the initial compliance assessment did not determine compliance with provisions regarding specific classes such as separation of genders/gender-identities, youth, and ensuring medical equipment is transported with the individual. (¶ 229, 230).

## A. Evaluating Compliance

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented.  The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of characterizing BPD's current status across Consent Decree implementation.  Thus, as in both the initial compliance assessment and previous Semiannual Reports, the transport section and all other sections of the Consent Decree are scored according to the following framework:

---

[4] The initial compliance report included a seventh action to insert a question about TVC functionality on the Wagon Hard Drive Inspection Sheet.  This has been removed on account of TVC functionality being documented elsewhere (Field H on the "Vehicle Inspection and Maintenance Report").

[5] While the Monitoring Team recommended these steps as the most efficient way to remedy the deficiencies, it did not mandate them, and invited BPD to propose different paths to reaching compliance.

[6] The initial compliance report referred to Form 12's, but according to BPD "The nature of Form 12 has changed. In 2021, this was the only form where the information from paragraph 232 was recorded. Since the beginning of 2022, members are required to enter information into the Transport Form in Axon Records. The only information they are required to complete in Form 12 is the information needed by CBIF."

**0 – Not Assessed**: The Monitoring Team has yet to assess if the City/BPD has made progress or complied with the requirement.

**1 – Not Started**: The City/BPD has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/BPD is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase**: The City/BPD is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:** The City/BPD is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

> **4a – Implementation - Not Assessed:** The City/BPD has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/BPD's progress in implementation.

> **4b – Implementation - Off Track:** The City/BPD is not making satisfactory progress toward compliance with the requirement.

> **4c – Implementation - On Track:** The City/BPD is making satisfactory progress toward compliance with the requirement.

> **4d – Implementation - Initial Compliance:** The City/BPD has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in Paragraph 504 of the Consent Decree.

**5a – Full and Effective Compliance:** The City/BPD has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree. This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance**: The City/BPD has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently

adhering to all such requirements for the time period specified in paragraph 504 of
the Consent Decree.

During the initial formal compliance evaluation, the Team assigned individual scores for each
paragraph of the Transportation of Persons in Custody section of the Consent Decree (see
Appendix I for each initial compliance score by paragraph).  The Monitoring Team has also
conducted continuous, informal evaluations on Consent Decree requirement progress pertaining
to transport equipment and procedures, including whether BPD has implemented and is adhering
to the required transport policies, and whether they are using the transport equipment correctly and
consistently.  Scores based on these ongoing assessment activities have been provided as recently
in the Seventh Semi-Annual Report.[7]

### B.      The Role and Purpose of this Compliance Assessment

The Monitoring Team has previously described the two major types of assessment that the Consent
Decree requires: (1) compliance reviews, and (2) outcome assessments.  Compliance reviews,
which almost always have qualitative elements and may also have quantitative elements, are
evaluations of BPD's performance across time, incidents, cases, events, and officers that are
conducted to determine if BPD is adhering in practice to the specific requirements of the Consent
Decree.  For instance, this compliance review considers, among other things, whether BPD is
adhering to the Decree's requirements to have transport vehicles equipped with specific
equipment, and whether BPD has made progress on any of the areas highlighted as needing
improvement during prior assessments.

In this way, compliance reviews address whether BPD is meaningfully doing what the Decree
requires across its many requirements.  Within the classification scheme that the Monitoring Team
has previously adopted, the purpose of this and other compliance reviews is to determine whether
BPD can be considered to be in initial compliance across a major substantive area of the Consent
Decree.

Outcome assessments are largely quantitative assessments that are "designed to determine whether
the reforms required by the Consent Decree in each area are having a tangible, measurable impact
– whether, independent and apart from BPD's progress toward compliance with Consent Decree
requirements, policing is changing in the real world."[8]  Because the Consent Decree does not
outline any outcome assessments pertaining specifically to transport, the present report focuses on

---

[7] https://static1.squarespace.com/static/59db8644e45a7c08738ca2f1/t/620c205fdfa1535274047ae2/1644961899345/7th+Semiannual+Report.pdf

[8] Consent Decree, *United States of America v. Police Department of Baltimore City, et al.* Case No. 1:17-CV-00099-JKB (D. Md. Jan. 12, 2017), https://www.justice.gov/opa/file/925056/download

a systematic compliance review and audit of BPD's performance with respect to the transport of persons in custody.

As described in Paragraph 506 of the Consent Decree:

> To achieve "Full and Effective Compliance," the City and BPD must demonstrate that they have (a) incorporated all Material Requirements of this Agreement into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the Agreement's Outcome Assessments.

A core issue in determining whether BPD has reached "initial" compliance with any material requirement of the Consent Decree is determining whether that requirement "is being carried out in practice" by BPD. To that end, the Monitoring Team considers the following:

1.  **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires adhering to Decree requirements across a material span of time, number of incidents, and number of officers. In this way, isolated compliance does not establish "initial compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.

2.  **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that BPD must remedy deficiencies in departmental and officer performance. Consequently, the Monitoring Team in its compliance reviews considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.

3.  **The extent to which BPD is identifying and appropriately addressing problematic performance.** Consistent with the Decree, the Monitoring Team's compliance reviews will consider whether, when BPD has deviated from policy, law, or Decree requirements, BPD has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful change, BPD is in a different place if a policy

8

deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time. Steady improvement over time suggests positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or fail to adequately address competing considerations.  Even as the test articulated above requires different considerations to be weighed together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."

In applying this multi-factor test for compliance, the first factor – the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers – is the initial, threshold inquiry.  If BPD and/or its officers' performance is not what it should be across a sufficient number or portion relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance.  For example, if BPD meets some Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put BPD into compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to BPD and to the community about the benchmarks that it expects and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as possibly, though certainly not conclusively or even presumptively, consistent with initial compliance.  In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time).  Where the Team determines that BPD has adhered to expectations in 95% or more of relevant circumstances, initial compliance will be found unless one of the other factors – severity of deviations, BPD identification of noncompliance, and progress over the time – starkly point in the other direction.

On the other hand, where BPD has adhered to expectations less than 85% of the time, initial compliance will not be certified unless one of the other factors points definitively in a positive direction.  For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that BPD identified and took appropriate

9

corrective action in instances where requirements were not followed, and BPD had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances.  Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Finally, it is possible that, the Monitoring Team might assign, pursuant to the weighing of factors outlined above, a score for an individual decree requirement that is lower than the score given in a prior report.  For instance, the score for a particular requirement might move from "4c" (implementation—on track) to "4b" (implementation—off track).

Ultimately, to establish initial compliance with the Consent Decree's provisions and to sustain "full and effective" compliance pursuant to Paragraph 506, BPD must do more than show that it has technically adopted the pertinent policies, procedures, and protocols.  Instead, it must demonstrate through officers' actions on the street that, as an agency, it is complying with the policies.  Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

The following report outlines the methodology and results of the Monitoring Team's compliance assessment of the Transport of Persons in Custody section of the Consent Decree.  Consistent with the findings from DOJ's initial investigation, and the pertinent paragraphs of the Consent Decree, and the prior compliance assessment, the compliance review is broken into two general areas: transport equipment and transport procedures.  This assessment will cover compliance with the central requirements in this area (¶¶ 222–38).

## III.    ASSESSMENT OF TRANSPORT EQUIPMENT

The Consent Decree requires that BPD's transport vehicles be outfitted with the equipment necessary to protect the wellbeing and safety of the officers, public, and people being transported. It requires all vehicles used to transport persons in custody to have dividers and sufficient and functioning seatbelts for each person transported.  Additionally, all transport wagons or vans, with the exception of the Warrant Apprehension Task Force ("WATF") due to the layout of their vans, must be outfitted with a strap along the rear of each seat that a person being transported may grip for security.  All transport wagons must also have a functioning transport vehicle camera ("TVC") system that both provides a live feed and records activity in all compartments used to transport persons in custody; this footage is to be maintained by BPD for at least one year.  Finally, all vehicles used to transport persons in custody must be inspected on at least a monthly basis to ensure that all equipment, including video recording equipment, seatbelts, and straps, are fully functional.

As in the initial compliance assessment, the Monitoring Team's reassessment of BPD's compliance with Paragraphs 223, 224, and 225 consisted of (1) first-hand observations and assessments of all transport vans and a sample of cruisers, (2) assessments of BPD's internal transport equipment audits, including data from BPD's vehicle and IT inspection logs, and (3) a review of TVC retention.

### A.    Vehicle Equipment Spot Checks

Paragraph 223 of the Consent Decree requires all transport vehicles to be "outfitted with dividers, contain sufficient and functioning seatbelts," and that wagons be "outfitted with a strap located along the rear of each seat." Paragraph 224 requires wagons to also be "equipped with a functioning transport vehicle camera." To assess compliance with equipment requirements firsthand, Monitoring Team members conducted spot checks of a random selection of prisoner transport vehicles and all wagons across each of the 9 districts.

As of April 2023, BPD reported having 268 prisoner transport vehicles, and 8 district wagons, with an additional 3 wagons used by the WATF. Based on the number of total vehicles, the Monitoring Team members inspected a total of 71 cruisers/SUVs selected at random, to achieve a 95% confidence interval, with a margin of error $\pm 10$%. As, according to BPD, approximately one-third of vehicles are undergoing maintenance at any given time, this sample is likely more representative of the fleet that is currently being used for transports than the confidence interval suggests. At the time of the spot checks in June 2023, 9 of the 11 total transport wagons were in service, and each one was checked by the Monitoring Team.

Each Monitoring Team member completed a score sheet while conducting the spot checks, documenting the following:

1.   Was the vehicle operable?

2.   Was the vehicle equipped with a seatbelt for every potential passenger?

3.   Was a grip strap located along the rear of each seat? (district wagons only)

4.   Was the vehicle outfitted with a divider or partition?

5.   If a TVC is installed, is it capable of recording all compartments where prisoners may be transported? (wagons only)

#### *Findings*

In the initial compliance assessment, the Monitoring Team viewed a total of 66 transport cruisers/SUVs and 14 wagons. In the reassessment, the Monitoring Team viewed 71 transport cruisers/SUVs and nine wagons. The number of cruisers/SUVs viewed by the Monitoring Team increased, because during the initial compliance assessment BPD estimated that its prisoner transport fleet included 220 cruisers/SUVs, whereas in 2023, BPD reported that the number of

11

prisoner transport cruisers/SUVs had increased to 268.  The number of wagons inspected by the monitoring team, on the other hand, decreased, because two were out of service and several others had been removed from the fleet altogether since the initial assessment.

In the initial assessment, two cruisers had broken seatbelts.  All of the detainee seatbelts in the other 64 (97.0%) vehicles, and all vans, were functional.  In the reassessment, only *one* cruiser had an inoperable seatbelt.[9]  The seatbelts in the rest of the cruisers (n=70, 98.6%) and all wagons (n=9, 100%) were functioning.

Four of the 66 cruisers inspected (6.1%) in the *initial* compliance assessment did not have partitions between the driver and person being transported.  During the *reassessment*, all 71 cruisers observed had partitions.

