

# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

## COMPLIANCE REVIEW & OUTCOME ASSESSMENT
## REGARDING CRISIS INTERVENTION

February 9, 2024



## TABLE OF CONTENTS

I.      EXECUTIVE SUMMARY ................................................................................1

II.     BACKGROUND .........................................................................................4

        A.     DOJ Investigative Findings.............................................................4

        B.     Summary of Consent Decree Requirements ...................................6

        C.     BPD's Progress to Date .................................................................10

III.    SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF
        REVIEW ....................................................................................................12

        A.     Compliance Scoring.......................................................................12

        B.     Determining Initial Compliance ....................................................13

        C.     Methodology ..................................................................................16

IV.     COMPLIANCE ASSESSMENT ..............................................................19

        A.     Paragraph 96 – Goals of Consent Decree Provisions Related to
               Responding to and Interacting with People with Behavioral Health
               Disabilities or in Crisis...................................................................19

        B.     Paragraph 97 – Consent Decree Obligations of the City .............19

        C.     Paragraph 98 – Revision of Crisis Intervention Policies .............20

        D.     Paragraph 99 – Person in Behavioral Health Crisis Defined........21

        E.     Paragraph 100 – Officers Trained not to assume that Persons in
               Behavioral Health Crisis are Dangerous.......................................21

        F.     Paragraph 101 – Option to Continue the BEST Program .............21

        G.     Paragraph 102 – CIT First Responder Model ...............................22

        H.     Paragraph 103 – Goals of the CIT program...................................24

I.      Paragraph 104 – Collaborative Planning and Implementation Committee Expansion ........................................................................30

J.      Paragraph 105 – CPIC (BCBHC) Recommendations and Implementation ...............................................................................31

K.      Paragraphs 106 and 107 – Crisis Intervention Team Officer Training..........................................................................................31

L.      Paragraph 108 – Qualifications to Become a CIT Officer....................................32

M.      Paragraph 109 – Supervisor Identification of CIT Officers.................................32

N.      Paragraph 110 – Sufficient CIT Officers for All Shifts and All Districts ..........................................................................................33

O.      Paragraph 111 – CIT Officers Who Respond to Call are Responsible for the Scene ....................................................................................36

P.      Paragraph 112 – Crisis Intervention Training for All Officers.............................37

Q.      Paragraph 113 – BPD Dispatch Training..............................................................39

R.      Paragraph 114 – BPD Dispatch Policies..............................................................39

S.      Paragraph 115 – Crisis Intervention Coordinator ................................................40

T.      Paragraph 116 – Crisis Intervention Coordinator Training ..................................41

U.      Paragraph 117 – Crisis Intervention Coordinator Partnership with Advocates and Behavioral Health Providers .........................................................41

V.      Paragraph 118 – Crisis Intervention Coordinator Selection of CIT Officers .....................................................................................42

W.      Paragraph 119 – Crisis Intervention Coordinator Ensure that CIT Officers Available on All Shifts in All Districts....................................................43

X.      Paragraph 120 – Crisis Intervention Coordinator to Develop and Implement Crisis Intervention Plan .......................................................44

Y.    Paragraphs 121 and 122 – Behavioral Health Disability or Crisis
      Data Collection, Analysis, and Reporting................................................44

V.    **OUTCOME ASSESSMENTS** ........................................................................**46**

A.    Paragraph 459.h.i. – Number of Persons with Emergency Petitions
      Eligible for Community Based Services (paragraph 459.i.i.) ..............................46

B.    Referrals by BPD to Community Mental Health Services or Hospital
      Emergency Rooms (paragraph 459h.ii.) ................................................................46

VI.   **COMPLIANCE ASSESSMENT CONCLUSIONS** .......................................................**48**

## I.     EXECUTIVE SUMMARY

The Baltimore Police Department ("BPD") has made substantial and commendable progress in developing a program to respond to calls involving persons in behavioral health crisis that emphasizes de-escalation rather than force, reduces the use of arrest in favor of treatment, and treats people in crisis with respect and dignity. For most of the critical provisions of the Consent Decree that address the crisis intervention program, the Monitoring Team determines that BPD is in initial compliance.

This assessment is the Monitoring Team's first comprehensive evaluation of BPD's crisis intervention program. A critical component of the assessment was the review of a randomly-selected, statistically significant sample of behavioral health incidents from 2022 in which a Behavioral Health Form was completed. Specifically, the Monitoring Team evaluated whether BPD officers de-escalated crises and reduced the unnecessary use of force; minimized arrests; improved the safety of patrol officers, individuals with behavioral health disabilities or in crisis and their families, and others within the City's behavioral health crisis system; and reduced the inappropriate involvement of individuals with behavioral health disabilities with the criminal justice system. The Monitoring Team also evaluated whether CIT officers at the incident took primary responsibility, or if a supervisor took responsibility instead, whether the supervisor sought input from the CIT officer.

The outcome of this behavioral health incident review demonstrates that BPD has, through policy, training, and supervision, achieved an important shift in Departmental culture. The Monitoring Team found that officers resolved the vast majority of matters without the use of force or arrest and with due care to the rights of the individuals involved. Where force was necessary, it generally was low-level force – and was necessary to prevent the individual from engaging in self-harm or harm to others.

This outcome is the result of significant effort by the Department. Over the course of the Consent Decree, BPD undertook extensive revision of its policies for dispatching and responding to behavioral health calls. These new policies were reflected in the development of Monitoring Team-approved 24-hour behavioral health awareness training in the academy, and eight-hour annual in-service training programs for all officers. Dispatchers and 911 Specialists also received training to better handle behavioral health calls.

BPD has also developed a training program for specialized Crisis Intervention ("CIT") officers. This 40-hour course, in addition to the training provided to all officers, is designed for officers who volunteer to be CIT officers and are deemed to have the interest and qualifications to respond to and to be specifically dispatched to incidents implicating crisis intervention concerns.

To reduce the number of calls to which BPD officers respond, but that can be handled by mental health professionals, BPD has engaged with community providers to divert some calls to a mobile crisis team or a counselor. Over the last year, the volume of behavioral health calls to which BPD responds has gone down significantly, and more calls are handled through the newly established 9-8-8 system or by mobile crisis.

Despite this progress, there remain areas of concern. Under the Consent Decree, BPD committed to recruit and train sufficient numbers of CIT officers to ensure that a CIT officer is available on every shift in every district to respond to behavioral health calls. BPD currently has a fewer than one-third of the officers necessary to meet this standard. CIT officers are an essential component of the crisis response program.

Additionally, there continues to be too few non-law enforcement resources aimed at preventing individuals from going into crisis and responding to all of the calls that are appropriate for a non-law enforcement response. The Monitoring Team did not assess the City's obligation to enhance behavioral health services as part of this assessment. However, the unavailability of adequate resources impacted the Consent Decree provisions that were assessed and necessarily are referenced throughout the assessment.

The hard work undertaken by BPD is clear, its officers' performance in instances implicating crisis intervention concerns is by and large impressive, and the Department's overall approach is appearing to have a positive impact on people who have behavioral health needs. The Monitoring Team is encouraged by BPD's successful implementation of many of the Consent Decree provisions relating to crisis intervention—and by BPD's commitment to come into initial compliance with the smaller number of provisions that are still being implemented.

To reach compliance, BPD must improve in the following areas:

1. **Compliance with CIT Officer selection process**. BPD must resume in-person interviews of applicants for CIT officer positions, a required element of the Consent Decree. Additionally, BPD must show—through documentation or otherwise—that it adequately completes the other required steps in the Consent-Decree mandated selection process.

2. **Number of CIT Officers**. BPD needs to increase its number of CIT officers. Currently, only 10% of BPD patrol officers are CIT trained, whereas BPD's crisis intervention plan requires that 30% of all patrol officers receive that training. Although this deficiency is due in part to BPD's larger staffing challenges, BPD must do more to encourage officers to join the CIT program. Specifically, BPD must develop a plan to increase participation and remove barriers to officers joining the program, such as failure by supervisors to approve participation in the 40-hour CIT training.

3. **Control of the Scene by CIT Officers**.  BPD needs to ensure that when CIT officers are at the scene of a behavioral health call, they are in control of the police response there.

BPD must also continue to implement its Crisis Intervention Plan.

## II.     BACKGROUND

### A.  DOJ investigative Findings

The United States Department of Justice ("DOJ") performed a pattern or practice investigation of BPD covering the years 2010 through 2015 and issued its report in August of 2016. The investigation found that "BPD officers routinely use unreasonable force against individuals with mental health disabilities or those experiencing a crisis in violation of the Fourth Amendment. Additionally, by routinely using unreasonable force against individuals with mental health disabilities, BPD officers repeatedly fail to make reasonable modifications necessary to avoid discrimination in violation of Title II of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12131–12134."[1]

Specifically, the Department of Justice found:

- **Failure to de-escalate.** "BPD officers frequently fail to de-escalate encounters with unarmed individuals with mental health disabilities and those in crisis. Indeed, their tactics often escalate these encounters."[2]

- **Inadequate Program for Crisis Trained Officers to respond.** "Instead of requesting an officer trained in handling crisis events or a mobile crisis team made up of trained mental health professionals, officers handcuff and detain people with mental health disabilities and those in crisis and resort too quickly to force without understanding or accounting for the person's disability or crisis."[3] While some officers are trained in crisis intervention, "the BPD does not have a protocol requiring that a person with this training be dispatched to a crisis call."[4]

- **Unreasonable force was used against persons who had committed no crime.** Persons in crisis were being taken into custody for the sole purpose of being taken to the hospital for evaluation pursuant to an emergency petition.[5] The unreasonable uses

---

[1] Report of Investigation of the Baltimore Police Department, United States Department of Justice, August 10, 2016 ("Findings Report") at 80. The Findings Report is published at: Baltimore Police Department - Findings Report - August 10, 2016 (justice.gov)

[2] *Id*.

[3] *Id*.

[4] *Id*.

[5] *Id*. Under Maryland law any Peace Officer as defined by the statute may petition for an emergency mental health evaluation if the officer has reason to believe that the person has a mental illness and the individual presents a danger to the life or safety of the person or of others. MD Code 10-622.

of force included Tasers against persons in crisis[6] and deadly force against persons in crisis.[7]

- **Arrests of Persons in Crisis Rather than Treatment.** The Department of Justice found that "officers resort to arresting individuals with mental health disabilities or in crisis in situations where treatment—instead of jail—would more effectively serve the goals of public safety and welfare and could prevent the need for unnecessary force."[8]

The Department of Justice Report found that these patterns were caused by:

- **Inadequate policy guidance to officers**. Police officers were not provided with adequate policy guidance to address encounters with a person in a behavioral health crisis, including the absence of policies to "encourage any de-escalation strategies."[9]

- **The failure to train all officers on how to interact with persons with mental health disabilities.** The BPD lacked training to give officers the tools to identify persons in crisis, engage in de-escalation, and determine when to involve mental health professionals or crisis intervention trained officers.[10]

- **Failure to train 911 dispatchers.**[11] Dispatchers lacked adequate training to address calls regarding persons in a behavioral health crisis and nor when and how to deploy crisis trained officers to these calls.

- **Failure to have a sufficient number of specially trained crisis intervention officers.** Too few specially trained officers were available to respond to crisis calls. In the absence of a sufficient number of specially trained officers, police officers without specialized training had fewer options.

- **The lack of policies to govern the deployment of crisis intervention officers.**[12] The DOJ found that there was no system in place to dispatch crisis intervention trained officers to crisis related calls.

---

[6] *Id*. at 81–84.

[7] *Id*. at 84.

[8] *Id*. at 85.

[9] *Id*. at 99.

[10] *Id*. at 81, 109.

[11] *Id*. at 110.

[12] *Id*. at 109 – 110.

