

# BALTIMORE POLICE DEPARTMENT CONSENT DECREE MONITORING TEAM

## COMMUNITY OVERSIGHT TASK FORCE ASSESSMENT

November 2024



**TABLE OF CONTENTS**

I. EXECUTIVE SUMMARY ................................................................................................. 1
II. BACKGROUND .................................................................................................................. 2
    A. **The Department of Justice's Investigative Findings Regarding Civilian Oversight**............................................................................................................... 2
    B. **Consent Decree Requirements**........................................................................... 3
III. SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW ........... 3
    A. Scope of Review...................................................................................................... 3
    B. Methodology .......................................................................................................... 3
    C. Standard of Review................................................................................................ 3
IV. COMMUNITY OVERSIGHT TASK FORCE ASSESSMENT.................................... 8
    A. Paragraph 11 .......................................................................................................... 8
    B. Paragraph 12 ........................................................................................................ 10
    C. Paragraph 13 ........................................................................................................ 11
    D. Paragraph 14 ........................................................................................................ 14
V. COMPLIANCE ASSESSMENT CONCLUSIONS....................................................... 16

I.      EXECUTIVE SUMMARY

Paragraph 10 of the Consent Decree notes community oversight is "essential to rebuilding trust between BPD and communities it serves…and it must reflect input from a broad and diverse group of communities and stakeholders throughout the City of Baltimore." To that end, Paragraphs 11 through 14 require the Baltimore Police Department ("BPD" or "the Department") and the City of Baltimore (the "City") to establish the Community Oversight Task Force (the "COTF"). The COTF, which is to be established by the Mayor of Baltimore, must assess existing City and BPD operations, review best practices elsewhere, seek community input, and make recommendations to improve civilian and community oversight of BPD in several areas.

The Monitoring Team has conducted a compliance review of paragraphs 11 through 14. Paragraph 10 is a prefatory statement and not a paragraph with specific requirements and therefore is not being formally assessed. The Monitoring Team reviewed publicly available information, including the COTF website, the City's website, the COTF's meeting minutes and published reports, and the COTF's [final report](), titled "The Community Oversight Task Force's Recommendations for Strengthening Police Accountability and Police-Community Relations in Baltimore City" (the "COTF Report.").[1]

**Summary of Findings**

The Monitoring Team concludes that the City of Baltimore created the COTF as required by the Consent Decree. Its membership was representative of an array of Baltimore residents, and it actively sought input from other systems and experts. The COTF's work met the requirements of the Consent Decree and the COTF made recommendations to improve the process of and access to oversight and accountability of Baltimore police personnel.

Using the compliance scoring framework the Monitoring Team has adopted, **the City's/BPD's compliance score for the material requirements of the Consent Decree section related to the COTF (¶¶ 11-14) is "Full and Effective Compliance," because the City/BPD has reached "Initial Compliance" in every paragraph in that area.** This means that, should the Court concur that the available evidence indicates that the City/BPD has reached Full and Effective Compliance with the COTF section of the Decree, the City/BPD must demonstrate sustained compliance for a period of one year (¶ 504(a)).

---

[1] ECF No. 136; available at https://consentdecree.baltimorecity.gov/sites/default/files/Final%20COTF%20Report.pdf.

## II. BACKGROUND

### A. The Department of Justice's Investigative Findings Regarding Civilian Oversight

The DOJ's investigation found that:

> "BPD lacks meaningful accountability systems to deter misconduct. The Department does not consistently classify, investigate, adjudicate, and document complaints of misconduct according to its own policies and accepted law enforcement standards. Instead, we found that BPD personnel discourage complaints from being filed, misclassify complaints to minimize their apparent severity, and conduct little or no investigation. As a result, a resistance to accountability persists through much of BPD, and many officers are reluctant to report misconduct for fear that doing so is fruitless and may provoke retaliation. The Department also lacks adequate civilian oversight – its Civilian Review Board is hampered by inadequate resources, and the agencies internal affairs and disciplinary process lacks transparency."[2]

