IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| *Plaintiff*, | * | CIVIL NO.: 1:17-cv-00099-JKB |
| V. | * | |
| **BALTIMORE POLICE DEPARTMENT** *et al.* | * | |
| | * | |
| *Defendant.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PARTIAL DECLARATION
OF FULL AND EFFECTIVE COMPLIANCE**

In 2017, the Mayor and City Council of Baltimore ("the City"), the Baltimore City Police Department ("BPD"), and the United States Department of Justice ("DOJ") collectively "the Parties," entered into a Consent Decree to "ensure that the City and BPD protect individuals' statutory and constitutional rights, treat individuals with dignity and respect, and promote public safety in a manner that is fiscally responsible and responsive to community priorities." *See U.S.A. v. Police Department of Baltimore City*, Case No. 1:17-cv-00099, ECF No. 2-2 at ¶ 1.  The Consent Decree consists of more than five-hundred separate paragraphs across seventeen different sections that collectively provide the requirements and objectives BPD and the City must meet to fulfill that purpose.  The Consent Decree also includes a description of the process through which BPD and the City can ultimately reach a state of compliance, leading to the Decree's eventual termination.

On January 26, 2024, the Court found that BPD had achieved "Full and Effective Compliance" with two areas of the Consent Decree.  *See* ECF No. 687.  Specifically, the Court

found that BPD was in compliance with 1) Transportation of Persons in Custody (contained in paragraphs 222-238 of the Consent Decree) and 2) Officer Assistant and Support (contained in paragraphs 436-438a and 439-441 of the Consent Decree. *Id.* In so ruling, the Court held that the "one-year sustainment period" would begin with respect to these two sections. *Id.*, at 3. The Parties anticipate that this one-year period, which will conclude on January 25, 2025, will result in a further positive ruling from the Court.

BPD is now poised to reach another milestone. BPD and the City are today moving the court to find the parties have reached a state of full and effective compliance for three additional sections of the Consent Decree: First Amendment, School Police, and the Community Oversight Taskforce. The Monitoring Team's recent assessments of these three topics supports a finding that BPD has fully complied with these areas. Therefore, the Court should affirm these findings and rule that BPD has achieved full and effective compliance with the First Amendment, School Police, and the Community Oversight Taskforce sections of the Consent Decree. Doing so will enable the Parties to move towards the goal of sustained compliance for the First Amendment and School Police portions of the Consent Decree.

## I.     BACKGROUND

In 2016, DOJ issued a report detailing the findings of an investigation into a pattern or practice of BPD conduct that violated the Constitution and federal law. DOJ's investigation concluded that BPD had been engaging in unconstitutional policing, including:

> 1) making unconstitutional Stops, Searches, and Arrests; 2) using enforcement strategies that produce severe and unjustified disparities in the rates of Stops, Searches and Arrests of African Americans; 3) using excessive force; and 4) retaliating against people engaging in constitutionally-protected expression. The Report additionally outlined areas in which the United States had serious concerns about the lawfulness of BPD's police practices.

*See* ECF No. 2-2 at ¶ 4.  DOJ's Investigation did more than simply identify issues related to BPD's conduct.  The Investigation and ensuing report provided a roadmap for the transformations later called for in the Consent Decree.  Focusing on the establishment of a positive relationship with the community, DOJ's investigation resulted in a months-long process of engagement with community leaders, advocacy groups, police officers, residents, City officials, and other stakeholders.  This investigation and reporting process produced an agreement that would not only avoid unnecessary litigation, but set forth the commonly shared goals and principles that would guide BPD's transformation.  The Consent Decree provided guideposts and targets for the Department, management and supervision duties for the Consent Decree Monitoring Team and DOJ, and allowed the Court to maintain control and oversight over this years-long process.  The close working relationship between the Parties has been instrumental in achieving great strides under the Consent Decree, and has allowed the Parties to bring the below matters to this Court for consideration.

## II. ANALYSIS

### A. Consent Decree's Definition of Full and Effective Compliance

The Consent Decree describes how compliance will be monitored and assessed.  The Consent Decree provides that the court-appointed Monitor will be responsible for conducting compliance reviews and outcome assessments to measure "whether BPD's revised practices and procedures are achieving the purposes of this Agreement." ECF No. 2-2 at ¶ 456.  To reach Full and Effective Compliance, the City and BPD must:

> [D]emonstrate that they have (a) incorporated all Material Requirements of this Agreement into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the

>Agreement's Outcome Assessments. Full and Effective Compliance must be maintained according to the time periods set forth in Paragraph 504.

