IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CIVIL NO. JKB-17-0099 |
| BALTIMORE POLICE DEPARTMENT, et al., | |
| Defendants. | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PARTIAL DECLARATION OF FULL AND EFFECTIVE COMPLIANCE

## TABLE OF CONTENTS

I.     BACKGROUND ..................................................................................................... 3

    A.   The Investigation, Consent Decree, and Implementation of Remedies....................... 3

    B.   First Amendment Protected Activities......................................................................... 5

        1.   Investigative Findings ......................................................................................... 5

        2.   Consent Decree Remedies .................................................................................. 6

        3.   Implementation of the Consent Decree Remedies and Monitor's
            Assessments........................................................................................................ 7

    C.   Community Oversight Task Force ............................................................................. 11

        1.   Investigative Findings ....................................................................................... 11

        2.   Consent Decree Remedies ................................................................................ 12

        3.   Implementation of the Consent Decree Remedies and Monitor's
            Assessments...................................................................................................... 13

    D.   Coordination with Baltimore City School Police Force ........................................... 14

        1.   Investigative Findings ....................................................................................... 14

        2.   Consent Decree Remedies ................................................................................ 15

        3.   Implementation of the Consent Decree Remedies and Monitor's
            Assessments...................................................................................................... 16

II.    ARGUMENT....................................................................................................... 18

    A.   The "Full and Effective Compliance" Standard ....................................................... 18

    B.   BPD Has Reached Full and Effective Compliance with Respect to First
        Amendment Protected Activities, COTF, and Coordination with School Police...... 19

III.   CONCLUSION AND RECOMMENDATION ............................................................. 21

In 2017, this Court entered a Consent Decree meant to achieve meaningful and long-lasting reform of the Baltimore Police Department (BPD). The Consent Decree followed the United States' thorough, 15-month investigation of BPD, which was initiated at the request of the City of Baltimore (the City) and BPD. By then, the City had seen considerable turmoil following the death of Freddie Gray in police custody in April 2015. In the subsequent years, the City and BPD worked collaboratively with the United States to implement each requirement of the Consent Decree, under the supervision of the Court-appointed independent Monitor. The Monitor issued periodic reports to apprise the Court and the public of progress made and the challenges still facing the City and BPD.

Due to these collective efforts, the United States and the City now agree that BPD and the City have reached Full and Effective Compliance in three important areas of the Consent Decree:

- First Amendment Protected Activities. BPD has made commendable improvements in its handling of First Amendment activities. Notably, BPD satisfied the Consent Decree's protest activity requirements during the 2020 racial justice protests, during a speech by the Vice President in 2020, and during a separate protest in November 2023. There were seven arrests for failure to obey a dispersal order during the 2020 racial justice protests, and none of those arrests violated the First Amendment. The Monitoring Team found only four incidents in which BPD officers engaged in retaliation among many thousands of interactions with the public between January 1, 2020 and June 30, 2022.

- Community Oversight Task Force. The United States' investigation found that the BPD's accountability system lacked transparency, and that the City's civilian oversight mechanisms were "inadequate and ineffective." Four paragraphs of the Consent Decree required that the City establish a Community Oversight Task Force (COTF) to

recommend reforms to civilian oversight (ECF No. 2-2 ¶¶ 10-14). The Monitor has concluded that the BPD and the City have reached initial compliance with all four paragraphs.

- <u>Coordination with Baltimore City School Police Force</u>. The United States' investigation found that BPD failed to appropriately coordinate its efforts with other law enforcement agencies, including the Baltimore City school police. The Consent Decree requires BPD to evaluate how BPD and the school police coordinate efforts throughout the City, identify areas to improve coordination, and implement these improvements, to the extent they are within BPD's control. The Monitor has assessed BPD's coordination with school police and has found BPD in initial compliance with the Coordination with School Police provisions.

As explained in more detail below, BPD's progress under the Consent Decree would be commendable at any time, but achieving compliance during the tumultuous protests of the last four years is especially remarkable. The 2020 racial justice protests posed serious challenges to law enforcement agencies nationwide. Because of the hard work done under the Consent Decree to develop policies, train officers, and hold officers accountable, BPD had the foundation and internal processes to withstand those challenges. Declaring the City and BPD in Full and Effective Compliance with the First Amendment, COTF, and coordination with school police requirements of the Decree is appropriate.

I.    **BACKGROUND**

A.    **The Investigation, Consent Decree, and Implementation of Remedies**

In 2015, the United States opened a comprehensive investigation under 34 U.S.C.

