IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CIVIL NO. JKB-17-0099 |
| BALTIMORE POLICE DEPARTMENT, et al., | |
| Defendants. | |

## UNITED STATES' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PARTIAL TERMINATION

## TABLE OF CONTENTS

I.    INTRODUCTION...................................................................................................... 1

II.   BACKGROUND ....................................................................................................... 2

    A.   The Consent Decree and Implementation of Requirements................................. 2

    B.   Transportation of Persons in Custody ................................................................. 3

        1.   Consent Decree Requirements ................................................................... 3

        2.   Full and Effective Compliance Declaration............................................... 3

        3.   Sustainment of Compliance ....................................................................... 4

    C.   Officer Assistance and Support ......................................................................... 10

        1.   Consent Decree Requirements ................................................................. 10

        2.   Full and Effective Compliance Declaration............................................. 11

        3.   Sustainment of Compliance ..................................................................... 11

III.  ARGUMENT........................................................................................................... 16

    A.   The "Full and Effective Compliance" Standard ................................................ 16

    B.   BPD Has Sustained Full and Effective Compliance with Respect to
         Transportation of Persons in Custody and Officer Assistance and Support. ..... 17

IV.   CONCLUSION AND RECOMMENDATION .................................................... 19

## I.     INTRODUCTION

In 2017, this Court entered a Consent Decree regarding the Baltimore Police Department (BPD). The City and BPD have worked to implement the requirements of the Consent Decree, under the supervision of the Court-appointed independent Monitor. The Monitor has issued reports to apprise the Court and the public of progress made and the challenges still facing the City and BPD.

On January 26, 2024, the Court declared the City and BPD to be in Full and Effective Compliance with respect to Transportation of Persons in Custody (paragraphs 222-238 of the Consent Decree) and Officer Assistance and Support (paragraphs 436-438.a. and 439-441)[1] (ECF No. 687). The Court established the one-year sustainment period for both areas would last from January 25, 2024 to January 25, 2025 (*id*.). Once BPD has reached Full and Effective Compliance with a part of the Agreement and maintained that compliance in accordance with the specified sustainment period, the City and BPD may ask the Court to terminate that part of the Decree. (ECF No. 2-2 ¶ 508). As set forth below, BPD has sustained compliance with all requirements of these paragraphs of the Consent Decree, and termination of these paragraphs is appropriate.

This request reflects another important milestone in the Consent Decree. Should the Court grant the Parties' Joint Motion, this would mark the first time that the Court has terminated provisions of the Consent Decree. The Parties believe that BPD's consistent sustainment of compliance over the last year demonstrates BPD's ability to independently sustain progress in

---

[1] The Court determined that it would consider subparagraph 438.b. of the Consent Decree, relating to peer intervention, as part of the Misconduct and Discipline section of the Consent Decree (ECF No. 687). The Court therefore made no findings as to the City and BPD's compliance with that provision of the Decree, and the Parties do not seek termination of that subparagraph.

1

these areas moving forward. Partial termination of these two sections will enable the Parties to focus on the remaining areas of the Decree, as BPD and the City work to achieve and maintain compliance in those areas.

## II.    BACKGROUND

### A.  The Consent Decree and Implementation of Requirements

Since the Decree took effect in 2017, the City and BPD have worked to implement its provisions with assistance and oversight from the United States and the Court-appointed independent Monitor and his staff ("Monitor" or "Monitoring Team"). To determine whether the City and BPD have complied with requirements of each section of the Decree, the Monitor conducts "Compliance Reviews" (ECF No. 2-2 ¶ 454). In these assessments, the Monitor seeks to determine whether the Decree's requirements are "being carried out in practice" (*id.* ¶ 506). The Monitor completed two assessments for each of the sections addressed here—a detainee transport assessment filed with the Court on February 15, 2022 (ECF No. 488-1), an officer assistance assessment filed on November 30, 2022 (ECF No. 576-1), and assessments of each area filed on December 29, 2023 (ECF Nos. 674, 675). The Monitor found the City and BPD in initial compliance with both the transport and officer assistance sections in its filings on December 29, 2023.

