

# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

## SECOND COMPLIANCE REVIEW
## REGARDING RECRUITMENT & RETENTION

December 2025



## TABLE OF CONTENTS

I. EXECUTIVE SUMMARY .................................................................................................. 3

II. BACKGROUND, APPROACH, AND METHODOLGY ...................................................... 6

III. COMPLIANCE REVIEW .................................................................................................. 11

    A. PARAGRAPH 421(E) ................................................................................................... 11
    B. PARAGRAPH 424 ........................................................................................................ 13
    C. PARAGRAPH 427 ........................................................................................................ 14

V. COMPLIANCE ASSESSMENT CONCLUSIONS ............................................................. 18

## I. EXECUTIVE SUMMARY

Paragraphs 419 through 427 of the Consent Decree ("CD") require the Baltimore City Police Department ("BPD" or "the Department") to reform its recruiting, hiring, and retention practices to better attract, hire, and retain a qualified and diverse police force capable of providing quality service, ensuring public officer safety and accountability, and promoting constitutional, effective policing.

The Monitoring Team previously conducted an initial comprehensive review of this section of the Consent Decree which was filed with the Court in August 2023 (the "First Recruitment Assessment"). In that assessment, the Monitoring Team found that the City and BPD had made significant progress, concluding that BPD was in initial compliance with 17 of 20 paragraphs in the recruitment, hiring, and retention area of the Consent Decree. The Monitoring Team found BPD "on track" toward compliance with the three remaining requirements, Consent Decree paragraphs 421(e), 424(d), and 427. In its report, the Monitoring Team explained what BPD needed to do to remedy its deficiencies. Specifically, the Monitoring Team found that, to reach initial compliance with the final requirements, BPD and the City had to:

- Enhance its annual assessment of its recruitment and retention processes so that it could better make evidence-based changes to its recruitment and hiring strategies.
- Better document its review of the use of force history of candidates with prior law enforcement experience.
- Establish ways for non-BPD city personnel to assist in recruitment efforts.

Working with the Monitoring Team and the Department of Justice ("DOJ") since the filing of the First Recruitment Assessment, the City and BPD have addressed these issues. BPD updated its hiring processes, tightened its documentation of applicant background investigations, and created an Annual Report that demonstrates improved use of data to update strategies for recruitment, hiring, and retention.

Although the requirements of the recruitment, hiring, and retention area of the Consent Decree mandate specific, important steps that will assist BPD to hire enough high-quality candidates to carry out its mission, this area does not require that BPD reach full staffing. Indeed, despite diligent effort, continued improvement, and a rigorous review of data, the actual staffing of the BPD remains below the targeted level. This is consistent with many large city police agencies across the nation.

Having conducted its assessment, the Monitoring Team finds that BPD is now in initial compliance with the three remaining requirements and thus finds that the City and BPD are in Initial Compliance, 4(d) with all of the paragraphs in the recruitment, hiring, and retention area of the

3

Consent Decree. Accordingly, the Monitoring Team recommends that the Court find BPD in full and effective compliance with this area.

**Summary of Findings**

- **Paragraph 421(e) requires there to be "***Opportunities for officers, civilians, and members of City Government to assist the BPD's effort to attract a broad spectrum of qualified applicants.***"** In the First Recruitment Assessment, the Monitoring Team found insufficient evidence of a meaningful partnership between BPD and the City to recruit qualified BPD applicants. Much progress has been made and BPD and the City have taken sufficient steps to establish and maintain such partnerships and are now in initial compliance with this requirement.

- **Paragraph 424(d) requires** *"a preemployment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history if a candidate has previous law enforcement experience."* In the First Recruitment Assessment, the Monitoring Team found insufficient evidence that BPD was reviewing discipline, use of force, and training records of candidates who had prior law enforcement experience. Following that assessment, BPD adjusted its documentation practices to ensure its background investigation casefiles contained evidence of this review. In the current assessment, the Monitoring Team reviewed the background investigation case files of all candidates with prior law enforcement experience that were approved for hire in the last year, and a random sample of all other candidates with prior law enforcement experience who were disqualified or withdrew from the hiring process. The Monitoring Team found sufficient evidence that BPD reviewed the use of force and disciplinary records of these candidates, and thus the Monitoring Team finds BPD in initial compliance with this requirement.

