

# BALTIMORE POLICE DEPARTMENT
# CONSENT DECREE MONITORING TEAM

### ADDENDUM TO FIRST COMPLIANCE REVIEW & OUTCOME ASSESSMENT REGARDING CRISIS INTERVENTION

December 2025



I.  **EXECUTIVE SUMMARY**

This Addendum is an addition to the Monitoring Team's report on its comprehensive outcome assessment of the Baltimore Police Department's ("BPD") crisis intervention program issued on February 9, 2024. That first assessment reviewed a statistically significant sample of behavioral health incidents from 2022 in which a BPD "Behavioral Health Form" was completed. The assessment, however, did not include cases involving a behavioral health incident where the Behavioral Health Form was not completed. To address that gap, the Monitoring Team conducted a review of a randomly selected, statistically significant sample of behavioral health incidents from 2022 in which a Behavioral Health Form was not completed even though the call for service was dispatched as a behavioral health crisis call. This addendum summarizes the results of that review. The Monitoring Team's key findings are that:

- Officers responding to behavioral health calls generally handled them well.
- In most cases, the officers were able to appropriately address the cause of the behavioral health call without taking the individuals in crisis to the hospital pursuant to an emergency petition or for voluntary admission.
- At the same time, officers did not appear to make use of alternative resources such as 988 or the mobile crisis team.
- CIT trained officers did not respond to the majority of behavioral crisis calls.
- In a majority of the behavioral health calls, the reviewers determined that the Behavioral Health Form should have been completed but was not.

With the exception of the use of community resources and the crisis intervention team, the results are encouraging. Consistent with the Monitoring Team's findings in its initial assessment of this area of the Consent Decree, the Monitoring Team found in this supplemental review that BPD has made an important shift in departmental culture in their response to individuals with behavioral health disabilities. BPD is making good use of de-escalation strategies, diverting calls from arrest and avoiding referrals for hospitalization.

Policy 712 Crisis Intervention Program requires all members to complete a Behavioral Health Form for all behavioral health-related calls for service for incidents involving a suicide attempt, behavioral health crisis, and all incidents involving persons with behavioral health disabilities. There are several legitimate reasons why a Behavioral Health Form might not be completed: the call included a person who was not found, EMS or another responder addressed the call, or the person was not in behavioral health crisis. The Monitoring Team found, however, that in a number of the reviewed cases the responding officer inappropriately failed to complete the form.

The Monitoring Team analyzed Computer-Aided Dispatch ("CAD") data of all behavioral health calls received from January 1, 2022, to December 31, 2022, using a review instrument form. During this period, BPD received a total of 5,480 calls for service that were labeled in its CAD system as behavioral health crisis calls, but for which the Behavioral Health Form was not completed in Axon. Every Behavioral Health call for service in the study period was numbered sequentially and a random selection applied. The Monitoring Team randomly selected a representative sample of 95 behavioral health-related of those calls for the review. This sampling method generated results at a 95% confidence level with a margin of error of plus or minus 10 percent.

The Monitoring Team members reviewed the body worn camera video and the officer's report of the incident when available. The review evaluated: 1) whether the dispatched calls *should* have resulted in a Behavioral Health Form, 2) if there was some other reason why the Behavioral Health Form was not completed, 3) whether the force was used and whether the officers used appropriate de-escalation techniques, and 4) whether the crisis intervention officers arrived at the scene. The results of each review were recorded on the standardized instrument.

1. **Type of incidents without a Behavioral Health Form**

BPD provided the Monitoring Team for each of the sampled cases: 1) the call type determined by the dispatcher and 2) the call type determined by the BPD member after responding to the scene. 46.3 percent of the reviewed calls were identified by the dispatcher as suicide attempts and 53.7 percent were identified by the dispatcher as behavioral crisis calls. The officer responding to these calls labeled them as follows (these include more categories than those used by the dispatcher).

Table 1. **Call Types Determined by the BPD Member**

| | |
|---|---|
| Suicide Attempts | 23 (24.2%) |
| Behavioral Crisis | 25 (26.3) |
| Disorderly Person | 12 (12.6%) |
| Family Disturbance | 7 (7.4%) |
| Sick Person | 13 (13.7%) |
| Property Destruction | 3 (3.2%) |
| Other | 12 (12.7%) |
| **Total** | **95** |

In addition to labeling the type of call, the responding officer also records a "disposition" for the call—noting how the call ended. The responding officers recorded a disposition of "no police service necessary*"* in 41.1% of the cases reviewed and "complainant abated" in 34.7% of

2

the cases reviewed. The BPD member recorded a disposition of "report written" (noting that an incident report was written) in 10.5 percent of the reviewed calls. The following is the breakdown of the dispositions recorded for each reviewed case.

