IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| | * | |
| *Plaintiff,* | * | CIVIL NO. 1:17-cv-00099-JKB |
| | * | |
| v. | * | |
| | * | |
| BALTIMORE POLICE DEPARTMENT, *et al.,* | * | |
| | * | |
| | * | |
| *Defendants.* | * | |

*******************************************************************************

**MEMORANDUM IN SUPPORT OF PARTIES' JOINT MOTION FOR PARTIAL
TERMINATION**

The United States of America and Defendants, the Mayor and City Council of Baltimore ("the City") and the Baltimore Police Department ("BPD"), collectively "the Parties," hereby jointly move this honorable Court to find Defendants in sustained compliance with three sections of the Consent Decree (ECF No. 2-2, as amended by ECF Nos. 39, 56, 89, 410, 851), and to sever and terminate those sections from the Decree. Specifically, the Parties request termination of the following sections: Section II: Community Oversight Task Force ("COTF"), Paragraphs 10-14; Section X: First Amendment Protected Activities ("First Amendment"), Paragraphs 239-256; and Section XV: Coordination with Baltimore City School Police ("School Police"), Paragraphs 416-418. Wherefore, the Parties respectfully submit this memorandum in support of the Parties' Joint Motion for Partial Termination (ECF No. 899).

## I.    INTRODUCTION

On January 27, 2025, the Court entered an order finding the City and BPD to be in Full and Effective Compliance with the paragraphs of the Decree related to COTF, First Amendment, and School Police based on the Monitoring Team's assessments and reports,[1] the United States' conclusion that the

_____

[1] The Monitoring Team completed assessments for each of the sections addressed here—a COTF assessment filed with the Court on November 8, 2024 (ECF No. 758), a First Amendment compliance review filed on October 1, 2024 (ECF No. 749),

City and BPD had reached Full and Effective compliance in these areas, and the Court's own review of the evidence. ECF No. 792 at 3. This meant Defendants had achieved sufficient compliance such that the one-year sustainment period ("the Sustainment Period") required by Paragraphs 504 (as amended by ECF No. 410) and 506 could begin. The Sustainment Period for these areas lasted from January 25, 2025 through January 25, 2026. ECF No. 792 at 7. During that time, Defendants have sustained compliance with the Consent Decree's requirements. The City and BPD's demonstrated capacity for self-assessment and self-correction during the Sustainment Period, as well as the United States and Monitoring Team's independent review of Defendants' compliance during this time, show that Defendants can sustain compliance in these areas in the future without court oversight.

Furthermore, the COTF, First Amendment, and School Police sections of the Decree are "sufficiently severable" from the Decree's other requirements such that "noncompliance with those other requirements does not implicate BPD's ability to police in accordance with federal law." ECF No. 2-2 ¶ 508. Ending jurisdiction over these sections will not impact the Court's oversight of the remaining sections of the Decree. Termination of these sections also will permit the City and BPD to focus their time, attention, and resources on achieving and maintaining compliance in the Decree's remaining areas. Thus, severing and terminating these sections of the Decree is consistent with Paragraph 508.

Because the City and BPD have successfully maintained sustained compliance for a one-year period for these sections, which are sufficiently severable from the remaining areas of the Decree, the Parties respectfully submit that their Joint Motion (ECF No. 899) should be granted.

## II.    BACKGROUND

In 2016, the United States Department of Justice issued a report detailing the findings of an

---

and a School Police compliance review and outcome assessment filed on October 17, 2024 (ECF No. 752). The Monitoring Team's compliance reviews and assessments are "based on data and documents that reflect not just a single point in time, but rather BPD's operations on a daily basis over a significant period of time. As a result, they show that 'each material requirement' of these sections of the Decree 'is being carried out in practice' ([ECF No. 2-2] ¶ 506(a))." ECF No. 779 at 22.

