# BALTIMORE POLICE DEPARTMENT CONSENT DECREE MONITORING TEAM

## COMPLIANCE REVIEW & OUTCOME ASSESSMENT REGARDING SEXUAL ASSAULT

April 2026



CD
Monitoring
Team

**TABLE OF CONTENTS**

Page

I. EXECUTIVE SUMMARY ........................................................................................ 1

II. BACKGROUND ...................................................................................................... 3

    A. The Department of Justice's Investigative Findings Regarding Sexual Assault Investigations ................................................................................. 3

    B. Consent Decree Requirements ...................................................................... 4

III. SCOPE OF THE REVIEW AND METHODOLOGY .......................................... 7

    A. Scope of Review ............................................................................................ 7

    B. Methodology ................................................................................................. 7

    1. Sexual Assault Investigation Audit ............................................................. 7

    2. Outcome Assessment .................................................................................... 9

    C. Determining Compliance Status ................................................................... 9

IV. BPD's SEXUAL ASSAULT INVESTIGATION IMPLEMENTATION PROGRESS TO DATE .......................................................................................... 14

    A. Sexual Assault Investigator Training ......................................................... 14

    B. Policy and Standard Operating Procedures ................................................ 17

V. SEXUAL ASSAULT INVESTIGATION COMPLIANCE REVIEW .............. 18

    A. Data Collection (CD ¶ 264) ....................................................................... 18

    a. Basic Information ........................................................................................ 18

    b. Victim Details ............................................................................................. 20

    B. Investigations ............................................................................................. 21

    a. Assignment to Detectives .......................................................................... 22

    b. Forensic Exams .......................................................................................... 22

    c. Victim Contacts .......................................................................................... 22

        i. Initial Patrol Officer Contact ......................................................... 23

        ii. SOU Interviews .............................................................................. 24

        iii. Other Requirements ....................................................................... 25

    d. Witness Interviews ..................................................................................... 26

    e. Suspect Interviews ..................................................................................... 27

    f. Other Investigative Steps ........................................................................... 27

    g. Overall Quality of the Investigation .......................................................... 28

    h. Other Consent Decree Requirements ......................................................... 30

        i.     Compliance Determination ................................................................................. 30

        C.    Administrative Reviews...................................................................................... 31

VI.    FOURTH-DEGREE SEXUAL OFFENSE INVESTIGATIONS .................................... 31

VII.   OUTCOME ASSESSMENT RESULTS............................................................................ 32

        A.    Paragraph 459(k)(i): Number of sexual assault reports made to BPD.................. 32

        B.    Paragraph 459(k)(ii): Rate of victim participation in BPD sexual assault
            investigations ..................................................................................................... 35

        C.    Paragraph 459(k)(iii): Clearance rate in sexual assault cases and Paragraph
            459(k)(iv): Rate of declination of sexual assault cases referred to
            Baltimore City State's Attorney's Office for prosecution ................................... 35

VIII.  COMPLIANCE ASSESSMENT CONCLUSIONS........................................................... 39

## I.    EXECUTIVE SUMMARY

Paragraph 260 of the Consent Decree contains steps that the Baltimore Police Department ("BPD" or "the Department") must take in its investigations of reports of sexual assault, and Paragraph 262 prescribes the manner in which BPD must supervise these types of investigations.[1]

The following report assesses BPD's compliance with paragraphs 258 to 260, 262 and 264. The assessment is based on the Monitoring Team's review of a random sample of sexual assault investigations opened by the Sex Offense Unit ("SOU") between July 1, 2023, and September 30, 2024.[2] The start of this timeframe followed: (1) BPD's implementation of a new records system, which addressed the documentation deficiencies described in the Monitoring Team's previous assessment of this area, and (2) BPD's implementation of revised policies, standard operating procedures, and training.

This report also contains the outcome assessment required by Paragraph 459(k) to assess whether BPD responds to sexual assault in a nondiscriminatory manner that complies with the Constitution and federal law, and improves the safety and security of sexual assault victims in Baltimore. The outcome assessment reviews (1) the total number of sexual assault reports made to BPD; (2) the rate of victim participation in BPD sexual assault investigations; (3) the clearance rate of sexual assault cases; and (4) the rate at which the Baltimore State's Attorney's office declines sexual assault cases that BPD refers for prosecution.

This assessment identified areas of meaningful improvement in BPD's handling of sexual assault investigations. The Monitoring Team reviewers observed more consistent efforts by detectives to collect DNA evidence and submit it for laboratory analysis, unlike prior DOJ findings that BPD persistently neglected to request lab testing of rape kits and other forensic evidence. Additionally, BPD has made progress in collecting and reviewing data related to sexual assault cases. While classification issues remain in some instances, BPD has strengthened its capacity to capture and report basic information about victims, suspects, and the nature of reported cases—marking a clear improvement from the deficiencies previously cited by the DOJ.

The Monitoring Team's assessment, however, echoes several concerns previously identified by the DOJ regarding BPD's handling of sexual assault investigations. The Monitoring Team found insufficient evidence of efforts to identify and interview all witnesses, as well as inadequate evidence of follow-up when witnesses were not reached during initial contact attempts. The Monitoring Team also observed that BPD frequently failed to identify and pursue serial offenders. Supervisory oversight also showed room for improvement. While the mandated supervisory

---

[1] Consent Decree, United States of America v. Police Department of Baltimore City, et al., No. 1:17-cv-00099-JKB (D. Ma. Jan. 12, 2017) ECF No. 2-2 ("Consent Decree" or "CD").

[2] Sex crime investigators from the SOU and Child Abuse units were combined to form the "Sex Crimes Unit." Because the SOU still existed for most of the reviewed period, this report refers to it rather than the Sex Crimes Unit.

reviews required under the Consent Decree are occurring, their quality is lacking, with written reviews often containing non-substantive, repetitive entries copied from one review to the next, and most importantly, the reviews are failing to correct the deficiencies in the investigations noted above.

**Summary of Findings**

The primary takeaways from the Monitoring Team's compliance audit and outcome assessment include:

1. **Training**. BPD, in consultation with DOJ and the Monitoring Team, has developed and implemented all of the training required by Consent Decree paragraph 259. The Monitoring Team concludes that BPD is in initial compliance with these requirements.

2. **Data collection and reporting**. The Monitoring Team finds that BPD is collecting data and reporting that data as required by paragraph 264 of the Consent Decree and thus concludes that BPD is in initial compliance with this requirement.

3. **Policies**.  BPD has issued written policies covering the areas described in Consent Decree paragraph 258.  BPD, however, has not yet demonstrated that it is consistently following those policies in practice, and in particular, must show that officers and detectives follow the victim-centered, trauma-informed strategies required by paragraph 258.

4. **Investigation Practices.** Several cases reviewed by the Monitoring Team demonstrated strong investigative practices consistent with policy, including effective victim engagement and thorough documentation—all improvements from the prior assessment. In other cases reviewed by the Monitoring Team, however, investigative steps were still incomplete or improper, or, at a minimum, not documented. BPD must continue to work to ensure investigators take all appropriate investigative steps. BPD must (1) ensure trauma-informed, victim-centered techniques are conducted more consistently; (2) improve efforts to interview witnesses and suspects; (3) ensure that key investigative steps are taken and documented; and (4) improve the overall quality of investigations.

5. **Supervisory Review.** While BPD has demonstrated that supervisors are consistently reviewing sexual assault investigative reports within 48 hours, supervisors are still not correcting the investigative deficiencies noted above. BPD will need to improve the quality of its supervisory reviews to ensure investigative reports are complete and thorough.

6. **Fourth Degree Assault Cases.** The Monitoring Team deferred the assessment of Fourth Degree cases to the next assessment period to work with BPD on clarifying what should be assessed and how compliance will be defined. These cases were therefore not assessed during this period and will be reviewed in full during the next assessment of this area.

## II.    BACKGROUND

### A.    The Department of Justice's Investigative Findings Regarding Sexual Assault Investigations

The United States Department of Justice's ("DOJ") findings pursuant to its pattern or practice investigation into the Baltimore Police Department "raised serious concerns about how BPD responds to and investigates reports of sexual assault."[3]

First, DOJ identified "evidence of gender bias in BPD's response to sexual assault."[4]  Based on information from victim advocates, victims, and a review of sexual assault case files and related documents, DOJ found that officers in the Sex Offense Unit "often question victims in a manner that puts the blame for the sexual assault on the victim's shoulders," and that officers and detectives "asked questions suggesting that they discredit the reports of victims who delayed in reporting the assault to the police."[5] DOJ also found that detectives made statements "suggesting an undue skepticism of reports of sexual assault" and indications that "BPD disregards reports of sexual assault by people involved in the sex trade."[6] Additionally, DOJ "received allegations of BPD officers' mistreatment of transgender individuals and have concerns that BPD's interactions with transgender individuals reflect underlying unlawful gender bias."[7]

Second, DOJ found that "BPD seriously and systematically under-investigates reports of sexual assault, and the sexual assault investigations it does conduct are marked by practices that significantly compromise the effectiveness and impartiality of its response to sexual assault."[8] DOJ determined that despite prior efforts at reform in this area, BPD's sexual assault investigations suffered from the following deficiencies:

- "Failure to Develop and Resolve Preliminary Investigations."[9]  DOJ observed that in the majority of sexual assault cases, BPD failed to "pursue investigations beyond the immediate, preliminary response to a report of sexual assault."[10]

- "Failure to Identify and Collect Evidence to Corroborate Victims' Complaints."[11] DOJ highlighted that BPD was not proficient in "identifying and interviewing witnesses, gathering other types of evidence" such as surveillance footage, ineffective in

---

[3] DOJ Findings Letter at 122.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] DOJ Findings Letter at 123.
[9] *Id*. at 124.
[10] *Id.*
[11] *Id.*

"identifying and interrogating suspects", and "almost never mak[ing] a second attempt to contact" witnesses who were not reached in the first contact attempt.[12]

- "BPD persistently neglects to request lab testing of rape kits and other forensic evidence."[13] Specifically, "detectives consistently neglect to gather DNA evidence and to request lab tests for DNA evidence from swabs or clothing."[14]

- BPD "makes minimal to no effort to locate, identify, interrogate, or investigate suspects."[15]

- "BPD fails to identify and follow up on indications of serial suspects in its sexual assault cases."[16]

- "Missing or Inadequate Documentation of Investigation."[17] DOJ cautioned that BPD's sexual assault case files were "missing critical information and lack[ed] sufficient documentation of the investigation to allow detectives, their supervisors, and prosecutors to effectively evaluate the quality of the investigation and to assess and respond to the reported crimes."[18]

- "Failure to Collect and Review Data About, and to Appropriately Report and Classify, Reports of Sexual Assault."[19] In addition to its determination that it incorrectly classified many cases, DOJ found BPD was deficient in providing "basic data about the victim and suspect population, the incidence and nature of cases of sexual assault reported and handled by the department, and the incidence of cases of sexual assault involving BPD officers."[20]

- "Lack of Supervisory Review."[21] DOJ found supervisory review forms were almost always blank, and when completed, contained very little information. DOJ raised similar concerns regarding a "State's Attorney Contact Log" form.

## B. Consent Decree Requirements

Broadly, the Consent Decree requires BPD to enhance the trust of sexual assault victims, to strengthen its response to, and investigations of, reports of sexual assault, and to combat gender bias. CD ¶ 257.

---

[12] DOJ Findings Letter at 124.

[13] *Id.* at 125.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.* at 126.

[18] *Id.*

[19] DOJ Findings Letter at 126.