Seven of the nine wagons viewed during the reassessment were equipped with partitions and grip straps.  The two that did not have partitions or grip straps were both forward facing configurations. As in the initial compliance assessment, the Monitoring Team recognizes that the Consent Decree did not account for different seat configurations and does not conclude that these two vans are out of compliance.

As in 2022, all wagons observed during the reassessment had a functioning TVC system.

**These results, which are even stronger than in the initial assessment, place BPD in compliance in this area. (Implementation – Initial Compliance (4(d)).**

### B.    Weekly District Vehicle Inspection Records

Paragraph 225 of the Consent Decree requires that BPD inspect all vehicles used for the transportation of persons in custody on at least a monthly basis.  BPD provided the Monitoring Team access to every "Weekly District Vehicle Inspection Record" dating back to 2018.  These forms are handwritten by district inspectors and compiled into PDF files based on week and district.  As with the initial compliance assessment, the only way to accurately identify the number of unique vehicles inspected each month was to review the handwritten reports individually.

Due to the high volume of inspection records and the way they are maintained, the Monitoring Team reviewed every form in a three-month period (January 1, 2023, through March 31, 2023), to determine if each transport vehicle had a documented inspection for each month, and to note the results of the inspections.

---

[9] BPD notes that in instances in which the seatbelt is not operable, the vehicle is not used to conduct prisoner transports.

*Findings*

On average, across the nine districts, between 44% and 72% of all district vehicles on the prisoner transport inventory provided by BPD had at least one inspection each month (Figure 1b). These overall inspection rates were generally consistent with those observed during the initial compliance assessment (Figure 1a), though the inspection rates in individual districts varied considerable over time (e.g., Western's three-month average dropped from 73% of vehicles to 44%). Notably, three districts (Northwestern, Southern, and Southwestern) reported having fewer prisoner transport vehicles during this time period, yet still experienced a decrease in the average percent of vehicles inspected at least once monthly.

As with the initial assessment, the lack of a centralized fleet database meant that it was not possible to determine whether vehicles were not inspected because they were temporarily or permanently out of service, or because BPD failed to comply with the inspection requirement articulated in Paragraph 225. As such it is possible that the total number of transport vehicles in service for each district (the denominator) changed each month, based on how many vehicles were out of service. It is also possible, however, given the reliance on paper records, that some inspections took place, but records of the inspections were not properly documented or stored.

Because these results are consistent with the initial assessment, which found compliance, and because the percentage of cars inspected are roughly consistent with the total number of transport vehicles in service in a given month (as stated above, roughly 1/3, or 33%, of transport vehicles are typically out of service, so an inspection rate of 66% is likely close to 100% of the vehicles in service) **BPD remains in initial compliance in this area.   (Implementation – Initial Compliance (4(d)).**

**Figure 1: Occurrence of Transport Vehicle and Wagon Inspections**

a.   Results of Initial Compliance Assessment

|  | July 2021 | August 2021 | September 2021 | 3-month Average | Total Vehicles |
|---|---|---|---|---|---|
| **Central** | 35% | 52% | 42% | 43% | 31 |
| **Eastern** | 60% | 75% | 50% | 62% | 40 |
| **Northeastern** | 51% | 57% | 70% | 59% | 37 |
| **Northern** | 34% | 52% | 45% | 44% | 29 |
| **Northwestern** | 80% | 84% | 76% | 80% | 25 |
| **Southeastern** | 58% | 48% | 45% | 51% | 31 |
| **Southern** | 50% | 67% | 60% | 59% | 30 |
| **Southwestern** | 79% | 79% | 83% | 81% | 24 |
| **Western** | 64% | 73% | 82% | 73% | 22 |

b.   Results of Compliance Reassessment

|  | January 2023 | February 2023 | March 2023 | 3-month Average | Total Vehicles |
|---|---|---|---|---|---|
| **Central** | 70% | 61% | 64% | 65% | 33 |
| **Eastern** | 49% | 42% | 44% | 45% | 45 |
| **Northeastern** | 60% | 57% | 57% | 58% | 35 |
| **Northern** | 62% | 62% | 71% | 65% | 21 |
| **Northwestern** | 73% | 59% | 68% | 67% | 22 |
| **Southeastern** | 49% | 66% | 51% | 55% | 35 |
| **Southern** | 57% | 38% | 67% | 54% | 21 |
| **Southwestern** | 65% | 70% | 80% | 72% | 20 |
| **Western** | 40% | 40% | 52% | 44% | 25 |

Seatbelt Inspection Documentation

The Consent Decree requires that all vehicles used for prisoner transport, including both wagons and cruisers, contain functioning seatbelts for each person in custody. BPD assesses seatbelts using a three-point scale (1: Unsatisfactory, 2: Needs Improvement, 3: Satisfactory); any score below a 3 was considered to be out of compliance with the requirements.

**Figure 2: Seatbelt Scores in All BPD Inspection Reports (January – March 2023)**

| Seatbelt Score | Frequency | Percent |
|---|---|---|
| **1 – Unsatisfactory** | 4 | 0.2% |
| **2 – Improvement Needed** | 16 | 1.0% |
| **3 – Satisfactory** | 1606 | 98.0% |
| **"Minor Damage"** | 3 | 0.2% |
| **"Equipped" or "✓"** | 3 | 0.2% |
| **Blank** | 3 | 0.2% |
| **Illegible** | 4 | 0.2% |

The reports reflected that nearly every inspection (98%) found that vehicle had functioning seatbelts.[10]  This is slightly higher than the rate observed in the prior assessment (93.4% satisfactory scores for all August 2021 Inspection Reports), and consistent with observations made in the field during the Monitoring Team's spot checks.  A total of 23 forms (<1%) indicated that the seatbelt was not fully functional.  Only two vehicles, both from the Western District (shop

---

[10] Because of how the reports are stored, the scores presented in Figure 2 reflect all BPD inspection reports completed during the three-month period, the number of individual vehicles found without an operable seatbelt during that time. Thus, if an individual vehicle was inspected 13 times (every week) and found satisfactory each time, that would appear as 13 reports in the table.  Additionally, the table does not reflect how many times individual vehicles were inspected or that each vehicle was inspected at least once.  While it would be possible to isolate and identify each of the unique vehicles within the data, that is unnecessary given the number of total inspections and the high rate (98%) of satisfactory scores.

numbers 9235 and 9181) received scores less than three on more than one occasion during the three-month period.[11]  **These results place BPD in compliance with respect to this requirement. (Implementation – Initial Compliance (4(d)).**

Wagon Inspections

The Monitoring Team found that most BPD wagons are being inspected at least once per month, as required by the Consent Decree.[12]  Ten vehicles that were classified as wagons were inspected at least once over the three-month period reviewed.

**Figure 3: Inspections Per Number of Operable Wagons in Each District**
*(number inspected during month / total wagons in service)*

|               | Jan 2023 | Feb 2023 | Mar 2023 |
|---------------|----------|----------|----------|
| Central       | 1/1      | 1/1      | 1/1      |
| Eastern       | 1/1      | 1/1      | 1/1      |
| Northeastern  | 2/2      | 2/2      | 1/2      |
| Northern      | 1/1      | 1/1      | 1/1      |
| Northwestern  | 0/1      | 1/1      | 0/0      |
| Southeastern  | 1/1      | 1/1      | 1/1      |
| Southern      | 1/1      | 0/1      | 1/1      |
| Southwestern  | 0/0      | 0/0      | 1/0      |
| Western       | 1/1      | 1/1      | 1/1      |

Of the ten wagons that were inspected, only one had a documented grip strap issue: wagon 9546 from the Northern District.[13]  Inspection documentation was inconsistent regarding whether a grip strap was present in January (e.g., had scores of both "satisfactory" and "not applicable"), and then seemingly scored that the grip strap was damaged in both February and March.  BPD notes that some of the documentation issues observed in this section (see Figure 4 notes) will be rectified as BPD transitions to an electronic inspection sheet, in which members will only be able to select

---

[11] 13 forms used an incorrect value, illegible score, or was missing a score.

[12] The Monitoring Team had some difficulty determining the number of wagons in service each month in each district.  BPD does not have a comprehensive fleet management system that tracks all vehicles.  This made it difficult to determine from the inspection records whether all in-service wagons were inspected each month.  The Monitoring Team relied on the notes from the Wagon IT Inspection Forms to determine how many wagons were allocated to each district during the three months reviewed.  This approach was imperfect.  For instance, in March 2023, a Vehicle Inspection and Maintenance Report was submitted for a wagon in the Southwestern District, but an IT Inspection Form submitted during that time reported that the Southwestern District did not have any wagons.  Nevertheless, the Monitoring Team's method was sufficient to assess BPD's compliance.

[13] BPD notes that 9546 was removed from service entirely by July of 2023, and is no longer in use.

options appropriate for the type of vehicle (i.e., cruiser/SUV or wagon) and the part of vehicle (e.g., interior or exterior) being inspected.

All other district wagon inspection reports reflected that the wagon had a functioning grip strap.

**Figure 4: Grip Strap Score Documented in Vehicle Inspection Reports, by Week**

| District | Shop No. | January |||||| February |||| March ||||
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 |
| Central | 9552 | | | 3 | 3 | 3 | 3 | 3 | 3 | | | | 3 | 3 | 3 |
| Eastern | 9502 | | 3 | | 3 | 3 | 3 | 3 | 3 | | 3 | | | 3 | 3 |
| Northeastern | 9514 | 3 | 3 | | 3 | | 3 | 3 | | | | | | | |
| Northeastern | 9534 | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 3 | 3 | |
| Northern | 9546 | | | 3 | 3 | N/A | EMD | | | | | | | 0 | |
| Northwestern | 9554 | | | | | | 3 | 3 | | | | | | | |
| Southeastern | 9533 | | 3 | 3 | 3 | 3 | 3 | | | 3 | 3 | 3 | | | 3 |
| Southern | 9548 | | | | 3 | | | | | | 3 | | | | 3 |
| Southwestern | 9514 | | | | | | | | | | 3 | 3 | | | |
| Western | 9547 | 3 | 3 | 3 | | | 3 | | | 3 | 3 | | | 3 | 3 |

*A blank space indicates that no report was submitted for the week.*
*Possible scores for Grip Straps include: 1 – Unsatisfactory, 2 – Improvement Needed, 3 – Satisfactory, and N/A – Not Applicable.*
*Grip straps may also be scored using the following codes: M – Missing, MD – Minor Damage, SD – Severe Damage, and E – Equipped.*
*According to BPD, "EMD" means the vehicle is "equipped with minor damage". The report does not specify when it is appropriate to use a numerical score or a code. A score of "0" only applies to exterior damage.*

Overall, the inspections confirmed that the wagons had working TVC systems, with every wagon found to have a working TVC system at some point during the three-month period. There were, however, several instances of inconsistent documentation regarding the functionality of the TVC systems based on the vehicle inspection reports. For five of the ten wagons, there was at least one instance of a form indicating that there was no TVC system ("N/A") during the same calendar month that another form recorded a score of 3 for the same wagon. As this occurred across multiple wagons and districts, it appears that there is confusion regarding how to score TVC (Figure 5). The Monitoring Team expects that this self-assessment issue will be resolved, particularly as new wagons with TVC systems are introduced into the fleet in the coming months. **The results in this area, along with the fact that the remaining issue will become moot with the introduction of new wagons and updated TVC, place BPD into compliance in this area (Implementation – Initial Compliance (4(d))).**