- **Inadequate community-based, non-law enforcement mental health or crisis services.** The City had inadequate mental health and crisis services and the BPD failed to meaningfully partner with existing resources.[13]

## B. Summary of Consent Decree Requirements

The Consent Decree requires that the City and BPD have a comprehensive set of services to reduce encounters between police officers and persons with mental illness or who are in a behavioral health crisis and when an officer does encounter a person in a behavioral health crisis that officers "use appropriate crisis response techniques."[14] The program is required to be designed to prevent the unreasonable use of force, ensure that people are connected to appropriate behavioral health services, and reduce criminal justice involvement.[15]

The Consent Decree requires that BPD "implement a CIT first-responder model of police-based crisis intervention with community, health care, and advocacy partnerships to assist individuals with Behavioral Health Disabilities and individuals who are in crisis."[16] The goal of the program is to provide officers with the skills and training to "properly interact with persons with Behavioral Health Disabilities or in crisis safely; de-escalate crises and reduce the unnecessary use of force against individuals with Behavioral Health Disabilities or in crisis; minimize arrests; improve the safety of patrol officers, individuals with Behavioral Health Disabilities or in crisis and their families, and others within the community; refer individuals to the City's behavioral health crisis system; and reduce the inappropriate involvement of individuals with Behavioral Health Disabilities with the criminal justice system."[17]

Essential to the implementation of the crisis intervention program is that the BPD revise the policy guidance provided to its officers. Pursuant to the Consent Decree, BPD's revised policies must "establish a preference for the least police-involved response possible consistent with public safety. In situations that do not involve an Emergency Petition, BPD will divert people with Behavioral Health Disabilities or in crisis to the Behavioral Health service system rather than jail or a hospital emergency room whenever appropriate."

---

[13] *Id*. at 111-112.

[14] Dkt. 2-2 ¶ 97.

[15] *Id*.

[16] *Id*. at ¶ 102.

[17] *Id* at ¶ 103.

To achieve these objectives, the Consent Decree requires:

### 1. Close Gaps in the Behavioral Health System.

Paragraph 97 of the Consent Decree requires the City to identify gaps in the behavioral health system, recommend solutions and assist in the implementation of recommended solutions. These objectives are to be achieved through the Collaborative Planning and Implementation Committee.

### 2. Expansion of the Collaborative Planning and Implementation Committee.

The Collaborative Planning and Implementation Committee ("CPIC") (currently, Baltimore City Behavioral Health Collaborative) is a working group jointly sponsored by BPD, the City, and Behavioral Health System Baltimore ("BHSB"). The Committee is comprised of a broad range of stake holders. Paragraph 104 of the Consent Decree requires BPD to seek to expand CPIC to encourage membership from a broad range of stakeholders. CPIC has been renamed the Baltimore City Behavioral Health Collaborative. Throughout the report, this entity is referred to by its new acronym "BCBHC." Paragraph 105 requires BPD to encourage BCBHC to identify and implement programs to reduce encounters between persons with a behavioral health disability and police.

### 3. Crisis Intervention Team Program.

The Consent Decree requires that BPD maintain a team of specially trained officers to respond to calls involving persons in behavioral health crisis. Paragraphs 101 through 105 set out the requirements for the CIT program.

The program is required to be a "CIT first-responder model of police-based crisis intervention with community, health care, and advocacy partnerships to assist individuals with Behavioral Health Disabilities and individuals who are in crisis."[18] The goal of the program is to increase de-escalation, reduce arrests and criminal justice system involvement, improve safety of officers and individuals in behavioral health crisis, and connect persons in crisis with behavioral health resources.[19]

### 4. Crisis Intervention Team.

Paragraphs 106 through 111 establish requirements for Crisis Intervention Team ("CIT") officers. CIT officers must receive advanced specialized training to respond to behavioral health crisis calls. The training is 40 hours in length and in addition to the behavioral health training provided to all officers. The enhanced training must provide officers with "competence in the following areas: how to conduct a field evaluation, suicide intervention, community behavioral health and

---

[18] *Id*. at ¶ 102.
[19] *Id*. at ¶ 103.

Intellectual and Developmental Disability resources, common behavioral health and Intellectual and Developmental Disability diagnoses, the effects of substance misuse, perspectives of individuals with Behavioral Health Disabilities and their family members, the rights of persons with Behavioral Health Disabilities, civil commitment criteria, crisis de-escalation, and scenario-based exercises."[20]

CIT training and designation must be voluntary. To be eligible, officers must have served on the force for a year and undergone an in-depth assessment of their qualifications.

BPD is required to increase its CIT capacity to ensure that there are adequate numbers of officers to respond to behavioral health crises on every shift in every district. Absent extraordinary circumstances, CIT officers are required to respond to all behavioral health calls. Once a CIT officer is dispatched, she or he will have primary responsibility for the encounter with the person in crisis.

### 5. Crisis Intervention Training for All Officers.

Paragraph 112 requires that BPD provide crisis intervention training for all BPD officers. New recruits must receive 16 hours of crisis intervention training at the academy and all officers must receive eight hours of annual in-service training. The training must include topics that will facilitate lawful and appropriate interactions between police and persons with a behavioral health or intellectual and developmental disability, including: identification of persons with a disability, common characteristics and behaviors of persons with a disability, effective communication and accommodation of a disability, de-escalation, engagement of crisis intervention officers and available non-law enforcement community resources. This training is for all officers and is not designed to satisfy the training requirements for Crisis Intervention Team members.

### 6. Policy and Training for BPD Dispatchers.

To ensure that calls involving a behavioral health crisis are addressed appropriately, Paragraphs 113 and 114 of the Consent Decree require policy and training for all BPD dispatchers. The Consent Decree requires that policies be changed "[W]ith the goal of limiting police involvement in crises where appropriate, calls related to crises that do not necessitate a police response will be sent to other crisis services, such as a Mobile Crisis Team. When a police response is necessary, BPD will ensure that dispatchers use all reasonable efforts to dispatch a CIT trained officer to respond to the call."[21] In addition, all BPD dispatchers will receive training that will "enable them

---

[20] *Id.* at ¶ 107
[21] *Id.* at ¶ 114.

to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis."[22]

### 7. Crisis Intervention Coordinator.

The Consent Decree requires the appointment of a Crisis Intervention Coordinator "to better facilitate communication between BPD and members of the behavioral health provider community and to increase the effectiveness of BPD's crisis intervention program."[23] The Coordinator will receive specialized training in addition to CIT officer training,[24] select CIT Officers,[25] and development an maintain effective relationships with community-based program stakeholders, providers, advocates, and others.[26]

The Crisis Intervention Coordinator will be responsible to develop and implement a Crisis Intervention Plan. In addition, on an annual basis, BPD is required to conduct an analysis of its crisis intervention program to ensure that there are adequate CIT officers, they are properly deployed, calls are properly dispatched, and that the program is operating pursuant to the terms of the Consent Decree.[27]

The Crisis Intervention Coordinator must also facilitate compliance with the obligation that BPD "ensure that CIT officer capacity is sufficient to ensure that, at all times of the day and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis."[28]

### 8. Data Collection, Analysis, and Reporting.

To determine the effectiveness of the implementation of the provisions of the agreement, the Monitoring Team is required by the Agreement to conduct a data analysis of "i. The number of people subject to Emergency Petitions who were eligible for community-based services; ii. The number of referrals by BPD to community mental health services or to a hospital emergency room."[29]

---

[22] *Id.* at ¶ 113.
[23] *Id.* at ¶ 115.
[24] *Id.* at ¶ 116.
[25] *Id.* at ¶ 118
[26] *Id.* at ¶ 117.
[27] *Id.* at ¶ 120
[28] *Id.* at ¶ 119.
[29] *Id.* at ¶ 459.h.

## C. BPD's Progress to Date

This report is the Monitoring Team's first comprehensive assessment of BPD's efforts to implement the provisions of the Consent Decree regarding crisis intervention. However, the Monitoring Team has been tracking BPD's efforts in this area on an ongoing basis and providing technical assistance as appropriate to help BPD implement the required reforms.

BPD has taken significant steps to implement the provisions of the Consent Decree. These include:

*First,* BPD comprehensively revised its crisis response policies and promulgated policies to address the Crisis Intervention Program (Policy 712); Petitions for Emergency Evaluations and Voluntary Admission (Policy 713); and Behavioral Health Crisis Dispatch (Policy 715).[30] The policies were approved by the Monitoring Team and submitted to the Court;[31]

*Second*, BPD developed and provided a 24-hour behavioral health awareness training to all officers during academy training;

*Third,* BPD developed and provided crisis intervention training of at least eight hours to all officers during annual in-service training;

*Fourth*, BPD developed and provided a 40-hour training for CIT officers (currently provided six times a year for new CIT volunteers and for officers that work for other law enforcement agencies in Maryland), with an eight-hour annual refresher;[32]

*Fifth*, BPD developed and provided a curriculum for behavioral health training for 911 specialists and dispatchers;[33]

*Sixth*, BPD completed an analysis of the gaps in behavioral health services, developed an implementation plan to address the gaps in services, and published periodic reports on progress to implement the implementation plan;[34]

---

[30] https://www.baltimorepolice.org/transparency/consent-decree-basics/behavioral-health
[31] Docket No. 247.
[32] https://www.baltimorepolice.org/transparency/bpd-policies/na-crisis-intervention-team-cit-certification-curriculum (activated June 2021)
[33] https://www.baltimorepolice.org/transparency/consent-decree-basics/behavioral-health
[34] https://www.baltimorepolice.org/transparency/bpd-policies/na-city-baltimore-public-behavioral-health-system-gap-analysis

*Seventh,* BPD expanded the Collaborative Planning and Implementation Committee and engaged community and government stakeholders in various subcommittees to develop recommendations to address behavioral health needs of residents;

*Eighth,* BPD created a 911 diversion pilot program that directed non-law enforcement responders to behavioral health calls under circumstances in which police involvement was unnecessary;[35] and

*Ninth,* BPD has significantly improved its collection, analysis, and publication of data regarding behavioral health events and its response to them.

These steps have resulted in positive changes in the interactions between people in behavioral health crisis and police officers and improved the culture of the department. There continue to be significant challenges, however, with the development of non-law enforcement response options and with the recruitment of officers for Crisis Intervention Training. Due to the shortage of CIT trained officers, it is impossible for BPD to dispatch a CIT officer to every behavioral health call.

---

[35]https://mayor.baltimorecity.gov/news/press-releases/2022-06-30-mayor-scott-provides-update-9-1-1-diversion-behavioral-health-pilot

## III.     SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

This assessment is a Compliance Review (*i.e.*, a qualitative evaluation of BPD performance) conducted pursuant to Consent Decree ¶ 454. The Monitoring Team has previously described this assessment type:

> Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree. They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . . [36]

## A.     Compliance Scoring

The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of scoring BPD's performance in its effort to fully implement the Consent Decree's many requirements:

**0 – Not Assessed:**  The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 – Not Started:**  The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:**  The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:**  The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:**  The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

> **4a – Implementation - Not Assessed:**  The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

---

[36] Monitoring Team's Fourth Semiannual Report, Jan. 21, 2020, Docket No.. 279-1 at 22–23.

**4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not yet demonstrated compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:** The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree. This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:** The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

The Consent Decree required the City and the BPD to create a comprehensive set of requirements to ensure that police officers "respond to individuals with Behavioral Health Disabilities and those in crisis in a manner that respects individuals' civil rights and contributes to their overall health and welfare."[37] This assessment reviews the obligations imposed on BPD by Paragraphs 98–122 and 459(h) of the Consent Decree.

## B.  Determining Initial Compliance

The Consent Decree provides that "[n]o specific numerical test shall be required" to demonstrate compliance "so long as BPD is demonstrating substantial adherence with the Material Requirements, continual improvement, and the overall purpose of the Material Requirements has been met."[38] To determine whether BPD is in Initial Compliance (a score of "4d") with a material requirement of the Consent Decree, the Monitoring Team weighs the following factors across the Consent Decree's various areas and many requirements:

---

[37] *Id*. at ¶ 96.

[38] See Dkt. 2-2 ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

**1. The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers**. Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, isolated compliance does not establish "Initial Compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Consent Decree requires. For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

**2. The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.** The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Consent Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

**3. The extent to which BPD is identifying and appropriately addressing problematic performance**. In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Consent Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way. Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Consent Decree requirements, the Department has identified the deviation and, if so,

if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

**4. BPD's progress over time**. Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or fail to adequately address competing considerations.[39] Even as the test articulated above requires different considerations to be weighed together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."[40]

In applying this multi-factor test for compliance, the first factor —the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers— is the initial, threshold inquiry. If BPD and/or its officers' performance is not what it should be across a sufficient number or portion of relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance. For example, if BPD meets some Consent Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put the Department into compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to the Department and to the community about the benchmarks that it expects and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as *possibly*, though certainly not conclusively or even presumptively,

---

[39] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying a four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[40] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

consistent with initial compliance. In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time). Where the Team determines that BPD has adhered to expectations in 95% or more of relevant circumstances, initial compliance will be found unless one of the other factors – severity of deviations, Department identification of noncompliance, and progress over the time – starkly point in the other direction.