The DOJ further found that BPD's then-existing community oversight systems, in particular the Civilian Review Board ("CRB"), were under resourced and lacked sufficient authority. The DOJ described these systems as "shielded almost entirely from public view," stating that the civilian oversight "has proven to be ineffective at changing this dynamic" and finally that "[t]hese flaws damage the Department's legitimacy in the community."[3]

This lack of transparency made it impossible for members of the community to confirm that BPD was investigating their complaints and to track the progress of those investigations. During the DOJ's investigation, the CRB hired new staff but, while acknowledging that progress, the DOJ nevertheless found that "the Board will still be unable to fulfill its mission if it is not granted more authority and supported with adequate resources to perform its duties."[4]

Ultimately, the DOJ report concluded that the failures of BPD's community oversight systems damaged BPD's relationship with the community, which BPD called "broken."[5]

---

[2] DOJ Findings letter at 10.
[3] DOJ Findings letter at 148.
[4] DOJ Findings letter at 149.
[5] DOJ Findings letter at 156.

### B. Consent Decree Requirements

With the goal of repairing BPD's community oversight systems, the Consent Decree requires that the City create the COTF, which was to be appointed by the mayor. The Consent Decree requires that the COTF consist of five members "representative of diverse communities of Baltimore." The Consent Decree further requires the COTF to review the CRB, any impediments to the ability to the citizens of Baltimore to make complaints, and how the community oversight system currently functions and how that compares to national best practices. (Consent Decree ("CD") ¶¶ 11, 12). The COTF is to provide recommendations to the City and BPD and to make its findings public in a report. (CD ¶¶ 13, 14). The City is required to provide the COTF the resources it needs to fulfill its functions. (CD ¶ 11).

## III. SCOPE OF REVIEW, METHODOLOGY, AND STANDARD OF REVIEW

### A. Scope of Review

This report evaluates the City's and BPD's compliance with Paragraphs 11 through 14 which require the City to create the COTF and specify the activities the COTF is to complete. The compliance review evaluated (1) the composition of the COTF and whether it met the Consent Decree's requirement that it be "representative of diverse communities of Baltimore;" (2) the resources the City made available to the COTF; (3) the COTF's activities, including its review of the civilian complaint function and the Citizen Review Board, and its review of whether those functions were accessible to the public; and (4) the COTF's report. The Monitoring Team did this by reviewing the COTF materials that the City has published on its website, the minutes of COTF meetings, the COTF's preliminary and final reports, and other documents.

The COTF issued its final report in September 2018. This assessment is the first formal assessment for compliance on that work and these paragraphs.

### B. Methodology

The Assessment followed a methodology agreed to by the parties. The methodology called for a review of publicly available materials, including the biographies of the appointees, the processes the City put into place to solicit and review community input, and a review of the COTF work product, the COTF's website, and the minutes of the meetings of the COTF.

### C. Standard of Review

As in all the compliance assessments conducted by the Monitoring Team, there is a standard scale against which progress is assessed. A description of that scale follows.

*1.     Determining Compliance Status*

The Consent Decree Monitoring Team is charged with assessing and reporting on whether the requirements of the Consent Decree have been implemented. Although the scheme itself is not required or detailed in the Decree itself, the Parties and Monitoring Team have previously adopted and used a standardized way of characterizing and summarizing the City's current status across Consent Decree implementation:[6]

**0 – Not Assessed:** The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

**1 – Not Started:** The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:** The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:** The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not yet demonstrated

---

[6] Past assessments have examined requirements applicable to BPD. Here, the COTF-related requirements are primarily requirements of the City, and thus this description speaks of the City in addition to BPD.

compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:** The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree. This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:** The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

As additional considerations, more appropriate for work that is ongoing and advances or ebbs over time, the Monitoring Team offers the following details used in making final assessments.