*Id*. at ¶ 506.  While no "numerical test" is required, BPD must demonstrate "substantial adherence" with the Consent Decree's requirements, continual improvement, and that "the overall purpose of the Material Requirements has been met." *Id*.  While BPD evaluates its own progress, the most compelling evidence that BPD has reached a state of full and effective compliance is found in recent assessments conducted by the Monitoring Team.  Indeed, this standard was heavily relied upon during the previous filings concerning compliance.  ECF No. 687.  The Court noted that the Compliance Reassessments by the Monitoring Team are "particularly compelling" on determining whether compliance has been achieved.  *Id.*, at 3-4.

### B. BPD has Achieved Full and Effective Compliance on the issue of the First Amendment

BPD's progress on First Amendment related issues is remarkable, especially considering the nature and scope of complaints and allegations related to First Amendment violations against the Agency that were routinely leveled against BPD prior to the Consent Decree's reforms.  A review of the issues surrounding First Amendment violations, coupled with an examination of the Monitoring Team's recent assessment, compel a finding that BPD has achieved full and effective compliance on this topic.

#### i. Consent Decree's Requirements on the First Amendment

Section X of the Consent Decree addresses First Amendment Protected Activities.  ECF No. 2-2, at 81-87.   The fundamental bedrock principle behind effective community policing is the idea that a free exchange of ideas and information between individuals and law enforcement "engenders transparency and trust in policing, and advances accountability." *Id.*, at ¶ 239. "First Amendment Protected Activities" span eighteen paragraphs in the Consent Decree.  ECF No. 2-2,

at ¶¶ 239-256. The six key areas highlighted in the First Amendment section of the Consent Decree are the Right to Criticize Law Enforcement or Engage in Expressive Activity, as Protected by the First Amendment (*Id.*, at ¶¶ 240-244), the Right to Engage in Lawful Public Protest or Assembly, as Protected by the First Amendment (*Id.*, at ¶¶ 245-246), the Right to Observe and Record, as Protected by the First Amendment (*Id.*, at ¶¶ 247- 250), Policy and Training for First Amendment Protected Activity (*Id.*, at ¶ 251), Supervision of First Amendment Related Arrests and Seizures (*Id.*, at ¶¶ 252-254), and Ongoing Assessment and Improvement (*Id.*, at ¶¶ 255-256).

### ii. Monitoring Team's Assessment's on First Amendment Protected Activities

The Monitoring Team employs a mixed-methods (quantitative and qualitative) approach to assessing compliance with the Decree. Before each assessment, BPD and the Monitoring Team meet to review the proposed assessment methodology and mutually offer feedback and edits. To satisfy the requirements of the Consent Decree, BPD was required to review and revise its policies, procedures, and trainings associated with First Amendment protected activity, among other things. Officers were expected to allow free-speech, assembly, and other activities protected by the First Amendment to occur without unnecessary interference from law enforcement. As with other areas of the Consent Decree, BPD was also required to conduct regular audits and assessments of its practices related to First Amendment protected activity. BPD was required to review and analyze complaints alleging misconduct related to First Amendment protected activity, and was further tasked with identifying deficiencies and opportunities for improvement.

The Monitoring Team undertook a detailed review of the BPD's policies and procedures, and recently produced a comprehensive report on these topics. As an initial matter, the Monitoring Team confirmed that "BPD has put in appropriate measures to eliminate what DOJ found in its 2015-16 investigation to be an unconstitutional pattern or practice of retaliating against individuals

5

who criticize police conduct or engage in protest activity." ECF No. 749, at 5.  Changes to policies and adopting best practices were crucial steps undertaken by BPD since the time of the initial DOJ investigation in 2015.  For example, BPD revised in First Amendment policies, publishing Policy 804 ("First Amendment Protected Activities") in and Policy 1016 ("Public Observation/Recording of Police Officers") on September 7, 2021.  BPD has delivered Department-wide training on these policies and revised its procedures for dealing with public assemblies.  Most recently, BPD completed training on these revised Standard Operating Procedures for Public Order Forces in 2023.  Additionally, BPD published self-assessments of its performance with respect to First Amendment activity in 2019, 2020, 2021, and 2022.