§ 12601 of BPD practices after considering requests for such an investigation from City officials

and community members in the wake of the death of Freddie Gray. The United States issued a

findings report in August 2016 concluding that it had reasonable cause to believe that BPD was

engaged in a pattern or practice of conduct that violated the Constitution and federal law, and

that the pattern or practice was driven by systemic deficiencies in policies, training, supervision,

and accountability structures. The investigation detailed failures in a number of areas, including,

as relevant to this Joint Motion, deficient practices in response to First Amendment protected

activities, a need for more effective community oversight, and a lack of coordination with the

Baltimore school police.[1]

In January 2017, the Parties agreed to resolve the United States' allegations that BPD was

engaged in a pattern or practice of unlawful policing through a Consent Decree (ECF No. 2-2)

that was entered as an order of this Court in April 2017 (ECF No. 39) and amended at the request

of the Parties in May 2021 (ECF No. 410). The Decree requires changes to City and BPD

policies, practices, and training with the goal of ensuring that the City and BPD protect

individuals' statutory and constitutional rights, treat individuals with dignity and respect, and

promote public safety in a manner that is fiscally responsible and responsive to community

priorities. The Decree includes a separate section addressing each subject area in which the

United States found deficiencies during its investigation, including sections covering First

---

[1] A copy of the Findings Report is available at https://perma.cc/KK4B-E3QK [hereinafter "Findings Report"].

Amendment protected activities (ECF No. 2-2 ¶¶ 239-56), the Community Oversight Task Force (COTF) (*id.* ¶¶ 10-14), and coordination with Baltimore City School Police Force (school police) (*id.* ¶¶ 416-18).

Since the Decree took effect in 2017, the City and BPD have worked to implement its provisions with assistance and oversight from the United States and the Court-appointed independent Monitor and his staff (Monitor or Monitoring Team). To determine whether the City and BPD have complied with requirements of each section of the Decree, the Monitor conducts "Compliance Reviews" (*id.* ¶ 454). In these assessments, the Monitor seeks to determine whether the Decree's requirements are "being carried out in practice" (*id.* ¶ 506).

For each assessment, the Monitor collects a significant quantity of data and documents that reflects BPD's performance "across a material span of time, number of incidents/events, and number of officers" (*see, e.g.*, ECF No. 749, at 12), to ensure the assessment can effectively and credibly address whether the requirements of the Decree are being carried out. Each of the Monitor's assessment reports describes the methodology and the data and documents relied on. In each assessment, the Monitor assesses the compliance status of every Consent Decree provision in the relevant section. The Monitor characterizes the compliance status according to a framework agreed to by the Parties ranging from "1- Not Started" to "4d – Implementation – Initial Compliance" (*see, e.g.*, *id.*, at 9-10). As the Monitor conducts each assessment, the United States independently reviews the same issues and data (or a sample of the data) so that it can independently assess BPD's progress under the Decree.

To satisfy the requirements of the sections of the Decree related to First Amendment protective activity, COTF, and coordination with school police, the City and BPD must demonstrate that they have "reached Full and Effective Compliance and maintained that

compliance" with these sections for a period of at least one year (ECF No. 2-2 ¶ 506; ECF No. 410). During this one-year period, which the Parties have referred to as the "Sustainment Period," BPD will assume greater responsibility for monitoring its own compliance, rather than relying on the independent Monitor (*cf.* ECF No. 2-2 ¶¶ 457-58). This is consistent with practices in other cities under consent decrees with the United States, and it requires the City and BPD to demonstrate that they can engage in self-assessment and correction that will endure beyond the Consent Decree. The Monitor and the United States will verify whether the City's and BPD's efforts are sufficient. Accordingly, when all provisions contained in a section of the Decree reach "initial compliance," the City and BPD may move the Court to declare that they have reached Full and Effective Compliance with that section and that the Sustainment Period for the section has begun (*see, e.g.*, ECF No. 749, at 5).

The Monitor completed assessments for each of the sections addressed here—a First Amendment protected activities assessment filed with the Court on October 1, 2024 (ECF No. 749), a COTF assessment filed with the Court on November 8, 2024 (ECF No. 758), and a coordination with school police assessment filed with the Court on October 17, 2024 (ECF No. 752). As set forth in more detail below, in these assessments, the Monitor found the City and BPD in initial compliance with each of these sections.