On January 16, 2024, the United States joined BPD and the City in asking this Court to declare the City and BPD in Full and Effective Compliance with the detainee transport and officer assistance sections of the Decree (ECF No. 681, 682). On January 26, 2024, the Court granted the motion (ECF No. 687). Under the Consent Decree, once the City and BPD reach full and effective compliance with these sections of the Decree, they must maintain that compliance for a period of at least one year before the provisions can be terminated (ECF No. 2-2 ¶ 506;

ECF No. 410). This one-year period, which the Parties have referred to as the "Sustainment Period," began on January 25, 2024 (ECF No. 687).

During the Sustainment Period, BPD assumed greater responsibility for monitoring its own compliance, rather than relying on the Monitor, in accordance with self-assessment plans developed by the City and BPD and approved by the United States and the Monitor (*cf.* ECF No. 2-2 ¶¶ 457-58). The United States also independently reviewed the City's and BPD's sustainment during this period and, for the reasons below, concludes that BPD sustained compliance in both areas and that these provisions should be terminated from the Decree.

### B. Transportation of Persons in Custody

#### 1. *Consent Decree Requirements*

The Consent Decree requires BPD "to ensure that all detainees are treated in a humane manner before, during, and after their transportation, with due regard for their physical safety and protection, consistent with sound principles of prisoner security" (ECF No. 2-2 ¶ 222). The Decree contains specific requirements concerning policy development and training, equipment, duties and responsibilities of officers, and auditing (*id.* ¶¶ 223-38).

#### 2. *Full and Effective Compliance Declaration*

On January 26, 2024, pursuant to a Joint Motion filed by the Parties, the Court found that the City and BPD were in Full and Effective Compliance with the Transportation of Persons in Custody section of the Consent Decree (ECF No. 687).[2] In reaching this determination, the Court found the Monitoring Team's compliance assessment "particularly compelling" (*id.* at 3). The

---

[2] The United States' Memorandum in Support of Joint Motion for Partial Declaration of Full and Effective Compliance provides a more detailed summary of BPD's implementation of the Transportation of Persons in Custody provisions, the Monitoring Team's assessments of compliance, and the United States' assessment of compliance, as of January 2024 (ECF No. 682, at 5-8).

Court found that BPD had "ensured that its vehicles include safety equipment to minimize any harm to its vehicle occupants"; "implemented policies and procedures aimed at achieving that goal"; and "established the capacity for careful surveillance of vehicle occupants and of officers" (*id*. at 3-4). Notably, the compliance assessment also demonstrated that as a result of BPD's improvement in transport practices, injuries during transports were extremely rare—there were only 11 reported injuries during over 16,000 transports—and when they did occur, BPD officers appropriately contacted a medic or transported the individual to a hospital (ECF No. 675, at 31). The Court's declaration of "Full and Effective Compliance" commenced a one-year Sustainment Period, as required by the Consent Decree.

### 3. *Sustainment of Compliance*

On February 16, 2024, the City and BPD filed a Self-Assessment Plan, which had been reviewed and approved by the United States and the Monitoring Team (ECF No. 695). This plan was based on the Monitoring Team's methodology for its assessments of BPD and BPD's existing self-auditing processes and set out BPD's plan for self-assessing each paragraph of the Transport section of the Decree. BPD produced quarterly reports to United States and the Monitoring Team and filed its final sustainment report on February 19, 2025 (ECF No. 804). BPD's quarterly self-assessments and final Sustainment Report demonstrate that the City and BPD have maintained compliance with the Transport paragraphs of the Decree.

Since January 2020, BPD has developed an audit process to examine a sample of transport events each month (ECF No. 695). The audit unit now performs 20 event audits per month, exceeding the requirements of the Consent Decree (ECF No. 804, at 14). BPD has also developed and validated a scorecard to capture data from those audits and track BPD's progress from month to month. Since its implementation, the scorecard has shown consistent high marks

for Decree requirements regarding properly equipped vehicles, functioning video recording equipment, powered-on body-worn cameras, and the prohibition on officers engaging in enforcement activities during a transport that are unrelated to the transport itself (*id*. at 11,14, 18).