- **Paragraph 427 requires BPD to "***conduct assessments of its recruitment and retention efforts on an annual basis" and to amend its strategy in accordance with findings from the annual reviews.***** In 2025 BPD finalized an assessment of its recruitment and retention efforts in 2023 and 2024. The report, filled with relevant data, analysis, and a description of strategy changes based on the data, was filed with the Court. The Monitoring Team found that BPD enhanced its assessment process in this report and

4

accordingly finds that BPD is now in initial compliance with this requirement as well.

## II.     BACKGROUND, APPROACH, AND METHODLGY

This assessment is a compliance review regarding the three paragraphs in the recruitment, hiring, and retention section of the Consent Decree that are currently rated as "Implementation On Track," compliance level 4(c)—paragraphs 421(e), 424(d), and 427. The Monitoring Team has previously described the role of compliance reviews as follows:

> Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree. They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . .[1]

To conduct the compliance review, the Monitoring Team reviewed meeting notes, data, and presentations from the bi-weekly and later monthly meetings of recruitment and staffing personnel at BPD, the current practices of BPD and certain City personnel involved in the BPD hiring process, and the annual assessment of recruitment and retention efforts that BPD conducted pursuant to paragraph 427. To assess paragraph 424(d), which requires BPD to review the disciplinary and use of force history of candidates with prior law enforcement experience, the Monitoring Team reviewed BPD's documentation of its background investigations of those candidates. In the last 12 months, there were 237 such candidates, 48 of which BPD approved for hire. Using standard calculations of a 95% confidence interval and a 10% margin of error, the Monitoring Team reviewed 64 of the 189 candidates who were not approved for hire and all the 48 who were approved for hire. Following the procedures of the First Recruitment Assessment, and in cooperation with BPD, Monitoring Team members were provided access to BPD's candidate management data base system, eSOPH, for direct access to investigator reports and notes. To conduct its review, the Monitoring Team used an online survey instrument.

This report evaluates BPD's compliance with Consent Decree paragraphs 421(e), 424(d), and 427. The Monitoring Team, in collaboration with BPD and DOJ, has previously adopted and used a standardized way of scoring BPD's performance in its effort to fully implement the Decree's requirements:

> **0 – Not Assessed:** The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.
>
> **1 – Not Started:** The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

---

[1] ECF No. 279-1 at 22–23.

**2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:** The City/Department is addressing the training provisions for the requirement, based on approved policy.

> **4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.
>
> **4a – Implementation - Not Assessed:** The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.
>
> **4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.
>
> **4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.
>
> **4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not sustained compliance for the required time period specified in Paragraph 504 of the Consent Decree.

**5a – Full and Effective Compliance:** The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree. This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance**: The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

**This review is largely focused on whether BPD has, or has not, moved from working to implement the Decree's requirements on recruitment and retention to having successfully**

7

**implemented the remaining requirements in practice**.[2]  To make determinations about whether BPD is in Initial Compliance with a material requirement of the Decree, the Monitoring Team continues to weigh the following factors:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.**  Successfully carrying out a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer.  Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers.  In this way, isolated compliance does not establish "Initial Compliance" in practice.  At the same time, however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance.  The issue is whether, across time, events, and people, BPD is, in aggregate, sufficiently doing what the Decree requires.  For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more commonly implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.**  The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation.  Several minor or more technical deviations from administrative requirements may be different in quality than a single significant or gross deviation from core requirements for officer performance in the field.  Likewise, deficient performance in connection with less foundational requirements or issues may be different in quality than deficient performance in connection with significant requirements or issues.

3. **The extent to which BPD is identifying and appropriately addressing problematic performance.**  In its focus on accountability, supervision, and mechanisms for fostering critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will have mechanisms in place to engage with departmental and officer performance that is deficient in some way.  Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it has appropriately addressed the issue.  With respect to Consent Decree implementation and meaningful organizational change, the Department is in a different condition if a policy deviation is identified and appropriately addressed than if the deviation goes unnoticed and unaddressed.