Table 2. **Disposition for Dispatched Calls**

| Unfounded | 2 (2.1%) |
|---|---|
| Unable to Locate | 4 (4.2%) |
| No Police Service Necessary[1] | 39 (41.1%) |
| Gone on Arrival | 7 (7.4%) |
| Complainant Abated | 33 (34.7%) |
| Report Written | 10 (10.5%) |
| **Total** | **95** |

2. **Presence of Co-Responders**

In slightly less than half of the cases reviewed (47.4%), there was a co-responder at the scene. In all but a single case, the co-responder was the Baltimore City Fire Department, who supported the efforts of BPD to effectively resolve the situation. In one case, a private ambulance responded. In none of the cases reviewed was there a response by a mobile crisis team. In a total of 14 incidents (14.7%), the reviewer suggested that the call should be referred to a non-police service, such as a mobile crisis team. A total of 10 reviewed calls (10.4%) resulted in an emergency/hospital admission.

3. **Officers Responding to the Scene**

In at least 67 (70.5%) reviewed incidents, more than one officer responded to the scene. In more than half of the incidents (51.5%) neither a CIT officer nor a supervisor was on the scene.

4. **Need to Complete Behavioral Health Form**

From a total of 95 reviewed calls for service, the reviewers concluded that in at least 69.5 percent of these calls, the behavioral health form should be completed. In many of these cases, the police officers indicated that police services were not necessary, or the complaint was abated. However, the reviewers noted significant police services were provided. The reviewers found the officers often de-escalated the situation or offered problem-solving suggestions that were helpful to the individuals involved in the behavioral crisis event.

---

[1] A disposition no police service necessary refers to a variety of situations in which police involvement is not required to resolve a dispute or issues. This means the police are not needed to make an arrest, investigate a crime or handle the situation even though they were dispatched to the scene.

Table 3. **The Behavioral Health Form would be appropriate to complete**

| Yes | 66 (69.5%) |
|---|---|
| No | 26 (27.4%) |
| Unable to determine | 3 (3.2%) |
| Total | 95 (100.0%) |

**Findings**

*First*, **officers appropriately handled the reviewed behavioral health calls by using de-escalation techniques.** This finding is consistent with the Monitoring Team's findings in its initial assessment of events in which the Behavioral Health Form was completed. In most cases, officers used appropriate de-escalation techniques rather than force. The Monitoring Team, reviewing body worn camera video, found that officers engaged in de-escalation in one-third of the cases. In most of the remaining cases, de-escalation was not necessary because the person was calm and cooperative. In only four instances, the Monitoring Team concluded that additional de-escalation techniques, such as slowing down the pace, should have been attempted by the officers.

*Second,* **most behavioral health calls resulted in the officers resolving the crisis using options other than transportation to the hospital pursuant to an emergency petition or voluntarily.** In only 10.4% of the sampled cases were individuals transported to a hospital. Officers should be commended for making limited use of restrictive alternatives such as hospital admission or Emergency Petition. Additionally, officers often provided important assistance to EMS through de-escalating the situation.

*Third,* **in majority of the behavioral health calls, the reviewers determined that the Behavioral Health Form should have been completed**. The Monitoring Team found that BPD failed to complete a behavioral health form when they should have 69.5% of the cases.

*Fourth,* **CIT trained officers responded to a minority of behavioral crisis calls**. In the sample reviewed by the Monitoring Team, CIT officers and supervisors were present for fewer than a third of the calls (28.4%). BPD should determine the cause of the failure of CIT officers to respond to the events. The causes could include factors such as an insufficient number of trained CIT officers to meet the behavioral health call volume, failure of communications to dispatch the officers when a behavioral crisis event is identified, or supervisor resistance to allowing CIT officers to give behavioral health calls a priority.

*Fifth,* **in none of the reviewed cases there was a response of the mobile crisis team.** The reviewers found that close to 15.0% of the reviewed calls should have been referred to 988/a

Mobile Crisis Team. In another 15%, the reviewers did not have enough information to determine whether the case should have been referred to 988/a Mobile Crisis Team.