investigation into BPD. The United States concluded that it had reasonable cause to believe that BPD was engaged in a pattern or practice of conduct that violated the Constitution and federal law. In 2017, the Parties agreed to resolve the United States' allegations through a Consent Decree (ECF No. 2-2) that was entered as an order of this Court in April 2017 (ECF No. 39). The Decree requires changes to City and BPD policies, practices, training, supervision, and accountability systems, with the goal of ensuring that "the City and BPD protect individuals' statutory and constitutional rights, treat individuals with dignity and respect, and promote public safety in a manner that is fiscally responsible and responsive to community priorities." ECF No. 2-2 ¶ 1. The Decree includes sections covering First Amendment protected activities (ECF No. 2-2 ¶¶ 239-56), the Community Oversight Task Force (*id.* ¶¶ 10-14), and coordination with the Baltimore School Police (*id.* ¶¶ 416-18). Since 2017, the City and BPD have worked to implement the Decree with assistance and oversight from the United States and the Court-appointed Monitoring Team. The Monitoring Team has conducted compliance reviews to determine whether the Decree's requirements are "being carried out in practice" (*id.* ¶ 506).

The Decree also includes a description of the process through which the City and BPD ultimately can reach compliance, leading to the Decree's eventual dissolution. *Id.* ¶¶ 442-510. First, to achieve Full and Effective Compliance, the City and BPD must "demonstrate that they have (a) incorporated all Material Requirements of th[e] [Decree] into policy, trained relevant personnel as necessary to fulfill their responsibilities pursuant to the material requirements, and ensured that each material requirement is being carried out in practice; and (b) shown sustained and continuing improvement in constitutional policing as demonstrated by the [Decree]'s Outcome Assessments." *Id.* ¶ 506. No "specific numerical test" exists. *Id.* Rather, so long as Defendants are "demonstrating substantial adherence with the Material Requirements, continual improvement, and [that] the overall purpose of the Material Requirements has been met," Full and Effective Compliance will have been demonstrated. *Id.*

Next, once Full and Effective Compliance is achieved, a one-year sustainment period applies to

the areas of COTF, First Amendment, and School Police. *Id*. ¶ 504.a, as amended by ECF No. 410. After the Sustainment Period, the City and BPD are permitted to move "at any time" the Court to terminate portions of the Decree "upon a showing by a preponderance of evidence that the BPD has reached Full and Effective Compliance and maintained that compliance" during the required time period. ECF No. 2-2 ¶¶ 507-08. To terminate only a portion of the Decree, "that part must be sufficiently severable from the other requirements of the [Decree]" such that "noncompliance with those requirements does not implicate BPD's ability to police in accordance with federal law and th[e] Decree in the part to be terminated." *Id.* ¶ 508.

Now, after years of dedicated work from the Parties, a series of successful assessments by the Court's Monitoring Team, and sustained compliance for one year in the areas of COTF, First Amendment, and School Police, the Parties respectfully move this Court to find that Defendants have, in fact, maintained compliance during the Sustainment Period and that these sections of the Decree are sufficiently severable such that they may terminated pursuant to Paragraph 508.

### III.    ARGUMENT

**A. BPD Has Maintained Compliance During the Sustainment Period in the Areas of Community Oversight Task Force, First Amendment Protected Activities, and Coordination with Baltimore City School Police Force.**

Pursuant to Paragraphs 507 and 508 of the Decree and an order of this Court dated October 17, 2024 (ECF No. 753), the Parties filed a Joint Motion for Partial Declaration of Full and Effective Compliance for the areas of COTF, First Amendment, and School Police on December 13, 2024. ECF No. 777. Both parties filed a memorandum in support of the joint motion detailing the evidence supporting a finding of Full and Effective Compliance for these sections of the Decree, including the Monitoring Team's assessments and compliance reviews and Defendants' self-assessments and self-reporting. ECF Nos. 778, 779. On January 23, 2025, this Court heard argument from the Parties on the Joint Motion (ECF No. 777) and supporting memoranda (ECF Nos. 778,779), as well as recommendations from the

Monitoring Team. ECF No. 753, 790.