[20] *Id. at 127.*

[21] *Id. at 127.*

To address DOJ's findings of BPD's sexual assault investigation and collection of data inadequacies, the Consent Decree places two general classes of requirements on sexual assault investigations: supervision and internal oversight.

First, the Consent Decree requires BPD to take specific actions when it investigates reports of sexual assault. Paragraph 260 requires BPD to:

- "Assign all reports of sexual assault that meet the criteria outlined in BPD policy to detectives for follow up investigation;" (CD ¶ 260(a))
- "Thoroughly investigate reports of sexual assault, including any assaults that appear to be non-stranger assaults, assaults facilitated by alcohol or drugs, or assaults involving victims who were incapacitated or otherwise unable or unwilling to clearly describe the assault;" (CD ¶ 260(b))
- "Consult with forensic examiners to obtain and discuss the results of medical/forensic examinations, and include a summary of the findings of the forensic examinations, including findings related to all injuries, in case reports;" (CD ¶ 260(c))
- "Ensure that investigators of sexual assaults do not have a history of complaints of bias relating to gender or complaints of sexual misconduct that could impair their ability to investigate sexual assault in accordance with BPD policy and training;" (CD ¶ 260(d))
- "If the victim consents, BPD shall enable advocates to be present during victim interviews, unless doing so would compromise the evidentiary value of the interview;" (CD ¶ 260(e))
- "Continue to provide a 'soft' interview room, equipped with audio and video recording capabilities, for conducting victim interviews;" (CD ¶ 260(f))
- "Ensure that officers introduce sensitive lines of questioning by first explaining why those questions are relevant to the investigation;" (CD ¶ 260(g))
- "Ensure that if there is a specific and articulable investigative purpose, detectives can ask the victim about their desire to prosecute the assailant…"(CD ¶ 260(h))

Second, the Decree requires BPD to "establish and implement measures to ensure supervision and internal oversight of sexual assault investigations." (CD ¶ 262)) These measures, specified in Paragraph 262, include:

- "Developing a system of automated alerts to trigger a supervisory review of open sexual assault investigations" and a "protocol governing the supervisory review." (CD ¶ 262(a)) Supervisory reviews must occur "within 48 hours of the report being taken," (CD ¶ 262(a)(ii)) and evaluate the thoroughness of the investigation in cases when "the victim has not been interviewed within one week" of the report, or "a case has been classified as 'open,' without any investigative activity, for longer than six months." (CD ¶ 262(a)(ii))
- Prior to closing or classifying a sexual assault investigation or report "as 'unfounded,' a supervisor shall assess whether a comprehensive investigation has been conducted and whether appropriate follow-up has been completed." (CD ¶ 262(b)).

5

Separately, Paragraph 459(k) of the Consent Decree sets forth specific outcome measurements to "assess whether BPD responds to sexual assault in a nondiscriminatory manner that complies with the Constitution and federal law, and improves the safety and security of sexual assault victims in Baltimore." The outcome assessment requires the Monitoring Team to conduct an annual evaluation of the: (i) "[n]umber of sexual assault reports made to BPD"; (ii) "[r]ate of victim participation in BPD sexual assault investigations"; (iii) "[c]learance rate in sexual assault cases"; and (iv) "[r]ate of declination of sexual assault cases referred to the Baltimore City State's Attorney's Office for prosecution[.]" CD ¶ 459(k).

## III.   SCOPE OF THE REVIEW AND METHODOLOGY

### A.   Scope of Review

This report is a combined compliance audit and outcome assessment. The Monitoring Team has previously described the distinction identified in the Consent Decree between these two types of assessments:

> The Consent Decree requires the Monitoring Team to conduct both compliance reviews and outcome assessments. Compliance reviews are . . . evaluations of BPD performance in different areas of the Consent Decree. They are conducted with an eye toward determining how far BPD has come, and how far it still needs to go, to achieve compliance with [particular] Consent Decree requirements . . . .

> Outcome assessments, by contrast, are [largely] quantitative assessments designed to determine whether the reforms required by the Consent Decree in each area are having a tangible, measurable impact [overall]—whether, independent and apart from BPD's progress toward compliance with [any specific] Consent Decree requirements, policing is changing in the real world . . . . [22]

The compliance review and outcome assessment presented in this report focuses specifically on the sexual assault investigative capacity of the Baltimore Police Department.

This report is also an outcome assessment pursuant to the requirements of paragraph 459(k) of the Consent Decree, which sets forth specific outcome measurements regarding sexual assault investigations, including an evaluation of: "whether BPD responds to sexual assault in a nondiscriminatory manner that complies with the Constitution and federal law, and improves the safety and security of sexual assault victims in Baltimore…"[23] To that end, and as mandated in the Consent Decree, this report also serves as the Monitoring Team's annual review of the "[n]umber of sexual assault reports made to BPD," the "[r]ate of victim participation in BPD sexual assault investigations," the "[c]learance rate in sexual assault cases," and the "[r]ate of declination of sexual assault cases referred to the Baltimore City State's Attorney's Office for prosecution."[24]

### B.   Methodology

#### 1.   Sexual Assault Investigation Audit

To assess BPD's compliance with the requirements set forth in the Consent Decree relating to its capacity to investigate sexual assault, the Monitoring Team conducted a structured audit of a statistically significant, random sample of 78 sexual assault cases out of a total of 398 investigated

---

[22] ECF No. 279-1 at 22–23.
[23] Consent Decree ¶ 459(k).
[24] *Id.* ¶ 459(k)(i-iv).

by the Sex Offense Unit from July 1, 2023, until September 30, 2024. BPD provided the Monitoring Team data for sexual assault investigations that it opened in July 2023 through September 30, 2024. This data consisted of a file containing all sexual assaults processed by the Sex Offense Unit and case information related to Fourth Degree sexual assaults opened in 2023 through 2024.

The Monitoring Team reviewed only cases initiated after July 1, 2023, to coincide with the completion of BPD's migration to a new case management system in Axon. The new case management system has improved BPD's ability to document its sexual assault investigations in the manner required by the Consent Decree.

This sample size of 78 sexual assault incidents provides a 10% margin of error and a 95% confidence level. In other words, The Monitoring Team can be 95% confident that the findings from this sample are within 10 percentage points of what would be found if a different sample of 78 cases, or even a full review of all incidents from the time period, were analyzed.

The Monitoring Team reviewed the data provided by BPD recorded in Axon for this random sample of 78 sexual assault cases and then assessed SOU's performance on each case with an automated review instrument that captured certain data, including:

1. Basic Information;
2. Victim Details;
3. Investigative File;
4. Victim Contacts;
5. Victim Interviews;
6. Witness Interviews;
7. Suspect Interviews;
8. Victim Participation;
9. Administrative Reviews; and
10. Overall Case Evaluations.

The assessment for this 78-case sample focused on compliance with the requirements in Consent Decree paragraphs 260 (excluding 260(d)and (h))) and 262. The Monitoring Team reviewed a sufficient number of cases to reach conclusions regarding all sexual assault incidents investigated by the SOU.

To evaluate whether the assessment's sample of sexual assault investigations were thorough and comprehensive, the reviewers considered whether: (1) the investigators used trauma-informed interviewing techniques; (2) the investigators documented their investigative process in accordance with the requirements of the Consent Decree; and (3) the investigators received adequate supervision and internal oversight of their sexual assault case investigations. Reviewers rated the overall quality of the sexual assault investigations on a five-point scale.

8

The Monitoring Team began its assessment with a review of a set of pilot cases to identify any issues with the audit instrument itself, to ensure a shared understanding of each audit question, and to evaluate consistency among reviewers. Following this pilot review, the Monitoring Team provided its initial feedback to BPD, clarified how and where to locate specific items within the investigative files, and discussed cases that were exemplary, were inconsistent or incomplete, or otherwise warranted BPD's further review.

Patrol members are responsible for conducting investigations of cases that the SOU classifies as Fourth Degree Sex Offenses, and as discussed above, these cases will be assessed during the next assessment.

### 2. Outcome Assessment

Pursuant to the requirements of Paragraph 459(k) of the Consent Decree, this report includes the Monitoring Team's annual outcome assessment regarding BPD's responses to sexual assault. The Monitoring Team assessment: (i) provides the number of sexual assault reports made to BPD organized by certain categories (i.e., type of case, police district, and victim/survivor demographics); (CD ¶ 459(k)(i)) (ii) analyzes victim participation data collected during the audit process; (CD ¶ 459(k)(ii)); provides an overview of BPD's clearance rates itemized by the type of case clearance (i.e., cleared by arrest or cleared by exceptional means) while also describing other types of case closures (i.e., closed as unfounded or closed by other means) (CD ¶ 459(k)(iii)). The Monitoring Team's assessment also describes case closure dispositions for Fourth Degree sex offenses investigated by Patrol.[25]

Finally, the Monitoring Team assessed case declinations by the Baltimore City State's Attorney's Office by comparing the number of cases declined for prosecution to the number of cases BPD referred to the prosecutor's office for review. (CD ¶ 459(k)(iv)).

### C. Determining Compliance Status

The Consent Decree Monitoring Team is charged with assessing and reporting on whether BPD has implemented the requirements of the Consent Decree. Although the Decree is not specific on this point, the parties and the Monitoring Team have previously adopted a standardized mechanism to assess BPD's current status as to each of the Consent Decree's requirements.

> **0 – Not Assessed:** The Monitoring Team has yet to assess if the City/Department has made progress or complied with the requirement.

---

[25] The Monitoring Team learned from BPD, after reviews were already underway, that Fourth Degree cases are categorized using only two dispositions: "open" and "closed." Cases deemed unfounded are not classified as sexual offenses but are instead assigned a separate designation—"BPD-Unfounded."

**1 – Not Started:** The City/Department has not yet demonstrated progress toward implementing the requirement, possibly in order to work on other, necessary projects.

**2 – Planning/Policy Phase:** The City/Department is addressing the planning and/or policy provisions for the requirement.

**3 – Training Phase:** The City/Department is addressing the training provisions for the requirement, based on approved policy.

**4 – Implementation Phase:** The City/Department is in the implementation phase for the requirement, having developed any required plan or policy and conducted any required training, but has not yet demonstrated compliance with the requirement.

**4a – Implementation - Not Assessed:** The City/Department has initiated the implementation phase for the requirement, but the Monitoring Team has not yet assessed the City/Department's progress in implementation.

**4b – Implementation - Off Track:** The City/Department is not making satisfactory progress toward compliance with the requirement.

**4c – Implementation - On Track:** The City/Department is making satisfactory progress toward compliance with the requirement.

**4d – Implementation - Initial Compliance:** The City/Department has demonstrated compliance with the requirement but has not yet demonstrated compliance with all requirements of the section of the Consent Decree in which it is included.

**5a – Full and Effective Compliance:** The City/Department has demonstrated compliance with all requirements in a Consent Decree section but has not yet sustained compliance for the time period specified in paragraph 504 of the Consent Decree. This score applies only to an entire Consent Decree section, not to individual requirements within a section.

**5b – Sustained Compliance:** The City/Department has demonstrated sustained compliance with all requirements in a Consent Decree section by consistently adhering to all such requirements for the time period specified in paragraph 504 of the Consent Decree.

BPD has previously revised its sexual assault investigation policies, standard operating procedures, and training. Moreover, BPD has revised and updated training for SOU detectives as recently as

10

2024, implemented a two-day in-service training for all BPD SOU, CAU, and Family Crimes Detectives in 2022, 2023, and 2024 and completed e-learning for all sworn members who investigate or supervise sexual assault cases in 2022, 2023, and 2024.