**Figure 5: TVC Score Documented in Vehicle Inspection Reports, by week**

| District | Shop No. | January |||||| February |||| March ||||
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 |
| Central | 9552 | | | 3 | 3 | E | N/A | 3 | 3 | | | | 3 | 3 | 3 |
| Eastern | 9502 | | 3 | | 3 | 3 | | 3 | 3 | 3 | N/A | | | 3 | 3 |

| District | Shop No. | January | | | | | February | | | | March | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 |
| Northeastern | 9514 | E | E | | 3 | | E | 3 | | | | | | |
| Northeastern | 9534 | | E | 3 | E | E | E | 3 | 3 | 3 | 3 | | 3 | 3 |
| Northern | 9546 | | | *blank* | N/A | 3 | 0 | | | | | | | 3 |
| Northwestern | 9554 | | | | | | | N/A | 3 | | | | | |
| Southeastern | 9533 | | 3 | 3 | 3 | 3 | 3 | | | 3 | | 3 | | N/A |
| Southern | 9548 | | | | E | | | | | | 3 | | | 3 |
| Southwestern | 9514 | | | | | | | | | | E | 3 | | |
| Western | 9547 | 0 | N/A | N/A | | | 3 | | | *blank* | N/A | | N/A | 0 |

*A blank space indicates that no report was submitted for the week; the word "blank" indicates that a report was completed, but the TVC field was left blank.*

*Possible scores TVC include: 1 – Unsatisfactory, 2 – Improvement Needed, 3 – Satisfactory, and N/A – Not Applicable.*

*Grip straps may also be scored using the following codes: M – Missing, MD – Minor Damage, SD – Severe Damage, and E – Equipped. The report does not specify when it is appropriate to use a numerical score or a code. A score of "0" only applies to exterior damage.*

The Monitoring Team found that in some cases supervisors approved inspection reports with errors in them. For instance, approximately 10% of all forms for cruisers provided a grip strap score for a sedan even though sedans are not outfitted with grip straps. Other reports approved by supervisors used the wrong scoring metric, or were not completely filled out. This suggests that further work on supervision is advisable but is not substantial enough to take BPD out of compliance in this area. BPD has noted that they are already in the process of building an electronic inspection sheet within their Axon Records RMS, which will require supervisory review.

### C.   Weekly Wagon IT Inspections

The Consent Decree requires BPD to "inspect all vehicles used for the transportation of persons in custody on at least a monthly basis to ensure that all equipment, including video recording equipment… [is] fully functional" (¶ 225). BPD ITD reviews the TVC systems for storage space and downloads the footage.

BPD provided the Monitoring Team with the "Wagon Hard Drive Inspection Sheets," dating back to January of 2019. BPD completes these forms during the Weekly Wagon IT inspections. The Monitoring Team reviewed these forms to confirm that the computer hard drive for each BPD wagon was inspected monthly during this time. As with the Weekly District Vehicle Inspection Records, the forms were handwritten and then scanned and uploaded into PDF files for each week.

### *Findings*

As with the initial compliance assessment, the Monitoring Team's reassessment found that most wagons' hard drives were inspected at least monthly (Figure 6). The inspection forms reflected that the wagons that were not inspected in each month were either "shopped" or "out of service"

altogether. All wagons that missed an inspection during a particular week because of circumstances other than being shopped or out of service (e.g., actively conducting a transport during the inspection period) were reviewed another week during that month. **Consequently, this area is in initial compliance (Implementation – Initial Compliance (4(d))).**

The Monitoring Team observed improved consistency between the cover memos and contents of the inspection reports. The Sixth Semiannual Report and initial compliance assessment identified this as a problem area, but those issues now appear to have been resolved.

**Figure 6: Transport Wagons with One or More IT Inspections Per Month, by District**
*(number viewed during month / total wagons in service)*

|  | May 2022 | Jun 2022 | Jul 2022 | Aug 2022 | Sep 2022 | Oct 2022 | Nov 2022 | Dec 2022 | Jan 2023 | Feb 2023 | Mar 2023 | Apr 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Central | 1/1 | 0/0 | 0/0 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 |
| Eastern | 2/2 | 1/1 | 2/2 | 2/2 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 |
| Northeastern | 1/1 | 1/1 | 2/2 | 2/2 | 2/2 | 2/2 | 2/2 | 1/1 | 2/2 | 2/2 | 2/2 | 2/2 |
| Northern | 0/0 | 0/0 | 0/0 | 0/0 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 |
| Northwestern | 1/1 | 1/1 | 0/0 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 0/0 | 0/0 |
| Southeastern | 2/2 | 1/1 | 0/0 | 2/2 | 1/1 | 2/2 | 2/2 | 2/2 | 1/1 | 1/1 | 1/1 | 1/1 |
| Southern | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 |
| Southwestern | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 |
| Western | 0/0 | 0/0 | 0/0 | 0/0 | 0/0 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 | 1/1 |
| WATF | 3/3 | 3/3 | 3/3 | 3/3 | 3/3 | 2/2 | 3/3 | 3/3 | 3/3 | 3/3 | 3/3 | 2/2 |

*Denominator reflects number of wagons used for transports each month. Wagons that were "shopped", undergoing "preventive maintenance", or altogether "out of service" every week of a month are not included for that month.*

### D.    Assessment of TVC Video Retention

The Consent Decree requires all transport vehicle video recordings to be maintained by BPD for a period of at least one year, or for longer as required by BPD policy (¶ 224). To assess compliance with this requirement, the Monitoring Team requested video recordings for a randomly-selected set of transports.

In the initial assessment, the Monitoring Team confirmed that BPD maintained in its TVC footage system video for 77 of the 96 detainee transports in the random sample from December 2020 and January 2021. BPD had reasonable justifications for 7 of the 19 missing videos: two of the transports were conducted by the WATF, whose wagons did not have TVC installed until 2021, and five of the transports were conducted by a police cruiser, not a wagon. There was no explanation, however, for twelve of the missing videos, which represented 12.5% of the sample. For the missing videos, the Monitoring Team could not determine whether the videos were (1) not recorded in the first instance, (2) recorded but not retained, or (3) whether BPD had the videos but could not locate them in their records. Additionally, while reviewing footage during the initial

assessment, the Monitoring Team noted that many of the wagons did not have the passenger compartments illuminated while transporting detainees at night.  Policy 825, which requires vehicles be "taken out of service and sent for repairs when safety concerns related to the TVC arise (e.g., interior dome light stops working, and the compartment is too dark to record)" was enacted after the footage was recorded, so while this issue was noted, it was not in violation of any policy at the time.

For the reassessment, the Monitoring Team selected a random sample of 44 TVC videos from the approximately 845 wagon transports that occurred in August and September of 2022.  Using this sample, the Monitoring Team had a 90% chance of identifying at least one problematic case (i.e., a missing video) in the full set of 845, if at least 5% of cases are in fact problematic, based on a hypergeometric probability calculation.[14]

The Monitoring Team altered the methodology for confirming videos had been retained during the reassessment, from how it was performed during the initial assessment, to reduce the time and resource burden, without compromising the quality of the sample reviewed.  During the initial compliance assessment, the Monitoring Team assessed Paragraph 224, by viewing footage of 96 transports over a series of video conferences with BPD.  This was due to the inability to provide the Monitoring Team with direct access to TVC storage and was further complicated by the way in which the footage is stored.  Ultimately it took several days of Zoom conference screen-shares to complete this task, which constituted just one of the many steps required to complete the assessment.

To more efficiently assess BPD's compliance on this point, the Monitoring Team and the Parties agreed that the Monitoring Team would identify a smaller random sample (described above).  BPD would then locate the transport footage for each event in the sample and provided a screenshot as verification.  BPD also provided the Monitoring Team a formal, written certification, certifying that they had completed the required steps and that the screenshots were accurately reflected what was in their system.

### *Findings*

BPD was able to confirm that it had retained the TVC video footage for 43 of the 44 transport events (97.7%) in the random sample.  BPD explained that it could not locate one of the 44 videos,

---

[14] The reassessment sample was smaller than the one used for the initial compliance assessment, because in 2021, BPD could not determine how many transports were conducted per year, how many used a van or wagon, or how many had corresponding TVC footage, so a series of workarounds had to be employed to generate a sample.  A sample size of 96 TVC videos was generated based on an estimate of approximately 10,700 total annual transports (regardless of transport vehicle type).  To conserve resources while maintaining a rigorous approach to the assessment, the hypergeometric probability sample described above was generated.

because all videos that had been recorded in the involved wagon between July 1 and 4, 2022 had been mislabeled. (*See* Appendix III).

Further, based on the images in the screenshots provided, it appears that the issue of the passenger compartment being insufficiently lit (identified in the initial assessment) has been resolved.

**BPD's improvement from 81.5% to 97.7% reflects that the issues identified in the initial assessment have been remedied and, along with the correction of the failure to illuminate passenger areas in wagons, is sufficient to bring BPD into initial compliance in this area.**

## IV.     ASSESSMENT OF TRANSPORT PROCEDURES

The Consent Decree requires that BPD's transports of individuals in custody be conducted in a manner that protects the well-being and safety of the officers, public, and individuals being transported. This section considers BPD's current compliance status with respect to the provisions of Paragraphs 226 through 233, and 238, which all relate to BPD's procedures for transporting persons in custody. Additionally, to determine compliance with Paragraphs 234 through 237, the Team assessed BPD's own internal processes for self-monitoring with respect to transportation practices.

As in the initial assessment, the Monitoring Team considered data from BPD audits, the Team's own audits, information from BPD's Use of Force Assessment Unit, and information from BPD's Education & Training Section. The Monitoring Team audited BPD transport events in two ways. First, the Team reviewed a sample of transports that had been audited by BPD to determine whether BPD's internal reviews are fair and valid. Second, the Team also reviewed ten additional transports not previously reviewed by BPD auditors, for an additional level of independent analysis of BPD's compliance.

### A.     Detainee Transport Audits

As the Monitoring Team has previously observed, the Consent Decree requirements related to prison transport cannot be assessed through documentation alone. Accordingly, the Monitoring Team conducted a thorough review of transport events, from pickup to drop-off.

BPD has been conducting scorecard-based audits of two randomly selected transports in each of ten commands (nine districts and WATF) every month since January 2020 for a total of 20 audits per month (see Appendix II for list of scorecard measures). The Monitoring Team has noted that while the Consent Decree calls for five random audits per quarter from each district, for a total of 45 audits (¶236), BPD has exceeded the requirement by treating WATF as a district, and conducting an additional audit per district, performing a total of 60 audits per quarter. This is 15 more than the Consent Decree requires, per quarter. In addition to the greater frequency, BPD's audits are also broader, assessing not only compliance with the Consent Decree, but also BPD's

more robust policy provisions that require more than the Consent Decree. The reassessment reviewed the audits from a one-year period of June 2022 through May 2023. On an ongoing basis, a Monitoring Team subject matter expert ("SME") has been using a random number generator to select two of BPD's audits from every month to review independently as a quality assurance measure. Once the transports are selected, the SME validates each of the data points in the scorecard and reviews the corresponding body worn camera ("BWC") footage. The reviewer's findings are documented electronically and discussed with BPD monthly.