On the other hand, where BPD has adhered to expectations less than 85% of the time, initial compliance will *not* be certified unless one of the other factors points definitively in a positive direction. For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that BPD identified and took appropriate corrective action in instances where requirements were not followed, and the Department had made and maintained progress over time, then finding initial compliance with the Consent Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances. Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Finally, it is possible that, the Monitoring Team might assign, pursuant to the weighing of factors outlined above, a score for an individual decree requirement that is lower than the score given in a prior report. For instance, the score for a particular requirement might move from "4c" (implementation—on track) to "4b" (implementation—off track).

However, the Monitoring Team has recognized that these provisions cannot simply be about policy; they are also about *performance*—about BPD demonstrating *adherence* to policy. Accordingly, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 506, BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions *on the street and in the real world* that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

## C. Methodology

To assess the provisions of the Consent Decree that apply to BPD, the Monitoring Team engaged in the following:

*First*, the Monitoring Team reviewed a sample of crisis intervention incidents. The sample was selected from behavioral health incidents in which a Behavioral Health Form was completed by

an officer that occurred during the period from January 1, 2022 through December 31, 2022. BPD policy requires all officers who respond to a behavioral health or suicide call to complete a Behavioral Health Form.[41] Prior to June 29, 2021, Behavioral Health Forms were completed only for calls in which a police officer filed an emergency petition for a mental health evaluation. As a result, prior to this change, other relevant behavioral health events that did not result in an emergency petition, but for example, led to medical treatment, referral to a community provider, or resulted in a voluntary admission to the hospital were not captured on the form.

In addition, in July of 2021, BPD transitioned to a new record management system which allowed officers to digitally document behavioral health and behavioral health crisis events. The electronic record facilitated a more thorough and effective review by the Monitoring Team. Because of these two changes in the policy and practice, January 1, 2022 was selected as the beginning date for the assessment.

During the period of January 1, 2022 through December 31, 2022, officers completed 4,519 Behavioral Health Forms. As part of the assessment, members of the Monitoring Team reviewed a random sample of incidents in which an officer completed a Behavioral Health Form. Every Behavioral Health Form in the study period was numbered sequentially and a random selection applied. A total of 95 incidents in which a Behavioral Health Form was completed were selected. This sampling method generated results at a 95% confidence level with a margin of error of plus or minus 10%.[42]

The Monitoring Team members reviewed the complete file for each incident, including the Behavioral Health Form, body worn camera video, and the officer's report of the incident. The review assessed whether the goals of the crisis intervention program and training was achieved. The results of each review were recorded on a standardized instrument.

In particular, the Monitoring Team members assessed whether officers:

- De-escalated crises and reduced the unnecessary use of force;
- Minimized arrests;
- Improved the safety of patrol officers, individuals with Behavioral Health Disabilities or in crisis and their families, and others within the City's behavioral health crisis system;
- Reduced the inappropriate involvement of individuals with Behavioral Health Disabilities with the criminal justice system; and

---

[41] Crisis Intervention Program Policy 712.

[42] A 95% confidence level with a 10% margin of error means that an assessment of a different random sample of crisis intervention events from the same time period will yield a result within 10% ninety-five percent of the time. See, e.g., National Institute of Science and Technology Engineering Statistics Handbook 7.1.4. 7.1.4. What are confidence intervals? (nist.gov).

- Whether CIT officers that have been dispatched to the incident are taking primary responsibility, and if a supervisor took responsibility instead, whether they are seeking input from the CIT officer.

There is a set of calls that were coded by dispatchers as behavioral health calls, but the officer did not complete a Behavioral Health Form. There are many reasons why a form might not have been completed for the call, including the person was not found, EMS or another responder addressed the call, the person was not in behavioral health crisis, or the officer inappropriately failed to complete the form.  his group of calls was not reviewed as part of this assessment.

*Second*, several of the Consent Decree provisions required the review of policies and training curricula. Many of the policies and curricula had already been reviewed and approved by the Monitoring Team and submitted to the Court. This is noted in the assessment of the relevant paragraphs.

*Third,* the behavioral health lead of the Monitoring Team engaged extensively with BPD and others throughout the development of the program.  Monitoring Team members participated in curriculum development and observed all initial training sessions for recruits, in-service training sessions for all officers, 40-hour training sessions for CIT Officers, and 911 call-takers and police dispatchers. In addition, Monitoring Team members attended community meetings and workshops on the status of behavioral crisis care in Baltimore, met with local, state and national advocacy groups in listening sessions, attended weekly and bi-weekly BCBHC Policy, Training, Data, and Gap Analysis Committee meetings, and met with members of the Baltimore judiciary system. Monitoring Team members participated in discussions with local mental health providers and attended an on-site overview of the Baltimore Crisis Response Agency. They observed training sessions for specialized BPD programs such as the Homeless Outreach Team ("HOT"), the Law Enforcement Assisted Diversion ("LEAD"), and the Co-Responder Team ("CRT") and 911 call-takers and police dispatchers. In addition, the Monitoring Team conducted interviews with BPD personnel responsible for the CIT program and engaged in ride-a-longs with CIT trained officers.

*Fourth,* the Monitoring Team reviewed data regarding the training and assignment of CIT officers, CIT officer recruitment materials, reports of the Collaborative Planning and Implementation Committee; biannual reports of the BCBHC Data Subcommittee, and other reports and data prepared by BPD to demonstrate its compliance with the Consent Decree.

## IV.    COMPLIANCE ASSESSMENT

The following is a paragraph-by-paragraph assessment of BPD's implementation of Consent Decree paragraphs 96 – 122, 459(h)(i) and 459(h)(ii).

### A.    Paragraph 96 – Goals of Consent Decree Provisions Related to Responding to and Interacting with People with Behavioral Health Disabilities or in Crisis

> *BPD is committed to responding to individuals with Behavioral Health Disabilities and those in crisis in a manner that respects individuals' civil rights and contributes to their overall health and welfare. Ensuring that BPD uses appropriate crisis response techniques when responding to individuals with Behavioral Health Disabilities or in crisis will help prevent situations that could lead to unreasonable use of force, promote connection of people with Behavioral Health Disabilities or in crisis to the behavioral health system, and decrease inappropriate criminal justice involvement for people with Behavioral Health Disabilities or in crisis.*

Paragraph 96 sets out the goals and objectives of the provisions that follow. The paragraph provides important information for interpreting the succeeding provisions and serves as a statement of objectives and purpose for the many, specific terms in this section. However, it does not contain specific, actionable requirements that BPD or the City must fulfill. Thus, the Monitoring Team did not assess this provision directly as part of its review.

### B.  Paragraph 97 – Consent Decree Obligations of the City

> *The City will coordinate with the Collaborative Planning and Implementation Committee ("CPIC") to conduct an assessment to identify gaps in the behavioral health service system, recommend solutions, and assist with implementation of the recommendations as appropriate. The assessment will include an analysis of a sample of police interactions with people with Behavioral Health Disabilities to identify systemic barriers and solutions, including what precipitated the crisis, what services could have prevented the crisis, how police became involved, how the response to the crisis could be improved, and what can be done to prevent the crisis in the future. The analysis will include identifying gaps in Behavioral Health Disability services (including assertive community treatment, permanent supported housing, targeted case management, crisis services, and substance use disorder services),*

19

> problems with the quality or quantity of existing services, and other
> unmet needs that lead to preventable criminal justice system
> involvement.

The Monitoring Team defers evaluation of the City's compliance with Paragraph 97 until a future assessment. However, in reviewing the compliance of BPD with its obligations under the Consent Decree, it is apparent that there are inadequate behavioral health services in the City to prevent persons from going into crisis and to respond to persons in crisis. The dearth of non-police resources has an impact on the ability of the BPD to respond to behavioral health calls and come into compliance with the Consent Decree. Thus, by necessity, this assessment will include references to the steps that the City has taken, and the remaining efforts that will be needed to be taken, for the City to provide additional behavioral health resources to meet the needs of its residents.

Despite the continuing gaps in services, Baltimore has made some progress. The pilot 9-1-1 diversion program and the implementation of the 9-8-8 suicide prevention line has likely increased the number of calls that are resolved without law enforcement involvement and reduced the number of calls involving a behavioral health crisis that go to BPD.[43]

### C.  Paragraph 98 – Revision of Crisis Intervention Policies

> BPD will revise its policy to establish a preference for the least
> police-involved response possible consistent with public safety. In
> situations that do not involve an Emergency Petition, BPD will
> divert people with Behavioral Health Disabilities or in crisis to the
> Behavioral Health service system rather than jail or a hospital
> emergency room whenever appropriate.

BPD implemented its crisis intervention policies in June of 2021, which included Policy 712 (Crisis Intervention Program), Policy 713 (Petitions for Emergency Evaluation and Voluntary Admission), and Policy 715 (Behavioral Health Crisis Dispatch), which the Monitoring Team had approved and submitted to the Court in 2019. These three policies proceeded through a second set of revisions and refinements in September of 2022, and were approved by the Monitoring Team on June 22, 2023. The review and approval by the Monitoring Team of these policies previously, combined with the Monitoring Team's findings of BPD personnel performance during crisis encounters summarized below, support a compliance finding of **Initial Compliance (4d). As noted below, certain aspects of the policy have not yet been implemented in practice.**

---

[43] Behavioral Health Gap Analysis Implementation Plan Report 2022.

### D.  Paragraph 99 – Person in Behavioral Health Crisis Defined

> *A person may be suspected of having a Behavioral Health Disability*
> *or being in crisis from a number of factors including self-report,*
> *information provided by witnesses or informants to dispatch or to*
> *BPD officers, from BPD's previous knowledge of the individual, or*
> *the officer's direct observation.*

Paragraph 99 defines the persons who are intended to be covered by the crisis intervention provisions of the Consent Decree. The provision does not contain actionable terms; however, it does inform the assessment of the remaining terms and is assessed in the context of the implementation of those provisions. As discussed below, the Monitoring Team's assessment supports a finding of **Initial Compliance (4d)** with Paragraph 99.

### E.  Paragraph 100 – Officers Trained not to Assume that Persons in Behavioral Health Crisis are Dangerous

> *Officers will be trained to not make assumptions regarding the*
> *dangerousness of an individual based on that individual's disability.*

Crisis intervention training was approved by the Monitoring Team in September of 2021.[44] The Monitoring Team assessed the impact of the training on officer conduct during behavioral health calls as part of its assessment of paragraphs 107, 108, 112, and 113. As is discussed elsewhere in this document, the training has had an observable, positive impact on officer behavior and on the culture of BPD and the observed behavior of officers reflected that they do not make assumptions regarding the dangerousness of individuals based on their disability. The Monitoring Team therefore finds that BPD is in **Initial Compliance (4d)** with Paragraph 100.

### F.  Paragraph 101 – Option to Continue the BEST Program

> *BPD currently operates the BEST program for responding to*
> *individuals in crisis. BPD may continue to utilize the BEST program*
> *as its CIT program, as long as the BEST program meets the*
> *obligations of this Agreement.*

Prior to the Consent Decree, the Behavioral Emergency Services Team ("BEST") program provided training to officers on how to interact with persons in behavioral health crisis. BPD discontinued the BEST program. The BEST program, unlike CIT, was not voluntary and officers were sent to the training to develop skills even though many may not have been suitable to be CIT

---

[44] Dkt. 247. BPD has posted the training curriculum online at Crisis Intervention Team (CIT) Certification Curriculum | Baltimore Police Department.

officers. Since there had been no screening for BEST training and the approved CIT training was substantially different than BEST, BPD determined that it would require all CIT officers to participate in the Court-approved training and BEST trained officers were not grandfathered into the CIT program. This provision is not applicable to the current dynamics in Baltimore and is, therefore, not a part of this assessment.

## G.  Paragraph 102 – CIT First Responder Model

> *BPD will implement a CIT first-responder model of police-based crisis intervention with community, health care, and advocacy partnerships to assist individuals with Behavioral Health Disabilities and individuals who are in crisis.*

The Monitoring Team's assessment reveals that BPD has made substantial progress in creating a CIT first-responder model. This progress includes the development of a comprehensive policy that establishes as its objectives:

- Strategies for de-escalating crises and connecting individuals to community resources that provide appropriate services;
- Appropriate use of hospital emergency services only after less restrictive alternatives have been considered;
- Opportunities for diversion from the criminal justice system;
- Methods for addressing the long-term needs of individuals and families in order to provide for the least police-involved response.[45]

As is discussed below, the program has dramatically changed the nature of encounters between people with behavioral health disabilities or who are in behavioral health crisis and BPD officers. These encounters, except in rare circumstances, minimize force, apply de-escalation techniques, avoid arrests and incarceration, and respect the dignity of the person involved.