1. **The quality of the City's/BPD's performance across a material span of time, number of incidents/events, and number of officers.** Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that the City/BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, isolated compliance does not establish "Initial Compliance" in practice. At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. The issue is whether, across time, events, and people, the City/BPD is, in aggregate, sufficiently doing what the Decree requires. For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, the City/BPD policy, and/or law.** The Monitoring Team considers not simply whether the City's/BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

5

3. **The extent to which the City/BPD is identifying and appropriately addressing problematic performance.** In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within the City/BPD, the Consent Decree expressly contemplates that compliance with the Decree will require the City/BPD to have mechanisms in place to engage with deficient performance. Therefore, the Monitoring Team's compliance reviews consider whether, when City/BPD personnel have deviated from policy, law, or Decree requirements, the City/BPD has identified the deviation and, if so, if it has appropriately addressed the issue. With respect to Consent Decree implementation and meaningful organizational change, the City/BPD is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

4. **The City's/BPD's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of the City's/BPD's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[7] Even as the test articulated above requires different considerations to be factored together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."[8]

In applying this multi-factor test for compliance, the first factor—the quality of the City's/BPD's performance across a material span of time, number of incidents/events, and number of officers—is the initial, threshold inquiry. If the City, BPD, and/or its officers' performance is not what it should be across a sufficient number or portion of relevant circumstances, then things like progress over time or the City/BPD's identification of the issues are unlikely to cure the basic deficiencies with performance. For example, if the City/BPD meets some Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put the City/BPD into compliance with the requirement.

---

[7] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).
[8] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to the City and BPD and to the community about the benchmarks that it expects and how various levels of City/BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as *possibly*, though certainly not conclusively or even presumptively, consistent with initial compliance. In such instances, the Team weighs the other factors (severity of deviations, the City's/BPD's identification of noncompliance, and progress over time). Where the Team determines that the City/BPD has adhered to expectations in 95% or more of relevant circumstances, initial compliance will be found unless one of the other factors—severity of deviations, the City/BPD's identification of noncompliance, and progress over the time—starkly point in the other direction.

On the other hand, where the City/BPD has adhered to expectations less than 85% of the time, initial compliance will *not* be certified unless one of the other factors points definitively in a positive direction. For instance, if the City/BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that the City/BPD identified and took appropriate corrective action in instances where requirements were not followed, and the Department had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances. Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

However, the Monitoring Team has recognized that these provisions cannot simply be about policy; they are also about *performance*—about the City/BPD demonstrating *adherence* to policy. Accordingly, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 506, the City/BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions *on the street* that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

## IV.   COMMUNITY OVERSIGHT TASK FORCE ASSESSMENT

This section summarizes the Monitoring Team's evaluation, using the methodology outlined in Section II, of the COTF appointments and work for compliance with paragraphs 11-14 of the Consent Decree.

### A. Paragraph 11

*Recognizing that these issues require substantial consideration and public input, the City will establish, within 90 days of the Effective Date of the Agreement, a Community Oversight Task Force ("COTF") to recommend reforms to the current system of civilian oversight. COTF will consist of five members, representative of diverse communities of Baltimore, appointed by the Mayor. COTF will review the functions of the Civilian Review Board ("CRB"), and whether there are impediments to BPD civilian complaint processes that inhibit the ability of the Baltimore community to seek accountability for police misconduct. The City will provide sufficient resources for COTF to fulfill its obligations under the Agreement.*

The Court granted the parties' joint motion for entry of the Consent Decree on April 7, 2017, establishing that date as the "Effective Date" of the Consent Decree under its terms. (*See* CD ¶ 511 ff.). The City solicited applications for membership in the COTF in 2017, posting an application guide for the COTF on its website. The application guide explained that members had to be residents of Baltimore City and were to be "representative of diverse communities of Baltimore." The application guide also described responsibilities of COTF members and qualifications that each member was to have, including:

- Commit to 10 hours of work on the COTF a month for 11 months, including attendance at orientation and training sessions; police "ride-alongs;" work group meetings; and document review;
- Demonstrate ability to be impartial and objective;
- Demonstrate commitment to serving Baltimore City communities;
- Demonstrate interest and/or involvement in issues concerning civilian oversight;
- Possess sound communication and listening skills;
- Lead and function well in a group; and
- Maintain high standards of confidentiality.[9]

---

[9] https://consentdecree.baltimorecity.gov/sites/default/files/Community%20Oversight%20Task%20Force%20%28COTF%29%20Guide%20%282017.2%29.pdf.