      BPD has provided regular updates to the Court, DOJ, and Monitoring Team throughout the implementation of these new practices, and the Monitoring Team has reviewed these updates in real time.  For example, BPD was universally praised by local and national media for its response to the 2020 Protests related to the death of George Floyd.  As the Monitoring Team noted in its First Comprehensive Reassessment, "(1) BPD allowed protestors to assemble and demonstrate on the streets without intervention, a marked difference from the response to the protests after the death of Freddie Gray in 2015; (2) community members led the protests, were well organized and communicated with BPD regularly; (3) BPD officers in turn communicated with participants, deescalating and in many cases supporting their cause; (4) BPD prepared meticulous incident action plans; and (5) BPD used equipment and structures, such as barriers, that were non-militaristic and conveyed that BPD intended to honor the protestor's First Amendment rights." ECF No. 749, at 24.  Of the seven arrests BPD made during the protests for failing to obey a dispersal order, none violated the First Amendment.  This stands in stark contrast to the 2015 protests following the death of Freddie Gray.

6

The Monitoring Team's analysis detailed all of the areas in which BPD has improved and implemented procedures which comport with best practices in this area. In reviewing paragraphs 240-256 of the Consent Decree—the relevant areas addressing First Amendment Protected Activity—the Monitoring Team found that BPD was in "initial compliance." *Id.*, at 53-57.

### iii. Based on the Monitoring Team's Assessment, BPD Has Reached Compliance on First Amendment Protected Activities

BPD agrees with the overall assessments of the Monitoring Team and believes that it has met the appropriate standards to be found in full compliance with the Consent Decree's provisions related to First Amendment Protected Activities. BPD's revised policies and repeated Department-wide training emphasizes First Amendment protections. As the Monitoring Team noted, they found no evidence through audits, review of body worn camera, or anecdotal evidence of BPD obstructing individuals' ability to observe or record police activity. BPD's own internal auditing process has resulted in a robust and frequent review of First Amendment activity, and is designed capture any improper conduct.

Through the efforts of its members, the Monitoring Team, DOJ, and watchful oversight by the Court, BPD has transformed its policies and procedures related to First Amendment protected activity. BPD therefore believes that it has exceeded the standards required by the Consent Decree, incorporating these new protocols into its normal operation procedures and systems of accountability.

### C. BPD has Achieved Full and Effective Compliance with respect to School Police

As it pertains to Baltimore City School Police Force ("BSP" or "School Police"), the BPD has fulfilled the requirements of the Consent Decree and has increased its partnership with this Agency. As the Consent Decree noted, close collaboration with other law enforcement agencies is an important step to modeling best practices. BPD's reform efforts across the board have been

7

a model that has been studied nationally and internationally by other jurisdictions. As the Court is aware, BPD hosts countless delegations from other law enforcement agencies who are seeking guidance on their own reform efforts. Nowhere is that collaboration more important than with the School Police, who are often the first exposure that our City's youth have to law enforcement.

### i. Consent Decree's Requirements on School Police

Section XV of the Consent Decree addresses the School Police. ECF No. 2-2, at 150-151. As this section notes, the long-standing collaborative relationship between BPD and BSP is necessary to allow BSP to exercise its jurisdiction over Baltimore City Schools and other areas, as needed. *Id.* This relationship is memorialized, in part, in a Memorandum of Understanding ("MOU") between the two law enforcement agencies. This MOU, dated February 2, 2016, allows BSP to operate and conduct its business throughout the City. The requirements of the Consent Decree related to School Police are contained in three paragraphs. ECF No. 2-2, at ¶¶ 416-418. The main focus of the Consent Decree required BPD to conduct an initial assessment of BSP to determine how it has used its law enforcement powers throughout the City, pursuant to the MOU.