    **B.**    **First Amendment Protected Activities**

        *1.*    *Investigative Findings*

The investigation of BPD found that BPD officers routinely infringed upon the First Amendment rights of people in Baltimore. BPD officers unlawfully stopped and arrested people for speech they perceived as disrespectful or insolent. *Findings Report* at 116-18. BPD also used unreasonable force to retaliate against people engaging in protected speech. *Id.* at 118-19. We

also expressed serious concern that BPD interfered with the public's right to lawfully record police activity. *Id.* at 119-20.

### 2.    *Consent Decree Remedies*

To address these problems, the Consent Decree requires BPD "to ensure that all BPD personnel respect the First Amendment rights of all persons," including the right to criticize law enforcement, engage in lawful public protest, and observe and record police activity (ECF No. 2-2 ¶ 239). The Decree acknowledges that at the time it was entered, BPD had already revised its First Amendment-related policies, and requires BPD to periodically review and revise its policy and training and build on its previous changes, including by revising policies and protocols for policing public protests and assemblies and requiring officers to document instances in which they order members of the public to stop recording (*id.* ¶¶ 240-51).

The Consent Decree also requires that BPD officers refrain from retaliating against individuals lawfully exercising their First Amendment rights, including the right to criticize law enforcement (*id.* ¶¶ 240-44). It requires BPD to ensure that officers do not unlawfully interfere with lawful protests and assemblies, and that it develop a traffic control and public information sharing plan for significant pre-planned assemblies (*id.* ¶¶ 245-46). The Decree requires BPD to permit members of the public to peacefully observe, record, or photograph police officers performing their law enforcement duties in public (*id.* ¶¶ 247-50). It requires changes to BPD's supervision of First Amendment-related arrests and seizures (*id.* ¶¶ 252-54). And it requires BPD to annually assess its practices related to First Amendment protected activity and identify opportunities for improvement (*id.* ¶¶ 255-56). It also requires that BPD promptly investigate and take corrective action when officers violate BPD policy concerning First Amendment activity (*id.* ¶ 239, 256).

6

### 3. *Implementation of the Consent Decree Remedies and Monitor's Assessments*

The Monitoring Team issued its compliance review and outcome assessment regarding First Amendment Protected Activity on October 1, 2024 (ECF No. 749). The Monitoring Team recommended that the Court find BPD in Full and Effective Compliance with the First Amendment requirements of the Consent Decree. Key highlights from the Monitoring Team's compliance review include:

- The Monitoring Team identified only one case in its review of disorderly conduct arrests where an officer retaliated against an individual for exercising their First Amendment rights.

- None of the seven arrests for failure to obey a dispersal order during racial justice protests in 2020 violated the First Amendment.

- Many thousands of interactions with the public and arrests took place between January 1, 2020, and June 30, 2022, and ten complaints were lodged with BPD's Public Integrity Bureau alleging First Amendment violations. The Monitoring Team found that officers violated the First Amendment in three of those incidents, a significant departure from the United States' investigation, which found First Amendment violations widespread.

- BPD demonstrated compliance with the Consent Decree's protest activity requirements during the 2020 racial justice protests, during a speech by the Vice President in 2020, and during a separate protest in November 2023.

- The Monitoring Team found no evidence that BPD obstructs individuals' ability to observe or record police activity.

7

The Monitoring Team considered four factors in determining whether BPD has achieved initial compliance with each provision: (1) the quality of BPD's adherence to Consent Decree requirements across a material span of time, number of incidents, and number of officers; (2) the severity or significance of deviations from Consent Decree requirements, BPD policy, and law; (3) the extent to which BPD is identifying and appropriately addressing problematic performance; and (4) BPD's progress over time. The Monitoring Team reviewed multiple kinds of evidence for the assessment. It reviewed the body-worn camera footage, statements of probable cause, and other related documentation for a sample of arrests and citations involving disorderly conduct charges and arrests for failure to obey a dispersal order during the 2020 protests. The Monitoring Team also reviewed other types of evidence from the 2020 protests, including use of force incidents, dispersal orders, police helicopter video, after-action reports and incident action plans, and body-worn camera footage from randomly selected officers deployed during the protests. The Monitoring Team also reviewed misconduct complaints related to the exercise of First Amendment activity from January 1, 2020 to June 30, 2022.

The Monitoring Team's assessment found First Amendment issues related to only two paragraphs: Paragraph 240, regarding the right to criticize law enforcement or engage in expressive activity, and Paragraph 241, which prohibits the use of force in response to First Amendment protected activity.