Specifically, Paragraphs 223, 224, and 225 of the Consent Decree require BPD to inspect vehicles on a monthly basis and ensure that transportation vehicles contain functioning seatbelts and transport vehicle camera (TVC) systems, and that videos of transportations are recorded and saved (ECF No. 2-2 ¶¶ 223, 224, 225). During the Sustainment Period, BPD conducted a total of 395 in-person monthly inspections and found only four instances in which seatbelts were not functional (ECF No. 804-1, at 8). These vehicles were not used for transporting detainees until the seatbelts were fixed (*id*.). BPD also determined that TVC footage had been adequately stored in 93 percent of the cases audited, and noted that, since these storage issues were identified, BPD has installed a modernized TVC system that automatically uploads videos, eliminating the need for manual uploads (*id*. at 10-11).

BPD's self-assessment determined that 91 percent of forms were completed for required vehicle inspections (*id*. at 12). BPD addressed the issues with completion rates by issuing instructions regarding the proper completion of inspection forms as well as through targeted communications to district commanders (*id*. at 13). BPD is also seeking to modernize its system so that more information is available electronically (*id*.). Completion rates varied district-by-district over time, but, notably, all districts audited in the first quarter of 2025 achieved a 100 percent completion rate (*id*.).

Paragraph 226 and 228 require that every person being transported is secured in a seatbelt or other authorized restraining device and is secured in a manner that does not cause pain, risk of

5

injury, or actual injury (ECF No. 2-2 ¶¶ 226, 228). BPD's audits of these requirements found a

nearly 100 percent compliance rate (ECF No. 804-1, at 16). In the two incidents that were out of

compliance—one in which a transporting officer did not properly fasten a seatbelt and one in

which an officer failed to check the tightness of handcuffs when person complained that the

handcuffs were causing pain and potential injury—the officers involved received verbal

counseling (*id.*).

Paragraph 227 requires transporting officers to periodically check on people being

transported to ensure their safety and security and generally prohibits officers from engaging in

unrelated enforcement activities when transporting detainees (ECF No. 2-2 ¶ 227). BPD

achieved an average compliance score of 93 percent during the sustainment period with respect

to safety checks (ECF No. 804-1, at 17). BPD policy requires two safety checks per transport, so

this score includes incidents in which officers completed one, but not two, checks (*id.*).

Paragraph 229 requires that males and females are not transported within the same

compartment of a vehicle and that youth are not transported with adults (ECF No. 2-2 ¶ 229).

BPD's compliance in this area improved from 94 percent in the first quarter of 2024 to 100

percent in the last quarter of 2024, with an overall compliance rating of over 97 percent (ECF

No. 804-1, at 23).

Paragraph 230 requires BPD to ensure that medical equipment required by persons with

disabilities is transported to the destination of the person requiring the equipment (ECF No. 2-2 ¶

230). BPD used three different methods to assess compliance in this area and identified 93 cases

that were relevant to the requirements of this paragraph (ECF No. 804-1, at 27). BPD determined

that they complied with the requirements of this paragraph in all 93 cases (*id.*).

Under Paragraph 231, BPD must ensure that officers do not exceed the speed limit and drive in a manner calculated to preserve the safety and security of persons in custody (ECF No. 2-2 ¶ 231). BPD auditors used the automatic vehicle locator system, which tracks vehicle speed, and reviewed body-worn camera footage to check for other possible indicators of unsafe driving. BPD compiled the results of the monthly transport audit scorecards and determined that BPD officers obeyed the posted speed limit 90% of the time during the sustainment period (ECF No. 804-1, at 28). The average deviation above the speed limit was less than 10 miles per hour (*id.* at 30), and in two instances where officers drove more than 10 miles per hour above the speed limit, BPD referred the officers to PIB (*id.* at 42). This is an increase in the compliance score relative to the Monitoring Team's reassessment. BPD's ability to monitor vehicle speed has improved since the Monitoring Team's assessment, in which more than half of the transport speeds were undeterminable.