---

[2] *See* ECF No. 2-2 ¶ 506 (indicating that Initial Compliance with any material requirement of the Consent Decree involves evaluating whether a given requirement "is being carried out in practice by BPD").

4. **BPD's progress over time.**  Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time.  Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[3]   Although test articulated above requires different considerations to be factored together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."[4]

In applying this multi-factor test for compliance, the first factor—the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers—is the initial, threshold inquiry.  If BPD and/or its officers' performance is not what it should be across a sufficient number or portion relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance.  For example, if BPD meets some Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put the Department into compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to the Department and to the community about the benchmarks that it expects and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as *possibly*, though certainly not conclusively or even presumptively, consistent with initial compliance.  In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time).  Where the Team determines that BPD has adhered to expectations in 95% or more of relevant circumstances, initial compliance will be found unless one of the other factors—severity of deviations, Department identification of noncompliance, and progress over the time—starkly point in the other direction.

---

[3] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[4] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

On the other hand, where BPD has complied with Consent Decree requirements less than 85% of the time, initial compliance will *not* be found unless one of the other factors points definitively in a positive direction. For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that BPD identified and took appropriate corrective action in instances where requirements were not followed, and the Department had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances. Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Pursuant to paragraph 506, to establish compliance with provisions that address policy requirements, BPD must not only show that it has adopted the pertinent policies, but it must also demonstrate through officers' actions *on the street* that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

### III. COMPLIANCE REVIEW

To assist with the Monitoring Team review of the Decree's sections regarding recruitment, hiring, and retention, BPD provided access to dozens of internal and public documents and files, internal databases, and briefing memos. They also continued to share information on a bi-weekly, later monthly, basis with DOJ and the Monitoring Team.

### A. Paragraph 421(e)

> *421. The Recruitment Plan, will at a minimum require the following:*
>
> *(e) Opportunities for officers, civilians, and members of City Government to assist the BPD's efforts to attract a broad spectrum of qualified applicants.*

In the First Recruitment Assessment, the Monitoring Team found that Paragraph 421(e) was "On Track," but not yet in initial compliance, because the City was not yet providing sufficient opportunities for non-BPD members of City government to assist with BPD's hiring efforts. Since then, the City has taken a number of steps in this regard, and the Monitoring Team now finds them in initial compliance.

Following the First Recruitment Assessment, BPD invited the Monitoring Team to attend meetings with both the City's Human Resources and Finance Departments to explain the Consent Decree's requirements and to discuss potential ways that the City could support BPD in recruiting and hiring. BPD and the City pursued those opportunities and the partnership between the City and BPD in this regard is now strong.

These efforts took a number of forms.

*First,* the facility that BPD previously used for applicant physical agility tests ("PAT") was in such poor condition that the City condemned the building. In response, BPD's Recruitment Section, the division within BPD that handles recruitment and hiring, identified a new, safe, City-owned location that presented a better image for the BPD, which BPD could guarantee was available, at minimum, four times a month, including some Saturdays—the [Middle Branch Fitness and Wellness Center](#) (the "Middle Branch"). The Middle Branch contains gym facilities, a pool, and a climbing wall. Since March 2023, BPD has not only used the Middle Branch but also made it available to candidates to use for fitness training at any time. Additionally, any applicant who does not pass a portion of the PAT can use the Middle Branch for fitness training. Finally, to assist with their completion of the PAT, applicants, new hires, and cadets can receive additional fitness training support at the Middle Branch on alternating Wednesdays and Saturdays between 5-7 p.m.

11

*Second,* after the recent downsizing of the federal government and because of the large number of federal workers in the Maryland area, BPD participated in a joint career fair with the City in March 2025. As a result of this fair, BPD received inquiries from over 100 individuals interested in employment, including a number of individuals interested in professional positions at the Department.