On January 27, 2025, the Court entered an order finding the City and BPD to be in Full and Effective Compliance with the paragraphs of the Decree related to COTF, First Amendment, and School Police based on the Monitoring Team's assessments and reports, the United States' conclusion that the City and BPD had reached Full and Effective Compliance in these areas, and the Court's own review of the evidence. *See* ECF No. 792. For example, the Monitoring Team's outcome assessment related to First Amendment protected activity demonstrated that BPD had shown "sustained and continuing improvement" in this area of the Decree. ECF No. 779 at 22. Indeed, the Monitoring Team's assessments in these three areas "collectively, show[ed] that the City and BPD are consistently complying with the First Amendment protected activities, COTF, and coordination with school police requirements of the Decree, and any noncompliance has only been temporary or isolated." *Id*. The Court's Order dated January 27, 2025 also set deadlines for Defendants to file self-assessment plans for First Amendment and School Police. ECF No. 792 at 7-8. No self-assessment plan for COTF was necessary "as the task force has fulfilled its responsibilities under the Decree and has no continuing obligations." ECF No. 779 at 23.

The one-year sustainment period for these areas began on January 25, 2025 and ended on January 25, 2026. ECF 792 at 7. During the Sustainment Period, the City and BPD assumed greater responsibility for monitoring their own compliance, rather than relying on oversight and assessments from the Monitoring Team. To prepare for this, the City and BPD submitted sustainment plans which were reviewed and approved by the United States and Monitoring Team. *See* ECF Nos. 798, 799. After the Sustainment Period concluded, the City and BPD filed a Sustainment Report, which detailed their compliance and assessment efforts and demonstrated that, by a preponderance of the evidence, they have met their burden in maintaining compliance in the area of First Amendment. ECF No. 897. No Sustainment Report was required for School Police. ECF No. 798-1 at 2. As the Community Oversight Task Force fulfilled all its responsibilities prior to the beginning of the Sustainment Period, no action was necessary during the

Sustainment Period. ECF 779 at 23.

### 1. Community Oversight Task Force

#### a. The Consent Decree's Requirements on Community Oversight Task Force

Section II of the Decree addresses the Community Oversight Task Force ("COTF"). *See* ECF No. 2-2 ¶¶ 10-14. The COTF was established contemporaneously with the Consent Decree, and is comprised of five members of the community, as appointed by the Baltimore City Mayor. *Id.* ¶ 11. Chief among the COTF's responsibilities was reviewing the Civilian Review Board ("CRB"), which allowed a civilian complaint process to seek accountability for alleged police misconduct. *Id.*[2]

At its core, the COTF was tasked with reviewing the interplay between civilian and community oversight of BPD, and was empowered to make recommendations to improve this relationship. *Id.* ¶ 13. The Consent Decree required COTF to present a public report on its recommendations and allowed for a public comment period on this report. *Id.* ¶ 14. The final report was then required to be published on Baltimore City's website for the duration of the Agreement. This report also has been published on BPD's website since 2018.[3]

#### b. Sustainment Efforts Related to Community Oversight Task Force

As discussed *supra*, no further action was required regarding COTF during the Sustainment Period as the Task Force fulfilled all its requirements prior to the start of the Sustainment Period. In its memorandum in support of the Parties' Joint Motion for Full and Effective Compliance, the United States noted that "although the COTF recommendations are not binding on the City or BPD, a number of its overall goals have come into fruition—as evidenced by BPD's commitment to strengthen police-resident relations through its implementation of community policing policies and training, BPD's restructuring of

---

[2] The COTF "recommended that the City completely replace the CRB with a new design." ECF No. 758 at 15. The City subsequently passed legislation sunsetting the CRB; therefore, the CRB no longer accepts cases for review as of January 1, 2025. The Police Accountability Board ("PAB") and Administrative Charging Committee ("ACC") now handle many oversight functions previously managed by the CRB. MD. CODE ANN., PUB. SAFETY, § 3-102; BALTIMORE CITY CODE, art. 1, §11.