Consequently, this review focuses on how effectively BPD is meeting the requirements of the Consent Decree, as well as how much progress BPD may need to demonstrate going forward for it to achieve initial compliance with the Consent Decree ("Initial Compliance"). To determine whether BPD is in Initial Compliance with a significant requirement of the Decree, the Monitoring Team considers the following factors:

1. **The quality of BPD's performance across a material span of time, number of incidents/events, and number of officers.** Successful compliance with a requirement in practice requires more than meeting expectations on one day, in one case or event, or for one officer. Instead, it requires that BPD adhere to Decree requirements across a material span of time, number and/or portion of incidents, and number of officers. In this way, isolated compliance does not establish Initial Compliance in practice. At the same time however, isolated non-compliance does not, by itself, eliminate the possibility of systemic compliance. Rather, the salient consideration is whether, across time, events, and people, BPD is, in aggregate, sufficiently in compliance with Decree requirements. For some requirements that are applicable only to a relatively small absolute number of incidents or circumstances, performance in a single instance may weigh more significantly than it would in connection with a more comprehensively implicated requirement.

2. **The severity or significance of deviations from Consent Decree requirements, BPD policy, and/or law.** The Monitoring Team considers not simply whether BPD's performance has deviated in some instances from the Decree's requirements but also the severity or significance of that deviation. Several minor or more technical deviations from administrative requirements may be less significant than a single significant or gross deviation from core requirements for officer performance in the field. Likewise, deficient performance in connection with less foundational requirements or issues may be less significant in quality than deficient performance in connection with fundamental requirements or issues.

3. **The extent to which BPD identifies and appropriately addresses problematic performance.** In its focus on accountability, supervision, and mechanisms that foster critical self-analysis within BPD, the Consent Decree expressly contemplates that a BPD in compliance with the Decree will actualize mechanisms that engage with departmental and officer performance that is deficient in some way. Therefore, the Monitoring Team's compliance reviews consider whether, when BPD personnel have deviated from policy, law, or Decree requirements, the Department has identified the deviation and, if so, if it appropriately addressed the issue. With respect to Consent Decree implementation and

11

meaningful organizational change, the Department is in a different condition if it identifies and appropriately addresses a policy deviation than if it fails to notice and/or address the deviation.

4. **BPD's progress over time.** Where possible, the Monitoring Team aims to situate its evaluation of BPD's performance in terms of progress over time. Steady improvement may suggest positive, meaningful adoption of Consent Decree requirements in a way that erratic swings in performance over time may not.

Courts regularly apply multi-factor approaches where the application of determinative, bright-line rules are impossible, do not adequately incorporate the array of relevant circumstances at issue, or implicate competing considerations.[26] Even as the test articulated above requires different considerations to be factored together, the test is an "objective" one because the Monitoring Team "must explain how they derived their conclusions from the verifiable facts."[27]

In applying this multi-factor test for compliance, the first factor—the quality of BPD's performance across a material span of time, number of incidents/events, and number of officers— is the initial, threshold inquiry. If BPD and/or its officers' performance is not what it should be across a sufficient number or portion relevant circumstances, then things like progress over time or BPD's identification of the issues are unlikely to cure the basic deficiencies with performance. For example, if BPD meets some Decree requirement in only 25% of cases, the fact that it may have marked an improvement over time would be unlikely to put the Department into compliance with the requirement.

Although the multi-factor test for compliance works to ensure that all relevant objective factors are reasonably weighed, the Monitoring Team seeks to provide guidance to the Department and to the community about the benchmarks that it expects and how various levels of BPD performance may shape compliance determinations.

As a working standard, the Monitoring Team considers a compliance rate with any relevant requirement of 85% or above as *possibly*, though certainly not conclusively or even presumptively, consistent with initial compliance. In such instances, the Team weighs the other factors (severity of deviations, BPD's identification of noncompliance, and progress over time). Where the Team determines that BPD has adhered to expectations in 95% or more of relevant circumstances, initial

---

[26] *See, e.g.*, *Murr v. Wisconsin*, 582 U.S. __ (2017) (adopting a multi-factor test for determining whether governmental regulations effectuated a decline in the value of private property so as to be considered a government taking under the Fifth Amendment); *EBay v. MercExchange*, 547 U.S. 388 (2006) (applying four-factor test to determinations about permanent injunctive relief in disputes arising under the Patent Act); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (articulating three factors for courts to consider when determining whether additional governmental and/or judicial procedures are necessary to satisfy the Due Process Clause).

[27] James G. Wilson, "Surveying the 'Forms of Doctrine' on the Bright Line Balancing Test Continuum," 27 *Ariz. St. L.J.* 773, 802 (1995).

compliance will be found unless one of the other factors—severity of deviations, Department identification of noncompliance, and progress over the time—starkly point in the other direction.

On the other hand, where BPD has adhered to expectations less than 85% of the time, initial compliance will *not* be certified unless one of the other factors points definitively in a positive direction. For instance, if BPD complied with requirements in 80% of relevant circumstances but the Monitoring Team could certify that the significance or severity of instances where requirements were not followed was relatively minimal, that BPD identified and took appropriate corrective action in instances where requirements were not followed, and the Department had made and maintained progress over time, then finding initial compliance with the Decree requirement may be possible.

Additionally, some important requirements apply to, or are activated by, a relatively more limited number of encounters, incidents, or circumstances. Where the absolute number of instances where the requirement applies becomes lower, the application of the percentage-based rules of thumb for determining compliance becomes less useful.

Finally, it is possible that, the Monitoring Team might assign, pursuant to the weighing of factors outlined above, a score for an individual decree requirement that is lower than the score given in a prior report. For instance, the score for a particular requirement could potentially move from "4c" (implementation - on track) to "4b" (implementation - off track).

With respect to various provisions that address policy requirements, the Monitoring Team has previously explained that, to establish initial compliance with these provisions and ultimately to sustain "full and effective" compliance pursuant to Paragraph 506, BPD not only must show that it has adopted the pertinent policies, but also must demonstrate through officers' actions *on the street* that, as an agency, it is complying with the policies. Otherwise, the reforms the Consent Decree requires would be nothing more than "paper" reforms, with no obligation to police constitutionally in actuality.

IV.    **BPD's SEXUAL ASSAULT INVESTIGATION IMPLEMENTATION PROGRESS TO DATE**

As described in the Monitoring Team's Third Comprehensive Assessment, published in October 2025, BPD has satisfied all the foundational requirements in Section XI of the Consent Decree, including revising its written policies on sexual assault investigations and officer-involved sexual misconduct; conducting Department-wide e-learning and in-service training for all sworn members on responding to reports of sexual assault; and providing specialized training for detectives who investigate sex offenses, including not only an initial two-day training in late 2020, but also a follow-up two-day training delivered in December 2021 and November 2024 and an additional one-day training delivered in November 2022 and 2023. BPD has also produced five annual reports on sexual assault investigations and is expected to publish another report in 2025. The Department created a victim survey, which it posted on its website in 2022 and made accessible via a link provided on Form 310, which BPD officers are required to provide to all victims.

A.    **Sexual Assault Investigator Training**

Paragraph 259 requires BPD to provide initial and ongoing annual training to all detectives assigned to the Sex Offense, Family Crimes, and Child Abuse Units on policies and practices related to law enforcement's response to sexual assault. This training is intended to ensure that detectives perform in a manner consistent with the Consent Decree. The training must include guidance to patrol officers on how to respond to sexual assault reports, particularly in cases involving co-occurring crimes such as domestic violence or stalking. Detectives must also be trained on strategies that emphasize withholding judgment about the validity of a case until a thorough investigation is completed, and on methods for minimizing additional physical and psychological trauma to victims by maintaining a respectful and objective approach. The training is required to cover investigative strategies that maintain focus on the behavior and actions of the suspect, as well as the impact of trauma on victims and the importance of adapting interview techniques to be sensitive to victims' needs and the dynamics of sexual assault. This trauma-informed approach is intended to promote continued victim engagement with law enforcement, improve the overall experience for victims, and enhance the quality of investigations.

Detectives must also be trained on the dynamics of sexual assault and the core scientific concepts related to trauma, including trauma-related behavior, tonic immobility, and the effects of trauma on memory. Additionally, the training must address best practices for working with vulnerable populations, such as individuals experiencing homelessness, sex workers, people with behavioral health disabilities, and LGBTQ individuals. It must also cover law enforcement responses to various types of sexual assault, including non-stranger assaults, alcohol- or drug-facilitated assaults, and cases involving incapacitated victims. Detectives must receive instruction on report writing, documentation, investigation techniques, and appropriate classification of sexual assault reports. This includes trauma-informed approaches to interviewing victims, taking statements, and

14

interrogating suspects—particularly in complex cases involving non-stranger or drug/alcohol-facilitated assaults. Finally, for detectives with supervisory responsibilities, the training must include instruction on supervising sexual assault cases, conducting case reviews, and implementing mechanisms to identify and prevent gender bias in the law enforcement response to sexual assault.

As required by the Consent Decree, BPD has provided sexual assault investigation training to SOU investigators on multiple occasions since 2020 (see Table 1). These training sessions included both e-learning modules and in-person classroom instruction.

The e-learning modules were primarily designed to review relevant policies and procedures and to address certain Consent Decree requirements. The initial two-day, in-person training covered a range of critical topics, including conducting offender-focused investigations; understanding victimization, vulnerability, accessibility, and credibility; countering a consent defense; recognizing the intersection between intimate partner violence and sexual assault; improving report writing; and conducting trauma-informed interviews. BPD worked with an external subject matter expert in sexual assault investigations to develop the curriculum and facilitate in-class instruction. The training curriculum also incorporated substantial input from the Baltimore City Sexual Assault Response Team ("SART"). Both the Monitoring Team and the DOJ reviewed and approved the e-learning and classroom training content and lesson plans.

To refine the curriculum and delivery for in-person training, BPD conducted two pilot sessions. A member of the Monitoring Team and representatives from the DOJ observed these sessions and provided feedback on the content, instructional delivery, and overall effectiveness. Detectives were generally attentive and engaged, and the instructors demonstrated expertise. However, both the Monitoring Team and the DOJ recommended enhancing detective engagement through more active learning strategies and called for more specific instruction for supervisors on reviewing and improving investigative work.

In 2021, BPD developed and delivered its first annual sexual assault training for detectives, building upon the initial 2020 training. This updated training again included both e-learning and classroom components, and it revisited and expanded on core topics, such as offender-focused investigations, victim vulnerability and credibility, the consent defense, and trauma-informed interviewing. Notably, several detectives were randomly selected to demonstrate their skills through mock interviews with TurnAround staff. Supervisors received tailored e-learning modules to strengthen their oversight of sexual assault investigations. Beginning in 2021 and continuing through the present, several BPD detectives have also received individualized technical assistance from a DOJ subject matter expert, who has provided ongoing case-specific guidance.

15

**Table 1.  Sexual Assault Investigation Training Conduct by BPD Since 2021**

| Time Period | Type & Length | Participants | Content |
|---|---|---|---|
| **2021 – Ongoing** | Varies | • Sex Offense Unit Detectives | • Technical assistance from DOJ<br>• Subject matter expert |
| **November 2022 – March 2023** | In Person 1 Day | • Sexual Assault investigators and supervisors | • Guidance to patrol on how to respond to reports of sexual assault<br>• Procedure and practice guidelines for trauma-informed, victim centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime<br>• Offense-focused investigations<br>• Victimization and victim vulnerability<br>• Accessibility and credibility<br>• Guidance on working with vulnerable populations<br>• Interviewing non-stranger suspects in sexual assault cases<br>• Reporting writing and documentation<br>• Trauma-informed interviews |
| **December 2024** | In Person 2 Day | • Sex Offense Unit<br>• Family Crimes Unit<br>• Child Abuse Unit<br>• Sex Offender Registry Unit | • Victim-centered and trauma informed investigations and interviews<br>• Offender-focused investigations<br>• Vulnerable populations and drug/ alcohol facilitated sexual assaults<br>• Report writing<br>• Supervising sexual assault investigations |

BPD also continues to provide training to SOU detectives and all sworn personnel on the response and investigation of sexual assault. In November of 2022, SOU detectives received a one-day training that continued to build their investigation skills, and 1,868 sworn members completed an e-learning training in March 2023.