As in the initial compliance assessment, this review aggregated the SME's reviews to assess BPD's audit process, and to determine whether BPD's audit data could be used in this assessment. SME validation data was aggregated from the one-year period of June 2022 through May 2023. In the 24 randomly selected audits, in only 29 (2.9%) out of 984 possible instances (41 questions across 24 audits) did the Monitoring Team member score a field differently than BPD. There was no pattern to the disparities, regarding which questions were scored differently, nor whether the reviewer or BPD issued a more favorable score. In nearly every instance the discrepancy was the result of a technical coding decision (e.g., whether something should be scored as "N/A"). Because these differences were not systematic, and generally related to coding decisions and not substantive differences, the Monitoring Team concluded that it could use BPD's transport audits as a reliable data source in the Monitoring Team's assessment.

BPD estimates that approximately 10,521 transports occurred in calendar year 2022. A sample size of 96 BPD transport audits would thus provide a sufficient margin of error of less than or equal to $\pm 10\%$. The sample of 240 audits conducted by BPD per year exceeds this threshold. However, while BPD has been auditing 2 transports per command per month, the transports that occurred between June 2022 and May 2023 were not evenly distributed across all commands. To account for this, the Monitor Team supplemented its assessment by reviewing additional transports that had not previously been audited by BPD: 5 transports from the Central District and 5 from the Northeast District (i.e., the two districts with the most transports).

In all, the Monitoring Team reviewed a total of 34 transports (the 24 random audits conducted by the SME over twelve months, plus the reviews of 10 additional transports not previously reviewed by BPD). The total sample size in the Monitoring Team's analysis was thus 250: the 240 audits conducted by BPD and validated by the Monitoring SME and the 10 supplemental Monitoring Team Reviews. Where these 250 audits found a particular area out of compliance, the Monitoring Team analyzed the audit findings for the first six months (June through November 2022, "T2a") separately from the second six months (December 2022 through May 2023, "T2b") to determine which direction, if any, the findings were trending.

BPD has begun to track, and share with the Monitoring Team, when non-compliance uncovered by audits is referred to PIB. For the purposes of this assessment, the Monitoring Team notes when these referrals are made, but does not assess the misconduct investigation process or corresponding

outcomes.  Instead, the Monitoring Team will assess that process in its ongoing work assessing compliance with the Consent Decree's misconduct and discipline provisions.

### Findings

As stated above, the Monitoring Team analyzed 250 transport events (216 district audits and 24 WATF audits, as well as the Monitoring Team's 10 supplemental audits) from a one-year period. The results of this assessment are provided in Appendix II.

### i.    Audit of Equipment-Related Requirements

The Monitoring Team's audit results showed consistently high levels of compliance (>97%) with requirements related to equipment such as TVC (questions #1, #2, #41), grip straps (#3), handcuffing (#9), seatbelts (#15, #16, #17), and body worn cameras (#40).  This tracks with the findings of the prior section of the report, and demonstrates that not only is transport equipment functional, but also generally used in practice according to policy.  **The results of the Monitoring Team's review of transport events (over 95% compliance) are sufficient to place BPD in compliance in these areas. (Implementation – Initial Compliance (4(d))).**

### ii.    Audit of Responses to Medical Distress

Compliance with the requirement to take immediate action in response to signs of medical distress or injury (¶233, question #5) has shown some improvement.  This requirement involves not just injuries sustained during transport, but also injuries sustained before the transport, where the detainee exhibits distress or the injury is noted during the transport.  The Consent Decree requires BPD to ensure medical care in all of those instances, whether or not the injury occurred during the transport.  In the initial assessment, auditors said immediate action was not taken where appropriate in 21.1% of the reviewed cases (n=4 of 19).  In the reassessment the rate of non-compliance increased to 28.6% (n=10 of 35).  However, when the first six months of the reassessment period are analyzed separately from the second half, it appears that this area is trending in the right direction: in the first half of the reassessment period, 42.9% of relevant transports were determined to be non-compliant, whereas only 7.1% of the relevant transports in the second half were not compliant.

### Figure 7: Response to Medical Distress Audit Findings

Did the transporting member take immediate action in response to signs of medical distress or a physical injury?

| Time Period | No | Yes | Not Applicable |
|---|---|---|---|
| Initial Assessment (April – Sept. 2021) | 4 (21.1%) | 15 (78.9%) | 110 |
| Reassessment (June 2022 - May 2023) | 10 (28.6%) | 25 (71.4%) | 215 |
| *T2a (June – Nov. 2022)* | 9 (42.9%) | 12 (57.1%) | 101 |
| *T2b (Dec. 2022 – May 2023)* | 1 (7.1%) | 13 (92.9%) | 114 |

Additionally, nine of the ten instances in which members were determined to have not taken immediate action during the reassessment period were referred to the Public Integrity Bureau ("PIB"); as of the time of this writing, one referral was exonerated, one not sustained, and one sustained. The one instance that was not referred to PIB involved an arrestee saying "ow" in response to being handcuffed.

Per the Monitoring Team's standard test for compliance, BPD's rate of compliance places it outside of the area where compliance can be presumed, necessitating examination of the other factors laid out above. First, as initial matter, while the compliance rate over the entire year is low, it has risen to 92.9% over the last six months, placing this most recent performance very close to the zone of presumed compliance. The second factor, the severity of deviations from requirements deviation, cuts toward compliance as well – one of the cases of noncompliance involved a detainee simply saying "ow" when handcuffed, and only one of three completed PIB investigations resulted in a sustained finding. The third factor, the extent to which BPD is identifying and appropriately addressing problematic performance, also favors compliance. In particular, BPD has a robust audit function that has been validated by the Monitoring Team through this compliance review, and, critically, BPD auditors referred *all* instances of non-compliance to PIB for investigation. Finally, BPD's progress over time, also pushes towards a finding of compliance, with BPD having moved significantly from 67.1% compliance in the first half of the evaluated year to 92.9% compliance in the second half. **Weighing all of the factors, BPD has reached initial compliance in this area**. **(Implementation – Initial Compliance (4(d))).**

### iii.    Audit of Transportation Procedures for Persons in Custody

Another area in which there has been some degree of observed non-compliance is regarding whether the arresting and transporting member searched the detainee before placing them in the transport vehicle (question #10). This had previously been flagged as an area requiring improvement in the initial assessment, when detainees were not searched in 15.3% of transports in which reviewers could make a determination (18 of 129 were scored as "0" and 11 were "unable to determine"). In the reassessment, the percent of detainees not searched was 10.1% (24 "0", 11 "unable to determine").

Again, the rate of compliance with question #10 at 89.9% is outside the zone of presumed compliance, requiring that the Monitoring Team weigh the other compliance factors. The second factor (the severity of the deviations from Decree requirements) is neutral – there is nothing either aggravating or mitigating regarding the failures. The third factor, whether BPD has identified and addressed problematic performance, is also neutral. On the one hand, BPD has a robust audit function that has been validated by the Monitoring team. On the other, the Monitoring Team in this instance found that noncompliance was referred to PIB only half the time.

The final factor, BPD's progress over time, however, is sufficient to place BPD in compliance. First, BPD has improved its compliance for the entire evaluated period from the initial assessment by 5%. Second, when the first six months of the reassessment period are considered separately from the second half, BPD's performance in this area is improving: in the first half of the reassessment period, 14.0% of relevant transports were determined to be non-compliant, whereas only 6.5% of the relevant transports in the second half were not compliant. This improvement, which resulted in BPD improving to a rate of compliance of 93.5%, just below the 95% threshold, **is sufficient to carry BPD into compliance with the requirement that detainees be searched prior to transport. (Implementation – Initial Compliance (4(d)).)))**.

**Figure 8: Arrestee Search Audit Findings**

Did the arresting and transporting member search the detainee before placing him/her in the transport vehicle?



#### iv.    Audit of Monitoring Detainees and Other Enforcement Activities

Paragraph 227 of the Consent Decree requires BPD to periodically check persons in custody through direct observation or video transmission, and not to leave a person in custody unattended in a transport vehicle. Additionally, Paragraph 227 prevents officers from engaging in any "unrelated enforcement activities," while transporting a detainee, barring circumstances involving imminent risk of death or serious bodily injury. Little change has been observed regarding periodically checking on detainees via direct observation or video transmission (¶227, question #20). In the initial assessment, the rate of noncompliance was estimated to be 13.2%, though it was not possible to make a determination in many cases (15 scored "0", 14 scored "unable to determine"). The reassessment found noncompliance to be 14.5% (36 scored "0", 2 "unable to determine"), and there was no clear change when the first half of the reassessment period was compared to the second. The initial assessment found this area to be likely in compliance, but because many of the audits analyzed during the initial assessment did not address this requirement, a more robust analysis was required before the Monitoring Team could conclude that BPD was in compliance.

In the two other areas of this paragraph – refraining from leaving the detainee unattended and refraining from engaging in unrelated enforcement activities – the audits found 100% percent compliance during both the initial and reassessment periods.

Because this second, larger, sample has confirmed the same results as the first assessment, **the Monitoring Team finds BPD in compliance with Paragraph 227. (Implementation – Initial Compliance (4(d))).**

### v.    Audit of Safe Driving Practices

BPD has made sufficient progress to reach compliance in the areas of safe driving practices – both with regard to speed, and the manner in which the transporting member drives (¶231, question #33, #34).[15]  Additionally, following the recommendation in the initial assessment that BPD make AVL data available, BPD reports that audit personnel can access AVL data, and that supervisors can request AVL data, and see in Evidence.com the route that patrol officers took when transporting a detainee.  However, it is still not possible to use AVL to determine the speed of the prisoner transport vehicle.  Auditors must crosscheck each individual street's speed limit with speed data in a spreadsheet, which is time consuming, and not something that can be expected of first-line supervisors.

### Figure 9: Safe Driving Audit Findings

Did the transporting member obey the posted speed limit unless a person being transported required urgent and emergency medical care?  If a person being transported requires urgent and emergency medical care, the transporting officer may exceed the posted speed limit, as allowed for emergency vehicles under state law.



---

[15] This element of the assessment has been made more challenging by the fact that determinations could not be made in more than half of the cases during the initial and subsequent assessment, likely due to issues accessing AVL data.

Did the member drive the vehicle in a manner to preserve the safety and security of persons in custody?



BPD's rate of compliance in these two areas, 79% and 83% respectively, require examination of the other three factors described above. With respect to the second compliance factor, the instances of non-compliance are not severe. In most of these cases, the unsafe driving issue was related to speed, and there were some instances in which the "failing" score was largely the result of the slim margin of error that BPD has set and allows in its own audits. For example, there were cases in which transporting officers received a "0" for both safe driving questions (#33 and #34) due to driving as little as 7 miles per hour above the posted speed limit. BPD allows $\pm$ 5 miles per hour in non-emergency situations, which is prudently conservative. Nevertheless, speeds outside of that limit are still within safe driving practice and in line with the flow of traffic.[16] While there were some situations with clear and concerning speed violations (e.g., driving 61 mph in a 25 mph zone), it appears that some of BPD's struggles in this category are likely due to the tight parameters it has set for itself. While other unsafe driving practices beyond those dealing solely with speed have persisted, including at least 1 instance of driving an individual that was unrestrained, 20 failures to stop at a stop sign or red light, and 5 uses of a handheld device, only 5 of these identified instances were severe enough to result in a referral to PIB.