While BPD has instituted a CIT model and associated policies, training, and dispatch services, two significant barriers stand in the way of the full and effective execution of that model, as discussed more fully in the analysis of other paragraphs, below.

First, BPD has far too few CIT officers—or officers who volunteer[46] to receive "at least 40 hours of specialized training"[47] and who are dispatched to assume "primary responsibility"[48] on calls involving individuals who may be in crisis—to cover every District for every shift. As a result, the

---

[45] Crisis Intervention Program Policy 712.
[46] Dkt. 2-2 ¶ 108.
[47] Dkt. 2-2 ¶ 107.
[48] Dkt. 2-2 ¶ 111.

majority of behavioral health calls are handled by regular patrol officers who are not specially CIT-trained.

Second, inadequate *non*-law enforcement response options result in BPD officers responding to calls that could or should be addressed by a community behavioral health care provider. Too frequently, officers are given only the limited options of an emergency petition or voluntary hospital admission to address the needs of a person in crisis, resulting in institutionalization of individuals who might have been treated in the community and unnecessary law enforcement involvement.

The Monitoring Team also notes that a gap analysis completed by the Collaborative Planning and Implementation Committee (now BCBHC) identifies four recommendations for BPD:

> Conduct deeper exploration into the reasons CIT-trained officers are not responding to behavioral health calls at higher rates;
>
> Make officer training efforts an ongoing process, with all officers receiving CIT training;
>
> Ensure that officers are using existing community-based alternatives to E[mergency] P[etitions]s such as residential crisis beds, and other diversion services need to be developed within the system of care; and
>
> Officers need to interact with individuals in the manner they themselves would like to be treated during a time of distress. This would mean treating all individuals encountered with respect and understanding, and not immediately discounting information shared simply because an individual has a behavioral health disorder.[49]

These recommendations align closely with the provisions of the Consent Decree and, to the extent that they are required by the Consent Decree, were assessed in this review. Despite BPD having failed to recruit and screen sufficient numbers of CIT officers as required by the Consent Decree, the Monitoring Team has designated this provision as **Initial Compliance (4d)** due to the effective resolution of behavioral health calls by regular, non-CIT officers that is discussed in detail in relation to Paragraph 103 (Section H), below. The Monitoring Team finds below that—with respect to Paragraphs 108, 109, and 110—BPD is not meeting Consent Decree requirements to recruit, screen, and train specialized CIT officers in sufficient numbers and has indicated a lower compliance score for those paragraphs.

---

[49]Baltimore Public Behavioral Health System Gap Analysis, Final Report, October 2019 at 8-9, 82-90. (Hereinafter "Gap Analysis").

## H.  Paragraph 103 – Goals of the CIT program

> *The goals of the CIT program will continue to be to equip police officers with methods to properly interact with persons with Behavioral Health Disabilities or in crisis safely; de-escalate crises and reduce the unnecessary use of force against individuals with Behavioral Health Disabilities or in crisis; minimize arrests; improve the safety of patrol officers, individuals with Behavioral Health Disabilities or in crisis and their families, and others within the community; refer individuals to the City's behavioral health crisis system; and reduce the inappropriate involvement of individuals with Behavioral Health Disabilities with the criminal justice system.*

To assess implementation of Paragraphs 102 and 103 of the Consent Decree, the Monitoring Team reviewed 95 crisis intervention calls that occurred from January 1, 2022 through December 31, 2022 out of a total of 4,519 events in which an officer completed a Behavioral Health Form. This random incident review yields a 95% confidence level with a 10% margin of error.

The Monitoring Team's review of its sample of incidents in which a Behavioral Health Form was completed identified the following over-arching trends and themes:

*First*, **officers responding to behavioral health calls were generally handling them well.** In the overwhelming majority of cases, officers used de-escalation rather than force and where force was applied, it was at a low-level, and treated the person with dignity and respect. The performance of officers does not diminish the need for CIT officers.

*Second*, **there are insufficient numbers of CIT trained officers to respond to every crisis** call. In the sample reviewed by the Monitoring Team, CIT officers were present for fewer than a third of the calls.

*Third,* **officers rarely called for community-based services other than an ambulance to transport a person in behavioral health crisis to the hospital.** Extensive review of body-worn-camera video found very few instances in which officers even considered calling for mobile crisis or other services and when they did discuss calling for mobile crisis they were deterred by the potential of hours-long wait times. The Monitoring Team will assess the availability of behavioral health services in a future assessment of paragraph 97 of the Consent Decree.

*Fourth,* **most behavioral health calls resulted in the person in crisis being taken to the hospital pursuant to an emergency petition or for a voluntary admission.** It appears from the

incident review that officers had few options available to refer to services that would avoid institutionalization, even if for a brief period.

While patrol officers are not "CIT officers" who receive the 40-hour training, their work on behavioral health calls is nevertheless a key part of the CIT program. The patrol officers' performance on behavioral health calls as assessed by the Monitoring Team outweighs the other factors and warrants a finding of compliance in this area. More specifically, the behavioral health incident review conducted by the Monitoring Team found:

### 1. Demographics of Persons in Behavioral Health Crisis

Of the incidents reviewed it was nearly evenly split by gender, with 54.7% of the calls involving a person whose gender was male and 44.2% whose gender was female and 1.1% unknown.[50] More than 70% of the incidents involved a person who is Black and 23% involved a person who is white with a small number identifying by other races or ethnicities. The sample of cases that the Monitoring Team reviewed closely aligns with the demographics reported by BPD in the Collaborative Data Subcommittee Biannual Report for *all* crisis calls over the same period.[51]

Twenty-one percent were 17 years of age or younger. Nearly 33% of the persons in behavioral health crisis were between 18 and 29, 21.1% between 30 and 39, 11.6% between 40 and 49, 5.3% between 50 and 59, and 8.4% were 60 years old or older. In several of the incidents reviewed by the Monitoring Team, the person in behavioral health crisis was in a residential mental health or substance abuse program, and BPD was called by the provider—thus limiting the ability of BPD to seek assistance from another community-based resource. Additionally, some 47 of the 95 calls reviewed involved a person who had threatened or attempted self-harm. Some of these instances were complex, indicating the need for a CIT trained officer, as the involved individual was actively engaged in potentially dangerous behavior. The Monitoring Team reviewed cases in which persons attempted to consume dangerous substances in the presence of the officer or were holding or in close proximity to a knife.

Amongst the cases reviewed were calls directed for a police response where the sole basis for the call was that the person expressed suicidal ideation. In two cases reviewed, a person called 9-1-1 to request transportation to the hospital because they had suicidal thoughts. In both cases, the officers arrived to find the person calm and cooperative, and police services were limited to transporting the person. These calls tied up two officers on each occasion for a significant period of time.

---

[50] Transgender persons are listed according to the gender to which they indicate that they identify.

[51] Collaborative Biannual Report at 11.

### 2.   Officers Responding to the Scene

A CIT officer was on the scene in fewer than one-third (31.6%) of cases reviewed. Supervisors responded to the scene 24.2% of the time and, of the supervisors who were present, 21.7% were CIT trained. In more than half of the incidents (54.7%) neither a CIT officer nor a supervisor was on the scene. In 36.8% of the cases, either a CIT trained officer or supervisor was present and in more than eight percent of the cases, both a supervisor and a CIT officer were present. In few instances (only 8.4% of reviewed cases) did an officer call for additional resources, including a CIT officer, a Crisis Response Team (CRT),[52] or a behavioral health provider. Even when CIT officers were present, they did not necessarily control the interaction with the person in crisis.

Behavioral health crisis calls consume significant officer resources. The time spent responding to calls can last hours and often require multiple officers to be present. To this end, BPD estimates that the average behavioral health call in the period of July through December 2022 was 83 minutes in length.[53]

Additionally, multiple officers frequently are required to respond to incidents implicating behavioral health challenges due to the circumstances of the call. In 31.2% of the calls reviewed, four or five officers responded, and one call had 16 officers at the scene. A single officer responded in 7.4% of cases.

### 3.   Presence of Co-Responders

In slightly more than half of the cases reviewed (55.8%), there was a co-responder at the scene. In all but a single case, the co-responder was the Baltimore City Fire Department, who supported the efforts of BPD to effectively resolve the situation. In one case, a private ambulance responded. In *none* of the cases reviewed was there a response by a mobile crisis team. In one case reviewed, the Crisis Response Team was called and successfully de-escalated a complex situation involving a youth with intellectual disabilities who was threatening his mother with a knife. (The Crisis Response Team is a "specialized unit comprised of CIT certified officers and licensed Mental Health professionals who respond in pairs to persons in Crisis and highly complex and/or emotionally heightened situations."[54])

---

[52] The Crisis Response Team is a co-responder model initiative of BPD. The team consists of a CIT trained officer and a mental health provider. It is notable that the CRT has the capacity to add another team if BPD created a position for another officer assigned to the effort. Baltimore Crisis Response, Inc. has made an additional clinician available.

[53] Collaborative Biannual Report at page 9.

[54] Crisis Intervention Program Policy 712 at 3.

### 4. De-escalation

The Monitoring Team's review of the body-worn camera video of incidents in the random sample of crisis intervention incidents revealed that officers appropriately engaged in de-escalation in approximately two-thirds of the cases to help secure compliance by the individual. In most of the remaining cases, officers used de-escalation techniques to help keep the person calm and cooperative. In only four instances (4.2% of cases) did the Monitoring Team conclude that additional de-escalation techniques should have been attempted by the officers but were not. In two cases, due to the absence of body-worn camera video, the Monitoring Team was unable to determine if the officer engaged in de-escalation.

The most frequent forms of de-escalation that officers used during crisis incidents included communication and verbal persuasion (64.7%), slowing the pace of events (46.3%), creating distance (14.7%), warnings (9.5%), and using physical barriers (4.2%). In several cases officers contacted the mental health provider of the person in behavioral health crisis.

The Monitoring Team's findings in this regard are consistent with BPD's own assessment. The Collaborative Biannual report for the second half of 2022 concluded that de-escalation was used in 63% of behavioral health incidents with officers using verbalization de-escalation more than 50% of the time.[55] This conclusion is likely an undercount, as the Monitoring Team observed officers maintaining calm by using techniques that they learned in crisis intervention training.

### 5. Use of Force

Officers responding to behavioral health calls were able to resolve the situation without the use of force in 88.4% of the incidents reviewed by the Monitoring Team. Force was used in only 11 of 95 cases, or 11.6% of the total cases. In ten of those 11 incidents (90.9% of the force used in reviewed crisis incidents) was low-level, Level 1 force.[56] In the remaining case, the force was

---

[55] Collaborative Biannual Report at 15.

[56] Level 1 uses of force involve the lowest force. They are defined in BPD policy, consistent with Consent Decree requirements, as:

> Level 1 Use of Force — Includes:
> - Using techniques that cause Temporary Pain or disorientation as a means of gaining compliance, hand control or escort techniques (e.g., elbow grip, wrist grip, or shoulder grip),and pressure point compliance techniques. Force under this category is not reasonably expected to cause injury,
> - Pointing a firearm, Less-Lethal Launcher, or CEW at a person,
> - "Displaying the arc" with a CEW as a form of warning, and
> - Forcible takedowns that do not result in actual injury or complaint of injury.

Use of Force, Policy 1115 (activated November 2019).

Level 2.[57] None of the Level 1 uses of force reviewed involved the use of a weapon, a takedown, or a pain technique. All were applied to restrain the person in behavioral health crisis or to prevent the person from engaging in self-harm. For example, in one incident reviewed, officers used a low-level (level 1) amount of force to restrain a person from drinking dangerous chemicals. The single Level 2 use of force was a take down and the application of body weight on the legs of the person in crisis in order to restrain the person to apply handcuffs.