The City received over 100 applications, and on June 27, 2017, within 90 days of the Effective date of the Consent Decree as required, the Mayor of Baltimore selected from those applications nine individuals to serve on the COTF, from different neighborhoods throughout Baltimore.[10] The COTF began its work with a meeting on July 19, 2017.

As part of the assessment, the Monitoring Team reviewed biographies of the nine COTF members available on the COTF website and elsewhere online. The nine members live and work in City neighborhoods. Two thirds were male, and two thirds were Black, Indigenous, or People of Color ("BIPOC."). The members had a variety of experience and professional backgrounds, including work in journalism, sports, higher education, government, religious work, and other non-profit endeavors. Several had engaged in volunteer activities demonstrating commitments to Baltimore City, social justice, and support of communities.

The COTF examined the then-existing civilian accountability function and the BPD civilian complaint process. Those efforts are described below in the assessment of Paragraph 13.

Finally, the City provided the COTF sufficient resources to fulfill its obligations. Among other things:

- As stated above, the City formed the COTF through an application process involving solicitations of applicants with a publication outlining the roles and responsibilities of COTF members and the selection of COTF members from that applicant pool;
- The City provided the COTF a set of written training materials that included a report on reforming civilian oversight of BPD issued by the Open Society Institute ("OSI") and the National Association of Civilian Oversight of Law Enforcement ("NACOLE"), a summary of the Consent Decree, and materials from the CRB;[11]
- BPD and the City provided the opportunity for ride-alongs; and[12]
- The City provided an oral report on the CRB.[13]

The City's efforts in this regard resulted, as discussed below, in the COTF carrying out its mission fully.

---

[10] https://consentdecree.baltimorecity.gov/COTF_Members.
[11] July 17, 2017 COTF Meeting Minutes at 1-2; available at https://consentdecree.baltimorecity.gov/sites/default/files/COTF_minutes_17_07_19_asapproved.pdf.
[12] July 17, 2017 COTF Meeting Minutes at 2; available at https://consentdecree.baltimorecity.gov/sites/default/files/COTF_minutes_17_07_19_asapproved.pdf.
[13] July 17, 2017 COTF Meeting Minutes at 3; available at https://consentdecree.baltimorecity.gov/sites/default/files/COTF_minutes_17_07_19_asapproved.pdf.

The City created the COTF within 90 days of the Consent Decree's Effective Date, and its members represent a diverse set of communities geographically and also have a diverse set of professional and civic backgrounds relevant to community oversight of BPD. The members are racially, ethnically, and age diverse. Additionally, the City provided the COTF the necessary resources to carry out its mission, which it did by, among other things, reviewing the CRB, and whether there are impediments to the BPD civilian complaint processes that inhibit the ability of the Baltimore community to seek accountability for police misconduct. **Accordingly, the Monitoring Team finds the City has reached Initial Compliance (4(d)) with Paragraph 11.**

### B. Paragraph 12

*The COTF will review how the civilian oversight system currently functions, how it should function, and what are the impediments to change, and will then make recommendations based on that information. The assessment will consider civilian oversight models and promising practices in place in other cities throughout the nation.*

To assess the work of the COTF, the Monitoring Team reviewed its reports and meeting minutes. The COTF met 22 times, usually twice a month, between July 2017 and June 2018. At its first meeting, the COTF created subcommittees to conduct the COTF's initial work in each area within the scope of its mandate. Those subcommittees included the following:

- An External Comparative Research subcommittee focused on researching the operation of community oversight in other jurisdictions;

- A Baltimore City Institutions Research subcommittee which reviewed existing mechanisms of oversight and accountability in Baltimore, the history of policing in Baltimore, and the constitutional issues of policing;