As with the audits and analysis it routinely does of its own policing method, BPD is required to assess any deficiencies and opportunities for improvement by BSP. *Id.*, at ¶ 417. It is also required to document any corrective action needed and otherwise monitor BSP's efforts. *Id.* BPD was also tasked with conducting biennial evaluations of its relationship with BSP, modifying its actions to ensure that the most effective, close, and efficient coordination exists between these two law enforcement agencies. *Id.*

### ii. Monitoring Team's Assessment's on Coordination with School Police

As the Monitoring Team noted in its recent Compliance Review and Outcome Assessment Regarding the Interactions with Youth and Coordination with Baltimore City School Police Force

(ECF No. 752), the close relationship between BPD and BSP has existed for years. ECF No. 752, at 4. Because of this, the best practices that BPD has implemented are necessarily a vital part of BSP's operations.

Prior to the implementation of the Consent Decree, BSP did not maintain adequate records or data about their law enforcement activities under the MOU. As a result, there were no reliable methods to help BSP and BPD evaluate how the two agencies collaborated. Following the creation of the new MOU between BPD and BSP in 2020, and in keeping with the goals set forth in the Consent Decree, this MOU improved data collection and use of force reporting. *Id.*, at 11. The MOU was updated again in April 2023, following BPD's initial assessment and first biennial assessment of BSP and BPD collaboration. *Id.*, at 63. As the first assessment noted, "nothing that occurred during the review period indicated any problems with the operation of the MOU or raised any concerns about Consent Decree compliance." *Id.*

The latest MOU provides both BPD and BSP "to cooperate with one another's administrative investigations when both agencies' officers are involved in the investigation" and requires the parties to "periodically discuss policies and protocols governing civilian complaints involving [BSP] officers exercising law enforcement power outside its Primary Jurisdiction." *Id.*, at 64. BPD's Public Integrity Bureau ("PIB"), the bureau within BPD that handles investigations of police misconduct, recently shared training materials and other documents related to its investigations to provide best practice information to BSP.

The 2023 revisions to the MOU highlight the continued close working relationship between BPD and BSP. This partnership has been strengthened by the requirements of the Consent Decree and the implementation of best practices at BPD. The latest assessment by BPD makes minor adjustments to the MOU mostly to address BSP's use of BPD's records management system.

### iii. Based on the Monitoring Team's Assessment, BPD Has Reached Compliance on School Police

Pursuant to the Consent Decree, BPD has successfully completed an assessment on BSP, as well as two follow-up assessments. As these assessments have shown, BPD and BSP enjoy a close working relationship that continues to evolve as the needs of the agencies change. Updates in the MOU occur to address any areas of concerns, and to improve collaboration and communication between the parties.

BPD agrees with the overall assessment of the Monitoring Team as it pertains to BSP, and agrees that it has met the appropriate standards to be found by the Court to be in full compliance. Thus, BPD believes that it has more than met the standards required by the Consent Decree.

## D. BPD has Achieved Full and Effective Compliance with respect to the <u>Community Oversight Taskforce</u>

The Community Oversight Task Force is another area in which the City has fulfilled the requirements of the Consent Decree. The Consent Decree rightfully noted that a fundamental distrust between the community and BPD was at the heart of many issues plaguing BPD. Historically, the breach of trust between these two partners resulted in a fractured relationship that was often lamented. A strong and healthy working relationship between BPD and the communities it serves is necessary both for the Consent Decree and for a properly functioning law enforcement agency, and achieving full and effective compliance with this piece is an incredibly significant achievement.

### i. Consent Decree's Requirements on the Community Oversight Taskforce

The Community Oversight Taskforce has a prominent place in the Consent Decree, appearing immediately after the introductory sections of the Decree. Section II addresses the Task Force, and lays out the requirements of the Task Force in paragraphs 10 – 14 of the Consent

Decree. *See* ECF No. 2-2, at ¶¶ 10-14. The Community Oversight Task Force ("COTF") was established contemporaneously with the Consent Decree, and is comprised of five members of the community, as appointed by the Baltimore City Mayor. *Id.*, at ¶ 11. Chief among the responsibilities of the COTF was a review of the Civilian Review Board ("CRB"), which allows a civilian complaint process to help seek accountability for police misconduct. *Id.*