To evaluate BPD's compliance with Paragraph 240, the Monitoring Team looked at disorderly conduct arrests, evidence from the review of the 2020 protests, and the ten misconduct complaints related to the exercise of First Amendment Activity. The Monitoring Team found four incidents of retaliation: one from a disorderly conduct arrest and three of the ten complaints. The case involving a disorderly conduct arrest resulted in a criminal conviction for the involved

officer, and BPD did not immediately identify the situation as problematic, but ultimately appropriately addressed the situation through its Public Integrity Bureau. And the Monitoring Team found that misconduct investigators failed to sustain First Amendment charges in two of the three complaints in which officers had engaged in retaliation.

The Monitoring Team weighed the severity of these four incidents and BPD's failure to promptly identify and remedy problematic performance in three of those incidents against BPD's overall compliance with the requirements of the paragraph and the significant progress that BPD has made since the implementation of the Consent Decree. The Monitoring Team's review of disorderly conduct arrests demonstrated that BPD was complying with consent decree requirements more than 95% of the time and the Monitoring Team found that BPD's response to the 2020 Protests complied with the Consent Decree and the Constitution. It found no retaliation in the seven arrests for failure to obey a dispersal order from the 2020 Protests. It also considered that these four instances of retaliation were among many thousands of police interactions during the review period; BPD made over 25,000 adult arrests during that time frame. It concluded that BPD had demonstrated initial compliance with Paragraph 240.

To evaluate Paragraph 241, the Monitoring team reviewed disorderly conduct arrests and ten cases in which officers reported using force during the 2020 Protests. It found three uses of excessive force against protestors and an incident in which an officer used retaliatory force—the same incident involving a disorderly conduct arrest discussed in its evaluation of paragraph 240. Again, the Monitoring Team weighed BPD's overall compliance, the severity of the incidents, whether BPD identified and remedied problematic performance, and BPD's progress since the implementation of the decree and concluded that a finding of initial compliance is appropriate because the events were isolated and took place over a long period of time in which BPD has

9

made sustained and serious progress. Though these incidents did not take BPD out of compliance, they raise concerns about BPD's performance in two other areas—officer misconduct and discipline and use of force—which the Monitoring Team is currently assessing, and the Monitoring Team will take them into careful consideration moving forward.

The Monitoring Team found no evidence of disparate treatment based on the content of an individual's viewpoint; no instances where a person observing police activity was arrested because of their location and not given an opportunity to move; and no instances in which BPD officers arrested an individual recording police activity or engaging in a public protest for obstructing or hindering a law enforcement officer.

The Monitoring Team also found that BPD had implemented clear policies and conducted thorough training on protecting First Amendment rights, and that its annual First Amendment audits are satisfactory. BPD has adopted revised policies governing First Amendment protected activity and public observation and recording of officers (ECF No. 140); it adopted revised standard operating procedures for its Public Order Forces (ECF No. 483); and it has successfully delivered e-learning or training to officers on these updated policies and standard operating procedures (ECF No. 437, 532, 670). BPD's annual self-assessments of its handling of First Amendment protected activities, as required by the Consent Decree included discussions of misconduct cases related to First Amendment protected activity, the department's response to any protests that occurred during the relevant year, and a review of disorderly conduct arrests (ECF No. 287-1, 440, 523, 630).

The Monitoring Team recommended that the Court find BPD in full and effective compliance with the First Amendment requirements of the Consent Decree. The United States agrees with the Monitoring Team's conclusions. We completed an audit of the Monitoring

10

Team's review and are confident in its findings. BPD has put in place appropriate measures to eliminate the unconstitutional pattern or practice of First Amendment violations.

### C.    Community Oversight Task Force

#### 1.    *Investigative Findings*

The United States' investigation concluded that systemic deficiencies in the City's internal and external accountability mechanisms contributed to the constitutional violations found within the police department, and eroded community trust. *See Findings Report* at 128. BPD's accountability system lacked transparency, and the City's civilian oversight mechanisms were "inadequate and ineffective." *Id.* at 147. Both impaired police legitimacy in Baltimore. *Id.* Community members were unable to receive information about the status of complaints they had filed, or find out the disposition of their complaint. *Id.* BPD's Trial Board proceedings historically had been closed to complainants and the public, becoming open to the public only in early 2016. *Id.* at 148. Maryland's open records law, the Maryland Public Information Act, at the time further limited BPD's transparency by prohibiting the disclosure of personnel records to the public, which Maryland courts construed as applying to all materials related to discipline or employee status. *Id.*