Under Paragraph 232, BPD must ensure that the transporting officer communicates certain information to dispatch or through other field-based reporting, including the location where the persons in custody are picked up, the time the transportation unit departs the scene, how many people are in custody, the vehicle destination, the starting and ending mileage of the vehicle, the time of arrival, and whether the officer perceived the person in custody to be in need of medical attention (ECF No. 2-2 ¶ 232). BPD assessed this paragraph through its monthly audits; it demonstrated a near 100% compliance rate with the requirements (ECF No. 804-1, at 32). For these audits, a member of the audit unit reviewed the body-worn camera footage of each transport to determine whether the required information was relayed. It also reviewed the Transport Log, which had a 68% completion rate. Though the completion rate for the Transport

Log was lower than desired, the completion of the log is not a requirement of the Decree, and the information required to be captured under this paragraph was captured by other means (*id.*).

Paragraph 233 requires periodic welfare checks during transport and requires officers to provide first aid or obtain medical assistance for injured detainees if necessary (ECF No. 2-2 ¶ 233). When medical aid was necessary, BPD met the requirements of this paragraph 100% of the time (ECF No. 804-1, at 33).

Paragraph 234 requires data collection about transports, including whether the person was adequately restrained, whether force was used, whether the person was injured, and whether medical care was provided (ECF No. 2-2 ¶ 234). BPD reported 100% compliance in its Sustainment Report, based on aggregating six questions from its monthly transport audits (ECF No. 804-1, at 35).

Paragraph 235 and Paragraph 236(c) deal with injuries during transportation; 235 requires that every injury that occurs during transport must be reviewed as a use of force or as part of a vehicle crash investigation; 236(c) requires a review of every injury reported to have occurred during transportation to determine if there are any trends related to transport policies or practices (ECF No. 2-2 ¶¶ 235, 236(c)). In its Sustainment Report, BPD reported that only six injuries occurred during transport out of 13,425 transports during the sustainment period (ECF No. 804-1, at 36). Three were incidents in which the individuals being transported attempted to harm themselves by banging their head against the interior of the vehicle. In all three cases, medical attention was provided. One of the three incidents is still under review; BPD determined that the officers acted within policy during the other two. The fourth reported injury occurred after a person became unsecured from their seat. The transporting officer contacted a medic who rendered aid at the scene; this incident remains under review. The fifth was a complaint of too-

8

tight handcuffs, which BPD investigated and determined was not a use of force. The final injury was the result of a vehicle crash. Aid was rendered at the scene, and it was investigated as a vehicle crash pursuant to Paragraph 235 (*id*. at 36-37). BPD has thoroughly reviewed the incidents and has therefore sustained compliance with these paragraphs.

BPD must perform quarterly audits of its transportation process under Paragraph 236 of the Consent Decree (ECF No. 2-2 ¶ 236). It requires a quarterly audit of at least five randomly selected transports; an analysis of the data collected during the previous quarter; and random spot-checks of three transportation vehicles to inspect for seatbelts and TVC functionality. BPD demonstrated in its Sustainment Report that it had complied with these requirements. It has performed monthly, rather than quarterly audits of transports and conducts the required random spot-checks (ECF No. 804-1, at 38). It demonstrated an annual compliance score of 100% in this area (*id*. at 40).

Paragraph 237 requires BPD to take corrective action for non-compliance with BPD policies and procedures (ECF No. 2-2 ¶ 237). In its sustainment report, BPD reported that it made five referrals to PIB concerning prisoner transport during the sustainment period, mostly for unsafe driving practices (ECF No. 804-1, at 41-42). Three incidents remained under review as of January 25, 2025, one was sustained, and one was not sustained. Auditors also identified 92 compliance violations that were sent to Command and presented at Comstat. In total, BPD found that the number of compliance violations represented less than 1% of the total possible compliance violations (*id*. at 42). And since July 2024, BPD has been sending targeted emails to district commanders when audits found compliance violations.