*Third,* in partnership with Baltimore City Recreation and Parks ("BCRP"), the BPD hosted an expedited assessment event on August 15th, 2025. This event was designed for applicants whose applications were successfully screened and were awaiting the pre-employment written and physical assessments before proceeding to the background investigations portion of the hiring process. Forty-seven applicants elected to sign-up for the event that allowed eligible applicants the opportunity to take both pre-employment assessments the same morning, as opposed to separate times. Of the 36 applicants who appeared at Middle Branch in time to participate in the event, 35 passed the PAT and immediately proceeded to the written assessment. Ultimately, 28 applicants were able to proceed to background investigations after successful completion of the written assessment, the National Testing Network ("NTN") exam.

*Fourth,* in October of 2025, BPD and the Baltimore City Fire Department BCFD hosted a joint job fair at the Middle Branch Fitness and Wellness Center, aimed at attracting individuals interested in public safety careers.[5]

*Fifth,* with support from the City, BPD expanded its "Junior Cadets Program"[6] (known as the Explorer Program) from one to three schools. The Explorer Program provides opportunities, with compensation, for young people to become engaged with and learn about the work of law enforcement.

*Sixth* in July 2024 the Office of the Deputy Mayor of Public Safety implemented a program called "AdminStat." As part of this program, City and BPD employees working on BPD recruiting in various capacities, including the Mayor's "Innovation Team" (referred to as the "i-team"), met once or twice a month to share hiring data. This group works with BPD to increase communication to ensure data transparency and to provide information about hiring efforts.

As one example of AdminStat's work, BPD's Recruitment Section and the Mayor's i-team determined after reviewing hiring data that the requirement for cadets to possess a driver's license was preventing otherwise qualified candidates from being hired. BPD further determined that many young people either cannot afford the costs associated with obtaining a driver's license or don't have the necessary support to do so. By reducing the minimum age for an applicant from 18 years old to 17 ½ years old and then removing the driver license requirement, BPD observed an

---

[5] The advertisement for the recruitment efforts can be seen online at https://joinbaltimorepd.org/job-fair/
[6] https://www.baltimorepolice.org/jrcadets

12

increase in the number of cadet applications received by over 104.8% between 2023 and 2024. The Greater Baltimore Committee, a non-profit civic organization representing city businesses, committed to covering the costs for cadets to obtain driver's licenses, which typically totaled approximately $7,000 per candidate. Identifying the problem, and responding with strong problem solving skills, the BPD and City also partnered with the [Abell Foundation](#) to cover the costs of driver education at the [Michael Jones Driving Academy.](#) Abell funds the entire process including the cost of making a car available for on-the-road driving sessions and the testing process. Cadets also receive support through BPD's Education and Training Section. Since 2024, BPD has hired 12 cadets without driver's licenses, and 8 of those applicants have since obtained a driver's license.

As a final example of an achievement of AdminStat, BPD's Recruitment Section worked with the i-team and the Baltimore City Information Technology department ("BCIT") to streamline the processing of application and human resources paperwork, changing from a burdensome and time-consuming hand counting process to an automated one.

**As a result of the meaningful partnerships created and the development of processes to support BPD recruitment efforts, the Monitoring Team finds BPD and City has achieved 4d, Implementation – Initial Compliance for Paragraph 421(e):**

B.      Paragraph 424

> *BPD's background investigations for hiring officers will include evaluation of the following factors:*
>
> > *(d) A pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history if a candidate has previous law enforcement experience.*

For those candidates that have prior experience as a law enforcement officer, the Consent Decree requires that BPD's pre-employment investigation include requesting the candidate's history of using lethal and less lethal force, use of force training records, and complaint history. In the First Recruitment Assessment, the Monitoring Team found insufficient evidence of such requests in BPD's records. As described above, in the current assessment, the Monitoring Team reviewed the background investigation case files for BPD candidates with prior law enforcement experience maintained in BPD's eSOPH system to evaluate BPD's compliance with this requirement.

BPD developed a new form report to use in its background investigations to ensure its personnel took the steps required by the Consent Decree, including the review of fatal and less lethal use of force reports, discipline records, and use of force training. The Monitoring Team reviewed and approved this form.