[3] Available online at https://consentdecree.baltimorecity.gov/cotf_members (last accessed March 4, 2026).

its community policing practices in order to improve officer engagement and problem-solving, and the legislatively-mandated Administrative Charging Committee, which has the authority to make disciplinary recommendations that the police commissioner must either adopt or impose a higher degree of discipline." ECF No. 779 at 22.

Since the Task Force has met all its obligations and the Sustainment Period has elapsed, the Parties agree that the City and BPD have achieved sustained compliance in this area.

### 2. First Amendment Protected Activities

#### a. The Consent Decree's Requirements on First Amendment Protected Activities

Section X of the Consent Decree outlines provisions related to individuals' First Amendment rights and spans eighteen paragraphs. ECF No. 2-2 ¶¶ 239-56. This section requires BPD to: (1) update policies and training related to individuals' First Amendment rights (*id.* ¶¶ 239, 246, 251); (2) ensure proper supervision and assessment of members encountering individuals exercising their First Amendment rights (*id.* ¶¶ 252-26); (3) ensure individuals' First Amendment rights to criticize law enforcement or engage in expressive activity (*id.* ¶¶ 240-44); (4) safeguard individuals' rights to engage in lawful public protest or assembly (*id.* ¶ 245); and (5) protect individuals' right to observe and record police officers performing their law enforcement duties in public, so long the individuals recording are not jeopardizing public safety or interfering with law enforcement actions (*id.* ¶ 247).

#### b. Sustainment Efforts Related to First Amendment Protected Activities

Defendants have met or exceeded expectations for this area of the Decree. In September 2018, the Monitoring Team approved BPD's revised policies related to the First Amendment. ECF No. 140. Over the years, BPD has conducted extensive training in this area as well. *See* ECF Nos. 396, 437, 532. In February 2020, BPD filed its first annual assessment in this area, which reviewed police encounters with civilians from the calendar year 2019. ECF No. 287. Since then, BPD has completed five more annual self-assessments resulting in published reports. ECF Nos. 440, 523, 630, 830, 837.

In September 2020, the Monitoring Team completed a comprehensive re-assessment of all areas of the Consent Decree. ECF No. 342-1. Regarding First Amendment Protected Activities, the Monitoring Team conducted real-time, first-person observations of BPD's response to protest activity regarding the death of George Floyd. *Id*. at 71. On eight different days and nights between May 29 and June 13—all the days and nights that featured significant protest activity in that period—the Monitoring Team observed, either in the field or via live video feeds from BPD's command center, how BPD commanders directed officers on the street to respond to protesters and how officers responded to the directives from their commanders or otherwise carried out their duties during the protest activity. *Id*. The Monitoring Team found that:

> Commanders [ ] emphasized the prudence of allowing protestors to peacefully occupy public spaces and march through the streets without interference, even when assembling and marching has caused temporary traffic disruptions. Commanders [ ] similarly emphasized the need for restraint in the face of direct verbal provocation and have deftly handled potentially volatile events.

*Id*. at 72. Furthermore, based on dozens of hours of observation, the Monitoring Team concluded: "BPD's response to the protests [ ] complied with both the Constitution and the Consent Decree. BPD [ ] allowed community members to assemble in public spaces and march on public streets and sidewalks without intervention; deliver speeches denouncing law enforcement and criticize officers face-to-face without restriction or retaliation; and make video and audio recordings of police activity without impediment." *Id*.

In October 2024, the Monitoring Team conducted a compliance review regarding BPD's handling of First Amendment Protected Activities and recommended that this Court find BPD in Full and Effective Compliance with the First Amendment requirements of the Decree. ECF No. 749. Specifically, the Monitoring Team stated: "Having conducted thorough training and implemented first-rate policies reflecting national best practices on First Amendment-protected activities, BPD has put in appropriate measures to eliminate what the Department of Justice ("DOJ") found in its 2015-16 investigation to be an unconstitutional pattern or practice of retaliating against individuals who criticize police conduct or

engage in protest activity." *Id*. at 5. The Monitoring Team's assessment evaluated several areas to determine that BPD was in Full and Effective Compliance.