The Monitoring Team and the DOJ attended every in-class training session for detectives and provided BPD with comments and recommendations to improve the curriculum and delivery. Throughout the training rollout, the Monitoring Team and DOJ reviewed materials, observed training sessions, and provided feedback. In response to the feedback, BPD incorporated more adult-learning methodologies, such as participant engagement and role-playing exercises. BPD continued to collaborate with an external consultant to develop and facilitate key components of the training. Each session included instruction on trauma-informed victim interviews, offender-focused investigations, offender interviews, and evidence collection. BPD made continued progress in incorporating adult-learning methodologies and increasing participant engagement. Role-playing exercises were used in every training to reinforce core concepts. The 2024 classroom training, in particular, emphasized hands-on learning and was composed primarily of role-playing scenarios, tabletop exercises, and live demonstrations. Because BPD has completed the required training, it is in **initial compliance (4d)** with this paragraph.

## B.      Policy and Standard Operating Procedures

Paragraph 258 of the Consent Decree requires BPD to ensure that its sexual assault policy and protocols establish clear procedures and practice guidelines for a trauma-informed, victim-centered, and multi-disciplinary response to sexual assault cases, as well as a thorough investigation of the crime. The policy must clearly define the significant roles and responsibilities of all officers involved in the response and investigative process. It must also ensure that victims are informed of the opportunity to receive a forensic examination and comprehensive medical care. Additionally, the policy must guarantee that all victims are offered access to free and confidential support services, including referrals to social services and information from a trained sexual assault victim advocate.

BPD has previously satisfied the threshold requirement to revise both its written policy on sexual assault investigations—Policy 708 titled "Rape and Sexual Assault"—and its standard operating procedure on such investigations. Specifically, BPD's most recent revisions to the SOU Investigative Standard Operating Procedures, which went into effect after training was completed in 2020, were activated on August 30, 2021. BPD's most recent revisions to Policy 708 went into effect on September 7, 2021. Since then, BPD has made minor technical revisions to that policy to ensure consistency with other policies. BPD has also successfully created and finalized a new policy on member-involved sexual misconduct. The Monitoring Team reviewed the revisions to both the SOU Investigative Standard Operating Procedures and Policy 708, revised them to reflect a recent Maryland law change, and BPD published them in 2024. While the updated draft policy

has not yet been formally activated, the draft policy revised in 2024 reflects the most current thinking on how sexual assault cases should be addressed by BPD, the Monitoring Team, and DOJ. It represents the direction under consideration and should be treated as the most up-to-date framework for handling these cases. Accordingly, it was used as the basis for assessing BPD's compliance in this assessment. Finally, per the requirements of Paragraph 264, BPD has produced five annual reports on sex assault investigations for the years 2018, 2019, 2020, 2021, 2022, and 2023, all of which are available to the public on BPD's website. As a result of these sustained efforts, the Monitoring Team assigned a "4c" compliance rating (Implementation – On Track) under Paragraph 258 for Sexual Assault Investigations as of December 2024 and continues to do so in this assessment. To reach initial compliance, however, BPD must first demonstrate that the policies are being implemented in practice, as explained more fully below.

## V.    SEXUAL ASSAULT INVESTIGATION COMPLIANCE REVIEW

### A.    Data Collection (CD ¶ 264)

#### a.    Basic Information

Paragraph 264 of the Consent Decree requires that BPD continue to enhance its data collection, analysis, and reporting practices to support transparency, oversight, and improvements in its response to sexual offenses. The data to be collected and analyzed must include several key categories. First, BPD must track the number of sex offenses reported, broken down by crime category and identifying any incidents involving co-occurring crimes, such as sexual assaults that also involve domestic violence or stalking. Additionally, the data must capture information about offenders, including total counts and disaggregation by gender (e.g., male, female, transgender, queer, or non-binary), as well as the relationship of the offender to the victim (i.e., whether the offender is a stranger or known to the victim). BPD must also collect data on victims and complainants, with totals broken down by gender, race, and age (specifically identifying whether victims are under or over 18).

The Department is required to report the total number of sex offense cases categorized as founded or unfounded, including a breakdown by the BPD unit responsible for that categorization. Similarly, BPD must track the handling of sex offense reports across different units, reporting the number of cases that were (1) cleared by arrest, (2) cleared by exceptional clearance—including a breakdown by the specific clearance category, (3) remain open and inactive, and (4) referred to the Baltimore City State's Attorney's Office for prosecution. Finally, BPD must gather and analyze data related to the processing of forensic medical exams, commonly known as "rape kits." This includes tracking the date of the reported incident, the date the "SAFE" (Sexual Assault Forensic Exam) was conducted, the date detectives requested lab analysis of the SAFE exam, and the date lab results were received by detectives.

BPD has demonstrated the ability to appropriately categorize sexual assault cases in its records. Of the 78 cases reviewed, BPD classified 69.2% as Rape, 19.2% as Sex Offense, and 11.5% as Other (including Attempted Rape, Possible Sex Offense, and Sodomy[28]). Additionally, BPD documented co-occurring offenses in 26.9% of the cases, such as domestic violence, burglary, assault, and other serious crimes. This reflects BPD's ability to capture overlapping offenses—an essential component of the data collection requirements outlined in Paragraph 264 of the Consent Decree.

BPD also captured comprehensive victim demographic data in the cases that the Monitoring Team reviewed. That data included gender (Table 4), race (Table 5), ethnicity (Table 6), and age (Table 7). The number of cases with unknown ethnicity and age declined substantially compared to the previous review period, indicating improved documentation practices.

Of the 78 cases reviewed, BPD closed 13 with an arrest (16.7%) and two by exception. More than half of the cases—47 (57.7%)—remained open at the time of the Monitoring Team's review, while BPD classified 16 cases (20.5%) as open but inactive. Among these 16 inactive cases, the majority (93.7%) had been inactive for more than 90 days, often due to victim non-cooperation or pending developments or evidence. The number of open/inactive cases increased significantly compared to the previous assessment—from 10 cases (7.3% of the sample) to 16 cases (20.5%).

**Table 2.        Status of Review Upon Monitoring Team Review**

| *Status* | **Frequency (%)** |
|---|---|
| Open | 47 (60.3%) |
| Open/Inactive | 16 (20.5%) |
| Closed with Arrest | 13 (16.7%) |
| Closed with Exception | 2 (2.6%) |
| Total | 78 (100.0%) |

The open but inactive cases included situations where the victim did not cooperate or could not be contacted, the State Attorney's Office declined to prosecute, or detectives made numerous unsuccessful attempts to locate the victim. A significant portion of these cases involved declinations to prosecute by the State Attorney's Office.

---

[28] Although Maryland repealed its sodomy statute in 2023, the term "sodomy" continues to be used by the FBI's Uniform Crime Reporting (UCR) Program as a distinct offense category within the broader classification of sex offenses. As a result, BPD maintains this term in its crime tracking system to ensure compliance with federal reporting requirements and to maintain data consistency within national crime statistics. The usage is administrative and does not reflect the legal status of sodomy under Maryland state law.

Of the cases reviewed, BPD classified only one (1.3%) as Unfounded-False, indicating that upon the completion of the investigation, no evidence of a crime was found.[29] For this unfounded case, reviewers explored whether officers engaged in all reasonable efforts to locate the victim or reporting person, to identify the scene of the crime and collect evidence, and identify and secure witnesses.  In this incident, a patrol officer was dispatched to an anonymous report of a possible rape with the victim lying in the middle of the street. At the scene, the patrol officer spoke with a bystander who claimed to be the husband of the victim and reported that the victim had a seizure. This incident may have involved a dispute between the victim and her husband. The victim was responsive but refused medical assistance and left the scene. Thus, officers made all necessary investigatory efforts, but there was no evidence of sexual assault.

### b.    Victim Details

Most of the victims in the cases reviewed by the Monitoring Team were Black and female, with an average age of 31. Tables 4-7 below provide descriptive statistics on the victims involved in the reviewed sexual assault incidents. The demographic information presented below is based on the recording designation assigned by the responding officer as recorded in the incident reports contained within each investigative file. Unlike the previous assessment, where victim ethnicity was marked as "Unknown" in 35% of cases, this sample showed a significant reduction in such instances.

**Table 4.    Victim's Gender in Reviewed Cases**

| Gender | Frequency (percent) |
|---|---|
| Female | 70 (89.7%) |
| Male | 8 (10.3%) |
| Total | 78 (100.0%) |

**Table 5.    Victim's Race in Reviewed Cases**

| Race | Frequency (percent) |
|---|---|
| White/Caucasian | 21 (26.9%) |
| Black/African American | 47 (60.3%) |
| Asian or Pacific Islander, Native American | 1 (1.3%) |
| Unknown | 5 (6.4%) |

---

[29] An incident can only be officially classified as Unfounded-False following a complete investigation by SOU that demonstrates through evidence that no crime occurred or was attempted, has Special Investigation Section (SIS) chain of command approval, and is reviewed by SART. Note that while the review instrument captured cases officers determined to be Unfounded-False, it failed to assess whether the officer performed the necessary steps in order to reach such a disposition.

| Other | 4 (5.1%) |
|-------|----------|
| Total | 78 |

**Table 6.      Victim's Ethnicity in Reviewed Cases**

| Ethnicity | Frequency (percent) |
|-----------|---------------------|
| Hispanic/Latino | 12 (15.4%) |
| Not Hispanic/Latino | 57 (73.1%) |
| Unknown | 7 (9.0%) |
| Other | 25 (2.6%) |
| Total | 78 |

**Table 7.      Victim's Age in Reviewed Cases**

| Race | Frequency (percent) |
|------|---------------------|
| <18 years old | 7 (9.0%) |
| 18-29 years old | 39 (50.0%) |
| 30-39 years old | 12 (15.34%) |
| 40-49 years old | 5 (6.4%) |
| 50-59 years old | 8 (10.3%) |
| 60 and older | 4 (5.1%) |
| Unknown | 3 (3.8%) |
| Total | 78 |

BPD classified 100% of reviewed sexual assault cases into categories, documenting comprehensive victim demographic data, significantly reducing "Unknown" entries from the prior review. Additionally, BPD captured co-occurring offenses in 26.9% of cases, demonstrating its ability to document overlapping criminal conduct as required by the Consent Decree. BPD is in initial compliance with the data collection and reporting requirements of Paragraph 264. The Department has demonstrated categorization of sexual assault cases, reliable capture of victim demographics, and documentation of co-occurring offenses and case dispositions. BPD has met or exceeded the 85% compliance threshold for the core data categories outlined in the Consent Decree and the **Monitoring team finds BPD in 4d-Initial Compliance with Paragraph 264.**

**B.      Investigations**

Paragraph 260 requires BPD to take a series of steps to ensure the proper handling and investigation of sexual assault cases. Because Paragraph 260 sets forth broad principles governing how sexual assault investigations should be conducted, the Monitoring Team assesses compliance

with that principle by examining whether BPD is complying with the policies it has issued (in consultation with the DOJ and the Monitoring Team) that are related to the broad principle. Accordingly, where appropriate, the Monitoring Team used relevant policy or SOP provisions to further define objectively the broad, subjective standards in the Consent Decree. As described above, the Monitoring Team reviewed a random sample of cases investigated after BPD migrated to a new case management system on July 1, 2023.