As to the third factor, BPD's identifying and addressing areas of non-compliance, its robust audit function and the referrals to PIB of potentially unsafe driving practices are extremely positive because they require BPD to consider closely the safety of transport vehicle operations, but accountability regarding driving practices is not exhaustive, likely as a result of the stringent speed limits imposed on transporting officers. This factor is thus neutral. The final factor is also neutral. While scores related to speeding improved from the first assessment to the second, the scores for safe practices generally remained the same. Additionally, there was not a sizable difference in safe driving practices when the first half of the reassessment period was compared to the second, suggesting that practices are not yet trending in a positive direction. **Ultimately, because the identified deviations in driving practices are typically not severe, the Monitoring Team finds**

---

[16] *See, e.g.*, U.S. Department of Transportation, *National Traffic Speeds Survey III: 2015* (Mar. 2018).

**BPD in initial compliance in this area**. **(Implementation – Initial Compliance (4(d))).** Nevertheless, as stated above, BPD must continue to improve in this area, improving safe driving practices and ensuring more instances of unsafe driving identified are sustained by PIB investigations, to avoid the risk that it falls out of compliance.

Transporting members demonstrated high degrees of communication regarding transfer of custody (¶234) (100%, question #4), and reporting some of the specific details of the transport via radio or other field-based reporting (>99% for questions #22, #23, #24, #25, #26).  **These high scores place BPD in compliance in this area. (Implementation – Initial Compliance (4(d))).**

### vi.    Documentation of Transport Details

As in the initial assessment, compliance with requirements focused on the documentation of transport details (¶232) remains weaker (Figure 10).  While BPD's audits, appropriately, focus on whether officers have completed the Transport Form and/or the Charge Information Form (Form 12)[17], for purposes of ultimate compliance with the Consent Decree, information regarding transports is likely captured otherwise in BPD's records, namely in BWC and computer-aided dispatch (CAD) data.  In certain instances, even when a Form 12 was completed by an officer, either the form or the BWC was not properly linked to the corresponding event in the RMS.  BPD should continue to press for better documentation using the newly implemented Transport Log in Axon Records,  and ensure that the forms, the BWC, and all relevant records are linked within the RMS.  Nevertheless, the existence of these other records serves as a backup that the Monitoring Team considered in assessing compliance.

Again, the Monitoring Team looks to the other three factors.  With regard to the severity of the deviation, the issues appear to be an administrative rather than related to policy-adherence, as Monitoring Team members have found during both assessments that they could see transporting members completing a Form 12 via body worn camera, yet the form itself could not be located.  Again, as stated above, these errors are likely mitigated, if not entirely corrected, by the existence of BWC and CAD data that captures the required information.

With regard to the third factor, BPD's ability to identify and correct areas, according to BPD personnel, any of the areas that appear in red on the monthly scorecard (i.e., $\leq$79% compliance) are discussed during Comstat, and must be addressed by executive command staff through actions such as guidance and counseling.  BPD states that they have seen improvement in other areas of the Consent Decree, using this Comstat driven approach to compliance, and hope that Comstat, coupled with PIB referrals will be successful in addressing the problem areas highlighted above, such as safe driving.  Additionally, Performance Standards Section ("PSS") personnel went out to

---

[17] The Charge Information Form (Form 12) is a paper form also used by the Central Booking Intake Center for their records.

roll calls to inform officers about compliance related issues, and also sit with administrative sergeants to discuss problem areas.

Finally, compliance with documentation and communication requirements detailed in this series of questions is consistently higher during the reassessment period than during the initial assessment.  The Monitoring Team expects that the digital Transport Log added to Axon Records in August 2023 will support continued improvement in this area and anticipates observing such in future assessments.  **Because the second, third and fourth compliance factors point toward compliance, the Monitoring Team finds BPD in compliance in this area. (Implementation – Initial Compliance (4(d))).**

**Figure 10: Distribution of Scores for Scorecard Questions Involving Documentation**

| Scorecard Question | Initial Assessment % Compliance | Reassessment % Compliance |
|---|---|---|
| 22 | 100 | 100 |
| 23 | 100 | 100 |
| 24 | 100 | 100 |
| 25 | 100 | 99.6 |
| 26 | 95.3 | 99.2 |
| 27 | 57.1 | 79.2 |
| 28* | 53.7 | 78.3 |
| 29 | 61.6 | 78.8 |
| 30 | 63.7 | 78.8 |
| 31 | 65.4 | 79.6 |
| 32* | 69.7 | 79.4 |

*\* Note – although questions 28 and 32 are included in the audit scorecard, they do not capture requirements explicitly articulated in a Consent Decree paragraph.*

### B.    Quarterly Spot Check Audits

In addition to the after-the-fact reviews of transports, the Consent Decree requires that BPD conduct random and unannounced spot-checks of at least three transports from each BPD district to inspect for use of seatbelts and operation of the TVC system each quarter (¶ 236(d)).  These inspections have been documented in separate scorecards that address the two requirements of Paragraph 236(d), in addition to other Consent Decree requirements and BPD policies (e.g., equipment, gender separation, youth/adult separation, medical attention and BWC compliance requirements). .

Transport inspection data is available dating back to the first quarter of 2019, and scorecards are available in Excel spreadsheet format beginning with the second quarter of 2020.  The initial assessment reviewed 27 scorecards from the third quarter of 2020 through the second quarter of 2021.  This reassessment reviewed data is from transport reports from the third quarter of 2022 through second quarter of 2023.

*Findings*

BPD conducted three random spot checks in each of the nine districts every quarter, for a total sample of 108 transports reviewed over a one-year period.  Slightly less than half (n=49, 45%) of audits involved wagon transports (in the prior assessment, 67% involved wagons).  Again, because of the way BPD currently maintains transport data, it is not possible to determine if this proportion is representative of the broader population of transports that occur across districts.  Nevertheless, BPD reports fewer wagons have been available in the time since the initial compliance assessment, which would logically cause the proportion of wagon transports to total vehicle transports to decrease.

The 108 audited transports involved 83 different drivers, with most drivers (n=69) being audited just once.  As in the case of the initial audit, there was little variation in the shift time during which audits occurred.  In the initial assessment, all audited transports but one occurred between 7:40am and 1:55pm; in the reassessment, all audits occurred between 8:54am and 2:20 pm.

The following are the results of the Monitoring Team's review of the 108 sampled transports in the initial assessment (Q3 2020 – Q2 2021) and the 108 sampled transports of the reassessment (Q3 2022 – Q2 2023):

1. ***Was the wagon TVC system operating properly?***
   Initial Assessment:     100% (n=72)
   Reassessment:            100% (n=49)

2. ***Was the prisoner seat belted?***
   Initial Assessment:     99% (n=107), 1 PIB referral
   Reassessment:            100% (n=108)

3. ***Was a transport vehicle with safety barriers utilized?***
   Initial Assessment:     100% (n=108)
   Reassessment:            100% (n=108)

4. ***Were males and females separated?***
   Initial Assessment:     80% (n=4 of 5 relevant transports), 1 PIB referral
   Reassessment:            100% (n=2)

5. ***Were youth in the same vehicle as adult prisoners?***
   Initial Assessment:     N/A (n=0 relevant transports)
   Reassessment:            N/A (n=0 relevant transports)

**6.  If the prisoner complained of injury, or if there were obvious signs of injury, was the prisoner provided medical attention?**

Initial Assessment:  80% (n=8 of 10 relevant transports), 1 PIB referral (other instance of non-compliance occurred before PIB referrals were tracked on scorecard)

Reassessment:  83% (n=5 of 6 relevant transports), 1 PIB referral

**7.  Was the transporting officer's BWC activated during transport?**

Initial Assessment:  97% (n=105), 2 PIB referrals, (other instance of non-compliance occurred before PIB referrals were tracked on scorecard)

Reassessment:  98% (n=106), 2 PIB referrals

During the reassessment, the three instances of non-compliance (questions #6 and #7) each resulted in a PIB referral, reflecting a properly functioning internal accountability mechanism. Overall compliance rates for these audits were well above 95% (except for categories with very few samples) and there were only three instances of noncompliance total, all of which were appropriately addressed by internal mechanisms.  Given that finding, and that there was 100% compliance with the two requirements specifically articulated in Paragraph 236(d) (i.e., whether the TVC was operating properly, and whether the prisoner was seat belted) **the Monitoring Team finds this area in initial compliance**. **(Implementation – Initial Compliance (4(d))).**

###    C.    Assessment of Transport Injury Reports

The Consent Decree requires BPD to employ practices that reduce the likelihood of injury during transports, and to improve its documentation when injuries do occur.  At the time of the initial assessment, BPD did not document injuries using an electronic form or maintain data electronically, making analysis difficult.  Although Axon Records, BPD's new RMS, was launched in July 2021 and configured to record data from the Charge Information Form (Form 12) in early 2022, analyzing the data entered into the new system was still challenging throughout 2022.[18]  In August 2023, BPD added a Transport Log in Axon Records that captures information previously recorded on the Transport Form, and BPD has also improved its ability to extract data from the Transport Log.  With those improvements, BPD can now input and store data on transportation-related injuries.  In the initial assessment the Monitoring Team, lacking this new

---

[18] BPD provided the following additional views on the development of its RMS system:

"(The challenges were similar to those in the SSA section. See SSA Annual Data Analysis Progress Report https://www.baltimorepolice.org/sites/default/files/2023-08/2021-2022%20Stops%2C%20Searches%2C%20%26%20Arrests%20Progress%20Report.pdf).   With recent improvements to accessing data, coupled with a pivot in August 2023 from a Transport Form to a Transport Log that includes additional transport details, BPD is better positioned to store and analyze data moving forward."

data, attempted unsuccessfully to rely on assessments by the Use of Force Assessment Unit of transportation-related injuries.  In the initial assessment the Monitoring Team was unable to identify any such referrals in IAPro, BPD's PIB system.

Each report extracted from Axon Records contains data fields to include information related to injuries, including:

- Seat belted?

- Perceive arrestee to be in need of medical attention?

- Arrestee have medical equipment?

- Force used on arrestee?

- Arrestee injured during transport?

- Nature of injury and first aid/medical care provided

In the reassessment, BPD searched Transport Form data stored in the Axon Records from March 1, 2022 through August 16, 2023 for transport incidents involving injuries.  BPD produced a spreadsheet of transport incidents in which the officer answered "yes" to whether the arrestee had been injured during the transport.  Additionally, BPD personnel also separately flagged cases for the Monitoring Team in which injuries occurred during transports.

### Findings

BPD's search of Axon Records identified 19 transport events between March 1, 2022 and August 16, 2023, during which an officer marked "yes" to the question on the Transport Form that captured whether an arrestee was injured during a transport.