For the cases reviewed, the justifications inventoried in Table 1 for the use of force were present:[58]

**Table 1.**      **Justifications for Use of Force in Crisis Incidents**

| | |
|---|---|
| Person was armed | 1 |
| Person was harming self | 1 |
| Person was threatening harm to self | 2 |
| Person was harming others (civilians) | 1 |
| Person was threatening harm to others (civilians) | 5 |
| Person was threatening harm to others (civilians and Police) | 1 |

---

[57]Level 2 uses of force are more serious than level 1 uses of force, but not the most serious uses of force. Per the Decree and BPD policy, a level 2 use of force includes:

- Force that causes or could reasonably be expected to cause an injury greater than Temporary Pain or the use of weapons or techniques listed below — provided they do not otherwise rise to a Level 3 Use of Force:
- Discharge of a CEW in Drive-Stun or Probes Deployment, in the direction of a person, including where a CEW is fired at a person but misses,
- Use of OC spray or other Chemical Agents,
- Weaponless defense techniques including, but not limited to, elbow or closed fist strikes, open hand strikes, and kicks,
- Discharge of a Less-Lethal Launcher/Munitions in the direction of a person,
- Canine-inflicted injuries that do not rise to a Level 3 Use of Force,
- Non-weapon strikes to the head, neck, sternum, spine, groin, or kidney area, and
- Striking of a person or a vehicle with a vehicle that does not rise to Level 3 Use of Force.

Use of Force, Policy 1115 (activated November 2019).

[58] The justifications add up to more than 11 because multiple justifications exist for some incidents.

| | |
|---|---|
| Person was harming police | 3 |
| Prevent the person from injuring himself after sedation | 1 |
| Person was threatening harm to police | 4 |
| Resisting officer | 2 |

Of the eleven incidents evaluated in which force was used, in only one incident did the Monitoring Team determine that the use of force was improper. In none of the cases reviewed was the person or the officer injured by the use of force.[59] Further, the Monitoring Team identified no instances in which force was used in a retaliatory or discriminatory manner, or after the person was restrained.

### 6.  Outcomes of the Encounter

Despite the Consent Decree requiring that "BPD will divert people with Behavioral Health Disabilities in crisis to the Behavioral Health service system rather than jail or a hospital emergency room whenever appropriate,"[60] the vast majority of calls result either in an emergency petition or a voluntary admission to the hospital. Of the 95 incidents reviewed, 85 resulted in either the officer preparing an emergency petition (64 instances) or the person being taken to the emergency room for a voluntary admission (21 cases). In the remaining 10 cases, the person was either taken into custody pursuant to a court-ordered emergency petition, was taken to the hospital, evaluated and released into police custody, or was not on the location and a missing person's report was filed. In only two cases did the incident resolve with the person being treated by their existing mental health provider in the community as opposed to transporting the person to the hospital.

Of the incidents reviewed by the Monitoring Team, most of the persons in behavioral health crisis did not threaten or attempt harm to others. The most common reason for the call was self-harm or the threat of self-harm. Forty-nine of the 95 incidents reviewed involved a suicide attempt or threat.

Of a total of 4,519 behavioral health-related incidents in which the Behavioral Heath Form was completed 3,011 (66.5%) events resulted in a Petition for Emergency Evaluation (Emergency Petition). Emergency Petitions were issued by the court in 358 (11.9%) events, by the mental health professionals in 275 crises (9.1%), and in 1,465 incidents (48.7%) the Emergency Petition was issued by the responding officer. In a total of 913 (30.3%) Emergency Petitions, the record does

---

[59] In one case, the person who called the police reported that she had been hit by a thrown bottle, but that occurred before the police arrived.

[60] Dkt. 2-2 ¶ 98.

not indicate the issuing official. More than 550 calls resulted in the person being taken to the emergency room for either a voluntary admission (301) or for medical treatment (256).

### 7. Crisis Calls Without a Behavioral Health Form

There is a group of incidents in which dispatchers coded the initial call as involving behavioral health, but the officer did not complete a Behavioral Health Form. In a future assessment, the Monitoring Team will need to review statistically-significant sample of calls dispatched as crisis calls but *lacking* a Behavioral Health Form. Part of this assessment will focus on determining whether the dispatched calls *should* have resulted in a Behavioral Health Form or if there was some other reason why no Behavioral Health Form was completed – because, for instance, another provider was on the scene, the person could not be located, or the person was not in behavioral health crisis.

### 8. Conclusion

In sum, the Monitoring Team's review of a statistically significant sample of behavioral crisis incidents finds that BPD has reached **Initial Compliance (4d)** with Paragraph 103. The encounters reviewed demonstrated that BPD officers have systematically incorporated BPD policy and training into their interactions with persons in behavioral health crisis.

## I. Paragraph 104 – Collaborative Planning and Implementation Committee Expansion

> *BPD will seek to expand the membership of CPIC by encouraging representation from the Maryland Department of Health and Mental Hygiene; judges from the Baltimore City Mental Health Court; Baltimore City State's Attorney's Office; Office of the Public Defender for Baltimore     e jails that serve Baltimore City; other relevant Baltimore City officials; Disability Rights Maryland (the federally-designated Protection & Advocacy organization); community mental health providers; substance use services providers; local hospitals; and advocates. CPIC will also include the Crisis Intervention Coordinator and Behavioral Health Services Baltimore.*

BPD expanded BCBHC to include a broad cross section of governmental and provider stakeholders. The expanded BCBHC membership was approved by the Monitoring Team and submitted to the Court April 2018.[61] It is worth noting that since the effective date of the Consent

---

[61] Notice of Approval of Initial Expansion of CPIC Membership Under Paragraph 104 of the Consent Decree (Docket No. 108)(April 25, 2018).

Decree, BCBHC has played an active role through the subcommittees on policy, training, data, and gap analysis.

Given the confirmed, expanded membership and ongoing work of BCBHC, the Monitoring Team finds BPD in **Initial Compliance (4d)** with Paragraph 104.

## J.  Paragraph 105 – CPIC (BCBHC) Recommendations and Implementation

> *BPD will encourage CPIC to identify and implement, as appropriate, strategies to reduce the number of people with Behavioral Health Disabilities who have unnecessary encounters with the police, consistent with the City's and BPD's goals of promoting public health, welfare, and safety.*

Paragraph 105 was not included as part of this assessment. It will be assessed when the Monitoring Team assesses the City's implementation of Paragraph 97. BCBHC has issued a series of reports and recommendations that can be found at https://consentdecree.baltimorecity.gov/collaborative-planning-and-implementation-committee.

## K.  Paragraphs 106 and 107 – Crisis Intervention Team Officer Training

> *106. BPD will provide enhanced, specialized training in responding to individuals in crisis to certain officers ("CIT officers"). All officers will receive some intervention training for responding to individuals in crisis; that training is separate and distinct from the training and qualifications required to be a CIT officer. CIT officers will continue to be assigned to the patrol division and will maintain their standard patrol duties, except when called upon to respond to incidents or calls involving individuals in crisis.*

> *107. The enhanced training for CIT officers will be at least 40 hours of in-person training. This enhanced training will be adequate for officers to achieve competence in the following areas: how to conduct a field evaluation, suicide intervention, community behavioral health and Intellectual and Developmental Disability resources, common behavioral health and Intellectual and Developmental Disability diagnoses, the effects of substance misuse, perspectives of individuals with Behavioral Health Disabilities and their family members, the rights of persons with Behavioral Health Disabilities, civil commitment criteria, crisis deescalation, and scenario-based exercises. This training must*

> *include on-site visits to mental health, substance use, and Intellectual and Developmental Disability community programs and interaction with individuals with Behavioral Health Disabilities. CIT officers must receive eight hours of annual in-service training on responding to individuals in crisis to maintain their expertise and skills as specialized CIT officers.*

BPD has developed, and the Monitoring Team has previously approved, a CIT officer training curriculum.[62] The curriculum addresses each of the topics required by Paragraphs 106 and 107. The Monitoring Team observed the training at various intervals and found the quality of the instruction and implemented training to be high. Additionally, the Monitoring Team's review of BPD training records confirms that all CIT officers have completed the training curriculum. Consequently, the Monitoring Team finds that BPD has reached **Initial Compliance (4d)** with Paragraphs 106 and 107.

### L.  Paragraph 108 – Qualifications to Become a CIT Officer

> *Training and designation as a CIT officer will be voluntary. To be eligible for consideration, officers must have at least one year of experience as a BPD officer. BPD will provide an in-depth assessment of each applicant to determine the applicant's fitness to serve as a CIT officer. This assessment will include an examination of the officer's written application, supervisory recommendations, use of force by the applicant, complaints against the applicant, disciplinary file, and an in-person interview.*

The process for selection of CIT officers was developed by BPD in 2018, approved by the Monitoring Team, and presented to the Court.[63] The Monitoring Team discusses compliance with the CIT officer selection process in its analysis of BPD compliance with Paragraphs 109 and 118, below. Because the Monitoring Team concludes below that the Department has progress left to be made in recruiting and screening CIT officers, it concludes that a compliance score of **Off Track (4b)** is appropriate.

### M. Paragraph 109 – Supervisor Identification of CIT Officers

> *Supervisors will identify and encourage officers across all shifts and all districts who are qualified to serve as CIT officers.*

---

[62] [Crisis Intervention Team (CIT) Certification Curriculum | Baltimore Police Department](#)
[63] Notice of Approval of Crisis Intervention Plan and Crisis Intervention Team Officer Selection Process Under Paragraphs 118-120 of the Consent Decree, docket entry 154 (November 11, 2018).

The CIT program contacts every BPD officer with more than one year in service by letter and/or email to encourage them to apply for the CIT training. In addition, the CIT program has developed a recruitment video and other mechanisms to encourage applications which are discussed more fully in the assessment of paragraph 119. BPD reports that a number of supervisors are actively and successfully recruiting officers to join the CIT program.

However, the Monitoring Team understands that officers regularly report to the CIT program that supervisors decline to approve their participation because of the need to require overtime from other officers to cover their shifts while in the 40-hour training. Although some District Commanders with high numbers of behavioral health calls will approve the training regardless of the staffing limitations, others do not. CIT leadership can sometimes assist the officer to get approval if they raise the issue with sufficient time before the training session begins. CIT training is offered six times each year with a maximum of 24 participants in each class. When a class does not reach capacity with BPD officers, officers from other law enforcement agencies are invited or request attendance.

In this way, BPD supervisors are not identifying and encouraging officers to become CIT officers in the manner that is necessary to sustain a comprehensive CIT first-responder program. Troublingly, based on the Monitoring Team's best and current understanding, BPD does not yet have a clear plan to address this barrier. Even as the shortage of CIT-trained officers is a symptom of the larger staffing dynamics that the Department continues to encounter, BPD will continue to be significantly short of the number of CIT-trained officers necessary to meet the Consent Decree requirements unless and until something changes. Because BPD is not systematically encouraging identifying and encouraging existing officers to be CIT officers, the Monitoring Team assesses this paragraph as **Off Track (4b).**

### N. Paragraph 110 – Sufficient CIT Officers for All Shifts and All Districts

> *BPD will ensure that CIT officer capacity is sufficient to ensure that, at all times and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis. Absent unusual circumstances, at least one CIT officer will respond to all calls or incidents where BPD knows or reasonably should know an individual with a Behavioral Health Disability or an individual in crisis is involved.*

As noted above, BPD has failed to recruit sufficient numbers of officers to receive the CIT training to meet this requirement of the Consent Decree. Tables 3 and 4, below, demonstrate that *none* of the BPD districts have sufficient numbers to ensure that a CIT officer is available on every shift and for every call, especially once leave and days-off are taken into account.

In the Crisis Intervention Plan submitted by BPD to the Court on November 16, 2018, BPD determined that it needs to have 30% of its patrol officers CIT trained to meet this requirement. Prior to the Court approved CIT training program, BPD had 140 officers who were trained in the BEST program. Given the differences between the two programs, the BEST trained officers were not grandfathered into the CIT program. Overall, fewer than 10% of officers are CIT trained and for some Districts on some shifts no CIT officers are available. The Crisis Intervention Plan identified steps to address the shortfall in CIT trained officers, including more frequent training classes and efforts to encourage officers to apply. These strategies have proven unsuccessful, and the Monitoring Team recommends that BPD consider additional approaches to identify officers with the aptitude and the willingness to take on the role.

The following chart lists the CIT trained officers by shift and district.