- A Community Engagement Subcommittee focused on ways to solicit community input on policing and community oversight, which held five community workshops in different sections of Baltimore City and focus groups with the Latinx/immigrant community and incarcerated youth.[14]

In addition to the work of the three subcommittees, the full COTF worked to develop relationships with internal and external stakeholders. The COTF met with the Department of Justice, the Monitoring Team, BPD staff working in oversight, as well as community civil rights and advocacy

---

[14] COTF Report at 13-14.

groups and organizations such as the NAACP Legal Defense Fund, No Boundaries Coalition ("NBC"), Leaders of a Beautiful Struggle ("LBS"), and CASA Maryland.[15]

**The meeting minutes and the final reports demonstrate that the COTF reviewed and thoroughly assessed the three areas as described in paragraph 12 and consequently, the Monitor finds the City is in Initial Compliance (4(d)).**

### C. Paragraph 13

*The assessment will make recommendations to improve civilian and community oversight of BPD, which will include the following areas:*
   a. *Whether changes should be made to the CRB to improve its efficacy, including, but not limited to, changes to complaint intake, investigations, resources, coordination with and independence from BPD, and authority to recommend discipline; the assessment should specify whether any recommended changes require state legislative action;*
   b. *Whether there are impediments to BPD's civilian complaint processes that inhibit the ability of the Baltimore community to obtain accountability for misconduct;*
   c. *Whether the community has sufficient access to information about CRB's organization, complaint investigation activities, and discipline recommendation processes to promote public confidence in the CRB and ensure that it serves its function to enable BPD to be responsive to community values, and whether any recommended access would require state legislative action;*
   d. *Whether existing civilian-police communication and accountability structures can be improved, or whether additional or different civilian or community oversight entities are necessary to:*
      *i. provide effective guidance on community perspectives on BPD policies, procedures, and practices;*
      *ii. oversee BPD's accountability systems and disseminate information to the public about BPD's activities in readily accessible format; and*
      *iii. foster a stronger relationship between BPD and the communities it serves;*
   e. *Whether changes should be made to BPD's community policing strategies to increase cooperation between BPD and the communities it serves.*

The COTF Report provides a comprehensive list of recommendations to BPD and the City.[16] The COTF Report supports each recommendation with the COTF's analysis of the issue. The COTF, through its subcommittees, reviewed BPD and the City's existing civilian oversight system, examined models across the country and spoke with nationally-recognized experts in the field. The

---

[15] COTF Report at 14-15.
[16] COTF Report at 5.

11

COTF Report outlined the deficiencies in the system in place at that time, which according to the COTF created the perception that it was "ineffective and illegitimate."[17] The COTF went on to suggest specific changes to reimagine civilian oversight in Baltimore and create a system based on "independence, racial equity, accountability, transparency, and transformative justice."[18]

The COTF identified the following core principals which guided their recommendations:

- Independence: civilians making their own judgments not answerable to anyone other than the community, with adequate funding and resources.
- Comprehensiveness: Opportunities for the community to give feedback, good or critical, on any aspect of their interactions with the police. This principle gives authority to audit, review training and policy, assess trends, and conduct research.
- Racial Equity: Because of the history of the BPD, the civilian oversight body must review training and policies for their impact on racial equity, including the budget and acquisition of military equipment.
- Accountability: In order to act quickly and appropriately, the oversight body requires subpoena power, and the BPD must be within City control.
- Transparency: This sets the expectation for the oversight body to publish its work and be accessible to those with a range of language skills beyond English. Further, it recommends that the oversight be accessible and equipped with tools to assist community members with the complaint process. This principle demands public tracking of complaints and calls on clarity from the BPD.
- Transformative Justice: This calls for a variety of tools to build and restore trust between the community and BPD. Transformative justice in the context of the COTF is about providing resources appropriate for victims and perpetrators of police misconduct and doesn't limit response to punishment.[19]

The COTF engaged with professionals at NACOLE, reviewed dozens of oversight structures in other agencies across the country and considered the history of policing and the fraught community relationships in Baltimore. Informed by that research, the COTF recommended implementing a new two-tiered system capable of: 1) investigating alleged misconduct and recommending discipline; 2) auditing policies and practices of the BPD and making recommendations for change; and 3) engaging in robust community outreach to support and implement true community policing.[20]

---

[17] COTF Report at 20.
[18] COTF Report at 21-22.
[19] COTF Report at 22-23.
[20] COTF Report at 24.