At its core, the COTF was tasked with reviewing the interplay between civilian and community oversight of BPD, and was empowered to make recommendations to improve this relationship. *Id.*, at ¶ 13. The Consent Decree required COTF to present a public report on its recommendations and allowed for a public comment period of this report. *Id.*, at ¶ 14. The final report would then be published on Baltimore City's website for the duration of the Agreement. This report has been uploaded to BPD's website since 2018.[1]

      ii.    **Monitoring Team's Assessment on the Community Oversight Taskforce**

The Monitoring Team analyzed the BPD's efforts on the COTF issued an Assessment in November 2024. ECF No. 758. Because the City achieved full and effective compliance in every paragraph of the Consent Decree related to the COTF, the Monitoring Team argued that the Court should concur that the City has achieved its goals in this area. The creation of the COTF and its initial investigation into BPD practices was aided by the influx of significant resources from the City to the COTF. As the Monitoring Team noted, "the City formed the COTF through an application process involving solicitations of applicants with a publication outlining the roles and responsibilities of COTF members and the selection of COTF members from that applicant pool; the City provided the COTF a set of written training materials that included a report on reforming

---

[1] Available online at https://consentdecree.baltimorecity.gov/cotf_members (last accessed December 10, 2024)

civilian oversight of BPD issued by the Open Society Institute ("OSI") and the National Association of Civilian Oversight of Law Enforcement ("NACOLE"), a summary of the Consent Decree, and materials from the CRB; BPD and the City provided the opportunity for ride-alongs; and the City provided an oral report on the CRB." *Id.*, at 9.

The Monitoring Team reviewed the reports and meeting minutes of the COTF, which met 22 times between July 2017 and June 2018. *Id.*, at 10. In so doing, the Monitoring Team had the ability to deeply delve into the work of the COTF and could fully analyze its methodology. This allowed the Monitoring Team to closely review the COTF's efforts in a unique way. The COTF worked closely with the Department of Justice, BPD members, and several community civil rights and advocacy groups. *Id.*, at 10-11. In its Assessment, the Monitoring Team noted several areas of improvement addressed by the COTF. Notably, the Monitoring Team explained that the COTF's final report has been posted on the BPD's website since September 2018. *Id.*, at 14-15. In addition, the BPD website contains "materials about COTF members, their qualifications and responsibilities, and the COTF's meetings. These materials describe how the COTF solicited and considered public input. First, the public could provide input through COTF's website. Additionally, meeting minutes, in particular those of April 2018, reflect presentations to community members at workshops at which the COTF received further in-person community feedback." *Id.*, at 14-15. The Monitoring Team found that the City has achieved initial compliance with the paragraphs of the Consent Decree related to the COTF.

   iii. **Based on the Monitoring Team's Assessment, the City Has Reached Compliance on the COTF**

The COTF's work has led to tangible and concrete changes in the City's oversight practices and procedures. What had previously been a closed system without transparency has been changed through state legislation and other methods.

12

The COTF report has been the "playbook" by which continued community collaboration occurs. The recommendations from the COTF have been invaluable and many were used to inform the current oversight systems that was established after the passing of the Maryland Police Accountability Act. Thus, the City believes that it has more than met the standards required by the Consent Decree.

### III. CONCLUSION

As documented in the Monitoring Team's assessments, the City and BPD have demonstrated compliance with the Consent Decree's requirements with respect to First Amendment, School Police, and the Community Oversight Taskforce. This Court should find the City and BPD to have therefore reached a state of full and effective compliance with these three sections, so that BPD can move to the next stage of demonstrated sustained compliance.

Respectfully Submitted,
Ebony M. Thompson
Acting City Solicitor

JUSTIN CONROY
STEPHEN SALSBURY
BALTIMORE CITY LAW DEPARTMENT
100 N. Holliday Street
City Hall Baltimore, MD 21202
Telephone: 410-396-5784
stephen.salsbury@baltimorecity.gov

**CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that on this 13th day of December 2014, the foregoing Memorandum of Law in Support of the Mayor and City Council of Baltimore's Joint Motion for Partial Declaration Of Full And Effective Compliance were filed in accordance with the Electronic Filing Requirements and Procedures, as established by the United States District Court for the District of Maryland. A paper courtesy copy of these documents will be submitted to the Clerk within 48 hours of filing, in accordance with Local Rule 105(1)(a).

*/s/ Justin S. Conroy*
Justin S. Conroy
Chief Legal Counsel
Police Legal Affairs Practice Group