Although the City established a Civilian Review Board (CRB) in 2000 to help address these shortcomings, the CRB was not given sufficient staffing or resources to perform its duties. *Id.* The CRB had no direct access to complaints, instead having to rely on BPD to forward complaints that fall within the CRB's purview. *Id.* The CRB had authority to investigate complaints; however, from 2010 to 2015, the CRB was staffed with only a single investigator. *Id.* It could not compel BPD officers to participate in investigations. *Id.* Additionally, the CRB could only make recommendations to the police commissioner about investigative findings or the

11

need for further investigation. *Id.* The police commissioner did not have to adopt those recommendations or even respond to the CRB's recommendations. *Id.* The lack of authority and resources vested in CRB fueled concerns throughout the community that the City and BPD were resistant to improving accountability and enhancing civilian oversight.

### 2.    *Consent Decree Remedies*

To address those concerns, the Consent Decree requires that the City establish a Community Oversight Task Force (COTF) to recommend reforms to civilian oversight in Baltimore (ECF No. 2-2 ¶ 11). COTF, whose members will be selected from diverse communities in Baltimore (*id.*), will review CRB functions and "whether there are impediments to BPD civilian complaint processes that inhibit the ability of the Baltimore community to seek accountability for police misconduct" (*id.*). COTF will evaluate the current status of civilian oversight in Baltimore and how it should function, identify any barriers to change, and make recommendations based on the information gathered (*id.* ¶ 12). Specifically, COTF will assess how CRB can improve its effectiveness (*id.* ¶ 13(a)), if there are any barriers to accountability in BPD's civilian complaint process (*id.* ¶ 13(b)), and whether the public has enough information about CRB and its mechanisms to instill public confidence in the Board (*id.* ¶ 13(c)). COTF will also explore "whether existing civilian-police communication and accountability structures" can be improved in Baltimore, or if other structures are needed (*id.* ¶ 13(d)). At the conclusion of its review, COTF will issue a public report with its recommendations for improving CRB and BPD's civilian complaint processes and, after receiving public feedback, post the final report on the City's website (*id.* ¶ 14).

### 3.    *Implementation of the Consent Decree Remedies and Monitor's Assessments*

The City has implemented the COTF provisions of the Consent Decree. In November 2024, the Baltimore Monitoring Team filed its Community Oversight Task Force assessment with the Court (*see* ECF No. 758). In its assessment, the Monitoring Team concluded that the BPD and the City has reached initial compliance with all four paragraphs pertaining to COTF (ECF No. 758 at 1).[2]

The Monitoring Team's assessment found that the City created COTF as required by Paragraph 11, and that its membership was representative of diverse Baltimore communities (ECF No. 758 at 8-9). The assessment further found that pursuant to Paragraph 11, the City provided COTF with sufficient resources to fulfill its obligations under the Agreement (*id.*).

The assessment also determined that the City complied with Paragraph 12 by reviewing the current functioning of civilian oversight, analyzing the impediments to change, and making recommendations based on that information (ECF No. 2-2 ¶ 12). COTF met nearly two dozen times between July 2017 and June 2018 (ECF No. 758 at 10), forming subcommittees to conduct its initial work in each area required by the Consent Decree (*id.*). COTF spoke with the United States, the Monitoring Team, civil rights organizations, community groups, and other internal and external stakeholders to gain information critical to its mandate (*id.* at 10-11).

The assessment found that COTF met the requirements of Paragraph 13 by issuing a report which "provide[d] a comprehensive list of recommendations to BPD and the City" (ECF No. 758 at 11) and supported each recommendation with extensive analysis (*id.*). Among other

---

[2] Paragraph 10 of the Consent Decree, which acknowledges the importance of effective civilian and community oversight and the need for input from diverse communities and stakeholders, is an introductory paragraph and thus was not assessed by the Monitoring Team.

things, the COTF report determined that there was a lack of community trust in the existing CRB (*id.* at 13), and that the CRB suffered from structural issues that prevented it from being effective (*id.*). It recommended that the City implement a new two-tiered civilian oversight system that had investigative functions, policy audit functions, and community outreach functions (*id.* at 12). COTF explained that creating this two-tiered system would require complete local control of BPD, and thus advised the pursuit of legislative changes that would shift BPD control from the state to the City (*id.* at 13-14). COTF also recommended that BPD increase its community engagement efforts, by having officers at all ranks attend community events and by developing youth mentoring programs (*id.* at 14). Finally, it recommended that BPD develop and implement a community policing model that featured specialized foot patrols, district community liaisons, and consultations with community members before officer reassignments (*id.*).