Paragraph 238 requires that BPD review and revise its policies, procedures, and training related to the transportation of persons in custody and provide at least eight hours of training to

all officers who drive transport wagons (ECF No. 2-2 ¶ 238). BPD implemented revised

Transport policies in 2021 and developed and delivered both an e-learning and in-person training

for van drivers (ECF No. 804-1, at 45). Since 2017, van driver training has been a part of new

recruit training, so all members who have joined BPD since that date have been trained (*id*. at

45). In its self-assessment, BPD determined that 91.4% of van transports during the sustainment

period were conducted by officers who had received the required training. The remaining 8.6%

of transports were conducted by two members who were not assigned as primary or secondary

van drivers and have not completed the required training. BPD has notified the district

commanders of the two members who need to receive the training and will be holding two van

certification classes per month for current patrol officers (*id*. at 46).

The United States and the Monitoring Team met with BPD monthly to review and

discuss the transport scorecard data underlying BPD's self-assessment and corrective actions

taken in regard to any deficiencies. We continued to review transport-related policies. Based on

our review, combined with the BPD's comprehensive assessments and final report, we conclude

that BPD sustained compliance with the Consent Decree's provisions on transportation of

detainees.

### C.  Officer Assistance and Support

#### 1.  *Consent Decree Requirements*

The Consent Decree requires BPD to provide a range of assistance and support resources

for its officers. BPD must provide an Employee Assistance Program ("EAP") that allows all

sworn officers to access no- or low-cost counseling and mental wellness services (ECF No. 2-2

¶ 436), peer support services (*id*. ¶ 438), and voluntary mental health evaluations following

traumatic events (*id*. ¶ 439). The Consent Decree also requires BPD to develop protocols to

promote officer well-being during public demonstrations or civil unrest, including by close monitoring of officers' well-being by supervisors and ensuring the availability of mental health and medical professionals (*id*. ¶ 440). Finally, BPD must assess its officer assistance and support programs annually (*id*. ¶ 441).

### 2. Full and Effective Compliance Declaration

On January 26, 2024, pursuant to a Joint Motion filed by the Parties, the Court found that the City and BPD were in Full and Effective Compliance with the officer assistance section of the Decree (ECF No. 687).[3] The Court emphasized the importance of officer wellness and noted that the City and BPD "have become more enlightened with respect to the importance of the mental and emotional health of its employees" (*id*. at 4). The Court's declaration of Full and Effective Compliance started a one-year Sustainment Period, as required by the Decree.

### 3. Sustainment of Compliance

On February 23, 2024, the City and BPD submitted an Officer Assistance and Support Sustainment Plan, which had been reviewed and approved by the United States and the Monitoring Team (ECF No. 697). Drawing on methodologies from the Monitoring Team's assessment of this section of the Decree, the Sustainment Plan outlined the specific steps and timelines for BPD's self-assessments, which would be conducted by BPD's Performance Standards Section (PSS). The plan included quarterly review of documentation related to officer wellness services and supports, as well as specific reviews and audits to assess paragraphs related to large-scale public demonstrations or civil unrest. BPD submitted quarterly reports,

---

[3] The United States' Memorandum in Support of Joint Motion for Partial Declaration of Full and Effective Compliance provides a more detailed summary of BPD's implementation of the Officer Assistance and Support provisions, the Monitoring Team's assessments of compliance, and the United States' assessment of compliance, as of January 2024 (ECF No. 682, at 10-15).

with supporting documentation, to the United States and the Monitoring Team, and filed a final Officer Assistance and Support Sustainment Report on February 18, 2025 (ECF No. 801).

BPD's quarterly self-assessments and final Sustainment Report establish that the City and BPD have maintained compliance with the officer assistance paragraphs of the Decree. Paragraphs 436 and 437 require BPD to provide an EAP that offers no- or low-cost counseling and mental wellness services to sworn officers, provide information about the EAP at all BPD facilities, and ensure officers have access to an updated list of mental and physical health service providers available through the EAP (ECF No. 2-2 ¶¶ 436, 437). BPD's self-assessment reports showed that BPD continued to maintain its partnership with BHS to provide the EAP services required by the Consent Decree and has disseminated information about the EAP, including sending employees at least five emails per quarter informing them of EAP resources (ECF No. 801-1, 13-14). The self-assessments also confirmed that all nine districts continued to hang posters with officer wellness information and a QR code that linked to BPD safety and wellness resources, except for one quarter in which the poster in the Southwest District was temporarily removed during renovations (*id*. at 14).[4]

Paragraph 438 of the Consent Decree requires that BPD develop a peer support program that provides "emotional, social, and practical support to other officers" (ECF No. 2-2 ¶ 438.a). In its self-assessment, BPD demonstrated that it continues to maintain its peer support program, noting that peer support teams provided an average of 94 contact sessions each quarter of 2024 (ECF No. 801-1, at 15). In 2024, BPD deployed peer support teams to 22 critical or traumatic incidents, including six officer-involved shootings (*id*. at 8).