To conduct the assessment, the Monitoring Team reviewed the case files of the 48 individuals that BPD approved for hire between October 1, 2024 and September 30, 2025, and a randomly-selected sample of 64 candidates of the 189 that were processed by the Background Investigation Team, the members of the Recruitment Section who conduct background investigations, during that time but were disqualified, withdrew from the hiring process, or were still in the hiring process and had not yet been approved for hire for a total of 112 files.  This sample size was determined using a 95% confidence level and a 10% margin of error.

Twelve of the candidates who were approved for hire did not have available to review records of prior uses of force or use of force training.  Although each had prior law enforcement experience, their role was with security or auxiliary police agencies that did not track uses of force or use of force training.  In those 12 cases, BPD reviewed the candidates' prior work discipline and found no issues.  In the remaining 36 candidates, BPD conducted an inquiry into any problematic uses of force, and the candidates' prior use of force training.

Of the sample of 64 candidates who were not approved for hire, 56 exited the hiring process (either because they withdrew or were rejected by BPD for other reasons) before BPD reviewed the candidates'; discipline, training, and use of force history.  BPD had not yet reviewed the use of force, training, and disciplinary history of the remaining eight candidates of the 64 that were sampled, but those eight individuals had not yet completed the hiring process and thus had not yet reached the stage where BPD conducts that review.  BPD investigators explained that this time intensive review is reserved until the investigator submits the candidate for "2P" (psychological and physical evaluation) eligibility approval from a supervisor, the final stage before the final summary report is submitted for hiring approval.

BPD investigators explained that they typically travel to the candidate's prior law enforcement agency to review training files in person, rather than receiving copies of those files, and thus BPD rarely had training records in its candidates' case files.  When available, however, BPD investigators upload use of force training history into eSOPH.  Additionally, for transfers from other Maryland law enforcement agencies, BPD relies on the fact that the Maryland Police and Correctional Training Commission requires all officers in all such agencies to complete use of force training.

**Based on the review of the eSOPH investigation files, the Monitoring Team concludes that BPD conducts the investigations required by Paragraph 424(d) and thus finds BPD in 4(d) -- Implementation Initial Compliance**

C.      **Paragraph 427**

14

> *BPD will conduct assessments of its recruitment and retention efforts on an annual basis. These assessments will be designed to ensure that BPD's recruitment and retention practices are achieving the objective of attracting and retaining a diverse workforce of highly qualified officers. Assessments will include review of application and hiring information; review of the background investigation system, including applications rejected on account of the background investigation; surveys of officers to assess employee satisfaction; and analyses of officer exit interviews. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken.*

BPD issued its first annual retention and recruitment report on the year 2021 in September 2022. The Monitoring Team reviewed that report as part of the First Recruitment Assessment and concluded that BPD's analyses of data and its summary of changes in strategies as a result of data analysis was insufficient. Working closely with the DOJ and the Monitoring Team, BPD made changes to the content of its next report issued in August 2025 regarding BPD's recruiting in 2023 and 2024. The final report is posted on BPD website.[7]

The 2023-2024 Recruitment and Retention Report demonstrates BPD's dedication not only to collecting data but also to deepening its analysis, changing strategies, and continuing to improve on outcomes.

Over the past months, BPD has convened monthly meetings of the Monitoring Team, DOJ, and BPD personnel involved in recruitment and staffing to review data and adjust strategy in response to the BPD's analysis. As one noteworthy example, at one meeting this group reviewed data on polygraph examinations results and discovered higher than expected number of failures, each of which disqualified the candidate. BPD spoke with the personnel administering the polygraph examinations and learned that causes for results indicating deception were sometimes due to minor omissions which would not necessarily have a bearing on the candidate's integrity. For example, not recalling all of one's previous roommates (if the candidate has lived in many different places) or omission of a previous employer (with whom they perhaps had a difficult separation). Under the previous process, these candidates would be disqualified. The BPD reviewed Maryland state law and adjusted its process to allow for a subsequent polygraph interview in certain cases. The updated process resulted in a reduction of unnecessary disqualifications, improvements in the fairness of reviews, and while maintaining integrity standards. Under this new standard, BPD allowed 32 of 49 candidates who had previously failed the test to retake it.