The Monitoring Team found that during the 2020 protests, BPD complied with the First Amendment. *Id*. at 6. For example, none of the seven arrests BPD made for failing to obey a dispersal order during the 2020 protests violated the First Amendment. *Id*. The Monitoring Team also found no evidence that BPD officers failed to comply with the Consent Decree's requirements for the handling of protest activity in its review of randomly selected officer body worn camera ("BWC") video footage; incident action plans ("IAPs"), after-action reports, and other documentation; and video from BPD's police helicopter "Foxtrot" from the 2020 protests. *Id*. Furthermore, BPD did not interfere with protestors' ability to assemble and demonstrate, although the Monitoring Team did identify isolated incidents of excessive use of force that went unaddressed by BPD. *Id*. Finally, there was no evidence that officers inappropriately seized any recording equipment used to capture police activity or otherwise interfered with video recording activity. *Id*.

The Monitoring Team's 2024 assessment also concluded that "BPD has a well-operating internal audit function that provides feedback on how to improve protections for First Amendment activity." *Id*. at 7. This finding was based on the Monitoring Team's review of BPD's internal audits in this area, which confirmed the accuracy of BPD's findings and led the Monitoring Team to determine that BPD had satisfied the Consent Decree's requirements. *Id*. Finally, the Monitoring Team found that "BPD has implemented clear policies and conducted thorough training on protecting First Amendment rights." *Id*.

After this Court found Defendants had achieved Full and Effective Compliance in the area of First Amendment Protected Activities (ECF No. 792), BPD filed a Sustainment Plan, which the United States and the Monitoring Team reviewed and approved, on February 7, 2025. ECF No. 799. The Sustainment Plan outlined specific steps and timelines for BPD's self-assessments by BPD's Performance Standards

Section ("PSS").[4] *Id.*

The Parties agreed that the methods BPD used to conduct its annual assessments would serve as the primary basis for its self-assessment of Paragraphs 240-245, 250, and 252-256 during the Sustainment Period. When the Monitoring Team conducted its assessment of this area in 2023 (filed with the Court on October 1, 2024), they used a similar method. *See* ECF No. 749. The Sustainment Plan required BPD to review a sample of incidents for which at least one of the charges was loitering, obstructing, or hindering, disorderly conduct that disturbs the peace, or failure to obey. *See* ECF No. 799-1 at 2-3. For the purposes of BPD's annual reports and Sustainment Report, these charges are generally referred to as "Disorderly Conduct Arrests."

The Parties and Monitoring Team agreed that an in-depth review of "Disorderly Conduct Arrests" might offer a window into how BPD responds to the public's exercise of First Amendment rights for incidents outside of the protest context. Excluded from the sample were arrests with serious co-occurring crimes, such as driving under the influence and larceny, because such arrests would have occurred regardless of the "Disorderly Conduct Arrest" charge. *See id.* at 2. The Parties agreed that the same review instrument used in the "Disorderly Conduct Arrest" assessment would also be used for any arrests that occurred during protest events. *Id.* at 3. The Sustainment Plan for Paragraphs 240-245, 250, and 252-256 also included a review of BPD's response to protest activity and First Amendment misconduct complaints submitted to BPD's Public Integrity Division (PID), including those found during the protest activity review, "Disorderly Conduct Arrest" assessment, and BPD's routine use of force and body-worn camera reviews. *See* ECF No. 799-1.

Finally, during the Sustainment Period, Defendants submitted quarterly reports with supporting documentation to the United States and Monitoring Team, which culminated in a final First

---

[4] PSS is an auditing body within BPD that also investigates and documents compliance in areas such as uses of force, transports of persons in custody, and adherence to the body-worn camera policy. ECF No. 801-1 at 13.