### a.    Assignment to Detectives

BPD must assign all reports of sexual assault that meet the criteria outlined in its policy to detectives for follow-up investigation. (¶ 260(a)). Sexual assault investigations must be thorough and include all types of sexual assault, including non-stranger assaults, assaults facilitated by alcohol or drugs, and cases where the victim was incapacitated or otherwise unable or unwilling to clearly describe the assault. (¶ 260(b)). The Monitoring Team found that BPD complied with this requirement in all the cases it fully reviewed. However, the Monitoring Team did not fully assess this requirement during this assessment because, as discussed below, the Monitoring Team deferred the Fourth-Degree case assessment. This requirement will be evaluated during the next assessment.

### b.    Forensic Exams

Paragraph 260(c) requires investigators to "consult with forensic examiners to obtain and discuss the results of medical/forensic examinations and include a summary of the findings of the forensic examinations, including findings related to all injuries, in case reports." Policy 708, particularly Paragraph 63 and SOP Section II.C. outlines in detail the steps investigators must take and document the forensic exams.

Among the 37 cases where a Sexual Assault Forensic Exam ("SAFE") was necessary, the Monitoring Team found evidence that such an exam was submitted for laboratory analysis 36 times (97.3% of the total). In one incident, it appeared that no exam was submitted to the lab because only an evaluation was conducted. As the compliance rate exceeds 85%, this area is currently in compliance, and the Monitoring Team commends BPD for its progress and attention to this issue.

### c.    Victim Contacts

Paragraph 258 of the Consent Decree requires that BPD "ensure its sexual assault policy and protocols . . . Identify procedure and practice guidelines for a trauma-informed, victim-centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime." Relatedly, Paragraph 260(g) requires that officers "introduce sensitive lines of questioning by first explaining why those questions are relevant to the investigation." To that end, directive #63 of Policy 708 and Section II.E of the SOP, require a trauma-informed, victim-centered approach to sexual assault investigations.

i.    Initial Patrol Officer Contact

Rape and Sexual Assault Policy 708, which outlines several specific principles guiding BPD's efforts to fully investigate reported rapes and other sexual offenses. SOP Section II.B also outlines the responsibilities of SOU detectives in guiding patrol officers during the initial response. One of these relevant directives is that the responding patrol officer must conduct an on-scene investigation and obtain an initial victim statement in a nonjudgemental manner that captures the victim's own words in narrative form. Moreover, while the patrol officer need not conduct an in-depth interview, the patrol officer should obtain minimal facts to establish the elements of a crime if one was committed and obtain accurate contact information for the victim and any witnesses.

The patrol officer's initial response to the victim is critical to foster the victims' well-being, trust and cooperation. Paragraph 24 of Policy 708 provides specific guidance on how patrol officers should take initial statements from victims using a trauma-informed, victim-centered approach. The Monitoring Team's review of body-worn camera video of incidents in the random sample of rape and sexual assaults cases revealed that the vast majority of patrol officers appropriately used trauma response tactics while interacting with the victims—such as the two cases summarized below in section B.g.

BPD policy states that officers should "prioritize the victim's privacy throughout the preliminary investigation," determine whether the victim has "any safety concerns or fear of retaliation, and ensure that "all conversations with the victim and any witnesses should occur separately and privately."[30] Reviewers observed several instances in which this did not occur. For instance, in multiple cases, patrol members conducted victim interviews in public settings—on the street and in the presence of bystanders—thereby undermining their ability to establish victim support and trust. Moreover, the Monitoring Team reviewed incidents in which a member interviewed rape victims near the location of the alleged assault, with family members or even strangers within earshot. In these instances, officers did not appear to ask victims whether they were comfortable proceeding in such settings. In another case, the patrol officer interviewed the victim in the hallway of the police station. While the training and policy are clear on this, BPD should reinforce trauma-informed approaches through supervisory reviews and appropriate coaching to ensure consistent compliance with existing policy expectations among patrol officers.

Patrol members are also required by directive #28 of Policy 708 to advise the victim that they have a right to services and assistance from a victim advocate and to provide victims with Form 310.[31] The Monitoring Team observed that BPD was complying with this policy in most cases.

---

[30] Policy 708 Paragraph 22.

[31] Form 310 provides information about local organizations that provide services to victims of sexual assault. The responding officer must provide their information, the date, the detective's name, and the central complaint ("CC") number on Form 310.

ii.    SOU Interviews

The goal of a trauma-informed interview is to create a more comfortable environment for a victim to provide information about a crime. Interviewing techniques based on an accurate understanding of trauma and stress are more likely to generate the most accurate information about a crime and promote a victim's healing regardless of the legal outcome.

In 100% of incidents reviewed, the Monitoring Team found that the SOU detective appropriately attempted to interview the victim. This represents a notable improvement from the previous assessment, which found that detectives attempted to interview victims in approximately 65% of reviewed cases.

Most interviews conducted by SOU detectives reflected trauma-informed practices and demonstrated empathy toward victims. The two cases summarized below in section B.g. are prime examples of that strong performance. The Monitoring Team, however, observed several deficient interactions that raised concerns. In certain cases, interviews were conducted in less-than-ideal settings—for example, in one case, inside a vehicle with the victim seated in the back seat and making limited eye contact. Moreover, some lines of questioning could be interpreted as insufficiently sensitive to victims' experiences. For example, one detective asked about alcohol use without providing appropriate context, prompting a defensive reaction from the victim, who responded that her alcohol consumption was irrelevant to her victimization. Fortunately, the detective ultimately clarified the purpose of his question and successfully redirected the conversation to the relevant facts of the incident. In another case, the detective's tone and approach gave the impression that he doubted the victim's account. The detective began the interview challenging some of the information that the victim previously shared with an officer and the detective conducted the interview in a parking lot with the victim seated on a curb after she requested to move away from the front of her residence. Further, it appears that the detective expended minimal effort to verify the victim's story in that he reviewed subway video footage from a timeframe that did not align with when the victim said the incident occurred. Notably, the victim later provided additional relevant details.

In yet another incident, detectives interviewed a victim for less than twenty minutes, despite her reporting multiple years of abuse. One of the detectives focused solely on the most recent incident the victim reported and did not ask follow-up questions about the prior abuse. And, while the suspect was a family member, the detective failed to inquire about family dynamics or other contextually important factors critical to conducting a thorough investigation.

In addition, the Monitoring Team noted that in three reviewed cases, the detectives' performance was particularly problematic. In those cases, investigators questioned the victim's credibility and implied consent in a manner that gave the appearance that the investigator had prejudged the victim's account. In one case, discussed above, the SOU investigator interrupted the victim

24

multiple times, summarized the case in a judgmental manner, and fundamentally failed to use basic trauma-informed techniques during the interview.

Likewise, the Monitoring Team identified investigator demeanor concerns in three cases. In one, the investigator appeared dismissive when the victim referenced a prior rape in another jurisdiction. In another case, the SOU investigator adopted a noticeably curt tone, possibly influenced by prior interactions with the victim. A third case, also one of the cases discussed above, raised concerns about both demeanor and setting, as the interview was conducted with the victim seated in the back seat of a vehicle with no eye contact.

### iii.   Other Requirements

Consent Decree Paragraphs 260(e) and (f) contain other requirements related to trauma-informed, victim-centered investigations.

Paragraph 260(e) requires that "if a victim consents, BPD shall enable advocates to be present during victim interviews, unless doing so would compromise the evidentiary value of the interview." Policy 708 and the SOP require that BPD ensure the presence of a victim advocate if requested. The presence of a victim advocate or a supporting person during a victim interview can be helpful. The Monitoring Team found evidence that detectives requested a victim advocate in four (7.1%) instances.  Requests for victim advocates may be done off camera just prior to or when scheduling the interview. Additionally, Mercy Hospital offers staff advocates if the victim is treated there. Despite BPD's Case Management containing a "Victim Advocate Log" case task, when used, that notation would only indicate if an advocate was contacted, not if the advocate was offered to the victim or available. Due to the lack of documentation, the Monitoring Team cannot ultimately determine whether advocates were requested for the interviews. It is also unclear if advocates were requested, but unavailable. To reach compliance in this area, BPD will need to clearly document if a victim advocate was offered, requested, declines, and/or unavailable.  Of these cases, the victim refused the services of a victim advocate in one, in two other cases it was unclear why the advocate was not present for the victim interviews, and the victim advocate was present in the remaining one victim interview.

Paragraph 260(f) requires BPD to "continue to provide a 'soft' interview room, equipped with audio and video recording capabilities, for conducting victim interviews." Regarding the requirement that interviews be conducted in rooms capable of audio and video recording, the Monitoring Team found that the reviewed interviews were recorded in all but two instances—one interview was not recorded, and in another, the reviewer could not determine whether recording occurred. This reflects a compliance rate of over 95%. With respect to the requirement that interviews be conducted in a soft room, detectives conducted more than half of their interviews (59.4%) in such settings. The remaining interviews occurred in hospital rooms, SOU conference rooms, or victims' homes. In most cases—excluding the specific examples highlighted elsewhere in this report—interviews not held in soft rooms took place in locations that were potentially

appropriate, such as a victim's home, workplace (where the report was filed), or hospital room. In the next assessment, the Monitoring Team will, in consultation with BPD and DOJ, develop a methodology to evaluate whether a soft room was available in these cases, notwithstanding that the interview occurring elsewhere, and whether the use if the non-soft room locations are being used only when appropriate under the circumstances.

### d.    Witness Interviews

Witness interviews are a key element of any thorough investigation. *See* CD ¶ 260(b) (requiring that sexual assault investigations be conducted thoroughly). Directive #63.5 of Policy 708 requires detectives to identify and interview witnesses. Additionally, the SOP, particularly Section II.G requires offices to take specific steps to identify, secure, and interview potential witnesses.

Investigators conducted interviews in 17 cases. All 17 interviews were video and audio recorded. In eight of those seventeen cases, the detective documented in the investigative file in Axon records the steps taken to contact witnesses identified by the victim. The Monitoring Team saw evidence of good work in identifying witnesses, such as in the second case summarized below in section B.g.  In the other nine, however, while detectives took and documented sufficient efforts to locate and interview some witnesses, they failed to document sufficient steps with others, particularly outcry witnesses.[32] Among these nine cases:

- In two cases, victims reported contacting their family members or the suspect's family members after the incident, but the case file contained no indication that an investigator interviewed those individuals.

- The victim in another case disclosed years of abuse beginning at age 13, but there is no evidence that the investigator attempted to interview the victim's foster parent, who the victim identified as someone with relevant knowledge. The State Attorney's Office ultimately declined this case due to insufficient evidence, and detectives took no further investigative action.

- In another instance, a detective left voicemails for two outcry witnesses and spoke with a third witness who agreed to participate in a Zoom interview. There is no further documentation as to whether the interviews occurred, what further efforts were taken to contact the witnesses, and whether the detective's supervisor took any steps to review whether these steps were taken.

Attempting to contact outcry witnesses is an important step in any thorough investigation. These witnesses can offer crucial insights into a victim's emotional state, timing and content of any disclosure, and provide contextual details often unavailable with physical or forensic evidence.

---

[32] An outcry witness is the first person to whom a victim of a crime discloses the abuse or offense, and to whom the victim may later provide additional evidence about that initial disclosure.

Further, outcry witness testimony can strengthen investigative integrity and victim credibility. Given its importance, BPD should prioritize consistent outreach to all identified outcry witnesses and ensure efforts are thoroughly documented.