Although the 19 incidents were labeled as having transportation-related injuries, three were included in error, and based on the information entered on the forms, most of the injuries occurred during the arrest.  Eleven of the reported injuries, however, did occur during the transport.  Those included: a complaint of head pain following transport vehicle accident; an individual who hit his head when falling asleep or falling over in vehicle while seat belted; neck injury during suicide attempt involving a transport vehicle seatbelt; and scrapes and lacerations from escape attempts. Based on available documentation, it appears that a medic was contacted in each event, and/or the arrestee was transported to the hospital.[19]

---

[19] BPD notes that of the eleven injuries that occurred during transports, eight had associated use of force reviews and one was reviewed by the Crash Unit.  Of the eight use of force reviews, seven were found to be within policy and to have been caused by the arrestee moving in such a manner to cause the injury; one review resulted in a sustained allegation of neglect of duty. Of the two that did not have use of force or Crash Unit reviews, both arrestees bumped their head, and one had suicidal ideations; both were transported to the hospital.

In addition to the Axon Records results, BPD's Use of Force Assessment Unit personnel identified for the Monitoring Team, five instances in which arrestees were injured during transports. Only two were identified during the Axon search, because the other three were not properly filled out electronically, the officer completing the form having failed to check a box to indicate that there was an injury. Others within BPD have determined that two of these injuries flagged by the Use of Force Assessment Unit as involving injuries during transports, in fact occurred prior to the transport.

Lastly, Paragraph 236(c) of the Consent Decree requires "A review of every injury reported to have occurred during transportation to determine if there are any trends related to transport policies and practices". BPD has advised that this analysis will be included in their forthcoming Use of Force Report.

**Because BPD has continued to work on improving its data management and extraction from Axon Records, to include the new Transport Log, BPD is in compliance in this area. (Implementation – Initial Compliance (4(d)).**

### D.    Review of Training Records

The Consent Decree requires BPD to "ensure that all officers who drive transport wagons are provided a training of at least eight hours on safe and humane transportation of persons in custody, including the requirements of this Agreement, BPD policy and procedures related to transport, safe driving methods, the identification of medical distress and injuries, and proper restraint techniques" (¶238). BPD has provided standalone training to officers in this area, and has also incorporated it into initial training, such that all incoming recruits receive wagon instruction as part of their basic training curriculum.

The initial compliance assessment, which examined the training history documentation of drivers of transports selected in the monthly and quarterly BPD audits, found most wagon transports assessed (70 of 93, or 75.3%) involved officers with documented training.

For the reassessment, BPD was able to provide the Monitoring Team with an inventory of all wagon transports conducted during a 12-month period (April 21, 2022, through April 20, 2023). From these 3,518 wagon transports, the Monitoring Team randomly selected a statistically representative sample of transports (n=94), reflecting a 95% confidence interval, with a $\pm10\%$ margin of error. These 94 transport events involved 46 BPD drivers. Specialized training records were queried for the 33 drivers in the sample who completed academy training before wagon driving was included in the basic training curriculum; documentation of completing academy

training was queried for the thirteen drivers who completed the academy after wagon instruction was added to entry level training. [20]

*Findings*

All 13 of the drivers who completed entry level training after the wagon driving curriculum was added to initial training, had documentation to demonstrate that they had completed their training. Of the remaining 33 drivers, 85% (n=28) completed the wagon driver certification since 2015. The other 5 drivers were each described as "secondary," to indicate that driving wagons was not their primary assignment, and that they were temporarily filling the role.  When applied to the full sample, these 5 drivers conducted 8 (8.5%) of the 94 total transports.

In this reassessment, the Monitoring Team found training-related compliance issues were isolated to drivers who graduated the police academy before wagon training was added to the initial curriculum.  Given the continued improvement in training new personnel, and the staffing related challenges required use of "secondary" drivers, **Paragraph 238 will be scored *4d – Initial Compliance*, with the expectation that in future audits, all wagon transports will be conducted by individuals who have documented training.**

### E.      Compliance with Provisions Protecting Specific Classes

The initial assessment did not review compliance with transportation provisions related to gender identity or expression, juvenile status, or the transport of medical equipment used by persons with disabilities (¶ 229, 230), due to limitations in how these events were identified in BPD's then-existing data systems.  BPD believed that the incidence of transporting individuals of Transgender, Intersex, and/or Gender Non-conforming identity or expression to be relatively rare, though the actual frequency is unknown.  As a result, it was unlikely for events involving these individuals to be included in the random audit samples reviewed in this assessment.  To account for this, the Monitoring Team conducted targeted queries in the Axon records management system for transport events involving these specific classes.

### i.      Medical Equipment

Paragraph 230 requires medical equipment be "transported to the final destination of the individual who requires them."  The Monitoring Team assessed compliance with this paragraph by using the text search functionality within Axon Records to identify cases involving the transport of medical equipment, and then used linked Evidence.com records to view corresponding footage.  The Monitoring Team searched Transport Forms in Axon Records during a one-year period (July 1, 2022, through June 30, 2023), for the following terms: "wheelchair", "wheel chair", "cane",

---

[20] Such a random sampling was not possible at the time of the initial assessment but could be conducted during this assessment because of improvements to BPD's records systems.

"inhaler", "oxygen", "crutch", and "prosthetic". This list is not exhaustive of all medical equipment that may be transported, but identified cases that involved the transport of equipment in a targeted manner.

The search identified many reports that included medical equipment keywords in the narrative, but were used to describe a witness, otherwise involved person (e.g., bystander in a wheelchair), or weapon (e.g., hitting a victim with a cane or crutch), not an arrestee. There were also several instances in which "prosthetic" returned results, but the arrestees' prostheses were not removed, and were thus not transported separately from the individual.

During the 12-month period queried, the following transports were identified as involving the transport of detained individuals' medical equipment:

**Figure 11: Results of Keyword Search for Transports Involving Medical Equipment**

| Keyword Search Result | Keyword | "Arrestee Have Medical Equipment and/or Medication" indicated on Transport Form? | Transport of medical equipment visible on BWC? |
|---|---|---|---|
| 1 | Wheelchair | No | Yes |
| 2 | Wheelchair | Yes | Yes |
| 3 | Wheelchair | No | Yes |
| 4 | Wheelchair | No | Yes |
| 5 | Cane | Yes | Yes |
| 6 | Inhaler | Yes | Yes |
| 7 | Inhaler | No | Not visible, but officer is heard telling arrestee that he would inform CBIF about the inhaler |

This review of transport of medical equipment did not identify any problematic incidents but did make clear that Transport Forms are not always accurately documenting the transport of arrestees' medical equipment. Of the seven transports identified using the keyword search, only three had a corresponding Transport Form that affirmed that the arrestee had medical equipment and/or medication. While this shortcoming limits BPD's own self-monitoring and auditing functions, a more robust search of narratives and video footage for additional types of medical equipment, and medication may be possible as the capacity of BPD's Axon Records system improves, and the new Transport Log, which launched in August 2023, is used.

The findings of this review, paired with the monthly audits, which found reasonable accommodations were made during an arrest involving a detainee requiring a medical device 100% of the time (n=4; scorecard question #7), and that the transporting member followed policies

related to prescription medications in 4 of 5 relevant situations (scorecard question #8), **result in a score of 4d – Initial Compliance for Paragraph 230.**

   ii.   **Gender Identity**

The Monitoring Team also searched arrestee transports that occurred between July 1, 2022 and June 30, 2023 to assess compliance with Paragraph 229, which requires that that "males and females are not transported within the same compartment of a vehicle" and "Transgender, Intersex, and/or Gender Non-conforming individuals . . . shall be transported with other arrestees of the same Gender Identity and Expression unless the individual expresses a safety concern or the officer identifies a safety concern, in which case the individual shall be transported alone."

In the one-year period searched, 1,846 female arrestees were transported in 1,481 unique transport events (as some transports involved multiple female arrestees).  Of the 1,846 female arrestees, 1,414 (77%) were transported alone according to the corresponding transport forms; 431 (23%) involved between 1 and 5 other individuals, and one form left the field blank.

During the same period, 20 records indicated that a person involved had a gender of "X", however none of these individuals were the arrestee.  Instead, in most instances the individual identifying as "X" were victims or "otherwise involved parties."  Additionally, in several instances it appears that the personnel completing the report misused the gender "X" to indicate that the gender field was either "not applicable" or "unknown."

Video footage was located for 100% (n=50) of the 50 transport incidents that according to the Transport Forms involved one woman and one other person, which the Monitoring Team reviewed.  Notably, nearly half (46%, n=23) of the 50 transports involved a female being transported alone despite what was documented in the Transport Form.

Of the remaining 27 transports with video footage, 8 did not involve arrestees, and instead involved the transport of victims and juveniles.  In the remaining 19 unique transport events, females were transported only with other females 100% of the time.

This initial review of compliance with the requirement that males and females be transported separately did not identify any violations, which is consistent with the findings of the transport audits.  In the video footage of many of the events, officers could be heard stating to their colleagues or those being transported, that they needed to ensure males and females were not transported together.  The rate of inaccuracy of the Transport Forms regarding whether the individual was transported alone, while not taking BPD out of compliance is an issue that BPD should address to ensure its ability to self-audit going forward to remain in compliance.  These errors are likely due to officers misinterpreting the wording of the field "number of others being transported."  BPD has advised that it can revise this wording to improve clarity.  Additionally, use of the new Transport Log within Axon Records will likely reduce errors (as it is more user-

friendly, and includes a field for sex, which was not present in the Transport Form) and all for more reliable auditing after the fact.

The findings of this review, paired with the monthly audits described earlier, which found that male and female detainees were transported in separate compartments 100% of the time (n=2; scorecard question #12), and that a transgender, intersex, and/or gender non-conforming detainee was transported either alone or with someone of the same gender identity in the one relevant instance (scorecard question #13), **result in a score of 4d – Initial Compliance for this requirement.**

### iii.   Juvenile Status

Lastly, the Monitoring Team searched arrestee transports that occurred between July 1, 2022 and June 30, 2023 to assess compliance with Paragraph 229, which requires that "to the extent reasonably apparent, juvenile and adult persons in custody will not be transported in the same compartments."

In the one-year period queried, 771 arrested juveniles (i.e., under the age of 18) were transported in 522 transport events (as some transports involved multiple juvenile arrestees). Of the 771 juvenile arrestees, 564 (73%) were transported alone according to the corresponding transport forms; 207 (27%) involved between 1 and 5 other individuals.

Video footage was located for 100% (n=50) of the 50 transport incidents that, according to the Transport Forms, involved one juvenile and at least one other person. As with female transports, despite the form indicating that the individual was transported with one other person, more than half (56%, n=28) of the 50 transports viewed involved a juvenile arrestee being transported alone. This again suggests record keeping issues.

Of the 22 transports with available video footage and more than one individual being transported, 4 did not involve arrestees, and instead involved bringing a victim or missing individual home. In the remaining 18 unique transport events, there were 3 transports in which it appeared that there were both adult and juvenile arrestees; in all 3 instances the adult and juvenile were transported either in separate vehicles or separate wagon compartments.

As with the other areas of this paragraph, this initial review of compliance with the requirement that juveniles and adults be transported separately did not identify any violations. Again, however, that BPD should address its record-keeping lapses to ensure its ability to self-audit going forward to remain in compliance.