**Table 3.        CIT-Trained Officers by Shift and District**

| District | Shift A | | | Shift B | | | Shift C | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CIT Trained | Patrol Staffing | % per Shift | CIT Trained | Patrol Staffing | % per Shift | CIT Trained | Patrol Staffing | % per Shift | CIT Trained | Patrol Staffing | % per Shift |
| Central | 2 | 22 | 9.1% | 3 | 18 | 16.7% | 2 | 42 | 4.8% | 7 | 82 | 8.5% |
| Southeastern | 1 | 23 | 4.3% | 2 | 19 | 10.5% | 5 | 37 | 13.5% | 8 | 79 | 10.1% |
| Eastern | 4 | 26 | 15.4% | 2 | 28 | 7.1% | 7 | 37 | 18.9% | 13 | 91 | 14.3% |
| Northeastern | 4 | 25 | 16.0% | 1 | 25 | 4.0% | 2 | 31 | 6.5% | 7 | 81 | 8.6% |
| Northern | 1 | 25 | 4.0% | 5 | 24 | 20.8% | 5 | 30 | 16.7% | 11 | 79 | 13.9% |
| Northwestern | 0 | 21 | 0.0% | 1 | 20 | 5.0% | 6 | 35 | 17.1% | 7 | 76 | 9.2% |
| Western | 1 | 23 | 4.3% | 1 | 20 | 5.0% | 0 | 37 | 0.0% | 2 | 80 | 2.5% |
| Southwestern | 3 | 26 | 11.5% | 4 | 21 | 19.0% | 3 | 31 | 9.7% | 10 | 78 | 12.8% |
| Southern | 3 | 26 | 11.5% | 2 | 28 | 7.1% | 2 | 34 | 5.9% | 7 | 88 | 8.0% |
| **Total** | **19** | **217** | **8.8%** | **21** | **203** | **10.3%** | **32** | **314** | **10.2%** | **72** | **734** | **9.8%** |

The number of CIT trained officers available for each shift and District is significantly below the staffing numbers identified in BPD's Crisis Intervention Plan, which was approved by the Monitoring Team and filed with the Court. The Plan required:

**Table 4.        CIT Staffing Required by BPD Crisis Intervention Plan**

| District | Shift A | | | Shift B | | | Shift C | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CIT Trained | Patrol Staffing | % per Shift | CIT Trained | Patrol Staffing | % per Shift | CIT Trained | Patrol Staffing | % per Shift | CIT Trained | Patrol Staffing | % per Shift |
| Central | 9 | 32 | 28.1% | 9 | 33 | 27.3% | 10 | 34 | 29.4% | 28 | 99 | 28.3% |
| Southeastern | 8 | 28 | 28.6% | 9 | 31 | 29.0% | 9 | 32 | 28.1% | 26 | 91 | 28.6% |

| Eastern | 8 | 28 | 28.6% | 9 | 32 | 28.1% | 9 | 31 | 29.0% | 26 | 91 | 28.6% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Northeastern | 10 | 34 | 29.4% | 13 | 46 | 28.3% | 12 | 42 | 28.6% | 35 | 122 | 28.7% |
| Northern | 7 | 26 | 26.9% | 10 | 35 | 28.6% | 9 | 31 | 29.0% | 26 | 92 | 28.3% |
| Northwestern | 8 | 28 | 28.6% | 9 | 33 | 27.3% | 8 | 28 | 28.6% | 25 | 89 | 28.1% |
| Western | 7 | 25 | 28.0% | 9 | 32 | 28.1% | 9 | 30 | 30.0% | 25 | 87 | 28.7% |
| Southwestern | 8 | 27 | 29.6% | 10 | 34 | 29.4% | 11 | 37 | 29.7% | 29 | 98 | 29.6% |
| Southern | 8 | 27 | 29.6% | 9 | 33 | 27.3% | 9 | 33 | 27.3% | 26 | 93 | 28.0% |
| **Total** | **73** | **255** | **28.6%** | **87** | **309** | **28.2%** | **86** | **298** | **28.9%** | **246** | **862** | **28.5%** |

It is important to note that the total number of CIT officers assigned to each shift and each District are also well below the projected numbers and the BPD is experiencing a Department-wide staffing shortage. Nevertheless, even given this reduced baseline, BPD has not achieved the 30% CIT trained officer staffing level required by the Crisis Intervention Plan.[64] BPD will need nearly *triple* the number of CIT officers by recruiting and training 174 new CIT officers to achieve compliance with this provision, not accounting for attrition and promotions. Table 5 demonstrates the gaps in the CIT officer program and suggests that it will take a concerted recruitment effort to meet this requirement.

**Table 5.**   **Current CIT-Trained Officers and Number of Additional CIT Officers Needed to Meet Consent Decree Requirements, by District**

| District | Current CIT Trained Officers | Additional CIT Trained Officers Needed to Meet Consent Decree |
|---|---|---|
| Central | 7 | 21 |
| Southeastern | 8 | 18 |
| Eastern | 13 | 13 |
| Northeastern | 7 | 28 |
| Northern | 11 | 15 |
| Northwestern | 7 | 18 |
| Western | 2 | 23 |
| Southwestern | 10 | 19 |
| Southern | 7 | 19 |
| **Total** | **72** | **174** |

CIT leadership has identified several barriers to recruiting CIT officers. First, the Department-wide staffing shortage limits the ability of officers to participate in the 40-hour training. As discussed in the assessment of paragraph 109 above, supervisors may be declining to approve the participation of officers in CIT training because of staffing and recruitment shortages.

---

[64] *Id.*

Similarly, since many of the officers who are interested in CIT training are younger or newer to the force, the small size of academy classes has limited recruitment efforts. Small academy classes mean that there are fewer new officers in the Department who have not had the opportunity previously to participate in the training.

CIT leadership also identified persistent misperceptions about the role of a CIT officer as a barrier. Officers have reported reluctance because of a concern that they will be forced to work a shift or district not of their choosing or that they will be forced to take the calls of other officers.

BPD is taking several steps to recruit officers:

- BPD identifies every officer with at least one year of service and is thus eligible for CIT training and periodically sends them a short email or letter encouraging them to apply for the CIT Officer training;
- CIT leadership participates in roll call at the requests of District leadership to recruit officers;
- BPD developed and posted on-line a CIT recruitment video with personal testimonies from BPD officers who completed the training;
- CIT leadership has actively recruited supervisors to participate in the CIT training so that they will better understand the value of the training and will, with the expectation that they will encourage officers under their supervision to apply; and
- BPD has started to encourage recruits to complete the application for CIT training during their academy so that the CIT Coordinator can contact them and encourage them to participate as soon as they are eligible.

Given the tangible steps that the Department has identified to try to reach compliance with Paragraph 110, the Monitoring Teams finds that BPD's state of compliance is best described as **On Track (4c)**.

### O. Paragraph 111 – CIT Officers Who Respond to Call are Responsible for the Scene

> *CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene unless a supervisor has assumed responsibility. If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of a CIT officer regarding strategies for responding to the individual in crisis where it is reasonable for the supervisor to do so.*

The Monitoring Team's review found that CIT officers were on the scene in fewer than one-third of behavioral health calls. Even when a CIT officer was present, she or he did not necessarily take control of the call. The review, however, did not identify cases in which the failure of the CIT officer present to take control had a negative impact on the outcome. In cases with a CIT officer present, but the call was handled by a non-CIT officer, the non-CIT officer handled the cases effectively or received coaching or guidance from the CIT officer to address the situation. Given the findings of the case assessment, the Monitoring Team finds that BPD is at **Off Track** (**4b**) compliance.

## P. Paragraph 112 – Crisis Intervention Training for All Officers

*BPD will provide CIT training on responding to individuals in crisis to all of its officers and recruits:*

*a. All officers will receive at least eight hours of annual in-service training. The annual training will be adequate for officers to demonstrate competence in the subject matter and will include these topics:*

*i. How non-medically trained law enforcement personnel can recognize common characteristics and behaviors associated with Behavioral Health Disabilities or Intellectual and Developmental Disabilities;*

*ii. How to interact with individuals with these disabilities;*

*iii. When and how to make reasonable modifications for individuals with these disabilities;*

*iv. That individuals with these disabilities may have alternate perceptions and how that may affect their interactions with others;*

*v. How to take appropriate steps to ensure effective communication with individuals with these disabilities;*

*vi. How to recognize and respond to conduct or behavior that is related to these disabilities;*

*vii. How to avoid escalating an interaction with individuals with these disabilities;*

*viii. How to use de-escalation techniques to increase safety and to avoid using force unnecessarily;*

*ix. What local resources are available to provide treatment, services, or support for individuals with Behavioral Health Disabilities or Intellectual and Developmental Disabilities, and when and how to draw upon these resources; and*

*x. The circumstances in which a CIT officer should be dispatched or consulted; and how situations involving individuals in crisis should be addressed if a CIT officer is not immediately available.*

*b. All new recruits will receive at least 16 hours of training in the Academy;*

*c. Completion of this training does not qualify an officer as a CIT officer.*

BPD is providing training consistent with the requirements of paragraph 112 and the Monitoring Team-approved curriculum. The Monitoring Team's lead subject-matter expert and members of the Department of Justice observed the training sessions. The trainers were effective, and the feedback from officers was uniformly positive.

The crisis intervention cases reviewed by the Monitoring Team suggested that the crisis intervention training is having a significant, positive impact on officer performance and departmental culture. Officers nearly uniformly engaged in de-escalation, resisted the use of force, and treated persons in behavioral health crisis with respect. In addition, officers avoided arresting persons in favor of either an emergency petition or a voluntary admission. In one instance reviewed by the Monitoring Team, the officer, who responded to a call involving a man in behavioral health crisis who had been accused of attempted theft and assault, called a supervisor to confirm that he should not arrest the person, but instead have him transported to the hospital. In another instance, an officer uncertain whether a person met the standard for an emergency petition can be seen on her body worn camera video consulting training materials on her phone, demonstrating the seriousness with which she was taking a difficult decision.

In light of the foregoing, the Monitoring Team finds BPD to have reached **Initial Compliance (4d)** with Paragraph 112 regarding general crisis training for all BPD officers.

## Q. Paragraph 113 – BPD Dispatch Training

> *All BPD dispatchers and their supervisors will receive crisis intervention training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis.*

The Monitoring Team has previously assessed and evaluated the crisis intervention training developed and provided to BPD dispatchers and supervisors.[65] Indeed, BPD's behavioral health training for dispatch employees was approved by the Monitoring Team and submitted to the Court.[66] Consequently, BPD is in **Initial Compliance (4d)** with Paragraph 113.

## R. Paragraph 114 – BPD Dispatch Policies

> *BPD will revise its dispatch policies and protocol as necessary to meet the requirements of this Agreement, with input from the CPIC, the Monitor, and DOJ. With the of limiting police involvement in crises where appropriate, calls related to crises that do not necessitate a police response will be sent to other crisis services, such as a Mobile Crisis Team. When a police response is necessary, BPD will ensure that dispatchers use all reasonable efforts to dispatch a CIT trained officer to respond to the call.*

BPD's revised dispatch policies were approved by the Monitoring Team July 15, 2019 and were most recently updated in June 2021.[67] As the Monitoring Team has previously described, the policies meet the requirements of the Consent Decree.

It is notable that more calls to 9-1-1 that would otherwise receive an EMS response from the Baltimore City Fire Department (sometimes with BPD co-response) are being diverted to Baltimore Crisis Response Incorporated for a behavioral health response. According to the BGBHC Data Subcommittee, BPD behavioral health calls are on the decline and calls to the Fire Department and to BCRI have increased.[68] From 2021 to 2022, behavioral health calls declined

---

[65] The Training was approved in May of 202. See, Docket 314. The training was found in initial compliance in the Monitoring Team's Sixth Semiannual Report, May 14, 2021.

[66] The training curriculum is available online at: Behavioral Health Awareness Training for 911 and Dispatch Personnel | Baltimore Police Department

[67] Behavioral Health Crisis Dispatch, Policy 715.

[68] Baltimore City Behavioral Health Collaborative Data Subcommittee Biannual Report, July 1, 2022 – December 31, 2022 (August 11, 2023) at page 3.

25% from 5,717 to 4,264.[69] The Monitoring Team did not assess the causes for the decline, but notes that reduced law enforcement response is consistent with the consent decree requirements.

Baltimore launched an expansion of its 9-1-1 Diversion Program.[70] While the diversion program is not assessed in the report and will be assessed along with paragraph 97, the expansion is an important step to reduce the number of behavioral health calls assigned to BPD and increase those to non-law enforcement community providers. Significantly, the expansion permits diversion of subsequent calls about an event that has already been diverted and diversion of calls regarding youths. As discussed below, the Monitoring Team's review of incidents disproportionately involved young people, many of whom were in their homes at the time of crisis and may have benefited from a non-law enforcement alternative. Data from the diversion program shows hundreds of calls directly to 9-8-8 that are resolved without a law enforcement response, indicating its promise to support individuals who need a behavioral health response, as the City and BPD work to bolster the use of 9-8-8 and as the 9-1-1 Diversion Program continues to expand.[71]

BPD is in **Initial Compliance (4d)** in its efforts to train dispatch workers and divert crisis calls. Evaluation of CIT officers dispatched was not part of the methodology for this assessment and cannot be assessed until a greater number of CIT officers are recruited and trained.