Through its work, the COTF found that the existing system was not trusted by the community, and furthermore, suffered from structural issues that prevented it from being an effective force within the City bureaucracy. The CRB at the time reported to a City agency and was accountable to the mayor and not the public. The COTF recognized that BPD would need to alter that dynamic and take steps to change the perceptions of the Department as "corrupt, ineffective, and excessively forceful."[21]

Appreciating the low level of community trust in the BPD, the COTF recognized the need for the community to be involved in the new system. The COTF recommended that the City and BPD create a Police Accountability Commission ("PAC") made up of community members and a Civilian Office of Police Accountability ("COPA") to investigate misconduct of BPD officers, audit practices, policies, and procedures of BPD, and to address other issues raised by the community.[22]

The COTF recommended that BPD lead a series of meetings across all of BPD's police districts to engage diverse segments of the community. Further, the COTF recommended that officers in all ranks at BPD attend events hosted by others. Finally, the COTF recommended that BPD report these activities to the COPA.

The COTF also recommended developing youth mentoring programs, designed specifically to improve interactions between BPD and the City's African American youth, to boost community trust. The COTF explained that such a program would provide officers the opportunity to understand the challenges of the City's youth, hear their thoughts on possible solutions, and see them as problem-solvers in their own ways. The COTF drew these recommendations from research of the Big Brothers Big Sisters of America organization, and a similar program run in Denver.[23]

The COTF identified a number of flaws with the CRB then in place—all of which, the COTF explained, contributed to the perception among both community members and police officers that the CRB was ineffective.[24] These flaws included: inadequate funding and staffing, lack of true independence, its lack of real authority, and its ineffective design for intake. The COTF recommended that the City completely replace the CRB with a new design.

The COTF asserted that a newly designed PAC and COPA could provide the public genuine oversight, access, and opportunities for input in ways that the CRB did not. The COTF further explained that these changes required complete local control of the BPD, which, pursuant to state

---

[21] COTF Report at 41.
[22] COTF Report 24.
[23] COTF Report at 42.
[24] COTF Report at 20.

legislation, was a state agency. The COTF recognized that a change in legislation was needed to shift control of BPD from the state to the City, and recommended that those changes be pursued.[25]

The COTF recommended that BPD implement a community policing model and that it contain a number of key features:[26]

1. "Foot posts," with locations to be discussed with community members, where officers would engage in foot patrol and in so doing strengthen relationships between community members and individual officers;

2. Professional community liaison positions in each district to engage with the public, including residents, clergy, and business owners, who would meet with diverse segments of the community on a regular basis; and

3. Consultation with community members before reassignments occur to avoid disrupting community policing strategies.

The COTF's final report demonstrates this group was serious about their work and met the requirements of the Consent Decree. Consequently, the **Monitoring Team finds the City in Initial Compliance (4(d)) with this paragraph.**

### D. Paragraph 14

*The City will request that COTF present a public report with its recommendations within 11 months of the Effective Date. The City will post any COTF report on its website and invite public comment for 30 days. COTF will review and make any revisions of the report, based on the public comments. The final report will be posted on the City's website for the duration of this Agreement.*

The COTF filed a preliminary report on June 30, 2018, which solicited feedback from the public.[27] The COTF then filed the final COTF Report on September 10, 2018, 11 months after the inception of the Task Force. The COTF report remains available on the City's website.