The Monitoring Team's assessment found that COTF took its work seriously and developed recommendations that met Consent Decree requirements (ECF No. 758 at 14). And since COTF filed a preliminary report in June 2018 (*id.*), received and considered public feedback on the preliminary report, and posted the final report on the City-created COTF website where it currently remains (*id.*), the assessment also concluded that the City was in compliance with Paragraph 14 of the Consent Decree (*id.* at 15).

### D.    Coordination with Baltimore City School Police Force

#### 1.    *Investigative Findings*

The United States' investigation of BPD found that underlying systemic deficiencies, including BPD's failure to appropriately coordinate its efforts with other law enforcement agencies such as the Baltimore City school police, contributed to the constitutional violations we found. *Findings Report* at 154. The investigation concluded that BPD utilized the school police

14

as an auxiliary force to BPD, and school police officers were often present with BPD during enforcement activities. The investigation noted several concerns, including: the agreement between BPD and the school police did not delineate which agency was in charge of an incident when both agencies respond; the agreement did not specify which agency's policies control decisions made when both agencies respond to an incident; the agreement does not set forth a process for how complaints about alleged officer misconduct will be handled during incidents involving both BPD and the school police; and that data from incidents involving BPD and the school police were not being properly collected and analyzed. *Findings Report* at 154-55.

### 2.    *Consent Decree Remedies*

The Consent Decree requires BPD to evaluate how BPD and the school police coordinate efforts throughout the City, identify areas to improve coordination, and implement these improvements, to the extent they are within BPD's control. Specifically, BPD is required to conduct an initial assessment to evaluate how the school police exercises its law enforcement powers throughout the City, pursuant to the Memorandum of Agreement (MOU) between the Baltimore City Schools and BPD (ECF No. 2-2 ¶ 417). BPD must use the assessment to identify deficiencies and opportunities for improvement and implement improvements (*id.* ¶¶ 417-18). Following the initial assessment, BPD must conduct biennial evaluations of its efforts to improve coordination with the school police and make changes and improvements to ensure effective collaboration with the school police (*id.* ¶ 417). BPD must advocate to change to MOU to require BPD and BSP officers to cooperate with each other's administrative investigations (*id.* ¶ 418). The Consent Decree also requires BPD to propose policies and protocols governing the proper investigation of civilian complaints involving school police officers exercising law enforcement powers pursuant to the MOU (*id.* ¶ 418).

15

### 3.    *Implementation of the Consent Decree Remedies and Monitor's Assessments*

Since the Consent Decree took effect in 2017, BPD has made significant progress in improving its coordination with the school police, resulting in clearer protocols, communication, and data collection. The Monitoring Team completed an assessment of BPD's coordination with school police in October 2024 (ECF No. 752).[3] In that assessment, the Monitoring Team found that BPD was in initial compliance with both provisions of this section of the Consent Decree that they assessed (ECF No. 752, at 74-75).[4]

Paragraphs 417 and 418 of the Consent Decree require BPD to conduct initial and biennial assessments to evaluate BPD's coordination with school police pursuant to the MOU, identify deficiencies, implement improvement measures, and advocate for changes to the MOU, as needed (ECF No. 2-2 ¶¶ 417-18). In January 2020, BPD completed its initial evaluation of its MOU with Baltimore school police (ECF No. 284).[5] BPD completed its first biennial evaluation of the MOU in July 2022 (ECF No. 522-1). Consistent with the requirements of the Consent Decree and findings of the MOU evaluations, BPD and the school police revised its MOU with BSP in 2020 and 2023 to clarify roles, jurisdiction, and information and data sharing. (ECF No. 752, at 63-66).

Paragraph 418 also requires BPD to advocate to change the MOU to require BPD and school police to cooperate in each agency's investigations when both agencies' officers are

---

[3] The assessment report also included a separate compliance review and outcome assessment of the Interactions with Youth provisions of the Consent Decree.

[4] The Monitoring Team did not assess Paragraph 416 in this section of the Consent Decree because the paragraph is descriptive and does not include substantive requirements that are able to be assessed (ECF 752, at 1, n.1; 62).