---

[4] The self-assessments confirmed that, after the renovations, the poster was rehung and was displayed in the remaining three quarters of 2024 (*id*.).

Paragraph 439 of the Consent Decree requires BPD to offer voluntary mental health evaluations following a traumatic incident (ECF No. 2-2 ¶ 439). To assess this provision, BPD reviewed after-action reports (AARs) covering critical and traumatic events that occurred during the sustainment period (*id*. at 16). In the first two quarters of 2024, BPD identified three issues in the 15 AARs they reviewed (*id*. at 17). In one case, a peer support member did not conduct a follow-up for referral on the scene, but this follow-up was later conducted by the Officer Safety and Wellness section director (*id*.). Two additional cases included documentation errors (*id*.). BPD did not identify issues or concerns with the AARs submitted in the last two quarters of 2024 (*id*.).

Paragraph 440 of the Consent Decree requires BPD to develop well-being protocols for officer deployments during public demonstrations or civil unrest (ECF No. 2-2 ¶ 440). During the sustainment period, BPD reported no large protest activity. Anticipating this possibility, the Parties agreed during the development of the Sustainment Plan that BPD would assess this paragraph based on five scheduled public events: Preakness Horse Race, Fourth of July Fireworks, Maryland Cycling Classic, Baltimore Running Festival, and New Year's Eve (ECF No. 697-1, at 2).[5] Forms from these events suggested that, although BPD struggled with documentation errors in quarter one, BPD identified these errors, developed a corrective action plan, and corrected these errors (*id*. at 18). In the first quarter, 40 percent of the wellness forms were missing required information, but, in the next three quarters, 94 percent of the forms were completed properly (*id*.), demonstrating BPD's ability to self-correct its performance. BPD also

---

[5] The Cycling Classic was postponed to 2025 due to logistical issues surrounding the collapse of the Key Bridge, but PSS reviewed two additional events: the CIAA Basketball Championship and Sole of the City, a 10K run (*id*. at 17).

determined that supervisors provided health and safety guidance during 97 percent of the pre-deployment briefings reviewed (*id*. at 19).

Though the prescheduled events PSS reviewed were intended to serve as a proxy for large-scale civil unrest and public demonstrations, there are important distinctions between these categories of events. Because large-scale civil unrest and public demonstrations have the potential for emotional and confrontational interactions between demonstrators and officers, the Consent Decree includes provisions related to mental health services for officers during such events (ECF No. 2-2 ¶ 440(b) & (e)). Since officers are unlikely to require this level of mental health support during races or holiday celebrations, mental health resources were not deployed during the pre-planned events that were assessed.[6] The Monitoring Team faced similar limitations during their 2023 reassessment of Officer Safety and Support because no large protest activity occurred during the reassessment period (ECF No. 674, at 21). The Monitoring Team reviewed BPD's 2023 revisions and enhancements to its internal protocols and concluded that BPD's processes and directives, if followed, addressed Consent Decree requirements (*id*. at 24, 28). During BPD's 2024 assessment, the 2023 directives were incorporated into the Public Order Forces Standard Operating Procedures activated in 2024 (ECF No. 801-1, at 18).