---

[7] The final Recruitment and Retention 2023-2024 Annual Report, which was reviewed and approved by the Monitoring Team and the DOJ, can be found at https://www.baltimorepolice.org/sites/default/files/2025-11/2023-2024%20Recruitment%20and%20Retention%20Report.pdf

15

Another example of an important change that also resulted in strong community support was the change in age and driver license requirement for cadets, discussed above. Lowering the applicant age to 17 ½ years of age and the elimination of the requirement that applicants be a licensed driver at the time of application increased the number of eligible applications received, and the partnership with the Greater Baltimore Committee to cover the costs of obtaining driver's licenses reduced the burden on those applicants.

BPD Analysts also worked with BCIT and BPD human resources departments to streamline the processing of application paperwork. To accomplish this, BPD created centralized documentation, policies and procedures, and data reporting methodologies. Key data points, as well as recruitment and hiring policies and procedures, are reviewed by all teams within the Recruitment Section during the section's monthly "ReformStat" meeting. An example of a topic discussed during ReformStat was the Recruitment Section's refresher on the group of BPD support staff, known as the "Concierge Team" that is available to assist candidates and prompt their engagement in the hiring process. BPD created this refresher after it analyzed responses to an onboarding survey administered to police trainees and cadets, which reflected that the new hires were not aware of and did not use the Concierge Team during the hiring process.

BPD's Recruitment Section worked with the i-team to study departures by reviewing data on separations and contacting individuals who left BPD in the last 5 years to identify the reasons for their departures. The i-team has secured funding to pursue recommendations developed from insights shared by this group. BPD and the i-team are currently in the early stages of constructing retention plan for the Department. BPD determined that most resignations were from the officer rank (not surprising, as that is the largest group of BPD personnel, although that number is decreasing, but that trainee departures are increasing. An increase in trainee departures could be a good thing—if the trainee is determining early on that the job is not right for them, or BPD that the trainee is not right for the job. But other, more problematic reasons could also be the cause. Further analysis of these resignations would be prudent.

In order to continue to address attrition, the BPD committed to continued attention and investment in:

- o Officer Safety and Wellness programs,
- o The Family Childcare Support and Accessibility Services pilot,
- o The Female Mentoring Program ("FEMTOR"), and
- o Hiring and Retention Incentives which show utilization records of 50% more individuals in 2024 from 2023.

16

Finally, BPD is making efforts to improve working conditions by investing $9,300,000 in facilities upgrades, with a total of $67,000,000 in investments planned through 2030. BPD has likewise invested in its fleet of police vehicles.

Overall, the number of individuals leaving BPD decreased from 2022 to 2023 by 21% and by 17% 2023 from 2024. Applications to join BPD have also increased by 37% from 2023 to 2024.

The BPD has produced a comprehensive, analytical report on its efforts to assess and update BPD's recruitment and retention practices. BPD has a rigorous process to critique its processes and adjust strategies to enhance its recruitment and retention. **Accordingly, the Monitoring Team finds that BPD is Initial Compliance with Paragraph 427.**

## V. COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | | Compliance Score |
|---|---|---|
| 421(e) | a. Opportunities for officers, civilians, and members of City Government to assist the BPD's efforts to attract a broad spectrum of qualified applicants. | **4d. (Initial Compliance)** |
| 424(d) | a. A pre-employment investigation that includes requesting a candidate's history of using lethal and less lethal force, use of force training records, and complaint history if a candidate has previous law enforcement experience. | **4d. (Initial Compliance))** |
| 427 | BPD will conduct assessments of its recruitment and retention efforts on an annual basis. These assessments will be designed to ensure that BPD's recruitment and retention practices are achieving the objective of attracting and retaining a diverse workforce of highly qualified officers. Assessments will include review of application and hiring information; review of the background investigation system, including applications rejected on account of the background investigation; surveys of officers to assess employee satisfaction; and analyses of officer exit interviews. As part of this assessment process, BPD will identify deficiencies and opportunities for improvement; implement appropriate corrective action and improvement measures; and document measures taken. | **4d. (Initial Compliance)** |