Amendment Protected Activities Sustainment Report filed on March 5, 2026. *See* ECF No. 897-1.

In short, BPD's review of First Amendment protected activities identified during the Sustainment Period underscores a department-wide commitment to balancing public safety with the protection of constitutional rights. For the "Disorderly Conduct Arrest" assessment, PSS reviewed a total of 65 randomly selected arrests and found only three cases that involved a potential First Amendment violation and reported them to PID. ECF No. 897-1 at 10. In addition to these three cases, PID received four other complaints. *Id.* at 11. At the time of the Sustainment Report's filing, five of the cases were open and two were resolved as unfounded. *Id.* at 5.

Regarding protest events, during the Sustainment Period, BPD identified 134 potential protest events, including events described/labeled as "protest," "rally," "march," "demonstration," or "candlelight vigil." *Id*. at 12. BPD reviewed whether the events required Operational Plans ("OP"), Incident Action Plans ("IAP"), or "After Action Reviews" ("AAR") to determine the scale of the event and if it required a "significant police response." *Id*. Of those 134 events, only 13 required an OP or IAP, and of those 13, only six required a "significant officer response" (i.e. where reporting showed that five or more officers physically responded to or were deployed to the event). *Id*. Additionally, there were two notable events and one reoccurring event that did not have IAPs but were reviewed by PSS. *Id*. at 13. A review of the nine protest events that occurred during the Sustainment Period revealed that BPD did not make any arrests, give dispersal orders, or use force. *Id*. at 19.

In addition to conducting protest event reviews, the Sustainment Plan also required BPD to invite the Monitoring Team to Baltimore City's Emergency Operations Center ("EOC")[5] if activated for protest events. ECF no. 799-1 at 2. During the Sustainment Period, the EOC was activated only once in response

---

[5] The EOC is activated for multi-agency monitoring of the large-scale events (e.g, the Running Festival), which includes anticipated large-scale protests. The EOC is managed by Baltimore City's Office of Emergency Management ("OEM"). During events, it is overseen by an Incident Commander, a BPD sworn member, and staffed by representatives of various agencies involved in coordinating services and mitigating incidents. *See* ECF No. 897-1 at 10-11.
.

to a protest event, the May Day Rallies on May 1, 2025, and a representative from the Monitoring Team was in attendance. ECF No. 857 at 67.

During the Sustainment Period, BPD not only achieved sustained compliance, but also maintained a high level of professionalism, protected public safety, and safeguarded the rights of individuals lawfully exercising their First Amendment rights. *See, e.g.*, *id*. at 67. By utilizing comprehensive OPs, IAPs, aerial oversight by BPD's Foxtrot Unit, and, at one point, the EOC, BPD successfully managed notable demonstrations without any reported arrests, dispersal orders, or uses of force. ECF No. 897-1 at 19. Each major event remained peaceful, with many participants expressing appreciation, including through BPD's public portal, for the professional and facilitating roles of the officers involved.

In summary, BPD has achieved compliance through a multi-faceted and long-term commitment to protecting First Amendment rights, anchored by a consistent track record of annual assessments conducted since 2019 to ensure transparency and self-correction. BPD has continued this commitment during the Sustainment Period. For these reasons, the Parties agree Defendants have met the requirements needed to achieve compliance.

### 3.  Coordination with Baltimore City School Police Force

#### a.  The Consent Decree's Requirements on Coordination with Baltimore City School Police Force

Section XV of the Consent Decree addresses BPD's coordination with the Baltimore School Police ("BSP") and covers three paragraphs. ECF No. 2-2 ¶¶ 416-18. The relationship between BPD and BSP is memorialized, in part, in a Memorandum of Understanding ("MOU") between the two law enforcement agencies. The initial MOU, dated February 2, 2016, allowed BSP to operate and conduct its business throughout the City. The Consent Decree requires BPD to conduct an initial assessment of BSP to determine how it has used its law enforcement powers throughout the City, pursuant to the MOU. *Id.* ¶ 417. BPD must assess any deficiencies and opportunities for improvement and implement and document