### e.    Suspect Interviews

Interviewing the suspect is another critical aspect of a "thorough" investigation. *See* CD ¶ 260(b). Policy 708, Paragraph 63.7, requires investigators to "fully investigate the suspect, including proactively identifying any other sex crimes they may have committed." Furthermore, SOP Section II.H offers detailed guidance on interviewing suspects, including specific instructions on transitioning from interview to interrogation to effectively lock in suspect's narrative and key details. This section reflects the Monitoring Team's assessment of BPD's compliance with these provisions.

In most of the reviewed cases—59 out of 78 (75.6%)—a complainant or investigator identified a potential suspect. Of these 59 cases with an identified suspect, there was evidence that investigators attempted to interview the suspect in 27 cases (45.8%). When documented, the reasons for not interviewing the suspect included: the suspect refusing to be interviewed, legal counsel declined an interview on the suspect's behalf, and/or the suspect was not located, all of which are appropriate reasons why an interview would not be conducted.

In the 16 reviewed cases where an investigator interviewed the suspect, reviewers noted deficiencies in the interview process in five cases. The deficiencies included (a) inadequate questioning, (b) failure to address inconsistencies; and (c) failure to pursue reasonably available lines of inquiry. In one case, the detective documented extensive efforts over several months to schedule an interview with the suspect and his attorney. Despite that effort, the interview itself lasted only about 15 minutes and consisted of surface-level questions, with no follow-up on questionable or inconsistent statements made by the suspect, despite a lack of any resistance by the suspect's attorney. In other cases, detectives failed to address clear inconsistencies that emerged during the interview or to further probe conflicting accounts provided by the suspect and the victim. This lack of follow-up limited the effectiveness of the interviews and missed opportunities to clarify key facts or challenge discrepancies.

### f.    Other Investigative Steps

As stated above, Consent Decree Paragraph 260(b) requires sexual assault investigations to be "thorough" and BPD policy provides a number of other steps needed for a thorough investigation. SOP Section II.C identifies the investigative tasks that "are needed to confirm that a thorough investigation is conducted" and include the following categories: Crime Scene, Crime Lab, Evidence, Victim Contact, Body Cameras, Victim Reporting, Witness Reporting, and Suspect Reporting. In the cases that it sampled, the Monitoring Team reviewed the investigative case files to determine whether detectives had documented the completion of investigative tasks that were

appropriate given the facts of the cases. Many reviewed case files included core crime scene materials, such as officer interview records (98.7%) and documentation of canvassing for cameras (96.2%).

Additionally, 100% of the case files consistently included CAD reports, and body-worn camera footage was uploaded to Evidence.com in nearly all cases (97.4%), reflecting strong adherence to foundational documentation practices. Property receipts and evidence logs were also present in almost all cases, suggesting generally reliable evidence tracking procedures. This indicates that baseline documentation practices are largely in place.

### g.   Overall Quality of the Investigation

Reviewers evaluated the quality of the investigation conducted based on the following five-point system:

| | |
|---|---|
| **5 – Excellent –** The investigation complied with all Consent Decree requirements and BPD protocols, and investigators made reasonable attempts to follow all leads and answer all material questions. The investigation was fair, thorough, objective, and timely. The investigator successfully used trauma-informed, victim-centered techniques. | 18 (23.1%) |
| **4 – Very Good –** The investigation complied with most Consent Decree requirements and BPD protocols and investigators made reasonable attempts to follow all leads and answer all material questions. | 16 (20.5%) |
| **3 – Good –** Although some aspects of the investigation could be improved, the identified flaws did not appear to materially or unduly impact the quality of the overall investigation. The resulting investigation provided sufficient information to evaluate the incident but could be improved. | 13 (16.7%) |
| **2 – Fair –** Several aspects of the investigation could be improved. Identified flaws materially impacted the quality of the overall investigation, and the resulting file provided insufficient information to evaluate the incident. | 21 (26.9%) |
| **1 – Poor –** All or nearly all aspects of the investigation could be improved. The investigation failed to establish sufficient information to support an evidence-based evaluation of the incident due to investigative deficiencies, material omissions, or other issues. | 10 (12.8%) |

**Overall, about sixty percent (60.3%) of the cases reviewed were rated good, very good, or excellent**. Indeed, Monitoring Team reviewers identified a number of cases that exemplified high-quality, trauma-informed policing and investigative techniques. For instance:

- In a brutal incident that involved multiple victims and several witnesses, the detective and sergeant conducted thorough and compassionate interviews. Although the victim broke down several times during the interview, the sergeant appropriately offered her tissues and asked if she needed a break. The detective expressed empathy, offered water, and reassured the victim, saying: "I'm sorry you had to go through this." The sergeant, who demonstrated patience and apologized when he had to revisit difficult questions, also reinforced other good practices when he provided specific and supportive feedback to the investigating detective. The investigation was comprehensive, with appropriate outreach to witnesses and well-documented case files.

- Another extremely challenging example that the investigating detective handled in a very professional manner involved an incident where the suspect was known only by an alias and there was no physical evidence. The victim reported the crime a month after it allegedly occurred. The investigating detective conducted a careful and highly detailed interview with the victim, worked to develop a more specific suspect description and attempted to identify potential witnesses. The detective likewise attempted to locate a named witness, reviewed the victim's social media, and issued a "BOLO" ("be on the lookout") report to help identify the suspect. The detective presented an exemplary interview demeanor in that he was gentle, patient, and affirming. When the victim apologized for being scattered, the detective reassured her, saying: "I'm very sorry you have to go over this again. I can tell it's painful, and I appreciate you trusting me. You're doing really well recounting it, especially considering how long it's been." BPD should highlight this detective's work as a model for training purposes.

However, reviewers rated a critical portion (39.7%) of investigations as either "poor" or "fair" in overall quality—which often related to significant deficiencies in BPD's initial response, lack of investigative follow-up, and/or deficient supervisory oversight:

- In one case, the responding patrol officer failed to list a possible sex offense in the initial report, despite the victim's report of a sexual assault that included an allegation that the suspect held her against her will during the assault. The officer reported the incident as a kidnapping/abduction and aggravated assault. As a result, BPD did not refer the case to SOU in a timely manner until after a district detective's later review of the officer's body worn camera ("BWC") footage culminated in SOU contact. While the detective obtained the suspect's photo, address, and phone number, the overall investigative efforts were limited. The supervisor added to these failures by copying and pasting the same feedback across checkpoints, none of which offered any case-specific direction or accountability.

- In another case, patrol officers failed to capture important details from the victim, including that the victim had informed an officer that the suspect took her phone, which contained evidence of the conversation about the rape. After the case was transferred from the original

29

detective who had conducted the victim interview, the newly assigned detective conducted minimal follow-up and made no documented effort to locate either the suspect or any evidence. Although the supervisor initially provided specific instructions, the supervisory review ceased after 30 days even though the file did not indicate that the detective followed through with those instructions.

- In a third case, a detective requested a subpoena from the State Attorney's Office to obtain security camera footage but waited forty-five days before he followed up. The State's Attorney's Office never issued the subpoena, and the footage was ultimately deleted. In addition, key documents, including the referenced BWC footage of the patrol officer, were missing from the file, indicating lapses in both documentation and investigative effort.

### h. Other Consent Decree Requirements

Paragraph 260 contains two other requirements BPD must ensure that investigators assigned to sexual assault cases do not have a history of complaints involving gender bias or sexual misconduct that could compromise their ability to conduct investigations in accordance with department policy and training. (CD ¶ 260(d)). Additionally, if there is a specific and articulable investigative purpose, detectives may ask victims about their desire to prosecute the assailant; however, the victim's response should not be the sole or determinative factor in decisions about whether or how to proceed with the investigation. (CD ¶ 260(h)). These two requirements were not assessed for this assessment and will be assessed in the future assessment following discussions with BPD and DOJ on the most effective methodology to do so.

### i. Compliance Determination

Compared to the Monitoring Teams' review of sexual assault from 2018-2020, the quality of investigations, investigative reports and investigative documentation has improved. The sexual assault investigators are collecting evidence more comprehensively. Specifically: (1) the overall sexual assault investigation is improved after July 1, 2023 as compared to 2020; (2) the SOU has issued trauma-responded and victim centered written policies that the Decree requires; (3) the SOU detectives and supervisors have completed initial and comprehensive training how to respond sexual assault in victim centered and trauma informed way and to conduct the offender-focused investigations; and (4) the Department continues to provide a "soft" interview room, equipped with audio and video recording capabilities.

BPD, however, remains short of initial compliance with paragraphs 258 and 260 with respect to the conduct of sexual assault investigations. BPD must (a) ensure trauma-informed, victim-centered techniques are conducted more consistently; (b) improve efforts to interview witnesses and suspects; (c) document key investigative steps; and (d) improve the overall quality of investigations.

For the reasons stated above, BPD cannot be yet found in initial compliance with paragraphs 258 and 260 but appears to have made significant improvement from the baseline assessment. The Monitoring Team finds BPD to be in **4c- On Track** with Paragraphs 258 and 260.

## C.      Administrative Reviews

Paragraph 262(a)(i) of the Consent Decree requires BPD to develop an automated alert system and an accompanying supervisory review protocol to ensure timely and effective oversight including: (i) "supervisory review of all sexual assault reports that meet the investigative criteria for the Sex Offense Unit or Child Abuse Unit within 48 hours of the report being taken, to ensure compliance with BPD policy regarding initial officer response and documentation." CD ¶ 262(a)(i). Overall, BPD supervisors are generally providing oversight of sexual assault investigations and BPD developed a system of automated alerts to trigger supervisory review of open sexual assault investigations. The Monitoring Team found that in 74 of the 75 cases (98.7%), there was evidence of supervisory review within 48 hours. However, because of the deficiencies in the SOU investigations noted above, many of which could have been identified by supervisors and addressed, BPD remains short of compliance in this area. Once BPD demonstrates that its supervisory reviews are consistently correcting those errors, it will be in initial compliance.

Paragraph 262(a)(ii) requires BPD systems to ensure "supervisory evaluation of the thoroughness of the investigation in sexual assault cases when: (1) the victim has not been interviewed within one week of BPD receiving the report of sexual assault; (2) a case has been classified as 'open,' without any investigative activity for longer than six months." CD ¶ 262(a)(ii). From a total of 78 reviewed sexual assault cases, 20%, a total of 16 cases were open/inactive for longer than six months without any investigative activity.  Although it appears BPD had stopped supervisory reviews of those cases when they were made "inactive," BPD failed to conduct the required supervisory review of the investigation after a period of six months with no investigative activity.

BPD must ensure that "[b]efore an investigation of a report of sexual assault is closed or report of sexual assault is classified as 'unfounded,'" a supervisor assesses "whether a comprehensive investigation has been conducted and whether appropriate was follow-up has been completed." CD ¶ 262(b). The Monitoring reviewed a sample of such cases that were investigated by SOU and found that the supervisory review was appropriate in each case. In the next assessment, the Monitoring Team will expand that review to include a sample of Fourth Degree assault cases handled by Patrol.

## VI.      FOURTH-DEGREE SEXUAL OFFENSE INVESTIGATIONS

The Monitoring Team deferred the assessment of Fourth Degree cases to the next assessment period to work with BPD on clarifying what should be assessed and how compliance will be defined. These cases were therefore not assessed during this period and will be reviewed in full during the next assessment of this area.