**Overall, the findings of this review result in a score of 4d – Initial Compliance for this requirement.**

## V.      APPENDIX I: Summary of Compliance Determinations

| Consent Decree Paragraph | | Initial Compliance Score (2022) | Reassessment Compliance Score (2023) |
|---|---|---|---|
| 222 | The Parties recognize that safe and effective transportation of detainees is an essential step in the process of taking a person into custody and must be conducted in a manner that protects the wellbeing and personal security of officers, the public, and the people being transported.<br><br>BPD has recently implemented new and/or amended policies regarding transportation of passengers and persons in custody.  To the extent those policies meet the requirements of this Agreement, further revisions are not required.  BPD will build upon its recently revised policies as required by this Agreement to ensure that all detainees are treated in a humane manner before, during, and after their transportation, with due regard for their physical safety and protection, consistent with sound principles of prisoner security. | **4d**<br>*(Initial Compliance)* | **4d**<br>*(Initial Compliance)* |
| 223 | BPD will ensure that all vehicles used by BPD for the transportation of persons in custody, including transport wagons or vans and police cruisers outfitted with dividers, contain sufficient and functioning seatbelts for each person in custody they are intended to transport.  In addition to a seatbelt, BPD will ensure that all transport vans or wagons are outfitted with a strap located along the rear area of each seat that persons being transported may grip for security during transport. | **4d**<br>*(Initial Compliance)* | **4d**<br>*(Initial Compliance)* |
| 224 | BPD will supplement its existing policies to ensure that all transport wagons or vans that are used during prisoner transport are equipped with a functioning transport vehicle camera ("TVC") system, which includes video recording equipment within all compartments used for the transportation of persons in custody.  The TVC system will display a live video to officers located in the driver's section of the vehicle, and also record the video to be preserved for future viewing.  The TVC system will be used to record every instance of transportation of a person in custody, for the duration of the time the person in custody is within the vehicle.  BPD officers will be prohibited from turning off or disabling the TVC system at any point while a person in custody is within the vehicle or being loaded into or removed from the vehicle.  All transport vehicle video recordings will be maintained by BPD for a period of at least 1 year, or for longer as required by BPD policy. | **4d**<br>*(Initial Compliance)* | **4d**<br>*(Initial Compliance)* |
| 225 | BPD will inspect all vehicles used for the transportation of persons in custody on at least a monthly basis to ensure that all equipment, including video recording equipment, seatbelts, and straps, are fully functional. | **4c**<br>*(Implementation – On Track)* | **4d**<br>*(Initial Compliance)* |
| 226 | BPD will ensure that every person in custody being transported is secured by a fastened seatbelt or other authorized restraining device, in accordance with existing BPD policy.  The number of people being transported in a given vehicle shall never exceed the number of seatbelts or other authorized restraining devices in the vehicle. | **4d**<br>*(Initial Compliance)* | **4d**<br>*(Initial Compliance)* |

| Consent Decree Paragraph | | Initial Compliance Score (2022) | Reassessment Compliance Score (2023) |
|---|---|---|---|
| 227 | BPD will ensure that officers periodically check on the persons in custody during the transport process, either by direct observation or through live video transmission, in a manner that ensures the safety and security of the officers and the people being transported.  At no time will a person in custody be left unattended in a transport vehicle.  BPD will ensure that officers who are transporting persons in custody do not engage in any unrelated enforcement activities unless failure to act would result in imminent risk of death or serious bodily injury. | **4c** *(Implementation – On Track)* | **4d** *(Initial Compliance)* |
| 228 | BPD will ensure that officers restrain persons in custody for transport in a manner that does not cause undue pain, undue risk of injury, or actual injury to the individual being transported . BPD will prohibit officers from transporting any persons who are restrained in a prone position (including the so-called "hog-tie" position), or handcuffing persons in custody to any part of a vehicle used for transport. | **4d** *(Initial Compliance)* | **4d** *(Initial Compliance)* |
| 229 | BPD will ensure that males and females are not transported within the same compartment of a vehicle.  If a vehicle contains only one compartment used for transporting persons in custody, BPD will use separate vehicles to transport males and females.  Similarly, to the extent reasonably apparent, juvenile and adult persons in custody will not be transported in the same compartments.  Transgender, Intersex, and/or Gender Non-conforming individuals, as defined in this Agreement, shall be transported with other arrestees of the same Gender Identity and Expression unless the individual expresses a safety concern or the officer identifies a safety concern, in which case the individual shall be transported alone. | **4a** *(Implementation – Not Assessed)* | **4d** *(Initial Compliance)* |
| 230 | BPD will ensure that wheelchairs, crutches, prosthetic devices, and other medical equipment required by persons with disabilities are transported to the final destination of the individual who requires them.  If possible, without creating potentially hazardous conditions, such medical equipment will be transported in the same vehicle as the individual who requires them. | **4a** *(Implementation – Not Assessed)* | **4d** *(Initial Compliance)* |
| 231 | Other than the exception listed below, BPD will ensure that all officers driving a transport vehicle do not exceed the posted speed limit, and that the vehicle is driven in a manner that is calculated to preserve the safety and security of the persons in custody being transported.  If a person being transported requires urgent and emergency medical care, the transporting officer may exceed the posted speed limit, as allowed for emergency vehicles under state law. | **4a** *(Implementation – Not Assessed)* | **4d** *(Initial Compliance)* |
| 232 | BPD will ensure that during every instance of transport of a person in custody, the transporting officer will communicate the following information to dispatch or through other field-based reporting, which will be recorded and preserved for review:<br><br>a.   The location of the vehicle where persons in custody are picked up;<br><br>b.   The time that the transportation unit departs the scene where a person was taken into custody; | **4a** *(Implementation – Not Assessed)* | **4d** *(Initial Compliance)* |

| Consent Decree Paragraph | | Initial Compliance Score (2022) | Reassessment Compliance Score (2023) |
|---|---|---|---|
| | c. How many persons in custody are being transported;<br><br>d. The destination of the vehicle;<br><br>e. The starting and ending mileage on the vehicle;<br><br>f. The time of arrival at the destination; and<br><br>g. Whether at any time the officer perceived the person in custody to be in need of medical attention. | | |
| 233 | BPD will ensure that its officers periodically check on persons in custody from the time of arrest to the time of transfer of custody for apparent signs of medical distress or emergency.  When a person in custody displays signs of medical distress or physical injury, BPD will ensure that officers take immediate action.  These actions may vary depending on the particular circumstances but may include (a) calling for assistance from medical personnel; (b) rendering first aid; or (c) immediately transporting the person to a hospital emergency room.  Any time that an officer perceives that a person in custody is in medical distress or has a physical injury, the officer shall communicate this information to his or her supervisor. | **4c**<br>*(Implementation – On Track)* | **4d**<br>*(Initial Compliance)* |
| 234 | BPD will develop policies and procedures for determining at the point of transfer to another agency whether arrested persons were placed at undue risk, harmed, or injured while being transported.  This process will include gathering and preserving data regarding whether persons were adequately restrained by a seatbelt during transport, whether force was used during transport, whether the person was injured during transport, the nature of the injury, and whether first aid or medical care was provided. | **4d**<br>*(Initial Compliance)* | **4d**<br>*(Initial Compliance)* |
| 235 | Every injury that is reported to have occurred during transport will be reviewed as a use of force as provided for in Section VII(D), Use of Force, or, if appropriate, as part of a vehicle crash investigation. | **4a**<br>*(Implementation – Not Assessed)* | **4d**<br>*(Initial Compliance)* |
| 236 | BPD will conduct quarterly audits of its transportation process to determine whether officers are properly following correct transportation procedures and that persons in custody who are being transported are not placed at risk of injury.  The audits will include: | | **4d**<br>*(Initial Compliance)* |
| | a. A review of information for at least five randomly selected instances of transport of persons in custody from each police district within the previous quarter, including reviewing all video recordings associated with each instance; reviewing and analyzing location, time, and odometer information to calculate the speed that the transport vehicle was driven; and reading any reports associated with the arrest, detention, and transport of the arrested person; | **4c**<br>*(Implementation – On Track)* | **4d**<br>*(Initial Compliance)* |
| | b. An analysis of the data collected during the previous quarter in Paragraph 232 of this Section; | **4c**<br>*(Implementation – On Track)* | **4d**<br>*(Initial Compliance)* |

| Consent Decree Paragraph | | Initial Compliance Score (2022) | Reassessment Compliance Score (2023) |
|---|---|---|---|
| | c. A review of every injury reported to have occurred during transportation to determine if there are any trends related to transport policies and practices; and | **4c** *(Implementation – On Track)* | **4d** *(Initial Compliance)* |
| | d. Random and unannounced spot-checks of at least three transportation vehicles from each BPD district to inspect for use of seatbelts and operation of the TVC system. | **4d** *(Initial Compliance)* | **4d** *(Initial Compliance)* |
| 237 | Whenever, through auditing or otherwise, it is determined that an officer did not comply with BPD policies and procedures, BPD will take appropriate action, including the initiation of disciplinary procedures. | **4c** *(Implementation – On Track)* | **4d** *(Initial Compliance)* |
| 238 | BPD will review and revise its policies, procedures, and trainings associated with the transportation of persons in custody to ensure compliance with the requirements of this Agreement.  BPD will ensure that all officers who drive transport wagons are provided a training of at least eight hours on safe and humane transportation of persons in custody, including the requirements of this Agreement, BPD policy and procedures related to transport, safe driving methods, the identification of medical distress and injuries, and proper restraint techniques.  Up to four hours of the training required under this section may be satisfied by general training programs, which may include units regarding the requirements of the Agreement that are relevant to the safe transportation of detainees, including the identification of medical distress and injuries, and proper restraint techniques. | **4c** *(Implementation – On Track)* | **4d** *(Initial Compliance)* |