### S.   Paragraph 115 – Crisis Intervention Coordinator

> *Within 180 days of the Effective Date, BPD will designate an officer at the rank of Sergeant or above to act as a Crisis Intervention Coordinator ("Coordinator") to better facilitate communication between BPD and members of the behavioral health provider community and to increase the effectiveness of BPD's crisis intervention program. BPD will ensure that the Coordinator is empowered to fulfill all duties of the Coordinator required by this Agreement.*

The position of Crisis Intervention Coordinator is established by BPD policy with broad authorities and responsibilities consistent with the requirements of this paragraph and the other provisions of the Consent Decree.[72] These responsibilities include coordination with behavioral health

---

[69] *Id.*

[70] 911 Diversion Expansion Report 3-8-23 (powerdms.com); 911 Diversion Program Report.pdf (baltimorepolice.org) 911 Diversion Expansion Report (final).pdf (baltimorepolice.org).

[71] https://mayor.baltimorecity.gov/behavioral-health-and-consent-decree/9-1-1-diversion.

[72] Crisis Intervention Program Policy 712 paragraphs 53 – 74.

providers, collecting and analyzing data, facilitation of BCBHC, selecting CIT officers and maintaining a roster of officers, and preparing reports on the program.[73]

The CIT Coordinator has been a Sergeant or Lieutenant since September of 2016. The following persons have held the position:

> Lieutenant Azalee Johnson (September 2016 – July 2019)
>
> Sergeant Thomas Smith (Spring 2017 – Present)
>
> Lieutenant Don Slimmer (September 2019 – March 2020)
>
> Lieutenant Joanne Wallace (September 2020 – November 2021)
>
> Lieutenant Gary Edmondson (August 2022 – Present)

Consequently, BPD is in **Initial Compliance (4d)** with Paragraph 115.

## T.  Paragraph 116 – Crisis Intervention Coordinator Training

> *The Coordinator shall receive at least eight hours of training on the role and duties of the Crisis Intervention Coordinator, in addition to the CIT training he or she has already received in the Academy and to become a CIT trained officer.*

To meet this requirement, CIT Coordinators attend a 40-hour course at Baltimore Crisis Response, Inc., which has continued to occur. Paragraph 116 is therefore in **Initial Compliance (4d).**

## U.  Paragraph 117 – Crisis Intervention Coordinator Partnership with Advocates and Behavioral Health Providers

> *The Coordinator shall identify, develop, and maintain partnerships with program stakeholders and shall serve as a point of contact for advocates, individuals with Behavioral Health Disabilities, their families, caregivers, professionals, and others associated with the behavioral health and Intellectual and Developmental Disability community. The Coordinator will solicit input and guidance from the CPIC regarding BPD's CIT program.*

---

[73] *Id.*

The CIT Coordinator, together with the Major responsible for Education and Training are participants in BCBHC and its committees during which they interact with the various stakeholders. The CIT receives the recommendations from BCBHC for the CIT program. The Major continues to be the more visible face of the CIT program to the community. In addition to the Major's efforts, the CIT Coordinator could play a greater role in developing relationships with members of the provider community. Accordingly, we find that BPD is in **Initial Compliance (4d)** with the requirements of Paragraph 117.

### V.  Paragraph 118 – Crisis Intervention Coordinator Selection of CIT Officers

> *The Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as CIT officers consistent with the requirements set forth in this Agreement.*

A plan for the selection of CIT officers was approved by the Monitoring Team and submitted to the Court on November 1, 2021.[74] The plan requires that participation in the CIT program be voluntary and that officers have served in the Department for at least a year after completion of field training. Officers applying for CIT certification must submit a statement of interest and be interviewed by a Selection Board. The selection Board will assess their suitability based on the following factors:

- The volunteer nature of the CIT program and retention of an officer's normal patrol duties;
- Any background the officer may have related to Crisis Intervention;
- The required training and refresher training related to CIT;
- Response and report-writing criteria for CIT calls for service;
- Any discipline, complaints, awards, and evaluations from the personnel;
- Review that the Selection Board deems appropriate for clarification; and
- Any additional criteria at the discretion of the Selection Board.[75]

The Monitoring Team reviewed all 112 of the application records for officers who applied for crisis intervention training. The application files are insufficient to evaluate the assessment of officers for suitability. Officers are asked to explain their interest on a form that provides two lines

---

[74] Selection Process for the Baltimore Police Department Crisis Intervention Team (CIT) and Crisis Response Team (CRT) Officers, Docket 154-2, November 16, 2018.
[75] *Id*. at 4.

42

of written text. Only a small percentage of officers provide a separate written statement explaining their interest in receiving CIT training.

Supervisor recommendations are often provided over the phone and are not typically documented. When provided in writing, they are brief—sometimes consisting of only a few words. For example, in one case when a supervisor was asked how the officer responded to a behavioral health call, the response was "professionally." A check list notes that there was a review of the officer's record of discipline and force but there is no documentation of what was found during the review or how it was considered in the assessment of the officer's suitability to be a CIT officer. The sergeant assigned to the CIT Coordinator requests the officer's discipline record from the Public Integrity Bureau ("PIB") and reviews the record. At the conclusion of the review, at the request of the PIB, the CIT destroys its copy of the discipline record. Other than an entry that the file was reviewed there is not documentation of how the information contained in the PIB file was used to assess the suitability of the applicant for CIT training, the CIT Coordinator relies on the good judgment of the sergeant to identify potential concerns.

The only records of force considered in the assessment are incidents in which the PIB has sustained misconduct. The CIT Coordinator does not review any other use of force records.

BPD no longer conducts interviews of applicants for CIT training and has not done so since 2020. BPD ceased this practice in recognition that it was having trouble filling its CIT classes and determined that there was no reason to use the interviews to screen out potential CIT officers. Given the deficiencies in the screening of CIT officers, the Monitoring Team determines the compliance progress with respect to Paragraph 118 to be **Off Track (4b).**

## W. Paragraph 119 – Crisis intervention Coordinator Ensure that CIT Officers Available on All Shifts in All Districts

> *BPD, through the Coordinator, shall also ensure that CIT officer capacity is sufficient to ensure that, at all times of the day and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis.*

Paragraph 119 was assessed in conjunction with Paragraph 110. As discussed previously, there are too few CIT-trained officers to ensure sufficient capacity to respond to every call – and, in fact, in two-thirds of the behavioral health calls reviewed by the Monitoring Team, no CIT-trained officer responded. Given the failure to recruit and train sufficient numbers of CIT officers, this provision is determined to be **Off Track (4b).**

## X. Paragraph 120 – Crisis Intervention Coordinator to Develop and Implement Crisis Intervention Plan

> *BPD, through the Coordinator, will develop and implement a crisis intervention plan ("Crisis Intervention Plan"). The goal of the Crisis Intervention Plan will be to ensure that a CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis. On an annual basis, BPD will conduct an analysis of crisis intervention incidents to determine whether BPD has enough CIT officers, whether it is deploying those officers effectively, and whether CIT officers, call-takers, and dispatchers are appropriately responding to people in crisis, and will make appropriate changes to policies, procedures, and training regarding police contact with individuals in crisis. The Crisis Intervention Plan will include an assessment of the number of officers necessary to achieve the goal of ensuring that a CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis; identification of gaps in coverage of particular shifts or districts; and development of mechanisms to fill those gaps. BPD will review and revise the Crisis Intervention Plan in order to identify and address barriers to full coverage. BPD will identify performance measures for the CIT program. These measures will consider quantitative data on key aspects of program operation as well as qualitative data on officers' and community members' perceptions of the program. Community members include individuals who have experienced Behavioral Health crises that have included police involvement. BPD may consider engaging a university or other expert partner to guide these data collection and analysis efforts.*

The Crisis Intervention Plan was approved by the Monitoring Team on November 16, 2018 and submitted to the Court. While the plan has been developed, it has yet to be fully implemented. The Monitoring Team determined that this provision is **On Track (4c).**

## Y. Paragraphs 121 and 122 – Behavioral Health Disability or Crisis Data Collection, Analysis, and Reporting

> *121. BPD will collect data on suspected Behavioral Health Disability or crisis status of individuals subject to law enforcement actions including Stops, Searches, Arrests (to include type of offense and probable cause), use of force, injuries, and in-custody deaths.*

44

> For any section of this Agreement that calls for data collection, analysis, or reporting, BPD shall report on the suspected Behavioral Health Disability or crisis status of the individuals involved.
>
> 122. BPD will collect, analyze, and report data related to Behavioral Health Disability or crisis status, including:
>
>> a. BPD will collect data regarding calls for service that involve possible Behavioral Health Disabilities or people in crisis, including the number of calls, the nature of the crisis, and the extent to which individuals previously interacted with BPD; the disposition of those calls, including whether referred to community services, an emergency room, Emergency Petition, Arrest, booking; whether force was used; the type of forced used; and the steps taken, if any, to de-escalate interactions, especially when confrontations resulted in use of force, injury or death.
>
>> b. BPD will analyze the data on an ongoing basis to drive improvement toward the goals of Paragraph 96 and report the data on a quarterly basis to the Crisis Intervention Coordinator and the CPIC.

On a biannual basis, BPD issues the Baltimore City Behavioral Health Collaborative Data Subcommittee report. The Biannual report collects and analyzes the data required by the paragraphs of the agreement. Consequently, the Monitoring Team finds BPD to be in **Initial Compliance (4d)** with Paragraphs 121 and 122.

## V.     OUTCOME ASSESSMENTS

### A.     Paragraph 459.h.i. – Number of Persons with Emergency Petitions Eligible for Community Based Services (paragraph 459h.i.)

> *To assess whether people with behavioral health disabilities or in crisis are receiving reasonable modifications, the Monitor will conduct analysis of data showing:*
>
> *i. The number of people subject to Emergency Petitions who were eligible for community-based services;*

More than 67% of the behavioral health incidents reviewed by the Monitoring Team resulted in an emergency petition and more than 22% resulted in a voluntary admission. Only two cases of the 95 reviewed resulted in the person remaining in the community for treatment. In one case, a youth in crisis was assessed by EMS as not being a threat to self or others, but resulted in a trip to the emergency room because the youth's mother requested the admission and had no community-based resource to provide services to her child. The Monitoring Team will further assess this provision when it reviews compliance with paragraph 97.

### B.   Referrals by BPD to Community Mental Health Services or Hospital Emergency Rooms (para 459h.ii.)

> *To assess whether people with behavioral health disabilities or in crisis are receiving reasonable modifications, the Monitor will conduct analysis of data showing:*
>
> *...*
>
> *ii. The number of referrals by BPD to community mental health services or to a hospital emergency room;*

During the calendar year of 2022, of 4,519 behavioral health incidents resulted in the completion of a Behavioral Health Form,[76] 3,301 resulted in an emergency petition, 301 a voluntary admission, 251 were handled by EMS, and 256 in medical treatment. Only nine resulted in a referral to mobile crisis, four to peer support, and 26 to a current provider.

---

[76] It is important to note that the number of incidents with Behavioral Health Forms will not match the number of calls coded as behavioral health calls by dispatchers. Some incidents were initiated based on another call code or based on an encounter with an officer. In other cases, dispatchers coded the call as behavioral health, but the officer did not complete a Behavioral Health Form for a variety of reasons.

Given the limited non-law enforcement resources available, the behavioral health incident review conducted by the Monitoring Team found that officers involved in those incidents provided reasonable accommodations. Nevertheless, most calls reviewed resulted in at least a brief institutionalization. Additional community services and increased mobile crisis may have reduced the number of people in behavioral health crisis that required treatment in an institutional setting. Assessment of community services will be conducted in a future review of paragraph 97 of the Consent Decree.