Moreover, the City of Baltimore created a website for the COTF which contains not only the final report, but also materials about COTF members, their qualifications and responsibilities, and the

---

[25] COTF Report at 38-39.
[26] COTF Report at 46-47.
[27] "The Community Oversight Task Force's Recommendations for Strengthening Police Accountability and Police-Community Relations in Baltimore City," June 30, 2018, available at
https://static1.squarespace.com/static/59db8644e45a7c08738ca2f1/t/5b3e79f1aa4a9940864294a6/1530821106988/BPD+-+COTF+Report+6-30-18.pdf.

COTF's meetings. These materials describe how the COTF solicited and considered public input. First, the public could provide input through the website. Additionally, meeting minutes, in particular those of April 2018, reflect presentations to community members at workshops at which the COTF received further in-person community feedback.[28]

**The review of the process, the meeting minutes, and the current website demonstrate the City is in Initial Compliance (4(d)) with this paragraph**.

---

[28] Minutes, COTF, April 13, 2018. https://consentdecree.baltimorecity.gov/sites/default/files/COTF%20Minutes%204.13.18%20Adopted.pdf.

## V. COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| **II. Community Oversight Task Force** | | |
| 10 | The Parties recognize that effective civilian and community oversight of BPD is essential to rebuilding trust between BPD and the communities it serves and ensuring that BPD's enforcement activities reflect community values and are consistent with the Constitution and federal, state, and local laws. Civilian and community oversight of BPD raises complex issues of state and local law, and it must reflect input from a broad and diverse group of communities and stakeholders throughout the City of Baltimore | **Prefatory provision not requiring independent compliance review** |
| 11 | "…the City will establish, within 90 days of the Effective Date of the Agreement, a Community Oversight Task Force ("COTF") to recommend reforms to the current system of civilian oversight. COTF will consist of five members, representative of diverse communities of Baltimore, appointed by the Mayor. COTF will review the functions of the Civilian Review Board ("CRB"), and whether there are impediments to the BPD civilian complaint processes that inhibit the ability of the Baltimore community to seek accountability for police misconduct. The City will provide sufficient resources for COTF to fulfill its obligations under the Agreement. | **4d (Initial Compliance)** |
| 12 | The COTF will review how the civilian oversight system currently functions, how it should function, and what are the impediments to change, and will then make recommendations based on that information. The assessment will consider civilian oversight models and promising practices in place in other cities throughout the nation. | **4d (Initial Compliance)** |
| 13 | The assessment will make recommendations to improve civilian and community oversight of BPD, which will include the following areas:<br>a. Whether change should be made to the CRB to improve its efficacy, including, but not limited to changes to complaint intake, investigations, resources, coordination with and independence from BDP, and authority to recommend discipline; the assessment should specify whether any recommended changes require state legislative action;<br>b. Whether there are impediments to BPD's civilian complaint processes that inhibit the ability of the Baltimore community to obtain accountability for misconduct;<br>c. Whether the community has sufficient access to information about CRB's organization, complaint investigation activities, and discipline recommendation processes to promote public confidence in the CRB and ensure that it serves its function to enable BPD to be responsive to community values, and whether any recommended access would require state legislative action;<br>d. Whether existing civilian-police communication and accountability structures can be improved, or whether additional or different civilian or community oversight entities are necessary to:<br>    i. Provide effective guidance on community perspectives on BPD policies, procedures, and practices;<br>    ii. Oversee BPD's accountability systems and disseminate information to the public about BPD's activities in readily accessible format; and<br>    iii. Foster a stronger relationship between BPD and the communities it serves;<br>e. Whether changes should be made to BPD's community policing strategies to increase cooperation between BPD and the communities it serves. | **4d (Initial Compliance)** |
| 14 | The City will request the COTF present a public report with its recommendations within 11 months of the Effective Date. The City will post any COTF report on its website and invite | **4d** |

16

| | |
|---|---|
| public comment for 30 days. COTF will review and make any revisions of the report, based on the public comments. The final report will be posted on the City's website for the duration of this agreement. | **(Initial Compliance)** |