[5] A copy of BPD's Baltimore School Police MOU Assessment Report (2016-2019) is available at: https://perma.cc/TSV4-DCYK.

involved in an incident under investigation and that BPD propose policies and protocol governing the proper investigation of civilian complaints when school police exercise law enforcement powers pursuant to the MOU (ECF No. 2-2 ¶ 418). The Monitoring Team's assessment noted that the most recent MOU between BPD and the school police requires that BPD and school police officers must cooperate with one another's administrative investigations (ECF No. 752, at 63). The assessment also found that the MOU requires BPD and school police to periodically discuss policies and protocols governing civilian complaints (*id*.). Because the school police is a separate agency, BPD lacks authority to investigate school police officers based on BPD policies that do not apply to the school police (*id*.). The assessment explained that, although BPD maintains that it lacks authority to *require* the school police to adopt specific policies and protocols regarding their complaint investigations, BPD has shared policies, protocols, trainings, templates for conducting investigations with the school police (*id*.). Based on its assessment, the Monitoring Team found BPD in initial compliance with the Coordination with School Police provisions.

While the Monitoring Team was conducting its assessment, the United States conducted an independent assessment of BPD's compliance with these provisions of the Consent Decree. This assessment included a review of BPD's initial evaluation and first biennial evaluation reports of its coordination with school police; BPD's 2020 and 2023 MOUs with the school police; and other document and correspondence regarding BPD's efforts to advocate for protocols regarding the proper investigation of complaints for incidents involving both school police and BPD. Based on our review, combined with the Monitoring Team's comprehensive review and findings, we agree that BPD is in compliance with the Consent Decree's Coordination with School Police provisions.

17

## II.    ARGUMENT

### A.    The "Full and Effective Compliance" Standard

To achieve Full and Effective Compliance with the Decree, the City and BPD must demonstrate by a preponderance of the evidence "that they have (a) incorporated all Material Requirements of this [Decree] into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the [Decree's] Outcome Assessments" (ECF No. 2-2 ¶¶ 493, 506, 507).

The Decree specifies that "[n]o specific numerical test shall be required to demonstrate Full and Effective Compliance so long as BPD is demonstrating substantial adherence with the Material Requirements, continual improvement, and the overall purpose of the Material Requirements has been met" (*id.* ¶ 506). The Decree also makes clear that BPD's performance must be assessed as a whole, without undue emphasis on specific instances of compliance or non-compliance: on the one hand, "temporary or isolated failure to comply during a period of otherwise sustained compliance [] will not constitute failure to achieve or maintain Full and Effective Compliance," but on the other hand, "temporary compliance during a period of otherwise sustained noncompliance will not constitute" Full and Effective Compliance (*id.*).

"Upon the Court's determination that the City and BPD have reached Full and Effective Compliance with [the Decree] . . . and have maintained such compliance" for the Sustainment Periods applicable to each section, "the Court will terminate the [Decree]" (*id.* ¶ 504). As noted above, the Sustainment Period for each section is either one year or two years (*id.*).

18

The Decree accounts for the possibility that BPD will comply with some sections sooner than others. "If BPD has reached Full and Effective Compliance with a part of the [Decree] and maintained that compliance" for the applicable Sustainment Period, "the City and BPD may move at any time to terminate that part of the [Decree]" (*id.* ¶ 508). However, for the Court to terminate a part of the Decree, "that part must be sufficiently severable from the other requirements of the [Decree] that noncompliance with those other requirements does not implicate BPD's ability to police in accordance with federal law and this [Decree] in the part to be terminated" (*id.*). Furthermore, "[i]n determining whether there is Full and Effective Compliance with a part of the [Decree], all the requirements of the [Decree] may be assessed collectively to determine whether the intended outcome of the part has been achieved" (*id.*).

In summary, to establish that they have reached Full and Effective Compliance with a section of the Consent Decree, such that the section may be terminated if compliance is maintained for the applicable Sustainment Period, the City and BPD must show that (1) each material requirement in the section is being carried out in practice (*id.* ¶ 506(a)), (2) there has been sustained and continuing improvement in constitutional policing with respect to that section, as demonstrated by the Decree's outcome assessments (*id.* ¶ 506(b)), and (3) the section is sufficiently severable from the other requirements of the Decree that non-compliance with other requirements does not implicate that section (*id.* ¶ 508).

## B. BPD Has Reached Full and Effective Compliance with Respect to First Amendment Protected Activities, COTF, and Coordination with School Police.