Finally, paragraph 441 requires BPD to develop protocols for assessing BPD's officer assistance and support programs annually, including identifying opportunities for improvement and implementing and documenting corrective action measures (ECF No. 2-2 ¶ 441). During the Sustainment Period, BPD filed its 2023 Officer Safety and Wellness Report with the Court (ECF No. 741-1). This report followed a similar format to its previous reports, which were the basis of

---

[6] BPD also reviewed a public demonstration that occurred on January 20, 2025 at City Hall. This event occurred outside the 2024 Quarterly Audit Plan, but fell within the overall Sustainment Period. This demonstration was small and short in duration and therefore did not require the deployment of mental health services.

the Monitoring Team's conclusion that BPD complied with this paragraph (ECF No. 576-1, at 42; ECF No. 674, at 29). The 2023 report tracks BPD's officer wellness resources and utilization, compares trends over time, and documents BPD's self-identified areas for improvement (*see* ECF No. 741-1, at 7-11, 18-19). BPD's quarterly self-assessment audits further demonstrated BPD's ability to identify areas of concern, develop corrective action, and improve performance. As previously described, concerns that BPD identified in the first and second quarters of 2024 were consistently corrected in later quarters.

While BPD was conducting its assessments, the United States conducted independent assessments of BPD's compliance with the officer assistance provisions of the Consent Decree. The United States' assessment included a review of BPD's officer assistance and support reports, policies, and directives; pamphlets, posters, and other resources BPD has developed to ensure compliance with the Consent Decree; BHS data on BPD's utilization of EAP services; and other documentation collected by PSS when conducting its assessments. Based on our review, combined with BPD's comprehensive quarterly assessments and final report, we conclude that BPD sustained compliance with the Consent Decree's officer assistance provisions.[7]

We note that some provisions related to public demonstrations and civil unrest remain relatively untested, due to the lack of large protest activities during this period. As the Monitoring Team has noted in its assessments of these provisions, "this section pertains to events that are relatively rare. Because it is not possible to forecast when then next significant protest or civil unrest event will occur, other means of assessing compliance in this area must be used." (ECF No. 674, at 21.) For the reasons described above, these alternate methods of assessing

---

[7] Our conclusion does not include an assessment of BPD's compliance with paragraph 438.b, which was not included in the Monitoring Team's 2023 reassessment of Officer Safety and Wellness.

compliance, including reviewing large-scale non-protest events and review and assessment of BPD's written protocols and policies, are sufficient to establish that BPD has sustained compliance in this area. However, should the Court grant this Joint Motion and terminate these provisions, the United States urges BPD to be particularly cognizant of its officer wellness protocols when BPD responds to public demonstrations or civil unrest in the future.

## III.    ARGUMENT

### A.  The "Full and Effective Compliance" Standard

To achieve and maintain Full and Effective Compliance with the Decree, the City and BPD must demonstrate by a preponderance of the evidence "that they have (a) incorporated all Material Requirements of this [Decree] into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the [Decree's] Outcome Assessments" (ECF No. 2-2 ¶ 506).

The Decree specifies that "[n]o specific numerical test shall be required to demonstrate Full and Effective Compliance so long as BPD is demonstrating substantial adherence with the Material Requirements, continual improvement, and the overall purpose of the Material Requirements has been met" (*id.* ¶ 506). The Decree also makes clear that BPD's performance must be assessed as a whole, without undue emphasis on specific instances of compliance or non-compliance: on the one hand, "temporary or isolated failure to comply during a period of otherwise sustained compliance [] will not constitute failure to achieve or maintain Full and Effective Compliance," but on the other hand, "temporary compliance during a period of otherwise sustained noncompliance will not constitute" Full and Effective Compliance (*id.*).

"Upon the Court's determination that the City and BPD have reached Full and Effective Compliance with [the Decree] . . . and have maintained such compliance" for the Sustainment Periods applicable to each section, "the Court will terminate the [Decree]" (*id.* ¶ 504). The Sustainment Period for each section is either one year or two years (*id.*).

The Decree accounts for the possibility that BPD will comply with some sections sooner than others. "If BPD has reached Full and Effective Compliance with a part of the [Decree] and maintained that compliance" for the applicable Sustainment Period, "the City and BPD may move at any time to terminate that part of the [Decree]" (*id.* ¶ 508). For the Court to terminate a part of the Decree, "that part must be sufficiently severable from the other requirements of the [Decree] that noncompliance with those other requirements does not implicate BPD's ability to police in accordance with federal law and this [Decree] in the part to be terminated" (*id.*). Furthermore, "[i]n determining whether there is Full and Effective Compliance with a part of the [Decree], all the requirements of the [Decree] may be assessed collectively to determine whether the intended outcome of the part has been achieved" (*id.*). Partial termination of sections that reach compliance serves the overall goals of the Decree by formally recognizing progress as it is achieved and enabling the Parties, Monitor, and Court to focus attention and resources on the areas that need it most.