12

corrective action. *Id*. Additionally, BPD was required to conduct a biennial evaluation of its improvement efforts and modify those efforts as necessary to ensure effective coordination with BSP. *Id.*

      **b.**  **Sustainment Efforts Related to Coordination with Baltimore City School Police Force**

Prior to the implementation of the Consent Decree, BSP did not maintain adequate records or data about its law enforcement activities under the MOU. As a result, there were no reliable methods to help BSP and BPD evaluate how the two agencies collaborated. In 2020, BPD entered a new MOU with BSP. ECF 752 at 11. In keeping with the goals set forth in the Consent Decree, this MOU improved data collection and use of force reporting. *Id*. The MOU was updated again in April 2023, following BPD's initial assessment and first biennial assessment of BSP and BPD collaboration. *Id.* at 63. As the Monitoring Team's Assessment noted, "nothing that occurred during the review period indicated any problems with the operation of the MOU or raised any concerns about Consent Decree compliance." *Id.*

The 2023 MOU provides that both BPD and BSP must "cooperate with one another's administrative investigations when both agencies' officers are involved in the investigation" and requires the parties to "periodically discuss policies and protocols governing civilian complaints involving [BSP] officers exercising law enforcement power outside its Primary Jurisdiction." *Id*. at 64. In 2024, BPD's Public Integrity Division shared training materials and other documents related to its investigations with BSP. ECF No. 778 at 9.

On February 7, 2025, Defendants filed their Sustainment Plan with respect to School Police, which was approved by the United States and the Monitoring Team. ECF No. 798. The Parties agree that the Sustainment Plan did not need a method of assessment for Paragraph 416, but the Sustainment Plan did require BPD to self-assess Paragraphs 417 and 418, which are related to the MOU. ECF No. 798-1. The approved Sustainment Plan required the following: "Edit the 2023-2026 MOU based on recommendations from latest biennial assessment, if school police agrees, by December 2025." *Id*. at 2. The Sustainment Plan further required BPD to provide quarterly updates on the MOU edits to the United States and

Monitoring Team via email. *Id.*

In accordance with the Sustainment Plan (ECF No. 798-1), BPD supplied updates on MOU negotiations to the United States and Monitoring Team on April 9, 2025, August 14, 2025, November 13, 2025, and January 26, 2026. Since that last update, BPD met internally to review BSP's proposed edits and then met with the attorney for the City assigned to the School Police section twice more. BPD currently is reviewing the latest draft and expects to finalize the revised MOU before the current MOU expires in April 2026.

Thus, the Parties agree that Defendants have sustained compliance during the Sustainment Period. Defendants have demonstrated substantial adherence with all material requirements of the Decree with respect to School Police. The BPD-BSP MOU has been revised twice over the last nine years and is posed to be improved again. BPD has provided support and assistance to BSP when necessary. Although the most recent revision of the MOU has not yet been completed, BPD reports that its finalization is imminent.

### B. The Sections Are Severable from the Rest of the Decree.

The Consent Decree outlines a process by which the Parties may request that this Court sever and terminate specific portions of the Decree without impacting the remaining sections. ECF No. 2-2 ¶¶ 508-510. For the Court to terminate a part of the Decree, "that part must be sufficiently severable from the other requirements of the [Decree] that noncompliance with those other requirements does not implicate BPD's ability to police in accordance with federal law and this [Decree] in the part to be terminated." *Id.* ¶ 508. Here, the areas of COTF, First Amendment, and School Police are sufficiently severable from the remainder of the Consent Decree provisions.