## VII.    OUTCOME ASSESSMENT RESULTS

Paragraph 459(k) of the Consent Decree requires that the Monitoring Team conduct a review of:

i.      Number of sexual assault reports made to BPD;
ii.     Rate of victim participation in BPD sexual assault investigations;
iii.    Clearance rate in sexual assault cases; and
iv.     Rate of declination of sexual assault cases referred to the Baltimore City State's Attorney's Office for prosecution.

### A.    Paragraph 459(k)(i): Number of sexual assault reports made to BPD

Pursuant to Paragraph 459(k)(i), the below outcome assessment presents the number of sexual assault reports by the type of sexual assault case and victim demographics. The total number of sexual assault incidents excludes incidents investigated by the Child Abuse Unit.

Fourth Degree sexual assault cases are typically investigated by patrol rather than Sex Offense or Child Abuse Unit detectives. In some instances, cases initially investigated by SOU are returned to patrol for investigation. Thus, the total number for Fourth Degree Sex Offenses identified in Table 24 below includes incidents initially investigated by patrol, then triaged by SOU to confirm 4th degree status, but ultimately remained with patrol for investigation.

A review of sex offense cases by type and year from 2021 through September 30, 2024, reveals notable trends in both the volume and categorization of offenses. Rape/Sodomy and Sexual Assault with an Object consistently accounted for the highest proportion of cases, although its share decreased over time—from 75.3% of all sex offenses in 2021 to 50.6% from January 1, 2024, until September 30, 2024. Fourth Degree Sex Offenses, by contrast, increased significantly, rising from 14.4% in 2021 to 29.0% from January 1, 2024, until September 30, 2024.  Data suggests a spike in "Possible Sex Offense" accounting for 8.0% in 2021, before increasing to 33.4% in 2023 and 20.4% from January 1, 2024, until September 30, 2024. Only 1.1% of the cases in 2021 had missing records, but no such cases existed in any other year. Overall, the total number of cases fluctuated year to year—with 376 cases in 2021, 387 in 2022, increase to 419 in 2023, and a spike to 524 January 1, 2024, until September 30, 2024. This shifting distribution by offense type may indicate changes in reporting, classification practices, or investigative focus over time.

**Table 24.    Sex Offense Frequency by Type and Year**

| Offense | 2021 | 2022 | 2023 | 2024 January 1 – September 30 |
|---|---|---|---|---|
| Fourth Degree Sex Offenses | 54 (14.4%) | 117 (30.2) | 40 (9.5%) | 152 (29.0) |

32

| | | | | |
|---|---|---|---|---|
| Rape/Sodomy/Sexual Assault with an Object | 288 (76.6%) | 224 (57.9%) | 239 (57.0%) | 265 (50.6%) |
| Possible Sex Offense | 30 (8.0%) | 46 (11.9%) | 140 (33.4%) | 107 (20.4) |
| Missing values | 4 (1.1%) | 0 | 0 | 0 |
| **Total** | **376 (100.0%)** | **387 (100.0%)** | **419 (100.0%)** | **524 (100.0%)** |

Table 25 provides a breakdown of sex offense cases by victim race and ethnicity from 2021 through September 30, 2024. Over those four years, most victims identified Black, with proportions steadily increasing from 50.7% in 2021 to 64.3% in first three quarters of 2024. White victims accounted for the second-largest identified group but experienced a slight decline over time—from 25.1% in 2021 to 21.8% in first three quarters of 2024. Hispanic victims made up a relatively small portion of the total, ranging from 3.9% to 2.3% across the four years. Similarly, victims whose race/ethnicity was categorized as "Other" consistently represented just over 1% of the cases. Notably, the percentage of cases with unknown or missing victim race/ethnicity information decreased between 2021 and 2023 (from 12.8% to 5.7%), though it rose again slightly to 10.3% in 2024. These trends highlight the importance of consistent demographic data capture to better understand the communities impacted by sexual violence and to inform equitable service delivery and investigative practices.

**Table 25.    Sex Offense Cases by Victim Race/Ethnicity and Year[33]**

| *Race/Ethnicity* | **2021** | **2022** | **2023** | **2024 January 1 – September 30** |
|---|---|---|---|---|
| Black | 210 (50.7%) | 247 (57.8%) | 214 (61.5%) | 387 (64.3%) |
| White | 104 (25.1%) | 122 (28.6%) | 95 (27.3%) | 131 (21.8%) |
| Hispanic | 16 (3.9%) | 10 (2.3%) | 5 (1.4%) | 14 (2.3%) |
| Other* | 3 (0.7%) | 6 (1.4%) | 4 (1.1%) | 8 (1.3%) |
| Unknown | 28 (6.8%) | 12 (2.8%) | 10 (2.9%) | 62 (10.3%) |
| Missing | 53 (12.8%) | 30 (7.0%) | 20 (5.7%) | 0 |
| **Total** | **414 (100.0%)** | **427 (100.0%)** | **348 (100.0%)** | **602 (100.0%)** |

**Note: Category "Other" includes Asian, American Indian or Alaska Native, Native Hawaiian or Other Pacific Islander"**

---

[33] The total number of victims in sex offense cases differs from the total number of incidents reported in Table 24, as a single incident may involve multiple victims.

Table 26 presents the distribution of sex offense cases by victim gender from 2021 through first three quarters of 2024. Across all four years, a significant majority of victims identified as female, and the percentage of female victims increased from 73.7% of cases in 2021 to 86.23% during first three quarters of 2024. Male victims accounted for a smaller, but relatively stable portion, ranging from 11.3% to 11.5% over the same period. The data also demonstrates a significant improvement in the accuracy of gender data collection. In 2021, 14.9% of cases included unknown or missing gender information but decreased sharply to just 2.3% by September 30, 2024. This improvement suggests increased attention to complete and accurate demographic documentation in recent years, along with the introduction of a web-based records management system, which is essential for understanding patterns of victimization and ensuring informed, equitable responses.

**Table 26.        Sex Offense Cases by Victim Gender and Year**

| *Gender* | **2021** | **2022** | **2023** | **2024 January 1 – September 30** |
|---|---|---|---|---|
| Female | 306 (73.9%) | 382 (89.5%) | 285 (81.9%) | 519 (86.2%) |
| Male | 47 (11.4%) | 29 (6.8%) | 46 (13.2%) | 69 (11.5%) |
| Unknown | 30 (7.2%) | 0 | 1(0.3%) | 14 (2.3%) |
| Missing | 31 (7.5%) | 16 (3.7%) | 16 (4.6%) | 0 |
| **Total** | **414 (100.0%)** | **427 (100.0%)** | **348 (100.0%)** | **602 (100.0%)** |

Table 27 shows the distribution of sex offense cases by victim age from 2021 through September 30, 2024. Victims aged 18 to 34 consistently represented the largest age group each year. This age demographic accounted for more than half of all cases annually, ranging from 42.0% in 2024 to 54.1% in 2022. Victims aged 35 to 64, the second most represented group, comprised between 24.1% and 25.1% of annual cases. All told, the data makes clear that adults across a broad age range are impacted by such crimes. Notably, victims under 18 years old during first three quarters of 2024 suffered a sharp increase in proportion rising to 26.7% from just 8.0% in 2021. This increase may suggest shifts in reporting trends, investigative focus, or actual incidence rates involving minors. Victims aged 65 and older represented a small but consistent proportion of cases, peaking at 3.7% in 2023. The percentage of cases with missing age data declined significantly, from 13.0% in 2021 to 5.5% in 2024, reflecting improved documentation practices over time. These trends underscore the importance of capturing complete demographic data to inform victim services, resource allocation, and age-specific prevention strategies.

**Table 27.        Sex Offense Cases by Victim Age and Year**

| *Age Range* | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|

|  |  |  |  | January 1 – September 30 |
|---|---|---|---|---|
| Under 18 years old | 33 (8.0%) | 62 (14.5%) | 28 (8.0%) | 161 (26.7%) |
| 18-34 years old | 218 (52.5%) | 231 (54.1%) | 177 (50.9%) | 253 (42.0%) |
| 35-64 years old | 107 (25.8%) | 107 (25.1%) | 110 (31.6%) | 145 (24.1%) |
| 65 and older | 3 (0.7%) | 12 (2.8%) | 13 (3.7%) | 10 (1.7%) |
| Missing | 53 (13.0%) | 15 (3.5%) | 20 (5.7%) | 33 (5.5%) |
| **Total** | **414 (100.0%)** | **427 (100.0%)** | **348 (100.0%)** | **602 (100.0%)** |

**B.    Paragraph 459(k)(ii): Rate of victim participation in BPD sexual assault investigations**

The Monitoring Team collected outcome measures relevant to Paragraph 459(k)(ii) as part of its sexual assault investigation audit. As such, the findings described below are not based on the total population of cases but rather on a randomly selected sample of 78 sexual assaults investigated by SOU from July 1, 2023 until September 30, 2024.[34] This 78 case sample does not include Fourth Degree Sexual Offenses, as discussed above.

The Monitoring Team reviewed victim participation in key stages of the investigative process. In nearly all cases, the reporting officer located the victim (98.7%), and the majority of victims provided their contact information (91.9%), indicating strong initial engagement. Overall, based on BPD available documentation, 55 (73.3%) victims participated in the investigation beyond initial reporting to patrol, while 16 (21.3%) victims did not participate in such a manner. These figures highlight that while victims are highly engaged at the outset, continued participation can vary and may be influenced by multiple factors, including trauma, trust in law enforcement, and case-specific dynamics.

**C.    Paragraph 459(k)(iii): Clearance rate in sexual assault cases and Paragraph 459(k)(iv): Rate of declination of sexual assault cases referred to Baltimore City State's Attorney's Office for prosecution**

Pursuant to Paragraph 459(k)(iii), the Monitoring Team reports the clearance rates by the type of case clearance (i.e., cleared by arrest or cleared by exceptional means) in addition to providing a description of other types of case closures (i.e., closed as unfounded or closed by other means). Tables 30 through 33 also provide annual frequencies and rates of cases declined for prosecution relative to the number of cases BPD submitted to the prosecutor's office for review. The number of cases BPD referred to for prosecution includes cases that it closed by arrest or criminal

---

[34] See Section III – "Scope of the Review and Methodology" above for a complete description of the sampling methodology.

summons. Tables 30-33 exclude Fourth Degree Sex Offenses investigated by patrol. Cases "Closed by Other Means" include criminal summonses and re-classified cases. The data provided in these remaining tables reflect cases opened in 2021-until September 30, 2024, regardless of the year that they were closed.

The 2021 data reflect relatively low arrest and exception-based clearance rates, with a notable portion (30%) of cases that BPD referred declined for prosecution.

**Table 30.    Cases Investigated by SOU in 2021**

| Status of the Cases | Closed Cases | Total Cases | |
|---|---|---|---|
| Number of cases closed by arrest in 2021 compared to number of cases in 2021 (excluding unfounded (5), re-classified (1)) | 44 | 324 | 13.6% |
| Number of cases closed by exception in 2021 compared to number of cases in 2021 (excluding unfounded (5), re-classified (1)) | 2 | 324 | 0.6% |
| Number of cases declined in 2021 compared to number of cases referred for prosecution in 2021 | 20 | 66 | |
| Number of cases unfounded in 2018 compared to number of cases in 2021 | 5 | 324 | 1.5% |
| Number of cases closed by other means | 1 | 324 | 0.3% |

Note: A total number of cases investigated by SOU exclude cases that were out of jurisdiction.

Clearance by arrest in 2022 slightly increased compared to 2021, while exceptions remained at zero and declinations for prosecution slightly increased. Only two cases in total were unfounded or closed by other means.