## VI.    APPENDIX II: Detainee Transport Scorecard

*Note: "T1" refers to the initial assessment period; "T2" refers to the reassessment period. If a particular area was found to be out of compliance during T2, the Monitoring Team analyzed the audit findings for the first six months (June - November 2022, "T2a") separately from the second six months (December 2022 - May 2023, "T2b") to determine which direction, if any, the findings were trending.*

| | Scorecard Measure | Time Period | 0 | 1 | Not Applicable | Unable to Determine |
|---|---|---|---|---|---|---|
| 1 | Was the transport vehicle equipped with a functioning transport vehicle camera (TVC) system? | T1 | 1 (1.8%) | 55 (98.2%) | 71 | 2 |
| | | T2 | | 94 (100.0%) | 153 | |
| 2 | Did the transporting member conduct a function test to ensure the TVC was operating properly and contained sufficient available memory before each tour of duty? | T1 | | 53 (100.0%) | 73 | 3 |
| | | T2 | | 92 (100.0%) | 158 | |
| 3 | Was the transport van outfitted with a grip strap along the rear area of each seat? | T1 | 2 (4.2%) | 46 (95.8%) | 81 | |
| | | T2 | | 76 (100.0%) | 174 | |
| 4 | Did the transporting and the receiving member communicate transfer of custody? | T1 | | 118 (100.0%) | 9 | 2 |
| | | T2 | | 229 (100.0%) | 21 | |
| 5 | Did the transporting member take immediate action in response to signs of medical distress or a physical injury? | T1 | 4 (21.1%) | 15 (78.9%) | 110 | |
| | | T2 | 10 (28.6%) | 25 (71.4%) | 215 | |
| | | T2a | 9 (42.9%) | 12 (57.1%) | 101 | |
| | | T2b | 1 (7.1%) | 13 (92.9%) | 114 | |
| 6 | If the officer perceived that a person in custody was in medical distress or had a physical injury, did the officer communicate this information to his/her supervisor? | T1 | | 10 (100.0%) | 111 | 8 |
| | | T2 | | 16 (100.0%) | 215 | 19 |
| 7 | Did the transporting member make a reasonable accommodation for an arrest involving a detainee with a disability requiring wheelchairs, crutches, prosthetic devices, or other medical equipment required by persons with disabilities? | T1 | | 1 (100.0%) | 128 | |
| | | T2 | | 4 (100.0%) | 246 | |
| 8 | Did the transporting member determine if the detainee was under any prescribed medication prior to transporting him or her from the detention facility, mental health facility or hospital, and ensured that the medication accompanied the detainee in sufficient quantity to cover the anticipated time in departmental custody? | T1 | 3 (100.0%) | | 112 | 14 |
| | | T2 | 1 (20.0%) | 4 (80.0%) | 205 | 40 |
| 9 | Was the detainee handcuffed prior to transport? | T1 | | 129 (100.0%) | | |

| | Scorecard Measure | Time Period | 0 | 1 | Not Applicable | Unable to Determine |
|---|---|---|---|---|---|---|
| | | T2 | | 250 (100.0%) | | |
| 10 | Did the arresting and transporting member search the detainee before placing him/her in the transport vehicle? | T1 | 18 (15.3%) | 100 (84.7%) | | 11 |
| | | T2 | 24 (10.1%) | 213 (89.9%) | | 13 |
| | | T2a | 16 (14.0%) | 98 (86.0%) | | 8 |
| | | T2b | 8 (6.5%) | 115 (93.5%) | | 5 |
| 11 | If the detainee was searched, did the transporting member refrain from conducting a cross-gender search, absent exigent circumstances, or if impracticable ? | T1 | 3 (9.7%) | 28 (90.3%) | 94 | 4 |
| | | T2 | 1 (2.3%) | 42 (97.7%) | 203 | 4 |
| 12 | Were male and females detainees transported in separate compartments? | T1 | | 1 (100.0%) | 128 | |
| | | T2 | | 2 (100.0%) | 248 | |
| 13 | Were transgender, intersex, and/or gender non-conforming detainees transported with other arrestees of the same gender identity and expression or were they transported alone after expressing a safety concern or if a safety concern was apparent to the officer? | T1 | | | 129 | |
| | | T2 | | 1 (100.0%) | 249 | |
| 14 | Were juvenile and adult detainees transported in separate compartments (when it is reasonably apparent that the juvenile is a juvenile)? | T1 | | 2 (100.0%) | 127 | |
| | | T2 | | | 250 | |
| 15 | Were all passengers, regardless of age and seat location, restrained by a seatbelt or other authorized restraining device before transport commenced? | T1 | 1 (0.8%) | 128 (99.2%) | | |
| | | T2 | 2 (0.8%) | 247 (99.2%) | 1 | |
| 16 | Did the transporting member confirm the detainee was not restrained in a manner that caused undue pain, undue risk of injury, actual injury or a prone position (including the so called "hog-tie")? | T1 | | 129 (100.0%) | | |
| | | T2 | 7 (2.8%) | 242 (97.2%) | | 1 |
| 17 | Did the transporting member refrain from handcuffing detainees to any part of the vehicle used for transport? | T1 | | 129 (100.0%) | | |
| | | T2 | | 250 (100.0%) | | |
| 18 | Did the transporting member refrain from leaving the detainee unattended in the transport vehicle? | T1 | | 129 (100.0%) | | |
| | | T2 | | 250 (100.0%) | | |
| 19 | Did the transporting member refrain from engaging in unrelated enforcement activities, unless failure to act would result in imminent risk of death or serious bodily injury? | T1 | | 129 (100.0%) | | |
| | | T2 | | 250 (100.0%) | | |

| | Scorecard Measure | Time Period | 0 | 1 | Not Applicable | Unable to Determine |
|---|---|---|---|---|---|---|
| 20 | Did the transporting member periodically check on the detainee by direct observation or live video transmission from the time of the arrest to the time of transfer of custody? | T1 | 15 (13.2%) | 99 (86.8%) | 1 | 14 |
| | | T2 | 36 (14.5%) | 212 (85.5%) | | 2 |
| | | T2a | 16 (13.1%) | 106 (86.9%) | | |
| | | T2b | 20 (15.9%) | 106 (84.1%) | | 2 |
| 21 | Did the transporting member take action if a detainee became unrestrained? | T1 | 2 (33.3%) | 4 (66.7%) | 123 | |
| | | T2 | 3 (17.6%) | 14 (82.4%) | 187 | 46 |
| | | T2a | | 6 (100.0%) | 94 | 22 |
| | | T2b | 3 (27.3%) | 8 (72.7%) | 93 | 24 |
| 22 | Did the transporting member report, via radio/Charge Information Form, Form 12, the number of detainees in custody that were being transported? | T1 | | 128 (100.0%) | | 1 |
| | | T2 | | 250 (100.0%) | | |
| 23 | Did the transporting member report, via radio/Charge Information Form, Form 12, the location where the detainee(s) were picked up by the transport vehicle (if different from arrest location)? | T1 | | 78 (100.0%) | 49 | 2 |
| | | T2 | | 23 (100.0%) | 227 | |
| 24 | Did the transporting member report, via radio/Charge Information Form, Form 12, the location of the detainee(s) destination? | T1 | | 128 (100.0%) | | 1 |
| | | T2 | | 250 (100.0%) | | |
| 25 | Did the transporting member report via radio/Charge Information Form, Form 12, when the transporting vehicle departed the scene with dispatch providing the official timestamp? | T1 | | 127 (100.0%) | | 2 |
| | | T2 | 1 (0.4%) | 249 (99.6%) | | |
| 26 | Did the transporting member report via radio/Charge Information Form, Form 12, when the transportation vehicle arrived at the destination with dispatch providing the official timestamp? | T1 | 6 (4.7%) | 122 (95.3%) | | 1 |
| | | T2 | 2 (0.8%) | 248 (99.2%) | | |
| 27 | Did the transporting member report, via Charge Information Form, Form 12, the starting and ending mileage on the vehicle? | T1 | 54 (42.9%) | 72 (57.1%) | | 3 |
| | | T2 | 52 (20.8%) | 198 (79.2%) | | |
| 28 | Did the transporting member report, via Charge Information Form, Form 12, whether the transport vehicle made any additional stops? | T1 | 57 (46.3%) | 66 (53.7%) | | 6 |
| | | T2 | 54 (21.7%) | 195 (78.3%) | | 1 |
| 29 | Did the transporting member report, via radio/ Charge Information Form, Form 12, whether the detainee requested medical attention, was perceived to be in need of medical attention, injured during transport, the nature of the injury, and if first aid or medical care was provided? | T1 | 48 (38.4%) | 77 (61.6%) | | 4 |
| | | T2 | 53 (21.2%) | 197 (78.8%) | | |

| | Scorecard Measure | Time Period | 0 | 1 | Not Applicable | Unable to Determine |
|---|---|---|---|---|---|---|
| 30 | Did the transporting member report, via Charge Information Form, Form 12, whether force was used during transport? | T1 | 45 (36.3%) | 79 (63.7%) | | 5 |
| | | T2 | 53 (21.2%) | 197 (78.8%) | | |
| 31 | Did the transporting member report, via Charge Information Form, Form 12, whether the detainee was adequately restrained by the seatbelt? | T1 | 44 (34.6%) | 83 (65.4%) | | 2 |
| | | T2 | 51 (20.4%) | 199 (79.6%) | | |
| 32 | Did the transporting member submit all completed Charge Information Forms, Form 12, to their supervisor by the end of their tour of duty? | T1 | 37 (30.3%) | 85 (69.7%) | | 7 |
| | | T2 | 51 (20.6%) | 196 (79.4%) | | 3 |
| 33 | Did the transporting member obey the posted speed limit, unless a person being transported required urgent and emergency medical care? If a person being transported requires urgent and emergency medical care, the transporting officer may exceed the posted speed limit, as allowed for emergency vehicles under state law. | T1 | 17 (53.1%) | 15 (46.9%) | 3 | 94 |
| | | T2 | 21 (21.0%) | 79 (79.0%) | | 150 |
| | | T2a | 6 (19.4%) | 25 (80.6%) | | 91 |
| | | T2b | 15 (21.7%) | 54 (78.3%) | | 59 |
| 34 | Did the member drive the vehicle in a manner to preserve the safety and security of persons in custody? | T1 | 29 (22.5%) | 100 (77.5%) | | |
| | | T2 | 43 (17.3%) | 206 (82.7%) | | 1 |
| | | T2a | 19 (15.6%) | 103 (84.4%) | | |
| | | T2b | 24 (18.9%) | 103 (81.1%) | | 1 |
| 35 | Were sufficient officers present when moving detainees from the transporting vehicle to the booking facility, or other locations that might afford the opportunity for the detainee's escape or injury to the officer/others? | T1 | | 128 (100.0%) | | 1 |
| | | T2 | 2 (0.8%) | 246 (99.2%) | | 2 |
| 36 | Did the detainee escape the transporting member's custody at any time? | T1 | 1 (0.8%) | 128 (99.2%) | | |
| | | T2 | 10 (4.0%) | 240 (96.0%) | | |
| 37 | Did the transporting member mark the video data when the detainee entered and exited the vehicle's prisoner holding area? | T1 | 20 (35.1%) | 37 (64.9%) | 69 | 3 |
| | | T2 | 29 (30.9%) | 65 (69.1%) | 152 | 4 |
| | | T2a | 11 (29.7%) | 26 (70.3%) | 84 | 1 |
| | | T2b | 18 (31.6%) | 39 (68.4%) | 68 | 3 |
| 38 | Did the transporting member advise the arresting member of any activity captured on the TVC system that may be used for investigation/prosecution purposes? | T1 | 3 (100.0%) | | 71 | 55 |
| | | T2 | 2 (100.0%) | | 156 | 92 |
| 39 | Did the transporting member submit any seized/ recovered property to the ECU before the completion of their tour of duty? | T1 | 3 (100.0%) | | 121 | 5 |
| | | T2 | 1 (33.3%) | 2 (66.7%) | 242 | 5 |

| | Scorecard Measure | Time Period | 0 | 1 | Not Applicable | Unable to Determine |
|---|---|---|---|---|---|---|
| 40 | Were the transporting members' body-worn camera powered on, worn on the body at all times and activated for the duration of the transport? | T1 | | 129 (100.0%) | | |
| | | T2 | 1 (0.4%) | 247 (99.6%) | | 2 |
| 41 | Did the transporting member capture the entire transport on the TVC system? | T1 | 1 (1.9%) | 53 (98.1%) | 71 | 4 |
| | | T2 | 1 (1.1%) | 91 (98.9%) | 157 | 1 |