## VI.    COMPLIANCE ASSESSMENT CONCLUSIONS

| ¶ | Requirement | Status of Compliance |
|---|---|---|
| **A.   BPD Crisis Intervention** | | |
| 96 | BPD is committed to responding to individuals with Behavioral Health Disabilities and those in crisis in a manner that respects individuals' civil rights and contributes to their overall health and welfare. Ensuring that BPD uses appropriate crisis response techniques when responding to individuals with Behavioral Health Disabilities or in crisis will help prevent situations that could lead to unreasonable use of force, promote connection of people with Behavioral Health Disabilities or in crisis to the behavioral health system, and decrease inappropriate criminal justice involvement for people with Behavioral Health Disabilities or in crisis. | **Not Reviewed** |
| 97 | The City will coordinate with the Collaborative Planning and Implementation Committee ("CPIC") to conduct an assessment to identify gaps in the behavioral health service system, recommend solutions, and assist with implementation of the recommendations as appropriate. The assessment will include an analysis of a sample of police interactions with people with Behavioral Health Disabilities to identify systemic barriers and solutions, including what precipitated the crisis, what services could have prevented the crisis, how police became involved, how the response to the crisis could be improved, and what can be done to prevent the crisis in the future. The analysis will include identifying gaps in Behavioral Health Disability services (including assertive community treatment, permanent supported housing, targeted case management, crisis services, and substance use disorder services), problems with the quality or quantity of existing services, and other unmet needs that lead to preventable criminal justice system involvement. | **Not Reviewed** |
| 98 | BPD will revise its policy to establish a preference for the least police-involved response possible consistent with public safety. In situations that do not involve an Emergency Petition, BPD will divert people with Behavioral Health Disabilities or in crisis to the Behavioral Health service system rather than jail or a hospital emergency room whenever appropriate. | **4d (Initial Compliance)** |
| 99 | A person may be suspected of having a Behavioral Health Disability or being in crisis from a number of factors including self-report, information provided by witnesses or informants to dispatch or to BPD officers, from BPD's previous knowledge of the individual, or the officer's direct observation. | **4d (Initial Compliance)** |
| 100 | Officers will be trained to not make assumptions regarding the dangerousness of an individual based on that individual's disability | **4d (Initial Compliance)** |

| | *Crisis Intervention Team (CIT) Program* | |
|---|---|---|
| 101 | BPD currently operates the BEST program for responding to individuals in crisis. BPD may continue to utilize the BEST program as its CIT program, as long as the BEST program meets the obligations of this Agreement. | **Not Applicable** |
| 102 | BPD will implement a CIT first-responder model of police-based crisis intervention with community, health care, and advocacy partnerships to assist individuals with Behavioral Health Disabilities and individuals who are in crisis. | **4d (Initial Compliance)** |
| 103 | The goals of the CIT program will continue to be to equip police officers with methods to properly interact with persons with Behavioral Health Disabilities or in crisis safely; de-escalate crises and reduce the unnecessary use of force against individuals with Behavioral Health Disabilities or in crisis; minimize arrests; improve the safety of patrol officers, individuals with Behavioral Health Disabilities or in crisis and their families, and others within the City's behavioral health crisis system; and reduce the inappropriate involvement of individuals with Behavioral Health Disabilities with the criminal justice system | **4d (Initial Compliance)** |
| | *Collaborative Planning and Implementation Committee* | |
| 104 | BPD will seek to expand the membership of  Baltimore City Behavioral Health Collaborative (BCBHC)by encouraging representation from the Maryland Department of Health and Mental Hygiene; judges from the Baltimore City Mental Health Court; Baltimore City State's Attorney's Office; Office of the Public Defender for Baltimore City; the jails that serve Baltimore City; other relevant Baltimore City officials; Disability Rights Maryland (the federally-designated Protection & Advocacy organization); community mental health providers; substance use services providers; local hospitals; and advocates. BCBHC will also include the Crisis Intervention Coordinator and Behavioral Health Services Baltimore. | **4d (Initial Compliance)** |
| 105 | BPD will encourage BCBHC to identify and implement, as appropriate, strategies to reduce the number of people with Behavioral Health Disabilities who have unnecessary encounters with the police, consistent with the City's and BPD's goals of promoting public health, welfare, and safety | **Not Assessed** |
| | *Crisis Intervention Team (CIT) Officers* | |
| 106 | BPD will provide enhanced, specialized training in responding to individuals in crisis to certain officers ("CIT officers"). All officers will receive some intervention training for responding to individuals in crisis; that training is separate and distinct from the training and qualifications required to be a CIT officer. CIT officers will continue to be assigned to the patrol division and will maintain their standard patrol duties, except when called upon to respond to incidents or calls involving individuals in crisis. | **4d (Initial Compliance)** |

| 107 | The enhanced training for CIT officers will be at least 40 hours of in-person training. This enhanced training will be adequate for officers to achieve competence in the following areas: how to conduct a field evaluation, suicide intervention, community behavioral health and Intellectual and Developmental Disability resources, common behavioral health and Intellectual and Developmental Disability diagnoses, the effects of substance misuse, perspectives of individuals with Behavioral Health Disabilities and their family members, the rights of persons with Behavioral Health Disabilities, civil commitment criteria, crisis de-escalation, and scenario-based exercises. This training must include on-site visits to mental health, substance use, and Intellectual and Developmental Disability community programs and interaction with individuals with Behavioral Health Disabilities. CIT officers must receive eight hours of annual in-service training on responding to individuals in crisis to maintain their expertise and skills as specialized CIT officers. | **4d** **(Initial Compliance)** |
|---|---|---|
| 108 | Training and designation as a CIT officer will be voluntary. To be eligible for consideration, officers must have at least one year of experience as a BPD officer. BPD will provide an in-depth assessment of each applicant to determine the applicant's fitness to serve as a CIT officer. This assessment will include an examination of the officer's written application, supervisory recommendations, use of force by the applicant, complaints against the applicant, disciplinary file, and an in-person interview. | **4b** **(Implementation – Off Track)** |
| 109 | Supervisors will identify and encourage officers across all shifts and all districts who are qualified to serve as CIT officers. | **4b** **(Implementation – Off Track)** |
| 110 | BPD will ensure that CIT officer capacity is sufficient to ensure that, at all times and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis. Absent unusual circumstances, at least one CIT officer will respond to all calls or incidents where BPD knows or reasonably should know an individual with a Behavioral Health Disability or an individual in crisis is involved. | **4c** **(Implementation – On Track)** |
| 111 | CIT officers who are dispatched to an incident involving an individual in crisis will have primary responsibility for the scene unless a supervisor has assumed responsibility. If a supervisor has assumed responsibility for the scene, the supervisor will seek the input of a CIT officer regarding strategies for responding to the individual in crisis where it is reasonable for the supervisor to do so. | **4b** **(Implementation – Off Track)** |
| *Crisis Intervention Training for All BPD Officers* | | |
| 112 | BPD will provide CIT training on responding to individuals in crisis to all of its officers and recruits: a. All officers will receive at least eight hours of annual in-service training. The annual training will be adequate for officers to demonstrate competence in the subject matter and will include these topics: i. How non-medically trained law enforcement personnel can recognize common characteristics and behaviors associated with Behavioral Health Disabilities or Intellectual and Developmental Disabilities; ii. How to interact with individuals with these disabilities; iii. When and how to make reasonable modifications for individuals with these disabilities; iv. That individuals with these disabilities may have alternate perceptions and how that may affect their interactions with | **4d** **(Initial Compliance)** |

|  | others; v. How to take appropriate steps to ensure effective communication with individuals with these disabilities; vi. How to recognize and respond to conduct or behavior that is related to these disabilities; vii. How to avoid escalating an interaction with individuals with these disabilities; viii. How to use de-escalation techniques to increase safety and to avoid using force unnecessarily; ix. What local resources are available to provide treatment, services, or support for individuals with Behavioral Health Disabilities or Intellectual and Developmental Disabilities, and when and how to draw upon these resources; and x. The circumstances in which a CIT officer should be dispatched or consulted; and how situations involving individuals in crisis should be addressed if a CIT officer is not immediately available. b. All new recruits will receive at least 16 hours of training in the Academy; c. Completion of this training does not qualify an officer as a CIT officer. |  |
|---|---|---|
| *BPD Dispatch* | | |
| 113 | All BPD dispatchers and their supervisors will receive crisis intervention training that is adequate to enable them to identify, dispatch, and appropriately respond to calls for service that involve individuals in crisis. | **4d (Initial Compliance)** |
| 114 | BPD will revise its dispatch policies and protocol as necessary to meet the requirements of this Agreement, with input from the CPIC, the Monitor, and DOJ.<br><br>With the goal of limiting police involvement in crises where appropriate, calls related to crises that do not necessitate a police response will be sent to other crisis services, such as a Mobile Crisis Team. When a police response is necessary, BPD will ensure that dispatchers use all reasonable efforts to dispatch a CIT trained officer to respond to the call. | **4d (Initial Compliance)** |
| *Crisis Intervention Coordinator* | | |
| 115 | Within 180 days of the Effective Date, BPD will designate an officer at the rank of Sergeant or above to act as a Crisis Intervention Coordinator ("Coordinator") to better facilitate communication between BPD and members of the behavioral health provider community and to increase the effectiveness of BPD's crisis intervention program. BPD will ensure that the Coordinator is empowered to fulfill all duties of the Coordinator required by this Agreement. | **4d (Initial Compliance)** |
| 116 | The Coordinator shall receive at least eight hours of training on the role and duties of the Crisis Intervention Coordinator, in addition to the CIT training he or she has already received in the Academy and to become a CIT trained officer. | **4d (Initial Compliance)** |
| 117 | The Coordinator shall identify, develop, and maintain partnerships with program stakeholders and shall serve as a point of contact for advocates, individuals with Behavioral Health Disabilities, their families, caregivers, professionals, and others associated with the behavioral health and Intellectual and Developmental Disability community. The Coordinator will solicit input and guidance from the CPIC regarding BPD's CIT program. | **4d (Initial Compliance)** |

| 118 | The Coordinator will be responsible for ensuring the selection of appropriate candidates for designation as CIT officers consistent with the requirements set forth in this Agreement. | **4b (Implementation – Off Track)** |
|---|---|---|
| 119 | BPD, through the Coordinator, shall also ensure that CIT officer capacity is sufficient to ensure that, at all times of the day and in all districts, CIT officers can respond to individuals with Behavioral Health Disabilities and those in crisis. | **4b (Implementation – Off Track)** |
| 120 | BPD, through the Coordinator, will develop and implement a crisis intervention plan ("Crisis Intervention Plan"). The goal of the Crisis Intervention Plan will be to ensure that a CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis. On an annual basis, BPD will conduct an analysis of crisis intervention incidents to determine whether BPD has enough CIT officers, whether it is deploying those officers effectively, and whether CIT officers, call-takers, and dispatchers are appropriately responding to people in crisis, and will make appropriate changes to policies, procedures, and training regarding police contact with individuals in crisis. The Crisis Intervention Plan will include an assessment of the number of officers necessary to achieve the goal of ensuring that a CIT officer is available to respond to all calls and incidents that appear to involve an individual in crisis; identification of gaps in coverage of particular shifts or districts; and development of mechanisms to fill those gaps. BPD will review and revise the Crisis Intervention Plan in order to identify and address barriers to full coverage. BPD will identify performance measures for the CIT program. These measures will consider quantitative data on key aspects of program operation as well as qualitative data on officers' and community members' perceptions of the program. Community members include individuals who have experienced Behavioral Health crises that have included police involvement. BPD may consider engaging a university or other expert partner to guide these data collection and analysis efforts. | **4c (Implementation – On Track)** |
| **B.** | **Behavioral Health Disability or Crisis Data Collection, Analysis, and Reporting** | |
| 121 | BPD will collect data on suspected Behavioral Health Disability or crisis status of individuals subject to law enforcement actions including Stops, Searches, Arrests (to include type of offense and probable cause), use of force, injuries, and in-custody deaths. For any section of this Agreement that calls for data collection, analysis, or reporting, BPD shall report on the suspected Behavioral Health Disability or crisis status of the individuals involved. | **4d (Initial Compliance)** |
| 122 | BPD will collect, analyze, and report data related to Behavioral Health Disability or crisis status, including: a. BPD will collect data regarding calls for service that involve possible Behavioral Health Disabilities or people in crisis, including the number of calls, the nature of the crisis, and the extent to which individuals previously interacted with BPD; the disposition of those calls, including whether referred to community services, an emergency room, Emergency Petition, Arrest, booking; whether force was used; the type of forced used; and the steps taken, if any, to de-escalate interactions, especially when confrontations resulted in use of force, injury or death. b. BPD will analyze the data on | **4d (Initial Compliance)** |

| | an ongoing basis to drive improvement toward the goals of Paragraph 96 and report the data on a quarterly basis to the Crisis Intervention Coordinator and the CPIC. | |
|---|---|---|