As discussed above, the Monitor's findings in its recent assessments provide the Court with a rigorous and reliable basis for finding the City and BPD to be in Full and Effective Compliance with (1) paragraphs 239-256 of the Decree relating to First Amendment protected

19

activities; (2) paragraphs 10-14 of the Decree relating to COTF; and (3) paragraphs 416-418 of the Decree relating to coordination with school police. These assessments are based on data and documents that reflect not just a single point in time, but rather BPD's operations on a daily basis over a significant period of time. As a result, they show that "each material requirement" of these sections of the Decree "is being carried out in practice" (*id.* ¶ 506(a)).[6] The Monitoring Team's outcome assessment related to First Amendment protected activity further demonstrates BPD's "sustained and continuing improvement" in this area of the Decree. These assessments, collectively, show that the City and BPD are consistently complying with the First Amendment protected activities, COTF, and coordination with school police requirements of the Decree, and any noncompliance has only been temporary or isolated.

BPD's improvements have led to positive outcomes. BPD demonstrated compliance with the Consent Decree's protest activity requirements, including during the 2020 racial justice protests. The Monitoring Team also found no evidence that BPD obstructs individuals' ability to observe or record police activity. And although the COTF recommendations are not binding on the City or BPD, a number of its overall goals have come into fruition – as evidenced by BPD's commitment to strengthen police-resident relations through its implementation of community policing policies and training, BPD's restructuring of its community policing practices in order to improve officer engagement and problem-solving, and the legislatively-mandated Administrative Charging Committee, which has the authority to make disciplinary recommendations that the police commissioner must either adopt or impose a higher degree of

---

[6] No further showing of "sustained and continuing improvement in constitutional policing" (*id.* ¶ 506(b)) is necessary with respect to COTF and coordination with school police is necessary, because the Decree does not set forth outcome assessments related to these provisions (*see id.* ¶ 459), and the Monitor has not found that additional outcome assessments related to these sections "are necessary to determine" Full and Effective Compliance (*see id.* ¶ 457).

discipline. BPD also has shown its ability to look critically at its interactions and information-sharing with the Baltimore City school police, identify challenges and opportunities, and work with the school police to revise the MOU to addresses these challenges.

The Court should also find that the First Amendment protected activity, COTF, and coordination with school police sections of the Decree are each severable. Non-compliance with other sections of the Decree does not implicate BPD's ability to comply with federal law and this Decree as they relate to these three areas of the decree (*see id.* ¶ 508).

## III.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the United States respectfully requests that the Court grant the Joint Motion for Partial Declaration of Full and Effective Compliance and declare that the City and BPD have reached Full and Effective Compliance with paragraphs 239-256, 10-14, and 416-418 of the Consent Decree.

Finally, the United States respectfully requests that the Court set a deadline for the completion of BPD's self-assessment plans setting forth the manner in which it will review its own compliance with the First Amendment protected activities and coordination with school police sections of the Decree should the Court grant the Parties' motion (*see* ECF No. 2-2 ¶¶ 457-58). There is no self-assessment plan for the COTF sections of the Decree, as the task force has fulfilled its responsibilities under the Decree and has no continuing obligations. The Parties have conferred and propose that the Court approve the following deadlines:

| | |
|---|---|
| BPD provides proposed self-assessment plan regarding First Amendment protected activities to the Parties and Monitor | January 24, 2025 |

| | |
|---|---|
| BPD files final self-assessment plan, approved by the Parties and Monitor, regarding First Amendment protected activities | February 7, 2025 |
| BPD provides proposed self-assessment plan regarding coordination with school police to the Parties and Monitor | January 24, 2025 |
| BPD files final self-assessment plan, approved by the Parties and Monitor, regarding coordination with school police | February 7, 2025 |

Respectfully Submitted,

For the United States of America:

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REGAN RUSH
Chief
Special Litigation Section

CYNTHIA COE
MAUREEN JOHNSTON
Deputy Chiefs
Special Litigation Section

_/s/ Emily C. Keller_
EMILY C. KELLER
DAVID G. COOPER
NICOLE PORTER
SARAH STEEGE
JULIANNA ASTARITA
LESLIE BAILEY
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 514-6255
Fax: (202) 514-0212
Email: emily.keller@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that the foregoing Memorandum in Support of Joint Motion for Partial Declaration of Full And Effective Compliance was served through the electronic filing service on December 13, 2024, giving notice to all registered parties.

 */s/ Emily C. Keller*
Emily C. Keller
Attorney for the United States