**B. BPD Has Sustained Full and Effective Compliance with Respect to Transportation of Persons in Custody and Officer Assistance and Support.**

On January 26, 2024, the Court found the City and BPD to be in Full and Effective Compliance with (1) paragraphs 222-238 of the Decree relating to transportation of persons in custody and (2) paragraphs 436, 437, 438.a, and 439-441 of the Decree relating to officer assistance and support (ECF No. 687). Under the terms of the Decree, in order to terminate those

paragraphs, the Court must find by a preponderance of evidence that BPD has maintained Full and Effective Compliance during the one-year sustainment period (ECF No. 2-2 ¶ 508).

As described above, BPD's self-assessments combined with the United States' own assessments demonstrate that BPD and the City have maintained Full and Effective Compliance with these paragraphs during the one-year sustainment period. These assessments were based on data that reflect not just a single point in time, but rather BPD's operations on a daily basis over a full year. As a result, they showed that "each material requirement" of these sections of the Decree "is being carried out in practice" (*id.* ¶ 506(a)).[8] These assessments show that the City and BPD are consistently complying with the transport and officer assistance requirements of the Decree, and any noncompliance has only been temporary or isolated. Significantly, these assessments demonstrate BPD's ability to self-monitor and self-correct its compliance with these sections of the Decree. BPD's thorough and self-critical assessments in these areas provide a strong basis to conclude that BPD has the plans and ability to continue to monitor and maintain its compliance with these areas of the Decree, even after the provisions are terminated.

The Court should also find that the detainee transport and officer assistance sections of the Decree are each severable. These two sections of the Decree have distinct requirements, separate from the other areas of the Decree. Non-compliance with other sections of the Decree does not implicate BPD's ability to comply with federal law and this Decree as they relate to the transportation of persons in custody, or as they relate to officer assistance and support (*see id.* ¶ 508).

---

[8] No further showing of "sustained and continuing improvement in constitutional policing" (*id.* ¶ 506(b)) is necessary, because the Decree does not set forth outcome assessments related to detainee transport or officer assistance (*see id.* ¶ 459), and the Monitor did not find that additional outcome assessments related to these sections "are necessary to determine" Full and Effective Compliance (*see id.* ¶ 457).

18

BPD's improvements have led to positive outcomes. During the one-year Sustainment Period, injuries during transport were extremely rare—there were only six reported injuries that occurred during over 13,000 transports (ECF No. 804-1, at 36). BPD's officer wellness final assessment, in addition to including data and documentation regarding the wellness services provided, described the impact on individual officers. When one officer was intoxicated and possibly suicidal, BPD's officer wellness section ensured that the officer immediately receive treatment, and the officer maintained employment and became an informal ambassador for the services of the Officer Safety and Wellness section (ECF No. 801-1, at 4).

IV.     **CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the United States requests that the Court grant the Joint Motion for Partial Termination and terminate paragraphs 222-238 (relating to transportation of persons in custody) and paragraphs 436, 437, 438.a, and 439-441 (relating to officer assistance and support) of the Consent Decree.

Respectfully submitted,


Mac Warner
Deputy Assistant Attorney General
Civil Rights Division

REGAN RUSH
Chief
Special Litigation Section

CYNTHIA COE
Deputy Chief

 */s/ Emily C. Keller*
EMILY C. KELLER
DAVID G. COOPER
NICOLE PORTER
SARAH STEEGE
JULIANNA ASTARITA
LESLIE BAILEY
Trial Attorneys
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 514-6255
Fax: (202) 514-0212
Email: emily.keller@usdoj.gov

*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

      I certify that the foregoing Memorandum in Support of Joint Motion for Partial Termination was served through the electronic filing service on March 6, 2025, giving notice to all registered parties.


                                  */s/ Emily C. Keller*

                                    Emily C. Keller

                                    Attorney for the United States