For example, the Court already has determined that COTF is sufficiently severable (ECF No. 792 at 5-6), even though it intersects with Section XIV: Misconduct Investigations and Discipline. The COTF section is largely self-contained, with distinct remedies and requirements that BPD and the City have met. ECF No. 779 at 23. BPD's compliance with Section XIV's requirements regarding misconduct and

discipline will continue to be monitored and assessed by the United States and Monitoring Team even if COTF is severed from the Decree. Additionally, this Court will retain its jurisdiction and oversight over Section XIV. Thus, the Parties agree that COTF is sufficiently severable such that it may be terminated from the Decree without impacting the remainder of the Decree.

Similarly, the Parties agree School Police is sufficiently severable from the Decree even though the Decree also contains a section regarding BPD's interactions with youth. *See, e.g.*, ECF No. 2-2 ¶¶ 218-21. Defendants have met their obligations under the Decree to aid BSP in improving their recordkeeping, data collection, and law enforcement activities in accordance with best practices under the Decree. *See, e.g.*, ECF Nos. 778, 779. BPD's interactions with youth will continue to be monitored and assessed by the United States and Monitoring Team even if the School Police section of the Decree is severed and terminated. Additionally, this Court will retain its jurisdiction and oversight over Section VIII of the Decree: Interactions with Youth. Thus, the Parties agree the School Police section of the Decree is sufficiently severable such that it may be terminated from the Decree without impacting the remainder of the Decree.

The First Amendment section of the Decree also is sufficiently severable. The Parties agree, and the Court has already found (ECF No. 792 at 4-5), that this area is severable. To the extent that a person's exercise of his or her First Amendment rights interacts with other law enforcement activity (e.g., during an arrest), the United States and Monitoring Team will continue to monitor and assess BPD's policies, practices, and procedures, as well as individual incidents, as necessary and appropriate. Additionally, this Court will retain its jurisdiction and oversight over the remaining sections of the Decree. Thus, this section is sufficiently severable such that it may be terminated from the Decree without impacting the remainder of the Decree.

Finally, by beginning to narrow the areas of non-compliance, the Court will assist the Parties and Monitoring Team in focusing their attention on the remaining portions of the Decree, over which the Court

will retain jurisdiction and oversight. Therefore, it is appropriate for this Court to find that the COTF, First Amendment, and School Police areas of the Decree are sufficiently severable from any remaining sections such that the Court may terminate these sections if the Court finds that BPD has maintained compliance during the one-year sustainment period.

## IV.   CONCLUSION

For the reasons stated herein, this Court should find that the City and BPD have maintained compliance for the applicable one-year sustainment period for the sections of the Consent Decree related to COTF, First Amendment, and School Police. The Court should further find that those areas are severable from the remainder of the Decree, and, thus, terminate those sections.

[SIGNATURES ON FOLLOWING PAGE]

Respectfully Submitted,

HARMEET K. DHILLON
Assistant Attorney General

R. JONAS GEISSLER
Deputy Assistant Attorney General

PATRICK MCCARTHY
Acting Chief
Special Litigation Section

 /s/
SURAJ KUMAR
Trial Attorney
Special Litigation Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 598-1211
Fax: (202) 514-0212
Email: suraj.kumar@usdoj.gov

*Counsel for the United States of America*

EBONY THOMPSON
City Solicitor

 /s/
NATALIE R. AMATO
Chief Counsel for Consent Decree

STEPHEN T. SALSBURY
Deputy City Solicitor

JUSTIN S. CONROY
Chief Counsel

Baltimore City Department of Law
100 N. Holliday Street, Suite 101
Baltimore, Maryland 21202
T: 410.396.2496
F: 410.396.2126
stephen.salsbury@baltimorecity.gov
justin.conroy@baltimorepolice.org
natalie.amato@baltimorepolice.org

*Counsel for Baltimore Police Department and the
Mayor and City Council of Baltimore*

## **CERTIFICATE OF SERVICE**

I certify that the foregoing Memorandum in Support of the Parties' Joint Motion for Partial Termination was served through the Court's electronic filing service on March 12, 2026, giving notice to all registered parties.


_/s/_____

Natalie R. Amato (20749)
Chief Counsel for Consent Decree