**Table 31.    Cases Investigated by SOU in 2022**

| Status of the Cases | Closed Cases | Total Cases | |
|---|---|---|---|
| Number of cases closed by arrest in 2022 compared to number of cases in 2022 (excluding unfounded (1), re-classified (1)) | 49 | 261 | 18.8% |
| Number of cases closed by exception in 2022 compared to number of cases in 2022 (excluding unfounded (1) re-classified (1)) | 0 | 261 | 0 |
| Number of cases declined in 2022 compared to number of cases referred for prosecution in 2022 | 22 | 71 | |
| Number of cases unfounded in 2022 compared to number of cases in 2022 | 1 | 261 | 0.4% |

| | | | |
|---|---|---|---|
| Number of cases closed by other means | 1 | 261 | 0.4% |

Note: A total number of cases investigated by SOU exclude cases that were out of jurisdiction.

In 2023, arrest-based clearance rates dropped back to 2021 levels and the prosecution declination rate jumped significantly to over half of all referred cases. As in 2022, only two cases in total were unfounded or closed by other means.

**Table 32.    Cases Investigated by SOU in 2023**

| *Status of the Cases* | Closed Cases | Total Cases | |
|---|---|---|---|
| Number of cases closed by arrest in 2023 compared to number of cases in 2023 (excluding unfounded (1) and re-classified (1)) | 42 | 326 | 12.9% |
| Number of cases closed by exception in 2023 compared to number of cases in 2023 2023 (excluding unfounded (1) and re-classified (1)) | 1 | 326 | 0.3% |
| Number of cases declined in 2023 compared to number of cases referred for prosecution in 2023 | 53 | 95 | |
| Number of cases unfounded in 2023 compared to number of cases in 2023 | 1 | 326 | 0.3% |
| Number of cases closed by other means | 0 | 326 | 0 |

Note: A total number of cases investigated by SOU exclude cases that were out of jurisdiction.

In 2024, arrest clearances rose from 2023 but remained below 2022 levels.

**Table 33.    Cases Investigated by SOU from January 1 until September 30, 2024**

| *Status of the Cases* | Closed Cases | Total Cases | |
|---|---|---|---|
| Number of cases closed by arrest in 2024 compared to number of cases in 2024 (re- classified (1)) | 40 | 285 | 13.3% |
| Number of cases closed by exception in 2024 compared to number of cases in 2024 (re- classified (1)) | 1 | 285 | 0.4% |
| Number of cases declined in 2024 compared to number of cases referred for prosecution in 2024[35] | 32 | 79 | |
| Number of cases unfounded in 2024 compared to number of cases in 2024 | 0 | 285 | 0 |
| Number of cases closed by other means | 0 | 285 | 0 |

---

[35] The total cases referred listed here include all cases referred to the Baltimore City State's Attorney's Office. That number, however, includes cases where the State's Attorney Office has not yet made a decision whether to charge or decline. The relevant total number cases for a true "declination rate" includes only cases where the State's Attorney's Office has made a charging decision. In subsequent assessments, the Monitoring Team will obtain that number and report the declination rates for future years.

Note: A total number of cases investigated by SOU exclude cases that were out of jurisdiction.

An analysis of SOU clearance rates from 2021 through September 30, 2024, shows persistently low arrest rates, year-to-year fluctuations, and ongoing challenges in case resolution. In 2021, BPD closed only 13.6% of cases with an arrest and cleared 0.6% cases by exception. While BPD's arrest clearance rate rose to 18.8% in 2022, it declined again to 12.9% in 2023 and 13.3% until September 30, 2024. In those four years, clearance by exception remained rare—never exceeding 0.6% and cases closed by other means were minimal.

## VIII.   COMPLIANCE ASSESSMENT CONCLUSIONS

| Consent Decree Paragraph | | Compliance Status |
|---|---|---|
| 257 | To increase the trust of victims of sexual assault in BPD, strengthen BPD's response to and investigations of reports of sexual assault, and to combat gender bias, BPD shall implement the below measures. | **N/A** |
| 258 | BPD shall ensure its sexual assault policy and protocols:<br>   a.  Identify procedure and practice guidelines for a trauma-informed, victim-centered, multi-disciplinary response to sexual assault cases and thorough investigation of the crime;<br>   b.  Articulate the significant role and responsibilities of all officers throughout the sexual assault response and investigation;<br>   c.  Articulate the opportunity for forensic examination and comprehensive medical care to the sexual assault victim; and<br>   d.  Ensure all victims are offered access to free and confidential support, social service referrals, and information from a trained sexual assault victim advocate. | **4c- – Implementation – On Track** |
| 259 | BPD shall provide initial and on-going annual training to all BPD detectives in the Sex Offense, Family Crimes, and Child Abuse Units about its policies and practices applicable to law enforcement response to sexual assault. This initial and annual in-service training shall ensure that these BPD detectives can perform their duties pursuant to this Agreement include:<br>   a.  Guidance to patrol on how to respond to reports of sexual assault, including cases presenting co-occurring crimes such as domestic violence or stalking;<br>   b.  Guidance to detectives on strategies that postpone judgment regarding the validity of a case until a thorough investigation is completed;<br>   c.  Highlighting methods to minimize further physical and psychological trauma to victims of sexual violence by creating a respectful, objective response;<br>   d.  Identification of strategies to keep the investigation focused on the behavior and actions of the suspect;<br>   e.  The impact of trauma on victims and adjustments to interview practices to allow sensitivity to victims' needs and the dynamics of sexual assault, and this increase the likelihood of continued victim participation with law enforcement, improve the experience for victims cooperating with law enforcement, and strengthen sexual assault investigations;<br>   f.  The dynamics of and relevant core scientific concepts related to sexual assault including trauma-related behavior, tonic immobility, and the effects of trauma on memory;<br>   g.  Guidance on working with vulnerable populations, including homeless people, sex workers, people with Behavioral Health Disabilities, and LGBT individuals; Law enforcement response to non-stranger sexual assault, alcohol and drug- facilitated sexual assault, sexual assault where the victim is incapacitated or otherwise unwilling or unable to clearly describe the assault; | **4d – Implementation – Initial Compliance** |

39

| | | |
|---|---|---|
| | h. Report writing and documentation of the investigation undertaken, techniques for investigations of sexual assault, and classification of reports of sexual assault; Trauma- informed interviews of individuals reporting sexual assault; Taking statements from, interviewing, and interrogating suspects, including training about interrogating suspects in non-stranger or drug/alcohol-facilitated sexual assaults; and<br><br>i. For those detectives with supervisory responsibilities, supervision of sexual assault cases, including sexual assault case reviews and other mechanisms to detect and prevent gender bias in the response to reports of sexual assault. | |
| 260 | BPD will:<br><br>a. Assign all reports of sexual assault that meet the criteria outlined in BPD policy to detectives for follow up investigation;<br><br>b. Thoroughly investigate reports of sexual assault, including any assaults that appear to be non-stranger assaults, assaults facilitated by alcohol or drugs, or assaults involving victims who were incapacitated or otherwise unable or unwilling to clearly describe the assault;<br><br>c. Consult with forensic examiners to obtain and discuss the results of medical/forensic examinations, and include a summary of the findings of the forensic examinations, including findings related to all injuries, in case reports;<br><br>d. Ensure that investigators of sexual assaults do not have a history of complaints of bias relating to gender or complaints of sexual misconduct that could impair their ability to investigate sexual assault in accordance with BPD policy and training;<br><br>e. If the victim consents, BPD shall enable advocates to be present during victim interviews, unless doing so would compromise the evidentiary value of the interview;<br><br>f. Continue to provide a "soft" interview room, equipped with audio and video recording capabilities, for conducting victim interviews;<br><br>g. Ensure that officers introduce sensitive lines of questioning by first explaining why those questions are relevant to the investigation; and<br><br>h. Ensure that if there is a specific and articulable investigative purpose, detectives can ask the victim about their desire to prosecute the assailant, but the victim's responses should not be a determinative factor in law enforcement decisions about whether or how to pursue investigation. | **4c – Implementation – On Track** |
| 261 | BPD will ensure that officers transport victims to the designated medical facility for a forensic exam in all instances in which a forensic exam is warranted and the victim consents to the transport. | **4a – Implementation – Not Assessed** |
| 262 | BPD shall establish and implement measures to ensure supervision and internal oversight of sexual assault investigations. These measures should include but not be limited to:<br><br>a. Developing a system of automated alerts to trigger supervisory review of open sexual assault investigations, and a protocol | **4c – Implementation – On Track** |

40

| | | |
|---|---|---|
| | governing the supervisory review. This system and protocol shall include:<br><br>   i.  Supervisory review of all sexual assault reports, that fall under the investigative criteria for the Sex Offense Unit or Child Abuse Unit, within 48 hours of the report being taken in order to ensure consistency with BPD policy for initial officer response and documentation; and<br><br>   ii.  Supervisory evaluation of the thoroughness of the investigation in sexual assault cases when: (1) the victim has not been interviewed within one week of BPD receiving the report of sexual assault; (2) a case has been classified as "open," without any investigative activity, for longer than six months.<br><br>  b.  Before an investigation of a report of sexual assault is closed or a report of sexual assault is classified as "unfounded," a supervisor shall assess whether a comprehensive investigation has been conducted and whether appropriate follow-up has been completed. | |
| 263 | With the goal of better identifying serial offenders, BPD shall collect, share, and track crime-specific information about unresolved investigations of reports of sexual assault, including, to the extent possible, with law enforcement agencies in neighboring or with<br><br>overlapping jurisdictions who are willing to cooperate, to identify similarities between reported sexual assaults and unresolved cases. | **4a**      **–** **Implementation –** **Not Assessed** |
| 264 | BPD will continue to enhance its data collection, analysis, and reporting. The data to be collected and analyzed should include the following:<br><br>  a.  The numbers of sex offenses, broken down by crime category, that are reported to BPD, identifying, where applicable, incidents involving co-occurring crimes (i.e., sexual assaults involving domestic violence or stalking);<br><br>  b.  The number of offenders, both the totals and broken down by gender (i.e., male, female, transgender, queer or non-binary) and the relationship of the offender to the victim (i.e., stranger or non-stranger);<br><br>  c.  The number of victims/complainants, both the totals and broken down by gender, race, and age (i.e., under 18 and 18 and older);<br><br>  d.  The total number of sex offense reports categorized as founded and unfounded, broken down by the BPD unit categorizing the report;<br><br>  e.  The total numbers of sex offense reports, broken down by the BPD unit handling the report, that (1) were cleared by arrest, (2) were cleared by exceptional clearance, including by clearance category, (3) remain open and inactive, and (4) were referred to the Baltimore City State's Attorney's Office for the filing of charges; and<br><br>  f.  Data about the processing of forensic medical exams (often referred to as "rape kits"), including: (1) date of reported incident; (2) date of SAFE exam; (3) date detectives request lab analysis of SAFE exam; (4) date detectives receive lab analysis results. | **4d**      **–** **Implementation-** **Initial** **Compliance** |

41

| 265 | In a manner permitted by law, BPD shall share the information in Paragraph 264 with the public, and with its community and law enforcement partners and the Sexual Assault Response Team ("SART"), to promote public safety and better support the needs of sexual assault victims. | **4a – Implementation – Not Assessed** |
|---|---|---|
| 266 | To promote a coordinated, multidisciplinary, and victim-centered response to victims of sexual assault, the City and BPD will evaluate and revise as necessary the policies and protocol governing the functioning of Baltimore's SART to ensure that it is empowered to engage in periodic systems reviews to improve services provided to victims of sexual assault and ensure they are victim-centered, subject to limits of applicable law. The SART will continue to be permitted to review cases in accordane with the MOU, including samples of open cases and cases that are classified as "unfounded." | **4a – Implementation – Not Assessed** |